1                    IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

3    UNITED STATES OF AMERICA

4                                      CRIMINAL NO.

5    v.                                AMD 04-0029

6

7    WILLIE MITCHELL, ET AL.              October 14, 2005

8                   Defendants

9    _____/

10                   TRANSCRIPT OF MOTIONS HEARING

11              BEFORE THE HONORABLE ANDRE M. DAVIS,

12                   UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   On behalf of the United States:

15   Robert Harding, AUSA
     Christine Manuelian, AUSA
16

17   On behalf of the defendants:

18   Timothy Sullivan, Esquire
     Laura K. Rhodes, Esquire
19   Adam Kurland, Esquire
     Barry Coburn, Esquire
20   Gerard P. Martin, Esquire
     William Kanwisher, Esquire
21   Thomas Crowe, Esquire
     James Pyne, Esquire
22

23   Reported By:

24   Jacqueline Sovich, RPR, CMR, FOCRR

25   Official Court Reporter

```
 1                    (PROCEEDINGS)

 2           THE COURT:  Good morning.  Please be seated.

 3  Counsel, good morning.

 4           Mr. Harding, I have your letters.  I'm afraid, as

 5  much as I would like to accommodate Judge Brown, I've made an

 6  important personal commitment for the luncheon recess.  So

 7  I'm going to have to break right at 12:30, and we'll resume

 8  at 2:30 so I can take care of another short matter upstairs

 9  at two.

10           I must say, however, it's not clear to me why

11  you're calling Judge Brown.  I'm happy to have you do so or

12  any other judge.

13           I'm not sure you couldn't do whatever it is you

14  think you need to do in the way of making a record by way of

15  an affidavit from a judge in Baltimore City, Judge Brown, or

16  some other judge.  The suggestion that it ought to be Judge

17  Waxter who, as best I can tell, was the judge who signed the

18  disputed writ that we've been talking about.

19           It seems to me well-taken, but again I'm not clear

20  that you really need factual testimony from a judicial

21  officer, and so let me make sure I was clear, and I'm sure I

22  wasn't, but let me be clear, I did not mean to suggest by my

23  comments at the last hearing that the use of the writ for the

24  purposes shown by the record last time was per se or even

25  highly probative of involuntariness.
```

1          So to the extent that any of my comments might have

2     suggested that I thought that to be the case, I want to

3     disabuse the record of that notion.

4          But I have to say, in all candor, I mean, really

5     you could bring in a hundred state court judges or Chief

6     Justice Roberts, and I don't think the testimony of any such

7     judges would disabuse me of my belief that the use of court

8     process to facilitate law enforcement incommunicado

9     interrogation of a charged defendant, a suspect, for whom an

10    arrest warrant has already been issued, is anything other

11    than a perversion of the use of the writ.

12         I just believe that, based on several decades of

13    study, of constitutional principles and criminal law and

14    teaching it, and 18 years as a judge, it just absolutely on

15    the face of it cuts against the entire spirit, if not the

16    letter, of Miranda.

17         The whole point of Miranda, as we all know, was the

18    difficulty that the voluntariness doctrine imposed on judges

19    in determining the admissibility of statements and

20    confessions.

21         And so the Court created, some say out of holed

22    cloth, the Miranda doctrine in order to avoid the

23    difficulties posed by the voluntariness doctrine.

24         So the idea that law enforcement can just traipse

25    off to a judge and get an order that effectively permits law

1  enforcement to conduct the very incommunicado interrogation

2  of suspects that Miranda was designed to address, again, I

3  say I use a strong word, it's a perversion.

4        So there may be practices, and surely there are

5  practices all over the country where law enforcement and

6  courts and prosecutors have engaged in various techniques

7  that may or may not be constitutional, may or may not be

8  appropriate, just those are my views.  Those are my views.

9  They're not lightly spoken here.

10        I think it's inexplicable.  And I would like to

11  think that a judge, any judge, state or federal, who is

12  presented with what purports to be a writ of habeas corpus

13  for the purpose of permitting law enforcement to seize an

14  individual and transport that individual to a police

15  dominated police station for the purpose of incommunicado

16  interrogation, I would like to think that any judge would

17  stop and scratch his or her head and say, wait a minute,

18  that's not the purpose of a writ of habeas corp.  The purpose

19  of a writ of habeas corp pass, as we all know, is to produce

20  the body to the Court, bring me the body.  That's a close

21  transliteration of the Latin.  And it is not take the body

22  somewhere where you can question him without counsel.

23        And so that's -- that was the source of the Court's

24  reaction, coupled with the fact that it appeared that you and

25  Ms. Manuelian didn't even know about this, and it only came

1   out in Mr. Sullivan's cross-examination.

2        And so your sort of peremptory direct examination

3   of the witness, which I don't criticize, was -- it was just

4   the confluence of circumstances where you, the government,

5   didn't even think you needed to go into the question of how

6   he got to the police station in the first place, in aligning

7   the question of voluntariness, was a little surprising.

8        So that's my view.  So I don't think you need Judge

9   Brown.  I certainly don't think you need his live testimony.

10  If you want to do it by affidavit, I think that would be

11  fine.  I can't imagine Mr. Sullivan or Miss Rhoades would

12  have any serious objection to affidavit testimony.  It is

13  what it is.  And the order, to a very large extent, speaks

14  for itself.

15       So if you want to bring in a state's attorney to

16  sort of explain the background and perhaps to show the error

17  of my thinking in my rather firm belief it's not proper for a

18  state's attorney at the request of local law enforcement to

19  go to a judge to get a writ of habeas corpus, to transport a

20  defendant who's already in custody to the police station for

21  the purpose of incommunicado interrogation, I mean that would

22  be fine.  I certainly will permit you to make whatever record

23  you need to make.

24       But it's just a very bizarre circumstance to have

25  you, an assistant United States attorney, standing here

6

1    defending a practice that you would never engage in, and I

2    daresay, frankly, an assistant U.S. attorney who would engage

3    in such activities might well be subject to discipline by

4    Department of Justice.

5         Now, that's perhaps over the top.  But I don't know

6    everything, but I know some things.  And I feel strongly

7    about some things.  So those are my views.

8         But I'm happy to have you, again, I really mean

9    this, happy to have you present whatever you think you need

10   to present, in respect to these issues, as we go forward on

11   the question of the admissibility of the statement.

12        Go ahead.  Good morning.

13        MR. HARDING:  Good morning, Your Honor.

14        Your Honor, first of all, I have to self report

15   that, in questioning the practice of writting people over for

16   interviews, Your Honor is suggesting this is something that I

17   would never do.  I have to inform the Court I have done this

18   on a number of occasions and members of the U.S. Attorney's

19   office frequently writ prisoners over.

20        And if they don't have attorneys and don't want

21   attorneys because, of course, if they're in custody we make

22   sure they have the Miranda warnings, Your Honor is calling

23   into question a common federal practice, as well as a common

24   state practice.

25        I don't believe there's anything unusual about this

1  practice, and I certainly don't believe there's anything

2  illegal about it.

3        What caused me to want to put Judge Roger Brown on

4  the stand last time was that Your Honor, when you first

5  looked at the writ, said that you had never seen this kind of

6  document before.  So the purpose of calling Judge Brown is to

7  introduce testimony that these are routinely issued to assist

8  law enforcement.  He has signed a writ, many of these over

9  the years.

10        And I guess that Haven Kodeck will testify that he

11  believes his office seeks 20 to 40 of these per week to

12  assist law enforcement in conducting interviews.

13        I disagree with the Court also that a writ is a

14  document that is intended to bring someone to court.  It does

15  not necessarily have to bring somebody to court.  It can

16  simply transport a prisoner from one location to another.

17        In fact, Mr. Sullivan's letter quoted a treatise to

18  the effect that this kind of writ is used to transport

19  prisoners from one location to another.  It's an order to

20  transport a prisoner.  It's an order directed to the

21  custodians of a penal institution.  It's not something that

22  is directed to the prisoner.  It's directed only to the

23  custodians of the prisoner, and it explains the reasons why

24  the prisoner is to be moved somewhere.

25        Judge Brown would have testified, if he does, and I

1    assume would say the same thing in an affidavit, if that's

2    what the Court is suggesting, that this has been common and

3    routine procedure for decades in the Circuit Court of

4    Baltimore City, and throughout the state, as he is aware.

5          He would also explain why the true-test copies that

6    are issued by the clerk's office never have the signature of

7    the actual judge who signed the original writ, because when

8    they're brought down to the clerk's office --

9          THE COURT:  I'm aware of that practice.

10         MR. HARDING:  Okay.

11         THE COURT:  That practice began about 12 or 15

12   years ago when some inmate and pasted Judge Johnson's

13   signature, as I recall, on some purported order, and after

14   that, the clerk's office over there began to delete from

15   court orders the live signature even the copy of live

16   signature of the judge.  So I'm aware of that.

17         MR. HARDING:  Well, my witnesses will and would

18   testify that it's even older than that, Your Honor.  It goes

19   back to the 1970s, according to --

20         THE COURT:  That's not true.  It is simply not

21   true.

22         MR. HARDING:  Okay.  I don't suppose it's an

23   important issue, but the Court did raise it.

24         THE COURT:  What I say mean when I say it's not

25   true, there may well have been is practice in the clerk's

1   office in the Circuit Court of Baltimore City, you're saying

2   when the Court was still known as the Supreme Bench of

3   Baltimore City when they had the ridiculous or 9 or 10

4   different courts with different clerks' offices.

5           I'm sure you're right that, in certain of those

6   courts that together compromised the Supreme Bench of

7   Baltimore City, there may well have been some clerks'

8   offices, or some division of those various courts, that had

9   the practice that didn't send out live judge signatures.

10          But in terms of the what we might call modern

11  practice, since the Court's been at the Circuit Court for

12  Baltimore City for well into the '80s, there was a practice

13  of not, in many instances, criminal and civil cases, of not

14  covering the Judge's signature.  That's all I'm saying.

15          It became a real issue, as I say, when some inmate

16  used the copy of the judge's signature on some order, put it

17  on some other order, and that alarmed the Court, as you might

18  understand.

19          Since then, as I say, going back 12 maybe 15 years

20  or so, the Court has been assiduous in making sure that

21  nothing that goes out has the Judge's signature so you get

22  the little paste-its to say the Judge's signature appears on

23  the original order.

24          MR. HARDING:  Well, Judge Brown would also testify

25  that in the many years he has issued such subpoenas, he's

1    unaware of any legal challenge to them, or if anyone ever

2    raising the kind of constitutional issue that Your Honor has

3    raised today, and so we consider his testimony to be

4    relevant, very relevant, to the concerns raised by the Court,

5    even the concerns raised by the Court this morning.

6              So what I would like to do, Your Honor --

7              THE COURT:  So let me just make sure I understand,

8    because if I'm wrong I want to admit that I'm wrong.  You're

9    representing that it is a routine or near routine practice in

10   the United States Attorney's Office around the country, when

11   a person already in custody, in state court, for the clerk's

12   office of the United States District Courts around the

13   country and or magistrate judges around the country,

14   including this district, to authorize a writ of habeas corpus

15   that would permit the FBI or the Drug Enforcement

16   Administration, to go to the Carroll County Detention Center,

17   or Allegheny County Detention Center with that writ and bring

18   that person to the FBI office, or the office of the Secret

19   Service, and there conduct incommunicado of that suspect

20   defendant; is that what you're saying?

21             MR. HARDING:  Actually, typically, they're brought

22   to the U.S. Attorney's Office.  They could also be brought to

23   the law enforcement agency's office, and I believe I've done

24   that as well.

25             But, in any event, the first thing we do is to

1  ensure that they have their Miranda warnings.  And if they

2  want counsel, we make sure that they get one.  If they need

3  an appointment, one, we have them fill out a financial

4  affidavit.

5          THE COURT:  Do you do that at the detention center,

6  or do you first transport them?

7          MR. HARDING:  We transport them.

8          THE COURT:  Give them a coke and a Big Mac, have a

9  conversation with them, and then administer Miranda warnings?

10  I mean, how does it happen?

11          MR. HARDING:  Well, if Your Honor's asking me to

12  describe the procedure that's followed every single time this

13  is done, I may have a problem, because I don't know how my

14  colleagues do it.

15          I, of course, would be very sure that anybody who

16  was in custody oftentimes I will be interview them as

17  potential witnesses.

18          THE COURT:  See, that's not the situation we have

19  here.  We're not talking about witnesses.  We're not talking

20  about witnesses at all.  We're talking about defendants for

21  whom there is an arrest warrant issued.  That's what we're

22  talking about.

23          MR. HARDING:  Yes.  Well, I would interview such

24  people under those circumstances, too.  Often the status of

25  someone.

1          THE COURT:  Someone under federal indictment for

2    whom a complaint has been filed?  You actually have a judge,

3    a magistrate judge, issue a writ of habeas corpus, with the

4    agent has the warrant in hand, you would actually go to the

5    Carroll County Detention Center and transport that person to

6    the U.S. Attorney's Office?

7          MR. HARDING:  Judge, first of all, I wouldn't do it

8    if the prisoner were indicted.

9          THE COURT:  Well, of course you wouldn't.  And the

10   effect of an arrest warrant under Maryland law is virtually

11   the same.  It's virtually the same.  An arrest warrant is

12   issued on the basis of a statement of charges.

13         Now, murder charges don't go to trial on a

14   statement of charges.  But arrest warrants are issued on the

15   basis of a statement of probable cause, which, in effect, is

16   a statement of charges, Mr. Harding.

17         MR. HARDING:  Judge - -

18         THE COURT:  Until a few years ago, it was the

19   understanding of everybody that the Sixth Amendment right to

20   counsel attached upon indictment.  It wasn't until we got

21   Michigan versus Jackson and all of those cases in the '80s

22   that, you know, we now say, well, okay, used to be in

23   federal, in the federal system.  Once an indictment came

24   down, the defendant had a right to counsel.  That was

25   everybody's understanding.

1           And in this U.S. Attorney's Office and in every

2    U.S. Attorney's Office around the country, an Assistant U.S.

3    Attorney wouldn't remotely think of arranging for

4    interrogation of a defendant who had been indicted in Federal

5    Court without affording that defendant counsel.  It wouldn't

6    be contemplated, Mr. Harding.

7           And it was these more recent cases that have now

8    opened up this question of whether mere indictment is enough

9    to trigger the Sixth Amendment.  And Michigan vs. Jackson

10   created some real uncertainty there, I'll grant you all of

11   that.

12          But I'm just -- it's so hard for me to sit here and

13   hear you say, yeah, Judge, in circumstances similar,

14   substantially similar to this one, where a person is charged

15   with a viable charging document, and an arrest warrant is

16   issued for his or her arrest, that it is appropriate, I don't

17   care how longstanding the practice is, obviously, the growth

18   of the law comes about when some lawyer stands up in front of

19   some judge sometime after a practice has been going on for

20   years and years and years and says, well, Judge, I don't

21   think that's proper.

22          And some judge takes a deep breath and says, well,

23   you know, we've been doing it this way for 80 years or a

24   hundred years, or 20 years, but maybe you've got something

25   there.

1          So the fact that Judge Brown is prepared to come in

2    here and say, oh, we do this 12 times a week, and we've been

3    doing it for 40 years, and we do it all over the state is

4    scant testimony as to the proprietary of the practice.

5          So we shouldn't spend more time on this.  We've got

6    a lot of work to do, but if you could answer my question with

7    respect to charged defendants in Federal Court, have you, to

8    your knowledge, any other assistant U.S. attorneys in this

9    district ever caused a writ of habeas corpus or similar

10   process, because it's not about the writ so much, it's the

11   point of a court process being used as another tool in the

12   tool box of law enforcement.  They need all the tools they

13   can get.  I'm not questioning that at all.

14         I'm not.

15         MR. HARDING:  Yes, it's -- I --

16         THE COURT:  But it is been done.  You're sure it's

17   been done?

18         MR. HARDING:  Yes.  If you mean charged in the

19   sense of charged by a complaint, yes.

20         If you mean that it is a state prisoner who

21   therefore requires a writ of habeas corpus and he is charged

22   in a federal complaint, yes, that is done, Your Honor.

23         And if you mean that it's a federal prisoner that

24   requires a come-up --

25         THE COURT:  No.  I'm not talking about come-ups.

1  Of course, I'm not talking about come-ups.  So those are

2  people who have been indicted or who are about to be

3  indicted.  I'm not talking about come-ups.

4         MR. HARDING:  It's not uncommon, Your Honor, for

5  someone, as soon as he is caught by police with -- who have a

6  complaint for his arrest, to say he wants to talk to the

7  prosecutor.

8         THE COURT:  I'm not talking about people who are

9  caught.  I'm talking, we're talking, Mr. Harding, about

10  people who are in custody.

11         MR. HARDING:  Okay.  Also if he's in custody.

12         THE COURT:  In a detention facility, so the case

13  that I would like you to address is a defendant who is --

14  let's make it easy for yo -- in the Baltimore City Detention

15  Center, under state charges, and a federal arrest warrant is

16  issued, either on an indictment or complaint, I suppose your

17  easier case is a complaint, and magistrate judge issues an

18  arrest warrant for that person.  You're telling the Court

19  that the U.S. Attorney will obtain a writ, give it to the

20  Federal Bureau of Investigation or the DEA, or ATF, or Secret

21  Service, those agents will then take that court process to

22  the Baltimore City Detention Center, transport that person

23  for whom there's a federal arrest warrant to the FBI office,

24  conduct an interrogation, let's assume it's in compliance

25  with Miranda, once they get there, and what do they do then?

1   Do they take them back to the detention center?

2              Or do they under McNab, Mallory, within the 25, 24

3   hours, do they then bring them to the magistrate judge for an

4   initial appearance?  What is the practice?  What would happen

5   in that case?

6              MR. HARDING:  They'd come over to Federal Court for

7   initial appearance.

8              THE COURT:  They'd go to the FBI office first?

9              MR. HARDING:  Actually, probably not.

10             THE COURT:  Probably not.  That's my point.  That's

11  exactly my point.

12             MR. HARDING:  I don't think there's any

13  constitutional difference about the location where such an

14  interview would take place.  I'm just simply describing to

15  you, since Your Honor was interested, what the norm of

16  practices of federal prosecutors are.

17             I'm trying to ensure the Court and inform the Court

18  that it's not uncommon for someone who is arrested on a

19  federal complaint to indicate that he's willing to talk, and

20  I would participate in such an interview.

21             THE COURT:  I'm not talking about people who are

22  arrested on a complaint.

23             MR. HARDING:  If they're picked up at jail, it

24  doesn't matter constitutionally whether he's brought from the

25  jail or arrested on the street, either, Your Honor.  I don't

1    think there's any constitutional difference between those two

2    circumstances.

3              They're in custody both ways, and custody is what

4    matters not whether he's got prior charges or has just been

5    arrested for the first time.

6              I don't think there's any constitutional

7    differences between those two statuses.

8              THE COURT:  I'm not -- go ahead.

9              MR. HARDING:  Your Honor's raising legal issues,

10   and, obviously, as I indicated in my letter, I'm happy to try

11   to brief these issues for the Court.

12             THE COURT:  Oh, you'll have that opportunity.

13   Obviously, we've got to first conclude the evidence on the

14   voluntariness of the Miranda issues.

15             MR. HARDING:  Your Honor's also interested in

16   practices as I am familiar with them, so I'm trying to

17   describe them as I know them.

18             The Court is also interested in practices that are

19   followed in state writs, and that's why I was calling Judge

20   Brown.  That's why I consider his testimony to be relevant.

21             THE COURT:  That's fine.  And if you want to call

22   him, again, I can't take him at 1:00 today, but I'm happy to

23   have him come in and testify.

24             MR. HARDING:  Okay.  Well, if the Court permits, I

25   will check with him about his schedule.

1          THE COURT:  By the way, turns out, Ms. Manuelian, I

2  think, still has a conflict on Monday?

3          MS. MANUELIAN:    Yes, Your Honor, I do, but --

4          THE COURT:  Because my schedule opened up on

5  Monday, and I'd like to hold, unless I said something earlier

6  that suggested that counsel were relieved of Monday, I'd like

7  to continue our hearings on Monday.

8          MR. HARDING:  That's fine, Your Honor.  I was

9  assuming -- I called Toni a couple days ago and confirmed

10  that Your Honor had Monday set aside for this.

11          THE COURT:  Okay.

12          MR. HARDING:  We have only perhaps one or two

13  witnesses that we need to call on Monday.  And unless, of

14  course, Judge Brown indicates that he'd rather come over on

15  Monday morning than this afternoon at 2:30.

16          So I would ask the Court's permission to call him

17  --

18          THE COURT:  Certainly.  Certainly.

19          MR. HARDING:  -- if I can, and perhaps leave a

20  message on his cell phone and ask him, first of all, tell him

21  not to show up here at 1:00 today, but also ask if he'd like

22  to try to come later on this afternoon.

23          THE COURT:  Counsel are available on Monday, you

24  held that date.  Okay.  Yeah, good.  So we've got Monday

25  available.

1          MR. HARDING:  Okay.  We have one another witness, I

2    think, for Monday.  Is that correct?

3          MS. MANUELIAN:   Yes.

4          MR. HARDING:  Your Honor, the Trooper Woodson, I

5    think I indicated to you in one of my letters, wasn't

6    available because he's still on vacation today.  He is

7    somebody we would call on Monday.

8          There's one another person, the police officer who

9    actually transported Mr. Mitchell, will testify that he

10   didn't show the writ.  It turns out that it's not Detective

11   Bradshaw.  I was informed this morning it's another

12   detective.  But he's in state court today and in a homicide

13   trial, and so we may be seeking permission, if he can't make

14   it over here today, we would seek permission to put him on

15   the stand on Monday, also.

16         THE COURT: Sure.  Absolutely.  And anyone on your

17   list that we can't get to today, I hope they can be available

18   on Monday.  We'll conclude it on Monday.

19         So I think where we are -- we recessed with Mr.

20   Sullivan in the midst of his cross-examination, and I'm happy

21   to proceed any way you want.

22         Mr. Sullivan, if you want to continue with your

23   cross-examination, that's fine.  If you want to tender the

24   witness back to Mr. Harding and have the government go

25   forward on the statement, either way is fine with the Court.

1          MR. SULLIVAN:  Your Honor, I would like to continue

2  cross of the detective.

3          THE COURT:  Okay.  All right.

4          MR. SULLIVAN:  Kirk Hastings.  Detective Kirk

5  Hastings.

6          THE COURT:  Detective Hastings, good morning.

7  You're still under oath.  Please make your self comfortable.

8          THE CLERK:  State your name for the record, please.

9          THE WITNESS:  Detective Kirk Hastings Baltimore

10  City Homicide Unit.

11                  CONTINUED CROSS-EXAMINATION

12  BY MR. SULLIVAN:

13  Q.  Thank you.  Good morning, detective.

14  A.  Good morning.

15  Q.  Detective, last time we spoke was on September 29, 2005;

16  is that correct?

17  A.  Yes.

18  Q.  Now, in the interim, between September 29, 2005, have you

19  had any discussions with any other detectives from the

20  Baltimore City homicide division about the April 17th, 2002

21  interrogation of Mr. Mitchell?

22  A.  No.

23  Q.  You never talked to Detective Niedermeier?

24  A.  I talked to him, told him we had to come back to court,

25  but we didn't talk about my testimony.

1  Q.  You talked about his testimony?

2  A.  No.

3  Q.  Did you talk about the circumstances of how Mr. Mitchell

4  ended up in your office on April 17th, 2002?

5  A.  Yes.

6  Q.  So you talked to him, Detective Niedermeier, about that?

7  A.  Well, I had to ask him how he got to the -- from the

8  facility to the homicide office, yes.

9  Q.  And what did he tell you?

10  A.  That other detectives had transported him.

11  Q.  And do they have a name?

12  A.  I'm not sure who actually did the transport.

13  Q.  Okay.  So the only conversation, detective, that you had

14  with Detective Niedermeier after September 29 to this very

15  second was asking him how Mr. Mitchell got to your offices on

16  April 17th, 2002, and the response given to you by Detective

17  Niedermeier was some detectives brought him over; is that an

18  accurate statement?

19  A.  At first what we thought it was a detective who it

20  wasn't, and I'm not exactly sure who did the transport.

21  Q.  So there's more than one question with Detective

22  Niedermeier?

23  A.  I see Detective Niedermeier on a daily basis.

24  Q.  Then your testimony is you haven't talked about this

25  particular case since the 29th?

1  A.  We've talked -- I said I haven't talked to him about my

2  testimony.

3  Q.  Have you talked to him about any testimony?

4  A.  No.

5  Q.  Detective, when we last discussed this testimony, we were

6  talking about the writ that was issued, and we'll come back

7  to that at the appropriate time.

8           You were aware, were you not, detective, that on

9  April 16th, an arrest warrant for Willie Mitchell had been

10  issued for the murder of the Weise brothers?

11  A.  Yes.

12  Q.  And, in fact, just to refresh everybody's recollection,

13  Detective Niedermeier is your partner, correct?

14  A.  Yes, correct.

15  Q.  And he has been your partner for how long?

16  A.  Four to five years.

17  Q.  And would it be a fair statement?

18           THE COURT:  I'm sorry, Detective.  When you say

19  four or five years, you mean four to five years from today or

20  as of that time?

21           THE WITNESS:  At that time.  I think he came on in

22  2000 or 2001 to homicide.  One of those two years.

23  BY MR. SULLIVAN:

24  Q.  So it's -- now it may be four or five year.  Back then,

25  maybe a couple years, maybe a year or couple years?

1   A.   A year, probably.

2   Q.   Okay.   And when you work with a partner, for example,

3   Detective Niedermeier, could you describe to Judge Davis how

4   you work a case?

5            For example, the Weise brothers murders, you work

6   it together?

7   A.   Yes, we work it together.

8   Q.   Okay.   I'm going to show you, detective, what's been

9   marked as Mitchell's exhibit number 3.

10           Your Honor, may I approach the witness?

11           THE COURT:   Yes.

12  Q.   Application for a statement of charges, a statement of

13  charges, and arrest warrant.

14           Could you look at those?   I see you have a copy of

15  that here.

16           Could you look at Mitchell's number 3 and tell me

17  if you can identify those documents?

18  A.   It's an application for a statement of charges, and then

19  the charge papers.

20  Q.   Okay.   This is the application for the statement of

21  charges for the arrest of Willie Mitchell for the Weise

22  brothers murder; is it not?

23  A.   Yes, it is.

24  Q.   And --

25           MR. HARDING:   If I interrupt for one moment, Your

1   Honor?  Just for the record, the exhibit that Mr. Sullivan

2   just introduced is government's exhibit E, which was

3   introduced on direct.

4            MR. SULLIVAN:  Okay.  It's also Mitchell 3.

5            THE COURT:  Very well.

6   Q.  This was the application of charges that Detective

7   Niedermeier prepared for the arrest of Willie Mitchell,

8   correct?

9   A.  Yes.

10  Q.  Okay.  You were familiar with the investigation that led

11  up to this application of charges, correct?

12  A.  Correct.

13  Q.  Okay.  And would you agree with me, sir, that the

14  application of charges was presented by Detective Niedermeier

15  on April 16, 2002, to a commissioner?

16  A.  Yes.

17  Q.  And that the commissioner on April 16TH, 2002, at 7:22

18  a.m., actually authorized the application of charges and

19  issued an arrest warrant for Mr. Mitchell?

20  A.  Yes.

21  Q.  Okay.  If you look at the third sheet that I gave you,

22  the actual arrest warrant itself, would you agree with me,

23  sir, this is a District Court of Maryland for Baltimore City

24  arrest warrant that you're very familiar with, the form?

25  A.  Yes.

1  Q.  And would you agree with me, sir, that on April 16th,

2  2002, at 7:25 a.m., commissioner Angela McCray, ID 2 8 1 2 8

3  2, issued an arrest warrant for Willie Mitchell for the

4  murder of the Weise brothers?

5  A.  At 7:22, yes.

6  Q.  In the morning of April 16th?

7  A.  Correct.

8  Q.  Okay.  And did you go with Detective Niedermeier, sir, to

9  appear before the commissioner to obtain the arrest warrant?

10  A.  No.

11  Q.  Did you know that Detective Niedermeier was actually

12  going to go and get the arrest warrants for Mr. Mitchell?

13  A.  Yes.

14  Q.  Okay.  Did you help Detective Niedermeier prepare the

15  application of charges?

16  A.  No.

17  Q.  Now, your first contact, detective, on April 17th, of

18  2002, with Mr. Mitchell, was in the homicide division

19  offices?

20  A.  Yes.

21  Q.  Okay.  Just for the sake of clarity, is that a secure law

22  enforcement location not accessible to the general public?

23  A.  Yes.

24  Q.  Okay.  For example, if I walked in, I couldn't get into

25  your offices, correct?

1  A.  You shouldn't be able to.

2  Q.  I don't think I'd want to, but I could not, the public

3  doesn't have free egress or ingress into that facility; is

4  that correct?

5  A.  Yes, sir.

6  Q.  And when was -- you had the standard interview rooms for

7  suspects?

8  A.  There's interview rooms or holding areas.  At that time

9  we were on the eighth floor, and there were two, two holding

10 areas.

11 Q.  And could you describe for Judge Davis those rooms?

12 A.  They would be I guess approximately 12 by 12, with one

13 door, no windows, a glass window, with a door, and with a

14 bench, or a table and a chair.

15         THE COURT:  Detective Hastings, regretably, this

16 courtroom I think is great for juries, but not so great for

17 hearings, and I will not be insulted at all if you don't look

18 at me as you testify.  I would -- I would like the courtroom

19 to be set up in a way so that even in a non jury context a

20 witness could actually look at the judge.  But I don't want

21 you to twist your neck that way.

22         So feel free to continue to look at Mr. Sullivan or

23 whoever's questioning you.  I can hear you fine.  And I

24 regret that, really I regret the courtroom is set up this

25 way.

1        If there were a jury over there, it would be great

2    because that's who you'd be talking to.  Now you're talking

3    to me, but unfortunately, I'm sitting behind you.  I don't

4    want you to contort yourself in order to speak to the Court.

5        MR. SULLIVAN:  Thank you.

6    BY MR. SULLIVAN:

7    Q.  Detective, these interview rooms, are those two-way

8    mirrors?

9    A.  No.

10   Q.  What kind of mirrors are they?

11   A.  It wasn't a mirror, it was a window and door.

12   Q.  There's no two-way mirrors in there or anything like

13   that?

