1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA

    v.                            CRIMINAL CASE NO.
                                      AMD-04-029

WILLIE MITCHELL,
SHELTON HARRIS,
SHELLY WAYNE MARTIN,
SHAWN GARDNER,

     Defendants
_____/

VOLUME IV OF XXXVII
Thursday, September 18, 2008
Baltimore, Maryland


Before:  Honorable Andre M. Davis, Judge
          And a Jury

Appearances:
     On Behalf of the Government:
      Robert Harding, Esquire
      Michael Hanlon, Esquire
     On Behalf of Defendant Mitchell:
      Laura Kelsey Rhodes, Esquire
      Michael E. Lawlor, Esquire
     On Behalf of Defendant Harris:
      Gerard P. Martin, Esquire
      Paul Flannery, Esquire
     On Behalf of Defendant Martin:
      Thomas L. Crowe, Esquire
      James G. Pyne, Esquire
     On Behalf of Defendant Gardner:
      Adam H. Kurland, Esquire
      Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

1          (Defendants present in courtroom. Proceedings at 9:47

2     a.m.)

3          THE COURT:  Good morning, Mr. Coburn.

4          MR. COBURN:  Good morning, Your Honor.  I appreciate

5     Your Honor hearing me briefly before the jury comes in.

6          I understand that the government is going to be calling

7     its first cooperating witness today, Darryl Bacon.  I learned

8     from my client that, apparently, amongst his things, he has a lot

9     of paperwork at Jessup where he was serving his sentence.

10    Amongst those possessions are a couple, at least a couple of

11    letters from Mr. Bacon to him.

12          And I apologize to the Court for not having been aware

13    of that.  The letters, from what I'm hearing about them, would be

14    directly relevant to cross examination.  I don't know if that --

15    I mean, we don't have any objection to Mr. Bacon testifying

16    today.  But if it's possible --

17          THE COURT:  He can be put on recall.

18          MR. COBURN:  That's all we need.

19          THE COURT:  On the issue of Mr. Gardner's material back

20    at Jessup, the first thing you need to be working on, and I

21    presume you are, is trying to arrange for family to retrieve

22    those items.  And if I can assist you in any way, let me know

23    that.  But I don't know what the situation is there.  But I can't

24    imagine it would be too difficult to arrange to have his stuff

25    packed up and turned over to family members.

1          MR. COBURN:  Appreciate that very much, Your Honor.

2     I'll be on that immediately.

3          The only other thing I just wanted to tell Your Honor

4     is that, just from reading Mr. Bacon's grand jury testimony,

5     there's just a tremendous amount of hearsay in there.  So that

6     when I stand up and say "objection", it's going to be a hearsay

7     objection, in all likelihood.

8          THE COURT:  Okay.  Thank you.  Good morning, Mr.

9     Lawlor.

10          MR. LAWLOR:  Good morning, Your Honor.  Your Honor,

11     there is a witness who will be testifying today, Eric Clash,

12     another cooperating witness.  This morning the government

13     provided us with a May 17th, 2006 plea agreement entered into by

14     Mr. Clash.  And in it it contains a statement of facts that he

15     conspired with members of the Rice organization, including with a

16     gentleman by the name of Chet Pajardo.

17          THE COURT:  Spell that, please.

18          MR. LAWLOR:  P-A-J-A-R-D-O.  I currently represent Mr.

19     Pajardo.  I don't anticipate that it's a problem, though, because

20     of the following.  I represent Mr. Pajardo in a 2225 proceeding.

21     I was appointed by the court.  It's in front of Judge Quarles.

22     I've had several similar cases in front of Judge Quarles where,

23     amongst other issues in the 2255 pleading filed pro se is a claim

24     that the trial attorney did not discuss with the client or file

25     at the client's behest a notice of appeal.

4

1          As the Court knows, most pleas contain appeal waivers.

2    But in an abundance of caution, and at the direction of Fourth

3    Circuit, Judge Quarles has been setting evidentiary hearings when

4    that issue is raised.  And because I do a lot of habeas cases,

5    Ms. Shearer appoints me regularly to those types of cases.

6          I have never spoken with Mr. Pajardo and, in fact, I

7    have not seen a lick of paper on the case because it's, I

8    assigned it to an associate in my office to work up the case even

9    on the single issue.  I am prepared for the hearing, which he'll

10   be doing and I will sitting there.  If I need to withdraw from

11   Mr. Pajardo's case, I will do that.  I don't believe that would

12   in any way be to Mr. Pajardo's detriment because it is a single

13   issue hearing which has yet to take place.

14         I just wanted to bring that to the Court's attention.

15   I don't think it's a problem.  We can probably talk about, I can

16   probably discuss with Ms. Shearer even, and not even involve the

17   court in whether I should continue to represent Mr. Pajardo, in

18   any event.

19         THE COURT:  Thank you, Mr. Lawlor.  Mr. Lawlor, will

20   you be conducting the examination of the witness today?

21         MR. LAWLOR:  I had intended on it but perhaps,

22   depending on the order of the call of the witnesses, Ms. Rhodes

23   could do that.  I don't think that -- we obviously have discussed

24   and shared the notes on that cross.

25         THE COURT:  Thank you for your sensitivity to the

1    issue.

2           MR. PYNE:  Good morning, Your Honor.

3           THE COURT:  Good morning, Mr. Pyne.

4           MR. PYNE:  I don't know what the order of witnesses

5    will be this morning.  But we were provided this morning with a

6    copy of a letter from Darryl Bacon to my client, I believe, it's

7    indicated to Wayne.  We'd be objecting to that letter.  I don't

8    know if you want to address that now.

9           MR. HARDING:  Judge, this was a letter that was seized

10   from Mr. Martin's apartment's at the execution of the search

11   warrant in this case.  It's always been available for inspection

12   by the attorneys, along with all the other evidence that was

13   seized in the case.

14          THE COURT:  Do you intend to introduce the letter?

15          MR. HARDING:  Oh, yes, Your Honor.

16          THE COURT:  And will the witness ratify and adopt the

17   letter?

18          MR. HARDING:  Oh, sure, yeah.  He wrote the letter.  He

19   signed his own name to it.

20          THE COURT:  But I mean, in other words, it's not

21   hearsay if he essentially repeats what's in the letter here in

22   court.  And is that what you anticipate he's going to do

23   substantially?

24          MR. HARDING:  I was actually going to have him read the

25   letter aloud, Your Honor.

6

1          THE COURT:  Oh, okay.  So in effect the letter is his

2     testimony, some of it.

3          MR. HARDING:  I have a few little particular -- he

4     mentioned some people like Mr. Needleman and some other people.

5     I was going to ask him who those people are.

6          THE COURT:  So in this light, Mr. Pyne, it clearly is

7     not hearsay.

8          MR. PYNE:  Well, it is a prior consistent statement.

9     He is attempting to bolster the credibility of his own witness

10    through the means of a letter.

11         THE COURT:  Well, I don't know if that's true.  In

12    other words, one form of the examination would be Q and A about

13    everything that's in the letter and then, And did you say all of

14    this to Mr. Martin?  Yes.  Did you write him a letter?  Yes.  Do

15    you believe he received it?

16         In fact, forget, Do you believe he received it?  Is

17    this the letter you sent to him containing the information you

18    just shared with the jury?  Yes.

19         MR. PYNE:  Again, it would be our position that he's

20    bolstering the credibility of his own witness.

21         THE COURT:  No.  I think it's clearly relevant to know,

22    it certainly would appear to be clearly relevant to the

23    government's proof to know that certain things were communicated

24    to Mr. Martin.  And so the letter actually is independent

25    evidence of a communication to an alleged member of the alleged

7

1    conspiracy.  Your objection is preserved for the record.

2            MR. PYNE:  Thank you, Your Honor.

3            THE COURT:  Thank you, Mr. Pyne.

4            MR. HARDING:  Judge --

5            THE COURT:  Good morning, Mr. Harding.

6            MR. HARDING:  Yeah.  I provided copies of Mr. Bacon's

7    plea agreement before the trial.  And it is complete.  It's a

8    complete copy in that includes the statement of facts.

9            I intend to introduce the plea agreement but with a, a

10   redacted version of it that omits the statement of facts.  I

11   wasn't sure what Your Honor's practice was on that.  But that's

12   the way I've done it in other courtrooms.

13           THE COURT:  What I've done, what seems to be

14   acceptable, simply to say as a part of my instructions that the

15   factual stipulation contained in the plea agreement is in no way,

16   shape or form evidence against the defendants on trial.  So you

17   can do it either way.  You can either redact it or I'll just give

18   that instruction.

19           MR. HARDING:  I've already redacted it so I'll do it

20   that way.

21           THE COURT:  That's fine.  All right.  We'll have the

22   jury, please.

23           Somebody turn on the system.  I'm going to give the

24   jury an instruction about the other acts evidence.

25           MR. HARDING:  Sorry, Your Honor.  What evidence is

8

1    that?

2              THE COURT:  Just to explain the relevance of the

3    evidence from yesterday.

4              MR. HARDING:  Our view is that it's not other acts.

5              THE COURT:  Yes.  I'm using that in a very loose sense.

6    I know exactly what you mean, Mr. Harding.

7              (Jury enters the courtroom.)

8              THE COURT:  Good morning.  Please be seated, ladies and

9    gentlemen.  Ladies and gentlemen, good morning.  We trust you had

10   a pleasant evening.  We're ready to proceed.  We had something of

11   a bumpy start yesterday but we're doing fine and moving along at

12   a nice pace.  I apologize for the delays.  But as I told you,

13   there will be occasions when it's just necessary for me to speak

14   to counsel about various logistical matters and legal matters.

15   And we'll do our best to keep you waiting as little as possible.

16             I want to instruct you on a certain matter.  Yesterday,

17   and I believe today and perhaps later in the trial as well, you

18   will hear testimony from law enforcement officers who have had

19   interactions, arrests, charges placed against one or more of the

20   defendants.  As you'll recall and as I will instruct you in

21   greater detail, part of the government's burden in this case is

22   to prove a number of elements, which include the element of a

23   continuity of the alleged enterprise, which is a part of the

24   RICO.  There's a separate drug conspiracy charge in the

25   indictment that you will consider.

9

1          And so it is proper for the government to introduce

2     evidence of any defendant's prior involvement with law

3     enforcement, including arrests and including the charges.  This

4     evidence will be available to you to consider in considering

5     whether the government has proven the charges in this case.

6          However, as you fully are aware, the defendants are not

7     charged with any of the actual offenses that were described to

8     you by law enforcement officers.  And in particular, the outcome

9     of any of those matters does not in any way guide your

10    determination of the charges in this case.  The defendants are

11    only charged in this case with the charges I've described to you

12    in the indictment and your consideration of the evidence will be

13    focused on those charges.

14          I've permitted counsel to ask various law enforcement

15    officers if they recall what the outcome of a prior case against

16    the defendant was.  As you heard yesterday, sometimes the

17    officers remember, sometimes they don't.  But whether a defendant

18    was acquitted of a prior charge or convicted of a prior charge or

19    whether the conviction was based on a guilty plea or a trial and

20    a verdict by a jury, none of these matters are to inform your

21    decision as to whether or not the government has proven the

22    charges in this case beyond a reasonable doubt.

23          You may proceed.

24          MR. HARDING:  Your Honor, the United States calls Derek

25    Herndon.

1              DEREK HERNDON, GOVERNMENT'S WITNESS, SWORN

2              THE WITNESS:  Yes.

3              THE CLERK:  Be seated.  Speak directly forward the

4       mike.  State your name and spell it for the record, please.

5              THE WITNESS:  My name is Derek Herndon.  That's

6       D-E-R-E-K.  Last name is H-E-R-N-D-O-N.

7              DIRECT EXAMINATION

8       BY MR. HARDING:

9       Q    Good morning.

10      A    Good morning.

11      Q    Can you tell us how you're employed?

12      A    I'm a detective with the Baltimore City Police Department.

13      I work in the Child Abuse Unit.  I've been a police for 13 years.

14      Q    Okay.  Can you tell us what your assignment was back in

15      1998?

16      A    I worked patrol in the Eastern District.

17      Q    Okay.  Let me call your attention to November 6th of 1998.

18      Were you on patrol on that day?

19      A    Yes, I was.

20      Q    And do you recall, were you in uniform or plain clothes?

21      A    In uniform.

22      Q    And were you in a patrol car or on foot?

23      A    Patrol car.

24      Q    In a marked patrol car, is that correct?

25      A    Yes, sir.

1    Q    And were you alone or with someone else?

2    A    I was by myself at the time.

3    Q    Okay.  Do you remember just prior to around 2100 hours that

4    night, 9 p.m., do you remember what street you were on?

5    A    Yes, I do.

6    Q    What?

7    A    I was on Greenmount Avenue.

8    Q    And what direction were you going?

9    A    Northbound.

10   Q    Okay.  Did you make an arrest around that time?

11   A    Yes, I did.

12   Q    Can you tell us what happened?

13   A    I was traveling northbound in the 1600 block of Greenmount

14   Avenue.  As I was approaching the intersection of Greenmount and

15   Lanvale, a blue Acura pulled in front of me, cutting me off,

16   almost hitting my vehicle.  I had to hit my brakes.

17          As he pulled in front of me, I could tell that the, I

18   could see that the driver wasn't wearing a seat belt, also.  So I

19   activated my lights and sirens and I pulled him over.

20   Q    Okay.  He wasn't, the driver wasn't wearing his seat belt;

21   is that your testimony?

22   A    Yes, sir.

23   Q    And was there another reason why you pulled him over?

24   A    Yes, sir.  For almost running into me.

25   Q    Okay.  Which direction was he coming from?

1   A    He was coming off Lanvale Street, which is a one-way street

2   going east.  So he was going east and he turned left, which would

3   be northbound on to Greenmount Avenue.

4   Q    Okay.  Let me show you two exhibits.  May I approach the

5   witness, Your Honor?

6           THE COURT:  Yes.

7   Q    Can you tell us what PH-4 shows and what PH-5 shows?

8   A    PH-4 is a picture of Greenmount Avenue pointing northbound

9   from, it appears that it's at the corner of Lanvale pointing

10  northbound up into the 17 and 1800 block of Greenmount Avenue.

11  PH-5 is a, is a photograph of a street sign at the corner of

12  Lanvale and Greenmount.

13  Q    Let me put this one on the screen.  And I'm hoping you can

14  see it on your screen there, Officer Herndon -- Detective

15  Herndon.  Can you see that?

16  A    There's nothing on the screen.  Okay.  I can see that.

17  Q    Sorry.  The other screens are not on, either.  Can you see

18  it now?

19  A    Yes, sir.

20          THE COURT:  Mr. Hanlon, try turning it off and seeing

21  if it will reboot.

22          MR. HANLON:  Certainly, Your Honor.  Thank you.

23  BY MR. HARDING:

24  Q    Okay.  Sorry for the interruption, Detective.  Did you

25  identify what street this is that appears on PH-4?

1    A    PH-4, this is Greenmount Avenue.

2    Q    Which direction are we looking?

3    A    Northbound.

4    Q    What's this on the far right-hand side?

5    A    That would be the cemetery wall on the Greenmount Cemetery.

6    Q    I see.  Is this the area where you stopped the vehicle that

7    night?

8    A    It's, in this picture, yes, I stopped the vehicle.

9         THE COURT:  You can touch it, Detective, to indicate

10   the area.

11   A    It's a little further up.  It's right past the pole here,

12   the light pole.  Would be right past that.

13   Q    If you touch it, it actually --

14   A    How's that?

15   Q    You can actually touch the picture itself.

16   A    I'm touching it.

17   Q    Oh, okay.  So it's in front of that pole that appears in

18   that picture, is that right?

19   A    Yes.

20   Q    Okay.  And this is another photo that just shows the

21   intersection.  You said it was Greenmount and Lanvale.  Since the

22   street scenes appear in the picture itself, I guess that's not

23   too difficult, right?

24   A    Correct.

25   Q    Okay.

1          THE COURT:  Mr. Harding, it may be that the witness'

2    monitor is slightly differently configured.  It's obviously

3    smaller.  So you may want to do the touching and guide the

4    witness, if that's --

5    Q    Is that about where the car was?

6    A    Yes.

7    Q    Okay.

8          THE COURT:  You know how to remove?  Mr. Hanlon can

9    help you remove it.

10         MR. HANLON:  If he needs it, I'll be happy to.

11         MR. HARDING:  I don't know how to remove it, actually.

12         THE COURT:  Mr. Hanlon is the expert.  Thank you.

13   BY MR. HARDING:

14   Q    Okay.  Tell us what happened when you decided to stop the

15   car.

16   A    Well, after he pulled in front of me, I hit my brakes

17   because it was, it was pretty close.  I thought we were going to

18   actually have an accident.  And I could see as he turned on to

19   Greenmount that his, he wasn't wearing his seat belt.  So I

20   turned my lights and sirens on and my spotlight to illuminate the

21   car.  And I pulled him over right there at, that would be

22   Lafayette, right around Lafayette and Greenmount Avenue.

23         As I pulled him over, I radioed the dispatcher my

24   location and the tag number of the vehicle.  I exited the vehicle

25   and I approached the driver's side of the vehicle.

1    Q    Okay.  Could I ask you to speak directly into the microphone

2    or pull it closer to you?  Okay.  What happened then?

3    A    As I approached the driver's seat, I asked the driver for

4    his license and registration.  The driver was sitting sideways in

5    the vehicle and he handed me his registration and told me he

6    didn't have his license on him.

7         When he did that, he was sitting sideways and he had

8    his right arm behind him, and he never moved his arm.  He used

9    his left hand to hand me his registration.  And he said he didn't

10   have his license so I asked him for his name and his birthday so

11   I can do a Soundex check, which is a validation check of your

12   driver's license in Maryland, to see if he had a valid license.

13        After that, after I got his name and license, I walked

14   back to the vehicle and I asked for a backup unit because of the

15   way he was sitting in the vehicle, turned kind of sideways with

16   his hand behind him.  He never moved his hand.  It seemed pretty

17   suspicious to me.

18        So I called for the backup unit.  While I was waiting

19   for the backup unit, I ran his license, well, his name and date

20   of birth to see if he was valid in Maryland through the

21   dispatcher.  And the dispatcher advised me that he was suspended

22   in Maryland for a Code 4217, which meant he didn't have a valid

23   license and he shouldn't have been driving in the State of

24   Maryland.

25   Q    Okay.  Let me try to ask you about -- you said he was

1    sitting sideways.  Can you tell us, was he, instead of sitting

2    directly forward, I assume he was turned either to the right or

3    to the left, is that correct?

4    A    Yes, sir.  He was sitting sideways in his seat.  He was not

5    sitting straightforward.  And his hands weren't out.  He was

6    sitting like at a 45 degree angle facing the window, and he had

7    his right arm behind him the whole time and he never moved it.

8    He did all his motions with his left hand.  And he was kind of

9    slightly turned -- well, he was turned that way in the seat.

10   Q    And you thought that was suspicious so you radioed --

11   A    Yes.  With him staying like that the whole time and him

12   having his hand behind his back the whole time and not moving it.

13   Q    Was there, by the way, someone else in the vehicle?

14   A    Yes, there was.

15   Q    And where was that person seated?

16   A    In the passenger seat in the front.

17   Q    Okay.  Back to the driver.  What name did he give you when

18   you asked him for his name?

19   A    He gave me Shawn Gardner.

20   Q    Okay.  And then you say you went back to your patrol car and

21   you learned via the radio that his license was suspended.  What

22   did you do then?

23   A    After I learned his license was suspended and my backup

24   units arrived, it was an Officer Methena and an Officer Staub

25   approached the driver's side of the vehicle, asked Mr. Gardner to

1    step out, and placed him under arrest for having a suspended

2    license.

3    Q    Okay.  What about the other occupant of the car?

4    A    We asked him to step out afterwards.

5    Q    Okay.  What happened then?

6    A    Well, after that, we of course did a search incident to

7    arrest of Mr. Gardner and we didn't recover anything.  And we

8    inventoried the vehicle to insure there's no valuables in the

9    vehicle before we tow the vehicle to city yard.  And during the

10   inventory of the vehicle, I found a Taurus 9 millimeter in the

11   vehicle.

12   Q    Okay.  Where was it in the vehicle?

13   A    It's an Acura vehicle.  It was two door.  It was in the rear

14   passenger side arm rest of the vehicle.

15   Q    Okay.  Was the gun loaded?

16   A    Yes, it was.

17   Q    You say it was a Taurus 9 millimeter?

18   A    Yes.  It was a Taurus 9 millimeter.

19   Q    Do you remember how many rounds were in the gun?

20   A    It had 16 rounds in it.

21   Q    And was there a round already in the chamber?

22   A    Yes.  It had one in the chamber and 15 in the magazine.

23   Q    Did you arrest Mr., the other occupant of the vehicle, also?

24   A    After the gun was discovered, yes.

25   Q    And what did you learn his name was?

1   A    Darryl Bacon.

2   Q    Okay.  What charges did you place against Mr. Gardner?

3   A    Mr. Gardner was given some traffic citations.  I believe,

4   because I don't have them any more, I believe he got a traffic

5   citation for failure to yield, a suspended license, and a seat

6   belt violation.

7   Q    Okay.  What about the handgun?

8   A    He was also charged with the handgun.

9   Q    And what about Mr. Bacon?  Did he get any charges?

10  A    Just the handgun.

11  Q    So you charged both of them with a handgun?

12  A    Yes, sir.

13  Q    Do you know, Detective Herndon, what the ultimate

14  disposition of the case was against either defendant?

15  A    Yes, sir.  The defendants were both given stets.

16  Q    What does that mean?

17  A    A stet is a, basically, it's not a postponement but it's

18  kind of like a postponement, but only the Court can decide to

19  bring the case back only if there's good cause in writing and

20  they have to present that to a judge.

21  Q    Okay.  Thank you.  I have no further questions.

22            MR. LAWLOR:  No questions, Your Honor.

23            MR. MARTIN:  No questions.

24            CROSS EXAMINATION

25  BY MR. COBURN:

1    Q    Good morning, Detective Herndon.

2    A    Good morning, sir.

3    Q    You've told us, have you not, that this incident occurred on

4    November 6th, 1998, is that correct?

5    A    Yes, sir.

6    Q    So we're coming up now on the ten year anniversary of it,

7    right?

8    A    Yes, sir.

9    Q    And I believe you responded to one of Mr. Harding's

10   questions by telling us that the case received a stet.  That's

11   spelled S-T-E-T, stet, right?

12   A    Correct.

13   Q    Now, that's a very common disposition in the Maryland state

14   criminal justice system, right?  Maybe you don't know how common

15   it is.  I mean, the case was handled in the state system, not

16   federally, right?

17   A    Yes, sir.

18   Q    Okay.  And basically, a stet means that the case is

19   essentially dismissed or held in abeyance.  It's not processed.

20   Doesn't result in any conviction.  But like you said, it can be

21   brought back if certain conditions aren't satisfied, is that

22   correct?

23   A    I believe so.

24   Q    Okay.  Now, you indicated there were two occupants of this

25   vehicle, right?

1    A    Yes, sir.

2    Q    And the two occupants were Shawn Gardner -- by the way, when

3    you arrested Mr. Gardner, he gave you his correct name, right,

4    sir?

5    A    He gave me Shawn Gardner.

6    Q    Okay.  And the other person was, did you say Darryl Bacon?

7    A    That was the name he gave me.

8    Q    Okay.  Willie Mitchell was not in the car, right, sir?

9    A    No.  I don't know who Willie Mitchell is.

10   Q    Okay.  Do you know who Shelton Harris is?

11   A    No.

12   Q    He wasn't in the car, either, right?

13   A    No, there was only two people in the vehicle.

14   Q    Okay.  You indicated, did you not, that Mr. Gardner, the

15   gentleman you understood to be Mr. Gardner, was driving the car,

16   right?

17   A    Yes, sir.

18   Q    Because you said that you checked on the status of his

19   license so he had to have been the driver, right?

20   A    He gave me that name of Shawn Gardner, yes.

21   Q    Okay.  You also indicated that the gun, and I believe you

22   said, did you tell us what kind of gun it was?

23   A    It was a Taurus 9 millimeter.

24   Q    The gun, I think you said, was in the rare, the rear

25   passenger area of the car, is that right?

1    A     It was in the rear passenger arm rest, yes.

2    Q     And you also indicated that both individuals were charged

3    with the gun and both individuals received a stet for the gun in

4    the state system, right, sir?

5    A     Yes.

6    Q     The gun was actually closer to the passenger than to the

7    driver, right, sir?

8    A     Yes.

9    Q     And the passenger is Darryl Bacon, right, sir?

10   A     Yes.

11   Q     Nothing further.

12          MR. HARDING:  I have no questions.

13          THE COURT:  Thank you very much, Detective.  You are

14   excused.

15          THE WITNESS:  Thank you.

16          THE COURT:  Next witness.

17          MR. HARDING:  Yes, Your Honor.  The United States calls

18   Darryl Bacon.

19          DARRYL BACON, GOVERNMENT'S WITNESS, SWORN

20          THE WITNESS:  I do.

21          THE CLERK:  Be seated.  Scoot up.  Speak directly

22   toward the mike.  State your name and spell it for the record,

23   please.

24          THE WITNESS:  Darryl Bacon.

25          THE CLERK:  Spell your name for the record.

1      THE WITNESS:  D-A-R-R-Y-L.  B-A-C-O-N.

2      DIRECT EXAMINATION

3  BY MR. HARDING:

4  Q     Good morning, Mr. Bacon.

5  A     Good morning.

6  Q     Can you tell us how old you are, sir?

7  A     29.

8  Q     Where did you grow up, Mr. Bacon?

9  A     Randallstown.

10 Q     How far did you get in school?

11 A     Eleventh grade.

12 Q     What school was that that you were going to in the eleventh

13 grade?

14 A     Randallstown High.

15 Q     Okay.  Are you employed right now, Mr. Bacon?

16 A     Yes.

17 Q     Can you give us an idea of what kind of work you do, without

18 telling us the specific company you work for?

19 A     Sales rep.

20 Q     Okay.  Did you recently get out of jail after serving a

21 term?

22 A     Yes.

23 Q     How long ago did you get out?

24 A     About three months ago.

25 Q     And how long were you locked up for?

1   A    Four years.

2   Q    Okay.  Was that pursuant to a guilty plea that had a plea

3   agreement involved with it?

4   A    Yes.

5   Q    Okay.  Let me show you what's been marked as Government

6   Exhibit P-1 and ask you if you can identify that document.  I'll

7   call your attention to the last page.  Does that have your

8   signature on it?

9   A    Yes.

10  Q    And it also has a signature of an attorney, is that correct?

11  A    Yes.

12  Q    What's his name?

13  A    Michael Montemarano.

14  Q    Okay.  What charge or charges did you plead guilty to in

15  that plea agreement?

16  A    Possession of a handgun.

17  Q    Let me ask you.  By the way, I'm just going to put this on

18  the screen.  Can you read the date on the top of the plea

19  agreement?

20  A    I can't see it.

21  Q    Can you see it now?

22  A    No.  March 23rd.

23  Q    Is that better?

24  A    Yes.

25  Q    March 23rd of what year?

1    A    2005.

2    Q    Okay.  And is this a, is this a plea agreement with the

3    federal government rather than --

4            THE COURT:  I'm sorry, Mr. Harding.  I think you need

5    to adjust the iris, if you can find that button.  Mr. Hanlon to

6    the rescue once again.

7            MR. HANLON:  I don't know about, that Your Honor.

8            MR. HARDING:  Is that better?

9            THE COURT:  No.  That's worse.  That's better.  Okay.

10   Excellent.

11   BY MR. HARDING:

12   Q    Thank you, Your Honor.  Is this a plea agreement that you

13   made with the United States, Mr. Bacon?

14   A    Yes.

15   Q    Okay.  It's actually addressed to your lawyer, is that

16   correct?

17   A    Yes.

18   Q    Now, what did you promise to do in this plea agreement, Mr.

19   Bacon?

20   A    Testify in this case.

21   Q    Okay.  And specifically, are your commitments detailed,

22   first of all, in Paragraph Two, Subsection A and B?  Is that

23   correct?

24   A    Yes.

25   Q    Your client shall fully and truthfully respond to all

1    questions, and so on, and your client shall cooperate completely

2    with federal law enforcement authorities, those two

3    subparagraphs, is that right?

4    A    Yes.

5    Q    And then over on the next page, Subsection C, your client

6    shall testify fully and truthfully before grand juries and at all

7    trials of cases at which his testimony may be relevant.  Is that

8    right?

9    A    Yes.

10   Q    And also, it says, your client will not commit any offense

11   in violation of federal, state or local law between the date of

12   this agreement and his sentencing in this case.

13           What did you get in exchange for agreeing to testify

14   and to cooperate truthfully in this case?

15   A    Five years no parole.

16   Q    Five years no parole?

17   A    Yes.

18   Q    Okay.  Let me call your attention to some other provisions

19   in this plea agreement.  This is Paragraph 4-B.  In consideration

20   of the plea your client is entering in state court and in the

21   event that your client provides substantial assistance in the

22   investigation or prosecution of others who have committed an

23   offense, the government agrees not to prosecute him in federal

24   court for violations of federal criminal laws related to the

25   above stipulated facts about contraband and a firearm recovered

Case 1:04-cr-00029-RDB   Document 674   Filed 06/08/09   Page 26 of 302

1    on August 17th, 2004.  Is that right?

2    A    That's correct.

3    Q    And then it says, your client understands that the Circuit

4    Court for Baltimore City is not bound by this agreement and will

5    determine the facts relevant to sentencing.  And then it goes on

6    to say something about how your criminal history could affect

7    your sentence and there's no understanding between you and the

8    government about what your criminal history is.  Is that right?

9    A    Yes.

10   Q    So in other words, you were permitted, pursuant to this plea

11   agreement, in exchange for agreeing to cooperate and testify

12   truthfully, you were allowed to plead guilty in state court, is

13   that right?

14   A    Yes.

15   Q    Specifically, Circuit Court of Baltimore City.  And you

16   agreed, did you not, that you would, that the government would

17   recommend a sentence of five years without parole, is that right?

18   A    Yes.

19   Q    And that's in Paragraph Five.  In return for the complete

20   fulfillment by your client of all of his obligations under this

21   agree, this office agrees as follows:  A, recommend the minimum

22   mandatory sentence of five years without parole for the offense

23   to which your client is pleading guilty and recommend that the

24   sentence be imposed concurrently with any time that your client

25   receives for pending VOP charges.  Does that mean violation of

1    probation charges?

2    A    Parole.

3    Q    Parole.  Okay.  Do you recall, under this agreement, what

4    would happen if you were to testify falsely or otherwise break

5    the plea agreement?

6    A    I could be charged with perjury.

7    Q    Okay.  Anything else?

8    A    Violate this plea agreement, this contract.

9    Q    It would, it would do what to the plea agreement?

10   A    Violate it.

11   Q    Okay.  And is that contained in Paragraph Six, Mr. Bacon?

12   A    Yes.

13   Q    It says, in fact, in the fourth line down of that paragraph,

14   that if you knowingly withheld evidence or otherwise not be

15   completely truthful in your testimony before grand juries or at

16   hearings and trials, then this office will be free to, one,

17   prosecute him for perjury, two, prosecute for other offenses that

18   he has committed, and so on.  Is that right?

19   A    Yes.

20   Q    And in fact, the fourth one is, recommend to the Circuit

21   Court of Baltimore City any sentence that this office considers

22   appropriate, up to and including the maximum possible sentence,

23   and five, prosecute your client in federal court for the crimes

24   your client committed on August 17th, 2004.  Do you see that?

25   A    Yes.

DIRECT EXAMINATION OF BACON

28

1    Q    Now, supposing there were a dispute over whether or not

2    you'd violated your plea agreement, do you know who it is that

3    would decide whether or not you had violated your plea agreement?

4    A    Yes.

5    Q    Okay.  Is that contained in Paragraph Seven?

6    A    Yes.

7    Q    So who would decide if you had violated the terms of your

8    plea agreement?

9    A    Circuit Court of Baltimore City.

10   Q    Okay.  Circuit Court of Baltimore City in an appropriate

11   proceeding.  And then it goes on to explain that all sorts of

12   disclosures and documents shall be admissible and this office

13   shall be required to establish your breach by a preponderance of

14   the evidence.  Do you see that?

15   A    Yes.

16   Q    Okay.  And then Paragraph Eight also goes on to explain that

17   nothing in the agreement protects you from perjury or false

18   statement charges, obstruction of justice charges.  Do you see

19   all that?

20   A    Yes.

21   Q    Okay.  Did you, in fact, get sentenced under that plea

22   agreement?

23   A    Yes.

24   Q    And that's when you got the five year no parole sentence?

25   A    Yes.

1   Q    And you served that entire sentence and got out of jail

2   already, is that right?

3   A    Yes.

4              MR. COBURN:  Objection, leading.

5              THE COURT:  Overruled.

6   Q    And in fact, you served a little less than five years

7   because you said you were locked up for four years, is that

8   right?

9   A    Yes.

10  Q    How come you got less than five years?

11  A    Under the state it's pretty much you're earning good days.

12  So --

13             THE COURT:  Keep your voice up, please, Mr. Bacon, and

14  get closer to the microphone.

15             THE WITNESS:  Under the state you get good days so the

16  good days put me out the door in four years.

17  BY MR. HARDING:

18  Q    How do you get good days?

19  A    Working.

20  Q    Working while you're locked up?

21  A    Yes.

22  Q    So you basically worked a year off your sentence that way?

23  A    Yes.

24  Q    Okay.  Now, is it fair to say, Mr. Bacon, that had you been

25  prosecuted federally, you could have gotten a lot more time than

1   five years no parole?

2   A    Yes.

3   Q    Did you and your lawyer talk about that back at the time

4   when you were deciding whether or not to take the plea agreement?

5   A    Yes.

6   Q    Do you have any idea now how much time you could have faced

7   if you, if you had been successfully prosecuted federally for the

8   offenses that you pled guilty to in state court?

9   A    No.

10  Q    You don't?

11  A    No.

12  Q    Okay.  Did you testify in the grand jury in this

13  investigation, Mr. Bacon?

14  A    Yes.

15  Q    Do you remember the date that you testified in the grand

16  jury?

17  A    No.

18  Q    Okay.  Would it refresh your recollection if I showed you

19  the first page of the transcript?

20          THE COURT:  You can put it on the DOAR, Mr. Harding.

21  Q    Is that the date, Mr. Bacon?

22  A    Yes.

23  Q    May 12th, 2004?

24  A    Yes.

25  Q    Okay.  So correct me if I'm wrong.  You testified in the

Case 1:04-cr-00029-RDB    Document 674    Filed 06/08/09    Page 31 of 302

1    grand jury before you were even arrested in the case that you

2    pled guilty in, is that correct?

3    A    Yes.

4    Q    When you testified in the grand jury, you didn't have a

5    charge hanging over your head then, is that correct, Mr. Bacon?

6    A    No.

7    Q    You just got a subpoena to come and testify to court, is

8    that right?

9    A    Yes.

10   Q    And did you give details in your grand jury testimony about

11   everything that the government asked you about?

12   A    Yes.

13   Q    Okay.  Now, let me ask you about your other convictions in

14   the past.

15           Have you been convicted of other crimes, Mr. Bacon?

16   A    Yes.

17   Q    Can you give us an idea of what they are, as best you can?

18   A    Drug charges and gun charges.

19   Q    Okay.  Can you give us an idea of when these charges were

20   and, also, how many of them there were?

21   A    I caught four drug charges in '98, a handgun charge in '98,

22   '99 a drug charge.  2000, drug charge.  And 2004, drug charge,

23   gun charge.

24   Q    Okay.  The four drug charges in '98, were those all in a

25   single case or were some of them grouped into a single case?

DIRECT EXAMINATION OF BACON                          32

1    A    It was a single case.

2    Q    It was a single case?

3    A    Yeah.

4    Q    Okay.  Were those undercover buys or some sort of

5    transactions that you did --

6             MR. LAWLOR:  Objection, Your Honor.  Leading.

7             THE COURT:  Overruled.

8    A    Yes.

9    Q    They were?  But then you were charged with them altogether,

10   is that correct?

11   A    Yes.

12   Q    Okay.  So you've got, you've got, is it two or three drug

13   convictions, then?

14   A    Two.

15   Q    Okay.  Have you also been convicted of making a false

16   statement to an officer?

17   A    Yes.

18   Q    Was that part of the, one of the drug convictions?

19   A    Yes.

20   Q    What was the false statement that you made?

21   A    I used an alias.

22   Q    Okay.  Do you remember what alias you used?

23   A    No.

24   Q    Why was it -- was this an alias that you gave when you were

25   arrested?

1    A     Yes.

2    Q     Why did you give an alias?

3    A     I had a warrant on me for a violation of probation.

4    Q     Okay.

5          THE COURT:  Would you like some water, Mr. Bacon?

6          THE WITNESS:  Yes.

7          MR. HARDING:  I can handle that.

8          THE COURT:  Ms. Arrington will get it.

9    BY MR. HARDING:

10   Q     Now, back for a minute to this past four years that you've

11   been locked up until three months ago.  Did you pick up a charge

12   while you were in jail?

13   A     Yes.

14   Q     What was that charge?

15   A     Possession of marijuana.

16   Q     You were caught with marijuana while you were in jail?

17   A     Yes.

18   Q     What jail were you in?

19   A     MCIJ.

20   Q     Okay.  Is that a state facility in Jessup, Maryland?

21   A     Yes.

22   Q     And so the charge was what?

23   A     Possession of marijuana.

24   Q     How much marijuana did you have?

25   A     A gram.

DIRECT EXAMINATION OF BACON                              34

1    Q    A gram?

2    A    Yes.

3    Q    How did you get it in jail, anyway?

4    A    Just bought it through somebody.

5    Q    I'm sorry?

6    A    I bought it from a friend.

7    Q    Oh.  From another prisoner?

8    A    Yes.

9    Q    And is that case still pending in Anne Arundel state court?

10   A    Yes.

11   Q    When you got out of jail three months ago, did you express

12   an interest in moving yourself and your family because of this

13   case?

14            MR. LAWLOR:  Objection, Your Honor.

15            THE COURT:  Overruled.  You may answer.

16   A    Yes.

17   Q    And why was that?

18            MR. LAWLOR:  Objection.

19            THE COURT:  Overruled.  You may answer.

20   A    For safety reasons.

21   Q    And did the United States Attorney's Office, did the Victim

22   Witness Unit in the U.S. Attorney's Office provide you with funds

23   to help you move?

24   A    Yes.

25   Q    Do you have a recollection now as to how much money you got?

1    A    Around 3500.

2    Q    Okay.  And what was that to pay for, exactly?  Do you

3    remember?

4    A    Security deposit and first month's rent.

5    Q    Okay.  Now, you say you grew up in Randallstown and you went

6    to school there, is that correct?

7    A    Yes.

8    Q    While you were growing up, did you get to know somebody by

9    the name of Shawn Gardner?

10   A    Yes.

11   Q    Do you see him in the courtroom here today?

12   A    Yes.

13   Q    Could you point him out for us, please?

14   A    (Indicating.)

15   Q    Could you indicate, could you describe the person by the

16   type of clothing or other things about his appearance that would

17   help us to know who you're pointing to?

18   A    He has glasses on and a white shirt.

19   Q    Okay.  Can the record reflect that he's indicated the

20   defendant, Shawn Gardner, Your Honor?

21        THE COURT:  So noted.

22   Q    Do you remember how old you were when you met Shawn Gardner?

23   A    Around 12, 13.

24   Q    Is Mr. Gardner older than you or younger than you or the

25   same age or what?

1   A    He's older than me.

2   Q    How much?

3   A    By two years.

4   Q    Okay.  Did you also meet Willie Mitchell while you were in

5   Randallstown?

6   A    Yes.

7   Q    Do you see him in the courtroom?

8   A    Yes.

9   Q    Can you point him out?

10  A    (Indicating.)

11  Q    Can you describe what clothing he's wearing?

12  A    A sweater, gray.

13  Q    A gray sweater?

14  A    Yeah.

15  Q    Can the record reflect that the witness has identified the

16  defendant, Willie Mitchell, Your Honor?

17          THE COURT:  So noted.

18  Q    By the way, what's Mr. Mitchell's nickname, if you know?

19  A    Bo.

20  Q    And what's Mr. Gardner's nickname, if you know?

21  A    Goo.

22  Q    Goo?

23  A    Yes.

24  Q    Do you remember how you met Mr. Mitchell?

25  A    Through Goo.

1    Q    Through Goo?

2    A    Yes.

3    Q    Do you actually remember when you met Mr. Mitchell?

4    A    I think I met him in '93.

5    Q    Okay.  Do you remember how it was that you were introduced

6    to him?

7    A    We had cut out of, I think, Goo and I had cut out of school

8    and went over Willie, Bo's house.

9    Q    Okay.  Is that when you first met him?

10   A    Yes.

11   Q    Was he living in Randallstown, also, at the time?

12   A    Yes.

13   Q    And was Mr. Gardner living in Randallstown, also?

14   A    Yes.

15   Q    Okay.  Did you get to know, also, somebody by the name of

16   Shelly Martin?

17   A    Yes.

18   Q    Do you see him in the courtroom here today?

19   A    Yes.

20   Q    Could you point him out?

21   A    (Indicating.)

22   Q    What clothing is he wearing?

23   A    I can't tell.  White shirt.

24   Q    I'm sorry?  Did you say you can't tell?

25   A    No, I can't.  It's like a white shirt, I think, from over

1    here.

2    Q    Okay.  Tell us, tell us where he's --

3    A    He's sitting right there in the corner.

4    Q    In the corner?

5    A    Yes.

6    Q    Can the record reflect that the witness has identified Mr.

7    Martin, Your Honor?

8            THE COURT:  So noted.

9    Q    You said that Mr. Gardner was a couple of years older than

10   you.  What about Mr. Mitchell?  Is he older or younger than you?

11   A    He's older.

12   Q    How much older is he?

13   A    A couple years.

14   Q    And what about Mr. Martin?

15   A    A year older than me.

16   Q    He's older, also?

17   A    Yes.

18   Q    How much, do you know?

19   A    A year.

20   Q    One year?  Okay.  Does Mr. Martin have a nickname or a name

21   he usually goes by?

22   A    Wayne.

23   Q    Okay.  Is that also his middle name, do you know?

24   A    Yes.

25   Q    Okay.  Let me, back in the, a long time ago, around 1994,

1    did you get sent to the Charles Hickey School?

2    A    Yes.

3    Q    How long did you spend there?

4    A    A few months.

5    Q    Okay.  While you were there, did any of these three

6    defendants that you've just identified also arrive at the Hickey

7    School?

8    A    Yes.

9    Q    How many of them?

10   A    Two.

11   Q    Which two?

12   A    Wayne and Goo.

13   Q    Wayne and Goo?

14   A    Yes.

15   Q    Okay.  Did they tell you why they were there?

16   A    No, I can't remember.

17   Q    Okay.  Let me ask you another question.  Did you learn of a

18   robbery that Mr. Mitchell --

19             MR. LAWLOR:  Objection, Your Honor.

20             THE COURT:  Overruled.  Let him ask the question.

21   Q    -- that Mr. Mitchell was involved in back in, around that

22   time?

23             MR. LAWLOR:  Objection.

24             MR. CROWE:  Objection.

25             THE COURT:  Overruled.  You may answer.

DIRECT EXAMINATION OF BACON                    40

1          THE WITNESS:  I can't remember.

2     BY MR. HARDING:

3     Q    Okay.  Let me, would it refresh your recollection if I

4     showed you a passage from your grand jury transcript?

5     A    Yes.

6          MR. HARDING:  This is Page Six.

7          MS. RHODES:  Could you use the system so we can see it?

8          MR. LAWLOR:  No.  No.  No.  No.

9          THE COURT:  I think counsel would rather you not show

10    the transcript on the DOAR.  So just read it yourself, Mr. Bacon,

11    whatever he points out to you.

12          (Pause in Proceedings.)

13    BY MR. HARDING:

14    Q    Does that refresh your recollection, Mr. Bacon?

15    A    Yes.

16    Q    What did -- well, who told you about it, first of all?

17    A    I can't remember who told me about it.

18    Q    Was it one of the three or all of the three or what?

19          MR. LAWLOR:  Objection, Your Honor.

20          MR. CROWE:  Objection.

21          MR. LAWLOR:  Asked and answered, Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  It was one of the three.

24          MR. HARDING:  Okay.  What did you, what did you learn?

25          MR. COBURN:  Objection.

Case 1:04-cr-00029-RDB   Document 674   Filed 06/08/09   Page 41 of 302

1          MR. LAWLOR:  Objection.

2          THE COURT:  Overruled.

3          MR. LAWLOR:  Objection.  Can we approach, Your Honor?

4          THE COURT:  No.

5          THE WITNESS:  That a robbery happened.

6          MR. HARDING:  And was it an armed robbery or an unarmed

7   robbery --

8          MR. LAWLOR:  Objection.

9          MR. HARDING: -- did he tell you?

10          THE COURT:  Overruled.

11          THE WITNESS:  An armed robbery.

12   BY MR. HARDING:

13   Q    Okay.  Are you nervous today, Mr. Bacon?

14   A    No.

15   Q    Okay.  Did there come a time when you got involved in drug

16   trafficking, Mr. Bacon?

17   A    Yes.

18   Q    When was that?

19   A    '92, '93.

20   Q    How old were you then?

21   A    12, 13.

22   Q    Okay.  Let me just back up for one minute.  You told us

23   about how you met Mr. Mitchell when you cut out from school with

24   Mr. Gardner or Goo one day?

25   A    Yes.

DIRECT EXAMINATION OF BACON                                    42

1    Q    Was there somebody else there that you met at the same time?

2    A    I met Bo's cousin.

3    Q    Okay.  Who's Bo's cousin?

4    A    Donte.

5    Q    Donte?  Let me show you what's been marked as Government

6    Exhibit PH-54 and ask you if you can identify that?

7    A    That's Donte.

8    Q    Do you know Donte's last name?

9    A    No.

10   Q    And I'm putting PH-54 on the screen now.  He was there at

11   the same time when you met Mr. Mitchell, is that correct?

12   A    Yes.

13   Q    Okay.  When you got involved in drug trafficking, Mr. Bacon,

14   did you get involved with some of the defendants that you've just

15   identified here today?

16   A    Yes.

17   Q    Okay.  Can you tell us, did you get involved, for example,

18   with Goo?

19          MR. COBURN:  Objection, Your Honor, leading.

20          THE COURT:  Overruled.

21   A    Yes.

22   Q    Where was it that you were selling drugs, Mr. Bacon?

23   A    Catonsville.

24   Q    Okay.  What part of Catonsville?

25   A    Winters Lane.

DIRECT EXAMINATION OF BACON

43

1    Q    Winters Lane?

2    A    Yes.

3    Q    And what about Goo?  Do you know where he was selling?

4         MR. COBURN:  Objection, no foundation.

5         THE COURT:  Overruled.

6    Q    I'm sorry?

7    A    No.

8    Q    Okay.  Did you eventually learn places where he sold his

9    drugs?

10        MR. COBURN:  Same objection, Your Honor.

11        THE COURT:  Overruled.

12   A    Yes.

13   Q    Where?

14   A    Randallstown.

15   Q    Where about in Randallstown?

16   A    Savoy.

17        MR. COBURN:  Same objection.

18        THE COURT:  Overruled.

19   Q    Savoy.  What's that?

20   A    Apartment complex.

21   Q    Okay.  Did you sell there?

22   A    Yes.

23   Q    So you did, you sold both there and in Catonsville?

24   A    Yes.

25   Q    And are the Savoy Apartments still standing, Mr. Bacon?

1    A    No.

2    Q    What happened to them?

3    A    Tore them down.

4    Q    Okay.  What about Mr. Martin?  You said you met him in

5    Randallstown, also, is that correct?

6    A    Yes.

7    Q    Did there come a time when his family moved somewhere?

8    A    Yes.

9    Q    Where did they move to?

10   A    South Baltimore.

11   Q    What part of South Baltimore, do you remember?

12   A    Southwest.

13   Q    Okay.  Did they stay there or did they move back at some

14   point?

15   A    I don't know.  I guess they stayed there.

16   Q    Okay.  Do you know, where did Mr. Martin sell drugs, or did

17   he sell drugs, first of all?

18   A    Yes.

19   Q    Where did he sell drugs?

20   A    South Baltimore.

21   Q    Okay.  Can you tell us what drugs you sold?

22   A    Cocaine.

23   Q    Any others?

24   A    Heroin.

25   Q    Any others?

1    A     And marijuana.

2    Q     Okay.  What about Goo?

3          MR. COBURN:  Same objection, Your Honor.

4          THE COURT:  Overruled.

5    Q     What drugs did he sell?

6    A     Cocaine.

7    Q     What about marijuana?

8    A     Marijuana.

9    Q     Okay.  And you said he was selling in Randallstown.  Did

10   there come a time when he sold somewhere in Baltimore City, also?

11   A     Yes.

12         MR. COBURN:  Same objection, Your Honor.

13         THE COURT:  Overruled.

14   Q     Where?

15   A     South Baltimore.

16   Q     Okay.  Did he also sell to somebody in Park Heights, do you

17   know?

18         MR. MARTIN:  Objection.

19         THE COURT:  Overruled.

20   A     No.

21   Q     Okay.  Did he have another dealer that he distributed to who

22   then dealt in Park Heights?

23         MR. COBURN:  Objection, Your Honor.

24         MR. MARTIN:  Objection.

25         THE COURT:  Overruled.

DIRECT EXAMINATION OF BACON                    46

1    A    I can't remember.

2    Q    Okay.  Do you remember the name Avon?

3              MR. MARTIN:  Objection.

4              THE WITNESS:  Yes.

5              THE COURT:  Overruled.

6    Q    Who is Avon?

7    A    That's Goo's cousin.

8    Q    Where did -- to your knowledge, did Mr. Gardner sell drugs

9    to Avon?

10   A    I'm not sure.

11   Q    Okay.  Let me, let me call your attention to Page 12 of your

12   grand jury testimony, Mr. Gardner.  Specifically, to Line 15 and

13   the passages that follow.  Can you take a look at that?  Does

14   that refresh your recollection, Mr. Gardner?

15             MR. COBURN:  Objection.

16             THE COURT:  Overruled.

17   A    Yes.

18   Q    Where did, where did Avon distribute drugs?

19             MR. COBURN:  Objection.

20             MR. MARTIN:  Objection.

21             THE COURT:  Overruled.

22   A    Park Heights.

23   Q    Okay.  And did Goo or Mr. Gardner distribute to Avon?

24             MR. COBURN:  Objection.

25             THE COURT:  Overruled.

1    A    Yes.

2    Q    Okay.  And he was Mr. Gardner's cousin, is that right?

3    A    Yes.

4    Q    And you've met him, I assume, is that correct?

5    A    Yes.

6    Q    In fact, have you gotten drugs from him yourself?

7    A    Yes.

8    Q    Okay.  We'll, I think we'll come to that later.  Let me go

9    back to Mr. Martin.  You said he dealt in South Baltimore, is

10   that correct?

11   A    Yes.

12   Q    Do you remember the streets?

13   A    Smallwood and Ramsay.

14   Q    Smallwood and Ramsay?

15   A    Yes.

16   Q    Any others?

17   A    Not that I'm familiar with.

18   Q    Okay.  Did you deal down there in South Baltimore to some

19   extent, Mr. Bacon?

20   A    No.  I probably been down there for a month or two.

21   Q    A month or two?

22   A    Yes.

23   Q    Selling drugs?

24   A    Yes.

25   Q    What streets did you sell on?

DIRECT EXAMINATION OF BACON                    48

1    A    Wilhelm and Smallwood.

2    Q    Okay.  Wilhelm and Smallwood.  Is that a good area to go to

3    sell drugs?

4    A    Yes.

5    Q    Because it's not near your house, is it?

6    A    No.

7    Q    So was it just because it was a good market that you went

8    down there?

9    A    Yes.

10   Q    Okay.  Let me show you a couple of other photographs now.

11          THE COURT:  Why don't you put them on the DOAR, Mr.

12   Harding?

13   Q    I'm now going to show you Government Exhibit PH-56.  Can you

14   see that picture, Mr. Bacon?

15   A    Yes.

16   Q    Who is that guy?

17   A    Darryl Wyche.

18   Q    Okay.  Did he grow up with you in Randallstown, also?

19   A    Yes.

20   Q    Was he older than you or younger than you?

21   A    Older.

22   Q    Do you remember how much?

23   A    No.

24   Q    And now I'm going to show you Government Exhibit PH-55.  Do

25   you recognize who that is?

1    A    Yes.

2    Q    Who is it?

3    A    Anthony Wyche.

4    Q    And is he related to Darryl Wyche?

5    A    Yes.

6    Q    How so?

7    A    Brothers.

8    Q    Is Anthony older or younger than Darryl?

9    A    Younger.

10   Q    Is he younger than you?

11   A    No.

12   Q    Is he older or the same age?

13   A    Older.

14   Q    How much older?

15   A    Don't know.

16   Q    Okay.  Did you grow up with those guys, both of them, in

17   Randallstown?

18   A    Yes.

19   Q    Did they go to school with you?

20   A    Anthony Wyche did.

21   Q    Randallstown High School?

22   A    Yes.

23   Q    And Darryl, did he go there before you or what?

24   A    I don't know.

25   Q    Okay.  Did these two brothers, to your knowledge, get

1    involved in drug trafficking, also?

2    A    Yes.

3    Q    What kind of drugs did they sell?

4    A    Cocaine.

5    Q    Did there come a time when you got drugs from Darryl Wyche

6    through someone else?

7    A    Yes.

8    Q    Okay.  Who did you go through to get drugs from Darryl

9    Wyche?

10   A    Willie Mitchell.

11   Q    Okay.  Is that Bo?

12   A    Yes.

13   Q    Why didn't you just buy drugs directly from Darryl?

14   A    I ain't deal with Darryl like that.

15   Q    You didn't deal with Darryl like that?

16   A    No.

17   Q    Okay.  But Mr. Mitchell did?

18   A    Yes.

19   Q    Let me just try to get some chronological perspective here,

20   Mr. Bacon.  Did you get locked up in 2000?

21   A    Yes.

22   Q    And did you wind up doing about three years in jail at that

23   time?

24   A    Yes.

25   Q    So you were locked up from 2000 to 2003?

1    A    Yes.

2    Q    So it was before 2000 that you were getting drugs from

3    Darryl Wyche through Mr. Mitchell, is that right?

4    A    Yes.

5    Q    Do you remember what years you were doing that in?

6    A    '99.

7    Q    '99?

8    A    Yeah.

9    Q    Into 2000?

10   A    Yes.

11   Q    And after you got locked up in 2000, did you later learn

12   from Mr. Mitchell that he was still being supplied by Darryl

13   Wyche?

14           MR. LAWLOR:  Objection, Your Honor, leading.

15           THE COURT:  Overruled.  You may answer.

16           THE WITNESS:  Yes.

17   BY MR. HARDING:

18   Q    I want to ask, I want to show you a couple more pictures

19   now.  This is Government Exhibit PH-68.  Do you recognize who

20   that person is?

21   A    Yes.

22   Q    Who is that?

23   A    Claudus Lassiter.

24   Q    Claudus Lassiter.  Who is he?

25   A    A guy who grew up out Randallstown.

1    Q    Another guy who grew up in Randallstown?

2    A    Yes.

3    Q    Do you know, did he work with the Wyche brothers in the drug

4    business?

5    A    Yes.

6              MR. LAWLOR:  Again, Your Honor, objection.

7              THE COURT:  Overruled.

8    A    Yes.

9    Q    Okay.  What did he do, if you remember?

10   A    Pretty much sold drugs.

11   Q    For the Wyche brothers?

12   A    Yes.

13   Q    What kind of drugs did the Wyche brothers sell?

14   A    Cocaine.

15   Q    Is that powder cocaine as opposed to crack?

16   A    Yes.

17   Q    Okay.  And I'm showing you now PH-71.  Do you recognize who

18   that person is?

19   A    Yes.

20   Q    Who is that?

21   A    Deezo.

22   Q    Deezo?

23   A    Yes.

24   Q    I assume that's a nickname?

25   A    Yes.

DIRECT EXAMINATION OF BACON                         53

1    Q    What's his real name, do you know?

2    A    No.

3    Q    Okay.  Who is he?

4    A    Some guy from out Randallstown.

5    Q    Okay.  So did you grow up with him, also?

6    A    No.

7    Q    You didn't?

8    A    No.

9    Q    Was he involved with the Wyche brothers, also?

10   A    Yes.

11   Q    What did he do?

12   A    Sell drugs.

13   Q    He sold drugs?

14   A    Yes.

15   Q    Okay.  If I may back up for a minute.  Was there a time back

16   in the '90s when Bo or Mr. Mitchell got drugs from Wayne or Mr.

17   Martin?

18   A    Yes.

19            MR. PYNE:  Objection.

20            THE COURT:  Overruled.

21   Q    What drugs?

22   A    Cocaine.

23   Q    Did you get drugs from Wayne on occasion?

24   A    No.

25   Q    Did he sell you drugs?

1          MR. PYNE:  Objection.

2     A    No.

3          THE COURT:  Overruled.

4     Q    Did he front you drugs?  I mean, did he give you drugs on

5     the understanding that you would pay him back after you sold

6     them?

7     A    No.

8     Q    Okay.  Let me ask you about some of the people -- well, let

9     me ask you about some names.  Do you know the name Polo?

10    A    Yes.

11    Q    Who is Polo?

12    A    Polo was a guy from out Columbia that sold drugs.

13    Q    Okay.  Columbia, Maryland or Columbia, South America?

14    A    Columbia, Maryland.

15    Q    Okay.  And did you get drugs from Polo?

16    A    Yes.

17    Q    What kind of drugs?

18    A    Cocaine.

19    Q    Where did you used to go to get drugs from Polo?

20    A    Up Irvington, Baltimore, Maryland.

21         THE COURT:  Closer to the mike, close.

22    A    Up Irvington, Baltimore, Maryland.

23    Q    Okay.  So you didn't go all the way down to Columbia to meet

24    with him?

25    A    No.

1    Q    Did Mr. Martin and Mr. Gardner, that is to say, Wayne and

2    Goo, also get drugs from Polo?

3              MR. COBURN:  Objection.

4              THE COURT:  Overruled.  You may answer.

5    A    Yes.

6              THE COURT:  What was your answer?

7    A    Yes.

8    Q    Did you sometimes all go together to get drugs from Polo?

9    A    Yes.

10   Q    What kind of quantities did you get?

11   A    Like a kilo.

12   Q    A kilo at a time?

13   A    It was only one time.

14   Q    Only one time that you went with them to buy a package, is

15   that right?

16   A    Yes.

17   Q    Did you go separately on other occasions?

18   A    No.

19   Q    You only went once to get drugs from Polo?

20   A    Yes.

21   Q    What about Polo's cousin?  Did he have a cousin?

22   A    I don't know.

23   Q    Do you know the name Tim?

24   A    Yes.

25   Q    Who is Tim?

1    A    A friend of Polo's.

2    Q    A friend of Polo's?

3    A    Yes.

4    Q    Did you also get drugs from Tim?

5    A    Yes.

6    Q    Do you know, did Mr. Gardner and Mr. Martin also get drugs

7    from Tim?

8              MR. COBURN:  Objection.

9              THE COURT:  Overruled.

10   A    I don't know about Mr. Martin.  I know about Mr. Gardner.

11   Yes.

12   Q    Okay.  What kind of quantities?

13   A    I'm not for sure.

14   Q    Was it cocaine, also, or some other drug?

15   A    Cocaine.

16   Q    You know the name Poppi?

17   A    Yes.

18   Q    Who is Poppi?

19   A    Dominican from New York.

20   Q    Okay.  A Dominican from up in New York.  What kind, did he

21   deal drugs, also?

22   A    Yes.

23   Q    Did you get drugs from Poppi?

24   A    Yes.

25   Q    What kind of drugs?

1    A    Heroin.

2    Q    Heroin?

3    A    Yes.

4    Q    Any other drugs?

5    A    That's it to my recollection.

6    Q    How about Mr. Martin and Mr. Gardner?  Did they get drugs

7    from Poppi, also?

8              MR. COBURN:  Objection.

9              THE COURT:  Overruled.

10   A    Heroin.

11   Q    Heroin?

12   A    Yes.

13   Q    Okay.  Did you travel up there together sometimes?

14   A    Yes.

15   Q    How often did you go up there?

16   A    Went there about once or twice.

17   Q    Once or twice in what time period?

18   A    Twice in one month.

19   Q    Twice in a month?

20   A    Yes.

21   Q    Was this also in the 90's that you were going up to New York

22   to see Poppi?

23   A    Yes.

24   Q    What kind of quantities did you get when you were up there?

25   A    25, 50 grams of heroin.

1  Q    25 or 50 grams of heroin?

2  A    Yes.

3  Q    Was that your share or was that what all of you got?

4  A    That's, we all split it.

5  Q    You all would split it?

6  A    Yes.

7  Q    Did you pull your money to get packages of heroin from

8  Poppi?

9  A    Yes.

10 Q    Okay.  When you went up to New York, did you go with other

11 people usually?

12 A    No.

13 Q    Well, I mean, did Mr. Gardner and Mr. Martin go with you?

14       MR. COBURN:  Objection.

15       THE COURT:  Overruled.

16 A    Yes.

17 Q    Okay.  And you're saying there weren't other people in

18 addition to them?

19 A    I went up there one other time with Will Montgomery.

20 Q    Will Montgomery.  Who's Will Montgomery?

21 A    A guy that grew up out Catonsville, Maryland.

22 Q    Okay.  Let me show you Government Exhibit 58.  Can you

23 identify that?

24 A    William Montgomery.

25 Q    Okay.  Did you, did you guys, meaning you and Mr. Martin and

DIRECT EXAMINATION OF BACON                    59

1    Mr. Gardner and Will Montgomery, for that matter, did you buy

2    from other dealers in New York or just from this guy, Poppi?

3    A    No.  Will and I had bought from somebody else.

4    Q    Okay.  Who was that?  You don't remember his name?

5    A    No.

6    Q    Okay.  Let me ask you.  When you went up there to buy drugs

7    with Mr. Martin and Mr. Gardner, how did you get the drugs back

8    to Baltimore?

9    A    Drove.

10   Q    You drove?

11   A    Drove back or had somebody bring it back for us.

12   Q    Okay.  You had somebody who brought it back for you?

13   A    Yes.

14   Q    Was that a male or a female?

15   A    Female.

16   Q    What was her name?

17   A    Devin.

18   Q    Devin?

19   A    Yes.

20   Q    Did Mr. Martin have somebody who brought it back for him?

21   A    I'm not sure.

22   Q    You're not sure?

23   A    No.  I use, I use my friend for the majority everything.

24   Her name is Devin.

25   Q    Okay.  Did Mr. Martin also have a female that brought back

DIRECT EXAMINATION OF BACON                              60

1    drugs for him?

2              MR. COBURN:  Objection.  Asked and answered.

3              THE COURT:  Overruled.

4    A    I don't remember her name but it was a female.

5    Q    There was a female but you don't remember her name?

6    A    No.

7    Q    Okay.  How did they bring it back, Devin and this other

8    female, do you know?

9    A    I don't know how they would bring it back but they would

10   just, I mean, they would put it on their person and bring it back

11   on a bus.

12   Q    Okay.  Do you know how they put it on their person?

13   A    I don't know.  They might have put it inside of them.

14   Q    Okay.  Would this have been heroin, then, that you were

15   getting from this guy Poppi?

16   A    Yes.

17   Q    Okay.

18             THE COURT:  Want more water, Mr. Bacon?

19             THE WITNESS:  Yes.

20             THE COURT:  Okay.  You can have some but you've got to

21   get closer to the microphone.

22             THE WITNESS:  All right.

23             THE COURT:  Give the witness more water, please, Ms.

24   Arrington.  You can pull that microphone a little closer to

25   yourself.  That's good.

1    BY MR. HARDING:

2    Q    You said you got 50 grams or something every time,

3    typically, when you went up to New York, the three of you, or 25

4    grams?  What was it?

5    A    25 to 50 grams.

6    Q    25 to 50 grams?

7    A    Yes.

8    Q    How much did you pay for 50 grams of heroin?  Just give us a

9    ballpark?

10   A    A couple thousand.

11   Q    A couple thousand dollars?

12   A    Yes.

13   Q    Okay.  And then you told us how you got it back here to

14   Baltimore.  What did you do with it when you got it back here to

15   Baltimore?

16   A    Distributed it.

17   Q    Okay.  That meant you packaged it up, is that right?

18   A    Yes.

19   Q    Did you do that together with the other guys that you went

20   up to New York with?

21   A    No.

22   Q    Just did it by yourself?

23   A    Yes.

24   Q    Okay.  Did there come a time when Poppi started coming down

25   to this area to distribute drugs to you guys?

1   A    Not to me personally, no.

2   Q    To Mr. Gardner and Mr. Martin?

3        MR. COBURN:  Objection.

4        THE COURT:  Overruled.

5   A    I'm not for sure which one.

6   Q    Okay.  Do you know, did they or either of them meet Mr.,

7   this guy Poppi somewhere north of Baltimore to do drug

8   transactions?

9        MR. COBURN:  Objection.

10       THE COURT:  Overruled.

11  A    North of Baltimore?  Not to my recollection.

12       THE COURT:  Mr. Bacon, when a question is asked and one

13  of the attorneys objects, I need you to wait until the Court has

14  ruled on the objection before you answer.

15       THE WITNESS:  Okay.

16       THE COURT:  If I say "overruled", that means you may

17  answer.  If I say "sustained", that means you shouldn't answer

18  that question and just wait for the next question.

19       THE WITNESS:  Okay.

20       THE COURT:  All right.  Go ahead, Mr. Harding.

21  BY MR. HARDING:

22  Q    I'm trying to remember what my question was at this point,

23  Your Honor.

24       THE COURT:  I think he answered it.

25  Q    Okay.  Did you know a guy by the name of Black?

1   A   Yes.

2   Q   Was he another guy you got drugs from?

3   A   No.

4   Q   You didn't?

5   A   No.

6   Q   Do you know, did Mr. Gardner get drugs from him?

7           MR. COBURN:  Objection.

8   A   I don't know.  I'm sorry.

9           THE COURT:  Overruled.

10  Q   You don't know?

11  A   No.

12  Q   Well, who was Black?  Where did he live and what did he do?

13  A   Black was from South Baltimore.

14  Q   Did he deal drugs?

15  A   Yeah.  Yes.

16  Q   Do you know anybody he dealt to?

17  A   No.

18  Q   You don't?  Do you know a guy named Card?

19  A   Yes.

20  Q   And was he another drug dealer?

21  A   Yes.

22  Q   Do you know his real name?

23  A   No.

24  Q   Okay.  Where did he used to deal drugs?

25  A   In Baltimore.

64

1    Q    What part of Baltimore?

2    A    South Baltimore.

3    Q    Okay.  Do you know, did Mr. Gardner or Mr. Martin get drugs

4    from him?

5              MR. COBURN:  Objection.

6              THE COURT:  Overruled.

7    A    Yes.

8    Q    They did?  And how do you know that?

9    A    We used to hang together back then.

10   Q    You and Mr. Gardner and Mr. Martin?

11   A    Me and Mr. Gardner.

12   Q    You and Mr. Gardner?

13   A    Yes.

14   Q    Did you know that Mr. Martin also got drugs from Card?

15   A    Not to my recollection.

16   Q    Not to your recollection.  What about Darryl Wyche?  Did he

17   used to get drugs from Card?

18   A    Yes.

19   Q    He did?  Let me ask you about another guy.  In fact, I'll

20   just put a picture on the screen here.  This is Government

21   Exhibit 69.  Can you see that, Mr. Bacon?

22   A    Yes.

23   Q    Who is that?

24   A    Goose.

25   Q    Goose?

1    A    Yes.

2    Q    You know Goose's real name?

3    A    No.

4    Q    Did you -- well, tell us, did you meet Goose at some time?

5    A    Yes.

6    Q    Who introduced you to him?

7    A    I met him through, hanging out from down South Baltimore.

8    Q    Yeah.  But I mean who specifically introduced you to him?

9    A    Shawn Gardner.

10   Q    Shawn Gardner?

11   A    Yes.

12   Q    Was he another drug dealer?

13   A    Yes.

14   Q    Was Mr. Gardner getting supplied by him?

15        MR. COBURN:  Objection.

16        THE COURT:  Overruled.

17   A    I don't know.

18   Q    You don't know?

19   A    No.

20   Q    What about Mr. Martin?  Was he getting from Goose?

21   A    No.

22   Q    Did you get from Goose?

23   A    Yes.

24   Q    What quantities did you get from Goose?

25   A    Six ounces.

DIRECT EXAMINATION OF BACON                    66

1    Q    Is that why Mr. Gardner introduced you to Goose, so that you

2    could buy drugs from him?

3    A    No.

4    Q    Why did he introduce you to him?

5             MR. COBURN:  Objection.

6             THE COURT:  Overruled.

7    A    He was a, he was a cool guy.

8    Q    How much drugs -- you got six ounces from Goose, is that

9    correct?

10   A    Yes.

11   Q    For how much money?

12   A    5500.

13   Q    5500.  Okay.  So would this be cocaine we're talking about?

14   A    Yes.

15   Q    When you, you testified about this guy, Will Montgomery, and

16   you said you went up to New York with him on occasion, did Wayne

17   and Goo ever go also with you and Will Montgomery to New York?

18   A    No, just Goo and I, Goo and Wayne.  Sorry about that.  Just

19   Goo and, and Will.

20   Q    Will and Goo and you, all three went?

21   A    Yes.

22   Q    And that's when I believe you said Will Montgomery

23   introduced you to another dealer?

24   A    Yes.

25   Q    And Goo was there, too?

1    A    Yes.

2    Q    Okay.  What kind of drug did you get?

3    A    Weed.

4    Q    Weed, is that marijuana?

5    A    Yes.

6    Q    Do you remember what kind of quantities of weed you got from

7    this guy whose name you don't remember in New York?

8    A    A couple ounces.

9    Q    A couple of ounces at a time?

10   A    We only went one time.

11   Q    You just went one time?

12   A    Yes.

13   Q    Where did you find him?

14   A    In Manhattan, New York.

15   Q    Do you know where in Manhattan?

16   A    Like 142nd Street.

17   Q    142nd Street?

18   A    Yes.

19   Q    Did Mr. Montgomery ever hook you up with somebody to sell

20   drugs to?

21   A    Yes.

22   Q    Who was that?

23   A    I don't know the guy's name.

24   Q    Where was it that you sold him drugs?

25   A    Monroe and Lauretta.

DIRECT EXAMINATION OF BACON

68

1    Q    And that was somebody Will Montgomery introduced you to?

2    A    Yes.

3    Q    For purposes of selling these drugs?

4    A    Yes.

5    Q    What kind of drug was that?

6    A    Cocaine.

7    Q    Where is Lauretta and Monroe?

8    A    West Baltimore.

9    Q    Did Mr. Montgomery also distribute drugs in that area?

10   A    Yes.

11   Q    Did he distribute drugs in Catonsville?

12   A    I don't know.

13   Q    Okay.  Let me ask you this.  When you distributed drugs in

14   Catonsville, did you have somebody you used to give the drugs to

15   in order to sell for you?

16   A    Yes.

17   Q    Who was that?

18   A    A few people.

19   Q    Tell us their names.

20   A    Mike, Scott, Alex.

21   Q    Mike, Scott, and Alex?

22   A    Yes.

23   Q    I guess you don't know their last names?

24   A    No.

25   Q    Do you know a guy named Aaron Holly?

Case 1:04-cr-00029-RDB   Document 674   Filed 06/08/09   Page 69 of 302

1   A    Yes.

2   Q    Did you give drugs to him to sell in Catonsville?

3   A    Yes.

4   Q    Is he, is he related to you?

5   A    Yes.

6   Q    What's your relationship to him?

7   A    First cousins.

8   Q    First cousins?

9   A    Yes.

10  Q    Okay.  Let me show you Government Exhibit PH-59.  Do you

11  recognize that?

12  A    Yes.

13  Q    Who is it?

14  A    Aaron Holly.

15  Q    Does he have a nickname?

16  A    Aaron.

17  Q    Aaron?

18  A    Yes.

19  Q    Any other nickname?

20  A    No.

21  Q    Okay.  Let me show you Government Exhibit PH-22.  Do you

22  recognize that street?

23  A    Yes.

24  Q    What is it?

25  A    Winters Lane.

1    Q    That's Winters Lane in Catonsville?

2    A    Yes.

3    Q    Is that where Mr. Holly used to distribute drugs that you

4    gave to him?

5    A    Yes.

6    Q    Did Goo also give drugs to Mr. Holly to distribute in

7    Catonsville?

8              MR. COBURN:  Objection.

9              THE COURT:  Overruled.  You may answer.

10   A    Yes.

11   Q    And did he give them to Aaron Holly specifically?

12             MR. COBURN:  Objection.

13             THE COURT:  Overruled.  You may answer.

14   A    Yes.

15   Q    Did Will Montgomery give drugs to Aaron Holly to distribute

16   in Catonsville, also?

17   A    Not that I'm aware of.

18   Q    Not that you're aware of?

19   A    Um-um.

20   Q    Okay.  Did there come a time when you stopped selling to

21   drug users on the street and started selling mostly weight?

22   A    Yes.

23   Q    Can you tell the ladies and gentlemen of the jury what that

24   means, what it means to sell weight?

25   A    Instead of selling pills, basically you're selling like

DIRECT EXAMINATION OF BACON                    71

1    quarter ounces, half ounces, ounces, stuff like that.

2    Q    Okay.  Is it sort of like wholesale quantities?

3    A    Yes.

4    Q    That you'd give, that you'd sell to other dealers, is that

5    correct?

6    A    Yes.

7    Q    When was it, if you recall, about when was it that you

8    started selling weight?

9    A    '98.

10   Q    '98?

11   A    Yes.

12   Q    Did Mr. Gardner and Mr. Martin also start selling weight

13   rather than selling directly to customers?

14   A    I'm not for sure.  I know Mr. Gardner was selling weight.  I

15   don't know about Mr. Martin.

16   Q    You know Mr. Gardner was selling weight but you don't know

17   about Mr. Martin?

18   A    Yes.

19   Q    Can you give us an idea, when you were selling weight in

20   Catonsville, can you give us an idea how much money you could

21   make in an evening there?

22   A    About 3 to $500.

23   Q    Three to $500?

24   A    Yes.

25   Q    Okay.  Is that just your share or is that also what the

1    people you were, like Mr. Holly, does that include what he made

2    or is that just what you made?

3               MR. LAWLOR:  Objection, Your Honor.

4               THE COURT:  Overruled.

5    A    That's an overall total what you can make probably at the

6    end of the day.

7    Q    That you could make or that all of you could make together?

8    A    That we could make together.

9    Q    Okay.  Do you remember being asked about that when you

10   testified in the grand jury back in 2004, Mr. Bacon?

11              MR. LAWLOR:  Objection, Your Honor.  Lack of

12   foundation.

13              THE COURT:  Overruled.

14   A    No.

15   Q    Let me show you what has been --

16              MR. LAWLOR:  Objection, Your Honor.

17              THE COURT:  There's no question.

18              MR. LAWLOR:  It's an improper foundation.

19              THE COURT:  You object to questions, not to counsel

20   walking across the floor.

21   BY MR. HARDING:

22   Q    Would it refresh your recollection if I showed you your

23   grand jury testimony from 2004, Mr. Bacon?

24   A    Yes.

25              MR. LAWLOR:  Objection, Your Honor, asked and answered.

1          THE COURT:  Overruled.

2  Q    Okay.  Let me call your attention to Page 29, Line 8.  Could

3  you read those few lines and tell me, does that refresh your

4  recollection?

5  A    Okay.  Okay.  How much money were you making back --

6          THE COURT:  No.  Read it yourself.

7          THE WITNESS:  Okay.  Yes.

8  BY MR. HARDING:

9  Q    How much money were you making in Catonsville on a good

10  night?

11  A    A thousand dollars.

12  Q    Okay.  Do you remember what you said in the grand jury?

13  A    Yes.

14  Q    What did you say in the grand jury?

15  A    A thousand, 1500, 2000.  I exaggerated a little bit on that.

16  Q    You did?

17  A    Yes.

18  Q    What about sales of, sales in East Baltimore?  Were you also

19  dealing in East Baltimore?

20  A    Yes.

21  Q    How much money could you make selling in East Baltimore?

22  A    Anywhere from 500 to a thousand dollars.

23  Q    Okay.

24          THE COURT:  This seems to be a good point, Mr. Harding,

25  for a break.

1          MR. HARDING:  Sure.  Thank you, Your Honor.

2          THE COURT:  You can step down, Mr. Bacon.  You're

3     excused for a few minutes.

4          Ladies and gentlemen of the jury, we'll take our

5     morning recess at this time.  Please leave your note pads in your

6     chairs.  Have no discussion about the case or about any of the

7     evidence you've heard so far.  Continue to keep an open mind

8     about all issues.  The jury is excused for a 15 minute recess.

9          (Jury exits the courtroom.)

10         THE COURT:  Counsel, I'll be happy to give you a

11    standing objection to a discrete area of examination but I'm not

12    going to turn this 10 week trial into a 20 week trial by trying

13    to do textbook examinations.  Now, when areas are fundamentally

14    not in dispute, I'm going to permit not just the government, but

15    the defense, to lead all you want to, even your own witnesses, to

16    get through this.

17         And I don't know what you benefit yourself by

18    continuing to object.  But I think I've made it clear in my

19    rulings that non-controversial, leading questions are a good

20    thing, not a bad thing.  But you can continue to object all you

21    want and the Court will continue to rule on them, as you've seen

22    me do.  We've got to move on.

23         We're in recess for 15 minutes.

24         (Recess.)

25         (Defendants present in courtroom.  Jury not present.)

1          THE COURT:  Please be seated.  Yes, Mr. Coburn.

2          MR. COBURN:  Thank you so much, Your Honor.  First, I

3     appreciate Your Honor's offer very much of the continuing

4     objection.  I would request it.

5          THE COURT:  What is the continuing objection to?

6          MR. COBURN:  My understanding is during the course of

7     the examination that the questions are being asked, which just

8     from my point of view, Your Honor, I don't think the government's

9     eliciting a foundation and they seem to be hearsay to me.  So

10    it's really --

11         THE COURT:  I'm sorry.  What is hearsay?

12         MR. COBURN:  In other words, like when Mr. Harding asks

13    a question of the witness to the effect of, was Goo buying drugs

14    from Poppi up in New York, he's not eliciting any foundation.  We

15    have no idea how he would know that.

16         THE COURT:  That's what cross examination is for.

17    Prima facie, the government has established that Mr. Bacon

18    conspired with various individuals to distribute drugs.  I mean,

19    prima facie, there's a clear foundation.

20         MR. COBURN:  I understand Your Honor's ruling and I

21    appreciate the continuing objection very much.

22         THE COURT:  I'm not giving you one.  I'm not giving you

23    one because I still don't understand what the objection is to.

24    If it's to foundation, then the objection is overruled.  So what

25    is it?

1              MR. COBURN:  It's to, it's to --

2              THE COURT:  Lack of foundation?

3              MR. COBURN:  When those questions are asked in that

4     way.

5              THE COURT:  Okay.  It's overruled.  It's overruled.  Is

6     there anything else?

7              MR. COBURN:  So it's not continuing, then, Your Honor?

8              THE COURT:  No, it's not continuing.

9              MR. COBURN:  Okay.  There was actually one other issue

10    which I was hoping I might raise.

11             THE COURT:  Go ahead.

12             MR. COBURN:  Very, very briefly.

13             THE COURT:  Go ahead.

14             MR. COBURN:  During the break, Mr. Harding was

15    consulting with the witness, which he tells me is allowed under

16    the local rules as long as the direct isn't completed.  I just

17    wanted to bring that to Your Honor's attention, because you are

18    going to know the answer to that much better than I will.

19             THE COURT:  All right.  Anything else?

20             MR. COBURN:  No.

21             THE COURT:  Okay.  Thank you.  Now, this is going to be

22    pretty much the only time I'm going to issue this warning.  One

23    or more defendants are making faces at the witness and, indeed,

24    mouthing obscenities at the witness.  And I'm not going to put up

25    with that.  I'm reasonably sure the jury can observe that so I

Case 1:04-cr-00029-RDB    Document 674    Filed 06/08/09    Page 77 of 302

1    don't know why any defendant would believe that it's helpful to

2    do that.

3            Glaring at a witness is one thing and anybody is free

4    to glare at a witness.  But mouthing obscenities at a witness is

5    not acceptable and is not going to be tolerated.  Okay.

6            Let's have the jury.  Can we get Mr. Bacon back in,

7    please?  Before, before we bring the jury in, Belinda, let the

8    agent retrieve the witness.

9            Again, Mr. Harding, as I said yesterday, of course, I

10   understand counsel don't want the grand jury transcripts, the

11   actual testimony placed on the DOAR.  But it's difficult for me

12   to imagine that you would ever need to approach the witness or

13   any witness very often to show an exhibit before you place it on

14   the DOAR.

15           MR. HARDING:  Does that include grand jury transcripts?

16           THE COURT:  Okay.  Except for the grand jury

17   transcripts.

18           MR. HARDING:  Except for the grand jury transcripts.

19           THE COURT:  I mean, the cover was fine.  But counsel,

20   some of counsel would rather not have the actual testimony

21   displayed to the jury.

22           MR. HARDING:  That's fine, Your Honor.

23           (Witness Bacon enters the courtroom.)

24           THE COURT:  Mr. Bacon, please remember to stay as close

25   as you can to the microphone and speak directly into the

1    microphone.

2                    (Jury enters the courtroom.)

3                    THE COURT:  Please be seated, ladies and gentlemen.

4    You may proceed whenever you're ready, Mr. Harding.

5    BY MR. HARDING:

6    Q    Yes.  Thank you, Your Honor.

7                    Mr. Bacon, let me call your attention to earlier this

8    year while you were still locked up.  Did you become aware of the

9    Stop Snitching Two video at that time?

10   A    Yes.

11   Q    Did you learn that your name was actually broadcast in that?

12   A    Yes.

13   Q    How did you find out?

14   A    Through my brother.

15   Q    What's your understanding of the purpose of putting your

16   name out there in the Stop Snitching Two video?

17   A    I don't know if it was --

18                   MR. MARTIN:  Objection.

19                   THE COURT:  The objection is overruled.  You may state

20   your understanding.

21   A    My understanding was probably to tarnish my name, let

22   everybody know I was snitching.

23   Q    Okay.  Did that cause you concern?

24                   MR. MARTIN:  Objection.

25                   THE COURT:  Overruled.

1   A    I'm saying somewhat.

2   Q    Okay.  How was it that you found out about this?  Who told

3   you about it?

4   A    My brother.

5   Q    Your brother?

6   A    Yes.

7   Q    Did you speak to him by telephone or did you, did he come

8   out to see you at the facility where you were being held or what?

9   A    I spoke with him through the telephone.

10  Q    Okay.  Is it different testifying here in this courtroom

11  than it is to testify in the grand jury?

12  A    Yes.

13  Q    Are you less comfortable or more comfortable testifying here

14  in this courtroom?

15          MR. LAWLOR:  Objection.

16          THE COURT:  Overruled.  You may answer.

17  A    I'm comfortable.

18  Q    You're comfortable?

19  A    Yes.

20  Q    Were you more comfortable in the grand jury?

21  A    Yes.

22  Q    During your testimony, have you noticed the defendants from

23  time to time during your, while you've been testifying?

24  A    Yes.

25  Q    Have they made any gestures or seemed to mouth words to you

1    while you were testifying?

2              MR. COBURN:  Objection to "they."

3              THE COURT:  The objection is sustained.  Rephrase the

4    question.

5    BY MR. HARDING:

6    Q    Has any one of the defendants done that?

7    A    No.

8    Q    You haven't noticed that?

9    A    No.

10   Q    Do you know anybody in the audience here today?

11   A    No.

12             MR. LAWLOR:  Objection.

13             THE COURT:  Overruled.  The answer was no.

14   Q    You don't know any of those people?

15   A    No.

16   Q    Okay.  Let me go back to the time period of the 1990's, up

17   until you went to jail in 2000.  Did you used to carry a gun, Mr.

18   Bacon?

19   A    Yes.

20   Q    Why was that?

21   A    For protection.

22   Q    Protection from what?

23   A    From, from the streets, anything, like if somebody would try

24   to come rob you, if I was beefing with anybody.

25   Q    Okay.  To your knowledge, did Mr. Martin carry a gun?

1    A    No.

2    Q    Did he own a gun?

3    A    No.

4    Q    Do you remember a .44 caliber with a laser site on it that

5    he had?

6              MR. MARTIN:  Objection.

7              THE COURT:  The objection is overruled.  You may

8    answer.

9    A    Yes, I remember the handgun, but I remember it being a guy

10   name Wiley's.

11   Q    Wiley's?

12   A    Yes.

13   Q    Did Mr. Gardner carry a gun?

14   A    Yes.

15   Q    What kind of gun?

16   A    9 millimeter.

17   Q    Okay.  Did you ever trade guns with Mr. Gardner?

18   A    Yes.

19   Q    What gun did you trade for?  What gun did you give to Mr.

20   Gardner.

21   A    .32 revolver.

22   Q    What kind of gun did he give you?

23   A    A .380.

24   Q    .380?

25   A    Yes.

DIRECT EXAMINATION OF BACON                    82

1    Q    Did you ever loan guns to one another, you and these

2    defendants?

3              MR. LAWLOR:  Objection, Your Honor.

4              THE COURT:  Rephrase the question.

5    Q    Did you ever loan a gun to any one of these three defendants

6    that you've testified about here today?

7              MR. LAWLOR:  Objection, Your Honor.

8              THE COURT:  Overruled.  You may answer.

9    A    Yes.

10   Q    Who?

11   A    Shawn Gardner.

12   Q    What kind of gun did you loan to him?

13   A    A .40 Taurus.

14   Q    Do you recall about when it was that you loaned him a .40

15   caliber Taurus?

16   A    '98.

17   Q    Okay.  Did you loan it to him or did you sell it to him?

18   A    Loaned it to him.

19   Q    Let me call your attention to your drug business in

20   Catonsville.  Do you remember being involved in a turf war at

21   some point in Catonsville?

22   A    Yes.

23   Q    What's a turf war?

24   A    It's when, pretty much when one side, one side of the people

25   is dealing drugs out in one area, if you don't deal with them,

DIRECT EXAMINATION OF BACON                                    83

1    they dealing through somebody else.  So it pretty much starts an

2    animosity between both the people that's out there.

3    Q    Who were the guys that you got into a turf war with?

4    A    A guy named Bubbles and Tuffy.

5    Q    Okay.  What did you decide to do about it?

6    A    I decided to call my friends up and see what I was going to

7    do about it.

8    Q    What friends did you call up?

9    A    I called Wayne and Goo up.

10   Q    Did they come to help you?

11   A    Yes.

12   Q    Did they bring their guns with them?

13   A    Yes.

14   Q    And did you have a gun?

15   A    Yes.

16   Q    Did you go looking for Tuffy and Bubbles?

17   A    Yes.

18   Q    Did you locate them?

19   A    No.

20   Q    You've testified a good deal about heroin and cocaine and

21   marijuana.  Did you ever distribute crack, Mr. Bacon?

22   A    Yes.

23   Q    Did you cook it up?

24   A    Yes.

25   Q    Where did you cook it up?

DIRECT EXAMINATION OF BACON                                    84

1    A    I cooked it up in apartment buildings, out Winchester and

2    out Catonsville.

3    Q    Okay.  Where is the Winchester apartment building?

4    A    In West Baltimore.

5    Q    And where was it in Catonsville that you used to go to cook

6    up your cocaine into crack?

7    A    Johnnycake Road.

8    Q    Johnnycake Road?

9    A    Yes.

10   Q    Was it a friend's house or a stash house or what?

11   A    It was a stash house.

12   Q    Okay.  Can you explain to the ladies and gentlemen of the

13   jury what it means to cook up cocaine into crack?

14   A    It's just taking the powder form of cocaine, putting it in a

15   pot and bringing it back with baking soda and turning it into

16   crack.

17   Q    Okay.  Did Goo also cook up cocaine into crack?

18   A    Yes.

19   Q    Where did he do that?

20   A    Out Catonsville.

21   Q    Same place you did?

22   A    Yes.

23   Q    Any place else?

24   A    I don't know.

25   Q    Okay.  What about Mr. Martin?  Did he do that or did he just

1    distribute powdered cocaine?

2    A    To my recollection, he never messed with crack.

3    Q    Okay.

4    A    Just powder cocaine.

5    Q    What about Mr. Mitchell?  Did he cook up cocaine into crack?

6    A    Yes.

7    Q    Where did he used to do that?

8    A    Belmar.  Bell -- I don't know, I'm not for sure the

9    apartment name.  In Randallstown.

10   Q    Belmar.  Is that what you were saying?

11   A    Yes.

12   Q    Something like that?

13   A    Yes.

14   Q    Do you know, did he have anybody else he used to cook up the

15   cocaine with him?

16   A    Not that I'm aware of.

17   Q    Did you ever transport drugs in cars and other kinds of

18   vehicles?

19   A    Yes.

20   Q    Did you have some special kind of place where you used to

21   conceal your drugs?

22   A    Depends on the car.  Some cars you could take arm rest, I

23   mean, the arm rest out or the doors and you could stash, or the

24   vents, and you could stash drugs in there.

25   Q    Okay.  Let me call your attention to Mr. Gardner, Goo.  Did

DIRECT EXAMINATION OF BACON                    86

1   he have an Acura at one point in time?

2   A    Yes.

3   Q    Did he have a stash location in the Acura?

4   A    Yes.

5   Q    For his drugs?

6   A    Yes.

7   Q    What -- is the answer yes?

8   A    Yes.

9   Q    Where was it?

10  A    In the vent.

11  Q    The vent?

12  A    Yes.  The vent, like where the air conditioner comes out at

13  in the front.

14  Q    Okay.

15  A    On the dashboard.

16  Q    Let me call your attention to October 15th, 1998.  Did you

17  get arrested around that date with Shawn Gardner?

18  A    Yes.

19  Q    Do you recall where it was that you got arrested?

20  A    No.

21  Q    Okay.  What were you doing when you got arrested?

22  A    I was, we was driving.  We got arrested twice like back to

23  back.  I don't know which date we got arrested first for two, a

24  handgun, another handgun.

25  Q    Okay.  Do you remember, was one of those times, were you

1    arrested in a Mitsubishi?

2    A    Yes.

3    Q    Tell us about that time.

4    A    We was coming through, we was coming through a known drug

5    area on our way, on our way to our store.  We was coming through

6    the drug area.  The knockers were standing outside and they

7    stopped the car and pulled us out of the car and found a gun

8    inside the car.

9    Q    Okay.  When you say "the knockers", who are you talking

10   about?

11   A    Undercover police.

12   Q    Okay.  Do you remember what kind of gun it was?

13   A    A Glock, 9 millimeter.

14   Q    Okay.  Had you purchased that gun?

15   A    Yes.

16   Q    From who?

17   A    Claudus Lassiter.

18   Q    Do you remember how much you paid for it?

19   A    No.

20   Q    Did you then sell it to Mr. Gardner?

21   A    No.

22   Q    Was it still your gun when it was recovered that day?

23   A    Yes.

24   Q    This was in a Mitsubishi.  Where were you coming from?

25   A    We was coming from Irvington, West Baltimore.

1    Q    What were you doing in Irvington?

2    A    Looking for somebody that owe Shawn some money.

3    Q    I'm sorry?

4    A    We was looking for somebody that owe Shawn Gardner some

5    money.

6    Q    Okay.  Did you find the person?

7    A    Yes.

8    Q    What did you do?

9    A    Nothing.  Just got out, checked his pockets, asked him where

10   the money was at.  He ain't had nothing so we just let him go.

11   Q    Who checked his pockets?

12   A    Shawn and us -- Shawn and I.

13   Q    You mean you both checked his pockets?

14   A    Yes.

15   Q    Who had the gun at that point?

16   A    I had the gun.

17   Q    And did you keep it in your, did you keep it somewhere or

18   were you holding it in your hand?

19   A    I kept it in my dip.

20   Q    In your dip?

21   A    Yes.

22   Q    Did you ever take it out?

23   A    No.

24   Q    Who did this person owe money to?

25   A    Shawn Gardner.

1   Q    So you were helping him out by trying to recover the money

2   for him?

3   A    Yes.

4   Q    This was somebody that had purchased drugs from Mr. Gardner

5   and hadn't paid him back?

6             MR. COBURN:  Objection.

7             THE COURT:  Overruled.  You may answer.

8   A    Yes.

9   Q    But you say you didn't get any money off him, is that

10  correct?

11  A    Yes.

12  Q    So what did you do?

13  A    Nothing.  We just slapped him up a little bit and got back

14  in the car and left.

15  Q    Who slapped him up a little bit?

16  A    Shawn and I.

17  Q    Does that mean that he struck this guy?

18  A    Yes.

19  Q    What, what was his name?

20  A    J-Rock.

21  Q    J-Rock?

22  A    J-Rock.

23  Q    J-Rock?

24  A    Yes.

25  Q    And he distributes in Irvington, is that correct?

1    A    Yes.

2    Q    And that's over in Southwest Baltimore, correct?

3    A    Correct.

4    Q    And then you say you were driving back from that and that's

5    when you were stopped by the police, is that correct?

6    A    Yes.

7    Q    Or actually, were you stopped at an intersection and then

8    the police walked up on the car?  Is that what happened?

9    A    Yeah.  We was pulling up the street in a known drug area and

10   the undercover police were standing on the corner.  And they,

11   when we got to the stop sign, they told us to put the car in

12   park.  And they came, told us to get out the car and they

13   proceeded to search the car and search us.

14   Q    Where was the gun?

15   A    In the middle of the, between the driver's seat and the

16   middle console.

17   Q    Who put it there?

18   A    Shawn.

19   Q    So did he have it when the police arrived and put it in that

20   location?

21   A    No.

22   Q    To conceal it?

23   A    It was already right there when we got there.

24   Q    Okay.  Did you go some place, did you say you went some

25   place after you slapped up J-Rock or after Mr. Gardner slapped up

1    J-Rock, before the gun was seized by the police?

2    A    No.  We went, as soon as we left from around that area, we

3    was going on our way back down towards the McKean and Westwood

4    and we was stopped by the police.

5    Q    Okay.  What's at McKean and Westwood?

6    A    Corner store that we had together.

7    Q    You and who?

8    A    Shawn Gardner.

9    Q    Let me show you Government Exhibit PH-49.  Does that look

10   familiar?

11   A    Yes.

12   Q    What is it?

13   A    That's the corner store that was on McKean and Westwood.

14   Q    Is this some location that you rented with Mr. Gardner, is

15   that correct?

16   A    Yes.

17   Q    What was the purpose of having a store at McKean and

18   Westwood in West Baltimore?

19   A    To sell a variety of, variety of stuff, like food, tobacco

20   products.  And pretty much that's it.

21   Q    So you operated a business besides also selling drugs, is

22   that correct?

23   A    Yes.

24   Q    Did you sell drugs out of the store?

25   A    No.  I might have sold some weed out of the store but I

DIRECT EXAMINATION OF BACON                                    92

1    ain't, I haven't sold drugs out of the store.  No cocaine or

2    heroin out of the store.

3    Q    All right.  When I say drugs, I include weed, okay?

4    A    Okay.

5    Q    So you sold weed out of the store?

6    A    Yes.

7    Q    How about Mr. Gardner?

8    A    No.

9    Q    He didn't?

10   A    No.

11   Q    Just you?

12   A    Yes.

13   Q    You said that when you went through J-Rock's pockets, you

14   didn't find any money.  Did Shawn Gardner find some other things?

15   A    He had a couple like game on him.  I think it was like some

16   Play Station games or something.  Can't remember.

17   Q    Did Mr. Gardner take them?

18   A    Yes.

19   Q    Do you remember, did you ever do something like that with

20   Wayne, Mr. Martin?  That is, jump out on a drug debtor like that?

21   A    No.  One time I was in my car, Wayne was in the car with me,

22   I jumped out on somebody.

23   Q    Who was that?

24   A    Some, a guy that used to work for me down South Baltimore.

25   Q    Do you remember his name?

1    A    No.

2    Q    When you say he worked for you, does that mean that you

3    fronted him drugs that he would pay you back for later?

4    A    Yes.

5    Q    And did he owe you money then?

6    A    Yes.

7    Q    Is that why you jumped out on him?

8    A    Yes.

9    Q    Did Mr. Martin also help?

10   A    No.  He stayed in the car.

11   Q    He stayed in the car.  Did you have a gun on that occasion?

12   A    Yes.

13   Q    Did you use it?  Did you pull it out, or did you just keep

14   it on you?

15   A    I pulled it out.

16   Q    Did you get anything back from him?

17   A    Yeah.  I got something back from him later.  He didn't give

18   me nothing right there on the spot but he called me later on and

19   gave me the money.

20   Q    How much money?

21   A    I can't remember.

22   Q    Do you remember what street that happened on?

23   A    Wilhelm, Wilhelm and Pulaski, South Baltimore.

24   Q    Okay.  You said there were two occasions when you got

25   caught, you and Mr. Gardner got caught with a gun, is that

DIRECT EXAMINATION OF BACON                           94

1    correct?

2    A    Yes.

3    Q    Okay.  Let me call your attention to November 6th, 1998.

4    Were you in an Acura that night?

5    A    Yes.

6    Q    Was that Mr. Gardner's Acura that you just talked about a

7    few minutes ago?

8    A    Yes.

9    Q    The one where he used the vent as a stash location?

10   A    Yes.

11   Q    Okay.  Tell us what happened that night.

12   A    That night, we was over East Baltimore.  I don't know where

13   we were going at.  But we was coming through that area.  And it

14   was a stop sign.  And the police said we had ran the stop sign

15   and they had pulled us over.  And by us just getting locked up

16   together like a couple weeks before, they had like a high alert

17   out on us, on the car, and on his name, period.  And they

18   searched the car and found a handgun in the car.

19   Q    And what kind of gun was that?

20   A    A 9 millimeter.

21   Q    Do you know what kind of 9 millimeter?

22   A    Taurus.

23   Q    Do you know where that gun had been acquired?  Do you know

24   how you guys got it?

25        MR. COBURN:  Objection, hearsay.

1          THE COURT:  Overruled.  Do you know?

2     A    No, I can't remember.

3     Q    Is that the 9 millimeter Taurus that you said a few minutes

4     ago you loaned to Mr. Gardner?

5     A    No.

6     Q    A different one?

7     A    That was, the one you just talking about was a Glock, 9

8     millimeter Glock.

9     Q    But I talked to you also about loaning guns.  Didn't you say

10    that you loaned a Taurus to Mr. Gardner?

11    A    That was a .40 caliber Taurus.

12    Q    .40 caliber.  Okay.  Whose gun was that, the 9 millimeter

13    Taurus that the police recovered from the Acura?

14    A    That was Shawn.

15    Q    That was Shawn's?

16    A    Yes.

17    Q    Where was it in the car?

18    A    It was somewhere in the back, like on the passenger side

19    back seat somewhere.  I'm not for sure where the exact spot.

20    Q    Who put it back there?

21    A    Shawn.

22    Q    Did he put it back there after the police stopped him or

23    before?

24    A    It was, it was already back there before we got stopped.

25    Q    Okay.  Do you remember, did Mr. Gardner say anything to the

1    police when he was leaving the car?

2    A    I can't remember.

3    Q    Do you remember where you were coming from that night?

4    A    No.

5    Q    Do you remember where you were going to?

6    A    No.

7    Q    Had you been in your store with Mr. Gardner before that

8    incident that night?

9    A    Yes.

10   Q    Did you have the gun with you in the store?

11   A    Yes.

12   Q    It was Mr. Gardner's gun, is that correct?

13   A    Yes.

14   Q    Did he use, did he keep it in the store usually, or what?

15   A    We both kept, we both kept guns in the store.

16   Q    Okay.  Let me call your attention to another occasion when

17   you got stopped in the car.  Did you get stopped on I-95?

18   A    Yes.

19   Q    When you were driving?

20   A    Yes.

21   Q    And who was with you in the car?

22   A    Me, Bo, and Goo.

23   Q    And were you stopped in Maryland on I-95 or in another

24   state?

25   A    We were stopped in Maryland, in Harford County.

DIRECT EXAMINATION OF BACON                    97

1    Q    And did you pick up a charge for that?

2    A    Yes.

3    Q    What kind of -- was it a drug charge?

4    A    Yes.  Possession of marijuana.

5    Q    Okay.  And Mr. Gardner and Mr. Mitchell, were they charged

6    with anything?

7    A    No.

8    Q    Did you, as a result of that, stop going to New York around

9    that time?

10   A    Yes.

11   Q    Did Mr. Gardner and Mr. Martin stop going to New York or

12   just you?

13            MR. COBURN:  Objection.

14            THE COURT:  Rephrase the question.

15   Q    Do you know, did Mr. Gardner and Mr. Martin stop going to

16   New York?

17            MR. COBURN:  Objection.

18   A    I don't know.

19   Q    Do you know, did they talk to their source of supply about

20   meeting them closer to Maryland?

21            MR. PYNE:  Objection.

22            THE COURT:  Do you know when they did or not?

23            THE WITNESS:  Not, not to my recollection.

24   BY MR. HARDING:

25   Q    Was there an occasion when they got arrested on I-95

1    themselves?

2    A    Yes.

3                MR. COBURN:  Objection.  Hearsay.

4                THE COURT:  Overruled.

5    Q    Did they tell you about it?

6    A    Yes.

7    Q    What did they tell you?

8                MR. PYNE:  Objection.

9                THE COURT:  Overruled.

10   A    Goo had told me that he was going, he needed somebody to go

11   pick up his car with him, the car he just bought.  So he took

12   Wayne up there with him and Wayne went to go pick the car up.

13   And he was driving, following each other down, back down the

14   highway.  And Wayne had got pulled over and they had found drugs

15   in the car.  And Goo had came back and admitted that the drugs

16   was his, that Wayne didn't know anything about it.

17   Q    Okay.  So did that mean that only one of them was charged?

18   A    Yes.

19   Q    Or do you know?

20   A    As I know of, yes.

21   Q    As you know, yes?

22   A    Yes.

23   Q    Who was it?

24   A    Shawn Gardner.

25   Q    And that's because he went up and took responsibility for

DIRECT EXAMINATION OF BACON                    99

1    the drugs, is that it?

2    A    Yes.

3    Q    Do you know what kind of drugs there were in that car?

4    A    Cocaine.

5    Q    Was it cocaine base or cocaine powder, do you know?

6    A    I don't know.

7    Q    You don't know.  Okay.  Did Mr. Gardner wind up serving a

8    substantial amount of time in jail as a result of that?

9    A    I don't know how much time he served.  I know he wasn't in

10   jail for a long time.

11   Q    He was or was not?

12   A    Wasn't.  He was not in jail for a long time.  Probably like

13   a year or longer.

14   Q    A year or what?

15   A    A year or a couple months.

16   Q    What about Mr. Martin?  Did he also get arrested shortly

17   after that?

18   A    Yes.

19   Q    And what was that for?

20   A    Handgun.

21   Q    Did he get a substantial amount of jail time for that?

22   A    Three years.

23   Q    Three years?

24   A    Yes.

25   Q    Okay.  Okay.  Let me call your attention back to this same

1    time period, 1998 and '99, before you got locked up on those

2    charges in 2000.  Do you remember, did Boo and -- I'm sorry -- Bo

3    and Goo open up drug trafficking operations in Pennsylvania?

4    A    Yes.

5    Q    Where did Goo open his shop?

6    A    Hanover, Pennsylvania.

7    Q    Did you ever go up there and look at the people, look at the

8    town and meet some of the people that he knew up there?

9    A    Yes.  I went there a couple times.

10   Q    And who was it that he had working for him up there?

11   A    A lady and a man.

12   Q    Do you remember their names?

13   A    I just remember the guy's name was Darryl.  I don't remember

14   his wife's name.

15   Q    Okay.  Did they distribute drugs for Goo up there in

16   Hanover, Pennsylvania?

17   A    Yes.

18   Q    What kind of drug?

19   A    Cocaine base.

20   Q    Cocaine base.  That's crack, right?

21   A    Yes.

22   Q    And you were up there a couple times?

23   A    Yes.

24   Q    So did Mr. Gardner take crack up with him when he went up

25   there?

1    A    Yes.

2    Q    How much did he take?

3    A    I don't know.

4    Q    Did you see it?

5    A    Yes.

6    Q    You just can't, you didn't ever learn how much it weighed,

7    is that your testimony?

8    A    Yes.  It was already, I guess it was already put together.

9    Q    Already put together?

10   A    Yes.

11   Q    Into pills?  Into vials or pills, is that what you mean?

12   A    Yes.

13   Q    How many of them were there?  Can you estimate?

14   A    It was a bag.  I don't know how much was in the bag.

15   Q    Okay.  Did he have a bag of pills with him each time he went

16   up there with you?

17   A    Yes.

18   Q    How many times did you go up there with him?

19   A    Three times.

20   Q    Three times.  Did Goo cook up that crack himself from

21   cocaine?

22   A    Yes.

23   Q    And where did he used to do that?

24   A    Out --

25   Q    I'm sorry?

1    A    Out -- I don't know where he used to do it at that point in

2    time, where he was cooking at.

3    Q    Okay.  You named some places where he did it in general.

4    A    Yes.  Catonsville, Johnnycake Road.

5    Q    Okay.  That's a stash house you told us about?

6    A    Yes.

7    Q    What about the Winchester apartments?

8    A    Winchester as well.

9    Q    Okay.  What about Bo?  You said he opened up a shop in

10   Pennsylvania, also.

11   A    Yes.

12   Q    Do you know where in Pennsylvania?

13   A    York.

14   Q    York?  Did you ever go up there with him?

15   A    No.

16   Q    How do you know about it?  Did he tell you about it?

17   A    Yes.

18   Q    Why was it that they opened up shops in Pennsylvania,

19   anyway?

20           MR. COBURN:  Objection.

21           THE COURT:  Overruled.  You may answer.

22   A    It's more profit than Baltimore.

23   Q    How much more profit?

24   A    Probably quadruple your money.

25   Q    Quadruple your money?

1    A    Yes.

2    Q    Okay.  Did there come a time when Mr. Mitchell got arrested

3    up there in Pennsylvania?

4    A    Yes.

5    Q    Did he tell you about it?

6    A    Yes.

7    Q    What did he tell you?

8    A    It was a house raid and the girl snitched on him and they

9    came, raided the house and locked him up.  Everybody in the

10   house.

11   Q    Did he get out of jail?

12   A    Yes.

13   Q    Did he ever go back to Pennsylvania?

14   A    I don't know.

15   Q    Did Goo continue to sell in Pennsylvania after that?

16   A    After what?

17   Q    After Bo had his problem in Pennsylvania, his house raid?

18   A    Yes.

19   Q    He did?  Did he have, did Goo have a girlfriend up there, do

20   you know?

21   A    Not that I know of.

22   Q    Okay.  Let me call your attention to 2000.  You got arrested

23   again in that year, is that correct?

24   A    Yes.

25   Q    What were you doing when you got arrested?

1    A    I was getting ready to buy some marijuana up on Reisterstown

2    and Borman.

3    Q    Reisterstown Road and Balmore?

4    A    No, Borman Avenue.

5    Q    Borman Avenue?

6    A    Yes.

7    Q    Who were you going to buy the marijuana from?

8    A    Avon.

9    Q    Avon.  This guy who was a cousin of Goo's, is that correct?

10    A    Yes.

11    Q    How much marijuana were you going to buy?

12    A    A couple bags.  Dime bags.  Ten dollar bags.

13    Q    Okay.  Were you with anybody else?

14    A    Yes.

15    Q    Who?

16    A    Eric Stokes.

17    Q    Anybody else?

18    A    No.

19    Q    What happened?

20    A    We was standing, we were standing behind, me and Avon were

21    standing behind the car getting ready to make the transaction and

22    the police rolled down the street and jumped out on us.  And they

23    searched us, they didn't find anything.  They was like, they went

24    to the car that we was leaning on and looked inside the car, seen

25    Eric Stokes in the car.  He was wanted for attempted murder.  So

1    they automatically pulled him out of the car and they searched

2    the car and found drugs and locked him and I up because I was

3    driving the car.

4    Q    And whose drugs were those?

5    A    Mine.

6    Q    What kind of drug was it?

7    A    Crack.

8    Q    Do you remember how much it was?

9    A    It was like 40, 50 pills.

10   Q    Okay.  Did you cook that crack up yourself?

11   A    Yes.

12   Q    Where did you get the powder cocaine from?

13   A    Darryl Wyche.

14   Q    And who got it for you from Darryl Wyche?

15   A    Willie Mitchell.

16   Q    Where did you pick it up from Mr. Mitchell?

17   A    Out Catonsville, Route 40, Darryl's cell phone store.

18   Q    Darryl Wyche had a cell phone store?

19   A    Yes.

20   Q    On Route 40?

21   A    Yes.

22   Q    But you got it from Mr. Mitchell at that location, is that

23   correct?

24   A    Yes.  Me, me and Mr. Mitchell rode out there together and he

25   went and took care of it for me because me and Darryl wasn't on

1   good terms.

2   Q    You weren't on good terms?

3   A    No.

4   Q    Okay.  Well, how much did you, how much money did you give

5   Mr. Mitchell to buy this cocaine for?

6   A    A thousand dollars.

7   Q    Do you remember how much cocaine you got in weight?

8   A    An ounce.

9   Q    An ounce?

10  A    Yes.

11  Q    And then you took it and cooked it up, is that correct?

12  A    Yes.

13  Q    Where did you go to cook it up?

14  A    My house.

15  Q    Where was your house at that time?

16  A    Owings Mills.

17  Q    And then you had it with you when you were going to buy

18  marijuana from this guy Avon, is that correct?

19  A    Yes.

20  Q    And Avon's the guy who testified earlier who used to get

21  supplied by Goo to sell in Park Heights, is that correct?

22  A    Yes.

23  Q    Okay.  Now you said you wound up doing a substantial amount

24  of time in jail around that time.  From 2000 to 2003, is that

25  correct?

DIRECT EXAMINATION OF BACON

107

1    A    Yes.

2    Q    Did you get visited while you were in jail?  Did Mr.

3    Mitchell, first of all, come to visit you?

4    A    Yes.

5    Q    Where were you when he came to visit you?

6    A    Pikesville, Maryland.  State trooper had caught us.

7    Q    What were you doing there?

8    A    Working on a detail from, I was incarcerated in boot camp,

9    and we had a detail out there.

10   Q    I see.  Did Mr. Mitchell bring you anything when he came to

11   visit you?

12   A    He brought me some long johns and socks.

13   Q    Okay.  And did he tell you anything about Darryl Wyche?

14   A    No.

15   Q    Did he mention that he was still getting from Darryl Wyche?

16         MR. LAWLOR:  Objection, Your Honor.  Asked and

17   answered.

18         THE COURT:  Overruled.  You may answer.

19   A    Yes.

20   Q    Okay.  Do you remember what year this was?

21   A    Two thousand and -- 2001.

22   Q    Okay.  Did he mention anything about his music business?

23   A    Yes.

24   Q    What did he say?

25   A    He was producing.

1   Q    He was producing music?

2   A    Yes.

3   Q    Is that all he said?

4   A    Yes.

5   Q    Did he mention Donte Sands?

6   A    No.

7   Q    He didn't?

8   A    No.

9   Q    Okay.  Did you speak to Mr. Mitchell on later occasions on

10  the telephone?

11  A    Yes.

12  Q    Okay.  Let me ask you, in 2002, did you get a visit from Mr.

13  Martin and Mr. Gardner?

14  A    Yes.

15  Q    Where were you when they came to visit you?

16  A    I graduated from boot camp in Jessup and they came to the

17  Jessup Brockbridge facility.

18  Q    Okay.  Let me ask you about, did they ever come to visit you

19  in Pikesville?

20  A    Yes.

21  Q    Okay.  And do you recall, is this around February of 2002?

22  Does that sound about right?

23  A    Yes.

24  Q    Okay.  Did they tell you about anything involving Bo on that

25  occasion?

1    A    They told me he had gotten into something, he had stabbed a

2    couple guys out there --

3              MR. LAWLOR:  Objection, Your Honor.

4              THE COURT:  Overruled.

5    A    They had told me, they had told me that he had stabbed a

6    couple guys up down Hammerjacks and he got beat up real bad, and

7    the guys who had he stabbed up had put a hit out on him.

8    Q    Okay.  Do you remember how Wayne and Goo got out there to

9    Pikesville to tell you about this?

10   A    Wayne had a Plymouth.

11   Q    Okay.

12   A    He drove out.

13   Q    All right.  Let me call your attention now to March 4th of

14   2002.  I'm going to show you an exhibit.  I'm just going to put

15   it on the screen, with the Court's permission.

16             THE COURT:  Yes.

17   Q    This is Government Exhibit W-5-I.  Do you recognize this,

18   Mr. Bacon?

19   A    Yes.

20   Q    What is it?

21   A    A letter I wrote Wayne.

22   Q    All right.  Can you read it for us or do you want to hold it

23   in your hands while you read it?  Is this clear enough on the

24   screen?

25   A    If you can just slide it over some on the screen.

1    Q    Like this?

2    A    Yeah.  A little bit more.  All right.  What's --

3         THE COURT:  I'm sorry, Mr. Bacon.  Read it very slowly

4    because when you read you talk faster than normally.  So just try

5    to concentrate on reading it slowly.

6    A    What's poppin, playboy?  How are the streets treating you

7    out there?  I know you only been home for a minute but I hope

8    you're getting back into the swing of things.

9         I know it's hard out there to start over from scratch

10   ain't cutting it.  Kicking in doors and shit to us.  Hold on.

11   Kicking in doors and shit to us.  I know you're out there

12   plotting.  Just be careful, dog.  When I get out I hope I can

13   come to my dogs and get an eighth with no problem.  It's a risky

14   business but a nigga like me lives on the edge.  I don't have no

15   problem with ski masking it up.  You know we don't have any

16   picks.  I have a few niggas in mind, especially black.  Fuck all

17   that playing around.  We have families out there and we don't

18   have it in us coming back here.  You know how we carry it, dog.

19   Yo, if you do strike rich, make sure you holler at your dog real

20   loud.

21        I do need some help on this lawyer money.  I sent

22   Carolyn $400 -- move it over some.  Slide it over.  All right.

23        I sent Carolyn $400 from road crew and selling

24   cigarettes.  Ernie gave her 200 for me but I need 400 more.

25   Needleman wants that dough up front.  Yo, whatever you can do I

1    would appreciate.  A nigga's trying to get back on them streets

2    so I can support my family and make things happen.  Yo, I know

3    y'all niggas are in my corner.  I just want y'all to be safe out

4    there, out that bitch.  Goo supposed to come through and holler

5    at me Friday up MSP, bring a nigga a can and some drink so I can

6    fell that shit before I go down tight as BCCC.  I'm about to

7    shoot some dice.

8            I just smoked some hydro yesterday.  Yo, you know a

9    nigga was high as a bitch.  When I get out I can't afford to fuck

10   with that shit, you know.  All right, dog.  Be safe and send the

11   family my love.

12   Q    Okay.  You signed it?

13   A    My love, Darryl.  Little Darryl.

14   Q    Okay.  Let me ask you a couple of questions.  When, when you

15   say kicking in doors ain't shit to us, I know you're out there

16   plotting and I hope I can come home to my dogs, what are you

17   talking about there?

18   A    I was talking about pretty much if shit, if the drugs not

19   going right, that we got to do whatever we got to do to get

20   money.

21   Q    Okay.  Specifically kicking in doors, is that correct?

22   A    Yes.  That was just a line I used from a song.  So I mean,

23   just any means necessary, if the drug game ain't going as well as

24   planned.

25   Q    Okay.  And speaking of that, you also say, I don't have no

1    problem with ski masking it up.  What does that mean?

2    A    Putting on a ski mask and going, get, going to rob somebody.

3    Q    Okay.  You also say, when I get out I hope I can come home

4    to my dogs and get an eighth with no problem.  What are you

5    talking about?

6    A    Cocaine.

7    Q    Okay.  What does a eighth mean?

8    A    Four and a half ounces of cocaine.

9    Q    That's an eighth of a kilo?

10   A    Yes.

11   Q    Okay.  And you're hoping that Wayne, Mr. Martin, will supply

12   you with an eighth as soon as you get home?

13   A    Yes.

14   Q    Okay.  Who's this guy Black?  You say, we don't have any

15   picks.  I have a few niggas in mind, especially Black.  Who are

16   you talking about there?

17   A    That was a guy I told you about earlier that I jumped out on

18   down South Baltimore who owed me some money.

19   Q    Oh, is that the time that Mr. Martin was in the car with

20   you?

21   A    Yes.

22   Q    Okay.  And why would he be a good person for you to rob?

23   A    Because he, at the time he was doing good and now he

24   already, he still owed me some more money.  So I still have

25   animosity towards that.

1    Q    Okay.  He would have a lot of money because he was doing

2    good in the drug business?  Is that what you mean?

3    A    Yes.

4    Q    And then you say, fuck all that playing around.  We have

5    families out there and we don't have it in us coming back here.

6    What do you mean by that?

7    A    Coming back to jail.

8    Q    You talk about needing money and you mention, you mention

9    how you sent money to someone named Carolyn, is that correct?

10   A    Yes.

11   Q    And also, this is money you made selling cigarettes and

12   working on a road crew, is that correct?

13   A    Yes.

14   Q    That's selling contraband cigarettes in the boot camp where

15   you were?

16   A    Yes.

17   Q    And then Ernie gave her $200 for me but I need 400 more

18   because Needleman wants that dough up front.  Who's Needleman?

19   A    Stanley Needleman's a lawyer.

20   Q    What did, what did you need to have a lawyer for at that

21   point?  You were already locked up.

22   A    I had a pending case.  No.  No.  No.  No.  No.  I was trying

23   to get an appeal.

24   Q    Trying to get an appeal?

25   A    Yes.

1    Q    I see.  So you want Mr. Martin to send you some money so

2    that you can pay your lawyer, is that it?

3    A    Yes.

4    Q    Did he send you money for your lawyer?

5    A    Yes.  He sent me a couple hundred.

6    Q    And then you say, Goo supposed to come through and holler at

7    me Friday up MSP.  Is that Maryland State Police?

8    A    That's Maryland State Police Headquarters in Pikesville.

9    Q    I see.  Did he come?  Did Goo come?

10   A    Yes.

11   Q    Okay.  Do you remember what he talked about when he came to

12   see you?

13   A    No.  We just had some small talk about what was going on,

14   how he was doing.  Pretty much when I was leaving from up there

15   and going down B triple C.

16   Q    Okay.  You talk about you smoked some hydro yesterday.  What

17   is that?

18   A    Marijuana.

19   Q    Hydro is a kind of marijuana?

20   A    Yes.  Hydro planted.  I think it's like the seeds that grow

21   in the water.

22   Q    I see.  So that would be contraband marijuana in the jail,

23   also?

24   A    Yes.

25   Q    That's what you got locked up for later at Jessup, correct?

1    A    Yes.

2    Q    Okay.  Let me call your attention to March of 2002, the same

3    month.  Did you graduate from boot camp around that time?

4    A    Yes.

5    Q    Did anybody come to your graduation?

6    A    Yeah.  My mother, my son mother, and my son, and Wayne and

7    Goo came through for me.

8    Q    Okay.  Were Darryl and Anthony Wyche still alive at that

9    time when you graduated?

10    A    Yes.

11    Q    Okay.  Let me call your attention to the next month, up at,

12    were you at BCCC at that time?

13    A    Yes.

14    Q    That's a facility here in Baltimore that you mentioned in

15    your letter, is that correct?

16    A    Yes.

17    Q    Okay.  Did Wayne and Goo come and visit you there?

18    A    Yes.

19    Q    Did they mention the Wyche brothers' murder?

20    A    Yes.

21    Q    Murders?  Okay.  Did they tell you how the Wyche brothers

22    died?

23    A    They just told me somebody had shot them, both of them in

24    the back of the heads, and that guy, Claudus Lassiter, a friend

25    of Darryl and Tony's, had put their names in it from a voice

1    recording.

2    Q    Anybody else put their names in it?

3    A    Deezo, Tyrone, Wally.

4    Q    Okay.  These are all guys that you knew?

5    A    Yes.

6    Q    You've told us about Deezo already.  What about Tyrone and

7    the other one?

8    A    Tyrone has supposed to have said something as well about

9    their, that it sounded like them on the voice recording.  And

10   Wally.

11   Q    Sounded like their voice recording what?

12   A    Sounded like their voices on a recording.

13   Q    Okay.  What did Wayne and Goo tell you about a recording?

14   A    They said they tried to say it was them on there.

15   Q    I'm sorry?

16          THE COURT:  Just one moment, please.

17          (Loud outside siren.)

18          THE COURT:  Okay.  You can go ahead, Mr. Bacon.

19   A    All right.  No.  They was just telling me that Darryl home

20   boys, Claudus and Tyrone and them, tried to implicate them,

21   saying it was their voices on the voice recording message.

22   Q    Okay.  Did Wayne and Goo tell you anything about, anything

23   more about the voice recording?

24   A    No.

25          THE COURT:  About five minutes, Mr. Harding?

1    Q    Yes, Your Honor.  You told us back at the beginning of the

2    testimony that you got a grand jury subpoena.  And you testified

3    in the grand jury on May 12th of 2004.  Is that correct?

4    A    Yes.

5    Q    Did you let Wayne know that you had gotten a grand jury

6    subpoena?

7    A    Yes.

8    Q    And what did he tell you to do?

9    A    Talk to a lawyer before I come down there, before I come to

10   the grand jury.

11   Q    Did you?

12   A    Yes.

13   Q    What lawyer?

14   A    Lawrence Rosenberg.

15   Q    But you obviously testified, is that correct?

16   A    Yes.

17   Q    Afterwards, did you talk to Wayne and Goo some more by

18   telephone?

19   A    Yes.

20   Q    In fact, did you often speak to these guys by telephone?

21        MR. LAWLOR:  Objection, Your Honor.  These guys.

22        THE COURT:  Rephrase the question.

23   Q    Did you speak to -- well, you've already told us you spoke

24   to Mr. Mitchell by telephone from jail, is that correct?

25   A    Yes.

1    Q    Did you speak to Goo by telephone from jail from time to

2    time?

3    A    Yes.

4    Q    And what about Wayne, Mr. Martin?

5    A    Yes.

6    Q    Yes.  Okay.  Did you speak to Wayne after you testified in

7    the grand jury?

8    A    Yes.

9    Q    What did he tell you?

10   A    He was asking me what kind of questions was they asking and

11   stuff like that.

12   Q    Okay.  Did he tell you anything about Mr. Mitchell or Bo?

13   A    Not to my recollection.

14   Q    Did he tell you anything about getting mixed up in

15   something?

16          MR. LAWLOR:  Objection, Your Honor.  Asked and

17   answered.

18          THE COURT:  Overruled.  You may answer.

19   A    Yes.  He said that he got, all the stuff that was going on

20   with the Darryl and Tony stuff, that Bo had got him caught up in

21   it.

22   Q    Okay.  When you got out of jail in 2003, did you go and

23   visit Goo?

24   A    Yes.

25   Q    Because he was locked up at that time, is that correct?

1   A    Yes.

2   Q    Where was he?

3   A    Jessup, Maryland.

4   Q    Was that the last time you visited Goo before today?

5   A    Yes.

6   Q    But you spoke to him by telephone, is that correct?

7   A    Yes.

8   Q    When you spoke to him by telephone, did he ask you for

9   money?

10  A    Yes.

11  Q    Did you send him money?

12  A    Yes.

13  Q    How much did you send him?

14  A    A hundred dollars.

15           MR. HARDING:  No further questions, Your Honor.

16           THE COURT:  Members of the jury, we will take our

17  afternoon recess at this time.  Please leave your note pads in

18  your chairs.  Have no discussion about the case.  Let me correct

19  myself.  It's not the afternoon recess, it's the lunch recess.

20  Please be back in the jury room no later than two p.m. this

21  afternoon so that we may continue at that time.  Continue to keep

22  an open mind about all issues.  The jury is excused.

23           (Jury exits the courtroom.)

24           THE COURT:  Mr. Bacon is excused.

25           MR. HARDING:  May I have a word with the agent, Your

1    Honor?

2         THE COURT:  Yes.

3         (Pause in proceedings.)

4         THE COURT:  Mr. Harding, I trust that you realize I

5    wasn't saying, I'm sure you understood I wasn't saying you only

6    had five more minutes with the witness.  I was simply saying five

7    more minutes before the recess.

8         MR. HARDING:  Coincidentally, I only had five more

9    minutes to go, Your Honor.

10        THE COURT:  It's perfect.  Once again, a note from the

11   jury.  He's going to be away, one of the jurors, the weekend

12   after Thanksgiving.  We don't have to worry about that, do we?

13        MR. HARDING:  I sure hope not, Your Honor.

14        THE COURT:  Okay.  We're in recess until two p.m.

15        (Recess at 12:45 p.m.)

16        THE COURT:  Ready to go, Mr. Lawlor?

17        MR. LAWLOR:  Yes, Your Honor.

18        THE COURT:  May we have the witness, please?

19        Please resume your seat, Mr. Bacon.  And thank you.

20   Continue to keep your voice up and speak directly into the

21   microphone.  We'll have the jury.

22        (Jury enters the courtroom.)

23        THE COURT:  Please be seated, ladies and gentlemen.

24   Good afternoon.  Whenever you're ready, Mr. Lawlor.

25        CROSS EXAMINATION

1    BY MR. LAWLOR:

2    Q    Thank you, Your Honor.  Mr. Bacon, good afternoon.

3    A    Good afternoon.

4    Q    How are you?

5    A    All right.

6    Q    I would like to take you back, if I could, to when you first

7    met some of the gentlemen seated in court today.  You said that

8    you grew up in Randallstown?

9    A    Yes.

10   Q    And you started dealing drugs at a very young age?

11   A    Yes.

12   Q    Okay.  And did that owe in part to the conditions in which

13   you grew up?  Did you grow up in a sort of rough and tumble

14   neighborhood?

15   A    No.

16   Q    You did not?  Okay.  This just happened by happenstance that

17   you started dealing drugs at such a young age?

18   A    Yes.

19   Q    Okay.  And ultimately related to that is something else, you

20   went away into the Hickey School?

21   A    Yes.

22   Q    Was this in 1994?

23   A    The first time I went to Hickey School was '93.

24   Q    '93 was the first time.  What was the time or how old were

25   you or what year was it when you were there with Mr. Mitchell,

1    Mr. Gardner, and Mr. Martin?

2    A    '94.

3    Q    '94.  Okay.  So you are 29 years old now?

4    A    Yes.

5    Q    How old were you in 1994?

6    A    15.

7    Q    15.  And Mr. Mitchell is a year or so older than you?

8    A    Yes.

9    Q    So he was 16, is that correct?

10    A    I'm not for sure.

11    Q    Well, if you were 15 in 1994 and he's a year older than you,

12    that would make him 16, is that fair?

13    A    That's fair.

14    Q    Okay.  So you were at Hickey.  Mr. Mitchell was at Hickey.

15    And he was 16 years old.  Is that correct?

16    A    That's fair.

17    Q    Okay.  And you alluded on questioning from Mr. Harding to

18    the fact that you heard something about a robbery.  Is that

19    right?

20    A    Yes.

21    Q    And you heard it from a person, is that right?

22    A    Yes.

23    Q    Okay.  And today, as you sit here today, it's 2008, is that

24    right?

25    A    Yes.

1    Q    So that was 14 years ago?

2    A    Yes.

3    Q    And not just regarding that conversation but regarding a lot

4    of the events, a lot of the conversations you've had with people,

5    a lot of the things you've done and a lot of things that you've

6    heard, you don't remember all of it, right?

7    A    No.

8    Q    All right.  Certainly a conversation that you had in 1994

9    you might not remember the particulars of that.  Is that fair?

10   A    Yeah, that's fair.

11   Q    Okay.  So do you remember who you even had this conversation

12   with?

13   A    No.

14   Q    Okay.  You don't?  But you recall that you had a

15   conversation about the fact that they were there because of a

16   robbery?

17   A    Yes.

18   Q    All right.  You don't know that they committed a robbery.

19   You just know that they were there because of a robbery?

20   A    Yes.

21   Q    All right.  Have you ever been arrested for something you

22   didn't do?

23   A    Yes.

24   Q    Okay.  So you don't know that they did any robbery

25   whatsoever; is that fair?

Case 1:04-cr-00029-RDB   Document 674   Filed 06/08/09   Page 124 of 302

1   A    I don't know if they committed a crime.

2   Q    You don't know if they committed any crime that resulted in

3   them being incarcerated at Hickey School at 16 years old, do you?

4   A    No.  I know they committed a crime to get there.  But I

5   don't know if they got found guilty of the crime or not.

6   Q    Okay.  Now, do you know what each of them were there for or

7   is this discussion, this robbery between one person perhaps had

8   to do with what one of them was doing there?

9   A    I don't know what each one of them was there for.

10  Q    Okay.  All right.  So in any event, you and the gentlemen

11  here today obviously left the Hickey School at some point and

12  were back on the streets?

13  A    Yes.

14  Q    Okay.  And you've been incarcerated from '04 to '08, right?

15  '04 till just recently?

16  A    Yes.

17  Q    All right.  Prior to your incarceration, other than when you

18  were in jail, you basically spent your time selling drugs almost

19  throughout your whole life, from 12 years old until 2004?

20  A    Yes.

21  Q    Okay.  And that was what you did?  You didn't work?  You

22  didn't go to school?  You were by occupation, by profession, a

23  drug seller?

24  A    Yes.

25  Q    Okay.  And so you know the game, right?

1    A    Yes.

2    Q    Inside and out, correct?

3    A    Okay.

4    Q    You know how the game works?

5    A    Yes.

6    Q    All right.  Inside and out, right?

7    A    Yes.

8    Q    All right.  And at various points in time you've discussed

9    the fact that you had different dealings with the different

10   gentlemen here today or, I should say, with Mr. Mitchell, with

11   Mr. Martin, and with Mr. Gardner, is that fair?

12   A    Yes.

13   Q    Okay.  And it sounds like, and I'm not trying to put words

14   in your mouth, so forgive me, correct me if I say something

15   that's not right, but it sounds to me like you were more friendly

16   with Mr. Gardner and Mr. Martin than you were with Mr. Mitchell,

17   is that fair?

18   A    No.

19   Q    You were equal friends with all three of them?

20   A    I had a better relationship with Mr. Martin and Mr. Gardner.

21   Q    You had a better relationship?

22   A    Yes.

23   Q    And you had more dealings with them?

24   A    Yes.

25   Q    And you spent more time with them?

1    A    Yes.

2    Q    You got arrested with them?

3    A    Yes.

4    Q    You talked to them more often?

5    A    Yes.

6    Q    Okay.  And you've discussed the fact, you testified on

7    direct to a lot of different things over a lot of different

8    years.  Is that right?

9    A    Yes.

10   Q    All right.  So let me see if I can just sort of summarize

11   and then we'll get into some of the details.  Is it fair to say

12   that Mr. Mitchell, to the degree that you say he dealt drugs, did

13   that in a different part of the city than where Mr. Gardner did

14   or where Mr. Martin did?

15   A    Yes.

16   Q    He plied his trade in a different location than where Mr.

17   Gardner did and Mr. Martin did, right?

18   A    Yes.

19   Q    And is it fair to say that you, like many drug dealers, you

20   go where the money is, right?

21   A    Yes.

22   Q    And you're looking out for number one, right?

23   A    Yes.

24   Q    All right.  So when you're selling drugs, your goal is to

25   make as much profit as possible, is that fair?

1    A    Yes.

2    Q    All right.  So, and you don't care, for example -- who did

3    you deal drugs with?  Give me a name of someone you dealt drugs

4    with that's not in this courtroom today?

5    A    Aaron Holly.

6    Q    All right.  So you dealt, in various times in your life you

7    worked with Mr. Holly, you dealt drugs with him?

8    A    Yes.

9    Q    All right.  Now, if Mr. Holly dealt drugs on corner X and

10   you thought you could make more money on corner Y, then you would

11   make that decision on your own?  You would go to corner Y to make

12   more money, right?

13   A    Yes.

14   Q    All right.  And so at various points in time it behooved

15   you, it benefited you to do something with Mr. Gardner and so you

16   would do it with Mr. Gardner, right?

17   A    Yes.

18   Q    And other times it made no sense to do something with Mr.

19   Gardner, so you might do it with Mr. Holly?  Is that fair?

20   A    No.

21   Q    Well, at certain points in time you did work with only Mr.

22   Holly, is that right?

23   A    No.

24   Q    Didn't you just say five minutes ago that you dealt drugs

25   with Mr. Holly?

1    A    I did deal drugs with him.  Not only with him, though.

2    Q    Okay.  All right.  Well, we won't use Mr. Holly.  But

3    someone other than Mr. Gardner or Mr. Martin.  If it behooved

4    you, if money could be made by dealing drugs with someone other

5    than the two of them, if the opportunity presented itself, you

6    would seize upon that opportunity.  Is that fair?

7    A    No.

8    Q    It's not fair?

9    A    No, it's not fair.

10   Q    You're saying you would only do anything in your life if Mr.

11   Gardner or Mr. Martin were present?

12   A    No.  I'm not saying that.

13   Q    I'm -- you've confused me.

14   A    I'm just saying that you saying, you can't trust everybody

15   so why would you just go ahead and start selling drugs with

16   everybody?

17   Q    All right.  Fair enough.  There were certain people that you

18   knew that you dealt with?

19   A    Yes.

20   Q    In terms of selling to them, correct?

21   A    Correct.

22   Q    Buying from them, correct?

23   A    Correct.

24   Q    And selling with them?

25   A    Correct.

1    Q    But you knew a lot of people, right?

2    A    Yes.

3    Q    Because you dealt drugs in East Baltimore?

4    A    Yes.

5    Q    Catonsville?

6    A    Yes.

7    Q    South Baltimore?

8    A    Yes.

9    Q    Where else?

10   A    Pretty much all through Baltimore City.

11   Q    Okay.  So, and you dealt, I assume, with a lot of different

12   people in those various geographic areas?

13   A    Yes.

14   Q    All right.  So again, back to my original question.  Of

15   these many people that you've dealt with in these many years and

16   these many geographical regions, you would associate with someone

17   from time to time and someone else from time to time and you

18   would come in and out of people's lives.  Is that fair?

19   A    No.

20   Q    What is it I've said that's incorrect?

21   A    I mean, coming in and out of people's lives.  I only deal

22   with, you mean, people like, I mean, the people that I dealt with

23   like my associates, that was something different.  But friends,

24   we dealt with each other every day.

25   Q    All right.  So you would see -- how many people did you deal

1    drugs with over the course of, you started when you were twelve

2    in, say, '94 and '95.  You get arrested in 2004.  Over those ten,

3    roughly ten years, how many different people did you associate

4    with in the drug game?

5    A    I mean, I can't count.  Probably like 50.

6    Q    More than 50?

7    A    Yeah, more than 50.

8    Q    More than a hundred?

9    A    Probably around like in between that.

10   Q    So these are a hundred people that you bought from, sold to,

11   sold with?

12   A    Yes.

13   Q    All right.  And you did not see those people every day?

14   A    No.

15   Q    And I'm sure of those hundred people, some of them you might

16   see for a month and then not see for six months, right?

17   A    Yes.

18   Q    And that's common, right?

19   A    Yes.

20   Q    Okay.  And you said that you bought drugs.  You would go to

21   New York yourself occasionally with Mr. Gardner and with Mr.

22   Martin, is that right?

23   A    Yes.

24   Q    But not with Mr. Mitchell?

25   A    No.

Case 1:04-cr-00029-RDB    Document 674    Filed 06/08/09    Page 131 of 302

1    Q    Okay.  In fact, this one time that you got arrested and you

2    were in the car with Mr. Mitchell, you got arrested on I-95 for

3    possession of marijuana?

4    A    Yes.

5    Q    That was just some weed that you had on your person, right?

6    A    No.  It was just some weed in the car that was traces.

7    Q    It was just trace weed.  So this was no big time operation

8    that you were involved in with Mr. Mitchell?  This was just --

9    A    Some seeds.

10    Q    Some seeds.  It really had nothing to do with nothing?

11    A    Yes.

12    Q    Okay.  All right.  And in fact, so you bought from someone

13    named Polo, right?

14    A    Yes.

15    Q    And then you also bought from someone named Poppi, right?

16    A    Yes.

17    Q    And Polo is local?  He's Columbia, Maryland?

18    A    Yes.

19    Q    And Poppi is New York?

20    A    Yes.

21    Q    And you'd never went to New York with Bo, right?

22    A    I went to New York with Bo.

23    Q    You went to New York to see Bo.  You didn't travel there

24    with him, did you?

25    A    We traveled together, went to a club.

1  Q    You traveled together to a club because Bo was in college up

2  there, right?

3  A    Yes.

4  Q    All right.  So how old are you now?

5  A    29.

6  Q    All right.  So Mr. Mitchell is 30 or 31.  We're going back

7  about ten years when he was in college, right?

8  A    Yes.

9  Q    Late '90s?

10  A    Late 90's.

11  Q    So you were out of jail, still plying your trade, correct?

12  A    Yes.

13  Q    And Mr. Mitchell was in college for a couple years there,

14  right?

15  A    Yes.

16  Q    And you would go to visit him?

17  A    Yes.

18  Q    Okay.  So when you say you went to New York with him, you

19  went with him to socialize, not to engage in any illicit activity

20  together with him, right?

21  A    Correct.

22  Q    Okay.  And he was at a couple different colleges during that

23  time, right?

24  A    Yes.

25  Q    All right.  And you mentioned, though, that Bo came back to

1   the Baltimore region.  And you, Mr. Gardner, and Mr. Martin were

2   buying from, from Polo and Poppi and Bo was buying from, from Mr.

3   Wyche, right?

4   A    Yes.

5   Q    All right.  And you said that you knew where you cut up

6   your, cooked your crack, where Mr. Gardner cooked crack, where

7   Mr. Martin cooked his crack, but Bo did that somewhere else,

8   right?

9   A    Yes.

10          MR. PYNE:  Objection.

11  Q    And he worked with his cousin, right?  He worked with Donte?

12  A    I'm not for sure.

13  Q    You don't know who he worked with?

14  A    I don't know who he worked with.

15  Q    He was doing his own thing, more or less?

16  A    Yes.

17  Q    All right.  In addition to the fact that Mr. Mitchell was

18  away at college for some period of time, prior to that he was

19  also, he did another stint at the Hickey School, is that right?

20  A    Yes.

21  Q    For about a year prior to the time that he went to college,

22  right?

23  A    Yes.

24  Q    And then he graduated from the high school at Hickey, went

25  off to college?

1   A    Yes.

2   Q    All right.  So you were separated from him by and large for

3   some several years?

4   A    Yes.

5   Q    Okay.  And in addition to that, the other gentlemen, Mr.

6   Martin and Mr. Gardner, they would be gone for some periods of

7   time.  They might get a year or two in jail and they would be off

8   the streets and sort of just out of the game, right?

9   A    Yes.

10  Q    Okay.  Just like you, when you've been away, you went away

11  from 2000 to 2003, right?

12  A    Yes.

13  Q    And that shut you down, you're out of the game, right?

14  A    Yes.

15  Q    You're not conspiring with anyone.  You're just biding your

16  time.  Is that fair?

17  A    Yes.

18  Q    All right.  And I mentioned that Mr. Mitchell was doing his

19  own thing.  That includes when he was in Pennsylvania, right?

20  Goo was in one place and he was in an entirely different place,

21  right?

22  A    Yes.

23  Q    Unrelated, right?

24  A    Unrelated, yes.

25  Q    Okay.  Now, let me talk to you a little bit about, about

Case 1:04-cr-00029-RDB    Document 674    Filed 06/08/09    Page 135 of 302

1    everyday activity if you're in the game.  In addition to the fact

2    that you sold drugs all these years, you carried a gun all of

3    those years, right, by and large?

4    A    Yes.

5    Q    All right.  And that was by force of necessity?

6    A    Yes.

7    Q    And you were, do you, is it your desire to have to use that

8    gun?

9    A    No.

10   Q    Are you a killer?

11   A    No.

12   Q    Why do you carry a gun?

13   A    For protection and when people play games with your money.

14   Q    What kind of games?

15   A    Like ducking out when he owe you money and stuff like that.

16   When he --

17   Q    Someone owes you money, you need to have a gun to get your

18   money back?

19   A    Yeah.

20   Q    And you do understand, as you sit here today, for the rest

21   of us, for the ladies and gentlemen of the jury, for the lawyers

22   and for the judge, that this is not how normal, everyday life

23   works?  You do understand that, right?

24   A    Yes.

25   Q    That the fact that you need a gun to collect a debt is

1    unusual?

2    A    Yes.

3    Q    Okay.  But in the world that you lived in, and I say this

4    not to criticize but for clarification, the world in which you

5    lived, you needed to have the gun to get the money, right?

6    A    Yes.

7    Q    And you needed the gun to keep your own money, right?

8    A    Yes.

9    Q    Why do you need a gun to keep your own money?

10   A    Because somebody will try to come take it from you.

11   Q    And if you don't have a gun, what's going to happen?

12   A    It's going to be easier for them to get it.

13   Q    How will they get it if you don't have a gun?

14   A    How will they get it?  I don't know how they will get it.

15   Q    They will have a gun, right?

16   A    Pretty much.

17   Q    And they will show you their gun and you will not have a

18   gun.  And therefore, you will be disposing of your money to them,

19   right?

20   A    Yes.

21   Q    Because part of this game is robberies, right?

22   A    Yes.

23   Q    Everyone is robbing everyone, right?

24   A    Yes.

25   Q    There's no faith and there's no trust, right, outside of

1    your own circle?

2    A    Yes.

3    Q    It's the dog-eat-dog world, right?  And so you have, and you

4    have, have you been robbed personally?

5    A    Yes.

6    Q    All right.  How many times?

7    A    Twice.

8    Q    Okay.  Of drug proceeds?

9    A    Yes.

10   Q    Presumably by other dealers who knew that you were a drug

11   dealer?

12   A    Yes.

13   Q    Have you participated in robbing other people?

14   A    Yes.

15   Q    Okay.  You robbed other drug dealers?

16   A    Yes.

17   Q    And that was something you would do with no, no qualms?

18   A    Yes.

19   Q    Their money was there to be had, you were going to take it?

20   A    Yes.

21   Q    And that's part of, essentially, that's part of the code.

22   That's fair game, right?

23   A    Yes.

24   Q    Okay.  And that's why you said you have these hundred people

25   and you're going to socialize with some of them on some

1    occasions, right?

2    A    Yes.

3    Q    All right.  But if you're in a different part of town from

4    somebody, then you're not worried about -- if you're in South

5    Baltimore and someone else is in Park Heights, they're not

6    protecting you, right?

7    A    No.

8    Q    They got to be with you?

9    A    Yes.

10   Q    Okay.  Now, in addition to robberies, kidnappings, is that a

11   common phenomenon in the world, in the drug world?

12   A    You could say so.

13   Q    All right.  Well, I don't want to say so.  I want you to say

14   so if it's true?

15   A    I don't know.

16   Q    Have you ever heard of people being kidnapped, drug dealers

17   being kidnapped and basically held for ransom?

18   A    Yes.

19   Q    Okay.  Have you heard of people being murdered?

20   A    Yes.

21   Q    A lot of people?

22   A    Yes.

23   Q    Is that an all too common thing in this city, in this game,

24   for lack of a better word?

25   A    Yes.

1    Q    You know a lot of people been killed?

2    A    Yes.

3    Q    People that were close to you, that you cared about?

4    A    Yes.

5    Q    All right.  And people get killed for every reason and for

6    no reason, right?

7    A    Yes.

8    Q    All right.  So if I think you robbed me, right or wrong, I

9    might kill you, right?

10   A    Yes.

11   Q    If you looked at my girl the wrong way, I might kill you,

12   right?

13   A    Yes.

14   Q    Okay.  If you got a corner that I want, I might kill you,

15   right?

16   A    Yes.

17   Q    All right.  If you've got drugs on your person and I want

18   them, I might kill you, right?

19   A    Yes.

20   Q    These are, as I said, for every reason and no reason people

21   kill others and get killed, right?

22   A    Yes.

23   Q    Okay.  And you said, you testified before the grand jury,

24   right?

25   A    Yes.

1    Q    All right.  And in that you reference, I think there was

2    some questioning about sort of the size and scope of your own

3    operation.  And you were kind of small time, right?

4    A    Yes.

5    Q    You were small time; Bo was small time, right?

6    A    Yes.

7    Q    Bo was kind of really an abject failure at the game, wasn't

8    he?  He failed out of the drug game, didn't he?

9    A    I don't know.

10   Q    Well, did you say that to the grand jury?

11   A    I didn't say he failed out of the drug game.

12   Q    All right.  Well, did you say that he was not successful?

13   A    I don't know.  I didn't see it.

14   Q    All right.  Well, let me come back to that.  You agree,

15   though, that you were small time?

16   A    Yes.

17   Q    Bo was small time?

18   A    Yes.

19   Q    Mr. Gardner was small time?

20   A    Yes.

21   Q    Mr. Martin was small time?

22   A    Yes.

23   Q    All right.  And there are, as part of this culture, you

24   become aware of the other players, right?  Is that fair?

25   A    Yes.

1    Q    Okay.  So you've heard of, for example, the Rice

2    organization, have you?

3    A    No.

4    Q    Okay.  You've heard of the Wyche organization?

5    A    Yes.

6    Q    Okay.  And they were bigger?  They're a big organization,

7    right?

8    A    I don't know.

9    Q    You don't know?  Okay.  Well, they were dealing -- were they

10   moving weight?

11   A    Yes.

12   Q    All right.  And you mentioned to that end that they had a

13   couple of fellows working for them, Deezo and Lassiter?

14   A    Yes.

15   Q    Were they muscle for the Wyche brothers?  Is that what they

16   were?

17   A    I don't know.

18   Q    All right.  Well, someone who's moving weight like the Wyche

19   brothers, do they need muscle?

20   A    I mean, they pretty they probably could have used some.

21   Q    They could use some?

22   A    Yeah.

23   Q    And they probably would use some, right?

24   A    Yes.

25   Q    Okay.  Let me back up to something.  You, you talked about

1    robberies and being in the game and knowing what the game's all

2    about.  And you mentioned, and I don't recall the particulars of

3    whose car it was, but that the car had sort of a stash, right?

4    A    Yes.

5    Q    A hidden compartment?

6    A    Yes.

7    Q    Is that a common phenomenon, that drug dealers who have

8    automobiles, that drive those automobiles with illicit substances

9    in the automobiles, will have a secret compartment?

10    A    Yes.

11    Q    That's common.  Why do you need that?

12    A    If you get pulled over from the police, it ain't in plain

13    view.

14    Q    Because you care not to have them find your drugs, right?

15    So if you're going to rob someone in a car, you're going to know,

16    if you're going to rob a drug dealer in a car you're going to

17    know that they likely have a stash, right?

18    A    Yes.

19    Q    So the point of the robbery, right, is to take what they

20    have to improve your situation in the world, right?

21    A    Yes.

22    Q    All right.  So what they have you want, right?

23    A    Yes.

24    Q    And you want all of what they have, right?

25    A    Yes.

1    Q    So you're going to look through the car and take it all,

2    right?

3    A    Yes.

4    Q    Okay.  Now, you also said that, in the same vein, that there

5    was a turf war that you were involved in?

6    A    Yes.

7    Q    All right.  And where was that?

8    A    Catonsville.

9    Q    All right.  And am I summarizing a turf war correctly by

10   saying that someone is coming into your territory or even that,

11   just that they have territory that you want?

12   A    It could be anything.  It could be, a turf war could be

13   somebody coming into your area selling drugs or somebody coming

14   in there, or somebody that's already in your area that's selling

15   drugs.

16   Q    All right.  And so these would be people that you're

17   unfriendly with?

18   A    Yes.

19   Q    And you settle that border dispute with violence, right?

20   A    Yes.

21   Q    All right.  Because there's no other way to settle things,

22   is there?

23   A    Well, you could talk it out.

24   Q    All right.  If you can't talk it out, though, you're going

25   basically out with guns to enforce your will, right?

1    A    Yes.

2    Q    And you've done that, right?

3    A    Yes.

4    Q    I mean, you've done that not just, you reference going out

5    trying to find someone and you couldn't find them, gun in hand,

6    right?

7    A    Yes.

8    Q    What was your plan had you located these individuals?

9    A    Meaning?  You shoot them.

10   Q    You were going to shoot them.  Okay.  I assume shoot them to

11   kill them?

12   A    Yes.

13   Q    Okay.  And that's, I mean, that's a pretty powerful

14   statement, sir.  I mean, you're saying now that you are an

15   individual who would, in order to promote your own bottom line,

16   kill someone.  Is that what you're saying?

17   A    Yes.

18   Q    All right.  I mean, you have no qualms about that, right?

19   A    No.

20   Q    All right.  And you're not unique in that respect, are you?

21   A    No.

22   Q    All right.  As I said, it's all too common that one

23   individual who sells drugs might kill another individual for

24   something as silly as a couple blocks, right?

25   A    Yes.

1    Q    Because you want those blocks because you want to sell the

2    drugs on those blocks because you want to make more money?

3    A    Yes.

4    Q    And the other person's existence harms your effort, right?

5    A    Yes.

6    Q    Okay.  Now, you talked about some things that you heard and

7    some things that were told to you over the years on direct when

8    Mr. Harding asked you.  So what I want to know is, there's a lot

9    of chatter out there, right?

10   A    Yes.

11   Q    And notwithstanding the fact that you are personally, and

12   many of the people you associate with, very tough, and you carry

13   guns, you also gossip like women?  And I don't mean that to be

14   rude.  But is that fair?

15   A    Yes.

16   Q    There's a lot of chatter going on out there, right?  Who's

17   selling who, who did who dirty, and who's sleeping with whose

18   girlfriend, yada, yada, yada, right?

19   A    Yes.

20   Q    And it's not all true, is it?

21   A    No.

22   Q    All right.  Because someone would act upon information

23   that's true or false, right?

24   A    Yes.

25   Q    All right.  So things that you've heard over the years and

CROSS EXAMINATION OF BACON BY LAWLOR                146

1    things that you've said in court today, a lot of that's based on

2    just things that you heard that were in the air, right?

3    A    No.

4    Q    Everything you said in here is stone cold fact, you have

5    first-hand knowledge about?

6    A    No.

7    Q    All right.  Well, which is it?

8    A    First hand, first-hand facts.

9    Q    Everything -- all right.  Let me ask you this, then.  You

10   said that Wayne and Goo said that there was a fight at

11   Hammerjacks, right?  Did they tell you that?

12   A    Yes.

13   Q    And you testified about that fact when Mr. Harding

14   questioned you about it, right?

15   A    Yes.

16   Q    All right.  So that is something you don't have first-hand

17   knowledge about.  You heard from other people that there was a

18   fight at Hammerjacks and that Bo did whatever someone told you he

19   did and that Bo got beaten up, is that correct?

20   A    Yes.

21   Q    All right.  Now, you heard this information from Mr. Martin

22   and Mr. Gardner, right?

23   A    Yes.

24   Q    Were they in Hammerjacks the night that this all purportedly

25   happened?

1   A    Yes.

2   Q    You're sure about that?

3   A    Yes.

4   Q    Okay.  You're sure about that because they told you that

5   they were there?

6   A    Yes.

7   Q    All right.  You know that this was in 2002, right?  That the

8   incident at Hammerjacks occurred in 2002.  Are you aware of that

9   fact?

10  A    Yes.

11  Q    All right.  And so I assume that your conversation with Mr.

12  Gardner and Mr. Martin occurred in 2002?

13  A    Yes.

14  Q    And so you're saying six years later, you know that they

15  said that they were there?

16  A    Yes.

17  Q    You're sure about that?

18  A    Yes.

19  Q    And you're sure that they were there?

20  A    Yes.

21  Q    Okay.  All right.  And they also told you that they heard,

22  right, they're telling you some things they heard on the street,

23  right?

24  A    Yes.

25  Q    That Lassiter and Deezo and another gentleman said that they

1    heard that Goo's voice and Wayne's voice was on the voice mail,

2    right?

3    A    Yes.

4    Q    They said that they heard that?

5    A    Yes.

6    Q    Because it was in the air, it was in the wind.  You don't

7    know that to be true or not true, right?

8    A    Right.

9    Q    You don't even know whether Lassiter knew that, right, using

10   him as an example?  You don't know that Mr. Lassiter knew that,

11   right?

12   A    Right.

13   Q    You were hearing what the rumor on the street was, right?

14   A    Right.

15   Q    And that's a common thing, right, that there's a rumor on

16   the street, right?

17   A    Yes.

18   Q    And B, when your friends come to see you, they share with

19   you what the rumor is on the street, right?

20   A    Yes.

21   Q    And it's, is it even mostly not true?  Is that fair to say?

22   That most of this information is either completely false or

23   completely unreliable?

24   A    Sometimes.

25   Q    Okay.  And you also heard that Bo got caught up in some

1    homicide, right?  Is that right?  Did you say that?

2    A    Yes.

3    Q    And you just -- but that's what you heard, that he was

4    caught up in it, right?

5    A    Yes.

6    Q    Okay.  And again, that's just what the rumor mill is

7    spitting out at that given time, right?

8    A    Correct.

9    Q    All right.  And so you testified before the grand jury and

10   you're testifying here today, and going back to my original

11   question, some of the things that you said here today are not

12   based on first-hand knowledge, right?  They're based on things

13   that you heard that were going through the rumor mill, right?

14   A    Yeah, some of them are.

15   Q    All right.  Some of them are.  All right.  And you're here

16   today pursuant to an agreement with the government, right?

17   A    Correct.

18   Q    All right.  Now, I don't care to go through each and every

19   criminal event that has occurred in your lie.  Again, I say this

20   not to embarrass you or criticize you, but we've established that

21   your entire life up to this point that you've been on the street

22   has been involving attempted murder, robbery, sale of drugs,

23   carrying of weapons, right?

24   A    Correct.

25   Q    And we're past the point of deciding or concerning ourselves

1   with what you got convicted for and what you didn't, right?

2   A    Correct.

3   Q    You served your time, you paid your debt, and here you are

4   today, right?

5   A    Correct.

6   Q    But at some point in time the situation was different,

7   right?  You had charges pending, right?

8   A    Yes.

9   Q    All right.  Because you have been convicted many times,

10  right?

11  A    Yes.

12  Q    And you were on probation, right?

13  A    Parole.

14  Q    All right.  In 2004, the last time that you got arrested,

15  you were on parole, right?

16  A    Yes.

17  Q    And so the jury understands what that means, that means if,

18  for example, you got a ten year sentence and they released you

19  after three, you owe them seven years, right?

20  A    Yes.

21  Q    All right.  And you owe them that time with the condition

22  that I will behave myself on the street or I will go back to

23  prison to serve out the remainder of that ten years, right?

24  A    Correct.

25  Q    All right.  And so notwithstanding the fact that in 2004

Case 1:04-cr-00029-RDB    Document 674    Filed 06/08/09    Page 151 of 302

1    you're on parole, you were still involved in the game, right?

2    A    Correct.

3    Q    And you got arrested again, right?

4    A    Correct.

5    Q    All right.  And you were arrested in possession of a large

6    quantity of drugs?

7    A    Correct.

8    Q    And a weapon?

9    A    Correct.

10   Q    And you knew that you were looking at new charges, right?

11   A    Correct.

12   Q    And you were looking at federal charges, right?

13   A    Correct.

14   Q    And you understand, without getting into the specifics, that

15   a sentence in federal court is likely to be much worse than

16   anything you're going to see over in the city court, right?

17   A    Correct.

18   Q    And you wanted no part of that, right?

19   A    Correct.

20   Q    And that was what induced you to enter into this agreement

21   with the government, right?

22   A    I mean, I already had made the statement to the grand jury

23   before I caught the charge.

24   Q    All right.  Well, was your agreement with the government

25   made for no reason or for some reason?

1   A    For some reason.

2   Q    The reason being that you would get less time?

3   A    Correct.

4   Q    Okay.  And that was what interested you, interested you,

5   correct?

6   A    Correct.

7   Q    All right.  And as opposed to getting a lengthy term in this

8   court, you got a five year sentence in the state court, right?

9   A    Correct.

10  Q    And not only did you only get a five year sentence over in

11  state court, you also didn't get extra time for the violation of

12  your parole, did you?

13  A    Yes, I did.

14  Q    Did they run those two sentences concurrent?

15  A    No.

16  Q    They did not?

17  A    No.

18  Q    Wasn't that part of your agreement?

19  A    It was part of it but it didn't come through.

20  Q    Okay.  It didn't come through, so the judge rejected that

21  part of the agreement?

22  A    Yes.

23  Q    All right.  But you had an agreement with the government

24  that you would at least serve the sentence for the gun and the

25  drugs.  You wouldn't be prosecuted over here at all, right?

1   A    Correct.

2   Q    You would get five years for the gun.  Not only did they not

3   prosecute you here, they didn't prosecute you for the drugs at

4   all, correct?

5   A    Correct.

6   Q    You got a free ride on that and you just had to take five

7   years on the gun, right?

8   A    Right.

9   Q    And they at least offered an inducement that they would ask

10  for the violation of parole be run concurrent?

11  A    Correct.

12  Q    And that was an inducement for you to enter into this

13  agreement, right?

14  A    Correct.

15  Q    All right.  And since, on top of those things that you've

16  been given by the government, now that you've been released,

17  they've also given you money, right?

18  A    Correct.

19  Q    $3500, is that right?

20  A    Correct.

21  Q    Okay.  Now, is it part of your plea agreement, which was

22  entered May, March 23rd, 2005, right?

23  A    Correct.

24  Q    All right.  Part of the agreement was that you would do

25  certain things and they wouldn't prosecute you over here, right?

CROSS EXAMINATION OF BACON BY LAWLOR                      154

1   Was that part of the agreement?

2   A    Correct.

3   Q    All right.  And one of the things that you agreed to do was

4   to refrain from violating state law and federal law, right?

5   A    Correct.

6   Q    All right.  But you haven't done that, right?

7   A    Correct.

8   Q    All right.  You continue to smoke weed at a minimum, right?

9   A    I don't smoke weed no more.

10  Q    All right.  Well, while you were incarcerated, at least, you

11  were still --

12  A    I was still smoking.

13  Q    All right.  You were still smoking weed.  And has the

14  government notified you of the fact that, notwithstanding the

15  fact that you violated the terms of the agreement, that they

16  intend on prosecuting you?

17  A    Correct.

18  Q    My question is, have they notified you?

19  A    Correct.

20  Q    They have notified you that they intend to or they don't

21  intend to?

22  A    They notified me that I had violated the agreement.

23  Q    Are they going to prosecute you over here?

24  A    I don't know.

25  Q    I assume you hope not?

1   A    Correct.

2   Q    Okay.  I mean, you really hope not, right?

3   A    Correct.

4   Q    Now, one final thing.  Mr. Harding asked you about the money

5   that you were making on the street when you were selling drugs.

6   A    Correct.

7   Q    Right?  And you said, he asked you two separate questions.

8   How much money you made on a day selling coke and how much money

9   you made on a day selling heroin, right?

10  A    Correct.

11  Q    And he asked you if you pulled it up or if it was your own

12  money.  He asked you that, right?

13  A    Correct.

14  Q    And you said, that the answer you gave, which was like a

15  thousand dollars a day, was for your whole group, right?

16  A    Correct.

17  Q    All right.  And when he showed you your grand jury, though,

18  that revealed, your grand jury testimony is over four years ago,

19  right?

20  A    Correct.

21  Q    Closer in time to the events which you were testifying

22  about, right?

23  A    Correct.

24  Q    And at that time you said that you made a lot more than

25  three or $500 a day.  It was thousands of dollars a day, right?

1   A    Correct.

2   Q    3,000.  For heroin, it was like you could make 7000 a day on

3   a good day, right?

4   A    Correct.

5   Q    That's what you said then.  And you told Mr. Harding that

6   you exaggerated in the grand jury about how much money you made?

7   A    Correct.

8   Q    All right.  Why would you exaggerate -- I got to tell you,

9   this makes no sense to me whatsoever.  Why would you exaggerate

10  and say you made more money than you really did, that you were a

11  bigger dealer than you really were?

12  A    Because that's what drug dealers do.

13  Q    Exaggerate?

14  A    Yes.

15  Q    All right.  It's that or you would like to minimize your

16  activities now here today?

17  A    No.  That's what drug dealers do.  I mean, if you worth

18  20,000, they might think you worth 50,000 or so.

19  Q    All right.  Did you understand when you were testifying

20  before the grand jury that you were under oath?

21  A    Yes.

22  Q    In front of a federal grand jury?

23  A    Correct.

24  Q    You didn't think you were out on the corner with your

25  friends?

1    A    Correct.

2    Q    So you weren't really exaggerating, you were lying?  I mean,

3    it's the other side of the same coin, isn't it?

4    A    I mean, I exaggerated a little but I didn't lie.  I just

5    exaggerate on the figures.

6    Q    What's the difference?

7    A    I don't know.

8    Q    All right.  All right.  Well, we established, though, that

9    you would rob someone to help yourself, that you would kill

10   someone to help yourself.  You exaggerated in the grand jury.

11   When you went to your, when you got sentenced previously and when

12   you were on probation or parole, you told some authority figure

13   that you would stay out of trouble, right?

14   A    Correct.

15   Q    And you didn't do that?

16   A    Correct.

17   Q    And you didn't intend on doing that?

18   A    Correct.

19   Q    All right.  Because we saw that letter in 2002, while

20   incarcerated you had every intention of going out of jail, on to

21   the street, back selling and back robbing, right?

22   A    Correct.

23   Q    So the bottom line is, when the situation, when you're

24   confronted with a given situation, you will say whatever you have

25   to say at that time to better yourself, right?

1    A    No.

2    Q    No?

3    A    No.

4    Q    Just recently or through your whole life?

5    A    My whole life.

6    Q    All right.  I have no further questions.

7         MR. MARTIN:  No questions, Your Honor.

8         CROSS EXAMINATION

9    BY MR. PYNE:

10   Q    Good afternoon, Mr. Bacon?

11   A    Hello.

12   Q    All right.  My name's Jim Pyne.  I represent Mr. Martin.

13   Just a few questions for you, if I could.

14        Mr. Harding went through your plea agreement this

15   morning in great detail and emphasized that you're required under

16   your plea agreement to tell the truth, is that correct?

17   A    Correct.

18   Q    Now, who makes the determination of whether or not you're

19   telling the truth here today?

20   A    The jurors.

21   Q    Oh, so you only get the benefit of your plea bargain if they

22   come back guilty?

23   A    No.

24   Q    Well, how is the jury going to then determine what the truth

25   is in terms of the enforcement of your plea agreement?

1   A    I don't know.

2   Q    Isn't it true that, in fact, Mr. Harding and Mr. Hanlon will

3   be the ones who decide whether or not to, that you told the truth

4   here today?  Because isn't it, in fact, that according to your

5   plea agreement, they have to agree that you told the truth here

6   in court before you get the benefit of your plea agreement?

7   A    I don't know.

8   Q    Well, let me put it this way.  If they decide you weren't

9   truthful, then you violated your plea agreement?

10  A    Correct.

11  Q    And in fact, they could bring federal charges against you?

12  A    Correct.

13  Q    And in fact, if they brought federal charges against you,

14  not only could you be charged with the drugs that you weren't

15  charged with and the gun that you hadn't been charged with yet

16  federally, but everything you've told them up to now can be used

17  against you?

18  A    Correct.

19  Q    And this decision is totally in the hands of the government,

20  isn't that correct?

21  A    I don't know.

22  Q    Well, didn't, when Mr. Lawlor was asking you questions,

23  didn't the government already decide to notify you that you

24  violated your plea agreement?

25  A    Correct.

1    Q    And you're waiting to find out whether or not they're going

2    to prosecute you?

3    A    Correct.

4    Q    So it's very important for you to impress upon them that

5    you're being truthful?

6    A    Correct.

7    Q    And in that sense, you want to testify in a way that Mr.

8    Hanlon and Mr. Harding are happy with, is that accurate?

9    A    I'm just going to testify to my best of knowledge.

10   Q    Okay.  Now, also, in terms of the pending case you have,

11   you're hoping that your testimony here today will provide you a

12   benefit in that case as well.  Isn't that true?

13   A    No.

14   Q    You're not expecting anything at all in that case?

15   A    No.

16   Q    Now, I believe you testified earlier that you knew the Wyche

17   brothers, is that correct?

18   A    Correct.

19   Q    And you, in fact, were very good friends with Anthony Wyche,

20   isn't that true?

21   A    Correct.

22   Q    And it was your earlier testimony that you did not get any

23   drugs from Mr. Martin, is that correct?

24   A    Correct.

25   Q    You never were supplied by Mr. Martin?

161

1    A    Correct.

2    Q    And in spite of Mr. Lawlor's earlier testimony, I believe it

3    was your testimony, in fact, that Mr. Martin did not make crack,

4    isn't that correct?

5    A    Correct.

6    Q    You never knew Mr. Martin to cook crack?

7    A    No, sir.

8    Q    And even though you were getting drugs from Tim, who was a

9    friend of Polo's, you did not know if Mr. Martin ever got drugs

10   from Tim, isn't that correct?

11   A    Correct.

12   Q    And in terms of this Dominican, Poppi, in New York, I

13   believe it was your testimony that Mr. Martin went with you once

14   or twice, is that correct?

15   A    Correct.

16   Q    And during those trips, you got 25 to 50 grams of heroin and

17   you split the amounts of heroin, is that correct?

18   A    Correct.

19   Q    And another source of drugs for you was an individual you

20   identified as Card.  And in fact, you have no knowledge if Mr.

21   Martin ever got drugs from Mr. Card, is that correct?

22   A    Correct.

23   Q    And another source of yours was an individual who you knew

24   as Goose.  And it was your earlier testimony that Mr. Martin was

25   not getting any drugs from Goose?

1    A    Correct.

2    Q    And at a certain point in time you began selling weight but

3    it's your testimony that you don't know if Mr. Martin ever came

4    to the point where he was selling weight?

5    A    Correct.

6    Q    And again, referring to Mr. Lawlor's earlier testimony, he

7    left the impression that everyone was carrying guns.  In fact,

8    wasn't it your testimony that Mr. Martin did not carry a gun?

9    A    Correct.

10   Q    And wasn't it your testimony that Mr. Martin did not own a

11   gun, to your knowledge?

12   A    Correct.

13   Q    And so, in fact, not everyone was carrying guns, isn't that

14   true?

15   A    Correct.

16   Q    Now, when you were testifying about jumping out on this

17   individual who you described as J-Rock, several times you

18   testified that you were driving through a known drug area.

19   A    Correct.

20   Q    Where did you get that phrase, "known drug area", from?

21   A    It's like, I got that phrase from wherever drug corner is

22   like a known drug area.  There's drugs on that corner.  That's

23   like a drug area, known drug area.

24   Q    Did you get that phrase from reading police reports?

25   A    No.

1   Q    Did, in fact, you review police reports from your prior

2   arrest before you testified?

3   A    No.

4   Q    You never did?  Did you prepare for your testimony here

5   today with the U.S. attorneys?

6   A    No.

7   Q    They never prepared you for your testimony here today?

8   A    They asked me about my grand jury testimony.  That's about,

9   that was it.

10  Q    When did they do that?

11  A    A couple weeks ago.

12  Q    Okay.  How many times have you met with the U.S. attorneys

13  before today?

14  A    About three or four times.

15  Q    Okay.  And was your attorney present during those meetings?

16  A    Yes.  The first couple ones.

17  Q    And how long did those meetings last?

18  A    About an hour.

19  Q    And at no point did you review any police reports?

20  A    No.

21  Q    So that's your own nomenclature?  You drove through a known

22  drug area?

23  A    Yes.

24  Q    Okay.  Now, you've testified that you only jumped out on one

25  person when Mr. Martin was with you, is that correct?

1   A    Correct.

2   Q    And in fact, when that occurred, Mr. Martin didn't even get

3   out of the car?  He, in fact, remained in the car?

4   A    Correct.

5   Q    Now, you also told of several visits that Mr. Martin made to

6   see you while you were incarcerated.  And he spoke to you about

7   things that were occurring back in Baltimore?

8   A    Yes.

9   Q    Okay.  And he told you that, I believe it was your

10  testimony, that some home boys, some of Darryl's home boys were

11  trying to implicate him in a homicide?

12  A    Yes.

13  Q    Obviously, from your letter to Mr. Martin, you had no

14  problem sharing criminal type information back and forth, is that

15  correct?

16  A    Correct.

17  Q    Now, did Mr. Martin indicate to you that he was involved in

18  that homicide in any way?

19  A    No.

20  Q    Now, you also spoke to Mr. Martin on the phone several

21  times?

22  A    Correct.

23  Q    Probably numerous times over the time that you've known him.

24  Did you have any problem recognizing his voice?

25  A    No.

1    Q    Did there come a time when you had an opportunity to listen

2    to this voice mail that was involved in the Wyche murders?

3    A    Yes.

4    Q    Do you know if Mr. Martin's voice is on that tape?

5    A    No.

6    Q    No, you don't know or, no, his voice is not on that tape?

7    A    No, his voice is not on that tape from what I heard.

8    Q    Okay.  Some of your earlier testimony, I believe it was in

9    regards to the letter that you wrote to Mr. Martin, you said you

10   included a line from a song?

11   A    Yeah.

12   Q    Would that have been a rap song?

13   A    Yes.

14   Q    Are you familiar with rap music in general?

15   A    Yes.

16   Q    Are you familiar with the artist Jay-Z?

17   A    Yes.

18   Q    Have you ever heard the phrase in a rap song "shit main?"

19   A    Yes.

20   Q    Has Jay-Z used that term, "shit main", in songs before?

21   A    Yes.

22   Q    Have you ever heard it in other rap songs?

23   A    Yes.

24   Q    Were you ever arrested with Mr. Martin?

25   A    No.

1          MR. PYNE:  I don't think I have anything further.

2     Thank you.  Thank you, Mr. Bacon.

3          THE WITNESS:  Thank you.

4          CROSS EXAMINATION

5     BY MR. COBURN:

6     Q     Good afternoon, Mr. Bacon.

7     A     Good afternoon.

8     Q     You responded to one of Mr. Pyne, that's the gentleman who

9     was right before me, the tall gentleman, you responded to one of

10    his questions, did you not, by saying that you had met with the

11    prosecutors on a number of occasions before your testimony?

12    Right?

13    A     Correct.

14    Q     And -- excuse me, Your Honor, I'm sorry -- the purpose of

15    those meetings was in order to, I'm not suggesting there's

16    anything inappropriate about it, was to get you ready for your

17    testimony here today, right, sir?

18    A     And to go over my grand jury testimony with them.

19    Q     To go over your grand jury testimony and get you prepared to

20    testify before the ladies and gentlemen of the jury today, right,

21    sir?

22    A     Correct.

23    Q     And it's, again, not suggesting there's anything against the

24    rules about it, but you also had a conversation with the

25    prosecutor in the midst of your direct testimony, right, when we

1    were on a break, is that correct?

2    A    Correct.

3    Q    Today, this morning?

4    A    This morning, correct.

5    Q    Okay.  Now, you mentioned an individual during the course of

6    your testimony, Mr. Bacon, by the name of Aaron Holly, right?

7    A    Correct.

8    Q    Is Aaron Holly older or younger than you?

9    A    Younger.

10   Q    And you're younger than Mr. Gardner, right, sir?

11   A    Correct.

12   Q    How tall is Aaron Holly?

13   A    About six, probably about six-three.

14   Q    He's taller than you, right?

15   A    Right.

16   Q    And he's also, he's significantly taller than Mr. Gardner,

17   right, sir?

18   A    Right.

19   Q    You told Mr. Harding during the course of your, when he was

20   asking you questions, that's your direct testimony, you told him,

21   did you not, that among the various prior criminal offenses that

22   you've been convicted of, that one of them was a false statement

23   that you made to a police officer, right, sir?

24   A    Correct.

25   Q    And you told him that the reason you made the false

1    statement was because you knew there was a warrant that was out

2    for you at the time and you didn't want to be charged with a

3    violation of your probation, right, sir?

4    A    Correct.

5    Q    So because you thought that using a false name would help

6    you on that occasion, that's why you told the police officer that

7    you were somebody that you were not, right?

8    A    Correct.

9    Q    Now, in the year 2000, I believe you told us that you were

10    locked up, you were picked up for a criminal offense, a drug

11    offense, and you were locked up for approximately three years,

12    right?

13    A    Correct.

14    Q    If I understand correctly, when you got arrested in 2000,

15    this was in Park Heights, Maryland, right?

16    A    Correct.

17    Q    Park Heights is to the north, right?

18    A    Northwest.

19    Q    When you got caught in Park Heights on that occasion, was

20    that in April of 2000?

21    A    Yes.

22    Q    That was what you referred to as a jump-out, right?

23    A    Yes.

24    Q    Could you tell the ladies and gentlemen of the jury to your

25    right there just what a jump-out is?

CROSS EXAMINATION OF BACON BY COBURN

169

1    A    A jump-out, it's certain days in the city that Baltimore

2    City Police jump out and just pretty much want to know whether

3    you got ID or check to see if you got any warrants.  On Tuesdays

4    and Thursdays they jumped out, they jumped out on me and Avon and

5    searched us and they didn't find anything.  But they went to the

6    car that I was in and pretty much they just like jump out, they

7    check for ID, check for paraphernalia, any drugs, anything like

8    that.

9    Q    Now, when you were just describing that incident to the

10   ladies and gentlemen of the jury, you said that they jumped out

11   on you and Avon, right?

12   A    Yes.

13   Q    But there was a third person there, too, right?

14   A    Yes.

15   Q    And who was that?

16   A    Eric Stokes.

17   Q    Now, Eric Stoltz is not in this courtroom, is he?

18   A    No.

19   Q    And he's not charged in this case so far as you know, right?

20   A    Correct.

21   Q    Now, Avon, who you've identified as a relative of Mr.

22   Gardner's, Avon was not charged in April of 2000, is that right?

23   A    Correct.

24   Q    But you and Mr. Stoltz were, right?

25   A    Correct.

1    Q    So you and Mr. Stoltz were out there selling drugs at the

2    street level in April of 2000, right?

3    A    Correct.

4    Q    And you did three years on that one, from April of 2000

5    until June of 2003, right?

6    A    Correct.

7    Q    Just to kind of continue in chronological order then.  You

8    got released from jail, or from prison -- actually, let's be

9    specific about that.

10            When you did that time, did you do it at Jessup, from

11   2000 to 2003, after the jump-out arrest in Park Heights?  Where

12   were you locked up during that time period?

13   A    Hagerstown and, Hagerstown, Maryland, and Jessup, Maryland,

14   and Baltimore, Maryland.

15   Q    Now, when you say Jessup, Maryland, we're talking about a

16   large facility that's a little bit to the south of here.  It's

17   right in Jessup, Maryland, right?

18   A    Correct.

19   Q    And that's not, you understand the difference between a jail

20   and a prison?

21   A    Correct.

22   Q    Jessup is a prison, right?

23   A    Correct.

24   Q    That's where people are actually serving time after they get

25   convicted of a crime?

1    A    Correct.

2    Q    And that's why you were there?

3    A    Yes.

4    Q    Okay.  And you were in Jessup, again -- we'll get to this in

5    a second -- you were in Jessup again later on, after 2003, right?

6    A    Yes.

7    Q    Okay.  So you're released in June of 2003.  And then pretty

8    shortly after that, if I understand correctly, Mr. Bacon, you

9    testified in the grand jury, is that right?

10   A    Correct.

11   Q    Now, this is a federal grand jury.  And it's relating to

12   this case that we're here talking about here today, right?

13   A    Correct.

14   Q    Your testimony, and you may remember the date because Mr.

15   Harding on a couple of points showed you the transcript, was on

16   May the 12th, 2004, right?

17   A    Correct.

18   Q    Now, do you remember during your direct testimony, when Mr.

19   Harding was asking you questions, he made the point that your

20   plea agreement in this case came after your testimony in the

21   grand jury, right?

22   A    Correct.

23   Q    He pointed out that your plea agreement was on March 23rd,

24   2005.  Is that correct?

25   A    Correct.

1   Q     But before you got made all those promises and, you know,

2   you entered into the contract with the prosecutors, that's in

3   your plea agreement, you testified in the grand jury before that,

4   right?

5   A     Correct.

6   Q     And Mr. Harding indicated, during one of his questions on

7   direct examination, did he not, that at that time that was, you

8   just came in, I think his words were you just came in and

9   testified, right?

10  A     I got summonsed.

11  Q     Pardon?

12  A     I had got summonsed into the grand jury.

13  Q     But he was suggesting to you that you came in and testified

14  with no promises, right?  No concessions, no promises?  You just

15  came in and testified before the grand jury when you got your

16  summons, is that right?

17  A     Correct.

18  Q     Is that true?

19  A     Correct.

20  Q     Okay.  Well, I have an item, Your Honor, which I've marked,

21  with the Court's permission, as Defendant Gardner's Exhibit

22  Number One.  I'll show it to Mr. Harding before I put it on the

23  DOAR?  May I go ahead and put it on the device, Your Honor?

24          THE COURT:  Certainly.

25  Q     This document, which I've marked as Defendant Gardner's

1    Exhibit Number One, it doesn't actually have the date at the top

2    so we're just going to flip over and take a look at the date

3    that's on the second page.  You see it's on U.S. Department of

4    Justice stationery?

5    A    Yes.

6    Q    And it says United States Attorney, District of Maryland,

7    Northern Division?

8    A    Correct.

9    Q    Okay.  If we look at the second page, we can see the date.

10   Do you see the date down there in the lower left-hand corner?

11   A    Correct.

12   Q    And that date is May 12th, 2004, right?

13   A    Correct.

14   Q    So that's the date of your, it's the date you actually

15   testified in the grand jury, right, sir?

16   A    Correct.

17   Q    You familiar with the term "proffer letter?"  You ever hear

18   that one before?

19   A    Sort of.

20   Q    Okay.  Well, the terminology's really not important.  I'm

21   sorry to keep flipping this back and forth.  I mean, on the

22   second page of this document, that's your signature, right?

23   A    Correct.

24   Q    Right above your name, Darryl Bacon, on the lower left-hand

25   corner?

1    A    Correct.

2    Q    And it's also signed by a prosecutor by the name of

3    Christine Manuelian, who was involved in this matter before,

4    right?

5    A    Correct.

6    Q    And it's also signed by one of the detectives who's been

7    involved in this investigation, John Giganti, right?

8    A    Correct.

9    Q    Okay.  Now, this letter says, does it not, and I'm

10   referring, in the first paragraph, talks about you've been

11   subpoenaed to appear before a federal grand jury, right?

12   A    Correct.

13   Q    And then a couple of sentences down, I'll just put my finger

14   in there, it says, by way of this letter, this office agrees that

15   any of the information or statements provided or made by you with

16   regards to this matter will not be used against you in any

17   criminal case.  Right?

18   A    Correct.

19   Q    So that promise was, in fact, made to you before you

20   testified in the grand jury, right, sir?

21   A    Correct.

22   Q    Now, did you understand that to be a form of immunity that

23   you were receiving?

24   A    No.

25   Q    Okay.  Well, do you still have a copy of your grand jury

1    testimony up there with you?

2    A    No, I don't.

3    Q    Your Honor, could I come around and just get a second copy

4    from Mr. Kurland and then give it to the witness?

5              THE COURT:  Certainly.  Certainly.

6    Q    May I approach the witness, Your Honor?

7              THE COURT:  Yes.

8    Q    Let me direct your attention, sir, to Page 4 of the

9    transcript of your testimony.  This is right at the beginning,

10   before you actually get into the substance of what you were

11   talking about, when you were before the grand jury, right?

12   A    Okay.

13   Q    Directing you to Line 7 on Page 4.  Is it correct that the

14   prosecutor told you, right at the beginning of your testimony,

15   okay, did I, when we met earlier, did I give you something called

16   a proffer letter addressed to you and signed by me and Ms.

17   Manuelian, or actually it's just signed by Ms. Manuelian, it's

18   not signed by me?  Did I give you that letter?  And you said,

19   yes, sir?

20   A    Yes, sir.

21   Q    And then did the prosecutor say, and isn't your

22   understanding that you will not be prosecuted on the basis of

23   anything you say here today so long as it's truthful?

24   A    Correct.

25   Q    And you said yes, right?

1    A    Correct.

2    Q    And then the prosecutor said, did he not, okay, Mr. Bacon,

3    do you understand that you have a right under the Fifth Amendment

4    not to answer questions that might incriminate you?  However,

5    this immunity letter assures you that you're not going to be

6    prosecuted for anything you say here today.  Right?

7    A    Correct.

8    Q    And in response to that you said yes, right?

9    A    Correct.

10   Q    So that agreement existed when you testified before the

11   grand jury, right, sir?

12   A    Correct.

13   Q    Now, on the occasion when you entered the disposition, the

14   guilty plea, to the state offense that's -- this gets a little

15   complicated.  Sorry, Your Honor.  Let me pull this off the DOAR.

16   Your Honor, I've marked an item as Defendant's Exhibit Number

17   Two.  This is the plea agreement letter.  And the only reason I

18   marked it separately is because the government's version redacts

19   the statement of facts and I wanted to use it without, without

20   the statement redacted.

21        THE COURT:  Very well.

22   Q    Thank you, Your Honor.  What you're looking at now, sir,

23   Defendant Gardner's Exhibit Number Two.  This is your, this is

24   your plea agreement with the federal government, with the

25   prosecutors here today, right, sir?

Case 1:04-cr-00029-RDB   Document 674   Filed 06/08/09   Page 177 of 302

1    A    Correct.

2    Q    Okay.  Now, you understood that, and here we're talking

3    about a separate incident, not the one that you got locked up for

4    in 2000.  We're talking about something you got locked up for

5    subsequently, afterwards, right?

6    A    Yes.  In '04.

7    Q    In '04.  Now, is it, that was a drug and a gun offense,

8    right?

9    A    Correct.

10   Q    And the nature of the offense, what you did for which you

11   got prosecuted, is actually described in this, in this letter?

12   A    Correct.

13   Q    In this agreement with the government, right?

14   A    Correct.

15   Q    And it's described in this part of the letter agreement that

16   has the title Stipulation on it, right?

17   A    Correct.

18   Q    On Page Two?  It talks about how you got locked up for

19   having a hundred vials of crack as well as a Llama .45 caliber

20   semiautomatic handgun, right?

21   A    Correct.

22   Q    On this occasion, it was just you who got locked up.  You

23   didn't have any codefendants, right?

24   A    Correct.

25   Q    What happened, if I understand correctly, is that you

1    entered into an agreement with the federal government that you

2    would not be prosecuted federally at all for that conduct, even

3    though you could have been, right?  You could have been

4    prosecuted, you could have gotten federal charge because of that,

5    is that right?

6    A    I didn't get federal charges.

7    Q    Yeah.  But my question is, you could have gotten federal

8    charges, is that right?

9         MR. HARDING:  Sorry.  Are we talking about in the plea

10   agreement or the proffer letter?

11   Q    Well, we're onto the plea agreement and we're talking about

12   the incident that occurred on August 17th, 2004, after the

13   proffer letter and after the -- at least I think that's right.

14   Right?  The testimony in the grand jury is May 12th, 2004.  And

15   when you got locked up in Baltimore City for the offense that's

16   covered in your plea agreement with the government, that's

17   several months later, August 17th, 2004, right?

18   A    Correct.

19   Q    Okay.  And I believe you told Mr. Lawlor already, I may be

20   wrong, but you understood you could have been prosecuted, you

21   could have gotten federal charges because of that conduct, right?

22   A    Correct.

23   Q    But you didn't?

24   A    Correct.

25   Q    It was part of the agreement with the government that you

1    wouldn't, right?

2    A    Correct.

3    Q    Okay.  And you also got, you weren't prosecuted by the state

4    for the drugs.  They just let, I think you told Mr. Lawlor they

5    just let that go.  And you were prosecuted just for the gun,

6    right?

7    A    Yeah.

8    Q    Okay.  Just taking a look at the plea agreement that you

9    have with the government itself.  Turning to Page Three.  The

10   agreement in, I think, three separate places says that it's a

11   condition of your agreement with the government, with the federal

12   government, that you will not commit any other state or local

13   offense, right?

14   A    Correct.

15   Q    I mean, right at the top here it says, in the event that

16   your client fails to accept personal responsibility and then

17   commits any offense in violation of federal, state or local law,

18   then the office will be relieved of its obligations to you.

19   Right?

20   A    Correct.

21   Q    Moving on down the page, Paragraph Six.  If your client

22   fails to fulfill completely each and every one of his

23   obligations, the office will be released from its commitment to

24   honor its obligations.  Right?

25   A    Correct.

1   Q    Thus, for example, if he should commit any crime, right?

2   A    Correct.

3   Q    Then the U.S. Attorney's Office, the federal prosecutors in

4   this case, are relieved from their obligations under the

5   agreement and they can prosecute you federally for the conduct

6   that you committed on August 17th, 2004, right?

7   A    Correct.

8   Q    Now, the charge that you picked up afterwards, do you

9   remember you told us about a marijuana charge that you picked up

10  while you were locked up in Jessup, correct?

11  A    Correct.

12  Q    That happened sometime after you signed this plea agreement

13  with the government, right?

14  A    Right.

15  Q    Now, the date of the plea agreement is March 23rd, 2005.

16  When did you pick up that charge for the possession of marijuana

17  in the state prison in Jessup?

18  A    November.  I mean September, '07.

19  Q    I'm sorry?

20  A    September, '07.

21  Q    September, '07.  So that, that is about a year ago, right?

22  A    Correct.

23  Q    So during the course of the last year, has the federal

24  government, in fact, charged you with any federal offense

25  relating to the conduct you committed on August 17th, 2004?  Have

1    you been indicted?

2    A    No.

3    Q    Finally, you indicated that when you were talking about the

4    amounts of money that were made on the street, that you

5    exaggerated a little bit.  Is that correct?

6    A    Yes.

7    Q    What you actually testified to, and I'm referring to your

8    grand jury testimony.  You can feel free to look at it if you

9    like, on Page 29.  Starts from Line Eight on down, just for a few

10   lines.  It says, question is:  Okay.  How much money were you

11   making?

12          THE COURT:  Just one moment, Mr. Coburn.

13   Q    I'm sorry, Your Honor.  Thank you.

14   A    Okay.

15   Q    It says:  Okay.  How much money were you making back when

16   you were on Winters Lane in Catonsville selling cocaine?  How

17   much did you make there on a good night?  And you answered:

18   Anywhere from like 1,500, 1,200, to 2000, right?  Correct?

19   A    Correct.

20   Q    And then you were asked by the prosecutor:  And what about

21   from your sales in East Baltimore of cocaine and heroin, too?

22   And you answered:  That was a little bit more money.  Heroin was

23   like 3,500 on a slow day and 7,000 on a good day, right?

24   A    Correct.

25   Q    Now, those amounts of money are substantially greater than

1    the ones you told Mr. Harding about today, correct?

2    A    Correct.

3    Q    Now, you understood, did you not, sir, that when you

4    testified in the grand jury you swore the same oath to tell the

5    truth, the whole truth, and nothing but the truth that you swore

6    in this courtroom today, correct, sir?

7    A    Correct.

8    Q    Thank you, Your Honor.  Nothing further.

9              MR. HARDING:  May I have one moment, Your Honor?

10             THE COURT:  Yes.

11             REDIRECT EXAMINATION

12   BY MR. HARDING:

13   Q    Let me ask you first about the proffer letter that you got

14   when you got subpoenaed to the grand jury, Mr. Bacon.  Do you

15   remember you had an attorney on that occasion?

16   A    Correct.

17   Q    Lawrence Rosenberg?

18   A    Correct.

19   Q    And you knew, and I'm sure he explained to you, that you

20   have a Fifth Amendment right, correct?

21   A    Correct.

22   Q    You don't have to say anything that might incriminate you,

23   is that correct?

24   A    Correct.

25   Q    And what the proffer letter was designed to do was to assure

1    you that the government would not take your words and turn around

2    and prosecute you based on your words.  Was that your

3    understanding?

4    A    Correct.

5    Q    And do you understand the difference between that so-called

6    use immunity and a different kind of immunity that assures you

7    you won't be prosecuted at all?

8    A    Correct.  Yes.

9    Q    Was it your understanding that the government was promising

10   simply not to take your testimony in the grand jury and use it to

11   prosecute you, but that the government could still prosecute you

12   using other kinds of evidence?  Was that your understanding from

13   talking to Mr. Rosenberg?

14   A    Yes.

15   Q    And let me just call your attention to this language.  I'm

16   sure that Mr. Rosenberg went over it with you or that you had it

17   explained to you.  Let me call your attention to Paragraph Number

18   2.  It says your complete truthfulness and candor are express

19   material conditions to the undertakings of the government set

20   forth in this letter; therefore, in the event that you offer

21   testimony materially different from any statements made or other

22   information provided by you, the attorney for the government or

23   other opposing party may cross examine you concerning statements

24   made or other information provided by you regarding this matter.

25           Did you understand that you got the benefit of this use

1    immunity only if you were completely truthful?

2    A    Correct.

3    Q    And were you completely truthful and candid in the grand

4    jury, Mr. Bacon?

5    A    Yes.

6    Q    And am I correct that you have no charge pending against you

7    at all when you came in for the grand jury?

8    A    Correct.

9    Q    So the only thing you got was this guarantee that the

10   government supplied your attorney that you wouldn't be prosecuted

11   based on what you said in the grand jury, is that correct?

12   A    Yes, sir.

13   Q    Mr. Lawlor was asking you about when you were visiting Bo in

14   New York.  Do you recall that?

15   A    Yes.

16   Q    And he was up there in college on a couple of separate

17   occasions in 1997 and '98 or thereabouts, is that correct?

18   A    Yes.

19   Q    And that was during a time period that you were also going

20   up to New York on your trips with Wayne and Goo to purchase drugs

21   from Poppi, is that correct?

22   A    Correct.

23   Q    And you told us, also, that in 1998 and '99, Mitchell, Mr.

24   Mitchell, or Bo, got back into drug trafficking up in

25   Pennsylvania, is that correct?  Is that when he opened his shop

1    in Pennsylvania?

2    A    Correct.

3    Q    He was getting his cocaine from Darryl Wyche at that time,

4    is that correct?

5    A    Correct.

6    Q    And Mr. Lawlor also made the point that you guys would get

7    locked up periodically and you'd lose, you would be separated by,

8    literally by bars, is that correct?

9    A    Correct.

10   Q    But you stayed in touch when you were locked up, didn't you?

11   A    Correct.

12   Q    We've seen many examples already during your testimony here

13   today of visits that you made to one another, is that correct?

14   A    Correct.

15   Q    Did you give money to one another while you were locked up?

16   A    Yes.

17   Q    Did you help pay for lawyers and pay for bails and thing

18   like that?

19   A    Yes.

20   Q    Did you write letters like the one we saw in evidence

21   earlier today, in which you talked about future plans when you

22   got out of jail?

23   A    Yes.

24   Q    Even planning future crimes, is that correct?

25   A    Correct.

1    Q    So in fact, even though you were locked up from time to

2    time, it didn't in any way impede you from keeping in contact

3    with these guys in your inner circle, is that correct?

4    A    Correct.

5    Q    In fact, "inner circle" is a phrase that came up when Mr.

6    Lawlor was talking to you.  He said that robbery was common

7    amongst drug dealers because there's no faith outside your

8    circle, is that correct?

9    A    Correct.

10   Q    And is it fair to say that Mr. Gardner and Mr. Mitchell and

11   Mr. Martin were inside your circle?

12   A    Correct.

13   Q    You trusted them, didn't you?

14   A    Correct.

15   Q    So that even if you were locked up, you would still support

16   one another, still do what was necessary to help one another?

17   And if one or more of you was out on the street, you would make

18   phone calls to them and stay in touch with them, is that correct?

19   A    Correct.

20   Q    And it's very important to have that kind of support system

21   when you're locked up, isn't it?

22   A    Correct.

23   Q    Mr. Lawlor questioned you about Bo's activity as a drug

24   dealer.  And he tried to get you to say that Bo was a failure or,

25   actually, he said that you said that in the grand jury, and you

1    denied it, is that correct?

2    A    Correct.

3    Q    And then he said, well, did you say that he was not

4    successful?  And you denied that, too, is that correct?

5    A    Correct.

6    Q    And then he said he'd get back to you about that and he

7    didn't, in fact, get back to you about that, did he?

8    A    No.

9    Q    Okay.  Let me show you your grand jury.

10           THE COURT:  I think he's got a copy.

11   Q    Okay.  Do you have the concordance at the end where it lists

12   the words that appear in the course of the grand jury testimony?

13   I want you to look up the word "successful" or "successfully."

14   Do you see that the word "successful" does not appear at all and

15   the word "successfully" appears only one time?

16   A    Correct.

17   Q    And that word appears on Page 29, Line 6.  And that word was

18   actually used in connection with whether the contract that was

19   put out on Bo after the Hammerjacks stabbings was successful or

20   not.  I asked you, at least nobody did successfully, did they?

21   And you answered no, is that correct?

22   A    Correct.

23   Q    So is it fair to say that you never used the words

24   "successful" or "successfully" in connection with Bo's drug

25   dealing activities?

1    A    Correct.

2    Q    Mr. Lawlor also was making a point to you about whether your

3    testimony was first-hand, factual information.  And you said that

4    it was.  And then he brought up the example of what Mr. Martin

5    and Mr. Gardner told you about those Hammerjacks stabbings, is

6    that correct?

7    A    Correct.

8    Q    They told you that Bo stabbed some people and a contract was

9    put out on Bo as a result of those stabbings, is that correct?

10   A    Correct.

11   Q    Okay.  And what you reported to the grand jury and here in

12   court today was what you were told by Mr. Gardner and Mr. Martin,

13   is that correct?

14   A    Correct.

15   Q    And that's first-hand in the sense that what you're

16   reporting is what they told you, is that correct?

17   A    Correct.

18   Q    And it's important what they thought, isn't it?

19   A    Yes.

20   Q    For example, even if there never was a contract put out on

21   Bo, it was still very important that Mr. Gardner and Mr. Martin

22   thought there was a contract put out on him?

23        MR. LAWLOR:  Objection, Your Honor.

24        THE COURT:  Rephrase the question.

25   Q    Is it fair to say that it's important all by itself that Mr.

1    Gardner and Mr. Martin thought there was a contract out on Bo?

2              MR. LAWLOR:  Objection, Your Honor.

3              THE COURT:  Overruled.  You may answer.

4    A    Correct.

5    Q    And they wanted you to know about that, isn't that correct?

6    A    Correct.

7    Q    Mr. Pyne asked you a number of questions about your plea

8    agreement.  And he said that, isn't it true that it's the

9    prosecutors who totally decide whether you're being truthful here

10   today?  Do you recall that line --

11   A    Yes.

12   Q    -- of questioning?  And you said you didn't know.  Is that

13   correct?

14   A    Yes.

15   Q    Let's go back over your plea agreement.  I'll call your

16   attention to Paragraph Seven.  Doesn't it say that whether or not

17   your client has violated the terms of this agreement shall be

18   determined by the Circuit Court of Baltimore City in an

19   appropriate proceeding at which his disclosures, you, your

20   disclosures, and documents shall be admissible and at which this

21   office shall be required to establish his breach by a

22   preponderance of the evidence.  Do you see that?

23   A    Yes.

24   Q    So is it your understanding that if the government thought

25   you were being untruthful, you would have the right to have the

1    whole matter decided in the Circuit Court of Baltimore City and

2    that the burden would be on the government by a preponderance of

3    the evidence to persuade the judge that you had violated your

4    plea agreement?  Isn't that your understanding, Mr. Bacon?

5    A    Correct.

6    Q    Just returning to this passage one more time about the

7    amount of money you were making when you were in Catonsville.

8    Mr. Coburn referred to that again.  And he actually read the

9    passage aloud.  The question was actually:  How much did you make

10   on a good night?  And the figures you gave were responsive to

11   that question, is that correct?

12   A    Correct.

13   Q    Did you have bad nights when you were in Catonsville?

14   A    Correct.

15   Q    How much would you make on bad nights?

16   A    A couple hundred.

17   Q    When you wrote this letter that's been admitted into

18   evidence, Government Exhibit W5-I, you talked with, you talked to

19   Wayne about going out and ski masking it up.  That meant

20   basically committing robberies, including home invasion

21   robberies, is that correct?

22   A    Correct.

23   Q    And you knew that Wayne might be interested in doing that,

24   is that correct?

25   A    I wasn't for sure but if it was, I mean, I asked him, I

1    don't know if he was going to do it.  But if he was, if he was,

2    that was up to him.

3    Q    Okay.  Mr. Coburn asked you about a conversation that you

4    and I had during the time you were on direct examination this

5    morning.  Do you recall that?

6    A    Correct.

7    Q    And do you remember that you brought up two things with me

8    when we were talking outside the courtroom?  Do you remember the

9    Stop Snitching video?

10   A    Yes.

11   Q    And do you remember, also, your talking to me about how

12   difficult it was for you to testify in this courtroom with the

13   defendants here?

14   A    Yes.

15   Q    It's not easy, is it?

16   A    No.

17   Q    It's not easy for a couple of reasons, isn't it?  I mean,

18   for one thing --

19        THE COURT:  Don't lead the witness.

20   Q    What are the reasons that made it difficult, Mr. Bacon?

21        MR. LAWLOR:  Objection, Your Honor.

22        THE COURT:  Overruled.  You may answer.

23   A    I mean, these guys, we basically brothers.  We grew up

24   together so it's real hard.

25   Q    You've had a hard time because of that, haven't you?

1    A    Yes.

2    Q    Are there other reasons?

3    A    No.

4    Q    What about the Stop Snitching video?

5    A    I mean --

6    Q    Do you have worries about the consequences of your

7    testifying here today?

8    A    I mean, I have worries but that's what comes with it.  It

9    comes with the game.

10   Q    Okay.  You've been worried before, is that what you're

11   saying?

12   A    Correct.

13   Q    Just one moment, Your Honor.  No further questions, Your

14   Honor.

15            MR. LAWLOR:  Your Honor, very brief recross?

16            THE COURT:  Briefly, Mr. Lawlor.

17            RECROSS EXAMINATION

18   BY MR. LAWLOR:

19   Q    Mr. Bacon, I did forget to show you one thing and I used the

20   wrong phrase, so I apologize.  I used the word "successful" when

21   I referenced your characterization of Mr. Mitchell's drug sales.

22   Let me show you what you said.

23            You were asked how much money you made, right?  See

24   that?  You were asked how much money made?

25   A    What line was that?

Case 1:04-cr-00029-RDB   Document 674   Filed 06/08/09   Page 193 of 302

1    Q    Looking at 14 and 15.  Mr. Harding asked you in the grand

2    jury how many you were making, right?

3    A    Correct.

4    Q    And then he asked you whether Wayne and Goo were doing well

5    and you said they weren't doing that well, right?

6    A    What line is that?

7    Q    20.  Does it say right there, what about Wayne and Goo?

8    Your answer is:  They wasn't doing that well but they was doing

9    about the same.  Right?

10   A    Yes.

11   Q    Correct.  Is that what it says?

12   A    Correct.

13   Q    Is that what you testified to?

14   A    Correct.

15   Q    And then it said:  What about Bo?  On Line 24.  And you

16   said:  No.  Right?  Correct?

17   A    Correct.

18   Q    And then on the next page it says, not as much, right?

19   A    It says no underneath that.

20   Q    No.  Right.  So you said Bo -- I used the word "successful."

21   Wasn't certainly doing as well as you, right?

22   A    I mean, he was doing good for his self.  He wasn't doing

23   bad.

24   Q    He wasn't doing as well as you, right?

25   A    No.

1    Q    All right.  And you were small change, right?

2    A    Correct.

3    Q    All right.  No further questions.

4              THE COURT:  Mr. Bacon is excused.

5              MR. HARDING:  Yes, Your Honor.

6              THE COURT:  You are excused, Mr. Bacon.

7              MR. COBURN:  Subject to recall, Your Honor.

8              THE COURT:  Subject to recall.  Yes.  Who is the next

9    government witness?

10             MR. HANLON:  Eric Clash, Your Honor.

11             THE COURT:  All right.  Let's take our afternoon recess

12   at this time.  Ladies and gentlemen of the jury, please leave

13   your note pads on your chairs.  Have no discussion about the case

14   or any of the evidence you've heard so far.  Continue to keep an

15   open mind.  Jury is excused for a 15 minute recess.

16             (Jury exits the courtroom.)

17             THE COURT:  Sir in the white T-shirt, I actually

18   respect your First Amendment right to free speech but the Court

19   is not permitting any wearing apparel in this courtroom during

20   this trial with lettering.  So when you come back tomorrow or any

21   future day, and we'll be glad to have you, your attire must not

22   contain any lettering whatsoever.  Do you understand?  Thank you.

23             Counsel, I should have told you, and I meant to tell

24   you earlier, I have two witness rooms on the Fifth Floor outside

25   my courtroom which I would be delighted to make available to you

1  during the trial for lunch and preparation and whatever you need.

2          MR. COBURN:  That's very kind, Your Honor.

3          THE COURT:  If you could decide how you want to share

4  it.  Speak to Belinda and she'll arrange for you to have access.

5          MR. COBURN:  Thank you so much.

6          THE COURT:  All right.  We're in recess for 15 minutes.

7          (Recess at 3:33 p.m.)

8          THE COURT:  We'll have the jury, please.

9          MR. LAWLOR:  One quick thing.

10          THE COURT:  Yes.  Mr. Lawlor.

11          MR. LAWLOR:  This is related to the non-conflict issue

12  I brought to your attention.  You had referenced perhaps Ms.

13  Rhodes preparing the cross.  I have prepared it and we would

14  desire that I do it.  None of us think there's a conflict.

15          THE COURT:  I'm satisfied.

16          MR. LAWLOR:  Thank you.

17          THE COURT:  Thank you, Mr. Lawlor.

18          MR. HANLON:  Your Honor, I'm having the government's

19  witness brought out now.

20          THE COURT:  Good.  Apparently, we're having a problem

21  with the door, the inner door to the jury room.  I understand

22  they're going to work on it tonight.  Hopefully, it will be

23  repaired tomorrow.

24          You can have a seat for now, sir.

25          (Jury enters the courtroom.)

DIRECT EXAMINATION OF ERIC CLASH                    196

1        THE COURT:  Please be seated, ladies and gentlemen.

2   The government may call its next witness.

3        MR. HANLON:  Thank you, Your Honor.  The United States

4   calls Eric Clash to the stand.

5        THE COURT:  Would you stand, please, Mr. Clash, and be

6   sworn?

7             ERIC CLASH, GOVERNMENT'S WITNESS, SWORN

8        THE WITNESS:  Yes.

9        THE CLERK:  Please be seated.  Will you state your name

10  and spell your name for the record, please?

11       THE WITNESS:  Name is Eric Clash.  Spell E-R-I-C.

12  C-L-A-S-H.

13             DIRECT EXAMINATION

14  BY MR. HANLON:

15  Q    Mr. Clash, good afternoon to you.  If you'd like, you might

16  try moving the microphone a little bit farther towards you.  That

17  way you might not necessarily have to lean in quite as much.  How

18  old are you, sir?

19  A    30.

20  Q    And where were you born?

21  A    Baltimore City.

22  Q    Did you grow up in Baltimore?

23  A    Yes.

24  Q    What part of town?

25  A    Northwest Baltimore.

1    Q    Is there a particular neighborhood that you grew up in?

2    A    Park Heights.

3    Q    And how far did you go in school, sir?

4    A    Graduated from the 12th.

5    Q    And from what high school did you graduate?

6    A    Baltimore City College.

7    Q    And just approximately, when was it you graduated from City?

8    A    1996.

9    Q    Since getting out of school in 1996, Mr. Clash, what have

10   you done to make a living for yourself?

11   A    Prior to my arrest?

12   Q    Prior to your arrest.

13   A    Sold drugs.

14   Q    And what kind of drugs did you sell between getting out of

15   school in 1996 and when you got arrested?  And when was your

16   arrest, by the way?

17   A    I was arrested February, 2005.

18   Q    So between those dates, '96 and February of '05, what did

19   you do to support yourself?  What kind of drugs did you sell?

20   A    I sold cocaine.

21   Q    Did you sell powder cocaine or cocaine base or both?

22   A    Both.

23   Q    And ultimately did you end up, you mentioned this already,

24   getting arrested in 2005 in relation to that drug dealing?

25   A    Yes.

1    Q    Did you get charged with a crime over that?

2    A    Yes.

3    Q    And what court did you get charged in?

4    A    Circuit Court.

5    Q    Did your case end up going federal, as they say?

6    A    Federal, yes.

7    Q    And ultimately, did you sign a plea agreement and plead

8    guilty to a federal criminal charge in the U.S. District Court

9    here in the U.S. District Court?

10   A    Yes.

11   Q    And let me show you your plea agreement.  Your plea

12   agreement actually had two parts.  Is that right, Mr. Clash?

13   A    Yes.

14   Q    I'm going to show you the first part now.  Your Honor, can I

15   just check the jury monitor?

16            THE COURT:  Certainly.

17   Q    Mr. Clash, this document I put up in front of you is a

18   letter dated May 17th, 2006.  I'll show you the signature pages

19   in a minute.  But based on this first page, what does this look

20   like to you?

21   A    My plea agreement.

22   Q    And your name is right there, Eric Clash?

23   A    Yes.

24   Q    The very back of this plea agreement, Page Nine of the plea

25   agreement, is that your signature there?

1    A    Yes.

2    Q    And you had an attorney representing you in relation to this

3    case?

4    A    Yes.

5    Q    And this plea agreement's also signed, a little hard to see,

6    by two AUSA's, two Assistant U.S. Attorneys, two prosecutors, is

7    that right?

8    A    Yes.

9    Q    This agreement that we have here, May 17th of 2006, you

10   ended up pleading guilty to a charge of racketeering, is that

11   right?

12   A    Yes.

13   Q    And you were also charged or pled guilty to a charge of

14   conspiring to distribute and possess five kilograms or more of

15   cocaine, is that right?

16   A    Yes.

17   Q    Now, is there anything in this agreement dated March 17th of

18   2006 that talks about testifying or cooperating or anything like

19   this, in this particular piece of paper?

20   A    No.

21   Q    Let me show you, then, we've been talking about a May 17th

22   of 2006 plea agreement.  Let me show you what I referred to

23   previously as the second part of your plea.  This is another

24   letter.  This one is dated May 24th of 2006, is that right?

25   A    Yes.

1    Q    And what is this that I've put up here, this May 24th, 2006

2    piece of paper?

3    A    This is my second plea agreement.

4    Q    Why were there two parts to your plea agreement, Mr. Clash?

5    What was the reason for that?

6    A    At the time some of my co-defendants were, I guess,

7    allegedly going to trial.  So the prosecutors wanted to, I guess,

8    confuse the defense by thinking that I pleaded to one charge.  So

9    this second was a sealed, supposed to have been a sealed, sealed

10   plea agreement.

11   Q    This one was kept under seal with the court, is that right?

12   A    Yes.

13   Q    Was part of that order to protect your safety, so it

14   wouldn't be public, the fact that you were cooperating?

15   A    Yes.

16   Q    Now, let me show you about this or ask about this

17   cooperation agreement.  And I should have mentioned.  The first

18   agreement I showed you, May 17th of 2006, has been marked as

19   Government's Exhibit P-5A.  And this cooperation part, the May

20   24th, 2006 letter, has been marked as Exhibit P-5B, as in boy.

21   You entered into what are sometimes referred to as a cooperation

22   agreement in this piece of paper, is that right?

23   A    Yes.

24   Q    Let me show you or ask you about some of those obligations.

25   Among other things, you agreed to fully and truthfully respond to

1    any questions put to you by law enforcement, to provide any

2    information they asked for, is that right?

3    A    Correct.

4    Q    You agreed to cooperate completely with law enforcement, is

5    that correct?

6    A    Yes.

7    Q    There's a number of paragraphs that talk about things that

8    you agreed to do.  But let me ask you specifically about this

9    paragraph, Subparagraph D on Page Two.  Is that also part of the

10   agreement that you entered into?

11   A    Yes.

12   Q    And this paragraph reads, and correct me if I'm wrong, The

13   defendant shall testify fully and truthfully before grand juries

14   and at any trial and other court proceedings with respect to any

15   matters about which this office -- that's the U.S. Attorney's

16   Office, is that right?

17   A    Yes.

18   Q    May require his testimony.  Did I read that right?

19   A    Yes.

20   Q    And there are a number of other promises that you made here,

21   including not engage in any new criminal conduct and making the

22   government aware of any information you had and so forth.  Is

23   that right?

24   A    Yes.

25   Q    Now, there was some benefits that you received or hoped to

1   receive as part of this cooperation agreement, is that right, Mr.

2   Clash?

3   A    Yes.

4   Q    Let me ask you about one.  Paragraph Two on Page Two.  There

5   is what is called an immunity paragraph.  I won't read the whole

6   thing.  But does this basically say that the information you give

7   to the government won't be used against you?  Your words won't be

8   used against you in building any new criminal cases against you?

9   A    Yes.

10   Q    And then on Page Three of your plea agreement.  Again, I'm

11   not reading the entire agreement in.  But this Paragraph Four

12   here says that the government, if, if after the conclusion of

13   your case determines that you've provided something called

14   substantial assistance, that you've provided useful information,

15   that it can request a departure in your sentencing level of up to

16   four levels.  Is that right?

17   A    Yes.

18   Q    Now, it also provides that, that if the government makes a

19   decision to do that, who ultimately decides what sentence you're

20   going to receive?  Assuming the government makes that motion, who

21   ultimately decides what kind of a reduction to give and how much?

22   A    The Court.

23   Q    Mr. Clash, you and I have met in preparation for your

24   testimony today, and you've met with other prosecutors in my

25   office from time to time, is that right?

1    A    Yes.

2    Q    Have any promises been made to you, sir, about what kind of

3    a sentence you receive or whether you'll get any reductions under

4    this agreement?

5    A    No.

6    Q    Do you have an understanding of what would happen to you if

7    you were to lie on make up something, even if it was designed to,

8    to your way of thinking, help the government or make the

9    prosecutors happy?

10   A    Yes.

11   Q    What would happen to you?  What's your understanding of what

12   would happen to you?

13   A    I could lose this agreement and face perjury charges.

14   Q    Now, let me ask you about some of the circumstances that

15   brought about this prosecution in federal court.  You're still

16   awaiting sentencing on this case, is that right?

17   A    Yes.

18   Q    You indicated that you were dealing drugs between getting

19   out of school in 1996 until you got arrested in February of 2005.

20   What part of town did you deal drugs in?

21   A    Predominantly the Park Heights area.

22   Q    And was there a particular group of people that you dealt

23   with, you either purchased from or that you cooperated with in

24   your dealings?

25   A    Yes.

1  Q    Who was it that you worked with?

2  A    Howard Rice, Raeshio Rice, Anthony Leonard, Travis Golder,

3  Keenan Dorsey, George Butler.

4  Q    There's a number of names you rattled off and there's a few

5  more that you're actually thinking about, is that right?

6  A    Yes.

7  Q    Let me ask you about a few of the ones you've already

8  rattled off.  You mentioned Howard Rice and Raeshio Rice, is that

9  right?

10  A    Yes.

11  Q    Can you spell Raeshio for the court reporter?

12  A    No.

13  Q    That's all right.  We'll do it phonetically.  Are Howard

14  Rice and Raeshio Rice related?

15  A    Yes.

16  Q    What's the relationship?

17  A    They're brothers.

18  Q    Does either one of them, Howard or Raeshio, go by any kind

19  of a nickname?

20  A    Yes.

21  Q    What's Howard's nickname?

22  A    H.

23  Q    And how about Raeshio Rice?

24  A    Goodie or Whip.

25  Q    Now, you mentioned in addition to Howard Rice and Raeshio

1    Rice, there are a few other names you rattled off.  There's an

2    individual named Travis Golder?

3    A    Yes.

4    Q    And what was Travis Golder's nickname?

5    A    Worm.

6    Q    And you mentioned a few other names.  I'm not sure if you

7    mentioned one.  Is there a Darryl Alexander?

8    A    Yes.

9    Q    Was he a member of this group?

10   A    Yes.

11   Q    And did he go by any nicknames?

12   A    Hollywood.

13   Q    So Howard Rice and Raeshio Rice are the first two that you

14   mentioned.  Just briefly, what was their role in the group?

15   A    I mean, they were mainly the guys who I worked for at

16   sometime, at one time.

17   Q    Has this group occasionally been referred to as the Rice

18   organization?

19   A    Yes.

20   Q    Did Mr., did the Howard Rice and Raeshio Rice sort of run

21   it?

22   A    Yes.

23   Q    What was Eric, what was your role?

24   A    My role?

25   Q    Yes, sir.

1    A    I mean, I sold drugs in the community.  I picked up money.

2    I oversee stuff that took place daily.

3    Q    Under the direction of the Rice brothers?

4    A    Periodically, yes.

5    Q    And did you go by a nickname in those days?

6    A    Yes.

7    Q    What was your nickname?

8    A    Whites or White Boy.

9    Q    How about Travis Golder?  What was his job?

10   A    Pretty much the same as mine.

11   Q    And Darryl Alexander?

12   A    He was more or less just someone that purchased at times

13   drugs from us.

14   Q    Now, you mentioned there were a number of years from '96 to

15   2005 that you were involved in drug dealing.  Was that entire

16   time with the Rice organization that we just got done talking

17   about?

18   A    Yes.  For the most part, yes.

19   Q    There may have been some, some changes from time to time?

20   A    Yes.

21   Q    Let me direct your attention to February 18th of 2002.  Do

22   you remember attending a party at a place called Hammerjacks?

23   A    Yes.

24   Q    What is Hammerjacks?

25   A    A night club.

DIRECT EXAMINATION OF ERIC CLASH                          207

1    Q    And where is it located?

2    A    Downtown.  I'm not sure of the street name.

3    Q    That's fine.  But Downtown Baltimore City?  That is a yes?

4    A    Yes.

5    Q    And do you remember what night of the week this party was?

6    Is that something you recollect?

7    A    It was on a Sunday.

8    Q    Let me show you, just by way of putting a picture to things.

9    Your Honor, I worked with the DOAR system a little bit to avoid

10   glare but there might be a little bit.

11        This is Government's Exhibit H-2.  You see Government's

12   H-2 in front of you?

13   A    Yes.

14   Q    What is this a photograph of?

15   A    The front of Hammerjacks.

16   Q    The front of the night club?

17   A    Yes.

18   Q    Now, this particular party that you were attending, what was

19   the purpose of it?

20   A    At the time there was a president of Def Jam, his name was

21   Kevin Lyles, I think it was his birthday party.

22   Q    Now, you mentioned something called Def Jam.  What is Def

23   Jam?

24   A    It's a record label that produces predominantly hip-hop.

25   Q    Is it a record label that's just a Baltimore outfit or do

1    they operate nationwide?

2    A    Nationwide.

3    Q    How about Kevin Lyles?  He was the president of Def Jam?

4    Was he a Baltimorean or was he from elsewhere?

5    A    He's from Baltimore.

6    Q    What did you know about his background?

7    A    He was just friends with, him and Howard went to school

8    together.

9    Q    And is that how you came into possession of being able to go

10   to this Hammerjacks party?

11   A    Yes.

12   Q    Who did you actually go with that particular night?

13   A    Howard Rice, Raeshio Rice, Hollywood, Travis Golder.  A guy

14   Ty.  I don't know his real name.

15   Q    You mentioned a number of people who were in the Rice

16   organization, though, is that right?

17   A    Yes.

18   Q    And you also indicated that Kevin Lyles, whose birthday it

19   was, and Howard Rice, had gone to high school together.  I know

20   you went to City.  Where did they go together?

21   A    Woodlawn.

22   Q    Woodlawn High School?

23   A    Yes.

24   Q    Now, did you know Kevin Lyles personally or did you just

25   know of him through Howard Rice?

DIRECT EXAMINATION OF ERIC CLASH                  209

1    A    Of him through Howard.

2    Q    About what time did you arrive at the club that night, if

3    you remember?

4    A    Around 10, 10:30.

5    Q    Often times when you go into a night club you don't

6    necessarily arrive until it's already kind of late, is that

7    right?

8    A    Yes.

9    Q    And what was the party like?  What was going on?

10   A    Music, loud music playing.  A lot of people dancing and

11   drinking.  Partying.

12   Q    Did you have a good time?

13   A    Yeah.

14   Q    Up to a point?

15   A    Yes.

16   Q    Let me ask you about that.  At some point, did something

17   happen that was not expected?

18   A    Yes.

19   Q    What happened?

20   A    Well, we were all partying and drinking and Goodie or

21   Raeshio Rice was having some words with the guy on the dance

22   floor.  And at that time I seen Goodie try to throw a bottle, or

23   swing a bottle at the guy.  They got into fighting.  At that

24   point me and the guy got into some altercation and starting

25   exchanging blows.

1   Q     Let me step back for a minute.  It began with Goodie,

2   Raeshio Rice, having words with somebody?

3   A     Yes.

4   Q     When you talk about having words, what was going on between

5   Goodie and this other person?

6   A     I didn't actually hear what they were saying so I assumed

7   that they were just, you know, exchanging violent words to each

8   other.

9   Q     And it was violent words, it was an argument?

10  A     Yes, argument.

11  Q     At some point did the exchange of words become physical?

12  A     Yes.

13  Q     And what happened when things started to become physical?

14  Was it between, did it initially just involve those two men,

15  Goodie and this other individual, or was it --

16  A     It initially, yeah, just started with those two.

17  Q     Now, this other person that Raeshio Rice or Goodie was

18  having or exchanging words with, had you ever met that person

19  before?  Do you know him?

20  A     No.

21  Q     Do you remember what he looked like?

22  A     Yes.

23  Q     And let me ask you to take a look at Government's Exhibit

24  PH-54.  You see PH-54 in front of you?

25  A     Yes.

1    Q    Do you recognize that person?

2    A    Yes.

3    Q    Where have you seen that person before?

4    A    He's the guy that him and Goodie were having words with.

5    Q    Have you, aside from any connection with this case, aside

6    from hearing it through police or anything like that, have you

7    ever learned what this person's name is?

8    A    No.

9    Q    But the person in the photograph, is he the person that

10   Goodie was having words with?

11   A    Yes.

12   Q    So at some point it starts to become physical, is that

13   correct?

14   A    Yes.

15   Q    What happened after it became physical?  First it's Goodie

16   and this person?  What happens next?

17   A    After Goodie and the guy physically fighting, I go over to

18   see what's, you know, just help Goodie out.  Well, another guy

19   comes to me and we begin to fight.

20   Q    Now, at that time, that individual, did you know who that

21   person was?

22   A    No.

23   Q    Had you ever met him prior to that night?

24   A    No.

25   Q    Did you know, from what you could tell, was this an

1    individual who was with or in the same group as the person we see

2    in Government's Exhibit PH-54?

3    A    At that time, no.

4    Q    What did this person look like?

5    A    I didn't, I couldn't tell in the club.

6    Q    He was a male?

7    A    Yes, it was a male.

8    Q    White, black?

9    A    Oh, black.

10   Q    Did you get any look at this person's face at any point,

11   either at first or at any other time during the course of this

12   event at Hammerjacks?

13   A    During, at the club?

14   Q    At the club.

15   A    Oh, no.

16   Q    And did there ever come a time, Mr. Clash, that you've seen

17   this person again or come to know who that person was that you

18   were initially engaged with?

19   A    Yes.

20   Q    Do you see the person in court today that you came to learn

21   who it was?

22   A    Yes.

23        MR. LAWLOR:  Objection, Your Honor.  Can we approach?

24        THE COURT:  No.  Overruled.

25   BY MR. HANLON:

1    Q    If you would, please identify that person by his clothing

2    and by his physical location.

3    A    The man right here (indicating).

4    Q    If you could, how many people away from me is the person?

5    A    From you?

6    Q    Yeah.

7    A    One person away from you.

8    Q    And what's he wearing, for the record?

9    A    Tan or gray sweater.

10   Q    Your Honor, for the record, identifying the defendant,

11   Willie Mitchell.

12            THE COURT:  So noted.

13   Q    So you and Mr. Mitchell start to get into it, is that

14   correct?

15   A    Yes.

16   Q    What happened?

17   A    We were exchanging fists.  And at the time I thought I was

18   getting punched in my side, you know, on my body.  Somehow we

19   separated through the commotion of other people and I realized I

20   had a lot of blood in my hand.  When I realized I had a lot of

21   blood, another guy that was there with us seen the blood in my

22   hand and pulled me to the side, kind of away from everything, and

23   he took me down toward the steps.

24            When I got to the front of the club, I lifted up my

25   shirt and I realized I had, you know, I was stabbed.

DIRECT EXAMINATION OF ERIC CLASH                    214

1    Q    You actually observed stab wounds?

2    A    Yes.

3    Q    Were they on the parts of the body where you initially

4    thought you were being hit during your struggle?

5    A    Yes.

6    Q    And again, who was it that was hitting you?

7    A    The guy that I was fighting with.

8    Q    Mr. Mitchell?

9    A    Yes.

10   Q    If you would, it's not necessary to raise your shirt or

11   anything like that, Mr. Clash.  But if you would, with the

12   Court's permission, can you just please point out the parts of

13   your body where you felt stab wounds?  You can stand up, if it's

14   all right.

15   A    My arm, one here, one here.  Here.  And here.

16   Q    And if I've counted correctly, Mr. Clash, is that five parts

17   of your body?

18   A    Yes.

19   Q    Now, let me ask you, before we depart Hammerjacks, let me

20   show you a few additional photographs.  You mentioned that you

21   were taken out of the club.  Let me ask you about a few

22   photographs to set the scene here.  Government's Exhibit H-3.  Do

23   you see H-3?

24   A    Yes.

25   Q    It might be a little bit difficult to see on your screen and

1    I apologize.  But where is H-3?

2    A    The area where we were fighting at.

3    Q    And is this inside Hammerjacks?

4    A    Yes.

5    Q    Move through these quickly.  How about Government's Exhibit

6    H-4?  Is this another photo of the same scene?

7    A    Yes.

8    Q    And there's a lot of trash and debris and there's also some

9    police tape.  You wouldn't have been present for any

10   investigation following this event at Hammerjacks, would you?

11   A    Was I present of any investigation?

12   Q    Yes.  You were gone by then, is that right?

13   A    Yes.

14   Q    H-5?  Again, is that inside Hammerjacks?

15   A    Yes.

16   Q    H-7, Mr. Clash.  Do you see that?

17   A    Yes.

18   Q    There's some red material on the floor in this particular

19   photograph.  Do you know, sir, if that's your blood or someone

20   else's?

21   A    No, I don't know if it's mine.

22   Q    H-6?  Again, inside Hammerjacks?

23   A    Yes.

24   Q    You mentioned that there was a struggle between Raeshio Rice

25   and this individual and then there was a struggle between you and

DIRECT EXAMINATION OF ERIC CLASH                      216

1    another person.  At some point did the fight at Hammerjacks

2    become broader even than just those four people?  Were there

3    other people involved?

4    A    At the club?

5    Q    At the club.

6    A    Yes.

7    Q    Was it a pretty big brawl?

8    A    I wasn't around to actually see it.

9    Q    When you got taken out, where did you go?

10   A    Initially, they tried to put me in, tried to take me to my

11   car but my car was blocked by other cars.  So by then an

12   ambulance, someone had already called an ambulance.  So the guy

13   walked and put me in the ambulance.

14   Q    Was this the same individual that pulled you out of the

15   fight?

16   A    Yes.

17   Q    And did you actually go to the hospital?

18   A    Yes.

19   Q    And were you treated?

20   A    Yes.

21   Q    Let me ask you.  Later on, did you and the other members of

22   the Rice organization talk about what had happened inside

23   Hammerjacks?

24   A    Yes.

25   Q    Let me ask you specifically.  Showing you Government's

1    Exhibit PH-60.  Who is this person?

2    A    Goodie.  Raeshio Rice.

3    Q    Did you have any conversations with or were you present for

4    any conversations during which Raeshio Rice discussed what had

5    happened at Hammerjacks?

6    A    Yes.

7    Q    What were those discussions?  What was said?

8              MR. LAWLOR:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   A    We were --

11   Q    No, hold on.

12             THE COURT:  "Sustained" means don't answer.

13             THE WITNESS:  Okay.

14   BY MR. HANLON:

15   Q    Let me ask you this question, Mr. Clash.  Was there any

16   discussion about whether to do anything in response to what had

17   happened at Hammerjacks?

18             MR. LAWLOR:  Objection, Your Honor.

19             THE COURT:  Overruled.  You may answer.

20   A    Yes, we were --

21             MR. LAWLOR:  Objection.

22             THE COURT:  Just wait for next question.

23   Q    Who engaged in those discussions?  Who was present?  Just

24   who was present, not what was said.

25   A    Me and Goodie.

1    Q    Were there ever any other people present during these

2    discussions?

3    A    Yes.

4    Q    Who were those people?

5    A    Hollywood and Howard.

6    Q    Now, my next question to you is this.  Did Raeshio Rice,

7    Goodie, express any intentions about what to do in response to

8    the Hammerjacks incident?

9             MR. LAWLOR:  Objection.

10            THE COURT:  The objection is overruled.  You may

11   answer.

12   A    Yes.

13   Q    What did Raeshio Rice say to you in terms of his intentions?

14            MR. LAWLOR:  Objection.

15            THE COURT:  Overruled.  You may answer.

16   A    That we wanted to retaliate back to the guys who we were

17   fighting in the club with.

18   Q    Did Raeshio Rice tell you anything about what specifically

19   he intended to do as far as retaliation?

20   A    Yes.

21   Q    What did Raeshio Rice tell you?

22            MR. LAWLOR:  Objection.

23            THE COURT:  Overruled.

24            MR. LAWLOR:  Have a continuing objection, Your Honor.

25            THE COURT:  No.  Overruled.

1   A    We were going to put a contract on the guy who stabbed us.

2   Q    Now, by the term "contract", tell us what you mean by that.

3   A    To hire someone to kill him.

4   Q    And was there any discussion, did Raeshio Rice express a

5   belief about who the person was that the contract should be put

6   out on?

7           MR. LAWLOR:  Objection.

8   A    Yes.

9           THE COURT:  Overruled.  You may answer.

10  A    Yes.

11  Q    And who did Raeshio Rice talk about putting a contract on?

12          MR. LAWLOR:  Objection.

13          THE COURT:  Overruled.

14  A    A guy by the name of Bo.

15  Q    Was there any other name given to this person other than Bo?

16          MR. LAWLOR:  Objection.

17          THE COURT:  Overruled.

18  A    No.

19  Q    Was there any discussion about who might be in a position to

20  take up such a contract?  Did Raeshio Rice express any intentions

21  on that subject?

22          MR. LAWLOR:  Objection.

23          THE COURT:  Overruled.

24  A    Yes.

25  Q    And what did Raeshio Rice say about that?

1          MR. LAWLOR:  Objection.

2          THE COURT:  Overruled.

3     A    We were going to hire a guy by the name of Eric Hall.

4     Q    Was there any other discussion other than a person by the

5     name of Eric Hall?

6     A    Yes.

7     Q    Who?

8     A    I don't recall the other guy's name.

9     Q    So there was someone else, someone other than Eric Hall?

10    A    Yes.

11    Q    When you heard Raeshio Rice talk about this, what was your

12    response?  Did you say anything to him about that?

13         MR. LAWLOR:  Objection.

14         THE COURT:  Overruled.  You may answer.

15    A    Yes.

16    Q    What was your response?

17    A    I told him that at the time it wasn't the best time to do

18    it.

19    Q    Did anyone else in your group share that opinion?

20    A    Yes.

21         MR. LAWLOR:  Objection.

22         THE COURT:  Overruled.

23    Q    Just who else?

24    A    Howard and Hollywood.

25    Q    Why did you not think it a good idea to do any retaliation?

1          MR. LAWLOR:  Objection.

2          THE COURT:  Overruled.

3   A    Because everybody in the city had knew what was, you know,

4   knew what was going on.

5          MR. LAWLOR:  Objection, move to strike.

6          THE COURT:  Motion to Strike denied.  Objection

7   overruled.

8   BY MR. HANLON:

9   Q    You can answer.  Why did you believe it was a bad idea?  No.

10  I'm sorry.  You already answered.  Do you know, Mr. Clash,

11  whether or not a contract ended up being put out on this person,

12  Bo?

13  A    No.

14  Q    You don't know?

15  A    No.

16  Q    Let me ask you briefly about rap music, if that's all right.

17  Did you or the other people in the Rice organization ever have

18  any interests in any rap businesses or companies or try to put

19  any money into that area?

20  A    Yes.

21  Q    When was that?  About what time frame?

22  A    2001, summer of 2001.

23  Q    Who was involved in that effort?

24  A    Me, Howard, and Goodie, Raeshio Rice.

25  Q    If you could just briefly tell us, what was it that you all

1    were trying to accomplish in terms of a rap, a rap enterprise?

2    A    Trying to legitimize drug money.

3    Q    Did that take off?  Did it go anywhere?

4    A    No.

5    Q    Was there ever a name given to your enterprise?

6    A    Yes.

7    Q    What was the name?

8    A    Section Eight Records.

9    Q    Now, we also talked about the people that were involved.

10   And I showed you a photograph of one individual.  And we talked

11   about the person you got in a struggle with at Hammerjacks.  You

12   were actually interviewed by the police just almost immediately

13   following this event, is that correct, Mr. Clash?

14   A    Yes.

15   Q    Did you cooperate with the police at that time back in 2002?

16   A    No.

17   Q    Why not?

18   A    At that time, my mentality of thinking, it was, I wouldn't

19   have cooperated.

20   Q    You wouldn't want to talk to the police at that time?

21   A    Yes.

22   Q    You were a victim, though.  Wouldn't you want to talk to the

23   police about that?

24   A    No.

25   Q    And at some point were you shown any photographic arrays,

1    pictures of people who may or may not be involved in the fight at

2    Hammerjacks?

3    A    Yes.

4    Q    Police officer showed you that stuff?

5    A    Yes.

6    Q    And do you remember, did you tell the officer one way or the

7    other whether you recognized any of the people in the arrays?

8    A    I told him I didn't recognize anybody.

9    Q    And if you had recognized someone in those arrays, would you

10   have told the officer that at the time?

11   A    No.

12   Q    Again, for the same reasons you just mentioned?

13   A    Yes.

14   Q    Sitting here today, the people you've identified, were they

15   the people involved in the Hammerjacks event?

16   A    Yes.

17   Q    Do you know if anyone else actually got stabbed or injured

18   during the Hammerjacks event, sir?

19   A    Yes.

20   Q    Who else got stabbed?

21   A    Raeshio Rice and Hollywood.

22   Q    Did both of them go to the hospital?

23   A    Yes.

24   Q    Do you know if they cooperated with the police or provided

25   information to a police investigation?

1    A    I don't know.  No.

2    Q    You don't know or --

3    A    I don't know.

4    Q    Your Honor, that's all I have.  Thank you, sir.

5             CROSS EXAMINATION

6    BY MR. LAWLOR:

7    Q    Mr. Clash, good afternoon.  How are you?

8    A    Good.

9    Q    First question I have before I move into another topic.  Did

10   I hear you correctly say that you didn't see the face of the

11   individual who stabbed you?

12   A    Yes.

13   Q    So you don't know what he looks like then?

14   A    At the time of the club I didn't know.

15   Q    At the time when this was happening to you, you don't know

16   who did it?

17   A    Correct.

18   Q    The only time it ever happened to you, you don't know who

19   did it?

20   A    Correct.

21   Q    It only happened to you one time.  You had one chance to

22   observe this person's face and at the time you had that

23   opportunity you didn't observe the person's face, right?

24   A    Yes.

25   Q    All right.  Let me talk about your agreement with the

1    government.  Now, you were a member of the Rice organization,

2    correct?

3    A    Yes.

4    Q    And you were a member of that organization from the mid '90s

5    until you were arrested in 2005?

6    A    Yes.

7    Q    And you sold drugs all the time, 24/7/365, during that time

8    period?

9    A    No.

10   Q    Okay.  You sold drugs the majority of the time during that

11   time period?

12   A    Yes.

13   Q    That was your occupation?  You didn't have another job in

14   the meantime?

15   A    Right.

16   Q    Did you go to jail in, for some of that period of time?

17   A    No.

18   Q    You were never arrested?

19   A    No.  I was arrested but never sentenced.

20   Q    You were never sentenced.  All right.  And this was a fairly

21   large and cohesive organization, correct?

22   A    Yes.

23   Q    All right.  And it was headed by two men, Howard and Raeshio

24   Rice, right?

25   A    Yes.

1    Q    And you listed a number of associates that worked with you

2    in the Rice organization, correct?

3    A    Correct.

4    Q    And if I could read you these names, see if you recognize

5    them.  Two Rice brothers, Anthony Leonard, correct?

6    A    Yes.

7    Q    Travis Golder?

8    A    Yes.

9    Q    Steven Campbell?

10    A    Yes.

11    Q    Vernon Jackson?

12    A    Yes.

13    Q    James Murphy?

14    A    No.

15    Q    No?  You don't know the name James Murphy?

16    A    No.

17    Q    George Martinez?

18    A    Yes.

19    Q    Victor Alcala?

20    A    Yes.

21    Q    Augustine Biaz?

22    A    Don't know him.

23    Q    Louis Diaz?

24    A    Don't know him.

25    Q    Eric Hall?

1    A    Yes.

2    Q    Were there others?

3    A    Yes.

4    Q    Okay.  And these are people that you worked with in a

5    cohesive unit for a long period of time?

6    A    Yes.

7    Q    And you all worked in Park Heights, is that right?

8    A    Predominantly Park Heights.

9    Q    And so I assume given the size and scope of your

10   organization, that that was your turf?

11   A    Yes.

12   Q    All right.  And without delving into the details, would you

13   and other members of the Rice organization resort to violence or

14   force if need be?

15   A    Yes.

16   Q    To protect your turf?

17   A    Yes.

18   Q    And Park Heights was your turf?

19   A    Yes.

20   Q    Were you the biggest organization in Park Heights?

21   A    I don't know.

22   Q    Well, were there other people who were dealing in Park

23   Heights?  You would have known, right?

24   A    Yes.

25   Q    Would you have attempted to push them out of that

1     neighborhood if they were dealing in your neighborhood?

2     A    No.

3     Q    You would not have?

4     A    No.

5     Q    You would have accepted that competition readily and with no

6     problems whatsoever?

7     A    Yes.

8     Q    Okay.  Now, this was a successful organization in terms of

9     its profitability, correct?

10    A    Yes.

11    Q    And you dealt in massive quantities of drugs, correct?

12    A    Yes.

13    Q    All right.  Did you travel internationally in an effort to

14    facilitate the sale of drugs?

15    A    No, I didn't.

16    Q    Did you ever go to Mexico?

17    A    No, I didn't.

18    Q    Did other members of the organization go to Mexico?

19    A    Yes.

20    Q    Okay.  How many other members of the organization went to

21    Mexico?

22    A    Two.

23    Q    Did members of the organization travel to California?

24    A    Yes.

25    Q    Did you do that?

CROSS EXAMINATION OF ERIC CLASH BY LAWLOR                    229

1   A    No.

2   Q    Okay.  Did the Rice brothers, did one of the Rice brothers

3   drive a Rolls Royce Bentley?

4   A    Yes.

5   Q    Okay.  Which one was that?

6   A    Goodie.

7   Q    Okay.  And you yourself were doing well financially?

8   A    Yes.

9   Q    Okay.  In fact, as part of your agreement with the

10  government, you've agreed to forfeit large quantities of cash

11  that you had in the bank, right?

12  A    Yes.

13  Q    Okay.  Well, let's talk about that for a minute.  If you

14  give me your indulgence for a second.  Let's first, is this the

15  second agreement you came to or the second half of the agreement

16  that you came to with the government?

17  A    Yes.

18  Q    All right.  Now, speaking of that, you said that this second

19  agreement was drafted in an effort to confuse the defense?  Is

20  that what you said?

21  A    Yes.  I'm assuming.

22  Q    Is that what the prosecution told you?

23  A    Not to that degree of words.  But yes.

24  Q    All right.  Let's start here.  Mr. Hanlon asked you a

25  question about the second agreement, correct?

1   A    Correct.

2   Q    When he asked you the question of why there was a need for a

3   second agreement, you told him that the purpose of this agreement

4   was to confuse the defense, the lawyers who were representing

5   those members of the Rice organization who were going to trial?

6   A    Correct.

7   Q    That is not information that you came to on your own

8   volition, correct?

9   A    Correct.

10  Q    Someone told you that?

11  A    No.

12  Q    Correct?

13  A    Not those exact words.

14  Q    All right.  You used the words, that the purpose of this

15  second agreement was to confuse the defense.  Did you say that?

16  A    Yes, I used the words.

17  Q    All right.  You did not come to the conclusion that the

18  second agreement was effectuated to confuse the defense on your

19  own.  Someone told you that?

20  A    I --

21          MR. HANLON:  Objection, Your Honor.  Asked and

22  answered.

23          THE COURT:  Overruled.  You may answer.

24  A    I, I was explaining to the U.S. Attorney here that the

25  purpose, what was the purpose of them doing two plea agreements.

1    Q    I understand.  And someone told you what that purpose was,

2    right?

3    A    Yes.

4    Q    And the person who told you that, person or persons were

5    members of the U.S. Attorney's Office, right?

6    A    Yes.

7    Q    And they told you that they had this hidden second agreement

8    to confuse the defense, right?

9    A    No.  They didn't say those exact words.

10   Q    All right.  What were the exact words?

11   A    I don't recall the exact words.

12   Q    All right.  If you don't recall the exact words, the general

13   sentiment that they expressed to you was that the second

14   agreement was effectuated to confuse the defense, correct?

15   A    Yes.

16   Q    Thank you.  Now, as part of your agreement, getting back to

17   the forfeiture, you agreed, and you're looking at Paragraph

18   Seven, to forfeit $48,000 and change from an M & T Bank account,

19   correct?

20   A    Yes.

21   Q    $15,000 from a Provident Bank account?

22   A    Yes.

23   Q    $10,000 and change from a Bank of America account?

24   A    Yes.

25   Q    A watch, a second watch, a third watch, a fourth watch?

1    Four watches?

2    A    Yes.

3    Q    Including two Rolexes and a Cartier watch?

4    A    Yes.

5    Q    And a home at 598 Education Way?

6    A    Yes.

7    Q    Those things, that money, that home and those Rolexes, like

8    Mr. Rice's Bentley, were the fruits of your illegal drug

9    activity, correct?

10   A    Yes.

11   Q    All right.  And I think we can glean from your possession of

12   those items and Mr. Rice's possession of a Rolls Royce Bentley

13   that this was a large and successful organization, correct?

14   A    Yes.

15   Q    All right.  And you pled, did you not, to being involved in

16   a racketeering organization, right?  That's the crime to which

17   you pled guilty, right?

18   A    Yes.

19   Q    Okay.  Now, you went to, you went to this party at

20   Hammerjacks, correct?

21   A    Yes.

22   Q    And there was alcohol involved?

23   A    Yes.

24   Q    And you were consuming alcohol that evening?

25   A    Yes.

1    Q    And so the jury understands that we're also all, so we are

2    all clear, this was over six years ago that this occurred, right?

3    A    Yes.

4    Q    This was in, sometime in February of 2002, is that right?

5    A    Yes.

6    Q    And as we sit here today, we're in September of 2008?

7    A    Yes.

8    Q    Six and a half years later.  All right.  So you were

9    drinking -- what did you have to drink that night?

10   A    Can't recall.

11   Q    All right.  What time of the evening did the altercation

12   ensue?

13   A    I can't recall.

14   Q    Ballpark?

15   A    12.

16   Q    How long had you been there at the time it started?

17   A    Two hours maybe.  Hour and a half, two.

18   Q    What were you doing before you got there?

19   A    Waiting to go to the party.

20   Q    All right.  What were you doing while you were waiting?

21   Having a few cocktails?

22   A    No.

23   Q    Smoking any weed?

24   A    No.

25   Q    You got there and you had a few drink?

1    A    Yes.

2    Q    What were you drinking?

3    A    I don't recall.

4    Q    What did you have to drink?

5    A    I don't recall.

6    Q    Were you intoxicated?

7    A    No.

8    Q    Okay.  You don't recall what you had to drink but you recall

9    that you weren't intoxicated?

10   A    Yes.

11   Q    Okay.  And at some point in time one of the Rice brothers

12   became involved in an altercation with somebody, is that right?

13   A    Yes.

14   Q    Which Rice brother was that?  Forgive me.

15   A    Goodie.

16   Q    Which is?

17   A    Raeshio Rice.

18   Q    Excuse me one second, please.  So Goodie was having words

19   with somebody?

20   A    Yes.

21   Q    And advanced the discussion by swinging some sort of bottle

22   at that person's head?

23   A    Yes.

24   Q    And then you jumped in to assist Goodie?

25   A    Yes.

1  Q    Feeling that he and his bottle were insufficient to solve

2  this difference of opinion?

3  A    Yes.

4  Q    Okay.  And then someone else jumped in?

5  A    Yes.

6  Q    Was it just the four of you or did this become a big melee?

7  A    I really don't recall how many people were involved at the

8  time.

9  Q    All right.  Well, let's try to walk through it.  Other than

10  the four of you, did anyone else get involved?

11  A    Yes.

12  Q    All right.  Who were you there with?  You were there with

13  the two Rice brothers?

14  A    Two Rice brothers.

15  Q    Travis?

16  A    Travis.

17  Q    Hollywood.  What's Hollywood's name again?

18  A    Derek Alexander.

19  Q    Derek Alexander.  Who else?

20  A    Ty, Lamont, Dana.  I think that was about it.

21  Q    And you guys are going to look out for each other, right?

22  A    Supposedly.

23  Q    Okay.  Well, not supposedly.  In fact, you guys do look out

24  for each other, right, at the time?

25  A    Oh, yes.

1    Q    All right.  And Mr. Rice obviously does not solve conflict

2    with words.  When you were on the street, when you and members of

3    the Rice organization were on the street, were you known to solve

4    differences of opinion with words or with guns?

5    A    Words.

6    Q    Words?

7    A    Yes.

8    Q    You never had to resort to violence?

9    A    I have never had to resort to violence.

10   Q    You never have.  No other members of the Rice organization

11   have?

12   A    Yes, other members of the Rice organization.

13   Q    Other members of the Rice organization have from time to

14   time had to resort to violence to solve a dispute?

15   A    Yes.

16   Q    Sort of like Mr. Rice swinging a bottle at somebody's head?

17   A    Yes.

18   Q    All right.  So we've established that you're there with a

19   bunch of other people and four people have started to have a

20   little altercation.  Does anyone else jump in?

21   A    At the time I don't, I wasn't there long enough to see if

22   people, other people jumped in.  I just heard about it after.

23   Q    You heard about it afterwards.  But I mean, you were there.

24   You were involved in it.  You weren't intoxicated.  So did you

25   see anyone else jump in?  I'm not worried about what you heard

1    about.

2    A    No.

3    Q    I think we've all gotten a full dose of a lot of the things

4    you heard about.  I want to know what you saw.  So did you see

5    anyone else jump in?

6    A    No.

7    Q    Okay.  So it just remained the four people involved?

8    A    Yes.

9    Q    All right.  So it was yourself, Mr. Rice, the person whose

10    face you recognize but whose name you don't know, and the person

11    whose face you didn't see but whose name you do know now, right?

12    Is that what we've established so far?

13    A    Can you repeat that again?

14    Q    Okay.  The four people involved, they're yourself and Mr.

15    Rice, correct?  That's two?

16    A    Two people.

17    Q    One person whose face you recognize but whose name you don't

18    know, right?

19    A    Correct.

20    Q    And another individual who you know now to be Mr. Mitchell

21    but whose face you did not see, correct?

22    A    Correct.

23    Q    Okay.  Now, after this all ensued and you left, you said you

24    had a conversation with Mr. Rice, right?

25    A    Yes.

1    Q    And it was the wisdom of Mr. Rice -- was he the top guy?

2    Was he boss of this organization?

3    A    No.

4    Q    All right.  But when you tried to dissuade him from putting

5    a contract out on this unknown person, you could not, correct?

6    A    I don't know if that contract ever was --

7    Q    When you talked to him, did he indicate that he agreed with

8    your position, that withholding on this contract was a wise

9    course of action, or did he say, no, I'm going to kill the person

10   that stabbed the three individuals at Hammerjacks?

11   A    I don't recall what he said.

12   Q    You don't recall other than what you told the prosecution?

13   A    Right.

14   Q    Today here?  Okay.  I get it.  All right.  In any event, Mr.

15   Rice indicated a desire to have this person killed?

16   A    Correct.

17   Q    This, this faceless person with a name?  He indicated that

18   he would have that person killed?

19   A    Yes.

20   Q    And he indicated not that he would do it or that you would

21   do it, but that you would put out this, a contract?

22   A    Yes.

23   Q    All right.  And in case anyone doesn't know what a contract

24   is, you're going to pay someone, some third party, to go murder

25   someone else?

1    A    Yes.

2    Q    With a handgun?

3    A    Yes.

4    Q    Okay.  Presumably?

5    A    Presumably.

6    Q    With a handgun?  Okay.  Over a fight in a bar, Mr. Rice's

7    solution to this problem is to hire some other person to murder

8    the person who was involved in the stabbing, correct?

9    A    Correct.

10   Q    Okay.  And your response to Mr. Rice was not, we should not

11   violate one of the ten commandments, but rather, we should use

12   caution and do this some other time, right?

13   A    Correct.

14   Q    All right.  So you don't have a problem or did not have a

15   problem with the general notion of hiring someone to murder

16   another human being, right?

17   A    Correct.

18   Q    Okay.  You're that kind of person, right?  Notwithstanding

19   the fact that you don't endeavor to engage in violence yourself,

20   you don't have a problem with the general notion of hiring a

21   third person to murder someone else, right?

22   A    At the time.  No.

23   Q    At the time.  But now you're a changed man, right?

24   A    Yes, sir.

25   Q    You're an honest, law-abiding, humane, civilized,

1    non-violent person today, right?

2    A    Yes.

3    Q    And that is because of the agreement that you have with the

4    government, right?

5    A    No.

6    Q    Why is that?

7    A    Just grew past that stuff.

8    Q    Grew past it.  Okay.  You did get arrested at some point in

9    time, right?

10    A    Yes.

11    Q    And you pled guilty to an offense involving the distribution

12    of narcotics, right?

13    A    Yes.

14    Q    And your plea agreement contains a stipulation of facts,

15    right?

16    A    Yes.

17    Q    Okay.  Let's look at that for one minute.  Can I have you

18    read this paragraph, please?

19    A    During the period charged in the conspiracy, the defendant

20    and his -- I can't see the other.  Okay.  During the period

21    charged in the conspiracy, the defendant and his coconspirators

22    distributed and possessed with intent to distribute more than

23    1500 kilograms of cocaine.

24    Q    Okay.  And have you been sentenced yet?

25    A    No.

1    Q    Okay.  So you have an agreement with the government and they

2    are going to make a motion to your sentencing judge and ask that

3    your sentence be reduced, right?

4    A    Yes.

5    Q    And notwithstanding the fact that they're going to make a

6    motion for a certain reduction, you can ask the judge to reduce

7    it even further, right?

8    A    Yes.

9    Q    And your expectation is that the government, including these

10   two prosecutors, will come to the judge and tell the judge you're

11   going to be sentenced in front of what a great witness you are,

12   right?

13   A    Yes.

14   Q    That you told the jury whatever they wanted to hear, right?

15   A    No.

16   Q    The truth, right?

17   A    Told the truth.

18   Q    Okay.  You were interviewed about this incident in 2002?

19   A    Yes.

20   Q    And you denied to be interviewed?  Did you deny knowing who

21   did it?

22   A    I didn't know who did it at the time.

23   Q    You didn't know who did it because you didn't see their

24   face?

25   A    Right.

1    Q    All right.  You didn't know who did it, but even if you did

2    know who did it --

3    A    Didn't know who did it.

4    Q    Even if you knew who did it, you weren't about to tell,

5    right?

6    A    I wouldn't have told them then.

7    Q    Because you were going to find out who did it and you were

8    going to kill that person?

9    A    No.

10   Q    You were going to find out who did it and the Rice

11   organization was going to kill that person?

12   A    No. I wouldn't have told them because that's just not my way

13   of thinking.  I wouldn't have.

14   Q    Your way of thinking is, I was assaulted; rather than

15   cooperate with the police and see that justice is done in a

16   civilized courtroom, I will talk to my colleagues and see that

17   the person is murdered.  That's how you were prepared to handle

18   the situation in 2002, right?

19   A    Yes.

20   Q    Okay.  And had they brought you -- they did bring you a

21   photo spread, right?

22   A    Yes, they did.

23   Q    And you didn't recognize anyone there or you did but you

24   weren't telling?

25   A    I didn't recognize anyone in there.

CROSS EXAMINATION OF ERIC CLASH BY LAWLOR                    243

1    Q    Okay.  And had you recognized someone in there, you weren't

2    about to tell, right?

3    A    Correct.

4    Q    Because you were going to see to it that this person

5    suffered a more severe fate than some time in jail, right?

6    A    No.

7    Q    No.  Okay.  When did you get arrested?

8    A    February 2nd, 2005.

9    Q    All right.  At any time between 2002, February, when you got

10   arrested in 2005, did you go to the authorities with your changed

11   perspective on the world and tell them who had assaulted you at

12   that bar, who you heard had assaulted you at that bar?

13   A    No.

14   Q    You did not?  Okay.  So after you were arrested, after you

15   entered into an agreement with the government, after you learned

16   the name of the person from someone whose face you never saw, now

17   that you're a changed man, that's when you told them who did it,

18   right?

19   A    I never told them who actually did, who actually did it.

20   Q    Right.  They told you, right?

21   A    No.

22   Q    Okay.  You didn't tell them and they didn't tell you?

23   A    No.  Let me rephrase that.  I'm sorry.  What happened with

24   the government was that they asked me about the stabbing.  I

25   explained to them everything that I told you today about how it

1    took place.  And they asked me did I see, did I know the

2    defendant was in the club?  Did I see his face?  I said no.  And

3    at that point, you know, I told them where I originally, how I

4    found out who the defendant was.

5    Q    Okay.  Because someone told you?

6    A    Correct.

7    Q    Okay.  So someone told you the person whose face you didn't

8    see, who you've identified in court as the man in the tan

9    sweater, is the guy that stabbed you six and a half years ago?

10   A    Yes.

11   Q    All right.  There you go.  No further questions.

12              THE COURT:  Anything further?

13              REDIRECT EXAMINATION

14   BY MR. HANLON:

15   Q    Yes, Your Honor, briefly.

16              Mr. Clash, let me ask you a question Mr. Lawlor didn't

17   let you answer.  How did you find out who stabbed you in the bar?

18   A    People were talking, just the, like within the next couple

19   of days after everything went.  And they was just, people were

20   coming to us, just telling us.

21              MR. LAWLOR:  Objection, Your Honor.  Hearsay.

22              THE COURT:  Overruled.

23   A    People were coming and just telling us that it was a guy by

24   the name of Bo.

25   Q    Now, did there ever come a time, sir, when you met anybody

1    by the name of Bo?

2    A    I've never personally met him.

3    Q    Have you ever seen an individual by the name of Bo that you,

4    whether you met him or not or were introduced to him, did you

5    ever see a person that you understood to be a person by the name

6    of Bo?

7    A    Yes.

8    Q    And where did you see that person?

9    A    At Supermax.

10   Q    What was the context?  How did you come to see this person

11   at Supermax?

12   A    My co, I was arrested.  My codefendant, a couple of my

13   codefendants pointed him out.

14   Q    And who was the person you saw in Supermax?

15   A    The guy right here with the sweater.

16   Q    The person you identified earlier?

17   A    Yes.

18   Q    Now, you were also asked a number of questions by Mr. Lawlor

19   about the reason why there were two plea agreements done in your

20   case, one for cooperation and one for non-cooperation?  You used

21   the term that it was to confuse the defense.  Has anybody from

22   the U.S. Attorney's office ever used that word with you?

23   A    No.

24   Q    Let me try to understand what you meant by "confuse the

25   defense."  What would be the purpose of not disclosing publicly

1    the fact that you're a cooperating witness in a drug case?

2    A    For my safety.

3    Q    Do you have any understanding or concerns about what would

4    happen to you if a plea agreement that identifies you as a

5    cooperator could be picked up as a public record while you're

6    still cooperating against members of that organization?

7    A    Yes.

8    Q    What would your concerns about?

9    A    Safety, family safety.

10   Q    So keeping that confidential until you have to come to

11   court, is that what you meant by confusion?

12   A    Yes.

13   Q    And is it your understanding that when you come to court,

14   prior to your coming to court, that your plea agreement, your

15   status as a cooperator is always produced to the defendant in any

16   case you're going to testify in?

17   A    Yes.

18   Q    Nothing further, Your Honor.

19        MR. LAWLOR:  Briefly, Your Honor.

20        THE COURT:  Very briefly, Mr. Lawlor.

21        RECROSS EXAMINATION

22   BY MR. LAWLOR:

23   Q    We can agree on the fact that the only reason you're here in

24   court today identifying that man as the man who stabbed you is

25   because someone told you that, right?

1    A    Yes.

2    Q    Thank you.

3         THE COURT:  You're excused, Mr. Clash.  Thank you very

4    much.  Now, ladies and gentlemen of the jury, before we break

5    today let me give you an instruction.

6         As you have just heard in both the direct examination

7    of Mr. Clash as well as the cross examination of Mr. Clash, Mr.

8    Clash, by his own testimony, did not see and cannot identify the

9    person who stabbed him at Hammerjacks.  He's been told, as you

10   heard, that it was Mr. Mitchell.  Mr. Mitchell was pointed out to

11   him, according to his testimony, as the person who stabbed him.

12   And that's the basis on which he testified in this courtroom that

13   Mr. Mitchell was the one who stabbed him.

14        You may not consider Mr. Clash's testimony identifying

15   Mr. Mitchell as the person who stabbed him as proof that Mr.

16   Mitchell actually committed the stabbing.  However, there are a

17   number of purposes that I will detail for you at a later time for

18   which you may consider this testimony.  For example, as you well

19   know, from what we've heard so far, part of what the government

20   intends to prove in this case is the motivation for certain acts

21   which are alleged to have been committed by Mr. Mitchell and the

22   other defendants.

23        It will be for you to decide, one, whether the

24   government has proven that any defendant committed any act.  And

25   it will be for you to decide, two, whether the government has

1    satisfied you by proving a motivation for any particular alleged

2    act.

3          So this testimony from Mr. Clash regarding his

4    conversations with the Rice brothers and others with whom he was

5    associated in the distribution of drugs may be considered by you

6    as evidence relating to the possibility of motivation by other

7    people to do or commit acts which are alleged to be relevant to

8    this case.

9          But again, I emphasize, Mr. Clash's testimony, and

10   specifically his identification of Mr. Mitchell as the person who

11   stabbed him, may not be accepted by you as affirmative proof that

12   Mr. Mitchell actually was the person who committed the stabbing.

13         Obviously, there will be other evidence, other

14   witnesses.  And if appropriate, I will make comments relevant to

15   this issue at that time.

16         So this will conclude our first week of trial.  Again,

17   I want to thank you for your conscientious adherence to my

18   instructions.

19         During this weekend recess, please enjoy yourselves.

20   The weather promises to be good.  I suggest to you that you

21   simply put the case out of your mind entirely, get back to your

22   regular lives, enjoy your families, enjoy the outdoors.  This is

23   one of those times, I guess, when we're seeing basketball,

24   football, baseball, college football, and lots of diversions.  So

25   enjoy yourself.

1          Continue to avoid any exposure, media exposure about

2     this case.  I'm not aware that there has been any, but there may

3     well have been some.  But continue to avoid any broadcasts, radio

4     or television, cable, or print media.  If you think you encounter

5     an article or broadcast about this case, change the station, turn

6     off the TV, don't read any such article.

7          Do not discuss the case or any of the evidence you've

8     heard so far.  Continue to keep an open mind about all issues.

9     We still have quite a ways to go.

10         Do not conduct any investigation of any sort, not

11    online.  Don't visit any locations.  Don't look up any words.

12    Don't use any books, pictures, or any media at all to conduct any

13    sort of investigation whatsoever.

14         Enjoy your weekend, ladies and gentlemen.  We'll see

15    you Monday morning 9:30 and the case will resume at that time.

16    Enjoy your weekend.  Jury is excused until 9:30 Monday morning.

17         (Jury exits the courtroom.)

18         THE COURT:  Mr. Lawlor, I would invite you to make

19    whatever record you think is necessary at this time.  And of

20    course I'll consider any further instructions that you might wish

21    to propose next week.

22         MR. LAWLOR:  I think Mr. Martin will have a motion

23    concerning the Court's sort of sua sponte limiting instruction.

24         THE COURT:  I'll hear all of counsel in turn.

25         MR. LAWLOR:  I leave that to him.  And I appreciate

1    what the Court said about the jury's consideration, a limited

2    consideration of this.  From the vantage point of Mr. Mitchell,

3    the limiting instruction that, this particular limiting

4    instruction that was just given is insufficient.  This is

5    hearsay.

6             THE COURT:  It's not hearsay.  It's specifically, I

7    specifically instructed the jury that the jury could not use the

8    evidence for any hearsay purpose.  Now, you can complain about

9    the sufficiency of the instruction.  And as I say, I'll be glad

10   to elaborate on any instruction you wish to propose.

11            MR. LAWLOR:  Your Honor, I understand the Court's

12   ruling and the Court's instruction and I don't mean to continue

13   the argument.  I only want to just make this objection for the

14   record, which is that from our vantage point, notwithstanding the

15   Court's instruction, this remains hearsay and a denial of Mr.

16   Mitchell's right to confront, his confrontation rights.

17            As I said, not to be repetitive, but given that fact,

18   we don't think that the Court's limiting instruction is

19   sufficient.

20            THE COURT:  All right.  Submit to me whatever you'd

21   like.  I'll consider whatever you submit.  Yes, Mr. Martin.

22            MR. MARTIN:  Well, Your Honor, since I've been offered

23   up, I guess I'll --

24            THE COURT:  No, don't feel compelled.

25            MR. MARTIN:  With all due respect, Your Honor, my

1   feeling about this is, while I appreciate the Court trying to

2   take action at the appropriate time and not wanting to waste a

3   lot of everybody's time, I would like us to be able to have some

4   discussion about instructions you're going to give the jury

5   before you do it.  I might have, if I had time to think about it,

6   been able to suggest something different.

7           THE COURT:  I'll be happy to elaborate on the basis of

8   a submission from anybody.

9           MR. MARTIN:  And without incurring your wrath, I --

10          THE COURT:  No wrath here.

11          MR. MARTIN:  -- I'm sitting there as you're giving the

12  instruction, thinking that something has gone wrong with the

13  government's case.  And it sounds like the Court's formulating

14  the government's next theory for them.  And I would appreciate

15  having some input.

16          THE COURT:  I'm not formulating at theory at all.  All

17  I've been hearing about in this case is that a principal

18  motivation for all kinds of acts in this case was the fight at

19  Hammerjacks.  The fight at Hammerjacks and the discussion among

20  the Rice people are verbal acts.  It's not hearsay.  It's verbal

21  acts.  It's circumstantial evidence of Mr. Mitchell's motivation.

22          Now, the government doesn't have to prove motivation

23  but the government is entitled to prove motivation.  And it's

24  been mentioned in opening statement.  There's clearly no undue

25  prejudice to Mr. Mitchell.

1          I just don't believe it's hearsay and I don't believe

2     it's over the line at all.  I don't think I've formulated any

3     theory for the government.  It's what the government's been

4     telling me for the last four years about this case.

5          MR. MARTIN:  Okay.  Thank you, Your Honor.

6          THE COURT:  Anybody else want to weigh in?  Mr.

7     Kurland?

8          MR. KURLAND:  Your Honor, I don't want to get into a

9     fight with my co-defense counsel, and I have some quarrel with

10    the Court's rulings.  But on that one, I believe as an every

11    matter the Court is correct.

12         THE COURT:  Mr. Kurland, you're my kind of guy.

13         MR. KURLAND:  But I actually have a more, a more

14    pressing issue.

15         THE COURT:  You're all my kind of guys except Ms.

16    Rhodes, and she's my kind of gal.

17         MR. KURLAND:  Your Honor, while I'm hoping that this

18    might be able to be resolved between our side and the government,

19    I've got an issue with respect to the Court's 48 hour

20    notification of witnesses.  The government appears to be taking

21    the position that that's 48 hours as opposed to 48 business

22    hours.  That makes it --

23         THE COURT:  It's 48 hours by the clock.

24         MR. KURLAND:  So over the weekend -- well, then, I've

25    got an issue because the government sometimes sends me notices.

1    And maybe it's the government's arcane computer or my arcane

2    computer.  But I often cannot open what the government sends.

3              And so with respect to the 48 hours, we're not going to

4    know until Saturday morning at nine their witnesses for Monday?

5    Is that what I understand?

6              THE COURT:  That's my ruling.  But let's talk about

7    this.  What is the problem, exactly?

8              MR. KURLAND:  Well, it would seem to me --

9              THE COURT:  In other words, we started the witnesses

10   yesterday.  When did you learn of the name, or actually Tuesday

11   we had a couple witnesses.

12             MR. KURLAND:  I don't think --

13             THE COURT:  Actually, we didn't have witnesses on

14   Tuesday.  We had witnesses on Wednesday.

15             MR. KURLAND:  Well, I think the problem is coming for

16   this Monday.

17             THE COURT:  I'm sure they'll tell you right now who

18   is --

19             MR. KURLAND:  I would love it if they would.

20             THE COURT:  Of course they will.  Of course they will.

21             MR. KURLAND:  Could I then really push one more thing?

22             THE COURT:  Go ahead.

23             MR. KURLAND:  Because next week we're just meeting

24   Monday, Tuesday and Wednesday, because of some travel logistics

25   and keeping boxes in one place or another, maybe just for this

254

1  week, and subject to working out an agreement, if the government

2  is going to disclose 48 hours, could they disclose for Monday,

3  Tuesday, Wednesday?

4        THE COURT:  Sure.  I'm sure Mr. Harding and Mr. Hanlon

5  can do that.  At least give us the universe of potential

6  witnesses.  I'm not going to hold them to who they're going to

7  call on Wednesday morning.  But I'm sure they can tell us who

8  they think is coming up.

9        MR. KURLAND:  I would appreciate that, Your Honor.

10  Thank you.

11        THE COURT:  Sure.

12        MR. KURLAND:  Mr. Coburn, anything else?

13        MR. COBURN:  No.

14        THE COURT:  All right.  Mr. Harding, Mr. Hanlon?

15        MR. HARDING:  Judge --

16        THE COURT:  First of all, does the government have any

17  concerns about my instructions, my limiting instruction?  And if

18  you do, say so.

19        MR. HARDING:  The limiting instruction you gave to the

20  jury?

21        THE COURT:  Yes.

22        MR. HARDING:  No.  No concerns, Your Honor.

23        THE COURT:  What will be the other evidence, just so

24  we're not sweating this over the weekend?  What other evidence

25  will you have, Mr. Harding, that Mr. Mitchell was the actual

1    perpetrator of the stabbing?  And not in detail.

2              MR. HARDING:  Statements made by Mr., especially by Mr.

3    Harris.

4              THE COURT:  Which are in furtherance of the conspiracy?

5              MR. HARDING:  Oh, yes.  Yes.

6              THE COURT:  Any others?

7              MR. HARDING:  Well, there are also some statements by

8    Mr. Mitchell that, that are less direct.

9              THE COURT:  Can you just remind us what those

10   statements are?

11             MR. HARDING:  Statements made to various cooperators in

12   this case.  And the defense has the grand jury testimony of all

13   the cooperators.  So they are not in the dark about this.

14             THE COURT:  Are they statements?  When you say

15   indirect, obviously, it's not disputed that Mr. Mitchell was

16   present at Hammerjacks.

17             MR. HARDING:  I don't know.  Maybe it is.

18             THE COURT:  Well, okay.  What's the nature of the

19   statements to the coconspirators?  In other words, are any of the

20   statements, alleged statements by Mr. Mitchell regarding his

21   concern or alleged concern that a contract is out on him --

22             MR. HARDING:  Oh, yes.

23             THE COURT:  -- as a result of a Hammerjacks stabbing or

24   fracas?

25             MR. HARDING:  In fact, Your Honor, we put Mr.

1    Mitchell's, we put Jacquetta Smith in the grand jury and she

2    testified that Mr. Mitchell told her that there was a contract

3    out on him.

4              THE COURT:  And that's her, his baby's mother?

5              MR. HARDING:  Yes, Your Honor.

6              THE COURT:  Okay.  All right.  So on the question of

7    next week, can you give us, can you give us Monday for sure and

8    sort of Tuesday and Wednesday likely?  Likely witnesses now?  Or

9    at least the subject matter.

10             MR. HARDING:  Well, we have, we have some leftover

11   witnesses from this week.  We're a little behind schedule.

12             THE COURT:  Okay.

13             MR. HARDING:  So the defense already knows about

14   Russell Robard, Travis Golder, Terry Labbe, Kenneth Jones, who's

15   the DNA expert.  Other witnesses will include -- basically, the

16   next set of witnesses have to do with the McCaffity/Brown

17   homicides.  We have the investigating homicide detective, Ronald

18   Berger, a paramedic who came to the scene, Morsley.  A ballistics

19   expert.  Another crime scene technician.  A fingerprint expert,

20   the one who took the palm print.  Jacquetta Smith is scheduled to

21   testify.

22             THE COURT:  Okay.  That sounds like next week to me.

23   Are you going to hold off on the medical examiner until you've

24   got all the murders in?

25             MR. HARDING:  Yes, Your Honor.

1          THE COURT:  All right.

2          MR. HARDING:  And the same, I should say that we

3    anticipate calling the Deputy Chief Medical Examiner to testify

4    about all five autopsies.  She performed two of them herself.

5    The other three she is testifying about simply as a custodian of

6    the autopsy records of people below her in the Medical Examiner's

7    Office.

8          THE COURT:  Okay.  Just a thought, Mr. Harding.  I

9    deeply appreciate your desire not to inconvenience the doctor.

10   But I think that could be rather much.  If you have a medical

11   examiner on the stand from nine until who knows when going over

12   five autopsies with photographs, that could be rather much in one

13   day.  So I invite you to rethink that and to perhaps break it up

14   into at least two days.  Just a thought.

15         I mean, I think there are human limits to what people

16   can take.  I'm not speaking for myself.  But speaking --

17         MR. HARDING:  Are you concerned about the doctor or

18   about somebody else?

19         THE COURT:  Concerned about the evidence and the, and

20   the burden on the jurors to have to sit here all day and think

21   about nothing but murder and dead bodies for, for eight hours.

22         MR. HARDING:  Well, once again, I think I'm more

23   optimistic than Your Honor.  I've done this before and it doesn't

24   take an inordinate amount of time.  I anticipate this testimony

25   lasting perhaps an hour and a half on direct.  And I don't

1    anticipate it taking long on cross, either.  Because, frankly,

2    the autopsies are not, they aren't crucial issues in this case.

3         THE COURT:  Well, except we've got these questions

4    about how many guns and --

5         MR. HARDING:  Those aren't questions the, those are

6    questions for the ballistics expert.

7         THE COURT:  No.  I think counsel might well want to --

8    I mean, Mr. Coburn's shaking his head.  This is not, this is not,

9    and Mr. Lawlor --

10         MR. LAWLOR:  Your Honor, I will say from the

11    government's, we won't have much, if anything.

12         THE COURT:  All right.  Well, it's just a thought.  If

13    you think you can do it in an hour and a half, fine.  I just

14    wonder if it might be better to break it up.

15         You could say well, Judge, doing it twice is twice as

16    bad as spending a full morning on it.

17         MR. HARDING:  Would the Court recommend I bring the

18    medical examiner back two different days?

19         THE COURT:  That's what I'm saying.

20         MR. HARDING:  Okay.

21         THE COURT:  That's what I'm saying.  Rather than -- I

22    mean, if you really think you can do it in an hour and a half,

23    which I seriously doubt, in fact, I'm sure you can't do it in an

24    hour and a half, direct and -- well, you said on direct.  I just

25    think it ought to be broken up into two days.

1          MR. HARDING:  All right.  I'll try to work that out.

2          THE COURT:  But it's up to you.  It's just a thought.

3  I just, I'm thinking about the jury.  That's all.

4          How we doing on the palm print visit?

5          MR. HARDING:  It's arranged for tomorrow morning, Your

6  Honor.

7          THE COURT:  Excellent.  Excellent.  Thank you very

8  much.  Who gets the, who from your office gets the thank you?

9  You're not sure yet.

10          MR. HARDING:  It turns out, Your Honor, that because

11  Mr. Flannery and Mr. Martin have decided not to attend this --

12          THE COURT:  Oh, so the lawyer won't be there --

13          MR. HARDING:  Yes.  I'm not going to have to be there,

14  either.  I'm required to be there if the defense attorneys are

15  there.  And my initial understanding was that they were going to

16  be there, but they told me today they weren't.

17          THE COURT:  Okay.  Great.  So that's worked out.

18          I think you're satisfied, Mr. Kurland.  We have a

19  pretty clear --

20          MR. KURLAND:  For this week, yes.  Thank you very much.

21          THE COURT:  Pretty clear indication of who's going to

22  be here next week.  Okay.  Anything further for the good of the

23  order?

24          MR. HARDING:  I did have one point that I don't expect

25  the Court to decide.

1          THE COURT:  Oh, one other thing.  I'm sorry, Mr.

2     Harding.  Is the DNA guy going to have a Power Point?

3          MR. HARDING:  No.

4          THE COURT:  Telling him to have a power point, please.

5     I mean, really.

6          MR. HARDING:  Okay.

7          THE COURT:  Please.  Please.

8          MR. HARDING:  What if he's not --

9          THE COURT:  He's got visuals?  Does he have any

10    visuals?

11         MR. HARDING:  He has his report, which has charts in

12    it.

13         THE COURT:  Charts?  Pie charts?  Graphs?  No.  No.

14    No.  We need a Power Point.  Tell him the judge says spend a few

15    hours on Saturday putting together just a few slides.  My

16    goodness.  Help the jury out.

17         MR. HARDING:  Okay.  The one issue I wanted to raise,

18    you heard Mr. Pyne today ask the witness, Mr. Bacon, if he could

19    identify any of the voices on the tape.

20         THE COURT:  And I heard Mr. Bacon say it wasn't Mr.

21    Martin on the tape, in his opinion.

22         MR. HARDING:  Right.  But here's the problem that will

23    arrive very soon.  It's something like the problem with these

24    convictions and acquittals and stets and nol prosses that the

25    cops could or could not testify about.

1          We have a bunch of witnesses who identify certain

2     voices on the tape.  Somebody might identify Mr. Martin and Mr.

3     Gardner and somebody else might identify Mr. Harris.  And

4     somebody else might identify Mr. Mitchell and Mr. Gardner and Mr.

5     Harris but not the other one.  The government is intending not to

6     ask these people who they can identify.  But the defense

7     attorneys will, of course, try, if they can, whenever it's to

8     their advantage, to get up and get the witness to say that their

9     client was not identified.  And so --

10          THE COURT:  I get your point.

11          MR. HARDING:  If the government is not going to elicit

12     who they can identify, just because Your Honor expressed some, a

13     long time ago at a suppression hearing Your Honor discouraged the

14     government from eliciting too many of these ID's and we have so

15     far agreed only, we so far, our intent is to elicit ID's from one

16     person.

17          THE COURT:  One witness?

18          MR. HARDING:  Yes.

19          THE COURT:  Okay.  And we need to schedule that

20     hearing, of course, you remember?

21          MR. HARDING:  Okay.  It can be, can it be on a regular

22     court date, just outside the presence of the jury?

23          THE COURT:  Yeah.  Like to schedule it -- give me

24     advance notice so I can bring the jury in later or preferably let

25     them leave earlier.  I would like to do at the end of the day.

1              MR. HARDING:  Okay.

2              THE COURT:  Like three to o'clock or something one day?

3              MR. HARDING:  I mean, next week we'll have witnesses

4    who will be able to identify two of the defendants and not the

5    other two and vice versa.  So what do we do about that?  I would

6    like the Court to think about that.  I don't expect --

7              THE COURT:  Well, I have been thinking about it ever

8    since Mr. Pyne asked the question.  I was somewhat surprised.  I

9    was somewhat surprised that you didn't object.  I don't know how

10   I would have ruled.  It was arguably outside the scope of direct.

11   Arguably, maybe not.  But you raise a very valid concern.  And so

12   perhaps we ought to take just a second now, if somebody's

13   prepared to address that.  Maybe Mr. Pyne, we should start with

14   you.

15             MR. LAWLOR:  Actually, just before, Your Honor.

16             THE COURT:  Mr. Lawlor.

17             MR. LAWLOR:  To advance the debate, could we find out

18   who is going to identify whom?

19             THE COURT:  Well, Mr. Harding says there's only one

20   witness that made an identification that the government intends

21   to use.

22             MR. LAWLOR:  Right.

23             THE COURT:  What he's saying is, there are other

24   witnesses, some of whom made some identifications and not others.

25   And his point is the defense shouldn't be permitted to cherry

263

1  pick and ask the witnesses that you know from discovery didn't

2  make an identification, leaving the government --

3          MR. LAWLOR:  Yeah.

4          THE COURT:  -- without having elicited affirmative

5  identification.

6          MR. LAWLOR:  I'm going to leave that debate to my wiser

7  colleagues.  I just think the debate will be advanced by

8  knowledge from the four of us, which two of us really have a dog

9  in this fight.

10         THE COURT:  Well, Mr. Harding?

11         MR. HARDING:  I have given notice, Your Honor.

12         THE COURT:  I'm sure you have.  But can you just state

13 for the record what witness will identify a defendant and which

14 defendant or defendants will that witness identify from the tape?

15 Are you able to do that now?

16         MR. HARDING:  Well, I can identify.  The witness is

17 Rodney Hayes and he's going to identify Mr. Mitchell and Mr.

18 Harris's voice.  And the reason I, the reason I seek to use him

19 is that he is quite adamant about his identifications and because

20 he knows them very well and because he also is very familiar with

21 their voices from the rap music business and just years of

22 talking to them.

23         THE COURT:  Okay.

24         MR. HARDING:  I have other witnesses who have also had

25 years of talking to these people and they, some of them identify

1    Mr. Mitchell and Mr. Gardner or Mr. Mitchell and Mr. Martin.

2            THE COURT:  Okay.  So Mr. Pyne's question was largely

3    of no moment since, at least as things stand now, you never

4    intended to elicit an identification of Mr. Martin.

5            So Mr. Lawlor and Mr. Martin, Esquire, it's really on

6    you.

7            MR. LAWLOR:  Right.  Your Honor, rather than answer the

8    question about what questions I might ask of what witnesses, I

9    would just put to the Court, it sounds to me like the government

10   is suggesting that we should accept Mr. Hayes's identification of

11   our client as the voice on this tape and leave that unrebutted.

12   We think that another witness -- say, for example, there are

13   definitely two voices on the tape and say, for example, there was

14   some witness who would say, I know those two voices and they are

15   affirmatively John Smith and Sally Smith, or would affirmatively

16   say, I don't know who they are but I know they're not Mr.

17   Mitchell, that is relevant evidence.  And we would certainly want

18   to elicit that either through cross examination of the

19   government's witnesses or through the calling of witnesses in the

20   defense case in chief.

21           We think it's relevant evidence under 401 and we

22   certainly think, again, I don't, I can't anticipate the cross

23   examination so I don't want to get into that.

24           THE COURT:  I agree with you.  So it's really a

25   problem, again, of fairness and management.  Now, let's say

265

1    hypothetically --

2              MR. LAWLOR:  And I'm all about fairness.

3              THE COURT:  Absolutely.  Let's say hypothetically there

4    are five witnesses who made some identifications and an

5    overlapping additional three witnesses who made no

6    identifications.  So we have eight people who, let's just say

7    hypothetically, listened to the tape, who know the defendants

8    reasonably well, and would plausibly be able to identify their

9    voice ordinarily.

10             So here's the problem, as I see it.  The government

11   says, We have the burden to prove that it's X's voice on the tape

12   and we've identified one witness, if not uniquely qualified to

13   identify the voice, at least especially enabled to identify the

14   voice.

15             Now, what I hear you saying is, Okay, Judge, that's

16   fine, but if we've got one or two people who say either, I hear

17   that voice, that is not Mr. Mitchell's voice or, I hear the tape,

18   I know Mr. Mitchell's voice, and I don't hear Mr. Mitchell's

19   voice on that tape, I absolutely agree with you that you're

20   entitled to do that.

21             MR. LAWLOR:  Two thumbs up.

22             THE COURT:  So the trial management question is, how do

23   we do it in a way that you don't wait until cross examination?

24   Because I'm assuming, and this may be incorrect and unwarranted,

25   you know from the government's discovery who has made an

1    identification, who hasn't made an identification, and who would

2    say affirmatively that is not Mr. Mitchell's voice.  Do you have

3    that knowledge?

4              MR. LAWLOR:  I can't rattle that off but what the Court

5    said, I think, is fair.

6              THE COURT:  Okay.  So it seems to me it's simply a

7    matter of you discussing with Mr. Harding, and reaching agreement

8    if you can, of which witnesses you will call in your case or on

9    cross examination you will elicit negative voice identification,

10   if that's what you want to do.  And otherwise, I mean, I guess

11   we're going to have to have a full day hearing on all the

12   witnesses if the government wants to elicit some of these other

13   identifications.

14             MR. LAWLOR:  I guess the thing is, Your Honor, I'm at a

15   little bit of a disadvantage here because we're talking in the

16   abstract and I don't know who they intend to call and what --

17   perhaps I dozed off for a moment.

18             THE COURT:  He just told you.

19             MR. LAWLOR:  No, no, no.  Who they intend to call other

20   than Mr. Hayes, that they're worried about us sandbagging them,

21   for lack of a better term, on cross.

22             THE COURT:  I don't understand why you need to know

23   that.

24             MR. LAWLOR:  Just for the sake of discussion, you're

25   asking me to answer a question that is too hypothetical for me to

1   answer.

2           THE COURT:  Okay.  I don't understand why it's too

3   hypothetical for you to answer.  Again, the government says,

4   Judge, we've got one witness who will affirmatively and

5   apparently emphatically testify that Mr. Mitchell's voice is on

6   that tape.  All right?  So at face -- and we still got to have a

7   hearing.

8           MR. LAWLOR:  With you so far.

9           THE COURT:  So you'll cross examine that witness and

10  you'll do what you do to undermine that witness' identification

11  of Mr. Mitchell's voice on the tape.  Okay.

12          The government doesn't intend at this point to elicit a

13  voice identification from any other witness.  Obviously, there

14  will be other witnesses who will have attempted to make a voice

15  identification and perhaps even witnesses who have made a voice

16  identification that will be called by the government.  And I

17  suspect there will be witnesses who will be called by the

18  government in its case in chief who were not able to make a voice

19  identification.  And that's Brady.  And that's been turned over

20  to you, no question about it.

21          MR. LAWLOR:  No problems there, right.

22          THE COURT:  So that's where we are.  Surely, you're not

23  suggesting, or maybe you are, but you're not suggesting that

24  you're entitled to elicit, let's just say again hypothetically,

25  negative identification testimony the way Mr. Pyne did from three

1    witnesses so that you can then argue in closing argument, well,

2    it's not a numbers game, ladies and gentlemen, but only one

3    witness identified Mr. Mitchell's voice, but three others either

4    couldn't or affirmatively said they couldn't under circumstances

5    where the government is suggesting to the Court that, in fact,

6    there are other witnesses who could identify Mr. Mitchell.

7    Perhaps not with the, with the level of certainty of the one they

8    intend to call.

9         So I just want to know what you want to do.  And so do

10   you, would you not be satisfied with one negative response?

11        MR. LAWLOR:  Your Honor, I guess part of problem is,

12   and I'm not trying to quarrel with you here.

13        THE COURT:  No, of course not.

14        MR. LAWLOR:  This is way too abstract for me maybe

15   because it's the end of the week.

16        THE COURT:  Okay.  Fair enough.  Fair enough.

17        MR. LAWLOR:  But I will tell the Court that we are

18   certainly not going to be satisfied and we will seek to elicit

19   either in cross with notice to the government or in our case in

20   chief affirmative identifications of individuals other than Mr.

21   Mitchell or lack of identification of someone who's listened to

22   the tape and knows the voice of Mr. Mitchell.  We certainly will

23   want to do that.

24        THE COURT:  With that understanding, I certainly invite

25   the government to rethink its decision to call only one

1    identification witness.

2           MR. LAWLOR:  Okay.

3           THE COURT:  I'm not trying anybody's case.  I'm really

4    not.  I appreciated the government choosing one because, frankly,

5    I largely agreed with Mr. Martin and with all of you, the tape is

6    very poor quality and, frankly, I'm hoping we don't spend a whole

7    lot of time on that.  But maybe we need to.  And if we need to,

8    we will.

9           But, you know, at the end of the day if you've got, you

10   know, nine witnesses, one of whom says that's definitely Mr.

11   Mitchell's voice, two of whom say, I'm pretty sure that's Mr.

12   Mitchell's voice, three of whom say, I'm not sure if that's Mr.

13   Mitchell's voice or not, and three or four of whom say that's not

14   Mr. Mitchell's voice, you know, we will have spent an awful lot

15   of time --

16          MR. LAWLOR:  Judge, I just want to say two very brief

17   things.  First is that, I think we're sort of getting into a,

18   just a sort of discussion here as opposed to a real helpful, you

19   know, debate for a ruling from the Court.

20          But I don't think you can ask, I don't think --

21          THE COURT:  There's nothing before me.  I'm not ruling

22   now.  Go ahead.

23          MR. LAWLOR:  I don't think you can ask us to be

24   satisfied with one witness coming in, identifying our client.

25   That was point number one.

1          Point number two is, I'm going to turn this over to Mr.

2     Martin, who's smarter and more concise.

3          THE COURT:  Mr. Martin.

4          MR. MARTIN:  Your Honor, I think you've said it.  We

5     will, one of the issues is how many people were there.  The FBI

6     expert said no more than three.  At some point in this case I

7     heard the government say all four were there.  That may still be

8     their theory, although I don't know if I heard Mr. Harding say

9     that in his opening.

10          Obviously, our position is Mr. Harris wasn't there.

11     We're going to attempt to prove that during the course of this

12     trial.  And so we've had, you know, in the beginning nobody

13     identified him.  Now they've got Mr. Hayes, and at one point he

14     said that Detective Benson was going to identify him.  So whoever

15     said other people were there, it's important for us to bring that

16     out.  People who knew them and have the foundation to say that.

17     It's important for us to bring that out.

18          I think you said we could do that.  I think this whole

19     discussion began because Mr. Harding says he's only going to call

20     one witness for that purpose, but there are other people he's

21     going to call who were asked to make ID's and who knew the people

22     and could make them.  He's not going to ask them about it.

23          I think if he does that, we either get to ask that in

24     cross or we get to bring them back in our own case.  As long as

25     I'm understanding that, I don't have a gripe.

1    THE COURT:  Okay.  Well, I think where we are, I don't

2    think I need to hear from you, Mr. Kurland, but I will.  I think

3    where we are now, Mr. Harding, Mr. Hanlon, is you probably ought

4    to arrange, whenever we schedule this hearing, I think the more

5    prudent course is to bring in all of the voice identification

6    witnesses and let's just go through it, voir dire them, so you

7    can satisfy your, you know, the reliability prong on whoever will

8    make an identification.

9    And then, I mean, I agree with Mr. Lawlor and Mr.

10   Martin.  To the extent they want to bring in, if they want to

11   bring in nine people who say that's not their client's voice on

12   the tape, they're entitled to do that, either on cross or in the

13   defense case.

14   And that also would bring Mr. Gardner and Mr. Martin

15   into it because Mr. Harding was trying to limit it with this one

16   witness who will only make the identifications of Mr. Mitchell

17   and Mr. Harris.  But if we open it up, then it sounds like

18   probably there's going to be at least a tentative identification

19   of Mr. Gardner.

20   MR. KURLAND:  Your Honor, first off, if the government

21   is only going to call one, we were frankly very happy with the

22   government's representation.

23   THE COURT:  I'm sure you are.

24   MR. KURLAND:  It would seem to me, Your Honor, that

25   anything, if the government would not elicit from other witnesses

1    anything about the ID, it's beyond the scope of direct.  And then

2    it becomes a defense case issue.  But then, Your Honor, if my

3    codefendants, counsel, would then get into that, that's going to

4    raise a severance issue.

5              THE COURT:  Well --

6              MR. KURLAND:  This would not have come in in the

7    separate trial of Mr. Gardner.  Either it would have to be

8    redacted in a certain way, particularly if somebody else is

9    calling them.  There are ways to do it but I just want to put on

10   the record that the government's representation was acceptable to

11   us.  And if the, if other defendants are going to essentially

12   open the door and get into areas that end up having a witness

13   elicit identification of Mr. Gardner, my co-counsel and I are

14   going to talk very seriously about whether or not -- that

15   certainly raises severance implications.

16             THE COURT:  Okay.

17             MR. KURLAND:  Unless there's a way to fashion it, of

18   the testimony coming in a certain way that doesn't even

19   indirectly implicate my client.

20             THE COURT:  Okay.  Mr. Harding, would you approach the

21   lectern, please?  First, do you want to offer any response to

22   this colloquy with counsel?

23             MR. HARDING:  Well, if Mr. Kurland is talking about a

24   Bruton problem, I certainly disagree that this is --

25             THE COURT:  No.  I don't think he meant Bruton

1    particularly.  But I understand what he says.  You don't have to

2    respond to that.  I was really talking about Mr. Lawlor and

3    Martin on the voice identification.

4              MR. HARDING:  Well, Your Honor, if the Court going to

5    allow Mr. Lawlor and Mr. Martin to do what they say they're going

6    to do, I don't see any alternative --

7              THE COURT:  Okay.

8              MR. HARDING:  -- but for us to -- I don't even see a

9    need for voir dire, Your Honor.  The witnesses --

10             THE COURT:  No, there is a need for voir dire because

11   there's been a proper motion to suppress voice identification.

12   And prima facie, I think I've ruled with some level of clarity

13   that there was suggestiveness.  So rather than set aside a whole

14   day and have you bring in all 9 or 11 or 13 people who fall into

15   this category, I will acquiesce, if you want to do it witness by

16   witness --

17             MR. HARDING:  That's my preference.

18             THE COURT:  --we can do it that way.  We can do it that

19   way.  So when you have an identification witness, we'll either

20   take an early recess or a later recess or come back early or

21   start early or stay a little later in order to do, well, it will

22   have to be before the witness testifies, of course.  We can do

23   this seriatim for each witness.  I'm not going to require you to

24   bring everybody in on a single consolidated hearing basis.  Okay?

25             I think the hearings are going to be fairly brief.  In

1    fact, I know they're going to be fairly brief.

2              MR. HARDING:  I think you're right.

3              THE COURT:  Thank you very much, counsel.  We're in

4    recess until 9:30 Monday morning.

5              (Conclusion of Proceedings at 5:23 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

275

1                            INDEX

2

3                                                    PAGE
  WITNESS: DEREK HERNDON
4 DIRECT EXAMINATION BY MR. HARDING              10
  CROSS EXAMINATION BY MR. COBURN                18
5
  WITNESS: DARRYL BACON
6 DIRECT EXAMINATION BY MR. HARDING              22
  CROSS EXAMINATION BY MR. LAWLOR               121
7 CROSS EXAMINATION BY MR. PYNE                 158
  CROSS EXAMINATION BY MR. COBURN              166
8 REDIRECT EXAMINATION BY MR. HARDING          182
  RECROSS EXAMINATION BY MR. LAWLOR            192
9
  WITNESS: ERIC CLASH
10 DIRECT EXAMINATION BY MR. HANLON             196
   CROSS EXAMINATION BY MR. LAWLOR             224
11 REDIRECT EXAMINATION BY MR. HANLON           244
   RECROSS EXAMINATION BY MR. LAWLOR           246
12

13

14

15

16

17

18

19

20

21

22

23

24

25

276

REPORTER'S CERTIFICATE

3      I, Mary M. Zajac, do hereby certify that I recorded stenographically the proceedings in the matter of USA v. Willie Mitchell, et al., Case Number(s) AMD-04-029, on September 18, 2008.

      I further certify that the foregoing pages constitute the official transcript of proceedings as transcribed by me to the within matter in a complete and accurate manner.

      In Witness Whereof, I have hereunto affixed my signature this _____ day of _____, 2009.


_____
Mary M. Zajac,
Official Court Reporter

## $

**$10,000** [1] - 231:23
**$15,000** [1] - 231:21
**$200** [1] - 113:17
**$3500** [1] - 153:19
**$400** [2] - 110:22, 110:23
**$48,000** [1] - 231:18
**$500** [3] - 71:22, 71:23, 155:25

## '

**'04** [4] - 124:14, 124:15, 177:6, 177:7
**'05** [1] - 197:18
**'07** [3] - 180:18, 180:20, 180:21
**'08** [1] - 124:14
**'90s** [3] - 53:16, 132:9, 225:4
**'92** [1] - 41:19
**'93** [4] - 37:4, 41:19, 121:23, 121:24
**'94** [3] - 122:2, 122:3, 130:2
**'95** [1] - 130:2
**'96** [2] - 197:18, 206:14
**'98** [7] - 31:21, 31:24, 71:9, 71:10, 82:16, 184:17
**'99** [5] - 31:22, 51:6, 51:7, 100:1, 184:23

## 1

**1,200** [1] - 181:18
**1,500** [1] - 181:18
**10** [3] - 74:12, 209:4, 275:4
**101** [1] - 1:25
**10:30** [1] - 209:4
**11** [1] - 273:14
**12** [5] - 35:23, 41:21, 46:11, 124:19, 233:15
**121** [1] - 275:6
**12:45** [1] - 120:15
**12th** [6] - 30:23, 117:3, 171:16, 173:12, 178:14, 197:4
**13** [4] - 10:13, 35:23, 41:21, 273:14
**14** [2] - 123:1, 193:1
**142nd** [2] - 67:16, 67:17
**15** [10] - 17:22, 46:12, 74:8, 74:23, 122:6, 122:7, 122:11, 193:1,

194:15, 195:6
**1500** [2] - 73:15, 240:23
**158** [1] - 275:7
**15th** [1] - 86:16
**16** [5] - 17:20, 122:9, 122:12, 122:15, 124:3
**1600** [1] - 11:13
**166** [1] - 275:7
**17** [1] - 12:10
**17th** [12] - 3:13, 26:1, 27:24, 178:12, 178:17, 180:6, 180:25, 198:18, 199:9, 199:17, 199:21, 200:18
**18** [3] - 1:11, 275:4, 276:5
**1800** [1] - 12:10
**182** [1] - 275:8
**18th** [1] - 206:21
**192** [1] - 275:8
**196** [1] - 275:10
**1990's** [1] - 80:16
**1994** [5] - 38:25, 121:22, 122:5, 122:11, 123:8
**1996** [4] - 197:8, 197:9, 197:15, 203:19
**1997** [1] - 184:17
**1998** [7] - 10:15, 10:17, 19:4, 86:16, 94:3, 100:1, 184:23

## 2

**2** [1] - 183:18
**20** [2] - 74:12, 193:7
**20,000** [1] - 156:18
**200** [1] - 110:24
**2000** [21] - 31:22, 50:20, 50:25, 51:2, 51:9, 51:11, 73:15, 80:17, 100:2, 103:22, 106:24, 134:11, 168:9, 168:14, 168:20, 169:22, 170:2, 170:4, 170:11, 177:4, 181:18
**2001** [3] - 107:21, 221:22
**2002** [14] - 108:12, 108:21, 109:14, 115:2, 147:7, 147:8, 147:12, 157:19, 206:21, 222:15, 233:4, 241:18, 242:18, 243:9
**2003** [8] - 50:25, 106:24, 118:22, 134:11, 170:5, 170:11, 171:5, 171:7
**2004** [18] - 26:1, 27:24, 30:23, 31:22, 72:10,

72:23, 117:3, 124:19, 130:2, 150:14, 150:25, 171:16, 173:12, 178:12, 178:14, 178:17, 180:6, 180:25
**2005** [11] - 24:1, 153:22, 171:24, 180:15, 197:17, 197:24, 203:19, 206:15, 225:5, 243:8, 243:10
**2006** [9] - 3:13, 198:18, 199:9, 199:18, 199:22, 199:24, 200:1, 200:18, 200:20
**2008** [4] - 1:11, 122:23, 233:6, 276:6
**2009** [1] - 276:11
**2100** [1] - 11:3
**21201** [1] - 1:25
**22** [1] - 275:6
**2225** [1] - 3:20
**224** [1] - 275:10
**2255** [1] - 3:23
**23rd** [5] - 23:22, 23:25, 153:22, 171:23, 180:15
**24** [1] - 193:15
**24/7/365** [1] - 225:7
**244** [1] - 275:11
**246** [1] - 275:11
**24th** [3] - 199:24, 200:1, 200:20
**25** [6] - 57:25, 58:1, 61:3, 61:5, 61:6, 161:16
**29** [6] - 22:7, 73:2, 122:3, 132:5, 181:9, 187:17
**2nd** [1] - 243:8

## 3

**3** [1] - 71:22
**3,000** [1] - 156:2
**3,500** [1] - 181:23
**30** [2] - 132:6, 196:19
**31** [1] - 132:6
**32** [1] - 81:21
**3500** [1] - 35:1
**380** [2] - 81:23, 81:24
**3:33** [1] - 195:7

## 4

**4** [2] - 175:8, 175:13
**4-B** [1] - 25:19
**40** [7] - 82:13, 82:14, 95:11, 95:12, 105:9, 105:17, 105:20
**400** [2] - 110:24, 113:17
**401** [1] - 264:21

**4217** [1] - 15:22
**44** [1] - 81:4
**45** [2] - 16:6, 177:19
**48** [6] - 252:19, 252:21, 252:23, 253:3, 254:2
**4th** [1] - 109:13

## 5

**50** [1] - 57:25, 58:1, 61:2, 61:5, 61:6, 61:8, 105:9, 130:5, 130:6, 130:7, 161:16
**50,000** [1] - 156:18
**500** [1] - 73:22
**5500** [2] - 66:12, 66:13
**5515** [1] - 1:24
**58** [1] - 58:22
**598** [1] - 232:5
**5:23** [1] - 274:5

## 6

**6** [1] - 187:17
**69** [1] - 64:21
**6th** [3] - 10:17, 19:4, 94:3

## 7

**7** [1] - 175:13
**7,000** [1] - 181:23
**7000** [1] - 156:2

## 8

**8** [1] - 73:2

## 9

**9** [13] - 11:4, 17:10, 17:17, 17:18, 20:23, 81:16, 87:13, 94:20, 94:21, 95:3, 95:7, 95:12, 273:14
**90's** [2] - 57:21, 132:10
**9:30** [3] - 249:15, 249:16, 274:4
**9:47** [1] - 2:1

## A

**a.m** [1] - 2:2
**Aaron** [10] - 68:25, 69:14, 69:16, 69:17, 70:11, 70:15, 127:5,

167:6, 167:8, 167:12
**abeyance** [1] - 19:19
**abiding** [2] - 239:25
**abject** [1] - 140:7
**able** [8] - 208:9, 251:3, 251:6, 252:18, 262:4, 263:15, 265:8, 267:18
**Absolutely** [1] - 265:3
**absolutely** [1] - 265:19
**abstract** [2] - 266:16, 268:14
**abundance** [1] - 4:2
**Abuse** [1] - 10:13
**accept** [2] - 179:16, 264:10
**acceptable** [3] - 7:14, 77:5, 272:10
**accepted** [2] - 228:5, 248:11
**access** [1] - 195:4
**accident** [1] - 14:18
**accomplish** [1] - 222:1
**according** [2] - 159:4, 247:11
**account** [3] - 231:18, 231:21, 231:23
**accurate** [2] - 160:8, 276:9
**acquiesce** [1] - 273:15
**acquired** [1] - 94:23
**acquittals** [1] - 260:24
**acquitted** [1] - 9:18
**act** [3] - 145:22, 247:24, 248:2
**action** [2] - 238:9, 251:2
**activated** [1] - 11:19
**activities** [2] - 156:16, 187:25
**activity** [4] - 132:19, 135:1, 186:23, 232:9
**acts** [7] - 7:24, 8:4, 247:20, 248:7, 251:18, 251:20, 251:21
**actual** [4] - 9:7, 77:11, 77:20, 254:25
**Acura** [7] - 11:15, 17:13, 86:1, 86:3, 94:4, 94:6, 95:13
**Adam** [1] - 1:22
**adamant** [1] - 263:19
**addition** [6] - 58:18, 133:17, 134:5, 135:1, 138:10, 204:25
**additional** [2] - 214:20, 265:5
**address** [2] - 5:8, 262:13
**addressed** [2] - 24:15, 175:16
**adherence** [1] - 248:17

**adjust** [1] - 24:5
**admissible** [2] - 28:12, 189:20
**admitted** [2] - 98:15, 190:17
**adopt** [1] - 5:16
**advance** [2] - 261:24, 262:17
**advanced** [2] - 234:21, 263:7
**advantage** [1] - 261:8
**advised** [1] - 15:21
**affect** [1] - 26:6
**affirmatively** [5] - 264:15, 266:2, 267:4, 268:4
**affixed** [1] - 276:10
**afford** [1] - 111:9
**afternoon** [12] - 119:17, 119:19, 119:21, 120:24, 121:2, 121:3, 158:10, 166:6, 166:7, 194:11, 196:15, 224:7
**afterwards** [4] - 17:4, 177:5, 180:8, 236:23
**Afterwards** [1] - 117:17
**age** [4] - 35:25, 49:12, 121:10, 121:17
**agent** [2] - 77:8, 119:25
**ago** [15] - 22:23, 22:24, 33:11, 34:11, 38:25, 94:7, 95:4, 123:1, 127:24, 155:18, 163:11, 180:21, 233:2, 244:9, 261:13
**agree** [7] - 26:21, 140:14, 159:5, 246:23, 264:24, 265:19, 271:9
**agreed** [10] - 26:16, 154:3, 200:25, 201:4, 201:8, 229:10, 231:17, 238:7, 261:15, 269:5
**agreeing** [2] - 25:13, 26:11
**agreement** [108] - 3:13, 7:7, 7:9, 7:15, 23:3, 23:15, 23:19, 24:2, 24:12, 24:18, 25:12, 25:19, 26:4, 26:11, 27:3, 27:5, 27:8, 27:9, 28:2, 28:3, 28:8, 28:17, 28:22, 30:4, 149:16, 151:20, 151:24, 152:18, 152:21, 152:23, 153:13, 153:21, 153:24, 154:1, 154:15, 154:22, 158:14, 158:16, 158:25, 159:5, 159:6, 159:9, 159:24, 171:20, 171:23, 172:3, 176:10, 176:17, 176:24, 177:13,

177:15, 178:1, 178:10, 178:11, 178:16, 178:25, 179:8, 179:10, 179:11, 180:5, 180:12, 180:15, 189:8, 189:15, 189:17, 190:4, 198:7, 198:11, 198:12, 198:21, 198:24, 198:25, 199:9, 199:17, 199:22, 200:3, 200:4, 200:10, 200:17, 200:18, 200:22, 201:10, 202:1, 202:10, 202:11, 203:4, 203:13, 224:25, 229:9, 229:15, 229:19, 229:25, 230:3, 230:15, 230:18, 231:7, 231:14, 231:16, 240:3, 240:14, 241:1, 243:15, 246:4, 246:14, 254:1, 266:7
**agreement's** [1] - 199:5
**agreements** [2] - 230:25, 245:19
**agrees** [3] - 25:23, 26:21, 174:14
**ahead** [8] - 62:20, 76:11, 76:13, 116:18, 128:15, 172:23, 253:22, 269:22
**ain't** [1] - 50:14, 88:10, 92:1, 110:10, 111:15, 111:23, 142:12
**air** [3] - 86:12, 146:2, 148:6
**al** [1] - 276:5
**Alcala** [1] - 226:19
**alcohol** [2] - 232:22, 232:24
**alert** [1] - 94:16
**Alex** [2] - 68:20, 68:21
**Alexander** [4] - 205:7, 206:11, 235:18, 235:19
**alias** [4] - 32:21, 32:22, 32:24, 33:2
**alive** [1] - 115:8
**alleged** [8] - 6:25, 8:23, 247:21, 248:1, 248:7, 255:20, 255:21
**allegedly** [1] - 200:7
**allow** [1] - 273:5
**allowed** [2] - 26:12, 76:15
**alluded** [1] - 122:17
**almost** [4] - 11:16, 11:24, 124:18, 222:12
**alone** [1] - 11:1
**aloud** [2] - 5:25, 190:9
**altercation** [4] - 209:24, 233:11, 234:12, 236:20
**alternative** [1] - 273:6
**altogether** [1] - 32:9

**ambulance** [3] - 216:12, 216:13
**AMD-04-029** [2] - 1:6, 276:5
**Amendment** [3] - 176:3, 182:20, 194:18
**America** [2] - 54:13, 231:23
**AMERICA** [1] - 1:5
**amount** [6] - 3:5, 99:8, 99:21, 106:23, 190:7, 257:24
**amounts** [2] - 161:17, 181:4, 181:25
**Andre** [1] - 1:13
**angle** [1] - 16:6
**animosity** [2] - 83:2, 112:25
**Anne** [1] - 34:9
**anniversary** [1] - 19:6
**answer** [39] - 34:15, 34:19, 39:25, 51:15, 55:4, 55:6, 62:14, 62:17, 70:9, 70:13, 76:18, 79:16, 80:13, 81:8, 82:8, 86:7, 89:7, 102:21, 107:18, 118:18, 155:14, 176:4, 189:3, 191:22, 193:8, 217:12, 217:19, 218:11, 218:15, 219:9, 220:14, 221:9, 230:23, 244:17, 264:7, 266:25, 267:1, 267:3
**answered** [11] - 40:21, 60:2, 62:24, 72:25, 107:17, 118:17, 181:17, 181:22, 187:21, 221:10, 230:22
**Anthony** [7] - 49:3, 49:8, 49:20, 115:8, 160:19, 204:2, 226:5
**anticipate** [6] - 3:19, 5:22, 257:3, 257:24, 258:1, 264:22
**anyway** [2] - 34:3, 102:19
**apartment** [3] - 84:1, 84:3, 85:9
**Apartment** [1] - 43:20
**apartment's** [1] - 5:10
**Apartments** [1] - 43:25
**apartments** [1] - 102:7
**apologize** [4] - 2:12, 8:12, 192:20, 215:1
**apparel** [1] - 194:19
**appeal** [4] - 3:25, 4:1, 113:23, 113:24
**appear** [5] - 6:22, 13:22, 174:11, 187:12, 187:14
**appearance** [1] - 35:16

**Appearances** [1] - 1:15
**appointed** [1] - 3:21
**appoints** [1] - 4:5
**appreciate** [9] - 2:4, 75:3, 75:21, 111:1, 249:25, 251:1, 251:14, 254:9, 257:9
**Appreciate** [1] - 3:1
**appreciated** [1] - 269:4
**approach** [6] - 12:4, 41:3, 77:12, 175:6, 212:23, 272:20
**approached** [3] - 14:25, 15:3, 16:25
**approaching** [1] - 11:14
**appropriate** [5] - 27:22, 28:10, 189:19, 248:14, 251:2
**April** [4] - 168:20, 169:22, 170:2, 170:4
**arcane** [2] - 253:1
**area** [24] - 13:6, 13:10, 20:25, 48:2, 61:25, 68:9, 74:11, 82:25, 87:5, 87:6, 90:9, 91:2, 94:13, 143:13, 143:14, 162:18, 162:20, 162:22, 162:23, 163:22, 203:21, 215:2, 221:19
**areas** [3] - 74:13, 129:12, 272:12
**arguably** [1] - 262:10
**Arguably** [1] - 262:11
**argue** [1] - 268:1
**argument** [4] - 210:9, 210:10, 250:13, 268:1
**arm** [8] - 15:8, 16:7, 17:14, 21:1, 85:22, 85:23, 214:15
**armed** [2] - 41:6, 41:11
**arrange** [4] - 2:21, 2:24, 195:4, 271:4
**arranged** [1] - 259:5
**arrays** [3] - 222:25, 223:7, 223:9
**arrest** [9] - 11:10, 17:1, 17:7, 17:23, 163:2, 170:11, 197:11, 197:12, 197:16
**arrested** [36] - 20:3, 31:1, 32:25, 86:17, 86:19, 86:21, 86:22, 86:23, 87:1, 97:25, 99:16, 103:2, 103:22, 103:25, 123:21, 126:2, 130:2, 131:1, 131:2, 150:14, 151:3, 151:5, 165:24, 168:14, 197:15, 197:17, 197:24, 203:19, 225:5, 225:18, 225:19,

240:8, 243:7, 243:10, 243:14, 245:12
**arrests** [2] - 8:19, 9:3
**Arrington** [2] - 33:8, 60:24
**arrive** [4] - 39:6, 209:2, 209:6, 260:23
**arrived** [2] - 16:24, 90:19
**article** [2] - 249:5, 249:6
**artist** [1] - 165:16
**Arundel** [1] - 34:9
**aside** [3] - 211:5, 273:13
**assaulted** [3] - 242:14, 243:11, 243:12
**assigned** [1] - 4:8
**assignment** [1] - 10:14
**assist** [2] - 2:22, 234:24
**assistance** [2] - 25:21, 202:14
**Assistant** [1] - 199:6
**associate** [4] - 4:8, 129:16, 130:3, 145:12
**associated** [1] - 248:5
**associates** [2] - 129:23, 226:1
**assume** [8] - 16:2, 47:4, 52:24, 129:11, 144:10, 147:11, 154:25, 227:9
**assumed** [1] - 210:6
**Assuming** [1] - 202:20
**assuming** [2] - 229:21, 265:24
**assure** [1] - 182:25
**assures** [2] - 176:5, 183:6
**attempt** [1] - 270:11
**attempted** [4] - 104:25, 149:22, 227:25, 267:14
**attempting** [1] - 6:9
**attend** [1] - 259:11
**attending** [2] - 206:22, 207:18
**attention** [24] - 4:14, 10:17, 23:7, 25:18, 46:11, 73:2, 76:17, 78:7, 82:19, 85:25, 86:16, 94:3, 96:16, 99:25, 103:22, 109:13, 115:2, 115:11, 175:8, 183:15, 183:17, 189:16, 195:12, 206:21
**attire** [1] - 194:21
**attorney** [7] - 3:24, 23:10, 163:15, 182:15, 183:22, 184:10, 199:2
**Attorney** [2] - 173:6, 230:24
**Attorney's** [6] - 34:21,

34:22, 180:3, 201:15, 231:5, 245:22
**Attorneys** [1] - 199:6
**attorneys** [6] - 5:12, 62:13, 163:5, 163:12, 259:14, 261:7
**audience** [1] - 80:10
**August** [6] - 26:1, 27:24, 178:12, 178:17, 180:6, 180:25
**Augustine** [1] - 226:21
**AUSA's** [1] - 199:6
**authorities** [2] - 25:2, 243:10
**authority** [1] - 157:12
**automatically** [1] - 105:1
**automobiles** [3] - 142:8, 142:9
**autopsies** [3] - 257:4, 257:12, 258:2
**autopsy** [1] - 257:6
**available** [3] - 5:11, 9:4, 194:25
**Avenue** [9] - 11:7, 11:14, 12:3, 12:8, 12:10, 13:1, 14:22, 104:4, 104:5
**avoid** [3] - 207:9, 249:1, 249:3
**Avon** [13] - 46:2, 46:6, 46:9, 46:18, 46:23, 104:8, 104:9, 104:20, 106:18, 169:4, 169:11, 169:21, 169:22
**Avon's** [1] - 106:20
**awaiting** [1] - 203:16
**aware** [10] - 2:12, 9:6, 70:17, 70:18, 78:8, 85:16, 140:24, 147:8, 201:22, 249:2
**awful** [1] - 269:14

**B**

**B-A-C-O-N** [1] - 22:1
**baby's** [1] - 256:4
**background** [1] - 208:6
**backup** [4] - 15:14, 15:18, 15:19, 16:23
**BACON** [2] - 21:19, 275:5
**Bacon** [68] - 2:7, 2:11, 2:15, 5:6, 18:1, 18:9, 20:6, 21:9, 21:18, 21:24, 22:4, 22:8, 22:15, 24:13, 24:19, 27:11, 29:13, 29:24, 30:13, 30:21, 31:5, 31:15, 33:5, 40:10, 40:14, 41:13, 41:16,

42:13, 42:22, 43:25, 47:19, 48:14, 50:20, 60:18, 62:12, 64:21, 72:10, 72:23, 74:2, 75:17, 77:6, 77:23, 77:24, 78:7, 80:18, 83:21, 109:18, 110:3, 116:18, 119:24, 120:19, 121:2, 158:10, 166:2, 166:6, 167:6, 171:8, 173:24, 176:2, 182:14, 184:4, 190:4, 191:20, 192:19, 194:4, 194:6, 260:18, 260:20
**Bacon's** [2] - 3:4, 7:6
**bad** [7] - 74:20, 109:6, 190:13, 190:15, 193:23, 221:9, 258:16
**bag** [3] - 101:14, 101:15
**bags** [3] - 104:12
**bails** [1] - 185:17
**baking** [1] - 84:15
**ballistics** [2] - 256:18, 258:6
**ballpark** [1] - 61:9
**Ballpark** [1] - 233:14
**Balmore** [1] - 104:3
**Baltimore** [60] - 1:12, 1:25, 10:12, 26:4, 26:15, 27:21, 28:9, 28:10, 44:10, 44:11, 44:20, 45:10, 45:15, 47:9, 47:18, 54:20, 54:22, 59:8, 61:14, 61:15, 62:7, 62:11, 63:13, 63:25, 64:1, 64:2, 65:7, 68:8, 73:18, 73:19, 73:21, 84:4, 87:25, 90:2, 91:18, 92:24, 93:23, 94:12, 102:22, 112:18, 115:14, 129:3, 129:7, 129:10, 133:1, 138:5, 164:7, 169:1, 170:14, 178:15, 181:21, 189:18, 190:1, 196:21, 196:22, 196:25, 197:6, 207:3, 207:25, 208:5
**Baltimorean** [1] - 208:4
**bank** [1] - 229:11
**Bank** [3] - 231:18, 231:21, 231:23
**bar** [4] - 239:6, 243:12, 244:17
**bargain** [1] - 158:21
**Barry** [1] - 1:22
**bars** [1] - 185:8
**base** [4] - 99:5, 100:19, 100:20, 197:21
**baseball** [1] - 248:24
**based** [7] - 9:19, 146:1,

149:12, 183:2, 184:11, 198:19
**basis** [4] - 175:22, 247:12, 251:7, 273:24
**basketball** [1] - 248:23
**BCCC** [2] - 111:6, 115:12
**beat** [1] - 109:6
**beaten** [1] - 146:19
**became** [2] - 211:15, 234:12
**become** [7] - 78:8, 140:24, 210:11, 210:13, 211:12, 216:2, 235:6
**becomes** [1] - 272:2
**beefing** [1] - 80:24
**began** [3] - 162:2, 210:1, 270:19
**begin** [1] - 211:19
**beginning** [4] - 117:1, 175:9, 175:14, 270:12
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behave** [1] - 150:22
**behest** [1] - 3:25
**behind** [7] - 15:8, 15:16, 16:7, 16:12, 104:20, 104:21, 256:11
**behooved** [2] - 127:14, 128:3
**belief** [1] - 219:5
**Belinda** [2] - 77:7, 195:4
**Bell** [1] - 85:8
**Belmar** [2] - 85:8, 85:10
**below** [1] - 257:6
**belt** [4] - 11:18, 11:20, 14:19, 18:6
**benefit** [5] - 74:17, 158:21, 159:6, 160:12, 183:25
**benefited** [1] - 127:15
**benefits** [1] - 201:25
**Benson** [1] - 270:14
**Bentley** [3] - 229:3, 232:8, 232:12
**Berger** [1] - 256:18
**best** [4] - 8:15, 31:17, 160:9, 220:17
**better** [10] - 23:23, 24:8, 24:9, 76:18, 125:20, 125:21, 138:24, 157:25, 258:14, 266:21
**between** [17] - 25:11, 26:7, 83:2, 90:15, 124:7, 130:9, 170:19, 183:5, 197:14, 197:18, 203:18, 210:4, 210:14, 215:24, 215:25, 243:9, 252:18
**beyond** [2] - 9:22, 272:1

**Biaz** [1] - 226:21
**biding** [1] - 134:15
**big** [4] - 131:7, 141:6, 216:7, 235:6
**bigger** [2] - 141:6, 156:11
**biggest** [1] - 227:20
**birth** [1] - 15:20
**birthday** [3] - 15:10, 207:21, 208:18
**bit** [13] - 73:15, 89:13, 89:15, 110:2, 134:25, 170:16, 181:5, 181:22, 196:16, 207:9, 207:10, 214:25, 266:15
**bitch** [2] - 111:4, 111:9
**black** [3] - 110:16, 212:8, 212:9
**Black** [5] - 62:25, 63:12, 63:13, 112:14, 112:15
**block** [2] - 11:13, 12:10
**blocked** [1] - 216:11
**blocks** [3] - 144:24, 145:1, 145:2
**blood** [4] - 213:20, 213:21, 215:19
**blows** [1] - 209:25
**blue** [1] - 11:15
**Bo** [40] - 36:19, 50:11, 53:16, 96:22, 100:2, 102:9, 103:17, 108:24, 118:12, 118:20, 131:21, 131:22, 131:23, 132:1, 132:25, 133:2, 133:7, 140:5, 140:7, 140:17, 146:18, 146:19, 148:25, 184:13, 184:24, 186:24, 187:19, 188:8, 188:9, 188:21, 189:1, 193:15, 193:20, 219:14, 219:15, 221:12, 244:24, 245:1, 245:3, 245:6
**Bo's** [5] - 37:8, 42:2, 42:3, 186:23, 187:24
**bodies** [1] - 257:21
**body** [4] - 213:18, 214:3, 214:13, 214:17
**bolster** [1] - 6:9
**bolstering** [1] - 6:20
**Boo** [1] - 100:2
**books** [1] - 249:12
**boot** [4] - 107:8, 108:16, 113:14, 115:3
**border** [1] - 143:19
**Borman** [3] - 104:2, 104:4, 104:5
**born** [1] - 196:20
**boss** [1] - 238:2
**bottle** [5] - 209:22, 209:23, 234:21, 235:1,

236:16
**bottom** [2] - 144:15, 157:23
**bought** [8] - 34:4, 34:6, 59:3, 98:11, 130:10, 130:20, 131:12, 131:15
**bound** [1] - 26:4
**boxes** [1] - 253:25
**boy** [1] - 200:20
**Boy** [1] - 206:8
**boys** [3] - 116:20, 164:10
**Brady** [1] - 267:19
**brakes** [1] - 11:16, 14:16
**brawl** [1] - 216:7
**breach** [2] - 28:13, 189:21
**break** [7] - 27:4, 73:25, 76:14, 167:1, 247:4, 257:13, 258:14
**brief** [4] - 192:15, 269:16, 273:25, 274:1
**briefly** [7] - 2:5, 76:12, 205:14, 221:16, 221:25, 244:15, 246:20
**Briefly** [1] - 192:16, 246:19
**bring** [24] - 4:14, 18:19, 59:11, 60:7, 60:9, 60:10, 76:17, 77:7, 83:12, 107:10, 111:5, 159:11, 242:20, 258:17, 261:24, 270:15, 270:17, 270:24, 271:5, 271:10, 271:11, 271:14, 273:14, 273:24
**bringing** [1] - 84:15
**broadcast** [2] - 78:11, 249:5
**broadcasts** [1] - 249:3
**broader** [1] - 216:2
**Brockbridge** [1] - 108:17
**broken** [1] - 258:25
**brother** [4] - 78:14, 79:4, 79:5, 234:14
**Brothers** [1] - 49:7
**brothers** [19] - 49:25, 52:3, 52:11, 52:13, 53:9, 115:21, 141:15, 141:19, 160:17, 191:23, 204:17, 206:3, 226:5, 229:2, 234:11, 235:13, 235:14, 248:4
**brothers'** [1] - 115:19
**brought** [6] - 19:21, 59:12, 59:20, 59:25, 107:12, 159:13, 188:4, 191:7, 195:12, 195:19, 203:15, 242:20

Iапр

**Bruton** [2] - 272:24, 272:25
**Bubbles** [2] - 83:4, 83:16
**building** [2] - 84:3, 202:8
**buildings** [1] - 84:1
**bumpy** [1] - 8:11
**bunch** [2] - 236:19, 261:1
**burden** [4] - 8:21, 190:2, 257:20, 265:11
**bus** [1] - 60:11
**business** [8] - 52:4, 82:19, 91:21, 107:22, 110:14, 113:2, 252:21, 263:21
**businesses** [1] - 221:18
**Butler** [1] - 204:3
**button** [1] - 24:5
**buy** [10] - 50:13, 55:14, 59:1, 59:6, 66:2, 104:1, 104:7, 104:11, 106:5, 106:17
**buying** [3] - 75:13, 133:2
**Buying** [1] - 128:22
**buys** [1] - 32:4
**BY** [43] - 10:8, 12:23, 14:13, 18:25, 22:3, 24:11, 29:17, 33:9, 40:2, 40:13, 41:12, 51:17, 61:1, 62:21, 72:21, 73:8, 78:5, 80:5, 97:24, 121:1, 158:9, 166:5, 182:12, 192:18, 196:14, 212:25, 217:14, 221:8, 224:6, 244:14, 246:22, 275:4, 275:4, 275:6, 275:6, 275:7, 275:7, 275:8, 275:8, 275:10, 275:10, 275:11, 275:11

## C

**C-L-A-S-H** [1] - 196:12
**cable** [1] - 249:4
**caliber** [5] - 81:4, 82:15, 95:11, 95:12, 177:19
**California** [1] - 228:23
**camp** [4] - 107:8, 108:16, 113:14, 115:3
**Campbell** [1] - 226:9
**candid** [1] - 184:3
**candor** [1] - 183:18
**cannot** [2] - 247:8, 253:2
**car** [57] - 10:22, 10:23, 10:24, 14:5, 14:15,

14:21, 16:20, 17:3, 20:8, 20:12, 20:15, 20:25, 85:22, 87:7, 87:8, 89:14, 90:8, 90:11, 90:12, 90:13, 92:21, 93:10, 93:11, 94:17, 94:18, 95:17, 96:1, 96:17, 96:21, 98:11, 98:12, 98:15, 99:3, 104:21, 104:24, 104:25, 105:1, 105:2, 105:3, 112:19, 131:2, 131:6, 142:3, 142:15, 142:16, 143:1, 164:3, 169:6, 216:11
**Card** [5] - 63:18, 64:14, 64:17, 161:20, 161:21
**care** [4] - 105:25, 127:2, 142:14, 149:18
**cared** [1] - 139:3
**careful** [1] - 110:12
**Carolyn** [3] - 110:22, 110:23, 113:9
**carried** [1] - 135:2
**carry** [7] - 80:17, 80:25, 81:13, 110:18, 135:12, 145:12, 162:8
**carrying** [3] - 149:23, 162:7, 162:13
**cars** [3] - 85:17, 85:22, 216:11
**Cartier** [1] - 232:3
**Case** [1] - 276:5
**case** [69] - 4:7, 4:8, 4:11, 5:11, 5:13, 8:21, 9:5, 9:10, 9:11, 9:15, 9:22, 18:14, 18:19, 19:10, 19:15, 19:18, 24:20, 25:12, 25:14, 31:1, 31:25, 32:1, 32:2, 34:9, 34:13, 74:6, 113:22, 119:18, 160:10, 160:12, 160:14, 169:19, 171:12, 171:20, 174:17, 180:4, 194:13, 198:5, 199:3, 202:13, 203:16, 211:5, 238:23, 245:20, 246:1, 246:16, 247:20, 248:8, 248:21, 249:2, 249:5, 249:7, 249:15, 251:13, 251:17, 251:18, 252:4, 255:12, 258:2, 264:20, 266:8, 267:18, 268:19, 269:3, 270:6, 270:24, 271:13, 272:2
**CASE** [1] - 1:6
**cases** [5] - 3:22, 4:4, 4:5, 25:7, 202:8
**cash** [1] - 229:10
**category** [1] - 273:15
**Catonsville** [24] - 42:23,

42:24, 43:23, 58:21, 68:11, 68:14, 69:2, 70:1, 70:7, 70:16, 71:20, 73:9, 82:20, 82:21, 84:2, 84:5, 84:20, 102:4, 105:17, 129:5, 143:8, 181:16, 190:7, 190:13
**caught** [10] - 31:21, 33:16, 93:25, 107:6, 118:20, 148:25, 149:4, 151:23, 168:19
**caution** [2] - 4:2, 239:12
**cell** [2] - 105:17, 105:18
**cemetery** [1] - 13:5
**Cemetery** [1] - 13:5
**certain** [13] - 6:23, 8:16, 19:21, 127:21, 128:17, 153:25, 162:2, 169:1, 241:6, 247:20, 261:1, 272:8, 272:18
**Certainly** [6] - 12:22, 123:8, 172:24, 175:5, 198:16
**certainly** [9] - 6:22, 193:21, 264:17, 264:22, 268:18, 268:22, 268:24, 272:15, 272:24
**certainty** [1] - 268:7
**CERTIFICATE** [1] - 276:1
**certify** [2] - 276:3, 276:7
**chairs** [1] - 74:6, 119:18, 194:13
**chamber** [1] - 17:21, 17:22
**chance** [1] - 224:21
**change** [4] - 194:1, 231:18, 231:23, 249:5
**changed** [2] - 239:23, 243:10, 243:17
**changes** [1] - 206:19
**characterization** [1] - 192:21
**charge** [25] - 8:24, 9:18, 23:14, 31:5, 31:21, 31:22, 31:23, 33:11, 33:14, 33:22, 97:1, 97:3, 151:23, 178:4, 180:8, 180:9, 180:16, 184:6, 198:8, 199:10, 199:13, 200:8
**charged** [21] - 9:7, 9:11, 18:8, 18:11, 21:2, 27:6, 32:9, 97:5, 98:17, 159:14, 159:15, 168:2, 169:19, 169:22, 180:24, 198:1, 198:3, 199:13, 240:19, 240:21
**charges** [29] - 8:19, 9:3, 9:5, 9:10, 9:11, 9:13,

9:22, 18:2, 18:9, 23:14, 26:25, 27:1, 28:18, 31:18, 31:19, 31:21, 31:24, 100:2, 150:7, 151:10, 151:12, 159:11, 159:13, 178:6, 178:8, 178:21, 203:13
**Charles** [1] - 39:1
**charts** [2] - 260:11, 260:13
**Charts** [1] - 260:13
**chatter** [2] - 145:9, 145:16
**check** [6] - 15:11, 169:3, 169:7, 198:15
**checked** [4] - 20:18, 88:9, 88:11, 88:13
**cherry** [1] - 262:25
**Chet** [1] - 3:16
**chief** [3] - 264:20, 267:18, 268:20
**Chief** [1] - 257:3
**Child** [1] - 10:13
**choosing** [1] - 269:4
**Christine** [1] - 174:3
**chronological** [2] - 50:19, 170:7
**cigarettes** [3] - 110:24, 113:11, 113:14
**circle** [5] - 137:1, 186:3, 186:5, 186:8, 186:11
**Circuit** [9] - 4:3, 26:3, 26:15, 27:20, 28:9, 28:10, 189:18, 190:1, 198:4
**circumstances** [2] - 203:14, 268:4
**circumstantial** [1] - 251:21
**citation** [1] - 18:5
**citations** [1] - 18:3
**City** [17] - 10:12, 26:4, 26:15, 27:21, 28:9, 28:10, 45:10, 129:10, 169:2, 178:15, 189:18, 190:1, 196:21, 197:6, 197:7, 207:3, 208:20
**city** [6] - 17:9, 126:13, 138:23, 151:16, 169:1, 221:3
**civilized** [2] - 239:25, 242:16
**claim** [1] - 3:23
**clarification** [1] - 136:4
**clarity** [1] - 273:12
**Clash** [28] - 3:11, 3:14, 194:10, 196:4, 196:5, 196:11, 196:15, 197:9, 198:12, 198:17, 198:22, 200:4, 202:2, 202:23,

212:16, 214:11, 214:16, 215:16, 217:15, 221:10, 222:13, 224:7, 244:16, 247:3, 247:7, 247:8, 248:3
**CLASH** [2] - 196:7, 275:9
**Clash's** [2] - 247:14, 248:9
**Claudus** [5] - 51:23, 51:24, 87:17, 115:24, 116:20
**clear** [6] - 74:18, 75:19, 109:23, 233:2, 259:19, 259:21
**clearly** [4] - 6:6, 6:21, 6:22, 251:24
**CLERK** [4] - 10:3, 21:21, 21:25, 196:9
**client** [22] - 2:8, 3:24, 5:6, 24:25, 25:1, 25:5, 25:10, 25:20, 25:21, 26:3, 26:20, 26:23, 26:24, 27:23, 27:24, 179:16, 179:21, 189:17, 261:9, 264:11, 269:24, 272:19
**client's** [2] - 3:25, 271:11
**clock** [1] - 252:23
**close** [4] - 14:17, 54:21, 77:24, 139:3
**Closer** [2] - 54:21, 155:21
**closer** [6] - 15:2, 21:6, 29:14, 60:21, 60:24, 97:20
**closing** [1] - 268:1
**clothes** [1] - 10:20
**clothing** [4] - 35:16, 36:11, 37:22, 213:1
**club** [16] - 131:25, 132:1, 206:25, 207:16, 209:2, 209:5, 212:5, 212:13, 212:14, 213:24, 214:21, 216:4, 216:5, 218:17, 224:14, 244:2
**co** [4] - 200:6, 245:12, 252:9, 272:13
**co-counsel** [1] - 272:13
**co-defendants** [1] - 200:6
**co-defense** [1] - 252:9
**Coburn** [7] - 1:22, 2:3, 75:1, 181:12, 190:8, 191:3, 254:12
**COBURN** [54] - 2:4, 2:18, 3:1, 18:25, 29:4, 40:25, 42:19, 43:4, 43:10, 43:17, 45:3,

45:12, 45:23, 46:15, 46:19, 46:24, 55:3, 56:8, 57:8, 58:14, 60:2, 62:3, 62:9, 63:7, 64:5, 65:15, 66:5, 70:8, 70:12, 75:2, 75:6, 75:12, 75:20, 76:1, 76:3, 76:7, 76:9, 76:12, 76:14, 76:20, 80:2, 89:6, 94:25, 97:13, 97:17, 98:3, 102:20, 166:5, 194:7, 195:2, 195:5, 254:13, 275:4, 275:7

**Coburn's** [1] - 258:8

**Cocaine** [12] - 44:22, 45:6, 50:4, 52:14, 53:22, 54:18, 56:15, 68:6, 99:4, 100:19, 100:20, 112:6

**cocaine** [28] - 52:15, 56:14, 66:13, 83:20, 84:6, 84:13, 84:14, 84:17, 85:1, 85:4, 85:5, 85:15, 92:1, 99:5, 101:21, 105:12, 106:5, 106:7, 112:8, 181:16, 181:21, 185:3, 197:20, 197:21, 199:15, 240:23

**cocktails** [1] - 233:21

**coconspirators** [2] - 240:21, 255:19

**Code** [1] - 15:22

**code** [1] - 137:21

**codefendant** [1] - 245:12

**codefendants** [3] - 177:23, 245:13, 272:3

**cohesive** [2] - 225:21, 227:5

**coin** [1] - 157:3

**Coincidentally** [1] - 120:8

**coke** [1] - 155:8

**cold** [1] - 146:4

**colleagues** [2] - 242:16, 263:7

**collect** [1] - 135:25

**College** [1] - 197:6

**college** [8] - 132:1, 132:7, 132:13, 133:18, 133:21, 133:25, 184:16, 248:24

**colleges** [1] - 132:22

**colloquy** [1] - 272:22

**Columbia** [6] - 54:12, 54:13, 54:14, 54:23, 131:17

**comfortable** [5] - 79:13, 79:17, 79:18, 79:20

**coming** [12] - 11:25, 12:1, 19:6, 61:24, 87:4, 87:5, 87:24, 87:25,

94:13, 96:3, 110:18, 113:5, 129:21, 143:10, 143:13, 244:20, 244:23, 246:14, 253:15, 254:8, 269:24, 272:18

**Coming** [1] - 113:7

**commandments** [1] - 239:11

**comments** [1] - 248:16

**commit** [4] - 25:10, 179:12, 180:1, 248:7

**commitment** [1] - 179:23

**commitments** [1] - 24:21

**commits** [1] - 179:17

**committed** [13] - 25:22, 27:18, 27:24, 123:18, 124:1, 124:2, 124:4, 180:6, 180:25, 247:16, 247:21, 247:24, 248:12

**committing** [1] - 190:20

**common** [10] - 19:13, 19:14, 130:18, 138:11, 138:23, 142:7, 142:11, 144:22, 148:15, 186:6

**commotion** [1] - 213:19

**communicated** [1] - 6:23

**communication** [1] - 6:25

**community** [1] - 206:1

**companies** [1] - 221:18

**company** [1] - 22:18

**compartment** [2] - 142:5, 142:9

**compelled** [1] - 250:24

**competition** [1] - 228:5

**complain** [1] - 250:8

**complete** [5] - 7:7, 7:8, 26:19, 183:18, 276:9

**completed** [1] - 76:16

**completely** [8] - 25:1, 27:15, 148:22, 148:23, 179:22, 184:1, 184:3, 201:4

**complex** [1] - 43:20

**complicated** [1] - 176:15

**computer** [2] - 253:1, 253:2

**conceal** [2] - 85:21, 90:22

**concentrate** [1] - 110:5

**concern** [4] - 78:23, 255:21, 262:11

**concerned** [1] - 257:17

**Concerned** [1] - 257:19

**concerning** [3] - 149:25, 183:23, 249:23

**concerns** [4] - 246:3, 246:8, 254:17, 254:22

**concessions** [1] - 172:14

**concise** [1] - 270:2

**conclude** [1] - 248:16

**Conclusion** [1] - 274:5

**conclusion** [2] - 202:12, 230:17

**concordance** [1] - 187:11

**concurrent** [2] - 152:14, 153:10

**concurrently** [1] - 26:24

**condition** [2] - 150:21, 179:11

**conditioner** [1] - 86:12

**conditions** [3] - 19:21, 121:12, 183:19

**conduct** [7] - 178:2, 178:21, 180:5, 180:25, 201:21, 249:10, 249:12

**conducting** [1] - 4:20

**confidential** [1] - 246:10

**configured** [1] - 14:2

**conflict** [3] - 195:11, 195:14, 236:1

**confront** [1] - 250:16

**confrontation** [1] - 250:16

**confronted** [1] - 157:24

**confuse** [9] - 200:8, 229:19, 230:4, 230:15, 230:18, 231:8, 231:14, 245:21, 245:24

**confused** [1] - 128:13

**confusion** [1] - 246:11

**connection** [3] - 187:18, 187:24, 211:5

**conscientious** [1] - 248:17

**consequences** [1] - 192:6

**consider** [6] - 8:25, 9:4, 247:14, 247:18, 249:20, 250:21

**consideration** [4] - 9:12, 25:19, 250:1, 250:2

**considered** [1] - 248:5

**considering** [1] - 9:4

**considers** [1] - 27:21

**consistent** [1] - 6:8

**console** [1] - 90:16

**consolidated** [1] - 273:24

**conspiracy** [5] - 7:1, 8:24, 240:19, 240:21, 255:4

**conspired** [2] - 3:15,

75:18

**conspiring** [2] - 134:15, 199:14

**constitute** [1] - 276:7

**consulting** [1] - 76:15

**consuming** [1] - 232:24

**contact** [1] - 186:2

**contain** [2] - 4:1, 194:22

**contained** [3] - 7:15, 27:11, 28:5

**containing** [1] - 6:17

**contains** [2] - 3:14, 240:14

**context** [1] - 245:10

**Continue** [6] - 74:7, 119:21, 120:20, 194:14, 249:1, 249:8

**continue** [9] - 4:17, 74:20, 74:21, 103:15, 119:21, 154:8, 170:7, 249:3, 250:12

**continuing** [7] - 74:18, 75:3, 75:5, 75:21, 76:7, 76:8, 218:24

**continuity** [1] - 8:23

**contraband** [3] - 25:25, 113:14, 114:22

**contract** [20] - 27:8, 172:2, 187:18, 188:8, 188:20, 188:22, 189:1, 219:1, 219:2, 219:5, 219:11, 219:20, 221:11, 238:5, 238:6, 238:8, 238:21, 238:23, 255:21, 256:2

**controversial** [1] - 74:19

**conversation** [8] - 123:3, 123:8, 123:11, 123:15, 147:11, 166:24, 191:3, 237:24

**conversations** [4] - 123:4, 217:3, 217:4, 248:4

**convicted** [7] - 9:18, 31:15, 32:15, 150:1, 150:9, 167:22, 170:25

**conviction** [2] - 9:19, 19:20

**convictions** [4] - 31:13, 32:13, 32:18, 260:24

**cook** [11] - 83:23, 83:25, 84:5, 84:13, 84:17, 85:5, 85:14, 101:20, 105:10, 106:13, 161:6

**cooked** [5] - 84:1, 106:11, 133:6, 133:7

**cooking** [1] - 102:2

**cool** [1] - 66:7

**cooperate** [6] - 25:1, 25:14, 26:11, 201:4, 222:15, 242:15

**cooperated** [3] - 203:23, 222:19, 223:24

**cooperating** [6] - 2:7, 3:12, 199:18, 200:14, 246:1, 246:6

**cooperation** [6] - 200:17, 200:19, 200:21, 202:1, 245:20

**cooperator** [2] - 246:5, 246:15

**cooperators** [2] - 255:11, 255:13

**copies** [1] - 7:6

**cops** [1] - 260:25

**copy** [5] - 5:6, 7:8, 174:25, 175:3, 187:10

**corner** [16] - 12:9, 12:11, 38:3, 38:4, 90:10, 91:13, 111:3, 127:9, 127:10, 127:11, 139:14, 156:24, 162:21, 162:22, 173:10, 173:25

**Corner** [1] - 91:6

**Correct** [206] - 13:24, 19:12, 90:3, 128:21, 128:23, 128:25, 132:21, 149:8, 149:17, 149:24, 150:2, 150:5, 150:24, 151:2, 151:4, 151:7, 151:9, 151:11, 151:13, 151:17, 151:19, 152:3, 152:6, 152:9, 153:1, 153:5, 153:11, 153:14, 153:18, 153:20, 153:23, 154:2, 154:5, 154:7, 154:17, 154:19, 155:1, 155:3, 155:6, 155:10, 155:13, 155:16, 155:20, 155:23, 156:1, 156:4, 156:7, 156:23, 157:1, 157:14, 157:16, 157:18, 157:22, 158:17, 159:10, 159:12, 159:18, 159:25, 160:3, 160:6, 160:18, 160:21, 160:24, 161:1, 161:5, 161:11, 161:15, 161:18, 161:22, 162:1, 162:5, 162:9, 162:12, 162:15, 162:19, 164:1, 164:4, 164:16, 164:22, 166:13, 166:22, 167:2, 167:7, 167:11, 167:24, 168:4, 168:8, 168:13, 168:16, 169:20, 169:23, 169:25, 170:3, 170:6, 170:18, 170:21, 170:23, 171:1, 171:10, 171:13,

171:17, 171:22, 171:25,
172:5, 172:17, 172:19,
173:8, 173:11, 173:13,
173:16, 173:23, 174:1,
174:5, 174:8, 174:12,
174:18, 174:21, 175:24,
176:1, 176:7, 176:9,
176:12, 177:1, 177:9,
177:12, 177:14, 177:17,
177:21, 177:24, 178:18,
178:22, 178:24, 179:2,
179:14, 179:20, 179:25,
180:2, 180:7, 180:11,
180:22, 181:18, 181:19,
181:24, 182:2, 182:7,
182:16, 182:18, 182:21,
182:24, 183:4, 183:8,
184:2, 184:8, 184:22,
185:2, 185:5, 185:9,
185:11, 185:14, 185:25,
186:4, 186:9, 186:12,
186:14, 186:19, 186:22,
187:2, 187:5, 187:16,
187:22, 188:1, 188:7,
188:10, 188:14, 188:17,
189:4, 189:6, 190:5,
190:12, 190:14, 190:22,
191:6, 192:12, 193:3,
193:11, 193:12, 193:14,
193:16, 193:17, 194:2,
201:3, 224:17, 224:20,
226:3, 230:1, 230:6,
230:9, 230:12, 237:19,
237:22, 238:16, 239:9,
239:13, 239:17, 243:3,
244:6

**correct** [124] - 10:24,
16:3, 19:4, 19:22, 20:3,
23:10, 24:16, 24:23,
26:2, 30:25, 31:2, 31:5,
32:10, 35:6, 42:11, 44:5,
47:4, 47:10, 66:9, 71:5,
89:10, 89:25, 90:2, 90:5,
91:15, 91:22, 94:1,
96:12, 103:23, 104:9,
105:23, 106:11, 106:18,
106:21, 106:25, 111:21,
113:9, 113:12, 114:25,
115:15, 117:3, 117:15,
117:24, 118:25, 119:6,
119:18, 122:9, 122:15,
125:2, 125:14, 128:20,
128:22, 132:11, 146:19,
152:5, 153:4, 158:16,
159:20, 160:17, 160:23,
161:4, 161:10, 161:14,
161:17, 161:21, 163:25,
164:15, 167:1, 167:4,
171:24, 175:13, 180:10,
181:5, 182:1, 182:6,
182:20, 182:23, 184:6,

184:11, 184:17, 184:21,
184:25, 185:4, 185:8,
185:13, 185:24, 186:3,
186:8, 186:18, 187:1,
187:4, 187:21, 188:6,
188:9, 188:13, 188:16,
189:5, 189:13, 190:11,
190:21, 190:24, 201:5,
201:12, 211:13, 213:14,
222:13, 225:2, 225:21,
226:2, 226:5, 228:9,
228:11, 229:25, 230:8,
231:14, 231:19, 232:9,
232:13, 232:20, 237:15,
237:21, 238:5, 239:8,
252:11

**correctly** [6] - 143:9,
168:14, 171:8, 177:25,
214:16, 224:10

**counsel** [14] - 8:14,
9:14, 40:9, 72:19, 77:10,
77:19, 77:20, 249:24,
252:9, 258:7, 272:3,
272:13, 272:22, 274:3

**Counsel** [2] - 74:10,
194:23

**count** [1] - 130:5

**counted** [1] - 214:16

**County** [1] - 96:25

**couple** [34] - 2:10, 38:9,
38:13, 48:10, 51:18,
61:10, 61:11, 67:8, 67:9,
92:15, 94:16, 99:15,
100:9, 100:22, 104:12,
109:2, 109:6, 111:14,
114:5, 132:13, 132:22,
141:13, 144:24, 163:11,
163:16, 171:15, 174:13,
184:16, 190:16, 191:17,
244:18, 245:12, 253:11

**course** [19] - 17:6, 75:6,
77:9, 130:1, 167:5,
167:19, 180:23, 187:12,
212:11, 238:9, 249:20,
253:20, 261:7, 261:20,
268:13, 270:11, 271:5,
273:22

**COURT** [291] - 1:1, 2:3,
2:17, 2:19, 3:8, 3:17,
4:19, 4:25, 5:3, 5:14,
5:16, 5:20, 6:1, 6:6,
6:11, 6:21, 7:3, 7:5,
7:13, 7:21, 8:2, 8:5, 8:8,
12:6, 12:20, 13:9, 14:1,
14:8, 14:12, 21:13,
21:16, 24:4, 24:9, 29:5,
29:13, 30:20, 32:7, 33:5,
33:8, 34:15, 34:19,
35:21, 36:17, 38:8,
39:20, 39:25, 40:9,

40:12, 41:2, 41:4, 41:10,
42:20, 43:5, 43:11,
43:18, 45:4, 45:13,
45:19, 45:25, 46:5,
46:16, 46:21, 46:25,
48:11, 51:15, 52:7,
53:20, 54:3, 54:21, 55:4,
55:6, 56:9, 57:9, 58:15,
60:3, 60:18, 60:20,
60:23, 62:4, 62:10,
62:12, 62:16, 62:20,
62:24, 63:9, 64:6, 65:16,
66:6, 70:9, 70:13, 72:4,
72:13, 72:17, 72:19,
73:1, 73:6, 73:24, 74:2,
74:10, 75:1, 75:5, 75:11,
75:16, 75:22, 76:2, 76:5,
76:8, 76:11, 76:13,
76:19, 76:21, 77:16,
77:19, 77:24, 78:3,
78:19, 78:25, 79:16,
80:3, 80:13, 81:7, 82:4,
82:8, 89:7, 95:1, 97:14,
97:22, 98:4, 98:9,
102:21, 107:18, 109:4,
109:16, 110:3, 116:16,
116:18, 116:25, 117:22,
118:18, 119:16, 119:24,
120:2, 120:4, 120:10,
120:14, 120:16, 120:18,
120:23, 172:24, 175:5,
175:7, 176:21, 181:12,
182:10, 187:10, 188:24,
189:3, 191:19, 191:22,
192:16, 194:4, 194:6,
194:8, 194:11, 194:17,
195:3, 195:6, 195:8,
195:10, 195:15, 195:17,
195:20, 196:1, 196:5,
198:16, 212:24, 213:12,
217:9, 217:12, 217:19,
217:22, 218:10, 218:15,
218:23, 218:25, 219:9,
219:13, 219:17, 219:23,
220:2, 220:14, 220:22,
221:2, 221:6, 230:23,
244:12, 244:22, 246:20,
247:3, 249:18, 249:24,
250:6, 250:20, 250:24,
251:7, 251:10, 251:16,
252:6, 252:12, 252:15,
252:23, 253:6, 253:9,
253:13, 253:17, 253:20,
253:22, 254:4, 254:11,
254:14, 254:16, 254:21,
254:23, 255:4, 255:6,
255:9, 255:14, 255:18,
255:23, 256:4, 256:6,
256:12, 256:22, 257:1,
257:8, 257:19, 258:3,
258:7, 258:12, 258:19,

258:21, 259:2, 259:7,
259:12, 259:17, 259:21,
260:1, 260:4, 260:7,
260:9, 260:13, 260:20,
261:10, 261:17, 261:19,
261:23, 262:2, 262:7,
262:16, 262:19, 262:23,
263:4, 263:10, 263:12,
263:23, 264:2, 264:24,
265:3, 265:22, 266:6,
266:18, 266:22, 267:2,
267:9, 267:22, 268:13,
268:16, 268:24, 269:3,
269:21, 270:3, 271:1,
271:23, 272:5, 272:16,
272:20, 272:25, 273:7,
273:10, 273:18, 274:3

**court** [31] - 3:21, 4:17,
5:22, 25:20, 25:24,
26:12, 27:23, 30:8, 31:7,
34:9, 121:7, 146:1,
151:15, 151:16, 152:8,
152:11, 159:6, 188:12,
198:3, 200:11, 201:14,
203:15, 204:11, 212:20,
244:8, 246:11, 246:13,
246:14, 246:24, 261:22

**Court** [30] - 2:12, 4:1,
18:18, 26:4, 26:15,
27:21, 28:9, 28:10,
62:13, 74:21, 189:18,
190:1, 194:18, 198:4,
198:8, 198:9, 202:22,
250:1, 251:1, 252:11,
258:17, 259:25, 262:6,
264:9, 266:4, 268:5,
268:17, 269:19, 273:4,
276:16

**Court's** [12] - 4:14,
109:15, 172:21, 214:12,
249:23, 250:11, 250:12,
250:15, 250:18, 251:13,
252:10, 252:19

**Courthouse** [1] - 1:24

**courtroom** [25] - 2:1,
8:7, 35:11, 36:7, 37:18,
74:9, 74:25, 77:23, 78:2,
79:10, 79:14, 119:23,
120:22, 127:4, 169:17,
182:6, 191:8, 191:12,
194:16, 194:19, 194:25,
195:25, 242:16, 247:12,
249:17

**courtrooms** [1] - 7:12

**cousin** [8] - 42:2, 42:3,
46:7, 47:2, 55:21, 104:9,
133:11

**cousins** [2] - 69:7, 69:8

**cover** [1] - 77:19

**covered** [1] - 178:16

**crack** [18] - 52:15,
83:21, 84:6, 84:13,
84:16, 84:17, 85:2, 85:5,
100:20, 100:24, 101:20,
105:10, 133:6, 133:7,
161:3, 161:6, 177:19

**Crack** [1] - 105:7

**credibility** [2] - 6:9,
6:20

**crew** [2] - 110:23,
113:12

**crime** [9] - 124:1, 124:2,
124:4, 124:5, 170:25,
180:1, 198:1, 232:16,
256:19

**crimes** [3] - 27:23,
31:15, 185:24

**criminal** [12] - 19:14,
19:24, 26:6, 26:8,
149:19, 164:14, 167:21,
168:10, 174:17, 198:8,
201:21, 202:8

**CRIMINAL** [1] - 1:6

**criticize** [2] - 136:4,
149:20

**CROSS** [10] - 18:24,
120:25, 158:8, 166:4,
224:5, 275:4, 275:6,
275:7, 275:7, 275:10

**cross** [16] - 2:14, 4:24,
75:16, 183:23, 195:13,
247:7, 258:1, 264:18,
264:22, 265:23, 266:9,
266:21, 267:9, 268:19,
270:24, 271:12

**Crowe** [1] - 1:20

**CROWE** [2] - 39:24,
40:20

**crucial** [1] - 258:2

**culture** [1] - 140:23

**custodian** [1] - 257:5

**customers** [1] - 71:13

**cut** [4] - 37:7, 41:23,
133:5

**cutting** [2] - 11:15,
110:10

---

# D

**D-A-R-R-Y-L** [1] - 22:1

**D-E-R-E-K** [1] - 10:6

**daily** [1] - 206:2

**Dana** [1] - 235:20

**dance** [1] - 209:21

**dancing** [1] - 209:10

**dark** [1] - 255:13

**Darryl** [36] - 2:7, 5:6,
18:1, 20:6, 21:9, 21:18,
21:24, 48:17, 49:4, 49:8,

49:23, 50:5, 50:8, 50:13, 50:14, 50:15, 51:3, 51:12, 64:16, 100:13, 105:13, 105:14, 105:18, 105:25, 107:13, 107:15, 111:13, 115:8, 115:25, 116:19, 118:20, 173:24, 185:3, 205:7, 206:11

**DARRYL** [2] - 21:19, 275:5

**Darryl's** [2] - 105:17, 164:10

**dashboard** [1] - 86:15

**date** [17] - 15:19, 23:18, 25:11, 30:15, 30:21, 86:17, 86:23, 171:14, 173:1, 173:2, 173:9, 173:10, 173:12, 173:14, 180:15, 261:22

**dated** [3] - 198:18, 199:17, 199:24

**dates** [1] - 197:18

**Davis** [1] - 1:13

**days** [10] - 29:11, 29:15, 29:16, 29:18, 169:1, 206:5, 244:19, 257:14, 258:18, 258:25

**dead** [1] - 257:21

**deal** [13] - 47:18, 50:14, 50:15, 56:21, 63:14, 63:24, 82:25, 83:20, 127:3, 128:1, 129:21, 129:25, 203:20

**dealer** [8] - 45:21, 63:20, 65:12, 66:23, 137:11, 142:16, 156:11, 186:24

**dealers** [10] - 59:2, 71:4, 126:19, 137:10, 137:15, 138:16, 142:7, 156:12, 156:17, 186:7

**dealing** [13] - 73:19, 82:25, 83:1, 121:10, 121:17, 128:4, 141:9, 187:25, 197:24, 203:18, 206:15, 227:22, 228:1

**dealings** [2] - 125:9, 125:23, 203:24

**dealt** [17] - 45:22, 47:9, 63:16, 126:12, 127:3, 127:6, 127:7, 127:9, 127:24, 128:18, 129:3, 129:11, 129:15, 129:22, 129:24, 203:22, 228:11

**debate** [4] - 262:17, 263:6, 263:7, 269:19

**debris** [1] - 215:8

**debt** [2] - 135:25, 150:3

**debtor** [1] - 92:20

**decide** [12] - 18:18,

28:3, 28:7, 83:5, 159:3, 159:8, 159:23, 189:9, 195:3, 247:23, 247:25, 259:25

**decided** [4] - 14:14, 83:6, 190:1, 259:11

**decides** [2] - 202:19, 202:21

**deciding** [2] - 30:4, 149:25

**decision** [5] - 9:21, 127:11, 159:19, 202:19, 268:25

**deeply** [1] - 257:9

**Deezo** [6] - 52:21, 52:22, 116:3, 116:6, 141:13, 147:25

**Def** [4] - 207:20, 207:22, 208:3

**defendant** [16] - 9:16, 9:17, 18:14, 35:20, 36:16, 77:1, 201:13, 213:10, 240:19, 240:21, 244:2, 244:4, 246:15, 247:24, 263:13, 263:14

**Defendant** [7] - 1:17, 1:18, 1:20, 1:21, 172:21, 172:25, 176:23

**Defendant's** [1] - 176:16

**defendant's** [1] - 9:2

**defendants** [19] - 7:16, 8:20, 9:6, 9:10, 18:15, 39:6, 42:14, 76:23, 79:22, 80:6, 82:2, 82:5, 191:13, 200:6, 247:22, 262:4, 263:14, 265:7, 272:11

**Defendants** [3] - 1:9, 2:1, 74:25

**defense** [19] - 74:15, 200:8, 229:19, 230:4, 230:15, 230:18, 231:8, 231:14, 245:21, 245:25, 252:9, 255:12, 256:13, 259:14, 261:6, 262:25, 264:20, 271:13, 272:2

**definitely** [2] - 264:13, 269:10

**degree** [3] - 16:6, 126:12, 229:23

**delays** [1] - 8:12

**delighted** [1] - 194:25

**delving** [1] - 227:12

**denial** [1] - 250:15

**denied** [4] - 187:1, 187:4, 221:6, 241:20

**deny** [1] - 241:20

**depart** [1] - 214:19

**Department** [2] - 10:12,

173:3

**departure** [1] - 202:15

**deposit** [1] - 35:4

**Deputy** [1] - 257:3

**Derek** [4] - 9:24, 10:5, 235:18, 235:19

**DEREK** [2] - 10:1, 275:3

**describe** [2] - 35:15, 36:11

**described** [5] - 9:7, 9:11, 162:17, 177:11, 177:15

**describing** [1] - 169:9

**designed** [2] - 182:25, 203:7

**desire** [4] - 135:7, 195:14, 238:15, 257:9

**detail** [6] - 8:21, 107:8, 107:9, 158:15, 247:17, 255:1

**detailed** [1] - 24:21

**details** [3] - 31:10, 126:11, 227:12

**detective** [2] - 10:12, 256:17

**Detective** [7] - 12:14, 12:24, 13:9, 18:13, 19:1, 21:13, 270:14

**detectives** [1] - 174:6

**determination** [2] - 9:10, 158:18

**determine** [2] - 26:5, 158:24

**determined** [1] - 189:18

**determines** [1] - 202:13

**detriment** [1] - 4:12

**device** [1] - 172:23

**Devin** [4] - 59:17, 59:18, 59:24, 60:7

**Diaz** [1] - 226:23

**dice** [1] - 111:7

**died** [1] - 115:22

**difference** [4] - 157:6, 170:19, 183:5, 235:2

**differences** [1] - 236:4

**different** [19] - 79:10, 95:6, 125:9, 126:7, 126:13, 126:16, 129:11, 129:23, 130:3, 132:22, 134:20, 138:3, 150:6, 183:6, 183:21, 251:6, 258:18

**differently** [1] - 14:2

**difficult** [6] - 2:24, 13:23, 77:11, 191:12, 191:20, 214:25

**Dime** [1] - 104:12

**dip** [2] - 88:19, 88:20

**dire** [3] - 271:6, 273:9, 273:10

direct [17] - 76:16, 126:7, 145:7, 166:25, 167:20, 171:18, 172:7, 175:8, 191:4, 206:21, 247:6, 255:8, 257:25, 258:24, 262:10, 272:1

**DIRECT** [6] - 10:7, 22:2, 196:13, 275:4, 275:6, 275:10

**Directing** [1] - 175:13

**direction** [5] - 4:2, 11:8, 11:25, 13:2, 206:3

**directly** [2] - 2:14, 10:3, 15:1, 16:2, 21:21, 50:13, 71:13, 77:25, 120:20

**dirty** [1] - 145:17

**disadvantage** [1] - 266:15

**disagree** [1] - 272:24

**disclose** [2] - 254:2

**disclosing** [1] - 245:25

**disclosures** [3] - 28:12, 189:19, 189:20

**discouraged** [1] - 261:13

**discovered** [1] - 17:24

**discovery** [2] - 263:1, 265:25

**discrete** [1] - 74:11

**discuss** [3] - 3:24, 4:16, 249:7

**discussed** [4] - 4:23, 125:8, 126:6, 217:4

**discussing** [1] - 266:7

**discussion** [14] - 74:6, 119:18, 124:7, 194:13, 217:16, 219:4, 219:19, 220:4, 234:21, 251:4, 251:19, 266:24, 269:18, 270:19

**discussions** [3] - 217:7, 217:23, 218:2

**dismissed** [1] - 19:19

**dispatcher** [3] - 14:23, 15:21

**displayed** [1] - 77:21

**disposing** [1] - 136:18

**disposition** [3] - 18:14, 19:13, 176:13

**dispute** [4] - 28:1, 74:14, 143:19, 236:14

**disputed** [1] - 255:15

**dissuade** [1] - 238:4

**distribute** [14] - 46:18, 46:23, 61:25, 68:9, 68:11, 70:3, 70:6, 70:15, 75:18, 83:21, 85:1, 100:15, 199:14, 240:22

**Distributed** [1] - 61:16

**distributed** [3] - 45:21,

68:13, 240:22

**distributes** [1] - 89:25

**distribution** [2] - 240:11, 248:5

**DISTRICT** [2] - 1:1, 1:2

**District** [4] - 10:16, 173:6, 198:8, 198:9

**diversions** [1] - 248:24

**Division** [1] - 173:7

**DIVISION** [1] - 1:2

**DNA** [2] - 256:15, 260:2

**DOAR** [8] - 30:20, 40:10, 48:11, 77:11, 77:14, 172:23, 176:15, 207:9

**doctor** [2] - 257:9, 257:17

**document** [4] - 23:6, 172:25, 173:22, 198:17

**documents** [2] - 28:12, 189:20

**dog** [7] - 110:12, 110:18, 110:19, 111:10, 137:3, 263:8

**dog-eat-dog** [1] - 137:3

**dogs** [3] - 110:13, 111:16, 112:4

**dollar** [1] - 104:12

**dollars** [7] - 61:11, 73:11, 73:22, 106:6, 119:14, 155:15, 155:25

**Dominican** [2] - 56:19, 56:20, 161:12

**done** [7] - 7:12, 7:13, 80:6, 123:5, 144:2, 144:4, 154:6, 197:10, 206:16, 242:15, 245:19, 257:23

**Donte** [5] - 42:4, 42:5, 42:7, 108:5, 133:11

**Donte's** [1] - 42:8

**door** [5] - 17:13, 29:16, 195:21, 272:12

**doors** [5] - 85:23, 110:10, 110:11, 111:15, 111:21

**Dorsey** [1] - 204:3

**dose** [1] - 237:3

**doubt** [2] - 9:22, 258:23

**dough** [2] - 110:25, 113:18

**down** [25] - 27:13, 44:3, 47:18, 47:20, 48:8, 54:23, 61:24, 65:7, 74:2, 91:3, 92:24, 98:13, 104:22, 109:6, 111:6, 112:18, 114:15, 117:9, 134:13, 173:10, 174:13, 179:21, 181:9, 213:23

**Downtown** [2] - 207:2,

207:3
  **dozed** [1] - 266:17
  **drafted** [1] - 229:19
  **drink** [5] - 111:5, 233:9,
233:25, 234:4, 234:8
  **drinking** [4] - 209:11,
209:20, 233:9, 234:2
  **drive** [2] - 142:8, 229:3
  **driver** [7] - 11:18,
11:20, 15:3, 15:4, 16:17,
20:19, 21:7
  **driver's** [5] - 14:25,
15:3, 15:12, 16:25, 90:15
  **driving** [8] - 15:23,
20:15, 86:22, 90:4,
96:19, 98:13, 105:3,
162:18
  **Drove** [2] - 59:9, 59:11
  **drove** [3] - 59:10,
109:12, 163:21
  **Drug** [1] - 31:18
  **drug** [63] - 8:24, 31:21,
31:22, 31:24, 32:12,
32:18, 41:15, 42:13,
50:1, 52:3, 56:14, 62:7,
63:20, 65:12, 67:2, 68:5,
70:21, 82:19, 87:4, 87:6,
90:9, 92:20, 97:3, 100:3,
100:18, 105:6, 111:23,
113:2, 124:23, 126:19,
130:4, 137:8, 137:10,
137:15, 138:11, 138:16,
140:8, 140:11, 142:7,
142:16, 156:12, 156:17,
162:18, 162:20, 162:21,
162:22, 162:23, 163:22,
168:10, 177:7, 184:24,
186:7, 186:23, 187:24,
192:21, 197:24, 206:15,
222:2, 232:8, 246:1
  **drugs** [138] - 42:22,
43:9, 44:16, 44:17,
44:19, 44:21, 45:5, 46:8,
46:18, 47:6, 47:23, 48:3,
50:3, 50:5, 50:8, 50:13,
51:2, 52:10, 52:13,
53:12, 53:13, 53:16,
53:21, 53:23, 53:25,
54:4, 54:12, 54:15,
54:17, 54:19, 55:2, 55:8,
55:19, 56:4, 56:6, 56:21,
56:23, 56:25, 57:4, 57:6,
59:6, 59:7, 60:1, 61:25,
63:2, 63:6, 63:14, 63:24,
64:3, 64:14, 64:17, 66:2,
66:8, 67:20, 67:24, 68:3,
68:9, 68:11, 68:13,
68:14, 69:2, 70:3, 70:6,
70:15, 75:13, 75:18,
82:25, 85:17, 85:21,

85:24, 86:5, 89:4, 91:21,
91:24, 92:1, 92:3, 93:3,
98:14, 98:15, 99:1, 99:3,
100:15, 105:2, 105:4,
111:18, 121:10, 121:17,
124:18, 126:12, 126:24,
127:3, 127:7, 127:9,
127:24, 128:1, 128:4,
128:15, 129:3, 130:1,
130:20, 135:2, 139:17,
142:14, 143:13, 143:15,
144:23, 145:2, 149:22,
151:6, 152:25, 153:3,
155:5, 159:14, 160:23,
161:8, 161:9, 161:19,
161:21, 161:25, 162:22,
169:7, 170:1, 179:4,
184:20, 197:13, 197:14,
197:19, 203:18, 203:20,
206:1, 206:13, 225:7,
225:10, 228:11, 228:14,
248:5
  **ducking** [1] - 135:15
  **due** [1] - 250:25
  **During** [6] - 76:14,
79:22, 212:13, 240:19,
240:20, 248:19
  **during** [25] - 17:9, 75:6,
79:23, 132:22, 161:16,
163:15, 167:5, 167:19,
170:12, 171:18, 172:6,
180:23, 184:19, 185:12,
191:4, 194:19, 195:1,
212:11, 214:4, 217:4,
218:1, 223:18, 225:7,
225:10, 270:11

# E

  **E-R-I-C** [1] - 196:11
  **early** [3] - 273:20,
273:21
  **earning** [1] - 29:11
  **easier** [1] - 136:12
  **East** [6] - 73:18, 73:19,
73:21, 94:12, 129:3,
181:21
  **east** [2] - 12:2
  **Eastern** [1] - 10:16
  **easy** [2] - 191:15,
191:17
  **eat** [1] - 137:3
  **edge** [1] - 110:14
  **Education** [1] - 232:5
  **effect** [2] - 6:1, 75:13
  **effectuated** [2] -
230:18, 231:14
  **effort** [4] - 145:4,
221:23, 228:13, 229:19

  **Eight** [3] - 28:16, 181:9,
222:8
  **eight** [2] - 257:21, 265:6
  **eighth** [5] - 110:13,
112:4, 112:7, 112:9,
112:12
  **Either** [1] - 272:7
  **either** [20] - 7:17, 12:17,
16:2, 18:14, 20:12, 62:6,
148:22, 203:23, 204:18,
212:11, 258:1, 259:14,
264:18, 265:16, 268:3,
268:19, 270:23, 271:12,
273:19
  **elaborate** [2] - 250:10,
251:7
  **element** [1] - 8:22
  **elements** [1] - 8:22
  **Eleventh** [1] - 22:11
  **eleventh** [1] - 22:12
  **elicit** [11] - 261:11,
261:15, 264:4, 264:18,
266:9, 266:12, 267:12,
267:24, 268:18, 271:25,
272:13
  **elicited** [1] - 263:4
  **eliciting** [3] - 75:9,
75:14, 261:14
  **elsewhere** [1] - 208:4
  **embarrass** [1] - 149:20
  **emphasize** [1] - 248:9
  **emphasized** [1] -
158:15
  **emphatically** [1] - 267:5
  **employed** [2] - 10:11,
22:15
  **enabled** [1] - 265:13
  **encounter** [1] - 249:4
  **end** [9] - 72:6, 141:12,
187:11, 197:23, 198:5,
261:25, 268:15, 269:9,
272:12
  **endeavor** [2] - 239:19
  **ended** [2] - 199:10,
221:11
  **enforce** [1] - 143:25
  **enforcement** [8] - 8:18,
9:3, 9:8, 9:14, 25:2,
158:25, 201:1, 201:4
  **engage** [3] - 132:19,
201:21, 239:19
  **engaged** [2] - 212:18,
217:23
  **Enjoy** [2] - 249:14,
249:16
  **enjoy** [4] - 248:19,
248:22, 248:25
  **ensue** [1] - 233:12
  **ensued** [1] - 237:23
  **enter** [2] - 151:20,

153:12
  **entered** [8] - 3:13,
153:22, 172:2, 176:13,
178:1, 200:21, 201:10,
243:15
  **entering** [1] - 25:20
  **enterprise** [3] - 8:23,
222:1, 222:5
  **enters** [5] - 8:7, 77:23,
78:2, 120:22, 195:25
  **entire** [4] - 29:1, 149:21,
202:11, 206:15
  **entirely** [1] - 134:20,
248:21
  **entitled** [4] - 251:23,
265:20, 267:24, 271:12
  **equal** [1] - 125:19
  **ERIC** [2] - 196:7, 275:9
  **Eric** [14] - 3:11, 104:16,
104:25, 169:16, 169:17,
194:10, 196:4, 196:11,
198:22, 205:23, 220:3,
220:5, 220:9, 226:25
  **Ernie** [2] - 110:24,
113:17
  **especially** [4] - 110:16,
112:15, 255:2, 265:13
  **Esquire** [11] - 1:16,
1:16, 1:17, 1:18, 1:19,
1:19, 1:20, 1:21, 1:22,
1:22, 264:5
  **essentially** [4] - 5:21,
19:19, 137:21, 272:11
  **establish** [2] - 28:13,
189:21
  **established** [5] - 75:17,
149:20, 157:8, 236:18,
237:12
  **estimate** [1] - 101:13
  **et** [1] - 276:5
  **evening** [4] - 8:10,
71:21, 232:24, 233:11
  **event** [12] - 4:18, 25:21,
124:10, 149:19, 179:15,
183:20, 212:12, 215:10,
222:13, 223:15, 223:18,
238:14
  **events** [2] - 123:4,
155:21
  **eventually** [1] - 43:8
  **everyday** [2] - 135:1,
135:22
  **evidence** [28] - 5:12,
6:25, 7:16, 7:24, 7:25,
8:3, 9:2, 9:4, 9:12,
27:14, 28:14, 74:7,
183:12, 185:20, 189:22,
190:3, 190:18, 194:14,
248:6, 248:13, 249:7,
250:8, 251:21, 254:23,

254:24, 257:19, 264:17,
264:21
  **evidentiary** [1] - 4:3
  **exact** [6] - 95:19,
230:13, 231:9, 231:10,
231:11, 231:12
  **exactly** [3] - 8:6, 35:2,
253:7
  **exaggerate** [3] - 156:8,
156:9, 157:5
  **Exaggerate** [1] - 156:13
  **exaggerated** [5] -
73:15, 156:6, 157:4,
157:10, 181:5
  **exaggerating** [1] -
157:2
  **examination** [14] - 2:14,
4:20, 6:12, 74:11, 75:7,
75:16, 172:7, 191:4,
247:6, 247:7, 264:18,
264:23, 265:23, 266:9
  **EXAMINATION** [24] -
10:7, 18:24, 22:2,
120:25, 158:8, 166:4,
182:11, 192:17, 196:13,
224:5, 244:13, 246:21,
275:4, 275:4, 275:6,
275:6, 275:7, 275:7,
275:8, 275:8, 275:10,
275:10, 275:11, 275:11
  **examinations** [1] -
74:13
  **examine** [2] - 183:23,
267:9
  **examiner** [3] - 256:23,
257:11, 258:18
  **Examiner** [1] - 257:3
  **Examiner's** [1] - 257:6
  **example** [11] - 42:17,
127:2, 141:1, 148:10,
150:18, 180:1, 188:4,
188:20, 247:18, 264:12,
264:13
  **examples** [1] - 185:12
  **Excellent** [1] - 24:10,
259:7
  **Except** [2] - 77:16,
77:18
  **except** [2] - 252:15,
258:3
  **exchange** [3] - 25:13,
26:11, 210:11
  **exchanging** [4] -
209:25, 210:7, 210:18,
213:17
  **excuse** [1] - 166:14
  **Excuse** [1] - 234:18
  **excused** [6] - 21:14,
74:3, 74:8, 119:22,
119:24, 194:4, 194:6,

194:15, 247:3, 249:16
**execution** [1] - 5:10
**Exhibit** [24] - 23:6, 42:6, 48:13, 48:24, 51:19, 58:22, 64:21, 69:10, 69:21, 91:9, 109:17, 172:21, 173:1, 176:16, 176:23, 190:18, 200:19, 200:20, 207:11, 210:23, 212:2, 214:22, 215:5, 217:1
**exhibit** [2] - 77:13, 109:14
**exhibits** [1] - 12:4
**existed** [1] - 176:10
**existence** [1] - 145:4
**exited** [1] - 14:24
**exits** [4] - 74:9, 119:23, 194:16, 249:17
**expect** [2] - 259:24, 262:6
**expectation** [1] - 241:9
**expected** [1] - 209:17
**expecting** [1] - 160:14
**expert** [6] - 14:12, 256:15, 256:19, 258:6, 270:6
**explain** [4] - 8:2, 28:11, 28:16, 84:12
**explained** [3] - 182:19, 183:17, 243:25
**explaining** [1] - 230:24
**exposure** [2] - 249:1
**express** [5] - 34:11, 183:18, 218:7, 219:4, 219:20
**expressed** [2] - 231:13, 261:12
**extent** [2] - 47:19, 271:10
**extra** [1] - 152:11

---

**F**

**face** [14] - 203:13, 212:10, 224:10, 224:22, 224:23, 237:10, 237:11, 237:17, 237:21, 241:24, 243:16, 244:2, 244:7, 267:6
**faced** [1] - 30:6
**faceless** [1] - 238:17
**faces** [1] - 76:23
**facie** [3] - 75:17, 75:19, 273:12
**facilitate** [1] - 228:14
**facility** [5] - 33:20, 79:8, 108:17, 115:14, 170:16
**facing** [1] - 16:6

**fact** [54] - 4:6, 6:16, 27:13, 27:20, 28:21, 29:6, 47:6, 64:19, 117:20, 122:18, 123:15, 125:9, 126:6, 131:1, 131:12, 133:17, 135:1, 135:25, 145:11, 146:4, 146:13, 147:9, 150:25, 154:14, 154:15, 159:2, 159:4, 159:11, 159:13, 160:19, 161:3, 161:20, 162:7, 162:13, 163:1, 164:2, 164:3, 174:19, 180:24, 186:1, 186:5, 187:7, 200:14, 229:9, 235:23, 239:19, 241:5, 246:1, 246:23, 250:17, 255:25, 258:23, 268:5, 274:1
**facts** [8] - 3:14, 7:8, 7:10, 25:25, 26:5, 146:8, 176:19, 240:14
**factual** [2] - 7:15, 188:3
**failed** [2] - 140:8, 140:11
**fails** [2] - 179:16, 179:22
**failure** [3] - 18:5, 140:7, 186:24
**Fair** [3] - 128:17, 268:16
**fair** [26] - 29:24, 122:12, 122:13, 122:16, 123:9, 123:10, 123:25, 125:11, 125:17, 126:11, 126:19, 126:25, 127:19, 128:6, 128:8, 128:9, 129:18, 134:16, 137:22, 140:24, 145:14, 148:21, 186:10, 187:23, 188:25, 266:5
**fairly** [3] - 225:20, 273:25, 274:1
**fairness** [2] - 264:25, 265:2
**faith** [2] - 136:25, 186:7
**fall** [1] - 273:14
**false** [8] - 28:17, 32:15, 32:20, 145:23, 148:22, 167:22, 167:25, 168:5
**falsely** [1] - 27:4
**familiar** [4] - 47:17, 91:10, 165:14, 165:16, 173:17, 263:20
**families** [3] - 110:17, 113:5, 248:22
**family** [7] - 2:21, 2:25, 34:12, 44:7, 111:2, 111:11, 246:9
**far** [13] - 13:4, 22:10, 74:7, 169:19, 194:14, 197:3, 218:19, 237:12,

247:19, 249:8, 261:15, 267:8
**fashion** [1] - 272:17
**faster** [1] - 110:4
**fate** [1] - 243:5
**FBI** [1] - 270:5
**February** [8] - 108:21, 197:17, 197:18, 203:19, 206:21, 233:4, 243:8, 243:9
**federal** [28] - 24:3, 25:2, 25:11, 25:23, 25:24, 27:23, 151:12, 151:15, 154:4, 156:22, 159:11, 159:13, 171:11, 174:11, 176:24, 178:1, 178:4, 178:6, 178:7, 178:21, 179:11, 179:17, 180:3, 180:23, 180:24, 198:5, 198:8, 203:15
**Federal** [1] - 198:6
**federally** [6] - 19:16, 29:25, 30:7, 159:16, 178:2, 180:5
**fell** [1] - 111:6
**fellows** [1] - 141:13
**felt** [1] - 214:13
**female** [5] - 59:14, 59:25, 60:4, 60:5, 60:8
**Female** [1] - 59:15
**few** [21] - 6:3, 39:4, 68:18, 73:3, 74:3, 94:7, 95:3, 110:16, 112:15, 158:13, 181:9, 204:4, 204:7, 205:1, 205:6, 214:20, 214:21, 233:21, 233:25, 260:14, 260:15
**Fifth** [3] - 176:3, 182:20, 194:24
**fight** [11] - 146:10, 146:18, 211:19, 216:1, 216:15, 223:1, 239:6, 251:18, 251:19, 252:9, 263:9
**fighting** [5] - 209:23, 211:17, 214:7, 215:2, 218:17
**figure** [1] - 157:12
**figures** [2] - 157:5, 190:10
**file** [1] - 3:24
**filed** [1] - 3:23
**final** [1] - 155:4
**Finally** [1] - 181:3
**financially** [1] - 229:7
**fine** [7] - 7:21, 8:11, 77:19, 77:22, 207:3, 258:13, 265:16
**finger** [1] - 174:13
**fingerprint** [1] - 256:19

**firearm** [1] - 25:25
**First** [10] - 69:7, 69:8, 75:2, 146:8, 194:18, 211:15, 224:9, 254:16, 269:17, 272:21
**first** [30] - 2:7, 2:20, 24:22, 30:19, 35:4, 37:9, 40:16, 44:17, 86:23, 107:3, 121:6, 121:23, 121:24, 146:5, 146:8, 146:16, 149:12, 163:16, 174:10, 182:13, 188:3, 188:15, 198:14, 198:19, 200:17, 205:13, 212:11, 229:14, 248:16, 271:20
**first-hand** [6] - 146:5, 146:8, 146:16, 149:12, 188:3, 188:15
**fists** [1] - 213:17
**Five** [3] - 25:15, 25:16, 26:19
**five** [21] - 26:17, 26:22, 27:23, 28:24, 29:6, 29:10, 30:1, 116:25, 120:6, 120:8, 127:24, 152:8, 152:10, 153:2, 153:6, 199:14, 214:16, 257:4, 257:12, 265:4
**Flannery** [2] - 1:19, 259:11
**flip** [1] - 173:2
**flipping** [1] - 173:21
**floor** [3] - 72:20, 209:22, 215:18
**Floor** [1] - 194:24
**focused** [1] - 9:13
**follow** [1] - 46:13
**following** [4] - 3:20, 98:13, 215:10, 222:13
**follows** [1] - 26:21
**food** [1] - 91:19
**foot** [1] - 10:22
**football** [2] - 248:24
**FOR** [1] - 1:2
**force** [2] - 135:5, 227:14
**foregoing** [1] - 276:7
**forfeit** [2] - 229:10, 231:18
**forfeiture** [1] - 231:17
**forget** [2] - 6:16, 192:19
**Forgive** [1] - 234:14
**forgive** [1] - 125:14
**form** [4] - 6:12, 7:16, 84:14, 174:22
**formulated** [1] - 252:2
**formulating** [2] - 251:13, 251:16
**forth** [4] - 164:14, 173:21, 183:20, 201:22
**forward** [2] - 10:3, 16:2

**foundation** [9] - 43:4, 72:12, 72:18, 75:9, 75:14, 75:19, 75:24, 76:2, 270:16
**four** [18] - 29:7, 29:16, 31:21, 31:24, 33:10, 155:18, 163:14, 202:16, 216:2, 235:6, 235:10, 236:19, 237:7, 237:14, 252:4, 263:8, 269:13, 270:7
**Four** [4] - 23:1, 112:8, 202:11, 232:1
**Fourth** [1] - 4:2
**fourth** [3] - 27:13, 27:20, 231:25
**fracas** [1] - 255:24
**frame** [1] - 221:23
**frankly** [4] - 258:1, 269:4, 269:6, 271:21
**free** [5] - 27:16, 77:3, 153:6, 181:8, 194:18
**Friday** [2] - 111:5, 114:7
**friend** [6] - 34:6, 56:1, 56:2, 59:23, 115:24, 161:9
**friend's** [1] - 84:10
**friendly** [1] - 125:15
**friends** [8] - 83:6, 83:8, 125:19, 129:23, 148:18, 156:25, 160:19, 208:7
**front** [19] - 3:21, 3:22, 11:15, 11:17, 13:17, 14:16, 16:16, 54:4, 86:13, 110:25, 113:18, 156:22, 198:17, 207:12, 207:15, 207:16, 210:24, 213:24, 241:11
**fronted** [1] - 93:3
**fruits** [1] - 232:8
**Fuck** [1] - 110:16
**fuck** [2] - 111:9, 113:4
**fulfill** [1] - 179:22
**fulfillment** [1] - 26:20
**full** [3] - 237:3, 258:16, 266:11
**fully** [5] - 9:6, 24:25, 25:6, 200:25, 201:13
**fundamentally** [1] - 74:13
**funds** [1] - 34:22
**furtherance** [1] - 255:4
**future** [3] - 185:21, 185:24, 194:21

---

**G**

**gal** [1] - 252:16
**game** [18] - 92:15,

111:23, 124:25, 125:4, 130:4, 134:8, 134:13, 135:1, 136:21, 137:22, 138:23, 140:7, 140:8, 140:11, 142:1, 151:1, 192:9, 268:2
  **game's** [1] - 142:1
  **games** [3] - 92:16, 135:13, 135:14
  **GARDNER** [1] - 1:8
  **Gardner** [103] - 1:21, 16:19, 16:25, 17:7, 18:2, 18:3, 20:2, 20:3, 20:5, 20:14, 20:15, 20:20, 35:9, 35:20, 35:22, 35:24, 37:13, 38:9, 41:24, 46:8, 46:12, 46:14, 46:23, 55:1, 56:6, 56:10, 57:6, 58:13, 59:1, 59:7, 62:2, 63:6, 64:3, 64:10, 64:11, 64:12, 65:9, 65:10, 65:14, 66:1, 71:12, 71:14, 71:16, 81:13, 81:17, 81:20, 82:11, 85:25, 86:17, 87:20, 88:4, 88:25, 89:4, 90:25, 91:8, 91:14, 92:7, 92:14, 92:17, 93:25, 95:4, 95:10, 95:25, 96:7, 97:5, 97:11, 97:15, 98:24, 99:7, 100:24, 108:13, 122:1, 125:11, 125:16, 125:20, 126:13, 126:17, 127:15, 127:16, 127:19, 128:3, 128:11, 130:21, 133:1, 133:6, 134:6, 140:19, 146:22, 147:12, 167:10, 167:16, 186:10, 188:5, 188:12, 188:21, 189:1, 261:3, 261:4, 264:1, 271:14, 271:19, 272:7, 272:13
  **Gardner's** [9] - 2:19, 36:20, 47:2, 94:6, 96:12, 169:22, 172:21, 172:25, 176:23
  **general** [5] - 102:3, 165:14, 231:12, 239:15, 239:20
  **gentleman** [5] - 3:16, 20:15, 147:25, 166:8, 166:9
  **gentlemen** [20] - 8:9, 70:23, 74:4, 78:3, 84:12, 120:23, 121:7, 124:10, 125:10, 134:5, 135:21, 166:20, 168:24, 169:10, 194:12, 196:1, 247:4, 249:14, 268:2
  **geographic** [1] - 129:12

**geographical** [1] - 129:16
  **George** [2] - 204:3, 226:17
  **Gerard** [1] - 1:19
  **gestures** [1] - 79:25
  **Giganti** [1] - 174:7
  **girl** [2] - 103:8, 139:11
  **girlfriend** [2] - 103:19, 145:18
  **given** [12] - 18:3, 18:15, 149:7, 153:16, 153:17, 157:24, 219:15, 222:5, 227:9, 250:4, 250:17, 263:11
  **glad** [2] - 194:21, 250:9
  **glare** [2] - 77:4, 207:10
  **Glaring** [1] - 77:3
  **glasses** [1] - 35:18
  **glean** [1] - 232:11
  **Glock** [3] - 87:13, 95:7, 95:8
  **goal** [1] - 126:24
  **Golder** [6] - 204:2, 205:2, 206:9, 208:13, 226:7, 256:14
  **Golder's** [1] - 205:4
  **Goo** [51] - 36:21, 36:22, 36:25, 37:1, 37:7, 39:12, 39:13, 41:24, 42:18, 43:3, 45:2, 46:23, 55:2, 66:17, 66:18, 66:19, 66:20, 66:25, 70:6, 75:13, 83:9, 84:17, 85:25, 96:22, 98:10, 98:15, 100:3, 100:5, 100:15, 101:20, 103:15, 103:19, 106:21, 109:8, 111:4, 114:6, 114:9, 115:7, 115:17, 116:13, 116:22, 117:17, 118:1, 118:23, 119:4, 134:20, 146:10, 184:20, 193:4, 193:7
  **Goo's** [3] - 46:7, 104:9, 148:1
  **Goodie** [20] - 204:24, 209:20, 209:22, 210:1, 210:5, 210:15, 210:17, 211:4, 211:10, 211:15, 211:17, 211:18, 217:2, 217:25, 218:7, 221:24, 229:6, 234:15, 234:18, 234:24
  **goodness** [1] - 260:16
  **Goose** [10] - 64:24, 64:25, 65:4, 65:20, 65:22, 65:24, 66:1, 66:8, 161:24, 161:25
  **Goose's** [1] - 65:2

**gossip** [1] - 145:13
  **Government** [13] - 1:15, 23:5, 42:5, 48:13, 48:24, 51:19, 58:22, 64:20, 69:10, 69:21, 91:9, 109:17, 190:18
  **government** [85] - 2:6, 3:12, 9:1, 9:5, 9:21, 24:3, 25:23, 26:8, 26:16, 31:11, 74:14, 75:17, 149:16, 151:21, 151:24, 152:23, 153:16, 154:14, 159:19, 159:23, 176:24, 177:13, 178:1, 178:16, 178:25, 179:9, 179:11, 179:12, 180:13, 180:24, 183:1, 183:9, 183:11, 183:19, 183:22, 184:10, 189:24, 190:2, 194:9, 196:2, 201:22, 202:7, 202:12, 202:18, 202:20, 203:8, 225:1, 229:10, 229:16, 240:4, 241:1, 241:9, 243:15, 243:24, 247:19, 247:24, 247:25, 251:22, 251:23, 252:3, 252:18, 252:20, 252:25, 253:2, 254:1, 254:16, 261:5, 261:11, 261:14, 262:20, 263:2, 264:9, 265:10, 266:12, 267:3, 267:12, 267:16, 267:18, 268:5, 268:19, 268:25, 269:4, 270:7, 271:20, 271:25
  **Government's** [8] - 200:19, 207:11, 210:23, 212:2, 214:22, 215:5, 216:25
  **GOVERNMENT'S** [3] - 10:1, 21:19, 196:7
  **government's** [14] - 6:23, 8:21, 75:8, 176:18, 195:18, 251:13, 251:14, 252:3, 253:1, 258:11, 264:19, 265:25, 271:22, 272:10
  **grade** [2] - 22:11, 22:13
  **graduate** [2] - 115:3, 197:5
  **Graduated** [1] - 197:4
  **graduated** [4] - 108:16, 115:9, 133:24, 197:7
  **graduation** [1] - 115:5
  **gram** [2] - 33:25, 34:1
  **grams** [8] - 57:25, 58:1, 61:2, 61:4, 61:5, 61:6, 61:8, 161:16
  **grand** [66] - 3:4, 25:6, 27:15, 30:12, 30:15,

31:1, 31:4, 31:10, 40:4, 46:12, 72:10, 72:23, 73:12, 73:14, 77:10, 77:15, 77:16, 77:18, 79:11, 79:20, 117:2, 117:3, 117:5, 117:10, 118:7, 139:23, 140:10, 149:9, 151:22, 155:17, 155:18, 156:6, 156:20, 156:22, 157:10, 163:8, 166:18, 166:19, 171:9, 171:11, 171:21, 172:3, 172:12, 172:15, 173:15, 174:11, 174:20, 174:25, 175:11, 176:11, 178:14, 181:8, 182:4, 182:14, 183:10, 184:3, 184:7, 184:11, 186:25, 187:9, 187:12, 188:11, 193:1, 201:13, 255:12, 256:1
  **Graphs** [1] - 260:13
  **gray** [3] - 36:12, 36:13, 213:9
  **great** [2] - 158:15, 241:11
  **Great** [1] - 259:17
  **greater** [2] - 8:21, 181:25
  **Greenmount** [12] - 11:7, 11:13, 11:14, 12:3, 12:8, 12:10, 12:12, 13:1, 13:5, 13:21, 14:19, 14:22
  **Grew** [1] - 240:8
  **grew** [9] - 35:5, 51:25, 52:1, 58:21, 121:8, 121:13, 191:23, 197:1, 240:7
  **gripe** [1] - 270:25
  **group** [7] - 155:15, 203:22, 205:9, 205:14, 205:17, 212:1, 220:19
  **grouped** [1] - 31:25
  **grow** [7] - 22:8, 48:18, 49:16, 53:5, 114:20, 121:13, 196:22
  **growing** [1] - 35:8
  **guarantee** [1] - 184:9
  **guess** [11] - 13:22, 44:15, 68:23, 101:8, 200:6, 200:7, 248:23, 250:23, 266:10, 266:14, 268:11
  **guide** [2] - 9:9, 14:3
  **guilty** [15] - 9:19, 23:2, 23:14, 26:12, 26:23, 30:8, 31:2, 124:5, 158:22, 176:14, 198:8, 199:10, 199:13, 232:17, 240:11
  **gun** [59] - 17:15, 17:19,

17:24, 20:21, 20:22, 20:24, 21:3, 21:6, 31:18, 31:23, 80:17, 80:25, 81:2, 81:13, 81:15, 81:19, 81:22, 82:5, 82:12, 83:14, 87:7, 87:12, 87:14, 87:22, 88:15, 88:16, 90:14, 91:1, 93:11, 93:25, 94:19, 94:23, 95:12, 96:10, 96:12, 135:2, 135:8, 135:12, 135:17, 135:25, 136:5, 136:7, 136:9, 136:11, 136:13, 136:15, 136:17, 136:18, 144:5, 152:24, 153:2, 153:7, 159:15, 162:8, 162:11, 177:7, 179:5
  **guns** [1] - 81:17, 82:1, 83:12, 95:9, 96:15, 143:25, 145:13, 162:7, 162:13, 236:4, 258:4
  **guy** [46] - 46:18, 51:25, 52:1, 53:4, 54:12, 58:21, 59:2, 60:15, 62:7, 62:25, 63:2, 63:18, 64:19, 66:7, 66:15, 67:7, 68:25, 81:9, 83:4, 89:17, 92:24, 104:9, 106:18, 106:20, 112:14, 112:17, 115:24, 208:13, 209:21, 209:23, 209:24, 211:4, 211:17, 211:18, 213:21, 214:7, 216:12, 219:1, 219:14, 220:3, 238:1, 244:9, 244:23, 245:15, 252:12, 260:2
  **guys** [20] - 49:16, 58:25, 61:19, 61:25, 83:3, 94:24, 109:2, 109:6, 109:7, 116:4, 117:20, 117:21, 185:6, 186:3, 191:23, 205:15, 218:16, 235:21, 235:23, 252:15

**H**

  **H-2** [2] - 207:11, 207:12
  **H-3** [2] - 214:22, 214:23, 215:1
  **H-4** [1] - 215:6
  **H-5** [1] - 215:14
  **H-6** [1] - 215:22
  **H-7** [1] - 215:16
  **H-E-R-N-D-O-N** [1] - 10:6
  **habeas** [1] - 4:4
  **Hagerstown** [2] - 170:13
  **half** [10] - 71:1, 112:8,

229:15, 233:8, 233:17, 244:9, 257:25, 258:13, 258:22, 258:24

**Hall** [4] - 220:3, 220:5, 220:9, 226:25

**Hammerjacks** [33] - 109:6, 146:11, 146:18, 146:24, 147:8, 187:19, 188:5, 206:22, 206:24, 207:15, 208:10, 212:12, 214:19, 215:3, 215:10, 215:14, 215:22, 216:1, 216:23, 217:5, 217:17, 218:8, 222:11, 223:2, 223:15, 223:18, 232:20, 238:10, 247:9, 251:19, 255:16, 255:23

**hand** [20] - 13:4, 15:9, 15:16, 16:8, 16:12, 88:18, 144:5, 146:5, 146:8, 146:16, 149:12, 173:10, 173:24, 188:3, 188:15, 213:20, 213:22

**handed** [1] - 15:5

**handgun** [13] - 18:7, 18:8, 18:10, 18:11, 23:16, 31:21, 81:9, 86:24, 94:18, 177:20, 239:2, 239:6

**Handgun** [1] - 99:20

**handle** [2] - 33:7, 242:17

**handled** [1] - 19:15

**hands** [3] - 16:5, 109:23, 159:19

**hang** [1] - 64:9

**hanging** [2] - 31:5, 65:7

**HANLON** [14] - 12:22, 14:10, 24:7, 194:10, 195:18, 196:3, 196:14, 212:25, 217:14, 221:8, 230:21, 244:14, 275:10, 275:11

**Hanlon** [11] - 1:16, 12:20, 14:8, 14:12, 24:5, 159:2, 160:8, 229:24, 254:4, 254:14, 271:3

**Hanover** [2] - 100:6, 100:16

**happenstance** [1] - 121:16

**happy** [6] - 14:10, 74:10, 160:8, 203:9, 251:7, 271:21

**hard** [4] - 110:9, 191:24, 191:25, 199:5

**HARDING** [97] - 5:9, 5:15, 5:18, 5:24, 6:3, 7:4, 7:6, 7:19, 7:25, 8:4, 9:24, 10:8, 12:23, 14:11,

14:13, 21:12, 21:17, 22:3, 24:8, 24:11, 29:17, 33:7, 33:9, 40:2, 40:6, 40:13, 40:24, 41:6, 41:9, 41:12, 51:17, 61:1, 62:21, 72:21, 73:8, 74:1, 77:15, 77:18, 77:22, 78:5, 80:5, 97:24, 119:15, 119:25, 120:8, 120:13, 178:9, 182:9, 182:12, 194:5, 254:15, 254:19, 254:22, 255:2, 255:5, 255:7, 255:11, 255:17, 255:22, 255:25, 256:5, 256:10, 256:13, 256:25, 257:2, 257:17, 257:22, 258:5, 258:17, 258:20, 259:1, 259:5, 259:10, 259:13, 259:24, 260:3, 260:6, 260:8, 260:11, 260:17, 260:22, 261:11, 261:18, 261:21, 262:1, 262:3, 263:11, 263:16, 263:24, 272:23, 273:4, 273:8, 273:17, 274:2, 275:4, 275:6, 275:8

**Harding** [43] - 1:16, 7:5, 8:6, 14:1, 24:4, 30:20, 48:12, 62:20, 73:24, 75:12, 76:14, 77:9, 78:4, 116:25, 120:4, 122:17, 145:8, 146:13, 155:4, 156:5, 158:14, 159:2, 160:8, 167:19, 171:15, 171:19, 172:6, 172:22, 182:1, 193:1, 254:4, 254:14, 254:25, 257:8, 260:2, 262:19, 263:10, 266:7, 270:8, 270:19, 271:3, 271:15, 272:20

**Harding's** [1] - 19:9

**Harford** [1] - 96:25

**harms** [1] - 145:4

**HARRIS** [1] - 1:7

**Harris** [7] - 1:18, 20:10, 255:3, 261:3, 261:5, 270:10, 271:17

**Harris's** [1] - 263:18

**Hayes** [3] - 263:17, 266:20, 270:13

**Hayes's** [1] - 264:10

**head** [4] - 31:5, 234:22, 236:16, 258:8

**headed** [1] - 225:23

**Headquarters** [1] - 114:8

**heads** [1] - 115:24

**hear** [1] - 8:18, 173:17, 210:6, 224:10, 241:14,

249:24, 265:15, 265:16, 265:17, 265:18, 271:2

**heard** [39] - 9:16, 74:7, 122:18, 122:21, 123:6, 138:16, 138:19, 141:1, 141:4, 145:6, 145:25, 146:2, 146:17, 146:21, 147:21, 147:22, 148:1, 148:4, 148:25, 149:3, 149:13, 165:7, 165:18, 165:22, 194:14, 220:11, 236:22, 236:23, 236:25, 237:4, 243:12, 247:6, 247:10, 247:19, 249:8, 260:18, 260:20, 270:7, 270:8

**hearing** [13] - 2:5, 2:13, 4:9, 4:13, 148:13, 211:6, 251:17, 261:13, 261:20, 266:11, 267:7, 271:4, 273:24

**hearings** [3] - 4:3, 27:16, 273:25

**hearsay** [3] - 3:5, 3:6, 5:21, 6:7, 75:9, 75:11, 94:25, 250:5, 250:6, 250:8, 250:15, 251:20, 252:1

**Hearsay** [2] - 98:3, 244:21

**Heights** [16] - 45:16, 45:22, 46:22, 106:21, 138:5, 168:15, 168:17, 168:19, 170:11, 197:2, 203:21, 227:7, 227:8, 227:18, 227:20, 227:23

**held** [3] - 19:19, 79:8, 138:17

**Hello** [1] - 158:11

**help** [13] - 14:9, 34:23, 35:17, 83:10, 93:9, 110:21, 157:9, 157:10, 168:5, 185:17, 186:16, 203:8, 211:18

**Help** [1] - 260:16

**helpful** [2] - 77:1, 269:18

**helping** [1] - 89:1

**hereby** [1] - 276:3

**hereunto** [1] - 276:10

**Herndon** [6] - 9:25, 10:5, 12:14, 12:15, 18:13, 19:1

**HERNDON** [2] - 10:1, 275:3

**heroin** [12] - 57:25, 58:1, 58:7, 60:14, 61:8, 83:20, 92:2, 155:9, 156:2, 161:16, 161:17, 181:21

**Heroin** [6] - 44:24, 57:1, 57:2, 57:10, 57:11, 181:22

**herself** [1] - 257:4

**Hickey** [10] - 39:1, 39:6, 121:20, 121:23, 122:14, 124:3, 124:11, 133:19, 133:24

**hidden** [2] - 142:5, 231:7

**high** [5] - 94:16, 111:9, 133:24, 197:5, 208:19

**High** [3] - 22:14, 49:21, 208:22

**highway** [1] - 98:14

**himself** [1] - 101:20

**hip** [1] - 207:24

**hip-hop** [1] - 207:24

**hire** [3] - 219:3, 220:3, 239:7

**hiring** [2] - 239:15, 239:20

**history** [2] - 26:6, 26:8

**hit** [4] - 11:16, 14:16, 109:7, 214:4

**hitting** [1] - 11:16, 214:6

**hold** [4] - 109:22, 217:11, 254:6, 256:23

**Hold** [1] - 110:10

**holding** [1] - 88:18

**holler** [3] - 110:19, 111:4, 114:6

**Holly** [17] - 68:25, 69:14, 70:3, 70:6, 70:11, 70:15, 72:1, 127:5, 127:7, 127:9, 127:19, 127:22, 127:25, 128:2, 167:6, 167:8, 167:12

**Hollywood** [6] - 205:12, 208:13, 218:5, 220:24, 223:21, 235:17

**Hollywood's** [1] - 235:17

**home** [10] - 110:7, 111:16, 112:3, 112:12, 116:19, 164:10, 190:20, 232:5, 232:7

**homicide** [4] - 149:1, 164:11, 164:18, 256:17

**homicides** [1] - 256:17

**honest** [1] - 239:25

**honor** [1] - 179:24

**Honor** [123] - 2:4, 2:5, 3:1, 3:3, 3:10, 5:2, 5:15, 5:25, 7:2, 7:25, 9:24, 12:5, 12:22, 18:22, 21:17, 24:7, 24:12, 32:6, 34:14, 35:20, 36:16, 38:7, 39:19, 40:19,

40:21, 41:3, 42:19, 43:10, 45:3, 45:12, 45:23, 51:14, 52:6, 62:23, 72:3, 72:11, 72:16, 72:25, 74:1, 75:2, 75:8, 76:7, 77:22, 78:6, 82:3, 82:7, 107:16, 109:3, 117:1, 117:21, 118:16, 119:15, 120:1, 120:9, 120:13, 120:17, 121:2, 158:7, 166:14, 172:20, 172:23, 175:3, 175:6, 176:15, 176:16, 176:22, 181:13, 182:8, 182:9, 188:23, 189:2, 191:21, 192:13, 192:14, 192:15, 194:5, 194:7, 194:10, 195:2, 195:18, 196:3, 198:14, 207:9, 212:23, 213:10, 217:8, 217:18, 218:24, 224:4, 230:21, 244:15, 244:21, 246:18, 246:19, 250:11, 250:22, 250:25, 252:5, 252:8, 252:17, 254:9, 254:22, 255:25, 256:5, 256:25, 257:23, 258:10, 259:6, 259:10, 261:12, 261:13, 262:15, 263:11, 264:7, 266:14, 268:11, 270:4, 271:20, 271:24, 272:2, 273:4, 273:9

**Honor's** [4] - 7:11, 75:3, 75:20, 76:17

**Honorable** [1] - 1:13

**hook** [1] - 67:19

**hop** [1] - 207:24

**hope** [7] - 110:7, 110:12, 111:16, 112:3, 120:13, 154:25, 155:2

**hoped** [1] - 201:25

**Hopefully** [1] - 195:22

**hoping** [6] - 12:13, 76:10, 112:11, 160:11, 252:17, 269:6

**hospital** [2] - 216:17, 223:22

**Hour** [1] - 233:17

**hour** [6] - 163:18, 252:19, 257:25, 258:13, 258:22, 258:24

**hours** [9] - 11:3, 233:17, 252:21, 252:22, 252:23, 253:3, 254:2, 257:21, 260:15

**house** [12] - 37:8, 48:5, 84:10, 84:11, 102:5, 103:8, 103:9, 103:10, 103:17, 106:14, 106:15

**Howard** [16] - 204:2,

204:8, 204:13, 204:18, 204:25, 205:13, 205:20, 208:7, 208:13, 208:19, 208:25, 209:1, 218:5, 220:24, 221:24, 225:23
**Howard's** [1] - 204:21
**human** [2] - 239:16, 257:15
**humane** [1] - 239:25
**hundred** [8] - 114:5, 119:14, 130:8, 130:10, 130:15, 137:24, 177:19, 190:16
**hydro** [2] - 111:8, 114:16
**Hydro** [2] - 114:19, 114:20
**hypothetical** [2] - 266:25, 267:3
**hypothetically** [4] - 265:1, 265:3, 265:7, 267:24

**I**

**I-95** [4] - 96:17, 96:23, 97:25, 131:2
**ID** [3] - 169:3, 169:7, 272:1
**ID's** [3] - 261:14, 261:15, 270:21
**idea** [2] - 22:17, 30:6, 31:17, 31:19, 71:19, 71:20, 75:15, 220:25, 221:9
**identification** [24] - 248:10, 262:20, 263:2, 263:5, 264:4, 264:10, 266:1, 266:9, 267:10, 267:13, 267:15, 267:16, 267:19, 267:25, 268:21, 269:1, 271:5, 271:8, 271:18, 272:13, 273:3, 273:11, 273:19
**identifications** [7] - 262:24, 263:19, 265:4, 265:6, 266:13, 268:20, 271:16
**identified** [13] - 36:15, 38:6, 39:6, 42:15, 161:20, 169:21, 223:14, 244:8, 245:16, 261:9, 265:12, 268:3, 270:13
**identifies** [1] - 246:4
**identify** [25] - 12:25, 23:6, 42:6, 58:23, 213:1, 247:8, 260:19, 261:1, 261:2, 261:3, 261:4, 261:6, 261:12, 262:4,

262:18, 263:13, 263:14, 263:16, 263:17, 263:25, 265:8, 265:13, 268:6, 270:14
**identifying** [4] - 213:10, 246:24, 247:14, 269:24
**illegal** [1] - 232:8
**illicit** [2] - 132:19, 142:8
**illuminate** [1] - 14:20
**imagine** [2] - 2:24, 77:12
**immediately** [2] - 3:2, 222:12
**immunity** [6] - 174:22, 176:5, 183:6, 184:1, 202:5
**impede** [1] - 186:2
**implicate** [3] - 116:20, 164:11, 272:19
**implications** [1] - 272:15
**important** [8] - 160:4, 173:20, 186:20, 188:18, 188:21, 188:25, 270:15, 270:17
**imposed** [1] - 26:24
**impress** [1] - 160:4
**impression** [1] - 162:7
**improper** [1] - 72:18
**improve** [1] - 142:20
**IN** [1] - 1:1
**inappropriate** [1] - 166:16
**incarcerated** [6] - 107:8, 124:3, 124:14, 154:10, 157:20, 164:6
**incarceration** [1] - 124:17
**incident** [9] - 17:6, 19:3, 96:8, 147:8, 169:9, 177:3, 178:12, 218:8, 241:18
**include** [5] - 8:22, 72:1, 77:15, 92:3, 256:15
**included** [1] - 165:10
**includes** [2] - 7:8, 134:19
**including** [7] - 3:15, 9:3, 27:22, 190:20, 201:21, 241:9
**Including** [1] - 232:3
**inconvenience** [1] - 257:9
**incorrect** [2] - 129:20, 265:24
**incriminate** [2] - 176:4, 182:22
**incurring** [1] - 251:9
**indeed** [1] - 76:23
**independent** [1] - 6:24

**INDEX** [1] - 275:1
**indicate** [4] - 13:9, 35:15, 164:17, 238:7
**indicated** [13] - 5:7, 19:24, 20:14, 20:21, 21:2, 35:19, 172:6, 181:3, 203:18, 208:18, 238:15, 238:17, 238:20
**Indicating** [3] - 35:14, 36:10, 37:21
**indicating)** [1] - 213:3
**indication** [1] - 259:21
**indicted** [1] - 181:1
**indictment** [2] - 8:25, 9:12
**indirect** [1] - 255:15
**indirectly** [1] - 272:19
**individual** [7] - 144:15, 144:23, 161:19, 161:23, 162:17, 167:5, 205:2, 210:15, 211:20, 212:1, 215:25, 216:14, 222:10, 224:11, 237:20, 245:3
**individuals** [6] - 21:2, 21:3, 75:18, 144:8, 238:10, 268:20
**induced** [1] - 151:20
**inducement** [2] - 153:9, 153:12
**indulgence** [1] - 229:14
**inform** [1] - 9:20
**information** [15] - 6:17, 145:22, 146:21, 148:22, 164:14, 174:15, 183:22, 183:24, 188:3, 201:2, 201:22, 202:6, 202:14, 223:25, 230:7
**initial** [1] - 259:15
**injured** [1] - 223:17
**inner** [3] - 186:3, 186:5, 195:21
**inordinate** [1] - 257:24
**input** [1] - 251:15
**Inside** [2] - 125:2, 125:6
**inside** [8] - 60:13, 87:8, 104:24, 186:11, 215:3, 215:14, 215:22, 216:22
**inspection** [1] - 5:11
**Instead** [1] - 70:25
**instead** [1] - 16:1
**instruct** [2] - 8:16, 8:20
**instructed** [1] - 250:7
**instruction** [14] - 7:18, 7:24, 247:5, 249:23, 250:3, 250:4, 250:9, 250:10, 250:12, 250:15, 250:18, 251:12, 254:17, 254:19
**instructions** [5] - 7:14, 248:18, 249:20, 251:4,

254:17
**insufficient** [2] - 235:1, 250:4
**insure** [1] - 17:8
**intend** [10] - 5:14, 7:9, 154:16, 154:20, 154:21, 157:17, 266:16, 266:19, 267:12, 268:8
**intended** [4] - 4:21, 218:19, 264:4
**intending** [1] - 261:5
**intends** [2] - 247:20, 262:20
**intent** [2] - 240:22, 261:15
**intention** [1] - 157:20
**intentions** [3] - 218:7, 218:13, 219:20
**interactions** [1] - 8:19
**interest** [1] - 34:12
**interested** [3] - 152:4, 190:23
**interests** [1] - 221:18
**internationally** [1] - 228:13
**interruption** [1] - 12:24
**intersection** [3] - 11:14, 13:21, 90:7
**interviewed** [3] - 222:12, 241:18, 241:20
**intoxicated** [3] - 234:6, 234:9, 236:24
**introduce** [4] - 5:14, 7:9, 9:1, 66:4
**introduced** [7] - 37:5, 65:6, 65:8, 66:1, 66:23, 68:1, 245:4
**invasion** [1] - 190:20
**inventoried** [1] - 17:8
**inventory** [1] - 17:10
**investigating** [1] - 256:17
**investigation** [8] - 25:22, 30:13, 174:7, 215:10, 215:11, 223:25, 249:10, 249:13
**invite** [3] - 249:18, 257:13, 268:24
**involve** [2] - 4:16, 210:14
**involved** [31] - 23:3, 39:21, 41:15, 42:13, 42:14, 42:17, 50:1, 53:9, 82:20, 131:8, 143:5, 151:1, 164:17, 165:2, 174:3, 174:7, 206:15, 216:3, 221:23, 222:9, 223:1, 223:15, 232:15, 232:22, 234:12, 235:7, 235:10, 236:24, 237:7,

237:14, 239:8
**involvement** [1] - 9:2
**involving** [3] - 108:24, 149:22, 240:11
**iris** [1] - 24:5
**Irvington** [5] - 54:20, 54:22, 87:25, 88:1, 89:25
**issue** [19] - 2:19, 4:4, 4:9, 4:13, 5:1, 76:9, 76:22, 195:11, 248:15, 252:14, 252:19, 252:25, 260:17, 272:2, 272:4
**issues** [6] - 3:23, 74:8, 119:22, 249:8, 258:2, 270:5
**item** [2] - 172:20, 176:16
**items** [2] - 2:22, 232:12
**itself** [5] - 13:15, 13:22, 128:5, 179:9, 188:25
**IV** [1] - 1:11

**J**

**J-Rock** [7] - 89:20, 89:21, 89:22, 89:23, 90:25, 91:1, 162:17
**J-Rock's** [1] - 92:13
**Jackson** [1] - 226:11
**Jacquetta** [2] - 256:1, 256:20
**jail** [30] - 22:20, 29:1, 33:12, 33:16, 33:18, 34:3, 34:11, 50:22, 80:17, 99:8, 99:10, 99:12, 99:21, 103:11, 106:24, 107:2, 113:7, 114:22, 117:24, 118:1, 118:22, 124:18, 132:11, 134:7, 157:20, 170:8, 170:19, 185:22, 225:16, 243:5
**Jam** [4] - 207:20, 207:22, 207:23, 208:3
**James** [3] - 1:21, 226:13, 226:15
**Jay** [2] - 165:16, 165:20
**Jay-Z** [2] - 165:16, 165:20
**Jessup** [16] - 2:9, 2:20, 33:20, 108:10, 108:17, 114:25, 119:3, 170:10, 170:13, 170:15, 170:17, 170:22, 171:4, 171:5, 180:10, 180:17
**Jim** [1] - 158:12
**job** [2] - 206:9, 225:13
**John** [2] - 174:7, 264:15
**Johnnycake** [3] - 84:7,

84:8, 102:4
**johns** [1] - 107:12
**Jones** [1] - 256:14
**judge** [9] - 18:20, 135:22, 152:20, 190:3, 241:2, 241:6, 241:10, 260:14
**Judge** [11] - 1:13, 3:21, 3:22, 4:3, 5:9, 7:4, 254:15, 258:15, 265:15, 267:4, 269:16
**jump** [10] - 92:20, 168:22, 168:25, 169:1, 169:2, 169:6, 170:11, 236:20, 236:25, 237:5
**jump-out** [4] - 168:22, 168:25, 169:1, 170:11
**jumped** [11] - 92:22, 93:7, 104:22, 112:17, 163:24, 169:4, 169:10, 234:24, 235:4, 236:22
**jumping** [1] - 162:16
**June** [2] - 170:5, 171:7
**juries** [2] - 25:6, 27:15, 201:13
**jurors** [3] - 120:11, 158:20, 257:20
**jury** [102] - 2:5, 3:4, 6:18, 7:22, 7:24, 9:20, 30:12, 30:16, 31:1, 31:4, 31:10, 40:4, 46:12, 70:23, 72:10, 72:23, 73:12, 73:14, 74:4, 74:8, 76:25, 77:6, 77:7, 77:10, 77:15, 77:16, 77:18, 77:21, 79:11, 79:20, 84:13, 117:2, 117:3, 117:5, 117:10, 118:7, 119:16, 119:20, 119:22, 120:11, 120:21, 135:21, 139:23, 140:10, 149:9, 150:17, 151:22, 155:17, 155:18, 156:6, 156:20, 156:22, 157:10, 158:24, 163:8, 166:18, 166:19, 166:20, 168:24, 169:10, 171:9, 171:11, 171:21, 172:3, 172:12, 172:15, 173:15, 174:11, 174:20, 174:25, 175:11, 176:11, 178:14, 181:8, 182:4, 184:7, 184:11, 186:25, 187:9, 187:12, 188:11, 193:2, 194:12, 195:8, 195:21, 198:15, 233:1, 241:14, 247:4, 250:7, 251:4, 254:20, 255:12, 256:1, 259:3, 260:16, 261:22, 261:24

**Jury** [12] - 1:14, 8:7, 74:9, 74:25, 78:2, 119:23, 120:22, 194:15, 194:16, 195:25, 249:16, 249:17
**jury's** [1] - 250:1
**Justice** [1] - 173:4
**justice** [3] - 19:14, 28:18, 242:15

**K**

**Keenan** [1] - 204:3
**Keep** [1] - 29:13
**keep** [13] - 8:15, 74:7, 88:17, 93:13, 96:14, 119:21, 120:20, 136:7, 136:9, 173:21, 194:14, 249:8
**keeping** [3] - 186:2, 246:10, 253:25
**Kelsey** [1] - 1:17
**Kenneth** [1] - 256:14
**kept** [4] - 88:19, 96:15, 200:11
**Kevin** [4] - 207:21, 208:3, 208:18, 208:24
**kicking** [2] - 111:15, 111:21
**Kicking** [2] - 110:10, 110:11
**kidnapped** [2] - 138:16, 138:17
**kidnappings** [1] - 138:10
**kill** [13] - 139:9, 139:11, 139:14, 139:18, 139:21, 144:11, 144:16, 144:23, 157:9, 219:3, 238:9, 242:8, 242:11
**killed** [5] - 139:1, 139:5, 139:21, 238:15, 238:18
**killer** [1] - 135:10
**kilo** [3] - 55:11, 55:12, 112:9
**kilograms** [2] - 199:14, 240:23
**kind** [47] - 15:15, 16:8, 18:18, 20:22, 22:17, 50:3, 52:13, 54:17, 55:10, 56:12, 56:20, 56:25, 57:24, 67:2, 67:6, 68:5, 81:15, 81:22, 82:12, 85:20, 87:12, 94:19, 94:21, 97:3, 99:3, 100:18, 105:6, 114:19, 118:10, 135:14, 140:3, 140:7, 170:7, 183:6, 186:20, 195:2, 197:14,

197:19, 202:21, 203:2, 204:18, 209:6, 213:22, 239:18, 252:12, 252:15, 252:16
**kinds** [3] - 85:17, 183:12, 251:18
**knockers** [2] - 87:6, 87:9
**knowing** [2] - 142:1, 241:20
**knowingly** [1] - 27:14
**knowledge** [11] - 46:8, 49:25, 80:25, 146:5, 146:17, 149:12, 160:9, 161:20, 162:11, 263:8, 266:3
**known** [10] - 87:4, 90:9, 162:18, 162:20, 162:22, 162:23, 163:21, 164:23, 227:23, 236:3
**knows** [5] - 4:1, 256:13, 257:11, 263:20, 268:22
**KURLAND** [17] - 252:8, 252:13, 252:17, 252:24, 253:8, 253:12, 253:15, 253:19, 253:21, 253:23, 254:9, 254:12, 259:20, 271:20, 271:24, 272:6, 272:17
**Kurland** [1] - 1:22, 175:4, 252:7, 252:12, 259:18, 271:2, 272:23

**L**

**Labbe** [1] - 256:14
**label** [2] - 207:24, 207:25
**lack** [3] - 138:24, 266:21, 268:21
**Lack** [2] - 72:11, 76:2
**ladies** [13] - 8:8, 70:23, 78:3, 84:12, 120:23, 135:21, 166:20, 168:24, 169:10, 196:1, 247:4, 249:14, 268:2
**Ladies** [3] - 8:9, 74:4, 194:12
**lady** [1] - 100:11
**Lafayette** [2] - 14:22
**Lamont** [1] - 235:20
**Lane** [5] - 42:25, 43:1, 69:25, 70:1, 181:16
**language** [1] - 183:15
**Lanvale** [5] - 11:15, 12:1, 12:9, 12:12, 13:21
**large** [7] - 134:2, 135:3, 151:5, 170:16, 225:21, 229:10, 232:13

**largely** [2] - 264:2, 269:5
**laser** [1] - 81:4
**Lassiter** [8] - 51:23, 51:24, 87:17, 115:24, 141:13, 147:25, 148:9, 148:10
**Last** [1] - 10:6
**last** [8] - 23:7, 42:8, 68:23, 119:4, 150:14, 163:17, 180:23, 252:4
**lasting** [1] - 257:25
**Late** [2] - 132:9, 132:10
**late** [1] - 209:6
**Laura** [1] - 1:17
**Lauretta** [2] - 67:25, 68:7
**law** [3] - 8:18, 9:2, 9:8, 9:14, 25:2, 25:11, 154:4, 179:17, 201:1, 201:4, 239:25
**law-abiding** [1] - 239:25
**LAWLOR** [89] - 3:10, 3:18, 4:21, 18:22, 32:6, 34:14, 34:18, 39:19, 39:23, 40:8, 40:19, 40:21, 41:1, 41:3, 41:8, 51:14, 52:6, 72:3, 72:11, 72:16, 72:18, 72:25, 79:15, 80:12, 82:3, 82:7, 107:16, 109:3, 117:21, 118:16, 120:17, 121:1, 188:23, 189:2, 191:21, 192:15, 192:18, 195:9, 195:11, 195:16, 212:23, 217:8, 217:18, 217:21, 218:9, 218:14, 218:22, 218:24, 219:7, 219:12, 219:16, 219:22, 220:2, 220:13, 220:21, 221:1, 221:5, 224:6, 244:21, 246:19, 246:22, 249:22, 249:25, 250:11, 258:10, 262:15, 262:17, 262:22, 263:3, 263:6, 264:7, 265:2, 265:21, 266:4, 266:14, 266:19, 266:24, 267:8, 267:21, 268:11, 268:14, 268:17, 269:2, 269:16, 269:23, 275:6, 275:8, 275:10, 275:11
**Lawlor** [27] - 1:18, 3:9, 4:19, 120:16, 120:24, 159:22, 178:19, 179:4, 184:13, 185:6, 186:6, 186:23, 188:2, 192:16, 195:10, 195:17, 244:16, 245:18, 246:20, 249:18, 258:9, 262:16, 264:5,

271:9, 273:2, 273:5
**Lawlor's** [2] - 161:2, 162:6
**Lawrence** [2] - 117:14, 182:17
**laws** [1] - 25:24
**lawyer** [10] - 24:15, 30:3, 110:21, 113:19, 113:20, 114:2, 114:4, 117:9, 117:13, 259:12
**lawyers** [3] - 135:21, 185:17, 230:4
**lead** [2] - 74:15, 191:19
**leading** [4] - 29:4, 42:19, 51:14, 74:19
**Leading** [1] - 32:6
**lean** [1] - 196:17
**leaning** [1] - 104:24
**learn** [9] - 17:25, 39:17, 40:24, 43:8, 51:11, 78:11, 101:6, 212:20, 253:10
**learned** [5] - 2:7, 16:21, 16:23, 211:7, 243:15
**least** [12] - 2:10, 152:24, 153:9, 154:10, 178:13, 187:20, 254:5, 256:9, 257:14, 264:3, 265:13, 271:18
**leave** [7] - 74:5, 119:17, 194:12, 249:25, 261:25, 263:6, 264:11
**leaving** [3] - 96:1, 114:14, 263:2
**lectern** [1] - 272:21
**left** [11] - 12:2, 15:9, 16:3, 16:8, 89:14, 91:2, 124:11, 162:7, 173:10, 173:24, 237:23
**left-hand** [2] - 173:10, 173:24
**leftover** [1] - 256:10
**legal** [1] - 8:14
**legitimize** [1] - 222:2
**lengthy** [1] - 152:7
**Leonard** [2] - 204:2, 226:5
**less** [7] - 29:6, 29:10, 79:13, 133:15, 152:2, 206:12, 255:8
**letter** [37] - 5:6, 5:7, 5:9, 5:14, 5:17, 5:18, 5:21, 5:25, 6:1, 6:10, 6:13, 6:14, 6:17, 6:24, 109:21, 115:15, 157:19, 164:13, 165:9, 173:17, 174:9, 174:14, 175:16, 175:18, 176:5, 176:17, 177:11, 177:15, 178:10, 178:13, 182:13, 182:25, 183:20,

190:17, 198:18, 199:24, 200:20
**lettering** [2] - 194:20, 194:22
**letters** [3] - 2:11, 2:13, 185:20
**level** [4] - 170:2, 202:15, 268:7, 273:12
**levels** [1] - 202:16
**license** [13] - 15:4, 15:6, 15:10, 15:12, 15:13, 15:19, 15:23, 16:21, 16:23, 17:2, 18:5, 20:19
**lick** [1] - 4:7
**lie** [3] - 149:19, 157:4, 203:7
**life** [7] - 124:19, 127:6, 128:10, 135:22, 149:21, 158:4, 158:5
**lifted** [1] - 213:24
**light** [2] - 6:6, 13:12
**lights** [2] - 11:19, 14:20
**likelihood** [1] - 3:7
**Likely** [1] - 256:8
**likely** [3] - 142:17, 151:15, 256:8
**limit** [1] - 271:15
**limited** [1] - 250:1
**limiting** [6] - 249:23, 250:3, 250:18, 254:17, 254:19
**limits** [1] - 257:15
**Line** [4] - 46:12, 73:2, 175:13, 181:9, 187:17, 193:15
**line** [9] - 27:13, 111:22, 144:15, 157:23, 165:10, 189:10, 192:25, 193:6, 252:2
**lines** [2] - 73:3, 181:10
**listed** [1] - 226:1
**listen** [1] - 165:1
**listened** [2] - 265:7, 268:21
**lists** [1] - 187:11
**literally** [1] - 185:8
**live** [1] - 63:12
**lived** [2] - 136:3, 136:5
**lives** [4] - 110:14, 129:18, 129:21, 248:22
**living** [3] - 37:11, 37:13, 197:10
**Llama** [1] - 177:19
**loaded** [1] - 17:15
**loan** [4] - 82:1, 82:5, 82:12, 82:17
**loaned** [3] - 82:14, 95:4, 95:10
**Loaned** [1] - 82:18
**loaning** [1] - 95:9

**local** [5] - 25:11, 76:16, 131:17, 179:12, 179:17
**locate** [1] - 83:18
**located** [2] - 144:8, 207:1
**location** [8] - 14:24, 86:3, 90:20, 91:14, 94:9, 105:22, 126:16, 213:2
**locations** [1] - 249:11
**locked** [30] - 22:25, 29:7, 29:20, 33:11, 50:20, 50:25, 51:11, 78:8, 94:15, 100:1, 103:9, 105:2, 113:21, 114:25, 118:25, 168:10, 168:11, 170:12, 177:3, 177:4, 177:18, 177:22, 178:15, 180:10, 185:7, 185:10, 185:15, 186:1, 186:15, 186:21
**logistical** [1] - 8:14
**logistics** [1] - 253:24
**Lombard** [1] - 1:25
**look** [18] - 46:13, 91:9, 100:7, 143:1, 173:2, 173:9, 179:8, 181:8, 187:13, 198:19, 210:23, 212:4, 212:10, 235:21, 235:23, 240:17, 249:11
**looked** [3] - 104:24, 139:11, 210:21
**Looking** [2] - 88:2, 193:1
**looking** [8] - 13:2, 83:16, 88:4, 126:22, 151:10, 151:12, 176:22, 231:17
**looks** [1] - 224:13
**loose** [1] - 8:5
**lose** [2] - 185:7, 203:13
**loud** [2] - 110:20, 209:10
**Loud** [1] - 116:17
**Louis** [1] - 226:23
**love** [3] - 111:11, 111:13, 253:19
**lower** [2] - 173:10, 173:24
**lunch** [2] - 119:19, 195:1
**lying** [1] - 157:2
**Lyles** [4] - 207:21, 208:3, 208:18, 208:24

# M

**magazine** [1] - 17:22
**mail** [2] - 148:1, 165:2
**main** [2] - 165:18,

165:20
**majority** [2] - 59:23, 225:10
**male** [3] - 59:14, 212:6, 212:7
**man** [7] - 100:11, 213:3, 239:23, 243:17, 244:8, 246:24
**management** [2] - 264:25, 265:22
**mandatory** [1] - 26:22
**Manhattan** [2] - 67:14, 67:15
**manner** [1] - 276:9
**Manuelian** [3] - 174:3, 175:17
**March** [8] - 23:22, 23:25, 109:13, 115:2, 153:22, 171:23, 180:15, 199:17
**marijuana** [11] - 33:15, 33:16, 33:23, 33:24, 45:1, 45:7, 67:4, 83:21, 97:4, 104:1, 104:7, 104:11, 106:18, 114:19, 114:22, 131:3, 180:9, 180:16
**Marijuana** [2] - 45:8, 114:18
**marked** [9] - 10:24, 23:5, 42:5, 172:20, 172:25, 176:16, 176:18, 200:18, 200:20
**market** [1] - 48:7
**MARTIN** [16] - 1:8, 18:23, 45:18, 45:24, 46:3, 46:20, 78:18, 78:24, 81:6, 158:7, 250:22, 250:25, 251:9, 251:11, 252:5, 270:4
**Martin** [96] - 1:19, 1:20, 6:14, 6:24, 37:16, 38:7, 38:14, 38:20, 44:4, 44:16, 47:9, 53:17, 55:1, 56:6, 56:10, 57:6, 58:13, 58:25, 59:7, 59:20, 59:25, 62:2, 64:3, 64:10, 64:14, 65:20, 71:12, 71:15, 71:17, 80:25, 84:25, 92:20, 93:9, 97:11, 97:15, 99:16, 108:13, 112:11, 112:19, 114:1, 118:4, 122:1, 125:11, 125:16, 125:20, 126:14, 126:17, 128:3, 128:11, 130:22, 133:1, 133:7, 134:6, 140:21, 146:21, 147:12, 158:12, 160:23, 160:25, 161:3, 161:6, 161:9, 161:13,

161:21, 161:24, 162:3, 162:8, 162:10, 163:25, 164:2, 164:5, 164:13, 164:17, 164:20, 165:9, 165:24, 186:11, 188:4, 188:12, 188:21, 189:1, 249:22, 250:21, 259:11, 260:21, 261:2, 264:1, 264:4, 264:5, 269:5, 270:2, 270:3, 271:10, 271:14, 273:3, 273:5
**Martin's** [2] - 5:10, 165:4
**Martinez** [1] - 226:17
**Mary** [3] - 1:24, 276:3, 276:15
**MARYLAND** [1] - 1:2
**Maryland** [28] - 1:12, 1:25, 15:12, 15:20, 15:22, 15:24, 19:13, 33:20, 54:13, 54:14, 54:20, 54:22, 58:21, 96:23, 96:25, 97:20, 107:6, 114:7, 114:8, 119:3, 131:17, 168:15, 170:13, 170:14, 170:15, 170:17, 173:6
**mask** [1] - 112:2
**masking** [3] - 110:15, 112:1, 190:19
**massive** [1] - 228:11
**material** [3] - 2:19, 183:19, 215:18
**materially** [1] - 183:21
**matter** [11] - 8:16, 59:1, 174:3, 174:16, 183:24, 190:1, 252:11, 256:9, 266:7, 276:4, 276:9
**matters** [5] - 8:14, 9:9, 9:20, 201:15
**maximum** [1] - 27:22
**McCaffity/Brown** [1] - 256:16
**MCIJ** [1] - 33:19
**McKean** [4] - 91:3, 91:5, 91:13, 91:17
**mean** [59] - 2:15, 5:20, 8:6, 18:16, 19:15, 26:25, 54:4, 58:13, 60:10, 65:8, 75:18, 77:19, 85:23, 88:13, 89:17, 93:2, 98:17, 101:11, 111:22, 112:1, 112:7, 113:2, 113:6, 129:21, 129:22, 130:5, 141:20, 144:4, 144:13, 144:14, 144:18, 145:13, 151:22, 155:2, 156:17, 157:2, 157:4, 173:21, 179:15, 180:18, 190:25, 191:17, 191:23,

192:5, 192:8, 193:22, 205:15, 206:1, 219:2, 236:23, 250:12, 257:15, 258:8, 258:22, 260:5, 262:3, 266:10, 271:9
**Meaning** [1] - 144:9
**meaning** [1] - 58:25
**means** [11] - 6:10, 19:18, 62:16, 62:17, 70:24, 84:13, 111:23, 150:17, 217:12
**meant** [7] - 15:22, 61:17, 190:19, 194:23, 245:24, 246:11, 272:25
**meantime** [1] - 225:14
**media** [3] - 249:1, 249:4, 249:12
**medical** [3] - 256:23, 257:10, 258:18
**Medical** [2] - 257:3, 257:6
**meet** [5] - 36:4, 54:23, 62:6, 65:4, 100:8
**meeting** [2] - 97:20, 253:23
**meetings** [3] - 163:15, 163:17, 166:15
**melee** [1] - 235:6
**member** [4] - 6:25, 205:9, 225:1, 225:4
**Members** [1] - 119:16
**members** [14] - 2:25, 3:15, 216:21, 227:13, 228:18, 228:20, 228:23, 230:5, 231:5, 236:2, 236:10, 236:12, 236:13, 246:6
**men** [2] - 210:14, 225:23
**mentality** [1] - 222:18
**mention** [6] - 107:15, 107:22, 108:5, 113:8, 115:19
**mentioned** [21] - 6:4, 115:14, 132:25, 134:18, 141:12, 142:2, 167:5, 197:23, 200:17, 204:8, 204:25, 205:6, 205:7, 205:14, 206:14, 207:22, 208:15, 214:20, 215:24, 223:12, 251:24
**message** [1] - 116:21
**messed** [1] - 85:2
**met** [23] - 35:22, 36:24, 37:3, 37:4, 37:9, 41:23, 42:1, 42:2, 42:11, 44:4, 47:4, 65:7, 121:7, 163:12, 166:10, 175:15, 202:23, 202:24, 210:18, 211:23, 244:25, 245:2,

245:4
**Methena** [1] - 16:24
**Mexico** [3] - 228:16, 228:18, 228:21
**Michael** [3] - 1:16, 1:18, 23:13
**microphone** [8] - 15:1, 29:14, 60:21, 60:24, 77:25, 78:1, 120:21, 196:16
**mid** [1] - 225:4
**middle** [3] - 38:23, 90:15, 90:16
**midst** [1] - 166:25
**might** [30] - 60:13, 76:10, 91:25, 123:9, 127:19, 130:15, 134:7, 139:9, 139:11, 139:14, 139:18, 144:23, 156:18, 176:4, 182:22, 190:23, 196:15, 196:17, 207:10, 214:25, 219:19, 249:20, 251:5, 252:18, 258:7, 258:14, 261:2, 261:3, 261:4, 264:8
**mike** [3] - 10:4, 21:22, 54:21
**Mike** [2] - 68:20, 68:21
**mill** [2] - 149:6, 149:13
**millimeter** [11] - 17:10, 17:17, 17:18, 20:23, 81:16, 87:13, 94:20, 94:21, 95:3, 95:8, 95:12
**Mills** [1] - 106:16
**mind** [7] - 74:7, 110:16, 112:15, 119:22, 194:15, 248:21, 249:8
**Mine** [1] - 105:5
**mine** [2] - 206:10, 215:21
**minimize** [1] - 156:15
**minimum** [2] - 26:21, 154:8
**minute** [10] - 33:10, 41:22, 53:15, 74:8, 110:7, 194:15, 198:19, 210:1, 229:13, 240:17
**minutes** [10] - 74:3, 74:23, 94:7, 95:3, 116:25, 120:6, 120:7, 120:9, 127:24, 195:6
**MITCHELL** [1] - 1:7
**Mitchell** [75] - 1:17, 20:8, 20:9, 36:4, 36:16, 36:24, 37:3, 38:10, 39:18, 39:21, 41:23, 42:11, 50:10, 50:17, 51:3, 51:12, 53:16, 85:5, 97:5, 103:2, 105:15, 105:16, 105:22, 105:24,

106:5, 107:3, 107:10, 108:9, 117:24, 118:12, 121:25, 122:7, 122:14, 125:10, 125:16, 126:12, 130:24, 131:2, 131:8, 132:6, 132:13, 133:17, 134:18, 184:23, 184:24, 186:10, 213:11, 213:13, 214:8, 237:20, 247:10, 247:13, 247:15, 247:16, 247:21, 248:10, 248:12, 250:2, 251:25, 254:25, 255:8, 255:15, 255:20, 256:2, 261:4, 263:17, 264:1, 264:17, 268:6, 268:21, 268:22, 271:16, 276:5
**Mitchell's** [16] - 36:18, 192:21, 250:16, 251:21, 256:1, 265:17, 265:18, 266:2, 267:5, 267:11, 268:3, 269:11, 269:12, 269:13, 269:14
**Mitsubishi** [2] - 87:1, 87:24
**mixed** [1] - 118:14
**moment** [6] - 116:16, 181:12, 182:9, 192:13, 264:3, 266:17
**Monday** [8] - 249:15, 249:16, 253:4, 253:16, 253:24, 254:2, 256:7, 274:4
**money** [66] - 34:25, 58:7, 66:11, 71:20, 73:5, 73:9, 73:21, 88:2, 88:5, 88:10, 88:24, 89:1, 89:9, 92:14, 93:5, 93:19, 93:20, 102:24, 102:25, 106:4, 110:21, 111:20, 112:18, 112:24, 113:1, 113:8, 113:9, 113:11, 114:1, 114:4, 119:9, 119:11, 126:20, 127:10, 127:12, 128:4, 135:13, 135:15, 135:17, 135:18, 136:5, 136:7, 136:9, 136:18, 137:19, 145:2, 153:17, 155:4, 155:8, 155:12, 156:6, 156:10, 181:4, 181:10, 181:15, 181:22, 181:25, 185:15, 190:7, 192:23, 192:24, 206:1, 221:19, 222:2, 232:7
**monitor** [2] - 14:2, 198:15
**Monroe** [2] - 67:25, 68:7
**Montemarano** [1] -

23:13
**Montgomery** [12] - 58:19, 58:20, 58:24, 59:1, 66:15, 66:17, 66:22, 67:19, 68:1, 68:9, 70:15
**month** [7] - 47:20, 47:21, 57:18, 57:19, 115:3, 115:11, 130:16
**month's** [1] - 35:4
**months** [7] - 22:24, 33:11, 34:11, 39:4, 99:15, 130:16, 178:17
**morning** [30] - 2:3, 2:4, 3:8, 3:10, 3:12, 5:2, 5:3, 5:5, 7:5, 8:8, 8:9, 10:9, 10:10, 19:1, 19:2, 22:4, 22:5, 74:5, 158:15, 167:3, 167:4, 191:5, 249:15, 249:16, 253:4, 254:7, 258:16, 259:5, 274:4
**Morsley** [1] - 256:18
**most** [3] - 4:1, 148:22, 206:18
**mostly** [2] - 70:21, 148:21
**mother** [3] - 115:6, 256:4
**Motion** [1] - 221:6
**motion** [5] - 202:20, 241:2, 241:6, 249:22, 273:11
**motions** [1] - 16:8
**motivation** [7] - 247:20, 248:1, 248:6, 251:18, 251:21, 251:22, 251:23
**mouth** [2] - 79:25, 125:14
**mouthing** [2] - 76:24, 77:4
**Move** [1] - 215:5
**move** [7] - 34:23, 44:9, 44:13, 74:22, 110:22, 221:5, 224:9
**moved** [4] - 15:8, 15:16, 16:7, 44:7
**moving** [6] - 8:11, 16:12, 34:12, 141:10, 141:18, 196:16
**Moving** [1] - 179:21
**MR** [301] - 2:4, 2:18, 3:1, 3:10, 3:18, 4:21, 5:2, 5:4, 5:9, 5:15, 5:18, 5:24, 6:3, 6:8, 6:19, 7:2, 7:4, 7:6, 7:19, 7:25, 8:4, 9:24, 10:8, 12:22, 12:23, 14:10, 14:11, 14:13, 18:22, 18:23, 18:25, 21:12, 21:17, 22:3, 24:7,

24:8, 24:11, 29:4, 29:17, 32:6, 33:7, 33:9, 34:14, 34:18, 39:19, 39:23, 39:24, 40:2, 40:6, 40:8, 40:13, 40:19, 40:20, 40:21, 40:24, 40:25, 41:1, 41:3, 41:6, 41:8, 41:9, 41:12, 42:19, 43:4, 43:10, 43:17, 45:3, 45:12, 45:18, 45:23, 45:24, 46:3, 46:15, 46:19, 46:20, 46:24, 51:14, 51:17, 52:6, 53:19, 54:1, 55:3, 56:8, 57:8, 58:14, 60:2, 61:1, 62:3, 62:9, 62:21, 63:7, 64:5, 65:15, 66:5, 70:8, 70:12, 72:3, 72:11, 72:16, 72:18, 72:21, 72:25, 73:8, 74:1, 75:2, 75:6, 75:12, 75:20, 76:1, 76:3, 76:7, 76:9, 76:12, 76:14, 76:20, 77:15, 77:18, 77:22, 78:5, 78:18, 78:24, 79:15, 80:2, 80:5, 80:12, 81:6, 82:3, 82:7, 89:6, 94:25, 97:13, 97:17, 97:21, 97:24, 98:3, 98:8, 102:20, 107:16, 109:3, 117:21, 118:16, 119:15, 119:25, 120:8, 120:13, 120:17, 121:1, 133:10, 158:7, 158:9, 166:1, 166:5, 178:9, 182:9, 182:12, 188:23, 189:2, 191:21, 192:15, 192:18, 194:5, 194:7, 194:10, 195:2, 195:5, 195:9, 195:11, 195:16, 195:18, 196:3, 196:14, 212:23, 212:25, 217:8, 217:14, 217:18, 217:21, 218:9, 218:14, 218:22, 218:24, 219:7, 219:12, 219:16, 219:22, 220:1, 220:13, 220:21, 221:1, 221:5, 221:8, 224:6, 230:21, 244:14, 244:21, 246:19, 246:22, 249:22, 249:25, 250:11, 250:22, 250:25, 251:9, 251:11, 252:5, 252:8, 252:13, 252:17, 252:24, 253:8, 253:12, 253:15, 253:19, 253:21, 253:23, 254:9, 254:12, 254:13, 254:15, 254:19, 254:22, 255:2, 255:5, 255:7, 255:11, 255:17, 255:22, 255:25, 256:5, 256:10, 256:13, 256:25,

257:2, 257:17, 257:22, 258:5, 258:10, 258:17, 258:20, 259:1, 259:5, 259:10, 259:13, 259:20, 259:24, 260:3, 260:6, 260:8, 260:11, 260:17, 260:22, 261:11, 261:18, 261:21, 262:1, 262:3, 262:15, 262:17, 262:22, 263:3, 263:6, 263:11, 263:16, 263:24, 264:7, 265:2, 265:21, 266:4, 266:14, 266:19, 266:24, 267:8, 267:21, 268:11, 268:14, 268:17, 269:2, 269:16, 269:23, 270:4, 271:20, 271:24, 272:6, 272:17, 272:23, 273:4, 273:8, 273:17, 274:2, 275:4, 275:4, 275:6, 275:6, 275:7, 275:7, 275:8, 275:8, 275:10, 275:10, 275:11, 275:11
**MS** [1] - 40:7
**MSP** [2] - 111:5, 114:7
**murder** [8] - 104:25, 115:19, 149:22, 238:24, 239:7, 239:15, 239:21, 257:21
**murdered** [2] - 138:19, 242:17
**murders** [2] - 165:2, 256:24
**Murders** [1] - 115:21
**Murphy** [2] - 226:13, 226:15
**muscle** [2] - 141:15, 141:19
**Music** [1] - 209:10
**music** [6] - 107:22, 108:1, 165:14, 209:10, 221:16, 263:21
**must** [1] - 194:21

**N**

**name** [78] - 3:16, 5:19, 10:4, 10:5, 10:6, 15:10, 15:13, 15:19, 16:17, 16:18, 17:25, 20:3, 20:7, 20:20, 21:22, 21:25, 23:12, 35:9, 37:15, 38:20, 38:23, 42:8, 46:2, 53:1, 54:9, 55:23, 56:16, 59:4, 59:16, 59:24, 60:4, 60:5, 62:25, 63:22, 65:2, 67:7, 67:23, 78:11, 78:16, 78:21, 81:10, 85:9, 89:19, 92:25, 94:17, 100:13, 100:14,

127:3, 167:6, 168:5, 173:24, 174:2, 196:9, 196:10, 198:22, 207:2, 207:20, 208:14, 211:7, 219:14, 219:15, 220:3, 220:5, 220:8, 222:5, 222:7, 226:15, 235:17, 237:10, 237:11, 237:17, 238:17, 243:16, 244:24, 245:1, 245:3, 245:5, 253:10

**Name** [1] - 196:11
**name's** [1] - 158:12
**named** [8] - 63:18, 68:25, 83:4, 102:3, 113:9, 131:13, 131:15, 205:2
**names** [10] - 54:9, 68:19, 68:23, 100:12, 115:25, 116:2, 204:4, 205:1, 205:6, 226:4
**narcotics** [1] - 240:12
**nationwide** [1] - 208:1
**Nationwide** [1] - 208:2
**nature** [2] - 177:10, 255:18
**near** [1] - 48:5
**necessarily** [2] - 196:17, 209:6
**necessary** [5] - 8:13, 111:23, 186:16, 214:10, 249:19
**necessity** [1] - 135:5
**need** [26] - 2:18, 2:20, 4:10, 24:4, 62:13, 77:12, 110:21, 110:24, 113:17, 113:20, 135:17, 135:25, 136:9, 141:19, 142:11, 195:1, 227:14, 230:2, 260:14, 261:19, 266:22, 269:7, 271:2, 273:9, 273:10
**needed** [3] - 98:10, 136:5, 136:7
**needing** [1] - 113:8
**Needleman** [4] - 6:4, 110:25, 113:18
**Needleman's** [1] - 113:19
**needs** [1] - 14:10
**negative** [2] - 266:9, 267:25, 268:10
**neighborhood** [4] - 121:14, 197:1, 228:1
**nervous** [1] - 41:13
**never** [22] - 4:6, 15:8, 15:16, 16:7, 85:2, 131:21, 160:25, 161:6, 163:4, 163:7, 187:23, 188:20, 225:18, 225:19,

225:20, 236:8, 236:9, 236:10, 243:16, 243:19, 245:2, 264:3
**new** [3] - 151:10, 201:21, 202:8
**New** [24] - 56:19, 56:20, 57:21, 58:10, 59:2, 61:3, 61:20, 66:16, 66:17, 67:7, 67:14, 75:14, 97:8, 97:11, 97:16, 130:21, 131:19, 131:21, 131:22, 131:23, 132:18, 161:12, 184:14, 184:20
**next** [18] - 25:5, 62:18, 115:11, 193:18, 194:8, 196:2, 211:16, 217:22, 218:6, 244:18, 249:21, 251:14, 253:23, 256:7, 256:16, 256:22, 259:22, 262:3
**Next** [1] - 21:16
**nice** [1] - 8:12
**nickname** [11] - 36:18, 36:20, 38:20, 52:24, 69:15, 69:19, 204:19, 204:21, 205:4, 206:5, 206:7
**nicknames** [1] - 205:11
**nigga** [3] - 110:14, 111:5, 111:9
**nigga's** [1] - 111:1
**niggas** [3] - 110:16, 111:3, 112:15
**night** [19] - 11:4, 13:7, 73:10, 94:4, 94:11, 94:12, 96:3, 96:8, 146:24, 181:17, 190:10, 206:25, 207:5, 207:16, 208:12, 209:2, 209:5, 211:23, 233:9
**nights** [2] - 190:13, 190:15
**nine** [4] - 253:4, 257:11, 269:10, 271:11
**Nine** [1] - 198:24
**NO** [1] - 1:6
**nobody** [2] - 187:20, 270:12
**nol** [1] - 260:24
**nomenclature** [1] - 163:21
**non** [4] - 74:19, 195:11, 240:1, 245:20
**non-conflict** [1] - 195:11
**non-controversial** [1] - 74:19
**non-cooperation** [1] - 245:20
**non-violent** [1] - 240:1

**none** [1] - 9:20
**None** [1] - 195:14
**normal** [1] - 135:22
**normally** [1] - 110:4
**north** [2] - 62:7, 168:17
**North** [1] - 62:11
**Northbound** [2] - 11:9, 13:3
**northbound** [4] - 11:13, 12:3, 12:8, 12:10
**Northern** [1] - 173:7
**NORTHERN** [1] - 1:2
**Northwest** [2] - 168:18, 196:25
**note** [4] - 74:5, 119:17, 120:10, 194:13
**noted** [4] - 35:21, 36:17, 38:8, 213:12
**notes** [1] - 4:24
**nothing** [9] - 12:16, 28:17, 88:10, 93:18, 131:10, 182:5, 257:21, 269:21
**Nothing** [5] - 21:11, 88:9, 89:13, 182:8, 246:18
**notice** [4] - 3:25, 261:24, 263:11, 268:19
**noticed** [2] - 79:22, 80:8
**notices** [1] - 252:25
**notification** [1] - 252:20
**notified** [4] - 154:14, 154:18, 154:20, 154:22
**notify** [1] - 159:23
**notion** [2] - 239:15, 239:20
**notwithstanding** [5] - 145:11, 150:25, 154:14, 241:5, 250:14
**Notwithstanding** [1] - 239:18
**November** [4] - 10:17, 19:4, 94:3, 180:18
**number** [15] - 8:22, 14:24, 126:22, 166:11, 189:7, 201:7, 201:20, 204:4, 206:14, 208:15, 226:1, 245:18, 247:17, 269:25, 270:1
**Number** [5] - 172:22, 173:1, 176:16, 176:23, 183:17
**Number(s** [1] - 276:5
**numbers** [1] - 268:2
**numerous** [1] - 164:23

**O**

**o'clock** [1] - 262:2

**oath** [2] - 156:20, 182:4
**object** [4] - 72:19, 74:18, 74:20, 262:9
**objecting** [1] - 5:7
**objection** [22] - 2:15, 3:6, 3:7, 7:1, 43:10, 43:17, 45:3, 45:12, 52:6, 62:14, 74:11, 75:4, 75:5, 75:21, 75:23, 75:24, 78:19, 80:3, 81:7, 218:10, 218:24, 250:13
**Objection** [86] - 29:4, 32:6, 34:14, 34:18, 39:19, 39:23, 39:24, 40:19, 40:20, 40:25, 41:1, 41:3, 41:8, 42:19, 43:4, 45:18, 45:23, 45:24, 46:3, 46:15, 46:19, 46:20, 46:24, 51:14, 53:19, 54:1, 55:3, 56:8, 57:8, 58:14, 60:2, 62:3, 62:9, 63:7, 64:5, 65:15, 66:5, 70:8, 70:12, 72:3, 72:11, 72:16, 72:25, 78:18, 78:24, 79:15, 80:2, 80:12, 81:6, 82:3, 82:7, 89:6, 94:25, 97:13, 97:17, 97:21, 98:3, 98:8, 102:20, 107:16, 109:3, 117:21, 118:16, 133:10, 188:23, 189:2, 191:21, 212:23, 217:8, 217:18, 217:21, 218:9, 218:14, 218:22, 219:7, 219:12, 219:16, 219:22, 220:1, 220:13, 220:21, 221:1, 221:5, 221:6, 230:21, 244:21
**objects** [1] - 62:13
**obligations** [6] - 26:20, 179:18, 179:23, 179:24, 180:4, 200:24
**obscenities** [2] - 76:24, 77:4
**observe** [3] - 76:25, 224:22, 224:23
**observed** [1] - 214:1
**obstruction** [1] - 28:18
**obviously** [6] - 4:23, 14:2, 117:15, 124:11, 236:1, 255:15
**Obviously** [4] - 164:13, 248:13, 267:13, 270:10
**occasion** [11] - 53:23, 66:16, 93:11, 96:16, 97:25, 108:25, 168:6, 168:19, 176:13, 177:22, 182:15
**occasionally** [2] - 130:21, 205:17

**occasions** [7] - 8:13, 55:17, 93:24, 108:9, 138:1, 166:11, 184:17
**occupant** [2] - 17:3, 17:23
**occupants** [1] - 19:24, 20:2
**occupation** [2] - 124:22, 225:13
**occurred** [7] - 19:3, 147:8, 147:12, 149:19, 164:2, 178:12, 233:2
**occurring** [1] - 164:7
**October** [1] - 86:16
**OF** [3] - 1:2, 1:5, 1:11
**offense** [3] - 25:10, 55:23, 26:22, 168:10, 168:11, 176:14, 177:7, 177:10, 178:15, 179:13, 179:17, 180:24, 240:11
**offenses** [4] - 9:7, 97:17, 30:8, 167:21
**offer** [3] - 75:3, 183:20, 272:21
**offered** [2] - 153:9, 250:22
**Office** [6] - 34:21, 34:22, 180:3, 201:16, 231:5, 257:7
**office** [13] - 4:8, 26:21, 27:16, 27:21, 28:12, 174:14, 179:18, 179:23, 189:21, 201:15, 202:25, 245:22, 259:8
**Officer** [3] - 12:14, 16:24
**officer** [6] - 32:16, 167:23, 168:6, 223:4, 223:6, 223:10
**officers** [4] - 8:18, 9:8, 9:15, 9:17
**official** [1] - 276:8
**Official** [1] - 276:16
**often** [5] - 57:15, 77:13, 117:20, 126:4, 253:2
**Often** [1] - 209:5
**old** [11] - 22:6, 35:22, 41:20, 121:24, 122:3, 122:5, 122:15, 124:3, 124:19, 132:4, 196:18
**Older** [2] - 48:21, 49:13
**older** [15] - 35:24, 36:1, 38:9, 38:10, 38:11, 38:12, 38:15, 38:16, 48:20, 49:8, 49:12, 49:14, 122:7, 122:11, 167:8
**omits** [1] - 7:10
**once** [5] - 24:6, 55:19, 57:16, 161:13, 257:22

**Once** [2] - 57:17, 120:10

**one** [124] - 6:12, 8:19, 12:1, 12:13, 17:22, 19:9, 27:16, 27:20, 32:18, 40:18, 40:23, 41:22, 41:24, 55:13, 55:14, 57:18, 58:19, 62:5, 62:12, 67:10, 67:11, 75:22, 75:23, 76:9, 77:3, 80:6, 82:1, 82:5, 82:24, 82:25, 86:1, 86:25, 94:9, 95:6, 95:7, 98:17, 116:7, 116:16, 120:11, 124:7, 124:8, 124:9, 126:22, 131:1, 134:20, 144:22, 154:3, 155:4, 163:24, 166:8, 166:9, 167:22, 170:4, 172:6, 173:18, 174:6, 177:3, 179:22, 181:12, 182:9, 185:13, 185:15, 185:20, 186:16, 186:17, 187:15, 190:6, 191:18, 192:13, 192:19, 199:24, 200:8, 200:11, 202:4, 204:18, 205:7, 205:16, 214:15, 222:10, 223:6, 224:21, 229:2, 229:5, 234:11, 234:18, 239:11, 240:17, 245:20, 247:13, 247:23, 248:23, 252:10, 253:21, 253:25, 256:20, 257:12, 259:24, 260:1, 260:17, 261:5, 261:15, 262:2, 262:19, 265:12, 265:16, 267:4, 268:2, 268:7, 268:10, 268:25, 269:4, 269:10, 269:24, 269:25, 270:5, 270:13, 270:20, 271:15, 271:21

**One** [9] - 38:20, 76:22, 92:21, 172:22, 173:1, 195:9, 213:7, 237:17, 261:17

**one-way** [1] - 12:1

**ones** [4] - 159:3, 163:16, 182:1, 204:7

**online** [1] - 249:11

**open** [9] - 74:7, 100:3, 100:5, 119:22, 194:15, 249:8, 253:2, 271:17, 272:12

**opened** [3] - 102:9, 102:18, 184:25

**opening** [2] - 251:24, 270:9

**operate** [1] - 208:1

**operated** [1] - 91:21

**operation** [2] - 131:7,

140:3

**operations** [1] - 100:3

**opinion** [2] - 129:10, 235:2, 236:4, 260:21

**opportunity** [4] - 128:5, 128:6, 165:1, 224:23

**opposed** [4] - 52:15, 152:7, 252:21, 269:18

**opposing** [1] - 183:23

**optimistic** [1] - 257:23

**order** [9] - 4:22, 5:4, 68:15, 144:15, 166:15, 170:7, 200:13, 259:23, 273:21

**ordinarily** [1] - 265:9

**organization** [30] - 3:15, 141:2, 141:4, 141:6, 205:18, 206:16, 208:16, 216:22, 221:17, 225:1, 225:4, 225:21, 226:2, 227:10, 227:13, 227:20, 228:8, 228:18, 228:20, 228:23, 230:5, 232:13, 232:16, 236:3, 236:10, 236:12, 236:13, 238:2, 242:11, 246:6

**original** [2] - 129:14, 149:10

**originally** [1] - 244:3

**otherwise** [3] - 27:4, 27:14, 266:10

**ought** [3] - 258:25, 262:12, 271:3

**ounce** [2] - 106:8, 106:9

**ounces** [8] - 65:25, 66:8, 67:8, 67:9, 71:1, 112:8

**ourselves** [1] - 149:25

**outcome** [2] - 9:8, 9:15

**outdoors** [1] - 248:22

**outfit** [1] - 207:25

**outside** [8] - 87:6, 116:17, 136:25, 186:7, 191:8, 194:24, 261:22, 262:10

**overall** [1] - 72:5

**overlapping** [1] - 265:5

**Overruled** [70] - 29:5, 32:7, 34:15, 34:19, 39:20, 39:25, 40:22, 41:2, 41:10, 42:20, 43:5, 43:11, 43:18, 45:4, 45:13, 45:19, 45:25, 46:5, 46:16, 46:21, 46:25, 51:15, 52:7, 53:20, 54:3, 55:4, 56:9, 57:9, 58:15, 60:3, 62:4, 62:10, 63:9, 64:6, 65:16, 66:6, 70:9, 70:13, 72:4, 72:13, 73:1, 78:25,

79:16, 80:13, 82:8, 89:7, 95:1, 98:4, 98:9, 102:21, 107:18, 109:4, 118:18, 189:3, 191:22, 212:24, 217:19, 218:15, 218:23, 218:25, 219:19, 219:13, 219:17, 219:23, 220:2, 220:14, 220:22, 221:2, 230:23, 244:22

**overruled** [8] - 62:16, 75:24, 76:5, 78:19, 81:7, 218:10, 221:7

**oversee** [1] - 206:2

**owe** [8] - 88:2, 88:4, 88:24, 93:5, 121:12, 135:15, 150:19, 150:21

**owed** [2] - 112:18, 112:24

**owes** [1] - 135:17

**Owings** [1] - 106:16

**own** [20] - 5:19, 6:9, 6:20, 74:15, 81:2, 127:11, 133:15, 134:19, 136:7, 136:9, 137:1, 140:2, 144:15, 155:11, 162:10, 163:21, 230:7, 230:19, 247:8, 270:24

## P

**P-1** [1] - 23:6

**P-5A** [1] - 200:19

**P-5B** [1] - 200:20

**P-A-J-A-R-D-O** [1] - 3:18

**p.m** [6] - 11:4, 119:20, 120:14, 120:15, 195:7, 274:5

**pace** [1] - 8:12

**package** [1] - 55:14

**packaged** [1] - 61:17

**packages** [1] - 58:7

**packed** [1] - 2:25

**pads** [3] - 74:5, 119:17, 194:13

**PAGE** [1] - 275:3

**page** [9] - 23:7, 25:5, 30:19, 173:3, 173:9, 173:22, 179:21, 193:18, 198:19

**Page** [13] - 40:6, 46:11, 73:2, 175:8, 175:13, 177:18, 179:9, 181:9, 187:17, 198:24, 201:9, 202:4, 202:10

**pages** [2] - 198:18, 276:7

**paid** [3] - 87:18, 89:5, 150:3

**Pajardo** [5] - 3:16, 3:19, 3:20, 4:6, 4:17

**Pajardo's** [2] - 4:11, 4:12

**palm** [2] - 256:20, 259:4

**paper** [4] - 4:7, 199:19, 200:2, 200:22

**paperwork** [1] - 2:9

**paragraph** [6] - 27:13, 174:10, 201:9, 201:12, 202:5, 240:18

**Paragraph** [12] - 24:22, 25:19, 26:19, 27:11, 28:5, 28:16, 179:21, 183:17, 189:16, 202:4, 202:11, 231:17

**paragraphs** [1] - 201:7

**paramedic** [1] - 256:18

**paraphernalia** [1] - 169:7

**Pardon** [1] - 172:11

**park** [1] - 90:12

**Park** [16] - 45:16, 45:22, 46:22, 106:21, 138:5, 168:15, 168:17, 168:19, 170:11, 197:2, 203:21, 227:7, 227:8, 227:18, 227:20, 227:22

**parole** [11] - 25:15, 25:16, 26:17, 26:22, 28:24, 30:1, 150:15, 151:1, 152:12, 153:10, 157:12

**Parole** [3] - 27:2, 27:3, 150:13

**part** [35] - 7:14, 8:21, 8:23, 32:18, 42:24, 44:11, 64:1, 121:12, 126:13, 136:21, 137:21, 138:3, 140:23, 151:18, 152:18, 152:19, 152:21, 153:21, 154:1, 177:15, 178:25, 196:24, 198:14, 199:23, 200:13, 200:19, 201:9, 202:1, 203:20, 206:18, 229:9, 231:16, 247:19, 268:11

**Part** [1] - 153:24

**participated** [1] - 137:13

**particular** [10] - 6:3, 9:8, 197:1, 199:19, 203:22, 207:18, 208:12, 215:18, 248:1, 250:3

**particularly** [2] - 272:8, 273:1

**particulars** [2] - 123:9, 142:2

**parts** [5] - 198:12, 200:4, 214:3, 214:12,

214:16

**party** [10] - 183:23, 206:22, 207:5, 207:18, 207:21, 208:10, 209:9, 232:19, 233:19, 238:24

**Partying** [1] - 209:11

**partying** [1] - 209:20

**passage** [3] - 40:4, 190:6, 190:9

**passages** [1] - 46:13

**passenger** [7] - 16:16, 17:14, 20:25, 21:1, 21:6, 21:9, 95:18

**past** [7] - 13:11, 13:12, 31:14, 33:10, 149:25, 240:7, 240:8

**patrol** [5] - 10:16, 10:18, 10:22, 10:24, 16:20

**Patrol** [1] - 10:23

**Paul** [1] - 1:19

**Pause** [2] - 40:12, 120:3

**pay** [8] - 35:2, 54:5, 61:8, 93:3, 114:2, 185:17, 238:24

**pending** [6] - 26:25, 34:9, 113:22, 150:7, 160:10, 184:6

**Pennsylvania** [13] - 100:3, 100:6, 100:16, 102:10, 102:12, 102:18, 103:3, 103:13, 103:15, 103:17, 134:19, 184:25, 185:1

**People** [4] - 139:3, 244:18, 244:23, 270:16

**people** [80] - 6:4, 6:5, 20:13, 54:8, 58:11, 58:17, 68:18, 72:1, 80:14, 82:24, 83:2, 100:7, 100:8, 123:4, 128:17, 129:1, 129:12, 129:15, 129:22, 129:25, 130:3, 130:10, 130:13, 130:15, 135:13, 137:13, 137:24, 138:16, 138:19, 138:21, 139:1, 139:5, 139:20, 143:16, 145:12, 146:17, 170:24, 188:8, 203:22, 208:15, 209:10, 213:4, 213:19, 216:2, 216:3, 218:1, 218:4, 221:17, 222:9, 223:1, 223:7, 223:14, 223:15, 227:4, 227:22, 235:7, 236:19, 236:22, 237:7, 237:14, 237:16, 244:19, 248:7, 251:20, 257:6, 257:15, 261:6, 263:25, 265:6, 265:16, 270:5,

270:15, 270:20, 270:21, 271:11, 273:14

**people's** [2] - 129:18, 129:21

**perfect** [1] - 120:10

**performed** [1] - 257:4

**Perhaps** [1] - 268:7

**perhaps** [9] - 4:21, 8:17, 124:7, 195:12, 257:13, 257:25, 262:12, 266:17, 267:15

**period** [13] - 57:17, 80:16, 94:17, 100:1, 133:18, 170:12, 184:19, 225:8, 225:11, 225:16, 227:5, 240:19, 240:20

**Periodically** [1] - 206:4

**periodically** [1] - 185:7

**periods** [1] - 134:6

**perjury** [4] - 27:6, 27:17, 28:17, 203:13

**permission** [3] - 109:15, 172:21, 214:12

**permit** [1] - 74:14

**permitted** [3] - 9:14, 26:10, 262:25

**permitting** [1] - 194:19

**perpetrator** [1] - 255:1

**person** [73] - 16:15, 20:6, 35:15, 51:20, 52:18, 60:10, 60:12, 88:6, 88:24, 112:22, 122:21, 124:7, 131:5, 139:17, 163:25, 169:13, 210:5, 210:17, 210:18, 211:1, 211:3, 211:9, 211:16, 211:21, 212:1, 212:4, 212:17, 212:20, 213:1, 213:4, 213:7, 216:1, 217:1, 219:5, 219:15, 220:4, 221:11, 222:11, 231:4, 237:9, 237:10, 237:17, 238:5, 238:9, 238:15, 238:17, 238:18, 239:7, 239:8, 239:18, 239:21, 240:1, 242:8, 242:11, 242:17, 243:4, 243:16, 244:7, 245:5, 245:8, 245:10, 245:14, 245:16, 247:9, 247:11, 247:15, 248:10, 248:12, 261:16

**person's** [6] - 145:4, 211:7, 212:10, 224:22, 224:23, 234:22

**personal** [1] - 179:16

**personally** [5] - 62:1, 137:4, 145:11, 208:24, 245:2

**persons** [1] - 231:4

**perspective** [2] - 50:19, 243:11

**persuade** [1] - 190:3

**PH-22** [1] - 69:21

**PH-4** [4] - 12:7, 12:8, 12:25, 13:1

**PH-49** [1] - 91:9

**PH-5** [2] - 12:7, 12:11

**PH-54** [5] - 42:6, 42:10, 210:24, 212:2

**PH-55** [1] - 48:24

**PH-56** [1] - 48:13

**PH-59** [1] - 69:10

**PH-60** [1] - 217:1

**PH-68** [1] - 51:19

**PH-71** [1] - 52:17

**phenomenon** [2] - 138:11, 142:7

**phone** [4] - 105:17, 105:18, 164:20, 186:18

**phonetically** [1] - 204:13

**photo** [3] - 13:20, 215:6, 242:21

**photograph** [5] - 12:11, 207:14, 211:9, 215:19, 222:10

**photographic** [1] - 222:25

**photographs** [4] - 48:10, 214:20, 214:22, 257:12

**phrase** [6] - 162:20, 162:21, 162:24, 165:18, 186:5, 192:20

**physical** [5] - 210:11, 210:13, 211:12, 211:15, 213:2

**physically** [1] - 211:17

**pick** [7] - 33:11, 97:1, 98:11, 98:12, 105:16, 180:16, 263:1

**picked** [5] - 168:10, 180:8, 180:9, 206:1, 246:5

**picks** [2] - 110:16, 112:15

**picture** [8] - 12:8, 13:8, 13:15, 13:18, 13:22, 48:14, 64:20, 207:8

**pictures** [3] - 51:18, 223:1, 249:12

**Pie** [1] - 260:13

**piece** [3] - 199:19, 200:2, 200:22

**Pikesville** [4] - 107:6, 108:19, 109:9, 114:8

**pills** [5] - 70:25, 101:11, 101:15, 105:9

**place** [14] - 4:13, 18:2,

77:13, 84:21, 84:23, 85:20, 90:24, 90:25, 134:20, 206:2, 206:22, 244:1, 253:25

**placed** [3] - 8:19, 17:1, 77:11

**places** [3] - 43:8, 102:3, 179:10

**plain** [2] - 10:20, 142:12

**plan** [1] - 144:8

**planned** [1] - 111:24

**planning** [1] - 185:24

**plans** [1] - 185:21

**planted** [1] - 114:20

**plausibly** [1] - 265:8

**Play** [1] - 92:16

**play** [1] - 135:13

**playboy** [1] - 110:6

**players** [1] - 140:24

**playing** [3] - 110:17, 113:4, 209:10

**plea** [65] - 3:13, 7:7, 7:9, 7:15, 9:19, 23:2, 23:15, 23:18, 24:2, 24:12, 24:18, 25:19, 25:20, 26:10, 27:5, 27:8, 27:9, 28:2, 28:3, 28:8, 28:21, 30:4, 153:21, 158:14, 158:16, 158:21, 158:25, 159:5, 159:6, 159:9, 159:24, 171:20, 171:23, 172:3, 176:14, 176:17, 176:24, 178:9, 178:11, 178:16, 179:8, 180:12, 180:15, 189:7, 189:15, 190:4, 198:7, 198:11, 198:21, 198:24, 199:5, 199:22, 199:23, 200:3, 200:4, 200:10, 202:10, 230:25, 240:14, 245:19, 246:4, 246:14

**plead** [3] - 23:14, 26:12, 198:7

**pleaded** [1] - 200:8

**pleading** [3] - 3:23, 26:23, 199:10

**pleas** [1] - 4:1

**pleasant** [1] - 8:10

**pled** [6] - 30:8, 31:2, 199:13, 232:15, 232:17, 240:11

**plied** [1] - 126:16

**plotting** [2] - 110:12, 111:16

**plying** [1] - 132:11

**Plymouth** [1] - 109:10

**pockets** [4] - 88:9, 88:11, 88:13, 92:13

**point** [45] - 35:13, 36:9, 37:20, 44:14, 62:22,

73:24, 75:8, 82:21, 86:1, 88:15, 102:1, 113:21, 124:11, 142:19, 149:21, 149:25, 150:6, 162:2, 162:4, 163:19, 171:19, 185:6, 188:2, 209:14, 209:16, 209:24, 210:11, 211:12, 212:10, 214:12, 216:1, 222:25, 234:11, 240:8, 244:3, 250:2, 250:14, 259:24, 260:4, 261:10, 262:25, 267:12, 269:25, 270:6, 270:13

**Point** [3] - 260:2, 260:14, 270:1

**pointed** [3] - 171:23, 245:13, 247:10

**pointing** [2] - 12:8, 12:9, 35:17

**points** [5] - 40:11, 125:8, 127:14, 127:21, 171:15

**pole** [3] - 13:11, 13:12, 13:17

**Police** [5] - 10:12, 114:7, 114:8, 169:2, 223:4

**police** [28] - 10:13, 87:11, 90:5, 90:8, 90:10, 90:19, 91:1, 91:4, 94:14, 95:13, 95:22, 96:1, 104:22, 142:12, 162:24, 163:1, 163:19, 167:23, 168:6, 211:6, 215:9, 222:12, 222:15, 222:20, 222:23, 223:24, 223:25, 242:15

**Polo** [11] - 54:9, 54:11, 54:12, 54:15, 54:19, 55:2, 55:8, 55:19, 131:13, 131:17, 133:2

**Polo's** [4] - 55:21, 56:1, 56:2, 161:9

**poor** [1] - 269:6

**Poppi** [16] - 56:16, 56:18, 56:23, 57:7, 57:22, 58:8, 59:2, 60:15, 61:24, 62:7, 75:14, 131:15, 131:19, 133:2, 161:12, 184:21

**poppin** [1] - 110:6

**position** [5] - 6:19, 219:19, 238:8, 252:21, 270:10

**possess** [1] - 199:14

**possessed** [1] - 240:22

**Possession** [4] - 23:16, 33:15, 33:23, 97:4

**possession** [2] - 131:3, 151:5, 180:16, 208:9

232:11, 232:12

**possessions** [1] - 2:10

**possibility** [1] - 248:6

**possible** [4] - 2:16, 8:15, 27:22, 126:25

**postponement** [2] - 18:17, 18:18

**pot** [1] - 84:15

**potential** [1] - 254:5

**powder** [6] - 52:15, 84:14, 85:4, 95:5, 105:12, 197:21

**powdered** [1] - 85:1

**Power** [2] - 260:2, 260:14

**power** [1] - 260:4

**powerful** [1] - 144:13

**practice** [1] - 7:11

**predominantly** [1] - 207:24

**Predominantly** [1] - 203:21, 227:8

**preferably** [1] - 261:24

**preference** [1] - 273:17

**prejudice** [1] - 251:25

**preparation** [2] - 195:1, 202:23

**prepare** [1] - 163:4

**prepared** [6] - 4:9, 163:7, 166:19, 195:13, 242:17, 262:13

**preparing** [1] - 195:13

**preponderance** [3] - 28:13, 189:22, 190:2

**presence** [1] - 261:22

**present** [3] - 2:1, 18:20, 74:25, 128:11, 163:15, 215:9, 215:11, 217:3, 217:23, 217:24, 218:1, 255:16

**presented** [1] - 128:5

**preserved** [1] - 7:1

**president** [2] - 207:20, 208:3

**pressing** [1] - 252:14

**Presumably** [3] - 137:10, 239:4, 239:5

**presume** [1] - 2:21

**pretty** [16] - 14:17, 15:16, 29:11, 76:22, 82:24, 83:1, 91:20, 111:18, 141:20, 144:13, 169:2, 169:6, 171:7, 216:7, 259:19, 269:11

**Pretty** [6] - 52:10, 114:14, 129:10, 136:16, 206:10, 259:21

**previously** [2] - 157:11, 199:23

**Prima** [1] - 75:17

**prima** [2] - 75:19, 273:12
**principal** [1] - 251:17
**print** [3] - 249:4, 256:20, 259:4
**prison** [5] - 150:23, 170:8, 170:20, 170:22, 180:17
**prisoner** [1] - 34:7
**pro** [1] - 3:23
**probation** [5] - 27:1, 33:3, 150:12, 157:12, 168:3
**problem** [22] - 3:19, 4:15, 103:17, 110:13, 110:15, 112:1, 112:4, 164:14, 164:24, 195:20, 239:7, 239:14, 239:15, 239:20, 253:7, 253:15, 260:22, 260:23, 264:25, 265:10, 268:11, 272:24
**problems** [2] - 228:6, 267:21
**proceed** [3] - 8:10, 9:23, 78:4
**proceeded** [1] - 90:13
**proceeding** [3] - 3:20, 28:11, 189:19
**proceedings** [4] - 120:3, 201:14, 276:4, 276:8
**Proceedings** [3] - 2:1, 40:12, 274:5
**proceeds** [1] - 137:8
**processed** [1] - 19:19
**produced** [2] - 246:15
**produces** [1] - 207:24
**producing** [2] - 107:25, 108:1
**products** [1] - 91:20
**profession** [1] - 124:22
**proffer** [6] - 173:17, 175:16, 178:10, 178:13, 182:13, 182:25
**profit** [3] - 102:22, 102:23, 126:25
**profitability** [1] - 228:9
**promise** [2] - 24:18, 174:19
**promises** [6] - 172:1, 172:14, 201:20, 203:2, 248:20
**promising** [1] - 183:9
**promote** [1] - 144:15
**prong** [1] - 271:7
**proof** [3] - 6:23, 247:15, 248:11
**proper** [2] - 9:1, 273:11
**propose** [2] - 249:21, 250:10

**prosecute** [13] - 25:23, 27:17, 27:23, 153:3, 153:25, 154:23, 160:2, 180:5, 183:2, 183:11
**prosecuted** [13] - 29:25, 30:7, 152:25, 175:22, 176:6, 177:11, 178:2, 178:4, 178:20, 179:3, 179:5, 183:7, 184:10
**prosecuting** [1] - 154:16
**prosecution** [4] - 25:22, 203:15, 229:22, 238:12
**prosecutor** [6] - 166:25, 174:2, 175:14, 175:21, 176:2, 181:20
**prosecutors** [10] - 166:11, 172:2, 176:25, 180:3, 189:9, 199:6, 200:7, 202:24, 203:9, 241:10
**prosses** [1] - 260:24
**protect** [2] - 200:13, 227:16
**protecting** [1] - 138:6
**protection** [2] - 80:21, 135:13
**Protection** [1] - 80:22
**protects** [1] - 28:17
**prove** [6] - 8:22, 247:20, 251:22, 251:23, 265:11, 270:11
**proven** [3] - 9:5, 9:21, 247:24
**provide** [3] - 34:22, 160:11, 201:1
**provided** [9] - 3:13, 5:5, 7:6, 174:15, 183:22, 183:24, 202:13, 202:14, 223:24
**Provident** [1] - 231:21
**provides** [2] - 25:21, 202:18
**proving** [1] - 248:1
**provisions** [1] - 25:18
**prudent** [1] - 271:5
**public** [2] - 200:14, 246:5
**publicly** [1] - 245:25
**Pulaski** [1] - 93:23
**pull** [5] - 15:2, 58:7, 60:24, 93:13, 176:15
**pulled** [16] - 11:15, 11:17, 11:19, 11:23, 14:16, 14:21, 14:23, 87:7, 93:15, 94:15, 98:14, 105:1, 142:12, 155:11, 213:22, 216:14
**pulling** [1] - 90:9

**punched** [1] - 213:18
**purchase** [1] - 184:20
**purchased** [4] - 87:14, 89:4, 203:23, 206:12
**purportedly** [1] - 146:24
**purpose** [12] - 78:15, 91:17, 166:14, 207:19, 230:3, 230:14, 230:25, 231:1, 245:25, 250:8, 270:20
**purposes** [2] - 68:3, 247:17
**pursuant** [3] - 23:2, 26:10, 149:16
**push** [2] - 227:25, 253:21
**put** [46] - 2:17, 12:13, 23:17, 29:16, 30:20, 48:11, 60:10, 60:12, 60:13, 64:20, 76:24, 90:11, 90:17, 90:19, 95:20, 95:22, 101:8, 101:9, 109:7, 109:14, 115:25, 116:2, 125:13, 159:8, 172:22, 172:23, 174:13, 187:19, 188:9, 188:20, 188:22, 198:17, 200:1, 201:1, 216:10, 216:13, 219:1, 219:5, 221:11, 221:18, 238:21, 248:21, 255:25, 256:1, 264:9, 272:9
**Putting** [1] - 112:2
**putting** [7] - 42:10, 78:15, 84:14, 207:8, 219:11, 238:4, 260:15
**Pyne** [1] - 1:21, 5:3, 6:6, 7:3, 158:12, 166:8, 189:7, 260:18, 262:8, 262:13, 267:25
**PYNE** [1] - 5:2, 5:4, 6:8, 6:19, 7:2, 53:19, 54:1, 97:21, 98:8, 133:10, 158:9, 166:1, 275:7
**Pyne's** [1] - 264:2

## Q

**quadruple** [1] - 102:24
**Quadruple** [1] - 102:25
**qualified** [1] - 265:12
**quality** [1] - 269:6
**qualms** [2] - 137:17, 144:18
**quantities** [8] - 55:10, 56:12, 57:24, 65:24, 67:6, 71:2, 228:11,

229:10
**quantity** [1] - 151:6
**Quarles** [3] - 3:21, 3:22, 4:3
**quarrel** [2] - 252:9, 268:12
**quarter** [1] - 71:1
**questioned** [2] - 146:14, 186:23
**questioning** [3] - 122:17, 140:2, 189:12
**questions** [33] - 18:21, 18:22, 18:23, 19:10, 21:12, 25:1, 72:19, 74:19, 75:7, 76:3, 111:14, 118:10, 119:15, 155:7, 158:6, 158:7, 158:13, 159:22, 166:10, 167:20, 171:19, 172:6, 176:4, 189:7, 192:13, 194:3, 201:1, 244:11, 245:18, 258:3, 258:5, 258:6, 264:8
**quick** [1] - 195:9
**quickly** [1] - 215:5
**quite** [3] - 196:17, 249:9, 263:19

## R

**racketeering** [2] - 199:10, 232:16
**radio** [2] - 16:21, 249:3
**radioed** [2] - 14:23, 16:10
**Raeshio** [29] - 204:2, 204:8, 204:11, 204:14, 204:18, 204:23, 204:25, 205:13, 205:20, 208:13, 209:21, 210:2, 210:17, 215:24, 217:2, 217:4, 218:6, 218:13, 218:18, 218:21, 219:4, 219:11, 219:20, 219:25, 220:11, 221:24, 223:21, 225:23, 234:17
**raid** [2] - 103:8, 103:17
**raided** [1] - 103:9
**raise** [5] - 76:10, 214:10, 260:17, 262:11, 272:4
**raised** [1] - 4:4
**raises** [1] - 272:15
**Ramsay** [2] - 47:13, 47:14
**ran** [2] - 15:19, 94:14
**Randallstown** [18] - 22:9, 22:14, 35:5, 36:5, 37:11, 37:13, 43:14,

43:15, 44:5, 45:9, 48:18, 49:17, 49:21, 51:25, 52:1, 53:4, 85:9, 121:8
**ransom** [1] - 138:17
**rap** [9] - 165:12, 165:14, 165:18, 165:22, 221:16, 221:18, 222:1, 263:21
**rare** [1] - 20:24
**rather** [10] - 24:3, 40:9, 71:13, 77:20, 239:11, 242:14, 257:10, 257:12, 264:7, 273:13
**Rather** [1] - 258:21
**ratify** [1] - 5:16
**rattle** [1] - 266:4
**rattled** [1] - 204:4, 204:8, 205:1
**reaching** [1] - 266:7
**read** [13] - 5:24, 23:18, 40:10, 73:3, 109:22, 109:23, 110:4, 190:8, 201:18, 202:5, 226:4, 240:18, 249:6
**Read** [2] - 73:6, 110:3
**readily** [1] - 228:5
**reading** [4] - 3:4, 110:5, 162:24, 202:11
**reads** [1] - 201:12
**ready** [6] - 8:10, 78:4, 104:1, 104:21, 120:24, 166:16
**Ready** [1] - 120:16
**real** [8] - 53:1, 63:22, 65:2, 109:6, 110:19, 191:24, 208:14, 269:18
**realize** [1] - 120:4
**realized** [3] - 213:19, 213:20, 213:25
**really** [1] - 75:10, 131:10, 140:7, 155:2, 156:10, 156:11, 157:2, 173:20, 235:7, 253:21, 258:22, 260:5, 263:8, 264:5, 264:24, 269:3, 273:2
**rear** [3] - 17:13, 20:24, 21:1
**reason** [16] - 11:23, 139:5, 139:6, 139:20, 151:25, 152:1, 152:2, 167:25, 176:17, 200:5, 245:19, 246:23, 263:18
**reasonable** [1] - 9:22
**reasonably** [2] - 76:25, 265:8
**reasons** [5] - 34:20, 191:17, 191:20, 192:2, 223:12
**reboot** [1] - 12:21
**receive** [3] - 202:1,

202:20, 203:3
**received** [5] - 6:15, 6:16, 19:10, 21:3, 201:25
**receives** [1] - 26:25
**receiving** [1] - 174:23
**recently** [3] - 22:20, 124:15, 158:4
**recess** [15] - 74:5, 74:8, 74:23, 119:17, 119:19, 120:7, 120:14, 194:11, 194:15, 195:6, 248:19, 273:20, 274:4
**Recess** [3] - 74:24, 120:15, 195:7
**recognize** [13] - 48:25, 51:19, 52:17, 69:11, 69:22, 109:17, 211:1, 223:8, 226:4, 237:10, 237:17, 242:23, 242:25
**recognized** [3] - 223:7, 223:9, 243:1
**recognizing** [1] - 164:24
**recollect** [1] - 207:6
**recollection** [14] - 30:18, 34:25, 40:3, 40:14, 46:14, 57:5, 62:11, 64:15, 64:16, 72:22, 73:4, 85:2, 97:23, 118:13
**recommend** [5] - 26:17, 26:21, 26:23, 27:20, 258:17
**record** [17] - 7:1, 10:4, 21:22, 21:25, 35:19, 36:15, 38:6, 196:10, 207:24, 207:25, 213:8, 213:10, 246:5, 249:19, 250:14, 263:13, 272:10
**recorded** [1] - 276:3
**recording** [7] - 116:1, 116:9, 116:11, 116:12, 116:13, 116:21, 116:23
**Records** [1] - 222:8
**records** [1] - 257:6
**recover** [2] - 17:7, 89:1
**recovered** [3] - 25:25, 87:22, 95:13
**recross** [1] - 192:15
**RECROSS** [4] - 192:17, 246:21, 275:8, 275:11
**red** [1] - 215:18
**redact** [1] - 7:17
**redacted** [4] - 7:10, 7:19, 176:20, 272:8
**redacts** [1] - 176:18
**REDIRECT** [4] - 182:11, 244:13, 275:8, 275:11
**reduce** [1] - 241:6
**reduced** [1] - 241:3

**reduction** [2] - 202:21, 241:6
**reductions** [1] - 203:3
**reference** [2] - 140:1, 144:4
**referenced** [2] - 192:21, 195:12
**referred** [5] - 168:22, 190:8, 199:22, 200:21, 205:17
**referring** [3] - 162:6, 174:10, 181:7
**reflect** [2] - 35:19, 36:15, 38:6
**refrain** [1] - 154:4
**refresh** [6] - 30:18, 40:3, 40:14, 46:14, 72:22, 73:3
**regarding** [5] - 123:3, 183:24, 248:3, 255:20
**regards** [2] - 165:9, 174:16
**region** [1] - 133:1
**regions** [1] - 129:16
**registration** [3] - 15:4, 15:5, 15:9
**regular** [2] - 248:22, 261:21
**regularly** [1] - 4:5
**Reisterstown** [2] - 104:1, 104:3
**rejected** [1] - 152:20
**related** [6] - 25:24, 49:4, 69:4, 121:19, 195:11, 204:14
**relating** [3] - 171:11, 180:25, 248:6
**relation** [2] - 197:24, 199:2
**relationship** [4] - 69:6, 125:20, 125:21, 204:16
**relative** [1] - 169:21
**released** [5] - 150:18, 153:16, 170:8, 171:7, 179:23
**relevance** [1] - 8:2
**relevant** [9] - 2:14, 6:21, 6:22, 25:7, 26:5, 248:7, 248:14, 264:17, 264:21
**reliability** [1] - 271:7
**relieved** [2] - 179:18, 180:4
**remainder** [1] - 179:16
**remained** [2] - 164:3, 237:7
**remains** [1] - 250:15
**remember** [72] - 9:17, 11:3, 11:4, 17:19, 30:15, 32:22, 35:3, 35:22, 36:24, 37:3, 37:5, 39:16,

40:1, 40:17, 44:11, 46:1, 46:2, 47:12, 48:22, 51:5, 52:9, 59:4, 60:4, 60:5, 62:22, 67:6, 67:7, 72:9, 73:12, 77:24, 81:4, 81:9, 82:20, 86:25, 87:12, 87:18, 92:16, 92:19, 92:25, 93:21, 93:22, 95:2, 95:25, 96:2, 96:3, 96:5, 100:2, 100:12, 100:13, 105:8, 106:7, 107:20, 109:8, 114:11, 123:6, 123:9, 123:11, 171:14, 171:18, 180:9, 182:15, 191:7, 191:8, 191:11, 206:22, 207:5, 209:3, 210:21, 223:6, 261:20
**remind** [1] - 255:9
**remove** [3] - 14:8, 14:9, 14:11
**rent** [1] - 35:4
**rented** [1] - 91:14
**rep** [1] - 22:19
**repaired** [1] - 195:23
**repeat** [1] - 237:13
**repeats** [1] - 5:21
**repetitive** [1] - 250:17
**rephrase** [1] - 243:23
**Rephrase** [5] - 80:3, 82:4, 97:14, 117:22, 188:24
**report** [1] - 260:11
**Reported** [1] - 1:23
**reported** [1] - 188:11
**Reporter** [1] - 276:16
**reporter** [1] - 204:11
**REPORTER'S** [1] - 276:1
**reporting** [1] - 188:16
**reports** [2] - 162:24, 163:1, 163:19
**represent** [4] - 3:18, 3:20, 4:17, 158:12
**representation** [2] - 271:22, 272:10
**representing** [2] - 199:2, 230:4
**request** [2] - 75:4, 202:15
**require** [2] - 201:18, 273:23
**required** [4] - 28:13, 158:15, 189:21, 259:14
**rescue** [1] - 24:6
**resolved** [1] - 252:18
**resort** [4] - 227:13, 236:8, 236:9, 236:14
**respect** [6] - 144:20, 194:18, 201:14, 250:25,

252:19, 253:3
**respond** [3] - 24:25, 200:25, 273:2
**responded** [2] - 19:9, 166:8, 166:9
**response** [8] - 176:8, 217:16, 218:7, 220:12, 220:16, 239:10, 268:10, 272:21
**responsibility** [2] - 98:25, 179:16
**responsive** [1] - 190:10
**rest** [5] - 17:14, 21:1, 85:22, 85:23, 135:20
**result** [5] - 19:20, 97:8, 99:8, 188:9, 255:23
**resulted** [1] - 124:2
**resume** [2] - 120:19, 249:15
**retaliate** [1] - 218:16
**retaliation** [2] - 218:19, 220:25
**rethink** [2] - 257:13, 268:25
**retrieve** [2] - 2:21, 77:8
**return** [1] - 26:19
**returning** [1] - 190:6
**revealed** [1] - 155:18
**review** [2] - 163:1, 163:19
**revolver** [1] - 81:21
**Rhodes** [4] - 1:17, 4:22, 195:13, 252:16
**RHODES** [1] - 40:7
**Rice** [70] - 3:15, 141:1, 204:2, 204:8, 204:14, 204:23, 204:25, 205:1, 205:13, 205:17, 205:20, 206:3, 206:16, 208:13, 208:15, 208:19, 208:25, 209:21, 210:2, 210:17, 215:24, 216:22, 217:2, 217:4, 218:6, 218:13, 218:18, 218:21, 219:4, 219:11, 219:20, 219:25, 220:11, 221:17, 221:24, 223:21, 225:1, 225:24, 226:2, 226:5, 227:13, 229:2, 230:5, 234:11, 234:14, 234:17, 235:13, 235:14, 236:1, 236:3, 236:10, 236:12, 236:13, 236:16, 237:9, 237:15, 237:24, 238:1, 238:15, 239:10, 242:10, 248:4, 251:20
**Rice's** [3] - 232:8, 232:12, 239:6
**rich** [1] - 110:19
**RICO** [1] - 8:24

**ride** [1] - 153:6
**right-hand** [1] - 13:4
**rights** [1] - 250:16
**risky** [1] - 110:13
**Road** [4] - 84:7, 84:8, 102:4, 104:3
**road** [2] - 110:23, 113:12
**rob** [6] - 80:24, 112:2, 112:22, 142:15, 142:16, 157:9
**Robard** [1] - 256:14
**robbed** [3] - 137:4, 137:15, 139:8
**robberies** [5] - 136:21, 138:10, 142:1, 190:20, 190:21
**robbery** [14] - 39:18, 41:5, 41:6, 41:7, 41:11, 122:18, 123:16, 123:18, 123:22, 123:24, 124:7, 142:19, 149:22, 186:6
**robbing** [3] - 136:23, 137:13, 157:21
**Robert** [1] - 1:16
**Rock** [7] - 89:20, 89:21, 89:22, 89:23, 90:25, 91:1, 162:17
**Rock's** [1] - 92:13
**rode** [1] - 105:24
**Rodney** [1] - 263:17
**role** [3] - 205:14, 205:23, 205:24
**Rolexes** [1] - 232:3, 232:7
**rolled** [1] - 104:22
**Rolls** [2] - 229:3, 232:12
**Ronald** [1] - 256:17
**room** [2] - 119:20, 195:21
**Room** [1] - 1:24
**rooms** [1] - 194:24
**Rosenberg** [4] - 117:14, 182:17, 183:13, 183:16
**rough** [1] - 121:13
**roughly** [1] - 130:3
**round** [1] - 17:21
**rounds** [2] - 17:19, 17:20
**Route** [2] - 105:17, 105:20
**Royce** [2] - 229:3, 232:12
**RPR** [1] - 1:24
**rude** [1] - 145:14
**rule** [1] - 74:21
**ruled** [3] - 62:14, 262:10, 273:12
**rules** [2] - 76:16, 166:24
**ruling** [5] - 75:20,

250:12, 253:6, 269:19, 269:21
**rulings** [2] - 74:19, 252:10
**rumor** [5] - 148:13, 148:15, 148:19, 149:6, 149:13
**run** [3] - 152:14, 153:10, 205:20
**running** [1] - 11:24
**Russell** [1] - 256:14

## S

**safe** [2] - 111:3, 111:10
**Safety** [1] - 246:9
**safety** [4] - 34:20, 200:13, 246:2, 246:9
**sake** [1] - 266:24
**sale** [2] - 149:22, 228:14
**Sales** [1] - 22:19
**sales** [4] - 73:18, 181:21, 192:21
**Sally** [1] - 264:15
**sandbagging** [1] - 266:20
**Sands** [1] - 108:5
**satisfied** [7] - 19:21, 195:15, 248:1, 259:18, 268:10, 268:18, 269:24
**satisfy** [1] - 271:7
**Saturday** [2] - 253:4, 260:15
**Savoy** [3] - 43:16, 43:19, 43:25
**saw** [5] - 157:19, 185:20, 237:4, 243:16, 245:14
**scene** [4] - 214:22, 215:6, 256:18, 256:19
**scenes** [1] - 13:22
**schedule** [4] - 256:11, 261:19, 261:23, 271:4
**scheduled** [1] - 256:20
**School** [9] - 39:1, 39:7, 49:21, 121:20, 121:23, 124:3, 124:11, 133:19, 208:22
**school** [15] - 22:10, 22:12, 35:6, 37:7, 41:23, 49:19, 124:22, 133:24, 197:3, 197:5, 197:9, 197:15, 203:19, 208:7, 208:19
**Scoot** [1] - 21:21
**scope** [4] - 140:2, 227:9, 262:10, 272:1
**Scott** [2] - 68:20, 68:21

**scratch** [1] - 110:9
**screen** [10] - 12:13, 12:14, 12:16, 23:18, 42:10, 64:20, 109:15, 109:24, 109:25, 214:25
**screens** [1] - 12:17
**se** [1] - 3:23
**seal** [1] - 200:11
**sealed** [3] - 200:9
**search** [4] - 5:10, 17:6, 90:13
**searched** [4] - 94:18, 104:23, 105:1, 169:5
**seat** [12] - 11:18, 11:20, 14:19, 15:3, 16:4, 16:9, 16:16, 18:5, 90:15, 95:19, 120:19, 195:24
**seated** [10] - 8:8, 10:3, 16:15, 21:21, 75:1, 78:3, 120:23, 121:7, 196:1, 196:9
**second** [21] - 171:5, 173:3, 173:9, 173:22, 175:3, 199:23, 200:3, 200:9, 229:14, 229:15, 229:18, 229:25, 230:3, 230:15, 230:18, 231:7, 231:13, 231:25, 234:18, 262:12
**secret** [1] - 142:9
**Section** [1] - 222:8
**Security** [1] - 35:4
**see** [78] - 11:18, 12:14, 12:15, 12:16, 12:17, 13:6, 14:18, 15:12, 15:20, 23:20, 23:21, 27:24, 28:14, 28:18, 35:11, 36:7, 37:18, 40:7, 48:14, 57:22, 64:21, 79:8, 83:6, 101:4, 107:10, 114:1, 114:9, 114:12, 114:22, 126:10, 129:25, 130:13, 130:16, 131:23, 140:13, 148:18, 151:16, 164:6, 169:3, 173:3, 173:9, 173:10, 187:14, 189:22, 199:5, 207:11, 210:24, 211:18, 212:1, 212:20, 214:23, 214:25, 215:16, 216:8, 224:10, 226:4, 236:21, 236:25, 237:4, 237:11, 237:21, 240:20, 241:23, 242:15, 242:16, 243:4, 244:1, 244:2, 244:8, 245:5, 245:8, 245:10, 247:8, 249:14, 265:10, 273:6, 273:8
**See** [1] - 192:23
**seeds** [3] - 114:20,

131:9, 131:10
**seeing** [2] - 12:20, 248:23
**seek** [2] - 263:18, 268:18
**seem** [3] - 75:9, 253:8, 271:24
**seize** [1] - 128:6
**seized** [3] - 5:9, 5:13, 91:1
**self** [1] - 193:22
**Sell** [1] - 53:12
**sell** [27] - 43:21, 44:16, 44:17, 44:19, 45:5, 45:16, 46:8, 47:25, 48:3, 50:3, 52:13, 53:25, 67:19, 68:15, 69:2, 70:24, 71:4, 82:17, 87:20, 91:19, 91:24, 103:15, 106:21, 145:1, 197:14, 197:19, 197:21
**seller** [1] - 124:23
**selling** [35] - 42:22, 43:3, 45:9, 68:3, 70:20, 70:21, 70:25, 71:8, 71:12, 71:13, 71:14, 71:16, 71:19, 73:21, 91:21, 110:23, 113:11, 113:14, 124:18, 126:24, 128:15, 128:20, 128:24, 143:13, 143:14, 145:17, 155:5, 155:8, 155:9, 157:21, 162:2, 162:4, 170:1, 181:16
**Selling** [1] - 47:23
**sells** [1] - 144:23
**semiautomatic** [1] - 177:20
**send** [5] - 111:10, 114:1, 114:4, 119:11, 119:13
**sends** [2] - 252:25, 253:2
**sense** [5] - 8:5, 127:18, 156:9, 160:7, 188:15
**sensitivity** [1] - 4:25
**sent** [6] - 6:17, 39:1, 110:21, 110:23, 113:9, 114:5
**sentence** [18] - 2:9, 26:7, 26:17, 26:22, 26:24, 27:21, 27:22, 28:24, 29:1, 29:22, 150:18, 151:15, 152:8, 152:10, 152:24, 202:19, 203:3, 241:3
**sentenced** [6] - 28:21, 157:11, 225:19, 225:20, 240:24, 241:11
**sentences** [2] - 152:14,

174:13
**sentencing** [5] - 25:12, 26:5, 202:15, 203:16, 241:2
**sentiment** [1] - 231:13
**separate** [6] - 8:24, 155:7, 177:3, 179:10, 184:16, 272:7
**separated** [2] - 134:2, 185:7, 213:19
**separately** [2] - 55:17, 176:18
**September** [6] - 1:11, 180:18, 180:20, 180:21, 233:6, 276:5
**seriatim** [1] - 273:23
**seriously** [2] - 258:23, 272:14
**serve** [2] - 150:23, 152:24
**served** [4] - 29:1, 29:6, 99:9, 150:3
**serving** [4] - 2:9, 22:20, 99:7, 170:24
**set** [4] - 183:19, 214:22, 256:16, 273:13
**setting** [1] - 4:3
**settle** [2] - 143:19, 143:21
**seven** [1] - 150:19
**Seven** [3] - 28:5, 189:16, 231:18
**several** [6] - 3:22, 134:3, 162:17, 164:5, 164:20, 178:17
**severance** [2] - 272:4, 272:15
**severe** [1] - 243:5
**shaking** [1] - 258:8
**shall** [9] - 24:25, 25:1, 25:6, 28:12, 28:13, 189:17, 189:20, 189:21, 201:13
**shape** [1] - 7:16
**share** [5] - 58:3, 71:25, 148:18, 195:3, 220:19
**shared** [2] - 4:24, 6:18
**sharing** [1] - 164:14
**Shawn** [23] - 16:19, 20:2, 20:5, 20:20, 35:9, 35:20, 35:22, 65:9, 65:10, 82:11, 86:17, 88:2, 88:4, 88:12, 88:25, 89:16, 90:18, 91:8, 92:14, 95:14, 95:21, 98:24
**SHAWN** [1] - 1:8
**Shawn's** [1] - 95:15
**Shearer** [2] - 4:5, 4:16
**Shelly** [1] - 37:16

**SHELLY** [1] - 1:8
**Shelton** [1] - 20:10
**SHELTON** [1] - 1:7
**shirt** [6] - 35:18, 37:23, 37:25, 194:17, 213:25, 214:10
**shit** [8] - 110:10, 110:11, 111:6, 111:10, 111:15, 111:18, 165:18, 165:20
**shoot** [4] - 111:7, 144:9, 144:10
**shop** [3] - 100:5, 102:9, 184:25
**shops** [1] - 102:18
**shortly** [2] - 99:16, 171:8
**shot** [1] - 115:23
**show** [29] - 12:4, 23:5, 40:9, 42:5, 48:10, 48:13, 48:24, 51:18, 58:22, 69:10, 69:21, 72:15, 77:13, 91:9, 109:14, 136:17, 172:22, 187:9, 192:19, 192:22, 198:11, 198:14, 198:18, 199:21, 199:22, 200:16, 200:24, 207:8, 214:20
**showed** [8] - 30:18, 40:4, 72:22, 155:17, 171:15, 200:18, 222:10, 223:4
**showing** [1] - 52:17
**Showing** [1] - 216:25
**shown** [1] - 222:25
**shows** [3] - 12:7, 13:20
**shut** [1] - 134:13
**side** [11] - 13:4, 14:25, 16:25, 17:14, 82:24, 95:18, 157:3, 213:18, 213:22, 252:18
**sideways** [5] - 15:4, 15:7, 15:15, 16:1, 16:4
**sign** [5] - 12:11, 90:11, 94:14, 198:7
**signature** [2] - 23:8, 23:10, 173:22, 198:18, 198:25, 276:11
**signed** [9] - 5:19, 111:12, 174:2, 174:6, 175:16, 175:17, 175:18, 180:12, 199:5
**significantly** [1] - 167:16
**silly** [1] - 144:24
**similar** [1] - 3:22
**simply** [6] - 7:14, 120:6, 183:10, 248:21, 257:5, 266:6
**single** [7] - 4:9, 4:12,

31:25, 32:1, 32:2, 273:24
**siren** [1] - 116:17
**sirens** [2] - 11:19, 14:20
**sit** [4] - 122:23, 135:20, 233:6, 257:20
**site** [1] - 81:4
**Sitting** [1] - 223:14
**sitting** [11] - 4:10, 15:4, 15:7, 15:15, 16:1, 16:4, 16:5, 16:6, 38:3, 251:11
**situation** [6] - 2:23, 142:20, 150:6, 157:23, 157:24, 242:18
**six** [7] - 66:8, 130:16, 147:14, 167:13, 233:2, 244:9
**Six** [5] - 27:11, 40:6, 65:25, 179:21, 233:8
**six-three** [1] - 167:13
**size** [2] - 140:2, 227:9
**ski** [4] - 110:15, 112:1, 112:2, 190:19
**slapped** [4] - 89:13, 89:15, 90:25
**sleeping** [1] - 145:17
**slide** [1] - 109:25
**Slide** [1] - 110:22
**slides** [1] - 260:15
**slightly** [2] - 14:2, 16:9
**slow** [1] - 181:23
**slowly** [2] - 110:3, 110:5
**small** [9] - 114:13, 140:3, 140:5, 140:15, 140:17, 140:19, 140:21, 194:1
**smaller** [1] - 14:3
**Smallwood** [4] - 47:13, 47:14, 48:1, 48:2
**smarter** [1] - 270:2
**Smith** [4] - 256:1, 256:20, 264:15
**smoke** [2] - 154:8, 154:9
**smoked** [2] - 111:8, 114:16
**Smoking** [1] - 233:23
**smoking** [2] - 154:12, 154:13
**snitched** [1] - 103:8
**Snitching** [4] - 78:9, 78:16, 191:9, 192:4
**snitching** [1] - 78:22
**so-called** [1] - 183:5
**socialize** [2] - 132:19, 137:25
**socks** [1] - 107:12
**soda** [1] - 84:15
**Sold** [1] - 197:13
**sold** [19] - 43:8, 43:23,

44:21, 45:10, 52:10, 53:13, 54:5, 54:12, 67:24, 91:25, 92:1, 92:5, 130:10, 130:11, 135:2, 197:20, 206:1, 225:7, 225:10
**solution** [1] - 239:7
**solve** [4] - 235:1, 236:1, 236:3, 236:14
**someone** [40] - 11:1, 16:13, 50:6, 113:9, 127:3, 128:3, 128:4, 129:16, 129:17, 131:12, 131:15, 138:5, 141:18, 142:15, 143:10, 144:5, 144:16, 145:22, 146:18, 157:9, 157:10, 206:12, 215:19, 216:12, 219:3, 220:9, 223:9, 231:1, 235:15, 239:21, 243:1, 243:16, 244:5, 244:7, 246:25, 268:21
**Someone** [3] - 135:17, 230:10, 230:19
**sometime** [3] - 180:12, 205:16, 233:4
**Sometimes** [1] - 148:24
**sometimes** [6] - 9:16, 9:17, 55:8, 57:13, 200:21, 252:25
**somewhat** [3] - 79:1, 262:8, 262:9
**somewhere** [7] - 44:7, 45:10, 62:7, 88:17, 95:18, 95:19, 133:7
**son** [2] - 115:6
**song** [4] - 111:22, 165:10, 165:12, 165:18
**songs** [2] - 165:20, 165:22
**soon** [3] - 91:2, 112:12, 260:23
**Sorry** [6] - 7:25, 12:17, 12:24, 66:18, 176:15, 178:9
**sorry** [18] - 24:4, 34:5, 37:24, 43:6, 63:8, 75:11, 88:3, 100:2, 101:25, 110:3, 116:15, 166:14, 173:21, 180:19, 181:13, 221:10, 243:23, 260:1
**Sort** [2] - 173:19, 236:16
**sort** [15] - 32:4, 71:2, 121:13, 126:10, 134:8, 140:2, 142:3, 205:20, 234:21, 249:10, 249:13, 249:23, 256:8, 269:17, 269:18

**sorts** [1] - 28:11
**sound** [1] - 108:22
**sounded** [1] - 116:9
**Sounded** [2] - 116:11, 116:12
**Soundex** [1] - 15:11
**sounds** [6] - 125:13, 125:15, 251:13, 256:22, 264:9, 271:17
**source** [3] - 97:19, 161:19, 161:23
**south** [1] - 170:16
**South** [15] - 44:10, 44:11, 44:20, 45:15, 47:9, 47:18, 54:13, 63:13, 64:2, 65:7, 92:24, 93:23, 112:18, 129:7, 138:4
**Southwest** [2] - 44:12, 90:2
**speaking** [4] - 111:25, 229:18, 257:16
**special** [1] - 85:20
**specific** [2] - 22:18, 170:9
**specifically** [9] - 24:21, 65:8, 70:11, 201:8, 216:25, 218:18, 248:10, 250:6, 250:7
**Specifically** [3] - 26:15, 46:12, 111:21
**specifics** [1] - 151:14
**speech** [1] - 194:18
**Spell** [3] - 3:17, 21:25, 196:11
**spell** [4] - 10:4, 21:22, 196:10, 204:11
**spelled** [1] - 19:11
**spend** [3] - 39:3, 260:14, 269:6
**spending** [1] - 258:16
**spent** [3] - 124:18, 125:25, 269:14
**spite** [1] - 161:2
**spitting** [1] - 149:7
**split** [3] - 58:4, 58:5, 161:17
**spoken** [1] - 4:6
**sponte** [1] - 249:23
**spot** [2] - 93:18, 95:19
**spotlight** [1] - 14:20
**spread** [1] - 242:21
**stab** [2] - 214:1, 214:13
**stabbed** [18] - 109:1, 109:5, 109:7, 188:8, 213:25, 219:1, 223:17, 223:20, 224:11, 238:10, 244:9, 244:17, 246:24, 247:9, 247:11, 247:13, 247:15, 248:11

**stabbing** [6] - 239:8, 243:24, 247:16, 248:12, 255:1, 255:23
**stabbings** [3] - 187:19, 188:5, 188:9
**stand** [4] - 3:6, 196:4, 196:5, 214:13, 257:11, 264:3
**standing** [7] - 43:25, 74:11, 87:6, 90:10, 104:20, 104:21
**Stanley** [1] - 113:19
**start** [8] - 8:11, 71:12, 110:9, 128:15, 213:13, 229:24, 262:13, 273:21
**started** [11] - 61:24, 70:21, 71:8, 121:10, 121:17, 130:1, 210:13, 210:16, 233:16, 236:19, 253:9
**starting** [1] - 209:24
**starts** [2] - 83:1, 211:12
**Starts** [1] - 181:9
**stash** [9] - 84:10, 84:11, 85:23, 85:24, 86:3, 94:9, 102:5, 142:3, 142:17
**state** [23] - 19:13, 19:15, 21:4, 25:11, 25:20, 26:12, 29:11, 29:15, 30:8, 33:20, 34:9, 78:19, 96:24, 152:8, 152:11, 154:4, 176:14, 179:3, 179:12, 179:17, 180:17, 196:9, 263:12
**State** [6] - 10:4, 15:23, 21:22, 107:6, 114:7, 114:8
**statement** [14] - 3:14, 6:8, 7:8, 7:10, 28:18, 32:16, 32:20, 144:14, 151:22, 167:22, 168:1, 176:19, 176:20, 251:24
**Statements** [2] - 255:2, 255:11
**statements** [9] - 174:15, 183:21, 183:23, 255:7, 255:10, 255:14, 255:19, 255:20
**States** [6] - 9:24, 21:17, 24:13, 34:21, 173:6, 196:3
**STATES** [2] - 1:1, 1:5
**Station** [1] - 92:16
**station** [1] - 249:5
**stationery** [1] - 173:4
**status** [2] - 20:18, 246:15
**Staub** [1] - 16:24
**stay** [5] - 44:13, 77:24, 157:13, 186:18, 273:21

**stayed** [4] - 44:15, 93:10, 93:11, 185:10
**staying** [1] - 16:11
**stenographically** [1] - 276:4
**step** [4] - 17:1, 17:4, 74:2, 210:1
**steps** [1] - 213:23
**STET** [1] - 19:11
**stet** [5] - 18:17, 19:10, 19:11, 19:18, 21:3
**stets** [2] - 18:15, 260:24
**Steven** [1] - 226:9
**still** [25] - 34:9, 43:25, 51:12, 75:23, 78:8, 87:22, 107:15, 112:24, 115:8, 132:11, 151:1, 154:11, 154:12, 154:13, 174:25, 183:11, 186:15, 186:16, 188:21, 203:15, 246:6, 249:9, 267:6, 270:7
**stint** [1] - 133:19
**stipulated** [1] - 25:25
**Stipulation** [1] - 177:16
**stipulation** [2] - 7:15, 240:14
**Stokes** [3] - 104:16, 104:25, 169:16
**Stoltz** [3] - 169:17, 169:24, 170:1
**stone** [1] - 146:4
**stop** [7] - 14:14, 90:11, 94:14, 97:8, 97:11, 97:15
**Stop** [4] - 78:9, 78:16, 191:9, 192:4
**stopped** [13] - 13:6, 13:8, 70:20, 87:7, 90:5, 90:7, 91:4, 95:22, 95:24, 96:17, 96:23, 96:25
**store** [15] - 87:5, 91:6, 91:13, 91:17, 91:24, 91:25, 92:1, 92:2, 92:5, 96:7, 96:10, 96:14, 96:15, 105:17, 105:18
**straightforward** [1] - 16:5
**street** [24] - 11:4, 12:1, 12:11, 12:25, 13:22, 69:22, 70:21, 90:9, 93:22, 104:22, 147:22, 148:13, 148:16, 148:19, 149:21, 150:22, 155:5, 157:21, 170:2, 181:4, 186:17, 207:2, 236:2, 236:3
**Street** [4] - 1:25, 12:1, 67:16, 67:17
**streets** [7] - 47:12, 47:25, 80:23, 110:6,

111:1, 124:12, 134:8
**strike** [2] - 110:19, 221:5
**Strike** [1] - 221:6
**struck** [1] - 89:17
**struggle** [4] - 214:4, 215:24, 215:25, 222:11
**stuff** [10] - 2:24, 71:1, 91:19, 118:11, 118:19, 118:20, 135:15, 206:2, 223:4, 240:7
**sua** [1] - 249:23
**Subject** [2] - 194:7, 194:8
**subject** [3] - 219:21, 254:1, 256:9
**submission** [1] - 251:8
**Submit** [1] - 250:20
**submit** [1] - 250:21
**Subparagraph** [1] - 201:9
**subparagraphs** [1] - 25:3
**subpoena** [3] - 31:7, 117:2, 117:6
**subpoenaed** [2] - 174:11, 182:14
**Subsection** [2] - 24:22, 25:5
**subsequently** [1] - 177:5
**substance** [1] - 175:10
**substances** [1] - 142:8
**substantial** [5] - 25:21, 99:8, 99:21, 106:23, 202:14
**substantially** [2] - 5:23, 181:25
**successful** [10] - 140:12, 187:4, 187:13, 187:14, 187:19, 187:24, 192:20, 193:20, 228:8, 232:13
**successfully** [5] - 30:7, 187:13, 187:15, 187:20, 187:24
**suffered** [1] - 243:5
**sufficiency** [1] - 250:9
**sufficient** [1] - 250:19
**suggest** [2] - 248:20, 251:6
**suggesting** [7] - 166:15, 166:23, 172:13, 264:10, 267:23, 268:5
**suggestiveness** [1] - 273:13
**summarize** [1] - 126:10
**summarizing** [1] - 143:9
**summer** [1] - 221:22

**summons** [1] - 172:16
**summonsed** [2] - 172:10, 172:12
**Sunday** [1] - 207:7
**Supermax** [3] - 245:9, 245:11, 245:14
**supplied** [5] - 51:12, 65:14, 106:21, 160:25, 184:10
**supply** [2] - 97:19, 112:11
**support** [4] - 111:2, 186:15, 186:20, 197:19
**supposed** [4] - 111:4, 114:6, 116:8, 200:9
**Supposedly** [1] - 235:22
**supposedly** [1] - 235:23
**supposing** [1] - 28:1
**suppress** [1] - 273:11
**suppression** [1] - 261:13
**Surely** [1] - 267:22
**surprised** [2] - 262:8, 262:9
**suspect** [1] - 267:17
**suspended** [5] - 15:21, 16:21, 16:23, 17:1, 18:5
**suspicious** [2] - 15:17, 16:10
**Sustained** [2] - 217:9, 217:12
**sustained** [2] - 62:17, 80:3
**sweater** [5] - 36:12, 36:13, 213:9, 244:9, 245:15
**sweating** [1] - 254:24
**swing** [2] - 110:8, 209:23
**swinging** [2] - 234:21, 236:16
**swore** [2] - 182:4, 182:5
**SWORN** [3] - 10:1, 21:19, 196:7
**sworn** [1] - 196:6
**system** [7] - 7:23, 19:14, 19:15, 21:4, 40:7, 186:20, 207:9

## T

**T-shirt** [1] - 194:17
**tag** [1] - 14:24
**talks** [3] - 174:10, 177:18, 199:18
**tall** [2] - 166:9, 167:12
**taller** [2] - 167:14,

167:16
**Tan** [1] - 213:9
**tan** [1] - 244:8
**tape** [19] - 165:4, 165:6, 165:7, 215:9, 260:19, 260:21, 261:2, 263:14, 264:11, 264:13, 265:7, 265:11, 265:17, 265:19, 267:6, 267:11, 268:22, 269:5, 271:12
**tarnish** [1] - 78:21
**Taurus** [11] - 17:10, 17:17, 17:18, 20:23, 82:13, 82:15, 94:22, 95:3, 95:10, 95:11, 95:13
**technician** [1] - 256:19
**telephone** [9] - 79:7, 79:9, 108:10, 117:18, 117:20, 117:24, 118:1, 119:6, 119:8
**television** [1] - 249:4
**Ten** [1] - 104:12
**ten** [7] - 19:6, 130:2, 130:3, 132:7, 150:18, 150:23, 239:11
**tentative** [1] - 271:18
**term** [7] - 22:21, 152:7, 165:20, 173:17, 219:2, 245:21, 266:21
**terminology's** [1] - 173:20
**terms** [12] - 28:7, 106:1, 106:2, 128:20, 154:15, 158:25, 160:10, 161:12, 189:17, 218:13, 222:1, 228:8
**territory** [2] - 143:10, 143:11
**Terry** [1] - 256:14
**testified** [32] - 30:15, 30:25, 31:4, 66:15, 72:10, 82:6, 83:20, 106:20, 117:2, 117:15, 118:6, 126:6, 139:23, 146:13, 149:9, 160:16, 162:18, 163:2, 163:24, 171:9, 172:3, 172:9, 172:13, 172:15, 173:15, 174:20, 176:10, 181:7, 182:4, 193:13, 247:12, 256:2
**testifies** [1] - 273:22
**Testify** [1] - 24:20
**testify** [17] - 25:6, 25:13, 26:11, 27:4, 30:12, 31:7, 79:11, 160:7, 160:9, 166:20, 191:12, 201:13, 246:16, 256:21, 257:3, 260:25, 267:5

**testifying** [13] - 2:15, 3:11, 79:10, 79:13, 79:23, 80:1, 149:10, 155:21, 156:19, 162:16, 192:7, 199:18, 257:5
**testimony** [62] - 3:4, 6:2, 8:18, 11:21, 25:7, 27:15, 31:10, 46:12, 72:23, 77:11, 77:20, 79:22, 101:7, 117:2, 155:18, 160:11, 160:22, 161:2, 161:3, 161:13, 161:24, 162:3, 162:6, 162:8, 162:10, 163:4, 163:7, 163:8, 164:10, 165:8, 166:11, 166:17, 166:18, 166:19, 166:25, 167:6, 167:20, 171:14, 171:18, 171:20, 175:1, 175:9, 175:14, 178:14, 181:8, 183:10, 183:21, 185:12, 187:12, 188:3, 201:18, 202:24, 247:8, 247:11, 247:14, 247:18, 248:3, 248:9, 255:12, 257:24, 267:25, 272:18
**textbook** [1] - 74:13
**Thanksgiving** [1] - 120:12
**THE** [320] - 1:1, 1:2, 2:3, 2:17, 2:19, 3:8, 3:17, 4:19, 4:25, 5:3, 5:14, 5:16, 5:20, 6:1, 6:6, 6:11, 6:21, 7:3, 7:5, 7:13, 7:21, 8:2, 8:5, 8:8, 10:2, 10:3, 10:5, 12:6, 12:20, 13:9, 14:1, 14:8, 14:12, 21:13, 21:15, 21:16, 21:20, 21:21, 21:24, 21:25, 22:1, 24:4, 24:9, 29:5, 29:13, 29:15, 30:20, 32:7, 33:5, 33:6, 33:8, 34:15, 34:19, 35:21, 36:17, 38:8, 39:20, 39:25, 40:1, 40:9, 40:22, 40:23, 41:2, 41:4, 41:5, 41:10, 41:11, 42:20, 43:5, 43:11, 43:18, 45:4, 45:13, 45:19, 45:25, 46:4, 46:5, 46:16, 46:21, 46:25, 48:11, 51:15, 51:16, 52:7, 53:20, 54:3, 54:21, 55:4, 55:6, 56:9, 57:9, 58:15, 60:3, 60:18, 60:19, 60:20, 60:22, 60:23, 62:4, 62:10, 62:12, 62:15, 62:16, 62:19, 62:20, 62:24, 63:9, 64:6, 65:16, 66:6,

70:9, 70:13, 72:4, 72:13, 72:17, 72:19, 73:1, 73:6, 73:7, 73:24, 74:2, 74:10, 75:1, 75:5, 75:11, 75:16, 75:22, 76:2, 76:5, 76:8, 76:11, 76:13, 76:19, 76:21, 77:16, 77:19, 77:24, 78:3, 78:19, 78:25, 79:16, 80:3, 80:13, 81:7, 82:4, 82:8, 89:7, 95:1, 97:14, 97:22, 97:23, 98:4, 98:9, 102:21, 107:18, 109:4, 109:16, 110:3, 116:16, 116:18, 116:25, 117:22, 118:18, 119:16, 119:24, 120:2, 120:4, 120:10, 120:14, 120:16, 120:18, 120:23, 166:3, 172:24, 175:5, 175:7, 176:21, 181:12, 182:10, 187:10, 188:24, 189:3, 191:19, 191:22, 192:16, 194:4, 194:6, 194:8, 194:11, 194:17, 195:3, 195:6, 195:8, 195:10, 195:15, 195:17, 195:20, 196:1, 196:5, 196:8, 196:9, 196:11, 198:16, 212:24, 213:12, 217:9, 217:12, 217:13, 217:19, 217:22, 218:10, 218:15, 218:23, 218:25, 219:9, 219:13, 219:17, 219:23, 220:2, 220:14, 220:22, 221:2, 221:6, 230:23, 244:12, 244:22, 246:20, 247:3, 249:18, 249:24, 250:6, 250:20, 250:24, 251:7, 251:10, 251:16, 252:6, 252:12, 252:15, 252:23, 253:6, 253:9, 253:13, 253:17, 253:20, 253:22, 254:4, 254:11, 254:14, 254:16, 254:21, 254:23, 255:4, 255:6, 255:9, 255:14, 255:18, 255:23, 256:4, 256:6, 256:12, 256:22, 257:1, 257:8, 257:19, 258:3, 258:7, 258:12, 258:19, 258:21, 259:2, 259:7, 259:12, 259:17, 259:21, 260:1, 260:4, 260:7, 260:9, 260:13, 260:20, 261:10, 261:17, 261:19, 261:23, 262:2, 262:7, 262:16, 262:19, 262:23, 263:4, 263:10, 263:12, 263:23, 264:2, 264:24, 265:3, 265:22, 266:6, 266:18,

266:22, 267:2, 267:9, 267:22, 268:13, 268:16, 268:24, 269:3, 269:21, 270:3, 271:1, 271:23, 272:5, 272:16, 272:20, 272:25, 273:7, 273:10, 273:18, 274:3

**themselves** [1] - 98:1

**theory** [4] - 251:14, 251:16, 252:3, 270:8

**thereabouts** [1] - 184:17

**therefore** [2] - 136:18, 183:20

**they've** [2] - 153:17, 270:13

**thinking** [9] - 200:8, 203:8, 204:5, 222:18, 242:13, 242:14, 251:12, 259:3, 262:7

**third** [4] - 169:13, 231:25, 238:24, 239:21

**Thomas** [1] - 1:20

**thousand** [8] - 61:10, 61:11, 73:11, 73:15, 73:22, 106:6, 107:21, 155:15

**thousands** [1] - 155:25

**three** [29] - 22:24, 32:12, 33:11, 34:11, 39:5, 40:18, 40:23, 50:22, 61:3, 66:20, 82:5, 125:19, 150:19, 155:25, 163:14, 167:13, 168:11, 170:4, 179:10, 238:10, 257:5, 262:2, 265:5, 267:25, 268:3, 269:12, 269:13, 270:6

**Three** [7] - 71:23, 99:22, 99:23, 101:19, 101:20, 179:9, 202:10

**throughout** [1] - 124:19

**throw** [1] - 209:22

**thumbs** [1] - 265:21

**Thursday** [1] - 1:11

**Thursdays** [1] - 169:4

**tight** [1] - 111:6

**Tim** [6] - 55:23, 55:25, 56:4, 56:7, 161:8, 161:10

**title** [1] - 177:16

**tobacco** [1] - 91:19

**today** [54] - 2:7, 2:16, 3:11, 4:20, 8:17, 35:11, 37:18, 41:13, 42:15, 80:10, 82:6, 119:4, 121:7, 122:23, 124:11, 125:10, 127:4, 135:20, 146:1, 149:10, 149:11, 149:16, 150:4, 156:16, 158:19, 159:4, 160:11,

163:5, 163:7, 163:13, 166:17, 166:20, 171:12, 175:23, 176:6, 176:25, 182:1, 182:6, 185:13, 185:21, 188:12, 189:10, 192:7, 202:24, 212:20, 223:14, 233:6, 240:1, 243:25, 246:24, 247:5, 259:16, 260:18

**Today** [2] - 167:3, 238:14

**together** [19] - 55:8, 57:13, 61:19, 64:9, 72:7, 72:8, 91:6, 94:16, 101:8, 101:9, 105:24, 131:25, 132:1, 132:20, 191:24, 208:8, 208:19, 208:20, 260:15

**tolerated** [1] - 77:5

**tomorrow** [3] - 194:20, 195:23, 259:5

**tonight** [1] - 195:22

**Tony** [1] - 118:20

**Tony's** [1] - 115:25

**took** [8] - 98:11, 98:25, 105:25, 106:11, 206:2, 213:23, 244:1, 256:20

**top** [5] - 23:18, 153:15, 173:1, 179:15, 238:1

**topic** [1] - 224:9

**Tore** [1] - 44:3

**total** [1] - 72:5

**totally** [2] - 159:19, 189:9

**touch** [5] - 13:9, 13:13, 13:15, 185:10, 186:18

**touching** [2] - 13:16, 14:3

**tough** [1] - 145:12

**tow** [1] - 17:9

**toward** [2] - 21:22, 213:23

**towards** [3] - 91:3, 112:25, 196:16

**town** [4] - 100:8, 138:3, 196:24, 203:20

**trace** [1] - 131:7

**traces** [1] - 131:6

**trade** [4] - 81:17, 81:19, 126:16, 132:11

**traffic** [2] - 18:3, 18:4

**trafficking** [5] - 41:16, 42:13, 50:1, 100:3, 184:24

**transaction** [1] - 104:21

**transactions** [2] - 32:5, 62:8

**transcribed** [1] - 276:8

**transcript** [6] - 30:19, 40:4, 40:10, 171:15,

175:9, 276:8

**transcripts** [4] - 77:10, 77:15, 77:17, 77:18

**transport** [1] - 85:17

**trash** [1] - 215:8

**travel** [5] - 57:13, 131:23, 228:13, 228:23, 253:24

**traveled** [2] - 131:25, 132:1

**traveling** [1] - 11:13

**Travis** [9] - 204:2, 205:2, 205:4, 206:9, 208:13, 226:7, 235:15, 235:16, 256:14

**treated** [1] - 216:19

**treating** [1] - 110:6

**tremendous** [1] - 3:5

**trial** [16] - 3:24, 7:7, 7:16, 8:17, 9:19, 74:12, 194:20, 195:1, 200:7, 201:14, 230:5, 248:16, 265:22, 270:12, 272:7

**trials** [2] - 25:7, 27:16

**tried** [6] - 116:14, 116:20, 186:24, 216:10, 238:4

**triple** [1] - 114:15

**trips** [2] - 161:16, 184:20

**trooper** [1] - 107:6

**trouble** [1] - 157:13

**true** [13] - 6:11, 138:14, 145:20, 145:23, 148:7, 148:21, 159:2, 160:12, 160:20, 162:14, 172:18, 189:8

**trust** [4] - 8:9, 120:4, 128:14, 136:25

**trusted** [1] - 186:13

**truth** [10] - 158:16, 158:19, 158:24, 159:3, 159:5, 182:5, 241:16, 241:17

**truthful** [7] - 27:15, 159:9, 160:5, 175:23, 184:1, 184:3, 189:9

**truthfully** [6] - 24:25, 25:6, 25:14, 26:12, 200:25, 201:13

**truthfulness** [1] - 183:18

**try** [13] - 12:20, 15:25, 50:19, 80:23, 110:4, 136:10, 196:16, 209:22, 221:18, 235:9, 245:24, 259:1, 261:7

**trying** [14] - 2:21, 62:22, 74:12, 89:1, 111:1, 113:22, 125:13, 144:5,

164:11, 222:1, 251:1, 268:12, 269:3, 271:15

**Trying** [2] - 113:24, 222:2

**Tuesday** [5] - 253:10, 253:14, 253:24, 254:3, 256:8

**Tuesdays** [1] - 169:3

**Tuffy** [2] - 83:4, 83:16

**tumble** [1] - 121:13

**turf** [9] - 82:20, 82:23, 83:3, 143:5, 143:9, 143:12, 227:10, 227:16, 227:18

**turn** [6] - 7:23, 74:12, 183:1, 249:5, 249:24, 270:1

**turned** [2] - 2:25, 12:2, 14:18, 14:20, 15:15, 16:2, 16:9, 267:19

**turning** [2] - 12:20, 84:15

**Turning** [1] - 179:9

**turns** [1] - 259:10

**TV** [1] - 249:6

**twelve** [1] - 130:1

**twice** [6] - 57:16, 57:17, 86:22, 161:14, 258:15

**Twice** [2] - 57:18, 57:19, 137:7

**Two** [18] - 24:22, 32:14, 39:10, 78:9, 78:16, 107:21, 176:17, 176:23, 177:18, 201:9, 202:4, 226:5, 228:22, 233:17, 235:14, 237:16, 265:21

**two** [53] - 12:4, 17:13, 19:24, 20:2, 20:13, 25:2, 27:17, 32:12, 36:3, 39:11, 47:20, 47:21, 49:25, 86:23, 93:24, 119:20, 120:14, 128:5, 134:7, 152:14, 155:7, 191:7, 194:24, 198:12, 199:6, 200:4, 205:13, 210:14, 210:16, 225:23, 230:25, 232:3, 233:17, 235:13, 237:15, 241:10, 245:19, 247:25, 257:4, 257:14, 258:18, 258:25, 262:4, 262:5, 263:8, 264:13, 264:14, 265:16, 269:11, 269:16, 270:1

**Ty** [2] - 208:14, 235:20

**type** [2] - 35:16, 164:14

**types** [1] - 4:5

**typically** [1] - 61:3

**Tyrone** [4] - 116:3, 116:6, 116:8, 116:20

**U**

**U.S** [13] - 1:24, 34:22, 163:5, 163:12, 173:3, 180:3, 198:8, 198:9, 199:6, 201:15, 230:24, 231:5, 245:22

**ultimate** [1] - 18:13

**ultimately** [5] - 121:19, 197:23, 198:7, 202:19, 202:21

**Um-um** [1] - 70:19

**unarmed** [1] - 41:6

**Under** [3] - 29:11, 29:15, 206:3

**under** [17] - 17:1, 26:20, 27:3, 28:21, 76:15, 156:20, 158:15, 176:3, 180:4, 200:11, 203:3, 264:21, 268:4

**Undercover** [1] - 87:11

**undercover** [2] - 32:4, 90:10

**undermine** [1] - 267:10

**underneath** [1] - 193:19

**understood** [6] - 20:15, 120:5, 177:2, 178:20, 182:3, 245:5

**undertakings** [1] - 183:19

**undue** [1] - 251:24

**unfriendly** [1] - 143:17

**uniform** [2] - 10:20, 10:21

**unique** [1] - 144:20

**uniquely** [1] - 265:12

**Unit** [2] - 10:13, 34:22

**unit** [4] - 15:14, 15:18, 15:19, 227:5

**UNITED** [2] - 1:1, 1:5

**United** [6] - 9:24, 21:17, 24:13, 34:21, 173:6, 196:3

**units** [1] - 16:24

**universe** [1] - 254:5

**unknown** [1] - 238:5

**Unless** [1] - 272:17

**unrebutted** [1] - 264:11

**Unrelated** [2] - 134:23, 134:24

**unreliable** [1] - 148:23

**untruthful** [1] - 189:25

**unusual** [1] - 136:1

**unwarranted** [1] - 265:24

**Up** [3] - 54:20, 54:22, 209:14

**up** [180] - 2:25, 3:6, 4:8, 12:10, 13:11, 19:6,

21:21, 22:8, 22:25, 27:22, 29:7, 29:13, 29:20, 33:11, 35:5, 35:8, 41:22, 48:18, 49:16, 50:20, 50:22, 50:25, 51:11, 51:25, 52:1, 53:5, 53:15, 56:20, 57:13, 57:15, 57:21, 57:24, 58:10, 58:19, 58:21, 59:6, 61:3, 61:17, 61:20, 66:16, 67:19, 75:14, 76:24, 78:8, 80:16, 83:6, 83:8, 83:9, 83:23, 83:25, 84:1, 84:6, 84:13, 84:17, 85:5, 85:14, 89:13, 89:15, 90:8, 90:9, 90:25, 94:15, 97:1, 98:11, 98:12, 98:25, 99:7, 100:1, 100:3, 100:7, 100:8, 100:10, 100:15, 100:22, 100:24, 101:16, 101:18, 101:20, 102:9, 102:14, 102:18, 103:3, 103:9, 103:19, 104:1, 105:2, 105:10, 105:16, 106:11, 106:13, 106:23, 109:6, 109:7, 110:15, 110:25, 111:5, 112:1, 113:18, 113:21, 114:7, 114:14, 114:25, 115:11, 118:14, 118:20, 118:25, 120:20, 121:8, 121:13, 132:1, 133:5, 141:25, 146:19, 148:25, 149:4, 149:21, 155:11, 159:16, 168:10, 168:11, 170:12, 175:1, 177:3, 177:4, 177:18, 177:22, 178:15, 180:8, 180:9, 180:10, 180:16, 184:16, 184:20, 184:24, 185:7, 185:10, 185:15, 186:1, 186:5, 186:15, 186:21, 187:13, 188:4, 190:19, 191:2, 191:7, 191:23, 196:22, 197:1, 197:23, 198:5, 198:17, 199:10, 200:1, 202:15, 203:7, 206:1, 213:24, 214:13, 219:20, 221:11, 246:5, 249:11, 250:23, 254:8, 257:13, 258:14, 258:25, 259:2, 261:8, 265:21, 271:17, 272:12

**USA** [1] - 276:4
**useful** [1] - 202:14
**users** [1] - 70:21

## V

**valid** [4] - 15:12, 15:20, 15:22, 262:11
**validation** [1] - 15:11
**valuables** [1] - 17:8
**vantage** [2] - 250:2, 250:14
**variety** [2] - 91:19
**various** [9] - 4:9, 9:14, 75:18, 125:8, 127:6, 127:14, 129:12, 167:21, 255:11
**vehicle** [22] - 11:16, 13:6, 13:8, 14:24, 14:25, 15:5, 15:14, 15:15, 16:13, 16:25, 17:8, 17:9, 17:10, 17:11, 17:12, 17:13, 17:14, 17:23, 19:25, 20:13
**vehicles** [1] - 85:18
**vein** [1] - 143:4
**vent** [4] - 86:10, 86:11, 86:12, 94:9
**vents** [1] - 85:24
**verbal** [2] - 251:20
**verdict** [1] - 9:20
**Vernon** [1] - 226:11
**versa** [1] - 262:5
**version** [2] - 7:10, 176:18
**via** [1] - 16:21
**vials** [2] - 101:11, 177:19
**vice** [1] - 262:5
**victim** [1] - 222:22
**Victim** [1] - 34:21
**Victor** [1] - 226:19
**video** [4] - 78:9, 78:16, 191:9, 192:4
**view** [3] - 8:4, 75:8, 142:13
**Violate** [2] - 27:8, 27:10
**violate** [1] - 239:11
**violated** [9] - 28:2, 28:3, 28:7, 154:15, 154:22, 159:9, 159:24, 189:17, 190:3
**violating** [1] - 154:4
**violation** [8] - 18:6, 25:11, 26:25, 33:3, 152:11, 153:10, 168:3, 179:17
**violations** [1] - 25:24
**violence** [6] - 143:19, 227:13, 236:8, 236:9, 236:14, 239:19
**violent** [3] - 210:7, 210:9, 240:1

**visit** [11] - 107:3, 107:5, 107:11, 108:12, 108:15, 108:18, 115:17, 118:23, 132:16, 249:11, 259:4
**visited** [2] - 107:2, 119:4
**visiting** [1] - 184:13
**visits** [2] - 164:5, 185:13
**visuals** [2] - 260:9, 260:10
**voice** [43] - 29:13, 115:25, 116:9, 116:11, 116:21, 116:23, 120:20, 148:1, 164:24, 165:2, 165:4, 165:6, 165:7, 263:18, 264:11, 265:9, 265:11, 265:13, 265:14, 265:17, 265:18, 265:19, 266:2, 266:9, 267:5, 267:11, 267:13, 267:14, 267:15, 267:18, 268:3, 268:22, 269:11, 269:12, 269:13, 269:14, 271:5, 271:11, 273:3, 273:11
**voices** [1] - 116:12, 116:21, 260:19, 261:2, 263:21, 264:13, 264:14
**voir** [3] - 271:6, 273:9, 273:10
**volition** [1] - 230:8
**VOLUME** [1] - 1:11
**VOP** [1] - 26:25

## W

**W-5-I** [1] - 109:17
**W5-I** [1] - 190:18
**wait** [4] - 62:13, 62:18, 217:22, 265:23
**Waiting** [1] - 233:19
**waiting** [4] - 8:15, 15:18, 160:1, 233:20
**waivers** [1] - 4:1
**walk** [1] - 235:9
**walked** [3] - 15:13, 90:8, 216:13
**walking** [1] - 72:20
**wall** [1] - 13:5
**Wally** [2] - 116:3, 116:10
**wants** [3] - 110:25, 113:18, 266:12
**war** [6] - 82:20, 82:23, 83:3, 143:5, 143:9, 143:12
**warning** [1] - 76:22
**warrant** [3] - 5:11, 33:3, 168:1

**warrants** [1] - 169:3
**waste** [1] - 251:2
**watch** [5] - 231:25, 232:3
**watches** [1] - 232:1
**water** [4] - 33:5, 60:18, 60:23, 114:21
**WAYNE** [1] - 1:8
**Wayne** [34] - 5:7, 38:22, 39:12, 39:13, 53:16, 53:23, 55:1, 66:16, 66:18, 83:9, 92:20, 92:21, 98:12, 98:14, 98:16, 109:8, 109:10, 109:21, 112:11, 115:6, 115:17, 116:13, 116:22, 117:5, 117:17, 118:4, 118:6, 146:10, 184:20, 190:19, 190:23, 193:4, 193:7
**Wayne's** [1] - 148:1
**ways** [2] - 249:9, 272:9
**weapon** [1] - 151:8
**weapons** [1] - 149:23
**wearing** [7] - 11:18, 11:20, 14:19, 36:11, 37:22, 194:19, 213:8
**weather** [1] - 248:20
**Wednesday** [5] - 253:14, 253:24, 254:3, 254:7, 256:8
**Weed** [2] - 67:3, 67:4
**weed** [11] - 67:6, 91:25, 92:3, 92:5, 131:5, 131:6, 131:7, 154:8, 154:9, 154:13, 233:23
**week** [14] - 74:12, 207:5, 248:16, 249:21, 253:23, 254:1, 256:7, 256:11, 256:22, 259:20, 259:22, 262:3, 268:15
**weekend** [6] - 120:11, 248:19, 249:14, 249:16, 252:24, 254:24
**weeks** [2] - 94:16, 163:11
**weigh** [1] - 252:6
**weighed** [1] - 101:6
**weight** [12] - 70:21, 70:24, 71:8, 71:12, 71:14, 71:16, 71:19, 106:7, 141:10, 141:18, 162:2, 162:4
**West** [5] - 1:25, 68:8, 84:4, 87:25, 91:18
**Westwood** [4] - 91:3, 91:5, 91:13, 91:18
**whatsoever** [5] - 123:25, 156:9, 194:22, 228:6, 249:13

**Whereof** [1] - 276:10
**Whip** [1] - 204:24
**white** [3] - 35:18, 37:25, 194:17
**White** [3] - 37:23, 206:8, 212:8
**Whites** [1] - 206:8
**whole** [13] - 16:7, 16:11, 16:12, 124:19, 155:15, 158:4, 158:5, 182:5, 190:1, 202:5, 269:6, 270:18, 273:13
**wholesale** [1] - 71:2
**wife's** [1] - 100:14
**Wiley's** [2] - 81:10, 81:11
**Wilhelm** [4] - 48:1, 48:2, 93:23
**William** [1] - 58:24
**Willie** [9] - 20:8, 20:9, 36:4, 36:16, 37:8, 50:10, 105:15, 213:11, 276:4
**WILLIE** [1] - 1:7
**Winchester** [4] - 84:1, 84:3, 102:7, 102:8
**wind** [3] - 50:22, 99:7, 148:6
**window** [1] - 16:6
**Winters** [5] - 42:25, 43:1, 69:25, 70:1, 181:16
**wisdom** [1] - 238:1
**wise** [1] - 238:8
**wiser** [1] - 263:6
**wish** [2] - 249:20, 250:10
**withdraw** [1] - 4:10
**withheld** [1] - 27:14
**withholding** [1] - 238:8
**witness** [58] - 2:7, 3:11, 3:12, 4:20, 5:16, 6:9, 6:20, 12:5, 14:4, 21:16, 36:15, 38:6, 60:23, 75:13, 76:15, 76:23, 76:24, 77:3, 77:4, 77:8, 77:12, 77:13, 120:6, 120:18, 175:4, 175:6, 191:19, 194:9, 194:24, 195:19, 196:2, 241:11, 246:1, 260:18, 261:8, 261:17, 262:20, 263:13, 263:14, 263:16, 264:12, 264:14, 265:12, 267:4, 267:9, 267:13, 268:3, 269:1, 269:24, 270:20, 271:16, 272:12, 273:15, 273:16, 273:19, 273:22, 273:23
**Witness** [3] - 34:22, 77:23, 276:10
**WITNESS** [30] - 10:1,

10:2, 10:5, 21:15, 21:19,
21:20, 21:24, 22:1,
29:15, 33:6, 40:1, 40:23,
41:5, 41:11, 46:4, 51:16,
60:19, 60:22, 62:15,
62:19, 73:7, 97:23,
166:3, 196:7, 196:8,
196:11, 217:13, 275:3,
275:5, 275:9
   **witness'** [2] - 14:1,
267:10
   **witnesses** [36] - 4:22,
5:4, 74:15, 248:14,
252:20, 253:4, 253:9,
253:11, 253:13, 253:14,
254:6, 256:8, 256:11,
256:15, 256:16, 261:1,
262:3, 262:24, 263:1,
263:24, 264:8, 264:19,
265:4, 265:5, 266:8,
266:12, 267:14, 267:15,
267:17, 268:1, 268:6,
269:10, 271:6, 271:25,
273:9
   **women** [1] - 145:13
   **wonder** [1] - 258:14
   **Woodlawn** [2] - 208:21,
208:22
   **word** [10] - 119:25,
138:24, 187:13, 187:14,
187:15, 187:17, 192:20,
193:20, 245:22
   **Words** [2] - 236:5,
236:6
   **words** [35] - 5:20, 6:12,
26:10, 75:12, 79:25,
125:13, 172:8, 183:1,
183:2, 187:12, 187:23,
202:7, 209:21, 210:2,
210:4, 210:7, 210:9,
210:11, 210:18, 211:4,
211:10, 229:23, 230:13,
230:14, 230:16, 231:9,
231:10, 231:11, 231:12,
234:18, 236:2, 236:4,
249:11, 253:9, 255:19
   **works** [2] - 125:4,
135:23
   **world** [7] - 136:3, 136:4,
137:3, 138:11, 142:20,
243:11
   **Worm** [1] - 205:5
   **worried** [4] - 138:4,
192:10, 236:25, 266:20
   **worries** [2] - 192:6,
192:8
   **worry** [1] - 120:12
   **worse** [2] - 24:9, 151:15
   **worth** [2] - 156:17,
156:18

   **wound** [1] - 106:23
   **wounds** [2] - 214:1,
214:13
   **wrath** [2] - 251:9,
251:10
   **write** [2] - 6:14, 185:20
   **writing** [1] - 18:19
   **wrote** [4] - 5:18, 109:21,
165:9, 190:17
   **Wyche** [29] - 48:17,
49:3, 49:4, 49:20, 50:5,
50:9, 51:3, 51:13, 52:3,
52:11, 52:13, 53:9,
64:16, 105:13, 105:14,
105:18, 107:13, 107:15,
115:8, 115:19, 115:21,
133:3, 141:4, 141:15,
141:18, 160:16, 160:19,
165:2, 185:3

## X 

   **X's** [1] - 265:11
   **XXXVII** [1] - 1:11

## Y

   **y'all** [2] - 111:3
   **yada** [3] - 145:18
   **yard** [1] - 17:9
   **year** [24] - 19:6, 23:25,
28:24, 29:22, 38:15,
38:19, 38:20, 78:8,
99:13, 99:14, 99:15,
103:23, 107:20, 121:25,
122:7, 122:11, 133:21,
134:7, 150:18, 152:8,
152:10, 168:9, 180:21,
180:23
   **years** [49] - 10:13, 23:1,
25:15, 25:16, 26:17,
26:22, 29:6, 29:7, 29:10,
29:16, 30:1, 33:10, 36:3,
38:9, 38:13, 50:22, 51:5,
99:22, 99:23, 122:3,
122:15, 123:1, 124:3,
124:19, 126:8, 129:15,
130:3, 132:7, 132:13,
134:3, 135:2, 135:3,
145:7, 145:25, 147:14,
150:19, 150:23, 153:2,
153:7, 155:18, 168:11,
170:4, 206:14, 233:2,
233:8, 244:9, 252:4,
263:21, 263:25
   **yesterday** [7] - 8:3,
8:11, 9:16, 77:9, 111:8,
114:16, 253:10
   **Yesterday** [1] - 8:16

   **yield** [1] - 18:5
   **Yo** [4] - 110:19, 110:25,
111:2, 111:8
   **York** [26] - 56:19, 56:20,
57:21, 58:10, 59:2, 61:3,
61:20, 66:16, 66:17,
67:7, 67:14, 75:14, 97:8,
97:11, 97:16, 102:13,
102:14, 130:21, 131:19,
131:21, 131:22, 131:23,
132:18, 161:12, 184:14,
184:20
   **young** [2] - 121:10,
121:17
   **Younger** [2] - 49:9,
167:9
   **younger** [7] - 35:24,
38:10, 48:20, 49:8,
49:10, 167:8, 167:10
   **yourself** [19] - 34:12,
40:10, 47:6, 60:25,
61:22, 73:6, 74:17,
105:10, 130:21, 157:9,
157:10, 157:25, 197:10,
197:19, 229:7, 237:9,
237:14, 239:19, 248:25
   **yourselves** [1] - 248:19

## Z

   **Zajac** [3] - 1:24, 276:3,
276:15