1

1                    IN THE UNITED STATES DISTRICT COURT
2                     FOR THE DISTRICT OF MARYLAND
                              NORTHERN DIVISION
3

4

5       UNITED STATES OF AMERICA

6            v.                              CRIMINAL CASE NO.
                                              AMD-04-029
7       WILLIE MITCHELL,
        SHELTON HARRIS,
8       SHELLY WAYNE MARTIN,
        SHAWN GARDNER,
9
              Defendants
10      _____/

11                      VOLUME VI OF XXXVII
                      Tuesday, September 23, 2008
12                    Baltimore, Maryland

13

        Before:  Honorable Andre M. Davis, Judge
14                     And a Jury

15      Appearances:
               On Behalf of the Government:
16              Robert Harding, Esquire
                Michael Hanlon, Esquire
17             On Behalf of Defendant Mitchell:
                Laura Kelsey Rhodes, Esquire
18              Michael E. Lawlor, Esquire
               On Behalf of Defendant Harris:
19              Gerard P. Martin, Esquire
                Paul Flannery, Esquire
20             On Behalf of Defendant Martin:
                Thomas L. Crowe, Esquire
21              James G. Pyne, Esquire
               On Behalf of Defendant Gardner:
22              Adam H. Kurland, Esquire
                Barry Coburn, Esquire
23
        Reported by:
24      Mary M. Zajac, RPR
        Room 5515, U.S. Courthouse
25      101 West Lombard Street
        Baltimore, Maryland 21201

2

1            (Proceedings at 9:40 a.m.)

2            THE COURT:  We're ready to proceed?

3            MR. HARDING:  Judge, for logistical reasons, the

4    government requests that we start a little bit late tomorrow, at

5    10:00 rather than 9:30.  Is that possible?

6            THE COURT:  Certainly.

7            MR. HARDING:  Thank you.

8            THE COURT:  While you're there, Mr. Harding, a couple

9    of things.  First, the motion you filed this morning -- I want to

10   make a joke but I won't -- only the first page came up on ECF.

11           MR. HARDING:  I have a hard copy.

12           THE COURT:  I knew you would.  I knew you would.

13           MR. HARDING:  And I supplied email and hard copies to

14   counsel.

15           THE COURT:  Did you e-mail one page or the entire

16   motion?

17           MR. HARDING:  The whole thing.

18           THE COURT:  The whole thing.  All right.  So I'll take

19   a look at that.

20           Number two, Mr. Harding, I realize -- Belinda, do we

21   have any tape?  I'm awfully afraid that somebody is going to trip

22   over that cable.  Can we do a better job of taping that?

23           MR. HARDING:  We don't need this hooked up right now

24   because --

25           THE COURT:  That was the Power Point connection?

3

1          MR. HARDING:  Yes.

2          THE COURT:  Excellent.  Let's get that disconnected.

3          MR. HARDING:  Also, Your Honor, I should let the Court

4    know that I want to interrupt Detective Berger this morning

5    because we have Jaquetta Smith here to testify.  She was on the

6    list for yesterday.  She's a witness that didn't show up

7    yesterday.

8          THE COURT:  Okay.  So we'll start with her?

9          MR. HARDING:  Yes.

10          THE COURT:  And then will we go back to the detective

11    or --

12          MR. HARDING:  Yes.

13          THE COURT:  All right.  Fine.  Now, Mr. Harding, old

14    habits die hard, we all know that.  But let me just remind you,

15    I'm not hearing any objection over here except to the extent that

16    we're aware of.  When you need to show an exhibit to a witness,

17    you really don't have to approach the witness.  In my view, even

18    if it's one of those packaged exhibits, such as the bullet

19    fragment, you just put it on the DOAR, you show the witness the

20    envelope and the property number.  The witness can look at it on

21    the screen.  You take the bullet fragment out, you put it on the

22    DOAR.  The witness can identify the bullet fragment.

23          So really, it really will save us a couple of minutes a

24    day, to the extent you can limit your, and Mr. Hanlon's, need to

25    approach the witness to hand them an exhibit.

4

1                    MR. HARDING:  That's fine, Your Honor.

2                    THE COURT:  Okay.  So just make use of the technology.

3               Now, Mr. Coburn just stood up.  And I saw your letter

4      this morning, Mr. Coburn.  And I'm sensitive to photographs of

5      bodies.  I don't think the government was excessive in any way

6      yesterday although I agree the photos were left on the DOAR too

7      long.  They didn't need to be up there.

8               And so Mr. Hanlon, Mr. Harding, I will remind you, two

9      things.  One, be sure to show the actual photographs, including

10     autopsy photographs, if you haven't already, to counsel before

11     you use them as evidence.  And remember to remove the photographs

12     of victims from the DOAR when you are not actually questioning a

13     witness about the evidence.

14              I don't know how many other photographs of the other

15     murders you intend to use, but just consult with defense counsel.

16     You're entitled to create as graphic an image of a crime scene as

17     you need to, but there may be some line that the Court is

18     concerned about.

19                    (Defendants enter the courtroom.)

20                    THE COURT:  Again, yesterday I thought that those

21     photographs of Mr. McCaffity and Mr. Brown were perfectly

22     appropriate.  You showed them to two witnesses, the responding

23     medic and the responding homicide detective.  Again, I didn't

24     think that was over the top at all.  It was perfectly

25     appropriate, except to the extent that they were left on the DOAR

1    after you were finished with them.

2            I'll remind you if you forget to remove them from the

3    DOAR after you show them.

4            On the other murders, I mean, do you have more than

5    half dozen photographs of the actual victims, off the top of your

6    head?

7            MR. HARDING:  Well --

8            THE COURT:  Not counting autopsy.

9            MR. HARDING:  For the Wyche brothers we have roughly a

10   half a dozen maybe.  Maybe more.  We, of course, have the autopsy

11   photos.  I've made these photos available for defense counsel.

12   One of them actually came over one day and looked at all the

13   autopsy photos.

14           THE COURT:  Okay.  But I assume the copies that defense

15   counsel have are black and white photocopies.

16           MR. HARDING:  They do have, I think they have black and

17   white copies.

18           THE COURT:  Okay.  So they may be seeing, one or more

19   counsel may be seeing color photographs for the first time.  And

20   so that's a dramatic presentation.

21           So all I'm saying is, seems to me half dozen, no

22   problem, not counting autopsy.  But you're not going to have 11

23   or 12, 13 photographs of a victim?

24           MR. HARDING:  Let me just check with Mr. Hanlon.

25           (Pause in proceedings.)

6

1        MR. HARDING:  Yeah.  About a half a dozen for the Tanya

2   Jones Spence murder, also.

3        THE COURT:  Okay.  I don't see any problem with that.

4   And I might say, with respect to Mr. Gardner's letter from Mr.

5   Coburn and Mr. Kurland, it seems to me you were perfectly

6   appropriate in what some might regard as somewhat excessive

7   aerial views and down the alley, up the alley, around the corner

8   photographs.  But I understand your point to be that this was a

9   setup murder in a secluded area.  And so I thought that was

10  perfectly appropriate as well.

11       And I imagine you're going to do something very similar

12  to that with regard to the Wyche brothers?

13       MR. HARDING:  With aerial photographs?  Yes.

14       THE COURT:  Aerial photographs and showing railroad

15  tracks.

16       MR. HARDING:  That's right.

17       THE COURT:  And the metro and all of that.  I draw a

18  distinction between crime scene photographs on the one hand, and

19  you can have as many of those as you want, as opposed to

20  photographs of deceased persons.  That's all.  So just be

21  sensitive to it.  Mr. Coburn?

22       MR. COBURN:  Appreciate it very much, Your Honor.

23       THE COURT:  And counsel, again, this is for Mr.

24  Harding, please remember not to speak until you get to the mike.

25  I appreciate the courtesy.  And you don't have to say "no

7

1    questions."  You know, when I look at you, you get about a second

2    and a half to stand up if you're going to ask any questions.  If

3    you don't stand up, that's a communication to the Court that you

4    have no questions.  Okay.  Mr. Coburn.

5        MR. COBURN:  Understand.  Your Honor, I make the same

6    distinction that Your Honor just referred to in terms of crime

7    scene photos, which I think the government can basically kind of

8    show diagrams and aerial photos and so on and they don't really

9    raise any particular evidentiary concern from my point of view,

10   versus photos of dead people, which are just by their nature,

11   they're upsetting.

12        So in the past in these kinds of cases we've made the

13   request that the Court review those photos, just those photos, in

14   camera before the government uses them.  Then there's typically,

15   you know, a little bit of debate in terms of how many they're

16   allowed to use.  I'm taking it that the Court's probably

17   disinclined to do that in this case, but I just wanted to make

18   the request.

19        THE COURT:  Certainly, if the government says, Judge,

20   we're going to have a half dozen or so, I don't need to look at

21   anything.

22        MR. COBURN:  The only other issue I wanted to raise

23   just very quickly with the Court's permission is, in terms of

24   witness order of call, I mean, these kinds of big cases, they're

25   very tough for the government, I know they are.  They're juggling

1    a lot of witnesses.  At one point Mr. Hanlon said he felt like a

2    travel agent.  I've been there.  I understand that feeling.

3           But when the government switches up at the last minute,

4    as they did today, in two cases, because when I talked to Mr.

5    Harding yesterday he didn't mention Jaquetta Smith at all.  He

6    had mentioned her the previous day.  But I had taken it that she

7    was not coming up this week.  And also, Mr. Harding mentioned to

8    me just a minute before Your Honor came on the bench that he was

9    calling a chemist by the name of Friedman who doesn't relate that

10   directly to us.  But I have a file on him back where I'm staying

11   and I didn't bring it with me because I had no idea he was being

12   called.

13          I know there's no bad faith here and I know these are

14   just the kinds of things that happen in these kinds of cases.

15   But if the government could tell us like a little before we

16   actually walk in the courtroom, it would help a lot.

17          I'm checking my e-mail starting at 4:00 in the morning.

18   If they could just send us a note, I could be ready.  I'll ask

19   the government to notify counsel by e-mail whenever there's a

20   change in the proposed lineup of a witness order on any

21   particular day.  That's a reasonable request.

22          With respect to the chemist, look, I've assumed all

23   along and maybe it's not quite an accurate or sound assumption,

24   that the only reason we're going to have, I don't know how many,

25   six or seven chemists, or maybe only two or three, is because

1    counsel don't have permission from their clients to stipulate to

2    the chemical analyses.  I can't remember the last time I had a

3    chemist testify in a drug case.

4            So I don't think that's particularly controversial.  So

5    I don't think you're going to need that file on this chemist

6    unless there's something I don't know, Mr. Coburn.

7            MR. COBURN:  I suspect there's nothing in there that

8    relates to us, anyway.

9            THE COURT:  Okay.  Thank you.

10           MR. COBURN:  Thank you, Your Honor.

11           THE COURT:  Mr. Crowe, good morning.

12           MR. CROWE:  Good morning, Your Honor.

13           THE COURT:  Now you see how he did that?  That was

14   excellent, Mr. Crowe.  That was absolutely excellent.

15           MR. CROWE:  I am very good at the little things.

16           Mr. Harding mentioned that he was going to interrupt

17   Detective Berger's testimony to call Jaquetta Smith.  By way of

18   one sentence background, Ms. Smith is a long time companion of

19   Mr. Mitchell and they have a child together.

20           Just prior to her grand jury testimony, the transcript

21   indicates that Mr. Harding and perhaps other people played a tape

22   for her of the misdirected voice mail.  And as I understand from

23   the discussion in the grand jury testimony, the only person that

24   she identified in that was Mr. Harris.

25           Now, because this matter is somewhat up in the air, I

1   do not plan on raising the subject myself when she comes, but I

2   would like the witness subject to recall in the event it is a

3   matter we would like to have.  And in terms of recalling her, I

4   understand the government has had some difficulty getting her

5   here.  And I'm not quite sure what the arrangements for us are to

6   recall her when we need her.

7           THE COURT:  Well, thanks for highlighting that issue,

8   Mr. Crowe.  My feeling is that absolutely every government

9   witness is subject to recall during the defense case.  I'll be

10  happy to advise any witness that you or other counsel have a

11  concern about that the subpoena remains effective and that they

12  may be contacted on somewhat short notice that they'll have to

13  come back to court.

14          MR. CROWE:  Again, the logistic problem is I'm not sure

15  how we contact her.

16          THE COURT:  Well, I'm going to rely on the government

17  to get them back.

18          MR. CROWE:  Thank you.

19          THE COURT:  All right.  Mr. Hanlon, good morning.

20          MR. HANLON:  Good morning, Your Honor.  I try not to

21  talk too much, Your Honor.

22          THE COURT:  No.  You talk as much as you want.  Just

23  don't talk until you get to the microphone.

24          MR. HANLON:  Just for the Court's information and to

25  confirm what Mr. Crowe said, the government does anticipate

1    eliciting from Ms. Jaquetta Smith her opinion as to a voice ID on

2    the famous voice mail.  And I wanted to let the Court know that.

3    If the court or counsel feel there needs to be any kind of

4    hearing to address that, we could do that now.  But it's my

5    intention to elicit that.

6            THE COURT:  All right.  Anybody want to voir dire the

7    witness on voice identification?  Well, she's only going to

8    identify Mr. Harris?

9            MR. HANLON:  Yes, Your Honor.

10           THE COURT:  All right.  It's not to say, Mr. Lawlor,

11   that you can't interrogate the witness but I would think it's Mr.

12   Martin's interest more.

13           MR. LAWLOR:  Your Honor, if she's not going to identify

14   our client, we might elicit, you know, that she knows our

15   client's voice and affirmatively would say that's not him, just

16   to put everybody on notice about that.  But we wouldn't need to

17   voir dire her.

18           THE COURT:  Okay.  Good morning, Mr. Martin.

19           MR. MARTIN:  Good morning, Your Honor.  Does that mean,

20   Your Honor, that the government intends to play the voice mail

21   this morning?

22           MR. HANLON:  That was not my intention this morning,

23   Your Honor.

24           THE COURT:  All right.

25           MR. MARTIN:  Your Honor, then I would want her back

1     when the voice mail is played.  I don't think an identification

2     that, I can hear his voice on that voice mail, without us going

3     through it statement by statement, line by line is --

4              THE COURT:  Well, I can require --

5              MR. MARTIN:  -- is very fair.

6              THE COURT:  You can play it if you want.

7              MR. MARTIN:  I don't even have it with me, Your Honor.

8     I didn't know she was going to be called today.

9              THE COURT:  Does the government have it, have the voice

10    mail?

11            MR. HANLON:  I don't think we're, it's just not

12    something we anticipated doing today, Your Honor.  I thought we

13    provided notice that we were calling Ms. Smith late last week for

14    this week.  She didn't show up yesterday.  We were looking for

15    her.

16            THE COURT:  Did you notify defense counsel that you

17    were going to elicit voice identification?

18            MR. HANLON:  No, Your Honor, not specifically.  It's

19    referenced in the grand jury.

20            THE COURT:  I take it she's not the one that Mr.

21    Harding referred to last week when we had this discussion?

22            MR. HANLON:  No, Your Honor.

23            THE COURT:  So she's going to be used as a voice

24    identification witness in light of the discussion we had last

25    week?

1          MR. HANLON:  That's correct, Your Honor.

2          THE COURT:  All right.  Well, you don't have the disk

3  here in court?

4          MR. MARTIN:  Me, Your Honor?  I don't have it, Your

5  Honor.

6          THE COURT:  No.  I'm addressing Mr. Hanlon.

7          MR. MARTIN:  I have it, but I don't have it here.

8          MR. HANLON:  I think it's in our room, Your Honor, it's

9  just --

10          THE COURT:  Does anybody have it with them?

11          MR. COBURN:  I'm sure I have it somewhere on my

12  computer, Your Honor.

13          THE COURT:  I think, Mr. Hanlon, that the jury's

14  entitled to hear the voice mail if you're going to ask a witness

15  to identify a voice on the voice mail.  Now, Mr. Martin has

16  suggested we can do this by simply recalling her when you do play

17  the voice mail.  And I guess if you're willing to do, take

18  responsibility for bringing her back, then I would do it then.

19  But it sounds like she's a slippery witness, with all respect.

20          MR. HANLON:  Yes, Your Honor.

21          THE COURT:  And so it may not be easy to get her back.

22  But I think it would be quite unfair for her to make an

23  identification of Mr. Martin's client today and then nobody be

24  able to find her after today.

25          MR. HANLON:  No.  I agree with, that Your Honor.  And I

1    don't have a problem with her being under recall.  I think a

2    Court instruction --

3              THE COURT:  Well, maybe an alternative is not to start

4    with her this morning, to finish up with the detective.  Mr.

5    Coburn can try to locate the voice mail on his laptop.  And if he

6    can do that, then we can bring her in as a second witness.  She's

7    not going anywhere this morning.  I don't want to take the time

8    now -- or we can just bring her in and do the voir dire while Mr.

9    Coburn -- Mr. Coburn, how long is it going to take you to find

10   it?

11             MR. COBURN:  I can, if it's where I think it might be,

12   I might be able to pull it up in a second, Your Honor.

13             MS. RHODES:  Your Honor, I think I have it on my

14   computer as well.

15             THE COURT:  All right.  So why don't we bring her in,

16   we'll do the voir dire, and hopefully by then Ms. Rhodes or Mr.

17   Coburn will find the voice mail.  And we can just play it once

18   and satisfy Mr. Martin in that regard.

19             MR. MARTIN:  Your Honor, part of what I wanted to say

20   was that the voir dire I would think would include us trying to

21   find out from her where it is on this voice mail she thinks she's

22   hearing Mr. Harris.  If I'm not going to have it to do the voir

23   dire, it doesn't make much sense to do a voir dire.  That's the

24   only thing I really want to talk to her about.

25             THE COURT:  All right.

1          MR. MARTIN:  Hate tod do this.

2          THE COURT:  Ms. Rhodes has it.

3          MS. RHODES:  Your Honor, I have it but it's just on my

4    laptop.  I have no knowledge about how to hook it up to anything

5    else here.

6          THE COURT:  Oh, Mr. Hanlon can take care of that.

7          MS. RHODES:  Okay.  Without frying my laptop, I hope.

8          THE COURT:  Do you have your --

9          MR. MARTIN:  Your Honor, I think the witness is in the

10   courtroom.

11         THE COURT:  Okay.  That's fine.  Do you have -- Ms.

12   Smith, you can have a seat up here, please, on the witness stand.

13   Make yourself comfortable.  Up here.  Up here.

14         All you need to do, I hope, is if you have your laptop

15   speakers muted, take off the mute.  We can use one of the

16   handhelds.  Probably want to take your laptop off the -- I don't

17   think we're going to need the speakers.

18         MS. RHODES:  I think, well, I don't know.  I think we

19   probably do.

20         THE COURT:  You think so?  Okay.  All right.  How are

21   we doing, Ms. Rhodes?

22         MS. RHODES:  Just fine.

23         MR. HARDING:  Judge, while we're doing that, I have the

24   drug exhibit --

25         THE COURT:  Please go to the mike.

1          MR. HARDING:  I have the drug exhibit from

2    Pennsylvania, which the witness requested I give to him still

3    sealed and let him open it on the stand.  Apparently, it made him

4    feel uncomfortable to open it in advance.  So I'm going to have

5    to approach the witness.

6          THE COURT:  Of course.  Of course.

7          MR. LAWLOR:  And Judge, I don't know if it matters, but

8    in terms of the chemical analysis, anything relating to Mr.

9    Mitchell, we would certainly stipulate to the chemical analysis.

10          THE COURT:  Okay.  Thank you.

11          MR. LAWLOR:  I don't know if it matters, if everybody

12    has to stipulate even though it only applies to us.

13          THE COURT:  It only matters if all four defendants

14    stipulate.

15          MR. MARTIN:  Just for the record, Your Honor, we would

16    stipulate to it as well.

17          THE COURT:  All right.  Two out of four.

18          MR. CROWE:  Your Honor, based on the representation we

19    heard, we received from Mr. Harding today, that the only thing

20    that ties our client to the drug activities in Pennsylvania was

21    this supposed membership in the conspiracy and the witness

22    testimony, we would stipulate to the chemical analysis as well.

23          THE COURT:  Thank you, Mr. Crowe.  That's three out of

24    four.

25          MR. COBURN:  We'll stipulate also, Your Honor.

1          THE COURT:  All right.  So Mr. Harding, don't be

2    distressed.

3          MR. HARDING:  Well, I'm distressed because the witness

4    came all the way down here from Pennsylvania today and we had

5    stipulations from seven of the eight defense attorneys.

6          THE COURT:  But you still shouldn't get distressed.

7    You should say -- the witness is a professional witness.  He

8    knows how trials work.  And he'll be as happy to get on his way

9    now as he would have been if you called him last night and told

10   him he didn't have to drive down.  Tell him to stick around, have

11   a late breakfast.

12         MR. HARDING:  Can we, we have half a dozen other

13   chemists.

14         THE COURT:  And we'll do the same thing with respect to

15   the others.  We'll do it one at a time.

16         MR. HARDING:  Can we do it now?

17         THE COURT:  No.  We're not going to do it now.  We'll

18   do it one at a time.  It may be that counsel was simply waiting

19   for you to bring the chemist down here and then they stipulate.

20   I don't know.

21         MR. HARDING:  Well, with the Court's permission, it's

22   quicker for me to actually put the chemist on the stand and have

23   him testify rather than read his report aloud, which is what

24   assume I would do in a stipulation.

25         THE COURT:  No.  No.  The stipulation will simply be

1   that the seizure of these things resulted in a seizure of

2   substance which was determined to be a Schedule Two controlled

3   dangerous substance.  I mean, if you want to put him on -- look,

4   if you want to put him on, I'm not going to prohibit you from

5   putting him on.  You can do that.

6           MR. HARDING:  I need to have the weights of the various

7   components --

8           THE COURT:  Okay.  Put him on.  Put him on.  You have

9   the stipulation but you can put him on.  And we'll see if there

10  are other stipulations that are being offered.

11          MR. LAWLOR:  I don't want to go around in circles on

12  this.  Mr. Harding, you know, the witness for today is

13  Pennsylvania.  I think it only affects Mr. Mitchell.

14          THE COURT:  I understand.  I understand.

15          MR. LAWLOR:  Mr. Harding, I think, I hope, has been on

16  notice from Mr. Mitchell's perspective that we would stipulate to

17  this.  We didn't know this witness was coming down today.  But

18  I'll put on the record now, for any drug analysis we will

19  stipulate, Mr. Mitchell will.

20          THE COURT:  Okay.  I understand.  All right.  How are

21  we doing, Ms. Rhodes?

22          MS. RHODES:  Not finding it where I thought it was.

23          MR. MARTIN:  Your Honor, can we go back to this topic

24  here?  Ms. Rhodes is trying to find a copy that I e-mailed to her

25  at some point in time.  What we don't know and she doesn't know

1    and Mr. Flannery doesn't know is whether we e-mailed her the

2    enhanced version that we got from the government or the

3    unenhanced version.  It seems to me that either up on the Sixth

4    Floor or right across the street, and with two agents sitting

5    here, the government ought to be able to go get this CD and play

6    it for us.

7              MR. HARDING:  We have it on the way over here, Your

8    Honor.

9              THE COURT:  You have it on the way?  All right.

10             MR. HARDING:  Yes.

11             THE COURT:  All right.  Let's proceed with the voir

12   dire.  And then we'll decide if the disk gets here soon enough,

13   we can continue.  Otherwise, we may have to recall Ms. Smith

14   later today.  Go ahead, Mr. Hanlon.  Ms. Smith, would you stand,

15   please, and be sworn by the clerk?

16           JAQUETTA SMITH, GOVERNMENT'S WITNESS, SWORN

17             THE WITNESS:  Correct.

18             THE CLERK:  Be seated.  Scoot up to the mike.  State

19   your name and spell it for the record.

20             THE WITNESS:  Say that again.

21             THE COURT:  State your name and then spell it for the

22   record.  Your first name and your last name.

23             THE WITNESS:  Jaquetta Smith, J-A-Q-U-E-T-T-A, last

24   name Smith, S-M-I-T-H.

25             THE COURT:  Thank you, Ms. Smith.

1        THE WITNESS:  May I say something?

2        THE COURT:  No, ma'am.  You're here simply to answer

3    questions.

4        DIRECT EXAMINATION

5    BY MR. HANLON:

6    Q    Good morning, Ms. Smith.

7    A    Good morning.

8    Q    Last, actually back in 2004, do you remember testifying

9    twice in the grand jury here in the federal courthouse, once in

10   March and once in April of that year?

11   A    I remember being summonsed once and then summonsed again the

12   second time they asked me a question in front of the grand jury.

13   Q    And you also spoke with my colleague here, Mr. Harding,

14   during both of your appearances before the grand jury and then in

15   the grand jury room?

16   A    Yes.  It was him and a couple other people.

17   Q    During one of the times that you came to the courthouse, Ms.

18   Smith, did you have a chance to, one of the prosecutors and one

19   of the agents asked you to listen to an audiotape where there was

20   some conversation that sounded like a voice mail tape or

21   something like that?

22   A    Uh-huh.

23   Q    That's a yes, ma'am?

24   A    Yes.

25   Q    And both before the grand jury and also in the grand jury,

1    the prosecutors asked you if you recognized any of the voices on

2    the people on that audiotape.  Do you remember?

3    A    What was said was that --

4            THE COURT:  Ms. Smith, Ms. Smith, listen to the

5    question --

6            THE WITNESS:  All right.

7            THE COURT:  -- asked by the attorney.

8            THE WITNESS:  Okay.

9            THE COURT:  Answer the question --

10           THE WITNESS:  Okay.

11           THE COURT: -- yes or no.  And if you need to explain,

12   you will be permitted to explain.  All right?

13           THE WITNESS:  Yes.  You asked me was there a voice on

14   there that I recognized?

15   BY MR. HANLON:

16   Q    It was one of the prosecutors, wasn't me personally.  But it

17   was one of the prosecutors, right?

18   A    Um-hum.

19   Q    Is that yes?

20   A    Right.

21           THE COURT:  And I need you to say, Ms. Smith, I need

22   you to say yes or no.

23           THE WITNESS:  Yes.

24           THE COURT:  Thank you.  Would you like some water, by

25   the way?

Case 1:04-cr-00029-RDB   Document 676   Filed 06/08/09   Page 22 of 291

1          THE WITNESS:  No.

2          THE COURT:  All right.

3    BY MR. HANLON:

4    Q    And did you recognize any of the voices on that audiotape?

5    A    I said it sounds like someone on there.

6    Q    And who did the voice that, who did the voice sound like

7    that you thought you heard?

8    A    When the tape was played, the officer said, We believe this

9    is Rock on here.  Does it sound like him?  I said, I don't know,

10   it sounds like him.

11   Q    So you're saying that an agent mentioned the name to you?

12   A    Yes, they did.

13   Q    And then you said, It sounds like him?

14   A    Yes.

15   Q    Were there other voices on the tape, Ms. Smith, that you did

16   not recognize and did not have an opinion about?

17   A    Correct.  I didn't recognize any other voice.

18   Q    Now, the name that you mentioned a few minutes ago, could

19   you give us the full name of that person?  You mentioned a

20   nickname Rock, I think?

21   A    Shelton Harris.

22   Q    Now, Shelton Harris, is this a person that you knew at that

23   time prior to 2004?

24   A    I knew him.  Not that well, but I knew him.

25   Q    How long had you known him?  About how long?

1    A    Say two years maybe.

2    Q    Two years prior to 2004?

3    A    Yeah.

4    Q    And how did you know Shelton Harris?

5    A    He was signed to Mr. Mitchell's record label.

6    Q    And Mr. Mitchell is Willie Mitchell, the defendant here?

7    A    Correct.

8    Q    And had you actually had conversations with Mr. Harris prior

9    to that day?

10   A    No.  Not really.  Only for music-wise, listening to music.

11   That's about it.

12   Q    Had you ever heard his voice?

13   A    Yeah.  I heard his voice.

14   Q    You heard his voice in music, correct?

15   A    Um-hum.

16   Q    That's a yes?

17   A    Yes.

18   Q    And you also heard his voice in conversation from time to

19   time?

20   A    Sometimes.

21   Q    Did you ever hear his voice over the phone?  Did you get a

22   phone call from him?

23   A    No.

24   Q    Or have a phone conversation with him?  That's a no?

25   A    Never talked to him over the phone.

1    Q    But you did talk to him in person?

2    A    Yes.

3    Q    During the course of those two years?

4    A    Correct.

5    Q    About how frequently?

6    A    I didn't see him that much so, I mean, I seen him come in

7    passing, so I can't really say.

8    Q    It was more than once, correct?

9    A    I would say probably twice.

10   Q    Twice in two years?

11   A    Um-hum.

12              THE COURT:  You have to say yes or no.

13              THE WITNESS:  Yes.

14   BY MR. HANLON:

15   Q    And when the agents used the name "Rock", you knew who they

16   were referring to?

17   A    Yes.

18   Q    Rock was a nickname for Shelton Harris?

19   A    Yes.  That's his rap name.

20   Q    Did you know Shelton Harris by any other names?

21   A    No.

22   Q    And how frequently had you listened to Mr. Harris's voice in

23   the, in the rap CD's or in the rap music?

24   A    Only when Mr. Mitchell asked my opinion on a song.

25   Q    How many times was that?

1    A    Maybe twice.

2    Q    Hold on.  Your Honor, can I have a moment?

3         THE COURT:  Yes.

4    Q    Nothing further on the voir dire issue, Your Honor.

5         THE COURT:  All right.  Mr. Lawlor.

6         MR. LAWLOR:  Court's indulgence.

7         (Pause in proceedings.)

8         MR. LAWLOR:  I'm sorry, Your Honor.  One minute.

9         CROSS EXAMINATION

10   BY MS. RHODES:

11   Q    Good morning, Ms. Smith.

12   A    Good morning.

13   Q    I'm Laura Kelsey Rhodes.  I represent Willie Mitchell.  When

14   you were listening to that tape, did they ask you specifically if

15   you recognized any other voices?

16   A    No.  They just asked basically what was said when the agent,

17   he's not in here, his name is Officer Giganti, he was like, We

18   believe this is Rock on this tape.

19   Q    Um-hum.  And so they didn't ask you about any other names,

20   do you hear anybody else?

21   A    No.

22   Q    Did you recognize Willie's voice on that tape?

23   A    No.

24   Q    Okay.  Thank you.

25        THE COURT:  It appears that the disk is here, Mr.

1    Martin.

2              MR. MARTIN:  Would you prefer, then, that we just move

3    into the next phase or do I get to ask her a few questions?

4              THE COURT:  Go right ahead.

5              CROSS EXAMINATION

6    BY MR. MARTIN:

7    Q    I'm sorry, Your Honor.  Thank you.  Ms. Smith, so before you

8    ever heard this tape, Officer Giganti told you that he thought it

9    was Rock?

10   A    Yes.

11   Q    If he hadn't said that to you, would you have ever been able

12   to identify anybody on that tape?

13   A    No.

14   Q    And when you heard his voice before, when you listened to

15   the CD, the rap CD --

16   A    Um-hum.

17   Q    You said that Mr. Mitchell asked you to listen to it?

18   A    Um-hum.

19   Q    Did I hear you say that you --

20             THE COURT:  I'm sorry.  Again, you have to say yes or

21   no.

22   A    Yes.

23   Q    Did I hear you say that he asked you to listen to it on the

24   phone?

25   A    No.

1    Q    Okay.  So you actually listened to the CD?

2    A    Yes.

3    Q    And when he did that, and you listened to that CD, did he

4    tell that you that that was Rock who was --

5    A    Yes.  He had to tell me like who was, there was a couple

6    other artists on there.

7    Q    On your own, you never would have known that that was Rock?

8    A    Correct.

9    Q    I have nothing further, Your Honor.

10                    CROSS EXAMINATION

11   BY MR. CROWE:

12   Q    Good morning, Ms. Smith.  My name is Tom Crowe and I

13   represent Shelly Martin.

14   A    Good morning.

15   Q    You know my client Mr. Martin, do you not?

16   A    Yes.

17   Q    And you've known him many years?

18   A    Yes.

19   Q    And in fact, is it correct that you are familiar with his

20   voice?

21   A    Yes.

22   Q    Did you hear Mr. Martin's voice on that tape that was played

23   for you?

24   A    No.

25   Q    And in fact, were you asked in grand jury whether you could

1   identify any other voices on the tape other than that of Rock?

2   A    No.

3   Q    Okay.  Let me just show you a portion of your grand jury

4   testimony.  I know this has been some time.

5            Going to call your attention to Page 21 of your grand

6   jury transcript on April 24, which was the second day of your

7   appearance.  Do you see, there's a question at Line Ten.

8            Did you identify Little Rock's voice on that?

9            Answer:  Yes, the voice that sounded like his.

10           Well, okay.  And you said that the other voices you

11  couldn't identify, is that right?  Yes.

12           Does that refresh your recollection as to whether you

13  were actually asked if you could identify other voices in the

14  grand jury, and you said no?

15  A    Correct.

16  Q    Thank you very much.

17           CROSS EXAMINATION

18  BY MR. COBURN:

19  Q    Ms. Smith, good morning.

20  A    Good morning.

21  Q    I represent Shawn Gardner, who I think you know as Goo, is

22  that right?

23  A    Yes.

24  Q    You've seen him and talked to him a number of times, right?

25  A    Yes.

1    Q    Quite a number of times?

2    A    Yes.

3    Q    His voice isn't on that tape, either, is it?

4    A    No.

5    Q    Thank you.

6              MS. RHODES:  Your Honor, if I could inquire briefly

7    again.

8              THE COURT:  I'm sorry?

9              MS. RHODES:  In light of their questioning, if I could

10   inquire briefly again.

11             THE COURT:  Well, let's see if the government has

12   anything further.

13             REDIRECT EXAMINATION

14   BY MR. HANLON:

15   Q    For fun, Your Honor, maybe I can anticipate Ms. Rhodes's

16   question.  Did you hear Mr. Mitchell's voice on the tape?

17   A    No.

18   Q    Ma'am, you didn't mention anything about Detective Giganti

19   saying anything to you about whose voice was on that tape when

20   you testified in the grand jury in April of 2004, did you?

21   A    No.

22   Q    You readily mentioned that today, but in the grand jury you

23   never brought that up when you were asked if you could identify

24   any voices, is that right?

25   A    Correct.

1    Q     Nothing further, Your Honor.

2              THE COURT:  All right.  Ms. Smith, if you will step

3    out-- you still have more?

4              MS. RHODES:  Yes.  Just briefly.

5              THE COURT:  All right.

6              RECROSS EXAMINATION

7    BY MS. RHODES:

8    Q     Ms. Smith, you knew that Mr. Mitchell and Mr. Harris were

9    making rap music, right?

10   A     Yes.

11   Q     And cutting CD's?

12   A     Yes.

13   Q     And you knew that, and you had listened to some of those

14   CD's, right?

15   A     Yes.

16   Q     Okay.  And you knew that they had, had you ever heard them

17   play it at clubs, too, or the music played at clubs?

18   A     I attended one of their events that they had at a club.

19   Q     All right.  Thank you.  Nothing further, Your Honor.

20             THE COURT:  All right.  Ms. Smith, would you step

21   outside, please, and we'll be with you in just a moment?

22             MR. HANLON:  Your Honor, before the witness, we have

23   the voice mail.

24             THE COURT:  Mr. Martin didn't want to use it.

25             MR. HANLON:  That's fine.

1          THE COURT:  But thank you very much for getting it over

2    here.  Thank you.  We may need it.  All right.  Mr. Martin, did

3    you want to be heard?  I think before I hear you, Mr. Martin, Mr.

4    Hanlon, I think the government needs to proffer as to what you

5    believe Detective Giganti would say in rebuttal to the witness'

6    testimony.

7          MR. HANLON:  I think Detective Giganti would say that

8    no such conversation took place with the witness.

9          THE COURT:  All right.  And as you pointed out in your

10   examination, there's nothing in the grand jury transcript that

11   would support the witness' assertion in that regard.

12         MR. HANLON:  That is correct, Your Honor.  I should

13   point out that, based on my conversations with Mr. Harding, in

14   light of what we anticipate's going to happen on the stand, we

15   don't anticipate asking the witness this question during our

16   direct.

17         THE COURT:  Good.  Then I don't need to hear from Mr.

18   Martin except now the defense may want to elicit negative

19   identification testimony, which I suppose kind of puts us back to

20   where we were.  Mr. Martin.

21         MR. MARTIN:  Just so I understand.

22         THE COURT:  The government is not going --

23         MR. MARTIN:  The government is not going to do what

24   they said earlier they will do.

25         THE COURT:  Exactly.

1          MR. MARTIN:  Then you and I don't need to talk any

2     more.

3          THE COURT:  Okay.  That's what I thought.  So from my

4     perspective, it seems to me where we are is, there's not going to

5     be any testimony from this witness regarding the voice mail or

6     any affirmative or negative identification.  Mr. Lawlor, do you

7     have a different view?

8          MR. LAWLOR:  No.  That would mean she'd be subject to

9     recall, Your Honor?

10         THE COURT:  Yeah.  Every witness is still subject to

11    recall.I'm sorry.  Maybe I should get clarification from you.

12    Where I think we are is here.  The defense have made a motion to

13    suppress voice identifications on Sixth Amendment grounds.  The

14    government had intended, based on our colloquy last week, to

15    elicit affirmative voice identification evidence from only one

16    witness.

17         As a result of our colloquy, it turns out that there

18    may have been some interest on the defense side of eliciting

19    negative voice identification testimony.  In that light, the

20    government said, all right, if they want to go into negative

21    voice identification testimony, then we're going to broaden our

22    witness base to elicit other voice identifications that we were

23    not otherwise going to use.

24         So this witness, Ms. Smith, is the first person who

25    falls into that latter category.  Now, the government didn't

1    intend to use her as a voice identification witness other than in

2    light of the colloquy last week.

3           We've now had the voir dire and prima facie, according

4    to the witness' testimony, the identification was suggestive.

5           Mr. Hanlon has proffered that Detective Giganti would

6    and will testify that no such conversation took place, that it

7    wasn't suggestive, which would require the Court to make a

8    finding.  And frankly, I'm prepared to make that finding today on

9    the basis of the proffer if I have to.

10          But in any event, having heard the witness' testimony

11   and voir dire, Mr. Hanlon now says, okay, we're not going to

12   elicit her testimony that Mr. Harris's voice is on the tape.  And

13   as you just heard, Mr. Martin says, okay, I'm good with that, I'm

14   fine.  All right?

15          So the remaining issue is, does anybody else want to

16   ask her, Did you hear the tape, Could you identify anybody

17   else's, Could you identify a voice on the tape?  I don't know

18   what the government might want to do if anybody wants to go

19   there.  But I'm assuming nobody wants to go there and open up

20   that, open up that box.  So that's where we are.

21          MR. LAWLOR:  That's my question.  I'm 100% with you up

22   to everything you just said.  My question is, in light of that,

23   we would, if given the opportunity with this witness, elicit from

24   her on cross examination this morning, you heard the tape, you

25   know Mr. Mitchell's voice, Mr. Mitchell's voice was not on the

34

1    tape.  My question is, and I think we're going to have to take

2    this up on a sort of witness-by-witness basis.

3              THE COURT:  Sure.

4              MR. LAWLOR:  Because of all of the different

5    considerations.  But given as to this witness, what we know now,

6    will the Court permit the cross that I just suggested?

7              THE COURT:  I don't see why I wouldn't.  But let me

8    hear from the government and see what the government thinks of

9    that.

10             MR. HANLON:  May I check with Mr. Harding about what

11   the government thinks about that?

12             THE COURT:  Of course.

13             (Pause in proceedings.)

14             MR. HANLON:  Your Honor, if that's the case, which is

15   fine, I think in that case we would have to anticipate that and

16   elicit for what it's worth a positive identification on the tape

17   during direct.  I think we'd have to anticipate that cross and go

18   ahead and put out what we have.

19             THE COURT:  Okay.

20             MR. COBURN:  I guess that -- sorry, Your Honor.  I

21   mean, that's a kind of a rapidly changing landscape here.  But

22   based on what Mr. Hanlon just said, I think that answers my

23   question.  If they're going to do that, then obviously I have to

24   elicit the negative ID.

25             THE COURT:  Are you saying you would not elicit it but

1    for the government opening it up on direct?

2              MR. COBURN:  I think if I could get a commitment from

3    the government that they would not seek to elicit any evidence in

4    this trial that puts Mr. Gardner on that tape, then I wouldn't

5    seek to elicit any negative ID.

6              THE COURT:  But let's not broaden it.  Now we're

7    talking just about this witness.  I assume that what Mr. Hanlon

8    just said means that the government's going to ask about each of

9    the defendants.  And so the government expects to elicit, and

10   I'll hear from Mr. Martin in a moment, negative voice

11   identification testimony as to Mr. Mitchell, Mr. Martin, and Mr.

12   Gardner, and, if I permit it, affirmative voice identification

13   testimony of Mr. Harris.

14             What you're saying, if the government weren't going to

15   do that, then you wouldn't be going into this area with this

16   witness.  You would not ask her, did you hear Mr. Gardner's voice

17   on it, do you know Mr. Gardner's voice, did you hear Mr.

18   Gardner's voice on the tape?  You wouldn't do that?

19             MR. COBURN:  Actually, I think I might do it, anyway,

20   Your Honor.

21             THE COURT:  Oh, okay.  So you're in the same position

22   as Mr. Lawlor.  Mr. Martin?

23             MR. MARTIN:  I think you're going to have to buy some

24   new carpet here, Your Honor, by the time this trial is over.

25   Obviously, I heard what you said.  And you're prepared to make

1    the ruling even without hearing from Detective Giganti.  I can

2    guess from the way you said it what your ruling would be.

3            I still say, Your Honor, that you have a witness here

4    who knows Mr. Harris less than she knows any of the other three

5    defendants.  And but for Giganti putting Rock's name in her head,

6    she says, I would not have identified him.

7            I think it's highly suggestive, I think.  And given the

8    quality of this tape, the dubious quality of this tape, it really

9    is, if it were me making the decision, I would say you can't

10   recognize anybody on this tape because you really can't.  They

11   don't know what they're saying.

12           And if that's the case, it's not so bad to say, I

13   didn't recognize anybody.  The government can argue, well, you

14   wouldn't recognize anybody, anyway, the tape's of dubious

15   quality.

16           THE COURT:  Would you play the tape, please?

17           MR. MARTIN:  Pardon me, Your Honor?

18           THE COURT:  I'm sorry.  I'm addressing the government.

19   While you have the mike I want to hear the tape again.  Is it

20   cued up, please?  Would you play it, please?

21           (Tape playing.)

22           THE COURT:  Okay.  Anything further, Mr. Martin?

23           MR. MARTIN:  No, Your Honor.

24           THE COURT:  All right.  Mr. Harding, will Detective

25   Giganti actually be a witness in the case?

1          MR. HARDING:  Yes, Your Honor.

2          THE COURT:  All right.  The Court is satisfied, based

3     on the record as it stands, that the Court should accept the

4     government's proffer and rely on the grand jury testimony, which,

5     according to the government's proffer, contains no indication

6     whatsoever by Ms. Smith that she was prompted to make an

7     identification by Detective Giganti or anybody else,

8     acknowledging, as the Court does, that Ms. Smith is a hostile

9     witness, and human nature being what it is, there is no reason to

10    think that she would do anything knowingly to help the government

11    prove this case.

12          The Court is satisfied that the weight of her

13    identification testimony as to Mr. Harris is a question for the

14    jury and that the government has satisfied the Court under the

15    circumstances that her identification of Mr. Harris is of

16    sufficient reliability, notwithstanding her negative testimony

17    here this morning, that the jurors should be permitted to

18    consider that testimony.

19          Now, important factors for the Court are, of course,

20    that she admitted in her testimony that she's known Mr. Harris

21    for two years, that she's heard his voice, that although she

22    claims she's only had two conversations with Mr. Harris, under

23    the circumstances of this case that would seemingly be a dubious

24    proposition.

25          She says she's only listened to Mr. Harris's voice on

1    rap music when Mr. Mitchell asked her to do so.  That would seem

2    to be a dubious proposition as well.  And again, the manifest

3    hostility that she displayed to her presence here in court and to

4    the government's interrogation of her here in court during the

5    voir dire informs the Court's decision to permit the jury to

6    judge for itself, one, whether she did indeed identify Mr.

7    Harris, and the weight to be accorded that testimony.

8           Also important, of course, is the fact that, for this

9    witness, and I gather for many, if not all, of the witnesses who

10   the government would call who's listened to this tape, other

11   defendants will be eliciting negative voice identification

12   testimony.

13          I understand, Mr. Martin, your basic position has been

14   throughout, and I respect it, that the tape's quality itself is

15   so bad, so degraded, so indecipherable that the Court should rule

16   out the tape or at least any purported identification as an

17   initial matter.  But having again just now listened to the tape,

18   the Court has no hesitation in finding that though the tape is of

19   very poor quality, a person who is familiar with any of the

20   persons who are on that tape, whoever they may be, and with their

21   voices, would be able to make an identification.  Perhaps I

22   should put it in the negative.

23          The tape is not so bad that a person with a sufficient

24   basis in experience and contact with the person or persons whose

25   voices appear on that tape would not be disabled from making not

1    just a tentative identification, but a reliable and firm

2    identification of portions of that tape.

3            So the Court ultimately concludes that as to Ms. Smith,

4    the voice identification of Mr. Harris is sufficiently reliable

5    to permit the jury to hear her identification.  And, of course,

6    the government will be free to cross examine and/or impeach her

7    as appropriate, using the grand jury transcript, or in any other

8    manner show that the witness perhaps has shaded her testimony,

9    changed her testimony, and is hostile to the government.

10            Mr. Martin, final word.

11            MR. MARTIN:  Yes, Your Honor.  She, in the grand jury,

12    said -- first of all, she was never asked in the grand jury about

13    anything that happened downstairs when she was questioned

14    downstairs.  Number one.  So who knows what would have happened

15    if they'd asked her.  That's the nature of the grand jury.  The

16    government doesn't ask questions like that.

17            Number two, she didn't say that's Mr., that's Rock.

18    What she said was, the question was, Did you identify Little

19    Rock's voice on the tape?  She says yes.  But then she said the

20    voice that sounds like his.  It's for cross examination.  I

21    understand the Court's ruling.

22            I would also disagree with the Court's readiness to

23    assume that the witness is not telling the truth here today.  I

24    don't think you have enough evidence before you to know how many

25    times she may or may not have ever talked to Mr. Harris because

1    we don't have any evidence yet in this courtroom as to how often

2    Mr. Harris may have been around her.  We don't even know how

3    often Mr. Mitchell may have been around her.  In the grand jury

4    it says that she is the mother of his child but it also says she

5    doesn't see him all that often.  So --

6         THE COURT:  All right.  Thank you, Mr. Martin.  Good

7    morning, Mr. Kurland.

8         MR. KURLAND:  Good morning, Your Honor.  Your Honor,

9    because this topic and this witness came up sort of out of order,

10   I haven't had an opportunity yet, and I don't think other

11   co-counsel have, either, to kind of confer with co-counsel on

12   some fairly important strategic decisions.  I was wondering if we

13   could take a short recess before the witness actually testifies

14   before the jury to at least give us a chance to talk.

15        Number two, there's also a kind of a lavatory issue

16   that needs to be --

17        THE COURT:  All right.  I was hoping to get her direct

18   in and then take a recess.  That won't work?

19        MR. KURLAND:  I mean, if it were up to me, I would

20   prefer we take a brief recess now.  If it's okay with the Court.

21        THE COURT:  I kept the jury waiting for more than an

22   hour.

23        MR. KURLAND:  Well, this way, Your Honor, we take a

24   break now and just go up through lunch.

25        THE COURT:  Okay.  All right.  We'll take a ten minute

1    recess.

2              MR. KURLAND:  Thank you, Judge.

3              MR. HANLON:  Your Honor, very briefly.  I'm sorry.

4              THE COURT:  Yes.

5              MR. HANLON:  One of the agents has notified me that we

6    think our next witness, Jaquetta Smith, that she may have a

7    family member in the audience, which is perfectly fine.  But I

8    would just ask that perhaps the Court could instruct that there

9    be no conversation with the witness about what's been going on in

10   court.

11             THE COURT:  Yes.  Those of you who are present in the

12   courtroom, you are welcome, of course.  But the Court has issued

13   an order in this case that no witness is to be in the courtroom

14   during these proceedings.  And that means that no one who is in

15   the courtroom is permitted to discuss with any witness anything

16   that occurs in the courtroom while the witness is not in the

17   courtroom.

18             So it would be a violation of this Court's order if

19   anyone who's been in here for the last 15 or 20 minutes since Ms.

20   Smith left to discuss with Ms. Smith during this recess any of

21   the conversation the Court has had with counsel.  And such

22   conversations are protected by this Court's order.

23             All right.  We're in recess for 10 minutes.

24             (Recess.)

25             (Defendants present in court.)

1            THE COURT:  All right.

2            MR. HANLON:  Your Honor, Jaquetta Smith.  Should we

3    bring her in?

4            THE COURT:  Yes.  I think the agent's going to get her.

5            MR. HANLON:  Your Honor, just by way of telegraphing

6    our plans for today.

7            THE COURT:  All right.

8            MR. HANLON:  Our strategy evolves.  But at this point

9    the government's intention with the witness is not to bring in on

10   direct that voice issue.  I understand it may be brought up on

11   cross.  We would do it on redirect.  I understand that Mr. Martin

12   may then --

13           THE COURT:  Thank you for that memo.

14           (Witness enters the courtroom.)

15           THE COURT:  All right.  Ms. Smith, if you will approach

16   the witness stand, please.

17           Now, Ms. Smith, what's going to happen is in a minute

18   the jury will be brought out and then you're going to be placed

19   under oath again.  And then you will be examined.  Please stay

20   close to the microphone.  Please remember to say yes or no.  And

21   if you want some water, we'll be happy to give you some water.

22           THE WITNESS:  Okay.

23           THE COURT:  We'll have the jury, please.

24           (Jury enters the courtroom.)

25           THE COURT:  Please be seated, ladies and gentlemen.

1  Good morning.

2          Members of the jury, good morning.  I suspect, like me,

3  you're disappointed that you've been kept waiting for an hour and

4  a half.  I actually thought driving in this morning that this may

5  be the first day that we'll actually start with you on time at

6  9:30.  But I'm afraid that was not to be.  There were a number of

7  matters that I had to take up with counsel outside of your

8  presence.  So I assure you we weren't simply sitting around.  We

9  were working.

10          We're ready to continue.  As I have discussed with

11  counsel in preparation for trial, there will be occasions when,

12  for very good reasons, we will need to interrupt the testimony of

13  a particular witness in order to accommodate the schedule or the

14  trial schedule and bring in another witness.  And this will be

15  that first occasion.

16          As you recall, when we ended yesterday Detective Berger

17  was on the stand.  We now have a new government witness, although

18  the government had not completed its examination of Detective

19  Berger, and the defense had not yet had its opportunity to cross

20  examine the detective.  So we're going to interrupt Detective

21  Berger now and proceed with this new witness.  And then Detective

22  Berger will be back later today.

23          The government may call its next witness.

24          MR. HANLON:  Thank you, Your Honor.  The United States

25  calls Ms. Jaquetta Smith to the stand.

1          THE COURT:  Ms. Smith, would you stand and be sworn,

2     please?

3               JAQUETTA SMITH, GOVERNMENT'S WITNESS, SWORN

4          THE WITNESS:  Yes.

5          THE CLERK:  Be seated.  Speak directly toward the mike.

6     State your name and spell it for the record.

7          THE WITNESS:  Jaquetta, J-A-Q-U-E-T-T-A.  Last name is

8     Smith, S-M-I-T-H.

9               DIRECT EXAMINATION

10    BY MR. HANLON:

11    Q    Thank you, Your Honor.  Good morning again, Ms. Smith.

12    A    Good morning.

13    Q    How old are you, ma'am?

14    A    30.

15    Q    And where do you, what area do you live in?  Baltimore City?

16    A    Yes.

17    Q    And did you, were you born in Baltimore City?

18    A    Yes.

19    Q    Did you grow up in the Baltimore area?

20    A    Yes.

21    Q    Just by way of background, Ms. Smith, how far did you go in

22    school?

23    A    To the 12th.

24    Q    And what high school was that?

25    A    Randallstown.

DIRECT EXAMINATION OF JAQUETTA SMITH                45

1    Q    Did you graduate from Randallstown?

2    A    No.

3    Q    Around about what year was it that you left school?

4    A    '96.

5    Q    Since 1996 or so you've been out of school and living your

6    life, is that correct?

7    A    Correct.

8    Q    Ms. Smith, do you know the defendant seated to the right of

9    me, Mr. Willie Mitchell?

10   A    Yes.

11   Q    How do you know Mr. Willie Mitchell?

12   A    He's my children's father.

13   Q    And how long have you known Willie Mitchell?

14   A    Since the eighth grade.

15   Q    You were in school together?

16   A    Correct.

17   Q    Now, how many children do you have with Mr. Mitchell?

18   A    We have one child together.

19   Q    And how old?  Is it a little boy or a little girl?

20   A    Boy.

21   Q    And how old is your son?

22   A    Ten.

23   Q    And does Mr. Mitchell go by any nicknames?  Do you refer to

24   him by nickname?

25   A    Bo.

DIRECT EXAMINATION OF JAQUETTA SMITH                    46

1    Q     You met in eighth grade.  Were you immediately dating or

2    were you friends first?

3    A     Friends.

4    Q     And about approximately, just ballpark, when did your

5    relationship with Mr. Mitchell become more than just friends?

6    A     Ninth grade year.

7    Q     How long did you end up being with him, from your ninth

8    grade on?  That would have been in the early 1990s?

9    A     Correct.

10   Q     And how long were you with Mr. Mitchell?

11   A     Up until 2005.

12   Q     You have a son with Mr. Mitchell.  Do you stay in touch with

13   Mr. Mitchell?

14   A     Yes.

15   Q     You still have warm feelings for Mr. Mitchell?

16   A     Yes.

17   Q     He and you obviously share warm feelings for your little

18   boy, is that fair to say?

19   A     Yes.

20   Q     Fair to say that you care about Mr. Mitchell, don't want

21   anything bad to happen to him?

22   A     Yes.

23   Q     Now, Ms. Smith, you were subpoenaed for this trial.  You and

24   I spoke briefly last week on the first day of the trial when you

25   came in pursuant to your subpoena, is that right?

1   A    Yes.

2   Q    I spoke to you and mentioned to you that since we were

3   picking a jury on that first day of trial, that we weren't going

4   to be calling any witnesses that day and we discussed when you

5   would come back.  And we discussed, actually, we discussed and

6   agreed that you would come back in yesterday, is that correct?

7   A    Yes.

8   Q    And prior to the trial, prior to September 15th, I left you,

9   think, two voice mails to talk to you about the logistics and

10  when to come.  I also left you a voice mail Friday of last week

11  and then a number of voice mails yesterday, is that --

12           MS. RHODES:  Objection.

13           THE COURT:  Overruled.

14  Q    Is that correct, ma'am?

15  A    Yes.

16  Q    And you haven't returned any of my calls, is that right?

17  A    Right.

18  Q    And you did not appear yesterday, is that correct?

19  A    No.

20  Q    We discussed the possibility and asked if you would be

21  interested in getting together with me and maybe one of the

22  agents in order to go over the questions that we would ask you

23  today so you'd have a sense of what we would be asking you.

24  You've not expressed an interest in talking to us or going over

25  the questions or anything like that, is that correct?

1    A    Yes.

2    Q    Fair to say you're not happy to be here, Ms. Smith?

3    A    No, I'm not.

4    Q    You would rather be somewhere else, is that fair?

5    A    Yeah.  Working.

6    Q    Sure.  We'll try to get you out of here as fast as we can.

7         We've talked a little bit about your background.  We've

8    talked about your relationship with Mr. Mitchell.  Let me ask you

9    about, during the 1990's or so, from the time you got out of

10   school, from the time you left Randallstown, did you and Mr.

11   Mitchell live together?  Were you apart?  How did it work?

12   A    We lived together.

13   Q    And what part of town did you live with Mr. Mitchell?

14   A    Both, both East Baltimore and Baltimore County.

15   Q    So you moved around just a little bit?

16   A    Just a little bit.

17   Q    How long was it that you actually lived with Mr. Mitchell?

18   During what years, and about how long?

19   A    We've always lived together from '98 on up until he was

20   incarcerated.

21   Q    And when was Mr. Mitchell incarcerated?

22   A    It was April, I believe April, '02.

23   Q    Now, during, from the time you began living, from the time

24   you were together with Mr. Mitchell until the time of his

25   incarceration, let me ask you a few questions about what Mr.

1    Mitchell did for, for a living, what he was occupied doing.

2              In 1994, was Mr. Mitchell at the Hickey School as a

3    resident there?

4    A    Yes.

5    Q    Registered student there?

6    A    Yes.

7    Q    And there was a first and a second time that Mr. Mitchell

8    was at the Hickey School as a student, is that correct?

9    A    Yes.

10   Q    During the second time that he was there, do you know what

11   he was there at the Hickey School for the second time?

12             MS. RHODES:  Objection.

13             THE COURT:  Overruled.  You may answer.

14   A    I can't remember.

15   Q    You don't remember what Mr. Mitchell was there for during

16   that second stay?

17   A    No.

18   Q    Do you remember ever having any conversations with Mr.

19   Mitchell or ever having any knowledge of why Mr. Mitchell was at

20   the Hickey School during that second time?

21   A    I assume it was because of the fight that he had got into.

22   Q    You make that assumption how?  Because Mr. Mitchell told you

23   that?

24   A    No.  Because it happened at school.

25   Q    Now, at any point, did you ever become aware of Mr. Mitchell

1    meeting anyone else, making any friends or making any associates

2    at the Hickey School during either his first or second stay, or

3    any other time?

4    A    No.

5    Q    Did Mr. Mitchell spend any time after leaving Hickey, did he

6    spend any time at any colleges?

7    A    Yes.

8    Q    What colleges did Mr. Mitchell attend?

9    A    I know he went to one college, I can't remember the name.

10   No.  I'm sorry.  Nassau Community College in New York.  Then from

11   there he transferred to Bryant College, I believe is in Rhode

12   Island.

13   Q    And what were the years Mr. Mitchell was in college at

14   Nassau and then in Bryant College?

15   A    I want to say between '96 through '98, '99.

16   Q    Now, and I just want to make sure I don't get my dates

17   wrong.  When was it that you and Mr. Mitchell began living

18   together sort of as a couple?

19   A    Well, when he came home from school, he would stay with me

20   at my mother's house.  We, when he stopped going to school in

21   '98, he lived with me at my mother's house.

22   Q    Did Mr. Mitchell play some football during some of the time

23   he was at school?

24   A    Yes, he did.

25   Q    Did he play at Nassau or at Bryant or at both?

1    A    He received a scholarship to go to Nassau when he was at the

2    Hickey School.

3    Q    Now, at some point did you come to know an individual named

4    Shawn Gardner?

5    A    I've known Shawn Gardner from school.

6    Q    How long have you known Shawn Gardner?

7    A    Since ninth grade.

8    Q    And Mr. Gardner is the defendant farthest from me, sitting

9    at the end of the table?

10   A    Yes.

11   Q    What kind of a relationship have you had with Mr. Gardner

12   since the ninth grade?

13   A    We were all friends.  We would actually, me and Shawn were

14   kind of close.

15   Q    Pretty good friends, then?

16   A    Yes.

17   Q    You care about Mr. Gardner, too, still as a friend?

18   A    Yes.

19   Q    How about Shelly Wayne Martin, the defendant, I believe,

20   sitting near the end of that table over there?  Do you know Mr.

21   Martin?

22   A    Yes.

23   Q    How do you know Mr. Martin?

24   A    Same thing.  From school.

25   Q    Ninth grade as well?

1    A    Yes.

2    Q    Also friends with Mr. Martin?

3    A    Yes.

4    Q    Have you remained friends over the years with Mr. Martin

5    with Mr. Gardner?

6    A    Yes.

7    Q    Still care about Mr. Martin as a friend?  Want to see good

8    things for him?

9    A    Yes.

10   Q    Did Mr. Martin and Mr. Gardner know Mr. Mitchell during the

11   1990s?

12   A    Yes.

13   Q    How did they come to know one another?

14   A    From school.

15   Q    Same school, same situation?

16   A    From school.  Just I guess people that they knew from

17   school.  I don't know how they net.

18   Q    That's all right.  From what you observed, what kind of a

19   relationship did Mr. Mitchell, Mr. Gardner, and Mr. Martin have

20   together, when they were in school and later on through the '90s?

21   A    They were good friends.

22   Q    Hung out together quite a bit?

23   A    Sometimes.

24   Q    Go to each other's houses?  Go out together, things like

25   that?

1   A    Bo was not a going out type of person.  So no.

2   Q    Understood.  They spent time together, though?

3   A    They hung out every now and then.

4   Q    At some point did Mr. Mitchell, did Bo get interested in a

5   music enterprise, a music business?

6   A    Yes.

7   Q    When was that?

8   A    I believe it was 2000.  I'm not sure.

9   Q    So this would have been after his return from college?

10  A    Yes.

11  Q    Before we get into that.  Mr. Mitchell at some point also

12  returned to the Hickey School after his college time, returned to

13  Hickey School as a counselor, is that right?

14  A    Yes.

15  Q    And about when was it that Mr. Mitchell was working as a

16  counselor at the Hickey School?

17  A    I don't know.

18  Q    That's all right.  But this was after his college time?

19  A    Yes.

20  Q    Do you know if he met anyone, made any new friends or

21  associates that you were aware of while he was a counselor at the

22  Hickey School?

23  A    One.

24  Q    And who was the one friend that you were aware of?

25  A    Shelton Harris.

1    Q    Did Mr. Shelton Harris have any nicknames that he went by?

2    A    He was introduced to me as his rap name, Roc.

3    Q    How were you introduced to Shelton Harris?

4    A    I don't remember.

5    Q    All right.  Mr. Harris is also in court.  Is he the

6    defendant, Mr. Mitchell, two attorneys, and then the next

7    defendant over.  Is that Mr. Harris?

8    A    Yes.

9    Q    Did Mr. Harris have any rap efforts or rap businesses going

10   on with Mr. Mitchell that you were aware of?

11   A    He was signed to his record label.

12   Q    Mr. Harris was signed to Mr. Mitchell's record label?

13   A    Yes.

14   Q    What was the name of the label?  Do you remember?

15   A    Shakedown.

16   Q    Shakedown?

17   A    Um-hum.

18   Q    That's a yes, ma'am?

19   A    Yes.

20   Q    Now, there was a Shakedown.  Was there also a word

21   "Sheistyville?"

22   A    I think that was the name of a group of rappers.

23   Q    Do you know if Mr. Mitchell and Mr. Harris, who was signed

24   to the label, had any success in the rap business?

25   A    They had just got started.

1   Q    In terms of a nicknames, I should have asked you this

2   before.  Mr. Gardner, who you talked about, that you knew from

3   high school, would he sometimes go by the name "Goo?"

4   A    Goo?  Yes.

5   Q    And Mr. Martin, did he ever go by the name "Wayne?"

6   A    Yes.

7   Q    Any other nicknames that Mr. Martin had?

8   A    No, not that I know of.

9   Q    I've asked you a few questions, Ms. Smith, about what Mr.

10  Mitchell was doing for a living through the 1990's.  We've talked

11  about school and when you first got to know him and then he was a

12  counselor at the Hickey School.

13        Is it correct that Mr. Mitchell did not have any job

14  that you were aware of during the years 2001 and 2002?

15  A    He had a job in 2001 for Fresh and Clean Floor Services.

16  Q    Flesh and Clean Floor Services?

17  A    Um-hum.

18  Q    That's a yes, ma'am?

19  A    Yes.

20  Q    And in 2001, when did that job come to an end, do you know?

21  A    I don't remember.

22  Q    Was it early in the year?

23  A    I don't remember.

24  Q    You don't remember when Mr. Mitchell no longer had a job in

25  2001?

1    A    No.

2    Q    You were residing with him and raising your son with him at

3    that time, is that correct?

4    A    Yes.

5    Q    But whenever Mr. Mitchell left that employment until the

6    time of his arrest in 2002, am I correct that he had no job

7    during that remaining period of time?

8    A    May help his uncle out or something like that.  But no.

9    Q    Nothing else you were aware of?

10   A    Not that I was aware of.

11   Q    Did Mr. Mitchell ever spend time on the streets hanging out?

12   A    What you mean?

13   Q    Was he ever on the street, in Park Heights or any part of

14   Baltimore City, during the daytime?

15   A    I'm at work during the daytime so what he did, I don't know.

16   Q    I'm sorry?

17   A    I'm at work during the daytime, so where he was hanging out

18   I don't know.

19   Q    So sitting here today, you don't have any memory about

20   whether or not Mr. Mitchell ever spent time on the streets in

21   Park Heights during 2001 and 2002?

22   A    All I know is one of his rap artists lives up that way.

23   Q    His rap artists lived up that way?  Who were his rap

24   artists?  Mr. Harris was one, correct?

25   A    Correct.

1    Q    How about, who else was living in that part of town or, I'm

2    sorry, hanging out in that part of town?

3    A    I think there was a couple other ones.  I don't remember

4    their names.

5    Q    Do you know if there were ever times that Mr. Gardner might

6    hang out out on the street in Park Heights or any other part of

7    Baltimore City that you're aware of?

8    A    No.

9    Q    How about Mr. Martin?  Did he ever spend any time on the

10   street in Park Heights or any of that part of Baltimore?

11   A    Not that I know of.

12   Q    And how about Mr. Harris, who was signed to Mr. Mitchell's

13   label?  Did he ever spend any time out on Park Heights or any

14   other street in Baltimore?

15   A    He may have.  He grew up around that area.  That's the area

16   he grew up.  So I don't know.

17   Q    A moment please, Your Honor.

18          THE COURT:  Yes.

19   Q    Did you ever know Mr. Mitchell to be involved in selling

20   drugs?

21   A    No.

22   Q    You never knew Mr. Mitchell to be involved in selling drugs?

23   A    No.

24   Q    You never knew Mr. Mitchell to be involved in selling drugs,

25   even unsuccessfully?

1    A    No.

2    Q    Your Honor, may I approach the witness?

3             THE COURT:  You may.

4             MR. HANLON:  Understanding the Court's instructions,

5    Your Honor.

6             THE COURT:  I understand.

7             MR. HANLON:  This is for convenience.

8             THE COURT:  I understand.

9    BY MR. HANLON:

10   Q    Ms. Smith, you're appearing today under subpoena.  You also

11   appeared under subpoena on two occasions, in March and April of

12   2004, and testified in front of a federal grand jury here in the

13   U.S. Courthouse, is that right?

14   A    Right.

15   Q    You were brought under oath on both those occasions.  You

16   were sworn to tell the truth and whole truth, like you were

17   today, and then you were asked a series of questions in front of

18   a grand jury, is that right?

19   A    Yes.

20   Q    You were advised of your obligation to tell the truth and

21   the fact that you were under oath, and you were also given an

22   opportunity, if you wanted to, to notify the U.S. Attorney's

23   office after your testimony if you wanted to change any part of

24   your testimony, is that correct?

25   A    Yes.

DIRECT EXAMINATION OF JAQUETTA SMITH                    59

1    Q    Directing your attention, and I put a copy of it in front of

2    you for your reference, there's two transcripts.  One of them is

3    dated March the 24th of 2004, Ms. Smith.  I would like to ask you

4    about one or two questions that you were asked on that day.  And

5    I'm going to refer you to Page 19 of your grand jury transcript

6    on March the 24th of 2004.

7    A    You want me -- are you putting it up here?

8    Q    You can go ahead and flip to the page.  I'm also putting it

9    on the screen and you can use either one.  Do you see it on the

10   screen there?

11   A    Um-hum.

12   Q    That's a yes, ma'am?

13   A    Yes.

14   Q    Referencing Page 19 of your March, 2004 grand jury

15   appearance.  You were asked the question by the prosecutor, who I

16   believe was Rob Harding that day --

17   A    Um-hum.

18   Q    -- was Willie Mitchell involved in drug trafficking?  You

19   see that?

20   A    Yes.

21   Q    And then your answer that day was:  He tried to but it never

22   worked for him, so yeah, he was.  That was your testimony in the

23   grand jury, is that right?

24   A    Yes.

25   Q    Asked you some questions, also, about whether or not you

1    ever observed Mr. Harris standing on the street in Park Heights

2    or any other part of the city, whether or not you had any

3    knowledge of that.  You've indicated today you either don't know

4    or don't remember.  Can I ask you to take a look at Page 26 of

5    the same transcript?  I'll put it in front of you on the screen

6    here.  You see it on the screen?

7    A    Um-hum.

8    Q    You were asked the question by Mr. Harding:  And do you know

9    whether Shelton --

10            MR. MARTIN:  Objection, Your Honor.

11            THE COURT:  Overruled.

12   Q    You were asked a question by Mr. Harding:  And do you know

13   whether Shelton Harris was dealing drugs up in Park Heights?

14   Your answer:  I don't know but I figure if you're standing

15   outside all day around there, you ain't got to be a genius to put

16   that together, that they're doing something they don't have no

17   business doing.

18            You were then asked the question:  What street did he

19   used to stand out on?  Your answer:  Woodland.

20            You were asked the question:  Woodland Avenue?  And

21   your answer was:  Yes, sir.

22            Is that correct?

23   A    Yes.

24   Q    You were then asked another question about Willie Mitchell,

25   referred to as Bo.  Okay.  Question:  Okay.  What about Bo, where

1    did he deal his drugs?  Answer:  I don't know.  I know he be up

2    Park Heights sometimes.

3              Is that correct?

4    A    Correct.

5    Q    Now, there came a time, Ms. Smith, that Mr. Mitchell began

6    to spend some time in Pennsylvania, is that correct?

7    A    Yes.

8    Q    Did you become aware that at one point he got arrested up in

9    Pennsylvania?

10   A    Yes.

11   Q    Do you ever talk to Mr. Mitchell about how he was arrested

12   in Pennsylvania or what he got arrested doing?

13   A    Yes.

14   Q    What did Mr. Mitchell tell you about his arrest in

15   Pennsylvania?  Did he say that he got arrested in an apartment or

16   somewhere else?

17   A    He said he was dropping someone off.  He was using a

18   bathroom.  I don't know if it was an apartment or not.

19   Q    And he got arrested while he was dropping someone off?

20   A    Yes.

21   Q    Let me show you what has been marked as Government's Exhibit

22   PA-4.  This is a photocopy of a document.  It's not a great

23   photocopy so if you need me to walk it up to you, I'm happy to do

24   that.

25   A    I can see it.

DIRECT EXAMINATION OF JAQUETTA SMITH                    62

1    Q    Government's Exhibit PA-4 is a Western Union wire

2    transmittal receipt, is that correct?

3    A    Yes.

4    Q    I'm going to ask you a couple questions.  I'm going to try

5    to zoom in just a little bit, if I can.

6              MS. RHODES:  Objection, Your Honor.  Can we approach,

7    please?

8              THE COURT:  No.

9    Q    This document was shown to you when you appeared in the

10   grand jury, is that right?

11   A    Yes.

12   Q    It shows the sending of $800, is that right?

13   A    Yes.

14             MS. RHODES:  Objection.

15             THE COURT:  Overruled.

16             MS. RHODES:  Can I have a standing objection, Your

17   Honor, on this?

18             THE COURT:  Yes.

19   BY MR. HANLON:

20   Q    The receiver is identified as Willie Mitchell.  That's Bo,

21   is that correct?

22   A    Yes.

23   Q    Let me ask you about the sender of this money.  The sender

24   here is identified as Jaquetta Smith, as the person who sent

25   $800.  Do you see that?

1    A    I see that.

2    Q    Ma'am, during this period, and I'll show you the date --

3    well, I'm not sure I'm seeing the date.  Bu regardless of the

4    period, did you ever wire $800 to Mr. Mitchell?

5    A    No.

6    Q    You don't have any knowledge about how your name would have

7    come to be on this Western Union receipt, is that correct?

8    A    No.

9    Q    There's an address, sender's address of 1221, I may

10   mispronounce this, Etting Street or Eating Street?  Do you see

11   this?

12   A    Etting Street.

13   Q    E-T-T-I-N-G, is that right?

14   A    Yes.

15   Q    In Baltimore, Maryland.  Was that a residence that you were

16   using in 1999 or in 2000?

17   A    It was a residence where I lived at.

18   Q    And when was it that you lived at that residence?

19   A    '96 to, I want to say '99 maybe.

20   Q    Not in the year 2000?

21   A    No.

22   Q    And you have no knowledge about how your name would have

23   come to be on this document, is that correct, ma'am?

24   A    That's correct.

25   Q    Let me ask you about telephones for a few minutes, if that's

1    all right.  Directing your attention to 2002 or so.  Do you

2    remember if Mr. Mitchell, in 2002, before his arrest, had a

3    particular type of cell phone that he liked to use?

4    A    I can't remember.

5    Q    Do you know what a burner phone is?

6    A    I've heard of them, yeah.

7    Q    What's a burner phone?  What is your understanding of a

8    burner phone?

9    A    I guess the phone that you use for maybe a month and then

10   you throw it away.  It's not good any more.

11   Q    The type of phone you can actually buy in a store and it's

12   got minutes already preset on it?

13   A    Yes.

14   Q    So it doesn't necessarily get subscribed to a particular

15   name.  You just buy it.  It's got a hundred minutes, you use it

16   and then you toss it, is that correct?  You burn it out?

17   A    I guess.

18   Q    Did Mr. Mitchell in early 2002, before his arrest, ever use

19   a burner phone that you were aware of?

20   A    No.  The phone he was using was mine.

21   Q    There was a time that he actually began using your phone, is

22   that correct?

23   A    He had my phone.

24   Q    How was it that Mr. Mitchell had to begin using your phone

25   rather than his own phone?

1    A    I think he lost his cell phone.

2    Q    And you, do you have a recollection of what kind of a phone

3    it was that Mr. Mitchell lost or what the number was of that

4    phone?

5    A    No.

6    Q    If you wouldn't mind, just taking a look at, again, I'll put

7    it up on the screen, but your April, 2004 grand jury transcript.

8    I just want to ask a quick question.  You see that on the screen

9    in front of you?

10   A    Um-hum.

11   Q    You testified, you were asked this question, referencing

12   Page 15 of the April, 2004 grand jury transcript.  You were asked

13   the question, ma'am:  You testified last time that Mr. Mitchell

14   had a cell phone that got burnt out?

15   A    Um-hum.

16   Q    Your answer:  That's what they call them, burn-outs.  Like

17   cell phones that people cell with a chip in them.  I don't know

18   if when you use it then the bill is going to somebody else's bill

19   or something like that.  But they don't last long.  They stay on

20   for like maybe, I'd give them no more than two months.

21   A    Um-hum.

22   Q    Question:  Okay.  And you didn't remember the number that

23   was on the burnout cell phone of Bo's?  And your answer was no.

24   Is that correct?

25   A    That's correct.

1    Q    So did Mr. Mitchell have a burn, I may have used the word

2    burner, but did he have a burnout cell phone during 2002?

3    A    He may have.

4    Q    You ended up loaning him a phone of yours, is that correct?

5    A    That's correct.

6    Q    Do you recollect the phone number of the cell phone that you

7    loaned to Mr. Mitchell?

8    A    Do I remember what type of phone it was?

9    Q    The number.  I know it's several years ago.

10   A    I don't remember what the number is.

11   Q    Do you remember if the number was in your name?

12   A    Yes.

13   Q    Was it a T-Mobile phone?

14   A    No.

15   Q    It was not a T-Mobile phone?

16   A    No.

17   Q    Do you have any recollection of what the last four digits

18   were?

19   A    No.

20   Q    Of the phone?  Let me show you, ma'am, some records.  I'm

21   going to ask you about some phone numbers on the records.  I

22   don't have an expectation you're going to be able to identify

23   this phone number or the records or anything like that.  But I do

24   want to show you these records and ask you about some phone

25   numbers on them, if that's all right.

1          This is Government's Exhibit -- sorry -- T-1.

2     Government's Exhibit T-1.  Just for purposes, as an aid for

3     today, Ms. Smith.  These are toll records for a phone bearing the

4     call number 443-739-5811.  Do you see that?

5     A    Yes.

6     Q    You were shown phone records like these during your grand

7     jury appearance in April of 2004, is that right?

8     A    Yes.

9     Q    And these particular records, understanding you're not from

10    T-Mobile, but just for the jury's information, these are records

11    from a T-Mobile phone, is that correct?

12    A    That's what it says.

13    Q    That's what it says.  Let me show you or ask you about a few

14    of the particular phone numbers on this record, if you can bear

15    with me.  Do you see those numbers in front of you?

16    A    Yes.

17    Q    Let me ask you about the number 410-644-7685 that I've

18    circled.

19          MR. MARTIN:  664.

20    Q    I'm sorry.  410-664-7685.  Thank you, Mr. Martin.  Do you

21    see the number I've circled there, Ms. Smith?

22    A    Yes.

23    Q    Do you recognize that phone number that appears on these

24    phone records?

25    A    Yes.

1    Q    And whose phone number is that, do you know?

2    A    Bo's aunt.

3    Q    Now, Bo's aunt, was there a lady that she lived with named

4    Rochelle Bass that you knew?

5    A    That is his aunt.

6    Q    That is the aunt.  I apologize.  So Bo's aunt's name is

7    Rochelle Bass, and that's her phone number ending in 7685?

8    A    Yes.

9    Q    Let me ask you --

10        THE COURT:  You did it again, Mr. Hanlon.

11   Q    What did I do, Your Honor.

12        THE COURT:  It's 7685.  I think you said 7865.

13   Q    I have a tendency to do that, Your Honor.  410-664-7685.

14   I'll probably do it again.  I'll try to be careful.

15        Let me ask you about 410-655-4247.  410-655-4247.  Do

16   you see that number that I've circled?

17   A    Yes.

18   Q    Do you recognize that number?

19   A    Yes.

20   Q    And whose number is that?

21   A    That's the number to Bo's sister's salon.

22   Q    Bo, Mr. Mitchell's sister worked at or --

23   A    She owns a beauty salon.

24   Q    Owned a beauty salon?

25   A    Um-hum.

DIRECT EXAMINATION OF JAQUETTA SMITH                    69

1    Q    That's the number for the salon?

2    A    Yes.

3    Q    Let me ask you about 410-254-5743.  Do you see that number?

4    A    Yes.

5    Q    And can you tell me if you recognize that number?

6    A    That's my mother's number, or her old number.

7    Q    Was this her number in 2002 that I've asked?

8    A    Yes.

9    Q    Bear with me, Your Honor.

10        THE COURT:  Yes.

11   Q    This number here, Ms. Smith.  Area code 443-394-2429.  Do

12   you recognize that number?

13   A    It looks like my old work phone number.

14   Q    In 2002 or thereabouts, where was it that you were working

15   that this number looks familiar for?

16   A    Global Payments.

17   Q    What did you do for Global Payments?

18   A    Research analyst.

19   Q    Here's a number I've circled, Ms. Smith.  It bears the call

20   number 410-542-5446.  Do you recognize that number?

21   A    It looks familiar.

22   Q    Do you have a recollection of whose number that was?

23   A    No.

24   Q    Do you have your transcript from the April, 2004 grand jury

25   appearance in front of you?  If you wouldn't mind flipping to

1    Page 16 of the transcript.  Line 22 on Page 16.  Let me know when

2    you're there, Ms. Smith.

3    A    Um-hum.

4    Q    Line 22.  Take a look at that.  Tell me if that refreshes

5    your recollection about this number, 410-542-5446.

6    A    Yes.  It states that I said that was his aunt's.

7          THE COURT:  I'm sorry.  Speak directly --

8    A    Said it states -- excuse me?

9          THE COURT:  Speak directly into the microphone.

10   A    It states that I said that's his Aunt Melva's number.

11   Q    Aunt Melva's number?

12   A    Yes.

13   Q    And is that correct, to the best of your recollection?

14   A    I guess that's what it was back then.

15   Q    Another phone number, Ms. Smith.  Area code 410-484-1475.

16   You were also shown this phone number in the grand jury, is that

17   correct?

18   A    Yes.

19   Q    And at that time, in 2002, did you indicate that it looked

20   familiar?

21   A    Yeah.  It looks familiar.

22   Q    You didn't indicate in the grand jury that you could

23   specifically remember whose number it was, but it looked

24   familiar, is that correct?

25   A    I don't remember.

DIRECT EXAMINATION OF JAQUETTA SMITH                71

1    Q    One more.  This number that I've circled, area code

2    410-325-5398.  Do you see that number?

3    A    Yes.

4    Q    Do you recognize that number?

5    A    I don't know.

6    Q    Not sure about that one?

7    A    No, I'm not sure.

8    Q    You still have your grand jury transcript in front of you

9    from that April appearance?

10   A    Yes.

11   Q    Take a look at Page 17.  I think it's the next page over.

12   Line 6.  Tell me if that refreshes your recollection about

13   410-325-5398.  Line 6 on Page 17.

14   A    Yeah.  I said that was my father's number.

15   Q    Does that sound correct, that it was your father's number?

16   A    If that's what it was at the time.

17   Q    Now, at some point Mr. Mitchell began using your cell phone,

18   is that correct?

19   A    Yes.

20   Q    And you've indicated here today that you don't have a

21   recollection specifically of what the phone number was on that

22   phone of yours that he started using, is that correct?

23   A    Correct.

24   Q    Let me ask you about the last four digits of it.  Do the

25   last four digits, 3607, sound familiar?

1    A    I don't know.  That was six years ago.  I don't know.

2    Q    That's understandable.  That's understandable.  Let me show

3    you, just to put this in.  Again, Page 17 of your grand jury

4    transcript.  Page 17 of the transcript.  Do you see it on the

5    screen, ma'am?

6    A    Yes.

7    Q    You were asked the question here.  You said that this was

8    the phone that Bo was using just before he started using your

9    cell phone.  If I can reference.  It sounds like you were being

10   asked here about the burnout phone that Mr. Mitchell had been

11   using, is that correct, before he started using your cell phone

12   which you had?  And the last time I think you said the number was

13   443.  And then you gave an answer:  I'm not sure if it was.  I

14   know the last digits were 3607 but I'm not sure if it's 443-742

15   or 734.  It was something like that.  I'm not sure.

16             And then another question.  Okay.  Anyway, the last

17   four digits were 3607, is that right?  And you indicated yes, is

18   that right?

19   A    That's what it says on here.

20   Q    So at least in the grand jury your recollection was that the

21   last four digits on your cell phone that you loaned to Mr. Bo,

22   I'm sorry, to Mr. Mitchell were ending in 3607, is that right?

23   A    That's what it says.

24   Q    Now, Ms. Smith, did there come a time when you became aware

25   that Mr. Mitchell had been involved, had been present at a party

1    at a place called Hammerjacks?

2    A    Yes.

3    Q    And did Mr. Mitchell end up getting hurt and going to the

4    hospital?

5    A    Yes.

6    Q    Did you visit him at the hospital?

7    A    The hospital called me.

8    Q    And you went down to see him?

9    A    Yes.

10   Q    And would this have been in February of 2002?

11   A    Yes.

12   Q    And at some point, did you have any conversation with Mr.

13   Mitchell in which he described to you what had happened at

14   Hammerjacks?

15   A    Yes.

16   Q    What did Mr. Mitchell tell you about what had happened at

17   Hammerjacks?

18   A    A fight broke out.  Somebody hit him in the head with a

19   bottle.

20   Q    Did Mr. Mitchell use any names with respect to who was

21   involved or who might have hit him in the head with the bottle?

22   A    White Boy.

23   Q    Did Mr. Mitchell say whether or not he, Mr. Mitchell, had

24   any friends with him when this fight broke out at Hammerjacks?

25   A    He was with his cousin.

DIRECT EXAMINATION OF JAQUETTA SMITH                    74

1   Q    And what was Mr. Mitchell's cousin's name that he was with

2   at Hammerjacks?

3   A    Donte.

4   Q    Donte Sands?

5   A    Yes.

6   Q    Now, after that had happened, at any time did Mr. Mitchell

7   ever tell you whether or not he had any additional problems as a

8   result of what happened at Hammerjacks?

9   A    Yes.

10  Q    What did Mr. Mitchell tell you was going on as a result of

11  what happened at Hammerjacks?

12  A    Well, because he was, he, I guess he beat the person up,

13  that they wanted to do some bodily harm to him.

14  Q    Is this what Mr. Mitchell told you?

15  A    Yes.

16  Q    Did Mr. Mitchell tell you who it was that wanted to do

17  bodily harm to him?

18  A    I don't remember.

19  Q    Did Mr. Mitchell tell you that a contract had been put out

20  on him?

21  A    I don't remember him telling me but I've heard that it was

22  put out on him.

23  Q    Did Mr. Mitchell tell you, this is a related question, did

24  Mr. Mitchell tell you if anyone in particular put out a contract

25  on him?

1    A    I don't remember.

2    Q    Did Mr. Mitchell tell you who was going to do bodily harm to

3    him or who had picked up any contract on him?

4    A    May have been the person that he was fighting in the club.

5    Q    Were there any names that you got from Mr. Mitchell?

6    A    White Boy and Goodie.

7    Q    White Boy and Goodie?

8    A    Yes.

9    Q    Did Mr. Mitchell ever tell you specifically who White Boy

10   and Goodie were going to have do something to him?

11   A    No.

12   Q    Referencing your April 28th, 2004 grand jury testimony, Page

13   12.  You see that on the screen in front of you?

14   A    Yes.

15   Q    You were asked a series of questions by Mr. Harding, again

16   under oath.

17        Question: Okay.  And then you were telling us about how

18   the dudes that Bo got into a fight with put out a contract on

19   him.  Your answer was:  Yes.

20        Question:  You found that out later, is that right?

21   And your answer was yes.

22        Have I read your sworn testimony correctly so far?

23   A    Yes.

24   Q    Moving on to Page 13.  Okay.  And it was Bo that told you

25   about that?  And your answer was yes, is that correct?

1    A    Um-hum.

2    Q    Question:  And he also told you that Woodie picked up that

3    contract, is that right?  And your answer was yes.

4         Question:  And who is Woody?  Answer:  It's somebody

5    that he knew, he met through Desi.  I don't know Desi's real

6    name.

7         Was that your testimony in the grand jury, ma'am?

8    A    Yes.

9    Q    This individual that Mr. Mitchell told you picked up the

10   contract, Woody, did you know Woody by any other names?

11   A    No.

12   Q    Did you ever hear the name Oliver McCaffity?

13   A    No.

14   Q    This individual, Woody, did actually at one point visit Mr.

15   Mitchell and Mr. Mitchell was recuperating from, by getting hurt

16   at Hammerjacks?

17   A    Yes.

18   Q    And you were present when that visit happened?

19   A    No.

20   Q    How did you learn about it?

21   A    I think Bo's mother told me.

22   Q    Let me ask you about a date that you were about in the grand

23   jury, March the 24th of 2002.  Around about a time when you were

24   getting ready to move.

25   A    Yes.

1   Q    From one residence to the other.  Do you remember that, Ms.

2   Smith?

3   A    Yes.

4   Q    This particular evening, March 24th of 2002, where were you

5   living at that time?

6   A    Gilray Drive.

7   Q    Is that in Baltimore City?

8   A    Yes.

9   Q    Could you spell the drive for us, for the court reporter?

10  A    G-I-L-R-A-Y.

11  Q    And you were getting ready to move somewhere else.  Where

12  was that?

13  A    We were moving to, I think it's Valdivia Court in Baltimore

14  County.

15  Q    You were residing with Mr. Mitchell at that time, is that

16  right?

17  A    Yes.

18  Q    And you were going to continue to reside with him, to live

19  with him when you moved to Valdivia Court, is that right?

20  A    Yes.

21  Q    On this particular evening, March 24th of '02, what time did

22  you go to bed around?

23  A    I don't remember.

24  Q    Do you recollect if Mr. Mitchell was at home that night?

25  A    Yes.

1  Q    Do you remember if he was still up when you went to sleep

2  that evening?

3  A    I don't remember.

4  Q    Once again your April 28th, 2004 grand jury transcript, Ms.

5  Smith.  If you would indulge me one more time.  I'm at Page 17

6  for counsel.  And I'm putting up on the screen as well.

7       You were asked a question, again under oath before the

8  grand jury, in April of 2004, Question:  Okay.  Let me call your

9  attention to March 24th, 2002.  That was the night, you told us

10  downstairs that was the night that you were packing your stuff to

11  move, is that right?  And you said yes, sir.

12       And then flipping over to Page 18.  It was a Sunday

13  night?  Your answer was yes.

14       Question:  And so Bo was using your cell phone at that

15  time, is that right?  And your answer was yes.

16       And then your question:  And he came home that night

17  during the time period when you were packing, is that right?  And

18  your answer, yes.

19       Question:  What time was that?  Your answer, it had to

20  be between 9:00 and 9:30.

21       Question:  And then you went to bed at some point, is

22  that right?  Your answer:  Yes.  I went to bed, I would say,

23  around 11:00.

24       Question:  Okay.  Was Bo still up when you went to bed?

25  Answer:  Yes, he was playing Play Station.

1          Question:  Okay.  Now, was he supposed to meet somebody

2     that night, do you know?  Answer:  No, not to my knowledge.

3          Question:  Okay.  You told us that you did, in fact,

4     move the next day, is that right?  And the answer was yes.

5          Is that, in fact, correct, you did move the next day?

6     A    Yes.

7     Q    So going to bed around 11:00, is that correct?

8     A    You asked me in 2004.  It's 2008.  So yes, at that time,

9     yes.

10    Q    Perfectly fair.  And Mr. Mitchell was still up when you went

11    to bed that night, is that correct?

12    A    Yes.

13    Q    Now, at some point were you present with Mr. Mitchell when

14    he got arrested by the police?

15    A    Yes.

16    Q    When, approximately when was that?  Was it in 2002?

17    A    Yes.

18    Q    And what were you doing with Mr. Mitchell when he got

19    arrested by the police?

20    A    I was driving.  We were on our way to a funeral.

21    Q    Whose funeral were you going to?

22    A    Pete and Darryl.

23    Q    Is that Pete and Darryl Wyche?

24    A    Yes.

25    Q    Who were Pete and Darryl Wyche?  Were these people you knew?

1    A    They were friends of ours.

2    Q    How long had you known Pete and Darryl Wyche?

3    A    I knew Pete from school.  And I met his brother, him and Bo

4    were friends.

5    Q    That was going to be my next question.  Pete and Darryl

6    were, in fact, brothers, is that right?

7    A    Correct.

8    Q    And they were both friends with Mr. Mitchell?

9    A    Yes.

10   Q    Did Mr. Mitchell and Darryl and Pete Wyche ever do any kind

11   of business together that you were aware of?

12   A    Not that I'm aware of.  I mean, they were friends.

13   Q    We talked a little while about hanging out in Park Heights

14   and on the street.  Did you know whether or not Mr. Mitchell ever

15   spent any time out on the street with the Wyche brothers in any

16   way, doing anything with them?  Hanging out or any other reason?

17   A    I know he was friends and he was friends with Darryl.

18   Q    So you're on the way to the funeral for the Wyche brothers

19   on this particular day, is that right?

20   A    Yes.

21   Q    What car were you driving?

22   A    My car.

23   Q    And were you actually driving?

24   A    Yes.

25   Q    Mr. Mitchell in the car with you?

DIRECT EXAMINATION OF JAQUETTA SMITH                    81

1   A    Yes.

2   Q    Was there anybody else in the car?

3   A    No.

4   Q    Did the police stop you?

5   A    I didn't know they were police at the time, but yeah.

6   Q    Somebody stopped you?

7   A    Yes.

8   Q    Were there flashing lights?

9   A    No.

10  Q    Did you see Mr. Mitchell get taken under arrest?

11  A    Yes.

12  Q    At some point the people that were arresting him, you became

13  aware that they were police officers?

14  A    Well, once they got out the car, after she showed their

15  guns, then yes.

16  Q    And at some point did some of the officers actually do a

17  search of your car?

18  A    Yes.

19  Q    What kind of a car was it, by the way, Ms. Smith?

20  A    Nissan Ultima.

21  Q    Did you actually see the search happening?

22  A    Yes.

23  Q    And did you see if the police got anything from under the

24  driver's seat of your Nissan Ultima?

25  A    Yes.

DIRECT EXAMINATION OF JAQUETTA SMITH                82

1   Q     What did they find under the driver's seat?

2   A     A gun.

3   Q     Had you ever seen this gun before?

4   A     No.

5   Q     Have you ever, in your life, at that point owned a gun?

6   A     No.

7   Q     Do you have any idea how that gun came to be there?

8   A     No.

9   Q     Did you know personally whether the gun was loaded or

10  anything about the gun?

11  A     No.

12  Q     Do you remember, sitting here today, what type of a gun it

13  was?  Semiautomatic, revolver, anything?

14  A     I don't know.

15  Q     You saw it.  It was, in fact, a gun, is that right?

16  A     Yes.

17  Q     Did you ever talk to Mr. Mitchell about this gun, about

18  whether the gun was his?

19  A     No.

20  Q     Did you ever talk to Mr. Mitchell about why he would have a

21  gun?

22  A     No.

23  Q     You never had any conversation with Mr. Mitchell about

24  owning a gun or reasons he would have for owning a gun?

25  A     Not that I remember, no.

1   Q    I'm going to flip to the other grand jury transcript.  We've

2   been looking at the April transcript for a while.  I'm going to

3   ask you to take a look at your March grand jury transcript.

4   That's the other one, Ms. Smith.  And I will put it on the

5   screen.

6        Page 8 of the March transcript.  Beginning up here.

7   You were asked a question, Ms. Smith:  Did you ask him, when the

8   police got the gun, you must have asked him how come he had that

9   gun?  Do you see the question?

10  A    Yes.

11  Q    The him that you're being asked about here was Mr. Mitchell,

12  is that correct?

13  A    Yes.

14  Q    And in fact just to clarify that, I should start a little

15  earlier.  You're asked a question at the very top of Page Eight

16  of your March transcript.  Okay.  Had you ever seen Willie

17  Mitchell with a gun before that?  Your answer was:  No, I've

18  heard that he carried it but I've never seen him with one, no.

19       Then the question, which I'll repeat.  Did you ask him,

20  when the police got the gun, you must have asked him how come he

21  had that gun?  Your answer:  I asked him when I went to see him

22  and he told me because of the fight that he got into at the club

23  on February 18th there was a hit, well, a contract put out for

24  his life.

25       Then you're asked a question:  Okay.  And what was the

1    name of the club where he got into a fight on February the 18th?

2    And your answer:  Hammerjacks.  And it goes on to ask you about

3    how you came to know about the Hammerjacks fight.

4              Have I read your testimony correctly?

5    A    Yes.

6    Q    Now, this arrest in 2002, is this the point at which Mr.

7    Mitchell got incarcerated that we talked about at the beginning

8    of your testimony today?

9    A    Yes.

10   Q    After Mr. Mitchell got arrested, did you hear from Mr.

11   Martin or Mr. Gardner or Mr. Harris, did they come out to check

12   after you and see how you were doing?

13   A    Yes.  They came and checked on me and the boys.

14   Q    All three of them?

15   A    Not all at the same time.

16   Q    But various points?

17   A    Yes.

18   Q    But all three of them at one time or another?

19   A    Yes.

20   Q    We talked at the beginning of your testimony today, Ms.

21   Smith, about the fact that you were not interested in speaking

22   with us.  And you and I have never actually talked at all, with

23   the exception of asking you to come to court, aside from the

24   conversation we've been having in court today, is that correct?

25   A    That's correct.

1    Q    By way of clarification.  I asked about whether or not the

2    individual, Woody, ever visited Mr. Mitchell while he was

3    recuperating.  And just to be clear, do you know if Woody ever

4    visited Mr. Mitchell at the hospital or was it their visit at

5    home, after Mr. Mitchell got out of the hospital?

6    A    It was at Mr. Mitchell's mother's house after he got out of

7    the hospital.

8    Q    Nothing further, Your Honor.

9         THE COURT:  Would you like some water, Ms. Smith?

10        THE WITNESS:  No, I'm fine.

11        CROSS EXAMINATION

12   BY MS. RHODES:

13   Q    Good morning, Ms. Smith.

14   A    Good morning.

15   Q    My name is Laura Kelsey Rhodes and I'm representing Willie

16   Mitchell.  I'm going to ask you some questions now for a while.

17        You've never spoken before with Mr. Hanlon, is that

18   right?

19   A    That's correct.

20   Q    Okay.  Have you ever spoken before today with any of the

21   defense attorneys here?

22   A    No.

23   Q    Okay.  You and Willie were together for quite a while,

24   weren't you?

25   A    Yes.

1    Q    And you mentioned that you have a child together?

2    A    Yes.

3    Q    And you have another child as well, don't you?

4    A    Yes.

5    Q    And how old is he?

6    A    He's 12.

7    Q    Okay.  And who has been raising him with you?

8    A    Mr. Mitchell.

9    Q    Okay.  So he's raised both the boys with you?

10   A    Yes.

11   Q    And you said that he got locked up in April of 2002, is that

12   right?

13   A    Yes.

14   Q    And since then, you two were together for a few more years?

15   A    Yes.

16   Q    Okay.  But you no longer are together?

17   A    No.

18   Q    Okay.  Is he still in touch with the boys?

19   A    Yes.

20   Q    Okay.  And how does he stay in touch with them?

21   A    By phone, and I take them to see him.

22   Q    Okay.  You talked a lot about -- I know it's hard to

23   remember your testimony from before because it was many years ago

24   and it can be hard -- is it hard for you to remember some of the

25   incidents that happened back in 2002 and before then as well?

1    A    Yes.

2    Q    For example, you said that you didn't know for a time that

3    there was supposedly a contract out on Willie, right?

4    A    Right.

5    Q    Okay.  You heard about it at some point from people on the

6    street, right?

7    A    Yes.

8    Q    Okay.  And that was what, some rumors that were out there?

9    A    Yes.

10   Q    And same thing with the gun.  The gun, you didn't know,

11   you'd never seen him carry a gun, right?

12   A    No.

13   Q    But you heard on the street that he carried one?

14   A    Yes.

15   Q    And that was what rumors were?

16   A    Yes.

17   Q    Okay.  And some of them were true and some of them aren't,

18   right?

19   A    Correct.

20   Q    And you also, you eventually learned about the Hammerjacks

21   fight, but not directly from Mr. Mitchell, right?

22   A    I learned about the fight because the hospital called me

23   after the fight.

24   Q    Okay.  And you went there that night?

25   A    Yes.

1   Q    Okay.  And you eventually learned about the contract from

2   Mr. Mitchell later on, right?

3   A    Yes.

4   Q    Okay.  And that was when you went to see him at jail?

5   A    Yes.

6   Q    And that was after he'd gotten arrested?

7   A    Yes.

8   Q    Okay.  And did you ask him why he had had the gun on him

9   that day?

10  A    Yes.

11  Q    And did he tell you that it was because he was worried about

12  the contract?

13  A    Yes.

14  Q    And that's when you learned from him about the contract?

15  A    Yes.

16  Q    Okay.  Did it surprise you that he was carrying the gun in

17  the car with you?

18  A    Yes.

19  Q    Okay.  And let me jump to another event, then, the drug

20  dealing in Pennsylvania.  You didn't know for a fact what he was

21  doing in Pennsylvania, right?

22  A    Right.

23  Q    Okay.  Did he keep that stuff, that behavior from you?

24  A    Yes.

25  Q    Okay.  Is that why you were surprised that he had the gun in

1    the car with you?

2    A    Yes.

3    Q    Okay.  And you would not have expected him to bring that,

4    whether it was drugs or guns, into the home?

5    A    Right.

6    Q    You would not have expected him to do that where you and the

7    boys were?

8    A    Right.

9    Q    And was that his practice, that those things did not come

10   into the home?

11   A    Yes.

12   Q    Okay.  And you didn't question him about everything he was

13   doing, did you?

14   A    No.

15   Q    You didn't really want to know, did you?

16   A    No.

17   Q    When he went to Hickey, he went there two times, right?

18   A    Yes.

19   Q    And they were for charges he got?

20   A    Yes.

21   Q    Both times?  And then later, you were aware that he worked

22   there, right?

23   A    Yes.

24   Q    Okay.  When he came back from working there, he had met

25   somebody.  He told you about some, some of the kids that were

1    there that he had worked with, right?

2    A    Yes.

3    Q    Okay.  And a couple of them who were good rappers, right?

4    A    Yes.

5    Q    And one of them was, was Mr. Harris?

6    A    Yes.

7    Q    And he saw some talent in Mr. Harris?

8    A    Yes.

9    Q    Okay.  And was that, was that when he first started

10   mentioning the rap business to you, when Willie first mentioned

11   that to you?

12   A    Yes.

13   Q    And what did he tell you about it in terms of what he wanted

14   to do?

15   A    He wanted to start his own record label.  He was excited

16   about it.  And that's basically what he did.  He put his

17   everything in it.

18   Q    He put his everything in it?

19   A    Yes.

20   Q    And he worked hard at it?

21   A    Yes.

22   Q    And that was his dream?

23   A    Yes.

24   Q    When you learned about, when you learned about the rumor

25   there was a hit out on him, and when he told you about it, did

1    you think back to how he'd been behaving?

2    A    No.

3    Q    Okay.  Had he, during that time, did he move out of the

4    house?

5    A    No.  The only time he was away from the house is after the

6    fight he had.  He stayed with his mom.

7    Q    Okay.  Did he -- all right.  And how long did he stay with

8    his mom?  Until he got better?

9    A    Yes.

10   Q    Okay.  All right.  Thank you.  Now, you mentioned that back

11   when you were in school you knew Goo and Wayne, right?

12   A    Yes.

13   Q    And that you also knew that even way back then they did some

14   drug dealing, right?

15   A    No.

16   Q    Okay.  Well, you had said that in the grand jury, hadn't

17   you, that you knew they did some deals together and stuff?

18   A    I may have said it but I never had proof of it.

19   Q    Well, Willie wasn't doing stuff with them back then, was he?

20   A    Not really.

21   Q    Okay.  I mean, he wasn't dealing drugs with them back then?

22   Is that right, he was not?

23   A    No.

24   Q    Okay.  And when Wayne and Goo were dealing back in Poplar

25   Grove, which is West Baltimore, Willie wasn't doing that with

1    them then, was he?

2    A    No.

3    Q    Now, after he had got back from working at Hickey and was

4    interested in the rap business, did he begin to work on that with

5    Mr. Harris?

6    A    Yes.

7    Q    And what sorts of things did they do to begin that business

8    together?

9    A    They promoted.  They went to, I guess, rap battles, if

10   that's what you call it.

11   Q    What's a rap battle?

12   A    Different artists, freestyle.

13   Q    A contest?

14   A    Yes.

15   Q    Did you ever go to hear them do that?

16   A    I only went to one of their shows.

17   Q    And where was that?

18   A    Downtown.  Not sure.  I want to say Five Seasons but I'm not

19   sure.

20   Q    That's a club, Five Seasons?

21   A    Yes.

22   Q    And what else did they do to get their business going?

23   A    I mean, they made demo tapes.  That's about it.  Made demo

24   tapes and stuff like that.

25   Q    Demo tapes.  And did they go on the radio?

1    A    I'm not sure if they went on the radio or not.

2    Q    Did they ever do any contests at the Heritage Club?  Do you

3    remember that?

4    A    Yes.

5    Q    Okay.  And what about, there's a radio show called 92 Q.

6    Does that ring a bell?

7    A    Yes.

8    Q    And what else did they do to, to produce their music and to

9    get it known?

10   A    I can't remember.

11   Q    Okay.  So have you heard some of their CD's?

12   A    I listened to one of them.

13   Q    Okay.  Did you like it?

14   A    It was all right.

15   Q    Okay.  Do you like gangsta rap?

16   A    Some of it.

17   Q    Okay.  When you, when you came down here to testify at the

18   grand jury -- well, let me back up a second.  Are you comfortable

19   being here today?

20   A    No.

21   Q    Okay.  It's a pretty awful situation for you, isn't it?

22   A    Yes.

23   Q    Because the person you were with for a long time, who's

24   helped you raise the boys, is on trial, right?

25   A    Correct.

1    Q    And it makes you very nervous knowing that something you say

2    may hurt their case, right?

3    A    Yes.

4    Q    And could well help the government's case, right?

5    A    Right.

6    Q    And that's a pretty miserable situation for you to have to

7    be in today?

8    A    Yes.

9    Q    And is that why you've avoided talking to anybody about the

10   case before today?

11   A    Yes.

12   Q    Does it make you sad to be here today?

13   A    Yes.

14   Q    When you came down before, you were asked by a detective,

15   Detective Giganti and some others, and the prosecutors, to listen

16   to a --

17           MR. MARTIN:  Objection.

18           THE COURT:  Who objected?

19           MR. MARTIN:  I did.

20           THE COURT:  The objection is sustained.

21           MS. RHODES:  As to the entire area, Your Honor?

22           THE COURT:  It would appear so.

23           MS. RHODES:  Okay.

24           THE COURT:  I mean, you can test it a little if you

25   want.

1    BY MS. RHODES:

2    Q    All right.  Were you asked to listen to a tape when you came

3    down to testify before?

4    A    Yes.

5    Q    Okay.  And did you, after you listened to that, were you

6    asked to testify about it at the grand jury?

7    A    Yes.

8    Q    Okay.  And they played the tape for you, is that right?

9    A    Yes.

10   Q    And they wanted you to see if you could identify any of the

11   voices on that tape, is that right?

12   A    Yes.

13   Q    And you were -- at the time they told you who they thought

14   might be on that tape, is that right?

15   A    They mentioned a name, yes.

16   Q    Okay.  And did they say, we think this may be Rock on here,

17   can you tell us if you recognize the voice, or something to that

18   effect?

19   A    Yes.

20   Q    Okay.  And you then listened to it, is that right?

21   A    Yes.

22         MR. MARTIN:  Objection, Your Honor, unless we're going

23   to play it.

24         THE COURT:  Overruled.  Go ahead.

25   BY MS. RHODES:

1    Q    And you listened to that tape, right?

2    A    Yes.

3    Q    And you said that there was, when they asked you, Is this

4    Rock, you said, That voice sounds like his?

5    A    Yes.

6    Q    Right?  But you did not say, I'm sure that's him, right?

7    A    Correct.

8    Q    And you did not identify Mr. Mitchell's voice on that tape,

9    did you?

10   A    No.

11   Q    And you did not identify Mr. Martin's voice on that tape,

12   did you?

13   A    No.

14   Q    And you did not identify Mr. Gardner's voice on that tape,

15   did you?

16   A    No.

17   Q    Okay.  And you know Mr. Mitchell's voice, don't you?

18   A    Yes.

19   Q    And you know Wayne and Goo's voices, too, don't you?

20   A    Yes.

21   Q    Court's indulgence.

22        (Pause in proceedings.)

23   Q    One of the rumors you had heard earlier was that this hit

24   might be from the people who had had the fight with Willie at the

25   club, right?

1    A    Yes.

2    Q    And that would be the Rice, people in the Rice organization?

3    A    Yes.

4    Q    Okay.  And you knew them as Howie Rice, is that right?

5    A    Yes.

6    Q    And Raeshio Rice?  And the guy named White Boy, right?

7    A    Yes.

8    Q    Okay.  So that night of -- one last matter.  You mentioned

9    to the prosecutor that that night you were packing to move, that

10   you and he, he refreshed your memory with that part of the

11   transcript from the grand jury, that you were packing up that

12   night, right?

13   A    Yes.

14   Q    And you recalled, back when you testified that you had gone

15   to bed around 11, right?

16   A    Yes.

17   Q    And as far as you know, he didn't have any appointment that

18   evening, right?

19   A    Right.

20   Q    And you did not hear him leave after you went to bed, did

21   you?

22   A    No.

23   Q    Nothing further, Your Honor.

24        THE COURT:  Wait your turn, Mr. Crowe.

25        CROSS EXAMINATION

1    BY MR. MARTIN:

2    Q    Thank you, Ms. Smith.  Ms. Smith, my name's Gerry Martin and

3    I represent Mr. Shelton Harris.  You testified a little while ago

4    that after Mr. Mitchell was arrested, I think you said Mr.

5    Gardner and Mr. Martin came to see you?

6    A    Yes.

7    Q    And offered you help, whatever help you might need, is that

8    right?

9    A    Yes.

10   Q    Did you say that Mr. Harris came to see you as well?

11   A    He didn't come.  He called.

12   Q    He called.  All right.  So he did not come with Mr. Martin

13   and Mr. Gardner, did he?

14   A    No.

15   Q    Did you ever know him to hang out with Mr. Martin and Mr.

16   Gardner?

17   A    No.

18   Q    Now, you were asked just a few minutes ago about this tape

19   that you listened to?

20   A    Yes.

21   Q    And did I understand you to say that before you listened to

22   it, they told you who it was they thought was on the tape?

23   A    Yes.

24   Q    And then you, what you said was, It sounds like Mr. Harris?

25   A    Yes.

1    Q    Now, you've known Mr. Gardner and you've known Mr. Martin

2    since you were in ninth grade, correct?

3    A    Yes.

4    Q    And you've known Mr. Mitchell at least since ninth grade?

5    A    Yes.

6    Q    So you know them far better than you know Mr. Harris, don't

7    you?

8    A    Yes.

9    Q    And you've listened to their voices for many more years than

10   you've ever listened to Mr. Harris's voice, isn't that right?

11   A    Yes.

12   Q    So it's fair to say, isn't it, that Mr. Harris's voice is

13   the one whose voice you would least be able to identify out of

14   that group?

15   A    Yes.

16   Q    Is that fair?

17   A    Yes.

18   Q    And if the people who had you listen to that tape hadn't

19   suggested to you that that was Mr. Harris, would you have

20   identified him?

21   A    No.

22   Q    Thank you.  Excuse me, Your Honor.  I have one more

23   question.

24        THE COURT:  All right.

25   Q    When, when you received a call from the hospital that Mr.

1   Mitchell was in the hospital that night after the Hammerjacks

2   incident --

3   A    Yes.

4   Q    -- you went to see him, isn't that right?

5   A    I went to the hospital that night.

6   Q    And he was very drunk, wasn't he?

7   A    Mr. Mitchell?

8   Q    Yes.

9   A    Yes.

10  Q    Thank you.

11          CROSS EXAMINATION

12  BY MR. CROWE:

13  Q    Good morning, Ms. Smith.  My name is Tom Crowe and I

14  represent Shelly Martin, along with Jim Pyne.  Ms. Rhodes already

15  asked you this, but this is the first time you've talked to

16  either me or Mr. Pyne, is that correct?

17  A    Yes.

18  Q    I want to get a couple of dates straight, if I can.  You've

19  indicated that you met my client originally when the two of you

20  were in eighth grade together, is that correct?

21  A    Mr. Mitchell I met eighth grade.  I met your client in ninth

22  grade.

23  Q    My client was a year ahead, in ninth grade?

24  A    Yes.

25  Q    And you also met Mr. Gardner at about that time, is that

Case 1:04-cr-00029-RDB   Document 676   Filed 06/08/09   Page 101 of 291

1    correct?

2    A    Yes.

3    Q    Where did you go to high school?

4    A    Randallstown.

5    Q    And at that time was Randallstown, that was a four year high

6    school, freshman, sophomore, junior, and senior year?

7    A    Yes.

8    Q    And you dropped out in your senior year, in 1997?

9    A    '96.

10   Q    '96.  Is it true that Mr. Martin never went to high school

11   in Randallstown?

12   A    True.

13   Q    And is that because his family moved into Baltimore City

14   roughly 1991?

15   A    I'm not sure.

16   Q    You're not sure.  But he never went to Randallstown High

17   School; you are sure of that?

18   A    Yes.

19   Q    And is it also correct that you had only seen Mr. Martin

20   occasionally in the Randallstown area after he moved into

21   Baltimore City?

22   A    Yes.

23   Q    Certainly didn't see him every day?

24   A    No.

25   Q    Wouldn't see him every week?

1   A    No.  He just came like maybe a party or something that was

2   at the school, something like that.

3   Q    Just old friends getting back together again, is that

4   correct?

5   A    Yes.

6   Q    Now, my understanding is that for a period of time Mr.

7   Mitchell was, spent two periods where he was living at the Hickey

8   school, is that correct?

9   A    Yes.

10  Q    And that after that time, that he went to college first at,

11  I think you said it was Nassau, which I guess is a community

12  college in New Jersey?

13  A    In New York.

14  Q    In New York.  And then to Bryant College, which is a four

15  year college in Rhode Island?

16  A    Yes.

17  Q    And he went there on football scholarships, is that correct?

18  A    Yes.

19  Q    And during the period of time that he was out of town or

20  that he was at least not living in Baltimore or Baltimore County,

21  you very rarely saw Mr. Martin, is that correct?

22  A    Correct.

23  Q    And did you ever hear that Mr. Martin had ever gone to visit

24  Mr. Mitchell at either of those colleges?

25  A    No.

1    Q    And my understanding is that what Mr. Mitchell would do is

2    that when he would come home, either for breaks during college or

3    for summer recess, that he would, he would live with you, is that

4    right?

5    A    Yes.

6    Q    And is it correct that you were living with your mother at

7    that time?

8    A    Yes.

9    Q    Now, so that we understand, have you been employed

10   essentially full-time since you dropped, since you dropped out of

11   Randallstown in 1996?

12   A    Yes.

13   Q    I mean, you've been a 9 to 5 worker, wage earner, is that

14   right?

15   A    Yes.

16   Q    Now, am I also correct that when Mr. Mitchell -- Mr.

17   Mitchell came back from Bryant College, that would have been --

18   when was it?

19   A    I believe it was the early part of '99, I want to say.  I

20   know it was after our son was born.

21   Q    Probably the early part of 1999?  Were you aware that Mr.

22   Martin was confined beginning in about October of 1999?

23   A    I believe so.

24   Q    Okay.  And in fact, prior to the time when Mr. Martin was

25   confined, is it also correct that you didn't see him that often

1    with Mr. Mitchell?

2    A    That's correct.

3    Q    And there was only a -- and after Mr. Martin was confined,

4    he was released, do you recall if it was like early 2002?

5    A    Yes.

6    Q    Maybe February or March, 2002?

7    A    I think so.

8    Q    And during that short period of time that he was, that he

9    was out, you didn't see him that often, either, did you?

10   A    No.

11   Q    And you certainly didn't see him with Mr. Mitchell?

12   A    No.

13   Q    And you were living with Mr. Mitchell at this time?

14   A    Yes.

15   Q    And the two of you were, the two of you were raising your

16   child.  Now, it was during the period 1999 to 2000 that Mr.

17   Mitchell spent a couple of months working as a counselor at the

18   Hickey School, is that right?

19   A    Yes.

20   Q    And he told you during that time that he'd met a couple of

21   young guys, including this guy Rock, who had real, real talent as

22   rappers?

23   A    Yes.

24   Q    And is it true that from the time that he got out of Hickey

25   School, he was, he saw this fellow, Rock, I think you testified

1    in the grand jury, almost every other day?

2    A    Yes.

3    Q    He was, he was a pretty constant companion of Mr. Mitchell,

4    is that right?

5    A    Yes.

6    Q    And this is during the period of time when Mr. Martin was

7    unfortunately away doing other things, is that correct?

8    A    Yes.

9    Q    Now, with respect to Hammerjacks, is it true that Mr.

10   Mitchell told you that the only person he was at Hammerjacks with

11   was Donte Sands?

12   A    That I know of, yes.

13   Q    Okay.  That's the only person that he told you that he was

14   there with, is that correct?

15   A    Yes.

16   Q    And Donte Sands is his cousin?

17   A    Yes.

18   Q    And Mr. Mitchell and Mr. Sands are very, very close, is that

19   correct?

20   A    Yes.

21   Q    Now, we've talked a little bit about March 24, 2005, which

22   was a Sunday night.  My understanding from your testimony is that

23   the next day, that is March 25th, 2002, is that you and Mr.

24   Mitchell actually moved into Four Valdivia Court in the

25   Randallstown area?

1    A    Yes.

2    Q    And did you hire a moving company or were you sort of like

3    me when I was a lot younger?  You got some friends together and

4    they helped you move?

5    A    We had some friends that helped us move.

6    Q    And was Mr. Martin one of those friends who helped you move?

7    A    No.

8    Q    The last day Mr. Mitchell was free was April 1 of 2002, is

9    that correct?

10   A    Yes.

11   Q    And your testimony is that you and Mr. Mitchell were

12   arrested while you were on the way to the funeral of the Wyche

13   brothers, Darryl and Anthony Wyche; do I have that correct?

14   A    Yes.

15   Q    Do you recall how Mr. Mitchell was dressed that day?

16   A    I just remember he had a blue sweat jacket on and some

17   jeans.

18   Q    Okay.  Let me ask you about something that I wasn't aware of

19   until, until fairly recently.  Are you familiar with a style,

20   with a brand of sweater called Coogi, C-O-O-G-I?

21   A    Yes.

22   Q    I didn't pronounce that right, did I?

23   A    You said it right.

24   Q    I did get it right?  Okay.  Is that a fairly high quality

25   sweater?

1    A    Yes.

2    Q    I mean, it's not cheap, is it?

3    A    No.

4    Q    And is it true that it's very popular urban wear?

5    A    Yes.

6    Q    For lack of a better term.  And it is certainly considered

7    to be respectful attire, is that correct?

8    A    I guess so, yes.

9    Q    I mean, somebody would not be out of place going to, going

10   to a funeral in that sort of sweater?

11   A    Back then?  No.

12   Q    Pardon?

13   A    Back then?  No.

14   Q    Okay.  Maybe standards have changed.

15        After Mr. Mitchell was arrested on April 1, you said

16   that Mr. Martin came around to see you just one time, is that

17   correct?

18   A    Yes.

19   Q    And was it just the very normal conversation?  I'm sorry

20   about what happened?  Is there anything I can do?

21   A    Yes.

22   Q    And did it go any further than that?

23   A    No.

24   Q    Indeed, were you aware that approximately two and a half

25   weeks later Mr. Martin himself was arrested?

1    A    Yes.

2    Q    Now, Mr. Martin didn't live in Randallstown at any time past

3    1991 or so, is that correct?

4    A    I believe so.

5    Q    He's 30 years old, so that's a great deal more than half of

6    his life, 17 years, is that correct?

7    A    Yes.

8    Q    And you've also said that you did not see him very often

9    around Park Heights, is that correct, also?

10   A    Yes.

11   Q    You were asked by Ms. Rhodes about a tape that was played,

12   played to you, is that correct?

13   A    Yes.

14   Q    Do you recall who played the tape for you?

15   A    One of the guys at the grand jury.

16   Q    Okay.

17   A    One of, I don't remember who played it.

18   Q    I'm sorry.  The tape was not actually played for you in the

19   grand jury, was it?

20   A    No.

21   Q    It was played for you before you went up to the grand jury?

22   A    Yes.

23   Q    And the person who played it and who made the comment was a

24   fellow by the name of a Detective Giganti?

25   A    No.  At the grand jury, Mr. Giganti was there when they

1    summonsed me there.  And he was in there when they, before they

2    played it.

3    Q    Okay.  And who else was in the room?

4    A    I know Mr. Harding was in there.

5    Q    Anybody else you can think of?

6    A    I can't think of.

7    Q    Now, you've said that you said that you, that after some

8    suggestion that you thought it sounded like Mr. Harris's voice,

9    is that correct?

10   A    Yes.

11   Q    Okay.  You never for a moment thought that Mr. Martin's

12   voice was on that tape, did you?

13   A    No.

14   Q    And you've known Mr. Martin for a long period of time?

15   A    Yes.

16   Q    And you're pretty familiar with his voice?

17   A    Yes.

18   Q    So to the extent that anybody could identify voices on that

19   tape, you're firmly convinced today that was, it was not Mr.

20   Martin, is that right?

21   A    That's correct.

22   Q    Now, Mr. Martin's been locked up since April 17th of 2002.

23   We've already established that you didn't speak to Mr. Pyne or

24   me.  Have you had any conversations with Mr. Martin since the

25   time that he was locked up?

1    A    Yes.

2    Q    Okay.  And just brief conversations?

3    A    Yes.

4    Q    Okay.  But no ongoing, no ongoing contact or anything of

5    that nature?

6    A    No.

7    Q    Okay.  Thank you very much.

8              CROSS EXAMINATION

9    BY MR. COBURN:

10   Q    Ms. Smith, good afternoon.

11   A    Good afternoon.

12   Q    Just picking up where Mr. Crowe, the lawyer right before me,

13   left off with the tape.  Tell us in your own words just kind of

14   how it came about that the government played that tape for you.

15   Just tell us the whole story.  I guess it was right before you

16   testified on one of these two occasions in the grand jury, is

17   that right?

18   A    Yes.

19   Q    Tell the ladies and gentlemen of the jury what happened,

20   would you?

21   A    They said that they were going to play a tape.  The officer

22   that was in the room at the time was Officer Giganti.  He said

23   that we think that this is Rock's voice on here, we want you to

24   listen to the tape.  I'm not sure if those are his exact words.

25   But he did mention Rock name.  And he played the tape.  And he

1    asked me did I recognize the voice.  And I said that it sounded

2    like Rock on the tape.

3    Q    And you already told Mr. Crowe who was present at that time.

4    I guess it was Detective Giganti and one other person?

5    A    It was Mr. Harding, but it was a couple other people in

6    there.  I don't remember their names.

7    Q    Sure thing.  Was anybody taking any notes while this

8    occurred, when they played the tape for you and then asked you

9    who you recognized, if anybody?

10   A    I don't know.  I can't remember.

11   Q    Okay.  Do you remember if anybody was making any kind of a

12   recording of what you were saying or not saying?

13   A    I think they may have been but I don't remember.

14   Q    Okay.  Now, with respect to Mr. Gardner, it's a fact that

15   his voice is not on that tape, right?

16   A    That's correct.

17   Q    And you listened to it carefully, right?

18   A    Yes.

19   Q    If I understand correctly, Ms. Smith, you have now testified

20   on three separate occasions concerning this matter, right?

21   A    Yes.

22   Q    The first time you were subpoenaed to come into the grand

23   jury on March 24th, 2004.  Does that sound right?

24   A    Yes.

25   Q    That's about four and a half years ago, right?

1    A    Yes.

2    Q    And then the second time was a month after that, on April

3    28th, 2004, right?

4    A    Yes.

5    Q    And then this is the third time, right?

6    A    Yes.

7    Q    About four and a half years after the two grand jury

8    appearances, right?

9    A    Yes.

10   Q    Now, you're a working person, I think you told the

11   government and jury right at the beginning of your testimony,

12   right?

13   A    Yes.

14   Q    So when you come in to testify, you've got to take time off

15   from work, right?

16   A    Yes.

17   Q    Now, each time you come in to testify about this matter,

18   you've tried to be honest, is that right?

19   A    Yes.

20   Q    And you've tried to tell the government and whoever else was

21   listening just exactly what you knew, right?

22   A    Yes.

23   Q    In terms of what you knew or may have known about any drug

24   dealing by any of these individuals, did you tell, actually, I

25   forget now if it was Mr. Hanlon or one of the other lawyers,

1   whether, something to the effect of, you might have suspected

2   that they were involved but you didn't have any first-hand

3   information about it?

4   A     That sounds about right.

5   Q     When the government would ask you about that during the

6   course of your grand jury testimony, would they typically ask

7   you, would they try to lay any foundation?  Would they ask you

8   like how you knew or how you suspected or anything like that, or

9   would they just ask you, you know, whether or not anybody was

10  engaged in that conduct?

11  A     I don't remember.

12  Q     Okay.  Has anyone shown you a copy of either of your two

13  grand jury transcripts between the time you testified in 2004 and

14  today?

15  A     No.

16  Q     Did you have a copy of the grand jury transcripts during

17  that four and a half year period that ended with today?

18  A     No.

19  Q     Have you had occasion to lead any of those, either of those

20  two transcripts before you testified today?

21  A     No.

22  Q     Now, do you have a lawyer with you today to represent you?

23  A     No.

24  Q     Did you have a lawyer with you at either of those two grand

25  jury appearances to represent you?

1   A    No.

2   Q    Did you ask the government for any kind of immunity or any

3   sort of protection before you testified?

4   A    No.

5   Q    And did you get any?

6   A    No.

7   Q    Okay.  On the occasion of your first grand jury appearance,

8   and I'm referring now to the one on March 24th, 2004, Page 2,

9   Line 19, it was Mr. Harding, the gentleman seated immediately to

10  my left, who was asking you questions back in '04, right?

11  A    Yes.

12  Q    And with the Court's permission, I'll just put it on the

13  DOAR.  He said to you, did he not, you've just been sworn in by

14  the foreperson of the grand jury and so you've taken an oath to

15  testify truthfully here today.  Do you understand that?  And you

16  said yes, right?

17  A    Yes.

18  Q    And you did, right?

19  A    Yes.

20  Q    And he then said, do you understand that you have a legal

21  obligation to testify truthfully and that you must answer

22  truthfully all the questions, whether I ask them or the grand

23  jury asks them?  Do you understand that?  And you said yes,

24  right?

25  A    Yes.

1    Q    And then he said, if you should lie or knowingly make a

2    false statement in your testimony, you could be prosecuted for

3    the crimes of perjury or making a false statement.  Do you

4    understand that?  And you said yes, right?

5    A    Yes.

6    Q    And you did understand, right?

7    A    Yes.

8    Q    And he said, and if you were convicted of those crimes, you

9    could face a term of imprisonment.  Do you understand that?  And

10   you said yes.  Right?

11   A    Yes.

12   Q    Then he said, you do not have a right to remain silent, Ms.

13   Smith, but you do have a constitutional right not to answer a

14   question if it might tend to incriminate you.  Do you understand

15   that?  And you said yes, I do.  Right?

16   A    Correct.

17   Q    But have you ever sought not to answer any questions, either

18   in the grand jury or here, because you thought an answer might

19   tend to incriminate you in any way?

20   A    No.

21   Q    Have you ever said, no, you won't answer?

22   A    No.

23   Q    Okay.  He even told you, anything you say may be used

24   against you by the grand jury in a subsequent legal proceeding;

25   do you understand that?  And you said yes, right?

1    A    Yes.

2    Q    Now, the four individuals who you see arrayed to my right

3    here, who you've been testifying about today, would it be correct

4    that, with respect to, if I understood you right, Mr. Mitchell,

5    Mr. Martin, Mr. Gardner, all knew each other since ninth grade at

6    Randallstown High School, right?

7    A    Yes.

8    Q    And so they, at least for some time periods, would hang out

9    together, right?

10   A    Yes.

11   Q    Would they also hang out with other people or just with each

12   other?

13   A    I don't know.

14   Q    Okay.  How about Mr. Harris?  Was he in Randallstown High

15   School?

16   A    No.

17   Q    Okay.  Did I understand you correctly, in response to one of

18   the other questions earlier today, to say that Mr. Harris did not

19   hang out with either Mr. Gardner or with Mr. Martin?

20   A    That I know of, no, he didn't hang out with them.

21   Q    He didn't.  Okay.  Now, if I understood your testimony

22   right, you've known Mr. Mitchell for quite sometime, right?

23   A    Yes.

24   Q    You have a child together?

25   A    Yes.

1    Q    Mr. Mitchell was helping you raise the other child, right?

2    A    Yes.

3    Q    So you spent a lot of time with him?

4    A    Yes.

5    Q    And you know him well, right?

6    A    Yes.

7    Q    And you know the people that he hangs with well, right?

8    A    Yes.

9    Q    Okay.  Your Honor, may I retrieve one of the government's

10   exhibits and show it to the witness?

11          THE COURT:  Certainly.  You should confer with counsel.

12          MR. COBURN:  Absolutely, Your Honor.

13          Your Honor, I take it there may be an objection to my

14   using this chart.

15          THE COURT:  Can you just turn it slightly just so I can

16   see what it is?  Yeah.  I'll sustain the objection.

17          MR. COBURN:  Okay.

18   BY MR. COBURN:

19   Q    Was it your understanding, ma'am, that any or all of these

20   individuals were part of a gang?

21   A    No.

22   Q    They weren't?

23   A    No.

24   Q    Is it your understanding that any or all of them were part

25   of any kind of a RICO entity?

1      MR. HANLON:  Objection, Your Honor.

2      THE COURT:  Sustained.

3  Q    Any sort of a racketeering entity?

4      MR. HANLON:  Objection, Your Honor.

5      THE COURT:  Sustained.  That means don't answer, Ms.

6  Smith.

7  Q    You indicated, if I understood your testimony correctly,

8  that Mr. Mitchell and Mr. Harris, during a certain time period,

9  used to go to rap, kind of like rap contests, is that right?

10  A    Yes.

11  Q    There was a word you used for that which I missed.  What are

12  they called?

13  A    I said freestyle.

14  Q    Freestyle.  There was another one, too.  Never mind.  How

15  often would they go to these things?

16  A    They went quite often as the way to get, I guess, get his

17  artists known.

18  Q    It was your understanding they were trying to get the rap

19  label or the rap business off the ground, is that right?

20  A    Yes.

21  Q    Okay.  Did Mr. Gardner ever go?

22  A    No, not that I know of.

23  Q    Did Mr. Gardner have any involvement in the music industry

24  or the rap industry of any kind so far as you knew?

25  A    No.

1   Q    Sorry for the delay, Your Honor.  I won't be but a minute.

2        (Pause in proceedings.)

3   Q    Now, the label, the rap label that you understood that Mr.

4   Mitchell was involved in was something called Shake Down

5   Entertainment, is that right?

6   A    Yes.

7   Q    Did the label actually produce some CD's, to your knowledge?

8   A    Yes.

9   Q    Were attempts made to sell the CD's?

10  A    Yes.

11  Q    Okay.  Do you know if Shawn Gardner has any brothers?

12  A    I think he do.  I never met his brothers.

13  Q    Never met any of his brothers?

14  A    No.

15  Q    Okay.  Do you know whether Shawn Gardner was ever involved

16  with any women?

17  A    I mean, I've heard but --

18  Q    Did you ever meet anybody like that?

19  A    I only know one from school.

20  Q    What was her name?

21  A    Don't remember her name.

22  Q    Okay.  Do you know somebody by the name of Keeway?

23  A    I've heard his name.

24  Q    Who do you know Keeway to be, if anybody?

25  A    I believe he's a friend of Bo cousin.

1   Q    Say that again.

2   A    I think he's a friend of Bo's cousin.

3   Q    Okay.  May I have the Court's indulgence just for a moment

4   to talk to Mr. Kurland?

5            (Pause in proceedings.)

6            MR. COBURN:  Thank you so much, Your Honor.  Nothing

7   further.

8            REDIRECT EXAMINATION

9   BY MR. HANLON:

10  Q    Ms. Smith, good afternoon again.  Mr. Coburn asked you a

11  number of questions about the various rights you were informed of

12  and the instructions you were given by Mr. Harding when you first

13  appeared in the grand jury.  When you met with him or with the

14  agents before actually going into the grand jury, did Mr. Harding

15  by any chance mention that the advice of rights he was giving you

16  was a standard advice of rights that's given to every single

17  witness that goes into the grand jury?

18  A    No.

19  Q    He did advise you, in addition to the various pieces of

20  information that Mr. Coburn reviewed with you, I believe that

21  just a few minutes ago we went down to about Line 20 there.  And

22  then right after this you were also advised that you have the

23  right to be represented by an attorney, Ms. Smith.  And then you

24  were asked if you were represented by an attorney and your

25  response was no, you were not.  Is that correct?

1    A    Yes.

2    Q    But you were advised of your right to counsel, is that

3    right?

4    A    I guess.  I don't know.

5    Q    After this, you were asked the bottom of Page Three of your

6    March grand jury appearance, in 2004, if after you leave here

7    today, Ms. Smith, you -- actually, for whatever reason the

8    transcript picks up at the same line up above -- if after you

9    leave here today, Ms. Smith, you realize you said something

10   incorrect or wrong, you can come back before the grand jury and

11   correct your testimony as long as you do it within the next month

12   or six weeks.  And you responded okay.  Question:  Before the

13   grand jury acts in this case.  Do you understand?  And your

14   answer was yes.  Have I read that correctly?

15   A    Yes.

16   Q    So in addition, you were also advised if you made a mistake

17   or needed to correct anything, you could contact the government,

18   the agents, the U.S. Attorney's Office, come back and make

19   whatever change you want, is that right?

20   A    Yes.

21   Q    Ms. Rhodes asked you a series of questions about the fact

22   that when you and Mr. Mitchell were residing together, whether it

23   was in a house separately or with your mother, anything like

24   that, you would not have expected him to bring things into the

25   house that could get people into trouble.  In other words, there

1    weren't going to be any drugs, there weren't going to be any

2    guns.  Mr. Mitchell kept that apart from you, is that correct?

3    A    Yes.

4    Q    So if those things were going on, you wouldn't necessarily

5    have known about them, is that right?

6    A    That's right.

7    Q    Like, by way of example, the firearm that Mr., that was

8    taken out of your car during that arrest.  The gun was there but

9    you didn't have any knowledge of it, is that right?

10   A    That's right.

11   Q    And so whether or not Mr. Mitchell was spending times on the

12   streets or had any kind of drug-related activity with Mr.

13   Gardner, Mr. Martin, Mr. Harris, you might not know about it even

14   if it was going on, is that correct?

15   A    That's correct.

16   Q    Now, there were times in the past, and again, you were asked

17   a number of questions about Mr. Mitchell's relationship with Mr.

18   Harris and Mr. Martin and Mr. Gardner at various points of time,

19   and about the time that Mr. Mitchell spent in and out of

20   Baltimore.  I asked you those questions.  So did counsel.

21           Going back, say, to the very earlier part of your

22   relationship, I asked you about the time that Mr. Mitchell spent,

23   there were two stints at the Hickey School.  Do you remember we

24   talked about that?

25   A    Yes.

1    Q    And it came up once or twice during cross examination.  The

2    second time that Mr. Mitchell was at the Hickey School, do you

3    remember if he was there for anything, for any conduct that also

4    involved Mr. Martin or Mr. Gardner?

5    A    Yes.

6    Q    What was it that Mr. Mitchell went to the Hickey School for

7    that also involved Mr. Gardner and Mr. Martin?

8    A    It was supposed to have been a robbery.

9    Q    A robbery that Mr. Mitchell did with Mr. Gardner and Mr.

10   Martin, that's why he went to the Hickey School?

11   A    That's what they said.

12   Q    You were asked a number of questions, again, we've discussed

13   this for a few minutes, about separating what you heard on the

14   street versus what Mr. Mitchell told you about.  Just so we're

15   very clear.  There was street things that you'd hear about

16   sometimes.  But there were also things that Mr. Mitchell told you

17   about personally.  I want to make sure I understand that right.

18        Mr. Mitchell told you about the fight at Hammerjacks

19   personally, is that right?

20   A    Yes.

21   Q    Was it Mr. Mitchell that told you that he believed there was

22   a contract out on his life or that somebody was trying to do

23   something to get him hurt?

24   A    Yes.

25   Q    Mr. Mitchell told you that Woody had picked up that

1    contract, is that correct?

2    A    Yes.

3    Q    Mr. Mitchell told you that the reason he had a gun when he

4    was arrested in April of '02 was because he was concerned about

5    that contract?  That's information you got from Mr. Mitchell's

6    own words, is that correct?

7    A    Yes.

8    Q    You listened to some of these various songs that the Shake

9    Down label put together at various points.  You actually heard

10   some of the songs, you're familiar with the lyrics, is that

11   right?

12   A    Yes.

13   Q    And you would hear Mr. Harris's voice and he would be

14   singing these songs, doing the raps, is that right?

15   A    He would be on there, amongst other people.

16   Q    Other people sometimes, too, is that right?

17   A    Yes.

18   Q    Let me ask you about some particular words that you might

19   have heard during some of these songs.  Did Mr. Harris ever make

20   a reference, during the songs, to Bo?

21   A    I don't know.

22   Q    Did Mr. Harris ever make or, I should say, did anyone else

23   on any of these songs ever use the word "Bo" or refer to Bo, that

24   you remember hearing?

25   A    I don't know.

1    Q    That's all right.  Did anyone on the songs, whether it was

2    Mr. Harris singing or someone else, ever make a reference to

3    Weaze?

4    A    I don't know.

5    Q    Do you know if any of the defendants ever used the nickname

6    "Weaze?"

7    A    Yes.

8    Q    Who used the nickname "Weaze?"

9    A    Wayne.

10   Q    And that's Mr. Martin?

11   A    Yes.

12   Q    And then Mr. Harris, did he occasionally make references to

13   "Rock?"  I understand his nickname sometimes was Rock.  Did he

14   ever refer to himself on the songs by the name "Rock?"

15   A    Yes.

16   Q    A couple of shorter questions.  Mr. Mitchell returned from

17   Bryant College, did I hear you right, 1999 or thereabouts?

18   A    I believe so.  Around that time.

19   Q    Do you remember why he returned home?

20   A    Because he didn't have the money to get his books.

21   Q    Just, and I'm asking just to be clear on the dates, Ms.

22   Smith?

23   A    I can't be clear on the dates because I'm not sure.

24   Q    I understand that.  But just, he didn't actually complete

25   his work at Bryant College.  He returned early, is that correct?

1    A    Yes.

2    Q    You were asked a number of questions by Mr. Crowe about Mr.

3    Martin's arrest on, I believe the date was April 17th of 2002

4    that Mr. Crowe asked you about.  Mr. Martin was arrested at home,

5    is that right?

6    A    I think so.

7    Q    Do you recollect his address at the time?

8    A    No.

9    Q    Do you remember ever hearing the address Two Cree Court,

10   C-R-E-E, Two Cree Court?

11   A    Yes.

12   Q    Was that the address that Mr. Martin was arrested at on

13   April 17th of '02?

14   A    I don't know.  I know that's his mother's address.

15   Q    That's all right.  But you do recognize it as his mother's

16   address?

17   A    Yes.

18   Q    And is that located in the Randallstown section of

19   Baltimore?

20   A    Yes.

21   Q    You were also asked by Mr. Crowe whether he had had any

22   conversations with Mr. Martin since the time that he got

23   arrested.  I believe you indicated that you had.  Can I ask what

24   you and Mr. Martin have talked about since his arrest in April of

25   2002?

1    A    He would call and see how the boys were doing.

2    Q    Checking after your sons?

3    A    Yes.

4    Q    Has he talked to you about anything else?

5    A    No.

6    Q    Ever talked to you about his case or his arrest or what he

7    was charged with?

8    A    No.

9    Q    You were asked questions about this process whereby you

10   listened to a tape.  During one of the times you came for grand

11   jury you met with a detective or an agent and, in addition to

12   going to the grand jury, you listened to a tape.  And you were

13   asked about whether you recognized any of the voices.  You were

14   asked some questions about that.

15        I believe your testimony today was that a detective

16   mentioned the name "Rock" on the tape and asked you if you

17   recognized that name, is that correct?

18   A    Yes.

19   Q    That was your testimony in this proceeding.  And then a few

20   minutes earlier today, shortly before the jury came out, we had a

21   short hearing and I asked you a question about coming to court,

22   listening to this voice the day of your grand jury appearance.

23   And I asked you if during the time that you listened to that

24   tape, if you recognized any voices.  And on your own you

25   mentioned, well, one of the detectives told me that he thought

1   that Rock's voice was on the tape so I told him I recognize that

2   voice.  Is that, have I fairly described your testimony from

3   earlier today?

4   A    Yes.

5   Q    That's a yes?  That's a yes, ma'am.

6   A    Yes.

7   Q    Referring you to Page 21 of your April, 2004 transcript.

8   I'll put it up on the screen again, of course.  You were asked a

9   couple of the questions in the grand jury back in April of 2004

10  on the same subject.  The questions went:  Okay.  Just a few more

11  questions.  We played for you downstairs a tape that's already

12  been received in evidence and heard by this grand jury.  It's

13  labeled Grand Jury Exhibit Number Three, KG.  Your answer was:

14  Okay.  And the only tape you listened to was this same recording

15  that we've been talking about today, is that correct?

16  A    Yes.

17  Q    And the question:  I guess those are the reporter's

18  initials.  And then it's dated 1/21/04.  Do you remember

19  listening to that downstairs?  Your answer:  Yes.

20       Question:  Did you identify Little Rock's voice on

21  that?  Your answer:  Yes, the voice that sounded like his.

22       Question:  Okay.  And you said that the other voices

23  you couldn't identify, is that right?  And your answer is:  Yes.

24  Have I read that correct?

25  A    Yes.

1    Q    At no point during the course of your grand jury appearance

2    did you ever mention Detective Giganti or any detective or agent

3    suggesting the name "Rock" as a voice you heard on the tape.

4    That never comes up on this transcript?

5    A    No, it doesn't.

6                MR. COBURN:  Objection.

7                THE COURT:  Overruled.

8    Q    And in addition, just so we're very clear, you did testify

9    in the grand jury that there was a voice on this tape that

10   sounded like Little Rock.  That was your testimony, is that

11   right?

12   A    Yes.

13   Q    And that is the truth, is that correct?

14   A    That's what I stated on there.

15   Q    And that is the truth, correct?

16   A    Yes.

17   Q    Thank you, Your Honor.

18                THE COURT:  Very briefly, Ms. Rhodes.  This is beyond

19   the scope, but go ahead.

20                RECROSS EXAMINATION

21   BY MS. RHODES:

22   Q    Ms. Smith, do you remember being shown this document

23   earlier?

24   A    Yes.

25   Q    Is that your handwriting on there?

1   A    No.

2   Q    Is that your signature on there?

3   A    No.

4   Q    Did you tell that to the prosecutors when they asked you

5   about it before in the grand jury?

6   A    Yes.

7   Q    Somebody asked you about Keeway.  And you mentioned he's a

8   friend of Bo's cousin?

9   A    Yes.

10  Q    Okay.  Who is the cousin?

11  A    Donte.

12  Q    Okay.  And did you see Keeway at the hospital when you went

13  there after the fight that Willie was in?

14  A    No.

15  Q    Okay.  Did he come after the Hammerjacks, Hammerjacks fight?

16  You went to the hospital, right?

17  A    Yes.

18  Q    And when you testified the second time at the grand jury,

19  didn't you say that Keeway, you recalled that Keeway had been

20  there and he had gotten treated or something?

21  A    I don't remember.

22  Q    Okay.  When Willie was at Hickey, did you have a chance to

23  go to any of his games, football games?

24  A    When he played at Hickey?

25  Q    Yeah.

1    A    No.

2    Q    What about when he was in college?  Did you have a chance to

3    see him there or playing in a game?

4    A    I went to one of his games at Bryant College.

5    Q    One of his games where?

6    A    Bryant College.

7    Q    Oh, at Bryant College.  In terms of the timing, you say you

8    think he came back after Bryant in around early '99?

9    A    I think so.

10   Q    It was after your son had been born, right?

11   A    Yes.

12   Q    And your son was born in July of '98?

13   A    Yes.

14   Q    Okay.  And Willie was in town then.  He was there for the

15   birth?

16   A    Yes.

17   Q    The rap business that he was doing, do you know what other

18   artists besides Mr. Harris were working with him?

19   A    He had different ones.  I think his name was White.  Two

20   brothers that was twins.  And I can't think of the other.

21   Q    Okay.  And Mr. Mitchell didn't write any of the lyrics for

22   the songs, did he?

23   A    No, not that I know of.

24   Q    Do you know Hasim Rahman?  Have you ever met him?

25   A    Have I ever met Rock?  Yes?

1    Q    Hasim Rahman.

2    A    Hasim Rahman?  Oh, no.

3    Q    Did you, weren't you at a party once, a birthday party for

4    Keisha's --

5    A    Son.

6    Q    Child?  Son?

7    A    Yes.  He was there.

8    Q    He was there.  Did you meet him or you just saw him?

9    A    I just saw him there.  I didn't personally meet him.

10   Q    Okay.  Okay.  And do you know why he was at the party or who

11   he knew?

12   A    I believe Keisha's --

13            MR. HANLON:  Your Honor, objection.

14            THE COURT:  Sustained.  Sustained.

15   BY MS. RHODES:

16   Q    You mentioned when the prosecutor first asked you about Mr.

17   Mitchell dealing and you said that, yes, when you were shown the

18   transcript, that you said he tried to deal but was never very

19   good at it?

20   A    Yes.

21   Q    And what you, by that you mean he never made much money at

22   it?

23   A    Yes.

24   Q    And he didn't deal a lot?  He wasn't a big time dealer?

25   A    No.

1    Q    And he didn't have a lot of fancy clothes?

2    A    No.

3    Q    Or fancy cars?

4    A    No.

5    Q    Did you have $800 to send to him via Western Union when he

6    was up in Pennsylvania?

7    A    No.

8    Q    Okay.  Did the two of you struggle financially?

9    A    I wouldn't say we struggled, but just made enough to pay the

10   bills.

11   Q    Okay.  And you were living with your mom a lot of that time?

12   A    Yes.

13   Q    Okay.  When you heard that voice mail tape back in 2004,

14   were you positive that Bo's voice was not on it?

15   A    Yes.

16   Q    Okay.  Thank you.  Nothing further, Your Honor.

17            THE COURT:  Briefly, Mr. Martin.

18            RECROSS EXAMINATION

19   BY MR. MARTIN:

20   Q    Thank you, Your Honor.  Ms. Smith, you were asked just a few

21   minutes ago by Mr. Hanlon about when you were in the grand jury

22   and the fact that you didn't volunteer in the grand jury that

23   Detective Giganti had suggested to you that it was Rock's voice

24   on the tape.  Do you remember that?

25   A    Yes.

1    Q    And nobody asked you about that, did they?

2    A    No.

3    Q    And the person who was asking the questions in the grand

4    jury was there earlier when you listened to the tape, wasn't he?

5    A    Yes.

6    Q    And you were asked questions by Mr. Crowe and I think by Mr.

7    Coburn a little while ago about whether so and so ever spent much

8    time in Park Heights.  I can't remember which one, whether it was

9    Mr. Gardner or Mr. Martin.  The truth of the matter is you didn't

10   spend much time in Park Heights, did you?

11   A    No.

12   Q    And finally, there was a question about whether in the

13   period, I think Mr. Crowe asked this, in the period in 2001, did,

14   did Mr. Mitchell and Mr. Harris spend every other day together,

15   and you said yes.  Correct?

16   A    Yes.

17   Q    And what they were doing was working on that rap business,

18   isn't that correct?

19   A    Yes.

20   Q    You don't know of any connection between Mr. Mitchell and

21   Mr. Harris with respect to drugs, do you?

22   A    No.

23   Q    Thank you.

24        MR. CROWE:  No questions.

25        THE COURT:  Thank you very much, Ms. Smith.  You are

135

1    excused.  I must advise you, however, that while we are fairly

2    confident your testimony in this case has been concluded, it may

3    be necessary for you to come back at a later time and you will be

4    notified.

5              THE WITNESS:  Okay.

6              THE COURT:  All right.  Thank you very much.  You are

7    excused, ma'am.  Watch your step.

8              Members of the jury, we'll take our luncheon recess at

9    this time.  I want to advise you now, and I'll remind you later,

10   tomorrow morning we will start at 10:00.  You're still free to

11   arrive at your normal time, but we won't be starting until 10:00.

12   And then I'll remind you that we're not in session on Thursday of

13   this week or Friday of this week.  So tomorrow will be the last

14   day for this week.

15             And on Monday next week, again, I'll remind you, we

16   will break mid-afternoon, probably around 3:00.  And then we

17   won't be in session on Tuesday of next week, the 30th.  We will

18   be in session on Wednesday, the 1st.  And then we will not be in

19   session on Thursday, the 2nd.  So we're only going to have

20   roughly a day and a half next week.  But I'll remind you of the

21   schedule as we go along.

22             Please leave your note pads on your chairs.  Have no

23   discussion about the evidence or the case at all.  Enjoy your

24   lunch.  The jury's excused until 2 p.m.

25             (Jury exits the courtroom.)

1          THE COURT:  It's 1:45 by the clock in the courtroom.

2     I'm sorry.  12:45 by the clock in the courtroom.

3          MR. MARTIN:  It's actually 12:51.

4          THE COURT:  Is that clock slow, Belinda?  That one?  I

5     shouldn't rely on that one.  The computer says 12:51.

6          So we're going to finish with the detective this

7     afternoon, or the chemist?

8          MR. HARDING:  We have three people here from

9     Pennsylvania.  I'd like to continue to interrupt the detective.

10         THE COURT:  Okay.  All right.  We're in recess until

11    two p.m.

12         (Luncheon recess.)

13         THE COURT:  Ready to proceed?

14         MR. HANLON:  Yes, Your Honor.  The government's next

15    witness, Nieshia Duganne, is on the stand.

16         THE COURT:  You can be seated for now Ms., is it

17    Gaines?

18         MR. HANLON:  Duganne.

19         THE COURT:  Ms. Duganne.  Counsel, we will break a

20    little bit early so that we can take up the two questions that I

21    believe are before the Court, Mr. Coburn's concern about

22    Detective Niedermeier's testimony and the government's motion

23    this morning, which I take it each of those is coming up

24    tomorrow, each of those issues?

25         MR. MARTIN:  Your Honor, that's an issue that we have

1    with that.  I can explain it to you at the end of the day if you

2    want to wait.

3              THE COURT:  But they're coming up tomorrow?

4              MR. HARDING:  One is and one is not.

5              MR. MARTIN:  I'm going to object to him being called

6    tomorrow.

7              THE COURT:  Okay.  So we'll take it up at the end of

8    today.

9              MR. HARDING:  Your Honor, Detective Niedermeier, we're

10   not going to get to him tomorrow.

11             THE COURT:  Oh, you're not going to get to him

12   tomorrow?

13             MR. HARDING:  No.

14             (Jury enters the courtroom.)

15             THE COURT:  Please be seated, ladies and gentlemen.

16   Thank you again for your patience.  You may call your next

17   witness.

18             MR. HANLON:  Thank you, Your Honor.  The United States

19   calls Nieshia Duganne.

20             THE COURT:  As you can see, ladies and gentlemen,

21   they're kept safe, as I promised.  Thank you, Ms. Arrington.

22             THE CLERK:  Raise your right hand.

23             NIESHIA DUGANNE, GOVERNMENT'S WITNESS, SWORN

24             THE WITNESS:  Yes.

25             THE CLERK:  Be seated.  Please speak up.  Speak

1    directly toward the mike.  State your name and spell it for the

2    record, please.

3              THE WITNESS:  Nieshia Duganne.  N-I-E-S-H-I-A.

4    Duganne, D-U-G-A-N-N-E.

5              DIRECT EXAMINATION

6    BY MR. HANLON:

7    Q    Thank you, Your Honor.  Ms. Duganne, good afternoon.  How

8    old are you?

9    A    28.

10   Q    And where were you born?

11   A    In Altoona, Pennsylvania.

12   Q    And did you grow up in Altoona?

13   A    Yes.

14   Q    How far did you go in school up in Altoona?

15   A    I graduated high school.

16   Q    And is that from Altoona High School?

17   A    Yes.

18   Q    And when was that that you graduated?

19   A    1997.

20   Q    Since -- well, let me rephrase.  Have you ever sold drugs to

21   support yourself?

22   A    Yes.

23   Q    When did you begin selling drugs?

24   A    Around '97, 1997.

25   Q    How did you get into the drug business?

1    A    My children's father.

2    Q    Your children's father?

3    A    Yes.

4    Q    And what was your children's father's name?

5    A    Akil Johnson.

6    Q    Is that an individual that you met in Altoona?

7    A    Yes.

8    Q    For the record, for the benefit of our court reporter, can

9    you please spell the first name of your children's father,

10   please?

11   A    A-K-I-L.

12   Q    Now, Ms. Duganne, when you began selling drugs, how did your

13   children's father get you into that business?  How did it come

14   about?

15   A    It was something that he was into and I just started selling

16   with him.

17   Q    What kind of drugs did you sell?

18   A    Crack cocaine.

19   Q    And where did you sell crack cocaine?

20   A    In Altoona, Pennsylvania.

21   Q    Now, your family, various members of your family have also

22   from time to time been involved in the selling of drugs in

23   Altoona, is that right?

24   A    Yes.

25   Q    Is this something you were exposed to when you were a

1    younger person, as a child?

2    A    Yes.

3    Q    But just so we're clear, you ended up getting into drugs

4    sort of independently from your family, is that right?

5    A    Yes.

6    Q    Now, during the time that you've been selling drugs, have

7    there ever been times that you got arrested or got convicted of

8    any drug charges?

9    A    Yes.

10   Q    Specifically, in 1998, I believe, were you convicted of a

11   drug crime up in Pennsylvania?

12   A    Yes.

13   Q    And then a few years later you were again convicted of a

14   drug crime and entered up doing some time in jail, more recently

15   also in Pennsylvania, is that right?

16   A    Yes.

17   Q    What was your date of release from your most recent prison

18   sentence?

19   A    January 7th, 2008.

20   Q    And since getting out of jail, without telling me

21   specifically where, how have you been able, how have you been

22   supporting yourself?

23   A    Assistance.

24   Q    Public assistance?

25   A    Yes.

1    Q    You are still raising a child, is that right?

2    A    Four children.

3    Q    Are they all from Mr. Johnson?

4    A    Yes.

5    Q    And where is Mr. Johnson right now?

6    A    He's incarcerated.

7    Q    Also on a drug charge?

8    A    Yes.

9    Q    Now, I'm going to take you back -- well, before I do that.

10   During the time that you were engaged in drug activity back in

11   the late '90s or into 1999, 2000, 2001, you were involved in some

12   drug activity during that time frame, is that right?

13   A    Yes.

14   Q    When you would sell drugs, ma'am, where did you get your

15   drugs from?  Was there one supplier or multiple suppliers?

16   A    Multiple.

17   Q    And who would you sell drugs to?

18   A    Multiple people.

19   Q    All around the Altoona area?

20   A    Yes.

21   Q    Now, do you know a person named Sharmeka Fletcher?

22   A    Yes.

23   Q    Who is Sharmeka Fletcher?

24   A    She was just a female that I knew.

25   Q    How did you know her?  Were you friends with her?  Did you

1    know her from Altoona?

2    A    Yes, I knew her from Altoona.

3    Q    Around about how long did you know Sharmeka Fletcher?

4    Approximately?  Late '90s, mid '90s?

5    A    The late 90's.

6    Q    Was Ms. Fletcher involved in any kind of drug activity?

7    A    Yes.

8    Q    I'm showing you what's been marked, and I'll try to zoom in

9    a little bit.  Do you see it on the screen in front of you,

10   ma'am?

11   A    Yes.

12   Q    Who is in this photograph?

13   A    Sharmeka Fletcher.

14   Q    Did there ever come a time that Sharmeka Fletcher approached

15   you and had any ideas or opportunities for you in the drug

16   business?

17   A    Yes.

18   Q    About when did Ms. Fletcher approach you about that?

19   A    It was the late '90s.  I'm not exactly sure when.

20   Q    That's all right.  And what was it that Ms. Fletcher told

21   you about?  What was the opportunity?

22   A    She wanted me to hustle for her, crack cocaine.

23   Q    Now, was there a particular person she was working with that

24   she thought you could work with as well?

25   A    She had introduced me to somebody by the name of Bo.

1   Q    Prior to that, before we get to that, did she ever talk to

2   you about a guy named Charles?

3   A    Yes.

4   Q    And who was Charles?

5   A    I don't know.  I just knew him through her.

6   Q    What did Ms. Fletcher tell you about Charles?

7   A    That he was her supplier at the time, I believe, and that he

8   had killed a school teacher or something.  I don't know.  She was

9   saying that to, you know, try to get me to hustle for her, what

10  it was to scare me into it.  But I denied at the time.

11  Q    You said no to her?

12  A    Yes.

13  Q    Why was that?

14  A    Because I was with my kids' father.

15  Q    Now, at some point you found yourself in a position where

16  you began providing information to Pennsylvania law enforcement

17  and to federal and state authorities up in Pennsylvania, is that

18  right?

19  A    Yes.

20  Q    How did it come about, Ms. Duganne, that you were providing

21  information or cooperating with the authorities up in

22  Pennsylvania?

23  A    My children's father was arrested and I began to cooperate

24  with the police to help him out.

25  Q    Help him?

1    A    Yes.

2    Q    Akil Johnson, was that a drug charge he was arrested for?

3    A    Yes.

4    Q    Now, you were providing information and cooperating.  I

5    gather you hoped that that might be considered for helping him,

6    maybe getting him a lower charge or something like that?

7    A    Yeah.  Yes.

8    Q    The authorities you were working with, was this Pennsylvania

9    authority, state, federal people up there?

10   A    Yes.

11   Q    At any point, did any of the prosecutors or police up there

12   make any promises to you about what would end up happening to

13   your children's father if you did cooperate?

14   A    No.

15   Q    But you had some hopes, is that fair to say?

16   A    Um-hum.

17   Q    Is that a yes?

18   A    Yes.

19   Q    Let me ask you a couple related questions and sort of bring

20   us forward.  You provided some cooperation and things moved on.

21   Did your children's father ultimately get out of jail following

22   the completion of some of your cooperation?

23   A    Yes.

24   Q    Do you know if your cooperation caused him to get out of

25   jail altogether or just cut down the time, or do you know one way

1    or the other?

2    A    I'm not sure.

3    Q    That's all right.  At some point he got out of jail.  You

4    began to reside with him again in Altoona?

5    A    Yes.

6    Q    Just so the jury's aware of the circumstances leading up to

7    the more recent time you spent incarcerated, it's in the 2000

8    time frame that you began providing cooperation and working with

9    law enforcement to help your children's father, is that right?

10   A    Yes.

11   Q    A few years later, he gets out of jail, you were living with

12   him.  The two of you got into some trouble again, is that

13   correct?

14   A    Yes.

15   Q    Did Pennsylvania law enforcement find something in your

16   house that you were sharing with Mr. Johnson?

17   A    Yes.

18   Q    What was it that they found?

19   A    A kilo of cocaine.

20   Q    And did you end up taking a charge for that?

21   A    Yes.

22   Q    And did Mr. Johnson also end up getting prosecuted for that?

23   A    Yes.

24   Q    Now, you have since served all of your time on that charge,

25   is that right?  You've gotten out of jail?

1    A    Yes.

2    Q    As far as you know, are you receiving any, are you hopeful

3    of receiving any benefit from the U.S. Attorney's office here in

4    this case or from any law enforcement agency to, to help you out

5    in any way on that charge that you're already out of jail for?

6    A    No.

7    Q    Is there any parole or probation that you're hoping to get

8    help on, or any benefit that you're hoping to get with respect to

9    your Pennsylvania charge?

10    A    No.

11    Q    Have you been promised anything with respect to your old

12    charges by my office or by any of the agents involved in this

13    case?

14    A    No.

15    Q    The one thing you have been promised is that if you come

16    testify truthfully, and even if you testify about criminal

17    activity in the past, is it your understanding that nothing you

18    say in court today is going to be used against you in building

19    any additional federal or criminal case against you?

20    A    Yes.

21    Q    And you testified a couple of years ago, I believe, back in

22    May of 2004 in the grand jury, again in the U.S. courthouse here,

23    is that right, ma'am?

24    A    Yes.

25    Q    And was the same promise made to you, that nothing you said

1    in the grand jury would be used against you in building any

2    criminal case?

3    A    Yes.

4    Q    And just to round things out in terms of your time here in

5    Baltimore.  The one request you did have of us was that, if

6    possible, you might have an opportunity to see your sister, whose

7    name is Marquetta Duganne?

8    A    Yes.

9    Q    Your understanding is that your sister may also be

10   testifying in this case, is that correct?

11   A    Yes.

12   Q    Did we give you an opportunity to talk to your sister during

13   the lunch break a few minutes ago?

14   A    Yes.

15   Q    During that conversation, were there agents available, or

16   with you the whole time?

17   A    Yes.

18   Q    And you were instructed, in fact I instructed you that you

19   could visit with her but that you couldn't discuss your testimony

20   or this case or anything like that, is that correct?

21   A    Yes.

22   Q    We've talked for a few minutes now about your cooperation.

23   Let me ask you, then, about some of the things you were doing.

24         Back in 2000, when Mr. Johnson had gotten into trouble

25   and you were working with Pennsylvania law enforcement in the

1    hope of helping him, what was it that they asked you to do as

2    part of your cooperation?

3    A    Make buys.

4    Q    Controlled buys?

5    A    Yes.

6    Q    What does that mean, to make a controlled buy?  What did you

7    understand that to mean, for the jury which may not be familiar

8    with the term?

9    A    They would give me money to go make a buy from a dealer and

10    I'd bring them back the drugs.

11    Q    So the idea is that they would put you in a position to make

12    a buy that they could either observe or observe part of?

13    A    Yes.

14    Q    And that would lead them to another dealer?

15    A    Um-hum.  Yes.

16    Q    You also provided them information about the people you

17    might be in a position to make controlled buys from, is that

18    right?

19    A    Yes.

20    Q    During the time that you spoke with law enforcement in

21    Pennsylvania, did you mention the name "Sharmeka Fletcher", it's

22    the lady who's on the screen right now?

23    A    Yes.

24    Q    This was somebody you told law enforcement you might be able

25    to make a buy from?

1    A    Yes.

2    Q    We'll talk about some things that happened with Ms. Fletcher

3    in a few minutes.  But just so the jury's aware, were there other

4    people that you told law enforcement about that you actually made

5    controlled buys from during your cooperation?

6    A    Yes.

7    Q    Let me ask you about Ms. Fletcher.  Did there come a time

8    that you actually made a controlled buy from her?

9    A    Yes.

10    Q    How did that come about?

11    A    I had seen her and she told me that she had some crack for

12    sale, and she told me to call her if I needed anything.  That was

13    basically how it happened.

14    Q    And you told the law enforcement people that you were

15    working with in Altoona about that?

16    A    Yes.

17    Q    And did they set you up to actually meet with her and make a

18    buy?

19    A    Yes.

20    Q    How did that work?  Did you contact her by phone?  Did you

21    wait for her to contact you?

22    A    No.  I contacted her by phone.

23    Q    And you made like you were interested in making a purchase?

24    A    Yes.

25    Q    I gather that you didn't tell Ms. Fletcher that you were

150

1    making this purchase for the police, right?

2    A    No, I didn't.

3    Q    Just to seem like you're a customer?

4    A    Yes.

5    Q    Did you make arrangements to meet with Sharmeka Fletcher for

6    the purpose of making a buy?

7    A    Yes.

8    Q    What did you end up doing?  Was there a meeting?

9    A    Yes, I met her at a Sheets grocery store.

10   Q    Like a convenience grocery store?

11   A    Um-hum.

12   Q    That's a yes?

13   A    Yes.

14   Q    What happened at Sheets?

15   A    We pulled off from there and we went around the block and I

16   gave her $150 and she gave me an eight ball.

17   Q    Now, you gave Ms. Fletcher $150.  If I understand this

18   correctly, you meet her up at a Sheets place.  And did you get

19   into a car with her or did she get in a car with you?

20   A    No, I got in a car with her.

21   Q    And them you went around the block?

22   A    Yes.

23   Q    Was there anyone else present during this time that you

24   remember?

25   A    I don't remember.

1    Q    Now, you gave some money to Sharmeka and then she gave you

2    something called an eight ball?

3    A    Yes.

4    Q    What's an eight ball?

5    A    3.5 grams.

6    Q    Of what?

7    A    Crack cocaine.

8    Q    Now, 3.5 grams, if my math is correct, comes out to about

9    one-eighth of a gram of crack, is that right?

10   A    Yes.

11   Q    And that's what the term eight ball means, one-eighth?

12   A    Yes.

13   Q    And you paid $150 for that?

14   A    Yes.

15   Q    In Altoona at that time, what could you, if you'd still been

16   selling at that time, what could you have sold an eighth of a

17   gram of crack cocaine, an eight ball, for?  If you paid $150,

18   what could you sell it for, if you remember?

19   A    350.  $350.

20   Q    This is a fairly good price?

21   A    Yes.

22   Q    How did you leave things with Ms. Fletcher after making this

23   purchase from her that day?

24   A    I had told her I'd call her if I needed anything else.

25   Q    Now, at that time you had conversations with Ms. Fletcher

1   when she mentioned Charles to you before your cooperation.  And

2   now you're making a controlled buy from her.  Did you have any

3   knowledge about where Sharmeka Fletcher was from?

4   A    Yes.

5   Q    Where was she from?

6   A    Baltimore.

7   Q    How did you know she was from Baltimore?

8   A    She told me.

9   Q    During the time that you were dealing with, whether it was

10  with Ms. Fletcher, with other people, did you occasionally meet

11  people from the Baltimore area in Altoona?

12  A    I'm sorry.  Could you repeat that?

13  Q    That was not a good question.  Let me rephrase.  Did you

14  have knowledge that there were other people from Baltimore who

15  were in Altoona, people like Ms. Fletcher?

16  A    Yes.

17  Q    If you know, what were the advantages of someone from

18  Baltimore coming up to Altoona to sell drugs in the Altoona area?

19  A    They could sell it, they could sell smaller product for more

20  in Altoona than what they would have made from it here in

21  Baltimore.

22  Q    Are drugs in Baltimore, large cities like Baltimore

23  sometimes a little cheaper to buy?

24  A    Yes.

25          MR. LAWLOR:  Objection, Your Honor, move to strike.

1           THE COURT:  Overruled.

2   Q    And in Altoona, how does the price compare?  If they sell

3   for one price in Baltimore, say $10 in Baltimore, what might a

4   person be able to earn in Altoona by selling the same drug?

5           MR. LAWLOR:  Objection, Your Honor, lack of foundation.

6           THE COURT:  Overruled.  You may answer.

7   A    Probably $50.

8   Q    Now, we talked about the first controlled buy.  Did there

9   come a time when you saw Sharmeka Fletcher again?

10  A    Yes.

11  Q    How did that happen?

12  A    She had came to my house.

13  Q    Just approximately, if you remember, Ms. Duganne, how long

14  after the first controlled buy was it that Sharmeka Fletcher came

15  to your home?

16  A    Not sure.  A few days, maybe.

17  Q    And this is your home in Altoona?

18  A    Yes.

19  Q    Were you expecting her that day?

20  A    No.

21  Q    She just showed up?

22  A    Yes.

23  Q    Was that unusual, for someone just to show up at your house?

24  A    No.

25  Q    Sometimes it happened?

1   A    Yes.

2   Q    So there's a knock at the door, I gather?

3   A    Yes.

4   Q    You answer it and then who was there?

5   A    It was Sharmeka and a gentleman that she introduced to me as

6   Bo.

7   Q    Now, this individual, Bo, had you ever seen him prior to

8   that day?

9   A    No.

10  Q    Bo is the name that was given to you by Ms. Fletcher?

11  A    Yes.

12  Q    Did you introduce yourself to Bo?

13  A    I don't remember.

14  Q    Did you have any conversation with him?  Were there any

15  pleasantries exchanged between you and Bo when they came to visit

16  you that day?

17  A    He was basically talking to Sharmeka.  She was talking to

18  me.

19  Q    Now, this is back around about 2000 or so, about eight years

20  ago.  If you saw Bo again, Ms. Duganne, would you be able to

21  identify him?

22  A    No.

23  Q    What did he look like?

24  A    I just know he was African-American.

25  Q    Male, obviously?

1    A    Yes.

2    Q    Now, while Bo and Ms. Fletcher were there, did either one of

3    them hand anything to each other?

4    A    He handed her some eight balls, which she showed me.

5    Q    Now, he handed her some eight balls.  Were they just sort of

6    loose, little eight balls, or were they packaged up some place or

7    somehow?

8    A    They were packaged up.

9    Q    What were they packaged in?

10   A    A Ziploc bag.

11   Q    Bo handed that bag to who?

12   A    Sharmeka.

13   Q    I'm sorry.  Let me rephrase.  Bo had the bag?

14   A    Yes.

15   Q    And what did Bo do with the bag?

16   A    He pulled a few of them out and handed them to Sharmeka.

17   Q    If you could tell, about how many eight balls could you tell

18   were inside this bag?

19   A    Maybe 15, 20.  I'm not sure.

20   Q    And to the extent you could tell, how many of these eight

21   balls did Bo hand to Sharmeka Fletcher?

22   A    Maybe five.

23   Q    Did Sharmeka Fletcher do anything with the eight balls that

24   she was handed?

25   A    She showed them to me.

1    Q    And did she say anything to you about that?

2    A    She told me that that's what they were, that's what they had

3    at the time.

4    Q    Now, we talked about handing of eight balls, five or six

5    eight balls.  We talked about an eight ball.  We talking about

6    eight ball as you already defined it, one eighth of a gram of

7    crack cocaine?

8    A    Yes.

9    Q    Were they packaged individually?  I mean, were they in

10   little rocks?  What did they look like?  What did each one look

11   like?

12   A    No.  They were bagged up separately.

13   Q    I'm sorry, Ms. Duganne.  I made a mistake.  An eight ball, I

14   think I referred to it as one-eighth of a gram.  It's actually

15   one-eighth of an ounce, is that right?

16   A    Right.

17   Q    I apologize.  And you were talking about if they were

18   wrapped up individually in any way?

19   A    Yes.

20   Q    What did they look like?  How were they wrapped?

21   A    They were just singly wrapped up eight balls.

22   Q    In plastic or in some other package?

23   A    Yes, plastic.

24   Q    Did you get any of these eight balls?  Were any of them

25   handed to you or were they just shown to you?

DIRECT EXAMINATION OF DUGANNE                                157

1    A    No, I didn't get any.  They were just shown to me at the

2    time.

3    Q    From what you observed between Bo and Sharmeka Fletcher,

4    what could you tell about the relationship between the two?

5              MR. LAWLOR:  Objection.

6              THE COURT:  Overruled.  You may answer.

7    A    That they was getting money together.

8    Q    Money for that purpose?

9              MR. LAWLOR:  Objection, Your Honor, foundation.

10             THE COURT:  Overruled.  You may answer.

11   A    Selling drugs together.

12   Q    Did you ever learn either from talking to Bo or from talking

13   to Sharmeka Fletcher, where Bo was from?

14   A    No.

15   Q    Did you have any knowledge of where Bo was from?

16   A    I assumed that he was from Baltimore.

17   Q    Ms. Fletcher --

18             MR. LAWLOR:  Objection, Your Honor, move to strike.

19             THE COURT:  Overruled.

20   Q    Ms. Fletcher was from Baltimore, is that correct?

21   A    Yes.

22   Q    Did a lot of her friends and associates also come from

23   Baltimore?

24   A    Yes.

25   Q    We've talked about Bo and we've talked about Sharmeka

1    Fletcher.  Did you know anything about who Bo and Sharmeka

2    Fletcher, anyone else hung out with and worked with on the

3    Baltimore end of things?

4    A    No.

5    Q    Did you know one way or the other who their associates or

6    who their suppliers were in Baltimore?

7    A    No.

8    Q    I'm going to throw out a few names for you.  Tell me if any

9    of them are familiar.  Have you ever heard the name "Shawn

10   Gardner?"

11   A    No.

12   Q    You ever heard the name "Wayne Martin?"

13   A    No.

14   Q    Have you ever heard the name "Shelton Harris?"

15   A    No.

16   Q    Ever heard the name "Goo?"

17   A    No.

18   Q    Ever heard the name "Weaze?"

19   A    No.

20   Q    Know nothing about the people on the Baltimore side?

21   A    No.

22   Q    Now, we've talked about this visit to your home.  Did there

23   come a time when you made arrangements with the law enforcement

24   people in Pennsylvania to make a second controlled purchase?

25   A    Yes.

1    Q     And who was the person you were supposed to buy from?

2    A     Sharmeka Fletcher.

3    Q     How were the arrangements made this time?

4    A     I called her and told her that I needed something.

5    Q     And did you assume she would understand what that would

6    mean?

7    A     Yes.

8    Q     And did you make arrangements to meet with her?

9    A     Yes.

10   Q     What were the arrangements?

11   A     She told me to come to her house.

12   Q     Where was she living at the time?  What kind of place?

13   A     She was living on 10th Street in Altoona.  I'm not sure of

14   the address.

15   Q     A moment please, Your Honor.  In terms of the date of this,

16   around about January of 2000 sound correct?

17   A     Yes.

18   Q     Now, did the law enforcement people you were working with

19   have any particular hopes or ideas about the best way to make

20   this purchase?

21   A     They wanted Sharmeka to come out of the house because I

22   guess she had just been sentenced to house arrest or something.

23   Q     Did you suggest, when you made your arrangements with

24   Sharmeka Fletcher, that she could come out and meet with you?

25   A     Yes.

1   Q   What was her response to that?

2   A   She couldn't.

3   Q   Because of house arrest?

4   A   Right.

5   Q   So what ended up happening?  Did you go to the place?

6   A   Yes.

7   Q   During these controlled buy operations, were they done in a

8   law enforcement way?  Would you be searched before the operation

9   and searched after the operation?

10  A   Yes.

11  Q   And that was done in this instance?

12  A   Yes.

13  Q   So you end up going to Sharmeka Fletcher's house.  Did you

14  knock on the door and go in?

15  A   Yes.

16  Q   Who let you in, if you remember?

17  A   I don't remember.

18  Q   That's all right.  Who did you see inside the residence?

19  A   Sharmeka, Dionne, and Bo.

20  Q   Now, Sharmeka, Dionne and Bo were there.  Dionne is a name

21  that we've heard for the first time.  Who was Dionne?

22  A   That was Sharmeka's girlfriend.

23  Q   Showing you what's been marked as Government's Exhibit PA-3,

24  who is this individual?

25  A   Dionne.

1    Q    Did you know Dionne prior to this day?

2    A    Yes.

3    Q    Just friends of Sharmeka.  Anything more than that?

4    A    No.

5    Q    What happens inside the apartment?  You've gone in.  The

6    three people are there.  What part of the apartment did you go

7    to?

8    A    I went to the dining room.

9    Q    Who was in the dining room?

10   A    Sharmeka, Dionne, and Bo.

11   Q    Were they all sitting at a table or were they just hanging

12   out in there?

13   A    No, they were sitting at the table.

14   Q    When you walked in, in addition to the three of them, did

15   you see anything else in the dining room area?

16   A    There was cocaine and vials and a gun on the table.

17   Q    Let me ask you about the vials.  Had you seen vials like

18   this before that day in your own drug activities?

19   A    I had seen them.

20   Q    What are vials generally used for, that you'd observed?

21   A    To put the cocaine in.

22   Q    There was actually, were some of the vials empty?

23   A    Yes.

24   Q    Did some of the vials have anything inside them?

25   A    Yes.

1    Q    Could you tell what was inside them?

2    A    It was crack cocaine.

3    Q    Was there any packaging going on?  Was anybody in the

4    process of putting cocaine into the vials?

5    A    Yes.  That's what they were doing at the time that I came

6    in.

7    Q    Were all three of them doing that or just one or two of

8    them?

9    A    I can't remember.

10   Q    I think you've anticipated part of my next question.  You

11   mentioned that there was some cocaine in the room.  Some of it

12   was in the vials.  Was there any loose cocaine, cocaine that was

13   not packaged up?

14   A    Yes.

15   Q    Could you tell about how much cocaine there was?

16   A    A couple ounces, maybe.

17   Q    And could you tell what type of cocaine it was?  Was it

18   powder cocaine or crack cocaine or was it a bit of both?

19   A    It was crack cocaine.

20   Q    You walk in and the idea on this day was that you were going

21   to make a purchase of some crack, is that right?

22   A    Yes.

23   Q    How much were you anticipating getting from Sharmeka

24   Fletcher?

25   A    I gave her $300.

1    Q    And how much would you have expected to get for $300 from

2    Ms. Fletcher?

3    A    That would have got two eight balls.

4    Q    And how much would that be worth on the street up in

5    Altoona?  What could you turn that around for, if you were still

6    selling?

7    A    Six, $700.

8    Q    This idea of being able to pay $300 and being able to get

9    about twice that value in the drugs, was there a term for that,

10   Ms. Duganne?

11   A    Double up.

12   Q    Double up.  Was this something you'd been able to do with

13   suppliers from Baltimore?

14   A    Yes.

15   Q    Is that for the reasons we already discussed, about

16   Baltimore prices versus Altoona prices?

17   A    Yes.

18   Q    How did it work?  Who did you give the money to and who did

19   you get the drugs from?

20   A    I gave the money to Sharmeka and Dionne handed Sharmeka the

21   vials and Sharmeka handed them to me.

22   Q    When you gave the money to Sharmeka Fletcher, did you see

23   Ms. Fletcher give the money to anyone else?

24   A    She gave the money to Bo.

25   Q    Did you see what Bo did with the money?

1    A    No.

2    Q    At any point, did Bo or any of the other people ask you to

3    do anything for them?

4    A    Bo asked me to bring back a six pack when I came back.

5    Q    Six pack of beer?

6    A    Yes.

7    Q    Before you left, did he go any place or do anything?  Did

8    you see him walk away any place or anything like that?

9    A    I don't remember.

10   Q    Now, you also mentioned that there was a gun in the room?

11   A    Yes.

12   Q    You described the drugs and the vials.  Where was the gun?

13   A    On the table.

14   Q    Near the drugs or far from the drugs?

15   A    It was right there with them.

16   Q    Do you recollect what kind of a gun it was?

17   A    I believe it was a .357 revolver.

18   Q    Had you ever seen guns prior to that day?

19   A    Yes.

20   Q    You know the difference between a revolver and a

21   semiautomatic?

22   A    Yes.

23   Q    And do you feel comfortable knowing enough about guns to

24   have a sense it was a .357?

25   A    Yes.

1    Q    Who was closest to the gun of the three people you were

2    with?

3    A    I don't know.  I don't even remember.  I just remember it

4    being on the table.

5    Q    So you got some crack and you'd been asked to get a six pack

6    of beer.  Did you leave the apartment?

7    A    Yes.

8    Q    And what did you do when you left?

9    A    I had gave the vials to the officers I was with and went

10   back to their office to be strip searched.

11   Q    When you did a controlled purchase, you would have a meeting

12   place to get together with law enforcement after you left an

13   area?

14   A    Yes.

15   Q    And that's how that worked in this case?

16   A    Yes.

17   Q    You went back.  You got strip searched.  I assume that was a

18   female officer who did that?

19   A    Yes.

20   Q    And then what was the plan afterward?  You'd been searched

21   and the crack has been given to the police.  What happened next?

22   A    They wanted me to go back and knock on the door.

23   Q    Was this so they could make a arrest?

24   A    Yes.

25   Q    Did you warn them that you'd seen a firearm in the

1    apartment?

2    A    Yes.

3    Q    Did you go back and knock on the door?

4    A    Yes.

5    Q    And someone answered it?

6    A    Yes.

7    Q    What happened after that?

8    A    I went in the house and they all came in behind me and

9    arrested everybody.

10   Q    Now, during the time that you were spending a time -- well,

11   strike that.  At any point have you ever heard or became aware

12   that Bo had any interests in the music business?

13   A    I had heard a CD.

14            MR. LAWLOR:  Objection.

15            THE COURT:  Overruled.  You may continue your answer.

16   A    I had heard a CD that my sister had.

17   Q    So you heard a CD?

18   A    Um-hum.

19   Q    That's a yes?

20   A    Yes.

21   Q    And leaving aside what your sister told you, did you see any

22   names or labels or company names on the CD?

23   A    I believe it said Sheistyville.  I'm not exactly sure.

24   Q    Nothing further, Your Honor.  Thank you, Ms. Duganne.

25            CROSS EXAMINATION

1    BY MR. LAWLOR:

2    Q    Ma'am, I'm sorry.  Could you help me pronounce your last

3    name, please?

4    A    Duganne.

5    Q    Duganne.  Ma'am, you said that your, your decision to

6    cooperate with the police was based on a desire to help your, the

7    father of your children, is that right?

8    A    Yes.

9    Q    Okay.  Do you recall testifying in the grand jury in this

10   matter?

11   A    About four years ago?

12   Q    Yes.  You testified before the grand jury four years ago, is

13   that right?

14   A    Yes.

15   Q    Okay.  And were you asked about your decision to cooperate

16   with the police then?  Were you asked that question?

17   A    I don't remember.

18   Q    Okay.  Does that appear to be a copy of your grand jury

19   testimony?

20   A    Yes.

21   Q    That's May 19th, 2004?

22   A    Yes.

23   Q    Okay.  So it was closer in time to the events that you're

24   testifying about here today, right?

25   A    Yes.

1   Q    Okay.  And they asked you, do you recall being asked whether
2   you were cooperating with the police?
3   A    Yes.
4   Q    And do you recall being asked why?
5   A    Yeah.  Yes, I do.
6   Q    Okay.  And starting on Line Two, could you read your answer
7   right there?
8   A    Well, I had got in trouble and I started cooperating with
9   the police and I had made the buys from her then, yes.
10  Q    And the next question is, you had gotten arrested, right?
11  A    Yes.  That's the question.
12  Q    Am I correct?  So the truth of the matter is is that you
13  were trying to help yourself because you had gotten arrested,
14  right?
15  A    No.  That's not the truth of the matter.
16  Q    Four years ago when you testified under oath before the
17  grand jury, that's what you said, right?
18  A    Okay.
19  Q    No, not okay.  Is that right?
20  A    Yes.  That's what I said.
21  Q    Okay.  So you were under oath, right?
22  A    Yes.
23  Q    It was your desire to tell the truth, right?
24  A    Yes.
25  Q    You are under oath today, right?

1    A    Yes.

2    Q    And it's your desire to tell the truth today, right?

3    A    Yes.

4    Q    And you've given materially inconsistent answers to the same

5    question, right?

6         MR. HANLON:  Objection, Your Honor, to that

7    characterization.

8         THE COURT:  Overruled.  You may answer.

9    A    Could you repeat the question?

10   Q    Sure.  Was your answer the same then as it is now?

11   A    Yes.

12   Q    It's the same today as it was then?

13   A    Yes.

14   Q    All right.  Well, let's rehash it, then.  Then you said you

15   were trying to help yourself because you got arrested, right?

16   A    Yes.

17   Q    Today you said you were trying to help the father of your

18   children, right?

19   A    Yes.

20   Q    All right.  Is that the same answer or is that a different

21   answer?

22   A    That's a different answer.

23   Q    All right.  So were you lying then or are you lying now?

24   A    No, I wasn't lying either time.

25   Q    Help me out here because one answer was right and one answer

1    was wrong.  Which is right and which is wrong?

2              MR. HANLON:  Objection, Your Honor.

3              THE COURT:  Sustained to that.

4    Q    Okay.  Which is it?

5              THE COURT:  Rephrase the question, please.

6    Q    Were you helping yourself or were you helping the father of

7    your children?

8    A    I was helping the father of my children.

9    Q    Okay.  So why, when you were asked before the grand jury,

10   did you say that you were helping yourself?

11             MR. HANLON:  Objection, Your Honor.

12             THE COURT:  I'll overrule.  Would you like to explain?

13   A    In a sense it was helping me because I had a child through

14   this man.  I had gotten in trouble but I had already been

15   sentenced for my crime.  I was doing what I was doing for him.

16   Q    Okay.  All right.  Well, let's talk about that.  You sold

17   drugs in the past.  This is around 1999 that we're talking about?

18   A    Yes.

19   Q    You had sold drugs.  You had been arrested.  You had been

20   incarcerated, right?

21   A    I was not incarcerated.

22   Q    All right.  You had sold drugs and you'd been arrested?

23   A    Yes.

24   Q    And you had gotten probation or something?

25   A    Yes.

1   Q    Okay.  And then you either got arrested or the father of

2   your children got arrested, whichever it is, and you decided to

3   cooperate with the police?

4   A    Yes.

5   Q    And then you fulfilled that obligation?

6   A    Yes.

7   Q    And then to continue to be a good citizen, you entered back

8   into the drug trade, right?  You were later arrested in

9   possession of a kilogram of cocaine, right?

10  A    Yes.

11  Q    So you sell drugs when it's convenient for you, you

12  cooperate with the police when it's convenient for you, and then

13  when that convenience is completed, you begin to sell drugs

14  again, right?

15  A    No, that's not right.

16  Q    Well, is that how it transpired in time?

17  A    Yes.

18  Q    Okay.  Do you recognize anyone in this courtroom?

19  A    No.

20  Q    And you know someone named Bo from Baltimore, right?

21  A    Yes.

22  Q    You assumed he was from Baltimore, right?

23  A    Yes.

24  Q    You don't even know that much, right?

25  A    Correct.

1    Q    Do you know anyone else in this courtroom?

2    A    No.

3    Q    And Mr. Hanlon asked you, you do not know Shelton Harris?

4    A    No.

5    Q    And you do not know Shelly Wayne Martin?

6    A    No.

7    Q    And you do not know Shawn Gardner?

8    A    No.

9    Q    Okay.  And the individuals that associated with Bo were

10   someone named Dionne and someone named Sharmeka?

11   A    Yes.

12   Q    Okay.  And you bought from them eight balls, correct, from

13   either Bo or Sharmeka?

14   A    Yes.

15   Q    All right.  And is that kind of a small, street level amount

16   of drugs?

17   A    Yes.

18   Q    All right.  So you would buy for a couple hundred dollars

19   and turn around and sell it for a couple hundred dollars?

20   A    Yes.

21   Q    All right.  So three and half -- help me with the math.

22   Three and a half grams.  How many times do you get that to get an

23   ounce?

24   A    Eight.

25   Q    All right.  And how many ounces do you need to get all the

1    way up to a kilogram?

2    A    Thirty-something.

3    Q    Okay.

4    A    32, 38, something.

5    Q    Well, then an eight ball, you've seen and sold eight balls,

6    right?

7    A    Yes.

8    Q    And you've seen and dealt in quantities as high as a

9    kilogram, right?

10   A    Yes.

11   Q    Could I have the Court's indulgence for a minute?

12        THE COURT:  Yes.

13   Q    Excuse me.  So how, what fraction of a kilogram is an eight

14   ball?

15   A    An eighth of an ounce.

16   Q    All right.  So if an eight ball is an eighth of an ounce and

17   it takes thirty-something ounces to get all the way up to a

18   kilogram, then it's like 200-something eight balls to get up to a

19   kilogram?

20   A    Yes.

21   Q    So these are very small quantities that you're dealing with?

22   A    Yes.

23   Q    All right.  Because this is street level stuff, right?

24   A    Yes.

25   Q    Not kingpin stuff?

1    A    Yes.

2    Q    It was later on that you personally got a little kingpin,

3    right?  Started dealing in kilograms?

4    A    No, not myself personally.

5    Q    That wasn't you?  Didn't you testify five minutes ago that

6    you got arrested with a kilogram of cocaine?

7    A    Okay.  But I didn't never get a kingpin charge.

8    Q    Oh, okay.  I see.  What kind of charge did you get for that

9    kilogram?

10   A    Conspiracy.

11   Q    Conspiracy to do what?

12   A    Possess with intent to deliver.

13   Q    Was that charge disposed of in state court?

14   A    Yes.

15   Q    You didn't get any federal time out of that?

16   A    No.

17   Q    Are you still serving time?

18   A    I'm on parole.

19   Q    All right.  And what about your sister?

20   A    She's in the state correctional facility.

21   Q    She is?  Okay.  And as a result of your cooperation today,

22   the authorities arranged that you two can meet here today and

23   catch up?

24   A    Yes.

25   Q    All right.  Now, one final thing.  You said that when you

1    went to buy this amount of drugs when you saw, what was it, a

2    couple ounces around the table?

3    A    Yes.

4    Q    And a gun?

5    A    Yes.

6    Q    That Bo sent you, tried to send you on an errand to get a

7    six pack?  Is that what you said?

8    A    Yes.

9    Q    No further questions.

10                    REDIRECT EXAMINATION

11   BY MR. HANLON:

12   Q    Just a couple questions, Your Honor.  Ms. Duganne, you were

13   shown some questions about some of your prior grand jury

14   testimony.  You were allowed to read part of that testimony.  I'm

15   going to give you a chance now to read the rest of it.  This is

16   Page Six of your grand jury transcript, May 19th of 2004.  Do you

17   see it on the screen?

18   A    Yes.

19   Q    Mr. Lawlor asked you a moment ago, your answer to a previous

20   question was, Well, I got in trouble and I had started

21   cooperating with police and I had made the buys from her then,

22   yes.  Question:  You got arrested?  And then your answer, which

23   was not something that was put out on cross, but I'll ask about

24   it now, was as follows.  Answer:  I had got arrested but I wasn't

25   in trouble for myself or, when I was working with the police.  I

1    had a previous drug charge but I had got probation and I walked

2    off my time on that.  I had started working with the police

3    after, after all my matters had already been dealt with.  My

4    matters, myself, on me.  And I told them that I could make a buy

5    from Sharmeka.  And they asked me would I do it and I told them

6    yeah.

7              Is that your testimony in the grand jury?

8    A    Yes.

9    Q    And did you say in the grand jury, as you said today, that

10   your cooperation wasn't going to benefit you personally or your

11   case?

12   A    Yes.

13   Q    And that's what you told the grand jury, correct?

14   A    Yes.

15   Q    And then I've asked you to put on the record to make

16   everything clear, that the father of your children was in trouble

17   and you were hoping to benefit maybe him, but not yourself, in

18   your case, is that right?

19   A    Yes.

20   Q    Now, I'm not going to ask you to do a bunch of mathematical

21   calculations.  I don't have a calculator.  But an eight ball,

22   during your dealings with Sharmeka Fletcher, how much were you

23   paying for an eight ball?

24   A    $150.

25   Q    $150 for one eight ball, is that right?

1   A    Yes.

2   Q    This time when Ms. Fletcher and Bo came to your house and

3   visited, you indicated that Bo had between 15 and 20 of those

4   eight balls on him at that time, is that right?

5   A    Yes.

6   Q    So that would be 15 or 20 times 150 that he had on hand

7   during that one visit; am I understanding you right?

8   A    Yes.

9   Q    And the math, that would be as much as 20 times 150, if my

10  math is correct, as much as $3,000 worth of crack cocaine that he

11  had on him in a sandwich bag on that one occasion, is that right?

12  A    Yes.

13  Q    Thank you, Your Honor.

14          MR. LAWLOR:  Briefly, Your Honor.

15          THE COURT:  Very briefly, Mr. Lawlor.

16          REDIRECT EXAMINATION

17  BY MR. LAWLOR:

18  Q    Ma'am, I'm afraid I am going to have to ask you to do a

19  little math.  You said that a eight ball is three and a half

20  grams, right?

21  A    Yes.

22  Q    So then 20 times 3 and a half is still 70 grams, right?

23  Does that math look right to you?

24  A    Yeah.  Yeah.

25  Q    Does that math like right to you?

1    A     Yes.  Yes.

2    Q     And that's still less than one-tenth of a kilogram, right?

3    A     Yes.

4    Q     Okay.  Thank you.

5          THE COURT:  Thank you very much, Ms. Duganne.  You're

6    excused.

7          THE WITNESS:  Thank you.

8          THE COURT:  Watch your step.  Next witness.

9          MR. HARDING:  Your Honor, the United States calls

10   Norman Young.

11          NORMAN YOUNG, GOVERNMENT'S WITNESS, SWORN

12          THE WITNESS:  I do.

13          THE CLERK:  Speak directly toward the mike.  State your

14   name and spell it for the record.

15          THE WITNESS:  My name is Norman Young.  Last name

16   Y-O-U-N-G.

17          DIRECT EXAMINATION

18   BY MR. HARDING:

19   Q     Good afternoon, Mr. Young.  Mr. Young, can you tell us how

20   are you employed, sir?

21   A     I am currently employed with Pennsylvania Attorney General's

22   Office.

23   Q     And how long have you been employed by the Attorney

24   General's Office?

25   A     Approximately two and a half years.

1    Q    What kind of work do you do for them?

2    A    I'm a narcotic agent.

3    Q    Let me call your attention back to the year 2000.  Can you

4    tell us what you were doing at that time?

5    A    Yes.  I was employed with the Altoona Police Department in

6    the City of Pennsylvania, or in the State of Pennsylvania.

7    Q    And how long did you work for the Altoona Police Department?

8    A    I worked 25 years.

9    Q    And what kind of work were you doing for them back in 2000?

10   A    Back in 2000, I was in charge of their Narcotic Unit.

11   Q    Around that time, in early 2000, did you know a woman by the

12   name of Nieshia Duganne?

13   A    Yes, I did.

14   Q    Can you tell us how you became acquainted with her?

15   A    She became a confidential informant for us and did, made

16   buys, undercover buys for us.

17   Q    Do you recall how she came to your attention?

18   A    She was brought to us from the federal government.  They

19   were working with her on several other cases.  And the agent, the

20   FBI agent indicated that he could, she could do some things for

21   us in the City of Altoona.

22   Q    Okay.  Did you proceed to have her make buys?

23   A    Yes, she did.

24   Q    All right.  When you were using her as a, a person who could

25   make buys, did you make payments to her for her services?

1    A    She would on occasion be paid, yes.  My recollection, she

2    only made, I believe, and I want to say three or four buys for me

3    personally.  I don't know what she did for the federal

4    government.

5    Q    Okay.  And the buys that she made for you, how much money

6    did you give her?

7    A    This particular buy that we're here for, I believe she was

8    given $40.

9    Q    Okay.  And did she also get similar amounts of money when

10   she made the other buys that you alluded to?

11   A    It would have been in that ballpark, yes.

12   Q    The other buys that she made, were those before the buy that

13   we're here for today?

14   A    Yes, they were.

15   Q    Can you tell us who the targets were in those buys?

16   A    The one individual was an individual from Philadelphia.  I

17   believe his last name was Walker.  I want to say David Walker.

18   And I think she purchased from another one or two people in the

19   city of Altoona.  But I'll be honest with you, the names, I do

20   not recall at this time.

21   Q    Did you and Altoona have a problem with drug dealers coming

22   in from other big cities?

23   A    Yes, we did.  Not only from the City of Baltimore, but the

24   City of Philadelphia, the City of New York, and Buffalo became

25   source cities for us in the late '90s.

1    Q    Do you know why that was?

2    A    In our particular community, you could, the drugs sold for

3    more money than they cost in the larger cities.  An individual

4    that would be able to buy a ounce of cocaine here in Baltimore

5    maybe for five, $600, could turn around and make three, four,

6    five times that in our city.

7    Q    Okay.  Let me call your attention to -- well, let me ask you

8    first a general question.  Why was it that Nieshia Duganne was

9    doing these buys for you?  What was she, what was she hoping to

10   gain out of it?

11   A    She was, well, she was in trouble for, or she was trying to

12   get her -- that's right.  She was trying to get her boyfriend at

13   the time out of trouble.

14   Q    Okay.  Did you know her boyfriend at the time?

15   A    Yes.  Akil Johnson.  I think she later married him.

16   Q    Were you involved in, in the, in how he got into trouble?

17   A    The first time.  The second time I was on the outside, not

18   overly involved.  I wasn't the case agent.

19   Q    Okay.  Let me call your attention to January 24th of 2000.

20   Did you meet with Nieshia Duganne?

21   A    Yes, I did.

22   Q    With some other police officers?

23   A    Yes.

24   Q    And was that for the purpose of making a controlled buy?

25   A    That is correct.

1    Q    Who were you going to make the controlled buy from?

2    A    From a female named Sharmeka Fletcher.

3    Q    And who was Sharmeka Fletcher?

4    A    Sharmeka Fletcher was an individual from Baltimore that we

5    had previously arrested for selling drugs.  She was actually

6    sentenced that day in our court system.  And she was due to start

7    serving her sentence the next day.  She was targeted because we

8    felt that the sentence she was given was less than it should have

9    been.  And then Nieshia, who was talking to me daily during this

10   time frame, indicated that she could make a purchase from her.

11   And at that point it was made, a decision was made to make a

12   purchase from her.

13   Q    Let me show you what has been marked as Government's Exhibit

14   PA-2, Mr. Young.  I'll ask you if you can identify the person

15   whose picture appears in PA-2?

16   A    Yes, I can.

17   Q    Who is that?

18   A    That would be Sharmeka Fletcher.

19   Q    Okay.  So tell us how you went about having Nieshia Duganne

20   make a controlled buy from Sharmeka Fletcher?

21   A    As indicated earlier, I spoke to her in the afternoon.  She

22   indicated she could make a buy.  For us to make a buy with the

23   use of a female CI, I had to make sure that I had a female

24   officer to search her.  That usually takes some time.  At that

25   particular time I think our police department had just two female

1    officers.  So arrangements were eventually made to have a female

2    officer search Nieshia.

3    Q    And that would have been done at the police station, I

4    assume?

5    A    That would have been, yes.

6    Q    Okay.  And then what happened?

7    A    Nieshia was searched by Patrolman Hogan.  Then we made a

8    phone call or we called a pager that she had for Sharmeka.  We

9    went to an area, shopping mall, to make the call from a pay

10   phone.

11          The phone call was made to the pager.  I believe it was

12   a minute later that the, a phone call was received to the pay

13   phone.

14   Q    And what happened then?

15   A    Arrangements were made to make a purchase of crack cocaine.

16   Q    I assume that the phone call that was made to the pager was

17   from Sharmeka Fletcher?

18   A    That is correct.

19   Q    And what was your understanding as to the arrangement that

20   was made in the conversation?

21   A    That we were going to purchase $300 of crack cocaine.

22   Q    And where was this purchase going to take place?

23   A    At the residence where Sharmeka Fletcher was residing, which

24   was 1302 10th Street, in the City of Altoona.

25   Q    Okay.  So what happened then?

1    A    Well, we departed from the station mall area, which was

2    approximately two, three miles from the target location.

3    Officers, there was additional officers assigned to the detail

4    and we set up surveillance on the residence.

5    Q    Okay.  What time of day or night was this that you --

6    A    This was approximately 8:24, 8:25 in the evening.  And this

7    was January so it was, in fact, dark.

8    Q    Okay.  Tell us what Ms. Duganne did at that point.

9    A    She exited, actually it was my car, undercover car.  She

10   walked approximately a half block to this residence.  She was in

11   our view the whole time.  She went into the residence.  She was

12   in there approximately six minutes.

13   Q    She came out around 8:30 then?

14   A    That's correct.

15   Q    What happened then?

16   A    She walked back to our surveillance vehicle.  And at that

17   time she handed over a plastic bag with numerous vials of

18   suspected crack cocaine.  We took Nieshia back to the police

19   department, which is approximately a half a mile from this

20   location.  The suspected crack cocaine was field tested.  It

21   indicated a positive reaction for crack cocaine.  Then Nieshia

22   was strip searched again by the female officer.

23   Q    And was she clean, as you say?

24   A    Yes, she had no other drugs or monies on her.

25   Q    Did she tell you anything about what she had observed inside

1    the house?

2    A    Yes, she did.

3    Q    What did she tell you?

4    A    She indicated to me that evening her version of this

5    particular buy was that she knocked on the door, that a female by

6    the name of Dionne Boynton answered the door.  She asked for

7    Sharmeka.  Ms. Boynton yelled upstairs and, according to Nieshia,

8    Sharmeka and an individual known to Nieshia, a black male named

9    Bo, came downstairs.

10   Q    Okay.  Did Nieshia tell you anything more about what she

11   observed inside the house?

12   A    Yes.  Bo made a motion that he wanted the money and Nieshia

13   indicated that she wanted to give the money to Sharmeka.  And

14   eventually Sharmeka was given the money.  And then there was a,

15   according to her, an indication that Bo motioned to Dionne

16   Boynton to give the crack cocaine to Sharmeka, who gave it in

17   turn to our CI.

18   Q    How much crack cocaine was it?

19   A    It ended up being 30 vials.

20   Q    Okay.  So she didn't, in fact, buy an eight ball.  She

21   bought an eight ball divided up into many, or several eight balls

22   divide into 30 vials, is that right?

23   A    Well, actually, the final weight ended up being less than

24   two grams.  So it wasn't even a eight ball.  It was a little more

25   than a half an eight ball.

1   Q    I see.  You say you field tested the crack once you got back

2   to the police station.  Did you also obtain a search warrant?

3   A    Yes, we did.  Prior to obtaining the search warrant, we were

4   in contact with our district attorney.  We indicated the details

5   of what occurred.  He felt that it would be --

6              MR. LAWLOR:  Objection, Your Honor.

7              THE COURT:  Sustained.  Go ahead, Mr. Harding.

8   BY MR. HARDING:

9   Q    Did you obtain the search warrant?

10  A    Yes, we did.

11  Q    By the way, did Ms. Duganne tell you anything about firearms

12  in the house?

13  A    Yes, there was information.

14  Q    Okay.

15  A    That she had seen firearms before.

16  Q    Did she indicate that she was expected late, back there

17  later that evening?

18  A    Yes.  There was an indication that if she needed more, to

19  stop back.  And we used that to gain entry into the residence.

20  Q    So tell us what happened.

21  A    We re-grouped.  We called some additional officer in, not

22  knowing what we were going to have in there.  We know that there

23  was at least three people in the residence.  A period after we

24  re-grouped, we went to the residence with Nieshia, knocking on

25  the door.  When the door was opened, we went in and identified

Case 1:04-cr-00029-RDB    Document 676    Filed 06/08/09    Page 187 of 291

1    ourselves and secured the residence.

2    Q    Who was on the first floor when you went in?

3    A    On the first floor was Sharmeka and Dionne Boynton.

4    Q    By the way, let me show you what's been marked as PA-3.  Can

5    you tell us what this shows?

6    A    Yes.  That would be Ms. Boynton.  Dionne, I think, is her

7    first name.

8    Q    And these two photographs, were these taken by the police?

9    A    Yes, they were.

10   Q    Following the arrest that night?

11   A    That is correct.

12   Q    Okay.  They have the dates on the bottom?

13   A    Yes.

14   Q    Actually, that's a couple, that's a few days later, is that

15   right?

16   A    It is.

17   Q    All right.  You said that Dionne and Sharmeka were on the

18   first floor.  What else?

19   A    Yes.  We had had a police dog with us.  At that point, there

20   was a, the black male was upstairs.  We only knew him as Boo

21   (sic) at this particular time.  He was asked to come down,

22   ordered to come downstairs.  He did not come downstairs

23   immediately.  We ordered again for him to come downstairs or

24   we're going to send the dog up.  At that point he did come

25   downstairs and he was taken into custody.

1    Q    Okay.  Did you recover other evidence while you were in the

2    house?

3    A    Yes, we did.

4    Q    What?

5    A    We recovered additional crack cocaine, currency, and other

6    items that we felt were significant.

7    Q    Do you recall where the currency was when you recovered it?

8    A    $900 of the currency was found on Sharmeka Fletcher,

9    including the $300 from the buy that occurred approximately an

10   hour before that.  There was an additional $210 currency found on

11   Willie Mitchell, William Mitchell, the individual known as Bo.

12   Q    Okay.  So you, after taking Bo into custody, you were able

13   to identify him as Willie Mitchell, is that right?

14   A    Yes, he was eventually identified as William Mitchell.

15   Q    And he had $210.  What about Boynton, did she have anything?

16   A    She had no currency on her.

17   Q    Okay.  Did you recover anything else?

18   A    Again, there was a, a safe found in the master bedroom, as

19   we referred to it as.  We referred to it as master bedroom

20   because it was much larger than the other bedroom.  This was a

21   two bedroom apartment.

22          Additional vials of crack cocaine, along with five

23   medium-size rocks of crack cocaine were found in the master

24   bedroom.

25   Q    Okay.  Was that on the second floor?

1   A    That would be on the second floor, yes.

2   Q    And that's where Bo was when you guys went in the house, is

3   that right?

4   A    That is correct.

5   Q    Was he coming out of a -- which bedroom was he coming out

6   of, the master bedroom or another bedroom?

7   A    The master bedroom.

8   Q    Okay.  Were there other items recovered from the floor in

9   that bedroom, do you recall?

10  A    Can I be allowed to look at the --

11  Q    Sure.

12  A    There was packaging materials, numerous cell phones, a

13  couple pagers, and also digital scales.

14  Q    Okay.  Were there, was there a box of glass vials?

15  A    Yes.  That was the packaging materials I'm talking about.

16  Q    Oh, I see.  And also baggies, little baggies?

17  A    Yes.

18  Q    Okay.  Let me show you what's been marked as PA-1.  Can you

19  identify the person in that photograph?

20  A    Yes.  That would have been, that's William Mitchell.

21  Q    Okay.  And was this taken the very, the very night of this

22  controlled buy, January 24th, 2000?

23  A    Yes.  The photo's dated 1/24/2000.

24  Q    And it says at the top, Willie Edward Mitchell, III, is that

25  right?

1    A    Yes.

2    Q    I assume that was, was there a fingerprint check done on him

3    that night after he was arrested?

4    A    Yes.

5    Q    What happened after you made the arrests and finished

6    executing the search warrant?

7    A    Well, the individuals were processed and arraigned, and

8    after arraignment they were sent to our county jail.

9    Q    Okay.  Let me show you what's been marked PA-6.  I'm going

10   to ask the clerk if she has a pair of scissors you could borrow.

11   Would you open this up?  First of all, tell us what PA-6 is and

12   then open it up, please.

13   A    PA-6, without opening it up, appears to be evidence

14   packaging of items that I sent to the Crime Lab.

15   Q    Can you open it up?

16   A    Yes.  Do you care where I cut it or does it not matter?

17   Q    Doesn't matter to me.  Why don't you tell us what's in the

18   brown envelopes?

19   A    These would have been, this would have been evidence that we

20   seized from the residence that evening.

21   Q    The drug evidence?

22   A    Yes.

23   Q    Okay.  Now, did you submit those to be tested by

24   Pennsylvania State Police Bureau of Forensic Services Laboratory?

25   A    Yes.

1    Q    Let me ask you what the incident number and lab report

2    number were that you submitted those under.

3    A    That would be the incident number that we attached to it, is

4    002691.  The lab report number that GOO-0611-R is the laboratory

5    number that the State Police Crime Lab gives it.

6    Q    Okay.  And --

7              THE COURT:  We really need you near the mike, Mr.

8    Harding.

9    Q    I'm sorry, Your Honor.  I keep forgetting.

10             Was there a second lab report number because two

11   different drug submissions were made to the lab?

12   A    Yes, there is.

13   Q    What's the other number?

14   A    It would still have the same, our case number.

15   Q    Same incident number.

16   A    Right.  But a different lab report number.  That being

17   G04-02061-1.  And that was done in April of 2004.

18   Q    Let me borrow this report.  Is the reason, Mr. Young, that

19   there are two lab submissions, because you submitted the 30 vials

20   that were obtained in the controlled buy in one submission and

21   then the drugs that were recovered in the execution of the search

22   warrant in another submission?

23   A    Yes.  There was two submissions, two envelopes that night.

24   But the submission back in April of '04 was for additional

25   testing.

1    Q    I see.  Both of the packages were retested in '04, is that

2    correct?

3    A    That is correct.

4    Q    Let me, just so this is straight.  There was a lab report

5    done for the bag of five large white rock-like substances,

6    rock-like pieces, and also 15 glass vials containing rock pieces.

7    And that was submitted under a lab report number that ends in

8    612-R, is that correct?

9    A    Yes.

10   Q    And that was retested in 2004.  Do you recall why it was

11   retested in 2004?

12   A    Yes.  It needed to be tested for cocaine base.

13   Q    In other words, the first analysis just determined that it

14   was cocaine?

15   A    That is correct.

16   Q    And then there's another lab report.  The first lab report

17   actually -- wait a minute.  Sorry.  I see.  The second lab report

18   has the same lab report number for the original submission and

19   there's a separate report for the 30 vials that you purchased in

20   the controlled buy?

21   A    That's correct.  We put that into evidence prior to

22   executing the search warrant.  So there was two, actually,

23   envelopes submitted.

24   Q    And then you got another lab report number attached to it in

25   2004 when you sent both of these exhibits back to determine

1    whether they contained crack cocaine, is that correct?

2    A    That is correct.

3    Q    Okay.  All right.  I think those are all the questions I

4    have.  Oh, one other thing.  Did you also recover two Western

5    Union wire transmittals of money?

6    A    Yes, we did.

7    Q    Let me show you PA-4, first of all.  Who's the name of the

8    receiver on this one?

9    A    On this one, it will be Willie Mitchell.

10   Q    And it gives Baltimore as the expected pay out location, is

11   that correct?

12   A    That is correct.

13   Q    The amount is $800?

14   A    That is correct.

15   Q    And the sender is listed as Jaquetta Smith, is that correct?

16   A    That is correct.

17   Q    You don't know who Jaquetta Smith is, do you?

18   A    I do not.

19   Q    Okay.  Gives an address in Baltimore on Etting Street, is

20   that correct?

21   A    That is correct.

22   Q    Okay.  This other one, which is marked PA-5 is also, it also

23   lists Willie Mitchell as the recipient, is that correct?

24   A    That is correct.

25   Q    This one's for $400?

1    A    That's correct.

2    Q    And who is the sender in this case?

3    A    Sharmeka Fletcher.

4    Q    And does it have an address in Baltimore, also, for Ms.

5    Fletcher?

6    A    Yes.  It indicates 2545 -- I'm not familiar with the

7    particular address.  I think it's A-R-U-N-A.

8    Q    Okay.

9    A    Avenue.

10   Q    And what's the date on this one?

11   A    That would have been 1/23 of 2000, the day before this

12   incident.

13   Q    Okay.

14   A    And the establishment number is a supermarket located

15   approximately one mile from this residence where we executed the

16   search warrant.

17   Q    I see.  There is no operator number on the first one, PA-4.

18   But there's a money transfer control number on that one?

19   A    Yes.  That number does not mean anything to me, though.

20   Q    Okay.  All right, then.  Just one moment.

21         Those are the only questions I have.  Thank you, Your

22   Honor.

23         CROSS EXAMINATION

24   BY MR. LAWLOR:

25   Q    Could I have the Court's indulgence for one moment?

1     THE COURT:  Certainly.

2     (Pause in proceedings.)

3  Q   Okay, I'm sorry.  Good afternoon.

4  A   Good afternoon.

5  Q   How are you?

6  A   Pretty good.

7  Q   Did you ever engage in a controlled buy with Ms. Duganne at

8  a Sheets convenience store or gas station?

9  A   Yes, I believe a few days before this particular incident.

10 Q   You did do that?

11 A   Yes.

12 Q   Okay.

13 A   I'm aware of it.  I don't know if I was actually involved in

14 it.  But I'm aware.

15 Q   I'm not trying to trip you up here.  But did you testify on

16 direct that the purchase at the house was the first, first

17 controlled buy with Ms. Fletcher?

18 A   I did but I'm confused.  That was the first time at that

19 particular location.

20 Q   I see.  All right.  So there was a prior purchase?

21 A   Yes.  She had already been --

22 Q   With Ms. Fletcher.  I see.  Ms. Fletcher was the target of

23 your investigation, right?

24 A   That is correct.

25 Q   And you never heard of Bo before you went in the house,

1    right?

2    A    That is correct.

3    Q    Okay.  And when you execute a search warrant, you're concern

4    for your safety and the safety of your fellow officers, right?

5    A    That is correct.

6    Q    In fact, that's your primary concern, is it not?

7    A    Yes.

8    Q    All right.  So when Ms. Duganne came out and told you about

9    a gun she saw in the house when she had been in there previously,

10   this must have raised your concern to a high level, correct?

11   A    Yes.  That's why we --

12   Q    Where did you find that gun?

13   A    She had said she had seen it several days before that.

14   Q    Several days?

15   A    I believe is what her testimony to me was.  She did not see

16   a gun that night, no.  That was not the testimony she gave me.

17   Q    All right.  Well, let me have you walk me, walk me through

18   it.

19        How many times did you talk to her?

20   A    How many times did I talk to who?

21   Q    Yeah.  How many times did you talk to Ms. Duganne?

22   A    When?

23   Q    Prior to January 24th of 2000?

24   A    I had been working with her for several months.

25   Q    Okay.  Were there other targets?

1   A    Yes.  As indicated, we had purchased from several other

2   people.

3   Q    Okay.  Ms. Fletcher was also a target?

4   A    Yes.

5   Q    And you testified on direct that, in fact, you testified on

6   direct and on cross that January 24th of 2000 was the first

7   controlled buy at the house on 10th Street?

8   A    That is correct.

9   Q    All right.  Is that correct?

10  A    Yes.

11  Q    All right.  So this was the first controlled buy?

12  A    Out of that house, yes.

13  Q    Out of that house.  Okay.  And that evening, the chronology

14  is that you meet with Ms. Duganne, correct?

15  A    That is correct.

16  Q    To sort of establish the operation for the evening?

17  A    That is correct.

18  Q    And you strip search her to make sure that she doesn't have

19  any contraband or currency on her person?

20  A    That is correct.

21  Q    And then you send her to the house?

22  A    After we make a phone call to the pager.

23  Q    You made a phone call to the pager, and then you armed her

24  with the money that she would need?

25  A    That's correct.

Case 1:04-cr-00029-RDB   Document 676   Filed 06/08/09   Page 198 of 291

1    Q    She went to the house?

2    A    That's correct.

3    Q    She left the house?

4    A    Yes.

5    Q    She met with you?

6    A    Yes.

7    Q    You interrogated her about the goings-on in the house?

8    A    Spoke to her, yes.

9    Q    Okay.  And -- let me stop you for a second.  She's a

10   confidential informant at this time, correct?

11   A    Yes.

12   Q    She's working with you on the Fletcher operation, along with

13   other operations?

14   A    Yes.

15   Q    Correct?  This was the only time that you sent her to 10th

16   Street?

17   A    That's the only time I sent her to 10th Street.

18   Q    All right.  And you would prefer, I assume, that your

19   confidential informants not freelance, correct?

20   A    To not freelance, that is correct.

21   Q    All right.  Would you prefer that they not buy and sell

22   drugs outside of your supervision?

23   A    That is correct.

24   Q    And that they not try to play Super Cop on their own, right?

25   A    That's correct.

1    Q    And you give them explicit instructions to not do those

2    things, right?

3    A    Not only that, they're informed if we catch them, they will

4    be arrested.

5    Q    Okay.  Excuse me, please.  She told you at some point in

6    time she had seen a gun in the house?

7    A    That's the information that was given to the other officer

8    that prepared the search warrant, yes.

9    Q    Okay.  And since you told her not to do anything without

10   your supervision and this is the first time you told her to go to

11   the house on 10th Street, then shouldn't we assume that this is

12   the first time that she'd been to the house on 10th Street?

13   A    Yes.  But it's my understanding that she had had another

14   contact with him through Sharmeka a few days earlier.

15   Q    At the house?

16   A    I'm not sure where it occurred because I wasn't there.

17   Q    All right.  What I'm trying to find out, guns concern you?

18   A    Guns concern everyone.

19   Q    Okay.  Particularly officers when they're executing a

20   search?

21   A    That's correct.

22   Q    All right.  And so to the degree that there was a gun in the

23   house that you were about to search, this is something you would

24   be very concerned about?

25   A    Again, the information we had, it was several days earlier

1    that --

2    Q    That wasn't the question I asked you, though.  The question

3    I asked you is, would you be concerned about it?

4    A    Yes.

5    Q    All right.  And Ms. Duganne was told not to do things

6    without your supervision?

7    A    That's correct.

8    Q    And she wouldn't have had a reason to go that house but for

9    your direction for her to do so?

10   A    That's correct.

11   Q    All right.  And this was the first time you directed her to

12   go there?

13   A    Yes.

14   Q    All right.  If she testified on direct that she saw the gun

15   when she went in the first time 30 minutes -- how long was it

16   between the time she went and the time you executed the search?

17   A    Until we executed the search?  It would have been several

18   hours.  The place was secured probably within an hour after the

19   buy.

20   Q    Okay.  Could I have the Court's indulgence please?

21             THE COURT:  Yes.

22             (Pause in proceedings.)

23   Q    So if she testified here in court under oath that she saw

24   the gun in the house on January 24th, she'd be lying in this

25   courtroom, right?

1    A    She did not relay that information to me that evening.

2    Q    All right.  And that would be something you would want to

3    know, right?

4    A    That would have been something I would have wanted to know,

5    yes.

6    Q    And when she comes out, I don't want to use the word

7    "interrogate", but for lack of a better term, you interrogate her

8    about the number of persons in the home, right?

9    A    I think it's debrief, yes.

10   Q    Debrief, thank you.  So you debrief her about the number of

11   people in the home?

12   A    That she saw in the house and anything we thought important.

13   Q    And you would ask her if she saw a weapon?

14   A    That's correct.

15   Q    All right.  And just so we're all clear, you never found a

16   weapon in the house that night?

17   A    That is correct.

18   Q    Okay.  Now, how much money did you give her to go in and

19   make the controlled purchase with?

20   A    How much money did I give her?

21   Q    Yes, sir.

22   A    I gave her $300.

23   Q    With the direction to do what?

24   A    Make a purchase of crack cocaine and get as much crack

25   cocaine as you could get for the $300.

1    Q    And how much did she get?

2    A    She got 30 vials.

3    Q    And how much did that weigh?

4    A    I'm sorry?

5    Q    Not the vials, but the cocaine.  How much did that cocaine

6    weigh?

7    A    It ended up weighing 1.9 grams.  1.9 grams.

8    Q    1.9 grams.  And is an eight ball three and a half grams?

9    A    Yes.

10   Q    And two eight balls, then, is seven grams?

11   A    That's correct.

12   Q    All right.  So she testified on direct examination in this

13   court today --

14              MR. HARDING:  Objection, Your Honor.

15              THE COURT:  Sustained.

16   Q    Under oath.  She didn't come out with two eight balls?

17              MR. HARDING:  Objection.

18              THE COURT:  Sustained.  Rephrase your question.

19   BY MR. LAWLOR:

20   Q    Okay.  She came out, after she made the controlled purchase,

21   with less than two eight balls, correct?

22   A    Up in our town, you never get the full weight that you're

23   purchasing.

24   Q    All right.  Can you do me a favor and just try to answer the

25   question I'm asking you?

1   A    You asked me if she came out with full weight.  She did not

2   come out with full weight.

3   Q    All right.  She came out with about a half of one eight

4   ball?

5   A    Yes.  1.9 grams is a little over a half an eight ball, yes.

6   Q    So about a fourth of two eight balls?

7   A    That's correct.

8   Q    Okay.  And you sent her in with marked money?

9   A    That's correct.

10  Q    And did she come out and say, you tried to say that she

11  insinuated, if not stated specifically, that Bo, by winking and

12  nodding and moving his head a little bit, was directing the

13  traffic here?

14  A    That's the way she --

15  Q    She described it to you?

16  A    Yes.

17  Q    Okay.  And -- well, strike that.  So did she tell you that

18  she gave the money to Ms. Fletcher?

19  A    That's what she told me.

20  Q    And then she also told you that Ms. Fletcher gave the money

21  to Mr. Mitchell, right?

22  A    No, she did not.

23  Q    She didn't say that?

24  A    No.

25  Q    You don't remember that or she didn't tell you that?

CROSS EXAMINATION OF NORMAN YOUNG BY LAWLOR                    204

1    A    She told me she did not want to give the money to Mr.

2    Mitchell.  She gave it to Sharmeka.

3    Q    Okay.  Was that your instructions, to make sure that she

4    gave it to the target, no matter who asked for it?

5    A    Well, we wanted -- our target was Sharmeka Fletcher.

6    Q    Right.  So no matter who asked for the money, she was under

7    specific instructions to make sure that the target was

8    effectuated, right?

9    A    We hoped that she would obviously give the money to Sharmeka

10   and receive the drugs from Sharmeka.

11   Q    Okay.

12   A    You know, what happens in there, she does not have total

13   control of.

14   Q    Sure.  Okay.  But she's trying to, she's trying to do your

15   bidding, right?

16   A    My bidding?

17   Q    Yeah.  She knows who the target is and she's working for

18   you.  So, you know, you're telling her the goal here is to get

19   Sharmeka, right?

20   A    I have wouldn't have stressed it like that.  But yes, the

21   target was Sharmeka.

22   Q    Okay.  Did she also tell you that on the table with the gun,

23   whenever she saw it, that she also saw ounces of cocaine?

24   A    There was no information.

25   Q    She never said that to you?

1    A    She did not say that she saw ounces of cocaine.

2    Q    Okay.  What did she say that she saw?

3    A    That she received the 30 vials.

4    Q    Did she say, did she say that -- I can't talk.  Did she say

5    that she saw other drugs other than what she received?

6    A    She did indicate she saw other drugs, but I don't think she

7    indicated she saw, you know, she didn't rate it in an amount.

8    Q    All right.  What's your best recollection today of how she

9    described it?

10   A    She saw additional drugs.

11   Q    Okay.  So that's what she told you?  She saw some additional

12   drugs?

13   A    That is correct.

14   Q    So if she testified in this courtroom that the drugs she saw

15   were in ounces, it appears that --

16        MR. HARDING:  Objection.

17   Q    -- her testimony's getting elaborate --

18        THE COURT:  The objection is sustained.

19   Q    How much drugs did you uncover in total weight?

20   A    Ended up being approximately, total, two-thirds of an ounce.

21   Q    Two-thirds of an ounce.  How much is that in grams?

22   A    13.9.  And I think there was another additional 3.9.  So

23   that would make it about 18.9 or 18.8.  About two-thirds.  Pretty

24   close.

25   Q    So that's less than six eight balls?

1   A    Real close to six eight balls, yeah.

2   Q    But less, right?

3   A    Well, six --

4   Q    Six times three and a half is 21, right?

5   A    Okay.  Less than six.

6   Q    Less than six.  Okay.  And the $300, did you say that that

7   was marked money?

8   A    Yes.  Recorded serial numbers, yes.

9   Q    And where did you find that?

10  A    On Sharmeka Fletcher.

11  Q    Right in her pocket?

12  A    In her pants pocket.

13  Q    Okay.  No further questions.

14                 REDIRECT EXAMINATION

15  BY MR. HARDING:

16  Q    Let me ask you, Mr. Young.  $300 for 30 vials would be $10 a

17  vial, is that correct?

18  A    That's correct.

19  Q    What was the going price for a vial of crack in Altoona back

20  then in 2000, if you recall?

21  A    Those vials would have been sold from anywhere from 30 to

22  $50.

23  Q    So did you believe and did Ms. Duganne believe that you had

24  gotten a very good deal?

25                 MR. LAWLOR:  Objection.

1        THE COURT:  The objection is sustained.  Rephrase.

2   Q    Were you disappointed with the amount of crack that you got

3   for your $300 that might?

4        MR. LAWLOR:  Objection.

5        THE COURT:  Overruled.  You may answer.

6        THE WITNESS:  We were actually pleased.

7   BY MR. HARDING:

8   Q    Okay.  When drugs are broken down from a large quantity and

9   then packaged in vials, are they generally marked up in price,

10  also?

11  A    Yes.

12  Q    Did you, when you executed the search warrant that night,

13  did you, in fact, recover a gun?

14  A    Did I recover a gun?  No.

15  Q    Okay.  You did, however, recover all of the buy money that

16  you had given to Ms. Duganne, is that correct?

17  A    I did, yes.  We did.

18  Q    And it was all on the possession of whom?

19  A    Sharmeka Fletcher.

20  Q    Okay.  Thank you.  Those are the only questions I have, Your

21  Honor.

22        THE COURT:  Mr. Young, thank you very much.  You're

23  excused.

24        MR. HARDING:  We have one more quick witness on this

25  issue, Your Honor.

1          THE COURT:  And then who's after that?

2          MR. HARDING:  The detective.

3          THE COURT:  Finish up Berger?

4          MR. HARDING:  Yes.

5          THE COURT:  Why don't we take our recess now?  We'll

6      take a recess and we'll finish the witness.

7          Members of the jury, we'll take our afternoon recess at

8      this time.  Please leave your note pads on your chairs.  Have no

9      discussion about any aspect of the case or any of the evidence

10     you've heard.  We'll stand in recess for 15 minutes.

11         (Recess.)

12         THE COURT:  Have the jury, please.

13         MR. HARDING:  Your Honor, I believe we have a

14     stipulation as to expertise of this witness.  So I'm simply going

15     to ask him to summarize his results.

16         THE COURT:  Good.  You can lead him right through it.

17         (Jury enters the courtroom.)

18         THE COURT:  Please be seated, ladies and gentlemen.

19     You may call your next witness, Mr. Harding.

20         MR. HARDING:  Yes, Your Honor.  The United States calls

21     Thomas Frieben.

22         THE COURT:  Would you stand, please, sir, and be sworn?

23          THOMAS FRIEBEN, GOVERNMENT'S WITNESS, SWORN

24         THE WITNESS:  Yes, I do.

25         THE CLERK:  Be seated.  Scoot up to the mike.  Speak

1    directly toward it.  State your name and spell it for record,

2    please.

3              THE WITNESS:  Thomas Frieben.  F-R-I-E-B-E-N.

4              DIRECT EXAMINATION

5    BY MR. HARDING:

6    Q    Good afternoon, Mr. Frieben.  Mr. Frieben, could you speak

7    directly into that microphone in front of you so we can all hear

8    you easily?  How are you employed, sir?

9    A    I'm a forensic scientist, State Police Crime Lab in

10   Greensburg, Pennsylvania.

11   Q    Your Honor, the parties have reached a stipulation as to the

12   expertise of this witness in the field of the analysis of

13   controlled substances.

14             THE COURT:  Very well.  The witness will be accepted as

15   expert in the analysis of controlled substances.

16   Q    Mr. Frieben, I've placed in front of you there an exhibit

17   that's labeled PA-6.  Do you see that it contains two brown

18   envelopes containing controlled substances?

19   A    Yes.

20   Q    Did you analyze both of those?

21   A    Yes, I did.

22   Q    And how do you know, how do you recognize them as exhibits

23   that you personally analyzed?

24   A    This is my signature on the top of the envelope.  The date

25   of analysis and the laboratory number that we applied.  Same

1    thing on, on the other envelope.  My signature and the date on

2    the top, with our sealing tape.

3    Q    I have also an exhibit here that's been marked Government

4    Exhibit L-10.  And it should be on the screen there in front of

5    you.  I'm going to pull it back a little bit so you can see it

6    better.  Does this contain the lab report that you prepared for

7    the analysis of these two controlled substance exhibits?

8    A    Yes, it does.

9    Q    And is that your signature that appears on several of these

10   pages in here?

11   A    Yes.

12   Q    Let me ask you first about one of the brown envelopes that

13   contains a plastic bag with 30 vials of suspected crack cocaine.

14   Did you initially analyze that exhibit on February 23rd, 2000?

15   A    Yes, I did.

16   Q    And at that time did you determine that it was cocaine?

17   A    Yes.

18   Q    And then did you, in 2004, re-analyze the same exhibit and

19   determine that it was more specifically crack cocaine?

20   A    Yes, I did.

21   Q    Okay.  And what was the total weight of the crack cocaine

22   in --

23   A    Well, the weight was determined in the initial analysis.  It

24   didn't need to be re-weighed.  It was 1.9 grams.

25   Q    Okay.  And you recorded that in the second lab report as

1    well, is that correct?

2    A    Yes.

3    Q    And I am pointing now to one of the pages in L-10, which is

4    your April 6th, 2004 re-analysis of the 30 vials, is that

5    correct?

6    A    Yes.

7    Q    Not coming through very clearly at the moment.  That's got

8    it.  And by the way, this incident number up here, does that

9    refer to the number the police department gave to this exhibit

10   when they submitted it as a whole?

11   A    Yes, that's correct.

12   Q    And then you also put a lab report number that's recorded in

13   the top right-hand corner of each lab report, is that right?

14   A    That's our laboratory tracking number that we apply, yes.

15   Q    And then did you also, as part of the same incident, prepare

16   a report on one plastic bag containing five large white rock-like

17   pieces and two baggies containing 15 glass vials, each containing

18   rock pieces?

19   A    Yes, I did.

20   Q    And when you initially analyzed these exhibits back in 2000,

21   the date of your report is February 22nd, 2000, did you determine

22   that the white rock-like pieces and the glass vials containing

23   rock pieces, those were all cocaine?

24   A    We determined, it just has cocaine on that initial analysis.

25   Q    And the total weight was 13.4 grams for the plastic bag

1    containing five large white rock-like pieces, is that correct?

2    A    Correct.

3    Q    That's the weight of the cocaine, not the bags, is that

4    correct?

5    A    Correct.

6    Q    And the second one is the cocaine in the vials, and that was

7    3.9 grams, is that correct?

8    A    Yes.

9    Q    And then did you also, in 2004, re-analyze those exhibits to

10   determine if they were more specifically crack cocaine?

11   A    Yes, I did.

12   Q    And when you -- and was that your result?  Did you determine

13   that those exhibits contained crack cocaine, also?

14   A    Yes.  The weights were as in the original analysis.  No

15   re-weighing was done.  It was 13.4 grams cocaine base and 3.9

16   grams of cocaine base.

17   Q    Okay.  And the report date is April 6th, 2004, is that

18   correct?

19   A    Correct.

20   Q    I have no further questions, Your Honor.

21        MR. LAWLOR:  No questions, Judge.

22        THE COURT:  Mr. Frieben, thank you very much.

23        THE WITNESS:  Am I free to go?

24        THE COURT:  You're excused.  Have a safe trip home.  I

25   believe now we're going to return to Detective Berger, is that

1   right?

2                MR. HARDING:  Yes, Your Honor.

3      DET. RONALD BERGER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

4                THE COURT:  All right.  Welcome back, Detective.

5   You're still under oath.  Please make yourself comfortable on the

6   stand, and please state your name for the record.

7                THE WITNESS:  Ronald Berger.

8                THE COURT:  Thank you.

9                DIRECT EXAMINATION

10  BY MR. HARDING:

11  Q    Okay.  Detective Berger, sorry to keep you waiting here

12  today.  When we left off with you last night we were discussing

13  your analysis of the two telephones that were recovered from Mr.

14  McCaffity's car on the night of the double murder.  Do you recall

15  that?

16  A    Yes, sir.

17  Q    Specifically, we were talking about MB-39, which is a Nextel

18  telephone recovered from the rear pocket of the driver's seat of

19  Mr. McCaffity's car, is that correct?

20  A    Yes, sir.

21  Q    And also MB --

22  A    That's the rear driver's seat pocket.

23  Q    Rear driver's seat pocket.  Yes.  And then there's the

24  Panasonic telephone, MB-38, which was recovered with an adapter

25  on the floor of the driver's side of the car, is that correct?

1    A    Yes, sir.

2    Q    Talking first about the Panasonic.  You mentioned, I

3    believe, last night that Detective Laslett took photographs of

4    the last ten calls placed by Mr. McCaffity on the Panasonic

5    telephone, correct?

6    A    I don't recall the number of photographs.  But there was a

7    photograph of a sequence of calls, the last calls in memory on

8    the Panasonic.

9    Q    Okay.  Let me call your attention to Government Exhibit

10   MB-34.  Does this appear to be the packet of photographs that

11   appear --

12   A    Yes.

13   Q    -- from the analysis of the Panasonic?

14   A    Yes, sir, it does.

15   Q    Okay.  I want to call your attention in particular to two

16   numbers, to two pictures.  First of all, this screen says,

17   dialed, Bo, 443-739-5811.  And then it gives the time of 11:21

18   p.m. on 2/27.  Do you see that?

19   A    Yes, sir.

20   Q    And do you recall that as the last telephone call placed

21   from Mr. McCaffity's phone?

22   A    As I recall, that was the last phone call placed from that

23   phone.

24   Q    And do you recall, also, that there was an earlier call that

25   evening?  Showing you another page.  This one was an incoming

1    call received from Bo.  Do you see that?

2    A    Yes, sir.

3    Q    And it gives the same phone number there ending in 5811, at

4    9:41 p.m. on the same day.  Do you see that?

5    A    That's correct.  And most of that is visible on the display

6    here.  The 5811 is pretty blurry.

7    Q    Okay.  Did Detective Laslett also take photographs of other

8    calls that were received and placed that night?

9    A    Yes, sir, he did.

10   Q    All right.  Well, we're going to have more testimony about

11   this later.  So let me move on to Government Exhibit MB-35.  Do

12   you know what this is?  We can see it.

13   A    Those are notes taken from the, from the record of, in the

14   call history of the same phone.

15   Q    Okay.  First, who took those?

16   A    The call history of one of the phones.

17   Q    Yes.  Who took those notes?  Can you tell by looking at it?

18   A    I can't tell by the writing.  I think it was Detective

19   Laslett.

20   Q    Okay.  You had testified earlier that he was helping you

21   with the evidence gathered in this homicide investigation, is

22   that correct?

23   A    He was acting on my behalf, acting in support of my

24   investigation in executing a search and seizure warrant at the

25   Police Headquarters forensic bay on the vehicle recovered from

1    the crime scene.

2    Q    And did he list in order of when they were received the

3    previous ten calls, first of all, that were received on Mr.

4    McCaffity's phone?

5    A    A previous array of calls.  Again, I don't recall an exact

6    count of how many there was.  But that is a list, that is a list

7    of the last calls.

8    Q    Okay.  The most recently received call is listed as 11:24

9    p.m. from R-A-H.  Do you see that?

10   A    Yes, sir.

11   Q    And then the call before that that was received on that

12   telephone that night was the call we previously mentioned from

13   Bo.  Do you see that?

14   A    Yes, sir.  9:41 p.m., received from Bo.

15   Q    And you said --

16   A    With the same number, 443-739-5811.

17   Q    And you said you couldn't see the number very clearly on the

18   photograph that we had on the screen.  But it's clearly marked on

19   Detective Laslett's notes, is it not, Detective?

20   A    Yes, sir.  On this image it is.  And I know that in the

21   original photograph it is.  It's just that the photograph didn't

22   carry well over this particular monitor.

23   Q    Did you, by the way, learn who R-A-H was?

24   A    I did learn that.  I can't quite remember that name.

25   Q    Well, let me ask you, does the name Anis Rahim mean anything

1  to you?

2  A    Yes.  That is the individual.

3  Q    Is that who it was?  Did you talk to him?

4  A    I can't recall whether I spoke to him or not.  If I can

5  refer to my notes as to whether or not there's an interview with

6  him.

7  Q    Okay.  Please do.

8  A    Anis Rahim was interviewed on the 26th of March, 2002.

9  Q    Did he have any information that furthered your

10  investigation, Detective?

11  A    He gave information but as I recall it wasn't really, it

12  wasn't a substantial contribution to the progress of the

13  investigation.

14  Q    Okay.  Well, let's just run through these last -- these ten

15  calls appear to be listed in chronological order, is that

16  correct?

17  A    In reverse chronological order.  11:24 p.m., 9:41 p.m., 9:09

18  p.m., 8:50 p.m., 8:05 p.m.

19  Q    Okay.  And some of these have names next to them and some

20  don't, is that correct?

21  A    Yes, sir.

22  Q    Like the name "Rob" appears next to the call at 8:50 p.m.?

23  A    That's correct.

24  Q    And then over on the next page we have a call at 6:04 p.m.

25  Do you see that?

1   A    Yes, sir, 6:04 p.m.

2   Q    With no name.  But then at 5:52 p.m., there is another call

3   and the name "Lisa Brown" appears in parentheses, is that

4   correct?

5   A    That's correct.

6   Q    And then the next sheet is labeled incoming calls.  Do you

7   see that?

8   A    Yes, sir.

9   Q    But this one is missed.  So these would be calls that he

10  never took, is that correct?  Is that your understanding?

11  A    Yes, sir.  That would be calls that were not answered on the

12  phone but are recorded in the phone for having been missed.

13  Q    Okay.  The last one of those calls was at 8:30 a.m., is that

14  correct?

15  A    Yes, sir.

16  Q    These calls actually are on 2/28.  Do you see that?

17  A    Yes, sir.

18  Q    So can you explain that, Detective, since --

19  A    Those are calls that are being received by the phone after

20  the time that the crime scene was discovered and processed.  And

21  because no one's answering them on the phone, they're being

22  recorded as missed.

23  Q    I see.  So this, in fact, was several hours after you were

24  there that night at the crime scene, is that right?

25  A    Yes, sir.  And my arrival time, again, was 0246 that same

1    morning.  So the call at, for instance, at 8:11 would be over,

2    more than five hours after the time of my arrival there.

3    Q    Can you read what this says here, by the way?

4    A    I can't quite make out the handwriting.

5    Q    Okay.  So the last ten calls that were received on the

6    telephone were all hours after Mr. McCaffity was dead, is that

7    correct?

8    A    Well, the last call on the list shown here is at 7:05.

9    Q    A.m.

10   A    Yes, sir.  7:05 a.m. on the 28th.  And that would have been

11   over four hours after the time of my arrival at the crime scene.

12   Q    Okay.  Then also Detective Laslett recorded the last dialed

13   numbers on the telephone.  And the most, again, the most recently

14   dialed number on 2/27, at 11:21 p.m., was dialed to Bo.  Do you

15   see that?

16   A    Yes, sir.

17   Q    At this 5811 number?

18   A    Yes, sir.  Again, with the same number that we've discussed,

19   443-739-5811.

20   Q    And some of these have, numbers have names again.  We have

21   Lisa Brown and Ada McCaffity.  Do you know who Ada McCaffity?

22   A    Ada McCaffity is Oliver McCaffity's mother.

23   Q    Okay.  Do you know who Hasim is?

24   A    Hasim I would assume to be the owner of the vehicle.  Hasim

25   Rahman.

1    Q    Okay.  Again, we'll have more testimony about that exhibit

2    later.

3              Let me show you Government Exhibit MB-33.  Do you know

4    what this is?

5    A    Again, that's a summarized history of phone calls from the

6    phone.  Or from a phone.

7    Q    Is this a summary of phone calls or is this a summary of the

8    phone numbers listed in the directory of the telephone?

9    A    Yes.  Yeah.  Well, it appears to be alphabetical.  They're

10   alphabetical numerical entry, alphabetical entries and letters

11   and words.  And there's also numerical entries next to it, which

12   would indicate that it was the directory of the phone.

13   Q    Okay.  Do you know who prepared this list?

14   A    As far as I know, that's also prepared by Detective Laslett.

15   Q    Okay.  Let me call your attention to several of the entries

16   here.  Number nine.  Can you read that?

17   A    Number nine says Bo, 443-739-5811.

18   Q    Let me call your attention to two other numbers here.  This

19   appear to be Number 31.  An attempt has been made to highlight it

20   in red or pink.  Can you read what it says?

21   A    It's, the highlighter somewhat obstructs it but it looks

22   like it's B-O-L-I-L-N-I-G.  410-669-6731.

23   Q    Bo Lil, Bo Lil Nig, is that what you make it out to say?

24   A    If that's the division of the letters into three words, that

25   would be Bo Lil Nig.

DIRECT EXAMINATION OF BERGER

221

1    Q    And then do you see another number for the same person at

2    entry number eight?

3    A    Yes, sir.  It's the same, same letters, but the number there

4    is 410-808-9606.

5    Q    Okay.  Again, we'll return to this later.

6         Had you, within a few days of the double murder,

7    focused on a suspect in your investigation, Detective?

8    A    No, there wasn't focus on a suspect in the immediate time

9    period after, after the murder.

10   Q    How long did it take before you had a suspect?

11   A    I was away.  I was deployed, mobilized with the Maryland

12   National Guard and deployed at the time that a suspect was

13   actually developed.  There were names that came up.  There were

14   scenarios and theories.  But no suspect was actually developed or

15   charged.

16   Q    Okay.  I didn't mean charged.  I just meant a suspect.  But

17   let me show you another exhibit.  First, did you execute any

18   search warrants?

19   A    I participated in the execution of search warrants.

20   Q    Yes.  That's what I mean.

21   A    Yes.  At 3303 Eutaw Place, third floor apartment, that being

22   the residence of Lisa Brown, and at 1313 Woodington Avenue,

23   Apartment Four, the residence of Oliver McCaffity.

24   Q    Could I ask you to check the address of the first search

25   warrant you mentioned, the Eutaw address?

1    A    Those were actually, chronologically, those warrants were

2    executed in reverse order.  First on Woodington Avenue, and that

3    was at 10:38 p.m. the night of the 28th.  And the Eutaw Place

4    address was at 11:52, the same night.

5    Q    Do you have a record of the address on Eutaw?

6    A    2303 Eutaw Place, Apartment Three.

7    Q    Okay.  So it was 2303, not 3303, is that correct?

8    A    Yes, sir.  If it sounded like I said 3303 three, that's,

9    that's, that's just a misstatement.  It's 2303.

10   Q    Okay.  And do you know --

11        THE COURT:  Mr. Harding, please.

12   Q    I'm sorry.  Who resided at that Eutaw address?

13   A    That's the address of Lisa Brown.

14   Q    Okay.  So that would be in the 2300 block of Eutaw, is that

15   correct?

16   A    That's correct.

17   Q    Did you talk to the people who were analyzing the GPS device

18   on Mr. McCaffity's car, Detective?

19   A    I talked to Detective Fife with reference to that.

20   Q    Okay.

21   A    He was one of those participating in that operation.

22   Q    Were you aware of whether Mr. McCaffity's car had stopped at

23   that block earlier that evening before going on to the location

24   where Mr. McCaffity was killed?

25   A    Yes.  I was aware that there was a stop for a short time,

1   and then it proceeded on to the point where it came to final

2   rest.

3   Q    Okay.  Let me show you now what's been marked MB-25.  Can

4   you tell us what this is?

5        THE COURT:  I'm sorry.  Mr. Hanlon, would you help your

6   colleague?  Show him how to erase the marks.  Thank you.

7   A    Okay.  That is a photograph which includes Lisa Brown, the

8   female adult subject shown there.  And, as I recall, that

9   photograph was recovered in the execution of the search and

10  seizure warrant at her home, 2303 Eutaw Place, apartment, third

11  floor apartment.  And I believe that the male adult in the

12  photograph is Edward Junghue (phonetic), her, her boyfriend

13  shortly, a short time before this incident occurred.

14  Q    And how many children did Ms. Brown have?

15  A    She had three, Shalee, who was at the time a female age

16  nine, and Joshonee, who was seven, and Damien, who was a small

17  child, I believe less than a year old.

18  Q    Do you know which of the children appears in this picture?

19  A    I would expect that that's Damien.

20  Q    Did you, you said that you went out to the movie theater at

21  Arundel Mills Mall, is that correct?

22  A    I didn't.  That was Detective Giganti and Detective Brummer

23  went to the movie theater.

24  Q    And they were also acting on your behalf in this

25  investigation?

1    A    Yes, sir, they were.

2    Q    Did you check on any other crimes that had been committed

3    around the time of this double murder to see if there was a

4    connection that you could figure out with this crime?

5    A    Yes.  I checked on the possibility that the other incidents

6    involving Mr. Junghue, the former, recent former boyfriend of Ms.

7    Brown, had been a victim of a violent offense in Baltimore

8    County, whether or not that was related.  And no evidence was

9    uncovered that there was a correlation between the two.

10   Q    Okay.  You said a moment ago that you got deployed overseas,

11   is that correct?

12   A    Yes, sir, that's correct.

13   Q    You were called up for the National Guard?

14   A    Yes, sir.  I was called up as recently, after this incident,

15   as recently as April of 2002 I was on, involved in the military

16   exercise in the Caribbean for a period of approximately three

17   weeks.  In the fall of 2002, I was involved in training at Ft.

18   Bragg, North Carolina in anticipation of a mobilization.  And in

19   January of 2003, I was mobilized with the Maryland National Guard

20   until January, 2004, including deployment, to Afghanistan.

21   Q    Did you, while you were gone, did other detectives do

22   various things in furtherance of this investigation that you had

23   initiated?

24   A    Yes, sir, they did.

25   Q    And including, included in that, was there a request made

1    for a fingerprint comparison while you were deployed overseas?

2    A    Upon my return, I learned that that had happened and that

3    the investigation was further pursued by Detective Gary

4    Niedermeier in efforts that included a fingerprint comparison.

5    Q    Okay.  I think those are all the questions I have for you.

6    Let me just check with my co-counsel.

7               (Pause in proceedings.)

8               MR. HARDING:  That completes my direct, Your Honor.

9               THE COURT:  You may remove the photograph, Mr. Harding.

10              MR. LAWLOR:  Court's indulgence, please.

11              THE COURT:  Certainly.

12              (Pause in proceedings.)

13              MR. LAWLOR:  I have no questions, Your Honor.  Thank

14   you.

15              CROSS EXAMINATION

16   BY MR. MARTIN:

17   Q    Good afternoon, Detective Berger.

18   A    Good afternoon, sir.

19   Q    Detective Berger, during the course of your investigation

20   did you ever hear any of the many people you talked to hear a

21   gang described as Randallstown/Park Heights organization?

22   A    Randallstown/Park Heights?  I recall Park Heights coming up.

23   Q    Did you ever hear anybody describe an organization

24   committing crimes in that area as the Randallstown/Park Heights

25   organization?

1    A    Not, not that exact term.

2    Q    Now, during the course of your investigation, in the

3    beginning you were follow all these leads and speaking to a lot

4    of people.  One of the things you learned, did you not, was that,

5    in the area of the crime on that evening in February, a blue

6    Bentley that was being driven by the Rice brothers was in the

7    area.  You learned that, didn't you?

8    A    Yes.  I learned that there was a Bentley spotted in the

9    area.  That was information originally that came to the police

10   department from a bus driver.

11   Q    Who saw them several times that day, including as late as

12   10:30 at night, isn't that correct?

13              MR. HARDING:  Objection.

14              THE COURT:  Overruled.  You may answer.

15   A    I don't recall the exact times.  But as, I believe it was

16   three times on that night he described having seen it, at various

17   locations around Baltimore City.

18   Q    And one of those locations was in the Park Heights area, is

19   that correct?

20   A    At least one of them.

21   Q    I have no further questions, Your Honor.

22              MR. KURLAND:  Nothing, Your Honor.

23              THE COURT:  Detective, thank you very much.  I'm sorry,

24   Mr. Harding.

25              REDIRECT EXAMINATION

1    BY MR. HARDING:

2    Q    Oh, no.  I'm not sure about this blue Bentley.  Do you

3    recall where the other locations were in the city where this blue

4    Bentley had been spotted that evening or what time the blue

5    Bentley was spotted that evening or anything like that?

6    A    If I can consult my notes for a complete accounting of that.

7    Q    Okay.  Please do.  Mr. Martin suggests March 8th.

8    A    Okay.  I spoke with Christopher Pendergast, the bus driver

9    who had originated the information.  And his information I

10   recorded as being on the 27th of February, 2002.  He was driving

11   the Number 91 bus and he saw a Bentley which was blue --

12   Q    Don't read the report.  Just tell us what the locations were

13   where the Bentley was seen.

14   A    First seen at Garrison Boulevard and Dolfield at

15   approximately 2:20 p.m.

16   Q    Okay.

17   A    That would be on the 27th.

18   Q    2:20 p.m. would be 2:20 in the afternoon?

19   A    Yes, sir.

20   Q    Maybe 10 or 11 hours before the double murder, is that

21   correct?

22   A    Maybe nine hours before.

23   Q    Okay.  But Dolfield and Garrison is in Park Heights, is it

24   not?

25   A    That is in the Park Heights area.

1    Q    Okay.

2    A    Eutaw and Saratoga at 3:20 to 3:25 p.m.

3    Q    And that's in the middle of the afternoon of the day of this

4    double murder.  Again, perhaps seven or eight hours before the

5    double murder, is that correct?

6    A    Yes, sir.

7    Q    And that's Downtown, is it not?

8    A    Eutaw and Saratoga is Downtown, actually not very far from

9    here.

10   Q    Where was the third location?

11   A    The third location is turning off Greene Street -- I'm

12   sorry.  Turning off Gay Street on to 83.  And that is at 3:35 to

13   3:40 p.m.

14   Q    So that's in the middle of the afternoon, also?

15   A    Later when he was off work, 10:50 to 10:52, going south on

16   Park Heights across Belvedere, turn on to Garrison or Spalding.

17   Q    And what time was that?

18   A    10:50 to 10:52 p.m.

19   Q    Okay.  So that would, that would be approximately an hour or

20   so before the time of this crime, is that correct?

21   A    Yes, sir.

22   Q    A blue Bentley.  Did you associate a blue Bentley with

23   anybody in this case, anybody involved at all?

24   A    Well, I did research on registrations of Bentleys and sales

25   of Bentleys in the State of Maryland and nothing in it connected

1    a Bentley to this case.

2    Q    Okay.  Thank you.  I have no further questions.

3            RECROSS EXAMINATION

4    BY MR. MARTIN:

5    Q    Your Honor, I have one question.  You learned, did you not,

6    that on March 8th, that at 2010 hours, two of your officers

7    stopped a Bentley that was being driven by the Rice brothers on

8    that same, on the 8th of March at 2010 hours?  You want to look

9    at your report from March 9th, 2002?  It was a blue Bentley.  You

10   learned that, didn't you?

11   A    I do recall receiving information about a stop of a Bentley.

12   Q    The Rice brothers blue Bentley, correct?

13   A    I believe it was but, again, I can consult notes for an

14   exact reference on that.

15   Q    You might want to look at your report for March the 9th,

16   2002.  Third page.

17   A    Yes, sir.  Sergeant Dean Palmere and Lieutenant Michael

18   McKnight of the Tactical Section observed a blue Bentley bearing

19   Maryland temporary tag 95428V Victor in the 2000 block of Mosher

20   Street.

21   Q    And it was being driven by Raeshio Rice, right?  Raeshio

22   Rice?

23   A    Yes, sir.  The driver was --

24   Q    The one passenger was Howard Rice, is that correct?

25   A    The driver was identified as Raeshio Rice.  There was one

1   passenger and he was identified as Howard Rice.

2   Q    Thank you, sir.

3        MR. HARDING:  May I follow up very quickly, Your Honor?

4        THE COURT:  Yes.

5        REDIRECT EXAMINATION

6   BY MR. HARDING:

7   Q    You told us yesterday, I believe, that you had early on

8   connected this crime to an incident in Hammerjacks, is that

9   correct?

10       MR. LAWLOR:  Objection, Your Honor.

11       THE COURT:  Overruled.

12  A    The information arose involving the nickname Good or Goodie

13  and a browse of a computerized records of offenses linked that

14  name Good or Goodie to an individual at, with a stabbing incident

15  at Hammerjacks.

16  Q    And where did you get the name "Goodie" from?

17  A    That name arose, as I recall, from Ms. Brown's father,

18  Reverend Williams.

19  Q    Okay.  And that was within a short time of the double

20  homicide?

21  A    Yes, sir.

22  Q    And is that why you connected this particular double murder

23  to a stabbing incident at Hammerjacks?

24  A    Well, I was able to uncover the fact that a stabbing

25  incident had occurred in the course of investigating the double

1    murder.

2    Q    Okay.  Thank you.  I have no further questions.

3              MR. LAWLOR:  Your Honor, can I inquire?

4              THE COURT:  No.  Thank you.  That's the end.  Thank

5    you, Detective.  Sorry to have kept you here all day.

6              MR. LAWLOR:  Your Honor, can I please inquire briefly?

7              THE COURT:  No.  Detective is excused.

8              So ladies and gentlemen, that will conclude our court

9    day unless you have -- you don't have any more witnesses?

10             MR. HARDING:  No.

11             THE COURT:  Tomorrow we'll start at 10:00 and I will

12   endeavor, and I tell you I will keep counsel here as late as we

13   need to be here tonight so that we can start at 10:00 tomorrow.

14             So let's hope we can start promptly at ten.  And we'll

15   go until about five or so tomorrow afternoon.

16             On Monday, we will break early, meaning sometime

17   between, I would say, 2 and 3:00.  I may, I'll consult with

18   counsel and we may not have a luncheon recess on Monday.  What we

19   may do is we may have a longer mid-morning, early morning recess

20   and then a longer late morning, early afternoon recess, and you

21   may be excused as early as 1:30 or 2:00 on Monday.  We'll see how

22   it goes.

23             So eat a healthy breakfast, as I'm sure you do every

24   day.  But we'll have, if we don't have a luncheon recess, we will

25   have snacks for you in the jury room for that late morning

1    recess.  But you will be out of here on Monday no later than 3

2    p.m. Monday afternoon p.m., and perhaps a little earlier than

3    that.

4         We will not be in session on Tuesday of next week.  So

5    you are free on Tuesday.  We will be in session on Wednesday of

6    next week.  And then we will not be in session on Thursday or

7    Friday of next week.

8         So we only have, well, tomorrow and then a day and half

9    next week.  So we'll only have about two and a half trial days

10   for the next, I guess, 10 or 11 days.  And then we'll really pick

11   it up and start moving.  And we'll be seeing a lot more of you on

12   a regular basis week to week.

13        But you have the schedule.  If anybody needs an

14   additional copy of that, let us know.  And we'll keep you

15   apprised as we go along.

16        In the meantime, enjoy your evening.  Have no

17   discussion about the case or about any of the evidence you've

18   heard so far.  Please leave your note pads on your chairs.

19   Conduct no investigation of any sort.  Don't look up any words.

20   Do not go online.  Do not visit any of the sites that have been

21   mentioned in the evidence.  We'll see you tomorrow morning at

22   10:00 in the jury room to start promptly at that time.  Jury is

23   excused.  Thank you, ladies and gentlemen.

24        (Jury exits the courtroom.)

25        THE COURT:  All right, counsel.  Let's see what we can

1    get taken care of this afternoon.  First, anybody who needs to

2    make a record, please go ahead.

3           Ms. Rhodes, you were concerned, I think, about that

4    Western Union thing.  Maybe you took care of it or maybe its

5    seeming significance has waned.  But if there's anything you want

6    to say about that.  I overruled your objection during the

7    examination of Ms. Smith earlier today.  You don't remember?

8           MS. RHODES:  I do.  I think it's taken care of.  Thank

9    you.

10          THE COURT:  Okay.  Mr. Lawlor.

11          MR. LAWLOR:  Sadly, I don't think I have a single

12   objection.

13          THE COURT:  All right.  I just wanted to give you the

14   opportunity.  That's all.

15          MR. LAWLOR:  I appreciate it.

16          THE COURT:  All right.  Anybody else?

17          MR. COBURN:  Just very briefly, Your Honor.  And I know

18   Your Honor's already sensitive to this issue because Your Honor

19   actually mentioned it to Mr. Harding at the very end of the day

20   today.  But we had that sort of, that life picture of Lisa Brown

21   that was up on the presenter for something like five minutes, at

22   least it seemed interminable to me.

23          These kinds of pictures are just extremely

24   inflammatory.  I don't think a life picture of Lisa Brown is

25   probative of anything.  And I mean, I've been in murder cases in

234

1   which they've been absolutely excluded because they have nothing

2   but prejudicial value and no probative value that I'm aware of.

3   So I just mention that to Your Honor again.

4              THE COURT:  Well, again, he wanted to connect, he

5   wanted to explain why the GPS went to sleep on Eutaw.  He found

6   the photograph at Eutaw.  It was her apartment.  I don't see any

7   prejudice.  And I reminded him to take it off.  And Mr. Harding

8   just forgot to take it off.  That's all.  But I appreciate your

9   sensitivity, Mr. Coburn.

10             MS. RHODES:  Your Honor, I am glad that Mr. Coburn

11  raised that.  Would it be possible if we could just have the

12  government show us what's going to be coming up with the next

13  witness?  Because we do have thousands of pages in this case.

14  And so yes, we've been provided most of these things or given an

15  opportunity to see the many, many boxes that were seized.  But if

16  we could just see something like that, we could maybe address it

17  before it goes back.

18             THE COURT:  You're referring to Detective Niedermeier?

19             MS. RHODES:  All the witnesses coming up.  Photographs,

20  documents, everything.  Just kind of a stack we could just be

21  aware of.  First of all, it saves us some time because, again,

22  for a given witness we might have a couple hundred pages of

23  potential documents the government may be using.

24             THE COURT:  Okay.  I'm not sure I'm fully grasping your

25  request.

1          MS. RHODES:  Could the government show us, out of the

2     spectrum of possible documents it might use with a given witness,

3     tell us what it's going to be referring to?  For example, for

4     some witnesses it might just be grand jury testimony from two

5     days.

6          THE COURT:  Well, you've got the exhibit list.  You

7     don't have the exhibit list?  The government gave me an exhibit

8     list.

9          MS. RHODES:  We have an exhibit list but we don't know

10    what they're going to use for what witnesses.

11         THE COURT:  Okay.  So what I'll instruct the government

12    to do, and I think the government's been fairly conscientiously

13    doing it, is they've announced the exhibit number before or as

14    they're placing the exhibit on the DOAR.

15         MS. RHODES:  Well, in the situation of this life

16    picture, that doesn't help us once it gets up there.  I mean, I'm

17    sitting here --

18         THE COURT:  Well, I would not have sustained an

19    objection to that photograph under the circumstances.

20         MS. RHODES:  I understand that.  But I'm just saying

21    that it would be helpful.  Some things, like once they're up

22    there, it's done.  If one of us makes a huge stink about it, then

23    it draws more attention to it.

24         So we think it would be helpful if we could have some

25    opportunity to review some of the pictures in particular, but

1    also documents, before they go up.

2              THE COURT:  Okay.  Wait a minute.  Let's see if we

3    can -- has the government provided the exhibit list to counsel?

4              MS. RHODES:  Yes, Your Honor.

5              THE COURT:  All right.  I have my copy of the exhibit

6    list right here.  Now, the government has usefully provided all

7    kinds of codes and headings.  And so I'm just going to have to

8    rely on counsel to turn to the exhibit when the government

9    announces what exhibit it's about to place on the DOAR.

10             Now, if it says photo, counsel for the government

11   should show the photo to counsel for the defendants before they

12   place the photo on the DOAR, yes.  That's perfectly reasonable.

13             MS. RHODES:  And I'm just saying --

14             THE COURT:  And when I say "show", I mean just, I don't

15   mean walk all the way down the line.  I mean just hold it up so

16   counsel can see it.

17             MS. RHODES:  Well, would it be perhaps more practical

18   if they could have them here and before the witness is called,

19   before the jury comes in, while we're all here, we could just

20   quickly look at the documents?  And therefore, if we have any

21   objection, we can deal with it before the jury comes out?  I feel

22   like right now we're constrained because --

23             THE COURT:  Well, but the jury's going to already be

24   out for most of the witnesses.  When they come into the

25   courtroom, the jury's going to be sitting there.

1          MS. RHODES:  Well, then --

2          THE COURT:  So yeah.  I agree with you.  When we have a

3    witness coming after a recess, yeah, I think counsel can confer

4    and ask the government, and the government can volunteer, here's

5    what we're going to be using with this witness, or the upcoming

6    witnesses, yes.  Absolutely.

7          MS. RHODES:  All right.

8          THE COURT:  That kind of courtesy I know would be

9    extended to counsel for the defense.

10         MR. COBURN:  We appreciate it very much, Your Honor.

11         MS. RHODES:  Thank you, Your Honor.

12         THE COURT:  That's just a very different issue from how

13   long a photograph stays on the DOAR.  And only I can police that

14   and I will, as I did.  But that's a different question from what

15   photographs are shown.  All right.

16         MR. HARDING:  Could I briefly be heard on that?

17         THE COURT:  Of course, Mr. Harding.

18         MR. HARDING:  Yesterday the complaint was that the

19   government had put pictures of the victims dead on the screen.

20   Today the complaint is that the government put a picture, a

21   single picture of the one victim alive on the screen.  I cannot

22   accept the premise that a homicide trial should be so dehumanized

23   that it is objectionable for the government to show a photograph,

24   either dead or alive, of a victim on a screen.

25         I want to point out, also, Your Honor, that the exhibit

238

1    list includes a description of which photographs, MB-6, for

2    example, says photo of Lisa Brown dead, MB-5, photo of Oliver

3    McCaffity dead.  It was never kept secret that we were going to

4    be showing these kinds of photographs.

5            And the photograph of Lisa Brown that we put on the

6    screen today, MB-25, is captioned photo of Lisa Brown, child and

7    man from 2303 Eutaw Place.  There has been no effort to conceal

8    the kinds of exhibits that the government was going to use here.

9            I'm a little concerned about the instruction that we

10   should show these photographs to defense counsel before we

11   actually put them on the screen.  I see two problems.  One is

12   that it will take time because all defense counsel will come

13   running around here to have a look at the photograph.

14           Secondly, if they actually handled them, they will get

15   them out of order and completely mix up our ability to streamline

16   the presentation of each witness because we will then have to

17   reorganize all the photographs before we actually put them on the

18   screen.

19           I can, I can perhaps set, set aside time in the morning

20   before court, if defense counsel want to come up to the trial, to

21   a neutral area and look at the exhibits without getting them out

22   of order.  I could do something like that.  But I think if we try

23   to do anything here in the courtroom, it's going to really impede

24   the efficient flow of the testimony in this trial.

25           THE COURT:  All right.  Thank you, Mr. Harding.  And I

1    certainly appreciate your offer there to set aside some time at

2    nine or 9:10 in the morning where counsel could come and look at

3    the exhibits that you expect to use during the day.

4         I am not at all suggesting, as I said, you are not to

5    walk down and hand anything to defense counsel.  All I suggested

6    is that as a courtesy you just show them, by standing right there

7    and just showing them the photographs that you intend to use.

8    And your point is well taken.  And I'm not ordering you to do

9    anything.  Just inviting you to extend what you just did, the

10   courtesy of giving counsel a chance to look at photographs and

11   other exhibits.

12        And as I say, the issue of how long a photograph

13   remains displayed to the jury is a question that I don't think

14   the government has intentionally taken advantage of anything.

15   And I simply remind counsel to remove an exhibit from the DOAR

16   after it's been used.  That's all.  Just remember.

17        Okay.  Mr. Martin, I'll hear you.  If I understood you

18   correctly, you said you had a motion to preclude the government

19   from calling Detective Niedermeier.  And he is the next witness,

20   is that right?

21        MR. MARTIN:  No, Your Honor.  It's not Niedermeier.

22        THE COURT:  I'm sorry.

23        MR. MARTIN:  The government proposes to call, as they

24   said in the motion in limine, Mr. Dobropolski tomorrow morning,

25   or tomorrow.

1          THE COURT:  And he will be called tomorrow?

2          MR. HARDING:  Yes, Your Honor.

3          THE COURT:  I'm sorry, Mr. Martin.  Let me practice the

4    name for just a moment.  Say it again.  You did it so well.

5          MR. MARTIN:  Dobropolski.

6          THE COURT:  Dobropolski.

7          MR. MARTIN:  I can't tell you how many times I've

8    gotten it wrong.  I may still have it wrong.

9          THE COURT:  Okay.

10          MR. MARTIN:  Your Honor, I started asking for these, I

11    wrote you the letter over the weekend, I started asking for these

12    tapes with Mr. Dobropolski that were made because I knew they

13    were made.  They were never offered by the government.  Never got

14    them.  I asked for them in my discovery three years ago.  I

15    wasn't specific, but I said any tapes made by agents or police

16    officers of any witness in the case, any cooperator, whatever.

17    No, never got anything.

18          I wrote Mr. Harding a month ago.  I didn't get a

19    response from him.  I finally called, I wrote him, I sent him

20    another e-mail.  I finally got a response from him.  He finally

21    looked for them.  He found some.  We got those.  I sent those to

22    somebody to have them enhanced.  He's working on it but they're

23    not done yet.  Number one.

24          Number two, yesterday, I kept saying, there has to be

25    reports about these.  You know, you wire the guy up, you surveil

1    them, there has to be reports about it.  Mr. Harding didn't

2    produce any.  All of a sudden he starts coming in with them this

3    week.  As late as yesterday we got three new tapes and some more

4    reports.  I'm not ready to cross examine Mr. Dobropolski on those

5    aspects of it.

6           Then I pick up this morning this document that says

7    that not only is he now going to rely on all these conversations

8    that Mr. Dobropolski supposedly had with my client, but that's

9    part of the reason why they should be admissible against Mr.

10   Mitchell, because it's part of the conspiracy.  It shows them

11   recruiting him into the conspiracy.

12          As late as a week ago, Mr. Harding didn't even know

13   that there were reports about the conversations.  And I'll tell

14   you what the problem is.

15          These conversations were recorded and you really can't

16   understand them.  I mean, it's worse than what we listened to

17   today, far worse.  But we're trying to enhance them and our

18   fellow's working on it.  But I don't have any results back yet.

19          Until I know what they say, I don't think it's fair for

20   him to be allowed to call this guy and have me have to stand up

21   and cross examine him.  What we're left with is, well, yeah, I

22   taped them, but he told me A, B, C and D but, of course, I didn't

23   get it on a tape because for some reason it malfunctioned, it

24   malfunctioned, or I didn't ask him the right question.

25          I don't really know what's going on here.  All I know

1   is I've been asking for this information for a long time and I

2   didn't get it.  I've tried not to complain about it.  I just

3   tried to get the information.  But now they want to put him on

4   the stand and I'm not complete yet with what I need to do.  Had I

5   been given this stuff when I should have been given it, this all

6   would have been done.

7         THE COURT:  When do you expect to have your tape

8   analysis done?

9         MR. MARTIN:  I don't know because we just got three

10  more yesterday that we sent up there.  I expect in a couple of

11  days.  It's not going to be tomorrow, that's for sure.  I'm not

12  saying he shouldn't be able to be called.  I'm just saying --

13        THE COURT:  I see.

14        MR. MARTIN:  -- not tomorrow.  Thank you, Your Honor.

15        THE COURT:  So basically, if he's not called tomorrow,

16  and leaving aside next week, basically, what we now have facing

17  us, as I said to the jury, today is the 23rd, we only have

18  effectively two and a half more trial days before, what, October

19  6th?

20        MR. MARTIN:  I think that's right, Your Honor.

21        THE COURT:  Would be Monday.  Let me hear from you, Mr.

22  Harding.  And you really need to catch me up on this because

23  until I got Mr. Martin's letter a week or so ago, I had no idea

24  about any tapes, any wires.  Maybe I should have.  But I just,

25  that came out of the blue for me.

243

1          MR. HARDING:  Yes.

2          THE COURT:  So fill me in.

3          MR. HARDING:  The situation is that Giganti, after

4   Dobropolski and Harris were both out of jail in 2003 --

5          THE COURT:  Tell me who Dobropolski is.  Is he as

6   Polish as his name sounds?

7          MR. HARDING:  Yes.

8          THE COURT:  Okay.  Where's he from?

9          MR. HARDING:  Park Heights.

10          THE COURT:  From Park Heights?

11          MR. HARDING:  Yes.

12          THE COURT:  Okay.  All right.

13          MR. HARDING:  I don't believe he was born in Poland.

14   He's an American and speaks like an American.

15          THE COURT:  Okay.

16          MR. HARDING:  So you won't have any trouble

17   understanding him.

18          THE COURT:  All right.

19          MR. HARDING:  Detective Giganti, when he was involved

20   in this investigation, attempted to make undercover contacts

21   between Dobropolski and Harris for the purpose of seeing if

22   Harris would be willing to talk again about the murder that he

23   had described to Dobropolski while they were both locked up

24   together in Central Booking, and Mr. Mitchell was there at the

25   same time.

1          THE COURT:  Now I need you to back up.  I know we've

2     been over this.  But tell me about the being locked up together,

3     and when that all occurred.

4          MR. HARDING:  Well, you remember that Mr. Harris was

5     locked up after the drug raid on his mother's house on Amity

6     Street?

7          THE COURT:  Right.

8          MR. HARDING:  In 2002.

9          THE COURT:  In June?

10         MR. HARDING:  Yes.

11         THE COURT:  Of 2002.

12         MR. HARDING:  He was locked up and he also had an

13    assault charge pending at the same time.  Mr. Mitchell was locked

14    up because he had been arrested on April 1st for the murder of,

15    well, on April 17th was actually the date when he was served with

16    the arrest warrant for the Wyche brothers murder.

17         THE COURT:  He had been arrested earlier that month on

18    the gun?

19         MR. HARDING:  Yeah.

20         THE COURT:  And actually on the warrant from

21    Pennsylvania?

22         MR. HARDING:  Yeah.  And the warrant on Hammerjacks,

23    actually.

24         THE COURT:  Oh, there was a warrant on Hammerjacks by

25    then?  Okay.

1          MR. HARDING:  So Mitchell and Harris are both in jail.

2     Dobropolski is in jail for, I believe, some kind of domestic

3     assault or something like that.

4          THE COURT:  At Central Booking.

5          MR. HARDING:  At Central Booking.

6          THE COURT:  Did they know each other at that time?

7          MR. HARDING:  No.  Mr. Harris and Mr. Mitchell were

8     familiar with Dobropolski's reputation in Park Heights.

9          THE COURT:  In Park Heights.

10         MR. HARDING:  But they didn't know Mr. Dobropolski

11     personally until they met him in Central Booking.

12         THE COURT:  Okay.  Who did Dobropolski work with before

13     or associate with in Park Heights?  Anybody?  Everybody?

14         MR. HARDING:  He had discussions about a number of

15     people that he knew in common with Mr. Harris and Mr. Mitchell

16     but I can't tell you the name of anybody he worked with.

17         THE COURT:  Okay.  All right.  So they meet at Central

18     Booking.

19         MR. HARDING:  Yes.

20         THE COURT:  All right.

21         MR. HARDING:  And there are conversations with both Mr.

22     Harris and Mr. Mitchell about the double murder in Hasim Rahman's

23     car.

24         THE COURT:  Okay.  And that, those conversations are

25     obviously unrecorded.

1          MR. HARDING:  Unrecorded.

2          THE COURT:  On the tier, whatever, in the day room.

3          MR. HARDING:  Right.  They also had some conversations

4     together, all three of them.  In any event, the government has

5     elicited that information in the grand jury testimony and defense

6     counsel have been well aware of that literally for years in this

7     case since that's when the discovery was first made available.

8     So Mr. Dobropolski and his basic testimony is not a surprise.

9          What happened in 2003 is that Giganti tried to make

10    some undercover contacts with Harris after they were both out, in

11    hopes of recording some more incriminating conversation.  All

12    Giganti told me at the time was that he couldn't get any decent

13    recordings out of any of it.  You couldn't understand anything on

14    the disks.

15         It wasn't until I got requests from Mr. Martin within

16    the last few weeks that I actually sent Agent Benson, TFO Benson,

17    to go back into the evidence at DEA.  And he found a number of

18    recorded phone calls and several more of these efforts to have

19    meetings.  As Mr. Martin says, the quality of the tapes is by and

20    large, for the most part, they're incomprehensible.  The phone

21    calls are comprehensible but there's nothing of evidentiary value

22    on the phone calls.

23         THE COURT:  Is it just a deficiency in the equipment?

24    Is that what it is?

25         MR. HARDING:  No.  It's primarily, it could be in part

1     the equipment.  But the meetings took place at Parole and

2     Probation.  That was where Dobropolski could run into Harris and

3     just engage him in a conversation.  They were both on some kind

4     of supervision at the time.  There's so much noise that you can't

5     make out what's being said.

6          THE COURT:  I see.  Large waiting room or something?

7          MR. HARDING:  So I never listened to any of these tapes

8     until the last few weeks.  And as I said, for the most part

9     they're incomprehensible.

10         What I guess the fundamental problem is that, because

11    of the delay in bringing this case to trial, Giganti was taken

12    off this case in 2005 and has lost touch with it.  And I have, no

13    one has ever told me about the existence of all this material.

14    So I started scrounging around for it when Mr. Martin started

15    asking me about it.  And that's why I've come up with it very

16    tardily.  And I apologize to the Court and to defense counsel for

17    the tardy submission of this material.

18         What I would propose with Dobropolski, though, is that

19    I be permitted to do my direct of him tomorrow and that -- let me

20    also make clear that I've gone to elaborate steps to get him here

21    tomorrow without it arousing any suspicions in the facility where

22    he's held.  I've actually, I've done it without any paperwork

23    whatsoever.  He's being brought here in a very unusual fashion.

24    And I would have difficulty arranging it again.

25         It's for his security.  I've also arranged to have him

1    transported to a distant facility after he's done, a distant

2    facility within Maryland after he's done testifying here

3    tomorrow, again for his safety.  He's very concerned about his

4    safety.

5            I would like to be able to go forward with my direct

6    tomorrow.  If Mr. Martin wishes either to recall him or to

7    postpone his cross examination until next week, I don't see a

8    problem with that.  But the government's position is that we

9    should be permitted to go forward with our direct.  That's what

10   the government proposes.

11           THE COURT:  Why can't you -- I mean, you see my

12   problem?  I'm sure you must see my problem.  If I permit you to

13   do your direct tomorrow and bring him back for cross, what's the

14   point of having you do your direct tomorrow?  Why not just put

15   him off until Wednesday, next week?  That will give Mr. Martin a

16   couple of more days to light a fire under his voice enhancer so

17   that he can satisfy himself that there's nothing on the tapes

18   that is useful.

19           Now, I mean, you may be right, there's not going to be

20   anything on the tape.

21           MR. HARDING:  Well, I will --

22           THE COURT:  But I hesitate to require Mr. Martin to

23   even begin a cross examination under circumstances such as this

24   when he hasn't been able to listen to the tape.  And, you know,

25   I'm not blaming you.  I understand how things happen, although I

1    must say, I mean, it may be all well and good that Giganti was,

2    as you put it, taken off the case but, you know, there's

3    something called Brady that I don't think you can just --

4            MR. HARDING:  None of this is Brady material.

5            THE COURT:  Well, how do you know if you didn't listen

6    to the tapes?  How do you know if all you've got is some

7    detective telling you, oh, there's nothing on the tapes?  I'm not

8    questioning anybody's integrity or good faith or anything.  It's

9    just that you can't have a ten year investigation and have some

10   detective leave the investigation and then -- let's move past

11   that.

12           What's the problem with bringing him back on Wednesday?

13           MR. HARDING:  I can do that.  I foresee only one

14   problem, which is that we've, of course, arranged for witnesses

15   for tomorrow on the assumption that Dobropolski was going to be

16   taking up a good deal of time.  We would have to scramble to

17   mobilize other witnesses for tomorrow.  I can't guarantee the

18   Court that we'll come up with enough that will fill the day.

19           THE COURT:  All right.  We'll break early.  So you want

20   to make Dobropolski your first witness next Wednesday?

21           MR. HARDING:  Yes, Your Honor.  Is that, that's a full

22   day, isn't it?

23           THE COURT:  That's a full day.  October 1st.

24           MR. HARDING:  Yes, Your Honor.

25           THE COURT:  All right.

1          MR. LAWLOR:  Can we have the list for tomorrow, Your

2     Honor?

3          THE COURT:  Apparently just got a lot shorter.  All

4     right.  Before we talk about tomorrow, let me hear from Mr.

5     Coburn on this, this gun relating to the Lee murder or something

6     like that.  Mr. Kurland.

7          MR. KURLAND:  Good afternoon, Your Honor.

8          THE COURT:  Good afternoon.

9          MR. KURLAND:  Your Honor, to some extent this, I mean,

10     it's related to Niedermeier only because in many of his reports

11     there's reference to this gun.  So while Niedermeier is not going

12     to be called tomorrow it's my understanding.

13          THE COURT:  Maybe he will be now.  No?

14          MR. HARDING:  It's not Niedermeier who's going to be

15     the witness on this particular issue, in any case.  It's

16     Detective Welsh.

17          MR. KURLAND:  Well, that clears up one thing.  While I

18     have the mike, the general issue is this.  It's a combination of

19     both a -- there apparently, from the government's opening and

20     some other notes we have, one of the guns found at the Spence

21     scene and one of the guns, I believe, found at the, either the

22     Wyche or the McCaffity, I guess the Wyche shootings --

23          THE COURT:  I'm sorry.  There was a gun found at the

24     Wyche shooting?

25          MR. KURLAND:  I'm sorry.  The ballistics.  When they do

1    the ballistics.  There is some connection between one of the guns

2    in the Spence scene and one of the guns that was used in the

3    Wyche.  Apparently, there's, those two guns supposedly were also

4    the guns that were used in, firearms used in this Lee shooting,

5    which resulted in one homicide.

6           Now, I might be wrong on this, but it's my recollection

7    and understanding that we've never received the formal expert

8    ballistics reports concerning that match, that alleged match.

9    And number two, even, even aside from that issue, which is number

10   one, the second related issue is, this is an uncharged murder.

11   None of the defendants are charged in the murder.  None of the

12   defendants, I think, are even suspects in the murder.  And to

13   have it come in raises a 403 issue that we don't necessarily have

14   to resolve today.

15          But again, one of the things that was amplified today

16   that kind of gratuitously came up from the double hearsay that

17   came in through one of the government witnesses was the fact that

18   Willie was at the Hickey School for the first time because of a

19   joint robbery with all three.  That was the first time that

20   evidence came into the trial.  It's double triple hearsay, and

21   this is just going to be magnified with respect to alleged

22   criminal activity uncharged that I'm concerned is going to come

23   in through, if not Niedermeier, Welsh.

24          But the general thing is whatever witness it comes in,

25   we think it raises, again, both the expert testimony issue,

1  because we've never received the ballistic reports.  If I'm

2  incorrect on that, one of the ten other lawyers here can, would

3  correct me.

4         And in addition to that, even when the expert issue is

5  put aside, I think there's a significant 403 issue because it's

6  an uncharged murder and we need to kind of deal with that.

7         THE COURT:  All right.  Let me hear from Mr. Harding on

8  this.

9         MR. HARDING:  I think that, I'm reasonably confident

10  that Mr. Kurland is incorrect in saying that the government has

11  not provided the discovery relevant to this.  I believe the

12  ballistics report and other reports were turned over years ago on

13  this matter.  I can --

14         THE COURT:  Okay.  Help me out with the facts first,

15  Mr. Harding.

16         MR. HARDING:  Yes.  Let me explain.

17         THE COURT:  Yeah.  Go ahead.  Just walk me through.

18         MR. HARDING:  On March 11th of 2002, two men were shot

19  on the street in West Baltimore.  One was named Eric Lee, who

20  died, and the other was named Jason Epps, who did not die.  Two

21  guns were used in the shooting, we know from the shell casings

22  and the fragments, the bullet projectiles themselves.

23         One of those guns was also the gun that was used to

24  kill the Wyche brothers.  The other was the gun that was used to

25  kill Tonya Jones Spence.

1              The government views the fact that both guns were used

2      together as a significant connection between these murders.  Part

3      of the goal, part of the burden the government has to establish

4      here, and defense counsel have made it clear already in their

5      openings that they intend to challenge the government on this, is

6      the connection between the Tonya Jones Spence murder and the

7      other criminal activity in this case that preceded it.

8              And so the government views this as relevant evidence.

9      I did, in fact, make this point in the opening.  And so the

10     government's view is that the probative value of this evidence

11     far outweighs the prejudicial effect, especially since the

12     government isn't going to actually introduce evidence that any of

13     these defendants actually committed the murder of Eric Lee or the

14     shooting of Jason Epps.  We're simply concerned to establish that

15     these two guns have a prior history of being used together.

16             THE COURT:  Okay.  So what immediately is apparent to

17     me -- and I appreciate that clarification.  I recall your

18     statements in opening statement and I wasn't sure how it all

19     matched up.  But I see it now.

20             We've got three incidents and two guns.  In

21     chronological order, incident one involved guns A and B, two

22     separate victims.  Incident two involved gun A.  And incident

23     three involved gun B.

24             MR. HARDING:  That's correct.

25             THE COURT:  Now, one thing that is immediately apparent

1    to me is that you don't have to, and I'm not making a ruling now,

2    you don't have to tell the jury, and I don't think you told the

3    jury this in opening statement, but the jury doesn't have to know

4    that incident one was a homicide.  It would be more than

5    sufficient, I would think, to say that there was a shooting

6    incident and that the ballistics from that incident identified

7    two separate firearms, one of which comes back to the Wyche

8    murders a couple of weeks later and one of which comes back to

9    the Jones Spence murder two months later.  Or three months later.

10   That's one way we could cut this.

11        But I see your point.  And I certainly agree with you

12   that the probative value in the context of this case is very

13   significant.  Very significant.

14        Now, I'll hear from Mr. Kurland in a moment.  But what

15   is your -- I mean, there's no particular reason to show that the

16   Lee shooting was an actual homicide, is there?

17        MR. HARDING:  Well, Judge, I just, I'm always wary of

18   putting witnesses on the stand.

19        THE COURT:  And having them --

20        MR. HARDING:  Having them be unable to mention one of

21   the most salient and profound facts about the case they're

22   testifying about.  I think that --

23        THE COURT:  But that's not a profound fact about this

24   case.  That's exactly Mr. Kurland's point.  The fact that Mr. Lee

25   died as a result of the shooting is not, doesn't have anything to

1   do with this case, unless you're prepared -- I mean, obviously,

2   if you thought the Lee case should have been in this indictment,

3   you'd have put it in this indictment.

4           MR. HARDING:  I certainly would have.

5           THE COURT:  Exactly.  Fourth superseding.  And so my

6   point is simply that you're not going to call one of the

7   investigating detectives, are you, on the Lee homicide?

8           MR. HARDING:  Yes.

9           THE COURT:  Why would you call the investigating

10  detective?  Why wouldn't you just call the ballistics person?

11          MR. HARDING:  Because I got to have testimony about --

12          THE COURT:  The seizure.

13          MR. HARDING:  -- recovery of the shell casings at the

14  scene of the shooting.

15          THE COURT:  Okay.  They would stipulate to that.  So

16  you want to go through the whole autopsy of the Lee?

17          MR. HARDING:  No.  No.  No.  No.  I have a very --

18          THE COURT:  How far would you go with it?  I mean, I

19  assume -- oh, are you talking only casings or fragments as well?

20          MR. HARDING:  Both, yeah.

21          THE COURT:  All right.  So some of those fragments were

22  recovered at the autopsy.

23          MR. HARDING:  Oh.

24          THE COURT:  Right?  Or maybe not.

25          MR. HARDING:  I don't actually remember right now.

1          THE COURT:  Okay.

2          MR. HARDING:  In any case, Your Honor, I would propose

3     the more traditional solution to this.

4          THE COURT:  And what's that?

5          MR. HARDING:  Your pointing out to the jury that none

6     of the defendants is charged in these shootings, and giving them

7     an instruction to, on how, on the limited use they may make of

8     the evidence.

9          THE COURT:  That would, I can tell you, Mr. Harding, of

10    course, that would absolutely, absolutely, absolutely be my last

11    option.  There's a limit to limiting instructions.  And that's

12    going to be absolutely the last, last option.

13          I just don't see why -- and this may call upon the

14    defense to offer up a few more stipulations -- but I don't see

15    why the Lee shooting has to be described as a homicide.  I mean,

16    if nothing else -- well, let me hear from Mr. Kurland.  And I

17    take it we're a couple of weeks away from actually having to

18    cross this bridge?

19          MR. HARDING:  Yes.  Yes.  We're nowhere near having

20    this testimony.  Your Honor, if the Court is convinced that we

21    ought not to mention this was a homicide --

22          THE COURT:  And I'm not convinced.  We're just talking

23    here.  I'm not convinced.  I'm not ruling.  But go ahead.  Go

24    ahead.

25          MR. HARDING:  It would be valuable to have a witness be

1   able to testify about the recovery of all of these casings and

2   bullets.

3           THE COURT:  Sure.

4           MR. HARDING:  And the government would prefer being

5   able to do that and limiting the description of a crime to a

6   shooting than to simply have a stipulation.

7           THE COURT:  Okay.  No.  And I don't see the use of a

8   stipulation as in lieu of a witness.  I really don't.  Again, my

9   concern, and I'll hear from Mr. Kurland, let's not put more

10  homicides in the case, you know, gratuitously.  And I didn't mean

11  to suggest that you would be precluded from calling crime scene

12  technicians, detectives.  Just, I don't see the need to call it a

13  homicide and I don't see the need to have the witness say I

14  recovered this, this fragment at the autopsy.  That's all I'm

15  saying.

16          So you could call those witnesses to talk about the

17  recovery where the shooting took place and so forth.  I just

18  don't see the need to call it a homicide.  Mr. Kurland.

19          MR. KURLAND:  Judge, a couple things.  The first is

20  that by an e-mail, I think, earlier this morning to Mr. Harding

21  that was cc'd to everybody, including the Court, we made our

22  formal, essentially, 404(b) notice with respect to the Lee

23  shooting.  So we would expect to get some formal thing.  I'm

24  going to talk with, obviously, my co-counsel about some of the

25  suggestions that the Court has raised.

1          The other point, just to clear up a factual

2     clarification.  I believe the government unintentionally misspoke

3     that the gun that was, that was tied to the Lee shooting was not

4     the murder weapon in the Spence.  I believe it's one of the other

5     gun, it was the other gun that was recovered.  But it was not the

6     murder weapon.

7          THE COURT:  They were recovered in the woods under some

8     leaves and that kind of thing.

9          MR. KURLAND:  But I appreciate the Court taking this

10    up.  We'll obviously have it resolved.

11         THE COURT:  Well, no. Thank you for highlighting it.  I

12    think we had some time this afternoon to talk about it.  Maybe

13    other counsel want to weigh in.

14         MR. KURLAND:  One last thing.  Is the government going

15    to give its truncated list of who's going to be called?

16         THE COURT:  Yeah.  We're going to come back to that.

17    We're going to come back to that.

18         MR. KURLAND:  Thank you.

19         THE COURT:  Do you want to address this point, Mr.

20    Martin?

21         MR. MARTIN:  Yes, Your Honor.

22         THE COURT:  Okay.  Go ahead.

23         MR. MARTIN:  Just so you're aware, that when we do

24    finally address this issue, we want this evidence in.

25          This is a real problem in this joint trial.  We think

1    some of this evidence points to people other than our clients.

2    And it points up the whole thing we've been saying about why this

3    isn't the conspiracy that the government thinks it is and it

4    might be something different.  It's coming out in the evidence.

5          THE COURT:  When you say you want it in, are you saying

6    you want the Lee in as a homicide?

7          MR. MARTIN:  Yes, sir.  I may not have it come in as a

8    homicide, but I want the shooting in and the fact of the gun, and

9    then what happened afterwards because I think it will demonstrate

10   at some point, even to Your Honor, that this isn't the conspiracy

11   that the government has charged.

12         THE COURT:  Well, it doesn't matter what I think.

13         MR. MARTIN:  Oh, yes, it does, Your Honor.  It's going

14   to.  Thank you.

15         THE COURT:  So tentatively I think I'm likely to come

16   out the way we just discussed.  Obviously, I'm not take making a

17   final ruling.  Mr. Hanlon and Mr. Harding will have now, it

18   appears, weeks to discuss this.

19         And bearing in mind what Mr. Martin just said, I'm

20   hard-pressed to see why the Lee shooting has to come into

21   evidence as a homicide.  On the other hand, I don't think I'm

22   going to hesitate to conclude that the probative value of the

23   connection between these two firearms in respect to the alleged

24   racketeering acts, murders committed in this case, even though

25   one of them is not the actual firearm, its nexus to the Tonya

260

1    Jones Spence murder is sufficient for me to find, frankly, by

2    clear and convincing evidence that the probative value outweighs

3    any undue, unfair prejudice to the defendants from showing this

4    separate shooting.  But I don't think I need to show it as a

5    homicide.  And I don't think that takes anything away from the

6    government.

7         Now, Mr. Martin says, we may want to call it a homicide

8    and go into it in greater depth.  That poses a different set of

9    issues.  And Mr. Kurland and Mr. Martin will have edit over that

10   if they want to.  But that's, that's my preliminary view of that

11   issue.  You certainly get to show the connection between these

12   two firearms and the prior shooting.

13        Okay.  All right.  Anything else on this side from

14   anybody?  All right.  Mr. Harding, who are we going to have

15   tomorrow, as best you can tell us, without Dobropolski?

16        MR. HARDING:  Your Honor, we have Marquetta Duganne and

17   we have --

18        THE COURT:  Now, she's in custody?

19        MR. HARDING:  Yes.

20        THE COURT:  Are we going to start with her in the

21   morning?

22        MR. HARDING:  I guess so.

23        THE COURT:  All right.

24        MR. HANLON:  I'm assuming that she'll be first thing.

25   The plan was to have had her here at ten o'clock this morning.

1    I'm assuming she'll be here tomorrow morning.

2            THE COURT:  Okay.  So we ought to be able to bring her

3    down and have her on the witness stand to start.

4            MR. HARDING:  Now, we will also have Trooper First

5    Class Douglas Forrester, who was involved in the I-95 stop of

6    Gardner and Martin.

7            THE COURT:  Right.

8            MR. HARDING:  I will try to get Richard Willard here,

9    although I told him earlier today we weren't going to be able to

10   get to him tomorrow.

11           THE COURT:  Who's he?

12           MR. HARDING:  He's another cop who made an arrest.  I

13   believe this is the cop who arrested Mr. Martin on the gun charge

14   that led to his federal conviction.

15           THE COURT:  All right.

16           MR. HARDING:  Mr. Hanlon will try to get Christopher

17   O'Ree here, who arrested Mr. Harris on a narcotics charge.  And I

18   will try to get John Calpin and David Jones here.  They were

19   involved in an arrest in 2000 of Mr. Mitchell on McHenry Street

20   in Southwest Baltimore.  And Jones testified in the suppression

21   hearing in this case.

22           MR. LAWLOR:  What were those two names again?

23           MR. HARDING:  John Calpin, C-A-L-P-I-N, and David

24   Jones.

25           THE COURT:  Anybody else on deck?

262

1          MR. HANLON:  Your Honor, for counsel's information,

2     Christopher O'Ree is special O apostrophe R-E-E.

3          THE COURT:  All right.  So if we break a little early,

4     we break a little early tomorrow.  How's that 12 day prediction

5     working out for you, Mr. Harding?

6          MR. HARDING:  We're behind schedule, Your Honor.

7          THE COURT:  Behind schedule.  We up to what?  14, 15

8     days for the government's case now?

9          MR. HARDING:  We've used, Mr. Hanlon tells me we're

10    three-quarters of a day behind.

11         MR. HANLON:  I don't think we're doing that bad, Your

12    Honor.

13         THE COURT:  Three-quarters of a day behind a 12 day

14    projected trial schedule?

15         MR. HARDING:  Yes.

16         THE COURT:  Excellent.  All right.

17         MR. HANLON:  Roughly, Your Honor.

18         THE COURT:  I'm sorry?

19         MR. HANLON:  Roughly, Your Honor.

20         THE COURT:  Roughly.  Emphasis on "roughly."

21         MR. HANLON:  Yes, Your Honor.

22         THE COURT:  All right, counsel.  10:00 tomorrow.  We're

23    in recess.

24              (Conclusion of Proceedings at 5:13 p.m.)

25

1                              INDEX

2

3                                                    PAGE
     WITNESS: JAQUETTA SMITH
4    DIRECT EXAMINATION ON MOTION BY HANLON            20
     CROSS EXAMINATION ON MOTION BY RHODES             25
5    CROSS EXAMINATION ON MOTION BY MARTIN             26
     CROSS EXAMINATION ON MOTION BY CROWE              27
6    CROSS EXAMINATION ON MOTION BY COBURN             28
     REDIRECT EXAMINATION ON MOTION BY HANLON          29
7    RECROSS EXAMINATION ON MOTION BY RHODES           30

8    WITNESS: JAQUETTA SMITH
     DIRECT EXAMINATION BY HANLON                      44
9    CROSS EXAMINATION BY RHODES                       85
     CROSS EXAMINATION BY MARTIN                       98
10   CROSS EXAMINATION BY CROWE                        100
     CROSS EXAMINATION BY COBURN                       110
11   REDIRECT EXAMINATION BY HANLON                    120
     RECROSS EXAMINATION BY RHODES                     129
12   RECROSS EXAMINATION BY MARTIN                     133

13   WITNESS NIESHIA DUGANNE
     DIRECT EXAMINATION BY HANLON                      138
14   CROSS EXAMINATION BY LAWLOR                       167
     REDIRECT EXAMINATION BY HANLON                    175
15   RECROSS EXAMINATION BY LAWLOR                     177

16   WITNESS: NORMAN YOUNG
     DIRECT EXAMINATION BY HARDING                     178
17   CROSS EXAMINATION BY LAWLOR                       195
     REDIRECT EXAMINATION BY HARDING                   206
18
     WITNESS THOMAS FRIEBEN
19   DIRECT EXAMINATION BY HARDING                     209

20   WITNESS: RONALD BERGER
     DIRECT EXAMINATION BY HARDING                     213
21   CROSS EXAMINATION BY MARTIN                       225
     REDIRECT EXAMINATION BY HARDING                   227
22   RECROSS EXAMINATION BY MARTIN                     229
     REDIRECT EXAMINATION BY HARDING                   230

23

24

25

1                    REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on September 23,

6    2008.

7          I further certify that the foregoing pages constitute

8    the official transcript of proceedings as transcribed by me to

9    the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my

11   signature this _____ day of _____, 2009.

12

13

14

15                       _____

                         Mary M. Zajac,
16                       Official Court Reporter

17

18

19

20

21

22

23

24

25

## $

**$10** [2] - 153:3, 206:16
**$150** [6] - 150:16, 150:17, 151:13, 151:17, 176:24, 176:25
**$210** [2] - 188:10, 188:15
**$3,000** [1] - 177:10
**$300** [10] - 162:25, 163:1, 163:8, 183:21, 188:9, 201:22, 201:25, 206:6, 206:16, 207:3
**$350** [1] - 151:19
**$40** [1] - 180:8
**$400** [1] - 193:25
**$50** [2] - 153:7, 206:22
**$600** [1] - 181:5
**$700** [1] - 163:7
**$800** [5] - 62:12, 62:25, 63:4, 133:5, 193:13
**$900** [1] - 188:8

## '

**'02** [4] - 48:22, 77:21, 124:4, 126:13
**'04** [3] - 114:10, 191:24, 192:1
**'90s** [6] - 52:20, 141:11, 142:4, 142:19, 180:25
**'96** [5] - 45:4, 50:15, 63:19, 101:9, 101:10
**'97** [1] - 138:24
**'98** [4] - 48:19, 50:15, 50:21, 131:12
**'99** [4] - 50:15, 63:19, 103:19, 131:8

## 0

**002691** [1] - 191:4
**0246** [1] - 218:25

## 1

**1** [2] - 106:8, 107:15
**1.9** [5] - 202:7, 202:8, 203:5, 210:24
**1/21/04** [1] - 128:18
**1/23** [1] - 194:11
**1/24/2000** [1] - 189:23
**10** [3] - 41:23, 227:20, 232:10
**100** [1] - 263:10
**100%** [1] - 33:21
**101** [1] - 1:25

**10:00** [7] - 2:5, 135:10, 135:11, 231:11, 231:13, 232:22, 262:22
**10:30** [1] - 226:12
**10:38** [1] - 222:3
**10:50** [2] - 228:15, 228:18
**10:52** [2] - 228:15, 228:18
**10th** [7] - 159:13, 183:24, 197:7, 198:15, 198:17, 199:11, 199:12
**11** [4] - 5:2, 97:15, 227:20, 232:10
**110** [1] - 263:10
**11:00** [2] - 78:23, 79:7
**11:21** [2] - 214:17, 219:14
**11:24** [2] - 216:8, 217:17
**11:52** [1] - 222:4
**11th** [1] - 252:18
**12** [5] - 5:23, 75:13, 86:6, 262:4, 262:13
**120** [1] - 263:11
**1221** [1] - 63:9
**129** [1] - 263:11
**12:45** [1] - 136:2
**12:51** [2] - 136:3, 136:5
**12th** [1] - 44:23
**13** [2] - 5:23, 75:24
**13.4** [2] - 211:25, 212:15
**13.9** [1] - 205:22
**1302** [1] - 183:24
**1313** [1] - 221:22
**133** [1] - 263:12
**138** [1] - 263:13
**14** [1] - 262:7
**15** [9] - 41:19, 65:12, 155:19, 177:3, 177:6, 192:6, 208:10, 211:17, 262:7
**150** [2] - 177:6, 177:9
**15th** [1] - 47:8
**16** [2] - 70:1
**167** [1] - 263:14
**17** [6] - 71:11, 71:13, 72:3, 72:4, 78:5, 108:6
**175** [1] - 263:14
**177** [1] - 263:15
**178** [1] - 263:16
**17th** [4] - 109:22, 126:3, 126:13, 244:15
**18** [1] - 78:12
**18.8** [1] - 205:23
**18.9** [1] - 205:23
**18th** [2] - 83:23, 84:1
**19** [3] - 59:5, 59:14,

114:9
**195** [1] - 263:17
**1990's** [2] - 48:9, 55:10
**1990s** [2] - 46:8, 52:11
**1991** [2] - 101:14, 108:3
**1994** [1] - 49:2
**1996** [2] - 45:5, 103:11
**1997** [3] - 101:8, 138:19, 138:24
**1998** [1] - 140:10
**1999** [7] - 63:16, 103:21, 103:22, 104:16, 125:17, 141:11, 170:17
**19th** [2] - 167:21, 175:16
**1:30** [1] - 231:21
**1:45** [1] - 136:1
**1st** [3] - 135:18, 244:14, 249:23

## 2

**2** [3] - 114:8, 135:24, 231:17
**2/27** [2] - 214:18, 219:14
**2/28** [1] - 218:16
**20** [8] - 41:19, 120:21, 155:19, 177:3, 177:6, 177:9, 177:22, 263:4
**200-something** [1] - 173:18
**2000** [24] - 53:8, 63:16, 63:20, 104:16, 141:11, 145:7, 147:24, 154:19, 159:16, 179:3, 179:9, 179:10, 179:11, 181:19, 189:22, 194:11, 196:23, 197:6, 206:20, 210:14, 211:20, 211:21, 229:19, 261:19
**2001** [7] - 55:14, 55:15, 55:20, 55:25, 56:21, 134:13, 141:11
**2002** [34] - 55:14, 56:6, 56:21, 64:1, 64:2, 64:18, 66:2, 69:7, 69:14, 70:19, 73:10, 76:23, 77:4, 78:9, 79:16, 84:6, 86:11, 86:25, 104:4, 104:6, 105:23, 106:8, 109:22, 126:3, 126:25, 217:8, 224:15, 224:17, 227:10, 229:9, 229:16, 244:8, 244:11, 252:18
**2003** [3] - 224:19, 243:4, 246:9
**2004** [36] - 20:8, 22:23, 23:2, 29:20, 58:12, 59:3,

59:6, 59:14, 65:7, 65:12, 67:7, 69:24, 75:12, 78:4, 78:8, 79:8, 111:23, 112:3, 113:13, 114:8, 121:6, 128:7, 128:9, 133:13, 146:22, 167:21, 175:16, 191:17, 192:10, 192:11, 192:25, 210:18, 211:4, 212:9, 212:17, 224:20
**2005** [3] - 46:11, 105:21, 247:12
**2008** [4] - 1:11, 79:8, 140:19, 264:6
**2009** [1] - 264:11
**2010** [2] - 229:6, 229:8
**206** [1] - 263:17
**209** [1] - 263:19
**21** [3] - 28:5, 128:7, 206:4
**21201** [1] - 1:25
**213** [1] - 263:20
**22** [2] - 70:1, 70:4
**225** [1] - 263:21
**227** [1] - 263:21
**229** [1] - 263:22
**22nd** [1] - 211:21
**23** [2] - 1:11, 264:5
**230** [1] - 263:22
**2300** [1] - 222:14
**2303** [5] - 222:6, 222:7, 222:9, 223:10, 238:7
**23rd** [2] - 210:14, 242:17
**24** [2] - 28:6, 105:21
**24th** [13] - 59:3, 59:6, 76:23, 77:4, 77:21, 78:9, 111:23, 114:8, 181:19, 189:22, 196:23, 197:6, 200:24
**25** [2] - 179:8, 263:4
**2545** [1] - 194:6
**25th** [1] - 105:23
**26** [2] - 60:4, 263:5
**26th** [1] - 217:8
**27** [1] - 263:5
**27th** [2] - 227:10, 227:17
**28** [2] - 138:9, 263:6
**28th** [5] - 75:12, 78:4, 112:3, 219:10, 222:3
**29** [1] - 263:6
**2:00** [1] - 231:21
**2:20** [3] - 227:15, 227:18
**2nd** [1] - 135:19

## 3

**3** [2] - 177:22, 232:1
**3.5** [2] - 151:5, 151:8
**3.9** [3] - 205:22, 212:7, 212:15
**30** [14] - 44:14, 108:5, 185:19, 185:22, 191:19, 192:19, 200:15, 202:2, 205:3, 206:16, 206:21, 210:13, 211:4, 263:7
**30th** [1] - 135:17
**31** [1] - 220:19
**32** [1] - 173:4
**3303** [3] - 221:21, 222:7, 222:8
**350** [1] - 151:19
**357** [2] - 164:17, 164:24
**3607** [4] - 71:25, 72:14, 72:17, 72:22
**38** [1] - 173:4
**3:00** [2] - 135:16, 231:17
**3:20** [1] - 228:2
**3:25** [1] - 228:2
**3:35** [1] - 228:12
**3:40** [1] - 228:13

## 4

**403** [2] - 251:13, 252:5
**404(b** [1] - 257:22
**410-254-5743** [1] - 69:3
**410-325-5398** [2] - 71:2, 71:13
**410-484-1475** [1] - 70:15
**410-542-5446** [2] - 69:20, 70:5
**410-644-7685** [1] - 67:17
**410-655-4247** [2] - 68:15
**410-664-7685** [2] - 67:20, 68:13
**410-669-6731** [1] - 220:22
**410-808-9606** [1] - 221:4
**44** [1] - 263:8
**443** [1] - 72:13
**443-394-2429** [1] - 69:11
**443-739-5811** [5] - 67:4, 214:17, 216:16, 219:19, 220:17
**443-742** [1] - 72:14
**4:00** [1] - 8:17

## 5

**5** [1] - 103:13
**5515** [1] - 1:24
**5811** [3] - 215:3, 215:6, 219:17
**5:13** [1] - 262:24
**5:52** [1] - 218:2

## 6

**6** [2] - 71:12, 71:13
**612-R** [1] - 192:8
**664** [1] - 67:19
**6:04** [2] - 217:24, 218:1
**6th** [3] - 211:4, 212:17, 242:19

## 7

**70** [1] - 177:22
**734** [1] - 72:15
**7685** [2] - 68:7, 68:12
**7865** [1] - 68:12
**7:05** [2] - 219:8, 219:10
**7th** [1] - 140:19

## 8

**8** [1] - 83:6
**83** [1] - 228:12
**85** [1] - 263:9
**8:05** [1] - 217:18
**8:11** [1] - 219:1
**8:24** [1] - 184:6
**8:25** [1] - 184:6
**8:30** [2] - 184:13, 218:13
**8:50** [2] - 217:18, 217:22
**8th** [3] - 227:7, 229:6, 229:8

## 9

**9** [1] - 103:13
**90's** [1] - 142:5
**91** [1] - 227:11
**92** [1] - 93:5
**95428V** [1] - 229:19
**98** [1] - 263:9
**9:00** [1] - 78:20
**9:09** [1] - 217:17
**9:10** [1] - 239:2
**9:30** [3] - 2:5, 43:6, 78:20

**9:40** [1] - 2:1
**9:41** [3] - 215:4, 216:14, 217:17
**9th** [2] - 229:9, 229:15

## A

**A-K-I-L** [1] - 139:11
**A-R-U-N-A** [1] - 194:7
**A.m** [1] - 219:9
**a.m** [3] - 2:1, 218:13, 219:10
**ability** [1] - 238:15
**able** [24] - 13:24, 14:12, 19:5, 26:11, 38:21, 66:22, 99:13, 140:21, 148:24, 153:4, 154:20, 163:8, 163:12, 181:4, 188:12, 230:24, 242:12, 248:5, 248:24, 257:1, 257:5, 261:2, 261:9
**Absolutely** [2] - 117:12, 237:6
**absolutely** [7] - 9:14, 10:8, 234:1, 256:10, 256:12
**accept** [2] - 37:3, 237:22
**accepted** [1] - 209:14
**accommodate** [1] - 43:13
**accorded** [1] - 38:7
**according** [4] - 33:3, 37:5, 185:7, 185:15
**accounting** [1] - 227:6
**accurate** [2] - 8:23, 264:9
**acknowledging** [1] - 37:8
**acquainted** [1] - 179:14
**acting** [3] - 215:23, 223:24
**activities** [2] - 16:20, 161:18
**activity** [7] - 122:12, 141:10, 141:12, 142:6, 146:17, 251:22, 253:7
**acts** [2] - 121:13, 259:24
**actual** [4] - 4:9, 5:5, 254:16, 259:25
**Ada** [3] - 219:21, 219:22
**Adam** [1] - 1:22
**adapter** [1] - 213:24
**addition** [6] - 120:19, 121:16, 127:11, 129:8, 161:14, 252:4
**Additional** [1] - 188:22
**additional** [11] - 74:7,

146:19, 184:3, 186:21, 188:5, 188:10, 191:24, 205:10, 205:11, 205:22, 232:14
**address** [21] - 11:4, 63:9, 126:7, 126:9, 126:12, 126:14, 126:16, 159:14, 193:19, 194:4, 194:7, 221:24, 221:25, 222:4, 222:5, 222:12, 222:13, 234:16, 258:19, 258:24
**addressing** [2] - 13:6, 36:18
**admissible** [1] - 241:9
**admitted** [1] - 37:20
**adult** [2] - 223:8, 223:11
**advance** [1] - 16:4
**advantage** [1] - 239:14
**advantages** [1] - 152:17
**advice** [2] - 120:15, 120:16
**advise** [1] - 10:10, 120:19, 135:1, 135:9
**advised** [4] - 58:20, 120:22, 121:2, 121:16
**aerial** [3] - 6:7, 6:13, 7:8
**Aerial** [1] - 6:14
**affects** [1] - 18:13
**affirmatively** [1] - 11:15
**affixed** [1] - 264:10
**Afghanistan** [1] - 224:20
**afraid** [3] - 2:21, 43:6, 177:18
**African** [1] - 154:24
**African-American** [1] - 154:24
**afternoon** [24] - 110:10, 110:11, 120:10, 135:16, 136:7, 138:7, 178:19, 182:21, 195:3, 195:4, 208:7, 209:6, 225:17, 225:18, 227:18, 228:3, 228:14, 231:15, 231:20, 232:2, 233:1, 250:7, 250:8, 258:12
**afterwards** [1] - 259:9
**age** [1] - 223:15
**agency** [1] - 146:4
**agent** [9] - 8:2, 22:11, 25:16, 127:11, 129:2, 179:2, 179:19, 179:20, 181:18
**Agent** [1] - 246:16
**agent's** [1] - 42:4
**agents** [10] - 19:4, 20:19, 24:15, 41:5, 47:22, 120:14, 121:18, 146:12, 147:15, 240:15

**ago** [24] - 22:18, 66:9, 72:1, 86:23, 98:3, 98:18, 111:25, 120:21, 133:21, 134:7, 146:21, 147:13, 154:20, 167:11, 167:12, 168:16, 174:5, 175:19, 224:10, 240:14, 240:18, 241:12, 242:23, 252:12
**agree** [4] - 4:6, 13:25, 237:2, 254:11
**agreed** [1] - 47:6
**ahead** [13] - 19:14, 26:4, 34:18, 59:8, 95:24, 100:23, 129:19, 186:7, 233:2, 252:17, 256:23, 256:24, 258:22
**aid** [1] - 67:2
**ain't** [1] - 60:15
**air** [1] - 9:25
**Akil** [3] - 139:5, 144:2, 181:15
**al** [1] - 264:5
**alive** [2] - 237:21, 237:24
**alleged** [3] - 251:8, 251:21, 259:23
**alley** [2] - 6:7
**allowed** [4] - 7:16, 175:14, 189:10, 241:20
**alluded** [1] - 180:10
**almost** [1] - 105:1
**aloud** [1] - 17:23
**alphabetical** [3] - 220:9, 220:10
**alternative** [1] - 14:3
**altogether** [1] - 144:25
**Altoona** [31] - 138:11, 138:12, 138:14, 138:16, 139:6, 139:20, 139:23, 141:19, 142:1, 142:2, 145:4, 149:15, 151:15, 152:11, 152:15, 152:18, 152:20, 153:2, 153:4, 153:17, 159:13, 163:5, 163:16, 179:5, 179:7, 179:21, 180:19, 180:21, 183:24, 206:19
**AMD-04-029** [2] - 1:6, 264:5
**Amendment** [1] - 32:13
**AMERICA** [1] - 1:5
**American** [3] - 154:24, 243:14
**Amity** [1] - 244:5
**amount** [5] - 172:15, 175:1, 193:13, 205:7, 207:2
**amounts** [1] - 180:9
**amplified** [1] - 251:15
**analyses** [1] - 9:2

**analysis** [16] - 16:8, 16:9, 16:22, 18:18, 192:13, 209:12, 209:15, 209:25, 210:7, 210:23, 211:4, 211:24, 212:14, 213:13, 214:13, 242:8
**analyst** [1] - 69:18
**analyze** [4] - 209:20, 210:14, 210:18, 212:9
**analyzed** [2] - 209:23, 211:20
**analyzing** [1] - 222:17
**Andre** [1] - 1:13
**Anis** [2] - 216:25, 217:8
**announced** [1] - 235:13
**announces** [1] - 236:9
**Answer** [7] - 21:9, 28:9, 61:1, 76:4, 78:25, 79:2, 175:24
**answer** [51] - 20:2, 49:13, 59:21, 60:14, 60:19, 60:21, 65:16, 65:23, 72:13, 75:19, 75:21, 75:25, 76:3, 78:13, 78:15, 78:18, 78:19, 78:22, 79:4, 83:17, 83:21, 84:2, 114:21, 115:13, 115:17, 115:18, 115:21, 118:5, 121:14, 128:13, 128:19, 128:21, 128:23, 153:6, 154:4, 157:6, 157:10, 166:15, 168:6, 169:8, 169:10, 169:20, 169:21, 169:22, 169:25, 175:19, 175:22, 202:24, 207:5, 226:14
**answered** [3] - 166:5, 185:6, 218:11
**answering** [1] - 218:21
**answers** [2] - 34:22, 169:4
**Anthony** [1] - 106:13
**anticipate** [5] - 10:25, 29:15, 31:15, 34:15, 34:17
**anticipate's** [1] - 31:14
**anticipated** [2] - 12:12, 162:10
**anticipating** [1] - 162:23
**anticipation** [1] - 224:18
**anyway** [3] - 9:8, 35:19, 36:14
**Anyway** [1] - 72:16
**apart** [2] - 48:11, 122:2
**Apartment** [2] - 221:23, 222:6
**apartment** [11] - 61:15,

61:18, 161:5, 161:6, 165:6, 166:1, 188:21, 221:21, 223:10, 223:11, 234:6
**apologize** [3] - 68:6, 156:17, 247:16
**apostrophe** [1] - 262:2
**apparent** [2] - 253:16, 253:25
**appear** [8] - 38:25, 47:18, 94:22, 167:18, 214:10, 214:11, 217:15, 220:19
**appearance** [9] - 28:7, 59:15, 67:7, 69:25, 71:9, 114:7, 121:6, 127:22, 129:1
**appearances** [3] - 20:14, 112:8, 113:25
**Appearances** [1] - 1:15
**appeared** [3] - 58:11, 62:9, 120:13
**appearing** [1] - 58:10
**applied** [1] - 209:25
**applies** [1] - 16:12
**apply** [1] - 211:14
**appointment** [1] - 97:17
**Appreciate** [1] - 6:22
**appreciate** [7] - 6:25, 233:15, 234:8, 237:10, 239:1, 253:17, 258:9
**apprised** [1] - 232:15
**approach** [7] - 3:17, 3:25, 16:5, 42:15, 58:2, 62:6, 142:18
**approached** [1] - 142:14
**appropriate** [5] - 4:22, 4:25, 6:6, 6:10, 39:7
**April** [33] - 20:10, 28:6, 29:20, 48:22, 58:11, 65:7, 65:12, 67:7, 69:24, 71:9, 75:12, 78:4, 78:8, 83:2, 86:11, 106:8, 107:15, 109:22, 112:2, 124:4, 126:3, 126:13, 126:24, 128:7, 128:9, 191:17, 191:24, 211:4, 212:17, 224:15, 244:14, 244:15
**area** [24] - 6:9, 35:15, 44:15, 44:19, 57:15, 71:1, 94:21, 101:20, 105:25, 141:19, 152:11, 152:18, 161:15, 165:13, 183:9, 184:1, 225:24, 226:5, 226:7, 226:9, 226:18, 227:25, 238:21
**Area** [2] - 69:11, 70:15
**argue** [1] - 36:13

**armed** [1] - 197:23
**arose** [2] - 230:12, 230:17
**arousing** [1] - 247:21
**arraigned** [1] - 190:7
**arraignment** [1] - 190:8
**arranged** [3] - 174:22, 247:25, 249:14
**arrangement** [1] - 183:19
**arrangements** [8] - 10:5, 150:5, 158:23, 159:3, 159:8, 159:10, 159:23, 183:1
**Arrangements** [1] - 183:15
**arranging** [1] - 247:24
**array** [1] - 216:5
**arrayed** [1] - 116:2
**arrest** [17] - 56:6, 61:14, 64:2, 64:18, 81:10, 84:6, 122:8, 126:3, 126:24, 127:6, 159:22, 160:3, 165:23, 187:10, 244:16, 261:12, 261:19
**arrested** [39] - 61:8, 61:11, 61:12, 61:15, 61:19, 79:14, 79:19, 84:10, 88:6, 98:4, 106:12, 107:15, 107:25, 124:4, 126:4, 126:12, 126:23, 140:7, 143:23, 144:2, 166:9, 168:10, 168:13, 169:15, 170:19, 170:22, 171:1, 171:2, 171:8, 174:6, 175:22, 175:24, 182:5, 190:3, 199:4, 244:14, 244:17, 261:13, 261:17
**arresting** [1] - 81:12
**arrests** [1] - 190:5
**Arrington** [1] - 137:21
**arrival** [2] - 218:25, 219:2, 219:11
**arrive** [1] - 135:11
**artists** [7] - 26:6, 56:22, 56:23, 56:24, 92:12, 118:17, 131:18
**Arundel** [1] - 223:21
**aside** [7] - 84:23, 166:21, 238:19, 239:1, 242:16, 251:9, 252:5
**aspect** [1] - 208:9
**aspects** [1] - 241:5
**assault** [2] - 244:13, 245:3
**assertion** [1] - 31:11
**assigned** [1] - 184:3
**Assistance** [1] - 140:23
**assistance** [1] - 140:24

**associate** [2] - 228:22, 245:13
**associated** [1] - 172:9
**associates** [4] - 50:1, 53:21, 157:22, 158:5
**assume** [4] - 5:14, 17:24, 35:7, 39:23, 49:21, 159:5, 165:17, 183:4, 183:16, 190:2, 198:18, 199:11, 219:24, 255:19
**assumed** [3] - 8:22, 157:16, 171:22
**assuming** [3] - 33:19, 260:24, 261:1
**assumption** [3] - 8:23, 49:22, 249:15
**assure** [1] - 43:8
**attached** [2] - 191:3, 192:24
**attempt** [1] - 220:19
**attempted** [1] - 243:20
**attempts** [1] - 119:9
**attend** [1] - 50:8
**attended** [1] - 30:18
**attention** [13] - 28:5, 59:1, 64:1, 78:9, 179:3, 179:17, 181:7, 181:19, 214:9, 214:15, 220:15, 220:18, 235:23
**attire** [1] - 107:7
**Attorney** [2] - 178:21, 178:23
**attorney** [4] - 21:7, 120:23, 120:24, 186:4
**Attorney's** [3] - 58:22, 121:18, 146:3
**attorneys** [3] - 17:5, 54:6, 85:21
**audience** [1] - 41:7
**audiotape** [3] - 20:19, 21:2, 22:4
**aunt** [4] - 68:2, 68:3, 68:5, 68:6
**Aunt** [2] - 70:10, 70:11
**aunt's** [2] - 68:6, 70:6
**authorities** [4] - 143:17, 143:21, 144:8, 174:22
**authority** [1] - 144:9
**autopsy** [8] - 4:10, 5:8, 5:10, 5:13, 5:22, 255:16, 255:22, 257:14
**available** [5] - 5:11, 147:15, 246:7
**Avenue** [4] - 60:20, 194:9, 221:22, 222:2
**avoided** [1] - 94:9
**aware** [30] - 3:16, 49:25, 53:21, 53:24, 54:10, 55:14, 56:9, 56:10, 57:7,

61:8, 64:19, 72:24, 80:11, 80:12, 81:13, 89:21, 103:21, 106:18, 107:24, 145:6, 149:3, 166:11, 195:13, 195:14, 222:22, 222:25, 234:2, 234:21, 246:6, 258:23
**awful** [1] - 93:21
**awfully** [1] - 2:21

**B**

**B-O-L-I-L-N-I-G** [1] - 220:22
**background** [3] - 9:18, 44:21, 48:7
**bad** [6] - 8:13, 36:12, 38:15, 38:23, 46:21, 262:11
**bag** [11] - 155:10, 155:11, 155:13, 155:15, 155:18, 177:11, 184:17, 192:5, 210:13, 211:16, 211:25
**bagged** [1] - 156:12
**baggies** [1] - 189:16, 211:17
**bags** [1] - 212:3
**ball** [22] - 150:16, 151:2, 151:4, 151:11, 151:17, 156:5, 156:6, 156:13, 173:5, 173:14, 173:16, 176:21, 176:23, 176:25, 177:19, 185:20, 185:21, 185:24, 185:25, 202:8, 203:4, 203:5
**ballistic** [1] - 252:1
**ballistics** [6] - 250:25, 251:1, 251:8, 252:12, 254:6, 255:10
**ballpark** [2] - 46:4, 180:11
**balls** [22] - 155:4, 155:5, 155:6, 155:17, 155:21, 155:23, 156:4, 156:5, 156:21, 156:24, 163:3, 172:12, 173:5, 173:18, 177:4, 185:21, 202:10, 202:16, 202:21, 203:6, 205:25, 206:1
**Baltimore** [52] - 1:12, 1:25, 44:15, 44:17, 44:19, 48:14, 56:14, 57:7, 57:10, 57:14, 63:15, 77:7, 77:13, 91:25, 101:13, 101:21, 102:20, 122:20, 126:19, 147:5, 152:6, 152:7, 152:11, 152:14, 152:18, 152:21, 152:22, 153:3,

157:16, 157:20, 157:23, 158:3, 158:6, 158:20, 163:13, 163:16, 171:20, 171:22, 180:23, 181:4, 182:4, 193:10, 193:19, 194:4, 224:7, 226:17, 252:19, 261:20
**Barry** [1] - 1:22
**base** [4] - 32:22, 192:12, 212:15, 212:16
**based** [6] - 16:18, 31:13, 32:14, 34:22, 37:2, 167:6
**basic** [2] - 38:13, 246:8
**basis** [4] - 33:9, 34:2, 38:24, 232:12
**Bass** [2] - 68:4, 68:7
**bathroom** [1] - 61:18
**battle** [1] - 92:11
**battles** [1] - 92:9
**bay** [1] - 215:25
**bear** [1] - 67:14
**Bear** [1] - 69:9
**bearing** [3] - 67:3, 229:18, 259:19
**bears** [1] - 69:19
**beat** [1] - 74:12
**beauty** [2] - 68:23, 68:24
**became** [6] - 72:24, 81:12, 166:11, 179:14, 179:15, 180:24
**become** [3] - 46:5, 49:25, 61:8
**bed** [8] - 77:22, 78:21, 78:22, 78:24, 79:7, 79:11, 97:15, 97:20
**bedroom** [10] - 188:18, 188:19, 188:20, 188:21, 188:24, 189:5, 189:6, 189:7, 189:9
**beer** [2] - 164:5, 165:6
**began** [10] - 48:23, 50:17, 61:5, 64:21, 71:17, 139:12, 143:16, 143:23, 145:4, 145:8
**begin** [6] - 64:24, 92:4, 92:7, 138:23, 171:13, 248:23
**Beginning** [1] - 83:6
**beginning** [5] - 84:7, 84:20, 103:22, 112:11, 226:3
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behalf** [2] - 215:23, 223:24
**behaving** [1] - 91:1
**behavior** [1] - 88:23
**Behind** [1] - 262:7

**behind** [4] - 166:8, 262:6, 262:10, 262:13
**Belinda** [2] - 2:20, 136:4
**bell** [1] - 93:6
**Belvedere** [1] - 228:16
**bench** [1] - 8:8
**benefit** [5] - 139:8, 146:3, 146:8, 176:10, 176:17
**Benson** [2] - 246:16
**Bentley** [15] - 226:6, 226:8, 227:2, 227:4, 227:5, 227:11, 227:13, 228:22, 229:1, 229:7, 229:9, 229:11, 229:12, 229:18
**Bentleys** [2] - 228:24, 228:25
**BERGER** [2] - 213:3, 263:20
**Berger** [11] - 3:4, 43:16, 43:19, 43:21, 43:22, 208:3, 212:25, 213:7, 213:11, 225:17, 225:19
**Berger's** [1] - 9:17
**best** [4] - 70:13, 159:19, 205:8, 260:15
**better** [6] - 2:22, 91:8, 99:6, 107:6, 201:7, 210:6
**between** [19] - 6:18, 50:15, 78:20, 113:13, 134:20, 154:15, 157:3, 157:4, 164:20, 177:3, 200:16, 224:9, 231:17, 243:21, 251:1, 253:2, 253:6, 259:23, 260:11
**beyond** [1] - 129:18
**bidding** [2] - 204:15, 204:16
**big** [3] - 7:24, 132:24, 180:22
**bill** [2] - 65:18
**bills** [1] - 133:10
**birth** [1] - 131:15
**birthday** [1] - 132:3
**bit** [13] - 2:4, 7:15, 48:7, 48:15, 48:16, 52:22, 62:5, 105:21, 136:20, 142:9, 162:18, 203:12, 210:5
**black** [4] - 5:15, 5:16, 185:8, 187:20
**blaming** [1] - 248:25
**block** [6] - 150:15, 150:21, 184:10, 222:14, 222:23, 229:19
**blue** [12] - 106:16, 226:5, 227:2, 227:3, 227:4, 227:11, 228:22,

229:9, 229:12, 229:18, 242:25
**blurry** [1] - 215:6
**Bo** [67] - 45:25, 53:1, 53:4, 60:25, 62:20, 68:22, 72:8, 72:21, 75:18, 75:24, 78:14, 78:24, 80:3, 119:25, 124:20, 124:23, 142:25, 154:6, 154:7, 154:10, 154:12, 154:15, 154:20, 155:2, 155:11, 155:13, 155:15, 155:21, 157:3, 157:12, 157:13, 157:15, 157:25, 158:1, 160:19, 160:20, 161:10, 163:24, 163:25, 164:2, 164:4, 166:12, 171:20, 172:9, 172:13, 175:6, 177:2, 177:3, 185:9, 185:12, 185:15, 188:11, 188:12, 189:2, 195:25, 203:11, 214:17, 215:1, 216:13, 216:14, 219:14, 220:17, 220:23, 220:25
**Bo's** [9] - 65:23, 68:2, 68:3, 68:6, 68:21, 76:21, 120:2, 130:8, 133:14
**bodies** [1] - 4:5
**bodily** [3] - 74:13, 74:17, 75:2
**Boo** [1] - 187:20
**Booking** [5] - 243:24, 245:4, 245:5, 245:11, 245:18
**books** [1] - 125:20
**born** [6] - 44:17, 103:20, 131:10, 131:12, 138:10, 243:13
**borrow** [2] - 190:10, 191:18
**bottle** [2] - 73:19, 73:21
**bottom** [2] - 121:5, 187:12
**bought** [2] - 172:12, 185:21
**Boulevard** [1] - 227:14
**box** [2] - 33:20, 189:14
**boxes** [1] - 234:15
**boy** [2] - 45:19, 46:18
**Boy** [5] - 45:20, 73:22, 75:6, 75:7, 75:9, 97:6
**boyfriend** [4] - 181:12, 181:14, 223:12, 224:6
**Boynton** [6] - 185:6, 185:7, 185:16, 187:3, 187:6, 188:15
**boys** [6] - 84:13, 86:9, 86:18, 89:7, 93:24, 127:1
**Brady** [2] - 249:3, 249:4

**Bragg** [1] - 224:18
**brand** [1] - 106:20
**break** [8] - 40:24, 135:16, 136:19, 147:13, 231:16, 249:19, 262:3, 262:4
**breakfast** [2] - 17:11, 231:23
**breaks** [1] - 103:2
**bridge** [1] - 256:18
**brief** [2] - 40:20, 110:2
**Briefly** [1] - 133:17, 177:14
**briefly** [10] - 29:6, 29:10, 30:4, 41:3, 46:24, 129:18, 177:15, 231:6, 233:17, 237:16
**bring** [5] - 8:11, 14:6, 14:8, 14:15, 17:19, 42:3, 42:9, 43:14, 89:3, 121:24, 144:19, 148:10, 164:4, 248:13, 261:2
**bringing** [3] - 13:18, 247:11, 249:12
**broaden** [2] - 32:21, 35:6
**broke** [2] - 73:18, 73:24
**broken** [1] - 207:8
**brother** [1] - 80:3
**brothers** [15] - 5:9, 6:12, 80:6, 80:15, 80:18, 106:13, 119:11, 119:12, 119:13, 131:20, 226:6, 229:7, 229:12, 244:16, 252:24
**brought** [6] - 29:23, 42:10, 42:18, 58:15, 179:18, 247:23
**Brown** [13] - 4:21, 218:3, 219:21, 221:22, 222:13, 223:7, 223:14, 224:7, 233:20, 233:24, 238:2, 238:5, 238:6
**brown** [3] - 190:18, 209:17, 210:12
**Brown's** [1] - 230:17
**browse** [1] - 230:13
**Brummer** [1] - 223:22
**Bryant** [11] - 50:11, 50:14, 50:25, 102:14, 103:17, 125:17, 125:25, 131:4, 131:6, 131:7, 131:8
**Bu** [1] - 63:3
**Buffalo** [1] - 180:24
**building** [2] - 146:18, 147:1
**bullet** [4] - 3:18, 3:21, 3:22, 252:22
**bullets** [1] - 257:2

**bunch** [1] - 176:20
**burden** [1] - 253:3
**Bureau** [1] - 190:24
**burn** [3] - 64:16, 65:16, 66:1
**burn-outs** [1] - 65:16
**burner** [5] - 64:5, 64:7, 64:8, 64:19, 66:2
**burnout** [3] - 65:23, 66:2, 72:10
**burnt** [1] - 65:14
**bus** [3] - 226:10, 227:8, 227:11
**business** [15] - 53:5, 54:24, 60:17, 80:11, 90:10, 92:4, 92:7, 92:22, 118:19, 131:17, 134:17, 138:25, 139:13, 142:16, 166:12
**businesses** [1] - 54:9
**buy** [40] - 35:23, 64:11, 64:15, 148:6, 148:9, 148:12, 148:25, 149:8, 149:18, 150:6, 152:2, 152:23, 153:8, 153:14, 159:1, 160:7, 172:18, 175:1, 176:4, 180:7, 180:12, 181:4, 181:24, 182:1, 182:20, 182:22, 185:5, 185:20, 188:9, 189:22, 191:20, 192:20, 195:7, 195:17, 197:7, 197:11, 198:21, 200:19, 207:15
**buys** [16] - 148:3, 148:4, 148:17, 149:5, 168:9, 175:21, 179:16, 179:22, 179:25, 180:2, 180:5, 180:10, 180:12, 180:15, 181:9
**BY** [68] - 20:5, 21:15, 22:3, 24:14, 25:10, 26:6, 27:11, 28:18, 29:14, 30:7, 44:10, 58:9, 62:19, 85:12, 95:1, 95:25, 98:1, 100:12, 110:9, 117:18, 120:9, 129:21, 132:15, 133:19, 138:6, 167:1, 175:11, 177:17, 178:18, 186:8, 194:24, 202:19, 206:15, 207:7, 209:5, 213:10, 225:16, 227:1, 229:4, 230:6, 263:4, 263:4, 263:5, 263:5, 263:6, 263:6, 263:7, 263:8, 263:9, 263:9, 263:10, 263:10, 263:11, 263:11, 263:12, 263:13, 263:14, 263:14, 263:15, 263:16, 263:17, 263:17,

263:19, 263:20, 263:21, 263:21, 263:22, 263:22

**C**

**cable** [1] - 2:22
**calculations** [1] - 176:21
**calculator** [1] - 176:21
**Calpin** [2] - 261:18, 261:23
**CALPIN** [1] - 261:23
**camera** [1] - 7:14
**cannot** [1] - 237:21
**captioned** [1] - 238:6
**car** [21] - 80:21, 80:22, 80:25, 81:2, 81:14, 81:17, 81:19, 88:17, 89:1, 122:8, 150:19, 150:20, 184:9, 213:14, 213:19, 213:25, 222:18, 222:22, 245:23
**care** [15] - 6, 46:20, 51:17, 52:7, 190:16, 233:1, 233:4, 233:8
**careful** [1] - 68:14
**carefully** [1] - 111:17
**Caribbean** [1] - 224:16
**Carolina** [1] - 224:18
**carpet** [1] - 35:24
**carried** [2] - 83:18, 87:13
**carry** [2] - 87:11, 216:22
**carrying** [1] - 88:16
**cars** [1] - 133:3
**case** [51] - 7:17, 9:3, 10:9, 34:14, 34:15, 36:12, 36:25, 37:11, 37:23, 41:13, 94:2, 94:4, 94:10, 121:13, 127:6, 135:2, 135:23, 146:4, 146:13, 146:19, 147:2, 147:10, 147:20, 165:15, 176:11, 176:18, 181:18, 191:14, 194:2, 208:9, 228:23, 229:1, 232:17, 234:13, 240:16, 246:7, 247:11, 247:12, 249:2, 250:15, 253:7, 254:12, 254:21, 254:24, 255:1, 255:2, 256:2, 257:10, 259:24, 261:21, 262:8
**Case** [1] - 264:5
**CASE** [1] - 1:6
**cases** [6] - 7:12, 7:24, 8:4, 8:14, 179:19, 233:25
**casings** [4] - 252:21, 255:13, 255:19, 257:1
**catch** [3] - 174:23,

199:3, 242:22
**category** [1] - 32:25
**caused** [1] - 144:24
**cc'd** [1] - 257:21
**CD** [9] - 19:5, 26:15, 27:1, 27:3, 166:13, 166:16, 166:17, 166:22
**CD's** [6] - 24:23, 30:11, 30:14, 93:11, 119:7, 119:9
**cell** [14] - 64:3, 65:1, 65:14, 65:17, 65:23, 66:2, 66:6, 71:17, 72:9, 72:11, 72:21, 78:14, 189:12
**Central** [5] - 243:24, 245:4, 245:5, 245:11, 245:17
**certain** [1] - 118:8
**Certainly** [6] - 2:6, 7:19, 101:23, 117:11, 195:1, 225:11
**certainly** [7] - 16:9, 104:11, 107:6, 239:1, 254:11, 255:4, 260:11
**CERTIFICATE** [1] - 264:1
**certify** [2] - 264:3, 264:7
**chairs** [3] - 135:22, 208:8, 232:18
**challenge** [1] - 253:5
**chance** [7] - 20:18, 40:14, 120:15, 130:22, 131:2, 175:15, 239:10
**change** [3] - 8:20, 58:23, 121:19
**changed** [2] - 39:9, 107:14
**changing** [1] - 34:21
**characterization** [1] - 169:7
**charge** [15] - 141:7, 144:2, 144:6, 145:20, 145:24, 146:5, 146:9, 174:7, 174:8, 174:13, 176:1, 179:10, 244:13, 261:13, 261:17
**charged** [6] - 127:7, 221:15, 221:16, 251:11, 256:6, 259:11
**charges** [3] - 89:19, 140:8, 146:12
**Charles** [4] - 143:2, 143:4, 143:6, 152:1
**chart** [1] - 117:14
**cheap** [1] - 107:2
**cheaper** [1] - 152:23
**check** [7] - 5:24, 34:10, 84:11, 190:2, 221:24, 224:2, 225:6

**checked** [2] - 84:13, 224:5
**checking** [1] - 8:17
**Checking** [1] - 127:2
**chemical** [4] - 9:2, 16:8, 16:9, 16:22
**chemist** [7] - 8:9, 8:22, 9:3, 9:5, 17:19, 17:22, 136:7
**chemists** [2] - 8:25, 17:13
**child** [13] - 9:19, 40:4, 45:18, 86:1, 86:3, 104:16, 116:24, 117:1, 140:1, 141:1, 170:13, 223:17, 238:6
**Child** [1] - 132:6
**children** [10] - 45:17, 141:2, 167:7, 169:18, 170:7, 170:8, 171:2, 176:16, 223:14, 223:18
**children's** [10] - 45:12, 139:1, 139:2, 139:4, 139:9, 139:13, 143:23, 144:13, 144:21, 145:9
**chip** [1] - 65:17
**Christopher** [3] - 227:8, 261:16, 262:2
**chronological** [3] - 217:15, 217:17, 253:21
**chronologically** [1] - 222:1
**chronology** [1] - 197:13
**CI** [2] - 182:23, 185:17
**circled** [5] - 67:18, 67:21, 68:16, 69:19, 71:1
**circles** [1] - 18:11
**circumstances** [5] - 37:15, 37:23, 145:6, 235:19, 248:23
**cities** [4] - 152:22, 180:22, 180:25, 181:3
**citizen** [1] - 171:7
**city** [4] - 60:2, 180:19, 181:6, 227:3
**City** [14] - 44:15, 44:17, 56:14, 57:7, 77:7, 101:13, 101:21, 179:6, 179:21, 180:23, 180:24, 183:24, 226:17
**claims** [1] - 37:22
**clarification** [4] - 32:11, 85:1, 253:17, 258:2
**clarify** [1] - 83:14
**Class** [1] - 261:5
**clean** [1] - 184:23
**Clean** [2] - 55:15, 55:16
**clear** [12] - 85:3, 123:15, 125:21, 125:23, 129:8, 140:3, 176:16,

201:15, 247:20, 253:4, 258:1, 260:2
**clearly** [3] - 211:7, 216:17, 216:18
**clears** [1] - 250:17
**clerk** [2] - 19:15, 190:10
**CLERK** [6] - 19:18, 44:5, 137:22, 137:25, 178:13, 208:25
**client** [8] - 11:14, 13:23, 16:20, 27:15, 100:19, 100:21, 100:23, 241:8
**client's** [1] - 11:15
**clients** [2] - 9:1, 259:1
**clock** [3] - 136:1, 136:2, 136:4
**close** [5] - 42:20, 51:14, 105:18, 205:24, 206:1
**closer** [1] - 167:23
**closest** [1] - 165:1
**clothes** [1] - 133:1
**Club** [1] - 93:2
**club** [6] - 30:18, 75:4, 83:22, 84:1, 92:20, 96:25
**clubs** [2] - 30:17
**co** [4] - 40:11, 225:6, 257:24
**co-counsel** [4] - 40:11, 225:6, 257:24
**Coburn** [17] - 1:22, 4:3, 4:4, 6:5, 6:21, 7:4, 9:6, 14:5, 14:9, 14:17, 120:10, 120:20, 134:7, 234:9, 234:10, 250:5
**COBURN** [22] - 6:22, 7:5, 7:22, 9:7, 9:10, 13:11, 14:11, 16:25, 28:18, 34:20, 35:2, 35:19, 110:9, 117:12, 117:17, 117:18, 120:6, 129:6, 233:17, 237:10, 263:6, 263:10
**Coburn's** [1] - 136:21
**cocaine** [54] - 139:18, 139:19, 142:22, 145:19, 151:7, 151:17, 156:7, 161:16, 161:21, 162:2, 162:4, 162:11, 162:12, 162:15, 162:17, 162:18, 162:19, 171:9, 174:6, 177:10, 181:4, 183:15, 183:21, 184:18, 184:20, 184:21, 185:16, 185:18, 188:5, 188:22, 188:23, 192:12, 192:14, 193:1, 201:24, 201:25, 202:5, 204:23, 205:1, 210:13, 210:16, 210:19, 210:21, 211:23, 211:24, 212:3, 212:6, 212:10, 212:13,

212:15, 212:16
**code** [3] - 69:11, 70:15, 71:1
**codes** [1] - 236:7
**colleague** [2] - 20:13, 223:6
**college** [10] - 50:9, 50:13, 53:9, 53:12, 53:18, 102:10, 102:12, 102:15, 103:2, 131:2
**College** [10] - 50:10, 50:11, 50:14, 102:14, 103:17, 125:17, 125:25, 131:4, 131:6, 131:7
**colleges** [3] - 50:6, 50:8, 102:24
**colloquy** [3] - 32:14, 32:17, 33:2
**color** [1] - 5:19
**combination** [1] - 250:18
**comfortable** [4] - 15:13, 93:18, 164:23, 213:5
**coming** [16] - 8:7, 18:17, 127:21, 136:23, 137:3, 152:18, 180:21, 189:5, 211:7, 225:22, 234:12, 234:19, 237:3, 241:2, 259:4
**comment** [1] - 108:23
**commitment** [1] - 35:2
**committed** [3] - 224:2, 253:13, 259:24
**committing** [1] - 225:24
**common** [1] - 245:15
**communication** [1] - 7:3
**Community** [1] - 50:10
**community** [2] - 102:11, 181:2
**companion** [2] - 9:18, 105:3
**company** [2] - 106:2, 166:22
**compare** [1] - 153:2
**comparison** [2] - 225:1, 225:4
**complain** [1] - 242:2
**complaint** [2] - 237:18, 237:20
**complete** [4] - 125:24, 227:6, 242:4, 264:9
**completed** [2] - 43:18, 171:13
**completely** [1] - 238:15
**completes** [1] - 39:3
**completion** [1] - 144:22
**components** [1] - 18:7
**comprehensible** [1] - 246:21

**computer** [3] - 13:12, 14:14, 136:5
**computerized** [1] - 230:13
**conceal** [1] - 238:7
**concern** [7] - 7:9, 10:11, 136:21, 196:3, 196:6, 196:10, 199:17, 199:18, 257:9
**concerned** [9] - 4:18, 124:4, 199:24, 200:3, 233:3, 238:9, 248:3, 251:22, 253:14
**concerning** [2] - 111:20, 251:8
**conclude** [2] - 231:8, 259:22
**concluded** [1] - 135:2
**concludes** [1] - 39:3
**Conclusion** [1] - 262:24
**conduct** [2] - 113:10, 123:3
**Conduct** [1] - 232:19
**confer** [3] - 40:11, 117:11, 237:3
**confident** [2] - 135:2, 252:9
**confidential** [3] - 179:15, 198:10, 198:19
**confined** [3] - 103:22, 103:25, 104:3
**confirm** [1] - 10:25
**confused** [1] - 195:18
**connect** [1] - 234:4
**connected** [3] - 228:25, 230:8, 230:22
**connection** [8] - 2:25, 134:20, 224:4, 251:1, 253:2, 253:6, 259:23, 260:11
**conscientiously** [1] - 235:12
**consider** [1] - 37:18
**considerations** [1] - 34:5
**considered** [2] - 107:6, 144:5
**conspiracy** [5] - 16:21, 241:10, 241:11, 259:3, 259:10
**Conspiracy** [2] - 174:10, 174:11
**constant** [1] - 105:3
**constitute** [1] - 264:7
**constitutional** [1] - 115:13
**constrained** [1] - 236:22
**consult** [4] - 4:15, 227:6, 229:13, 231:17

**contact** [8] - 10:15, 38:24, 110:4, 121:17, 149:20, 149:21, 186:4, 199:14

**contacted** [2] - 10:12, 149:22

**contacts** [2] - 243:20, 246:10

**contain** [1] - 210:6

**contained** [2] - 193:1, 212:13

**containing** [7] - 192:6, 209:18, 211:16, 211:17, 211:22, 212:1

**contains** [3] - 37:5, 209:17, 210:13

**contest** [1] - 92:13

**contests** [2] - 93:2, 118:9

**context** [1] - 254:12

**continue** [6] - 19:13, 43:10, 77:18, 136:9, 166:15, 171:7

**contraband** [1] - 197:19

**contract** [14] - 74:19, 74:24, 75:3, 75:18, 76:3, 76:10, 83:23, 87:3, 88:1, 88:12, 88:14, 123:22, 124:1, 124:5

**contribution** [1] - 217:12

**control** [2] - 194:18, 204:13

**controlled** [27] - 18:2, 148:6, 148:17, 149:5, 149:8, 152:2, 153:8, 153:14, 158:24, 160:7, 165:11, 181:24, 182:1, 182:20, 189:22, 191:20, 192:20, 195:7, 195:17, 197:7, 197:11, 201:19, 202:20, 209:13, 209:15, 209:18, 210:7

**Controlled** [1] - 148:4

**controversial** [1] - 9:4

**convenience** [4] - 58:7, 150:10, 171:13, 195:8

**convenient** [2] - 171:11, 171:12

**conversation** [16] - 20:20, 23:18, 23:24, 31:8, 33:6, 41:9, 41:21, 73:12, 82:23, 84:24, 107:19, 147:15, 154:14, 183:20, 246:11, 247:3

**conversations** [15] - 23:8, 31:13, 37:22, 41:22, 49:18, 109:24, 110:2, 126:22, 151:25, 241:7, 241:13, 241:15,

245:21, 245:24, 246:3

**convicted** [4] - 115:8, 140:7, 140:10, 140:13

**conviction** [1] - 261:14

**convinced** [4] - 109:19, 256:20, 256:22, 256:23

**convincing** [1] - 260:2

**Coogi** [1] - 106:20

**COOGI** [1] - 106:20

**cooperate** [6] - 143:23, 144:13, 167:6, 167:15, 171:3, 171:12

**cooperating** [5] - 143:21, 144:4, 168:2, 168:8, 175:21

**cooperation** [10] - 144:20, 144:22, 144:24, 145:8, 147:22, 148:2, 149:5, 152:1, 174:21, 176:10

**cooperator** [1] - 240:16

**Cop** [1] - 198:24

**cop** [2] - 261:12, 261:13

**copies** [2] - 2:13, 5:14, 5:17

**copy** [8] - 2:11, 18:24, 59:1, 113:12, 113:16, 167:18, 232:14, 236:5

**corner** [2] - 6:7, 211:13

**correct** [187] - 13:1, 23:14, 24:8, 27:19, 31:12, 45:6, 47:6, 47:14, 47:18, 47:25, 49:8, 55:13, 56:3, 56:6, 56:24, 58:24, 60:22, 61:3, 61:6, 62:2, 62:21, 63:7, 63:23, 63:24, 64:16, 64:22, 65:24, 65:25, 66:4, 66:5, 67:11, 70:13, 70:17, 70:24, 71:15, 71:18, 71:22, 72:11, 75:25, 79:5, 79:7, 79:11, 83:12, 84:24, 84:25, 85:19, 99:2, 100:16, 100:20, 101:1, 101:19, 102:4, 102:8, 102:17, 102:21, 103:6, 103:16, 103:25, 104:2, 105:7, 105:14, 105:19, 106:9, 106:13, 107:7, 107:17, 108:3, 108:6, 108:9, 108:12, 109:9, 109:21, 111:16, 116:3, 120:25, 121:11, 121:17, 122:2, 122:14, 122:15, 124:1, 124:6, 125:25, 127:17, 128:15, 128:24, 129:13, 129:15, 134:18, 145:13, 147:10, 147:20, 151:8, 157:20, 159:16, 168:12, 172:12,

176:13, 177:10, 181:25, 183:18, 184:14, 187:11, 189:4, 192:2, 192:3, 192:8, 192:15, 192:21, 193:1, 193:2, 193:11, 193:12, 193:14, 193:15, 193:16, 193:20, 193:21, 193:23, 193:24, 194:1, 195:24, 196:2, 196:5, 196:10, 197:8, 197:9, 197:14, 197:15, 197:17, 197:20, 197:25, 198:2, 198:10, 198:19, 198:20, 198:23, 198:25, 199:21, 200:7, 200:10, 201:14, 201:17, 202:11, 202:21, 203:7, 203:9, 205:13, 206:17, 206:18, 207:16, 211:1, 211:5, 211:11, 212:1, 212:4, 212:7, 212:18, 213:19, 213:25, 214:5, 215:5, 215:22, 217:16, 217:20, 217:23, 218:4, 218:5, 218:10, 218:14, 219:7, 222:7, 222:15, 222:16, 223:21, 224:11, 224:12, 226:12, 226:19, 227:21, 228:5, 228:20, 229:12, 229:24, 230:9, 252:3, 253:24

**Correct** [25] - 19:17, 22:17, 23:7, 24:4, 27:8, 28:15, 29:25, 45:7, 45:16, 46:9, 56:25, 61:4, 71:23, 80:7, 87:19, 93:25, 96:7, 102:22, 115:16, 134:15, 171:25, 198:15, 212:2, 212:5, 212:19

**correctional** [1] - 174:20

**correctly** [8] - 75:22, 84:4, 111:19, 116:17, 118:7, 121:14, 150:18, 239:18

**correlation** [1] - 224:9

**cost** [1] - 181:3

**counsel** [46] - 2:14, 4:10, 4:15, 5:11, 5:15, 5:19, 6:23, 8:19, 9:1, 10:10, 11:3, 12:16, 17:18, 40:11, 41:21, 43:7, 43:11, 78:6, 117:11, 121:2, 122:20, 225:6, 231:12, 231:18, 232:25, 236:3, 236:8, 236:10, 236:11, 236:16, 237:3, 237:9, 238:10, 238:12, 238:20, 239:2, 239:5, 239:10, 239:15,

246:6, 247:16, 253:4, 257:24, 258:13, 262:22

**Counsel** [1] - 136:19

**counsel's** [1] - 262:1

**counselor** [5] - 53:13, 53:16, 53:21, 55:12, 104:17

**count** [1] - 216:6

**counting** [2] - 5:8, 5:22

**county** [1] - 190:8

**County** [4] - 48:14, 77:14, 102:20, 224:8

**couple** [9] - 2:8, 3:23, 20:16, 27:5, 50:18, 57:3, 62:4, 90:3, 100:18, 104:17, 104:20, 111:5, 125:16, 128:9, 144:19, 146:21, 162:16, 172:18, 172:19, 175:2, 175:12, 187:14, 189:13, 234:22, 242:10, 248:16, 254:8, 256:17, 257:19

**course** [19] - 5:10, 16:6, 24:3, 34:12, 37:19, 38:8, 39:5, 41:12, 113:6, 128:8, 129:1, 225:19, 226:2, 230:25, 237:17, 241:22, 249:14, 256:10

**Court** [34] - 3:3, 4:17, 7:3, 7:13, 11:2, 14:2, 33:7, 34:6, 37:2, 37:3, 37:8, 37:12, 37:14, 37:19, 38:15, 38:18, 39:3, 40:20, 41:8, 41:12, 41:21, 77:13, 77:19, 105:24, 126:9, 126:10, 136:21, 247:16, 249:18, 256:20, 257:21, 257:25, 258:9, 264:16

**court** [20] - 10:13, 11:3, 13:3, 38:3, 38:4, 41:10, 41:25, 54:5, 77:9, 84:23, 84:24, 127:21, 139:8, 146:18, 174:13, 182:6, 200:23, 202:13, 231:8, 238:20

**COURT** [319] - 1:1, 2:2, 2:6, 2:8, 2:12, 2:15, 2:18, 2:25, 3:2, 3:8, 3:10, 3:13, 4:2, 4:20, 5:8, 5:14, 5:18, 6:3, 6:14, 6:17, 6:23, 7:19, 9:9, 9:11, 9:13, 10:7, 10:16, 10:19, 10:22, 11:6, 11:10, 11:18, 11:24, 12:4, 12:6, 12:9, 12:16, 12:20, 12:23, 13:2, 13:6, 13:10, 13:13, 13:21, 14:3, 14:15, 14:25, 15:2, 15:6, 15:8,

15:11, 15:20, 15:25, 16:6, 16:10, 16:13, 16:17, 16:23, 17:1, 17:6, 17:14, 17:17, 17:25, 18:8, 18:14, 18:20, 19:9, 19:11, 19:21, 19:25, 20:2, 21:4, 21:7, 21:9, 21:11, 21:21, 22:4, 22:2, 24:12, 25:3, 25:5, 25:25, 26:4, 26:20, 29:8, 29:11, 30:2, 30:5, 30:20, 30:24, 31:1, 31:9, 31:17, 31:22, 31:25, 32:3, 32:10, 34:3, 34:7, 34:12, 34:19, 34:25, 35:6, 35:21, 36:16, 36:18, 36:22, 36:24, 37:2, 40:6, 40:17, 40:21, 40:25, 41:4, 41:11, 42:1, 42:4, 42:7, 42:13, 42:15, 42:23, 42:25, 44:1, 47:13, 49:13, 57:18, 58:3, 58:6, 58:8, 60:11, 62:8, 62:15, 62:18, 68:10, 68:12, 69:10, 70:7, 70:9, 85:9, 94:18, 94:20, 94:22, 94:24, 95:24, 97:24, 99:24, 117:11, 117:15, 118:2, 118:5, 129:7, 129:18, 132:14, 133:17, 134:25, 135:6, 136:1, 136:4, 136:10, 136:13, 136:16, 136:19, 137:3, 137:7, 137:11, 137:15, 137:20, 153:1, 153:6, 157:6, 157:10, 157:19, 166:15, 169:8, 170:3, 170:5, 170:12, 173:12, 177:15, 178:5, 178:8, 186:7, 191:7, 195:1, 200:21, 202:15, 202:18, 205:18, 207:1, 207:5, 207:22, 208:1, 208:3, 208:5, 208:12, 208:16, 208:18, 208:22, 209:14, 212:22, 212:24, 213:4, 213:8, 222:11, 223:5, 225:9, 225:11, 226:14, 226:23, 230:4, 230:11, 231:4, 231:7, 231:11, 232:25, 233:10, 233:13, 233:16, 234:4, 234:18, 234:24, 235:6, 235:11, 235:18, 236:2, 236:5, 236:14, 236:23, 237:2, 237:8, 237:12, 237:17, 238:25, 239:22, 240:1, 240:3, 240:6, 240:9, 242:7, 242:13, 242:15, 242:21, 243:2, 243:5, 243:8,

243:10, 243:12, 243:15, 243:18, 244:1, 244:7, 244:9, 244:11, 244:17, 244:20, 244:24, 245:4, 245:6, 245:9, 245:12, 245:17, 245:20, 245:24, 246:2, 246:23, 247:6, 248:11, 248:22, 249:5, 249:19, 249:23, 249:25, 250:3, 250:8, 250:13, 250:23, 252:7, 252:14, 252:17, 253:16, 253:25, 254:19, 254:23, 255:5, 255:9, 255:12, 255:15, 255:18, 255:21, 255:24, 256:1, 256:4, 256:9, 256:22, 257:3, 257:7, 258:7, 258:11, 258:16, 258:19, 258:22, 259:5, 259:12, 259:15, 260:18, 260:20, 260:23, 261:2, 261:7, 261:11, 261:15, 261:25, 262:3, 262:7, 262:13, 262:16, 262:18, 262:20, 262:22

**Court's** [18] - 7:16, 7:23, 10:24, 17:21, 25:6, 38:5, 39:21, 39:22, 41:18, 41:22, 58:4, 96:21, 114:12, 120:3, 173:11, 194:25, 200:20, 225:10

**courtesy** [4] - 6:25, 237:8, 239:6, 239:10

**Courthouse** [2] - 1:24, 58:13

**courthouse** [3] - 20:9, 20:17, 146:22

**courtroom** [23] - 4:19, 8:16, 15:10, 40:1, 41:12, 41:13, 41:15, 41:16, 41:17, 42:14, 42:24, 135:25, 136:1, 136:2, 137:14, 171:18, 172:1, 200:25, 205:14, 208:17, 232:24, 236:25, 238:23

**cousin** [6] - 73:25, 105:16, 119:25, 120:2, 130:8, 130:10

**cousin's** [1] - 74:1

**Crack** [2] - 139:18, 151:7

**crack** [34] - 139:19, 142:22, 149:11, 151:9, 151:17, 156:7, 162:2, 162:18, 162:19, 162:21, 165:5, 165:21, 177:10, 183:15, 183:21, 184:18, 184:20, 184:21, 185:16, 185:18, 186:1, 188:5,

188:22, 188:23, 193:1, 201:24, 206:19, 207:2, 210:13, 210:19, 210:21, 212:10, 212:13

**create** [1] - 4:16

**Cree** [2] - 126:9, 126:10

**CREE** [1] - 126:10

**Crime** [3] - 190:14, 191:5, 209:9

**crime** [16] - 4:16, 6:18, 7:6, 140:11, 140:14, 170:15, 216:1, 218:20, 218:24, 219:11, 224:4, 226:5, 228:20, 230:8, 257:5, 257:11

**crimes** [4] - 115:3, 115:8, 224:2, 225:24

**criminal** [5] - 146:16, 146:19, 147:2, 251:22, 253:7

**CRIMINAL** [1] - 1:6

**cross** [16] - 33:24, 34:6, 34:17, 39:6, 39:20, 42:11, 43:19, 123:1, 175:23, 197:6, 241:4, 241:21, 248:7, 248:13, 248:23, 256:18

**CROSS** [22] - 25:9, 26:5, 27:10, 28:17, 85:11, 97:25, 100:11, 110:8, 166:25, 194:23, 225:15, 263:4, 263:5, 263:5, 263:6, 263:9, 263:9, 263:10, 263:10, 263:14, 263:17, 263:21

**Crowe** [16] - 1:20, 9:11, 9:14, 10:8, 10:25, 16:23, 27:12, 97:24, 100:13, 110:12, 111:3, 126:2, 126:4, 126:21, 134:6, 134:13

**CROWE** [10] - 9:12, 9:15, 10:14, 10:18, 16:18, 27:11, 100:12, 134:24, 263:5, 263:10

**cued** [1] - 36:20

**currency** [6] - 188:5, 188:7, 188:8, 188:10, 188:16, 197:19

**custody** [3] - 187:25, 188:12, 260:18

**customer** [1] - 150:3

**cut** [3] - 144:25, 190:16, 254:10

**cutting** [1] - 30:11

---

# D

**D-U-G-A-N-N-E** [1] -

138:4

**daily** [1] - 182:9

**Damien** [2] - 223:16, 223:19

**dangerous** [1] - 18:3

**dark** [1] - 184:7

**Darryl** [8] - 79:22, 79:23, 79:25, 80:2, 80:5, 80:10, 80:17, 106:13

**date** [12] - 63:2, 63:3, 76:22, 126:3, 140:17, 159:15, 194:10, 209:24, 210:1, 211:21, 212:17, 244:15

**dated** [3] - 59:3, 128:18, 189:23

**dates** [5] - 50:16, 100:18, 125:21, 125:23, 187:12

**dating** [1] - 46:1

**David** [3] - 180:17, 261:18, 261:23

**Davis** [1] - 1:13

**days** [15] - 153:16, 187:14, 195:9, 196:13, 196:14, 199:14, 199:25, 221:6, 232:9, 232:10, 235:5, 242:11, 242:18, 248:16, 262:8

**daytime** [3] - 56:14, 56:15, 56:17

**DEA** [1] - 246:17

**dead** [6] - 7:10, 219:6, 237:19, 237:24, 238:2, 238:3

**deal** [8] - 61:1, 108:5, 132:18, 132:24, 206:24, 236:21, 249:16, 252:6

**dealer** [2] - 132:24, 148:9, 148:14

**dealers** [1] - 180:21

**dealing** [10] - 60:13, 88:20, 91:14, 91:21, 91:24, 112:24, 132:17, 152:9, 173:21, 174:3

**dealings** [1] - 176:22

**deals** [1] - 91:17

**dealt** [2] - 173:8, 176:3

**Dean** [1] - 229:17

**debate** [1] - 7:15

**debrief** [2] - 201:9, 201:10

**Debrief** [1] - 201:10

**deceased** [1] - 6:20

**decent** [1] - 246:12

**decide** [1] - 19:12

**decided** [1] - 171:2

**decision** [5] - 36:9, 38:5, 167:5, 167:15, 182:11

**decisions** [1] - 40:12

**deck** [1] - 261:25

**Defendant** [4] - 1:17, 1:18, 1:20, 1:21

**defendant** [2] - 23:6, 45:8, 51:8, 51:19, 54:6, 54:7

**Defendants** [3] - 1:9, 4:19, 41:25

**defendants** [11] - 16:13, 35:9, 36:5, 38:11, 125:5, 236:11, 251:11, 251:12, 253:13, 256:6, 260:3

**defense** [20] - 4:15, 5:11, 5:14, 10:9, 12:16, 17:5, 31:18, 32:12, 32:18, 43:19, 85:21, 237:9, 238:10, 238:12, 238:20, 239:5, 246:5, 247:16, 253:4, 256:14

**deficiency** [1] - 246:23

**defined** [1] - 156:6

**degraded** [1] - 38:15

**degree** [1] - 199:22

**dehumanized** [1] - 237:22

**delay** [2] - 119:1, 247:11

**deliver** [1] - 174:12

**demo** [2] - 92:23

**Demo** [1] - 92:25

**demonstrate** [1] - 259:9

**denied** [1] - 143:10

**departed** [1] - 184:1

**Department** [2] - 179:5, 179:7

**department** [4] - 182:25, 184:19, 211:9, 226:10

**deployed** [4] - 221:11, 221:12, 224:10, 225:1

**deployment** [1] - 224:20

**depth** [1] - 260:8

**describe** [1] - 225:23

**described** [9] - 73:13, 128:2, 164:12, 203:15, 205:9, 225:21, 226:16, 243:23, 256:15

**description** [2] - 238:1, 257:5

**Desi** [1] - 76:5

**Desi's** [1] - 76:5

**desire** [3] - 167:6, 168:23, 169:2

**DET** [1] - 213:3

**detail** [1] - 184:3

**details** [1] - 186:4

**Detective** [47] - 3:4, 9:17, 29:18, 31:5, 31:7,

33:5, 36:1, 36:24, 37:7, 43:16, 43:18, 43:20, 43:21, 94:15, 108:24, 111:4, 129:2, 133:23, 136:22, 137:9, 212:25, 213:4, 213:11, 214:3, 215:7, 215:18, 216:19, 217:10, 218:18, 219:12, 220:14, 221:7, 222:18, 222:19, 223:22, 225:3, 225:17, 225:19, 226:23, 231:5, 231:7, 234:18, 239:19, 243:19, 250:16

**detective** [14] - 3:10, 4:23, 14:4, 43:20, 94:14, 127:11, 127:15, 129:2, 136:6, 136:9, 208:2, 249:7, 249:10, 255:10

**detectives** [4] - 127:25, 224:21, 255:7, 257:12

**determine** [6] - 192:25, 210:16, 210:19, 211:21, 212:10, 212:12

**determined** [4] - 18:2, 192:13, 210:23, 211:24

**developed** [2] - 221:13, 221:14

**device** [1] - 222:17

**diagrams** [1] - 7:8

**dialed** [4] - 214:17, 219:12, 219:14

**die** [2] - 3:14, 252:20

**died** [2] - 252:20, 254:25

**difference** [1] - 164:20

**different** [11] - 32:7, 34:4, 131:19, 169:20, 169:22, 191:11, 191:16, 237:12, 237:14, 259:4, 260:8

**Different** [1] - 92:12

**difficulty** [1] - 10:4, 247:24

**digital** [1] - 189:13

**digits** [6] - 66:17, 71:24, 71:25, 72:14, 72:17, 72:21

**dining** [3] - 161:8, 161:9, 161:15

**Dionne** [14] - 160:19, 160:20, 160:21, 160:25, 161:1, 161:10, 163:20, 172:10, 185:6, 185:15, 187:3, 187:6, 187:17

**dire** [12] - 11:6, 11:17, 14:8, 14:16, 14:20, 14:23, 19:12, 25:4, 33:3, 33:11, 38:5

**DIRECT** [12] - 20:4, 44:9, 138:5, 178:17,

209:4, 213:9, 263:4, 263:8, 263:13, 263:16, 263:19, 263:20
**direct** [16] - 31:16, 34:17, 35:1, 40:17, 42:10, 195:16, 197:5, 197:6, 200:14, 202:12, 225:8, 247:19, 248:5, 248:9, 248:13, 248:14
**directed** [1] - 200:11
**Directing** [2] - 59:1, 64:1
**directing** [1] - 203:12
**direction** [2] - 200:9, 201:23
**directly** [9] - 8:10, 44:5, 70:7, 70:9, 87:21, 138:1, 178:13, 209:1, 209:7
**directory** [2] - 220:8, 220:12
**disabled** [1] - 38:25
**disagree** [1] - 39:22
**disappointed** [2] - 43:3, 207:2
**disconnected** [1] - 3:2
**discovered** [1] - 218:20
**discovery** [3] - 240:14, 246:7, 252:11
**discuss** [4] - 41:15, 41:20, 147:19, 259:18
**discussed** [9] - 43:10, 47:4, 47:5, 47:20, 123:12, 163:15, 219:18, 259:16
**discussing** [1] - 213:12
**discussion** [6] - 9:23, 12:21, 12:24, 135:23, 208:9, 232:17
**discussions** [1] - 245:14
**disinclined** [1] - 7:17
**disk** [3] - 13:2, 19:12, 25:25
**disks** [1] - 246:14
**display** [1] - 215:5
**displayed** [2] - 38:3, 239:13
**disposed** [1] - 174:13
**distant** [2] - 248:1
**distinction** [2] - 6:18, 7:6
**distressed** [3] - 17:2, 17:3, 17:6
**district** [1] - 186:4
**DISTRICT** [2] - 1:1, 1:2
**divide** [1] - 185:22
**divided** [1] - 185:21
**division** [1] - 220:24
**DIVISION** [1] - 1:2
**DOAR** [12] - 3:19, 3:22,

4:6, 4:12, 4:25, 5:3, 114:13, 235:14, 236:9, 236:12, 237:13, 239:15
**Dobropolski** [19] - 239:24, 240:5, 240:6, 240:12, 241:4, 241:8, 243:4, 243:5, 243:21, 243:23, 245:2, 245:10, 245:12, 246:8, 247:2, 247:18, 249:15, 249:20, 260:15
**Dobropolski's** [1] - 245:8
**document** [5] - 61:22, 62:9, 63:23, 129:22, 241:6
**documents** [5] - 234:20, 234:23, 235:2, 236:1, 236:20
**dog** [2] - 187:19, 187:24
**Dolfield** [2] - 227:14, 227:23
**dollars** [2] - 172:18, 172:19
**domestic** [1] - 245:2
**done** [14] - 160:7, 160:11, 183:3, 190:2, 191:17, 192:5, 212:15, 235:22, 240:23, 242:6, 242:8, 247:22, 248:1, 248:2
**Donte** [5] - 74:3, 74:4, 105:11, 105:16, 130:11
**door** [8] - 154:2, 160:14, 165:22, 166:3, 185:5, 185:6, 186:25
**Double** [2] - 163:11, 163:12
**double** [12] - 213:14, 221:6, 224:3, 227:20, 228:4, 228:5, 230:19, 230:22, 230:25, 245:22, 251:16, 251:20
**Douglas** [1] - 261:5
**Down** [2] - 119:4, 124:9
**down** [16] - 6:7, 17:4, 17:10, 17:19, 18:17, 73:8, 93:17, 94:14, 95:3, 120:21, 144:25, 187:21, 207:8, 236:15, 239:5, 261:3
**downstairs** [10] - 39:13, 39:14, 78:10, 128:11, 128:19, 185:9, 187:22, 187:23, 187:25
**Downtown** [3] - 92:18, 228:7, 228:8
**dozen** [6] - 5:5, 5:10, 5:21, 6:1, 7:20, 17:12
**dramatic** [1] - 5:20

**draw** [1] - 6:17
**draws** [1] - 235:23
**dream** [1] - 90:22
**dressed** [1] - 106:15
**drive** [2] - 17:10, 77:9
**Drive** [1] - 77:6
**driven** [2] - 226:6, 229:7, 229:21
**driver** [4] - 226:10, 227:8, 229:23, 229:25
**driver's** [6] - 81:24, 82:1, 213:18, 213:22, 213:23, 213:25
**driving** [5] - 43:4, 79:20, 80:21, 80:23, 227:10
**dropped** [3] - 101:8, 103:10
**dropping** [2] - 61:17, 61:19
**drug** [28] - 9:3, 15:24, 16:1, 16:20, 18:18, 59:18, 88:19, 91:14, 112:23, 122:12, 138:25, 140:8, 140:11, 140:14, 141:7, 141:10, 141:12, 142:6, 142:15, 144:2, 153:4, 161:18, 171:8, 176:1, 180:21, 190:21, 191:11, 244:5
**drug-related** [1] - 122:12
**drugs** [48] - 57:20, 57:22, 57:24, 60:13, 61:1, 89:4, 91:21, 122:1, 134:21, 138:20, 138:23, 139:12, 139:17, 139:22, 140:3, 140:6, 141:14, 141:15, 141:17, 148:10, 152:18, 152:22, 157:11, 163:9, 163:19, 164:12, 164:14, 170:17, 170:19, 170:22, 171:11, 171:13, 172:16, 175:1, 181:2, 182:5, 184:24, 191:21, 198:22, 204:10, 205:5, 205:6, 205:10, 205:12, 205:14, 205:19, 207:8
**drunk** [1] - 100:6
**dubious** [4] - 36:8, 36:14, 37:23, 38:2
**dudes** [1] - 75:18
**due** [1] - 182:6
**Duganne** [33] - 136:15, 136:18, 136:19, 137:19, 138:3, 138:4, 138:7, 139:12, 143:20, 147:7, 153:13, 154:20, 156:13, 163:10, 166:24, 167:4, 167:5, 175:12, 178:5,

179:12, 181:8, 181:20, 182:19, 184:8, 186:11, 195:7, 196:8, 196:21, 197:14, 200:5, 206:23, 207:16, 260:16
**DUGANNE** [2] - 137:23, 263:13
**During** [10] - 20:17, 24:3, 48:18, 49:10, 127:10, 141:10, 147:15, 148:20, 152:9, 160:7
**during** [53] - 10:9, 20:14, 31:15, 34:17, 38:4, 41:14, 41:20, 48:9, 48:23, 49:15, 49:20, 50:2, 50:22, 52:10, 55:14, 56:7, 56:14, 56:15, 56:17, 56:21, 63:2, 66:2, 67:6, 78:17, 91:3, 102:19, 103:2, 104:8, 104:16, 104:20, 105:6, 113:5, 113:16, 118:8, 122:8, 123:1, 124:19, 124:20, 127:23, 129:1, 140:6, 141:12, 147:12, 149:5, 150:23, 166:10, 176:22, 177:7, 182:9, 225:19, 226:2, 233:6, 239:3

## E

**e-mail** [5] - 2:15, 8:17, 8:19, 240:20, 257:20
**e-mailed** [2] - 18:24, 19:1
**early** [18] - 46:8, 55:22, 64:18, 103:19, 103:21, 104:4, 125:25, 131:8, 136:20, 179:11, 230:7, 231:16, 231:19, 231:20, 231:21, 249:19, 262:3, 262:4
**earn** [1] - 153:4
**earner** [1] - 103:13
**easily** [1] - 209:8
**East** [1] - 48:14
**easy** [1] - 13:21
**eat** [1] - 231:23
**Eating** [1] - 63:10
**ECF** [1] - 2:10
**edit** [1] - 260:9
**Edward** [2] - 189:24, 223:12
**effect** [3] - 95:18, 113:1, 253:11
**effective** [1] - 10:11
**effectively** [1] - 242:18
**effectuated** [1] - 204:8

**efficient** [1] - 238:24
**effort** [1] - 238:7
**efforts** [3] - 54:9, 225:4, 246:18
**eight** [48] - 17:5, 150:16, 151:2, 151:4, 151:11, 151:17, 154:19, 155:4, 155:5, 155:6, 155:17, 155:20, 155:23, 156:4, 156:5, 156:6, 156:13, 156:21, 156:24, 163:3, 172:12, 173:5, 173:13, 173:16, 173:18, 176:21, 176:23, 176:25, 177:4, 177:19, 185:20, 185:21, 185:24, 185:25, 202:8, 202:10, 202:16, 202:21, 203:3, 203:5, 203:6, 205:25, 206:1, 221:2, 228:4
**Eight** [2] - 83:15, 172:24
**eighth** [12] - 45:14, 46:1, 100:20, 100:21, 151:9, 151:11, 151:16, 156:6, 156:14, 156:15, 173:15, 173:16
**either** [24] - 19:3, 29:3, 40:11, 50:2, 59:9, 60:3, 100:16, 102:24, 103:2, 104:9, 113:12, 113:19, 113:24, 115:17, 116:19, 148:12, 155:2, 157:12, 169:24, 171:1, 172:13, 237:24, 248:6, 250:21
**elaborate** [2] - 205:17, 247:20
**elicit** [14] - 11:5, 11:14, 12:17, 31:18, 32:15, 32:22, 33:12, 33:23, 34:16, 34:24, 34:25, 35:3, 35:5, 35:9
**elicited** [1] - 246:5
**eliciting** [3] - 11:1, 32:18, 38:11
**email** [1] - 2:13
**Emphasis** [1] - 262:20
**employed** [6] - 103:9, 178:20, 178:21, 178:23, 179:5, 209:8
**employment** [1] - 56:5
**empty** [1] - 161:22
**end** [16] - 46:7, 51:9, 51:20, 55:20, 73:3, 137:1, 137:7, 144:12, 145:20, 145:22, 150:8, 158:3, 160:13, 231:4, 233:19
**endeavor** [1] - 231:12
**Ended** [1] - 205:20

**ended** [8] - 43:16, 66:4, 113:17, 140:3, 160:5, 185:19, 185:23, 202:7
**ending** [3] - 68:7, 72:22, 215:3
**ends** [1] - 192:7
**enforcement** [13] - 143:16, 145:9, 145:15, 146:4, 147:25, 148:20, 148:24, 149:4, 149:14, 158:23, 159:18, 160:8, 165:12
**engage** [2] - 195:7, 247:3
**engaged** [2] - 113:10, 141:10
**enhance** [1] - 241:17
**enhanced** [2] - 19:2, 240:22
**enhancer** [1] - 248:16
**enjoy** [1] - 232:16
**Enjoy** [1] - 135:23
**enter** [1] - 4:19
**entered** [2] - 140:14, 171:7
**enterprise** [1] - 53:5
**enters** [4] - 42:14, 42:24, 137:14, 208:17
**Entertainment** [1] - 119:5
**entire** [2] - 2:15, 94:21
**entitled** [2] - 4:16, 13:14
**entity** [2] - 117:25, 118:3
**entries** [3] - 220:10, 220:11, 220:15
**entry** [3] - 186:19, 220:10, 221:2
**envelope** [3] - 3:20, 209:24, 210:1
**envelopes** [5] - 190:18, 191:23, 192:23, 209:18, 210:12
**Epps** [2] - 252:20, 253:14
**equipment** [2] - 246:23, 247:1
**erase** [1] - 223:6
**Eric** [2] - 252:19, 253:13
**errand** [1] - 175:6
**especially** [1] - 253:11
**Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**essentially** [2] - 103:10, 257:22
**establish** [3] - 197:16, 253:3, 253:14
**established** [1] - 109:23

**establishment** [1] - 194:14
**et** [1] - 264:5
**Etting** [3] - 63:10, 63:12, 193:19
**ETTING** [1] - 63:13
**Eutaw** [13] - 221:21, 221:25, 222:3, 222:5, 222:6, 222:12, 222:14, 223:10, 228:2, 228:8, 234:5, 234:6, 238:7
**evening** [17] - 77:4, 77:21, 78:2, 97:18, 184:6, 185:4, 186:17, 190:20, 197:13, 197:16, 201:1, 214:25, 222:23, 226:5, 227:4, 227:5, 232:16
**event** [4] - 10:2, 33:10, 88:19, 246:4
**events** [2] - 30:18, 167:23
**eventually** [5] - 87:20, 88:1, 183:1, 185:14, 188:14
**evidence** [29] - 4:11, 4:13, 32:15, 35:3, 39:24, 40:1, 128:12, 135:23, 188:1, 190:13, 190:19, 190:21, 192:21, 208:9, 215:21, 224:8, 232:17, 232:21, 246:17, 251:20, 253:8, 253:10, 253:12, 256:8, 258:24, 259:1, 259:4, 259:21, 260:2
**evidentiary** [2] - 7:9, 246:21
**evolves** [1] - 42:8
**exact** [5] - 110:24, 216:5, 226:1, 226:15, 229:14
**Exactly** [2] - 31:25, 255:5
**exactly** [4] - 112:21, 142:19, 166:23, 254:24
**examination** [9] - 31:10, 33:24, 39:20, 43:18, 123:1, 202:12, 233:7, 248:7, 248:23
**EXAMINATION** [56] - 20:4, 25:9, 26:5, 27:10, 28:17, 29:13, 30:6, 44:9, 85:11, 97:25, 100:11, 110:8, 120:8, 129:20, 133:18, 138:5, 166:25, 175:10, 177:16, 178:17, 194:23, 206:14, 209:4, 213:9, 225:15, 226:25, 229:3, 230:5, 263:4, 263:4, 263:5, 263:5,

263:6, 263:6, 263:7, 263:8, 263:9, 263:9, 263:10, 263:10, 263:11, 263:11, 263:12, 263:13, 263:14, 263:14, 263:15, 263:16, 263:17, 263:17, 263:19, 263:20, 263:21, 263:21, 263:22, 263:22
**examine** [4] - 39:6, 43:20, 241:4, 241:21
**examined** [1] - 42:19
**example** [4] - 87:2, 122:7, 235:3, 238:2
**Excellent** [2] - 3:2, 262:16
**excellent** [2] - 9:14
**except** [3] - 3:15, 4:25, 31:18
**exception** [1] - 84:23
**excessive** [2] - 4:5, 6:6
**exchanged** [1] - 154:15
**excited** [1] - 90:15
**excluded** [1] - 234:1
**excuse** [1] - 70:8
**Excuse** [3] - 99:22, 173:13, 199:5
**excused** [9] - 135:1, 135:7, 135:24, 178:6, 207:23, 212:24, 231:7, 231:21, 232:23
**execute** [2] - 196:3, 221:17
**executed** [5] - 194:15, 200:16, 200:17, 207:12, 222:2
**executing** [4] - 190:6, 192:22, 199:19, 215:24
**execution** [3] - 191:21, 221:19, 223:9
**exercise** [1] - 224:16
**exhibit** [23] - 3:16, 3:25, 15:24, 16:1, 209:16, 210:3, 210:14, 210:18, 211:9, 220:1, 221:17, 235:6, 235:7, 235:9, 235:13, 235:14, 236:3, 236:5, 236:8, 236:9, 237:25, 239:15
**Exhibit** [11] - 61:21, 62:1, 67:1, 67:2, 128:13, 160:23, 182:13, 210:4, 214:9, 215:11, 220:3
**exhibits** [2] - 3:18, 117:10, 192:25, 209:22, 210:7, 211:20, 212:9, 212:13, 238:8, 238:21, 239:3, 239:11
**existence** [1] - 247:13
**exited** [1] - 184:9
**exits** [2] - 135:25,

232:24
**expect** [5] - 223:19, 239:3, 242:7, 242:10, 257:23
**expectation** [1] - 66:22
**expected** [6] - 89:3, 89:6, 121:24, 163:1, 186:16, 193:10
**expecting** [1] - 153:19
**expects** [1] - 35:9
**experience** [1] - 38:24
**expert** [4] - 209:15, 251:7, 251:25, 252:4
**expertise** [2] - 208:14, 209:12
**explain** [7] - 21:11, 21:12, 137:1, 170:12, 218:18, 234:5, 252:16
**explicit** [1] - 199:1
**exposed** [1] - 139:25
**expressed** [1] - 47:24
**extend** [1] - 239:9
**extended** [1] - 237:9
**extent** [6] - 3:15, 3:24, 4:25, 109:18, 155:20, 250:9
**extremely** [1] - 233:23

---

## F

**F-R-I-E-B-E-N** [1] - 209:3
**face** [1] - 115:9
**facie** [1] - 33:3
**facility** [4] - 174:20, 247:21, 248:1, 248:2
**facing** [1] - 242:16
**fact** [29] - 27:19, 27:25, 38:8, 58:21, 79:3, 79:5, 80:6, 82:15, 83:14, 84:21, 88:20, 103:24, 111:14, 121:21, 133:22, 147:18, 184:7, 185:20, 196:6, 197:5, 207:13, 218:23, 230:24, 251:17, 253:1, 253:9, 254:23, 254:24, 259:8
**factors** [1] - 37:19
**facts** [2] - 252:14, 254:21
**factual** [1] - 258:1
**Fair** [2] - 46:20, 48:2
**fair** [8] - 12:5, 46:18, 48:4, 79:10, 99:12, 99:16, 144:15, 241:19
**fairly** [7] - 40:12, 106:19, 106:24, 128:2, 135:1, 151:20, 235:12
**faith** [2] - 8:13, 249:8

**fall** [1] - 224:17
**falls** [1] - 32:25
**false** [2] - 115:2, 115:3
**familiar** [11] - 27:19, 38:19, 69:15, 69:21, 70:20, 70:21, 70:24, 71:25, 106:19, 109:16, 124:10, 148:7, 158:9, 194:6, 245:8
**family** [5] - 41:7, 101:13, 139:21, 140:4
**famous** [1] - 11:2
**fancy** [2] - 133:1, 133:3
**far** [14] - 44:21, 75:22, 97:17, 99:6, 118:24, 138:14, 146:2, 164:14, 220:14, 228:8, 232:18, 241:17, 253:11, 255:18
**farthest** [1] - 51:8
**fashion** [1] - 247:23
**fast** [1] - 48:6
**father** [7] - 45:12, 139:1, 139:2, 139:9, 139:13, 143:14, 143:23, 144:13, 144:21, 145:9, 167:7, 169:17, 170:6, 170:8, 171:1, 176:16, 230:17
**father's** [3] - 71:14, 71:15, 139:4
**favor** [1] - 202:24
**FBI** [1] - 179:20
**February** [8] - 73:10, 83:23, 84:1, 104:6, 210:14, 211:21, 226:5, 227:10
**federal** [9] - 20:9, 58:12, 143:17, 144:9, 146:19, 174:15, 179:18, 180:3, 261:14
**feelings** [2] - 46:15, 46:17
**fellow** [3] - 104:25, 108:24, 196:4
**fellow's** [1] - 241:18
**felt** [4] - 8:1, 182:8, 186:5, 188:6
**female** [1] - 141:24, 165:18, 182:2, 182:23, 182:25, 183:1, 184:22, 185:5, 223:8, 223:15
**few** [28] - 22:18, 26:3, 48:25, 55:9, 63:25, 67:13, 86:14, 98:18, 120:21, 123:13, 127:19, 128:10, 133:20, 140:13, 145:11, 147:13, 147:22, 149:3, 153:16, 155:16, 158:8, 187:14, 195:9, 199:14, 221:6, 246:16,

247:8, 256:14
**field** [3] - 184:20, 186:1, 209:12
**Fife** [1] - 222:19
**fight** [15] - 49:21, 73:18, 73:24, 75:18, 83:22, 84:1, 84:3, 87:21, 87:22, 87:23, 91:6, 96:24, 123:18, 130:13, 130:15
**fighting** [1] - 75:4
**figure** [2] - 60:14, 224:4
**file** [2] - 8:10, 9:5
**filed** [1] - 2:9
**fill** [2] - 243:2, 249:18
**final** [5] - 39:10, 174:25, 185:23, 223:1, 259:17
**finally** [5] - 134:12, 240:19, 240:20, 258:24
**financially** [1] - 133:8
**Fine** [1] - 3:13
**fine** [8] - 4:1, 15:11, 15:22, 30:25, 33:14, 34:15, 41:7, 85:10
**fingerprint** [3] - 190:2, 225:1, 225:4
**Finish** [1] - 208:3
**finish** [3] - 14:4, 136:6, 208:6
**finished** [2] - 5:1, 190:5
**fire** [1] - 248:16
**firearm** [3] - 122:7, 165:25, 259:25
**firearms** [6] - 186:11, 186:15, 251:4, 254:7, 259:23, 260:12
**firm** [1] - 39:1
**firmly** [1] - 109:19
**First** [10] - 2:9, 190:11, 214:16, 215:15, 221:17, 222:2, 227:14, 233:1, 234:21, 261:4
**first** [56] - 2:10, 5:19, 19:22, 32:24, 39:12, 43:5, 43:15, 46:2, 46:24, 47:3, 49:7, 50:2, 55:11, 90:9, 90:10, 100:15, 102:10, 111:22, 113:2, 114:7, 120:12, 132:16, 139:9, 153:8, 153:14, 160:21, 181:8, 181:17, 187:2, 187:3, 187:7, 187:18, 192:13, 192:16, 193:7, 194:17, 195:16, 195:18, 197:6, 197:11, 199:10, 199:12, 200:11, 200:15, 210:12, 214:2, 216:3, 221:24, 246:7, 249:20, 251:18, 251:19, 252:14, 257:19, 260:24
**first-hand** [1] - 113:2

**five** [12] - 155:22, 156:4, 174:5, 181:5, 181:6, 188:22, 192:5, 211:16, 212:1, 219:2, 231:15, 233:21
**Five** [2] - 92:18, 92:20
**Flannery** [2] - 1:19, 19:1
**flashing** [1] - 81:8
**Flesh** [1] - 55:16
**Fletcher** [60] - 141:21, 141:23, 142:3, 142:6, 142:13, 142:14, 142:18, 142:20, 143:6, 148:21, 149:2, 149:7, 149:25, 150:5, 150:17, 151:22, 151:25, 152:3, 152:10, 152:15, 153:9, 153:14, 154:10, 155:2, 155:21, 155:23, 157:3, 157:13, 157:17, 157:20, 158:1, 158:2, 159:2, 159:24, 162:24, 163:2, 163:22, 163:23, 176:22, 177:2, 182:2, 182:3, 182:4, 182:18, 182:20, 183:17, 183:23, 188:8, 194:3, 194:5, 195:17, 195:22, 197:3, 198:12, 203:18, 203:20, 204:5, 206:10, 207:19
**Fletcher's** [1] - 160:13
**flip** [1] - 59:8, 83:1
**flipping** [2] - 69:25, 78:12
**floor** [9] - 187:2, 187:3, 187:18, 188:25, 189:1, 189:8, 213:25, 221:21, 223:11
**Floor** [3] - 19:4, 55:15, 55:16
**flow** [1] - 238:24
**focus** [1] - 221:8
**focused** [1] - 221:7
**follow** [2] - 226:3, 230:3
**Following** [1] - 187:10
**following** [1] - 144:21
**follows** [1] - 175:24
**football** [3] - 50:22, 102:17, 130:23
**FOR** [1] - 1:2
**foregoing** [1] - 264:7
**Forensic** [1] - 190:24
**forensic** [2] - 209:9, 215:25
**foreperson** [1] - 114:14
**foresee** [1] - 249:13
**forget** [2] - 5:2, 112:25
**forgetting** [1] - 191:9
**forgot** [1] - 234:8

**formal** [3] - 251:7, 257:22, 257:23
**former** [2] - 224:6
**Forrester** [1] - 261:5
**forth** [1] - 257:17
**forward** [3] - 144:20, 248:5, 248:9
**foundation** [2] - 113:7, 153:5, 157:9
**Four** [4] - 105:24, 141:2, 168:16, 221:23
**four** [19] - 16:13, 16:17, 16:24, 66:17, 71:24, 71:25, 72:17, 72:21, 101:5, 102:14, 111:25, 112:7, 113:17, 116:2, 167:11, 167:12, 180:2, 181:5, 219:11
**fourth** [1] - 203:6
**Fourth** [1] - 255:5
**fraction** [1] - 173:13
**fragment** [4] - 3:19, 3:21, 3:22, 257:14
**fragments** [3] - 252:22, 255:19, 255:21
**frame** [3] - 141:12, 145:8, 182:10
**frankly** [2] - 33:8, 260:1
**free** [5] - 39:6, 106:8, 135:10, 212:23, 232:5
**freelance** [2] - 198:19, 198:20
**freestyle** [2] - 92:12, 118:13
**Freestyle** [1] - 118:14
**frequently** [2] - 24:5, 24:22
**Fresh** [1] - 55:15
**freshman** [1] - 101:6
**Friday** [3] - 47:10, 135:13, 232:7
**Frieben** [6] - 208:21, 209:3, 209:6, 209:16, 212:22
**FRIEBEN** [2] - 208:23, 263:18
**Friedman** [1] - 8:9
**friend** [6] - 51:17, 52:7, 53:24, 119:25, 120:2, 130:8
**friends** [23] - 46:2, 46:5, 50:1, 51:13, 51:15, 52:2, 52:4, 52:21, 53:20, 73:24, 80:1, 80:4, 80:8, 80:12, 80:17, 102:3, 106:3, 106:5, 106:6, 141:25, 157:22, 161:3
**Friends** [1] - 46:3
**front** [14] - 20:12, 58:12, 58:17, 59:1, 60:5, 65:9,

67:15, 69:25, 71:8, 75:13, 142:9, 209:7, 209:16, 210:4
**frying** [1] - 15:7
**Ft** [1] - 224:17
**fulfilled** [1] - 171:5
**full** [7] - 22:19, 103:10, 202:22, 203:1, 203:2, 249:21, 249:23
**full-time** [1] - 103:10
**fully** [1] - 234:24
**fun** [1] - 29:15
**fundamental** [1] - 247:10
**funeral** [5] - 79:20, 79:21, 80:18, 106:12, 107:10
**furtherance** [1] - 224:22
**furthered** [1] - 217:9

**G**

**G-I-L-R-A-Y** [1] - 77:10
**G04-02061-1** [1] - 191:17
**gain** [2] - 181:10, 186:19
**Gaines** [1] - 136:17
**game** [1] - 131:3
**games** [4] - 130:23, 131:4, 131:5
**gang** [2] - 117:20, 225:21
**gangsta** [1] - 93:15
**GARDNER** [1] - 1:8
**Gardner** [37] - 1:21, 28:21, 35:4, 35:12, 51:4, 51:5, 51:6, 51:8, 51:11, 51:17, 52:5, 52:10, 52:19, 55:2, 57:5, 84:11, 98:5, 98:13, 98:16, 99:1, 100:25, 111:14, 116:5, 116:19, 118:21, 118:23, 119:11, 119:15, 122:13, 122:18, 123:4, 123:7, 123:9, 134:9, 158:10, 172:7, 261:6
**Gardner's** [5] - 6:4, 35:16, 35:17, 35:18, 96:14
**Garrison** [3] - 227:14, 227:23, 228:16
**Gary** [1] - 225:3
**gas** [1] - 195:8
**gather** [4] - 38:9, 144:5, 149:25, 154:2
**gathered** [1] - 215:21
**Gay** [1] - 228:12
**general** [3] - 181:8,

250:18, 251:24
**General's** [2] - 178:21, 178:24
**generally** [2] - 161:20, 207:9
**genius** [1] - 60:15
**gentleman** [2] - 114:9, 154:5
**gentlemen** [7] - 42:25, 110:19, 137:15, 137:20, 208:18, 231:8, 232:23
**Gerard** [1] - 1:19
**Gerry** [1] - 98:2
**Giganti** [24] - 25:17, 26:8, 29:18, 31:5, 31:7, 33:5, 36:1, 36:5, 36:25, 37:7, 94:15, 108:24, 108:25, 110:22, 111:4, 129:2, 133:23, 223:22, 243:3, 243:19, 246:9, 246:12, 247:11, 249:1
**Gilray** [1] - 77:6
**girl** [1] - 45:19
**girlfriend** [1] - 160:22
**given** [19] - 33:23, 34:5, 36:7, 58:21, 120:12, 120:16, 154:10, 165:21, 169:4, 180:8, 182:8, 185:14, 199:7, 207:16, 234:14, 234:22, 235:2, 242:5
**glad** [1] - 234:10
**glass** [4] - 189:14, 192:6, 211:17, 211:22
**Global** [2] - 69:16, 69:17
**goal** [2] - 204:18, 253:3
**goings** [1] - 198:7
**goings-on** [1] - 198:7
**Goo** [6] - 28:21, 55:3, 55:4, 91:11, 91:24, 158:16
**Goo's** [1] - 96:19
**GOO-0611-R** [1] - 191:4
**Goodie** [6] - 75:6, 75:7, 75:10, 230:12, 230:14, 230:16
**government** [85] - 2:4, 4:5, 7:7, 7:14, 7:19, 7:25, 8:3, 8:15, 8:19, 10:4, 10:8, 10:16, 10:25, 11:20, 12:9, 19:2, 19:5, 29:11, 31:4, 31:22, 31:23, 32:14, 32:20, 32:25, 33:18, 34:8, 34:11, 35:1, 35:3, 35:9, 35:14, 36:13, 36:18, 37:10, 37:14, 38:10, 39:6, 39:9, 39:16, 43:17, 43:18, 43:23, 110:14,

112:11, 112:20, 113:5, 114:2, 121:17, 179:18, 180:4, 234:12, 234:23, 235:1, 235:7, 235:11, 236:3, 236:6, 236:8, 236:10, 237:4, 237:19, 237:20, 237:23, 238:8, 239:14, 239:18, 239:23, 240:13, 246:4, 248:10, 251:17, 252:10, 253:1, 253:3, 253:5, 253:8, 253:12, 257:4, 258:2, 258:14, 259:3, 259:11, 260:6

**Government** [5] - 1:15, 210:3, 214:9, 215:11, 220:3

**GOVERNMENT'S** [6] - 19:16, 44:3, 137:23, 178:11, 208:23, 213:3

**Government's** [6] - 61:21, 62:1, 67:1, 67:2, 160:23, 182:13

**government's** [14] - 35:8, 37:4, 37:5, 38:4, 42:9, 94:4, 117:9, 136:14, 136:22, 235:12, 248:8, 250:19, 253:10, 262:8

**GPS** [2] - 222:17, 234:5

**grade** [14] - 45:14, 46:1, 46:6, 46:8, 51:7, 51:12, 51:25, 99:2, 99:4, 100:20, 100:21, 100:22, 100:23, 116:5

**graduate** [1] - 45:1

**graduated** [2] - 138:15, 138:18

**gram** [4] - 151:9, 151:17, 156:6, 156:14

**grams** [18] - 151:5, 151:8, 172:22, 177:20, 177:22, 185:24, 202:7, 202:8, 202:10, 203:5, 205:21, 210:24, 211:25, 212:7, 212:15, 212:16

**Grand** [1] - 128:13

**grand** [97] - 9:20, 9:23, 12:19, 20:9, 20:12, 20:14, 20:15, 20:25, 27:25, 28:3, 28:5, 28:14, 29:20, 29:22, 31:10, 37:4, 39:7, 39:11, 39:12, 39:15, 40:3, 58:12, 58:18, 59:5, 59:14, 59:23, 62:10, 65:7, 65:12, 67:6, 69:24, 70:16, 70:22, 71:8, 72:3, 72:20, 75:12, 76:7, 76:22, 78:4, 78:8, 83:1,

83:3, 91:16, 93:18, 95:6, 97:11, 105:1, 108:15, 108:19, 108:21, 108:25, 110:16, 111:22, 112:7, 113:6, 113:13, 113:16, 113:24, 114:7, 114:14, 114:22, 115:18, 115:24, 120:13, 120:14, 120:17, 121:6, 121:10, 121:13, 127:10, 127:12, 127:22, 128:9, 128:12, 129:1, 129:9, 130:5, 130:18, 133:21, 133:22, 134:3, 146:22, 147:1, 167:9, 167:12, 167:18, 168:17, 170:9, 175:13, 175:16, 176:7, 176:9, 176:13, 235:4, 246:5

**graphic** [1] - 4:16

**grasping** [1] - 234:24

**gratuitously** [2] - 251:16, 257:10

**great** [2] - 61:22, 108:5

**greater** [1] - 260:8

**Greene** [1] - 228:11

**Greensburg** [1] - 209:10

**grew** [2] - 57:15, 57:16

**grocery** [2] - 150:9, 150:10

**ground** [1] - 118:19

**grounds** [1] - 32:13

**group** [2] - 54:22, 99:14

**grouped** [2] - 186:21, 186:24

**Grove** [1] - 91:25

**grow** [2] - 44:19, 138:12

**guarantee** [1] - 249:17

**Guard** [3] - 221:12, 224:13, 224:19

**guess** [21] - 13:17, 34:20, 36:2, 52:16, 64:9, 64:17, 70:14, 74:12, 92:9, 102:11, 107:8, 110:15, 111:4, 118:16, 121:4, 128:17, 159:22, 232:10, 247:10, 250:22, 260:22

**gun** [55] - 82:2, 82:3, 82:5, 82:7, 82:9, 82:10, 82:12, 82:15, 82:17, 82:18, 82:21, 82:24, 83:8, 83:9, 83:17, 83:20, 83:21, 87:10, 87:11, 88:8, 88:16, 88:25, 122:8, 124:3, 161:16, 164:10, 164:12, 164:16, 165:1, 175:4, 196:9, 196:12, 196:16, 199:6, 199:22, 200:14, 200:24,

204:22, 207:13, 207:14, 244:18, 250:5, 250:11, 250:23, 252:23, 252:24, 253:22, 253:23, 258:3, 258:5, 259:8, 261:13

**Guns** [1] - 199:18

**guns** [18] - 81:15, 89:4, 122:2, 164:18, 164:23, 199:17, 250:20, 250:21, 251:1, 251:2, 251:3, 251:4, 252:21, 252:23, 253:1, 253:15, 253:20, 253:21

**guy** [5] - 97:6, 104:21, 143:2, 240:25, 241:20

**guys** [3] - 104:21, 108:15, 189:2

## H

**habits** [1] - 3:14

**half** [29] - 5:5, 5:10, 5:21, 6:1, 7:2, 7:20, 17:12, 43:4, 107:24, 108:5, 111:25, 112:7, 113:17, 135:20, 172:21, 172:22, 177:19, 177:22, 178:25, 184:10, 184:19, 185:25, 202:8, 203:3, 203:5, 206:4, 232:8, 232:9, 242:18

**Hammerjacks** [22] - 73:1, 73:14, 73:17, 73:24, 74:2, 74:8, 74:11, 76:16, 84:2, 84:3, 87:20, 100:1, 105:9, 105:10, 123:18, 130:15, 230:8, 230:15, 230:23, 244:22, 244:24

**hand** [10] - 3:25, 6:18, 113:2, 137:22, 155:3, 155:21, 177:6, 211:13, 239:5, 259:21

**handed** [9] - 155:4, 155:5, 155:11, 155:16, 155:24, 156:25, 163:20, 163:21, 184:17

**handhelds** [1] - 15:16

**handing** [1] - 156:4

**handled** [1] - 238:14

**handwriting** [2] - 129:25, 219:4

**hang** [6] - 57:6, 98:15, 116:8, 116:11, 116:19, 116:20

**Hanging** [1] - 80:16

**hanging** [5] - 56:11, 56:17, 57:2, 80:13, 161:11

hangs [1] - 117:7

**Hanlon** [23] - 1:16, 4:8, 5:24, 8:1, 10:19, 13:6, 13:13, 15:6, 19:14, 31:4, 33:5, 33:11, 34:22, 35:7, 68:10, 85:17, 112:25, 133:21, 172:3, 223:5, 259:17, 261:16, 262:9

**HANLON** [57] - 10:20, 10:24, 11:9, 11:22, 12:11, 12:18, 12:22, 13:1, 13:8, 13:20, 13:25, 20:5, 21:15, 22:3, 24:14, 29:14, 30:22, 30:25, 31:7, 31:12, 34:10, 34:14, 41:3, 41:5, 42:2, 42:5, 42:8, 43:24, 44:10, 58:4, 58:7, 58:9, 62:19, 118:1, 118:4, 120:9, 132:13, 136:14, 136:18, 137:18, 138:6, 169:6, 170:2, 170:11, 175:11, 260:24, 262:1, 262:11, 262:17, 262:19, 262:21, 263:4, 263:6, 263:8, 263:11, 263:13, 263:14

**Hanlon's** [1] - 3:24

**happy** [5] - 10:10, 17:8, 42:21, 48:2, 61:23

**hard** [8] - 2:11, 2:13, 3:14, 86:22, 86:24, 90:20, 259:20

**hard-pressed** [1] - 259:20

**Harding** [49] - 1:16, 2:8, 2:20, 3:13, 4:8, 6:24, 8:5, 8:7, 9:16, 9:21, 12:21, 16:19, 17:1, 18:12, 18:15, 20:13, 31:13, 34:10, 36:24, 59:16, 60:8, 60:12, 75:15, 109:4, 111:5, 114:9, 120:12, 120:14, 186:7, 191:8, 208:19, 222:11, 225:9, 226:24, 233:19, 234:7, 237:17, 238:25, 240:18, 241:1, 241:12, 242:22, 252:7, 252:15, 256:9, 257:20, 259:17, 260:14, 262:5

**HARDING** [124] - 2:3, 2:7, 2:11, 2:13, 2:17, 2:23, 3:1, 3:3, 3:9, 3:12, 4:1, 5:7, 5:9, 5:16, 5:24, 6:1, 6:13, 6:16, 15:23, 16:1, 17:3, 17:12, 17:16, 17:21, 18:6, 19:7, 19:10, 37:1, 136:8, 137:4, 137:9, 137:13, 178:9, 178:18, 186:8, 202:14,

202:17, 205:16, 206:15, 207:7, 207:24, 208:2, 208:4, 208:13, 208:20, 209:5, 213:2, 213:10, 225:8, 226:13, 227:1, 230:3, 230:6, 231:10, 237:16, 237:18, 240:2, 243:1, 243:3, 243:7, 243:9, 243:11, 243:13, 243:16, 243:19, 244:4, 244:8, 244:10, 244:12, 244:19, 244:22, 245:1, 245:5, 245:7, 245:10, 245:14, 245:19, 245:21, 246:1, 246:3, 246:25, 247:7, 248:21, 249:4, 249:13, 249:21, 249:24, 250:14, 252:9, 252:16, 252:18, 253:24, 254:17, 254:20, 255:4, 255:8, 255:11, 255:13, 255:17, 255:20, 255:23, 255:25, 256:2, 256:5, 256:19, 256:25, 257:4, 260:16, 260:19, 260:22, 261:4, 261:8, 261:12, 261:16, 261:23, 262:6, 262:9, 262:15, 263:16, 263:17, 263:19, 263:20, 263:21, 263:22

**harm** [3] - 74:13, 74:17, 75:2

**HARRIS** [1] - 1:7

**Harris** [67] - 1:18, 9:24, 11:8, 14:22, 22:21, 22:22, 23:4, 23:8, 24:18, 24:20, 30:8, 35:13, 36:4, 37:13, 37:15, 37:20, 37:22, 38:7, 39:4, 39:25, 40:2, 53:25, 54:1, 54:3, 54:5, 54:7, 54:9, 54:12, 54:23, 56:24, 57:12, 60:1, 60:13, 84:11, 90:5, 90:7, 92:5, 98:3, 98:10, 98:24, 99:6, 99:19, 116:14, 116:18, 118:8, 122:13, 122:18, 124:19, 124:22, 125:2, 125:12, 131:18, 134:14, 134:21, 158:14, 172:3, 243:4, 243:21, 243:22, 244:4, 245:1, 245:7, 245:15, 245:22, 246:10, 247:2, 261:17

**Harris's** [7] - 24:22, 33:12, 37:25, 99:10, 99:12, 109:8, 124:13

**Hasim** [1] - 131:24, 132:1, 132:2, 219:23, 219:24, 245:22

**Hate** [1] - 15:1
**head** [5] - 5:6, 36:5, 73:18, 73:21, 203:12
**headings** [1] - 236:7
**Headquarters** [1] - 215:25
**healthy** [1] - 231:23
**hear** [36] - 12:2, 13:14, 23:21, 25:20, 26:19, 26:23, 27:22, 29:16, 31:3, 31:17, 33:16, 34:8, 35:10, 35:16, 35:17, 36:19, 39:5, 76:12, 84:10, 92:15, 97:20, 102:23, 123:15, 124:13, 125:17, 209:7, 225:20, 225:23, 239:17, 242:21, 250:4, 252:7, 254:14, 256:16, 257:9
**heard** [44] - 16:19, 22:7, 23:12, 23:13, 23:14, 23:18, 26:8, 26:14, 30:16, 31:3, 33:10, 33:13, 33:24, 35:25, 37:21, 64:6, 74:21, 83:18, 87:5, 87:13, 93:11, 96:23, 119:17, 119:23, 123:13, 124:9, 124:19, 128:12, 129:3, 133:13, 158:9, 158:12, 158:14, 158:16, 158:18, 160:21, 166:11, 166:13, 166:16, 166:17, 195:25, 208:10, 232:18, 237:16
**hearing** [8] - 3:15, 11:4, 14:22, 36:1, 124:24, 126:9, 127:21, 261:21
**hearsay** [2] - 251:16, 251:20
**Heights** [25] - 56:13, 56:21, 57:6, 57:10, 57:13, 60:1, 60:13, 61:2, 80:13, 108:9, 134:8, 134:10, 225:21, 225:22, 225:24, 226:18, 227:23, 227:25, 228:16, 243:9, 243:10, 245:8, 245:9, 245:13
**held** [1] - 247:22
**Help** [1] - 143:25, 169:25, 252:14
**help** [18] - 8:16, 37:10, 56:8, 94:4, 98:7, 143:24, 145:9, 146:4, 146:8, 167:2, 167:6, 168:13, 169:15, 169:17, 172:21, 223:5, 235:16
**helped** [4] - 93:24, 106:4, 106:5, 106:6
**helpful** [2] - 235:21,

235:24
**helping** [9] - 117:1, 144:5, 148:1, 170:6, 170:8, 170:10, 170:13, 215:20
**hereby** [1] - 264:3
**hereunto** [1] - 264:10
**Heritage** [1] - 93:2
**hesitate** [2] - 248:22, 259:22
**hesitation** [1] - 38:18
**Hickey** [24] - 49:2, 49:8, 49:11, 49:20, 50:2, 50:5, 51:2, 53:12, 53:13, 53:16, 53:22, 55:12, 89:17, 92:3, 102:7, 104:18, 104:24, 122:23, 123:2, 123:6, 123:10, 130:22, 130:24, 251:18
**high** [9] - 44:24, 55:3, 101:3, 101:5, 101:10, 106:24, 138:15, 173:8, 196:10
**High** [4] - 101:16, 116:6, 116:14, 138:16
**highlight** [1] - 220:19
**highlighter** [1] - 220:21
**highlighting** [2] - 10:7, 258:11
**highly** [1] - 36:7
**himself** [3] - 107:25, 125:14, 248:17
**hire** [1] - 106:2
**history** [4] - 215:14, 215:16, 220:5, 253:15
**hit** [5] - 73:18, 73:21, 83:23, 90:25, 96:23
**Hogan** [1] - 183:7
**hold** [1] - 236:15
**Hold** [1] - 25:2
**home** [16] - 50:19, 77:24, 78:16, 85:5, 89:4, 89:10, 103:2, 125:19, 126:4, 153:15, 153:17, 158:22, 201:8, 201:11, 212:24, 223:10
**homicide** [4] - 4:23, 215:21, 230:20, 237:22, 251:5, 254:4, 254:16, 255:7, 256:15, 256:21, 257:13, 257:18, 259:6, 259:8, 259:21, 260:5, 260:7
**homicides** [1] - 257:10
**honest** [2] - 112:18, 180:19
**Honor** [159] - 3:3, 4:1, 6:22, 7:5, 7:6, 8:8, 9:10, 9:12, 10:20, 10:21, 11:9, 11:13, 11:19, 11:20,

11:23, 11:25, 12:7, 12:12, 12:18, 12:22, 13:1, 13:4, 13:5, 13:8, 13:12, 13:20, 13:25, 14:12, 14:13, 14:19, 15:3, 15:9, 16:15, 16:18, 16:25, 18:23, 19:8, 25:2, 25:4, 25:8, 26:7, 27:9, 29:6, 29:15, 30:1, 30:19, 30:22, 31:12, 32:9, 34:14, 34:20, 35:20, 35:24, 36:3, 36:17, 36:23, 37:1, 39:11, 40:8, 40:23, 41:3, 42:2, 42:5, 43:24, 44:11, 57:17, 58:2, 58:5, 60:10, 62:6, 62:17, 68:11, 68:13, 69:9, 85:8, 94:21, 95:22, 97:23, 99:22, 117:9, 117:12, 117:13, 118:1, 118:4, 119:1, 120:6, 129:17, 132:13, 133:16, 133:20, 136:14, 136:25, 137:9, 137:18, 138:7, 152:25, 153:5, 157:9, 157:18, 159:15, 166:24, 169:6, 170:2, 170:11, 175:12, 177:13, 177:14, 178:9, 186:6, 191:9, 194:22, 202:14, 207:21, 207:25, 208:13, 208:20, 209:11, 212:20, 213:2, 225:8, 225:13, 226:21, 226:22, 229:5, 230:3, 230:10, 231:3, 231:6, 233:17, 233:18, 234:3, 234:10, 236:4, 237:10, 237:11, 237:25, 239:21, 240:2, 240:10, 242:14, 242:20, 249:21, 249:24, 250:2, 250:7, 250:9, 256:2, 256:20, 258:21, 259:10, 259:13, 260:16, 262:1, 262:6, 262:12, 262:17, 262:19, 262:21
**Honor's** [1] - 233:18
**Honorable** [1] - 1:13
**hook** [1] - 15:4
**hooked** [1] - 2:23
**hope** [5] - 15:7, 15:14, 18:15, 148:1, 231:14
**hoped** [2] - 144:5, 204:9
**hopeful** [1] - 146:2
**hopefully** [1] - 14:16
**hopes** [3] - 144:15, 159:19, 246:11
**hoping** [5] - 40:17, 146:7, 146:8, 176:17, 181:9
**hospital** [12] - 73:4,

73:6, 73:7, 85:4, 85:5, 85:7, 87:22, 99:25, 100:1, 100:5, 130:12, 130:16
**hostile** [2] - 37:8, 39:9
**hostility** [1] - 38:3
**hour** [5] - 40:22, 43:3, 188:10, 200:18, 228:19
**hours** [10] - 200:18, 218:23, 219:2, 219:6, 219:11, 227:20, 227:22, 228:4, 229:6, 229:8
**house** [4] - 50:20, 50:21, 85:6, 91:4, 91:5, 121:23, 121:25, 145:16, 153:12, 153:23, 159:11, 159:21, 159:22, 160:3, 160:13, 166:8, 177:2, 185:1, 185:11, 186:12, 188:2, 189:2, 195:16, 195:25, 196:9, 197:7, 197:12, 197:13, 197:21, 198:1, 198:3, 198:7, 199:6, 199:11, 199:12, 199:15, 199:23, 200:8, 200:24, 201:12, 201:16, 244:5
**houses** [1] - 52:24
**Howard** [2] - 229:24, 230:1
**Howie** [1] - 97:4
**huge** [1] - 235:22
**hum** [21] - 21:18, 23:15, 24:11, 25:19, 26:16, 26:18, 54:17, 55:17, 59:11, 59:17, 60:7, 65:10, 65:15, 65:21, 68:25, 70:3, 76:1, 144:16, 148:15, 150:11, 166:18
**human** [1] - 37:9
**hundred** [4] - 64:15, 172:18, 172:19, 234:22
**Hung** [1] - 52:22
**hung** [2] - 53:3, 158:2
**hurt** [4] - 73:3, 76:15, 94:2, 123:23
**hustle** [2] - 142:22, 143:9

## I

**I-95** [1] - 261:5
**ID** [3] - 11:1, 34:24, 35:5
**idea** [6] - 8:11, 82:7, 148:11, 162:20, 163:8, 242:23
**ideas** [2] - 142:15, 159:19

**identification** [25] - 11:7, 12:1, 12:17, 12:24, 13:23, 31:19, 32:6, 32:15, 32:19, 32:21, 33:1, 33:4, 34:16, 35:11, 35:12, 37:7, 37:13, 37:15, 38:11, 38:16, 38:21, 39:1, 39:2, 39:4, 39:5
**identifications** [2] - 32:13, 32:22
**identified** [10] - 9:24, 36:6, 62:20, 62:24, 99:20, 186:25, 188:14, 229:25, 230:1, 254:6
**identify** [27] - 3:22, 11:8, 11:13, 13:15, 26:12, 28:1, 28:8, 28:11, 28:13, 29:23, 33:16, 33:17, 38:6, 39:18, 66:22, 95:10, 96:8, 96:11, 96:14, 99:13, 109:18, 128:20, 128:23, 154:21, 182:14, 188:13, 189:19
**III** [1] - 189:24
**image** [2] - 4:16, 216:20
**imagine** [1] - 6:11
**immediate** [1] - 221:8
**immediately** [5] - 46:1, 114:9, 187:23, 253:16, 253:25
**immunity** [1] - 114:2
**impeach** [1] - 39:6
**impede** [1] - 238:23
**important** [4] - 37:19, 38:8, 40:12, 201:12
**imprisonment** [1] - 115:9
**IN** [1] - 1:1
**incarcerated** [7] - 48:20, 48:21, 84:7, 141:6, 145:7, 170:20, 170:21
**incarceration** [1] - 48:25
**Incident** [1] - 253:22
**incident** [19] - 100:2, 191:1, 191:3, 191:15, 194:12, 195:9, 211:8, 211:15, 223:13, 224:14, 230:8, 230:14, 230:23, 230:25, 253:21, 253:22, 254:4, 254:6
**incidents** [3] - 86:25, 224:5, 253:20
**include** [1] - 14:20
**included** [2] - 224:25, 225:4
**includes** [2] - 223:7,

238:1
  **including** [7] - 4:9,
104:21, 188:9, 224:20,
224:25, 226:11, 257:21
  **incoming** [2] - 214:25,
218:6
  **incomprehensible** [2] -
246:20, 247:9
  **inconsistent** [1] - 169:4
  **incorrect** [3] - 121:10,
252:2, 252:10
  **incriminate** [2] -
115:14, 115:19
  **incriminating** [1] -
246:11
  **indecipherable** [1] -
38:15
  **Indeed** [1] - 107:24
  **indeed** [1] - 38:6
  **independently** [1] -
140:4
  **INDEX** [1] - 263:1
  **indicate** [5] - 70:19,
70:22, 186:16, 205:6,
220:12
  **indicated** [17] - 60:3,
71:20, 72:17, 100:19,
118:7, 126:23, 177:3,
179:20, 182:10, 182:21,
182:22, 184:21, 185:4,
185:13, 186:4, 197:1,
205:7
  **indicates** [2] - 9:21,
194:6
  **indication** [3] - 37:5,
185:15, 186:18
  **indictment** [2] - 255:2,
255:3
  **individual** [15] - 51:3,
76:9, 76:14, 85:2, 139:6,
154:7, 160:24, 180:16,
181:3, 182:4, 185:8,
188:11, 217:2, 230:14
  **individually** [2] - 156:9,
156:18
  **individuals** [5] - 112:24,
116:2, 117:20, 172:9,
190:7
  **indulge** [1] - 78:5
  **indulgence** [7] - 25:6,
96:21, 120:3, 173:11,
194:25, 200:20, 225:10
  **industry** [2] - 118:23,
118:24
  **inflammatory** [1] -
233:24
  **informant** [2] - 179:15,
198:10
  **informants** [1] - 198:19
  **information** [25] -

10:24, 67:10, 113:3,
120:20, 124:5, 143:16,
143:21, 144:4, 148:16,
186:13, 199:7, 199:25,
201:1, 204:24, 217:9,
217:11, 226:9, 227:9,
229:11, 230:12, 242:1,
242:3, 246:5, 262:1
  **informed** [2] - 120:11,
199:3
  **informs** [1] - 38:5
  **initial** [3] - 38:17,
210:23, 211:24
  **initials** [1] - 128:18
  **initiated** [1] - 224:23
  **inquire** [4] - 29:6,
29:10, 231:3, 231:6
  **inside** [7] - 155:18,
160:18, 161:5, 161:24,
162:1, 184:25, 185:11
  **insinuated** [1] - 203:11
  **instance** [2] - 160:11,
219:1
  **instruct** [2] - 41:8,
235:11
  **instructed** [2] - 147:18
  **instruction** [3] - 14:2,
238:9, 256:7
  **instructions** [6] - 58:4,
120:12, 199:1, 204:3,
204:7, 256:11
  **integrity** [1] - 249:8
  **intend** [4] - 4:15, 33:1,
239:7, 253:5
  **intended** [1] - 32:14
  **intends** [1] - 11:20
  **intent** [1] - 174:12
  **intention** [3] - 11:5,
11:22, 42:9
  **intentionally** [1] -
239:14
  **interest** [3] - 11:12,
32:18, 47:24
  **interested** [5] - 47:21,
53:4, 84:21, 92:4, 149:23
  **interests** [1] - 166:12
  **interminable** [1] -
233:22
  **interrogate** [3] - 11:11,
201:7
  **interrogated** [1] - 198:7
  **interrogation** [1] - 38:4
  **interrupt** [5] - 3:4, 9:16,
43:12, 43:20, 136:9
  **interview** [1] - 217:5
  **interviewed** [1] - 217:8
  **introduce** [2] - 154:12,
253:12
  **introduced** [4] - 54:2,
54:3, 142:25, 154:5

  **investigating** [3] -
230:25, 255:7, 255:9
  **investigation** [15] -
195:23, 215:21, 215:24,
217:10, 217:13, 221:7,
223:25, 224:22, 225:3,
225:19, 226:2, 232:19,
243:20, 249:9, 249:10
  **inviting** [1] - 239:9
  **involved** [27] - 57:19,
57:22, 57:24, 59:18,
72:25, 73:21, 113:2,
119:4, 119:15, 123:4,
123:7, 139:22, 141:11,
142:6, 146:12, 181:16,
181:18, 195:13, 224:15,
224:17, 228:23, 243:19,
253:21, 253:22, 253:23,
261:5, 261:19
  **involvement** [1] -
118:23
  **involving** [2] - 224:6,
230:12
  **Island** [2] - 50:12,
102:15
  **issue** [21] - 7:22, 10:7,
25:4, 33:15, 40:15,
42:10, 136:25, 207:25,
233:18, 237:12, 239:12,
250:15, 250:18, 251:9,
251:10, 251:13, 251:25,
252:4, 252:5, 258:24,
260:11
  **issued** [1] - 41:12
  **issues** [2] - 136:24,
260:9
  **items** [3] - 188:6, 189:8,
190:14
  **itself** [2] - 38:6, 38:14

**J**

  **J-A-Q-U-E-T-T-A** [1] -
44:7
  **jacket** [1] - 106:16
  **jail** [13] - 88:4, 140:14,
140:20, 144:21, 144:25,
145:3, 145:11, 145:25,
146:5, 190:8, 243:4,
245:1, 245:2
  **James** [1] - 1:21
  **January** [1] - 140:19,
159:16, 181:19, 184:7,
189:22, 196:23, 197:6,
200:24, 224:19, 224:20
  **JAQUETTA** [1] - 19:16,
19:23, 44:3, 263:3, 263:8
  **Jaquetta** [12] - 3:5, 8:5,
9:17, 11:1, 19:23, 41:6,

42:2, 43:25, 44:7, 62:24,
193:15, 193:17
  **Jason** [2] - 252:20,
253:14
  **jeans** [1] - 106:17
  **Jersey** [1] - 102:12
  **Jim** [1] - 100:14
  **job** [6] - 2:22, 55:13,
55:15, 55:20, 55:24, 56:6
  **John** [2] - 261:18,
261:23
  **Johnson** [8] - 139:5,
141:3, 141:5, 144:2,
145:16, 145:22, 147:24,
181:15
  **joint** [2] - 251:19,
258:25
  **joke** [1] - 2:10
  **Jones** [8] - 6:2, 252:25,
253:6, 254:9, 260:1,
261:18, 261:20, 261:24
  **Joshonee** [1] - 223:16
  **Judge** [9] - 1:13, 2:3,
7:19, 15:23, 16:7, 41:2,
212:21, 254:17, 257:19
  **judge** [1] - 38:6
  **juggling** [1] - 7:25
  **July** [1] - 131:12
  **jump** [1] - 88:19
  **June** [1] - 244:9
  **Junghue** [2] - 223:12,
224:6
  **junior** [1] - 101:6
  **jurors** [1] - 37:17
  **jury** [123] - 9:20, 9:23,
12:19, 20:9, 20:12,
20:14, 20:15, 20:25,
27:25, 28:3, 28:6, 28:14,
29:20, 29:22, 31:10,
37:4, 37:14, 38:5, 39:5,
39:7, 39:11, 39:12,
39:15, 40:3, 40:14,
40:21, 42:18, 42:23,
43:2, 47:3, 58:12, 58:18,
59:5, 59:14, 59:23,
62:10, 65:7, 65:12, 67:7,
69:24, 70:16, 70:22,
71:8, 72:3, 72:20, 75:12,
76:7, 76:23, 78:4, 78:8,
83:1, 83:3, 91:16, 93:18,
95:6, 97:11, 105:1,
108:15, 108:19, 108:21,
108:25, 110:16, 110:19,
111:23, 112:7, 112:11,
113:6, 113:13, 113:16,
113:25, 114:7, 114:14,
114:23, 115:18, 115:24,
120:13, 120:14, 120:17,
121:6, 121:10, 121:13,
127:11, 127:12, 127:20,

127:22, 128:9, 128:12,
129:1, 129:9, 130:5,
130:18, 133:21, 133:22,
134:4, 135:8, 146:22,
147:1, 148:7, 167:9,
167:12, 167:18, 168:17,
170:9, 175:13, 175:16,
176:7, 176:9, 176:13,
208:7, 208:12, 231:25,
232:22, 235:4, 236:19,
236:21, 239:13, 242:17,
246:5, 254:2, 254:3,
256:5
  **Jury** [8] - 1:14, 42:24,
128:13, 135:25, 137:14,
208:17, 232:22, 232:24
  **jury's** [7] - 13:13, 67:10,
135:24, 145:6, 149:3,
236:23, 236:25

**K**

  **keep** [5] - 88:23, 191:9,
213:11, 231:12, 232:14
  **Keeway** [6] - 119:22,
119:24, 130:7, 130:12,
130:19
  **Keisha's** [2] - 132:4,
132:12
  **Kelsey** [3] - 1:17, 25:13,
85:15
  **kept** [7] - 40:21, 43:3,
122:2, 137:21, 231:5,
238:3, 240:24
  **KG** [1] - 128:13
  **kids** [1] - 89:25
  **kids'** [1] - 143:14
  **kill** [2] - 252:24, 252:25
  **killed** [2] - 143:8,
222:24
  **kilo** [1] - 145:19
  **kilogram** [7] - 171:9,
173:1, 173:9, 173:13,
173:18, 173:19, 174:6,
174:9, 178:2
  **kilograms** [1] - 174:3
  **kind** [34] - 7:7, 11:3,
31:19, 34:21, 40:11,
40:15, 51:11, 51:14,
52:18, 65:2, 80:10,
81:19, 110:13, 111:11,
114:2, 117:25, 118:9,
118:24, 122:12, 139:17,
142:6, 159:12, 164:16,
172:15, 174:8, 179:1,
179:9, 234:20, 237:8,
245:2, 247:3, 251:16,
252:6, 258:8
  **kinds** [8] - 7:12, 7:24,

8:14, 233:23, 236:7, 238:4, 238:8

**kingpin** [3] - 173:25, 174:2, 174:7

**knock** [4] - 154:2, 160:14, 165:22, 166:3

**knocked** [1] - 185:5

**knocking** [1] - 186:24

**knowing** [3] - 94:1, 164:23, 186:22

**knowingly** [2] - 37:10, 115:1

**knowledge** [11] - 15:4, 49:19, 60:3, 63:6, 63:22, 79:2, 119:7, 122:9, 152:3, 152:14, 157:15

**known** [19] - 22:25, 27:7, 27:17, 37:20, 45:13, 51:5, 51:6, 80:2, 93:9, 99:1, 99:4, 109:14, 112:23, 116:22, 118:17, 122:5, 185:8, 188:11

**knows** [6] - 11:14, 17:8, 36:4, 39:14, 204:17

**KURLAND** [13] - 40:8, 40:19, 40:23, 41:2, 226:22, 250:7, 250:9, 250:17, 250:25, 257:19, 258:9, 258:14, 258:18

**Kurland** [11] - 1:22, 6:5, 40:7, 120:4, 250:6, 252:10, 254:14, 256:16, 257:9, 257:18, 260:9

**Kurland's** [1] - 254:24

## L

**L-10** [2] - 210:4, 211:3

**Lab** [3] - 190:14, 191:5, 209:9

**lab** [27] - 191:1, 191:4, 191:10, 191:11, 191:16, 191:19, 192:4, 192:7, 192:16, 192:17, 192:18, 192:24, 210:6, 210:25, 211:12, 211:13

**label** [12] - 23:5, 54:11, 54:12, 54:14, 54:24, 57:13, 90:15, 118:19, 119:3, 119:7, 124:9

**labeled** [3] - 128:13, 209:17, 218:6

**labels** [1] - 166:22

**Laboratory** [1] - 190:24

**laboratory** [3] - 191:4, 209:25, 211:14

**lack** [3] - 107:6, 153:5, 201:7

**ladies** [7] - 42:25,

110:19, 137:15, 137:20, 208:18, 231:8, 232:23

**lady** [2] - 68:3, 148:22

**landscape** [1] - 34:21

**laptop** [5] - 14:5, 15:4, 15:7, 15:14, 15:16

**large** [6] - 152:22, 192:5, 207:8, 211:16, 212:1, 246:20

**Large** [1] - 247:6

**larger** [2] - 181:3, 188:20

**Laslett** [5] - 214:3, 215:7, 215:19, 219:12, 220:14

**Laslett's** [1] - 216:19

**last** [45] - 8:3, 9:2, 12:13, 12:21, 12:24, 17:9, 19:22, 19:23, 32:14, 33:2, 41:19, 46:24, 47:10, 65:13, 65:19, 66:17, 71:24, 71:25, 72:12, 72:14, 72:16, 72:21, 97:8, 106:8, 135:13, 167:2, 180:17, 213:12, 214:3, 214:4, 214:7, 214:20, 214:22, 216:7, 217:14, 218:13, 219:5, 219:8, 219:12, 246:16, 247:8, 256:10, 256:12, 258:14

**Last** [3] - 20:8, 44:7, 178:15

**late** [14] - 2:4, 12:13, 17:11, 141:11, 142:5, 142:19, 180:25, 186:16, 226:11, 231:12, 231:20, 231:25, 241:3, 241:12

**Late** [1] - 142:4

**latter** [1] - 32:25

**Laura** [3] - 1:17, 25:13, 85:15

**lavatory** [1] - 40:15

**law** [13] - 143:16, 145:9, 145:15, 146:4, 147:25, 148:20, 148:24, 149:4, 149:14, 158:23, 159:18, 160:8, 165:12

**LAWLOR** [37] - 11:13, 16:7, 16:11, 18:11, 18:15, 25:6, 25:8, 32:8, 33:21, 34:4, 152:25, 153:5, 157:5, 157:9, 157:18, 166:14, 167:1, 177:14, 177:17, 186:6, 194:24, 202:19, 206:25, 207:4, 212:21, 225:10, 225:13, 230:10, 231:3, 231:6, 233:11, 233:15, 250:1, 261:22, 263:14,

263:15, 263:17

**Lawlor** [8] - 1:18, 11:10, 25:5, 32:6, 35:22, 175:19, 177:15, 233:10

**lawyer** [3] - 110:12, 113:22, 113:24

**lawyers** [2] - 112:25, 252:2

**lay** [1] - 113:7

**lead** [3] - 113:19, 148:14, 208:16

**leading** [1] - 145:6

**leads** [1] - 226:3

**learn** [4] - 76:20, 157:12, 216:23, 216:24

**learned** [12] - 87:20, 87:22, 88:1, 88:14, 90:24, 225:2, 226:4, 226:7, 226:8, 229:5, 229:10

**least** [10] - 38:16, 40:14, 72:20, 99:4, 99:13, 102:20, 116:8, 186:23, 226:20, 233:22

**leave** [9] - 97:20, 121:6, 121:9, 135:22, 151:22, 165:6, 208:8, 232:18, 249:10

**leaves** [1] - 258:8

**leaving** [1] - 50:5, 166:21, 242:16

**led** [1] - 261:14

**Lee** [14] - 250:5, 251:4, 252:19, 253:13, 254:16, 254:24, 255:2, 255:7, 255:16, 256:15, 257:22, 258:3, 259:6, 259:20

**left** [16] - 4:6, 4:25, 41:20, 45:3, 47:8, 47:10, 48:10, 56:5, 110:13, 114:10, 164:7, 165:8, 165:12, 198:3, 213:12, 241:21

**legal** [2] - 114:20, 115:24

**Less** [2] - 206:5, 206:6

**less** [8] - 36:4, 178:2, 182:8, 185:23, 202:21, 205:25, 206:2, 223:17

**letter** [4] - 4:3, 6:4, 240:11, 242:23

**letters** [3] - 220:10, 220:24, 221:3

**level** [2] - 172:15, 173:23, 196:10

**lie** [1] - 115:1

**lieu** [1] - 257:8

**Lieutenant** [1] - 229:17

**life** [8] - 45:6, 82:5, 83:24, 108:6, 123:22,

233:20, 233:24, 235:15

**light** [7] - 12:24, 29:9, 31:14, 32:19, 33:2, 33:22, 248:16

**lights** [1] - 81:8

**likely** [1] - 259:15

**Lil** [3] - 220:23, 220:25

**limine** [1] - 239:24

**limit** [3] - 3:24, 256:11

**limited** [1] - 256:7

**limiting** [2] - 256:11, 257:5

**line** [5] - 4:17, 12:3, 121:8, 236:15

**Line** [8] - 28:7, 70:1, 70:4, 71:12, 71:13, 114:9, 120:21, 168:6

**lineup** [1] - 8:20

**linked** [1] - 230:13

**Lisa** [10] - 218:3, 219:21, 221:22, 222:13, 223:7, 233:20, 233:24, 238:2, 238:5, 238:6

**list** [15] - 3:6, 216:2, 216:6, 219:8, 220:13, 235:6, 235:7, 235:8, 235:9, 236:3, 236:6, 238:1, 250:1, 258:15

**listed** [4] - 193:15, 216:8, 217:15, 220:8

**listen** [10] - 20:19, 21:4, 26:17, 26:23, 94:15, 95:2, 99:18, 110:24, 248:24, 249:5

**listened** [25] - 24:22, 26:14, 27:1, 27:3, 30:13, 37:25, 38:10, 38:17, 93:12, 95:5, 95:20, 96:1, 98:19, 98:21, 99:9, 99:10, 111:17, 124:8, 127:10, 127:12, 127:23, 128:14, 134:4, 241:16, 247:7

**listening** [5] - 23:10, 25:14, 112:21, 127:22, 128:19

**lists** [1] - 193:23

**literally** [1] - 246:6

**live** [6] - 44:15, 48:11, 48:13, 77:18, 103:3, 108:2

**lived** [8] - 48:12, 48:17, 48:19, 50:21, 56:23, 63:17, 63:18, 68:3

**lives** [1] - 56:22

**living** [15] - 45:5, 48:23, 49:1, 50:17, 55:10, 57:1, 77:5, 102:7, 102:20, 103:6, 104:13, 133:11, 145:11, 159:12, 159:13

**loaded** [1] - 82:9

**loaned** [2] - 66:7, 72:21

**loaning** [1] - 66:4

**locate** [1] - 14:5

**located** [2] - 126:18, 194:14

**location** [7] - 184:2, 184:20, 193:10, 195:19, 222:23, 228:10, 228:11

**locations** [4] - 226:17, 226:18, 227:3, 227:12

**locked** [6] - 86:11, 109:22, 109:25, 243:23, 244:2, 244:5, 244:12, 244:13

**logistic** [1] - 10:14

**logistical** [1] - 2:3

**logistics** [1] - 47:9

**Lombard** [1] - 1:25

**look** [25] - 2:19, 3:20, 7:1, 7:20, 8:22, 18:3, 60:4, 65:6, 70:4, 71:11, 83:3, 154:23, 156:10, 156:20, 177:23, 189:10, 229:8, 229:15, 232:19, 236:20, 238:13, 238:21, 239:2, 239:10

**looked** [4] - 5:12, 70:19, 70:23, 240:21

**looking** [3] - 12:14, 83:2, 215:17

**looks** [6] - 69:13, 69:15, 69:21, 70:21, 220:21

**loose** [2] - 155:6, 162:12

**lost** [3] - 65:1, 65:3, 247:12

**lower** [1] - 144:6

**lunch** [3] - 40:24, 135:24, 147:13

**luncheon** [3] - 135:8, 231:18, 231:24

**Luncheon** [1] - 136:12

**lying** [4] - 169:23, 169:24, 200:24

**lyrics** [2] - 124:10, 131:21

## M

**ma'am** [18] - 20:2, 20:23, 44:13, 47:14, 54:18, 55:18, 59:12, 63:23, 65:13, 66:20, 72:5, 76:7, 117:19, 128:5, 135:7, 141:14, 142:10, 146:23

**Ma'am** [5] - 29:18, 63:2, 167:2, 167:5, 177:18

**magnified** [1] - 251:21
**mail** [22] - 2:15, 8:17, 8:19, 9:22, 11:2, 11:20, 12:1, 12:2, 12:10, 13:14, 13:15, 13:17, 14:5, 14:17, 14:21, 20:20, 30:23, 32:5, 47:10, 133:13, 240:20, 257:20
**mailed** [1] - 18:24, 19:1
**mails** [2] - 47:9, 47:11
**male** [3] - 185:8, 187:20, 223:11
**Male** [1] - 154:25
**malfunctioned** [2] - 241:23, 241:24
**Mall** [1] - 223:21
**mall** [2] - 183:9, 184:1
**man** [2] - 170:14, 238:7
**manifest** [1] - 38:2
**manner** [2] - 39:8, 264:9
**March** [25] - 20:10, 58:11, 59:3, 59:6, 59:14, 76:23, 77:4, 77:21, 78:9, 83:3, 83:6, 83:16, 104:6, 105:21, 105:23, 111:23, 114:8, 121:6, 217:8, 227:7, 229:6, 229:8, 229:9, 229:15, 252:18
**marked** [14] - 61:21, 142:8, 160:23, 182:13, 187:4, 189:18, 190:9, 193:22, 203:8, 206:7, 207:9, 210:3, 216:18, 223:3
**marks** [1] - 223:6
**Marquetta** [2] - 147:7, 260:16
**married** [1] - 181:15
**MARTIN** [50] - 1:8, 11:19, 11:25, 12:5, 12:7, 13:4, 13:7, 14:19, 15:1, 15:9, 16:15, 18:23, 26:2, 26:6, 31:21, 31:23, 32:1, 35:23, 36:17, 36:23, 39:11, 60:10, 67:19, 94:17, 94:19, 95:22, 98:1, 133:19, 136:3, 136:25, 137:5, 225:16, 229:4, 239:21, 239:23, 240:5, 240:7, 240:10, 242:9, 242:14, 242:20, 258:21, 258:23, 259:7, 259:13, 263:5, 263:9, 263:12, 263:21, 263:22
**Martin** [87] - 1:19, 1:20, 11:18, 13:15, 14:18, 26:1, 27:13, 27:15, 30:24, 31:2, 31:3, 31:18, 31:20, 33:13, 35:10,

35:11, 35:22, 36:22, 38:13, 39:10, 40:6, 42:11, 51:19, 51:21, 51:23, 52:2, 52:4, 52:7, 52:10, 52:19, 55:5, 55:7, 57:9, 67:20, 84:11, 98:2, 98:5, 98:12, 98:15, 99:1, 100:14, 101:10, 101:19, 102:21, 102:23, 103:22, 103:24, 104:3, 105:6, 106:6, 107:16, 107:25, 108:2, 109:14, 109:20, 109:24, 116:5, 116:19, 122:13, 122:18, 123:4, 123:7, 123:10, 125:10, 126:4, 126:12, 126:22, 126:24, 133:17, 134:9, 158:12, 172:5, 227:7, 239:17, 240:3, 246:15, 246:19, 247:14, 248:6, 248:15, 248:22, 258:20, 259:19, 260:7, 260:9, 261:6, 261:13
**Martin's** [8] - 11:12, 13:23, 27:22, 96:11, 109:11, 109:22, 126:3, 242:23
**Mary** [3] - 1:24, 264:3, 264:15
**MARYLAND** [1] - 1:2
**Maryland** [8] - 1:12, 1:25, 63:15, 221:11, 224:19, 228:25, 229:19, 248:2
**master** [5] - 188:18, 188:19, 188:23, 189:6, 189:7
**match** [2] - 251:8
**matched** [1] - 253:19
**material** [3] - 247:13, 247:17, 249:4
**materially** [1] - 169:4
**materials** [2] - 189:12, 189:15
**math** [7] - 151:8, 172:21, 177:9, 177:10, 177:19, 177:23, 177:25
**mathematical** [1] - 176:20
**matter** [18] - 9:25, 10:3, 38:17, 97:8, 111:20, 112:17, 134:9, 167:10, 168:12, 168:15, 190:16, 190:17, 204:4, 204:6, 252:13, 259:12, 264:4, 264:9
**matters** [6] - 16:7, 16:11, 16:13, 43:7, 176:3, 176:4
**MB** [1] - 213:21

**MB-25** [2] - 223:3, 238:6
**MB-33** [1] - 220:3
**MB-34** [1] - 214:10
**MB-35** [1] - 215:11
**MB-38** [1] - 213:24
**MB-39** [1] - 213:17
**MB-5** [1] - 238:2
**MB-6** [1] - 238:1
**McCaffity** [11] - 4:21, 76:12, 214:4, 219:6, 219:21, 219:22, 221:23, 222:24, 238:3, 250:22
**McCaffity's** [7] - 213:14, 213:19, 214:21, 216:4, 219:22, 222:18, 222:22
**McHenry** [1] - 261:19
**McKnight** [1] - 229:18
**mean** [41] - 5:4, 7:24, 11:19, 18:3, 24:6, 32:8, 34:21, 40:19, 56:12, 80:12, 91:21, 92:23, 94:24, 103:13, 107:2, 107:9, 119:17, 132:21, 148:6, 148:7, 156:9, 159:6, 194:19, 216:25, 221:16, 221:20, 233:25, 235:16, 236:14, 236:15, 241:16, 248:11, 248:19, 249:1, 250:9, 254:15, 255:1, 255:18, 256:15, 257:10
**meaning** [1] - 231:16
**means** [4] - 35:8, 41:14, 118:5, 151:11
**meant** [1] - 221:16
**meantime** [1] - 232:16
**medic** [1] - 4:23
**medium** [1] - 188:23
**medium-size** [1] - 188:23
**meet** [14] - 79:1, 119:18, 132:8, 132:9, 149:17, 150:5, 150:18, 152:10, 159:8, 159:24, 174:22, 181:20, 197:14, 245:17
**meeting** [3] - 50:1, 150:8, 165:11
**meetings** [2] - 246:19, 247:1
**Melva's** [2] - 70:10, 70:11
**member** [1] - 41:7
**members** [1] - 139:21
**Members** [3] - 43:2, 135:8, 208:7
**membership** [1] - 16:21
**memo** [1] - 42:13
**memory** [3] - 56:19,

97:10, 214:7
**men** [1] - 252:18
**mention** [9] - 8:5, 29:18, 110:25, 120:15, 129:2, 148:21, 234:3, 254:20, 256:21
**mentioned** [25] - 8:6, 8:7, 9:16, 22:11, 22:18, 22:19, 29:22, 47:2, 86:1, 90:10, 91:10, 95:15, 97:8, 127:16, 127:25, 130:7, 132:16, 152:1, 162:11, 164:10, 214:2, 216:12, 221:25, 232:21, 233:19
**mentioning** [1] - 90:10
**met** [20] - 46:1, 53:20, 76:5, 80:3, 89:24, 100:19, 100:21, 100:25, 104:20, 119:12, 119:13, 120:13, 127:11, 131:24, 131:25, 139:6, 150:9, 198:5, 245:11
**metro** [1] - 6:17
**Michael** [3] - 1:16, 1:18, 229:17
**microphone** [4] - 10:23, 42:20, 70:9, 209:7
**mid** [3] - 135:16, 142:4, 231:19
**mid-afternoon** [1] - 135:16
**mid-morning** [1] - 231:19
**middle** [2] - 228:3, 228:14
**might** [29] - 6:4, 6:6, 11:9, 14:11, 14:12, 33:18, 35:19, 57:5, 73:21, 95:14, 96:24, 98:7, 113:1, 115:14, 115:18, 122:13, 124:18, 144:5, 147:6, 148:17, 148:24, 153:3, 207:3, 229:15, 234:22, 235:2, 235:4, 251:6, 259:4
**mike** [10] - 6:24, 15:25, 19:18, 36:19, 44:5, 138:1, 178:13, 191:7, 208:25, 250:18
**mile** [2] - 184:19, 194:15
**miles** [1] - 184:2
**military** [1] - 224:15
**Mills** [1] - 223:21
**mind** [4] - 65:6, 69:25, 118:14, 259:19
**mine** [1] - 64:20
**minute** [10] - 8:3, 8:8, 25:8, 40:25, 42:17,

119:1, 173:11, 183:12, 192:17, 236:2
**minutes** [20] - 3:23, 22:18, 41:19, 41:23, 63:25, 64:12, 64:15, 98:18, 120:21, 123:13, 127:20, 133:21, 147:13, 147:22, 149:3, 174:5, 184:12, 200:15, 208:10, 233:21
**misdirected** [1] - 9:22
**miserable** [1] - 94:6
**mispronounce** [1] - 63:10
**missed** [4] - 118:11, 218:9, 218:12, 218:22
**misspoke** [1] - 258:2
**misstatement** [1] - 222:9
**mistake** [2] - 121:16, 156:13
**MITCHELL** [1] - 1:7
**Mitchell** [187] - 1:17, 9:19, 16:9, 18:13, 18:19, 23:6, 24:24, 25:13, 26:17, 30:8, 35:11, 38:1, 40:3, 45:9, 45:11, 45:13, 45:17, 45:23, 46:5, 46:10, 46:12, 46:13, 46:15, 46:20, 48:8, 48:11, 48:13, 48:17, 48:21, 48:24, 49:1, 49:2, 49:7, 49:15, 49:19, 49:22, 49:25, 50:5, 50:8, 50:13, 50:17, 50:22, 52:10, 52:19, 53:4, 53:11, 53:15, 54:6, 54:10, 54:23, 55:10, 55:13, 55:24, 56:5, 56:11, 56:20, 57:19, 57:22, 57:24, 59:18, 60:24, 61:5, 61:11, 61:14, 62:20, 63:4, 64:2, 64:18, 64:24, 65:3, 65:13, 66:1, 66:7, 71:17, 72:10, 72:22, 72:25, 73:3, 73:13, 73:16, 73:20, 73:23, 74:6, 74:10, 74:14, 74:16, 74:19, 74:23, 74:24, 75:2, 75:5, 75:9, 76:9, 76:15, 77:15, 77:24, 79:10, 79:13, 79:18, 80:8, 80:10, 80:14, 80:25, 81:10, 82:17, 82:20, 82:23, 83:11, 83:17, 84:7, 84:10, 85:2, 85:4, 85:5, 85:16, 86:8, 87:21, 88:2, 98:4, 99:4, 100:1, 100:7, 100:21,

102:7, 102:24, 103:1, 103:16, 103:17, 104:1, 104:11, 104:13, 104:17, 105:3, 105:10, 105:18, 105:24, 106:8, 106:11, 106:15, 107:15, 116:4, 116:22, 117:1, 118:8, 119:4, 121:22, 122:2, 122:11, 122:19, 122:22, 123:2, 123:6, 123:9, 123:14, 123:16, 123:18, 123:21, 123:25, 124:3, 125:16, 131:21, 132:17, 134:14, 134:20, 188:11, 188:13, 188:14, 189:20, 189:24, 193:9, 193:23, 203:21, 204:2, 241:10, 243:24, 244:13, 245:1, 245:7, 245:15, 245:22, 261:19, 264:5

**Mitchell's** [14] - 18:16, 23:5, 29:16, 33:25, 54:12, 57:12, 68:22, 74:1, 85:6, 96:8, 96:17, 122:17, 124:5

**mix** [1] - 238:15

**Mobile** [4] - 66:13, 66:15, 67:10, 67:11

**mobilization** [1] - 224:18

**mobilize** [1] - 249:17

**mobilized** [2] - 221:11, 224:19

**mom** [3] - 91:6, 91:8, 133:11

**moment** [14] - 25:2, 30:21, 35:10, 57:17, 109:11, 120:3, 159:15, 175:19, 194:20, 194:25, 211:7, 224:10, 240:4, 254:14

**Monday** [7] - 135:15, 231:16, 231:18, 231:21, 232:1, 232:2, 242:21

**money** [31] - 62:23, 125:20, 132:21, 148:9, 151:1, 157:7, 163:18, 163:20, 163:22, 163:23, 163:24, 163:25, 180:5, 180:9, 181:3, 185:12, 185:13, 185:14, 193:5, 194:18, 197:24, 201:18, 201:20, 203:8, 203:18, 203:20, 204:1, 204:6, 204:9, 206:7, 207:15

**Money** [1] - 157:8

**monies** [1] - 184:24

**monitor** [1] - 216:22

**month** [5] - 64:9, 112:2, 121:11, 240:18, 244:17

**months** [5] - 65:20, 104:17, 196:24, 254:9

**morning** [50] - 2:9, 3:4, 4:4, 8:17, 9:11, 9:12, 10:19, 10:20, 11:18, 11:19, 11:21, 11:22, 14:4, 14:7, 20:6, 20:7, 25:11, 25:12, 27:12, 27:14, 28:19, 28:20, 33:24, 37:17, 40:7, 40:8, 43:1, 43:2, 43:4, 44:11, 44:12, 85:13, 85:14, 100:13, 135:10, 136:23, 219:1, 231:19, 231:20, 231:25, 232:21, 238:19, 239:2, 239:24, 241:6, 257:20, 260:21, 260:25, 261:1

**Mosher** [1] - 229:19

**most** [10] - 140:17, 215:5, 216:8, 219:13, 234:14, 236:24, 246:20, 247:8, 254:21

**mother** [5] - 40:4, 76:21, 103:6, 121:23, 219:22

**mother's** [7] - 50:20, 50:21, 69:6, 85:6, 126:14, 126:15, 244:5

**motion** [7] - 2:9, 2:16, 32:12, 136:22, 185:12, 239:18, 239:24

**MOTION** [7] - 263:4, 263:4, 263:5, 263:5, 263:6, 263:6, 263:7

**motioned** [1] - 185:15

**move** [15] - 26:2, 76:24, 77:11, 78:11, 79:4, 79:5, 91:3, 97:9, 106:4, 106:5, 106:6, 152:25, 157:18, 215:11, 249:10

**moved** [6] - 48:15, 77:19, 101:13, 101:20, 105:24, 144:20

**movie** [2] - 223:20, 223:23

**Moving** [1] - 75:24

**moving** [4] - 77:13, 106:2, 203:12, 232:11

**MR** [288] - 2:3, 2:7, 2:11, 2:13, 2:17, 2:23, 3:1, 3:3, 3:9, 3:12, 4:1, 5:7, 5:9, 5:16, 5:24, 6:1, 6:13, 6:16, 6:22, 7:5, 7:22, 9:7, 9:10, 9:12, 9:15, 10:14, 10:18, 10:20, 10:24, 11:9, 11:13, 11:19, 11:22, 11:25, 12:5, 12:7, 12:11, 12:18, 12:22, 13:1, 13:4,

13:7, 13:8, 13:11, 13:20, 13:25, 14:11, 14:19, 15:1, 15:9, 15:23, 16:1, 16:7, 16:11, 16:15, 16:18, 16:25, 17:3, 17:12, 17:16, 17:21, 18:6, 18:11, 18:15, 18:23, 19:7, 19:10, 20:5, 21:15, 22:3, 24:14, 25:6, 25:8, 26:2, 26:6, 27:11, 28:18, 29:14, 30:22, 30:25, 31:7, 31:12, 31:21, 31:23, 32:1, 32:8, 33:21, 34:4, 34:10, 34:14, 34:20, 35:2, 35:19, 35:23, 36:17, 36:23, 37:1, 39:11, 40:8, 40:19, 40:23, 41:2, 41:3, 41:5, 42:2, 42:5, 42:8, 43:24, 44:10, 58:4, 58:7, 58:9, 60:10, 62:19, 67:19, 94:17, 94:19, 95:22, 98:1, 100:12, 110:9, 117:12, 117:17, 117:18, 118:1, 118:4, 120:6, 120:9, 129:6, 132:13, 133:19, 134:24, 136:3, 136:8, 136:14, 136:18, 136:25, 137:4, 137:5, 137:9, 137:13, 137:18, 138:6, 152:25, 153:5, 157:5, 157:9, 157:18, 166:14, 167:1, 169:6, 170:2, 170:11, 175:11, 177:14, 177:17, 178:9, 178:18, 186:6, 186:8, 194:24, 202:14, 202:17, 202:19, 205:16, 206:15, 206:25, 207:4, 207:7, 207:24, 208:2, 208:4, 208:13, 208:20, 209:5, 212:21, 213:2, 213:10, 225:8, 225:10, 225:13, 225:16, 226:13, 226:22, 227:1, 229:4, 230:3, 230:6, 230:10, 231:3, 231:6, 231:10, 233:11, 233:15, 233:17, 237:10, 237:16, 237:18, 239:21, 239:23, 240:2, 240:5, 240:7, 240:10, 242:9, 242:14, 242:20, 243:1, 243:3, 243:7, 243:9, 243:11, 243:13, 243:16, 243:19, 244:4, 244:8, 244:10, 244:12, 244:19, 244:22, 245:1, 245:5, 245:7, 245:10, 245:14, 245:19, 245:21, 246:1, 246:3, 246:25, 247:7, 248:21, 249:4,

249:13, 249:21, 249:24, 250:1, 250:7, 250:9, 250:14, 250:17, 250:25, 252:9, 252:16, 252:18, 253:24, 254:17, 254:20, 255:4, 255:8, 255:11, 255:13, 255:17, 255:20, 255:23, 255:25, 256:2, 256:5, 256:19, 256:25, 257:4, 257:19, 258:9, 258:14, 258:18, 258:21, 258:23, 259:7, 259:13, 260:16, 260:19, 260:22, 260:24, 261:4, 261:8, 261:12, 261:16, 261:22, 261:23, 262:1, 262:6, 262:9, 262:11, 262:15, 262:17, 262:19, 262:21

**MS** [36] - 14:13, 15:3, 15:7, 15:18, 15:22, 18:22, 25:10, 29:6, 29:9, 30:4, 30:7, 47:12, 49:12, 62:6, 62:14, 62:16, 85:12, 94:21, 94:23, 95:1, 95:25, 129:21, 132:15, 233:8, 234:10, 234:19, 235:1, 235:9, 235:15, 235:20, 236:4, 236:13, 236:17, 237:1, 237:7, 237:11

**multiple** [1] - 141:15

**Multiple** [2] - 141:16, 141:18

**murder** [27] - 6:2, 6:9, 213:14, 221:6, 221:9, 224:3, 227:20, 228:4, 228:5, 230:22, 231:1, 233:25, 243:22, 244:14, 244:16, 245:22, 250:5, 251:10, 251:11, 251:12, 252:6, 253:6, 253:13, 254:9, 258:4, 258:6, 260:1

**murders** [5] - 4:15, 5:4, 253:2, 254:8, 259:24

**music** [12] - 23:10, 23:14, 24:23, 30:9, 30:17, 38:1, 53:5, 93:8, 118:23, 166:12

**music-wise** [1] - 23:10

**must** [7] - 83:8, 83:20, 114:21, 135:1, 196:10, 248:12, 249:1

**mute** [1] - 15:15

**muted** [1] - 15:15

**N**

**N-I-E-S-H-I-A** [1] - 138:3

**name** [80] - 8:9, 19:19,

19:21, 19:22, 19:24, 22:11, 22:18, 22:19, 24:15, 24:19, 25:17, 27:12, 36:5, 44:6, 44:7, 50:9, 54:2, 54:14, 54:22, 55:3, 55:5, 63:6, 63:22, 64:15, 66:11, 68:6, 74:1, 76:6, 76:12, 84:1, 85:15, 95:15, 100:13, 108:24, 110:25, 119:20, 119:21, 119:22, 119:23, 125:14, 127:16, 127:17, 129:3, 131:19, 138:1, 139:4, 139:9, 142:25, 147:7, 148:21, 154:10, 158:9, 158:12, 158:14, 158:16, 158:18, 160:20, 167:3, 178:14, 178:15, 179:12, 180:17, 185:6, 187:7, 193:7, 209:1, 213:6, 216:24, 216:25, 217:22, 218:2, 218:3, 230:14, 230:16, 230:17, 240:4, 243:6, 245:16

**name's** [1] - 98:2

**named** [12] - 51:3, 68:3, 97:6, 141:21, 143:2, 171:20, 172:10, 182:2, 185:8, 252:19, 252:20

**names** [1] - 24:20, 25:19, 57:4, 73:20, 75:5, 76:10, 111:6, 158:8, 166:22, 180:19, 217:19, 219:20, 221:13, 261:22

**narcotic** [1] - 179:2

**Narcotic** [1] - 179:10

**narcotics** [1] - 261:17

**Nassau** [5] - 50:10, 50:14, 50:25, 51:1, 102:11

**National** [3] - 221:12, 224:13, 224:19

**nature** [4] - 7:10, 37:9, 39:15, 110:5

**Near** [1] - 164:14

**near** [5] - 51:20, 191:7, 256:19

**necessarily** [3] - 64:14, 122:4, 251:13

**necessary** [1] - 135:3

**need** [34] - 2:23, 3:16, 3:24, 4:7, 4:17, 7:20, 9:5, 10:6, 11:16, 15:14, 15:17, 18:6, 21:11, 21:21, 31:2, 31:17, 32:1, 43:12, 61:23, 98:7, 172:25, 191:7, 197:24, 210:24, 231:13, 242:4, 242:22, 244:1, 252:6, 257:12, 257:13, 257:18,

260:4
**needed** [6] - 121:17, 149:12, 151:24, 159:4, 186:18, 192:12
**needs** [5] - 11:3, 31:4, 40:16, 232:13, 233:1
**negative** [10] - 31:18, 32:6, 32:19, 32:20, 34:24, 35:5, 35:10, 37:16, 38:11, 38:22
**nervous** [1] - 94:1
**net** [1] - 52:17
**neutral** [1] - 238:21
**Never** [4] - 23:25, 118:14, 119:13, 240:13
**never** [31] - 27:7, 29:23, 39:12, 57:22, 57:24, 59:21, 82:23, 83:18, 84:22, 85:17, 87:11, 91:18, 101:10, 101:16, 109:11, 119:12, 129:4, 132:18, 132:21, 174:7, 195:25, 201:15, 202:22, 204:25, 218:10, 238:3, 240:13, 240:17, 247:7, 251:7, 252:1
**New** [5] - 50:10, 102:12, 102:13, 102:14, 180:24
**new** [5] - 35:24, 43:17, 43:21, 53:20, 241:3
**Next** [1] - 178:8
**next** [36] - 26:3, 41:6, 43:23, 54:6, 71:11, 79:4, 79:5, 80:5, 105:23, 121:11, 135:15, 135:17, 135:20, 136:14, 137:16, 162:10, 165:21, 168:10, 182:7, 208:19, 217:19, 217:22, 217:24, 218:6, 220:11, 232:4, 232:6, 232:7, 232:9, 232:10, 234:12, 239:19, 242:16, 248:7, 248:15, 249:20
**Nextel** [1] - 213:17
**nexus** [1] - 259:25
**nickname** [7] - 22:20, 24:18, 45:24, 125:5, 125:8, 125:13, 230:12
**nicknames** [4] - 45:23, 54:1, 55:1, 55:7
**Niedermeier** [9] - 137:9, 225:4, 234:18, 239:19, 239:21, 250:10, 250:11, 250:14, 251:23
**Niedermeier's** [1] - 136:22
**Nieshia** [17] - 136:15, 137:19, 138:3, 179:12, 181:8, 181:20, 182:9, 182:19, 183:2, 183:7,

184:18, 184:21, 185:7, 185:8, 185:10, 185:12, 186:24
**NIESHIA** [2] - 137:23, 263:13
**Nig** [2] - 220:23, 220:25
**night** [33] - 17:9, 77:24, 78:9, 78:10, 78:13, 78:16, 79:2, 79:11, 87:24, 97:8, 97:9, 97:12, 100:1, 100:5, 105:22, 184:5, 187:10, 189:21, 190:3, 191:23, 196:16, 201:16, 207:12, 213:12, 213:14, 214:3, 215:8, 216:12, 218:24, 222:3, 222:4, 226:12, 226:16
**nine** [5] - 220:16, 220:17, 223:16, 227:22, 239:2
**Ninth** [2] - 46:6, 51:25
**ninth** [8] - 46:7, 51:7, 51:12, 99:2, 99:4, 100:21, 100:23, 116:5
**Nissan** [2] - 81:20, 81:24
**NO** [1] - 1:6
**nobody** [3] - 13:23, 33:19, 134:1
**noise** [1] - 247:4
**none** [1] - 256:5
**None** [3] - 249:4, 251:11
**normal** [2] - 107:19, 135:11
**Norman** [2] - 178:10, 178:15
**NORMAN** [2] - 178:11, 263:16
**North** [1] - 224:18
**NORTHERN** [1] - 1:2
**note** [4] - 8:18, 135:22, 208:8, 232:18
**notes** [6] - 111:7, 215:13, 215:17, 216:19, 217:5, 227:6, 229:13, 250:20
**nothing** [12] - 9:7, 27:9, 31:10, 146:17, 146:25, 158:20, 228:25, 234:1, 246:21, 248:17, 249:7, 256:16
**Nothing** [10] - 25:4, 30:1, 30:19, 56:9, 85:8, 97:23, 120:6, 133:16, 166:24, 226:22
**notice** [5] - 10:12, 11:16, 12:13, 18:16, 257:22
**notified** [2] - 41:5,

135:4
**notify** [3] - 8:19, 12:16, 58:22
**notwithstanding** [1] - 37:16
**nowhere** [1] - 256:19
**number** [92] - 3:20, 28:24, 29:1, 43:6, 47:11, 65:3, 65:22, 66:6, 66:9, 66:10, 66:11, 66:23, 67:4, 67:17, 67:21, 67:23, 68:1, 68:7, 68:16, 68:18, 68:20, 68:21, 69:1, 69:3, 69:5, 69:6, 69:7, 69:11, 69:12, 69:13, 69:15, 69:19, 69:20, 69:22, 70:5, 70:10, 70:11, 70:15, 70:16, 70:23, 71:1, 71:2, 71:4, 71:14, 71:15, 71:21, 72:12, 120:11, 122:17, 123:12, 126:2, 191:1, 191:2, 191:3, 191:4, 191:5, 191:10, 191:13, 191:14, 191:15, 191:16, 192:7, 192:18, 192:24, 194:14, 194:17, 194:18, 194:19, 201:8, 201:10, 209:25, 211:8, 211:9, 211:12, 211:14, 214:6, 215:3, 216:16, 216:17, 219:14, 219:17, 219:18, 221:1, 221:2, 221:3, 235:13, 245:14, 246:17, 251:9
**Number** [11] - 2:20, 39:14, 39:17, 40:15, 128:13, 220:16, 220:17, 220:19, 227:11, 240:23, 240:24
**Number(s** [1] - 264:5
**numbers** [10] - 66:21, 66:25, 67:14, 67:15, 206:8, 214:16, 219:13, 219:20, 220:8, 220:18
**numerical** [2] - 220:10, 220:11
**numerous** [2] - 184:17, 189:12

---

# O

**o'clock** [1] - 260:25
**O'Ree** [2] - 261:17, 262:2
**oath** [12] - 42:19, 58:15, 58:21, 75:16, 78:7, 114:14, 168:16, 168:21, 168:25, 200:23, 202:16, 213:5

**object** [1] - 137:5
**objected** [1] - 94:18
**Objection** [27] - 47:12, 49:12, 60:10, 62:6, 62:14, 94:17, 95:22, 118:1, 118:4, 129:6, 152:25, 153:5, 157:5, 157:9, 157:18, 166:14, 169:6, 170:2, 170:11, 186:6, 202:14, 202:17, 205:16, 206:25, 207:4, 226:13, 230:10
**objection** [12] - 3:15, 62:16, 94:20, 117:13, 117:16, 132:13, 205:18, 207:1, 233:6, 233:12, 235:19, 236:21
**objectionable** [1] - 237:23
**obligation** [3] - 58:20, 114:21, 171:5
**observe** [2] - 148:12
**observed** [7] - 52:18, 60:1, 157:3, 161:20, 184:25, 185:11, 229:18
**obstructs** [1] - 220:21
**obtain** [2] - 186:2, 186:9
**obtained** [1] - 191:20
**obtaining** [1] - 186:3
**obviously** [8] - 34:23, 46:17, 154:25, 204:9, 245:25, 255:1, 257:24, 258:10
**Obviously** [2] - 35:25, 259:16
**occasion** [5] - 43:15, 113:19, 114:7, 177:11, 180:1
**occasionally** [3] - 101:20, 125:12, 152:10
**occasions** [5] - 43:11, 58:11, 58:15, 110:16, 111:20
**occupied** [1] - 49:1
**occurred** [7] - 111:8, 186:5, 188:9, 199:16, 223:13, 230:25, 244:3
**occurs** [1] - 41:16
**October** [3] - 103:22, 242:18, 249:23
**OF** [3] - 1:2, 1:5, 1:11
**offense** [1] - 224:7
**offenses** [1] - 230:13
**offer** [2] - 239:1, 256:14
**offered** [3] - 18:10, 98:7, 240:13
**Office** [3] - 121:18, 178:22, 178:24
**office** [4] - 58:23, 146:3, 146:12, 165:10

**officer** [8] - 22:8, 110:21, 165:18, 182:24, 183:2, 184:22, 186:21, 199:7
**Officer** [3] - 25:17, 26:8, 110:22
**officers** [10] - 81:13, 81:16, 165:9, 181:22, 183:1, 184:3, 196:4, 199:19, 229:6, 240:16
**Officers** [1] - 184:3
**official** [1] - 264:8
**Official** [1] - 264:16
**often** [6] - 40:1, 40:3, 40:5, 103:25, 104:9, 108:8, 118:15, 118:16
**old** [12] - 3:13, 44:13, 45:19, 45:21, 69:6, 69:13, 86:5, 102:3, 108:5, 138:8, 146:11, 223:17
**Oliver** [4] - 76:12, 219:22, 221:23, 238:2
**ON** [7] - 263:4, 263:4, 263:5, 263:5, 263:6, 263:6, 263:7
**once** [11] - 14:17, 20:9, 20:10, 20:11, 24:8, 81:14, 123:1, 132:3, 186:1, 235:16, 235:21
**Once** [1] - 78:4
**One** [17] - 4:9, 5:12, 25:8, 41:5, 53:23, 59:2, 71:1, 96:23, 108:15, 108:17, 131:5, 137:4, 226:4, 238:11, 252:19, 252:23, 258:14
**one** [137] - 2:15, 3:18, 5:12, 5:18, 6:18, 8:1, 9:18, 12:20, 15:15, 17:15, 17:18, 20:17, 20:18, 21:16, 21:17, 30:18, 32:15, 38:6, 39:14, 41:14, 45:18, 47:21, 50:9, 52:13, 53:24, 56:22, 56:24, 59:4, 59:9, 61:8, 71:6, 76:14, 77:1, 78:5, 83:4, 83:18, 84:18, 87:13, 90:5, 92:16, 93:12, 97:8, 99:13, 99:22, 106:6, 107:16, 110:16, 111:4, 112:25, 114:8, 116:17, 117:9, 118:14, 119:19, 127:10, 127:25, 131:4, 134:8, 136:4, 136:5, 137:4, 141:15, 144:25, 146:15, 147:5, 151:9, 151:11, 153:3, 155:2, 156:6, 156:10, 156:14,

156:15, 158:5, 162:7,
169:25, 174:25, 176:25,
177:7, 177:11, 178:2,
180:16, 180:18, 191:20,
193:4, 193:8, 193:9,
193:22, 194:10, 194:15,
194:17, 194:18, 194:20,
194:25, 203:3, 207:24,
210:12, 211:3, 211:16,
212:6, 214:25, 215:16,
218:9, 218:13, 222:21,
226:18, 226:20, 229:5,
229:24, 229:25, 235:22,
237:21, 240:23, 247:13,
249:13, 250:17, 250:20,
250:21, 251:1, 251:2,
251:5, 251:10, 251:15,
251:17, 252:2, 253:21,
253:25, 254:4, 254:7,
254:8, 254:10, 254:20,
255:6, 258:4, 259:25
**one's** [2] - 193:25,
218:21
**one-eighth** [4] - 151:9,
151:11, 156:14, 156:15
**one-tenth** [1] - 178:2
**ones** [2] - 57:3, 131:19
**ongoing** [2] - 110:4
**online** [1] - 232:20
**open** [7] - 16:3, 16:4,
33:19, 33:20, 190:11,
190:12, 190:15
**opened** [1] - 186:25
**opening** [6] - 35:1,
190:13, 250:19, 253:9,
253:18, 254:3
**openings** [1] - 253:5
**operation** [5] - 160:8,
160:9, 197:16, 198:12,
222:21
**operations** [2] - 160:7,
198:13
**operator** [1] - 194:17
**opinion** [3] - 11:1,
22:16, 24:24
**opportunities** [1] -
142:15
**opportunity** [10] -
33:23, 40:10, 43:19,
58:22, 142:21, 147:6,
147:12, 233:14, 234:15,
235:25
**opposed** [1] - 6:19
**option** [2] - 256:11,
256:12
**order** [15] - 7:24, 8:20,
40:9, 41:13, 41:18,
41:22, 43:13, 47:22,
216:2, 217:15, 217:17,
222:2, 238:15, 238:22,

253:21
**ordered** [2] - 187:22,
187:23
**ordering** [1] - 239:8
**organization** [4] - 97:2,
225:21, 225:23, 225:25
**original** [3] - 192:18,
212:14, 216:21
**originally** [2] - 100:19,
226:9
**originated** [1] - 227:9
**Otherwise** [1] - 19:13
**otherwise** [1] - 32:23
**ought** [3] - 19:5,
256:21, 261:2
**ounce** [7] - 156:15,
172:23, 173:15, 173:16,
181:4, 205:20, 205:21
**ounces** [7] - 162:16,
172:25, 173:17, 175:2,
204:23, 205:1, 205:15
**ourselves** [1] - 187:1
**outs** [1] - 65:16
**outside** [5] - 30:21,
43:7, 60:15, 181:17,
198:22
**outweighs** [2] - 253:11,
260:2
**overly** [1] - 181:18
**overrule** [1] - 170:12
**overruled** [1] - 233:6
**Overruled** [16] - 47:13,
49:13, 60:11, 62:15,
95:24, 129:7, 153:1,
153:6, 157:6, 157:10,
157:19, 166:15, 169:8,
207:5, 226:14, 230:11
**overseas** [2] - 224:10,
225:1
**own** [8] - 27:7, 64:25,
90:15, 110:13, 124:6,
127:24, 161:18, 198:24
**Owned** [1] - 68:24
**owned** [1] - 82:5
**owner** [1] - 219:24
**owning** [2] - 82:24
**owns** [1] - 68:23

**P**

**p.m** [25] - 135:24,
136:11, 214:18, 215:4,
216:9, 216:14, 217:17,
217:18, 217:22, 217:24,
218:1, 218:2, 219:14,
222:3, 227:15, 227:18,
228:2, 228:13, 228:18,
232:2, 262:24
**PA-1** [1] - 189:18

**PA-2** [2] - 182:14,
182:15
**PA-3** [2] - 160:23, 187:4
**PA-4** [4] - 61:22, 62:1,
193:7, 194:17
**PA-5** [1] - 193:22
**PA-6** [4] - 190:9,
190:11, 190:13, 209:17
**pack** [4] - 164:4, 164:5,
165:5, 175:7
**package** [1] - 156:22
**packaged** [7] - 3:18,
155:6, 155:8, 155:9,
156:9, 162:13, 207:9
**packages** [1] - 192:1
**packaging** [4] - 162:3,
189:12, 189:15, 190:14
**packet** [1] - 214:10
**packing** [4] - 78:10,
78:17, 97:9, 97:11
**pads** [3] - 135:22,
208:8, 232:18
**Page** [21] - 28:5, 59:5,
59:14, 60:4, 65:12, 70:1,
71:11, 71:13, 72:3, 72:4,
75:12, 75:24, 78:5,
78:12, 83:6, 83:15,
114:8, 121:5, 128:7,
175:16
**page** [7] - 2:10, 2:15,
59:8, 71:11, 214:25,
217:24, 229:16
**PAGE** [1] - 263:3
**pager** [5] - 183:8,
183:11, 183:16, 197:22,
197:23
**pagers** [1] - 189:13
**pages** [5] - 210:10,
211:3, 234:13, 234:22,
264:7
**paid** [3] - 151:13,
151:17, 180:1
**pair** [1] - 190:10
**Palmere** [1] - 229:17
**Panasonic** [5] - 213:24,
214:2, 214:4, 214:8,
214:13
**pants** [1] - 206:12
**paperwork** [1] - 247:22
**Pardon** [2] - 36:17,
107:12
**parentheses** [1] - 218:3
**Park** [2] - 56:13, 56:21,
57:6, 57:10, 57:13, 60:1,
60:13, 61:2, 80:13,
108:9, 134:8, 134:10,
225:22, 226:18, 227:23,
227:25, 228:16, 243:9,
243:10, 245:8, 245:9,
245:13

parole [2] - 146:7,
174:18
**Parole** [1] - 247:1
**part** [27] - 14:19, 48:13,
56:13, 57:1, 57:2, 57:6,
57:10, 58:23, 60:2,
97:10, 103:19, 103:21,
117:20, 117:24, 122:21,
148:2, 148:12, 161:6,
162:10, 175:14, 211:15,
241:9, 241:10, 246:20,
246:25, 247:8, 253:3
**Part** [1] - 253:2
**participated** [1] -
221:19
**participating** [1] -
222:21
**particular** [28] - 7:9,
8:21, 43:13, 64:3, 64:14,
67:9, 67:14, 74:24, 77:4,
77:21, 80:19, 124:18,
142:23, 159:19, 180:7,
181:2, 182:25, 185:5,
187:21, 194:7, 195:9,
195:19, 214:15, 216:22,
230:22, 235:25, 250:15,
254:15
**particularly** [1] - 9:4
**Particularly** [1] - 199:19
**parties** [1] - 209:11
**party** [5] - 72:25, 102:1,
132:3, 132:10
**passenger** [2] - 229:24,
230:1
**passing** [1] - 24:7
**past** [6] - 7:12, 108:2,
122:16, 146:17, 170:17,
249:10
**patience** [1] - 137:16
**Patrolman** [1] - 183:7
**Paul** [1] - 1:19
**Pause** [10] - 5:25, 25:7,
34:13, 96:22, 119:2,
120:5, 195:2, 200:22,
225:7, 225:12
**pay** [5] - 133:9, 163:8,
183:9, 183:12, 193:10
**paying** [1] - 176:23
**Payments** [2] - 69:16,
69:17
**payments** [1] - 179:25
**Pendergast** [1] - 227:8
**pending** [1] - 244:13
**Pennsylvania** [31] -
16:2, 16:20, 17:4, 18:13,
61:6, 61:9, 61:12, 61:15,
88:20, 88:21, 133:6,
136:9, 138:11, 139:20,
140:11, 140:15, 143:16,
143:17, 143:22, 144:8,

145:15, 146:9, 147:25,
148:21, 158:24, 178:21,
179:6, 190:24, 209:10,
244:21
**people** [43] - 7:10, 9:21,
20:16, 21:2, 52:16,
65:17, 79:25, 81:12,
87:5, 96:24, 97:2, 99:18,
111:5, 116:11, 117:7,
121:25, 124:15, 124:16,
136:8, 141:18, 144:9,
148:16, 149:4, 149:14,
152:10, 152:11, 152:14,
152:15, 158:20, 158:24,
159:18, 161:6, 164:2,
165:1, 180:18, 186:23,
197:2, 201:11, 222:17,
225:20, 226:4, 245:15,
259:1
**Perfectly** [1] - 79:10
**perfectly** [6] - 4:21,
4:24, 6:5, 6:10, 41:7,
236:12
**perhaps** [7] - 9:21,
39:8, 41:8, 228:4, 232:2,
236:17, 238:19
**Perhaps** [1] - 38:21
**period** [17] - 56:7, 63:2,
63:4, 78:17, 102:6,
102:19, 104:8, 104:16,
105:6, 109:14, 113:17,
118:8, 134:13, 186:23,
221:9, 224:16
**periods** [2] - 102:7,
116:8
**perjury** [1] - 115:3
**permission** [4] - 7:23,
9:1, 17:21, 114:12
**permit** [5] - 34:6, 35:12,
38:5, 39:5, 248:12
**permitted** [5] - 21:12,
37:17, 41:15, 247:19,
248:9
**person** [30] - 9:23,
22:19, 22:22, 24:1,
32:24, 38:19, 38:23,
38:24, 53:1, 62:24,
74:12, 75:4, 93:23,
105:10, 105:13, 108:23,
111:4, 112:10, 134:3,
140:1, 141:21, 142:23,
153:4, 159:1, 179:24,
182:14, 189:19, 197:19,
221:1, 255:10
**personally** [11] - 21:16,
82:9, 123:17, 123:19,
132:9, 174:2, 174:4,
176:10, 180:3, 209:23,
245:11
**persons** [4] - 6:20,

38:20, 38:24, 201:8
**perspective** [2] - 18:16, 32:4
**Pete** [7] - 79:22, 79:23, 79:25, 80:2, 80:3, 80:5, 80:10
**phase** [1] - 26:3
**Philadelphia** [2] - 180:16, 180:24
**phone** [83] - 23:21, 23:22, 23:24, 23:25, 26:24, 64:3, 64:5, 64:7, 64:8, 64:9, 64:11, 64:19, 64:20, 64:21, 64:23, 64:24, 64:25, 65:1, 65:2, 65:4, 65:14, 65:23, 66:2, 66:4, 66:6, 66:8, 66:13, 66:15, 66:20, 66:21, 66:23, 66:24, 67:3, 67:6, 67:11, 67:14, 67:23, 67:24, 68:1, 68:7, 69:13, 70:15, 70:16, 71:17, 71:21, 71:22, 72:8, 72:9, 72:10, 72:11, 72:21, 78:14, 86:21, 149:20, 149:22, 183:8, 183:10, 183:11, 183:12, 183:13, 183:16, 197:22, 197:23, 214:21, 214:22, 214:23, 215:3, 215:14, 216:4, 218:12, 218:19, 218:21, 220:5, 220:6, 220:7, 220:8, 220:12, 246:18, 246:20, 246:22
**phones** [3] - 65:17, 189:12, 215:16
**phonetic** [1] - 223:12
**photo** [6] - 236:10, 236:11, 236:12, 238:2, 238:6
**photo's** [1] - 189:23
**photocopies** [1] - 5:15
**photocopy** [2] - 61:22, 61:23
**photograph** [17] - 142:12, 189:19, 214:7, 216:18, 216:21, 223:7, 223:9, 223:12, 225:9, 234:6, 235:19, 237:13, 237:23, 238:5, 238:13, 239:12
**photographs** [26] - 4:4, 4:9, 4:10, 4:11, 4:14, 4:21, 5:5, 5:19, 5:23, 6:8, 6:13, 6:14, 6:18, 6:20, 187:8, 214:3, 214:6, 214:10, 215:7, 237:15, 238:1, 238:4, 238:10, 238:17, 239:7, 239:10

**Photographs** [1] - 234:19
**photos** [9] - 4:6, 5:11, 5:13, 7:7, 7:8, 7:10, 7:13
**pick** [2] - 232:10, 241:6
**picked** [4] - 75:3, 76:2, 76:9, 123:25
**picking** [2] - 47:3, 110:12
**picks** [1] - 121:8
**picture** [7] - 182:15, 223:18, 233:20, 233:24, 235:16, 237:20, 237:21
**pictures** [4] - 214:16, 233:23, 235:25, 237:19
**pieces** [8] - 120:19, 192:6, 211:17, 211:18, 211:22, 211:23, 212:1
**pink** [1] - 220:20
**Place** [5] - 221:21, 222:3, 222:6, 223:10, 238:7
**place** [17] - 31:8, 33:6, 73:1, 107:9, 150:18, 155:6, 159:12, 160:5, 164:7, 164:8, 165:12, 183:22, 200:18, 236:9, 236:12, 247:1, 257:17
**placed** [6] - 42:18, 209:16, 214:4, 214:20, 214:22, 215:8
**placing** [1] - 235:14
**plan** [3] - 10:1, 165:20, 260:25
**plans** [1] - 42:6
**plastic** [6] - 156:22, 156:23, 184:17, 210:13, 211:16, 211:25
**play** [13] - 11:20, 12:6, 13:16, 14:17, 19:5, 30:17, 36:16, 36:20, 50:22, 50:25, 95:23, 110:21, 198:24
**Play** [1] - 78:25
**played** [19] - 9:21, 12:1, 22:8, 27:22, 30:17, 95:8, 108:11, 108:12, 108:14, 108:17, 108:18, 108:21, 108:23, 109:2, 110:14, 110:25, 111:8, 128:11, 130:24
**playing** [3] - 36:21, 78:25, 131:3
**pleasantries** [1] - 154:15
**pleased** [1] - 207:6
**pocket** [5] - 206:11, 206:12, 213:18, 213:22, 213:23
**point** [43] - 6:8, 7:9, 8:1,

18:25, 31:13, 42:8, 49:25, 51:3, 53:4, 53:11, 61:8, 71:17, 73:12, 76:14, 78:21, 79:13, 81:12, 81:16, 82:5, 84:6, 87:5, 129:1, 143:15, 144:11, 145:3, 164:2, 166:11, 182:11, 184:8, 187:19, 187:24, 199:5, 223:1, 237:25, 239:8, 248:14, 253:9, 254:11, 254:24, 255:6, 258:1, 258:19, 259:10
**Point** [1] - 2:25
**pointed** [1] - 31:9
**pointing** [2] - 211:3, 256:5
**points** [5] - 84:16, 122:18, 124:9, 259:1, 259:2
**Poland** [1] - 243:13
**Police** [6] - 179:5, 179:7, 190:24, 191:5, 209:9, 215:25
**police** [32] - 79:14, 79:19, 81:4, 81:5, 81:13, 81:23, 83:8, 83:20, 143:24, 144:11, 150:1, 165:21, 167:6, 167:16, 168:2, 168:9, 171:3, 171:12, 175:21, 175:25, 176:2, 181:22, 182:25, 183:3, 184:18, 186:2, 187:8, 187:19, 211:9, 226:9, 237:13, 240:15
**Polish** [1] - 243:6
**poor** [1] - 38:19
**Poplar** [1] - 91:24
**popular** [1] - 107:4
**portion** [1] - 28:3
**portions** [1] - 39:2
**poses** [1] - 260:8
**position** [6] - 35:21, 38:13, 143:15, 148:11, 148:17, 248:8
**positive** [3] - 34:16, 133:14, 184:21
**Possess** [1] - 174:12
**possession** [2] - 171:9, 207:18
**possibility** [2] - 47:20, 224:5
**possible** [4] - 2:5, 147:6, 234:11, 235:2
**postpone** [1] - 248:7
**potential** [1] - 234:23
**powder** [1] - 162:18
**Power** [1] - 2:25
**practical** [1] - 236:17
**practice** [1] - 89:9,

240:3
**preceded** [1] - 253:7
**preclude** [1] - 239:18
**precluded** [1] - 257:11
**prediction** [1] - 262:4
**prefer** [5] - 26:2, 40:20, 198:18, 198:21, 257:4
**prejudice** [1] - 234:7, 260:3
**prejudicial** [2] - 234:2, 253:11
**preliminary** [1] - 260:10
**premise** [1] - 237:22
**preparation** [1] - 43:11
**prepare** [1] - 211:15
**prepared** [7] - 33:8, 35:25, 199:8, 210:6, 220:13, 220:14, 255:1
**presence** [2] - 38:3, 43:8
**present** [7] - 41:11, 41:25, 72:25, 76:18, 79:13, 111:3, 150:23
**presentation** [2] - 5:20, 238:16
**presenter** [1] - 233:21
**preset** [1] - 64:12
**pressed** [1] - 259:20
**Pretty** [1] - 51:15, 195:6, 205:23
**pretty** [5] - 93:21, 94:6, 105:3, 109:16, 215:6
**previous** [5] - 8:6, 175:19, 176:1, 216:3, 216:5
**PREVIOUSLY** [1] - 213:3
**previously** [3] - 182:5, 196:9, 216:12
**price** [5] - 151:20, 153:2, 153:3, 206:19, 207:9
**prices** [2] - 163:16
**prima** [1] - 33:3
**primarily** [1] - 246:25
**primary** [1] - 196:6
**prison** [1] - 140:17
**probation** [3] - 146:7, 170:24, 176:1
**Probation** [1] - 247:2
**probative** [6] - 233:25, 234:2, 253:10, 254:12, 259:22, 260:2
**problem** [13] - 5:22, 6:3, 10:14, 14:1, 180:21, 241:14, 247:10, 248:8, 248:12, 249:12, 249:14, 258:25
**problems** [2] - 74:7, 238:11

**proceed** [5] - 2:2, 19:11, 43:21, 136:13, 179:22
**proceeded** [1] - 223:1
**proceeding** [2] - 115:24, 127:19
**Proceedings** [2] - 2:1, 262:24
**proceedings** [13] - 5:25, 25:7, 34:13, 41:14, 96:22, 119:2, 120:5, 195:2, 200:22, 225:7, 225:12, 264:4, 264:8
**process** [2] - 127:9, 162:4
**processed** [2] - 190:7, 218:20
**produce** [3] - 93:8, 119:7, 241:2
**product** [1] - 152:19
**professional** [1] - 17:7
**proffer** [4] - 31:4, 33:9, 37:4, 37:5
**proffered** [1] - 33:5
**profound** [2] - 254:21, 254:23
**progress** [1] - 217:12
**prohibit** [1] - 18:4
**projected** [1] - 262:14
**projectiles** [1] - 252:22
**promise** [1] - 146:25
**promised** [2] - 137:21, 146:11, 146:15
**promises** [1] - 144:12
**promoted** [1] - 92:9
**prompted** [1] - 37:6
**promptly** [2] - 231:14, 232:22
**pronounce** [2] - 106:22, 167:2
**proof** [1] - 91:18
**property** [1] - 3:20
**propose** [2] - 247:18, 256:2
**proposed** [1] - 8:20
**proposes** [2] - 239:23, 248:10
**proposition** [2] - 37:24, 38:2
**prosecuted** [2] - 115:2, 145:22
**prosecutor** [3] - 59:15, 97:9, 132:16
**prosecutors** [7] - 20:18, 21:1, 21:16, 21:17, 94:15, 130:4, 144:11
**protected** [1] - 41:22
**protection** [1] - 114:3
**prove** [1] - 37:11
**provided** [7] - 12:13,

144:20, 148:16, 234:14, 236:3, 236:6, 252:11
**providing** [4] - 143:16, 143:20, 144:4, 145:8
**Public** [1] - 140:24
**pull** [2] - 14:12, 210:5
**pulled** [2] - 150:15, 155:16
**purchase** [17] - 149:23, 150:1, 151:23, 158:24, 159:20, 162:21, 165:11, 182:10, 182:12, 183:15, 183:21, 183:22, 195:16, 195:20, 201:19, 201:24, 202:20
**purchased** [3] - 180:18, 192:19, 197:1
**purchasing** [1] - 202:23
**purported** [1] - 38:16
**purpose** [4] - 150:6, 157:8, 181:24, 243:21
**purposes** [1] - 67:2
**pursuant** [1] - 46:25
**pursued** [1] - 225:3
**put** [43] - 3:19, 3:21, 11:16, 17:22, 18:3, 18:4, 18:9, 18:18, 34:18, 38:22, 59:1, 60:5, 60:15, 65:6, 72:3, 74:19, 74:22, 74:24, 75:18, 83:4, 83:23, 90:16, 90:18, 114:12, 124:9, 128:8, 148:11, 161:21, 175:23, 176:15, 192:21, 211:12, 237:19, 237:20, 238:5, 238:11, 238:17, 242:3, 248:14, 249:2, 252:5, 255:3, 257:9
**Put** [2] - 18:8
**puts** [2] - 31:19, 35:4
**putting** [7] - 18:5, 36:5, 59:7, 59:8, 78:6, 162:4, 254:18
**Pyne** [4] - 1:21, 100:14, 100:16, 109:23

## Q

**quality** [7] - 36:8, 36:15, 38:14, 38:19, 106:24, 246:19
**quantities** [2] - 173:8, 173:21
**quantity** [1] - 207:8
**quarters** [2] - 262:10, 262:13
**questioned** [1] - 39:13
**questioning** [3] - 4:12, 29:17, 249:8

**questions** [51] - 7:1, 7:2, 7:4, 20:3, 26:3, 39:16, 47:22, 47:25, 48:25, 55:9, 58:17, 59:4, 59:25, 62:4, 75:15, 85:16, 114:10, 114:22, 115:17, 116:18, 120:11, 121:21, 122:17, 122:20, 123:12, 125:16, 126:2, 127:9, 127:14, 128:9, 128:10, 128:11, 134:3, 134:6, 134:24, 136:20, 144:19, 175:9, 175:12, 175:13, 193:3, 194:21, 206:13, 207:20, 212:20, 212:21, 225:5, 225:13, 226:21, 229:2, 231:2
**quick** [2] - 65:8, 207:24
**quicker** [1] - 17:22
**quickly** [3] - 7:23, 230:3, 236:20
**Quite** [1] - 29:1
**quite** [9] - 8:23, 10:5, 13:22, 52:22, 85:23, 116:22, 118:16, 216:24, 219:4

## R

**R-A-H** [1] - 216:9
**R-E-E** [1] - 262:2
**racketeering** [2] - 118:3, 259:24
**radio** [3] - 92:25, 93:1, 93:5
**Raeshio** [4] - 97:6, 229:21, 229:25
**RAH** [1] - 216:23
**Rahim** [2] - 216:25, 217:8
**Rahman** [4] - 131:24, 132:1, 132:2, 219:25
**Rahman's** [1] - 245:22
**raid** [1] - 244:5
**railroad** [1] - 6:14
**Raise** [1] - 137:22
**raise** [4] - 7:9, 7:22, 93:24, 117:1
**raised** [4] - 86:9, 196:10, 234:11, 257:25
**raises** [2] - 251:13, 251:25
**raising** [5] - 10:1, 56:2, 86:7, 104:15, 141:1
**Randallstown** [14] - 44:25, 45:1, 48:10, 101:4, 101:5, 101:11, 101:16, 101:20, 103:11, 105:25, 108:2, 116:6,

116:14, 126:18
**Randallstown/Park** [3] - 225:21, 225:22, 225:24
**rap** [26] - 24:19, 24:23, 26:15, 30:9, 38:1, 54:2, 54:9, 54:24, 56:22, 56:23, 90:10, 92:4, 92:9, 92:11, 93:15, 118:9, 118:18, 118:19, 118:24, 119:3, 131:17, 134:17
**rapidly** [1] - 34:21
**rappers** [3] - 54:22, 90:3, 104:22
**raps** [1] - 124:14
**rarely** [1] - 102:21
**rate** [1] - 205:7
**rather** [4] - 2:5, 17:23, 48:4, 64:25
**re** [7] - 186:21, 186:24, 210:18, 210:24, 211:4, 212:9, 212:19
**re-analysis** [1] - 211:4
**re-analyze** [2] - 210:18, 212:9
**re-grouped** [2] - 186:21, 186:24
**re-weighed** [1] - 210:24
**re-weighing** [1] - 212:15
**reached** [1] - 209:11
**reaction** [1] - 184:21
**read** [12] - 17:23, 75:22, 84:4, 121:14, 128:24, 168:6, 175:14, 175:15, 219:3, 220:16, 220:20, 227:12
**readily** [1] - 29:22
**readiness** [1] - 39:22
**Ready** [1] - 136:13
**ready** [6] - 2:2, 8:18, 43:10, 76:24, 77:11, 241:4
**real** [4] - 76:5, 104:21, 258:25
**Real** [1] - 206:1
**realize** [2] - 2:20, 121:9
**really** [19] - 3:17, 3:23, 7:8, 14:24, 23:10, 24:7, 36:8, 36:10, 89:15, 91:20, 191:7, 217:11, 232:10, 238:23, 241:15, 241:25, 242:22, 257:8
**rear** [2] - 213:18, 213:22
**Rear** [1] - 213:23
**reason** [10] - 8:24, 37:9, 80:16, 121:7, 124:3, 191:18, 200:8, 241:9, 241:23, 254:15
**reasonable** [2] - 8:21, 236:12

**reasonably** [1] - 252:9
**reasons** [4] - 2:3, 43:12, 82:24, 163:15
**rebuttal** [1] - 31:5
**recall.I'm** [1] - 32:11
**recalled** [2] - 97:14, 130:19
**recalling** [2] - 10:3, 13:16
**receipt** [2] - 62:2, 63:7
**receive** [1] - 204:10
**received** [18] - 16:19, 51:1, 99:25, 128:12, 183:12, 205:3, 205:5, 215:1, 215:8, 216:2, 216:3, 216:8, 216:11, 216:14, 218:19, 219:5, 251:7, 252:1
**receiver** [1] - 62:20, 193:8
**receiving** [3] - 146:2, 146:3, 229:11
**recent** [2] - 140:17, 145:7, 224:6
**recently** [6] - 106:19, 140:14, 216:8, 219:13, 224:14, 224:15
**recess** [2] - 40:13, 40:18, 40:20, 41:1, 41:20, 41:23, 103:3, 135:8, 136:10, 136:12, 208:5, 208:6, 208:7, 208:10, 231:18, 231:19, 231:20, 231:24, 232:1, 237:3, 262:23
**Recess** [2] - 41:24, 208:11
**recipient** [1] - 193:23
**recognize** [19] - 22:4, 22:16, 22:17, 25:22, 36:10, 36:13, 36:14, 67:23, 68:18, 69:5, 69:12, 69:20, 71:4, 95:17, 111:1, 126:15, 128:1, 171:18, 209:22
**recognized** [7] - 21:1, 21:14, 25:15, 111:9, 127:13, 127:17, 127:24
**recollect** [4] - 66:6, 77:24, 126:7, 164:16
**recollection** [12] - 28:12, 65:2, 66:17, 69:22, 70:5, 70:13, 71:12, 71:21, 72:20, 180:1, 205:8, 251:6
**record** [20] - 16:15, 18:18, 19:19, 19:22, 23:5, 37:3, 44:6, 54:11, 54:12, 67:14, 90:15, 138:2, 139:8, 176:15,

178:14, 209:1, 213:6, 215:13, 222:5, 233:2
**Recorded** [1] - 206:8
**recorded** [9] - 210:25, 211:12, 218:12, 218:22, 219:12, 227:10, 241:15, 246:18, 264:3
**recording** [3] - 111:12, 128:14, 246:11
**recordings** [1] - 246:13
**records** [10] - 66:20, 66:21, 66:23, 66:24, 67:3, 67:6, 67:9, 67:10, 67:24, 230:13
**recover** [6] - 188:1, 188:17, 193:4, 207:13, 207:14, 207:15
**recovered** [13] - 188:5, 188:7, 189:8, 191:21, 213:13, 213:18, 213:24, 215:25, 223:9, 255:22, 257:14, 258:5, 258:7
**recovery** [2] - 255:13, 257:1, 257:17
**RECROSS** [9] - 30:6, 129:20, 133:18, 229:3, 263:7, 263:11, 263:12, 263:15, 263:22
**recruiting** [1] - 241:11
**recuperating** [2] - 76:15, 85:3
**red** [1] - 220:20
**REDIRECT** [13] - 29:13, 120:8, 175:10, 177:16, 206:14, 226:25, 230:5, 263:6, 263:11, 263:14, 263:17, 263:21, 263:22
**redirect** [1] - 42:11
**refer** [4] - 45:23, 59:5, 124:23, 125:14, 211:9, 217:5
**reference** [7] - 59:2, 72:9, 124:20, 125:2, 222:19, 229:14, 250:11
**referenced** [1] - 12:19
**references** [1] - 125:12
**Referencing** [2] - 59:14, 75:12
**referencing** [1] - 65:11
**referred** [6] - 7:6, 12:21, 60:25, 156:14, 188:19
**referring** [4] - 24:16, 114:8, 234:18, 235:3
**Referring** [1] - 128:7
**refresh** [1] - 28:12
**refreshed** [1] - 97:10
**refreshes** [2] - 70:4, 71:12
**regard** [4] - 6:6, 6:12, 14:18, 31:11

**regarding** [1] - 32:5
**regardless** [1] - 63:3
**Registered** [1] - 49:5
**registrations** [1] - 228:24
**regular** [1] - 232:12
**rehash** [1] - 169:14
**relate** [1] - 8:9
**related** [6] - 74:23, 122:12, 144:19, 224:8, 250:10, 251:10
**relates** [1] - 9:8
**relating** [2] - 16:8, 250:5
**relationship** [7] - 46:5, 48:8, 51:11, 52:19, 122:17, 122:22, 157:4
**relay** [1] - 201:1
**release** [1] - 140:17
**released** [1] - 104:4
**relevant** [2] - 252:11, 253:8
**reliability** [1] - 37:16
**reliable** [2] - 39:1, 39:4
**rely** [5] - 10:16, 37:4, 136:5, 236:8, 241:7
**remain** [1] - 115:12
**remained** [1] - 52:4
**remaining** [2] - 33:15, 56:7
**remains** [2] - 10:11, 239:13
**remember** [75] - 4:11, 6:24, 9:2, 20:8, 20:11, 21:2, 42:20, 49:14, 49:15, 49:18, 50:9, 54:4, 54:14, 55:21, 55:23, 55:24, 57:3, 60:4, 64:2, 64:4, 65:22, 66:8, 66:10, 66:11, 70:23, 70:25, 74:18, 74:21, 75:1, 77:1, 77:23, 78:1, 78:3, 82:12, 82:25, 86:23, 86:24, 93:3, 93:10, 106:16, 108:17, 111:6, 111:10, 111:11, 111:13, 113:11, 119:21, 122:23, 123:3, 124:24, 125:19, 126:9, 128:18, 129:22, 130:21, 133:24, 134:8, 150:24, 150:25, 151:18, 153:13, 154:13, 160:16, 160:17, 162:9, 164:9, 165:3, 167:17, 203:25, 216:24, 233:7, 239:16, 244:4, 255:25
**remind** [8] - 3:14, 4:8, 5:2, 135:9, 135:12, 135:15, 135:20, 239:15
**reminded** [1] - 234:7

**remove** [4] - 4:11, 5:2, 225:9, 239:15
**reorganize** [1] - 238:17
**repeat** [3] - 83:19, 152:12, 169:9
**Rephrase** [3] - 170:5, 202:18, 207:1
**rephrase** [3] - 138:20, 152:13, 155:13
**report** [25] - 17:23, 191:1, 191:4, 191:10, 191:16, 191:18, 192:4, 192:7, 192:16, 192:17, 192:18, 192:19, 192:24, 210:6, 210:25, 211:12, 211:13, 211:16, 211:21, 212:17, 227:12, 229:9, 229:15, 252:12
**Reported** [1] - 1:23
**reporter** [2] - 77:9, 139:8
**Reporter** [1] - 264:16
**reporter's** [1] - 128:17
**REPORTER'S** [1] - 264:1
**reports** [8] - 240:25, 241:1, 241:4, 241:13, 250:10, 251:8, 252:1, 252:12
**represent** [7] - 25:13, 27:13, 28:21, 98:3, 100:14, 113:22, 113:25
**representation** [1] - 16:18
**represented** [2] - 120:23, 120:24
**representing** [1] - 85:15
**reputation** [1] - 245:8
**request** [6] - 7:13, 7:18, 8:21, 147:5, 224:25, 234:25
**requested** [1] - 16:2
**requests** [2] - 2:4, 246:15
**require** [3] - 12:4, 33:7, 248:22
**Research** [1] - 69:18
**research** [1] - 228:24
**reside** [2] - 77:18, 145:4
**resided** [1] - 222:12
**residence** [17] - 63:15, 63:17, 63:18, 77:1, 160:18, 183:23, 184:4, 184:10, 184:11, 186:19, 186:23, 186:24, 187:1, 190:20, 194:15, 221:22, 221:23
**resident** [1] - 49:3
**residing** [4] - 56:2, 77:15, 121:22, 183:23

**resolve** [1] - 251:14
**resolved** [1] - 258:10
**respect** [15] - 6:4, 8:22, 13:19, 17:14, 38:14, 73:20, 105:9, 111:14, 116:4, 134:21, 146:8, 146:11, 251:21, 257:22, 259:23
**respectful** [1] - 107:7
**responded** [1] - 121:12
**responding** [2] - 4:22, 4:23
**response** [5] - 116:17, 120:25, 160:1, 240:19, 240:20
**responsibility** [1] - 13:18
**rest** [2] - 175:15, 223:2
**result** [6] - 32:17, 74:8, 74:10, 174:21, 212:12, 254:25
**resulted** [2] - 18:1, 251:5
**results** [2] - 208:15, 241:18
**retested** [3] - 192:1, 192:10, 192:11
**retrieve** [1] - 117:9
**return** [4] - 53:9, 212:25, 221:5, 225:2
**returned** [6] - 47:16, 53:12, 125:16, 125:19, 125:25
**Reverend** [1] - 230:18
**reverse** [2] - 217:17, 222:2
**review** [2] - 7:13, 235:25
**reviewed** [1] - 120:20
**revolver** [3] - 82:13, 164:17, 164:20
**Rhode** [2] - 50:11, 102:15
**RHODES** [40] - 14:13, 15:3, 15:7, 15:18, 15:22, 18:22, 25:10, 29:6, 29:9, 30:4, 30:7, 47:12, 49:12, 62:6, 62:14, 62:16, 85:12, 94:21, 94:23, 95:1, 95:25, 129:21, 132:15, 233:8, 234:10, 234:19, 235:1, 235:9, 235:15, 235:20, 236:4, 236:13, 236:17, 237:1, 237:7, 237:11, 263:4, 263:7, 263:9, 263:11
**Rhodes** [13] - 1:17, 14:16, 15:2, 15:21, 18:21, 18:24, 25:13, 85:15, 100:14, 108:11,

121:21, 129:18, 233:3
**Rhodes's** [1] - 29:15
**Rice** [12] - 97:2, 97:4, 97:6, 226:6, 229:7, 229:12, 229:21, 229:22, 229:24, 229:25, 230:1
**Richard** [1] - 261:8
**RICO** [1] - 117:25
**right-hand** [1] - 211:13
**rights** [3] - 120:11, 120:15, 120:16
**ring** [1] - 93:6
**Rob** [2] - 59:16, 217:22
**robbery** [3] - 123:8, 123:9, 251:19
**Robert** [1] - 1:16
**Roc** [1] - 54:2
**Rochelle** [2] - 68:4, 68:7
**Rock** [23] - 22:9, 22:20, 24:15, 24:18, 25:18, 26:9, 27:4, 27:7, 28:1, 39:17, 95:16, 96:4, 104:21, 104:25, 110:25, 111:2, 125:13, 125:14, 127:16, 129:3, 129:10, 131:25
**rock** [8] - 192:5, 192:6, 211:16, 211:18, 211:22, 211:23, 212:1
**Rock's** [7] - 28:8, 36:5, 39:19, 110:23, 128:1, 128:20, 133:23
**rock-like** [5] - 192:5, 192:6, 211:16, 211:22, 212:1
**rocks** [2] - 156:10, 188:23
**RONALD** [2] - 213:3, 263:20
**Ronald** [1] - 213:7
**Room** [1] - 1:24
**room** [13] - 13:8, 20:15, 109:3, 110:22, 161:8, 161:9, 161:15, 162:11, 164:10, 231:25, 232:22, 246:2, 247:6
**roughly** [4] - 5:9, 101:14, 135:20, 262:20
**Roughly** [3] - 262:17, 262:19, 262:20
**round** [1] - 147:4
**RPR** [1] - 1:24
**rule** [1] - 38:15
**ruling** [6] - 36:1, 36:2, 39:21, 254:1, 256:23, 259:17
**rumor** [1] - 90:24
**rumors** [2] - 87:8, 87:15, 96:23

**run** [2] - 217:14, 247:2
**running** [1] - 238:13

**S**

**S-M-I-T-H** [2] - 19:24, 44:8
**sad** [1] - 94:12
**Sadly** [1] - 233:11
**safe** [3] - 137:21, 188:18, 212:24
**safety** [4] - 196:4, 248:3, 248:4
**sale** [1] - 149:12
**sales** [1] - 228:24
**salient** [1] - 254:21
**salon** [4] - 68:21, 68:23, 68:24, 69:1
**Sands** [4] - 74:4, 105:11, 105:16, 105:18
**sandwich** [1] - 177:11
**Saratoga** [2] - 228:2, 228:8
**satisfied** [3] - 37:2, 37:12, 37:14
**satisfy** [2] - 14:18, 248:17
**save** [1] - 3:23
**saves** [1] - 234:21
**saw** [27] - 4:3, 82:15, 90:7, 102:21, 104:25, 132:8, 132:9, 153:9, 154:20, 175:1, 196:9, 200:14, 200:23, 201:12, 201:13, 204:23, 205:1, 205:2, 205:5, 205:6, 205:7, 205:10, 205:11, 205:14, 226:11, 227:11
**scales** [1] - 189:13
**scare** [1] - 143:10
**scenarios** [1] - 221:14
**scene** [11] - 4:16, 6:18, 7:7, 216:1, 218:20, 218:24, 219:11, 250:21, 251:2, 255:14, 257:11
**Schedule** [1] - 18:2
**schedule** [7] - 43:13, 43:14, 135:21, 232:13, 262:6, 262:7, 262:14
**scholarship** [1] - 51:1
**scholarships** [1] - 102:17
**school** [30] - 44:22, 44:24, 45:3, 45:5, 45:15, 48:10, 49:24, 50:19, 50:20, 50:23, 51:5, 51:24, 52:14, 52:15, 52:16, 52:17, 52:20, 55:3, 55:11, 80:3, 91:11,

101:3, 101:6, 101:10, 102:2, 102:8, 119:19, 138:14, 138:15, 143:8
**School** [22] - 49:2, 49:8, 49:11, 49:20, 50:2, 51:2, 53:12, 53:13, 53:16, 53:22, 55:12, 101:17, 104:18, 104:25, 116:6, 116:15, 122:23, 123:2, 123:6, 123:10, 138:16, 251:18
**scientist** [1] - 209:9
**scissors** [1] - 190:10
**Scoot** [2] - 19:18, 208:25
**scope** [1] - 129:19
**scramble** [1] - 249:16
**screen** [24] - 3:21, 59:9, 59:10, 60:5, 60:6, 65:7, 65:8, 72:5, 75:13, 78:6, 83:5, 128:8, 142:9, 148:22, 175:17, 210:4, 214:16, 216:18, 237:19, 237:21, 237:24, 238:6, 238:11, 238:18
**scrounging** [1] - 247:14
**sealed** [1] - 16:3
**sealing** [1] - 210:2
**search** [24] - 81:17, 81:21, 182:24, 183:2, 186:2, 186:3, 186:9, 190:6, 191:21, 192:22, 194:16, 196:3, 197:18, 199:8, 199:20, 199:23, 200:16, 200:17, 207:12, 215:24, 221:18, 221:19, 221:24, 223:9
**searched** [7] - 160:8, 160:9, 165:10, 165:17, 165:20, 183:7, 184:22
**Seasons** [2] - 92:18, 92:20
**seat** [6] - 15:12, 81:24, 82:1, 213:18, 213:22, 213:23
**seated** [10] - 19:18, 42:25, 44:5, 45:8, 114:9, 136:16, 137:15, 137:25, 208:18, 208:25
**secluded** [1] - 6:9
**second** [25] - 7:1, 14:6, 14:12, 20:12, 28:6, 49:7, 49:10, 49:11, 49:16, 49:20, 50:2, 93:18, 112:2, 123:2, 130:18, 158:24, 181:17, 188:25, 189:1, 191:10, 192:17, 198:9, 210:25, 212:6, 251:10
**Secondly** [1] - 238:14

**secret** [1] - 238:3
**section** [1] - 126:18
**Section** [1] - 229:18
**secured** [2] - 187:1, 200:18
**security** [1] - 247:25
**see** [109] - 6:3, 9:13, 18:9, 24:6, 28:7, 29:11, 34:7, 34:8, 40:5, 52:7, 59:9, 59:19, 60:6, 61:25, 62:25, 63:1, 63:10, 65:8, 67:4, 67:15, 67:21, 68:16, 69:3, 71:2, 72:4, 73:8, 75:13, 81:10, 81:21, 81:23, 83:9, 83:21, 84:12, 86:21, 88:4, 95:10, 98:5, 98:10, 100:4, 101:23, 101:25, 103:25, 104:9, 104:11, 107:16, 108:8, 116:2, 117:16, 127:1, 130:12, 131:3, 137:20, 142:9, 147:6, 160:18, 161:15, 163:22, 163:25, 164:8, 166:21, 174:8, 175:17, 186:1, 189:16, 192:1, 192:17, 194:17, 195:20, 195:22, 196:15, 209:17, 210:5, 214:18, 215:1, 215:4, 215:12, 216:9, 216:13, 216:17, 217:25, 218:7, 218:16, 218:23, 219:15, 221:1, 224:3, 231:21, 232:21, 232:25, 234:6, 234:15, 234:16, 236:2, 236:16, 238:11, 242:13, 247:6, 248:7, 248:11, 248:12, 253:19, 254:11, 256:13, 256:14, 257:7, 257:12, 257:13, 257:18, 259:20
**seeing** [5] - 5:18, 5:19, 63:3, 232:11, 243:21
**seek** [2] - 35:3, 35:5
**seem** [2] - 38:1, 150:3
**seeming** [1] - 233:5
**seemingly** [1] - 37:23
**seized** [2] - 190:20, 234:15
**seizure** [5] - 18:1, 215:24, 223:10, 255:12
**sell** [14] - 119:9, 139:17, 139:19, 141:14, 141:17, 151:18, 152:18, 152:19, 153:2, 171:11, 171:13, 172:19, 198:21
**Selling** [1] - 157:11
**selling** [5] - 57:19, 57:22, 57:24, 138:23, 139:12, 139:15, 139:22,

140:6, 151:16, 153:4, 163:6, 182:5
**semiautomatic** [1] - 164:21
**Semiautomatic** [1] - 82:13
**send** [5] - 8:18, 133:5, 175:6, 187:24, 197:21
**sender** [4] - 62:23, 193:15, 194:2
**sender's** [1] - 63:9
**sending** [1] - 62:12
**senior** [2] - 101:6, 101:8
**sense** [4] - 14:23, 47:23, 164:24, 170:13
**sensitive** [3] - 4:4, 6:21, 233:18
**sensitivity** [1] - 234:9
**sent** [12] - 62:24, 175:6, 190:8, 190:14, 192:25, 198:15, 198:17, 203:8, 240:19, 240:21, 242:10, 246:16
**sentence** [4] - 9:18, 140:18, 182:7, 182:8
**sentenced** [3] - 159:22, 170:15, 182:6
**separate** [5] - 111:20, 192:19, 253:22, 254:7, 260:4
**separately** [2] - 121:23, 156:12
**separating** [1] - 123:13
**September** [3] - 1:11, 47:8, 264:5
**sequence** [1] - 214:7
**Sergeant** [1] - 229:17
**serial** [1] - 206:8
**series** [3] - 58:17, 75:15, 121:21
**served** [2] - 145:24, 244:15
**services** [1] - 179:25
**Services** [3] - 55:15, 55:16, 190:24
**serving** [2] - 174:17, 182:7
**session** [7] - 135:12, 135:17, 135:18, 135:19, 232:4, 232:5, 232:6
**set** [6] - 149:17, 184:4, 238:19, 239:1, 260:8
**setup** [1] - 6:9
**seven** [5] - 8:25, 17:5, 202:10, 223:16, 228:4
**several** [13] - 66:9, 179:19, 185:21, 196:13, 196:24, 197:1, 199:25, 200:17, 210:9, 218:23, 220:15, 226:11, 246:18

**Several** [1] - 196:14
**shaded** [1] - 39:8
**Shake** [2] - 119:4, 124:8
**Shakedown** [3] - 54:15, 54:16, 54:20
**Shalee** [1] - 223:15
**share** [1] - 46:17
**sharing** [1] - 145:16
**Sharmeka** [64] - 141:21, 141:23, 142:3, 142:13, 142:14, 148:21, 150:5, 151:1, 152:3, 153:9, 153:14, 154:5, 154:17, 155:12, 155:16, 155:21, 155:23, 157:3, 157:13, 157:25, 158:1, 159:2, 159:21, 159:24, 160:13, 160:19, 160:20, 161:3, 161:10, 162:23, 163:20, 163:21, 163:22, 172:10, 172:13, 176:5, 176:22, 182:2, 182:3, 182:4, 182:18, 182:20, 183:8, 183:17, 183:23, 185:7, 185:8, 185:13, 185:14, 185:16, 187:3, 187:17, 188:8, 194:3, 199:14, 204:2, 204:5, 204:9, 204:10, 204:19, 204:21, 206:10, 207:19
**Sharmeka's** [1] - 160:22
**SHAWN** [1] - 1:8
**Shawn** [9] - 28:21, 51:4, 51:5, 51:6, 51:13, 119:11, 119:15, 158:9, 172:7
**sheet** [1] - 218:6
**Sheets** [4] - 150:9, 150:14, 150:18, 195:8
**Sheistyville** [2] - 54:21, 166:23
**shell** [2] - 252:21, 255:13
**Shelly** [4] - 27:13, 51:19, 100:14, 172:5
**SHELLY** [1] - 1:8
**Shelton** [13] - 22:21, 22:22, 23:4, 24:18, 24:20, 53:25, 54:1, 54:3, 60:9, 60:13, 98:3, 158:14, 172:3
**SHELTON** [1] - 1:7
**shooting** [17] - 250:24, 251:4, 252:21, 253:14, 254:5, 254:16, 254:25, 255:14, 256:15, 257:6, 257:17, 257:23, 258:3, 259:8, 259:20, 260:4, 260:12

**shootings** [2] - 250:22, 256:6
**shopping** [1] - 183:9
**short** [7] - 10:12, 40:13, 104:8, 127:21, 222:25, 223:13, 230:19
**shorter** [2] - 125:16, 250:3
**shortly** [2] - 127:20, 223:13
**shot** [1] - 252:18
**show** [36] - 3:6, 3:16, 3:19, 4:9, 5:3, 7:8, 12:14, 28:3, 39:8, 61:21, 63:2, 66:20, 66:24, 67:13, 72:2, 93:5, 117:10, 153:23, 182:13, 187:4, 189:18, 190:9, 193:7, 220:3, 221:17, 223:3, 234:12, 235:1, 236:11, 236:14, 237:23, 238:10, 239:6, 254:15, 260:4, 260:11
**Show** [1] - 223:6
**showed** [5] - 4:22, 81:14, 153:21, 155:4, 155:25
**Showing** [1] - 160:23, 214:25
**showing** [5] - 6:14, 142:8, 238:4, 239:7, 260:3
**shown** [12] - 62:9, 67:6, 70:16, 113:12, 129:22, 132:17, 156:25, 157:1, 175:13, 219:8, 223:8, 237:15
**shows** [4] - 62:12, 92:16, 187:5, 241:10
**sic** [1] - 187:21
**side** [4] - 32:18, 158:20, 213:25, 260:13
**signature** [5] - 130:2, 209:24, 210:1, 210:9, 264:11
**signed** [5] - 23:5, 54:11, 54:12, 54:23, 57:12
**significance** [1] - 233:5
**significant** [5] - 188:6, 252:5, 253:2, 254:13
**silent** [1] - 115:12
**similar** [2] - 6:11, 180:9
**simply** [10] - 13:16, 17:18, 17:25, 20:2, 43:8, 208:14, 239:15, 253:14, 255:6, 257:6
**singing** [2] - 124:14, 125:2
**single** [3] - 120:16, 233:11, 237:21

**singly** [1] - 156:21
**sister** [7] - 68:22, 147:6, 147:9, 147:12, 166:16, 166:21, 174:19
**sister's** [1] - 68:21
**sites** [1] - 232:20
**sitting** [10] - 19:4, 43:8, 51:8, 51:20, 56:19, 82:12, 161:11, 161:13, 235:17, 236:25
**situation** [5] - 52:15, 93:21, 94:6, 235:15, 243:3
**six** [13] - 8:25, 72:1, 121:12, 156:4, 164:4, 165:5, 175:7, 184:12, 205:25, 206:1, 206:3, 206:5, 206:6
**Six** [4] - 163:7, 164:5, 175:16, 206:4
**Sixth** [2] - 19:3, 32:13
**size** [1] - 188:23
**sleep** [2] - 78:1, 234:5
**slightly** [1] - 117:15
**slippery** [1] - 13:19
**slow** [1] - 136:4
**small** [3] - 172:15, 173:21, 223:16
**smaller** [1] - 152:19
**Smith** [81] - 3:5, 8:5, 9:17, 9:18, 11:1, 12:13, 15:12, 19:13, 19:14, 19:23, 19:24, 19:25, 20:6, 20:18, 21:4, 21:21, 22:15, 25:11, 26:7, 27:12, 28:19, 30:2, 30:8, 30:20, 32:24, 37:6, 37:8, 39:3, 41:6, 41:20, 42:2, 42:15, 42:17, 43:25, 44:1, 44:8, 44:11, 44:21, 45:8, 46:23, 48:2, 55:9, 58:10, 59:3, 61:5, 62:24, 67:3, 67:21, 69:11, 69:19, 70:2, 70:15, 72:24, 77:2, 78:5, 81:19, 83:4, 83:7, 84:21, 85:9, 85:13, 98:2, 100:13, 110:10, 111:19, 115:13, 118:6, 120:10, 120:23, 121:7, 121:9, 125:22, 129:22, 133:20, 134:25, 193:15, 193:17, 233:7
**SMITH** [4] - 19:16, 44:3, 263:3, 263:8
**snacks** [1] - 231:25
**sold** [8] - 138:20, 151:16, 170:16, 170:19, 170:22, 173:5, 181:2, 206:21
**solution** [1] - 256:3

**someone** [10] - 22:5, 61:17, 61:19, 125:2, 152:17, 153:23, 166:5, 171:20, 172:10
**sometime** [2] - 116:22, 231:16
**sometimes** [6] - 55:3, 61:2, 123:16, 124:16, 125:13, 152:23
**Sometimes** [3] - 23:20, 52:23, 153:25
**somewhat** [4] - 6:6, 9:25, 10:12, 220:21
**somewhere** [4] - 13:11, 48:4, 61:16, 77:11
**Son** [2] - 132:5, 132:6
**son** [6] - 45:21, 46:12, 56:2, 103:20, 131:10, 131:12
**song** [1] - 24:24
**songs** [9] - 124:8, 124:10, 124:14, 124:19, 124:20, 124:23, 125:1, 125:14, 131:22
**sons** [1] - 127:2
**soon** [1] - 19:12
**sophomore** [1] - 101:6
**sorry** [35] - 25:8, 26:7, 26:20, 29:8, 32:11, 34:20, 36:18, 41:3, 50:10, 56:16, 57:2, 67:1, 67:20, 70:7, 72:22, 107:19, 108:18, 136:2, 152:12, 155:13, 156:13, 167:2, 191:9, 195:3, 202:4, 213:11, 222:12, 223:5, 226:23, 228:12, 239:22, 240:3, 250:23, 250:25, 262:18
**Sorry** [3] - 119:1, 192:17, 231:5
**sort** [13] - 34:2, 40:9, 50:18, 106:2, 107:10, 114:3, 118:3, 140:4, 144:19, 155:5, 197:16, 232:19, 233:20
**sorts** [1] - 92:7
**sought** [1] - 115:17
**sound** [7] - 8:23, 22:6, 22:9, 71:15, 71:25, 111:23, 159:16
**sounded** [7] - 20:20, 28:9, 109:8, 111:1, 128:21, 129:10, 222:8
**sounds** [10] - 13:19, 22:5, 22:10, 22:13, 39:20, 72:9, 96:4, 98:24, 113:4, 243:6
**source** [1] - 180:25
**south** [1] - 228:15

**Southwest** [1] - 261:20
**Spalding** [1] - 228:16
**speakers** [2] - 15:15, 15:17
**speaking** [2] - 84:21, 226:3
**speaks** [1] - 243:14
**special** [1] - 262:2
**specific** [2] - 204:7, 240:15
**specifically** [9] - 12:18, 25:14, 70:23, 71:21, 75:9, 140:21, 203:11, 210:19, 212:10
**Specifically** [2] - 140:10, 213:17
**spectrum** [1] - 235:2
**spell** [8] - 19:19, 19:21, 44:6, 77:9, 138:1, 139:9, 178:14, 209:1
**Spence** [8] - 6:2, 250:20, 251:2, 252:25, 253:6, 254:9, 258:4, 260:1
**spend** [8] - 50:5, 50:6, 56:11, 57:9, 57:13, 61:6, 134:10, 134:14
**spending** [2] - 122:11, 166:10
**spent** [10] - 53:2, 56:20, 80:15, 102:7, 104:17, 117:3, 122:19, 122:22, 134:7, 145:7
**spoken** [2] - 85:17, 85:20
**spotted** [3] - 226:8, 227:4, 227:5
**stabbing** [3] - 230:14, 230:23, 230:24
**stack** [1] - 234:20
**stand** [20] - 7:2, 7:3, 15:12, 16:3, 17:22, 19:14, 31:14, 42:16, 43:17, 43:25, 44:1, 60:19, 136:15, 208:10, 208:22, 213:6, 241:20, 242:4, 254:18, 261:3
**standard** [1] - 120:16
**standards** [1] - 107:14
**standing** [4] - 60:1, 60:14, 62:16, 239:6
**stands** [1] - 37:3
**start** [15] - 2:4, 3:8, 14:3, 43:5, 83:14, 90:15, 135:10, 182:6, 231:11, 231:13, 231:14, 232:11, 232:22, 260:20, 261:3
**Started** [1] - 174:3
**started** [13] - 54:25, 71:22, 72:8, 72:11, 90:9,

139:15, 168:8, 175:20, 176:2, 240:10, 240:11, 247:14
**starting** [3] - 8:17, 135:11, 168:6
**starts** [1] - 241:2
**state** [5] - 143:17, 144:9, 174:13, 174:20, 213:6
**State** [11] - 19:18, 19:21, 44:6, 138:1, 178:13, 179:6, 190:24, 191:5, 209:1, 209:9, 228:25
**statement** [6] - 12:3, 115:2, 115:3, 253:18, 254:3
**statements** [1] - 253:18
**STATES** [2] - 1:1, 1:5
**states** [3] - 70:6, 70:8, 70:10
**States** [4] - 43:24, 137:18, 178:9, 208:20
**station** [2] - 183:3, 184:1, 186:2, 195:8
**Station** [1] - 78:25
**stay** [8] - 42:19, 46:12, 49:16, 50:2, 50:19, 65:19, 86:20, 91:7
**stayed** [1] - 91:6
**staying** [1] - 8:10
**stays** [1] - 237:13
**stenographically** [1] - 264:4
**step** [4] - 30:2, 30:20, 135:7, 178:8
**steps** [1] - 247:20
**stick** [1] - 17:10
**Still** [1] - 52:7
**still** [22] - 16:2, 17:6, 30:3, 32:10, 36:3, 46:15, 51:17, 71:8, 78:1, 78:24, 79:10, 86:18, 135:10, 141:1, 151:15, 163:5, 174:17, 177:22, 178:2, 191:14, 213:5, 240:8
**stink** [1] - 235:22
**stints** [1] - 122:23
**stipulate** [11] - 9:1, 16:9, 16:12, 16:14, 16:16, 16:22, 16:25, 17:19, 18:16, 18:19, 255:15
**stipulation** [7] - 17:24, 17:25, 18:9, 208:14, 209:11, 257:6, 257:8
**stipulations** [3] - 17:5, 18:10, 256:14
**stood** [1] - 4:3
**stop** [6] - 81:4, 186:19,

198:9, 222:25, 229:1, 261:5
**stopped** [4] - 50:20, 81:6, 222:22, 229:7
**store** [4] - 64:11, 150:9, 150:10, 195:8
**story** [1] - 110:15
**straight** [2] - 100:18, 192:4
**strategic** [1] - 40:12
**strategy** [1] - 42:8
**streamline** [1] - 238:15
**Street** [17] - 1:25, 63:10, 63:12, 159:13, 183:24, 193:19, 197:7, 198:16, 198:17, 199:11, 199:12, 228:11, 228:12, 229:20, 244:6, 261:19
**street** [1] - 19:4, 56:13, 57:6, 57:10, 57:14, 60:1, 60:18, 80:14, 80:15, 87:6, 87:13, 123:14, 123:15, 163:4, 172:15, 173:23, 252:19
**streets** [3] - 56:11, 56:20, 122:12
**stressed** [1] - 204:20
**strike** [4] - 152:25, 157:18, 166:11, 203:17
**strip** [4] - 165:10, 165:17, 184:22, 197:18
**struggle** [1] - 133:8
**struggled** [1] - 133:9
**student** [2] - 49:5, 49:8
**stuff** [8] - 78:10, 88:23, 91:17, 91:19, 92:24, 173:23, 173:25, 242:5
**style** [1] - 106:19
**subject** [7] - 10:1, 10:2, 10:9, 32:8, 32:10, 128:10, 223:8
**submission** [5] - 191:20, 191:22, 191:24, 192:18, 247:17
**submissions** [3] - 191:11, 191:19, 191:23
**submit** [1] - 190:23
**submitted** [5] - 191:2, 191:19, 192:7, 192:23, 211:10
**subpoena** [4] - 10:11, 46:25, 58:10, 58:11
**subpoenaed** [2] - 46:23, 111:22
**subscribed** [1] - 64:14
**subsequent** [1] - 115:24
**substance** [3] - 18:2, 18:3, 210:7
**substances** [4] - 192:5,

209:13, 209:15, 209:18
**substantial** [1] - 217:12
**success** [1] - 54:24
**sudden** [1] - 241:2
**sufficient** [4] - 37:16,
38:23, 254:5, 260:1
**sufficiently** [1] - 39:4
**suggest** [2] - 159:23,
257:11
**suggested** [5] - 13:16,
34:6, 99:19, 133:23,
239:5
**suggesting** [2] - 129:3,
239:4
**suggestion** [1] - 109:8
**suggestions** [1] -
257:25
**suggestive** [3] - 33:4,
33:7, 36:7
**suggests** [1] - 227:7
**summarize** [1] - 208:15
**summarized** [1] - 220:5
**summary** [2] - 220:7
**summer** [1] - 103:3
**summonsed** [3] -
20:11, 109:1
**Sunday** [2] - 78:12,
105:22
**Super** [1] - 198:24
**supermarket** [1] -
194:14
**superseding** [1] - 255:5
**supervision** [4] -
198:22, 199:10, 200:6,
247:4
**supplied** [1] - 2:13
**supplier** [2] - 141:15,
143:7
**suppliers** [3] - 141:15,
158:6, 163:13
**support** [3] - 31:11,
138:21, 215:23
**supporting** [1] - 140:22
**suppose** [1] - 31:19
**supposed** [4] - 16:21,
79:1, 123:8, 159:1
**supposedly** [3] - 87:3,
241:8, 251:3
**suppress** [1] - 32:13
**suppression** [1] -
261:20
**surprise** [2] - 88:16,
246:8
**surprised** [1] - 88:25
**surveil** [1] - 240:25
**surveillance** [2] - 184:4,
184:16
**suspect** [8] - 9:7, 43:2,
221:7, 221:8, 221:10,
221:12, 221:14, 221:16

**suspected** [5] - 113:1,
113:8, 184:18, 184:20,
210:13
**suspects** [1] - 251:12
**suspicions** [1] - 247:21
**sustain** [1] - 117:16
**sustained** [4] - 94:20,
205:18, 207:1, 235:18
**Sustained** [8] - 118:2,
118:5, 132:14, 170:3,
186:7, 202:15, 202:18
**sweat** [1] - 106:16
**sweater** [3] - 106:20,
106:25, 107:10
**switches** [1] - 8:3
**sworn** [6] - 19:15, 44:1,
58:16, 75:22, 114:13,
208:22
**SWORN** [6] - 19:16,
44:3, 137:23, 178:11,
208:23, 213:3
**system** [1] - 182:6

# T

**T-1** [2] - 67:1, 67:2
**T-Mobile** [4] - 66:13,
66:15, 67:10, 67:11
**table** [9] - 51:9, 51:20,
161:11, 161:13, 161:16,
164:13, 165:4, 175:2,
204:22
**Tactical** [1] - 229:18
**tag** [1] - 229:19
**talent** [2] - 90:7, 104:21
**Tanya** [1] - 6:1
**Tape** [1] - 36:21
**tape** [78] - 2:21, 9:21,
20:20, 22:8, 22:15,
25:14, 25:18, 25:22,
26:8, 26:12, 27:22, 28:1,
29:3, 29:16, 29:19,
33:12, 33:16, 33:17,
33:24, 34:1, 34:16, 35:4,
35:18, 36:8, 36:10,
36:16, 36:19, 38:10,
38:16, 38:17, 38:18,
38:20, 38:23, 38:25,
39:2, 39:19, 95:2, 95:8,
95:11, 95:14, 96:1, 96:8,
96:11, 96:14, 98:18,
98:22, 99:18, 108:11,
108:14, 108:18, 109:12,
109:19, 110:13, 110:14,
110:21, 110:24, 110:25,
111:2, 111:8, 111:15,
127:10, 127:12, 127:16,
127:24, 128:1, 128:11,
128:14, 129:3, 129:9,

133:13, 133:24, 134:4,
210:2, 241:23, 242:7,
248:20, 248:24
**tape's** [2] - 36:14, 38:14
**taped** [1] - 241:22
**tapes** [12] - 92:23,
92:24, 92:25, 240:12,
240:15, 241:3, 242:24,
246:19, 247:7, 248:17,
249:6, 249:7
**taping** [1] - 2:22
**tardily** [1] - 247:16
**tardy** [1] - 247:17
**target** [8] - 184:2,
195:22, 197:3, 204:4,
204:5, 204:7, 204:17,
204:21
**targeted** [1] - 182:7
**targets** [2] - 180:15,
196:25
**teacher** [1] - 143:8
**technicians** [1] - 257:12
**technology** [1] - 4:2
**telegraphing** [1] - 42:5
**telephone** [8] - 213:18,
213:24, 214:5, 214:20,
216:12, 219:6, 219:13,
220:8
**telephones** [2] - 63:25,
213:13
**temporary** [1] - 229:19
**Ten** [2] - 28:7, 45:22
**ten** [9] - 40:25, 214:4,
216:3, 217:14, 219:5,
231:14, 249:9, 252:2,
260:25
**tend** [2] - 115:14,
115:19
**tendency** [1] - 68:13
**tentative** [1] - 39:1
**tentatively** [1] - 259:15
**tenth** [1] - 178:2
**term** [7] - 107:6, 115:9,
148:8, 151:11, 163:9,
201:7, 226:1
**terms** [11] - 7:6, 7:15,
7:23, 10:3, 16:8, 55:1,
90:13, 112:23, 131:7,
147:4, 159:15
**test** [1] - 94:24
**tested** [4] - 184:20,
186:1, 190:23, 192:12
**testified** [24] - 29:20,
58:12, 65:11, 65:13,
97:14, 98:3, 104:25,
110:16, 111:19, 113:13,
113:20, 114:3, 130:18,
146:21, 167:12, 168:16,
197:5, 200:14, 200:23,
202:12, 205:14, 215:20,

261:20
**testifies** [1] - 40:13
**testify** [17] - 3:5, 9:3,
17:23, 33:6, 93:17, 95:3,
95:6, 112:14, 112:17,
114:15, 114:21, 129:8,
146:16, 174:5, 195:15,
257:1
**testifying** [7] - 20:8,
116:3, 147:10, 167:9,
167:24, 248:2, 254:22
**testimony** [65] - 9:17,
9:20, 9:23, 16:22, 28:4,
31:6, 31:19, 32:5, 32:19,
32:21, 33:4, 33:10,
33:12, 35:11, 35:13,
37:4, 37:13, 37:16,
37:18, 37:20, 38:7,
38:12, 39:8, 39:9, 43:12,
58:23, 58:24, 59:22,
75:12, 75:22, 76:7, 84:4,
84:8, 84:20, 86:23,
105:22, 106:11, 112:11,
113:6, 115:2, 116:21,
118:7, 121:11, 127:15,
127:19, 128:2, 129:10,
135:2, 136:22, 147:19,
167:19, 175:14, 176:7,
196:15, 196:16, 215:10,
220:1, 235:4, 238:24,
246:5, 246:8, 251:25,
255:11, 256:20
**testimony's** [1] - 205:17
**testing** [1] - 191:25
**TFO** [1] - 246:16
**THE** [352] - 1:1, 1:2, 2:2,
2:6, 2:8, 2:12, 2:15,
2:18, 2:25, 3:2, 3:8,
3:10, 3:13, 4:2, 4:20,
5:8, 5:14, 5:18, 6:3,
6:14, 6:17, 6:23, 7:19,
9:9, 9:11, 9:13, 10:7,
10:16, 10:19, 10:22,
11:6, 11:10, 11:18,
11:24, 12:4, 12:6, 12:9,
12:16, 12:20, 12:23,
13:2, 13:6, 13:10, 13:13,
13:21, 14:3, 14:15,
14:25, 15:2, 15:6, 15:8,
15:11, 15:20, 15:25,
16:6, 16:10, 16:13,
16:17, 16:23, 17:1, 17:6,
17:14, 17:17, 17:25,
18:8, 18:14, 18:20, 19:9,
19:11, 19:17, 19:18,
19:20, 19:21, 19:23,
19:25, 20:1, 20:2, 21:4,
21:6, 21:7, 21:8, 21:9,
21:10, 21:11, 21:13,
21:21, 21:23, 21:24,

22:1, 22:2, 24:12, 24:13,
25:3, 25:5, 25:25, 26:4,
26:20, 29:8, 29:11, 30:2,
30:5, 30:20, 30:24, 31:1,
31:9, 31:17, 31:22,
31:25, 32:3, 32:10, 34:3,
34:7, 34:12, 34:19,
34:25, 35:6, 35:21,
36:16, 36:18, 36:22,
36:24, 37:2, 40:6, 40:17,
40:21, 40:25, 41:4,
41:11, 42:1, 42:4, 42:7,
42:13, 42:15, 42:22,
42:23, 42:25, 44:1, 44:4,
44:5, 44:7, 47:13, 49:13,
57:18, 58:3, 58:6, 58:8,
60:11, 62:8, 62:15,
62:18, 68:10, 68:12,
69:10, 70:7, 70:9, 85:9,
85:10, 94:18, 94:20,
94:22, 94:24, 95:24,
97:24, 99:24, 117:11,
117:15, 118:2, 118:5,
129:7, 129:18, 132:14,
133:17, 134:25, 135:5,
135:6, 136:1, 136:4,
136:10, 136:13, 136:16,
136:19, 137:3, 137:7,
137:11, 137:15, 137:20,
137:22, 137:24, 137:25,
138:3, 153:1, 153:6,
157:6, 157:10, 157:19,
166:15, 169:8, 170:3,
170:5, 170:12, 173:12,
177:15, 178:5, 178:7,
178:8, 178:12, 178:13,
178:15, 186:7, 191:7,
195:1, 200:21, 202:15,
202:18, 205:18, 207:1,
207:5, 207:6, 207:22,
208:1, 208:3, 208:5,
208:12, 208:16, 208:18,
208:22, 208:24, 208:25,
209:3, 209:14, 212:22,
212:23, 212:24, 213:4,
213:7, 213:8, 222:11,
223:5, 225:9, 225:11,
226:14, 226:23, 230:4,
230:11, 231:4, 231:7,
231:11, 232:25, 233:10,
233:13, 233:16, 234:4,
234:18, 234:24, 235:6,
235:11, 235:18, 236:2,
236:5, 236:14, 236:23,
237:2, 237:8, 237:12,
237:17, 238:25, 239:22,
240:1, 240:3, 240:6,
240:9, 242:7, 242:13,
242:15, 242:21, 243:2,
243:5, 243:8, 243:10,
243:12, 243:15, 243:18,

244:1, 244:7, 244:9, 244:11, 244:17, 244:20, 244:24, 245:4, 245:6, 245:9, 245:12, 245:17, 245:20, 245:24, 246:2, 246:23, 247:6, 248:11, 248:22, 249:5, 249:19, 249:23, 249:25, 250:3, 250:8, 250:13, 250:23, 252:7, 252:14, 252:17, 253:16, 253:25, 254:19, 254:23, 255:5, 255:9, 255:12, 255:15, 255:18, 255:21, 255:24, 256:1, 256:4, 256:9, 256:22, 257:3, 257:7, 258:7, 258:11, 258:16, 258:19, 258:22, 259:5, 259:12, 259:15, 260:18, 260:20, 260:23, 261:2, 261:7, 261:11, 261:15, 261:25, 262:3, 262:7, 262:13, 262:16, 262:18, 262:20, 262:22

**theater** [2] - 223:20, 223:23

**themselves** [1] - 252:22

**theories** [1] - 221:14

**thereabouts** [2] - 69:14, 125:17

**therefore** [1] - 236:20

**they've** [2] - 234:1, 235:13

**thinks** [4] - 14:21, 34:8, 34:11, 259:3

**third** [5] - 112:5, 221:21, 223:10, 228:10, 228:11

**Third** [1] - 229:16

**thirds** [3] - 205:20, 205:21, 205:23

**Thirty** [1] - 173:2

**thirty** [1] - 173:17

**Thirty-something** [1] - 173:2

**thirty-something** [1] - 173:17

**Thomas** [3] - 1:20, 208:21, 209:3

**THOMAS** [2] - 208:23, 263:18

**thousands** [1] - 234:13

**Three** [5] - 121:5, 128:13, 172:22, 222:6, 262:13

**three** [33] - 8:25, 16:23, 36:4, 84:14, 84:18, 111:20, 136:8, 161:6, 161:14, 162:7, 165:1, 172:21, 177:19, 180:2,

181:5, 184:2, 186:23, 202:8, 206:4, 220:24, 222:8, 223:15, 224:16, 226:16, 240:14, 241:3, 242:9, 246:4, 251:19, 253:20, 253:23, 254:9, 262:10

**three-quarters** [1] - 262:10

**Three-quarters** [1] - 262:13

**throughout** [1] - 38:14

**throw** [2] - 64:10, 158:8

**Thursday** [3] - 135:12, 135:19, 232:6

**tied** [1] - 258:3

**tier** [1] - 246:2

**ties** [1] - 16:20

**timing** [1] - 131:7

**tod** [1] - 15:1

**Today** [2] - 169:17, 237:20

**today** [66] - 8:4, 12:8, 12:12, 13:23, 13:24, 16:19, 17:4, 18:12, 18:17, 19:14, 29:22, 33:8, 39:23, 42:6, 43:22, 47:23, 56:19, 58:10, 58:17, 60:3, 67:3, 71:20, 82:12, 84:8, 84:20, 84:24, 85:20, 93:19, 94:7, 94:10, 94:12, 109:19, 113:14, 113:17, 113:20, 113:22, 114:15, 116:3, 116:18, 121:7, 121:9, 127:15, 127:20, 128:3, 128:15, 137:8, 146:18, 167:24, 168:25, 169:2, 169:12, 174:21, 174:22, 176:9, 180:13, 202:13, 205:8, 213:12, 233:7, 233:20, 238:6, 241:17, 242:17, 251:14, 251:15, 261:9

**together** [37] - 9:19, 45:15, 45:18, 47:21, 48:11, 48:12, 48:19, 48:24, 50:18, 52:20, 52:22, 52:24, 53:2, 60:16, 80:11, 85:23, 86:1, 86:14, 86:16, 91:17, 92:8, 100:20, 102:3, 106:3, 116:9, 116:24, 121:22, 124:9, 134:14, 157:7, 157:11, 165:12, 243:24, 244:2, 246:4, 253:2, 253:15

**toll** [1] - 67:3

**Tom** [2] - 27:12, 100:13

**Tomorrow** [1] - 231:11

**tomorrow** [34] - 2:4, 135:10, 135:13, 136:24, 137:3, 137:6, 137:10, 137:12, 231:13, 231:15, 232:8, 232:21, 239:24, 239:25, 240:1, 242:11, 242:14, 242:15, 247:19, 247:21, 248:3, 248:6, 248:13, 248:14, 249:15, 249:17, 250:1, 250:4, 250:12, 260:15, 261:1, 261:10, 262:4, 262:22

**tonight** [1] - 231:13

**Tonya** [3] - 252:25, 253:6, 259:25

**took** [10] - 31:8, 33:6, 184:18, 214:3, 215:15, 215:17, 218:10, 233:4, 247:1, 257:17

**top** [7] - 4:24, 5:5, 83:15, 189:24, 209:24, 210:2, 211:13

**topic** [2] - 18:23, 40:9

**toss** [1] - 64:16

**total** [5] - 204:12, 205:19, 205:20, 210:21, 211:25

**touch** [4] - 46:12, 86:18, 86:20, 247:12

**tough** [1] - 7:25

**toward** [4] - 44:5, 138:1, 178:13, 209:1

**town** [6] - 48:13, 57:1, 57:2, 102:19, 131:14, 202:22

**tracking** [1] - 211:14

**tracks** [1] - 6:15

**trade** [1] - 171:8

**traditional** [1] - 256:3

**traffic** [1] - 203:13

**trafficking** [1] - 59:18

**training** [1] - 224:17

**transcribed** [1] - 264:8

**transcript** [26] - 9:20, 28:6, 31:10, 39:7, 59:5, 60:5, 65:7, 65:12, 69:24, 70:1, 71:8, 72:4, 78:4, 83:1, 83:2, 83:3, 83:6, 83:16, 97:11, 121:8, 128:7, 129:4, 132:18, 175:16, 264:8

**transcripts** [4] - 59:2, 113:13, 113:16, 113:20

**transfer** [1] - 194:18

**transferred** [1] - 50:11

**transmittal** [1] - 62:2

**transmittals** [1] - 193:5

**transpired** [1] - 171:16

**transported** [1] - 248:1

**travel** [1] - 8:2

**treated** [1] - 130:20

**trial** [18] - 35:4, 35:24, 43:11, 43:14, 46:23, 46:24, 47:3, 47:8, 93:24, 232:9, 237:22, 238:20, 238:24, 242:18, 247:11, 251:20, 258:25, 262:14

**trials** [1] - 17:8

**tried** [9] - 59:21, 112:18, 112:20, 132:18, 175:6, 203:10, 242:2, 242:3, 246:9

**trip** [3] - 2:21, 195:15, 212:24

**triple** [1] - 251:20

**Trooper** [1] - 261:4

**trouble** [2] - 121:25, 145:12, 147:24, 168:8, 170:14, 175:20, 175:25, 176:16, 181:11, 181:13, 181:16, 243:16

**true** [5] - 87:17, 101:10, 104:24, 105:9, 107:4

**True** [1] - 101:12

**truncated** [1] - 258:15

**truth** [11] - 39:23, 58:16, 58:20, 129:13, 129:15, 134:9, 168:12, 168:15, 168:23, 169:2

**truthfully** [4] - 114:15, 114:21, 114:22, 146:16

**try** [14] - 10:20, 14:5, 48:6, 62:4, 68:14, 113:7, 142:8, 143:9, 198:24, 202:24, 238:22, 261:8, 261:16, 261:18

**trying** [14] - 14:20, 18:24, 118:18, 123:22, 168:13, 169:15, 169:17, 181:11, 181:12, 195:15, 199:17, 204:14, 241:17

**Tuesday** [4] - 1:11, 135:17, 232:4, 232:5

**turn** [8] - 97:24, 117:15, 163:5, 172:19, 181:5, 185:17, 228:16, 236:8

**turned** [1] - 252:12

**turning** [1] - 228:11

**Turning** [1] - 228:12

**turns** [1] - 32:17

**twice** [5] - 20:9, 24:9, 25:1, 123:1, 163:9

**Twice** [1] - 24:10

**twins** [1] - 131:20

**Two** [9] - 16:17, 18:2, 23:2, 126:9, 126:10, 131:19, 168:6, 205:21, 252:20

**two** [85] - 2:20, 4:8, 4:22, 8:4, 8:25, 19:4,

23:1, 24:3, 24:10, 37:21, 37:22, 39:17, 40:15, 47:9, 54:6, 58:11, 59:2, 59:4, 65:20, 86:14, 89:17, 100:19, 102:7, 104:15, 107:24, 110:16, 112:7, 113:12, 113:20, 113:24, 122:23, 133:8, 136:11, 136:20, 145:12, 157:4, 162:7, 163:3, 174:22, 178:25, 180:18, 182:25, 184:2, 185:24, 187:8, 188:21, 191:10, 191:19, 191:23, 192:22, 193:4, 202:10, 202:16, 202:21, 203:6, 205:20, 205:23, 209:17, 210:7, 211:17, 213:13, 214:15, 214:16, 220:18, 224:9, 229:6, 232:9, 235:4, 238:11, 240:24, 242:18, 251:3, 251:9, 252:18, 253:15, 253:20, 253:21, 253:22, 254:7, 254:9, 259:23, 260:12, 261:22

**two-thirds** [1] - 205:20, 205:23

**Two-thirds** [1] - 205:21

**type** [6] - 53:1, 64:3, 64:11, 66:8, 82:12, 162:17

**typically** [2] - 7:14, 113:6

## U

**U.S** [6] - 1:24, 58:13, 58:22, 121:18, 146:3, 146:22

**Ultima** [2] - 81:20, 81:24

**ultimately** [2] - 39:3, 144:21

**Um-hum** [21] - 21:18, 23:15, 24:11, 25:19, 26:16, 26:18, 54:17, 55:17, 59:11, 59:17, 60:7, 65:10, 65:15, 65:21, 68:25, 70:3, 76:1, 144:16, 148:15, 150:11, 166:18

**unable** [1] - 254:20

**uncharged** [3] - 251:10, 251:22, 252:6

**uncle** [1] - 56:8

**uncomfortable** [1] - 16:4

**uncover** [2] - 205:19, 230:24

**uncovered** [1] - 224:9

**under** [25] - 14:1, 37:14, 37:22, 42:19, 58:10, 58:11, 58:15, 58:21, 75:16, 78:7, 81:10, 81:23, 82:1, 168:16, 168:21, 168:25, 191:2, 192:7, 200:23, 204:6, 213:5, 235:19, 248:16, 248:23, 258:7

**Under** [1] - 202:16

**undercover** [4] - 179:16, 184:9, 243:20, 246:10

**understandable** [2] - 72:2

**understood** [5] - 116:4, 116:21, 118:7, 119:3, 239:17

**Understood** [1] - 53:2

**undue** [1] - 260:3

**unenhanced** [1] - 193:17

**unfair** [1] - 13:22, 260:3

**unfortunately** [1] - 105:7

**unintentionally** [1] - 258:2

**Union** [5] - 62:1, 63:7, 133:5, 193:5, 233:4

**Unit** [1] - 179:10

**United** [4] - 43:24, 137:18, 178:9, 208:20

**UNITED** [2] - 1:1, 1:5

**unless** [4] - 9:6, 95:22, 231:9, 255:1

**unrecorded** [1] - 245:25

**Unrecorded** [1] - 246:1

**unsuccessfully** [1] - 57:25

**unusual** [2] - 153:23, 247:23

**Up** [4] - 15:13, 46:11, 202:22

**up** [161] - 2:10, 2:23, 3:6, 4:3, 4:7, 6:7, 7:2, 7:3, 8:3, 8:7, 9:25, 12:14, 14:4, 14:12, 15:4, 15:12, 19:3, 19:18, 29:23, 33:19, 33:20, 33:21, 34:2, 35:1, 36:20, 40:9, 40:19, 40:24, 42:10, 43:7, 44:19, 46:7, 48:19, 56:22, 56:23, 57:15, 57:16, 59:7, 60:13, 61:1, 61:8, 61:23, 65:7, 66:4, 73:3, 74:12, 75:3, 76:2, 76:9, 78:1, 78:6, 78:24, 79:10, 83:6, 86:11, 93:18, 97:11, 108:21, 109:22, 109:25, 110:12, 121:8, 123:1,

123:25, 128:8, 129:4, 133:6, 136:20, 136:23, 137:3, 137:7, 137:25, 138:12, 138:14, 140:3, 140:11, 140:14, 143:17, 143:21, 144:9, 144:11, 144:12, 145:6, 145:20, 145:22, 149:17, 150:8, 150:18, 152:18, 153:21, 153:23, 155:6, 155:8, 156:12, 156:18, 156:21, 160:5, 160:13, 162:13, 163:4, 163:11, 163:12, 173:1, 173:17, 173:18, 174:23, 184:4, 185:19, 185:21, 185:23, 187:24, 190:11, 190:12, 190:13, 190:15, 195:15, 202:7, 205:20, 207:9, 208:3, 208:25, 211:8, 221:13, 224:13, 224:14, 225:22, 230:3, 232:11, 232:19, 233:21, 234:12, 234:19, 235:16, 235:21, 236:1, 236:15, 238:15, 238:20, 240:25, 241:6, 241:20, 242:10, 242:22, 243:23, 244:1, 244:2, 244:5, 244:12, 244:14, 247:15, 249:16, 249:18, 250:17, 251:16, 253:19, 256:14, 258:1, 258:10, 259:2, 262:7

**upcoming** [1] - 237:5

**upsetting** [1] - 7:11

**upstairs** [2] - 185:7, 187:20

**urban** [1] - 107:4

**USA** [1] - 264:4

**useful** [1] - 248:18

**usefully** [1] - 236:6

**uses** [1] - 7:14

**V**

**Valdivia** [3] - 77:13, 77:19, 105:24

**valuable** [1] - 256:25

**value** [8] - 163:9, 234:2, 246:21, 253:10, 254:12, 259:22, 260:2

**various** [10] - 18:6, 84:16, 120:11, 120:19, 122:18, 124:8, 124:9, 139:21, 224:22, 226:16

**vehicle** [3] - 184:16, 215:25, 219:24

**version** [3] - 19:2, 19:3, 185:4

**versus** [3] - 7:10,

123:14, 163:16

**VI** [1] - 1:11

**via** [1] - 133:5

**vial** [2] - 206:17, 206:19

**vials** [30] - 161:16, 161:17, 161:20, 161:22, 161:24, 162:4, 162:12, 163:21, 164:12, 165:9, 184:17, 185:19, 185:22, 188:22, 189:14, 191:19, 192:6, 192:19, 202:2, 202:5, 205:3, 206:16, 206:21, 207:9, 210:13, 211:4, 211:17, 211:22, 212:6

**victim** [4] - 5:23, 224:7, 237:21, 237:24

**victims** [4] - 4:12, 5:5, 237:19, 253:22

**Victor** [1] - 229:19

**view** [6] - 3:17, 7:9, 32:7, 184:11, 253:10, 260:10

**views** [5] - 6:7, 253:1, 253:8

**violation** [1] - 41:18

**violent** [1] - 224:7

**visible** [1] - 215:5

**visit** [10] - 73:6, 76:14, 76:18, 85:4, 102:23, 147:19, 154:15, 158:22, 177:7, 232:20

**visited** [3] - 85:2, 85:4, 177:3

**voice** [93] - 9:22, 11:1, 11:2, 11:7, 11:15, 11:20, 12:1, 12:2, 12:9, 12:17, 12:23, 13:14, 13:15, 13:17, 14:5, 14:17, 14:21, 20:20, 21:13, 22:6, 22:17, 23:12, 23:13, 23:14, 23:18, 23:21, 24:22, 25:22, 26:14, 27:20, 27:22, 28:8, 28:9, 29:3, 29:16, 29:19, 30:23, 32:5, 32:13, 32:15, 32:19, 32:21, 32:22, 33:1, 33:12, 33:17, 33:25, 35:10, 35:12, 35:16, 35:17, 35:18, 37:21, 37:25, 38:11, 39:4, 39:19, 39:20, 42:10, 47:9, 47:10, 47:11, 95:17, 96:4, 96:8, 96:11, 96:14, 96:17, 99:10, 99:12, 99:13, 109:8, 109:12, 109:16, 110:23, 111:1, 111:15, 124:13, 127:22, 128:1, 128:2,

128:20, 128:21, 129:3, 129:9, 133:13, 133:14, 133:23, 248:16

**voices** [17] - 21:1, 22:4, 22:15, 25:15, 28:1, 28:10, 28:13, 29:24, 38:21, 38:25, 95:11, 96:19, 99:9, 109:18, 127:13, 127:24, 128:22

**voir** [12] - 11:6, 11:17, 14:8, 14:16, 14:20, 14:22, 14:23, 19:11, 25:4, 33:3, 33:11, 38:5

**VOLUME** [1] - 1:11

**volunteer** [2] - 133:22, 237:4

**W**

**wage** [1] - 103:13

**wait** [3] - 137:2, 149:21, 192:17

**Wait** [5] - 97:24, 236:2

**waiting** [5] - 17:18, 40:21, 43:3, 213:11, 247:6

**walk** [9] - 8:16, 61:23, 162:20, 164:8, 196:17, 236:15, 239:5, 252:17

**walked** [4] - 161:14, 176:1, 184:10, 184:16

**Walker** [2] - 180:17

**waned** [1] - 233:5

**wants** [2] - 33:18, 33:19

**warm** [2] - 46:15, 46:17

**warn** [1] - 165:25

**warrant** [17] - 186:2, 186:3, 186:9, 190:6, 191:22, 192:22, 194:16, 196:3, 199:8, 207:12, 215:24, 221:25, 223:10, 244:16, 244:20, 244:22, 244:24

**warrants** [3] - 221:18, 221:19, 222:1

**wary** [1] - 254:17

**Watch** [2] - 135:7, 178:8

**water** [4] - 21:24, 42:21, 85:9

**WAYNE** [1] - 1:8

**Wayne** [8] - 51:19, 55:5, 91:11, 91:24, 96:19, 125:9, 158:12, 172:5

**weapon** [4] - 201:13, 201:16, 258:4, 258:6

**wear** [1] - 107:4

**Weaze** [4] - 125:3, 125:6, 125:8, 158:18

**Wednesday** [5] -

135:18, 232:5, 248:15, 249:12, 249:20

**week** [26] - 8:7, 12:13, 12:14, 12:21, 12:25, 32:14, 33:2, 46:24, 47:10, 101:25, 135:13, 135:14, 135:15, 135:17, 135:20, 232:4, 232:6, 232:7, 232:9, 232:12, 241:3, 241:12, 242:16, 242:23, 248:7, 248:15

**weekend** [1] - 240:11

**weeks** [6] - 107:25, 121:12, 224:17, 246:16, 247:8, 254:8, 256:17, 259:18

**weigh** [3] - 202:3, 202:6, 258:13

**weighed** [1] - 210:24

**weighing** [2] - 202:7, 212:15

**weight** [11] - 37:12, 38:7, 185:23, 202:22, 203:1, 203:2, 205:19, 210:21, 210:23, 211:25, 212:3

**weights** [2] - 18:6, 212:14

**welcome** [1] - 41:12

**Welcome** [1] - 213:4

**Welsh** [2] - 250:16, 251:23

**West** [3] - 1:25, 91:25, 252:19

**Western** [5] - 62:1, 63:7, 133:5, 193:4, 233:4

**whatsoever** [2] - 37:6, 247:23

**whereby** [1] - 127:9

**Whereof** [1] - 264:10

**whichever** [1] - 171:2

**white** [6] - 5:15, 5:17, 192:5, 211:16, 211:22, 212:1

**White** [6] - 73:22, 75:6, 75:7, 75:9, 97:6, 131:19

**whole** [9] - 2:17, 2:18, 58:16, 110:15, 147:16, 184:11, 211:10, 255:16, 259:2

**Willard** [1] - 261:8

**William** [3] - 188:11, 188:14, 189:20

**Williams** [1] - 230:18

**Willie** [26] - 23:6, 25:13, 45:9, 45:11, 45:13, 59:18, 60:24, 62:20, 83:16, 85:15, 85:23, 87:3, 90:10, 91:19, 91:25, 96:24, 130:13,

130:22, 131:14, 188:11, 188:13, 189:24, 193:9, 193:23, 251:18, 264:4
**WILLIE** [1] - 1:7
**Willie's** [1] - 25:22
**willing** [2] - 13:17, 243:22
**winking** [1] - 203:11
**wire** [4] - 62:1, 63:4, 193:5, 240:25
**wires** [1] - 242:24
**wise** [1] - 23:10
**wishes** [1] - 248:6
**WITNESS** [38] - 19:16, 19:17, 19:20, 19:23, 20:1, 21:6, 21:8, 21:10, 21:13, 21:23, 22:1, 24:13, 42:22, 44:3, 44:4, 44:7, 85:10, 135:5, 137:23, 137:24, 138:3, 178:7, 178:11, 178:12, 178:15, 207:6, 208:23, 208:24, 209:3, 212:23, 213:3, 213:7, 263:3, 263:8, 263:13, 263:16, 263:18, 263:20
**Witness** [2] - 42:14, 264:10
**witness** [92] - 3:6, 3:16, 3:17, 3:19, 3:20, 3:22, 3:25, 4:13, 7:24, 8:20, 10:2, 10:9, 10:10, 11:7, 11:11, 12:24, 13:14, 13:19, 14:6, 15:9, 15:12, 16:2, 16:5, 16:21, 17:3, 17:7, 18:12, 18:17, 30:22, 31:8, 31:15, 32:5, 32:10, 32:16, 32:22, 32:24, 33:1, 33:23, 34:2, 34:5, 35:7, 35:16, 36:3, 36:25, 37:9, 38:9, 39:8, 39:23, 40:9, 40:13, 41:6, 41:9, 41:13, 41:15, 41:16, 42:9, 42:16, 43:13, 43:14, 43:17, 43:21, 43:23, 58:2, 117:10, 120:17, 136:15, 137:17, 178:8, 207:24, 208:6, 208:14, 208:19, 209:12, 209:14, 234:13, 234:22, 235:2, 236:18, 237:3, 237:5, 238:16, 239:19, 240:16, 249:20, 250:15, 251:24, 256:25, 257:8, 257:13, 261:3
**witness'** [4] - 31:5, 31:11, 33:4, 33:10
**witness-by-witness** [1] - 34:2
**witnesses** [15] - 4:22,

8:1, 38:9, 47:4, 231:9, 234:19, 235:4, 235:10, 236:24, 237:6, 249:14, 249:17, 251:17, 254:18, 257:16
**woman** [1] - 179:11
**women** [1] - 119:16
**wondering** [1] - 40:12
**Woodie** [1] - 76:2
**Woodington** [2] - 221:22, 222:2
**Woodland** [2] - 60:19, 60:20
**woods** [1] - 258:7
**Woody** [7] - 76:4, 76:10, 76:14, 85:2, 85:3, 123:25
**word** [6] - 39:10, 54:20, 66:1, 118:11, 124:23, 201:6
**words** [9] - 110:13, 110:24, 121:25, 124:6, 124:18, 192:13, 220:11, 220:24, 232:19
**worker** [1] - 103:13
**worried** [1] - 88:11
**worse** [2] - 241:16, 241:17
**worth** [3] - 34:16, 163:4, 177:10
**wrapped** [3] - 156:18, 156:20, 156:21
**write** [1] - 131:21
**writing** [1] - 215:18
**wrote** [3] - 240:11, 240:18, 240:19
**Wyche** [17] - 5:9, 6:12, 79:23, 79:25, 80:2, 80:10, 80:15, 80:18, 106:12, 106:13, 244:16, 250:22, 250:24, 251:3, 252:24, 254:7

## X

**XXXVII** [1] - 1:11

## Y

**Y-O-U-N-G** [1] - 178:16
**year** [14] - 20:10, 45:3, 46:6, 55:22, 63:20, 100:23, 101:5, 101:6, 101:8, 102:15, 113:17, 179:3, 223:17, 249:9
**years** [31] - 23:1, 23:2, 24:3, 24:10, 27:17, 37:21, 48:18, 50:13, 52:4, 55:14, 66:9, 72:1,

86:14, 86:23, 99:9, 108:5, 108:6, 111:25, 112:7, 140:13, 145:11, 146:21, 154:19, 167:11, 167:12, 168:16, 178:25, 179:8, 240:14, 246:6, 252:12
**yelled** [1] - 185:7
**yesterday** [14] - 3:6, 3:7, 4:6, 4:20, 8:5, 12:14, 43:16, 47:6, 47:11, 47:18, 230:7, 240:24, 241:3, 242:10
**Yesterday** [1] - 237:18
**York** [4] - 50:10, 102:13, 102:14, 180:24
**Young** [8] - 178:10, 178:15, 178:19, 182:14, 191:18, 206:16, 207:22
**young** [1] - 104:21
**YOUNG** [2] - 178:11, 263:16
**younger** [2] - 106:3, 140:1
**yourself** [11] - 15:13, 138:21, 140:22, 143:15, 154:12, 168:13, 169:15, 170:6, 170:10, 176:17, 213:5

## Z

**Zajac** [3] - 1:24, 264:3, 264:15
**Ziploc** [1] - 155:10
**zoom** [2] - 62:5, 142:8