14   A.  Not in that facility, there wasn't, no.

15   Q.  I'm just talking about in 2002, not what they have now?

16   A.  Right.

17   Q.  Was there a handcuff device to a chair or wall or

18   anything at that point, in 2002?

19   A.  Not that I recall.

20   Q.  Okay.  Somebody that's put in that room, were they free

21   to leave, usually?

22   A.  No.

23   Q.  Does the door lock from the outside?

24   A.  Depends on -- what type of case it was.  In this

25   particular instance, no, he wouldn't have been free to leave.

1  Q.  Let's just talk about somebody, not particularly Mr.

2  Mitchell, but somebody who you obtained an arrest warrant for

3  two counts of first degree murder and already had the arrest

4  warrant so that person would not be free to leave, correct?

5  A.  Correct.

6  Q.  Now, do you have any recollection of when you first

7  encountered Mr. Mitchell on April 17th, 2002?

8  A.  When we began the interview.

9  Q.  Okay.  Do you know what time of interview began?

10         (Pause.)

11  A.  About 11:05 a.m. on the 17th.

12         MR. SULLIVAN:  Your Honor, I'll just move in

13  Mitchell 3.

14         THE COURT:  It's admitted.

15         (Received in evidence.)

16  BY MR. SULLIVAN:

17  Q.  Detective, your testimony is your first encounter with

18  Mr. Mitchell would have been at what time?

19  A.  11:05 a.m.

20  Q.  And, sir, what are you looking at there?

21  A.  An information sheet.

22  Q.  And what is an information sheet?

23  A.  It's a form that we fill out when we interview people in

24  the homicide unit.

25  Q.  Sir, let me show you what's been marked for

1    identification as Mitchell exhibit number 4, which doesn't

2    have, Your Honor, a corollary government exhibit into

3    evidence.

4              Sir, could you look at that and tell me what that

5    is?

6    A.   That's a copy of the information sheet.

7    Q.   And would this be the information sheet that you prepared

8    in this case?

9    A.   Yes.

10   Q.   Okay.  And this is your handwriting?

11   A.   Yes.

12   Q.   Okay.  Now, this information sheet, who fills out the top

13   part?

14   A.   I filled out entire form.

15   Q.   Okay.  So and that's why your signature's at the bottom,

16   K. Hastings?

17   A.   Right.  It's not a signature.

18   Q.   Your printed name?

19             Okay.  So everything about name, race, nickname,

20   date of birth, height, weight, complexion, address, and the

21   personal information, was obtained from you by you how?

22   A.   I asked Willie Mitchell.

23   Q.   Okay.  And on April 17th, where did you -- where was Mr.

24   Mitchell when you began going over the information sheet with

25   him?

1  A.  We were in a sergeant's office in the homicide unit.

2  Q.  Okay.  And you had not met Mr. Mitchell before, correct?

3  A.  Correct.

4  Q.  Okay.  And it says here date and time of interview, April

5  17 April 11:05, correct?

6  A.  Correct.

7  Q.  Okay.  So your testimony is that your first discussion

8  with Mr. Mitchell was at 11:05 a.m. on the 17th?

9  A.  Correct.

10  Q.  Did Detective Niedermeier meet with Mr. Mitchell prior to

11  that?

12  A.  Not to my knowledge.

13  Q.  Well, let me back up and ask you this, Detective.  I'm

14  sure you and detective, and correct me if I'm wrong, but I'm

15  sure you and Detective Niedermeier had a discussion about the

16  very fact that Mr. Mitchell was going to be brought over to

17  the homicide division, correct?

18  A.  Yes.  We knew he was going to be brought over.

19  Q.  Okay.  And in your discussions with Detective

20  Niedermeier, why was Mr. Mitchell being brought over?

21  A.  He was being charged in this case.

22  Q.  Based on the arrest warrant that you already had?

23  A.  Correct.

24  Q.  Is there a reason why you didn't serve him with the

25  arrest warrant at central booking?

1   A.   That's not how the procedure works.

2   Q.   But you could have served Mr. Mitchell with the arrest

3   warrant where he was already detained; could you not?

4   A.   I would imagine they could put a detainer on him, but

5   that's not the process we use.

6   Q.   Okay.  But you don't deny the fact that you could have

7   gone into either the Baltimore City Detention Center or

8   Central Booking Intake facility or even Supermax and serve

9   the defendant with an arrest warrant?

10  A.   No, you really can't do that.

11  Q.   So your testimony is that a Baltimore City homicide

12  detective is not permitted to serve a defendant who they're

13  charging who's already in jail, you can't serve an arrest

14  warrant on them?

15  A.   You have to obtain a writ.  It's a writ to be charged.

16  Q.   And what kind of writ to be charged?

17  A.   It's a writ.  It's a court order for the person to be

18  taken from the facility to be interview, and then he's taken

19  to another facility to be charged.

20  Q.   So, but in this case, with Mr. Mitchell, it was more than

21  just being charged, wasn't it?

22            You wanted to interrogate him, correct, and get a

23  statement from him, correct?

24  A.   Yes, we wanted to interview him.

25  Q.   Now, so it wasn't just a matter of a procedural

1  ministerial matter of charging Mr. Mitchell, it was a plan by

2  you or Detective Niedermeier in conformity with the process

3  to bring Mr. Mitchell from where he was confined to your

4  office to interview him then charge him, correct?

5  A.  Yes.

6  Q.  When you first met Mr. Mitchell at 11:05, according to

7  your testimony, you didn't serve Mr. Mitchell with the arrest

8  warrant, did you?

9  A.  You mean actually serve him, give him the arrest warrant?

10  Q.  Or even tell him about it?

11  A.  Shortly, yes, I did tell him.

12  Q.  So where is that on the information sheet?

13  A.  It's not on there.

14        THE COURT:  I'm sorry, Mr. Sullivan.  I just really

15  want clarification.

16        Detective Hastings, just a couple questions ago Mr.

17  Sullivan asked you a question, and you answered yes.  And the

18  question was something to the effect of Mr. Mitchell had to

19  be charged after he was transported; do you recall that?

20        THE WITNESS:  Well, Your Honor --

21        THE COURT:  You see where I'm confused, because he

22  had already right been charged with murder, and an arrest

23  warrant had been issued for him, so I'm really a little

24  confused.

25        THE WITNESS:  He wasn't charged.

1          THE COURT:  Excuse me?

2          THE WITNESS:  He wasn't charged at that point.

3          THE COURT:  So you don't believe when a

4    commissioner issues an arrest warrant based on a statement of

5    probable cause or application for statement of charges, you

6    don't believe when the commissioner issues the arrest warrant

7    the person hasn't been charged with murder?

8          THE WITNESS:  He hasn't been physically arrested,

9    no, Your Honor.

10          THE COURT:  That's not what we're talking about.

11   I'm asking you about has the person been charged with murder

12   when a commissioner issues an arrest warrant for that person?

13          THE WITNESS:  I would say that the charges, the

14   charges are there, but he hasn't been physically brought in

15   and been booked, so he hasn't been charged.

16          THE COURT:  So he has been charged?

17          THE WITNESS:  The charges are on paper, but he

18   hasn't physically been arrested.

19          THE COURT:  Okay.  Go ahead, Mr. Sullivan.

20   BY MR. SULLIVAN:

21   Q.  But you know, detective, just to follow up on Judge

22   Davis's question, you know that all you have to do is

23   physically charge him, correct?

24   A.  Yes.

25   Q.  Okay.  But in this case on April 17th, you and Detective

1  Niedermeier, consistent with the policy of the homicide

2  division, used this writ to get him to your office to

3  interview him, to try to get him to make a statement before

4  you physically gave him the piece of paper that says arrest

5  warrant, correct?

6  A.  Yes.  I brought him there to be interviewed.

7  Q.  But, yes, you wanted to get a statement from him,

8  hopefully to help you before you told him that he had already

9  been charged by a commissioner with two counts of first

10 degree murder and other charges?

11 A.  I told him he was charged with murder.

12 Q.  Okay.  When did you do that?

13 A.  After the information sheet, I advised him he was under

14 arrest when I advised him of his rights, at 11:10.

15 Q.  So let me just back up, because I wasn't there, okay?  So

16 you were there, and I guess you were alone with Mr. Mitchell,

17 correct?

18 A.  No.

19 Q.  Who else was there?

20 A.  Detective Niedermeier.

21 Q.  So it's you, Detective Niedermeier in some office, locked

22 office building, or locked floor of homicide, right?

23 A.  We were in a sergeant's office in the homicide unit.

24 Q.  And we've already agreed, so we don't belabor, Mr.

25 Mitchell couldn't leave?

1  A.  Correct.

2  Q.  In fact, do you know what a three piece is, okay?

3  A.  No.

4  Q.  Was he handcuffed?

5  A.  No.

6  Q.  Was he in shackles?

7  A.  At that point, no.

8  Q.  So how did he get unshackled or unhandcuffed?

9  A.  Whoever brought him from the facility.

10  Q.  But you don't know?

11  A.  Right.

12  Q.  Okay.  But you remember that he was not handcuffed or

13  shackled?

14  A.  Yes.

15  Q.  Okay.  So it's you, Detective Niedermeier, and Mr.

16  Mitchell, right?  And you fill out this form at 11:05, and

17  it's your testimony that neither you nor Detective

18  Niedermeier had asked Mr. Mitchell any questions whatsoever

19  about anything prior to 11:05 a.m. on April 17th?

20  A.  I didn't ask him any questions till 11:05.

21  Q.  How about Detective Niedermeier?

22  A.  Not to my knowledge.

23  Q.  Was Detective Niedermeier ever alone with Mr. Mitchell?

24  A.  He could have been alone with him when he was taken back

25  to the interview room after the interview was conducted.  But

1  at the time of the interview, we were together.

2  Q.  Okay.  What -- that's fine.

3           But my question, we're still at the beginning.

4  We'll get to the end whenever we get to the end.  But at

5  11:05, was that the first time that you and Detective

6  Niedermeier met Mr. Mitchell on the 17th?

7  A.  That was the first time I met him, and to my knowledge,

8  the first time Niedermeier met him.

9  Q.  Okay.  Now, you had discussed with Detective Niedermeier

10 who was going to lead the interrogation of Mr. Mitchell when

11 he got over on the writ, right?

12 A.  Yes.

13 Q.  And who was going to be the lead, you want to call him

14 interviewer of Mr. Mitchell?

15 A.  I was.

16 Q.  Okay.  So from -- just so we don't need to go into it

17 again from 11:05 through the end of this, before Mr. Mitchell

18 was served with the arrest warrant and returned to CBIF, you

19 did the questioning of Mr. Mitchell?

20 A.  Detective Niedermeier also asked questions, but I was

21 conducting the interview, correct.

22 Q.  And just looking on this form for just one other second,

23 you knew that Mr. Mitchell was already detained and

24 incarcerated on a no bond status, right?

25 A.  I knew he was incarcerated.

1  Q.  Okay.  How did you find out even where he was?

2  A.  I didn't find out where he was.

3  Q.  So he just -- how did you know where to go to get him?

4  A.  I guess Detective Niedermeier knew he was in jail.

5  Q.  But you had no information about that?

6  A.  No.

7  Q.  But you did know, when Mr. Mitchell appeared in your

8  office wearing a yellow jumpsuit, you knew that he was

9  already in custody somewhere, right?

10  A.  Yes.

11  Q.  Okay.  Did you know what -- somebody who wears a yellow

12  jumpsuit does, that mean they're at a specific facility, to

13  your knowledge?

14  A.  I'm not sure.  I'm not sure.

15  Q.  But you knew that Mr. Mitchell was detained somewhere and

16  brought over, right?

17  A.  Yes.

18  Q.  All right.  Now, when you did this information sheet with

19  them, did you administer the Miranda warnings to Mr. Mitchell

20  at that point or what's referred to as Miranda warnings

21  before the information sheet?

22  A.  After.

23  Q.  Okay.  So let's -- so Detective Niedermeier, yourself,

24  and Mr. Mitchell, Mr. Mitchell is wearing his yellow

25  jumpsuit, did you ask Mr. Mitchell whether he had a lawyer

1   for the case that he was in jail on?

2   A.  No.

3   Q.  Okay.  Does anywhere on this information sheet, does it

4   ask any questions about, are you represented by an attorney?

5   A.  No, it doesn't.

6   Q.  But it asks questions about are you under the influence

7   of drugs, right?

8   A.  Yes.

9   Q.  And can you read and write?

10  A.  Correct.

11  Q.  And have you been drinking --

12  A.  Yes.

13  Q.  -- right?

14          And a description of clothing, right?

15  A.  Correct.

16  Q.  But nothing about you have the right to an attorney,

17  can't afford one, one will be appointed for you, or if you're

18  already in custody when we writ you over, you have the right

19  to an attorney, that's not on the information form, correct,

20  information sheet?

21  A.  That's not on the information sheet.

22  Q.  Okay.  Now, would you remember your testimony on the 29th

23  when Mr. Harding asked you a series of question concerning

24  your questioning of Mr. Martin and then Mr. Mitchell, do you

25  remember that?

1   A.   Yes, I remember.

2   Q.   Because Mr. Martin and Mr. Mitchell were both there on

3   the same day, correct?

4   A.   Correct.

5   Q.   And Mr. Martin was there, because he was actually

6   arrested on the street and brought to the homicide division,

7   right?

8   A.   Well, he was arrested at his home, correct.

9   Q.   I don't mean on the street like standing on Lombard, but

10  he was at his residence arrested, right?

11  A.   Correct.

12  Q.   And he was brought, based on the arrest warrant that you

13  had obtained at the same time for Mr. Mitchell, he was

14  brought over to your office based on that arrest warrant,

15  correct?

16  A.   Correct.

17  Q.   Okay.

18          THE COURT:  You mean an arrest warrant for Mr.

19  Martin?

20  Q.   That's correct, the arrest warrant for Mr. Martin.

21          He was arrested at his home and brought to the

22  homicide division?

23  A.   Yes.

24  Q.   Okay.  And do you remember your testimony with Mr.

25  Harding that what you did that day is you did a

1  pre-interview, and then you did a taped interview, correct?

2  A.  Yes.

3  Q.  Okay.  Now, is that the policy of the Baltimore City

4  homicide division to do a pre-interview and then do a second

5  interview?

6  A.  There's not a written policy, but many do it that way,

7  yes.

8  Q.  And of the many that do it that way, I guess this is

9  somewhat rhetorical, that's how you do it, too, correct?

10  A.  Yes, sir.

11  Q.  Because that's what you did on April 17th, correct?

12  A.  Correct.

13  Q.  And the pre-interview of Mr. Mitchell on the 17th was not

14  taped, correct?

15  A.  Correct.

16  Q.  Okay.  And it's your testimony that he was Mirandized

17  when the tape recording was done, correct?

18  A.  Yes.

19  Q.  Okay.  And that he was Mirandized before this

20  pre-interview?

21  A.  Correct.

22  Q.  Okay.  Now, what time did you -- let's do it this way,

23  what time was the taped interview of Mr. Mitchell?

24  A.  12:40 p.m.

25  Q.  Your Honor, if I could approach?

1              THE COURT:  Yes.

2  Q.  Let me show you Mitchell number 5, which is not a

3  government exhibit as well.  Could you identify Mitchell

4  exhibit number 5?

5  A.  Yes.

6  Q.  What is that?

7  A.  That's a witness suspect activity log.

8  Q.  Okay.  And is this routinely prepared when a witness

9  suspect comes to the homicide unit?

10 A.  It should be, yes.

11             MR. SULLIVAN:  Your Honor, I'd move Mitchell 4 into

12 evidence.

13             THE COURT:  It's admitted.

14             MR. HARDING:  Just to correct Mr. Sullivan, this is

15 government's exhibit G, 7 G.

16             MR. SULLIVAN:  I'm sorry.

17             (Received in evidence.)

18 BY MR. SULLIVAN:

19 Q.  Now, is this your handwriting?

20 A.  No.

21 Q.  Detective Niedermeier's handwriting?

22 A.  Yes.

23 Q.  So while you were the lead agent to interview Mr.

24 Mitchell, detective, it was agreed by you and Detective

25 Niedermeier that he be the scribe?

1  A.  Well, he filled out the form.

2  Q.  Okay.  Were you taking handwritten notes?

3  A.  No.

4  Q.  Okay.  Was Detective Niedermeier taking handwritten

5  notes?

6  A.  Yes.

7  Q.  Okay.  And what's the purpose -- let's step back from

8  April 17th for a second.

9          What's the purpose of a homicide detective to take

10  handwritten notes of an interrogation of a double murder

11  suspect?

12          Why do you do that?

13          Why do you take notes?

14  A.  So you have -- it couldn't come in time during the time

15  in interview, he would stop request a lawyer, and we would

16  have a record of what we talked about before, before he did

17  so.

18  Q.  Okay.  So based on the -- based on the witness suspect

19  activity log that you have in front of you, right?

20  A.  Yes.

21  Q.  Would it be a fair statement that at 11:05 this

22  information sheet was done by Mr. Mitchell on Hastings and

23  Niedermeier were there, correct?

24  A.  Correct.

25  Q.  And that the advisement of rights, which we'll get to in

1  a second, was done at 11:10 a.m. of Mr. Mitchell, correct?

2  A.  Correct.

3  Q.  And that Hastings and Niedermeier were there?

4  A.  Correct.

5  Q.  Okay.  But you'd also agree with me that Mr. Mitchell

6  arrived at homicide at 10:05 a.m.?

7  A.  That's what it says, arrival time, 10:05 a.m.

8  Q.  Do you have any reason to dispute that?

9  A.  No.

10  Q.  I mean, not just you, but your partner's very careful in

11  all of these forms that he's filling out to make sure they're

12  true and accurate in the event you're called at a later point

13  to testify in court, correct?

14  A.  Correct.

15  Q.  So you'd agree with me on April 17, 2002, Mr. Mitchell

16  arrived at your offices at 10:05 a.m.?

17  A.  Correct.

18  Q.  Now, over to the right says unit 6447, what is that?

19  A.  That's a unit number.

20  Q.  I'm sorry, I guess it was a bad question.

21        What is 6447?

22  A.  That's a detective's call sign.

23  Q.  Do you know who the 6447 is?

24  A.  No, I don't.

25  Q.  Do you have the ability to find out who 6447 is?

1  A.  Yes.

2  Q.  But it's not you or Detective Niedermeier, I guess?

3  A.  Correct.

4  Q.  All right.  Now, based on what you recollect, detective,

5  what was going on with Mr. Mitchell in Sergeant Petrie, is

6  that how you pronounce it?

7  A.  Petrie.

8  Q.  Petrie?  In Sergeant Petrie's office, what was happening

9  with Mr. Mitchell between 10:05 a.m. and 11:05 a.m.?

10  A.  If he was put in there, he was probably sitting in there.

11  Q.  Now, is it the normal course in 2002 to let criminal

12  suspects sit in sergeant's offices unwatched and unguarded

13  until, for an hour let's say?

14  A.  Well, it wouldn't be common practice, but if we only had

15  two interview rooms, I don't know what else was going on that

16  day.

17  Q.  Well, you'd agree with me, would you not, detective, if

18  you're not ready for a criminal suspect perhaps someone

19  you're charging with double murder, you put him in a cell or

20  holding cell or a lock room, or something before you're ready

21  for them, right?

22  A.  If there's one available.

23  Q.  Okay.  So your recollection is, on this day, there was

24  not one available, and he just stayed in Sergeant Petrie's

25  offices?

1  A.  What I am saying is, I didn't have any contact with him

2  till 11:05, I don't know what he was doing in there at 10:05.

3  Q.  Just so I'm straight, Mitchell number 5, whose

4  handwriting is on this?

5  A.  On what?

6  Q.  On this witness suspect activity log?

7  A.  Niedermeier.

8  Q.  And he was the one that was charged with keeping the

9  details of everything, correct?

10  A.  He was filling out the form, correct.

11  Q.  Okay.  Do you have -- admit Mitchell's 5, Your Honor.

12         THE COURT:  Admitted.

13             (Received in evidence)

14  Q.  Do you have any reason, detective, to believe that

15  Detective Niedermeier can't tell time, or anything on this

16  form's inaccurate?

17  A.  No.

18  Q.  Okay.  So and what is Sergeant Petrie, what does he do?

19  A.  He's a homicide supervisor.

20  Q.  Okay.  And that's his work office?

21  A.  At that time it was, yes.

22  Q.  Okay.  And was Mr. Mitchell handcuffed while he waited in

23  Sergeant Petrie's office?

24  A.  I didn't see him in Sergeant Petrie's office.

25  Q.  Okay.  Do you know whether or not you and -- strike that.

1          Do you know whether Detective Niedermeier had any

2    discussions with Mr. Mitchell from 10:05 to -- I mean from

3    10:05 to 11:05?

4    A.   To my knowledge.

5    Q.   Now, there came a point at -- according to you, at 11:05,

6    based on your information sheet, that you went into the

7    sergeant's office first to meet Mr. Mitchell, correct?

8    A.   Correct.

9    Q.   And based on what we just talked about, the first thing

10   you did was obtain the information sheet information,

11   correct?

12   A.   Correct.

13   Q.   And then you did what?

14   A.   Advised him of his rights.

15   Q.   Okay.  And when you say you advised him of his rights,

16   what did you do?

17   A.   I provided an explanation of rights form.  I filled out

18   his name on the top portion of it.  I handed it to him, and

19   he read me his rights.  I filed it along with another sheet.

20   Q.   So let me understand this.  You used a blank standard

21   Baltimore City Police Department explanation of rights form,

22   correct?

23   A.   It wasn't blank.  I had his name filled out on the top of

24   it.

25   Q.   When you got it, it was blank, just a standard form?

1  A.  Correct.

2  Q.  Okay.  And you wrote out all the information at the top?

3  A.  Correct.

4  Q.  Now, what are you referring to there, sir?  What are you

5  looking at?

6  A.  The explanation of rights form.

7  Q.  Okay.  And that's the one that you presented to Mr.

8  Mitchell at 11:10?

9  A.  That's correct.

10  Q.  Now, tell Judge Davis, sir, how exactly you went about

11  explaining his form to Mr. Mitchell?

12  A.  Well, Mr. Mitchell was given the form, and he told me

13  that he had a year of college, so I assumed that he could

14  read and write.  I asked him if he could read and write.  He

15  said he could.  I handed him the form, and he read me his

16  rights.

17  Q.  And he would read them out loud to you?

18  A.  Correct.

19  Q.  Okay.  And just so I understand this, this wasn't when

20  the tape recorder was on?

21  A.  No.  The tape recorder wasn't on.

22  Q.  Okay.  And this was not before -- Mr. Mitchell had not

23  been asked any questions about the Weise brothers murders

24  prior to this occasion by you or Detective Niedermeier?

25  A.  That's correct.

1  Q.  Okay.  So Mr. Mitchell -- I guess you would say Mr.

2  Mitchell, how old are you?

3  A.  Yes.

4  Q.  Let's do it this way.  Did you say what's your full name?

5  A.  Yes.

6  Q.  And he told you my full name is Willie Edwards Mitchell?

7  A.  Willie Edward Mitchell.

8  Q.  That's not what the explanation of rights form says, does

9  it?

10  A.  It does look like an S on the end.  If there is, I made a

11  mistake.

12  Q.  Right.  So if Mr. Mitchell told you his name was Willie

13  Edward Mitchell, it's not a big deal, but you made a mistake

14  on that, right?  It looks like Edwards to me, right?

15  A.  It could be just a line next to the D, but it could be an

16  S, also.  I could have made a mistake and put an S on the

17  end.

18  Q.  No big deal.  You asked him where do you live?

19  A.  Yes.

20  Q.  And did he tell you I live at the Baltimore City intake

21  facility, that's why I'm wearing a yellow jumpsuit?

22  A.  No.  He didn't tell me that.

23  Q.  He gave you this address?

24  A.  Correct.

25  Q.  And what was that address?

1   A.   4 Volvia Court.

2   Q.   And then did you ask him how old he was?

3   A.   Yes.

4   Q.   How old did he tell you?

5   A.   24.

6   Q.   And did you ask him how far he'd gone to school or what

7   his education background was?

8   A.   Yes, I did.

9   Q.   What did he tell you?

10  A.   One year of college.

11  Q.   And then you dated it?

12  A.   Correct.

13  Q.   It says 17 April '02, and put the time on there?

14  A.   Correct.

15  Q.   Okay.  Now, the time was put on there at 11:10, so would

16  it be a fair statement that it took you five minutes to go

17  through the information sheet, right?

18  A.   Correct.

19  Q.   And then you immediately began to go into the explanation

20  of rights form?

21  A.   Close, close to it.

22  Q.   Okay.  And then the only thing that you did, detective,

23  is you gave this form that you filled out, you have it in

24  front of you, don't you, you have the explanation of rights

25  form in front of you?

1   A.   Yes.

2        MR. HARDING:   For the record, this is government's

3   exhibit F, 7 F.

4   Q.   It will also be Mitchell 6, Your Honor.

5        Then you physically handed that form to Mr.

6   Mitchell?

7   A.   Yes.

8   Q.   And you said to Mr. Mitchell what?

9   A.   I had him read me his rights.

10  Q.   How?  I mean you do it the same way every time you get

11  him advice of rights from someone?

12  A.   Yes.

13  Q.   What did you say to the person, and what did you say to

14  Mr. Mitchell?

15  A.   I told him that I was advising him of his rights, and I

16  handed him the form, turned it in front of him.  I sit in

17  front of him, and I have another exact copy of it, which is

18  labeled Hastings copy, and he reads his rights, and I would

19  go through with them, if he had any problem reading or

20  understanding the right, I would make a notation on my form.

21  On this case, I did not.

22  Q.   On what form?

23  A.   My copy of the explanation of rights form.

24  Q.   Oh.  So we'll get to that in a second.  So mark for

25  identification purposes Mitchell 7.

1            Now, is this a copy, blank copy of the explanation

2   of rights form?

3   A.   Yes.

4   Q.   Now, isn't it a fact, detective, that you just showed the

5   defendant, Mr. Mitchell in this case, Hastings copy and the

6   explanation of rights copy, and tell him answer, yes, no, put

7   his initials by it, isn't that how it's done?

8   A.   What was the question?

9   Q.   That you present to the defendant, or the suspect, both

10  of these forms, okay, the explanation of rights form, which

11  is Mitchell number 6, and the explanation of rights form

12  that's blank that says Mitchell number 7, which this is your

13  handwriting, Hastings copy, right?

14  A.   Right.

15  Q.   And you present both these forms to the person, like Mr.

16  Mitchell, and you've already shown him where he has to check

17  and sign, correct?

18  A.   No, that's not correct.

19  Q.   Okay.  What's the purpose of the Hastings copy?

20  A.   So while he's reading his rights, I can follow along with

21  him.  I don't present him my copy.  That's my copy that I

22  follow along with.

23  Q.   And you don't know it by heart what the explanation of

24  rights form says, you have to follow along with that?

25  A.   Yes.

1  Q.  Okay.  And is this a policy that all detectives use, they

2  have like the Niedermeier copy, the Hastings copy, the

3  whoever's copy?

4  A.  Some do, some don't.

5  Q.  Okay.  And it's your testimony, then, detective -- by the

6  way, was Detective Niedermeier present during this period of

7  time, too?

8  A.  Yes.

9  Q.  Okay.  So the testimony, your testimony is that Mr.

10 Mitchell wasn't shown both forms where to fill it out and

11 where to sign by you?

12 A.  He was presented the form.  He reads, he reads his right,

13 like number 1, he read his right.  I asked him if he

14 understands it.  At that time, he wrote, yes, that he

15 understood his rights.

16 Q.  Who tells him to write yes?

17 A.  I did.

18 Q.  Okay.  So you tell him you have an absolute right --

19 let's just do number one.

20          You have an absolute right to remain silent, and

21 you say to him, what?

22 A.  Do you understand your right?

23 Q.  Okay.  Let's assume somebody says I do.  And then what

24 did you do say?

25 A.  If you understand your right, write yes, and put your

1  initials next to it.

2  Q.  If you say you don't understand, he can say no?

3  A.  Then I would go through it.  That's why I take my copy.

4  If he had trouble with the word absolute, some people might,

5  I would make a notation on my form he had problems with right

6  number one and that I explained it to him.  And that in fact

7  he would understand it because I explained it to him.

8  Q.  I mean forgive me, because I wasn't there.  So the

9  checkmarks, I guess, according to your testimony, is that

10 that not designed to tell Mr. Mitchell where to answer and

11 initial, but apparently the checkmark means that you got the

12 answer?  What does the checkmark means?

13 A.  The checkmark means to me he understood his right, and I

14 checked that he understood number one.

15 Q.  And you checked number two, but you were telling him how

16 to answer the question, right?

17 A.  No.

18 Q.  You can answer yes or no, that you were giving him that

19 explanation?

20 A.  The answer to the question is, I asked him to read his

21 right, and then I asked him if he understands his right, and

22 he said yes, and he wrote yes.

23 Q.  For number?

24 A.  He wouldn't say no if he understood it.

25 Q.  But you didn't give him the option to say no, did you?

1  A.  If he didn't understand his right, he would say no.

2  Q.  Okay.  So for number two, anything you say or write may

3  be used against you in a court of law.

4         Do you agree that says that, right?

5  A.  I agree.

6  Q.  Okay.  That's not a question, is it?  That's not a call

7  for yes or no answer by a defendant?

8  A.  Yes, it does.

9  Q.  It does?

10 A.  It indicates that he understands that he has that right.

11 Q.  You are hereby advised number two anything you say or

12 write may be used against you in a court of law, right?

13 That's what it says?

14 A.  Yes.

15 Q.  And you would say to Mr. Mitchell, do you understand that

16 or, or you don't understand that?

17 A.  Correct.

18 Q.  You'd use that language?

19 A.  I would say do you understand what you just read to me,

20 and he said yes, and he wrote yes.

21 Q.  You told him to write yes and put his initials next to

22 it, do you remember, if you don't remember, you don't

23 remember?

24 A.  If he writes yes, it's because he understood.  Not

25 because I directed him to write it.

1  Q.  How did his initials get there?

2  A.  By him.

3  Q.  At your instructions?

4  A.  Correct.

5  Q.  So Mr. Mitchell just wasn't putting his own initials to

6  verify, you were giving him instructions how to fill out this

7  form, right?

8  A.  Correct.

9  Q.  Okay.  And it's your testimony, just so I'm sure,

10  Hastings copy, Mr. Mitchell never saw?

11  A.  No.  He doesn't get my copy.

12  Q.  That's the Hastings copy?

13  A.  That's the Hastings copy.

14  Q.  Okay.  Now, what time did Mr. Mitchell finish reviewing

15  this, all his constitutional rights under Maryland law and

16  federal law?  What time did that end?

17  A.  It's not documented.

18  Q.  It's kind of an important fact, isn't it, detective,

19  about when you actually get the consent of the person to

20  speak to them after you've advised them of their rights?

21  A.  It is documented I started reading his rights at 11:10.

22  Q.  Was this process over at 11:11 or maybe 12:40?

23  A.  It wasn't 12:40.

24  Q.  I'm just making up 12:40, but you don't have any idea how

25  long this process took?

1  A.   It takes a few minutes.

2  Q.   Well, did it take a few minutes on this case, or you

3  don't remember, or you're just guessing that it took a few

4  minutes?

5  A.   I'm not guessing.  I know it took a few minutes.

6  Q.   How come the time's not on here, and how do you know

7  that?

8  A.   It's not a block for it, and it is not indicated on the

9  form.

10  Q.   So what happens now?  You get this explanation of rights

11  form for Mr. Mitchell, what happens next?

12  A.   We interview him.

13  Q.   Okay.  And who's we?

14  A.   Myself and Detective Niedermeier.

15  Q.   Okay.  And this would begin the pre-interview process?

16  A.   Correct.

17  Q.   Okay.  And then after the pre-interview process, what

18  happens then?

19  A.   In this case, we did a taped statement.

20  Q.   Okay.  But doing a taped statement, that's a routine

21  thing that homicide detectives do, isn't it?

22  A.   If people agree to be taped.  Not everyone agrees to be

23  taped.

24  Q.   But if somebody you do the pre-interview and then you do

25  the taped interview, that's pretty routine, right?  At least

1    for you?

2    A.   It's pretty routine.

3    Q.   Okay.   Now, Mr. Mitchell then -- well, let me ask you

4    this.

5              This oral version that Mr. Mitchell gave to you

6    after his supposed Miranda rights were given to him, do you

7    have any notes of that part?

8    A.   Detective Niedermeier took notes.

9    Q.   How long did that part take, the pre-interview

10   questioning of Mr. Mitchell?

11   A.   Now, you're referring back to the activity log?

12   Q.   No.

13   A.   What happened in this case, we were also interviewing the

14   co-defendant.

15   Q.   Who was that, Mr. Martin?

16   A.   Right.

17   Q.   Yeah, okay.   And so, I mean, when did the oral interview

18   of Mr. Mitchell conclude?

19   A.   I don't have the time documented.   I'm looking for

20   Niedermeier's notes, but I can't seem to find them.

21   Q.   Do you have his notes with you?

22   A.   Yes.

23              MR. SULLIVAN:   Your Honor, may I approach?

24              THE COURT:   Yes.

25                   (Pause)

1  Q.  Could I see them?

2       You can look at Mr. Harding.  I mean, he can --

3  you're looking at those notes, may I see your notes with --

4  A.  That's up to the Court.

5  Q.  Forget it.  I don't need to see the notes.

6       THE COURT:  Of course, you do.

7       MR. SULLIVAN:  No.  I have a copy, Your Honor.

8       (Pause.)

9       MR. SULLIVAN:  Marking these as the next Mitchell

10  exhibit.

11       THE COURT:  Detective, would you hand the other

12  exhibits to the Clerk, please?  I think it's 6 and 7?

13  BY MR. SULLIVAN:

14  Q.  Detective, let me show, if I can approach, what's marked

15  as Mitchell I guess 8 for identification purposes, what is

16  Mitchell 8 that I'm showing you?

17  A.  That's appears to be a copy of Detective Niedermeier's

18  notes.

19  Q.  Let's take your time and review the notes that you

20  brought to court with you from Detective Niedermeier and

21  compare them to the notes that I just showed you in Mitchell

22  8, and tell me if they are the same, not appear to be, but

23  are they the same?

24  A.  They're the same.

25  Q.  Okay.  Now, those notes were done by Detective

1  Niedermeier and given to you at some point, correct?

2  A.  Given to me?

3  Q.  Yeah.

4  A.  They were kept as part of the case folder, but we

5  wouldn't exactly present me his notes.

6  Q.  But the case folder, or the case file was something that

7  was shared between the two partners, correct, you and him?

8  A.  The case folder was put together by Detective

9  Niedermeier, and it was kept by Detective Niedermeier.

10 Q.  Could you just answer me this question, sir, could you --

11 could you answer me the question about how come the time on

12 Mitchell 8 says 10:00 and Mr. Mitchell has given statements

13 about this murder when you didn't administer the Miranda

14 warnings until 11:05 or 11:10 or sometime after that?

15        Could you answer me the question about how Mr.

16 Mitchell gave you a statement before you Mirandized him, or

17 Detective Niedermeier mirandized him?

18 A.  It must be a mistake.

19 Q.  Another.  Mistake like the Edwards?

20 A.  Uh-huh.

21        MR. SULLIVAN:  Your Honor, move in exhibit 8.

22        THE COURT:  It's admitted.

23 Q.  But let's understand this, you don't dispute, do you,

24 detective, at least at of 11:00 Mr. Mitchell had already

25 given an oral statement about these murders prior to the time

1   that you Mirandized him?

2   A.   That's not true.

3   Q.   Your Honor, can I have exhibit 8 back again?  I'm sorry.

4           Let's go through exhibit 8.  You have it right

5   there in front of you, right?

6   A.   That's correct.

7   Q.   Says 11 a.m., right?

8   A.   That's what it says.

9   Q.   Says Willie Edward Mitchell, Sergeant Petrie's office?

10  A.   Petrie.

11  Q.   I'm sorry.  Hastings and Niedermeier?

12  A.   That's what it says.

13  Q.   Now, you've already testified that Mr. Mitchell was

14  questioned in this sergeant's office, right?

15  A.   Correct.

16  Q.   And you already testified that Hastings and yourself,

17  Detective Hastings, and Detective Niedermeier were the ones

18  who did it, right?

19  A.   Right.

20  Q.   And then would you agree with me that there are

21  statements here from Mr. Mitchell about the Weise brothers

22  murders, or about in response to questions you're asking him?

23  A.   I'm telling you that Detective Niedermeier didn't ask him

24  any questions about this murder until I read him his rights.

25  Q.   So Detective Niedermeier, then, even though you don't

1  really know what happened, because your first direct contact

2  with Mr. Mitchell was 11:05, but we know that Mr. Mitchell

3  was there from at least 10:05 to 11:05, and you don't know

4  what happened between 10:05 and 11:05, your answer is you

5  don't know how Mr. Mitchell would have answered these

6  questions at 11:00?

7  A.  Correct.

8  Q.  Okay.  You don't disagree with me, sir, do you, that

9  based on your five years or whatever relationship with

10  Detective Niedermeier -- don't look so aggrieved, sir.

11          MR. HARDING:  Objection.

12  Q.  That --

13          MR. HARDING:  Objection, Your Honor.

14          THE COURT:  The objection's overruled.  It's

15  withdrawn.

16  Q.  This is Detective Niedermeier's handwriting, correct?

17  A.  That's correct.

18  Q.  And you read and write the English language, don't you,

19  detective?

20  A.  That's correct.

21  Q.  And you have no problem saying that that's 11 a.m.,

22  right?

23  A.  I have no problem saying that.

24  Q.  You don't disagree with me, sir, detective, on the

25  information sheet and on the explanation of rights, it's

1  11:05 or 11:10, right?

2  A.  Correct.

3  Q.  So you know how to tell time 11:00 is before 11:05 or

4  11:10, right?

5  A.  Yes.

6           MR. HARDING:  Objection.

7  Q.  Okay.

8           THE COURT:  Overruled.

9  Q.  So to the question about -- let me ask you this, you

10  weren't even there, then, I guess, you don't know how

11  Niedermeier got these answers down there, I got to that ask

12  Niedermeier, right?

13  A.  No.  Niedermeier took these notes when I was interviewing

14  him.  That's what I testified to.

15  Q.  So Niedermeier must have put the wrong time down, that's

16  your testimony?

17  A.  That's my testimony.

18  Q.  I guess he also got the date wrong because it's 3-17-02?

19  A.  I saw that, yes.

20  Q.  I guess based on your testimony, Detective Niedermeier

21  may not be the most astute person because he, on this

22  document, he, according to you, he got the date wrong by a

23  clear month?

24           MR. HARDING:  Objection.

25  Q.  And got the time wrong?

 1            MR. HARDING:  Objection.

 2            THE COURT:  Overruled.  You may answer.

 3  A.  Correct.

 4  Q.  Is Detective Niedermeier, based on your experience, prone

 5  to make mistakes like this?

 6  A.  I wouldn't say he's prone to make mistakes, but anyone

 7  can make a mistake.

 8  Q.  Now, let's move into detective --

 9            THE COURT:  Can I have Mitchell 8, please?

10  Q.  Yes, Your Honor.

11            (Pause.)

12  Q.  Now, detective, just so I understand this, the

13  pre-interview that you do, is identical to the taped

14  interview that you do?

15  A.  It can't be identical, but it's close, correct.

16  Q.  Because why is it close?

17  A.  I can't expect a person to say exactly the same thing

18  twice.

19  Q.  Why don't you just tape it the first time?  Is it because

20  you don't know what he's going to say?

21  A.  Yes.

22  Q.  Okay.  So you wait to hear, you do this pre-interview

23  that's not taped to get the defendant or not talking about

24  Mr. Mitchell for a second to get the suspect or the person

25  you think has committed a murder to say something, and then

1    if they say something that you think is helpful to them, then

2    I mean helpful to you, then you will tape it, right?

3    A.   It doesn't matter if it's helpful or not.   We would tape

4    it anyway.

5    Q.   So if the person said, for example, I didn't do it, I was

6    at church, I'm totally innocent, you'd tape that, too?

7    A.   Yes.

8    Q.   Okay.   Now, we know that, based on what we've talked

9    about, that the taped statement began at 12:40, correct?

10   A.   Correct.

11   Q.   Okay.   Now, what happened with Mr. Mitchell between 11:10

12   and 12:40?

13   A.   He was put either in the interview room or back into

14   another office.

15   Q.   Now, was Mr. Mitchell served with the arrest warrant at

16   this point?

17   A.   He was told he was under arrest.

18   Q.   For what?

19   A.   First degree murder.

20   Q.   Why didn't you just serve him with the arrest warrant?

21   A.   The court commissioner serves him with the arrest

22   warrant.

23   Q.   Okay.   When did you tell him, or was it you or Detective

24   Niedermeier that he was under arrest for first degree murder,

25   what time was that?

1  A.  When he was advised of his rights.

2  Q.  So that would have been at 11:10?

3  A.  Correct.

4  Q.  I just wanted to make sure.

5           So part of the colloquy of explanation rights is

6  more than just having him read this form.  I guess you tell

7  him, in this case, that Mr. Mitchell we have obtained an

8  arrest warrant for you for the murder of the Weise brothers?

9  A.  Correct.  He wanted know why he was there.

10  Q.  He asked you?

11  A.  Yes, he did.

12  Q.  When did he ask you?

13  A.  Why he was here.

14  Q.  Okay.  Just that's exactly what he said?

15  A.  I don't remember exactly what he said.

16  Q.  Now, what happens, detective, now, you bring a tape

17  recorder into the sergeant's office, or is it already there?

18  A.  Sometimes it's one in there.  Sometimes we have to go get

19  one.

20  Q.  Well, what happened in this case?

21  A.  In this case, the first time we interviewed him, we

22  didn't tape it.  So I don't know if there was a tape recorder

23  in there or not.

24  Q.  Now, the tape, detective, you -- you're in charge of

25  turning it on and turning it off?

1  A.  Yes.

2  Q.  Okay.  And you don't argue with me that you get the

3  defendant to tell you everything and then you tape it so

4  you're asking the same questions you would have previously

5  asked?

6  A.  Correct.

7  Q.  Are there some questions that you don't ask on tape that

8  you asked before?

9  A.  Sometimes there could be.

10  Q.  What would be a circumstance of that?

11  A.  It could be anything.  I remember something during the

12  interview he could say something that he didn't say during

13  the pre-interview, it could just be a simple question.

14  Q.  So is it your testimony, detective, that Mr. Mitchell

15  affirmatively said I really want to speak with you guys about

16  this murder that you're about to charge me with?

17  A.  I'm saying he was advised of his rights, and he agreed to

18  talk to me, yes, that's correct.

19  Q.  But you would agree that agreeing to talk to you is

20  different than wanting to talk to you?  Do you understand the

21  distinction?

22  A.  In this case, I think Mr. Mitchell wanted to talk to me.

23  Q.  What do you base that on?

24  A.  Because he alleged he didn't do it.

25  Q.  What was he supposed to do, was he free to leave?

1  A.  No.

2  Q.  Where would he have gone to?  If he didn't make a

3  statement, what would have happened to him?

4  A.  He would go back to jail.

5  Q.  Where you picked him up from?

6  A.  I'm not what facility he was picked up, but he would have

7  went to CBIF after this.

8  Q.  What would have happened if Mr. Mitchell said I elect to

9  exercise my right to counsel, and I don't want to make a

10  statement to you, what would have happened then?

11  A.  He would have been transported back.

12  Q.  Would he have been served with the arrest warrant?

13  A.  Yes.

14  Q.  And then transported back to wherever he was?

15  A.  No.  The arrest warrant goes with him to the facility.

16  He gets served the arrest warrant by the facility.

17  Q.  That acts as a detainer, which you didn't do in this

18  case, because you wanted him to come to homicide, right?

19  A.  We had a writ to bring him over to interview him, that's

20  correct.

21  Q.  Let's talk about the writ for a second.  I was trying to

22  save this, but we can talk about the writ.

23          You'd agree with me, wouldn't you, detective, that

24  the homicide division detectives get these writs all the

25  time?

1  A.   Quite often, yes.

2  Q.   Okay.   And the methodology to obtain a writ is what?

3  A.   We would talk to the state's attorney who is assigned the

4  case, explain to them why we wanted to get the writ, and then

5  they would in fact order a writ for us.

6  Q.   Okay.   When you say order a writ, what is that?

7  A.   They fill out the form that you have, and they -- a court

8  clerk or even a state's attorney would bring it to a judge to

9  have it signed.

10 Q.   How would you know as a detective that the writ had been

11 ordered by a court or a judge that you can go get a

12 defendant.   And we're not talking about Mr. Mitchell right

13 now, how do you know that?

14 A.   How do I know we got and the form?

15 Q.   Right.

16 A.   We go pick it up.

17 Q.   Where would you go pick it up?

18 A.   The state's attorney's office.

19 Q.   Again, not with Mr. Mitchell, not to confuse things, but

20 just in your experience, so you asked an assistant state's

21 attorney that you want to bring a defendant, let's talk about

22 Mr. Mitchell, who's already in jail on no bond status that,

23 you're about to charge with two counts of murder, first

24 degree murder, you tell the state's attorney that we want to

25 get Mr. Mitchell and bring him to the homicide division?

1    A.   Correct.

2    Q.   Okay.   For what?

3    A.   To interview him.

4    Q.   To interview him?   Okay.

5            So you would tell the assistant state's attorney,

6    in this case, who was it, do you know?

7    A.   Bill McCollum.

8    Q.   So you would tell Mr. McCollum?

9    A.   McCollum.

10   Q.   You could would tell Mr. McCollum that we're about to

11   charge Willie Edward and Mitchell with two counts of first

12   degree murder.   He's in central booking on an unrelated ADW,

13   assault with deadly weapon, and we want to bring him to

14   homicide?

15   A.   Correct.

16   Q.   And then Mr. Mitchell, who is -- Mr. McCollum, who's an

17   assistant state's attorney, would get this writ for you?

18   A.   Correct.

19   Q.   And then you would go to the state's attorney's office

20   and actually pick it up?

21   A.   Somebody would.

22   Q.   I'm not -- okay.   And that person would then go to

23   central booking and get Mr. Mitchell?

24   A.   Correct.

25   Q.   Or whoever, and bring them to your office, for

1   interviews?

2   A.   Yes.

3   Q.   Okay.   Now, again, I think I've asked this, but you on

4   this date, April 17, there's no dispute that you knew that

5   Mr. Mitchell was in jail, no bond, on an unrelated case,

6   right?

7   A.   I knew he was in jail.   I didn't know it was on no bond

8   status.

9   Q.   But you knew he was in jail?

10  A.   Yes.

11  Q.   Did you know how long he'd been in jail?

12  A.   No.

13  Q.   Did you know he'd been in jail since April first?

14  A.   No, I didn't.

15  Q.   2002?

16           Now, did you ask Mr. Mitchell to give you a written

17  statement?

18  A.   No.

19  Q.   Is it your policy to ask for written statements?

20  A.   We tape our statements when at all possible.

21  Q.   So your practice is not to get written statements from a

22  suspect?

23  A.   Some.   I guess there's cases where sometimes you might

24  get one.

25  Q.   Okay.

1  A.  Not in this instance.

2  Q.  Okay.  Now, you have in front of you, don't you,

3  detective, the transcript of the tape, right?

4  A.  That's correct.

5  Q.  Madam clerk, what's my last exhibit number?

6          THE CLERK:  8.

7          MR. HARDING:  This is government's exhibit H, Your

8  Honor.

9  Q.  It's Mitchell 9, Your Honor.

10         (Pause.)

11  Q.  You have that in front of you?  I will give you this one.

12         Your Honor, I ask this be admitted and provided to

13  the Court to so Your Honor can follow along.

14         THE COURT: It's admitted.

15           (Received in evidence.)

16         THE COURT:  Do you have it?

17  Q.  I'm sorry, Mitchell 9, I'm sorry, Your Honor.

18         Now, this transcript that we're looking at,

19  detective, is it done by you?

20  A.  No.

21  Q.  Was it done by Detective Niedermeier?

22  A.  No.

23  Q.  It was transcribed by a Dolly Tobrinksi, CID Drug

24  Enforcement Section?

25  A.  That's correct.

1  Q.  Do you know who she is?

2  A.  Yes.

3  Q.  And is she a Baltimore City Police Department employee?

4  A.  Yes.

5  Q.  Okay.  But she's not in homicide, she's in drug

6  enforcement?

7  A.  She's a secretary, correct.

8  Q.  Okay.  Now, in this transcript, detective, of the tape,

9  and I'll just tell Your Honor that we do have the tape that

10 was provided from the government of this day, you say to him

11 first page, you understand that a warrant was obtained for

12 your arrest -- sorry.  For your arrest in reference to this

13 case; is that correct?

14        Do you see that question there on the first page,

15 fourth from the bottom?

16 A.  Yes.

17 Q.  And Mr. Mitchell says now I do, yes, I do.  Okay?

18        So was it on the tape was the first time that you

19 were telling Mr. Mitchell that he had been arrested, or you

20 had a warrant for his arrest, was that the first time?

21 A.  No.

22 Q.  You told Mr. Mitchell that?

23 A.  No.

24 Q.  And then on the second page, detective, about halfway

25 through, it says, at that point, you said you wanted to talk

1  to me about this incident; do you see that?

2  A.  Yes.

3  Q.  Okay.  And Mr. Mitchell said, yes, I did.

4          But when did Mr. Mitchell, where's the piece of

5  paper here that says Mr. Mitchell wanted to talk with you as

6  opposed to any other method he was there, you brought him

7  there for questioning, right?

8  A.  Correct.

9  Q.  He didn't ask to speak with you, right?

10  A.  No.

11  Q.  And turning to page 5, detective, you say, quote, and

12  before we had this, this conversation, now on tape, we had a

13  conversation before that, right?  Do you see that, about

14  halfway down?

15  A.  Yes.

16  Q.  Okay.  Mr. Mitchell says yes?

17          Now, you don't say anything in here, detective,

18  about this conversation about whether he had been

19  administered his rights at that point, correct?  Miranda

20  rights?

21  A.  Well, do I say anything here on the tape?

22  Q.  For the first conversation?

23  A.  I already testified I advised him of his rights at 11:10

24  before the interview.

25  Q.  You also agree with me that Detective Niedermeier has

1  handwritten notes about what Mr. Mitchell said that are timed

2  11 a.m., correct?

3  A.  Correct.

4  Q.  Okay.  Now, you also tell him, don't you, on the next

5  page, that you want the full story like I told you in, ah,

6  right?

7          Do you see that at the top of page 6?

8  A.  Yes.

9  Q.  You say you want the full story from Mr. Mitchell, right?

10 A.  Right.

11 Q.  Okay.  Didn't you already have that?

12 A.  I wanted him -- in this instance, I wanted him to start

13 and tell me everything that he told me in the pre-interview.

14 Q.  And you also told him, did you not, Detective, also on

15 page 6, that nothing that he says to you about, for example,

16 drug transactions or involvement in drugs would be used

17 against him, right?

18 A.  That's what I said.

19 Q.  Okay.  Now, do you have the power, detective, to give

20 someone immunity from criminal prosecution, as a Baltimore

21 City detective?

22 A.  No.

23 Q.  All right.  So I mean, not to cast it in the wrong light,

24 but that would just be a lie, right?

25 A.  What I had said to him was how I felt about the incident.

1          MR. HARDING:  Objection.

2          THE COURT:  The objection is overruled.

3  Q.  Well, you said, detective, and follow along with me, just

4  for the record, I'll explain this to you.

5          While the tape's still running, we're not

6  interested, none of this information in reference to the drug

7  transactions that you're talking about, none of this will be

8  used against you in any way.  I'm investigating a murder.  I

9  just want to know how it got to the point where these

10 gentlemen were shot.  So don't worry about the cocaine.

11 A.  Yes.

12 Q.  End of quote?

13 A.  That's exactly what I said.

14 Q.  But my question to you is, you told Mr. Mitchell none of

15 this will be used against you in any way, right?

16 A.  I didn't think it would.

17 Q.  And you were trying to get him to give you more

18 information about by telling him, talk to me about the drug

19 transaction, because I'm not going to prosecute you for

20 though, correct?

21 A.  I was trying to get him to tell me what he told me before

22 the tape started.

23 Q.  So Mr. Mitchell wasn't telling you the same thing as in

24 the pre-interview?

25 A.  He was a little apprehensive about talking about the

 1   drugs.

 2   Q.  Was this the first time you noticed Mr. Mitchell's

 3   apprehension about being the in Sergeant Petrie's office?

 4   A.  No.

 5   Q.  So --

 6   A.  What I'm saying is, in the interview before the tape, he

 7   told me certain things about a drug transaction that may or

 8   may not have occurred.

 9   Q.  Okay.

10   A.  When we were on the tape, he wasn't saying everything

11   that he said in the interview before the tape was running,

12   and I wanted him to tell me what he said.

13   Q.  Where are your notes about the pre -- where are any notes

14   about the pre-interview interview?

15   A.  Niedermeier took the notes.

16   Q.  Do you have those in the case file?

17   A.  You have them.  You produced them to me with the time of

18   11 a.m. on them.

19   Q.  Right.  But where are the ones after 11:10, after 11:10

20   but before 12:40?

21   A.  Those are Niedermeier's notes from the interview.

22   Q.  You're saying he gave them those notes before he was

23   Mirandized?

24   A.  I'm saying it didn't happen that way.

25   Q.  But is this -- I just want to understand because you've

1  looked at the case file and prepared and testified a couple

2  weeks ago and prepared and testified today, you want to look

3  through the documents and be ready to answer my questions and

4  Mr. Harding's questions, because the case was 2002, a long

5  time ago, correct?

6  A.  Yes.

7  Q.  Is it your testimony in the Baltimore City homicide

8  division case file, or whatever you want to call it, this one

9  sheet is all there is of handwritten notes relative to any

10  detective writing down responses that Mr. Mitchell supposedly

11  made?

12  A.  Correct.

13  Q.  With the wrong date and the wrong time?

14  A.  Correct.

15  Q.  Okay.  So do you usually, in the way you interrogate, I'm

16  sorry, interview suspects of double murders, do you usually

17  tell them, detective, that nothing they say will be used

18  against them in certain instances?

19  A.  No.

20  Q.  Okay.  So was this kind of a unique thing for to you tell

21  Mr. Mitchell that you know, I'm not going to -- nothing, I

22  don't want to paraphrase it, none of this will be used

23  against you in any way.

24          Do you agree with me you told Mr. Mitchell that?

25  A.  Right.  About the drug transaction, correct.

1  Q.  And you had told Mr. Mitchell that nothing will be used

2  against him in reference to the drug transaction to induce

3  him to continue to speak with you, to say what he said

4  before?

5  A.  Correct.

6  Q.  Okay.  And, in fact, right after you tell him that

7  nothing he says will be used against him in terms of the drug

8  transactions so don't worry about the cocaine, Mr. Mitchell

9  says okay.  And you say do you understand what I am saying?

10 Top of page 7.

11 A.  What I said was, I was talking about the gentlemen that

12 were shot, so don't worry about the cocaine.  That's what I

13 said.

14 Q.  No, I know that.  And then Mr. Mitchell says okay.  And

15 you say do you understand what I am saying?  Right?

16 A.  Correct.

17 Q.  And that refers back to don't worry about the cocaine,

18 and that nothing you say about the drug transactions would be

19 used against you, correct?

20 A.  That's what I said, yes.

21 Q.  And then at that point, Mr. Mitchell tells you, gives you

22 a statement about a drug transaction, correct?  Or an alleged

23 drug transaction?

24 A.  An alleged drug transaction.

25 Q.  Because you don't know whether it happened or not, do

1   you?

2   A.  No.

3   Q.  Okay.  And then on page 9, you say to Mr. Mitchell, I

4   understand, and I'm quoting, I understand you don't have to

5   say anything about anything, and you didn't do anything, so

6   you don't have any intent, okay?  Do you see that?

7   A.  Yes.

8   Q.  Now, were you talking with Mr. Mitchell, either in the

9   pre-interview interview or at any other point about the legal

10  concept of intent, what intent means?

11  A.  What I was explaining to him in that point he was talking

12  about the drug transaction, and if you read the statement,

13  that was his explanation for what had happened.  And I was

14  just explaining to him if he didn't do it, then he didn't

15  have any intent to set the Weise brothers up to be killed.

16  Q.  But would you agree with me that the drug transaction and

17  the Weise brothers murders are pretty -- pretty -- they run

18  pretty parallel to each other, don't they?  I mean, you knew

19  -- strike that.

20          You knew that the Weise brothers were drug dealers;

21  did you not?

22  A.  Yes.

23  Q.  Okay.  So it wasn't like Jane Doe and John Doe were

24  killed at the Inner Harbor on a trip here from York,

25  Pennsylvania, you had done information and research and

1  investigation to know that the Weise brothers were drug

2  dealers?

3  A.  Yes.

4  Q.  Okay.  So you knew that your victims in this case, not to

5  belittle them or say anything about it, were drug dealers,

6  right?

7  A.  Yes.

8  Q.  You're talking to Mr. Mitchell after he supposedly gave

9  you all these waivers about the murder of these two drug

10  dealers, right?

11  A.  Correct.

12  Q.  And you're telling Mr. Mitchell that any drug

13  transactions that are involved here, he doesn't have anything

14  to worry about, because you're not interested in the drug

15  transactions, right?

16  A.  I wasn't.

17  Q.  But you knew that the Weise brothers were drug dealers?

18  A.  Yes.

19  Q.  Did you have a sense or a suspicion or base -- strike

20  that.

21        Based on your investigation at this point April 17

22  -- strike that.

23        What date were the Weise brothers killed?  March of

24  2002, end of March?

25  A.  March 25th.

1  Q.  Okay.  So from March 25th to April 17th, you and

2  Detective Niedermeier had been working this investigation,

3  right?

4  A.  Yes, along with others.

5  Q.  Okay.  And based on your knowledge, how would you

6  describe the drug transactions or drug involvement of the

7  Weise brothers?

8  A.  I don't understand.

9  Q.  Did you know that they were -- were they large scale drug

10 dealers, medium scale drug dealers, violent drug dealers?

11 What did you did you know about them?

12 A.  I knew they were involved in drugs.  I didn't really know

13 the level.

14 Q.  Now, was that because -- that's not your concern, you're

15 a homicide detective?

16 A.  It would be my concern in certain situations, but in this

17 case, I knew that they were drug dealers, but we were looking

18 for the person who killed them.

19       MR. HARDING:  Judge, it's 11:30, I want to inform

20 the Court that -- or at least tell the Court that propose to

21 the Court that I be given an opportunity, first of all, to

22 call Judge Brown to make the arrangement I described earlier.

23       And, secondly, I want to ask permission to, in the

24 interest of the other government witnesses, most of whom will

25 be relatively brief, to interrupt this witness's

1    cross-examination again so that we can get some of these

2    other people out of here.

3              Your Honor has indicated you're going to break for

4    lunch at 12:30, which means we'll have less than an hour left

5    to us.  I know Haven Kodeck is due here at 11:30.  I have the

6    woman chief of the criminal division in the clerk's office

7    Marian Soto is here, been here all morning since 8:30.  And I

8    also have another person from CBIF who's been here all

9    morning.

10             So I'm asking the permission to interrupt this

11   witness's testimony.

12             THE COURT:  Mr. Sullivan?  And Mr. Sullivan, I

13   should be very clear, please don't feel any pressure, I know

14   you want to be courteous to Mr. Harding and to the witnesses

15   and cooperate with them, I mean it's really up to you.

16             I, again, hope this isn't misunderstood, Mr.

17   Harding, I don't fully understand the importance of this

18   testimony that you're going to offer regarding the use of the

19   writ.  It really seems to me to be an issue of law.  And to

20   the extent that there might be factual underpinnings to those

21   questions, it just seems to me that you could put in

22   affidavits from all those witnesses explaining the process,

23   explaining the procedures I think you've basically proffered

24   all of them, and I think I understand it.

25             So, again, I don't want to foreclose you, but --

1           MR. HARDING:  I propose a compromise largely.

2           THE COURT:  I'm sorry.  Are the witnesses that you

3  mentioned from the clerk's office and from Central Booking,

4  are they here to talk about the Mitchell transport or just in

5  general?

6           MR. HARDING:  In general.

7           THE COURT:  Yeah.  See, I fail to see why you need

8  live witnesses for that.  I mean, largely through your

9  proffer, and through Detective Hastings's testimony, and

10 you're going to have McCollum this afternoon, correct?

11          MR. HARDING:  No.  Your Honor,

12          THE COURT:  I'm sorry, you're going to have Mr.

13 Cohen?

14          MR. HARDING:  Haven Kodeck.  He's here right now.

15          THE COURT:  You think he is.

16          MR. HARDING:  No.  I'm told he is here.

17          THE COURT:  Oh, he's here?

18          MR. HARDING:  What I hope, Your Honor, I will call

19 Judge Brown and propose the affidavit that Your Honor

20 recommended.  I will also tell Marian Soto that we don't need

21 her to testify.

22          But I'd like to at least put on the record the

23 fundamentals on the writ system, and I hope do that with

24 Haven Kodeck in fairly brief testimony.

25          THE COURT:  I think that's fine.  Again, just so

1  I'm clear, I don't have any reason to think that what

2  purports to be Judge Waxter's signature, if I'm right in my

3  interpretation, is in fact Judge Waxter's signature.

4          In other words, I don't think there's a question

5  here as to whether state's attorneys, assistant state's

6  attorney, the detective believes Mr. McCollum, who I know

7  well, I don't have any doubt that assistant state's attorneys

8  actually go to judges and get judges to sign these orders.  I

9  don't have any doubt, frankly, that law enforcement officers

10 go to Mitchell Courthouse or Courthouse East and pick up

11 those pieces of paper, or at least they're told that the

12 judge has signed them.

13         So this is not a question of the bona fides of the

14 actual application for an issuance of the writ.  That's not

15 in question here.

16         Now, Mr. Sullivan may have a different view.  I

17 don't think he does.  But none of that is in question.

18 Nobody's suggesting that police officers at home at night

19 make up these forms.

20         MR. HARDING:  Well, I thought that some of your

21 comments last time, Your Honor, did tend in that direction.

22         THE COURT:  That's a fair comment.  But, no, I

23 don't really believe that.  I don't believe that about this

24 case, certainly.

25         So to the extent that you thought that there was

1   some need for you to prove up factually the bona fides of the

2   issuance of warrant -- of the writ in this case, you don't

3   need to go there.

4        MR. HARDING:  Thank you, Your Honor.

5        THE COURT:  Okay.

6        MR. HARDING:  Is it all right then if I put Haven

7   Kodeck on the stand?  I imagine it will only take ten minutes

8   on direct.  Mr. Sullivan may be two hours on cross.

9        MR. SULLIVAN:  It's always cross that takes so

10  long, Your Honor.

11        As long as Detective Hastings doesn't have

12  discussions with anybody pending his return, I'd be totally

13  happy to accommodate the government.

14        THE COURT:  We have that assurance, of course,

15  Detective Hastings.  You're excused until 2:30.  Enjoy your

16  lunch.  And we'll have Mr. Kodeck come in.

17        MR. HARDING:  Can we have a short break so I can

18  make this phone call?

19        THE COURT:  I was going to suggest that, that will

20  consume some time, but I suspect we all need a break, not

21  least of all our court reporter.  So we'll stand in recess,

22  try to keep it to 15 minutes.  I appreciate the marshals

23  cooperating.

24        (Recess.)

25        MR. HARDING:  Your Honor, the government calls

1  Haven Kodeck.

2          THE COURT:  By the way, Mr. Harding, I couldn't

3  help myself put to observe apropos our last exchange it was a

4  fair observation for you to suggest that maybe some of my

5  comments last time did indeed call into question the bona

6  fides of the behaviors that you've been talking about.

7          The fact of the matter is, your own office has a

8  number of Baltimore City police officers under indictment.

9  It's not entirely fanciful for a court to be concerned about

10  the integrity of court processes under present circumstances,

11  that's all.

12          MR. HARDING:  No question about that.

13          THE COURT:  Your observation was very fair.

14          Mr. Kodeck, good morning.

15          THE WITNESS:  Good morning, nice to see you.

16          (The Witness is sworn.)

17          THE CLERK:  Be seated.

18          Scoot up and speak directly toward the mike.  State

19  your name.

20          THE WITNESS:  Haven Kodeck, K O D E C K.

21                  DIRECT EXAMINATION

22  BY MR. HARDING:

23  Q.  Good morning.

24  A.  Good morning.

25  Q.  Can you tell us how are you employed?

1  A.  City of Baltimore City State's Attorney Office for

2  Baltimore City.

3  Q.  And what is your position there?

4  A.  I am presently Deputy State's Attorney for Baltimore

5  City.

6  Q.  And can you tell us how long you've been working at the

7  State's Attorney Office?

8  A.  I just passed my 35th year.

9  Q.  How long have you been the Deputy State's Attorney?

10  A.  Since 1995.

11  Q.  Have you, as a regular part of your job over the years,

12  obtained writs to assist detectives in investigations?

13  A.  Many times.

14  Q.  Can you tell us, sir, have you obtained writs simply to

15  allow the detectives to take prisoners out of an institution

16  so that they could be interviewed at the police headquarters?

17  A.  Many times.

18  Q.  Okay.  Can you give us an idea about how often your

19  office obtains writs for police interviews?

20  A.  Probably, if not on a daily basis, at least a weekly

21  basis.

22  Q.  Every week?

23  A.  Probably some detective either in the homicide unit, our

24  non fatal unit, or narcotics units is calling one of our

25  division asking for a writ to either take an individual out

1   to be charged or to be interviewed.

2   Q.  Okay.

3           THE COURT:  We're talking here strictly about

4   interviews?

5           THE WITNESS:  Yes, Your Honor.

6   Q.  Do you also request writs for prisoners to be brought to

7   court?

8   A.  That is correct.  There are two different types of writs.

9   There's a writ ad testificandum, writ of prosequendum that's

10  usually furnished by the clerk's office.

11  Q.  Okay.

12          THE COURT:  I'm sorry.  Could you explain that, Mr.

13  Kodeck, when you say furnished by the clerk's office?

14          THE WITNESS:  If you want a defendant or a witness

15  who happens to be incarcerated, you would go to the clerk's

16  office and with the case number and the defendant's name, ask

17  that a writ be issued to that particular institution at least

18  ten days prior to the date of trial so that it can be served

19  on the institution to produce the defendant, the individual

20  who's incarcerated.

21          THE COURT:  And do you need a judge's signature to

22  do that?

23          THE WITNESS:  That a judge's signature is then

24  appended to it.  Usually, I do not see the judge's signature

25  on that, but at the end of the day, I am sure that a group of

1    them are given to the judge in charge, who then signs it.

2    Q.  Okay.  Mr. Kodeck, I have two documents.  One is defense

3    exhibit 2, which is in evidence.  I'll ask you about that

4    first.

5              Have you had a chance to look at that document

6    before, Mr. Kodeck?

7    A.  I have.

8    Q.  Is there anything unusual about that writ, Mr. Kodeck,

9    from your experience?

10   A.  No, it is not.

11   Q.  Is that typical of the kind of writs that your office

12   would obtain for detectives to assist them in doing

13   investigations?

14   A.  Yes, it is.

15   Q.  Do you know why a true-test copy is used for actually

16   delivering the document to the institution of incarceration,

17   rather than an original copy of the writ?

18   A.  Yes.  The judge's signature does not go outside the

19   courthouse.

20   Q.  So who would have signed the signature that appears on

21   defense exhibit 2?

22   A.  Probably either a court clerk or someone in the clerk's

23   office.

24   Q.  Is it up to the clerk to look at the original of the writ

25   when it's brought to them?

1  A.  I can't answer that.  I'm not present when it's done, but

2  I have to believe so.

3  Q.  Okay.

4  A.  So they know what judge signed it and then to sign the

5  appropriate judge's name to it.

6         Now, in the clerk's office itself, they have a

7  preprinted name, whether depending on whatever of the 30

8  judges, that is then put on a copy, a blank copy, and is then

9  photographed, and it says the original will remain in the

10 courthouse.  The original of the judge's signature does not

11 leave the courthouse.

12 Q.  Okay.  And then the clerk signs the Judge's name, does

13 the clerk attempt to replicate the signature of the actual

14 judge?

15 A.  No, not necessarily, no, just in their own handwriting.

16        THE COURT:  Wait, wait, wait.

17        Is it your testimony, I can't believe what I'm

18 hearing.

19        I thought that they had these preprinted typed

20 post-its that they placed over the judge's actual signature,

21 which they then photocopy, and that becomes the copy.

22        Are you saying that somebody in the clerk's office

23 in his or her own hand purports to duplicate the judge's

24 actual script signature?  You're not saying that, are you?

25        THE WITNESS:  Yes, Your Honor.  It's done in one of

1  two ways.  The one I'm look at has Judge Waxter's signature I

2  can see it has been true-tested, so I can believe it's not

3  Judge Waxter's actual signature.

4           THE COURT:  So you think somebody in the clerk's

5  office purportedly got an original that did have Judge

6  Waxter's signature, and then in his or her own hand put Judge

7  Waxter's name purporting to be his signature on the writ; is

8  that what you're saying?

9           THE WITNESS:  That's what I am saying, Your Honor.

10  That is done.  That's the common practice that is done every

11  single day.

12           THE COURT:  So if the original were to get eaten up

13  by a rat in the basement of the Mitchell Courthouse or

14  something, no one would ever -- do the judges keep copies?

15           THE WITNESS:  Not that I'm aware of.

16           THE COURT:  Do the state's attorneys keep copies?

17           THE WITNESS:  In some instances, yes.

18           THE COURT:  Of the original signature?

19           THE WITNESS:  It doesn't leave the courthouse, so

20  if it's not a case that has an indictment or criminal

21  information, it would be either kept in the State's

22  Attorney's Office case folder, or the officer's case folder.

23           THE COURT:  Okay.  Go ahead.

24  BY MR. HARDING:

25  Q.  Do you know when this system was set up, Mr. Kodeck,

1  whereby the clerk signs the judge's name, rather than

2  actually reproducing the actual judge's signature?

3  A.  It was in existence when I got there in 1970.

4  Q.  And why was it set up that way?

5  A.  So the judge's signature wouldn't leave the courthouse.

6  Q.  Why don't they want the judge's signature to leave the

7  courthouse?

8  A.  Fearing of forgeries, which I know do exist, and when I

9  was in the economic crimes unit, unfortunately, prosecuted

10  individuals who attempted to pass documents that purported to

11  be the judge's signature on it.

12        THE COURT:  This is delicious.  This is absolutely

13  -- did you just hear what he said?  Is that --

14        MR. MARTIN:  They have their own forgery.

15        THE COURT:  Unbelievable.  By what the way, Mr.

16  Kodeck, Mr. Harding and I had sort of difference of recall,

17  or I guess, he was relying on what you told him.  My

18  recollection is that, about 12 or 15 years or so ago, there

19  was some really big blow-up, and I seem to recall it was

20  Judge Kenneth Johnson's signature got into the Division of

21  Corrections, and some inmate photocopied or traced over

22  something.  I think it Was judge Johnson's or some judge's

23  signature on a document, and that became sort of a cause

24  celebre, so to speak.  My recollection was it was at that

25  time, perhaps it was the second or third time the clerk's

1   office personnel for the Circuit Court for Baltimore City

2   became really aware of the danger, or so they thought of

3   allowing judges' signatures to go out on the mail in orders.

4   Is that at all consistent with your recollection?  It was

5   between 10 and 15 years ago.

6              THE WITNESS:  I think it preceded that.

7              THE COURT:  Do you think back during the Supreme

8   Bench days?

9              THE WITNESS:   Yes.

10             THE COURT:  Now, you would not have practiced in

11  the Circuit Court for Baltimore City, because they didn't do

12  criminal cases, right?  So would you be aware --

13             THE WITNESS:  What do you mean they didn't do

14  criminal?

15             THE COURT:  In other words, the Supreme Bench, you

16  had the criminal court.

17             THE WITNESS:  Right.

18             THE COURT:  Circuit Court does divorces and all

19  that stuff, they didn't do criminal cases.

20             THE WITNESS:  Okay.

21             THE COURT:  So my question is, would you be aware

22  of whether the Circuit Court for Baltimore City or the

23  Superior Court for Baltimore City, which was one of the

24  constituent parts of the Supreme Bench, would you being aware

25  of whether those courts sent judges' signatures out?

1          THE WITNESS:  That I can't answer.

2          THE COURT:  Right.  Okay.  So I mean, go ahead.

3   BY MR. HARDING:

4   Q.  So is it your testimony, then, Mr. Kodeck, that the

5   clerk, who was signing on behalf of the judge, does not

6   attempt to duplicate the judge's signature, because that will

7   in fact be counter to the policy of not allowing the

8   signature to leave the courthouse?

9   A.  That's correct.

10  Q.  Who set up this system?

11  A.  I can't answer that.  I do not know.

12  Q.  Would the clerks do it if the courts hadn't instructed

13  them to do it?

14         MR. SULLIVAN:  Objection.

15         THE COURT:  Sustained.  Maybe we do need Judge

16  Brown.  I had no idea that.

17         MR. HARDING:  Your Honor, I was prepared to call

18  Marian Soto also on this issue, but I thought it was

19  resolved, and I told her to go home, but I will bring her

20  back on Monday.

21         THE COURT:  I think, now that I understand that

22  clerk's office personnel, and I, of course, as you all know,

23  I was there for five years, I had no -- I never signed one of

24  these orders.  I'd love for somebody to produce one with my

25  signature on it.  It won't be my signature, I can guarantee

1  you that.

2           But the idea that clerk's office personnel in their

3  own hand purport to apply a judge's signature to a court

4  order, you know, it's just jaw-dropping.  It's absolutely

5  jaw-dropping.

6           In any event --

7  BY MR. HARDING:

8  Q.  Who is the writ addressed to, Mr. Kodeck?

9  A.  Usually, the warden of the institution where the inmate

10 is located.

11 Q.  Do prisoners get a copy of the writ?

12 A.  Not that I'm aware of.

13 Q.  Have you, in any of your cases, ever provided a prisoner

14 with a copy of a writ?

15 A.  There would be no reason to, no.

16 Q.  To your knowledge, Mr. Kodeck, has anyone ever challenged

17 the use of writs to bring prisoners to police headquarters

18 for interviews?

19 A.  None that I'm aware of, no.

20 Q.  Are you familiar with what's called a signing judge?

21 A.  Yes.

22 Q.  What is that?

23 A.  Up until recently, I guess for expedient purposes, they

24 assign, since we have two courthouses, they assign one judge

25 to each of the courthouses, and it's on a rotating basis,

1  depending on the judge's availability and their schedule.  So

2  a judge in the Courthouse East, which was the old federal

3  building, or the Clarence Mitchell Courthouse, are assigned

4  that additional duty.

5  Q.  Did you at my request speak to some judges about the

6  practice of doing writs this way?

7  A.  I did.

8  Q.  Who did you speak to?

9  A.  I spoke to Judge Lynn Stewart.  The reason I chose her

10  because not only was --

11        MR. SULLIVAN:  Objection.  Objection.

12        THE COURT:  Well --

13        MR. SULLIVAN:  For background, I don't have an

14  objection, but if we start getting into the hearsay of what

15  judge said.

16        MR. HARDING:  This is a suppression hearing.

17        THE COURT:  I understand hearsay is admissible, but

18  again, I'm smiling because Judge Stuart was my student in

19  criminal procedure.  So that may be a basis to sustain the

20  objection.

21        Go ahead.  Go ahead.  What did Judge Stuart tell

22  you?

23        THE WITNESS:  Judge Stuart, I showed her a copy of

24  a blank writ, which is similar to the one I have in front of

25  me.  Not only is she a judge on the Circuit Court, but she

1   was also a former prosecutor in our homicide unit.

2           I'd asked her if she'd ever seen one of these or

3   signed it, and she acknowledged both many times.  She then

4   referred me to Judge Brown, because he had sat on the bench

5   for a longer period of time than she did.

6           I proceeded to Judge Brown, who was in the midst of

7   the trial.  He motioned me to the bench, I showed him the

8   writ.  He said I signed many of these during my tenure in the

9   same format, as I indicated earlier.

10  BY MR. HARDING:

11  Q.  One other question, Mr. Kodeck.  I'm showing you

12  government's exhibit I, and I believe I have a copy for

13  defense counsel.

14          You testified earlier about the fact that the Court

15  also issues writs.  Can you tell us what government exhibit I

16  is?

17  A.  That's one of the writs where you would go to the clerk's

18  office and get either a writ, habeas corpus, when you wanted

19  a -- either a defendant or witness that is incarcerated to be

20  served with a summons to be produced on the date of trial.

21  Q.  Okay.  And can you read at the bottom, does it talk about

22  a person coming to court and testifying?

23  A.  Yes.  It says and shall give his testimony before said

24  court to return to said prison and have you then and there

25  this writ.

1  Q.  Okay.  Is there any explanation of the prisoner's Miranda

2  Rights there on -- his right not to testify on the writ?

3  A.  The writ ad testificandum?

4  Q.  Yes.

5  A.  There is not.

6  Q.  But it's addressed to the warden or the custodian of the

7  prison?

8  A.  To the commissioner of correct, that is correct.

9  Q.  To your knowledge, would a prisoner who was being brought

10  over get a copy of that writ?

11  A.  Not that I'm aware of.  It would go to the institution

12  more of a transportation order to that particular institution

13  to deliver the prisoner to the assigned court as outlined in

14  the document.

15          MR. HARDING:  And I an moving in exhibit I.

16          Does the Court want to follow the local rule of

17  just admitting an exhibit automatically?

18          THE COURT:  Sure.

19          MR. HARDING:  One moment.

20          (Pause.)

21          MR. HARDING:  No further questions, Your Honor.

22            (Received in evidence.)

23              CROSS-EXAMINATION

24  BY MR. SULLIVAN:

25  Q.  Mr. Kodeck, is that how you pronounce your name?

1   A.   Kodeck, uh-huh.

2   Q.   Do you agree with me, just before I start questioning

3   you, no one thought that a woman not being able to vote was a

4   problem until it became a constitutional problem?

5   A.   It's never a problem until it becomes a problem.

6   Q.   Would you agree with me that keeping African Americans

7   out of public places was never perceived to be a problem by

8   some until it became a problem and resulted in the civil

9   rights out?

10  A.   Again, not a problem until it becomes a problem.

11  Q.   Just the fact that nobody's ever challenged at whatever

12  street the Court is over there, doesn't mean there might not

13  be a problem; would you agree with that?

14  A.   I will agree with that.

15  Q.   Now, let me ask you, you're Deputy State's Attorney for

16  Baltimore City, correct?

17  A.   That's correct.

18  Q.   Been there for 30 years?

19  A.   35.

20  Q.   35?  You started when I was seven.

21       Are you in charge of the policy in that office?

22  A.   I am not.  Miss Jessemy in charge of the policy.

23  Q.   I'm sorry, Your Honor, I was eight.

24       Do you help in the implementation of policy?

25  A.   I do.

1  Q.  In your 35 years, in implementation of policy, have you

2  ever sought an opinion by the Attorney General's office, or

3  any other government agency, about your office's use of the

4  writ?

5  A.  Not that I'm aware of, no.

6  Q.  You're familiar, are you not, sir, with I guess what it's

7  called the Annotated Code of Maryland, right?

8  A.  I think I know about it, yes.

9  Q.  And you're also familiar with the section of the

10  Annotated Code of Maryland that deals with habeas corpus?

11  A.  Yes.

12  Q.  And just so we can speak at the same level, let me show

13  you what's been marked as exhibit 15.  Take a look at that,

14  sir, and tell me if that looks like a fair and accurate

15  representation of Section 3701 of the Criminal Proceedings

16  Article of the Annotated Code of Maryland?

17  A.  It appears to be.

18  Q.  And you just said you're familiar with this, right?

19  A.  Yes.

20  Q.  Could you look at this, sir, and tell me where the

21  authority is for a State's Attorney to get this type of writ

22  in any Maryland County?

23  A.  I don't see it outlined in here.

24  Q.  Right.  In fact, you know, because you're experienced and

25  you've been in that office, Section 3702, on the next page,

1  sets forth individuals who could make these kind of

2  petitions, right?

3  A.  Yes.

4  Q.  And would you agree with me, sir, that nowhere in Section

5  3702, or nowhere in Section 3701, the habeas corpus section

6  of the Annotated Code, is there deliberated the right of the

7  State's Attorney's Office for any Maryland County, including

8  the City, to act as your office acts in obtaining these

9  writs?

10         (Pause.)

11  A.  That's correct.

12  Q.  Now, this concept of a signing judge, these types of

13  writs, sir, they don't go up with any application or

14  petition, do they?

15  A.  They do not.

16         THE COURT:  They don't?  There's no application?

17         THE WITNESS:  No, Your Honor.

18  Q.  So because there's no application, and there's no

19  petition, a judge, whether he or she be the signing judge or

20  anything, has no background of why somebody's asking for the

21  writ, somebody being your office, by the way?

22  A.  Other than what is contained in the writ itself.

23  Q.  Okay.  And there's no court hearing, correct?

24  A.  There is not.

25  Q.  And there's no official recording of the proceedings

1   either tape recording or court reporter, correct?

2   A.  There is not.

3   Q.  Because there's never a hearing?

4   A.  No.

5   Q.  And, in fact, we don't even really know where the

6   original writ with the original judge's signature is?

7   A.  That is correct.

8   Q.  Okay.  And we also know that, whatever happens over

9   there, clerks forge people's names, and outsiders forge

10  people's names, those being judges, we don't even have real

11  judge's signatures on that exhibit that the government's

12  provided you, correct, that of Judge Waxter?

13  A.  I wouldn't classify it as a forgery, no.

14  Q.  But that's not Judge Waxter's signature, is it?

15  A.  In all likelihood, it is not.

16          THE COURT:  I'm sorry.  I'm sorry to interrupt, Mr.

17  Sullivan, just to try to clarify.

18          When you say in all likelihood it is not Judge

19  Waxter's signature, you're saying that because you have a

20  copy there with what purports to be a judge's signature, and

21  you know under the policy and practices that your office and

22  the Court have followed that that should never happen,

23  correct?

24          THE WITNESS:  That is correct, Your Honor.

25          THE COURT:  So you should not be sitting anywhere

1  looking at a piece of paper with what purports to be a

2  judge's signature on it, that is a copy, that is not actually

3  that judge's signature?

4            THE WITNESS:  Not if it's stamped as a true-test

5  copy, it should not.

6            THE COURT:  I'm sorry?

7            THE WITNESS:  If it's stamped, as it is in this

8  case a true-test copy, I would believe that would not be

9  Judge Waxter's signature.

10            THE COURT:  Now, I'm really confused.  Wait a

11  second.

12            Assuming Judge Waxter in fact signed that order,

13  someone from your office would have picked it up from his

14  chambers or would he have sent it together with I guess other

15  papers to the clerk's office, or to your office?  Where does

16  it go?

17            THE WITNESS:  A clerk from our office or intern

18  from our office would pick it up and then take it to the

19  Clerk's office to get it true-tested, and then turn over the

20  true-test copy to the detective.

21            THE COURT:  So the intern from your office would go

22  to Judge Waxter's chambers, pick up the paperwork, take it to

23  the clerk's office, and someone in the clerk's office would

24  look at Judge Waxter's original signature on what purported

25  to be the original writ, do I have that right so far?

1             THE WITNESS:  That is correct.

2             THE COURT:  And then someone, perhaps that same

3  person, would take a blank of that document?

4             THE WITNESS:  Would make a copy, that's correct.

5             THE COURT:  Would make a copy of what?

6             THE WITNESS:  Make a copy of the writ, blank.

7             THE COURT:  But Judge Waxter has already signed the

8  original, so how do you make a copy?

9             THE WITNESS:  Putting a piece of paper over the

10  Judge's signature so they can true-test it without the

11  original signature appearing on the copy.

12            THE COURT:  May I see that exhibit, please?

13            So you're saying the photocopy is made by covering

14  the entire, I see.  Okay.  So that's -- that's an S/?

15            THE WITNESS:  That's correct, Your Honor.

16            THE COURT:  So the original would have been covered

17  over before it was photocopied?

18            THE WITNESS:  That's a possibility.  Or that could

19  have been a blank which was a blank copy, and merely given to

20  the clerk along with the original signed by the judge so that

21  that clerk can then pen Judge Waxter's signature and

22  true-test it as it appeared on the original.

23            THE COURT:  Okay.  Thank you.

24            Go ahead, Mr. Sullivan.  I'm sorry.

25  BY MR. SULLIVAN:

1  Q.  Thank you, Your Honor.  Mr. Kodeck --

2  A.  Just like the camera spelled differently.

3  Q.  Just so I understand it, this is Mitchell exhibit number

4  2, this is --

5          THE COURT:  It's actually a copy of a true-test

6  copy, just so we're clear go ahead, Mr. Sullivan, I'm sorry.

7  Q.  It's true-tested, but there's no disagreement here that

8  this is not Judge Waxter's signature, so it's not a true-test

9  of the original?

10  A.  That is correct.

11  Q.  Which, based on your experience as an attorney and as the

12  Deputy State's Attorney, you know a true-test usually is a

13  representation --

14  A.  Of the original, that is correct.

15  Q.  -- of a copy of the original, which is not this case?

16  A.  It is not in any case, because the original would not

17  have gone out of the courthouse, so they would not replicate

18  the judge's signature.

19  Q.  Did you look for the original of this one?

20  A.  I'm not involved in this case, no.  I would have no idea

21  where to even begin to look.

22  Q.  As head of policy for the State's Attorney's Office, do

23  you keep a file for all these writs that your office obtains?

24  A.  One file?

25  Q.  Right.

1  A.  No.

2  Q.  So they're spread out through the hinder lands, a

3  different case folder?

4  A.  Different units, different case folders whether it is our

5  case folder or the detective's case folder.

6  Q.  But the detective would never have one that has the

7  original judge's signature?

8  A.  Should not.

9  Q.  Because it should never leave the building?

10  A.  That's correct.

11  Q.  Do even know, is there any record, sir, that Judge Waxter

12  even saw this document?

13  A.  I can't answer that.  I do not know.

14  Q.  And just so I understand it, does a clerk in your office

15  walk these writs to the signing judge?

16  A.  Yes.

17  Q.  And then that's the extent of what happens, somebody

18  walks it to the signing judge, the signing judge signs it,

19  and then it gets carried to the office, and this true-test

20  procedure happens, and then it gets carried back to your

21  office to be picked up by a detective?

22  A.  That is correct.

23  Q.  Okay.  Is it a routine policy, in your office, to approve

24  writs to get somebody out of jail whose already in custody to

25  be transported to the homicide division for questioning, or

1  interviewing, or interrogation, however you want to phrase

2  it?

3  A.  Yes.

4  Q.  And that happens weekly?

5  A.  Yes.

6  Q.  Based on the same process where somebody who's already in

7  custody on an unrelated charge, your clerk walks to the

8  signing judge with this writ, the signing judge signs it, the

9  clerk takes it to the clerk's office, who puts this fake --

10  well, this non judge signature, well, it is a judge, you know

11  what I mean, and then takes it back to the State's Attorney's

12  Office, for your office to call the detective to say the

13  writ's here, the detective comes and picks up the writ, goes

14  gets the inmate out of jail to take him to homicide?

15  A.  That is correct.

16  Q.  That is a routine occurrence here in the city?

17  A.  It is.

18  Q.  What is it based on legally?

19  A.  I can only answer that it was in existence when I got

20  there, the Circuit Court, in 1972.

21  Q.  So there is no discussion, based on what we've just

22  talked about, nobody from your office makes a representation

23  to the judge that, for example, this person wants to talk to

24  our homicide detectives, or this defendant is cooperating in

25  another murder, or this defendant is -- we want to

1  interrogate this defendant because we think he did this other

2  murder, the circumstances aren't made known to the judge, are

3  they?

4  A.  In all likelihood, no.

5  Q.  Because there's nothing else besides that form itself,

6  right?

7  A.  That is correct.

8  Q.  Okay.  Now, government's exhibit I, do you have that in

9  front of you, sir?

10  A.  Yes, I do.

11  Q.  Now, this is a writ that requires somebody to produce the

12  body of a criminal defendant in court, correct?

13  A.  That is correct.

14  Q.  For a judicial proceeding in court?

15  A.  That is correct.

16  Q.  For an arraignment, motions hearing, trial, testifying,

17  or sentencing, right?

18  A.  Any type of hearing that's schedule scheduled, that is

19  correct.

20  Q.  So this kind of order, does this have a petition with it,

21  or an application?

22  A.  It does not.

23  Q.  So, again, this is just a one-page document that goes in

24  the same process, clerk from your office, to signing judge,

25  to clerk's office, back to your office?

1  A.  That is correct, with one addition.  In every case where

2  a defendant is incarcerated, the Department of Correction,

3  these writs will automatically be issued by the clerk's

4  office when the location of the defendant is known to the

5  clerk so that the body of that defendant can be produced in

6  court for a hearing.  So it's not always generated by my

7  office.

8  Q.  Is this document generated by your office, or by the

9  court itself?

10  A.  By the clerk's office.

11  Q.  The clerk of the court?

12  A.  That's correct.

13  Q.  So this document that Mr. Harding just showed you,

14  government's exhibit I, is a standard habeas writ form that

15  the Baltimore City Circuit Court Clerk's office uses?

16  A.  That is correct.

17  Q.  Okay.  Now, the habeas corpus subject condemn whatever it

18  is you have before you, that is not a preprinted form?

19  A.  I don't have it in front of me.  I think Judge Davis has

20  it.

21        THE COURT:  Here it is.

22  Q.  That form, sir, is not a preprinted form by the office

23  for the Circuit Court for Baltimore City, correct?

24  A.  That is correct.

25  Q.  That form is a creation of the State's Attorney's Office

1  for Baltimore City?

2  A.  I have to believe so.  As I said, it was in existence

3  when I got into the office.

4  Q.  In your 35 years, has it retained its form for that

5  period of time, is this form we're looking at now?

6  A.  Pretty much the same.

7  Q.  I didn't mean to talk over you.

8  A.  I'm sorry.  I'm saying pretty much the same.

9  Q.  Now, do these writs, aside from what we've talked about,

10 I think you've told Mr. Harding that they get used for

11 somebody to be charged, or someone to be interviewed, are

12 there other reasons or other ways these writs are used?

13 A.  Not that I'm aware of, either to be interviewed or to be

14 charged, when I make reference to the charge that the

15 defendant is in jail on another charge, they get, the

16 detectives will get a writ out to charge that individual, to

17 take them to CBIF, to get them booked on the new charge.

18          THE COURT:  That's the weird thing about this case,

19 because in this case the defendant was in fact at CBIF.  The

20 court commissioner was right there at CBIF, and an arrest

21 warrant had already been issued for the defendant. So all

22 that would have been necessary is for the defendant to be

23 presented to a court commissioner, and that's all that was

24 required.

25          So that's this case.  You're aware of that, this is

1    this case.

2              THE WITNESS:  I'm not aware of the facts of this

3    case at all, Your Honor.

4              THE COURT:  Does that scenario strike you as odd?

5    Or I guess it doesn't.

6              THE WITNESS:  No.

7              THE COURT:  The fact that a person is at Central

8    Booking, and the fact there's an arrest warrant issued for

9    that person, and the police have the arrest warrant, that

10   doesn't take the case outside of the normal procedure of take

11   him over to homicide, or the drug unit, whatever, and then

12   take him back to CBIF?

13             THE WITNESS:  As the procedure is presently set up,

14   no, because in order for the detectives to get the body from

15   CBIF to take to police headquarters to be interviewed, they

16   need some document.

17             THE COURT:  I understand that.  I understand that.

18   My point is, do they need a document to take him from the

19   unit where he's being housed down to the commissioner for the

20   purpose of presenting the new charge in front of the

21   commissioner?

22             THE WITNESS:  That's all within the same

23   institution, Your Honor.

24             THE COURT:  Okay.  Go ahead.

25   BY MR. SULLIVAN:

1  Q.  Based on your experience, if a homicide division

2  detective wanted, for example, a blood sample from a

3  defendant, could they use this habeas corp form?

4  A.  No, they could not.

5          THE COURT:  They couldn't?

6          THE WITNESS:  Just to take a blood sample?

7          THE COURT:  Yes.

8          THE WITNESS:  No, Your Honor.

9  BY MR. SULLIVAN:

10  Q.  Let me show you what's been marked as Mitchell exhibit

11  14.  Let me have you take a look at this, and tell me, sir,

12  is that not the identical form to have Mr. Mitchell appear at

13  Mercy Hospital to give a blood sample?

14          (Pause.)

15  A.  It's the same form.

16  Q.  And tell Judge Davis, what is it ordering?

17  A.  To give a blood sample.

18  Q.  At Mercy Hospital?

19  A.  Yes, it.

20  Q.  For Willie Mitchell?

21  A.  Yes, it does.

22  Q.  To give it at 9:30 a.m., on Monday, September 16, 2002,

23  to give a blood sample then and there to be present and

24  immediately after the said Willie Mitchell, black male, SID

25  number, date of birth, shall have given his give a blood

1   sample before the said Mercy Medical Center to return him to

2   said prison and have you then and there this writ, issued by

3   what, again, was this the original signature of this judge,

4   to your knowledge?

5   A.  I do not know.  I am not a swear of judge's original

6   signature.  There's not a true-test on here, so I can't

7   answer that.

8           THE COURT:  There is not a true-test on there?

9           THE WITNESS:  Not on this one.

10          THE COURT:  So there's a signature, but not on a

11  true-test?

12          THE WITNESS:  Not on this document I'm shown.

13          MR. SULLIVAN:  I'm going to substitute this

14  document and let the Court look at Mitchell 14.

15          THE COURT:  Thank you.

16  BY MR. SULLIVAN:

17  Q.  Now, correct me if I'm wrong, sir, but you just told me

18  you can't use this type of writ for a blood sample, and I

19  just showed you that your office does?

20  A.  I would not use such a writ.

21  Q.  You're the Deputy State's Attorney, 35 years, head of

22  policy?

23  A.  I am not head of policy.

24  Q.  Involved in policy, or operations?

25  A.  Yes.

1  Q.  Oh.  So operations is really the meat of your office,

2  that's actually prosecuting people and getting them

3  convicted, right?

4  A.  That is one of the elements, yes.

5  Q.  So as the head of policy -- I mean, head of operations,

6  you don't know that your office is getting these writs for

7  blood samples for criminal defendants in your city?

8  A.  I am not aware of this particular writ, no.

9  Q.  You mean this particular writ, as used for blood samples?

10  A.  That's correct.

11  Q.  Not this particular writ?

12  A.  This particular writ for a blood sample.

13  Q.  Because the writ had existed since you started in 1970?

14  A.  That's correct.

15  Q.  Now, turn to page 2.  Have you ever seen this form

16  before?

17  A.  I have not.

18         MR. HARDING:  Judge, I'm going to object to this

19  line of questioning, because it's months after the statement

20  that is at issue for voluntariness in this case.  It's not

21  relevant.

22         MR. SULLIVAN:  Your Honor, can I answer or --

23         THE COURT:  Well, yes.  Why don't you respond

24  briefly, Mr. Sullivan?

25         MR. SULLIVAN:  One of the issues for voluntariness,

1  obviously, is a pattern of misconduct is entirely appropriate

2  for the Court to consider as intend circumstances of this

3  whole behavior.  I'm not going into specifics of it.  I'm

4  just asking a couple question, because this is not an

5  aberration, and that is what this is designed to prove.

6          THE COURT:  Well, you know, I thought that I

7  understood what all this was about, and now it's reasonably

8  clear to me that I have no idea.

9          This is, to my mind, fairly remarkable, this

10 evidence, and I want to be very clear for Mr. Kodeck, I have

11 known quite a while and respect highly, it sounds like this

12 isn't a criticism of you, Mr. Sullivan, it sounds like a

13 criticism of the State's Attorney's Office, in part, but you

14 know, I don't really fault the State's Attorney or the

15 Baltimore City Police for taking advantage of whatever the

16 system offers them.

17         I mean, I don't fault them in any moral sense.  I

18 mean, the law is the law, and the Court will certainly

19 consider the law.

20         With all respect, the judges are willing to even be

21 listed in the work of the executive branch, then so be it.  I

22 mean, really, this is really remarkable, but I don't know,

23 Mr. Harding, that I can foreclose Mr. Sullivan any more than

24 I would have foreclosed you, although I thought that there

25 wasn't need to go into this, I don't think I'm prepared to

1    foreclose Mr. Sullivan to make a full record here.

2              This is really remarkable stuff.  And it seems that

3    at every turn there's some new disclosure, some new

4    development, that I'm really just somewhat flabbergasted by

5    some of what I heard so far.

6              Again, that's not to say for one second how the

7    Court's going to rule on the motion to suppress.  After all,

8    let me remind us, that's what we're dealing with here.  And

9    as a result of the way the Baltimore City criminal justice

10   system operates, we've now gone pretty far out there, into

11   all kinds of areas that, in my humble opinion, judges were

12   doing what they were supposed to be doing, and if state's

13   attorneys and law enforcement officers were prudent, perhaps,

14   if I can use that word, we wouldn't be spending the time that

15   we're spending on this.

16             But now that we've, you know, sort of lifted the

17   lid off the box, or not the lid, ajar, I don't see how I can

18   cut off inquiry here.

19             So I continue to think that most of these are

20   really issues of law that the Court will have to grapple

21   with, but it is clear that there are indeed factual

22   circumstances that need to be fully explored, not the least

23   among them what Mr. Sullivan just said about whether any of

24   this is aberrational or whether it's a standard operating

25   procedure.

1          So it's just extraordinary.  It's truly

2    extraordinary.  So the objection's overruled.  We're not

3    going to finish Mr. Kodeck.

4          How much more do you have, do you think, Mr.

5    Sullivan?  I realize you're listening to Mr. Martin.

6          MR. SULLIVAN:  I'm sorry, Your Honor.

7          THE COURT:  How much more do you have?

8          MR. SULLIVAN:  Not very much with Mr. Kodeck, five,

9    ten minutes.

10          THE COURT:  Five minutes, okay.  The objection's

11    overruled.  Go ahead.

12    BY MR. SULLIVAN:

13    Q.  Sir, I asked you on page 2 of the exhibit in front of

14    you, are you familiar with this request form?

15    A.  I have not seen that before, no.

16    Q.  Okay.  So that you're the director or head of operations

17    for the Baltimore City State's Attorney Office, you've never

18    seen this form, but do you know Carrie Bower is?

19    A.  Yes, she's an assistant in our office.

20    Q.  Now, just for clarity's sake, as head of operations, your

21    office does probably routinely, and correct me if I'm wrong,

22    go to court to get a court order signed by a judge based on a

23    motion for a blood sample from a defendant?

24    A.  Yes.

25    Q.  Okay.  And for a saliva sample or DNA.  But when you do

1  that, you get a court order filing a motion serving the

2  parties and have a judge determine that, correct --

3  A.  Yes.

4  Q.  -- after a hearing?

5  A.  Yes.

6  Q.  Okay.  And there is no hearing on these -- on this habeas

7  corpus, right?

8  A.  Under the way you frame it, no.

9  Q.  It's not the way I framed it.  Didn't you testify that

10 these types of habeas corpus gets taken by the clerk to a

11 signing judge?

12 A.  That is correct.

13 Q.  Do you have any reason to believe that this one for the

14 blood sample of Willie Mitchell at Mercy Hospital was treated

15 any differently than the one in April 2002 directing Mr.

16 Mitchell to appear at the homicide division for an interview?

17 A.  No, I'm not.

18           MR. SULLIVAN:  Thank you, Your Honor.  Thank you,

19 sir.

20                  REDIRECT EXAMINATION

21 BY MR. HARDING:

22 Q.  Mr. Kodeck, it was pointed out to you just now on cross

23 that there is an S and is slash next to the judge's signature

24 on defense exhibit number 2, the writ for Willie Mitchell?

25 A.  Yes.

1  Q.  Is there also someone's initials?

2  A.  That's the true-test.  Initials that are under the

3  true-test, a clerk in Mr. Conaway's office would have put

4  those on there.

5  Q.  Okay.  Would that be the clerk who did the true-test copy

6  and perhaps signed the judge's signature?

7  A.  I would believe so, yes.

8  Q.  Are you aware, sir, that in connection with your

9  testimony about there being no application or motion for the

10  writ, are you familiar with the practice in Federal Court of

11  a magistrate issuing writs similarly without any kind of

12  application or motion?

13  A.  I am not.  I have never practiced in Federal Court.

14  Q.  Can you tell us where in the current procedure is an

15  arrest warrant served, if a prisoner is incarcerated at CBIF,

16  where is the arrest warrant served?

17  A.  It would be served on the prisoner at CBIF.  Once a writ

18  is issued, the defendant is then taken to the Court

19  commissioner at CBIF, booked and processed, and then within

20  24 hours, sees a court commissioner.

21  Q.  Okay.  Booked and processed and then sees a court

22  commissioner.  When is the warrant actually served?  When

23  would you say that occurs?

24  A.  At the time that he is formally charged would be the time

25  he sees the Court commissioner.

1   Q.   So it's done in the presence of the Court commissioner?

2   A.   Yes.

3   Q.   Or by the Court commissioner?

4   A.   Well, we have a liaison officer who is there, who

5   actually does the presentation, and then he see, he or she

6   will see a court commissioner.

7   Q.   So it's not the current procedure, correct me if I'm

8   wrong, to have the detective who obtained the arrest warrant

9   serve the prisoner at the time of arrest?

10  A.   That is certainly possible.  He could serve the arrest

11  warrant on the prisoner, sure.

12  Q.   He could?

13  A.   Yes.

14  Q.   Is it his option or what?

15  A.   He will give him a copy of the arrest warrant, and then

16  he could transport or have him transported to CBIF to see a

17  court commissioner.

18  Q.   Okay.  Would there have been a representation of the

19  warrant for arrest?

20  A.   At the time he sees the Court commissioner, the Court

21  commissioner advise him of his rights, what he's charged

22  with, what his exposure is, that he has a right to counsel,

23  and whether or not he wants a preliminary hearing, that he's

24  entitled to that.

25            MR. HARDING:  One moment, Your Honor.

1          (Pause.)

2          MR. HARDING:  No further question, Your Honor.

3          THE COURT:  Mr. Sullivan?

4              RECROSS-EXAMINATION

5    BY MR. SULLIVAN:

6    Q.  Sir, let me just understand, when you said there is a

7    liaison at CBIF, a liaison from whom, for what?

8    A.  From the police department who actually does the serving

9    of the warrant, if a defendant is arrested.

10   Q.  So is this in -- this liaison, is it 24/7?

11   A.  I believe it is, yes.

12   Q.  So there is always a Baltimore City Police officer at

13   CBIF to facility at any time the service of an arrest warrant

14   on a defendant who's already in custody?

15   A.  That is correct.

16          MR. SULLIVAN:  Thanks.

17          THE COURT:  Mr. Kodeck, thank you very much for

18   coming over.  I have just a few, I think, very quick

19   questions.  They're largely academic, I think.

20          Does this procedure that you testified about apply

21   outside of Baltimore City; that is, for a defendant who say

22   is in the custody of Howard County Detention Center, who is

23   --  for whom there's developed probable cause to arrest for

24   an antecedent offense in Baltimore City, an arrest warrant is

25   obtained by the police, would this procedure be used?

1          THE WITNESS:  Procedure of this writ?

2          THE COURT:  Yes, to get him from Howard County?

3          THE WITNESS:  Yes, if he's in the Howard County

4    Detention Center, yes.

5          THE COURT:  So the Baltimore City Police would

6    drive out to Howard County with one of these writs, present

7    that to the warden out that Howard County, bring him back to

8    homicide here in Baltimore, and conduct --

9          THE WITNESS:  To be interviewed.

10          THE COURT:  To be interviewed?

11          Now, is there any requirement -- first of all, does

12    it matter whether an arrest warrant has already been issued

13    before the judge issued this writ?

14          THE WITNESS:  No.  The defendant could have already

15    been incarcerated.  The defendant could have been arrested on

16    the arrest warrant, already been in jail, and the individual

17    could be incarcerated, the writ could have been obtained,

18    days, weeks later.

19          THE COURT:  Okay.  Let me sure you understand my

20    question.

21          Does it matter -- does it matter whether an arrest

22    warrant has been issued for the defendant before the judge

23    issues the writ authorizing his transportation to Baltimore

24    City Police Department?

25          THE WITNESS:  No.

1          THE COURT:  So a person, say, serving a sentence in

2    Carroll County, a person serving a sentence on an unrelated

3    charge in the Division of Corrections, a person at the

4    Central Booking, who's just been arrested, you know, the day

5    before, on some charge, none of that matters if the police

6    department asks your office to obtain a writ to go get one of

7    these people, your office will present the request to a

8    judge?

9          THE WITNESS:  That is correct.  It's merely a

10   transportation order, Your Honor.

11         THE COURT:  Well, it's not merely a transportation

12   order.  I understand what you mean by that.  It calls itself

13   a writ.

14         THE WITNESS:  That's correct.

15         THE COURT:  It's not an order issued by a judge

16   directing a transportation, but I understand what you mean, I

17   think.  Okay.

18         So is there any obligation on the detectives or the

19   officers to actually serve an arrest warrant?

20         In other words, would it be within the discretion

21   of a law enforcement officer to get the warrant, or any

22   warrant, because they, obviously, under Miranda they don't

23   have to question him about what they have the warrant for,

24   they can question him about anything provided they comply

25   with Miranda.

1          So my question is, is it possible, within the

2   discretion of the officer, to get a writ, pick up the person,

3   bring them to the homicide or the drug unit, wherever,

4   conduct the interview, and then just take him back to Central

5   Booking or take him back to Carroll County and not execute

6   the arrest warrant?

7          THE WITNESS:  No, Your Honor.  Because I believe

8   the officers would be charged with responsibility, and they

9   know of existence of an arrest warrant, they would have to

10  book that prisoner on the arrest warrant.

11         THE COURT:  Why?  If the person is in custody in

12  Howard County, for driving on a suspended license, and they

13  get a homicide warrant in Baltimore City, if I understand

14  your testimony, they're not really arresting him when they go

15  to Howard County and bring him to Baltimore City.  They're

16  not arresting him.  They are acting under the authority to

17  transport and question.

18         So what in law would require them to do anything

19  other than return him to Howard County?

20         THE WITNESS:  I would answer that by saying if they

21  return him to Howard County, and for whatever reason the

22  defendant makes bail, then the defendant could certain skip.

23  They would want to have that warrant act as a detainer to

24  make sure that defendant doesn't leave.

25         THE COURT:  Great.  I'm not suggesting for one

1    second that any officer would ever do what I'm suggesting.

2            My question is, is there any compulsion on the

3    officer, not practical compulsion, person may skip, you're

4    right, is there a legal compulsion, is there a legal

5    compulsion that if you can get, if you can seize a person

6    from a detention facility under the authority of a writ, you

7    just said it didn't matter whether an arrest warrant had been

8    issued previously or not.  So it's hard for me to understand

9    what would be the source of any legal compulsion under McNab,

10   Mallory, or Maryland Annotated Code, if you're really not

11   arresting the person, all you're doing is seizing him at the

12   detention center facility, bringing him to homicide,

13   conducting the interview, what is there that would prevent

14   the detective from simply taking him back, especially if he's

15   on a no bail situation?

16           THE WITNESS:  I believe the officer's obligated, if

17   once they know an arrest warrant is in existence, they must,

18   and they know the existence of that warrant, then they should

19   book that person.

20           MR. HARDING:  Could I ask a question?

21           THE COURT:  We know that's not true.  There's no

22   obligation on a law enforcement officer to effect an arrest

23   at any particular time, unless the obligation is -- what I am

24   getting at is the obligation is to present an arrestee to a

25   judicial officer within a certain amount of time after

1    arrest, what I'm trying to understand is how the judicial

2    legal system of Maryland would be able to tell when an arrest

3    occurs for purposes of prompt presentment and all of that, if

4    in fact you can get a court order that rides on top of an

5    arrest warrant, that permits you to do exactly the same thing

6    that an arrest warrant permits you to do without the

7    requirement of prompt presentment.  That's what I am trying

8    to explore with you.

9            Again, I'm not suggesting that a law enforcement

10   officer would take a risk of doing such a thing.  It is hard

11   to imagine why he would, but I'm trying to explore this whole

12   practice and the development I heard about.

13           Can you identify any legal compulsion on a law

14   enforcement officer to do anything other than simply return

15   the person to the detention center?

16           THE WITNESS:  No, Your Honor.

17           THE COURT:  All right.

18           THE WITNESS:  I may also add, Your Honor, in my

19   experience, I've also taken federal prisoners, I know, from

20   institutions, and they have honored this writ along with a

21   court order.

22           THE COURT:  Well, the institution's going to honor

23   the writ.  Again, let's be very clear.  It's not a warden in

24   the world who's going to be presented with a piece of paper

25   from a court say no you can't have him.

1          That's not the question at all.

2          So there's no application.  So the judge just comes

3    off the bench, there's a stack of papers there, and the judge

4    just signs whatever's there.

5          I mean, if the judge's secretary says these were

6    brought up by the state's attorney, and it says writ habeas

7    corpus, ad sub, or ad test, or ad pros, the judge just signs

8    them, actually, again, I'm sorry, the ad pros and the ad

9    test, are issued by a clerk, and you don't need the judge's

10   signature?

11         THE WITNESS:  The judge signs it, yes.

12         THE COURT:  A judge does sign it?

13         THE WITNESS:  Yes.

14         THE COURT:  Does the judge sign an order, which

15   authorizes the clerk to issue the writ, or does the judge

16   actually sign the writ?

17         THE WITNESS:  At the end of the day, I'm told, and,

18   again, I think Miss Soto can address that, at the end of the

19   day, the writs, which is government's exhibit I, they are

20   issued.  They are submitted by the Clerk of the Court, to the

21   administrative judge, or judge in charge of criminal to sign,

22   they're then true-tested and sent to the various

23   institutions.

24         THE COURT:  Okay.  Did you have another question,

25   Mr. Harding?

1                    REDIRECT EXAMINATION

2  BY MR. HARDING:

3  Q let me show you what's already been admitted into evidence

4  as government exhibit E, the arrest warrant for Willie

5  Mitchell.  Can you read the line that begins "you are

6  ordered?"

7  A.  You are ordered to arrest and bring before judicial

8  officer the above named defendant as soon as practicable and

9  without unnecessary delay.  If a judicial officer is not

10 readily available, this warrant shall authorize the

11 prisoner's detention until such compliance has with Rule

12 4-212, any arresting officer is inquired to comply with Rule

13 4-212.

14            MR. HARDING:  Thank you.  No further questions.

15                    RECROSS-EXAMINATION

16 Q.  And could you also, this arrest warrant where it says

17 take it before the judicial officer as soon as practicable

18 without unnecessary delay, this could be given to that

19 Baltimore City liaison officer in the facility, right?

20 A.  It could be.

21 Q.  And that would not -- that would be very practicable,

22 right?

23 A.  If the defendant is in that institution, yes.

24 Q.  Assuming he's in that institution?

25 A.  Yes.

1  Q.  It would be very practicable, and it would be no delay

2  right, in serving this arrest warrant?

3  A.  That would be idealistic if it is done that way.

4  Q.  And it is not to take him to the homicide and division,

5  and then bring him back and then to serve him, that's pretty

6  delay prone, isn't it?

7  A.  Possibly.

8            MR. SULLIVAN:  Thank you, sir.

9            THE COURT:  Professor Kurland, I think you have a

10  great argument.

11            MR. KURLAND:  I have a lot of them, Judge.

12            THE COURT:  Quite right.  All right.  Thank you,

13  counsel.  We're in recess until 2:30.

14            (Luncheon recess.)

15            THE COURT:  Shall we return to detective -- no?

16            MS. MANUELIAN:   No, Your Honor.  We're going to

17  take Officer Saladino out of order, all of five minutes, and

18  this concerns Shawn Gardner's statement back in June of 2002.

19            THE COURT:  All right.

20            (Pause.)

21            (The Witness is sworn.)

22            THE CLERK:  Be seated.  Scoot up and speak directly

23  toward the mike.  State your name for the record.

24            THE WITNESS:  Officer Eric Saladino, S A L A D I N

25  O.

130

1                    DIRECT EXAMINATION

2  BY MS. MANUELIAN:

3  Q.  Officer, where you employed?

4  A.  Baltimore County Police Department.

5  Q.  How long have you been with the Baltimore County Police

6  Department?

7  A.  Eight years.

8  Q.  Where are you currently assigned?

9  A.  Training section.  I'm at the firearms range.

10 Q.  Directing your attention back to June 9, 2002, where were

11 you assigned at that time?

12 A.  I was assigned to Woodlawn precinct as a patrol officer.

13 Q.  On that particular day, did you have occasion to come in

14 contact with an individual by the name of Shawn Gardner?

15 A.  Yes, I did.

16 Q.  Could you tell us the circumstances?

17 A.  On that day, I was assigned to the prisoner processing

18 area, position three at our desk.  While I was working that

19 day, two subjects were brought in in reference to a shooting

20 of a woman that had happened earlier in my shift.  They were

21 later identified through prisoner paperwork and photographs

22 Mr. Shawn Gardner and Mr. Aaron Holly.

23 Q.  What were the circumstances that led to your actually

24 having contact with Mr. Gardner?

25 A.  In processing the prisoners hoping to take photographs

1  and fingerprint, I was working in that area, during that

2  time, the two prisoners had been put in adjacent interview

3  rooms.  And during my activities in the back in the

4  processing area, I heard the two talking back and forth to

5  each other.  I removed Mr. Gardner and put him in a temporary

6  holding cell.

7  Q.  At the time you initially heard what you believe to be

8  the two individuals speaking with one another, could you

9  actually hearing what they were saying to each other?

10 A.  No.  I could just hear their voices back and forth.

11 Q.  After you removed Mr. Gardner and placed him into an

12 individual holding cell, did you have occasion to see or hear

13 him again?

14 A.  Yes.  A little later, crime lab technicians came in to

15 process both prisoners.  Mr. Holly was in one of the

16 interview rooms, and Mr. Gardner was handcuffed to a security

17 bar in the hallway out of the of the security room.

18         One of the officers was getting information from

19 Mr. Holly, name and date of birth, and I heard Mr. Gardner

20 say -- pardon the profanity -- but "don't say a fucking

21 thing" or something to that effect.

22         At that time I removed him from the security bar

23 and put him in the cell.

24 Q.  Where was that in relationship to where Mr. Holly was

25 positioned?

1  A.  Probably about 15 feet away from the doorway of the

2  interview room.

3  Q.  And could you see to where it was that Mr. Gardner -- to

4  whom Mr. Gardner was directing his comments?

5  A.  Directed toward that door.  They were the only ones.  We

6  were only ones in the processing area at that time, myself,

7  Mr. Gardner, Mr. Holly, the officer, and the crime lab

8  technician.

9        MS. MANUELIAN:   I have nothing further, Your

10  Honor.

11        THE COURT:  You may cross-examine.

12                  CROSS-EXAMINATION

13  BY MR. KURLAND:

14  Q.  Good afternoon, officer.

15  A.  Good afternoon.

16  Q.  Just a couple of questions.  You have some notes in front

17  of you, is that correct?

18  A.  No.  These were here when I sat down.

19  Q.  Okay.  In preparation for your testimony, have you

20  discussed this matter with the U.S. Attorneys here?

21  A.  Yes.

22  Q.  Have you -- prior to today, have you ever testified

23  concerning this matter in court?

24  A.  No, sir, I have not.

25  Q.  Okay.  In your discussions with the U.S. Attorneys, have

1  you been made aware of who are the defendants in this case?

2  A.  No, sir, I have not.

3  Q.  All right.  In the courtroom today, do you see Mr. Holly?

4  A.  I -- I don't recognize the person that I know as Mr.

5  Holly, no, sir.

6  Q.  Do you see Mr. Gardner?

7  A.  No one that I recognize as Mr. Gardner, no, sir.

8  Q.  Okay.  Just a clarification, how far away from you when

9  -- where were you in relationship to Mr. Gardner when you

10  heard the statement?

11  A.  Probably about 10 or 15 feet away, is my best

12  recollection.

13  Q.  Okay.  More toward the -- was the door to the interview

14  room open or closed?

15  A.  Open.

16  Q.  Other than yourself, Mr. Gardner, and Mr. Holly, and I

17  presumably another officer, anyone else in the area at that

18  time?

19  A.  Another officer and another lab technician, to my

20  recollection, but no one else.

21  Q.  Okay.  At the time that you heard the statements, is it

22  your testimony that you could not identify by name, you

23  didn't know the names of the persons?

24  A.  I don't recall.  I would have seen paperwork long before,

25  before that, but I don't remember which one was which.  I

1  think you're asking me --

2  Q.  Well, at the time the statement you just testified to was

3  made, at that time, did you know the name of the person

4  making the statement?

5  A.  Yes.

6  Q.  All right.  I don't understand how that could be based on

7  your -- well, you earlier said, your original testimony had

8  to do with -- do you have the persons later identified with

9  Mr. Holly and Mr. Gardner?

10  A.  Yes.  When they came in, I did not know who they were.

11  But in the course of my prisoner processing duties, I had to

12  help complete their paperwork and take their photographs.

13  That's how I was able to distinguish between them.

14        MR. KURLAND:  Let me check.  That's all.  Thank

15  you.

16        MS. MANUELIAN:  I have nothing else, Your Honor.

17        THE COURT:  Thank you very much, officer.

18        Anything more from that?

19        MS. MANUELIAN:  No, Your Honor.

20        THE COURT:  Anything more on that?

21        MR. KURLAND:  We'd submit.  I mean, at trial there

22  might be an issue with respect to whether or not there's any

23  --

24        THE COURT:  Go to the mike, please.

25        I guess why did I hear that evidence?  Are you

1    moving to suppress that statement?

2             MR. KURLAND:  Well, it was part of the omnibus with

3    respect to the issues as an identification issue obviously

4    that would be later on determined, but we would submit on

5    papers with respect to the basis.  I don't see any -- there's

6    no voluntariness issue here.

7             THE COURT:  Okay.  And --

8             MR. KURLAND:  I believe factually there's an

9    argument as to whether he even knows who it was.  I don't

10   think there's sufficient predicate based on the testimony

11   presented that it was -- that Mr. Gardner made that

12   statement.

13            THE COURT:  It is kind of odd.  I gather what he's

14   saying is he had desk duty, whatever, at the time he learned

15   the names of these two people, had they been arrested?  What

16   had they been arrested for, on the homicide?

17            MS. MANUELIAN:  Yes.

18            THE COURT:  On the homicide.  So they're brought to

19   Woodlawn for processing, and he sort of is helping out doing

20   the booking stuff, and then Holly's in the room, and

21   Gardner's handcuffed to the rail outside, and this officer,

22   paying no particular attention, does overhear Gardner say

23   something like "don't say a fucking thing"?

24            MR. KURLAND:  That's the testimony.  But, Judge, to

25   the extent there's an issue here, I don't want to make it so,

1  you know, the government gets three bites at the apple, but

2  as a technical matter on the record, the standard with

3  respect to admissibility, the government needs to establish

4  by a preponderance of the evidence, for an evidentiary

5  standpoint, that Gardner was the one who made the statements.

6  I would submit that isn't established here.

7         THE COURT:  They don't have to establish that until

8  trial.

9         And I suppose I'm going to have to hear -- well,

10  we're going to have a very careful pretrial in this case.

11         MR. KURLAND:  For right now, there's no

12  voluntariness issue, assuming whoever said it.  We want to

13  obviously leave open whether -- and also the Court determines

14  the evidentiary issues, if the officer keeps on coming back,

15  the second or third or fourth time, the Court could take

16  judicial notice to the cumulative aspects of when the officer

17  is open and able to, if he's ever able to make an

18  identification as to who is whom.

19         THE COURT:  Well, that's what makes it rather odd.

20         He looked around the courtroom today, did not make

21  an identification.  Now, I infer what's going to happen is --

22  well, I won't infer anything.  There's no voluntariness issue

23  here.  To the extent there is no coerciveness, and there's no

24  interrogation, so there's no Miranda surrounding this learned

25  or volunteered statement, but whether it is comes in evidence

1  and against whom it comes in, obviously, is a question we

2  won't reach for some time.

3           MR. KURLAND:  Thank you, Your Honor.

4           THE COURT:  Okay.  All right.

5           MR. HARDING:  Judge, we now have one more purely

6  quick witness, Lieutenant Wilson from CBIF.

7           THE COURT:  Okay.

8           (Pause.)

9           THE COURT:  By the way, is that statement recorded

10 somewhere?

11          MS. MANUELIAN:   Yes, Your Honor, it's in a report.

12          THE COURT:  Okay.

13          MR. KURLAND:  You mean recorded in a report or

14 actually recorded?

15          THE COURT:  In a report.  In other words, did this

16 officer write down what he claims to have seen and heard?

17          MR. KURLAND:  Several days later.

18          THE COURT:  Okay.  All right.

19          THE CLERK:  Raise your right hand, please.

20          (The Witness is sworn.)

21          THE CLERK:  Be seated.  Scoot up.  Speak directly

22 toward the mike.  State your name and spell it for the

23 record.

24          THE WITNESS:  Tyrell Wilson, T Y R E L L, W I L S O

25 N.

```
1                    DIRECT EXAMINATION

2  BY MR. HARDING:

3  Q.  Good afternoon.  Can you tell us how you're employed,

4  sir?

5  A.  Yes, sir.  I work for the Division of Pretrial Detention

6  Services at Central Booking Intake Facility.

7  Q.  What's your position there?

8  A.  Warrant unit supervisor.

9            MR. SULLIVAN:  Can he speak up?

10           THE COURT:  Can you get a little closer to the

11  mike?

12  A.  Warrant unit supervisor.

13           THE COURT:  Warrant unit supervisor.

14           MR. SULLIVAN:   Thank you.

15  Q.  And can you tell us, do you have a rank?

16  A.  Yes, sir.  Lieutenant.

17  Q.  How long have you worked at the intake facility?

18  A.  Ten years, this past April.

19  Q.  Are you familiar with the procedures used by law

20  enforcement personnel when they want to transport prisoners

21  to and from Central Booking?

22  A.  Yes, sir.

23  Q.  Can you tell us what your responsibilities are in

24  connection with the transporting from prisons?

25  A.  A lot of times, I will locate which of our facilities the
```

1    offender is when the writ comes in.

2    Q.  Okay.  And then what?  Supposing the prisoner's in

3    central booking, do you have responsibility for what happens

4    when a writ is issued for one of your prisoners?

5    A.  On a booking search writ, yes.  It's my responsibility to

6    get the charging documents and book and charge him on that

7    specific case, when it comes to those offenders being taken

8    out to get questioned, just verifying location.

9    Q.  Okay.  Now, are there interview facilities at CBIF?

10   A.  No, sir.

11   Q.  Is it under normal circumstances, are prisoners ever

12   interviewed by law enforcement agencies at Central Booking?

13   A.  Extenuating circumstances, they are, and that's with

14   jurisdictions outside of Baltimore City that don't have

15   interview areas.

16           THE COURT:  I'm sorry.  I did not understand that

17   answer.

18           THE WITNESS:  That would be if detectives from New

19   York came down to interview someone that was in our custody,

20   they would facilitate the Baltimore Police Department to give

21   a writ for them, but since they don't have anyplace to

22   interview them, they make special concessions at that point.

23           THE COURT:  Go ahead, Mr. Harding.  I'm sure you'll

24   clarify.

25           MR. HARDING:  Okay.

1          THE COURT:  Officer, please.  It's nothing wrong

2  with your answer, I just don't understand it.  Mr. Harding

3  will clarify.

4  BY MR. HARDING:

5  Q.  Okay.  What about Baltimore City police officers, do they

6  interview prisoners in Central Booking?

7  A.  No, sir.  They take them back I guess to either

8  headquarters or their districts.

9  Q.  Why is that?

10 A.  That's to reduce the liability on the facility and not

11 allow other offenders to see these offenders speaking with

12 the police.

13         So it is for their protection and our protection.

14 Q.  Okay.  What would the liability be to your facility?

15 Where would that come from?

16 A.  That could come from the inmate being injured due to the

17 word getting out that they've spoken to police, or an

18 altercation in an interview room itself with the interviewing

19 officers.

20 Q.  Okay.  So this is a matter of policy by Central Booking?

21 A.  Yes, sir.

22 Q.  But, on the other hand, you say that for these detectives

23 from some other state like New York, they might be able to

24 interview prisoners at Central Booking?

25 A.  Yes, sir.  That would go through our chief of security.

1  Q.  So if somebody from another state wanted to interview a

2  prisoner right there, they'd have to go through a special

3  procedure involving senior security?

4  A.  Yes, sir.

5  Q.  Where -- if an out-of-state detective wanted to interview

6  somebody, where would they be taken at Central Booking?

7  A.  If it's approved by the security chief, they would go to

8  the major's office.

9  Q.  Major's office?

10 A.  Yes, sir.  Which is on the booking floor, but out of

11 sight from the offenders being processed in that area.

12 Q.  So is there no interview room, no facility for

13 interviewing prisoners apart from the major's office?

14 A.  No, sir.

15 Q.  Do you ever show the writ to the prisoner?

16 A.  No, sir.  It's actually served on the facility.

17 Q.  And when you said that part of your responsibilities is

18 to include taking care of the charging process --

19 A.  Yes, sir.

20 Q.  -- what does that mean exactly?

21 A.  On most cases, the offender will return from the

22 questioning with the officers and charging documents, and

23 they need to be processed when those charging documents and

24 have an initial appearance before the commissioner, which

25 would be done in the booking area prior to being sent back to

1  their housing unit.

2  Q.  Okay.  When you say they're booked, what if they were

3  already at Central Booking before they were taken out to be

4  interviewed?

5  A.  It's a new charge, so they got fingerprinted,

6  photographed, identified, and have initial appearance for

7  that case to up load the charges to their rap sheet.

8  Q.  So even though they were already a prisoner at Central

9  Booking, they have to go through the whole procedure again?

10 A.  Yes, sir.

11 Q.  And then you said they go before a court commissioner?

12 A.  Yes, sir.

13 Q.  At what point is it they actually see the warrant for

14 their arrest and or get presented with their charging

15 documents?

16 A.  That would be done at the booking process.

17 Q.  The booking process?

18 A.  Yes, sir.

19 Q.  Is it also done when they see the court commissioner?

20 A.  Yes, sir.  It's explained in detail via the court

21 commissioner.

22 Q.  You have responsibility for transporting the prisoners

23 during all of that?

24 A.  Not specifically, no.  They are assigned posts along the

25 process.

1  Q.  Okay.

2  A.  So it's going to be a different officer for each process.

3  Q.  And you're the supervisor of the officers that do that?

4  A.  Yes, sir.

5  Q.  Okay.  All right.  Thank you.  I have no further

6  questions.

7                      CROSS-EXAMINATION

8  BY MR. SULLIVAN:

9  Q.  Good afternoon, lieutenant.

10  A.  Good afternoon, sir.

11  Q.  Tim Sullivan.  I represent Mr. Mitchell.

12          Let me understand, is it your testimony today,

13  lieutenant, that the only place that a police officer can

14  interview someone is in the major's office?

15  A.  That's where it's done, yes, sir, when it's approved by

16  the chief of security, yes.

17  Q.  But that's not my question.  My question is, is it your

18  testimony today, before Judge Davis, that the only place, the

19  only room available in that giant facility over there, to

20  interview someone, is the major's office, that there's no

21  other room anywhere in CBIF that an interview can take place?

22  A.  I'm sure there is, sir.

23  Q.  Okay.

24  A.  But they are not used for that purpose.

25  Q.  Right.  But there are other rooms available for a police

1  officer, let's say, from, Roanoke, Virginia, to come up and

2  interview not in the major's office, right?

3  A.  Yes, sir.

4  Q.  Okay.  Now, are you familiar with the term liaison

5  officer?

6  A.  Yes, sir.

7  Q.  What is a liaison officer?

8  A.  That is a Baltimore police officer that's assigned to our

9  facility.

10  Q.  What does he or she do?

11  A.  Facilitate the charging documents from the districts to

12  the state's attorney.

13  Q.  And what does that mean?

14  A.  That means that they had a remote booking process.  The

15  offender is brought to our facility.  The arresting officer

16  goes back to their district, and they actually do the

17  paperwork there.  It's a computer transmitted to us, or to

18  our facility, and the liaison officer is the one that

19  receives it and forwards it to the State's Attorney.

20  Q.  Does the liaison officer play a role in the booking

21  process?

22  A.  In those instances, yes.

23  Q.  Okay.  And specifically, is the liaison officer involved

24  in making sure that an individual defendant gets the

25  application of charges or whatever the arrest warrant or

1  anything like that?

2  A.  Not arrest warrants, only on view cases.

3  Q.  What?

4  A.  Only on view cases.

5  Q.  What's an on view case?

6  A.  That's an arrest made on the street, not in warrant

7  cases.

8  Q.  Let's talk about somebody -- by the way, you call them

9  prisoners, but they're really detainees, because most the

10 people in your facility are awaiting trials, right?

11 A.  Offenders.

12 Q.  Okay.  So they're offenders --

13 A.  Yes, sir.

14 Q.  -- but they're not prisoners, because you don't have a

15 facility that services inmates, correct?  I mean, people

16 convicted serving time at your facility?

17          THE COURT:  He's got one.

18 A.  Yes, sir.

19 Q.  Except the kosher guy, but other than that, routinely,

20 routinely your facility is not a DOC serving facility, you're

21 a pretrial facility?

22 A.  Yes, sir.  We are a pretrial facility.

23 Q.  Let me let me ask you, if someone's in your facility as

24 an offender, in your facility because can't make bond, you

25 get one of these writs from, who did you get it from, a writ

1  at this time for an interview?

2  A.  Whatever agency is requesting that interview.

3  Q.  What agency is it usually?

4  A.  Baltimore City Police Department.

5  Q.  Baltimore City Homicide Division?

6  A.  Not as specific, no.  We get them from sex crimes,

7  robbery.

8  Q.  So when you get a writ, what do you do with it?

9  A.  Ensure that the person is in our facility.  There should

10  be identifiers on the writ, name, date of birth, state

11  identification number.

12  Q.  When you get these writs, have you ever not honored one

13  of these writs that you get, and say I'm not going, we're not

14  going -- we're not going to honor this Court writ?

15  A.  No, sir, it does not occur.  If the offender is not in

16  our facility, the writ itself is returned to the Court, so it

17  may be quashed.

18  Q.  Where does it get returned to specifically, if you know?

19  A.  Well, it goes back to the officer who presented it.  He's

20  instructed to take it back to the State's Attorney's Office,

21  who is supposed to take it back to the court clerk and have

22  it quashed.

23  Q.  Lieutenant, help me out here.  So physically, a

24  detective, let's assume Baltimore City homicide, a detective

25  physically walks into the front door or your facility and

1  presents you or someone with a writ that an inmate in your

2  facility or detainee or offender, wants to be taken to the

3  Baltimore City Homicide Division for an interview --

4  A.  Yes, sir.

5  Q.  -- okay?  What does that detective do when he gets to

6  your place?  What happens physically?

7  A.  Physically he presents the writ.

8  Q.  Okay.  And you verify that the offender is in your

9  facility?

10  A.  Yes, sir.

11  Q.  And then what happens?

12  A.  A copy of it gets forwarded to our records department,

13  who prepares the jail record to show this individual out with

14  a writ of that jurisdiction.

15  Q.  Then physically what happens next?

16  A.  The paperwork goes to our release area.  The offenders

17  brought from the housing unit to the release area, and that's

18  where the transfer of custody is done.

19  Q.  What usually -- I understand each case is different.

20  What usually is the timing between the presentment of the

21  writ to the release area?

22  A.  It could be anywhere between 2 hours and 24 hours.

23  Q.  And when you or your subordinate officers goes to the

24  housing unit to get an offender, is he told what's happening

25  to him?

 1  A.  He's told that he's going out on a writ, yes.

 2  Q.  Is he told what a writ means?

 3  A.  Not to my knowledge, no.

 4  Q.  I mean, have you told offenders they're going out on a

 5  writ?

 6  A.  Yes, sir.

 7  Q.  Do you explain to them what a writ means?

 8  A.  No, sir.

 9  Q.  Do you explain to them who wants them on a writ?

10  A.  Yes, sir.

11  Q.  Okay.

12  A.  They do know what agency.

13  Q.  When you say Baltimore City Police Department, you're

14  here on a writ --

15  A.  Yes, sir.

16  Q.  -- do you tell them they don't have to go with you down

17  to booking?

18  A.  No, I don't.

19  Q.  Are they given an option, or they've got to go?

20  A.  No, sir.  They're not given an option.

21  Q.  So if you're presented with a writ like in this case from

22  the Baltimore City Homicide Division, signed by a judge, that

23  offender is going whether he wants to go or not?

24  A.  Yes, sir.

25          THE COURT:  Do they know it's signed by a judge?

1  A.  Excuse me, sir?

2          THE COURT:  Do they know it's signed by a judge?

3          THE WITNESS:  No, sir.  It's not issued to that

4  individual.

5          THE COURT:  No, my question is, do they know that

6  it's been signed by a judge?

7          THE WITNESS:  No, sir.

8          THE COURT:  How do you know that?

9          THE WITNESS:  They don't even see it.

10          THE COURT:  I understand they don't see it, but who

11  issues the writ?

12          THE WITNESS:  It comes from the Circuit Court,

13  signed by a judge true-tested by one of the clerks.

14          THE COURT:  Okay.  Is it your belief that the

15  detainees at the Central Booking don't know it's the Court

16  that issues a writ?

17          THE WITNESS:  To my knowledge, no, sir.

18          THE COURT:  You don't think they know that?

19          THE WITNESS:  No, sir.

20          THE COURT:  Okay.  Go ahead, Mr. Sullivan.

21  BY MR. SULLIVAN:

22  Q.  When an offender moves from one facility to another

23  facility or back to Baltimore for some reason, you know they

24  move on a writ, right?

25  A.  Yes, sir.

1  Q.  So you have enough -- you've been in this status for how

2  many years, 18 years?

3  A.  As a lieutenant, five years.

4  Q.  Before a lieutenant, were you -- were you ever in DOC an

5  officer in DOC?

6  A.  No, I've been in pretrial the entire duration.

7  Q.  You know in life, in your daily experience, inmates,

8  whether offenders or prisoners, get moved around physically

9  by writs?

10  A.  Yes, sir.

11  Q.  Writs that are signed by judges, right?

12  A.  Yes, sir.

13  Q.  And inmates know if they're in DOC, Jessup and coming

14  back to that Baltimore City, they're getting moved by a

15  court-ordered writ?

16  A.  Not necessarily.

17          MR. HARDING:  Objection.

18  A.  Not necessarily.

19          THE COURT:  Overruled.

20  Q.  Your testimony, do inmates at your facility, in light of

21  your experience, even know what a writ is?

22  A.  No, sir.

23  Q.  They don't know?

24  A.  No, sir.

25  Q.  So when an inmate moves down to processing, I guess he's

1  returned to his street clothes?

2  A.  No, sir.

3  Q.  Oh, my goodness, what happens to him?

4  A.  Well, he's still in custody.  We have to show by him

5  being in a jumpsuit and having a picture band with this

6  picture and his state identification number on it.

7  Q.  That's on this wrist or something?

8  A.  No, sir.

9  Q.  He's not put in a three-piece or anything?

10  A.  No, because he's transferred within the facility.

11  Q.  When he's going over with whomever has come to get him,

12  he's put in the front seat?

13  A.  I think he's shackled.

14  Q.  What do you mean by "shackled?" What happens then?

15  A.  He gets handcuffed, depending on what equipment they use.

16  We'll use handcuffs, some use handcuffs and leg irons.

17  Q.  And you know, don't you, a three-piece is handcuffs and

18  leg irons?

19  A.  And black box.

20  Q.  And a black box?

21  A.  Yes, sir.

22  Q.  And the name, three-piece, doesn't surprise you, because

23  you see it all the time?

24  A.  Yes, sir.

25  Q.  So the person, is he introduced to whoever's there to get

1    him?

2    A.  Yes, sir.

3    Q.  And you make the introduction, or is there introduction

4    over in booking?

5    A.  Well, the police officer is going to be the one to let

6    them know that this is the Baltimore Police Department and

7    you're going out with them.

8    Q.  And that -- that ends your involvement in it?

9    A.  Yes, sir.

10   Q.  And then this person who's handcuffed or shackled or

11   three-pieced moves away with the Baltimore City officer?

12   A.  Yes, sir.

13   Q.  And that's the end of your involvement?

14   A.  Yes, sir.  They take them to the facility at that point.

15   Q.  Okay.  Now, the person comes back at some point, right?

16   A.  Yes, sir.

17   Q.  And does he come back through the booking section again?

18   A.  It depends.  If he comes back with new charges, yes.  If

19   he does not, he goes back to the releasing area, they receive

20   him, and send him back to his housing unit.

21   Q.  So for the purpose of my discussion, or our discussion,

22   actually, lieutenant, let's assume somebody comes back with

23   charging documents for, you know, murder --

24   A.  Yes, sir.

25   Q.  -- more than one count of murder.  Now, along with the

1  liaison officer, is that liaison officer there pretty much

2  there 24/7, or is it always a Baltimore City liaison officer

3  there?

4  A.  Yes, sir, there is.

5  Q.  And is there a -- District Court of Maryland for

6  Baltimore City Commissioner in your facility?

7  A.  Yes, sir, several.

8  Q.  Several?  And there's several of them?

9  A.  Yes, sir.

10 Q.  Would it be a fair statement there's always 24/7 a

11 commissioner working in your building?

12 A.  Yes, sir.

13 Q.  Okay.  So an inmate -- I'm sorry, an offender comes back

14 from homicide division with new charges for let's say murder,

15 what happens to that person then?

16 A.  If we're able to facilitate the booking charge at that

17 time, they are received in the booking area.  They received a

18 band to be in charge at that time.  If not, as in the house

19 count being high, 300, 350 people in the booking area, we

20 won't subject them to that.  We'll send them back to their

21 housing unit and bring them back down and book and charge

22 them on a case.

23 Q.  At a later time when you're less busy and not

24 overpopulated?

25 A.  Yes, sir.

1  Q.  Let's assume you're not busy and you're not overcrowded,

2  the offender comes through, is he served with the application

3  of charges then, or does he usually have them by them?

4  A.  No, he's served with them then.

5  Q.  And your officers, or your facilities serve them with the

6  application of charges then?

7  A.  Yes, sir, one of the booking officers.

8  Q.  Okay.  Does a city detective come into your facility and

9  serve an inmate with the application of charges?

10 A.  That has been also done, sir.

11 Q.  What's the normal practice?

12 A.  The normal practice, they are supplied a copy from the

13 booking officer.

14 Q.  Okay.  The offender supplied the copy from the booking

15 officer?

16 A.  Yes, sir.

17 Q.  Then what's the next step?

18 A.  We take all their vital information.  Again, they're

19 fingerprinted, photographed, and they await their turn to see

20 the Court Commissioner.

21 Q.  So even though you already had the person there, when he

22 or she comes back with new charges, whatever they might be,

23 do you have to do the whole booking process over again?

24 A.  Yes, sir.

25 Q.  Now, with this liaison officer, is it possible, who's not

1  a view or on view or whatever that is, but if a Baltimore

2  City detective comes to your facility to want an offender

3  served with new charges, can that occur?

4  A.  Yes, sir.

5  Q.  And does that require the person to leave, go somewhere

6  else and come back, or can it all be done right in your

7  facility?

8  A.  It can all be done right at the facility.

9  Q.  And would it be done by the detective normally?  Would it

10  be done by the detective giving the liaison officer the

11  application of charges and the arrest warrant and whatever

12  the paperwork is?

13  A.  No, sir.

14  Q.  Okay.  How would that happen?

15  A.  That also would have a booking charge writ.

16  Q.  What's a booking charge writ?

17  A.  It's a writ for the purposes of booking this person on

18  the new charges.

19  Q.  Does the person leave your facility?

20  A.  No, sir.

21  Q.  Okay.  So it's a writ -- who signs this writ?

22  A.  That's also comes from the Circuit Court.

23  Q.  Is that also signed by a judge?

24  A.  Yes, sir.

25  Q.  And what does that tell you to do?

1  A.  That is that this person needs to be booked and charged

2  on those new charges at that time.

3  Q.  Do you keep copies of these book charge writs?

4  A.  They should be, yes, sir.

5  Q.  And where do they go to, inmate file or base file?

6  A.  The book charge writs, it would go with a copy of his

7  charging documents.

8  Q.  And what about the writ to, for example, the writ to

9  leave CBIF to go to homicide, what do you do with that writ?

10  A.  That's kept and maintained by our records department, so

11  that should be in their file.

12  Q.  All right.  So you get the booking charge writ that's

13  signed by a judge, and then what do you do then?

14  A.  We receive the offender from the detective, he serves him

15  with the papers.  They book and charge, and then they go

16  through the same process.

17  Q.  They wait their opportunity to see the commissioner?

18  A.  Yes, sir.

19  Q.  And the commissioner then formulates --

20        THE COURT:  I'm sorry.  He said he receives.  He

21  receives the offender from the detective, but the offender's

22  already there?

23        THE WITNESS:  Well, sir, we have multiple

24  facilities for pretrial.

25        THE COURT:  I thought Mr. -- I'm sorry.  I thought

1  Mr. Sullivan's question was asking you to describe the

2  scenario when a person who is already there, a detective or

3  officer shows up with an arrest warrant, on a new charge, and

4  you say you still need a writ to bring them down from housing

5  and book him, is that was your testimony, correct?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  So I didn't understand.  I'm sorry, Mr.

8  Sullivan.

9              So is it just like a symbolic turning over custody

10 of under the writ?

11             In other words, you bring someone down for housing,

12 the detectives lays hands on him and hands him off to the

13 booking officer, is that how it works?

14             THE WITNESS:  Yes, sir.  Because we have four

15 facilities used for pretrial; Baltimore City Detention

16 Center, our Women's Detention Center, and our Jail Industries

17 Building.  So technically they are housed with pretrial, but

18 they aren't in our facility.

19             THE COURT:  But we're talking about someone in your

20 facility in Central Booking?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  On an existing charge?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Has a bail, can't make bail?

25             THE WITNESS:  Right.

1           THE COURT:  Awaits his appearance in court, okay?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  Now, a new charge comes up, an arrest

4   warrant is issued for something he did before or allegedly

5   did before he got arrested on the old charge?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  The detective or officer shows up with

8   arrest warrant, so you've got a guy upstairs, I got an arrest

9   warrant, we need to process him on this arrest warrant.

10          Does that officer or detective need a writ from the

11  court in order for Central Booking to bring him downstairs,

12  book him on the new charge, and present it to the

13  commissioner?

14          THE WITNESS:  They normally have it in hand, sir.

15          THE COURT:  But do you need it?

16          THE WITNESS:  No, sir.

17          THE COURT:  Okay.

18  BY MR. SULLIVAN:

19  Q.  Thank you.

20          Now, then, the inmate is presented to the

21  commissioner, right?

22  A.  Yes, sir.

23  Q.  And then the commission, what does the commissioner do?

24  A.  They give him their initial appearance and decide what

25  the disposition will be.

1  Q.  And also does --

2         THE COURT:  I'm sorry.  By disposition, you mean

3  bail?

4         THE WITNESS:  Bail or recognizance.

5         THE COURT:  Right.

6  Q.  And the commissioner, if you know, provides a more formal

7  reading or formal explanation to the person about the nature

8  of the charges that they have been charged with?

9  A.  Yes, sir.

10  Q.  And the possible maximum penalties?

11  A.  Yes, sir.

12  Q.  And also writes about bail and attorneys and things like

13  that?

14  A.  Yes, sir.

15  Q.  Okay.  And that's never done by any of your booking

16  staff?

17  A.  No, sir.

18  Q.  So you're just facilitating the picture, identification,

19  updating the records, and then moving the person to the

20  commissioner?

21  A.  And retaining him, yes.

22  Q.  Detaining, the offender, right?

23  A.  Yes.

24  Q.  Thanks very much.  Oh, wait.  I have one other question,

25  I'm sorry.

1          When that person comes back -- by the way,

2    normally, when the person comes back, are they still in the

3    jumpsuit and still in the shackles or handcuffs?

4    A.  Yes, sir.

5    Q.  Okay.  And what do you do with -- do they sign anything

6    when they come back and they return the prisoner or the

7    offender?

8    A.  The officer does.

9    Q.  In light of your experience right now as a lieutenant at

10   CBIF, how many of these types of writs do you see on a weekly

11   basis that are issued by Baltimore City police to take

12   someone who's on offender in your facility, to take them to

13   the district or police, division for an interview?

14   A.  Weekly?  Anywhere from 10 to 30.

15   Q.  So from 10 to 30?

16          How long, to your knowledge, has this process been

17   going on?

18   A.  The entire ten years I've been there, throughout.

19   Q.  So from 10 to 30 a week for ten years, past April?

20   A.  Yes.

21   Q.  And during that entire time, has any offender said I

22   don't want go with the Baltimore City Police?

23   A.  Not to my knowledge.

24   Q.  Okay.  And based on your training and experience and your

25   position, if an inmate said I don't want to go, what would

1  happen?

2  A.  They would still go.  We have a court order to transfer

3  custody.

4          MR. SULLIVAN:  Thank you.

5          THE COURT:  What if the offender said I want to

6  talk to my public defender first?

7          THE WITNESS:  I'm sure they would facilitate it

8  some way.  It's never been brought up.

9          THE COURT:  You've never had an offender say I

10 really would like to talk to my lawyer before I'm taken over

11 to the police department?

12         THE WITNESS:  No, sir.

13         THE COURT:  Never had a defendant invoke right to

14 counsel?

15         THE WITNESS:  No, sir.  Not in my presence.

16         THE COURT:  Okay.

17         MR. HARDING:  I have no further questions, Your

18 Honor.

19         THE COURT:  You said, lieutenant, it could take

20 from 2 hours to 24 hours.  Does that mean the absolute

21 minimum time you need is two hours in virtually every case?

22         THE WITNESS:  No, sir.  I'm sure there's times when

23 it has been less.  We've had judges request offenders appear

24 in their courtroom.

25         THE COURT:  We're not talking about that.  Boy, if

1  we were talking about that, we wouldn't be talking about

2  anything.

3         What we're focused on in this case is the use of a

4  writ to take someone from your custody, and transport that

5  person to the Baltimore City Police Department?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  From what I heard in this case so far,

8  judges have no idea what they're signing.  All they know is

9  that some police officer or some detective wants to have at

10  somebody.  And so from what I've heard this morning, judges

11  on the Circuit Court just sign a writ, and then it's up to

12  the police department and the State's Attorney's office and

13  your facility to work it all out?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Okay.  So I'm not talking about what

16  judges want, I understand judges are get him over here right

17  away, I know that drives you crazy.

18         I'm talking about the routine detective or officer

19  who wants a --

20         THE WITNESS:  The officers that do it on a regular

21  basis, will normally Fax us a copy of the writ prior with the

22  pickup time.

23         So if they Fax it to me today and they want to get

24  them Monday, they'll say approximately 10 a.m.  What we'll

25  try to have them fit in in our array in the release area.  If

1  we don't have the writ prior, we have to bring the offender

2  from the bed assignment to the area and send a copy to the

3  register's department so it can indicate in his file he's

4  going out with this jurisdiction, this date, this time.

5          THE COURT:  Okay.

6          THE WITNESS:  And a copy is added to the offender

7  file.

8          THE COURT:  So when you say the seasoned

9  detectives, I mean, the officers know what they're doing they

10  will have a relationship with someone in your facility, if

11  not you, and at least give advance notice that the writ is

12  coming, and we'll be there such and such?

13          THE WITNESS:  It makes it easier.

14          THE COURT:  They're not sitting around for two

15  hours waiting for to you find somebody?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  First to find whether he's actually

18  there and then to find him?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Now, I thought what you said was that

21  the part of the reason there's no interview facilities at

22  Central Booking is to protect the offender from being

23  suspected as a snitch and so forth?

24          THE WITNESS:  One of the reasons, yes.

25          THE COURT:  How do you reconcile that with the idea

1  that you got outside that unit and you say to the offender,

2  presumably within hearing, because I've been in those housing

3  units, I know what they're like, you're going in the police

4  department we got a writ for you, doesn't have to broadcast

5  to anyone within hearing, maybe it's a new charge that this

6  guy doesn't know anything about, but maybe he's cooperating,

7  and he's going over to talk to the police about something?

8            THE WITNESS:  I can't comment specifically on that,

9  sir, because I'm not on the floor at the time he's removed

10 from the housing unit.

11           THE COURT:  So how does that work?

12           THE WITNESS:  I --

13           THE COURT:  How do you protect an offender from the

14 probability of retribution by those who may think he's going

15 to cooperate?

16           THE WITNESS:  My honest opinion, a lot of the

17 offenders in the using units, when they hear writ, first

18 thing they think is new charges, he caught something

19 somewhere else is the terminology used.

20           THE COURT:  So does that mean they know what a writ

21 is?

22           THE WITNESS:  Yes and no.

23           THE COURT:  I love those answers.

24           THE WITNESS:  They have their own understanding of

25 what it is.  Some do, and have great knowledge of it.  And

1    some just have their own understanding of it.  And their

2    understanding is writ means I got a new charge I got to deal

3    with.

4            THE COURT:  Now, this is a tricky, when is the

5    person, who's already in your custody, who's writted out on a

6    new charge, when is that person under arrest on the new

7    charge?

8            THE WITNESS:  When that are under arrest on the new

9    charge, when they're served with the new charges documents.

10           THE COURT:  When they're served with the new

11   charging documents?

12           THE WITNESS:  Yes, sir.

13           THE COURT:  So, theoretically, a detective could

14   Fax you a writ, pick up the guy at 10:00, a.m., and keep him

15   until 3, 4, 5:00 that afternoon, and he still hasn't been

16   arrested?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  He's brought back to your facility, and

19   you say he wouldn't be arrested until either the detective

20   or, more likely, the liaison officer serves him with the

21   arrest warrant?

22           THE WITNESS:  Yes, sir.  And that's when he serves,

23   that's when he's officially charged.

24           THE COURT:  Okay.

25           THE WITNESS:  Now, they read him his rights and

1  arrest him at the interview location, that is a possibility.

2  That's beyond my reach.

3          THE COURT:  Okay.  And from the perspective of you

4  and your staff, I take it you don't care whether the person

5  -- whether there's already an arrest warrant outstanding for

6  the person, or the arrest warrant is obtained after he

7  leaves, but before he comes back, or even if he comes back,

8  without an arrest warrant, I mean, I guess it doesn't matter

9  to you one way or the other, you treat all those instances

10  the same?

11          THE WITNESS:  Yes, sir, we do.

12          THE COURT:  Now, you mentioned that if it's

13  crowded, a person can come back and, as a courtesy, or an

14  accommodation to the offender, you may not keep him in the

15  booking area on a new charge, you may send him back to

16  housing until things clear out a little bit?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  What's the maximum amount of time that

19  that could happen?  I can imagine, if a person who were

20  writted out on a Friday and came back Friday evening, things

21  being what they are in Baltimore City, it would be pretty

22  jammed up by Friday evening?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  So what would be the length of time

25  that you would send somebody back to housing before you

1    brought him back down to be booked?

2              THE WITNESS:  I couldn't state it specifically.

3              THE COURT:  Could it be as long as Monday?

4              THE WITNESS:  Yes, sir, very easy.

5              THE COURT:  So he comes back, he is served with

6    this new charge --

7              THE WITNESS:  Yes, sir.

8              THE COURT:  -- but he's not booked, and he doesn't

9    see the commissioner on the new charge, he's sent back to

10   housing because he's there anyway --

11             THE WITNESS:  Yes, sir.

12             THE COURT:  -- and you've got people, some of whom

13   may be bailed out, or at least recogged, and you want to get

14   down to see the commissioner, and you know this one is not

15   going anywhere, because he's there on a no bail situation and

16   --

17             THE WITNESS:  Yes, sir.

18             THE COURT:  -- on the prior charge, he cools his

19   heels over the weekend until things clear out Monday,

20   Tuesday?

21             THE WITNESS:  Yes, sir.  He gets added to our

22   booking list.  Those are all the other offenders that had the

23   new -- before the new charges were filed or old charges

24   actually out there.

25             THE COURT:  Unexecuted warrants?

1          THE WITNESS:  Yes, sir.  And we do those on a daily

2    basis.

3          THE COURT:  Okay.  Any other questions?

4          MR. HARDING:  No, Your Honor.

5    BY MR. SULLIVAN:

6    Q.  I just have one, Your Honor.

7          Lieutenant, I just want to follow up on what Judge

8    Davis asked you.

9          A seasoned detective can call and Fax you something

10   and really make a reservation to pick up offender, like today

11   he would call and say, hey, lieutenant this is Tim Sullivan

12   from homicide, I'm going Fax you over a writ, I'll be there

13   around 10:30 on Monday, and you say, okay, I'll have him

14   ready?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Thank you very much, lieutenant --

17         THE WITNESS:  You're welcome.

18         THE COURT:  -- you're excused.

19         (Pause.)

20         (Detective Hastings resumes the stand.)

21         THE COURT:  Welcome back, detective.

22         THE WITNESS:  Thank you, Your Honor.

23         THE COURT:  We're going to get through you one way

24   or another.  Please make your self comfortable.  You're still

25   under oath.

```
 1            THE WITNESS:  Yes, sir.
 2                 CONTINUED CROSS-EXAMINATION
 3  BY MR. SULLIVAN:
 4  Q.  Good afternoon, detective.
 5  A.  Afternoon.
 6  Q.  Detective, have you talked to Detective Niedermeier since
 7  you left the stand?
 8  A.  Yes.
 9  Q.  Okay.  Didn't Judge Davis say to you don't talk to
10  Detective Niedermeier from the time you left the box till the
11  time you come back at 2:30?
12  A.  About my testimony.  He told me not to talk --
13  Q.  But you talked to him, right?
14  A.  I had lunch with him.
15  Q.  And you never talked about this defense lawyer being is
16  pain in my ass or -- excuse me, Your Honor -- or anything
17  else?
18  A.  I didn't talk to him about my testimony.
19  Q.  Did you talk to him about, well, how did they get all
20  this paperwork on our files?
21  A.  No.
22  Q.  Did you say how did they get all these documents?
23  A.  No.
24  Q.  And you talked to him in the lobby of the courthouse, and
25  then you had lunch with him?
```

1  A.  Correct.

2  Q.  And you talked about I guess the White Sox?

3  A.  No.  We were more talking about the Ravens.

4  Q.  You didn't think that you would put yourself in a

5  position to appear to be kind of doing something wrong by

6  being instructed not to talk to Detective Niedermeier and

7  then meeting with him out here two seconds after you left the

8  courtroom and then having lunch with him, that didn't bother

9  you at all?

10  A.  No.

11  Q.  And the only person's testimony about was talked about is

12  I guess yours, right, and Niedermeier's?

13  A.  Excuse me?

14  Q.  The only person, there's no other witness, can you point

15  me to any other person that can say, oh, Detective Hastings

16  or Detective Niedermeier didn't talk about the Willie

17  Mitchell case during their meeting in the courthouse lobby or

18  their meeting in the cafeteria, we have to rely on you?

19  A.  We were at my office.

20  Q.  That's not my question.

21       Who else?  Who else can I go talk to about what you

22  and Detective Niedermeier talked about from the time Judge

23  Davis told you not to talk to Detective Niedermeier after

24  lunch till now?

25  A.  The Judge did not tell me not to talk to Detective

1  Niedermeier.  He told me not to talk about my testimony.

2  Q.  My point is, who can I talk to or subpoena to have come

3  here on Monday to say you and Detective Niedermeier didn't

4  talk about this case?

5  A.  Anyone you like.

6  Q.  Beside you or Niedermeier, that's my point.  I have to

7  rely on your two words, right?

8  A.  Correct.

9  Q.  Yeah.  Okay.  Let's get back to what we were talking

10 about, detective, turning to page 12 of your statement of the

11 transcribed testimony, are you ready?  Halfway through there,

12 you say, quote, okay.  Like I told you before, Willie, we

13 will investigate this information and ah as it stands now,

14 you'll be charged, and we're going to go and investigate

15 this, and like I told you, I'll get you out on a writ, and

16 you can show us where this location was.  Are you okay with

17 that?

18         Mr. Mitchell says, yes, I am.

19         Do you see that there?

20 A.  Yes, I see it.

21 Q.  So you're telling him at this point he's going to be

22 charged for this double murder, right?

23 A.  He's already been told he's been charged.

24 Q.  But where is that?

25 A.  I think page 1.

1   Q.  No, no, I'm not talking about the taped interview that

2   you guys had.  Where is it earlier that you've officially

3   charged him with these double murders?  You had the arrest

4   warrant, but you'll agree with me you kept it in your pocket,

5   right?

6   A.  No, sir.  I won't agree with that.

7   Q.  Okay.  Kept it in your case file?

8   A.  That's probably more like it.

9   Q.  Well, thanks.  So you kept an active open arrest warrant

10  in your file to interrogate Mr. Mitchell?

11  A.  That's not how it works, and that's not what I said.

12  Q.  I don't care how it works.  I'm asking about what

13  happened on April 17, 2002.

14  A.  He was charged.

15  Q.  How was he charged?

16  A.  When he was brought back to the booking facility.

17  Q.  But this interview occurred before he got back to the

18  booking facility?

19  A.  That's correct.

20  Q.  So he wasn't charged, do you agree with me?

21  A.  He was under arrest.

22  Q.  He was under arrest already, right, as of April 1, 2002,

23  he was under arrest?

24  A.  That's what you said.

25  Q.  Okay.  Well, and as of April 16th, 2002, you don't

1  disagree with me -- well, please strike that.

2           Come on, you know he was under arrest at CBIF, and

3  couldn't make bond, or there was no bond?

4  A.  I knew he was in jail.

5  Q.  Huh?

6  A.  Yes, I knew he was in jail.

7  Q.  Okay.  And did you call, or did Detective Niedermeier

8  call CBIF and say we're coming to get Willie Mitchell, have

9  him ready for us?

10 A.  Someone did.  It wasn't me.  It was probably Niedermeier.

11 Q.  Probably Niedermeier?  Okay.  All right.

12           So do you know whether Mr. Mitchell was ready for

13 when you generically when a detective got there?

14 A.  I didn't go to pick him up.

15 Q.  But you won't argue with me or disagree with me, would

16 you, detective, that you never formally gave Mr. Mitchell his

17 application of charges, you or Detective Niedermeier?

18 A.  I didn't give it to him, correct.

19 Q.  You or Detective Niedermeier in your presence never

20 served him with the arrest warrant?

21 A.  That's correct.

22           THE COURT:  Well, I'm sorry, Mr. Sullivan, I'm

23 trying to keep it clear.

24           According to the return, the arrest warrant was

25 executed by Detective Niedermeier at Central Booking at 1

1  p.m. on April 17, 2002.  That's the return on the warrant.

2            MR. SULLIVAN:  Right.

3            THE COURT:  Now, is that right?

4            THE WITNESS:  When he goes over to the booking

5  facility, that's when you fill out the paperwork for the

6  warrant.

7            THE COURT:  Well, no.  You fill out the paperwork

8  whenever you fill out the paperwork.  But I'm just saying the

9  return of service on the warrant itself recites by way of

10  certification that, at 1 p.m., at Central Booking, he

11  executed the warrant?

12            THE WITNESS:  Yes.

13            THE COURT:  Okay.

14  BY MR. SULLIVAN:

15  Q.  So he wasn't given the warrant, wasn't given the

16  application of charges, in the homicide division?

17  A.  No.

18  Q.  So are you comfortable with, based on your training and

19  experience, this return of service on the arrest warrant, as

20  Judge Davis said, I certify at 1 p.m. on April 17, 2002 at

21  CBIF that he checked the box I left a copy of the warrant and

22  charging document as a detainer for the continued detention

23  of the defendant at CBIF 300 East Madison and is that officer

24  -- is that your partner's signature?

25  A.  I don't have that piece of paper.

1  Q.  I don't need that one.  I'll just show him this.

2          (Pause.)

3          THE COURT:  I'm sorry to interrupt, but it's right

4  here.

5  Q.  Is that Detective Niedermeier's --

6  A.  Yes.

7  Q.  -- signature?  Okay.

8          And each by your own words on page 12, detective,

9  you say as it stands now, you'll be charged.  Do you see

10  where you say that?

11  A.  Yes.

12  Q.  So you have -- you don't say here you've already been

13  charged, do you understand that distinction?

14  A.  Oh, yes.

15  Q.  Okay.  So is it a fair statement, by using the language,

16  you'll be charged that Mr. Mitchell at least when this

17  interview almost concluded at 12:52 p.m. on the 17th, he had

18  not been charged, he did not know he was going to be charged?

19  A.  We never give the person the arrest report.  We never

20  actually -- he doesn't get the paperwork from the police

21  department.  He gets it from the court commissioner.

22  Q.  Okay.  But did you tell him, is it your testimony that

23  you told him we're charging you with two counts of first

24  degree murder, you told him that?

25  A.  He was charged with murder, yes, he was told that.

1  Q.  I thought you said you don't know anything about the

2  charging documents.  What did you say?

3  A.  He was told we had an arrest warrant for him for first

4  degree murder.

5  Q.  Multiple first degree murders?

6  A.  Multiple first degree murder.

7  Q.  When did you or Detective Niedermeier tell him that?

8  A.  Page one of the taped statement, and the pre-interview,

9  he understood he was under arrest.

10  Q.  The interview begins at 12:40, so when before 12:40 did

11  you or didn't you tell Mr. Mitchell?

12  A.  We told him he was under arrest in the interview that

13  took place prior to that.

14  Q.  Oh, the one that's not recorded?

15  A.  The one that's not recorded, correct.

16  Q.  All right.  Now, do you know, detective, again, based on

17  your training and experience, you've seen a lot of District

18  Court of Maryland for Baltimore City initial appearance

19  reports, correct?

20        Let me -- I'll show you what's been marked as

21  Mitchell 10.

22        Are you familiar with those initial appearance

23  reports?

24  A.  I've seen them.

25  Q.  Okay.  Is this the one that the case number, the track

1  number deals with the arrest of Mr. Mitchell that we're

2  talking about?

3  A.  Yes.

4  Q.  Okay.  And do you see what time Mr. Mitchell appeared in

5  front of a commissioner?

6  A.  Yes.

7  Q.  Okay.  And what time did Mr. Mitchell appear in front of

8  the commissioner after he was returned?  By the way -- strike

9  that.

10         Who returned him, by the way?

11  A.  I'm not sure.

12  Q.  It's not in notes or anything like that?

13  A.  I don't have any notes to that, no.

14  Q.  Just, obviously, I'm not from around here, how far is it

15  from the detective division where you were located in 2002 to

16  Central Booking on Madison?

17  A.  Probably less than a half mile.

18  Q.  Okay.  So it's a route, there's is there an officer that

19  the homicide division who just picks up people and brings

20  them back every day?

21  A.  No.

22  Q.  Or is it whoever's available?

23  A.  Sometimes they go in the wagon, and sometimes detectives

24  transport them theirselves.

25  Q.  I'm sorry.  Going what in what?

1  A.  Transport vehicle, we call it a wagon.

2  Q.  There's so many writs issued, you can use a paddy wagon.

3  A.  This wasn't a writ.  It wasn't returned from a writ.  He

4  was under arrest.

5  Q.  Let me back up.  Maybe I'm not -- it's late.  Maybe I'm

6  not making myself clear.

7         So many people, your homicide division issues so

8  many of these writs to bring people who are already detained

9  to the homicide division that sometimes you use a paddy

10  wagon?

11  A.  Not for writs, no, for arrestees.

12  Q.  What's an arrestee?

13  A.  When you place under arrest, if you're going to be

14  booked, we can put knew a paddy wagon or transport vehicle.

15  Q.  What if you're already in jail like Mr. Mitchell?

16  A.  He was picked up on a writ.

17  Q.  But my point is, this was not a unique circumstance, this

18  is something you guys do every day, right?  These writs

19  getting people out of CBIF, bringing him to homicide?

20  A.  And charging him with another crime.

21  Q.  That or sometimes interviewing them and not charging

22  them?

23  A.  Correct.

24  Q.  Like, for example, if you had a cooperator who was saying

25  that he was present when you know Tim got shot, and he's

1  detained on a drug charge, you would writ him out to

2  interview him, and he would want to come, because he's

3  working out a deal, and you'd interview him and return him to

4  Central Booking with no new charges, right?

5  A.  Correct.

6  Q.  That happens probably a lot, right?

7  A.  Often.

8  Q.  Often, right.

9        So strike that.  I'll move on.

10       So Mr. Mitchell was presented before the

11  commissioner on April 18, 2002, at 1:48 a.m., right?

12  A.  Correct.

13  Q.  Based on the initial appearance report, correct?

14  A.  Correct.

15  Q.  And do you know what his bond status was when he was

16  returned on your new charges?

17  A.  No.

18  Q.  Let me show you Mitchell 11.  What does it say happened

19  to Mr. Mitchell?

20  A.  He was committed to the Baltimore City Detention Center.

21  Q.  And what time was that?  Let me help you out.

22  A.  1:48.

23  Q.  April 14, 2002 Commissioner Aileen Archer, right?

24  A.  Right.

25  Q.  And do you know the first time Mr. Mitchell appeared in

180

1  front of a District Court Judge for Baltimore City for his

2  bail review hearing?

3          MR. HARDING:  Objection as to relevance, Your

4  Honor.

5          THE COURT:  Overruled.  You may answer.

6  A.  It says here on 4-18-2002 at 8:30 a.m.

7  Q.  Let me show you what's been marked and admitted as

8  Mitchell 12.  Are you familiar with this form?

9  A.  I have seen forms similar to this, but I haven't seen

10  this before.

11  Q.  Does it say he had his bail review hearing on April 19,

12  2002, in front of Judge Emanuel Brown?

13  A.  Yes, it does.

14  Q.  By video?

15  A.  Right.

16  Q.  And he was committed at that point?

17  A.  Right.

18  Q.  And that occurred on April 19, 2002, at 2:59 p.m.?

19  A.  Correct.

20  Q.  Were you present for that?

21  A.  No.

22  Q.  Now, you told Mr. Mitchell you'll be charged and you were

23  to go and investigate this.  But, again, you had already

24  investigated and got the arrest warrant, correct?

25  A.  That's correct.

1  Q.  So would it be a fair statement that you were misleading

2  Mr. Mitchell?

3  A.  No.

4  Q.  You were really still going to go out and investigate

5  forward after you already got an arrest warrant the day

6  before for him?

7  A.  The investigation doesn't end that day.

8  Q.  Okay.  Did you ever go get Mr. Mitchell out on another

9  writ like you said here?

10  A.  No.

11  Q.  Why not?

12  A.  We didn't feel it was necessary.

13  Q.  Okay.  Did you ever play any role in getting Mr. Mitchell

14  out for a blood test?

15  A.  No.

16  Q.  Have you ever got a person out of jail because you wanted

17  a DNA, blood, saliva sample taken?

18  A.  Have I ever?  Yes.

19  Q.  Is that process for blood, saliva, DNA, pretty much the

20  same process that we talked about for an interview?

21  A.  The person would be picked up and taken to a hospital.

22  Q.  Right.  So with the exception of either going to Mercy or

23  going to the homicide division, is the process the same?

24  A.  Getting the person from the facility?

25  Q.  Right.

1  A.  Yes.

2  Q.  Do they ever go to the homicide division then to Mercy?

3  A.  Yes, they could.

4  Q.  Okay.  Now, finally, detective, let me show you what the

5  is a summary exhibit, Mitchell 13, and let's just run through

6  this real quick.

7          All the dates on here we've already talked about,

8  April first, to April 16th, April 17, April 18 and April 19

9  we've gone through all these together; have we not?

10  A.  Yes.

11  Q.  And the times, were the times you read right off either

12  the District Court of Maryland forms or your own agency

13  forms, correct?

14  A.  Correct.

15  Q.  And these times and dates are a fair and accurate

16  representation and summary of the testimony that we just

17  gave?

18          MR. HARDING:  Objection.

19  Q.  Last week and today?

20          MR. HARDING:  I object, because I don't think this

21  witness could possibly read through this document and testify

22  about the accuracy of the entries of these times, having been

23  handed it 30 seconds ago.

24  Q.  He said yes.

25          THE COURT:  The witness will have however much time

1  he needs before he will answer.

2  Q.  Would you like the full set of exhibits so you can check

3  the times?

4  A.  If you have a question, I'm ready.

5  Q.  I don't have a question.  Mr. Harding had an objection.

6          Are these a fair and accurate summary of what we

7  just went through today, of the dates and the times of your

8  involvement with Mr. Mitchell on the 16 and 17th and also

9  what happened to him before and after?

10  A.  You showed me the paperwork, but I wasn't involved in the

11  April 18th for his initial appearance.  I wasn't there when

12  he was denied bail.  I'm not -- I wasn't -- I had nothing to

13  do witness the April first arrest.

14  Q.  Right.  But other than that, you looked at those forms,

15  do you think I made up those commitment forms from the

16  District Court?

17          MR. HARDING:  Objection, Your Honor.

18          THE COURT:  Sustained.

19  Q.  Do they look like regularly done Baltimore City District

20  Court records to you?

21  A.  Yes.

22          MR. HARDING:  Objection.

23  Q.  Computer-generated?

24          THE COURT:  Overruled.

25  Q.  Computer generated in the routine everyday District Court

1    case?

2    A.   (The witness nodded affirmatively.) Yeah, they look real.

3            MR. SULLIVAN:  Okay.  Thank you.

4            THE COURT:  All right.

5                    REDIRECT EXAMINATION

6    BY MR. HARDING:

7    Q.   Detective Hastings, you've testified on direct that you

8    first told Mr. Mitchell -- I'm sorry.  You testified on cross

9    that you first told Mr. Mitchell that he was being arrested

10   for these homicides, the Weise brothers homicides, back when

11   you read him the statement of -- back when you read him his

12   rights at about 11:10 in the morning that day; is that

13   correct?

14   A.   Yes.

15   Q.   And right around that time is when you started the

16   pre-interview as you indicated, also, is that correct?

17   A.   Correct.

18   Q.   Let me call your attention to exhibit H, the transcript

19   of the tape recording you made.

20            And first I want to call your attention to the

21   first few lines.  Do you see where it says "I am Detective

22   Kirk Hastings"?

23   A.   Yes.

24   Q.   Would you read that sentence, please?

25   A.   "I'm Detective Kirk Hastings of the Baltimore City

1    Homicide Unit.  I'm interviewing one William Mitchell in

2    reference to a homicide that occurred in the 4400 block of

3    Wabash Avenue on the 25th of March, 2002.  I'm conducting

4    this interview along with Detective Gary Niedermeier."

5            And then I said, "For the record, state your name."

6    Q.  And then further down on that page, do you see where it

7    says "okay, Bo," where you're talking there, two-thirds of

8    the way down the page?

9    A.  Yes, I see that.

10   Q.  Would you read that sentence that begins in reference?

11   A.  Yes.  "Okay, Bo, in reference to this incident that

12   occurred in the 4400 block of Wabash -- "

13           THE COURT:  Way, way slow down.

14   A.  "In reference to this incident that occurred in the 4400

15   block of Wabash Avenue, you understand that a warrant was

16   obtained for your arrest in reference to this case; is that

17   correct?"

18   Q.  Okay.  And what does Mr. Mitchell say?

19   A.  "Now, I do, yes, I do."

20   Q.  And what do you say?

21   A.  "And I explained that to you, right?"

22   Q.  And what does Mr. Mitchell say?

23   A.  "Yes, you did."

24   Q.  And what did you say after that?

25   A.  We turn to the next page, I say, "You're currently under

1    arrest."

2              THE COURT:  I'm sorry.  Are you going to have him

3    read the whole thing?

4              MR. HARDING:  No.

5              THE COURT:  Okay.

6              MR. HARDING:  I'm going to play the whole tape

7    actually when Niedermeier testifies, with the Court's

8    permission.

9              THE COURT:  Okay.

10   BY MR. HARDING:

11   Q.  And then what did.  Mr. Mitchell say?

12   A.  "Yes, you did."

13   Q.  And then what did you say after that?

14   A.  "And now before we spoke, there came a time when I read

15   you your rights; is that correct?"

16   Q.  And what did he say?

17   A.  "Yes, you did."

18   Q.  Okay.  So when you tell him that you had -- when you tell

19   had him in the past tense I explained that to you, right, he

20   said yes, you did, when -- what are you referring to?

21   A.  As in the pre-interview.

22   Q.  Did you ask him any questions about this murder before

23   you told him that he was under arrest and being charged with

24   this murder?

25   A.  I didn't ask him any questions till after I read him his

1    rights.

2    Q.   Okay.

3    A.   And then we told him he was under arrest, and I explained

4    that to him.

5    Q.   At the time you read him his rights?

6    A.   Correct.

7    Q.   Okay.   You said that you interviewed Mr. Mitchell in a

8    sergeant's office; is that correct?

9    A.   That's correct.

10   Q.   Sergeant Petrie's office.   Was the door locked?

11   A.   No.

12   Q.   Was the door closed?

13   A.   Yes.

14   Q.   So it was you and Detective Niedermeier and Mr. Mitchell;

15   is that correct?

16   A.   Correct.

17   Q.   There were, you said, I believe, on cross-examination no

18   handcuffs, no shackles; is that correct?

19   A.   Correct.

20   Q.   Did Mr. Mitchell express any discomfort at any time?

21   A.   No.

22   Q.   Did he ask for anything to eat?

23   A.   No, not that I recall.

24   Q.   Did he ask to go to the bathroom?

25   A.   I think he did.   He was taken to the bathroom, but I'm

1  not positive.

2  Q.  Okay.  Was that before you interviewed him, or do you

3  know when that was?

4  A.  I'd have to look at the form and see what time.

5  Q.  There's a form that tells you that?

6  A.  The prisoner activity sheet.

7  Q.  That's one of the exhibits that you have there in front

8  of you.

9         Do you see a notation on there about him going to

10  the bathroom?

11  A.  There's no notes or remarks.

12  Q.  Okay.  And when you interviewed him, it was 12 -- when

13  you tape-recorded the interview, it was 12:40 in the

14  afternoon; is that right?

15  A.  That's correct.

16  Q.  And what time did he initially appear at homicide that

17  day?

18  A.  10:05.

19  Q.  So he'd been there for about two hours and 35 minutes

20  before you did the taped interview; is that correct?

21  A.  That's correct.

22  Q.  However, you'd done this pre-interview, and you'd done

23  the other forms that you've already testified about; is that

24  correct?

25  A.  That's correct.

1                MR. HARDING:  No further questions, Your Honor.

2                THE COURT:  Just so that I'm clear, I think you've

3  probably said it two or three times, detective, but just so

4  that I'm clear, you have a clear recollection that you told

5  Mr. Mitchell he was under arrest for a homicide sometime

6  before 11:00 or 11:10, or at about that time?

7                THE WITNESS:  About the time he was advised of his

8  rights, yes, sir.

9                THE COURT:  He arrived at homicide sometime around

10  10:00?

11                THE WITNESS:  Yes.

12                THE COURT:  So he was sitting there in the office

13  for about an hour before you and Detective Niedermeier began

14  the process?

15                THE WITNESS:  Yes, sir.

16                THE COURT:  Now, I guess I've just seen the

17  statement for the first time today.  Your understanding is

18  that this is essentially a false exculpatory, or I guess,

19  more accurately from the point of view from the government,

20  and from your own investigation, this is a partially false

21  exculpatory; is that it?

22                In other words, do I understand that the thrust of

23  this statement is that Mr. Mitchell was admitting involvement

24  with the Weise brothers; namely, in setting up a drug deal,

25  but that he was basically telling you and Mr. Niedermeier

1    that he didn't know about the homicide until after it all

2    occurred and that he had nothing to do with it?

3              THE WITNESS:  Yes, that's what he said.

4              THE COURT:  And so when you said to him on the tape

5    that you weren't interested in, you were not going to use his

6    statements against him regarding the drug transaction, I

7    guess I'm a little confused about that.

8              THE WITNESS:  I was trying to get to the point

9    where the actual murder occurred.

10             THE COURT:  Okay.  But this was, I mean, you knew

11   then apparently that this was a murder committed in

12   connection with either a real or a pretended drug

13   transaction; am I not correct about that?

14             THE WITNESS:  I knew drugs were involved, yes, sir.

15             THE COURT:  So I guess I'm trying to understand,

16   you had probable cause to arrest Mr. Mitchell for the

17   homicide.  He was admitting to you that he was very heavily

18   involved in the drug transaction.  I guess I'm trying to

19   understand how you cannot use his statement.

20             I guess I don't know how to ask the question.

21             THE WITNESS:  I was taking his statement more as a

22   denial statement about his involvement in the murder.

23             THE COURT:  Well, but he clearly was involved in

24   the murder to the extent that he set up the drug transaction.

25             THE WITNESS:  That's what he says.

1            THE COURT:  Exactly.  So I'm trying to understand.

2            THE WITNESS:  As far as I was concerned, he was

3   charged with the murder of the Weise brothers.

4            THE COURT:  Right.

5            THE WITNESS:  That's what I was investigating.

6            THE COURT:  And he knew that at the time he was

7   talking to you.

8            THE WITNESS:  Right.  And he wasn't comfortable

9   talking on the tape about his involvement in the drugs.  I

10  wasn't investigating the drug transaction that occurred.  I

11  was investigating the murder.

12           THE COURT:  How can you investigate the one without

13  investigating the other, I guess it's kind of what I'm

14  asking.

15           THE WITNESS:  I wasn't looking to charge him with a

16  drug charge.

17           THE COURT:  I'm not talking about what you were

18  looking to charge him with.  He was already charged with the

19  murder, I understand that.

20           What I'm trying to understand is that you knew that

21  the Weise brothers were drug dealers.  And I take it you knew

22  they'd been murdered in connection with a drug deal before

23  you -- before you ever met Mr. Mitchell.

24           THE WITNESS:  He was -- the Weise brothers were

25  robbed and killed.

 1             THE COURT:  When they showed up for a drug deal?

 2             THE WITNESS:  Right.  He says he wasn't there.

 3             THE COURT:  Okay.

 4             THE WITNESS:  We say he was.

 5             THE COURT:  Okay.  And so I guess I'm trying to

 6   understand how you could promise him that his statements

 7   about the drug deal wouldn't be used against him when you

 8   knew, based on what you knew, I take it, that the homicide

 9   was committed, that the drug transaction was used to set up

10   the homicide; wasn't that --

11             THE WITNESS:  That's what he said, Your Honor.  Our

12   contention was they went, and it was a robbery murder,

13   nothing to do with this drug transaction that he alleges

14   occurred.

15             He's saying in his statement that he didn't commit

16   the murder.  He was just involved in a drug transaction.

17             THE COURT:  I understand that.

18             THE WITNESS:  We charged him with the actual murder

19   of the Weise brothers.

20             THE COURT:  Okay.

21             THE WITNESS:  So when I was talking to him, I

22   wasn't looking for -- I considered this his alibi, that he

23   wasn't involved, he just set up a drug deal.  I didn't

24   believe what he told me, but I still taped it and listened to

25   it.

1              THE COURT:  Okay.  Sure.

2              THE WITNESS:  So if he was talking about a false

3    drug transaction, I just taped his statement, and I took his

4    statement.  But at that time he was charged with the murder

5    of the Weise brothers.

6              THE COURT:  I understand that.  But I thought that

7    the government's theory in this case, and more importantly

8    your investigation had disclosed, that the Weise brothers

9    went to the location of the murders in order to engage in

10   what I take it was a significant drug transaction?

11             THE WITNESS:  Correct.

12             THE COURT:  Is that not correct?

13             THE WITNESS:  That's correct.

14             THE COURT:  Either before or as they were engaged

15   in that drug transaction, they got murdered, correct?

16             THE WITNESS:  Robbed and murdered, yes.

17             THE COURT:  Robbed and murdered?

18             So, again, I don't want to beat a dead horse, but

19   how do you separate out the drug transaction, which was used

20   as the inducement to get the Weise brothers to go to the

21   location where the robbery and murder then occurred?  How do

22   you separate out those two?

23             I understand Mr. Mitchell wasn't charged with any

24   drug charges.  But --

25             THE WITNESS:  His contention is that he set up a

1   drug deal that somebody else killed the Weise brothers.

2             THE COURT:  Okay.

3             THE WITNESS:  I don't believe that's what happened.

4             THE COURT:  Okay.

5             THE WITNESS:  I believe they killed him.

6             THE COURT:  Well, you believe Mr. Mitchell killed

7   --

8             THE WITNESS:  Right, was involved in the actual

9   murder, correct.

10            THE COURT:  Okay.

11            THE WITNESS:  So this drug transaction he's talking

12  about --

13            THE COURT:  Well, I guess that's what I'm a little

14  confused about.  The quote unquote drug transaction that you

15  discuss with Mr. Mitchell on the tape, I'm having trouble

16  making a lot of sense out of the statements, but I thought

17  what it was he was giving you, from your perspective, some

18  truthful statements and some untruthful statements, but the

19  truthful part of it had to do with setting up a drug

20  transaction involving the Weise brothers at or near the

21  location when the murder took place; is that right?

22            THE WITNESS:  Yes, sir.

23            THE COURT:  So it was essentially I got the Weise

24  brothers wanted me to set up a drug transaction, I called

25  somebody named L or something, he, L, was supposed to meet

1    them or send somebody to meet them?

2            THE WITNESS:  He's saying that L's the murderer.

3            THE COURT:  Okay.  Okay.  All right.

4            Okay.  So do I understand, then that, essentially,

5    in this pre-interview interview, did you say something

6    essentially like, well, we -- you're under arrest, but if you

7    didn't do the murder, you know, you need to talk to us, or

8    you should talk to us, or you may choose to talk to us so

9    that we can go after the real murderer?

10           THE WITNESS:  I interviewed him.  We talked to him

11   about the murder.  This was his explanation for what happened

12   in the events of the murder.  It wasn't my explanation.

13           THE COURT:  Okay.  I understand that.  But I guess

14   I'm trying to understand, he knew, according to your

15   testimony, he knew he was under arrest for the murder.

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  And he knew that sometime before 11:00

18   or shortly thereafter?

19           THE WITNESS:  No.  We interviewed him.  We read him

20   his rights at 11:10, and then we interviewed him shortly

21   after 11:10.

22           THE COURT:  Shortly after 11:10, you told Mr.

23   Mitchell that he was under arrest for the Weise murders?

24           THE WITNESS:  Yes.

25           THE COURT:  And that's what you wanted to talk to

1  him about?

2          THE WITNESS:  Yes.

3          THE COURT:  And then you gave him his rights?

4          THE WITNESS:  I read him, yes.  He was read his

5  rights.

6          THE COURT:  Or vice versa?

7          Okay.  So I take it he said, no, I didn't do that,

8  or I didn't do that, or I wasn't there?

9          THE WITNESS:  Correct.  He said he didn't do it.

10          THE COURT:  But he knew about it, he knew something

11  about -- he knew something about why the Weises were where

12  they were when they were murdered?

13          THE WITNESS:  Yes, he had a cell phone

14  conversation.

15          THE COURT:  And then he proceeded to tell you about

16  this supposed drug transaction?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  And so is the taped statement

19  substantially the same as --

20          THE WITNESS:  The reason I said that on the tape

21  was because he wasn't comfortable speaking about the drug

22  transaction on the tape, about setting up the drug

23  transaction.  And that's why I told him I wasn't

24  investigating drugs, I wasn't interested in charging him with

25  drugs.

1          THE COURT:  In fact, you told him you wouldn't use

2     his statements against him?

3          THE WITNESS:  Yes, sir, I said that.  And I meant

4     it.

5          THE COURT:  Okay.  And so at the end, on page 12,

6     when you say we're going to investigate this, I take it

7     essentially you were telling him -- I guess falsely, but

8     that's okay, you were telling him, okay, I've gotten your

9     exculpatory statement, you're under arrest for this murder,

10    but from what you said, you weren't involved in the murder,

11    I'm going continue my investigation, and get you cleared of

12    this false charge.

13         I mean, you didn't say that, but that's in fact

14    what you were saying at the end?

15         THE WITNESS:  Right.

16         THE COURT:  Is that a fair --

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Okay.  All right.  Thank you very much.

19         THE WITNESS:  Thank you, Your Honor.

20         THE COURT: Are you going to go to Detective

21    Niedermeier next or --

22         MR. HARDING:  Yes.  He's the next witness.

23    Obviously, he's going to be a long one.

24         THE COURT:  So okay.  Before we bring him in, just

25    have some brief argument I take it I thought you had said,

1    Mr. Harding that, there was something in the statement, or at

2    least I thought you did about identifying voices on the voice

3    mail and so forth.  But now that I've seen the statement,

4    that's not here.  So --

5              MR. HARDING:  Actually mI remember saying at the

6    last hearing that Mr. Martin identified the voice on the tape

7    as Bo, and then I said erroneously that Mr. Mitchell

8    identified the voice as Martin's.  Mr. Sullivan corrected me

9    at the time, and I pointed out to the Court that that wasn't

10   correct.

11             THE COURT:  Correct.  Okay.  All right.  So now I

12   have I guess I have the Martin statement.  Oh, no.  This is

13   just the Mitchell statement.  Okay.  So it's the government's

14   intention to introduce Mr. Mitchell's statement as a false

15   exculpatory.

16             MR. HARDING:  Mitchell's statement is obviously

17   very important to the government's case, Your Honor.  It

18   establishes that Mitchell was intending to meet with the

19   Weises that night mthat he orchestrated it over the

20   telephone.

21             THE COURT:  I'm sorry.  Does it actually say that,

22   because again I couldn't quite follow.  Does the statement

23   actually say that Mr. Mitchell not only set up the meeting

24   but that he intended to be there?

25   Q.  What it describes is, in fact, the way the murder, in all

1   likelihood, actually happened.  He orchestrated two cars to

2   go together because he was on a cell phone talking.  We know

3   from the cell phone records he was talking to the Weise

4   brothers on his cell phone setting up this meeting, and

5   instead he probably was nearby, but he probably actually

6   wasn't in the car when the Weise brothers were shot.

7            THE COURT:  Okay.

8            MR. HARDING:  The Weise brothers were shot by

9   another defendant.

10           THE COURT:  Okay.  So the portion of Mr. Mitchell's

11   statement to Detective Hastings that the government says is

12   true is the part about setting up a drug transaction with the

13   Weise brothers, not in all of its details, but again, as I

14   understand the statement, Mr. Mitchell says, yes, I was asked

15   to, and I did in fact facilitate a drug transaction between

16   the Weise brothers on the one hand and somebody else, either

17   L or somebody else?

18           MR. HARDING:  Yes.

19           THE COURT:  Okay.  And that part of it in which he

20   admits to setting up of a drug transaction is true, that

21   small part?

22           MR. HARDING:  Judge, if I may --

23           THE COURT:  Yes.

24           MR. HARDING:  -- just to qualify that?

25           THE COURT:  Okay.

1          MR. HARDING:  We certainly think he set up the

2    meeting because of the cell phone records.

3          THE COURT:  Okay.

4          MR. HARDING:  The exact reason for the meeting,

5    there is some evidence that he intended to do a drug

6    transaction with Darryl Weise that night.

7          THE COURT:  Okay.

8          MR. HARDING:  But we don't pin our case on that.

9    It doesn't matter.  It could have been for some other

10   purpose.  It could have been to buy a gun.  It could have

11   been to exchange information about something.

12         THE COURT:  Absolutely.

13         MR. HARDING:  We don't know what Mr. Mitchell told

14   Darryl Weise over the telephone.

15         THE COURT:  Okay.

16         MR. HARDING:  It may have been that he set it up as

17   a drug transaction.  And, of course, they did recover drugs

18   from the Weise brothers' car, a very large quantity of drugs

19   from the trunk of the car.  In addition to the drugs that got

20   stolen and the money that got stolen, they actually left

21   drugs in the car.  So we know that the Weises came there that

22   night with drugs.

23         THE COURT:  Okay.  That's what I thought I knew

24   from your papers.  Okay.  So it's a partially false

25   exculpatory?

1          MR. HARDING:  That's right.

2          THE COURT:  All right.  Now, is the statement

3    admissible against the other defendants?

4          MR. HARDING:  Well, Your Honor, he doesn't name any

5    other participant.  He names this mythical person L, who he

6    claims not to know at all.  He claims not to know his name,

7    doesn't know where he lives, doesn't know anything about him.

8          THE COURT:  Well, help me out.  Does he say in the

9    statement, again, because I've had some difficulty following

10   it, does he say that L did the murder?

11         MR. HARDING:  He suggests that.  He didn't actually

12   say that, because he claims he doesn't know.  But he actually

13   did make a statement somewhere in the tape that Your Honor

14   will hear suggesting that it might have been L that did the

15   murder.

16         THE COURT:  Okay.  Because L was the one who was

17   supposed to meet with the Weise brothers.

18         MR. HARDING:  That's right.

19         THE COURT:  Do I have that right?

20         MR. HARDING:  That's right.

21         THE COURT:  So my question is, is the statement

22   admissible against any of the other defendants, assuming it

23   gets admissible against Mr. Mitchell?

24         MR. HARDING:  Judge, it's not a co-conspirator

25   statement.

1          THE COURT:  Clearly, it's not.

2          MR. HARDING:  But it is nevertheless, it doesn't

3   have to be redacted, because he doesn't incriminate any of

4   the defendants in this case.

5          THE COURT:  Well, I'm not talking about any

6   redactions.  I'm just asking you, is this statement

7   admissible against any other defendant?  I understand that

8   I'm getting into levels of detail that perhaps I don't need

9   to, but I'm trying to figure out why we're doing what we're

10  doing.

11         I understand Mr. Sullivan is very interested in

12  this.  I'm just trying to understand what I'm going to be

13  called on to do down the road.  I'm just trying to look down

14  the road, because I think it very much bears on severance and

15  other issues.

16         MR. HARDING:  You've already severed Mr. Mitchell

17  from Shelton Harris.

18         THE COURT:  Exactly.  So I'm trying to figure out

19  whether I'm going have to have four trials in this case

20  instead of only two.  Okay?

21         So help me out here.  Is the statement admissible

22  against any other defendant?

23         MR. HARDING:  I --

24         THE COURT:  Fine.  If you don't know yet, that's an

25  acceptable answer.

1          MR. HARDING:  We're not planning on playing it in

2    the first trial, which involves only Mr. Harris and Mr.

3    Gardner.

4          THE COURT:  Okay.

5          MR. HARDING:  Because it's not a co-conspirator

6    statement.

7          THE COURT:  Okay.

8          MR. HARDING:  It's an admission.

9          THE COURT:  Okay.

10          MR. HARDING:  And our contention is that it can be

11    played at the trial that Mr. Mitchell is in, and that it can

12    be played without.  Although Your Honor doesn't want to get

13    to this right now, I am trying to tell the Court what the

14    government's position is going to be.  It can be played,

15    because Your Honor can instruct the jury that is evidence

16    against Mr. Mitchell only, it doesn't incriminate Mr. Martin.

17    It doesn't mention Mr. Martin.  It in fact denies that it was

18    Mr. Martin because it identifies L as somebody that Bo

19    doesn't even know.

20          So it incriminates someone else.

21          THE COURT:  It really reminds me of Maryland versus

22    Gray.  It's exactly the same argument that the assistant

23    state's attorney made that case when I tried that case for

24    the Circuit Court for Baltimore City.

25          MR. HARDING:  We don't contend that L is Mr.

1  Martin.

2         THE COURT:  But will the jury infers that, that's

3  the question.

4         MR. HARDING:  We aren't going to argue that to the

5  jury.

6         THE COURT:  Well, I understand.

7         MR. HARDING:  In any event, this is a trial that's

8  occurring next September.  It doesn't have any -- it

9  shouldn't burden the Court during the first trial.

10        THE COURT:  Well, I appreciate that.  Okay.  We're

11  not going to go too much longer.  Let's at least get started

12  with Detective Niedermeier.

13        (Pause.)

14        MR. HARDING:  Your Honor, how long are you planning

15  to go with this?

16        THE COURT:  Till about 5 if we can all hold out

17  that long.  We'll resume at Monday at 10.

18        MR. HARDING:  Will we have a chance to discuss

19  what's going to happen on Monday?  Is there going to be legal

20  argument on Monday, for example?

21        THE COURT:  I hope so.

22        THE CLERK:  Raise your right hand, please.

23        (The Witness is sworn.)

24        THE CLERK:  Be seated.  Speak directly into the

25  mike.  State your name and spell it for the record.

1          THE WITNESS:  Detective Gary Niedermeier.  N I E D

2    E R M E I E R.

3                    DIRECT EXAMINATION

4    BY MR. HARDING:

5    Q.  If those exhibits are still tabbed, Detective

6    Niedermeier, I'm going to be referring your attention to

7    them.

8          First, let me ask you to, how are you employed?

9    A.  I work for the Baltimore City Police Department.

10   Q.  In what unit?

11   A.  The homicide unit.

12   Q.  How long have you been employed by the police department?

13   A.  Nine years.

14   Q.  How long have you been in homicide?

15   A.  Over four.

16   Q.  Were you involved in the investigation of a murders of

17   Darryl and Anthony Weise in 2002?

18   A.  I was.

19   Q.  Let me call your attention to exhibit E in that packet in

20   front of you, and I will ask you, did you obtain an arrest

21   warrant for Willie Mitchell back in April of 2002?

22   A.  I did.

23   Q.  What was the date and time you got that arrest warrant?

24   A.  The warrant was issued 4-16-2002 at 7:25 a.m.

25   Q.  And can I ask you, did you execute the warrant that day?

1  Did you execute the arrest warrant on the 16th?

2  A.  No, I did not.

3  Q.  Can you tell the Court why not?

4  A.  On that date Mr. Mitchell was being incarcerated on

5  several other charges, and as part of an ongoing

6  investigation, it was search and seizure warrants that were

7  going to be done, and to prevent the loss of evidence or the

8  fleeing of a second suspect, we decided that on the early

9  morning of the 17th, we would serve all of the warrants at

10  once.

11  Q.  Who's the second suspect you're talking about?

12  A.  Is Shelly Wayne Martin.

13  Q.  And so you say that you also intend -- in addition to

14  arresting Mr. Martin, you wanted to execute some search

15  warrants?

16  A.  Yes, I did.

17  Q.  Did you obtain search warrants for a number of locations?

18  A.  Yes, we did.  I did.

19  Q.  Can you tell us what those locations were?

20  A.  2 Creek Court, Mr. Martin's residence, 4 Valdiva, which

21  is Mr. Mitchell's residence, and also a warrant was obtained

22  for Mr. Martin's vehicle, and a business, County Sports.

23  Q.  Was one of the suspects working at that business at the

24  time?

25  A.  That's what was reported.

1  Q.  Okay.  And so then was everything executed the next

2  morning?

3  A.  Yes.

4  Q.  Were you present for the arrest of Mr. Martin?

5  A.  Yes, we were at the location.

6  Q.  And then did you execute -- was the location his

7  residence?

8  A.  It was.

9  Q.  And did you execute the search warrant then immediately

10 following the arrest?

11 A.  Yes, we did.

12 Q.  Now, I want to show you another document, which is

13 defense exhibit number 2.  Do you recognize that document?

14 A.  Yes.  That's a writ that was issued for the transport of

15 Willie Mitchell.

16 Q.  Okay.  Do you remember having anything to do with

17 obtaining that writ?

18 A.  I discussed the case with state's attorney William

19 McCollum and informed him of what our plans were, and in

20 concert with him, he got the writ himself, but I requested

21 it.

22 Q.  Okay.  Where does Mr. McCollum live now, by the way?

23 A.  I believe he's left the city and lives in Arizona.

24 Q.  Okay.  Now, then, did you also, in your obtaining that

25 writ, doesn't it say that you intended to interview Mr.

1   Mitchell?

2   A.   Yes.

3   Q.   Is that a routine you follow, when you're getting ready

4   to arrest somebody on a murder charge?

5   A.   Yes.

6   Q.   Okay.  Can you tell us was that writ executed the next

7   day, April 17th, the day you planned for the execution of all

8   the search warrants and the arrest warrant for Mr. Martin?

9   A.   It was.

10  Q.   Did you execute the writ?

11  A.   No, I didn't.

12  Q.   Do you know who did?

13  A.   Detective Darryl Townsend executed the writ and

14  transported Mr. Mitchell.

15  Q.   Okay.  Where were you at the time that transportation of

16  Mr. Mitchell was occurring?

17  A.   We were still out in Baltimore County at Creek Court or

18  in route back to the homicide unit.

19  Q.   Do you know, have you kept a record that would indicate

20  what time Mr. Mitchell arrived at homicide that morning?

21  A.   Yes, we have.

22  Q.   What time was that?

23  A.   I believe he arrived at 10:05 a.m.

24  Q.   Okay.  Do you recall when you first saw Mr. Mitchell that

25  morning?

209

 1  A.  Probably saw him shortly after that.

 2  Q.  You probably saw him?

 3  A.  Yes.

 4  Q.  Where was he when you saw him?

 5  A.  He would have been in the office.  He was placed in a

 6  Sergeant Petrie's office, which is on the floor.

 7  Q.  And so what did you do when you say you saw him, what --

 8  did you speak to him?

 9  A.  No, not at that point.

10  Q.  Okay.  Did there come a time when you spoke to him?

11  A.  Yes, we did.

12  Q.  When you say we, who are you referring to?

13  A.  Myself and Detective Hastings.

14  Q.  Okay.  Do you know about what time you started talking to

15  him?

16  A.  I believe the information sheet was done at 11:05, so

17  probably just a couple minutes before that.

18  Q.  Okay.  Now, when -- who did the questioning when you were

19  filling out the information sheet, and also an explanation of

20  rights form, was that filled out right after the information

21  sheet?

22  A.  Yes, it was.

23  Q.  Who went through the ritual of reading those forms or

24  having Mr. Mitchell read those forms?

25  A.  It was Detective Hastings.

210

1  Q.  Were you the lead detective on the case?

2  A.  Yes, I was.

3  Q.  Why was Detective Hastings doing the talking then?

4  A.  Detective Hastings had more experience and many, many

5  more interviews than I had, so I was more comfortable with

6  letting him take the lead in the interview part of this

7  investigation.

8  Q.  Okay.  Did you at any time that day show the writ to Mr.

9  Mitchell, the writ that was used to go pick him up by Darryl

10 Townsend?

11 A.  No.

12 Q.  Were you present when Hastings went through the questions

13 on the information sheet and the explanation of rights form?

14 A.  Yes, I was.

15 Q.  Did you sign your name at the bottom of those documents?

16        Let me call your attention to the exhibits there in

17 front of you marked F, and I don't have the information sheet

18 as an exhibit, but I can get one for you.

19        MR. SULLIVAN:  It's already admitted as a defense

20 exhibit, Mr. Harding.

21        MR. HARDING:  Okay.  Do you have the number of the

22 defense exhibit?

23        MR. SULLIVAN:  It might be 3 or 4.

24        MR. HARDING:  Defendant's exhibit 3 or 4?  No.

25 Wrong one.

1          (Pause.)

2    BY MR. HARDING:

3    Q.   This is the defendant's 4, is the information sheet;

4    isn't that correct?

5    A.   Correct.

6    Q.   And you, of course, have copies of these documents in

7    your file on this case; is that right?

8    A.   That's correct.

9    Q.   Did you sign the bottom of the explanation of rights form

10   as a witness?

11   A.   I did.

12   Q.   Can you tell us how those rights were given to Mr.

13   Mitchell?

14   A.   Mr. Mitchell was asked to read each one after which

15   Detective Hastings asked him if he understood each one, and

16   if he said, or indicated that he had, so he wrote, yes, he

17   that he understood and put his initials after each and every

18   one.

19   Q.   So the writing on exhibit F starting, where it says you

20   are hereby advised that, and then there are five questions

21   after that, whose writing is that?

22   A.   Mr. Mitchell's.

23   Q.   Did he sign immediately afterwards where it says I have

24   read the above explanation of my rights and I fully

25   understand it?

1  A.  He did.

2  Q.  And then it says I am willing to answer questions and I

3  do not want any attorney at this time.  My decision to answer

4  questions without having an attorney present is free and

5  voluntary on my part.

6          Do you see that?

7  A.  Yes, sir.

8  Q.  And did he sign right after that, also?

9  A.  He did.

10  Q.  Was he told to read that passage, also?

11  A.  Yes.

12  Q.  Now, what happened after you got done reading the

13  explanation of rights to Mr. Mitchell?

14  A.  We conducted, or Detective Hastings conducted a

15  pre-interview with him asking him questions about the

16  incident, but first he informed him that he was going to be

17  charged in this instance.

18  Q.  Okay.  And did you take notes during that time period,

19  that you called a pre-interview?

20  A.  I did.

21  Q.  Okay.  I have a sheet of paper here that also a defense

22  exhibit.  This is defense exhibit number 8.  Can you tell us

23  what that is?

24  A.  Those are the notes from the pre-interview that day.

25  Q.  Whose notes are they?

1  A.  These are mine.

2  Q.  And did I ask you about this over the lunch hour?  Did I

3  ask you to explain this set of notes --

4  A.  You did.

5  Q.  -- Detective Niedermeier?

6  A.  Yes.

7  Q.  And can you tell us what is the -- first of all, does

8  this have the correct date on it?

9  A.  No, it has 3-17.  It should be 4-17-02.

10  Q.  Okay.  And do you see the time up there in the upper

11  right-hand column?

12  A.  Yes.

13  Q.  Okay.  What time does that represent?

14  A.  11 a.m.

15  Q.  Okay.  Now, you told us just now that the information

16  sheet was filled out at 11:05, is that correct?

17  A.  Correct.

18  Q.  And then the explanation of rights form followed

19  immediately after that; is that correct?

20  A.  Correct.

21  Q.  Did you ask him any questions in the pre-interview before

22  Detective Hastings got done reading him his rights or

23  actually having him read his rights aloud?

24         MR. SULLIVAN:  Objection.  That assumes a fact not

25  in evidence in that question by this witness.

1          THE COURT:  Rephrase it, please, Mr. Harding.

2    BY MR. HARDING:

3    Q.  Did you ask him any questions about the facts of the

4    murder of the Weise brothers, or begin your interrogation

5    prior to the reading of the Miranda warnings, the explanation

6    of rights form?

7    A.  No.

8    Q.  Okay.  These notes here that follow, later down on the

9    page, starting where it says "heard I did something, killed

10   my man," when were those statements made?

11   A.  After Miranda and the information sheet, then Miranda

12   were done, once the interview actually started.

13          THE COURT:  Wait a minute.  Could you clarify that,

14   please?  Because I'm really curious about that.  I don't know

15   what that note is.

16   Q.  Okay.  What is that note?

17   A.  That's a quote that Mr. Mitchell made to me during the

18   interview.

19          THE COURT:  Read it again, please?

20          THE WITNESS:  He said that he heard, and then he

21   quote "I did something, killed my man."

22          THE COURT:  Okay.  Let me just want to make sure I

23   understand this, Mr. Harding.  He said to you that he had

24   heard like on the street that he, Mr. Mitchell, had "done

25   something to my man"?

1              THE WITNESS:  Correct.

2              THE COURT:  Do I have that right?

3              THE WITNESS:  He had heard on the street, and the

4    quote is I did something, like I killed my man.

5              THE COURT:  Okay.

6    Q.  And then what's the next sentence after that?

7    A.  A note about Cold Spring and Reisterstown, McDonald's is

8    a guy name big L, wanted four and a half.  Used his girl

9    friend's cell phone to call D, which he refers to as Darryl

10   Weise as D.

11             Around 10:00 then it quotes that he, when he spoke

12   to him on the phone, he said I want that times two.  Big L

13   drives a blue Buick, and then he set up a meeting.

14             MR. SULLIVAN:  Your Honor, I'm going to object.

15   That's not what he says there.  He's incorporating nice words

16   into the question is what's on the sheet.  I have no

17   objection.  What I would object to is editorializing things

18   that aren't on the sheet.

19             THE COURT:  Well, the sheet speaks for itself.  I

20   thought Mr. Harding --

21             MR. HARDING:  Let me ask this.

22             THE COURT:  -- was refreshing the witness's

23   recollection.

24             MR. SULLIVAN:  I'll withdraw the objection.

25   Q.  Does reading that passage refresh your recollection as to

1  what he was talking about that day?

2  A.  Yes.

3  Q.  Okay.  And then there's a phone number that follows, and

4  it says Jaquetta called Darryl on this phone.  Do you see

5  that?

6  A.  I do.

7  Q.  And then it says D, question mark?

8  A.  Correct.

9  Q.  Do you remember in the statement that Mr. Mitchell gave

10  you who is D?

11  A.  Darryl Weise.

12  Q.  And then it says able to identify and L, was Mr. Mitchell

13  able to identify L?

14  A.  That's what he had stated to me.

15  Q.  That he could identify him physically or by name?

16  A.  Physically.

17  Q.  Physically?

18        Okay.  And then there's some more notes.  How long

19  did you spend talking to Mr. Mitchell in this pre-interview;

20  do you recall, roughly?

21  A.  A guesstimate 15, 20.

22        MR. SULLIVAN:  Objection.

23        THE COURT:  Overruled.  You can continue.

24        THE WITNESS:  Maybe 15, 20 minutes.

25  Q.  And then what did you do?

1  A.  He was placed in a holding cell, and we conducted the

2  interview of Mr. Martin.

3  Q.  I see.  Did there come a time when you went back to Mr.

4  Mitchell?

5  A.  Yes, we did.

6  Q.  And was there anything different about the interview this

7  time?

8  A.  That statement was taped.

9  Q.  Okay.  Were you and Hastings present for that one, also?

10  A.  I was, and he was, yes.

11  Q.  What office did that occur in?

12  A.  That occurred in Sergeant Green's office.

13  Q.  A different office?

14  A.  Yes.

15  Q.  Okay.  Is the any difference between Sergeant Green's

16  office and Sergeant Petrie's office?

17  A.  Just availability.

18  Q.  Okay.  Did you and I listen to the tape recording of that

19  interview the other day in my office?

20  A.  Yeah, part of it.

21  Q.  Okay.  I'm -- what does the 11 a.m. represent on your

22  notes on Mitchell's exhibit number 8?

23  A.  It's the time I filled that heading for that sheet of

24  paper out.

25  Q.  Okay.  Let me show you government exhibit K.  This is

1  actually the tape was inside it.  Is that the tape of

2  Mitchell's statement?

3  A.  It is.

4  Q.  Okay.  Your Honor I'd like to play the tape and the

5  transcript of the tape is government exhibit H, which is also

6  discovery number 357 and 356 and following.

7        THE COURT:  Let me have that, please, Belinda.

8        (Pause.)

9        THE COURT:  Here it is.

10        (Pause.)

11        THE COURT:  Detective, while they're doing that,

12  why was Mr. Mitchell never prosecuted in state court for this

13  homicide?

14        THE WITNESS:  He was charged stateside, and I

15  believe that those charges were dropped.

16        THE COURT:  In lieu of this prosecution?

17        THE WITNESS:  Yes, sir.

18  BY MR. HARDING:

19  Q.  Detective, since we're short on copies of this

20  transcript, I'm going to stand over here with you while it is

21  being played.

22        MS. MANUELIAN:   He has a copy.

23  Q.  Oh, he has a copy.  Okay.  Then I won't stand there.

24        THE COURT:  Do you have a copy?

25        THE WITNESS:  I do, Your Honor.

1          THE COURT:  Oh, okay.

2          (Pause.)

3          (Tape played)

4          THE COURT:  Okay.  Can we break here, Mr. Harding?

5          MR. HARDING:  Sure, yes.

6          THE COURT:  You're available Monday, Detective

7    Niedermeier?  All right.  We'll complete your testimony at

8    that time.

9          MR. SULLIVAN:  Your Honor, I don't mean to be

10   interrupt.  I don't normally ask this, but I'd ask now for a

11   specific rule on witnesses.

12         THE COURT:  Yes.  That's very fair, Mr. Sullivan.

13   I try to be respectful of everybody, I really do.  But when I

14   say -- when I say a witness is not to discuss, well, I don't

15   remember what I said this morning, I certainly didn't want

16   Detective Niedermeier and Detective Hastings to have lunch,

17   that was the last thing on my mind.

18         So you've got to work this weekend I guess,

19   detective Niedermeier, so my instruction to you is not to

20   discuss the case, your testimony, or anybody else's

21   testimony, real, past, or future during this break.  Okay?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Don't discuss any aspect of the case

24   whatsoever.  Okay?  Thank you very much.

25         MR. HARDING:  I assume that, in conformity with the

1  local rules, Your Honor doesn't include me on that?

2      THE COURT:  I don't know why you need to talk to

3  him over the weekend.

4      MR. HARDING:  I need to talk to him first thing in

5  the morning on Monday just to go over anything that occurs to

6  me over the weekend, and the local rules specifically provide

7  when a witness is on direct he can talk to the prosecutor.

8      THE COURT:  Yeah, I know, vague rule.

9      You know, okay.

10      MR. HARDING:  And what --

11      THE COURT:  The local rule is the local rule.

12  Local rule is the local rule.  I'd like to override the local

13  rule, but I can't override the local rule.  If you want to

14  talk to him, you want to talk to him.  It all bears on

15  credibility, you know that, Mr. Harding.  If you want to talk

16  to him, you can talk to him, of course.

17      MR. HARDING:  Thank you, Your Honor.

18      THE COURT:  You're excused, detective, thank you.

19      I don't think we need the defendants to further

20  discuss our scheduling matters.  In fact we don't even need

21  to be on the record, so unless somebody has something they

22  need to say for the record, I'll be glad to excuse both.

23      MR. KURLAND:  Judge, I have one brief comment.

24      THE COURT:  All right, Mr. Kurland.

25      MR. MARTIN:  While he's making his comment, may I

1  step out for a second?

2           THE COURT:  Yes.

3           MR. KURLAND:  Your Honor, the record will show for

4  the afternoon procedure or the entire day during Officer

5  Saladino's testimony, all of the charged defendants were in

6  fact present in the courtroom in prison garb.

7           THE COURT:  Well, actually --

8           MR. KURLAND:  It says DOC.  That's prison garb.

9           THE COURT:  He didn't see the back.  It looks like

10  just a sweatshirt, a regular sweatshirt.

11           MR. KURLAND:  How about make it clear that all of

12  the defendants were in fact present during the entirety of

13  Officer Saladino's testimony?

14           THE COURT:  Certainly.  The record is so noted.

15           All right.  Thank you.  Thank you, marshals.  We'll

16  need the defendants again at 10:00 on Monday morning.  I

17  don't expect the Monday session to go too much past lunch,

18  and there's a possibility we could finish by lunchtime on

19  Monday.  Thank you.

20           (Proceedings adjourned)

21  I, Jacqueline Sovich, RPR, CM, do hereby certify that the
    foregoing is a correct transcript from the stenographic
22  record of proceedings in the above-entitled matter.

23

24  _____

25      Jacqueline Sovich                     DATE
        Official Court Reporter

```
1                    I N D E X

2   WITNESS           DIRECT    CROSS    REDIRECT    RECROSS

3   Kirk Hastings                21         184

4   Haven Kodek         86       98         118         121

5   Eric Saladino      129      132

6   Tyrell Wilson      137      143

7   Gary Niedermeier   205

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```