1

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION



    UNITED STATES OF AMERICA

          v.                              CRIMINAL CASE NO.
                                            AMD-04-029
    WILLIE MITCHELL,
    SHELTON HARRIS,
    SHELLY WAYNE MARTIN,
    SHAWN GARDNER,

          Defendants
    _____/

                        VOLUME IX OF XXXVII
                      Wednesday, October 1, 2008
                      Baltimore, Maryland


Before:  Honorable Andre M. Davis, Judge
                  And a Jury

Appearances:
        On Behalf of the Government:
         Robert Harding, Esquire
         Michael Hanlon, Esquire
        On Behalf of Defendant Mitchell:
         Laura Kelsey Rhodes, Esquire
         Michael E. Lawlor, Esquire
        On Behalf of Defendant Harris:
         Gerard P. Martin, Esquire
         Paul Flannery, Esquire
        On Behalf of Defendant Martin:
         Thomas L. Crowe, Esquire
         James G. Pyne, Esquire
        On Behalf of Defendant Gardner:
         Adam H. Kurland, Esquire
         Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

2

1          (Proceedings at 10:08 a.m.)

2          THE COURT:  Ready to proceed?  All right.  We'll have

3  the jury, please.  Who is the witness?

4          MR. HANLON:  It will be Sergeant George Wooden, Your

5  Honor.  Bring that out.

6          THE COURT:  Did you see Mr. Coburn's letter, Mr.

7  Hanlon?

8          MR. HANLON:  I did.  Mr. Harding did.

9          THE COURT:  Okay.  Any problem with that?

10         MR. HARDING:  Is this the -- are you referring to the

11  motion about firearms expert?

12         THE COURT:  No.  No.  Mr. Coburn objects to the

13  witness' opinion that the seizure was a, quote-unquote, "a large

14  seizure."

15         MR. HARDING:  Which opinion is that?

16         THE COURT:  Wooden.

17         MR. HARDING:  Oh.

18         THE COURT:  Something he said at the motions hearing.

19         MR. HARDING:  Well, I think that the witness should be

20  permitted to testify as to what he --

21         THE COURT:  But not to his opinion.  His opinion is of

22  no moment.  Just stay away from that.

23         Trooper, you're asked not to tell the jury your opinion

24  as to whether this was a large or small seizure.  You can just

25  give the weight.

1          (Jury enters the courtroom.)

2          THE COURT:  Please be seated, ladies and gentlemen.

3   Good morning to each of you, ladies and gentlemen.  Welcome back.

4   We're ready to continue.

5          The next witness, Mr. Hanlon.

6          MR. HANLON:  Your Honor, the United States calls

7   Sergeant George Wooden to the stand.

8          THE COURT:  If you'll stand, please, Sergeant.

9        SERGEANT GEORGE WOODEN, GOVERNMENT'S WITNESS, SWORN

10         THE WITNESS:  I do.

11         THE CLERK:  Be seated.  Speak directly toward the mike.

12   State your name and spell it for the record.

13         THE WITNESS:  George Wooden.  W-O-O-D-E-N.

14         DIRECT EXAMINATION

15   BY MR. HANLON:

16   Q    Sergeant, good morning.

17   A    Good morning.

18   Q    Where do you work?

19   A    Maryland State Police, John F. Kennedy barrack.

20   Q    And how long have you been a member of the Maryland State

21   Police?

22   A    Close to 18 years.

23   Q    Prior to joining the State Police, did you have any other

24   law enforcement experience?

25   A    No.

1    Q    Since becoming a trooper, what kind of work have you done

2    for the State Police?

3    A    I've been assigned to various duties, road patrol,

4    supervisory.  I was undercover, undercover detective for a

5    certain amount of time, and I was also a task force officer with

6    the DEA.

7    Q    During the time that you were a task force officer with the

8    Drug Enforcement Administration, was that during the late 1990's?

9    A    Yes.

10   Q    How long were you a DEA task force officer?

11   A    Four and a half years.

12   Q    And what did you do as a TFO?

13   A    Various things, such as interdiction.  And also, I was the

14   pipeline coordinator for the Maryland State Police in

15   coordination with the Drug Enforcement Administration.

16   Q    Now, what was the job of the pipeline coordinator?

17   A    I was in charge of and solely responsible for contacting the

18   State Police when a seizure was made which rose to the, to the,

19   to a pipeline statistics with the DEA.  And to do any follow-up

20   investigation as pertains to the arrest, the seizure.

21   Q    Part of that involved, since you were working both with DEA

22   and also with the State Police, if the State Police made a drug

23   arrest, would you occasionally go and conduct an interview of

24   that person?

25   A    Yes.

Case 1:04-cr-00029-RDB    Document 679    Filed 06/08/09    Page 5 of 272

1   Q    Let me direct your attention to May 7th of 1999.  Were you

2   on duty that day?

3   A    Yes, I was.

4   Q    And did you receive a call to come to the JFK barracks in

5   relation to an arrest of two individuals?

6   A    Yes, sir, I did.

7   Q    The troopers, among the troopers that were involved in that

8   particular arrest, was it a Trooper Forrester and a Trooper Bond?

9   A    Yes.

10  Q    And you were called in with respect to conducting interviews

11  of two individuals, is that right?

12  A    That's right.

13  Q    Who were the names of the two people you ultimately spoke to

14  that day?

15  A    Of the two?

16  Q    The two individuals --

17  A    That were arrested?

18  Q    -- persons who were arrested?

19  A    Mr. Gardner and Mr. Martin.

20  Q    Is that Shawn Gardner and Shelly Wayne Martin?

21  A    Yes, sir, it was.

22  Q    Sergeant, when you arrived, did this interview take place at

23  the JFK barracks?

24  A    Yes, sir, it did.

25  Q    When you arrived there, what did you do?  Did you go

1   straight into an interview?  Did you talk to the other troopers?

2   A    No, I initially spoke to the duty officer, let him know that

3   I was present in the barrack.  And then went and spoke to the

4   troopers that made the arrest and the seizures.

5   Q    And without getting into what the troopers told you, did

6   they bring you up to speed on more or less what had happened?

7   A    Yes.  From beginning to end.

8   Q    Did you talk to the two individuals, Mr. Martin and Mr.

9   Gardner, separately or the same time?

10  A    Separately.

11  Q    Where did the interviews take place?  What part of the

12  barracks?

13  A    In the corporal's office, which is adjacent to the cells.

14  Q    If you recollect, who did you talk to first?

15  A    Mr. Gardner.

16  Q    And going in and talking to Mr. Gardner, did you begin your

17  interview by Mirandizing him or anything like that?

18  A    No, I hadn't, because I'd already saw and spoke, saw a

19  Miranda form, a signed Miranda form by both, by both the trooper

20  that made the arrest and who read it and also from the

21  individuals themselves signed.

22  Q    So you did not either, with Mr. Gardner or Mr. Martin,

23  re-Mirandize them or anything like that?

24  A    In, I did not.

25  Q    How did you go about conducting an interview of Mr. Gardner?

1    A    Mr. Gardner, I went to the cell block, asked him to step

2    from the cell block and follow me into the corporal's office.

3    And we left there and went into the corporal's office.  It was

4    him and I seated at a desk and a chair, just an office.

5              Closed the door behind him.  Told him who I was.

6    Showed him my badge and told him I wanted to talk to him about

7    the arrest and seizure.

8    Q    Did Mr. Gardner object to that or say that he didn't want to

9    talk to you?

10   A    Not at all.

11   Q    Did he ask for an attorney or anything like that during the

12   course of your interview?

13   A    Not at all.

14   Q    How long did your interview with Mr. Shawn Gardner last?

15   A    Not very long but lengthy enough where we spoke at length

16   about the arrest and his experiences.

17   Q    Did you begin the interview by asking the suspect to

18   identify himself?

19   A    What's that again?

20   Q    Did you begin the interview by getting identifying

21   information from the person?

22   A    Yes, so I could fill out my appropriate paperwork.

23   Q    Just so we're very clear, what name did the person give you?

24   A    From looking, Shawn Earl Gardner.

25   Q    And what did Mr. Gardner tell you during that interview?

DIRECT EXAMINATION OF WOODEN                    8

1    A    That he and Mr. Martin had traveled to New York to buy, to

2    buy cocaine from an individual and that they were, they purchased

3    four ounces, they purchased four ounces of cocaine but they were

4    shorted 50 grams.  And they were going back, they went back to

5    meet this individual to get the 50 grams that they were shorted.

6    And then he also went into, that he had, he had been selling

7    marijuana -- I have it all in my report -- selling marijuana,

8    cocaine for approximately two years, and he detailed some of the

9    individuals that he had been purchasing narcotics from in the

10    past.

11    Q    And Sergeant, if you need to, you can certainly make

12    reference to your report if you want to, to refresh your

13    recollection.

14         Let me ask you a couple of specific questions about

15    that.  Did Mr. Gardner tell you, you mentioned that he indicated

16    he'd been selling drugs for how many, for how long?

17    A    Two years.

18    Q    And did he tell you what drugs they were?  I'm sorry if you

19    said already.

20    A    Yes, he did.

21    Q    What were those drugs?

22    A    Cocaine and marijuana for two years.

23    Q    Now, you mentioned that there was an individual or a source

24    in New York that Mr. Gardner described?

25    A    Several.

1    Q    Who were some of the New York individuals that Mr. Gardner

2    described during your interview with him?

3    A    Poppi, Maxie, Mickey, and Tone.

4    Q    Now, with respect to this instance where Mr. Garner told you

5    that he had been, used the word "shorted" on a buy?

6    A    Yes.

7    Q    Just so we're clear, what do you mean by the term "shorted?"

8    A    If he was going to get four ounces and they only gave him

9    three, that's called shorted because he purchased four but only

10   got three.  So it was, the order was short.

11   Q    Now, as a result of that, did Mr. Gardner describe to you

12   whether or not there was a follow-up meeting scheduled to correct

13   this shorting of drugs?

14   A    Yes, he did.

15   Q    And what was, what did Mr. Gardner tell you about that

16   follow-up meeting?

17   A    That they went, that him and Mr. Martin went to Delaware to

18   get the amount that was short from the individual.

19   Q    And again, that's Poppi?

20   A    Yes.

21   Q    Did Mr. Gardner tell you whether or not they actually got

22   any drugs during this trip to Delaware?

23   A    Yes.

24   Q    And did they?

25   A    Yes, they did.  And he hid it in the center console of the

Case 1:04-cr-00029-RDB    Document 679    Filed 06/08/09    Page 10 of 272

1    vehicle.

2    Q    Now, this trip to Delaware, is that, according to Mr.

3    Gardner, the trip that had led to their arrest where you were

4    talking to him?

5    A    Yes.

6    Q    Just so we're very clear, again, what quantity of drugs was

7    it that Mr. Gardner said he picked up in Delaware?

8    A    50 grams.

9    Q    Of what?

10   A    Crack cocaine.

11   Q    And you indicated that Mr. Gardner described hiding that

12   crack cocaine some place?

13   A    Yes.

14   Q    And where did they hide it?

15   A    In the center console of the vehicle that was later stopped.

16   Q    Now, did Mr. Gardner specify whether or not the crack was

17   hidden in Mr. Gardner's vehicle or in Mr. Martin's vehicle?  And

18   again, feel free to check your report to refresh your

19   recollection.

20   A    Within the MX-6, which, that he concealed the crack cocaine

21   within the MX-6, that he planned to sell it in Baltimore.  I can

22   look back at my reports and tell you which, who was driving the

23   MX-6 if I had to.

24   Q    That's perfectly all right.  But aside from the MX-6, do you

25   recollect Mr. Gardner specifying which car it was, who was

1    driving that particular car?

2    A    From looking at my report, no.

3    Q    That's fine.  Now, at any point did Mr. Gardner tell you how

4    much Mr. Gardner said he told Poppi he could sell each week in

5    terms of drugs?

6    A    36 ounces, which equates to a kilogram.  And Poppi got

7    excited about it and became real loyal to him over that.

8    Q    And again, this is information Mr. Gardner's relaying to

9    you?

10    A    Yes.

11    Q    And when Mr. Gardner told you about that 36 ounces or one

12    kilogram, what drug was he referring to?

13    A    Cocaine.

14    Q    Did he specify whether it was powder or crack cocaine?

15    A    No, just cocaine.

16    Q    About how long did your interview with Mr. Gardner last?

17    A    I don't have it detailed down to the minute, but long enough

18    to obtain enough information where I felt was equivalent to the

19    investigation.

20    Q    And how did you leave things with Mr. Gardner?  Did you just

21    say "thank you" or how does the interview come to an end, if you

22    recollect?

23    A    I can only tell you what I said time after time after time

24    because it was my modus operandi.  I did it.  I said, Thank you

25    and we'll talk to you in a few minutes if we need to.  And I

1   placed him back in the cell.

2   Q    Did you then talk to Mr. Martin?

3   A    Yes, I did.

4   Q    And did that --

5            THE COURT:  Would you like some water?

6            THE WITNESS:  No.  I'm trying to speak low, Your Honor,

7   I'm a little bit tired.

8   Q    Sergeant, I should have asked.  You're coming off the

9   midnight shift, is that correct?

10  A    That's correct.  I haven't slept in a day and a half.  A day

11  and a half.  So I'm a little tired.

12  Q    I appreciate you're staying with us.

13  A    That's okay.  I'm with you.

14  Q    Now, you ended up walking Mr. Martin from a holding location

15  into the corporal's office?

16  A    That's correct.

17  Q    And did you essentially talk to him?

18  A    Yes.

19  Q    Briefly, what did Mr. Martin describe?

20  A    Mr. Martin basically said he was with Gardner the entire

21  time in Delaware.

22  Q    And did Mr. Martin admit to having any knowledge of crack

23  cocaine or drug deals or anything?

24  A    No.

25  Q    And did you end your discussion with Mr. Martin the same way

DIRECT EXAMINATION OF WOODEN                13

1    you ended it with Mr. Gardner?

2    A    Yes.

3    Q    One more question.  Just by way of clarifying, Sergeant.

4    Going back to Mr. Gardner's interview.  The trip to Delaware was

5    to pick up a quantity to make up for a previous shorted quantity,

6    is that right?

7    A    That's right.

8    Q    And just so we're very clear.  That previous quantity that

9    had been shorted, what did Mr. Gardner tell you about where he

10   got that from?  What city and from whom?

11   A    I don't understand your question.

12   Q    The trip to Delaware was to correct a previous deal that had

13   been shorted, is that right?

14   A    Right.

15   Q    I just want to step back.  What did Mr. Gardner tell you

16   about that first trip?

17   A    To New York.

18   Q    And who was it being bought from?

19   A    Bought from?

20   Q    Yes.

21   A    From Poppi.

22   Q    And what was the amount supposed to have been that Mr.

23   Gardner was going to get from Poppi?

24   A    Four ounces.

25   Q    Thank you, Sergeant.  Nothing further, Your Honor.

1              CROSS EXAMINATION

2    BY MR. PYNE:

3    Q    Good morning, Sergeant.  I'm Jim Pyne.  I represent Mr.

4    Martin.

5    A    How are you doing, Mr. Pyne?

6    Q    When you first met with Mr. Martin, did you notice anything

7    unusual about him?

8    A    No.

9    Q    Now, you've been a trooper for a number of years, is that

10   correct?

11   A    Yes.

12   Q    And are you trained to note, to notice whether or not people

13   are acting under the influence of either drugs or alcohol?

14   A    I'm very well trained in that.

15   Q    Okay.  And did you notice anything about Mr. Martin that

16   would indicate to you that he was under the influence of either

17   drugs or alcohol?

18   A    No.

19   Q    And if you had made such observations, you would have noted

20   them in your report?

21   A    Yes.

22   Q    And you made no such notes in your report in regards to any

23   intoxication on the part of Mr. Martin?

24   A    No.

25   Q    So is it your opinion that he was not under the influence of

1    marijuana on that, at the time you interviewed him?

2    A    No.

3    Q    Okay.  Did you notice whether or not there was an odor of

4    marijuana about him?

5    A    Coming from his person?  No.

6    Q    So there was no odor of marijuana about his person?

7    A    About his person, no.

8    Q    Okay.  Now, when you met with Mr. Martin, did you Mirandize

9    him?

10   A    No.

11   Q    And why was that?

12   A    Because he was already Mirandized.

13   Q    And do you know when it was he was given his Miranda rights?

14   A    If I had that exhibit in front of me, I could tell you.  But

15   I don't have it with me.

16   Q    But you relied upon the other trooper, Trooper Bond, I

17   believe it was, telling you that he had Mirandized Mr. Martin?

18   A    And I wanted to see the written Miranda form, yes.

19   Q    And so you did assure yourself by viewing the written

20   Miranda form before you talked to him?

21   A    Yes.

22   Q    About how long did your interview with Mr. Martin last?

23   A    Not very long.

24   Q    And Mr. Martin advised you that he had gone up that morning

25   to pick up a car and drive it back to Maryland, is that correct?

1   A    From my notes, I have that he said that he was with Mr.

2   Gardner the entire time in Delaware.  That's all I've got.

3   Q    Well, did you speak to the other troopers?

4   A    Yes.

5   Q    Did they advise you what they had been told by Mr. Martin?

6   A    Yes.

7   Q    Did they advise you that Mr. Martin had told them that he

8   had gone up to pick up a car that Mr. Gardner had just purchased?

9           MR. HANLON:  Objection, Your Honor.

10          THE COURT:  Rephrase the question, please.

11  BY MR. PYNE:

12  Q    Were you advised by the other troopers what they were told

13  by Mr. Martin?

14  A    Yes.

15  Q    And did they tell you that Mr. Martin had told them he had

16  gone up with Mr. Gardner to pick up a car that Mr. Gardner had

17  just purchased?

18          MR. HANLON:  Objection, Your Honor.

19          THE COURT:  Again, ladies and gentlemen, a question

20  asked by counsel is not evidence in the case.  The objection is

21  sustained.  Go ahead, Mr. Pyne.

22  BY MR. PYNE:

23  Q    Did you do any further investigation in this case as to the

24  registrations of the vehicles involved?

25  A    No.

Case 1:04-cr-00029-RDB    Document 679    Filed 06/08/09    Page 17 of 272

1    Q    So your only involvement in this case was with the

2    interviews of Mr. Gardner and Mr. Martin?

3    A    Yes.

4    Q    And it's your testimony that all that Mr. Martin said to you

5    was that he was with Mr. Gardner the whole time?

6    A    He also gave me enough information to fill out a DEA

7    informational sheet about him, with his name, date of birth,

8    everything else that I have listed.  And also provided the fact

9    that he said he was with Mr. Gardner the entire time in Delaware.

10   That's it.  That's all I have.

11   Q    Okay.  Is that all you wrote down, meaning that he may have

12   told you additional information that you didn't deem noteworthy

13   or --

14   A    No.  If he would have said anything else to me, I would have

15   wrote it down.  But at that point there was nothing else to write

16   down and the interviewed was stopped.

17   Q    So it's your testimony that Mr. Martin never told you that

18   he had gone up to pick up a vehicle that Mr. Gardner had

19   purchased?

20   A    Exactly what I'm saying to you, Mr. Pyne, is exactly what I

21   have noted and it's the same thing over and over again.  He told

22   me, after I tried to debrief him and speak to him, that he spent

23   the entire time with Mr. Gardner.  That's all I have.

24   Q    Okay.  And what did you take "the entire time" to mean?

25   A    The entire time.  That he didn't leave his side the entire

1    time while he was in Delaware.  That's how I make it to mean.  If

2    you want my personal opinion, that he was with him every moment

3    of every day, however long it took.  He was right by his side.

4    Q    Well, did you have any idea of however long "it took" was?

5    I mean, are we talking a week?  Been up there a month?  Had they

6    just moved down there from living there for several years?  What

7    did you take "the entire time" to mean?

8    A    That he was with him the entire time.  That's it.  Plain and

9    simple.

10   Q    So you didn't attach any time frame to that entire time?

11   A    I don't understand.  However long it took, he was right at

12   his side.  I didn't ask him the time length down to the second,

13   down to the minute.  That he was with him, no matter what he did,

14   he was right at his side.  That's how I take it.  And that's what

15   he said.

16   Q    I guess my problem is with "it."  How long it took.  What is

17   the "it" that you're referring to?  What are we dealing with?

18              MR. HANLON:  Objection, Your Honor.  Asked and

19   answered.

20              THE COURT:  Sustained.

21   BY MR. PYNE:

22   Q    Are you aware that the charges against Mr. Martin were

23   dropped in this case?

24   A    Mr. Pyne, I have my investigation, I have no idea what

25   happened after that or pursuant.  I did what I was responsible

Case 1:04-cr-00029-RDB   Document 679   Filed 06/08/09   Page 19 of 272

1    for doing and that's why I'm here today.

2    Q    Okay.  Thank you very much.

3              THE WITNESS:  You're welcome.

4              CROSS EXAMINATION

5    BY MR. COBURN:

6    Q    Good morning, Corporal Wooden.

7    A    Sergeant Wooden.

8    Q    I know you've been up for a day and a half -- I'm sorry.

9    Sergeant.  Forgive me.  I know you've been up for a day and a

10   half.  I won't keep you much longer.

11   A    That's okay.

12   Q    If I understand correctly, or you can just tell me, was it

13   your understanding that when the other trooper, Trooper

14   Forrester, I think, who you spoke with before doing these

15   interviews, you understood from him that when he first

16   encountered Mr. Gardner, Mr. Gardner's car was just stopped on

17   the side of I-95, is that right?

18             MR. HANLON:  Objection, Your Honor.

19             THE COURT:  Overruled.  You may answer.

20   Q    Is that right?

21   A    Say it again, please.

22   Q    Did you understand from Trooper Forrester that when he first

23   encountered Mr. Gardner on the side of I-95, that Mr. Gardner's

24   car was just stopped there on the shoulder?

25   A    I don't recall exactly.

1  Q    You can feel free, by the way, in response to any of my

2  questions, as far as I'm concerned, you can feel free to refer to

3  any of your notes?

4  A    Okay.  Thank you.

5  Q    And you've actually got some very detailed notes about this,

6  right, on what's called a DEA-6?

7  A    Yes.

8  Q    Feel free to look at it.  Was it your understanding from

9  talking to the, the two other troopers that were involved in

10 these two stops, I believe that's Trooper Bond and Trooper

11 Forrester, that both of these individuals, Mr. Gardner and Mr.

12 Martin, consented freely and voluntarily to having theirs cars

13 searched?

14          MR. HANLON:  Objection, Your Honor.

15          THE COURT:  Overruled.

16 Q    Is that right?

17 A    That's what they told me and that's what I went with, yes.

18 Q    Okay.  Well, the part of this incident that you were more

19 involved in was actually talking to these two individuals,

20 correct?

21 A    The interview and debriefing, correct.

22 Q    That's what you did yourself?

23 A    That's what I did myself.

24 Q    Now, you're a very experienced trooper, experienced police

25 officer, correct?

1   A    Correct.

2   Q    When you talked to these individuals, you did nothing to

3   coerce them to talk to you in any way, did you?

4   A    No.

5   Q    Their conversations with you were completely free and

6   voluntary, weren't they?

7   A    Yes.

8   Q    In fact, you refer to these conversations with Mr. Gardner

9   and Mr. Martin as debriefings.  You debriefed them, right?

10  A    Correct.

11  Q    Okay.  You didn't deprive them of food or water, anything

12  like that, did you?

13  A    No.

14  Q    If they needed to go to the bathroom, you let them, right?

15  A    Yes.

16  Q    When you were asked by Mr. Hanlon whether they objected to

17  talking to you, your response was, Not at all, right?

18  A    Correct.

19  Q    And when Mr. Hanlon then asked you whether they asked for an

20  attorney before talking to you, your response again was, not at

21  all, right?

22  A    Correct.

23  Q    And that was completely accurate, right?

24  A    Yes.

25  Q    I mean, they just spoke with you openly and voluntarily,

1    correct?

2    A    Absolutely, yes.

3    Q    You didn't promise them anything in response to their

4    talking to you, is that right?

5    A    That's right.

6    Q    So far as they knew, they had nothing to gain and everything

7    to lose by talking to you, right?

8    A    I asked to speak to them.

9              MR. HANLON:  Objection, Your Honor.

10             THE COURT:  The objection is sustained.

11   BY MR. COBURN:

12   Q    It was your understanding, was it not, that Mr. Gardner,

13   just restricting myself for the moment to my client, admitted to

14   you that he was engaged in the criminal conduct of dealing drugs,

15   right?

16   A    Yes.

17   Q    He didn't have to but he did, anyway, right?

18   A    Yes, he did.

19   Q    And if I understood you correctly, Mr. Martin told you that

20   he was with Mr. Gardner during the transaction you described,

21   right?

22   A    Right.

23   Q    And Mr. Gardner told you that he was with Mr. Martin during

24   the transaction that you described, right?

25   A    Right.

1  Q    Mr. Gardner gave you his, at least so far as you know, to be

2  his true name, Shawn Earl Gardner, right?

3  A    Right.

4  Q    Now, in response to, Mr. Hanlon asked you a few questions

5  about what Mr. Gardner told you.  But he actually provided

6  significantly more detail than you told the jury so far, right?

7  A    Yes.

8  Q    I mean, you've got like a long paragraph, Paragraph Six,

9  about what Mr. Gardner told you about his contacts with Poppi,

10  Maxie, Mickey, Tone, meeting in the small restaurant in Delaware,

11  where the drugs were concealed, and all of that, right?

12  A    Yes, including some of their phone numbers that he showed

13  me.

14  Q    He gave you some of the phone numbers for his suppliers,

15  right?

16  A    Right.

17  Q    With respect to the cocaine which was in the vehicle that

18  was being driven by Mr. Martin, Mr. Gardner owned up to you that

19  that was his drugs, right?

20  A    Said that he concealed it in the MX-6, correct.

21  Q    And you may not know the answer to this, so forgive me, feel

22  free, obviously, to say you don't.  But it's a fact, is it not,

23  that with respect to the state charges that Mr. Gardner picked up

24  as a result of this, a result of the incident and his confession,

25  he went to jail, right?

1    A    I have no idea.

2    Q    Okay.  Now, what did Mr. Martin -- I'm sorry.  What did Mr.

3    Gardner tell you about someone by the name of Willie Mitchell?

4    A    Nothing.

5    Q    What did he tell you about someone by the name of Shelton

6    Harris?

7    A    Nothing.

8    Q    And what did he say about the Randallstown/Park Heights

9    organization?

10   A    Nothing.

11   Q    And what did he say about Shake Down Entertainment?

12   A    Nothing.

13   Q    Thank you, sir.

14               REDIRECT EXAMINATION

15   BY MR. HANLON:

16   Q    Thank you, Your Honor.  Sergeant, you were asked a number of

17   questions just now about Willie Mitchell, Shelton Harris, the

18   Randallstown/Park Heights organization, and, I can't remember if

19   you were asked about Shake Down Entertainment or Sheistyville

20   records.  Never heard of any of them, is that right?

21   A    No.

22   Q    Let me ask you.  During the time that you were a DEA TFO,

23   did you regularly do interviews with suspects like the ones that

24   you testified about today?

25   A    Yes, in very detailed drug organizations.  Investigations.

1    Q    During your time, in your experience talking to individuals

2    like the interviews you discussed today, did you ever in your

3    investigations find that people would provide you names but leave

4    out other names?

5            MR. COBURN:  Objection.

6            THE COURT:  The objection's overruled.  You may answer.

7    A    Yes.

8    Q    Under, what were your findings there?  What kind of names

9    would you occasionally find were left out when you would debrief

10   a suspect who would admit to drug trafficking?

11           MR. COBURN:  Objection.

12           MR. MARTIN:  Objection.

13           THE COURT:  The objection's overruled.  You may answer.

14   A    That they give away disposable people that mean very little

15   to them but they won't, they won't tell you the people that mean

16   the most to them.

17   Q    People mean the most to them, such as who?  What types of

18   individuals?

19   A    Co-conspirators, people that, major suppliers.  People they

20   depend on day to day.

21   Q    You were asked by Mr. Coburn, who pointed out that I

22   appeared to have left out some of the details in Paragraph Six of

23   your DEA report.  Just so we're clear and just so the jury has

24   the complete story of the report, do you have Paragraph Six in

25   front of you?

Case 1:04-cr-00029-RDB   Document 679   Filed 06/08/09   Page 26 of 272

1    A    Yes, I do.

2    Q    If you would, Sergeant, could you just read Paragraph Six of

3    your report into the record?

4    A    I will.

5            THE COURT:  Read it slowly, please, Sergeant, which you

6    probably would, anyway, given --

7            THE WITNESS:  Right.  And a little louder.

8            THE COURT:  Yes.  Thank you.

9            THE WITNESS:  TFO Wooden responded to the JFK barrack

10   and conducted a debriefing of both subjects.  Prior to TFO

11   Wooden's arrival, both Martin and Gardner were advised of their

12   written constitutional rights per Miranda respectively, which

13   both stated they understood.

14           During the debriefing, the following was determined.

15   Gardner has been selling cocaine and marijuana for two years.

16   Gardner stated he had been in contact with the Dominican male in

17   New York, 150th and Broadway in Manhattan -- 150th meaning the

18   street -- known only as Poppi.  Gardner stated that he contacted

19   Poppi by paging him or a subject named Maxie at the following

20   pager number, 917-798-4253.

21           Gardner further stated that he has purchased large

22   amounts of cocaine and marijuana from two other subjects known as

23   Mickey, the following number, 917-831-1324, and Tone,

24   718-858-4494.  Gardner stated that he initially purchased four

25   ounces of crack cocaine from Poppi.  However, the amount was

1    short 50 grams.  Gardner informed Poppi that he wanted the

2    remainder and both arranged a meeting.  Poppi, Gardner and Martin

3    met --

4              MR. PYNE:  Objection.

5              THE COURT:  Overruled.

6              THE WITNESS: -- met in Delaware at a small restaurant

7    and Poppi gave Gardner and Martin the CDS recovered above.

8    Gardner stated that he had, he then concealed the crack cocaine

9    within the MX-6 and planned to sell it in Baltimore.

10             Gardner further stated that he had told Poppi that he

11   could move or sell 36 ounces, one kilogram, of crack cocaine,

12   which Gardner stated made Poppi extremely interested and loyal.

13             Gardner stated that Martin was present --

14             MR. PYNE:  Objection.

15             THE COURT:  Overruled.

16             THE WITNESS: -- during all of the exchange.

17   BY MR. HANLON:

18   Q   And Sergeant, you were asked about Shake Down and

19   Sheistyville, whatever you may have known about that.  Would you

20   have any, would you have had any idea of knowing whether Shake

21   Down even existed as an entity in 1999 when this arrest took

22   place?

23             MR. COBURN:  Objection.

24             THE COURT:  I didn't hear the rest of the question.

25   Repeat the question, please.

1    Q    Certainly, Your Honor.  Sergeant, would you have any way of

2    knowing whether Shake Down Entertainment existed as an entity in

3    1999?

4              MR. COBURN:  Objection.

5              THE COURT:  Overruled.  You may answer.

6    A    No.

7    Q    And you were asked about, I asked you about Willie Mitchell

8    and you were asked about Willie Mitchell on cross.  Shelton

9    Harris is a name that came up during cross examination.  Would

10   you have any way of knowing whether or not Mr. Harris would have

11   become associated with Mr. Martin or Mr. Gardner later on after

12   your interview?

13             MR. MARTIN:  Objection.

14             THE COURT:  Overruled.  You may answer.

15   A    No.

16   Q    And finally, Sergeant, in Paragraph Six of your interview

17   near the end, if I heard you correctly, if I'm reading it

18   correctly, you specified that the 36 ounces or one kilogram of

19   narcotics that were being moved a week was crack cocaine; is that

20   what you specified?

21   A    Yes.

22   Q    All right.  Is that what you recollect hearing from Mr.

23   Gardner?

24   A    If it's in my report, it's exactly what I heard.

25   Q    Thank you, Your Honor.

1          MR. COBURN:  May I, Your Honor?

2          MS. RHODES:  Your Honor, if I can.

3          THE COURT:  Briefly.

4          RECROSS EXAMINATION

5    BY MS. RHODES:

6    Q    Trooper Wooden, you've said -- I represent Mr. Mitchell --

7    you've said that this was a lot, 36 ounces was for how much, what

8    period of time?

9    A    What is that again?

10   Q    36 ounces, it was over what period of time?

11   A    Basically, he said that he told, that Gardner further stated

12   that he told Poppi that he could move or sell 36 ounces, one

13   kilogram of crack cocaine.  There was no period of time.

14   Q    Didn't say -- okay.  But he also told you that that, that

15   Poppi was really excited about that?

16   A    Yes.

17   Q    That was a lot of, a lot of weight, right?

18   A    Yes.

19   Q    Okay.  And so Mr. Gardner is getting a lot of cocaine from

20   Poppi, right?

21   A    Yes.

22   Q    And he was going to New York to do that?

23   A    Yes.

24   Q    So Poppi was one of his suppliers?

25   A    Yes.

1    Q    And therefore not really in the category of disposable

2    people, right?

3    A    Everything could be disposable at any point in that time.

4    Q    Well, a minute ago you listed people who were really

5    important to them, like majors, like suppliers --

6    A    Um-hum.

7    Q    -- would not be somebody they'd necessarily mention, right?

8    A    Right.

9    Q    That sounds like Poppi, doesn't it?

10   A    Be a major supplier?  A major supplier could also --

11   Q    A supplier.  A supplier.

12   A    A major supplier could also be supplying 10 kilos, 20 kilos,

13   50 kilos.

14   Q    But you have no reason to think that that was going on with

15   Mr. Gardner, do you?

16   A    I have no way of knowing if that was going on.

17   Q    Well, excuse me.  But with your expertise --

18         THE COURT:  You're arguing with the witness, Ms.

19   Rhodes.

20   Q    You're an experienced officer, right?

21   A    Yes.

22   Q    You were doing task force work on drug dealing, right?

23   A    Yes.

24   Q    Okay.  So when you interviewed Mr. Gardner, you made

25   assessments about what he was saying and used that information,

1    even as he was telling you, right?

2    A    Right.

3    Q    Okay.  And you understood that Poppi was, for him, an

4    important supplier, right?

5    A    An important supplier?  No.

6    Q    Yes.

7    A    Not an important supplier.  No.  I just said he was a

8    supplier.

9    Q    Okay.  So Poppi could have just been as disposable as

10   anybody else to him, then, right?

11   A    Yes.

12   Q    Okay.  And did you follow up on all the leads that you got

13   from him?

14   A    It was moved to another entity who did that.

15   Q    Okay.  In other words, tracking down Maxie, tracking down

16   Poppi, tracking down Mickey, tracking down Tone, and seeing if

17   those numbers were correct and seeing if those people were known

18   to be involved in the drug trade, right?

19   A    The other entity?  Yes.

20   Q    Thank you.

21            THE COURT:  Briefly, Mr. Coburn.

22            RECROSS EXAMINATION

23   BY MR. COBURN:

24   Q    Thank you so much, Your Honor.  Sergeant, good morning

25   again.  Just a few additional questions.  If I understood you

1    correctly, it's your experience, and you said this in response to

2    Mr. Hanlon's redirect, that when you interview people, sometimes

3    they'll give away disposable people but not people that are

4    important to them.  Is that right?

5    A    That's right.

6    Q    Okay.  Now, when you talked to Mr. Gardner, he didn't just

7    tell you about one supplier, he told you about four separate

8    suppliers, right?

9    A    Right.

10   Q    And he gave you, I believe you said, their phone numbers,

11   right?

12   A    Several of the phone numbers, yes.

13   Q    And he got no benefit in exchange for this, so far as you

14   know, right?

15   A    So far as I know.

16   Q    Okay.  But even aside from the suppliers, Mr. Gardner also

17   told you that he and Mr. Martin --

18         MR. PYNE:  Objection.

19   Q    -- had met Poppi in Delaware at a small restaurant and Poppi

20   gave Gardner and Martin --

21         MR. PYNE:  Objection.

22   Q    -- the CDS, that's the controlled dangerous substance

23   referenced -- I'm just reading from the same paragraph.

24         THE COURT:  Yeah.  Let me instruct the jury.  As you

25   have observed and as you fully are aware, ladies and gentlemen,

1    in his direct examination of this witness, Mr. Hanlon asked

2    specific questions, which this witness answered, regarding his

3    interview of Mr. Gardner and his interview of Mr. Martin.

4            On cross examination Mr. Coburn brought out the fact

5    that Mr. Hanlon had left out a number of details in his

6    questioning of the witness that were contained in the report.

7    Mr. Hanlon then, on his redirect examination, quite properly, in

8    response to Mr. Coburn's cross examination of the witness, had

9    the witness read into the record the Paragraph Six contained in

10   his report.

11           Now, that Paragraph Six, of course, is this witness'

12   account of his interview with Mr. Gardner.  The information

13   provided by Mr. Gardner to this witness is available to you to

14   consider and evaluate, as is all the other evidence in the case.

15   You will be instructed in detail as to how to evaluate all the

16   evidence, all the testimony, and in particular, you will be

17   instructed as to how to evaluate and assess any alleged statement

18   by any alleged defendant or any alleged co-conspirator of any

19   alleged defendant.  All of this will be explained to you.

20           So we've sort of gone off somewhat on a tangent beyond

21   the direct examination of this witness, but that was appropriate

22   given Mr. Coburn's cross examination of the witness.  So now

23   we're talking about a statement that the government didn't even

24   go into until it found it appropriate to do so in response to the

25   cross examination.

1          So obviously, I think it's clear to you where we are,

2     what we're doing.  And Mr. Coburn is entitled to probe just a

3     little bit longer with this witness about this infamous Paragraph

4     Six.  Go ahead, Mr. Coburn.

5     BY MR. COBURN:

6     Q    Thank you so much, Your Honor.  I just have really two more

7     questions.  And again, just kind of bearing in mind what you said

8     about people being willing, in your experience, to give up the

9     people that are disposable but not the ones close to them.

10    Right?

11    A    Correct.

12    Q    Okay.  Mr. Gardner specifically told you that Mr. Martin was

13    present during some of the transactions he described, right?

14    A    All the transactions.

15          MR. PYNE:  Objection.

16    Q    All of the transactions he described?

17          THE COURT:  Objection is overruled.

18    Q    Right?

19    A    Right.

20    Q    Okay.  But he didn't say a word about Willie Mitchell or

21    Shelton Harris, right?

22    A    Right.

23    Q    Thank you.

24          THE COURT:  Thank you very much, Sergeant.  You're

25    excused.  Get some sleep.

1          THE WITNESS:  Thank you.

2          THE COURT:  Next witness.

3          MR. HARDING:  Your Honor, the next witness is the

4    T-Mobile custodian, whose name did not appear on the list of

5    potential witnesses or persons whose names would be mentioned in

6    the course of testimony.

7          THE COURT:  And what is his or her name?

8          MR. HARDING:  Her name is Sue Johnson.  She resides in

9    upstate New York and works in New Jersey.  So I doubt if she's

10   known to any of the jurors.

11         THE COURT:  Well, let's see.  Ms. Johnson, if you'll

12   come in, please.  Does any member of the jury recognize this

13   witness?  Ms. Sue Johnson residing in upstate New York, working

14   for T-Mobile?  It appears not.  Thank you very much.

15         Please raise your right hand and face the clerk, Ms.

16   Johnson.  Good morning.

17          SUSAN JOHNSON, GOVERNMENT'S WITNESS, SWORN

18         THE WITNESS:  I do.

19         THE CLERK:  Scoot around.  Speak directly toward the

20   mike.  State your name and spell it for the record, please.

21         THE WITNESS:  Susan Johnson.  J-O-H-N-S-O-N.

22         DIRECT EXAMINATION

23   BY MR. HARDING:

24   Q    Good morning, Ms. Johnson.

25   A    Good morning.

1    Q    Can you tell us how you're employed?

2    A    By T-Mobile.

3    Q    And how long have you been employed by T-Mobile, Ms.

4    Johnson?

5    A    Off and on for the last 11 years.

6    Q    Where are you based?

7    A    Parsippany, New Jersey.

8    Q    And can you tell us what state you reside in, without

9    telling us your address?

10   A    New York state.

11   Q    Okay.  What's your assignment working for T-Mobile in

12   Parsippany, New Jersey?

13   A    I am the custodian of records.

14   Q    And what does that entail exactly?

15   A    Subpoena compliance, as well as court-ordered wiretapping.

16   Q    Okay.  I bet you've had occasion to testify in courtrooms

17   before, is that correct?

18   A    Yes, I have.

19   Q    Can you give us an idea how many times?

20   A    Over a hundred.

21   Q    I have here an exhibit which is not yet in evidence, but

22   which I've just put on the screen here, MB-53.  Did you and I go

23   through this this morning, Ms. Johnson?

24   A    Yes, we did.

25   Q    And is this a compendium of cell site locations operated by

1   T-Mobile in the State of Maryland?

2   A     Yes, it is.

3   Q     And it's hundreds of pages, is that correct?

4   A     Correct.

5   Q     Do you have any idea how many cell sites T-Mobile has in

6   Maryland?

7   A     I don't.

8   Q     A very high number, it sounds like, though, is that correct?

9   A     Yes.

10  Q     Okay.  You and I discussed this this morning, Ms. Johnson.

11  And did you explain to me how each of the cell sites has a code

12  number assigned to it?  And I pulled out one of the pages of

13  this.

14          MR. MARTIN:  What page, Mr. Harding?

15  Q     Well, the pages aren't pagenated, I'm afraid.  It's the page

16  that contains an entry for 10171.  Do you see that, Ms. Johnson?

17  A     Yes, I do.

18  Q     Is it on the screen in front of you?

19  A     Yes, it is.

20  Q     Okay.  So according to this compendium, this printout that

21  you provided to me, is that correct?

22  A     Yes, I did.

23  Q     What is the physical location of the cell site bearing the

24  code number 10171?

25  A     2401 Violet Avenue, Baltimore City.

Case 1:04-cr-00029-RDB    Document 679    Filed 06/08/09    Page 38 of 272

1    Q    Okay.  And do you see how there are two other numbers

2    assigned for the same location, 10172 and 10173.  Do you see

3    that?

4    A    Yes, I do.

5    Q    And those numbers are actually repeated again following

6    10171.  Do you see that?

7    A    Yes, I do.

8    Q    Did you explain to me and can you explain to the ladies and

9    gentlemen of the jury, what is the difference between a cell site

10   location ending in 1, ending in 2, and ending in 3?

11   A    The numbers that you see here, 10172, the last digit of that

12   number tells us the sector of the cell site that the phone call

13   is hitting off of.  In this case, 2 is the south side of the

14   tower.  The 1 would represent the northeast side of that tower.

15   And then the last digit, 3, would represent the northwest side of

16   that tower.

17         So you're going to see the same number but just the

18   last digit is going to change.  It's going to be a one, a two, or

19   a three.  And that just tells us the sector and what side of the

20   tower they were on.

21   Q    So are there three sides to every cell phone tower?

22   A    Not, there could be more but the majority of them are

23   three-sided.

24   Q    Okay.  Did you explain this to me this morning by drawing a

25   diagram of a Mercedes Benz emblem?

1    A    I did.

2    Q    Okay.  I'm going to put this on this easel right here.

3         THE COURT:  Just a moment.  Do we have the lavaliere

4    available or the stand-alone for Mr. -- thank you, Ms. Arrington.

5    Q    I'm sorry, Your Honor.  I was trying to talk loudly but this

6    is much better.

7         THE COURT:  I understand.  Ms. Johnson, if you will

8    continue to speak into the microphone.  Sorry to do this to you.

9         THE WITNESS:  That's okay.

10        THE COURT:  Perhaps you can move the easel a bit so

11   that the witness doesn't have to turn quite so abruptly, Mr.

12   Harding.

13   Q    Can I move it in front of Ms. Arrington?

14        THE COURT:  I think that's a good idea.  If you can get

15   it through there without injuring yourself.  Counsel, if you need

16   to move over, of course.

17        MR. COBURN:  Thank you, Your Honor.

18   BY MR. HARDING:

19   Q    Okay.  A Mercedes emblem is an inverted Y, is that correct?

20   A    Yes.

21   Q    Like that?

22   A    Correct.

23   Q    Now, can you explain, using this diagram, what the

24   designations one, two, and three mean at the end of a cell site

25   location number on that exhibit that we were just referring to?

1    A    Sure.  Number one would be on the right-hand side, which

2    would represent northeast.  Two would be down at the bottom,

3    which would represent south.  And then the three sector would be

4    over to the left, which would represent northwest.

5    Q    Okay.  So this is one cell site location but there are three

6    different sides to the cell site location, is that correct?

7    A    Yes.

8    Q    So when a call comes through and it's listed as being in

9    cell site, a cell site location that ends in one, what does that

10   tell you about where the person is who's using that cell phone in

11   relation to the cell phone tower?

12   A    That tells me that they were on the northeast side of that

13   tower when they made that call or received that call.

14   Q    In other words, somewhere in this whole one-third of the pie

15   like this?

16   A    Correct.

17   Q    And same thing with two and three?  If somebody makes a cell

18   phone call and it comes up on the toll bills as hitting off of

19   cell phone tower ending in a two, that means he's south of the

20   cell phone tower, is that correct?

21   A    Correct.

22   Q    All right.

23        THE COURT:  You finished with the easel, Mr. Harding?

24   And you can turn off the lavaliere.  Why don't you keep it on in

25   case you have to move around?

1    Q    Okay.  Now, did I also discuss with you this morning two

2    sets of toll records that have been marked Government Exhibit T-1

3    and T-2?

4    A    Yes, you did.

5    Q    And I showed you T-1.  And we went over this in some detail

6    this morning, did we not, Ms. Johnson?

7    A    Yes, we did.

8    Q    Can you authenticate this as genuine records of T-Mobile

9    relating to the account that's listed on the cover letter of this

10   exhibit?

11   A    Yes, I can.

12   Q    And let me ask you a few questions about this.  On Page Two

13   of this account, which is subscribed to in the name of Maryland

14   Land Design, with an address in Westminster, Maryland, on Page

15   Two there's a, what appears to be a printout of a computer

16   screen.  And it contains in the upper right a designation "RAT."

17   Can you tell us, Ms. Johnson, what that means?

18   A    RAT indicates that it's a fraud account, and RAT stands for

19   Risk Assessment Team.  It lets us know that the fraud team has

20   reviewed this account.

21   Q    I see.  So does that mean that Maryland Land Design might

22   not have had anything to do with this account?  Is that your

23   testimony?

24   A    Correct.

25   Q    Now, let me call your attention to some of the pages in

1    here.  By the way, did you review when the service was

2    established on this account and when it was canceled?

3    A    Yes, I did.

4    Q    And when was it established and when was it canceled?

5    A    It was established February 14th, 2002.  And it was canceled

6    on March 4th, 2002.

7    Q    Okay.  Now, let me ask you a couple questions about the

8    entries for the calls that are listed in this set of toll

9    records.

10           For some of the calls that are listed here, there's a

11   sort of region given, like Baltimore, Maryland or Parkville,

12   Maryland or Catonsville, Maryland.  And for other calls, it just

13   says "incoming."  Can you explain what those designations mean?

14   A    Sure.  The calls to Baltimore, 410-542, that just means that

15   it's an exchange that belongs to Baltimore.  There's another

16   Baltimore exchange, 443-253.  It just simply means that that area

17   code and prefix is assigned to Baltimore.

18           The calls that are listed as incoming, it means that

19   they were incoming.  If you do see the city and state, that means

20   that they were outbound calls.

21   Q    Okay.  So in other words, the outbound calls were being

22   placed by whoever it was that was operating this phone bearing

23   the number 739-5811, is that correct?

24   A    Yes.

25   Q    But you say that these regions are in here for the outbound

1    calls are just the regions that are assigned to the prefixes of

2    the telephone numbers that are called, is that correct?

3    A    Correct.  The prefix and the area code.

4    Q    Does it tell you anything about where the caller is when the

5    call is being placed?

6    A    Not on these records, no.

7    Q    Okay.  Also, there's an indication here of the number of

8    minutes.  There's a column labeled minutes on here.  Can you tell

9    us what these entries mean?

10   A    Sure.  We bill in one minute increments.  So if a call is 45

11   seconds, we're going to bill it at one minute.  If a call is one

12   minute and two seconds, we're going to round it up and bill it at

13   two minutes.  If calls come into the phone that are not answered,

14   they're not going to reflect in the phone records at all.

15   Q    Okay.  So in other words, if there is an entry on these

16   records that are in T-1, that means there was actually a

17   conversation, is that correct?

18   A    Correct.  There was some sort of physical connection.

19   Whether it was with an answering machine or a live voice, there

20   was some sort of a connection.

21   Q    Okay.  So it could be a voice mail, is that correct?

22   A    Well, it wouldn't be a voice mail in.  It would be, if this

23   person was making a call out and received a voice mail on the

24   other end, it would be a physical connection.

25   Q    I see.  Only with an outbound call, then, if it's listed on

1    these tolls and there's an assignment of the number of minutes it

2    took does that mean that it might be a voice mail, is that

3    correct?

4    A    Correct.  Only if it's an outbound call.

5    Q    If it's an incoming call, it was a conversation, though,

6    because voice mails wouldn't show up at all, is that correct?

7    A    That's correct.

8    Q    And if it's an outbound call and it's listed, say, as being

9    one minute, can you tell whether it went over to the voice mail

10   or whether there was a conversation?

11   A    Well, if it's listed as one minute, there was some sort of a

12   conversation.  It would not have rolled over into this person's

13   voice mailbox.

14   Q    Okay.  But you said that it might be a voice mail if it were

15   listed on these bills.  What would the number of minutes appear

16   as if it were a voice mail?

17   A    If this phone here made an outbound call, okay, and it's

18   listed on here, that means that this phone had either a

19   conversation with somebody or received a voice mail on the other

20   end.  It's not into the phone.

21   Q    Or received a voice mail?  Didn't you mean that --

22              THE COURT:  I think she means a voice mail answered.

23              THE WITNESS:  Correct.  If I was to call you and

24   receive your voice mail, I would leave you a voice mail message,

25   but I'm the T-Mobile customer.  It would reflect in my record

1    because I'm connected to your voice mail on your land line desk

2    phone.

3    BY MR. HARDING:

4    Q    I see.  Okay.  Maybe I'm being a little slow about this.

5    But if you place an outbound call and it shows on these records,

6    it could be that I've just simply connected with a person's voice

7    mail machine and not had an actual conversation?

8    A    Correct.

9    Q    And therefore, I might have left a message for that person?

10   A    Correct.

11   Q    Okay.  And it's completely different with an incoming call

12   because voice mail wouldn't be recorded at all on these tolls, is

13   that correct?

14   A    That's correct.

15   Q    All right.

16              THE COURT:  Would you like some water, Ms. Johnson?

17              THE WITNESS:  No, I'm okay.  Thank you.

18   BY MR. HARDING:

19   Q    Now, did we also go over Government Exhibit T-2?

20   A    Yes, we did.

21   Q    And I think this one's actually already in evidence.  Do you

22   recognize this as another version of toll records for this same

23   phone, but one that includes cell site information?

24   A    This right here is the affidavit and then the tolls would

25   be --

1   Q    Yes.

2   A    Yes, I do recognize this.

3   Q    This does not show the phone numbers that placed the calls,

4   though, is that correct?

5   A    Well, it shows the phone numbers all the way over to the

6   right.  It just doesn't tell us if it's incoming or outgoing.

7   Q    I see.  Yes, it does contain the number called.  And these

8   were all called by this number to which the tolls apply,

9   namely --

10  A    It's up top.

11  Q    You know what?  You can point on the screen and it will

12  actually --

13  A    Doesn't look like.

14  Q    I see.  5811.  Okay.  So your testimony is that these calls

15  were all, all involved the 5811 phone and this is the number

16  called, but you said that it could be an incoming call, is that

17  correct?

18  A    Right.  We can't tell from these records if they're incoming

19  or outgoing.  This record here is basically for the cell site

20  information.

21  Q    I see.  Okay.  Now, are there calls on here that don't

22  appear on T-1?

23  A    Yes.

24  Q    Why is that?

25  A    Because they were incoming calls that rolled to the voice

1    mail.  So our customers aren't charged for them so, therefore, we

2    wouldn't show it on normal bill, which was in T-1.

3    Q    T-1 is really billing tolls, is that correct?

4    A    Correct.

5    Q    And this is somewhat broader because it includes calls that

6    were never actually completed but which, nevertheless, were made,

7    attempts were made to speak to somebody, is that right?

8    A    Correct.  The majority of them is the incoming or outgoing

9    calls with the cell site.  And then if no calls were answered and

10   rolled to the T-Mobile voice mail, that would reflect in there as

11   well.

12   Q    I see.  Okay.  Let me call your attention to a particular

13   day on these tolls marked as T-2.  I want to call your attention

14   to February 27th of 2002 at about 1624 hours, or 4:24 in the

15   afternoon.  Do you see that on the screen?

16   A    Yes, I do.

17   Q    And is it correct to say that starting at that time on that

18   day, the cell site shows up as 10171, is that correct?

19   A    Yes, it is.

20   Q    Which is the cell site we talked about earlier as being

21   located on Violet Avenue, is that correct?

22   A    Yes.

23   Q    2401 Violet Avenue?

24   A    Yes, I believe that was the address.

25   Q    And I have here a map we looked at also this morning, is

Case 1:04-cr-00029-RDB    Document 679    Filed 06/08/09    Page 48 of 272

1    that correct?

2    A    Yes, we did.

3    Q    This is a map 4, M-A-P 4.  Just for the benefit of the

4    ladies and gentlemen of the jury, this shows the southeast

5    section of Park Heights and Edgecombe Circle on Finney Avenue,

6    right here.  And East Wabash Avenue is over here.  And Violet

7    Avenue is down here, is that correct?

8    A    Yes.

9    Q    Now, your testimony before was that if a call came in listed

10   on these tolls and it came in to cell site 10171, that means that

11   the person talking on the phone was in the third of the pie to

12   the north and east of te cell site tower, is that correct?

13   A    Yes.

14   Q    So somewhere up in here?

15   A    Correct.

16   Q    Rather than in here?

17   A    Correct.

18   Q    If the caller were over here, it would appear as 101, 10173,

19   is that correct?

20   A    Yes.

21   Q    And down here, if he were down here, it would be 10172, is

22   that correct?

23   A    Yes.

24   Q    Now, let's go through this a little bit more, Ms. Johnson.

25   The calls in the 10171 cell site location to the northeast of the

1    cell site tower at Violet Avenue start around 4:24 in the

2    afternoon of the 27th.  And then they continue all the way

3    through that evening and into the next morning, except that there

4    are a few zeroes in here.  What do the zeroes mean?

5    A    If you move the page down a little bit to the left, you'll

6    see -- nope, the other way.  You'll see the last digits, 9999.

7    That means that it was an incoming call that rolled over to voice

8    mail that was not answered.  So therefore, if a call's not

9    answered, it's not going to pick up a cell site and it's going to

10   put a zero in that column.

11   Q    I see.  So there any time there's a zero, that means that

12   the call went to a voice mail machine, is that correct?

13   A    Correct.  As long as you see those four nines.

14   Q    Okay.  The four nines means that the person placing the call

15   on the 5811 phone reached a voice mail machine rather than a

16   person, is that correct?

17   A    No.  That means that 5811 received an incoming phone call

18   and did not answer it and it rolled to 5811's voice mail.

19   Q    Thank you for that clarification.

20   A    Sure.

21   Q    Now, on the next page continues on 2:28 in the early morning

22   hours and we still have calls in the 10171 cell site sector up

23   through 2:29 in the morning, is that correct?

24   A    Yes.

25   Q    And then there are no more calls either incoming or outgoing

1    until 11:49 the next morning.  Do you see that?

2    A    Yes, I do.

3    Q    And when those calls start in the late morning of the 28th,

4    they're in a different cell site location.  Do you see that?

5    A    Yes, I do.

6    Q    Okay.  Let's see.  If we turn to your big fat compendium of

7    cell sites in Maryland, we ought to have an entry for 10081, is

8    that correct?

9    A    Yes.

10   Q    Okay.  10081 is 1010 West Baltimore Street, Baltimore.  Do

11   you see that?

12   A    Yes, I do.

13   Q    Okay.  So do you know where that is Ms. Johnson, even though

14   you're from upstate New York?

15   A    No, I do not.

16   Q    Okay.  Can we have a stipulation that that's in Downtown

17   Baltimore, Your Honor?  Can the Court take --

18            THE COURT:  The Court will take judicial notice of the

19   fact that -- what was the address again?

20            MR. HARDING:  1010 West Baltimore Street.

21            THE COURT:  -- 1010 West Baltimore Street is located in

22   Downtown Baltimore, Maryland, approximately ten city blocks west

23   of this very location and one city block north of this location.

24   BY MR. HARDING:

25   Q    Okay.  And just to continue on.  There are a bunch of zeroes

1    out there after the calls the next morning.  By the afternoon,

2    we're into some other cell site locations.  And then we're back

3    to the southeast sector of Park Heights again at 10171.  Do you

4    see that?

5    A    Yes, I do.

6    Q    By about 2100 hours, 9:00, 9:26 and 9:58 the next day,

7    February 28th, we're back in Park Heights, is that correct?

8    A    Yes.

9    Q    And just for the Court's information, these two cell site

10   locations, 10202, is 38 West Belvedere Avenue, Pimlico?  Do you

11   see that?

12   A    Yes.  3800.

13   Q    3800 West Belvedere Avenue in Pimlico.  And you don't know

14   where that is, either, do you, Ms. Johnson?

15   A    No, I do not.

16   Q    And one other cell site on here is 10472, 4111 Menlo Drive,

17   Baltimore?

18   A    Correct.

19   Q    Okay.  And if we go back to the preceding day, before all

20   those calls coming from the northeast sector, northeast of the

21   Violet Avenue cell site tower, the calls immediately before that

22   came from 10222.  And do your records reflect that that refers to

23   a cell site tower at 5601 Loch Raven Boulevard in Baltimore?

24   A    Correct.

25            (Pause in proceedings.)

1    Q    Ms. Johnson, maybe this is obvious, but I'll go into it,

2    anyway.  When you place a cell phone call, does the cell phone

3    bounce off the nearest cell phone tower?

4    A    Yes, it does.

5    Q    Okay.  Can you give us, do you have any idea how far away

6    from a cell tower you can be and still get a call to bounce off

7    that tower?  Is there any answer to that question?

8    A    A cell tower, for example, in New York City, they're set

9    every couple blocks.  So every couple blocks a cell tower is

10   going to pick you up.  I live in upstate New York so the towers

11   are going to be spread out a little more widely.  And a cell

12   tower can cover up to 15 miles.

13   Q    Okay.  How about in Baltimore?  How dense are the cell site

14   towers in Baltimore?  Are they going to be more like New York or

15   more like upstate New York?

16   A    I believe it's going to be more like New York City.  It's a

17   heavy populate city, populated city, right?

18   Q    Yeah.  Maybe less so than 20 years ago but still heavily

19   populated.

20   A    So if it's heavy populated, the cell towers are going to be

21   closer together.

22   Q    Okay.  Thank you.  Those are all the questions I have for

23   you, Ms. Johnson.  Thank you very much for coming all the way

24   down here to tell us about this.

25   A    Sure.

1          MR. LAWLOR:  Court's indulgence, please.

2          (Pause in proceedings.)

3          MS. RHODES:  Your Honor, we'd ask the Court if we could

4   take a half hour break at this time in light of her testimony to

5   look at some map issues and formulate the questions we have for

6   her.  Otherwise, we'd have to recall her and I think that I would

7   be a waste of her time.

8          THE COURT:  Well, I don't believe the witness would

9   regard it as a waste of her time.  If you want to recall her

10  later, that would certainly --

11         MS. RHODES:  All right.  We'll do it that way, then.

12  We have no questions now.

13         CROSS EXAMINATION

14  BY MR. PYNE:

15  Q    Good morning, Ms. Johnson.

16  A    Good morning.

17  Q    I'm Jim Pyne.  I represent Mr. Martin here today.  The

18  billing procedures that you have been describing, are they fairly

19  standard throughout the industry?

20  A    Yes.

21  Q    So from what I understand, you would not start billing until

22  there's a connection of the call, is that correct?

23  A    Correct.

24  Q    Okay.  So once the call connects, either with a live person

25  or a voice mail, that's when the timer starts to run?

1    A    That's correct.

2    Q    Okay.  Now, I have my cell phone here today and it's turned

3    off.  If people are repeatedly calling me and the cell phone's

4    off, I would never get any billing in regards to that, would I?

5    A    No, you would not.

6    Q    Would I even know that people are calling me?

7    A    Not unless you were to check your voice mail.

8    Q    Okay.

9    A    If a message was left.

10   Q    Okay.  That was going to be my next question.  If, say

11   you're trying to contact me and you repeatedly call me, and as

12   soon as you hear my voice mail click on you hang up.  You're

13   going to be billed for that, is that correct?

14   A    Yes, that's correct.

15   Q    So when you get your bill, it's going to show repeated calls

16   to my number?

17   A    Yes.

18   Q    But I would have absolutely no knowledge of that since my

19   phone is off?

20   A    Correct.

21   Q    And I will never be billed for any of those calls?

22   A    Correct.

23   Q    And I would have no way of nothing that you're trying to get

24   in touch with me?

25   A    That's correct.

1    Q    Now, say, again, that same scenario, you're trying to get in

2    touch with me.  My voice mail clicks on.  And after two seconds,

3    you hang up.  As soon as you hear my voice mail, you hang up.

4    That's still on your bill going to appear as a one minute call to

5    my number?

6    A    That's correct.

7    Q    So you could have repeated calls to my number, each

8    indicating one minute, and in fact you've never spoken to me or

9    left a message for me?

10   A    Correct.

11   Q    So in fact, from these phone records, any of the outgoing

12   calls we have, we have no way of knowing whether or not any

13   parties ever spoke?

14   A    Correct.

15   Q    Even if the time appeared two or three minutes, it could be

16   just a two or three minute voice mail, is that correct?

17   A    That's correct.

18   Q    And unless and until that voice mail's accessed, the parties

19   have not communicated?

20   A    Correct.

21   Q    And again, this is standard throughout the industry,

22   different phone companies are going to bill the same way?

23   A    Pretty much.  It's about the same.  You know, other carriers

24   might put, you know, their calls on there.  I am not sure how

25   they work.  I can only tell you how T-Mobile reflects their

1    billing records.

2    Q    Okay.  Now, you say "billing records."  In terms of my

3    billing record, if you're trying to call me, I'm not going to get

4    billed for that, that is correct?

5    A    That's correct.  Only one person.

6    Q    Now, would my phone company have records of those incoming

7    calls?

8    A    They possibly might, yes.  It's hard for me to say.  I can

9    only answer for T-Mobile.

10   Q    Okay.  But for calls going into a T-Mobile phone, you would

11   have possible records of incoming calls but those calls would not

12   necessarily be billed unless a message was left?

13   A    Correct.  Correct.

14   Q    Okay.

15   A    But even if a message was left on an incoming call, we

16   wouldn't bill our customer for it because it bypasses the billing

17   system and goes directly into their voice mail.

18   Q    Okay.  And so voice mails are only billed when they're

19   listened to, is that correct?

20   A    From the handset itself, yes.

21   Q    All right.  So if I have countless numbers of voice mails

22   but never listen to them, I'm never billed for them, is that

23   correct?

24   A    Correct.

25   Q    So if I'm correct, the only way that you'd be able to tell

1    whether or not two parties actually spoke is if you looked at the

2    outgoing phone, which showed an outgoing call, and you'd also

3    have to look at the receiving phone and see whether or not they

4    were billed for an incoming call, is that correct?

5    A    Correct.

6    Q    Because it's only when that incoming call is billed that you

7    know, in fact, there was a connection?

8    A    Correct.

9    Q    So really, if you're looking at someone's phone records and

10   you're seeing repeated calls to a particular number, you have no

11   idea just from looking at that one phone whether or not any

12   communication was made between those two parties?

13            MR. HARDING:  Judge, could we have, could Mr. Pyne

14   specify whether he's talking about T-Mobile's practices or all

15   phone companies or what?

16            THE COURT:  Mr. Pyne, I assume you've been talking

17   about T-Mobile.

18   Q    Well, I have been talking to T-Mobile but I believe her

19   testimony has been that it's standard throughout the industry.

20   And I'll try to clarify that.

21            THE COURT:  All right.  Go ahead.

22   Q    Trying to remember what my question was now.  If you're

23   looking at in particular, in this question, T-Mobile records, and

24   you're seeing a number of calls going to a particular number, the

25   fact that those calls were made do not indicate to you whether or

1    not the parties ever actually spoke?

2    A    Right.  That just indicates that there was some sort of

3    physical, physical connection.  Whether it was with a live voice

4    talking or if there was a voice mail on the other end, we don't

5    know.

6    Q    Okay.  And as I think I asked you earlier, and this right

7    now is for T-Mobile, if a call is made over a number, the

8    answering machine comes on and you immediately hang up without

9    leaving a message, that's still going to be billed to the

10   T-Mobile phone that made the call for at least one minute?

11   A    Correct.

12   Q    And now going beyond T-Mobile.  Is it your understanding

13   that that is fairly standard practice throughout the industry?

14   A    I believe it is.  You know, some companies might show

15   incoming/outgoing calls that were missed.  I don't know.  I can

16   only really answer for T-Mobile.

17   Q    Okay.  I don't think I have anything further.  Thank you

18   very much.

19            THE WITNESS:  Sure.

20            MR. COBURN:  No questions, Your Honor.

21            REDIRECT EXAMINATION

22   BY MR. HARDING:

23   Q    Well, I don't know whether I'm going to clarify anything,

24   Ms. Johnson, but I'm going to ask a couple questions, anyway.  Do

25   all phone companies round up to one minute increments or round

1   down to one minute increments, or do some of them provide exact

2   time billing?  Do you know?

3   A    I don't know what the other carriers do.  I only know what

4   T-Mobile does as far as billing.

5   Q    Okay.  Billing practices vary from one phone company to

6   another, then, is that correct?

7   A    They do.

8   Q    On these tolls that we went over before, the ones that are

9   marked T-1, the ones you identified as billing tolls, if it's an

10  incoming call you said that that means it's a, didn't you testify

11  that that means it's a conversation between you weren't billed

12  for incoming voice mails?

13  A    Correct.  There was some conversation that took place on

14  that call there.

15  Q    So if it's listed an incoming on T-1, we know there was a

16  conversation, is that correct?

17  A    Correct.

18  Q    It's only with the outgoing calls that we aren't sure

19  whether it's a voice mail message that was placed or an actual

20  conversation?

21  A    Correct.

22  Q    What about if it were eight minutes long?  I suppose it's

23  possible that you could have an eight minute voice mail message,

24  is that correct?

25  A    Sure.

1    Q    So the length of, the duration of the call really doesn't

2    tell you whether it's a voice mail or a conversation, is that

3    right?

4    A    Correct.

5    Q    Just one moment, Your Honor.  No further questions, Your

6    Honor.

7              THE COURT:  I wonder, Ms. Rhodes, if you're now able to

8    examine the witness or whether the situation remains as it was

9    when you asked earlier.

10             MS. RHODES:  It's the same, Your Honor, although if we

11   could perhaps meet with Ms. Johnson over the break, over lunch

12   break --

13             THE COURT:  I was going to ask her.  Okay.

14             Ms. Johnson, what plans do you have to go home today?

15   It appears that if you could stick around perhaps until this

16   afternoon, counsel may be able to conclude your examination and

17   you wouldn't have to come back.  But if you need to get out of

18   here, we may need to have you come back in a couple of weeks.

19             THE WITNESS:  I'm driving.  So --

20             THE COURT:  So you have some flexibility?

21             THE WITNESS:  Yeah.  I mean, I would like to get home

22   before, you know, 5:00 tonight.

23             THE COURT:  Sure.  And you don't want to have to drive

24   through rush hour.

25             THE WITNESS:  Exactly.

61

1            THE COURT:  Although I think it's like a constant rush

2      hour between here and New York starting about now.

3            All right.  If you'll step down and make yourself

4      comfortable.  We're going to take a recess in a few minutes.  And

5      it may be that Ms. Rhodes can chat with you briefly and give you

6      some indication of whether she'll need you to stick around this

7      afternoon.  I assume you would rather stick around this afternoon

8      if you can get out of here early afternoon and be on your way

9      home rather than come back?

10           THE WITNESS:  Yes.

11           THE COURT:  Okay.  So we'll take a recess and Ms.

12     Rhodes will find you.  You're going to be seated outside?

13           THE WITNESS:  Yes, I am.

14           THE COURT:  Okay.  If you'll remain outside, Ms. Rhodes

15     will speak with you.

16           Thank you very much and thank you for coming down

17     today.  Next witness.

18           MR. HANLON:  Your Honor, the next witness will be

19     Natasha Wyche.  And this will be a witness, Your Honor, where

20     there may be a --

21           THE COURT:  Slight delay?

22           MR. HANLON:  Yes.

23           THE COURT:  All right.  Why don't we take our recess at

24     this time?

25           Ladies and gentlemen of the jury, please leave your

1  note pads on your chairs.  Have no discussion about the case or

2  about any of the evidence you've heard so far.  Continue to keep

3  an open mind.  We're in recess for 15 minutes.

4            Jury's excused.

5            (Recess at 11:32 a.m.)

6            THE COURT:  Is the witness down?

7            MR. HANLON:  The witness is in the process of coming

8  down now, Your Honor.  Natasha Wyche.

9            THE COURT:  All right.

10           MS. RHODES:  Your Honor, I was able to speak to Ms.

11 Johnson over the break.  We don't need to talk to her further.

12 We may need an engineer and she's going to arrange that for us if

13 we need that down the road.  Thank you.

14           THE COURT:  Excellent.  Thank you, Ms. Rhodes.  Mr.

15 Martin?

16           MR. MARTIN:  Your Honor, I'm definitely afraid at some

17 point this case going to end up on appeal.  And when you show a

18 witness a map and you're not precisely identifying it on the map

19 where it is, the record is not going to be clear.  I don't know

20 how to correct it, but there should be some way.

21           THE COURT:  Be more careful, counsel.  Bring the jury

22 in, please.

23           MR. HANLON:  Actually, Your Honor, we anticipate a

24 possible voice ID issue with Ms. Wyche.  This is one of the

25 witnesses the Court had contemplated doing a little hearing.

Case 1:04-cr-00029-RDB   Document 679   Filed 06/08/09   Page 63 of 272

1          THE COURT:  Okay.  Just a moment.  We're not ready for

2     the jury.  Where do we stand on that?

3          MR. HANLON:  Your Honor, the government anticipates

4     eliciting from Ms. Wyche on direct testimony that she listened to

5     the voice mail message at issue, that she thought that one of the

6     voice based on tone, voice, the words used, sounded like Wayne,

7     and the other voice, for similar reasons, sounded like another

8     defendant, Bo.

9          THE COURT:  Okay.  All right.  Anybody want to question

10    the witness on voice identification?

11         MR. LAWLOR:  Yes.

12         THE COURT:  Would you stand, please, and be sworn, Ms.

13    Wyche?

14          NATASHA WYCHE, GOVERNMENT'S WITNESS, SWORN

15         THE WITNESS:  Yes.

16         THE CLERK:  Be seated.  Speak directly toward the mike.

17    State your name and spell it for the record, please.

18         THE WITNESS:  Natasha Wyche, N-A-T-A-S-H-A.  W-Y-C-H-E.

19         DIRECT EXAMINATION

20    BY MR. CROWE:

21    Q    Good morning, Mrs. Wyche.  My name is Tom Crowe and I

22    represent Shelly Martin.  Do you know Shelly Martin?

23    A    I didn't hear what you said.

24    Q    Do you know Shelly Martin?

25    A    Yes.

DIRECT EXAMINATION BY CROWE                                    64

1    Q    How long have you known him?

2    A    For years.

3    Q    And --

4         THE COURT:  Please keep your voice up, Ms. Wyche.  You

5    can get a little closer to that mike.  Thanks.

6    Q    And starting in April of, starting in March 24 of 2002,

7    working backwards ten years, how many times had you seen him in

8    the ten years, that's the ten years preceding March of 2002?

9    A    I'm not sure.

10   Q    We're talking about fewer than ten times?

11   A    No.  Should have been more than that.

12   Q    Okay.  Do you know how many times?

13   A    I'm not sure.

14   Q    Were aware that he was in jail for a good portion of those

15   ten years?

16   A    Yes.

17   Q    So there were large periods of time when you did not see

18   him, is that correct?

19   A    Yes.

20   Q    Now, my understanding is that you actually placed a phone

21   call to your husband on the night of March 24, 2002, is that

22   correct?

23   A    Yes.

24   Q    And when you placed that phone call, you overheard a

25   conversation, is that correct, also?

1    A    Yes.

2    Q    And that conversation was between just two men, is that

3    right?

4    A    I'm not sure how many it was between.

5    Q    Okay.  Do you recall giving a taped statement to a Detective

6    Niedermeier and a Detective Hastings?

7    A    Yes.

8    Q    Okay.  And do you recall also testifying before the grand

9    jury?

10   A    Yes.

11   Q    Do you recall testifying that you initially heard two

12   voices?

13   A    There was a third voice, also, that I heard.  I couldn't

14   barely understand the third voice.

15   Q    But in any event, when you just called and you listened to

16   those two voices, you were not able to identify either of them,

17   were you?

18   A    No.

19   Q    Did it appear that those voices were coming from a moving

20   car?

21   A    I didn't hear what you said.

22   Q    Did it appear that the voices you heard were people speaking

23   in a moving car?

24   A    I don't know whether it was moving or not, but I heard the

25   voice, two voices that I heard talking, it wasn't directly into

1    the phone.

2    Q    And you were not able to identify them, were you?

3    A    No.

4    Q    Now, how did you first, where were you when you first

5    learned that a voice mail message had come into the cell phone of

6    your mother, Irene Magginson?

7    A    I was on the way to my mother's house.

8    Q    Pardon?

9    A    I was on my way to my mother's house.

10   Q    And did your mother give you, did your mother telephone you

11   and tell you that she wanted you to listen to something?

12   A    No.

13   Q    Okay.  How did you learn that there was a voice mail that

14   had come into Irene Magginson's cell phone?

15   A    Because my sister had called and told me to meet them at my

16   mother's house.

17   Q    And what is your sister's name?

18   A    Felicia Craig.

19   Q    And that was, and she's married to Byron Craig, is that

20   right?

21   A    Yes.

22   Q    And what did Felicia tell you in that telephone

23   conversation?

24   A    She asked have I heard the message yet.  I didn't know what

25   she was talking about.  So really she the one who told me.

1    Q    Okay.  Well, would you tell me everything that she said to

2    you and that you said to her during that telephone conversation?

3         THE COURT:  As best you recall, Ms. Wyche.

4    A    She asked did I leave to go to my mother's house yet.  And I

5    told her no, I was getting the kids ready, about to go.  And she

6    told me, did I listen to the message yet.  And I asked what was

7    she talking about, because at that time I didn't know anything

8    about a message.  And she stopped whatever she was trying to say.

9    She stopped because she didn't know that I didn't know about it

10   yet.

11   Q    And what time did you arrive at your mother's house?

12   A    I don't know.

13   Q    Who was there when you arrived at your mother's house?

14   A    It was quite a few people.  I don't remember.

15   Q    Can you give me the names of everybody you can remember

16   being there?

17   A    My mother, Irene Magginson, Tyrone Blandon.  Might have been

18   my brother, Anthony Magginson.  I'm not sure.  I don't remember.

19   Q    Were there, were there more than the three people you've

20   just named?

21   A    Yes.

22   Q    And when you arrived at your mother's house, did they begin

23   talking about the message?

24   A    Yeah.  Um-hum.

25   Q    And did the conversation indicate to you that they had

DIRECT EXAMINATION BY CROWE                      68

1    listened to the message?

2    A    No, not at that time.  She didn't let anybody hear it except

3    for herself, and I want to say one of my brothers may have heard

4    it.  But at that time nobody, she didn't let anybody listen to

5    it.

6    Q    And the brother that may have heard it, would that have been

7    Anthony Magginson?

8    A    Yes.

9    Q    And did Anthony say initially that it was his impression

10   that the voice on the tape was a man by, with a street name of

11   Plum, P-L-U-M?

12   A    No.

13   Q    Okay.  What did, what did Anthony say?

14   A    I don't recall nothing that he said, period.

15   Q    And did you then listen to that message that day with other

16   people?

17   A    No.

18   Q    Did other people listen to the message that day?

19   A    Later that day I think they did.

20   Q    Okay.  And were you there when they were listening to the

21   message?

22   A    I'm pretty sure I was there.

23   Q    And did you hear them?  Were you able to overhear the

24   message as they were listening to it?

25   A    No.

69

1    Q      Did any of those people tell you what they thought was on

2    the tape?

3    A      No.

4    Q      Not at all?

5    A      Not at that time, no.

6    Q      Not at all.  Nobody --

7    A      I just said, I didn't listen to the message for a reason.  I

8    didn't want to hear it.  So whatever had something to say about

9    it, I didn't want to hear it.  So they gave me that respect, not

10   repeating or saying anything about the message in front of me.

11   Q      And indeed, it was your testimony, was it not, that the

12   first time -- when did you learn that the message may have been a

13   conversation between people shortly after your husband and his

14   brother were murdered and that the people speaking may have been

15   implicated in the murder?

16   A      Probably like two or three days later.  Three, four days.

17   Q      And how did you, how did you learn that?

18   A      I listened to the message, about three days later I listened

19   to the message myself.

20   Q      And indeed, did you, how did you first listen to the

21   message?  Were you there?  And did your mother or somebody else

22   play it on her cell phone?

23   A      No.  I called from the house phone.

24   Q      Pardon?

25   A      I called from the house phone.

1    Q    You called from the house phone.  That would be a land line

2    phone in your house?

3    A    Yes.

4    Q    And how were you able to call from the land line phone in

5    your house and then hear the voice mail message which was

6    recorded on your mother's cell phone?

7    A    The way that you call cell phones and check messages from

8    any other phone.

9    Q    Okay.  And did you, in fact, listen to it at that time?

10   A    Yes.

11   Q    And did you, in fact, listen to it with other people?

12   A    I listened to it on my own.

13   Q    Okay.  Let me show you just part of the recorded statement

14   which you gave to Detective Niedermeier on April 3rd of 2002.

15   Can you see that up on the screen?  Sometime this --

16   A    I can see it.

17   Q    Then you said, I didn't even listen to the tape till maybe

18   two or three days later.  That's when I called my mother's

19   answering machine from my house and I listened to it myself.  And

20   right then and there I knew that that voice on Darryl pager

21   before and the other voice, I, I knew I could pick it up and I

22   kept listening and kept listening.  Me and his friends kept

23   listening, kept listening.  And I said, well, I know they saying

24   "Wayne" and I know that's how Wayne say the word "Shorty."

25            Now, does that change your testimony --

DIRECT EXAMINATION BY CROWE                              71

1    A    No, it don't change it because I listened to it on my own.

2    Everybody else was in the hallway when I listened to it.  When I

3    came out and thought, said what I thought of it, we all started

4    listening to it together.

5    Q    Okay.  So a bunch of people.  So you listened to it with a

6    bunch of people --

7    A    Two people.

8    Q    Pardon?

9    A    Two people.

10   Q    And who were those two people?

11   A    Wiley and Tyrone.

12   Q    I'm sorry.  What were the names again?

13   A    Wiley.

14   Q    Wiley and --

15   A    Tyrone.

16   Q    Tyrone.  And Tyrone is Tyrone Blandon that you just, you

17   mentioned before?

18   A    Yes.

19   Q    And who is Wiley?

20   A    Wiley.

21   Q    Don't know his last name?

22   A    No.

23   Q    Okay.  And when you first listened to the tape, did you come

24   and did you say that's Willie Mitchell or Bo, and that's Wayne,

25   or were you unsure at that point?

1    A    I was kind of unsure.  One of the voices sounded like a

2    voice that I heard before on a pager, which was Bo voice.  And

3    another voice that kind of, I don't know if it was, like I said,

4    I don't know if it was Wayne's voice, but similarity in the slang

5    or sounding like the slang that he used.  Because I had just seen

6    him like maybe like a week or two before that.

7    Q    I'm sorry.  Your testimony is that the other voice, you

8    didn't know whether it was Wayne's voice?

9    A    Wasn't sure, no.

10   Q    You weren't sure?

11   A    Um-um.

12   Q    And you then, and indeed, you're no more sure now than you

13   were when you first listened to it, whether it was Wayne's voice,

14   are you?

15   A    Right.

16   Q    Pardon?

17   A    Yes.

18   Q    The answer is, the answer is you're no more sure now than

19   you were at that time?

20   A    I'm not sure.  I'm not sure.

21   Q    You're not sure it's Wayne's voice now and you were never

22   sure, is that correct?

23           MR. HANLON:  Objection, Your Honor.

24           THE COURT:  Overruled.  You may answer, Ms. Wyche.  Do

25   you understand the question?

DIRECT EXAMINATION BY CROWE                    73

1    A    Yes.

2              THE COURT:  Okay.  You may answer.

3    A    I'm not sure if it was Wayne's voice.  I just know the type

4    of slang that he use or the way it sounded like.  I'm not sure.

5    Q    Did other people, did you talk to other people about whose

6    voices they thought was on the tape?

7    A    No.  It didn't matter what anyone thought.  It's what I

8    heard.

9    Q    So your testimony is that at no time before you went down

10   and you spoke to Detective Niedermeier and Detective Hastings on

11   April 3 did you talk to anybody else about whose voice was on the

12   tape?

13   A    The two that listened to the message with me.  Yeah.

14   Q    You talked to the two of them about it, is that correct?

15   A    And we started listening to the message together after I

16   listened to it on my own.

17   Q    Okay.  And did either of those people know either, indicate

18   they had any familiarity with Mr. Mitchell's voice?

19   A    Yeah.

20   Q    Did either of them indicate that they had any familiarity

21   with Mr. Martin's voice?

22   A    They said the same thing, they wasn't sure about Wayne.

23   Q    So they both said they weren't sure about Wayne, either, is

24   that correct?

25   A    Yeah.

1    Q    And indeed, if we have prior recorded statements from you or

2    grand jury testimony where you indicate that the voice you heard

3    on the tape was Wayne Martin, the truthful answer was that it

4    might have been him but that you're not sure, is that correct?

5              MR. HANLON:  Objection, Your Honor.

6              THE COURT:  Sustained.  That means don't answer, Ms.

7    Wyche.

8    Q    As you sit here today, you're not certain that it was his

9    voice on the tape, are you?

10   A    Right.

11   Q    You say that he speaks in kind of a slang, is that correct?

12   A    Yeah.

13   Q    Is that sort of the slang that a lot of people you know use?

14   A    I guess you can say that, yeah.

15   Q    Did you speak with anybody else about whose voice you

16   thought was on the tape?  I'm not talking about the prosecutors.

17   I'm talking about -- I'm not talking about the prosecutors or the

18   law enforcement officers, but other members of your family and

19   friends.

20   A    Members of my family, yes.

21   Q    And who did you tell whose voice you thought it was?

22   A    I'm not quite sure.  And it's a lot of family members that

23   we've talked about this.

24   Q    I'm sorry?  I didn't hear your last answer.

25   A    I'm not sure what family members.  It's a lot of my family

1    members have been, was around during that time.  My mother, my

2    brothers maybe.  I'm not sure.

3    Q    But you believe that you talked to some of them, is that

4    correct?

5    A    Yes.

6    Q    And what you were discussing talking back and forth is who

7    might be on the tape, is that right?

8    A    Yes.

9    Q    My understanding is that your husband and his brother,

10   Anthony, had a joint funeral on April 1, is that correct?

11   A    Yes.

12   Q    That's all I have, Your Honor.

13              DIRECT EXAMINATION

14   BY MR. LAWLOR:

15   Q    Sorry, Your Honor.  Skipped in the order.  Ma'am, good

16   afternoon.  How are you?

17   A    I'm fine.

18   Q    Now, you said in answer to Mr. Crowe's questions, that you

19   were unsure about, and help me out with this, are you unsure

20   about either voice?

21   A    Right.

22   Q    You heard, you heard --

23   A    Wait a minute.  It's two different times that I heard the

24   voices on, voices on the phone.  So you got to tell me which one

25   you're talking about.

1    Q    All right.  I apologize.  The first time when you called the

2    phone, you said you really don't know whose voice it was, right?

3    A    Right.

4    Q    Okay.  And then we still stand there, correct?  You called

5    the phone, Darryl's phone that evening, and you heard some

6    discussions but you don't know who was on that call, right?

7    A    Right.

8    Q    Okay.

9              MR. HANLON:  Your Honor --

10             THE COURT:  I'm really confused here.  Ms. Wyche, do I

11   understand your testimony to be that on the evening of the

12   murder, you called and spoke to your husband?

13             THE WITNESS:  Yes.

14             THE COURT:  And that during this -- on his cell phone?

15             THE WITNESS:  Right.

16             THE COURT:  And you could hear voices in the

17   background?

18             THE WITNESS:  No.  No.  No.  No.

19             THE COURT:  Okay.

20             THE WITNESS:  I spoke to him a little while before the

21   murder.

22             THE COURT:  Right.

23             THE WITNESS:  But I called his phone to see what was

24   taking him so long.  And when I called his phone, someone

25   answered the phone but must didn't know that they answered the

1    phone.  And I overheard someone talking, but I know it wasn't my

2    husband or Pete, Tony's voice.

3              THE COURT:  I see.  Okay.

4              MR. LAWLOR:  Prior to the voice mail.

5              THE COURT:  I see.  So when you called, I take it

6    somebody answered but they weren't talking to you?

7              THE WITNESS:  Right.  You know how you just make a

8    mistake and how --

9              THE COURT:  Right.  Right.

10             THE WITNESS:  It's like from a distance, but you could

11   still, I could hear everything they were saying.

12             THE COURT:  Okay.  And how --

13             THE WITNESS:  And I know at that time they weren't in a

14   car because I heard the radio a little bit.

15             THE COURT:  I see.  Okay.  And so how long were you

16   connected to your husband's cell phone during this period?

17             THE WITNESS:  Probably like a good two to three, I

18   mean, it seemed like about two minutes or three minutes maybe.

19             THE COURT:  Two to three minutes.  And what time was

20   this, approximately?

21             THE WITNESS:  Going on 1:00 in the morning.

22             THE COURT:  Okay.  And could you tell that the people

23   that you were hearing didn't realize that you had connected?

24             THE WITNESS:  Right.

25             THE COURT:  And you say you couldn't identify any of

1   the voices you could hear?

2            THE WITNESS:  No, because it just happened.  It caught

3   me off guard because it happened so fast.  But I just knew that

4   it wasn't my husband or Pete, Tony voice.

5            THE COURT:  Right.  And again, nobody answered the

6   phone?

7            THE WITNESS:  Right.  You could just hear them talk.

8            THE COURT:  You could hear.  So you eventually hung up?

9            THE WITNESS:  No, I didn't hang up.  I waited until the

10  phone went out.  His phone, Darryl phone was already almost dead.

11  His phone was already almost dead.  So I don't know if it just

12  went out like that or maybe they got rid of it because whatever

13  they was, he was talking, the two guys that was on there was

14  already saying, what you want me to do with this shit?  He was

15  like, I don't know, throw that shit in the reservoir.  So I don't

16  know if they threw his belongings wherever they threw them at,

17  because like a couple seconds after that, the phone was gone, the

18  phone was dead.

19            THE COURT:  I see.  So you did hear that part

20  distinctly?

21            THE WITNESS:  Right.

22            THE COURT:  All right.  And how did you know his phone

23  was almost out?

24            THE WITNESS:  He had told me that when I talked to him.

25            THE COURT:  When you talked to him earlier?

Case 1:04-cr-00029-RDB   Document 679   Filed 06/08/09   Page 79 of 272

1          THE WITNESS:  Right.

2          THE COURT:  All right.  And I take it that this call to

3     your mother's --

4          THE WITNESS:  That happened right before I called.  But

5     I didn't know that at the time.

6          THE COURT:  You didn't know about it at the time you

7     called?

8          THE WITNESS:  Right.  Because that call was, I think,

9     like at 12:48 or something like that.

10          THE COURT:  Okay.  I'm with you.  I'm with you.  All

11    right.  And that call to your mother, was that to a land line or

12    was it to her cell phone?

13          THE WITNESS:  Her cell phone.

14          THE COURT:  Her cell phone.  Okay.  Thank you, Mr.

15    Lawlor.

16    BY MR. LAWLOR:

17    Q    All right, Judge.  So that was the first call that the judge

18    and you just discussed, correct, ma'am?

19    A    You got -- I wasn't paying attention.

20    Q    Okay.  The first call that you and the judge just discussed.

21          THE COURT:  Well, it really wasn't a first call.  It

22    was her call to her husband's cell phone.

23    Q    That was your call.  That was your call and you don't

24    recognize the voices, is that right?

25    A    Yes.

1    Q    And now we're talking about the voice mail that you listened

2    to two or three days after your husband was murdered, correct?

3    A    Right.

4    Q    Okay.  And Mr. Crowe was asking you some questions about the

5    voices that you heard.  And you said you weren't really sure

6    whose voice it was, right?

7    A    Right.

8    Q    Okay.  And you're not really sure about either voice, is

9    that fair?

10   A    No.  One of the voices I did hear on the pager, on, on the

11   pager voice mail previously, before then.

12   Q    Okay.  Was that Bo?

13   A    Right.  But at that time I was trying to remember where I

14   heard the voice at.  I didn't think right away that it was him.

15   Q    So you had never talked to Bo personally?

16   A    Yes, I have.

17   Q    Yes, you have, or yes, you have not?

18   A    Yes.

19   Q    You have?

20   A    Um-hum.

21   Q    Okay.  Were you shown a photo spread and asked if you could

22   identify Bo?

23   A    Yes.

24   Q    And you couldn't, you don't recall what he looks like?

25   A    Yeah.  I recall what he looks like.

1    Q    Okay.  You were shown a photo spread and you were able to

2    identify the person you know as Bo?

3    A    Not the first time.  I did it on purpose because I wasn't

4    trying to really say nothing about him because at first I just

5    didn't want to do it.

6    Q    Okay.  Hang on one second, please.  Court's indulgence,

7    please.

8              (Pause in proceedings.)

9    BY MR. LAWLOR:

10   Q    Okay.  Ma'am, let me ask you about that.  You were shown a

11   photo spread and asked to identify Mr. Mitchell, right?

12   A    Yes.

13   Q    Okay.  Were you shown a photo spread with Mr. Mitchell's

14   picture in it twice or just one time?

15             THE COURT:  Rephrase that, please.

16   Q    Okay.

17             THE COURT:  You talking about two photographs in an

18   array or two sets?

19   Q    You were shown an array that had a picture, one of the

20   pictures was of Mr. Mitchell, right?  You were asked to identify

21   Bo from a photo array, correct?

22   A    Um-hum.  Yes.

23             THE COURT:  You have to say yes or no, Ms. Wyche.

24   A    Yes.

25   Q    And you could not?

1    A    No.  I could, I just did not.

2    Q    Okay.  So let's, the first time on one occasion you were

3    shown a photo spread that had Bo's picture in it and you elected

4    to purposefully say I don't know, I can't pick out Mr. Mitchell,

5    even though you really could?

6                MR. HANLON:  Objection, relevance, Your Honor.

7                THE COURT:  Yeah.  I'm not sure where this is going,

8    Mr. Lawlor.

9                MR. LAWLOR:  Your Honor, she, the witness indicated

10   that she had talked to Mr. Mitchell.  I'm trying to establish

11   when this was and how often it was.  And I think it's the fact

12   that she could not identify Mr. Mitchell --

13               THE COURT:  She said three times now it's not that she

14   could not.  She said she did not.

15               MR. LAWLOR:  Okay.

16               THE COURT:  So let's focus on the voice identification.

17   Go ahead.

18   BY MR. LAWLOR:

19   Q    All right.  How many times had you talked to Bo in person?

20   A    Once before.

21   Q    One time?  And did you talk to him or had you just seen him

22   with your husband?

23   A    No.  I talked to him.

24   Q    Okay.  And when was that that you talked to him?

25   A    I don't remember when.  It was, it was inside of a store

1    that we used to have.  Reisterstown and Gwynns Falls.

2    Q    That you and your husband had?

3    A    Yes.

4    Q    A little grocery?

5    A    Yes.

6    Q    Okay.  And you talked to Bo in there for how long?

7    A    A few minutes.  He came in the store looking for my husband.

8    Q    Okay.  And do you recall when that was in relation to your

9    husband's death?  How much prior to your husband's death?

10   A    Maybe like two years, three years, two and a half years.

11   Q    Okay.  And then, so other than that one occasion two and a

12   half years prior to your husband's death, you never talked to Mr.

13   Mitchell after that?

14   A    No.

15   Q    Okay.  Now, you said, though, that you heard his voice on --

16        THE COURT:  I'm sorry.  I'm sorry, Mr. Lawlor.  You

17   never talked to him after that at all or you never talked to him

18   after that in person?

19        THE WITNESS:  Period.  I never talked to him in person

20   or over the phone, nothing at all after that.

21        THE COURT:  All right.  Go ahead, Mr. Lawlor.

22   BY MR. LAWLOR:

23   Q    So you talked to him the one time in person.  You heard his

24   voice on other occasions, though?  Is that what you're trying to

25   tell us?

1    A    Yes.

2    Q    And that was on your husband's pager?

3    A    Correct.

4    Q    Okay.  Now, you're going to have to help me out here.

5    What's the difference between, because most of us think of a

6    pager that just beeps.  Are you talking like a two-way radio?  Is

7    it like a cell phone that --

8    A    A pager that has a voice mail.

9    Q    Okay.  So the times that you heard Mr. Mitchell's voice, he

10   had left a message on your husband's cell phone, essentially?

11   A    His pager.

12   Q    A pager?  But this is the type of pager that has voice mail

13   and you can leave a message for a person on it?

14   A    Yes.

15   Q    And then your husband would listen to that message and you

16   would be in the vicinity and --

17   A    No.  I had his pass code.  I would listen to it on my own.

18   Q    Oh, okay.  All right.  So you listened to his messages?

19   A    All the time.

20   Q    Pardon me?

21   A    All the time.

22   Q    Okay.  And on some of these occasions, you heard Bo's voice?

23   A    Yes.

24   Q    Okay.  And how many times was that?

25   A    I'm not sure how many times.  It's been a few.

1    Q    Pardon me?

2    A    I'm not sure exactly how many times.  It's been quite a few.

3    Q    How many?  Can you estimate?  Was it two or five or --

4    A    More than five.

5    Q    Okay.  More than 20?

6    A    No.  I wouldn't say more than 20 times.

7    Q    Less than ten?

8    A    About ten times.

9    Q    Ten times.  Okay.  And over what period of time was that?

10   A    Well, he, probably like a few months before that he had just

11   started leaving messages, if I'm not mistaken.

12   Q    I'm sorry?

13   A    Maybe like a few months before the murder.

14   Q    He had been leaving -- so that was the time frame, in the

15   several months leading up to?

16   A    Might not even been a few months.  Within maybe like two to

17   three months.  Two months.

18   Q    All right.  Now, you said that you listened to the voice

19   mail the first time, and there were at least two other people who

20   were there at that time?  The first time that you listened to the

21   voice mail on your mother's cell phone --

22   A    Um-hum.

23   Q    -- there was at least two other people there with you?

24   Wiley and Mr. --

25   A    Tyrone.

1    Q    And Tyrone?  They were there with you, at least the two of

2    them?

3    A    Yes.

4    Q    Okay.  And when you listened to it, you verbalized to them

5    that you thought one of the voices was Bo's, right?

6    A    No.  Not at that time.  I was trying to figure out who it

7    was.

8    Q    So you didn't recognize it at first?

9    A    I had to keep listening to it and keep listening to it

10   because I knew I knew the voice.

11   Q    Okay.  How many times did you have to listen to it?

12   A    I'm not sure.  Quite a few.

13   Q    Okay.  So it took you quite a few times of listening to it

14   before you were able to think in your mind that this was Bo, one

15   of the voices?

16   A    Yeah.  I had to remember where I heard the voice at.

17   Q    Okay.  And then once you deduced that in your own mind, did

18   you say this to Wiley and Tyrone?

19   A    Yeah.  They had already knew.

20   Q    They said it, too?

21   A    Um-hum.

22   Q    They said that that's Bo?  Had they said that before --

23   A    No.

24   Q    -- you said it?  How do you know they already knew?

25   A    Because they told me after the fact.

1    Q    Oh, so they told you.  Did that confirm it in your mind,

2    then, based on the fact of what they told you?

3    A    Yeah.

4    Q    All right.  So is it fair to say, then, you had a suspicion,

5    it took you a while to make the connection?  You had a suspicion

6    that this was Bo; that was confirmed when they said it was Bo?

7    A    No, I didn't have a suspicion.  It came to me where I heard

8    the voice at before and who it was.  And when I spoke of it, then

9    they agreed with me and told me that's who they knew it was, too.

10   Q    Okay.  And then you also had several conversations later on

11   with family members?

12   A    Yes.

13   Q    Okay.  And there was, as you indicated to Mr. Crowe, a lot

14   of discussion amongst you and your family members as to who the

15   voices were on the voice mail?

16   A    Yes.

17   Q    Okay.  And was there a consensus?

18   A    My family don't really know him, know Bo.

19   Q    Okay.  Who did they say it was?

20   A    Well, I mean, they kind of, they were saying that it kind of

21   sound like Wayne, too.  They weren't sure.  They haven't seen or

22   heard from Wayne in years, either.

23   Q    All right.  But Wayne's voice was discussed as one of the

24   possible voices on there?

25   A    Right.

1    Q    Were there other voices?  They didn't know Bo.  You did.  So

2    you referenced Bo, as did Wiley and Tyrone.  Did other people

3    reference Bo's voice?

4              MR. HANLON:  Objection, Your Honor.

5              THE COURT:  Sustained.

6    Q    Okay.  Did other people in your family say that Bo's voices

7    was one of the voices?

8    A    I just said nobody in my family know Bo.

9    Q    Okay.  Did anyone else say it was anyone else's voice?

10   A    No.

11   Q    So the only people -- amongst your family members, the only

12   name referenced was Mr. Martin's voice?

13   A    Right.

14   Q    Okay.

15   A    And they weren't sure about that.

16   Q    Okay.  Court's indulgence, please.  No further questions.

17   Thank you.

18             THE COURT:  All right.

19             MR. KURLAND:  Just have a few questions.

20             MR. HANLON:  Your Honor, if I may, what is Mr.

21   Kurland's standing here?

22             THE COURT:  I don't believe he has standing.  Mr.

23   Kurland, I don't think, I don't see you have, you don't have any

24   standing here.  No.  You don't need to take the walk.  Mr. Crowe,

25   do you have some additional?

1              REDIRECT EXAMINATION

2    BY MR. CROWE:

3    Q    Just a couple, Your Honor.  Ms. Wyche, who were the other

4    family members who told you they were not sure that it was

5    Wayne's voice?

6    A    Two of my brothers.

7    Q    And who are those two brothers?

8    A    Bryant Magginson and Anthony Magginson.

9    Q    And you're quite clear that they told you that they were not

10   sure that it was Wayne's voice?

11   A    Right.  Yes.

12   Q    Did Anthony tell you at any other time that he thought a

13   voice on the phone was a fellow by the name of Plum, with a

14   street number of Plum, who's real name, I believe, is Walter

15   Gardner?

16            MR. HANLON:  Objection, Your Honor.

17            THE COURT:  Sustained.  That means don't answer.

18            MR. CROWE:  Okay.  Thank you, Your Honor.

19            THE COURT:  While you're there, do you have any

20   additional argument, Mr. Crowe?

21            MR. CROWE:  It seems, no additional argument other than

22   what I briefed.  It seems to me that this is -- well, this is a

23   situation where obviously there were a number of conversations,

24   with people reinforcing each other as to who they thought it

25   might have been, and that that obviously tainted the subsequent,

1    the identification which was given during the interview with

2    Detective Niedermeier and Detective Hastings on April 3rd.  It

3    should also bar any identification testimony in court.

4            THE COURT:  All right.  You submit, Mr. Lawlor?

5            MR. LAWLOR:  I do.

6            THE COURT:  All right.  The Court is satisfied to

7    permit the witness to testify, as has been indicated.  The Court

8    has previously ruled that whatever suggestiveness may be

9    attendant to this particular witness' identification is clearly

10   overcome by the direct and circumstantial indicia of reliability.

11           As to Mr. Martin, the witness' testimony is tentative.

12   That is to say, her identification is tentative.  She admits

13   she's not sure.  As to Mr. Mitchell, the witness has indicated a

14   greater level of certainty.  But in any event, it's for the jury

15   to weigh that testimony and make an assessment as to how much, if

16   any, credence or weight to afford that testimony.

17           All right.  Let's have the jury, please.

18           Ms. Wyche, when the jury is seated, you will be sworn

19   again in their presence.

20           How long do you think your direct is, Mr. Hanlon?

21           MR. HANLON:  45 minutes, Your Honor.

22           (Jury enters the courtroom.)

23           THE COURT:  Please be seated, ladies and gentlemen.  I

24   do regret the delay, ladies and gentlemen.  But we're ready to

25   proceed.  The government may call its next witness.

1          MR. HANLON:  Thank you, Your Honor.  The United States

2    calls Natasha Wyche to the stand.

3          THE COURT:  Would you stand, please, Ms. Wyche, and be

4    sworn?

5          NATASHA WYCHE, GOVERNMENT'S WITNESS, SWORN

6          THE WITNESS:  Yes.

7          THE CLERK:  Be seated.  Speak directly toward the mike.

8    State your name and spell it for the record.

9          THE WITNESS:  Natasha Wyche, N-A-T-A-S-H-A.  W-Y-C-H-E.

10          DIRECT EXAMINATION

11   BY MR. HANLON:

12   Q    Ms. Wyche, good afternoon to you.

13   A    Good afternoon.

14   Q    How old are you?

15   A    32.

16   Q    And where were you born?

17   A    Baltimore, Maryland.

18   Q    Did you grow up in the Baltimore area?

19   A    Yes.

20   Q    What part of town did you grow up in?

21   A    Baltimore County, Randallstown.

22   Q    Did you go to school in Randallstown, middle school and high

23   school?

24   A    Yes.

25   Q    How far, what middle school did you go to?

DIRECT EXAMINATION OF WYCHE                    92

1   A    Old Court.

2   Q    And what high school did you go to?

3   A    Randallstown High School.

4   Q    How far did you go in high school?

5   A    Tenth grade.

6   Q    And after tenth grade, did you leave school?

7   A    Yes.

8   Q    How old were you, ballpark?

9   A    16.

10  Q    And when was that?  About what year, if you remember?  You

11  don't have to do the whole math.  Just a ballpark.

12  A    '91, '90.

13  Q    1991 or so?

14  A    Yes.

15  Q    And do you have any children?

16  A    Yes.

17  Q    And how many children do you have?

18  A    Five.

19  Q    Boys or girls?

20  A    Two boys and three girls.

21  Q    And if it's not too difficult, could you tell us their ages?

22  A    17, 16, 15, 5 and 7.

23  Q    A pretty big range there?

24  A    Yes.

25  Q    And who was the name your children's father?

1    A    Darryl Wyche.

2    Q    And Darryl Wyche is your husband or was your husband, is

3    that right?

4    A    Yes.

5    Q    I'll ask you in a moment about your relationship with Mr.

6    Wyche.  But you're a widow now, is that right?

7    A    Yes.

8    Q    When did your husband die?

9    A    March the 25th, 2002.

10   Q    And have you been on your own since then with your children?

11   A    Yes.

12   Q    Let me ask you a few questions about your relationship with

13   your husband, Darryl.  How long did you know him?  When did you

14   first meet?

15   A    I known him since I was 11 years old.

16   Q    So very young?

17   A    Yes.

18   Q    And how old was he when you met him?  Was he 11, too?

19   A    No.  13 or 14.

20   Q    Were you friends at first or did you become sweethearts

21   pretty quick?

22   A    Yes.  We start seeing each other when I was 11.  I known him

23   since I was 8.

24   Q    And was Darryl Wyche your boyfriend all through school and

25   high school, things like that?

```
 1    A    Yes.

 2    Q    When you left school in tenth grade, did Darryl leave at the

 3    same time?

 4    A    No.

 5    Q    What was his situation?  Did he graduate or had he left

 6    earlier?

 7    A    He ended up leaving, too.  We both received our GED.

 8    Q    Now, when was your first baby born?

 9    A    1990.

10    Q    And did you and Darryl live as a couple and start to support

11    each other from that point on?

12    A    Yes.

13    Q    Now, at some point there did come a time when you and Mr.

14    Wyche actually tied the knot and got married, is that right?

15    A    Yes.

16    Q    And when was that?  What was your wedding day?

17    A    February 7th, 2001.

18    Q    So from '90 or so, you and Mr. Wyche were a coupling raising

19    your family together, you got married in 2001, is that right?

20    A    Yes.

21    Q    Now, throughout the 1990's, did you and your future husband,

22    Darryl, live together as a couple, take care of your children?

23    A    Yes.

24    Q    What parts of town did you live in?  What neighborhoods?

25    A    Mostly, mostly the Randallstown area.
```

DIRECT EXAMINATION OF WYCHE                    95

1    Q    Did there come a time when you eventually moved out of the

2    Randallstown area?

3    A    Yes.

4    Q    About when was that?

5    A    2001, we moved to Cockeysville, Maryland.

6    Q    And were you living in Cockeysville when your husband,

7    Darryl, lost his life?

8    A    Yes.

9    Q    Now, what did Darryl, your future husband, Darryl, do for a

10   living through the 1990's, from when you started living together,

11   supporting each other, and up through the time when you got

12   married?  How did he support you and the children?

13   A    He sold drugs.

14   Q    And I'll ask you about that a little bit.  Did Darryl Wyche,

15   during that period, did your future husband ever talk to you

16   about the drugs?  Did he ever tell you what he was doing?  Or did

17   you see things?

18   A    More so I seen things.  He never talked about it.

19   Q    Let me ask you about the things that you saw.  Did you ever

20   see drugs in your home, in Randallstown or in Cockeysville or

21   anywhere else?

22   A    Yes.

23   Q    What would you see that you thought might be drugs in your

24   home?

25   A    Like the scales and the things you keep the drugs in, the

DIRECT EXAMINATION OF WYCHE                    96

1    glass things.  Stuff like that.

2    Q    Did you ever see packages and things that were wrapped up?

3    A    Yes.

4    Q    What did you understand or believe might be inside those

5    packages?

6    A    Drugs.

7    Q    Did you ever see any pieces of paper around the house?

8    A    Yes.

9    Q    Did you ever see things written on the pieces of paper?

10   A    Yes.

11   Q    And did you recognize these as notes that your husband would

12   have written?

13   A    Yes.

14   Q    What kinds of things might you have seen written on pieces

15   of paper that you saw lying around the house?  Did you ever see

16   lists of names?

17   A    Yeah.  Names and money amounts.

18   Q    And what did you understand those little pieces of paper to

19   represent?

20   A    I guess he kept track of money that he, that was his.

21   Q    Now, Ms. Wyche, I understand your husband didn't ever

22   specifically sit you down and tell you what was going on.  But

23   did you have a sense, a belief, through the '90's about how

24   Darryl was supporting the family?

25   A    Yes.

1    Q    And that was that he was dealing drugs?

2    A    Yes.

3    Q    Did you ever receive or hear voice mails or messages that

4    Darryl received during the '90's or later from people that

5    sounded to you like they were drug-related?

6    A    Yes.

7    Q    Some voices you recognized, some you didn't?

8    A    Yes.

9    Q    Let me ask you this, Ms. Wyche.  Were there ever times that

10   you would ever see money around the house, either out, or money

11   that was hidden places, things like that?

12   A    Yes.

13   Q    Did you ever help your husband count money through the '90s

14   or any other time?  Did you ever count money for him?

15   A    Yes.

16   Q    Just approximately, and I understand it's a long period of

17   time, but how frequently did you help your husband count money

18   that was around the house?

19   A    Maybe like once, maybe about five to ten times out the

20   month, something.

21   Q    Was it a pretty regular thing?

22   A    Yes.

23   Q    And over time, did the amounts of money that you would help

24   your husband count increase?  Was it, did it get a little bit

25   bigger or did it vary over time?

1    A    Got bigger.

2    Q    Again, we're talking about a long period.  But what kinds of

3    amounts of money are we talking about here, from the '90s and

4    then through till when you your husband lost his life?  How much

5    money in general would you sometimes help him count?

6    A    In the early '90s, it was a couple thousand here and there.

7    By the time he got killed, it probably was, sometimes as high as

8    30, $40,000 at a time.

9    Q    And did you understand, Ms. Wyche, when you helped count

10   this money, that you were counting money that had been earned

11   from selling drugs?

12   A    Yes.

13   Q    You understood that you were doing that?

14   A    Yes.

15   Q    Now, Ms. Wyche, you've spoken with me and Mr. Harding and

16   the federal agents here several times about this, is that right?

17   A    Yes.

18   Q    And you also testified in the grand jury in an investigation

19   in this case back in 2004, I think it was, is that right?

20   A    Yes.

21   Q    You've been informed both in the grand jury, and I've also

22   told you that, provided you're truthful during the course of your

23   testimony, both in the grand jury and also today, and provided

24   you're truthful when you give information to the government or to

25   defense counsel, that nothing that you say will be used against

DIRECT EXAMINATION OF WYCHE                    99

1    you, that we're not going to use your words to build any kind of

2    a federal criminal case against you.  That's your understanding

3    here?

4    A    Yes.

5    Q    And you have not been prosecuted for any kind of conspiracy

6    to distribute narcotics or anything like that, is that right?

7    A    Yes.

8    Q    But just to be clear today, it is your testimony that you

9    helped your husband with drug dealing by counting money for him,

10   is that fair to say?

11   A    Yes.

12   Q    Let me ask you about some things that you observed your

13   husband do.  Did you ever see your husband give or receive money

14   from people?

15   A    Yes.

16   Q    Where would you see your husband, Darryl, I say your husband

17   Darryl, whether it was before or after you got married, where

18   would you sometimes see Darryl Wyche receive or give money to

19   people?  What parts of town?

20   A    I mean, it was different places.  Could meet somebody at a

21   gas stations or something and pick up some money.  Or inside the

22   mall, anywhere.  It wasn't never a particular place.

23   Q    The places varied?

24   A    Yes.

25   Q    Gas stations was one place that you sometimes saw this

1    happen?

2    A    Yes.

3    Q    What part of town?

4    A    Sometimes it may have been out Randallstown, Security area.

5    And sometimes it could have been Baltimore City.

6    Q    Is there a place that used to exist that maybe doesn't exist

7    any more, was there a place that used to be call the Savoy

8    apartments or the Savoy apartments?

9    A    Savoy, yes.

10   Q    What part of town was that located in?

11   A    Randallstown.

12   Q    Was this a part of town, an apartment complex that you knew,

13   that you ever visited?

14   A    Yes.

15   Q    Did you ever see your husband around the Savoy apartments?

16   A    Yes.

17   Q    And what would you see your husband do around the Savoy

18   apartments?

19   A    Pick up money.

20   Q    Pick up money?

21   A    Yes.

22   Q    Did you ever see him give money to anyone else?

23   A    No.

24   Q    Let me ask you about a couple particular names.  Going back

25   to when you were in high school.  Do you know a name, Shelly

1   Wayne Martin?

2   A    Yes.

3   Q    And do you know a name, Shawn Gardner?

4   A    Yes.

5   Q    How do you know Shelly Wayne Martin?

6   A    I know him from out Randallstown area.

7   Q    Approximately, about how long have you known Shelly Wayne

8   Martin?

9   A    Probably over like 15 years or so.  Maybe more.

10  Q    How did you meet Mr. Martin?  How did you first become, get

11  to know him?

12  A    I think, I think I met him through Tony, Pete.

13  Q    Tony or Pete is the brother --

14  A    Right.  Brother of Darryl.

15  Q    -- of Mr. Wyche?  And Mr. Wyche is Darryl Wyche's brother,

16  his full name was Anthony Wyche, is that right?

17  A    Yes.

18  Q    People sometimes called him Pete?

19  A    Correct.

20  Q    And it's through Pete or Anthony Wyche that you met Mr.

21  Martin?

22  A    Yes.

23  Q    Do you see Mr. Martin in court today?

24  A    Yes.

25  Q    If you could, please tell us where he's sitting and what

DIRECT EXAMINATION OF WYCHE

1    he's wearing.

2    A    In the corner right there, next to the man with the glass,

3    between them two men with the glasses on.

4    Q    At defense table?

5    A    Yes.

6    Q    Your Honor, for the record, identifying the defendant, Mr.

7    Martin.

8         THE COURT:  So noted.

9    Q    And I also asked you about a name -- well, actually, before

10   we go on, Shelly Wayne Martin, what did people call him?

11   A    Wayne.

12   Q    I also asked you about a Shawn Gardner?

13   A    Yes.

14   Q    And how long have you known Mr. Gardner?

15   A    I known him since elementary school.

16   Q    Longer than Mr. Martin?

17   A    Yes.

18   Q    And what elementary school was it that you first knew Mr.

19   Gardner from?

20   A    Randallstown Elementary.

21   Q    And what kind of a relationship have you had with Mr.

22   Gardner?

23   A    We was friends.

24   Q    Did Mr. Gardner ever go by any nicknames?

25   A    Goo.

1  Q    And if you would, can you tell us if you see Mr. Gardner in

2  court?

3  A    He the one wearing the glasses on the end right there.

4  Q    End of defense counsel table?

5  A    Yes.

6  Q    Your Honor, for the record, identifying Mr. Gardner.

7        THE COURT:  So noted.

8  Q    Now, were there times, Ms. Wyche, that you would talk to Mr.

9  Martin?  Did you have conversations with him?

10 A    Yes.  Yes.

11 Q    And how about Mr. Gardner?  Did you sometimes talk to him

12 from the time you knew him in elementary school?

13 A    Um-hum.  Yes.  Yes.

14 Q    Now, did Shelly Wayne Martin or Wayne, Shawn Gardner or Goo,

15 know your husband?

16 A    Yes.

17 Q    How long, from what you observed, how long did they know

18 your husband?

19 A    Probably for over like 15 years, also.

20 Q    And do you know how they met?  Did they meet with you or did

21 your husband know them separately?

22 A    No, he knew them, he knew them separately.  I think I might

23 have known Goo longer than what Darryl had.  But Wayne pretty

24 much the same, around the same time.

25 Q    Ms. Wyche, did you ever know Shelly Wayne Martin to receive

1    drugs from your husband, Darryl Wyche?

2              MR. CROWE:  Objection.

3              THE COURT:  Overruled.  You may answer.

4    A    Yes.

5    Q    Did you ever know Shawn Gardner to receive drugs from your

6    husband, Darryl Wyche?

7    A    Yes.

8    Q    What did you see about that in terms of Mr. Martin, Mr.

9    Gardner, receiving anything or giving anything to your husband,

10   Darryl Wyche?  What did you observe?

11   A    I never seen him give them drugs but I've seen him get money

12   from them.

13   Q    Tell us about that.  Tell us about, were there times that

14   you saw Shelly Wayne Martin give money to your husband, Darryl

15   Wyche?

16   A    Yes.

17   Q    What did you observe there?

18   A    On Garrison and Gwynn Oak, I think it's Garrison and Gwynn

19   Oak, or either Garrison and, I mean, Liberty Heights and Gwynn

20   Oak or either Garrison and Liberty Heights.

21   Q    And would this be part of West Baltimore?

22   A    Yes.

23   Q    And what did you see?  Tell us about that.

24   A    We went to meet him there so he can give Darryl his money.

25   Q    You and Darryl went to meet?

DIRECT EXAMINATION OF WYCHE                    105

1   A    Yes.

2   Q    Mr. Martin?

3   A    Yes.

4   Q    And where did you -- you've described the location.  But did

5   you go in some place or was it on the street?

6   A    No.  Darryl got out the car.  But I just, from the

7   conversation, knew he was picking up money.

8              MR. CROWE:  Objection.

9              THE COURT:  Overruled.

10  Q    From conversation with whom?  When you talked about a

11  conversation, who was it that talked to you about this?

12  A    No.  Darryl and him was on the phone.

13  Q    I'm sorry.  I'm sorry.  You overheard a phone call?

14  A    Right.

15  Q    And who was on the phone?

16  A    It had to have been Wayne because Darryl and him was talking

17  and they decided a place to meet up.  And that's where we went

18  and Wayne was there.

19  Q    You actually saw Mr. Martin there?

20  A    Yes.

21  Q    And did you see your husband get out of the car?

22  A    Yes.

23  Q    And your husband actually interacted with Mr. Martin?

24  A    Yes.

25  Q    Could you tell what happened between the two, what their

1  interaction was?

2  A    They talked for a few minutes and Wayne handed him some

3  money.

4  Q    You actually saw that happen?

5  A    Yes.

6  Q    And then what did your husband do?

7  A    Got back in the car.

8  Q    Did he have money with him?

9  A    Yes.

10 Q    If you remember, Ms. Wyche, do you remember how much money

11 this was?  Would you have helped your husband count this money?

12 A    No.  I don't remember.

13 Q    Could you tell if it was -- well, strike that.  What did

14 your husband do with the money?

15 A    Probably put it in a book bag.  I don't remember that.

16 Q    You don't remember that specifically?

17 A    No.

18 Q    Did your husband sometimes carry around books, book bags as

19 part of his business?

20 A    Yes.

21 Q    And what would he use book bags to store?

22 A    One of them he used to keep money in, and another he used to

23 keep like CD's and stuff.

24 Q    When your husband kept money in a book bag, what kind of

25 money would he put in a book bag?  Was it money that he earned

1    from drugs or was it money that came from some other source?

2    A    Drugs.

3    Q    Now, how many times did you see your husband receive money

4    from Mr. Martin that you know of, that you observed?

5    A    That was just one particular time I remember.

6    Q    Did you ever receive, did you sometimes listen to your

7    husband's voice mails?

8    A    Yes.

9    Q    And how would it be, Ms. Wyche, that you would listen to

10   your husband's voice mails?  Why would you be listening to your

11   husband's voice mails?

12   A    Just to be nosy.

13   Q    Just to be nosy?

14   A    Yes.

15   Q    You wanted to know what he was up to?

16   A    Yeah.

17   Q    He was your husband, you wanted to know what he was up to?

18   A    Um-hum.  Yes.

19   Q    Did Mr. Martin ever leave voice mails for your husband?

20   A    No.  I don't remember, no.

21   Q    How about Mr. Gardner?  Did you ever see any interactions

22   between Mr. Gardner and your husband?

23   A    Back then at that gas station, I want to say I think Goo was

24   with Wayne.  I can't remember.  But as far as like pointing out a

25   particular time about Goo, I don't remember.

108

1    Q    That particular time?

2    A    Right.

3    Q    Were there any other times that you can remember with

4    respect to Mr. Gardner and your husband giving or receiving

5    anything, that you can recollect?

6    A    No.

7    Q    Did Mr. Gardner ever leave voice mails that you remember

8    receiving or anything like that?

9    A    No.

10   Q    Now, was there an individual, did you ever see your husband

11   give money to anyone?  We talked about him receiving money.  Was

12   there ever anybody that you observed him giving money to?

13   A    I can't remember.

14   Q    Did your husband ever talk to you about or did you ever have

15   any sense of who your husband, Darryl Wyche, got drugs from?

16   A    No.

17   Q    Did you ever know an individual named Card?

18   A    Yes.

19   Q    Who was Card?  Did he have another name?

20   A    Willie Fryson.

21   Q    Who was Card?  What kind of a relationship, if any, did he

22   have with your husband, Darryl Wyche?

23   A    They was friends.

24   Q    And if you know, how long were they friends, just

25   approximately?

1    A    They knew each other through their mothers.  From a younger

2    age.  I'm not sure.

3    Q    Did you ever see any money change hands or anything change

4    hands between your husband, Darryl Wyche, and Card?

5    A    Yeah.  I did see Darryl had gave Card some money before.

6    Q    When did that happen?  What were the circumstances?

7    A    I think that was at a gas station.  It was I think at Forest

8    Park and Windsor Mill.

9    Q    And you were with your husband when that happened?

10   A    Yes.

11   Q    And you actually saw him interact with Card and give him

12   some money?

13   A    Yeah.  Yes.

14   Q    Did your husband tell you anything that day about what he

15   was going to do with Card or why he was giving Card any money?

16   A    No.

17   Q    Did there ever come a time, Ms. Wyche, that you and your

18   husband had any kind of a grocery business or helped each other

19   run a grocery?

20   A    Yes.

21   Q    What was the grocery business called?

22   A    Bryant's Grocery.

23   Q    And what part of town was the Bryant's Grocery in?

24   A    I guess that's West Baltimore.

25   Q    Was it in Randallstown or Park Heights or was it another

1    part of West Baltimore?

2    A    Not far from Park Heights.  Reisterstown and Gwynns Falls.

3    Q    And about how long was it that you and your husband ran this

4    grocery store?

5    A    About a year, I guess.

6    Q    Was it a big place, Ms. Wyche, or was it just a little

7    grocery?

8    A    A little corner store.

9    Q    How was it that you and Darryl were able to get involved in

10    this business?  How did that come about?

11    A    Someone just was trying to get rid of the store, wanted

12    someone to take over the rent, rental payments.

13    Q    Somebody interested in getting rid of it fast, for whatever

14    reason?

15    A    Right.

16    Q    And it was a good opportunity, so your husband took

17    advantage of it?

18    A    Yes.

19    Q    Did you sometimes help run the grocery or run it with your

20    husband?

21    A    Yes.

22    Q    Were there ever times that you saw your husband, Darryl,

23    meeting with anybody in the back room of the Bryant Grocery?

24    A    Yes.

25    Q    Now, let me ask you about the back room of the Bryant

1   Grocery.  When your husband would meet with people back there,

2   did you ever go back with him and see what was going on back

3   there?

4   A    No.

5   Q    If he met with somebody, you'd let him have his meeting and

6   then they'd do it by themselves?

7   A    Yes.

8   Q    Was there anything in the back room of the grocery?  Was

9   there a cash register or any products for sale or any

10  grocery-related business that went on back there?

11  A    No.

12  Q    From what you were able to observe, Ms. Wyche, when your

13  husband did business in the back room of the Bryant Grocery, when

14  he met with people in the back room of the Bryant Grocery, what

15  was happening?

16  A    I guess, he was, I guess, exchanging drugs, money, whatever.

17  Q    Do you know an individual named Willie Mitchell?

18  A    Yes.

19  Q    And how do you know Willie Mitchell?  How long have you

20  known him?

21  A    I think the first time I had seen him, he came in the store.

22  That was like probably two years before the murder, maybe.  About

23  two years or so.  Three years.

24  Q    Your husband lost his life in 2002.  So we're talking about

25  two or three years before that?

1    A    Right.

2    Q    And did Willie Mitchell, I mean, did you ever talk to him or

3    did you ever hear your husband talking to Willie Mitchell?

4    A    Both.  I talked to him and I heard my husband on the phone

5    talking to him.

6    Q    Did Mr. Mitchell use any nicknames?

7    A    Bo.

8    Q    And do you see Mr. Mitchell, who you know as Bo, in court

9    today?

10    A    Yes.

11    Q    Would you please identify him by what he's wearing and by

12    where he's sitting?

13    A    The one right there in the green shirt.

14    Q    The closest defendant to me?

15    A    Yes.  Sitting next to the lady.

16    Q    Your Honor, for the record, identifying the defendant, Mr.

17    Mitchell.

18          THE COURT:  So noted.

19    Q    Now, you mentioned that the first time you met Bo was

20    possibly at the grocery store?

21    A    Yes.

22    Q    And how did that happen?  Did he just walk up to you and

23    say, hi, I'm Bo, or was there an introduction?

24    A    He came in the store looking for Darryl but Darryl wasn't at

25    the store at the time.  And I called Darryl to tell him that

1    somebody was there for him.  Asked him what was his name.  He

2    said Bo.

3    Q    And that was the defendant, Mr. Mitchell, who told you that?

4    A    Yeah.

5    Q    And do you know, did Mr. Mitchell wait for Darryl or did Mr.

6    Mitchell leave to come back?

7    A    Yeah.  He waited a few minutes for him.

8    Q    Did your husband, Darryl Wyche, eventually come to the

9    store?

10   A    Yes, but he was gone when he came.

11   Q    They didn't hook up that day?

12   A    No.

13   Q    Were there any other times that Mr. Mitchell, who you knew

14   of as Bo, ever visited the Bryant Grocery Store?

15   A    Yeah, he came to the store before.

16   Q    About how many times?

17   A    Probably like two or three different times.

18   Q    When Mr. Mitchell would come by the store, and if Darryl

19   Wyche was there, what would they do?

20   A    Go straight to the back.

21   Q    Every time they got together at the store, did they always

22   meet in the back of the grocery?

23   A    Yes.

24   Q    Was there ever a time that they did anything in the front of

25   the grocery?

1    A    No.

2    Q    Did you ever go back into the back to be nosey -- forgive

3    the term -- to see what was going on?

4    A    No.

5    Q    How long would your husband, Darryl Wyche, and Mr. Mitchell

6    stay in the back?

7    A    About 10 minutes, 10, 15 minutes, if that.

8    Q    And after that, would Mr. Mitchell leave?

9    A    Yes.

10   Q    And then what would your husband do?  Would he come back out

11   front to the store?

12   A    Yes.

13   Q    Aside from when your husband had visitors like Mr. Mitchell

14   or anyone else who came by the Bryant Grocery Store, did he

15   generally stay up front and help run the business?

16   A    Yes.

17   Q    On the times that, if you can remember, when Mr. Wyche had

18   visitors at the Bryant, they met in the back, did he ever produce

19   money later on that you would help him count, if you remember?

20   A    Not all the time.  Sometimes, yes.

21   Q    Now, you mentioned a conversation with Bo that very first

22   time when he came looking for your husband?

23   A    Yes.

24   Q    You mentioned that sometimes you would listen to your

25   husband's voice mails?

1    A    Yes.

2    Q    Let me ask you a couple questions just so I'm clear.  Did

3    your husband just have a cell phone that people would call him on

4    or did he have some kind of other device?

5    A    He had a pager, also.

6    Q    Now, is this the kind of pager system that you carry it

7    around with you and it beeps and there's a number calling you?

8    A    Yeah.  But it also had a voice mail to it.

9    Q    And just so I understand that.  If I were to call your

10   husband, if I were to call Darryl Wyche, it would come up on his

11   pager.  But was there a way that I could leave a voice mail for

12   him?

13   A    Yes.

14   Q    And how would your husband get those voice mails or how

15   would you get those voice mails?

16   A    When the pager --

17   Q    When you called?

18   A    Yeah.  When you just call the pager itself, dial zero, and

19   enter your code.

20   Q    So the pager had like a voice mail service?

21   A    Yes.

22   Q    The pager itself was not a cell phone?

23   A    Right.

24   Q    So you would sometimes check your husband's voice mails, is

25   that right?

1   A    Yes.

2   Q    And we talked about that.  That was just because you were

3   being nosey, is that correct?

4   A    Yes.

5   Q    And did you ever hear messages from Mr. Mitchell, from Bo?

6   A    Yes.

7   Q    Just approximately, how many times did you hear messages

8   from Mr. Mitchell, Bo?

9   A    Like about eight times.

10  Q    And this is in the period we were just talking about, the

11  couple, the period of time leading up to your husband's death?

12  A    Yes.  Yes.

13  Q    How would you know it was his voice?  Would he use his name

14  or would you just recognize his voice?

15  A    Like two or three different times he used his name.

16  Q    What kinds of things would Mr. Mitchell say in the message?

17  Was there any information he left or anything he said?

18  A    No, just for him to hit him back.

19  Q    Now, was there ever a time that you spoke with your husband

20  about a trip to Pennsylvania?

21  A    Yes.

22  Q    And about when was it that you spoke to your husband, Darryl

23  Wyche, about a trip to Pennsylvania, if you remember?

24  A    It might have been in around like 2001 maybe, 2000.  I can't

25  remember.

1    Q    That's all right.  You can't remember.  Is that fair to say?

2    A    Yes.

3    Q    What did your husband, Darryl Wyche, tell you about a trip

4    to Pennsylvania?

5              MR. LAWLOR:  Objection.

6              MR. KURLAND:  Objection.

7              THE COURT:  Perhaps this is a good point to release you

8    for your luncheon recess, ladies and gentlemen of the jury.  I've

9    kept you actually past the normal break point.

10             It's approximately 1:10.  I'm going to ask you to be

11   back in the jury room no later than 2:30 p.m. this afternoon.

12   And we'll proceed at that time, probably without an afternoon

13   recess.  In other words, we'll probably start at 2:30 and then

14   proceed until about 4:30 or so and break for the day.

15             I remind you we will not be in session tomorrow or

16   Friday this week.  So when you're excused later today, that will

17   be it for the week.

18             Please leave your note pads on your chairs.  Have no

19   discussion about the evidence or any aspect of the case.  The

20   jury's excused until 2:30 p.m.

21             (Jury exits the courtroom.)

22             THE COURT:  You may step down, Ms. Wyche.

23             (Witness exits the courtroom.)

24             THE COURT:  Okay.  Mr. Hanlon, where were we going with

25   Pennsylvania?

1          MR. HANLON:  Well, Your Honor, if allowed to answer the

2     question, Ms. Wyche will testify that Darryl Wyche told her that

3     he took a trip to Pennsylvania, that Bo got into trouble in

4     Pennsylvania, that someone ran up in the house with him.  I want

5     to get my information correct, Your Honor.  If I remember

6     correctly, this was in connection with a trip to Pennsylvania

7     that Mr. Wyche and Bo were both involved in.

8          THE COURT:  Okay.  So you're relying on the

9     coconspirator exception?

10          MR. HANLON:  That's correct, Your Honor.

11          THE COURT:  Did anything happen?  I mean, did Mr. Wyche

12     go to Pennsylvania and do anything?

13          MR. HANLON:  What ended up happening and what Mr. Wyche

14     told Ms. Wyche is that someone, as it was described to Ms. Wyche,

15     someone ran up into the house.  Everybody in Pennsylvania got in

16     trouble.  And there was some bad blood between Bo and Mr. Wyche.

17          THE COURT:  Oh, I see.  So he was going to make peace

18     and make things right and that kind of thing?

19          MR. HANLON:  Well, I'm not sure that they went that

20     far.  There was an issue.  What happened was they were involved

21     in something.

22          THE COURT:  This is after the raid on -- or maybe it's

23     not?  I'm just not following.

24          MR. HANLON:  The government's theory, Your Honor, is

25     that what Mr. Wyche was describing to Ms. Wyche was the raid.

1    Somebody ran up in the house, that's the police.

2           THE COURT:  Right.

3           MR. HANLON:  And there was trouble and everybody got in

4    trouble.  Bo got in trouble.  And there was some bad blood

5    between Mr. Mitchell and Darryl Wyche as a result of that.

6           THE COURT:  Why?

7           MR. HANLON:  Because Mr. Wyche was involved in the

8    Pennsylvania dealings.  He was the ultimate supplier for that

9    Pennsylvania narcotics.

10          THE COURT:  Is that it?  I mean, is there any more to

11    it?

12          MR. HANLON:  That would be the witness' evidence.

13          THE COURT:  And can you date this conversation?  Or do

14    you have --

15          MR. HANLON:  I'm sorry, Your Honor?

16          THE COURT:  Can you date this?  Other than saying it

17    was apparently after the raid, can you date it or do you have any

18    independent corroboration that he, in fact, went to Pennsylvania?

19          MR. HANLON:  Mr. Wyche went to Pennsylvania?

20          THE COURT:  Yes.

21          MR. HANLON:  None that I'm aware of, Your Honor.

22          THE COURT:  When was Mr. Wyche arrested in

23    Pennsylvania?

24          MR. HANLON:  It was January of 2000.

25          THE COURT:  All right.  It sounds like a coconspirator

1   statement made in furtherance of the conspiracy.  Mr. Lawlor,

2   tell me why that's not.

3          MR. LAWLOR:  Your Honor, I don't think, I'm trying to

4   figure out what conspiracy we're talking about.  And element

5   number one would be the existence of a conspiracy.

6          THE COURT:  Clearly, there's a conspiracy between Mr.

7   Wyche and the witness, and according to the witness, between Mr.

8   Wyche and Mr. Mitchell.

9          MR. LAWLOR:  Talking about a separate conspiracy.

10          THE COURT:  Oh, yeah, there-

11          MR. LAWLOR:  Okay.

12          THE COURT:  Sure.  I mean, ultimately, I mean, the

13   government's going to claim it was a part of the RICO conspiracy.

14   But for purposes of considering the coconspirator exception, I'm

15   not limited to that conspiracy.

16          MR. LAWLOR:  Understood.  Understood.  I guess, Your

17   Honor, to the degree that this was during the course of the

18   conspiracy and in furtherance of the conspiracy, I'd ask that the

19   government examine the witness so we can establish those

20   predicates, which I think now the government is sort of hemming

21   and hawing as to when this occurred.

22          So it has to be not only during, it has to be during

23   the conspiracy, but also, how is Mr. Wyche's idle chatter to his

24   wife about what happened in Altoona after the fact, when he may

25   or may not have even been present, in furtherance of the

1    conspiracy?

2           And that's why I think the initial question of what

3    conspiracy we're talking about is important because --

4           THE COURT:  There is, there is on this witness'

5    testimony alone the existence of a conspiracy that involved Mr.

6    Wyche, Ms. Wyche, Mr. Mitchell.

7           MR. LAWLOR:  Okay.

8           THE COURT:  Mr. Hanlon proffers that Mr. Mitchell got

9    arrested in Pennsylvania in January of 2000.  This is a statement

10   by a coconspirator to a coconspirator that he was going to the

11   location where a coconspirator had been arrested and some bad

12   blood had developed.  It's a clear, unmistakable inference that

13   he was going to Pennsylvania to tend to conspiratorial business.

14          Now, that's what it is.  Obviously, it's --

15          MR. LAWLOR:  Well, Your Honor --

16          THE COURT:  In the final analysis, nobody's going to

17   remember this testimony eight weeks from now.  But that doesn't

18   make it, that doesn't make it inadmissible.

19          MR. LAWLOR:  That doesn't make it admissible.  That's

20   our position.

21          THE COURT:  Well, the rules make it admissible.

22          MR. LAWLOR:  Well, our position is, Your Honor, we

23   would ask that the government be required to establish a better

24   foundation.  We don't think that there's a sufficient foundation

25   for the Court to find that this is during the course of some

1    conspiracy, whatever conspiracy that may be, or that it's in

2    furtherance of the conspiracy.  This seems to be --

3           THE COURT:  Your objection is noted.  Your objection is

4    noted.

5           MR. LAWLOR:  To that degree --

6           THE COURT:  I have to say, and I'll hear from other

7    counsel, but I have to say, in all candor, that the inconsistency

8    in the defense positions here is striking because it is perfectly

9    clear that at the end of the day all of the defendants will be

10    requesting a multiple conspiracy instruction.  And I'm going to

11    give it.  I tell you that now.

12           MR. LAWLOR:  I'm with you.

13           THE COURT:  And so to object to evidence from the

14    government as to the existence of all of these conspiracies, when

15    it's clear you're going to ask for an instruction on all these

16    conspiracies, is just, is just strikingly inconsistent to my

17    mind.

18           I'm not accusing anybody of wasting time.  But, you

19    know, I hope we're not just talking to hear ourselves talk.

20           MR. LAWLOR:  No, Your Honor.

21           THE COURT:  And that's not directed at you, Mr. Lawlor.

22           MR. LAWLOR:  No.  I understand.  I would say, you know,

23    just for the sake of the discussion, I think the two arguments

24    are a bit of apples and oranges.

25           THE COURT:  I'm sorry?  What are the two arguments?

1          MR. LAWLOR:  That there are multiple conspiracies in

2     terms of the government's theory and that there's a racketeering

3     enterprise, and asking the government to establish the existence

4     of a conspiracy.  I'm not saying that there wasn't a conspiracy.

5     I'm asking for an evidentiary predicate as to what conspiracy

6     we're talking about to decide the issue of whether or not the

7     statement by Mr. Wyche is in furtherance of that conspiracy.

8          My position isn't so much there's not a conspiracy.  I

9     understand what the Court has said about, be it the conspiracy

10     that has been alleged in the indictment by the government or a

11     separate conspiracy amongst Mr. and Mrs. Wyche and Mr. Mitchell.

12          Leaving that aside, my objection is that the statement

13     by Mr. Wyche is in furtherance of no conspiracy.  It's idle

14     chatter by a husband to his wife about, you know, I'm going to

15     watch the game on Sunday, I'm driving to Altoona.  It's not in

16     furtherance of any conspiracy.

17          THE COURT:  No.  That wasn't -- you're cutting off Mr.

18     Hanlon's proffer, conveniently.  He said, his proffer was that he

19     said to Ms. Wyche, I'm going to Pennsylvania, somebody ran up in

20     a house, Bo's gotten in trouble, I need to go and deal with this.

21     That's essentially the proffer.  Not just, see you tomorrow,

22     honey, I'm driving up to Altoona.

23          MR. LAWLOR:  Well, Your Honor, I don't, candidly, I

24     don't see the difference.  But I still don't see, I'm driving to

25     Altoona and I'm going to get some milk, I'll be back in a few

1    minutes as being in furtherance of some conspiracy.

2              THE COURT:  And if milk were listed under Title 21

3    United States Code Section 846, you and I would be having the

4    same conversation.  All right.

5              MR. LAWLOR:  We're not making much progress, are we?

6              THE COURT:  Mr. Crowe gets to go first, Mr. Kurland.

7              MR. KURLAND:  Other guys can go out of order, but not

8    me?  That's all right.

9              MR. CROWE:  Thank you, Your Honor.  The Court has very

10   correctly observed that it's kind of difficult to keep all the

11   conspiracies straight.

12             THE COURT:  And that redounds to the great benefit of

13   the defendants.  How many times am I going to hear that in

14   closing argument?

15             MR. CROWE:  And it's my understanding that it's only

16   admissible against my client if my client were a member of this

17   conspiracy.

18             THE COURT:  And prima facie he is.

19             MR. CROWE:  The conspiracy in Altoona?

20             THE COURT:  Absolutely.  Absolutely.  Of course.  If

21   Mr. Wyche supplied Mr. Mitchell and Mr. Mitchell supplied

22   Altoona, and Mr. Mitchell and Mr. Martin were also supplied by

23   Mr. Wyche, yeah.  It's for the jury to decide whether it's 103

24   conspiracies, 4 conspiracies, 1 conspiracy, 1 non-RICO

25   conspiracy, or the RICO conspiracy that's alleged.

1          MR. CROWE:  Well, then we are at a very minimum, at a

2     bare minimum, we are entitled to an instruction to the jury that

3     they're only to consider this against a defendant if they

4     determine that the defendant was a member of the particular

5     conspiracy which was being discussed.  Now, we have --

6          THE COURT:  And I'm going to instruct, and I'm going to

7     instruct the jury on that.

8          MR. CROWE:  And we have many, many times in our motions

9     for bills of particulars requested the government to say who the

10    conspirators were.  And it's just, it's just a shifting target.

11         THE COURT:  I appreciate that.  You know, I've often

12    thought that there's really only one drug conspiracy in America.

13    You know what I'm saying?

14         MR. CROWE:  I know exactly what you're --

15         MR. HANLON:  We trust the Court will instruct the jury

16    on that.

17         THE COURT:  To my knowledge, there he's no poppy being

18    grown in America.  Okay?  So everybody, everybody selling drugs

19    in America is, you know, at a certain level of generality, a

20    member of a conspiracy.  But let's not be too flip about that.

21         I appreciate your point, Mr. Crowe.

22         MR. CROWE:  Thank you, Your Honor.

23         MR. KURLAND:  Your Honor, first, if the government,

24    even with Mr. Hanlon's proffer, the contours of the timing and

25    who was supposed to be involved in the conspiracy haven't been

1   established.  They have to meet that by a preponderance of the

2   evidence.  And if, and if what I'm hearing the Court say is that

3   apparently, then, she, then, is prima facie a member of the

4   charged conspiracy in the indictment, even Mr. Wyche, the

5   government's little chart they showed the first day to the jury

6   during the opening statements, which I know isn't evidence, has a

7   list of suppliers on top.  It's never been articulated, even by

8   the government, that the suppliers, including Mr. Wyche, are part

9   of the charged conspiracy.

10          So I'm not sure exactly, other than simply saying that

11  all drug dealers are obviously, because they don't grow the drugs

12  themselves, import themselves, are always inherently involved in

13  some conspiracy, doesn't make every little discussion a part.

14          And with respect to the Altoona, we have three days of

15  evidence with respect to Altoona.  And other than Mr. Mitchell,

16  none of the other defendants' names came up.  And we had a

17  series, we had a list of a bunch of people who were allegedly

18  from Baltimore who were involved in that conspiracy.  If Mr.

19  Wyche, if his wife and some others are part of the Altoona

20  conspiracy, the government still is far short of establishing

21  that, you know, that that conspiracy existed that ties in with

22  these defendants.

23          The other thing is, I'm still unclear from the proffer

24  as to the bad blood issue.  And to the extent that that's

25  important, I think there needs to be a further proffer on that

1   because otherwise it's impossible to figure out exactly what is

2   the government's theory as to why that particular statement

3   between husband and wife is in furtherance of the conspiracy.

4          THE COURT:  All right.  Thank you, Mr. Kurland.

5          I'm looking back at my notes.  Just this morning, of

6   course, we had the testimony which we'd had earlier about the

7   May, 1999 stop on I-95, Mr. Martin and Mr. Gardner driving back,

8   the admissions by Mr. Gardner.

9          It is perfectly clear that no later, I mean even

10  applying a preponderance standard, based on the record so far, no

11  later than May 7th, 1999, and, frankly, there's even substantial

12  evidence of acts and omissions predating that day, no later than

13  May 7th, 1999, the government has established prima facie the

14  existence of a conspiracy involving these four defendants.

15         So I will give a standing objection to the extent we

16  can, we can do so, to any defendant who wants an objection based

17  on the alleged inapplicability of the coconspirator exception.

18         The Altoona conspiracy prima facie was simply another

19  piece of the conspiracy that the government has established prima

20  facie.  So I appreciate the arguments of all the defendants and

21  we'll work hard to insure that the Court's instructions frame the

22  issues the way the defense wants them to be framed.

23         Anything else on that, Mr. Hanlon?

24         MR. HANLON:  No, Your Honor.

25         THE COURT:  All right.  The objection is overruled.

1          I'm getting the impression, Mr. Hanlon, that we're not

2     going to finish this witness today.  Could you approach the

3     lectern?  I mean, we're not going to resume until 2:30.  And I'd

4     like to break by about 4:30.  Where does that leave us in terms

5     with this witness?  Who do you have out there?

6               MR. HANLON:  I believe that the next witness is Mr.

7     Dwayne Denham, who the Court has heard referred to as Deezo.

8               THE COURT:  Right.  Is he in custody?

9               MR. HANLON:  No, he's not, Your Honor.

10              THE COURT:  All right.  I misunderstood.  I thought,

11    for some reason I thought Ms. Wyche was in custody.

12              MR. HANLON:  No, Your Honor.  When I said there would

13    be a short delay, I was talking about the voice identification.

14              THE COURT:  I realize that now.  How much more do you

15    have with her, you think?  I mean, are you getting pretty close

16    to the --

17              MR. HANLON:  I'm getting down to my last couple of

18    questions --

19              THE COURT:  But you're going to, are you going to --

20              MR. HANLON:  -- dealing with the day of the murder and

21    the voice ID.  I was probably overly optimistic when I said 45

22    minutes.  I don't want to make that mistake again.  I think a

23    half hour is probably realistic.  I don't know what the planned

24    cross examination is going to be.

25              THE COURT:  Okay.  So you're going to cover the day of

1    the murder of both -- maybe I missed it earlier.  I didn't know

2    about this phone call to Mr. Wyche's cell phone.

3            MR. HANLON:  Yes, Your Honor.

4            THE COURT:  This is the first time I've ever heard of

5    that, today.

6            MR. HANLON:  It's never been litigated before because

7    we won't be -- I mean, I'll ask the witness, did you recognize

8    any of the voices?  She's going to say, I don't have any idea.

9            THE COURT:  Okay.  And some of them are going to ask,

10   did you hear any of the voice -- well, I don't know that we're

11   going to finish her today.

12           MR. HANLON:  Is the Court wondering if we should just

13   make the decision to --

14           THE COURT:  That's what I'm trying to do.  If we're

15   going to release Denham, we probably ought to go ahead and

16   release him now.

17           MR. HANLON:  If that would be the Court's preference, I

18   don't have major concerns about that.

19           THE COURT:  Are you going to play the tape?

20           MR. HANLON:  I don't believe the government was

21   planning on playing that tape.

22           THE COURT:  Are any of the defendants going to play the

23   voice mail with this witness?

24           MR. MARTIN:  Not with this witness.

25           MR. LAWLOR:  Not me.

1          MR. MARTIN:  Your Honor, at some point, are we going to

2     have some system in here that the jury will be able to hear tapes

3     with, like headphones?

4          THE COURT:  I don't think it gets any better.  We do

5     have a player as a part of the system.  So we don't have to use

6     the table top close to the --

7          MR. MARTIN:  It looked like something out of the

8     fifties that we were doing the other day.

9          THE COURT:  I agree.

10         MR. MARTIN:  I don't think we need to do that, do we?

11         MR. LAWLOR:  And Mr. Martin remembers the fifties.

12         THE COURT:  I'll have our expert, Ms. Arrington, work

13    with IT to test some CD's in the system.  I think it works pretty

14    well.  So we ought to be able to do that.

15         Why don't you hold on to Denham for a couple hours and

16    see if we can get to him today?

17         MR. HANLON:  Certainly, Your Honor.

18         THE COURT:  All right.  We're in recess until 2:30.

19         (Recess at 1:23 p.m.)

20         (Jurors not in courtroom.  Witness not in the

21    courtroom.)

22         THE COURT:  Mr. Hanlon.

23         MR. HANLON:  Thank you, Your Honor.  I wanted to put on

24    the record, I think this is by way of clarification.  I want to

25    make sure that what I communicate by way of a proffer about this

1    Pennsylvania testimony is correct.  And checking my notes, and I

2    actually also inquired with the witness during the break just to

3    make sure I had the information right.

4              THE COURT:  All right.

5              MR. HANLON:  And I want to make sure I get it.

6              I anticipate that the witness will testify, with

7    respect to the Pennsylvania situation, that she was told by her

8    husband, Darryl Wyche, that he went up, that he was in

9    Pennsylvania with Bo, that they planned on doing some kind of a

10   drug transaction, that someone, while they were there someone ran

11   up in the house and took all of the money and drugs that they

12   had.

13             I mentioned to the Court that there was a question

14   about bad blood later on.  By way of clarification, she did not,

15   the witness did not hear that from her husband directly.  She

16   heard that from word on the street.  I would not expect to elicit

17   that.

18             With respect to why her husband would have told her

19   this, the witness will testify that he often told her about

20   things related to the business.  If he was concerned or worried

21   about things he talked to his wife because she knew what was

22   going on, she knew the business, she counted money, she was

23   someone he could trust.

24             So that is what the government would anticipate

25   eliciting.

1          THE COURT:  You know what?  Can we make this easy, Mr.

2     Hanlon?  Just ask her, did he go up to Pennsylvania, was he in

3     involved in drug dealing up there?  Can we just do it that I way?

4          MR. HANLON:  That's fine with me, Your Honor.

5          THE COURT:  Let's just do it that way.  I mean, if you

6     want, if you want her to mention his association with Bo in

7     Pennsylvania, that's fine.  But let's not get bogged down.

8          MR. HANLON:  That's fine, Your Honor.

9          MR. KURLAND:  Judge, that might obviate it, but I just

10    wanted, for the record, to still have the standing coconspirator

11    objection with respect to Mr. Gardner.

12          THE COURT:  Yes.  Yes.

13          MR. LAWLOR:  Likewise, Your Honor.

14          THE COURT:  Let's just shorten it.  I went up to

15    Pennsylvania, did some deals with Bo.  We lost some money, they

16    lost some drugs, apparently.  My husband was concerned about it,

17    or whatever.

18          MR. HANLON:  Fine, Your Honor.

19          MR. LAWLOR:  Your Honor, we still have a continuing

20    objection?

21          THE COURT:  Yes.

22          MR. LAWLOR:  Thank you.

23          THE COURT:  Mr. Harding.

24          MR. HARDING:  This is the most boring of all, Your

25    Honor.  Apparently, there's some confusion about the exhibit

1   numbers I read out yesterday.  So I'd like, when the jury comes

2   out, simply to read through these exhibits with the numbers

3   again.

4           THE COURT:  All right.

5           MR. HARDING:  Thank you.

6           THE COURT:  Anything else?  All right.  We'll have the

7   jury.

8           MR. HANLON:  And Your Honor, we're going to get our

9   witness now.  And per the Court's instructions, I'm just going to

10  kind of lead through this part.

11          THE COURT:  Great.

12          MR. LAWLOR:  Did he say lead through it, Your Honor?

13          (Witness enters the courtroom.)

14          THE COURT:  Ms. Wyche, continue to speak into the

15  microphone, please.  Thank you.  You're doing fine.

16          (Jury enters the courtroom.)

17          THE COURT:  Please be seated, ladies and gentlemen.

18  Thank you for your patience.  We're ready to continue.  Ms.

19  Wyche, you remain under oath.  Please continue to speak into the

20  microphone.

21          Before we go back to the witness, Mr. Harding wanted to

22  clarify certain exhibit numbers that were recited on a prior

23  court session.  Mr. Harding, you may proceed.

24          MR. HARDING:  Yes.  Thank you, Your Honor.  I read off

25  these exhibit numbers beginning with MB-40A, and then I read off

1    the subsequent numbers without reading the MB number.  But each

2    of these numbers should be understood to have "MB" in front of

3    it.  These were introduced yesterday.

4           MB-40A, MB-40B, and then 40C, 40D, 40E, 40F, 41, 42,

5    43, 44, 45, and 46, all with an MB in front of them.

6           THE COURT:  Thank you for clarifying, Mr. Harding.

7    Whenever you're ready, Mr. Hanlon.

8           CONTINUED DIRECT EXAMINATION

9    BY MR. HANLON:

10   Q    Thank you, Your Honor.  Good afternoon again, Ms. Wyche.

11   A    Good afternoon.

12   Q    Before we broke, I'd just about, I asked you whether or not

13   there came a time when your husband or to-be husband, Darryl

14   Wyche, told you about taking a trip to Pennsylvania.  Did he

15   eventually tell you about a trip he had taken to Pennsylvania?

16   A    Yes.

17   Q    And is this something you heard about from your husband

18   after the fact?  He told you about it later on?

19   A    Yes.

20   Q    Did he tell you that he had taken this trip to Pennsylvania

21   with Bo?

22   A    Yes.

23   Q    Did your husband, in talking to you about this, tell you

24   that while he and Bo were in Pennsylvania, that someone had run

25   up in a house and taken all of the money and drugs that they had

1    in Pennsylvania?

2    A    Yes.

3    Q    And did your husband tell you this because it was something

4    he was worried about, he would sometimes talk to you about things

5    related to the business that he was concerned or had worries

6    about?

7    A    Yes.

8    Q    Let me ask you about a couple of names that are going to

9    come up.  We spoke about Anthony Wyche, also known as Peter, or

10   Pete, who was your husband's brother, is that right?

11   A    Yes.

12   Q    Did your husband have a friend named Deezo?

13   A    Yes.

14   Q    And is Deezo's full name Dwayne Denham?

15   A    Yes.

16   Q    Deezo's a nickname?

17   A    Yes.

18   Q    What was your husband's relationship with Deezo?

19   A    Friends.

20   Q    They've been friends a long time?

21   A    Yes.

22   Q    Your husband, since he lost his life back in 2002, have you

23   kept in touch with Dwayne Denham, Deezo?

24   A    Yes.

25   Q    And what kind of relationship have you or your family had

1   with Dwayne Denham, Deezo?

2   A    The same relationship as if my husband was here.

3   Q    Good friends?

4   A    Yes.

5   Q    Does he know your children?

6   A    Yes.

7   Q    You've stayed in touch with Dwayne Denham pretty regularly

8   since '02?

9   A    Yes.

10  Q    Has he helped out or helped take care of the family in any

11  way?

12  A    Yes.

13  Q    Let me ask you about the couple of days leading up to March

14  24th of 2002, the day that your husband was murdered.  At that

15  point, had you and Mr. Wyche moved to Cockeysville?

16  A    Yes.

17  Q    And you were married at that time, is that right?

18  A    Yes.

19  Q    You mentioned that, as of today, Ms. Wyche, you have five

20  children?

21  A    Yes.

22  Q    In the days leading up to your husband's murder, were you

23  actually expecting a child?

24  A    Yes.

25  Q    So you were about to have a baby?  This would have been your

1    fifth baby?

2    A    Yes.  Um-hum.

3    Q    Did I get any part of that wrong?

4    A    No.

5    Q    Okay.  In the days leading up to that day, March 24th of

6    2002, had your husband received a package or had you seen a

7    package around the house during that time frame?

8    A    Yes.

9    Q    Where had you seen this package?  Where was it and what was

10   your husband doing with it?

11   A    In the closet in his book bag.

12   Q    When you saw this package, was it, did you see your husband

13   taking it out of a book bag, putting it into a book bag?  What

14   was he doing with it?

15   A    Putting it in the book bag.

16   Q    What did the package look like?

17   A    About the size of a, little bit bigger than a Bible.

18   Q    Like a -- well, I shouldn't indicate with my hands.  Can you

19   show for the jury about what the size would be?

20   A    About like this (indicating).

21   Q    And you're indicating with your hands.  And I believe you

22   said, it didn't get picked up on the microphone, you said "about

23   like this" and you were indicating with your hands, Ms. Wyche?

24   A    Yes.

25   Q    What color was the package?  Could you see what was inside

1   of it?

2   A   No, I couldn't see what was inside of it.  It was wrapped up

3   and taped.

4   Q   Had you seen packages like this in the years prior to March

5   of 2002, from the early '90s on?  Had you ever seen packages like

6   this around the house?

7   A   Yes.

8   Q   And when you saw these packages, what was your understanding

9   of what was inside the packages?

10  A   Drugs.

11  Q   We've talked about drugs a number of times this afternoon,

12  Ms. Wyche.  You've testified you had an awareness that your

13  husband was dealing drugs.  But did you ever have a specific

14  knowledge of what type of drug --

15  A   No.

16  Q   -- your husband was dealing in?

17  A   No.

18  Q   I believe in some prior statements you may have occasionally

19  said cocaine.  Why would you have said cocaine early on?

20  A   Just because I guess a known drug, I just said it.  I don't

21  know what it was.

22  Q   It was some kind of drug and cocaine is just a common drug?

23  A   Right.

24  Q   This particular package, would you have had any idea of what

25  particular type of drug it was?

1   A    No.

2   Q    I believe you saw, you indicated that you saw the drug in a

3   brief, I'm sorry, in the book bag and also in the closet?

4   A    Yes.

5   Q    Where did you see this package in a closet?  Which closet, I

6   should say?

7   A    Where you hang the coats up at.

8   Q    Did you ever see, was there a particular part of the closet

9   that this package was stored in?

10  A    It was just behind some stuff on one of the top shelves.

11  Q    And where was this closet located in your house?

12  A    Off of the living room.

13  Q    Had you ever, on any other occasion, seen packages like that

14  one stored in that closet or any other closet in your home?

15  A    Under the kitchen sink.

16  Q    When was it that you saw drugs under your kitchen sink?  I'm

17  sorry.

18  A    I'm sorry.  That wasn't no packages in the kitchen sink.

19  Q    And I asked the question the wrong way.  You saw something

20  under your kitchen sink.  What was it that you saw under your

21  kitchen sink?  And we're talking about something different than

22  the package in the closet, is that right?

23  A    Right.

24  Q    What was it you saw under the kitchen sink?

25  A    It was a plastic bag like from the market, and it had

DIRECT EXAMINATION OF WYCHE

140

1    different little plastic bags in the inside of it with like the

2    glass vials.

3    Q    Had you seen glass vials like this at any other time prior

4    to that around the house or anything like that?

5    A    Occasionally, yes.

6    Q    And this particular bag that you mentioned, which was, I

7    think in your kitchen, you said?

8    A    Yes.

9    Q    If I understand correctly, there was a plastic bag and then

10   inside there were some additional plastic bags?

11   A    Yes.

12   Q    And inside those bags were some vials?

13   A    Yes.

14   Q    Could you tell whether or not any of the vials had anything

15   in them?

16   A    Yes.

17   Q    What did you see inside some of these vials?

18   A    It was like a brownish yellowish.

19   Q    Did it look, what did it look like to you?  I mean, what did

20   you understand it to be from looking at it?

21   A    I knew it was drugs.  I don't know what kind.

22   Q    What did you -- you ended up finding this item in the

23   kitchen shortly after your husband's death, is that right?

24   A    Yes.

25   Q    What did you end up doing with that bag, the little bags

1    inside with the glass vials?  What did you end up doing with

2    that?

3    A    Got rid of it.

4    Q    You didn't want the police to find it?

5    A    No.

6    Q    Is that fair to say?

7    A    Yes.

8    Q    We talked about something in the kitchen.  Let's go back to

9    the package in the closet for a second.  During that same time

10   frame, the couple of days leading up to your husband's death, did

11   you see any money around the house?

12   A    Yes.

13   Q    Where did you see money?  How did it come up?

14   A    It was in his book bag.

15   Q    Your husband's book bag?

16   A    Yes.

17   Q    And at any point did you help your husband with that money

18   in any way?  Did you count it for him?

19   A    Yes, the night before, the day before.

20   Q    The day before the murder?

21   A    Yes.

22   Q    And how much money did you count up?

23   A    It was 20, $23,000.

24   Q    You counted up and then gave it back to your husband?

25   A    Yes.

1    Q    Now, at some point did you see your husband put the package

2    you described and the money back into the book bag or back into

3    any other spots?

4    A    Back in the book bag.

5    Q    And when did you see him do that?

6    A    That same evening.

7    Q    The night before the murder?

8    A    Yes.

9    Q    I believe I asked you about book bags before.  Your husband

10   occasionally carried things in book bags?

11   A    Yes.

12   Q    Did he have more than one book bag?

13   A    Two or three of them.

14   Q    Would he carry everything that he needed to carry around

15   with him in his book bag?

16   A    Yes.

17   Q    That included money and drugs?

18   A    Yes.

19   Q    You've seen, you saw Mr. Wyche put money and drugs into book

20   bags on various occasions?

21   A    Yes.

22   Q    Let me ask you about that actual day, March 24th of 2002.

23   This is the last day that you saw your husband.  Do you remember

24   that?

25   A    Yes.

1    Q    That was a Sunday, is that correct?

2    A    Um-hum.  Yes.

3    Q    How did that day begin for you and your family?

4    A    Darryl had went to church that morning.  I didn't go.  I

5    stayed home.  Probably around like 1:30 maybe, between 1 and 1:30

6    he came home from church.  We ate something.  Then it was about

7    time for us to go get the kids.  They had stayed out Harford

8    County over a relative house.

9    Q    Now, you indicated your husband had gone to church that day?

10   A    Yes.

11   Q    And then came back at a particular time?

12   A    Yeah.  Yes.

13   Q    Was that typical of the time, a typical time that your

14   husband would come back from going to church on Sunday?

15   A    Yeah.  Church let out between 12:30 and 1.  Sometimes a

16   little longer.

17   Q    And you did not go with him on that particular Sunday?

18   A    No.

19   Q    Why was that?

20   A    Just couldn't get up.

21   Q    Now, you indicated that at some point you and Mr. Wyche were

22   making preparations to go pick up your children?

23   A    Right.

24   Q    Was that all four children at the time and you were

25   expecting a fifth?

1    A    Yes.  I didn't know at that time I was pregnant.

2    Q    I understand.  You came to know later you were pregnant?

3    A    Yes.

4    Q    And what were your plans, you and Mr. Wyche's plans, for

5    your children that day?

6    A    We was going to the movies.  We went, usually went to the

7    movies on Sunday evenings.  But we had left a little early to go

8    pick them up than what we normally would have picked them up

9    because my oldest son had hurt himself.

10        So we went out there to pick him up.  Our plans changed

11   about the movies.

12   Q    And what were your children doing out in Harford County?

13   A    Over my sister house.

14   Q    They were just staying there, visiting?

15   A    Yeah.

16   Q    So one of your kids had gotten hurt so your plans had

17   changed a little bit, is that right?

18   A    Right.

19   Q    Now, at some point did you see your husband on the phone?

20   A    Yes.

21   Q    When was that happening?  What were you doing when your

22   husband got on the phone?

23   A    I was in the doorway.  We was about to leave out the door

24   when Bo had called his phone.  I'm not sure, I'm not sure if Bo

25   called his phone or whether Darryl called him back from like a

1    missed call or maybe a paged call or something.  I can't

2    remember.  But I just know they ended up on the phone again.

3    Q    And you were actually with your husband and you saw him on

4    the phone?

5    A    Right.

6    Q    Was it a cell phone he was on?

7    A    Yes.

8    Q    As far as you knew, was it the regular cell phone your

9    husband used at the time?

10   A    Yes.

11   Q    Were you able to overhear your husband's half of this phone

12   conversation?

13   A    Yes.

14   Q    And you've already talked about this.  But did your husband

15   use the name during that call with the person he was speaking to?

16   A    Yes.

17   Q    What name did he use?

18   A    Bo.

19   Q    And what did you hear your husband talk to Bo about over the

20   cell phone call?

21        MR. LAWLOR:  Objection.

22        THE COURT:  Overruled.  You may answer.

23   A    First he said he hadn't heard from him in a minute, or where

24   he been at or something like that.  And to that nature, that he

25   hadn't heard from him.  And then he had said, when he get back,

1    when he get in town, he'll hit him later, or either for Bo to hit

2    him.  I can't remember exactly.  But it was to the point where

3    they supposed to have been meeting up.

4    Q    You mentioned that your husband, Mr. Wyche, talked about

5    when he got in town that they would get together or something

6    like that?

7    A    Yes.

8    Q    In this context, if your husband referred to "in town", what

9    would you have understood it to mean?

10   A    In the city.

11   Q    Baltimore City?

12   A    Yes.

13   Q    How did that phone call come to an end?  Was there anything

14   else that your husband said to Bo or that, that you were able to

15   hear Bo say on the other side of the phone?

16   A    No.  That was pretty much it.

17   Q    After your husband got off that phone, did he make any

18   statements to you about what his intentions were for later on

19   that day?

20   A    No.

21   Q    He did not tell you?

22   A    No.

23   Q    Did your husband tell you whether or not he intended to get

24   together with anybody later that day?

25   A    Not with Bo, no.

1    Q    Did your husband say anything to you about what his plans

2    were later on than day?

3    A    Yes.

4    Q    Whether they were with Bo or someone else?

5    A    Yes.

6    Q    What did your husband tell you about what his plans were for

7    later that day?

8    A    He supposed to have been taking a ride to DC.  I don't know

9    if he was trying to sell a car or buy a car or something like

10   that.  It was something about going to DC about a car.

11   Q    Did your husband tell you who he was planning on going to DC

12   with, who he intended to go to DC with?

13   A    Him and Deezo.

14   Q    Deezo is Mr. Denham, who we talked about earlier?

15   A    Yes.

16   Q    Now, did you and your husband end up going and picking up

17   your children?

18   A    Yes.

19   Q    Eventually you came home?

20   A    Yes.

21   Q    At some point during the course of the day, did your husband

22   begin to make preparations to go out?

23   A    Yeah.  Well, on the way to pick up the kids, when he told me

24   about the DC ride, he also, I think his brother had called, Pete

25   had called my phone or -- I don't know how me and Pete ended up

1  on the phone, whether I called him or he called me.  But I had

2  gave Darryl the phone.  And him and Darryl start talking.  So

3  they had planned on hooking up, also.

4  Q    And this is something you could hear coming up over the

5  phone?

6  A    Um-hum.

7  Q    That's a yes?

8  A    Yes.

9  Q    So this is on the way to pick up the children.  And later

10 on, did there come a time that your husband actually did leave

11 the house?

12 A    Yeah.  We went and picked the kids up, came back, took them

13 in the house.  And I was getting ready to run to the store to get

14 my son some medicine.  And he had grabbed some of his book bags

15 out of the car.

16 Q    Darryl?

17 A    Yeah.  He was on his way, I think.  I don't know if he was

18 on his way to get Pete first or Deezo.  I'm not sure.

19 Q    You mentioned "he" picked up some book bags out of the car.

20 That was Darryl Wyche, your husband?

21 A    Yes.

22 Q    Now, you mentioned that these book bags came out of his car?

23 Did I hear you?

24 A    One of the book bags was out his car, which had all his CD's

25 in it from the ride that we took out Harford County.  The other

1    book bag, when we took the kid in the house, there was another

2    book bag that was already in the house.

3    Q    Is that one he picked up?

4    A    Yeah.

5    Q    Did you see where he got it from?

6    A    Out of the closet.

7    Q    And if you remember, was this the same book bag that he put

8    the package and the money in?

9    A    Yes.

10   Q    And did he take that with him when he left?

11   A    Yes.

12   Q    If you know, Ms. Wyche, do you know if your husband ever

13   kept scales in any of his book bags?

14   A    Yes, he did.

15   Q    Did your husband ever keep cell phones in any book bags?

16   A    Yes.

17   Q    Do you know if, on this particular day, whether he took

18   scales and cell phones in his book bag?

19   A    Yes.

20   Q    You actually saw them?

21   A    Yeah.

22   Q    In the book bag that your husband took?

23   A    Yes.

24   Q    What time did your husband leave that day, approximately?

25   A    Probably, it was around like six.  It was before the sun

1    went down.  Around about, maybe, probably a little earlier than

2    that.

3    Q    He left and you stayed home?

4    A    Yes.

5    Q    And Ms. Wyche, this was the last time you ever saw your

6    husband, Darryl Wyche, is that right?

7    A    Yes.

8    Q    That evening, did you spend time with your kids, have

9    dinner, normal stuff?

10   A    Yes.

11   Q    Did you have any, did you hear from your husband, Darryl,

12   during the course of the evening and into the night?

13   A    Yes.  Several times.

14   Q    There were a number of calls?  He was checking in, things

15   like that?

16   A    Yes.

17   Q    Around about later on in the night, getting a little bit

18   later, do you remember actually either making or getting a phone

19   call from your husband, Darryl Wyche?

20   A    Wait a minute.  Can you say that again?

21   Q    Sure.  It wasn't a great question, anyway.  Later on that

22   night, getting later, closer to 11, 11:30, later, did you talk to

23   your husband on the phone?

24   A    Yes.

25   Q    And do you remember, did you call him or he call you?

1    A    I might, I think I called him because I was reminding him

2    not to forget my youngest daughter milk.

3    Q    And that was going to be my next question.  You talked to

4    him about, number one, picking up milk for your little girl?

5    A    Yes.

6    Q    Did you talk to him about returning a videotape?

7    A    No.  We was supposed to have been getting a new movie that

8    had just came out.  He wanted to, I was reminding him to see if

9    they had that movie.

10   Q    How long did this phone call last?

11   A    It was a few minutes, not long.

12   Q    Had you expected him home prior to that point?  Were you

13   upset at all that he hadn't come home?

14   A    Yes.

15   Q    You were upset?

16   A    Yes.

17   Q    Did he talk to you at all about what his intentions were,

18   where he was going to go after you got off the phone with him?

19   A    I think he said he had to drop Deezo off, or either he would

20   get the milk when he, before he dropped Deezo off, because I

21   think Deezo daughter mother needed some milk, also.  One or the

22   other.  But then he said after he dropped Deezo off, he had to

23   take Pete back to his car where the video store was at, and then

24   he would be home.

25   Q    And just to confirm, your husband did mention Deezo by name

1    to you during this phone call, is that right?

2    A    Yes.

3    Q    If Deezo had been in the car at that point, would Deezo have

4    known that your husband was telling you that he was there?

5              MR. LAWLOR:  Objection.

6              THE COURT:  Overruled.  You may answer.

7    Q    Do you understand my question?

8    A    No.

9    Q    When your husband referred to Deezo --

10   A    Right.

11   Q    -- mentioned Deezo's name, he wasn't whispering or using a

12   low tone of voice or anything, is that right?

13   A    No.

14   Q    If Deezo had been in the car with your husband, would he

15   have heard your husband talking about him to you?

16             MR. LAWLOR:  Objection.

17             THE COURT:  Overruled.  You may answer.

18   A    Yeah.  Yeah.

19   Q    This call came to an end and you continued to wait for your

20   husband, is that right?

21   A    Yes.

22   Q    At some point did you doze off?

23   A    Yes.

24   Q    Just got sleepy?

25   A    Um-hum.  Yes.

1    Q     Did you wake up?

2    A     Yes.

3    Q     About, ballpark, I understand you're just waking up, about

4    what time was it?

5    A     It was, it was around 1:00.

6    Q     And when you woke up, was your husband home?

7    A     No.

8    Q     Did that worry you?

9    A     Yes.

10   Q     What did you do to try to find your husband?

11   A     I went in the kitchen and used the phone.  That's how I knew

12   it was, it was 1:00, because on the microwave I seen the time.

13   Q     All right.

14   A     When I called his phone, I don't know if the first time it

15   rang and then something happened, then I called right back.  I

16   don't know what happened.  I don't know if the call dropped or

17   whatever happened.  I called the phone back.  When I called it

18   back, that's when I heard these voices talking.

19   Q     And this is a call, Ms. Wyche, not to cut you off, but this

20   is a call to your husband's cell phone?

21   A     Yes.

22   Q     At some point it picks up and you hear some voices talking?

23   A     Yes.

24   Q     From what you could tell, you heard these voices, you're on

25   the phone and you're hearing voices on the other end, were these

1    voices talking to you?

2    A    No.

3    Q    Who were the voices talking to?

4    A    They was talking to each other.  They didn't have the phone

5    directly at their mouth.

6    Q    Did it seem like you were hearing background voices around

7    the telephone?

8              MR. CROWE:  Objection.

9              THE COURT:  Overruled.  You may answer.

10   A    Yes.

11   Q    From what you could tell, what did the voices say to one

12   another?

13   A    He said, I don't know what to do with this shit.  He said,

14   throw that, he was like, I don't know, he said, throw that shit

15   in the reservoir.

16   Q    Was there anything else said?

17   A    That's all I heard.  Remember hearing, anyway.

18   Q    Was it multiple voices you heard?

19   A    Just, it was just two voices, it sounded like.

20   Q    At that point, you had just woken up, is that right?

21   A    Yes.

22   Q    Were you paying close attention to these voices to try to

23   figure out if you recognized these voices or anything like that?

24   A    No.  I just knew it wasn't Darryl voice or Pete voice.

25   Q    Did either of the voices sound like Deezo?

1    A    No.

2    Q    How long have you known Deezo, your husband's friend, Deezo?

3    A    Probably over 18 years.

4    Q    You recognize his voice?

5    A    Yeah.  He has a New York accent.  I would recognize his

6    voice.

7    Q    Either of these voices sound anything like Deezo?

8    A    No.

9    Q    And you weren't in a position to record this call,

10   obviously, is that correct?

11   A    Correct.

12   Q    At some point did the call end?

13   A    Yes.

14   Q    What did you do afterward?

15   A    I started trying to dial the number back again.

16   Q    Now, at this point, Ms. Wyche, are you more worried than you

17   were before?

18   A    Yeah.

19   Q    Had you ever been aware of any occasions when your husband,

20   Darryl, had been robbed or kidnapped?

21   A    Yes.

22   Q    This had happened previously?

23   A    Yes.

24   Q    Did he talk to you about it?

25   A    Briefly.

1    Q    How many times in the past had your husband, Darryl, been

2    robbed or kidnapped that you, that he told you about?

3    A    Twice that he was robbed and once that he was kidnapped.

4    Q    Did he tell you who robbed or kidnapped him?

5    A    No.

6    Q    Just told you that it had happened?

7    A    Yes.

8    Q    Was he injured either time?

9    A    No.

10    Q    From what he told you, was this something that was related

11    to the drug business?

12    A    Yes.

13    Q    Did he have drugs or money taken from him on those prior

14    occasions?

15    A    Yes.

16    Q    Back to the particular night we were talking about.  You

17    made some additional attempts to call your husband's cell phone?

18    A    Yes.

19    Q    Were you able to reach him?

20    A    No.

21    Q    Did the phone pick up at all?  Did you hear any of these

22    background voices?

23    A    No.  It kept going to the machine.

24    Q    And at this point, did you try calling any other numbers?

25    A    Started -- he had another cell phone, also, that I was

DIRECT EXAMINATION OF WYCHE                      157

1    trying to call.  But that battery had been dead since earlier.  I

2    tried to call Pete phone a few times.  Pete phone kept ringing

3    and kept ringing.

4    Q    Also no answer?

5    A    No.  I think I called his phone so much the battery went

6    dead because like a while later his battery, I mean, his phone

7    was going straight to the answering machine, also.

8    Q    And neither of these phones picked up and you didn't hear

9    any more background conversations --

10   A    No.

11   Q    -- is that right?  At some point, did you talk to your

12   mother about this?

13   A    Yes.

14   Q    And what's your mother's name?

15   A    Irene Magginson.

16   Q    Could you spell, for our court reporter, Magginson?

17   A    I-R-E-N-E, M-A-G-G-I-N-S-O-N.

18   Q    And when did you call your mom?

19   A    I called her in the midst of me kept calling Pete phone, I

20   called her, to tell her that, what I heard and that now I

21   couldn't reach neither one of them.

22   Q    At some point, did you and your mom speculate that maybe you

23   should call hospitals and jails, maybe?

24   A    Yes.

25   Q    That would have an answer?

1    A    Yes.

2    Q    I gather you didn't find any information about your husband,

3    is that right?

4    A    Right.

5    Q    Let me ask you about a couple of other things.  The next day

6    you went to your mother's house, is that right?

7    A    Yes.

8    Q    About what time of the morning?  Was it early or later in

9    the morning?

10    A    It was early.

11    Q    Your husband was still missing, is that right?

12    A    Yes.

13    Q    At some point, did you hear about a voice mail message?

14    A    Yes.

15    Q    And who told you about a voice mail message?

16    A    My sister.

17    Q    What you heard about this voice mail message, did anybody

18    tell you that it might have something to do with what had

19    happened the night before?

20    A    Yes.  Pretty much, yes.

21    Q    Did you want to listen to that voice mail message right then

22    and there?

23    A    No.

24    Q    Why not?

25    A    Just didn't want to hear it.

1    Q     Did there come a time when you actually listened to this

2    voice mail message?

3    A     Yes.

4    Q     When?  About how many days after?

5    A     Probably like three or four days.

6    Q     Now, this particular voice mail message I've been asking you

7    about, whose phone was it that this voice mail message was on

8    that you've been hearing about?

9    A     My mother's phone.

10   Q     Your mother, Irene?

11   A     Yes.

12   Q     And was this a message that had been left on her house phone

13   or her cell phone?

14   A     Her cell phone.

15   Q     And your understanding is that this is a cell phone message

16   that had been left on your mom's voice mail?

17   A     Yes.

18   Q     And you heard about it but you had not listened to it

19   yourself for a couple of days?

20   A     Yes.

21   Q     And what was your understanding of whose phone this voice

22   mail message had been put on your mom's voice mail from?  Whose

23   phone was leaving the voice mail?

24   A     Darryl's.

25   Q     Why were you hesitant to listen to this voice mail message

DIRECT EXAMINATION OF WYCHE                    160

1    on your mom's phone?

2              MR. LAWLOR:  Objection.

3              THE COURT:  Overruled.  You may answer.

4    A    I just didn't want to hear it.

5    Q    Were you afraid?

6    A    I wasn't afraid.  I just, I mean, who want to hear it?  Who

7    want to see and do all this?

8    Q    At some point, you finally did listen to the voice mail?

9    A    Yes.

10   Q    And how did you go about getting hold of it?  Did you call

11   your mom's cell phone?

12   A    Yes.

13   Q    And put in the pass code?

14   A    Yes.

15   Q    And did you listen to the whole voice mail?

16   A    Yes.

17   Q    What did you hear on that voice mail message, Ms. Wyche?

18   A    I heard some voices with people talking about apparently

19   what they just done.

20   Q    What words were you able to make out on the voice mail

21   message?

22   A    I can't remember.

23   Q    Did you hear any names on the voice mail message?

24             MR. CROWE:  Objection.

25             THE COURT:  Overruled.  You may answer.

DIRECT EXAMINATION OF WYCHE                161

1   A    It sound like I heard the name Wayne.

2   Q    Now, when you listened to this voice mail message, did you

3   listen to it just one time or did you listen to it multiple

4   times?

5   A    Multiple times.

6   Q    And why were you listening to it multiple times?

7   A    I was trying to catch the voices and see if I could

8   remember.

9   Q    Let me ask you a couple of questions about that.  At some

10  point, did you have an idea about who these voices or at least

11  some of the voices might have been?

12  A    No.

13  Q    At first?

14  A    Right.  At first.

15  Q    Did there ever come a time when you listened to these voices

16  and you had a belief about who the voices sounded like?

17  A    Yes.

18  Q    And who were the people, from your listening to this voice

19  mail, the people speaking on this voice mail message, who were

20  the people that you thought the voice mail message sounded like?

21  A    Bo and Wayne.

22  Q    Let me ask you about the two of them separately.  You

23  mentioned that you heard the word "Wayne" on the voice mail, is

24  that right?

25  A    Right.

1    Q    During the course of this voice mail message, did you ever

2    hear the word "Shorty?"

3    A    Yes.

4    Q    Now, is that a word that the individual you knew of as

5    Wayne, Mr. Martin, had ever used in the past in addressing you?

6    Had he ever used the word "Shorty" in your presence or called you

7    Shorty?

8    A    Yes.

9    Q    Let me ask you about that.  Some period prior to the night

10   of the murder, had you bumped into Mr. Martin at a place called

11   Corinthian's, a bar called Corinthian's?

12   A    Yes.

13   Q    And you were just there hanging out?

14   A    Yes.

15   Q    And Mr. Martin was there and came up to you and talked to

16   you?

17   A    Yes.

18   Q    Was anyone with him?

19   A    Goo.

20   Q    That's Mr. Gardner?

21   A    Yes.

22   Q    And what did you and Mr. Martin and Goo talk about that

23   night at Corinthian's?

24   A    Just asking each other how everybody been, stuff like that.

25   Q    Just making small talk?

1  A    Yeah.

2  Q    During the course of that conversation, did Mr. Martin refer

3  to you by any names?

4  A    I can't remember.

5  Q    Did he call you Shorty?

6           MR. CROWE:  Objection.

7           THE COURT:  Overruled.  You may answer.

8  A    I can't remember.

9  Q    Were there ever any other times, Ms. Wyche, that Mr. Martin

10  ever used the word "Shorty" to you or that you heard him use the

11  word "Shorty?"

12  A    Yes.

13  Q    But maybe not that night at Corinthian's?

14  A    Right.

15  Q    Now, with respect to this voice mail you heard, was it the

16  voice you thought might be Wayne that used the word "Shorty?"

17  A    I don't know if that was exactly the voice that was making

18  me think about Wayne.  Maybe it was just the way it was being

19  said.  Everybody just don't say "Shorty" and maybe not use the R

20  in it or --

21  Q    Tell us about that.  What was it about the way that the

22  voice, whether it was the words or the tone or whatever, what was

23  it about this voice that made you think of Wayne?

24  A    Well, for one, it sounded like somebody said Wayne name.  So

25  when I was thinking Wayne.  And then the slang or the talk or

DIRECT EXAMINATION OF WYCHE

164

1    whatever, the way, the way Shorty was said made me think that.

2    Q    Now, it would be fair to say you're not certain --

3    A    Right.

4    Q    -- that it was Wayne's voice.  Is that fair to say?

5    A    Right.

6    Q    Let me ask you about the other voice.  You mentioned there

7    was another voice you felt like you could recognize?

8    A    Yes.

9    Q    And whose voice was that?

10   A    Bo.

11   Q    What was it about one of the other voices on the voice mail

12   that made you think of Bo?

13   A    Because I heard that voice before on the pager.

14   Q    You testified about that earlier.  There had been other

15   times when you heard Mr. Mitchell leave voice mails on pagers?

16   A    Yes.

17   Q    And that voice sounded similar to what was on this voice

18   mail?

19   A    Yes.

20   Q    Could you tell, we've talked about two voices and what you

21   thought they might sound like, could you tell if there were any

22   other voices on the cell phone, maybe voices you weren't sure who

23   they were, whether you recognized them?

24   A    Sound like a voice in the background but I couldn't, I don't

25   even know what they sounded like.  Could barely hear.

1   Q    And you wouldn't have any idea whether or not that voice

2   belonged to any of these defendants; is that fair to say?

3   A    Yes.

4   Q    Did you hear any voice on that voice mail that sounded like

5   Deezo?

6   A    No.

7   Q    And would you have recognized Deezo's voice?

8   A    Yeah.  Yes.

9   Q    There came a time from time to time that people mentioned to

10  you, I'm not going to ask you what they said, but just, the

11  people around you, your family, friends, from time to time

12  expressed their opinions to you about whose voice might be on the

13  voice mail?

14  A    Yes.

15  Q    But am I correct that what you've testified to today and the

16  conclusions you drew were based just on your listening to the

17  voice mail and your own experiences?

18  A    Yes.

19  Q    If you remember, how many days after your husband lost his

20  life did the funeral take place?

21  A    A week later.

22  Q    And I gather that you made preparations for your husband to

23  be properly clothed for his burial and things like that?

24  A    Yes.

25  Q    On the day of the funeral, did Mr. Gardner and Mr. Martin

DIRECT EXAMINATION OF WYCHE                    166

1   come to the funeral?

2   A    Yes.

3   Q    And if you could, how were Mr. Gardner and Mr. Martin

4   dressed in comparison to how your husband had been prepared for

5   his burial?

6              MR. CROWE:  Objection.

7              THE COURT:  Overruled.  You may answer.

8   A    Similar to the same things they had on.

9   Q    Same type of clothes?

10  A    Yes.

11  Q    Same clothing labels?

12  A    Yes.

13  Q    How did you take that?

14  A    Disrespectful.

15  Q    Were Mr. Gardner and Mr. Martin asked to leave?

16  A    I don't know if they was asked to leave or not.

17  Q    The day that you went shopping to buy clothes for your

18  husband, had you seen Wayne or Mr. Martin, I should say, or Mr.

19  Gardner at the mall, at the shopping center?

20  A    I didn't see them.  The guys that I was with there at the

21  mall seen them.

22             MR. CROWE:  Objection.

23  Q    You didn't see them yourself, is that fair to say?

24  A    No.

25  Q    Nothing further, Your Honor.

1          THE COURT:  Do you need more water, Ms. Wyche?

2          THE WITNESS:  Yes, please.

3          MR. HANLON:  Your Honor, I neglected to ask Ms. Wyche

4    something.  I apologize.  Can I have one additional question?

5    I'm sorry.

6          THE COURT:  Of course.  Of course.

7    BY MR. HANLON:

8    Q    Ms. Wyche, one thing I forgot to ask you, and I do

9    apologize.  In the wake of your husband's death, you spoke a

10   couple of times with a police detective, is that right?

11   A    Yes.

12   Q    And you gave a statement to the detective.  And he also

13   showed you a couple of sets of photographs of people, is that

14   right?

15   A    Yes.

16   Q    I'm going to show you, and I'll put up on our screen here,

17   if I can just have a member's indulgence, Your Honor.

18          THE COURT:  Yes.

19   Q    Show you what's been marked as Exhibit Wyche 1, Ms. Wyche.

20   I'm going to put this up on the screen.  Do you see that on your

21   monitor?

22   A    Yes.

23   Q    Is this one of the sets of photos that you were shown by the

24   detective immediately following your husband's death?

25   A    Yes.

1   Q    And did you tell the detective that you did not recognize

2   any of the men in this array?

3   A    Yes.

4   Q    Sitting here today, Ms. Wyche, do you recognize any of the

5   men in this array?

6   A    Yes.

7   Q    And if you could, if I mark these as one -- that's not going

8   to work.  That's not going to work.  The individual you

9   recognize, is he in the lower part or the upper part?

10  A    Lower part.

11          MR. LAWLOR:  Objection.

12          MR. HANLON:  Your Honor, there was an objection.

13          THE COURT:  Yes.  Do it a different way, Mr. Hanlon.

14  BY MR. HANLON:

15  Q    Could you tell us which of the six you recognize, if any?

16          MR. LAWLOR:  Objection.

17  A    The last one on the bottom.

18          THE COURT:  Just a moment.  Overruled.  The question

19  was, which of the six, if any, do you recognize?

20  A    The last one on the bottom.

21  Q    Is that the one farthest to the left or farthest to the

22  right?

23  A    With the black jacket on.

24  Q    Right here?

25  A    Yes.

DIRECT EXAMINATION OF WYCHE

1    Q    And who is that person?

2    A    Bo.

3    Q    Now, Ms. Wyche, did you recognize Bo out of this photograph

4    on the day you were shown the array by the detective?

5    A    Yes.

6    Q    But you told the detective you knew no one?

7    A    Right.

8    Q    Why did you tell the detective something that wasn't true?

9    A    Because I didn't want him to get locked up.

10   Q    Him meaning Bo?

11   A    Right.

12   Q    Now, you were also shown -- let me show you what's been

13   marked as Government's Exhibit Wyche 2.  Were you shown this

14   array by the detective?

15   A    Yes.

16   Q    And did the detective also ask you whether or not you

17   recognized anyone in this set?

18   A    Yes.

19   Q    Did the detective tell you anything about this series of

20   photos, about who the people were, or give you any information

21   about the individual people in each of these six photographs?

22   A    No.

23   Q    But he asked you if you recognized any of them?

24   A    Yes.

25   Q    And what did you tell him?

DIRECT EXAMINATION OF WYCHE

170

1    A    The one in the orange shirt is Wayne.

2    Q    And that's the one with the writing above it?

3    A    Yes.

4    Q    And I believe you anticipated my next question.  But who did

5    you tell the detective that was?

6    A    Wayne.

7    Q    And is that, in fact, the individual you knew of as Wayne,

8    Mr. Martin?

9    A    Yes.

10   Q    Now, Ms. Wyche, let me ask you this.  You were willing to,

11   you didn't want to talk to the detective about Bo but you were

12   willing to tell him about Wayne.  Why was that?

13   A    I rather Wayne had just went on ahead and got locked up.

14   Q    Why is that?  Why would you feel differently about Wayne

15   than about Bo?

16   A    It's crazy saying, I still grew up around him.  I rather him

17   got locked up instead of him at the time.

18   Q    Is it because you knew Wayne longer?

19   A    No.  Just didn't want to see nothing happen to him.  I

20   rather it happen to him the same way it happened to my husband.

21   Q    And when you say that you wanted something to happen to -- I

22   want to make sure I understand you correctly.  You wanted, you

23   wanted to see Wayne locked up, but not necessarily Bo, is that

24   right?

25   A    Yeah.

1   Q    And is there something that you wanted at that time to

2   happen to Bo that you didn't want to have happen to Wayne?

3   A    Right.

4   Q    And what was it at that time, in 2002, that you were hoping

5   would happen to Bo if he was not locked up?

6   A    I was hoping someone would kill him the same way he killed

7   my husband.

8          MR. LAWLOR:  Objection, Your Honor.  Move to strike.

9          THE COURT:  Of course, ladies and gentlemen, one of the

10  issues before you in this trial is what, if any, involvement Mr.

11  Mitchell had in the murder of Mr. Wyche.  This witness' opinion

12  about that is not to be considered by you for any purpose.  You

13  may proceed, Mr. Hanlon.

14  BY MR. HANLON:

15  Q    Thank you, Your Honor.  And that's why you told the

16  detective what you told you, what you told him in 2002, is that

17  right, Ms. Wyche?

18  A    Yes.

19  Q    Thank you, Your Honor.

20          CROSS EXAMINATION

21  BY MR. LAWLOR:

22  Q    Good afternoon, Ms. Wyche.

23  A    Good afternoon.

24  Q    Now, you had known your husband since you both were kids?

25  A    Yes.

1    Q    Okay.  And basically, since he was a young man, your entire

2    youthful adult, and into the time you were adults, he dealt

3    drugs, correct?

4    A    Correct.

5    Q    And it sounds like he dealt drugs on kind of a large volume

6    basis, is that fair to say?

7    A    Yes.

8    Q    He wasn't standing on the corners, right?  He was, he was

9    dealing in weight, whatever it was, right?

10   A    He -- I'm not sure.

11   Q    Okay.  But when you did see him in possession of drugs, it

12   was usually in large quantities, right?  You mentioned before a

13   brick of drugs that you saw.

14   A    That was right before he was murdered, yes.

15   Q    Okay.  And when you saw him with cash, it was usually

16   thousands of dollars of cash?

17   A    Yes.

18   Q    Okay.  And you had a grocery that was, was the grocery

19   really a front for the drug business?

20   A    No, it was really a grocery store.

21   Q    All right.  What kind of jobs had your husband had prior to

22   the grocery?

23   A    He owned two different businesses, a sedan service and also

24   a delivery service, where he made thousands of dollars from his

25   delivery service, also.

1    Q    Did he deal drugs without ceasing that activity?

2    A    No, that's when he stopped selling drugs for two and a half

3    years, when he had the delivery service.

4    Q    Okay.  When was that?

5    A    That was in 2000 -- 1999 to maybe like, up until 2000, 2001

6    maybe.

7    Q    Okay.  Well, when was the business in Pennsylvania?  Do you

8    recall when that was?

9    A    That was 1997, '98, if I'm not mistaken.

10   Q    '97 or '98?

11   A    '98.

12   Q    So a good five years before the time that he passed away?

13   When he had to go to Pennsylvania, that was five years prior to

14   the time that he had passed away?

15   A    Say that again.

16   Q    Okay.  Did you just say -- correct me if I'm repeating this

17   wrong -- did you just say that his trip to Pennsylvania was in

18   '97 or '98?

19   A    I didn't say anything about the trip to Pennsylvania just

20   now.

21   Q    All right.  I'm sorry.  I think I'm confusing both of us.

22   When did he go to Pennsylvania?

23   A    I want to say he went like 2000 maybe, 2001.  I can't

24   remember exactly when it was.  Might have been, it was right

25   after, probably in 2000 or 2001.  I can't remember.

1    Q    But he was out of the business, you say, from '99 to 2001.

2    A    Yeah.  From about 2000.  I don't know.  He stopped selling

3    drugs for almost two years when we had the delivery service.

4    Q    And when did you become involved with the grocery store?

5    A    The grocery store was opened in '97 or -- I can't remember.

6    '98 or '97.

7    Q    And for how long did it stay open?

8    A    Almost a year.

9    Q    Okay.  So that was 1997.  And it was open only until 1998.

10    I'm sorry.  What was the name of that grocery store?

11    A    Bryant's.

12    Q    Bryant's?  Okay.  So you said that Mr. Mitchell would come

13    into that grocery store, two or three times you saw him?

14    A    Yes.

15    Q    Okay.  And that was the one and only time that you ever

16    talked to him face to face on your own?

17    A    Yes.

18    Q    Okay.  And that conversation was just for a few minutes?

19    A    Yes.

20    Q    Okay.  So that was about four to five years prior to the

21    time that your husband was killed?

22    A    Right.

23    Q    Okay.  So getting back to your husband's distribution of

24    drugs.  This was something other than these brief interludes when

25    he wasn't, this is what he did over the stretch of many years,

1    right up to the time that he passed away, right?

2    A    Until the time that he had stopped.  Yes.

3    Q    Okay.  Other than those times.  All right.  And you said

4    that, for example, in the store, that a lot of different people

5    came and you assumed they went to this back room to purchase

6    narcotics, correct?

7    A    Correct.

8    Q    Okay.  And what I was trying to get at before was, he seemed

9    to be the kind of guy who was distributing to, he was

10   distributing a certain kind of volume to other drug dealers,

11   right?  He wasn't the guy standing on the corner selling ten

12   dollar bags?  Was that your impression of his involvement?

13   A    Yes.

14   Q    Okay.  And that was borne out by, like I said, the

15   quantities of drugs that you saw and the quantities of money that

16   you saw him with, right?

17   A    Yes.

18   Q    Okay.  And so he, he must have known a fair number of people

19   that he sold drugs to, right?

20   A    Right.

21   Q    And he must have known, there must have been a lot of other

22   people who knew that he was involved in drugs, right?

23   A    Yes.

24   Q    Okay.  And did you say that he purchased his drugs from, is

25   his nickname Card?

1    A    I never said that.

2    Q    I'm sorry.  Did you say that?

3    A    No, I didn't.

4    Q    Did he purchase his drugs from Card?

5    A    I never said that.

6    Q    Okay.  I'm asking you not whether he said that but whether

7    it's true?

8    A    No, it was not true.

9    Q    Okay.  Who did he buy his drugs from?

10   A    I don't know that.

11   Q    Okay.  But you did know this gentleman named Card?

12   A    Yes.

13   Q    And he was also a drug distributor?

14   A    I don't know if he was or not.

15   Q    Okay.  You don't know.  All right.  Now, this one occasion a

16   couple days before your husband was, before he passed away, you

17   said that you saw him with a large amount of drugs, correct?

18   A    Yes.

19   Q    Okay.  And when Mr. Hanlon was asking you questions, you

20   said that it was about the size of a Bible, right?

21   A    Bigger than that, what you're holding.

22   Q    Okay.  Well, I don't want -- forget my hand gestures.  Is

23   that you said, it was about the size of a Bible?

24   A    Yes.

25   Q    Do you recall testifying in the grand jury February of 2004?

1   A    Yes.

2   Q    Okay.  And were you asked about observing that package that

3   day?

4   A    Yes.

5   Q    Okay.  And you were under oath then, right, and trying to be

6   truthful, correct?

7   A    Yes.

8   Q    And your testimony then was closer in time to the events of

9   March of 2002, right?

10  A    Yes.

11  Q    Okay.  Now, if you could look at the very top.  You were

12  asked:  In fact, you showed us downstairs what the package looked

13  like.  It was like the size of a brief case, is that right?  And

14  you said yes.  Is that what it says there?

15  A    That's what it says.

16  Q    And is that what you indicated to the grand jury, that the

17  package was, in fact, the size of a brief case?

18  A    Yes.

19  Q    Okay.  And was that the size of it, the size of a brief case

20  and not a Bible?

21  A    The package was like this big and like this.  Whether it's a

22  Bible or brief case, however, that's the size that it was.

23  Q    It was a large package, though, right?

24  A    Yeah.

25  Q    Okay.  And in fact, you said that your husband had been

1    robbed and kidnapped on prior occasions?

2    A    This was years, when he was younger, yes.

3    Q    Okay.  And that was, did you assume those incidents were

4    related to the fact that he was involved in drugs?

5    A    I'm pretty sure it was, yes.

6    Q    Okay.  Other drug dealers, you know, have been known to rob

7    each other and kidnap each other?

8    A    This happened out of town.

9    Q    Pardon me?

10   A    This happened out of town, not in Baltimore.

11   Q    Okay.  It happened out of town.  But as we said, it's likely

12   it was incidental to his drug trafficking?

13   A    I'm not sure.

14   Q    Okay.  And you talked that he had a friend named Deezo,

15   Dwayne Denham.  And what was Deezo's role in all of this?  Was he

16   just a friend or did he help them with the, help your husband

17   with his drug distribution?

18   A    No.  He was a friend.

19   Q    Okay.  Now, how often were they together?

20   A    Pretty often.

21   Q    Okay.  But you don't think that Deezo had any involvement in

22   drug trafficking?  He was just a friend or was he more than a

23   friend, in light of your husband's activities?

24   A    I know he didn't have any involvement in drug trafficking.

25   Q    You know that he did not?

1    A    Yes.

2    Q    Okay.  Now, you described your relationship with Mr. Gardner

3    and Mr. Martin.  You had known them since you were young?

4    A    Yes.

5    Q    Is that right?  And you met the two of them in school or

6    around the neighborhood?

7    A    Goo, around my neighborhood and school.  Wayne, just around

8    the neighborhood.

9    Q    Were you a teenager when you met both of them?

10    A    I met Goo when I was in elementary school.

11    Q    Okay.

12    A    Wayne, a little bit, when I was a little bit older.

13    Probably middle school sometime.

14    Q    And you knew the two of them to be friendly?

15    A    Yes.

16    Q    And you saw them, for example, shortly before your husband's

17    death, you saw the two of them together at Corinthian's, right?

18    A    Right.

19    Q    But you met Bo separately from your relationship with Mr.

20    Gardner and Mr. Martin, right?

21    A    Yes.

22    Q    You met him, he just showed up at the store one day by

23    himself, right?

24    A    Yes.

25    Q    And the few, several times that you saw him -- they were all

1   at the store the several times that you saw him?

2   A    Yes.  One other time, also, I seen him.

3   Q    Okay.  And those times he wasn't with Mr. Martin or Mr.

4   Gardner, right?

5   A    No.

6   Q    Okay.  I mean, your husband and Mr. Mitchell knew each

7   other, right?

8   A    Yes.

9   Q    And you knew that Mr. Mitchell and your husband knew each

10  other and had drug association, right?

11  A    Yes.

12  Q    This was known to you.  So the fact that they would talk on

13  the telephone was not unusual, right?

14  A    No.

15  Q    Okay.  Excuse me one second.

16       (Pause in Proceedings.)

17  Q    I'm sorry.  Forgive me.  So it was not uncommon, though,

18  for, for Mr. Mitchell to talk to your husband?

19  A    No.

20  Q    You were aware of the fact that they spoke on occasion?

21  A    Yes.

22  Q    Okay.  And you said that you had heard Mr. Mitchell's voice

23  because you listened to your husband's pager voice mail messages?

24  A    Yes.

25  Q    And it sounds like you said the messages, the extent of

1   those messages were, hey, this is Bo, hit me back?

2   A    Right.

3   Q    Okay.  And so you talked to him only one time in person,

4   '97, '98, and then you heard a couple messages where he said,

5   hey, hit me back?  That was pretty much the extent of your

6   associations, direct associations, if you will, with Bo?

7   A    Yeah.  But I also said that when he left messages, on a few

8   messages that he said his name.  That's what brought his name

9   back to my attention and his voice.

10  Q    Right.  But he said, hey, it's me, Bo, hit me back?

11  A    We only know one other Bo and it wasn't that Bo.

12  Q    Okay.  You know another Bo, though?

13  A    Yeah.

14  Q    What's his name?

15  A    Bo.

16  Q    But I assume that's not his Christian name.  Is his name

17  Samuel Garrett?

18  A    Samuel Garrett.

19  Q    All right.  What does Mr. Garrett do for a living?

20  A    He's locked up, also.

21  Q    For?

22  A    I'm not sure.

23  Q    Was he a drug distributor?

24  A    I'm not sure what he's locked up for.

25  Q    You never heard that, that Samuel Garrett dealt drugs?

1          MR. HANLON:  Objection.

2     A    I'm not sure what he's locked up for.

3          THE COURT:  Sustained.

4          MR. LAWLOR:  Indulge me one moment, please.

5          THE COURT:  Yes.

6     BY MR. LAWLOR:

7     Q    Okay.  Let me back up for a minute.  And I apologize.  We

8     were talking about the kidnapping and the robberies.  Did you say

9     that you had only heard about the fact that he was kidnapped,

10    that he didn't tell you about that, or were you -- did he tell

11    you about it?

12    A    Yeah, he told me about it.

13    Q    Okay.  And that was out of town?

14    A    Yes.

15    Q    All right.  And did he have any physical injuries as a

16    result of that, do you recall?

17    A    No.

18    Q    Okay.  Was there another occasion, did he tell you -- did he

19    try to keep things from you?

20    A    Not but so much, no.

21    Q    Okay.  So was there another occasion, I know you said there

22    was only one occasion, so I assume you're going to say no to this

23    question, but nonetheless, you're not aware of the fact there was

24    another occasion where he was shoved in his trunk and he ended up

25    with some scars on his face as a result of that?

1   A    That's the kidnapping.

2   Q    Okay.  You just said, though, that there were no physical

3   injuries from that one?

4   A    Darryl had a mark on his arm, a scratch on his arm.

5   Q    That was it?

6   A    That's it.  And he had it till the day he died, just a

7   scratch on his arm.

8   Q    The scratch on his arm was from the time that he was

9   kidnapped?

10  A    Yes.

11  Q    Okay.  And there wasn't another time, though, that he had

12  some, some scars on his face or anything like that?

13  A    No.

14  Q    Okay.  Okay.  Now, you said, though, that you had occasion

15  to listen to the voice mail that was left.  Is it your mother's

16  cell phone that the voice mail message was left on?

17  A    Yes.

18  Q    Okay.  And did it appear to you or sound to you like the

19  message was left inadvertently?  Is that what it sounded like?

20  A    Yes.

21  Q    And so it wasn't someone talking into the phone,

22  deliberately saying, you know, hi, this is John, call me back,

23  right?  It sound, it was faded?

24  A    Yes.

25  Q    Okay.  And the voices were kind of coming from a distance?

1    A    It wasn't from, I mean, it wasn't directly in the phone but

2    you could hear it loud and clear.

3    Q    Okay.  You could hear it loud and clear?  Okay.  And you say

4    two voices, one is Bo's.  And the other one, you think, but

5    you're not sure, may be Wayne, right?

6    A    Yes.

7    Q    All right.  You talked to Wayne, though, more times than

8    you've talked to Bo in your life, right?

9    A    Yes.

10    Q    Okay.  And Wayne is the one that you think is, said Shorty,

11    referencing something Shorty, right?  That was Wayne's voice that

12    said that?

13    A    Yes.

14    Q    Okay.

15    A    I said it sound like.

16    Q    Right.  Understanding everything you said about Wayne,

17    you're uncertain, it just, it sounds like him, is that --

18    A    Yes.

19    Q    Am I characterizing it right?

20    A    Yes.

21    Q    But the person who sounds like him is the one who used the

22    vernacular Shorty, right?

23    A    Yes.

24    Q    Okay.  Now, at some point in time you were shown some photo

25    spreads that Mr. Hanlon walked you through?  The photo spreads?

1    A    Yes.

2    Q    Mr. Hanlon discussed these with you?  Okay.  And when were

3    you shown these, do you recall?  Like how soon after?  Was it

4    shortly after your husband's death that you were shown these?

5    A    Yes.

6    Q    Okay.  And you were able to identify the individual, Mr.

7    Martin, right?

8    A    Yes.

9    Q    And you told the police at the time that you couldn't

10   identify anyone in the photo spread that contains the picture of

11   Mr. Mitchell, right?

12   A    Yes.

13   Q    All right.  And then you testified today, candidly,

14   basically, you were hoping that he was going to be killed, right?

15   A    Yes.

16   Q    All right.  And who did you, did you have an expectation of

17   who was going to do that?

18   A    No.  From what I heard on the streets, a lot of people

19   wanted to kill him.  So I rather him not be locked up and go

20   ahead and get done with him what he done to mine.

21   Q    Okay.  And Mr. Hanlon also asked you about the fact that a

22   lot of people had heard this voice mail and a lot of people were

23   talking about it, right?

24   A    Yes.

25   Q    Okay.  And when did you, when did you have a change of heart

1   or when did you alert someone to the fact that you did know that

2   this picture was Mr. Mitchell?

3   A    I don't remember.

4   Q    Did you, in fact -- did the police ever have a conversation

5   with you where you said, hey, back in March of 2002, you know,

6   you showed me that photo spread, you know, I was untruthful about

7   that, I really do know, I really can identify Mr. Mitchell?

8   A    No.  We never had that conversation.

9   Q    You never had that conversation until today?

10  A    Until I'll telling you.

11  Q    Okay.  So today is the first time, six years later, that

12  you're saying that you do recognize the picture of Mr. Mitchell?

13  A    I already -- yeah, I already knew what his picture looked

14  like.

15  Q    Okay.  That's not the question, though.  The question is,

16  right after your husband's death you were shown the picture and

17  you said you didn't recognize Mr. Mitchell.  Now, in court today,

18  you're saying that you do recognize Mr. Mitchell.  My question

19  is, when is the first time other than today that you told someone

20  that?

21          MR. HANLON:  Your Honor, objection to the form of the

22  question.

23          THE COURT:  Maybe, Mr. Lawlor, you can clarify the

24  question.

25  Q    Okay.  Do you understand the question, ma'am?

1    A    No.

2    Q    Okay.  Let me try it again.  You're with me to the fact that

3    when you were first shown the photo spread in 2002, you could not

4    identify Mr. Mitchell or did not identify Mr. Mitchell.  Are you

5    with me so far?

6    A    Yes.

7    Q    You agree with that?

8    A    Right.

9    Q    Today, as we sit here today, six years later, you're saying,

10   I see this picture and that's Mr. Mitchell, right?

11   A    Um-hum.

12   Q    Okay.  Between March of 2002 and today, did you ever tell

13   anyone, either of these two prosecutors, any of the police

14   detectives that you've talked to, that, I lied to you that day

15   and I do recognize the person in that picture as Willie Mitchell,

16   as Bo?  Have you ever had that conversation prior to today?

17   A    Yes.

18   Q    Okay.  When was that?

19   A    I don't remember.

20   Q    With whom was it?

21   A    I don't remember.  I've had so many people talk to me.  And

22   I didn't, I don't think I lied about it.  I just didn't want to

23   tell, I didn't want to say who he was.

24   Q    You didn't want to say who he was?

25   A    How many pictures people have of him?

1    Q    All right.  But you didn't --

2    A    Around the same time that they got killed, it was different

3    people bringing pictures and showing me pictures and everybody

4    looking for him and stuff.  I already knew who he was.

5    Q    Okay.  But, well, you seem to be changing the story here a

6    little bit.

7              MR. HANLON:  Objection, Your Honor.

8              THE COURT:  Sustained.

9    Q    Did you not recognize him because you saw a lot of pictures,

10   or did you deliberately say, I'm not going to say who it is, I

11   know who he is, because I'm hoping somebody's going to put a

12   bullet in his head?

13   A    No, I didn't deliberately say it like that.  No.

14             MR. LAWLOR:  Okay.  No further questions.

15             CROSS EXAMINATION

16   BY MR. FLANNERY:

17   Q    Ms. Wyche, good afternoon.

18   A    Good afternoon.

19   Q    My name's Paul Flannery and I'm one of the attorneys that

20   represents defendant Shelton Harris.  Ms. Wyche, you've testified

21   that you've known defendant Martin for several years?

22   A    Yes.

23   Q    And you've known defendant Gardner for even longer?

24   A    Yes.

25   Q    And you've had an opportunity to meet defendant Mitchell

1    several times?

2    A    Yes.

3    Q    And you understood defendant Mitchell to be involved in drug

4    dealing with your husband?

5    A    Yes.

6    Q    Do you know Hasim Rahman is?

7    A    Yes.

8    Q    Who is Hasim Rahman?

9    A    A boxer.

10   Q    Is it your understanding that defendants Gardner, Martin,

11   and Mitchell were associated with Hasim Rahman?

12   A    I know that, I know Wayne and Goo should know Hasim.  I

13   don't know about Bo knowing Hasim.

14   Q    Do you recall testifying before the grand jury about Hasim

15   Rahman's association with defendant Mitchell, defendant Gardner?

16   A    No.  That was on the streets.  I'm not sure.  But I know

17   Wayne and Goo know Hasim, not Bo.

18   Q    You don't remember testifying before the grand jury to that

19   effect?

20   A    No.

21   Q    If I showed you a copy of the transcript of your grand jury,

22   would that refresh your recollection?

23   A    Yes.

24   Q    Your Honor, may I approach?

25            THE COURT:  Why don't you put it on the monitor?  I

1    thought she indicated it was something she heard on the street --

2              THE WITNESS:  Right.

3              THE COURT:  Not that she didn't testify to it in front

4    of the grand jury.  But you can show it to her.

5    BY MR. FLANNERY:

6    Q    Ms. Wyche, you were asked:  Okay, so Goo, Wayne and Bo go

7    way back with Hasim, isn't that right?

8    A    Not Bo.  Goo and Wayne.  If I said that, that was a mistake.

9    That was not Bo.  Goo and Wayne.

10   Q    Do you understand Hasim Rahman to have been associated with

11   a night club in Baltimore City?

12   A    Yes.

13   Q    What's the name of that club?

14   A    I can't remember.

15   Q    Is the name of that club The Emineo?

16   A    That sounds like it, yes.

17   Q    Was it formerly known as Club Intellect?

18             THE COURT:  Club Intellect?

19             MR. FLANNERY:  Yes.

20             THE COURT:  Okay.

21             THE WITNESS:  I think so, yes.

22   BY MR. FLANNERY:

23   Q    Did you know defendant Mitchell to have frequented Club

24   Intellect?

25   A    From what I heard on the streets, yes.

1          MR. LAWLOR:  Objection, Your Honor.  Move to strike.

2          THE COURT:  Sustained.  As you know, ladies and

3     gentlemen of the jury, usually witnesses are only permitted to

4     testify to what they have personal knowledge of.  Now, there are

5     a number of exceptions, the most prominent, of course, as you've

6     heard from a few expert witnesses who are allowed to testify not

7     based on personal knowledge, but on the basis of their

8     experience, training, and any scientific or other forensic

9     analyses they may undertake.  But a witness such as Ms. Wyche is

10    only allowed to testify to things about which they have personal

11    knowledge.

12         Now, from time to time, lawyers will ask witnesses, did

13    you hear about this, did you know this, did you say this.  And

14    sometimes other lawyers will object to that and sometimes they

15    don't.  But when there is an objection, and unless there's an

16    exception, the Court will not permit the witness to answer the

17    question.

18         So I'm sustaining the objection now.  And you will see

19    this again and again, I think, throughout the trial.  Just

20    because a lawyer suggests something to a witness, and even if the

21    witness may think she has information about it, if it's not based

22    on his or her personal knowledge then the witness is not

23    permitted to testify about it.

24         You may proceed, Mr. Flannery.

25    BY MR. FLANNERY:

1  Q    Thank you, Your Honor.  Ms. Wyche, did you ever have an

2  opportunity to meet Hasim Rahman?

3  A    Yes.

4  Q    Were you at a party that Hasim Rahman attended?

5  A    No.

6  Q    When did you meet Hasim Rahman?

7  A    It was years ago.  I was probably in middle school.

8  Q    I understand.  Ms. Wyche, was your husband generally

9  concerned about who he associated with in his business?  Do you

10 understand my question?

11 A    I under --

12 Q    I'll rephrase it.  Did you have conversations with law

13 enforcement concerning the individuals that your husband

14 associated with?

15 A    Yes.

16 Q    And do you recall having conversations with law enforcement

17 and stating to them that your husband generally was a paranoid

18 individual regarding who he associated with?

19 A    No, I never said that.

20 Q    Do you recall having conversations with law enforcement,

21 that your husband was careful to who he put himself in positions

22 with?

23 A    Yes.

24 Q    Do you recall that, having conversations that your husband,

25 for instance, would have been very careful concerning who he

1    would allow to get in a car with him?

2    A    Yes.

3    Q    Do you recall having conversations with law enforcement that

4    he would never allow someone that he didn't fully trust to get in

5    a car with him?

6    A    Yes.

7    Q    Particularly, if he was in a car and he, say, for instance,

8    had his seat belt on, so that he was hampered in his ability to

9    move?  That that would make him less, that that would make him

10   more inclined to be particularly careful about who he allowed to

11   be near him.

12   A    I don't understand what you just said about a seat belt.

13   Q    Okay.  Well, you testified that you thought your husband was

14   concerned about who he allowed to be near him, particularly, in a

15   car, for example, in a closed space?

16   A    Yes.

17   Q    That it's your understanding that your husband would be very

18   careful about who he would allow to get in a car with him, in his

19   line of work?

20   A    Right.

21   Q    And that he wouldn't allow someone to get in a car with him

22   unless he was particularly trusting of that individual?

23   A    Right.

24   Q    That he certainly would have to know an individual to trust

25   him?

1   A    Yes.

2   Q    Do you know Shelton Harris?

3   A    No.

4   Q    Have you ever heard of Shelton Harris?

5   A    Yes.

6   Q    Was your husband familiar with Shelton Harris?

7   A    No.  Not that I know of, no.

8   Q    Your husband was involved in drug dealing with defendant

9   Mitchell, to your understanding?

10  A    Yes.

11  Q    Is it your understanding that your husband was involved in

12  drug dealing with defendant Martin?

13  A    Who's Mart?

14  Q    With defendant, Shelly Wayne Martin?

15  A    Oh, Martin.  Years ago when they was younger.

16  Q    Do you know who Oliver McCaffity is?

17  A    No.

18  Q    Does the name, is the name "Woody" familiar to you, the

19  nickname "Woody?"

20  A    I've heard of that name, yes.

21  Q    And is it your understanding or do you have knowledge of who

22  Woody was associated with?

23  A    From out the streets, yes.  And that's about all

24  recognition, from what I heard on the street.

25  Q    Do you have personal knowledge from discussing, from

1   discussions that you have been a part of as to who Woody is?

2   A    Yes.

3   Q    So you do have personal knowledge of Woody?  You do have

4   personal knowledge of who Woody is?

5   A    From what I heard on the streets, yes.

6   Q    And who did you understand Woody to be associated with?

7            MR. HANLON:  Objection, Your Honor.

8            THE COURT:  Sustained.  That means don't answer.

9   BY MR. FLANNERY:

10  Q    Ms. Wyche, you had an opportunity to review the voice mail

11  that was played for you in this case, correct?

12  A    Yes.

13  Q    And you identified defendants Martin and defendants

14  Mitchell?

15  A    Yes.

16  Q    No further questions.

17            CROSS EXAMINATION

18  BY MR. CROWE:

19  Q    Good afternoon, Mrs. Wyche.

20  A    Good afternoon.

21  Q    When you woke up in the early morning hours of what would

22  have been Monday, March 25th, were you, did you wake up from the

23  bedroom or were you sleeping on the couch in the living room?

24  A    I was laying in the living room.

25  Q    Okay.  And you then walked to the kitchen to make a phone

1    call from a land line phone?

2    A    Yes.

3    Q    And before you actually got through the first time and

4    actually heard voices, you'd made, what, two or three attempts to

5    call your husband, Darryl?

6    A    The first time I called, I don't know what went wrong with

7    the phone.  The second time I called, that's when I heard the

8    voices.

9    Q    Okay.  And is it true that your husband, Darryl, sometimes

10   when you would call, he would turn on the cell phone on the pager

11   so that you could hear telephone, so that you could hear

12   conversation that was going on but he would not actually answer

13   the phone and talk with you?

14   A    Yeah.  Sometimes he, if he in the middle of doing something,

15   couldn't talk right then and there, he would just push the talk

16   button but wouldn't put the phone to his ear to tell me he was in

17   the middle of something.

18   Q    And that was something that he'd done, that was just a

19   practice that he had, is that correct?

20   A    Yes.

21   Q    And my understanding is that somehow this cell phone was

22   turned on, is that correct?

23   A    Yes.

24   Q    You obviously have no idea who turned it on, do you?

25   A    Apparently, they must have made a mistake or something.  I'm

1    not sure.  Came on on the second ring.

2    Q    Okay.  Now, is it true that you listened to people talking

3    for a period of two to three, or maybe as long as three to four

4    minutes?

5    A    I heard them talking maybe like, probably wasn't even a

6    whole two minutes, about two minutes, I guess.

7    Q    Okay.  Do you remember testifying earlier that it could have

8    been two to three minutes or even three to four?

9    A    Yes.

10   Q    I mean, you testified to that very recently, did you not?

11   A    Yes.

12   Q    And you were trying to understand what people were saying,

13   is that correct?

14   A    No.  I heard exactly what they said.

15   Q    Okay.  And you were trying to determine who was talking, is

16   that right?

17   A    At that time, that was when, when the phone hung up.  When I

18   just heard the voices talking, I wasn't trying to determine who

19   it was.  I just, happened to fast, I just knew that it wasn't

20   Darryl or Pete.

21   Q    You knew it wasn't Darryl, you knew it wasn't Pete, is that

22   correct?

23   A    Right.

24   Q    Mr. Hanlon asked you if it was Mr. Denham, is that right?

25   A    Right.

1   Q    So it was on long enough that you knew that as well, is that

2   correct?

3   A    Correct.

4   Q    And while you were listening to the conversation that was

5   going on for a period of two minutes, you didn't make any, you

6   couldn't determine who was talking at that time, is that right,

7   also?

8   A    Yes.

9   Q    Now, I understood your testimony to be that you received a

10  phone call from your sister, who is named Filicia Craig?

11  A    Felicia.

12  Q    Felicia.  Excuse me.

13  A    Yes.

14  Q    And she told you that your mother had received a voice mail

15  that you should listen to.  Is that right, also?

16  A    No.

17  Q    Okay.  What did she tell you?

18  A    She said, she asked was I on my way to my mother's house.  I

19  told her I was getting the kids together now.  I really didn't

20  want to go.  I wanted to wait him.  And she said -- you want me

21  to finish?

22  Q    I certainly do, yeah.

23  A    And she said, did you hear the message yet?  And I didn't

24  know what she was -- I said, what message?  She said, Mommy said

25  something about a message on her phone from last night.

1    Q    And we are now talking about 6:30, 7, 7:30 on Monday

2    morning?

3    A    Yes.

4    Q    And you're pretty concerned at this point, aren't you?

5    A    Yes.

6    Q    Because you knew your husband was in a dangerous business?

7    A    Yes.

8    Q    And you knew that that night he had, he'd left with drugs

9    and an awful lot of money with him?

10   A    Yes.

11   Q    But you did not listen to that voice mail message for a

12   period of, what, three days, four days, something like that?

13   A    Yes.

14   Q    Pardon?

15   A    Yes.

16   Q    Okay.  And when you initially listened to the voice mail

17   message, you didn't, you didn't really recognize any of the

18   voices, did you?

19   A    No.

20   Q    Is it true that your initial reaction was that one of those

21   voices is a voice that I've heard on Darryl's cell phone before?

22   A    Right.

23   Q    And you were pretty certain of that, were you not?

24   A    Yes.

25   Q    And you later determined that that was Mr. Mitchell, is that

1    correct?

2    A    Yes.

3    Q    Now, with respect to Mr. Martin, when you were listening --

4    you listened to this message many, many times back in 2002,

5    didn't you?

6    A    Yes.

7    Q    In fact, you listened to it many, many times before the

8    funeral, which took place on April 1?

9    A    Yes.

10   Q    And you were not at all sure at that time that Mr. Martin's

11   voice was on that voice mail, were you?

12   A    I wasn't sure, no.

13   Q    Okay.  And indeed, you said that, you heard the word

14   "Shorty" being used in there.  Among your friends and

15   acquaintances back in 2002, was Shorty a very, very common term

16   which people used to address other people?

17   A    Yeah.  Yes.

18   Q    And I'm six foot two when I'm not stooped over.  That

19   wouldn't keep anybody from even calling me Shorty, would it?

20   A    Right.

21   Q    Or even Mr. Harding, who's a little bit taller than I am?

22   A    Correct.

23   Q    I mean, it's sort of like the term "guy" or 'man' or

24   something like that?

25   A    Yes.

1    Q    So there's nothing particular about the use of that word

2    which would tie it to Mr. Martin, is that right?

3    A    The way he said it.

4    Q    Well, and indeed, have you also testified that the slang way

5    that he said it was the way a lot of the people in your community

6    used the word "Shorty?"

7    A    Yes.

8    Q    Okay.  So a lot of people would say the word pretty much the

9    same way he would, is that correct?

10   A    Some, yes.

11   Q    Now, you've also testified about shopping for clothing for

12   your husband and his brother.  And that must have been a very

13   trying time, was it not?

14   A    Yes.

15   Q    You don't know as a matter of personal knowledge, that is in

16   the sense that you saw the faces of either Mr. Gardner or Mr.

17   Martin in that shopping center that day, did you?

18   A    No.  I didn't see them, no.

19   Q    You didn't see them.  So in the sense that you didn't see

20   them, you don't really have personal knowledge they were there,

21   is that correct?

22   A    Well, when everybody start running through mall --

23   Q    Okay.

24   A    -- was a reason.

25   Q    Okay.

1    A    But no, I didn't see their face.

2    Q    And indeed, you certainly didn't see them inside the store

3    at the time that you, that you and the other people purchased the

4    clothing for Darryl Wyche and Anthony Wyche, did you?

5    A    No.  I didn't see them inside the store.

6    Q    Okay.  With respect to the funeral, also, do you have

7    personal knowledge in the sense that you saw them, that either of

8    them was there?

9    A    That Wayne and Goo was there?

10    Q    Yeah.

11    A    Yeah, they were there.

12    Q    Did you see either of them?

13    A    No, I wouldn't look back.

14    Q    You didn't see them.  Okay.  Now, you were quite certain

15    that you heard Bo's name on the tape, is that right?

16    A    I didn't say that.

17    Q    You didn't say that.  How certain were you that his voice is

18    on the tape?

19    A    I'm 100% certain.

20    Q    Pardon?

21    A    I'm 100% certain.

22    Q    You're 100% certain?  Okay.  So that's even more than quite

23    certain, is that right?

24    A    Yes.

25    Q    But you didn't, you didn't identify his picture to law

1    enforcement, is that correct?

2    A     Correct.

3    Q     And I assume you were asked a question, do you recognize any

4    of the people here as somebody whose voice you heard on that tape

5    that night?

6    A     Say that again.

7    Q     Did law enforcement ask you, when they showed you the

8    collection of six photographs which had Mr. Mitchell's picture on

9    it, whether you recognized anybody there as someone whose voice

10   you had heard the voice mail on your mother's cell phone?

11   A     Right.

12   Q     And you didn't tell them the truth, did you?

13   A     About the picture?  No.

14   Q     And the reason for that was you would have rather seen

15   street justice take its course?

16   A     Yes.

17   Q     Okay.  Thank you.

18              CROSS EXAMINATION

19   BY MR. KURLAND:

20   Q     Good afternoon, Ms. Wyche.

21   A     Good afternoon.

22   Q     My name is Adam Kurland.  I represent, I'm one of the

23   lawyers who represent Mr. Gardner.  I just have a couple of

24   questions.

25              Now, you testified that you've known Shawn Gardner for

1    a long time, since elementary school?

2    A    Yes.

3    Q    And you're obviously quite familiar with his voice?

4    A    Yeah.

5    Q    And you also testified, I believe, in a question that Mr.

6    Hanlon asked, that a couple of weeks before your husband's murder

7    you had an opportunity to speak with Mr. Gardner for a couple of

8    minutes at Corinthian's?

9    A    Yes.

10   Q    And actually, I believe, that you saw him, I think, on one

11   or two consecutive Thursday evenings there?

12   A    Yes.

13   Q    So you had a good chance to talk to him, friendly

14   conversation?

15   A    Yes.

16   Q    So you know his voice, obviously, quite well?

17   A    Yes.

18   Q    And you actually know him better than all of the defendants?

19   A    Yes.

20   Q    I take it that you probably know his voice better than

21   anyone in your family?

22   A    Than my family would know his voice?

23   Q    Other people might know his voice, but you know it probably

24   better than anyone in your family?

25   A    Yes.

REDIRECT EXAMINATION OF WYCHE                               205

1    Q    And you've listened to that tape that we've referred to

2    several times over and over again?

3    A    Yes.

4    Q    Mr. Gardner's voice is not on the tape?

5    A    No.  I didn't hear his voice.

6    Q    You did not hear his voice.  I just want to get that clear

7    to the jury.  No questions.  No further questions.

8                   REDIRECT EXAMINATION

9    BY MR. HANLON:

10   Q    Ms. Wyche, you were asked some questions about some dates

11   and things like that that I won't get too much into.  But there

12   were some instances you described where Bo, Mr. Mitchell, would

13   come to the Bryant Grocery and would visit your husband there, is

14   that right?

15   A    Yes.

16   Q    Later on, was there ever a time that you bumped into your

17   husband, Darryl Wyche, on the street, near a salon?

18   A    Yes.

19   Q    Was this later on after the Bryant Grocery Store?

20   A    Yes, much later.

21   Q    Just very briefly, you're out one day.  You're driving down

22   in a car?

23   A    Yes.

24   Q    And what happened?

25   A    I have rode past, I was riding past Old Court Road and my

1    husband had called my phone and told me to turn around, he was on

2    the parking lot right there, where the salon was at.  I turned

3    around and asked him what was he standing outside for.  He said

4    he was waiting on Bo.  His sister had a salon right there.  He

5    went in, he must have been inside but he came back out.  By the

6    time he came back out, I was already to get ready to leave.

7    Q    So you bump into your husband near a salon?

8    A    Right.

9    Q    Talk to him for a few minutes on the parking lot?

10   A    Right.

11   Q    And your husband indicated that he was there to meet

12   somebody?

13   A    Right.

14   Q    And your husband told you who?

15   A    Yes.

16   Q    And who?

17   A    Oh, Bo.

18   Q    Sorry.  And at some point you actually saw someone come out

19   of the salon, right?

20   A    Yeah.

21   Q    And who did you see come out?

22   A    Bo.

23   Q    And did he greet your husband, shake hands, anything like

24   that?

25   A    No.  From what I got out of it, they was already outside

1    talking but he had went inside for something and came back out.

2    Q    When you left, were Bo and your husband still together?

3    A    Yes.

4    Q    You left them that way?

5    A    Yes.

6    Q    Were they together outside the salon?

7    A    Yes.

8    Q    And about how long before, just approximately, about how

9    long before the murder was this?

10   A    Probably like a month or two.

11   Q    You were asked some, a couple of questions about Dwayne

12   Denham, Deezo, and his relationship with your husband.  Let me

13   ask you a little bit about that relationship.

14              Was Mr. Denham someone that your husband could rely on

15   to watch his back?

16   A    Yes.

17   Q    To your knowledge, did your husband ever have Mr. Denham

18   with him to protect him or to look out for him?

19   A    Yes.

20   Q    Whether or not that was related to the drug business, you

21   don't know?

22   A    Right.

23   Q    You don't have any reason to believe that.  But did Mr.

24   Denham sometimes look out for your husband or protect him?

25   A    Yes.

1    Q    You were asked if there was another Bo that you knew, going

2    to the day your husband lost his life.  There was a second Bo

3    that you and your husband knew at about the same time.  I believe

4    that he was identified as Samuel Garrett by Mr. Lawlor?

5    A    Yes.

6    Q    I know you answered in response to a question by Mr. Lawlor,

7    you indicated that you don't have any idea whether or not, what

8    Mr. Garrett's up to right now or whether he's locked up.  Let me

9    ask you, do you have any idea whether or not he was actually

10   locked up at that time, on March 24th of 2000?

11   A    No, he wasn't at that time.  He was, he was on the run.  He

12   was in Virginia at that time.

13   Q    Now, after the phone call that we were talking about where

14   your husband addressed someone named Bo, after the phone call

15   ended -- and just answer this question yes or no, Ms. Wyche --

16   did you ask your husband or did he tell you which Bo he was

17   intending to see later that evening?  Just a yes or a no.

18   A    Yes.

19   Q    And what did your husband tell you on that day about which

20   Bo he was going to see?

21              MR. LAWLOR:  Objection.

22              MR. HANLON:  Hold on.

23              THE COURT:  Overruled, may answer.

24              THE WITNESS:  The one from Randallstown.

25   BY MR. HANLON:

1    Q    And which Bo would you have understood that to be?

2    A    That one right there.

3    Q    Mr. Mitchell?

4    A    Yes.

5    Q    You were asked a number of questions about people that your

6    husband trusted.  To your knowledge, did your husband trust Shawn

7    Gardner?

8    A    Yeah.  I believe he would have, he trusted him.

9    Q    How about Mr. Martin?  As far as you know, did your husband

10   have any reason not to trust Mr. Martin?

11   A    Wouldn't have had no reason to, not to trust him.

12   Q    And you were asked a number of questions about this photo

13   array and when was the first time you told police that you hadn't

14   been honest in the photo array.  Just to set everything and make

15   everything clear.  You and I have discussed the photo array, is

16   that correct?

17   A    Yes.

18   Q    We discussed it, I think, Friday of last week, is that

19   right?

20   A    Yes.

21   Q    And as far as information you've provided, in terms of

22   identifying Mr. Mitchell or talk about him on the voice mail or

23   things like that, you testified in the grand jury in this case

24   back in 2004.  You talked about Mr. Mitchell during the grand

25   jury, is that right?

1    A    Yes.

2    Q    The photo array maybe didn't come up during that testimony?

3    A    No, it didn't.

4    Q    Were you asked about it?

5    A    No.

6    Q    But you did testify about Mr. Mitchell way back in '04?

7    A    Right.  Yes.

8    Q    You were asked some questions about the voice mail that you

9    listened to.  This was the one that was recorded and left on your

10   mom's phone.  You listened to it.  There was some voices and

11   there was, a question came up of Wayne coming to your mind.

12   Understanding you were not certain about it.  You did think of

13   Wayne after listening to that voice mail a few times, is that

14   right?

15   A    Yes.

16        MR. CROWE:  Objection, Your Honor.

17        THE COURT:  Overruled.  You may answer.

18   A    Yes.

19   Q    And is Wayne a name that you identified to the police at

20   that time, in 2002?

21   A    Yes, before I even said anything about Bo, I said Wayne.

22   Q    From the beginning?

23   A    Yes.

24   Q    Thank you, Ms. Wyche.  Nothing further, Your Honor.

25        RECROSS EXAMINATION

1    BY MR. LAWLOR:

2    Q    Briefly, Your Honor.  Ma'am, just a couple questions.  You

3    said that Deezo, his function was to watch your husband's back?

4    A    There wasn't, that wasn't his job.  But he was --

5    Q    That's what he would do?

6    A    It's not just what he would do.  It wasn't like every time

7    he went outside, somebody was after him, that he had to watch his

8    back.  He just felt secure to trust him.

9    Q    Okay.  Now, you said that back when you were shown the photo

10   spreads that you did identify Mr. Martin and you deliberately did

11   not identify Mr. Mitchell because, kind of ironically, you hoped

12   that Mr. Martin would simply go to jail and Mr. Mitchell would be

13   killed, right?

14   A    Yes.

15   Q    Okay.  But when you were shown the photo spread, Mr.

16   Martin --

17         THE COURT:  Is that something that counsel are agreed

18   should be on the -- take it off, please, Mr. Lawlor.

19   Q    This is the cover page of the photo spread, Your Honor.

20         MR. HANLON:  Your Honor, from my point of view, the

21   government has no objection.

22         THE COURT:  Okay.  All right.  Go ahead.  Just wanted

23   to make sure.

24         MR. CROWE:  Your Honor, object.

25         THE COURT:  All right.  Take it off, please.

1              MR. LAWLOR:  Your Honor --

2              THE COURT:  If you want to question her about it, you

3     can question her about it.  It's not in evidence, though.

4              MR. LAWLOR:  Can I establish a foundation for it, then,

5     Your Honor?

6              THE COURT:  Doesn't sound like you need to.

7              MR. LAWLOR:  Well, then, it would be in evidence, Your

8     Honor.  Never mind, I'll move on.

9              THE COURT:  No.  The photo array is in.  There was no

10    objection to the photo array.

11             MR. LAWLOR:  Approach the witness, Your Honor?

12             THE COURT:  Certainly.

13             MR. LAWLOR:  Can you review that, please?

14             THE COURT:  Just read it to yourself, Ms. Wyche.

15             (Pause in proceedings.)

16    BY MR. LAWLOR:

17    Q    Do you recall writing --

18             THE COURT:  I'm sorry, Mr. Lawlor.  Wait until you get

19    back to the mike, please.

20    Q    Ma'am, did you review the remarks that you wrote?

21    A    Yes.

22    Q    Okay.  And those are, in fact, remarks that you wrote about

23    Mr. Martin when you were shown his photo spread, right?

24    A    Yes.

25    Q    Okay.  And not only did you tell the detectives and write

1    that you recognized his face, but you made observations about

2    recognizing his voice from the voice mail, right?

3    A    I said I know, I known him for a long time, I know the way

4    he talks.  That's what I said on there.

5    Q    Didn't you say, said it is a slang way he said it on the

6    tape?

7    A    Right.  That's the same thing I've been saying the whole

8    time.

9    Q    Right.

10   A    Right.

11   Q    That's what I'm saying.  I think we're in agreement here.

12   Let me try to clarify it.  You were shown a photo spread.  You

13   not only said, I recognize his face, but you also said, this is

14   the voice, Mr. Martin's voice is the voice I heard on the tape,

15   right?

16   A    That's the way he talks.

17   Q    Okay.  And when you were shown Mr. Mitchell's picture, you

18   said, I don't recognize him, and you didn't say anything about

19   even recognizing his voice, right?

20   A    Right.

21   Q    Okay.  And Mr. Crowe asked you a question about your

22   relative certainty between your identification of Mr. Mitchell's

23   voice and Mr. Martin's voice.  And you said, I'm not really sure

24   about Mr. Martin but I'm 100% sure about Mr. Mitchell, right?

25   A    Yes.

1    Q    Okay.  And again, back in '02, your desire was to help Mr.

2    Martin and hurt Mr. Mitchell, right?

3              MR. HANLON:  Objection, Your Honor.

4              THE COURT:  Overruled.  You may answer.

5    Q    Was that your objective when you looked at these two photo

6    spreads?  You wanted to, in your own mind at least, help Mr.

7    Martin and see great harm come to Mr. Mitchell, right?

8    A    What's helping him?  What's helping him about it?

9    Q    I'm sorry?

10   A    I don't understand what you mean by "helping him."

11   Q    Well, you said, didn't you, that in a sense, you would

12   identify him, he would be off the streets, he would go to jail,

13   he wouldn't be killed.  That was, in your mind, helping him,

14   right?  Isn't that what you said?

15   A    It wasn't helping him.

16             MR. HANLON:  Objection, Your Honor.

17             THE COURT:  Overruled.

18   Q    Is that what you said?

19   A    That's what I said, yes.

20   Q    Okay.  So you did say that in your mind you were helping Mr.

21   Martin and hurting Mr. Mitchell?

22   A    I didn't say nothing like that.

23   Q    Okay.  No further questions.

24             THE COURT:  Thank you very much, Ms. Wyche.  You are

25   excused.  Can we get a few minutes of the next witness?

1           MR. HARDING:  Sure.

2           THE COURT:  All right.  Ladies and gentlemen of the

3   jury, let me invite you, we won't take a recess because we're not

4   going to be in session much longer.  Let me invite you to take a

5   stretch break, if that's acceptable.  Just stand up while we

6   bring the next witness in.

7           Who is the next witness, Mr. Harding?

8           MR. HARDING:  Dwayne Denham.

9           THE COURT:  Dwayne Denham.

10          MR. HARDING:  20 minutes, Your Honor?

11          THE COURT:  Thereabouts.  Just one moment, sir.  The

12  clerk will place you under oath.

13          DWAYNE DENHAM, GOVERNMENT'S WITNESS, SWORN

14          THE WITNESS:  Yes.

15          THE CLERK:  Be seated.  Speak directly toward the mike.

16  State your name and spell it for the record, please.

17          THE WITNESS:  Dwayne Denham.

18          THE COURT:  Spell your first and last name, please, Mr.

19  Denham.

20          THE WITNESS:  D-W-A-Y-N-E.  Last name is D-E-N-H-A-M.

21          THE COURT:  Thank you, sir.

22          DIRECT EXAMINATION

23  BY MR. HARDING:

24  Q    Good afternoon, Mr. Denham.

25  A    Good afternoon.

1    Q    Mr. Denham, can you tell us how old you are?

2    A    35.

3    Q    And how far did you get in school?

4    A    Eleventh grade.

5    Q    And where did you go to school?

6    A    Randallstown High School.

7    Q    Okay.  Did you grow up in Randallstown?

8    A    Yeah.

9    Q    Are you employed right now?

10   A    Yes, I am.

11   Q    Without telling us where you work exactly, can you give us

12   an idea what kind of work you do?

13   A    Construction.

14   Q    Okay.  Mr. Denham, did you speak to an attorney last week

15   before you came in to talk to us?

16   A    Yes, I did.

17   Q    Do you sometimes use or have you in the past used the name

18   Dwayne Bryant?

19   A    Yes.

20   Q    And where does "Bryant" come from?  Where does that name

21   come from?

22   A    From my father.

23   Q    Okay.  And what about Denham?

24   A    It's my mother's last name.

25   Q    So did there come a time when you used your father's name

1    and then you stopped using your father's name or what?

2    A    Yes.

3    Q    How did that, what time period was it that you used your

4    father's name?

5    A    About a couple years ago.

6    Q    Okay.  And then you decided to go to your mother's name?

7    A    Yes.

8    Q    Can you give us an idea why you did that?

9    A    No particular reason.  I don't deal with my father too much.

10   Q    Okay.  Have you ever been convicted of a crime, Mr. Denham?

11   A    Yes.

12   Q    Can you tell us what crime you've been convicted of?

13   A    Assault, possession of a handgun.

14   Q    Okay.  Is that one conviction or two convictions?

15   A    Two convictions.

16   Q    Okay.  When were those convictions?  Recently or a long time

17   ago?

18   A    A long time ago.  In '96.

19   Q    Both convictions were in '96?

20   A    One was before '96 and the other one was in '96.  They was

21   ran concurrent.

22   Q    I see.  So I guess you are not on probation or parole now,

23   is that correct?

24   A    No.

25   Q    And do you have any pending charge at all?

1    A    No.

2    Q    Do you have any kind of agreement with the United States?  I

3    mean a plea agreement.  Are you testifying here pursuant to any

4    kind of cooperation agreement?

5    A    No.

6    Q    Is it fair to say that we've told you, however, that we

7    aren't going to turn and use what you say in court against you to

8    try to prosecute you, is that correct?

9    A    Yeah.  That's what you said.

10   Q    Okay.  Mr. Denham, do you know a guy by the name of Darryl

11   Wyche or did you know a man by that name?

12   A    Yes.

13   Q    How long did you know him?

14   A    About, maybe 15, 12 years, something like that.

15   Q    Okay.  And let me just show you Government Exhibit PH-56.

16   Can you identify that photo?

17   A    Yes.  That's Darryl Wyche.

18   Q    Was he involved in drug trafficking, Mr. Denham?

19   A    Yes.

20   Q    Did you also know the person whose picture is now on the

21   screen, PH-55?

22   A    Yeah.  That's his brother, Pete.

23   Q    How long did you know Pete?

24   A    About ten years, maybe more.

25   Q    Okay.  Now, starting about when was it that you got to know

1    Pete and Darryl?  Like how old would you have been?

2    A    Maybe about 18.  Probably 19, maybe.

3    Q    Around the end of high school or shortly after high school?

4    A    Yeah.

5    Q    Okay.  Did you know them from Randallstown?

6    A    Who?  Pete?

7    Q    Pete and Darryl.

8    A    No.  I knew, I knew Pete as being Darryl's little brother.

9    I didn't go to school with him.

10   Q    Did you go to school with Darryl?

11   A    Yeah.

12   Q    You said you went to Randallstown High School.  Did you know

13   Darryl from Randallstown High School?

14   A    Yes.

15   Q    Okay.  Did you know him before Randallstown High School?

16   A    No.  I met him in school.

17   Q    Okay.  Did you also know Darryl's wife?

18   A    Yes.

19   Q    And what's her name?

20   A    Natasha Magginson or Natasha Wyche.

21   Q    Okay.  Mr. Denham, do you also know a man by the name of

22   Shelly Wayne Martin?

23   A    Yes.

24   Q    Do you see him in the courtroom here today?

25   A    Yes.

1    Q    Can you point him out to us, please?

2    A    (Indicating.)

3    Q    Okay.  Can you tell us what kind of clothing Mr. Martin is

4    wearing?

5    A    A white T-shirt and a button up.

6    Q    Okay.  A button-up shirt, is that what you said?

7    A    Yeah.  The last one right there, with the bald head.

8    Q    Can the record reflect that the witness has identified Mr.

9    Martin, Your Honor?

10          THE COURT:  It so notes.

11   Q    How did you first know Mr. Martin?

12   A    Mr. Who?

13   Q    Shelly Wayne Martin.

14   A    I met him through Darryl.

15   Q    So when would that have been?

16   A    A long time ago, in the early '90s.

17   Q    Okay.  Would that have been in Randallstown, then?

18   A    I met around, I think around Savoy.

19   Q    What is Savoy?

20   A    Old apartment complex we used to live at.

21   Q    And where is that?

22   A    Out in Randallstown.

23   Q    Okay.  Do you mean to say that you and Mr. Martin both lived

24   in the Savoy Apartments?

25   A    They stayed on one side, I stayed on the other side.

1    Q    Okay.  But you remember him from back in those days, when

2    you were living there?

3    A    Yes.

4    Q    Okay.  Did there come a time when Mr. Martin moved down to

5    Southwest Baltimore?

6    A    I believe so, yes.

7    Q    Okay.  And to your knowledge, Mr. Denham, did Mr. Martin get

8    involved in drug business with Darryl Wyche?

9    A    That's what I heard.  I never seen it.

10   Q    Okay.  You heard it from who?

11   A    From Darryl.

12   Q    Okay.  What about Shawn Gardner?  Did you, did you know him?

13   A    Yeah.

14   Q    What's his nickname?

15   A    Goo.

16   Q    Do you see him in the courtroom here today?

17   A    Yes.

18   Q    Can you point him out to us?

19   A    Right there with the glasses on.

20   Q    Okay.  What color shirt?

21        MR. COBURN:  That's fine with us, Your Honor.

22        THE COURT:  The record will reflect the witness has

23   identified Mr. Gardner.

24        MR. HARDING:  Was he involved in drug trafficking with

25   Darryl Wyche, also?

1          MR. COBURN:  Objection, foundation.

2          THE COURT:  Overruled.  If you know.  Do you know?

3          THE WITNESS:  Not that, I haven't seen it.  I didn't

4    see him do any drug transactions with Darryl.

5          MR. HARDING:  Did you hear about it from Darryl?

6          MR. COBURN:  Objection.

7          THE COURT:  Sustained.  That means don't answer.

8    BY MR. HARDING:

9    Q    Well, let me ask you this, Mr. Denham.  Did you used to help

10   Darryl in the drug business yourself?

11   A    Yes.

12   Q    By doing what?  What was your relationship with Darryl?

13   A    A lot of times, whatever he really needed me to do.  Just

14   watch his back.

15   Q    Okay.  Going how far back were you, were you helping Darryl

16   out?

17   A    From day one, as soon as I met him.

18   Q    So back in the early '90s?

19   A    Yes.

20   Q    And were you still helping him at the time of his death?

21   A    Yes, I was.

22   Q    So did Darryl tell you anything about Mr. Gardner's

23   involvement with him in drug trafficking?

24   A    Not, not since I was home.

25   Q    How about before you were home?

1    A    Before I was home, he just, Goo would just be with him but I

2    never really seen Goo do any transactions with him.  I just knew

3    he used to be with him sometimes.

4    Q    Was it your understanding that Goo worked for Darryl?

5    A    Goo didn't play no relevant part.  So if he was around him,

6    I still never seen him do anything myself.

7    Q    Okay.  Let me call your attention to the approximately two

8    year period before Darryl Wyche died, Mr. Denham.  Were you tight

9    with Darryl during that time period?

10   A    Yes, I was.

11   Q    From about 2000 to 2002?

12   A    Yes.

13   Q    Okay.  What was your relationship with him at that time?

14   Same as what you told us before?

15   A    Yes, it was.

16   Q    Did you also have a job, a regular job during that time

17   period?

18   A    Yes, I did.

19   Q    What was your job?

20   A    I used to work at Sweetheart Cup.

21   Q    Okay.  Is that a company here in Baltimore?

22   A    Yeah.  In Owings Mills.

23   Q    And what about Darryl?  Did he have regular jobs?

24   A    He had his own company.

25   Q    What was his company?

1    A    He had a cell phone store and he had a sedan car service.

2    Q    Okay.  Where was the sedan car service located?

3    A    It was in Randallstown, off Liberty Road.

4    Q    And what does a sedan car service do exactly?

5    A    It was like a taxicab company.

6    Q    And how long did Darryl have that company?

7    A    Maybe about a year, probably longer than that.

8    Q    Okay.  And what about the cell phone store?  Where was that

9    located?

10   A    That was off of Route 40.  I guess it's considered

11   Catonsville.

12   Q    And how long did Darryl have that business?

13   A    He had that for a while, before I came home.  And it shut

14   down probably like a year after I came home.

15   Q    When you say "came home", did you serve a time in jail and

16   got out in 2000, is that right, Mr. Denham?

17   A    Yes.

18   Q    Okay.  Do you know, did, to your knowledge, did Darryl do

19   drug business with people without you being around?

20   A    Yes, he did.

21   Q    But you said that he relied on you to watch his back.  Is

22   that what you said?

23   A    Yes.

24   Q    So what kinds of business would it be in, would he be in

25   that he would need you around for?

1    A    If it was, if it was a situation where he wasn't comfortable

2    at, as far as a situation with a lot of money involved.  Mainly

3    if he did business without me being around, it was probably with

4    somebody that, you know, he didn't feel no threat, was no need

5    for me to be around.

6    Q    Okay.  And vice versa?  He would not need you if he was

7    dealing with people he trusted, is that right?

8    A    Yeah.  If it was somebody he trusted, he wouldn't need me

9    around.

10   Q    Do you know, did he do drug business out of those stores you

11   just told us about?

12   A    I never seen it.

13   Q    Okay.  Did you spend a lot of time at those stores?

14   A    No.

15   Q    Because you were working at Sweetheart Cup, I suppose?

16   A    Yes.

17   Q    Okay.  Let me ask you, did you know a guy by the name of

18   Darryl Bacon?

19   A    Yes.

20   Q    Can you identify this photo, PH-70?

21   A    Yeah.  That's him on the screen.

22   Q    How did you know Darryl Bacon?

23   A    I just know him from out Randallstown.

24   Q    Did you go to school with him, too?

25   A    No.

1    Q    Was he younger than you?

2    A    Yes.

3    Q    To your knowledge, did Darryl Bacon, was he getting drugs

4    from Darryl Wyche?

5    A    Not to my knowledge.

6    Q    Okay.  Can you tell us, Mr. Denham, did there come a time

7    when Darryl Wyche had problems with kidnappings and house

8    break-ins and that sort of thing?

9    A    Yeah.  He came to see me one time when I was in jail and he

10   told me that somebody had kidnapped him when I was in

11   pre-release.

12   Q    So you were almost about ready to get out of jail?

13   A    Yes.

14   Q    And so this would have been around 2000?

15   A    Yeah.  It was like early 2000, beginning of 2000.

16   Q    Well, what did Darryl tell you happened?

17   A    He told me --

18            MR. LAWLOR:  Objection.

19            THE COURT:  Overruled.  You may answer.

20   A    He told me that some guys had a mask on and ran up on him.

21   And his face was scratched up.  His head was lumped up, and they

22   threw him in the trunk.

23   Q    Did they take anything from him?

24   A    Yeah.  He said they took the money that was in his pocket, a

25   couple thousand dollars.

1   Q     Did he tell you what kind of masks these guys had on?

2              MR. LAWLOR:  Objection.

3              THE COURT:  Overruled.  You may answer.

4   A     Said they had a black ski mask on.

5   Q     Okay.  Did he have any idea who had done it?

6   A     No.

7   Q     Did there come a time when he got kidnapped again?

8   A     Yeah.

9   Q     Were you out of jail at that time?

10  A     Yeah.  I was out of jail at that time.

11  Q     And can you tell us what Darryl told you about that

12  occasion?

13  A     Yeah.  He had told me, he told me the same thing, that

14  somebody had robbed him.

15             MS. RHODES:  Objection.

16             THE COURT:  Overruled, go ahead.

17  A     He told me the same thing, that somebody had robbed him but

18  it wasn't, this time he didn't have no kind of bruise or marks on

19  him.

20  Q     Okay.  He had bruises and marks on him the first time, could

21  you see the bruises and marks?

22  A     Yeah.

23  Q     This was when he came to visit you just before he got out of

24  jail, right?

25  A     Yes.

1  Q     But the second time he didn't get injured in any way, is

2  that right?

3  A     No.

4  Q     Okay.  Did he tell you what he lost, what got taken from

5  him?

6  A     Yeah.  A couple thousand.

7  Q     A couple thousand dollars?

8  A     Yeah.  That's what he told me.

9  Q     And were these guys wearing masks this time, also?

10  A     Yeah.  That's what he told me.

11  Q     Same kind of masks?

12  A     I didn't ask was it the same kind of mask.

13  Q     Okay.  Could he tell you, he didn't know who had done it the

14  second time?

15  A     No.  He didn't have a clue.

16  Q     What about house break-ins?  Did he ever tell you about his

17  house being broken into?

18  A     Yeah.  He had, he had one house he said that they broke into

19  and stole some, some drugs and some money out of the house that

20  they broke into.

21  Q     Did he tell you how much drugs and how much money?

22  A     I don't remember how much.  I know it was, every time he got

23  hit it was about like a couple thousand dollars, I think they

24  took a couple ounces of drugs but I don't know how much.

25  Q     Did he get hit like that more than once?

1   A    As far as I know, that I know of, that I can remember, it

2   was one time.

3   Q    Okay.  Were you out of jail at that time, too?

4   A    Yeah, I was out of jail.

5   Q    Did he have any idea who did that housebreaking?

6   A    No.  He probably said something.  I ain't really sure.  I

7   don't think so because I don't remember.

8   Q    Okay.  Did he often have a lot of money, Mr. Denham?

9   A    Yes.

10  Q    And can you give us an idea of how much money he might have

11  at any given point in time?

12  A    5,000 or better.

13  Q    What would be the most you think you ever saw him with?

14  A    Around 50,000.

15  Q    Okay.  Where did he used to keep it?

16  A    Sometime he kept money on his person or sometime he kept

17  money in a knapsack, or he would keep some money stashed in

18  different houses.

19  Q    Okay.  And did he ever carry it around in his car, also?

20  A    Yeah.  If he picked some money up he would have it in his

21  car.

22  Q    What was this money from, if you know, Mr. Denham?

23  A    What do you mean, what was it from?  From the street?  From

24  the sale he made?

25  Q    Yeah.

1    A    Yeah.

2    Q    Sale of what?

3    A    Cocaine.

4    Q    Is that the main kind of drug that Darryl Wyche sold?

5    A    Yes.

6    Q    Did he ever sell other kinds of drugs?

7    A    Yeah.

8    Q    What?

9    A    He sold some heroin for a while.

10   Q    When was that, if you know?

11   A    He sold some while I was in jail and I think he sold a

12   little bit while I was, when I came home from jail.

13   Q    So that would have been after 2000?

14   A    Yes.

15   Q    Can you give us an idea how much cocaine Darryl Wyche would

16   buy at a time, say, during the time period 2000 to 2002, the two

17   years before he died?

18   A    He would buy, he would probably buy like two or three kilos

19   and get the rest of it on consignment, about another five or six

20   on consignment.

21   Q    So he'd be picking up between five and ten kilos at a time?

22   A    Yes.

23   Q    When you say "buying it on consignment", what does that mean

24   exactly?  Can you explain to the ladies and gentlemen of the jury

25   what that means?

1    A    If he bought, whatever, if he bought two or three kilos, he

2    would get on consignment, the connect would give him like seven

3    and tell him he would owe him the money.

4    Q    Do you know who Darryl's source of supply for cocaine or any

5    drug was?

6    A    Only one I knew was the Hispanic dude.

7    Q    Okay.  What do you know about the Hispanic dude?

8    A    All I knew was the name.  I never met him, I never saw him.

9    Q    What was his name?

10   A    The Hispanic dude that he was dealing with.  I don't

11   remember the name, to be honest with you.  I mean, I know I told

12   you a name but I don't remember the name right now.

13   Q    Okay.  Where did he live?

14   A    In Jersey.

15   Q    Did he come to Baltimore ever?

16   A    Yes.

17   Q    Did he come to Baltimore to do business with Darryl?

18   A    Yeah.  He came to Baltimore to drop it off.

19   Q    Darryl didn't have to go up to New Jersey because --

20   A    No.

21   Q    Okay.  Did you ever personally meet this Hispanic dude

22   you're telling us about?

23   A    No.  I never met him personally.

24   Q    So what you know about him comes from, what?  Having Darryl

25   talk about him?

1   A    Yeah.  Having Darryl talk to him.

2   Q    So you were just never around when Darryl picked up packages

3   from the Hispanic dude, is that right?

4   A    I was there just one time.

5   Q    Did you see the Hispanic dude?

6   A    No, he was in the car.  He got, Darryl got, he got in the

7   truck with the Hispanic dude and got out the truck with the bag

8   and we pulled off.

9   Q    Where were you when this exchange in the car took place?

10  A    About Fells Point.

11  Q    Okay.  Did Darryl have any kind of standard routine with

12  this source of supply?  Did he always meet him at Fells Point?

13  Did he always do the exchanges in cars?  Do you know?

14  A    I don't know.  That was the only time I was there.

15  Q    Did Darryl have another source of supply that you were aware

16  of?

17  A    Not that I know of.

18  Q    Okay.  Now, you said that your, part of what you did was to

19  watch Darryl's back.  Did he used to pay you to do that?

20  A    Yes.

21  Q    How did he pay you?

22  A    He gave me, he gave me a percentage or a cut out of whatever

23  money he made probably that day or that week.

24  Q    Can you give us an idea of how much money then you might

25  make in a week, say, toward the end of your relationship with

1    Darryl, before he died?

2    A    About maybe five, 5,000 a week.

3    Q    Well, that's certainly good money.  5,000 a week?  Did you

4    ride around with Darryl?

5    A    Yes.

6    Q    Okay.  But you weren't, evidently, according to what you

7    said before, you wouldn't be with him if he was just doing

8    ordinary business with people he trusted, is that right?

9    A    Yeah.  I would with him, I would with him even if he wasn't

10   doing business.  But if he was making, if he was doing business

11   and there wasn't a threat, or he was comfortable, then there

12   wouldn't be a reason for him to call me.

13   Q    When he needed you, he would give you a call, is that

14   correct?

15   A    Yes.

16   Q    Did you ever do any violence for Darryl?

17   A    Yes.

18   Q    What kind of violence?

19   A    I mean, no gun violence.  Just, you know, either beating

20   somebody up for him or just confronting them about money that

21   they owed Darryl.  That's it.

22   Q    Okay.  Do you have a background as a, as a boxer, Mr.

23   Denham?

24   A    Yes.

25   Q    Okay.  So you're pretty good with your hands, I guess, is

1    that correct?

2    A    I guess, yeah.

3    Q    Okay.  Did you ever shoot anybody for Darryl?

4    A    No.

5    Q    Did you sometimes carry a gun when you were watching

6    Darryl's back?

7    A    Yes.

8    Q    Did you have one gun or more than one gun?

9    A    More than one gun.

10   Q    What kind of guns?

11   A    A .45 automatic, .357.

12   Q    Okay.  Did Darryl have a gun?

13   A    No.

14   Q    Did he ever carry a gun?

15   A    No.

16   Q    Did he keep a gun in his house ever, do you know?

17   A    Yeah.  He kept a gun in his house.

18   Q    Okay.  Do you know what kind of gun he kept in his house?

19   A    I think it was a .357.  I'm not sure.

20   Q    Is that a revolver or a semi-automatic, do you know?

21   A    It's a revolver.

22   Q    Okay.  Can you tell us what Darryl's attitude was if one of

23   his customers didn't pay him or --

24            MS. RHODES:  Objection, Your Honor.

25            THE COURT:  The objection's overruled.  Now, ladies and

1    gentlemen of the jury, you're learning quite a bit about the late

2    Darryl Wyche and his business dealings and other things.  None of

3    this evidence is to be considered by you as affirmative evidence

4    of any defendant's guilt of any offense that's charged in this

5    indictment.  This information is being provided to you as

6    background so that you fully understand where Mr. Wyche was in

7    terms of his dealings and what he knew and what people who worked

8    with him knew.

9           The objection's overruled.  Go ahead, Mr. Harding.

10   Q    Sir, can you tell us what Darryl's attitude was when he got

11   into financial disputes with customers and things like that?

12   A    If they owed him money, instead of him worrying about it

13   being a confrontation, he would just cut them off, stop dealing

14   with them.

15   Q    Okay.  Your Honor, is this a good time to stop?

16          THE COURT:  Excellent.  Thank you.

17          MR. HARDING:  I read your mind, Your Honor.

18          THE COURT:  Mr. Denham, you may step down, sir.  You're

19   excused.

20          Ladies and gentlemen of the jury, this will conclude

21   our third --

22          MS. RHODES:  Your Honor, could I briefly interrupt just

23   to make sure he's warned about not talking about the case over

24   the weekend?

25          THE COURT:  Yes.  Mr. Denham, there is an order by the

1    Court that no witness in this case should talk to anyone.  And so

2    you should not discuss your testimony or discuss the case with

3    anyone over the weekend.  All right?  Thank you.

4           Members of the jury, this will conclude our week.  We

5    will not be in session tomorrow.  The Court has a number of

6    activities for the personnel.  And I know that Ms. Arrington

7    would rather be with you.  I think her supervisors would rather

8    have her in some training.

9           In any event, we will resume on Monday morning at 9:30.

10   We'll have three days next week, Monday, Tuesday, and Wednesday.

11   I remind you and instruct you not to conduct any investigation

12   during this extended recess.  Continue to avoid any exposure to

13   media reports about the case.  Do not discuss the case with any

14   family or friends or anyone else.  Conduct no investigation of

15   any sort concerning the case and continue to keep an open mind

16   about all issues.

17          I expect us to be in session, as I said, next week,

18   Monday, Tuesday, and Wednesday for full days.  I'm going to spend

19   some time during this recess in consultation with counsel to see

20   if we can't do a better job of reducing the delays that we've

21   encountered so that any legal matters that we need to discuss

22   hopefully we can get out of the way before next week.

23          I received a couple notes from you all.  It is clear to

24   me that you are scrupulously adhering to my instructions and I

25   appreciate that very much.

1          Have a nice weekend.  The jury is excused.  Oh, I did

2     want to mention.  There was an issue regarding reimbursements and

3     expense payments.  I believe that's all been clarified now.  And

4     just try to be sure to adhere to the schedule that the Clerk's

5     Office has asked you to adhere to in terms of submitting your

6     reimbursements so that that we can get funds in your hands as

7     promptly as possible.

8          Thank you, ladies and gentlemen.  Enjoy your weekend.

9     Please leave your note pads.

10          (Jury exits the courtroom.)

11          THE COURT:  Mr. Harding, Mr. Hanlon, where do we go

12     from here?

13          MR. HARDING:  Judge, we're planning to call Chris

14     Dobropolski, Andrea Smith, Kelly David, and Will Montgomery.  And

15     with the Court's permission, these witnesses, all of them, have,

16     well, especially Mr. Montgomery and Mr. Dobropolski, have special

17     requirements that required me to schedule their appearances long

18     in advance.

19          I'm going to interrupt Mr. Denham's testimony, if

20     that's all right, and return to him after they're done

21     testifying.

22          THE COURT:  Absolutely.  Not a problem.

23          MR. HARDING:  Thank you, Your Honor.  That will take up

24     next week, I think.

25          THE COURT:  Okay.  Two of those witnesses are in

1    custody?

2              MR. HARDING:  Yes, Your Honor.

3              THE COURT:  And I know that the marshals will work with

4    you, have worked with you.  Are you satisfied that things are in

5    place, satisfactory arrangements have been made?

6              MR. HARDING:  Yes.  One of the witnesses is in the

7    Federal Witness Protection Program, is going to have a marshal

8    detail with him.  And the other is in DOC custody and therefore

9    there's no danger of contact, I don't believe, with the

10   defendants.

11             THE COURT:  Okay.  In the program while serving a

12   sentence?

13             MR. HARDING:  Yes.  Yes.  That's correct.

14             THE COURT:  All right.  Okay.  And we don't have to

15   worry about that firearms motion that was filed this morning or,

16   as you said, yesterday, for a couple of weeks?

17             MR. HARDING:  That's right.

18             THE COURT:  I will say now that while I again salute

19   Mr. Kurland and Mr. Coburn for their diligence, I am loathe to,

20   how shall I put this, I'm not going to have time, and I know the

21   government counsel are not going to have time, to review a record

22   of a Daubert hearing conducted in some other district in the

23   middle of trial.

24             Unless you and Mr. Hanlon are seriously, seriously

25   bored over the weekend with absolutely nothing to do, assuming

1    Mr. Coburn is able to get that record as he says he's going to

2    try to do, I do not expect counsel to review that, that record.

3    Obviously, as I say, you're free to do so if you want.

4              MR. HARDING:  Thank you, Your Honor.  I don't think Mr.

5    Hanlon nor I will be bored over weekend.

6              THE COURT:  All right.  Now, I will look at Judge

7    Rakoff's opinion and certainly devote a little bit of time to

8    some argument, if counsel want to be heard.  But it's just not

9    something that I'm going to spend a lot of time on.

10             Mr. Kurland.

11             MR. KURLAND:  Good afternoon, Your Honor.  A couple of

12   things.  The first is that I think Wednesday, I've got to check

13   my schedule, is Yom Kippur eve.

14             THE COURT:  Yes.  We will break --

15             MR. KURLAND:  Early.

16             THE COURT:  Early.  I should have mentioned that.

17             MR. KURLAND:  All right.  The other things are, I'm

18   little bit kind of off because earlier representations, I'm not

19   holding the government to anything, that the Kelly David, the

20   Andrea Smith and the Will Montgomery comes quicker than I

21   thought.  Mr. Coburn and I need to, particularly with respect to

22   Mr. Montgomery, it doesn't affect Kelly David and Andrea Smith.

23   But Mr. Montgomery's testimony and his cross might impact that

24   ultimate decision if it's related to submissions with respect to

25   Mr. Gardner's prior conviction.

1          I haven't had a chance to talk with co-counsel yet.

2     But I don't think, as long as Montgomery doesn't testify on

3     Monday -- is that your intention?  Is he going to be here Monday?

4     I know Mr. Coburn and I were reaching our day of reckoning on

5     this.  I would just like clarification that he's not testifying

6     on Monday because if he is there are some strategic decisions

7     that we're going to have to make prior to Monday.

8          MR. HARDING:  He may testify on Monday, Your Honor.

9          THE COURT:  You should assume he will.

10         MR. KURLAND:  Okay.  And the other thing is we've made

11    a request of the government about whether or not Kelly David has

12    received any financial remuneration, and we have not yet gotten a

13    response.  We're expecting that.

14         MR. HANLON:  Your Honor, I'm taking care of that.  I

15    just need to check a couple of different sources.  Counsel have

16    asked me and they're still waiting on my response.  It's just

17    been a question of me making sure I've checked everyone's --

18         THE COURT:  Thank you, Mr. Hanlon.

19         MR. KURLAND:  Your Honor, it's quite likely, depending

20    on what counsel and I do over the weekend, that at the beginning

21    of day on Monday, prior to any of the witnesses, we might have

22    something with respect to that issue that might require some

23    discussion, some argument, some presentation outside the presence

24    of the jury.

25         THE COURT:  Well, I really would like to start Monday

1    morning on time.  I mean --

2              MR. KURLAND:  Your Honor, this is the, this is, I mean,

3    I appreciate that.

4              THE COURT:  Okay.  So get --

5              MR. KURLAND:  We'll put something in writing.

6              THE COURT:  Exactly.  Get something filed in writing

7    over the weekend.  Not Sunday at 8:30 p.m., but, you know,

8    sometime in the next 48 hours.  Get something filed so that Mr.

9    Hanlon, Mr. Harding can react to it, I can look at it and react

10   to it, and see where we go.

11             MR. KURLAND:  For the record, I am not a Sunday night

12   11 p.m. kind of guy.

13             THE COURT:  I know who to point the finger to, Mr.

14   Kurland.

15             MS. RHODES:  Actually, Mr. Coburn's more of a Monday

16   morning 4:30 a.m. kind of guy.

17             MR. COBURN:  I can do it all, Your Honor.

18             THE COURT:  Ms. Rhodes, it was very nice of you.  You

19   did it very nicely when you removed those exhibits from the DOAR

20   and I know that Mr. Harding appreciated your assistance in that

21   regard.

22             MS. RHODES:  I'm sure he did.  I just have a question

23   again about the witness order.  So we're looking at Mr.

24   Dobropolski, and I understand the list of witnesses.  But if we

25   could have a little more guidance on what the priority is.  If

1    they're being brought by federal marshals and DOC, we should have

2    some sense of that.  Because I also need to know when, since I'm

3    doing Mr. Denham's cross, when that's going to be.

4            Also, there's two other witnesses, Detective

5    Niedermeier and Damita Green, that were for this week and we

6    haven't heard yet when they're going to be re-set.

7            MR. HARDING:  I think we're going to postpone them,

8    also, Your Honor.  As for the witness order next week, we're

9    going to need some flexibility, Your Honor.  We have, there is a

10   possible Montgomery won't testify on Monday.  We intend to, we

11   hope to be able to put on Mr., we're going to have Mr.

12   Dobropolski here on Monday to testify.

13           THE COURT:  Okay.  I think that's what Ms. Rhodes is

14   saying.  You're going to, I think you're able to tell us now that

15   you will definitely start Monday morning first thing with

16   Dobropolski.

17           MR. HARDING:  Yes, Your Honor.

18           THE COURT:  And the question is simply whether we

19   finish him on Monday, how early we finish him on Monday.  But

20   right now you anticipate that Montgomery will be either

21   immediately after Dobropolski or with one or two witnesses in

22   between.  And therefore Montgomery might start Tuesday morning?

23           MR. HARDING:  That's correct, Your Honor.

24           THE COURT:  Okay.  And Mr. Kurland, we will, I have it

25   on my calendar, we will go on Wednesday next week similar to the

1    way we did on Monday this week.  We'll break before 3:00.

2             MS. RHODES:  I understood the government to be saying

3    that that was their list for the week.

4             THE COURT:  Right.

5             MS. RHODES:  So I don't know who's going Tuesday or

6    Wednesday, then.

7             THE COURT:  The other three people he named.

8             MS. RHODES:  That doesn't take care of two days.

9             THE COURT:  And Denham.

10            MR. HARDING:  Judge, we anticipate that those four

11   witnesses will probably fill up the week.  If they don't, we'll

12   come back to either Denham or Damita Green or Niedermeier.

13            THE COURT:  Okay.  All right.  That's what I

14   understood.

15            MS. RHODES:  Okay.  Thank you.

16            MR. MARTIN:  Your Honor, just to avoid the sort of

17   perfect storm on Monday.  I expect Mr. Dobropolski to testify.

18   We still haven't gotten all of our tapes back yet, but I think

19   that won't be a problem.

20            THE COURT:  Okay.

21            MR. MARTIN:  I'm still going to complain about it --

22            THE COURT:  Of course.

23            MR. MARTIN:  -- but that's neither here nor there.  On

24   Monday, the day I told you, I have a board meeting at four

25   o'clock.  So if I'm in the middle of my cross examination, I

1    might have to walk out at quarter to four to get up to St.

2    Ignatius.  I'm worried that's what's going to happen, given that

3    they're going to start with him.  But maybe it won't.  Did you

4    have any idea how long you'll be on direct on him?

5             MR. HARDING:  I won't be all day on direct.  I will

6    I'll be several, maybe a couple of hours.

7             THE COURT:  No.  I think the very fact that he's

8    anticipated a second witness on Monday suggests that

9    Dobropolski's going to be long gone by 3:30.

10            MR. HARDING:  I, of course, don't control what the

11   defense attorneys --

12            THE COURT:  Sure.

13            MR. MARTIN:  And Your Honor, the way we're going to do

14   it is I'm going to cross examine him first under the agreement we

15   had at the beginning of the case.  And Ms. Rhodes can follow up

16   after that.  She's not giving up her right to do that.

17            THE COURT:  Got it.

18            MR. MARTIN:  So hopefully I will be done and I can just

19   walk out.

20            THE COURT:  Mr. Martin, did I say we would break when

21   you left or are you willing --

22            MR. MARTIN:  I thought that, the arrangement, I thought

23   was going to be, that if it was something I wasn't involved in --

24            THE COURT:  You could leave.

25            MR. MARTIN:  I could leave and Paul can handle it.

245

 1                THE COURT:  Okay.  Good.

 2                MR. MARTIN:  I don't think that's any problem unless

 3     I'm in the middle of my cross.

 4                THE COURT:  Right.

 5                MR. MARTIN:  Thank you, Your Honor.

 6                THE COURT:  Good.  Counsel, thank you very much.  We

 7     will be using this courtroom, of course, on Friday.  I don't have

 8     any sessions tomorrow.  But I've got a number of proceedings on

 9     Friday.  So just don't leave anything that you don't want

10     missing.

11                Sir, all the way in the top, good afternoon.  Is your

12     head gear religious, a religious item?

13                A SPECTATOR:  No.

14                THE COURT:  It is not?  All right.  In that light, sir,

15     the Court treats it as a hat or a cap and that's not allowed in

16     the courtroom.  So we welcome you back next week or at any time,

17     but please don't wear head gear when you're in the courtroom.

18                I should also mention, there were a couple of occasions

19     today when people in the audience were visibly reacting to

20     certain of the testimony, and I understand that some of the

21     testimony is emotional.  But I caution spectators that there

22     should be no visible reaction, including no waving or signalling

23     to any of the lawyers, and certainly not to any of the

24     defendants.

25                Thank you very much.  Counsel have an excellent

1    weekend.

2              MR. COBURN:  Thank you, Your Honor.

3              (Conclusion of Proceedings at 4:47 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2
                                                        PAGE
3    WITNESS: SGT. GEORGE WOODEN
     DIRECT EXAMINATION BY MR. HANLON                       3
4    CROSS EXAMINATION BY MR. PYNE                          13
     CROSS EXAMINATION BY MR. COBURN                        19
5    REDIRECT EXAMINATION BY MR. HANLON                     24
     RECROSS EXAMINATION BY MS. RHODES                      29
6    RECROSS EXAMINATION BY MR. COBURN                      31

7    WITNESS: SUSAN JOHNSON
     DIRECT EXAMINATION BY MR. HARDING                      35
8    CROSS EXAMINATION BY MR. PYNE                          53
     REDIRECT EXAMINATION BY MR. HARDING                    58
9
     WITNESS: NATASHA WYCHE
10   DIRECT EXAMINATION BY MR. CROWE (ON VOICE ID)          63
     DIRECT EXAMINATION BY MR. LAWLOR (ON VOICE ID)         75
11   REDIRECT EXAMINATION BY MR. CROWE (ON VOICE ID)        88
     DIRECT EXAMINATION BY MR. HANLON                       91
12   CROSS EXAMINATION BY MR. LAWLOR                        171
     CROSS EXAMINATION BY MR. FLANNERY                      188
13   CROSS EXAMINATION BY MR. CROWE                         195
     CROSS EXAMINATION BY MR. KURLAND                       203
14   REDIRECT EXAMINATION BY MR. HANLON                     205
     RECROSS EXAMINATION BY MR. LAWLOR                      210
15
     WITNESS: DWAYNE DENHAM
16   DIRECT EXAMINATION BY MR. HARDING                      215

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on October 1, 2008.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2009.

11

12

13

14          _____

             Mary M. Zajac,
15           Official Court Reporter

16

17

18

19

20

21

22

23

24

25

## $

**$23,000** [1] - 141:23
**$40,000** [1] - 98:8

## '

**'02** [2] - 136:8, 214:1
**'04** [1] - 210:6
**'90** [2] - 92:12, 94:18
**'90s** [6] - 97:13, 98:3, 98:6, 138:5, 220:16, 222:18
**'91** [1] - 92:12
**'96** [4] - 217:18, 217:19, 217:20
**'97** [5] - 173:10, 173:18, 174:5, 174:6, 181:4
**'98** [6] - 173:9, 173:10, 173:11, 173:18, 174:6, 181:4
**'99** [1] - 174:1
**'man'** [1] - 200:23

## 1

**1** [11] - 1:11, 38:10, 38:14, 75:10, 124:24, 143:5, 143:15, 167:19, 200:8, 248:5
**10** [3] - 30:12, 114:7
**100%** [1] - 202:19, 202:21, 202:22, 213:24
**10081** [2] - 50:7, 50:10
**101** [2] - 1:25, 48:18
**1010** [3] - 50:10, 50:20, 50:21
**10171** [8] - 37:16, 37:24, 38:6, 47:18, 48:10, 48:25, 49:22, 51:3
**10172** [3] - 38:2, 38:11, 48:21
**10173** [2] - 38:2, 48:18
**10202** [1] - 51:10
**10222** [1] - 51:22
**103** [1] - 124:23
**10472** [1] - 51:16
**10:08** [1] - 2:1
**11** [6] - 36:5, 93:15, 93:18, 93:22, 150:22, 241:12
**11:30** [1] - 150:22
**11:32** [1] - 62:5
**11:49** [1] - 50:1
**12** [1] - 218:14
**12:30** [1] - 143:15
**12:48** [1] - 79:9
**13** [2] - 93:19, 247:4

## 14

**14** [1] - 93:19
**14th** [1] - 42:5
**15** [7] - 52:12, 62:3, 92:22, 101:9, 103:19, 114:7, 218:14
**150th** [2] - 26:17
**16** [2] - 92:9, 92:22
**1624** [1] - 47:14
**17** [1] - 92:22
**171** [1] - 247:12
**18** [3] - 3:22, 155:3, 219:2
**188** [1] - 247:12
**19** [2] - 219:2, 247:4
**195** [1] - 247:13
**1990** [1] - 94:9
**1990's** [3] - 4:8, 94:21, 95:10
**1991** [1] - 92:13
**1997** [2] - 173:9, 174:9
**1998** [1] - 174:9
**1999** [7] - 5:1, 27:21, 28:3, 127:7, 127:11, 127:13, 173:5
**1:00** [3] - 77:21, 153:5, 153:12
**1:10** [1] - 117:10
**1:23** [1] - 130:19
**1:30** [2] - 143:5

## 2

**2** [3] - 38:10, 38:13, 169:13
**20** [6] - 30:12, 52:18, 85:5, 85:6, 141:23, 215:10
**2000** [16] - 116:24, 119:24, 121:9, 173:5, 173:23, 173:25, 174:2, 208:10, 223:11, 224:16, 226:14, 226:15, 230:13, 230:16
**2001** [8] - 94:17, 94:19, 95:5, 116:24, 173:5, 173:23, 173:25, 174:1
**2002** [25] - 42:5, 42:6, 47:14, 64:6, 64:8, 64:21, 70:14, 93:9, 111:24, 135:22, 136:14, 137:6, 138:5, 142:22, 171:4, 171:16, 177:9, 186:5, 187:3, 187:12, 200:4, 200:15, 210:20, 223:11, 230:16
**2004** [3] - 98:19, 176:25, 209:24
**2008** [2] - 1:11, 248:5
**2009** [1] - 248:10

## 203

**203** [1] - 247:13
**205** [1] - 247:14
**21** [1] - 124:2
**210** [1] - 247:14
**2100** [1] - 51:6
**21201** [1] - 1:25
**215** [1] - 247:16
**24** [3] - 64:6, 64:21, 247:5
**2401** [2] - 37:25, 47:23
**24th** [4] - 136:14, 137:5, 142:22, 208:10
**25th** [2] - 93:9, 195:22
**27th** [2] - 47:14, 49:2
**28th** [2] - 50:3, 51:7
**29** [1] - 247:5
**2:28** [1] - 49:21
**2:29** [1] - 49:23
**2:30** [5] - 117:11, 117:13, 117:20, 128:3, 130:18

## 3

**3** [4] - 38:10, 38:15, 73:11, 247:3
**30** [1] - 98:8
**31** [1] - 247:6
**32** [1] - 91:15
**35** [2] - 216:2, 247:7
**357** [2] - 234:11, 234:19
**36** [7] - 11:6, 11:11, 27:11, 28:18, 29:7, 29:10, 29:12
**38** [1] - 51:10
**3800** [2] - 51:12, 51:13
**3:00** [1] - 243:1
**3:30** [1] - 244:9
**3rd** [2] - 70:14, 90:2

## 4

**4** [3] - 48:3, 124:24
**40** [1] - 224:10
**40C** [1] - 134:4
**40D** [1] - 134:4
**40E** [1] - 134:4
**40F** [1] - 134:4
**41** [1] - 134:4
**410-542** [1] - 42:14
**4111** [1] - 51:16
**42** [1] - 134:4
**43** [1] - 134:5
**44** [1] - 134:5
**443-253** [1] - 42:16
**45** [5] - 43:10, 90:21, 128:21, 134:5, 234:11
**46** [1] - 134:5

## 48

**48** [1] - 241:8
**4:24** [2] - 47:14, 49:1
**4:30** [3] - 117:14, 128:4, 241:16
**4:47** [1] - 246:3
**4th** [1] - 42:6

## 5

**5** [1] - 92:22
**5,000** [3] - 229:12, 233:2, 233:3
**50** [5] - 8:4, 8:5, 10:8, 27:1, 30:13
**50,000** [1] - 229:14
**53** [1] - 247:8
**5515** [1] - 1:24
**5601** [1] - 51:23
**58** [1] - 247:8
**5811** [4] - 46:14, 46:15, 49:15, 49:17
**5811's** [1] - 49:18
**5:00** [1] - 60:22

## 6

**63** [1] - 247:10
**6:30** [1] - 199:1

## 7

**7** [2] - 92:22, 199:1
**718-858-4494** [1] - 26:24
**739-5811** [1] - 42:23
**75** [1] - 247:10
**7:30** [1] - 199:1
**7th** [4] - 5:1, 94:17, 127:11, 127:13

## 8

**8** [1] - 93:23
**846** [1] - 124:3
**88** [1] - 247:11
**8:30** [1] - 241:7

## 9

**90's** [2] - 96:23, 97:4
**91** [1] - 247:11
**917-798-4253** [1] - 26:20
**917-831-1324** [1] - 26:23
**9999** [1] - 49:6

## 9:00

**9:00** [1] - 51:6
**9:26** [1] - 51:6
**9:30** [1] - 236:9
**9:58** [1] - 51:6

## A

**a.m** [3] - 2:1, 62:5, 241:16
**ability** [1] - 193:8
**able** [22] - 56:25, 60:7, 60:16, 62:10, 65:16, 66:2, 68:23, 70:4, 81:1, 86:14, 110:9, 111:12, 130:2, 130:14, 145:11, 146:14, 156:19, 160:20, 185:6, 239:1, 242:11, 242:14
**abruptly** [1] - 39:11
**absolutely** [2] - 54:18, 238:25
**Absolutely** [4] - 22:2, 124:20, 237:22
**accent** [1] - 155:5
**acceptable** [1] - 215:5
**accessed** [1] - 55:18
**according** [4] - 10:2, 37:20, 120:7, 233:6
**account** [7] - 33:12, 41:9, 41:13, 41:18, 41:20, 41:22, 42:2
**accurate** [2] - 21:23, 248:8
**accusing** [1] - 122:18
**acquaintances** [1] - 200:15
**acting** [1] - 14:13
**activities** [2] - 178:23, 236:6
**activity** [1] - 173:1
**acts** [1] - 127:12
**actual** [3] - 45:7, 59:19, 142:22
**Adam** [2] - 1:22, 203:22
**additional** [8] - 17:12, 31:25, 88:25, 89:20, 89:21, 140:10, 156:17, 167:4
**address** [5] - 36:9, 41:14, 47:24, 50:19, 200:16
**addressed** [1] - 208:14
**addressing** [1] - 162:5
**adhere** [2] - 237:4, 237:5
**adhering** [1] - 236:24
**adjacent** [1] - 6:13
**Administration** [2] - 4:8, 4:15

**admissible** [3] - 121:19, 121:21, 124:16
**admissions** [1] - 127:8
**admit** [2] - 12:22, 25:10
**admits** [1] - 90:12
**admitted** [1] - 22:13
**adult** [1] - 172:2
**adults** [1] - 172:2
**advance** [1] - 237:18
**advantage** [1] - 110:17
**advise** [2] - 16:5, 16:7
**advised** [3] - 15:24, 16:12, 26:11
**affect** [1] - 239:22
**affidavit** [1] - 45:24
**affixed** [1] - 248:9
**afford** [1] - 90:16
**afraid** [4] - 37:15, 62:16, 160:5, 160:6
**afternoon** [27] - 47:15, 49:2, 51:1, 60:16, 61:7, 61:8, 75:16, 91:12, 91:13, 117:11, 117:12, 134:10, 134:11, 138:11, 171:22, 171:23, 188:17, 188:18, 195:19, 195:20, 203:20, 203:21, 215:24, 215:25, 239:11, 245:11
**age** [1] - 109:2
**agents** [1] - 98:16
**ages** [1] - 92:21
**ago** [8] - 30:4, 52:18, 192:7, 194:15, 217:5, 217:17, 217:18, 220:16
**agree** [2] - 130:9, 187:7
**agreed** [2] - 87:9, 211:17
**agreement** [5] - 213:11, 218:2, 218:3, 218:4, 244:14
**ahead** [11] - 16:21, 34:4, 57:21, 82:17, 83:21, 129:15, 170:13, 185:20, 211:22, 227:16, 235:9
**ain't** [1] - 229:6
**al** [1] - 248:5
**alcohol** [2] - 14:13, 14:17
**alert** [1] - 186:1
**alleged** [7] - 33:17, 33:18, 33:19, 123:10, 124:25, 127:17
**allegedly** [1] - 126:17
**allow** [4] - 193:1, 193:4, 193:18, 193:21
**allowed** [6] - 118:1, 191:6, 191:10, 193:10, 193:14, 245:15
**Almost** [1] - 174:8

**almost** [5] - 78:10, 78:11, 78:23, 174:3, 226:12
**alone** [2] - 39:4, 121:5
**Altoona** [10] - 120:24, 123:15, 123:22, 123:25, 124:19, 124:22, 126:14, 126:15, 126:19, 127:18
**AMD-04-029** [2] - 1:6, 248:5
**America** [3] - 125:12, 125:18, 125:19
**AMERICA** [1] - 1:5
**amount** [5] - 4:5, 9:18, 13:22, 26:25, 176:17
**amounts** [4] - 26:22, 96:17, 97:23, 98:3
**analyses** [1] - 191:9
**analysis** [1] - 121:16
**Andre** [1] - 1:13
**Andrea** [3] - 237:14, 239:20, 239:22
**answer** [41] - 19:19, 23:21, 25:6, 25:13, 28:5, 28:14, 49:18, 52:7, 56:9, 58:16, 72:18, 72:24, 73:2, 74:3, 74:6, 74:24, 75:18, 89:17, 104:3, 118:1, 145:22, 152:6, 152:17, 154:9, 157:4, 157:25, 160:3, 160:25, 163:7, 166:7, 191:16, 195:8, 196:12, 208:15, 208:23, 210:17, 214:4, 222:7, 226:19, 227:3
**answered** [12] - 18:19, 33:2, 43:13, 44:22, 47:9, 49:8, 49:9, 76:25, 77:6, 78:5, 208:6
**answering** [4] - 43:19, 58:8, 70:19, 157:7
**Anthony** [11] - 67:18, 68:7, 68:9, 68:13, 75:10, 89:8, 89:12, 101:16, 101:20, 135:9, 202:4
**anticipate** [2] - 62:23, 131:6, 131:24, 242:20, 243:10
**anticipated** [2] - 170:4, 244:8
**anticipates** [1] - 63:3
**anyway** [6] - 22:17, 26:6, 52:2, 58:24, 150:21, 154:17
**apartment** [2] - 100:12, 220:20
**Apartments** [1] - 220:24
**apartments** [4] - 100:8, 100:15, 100:18
**apologize** [4] - 76:1,

167:4, 167:9, 182:7
**appeal** [1] - 62:17
**appear** [8] - 35:4, 44:15, 46:22, 48:18, 55:4, 65:19, 65:22, 183:18
**appearances** [1] - 237:17
**Appearances** [1] - 1:15
**appeared** [2] - 25:22, 55:15
**apples** [1] - 122:24
**apply** [1] - 46:8
**applying** [1] - 127:10
**appreciate** [6] - 12:12, 125:11, 125:21, 127:20, 236:25, 241:3
**appreciated** [1] - 241:20
**approach** [2] - 128:2, 189:24
**Approach** [1] - 212:11
**appropriate** [3] - 7:22, 33:21, 33:24
**April** [6] - 64:6, 70:14, 73:11, 75:10, 90:2, 200:8
**area** [7] - 42:16, 43:3, 91:18, 94:25, 95:2, 100:4, 101:6
**arguing** [1] - 30:18
**argument** [5] - 89:20, 89:21, 124:14, 239:8, 240:23
**arguments** [3] - 122:23, 122:25, 127:20
**arm** [4] - 183:4, 183:7, 183:8
**arrange** [1] - 62:12
**arranged** [1] - 27:2
**arrangement** [1] - 244:22
**arrangements** [1] - 238:5
**array** [13] - 81:18, 81:19, 81:21, 168:2, 168:5, 169:4, 169:14, 209:13, 209:14, 209:15, 210:2, 212:9, 212:10
**arrest** [10] - 4:20, 4:23, 5:5, 5:8, 6:4, 6:20, 7:7, 7:16, 10:3, 27:21
**arrested** [5] - 5:17, 5:18, 119:22, 121:9, 121:11
**Arrington** [4] - 39:4, 39:13, 130:12, 236:6
**arrival** [1] - 26:11
**arrive** [1] - 67:11
**arrived** [4] - 5:22, 5:25, 67:13, 67:22
**articulated** [1] - 126:7

**Aside** [1] - 114:13
**aside** [3] - 10:24, 32:16, 123:12
**aspect** [1] - 117:19
**Assault** [1] - 217:13
**assess** [1] - 33:17
**Assessment** [1] - 41:19
**assessment** [1] - 90:15
**assessments** [1] - 30:25
**assigned** [5] - 4:3, 37:12, 38:2, 42:17, 43:1
**assignment** [2] - 36:11, 44:1
**assistance** [1] - 241:20
**associated** [8] - 28:11, 189:11, 190:10, 192:9, 192:14, 192:18, 194:22, 195:6
**association** [3] - 132:6, 180:10, 189:15
**associations** [2] - 181:6
**assume** [7] - 57:16, 61:7, 178:3, 181:16, 182:22, 203:3, 240:9
**assumed** [1] - 175:5
**assuming** [1] - 238:25
**assure** [1] - 15:19
**ate** [1] - 143:6
**attach** [1] - 18:10
**attempts** [3] - 47:7, 156:17, 196:4
**attendant** [1] - 90:9
**attended** [1] - 192:4
**attention** [8] - 5:1, 41:25, 47:12, 47:13, 79:19, 154:22, 181:9, 223:7
**attitude** [2] - 234:22, 235:10
**attorney** [3] - 7:11, 21:20, 216:14
**attorneys** [2] - 188:19, 244:11
**audience** [1] - 245:19
**authenticate** [1] - 41:8
**automatic** [2] - 234:11, 234:20
**available** [2] - 33:13, 39:4
**Avenue** [10] - 37:25, 47:21, 47:23, 48:5, 48:6, 48:7, 49:1, 51:10, 51:13, 51:21
**avoid** [2] - 236:12, 243:16
**aware** [8] - 18:22, 32:25, 64:14, 119:21, 155:19, 180:20, 182:23, 232:15

**awareness** [1] - 138:12
**awful** [1] - 199:9

## B

**baby** [3] - 94:8, 136:25, 137:1
**background** [7] - 76:17, 154:6, 156:22, 157:9, 164:24, 233:22, 235:6
**backwards** [1] - 64:7
**Bacon** [3] - 225:18, 225:22, 226:3
**bad** [18] - 118:16, 119:4, 121:11, 126:24, 131:14
**badge** [1] - 7:6
**bag** [24] - 106:15, 106:24, 106:25, 137:11, 137:13, 137:15, 139:3, 139:25, 140:6, 140:9, 140:25, 141:14, 141:15, 142:2, 142:4, 142:12, 142:15, 149:1, 149:2, 149:7, 149:18, 149:22, 232:7
**bags** [16] - 106:18, 106:21, 140:1, 140:10, 140:12, 140:25, 142:9, 142:10, 142:20, 148:14, 148:19, 148:22, 148:24, 149:13, 149:15, 175:12
**bald** [1] - 220:7
**ballpark** [2] - 92:8, 92:11, 153:3
**Baltimore** [36] - 1:12, 1:25, 10:21, 27:9, 37:25, 42:11, 42:14, 42:15, 42:16, 42:17, 50:10, 50:17, 50:20, 50:21, 50:22, 51:17, 51:23, 52:13, 52:14, 91:17, 91:18, 91:21, 100:5, 104:21, 109:24, 110:1, 126:18, 146:11, 178:10, 190:11, 221:5, 223:21, 231:15, 231:17, 231:18
**bar** [2] - 90:3, 162:11
**bare** [1] - 125:2
**barely** [2] - 65:14, 164:25
**barrack** [3] - 3:19, 6:3, 26:9
**barracks** [5] - 5:4, 5:23, 6:12
**Barry** [1] - 1:22
**based** [8] - 36:6, 63:6, 87:2, 127:10, 127:16, 165:16, 191:7, 191:21
**basis** [2] - 172:6, 191:7

**bathroom** [1] - 21:14
**battery** [3] - 157:1, 157:5, 157:6
**bearing** [1] - 34:7, 37:23, 42:22
**beating** [1] - 233:19
**became** [1] - 11:7
**become** [4] - 28:11, 93:20, 101:10, 174:4
**becoming** [1] - 4:1
**bedroom** [1] - 195:23
**beeps** [2] - 84:6, 115:7
**begin** [6] - 6:16, 7:17, 7:20, 67:22, 143:3, 147:22
**beginning** [6] - 6:7, 133:25, 210:22, 226:15, 240:20, 244:15
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behind** [2] - 7:5, 139:10
**belief** [2] - 96:23, 161:16
**belonged** [1] - 165:2
**belongings** [1] - 78:16
**belongs** [1] - 42:15
**belt** [2] - 193:8, 193:12
**Belvedere** [2] - 51:10, 51:13
**benefit** [3] - 32:13, 48:3, 124:12
**Benz** [1] - 38:25
**best** [1] - 67:3
**bet** [1] - 36:16
**better** [8] - 39:6, 121:23, 130:4, 204:18, 204:20, 204:24, 229:12, 236:20
**Between** [1] - 187:12
**between** [22] - 38:9, 57:12, 59:11, 61:2, 65:2, 65:4, 69:13, 84:5, 102:3, 105:25, 107:22, 109:4, 118:16, 119:5, 120:6, 120:7, 127:3, 143:5, 143:15, 213:22, 230:21, 242:22
**beyond** [2] - 33:20, 58:12
**Bible** [5] - 137:17, 176:20, 176:23, 177:20, 177:22
**big** [4] - 50:6, 92:23, 110:6, 177:21
**Bigger** [1] - 176:21
**bigger** [3] - 97:25, 98:1, 137:17
**bill** [8] - 43:10, 43:11, 43:12, 47:2, 54:15, 55:4, 55:22, 56:16

**billed** [10] - 54:13, 54:21, 56:4, 56:12, 56:18, 56:22, 57:4, 57:6, 58:9, 59:11
**Billing** [1] - 59:5
**billing** [11] - 47:3, 53:18, 53:21, 54:4, 56:1, 56:2, 56:3, 56:16, 59:2, 59:4, 59:9
**bills** [3] - 40:18, 44:15, 125:9
**birth** [1] - 17:7
**bit** [21] - 12:7, 34:3, 39:10, 48:24, 49:5, 77:14, 95:14, 97:24, 122:24, 137:17, 144:17, 150:17, 179:12, 188:6, 200:21, 207:13, 230:12, 235:1, 239:7, 239:18
**black** [2] - 168:23, 227:4
**Blandon** [2] - 67:17, 71:16
**block** [3] - 7:1, 7:2, 50:23
**blocks** [3] - 50:22, 52:9
**blood** [5] - 118:16, 119:4, 121:12, 126:24, 131:14
**Bo** [83] - 63:8, 71:24, 72:2, 80:12, 80:15, 80:22, 81:2, 81:21, 82:19, 83:6, 86:14, 86:22, 87:6, 87:18, 88:1, 88:2, 88:8, 112:7, 112:8, 112:19, 112:23, 113:2, 113:14, 114:21, 116:5, 116:8, 118:3, 118:7, 118:16, 119:4, 131:9, 132:6, 132:15, 134:21, 134:24, 144:24, 145:18, 145:19, 146:1, 146:14, 146:15, 146:25, 147:4, 161:21, 164:10, 164:12, 169:2, 169:3, 169:10, 170:11, 170:15, 170:23, 171:2, 171:5, 179:19, 181:1, 181:6, 181:10, 181:11, 181:12, 181:15, 184:8, 187:16, 189:13, 189:17, 190:6, 190:8, 190:9, 205:12, 206:4, 206:17, 206:22, 207:2, 208:1, 208:2, 208:14, 208:16, 208:20, 209:1, 210:21
**Bo's** [5] - 82:3, 84:22, 86:5, 88:3, 88:6, 123:20, 184:4, 202:15
**board** [1] - 243:24

**bogged** [1] - 132:7
**Bond** [3] - 5:8, 15:16, 20:10
**book** [30] - 106:15, 106:18, 106:21, 106:24, 106:25, 137:11, 137:13, 137:15, 139:3, 141:14, 141:15, 142:2, 142:4, 142:9, 142:10, 142:12, 142:15, 142:19, 148:14, 148:19, 148:22, 148:24, 149:1, 149:2, 149:7, 149:13, 149:15, 149:18, 149:22
**books** [1] - 106:18
**bored** [2] - 238:25, 239:5
**boring** [1] - 132:24
**born** [2] - 91:16, 94:8
**borne** [1] - 175:14
**bottom** [3] - 40:2, 168:17, 168:20
**bought** [3] - 13:18, 231:1
**Bought** [1] - 13:19
**Boulevard** [1] - 51:23
**bounce** [2] - 52:3, 52:6
**boxer** [2] - 189:9, 233:22
**boyfriend** [1] - 93:24
**Boys** [1] - 92:19
**boys** [1] - 92:20
**break** [14] - 53:4, 60:11, 60:12, 62:11, 117:9, 117:14, 128:4, 131:2, 215:5, 226:8, 228:16, 239:14, 243:1, 244:20
**break-ins** [2] - 226:8, 228:16
**brick** [1] - 172:13
**brief** [6] - 139:3, 174:24, 177:13, 177:17, 177:19, 177:22
**briefed** [1] - 89:22
**briefly** [3] - 61:5, 205:21, 235:22
**Briefly** [5] - 12:19, 29:3, 31:21, 155:25, 211:2
**Bring** [2] - 2:5, 62:21
**bring** [2] - 6:6, 215:6
**bringing** [1] - 188:3
**broader** [1] - 47:5
**Broadway** [1] - 26:17
**broke** [3] - 134:12, 228:18, 228:20
**broken** [1] - 228:17
**Brother** [1] - 101:14
**brother** [11] - 67:18, 68:6, 69:14, 75:9, 101:13, 101:15, 135:10,

147:24, 201:12, 218:22, 219:8
**brothers** [4] - 68:3, 75:2, 89:6, 89:7
**brought** [3] - 33:4, 181:8, 242:1
**brownish** [1] - 140:18
**bruise** [1] - 227:18
**bruises** [2] - 227:20, 227:21
**Bryant** [12] - 89:8, 110:23, 110:25, 111:13, 111:14, 113:14, 114:14, 114:18, 205:13, 205:19, 216:18, 216:20
**Bryant's** [4] - 109:22, 109:23, 174:11, 174:12
**build** [1] - 99:1
**bullet** [1] - 188:12
**bump** [1] - 206:7
**bumped** [2] - 162:10, 205:16
**bunch** [4] - 50:25, 71:5, 71:6, 126:17
**burial** [2] - 165:23, 166:5
**business** [30] - 106:19, 109:18, 109:21, 110:10, 111:10, 111:13, 114:15, 121:13, 131:20, 131:22, 135:5, 156:11, 172:19, 173:7, 174:1, 192:9, 199:6, 207:20, 221:8, 222:10, 224:12, 224:19, 224:24, 225:3, 225:10, 231:17, 233:8, 233:10, 235:2
**businesses** [1] - 172:23
**button** [3] - 196:16, 220:5, 220:6
**button-up** [1] - 220:6
**buy** [9] - 8:1, 8:2, 9:5, 147:9, 166:17, 176:9, 230:16, 230:18
**buying** [1] - 230:23
**BY** [66] - 3:15, 14:2, 16:11, 16:22, 18:21, 19:5, 22:11, 24:15, 27:17, 29:5, 31:23, 34:5, 35:23, 39:18, 45:3, 45:18, 50:24, 53:14, 58:22, 63:20, 75:14, 79:16, 81:9, 82:18, 83:22, 89:2, 91:11, 134:9, 167:7, 168:14, 171:14, 171:21, 182:6, 188:16, 190:5, 190:22, 191:25, 195:9, 195:18, 203:19, 205:9, 208:25, 211:1, 212:16, 215:23,

222:8, 247:3, 247:4, 247:4, 247:5, 247:5, 247:6, 247:7, 247:8, 247:8, 247:10, 247:10, 247:11, 247:11, 247:12, 247:12, 247:13, 247:13, 247:14, 247:14, 247:16
**bypasses** [1] - 56:16
**Byron** [1] - 66:19

**C**

**calendar** [1] - 242:25
**call's** [1] - 49:8
**caller** [2] - 43:4, 48:18
**canceled** [3] - 42:2, 42:4, 42:5
**candidly** [2] - 123:23, 185:13
**candor** [1] - 122:7
**cap** [1] - 245:15
**car** [37] - 10:25, 11:1, 15:25, 16:8, 16:16, 19:16, 19:24, 65:20, 65:23, 77:14, 105:6, 105:21, 106:7, 147:9, 147:10, 148:15, 148:19, 148:22, 148:24, 151:23, 152:3, 152:14, 193:1, 193:5, 193:7, 193:15, 193:18, 193:21, 205:22, 224:1, 224:2, 224:4, 229:19, 229:21, 232:6, 232:9
**Card** [11] - 108:17, 108:19, 108:21, 109:4, 109:5, 109:11, 109:15, 175:25, 176:4, 176:11
**care** [4] - 94:22, 136:10, 240:14, 243:8
**careful** [5] - 62:21, 192:21, 192:25, 193:10, 193:18
**carried** [1] - 142:10
**carriers** [2] - 55:23, 59:3
**carry** [7] - 106:18, 115:6, 142:14, 229:19, 234:5, 234:14
**cars** [2] - 20:12, 232:13
**CASE** [1] - 1:6
**Case** [1] - 248:5
**case** [25] - 16:20, 16:23, 17:1, 18:23, 33:14, 38:13, 40:25, 62:1, 62:17, 98:19, 99:2, 117:19, 177:13, 177:17, 177:19, 177:22, 195:11, 209:23, 235:23, 236:1,

236:2, 236:13, 236:15, 244:15

**cash** [3] - 111:9, 172:15, 172:16

**catch** [1] - 161:7

**category** [1] - 30:1

**Catonsville** [2] - 42:12, 224:11

**caught** [1] - 78:2

**caution** [1] - 245:21

**CD's** [3] - 106:23, 130:13, 148:24

**CDS** [2] - 27:7, 32:22

**ceasing** [1] - 173:1

**cell** [86] - 7:1, 7:2, 12:1, 36:25, 37:5, 37:11, 37:23, 38:9, 38:12, 38:21, 39:24, 40:5, 40:6, 40:9, 40:10, 40:11, 40:17, 40:19, 40:20, 45:23, 46:19, 47:9, 47:18, 47:20, 48:10, 48:12, 48:25, 49:1, 49:9, 49:22, 50:4, 50:7, 51:2, 51:9, 51:16, 51:21, 51:23, 52:2, 52:3, 52:6, 52:8, 52:9, 52:11, 52:13, 52:20, 54:2, 54:3, 66:5, 66:14, 69:22, 70:6, 70:7, 76:14, 77:16, 79:12, 79:13, 79:14, 79:22, 84:7, 84:10, 85:21, 115:3, 115:22, 129:2, 145:6, 145:8, 145:20, 149:15, 149:18, 153:20, 156:17, 156:25, 159:13, 159:14, 159:15, 160:11, 164:22, 183:16, 196:10, 196:21, 199:21, 203:10, 224:1, 224:8

**cells** [1] - 6:13

**center** [4] - 9:25, 10:15, 166:19, 201:17

**certain** [15] - 4:5, 74:8, 125:19, 133:22, 164:2, 175:10, 199:23, 202:14, 202:17, 202:19, 202:21, 202:22, 202:23, 210:12, 245:20

**Certainly** [3] - 28:1, 130:17, 212:12

**certainly** [8] - 8:11, 53:10, 193:24, 198:22, 202:2, 233:3, 239:7, 245:23

**certainty** [2] - 90:14, 213:22

**CERTIFICATE** [1] - 248:1

**certify** [2] - 248:3, 248:6

**chair** [1] - 7:4

**chairs** [2] - 62:1, 117:18

**chance** [2] - 204:13, 240:1

**change** [6] - 38:18, 70:25, 71:1, 109:3, 185:25

**changed** [2] - 144:10, 144:17

**changing** [1] - 188:5

**characterizing** [1] - 184:19

**charge** [2] - 4:17, 217:25

**charged** [4] - 47:1, 126:4, 126:9, 235:4

**charges** [2] - 18:22, 22:23

**chart** [1] - 126:5

**chat** [1] - 61:5

**chatter** [2] - 120:23, 123:14

**check** [6] - 10:18, 54:7, 70:7, 115:24, 239:12, 240:15

**checked** [1] - 240:17

**checking** [2] - 131:1, 150:14

**child** [1] - 136:23

**children** [13] - 92:15, 92:17, 93:10, 94:22, 95:12, 136:5, 136:20, 143:22, 143:24, 144:5, 144:12, 147:17, 148:9

**children's** [1] - 92:25

**Chris** [1] - 237:13

**Christian** [1] - 181:16

**church** [4] - 143:4, 143:6, 143:9, 143:14

**Church** [1] - 143:15

**Circle** [1] - 48:5

**circumstances** [1] - 109:6

**circumstantial** [1] - 90:10

**City** [6] - 37:25, 52:8, 52:16, 100:5, 146:11, 190:11

**city** [7] - 13:10, 42:19, 50:22, 50:23, 52:17, 146:10

**claim** [1] - 120:13

**clarification** [4] - 49:19, 130:24, 131:14, 240:5

**clarified** [1] - 237:3

**clarify** [5] - 57:20, 58:23, 133:22, 186:23, 213:12

**clarifying** [2] - 13:3, 134:6

**clear** [19] - 7:23, 9:7, 10:6, 13:8, 25:23, 34:1, 62:19, 89:9, 99:8, 115:2, 121:12, 122:9, 122:15, 127:9, 184:2, 184:3, 205:6, 209:15, 236:23

**Clearly** [1] - 120:6

**clearly** [1] - 90:9

**clerk** [2] - 35:15, 215:12

**CLERK** [5] - 3:11, 35:19, 63:16, 91:7, 215:15

**Clerk's** [1] - 237:4

**click** [1] - 54:12

**clicks** [1] - 55:2

**client** [3] - 22:13, 124:16

**Close** [1] - 3:22

**close** [4] - 34:9, 128:15, 130:6, 154:22

**closed** [1] - 193:15

**Closed** [1] - 7:5

**closer** [4] - 52:21, 64:5, 150:22, 177:8

**closest** [1] - 112:14

**closet** [11] - 137:11, 139:3, 139:5, 139:8, 139:11, 139:14, 139:22, 141:9, 149:6

**closing** [1] - 124:14

**clothed** [1] - 165:23

**clothes** [2] - 166:9, 166:17

**clothing** [4] - 166:11, 201:11, 202:4, 220:3

**club** [3] - 190:11, 190:13, 190:15

**Club** [3] - 190:17, 190:18, 190:23

**clue** [1] - 228:15

**co** [2] - 33:18, 240:1

**Co** [1] - 25:19

**co-conspirator** [1] - 33:18

**Co-conspirators** [1] - 25:19

**co-counsel** [1] - 240:1

**coats** [1] - 139:7

**COBURN** [18] - 19:5, 22:11, 25:5, 25:11, 27:23, 28:4, 29:1, 31:23, 34:5, 39:17, 58:20, 221:21, 222:1, 222:6, 241:17, 246:2, 247:4, 247:6

**Coburn** [11] - 1:22, 2:12, 25:21, 31:21, 33:4, 34:2, 34:4, 238:19, 239:1, 239:21, 240:4

**Coburn's** [4] - 2:6, 33:8,

33:22, 241:15

**cocaine** [23] - 8:2, 8:3, 8:8, 10:10, 10:12, 10:20, 11:14, 11:15, 12:23, 23:17, 26:15, 26:22, 26:25, 27:8, 27:11, 28:19, 29:13, 29:19, 138:19, 138:22, 230:15, 231:4

**Cocaine** [3] - 8:22, 11:13, 230:3

**Cockeysville** [4] - 95:5, 95:6, 95:20, 136:15

**coconspirator** [8] - 118:9, 119:25, 120:14, 121:10, 121:11, 127:17, 132:10

**Code** [1] - 124:3

**code** [7] - 37:11, 37:24, 42:17, 43:3, 84:17, 115:19, 160:13

**coerce** [1] - 21:3

**collection** [1] - 203:8

**color** [2] - 137:25, 221:20

**column** [2] - 43:8, 49:10

**comfortable** [3] - 61:4, 225:1, 233:11

**Coming** [1] - 15:5

**coming** [9] - 12:8, 51:20, 52:23, 61:16, 62:7, 65:19, 148:4, 183:25, 210:11

**common** [2] - 138:22, 200:15

**communicate** [1] - 130:25

**communicated** [1] - 55:19

**communication** [1] - 57:12

**community** [1] - 201:5

**companies** [4] - 55:22, 57:15, 58:14, 58:25

**company** [7] - 56:6, 59:5, 223:21, 223:24, 223:25, 224:5, 224:6

**comparison** [1] - 166:4

**compendium** [3] - 36:25, 37:20, 50:6

**complain** [1] - 243:21

**complete** [2] - 25:24, 248:8

**completed** [1] - 47:6

**completely** [3] - 21:5, 21:23, 45:11

**complex** [2] - 100:12, 220:20

**compliance** [1] - 36:15

**computer** [1] - 41:15

**concealed** [4] - 10:20, 23:11, 23:20, 27:8

**concerned** [7] - 20:2, 131:20, 132:16, 135:5, 192:9, 193:14, 199:4

**concerning** [3] - 192:13, 192:25, 236:15

**concerns** [1] - 129:18

**conclude** [3] - 60:16, 235:20, 236:4

**Conclusion** [1] - 246:3

**conclusions** [1] - 165:16

**concurrent** [1] - 217:21

**Conduct** [1] - 236:14

**conduct** [3] - 4:23, 22:14, 236:11

**conducted** [2] - 26:10, 238:22

**conducting** [2] - 5:10, 6:25

**confession** [1] - 23:24

**confirm** [2] - 87:1, 151:25

**confirmed** [1] - 87:6

**confrontation** [1] - 235:13

**confronting** [1] - 233:20

**confused** [1] - 76:10

**confusing** [1] - 173:21

**confusion** [1] - 132:25

**connect** [1] - 231:2

**connected** [4] - 45:1, 45:6, 77:16, 77:23

**connection** [8] - 43:18, 43:20, 43:24, 53:22, 57:7, 58:3, 87:5, 118:6

**connects** [1] - 53:24

**consecutive** [1] - 204:11

**consensus** [1] - 87:17

**consented** [1] - 20:12

**consider** [2] - 33:14, 125:3

**considered** [3] - 171:12, 224:10, 235:3

**considering** [1] - 120:14

**consignment** [4] - 230:19, 230:20, 230:23, 231:2

**console** [2] - 9:25, 10:15

**conspiracies** [6] - 122:14, 122:16, 123:1, 124:11, 124:24

**conspiracy** [47] - 99:5, 120:1, 120:4, 120:5, 120:6, 120:9, 120:13,

120:15, 120:18, 120:23, 121:1, 121:3, 121:5, 122:1, 122:2, 122:10, 123:4, 123:5, 123:7, 123:8, 123:9, 123:11, 123:13, 123:16, 124:1, 124:17, 124:19, 124:24, 124:25, 125:5, 125:12, 125:20, 125:25, 126:4, 126:9, 126:13, 126:18, 126:20, 126:21, 127:3, 127:14, 127:18, 127:19

**conspirator** [1] - 33:18
**conspiratorial** [1] - 121:13
**conspirators** [2] - 25:19, 125:10
**constant** [1] - 61:1
**constitute** [1] - 248:6
**constitutional** [1] - 26:12
**Construction** [1] - 216:13
**consultation** [1] - 236:19
**contact** [3] - 26:16, 54:11, 238:9
**contacted** [1] - 26:18
**contacting** [1] - 4:17
**contacts** [1] - 23:9
**contain** [1] - 46:7
**contained** [2] - 33:6, 33:9
**contains** [3] - 37:16, 41:16, 185:10
**contemplated** [1] - 62:25
**context** [1] - 146:8
**Continue** [2] - 62:2, 236:12
**continue** [8] - 3:4, 39:8, 49:2, 50:25, 133:14, 133:18, 133:19, 236:15
**continued** [1] - 152:19
**CONTINUED** [1] - 134:8
**continues** [1] - 49:21
**continuing** [1] - 132:19
**contours** [1] - 125:24
**control** [1] - 244:10
**controlled** [1] - 32:22
**conveniently** [1] - 123:18
**conversation** [33] - 43:17, 44:5, 44:10, 44:12, 44:19, 45:7, 59:11, 59:13, 59:16, 59:20, 60:2, 64:25, 65:2, 66:23, 67:2, 67:25, 69:13, 105:7, 105:10, 105:11, 114:21, 119:13,

124:4, 145:12, 163:2, 174:18, 186:4, 186:8, 186:9, 187:16, 196:12, 198:4, 204:14
**conversations** [11] - 21:5, 21:8, 87:10, 89:23, 103:9, 157:9, 192:12, 192:16, 192:20, 192:24, 193:3
**convicted** [2] - 217:10, 217:12
**conviction** [2] - 217:14, 239:25
**convictions** [4] - 217:14, 217:15, 217:16, 217:19
**cooperation** [1] - 218:4
**coordination** [1] - 4:14, 4:16
**copy** [1] - 189:21
**Corinthian's** [6] - 162:11, 162:23, 163:13, 179:17, 204:8
**corner** [3] - 102:2, 110:8, 175:11
**corners** [1] - 172:8
**Corporal** [1] - 19:6
**corporal's** [4] - 6:13, 7:2, 7:3, 12:15
**Correct** [47] - 21:1, 21:10, 21:18, 21:22, 34:11, 37:4, 39:22, 40:16, 40:21, 41:24, 43:3, 43:18, 44:4, 44:23, 45:8, 45:10, 47:4, 47:8, 48:15, 48:17, 49:13, 51:18, 51:24, 53:23, 54:20, 54:22, 55:10, 55:14, 55:20, 56:13, 56:24, 57:5, 57:8, 58:11, 59:13, 59:17, 59:21, 60:4, 84:3, 101:19, 155:11, 172:4, 175:7, 198:3, 200:22, 203:2
**correct** [106] - 9:12, 12:9, 12:10, 12:16, 13:12, 14:10, 15:25, 20:20, 20:21, 20:25, 22:1, 23:20, 31:17, 36:17, 37:3, 37:8, 37:21, 39:19, 40:6, 40:20, 42:23, 43:2, 43:17, 43:21, 44:3, 44:6, 44:7, 45:13, 45:14, 46:4, 46:17, 47:3, 47:17, 47:18, 47:21, 48:1, 48:7, 48:12, 48:19, 48:22, 49:12, 49:16, 49:23, 50:8, 51:7, 53:22, 54:1,

54:13, 54:14, 54:25, 55:6, 55:16, 55:17, 56:4, 56:5, 56:19, 56:23, 56:25, 57:4, 59:6, 59:16, 59:24, 62:20, 64:18, 64:22, 64:25, 72:22, 73:14, 73:24, 74:4, 74:11, 75:4, 75:10, 76:4, 79:18, 80:2, 81:21, 116:3, 118:5, 118:10, 131:1, 143:1, 155:10, 165:15, 172:3, 173:16, 175:6, 176:17, 177:6, 195:11, 196:19, 196:22, 197:13, 197:22, 198:2, 200:1, 201:9, 201:21, 203:1, 209:16, 217:23, 218:8, 233:14, 234:1, 238:13, 242:23
**correctly** [9] - 9:12, 22:19, 28:17, 28:18, 32:1, 118:6, 124:10, 140:9, 170:22
**corroboration** [1] - 119:18
**couch** [1] - 195:23
**counsel** [13] - 16:20, 60:16, 62:21, 98:25, 103:4, 122:7, 211:17, 236:19, 238:21, 239:2, 239:8, 240:1, 240:20
**Counsel** [4] - 39:15, 240:15, 245:6, 245:25
**count** [10] - 97:13, 97:14, 97:17, 97:24, 98:5, 98:9, 106:11, 114:19, 141:18, 141:22
**counted** [2] - 131:22, 141:24
**counting** [2] - 98:10, 99:9
**countless** [1] - 56:21
**County** [4] - 91:21, 143:8, 144:12, 148:25
**couple** [43] - 8:14, 42:7, 52:9, 58:24, 60:18, 78:17, 89:3, 94:10, 94:22, 98:6, 100:24, 115:2, 116:11, 128:17, 130:15, 135:8, 136:13, 141:10, 158:5, 159:19, 161:9, 167:10, 167:13, 176:16, 181:4, 203:23, 204:6, 204:7, 207:11, 211:2, 217:5, 226:25, 228:6, 228:7, 228:23, 228:24, 236:23, 238:16, 239:11, 240:15, 244:6, 245:18
**coupling** [1] - 94:18

**course** [21] - 7:12, 33:11, 35:6, 39:16, 98:22, 120:17, 121:25, 124:20, 127:6, 147:21, 150:12, 162:1, 163:2, 167:6, 171:9, 191:5, 203:15, 243:22, 244:10, 245:7
**COURT** [268] - 1:1, 2:2, 2:6, 2:9, 2:12, 2:16, 2:18, 2:21, 3:2, 3:8, 12:5, 16:10, 16:19, 18:20, 19:19, 20:15, 22:10, 25:6, 25:13, 26:5, 26:8, 27:5, 27:15, 27:24, 28:5, 28:14, 29:3, 30:18, 31:21, 32:24, 34:17, 34:24, 35:2, 35:7, 35:11, 39:3, 39:7, 39:10, 39:14, 40:23, 44:22, 45:16, 50:18, 50:21, 53:8, 57:16, 57:21, 60:7, 60:13, 60:20, 60:23, 61:1, 61:11, 61:14, 61:21, 61:23, 62:6, 62:9, 62:14, 62:21, 63:1, 63:9, 63:12, 64:4, 67:3, 72:24, 73:2, 74:6, 76:10, 76:14, 76:16, 76:19, 76:22, 77:3, 77:5, 77:9, 77:12, 77:15, 77:19, 77:22, 77:25, 78:5, 78:8, 78:19, 78:22, 78:25, 79:2, 79:6, 79:10, 79:14, 79:21, 81:15, 81:17, 81:23, 82:7, 82:13, 82:16, 83:16, 83:21, 88:5, 88:18, 88:22, 89:17, 89:19, 90:4, 90:6, 90:23, 91:3, 102:8, 103:7, 104:3, 105:9, 112:18, 117:7, 117:22, 117:24, 118:8, 118:11, 118:17, 118:22, 119:2, 119:6, 119:10, 119:13, 119:16, 119:20, 119:22, 119:25, 120:6, 120:10, 120:12, 121:4, 121:8, 121:16, 121:21, 122:3, 122:6, 122:13, 122:21, 122:25, 123:17, 124:2, 124:6, 124:12, 124:18, 124:20, 125:6, 125:11, 125:17, 127:4, 127:25, 128:8, 128:10, 128:14, 128:19, 128:25, 129:4, 129:9, 129:14, 129:19, 129:22, 130:4, 130:9, 130:12, 130:18, 130:22, 131:4, 132:1, 132:5, 132:12, 132:14, 132:21, 132:23,

133:4, 133:6, 133:11, 133:14, 133:17, 134:6, 145:22, 152:6, 152:17, 154:9, 160:3, 160:25, 163:7, 166:7, 167:1, 167:6, 167:18, 168:13, 168:18, 171:9, 182:3, 182:5, 186:23, 188:8, 189:25, 190:3, 190:18, 190:20, 191:2, 195:8, 208:23, 210:17, 211:17, 211:22, 211:25, 212:2, 212:6, 212:9, 212:12, 212:14, 212:18, 214:4, 214:17, 214:24, 215:2, 215:9, 215:11, 215:18, 215:21, 220:10, 221:22, 222:2, 222:7, 226:19, 227:3, 227:16, 234:25, 235:16, 235:18, 235:25, 237:11, 237:22, 237:25, 238:3, 238:11, 238:14, 238:18, 239:6, 239:14, 239:16, 240:9, 240:18, 240:25, 241:4, 241:6, 241:13, 241:18, 242:13, 242:18, 242:24, 243:4, 243:7, 243:9, 243:13, 243:20, 243:22, 244:7, 244:12, 244:17, 244:20, 244:24, 245:1, 245:4, 245:6, 245:14
**court** [9] - 36:15, 90:3, 101:23, 103:2, 112:8, 133:23, 157:16, 186:17, 218:7
**Court** [21] - 50:17, 50:18, 53:3, 62:25, 90:6, 90:7, 92:1, 121:25, 123:9, 124:9, 125:15, 126:2, 128:7, 129:12, 131:13, 191:16, 205:25, 236:1, 236:5, 245:15, 248:15
**Court's** [8] - 51:9, 53:1, 81:6, 88:16, 127:21, 129:17, 133:9, 237:15
**court-ordered** [1] - 36:15
**Courthouse** [1] - 1:24
**courtroom** [14] - 3:1, 90:22, 117:21, 117:23, 130:20, 130:21, 133:13, 133:16, 219:24, 221:16, 237:10, 245:7, 245:16, 245:17
**courtrooms** [1] - 36:16
**cover** [4] - 41:9, 52:12, 128:25, 211:19
**Crack** [1] - 10:10

**crack** [10] - 10:12, 10:16, 10:20, 11:14, 12:22, 26:25, 27:8, 27:11, 28:19, 29:13
**Craig** [3] - 66:18, 66:19, 198:10
**crazy** [1] - 170:16
**credence** [1] - 90:16
**crime** [2] - 217:10, 217:12
**criminal** [2] - 22:14, 99:2
**CRIMINAL** [1] - 1:6
**CROSS** [14] - 14:1, 19:4, 53:13, 171:20, 188:15, 195:17, 203:18, 247:4, 247:4, 247:8, 247:12, 247:12, 247:13, 247:13
**cross** [12] - 28:8, 28:9, 33:4, 33:8, 33:22, 33:25, 128:24, 239:23, 242:3, 243:25, 244:14, 245:3
**Crowe** [1] - 1:20, 63:21, 80:4, 87:13, 88:24, 89:20, 124:6, 125:21, 213:21
**CROWE** [24] - 63:20, 89:2, 89:18, 89:21, 104:2, 105:8, 124:9, 124:15, 124:19, 125:1, 125:8, 125:14, 125:22, 154:8, 160:24, 163:6, 166:6, 166:22, 195:18, 210:16, 211:24, 247:10, 247:11, 247:13
**Crowe's** [1] - 75:18
**Cup** [2] - 223:20, 225:15
**custodian** [2] - 35:4, 36:13
**custody** [4] - 128:8, 128:11, 238:1, 238:8
**customer** [2] - 44:25, 56:16
**customers** [3] - 47:1, 234:23, 235:11
**cut** [3] - 153:19, 232:22, 235:13
**cutting** [1] - 123:17

**D**

**D-E-N-H-A-M** [1] - 215:20
**D-W-A-Y-N-E** [1] - 215:20
**Damita** [2] - 242:5, 243:12

**danger** [1] - 238:9
**dangerous** [2] - 32:22, 199:6
**Darryl** [116] - 70:20, 78:10, 93:1, 93:2, 93:13, 93:24, 94:2, 94:10, 94:22, 95:7, 95:9, 95:14, 96:24, 97:4, 99:16, 99:17, 99:18, 101:14, 101:15, 103:23, 104:1, 104:6, 104:10, 104:14, 104:24, 104:25, 105:6, 105:12, 105:16, 108:15, 108:22, 109:4, 109:5, 110:9, 110:22, 112:24, 112:25, 113:5, 113:8, 113:18, 114:5, 115:10, 116:22, 117:3, 118:2, 119:5, 131:8, 134:13, 143:4, 144:25, 148:2, 148:16, 148:20, 150:6, 150:11, 150:19, 154:24, 155:20, 156:1, 183:4, 196:5, 196:9, 197:20, 197:21, 202:4, 205:17, 218:10, 218:17, 219:1, 219:7, 219:10, 219:13, 220:14, 221:8, 221:11, 221:25, 222:4, 222:5, 222:10, 222:12, 222:15, 222:22, 223:4, 223:8, 223:9, 223:23, 224:6, 224:12, 224:18, 225:18, 225:22, 226:3, 226:4, 226:7, 226:16, 227:11, 230:4, 230:15, 231:17, 231:19, 231:24, 232:1, 232:2, 232:6, 232:11, 232:15, 233:1, 233:4, 233:16, 233:21, 234:3, 234:12, 235:2
**Darryl's** [10] - 76:5, 159:24, 199:21, 219:8, 219:17, 231:4, 232:19, 234:6, 234:22, 235:10
**date** [4] - 17:7, 119:13, 119:16, 119:17
**dates** [1] - 205:10
**Daubert** [1] - 238:22
**daughter** [2] - 151:2, 151:21
**David** [2] - 237:14, 239:19, 239:22, 240:11
**Davis** [1] - 1:13
**days** [21] - 69:16, 69:18, 70:18, 80:2, 126:14, 136:13, 136:22, 137:5, 141:10, 159:4, 159:5, 159:19, 165:19, 176:16, 199:12, 221:1, 236:10,

236:18, 243:8
**DC** [5] - 147:8, 147:10, 147:11, 147:12, 147:24
**DEA** [7] - 4:6, 4:10, 4:19, 4:21, 17:6, 24:22, 25:23
**DEA-6** [1] - 20:6
**dead** [5] - 78:10, 78:11, 78:18, 157:1, 157:6
**deal** [4] - 13:12, 123:20, 173:1, 217:9
**dealers** [3] - 126:11, 175:10, 178:6
**dealing** [16] - 18:17, 22:14, 30:22, 97:1, 99:9, 128:20, 132:3, 138:13, 138:16, 172:9, 189:4, 194:8, 194:12, 225:7, 231:10, 235:13
**dealings** [3] - 119:8, 235:2, 235:7
**deals** [2] - 12:23, 132:15
**dealt** [3] - 172:2, 172:5, 181:25
**death** [12] - 83:9, 83:12, 116:11, 140:23, 141:10, 167:9, 167:24, 179:17, 185:4, 186:16, 220:20
**debrief** [2] - 17:22, 25:9
**debriefed** [1] - 21:9
**debriefing** [3] - 20:21, 26:10, 26:14
**debriefings** [1] - 21:9
**decide** [2] - 123:6, 124:23
**decided** [2] - 105:17, 217:6
**decision** [2] - 129:13, 239:24
**decisions** [1] - 240:6
**deduced** [1] - 86:17
**deem** [1] - 17:12
**Deezo** [26] - 128:7, 135:12, 135:18, 135:23, 136:1, 147:13, 147:14, 148:18, 151:19, 151:20, 151:21, 151:22, 151:25, 152:3, 152:9, 152:14, 154:25, 155:2, 155:7, 165:5, 178:14, 178:21, 207:12, 211:3
**Deezo's** [5] - 135:14, 135:16, 152:11, 165:7, 178:15
**Defendant** [4] - 1:17, 1:18, 1:20, 1:21
**defendant** [21] - 33:18, 33:19, 63:8, 102:6, 112:14, 112:16, 113:3,

125:3, 125:4, 127:16, 188:20, 188:21, 188:23, 188:25, 189:3, 189:15, 190:23, 194:8, 194:12, 194:14
**defendant's** [1] - 235:4
**defendants** [13] - 122:9, 124:13, 126:22, 127:14, 127:20, 129:22, 165:2, 189:10, 195:13, 204:18, 238:10, 245:24
**Defendants** [1] - 1:9
**defendants'** [1] - 126:16
**defense** [6] - 98:25, 102:4, 103:4, 122:8, 127:22, 244:11
**definitely** [2] - 62:16, 242:15
**degree** [2] - 120:17, 122:5
**Delaware** [13] - 9:17, 9:22, 10:2, 10:7, 12:21, 13:4, 13:12, 16:2, 17:9, 18:1, 23:10, 27:6, 32:19
**delay** [3] - 61:21, 90:24, 128:13
**delays** [1] - 236:20
**deliberately** [4] - 183:22, 188:10, 188:13, 211:10
**delivery** [4] - 172:24, 172:25, 173:3, 174:3
**Denham** [38] - 128:7, 129:15, 130:15, 135:14, 135:23, 136:1, 136:7, 147:14, 178:15, 197:24, 207:12, 207:14, 207:17, 207:24, 215:8, 215:9, 215:17, 215:19, 215:24, 216:1, 216:14, 216:23, 217:10, 218:10, 218:18, 219:21, 221:7, 222:9, 223:8, 224:16, 226:6, 229:8, 229:22, 233:23, 235:18, 235:25, 243:9, 243:12
**DENHAM** [2] - 215:13, 247:15
**Denham's** [2] - 237:19, 242:3
**dense** [1] - 52:13
**deprive** [1] - 21:11
**describe** [2] - 9:11, 12:19
**described** [12] - 8:24, 9:2, 10:11, 22:20, 22:24, 34:13, 34:16, 105:4, 118:14, 142:2, 179:2, 205:12

**describing** [2] - 53:18, 118:25
**Design** [2] - 41:14, 41:21
**designation** [1] - 41:16
**designations** [2] - 39:24, 42:13
**desire** [1] - 214:1
**desk** [2] - 7:4, 45:1
**detail** [4] - 23:6, 33:15, 41:5, 238:8
**detailed** [4] - 8:8, 11:17, 20:5, 24:25
**details** [2] - 25:22, 33:5
**detective** [14] - 4:4, 167:10, 167:12, 167:24, 168:1, 169:4, 169:6, 169:8, 169:14, 169:16, 169:19, 170:5, 170:11, 171:16
**Detective** [8] - 65:5, 65:6, 70:14, 73:10, 90:2, 242:4
**detectives** [2] - 187:14, 212:25
**determine** [4] - 125:4, 197:15, 197:18, 198:6
**determined** [2] - 26:14, 199:25
**developed** [1] - 121:12
**device** [1] - 115:4
**devote** [1] - 239:7
**diagram** [2] - 38:25, 39:23
**dial** [2] - 115:18, 155:15
**die** [1] - 93:8
**died** [4] - 183:6, 223:8, 230:17, 233:1
**difference** [3] - 38:9, 84:5, 123:24
**different** [16] - 40:6, 45:11, 50:4, 55:22, 75:23, 99:20, 113:17, 116:15, 139:21, 140:1, 168:13, 172:23, 175:4, 188:2, 229:18, 240:15
**differently** [1] - 170:14
**difficult** [2] - 92:21, 124:10
**digit** [3] - 38:11, 38:15, 38:18
**digits** [1] - 49:6
**diligence** [1] - 238:19
**dinner** [1] - 150:9
**direct** [9] - 5:1, 33:1, 33:21, 63:4, 90:10, 90:20, 181:6, 244:4, 244:5
**DIRECT** [13] - 3:14, 35:22, 63:19, 75:13,

91:10, 134:8, 215:22, 247:3, 247:7, 247:10, 247:10, 247:11, 247:16
**directed** [1] - 122:21
**directly** [10] - 3:11, 35:19, 56:17, 63:16, 65:25, 91:7, 131:15, 154:5, 184:1, 215:15
**discuss** [5] - 41:1, 236:2, 236:13, 236:21
**discussed** [9] - 25:2, 37:10, 79:18, 79:20, 87:23, 125:5, 185:2, 209:15, 209:18
**discussing** [2] - 75:6, 194:25
**discussion** [7] - 12:25, 62:1, 87:14, 117:19, 122:23, 126:13, 240:23
**discussions** [2] - 76:6, 195:1
**disposable** [6] - 25:14, 30:1, 30:3, 31:9, 32:3, 34:9
**disputes** [1] - 235:11
**Disrespectful** [1] - 166:14
**distance** [2] - 77:10, 183:25
**distinctly** [1] - 78:20
**distribute** [1] - 99:6
**distributing** [2] - 175:9, 175:10
**distribution** [2] - 174:23, 178:17
**distributor** [2] - 176:13, 181:23
**district** [1] - 238:22
**DISTRICT** [2] - 1:1, 1:2
**DIVISION** [1] - 1:2
**DOAR** [1] - 241:19
**Dobropolski** [7] - 237:14, 237:16, 241:24, 242:12, 242:16, 242:21, 243:17
**Dobropolski's** [1] - 244:9
**DOC** [2] - 238:8, 242:1
**dollar** [1] - 175:12
**dollars** [5] - 172:16, 172:24, 226:25, 228:7, 228:23
**Dominican** [1] - 26:16
**done** [9] - 4:1, 160:19, 185:20, 196:18, 227:5, 228:13, 237:20, 244:18
**door** [2] - 7:5, 144:23
**doorway** [1] - 144:23
**doubt** [1] - 35:9
**Down** [5] - 24:11,

24:19, 27:18, 27:21, 28:2
**down** [33] - 11:17, 17:11, 17:15, 17:16, 18:6, 18:12, 18:13, 31:15, 31:16, 40:2, 48:7, 48:21, 49:5, 52:24, 59:1, 61:3, 61:16, 62:6, 62:8, 62:13, 73:9, 96:22, 117:22, 128:17, 132:7, 150:1, 205:21, 221:4, 224:14, 235:18
**downstairs** [1] - 177:12
**Downtown** [2] - 50:16, 50:22
**doze** [1] - 152:22
**drawing** [1] - 38:24
**dressed** [1] - 166:4
**drew** [1] - 165:16
**drive** [2] - 15:25, 60:23
**Drive** [1] - 51:16
**driven** [1] - 23:18
**driving** [8] - 10:22, 11:1, 60:19, 123:15, 123:22, 123:24, 127:7, 205:21
**drop** [2] - 151:19, 231:18
**dropped** [4] - 18:23, 151:20, 151:22, 153:16
**Drug** [2] - 4:8, 4:15
**drug** [44] - 4:22, 11:12, 12:23, 24:25, 25:10, 30:22, 31:18, 97:5, 99:9, 125:12, 126:11, 131:10, 132:3, 138:14, 138:20, 138:22, 138:25, 139:2, 156:11, 172:19, 175:10, 176:13, 178:6, 178:12, 178:17, 178:22, 178:24, 180:10, 181:23, 189:3, 194:8, 194:12, 207:20, 218:18, 221:8, 221:24, 222:4, 222:10, 222:23, 224:19, 225:10, 230:4, 231:5
**drug-related** [1] - 97:5
**drugs** [60] - 8:16, 8:18, 8:21, 9:13, 9:22, 10:6, 11:5, 14:13, 14:17, 22:14, 23:11, 23:19, 95:13, 95:16, 95:20, 95:23, 95:25, 97:1, 98:11, 104:1, 104:5, 104:11, 107:1, 108:15, 111:16, 125:18, 126:11, 131:11, 132:16, 134:25, 138:11, 138:13, 139:16, 140:21, 142:17, 142:19, 156:13, 172:3, 172:5, 172:11, 172:13, 173:1,

173:2, 174:3, 174:24, 175:15, 175:19, 175:22, 175:24, 176:4, 176:9, 176:17, 178:4, 181:25, 199:8, 226:3, 228:19, 228:21, 228:24, 230:6
**Drugs** [2] - 96:6, 107:2, 138:10
**dude** [7] - 231:6, 231:7, 231:10, 231:21, 232:3, 232:5, 232:7
**duration** [1] - 60:1
**During** [7] - 4:7, 24:22, 25:1, 26:14, 141:9, 162:1, 163:2
**during** [36] - 4:8, 7:11, 7:25, 9:2, 9:22, 22:20, 22:23, 27:16, 28:9, 34:13, 67:2, 75:1, 76:14, 77:16, 90:1, 95:15, 97:4, 98:22, 120:17, 120:22, 121:25, 126:6, 131:2, 137:7, 145:15, 147:21, 150:12, 152:1, 209:24, 210:2, 223:9, 223:16, 230:16, 236:12, 236:19
**duties** [1] - 4:3
**duty** [2] - 5:2, 6:2
**DWAYNE** [2] - 215:13, 247:15
**Dwayne** [11] - 128:7, 135:14, 135:23, 136:1, 136:7, 178:15, 207:11, 215:8, 215:9, 215:17, 216:18

## E

**ear** [1] - 196:16
**Earl** [2] - 7:24, 23:2
**early** [13] - 49:21, 61:8, 98:6, 138:5, 138:19, 144:7, 158:8, 158:10, 195:21, 220:16, 222:18, 226:15, 242:19
**Early** [2] - 239:15, 239:16
**earned** [2] - 98:10, 106:25
**easel** [3] - 39:2, 39:10, 40:23
**East** [1] - 48:6
**east** [1] - 48:12
**easy** [1] - 132:1
**Edgecombe** [1] - 48:5
**effect** [1] - 189:19
**eight** [4] - 59:22, 59:23, 116:9, 121:17
**Either** [1] - 155:7

**either** [30] - 6:22, 14:13, 14:16, 44:18, 49:25, 51:14, 53:24, 65:16, 73:17, 73:20, 73:23, 75:20, 80:8, 87:22, 97:10, 104:19, 104:20, 146:1, 150:18, 151:19, 154:25, 156:8, 187:13, 201:16, 202:7, 202:12, 233:19, 242:20, 243:12
**elected** [1] - 82:3
**element** [1] - 120:4
**elementary** [5] - 102:15, 102:18, 103:12, 179:10, 204:1
**Elementary** [1] - 102:20
**Eleventh** [1] - 216:4
**elicit** [1] - 131:16
**eliciting** [1] - 63:4, 131:25
**emblem** [2] - 38:25, 39:19
**Emineo** [1] - 190:15
**emotional** [1] - 245:21
**employed** [3] - 36:1, 36:3, 216:9
**encountered** [3] - 19:16, 19:23, 236:21
**End** [1] - 103:4
**end** [20] - 6:7, 11:21, 12:25, 28:17, 39:24, 43:24, 44:20, 58:4, 62:17, 103:3, 122:9, 140:25, 141:1, 146:13, 147:16, 152:19, 153:25, 155:12, 219:3, 232:25
**ended** [9] - 12:14, 13:1, 94:7, 118:13, 140:22, 145:2, 147:25, 182:24, 208:15
**ending** [4] - 38:10, 40:19
**ends** [1] - 40:9
**enforcement** [8] - 3:24, 74:18, 192:13, 192:16, 192:20, 193:3, 203:1, 203:7
**Enforcement** [2] - 4:8, 4:15
**engaged** [1] - 22:14
**engineer** [1] - 62:12
**Enjoy** [1] - 237:8
**entail** [1] - 115:19
**enter** [1] - 115:19
**enterprise** [1] - 123:3
**enters** [4] - 3:1, 90:22, 133:13, 133:16
**Entertainment** [3] - 24:11, 24:19, 28:2
**entire** [11] - 12:20, 16:2,

17:9, 17:23, 17:24, 17:25, 18:7, 18:8, 18:10, 172:1
**entitled** [2] - 34:2, 125:2
**entity** [4] - 27:21, 28:2, 31:14, 31:19
**entries** [2] - 42:8, 43:9
**entry** [3] - 37:16, 43:15, 50:7
**equates** [1] - 11:6
**equivalent** [1] - 11:18
**especially** [1] - 237:16
**Esquire** [19] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**essentially** [3] - 12:17, 84:10, 123:21
**establish** [5] - 82:10, 120:19, 121:23, 123:3, 212:4
**established** [6] - 42:2, 42:4, 42:5, 126:1, 127:13, 127:19
**establishing** [1] - 126:20
**estimate** [1] - 85:3
**et** [1] - 248:5
**evaluate** [3] - 33:14, 33:15, 33:17
**eve** [1] - 239:13
**evening** [7] - 49:3, 76:5, 76:11, 142:6, 150:8, 150:12, 208:17
**evenings** [2] - 144:7, 204:11
**event** [3] - 65:15, 90:14, 236:9
**events** [1] - 177:8
**Eventually** [1] - 147:19
**eventually** [4] - 78:8, 95:1, 113:8, 134:15
**evidence** [17] - 16:20, 30:14, 33:16, 36:21, 45:21, 62:2, 117:19, 119:12, 122:13, 126:2, 126:6, 126:15, 127:12, 212:3, 212:7, 235:3
**evidentiary** [1] - 123:5
**evidently** [1] - 233:6
**exact** [1] - 59:1
**exactly** [15] - 17:20, 19:25, 28:24, 36:14, 85:2, 125:14, 126:10, 127:1, 146:2, 163:17, 173:24, 197:14, 216:11, 224:4, 230:24
**Exactly** [3] - 17:20, 60:25, 241:6
**EXAMINATION** [41] -

3:14, 14:1, 19:4, 24:14, 29:4, 31:22, 35:22, 53:13, 58:21, 63:19, 75:13, 89:1, 91:10, 134:8, 171:20, 188:15, 195:17, 203:18, 205:8, 210:25, 215:22, 247:3, 247:4, 247:4, 247:5, 247:5, 247:6, 247:7, 247:8, 247:8, 247:10, 247:10, 247:11, 247:11, 247:12, 247:12, 247:13, 247:13, 247:14, 247:14, 247:16

**examination** [11] - 28:9, 33:1, 33:4, 33:7, 33:8, 33:21, 33:22, 33:25, 60:16, 128:24, 243:25

**examine** [3] - 60:8, 120:19, 244:14

**example** [4] - 52:8, 175:4, 179:16, 193:15

**excellent** [1] - 245:25

**Excellent** [2] - 62:14, 235:16

**except** [2] - 49:3, 68:2

**exception** [4] - 118:9, 120:14, 127:17, 191:16

**exceptions** [1] - 191:5

**exchange** [5] - 27:16, 32:13, 42:15, 42:16, 232:9

**exchanges** [1] - 232:13

**exchanging** [1] - 111:16

**excited** [2] - 11:7, 29:15

**excuse** [1] - 30:17

**Excuse** [2] - 180:15, 198:12

**excused** [7] - 34:25, 62:4, 117:16, 117:20, 214:25, 235:19, 237:1

**exhibit** [7] - 15:14, 36:21, 39:25, 41:10, 132:25, 133:22, 133:25

**Exhibit** [5] - 41:2, 45:19, 167:19, 169:13, 218:15

**exhibits** [2] - 133:2, 241:19

**exist** [2] - 100:6

**existed** [3] - 27:21, 28:2, 126:21

**existence** [5] - 120:5, 121:5, 122:14, 123:3, 127:14

**exits** [3] - 117:21, 117:23, 237:10

**expect** [4] - 131:16, 236:17, 239:2, 243:17

**expectation** [1] - 185:16

**expected** [1] - 151:12

**expecting** [3] - 136:23, 143:25, 240:13

**expense** [1] - 237:3

**experience** [5] - 3:24, 25:1, 32:1, 34:8, 191:8

**experienced** [3] - 20:24, 30:20

**experiences** [2] - 7:16, 165:17

**expert** [3] - 2:11, 130:12, 191:6

**expertise** [1] - 30:17

**explain** [7] - 37:11, 38:8, 38:24, 39:23, 42:13, 230:24

**explained** [1] - 33:19

**exposure** [1] - 236:12

**expressed** [1] - 165:12

**extended** [1] - 236:12

**extent** [4] - 126:24, 127:15, 180:25, 181:5

**extremely** [1] - 27:12

## F

**face** [9] - 35:15, 174:16, 182:25, 183:12, 202:1, 213:1, 213:13, 226:21

**faces** [1] - 201:16

**facie** [5] - 124:18, 126:3, 127:13, 127:18, 127:20

**fact** [33] - 17:8, 21:8, 23:22, 33:4, 50:19, 55:8, 55:11, 57:7, 57:25, 70:9, 70:11, 82:11, 86:25, 87:2, 119:18, 120:24, 134:18, 170:7, 177:12, 177:17, 177:25, 178:4, 180:12, 180:20, 182:9, 182:23, 185:21, 186:1, 186:4, 187:2, 200:7, 212:22, 244:7

**faded** [1] - 183:23

**fair** [12] - 80:9, 87:4, 99:10, 117:1, 141:6, 164:2, 164:4, 165:2, 166:23, 172:6, 175:18, 218:6

**fairly** [2] - 53:18, 58:13

**Falls** [2] - 83:1, 110:2

**familiar** [3] - 194:6, 194:18, 204:3

**familiarity** [2] - 73:18, 73:20

**family** [22] - 74:18,

74:20, 74:22, 74:25, 87:11, 87:14, 87:18, 88:6, 88:8, 88:11, 89:4, 94:19, 96:24, 135:25, 136:10, 143:3, 165:11, 204:21, 204:22, 204:24, 236:14

**far** [24] - 20:2, 22:6, 23:1, 23:6, 32:13, 32:15, 52:5, 59:4, 62:2, 91:25, 92:4, 107:24, 110:2, 118:20, 126:20, 127:10, 145:8, 187:5, 209:9, 209:21, 216:3, 222:15, 225:2, 229:1

**farthest** [2] - 168:21

**fast** [3] - 78:3, 110:13, 197:19

**fat** [1] - 50:6

**father** [3] - 92:25, 216:22, 217:9

**father's** [3] - 216:25, 217:1, 217:4

**February** [5] - 42:5, 47:14, 51:7, 94:17, 176:25

**Federal** [1] - 238:7

**federal** [3] - 98:16, 99:2, 242:1

**Felicia** [1] - 66:18, 66:22, 198:11, 198:12

**fellow** [1] - 89:13

**Fells** [2] - 232:10, 232:12

**felt** [3] - 11:18, 164:7, 211:8

**few** [29] - 11:25, 23:4, 31:25, 41:12, 49:4, 61:4, 67:14, 83:7, 84:25, 85:2, 85:10, 85:13, 85:16, 86:12, 86:13, 88:19, 93:12, 106:2, 113:7, 123:25, 151:11, 157:2, 174:18, 179:25, 181:7, 191:6, 206:9, 210:13, 214:25

**fewer** [1] - 64:10

**fifth** [2] - 137:1, 143:25

**fifties** [2] - 130:8, 130:11

**figure** [4] - 86:6, 120:4, 127:1, 154:23

**filed** [3] - 238:15, 241:6, 241:8

**Filicia** [1] - 198:10

**fill** [3] - 7:22, 17:6, 243:11

**final** [1] - 121:16

**finally** [2] - 28:16, 160:8

**financial** [2] - 235:11,

240:12

**findings** [1] - 25:8

**Fine** [1] - 132:18

**fine** [7] - 11:3, 75:17, 132:4, 132:7, 132:8, 133:15, 221:21

**finger** [1] - 241:13

**finish** [5] - 128:2, 129:11, 198:21, 242:19

**finished** [1] - 40:23

**Finney** [1] - 48:5

**firearms** [2] - 2:11, 238:15

**First** [1] - 145:23

**first** [49] - 6:14, 13:16, 14:6, 19:15, 19:22, 66:4, 69:12, 69:20, 71:23, 72:13, 76:1, 79:17, 79:20, 79:21, 81:3, 81:4, 82:2, 85:19, 85:20, 86:8, 93:14, 93:20, 94:8, 101:10, 102:18, 111:21, 112:19, 114:21, 124:6, 125:23, 126:5, 129:4, 148:18, 153:14, 161:13, 161:14, 186:11, 186:19, 187:3, 196:3, 196:6, 209:13, 215:18, 220:11, 227:20, 239:12, 242:15, 244:14

**Five** [1] - 92:18

**five** [10] - 85:3, 85:4, 97:19, 136:19, 173:12, 173:13, 174:20, 230:19, 230:21, 233:2

**FLANNERY** [7] - 188:16, 190:5, 190:19, 190:22, 191:25, 195:9, 247:12

**Flannery** [3] - 1:19, 188:19, 191:24

**flexibility** [2] - 60:20, 242:9

**flip** [1] - 125:20

**focus** [1] - 82:16

**follow** [6] - 4:19, 7:2, 9:12, 9:16, 31:12, 244:15

**follow-up** [3] - 4:19, 9:12, 9:16

**following** [6] - 26:14, 26:19, 26:23, 38:5, 118:23, 167:24

**food** [1] - 21:11

**foot** [1] - 200:18

**FOR** [1] - 1:2

**force** [4] - 4:5, 4:7, 4:10, 30:22

**foregoing** [1] - 248:6

**forensic** [1] - 191:8

**Forest** [1] - 109:7

**forget** [2] - 151:2, 176:22

**Forgive** [2] - 19:9, 180:17

**forgive** [2] - 23:21, 114:2

**forgot** [1] - 167:8

**form** [5] - 6:19, 15:18, 15:20, 186:21

**formerly** [1] - 190:17

**formulate** [1] - 53:5

**Forrester** [5] - 5:8, 19:14, 19:22, 20:11

**forth** [1] - 75:6

**foundation** [4] - 121:24, 212:4, 222:1

**four** [19] - 8:3, 9:8, 9:9, 26:24, 32:7, 49:13, 49:14, 69:16, 127:14, 143:24, 159:5, 174:20, 197:3, 197:8, 199:12, 243:10, 243:24, 244:1

**Four** [2] - 4:11, 13:24

**frame** [5] - 18:10, 85:14, 127:21, 137:7, 141:10

**framed** [1] - 127:22

**frankly** [1] - 127:11

**fraud** [2] - 41:18, 41:19

**free** [7] - 10:18, 20:1, 20:2, 20:8, 21:5, 23:22, 239:3

**freely** [1] - 20:12

**frequented** [1] - 190:23

**frequently** [1] - 97:17

**Friday** [4] - 117:16, 209:18, 245:7, 245:9

**friend** [7] - 135:12, 155:2, 178:14, 178:16, 178:18, 178:22, 178:23

**friendly** [2] - 179:14, 204:13

**friends** [11] - 70:22, 74:19, 93:20, 102:23, 108:23, 108:24, 135:20, 136:3, 165:11, 200:14, 236:14

**Friends** [1] - 135:19

**front** [12] - 15:14, 25:25, 37:18, 39:13, 69:10, 113:24, 114:11, 114:15, 134:2, 134:5, 172:19, 190:3

**Fryson** [1] - 108:20

**full** [3] - 101:16, 135:14, 236:18

**fully** [3] - 32:25, 193:4, 235:6

**function** [1] - 211:3

**funds** [1] - 237:6

**funeral** [6] - 75:10,

165:20, 165:25, 166:1, 200:8, 202:6
**furtherance** [9] - 120:1, 120:18, 120:25, 122:2, 123:7, 123:13, 123:16, 124:1, 127:3
**future** [3] - 94:21, 95:9, 95:15

## G

**gain** [1] - 22:6
**game** [1] - 123:15
**GARDNER** [1] - 1:8
**Gardner** [121] - 1:21, 5:19, 5:20, 6:9, 6:15, 6:16, 6:22, 6:25, 7:1, 7:8, 7:14, 7:24, 7:25, 8:15, 8:24, 9:1, 9:11, 9:15, 9:21, 10:3, 10:7, 10:11, 10:16, 10:25, 11:3, 11:4, 11:11, 11:16, 11:20, 12:20, 13:1, 13:9, 13:15, 13:23, 16:2, 16:8, 16:16, 17:2, 17:5, 17:9, 17:18, 17:23, 19:16, 19:23, 20:11, 21:8, 22:12, 22:20, 22:23, 23:1, 23:2, 23:5, 23:9, 23:18, 23:23, 24:3, 26:11, 26:15, 26:16, 26:18, 26:21, 26:24, 27:1, 27:2, 27:7, 27:8, 27:10, 27:12, 27:13, 28:11, 28:23, 29:11, 29:19, 30:15, 30:24, 32:6, 32:16, 32:20, 33:3, 33:12, 33:13, 34:12, 89:15, 101:3, 102:12, 102:14, 102:19, 102:22, 102:24, 103:1, 103:6, 103:11, 103:14, 104:5, 104:9, 107:21, 107:22, 108:4, 108:7, 127:7, 127:8, 132:11, 162:20, 165:25, 166:3, 166:15, 166:19, 179:2, 179:20, 180:4, 188:23, 189:10, 189:15, 201:16, 203:23, 203:25, 204:7, 209:7, 221:12, 221:23
**Gardner's** [8] - 10:17, 11:8, 13:4, 19:16, 19:23, 205:4, 222:22, 239:25
**Garner** [1] - 9:4
**Garrett** [5] - 181:17, 181:18, 181:19, 181:25, 208:4
**Garrett's** [1] - 208:8
**Garrison** [4] - 104:18,

104:19, 104:20
**gas** [3] - 99:21, 107:23, 109:7
**Gas** [1] - 99:25
**gather** [2] - 158:2, 165:22
**gear** [2] - 245:12, 245:17
**GED** [1] - 94:7
**general** [1] - 98:5
**generality** [1] - 125:19
**generally** [3] - 114:15, 192:8, 192:17
**gentleman** [1] - 176:11
**gentlemen** [18] - 3:2, 3:3, 16:19, 32:25, 38:9, 48:4, 61:25, 90:23, 90:24, 117:8, 133:17, 171:9, 191:3, 215:2, 230:24, 235:1, 235:20, 237:8
**genuine** [1] - 41:8
**GEORGE** [2] - 3:9, 247:3
**George** [3] - 2:4, 3:7, 3:13
**Gerard** [1] - 1:19
**gestures** [1] - 176:22
**girl** [1] - 151:4
**girls** [2] - 92:19, 92:20
**given** [7] - 15:13, 26:6, 33:22, 42:11, 90:1, 229:11, 244:2
**glass** [5] - 96:1, 102:2, 140:2, 140:3, 141:1
**glasses** [3] - 102:3, 103:3, 221:19
**Goo** [20] - 102:25, 103:14, 103:23, 107:23, 107:25, 162:19, 162:22, 179:7, 179:10, 189:12, 189:17, 190:6, 190:8, 190:9, 202:9, 221:15, 223:1, 223:2, 223:4, 223:5
**government** [23] - 33:23, 63:3, 90:25, 98:24, 120:19, 120:20, 121:23, 122:14, 123:3, 123:10, 125:9, 125:23, 126:8, 126:20, 127:13, 127:19, 129:20, 131:24, 211:21, 238:21, 239:19, 240:11, 243:2
**Government** [4] - 1:15, 41:2, 45:19, 218:15
**Government's** [1] - 169:13
**government's** [5] - 118:24, 120:13, 123:2,

126:5, 127:2
**GOVERNMENT'S** [5] - 3:9, 35:17, 63:14, 91:5, 215:13
**grabbed** [1] - 148:14
**grade** [4] - 92:5, 92:6, 94:2, 216:4
**graduate** [1] - 94:5
**grams** [4] - 8:4, 8:5, 10:8, 27:1
**grand** [13] - 65:8, 74:2, 98:18, 98:21, 98:23, 176:25, 177:16, 189:14, 189:18, 189:21, 190:4, 209:23, 209:24
**Great** [1] - 133:11
**great** [3] - 124:12, 150:21, 214:7
**greater** [1] - 90:14
**Green** [2] - 242:5, 243:12
**green** [1] - 112:13
**greet** [1] - 206:23
**grew** [1] - 170:16
**grocery** [20] - 83:4, 109:18, 109:19, 109:21, 110:4, 110:7, 110:19, 111:8, 111:10, 112:20, 113:22, 113:25, 172:18, 172:20, 172:22, 174:4, 174:5, 174:10, 174:13
**Grocery** [10] - 109:22, 109:23, 110:23, 111:1, 111:13, 111:14, 113:14, 114:14, 205:13, 205:19
**grocery-related** [1] - 111:10
**grow** [4] - 91:18, 91:20, 126:11, 216:7
**grown** [1] - 125:18
**guard** [1] - 78:3
**guess** [14] - 18:16, 74:14, 96:20, 109:24, 110:5, 111:16, 120:16, 138:20, 197:6, 217:22, 224:10, 233:25, 234:2
**guidance** [1] - 241:25
**guilt** [1] - 235:4
**gun** [10] - 233:19, 234:5, 234:8, 234:9, 234:12, 234:14, 234:16, 234:17, 234:18
**guns** [1] - 234:10
**guy** [7] - 175:9, 175:11, 200:23, 218:10, 225:17, 241:12, 241:16
**guys** [6] - 78:13, 124:7, 166:20, 226:20, 227:1, 228:9
**Gwynn** [3] - 104:18,

104:19
**Gwynns** [2] - 83:1, 110:2

## H

**half** [11] - 4:11, 12:10, 12:11, 19:8, 19:10, 53:4, 83:10, 83:12, 128:23, 145:11, 173:2
**hallway** [1] - 71:2
**hampered** [1] - 193:8
**hand** [3] - 35:15, 40:1, 176:22
**handed** [1] - 106:2
**handgun** [1] - 217:13
**handle** [1] - 244:25
**hands** [8] - 109:3, 109:4, 137:18, 137:21, 137:23, 206:23, 233:25, 237:6
**handset** [1] - 56:20
**hang** [6] - 54:12, 55:3, 58:8, 78:9, 139:7
**Hang** [1] - 81:6
**hanging** [1] - 162:13
**HANLON** [79] - 2:4, 2:8, 3:6, 3:15, 16:9, 16:18, 18:18, 19:18, 20:14, 22:9, 24:15, 27:17, 61:18, 61:22, 62:7, 62:23, 63:3, 72:23, 74:5, 76:9, 82:6, 88:4, 88:20, 89:16, 90:21, 91:1, 91:11, 118:1, 118:10, 118:13, 118:19, 118:24, 119:3, 119:7, 119:12, 119:15, 119:19, 119:21, 119:24, 125:15, 127:24, 128:6, 128:9, 128:12, 128:17, 128:20, 129:3, 129:6, 129:12, 129:17, 129:20, 130:17, 130:23, 131:5, 132:4, 132:8, 132:18, 133:8, 134:9, 167:3, 167:7, 168:12, 168:14, 171:14, 182:1, 186:21, 188:7, 195:7, 205:9, 208:22, 208:25, 211:20, 214:3, 214:16, 240:14, 247:3, 247:5, 247:11, 247:14
**Hanlon** [30] - 1:16, 2:7, 3:5, 21:16, 21:19, 23:4, 33:1, 33:5, 33:7, 90:20, 117:24, 121:8, 127:23, 128:1, 130:22, 132:2, 134:7, 168:13, 171:13, 176:19, 184:25, 185:2, 185:21, 197:24, 204:6,

237:11, 238:24, 239:5, 240:18, 241:9
**Hanlon's** [3] - 32:2, 123:18, 125:24
**hard** [2] - 56:8, 127:21
**HARDING** [42] - 2:10, 2:15, 2:17, 2:19, 35:3, 35:8, 35:23, 39:18, 45:3, 45:18, 50:20, 50:24, 57:13, 58:22, 132:24, 133:5, 133:24, 215:1, 215:8, 215:10, 215:23, 221:24, 222:5, 222:8, 235:17, 237:13, 237:23, 238:2, 238:6, 238:13, 238:17, 239:4, 240:8, 242:7, 242:17, 242:23, 243:10, 244:5, 244:10, 247:7, 247:8, 247:16
**Harding** [16] - 1:16, 2:8, 37:14, 39:12, 40:23, 98:15, 132:23, 133:21, 133:23, 134:6, 200:21, 215:7, 235:9, 237:11, 241:9, 241:20
**Harford** [3] - 143:7, 144:12, 148:25
**harm** [1] - 214:7
**HARRIS** [1] - 1:7
**Harris** [9] - 1:18, 24:6, 24:17, 28:9, 28:10, 34:21, 188:20, 194:2, 194:4, 194:6
**Hasim** [12] - 189:6, 189:8, 189:11, 189:12, 189:13, 189:14, 189:17, 190:7, 190:10, 192:2, 192:4, 192:6
**Hastings** [3] - 65:6, 73:10, 90:2
**hat** [1] - 245:15
**hawing** [1] - 120:21
**head** [5] - 188:12, 220:7, 226:21, 245:12, 245:17
**headphones** [1] - 130:3
**hear** [54] - 27:24, 54:12, 55:3, 63:23, 65:21, 68:2, 68:23, 69:8, 69:9, 70:5, 74:24, 76:16, 77:11, 78:1, 78:7, 78:8, 78:19, 80:10, 97:3, 112:3, 116:5, 116:7, 122:6, 122:19, 124:13, 129:10, 130:2, 131:15, 145:19, 146:15, 148:4, 148:23, 150:11, 153:22, 156:21, 157:8, 158:13, 158:25, 160:4, 160:6, 160:17, 160:23, 162:2, 164:25,

165:4, 184:2, 184:3,
191:13, 196:11, 198:23,
205:5, 205:6, 222:5
 **heard** [79] - 24:20,
28:17, 28:24, 62:2,
65:11, 65:13, 65:22,
65:24, 65:25, 66:24,
68:3, 68:6, 72:2, 73:8,
74:2, 75:22, 75:23, 76:5,
77:14, 80:5, 80:14,
83:15, 83:23, 84:9,
84:22, 86:16, 87:7,
87:22, 112:4, 128:7,
129:4, 131:16, 134:17,
145:23, 145:25, 152:15,
153:18, 153:24, 154:17,
154:18, 157:20, 158:17,
159:18, 160:18, 161:1,
161:23, 163:10, 163:15,
164:13, 164:15, 180:22,
181:4, 181:25, 182:9,
185:18, 185:22, 190:1,
190:25, 191:6, 194:4,
194:20, 194:24, 195:5,
196:4, 196:7, 197:5,
197:14, 197:18, 199:21,
200:13, 202:15, 203:4,
203:10, 213:14, 221:9,
221:10, 239:8, 242:6
 **hearing** [1] - 2:18,
28:22, 62:25, 77:23,
126:2, 153:25, 154:6,
154:17, 159:8, 238:22
 **heart** [1] - 185:25
 **heavily** [1] - 52:18
 **heavy** [2] - 52:17, 52:20
 **Heights** [9] - 24:8,
24:18, 48:5, 51:3, 51:7,
104:19, 104:20, 109:25,
110:2
 **help** [15] - 75:19, 84:4,
97:13, 97:17, 97:23,
98:5, 110:19, 114:15,
114:19, 141:17, 178:16,
214:1, 214:6, 222:9
 **helped** [6] - 98:9, 99:9,
106:11, 109:18, 136:10
 **helping** [8] - 214:8,
214:10, 214:13, 214:15,
214:20, 222:15, 222:20
 **hemming** [1] - 120:20
 **hereby** [1] - 248:3
 **hereunto** [1] - 248:9
 **heroin** [1] - 230:9
 **herself** [1] - 68:3
 **hesitant** [1] - 159:25
 **hi** [2] - 112:23, 183:22
 **hid** [1] - 9:25
 **hidden** [2] - 10:17,
97:11

 **hide** [1] - 10:14
 **hiding** [1] - 10:11
 **high** [9] - 37:8, 91:22,
92:2, 92:4, 93:25, 98:7,
100:25, 219:3
 **High** [5] - 92:3, 216:6,
219:12, 219:13, 219:15
 **himself** [4] - 7:18,
144:9, 179:23, 192:21
 **Hispanic** [7] - 231:6,
231:7, 231:10, 231:21,
232:3, 232:5, 232:7
 **hit** [8] - 116:18, 146:1,
181:1, 181:5, 181:10,
228:23, 228:25
 **hitting** [2] - 38:13,
40:18
 **hold** [2] - 130:15,
160:10
 **Hold** [1] - 208:22
 **holding** [3] - 12:14,
176:21, 239:19
 **home** [21] - 60:14,
60:21, 61:9, 95:20,
95:24, 139:14, 143:5,
143:6, 147:19, 150:3,
151:12, 151:13, 151:24,
153:6, 222:24, 222:25,
223:1, 224:13, 224:14,
224:15, 230:12
 **honest** [2] - 209:14,
231:11
 **honey** [1] - 123:22
 **Honor** [131] - 2:5, 3:6,
12:6, 13:25, 16:9, 16:18,
18:18, 19:18, 20:14,
22:9, 24:16, 28:1, 28:25,
29:1, 29:2, 31:24, 34:6,
35:3, 39:5, 39:17, 50:17,
53:3, 58:20, 60:5, 60:6,
60:10, 61:18, 61:19,
62:8, 62:10, 62:16,
62:23, 63:3, 72:23, 74:5,
75:12, 75:15, 76:9, 82:6,
82:9, 88:4, 88:20, 89:3,
89:16, 89:18, 90:21,
91:1, 102:6, 103:6,
112:16, 118:1, 118:5,
118:10, 118:24, 119:15,
119:21, 120:3, 120:17,
121:15, 121:22, 122:20,
123:23, 124:9, 125:22,
125:23, 127:24, 128:9,
128:12, 129:3, 130:1,
130:17, 130:23, 132:4,
132:8, 132:13, 132:18,
132:19, 132:25, 133:8,
133:12, 133:24, 134:10,
166:25, 167:3, 167:17,
168:12, 171:8, 171:15,

171:19, 186:21, 188:7,
189:24, 191:1, 192:1,
195:7, 210:16, 210:24,
211:2, 211:19, 211:20,
211:24, 212:1, 212:5,
212:8, 212:11, 214:3,
214:16, 215:10, 220:9,
221:21, 234:24, 235:15,
235:17, 235:22, 237:23,
238:2, 239:4, 239:11,
240:8, 240:14, 240:19,
241:2, 241:17, 242:8,
242:9, 242:17, 242:23,
243:16, 244:13, 245:5,
246:2
 **Honorable** [1] - 1:13
 **hook** [1] - 113:11
 **hooking** [1] - 148:3
 **hope** [2] - 122:19,
242:11
 **hoped** [1] - 211:11
 **hopefully** [2] - 236:22,
244:18
 **hoping** [4] - 171:4,
171:6, 185:14, 188:11
 **hospitals** [1] - 157:23
 **hour** [4] - 53:4, 60:24,
61:2, 128:23
 **hours** [7] - 47:14,
49:22, 51:6, 130:15,
195:21, 241:8, 244:6
 **house** [45] - 66:7, 66:9,
66:16, 67:4, 67:11,
67:13, 67:22, 69:23,
69:25, 70:1, 70:2, 70:5,
70:19, 96:7, 96:15,
97:10, 97:18, 118:4,
118:15, 119:1, 123:20,
131:11, 134:25, 137:7,
138:6, 139:11, 140:4,
141:11, 143:8, 144:13,
148:11, 148:13, 149:1,
149:2, 158:6, 159:12,
198:18, 226:7, 228:16,
228:17, 228:18, 228:19,
234:16, 234:17, 234:18
 **housebreaking** [1] -
229:5
 **houses** [1] - 229:18
 **hum** [13] - 30:6, 67:24,
80:20, 81:22, 85:22,
86:21, 103:13, 107:18,
137:2, 143:2, 148:6,
152:25, 187:11
 **hundred** [1] - 36:20
 **hundreds** [1] - 37:3
 **hung** [2] - 78:8, 197:17
 **hurt** [2] - 144:9, 144:16,
214:2
 **hurting** [1] - 214:21

 **husband** [194] - 64:21,
69:13, 75:9, 76:12, 77:2,
78:4, 80:2, 82:22, 83:2,
83:7, 84:15, 93:2, 93:8,
93:13, 94:21, 95:6, 95:9,
95:15, 96:11, 96:21,
97:13, 97:17, 97:24,
98:4, 99:9, 99:13, 99:16,
100:15, 100:17, 103:15,
103:18, 103:21, 104:1,
104:6, 104:9, 104:14,
105:21, 105:23, 106:6,
106:11, 106:14, 106:18,
106:24, 107:3, 107:17,
107:19, 107:22, 108:4,
108:10, 108:14, 108:15,
108:22, 109:4, 109:9,
109:14, 109:18, 110:3,
110:16, 110:20, 110:22,
111:1, 111:13, 111:24,
112:3, 112:4, 113:8,
114:5, 114:10, 114:13,
114:22, 115:3, 115:10,
115:14, 116:19, 116:22,
117:3, 123:14, 127:3,
131:8, 131:15, 131:18,
132:16, 134:13, 134:17,
134:23, 135:3, 135:12,
135:22, 136:2, 136:14,
137:6, 137:10, 137:12,
138:13, 138:16, 141:17,
141:24, 142:1, 142:9,
142:23, 143:9, 143:14,
144:19, 144:22, 145:3,
145:9, 145:14, 145:19,
146:4, 146:8, 146:14,
146:17, 146:23, 147:1,
147:6, 147:11, 147:16,
147:21, 148:10, 148:20,
149:12, 149:15, 149:22,
149:24, 150:6, 150:11,
150:19, 150:23, 151:25,
152:4, 152:9, 152:14,
152:15, 152:20, 153:6,
153:10, 155:19, 156:1,
158:2, 158:11, 165:19,
165:22, 166:4, 166:18,
170:20, 171:7, 171:24,
172:21, 174:21, 176:16,
177:25, 178:16, 180:6,
180:9, 180:18, 189:4,
192:8, 192:13, 192:17,
192:21, 192:24, 193:13,
193:17, 194:6, 194:8,
194:11, 196:5, 196:9,
199:6, 201:12, 205:13,
205:17, 206:1, 206:7,
206:11, 206:14, 206:23,
207:2, 207:12, 207:14,
207:17, 207:24, 208:2,
208:3, 208:14, 208:16,

208:19, 209:6, 209:9
 **husband's** [33] - 77:16,
79:22, 83:9, 83:12, 84:2,
84:10, 107:7, 107:10,
107:11, 114:25, 115:24,
116:11, 135:10, 135:18,
136:22, 140:23, 141:10,
141:15, 145:11, 153:20,
155:2, 156:17, 167:9,
167:24, 174:23, 178:23,
179:16, 180:23, 185:4,
186:16, 204:6, 211:3

**I**

 **I-95** [3] - 19:17, 19:23,
127:7
 **ID** [5] - 62:24, 128:21,
247:10, 247:10, 247:11
 **idea** [24] - 18:4, 18:24,
24:1, 27:20, 36:19, 37:5,
39:14, 52:5, 57:11,
129:8, 138:24, 161:10,
165:1, 196:24, 208:7,
208:9, 216:12, 217:8,
227:5, 229:5, 229:10,
230:15, 232:24, 244:4
 **identification** [8] -
63:10, 82:16, 90:1, 90:3,
90:9, 90:12, 128:13,
213:22
 **identified** [6] - 59:9,
195:13, 208:4, 210:19,
220:8, 221:23
 **identify** [21] - 7:18,
65:16, 66:2, 77:25,
80:22, 81:2, 81:11,
81:20, 82:12, 112:11,
185:6, 185:10, 186:7,
187:4, 202:25, 211:10,
211:11, 214:12, 218:16,
225:20
 **identifying** [6] - 7:20,
62:18, 102:6, 103:6,
112:16, 209:22
 **idle** [2] - 120:23, 123:13
 **Ignatius** [1] - 244:2
 **immediately** [4] - 51:21,
58:8, 167:24, 242:21
 **impact** [1] - 239:23
 **implicated** [1] - 69:15
 **import** [1] - 126:12
 **important** [7] - 30:5,
31:4, 31:5, 31:7, 32:4,
121:3, 126:25
 **impossible** [1] - 127:1
 **impression** [3] - 68:9,
128:1, 175:12
 **IN** [1] - 1:1

**inadmissible** [1] - 121:18

**inadvertently** [1] - 183:19

**inapplicability** [1] - 127:17

**incident** [2] - 20:18, 23:24

**incidental** [1] - 178:12

**incidents** [1] - 178:3

**inclined** [1] - 193:10

**included** [1] - 142:17

**includes** [2] - 45:23, 47:5

**including** [3] - 23:12, 126:8, 245:22

**incoming** [21] - 42:13, 42:18, 42:19, 44:5, 45:11, 46:6, 46:16, 46:18, 46:25, 47:8, 49:7, 49:17, 49:25, 56:6, 56:11, 56:15, 57:4, 57:6, 59:10, 59:12, 59:15

**incoming/outgoing** [1] - 58:15

**inconsistency** [1] - 122:7

**inconsistent** [1] - 122:16

**increase** [1] - 97:24

**increments** [3] - 43:10, 58:25, 59:1

**indeed** [7] - 69:11, 69:20, 72:12, 74:1, 200:13, 201:4, 202:2

**independent** [1] - 119:18

**INDEX** [1] - 247:1

**indicate** [7] - 14:16, 57:25, 67:25, 73:17, 73:20, 74:2, 137:18

**indicated** [13] - 8:15, 10:11, 82:9, 87:13, 90:7, 90:13, 139:2, 143:9, 143:21, 177:16, 190:1, 206:11, 208:7

**indicates** [2] - 41:18, 58:2

**Indicating** [1] - 220:2

**indicating** [1] - 55:8, 137:21, 137:23

**indicating)** [1] - 137:20

**indication** [2] - 43:7, 61:6

**indicia** [1] - 90:10

**indictment** [3] - 123:10, 126:4, 235:5

**individual** [15] - 8:2, 8:5, 8:23, 9:18, 108:10, 108:17, 111:17, 162:4,

168:8, 169:21, 170:7, 185:6, 192:18, 193:22, 193:24

**individuals** [13] - 5:5, 5:11, 5:16, 6:8, 6:21, 8:9, 9:1, 20:11, 20:19, 21:2, 25:1, 25:18, 192:13

**Indulge** [1] - 182:4

**indulgence** [4] - 53:1, 81:6, 88:16, 167:17

**industry** [4] - 53:19, 55:21, 57:19, 58:13

**infamous** [1] - 34:3

**inference** [1] - 121:12

**influence** [3] - 14:13, 14:16, 14:25

**information** [19] - 7:21, 11:8, 11:18, 17:6, 17:12, 30:25, 33:12, 45:23, 46:20, 51:9, 98:24, 116:17, 118:5, 131:3, 158:2, 169:20, 191:21, 209:21, 235:5

**informational** [1] - 17:7

**informed** [2] - 27:1, 98:21

**inherently** [1] - 126:12

**initial** [2] - 121:2, 199:20

**injured** [2] - 156:8, 228:1

**injuries** [2] - 182:15, 183:3

**injuring** [1] - 39:15

**inquired** [1] - 131:2

**inside** [15] - 82:25, 96:4, 99:21, 137:25, 138:2, 138:9, 140:1, 140:10, 140:12, 140:17, 141:1, 202:2, 202:5, 206:5, 207:1

**instance** [3] - 9:4, 192:25, 193:7

**instances** [1] - 205:12

**instead** [2] - 170:17, 235:12

**instruct** [5] - 32:24, 125:6, 125:7, 125:15, 236:11

**instructed** [2] - 33:15, 33:17

**instruction** [3] - 122:10, 122:15, 125:2

**instructions** [3] - 127:21, 133:9, 236:24

**insure** [1] - 127:21

**Intellect** [3] - 190:17, 190:18, 190:24

**intend** [1] - 242:10

**intended** [2] - 146:23,

147:12

**intending** [1] - 208:17

**intention** [1] - 240:3

**intentions** [2] - 146:18, 151:17

**interact** [1] - 109:11

**interacted** [1] - 105:23

**interaction** [1] - 106:1

**interactions** [1] - 107:21

**interdiction** [1] - 4:13

**interested** [2] - 27:12, 110:13

**interludes** [1] - 174:24

**interrupt** [2] - 235:22, 237:19

**interview** [23] - 4:23, 5:22, 6:1, 6:17, 6:25, 7:12, 7:14, 7:17, 7:20, 7:25, 9:2, 11:16, 11:21, 13:4, 15:22, 20:21, 28:12, 28:16, 32:2, 33:3, 33:12, 90:1

**interviewed** [3] - 15:1, 17:16, 30:24

**interviews** [6] - 5:10, 6:11, 17:2, 19:15, 24:23, 25:2

**intoxication** [1] - 14:23

**introduced** [1] - 134:3

**introduction** [1] - 112:23

**inverted** [1] - 39:19

**investigation** [7] - 4:20, 11:19, 16:23, 18:24, 98:18, 236:11, 236:14

**Investigations** [1] - 24:25

**investigations** [1] - 25:3

**invite** [2] - 215:3, 215:4

**involved** [27] - 4:21, 5:7, 16:24, 20:9, 20:19, 31:18, 46:15, 110:9, 118:7, 118:20, 119:7, 121:5, 125:25, 126:12, 126:18, 132:3, 174:4, 175:22, 178:4, 189:3, 194:8, 194:11, 218:18, 221:8, 221:24, 225:2, 244:23

**involvement** [6] - 17:1, 171:10, 175:12, 178:21, 178:24, 222:23

**involving** [1] - 127:14

**Irene** [5] - 66:6, 66:14, 67:17, 157:15, 159:10

**IRENE** [1] - 157:17

**ironically** [1] - 211:11

**issue** [7] - 62:24, 63:5,

118:20, 123:6, 126:24, 237:2, 240:22

**issues** [4] - 53:5, 127:22, 171:10, 236:16

**IT** [1] - 130:13

**item** [2] - 140:22, 245:12

**itself** [3] - 56:20, 115:18, 115:22

**IX** [1] - 1:11

## J

**J-O-H-N-S-O-N** [1] - 35:21

**jacket** [1] - 168:23

**jail** [14] - 23:25, 64:14, 211:12, 214:12, 224:15, 226:9, 226:12, 227:9, 227:10, 227:24, 229:3, 229:4, 230:11, 230:12

**jails** [1] - 157:23

**James** [1] - 1:21

**January** [2] - 119:24, 121:9

**Jersey** [5] - 35:9, 36:7, 36:12, 231:14, 231:19

**JFK** [3] - 5:4, 5:23, 26:9

**Jim** [2] - 14:3, 53:17

**job** [6] - 4:16, 211:4, 223:16, 223:19, 236:20

**jobs** [2] - 172:21, 223:23

**John** [2] - 3:19, 183:22

**Johnson** [24] - 35:8, 35:11, 35:13, 35:16, 35:21, 35:24, 36:4, 36:23, 37:10, 37:16, 39:7, 41:6, 41:17, 45:16, 48:24, 50:13, 51:14, 52:1, 52:23, 53:15, 52:24, 60:11, 60:14, 62:11

**JOHNSON** [2] - 35:17, 247:7

**joining** [1] - 3:23

**joint** [1] - 75:10

**Judge** [7] - 1:13, 57:13, 79:17, 132:9, 237:13, 239:6, 243:10

**judge** [2] - 79:17, 79:20

**judicial** [1] - 50:18

**jurors** [1] - 35:10

**Jurors** [1] - 130:20

**jury** [47] - 2:3, 2:23, 23:6, 25:23, 32:24, 33:6, 33:8, 33:9, 48:4, 61:25, 62:21, 63:2, 65:9, 74:2, 90:14, 90:17, 90:18,

98:18, 98:21, 98:23, 117:8, 117:11, 124:23, 125:2, 125:7, 125:15, 126:5, 130:2, 133:1, 133:7, 137:19, 176:25, 177:16, 189:14, 189:18, 189:21, 190:4, 191:3, 205:7, 209:23, 209:25, 215:3, 230:24, 235:1, 235:20, 236:4, 237:1, 240:24

**Jury** [6] - 1:14, 3:1, 90:22, 117:21, 133:16, 237:10

**jury's** [1] - 117:20

**Jury's** [1] - 62:4

**justice** [1] - 203:15

## K

**keep** [17] - 19:10, 40:24, 62:2, 64:4, 86:9, 95:25, 106:22, 106:23, 124:10, 149:15, 182:19, 200:19, 229:15, 229:17, 234:16, 236:15

**Kelly** [4] - 237:14, 239:19, 239:22, 240:11

**Kelsey** [1] - 1:17

**Kennedy** [2] - 3:19

**kept** [17] - 70:22, 70:23, 96:20, 106:24, 117:9, 135:23, 149:13, 156:23, 157:2, 157:3, 157:19, 229:16, 234:17, 234:18

**kid** [1] - 149:1

**kidnap** [1] - 178:7

**kidnapped** [9] - 155:20, 156:2, 156:3, 156:4, 178:1, 182:9, 183:9, 226:10, 227:7

**kidnapping** [2] - 182:8, 183:1

**kidnappings** [1] - 226:7

**kids** [8] - 67:5, 143:7, 144:16, 147:23, 148:12, 150:8, 171:24, 198:19

**kill** [2] - 171:6, 185:19

**killed** [9] - 98:7, 171:6, 174:21, 185:14, 188:2, 211:13, 214:13

**kilogram** [5] - 11:6, 11:12, 27:11, 28:18, 29:13

**kilos** [6] - 30:12, 30:13, 230:18, 230:21, 231:1

**kind** [45] - 4:1, 25:8, 34:7, 72:1, 72:3, 74:11, 87:20, 99:1, 99:5,

102:21, 106:24, 108:21, 109:18, 115:4, 115:6, 118:18, 124:10, 131:9, 133:10, 135:25, 138:22, 140:21, 172:5, 172:21, 175:9, 175:10, 183:25, 211:11, 216:12, 218:2, 218:4, 220:3, 227:1, 227:18, 228:11, 228:12, 230:4, 232:11, 233:18, 234:10, 234:18, 239:18, 241:12, 241:16
**kinds** [5] - 96:14, 98:2, 116:16, 224:24, 230:6
**Kippur** [1] - 239:13
**kitchen** [11] - 139:15, 139:16, 139:18, 139:20, 139:21, 139:24, 140:7, 140:23, 141:8, 153:11, 195:25
**knapsack** [1] - 229:17
**knot** [1] - 94:14
**knowing** [6] - 27:20, 28:2, 28:10, 30:16, 55:12, 189:13
**knowledge** [21] - 12:22, 54:18, 125:17, 138:14, 191:4, 191:7, 191:11, 191:22, 194:21, 194:25, 195:3, 195:4, 201:15, 201:20, 202:7, 207:17, 209:6, 221:7, 224:18, 226:3, 226:5
**known** [28] - 26:18, 26:22, 27:19, 31:17, 35:10, 64:1, 93:15, 93:22, 101:7, 102:14, 102:15, 103:23, 111:20, 135:9, 138:20, 152:4, 155:2, 171:24, 175:18, 175:21, 178:6, 179:3, 180:12, 188:21, 188:23, 190:17, 203:25, 213:3
**Kurland** [9] - 1:22, 88:23, 124:6, 127:4, 203:22, 238:19, 239:10, 241:14, 242:24
**KURLAND** [15] - 88:19, 117:6, 124:7, 125:23, 132:9, 203:19, 239:11, 239:15, 239:17, 240:10, 240:19, 241:2, 241:5, 241:11, 247:13
**Kurland's** [1] - 88:21

**L**

**labeled** [1] - 43:8
**labels** [1] - 166:11
**Ladies** [3] - 61:25,

215:2, 235:20
**ladies** [15] - 3:2, 3:3, 16:19, 32:25, 38:8, 48:4, 90:23, 90:24, 117:8, 133:17, 171:9, 191:2, 230:24, 234:25, 237:8
**lady** [1] - 112:15
**land** [5] - 45:1, 70:1, 70:4, 79:11, 196:1
**Land** [2] - 41:14, 41:21
**large** [8] - 2:13, 2:24, 26:21, 64:17, 172:5, 172:12, 176:17, 177:23
**Last** [1] - 215:20
**last** [22] - 7:14, 11:16, 15:22, 36:5, 38:11, 38:15, 38:18, 49:6, 71:21, 74:24, 128:17, 142:23, 150:5, 151:10, 168:17, 168:20, 198:25, 209:18, 215:18, 216:14, 216:24, 220:7
**late** [3] - 4:8, 50:3, 235:1
**Laura** [1] - 1:17
**lavaliere** [2] - 39:3, 40:24
**law** [8] - 3:24, 74:18, 192:12, 192:16, 192:20, 193:3, 202:25, 203:7
**LAWLOR** [58] - 53:1, 63:11, 75:14, 77:4, 79:16, 81:9, 82:9, 82:15, 82:18, 83:22, 90:5, 117:5, 120:3, 120:9, 120:11, 120:16, 121:7, 121:15, 121:19, 121:22, 122:5, 122:12, 122:20, 122:22, 123:1, 123:23, 124:5, 129:25, 130:11, 132:13, 132:19, 132:22, 133:12, 145:21, 152:5, 152:16, 160:2, 168:11, 168:16, 171:8, 171:21, 182:4, 182:6, 188:14, 191:1, 208:21, 211:1, 212:1, 212:4, 212:7, 212:11, 212:13, 212:16, 226:18, 227:2, 247:10, 247:12, 247:14
**Lawlor** [13] - 1:18, 79:15, 82:8, 83:16, 83:21, 90:4, 120:1, 122:21, 186:23, 208:4, 208:6, 211:18, 212:18
**lawyer** [1] - 191:20
**lawyers** [4] - 191:12, 191:14, 203:23, 245:23
**laying** [1] - 195:24
**lead** [2] - 133:10,

133:12
**leading** [6] - 85:15, 116:11, 136:13, 136:22, 137:5, 141:10
**leads** [1] - 31:12
**learn** [3] - 66:13, 69:12, 69:17
**learned** [1] - 66:5
**learning** [1] - 235:1
**least** [7] - 23:1, 58:10, 85:19, 85:23, 86:1, 161:10, 214:6
**leave** [27] - 11:20, 17:25, 25:3, 44:24, 61:25, 67:4, 84:13, 92:6, 94:2, 107:19, 108:7, 113:6, 114:8, 115:11, 117:18, 128:4, 144:23, 148:10, 149:24, 164:15, 166:15, 166:16, 206:6, 237:9, 244:24, 244:25, 245:9
**Leaving** [1] - 123:12
**leaving** [5] - 58:9, 85:11, 85:14, 94:7, 159:23
**lectern** [1] - 128:3
**led** [1] - 10:3
**left** [30] - 7:3, 25:9, 25:22, 33:5, 40:4, 45:9, 49:5, 54:9, 55:9, 56:12, 56:15, 84:10, 94:2, 94:5, 116:17, 144:7, 149:10, 150:3, 159:12, 159:16, 168:21, 181:7, 183:15, 183:16, 183:19, 199:8, 207:2, 207:4, 210:9, 244:21
**legal** [1] - 236:21
**length** [3] - 7:15, 18:12, 60:1
**lengthy** [1] - 7:15
**Less** [1] - 85:7
**less** [3] - 6:6, 52:18, 193:9
**letter** [2] - 2:6, 41:9
**level** [2] - 90:14, 125:19
**Liberty** [3] - 104:19, 104:20, 224:3
**lied** [2] - 187:14, 187:22
**life** [7] - 95:7, 98:4, 111:24, 135:22, 165:20, 184:8, 208:2
**light** [3] - 53:4, 178:23, 245:14
**likely** [2] - 178:11, 240:19
**Likewise** [1] - 132:13
**limited** [1] - 120:15
**line** [6] - 45:1, 70:1,

70:4, 79:11, 193:19, 196:1
**list** [5] - 35:4, 126:7, 126:17, 241:24, 243:3
**listed** [15] - 17:8, 30:4, 40:8, 41:9, 42:8, 42:10, 42:18, 43:25, 44:8, 44:11, 44:15, 44:18, 48:9, 59:15, 124:2
**listen** [26] - 56:22, 66:11, 67:6, 68:4, 68:15, 68:18, 69:7, 69:20, 70:9, 70:11, 70:17, 84:15, 84:17, 86:11, 107:6, 107:9, 114:24, 158:21, 159:25, 160:8, 160:15, 161:3, 183:15, 198:15, 199:11
**listened** [32] - 56:19, 63:4, 65:15, 68:1, 69:18, 70:12, 70:19, 71:1, 71:2, 71:5, 71:23, 72:13, 73:13, 73:16, 80:1, 84:18, 85:18, 85:20, 86:4, 159:1, 159:18, 161:2, 161:15, 180:23, 197:2, 199:16, 200:4, 200:7, 205:1, 210:9, 210:10
**listening** [18] - 68:20, 68:24, 70:22, 70:23, 71:4, 73:15, 86:9, 86:13, 107:10, 161:6, 161:18, 165:16, 198:4, 200:3, 210:13
**lists** [1] - 96:16
**litigated** [1] - 129:6
**live** [9] - 43:19, 52:10, 53:24, 58:3, 94:10, 94:22, 94:24, 220:20, 231:13
**lived** [1] - 220:23
**living** [9] - 18:6, 95:6, 95:10, 139:12, 181:19, 195:23, 195:24, 221:2
**loathe** [1] - 238:19
**located** [6] - 47:21, 50:21, 100:10, 139:11, 224:2, 224:9
**location** [14] - 12:14, 37:23, 38:2, 38:10, 39:25, 40:5, 40:6, 40:9, 48:25, 50:4, 50:23, 105:4, 121:11
**locations** [3] - 36:25, 51:2, 51:10
**Loch** [1] - 51:23
**locked** [11] - 169:9, 170:13, 170:17, 170:23, 171:5, 181:20, 181:24,

182:2, 185:19, 208:8, 208:10
**Lombard** [1] - 1:25
**look** [14] - 10:22, 20:8, 46:13, 53:5, 57:3, 137:16, 140:19, 177:11, 202:13, 207:18, 207:24, 239:6, 241:9
**looked** [6] - 47:25, 57:1, 130:7, 177:12, 186:13, 214:5
**looking** [12] - 7:24, 11:2, 57:9, 57:11, 57:23, 83:7, 112:24, 114:22, 127:5, 140:20, 188:4, 241:23
**looks** [2] - 80:24, 80:25
**lose** [1] - 22:7
**lost** [6] - 95:7, 98:4, 111:24, 132:15, 132:16, 135:22, 165:19, 208:2, 228:4
**loud** [2] - 184:2, 184:3
**louder** [1] - 26:7
**loudly** [1] - 39:5
**low** [2] - 12:6, 152:12
**lower** [1] - 168:9
**Lower** [1] - 168:10
**loyal** [2] - 11:7, 27:12
**lumped** [1] - 226:21
**lunch** [1] - 60:11
**luncheon** [1] - 117:8
**lying** [1] - 96:15

**M**

**M-A-G-G-I-N-S-O-N** [1] - 157:17
**Ma'am** [4] - 75:15, 81:10, 211:2, 212:20
**ma'am** [2] - 79:18, 186:25
**machine** [8] - 43:19, 45:7, 49:12, 49:15, 58:8, 70:19, 156:23, 157:7
**Magginson** [9] - 66:6, 67:17, 67:18, 68:7, 89:8, 157:15, 157:16, 219:20
**Magginson's** [1] - 66:14
**mail** [91] - 43:21, 43:22, 43:23, 44:2, 44:9, 44:14, 44:16, 44:19, 44:21, 44:22, 44:24, 45:1, 45:7, 45:12, 47:1, 47:10, 49:8, 49:12, 49:15, 49:18, 53:25, 54:7, 54:12, 55:2, 55:3, 55:16, 56:17, 58:4, 59:19, 59:23, 60:2, 63:5,

66:5, 66:13, 70:5, 77:4, 80:1, 80:11, 84:8, 84:12, 85:19, 85:21, 87:15, 115:8, 115:11, 115:20, 129:23, 158:13, 158:15, 158:17, 158:21, 159:2, 159:6, 159:7, 159:16, 159:22, 159:23, 159:25, 160:8, 160:15, 160:17, 160:20, 160:23, 161:2, 161:19, 161:20, 161:23, 162:1, 163:15, 164:11, 164:18, 165:4, 165:13, 165:17, 180:23, 183:15, 183:16, 185:22, 195:10, 198:14, 199:11, 199:16, 200:11, 203:10, 209:22, 210:8, 210:13, 213:2

**mail's** [1] - 55:18
**mailbox** [1] - 44:13
**mails** [15] - 44:6, 56:18, 56:21, 59:12, 97:3, 107:7, 107:10, 107:11, 107:19, 108:7, 114:25, 115:14, 115:15, 115:24, 164:15
**main** [1] - 230:4
**major** [5] - 25:19, 30:10, 30:12, 129:18
**majority** [2] - 38:22, 47:8
**majors** [1] - 30:5
**male** [1] - 26:16
**mall** [4] - 99:22, 166:19, 166:21, 201:22
**man** [5] - 68:10, 102:2, 172:1, 218:11, 219:21
**Manhattan** [1] - 26:17
**manner** [1] - 248:8
**map** [5] - 47:25, 48:3, 53:5, 62:18
**MAP** [1] - 48:3
**March** [14] - 42:6, 64:6, 64:8, 64:21, 93:9, 136:13, 137:5, 138:4, 142:22, 177:9, 186:5, 187:12, 195:22, 208:10
**marijuana** [8] - 8:7, 8:22, 15:1, 15:4, 15:6, 26:15, 26:22
**mark** [2] - 168:7, 183:4
**marked** [5] - 41:2, 47:13, 59:9, 167:19, 169:13
**market** [1] - 139:25
**marks** [3] - 227:18, 227:20, 227:21
**married** [6] - 66:19, 94:14, 94:19, 95:12, 99:17, 136:17

**marshal** [1] - 238:7
**marshals** [2] - 238:3, 242:1
**Mart** [1] - 194:13
**MARTIN** [18] - 1:8, 25:12, 28:13, 37:14, 62:16, 129:24, 130:1, 130:7, 130:10, 243:16, 243:21, 243:23, 244:13, 244:18, 244:22, 244:25, 245:2, 245:5
**Martin** [117] - 1:19, 1:20, 5:19, 5:20, 6:8, 6:22, 8:1, 9:17, 12:2, 12:14, 12:19, 12:20, 12:22, 12:25, 14:4, 14:6, 14:15, 14:23, 15:8, 15:17, 15:22, 15:24, 16:5, 16:7, 16:13, 16:15, 17:2, 17:4, 17:17, 18:22, 20:12, 21:9, 22:19, 22:23, 23:18, 24:2, 26:11, 27:2, 27:7, 27:13, 28:11, 32:17, 32:20, 33:3, 34:12, 53:17, 62:15, 63:22, 63:24, 74:3, 90:11, 101:1, 101:5, 101:8, 101:10, 101:21, 101:23, 102:7, 102:10, 102:16, 103:9, 103:14, 103:25, 104:8, 104:14, 105:2, 105:19, 105:23, 107:4, 107:19, 124:22, 127:7, 130:11, 162:5, 162:10, 162:15, 162:22, 163:2, 163:9, 165:25, 166:3, 166:15, 166:18, 170:8, 179:3, 179:20, 180:3, 185:7, 188:21, 189:10, 194:12, 194:14, 194:15, 195:13, 200:3, 201:2, 201:17, 209:9, 209:10, 211:10, 211:12, 211:16, 212:23, 213:24, 214:2, 214:7, 214:21, 219:22, 220:3, 220:9, 220:11, 220:13, 220:23, 221:4, 221:7, 244:20
**Martin's** [6] - 10:17, 73:21, 88:12, 200:10, 213:14, 213:23
**Mary** [3] - 1:24, 248:3, 248:14
**MARYLAND** [1] - 1:2
**Maryland** [18] - 1:12, 1:25, 3:19, 3:20, 4:14, 15:25, 37:1, 37:6, 41:13, 41:14, 41:21, 42:11, 42:12, 50:7, 50:22, 91:17, 95:5

**mask** [3] - 226:20, 227:4, 228:12
**masks** [3] - 227:1, 228:9, 228:11
**math** [1] - 92:11
**matter** [5] - 18:13, 73:7, 201:15, 248:4, 248:8
**matters** [1] - 236:21
**Maxie** [4] - 9:3, 23:10, 26:19, 31:15
**MB** [3] - 134:1, 134:2, 134:5
**MB-40A** [2] - 133:25, 134:4
**MB-40B** [1] - 134:4
**MB-53** [1] - 36:22
**McCaffity** [1] - 194:16
**mean** [49] - 9:7, 17:24, 18:1, 18:5, 18:7, 21:25, 23:8, 25:14, 25:15, 25:17, 39:24, 41:21, 42:13, 43:9, 44:2, 44:21, 49:4, 60:21, 77:18, 87:20, 99:20, 104:19, 112:2, 118:11, 119:10, 120:12, 127:9, 128:3, 128:15, 129:7, 132:5, 140:19, 146:9, 157:6, 160:6, 180:6, 184:1, 197:10, 200:23, 214:10, 218:3, 220:23, 229:23, 230:23, 231:11, 233:19, 241:1, 241:2
**meaning** [3] - 17:11, 26:17, 169:10
**means** [21] - 40:19, 41:17, 42:14, 42:16, 42:18, 42:19, 43:16, 44:18, 44:22, 48:10, 49:7, 49:11, 49:14, 49:17, 59:10, 59:11, 74:6, 89:17, 195:8, 222:7, 230:25
**media** [1] - 236:13
**medicine** [1] - 148:14
**meet** [19] - 8:5, 60:11, 66:15, 93:14, 99:20, 101:10, 103:20, 104:24, 104:25, 105:17, 111:1, 113:22, 126:1, 188:25, 192:2, 192:6, 206:11, 231:21, 232:12
**meeting** [8] - 9:12, 9:16, 23:10, 27:2, 110:23, 111:5, 146:3, 243:24
**member** [6] - 3:20, 35:12, 124:16, 125:4, 125:20, 126:3
**member's** [1] - 167:17
**members** [8] - 74:18,

74:22, 74:25, 75:1, 87:11, 87:14, 88:11, 89:4
**Members** [2] - 74:20, 236:4
**men** [4] - 65:2, 102:3, 168:2, 168:5
**Menlo** [1] - 51:16
**mention** [5] - 30:7, 132:6, 151:25, 237:2, 245:18
**mentioned** [19] - 8:15, 8:23, 35:5, 71:17, 112:19, 114:21, 114:24, 131:13, 136:19, 140:6, 146:4, 148:19, 148:22, 152:11, 161:23, 164:6, 165:9, 172:12, 239:16
**Mercedes** [2] - 38:25, 39:19
**message** [59] - 44:24, 45:9, 54:9, 55:9, 56:12, 56:15, 58:9, 59:19, 59:23, 63:5, 66:5, 66:24, 67:6, 67:8, 67:23, 68:1, 68:15, 68:18, 68:21, 68:24, 69:7, 69:10, 69:12, 69:18, 69:19, 69:21, 70:5, 73:13, 73:15, 84:10, 84:13, 84:15, 116:16, 158:13, 158:15, 158:17, 158:21, 159:2, 159:6, 159:7, 159:12, 159:15, 159:22, 159:25, 160:17, 160:21, 160:23, 161:2, 161:19, 161:20, 162:1, 183:16, 183:19, 198:23, 198:24, 198:25, 199:11, 199:17, 200:4
**messages** [12] - 70:7, 84:18, 85:11, 97:3, 116:5, 116:7, 180:23, 180:25, 181:1, 181:4, 181:7, 181:8
**met** [24] - 14:6, 15:8, 27:3, 27:6, 32:19, 93:18, 101:12, 101:20, 103:20, 111:5, 111:14, 112:19, 114:18, 179:5, 179:9, 179:10, 179:19, 179:22, 219:16, 220:14, 220:18, 222:17, 231:8, 231:23
**Michael** [2] - 1:16, 1:18
**Mickey** [4] - 9:3, 23:10, 26:23, 31:16
**microphone** [4] - 39:8, 133:15, 133:20, 137:22
**microwave** [1] - 153:12
**middle** [9] - 91:22, 91:25, 179:13, 192:7,

196:14, 196:17, 238:23, 243:25, 245:3
**midnight** [1] - 12:9
**midst** [1] - 157:19
**might** [30] - 41:21, 44:2, 44:14, 45:9, 55:24, 56:8, 58:14, 74:4, 75:7, 89:25, 95:23, 96:4, 96:14, 103:22, 116:24, 132:9, 151:1, 158:18, 161:11, 163:16, 164:21, 165:12, 204:23, 229:10, 232:24, 239:23, 240:21, 240:22, 242:22, 244:1
**Might** [3] - 67:17, 85:16, 173:24
**mike** [7] - 3:11, 35:20, 63:16, 64:5, 91:7, 212:19, 215:15
**miles** [1] - 52:12
**milk** [6] - 123:25, 124:2, 151:2, 151:4, 151:20, 151:21
**Mill** [1] - 109:8
**Mills** [1] - 223:22
**mind** [13] - 34:7, 62:3, 86:14, 86:17, 87:1, 122:17, 210:11, 212:8, 214:6, 214:13, 214:20, 235:17, 236:15
**mine** [1] - 185:20
**minimum** [2] - 125:1, 125:2
**minute** [19] - 11:17, 18:13, 30:4, 43:10, 43:11, 43:12, 44:9, 44:11, 55:4, 55:8, 55:16, 58:10, 58:25, 59:1, 59:23, 75:23, 145:23, 150:20, 182:7
**minutes** [32] - 11:25, 43:8, 43:13, 44:1, 44:15, 55:15, 59:22, 61:4, 62:3, 77:18, 77:19, 83:7, 90:21, 106:2, 113:7, 114:7, 124:1, 128:22, 151:11, 174:18, 197:4, 197:6, 197:8, 198:5, 204:8, 206:9, 214:25, 215:10
**Miranda** [6] - 6:19, 15:13, 15:18, 15:20, 26:12
**Mirandize** [2] - 6:23, 15:8
**Mirandized** [2] - 15:12, 15:17
**Mirandizing** [1] - 6:17
**missed** [3] - 58:15, 129:1, 145:1

**missing** [2] - 158:11, 245:10
**mistake** [4] - 77:8, 128:22, 190:8, 196:25
**mistaken** [2] - 85:11, 173:9
**misunderstood** [1] - 128:10
**MITCHELL** [1] - 1:7
**Mitchell** [78] - 1:17, 24:3, 24:17, 28:7, 28:8, 29:6, 34:20, 71:24, 81:11, 81:20, 82:4, 82:10, 82:12, 83:13, 90:13, 111:17, 111:19, 112:2, 112:3, 112:6, 112:8, 112:17, 113:3, 113:5, 113:6, 113:13, 113:18, 114:5, 114:8, 114:13, 116:5, 116:8, 116:16, 119:5, 120:8, 121:6, 121:8, 123:11, 124:21, 124:22, 126:15, 164:15, 171:11, 174:12, 180:6, 180:9, 180:18, 185:11, 186:2, 186:7, 186:12, 186:17, 186:18, 187:4, 187:10, 187:15, 188:25, 189:3, 189:11, 189:15, 190:23, 194:9, 195:14, 199:25, 205:12, 209:3, 209:22, 209:24, 210:6, 211:11, 211:12, 213:24, 214:2, 214:7, 214:21, 248:5
**Mitchell's** [7] - 73:18, 81:13, 84:9, 180:22, 203:8, 213:17, 213:22
**Mobile** [21] - 35:4, 35:14, 36:2, 36:3, 36:11, 37:1, 37:5, 41:8, 44:25, 47:10, 55:25, 56:9, 56:10, 57:17, 57:18, 57:23, 58:7, 58:10, 58:12, 58:16, 59:4
**Mobile's** [1] - 57:14
**modus** [1] - 11:24
**mom** [2] - 157:18, 157:22
**mom's** [5] - 159:16, 159:22, 160:1, 160:11, 210:10
**moment** [10] - 2:22, 18:2, 22:13, 39:3, 60:5, 63:1, 93:5, 168:18, 182:4, 215:11
**Mommy** [1] - 198:24
**Monday** [2] - 195:22, 199:1, 236:9, 236:10, 236:18, 240:3, 240:6,

240:7, 240:8, 240:21, 240:25, 241:15, 242:10, 242:12, 242:15, 242:19, 243:1, 243:17, 243:24, 244:8
**money** [75] - 96:17, 96:20, 97:10, 97:13, 97:14, 97:17, 97:23, 98:3, 98:5, 98:10, 99:9, 99:13, 99:18, 99:21, 100:19, 100:20, 100:22, 104:11, 104:14, 104:24, 105:7, 106:3, 106:8, 106:10, 106:11, 106:14, 106:22, 106:24, 106:25, 107:1, 107:3, 108:11, 108:12, 109:3, 109:5, 109:12, 109:15, 111:16, 114:19, 131:11, 131:22, 132:15, 134:25, 141:11, 141:13, 141:17, 141:22, 142:2, 142:17, 142:19, 149:8, 156:13, 175:15, 199:9, 225:2, 226:24, 228:19, 228:21, 229:8, 229:10, 229:16, 229:17, 229:20, 229:22, 231:3, 232:23, 232:24, 233:3, 233:20, 235:12
**monitor** [2] - 167:21, 189:25
**Montgomery** [8] - 237:14, 237:16, 239:20, 239:22, 240:2, 242:10, 242:20, 242:22
**Montgomery's** [1] - 239:23
**month** [3] - 18:5, 97:20, 207:10
**months** [6] - 85:10, 85:13, 85:15, 85:16, 85:17
**morning** [38] - 3:3, 3:16, 3:17, 14:3, 15:24, 19:6, 31:24, 35:16, 35:24, 35:25, 36:23, 37:10, 38:24, 41:1, 41:6, 47:25, 49:3, 49:21, 49:23, 50:1, 50:3, 51:1, 53:15, 53:16, 63:21, 77:21, 127:5, 143:4, 158:8, 158:9, 195:21, 199:2, 236:9, 238:15, 241:1, 241:16, 242:15, 242:22
**most** [6] - 25:16, 25:17, 84:5, 132:24, 191:5, 229:13
**mostly** [1] - 94:25
**Mostly** - 94:25

**mother** [11] - 66:6, 66:10, 67:17, 69:21, 75:1, 79:11, 151:21, 157:12, 159:10, 198:14
**mother's** [19] - 66:7, 66:9, 66:16, 67:4, 67:11, 67:13, 67:22, 70:6, 70:18, 79:3, 85:21, 157:14, 158:6, 159:9, 183:15, 198:18, 203:10, 216:24, 217:6
**mothers** [1] - 109:1
**motion** [2] - 2:11, 238:15
**motions** [2] - 2:18, 125:8
**mouth** [1] - 154:5
**Move** [2] - 171:8, 191:1
**move** [9] - 27:11, 29:12, 39:10, 39:13, 39:16, 40:25, 49:5, 193:9, 212:8
**moved** [7] - 18:6, 28:19, 31:14, 95:1, 95:5, 136:15, 221:4
**movie** [2] - 151:7, 151:9
**movies** [3] - 144:6, 144:7, 144:11
**moving** [3] - 65:19, 65:23, 65:24
**MR** [272] - 2:4, 2:8, 2:10, 2:15, 2:17, 2:19, 3:6, 3:15, 14:2, 16:9, 16:11, 16:18, 16:22, 18:18, 18:21, 19:5, 19:18, 20:14, 22:9, 22:11, 24:15, 25:5, 25:11, 25:12, 27:4, 27:14, 27:17, 27:23, 28:4, 28:13, 29:1, 31:23, 32:18, 32:21, 34:5, 34:15, 35:3, 35:8, 35:23, 37:14, 39:17, 39:18, 45:3, 45:18, 50:20, 50:24, 53:1, 53:14, 57:13, 58:20, 58:22, 61:18, 61:22, 62:7, 62:16, 62:23, 63:3, 63:11, 63:20, 72:23, 74:5, 75:14, 76:9, 77:4, 79:16, 81:9, 82:6, 82:9, 82:15, 82:18, 83:22, 88:4, 88:19, 88:20, 89:2, 89:16, 89:18, 89:21, 90:5, 90:21, 91:1, 91:11, 104:2, 105:8, 117:5, 117:6, 118:1, 118:10, 118:13, 118:19, 118:24, 119:3, 119:7, 119:12, 119:15, 119:19, 119:21, 119:24, 120:3, 120:9,

120:11, 120:16, 121:7, 121:15, 121:19, 121:22, 122:5, 122:12, 122:20, 122:22, 123:1, 123:23, 124:5, 124:7, 124:9, 124:15, 124:19, 125:1, 125:8, 125:14, 125:15, 125:22, 125:23, 127:24, 128:6, 128:9, 128:12, 128:17, 128:20, 129:3, 129:6, 129:12, 129:17, 129:20, 129:24, 129:25, 130:1, 130:7, 130:10, 130:11, 130:17, 130:23, 131:5, 132:4, 132:8, 132:9, 132:13, 132:18, 132:19, 132:22, 132:24, 133:5, 133:8, 133:12, 133:24, 134:9, 145:21, 152:5, 152:16, 154:8, 160:2, 160:24, 163:6, 166:6, 166:22, 167:3, 167:7, 168:11, 168:12, 168:14, 168:16, 171:8, 171:14, 171:21, 182:1, 182:4, 182:6, 186:21, 188:7, 188:14, 188:16, 190:5, 190:19, 190:22, 191:1, 191:25, 195:7, 195:9, 195:18, 203:19, 205:9, 208:21, 208:22, 208:25, 210:16, 211:1, 211:20, 211:24, 212:1, 212:4, 212:7, 212:11, 212:13, 212:16, 214:3, 214:16, 215:1, 215:8, 215:10, 215:23, 221:21, 221:24, 222:1, 222:5, 222:6, 222:8, 226:18, 227:2, 235:17, 237:13, 237:23, 238:2, 238:6, 238:13, 238:17, 239:4, 239:11, 239:15, 239:17, 240:8, 240:10, 240:14, 240:19, 241:2, 241:5, 241:11, 241:17, 242:7, 242:17, 242:23, 243:10, 243:16, 243:21, 243:23, 244:5, 244:10, 244:13, 244:18, 244:22, 244:25, 245:2, 245:5, 246:2, 247:3, 247:4, 247:4, 247:5, 247:6, 247:7, 247:8, 247:8, 247:10, 247:10, 247:11, 247:11, 247:12, 247:12, 247:13, 247:13, 247:14, 247:14, 247:16
**MS** [16] - 29:2, 29:5, 53:3, 53:11, 60:10, 62:10, 227:15, 234:24,

235:22, 241:15, 241:22, 243:2, 243:5, 243:8, 243:15, 247:5
**multiple** [5] - 122:10, 123:1, 154:18, 161:3, 161:6
**Multiple** [1] - 161:5
**murder** [4] - 69:15, 76:12, 76:21, 85:13, 111:22, 128:20, 129:1, 136:22, 141:20, 142:7, 162:10, 171:11, 204:6, 207:9
**murdered** [4] - 69:14, 80:2, 136:14, 172:14
**must** [7] - 76:25, 175:18, 175:21, 196:25, 201:12, 206:5
**MX-6** [6] - 10:20, 10:21, 10:23, 10:24, 23:20, 27:9

## N

**N-A-T-A-S-H-A** [2] - 63:18, 91:9
**name** [72] - 3:12, 7:23, 17:7, 23:2, 24:3, 24:5, 28:9, 35:4, 35:7, 35:8, 35:20, 41:13, 63:17, 63:21, 66:17, 68:10, 71:21, 88:12, 89:13, 89:14, 91:8, 92:25, 100:25, 101:3, 101:16, 102:9, 108:19, 113:1, 116:13, 116:15, 135:14, 145:15, 145:17, 151:25, 152:11, 157:14, 161:1, 163:24, 174:10, 181:8, 181:14, 181:16, 190:13, 190:15, 194:18, 194:20, 202:15, 203:22, 210:19, 215:16, 215:18, 215:20, 216:17, 216:20, 216:24, 216:25, 217:1, 217:4, 217:6, 218:10, 218:11, 219:19, 219:21, 225:17, 231:8, 231:9, 231:11, 231:12
**name's** [1] - 188:19
**named** [10] - 26:19, 67:20, 108:17, 111:17, 135:12, 176:11, 178:14, 198:10, 208:14, 243:7
**namely** [1] - 46:9
**names** [13] - 5:13, 25:3, 25:4, 25:8, 35:5, 67:15, 71:12, 96:16, 100:24, 126:16, 135:8, 160:23, 163:3
**Names** [1] - 96:17

narcotics [5] - 8:9, 28:19, 99:6, 119:9, 175:6
NATASHA [3] - 63:14, 91:5, 247:9
Natasha [7] - 61:19, 62:8, 63:18, 91:2, 91:9, 219:20
nature [1] - 145:24
near [5] - 28:17, 193:11, 193:14, 205:17, 206:7
nearest [1] - 52:3
necessarily [3] - 30:7, 56:12, 170:23
need [23] - 8:11, 11:25, 39:15, 60:17, 60:18, 61:6, 62:11, 62:12, 62:13, 88:24, 123:20, 130:10, 167:1, 212:6, 224:25, 225:4, 225:6, 225:8, 236:21, 239:21, 240:15, 242:2, 242:9
needed [5] - 21:14, 142:14, 151:21, 222:13, 233:13
needs [1] - 126:25
neglected [1] - 167:3
neighborhood [3] - 179:6, 179:7, 179:8
neighborhoods [1] - 94:24
Never [2] - 24:20, 212:8
never [33] - 17:17, 47:6, 54:4, 54:21, 55:8, 56:22, 72:21, 80:15, 83:12, 83:17, 83:19, 95:18, 99:22, 104:11, 126:7, 129:6, 176:1, 176:5, 181:25, 186:8, 186:9, 192:19, 193:4, 221:9, 223:2, 223:6, 225:12, 231:8, 231:23, 232:2
nevertheless [1] - 47:6
new [1] - 151:7
New [21] - 8:1, 8:24, 9:1, 13:17, 26:17, 29:22, 35:9, 35:13, 36:7, 36:10, 36:12, 50:14, 52:8, 52:10, 52:14, 52:15, 52:16, 61:2, 155:5, 231:19
Next [2] - 35:2, 61:17
next [27] - 3:5, 35:3, 49:3, 49:21, 50:1, 51:1, 51:6, 54:10, 61:18, 90:25, 102:2, 112:15, 128:6, 151:3, 158:5, 170:4, 214:25, 215:6, 215:7, 236:10, 236:17, 236:22, 237:24, 241:8, 242:8, 242:25, 245:16

nice [2] - 237:1, 241:18
nicely [1] - 241:19
nickname [4] - 135:16, 175:25, 194:19, 221:14
nicknames [2] - 102:24, 112:6
Niedermeier [6] - 65:6, 70:14, 73:10, 90:2, 242:5, 243:12
night [16] - 64:21, 141:19, 142:7, 150:12, 150:17, 150:22, 156:16, 158:19, 162:9, 162:23, 163:13, 190:11, 198:25, 199:8, 203:5, 241:11
nines [2] - 49:13, 49:14
NO [1] - 1:6
nobody [3] - 68:4, 78:5, 88:8
Nobody [1] - 69:6
nobody's [1] - 121:16
non [1] - 124:24
non-RICO [1] - 124:24
None [2] - 119:21, 235:2
none [1] - 126:16
nonetheless [1] - 182:23
normal [3] - 47:2, 117:9, 150:9
normally [1] - 144:8
north [2] - 48:12, 50:23
northeast [6] - 38:14, 40:2, 40:12, 48:25, 51:20
NORTHERN [1] - 1:2
northwest [2] - 38:15, 40:4
nosey [2] - 114:2, 116:3
nosy [2] - 107:12, 107:13
note [4] - 14:12, 62:1, 117:18, 237:9
noted [7] - 14:19, 17:21, 102:8, 103:7, 112:18, 122:3, 122:4
notes [3] - 14:22, 16:1, 20:3, 20:5, 96:11, 127:5, 131:1, 220:10, 236:23
noteworthy [1] - 17:12
Nothing [7] - 13:25, 24:4, 24:7, 24:10, 24:12, 166:25, 210:24
nothing [12] - 17:15, 21:2, 22:6, 54:23, 68:14, 81:4, 83:20, 98:25, 170:19, 201:1, 214:22, 238:25
notice [14] - 14:6, 14:12, 14:15, 15:3, 50:18
Number [1] - 40:1

number [40] - 14:9, 24:16, 26:20, 26:23, 33:5, 37:8, 37:12, 37:24, 38:12, 38:17, 39:25, 42:23, 43:7, 44:1, 44:15, 46:7, 46:8, 46:15, 54:16, 55:5, 55:7, 57:10, 57:24, 58:7, 89:14, 89:23, 115:7, 120:5, 134:1, 138:11, 150:14, 151:4, 155:15, 175:18, 191:5, 209:5, 209:12, 236:5, 245:8
Number(s [1] - 248:5
numbers [19] - 23:12, 23:14, 31:17, 32:10, 32:12, 38:1, 38:5, 38:11, 43:2, 46:3, 46:5, 56:21, 133:1, 133:2, 133:22, 133:25, 134:1, 134:2, 156:24

# O

o'clock [1] - 243:25
Oak [3] - 104:18, 104:19, 104:20
oath [3] - 133:19, 177:5, 215:12
object [4] - 7:8, 12:13, 191:14, 211:24
objected [1] - 21:16
Objection [53] - 16:9, 16:18, 18:18, 19:18, 20:14, 22:9, 25:5, 25:11, 25:12, 27:4, 27:14, 27:23, 28:4, 28:13, 32:18, 32:21, 34:15, 34:17, 72:23, 74:5, 82:6, 88:4, 89:16, 104:2, 105:8, 117:5, 117:6, 145:21, 152:5, 152:16, 154:8, 160:2, 160:24, 163:6, 166:6, 166:22, 168:11, 168:16, 171:8, 182:1, 188:7, 191:1, 195:7, 208:21, 210:16, 214:3, 214:16, 222:1, 222:6, 226:18, 227:2, 227:15, 234:24
objection [16] - 16:20, 22:10, 122:3, 123:12, 127:15, 127:16, 127:25, 132:11, 132:20, 168:12, 186:21, 191:15, 191:18, 211:21, 212:10
objection's [4] - 25:6, 25:13, 234:25, 235:9
objective [1] - 214:5
objects [1] - 2:12

observations [2] - 14:19, 213:1
observe [3] - 104:10, 104:17, 111:12
observed [6] - 32:25, 99:12, 103:17, 107:4, 108:12, 124:10
observing [1] - 177:2
obtain [1] - 11:18
obviate [1] - 132:9
obvious [1] - 52:1
obviously [9] - 23:22, 34:1, 89:23, 89:25, 126:11, 155:10, 196:24, 204:3, 204:16
Obviously [2] - 121:14, 239:3
occasion [12] - 36:16, 82:2, 83:11, 139:13, 176:15, 180:20, 182:18, 182:21, 182:22, 182:24, 183:14, 227:12
Occasionally [1] - 140:5
occasionally [4] - 4:23, 25:9, 138:18, 142:10
occasions [7] - 83:24, 84:22, 142:20, 155:19, 156:14, 178:1, 245:18
occurred [1] - 120:21
October [2] - 1:11, 248:5
odor [2] - 15:3, 15:6
OF [3] - 1:2, 1:5, 1:11
offense [1] - 235:4
office [5] - 6:13, 7:2, 7:3, 7:4, 12:15
Office [1] - 237:25
officer [6] - 4:5, 4:7, 4:10, 6:2, 20:25, 30:20
officers [1] - 74:18
official [1] - 248:7
Official [1] - 248:15
often [6] - 82:11, 125:11, 131:19, 178:19, 178:20, 229:8
old [6] - 91:14, 92:8, 93:15, 93:18, 216:1, 219:1
Old [3] - 92:1, 205:25, 220:20
older [1] - 179:12
oldest [1] - 144:9
Oliver [1] - 194:16
omissions [1] - 127:12
ON [3] - 247:10, 247:10, 247:11
once [5] - 53:24, 86:17, 97:19, 156:3, 228:25
Once [1] - 82:20

one [110] - 11:11, 27:11, 28:18, 29:12, 29:24, 32:7, 37:12, 38:18, 39:24, 40:1, 40:5, 40:9, 40:14, 43:10, 43:11, 44:9, 44:11, 45:23, 50:23, 51:16, 55:4, 55:8, 56:5, 57:11, 58:10, 58:25, 59:1, 59:5, 60:5, 62:24, 63:5, 66:25, 68:3, 75:24, 81:6, 81:14, 81:19, 82:2, 83:11, 83:23, 86:5, 86:14, 87:23, 88:7, 99:25, 103:3, 107:5, 112:13, 120:5, 125:12, 139:10, 139:14, 142:12, 144:16, 149:3, 151:4, 154:11, 157:21, 161:3, 163:24, 164:11, 167:4, 167:8, 167:23, 168:7, 168:17, 168:20, 168:21, 169:6, 170:1, 170:2, 171:9, 174:15, 176:15, 179:22, 180:15, 181:3, 181:11, 182:4, 182:22, 183:3, 184:4, 184:10, 184:21, 188:19, 199:20, 203:22, 204:10, 205:21, 208:24, 209:2, 210:9, 215:11, 217:14, 217:20, 220:7, 220:25, 222:17, 226:9, 228:18, 229:2, 231:6, 232:4, 234:8, 234:9, 234:22, 242:21
One [10] - 13:3, 72:1, 80:10, 82:21, 106:22, 148:24, 151:21, 180:2, 217:20, 238:6
one's [1] - 45:21
one-third [1] - 40:14
ones [4] - 24:23, 34:9, 59:8, 59:9
open [4] - 62:3, 174:7, 174:9, 236:15
opened [1] - 174:5
opening [1] - 126:6
openly [1] - 21:25
operandi [1] - 11:24
operated [1] - 36:25
operating [1] - 42:22
opinion [9] - 2:13, 2:15, 2:21, 2:23, 14:25, 18:2, 171:11, 239:7
opinions [1] - 165:12
opportunity [5] - 110:16, 188:25, 192:2, 195:10, 204:7
optimistic [1] - 128:21
orange [1] - 170:1

**oranges** [1] - 122:24
**order** [6] - 9:10, 75:15, 124:7, 235:25, 241:23, 242:8
**ordered** [1] - 36:15
**ordinary** [1] - 233:8
**organization** [2] - 24:9, 24:18
**organizations** [1] - 24:25
**Otherwise** [1] - 53:6
**otherwise** [1] - 127:1
**ought** [3] - 50:7, 129:15, 130:14
**ounces** [13] - 8:3, 9:8, 11:6, 11:11, 13:24, 26:25, 27:11, 28:18, 29:7, 29:10, 29:12, 228:24
**ourselves** [1] - 122:19
**outbound** [8] - 42:20, 42:21, 42:25, 43:25, 44:4, 44:8, 44:17, 45:5
**outgoing** [8] - 46:6, 46:19, 47:8, 49:25, 55:11, 57:2, 59:18
**outside** [7] - 61:12, 61:14, 206:3, 206:25, 207:6, 211:7, 240:23
**overcome** [1] - 90:10
**overhear** [2] - 68:23, 145:11
**overheard** [3] - 64:24, 77:1, 105:13
**overly** [1] - 128:21
**Overruled** [26] - 19:19, 20:15, 27:5, 27:15, 28:5, 28:14, 72:24, 104:3, 105:9, 145:22, 152:6, 152:17, 154:9, 160:3, 160:25, 163:7, 166:7, 168:18, 208:23, 210:17, 214:4, 214:17, 222:2, 226:19, 227:3, 227:16
**overruled** [2] - 25:6, 25:13, 34:17, 127:25, 234:25, 235:9
**owe** [1] - 231:3
**owed** [2] - 233:21, 235:12
**Owings** [1] - 223:22
**own** [10] - 70:12, 71:1, 73:16, 84:17, 86:17, 93:10, 165:17, 174:16, 214:6, 223:24
**owned** [2] - 23:18, 172:23

**P**

**p.m** [6] - 117:11, 117:20, 130:19, 241:7, 241:12, 246:3
**package** [18] - 137:6, 137:7, 137:9, 137:12, 137:16, 137:25, 138:24, 139:5, 139:9, 139:22, 141:9, 142:1, 149:8, 177:2, 177:12, 177:17, 177:21, 177:23
**packages** [2] - 96:2, 96:5, 138:4, 138:5, 138:8, 138:9, 139:13, 139:18, 232:2
**pads** [3] - 62:1, 117:18, 237:9
**PAGE** [1] - 247:2
**Page** [2] - 41:12, 41:14
**page** [5] - 37:14, 37:15, 49:5, 49:21, 211:19
**paged** [1] - 145:1
**pagenated** [1] - 37:15
**pager** [21] - 26:20, 70:20, 72:2, 80:10, 80:11, 84:2, 84:6, 84:8, 84:11, 84:12, 115:5, 115:6, 115:11, 115:16, 115:18, 115:20, 115:22, 164:13, 180:23, 196:10
**pagers** [1] - 164:15
**pages** [5] - 37:3, 37:12, 37:15, 41:25, 248:6
**paging** [1] - 26:19
**paper** [4] - 96:7, 96:9, 96:15, 96:18
**paperwork** [1] - 7:22
**paragraph** [2] - 23:8, 32:23
**Paragraph** [8] - 23:8, 25:22, 25:24, 26:2, 28:16, 33:9, 33:11, 34:3
**paranoid** [1] - 192:17
**Pardon** [9] - 66:8, 69:24, 71:8, 72:16, 84:20, 85:1, 178:9, 199:14, 202:20
**Park** [6] - 48:5, 51:3, 51:7, 109:8, 109:25, 110:2
**parking** [2] - 206:2, 206:9
**Parkville** [1] - 42:11
**parole** [1] - 217:22
**Parsippany** [2] - 36:7, 36:12
**Part** [1] - 4:21
**part** [27] - 6:11, 14:23,

20:18, 70:13, 78:19, 91:20, 100:3, 100:10, 100:12, 104:21, 106:19, 109:23, 110:1, 120:13, 126:8, 126:13, 126:19, 130:5, 133:10, 137:3, 139:8, 168:9, 168:10, 195:1, 223:5, 232:18
**particular** [26] - 5:8, 11:1, 33:16, 47:12, 57:10, 57:23, 57:24, 90:9, 99:22, 100:24, 107:5, 107:25, 108:1, 125:4, 127:2, 138:24, 138:25, 139:8, 140:6, 143:11, 143:17, 149:17, 156:16, 159:6, 201:1, 217:9
**Particularly** [1] - 193:7
**particularly** [4] - 193:10, 193:14, 193:22, 239:21
**particulars** [1] - 125:9
**parties** [5] - 55:13, 55:18, 57:1, 57:12, 58:1
**parts** [2] - 94:24, 99:19
**party** [1] - 192:4
**pass** [2] - 84:17, 160:13
**passed** [4] - 173:12, 173:14, 175:1, 176:16
**past** [7] - 8:10, 117:9, 156:1, 162:5, 205:25, 216:17
**patience** [1] - 133:18
**patrol** [1] - 4:3
**Paul** [3] - 1:19, 188:19, 244:25
**Pause** [5] - 51:25, 53:2, 81:8, 180:16, 212:15
**pay** [3] - 232:19, 232:21, 234:23
**paying** [1] - 79:19, 154:22
**payments** [2] - 110:12, 237:3
**peace** [1] - 118:17
**pending** [1] - 217:25
**Pennsylvania** [33] - 116:20, 116:23, 117:4, 117:25, 118:3, 118:4, 118:6, 118:12, 118:15, 119:8, 119:9, 119:18, 119:19, 119:23, 121:9, 121:13, 123:19, 131:1, 131:7, 131:9, 132:2, 132:7, 132:15, 134:14, 134:15, 134:20, 134:24, 135:1, 173:7, 173:13, 173:17, 173:19, 173:22
**people** [83] - 5:13,

14:12, 25:3, 25:14, 25:15, 25:19, 30:2, 30:4, 31:17, 32:2, 32:3, 34:8, 34:9, 54:3, 54:6, 65:22, 67:14, 67:19, 68:16, 68:18, 69:1, 69:13, 69:14, 70:11, 71:5, 71:6, 71:7, 71:9, 71:10, 73:5, 73:17, 74:13, 77:22, 85:19, 85:23, 88:2, 88:6, 88:11, 89:24, 97:4, 99:14, 99:19, 102:10, 111:1, 111:14, 115:3, 126:17, 160:18, 161:18, 161:19, 161:20, 165:9, 165:11, 167:13, 169:20, 169:21, 175:4, 175:18, 175:22, 185:18, 185:22, 187:21, 187:25, 188:3, 197:2, 197:12, 200:16, 201:5, 201:8, 202:3, 203:4, 204:23, 209:5, 224:19, 225:7, 233:8, 235:7, 243:7, 245:19
**People** [3] - 25:17, 25:19, 101:18
**per** [2] - 26:12, 133:9
**percentage** [1] - 232:22
**perfect** [1] - 243:17
**perfectly** [3] - 10:24, 122:8, 127:9
**perhaps** [2] - 60:11, 60:15
**Perhaps** [2] - 39:10, 117:7
**Period** [1] - 83:19
**period** [20] - 29:8, 29:10, 29:13, 68:14, 77:16, 85:9, 95:15, 97:16, 98:2, 116:10, 116:11, 162:9, 197:3, 198:5, 199:12, 217:3, 223:8, 223:9, 223:17, 230:16
**periods** [1] - 64:17
**permission** [1] - 237:15
**permit** [2] - 90:7, 191:16
**permitted** [3] - 2:20, 191:3, 191:23
**person** [27] - 4:24, 7:21, 7:23, 15:5, 15:6, 15:7, 40:10, 43:23, 45:9, 48:11, 49:14, 49:16, 53:24, 56:5, 81:2, 82:19, 83:18, 83:19, 83:23, 84:13, 145:15, 169:1, 181:3, 184:21, 187:15, 218:20, 229:16
**person's** [2] - 44:12,

45:6
**personal** [11] - 18:2, 191:4, 191:7, 191:10, 191:22, 194:25, 195:3, 195:4, 201:15, 201:20, 202:7
**personally** [3] - 80:15, 231:21, 231:23
**personnel** [1] - 236:6
**persons** [2] - 5:18, 35:5
**pertains** [1] - 4:20
**Pete** [23] - 77:2, 78:4, 101:12, 101:13, 101:18, 101:20, 135:10, 147:24, 147:25, 148:18, 151:23, 154:24, 157:2, 157:19, 197:20, 197:21, 218:22, 218:23, 219:1, 219:6, 219:7, 219:8
**Peter** [1] - 135:9
**PH-55** [1] - 218:21
**PH-56** [1] - 218:15
**PH-70** [1] - 225:20
**phone** [158] - 23:12, 23:14, 32:10, 32:12, 38:12, 38:21, 40:10, 40:11, 40:18, 40:19, 40:20, 42:22, 43:13, 43:14, 44:17, 44:18, 44:20, 45:2, 45:23, 46:3, 46:5, 46:15, 48:11, 49:15, 49:17, 52:2, 52:3, 54:2, 54:19, 55:11, 55:22, 56:6, 56:10, 57:2, 57:3, 57:9, 57:11, 57:15, 58:10, 58:25, 59:5, 64:20, 64:24, 66:1, 66:5, 66:14, 69:22, 69:23, 69:25, 70:1, 70:2, 70:4, 70:6, 70:8, 75:24, 76:2, 76:5, 76:14, 76:23, 76:24, 76:25, 77:1, 77:16, 78:6, 78:10, 78:11, 78:17, 78:18, 78:22, 79:12, 79:13, 79:14, 79:22, 83:20, 84:7, 84:10, 85:21, 89:13, 105:12, 105:13, 105:15, 112:4, 115:3, 115:12, 129:2, 144:19, 144:22, 144:24, 144:25, 145:2, 145:4, 145:6, 145:8, 145:11, 145:20, 146:13, 146:15, 146:17, 147:25, 148:1, 148:2, 148:5, 150:18, 150:23, 151:10, 151:18, 152:1, 153:11, 153:14, 153:17, 153:20, 153:25, 154:4, 156:17, 156:21, 156:25,

157:2, 157:5, 157:6, 157:19, 159:7, 159:9, 159:12, 159:13, 159:14, 159:15, 159:21, 159:23, 160:1, 160:11, 164:22, 183:16, 183:21, 184:1, 195:25, 196:1, 196:7, 196:10, 196:13, 196:16, 196:21, 197:17, 198:10, 198:25, 199:21, 203:10, 206:1, 208:13, 208:14, 210:10, 224:1, 224:8

**phone's** [1] - 54:3
**phones** [4] - 70:7, 149:15, 149:18, 157:8
**photo** [25] - 80:21, 81:1, 81:11, 81:13, 81:21, 82:3, 184:24, 184:25, 185:10, 186:6, 187:3, 209:12, 209:14, 209:15, 210:2, 211:9, 211:15, 211:19, 212:9, 212:10, 212:23, 213:12, 214:5, 218:16, 225:20
**photograph** [1] - 169:3
**photographs** [4] - 81:17, 167:13, 169:21, 203:8
**photos** [2] - 167:23, 169:20
**physical** [7] - 37:23, 43:18, 43:24, 58:3, 182:15, 183:2
**Pick** [2] - 100:19, 100:20
**pick** [16] - 13:5, 15:25, 16:8, 16:16, 17:18, 49:9, 52:10, 70:21, 82:4, 99:21, 143:22, 144:8, 144:10, 147:23, 148:9, 156:21
**picked** [10] - 10:7, 23:23, 137:22, 144:8, 148:12, 148:19, 149:3, 157:8, 229:20, 232:2
**picking** [4] - 105:7, 147:16, 151:4, 230:21
**picks** [1] - 153:22
**picture** [15] - 81:14, 81:19, 82:3, 185:10, 186:2, 186:12, 186:13, 186:16, 187:10, 187:15, 202:25, 203:8, 203:13, 213:17, 218:20
**pictures** [5] - 81:20, 187:25, 188:3, 188:9
**pie** [2] - 40:14, 48:11
**piece** [1] - 127:19
**pieces** [4] - 96:7, 96:9, 96:14, 96:18

**Pimlico** [2] - 51:10, 51:13
**pipeline** [3] - 4:14, 4:16, 4:19
**place** [20] - 5:22, 6:11, 10:12, 27:22, 45:5, 52:2, 59:13, 99:22, 99:25, 100:6, 100:7, 105:5, 105:17, 110:6, 162:10, 165:20, 200:8, 215:12, 232:9, 238:5
**placed** [7] - 12:1, 42:22, 43:5, 46:3, 59:19, 64:20, 64:24
**places** [3] - 97:11, 99:20, 99:23
**placing** [1] - 49:14
**Plain** [1] - 18:8
**planned** [5] - 10:21, 27:9, 128:23, 131:9, 148:3
**planning** [3] - 129:21, 147:11, 237:13
**plans** [7] - 60:14, 144:4, 144:10, 144:16, 147:1, 147:6
**plastic** [4] - 139:25, 140:1, 140:9, 140:10
**play** [4] - 69:22, 129:19, 129:22, 223:5
**played** [1] - 195:11
**player** [1] - 130:5
**playing** [1] - 129:21
**plea** [1] - 218:3
**Plum** [3] - 68:11, 89:13, 89:14
**PLUM** [1] - 68:11
**pocket** [1] - 226:24
**point** [40] - 11:3, 17:15, 30:3, 46:11, 62:17, 71:25, 94:11, 94:13, 117:7, 117:9, 125:21, 130:1, 136:15, 141:17, 142:1, 143:21, 144:19, 146:2, 147:21, 151:12, 152:3, 152:22, 153:22, 154:20, 155:12, 155:16, 156:24, 157:11, 157:22, 158:13, 160:8, 161:10, 184:24, 199:4, 206:18, 211:20, 220:1, 221:18, 229:11, 241:13
**Point** [2] - 232:10, 232:12
**pointed** [1] - 25:21
**pointing** [1] - 107:24
**Police** [8] - 3:19, 3:21, 3:23, 4:2, 4:14, 4:18, 4:22
**police** [9] - 20:24,

119:1, 141:4, 167:10, 185:9, 186:4, 187:13, 209:13, 210:19
**Poppi** [25] - 9:3, 9:19, 11:4, 11:6, 13:21, 13:23, 23:9, 26:18, 26:19, 26:25, 27:1, 27:2, 27:7, 27:10, 27:12, 29:12, 29:15, 29:20, 29:24, 30:9, 31:3, 31:9, 31:16, 32:19
**poppy** [1] - 125:17
**populate** [1] - 52:17
**populated** [3] - 52:17, 52:19, 52:20
**portion** [1] - 64:14
**position** [4] - 121:20, 121:22, 123:8, 155:9
**positions** [2] - 122:8, 192:21
**possession** [2] - 172:11, 217:13
**possible** [5] - 56:11, 59:23, 62:24, 87:24, 237:7, 242:10
**possibly** [2] - 56:8, 112:20
**postpone** [1] - 242:7
**potential** [1] - 35:5
**powder** [1] - 11:14
**practice** [2] - 58:13, 196:19
**practices** [2] - 57:14, 59:5
**pre** [1] - 226:11
**pre-release** [1] - 226:11
**preceding** [2] - 51:19, 64:8
**precisely** [1] - 62:18
**predating** [1] - 127:12
**predicate** [1] - 123:5
**predicates** [1] - 120:20
**preference** [1] - 129:17
**prefix** [2] - 42:17, 43:3
**prefixes** [1] - 43:1
**pregnant** [2] - 144:1, 144:2
**preparations** [3] - 143:22, 147:22, 165:22
**prepared** [1] - 166:4
**preponderance** [2] - 126:1, 127:10
**presence** [3] - 90:19, 162:6, 240:23
**present** [4] - 6:3, 27:13, 34:13, 120:25
**presentation** [1] - 240:23
**Pretty** [3] - 55:23, 158:20, 178:20

**pretty** [15] - 68:22, 92:23, 93:21, 97:21, 103:23, 128:15, 130:13, 136:7, 146:16, 178:5, 181:5, 199:4, 199:23, 201:8, 233:25
**previous** [3] - 13:5, 13:8, 13:12
**previously** [3] - 80:11, 90:8, 155:22
**prima** [5] - 124:18, 126:3, 127:13, 127:18, 127:19
**printout** [2] - 37:20, 41:15
**priority** [1] - 241:25
**probation** [1] - 217:22
**probe** [1] - 34:2
**problem** [5] - 2:9, 18:16, 237:22, 243:19, 245:2
**problems** [1] - 226:7
**procedures** [1] - 53:18
**proceed** [7] - 2:2, 90:25, 117:12, 117:14, 133:23, 171:13, 191:24
**proceedings** [7] - 51:25, 53:2, 81:8, 212:15, 245:8, 248:4, 248:7
**Proceedings** [3] - 2:1, 180:16, 246:3
**process** [1] - 62:7
**produce** [1] - 114:18
**products** [1] - 111:9
**proffer** [7] - 123:18, 123:21, 125:24, 126:23, 126:25, 130:25
**proffers** [1] - 121:8
**program** [1] - 238:11
**Program** [1] - 238:7
**progress** [1] - 124:5
**prominent** [1] - 191:5
**promise** [1] - 22:3
**promptly** [1] - 237:7
**properly** [2] - 33:7, 165:23
**prosecute** [1] - 218:8
**prosecuted** [1] - 99:5
**prosecutors** [3] - 74:16, 74:17, 187:13
**protect** [2] - 207:18, 207:24
**Protection** [1] - 238:7
**provide** [2] - 25:3, 59:1
**provided** [8] - 17:8, 23:5, 33:13, 37:21, 98:22, 98:23, 209:21, 235:5
**pulled** [2] - 37:12, 232:8

**purchase** [2] - 175:5, 176:4
**purchased** [10] - 8:2, 8:3, 9:9, 16:8, 16:17, 17:19, 26:21, 26:24, 175:24, 202:3
**purchasing** [1] - 8:9
**purpose** [2] - 81:3, 171:12
**purposefully** [1] - 82:4
**purposes** [1] - 120:14
**pursuant** [2] - 18:25, 218:3
**push** [1] - 196:15
**put** [21] - 36:22, 39:2, 49:10, 55:24, 106:15, 106:25, 130:23, 142:1, 142:19, 149:7, 159:22, 160:13, 167:16, 167:20, 188:11, 189:25, 192:21, 196:16, 238:20, 241:5, 242:11
**putting** [1] - 137:13
**Putting** [1] - 137:15
**Pyne** [9] - 1:21, 14:3, 14:5, 16:21, 17:20, 18:24, 53:17, 57:13, 57:16
**PYNE** [12] - 14:2, 16:11, 16:22, 18:21, 27:4, 27:14, 32:18, 32:21, 34:15, 53:14, 247:4, 247:8

## Q

**quantities** [3] - 172:12, 175:15
**quantity** [4] - 10:6, 13:5, 13:8
**quarter** [1] - 244:1
**questioning** [1] - 33:6
**questions** [36] - 8:14, 20:2, 23:4, 24:17, 31:25, 33:2, 34:7, 41:12, 42:7, 52:22, 53:5, 53:12, 58:20, 58:24, 60:5, 75:18, 80:4, 88:16, 88:19, 93:12, 115:2, 128:18, 161:9, 176:19, 188:14, 195:16, 203:24, 205:7, 205:10, 207:11, 209:5, 209:12, 210:8, 211:2, 214:23
**quick** [1] - 93:21
**quicker** [1] - 239:20
**Quite** [1] - 86:12
**quite** [13] - 33:7, 39:11, 67:14, 74:22, 85:2,

86:13, 89:9, 202:14, 202:22, 204:3, 204:16, 235:1, 240:19
**quote** [1] - 2:13
**quote-unquote** [1] - 2:13

**R**

**racketeering** [1] - 123:2
**radio** [2] - 77:14, 84:6
**Rahman** [7] - 189:6, 189:8, 189:11, 190:10, 192:2, 192:4, 192:6
**Rahman's** [1] - 189:15
**raid** [3] - 118:22, 118:25, 119:17
**raise** [1] - 35:15
**raising** [1] - 94:18
**Rakoff's** [1] - 239:7
**ran** [8] - 110:3, 118:4, 118:15, 119:1, 123:19, 131:10, 217:21, 226:20
**Randallstown** [22] - 91:21, 91:22, 92:3, 94:25, 95:2, 95:20, 100:4, 100:11, 101:6, 102:20, 109:25, 208:24, 216:6, 216:7, 219:5, 219:12, 219:13, 219:15, 220:17, 220:22, 224:3, 225:23
**Randallstown/Park** [2] - 24:8, 24:18
**rang** [1] - 153:15
**range** [1] - 92:23
**RAT** [3] - 41:16, 41:18
**Rather** [1] - 48:16
**rather** [10] - 49:15, 61:7, 61:9, 170:13, 170:16, 170:20, 185:19, 203:14, 236:7
**Raven** [1] - 51:23
**re** [2] - 6:23, 242:6
**re-Mirandize** [1] - 6:23
**re-set** [1] - 242:6
**reach** [2] - 156:19, 157:21
**reached** [1] - 49:15
**reaching** [1] - 240:4
**react** [2] - 241:9
**reacting** [1] - 245:19
**reaction** [2] - 199:20, 245:22
**read** [9] - 6:20, 26:2, 33:9, 133:1, 133:2, 133:24, 133:25, 212:14, 235:17
**Read** [1] - 26:5

**reading** [3] - 28:17, 32:23, 134:1
**Ready** [1] - 2:2
**ready** [9] - 3:4, 63:1, 67:5, 90:24, 133:18, 134:7, 148:13, 206:6, 226:12
**real** [2] - 11:7, 89:14
**realistic** [1] - 128:23
**realize** [2] - 77:23, 128:14
**really** [30] - 29:15, 30:1, 30:4, 34:6, 47:3, 57:9, 58:16, 60:1, 66:25, 76:2, 76:10, 79:21, 80:5, 80:8, 81:4, 82:5, 87:18, 125:12, 172:19, 172:20, 186:7, 198:19, 199:17, 201:20, 213:23, 222:13, 223:2, 229:6, 240:25
**reason** [3] - 30:14, 69:7, 110:14, 128:11, 201:24, 203:14, 207:23, 209:10, 209:11, 217:9, 233:12
**reasons** [1] - 63:7
**receive** [9] - 5:4, 44:24, 97:3, 99:13, 99:18, 103:25, 104:5, 107:3, 107:6
**received** [12] - 40:13, 43:23, 44:19, 44:21, 49:17, 94:7, 97:4, 137:6, 198:9, 198:14, 236:23, 240:12
**receiving** [5] - 57:3, 104:9, 108:4, 108:8, 108:11
**recently** [1] - 197:10
**Recently** [1] - 217:16
**Recess** [2] - 62:5, 130:19
**recess** [10] - 61:4, 61:11, 61:23, 62:3, 117:8, 117:13, 130:18, 215:3, 236:12, 236:19
**recited** [1] - 133:22
**reckoning** [1] - 240:4
**recognition** [1] - 194:24
**recognize** [26] - 35:12, 45:22, 46:2, 79:24, 86:8, 96:11, 116:14, 129:7, 155:4, 155:5, 164:7, 168:1, 168:4, 168:9, 168:15, 168:19, 169:3, 186:12, 186:17, 186:18, 187:15, 188:9, 199:17, 203:3, 213:13, 213:18
**recognized** [8] - 97:7, 154:23, 164:23, 165:7,

169:17, 169:23, 203:9, 213:1
**recognizing** [2] - 213:2, 213:19
**recollect** [5] - 6:14, 10:25, 11:22, 28:22, 108:5
**recollection** [3] - 8:13, 10:19, 189:22
**record** [24] - 3:12, 26:3, 33:9, 35:20, 44:25, 46:19, 56:3, 62:19, 63:17, 91:8, 102:6, 103:6, 112:16, 127:10, 130:24, 132:10, 155:9, 215:16, 220:8, 221:22, 238:21, 239:1, 239:2, 241:11
**recorded** [6] - 45:12, 70:6, 70:13, 74:1, 210:9, 248:3
**records** [19] - 24:20, 36:13, 41:2, 41:8, 42:9, 43:6, 43:14, 43:16, 45:5, 45:22, 46:18, 51:22, 55:11, 56:1, 56:2, 56:6, 56:11, 57:9, 57:23
**recovered** [1] - 27:7
**RECROSS** [2] - 29:4, 31:22, 210:25, 247:5, 247:6, 247:14
**REDIRECT** [8] - 24:14, 58:21, 89:1, 205:8, 247:5, 247:8, 247:11, 247:14
**redirect** [2] - 32:2, 33:7
**redounds** [1] - 124:12
**reducing** [1] - 236:20
**refer** [3] - 20:2, 21:8, 163:2
**reference** [2] - 8:12, 88:3
**referenced** [3] - 32:23, 88:2, 88:12
**referencing** [1] - 184:11
**referred** [4] - 128:7, 146:8, 152:9, 205:1
**referring** [4] - 2:10, 11:12, 18:17, 39:25
**refers** [1] - 51:22
**reflect** [6] - 43:14, 44:25, 47:10, 51:22, 220:8, 221:22
**reflects** [1] - 55:25
**refresh** [2] - 8:12, 10:18, 189:22
**regard** [2] - 53:9, 241:21
**regarding** [3] - 33:2, 192:18, 237:2

**regards** [2] - 14:22, 54:4
**region** [1] - 42:11
**regions** [2] - 42:25, 43:1
**register** [1] - 111:9
**registrations** [1] - 16:24
**regret** [1] - 90:24
**regular** [4] - 97:21, 145:8, 223:16, 223:23
**regularly** [2] - 24:23, 136:7
**reimbursements** [2] - 237:2, 237:6
**reinforcing** [1] - 89:24
**Reisterstown** [2] - 83:1, 110:2
**related** [8] - 97:5, 111:10, 131:20, 135:5, 156:10, 178:4, 207:20, 239:24
**relating** [1] - 41:9
**relation** [3] - 5:5, 40:11, 83:8
**relationship** [14] - 93:5, 93:12, 102:21, 108:21, 135:18, 135:25, 136:2, 179:2, 179:19, 207:12, 207:13, 222:12, 223:13, 232:25
**relative** [2] - 143:8, 213:22
**relaying** [1] - 11:8
**release** [4] - 117:7, 129:15, 129:16, 226:11
**relevance** [1] - 82:6
**relevant** [1] - 223:5
**reliability** [1] - 90:10
**relied** [2] - 15:16, 224:21
**religious** [2] - 245:12
**rely** [1] - 207:14
**relying** [1] - 118:8
**remain** [2] - 61:14, 133:19
**remainder** [1] - 27:2
**remains** [1] - 60:8
**remarks** [2] - 212:20, 212:22
**remember** [54] - 24:18, 57:22, 67:14, 67:15, 67:18, 80:13, 82:25, 86:16, 92:10, 106:10, 106:12, 106:15, 106:16, 107:5, 107:20, 107:24, 107:25, 108:3, 108:7, 108:13, 114:17, 114:19, 116:23, 116:25, 117:1, 118:5, 121:17, 142:23, 145:2, 146:2, 149:7,

150:18, 150:25, 160:22, 161:8, 163:4, 163:8, 165:19, 173:24, 173:25, 174:5, 186:3, 187:19, 187:21, 189:18, 190:14, 197:7, 221:1, 228:22, 229:1, 229:7, 231:11, 231:12
**Remember** [1] - 154:17
**remembers** [1] - 130:11
**remind** [2] - 117:15, 236:11
**reminding** [2] - 151:1, 151:8
**removed** [1] - 241:19
**remuneration** [1] - 240:12
**rent** [1] - 110:12
**rental** [1] - 110:12
**Repeat** [1] - 27:25
**repeated** [4] - 38:5, 54:15, 55:7, 57:10
**repeatedly** [2] - 54:3, 54:11
**repeating** [2] - 69:10, 173:16
**rephrase** [1] - 192:12
**Rephrase** [2] - 16:10, 81:15
**report** [12] - 8:7, 8:12, 10:18, 11:2, 14:20, 14:22, 25:23, 25:24, 26:3, 28:24, 33:6, 33:10
**Reported** [1] - 1:23
**reporter** [1] - 157:16
**Reporter** [1] - 248:15
**REPORTER'S** [1] - 248:1
**reports** [1] - 10:22, 236:13
**represent** [12] - 14:3, 29:6, 38:14, 38:15, 40:2, 40:3, 40:4, 53:17, 63:22, 96:19, 203:22, 203:23
**representations** [1] - 239:18
**represents** [1] - 188:20
**request** [2] - 240:11
**requested** [1] - 125:9
**requesting** [1] - 122:10
**require** [1] - 240:22
**required** [2] - 121:23, 237:17
**requirements** [1] - 237:17
**reservoir** [2] - 78:15, 154:15
**reside** [1] - 36:8
**resides** [1] - 35:8
**residing** [1] - 35:13

**respect** [17] - 5:10, 9:4, 23:17, 23:23, 69:9, 108:4, 126:14, 126:15, 131:7, 131:18, 132:11, 163:15, 200:3, 202:6, 239:21, 239:24, 240:22
**respectively** [1] - 26:12
**responded** [1] - 26:9
**response** [1] - 20:1, 21:17, 21:20, 22:3, 23:4, 32:1, 33:8, 33:24, 208:6, 240:13, 240:16
**responsible** [2] - 4:17, 18:25
**rest** [2] - 27:24, 230:19
**restaurant** [3] - 23:10, 27:6, 32:19
**restricting** [1] - 22:13
**result** [6] - 9:11, 23:24, 119:5, 182:16, 182:25
**resume** [2] - 128:3, 236:9
**return** [1] - 237:20
**returning** [1] - 151:6
**review** [6] - 42:1, 195:10, 212:13, 212:20, 238:21, 239:2
**reviewed** [1] - 41:20
**revolver** [2] - 234:20, 234:21
**Rhodes** [10] - 1:17, 30:19, 60:7, 61:5, 61:12, 61:14, 62:14, 241:18, 242:13, 244:15
**RHODES** [16] - 29:2, 29:5, 53:3, 53:11, 60:10, 62:10, 227:15, 234:24, 235:22, 241:15, 241:22, 243:2, 243:5, 243:8, 243:15, 247:5
**RICO** [2] - 120:13, 124:24, 124:25
**rid** [4] - 78:12, 110:11, 110:13, 141:3
**ride** [4] - 147:8, 147:24, 148:25, 233:4
**riding** [1] - 205:25
**right-hand** [1] - 40:1
**rights** [2] - 15:13, 26:12
**ring** [1] - 197:1
**ringing** [2] - 157:2, 157:3
**Risk** [1] - 41:19
**road** [2] - 4:3, 62:13
**Road** [2] - 205:25, 224:3
**rob** [1] - 178:6
**robbed** [7] - 155:20, 156:2, 156:3, 156:4, 178:1, 227:14, 227:17

**robberies** [1] - 182:8
**Robert** [1] - 1:16
**rode** [1] - 205:25
**role** [1] - 178:15
**rolled** [5] - 44:12, 46:25, 47:10, 49:7, 49:18
**room** [10] - 110:23, 110:25, 111:8, 111:13, 111:14, 117:11, 139:12, 175:5, 195:23, 195:24
**Room** [1] - 1:24
**rose** [1] - 4:18
**round** [2] - 43:12, 58:25
**Route** [1] - 224:10
**routine** [1] - 232:11
**RPR** [1] - 1:24
**ruled** [1] - 90:8
**rules** [1] - 121:21
**run** [8] - 53:25, 109:19, 110:19, 114:15, 134:24, 148:13, 208:11
**running** [1] - 201:22
**rush** [2] - 60:24, 61:1

**S**

**sake** [1] - 122:23
**sale** [2] - 111:9, 229:24
**Sale** [1] - 230:2
**salon** [6] - 205:17, 206:2, 206:4, 206:7, 206:19, 207:6
**salute** [1] - 238:18
**Samuel** [4] - 181:17, 181:18, 181:25, 208:4
**satisfactory** [1] - 238:5
**satisfied** [2] - 90:6, 238:4
**Savoy** [8] - 100:7, 100:8, 100:9, 100:15, 100:17, 220:18, 220:19, 220:24
**saw** [40] - 6:18, 95:19, 96:15, 99:25, 104:14, 105:19, 106:4, 109:11, 110:22, 137:12, 138:8, 139:2, 139:16, 139:19, 139:20, 139:24, 142:19, 142:23, 145:3, 149:20, 150:5, 172:13, 172:15, 174:13, 175:15, 175:16, 176:17, 179:16, 179:17, 179:25, 180:1, 188:9, 201:16, 202:7, 204:10, 206:18, 229:13, 231:8
**scales** [3] - 95:25, 149:13, 149:18
**scars** [2] - 182:25, 183:12

**scenario** [1] - 55:1
**schedule** [3] - 237:4, 237:17, 239:13
**scheduled** [1] - 9:12
**school** [28] - 91:22, 91:23, 91:25, 92:2, 92:4, 92:6, 93:24, 93:25, 94:2, 100:25, 102:15, 102:18, 103:12, 179:5, 179:7, 179:10, 179:13, 192:7, 204:1, 216:3, 216:5, 219:3, 219:9, 219:10, 219:16, 225:24
**School** [5] - 92:3, 216:6, 219:12, 219:13, 219:15
**scientific** [1] - 191:8
**Scoot** [1] - 35:19
**scratch** [2] - 183:4, 183:7, 183:8
**scratched** [1] - 226:21
**screen** [10] - 36:22, 37:18, 41:16, 46:11, 47:15, 70:15, 167:16, 167:20, 218:21, 225:21
**scrupulously** [1] - 236:24
**searched** [1] - 20:13
**seat** [2] - 193:8, 193:12
**seated** [10] - 3:2, 3:11, 7:4, 61:12, 63:16, 90:18, 90:23, 91:7, 133:17, 215:15
**second** [10] - 18:12, 81:6, 141:9, 180:15, 196:7, 197:1, 208:2, 228:1, 228:14, 244:8
**seconds** [4] - 43:11, 43:12, 55:2, 78:17
**Section** [1] - 124:3
**section** [1] - 48:5
**sector** [6] - 38:12, 38:19, 40:3, 49:22, 51:3, 51:20
**secure** [1] - 211:8
**Security** [1] - 100:4
**sedan** [3] - 172:23, 224:1, 224:2, 224:4
**see** [114] - 2:6, 15:18, 35:11, 37:16, 38:1, 38:2, 38:6, 38:11, 38:17, 41:21, 42:19, 43:25, 45:4, 46:7, 46:14, 46:21, 47:12, 47:15, 49:6, 49:11, 49:13, 50:1, 50:4, 50:6, 50:11, 51:4, 51:11, 57:3, 64:17, 70:15, 70:16, 76:23, 77:3, 77:5, 77:15, 78:19, 88:23, 95:17, 95:20, 95:23,

96:2, 96:7, 96:9, 96:15, 97:10, 99:13, 99:16, 99:18, 100:15, 100:17, 100:22, 101:23, 103:1, 104:8, 104:23, 105:21, 107:3, 107:21, 108:10, 109:3, 109:5, 111:2, 112:8, 114:3, 118:17, 123:21, 123:24, 130:16, 137:12, 137:25, 138:2, 139:5, 139:8, 140:17, 141:11, 141:13, 142:1, 142:5, 144:19, 149:5, 151:8, 160:7, 161:7, 166:20, 166:23, 167:20, 170:19, 170:23, 172:11, 187:10, 191:18, 201:18, 201:19, 202:1, 202:2, 202:5, 202:12, 202:14, 206:21, 208:17, 208:20, 214:7, 217:22, 219:24, 221:16, 222:4, 226:9, 227:21, 232:5, 236:19, 241:10
**seeing** [5] - 31:16, 31:17, 57:10, 57:24, 93:22
**seem** [2] - 154:6, 188:5
**seizure** [6] - 2:13, 2:14, 2:24, 4:18, 4:20, 7:7
**seizures** [1] - 6:4
**sell** [7] - 10:21, 11:4, 27:9, 27:11, 29:12, 147:9, 230:6
**selling** [9] - 8:6, 8:7, 8:16, 26:15, 98:11, 125:18, 173:2, 174:2, 175:11
**semi** [1] - 234:20
**semi-automatic** [1] - 234:20
**sense** [7] - 96:23, 108:15, 201:16, 201:19, 202:7, 214:11, 242:2
**sentence** [1] - 238:12
**separate** [3] - 32:7, 120:9, 123:11
**separately** [5] - 6:9, 103:21, 103:22, 161:22, 179:19
**Separately** [1] - 6:10
**Sergeant** [20] - 2:4, 3:7, 3:8, 3:16, 5:22, 8:11, 12:8, 13:3, 13:25, 14:3, 19:7, 19:9, 24:16, 26:2, 26:5, 27:18, 28:1, 28:16, 31:24, 34:24
**SERGEANT** [1] - 3:9
**series** [2] - 126:17, 169:19

**seriously** [2] - 238:24
**serve** [1] - 224:15
**service** [10] - 42:1, 115:20, 172:23, 172:24, 172:25, 173:3, 174:3, 224:1, 224:2, 224:4
**serving** [1] - 238:11
**session** [5] - 117:15, 133:23, 215:4, 236:5, 236:17
**sessions** [1] - 245:8
**set** [5] - 42:8, 52:8, 169:17, 209:14, 242:6
**sets** [4] - 41:2, 81:18, 167:13, 167:23
**seven** [1] - 231:2
**several** [10] - 18:6, 85:15, 87:10, 98:16, 179:25, 180:1, 188:21, 189:1, 205:2, 244:6
**Several** [3] - 8:25, 32:12, 150:13
**SGT** [1] - 247:3
**shake** [1] - 206:23
**Shake** [5] - 24:11, 24:19, 27:18, 27:20, 28:2
**shall** [1] - 238:20
**SHAWN** [1] - 1:7
**Shawn** [11] - 5:20, 7:14, 7:24, 23:2, 101:3, 102:12, 103:14, 104:5, 203:25, 209:6, 221:12
**sheet** [1] - 17:7
**Sheistyville** [2] - 24:19, 27:19
**SHELLY** [1] - 1:8
**Shelly** [14] - 5:20, 63:22, 63:24, 100:25, 101:5, 101:7, 102:10, 103:14, 103:25, 104:14, 194:14, 219:22, 220:13
**Shelton** [5] - 24:5, 24:17, 28:8, 34:21, 188:20, 194:2, 194:4, 194:6
**SHELTON** [1] - 1:7
**shelves** [1] - 139:10
**shift** [1] - 12:9
**shifting** [1] - 125:10
**shirt** [5] - 112:13, 170:1, 220:5, 220:6, 221:20
**shit** [4] - 78:14, 78:15, 154:13, 154:14
**shoot** [1] - 234:3
**shopping** [4] - 166:17, 166:19, 201:11, 201:17
**short** [5] - 9:10, 9:18, 27:1, 126:20, 128:13
**shorted** [8] - 8:4, 8:5, 9:5, 9:7, 9:9, 13:5, 13:9,

13:13
  **shorten** [1] - 132:14
  **shorting** [1] - 9:13
  **shortly** [5] - 69:13, 140:23, 179:16, 185:4, 219:3
  **Shorty** [17] - 70:24, 162:2, 162:6, 162:7, 163:5, 163:10, 163:11, 163:16, 163:19, 164:1, 184:10, 184:11, 184:22, 200:14, 200:15, 200:19, 201:6
  **shoulder** [1] - 19:24
  **shoved** [1] - 182:24
  **show** [12] - 44:6, 46:3, 47:2, 54:15, 58:14, 62:17, 70:13, 137:19, 167:16, 169:12, 190:4, 218:15
  **Show** [1] - 167:19
  **Showed** [1] - 7:6
  **showed** [10] - 23:12, 41:5, 57:2, 126:5, 167:13, 177:12, 179:22, 186:6, 189:21, 203:7
  **showing** [1] - 188:3
  **shown** [20] - 80:21, 81:1, 81:10, 81:13, 81:19, 82:3, 167:23, 169:4, 169:12, 169:13, 184:24, 185:3, 185:4, 186:16, 187:3, 211:9, 211:15, 212:23, 213:12, 213:17
  **shows** [4] - 45:5, 46:5, 47:18, 48:4
  **shut** [1] - 224:13
  **side** [15] - 17:25, 18:3, 18:12, 18:14, 19:17, 19:23, 38:13, 38:14, 38:15, 38:19, 40:1, 40:12, 146:15, 220:25
  **sided** [1] - 38:23
  **sides** [2] - 38:21, 40:6
  **signalling** [1] - 245:22
  **signature** [1] - 248:10
  **signed** [2] - 6:19, 6:21
  **significantly** [1] - 23:6
  **similar** [3] - 63:7, 164:17, 242:25
  **Similar** [1] - 166:8
  **similarity** [1] - 72:4
  **simple** [1] - 18:9
  **simply** [7] - 42:16, 45:6, 126:10, 127:18, 133:2, 211:12, 242:18
  **sink** [6] - 139:15, 139:16, 139:18, 139:20, 139:21, 139:24

  **sister** [5] - 66:15, 144:13, 158:16, 198:10, 206:4
  **sister's** [1] - 66:17
  **sit** [3] - 74:8, 96:22, 187:9
  **site** [27] - 36:25, 37:23, 38:9, 38:12, 39:24, 40:5, 40:6, 40:9, 45:23, 46:19, 47:9, 47:18, 47:20, 48:10, 48:12, 48:25, 49:1, 49:9, 49:22, 50:4, 51:2, 51:9, 51:16, 51:21, 51:23, 52:13
  **sites** [3] - 37:5, 37:11, 50:7
  **sitting** [2] - 101:25, 112:12
  **Sitting** [2] - 112:15, 168:4
  **situation** [6] - 60:8, 89:23, 94:5, 131:7, 225:1, 225:2
  **Six** [8] - 23:8, 25:22, 25:24, 26:2, 28:16, 33:9, 33:11, 34:4
  **six** [9] - 149:25, 168:15, 168:19, 169:21, 186:11, 187:9, 200:18, 203:8, 230:19
  **size** [9] - 137:17, 137:19, 176:20, 176:23, 177:13, 177:17, 177:19, 177:22
  **ski** [1] - 227:4
  **Skipped** [1] - 75:15
  **slang** [8] - 72:4, 72:5, 73:4, 74:11, 74:13, 163:25, 201:4, 213:5
  **sleep** [1] - 34:25
  **sleeping** [1] - 195:23
  **sleepy** [1] - 152:24
  **slept** [1] - 12:10
  **Slight** [1] - 61:21
  **slow** [1] - 45:4
  **slowly** [1] - 26:5
  **small** [5] - 2:24, 23:10, 27:6, 32:19, 162:25
  **Smith** [3] - 237:14, 239:20, 239:22
  **sold** [6] - 95:13, 175:19, 230:4, 230:9, 230:11
  **solely** [1] - 4:17
  **Someone** [1] - 110:11
  **someone** [23] - 24:3, 24:5, 76:24, 77:1, 110:12, 118:4, 118:14, 118:15, 131:10, 131:23, 134:24, 147:4, 171:6, 183:21, 186:1, 186:19,

193:4, 193:21, 203:9, 206:18, 207:14, 208:14
  **Sometime** [2] - 70:15, 229:16
  **sometime** [3] - 179:13, 229:16, 241:8
  **Sometimes** [4] - 100:4, 114:20, 143:15, 196:14
  **sometimes** [21] - 32:2, 98:5, 98:7, 99:18, 99:25, 100:5, 101:18, 103:11, 106:18, 107:6, 110:19, 114:24, 115:24, 135:4, 191:14, 196:9, 207:24, 216:17, 223:3, 234:5
  **somewhat** [2] - 33:20, 47:5
  **somewhere** [2] - 40:14, 48:14
  **son** [2] - 144:9, 148:14
  **soon** [4] - 54:12, 55:3, 185:3, 222:17
  **sorry** [24] - 8:18, 19:8, 24:2, 39:5, 71:12, 72:7, 74:24, 83:16, 85:12, 105:13, 119:15, 122:25, 139:3, 139:17, 139:18, 167:5, 173:21, 174:10, 176:2, 180:17, 212:18, 214:9
  **Sorry** [5] - 39:8, 75:15, 206:18
  **sort** [12] - 33:20, 42:11, 43:18, 43:20, 44:11, 58:2, 74:13, 120:20, 200:23, 226:8, 236:15, 243:16
  **Sound** [1] - 164:24
  **sound** [9] - 87:21, 154:25, 155:7, 161:1, 164:21, 183:18, 183:23, 184:15, 212:6
  **sounded** [13] - 63:6, 63:7, 72:1, 73:4, 97:5, 154:19, 161:16, 161:20, 163:24, 164:17, 164:25, 165:4, 183:19
  **sounding** [1] - 72:5
  **sounds** [8] - 30:9, 37:8, 119:25, 172:5, 180:25, 184:17, 184:21, 190:16
  **source** [5] - 8:23, 107:1, 231:4, 232:12, 232:15
  **sources** [1] - 240:15
  **south** [3] - 38:13, 40:3, 40:19
  **southeast** [2] - 48:4, 51:3
  **Southwest** [1] - 221:5
  **space** [1] - 193:15

  **speaking** [4] - 65:22, 69:14, 145:15, 161:19
  **speaks** [1] - 74:11
  **special** [1] - 237:16
  **specific** [3] - 8:14, 33:2, 138:13
  **specifically** [3] - 34:12, 96:22, 106:16
  **specified** [2] - 28:18, 28:20
  **specify** [3] - 10:16, 11:14, 57:14
  **specifying** [1] - 10:25
  **SPECTATOR** [1] - 245:13
  **spectators** [1] - 245:21
  **speculate** [1] - 157:22
  **speed** [1] - 6:6
  **Spell** [1] - 215:18
  **spell** [6] - 3:12, 35:20, 63:17, 91:8, 157:16, 215:16
  **spend** [4] - 150:8, 225:13, 236:18, 239:9
  **spent** [1] - 17:22
  **spoken** [2] - 55:8, 98:15
  **spots** [1] - 142:3
  **spread** [13] - 52:11, 80:21, 81:1, 81:11, 81:13, 82:3, 185:10, 186:6, 187:3, 211:15, 211:19, 212:23, 213:12
  **spreads** [4] - 184:25, 211:10, 214:6
  **St** [1] - 244:1
  **stand** [9] - 3:7, 3:8, 39:4, 63:2, 63:12, 76:4, 91:2, 91:3, 215:5
  **stand-alone** [1] - 39:4
  **standard** [6] - 53:19, 55:21, 57:19, 58:13, 127:10, 232:11
  **standing** [8] - 88:21, 88:22, 88:24, 127:15, 132:10, 172:8, 175:11, 206:3
  **stands** [1] - 41:18
  **start** [12] - 49:1, 50:3, 53:21, 93:22, 94:10, 117:13, 148:2, 201:22, 240:25, 242:15, 242:22, 244:3
  **started** [5] - 71:3, 73:15, 85:11, 95:10, 155:15
  **Started** [1] - 156:25
  **starting** [5] - 47:17, 61:2, 64:6, 218:25
  **starts** [1] - 53:25
  **stashed** [1] - 229:17

  **State** [14] - 3:12, 3:19, 3:20, 3:23, 4:2, 4:14, 4:18, 4:22, 35:20, 37:1, 63:17, 91:8, 215:16
  **state** [4] - 23:23, 36:8, 36:10, 42:19
  **statement** [10] - 33:17, 33:23, 65:5, 70:13, 120:1, 121:9, 123:7, 123:12, 127:2, 167:12
  **statements** [4] - 74:1, 126:6, 138:18, 146:18
  **STATES** [2] - 1:1, 1:5
  **States** [4] - 3:6, 91:1, 124:3, 218:2
  **stating** [1] - 192:17
  **station** [2] - 107:23, 109:7
  **stations** [2] - 99:21, 99:25
  **statistics** [1] - 4:19
  **stay** [4] - 2:22, 114:6, 114:15, 174:7
  **stayed** [6] - 136:7, 143:5, 143:7, 150:3, 220:25
  **staying** [2] - 12:12, 144:14
  **stenographically** [1] - 248:4
  **step** [5] - 7:1, 13:15, 61:3, 117:22, 235:18
  **stick** [3] - 60:15, 61:6, 61:7
  **still** [20] - 49:22, 52:6, 52:18, 55:4, 58:9, 76:4, 77:11, 123:24, 126:20, 126:23, 132:10, 132:19, 158:11, 170:16, 207:2, 222:20, 223:6, 240:16, 243:18, 243:21
  **stipulation** [1] - 50:16
  **stole** [1] - 228:19
  **stooped** [1] - 200:18
  **stop** [3] - 127:7, 235:13, 235:15
  **stopped** [10] - 10:15, 17:16, 19:16, 19:24, 67:8, 67:9, 173:2, 174:2, 175:2, 217:1
  **stops** [1] - 20:10
  **store** [29] - 82:25, 83:7, 106:21, 110:4, 110:8, 110:11, 111:21, 112:20, 112:24, 112:25, 113:9, 113:15, 113:18, 113:21, 114:11, 148:13, 151:23, 172:20, 174:4, 174:5, 174:10, 174:13, 175:4, 179:22, 180:1, 202:2,

202:5, 224:1, 224:8
**Store** [3] - 113:14, 114:14, 205:19
**stored** [2] - 139:9, 139:14
**stores** [2] - 225:10, 225:13
**storm** [1] - 243:17
**story** [2] - 25:24, 188:5
**straight** [4] - 6:1, 113:20, 124:11, 157:7
**strategic** [1] - 240:6
**Street** [4] - 1:25, 50:10, 50:20, 50:21
**street** [26] - 26:18, 68:10, 89:14, 105:5, 131:16, 190:1, 194:24, 203:15, 205:17, 229:23
**streets** [6] - 185:18, 189:16, 190:25, 194:23, 195:5, 214:12
**stretch** [2] - 174:25, 215:5
**strike** [3] - 106:13, 171:8, 191:1
**striking** [1] - 122:8
**strikingly** [1] - 122:16
**Stuff** [1] - 96:1
**stuff** [5] - 106:23, 139:10, 150:9, 162:24, 188:4
**subject** [1] - 26:19
**subjects** [2] - 26:10, 26:22
**submissions** [1] - 239:24
**submit** [1] - 90:4
**submitting** [1] - 237:5
**Subpoena** [1] - 36:15
**subscribed** [1] - 41:13
**subsequent** [2] - 89:25, 134:1
**substance** [1] - 32:22
**substantial** [1] - 127:11
**Sue** [2] - 35:8, 35:13
**sufficient** [1] - 121:24
**suggestiveness** [1] - 90:8
**suggests** [2] - 191:20, 244:8
**sun** [1] - 149:25
**Sunday** [7] - 123:15, 143:1, 143:14, 143:17, 144:7, 241:7, 241:11
**supervisors** [1] - 236:7
**supervisory** [1] - 4:4
**supplied** [1] - 124:21, 124:22
**supplier** [11] - 30:10, 30:11, 30:12, 31:4, 31:5,

31:7, 31:8, 32:7, 119:8
**suppliers** [8] - 23:14, 25:19, 29:24, 30:5, 32:8, 32:16, 126:7, 126:8
**supply** [3] - 231:4, 232:12, 232:15
**supplying** [1] - 30:12
**support** [2] - 94:10, 95:12
**supporting** [2] - 95:11, 96:24
**suppose** [2] - 59:22, 225:15
**supposed** [5] - 13:22, 125:25, 146:3, 147:8, 151:7
**SUSAN** [2] - 35:17, 247:7
**Susan** [1] - 35:21
**suspect** [2] - 7:17, 25:10
**suspects** [1] - 24:23
**suspicion** [2] - 87:4, 87:5, 87:7
**Sustained** [9] - 18:20, 74:6, 88:5, 89:17, 182:3, 188:8, 191:2, 195:8, 222:7
**sustained** [2] - 16:21, 22:10
**sustaining** [1] - 191:18
**Sweetheart** [2] - 223:20, 225:15
**sweethearts** [1] - 93:20
**sworn** [3] - 63:12, 90:18, 91:4
**SWORN** [5] - 3:9, 35:17, 63:14, 91:5, 215:13
**system** [5] - 56:17, 115:6, 130:2, 130:5, 130:13

**T**

**T-1** [8] - 41:2, 41:5, 43:16, 46:22, 47:2, 47:3, 59:9, 59:15
**T-2** [3] - 41:3, 45:19, 47:13
**T-Mobile** [21] - 35:4, 35:14, 36:2, 36:3, 36:11, 37:1, 37:5, 41:8, 44:25, 47:10, 55:25, 56:9, 56:10, 57:17, 57:18, 57:23, 58:7, 58:10, 58:12, 58:16, 59:4
**T-Mobile's** [1] - 57:14
**T-shirt** [1] - 220:5

**table** [3] - 102:4, 103:4, 130:6
**tainted** [1] - 89:25
**talks** [2] - 213:4, 213:16
**taller** [1] - 200:21
**tangent** [1] - 33:20
**tape** [19] - 68:10, 69:2, 70:17, 71:23, 73:6, 73:12, 74:3, 74:9, 74:16, 75:7, 129:19, 129:21, 202:15, 202:18, 203:4, 205:1, 205:4, 213:6, 213:14
**taped** [2] - 65:5, 138:3
**tapes** [2] - 130:2, 243:18
**target** [1] - 125:10
**task** [4] - 4:5, 4:7, 4:10, 30:22
**taxicab** [1] - 224:5
**Team** [1] - 41:19
**team** [1] - 41:19
**teenager** [1] - 179:9
**telephone** [7] - 43:2, 66:10, 66:22, 67:2, 154:7, 180:13, 196:11
**ten** [12] - 50:22, 64:7, 64:8, 64:10, 64:15, 85:7, 85:8, 97:19, 175:11, 218:24, 230:21
**Ten** [1] - 85:9
**tend** [1] - 121:13
**tentative** [2] - 90:11, 90:12
**Tenth** [1] - 92:5
**tenth** [2] - 92:6, 94:2
**term** [4] - 9:7, 114:3, 200:15, 200:23
**terms** [8] - 11:5, 56:2, 104:8, 123:2, 128:4, 209:21, 235:7, 237:5
**test** [1] - 130:13
**testified** [14] - 24:24, 98:18, 138:12, 164:14, 165:15, 185:13, 188:20, 193:13, 197:10, 201:4, 201:11, 203:25, 204:5, 209:23
**testify** [18] - 2:20, 36:16, 59:10, 90:7, 118:2, 131:6, 131:19, 190:3, 191:4, 191:6, 191:10, 191:23, 210:6, 240:2, 240:8, 242:10, 242:12, 243:17
**testifying** [9] - 65:8, 65:11, 176:25, 189:14, 189:18, 197:7, 218:3, 237:21, 240:5
**testimony** [34] - 17:4,

17:17, 33:16, 35:6, 41:23, 46:14, 48:9, 53:4, 57:19, 63:4, 69:11, 70:25, 72:7, 73:9, 74:2, 76:11, 90:3, 90:11, 90:15, 90:16, 98:23, 99:8, 121:5, 121:17, 127:6, 131:1, 177:8, 198:9, 210:2, 236:2, 237:19, 239:23, 245:20, 245:21
**TFO** [4] - 4:12, 24:22, 26:9, 26:10
**THE** [327] - 1:1, 1:2, 2:2, 2:6, 2:9, 2:12, 2:16, 2:18, 2:21, 3:2, 3:8, 3:10, 3:11, 3:13, 12:5, 12:6, 16:10, 16:19, 18:20, 19:3, 19:19, 20:15, 22:10, 25:6, 25:13, 26:5, 26:7, 26:8, 26:9, 27:5, 27:6, 27:15, 27:16, 27:24, 28:5, 28:14, 29:3, 30:18, 31:21, 32:24, 34:17, 34:24, 35:1, 35:2, 35:7, 35:11, 35:18, 35:19, 35:21, 39:3, 39:7, 39:9, 39:10, 39:14, 40:23, 44:22, 44:23, 45:16, 45:17, 50:18, 50:21, 53:8, 57:16, 57:21, 58:19, 60:7, 60:13, 60:19, 60:20, 60:21, 60:23, 60:25, 61:1, 61:10, 61:11, 61:13, 61:14, 61:21, 61:23, 62:6, 62:9, 62:14, 62:21, 63:1, 63:9, 63:12, 63:15, 63:16, 63:18, 64:4, 67:3, 72:24, 73:2, 74:6, 76:10, 76:13, 76:14, 76:15, 76:16, 76:18, 76:19, 76:20, 76:22, 76:23, 77:3, 77:5, 77:7, 77:9, 77:10, 77:12, 77:13, 77:15, 77:17, 77:19, 77:21, 77:22, 77:24, 77:25, 78:2, 78:5, 78:7, 78:8, 78:9, 78:19, 78:21, 78:22, 78:24, 78:25, 79:1, 79:2, 79:4, 79:6, 79:8, 79:10, 79:13, 79:14, 79:21, 81:15, 81:17, 81:23, 82:7, 82:13, 82:16, 83:16, 83:19, 83:21, 88:5, 88:18, 88:22, 89:17, 89:19, 90:4, 90:6, 90:23, 91:3, 91:6, 91:7, 91:9, 102:8, 103:7, 104:3,

105:9, 112:18, 117:7, 117:22, 117:24, 118:8, 118:11, 118:17, 118:22, 119:2, 119:6, 119:10, 119:13, 119:16, 119:20, 119:22, 119:25, 120:6, 120:10, 120:12, 121:4, 121:8, 121:16, 121:21, 122:3, 122:6, 122:13, 122:21, 122:25, 123:17, 124:2, 124:6, 124:12, 124:18, 124:20, 125:6, 125:11, 125:17, 127:4, 127:25, 128:8, 128:10, 128:14, 128:19, 128:25, 129:4, 129:9, 129:14, 129:19, 129:22, 130:4, 130:9, 130:12, 130:18, 130:22, 131:4, 132:1, 132:5, 132:12, 132:14, 132:21, 132:23, 133:4, 133:6, 133:11, 133:14, 133:17, 134:6, 145:22, 152:6, 152:17, 154:9, 160:3, 160:25, 163:7, 166:7, 167:1, 167:2, 167:6, 167:18, 168:13, 168:18, 171:9, 182:3, 182:5, 186:23, 188:8, 189:25, 190:2, 190:3, 190:18, 190:20, 190:21, 191:2, 195:8, 208:23, 208:24, 210:17, 211:17, 211:22, 211:25, 212:2, 212:6, 212:9, 212:12, 212:14, 212:18, 214:4, 214:17, 214:24, 215:2, 215:9, 215:11, 215:14, 215:15, 215:17, 215:18, 215:20, 215:21, 220:10, 221:22, 222:2, 222:3, 222:7, 226:19, 227:3, 227:16, 234:25, 235:16, 235:18, 235:25, 237:11, 237:22, 237:25, 238:3, 238:11, 238:14, 238:18, 239:6, 239:14, 239:16, 240:9, 240:18, 240:25, 241:4, 241:6, 241:13, 241:18, 242:13, 242:18, 242:24, 243:4, 243:7, 243:9, 243:13, 243:20, 243:22, 244:7, 244:12, 244:17, 244:20, 244:24, 245:1, 245:4, 245:6, 245:14
**theirs** [1] - 20:12
**themselves** [4] - 6:21, 111:6, 126:12
**theory** [3] - 118:24, 123:2, 127:2

**Thereabouts** [1] - 215:11

**therefore** [6] - 30:1, 45:9, 47:1, 49:8, 238:8, 242:22

**They've** [1] - 135:20

**thinking** [1] - 163:25

**third** [5] - 40:14, 48:11, 65:13, 65:14, 235:21

**Thomas** [1] - 1:20

**thousand** [5] - 98:6, 226:25, 228:6, 228:7, 228:23

**thousands** [2] - 172:16, 172:24

**threat** [2] - 225:4, 233:11

**three** [40] - 9:9, 9:10, 38:19, 38:21, 38:23, 39:24, 40:3, 40:5, 40:17, 55:15, 55:16, 67:19, 69:16, 69:18, 70:18, 77:17, 77:18, 77:19, 80:2, 82:13, 83:10, 85:17, 92:20, 111:25, 113:17, 116:15, 126:14, 142:13, 159:5, 174:13, 196:4, 197:3, 197:8, 199:12, 230:18, 231:1, 236:10, 243:7

**Three** [2] - 69:16, 111:23

**three-sided** [1] - 38:23

**threw** [3] - 78:16, 226:22

**throughout** [6] - 53:19, 55:21, 57:19, 58:13, 94:21, 191:19

**throw** [3] - 78:15, 154:14

**Thursday** [1] - 204:11

**tie** [1] - 201:2

**tied** [1] - 94:14

**ties** [1] - 126:21

**tight** [1] - 223:8

**timer** [1] - 53:25

**timing** [1] - 125:24

**tired** [2] - 12:7, 12:11

**Title** [1] - 124:2

**to-be** [1] - 134:13

**Today** [1] - 187:9

**today** [31] - 19:1, 24:24, 25:2, 53:17, 54:2, 60:14, 61:17, 74:8, 98:23, 99:8, 101:23, 112:9, 117:16, 128:2, 129:5, 129:11, 130:16, 136:19, 165:15, 168:4, 185:13, 186:9, 186:11, 186:17, 186:19, 187:9, 187:12, 187:16,

219:24, 221:16, 245:19

**together** [14] - 52:21, 71:4, 73:15, 94:19, 94:22, 95:10, 113:21, 146:5, 146:24, 178:19, 179:17, 198:19, 207:2, 207:6

**toll** [4] - 40:18, 41:2, 42:8, 45:22

**tolls** [9] - 44:1, 45:12, 45:24, 46:8, 47:3, 47:13, 48:10, 59:8, 59:9

**Tom** [1] - 63:21

**tomorrow** [4] - 117:15, 123:21, 236:5, 245:8

**Tone** [4] - 9:3, 23:10, 26:23, 31:16

**tone** [3] - 63:6, 152:12, 163:22

**tonight** [1] - 60:22

**Tony** [3] - 78:4, 101:12, 101:13

**Tony's** [1] - 77:2

**took** [21] - 18:3, 18:4, 18:11, 18:16, 27:21, 44:2, 59:13, 86:13, 87:5, 110:16, 118:3, 131:11, 148:12, 148:25, 149:1, 149:17, 149:22, 200:8, 226:24, 228:24, 232:9

**top** [6] - 46:10, 126:7, 130:6, 139:10, 177:11, 245:11

**touch** [4] - 54:24, 55:2, 135:23, 136:7

**toward** [6] - 3:11, 35:19, 63:16, 91:7, 215:15, 232:25

**tower** [19] - 38:14, 38:16, 38:20, 38:21, 40:11, 40:13, 40:19, 40:20, 48:12, 49:1, 51:21, 51:23, 52:3, 52:6, 52:7, 52:8, 52:9, 52:12

**towers** [3] - 52:10, 52:14, 52:20

**town** [14] - 91:20, 94:24, 99:19, 100:3, 100:10, 100:12, 109:23, 146:1, 146:5, 146:8, 178:8, 178:10, 178:11, 182:13

**track** [1] - 96:20

**tracking** [4] - 31:15, 31:16

**trade** [1] - 31:18

**trafficking** [7] - 25:10, 178:12, 178:22, 178:24, 218:18, 221:24, 222:23

**trained** [2] - 14:12,

14:14

**training** [2] - 191:8, 236:8

**transaction** [3] - 22:20, 22:24, 131:10

**transactions** [5] - 34:13, 34:14, 34:16, 222:4, 223:2

**transcribed** [1] - 248:7

**transcript** [2] - 189:21, 248:7

**traveled** [1] - 8:1

**treats** [1] - 245:15

**trial** [3] - 171:10, 191:19, 238:23

**tried** [2] - 17:22, 157:2

**trip** [16] - 9:22, 10:2, 10:3, 13:4, 13:12, 13:16, 116:20, 116:23, 117:3, 118:3, 118:6, 134:14, 134:15, 134:20, 173:17, 173:19

**trooper** [6] - 4:1, 6:19, 14:9, 15:16, 19:13, 20:24

**Trooper** [9] - 2:23, 5:8, 15:16, 19:13, 19:22, 20:10, 29:6

**troopers** [6] - 5:7, 6:1, 6:4, 6:5, 16:3, 16:12, 20:9

**trouble** [6] - 118:3, 118:16, 119:3, 119:4, 123:20

**truck** [2] - 232:7

**true** [7] - 23:2, 169:8, 176:7, 176:8, 196:9, 197:2, 199:20

**trunk** [2] - 182:24, 226:22

**trust** [8] - 125:15, 131:23, 193:4, 193:24, 209:6, 209:10, 209:11, 211:8

**trusted** [5] - 209:6, 209:8, 225:7, 225:8, 233:8

**trusting** [1] - 193:22

**truth** [1] - 203:12

**truthful** [4] - 74:3, 98:22, 98:24, 177:6

**try** [10] - 57:20, 153:10, 154:22, 156:24, 182:19, 187:2, 213:12, 218:8, 237:4, 239:2

**trying** [25] - 12:6, 39:5, 54:11, 54:23, 55:1, 56:3, 67:8, 80:13, 81:4, 82:10, 83:24, 86:6, 110:11, 120:3, 129:14, 147:9, 155:15, 157:1, 161:7,

175:8, 177:5, 197:12, 197:15, 197:18, 201:13

**Trying** [1] - 57:22

**Tuesday** [4] - 236:10, 236:18, 242:22, 243:5

**turn** [6] - 39:11, 40:24, 50:6, 196:10, 206:1, 218:7

**turned** [4] - 54:2, 196:22, 196:24, 206:2

**twice** [1] - 81:14

**Twice** [1] - 156:3

**Two** [3] - 8:17, 40:2, 41:12, 41:15, 71:7, 71:9, 77:19, 85:17, 89:6, 92:20, 142:13, 217:15, 237:25

**two** [94] - 5:5, 5:11, 5:13, 5:15, 5:16, 6:8, 8:8, 8:22, 20:9, 20:10, 20:19, 26:15, 26:22, 34:6, 38:1, 38:18, 39:24, 40:17, 40:19, 41:1, 43:12, 43:13, 51:9, 55:2, 55:15, 55:16, 57:1, 57:12, 65:2, 65:11, 65:16, 65:25, 69:16, 70:18, 71:10, 72:6, 73:13, 73:14, 75:23, 77:17, 77:18, 78:13, 80:2, 81:17, 81:18, 83:10, 83:11, 84:6, 85:3, 85:16, 85:19, 85:23, 86:1, 89:7, 102:3, 105:25, 111:22, 111:23, 111:25, 113:17, 116:15, 122:23, 122:25, 154:19, 161:22, 164:20, 172:23, 173:2, 174:3, 174:13, 179:5, 179:14, 179:17, 184:4, 187:13, 196:4, 197:3, 197:6, 197:8, 198:5, 200:18, 204:11, 207:10, 214:5, 217:14, 223:7, 230:16, 230:18, 231:1, 242:4, 242:21, 243:8

**two-way** [1] - 84:6

**type** [5] - 73:3, 84:12, 138:14, 138:25, 166:9

**types** [1] - 25:17

**typical** [2] - 143:13

**Tyrone** [10] - 67:17, 71:11, 71:15, 71:16, 85:25, 86:1, 86:18, 88:2

---

# U

**U.S** [1] - 1:24

**ultimate** [2] - 119:8,

239:24

**ultimately** [2] - 5:13, 120:12

**Um-hum** [13] - 30:6, 67:24, 80:20, 81:22, 85:22, 86:21, 103:13, 107:18, 137:2, 143:2, 148:6, 152:25, 187:11

**Um-um** [1] - 72:11

**uncertain** [1] - 184:17

**unclear** [1] - 126:23

**uncommon** [1] - 180:17

**Under** [2] - 25:8, 139:15

**under** [13] - 14:13, 14:16, 14:25, 124:2, 133:19, 139:16, 139:20, 139:24, 177:5, 192:11, 215:12, 244:14

**undercover** [1] - 4:4

**Understood** [2] - 120:16

**understood** [13] - 19:15, 22:19, 26:13, 31:3, 31:25, 98:13, 134:2, 146:9, 189:3, 198:9, 209:1, 243:2, 243:14

**undertake** [1] - 191:9

**UNITED** [2] - 1:1, 1:5

**United** [4] - 3:6, 91:1, 124:3, 218:2

**unless** [6] - 54:7, 55:18, 56:12, 191:15, 193:22, 245:2

**Unless** [1] - 238:24

**unmistakable** [1] - 121:12

**unquote** [1] - 2:13

**unsure** [4] - 71:25, 72:1, 75:19

**untruthful** [1] - 186:6

**unusual** [2] - 14:7, 180:13

**up** [158] - 4:19, 6:6, 9:12, 9:16, 10:7, 12:14, 13:5, 15:24, 15:25, 16:8, 16:16, 17:18, 18:5, 19:8, 19:9, 23:18, 23:23, 28:9, 31:12, 34:8, 40:18, 43:12, 44:6, 46:10, 47:18, 48:14, 49:9, 49:22, 52:10, 52:12, 54:12, 55:3, 58:8, 58:25, 62:17, 64:4, 70:15, 70:21, 78:8, 78:9, 85:15, 91:18, 91:20, 94:7, 95:11, 96:2, 99:21, 100:19, 100:20, 105:7, 105:17, 107:15, 107:17, 112:22, 113:11, 114:15,

115:10, 116:11, 118:4, 118:13, 118:15, 119:1, 123:19, 123:22, 126:16, 131:8, 131:11, 132:2, 132:3, 132:14, 134:25, 135:9, 136:13, 136:22, 137:5, 137:22, 138:2, 139:7, 140:22, 140:25, 141:1, 141:10, 141:13, 141:22, 141:24, 143:20, 143:22, 144:8, 144:10, 145:2, 146:3, 147:16, 147:23, 147:25, 148:3, 148:4, 148:9, 148:12, 148:19, 149:3, 151:4, 153:1, 153:3, 153:6, 153:22, 154:20, 156:21, 157:8, 162:15, 167:16, 167:20, 169:9, 170:13, 170:16, 170:17, 170:23, 171:5, 173:5, 175:1, 179:22, 181:20, 181:24, 182:2, 182:7, 182:24, 185:19, 195:21, 195:22, 197:17, 208:8, 208:10, 210:2, 210:11, 215:5, 216:7, 220:5, 220:6, 226:20, 226:21, 229:20, 230:21, 231:19, 232:2, 233:20, 237:23, 243:11, 244:1, 244:15, 244:16
**upper** [2] - 41:16, 168:9
**upset** [2] - 151:13, 151:15
**upstate** [5] - 35:9, 35:13, 50:14, 52:10, 52:15
**USA** [1] - 248:4

## V

**varied** [1] - 99:23
**Various** [1] - 4:13
**various** [2] - 4:3, 142:20
**vary** [2] - 59:5, 97:25
**vehicle** [6] - 10:1, 10:15, 10:17, 17:18, 23:17
**vehicles** [1] - 16:24
**verbalized** [1] - 86:4
**vernacular** [1] - 184:22
**versa** [1] - 225:6
**version** [1] - 45:22
**vials** [6] - 140:2, 140:3, 140:12, 140:14, 140:17, 141:1
**vice** [1] - 225:6
**vicinity** [1] - 84:16
**video** [1] - 151:23

**videotape** [1] - 151:6
**view** [1] - 211:20
**viewing** [1] - 15:19
**violence** [2] - 233:16, 233:18, 233:19
**Violet** [6] - 37:25, 47:21, 47:23, 48:6, 49:1, 51:21
**Virginia** [1] - 208:12
**visible** [1] - 245:22
**visibly** [1] - 245:19
**visit** [2] - 205:13, 227:23
**visited** [2] - 100:13, 113:14
**visiting** [1] - 144:14
**visitors** [2] - 114:13, 114:18
**VOICE** [3] - 247:10, 247:10, 247:11
**voice** [208] - 43:19, 43:21, 43:22, 43:23, 44:2, 44:6, 44:9, 44:13, 44:14, 44:16, 44:19, 44:21, 44:22, 44:24, 45:1, 45:6, 45:12, 46:25, 47:10, 49:7, 49:12, 49:15, 49:18, 53:25, 54:7, 54:12, 55:2, 55:3, 55:16, 55:18, 56:17, 56:18, 56:21, 58:3, 58:4, 59:12, 59:19, 59:23, 60:2, 62:24, 63:5, 63:6, 63:7, 63:10, 64:4, 65:13, 65:14, 65:25, 66:5, 66:13, 68:10, 70:5, 70:20, 70:21, 72:2, 72:3, 72:4, 72:7, 72:8, 72:13, 72:21, 73:3, 73:11, 73:18, 73:21, 74:2, 74:9, 74:15, 74:21, 75:20, 76:2, 77:2, 77:4, 78:4, 80:1, 80:6, 80:8, 80:11, 80:14, 82:16, 83:15, 83:24, 84:8, 84:9, 84:12, 84:22, 85:18, 85:21, 86:10, 86:16, 87:8, 87:15, 87:23, 88:3, 88:9, 88:12, 89:5, 89:10, 89:13, 97:3, 107:7, 107:10, 107:11, 107:19, 108:7, 114:25, 115:8, 115:11, 115:14, 115:15, 115:20, 115:24, 116:13, 116:14, 128:13, 128:21, 129:10, 129:23, 152:12, 154:24, 154:4, 155:6, 158:13, 158:15, 158:17, 158:21, 159:2, 159:6, 159:7, 159:16, 159:21, 159:22, 159:23, 159:25,

160:8, 160:15, 160:17, 160:20, 160:23, 161:2, 161:18, 161:19, 161:20, 161:23, 162:1, 163:15, 163:16, 163:17, 163:22, 163:23, 164:4, 164:6, 164:7, 164:9, 164:11, 164:13, 164:15, 164:17, 164:24, 165:1, 165:4, 165:7, 165:12, 165:13, 165:17, 180:22, 180:23, 181:9, 183:15, 183:16, 184:11, 185:22, 195:10, 198:14, 199:11, 199:16, 199:21, 200:11, 202:17, 203:4, 203:9, 203:10, 204:3, 204:16, 204:20, 204:22, 204:23, 205:4, 205:5, 205:6, 209:22, 210:8, 210:13, 213:2, 213:14, 213:19, 213:23
**voices** [56] - 65:12, 65:16, 65:19, 65:22, 65:25, 72:1, 73:6, 75:24, 76:16, 78:1, 79:24, 80:5, 80:10, 86:5, 86:15, 87:15, 87:24, 88:1, 88:6, 88:7, 97:7, 129:8, 153:18, 153:22, 153:24, 153:25, 154:1, 154:3, 154:6, 154:11, 154:18, 154:19, 154:22, 154:23, 154:25, 155:7, 156:22, 160:18, 161:7, 161:10, 161:11, 161:15, 161:16, 164:11, 164:20, 164:22, 183:25, 184:4, 196:4, 196:8, 197:18, 199:18, 199:21, 210:10
**VOLUME** [1] - 1:11
**volume** [2] - 172:5, 175:10
**voluntarily** [2] - 20:12, 21:25
**voluntary** [1] - 21:6

## W

**W-O-O-D-E-N** [1] - 3:13
**W-Y-C-H-E** [2] - 63:18, 91:9
**Wabash** [1] - 48:6
**Wait** [3] - 75:23, 150:20, 212:18
**wait** [3] - 113:5, 152:19, 198:20
**waited** [2] - 78:9, 113:7
**waiting** [2] - 206:4, 240:16
**wake** [3] - 153:1, 167:9,

195:22
**waking** [1] - 153:3
**walk** [4] - 88:24, 112:22, 244:1, 244:19
**walked** [2] - 184:25, 195:25
**walking** [1] - 12:14
**Walter** [1] - 89:14
**wants** [2] - 127:16, 127:22
**warned** [1] - 235:23
**waste** [2] - 53:7, 53:9
**wasting** [1] - 122:18
**watch** [7] - 123:15, 207:15, 211:3, 211:7, 222:14, 224:21, 232:19
**watching** [1] - 234:5
**water** [4] - 12:5, 21:11, 45:16, 167:1
**waving** [1] - 245:22
**Wayne** [62] - 5:20, 63:6, 70:24, 71:24, 73:22, 73:23, 74:3, 87:21, 87:22, 101:1, 101:5, 101:7, 102:10, 102:11, 103:14, 103:23, 103:25, 104:14, 105:16, 105:18, 106:2, 107:24, 161:1, 161:21, 161:23, 162:5, 163:16, 163:18, 163:23, 163:24, 163:25, 166:18, 170:1, 170:6, 170:7, 170:12, 170:13, 170:14, 170:18, 170:23, 171:2, 179:7, 179:12, 184:5, 184:7, 184:10, 184:16, 189:12, 189:17, 190:6, 190:8, 190:9, 194:14, 202:9, 210:11, 210:13, 210:19, 210:21, 219:22, 220:13
**WAYNE** [1] - 1:8
**Wayne's** [10] - 72:4, 72:8, 72:13, 72:21, 73:3, 87:23, 89:5, 89:10, 164:4, 184:11
**wear** [1] - 245:17
**wearing** [5] - 102:1, 103:3, 112:11, 220:4, 228:9
**wedding** [1] - 94:16
**Wednesday** [6] - 1:11, 236:10, 236:18, 239:12, 242:25, 243:6
**week** [25] - 11:4, 18:5, 28:19, 72:6, 117:16, 117:17, 165:21, 209:18, 216:14, 232:23, 232:25, 233:2, 233:3, 236:4, 236:10, 236:17, 236:22,

237:24, 242:5, 242:8, 242:25, 243:1, 243:3, 243:11, 245:16
**weekend** [9] - 235:24, 236:3, 237:1, 237:8, 238:25, 239:5, 240:20, 241:7, 246:1
**weeks** [4] - 60:18, 121:17, 204:6, 238:16
**weigh** [1] - 90:15
**weight** [4] - 2:25, 29:17, 90:16, 172:9
**welcome** [2] - 19:3, 245:16
**Welcome** [1] - 3:3
**west** [1] - 50:22
**West** [9] - 1:25, 50:10, 50:20, 50:21, 51:10, 51:13, 104:21, 109:24, 110:1
**Westminster** [1] - 41:14
**Whereof** [1] - 248:9
**whispering** [1] - 152:11
**white** [1] - 220:5
**whole** [6] - 17:5, 40:14, 92:11, 160:15, 197:6, 213:7
**widely** [1] - 52:11
**widow** [1] - 93:6
**wife** [6] - 120:24, 123:14, 126:19, 127:3, 131:21, 219:17
**Wiley** [6] - 71:11, 71:13, 71:14, 71:19, 71:20, 85:24, 86:18, 88:2
**Willie** [13] - 24:3, 24:17, 28:7, 28:8, 34:20, 71:24, 108:20, 111:17, 111:19, 112:2, 112:3, 187:15, 248:4
**WILLIE** [1] - 1:7
**willing** [4] - 34:8, 170:10, 170:12, 244:21
**Windsor** [1] - 109:8
**wiretapping** [1] - 36:15
**WITNESS** [62] - 3:9, 3:10, 3:13, 12:6, 19:3, 26:7, 26:9, 27:6, 27:16, 35:1, 35:17, 35:18, 35:21, 39:9, 44:23, 45:17, 58:19, 60:19, 60:21, 60:25, 61:10, 61:13, 63:14, 63:15, 63:18, 76:13, 76:15, 76:18, 76:20, 76:23, 77:7, 77:10, 77:13, 77:17, 77:21, 77:24, 78:2, 78:7, 78:9, 78:21, 78:24, 79:1, 79:4, 79:8, 79:13, 83:19, 91:5, 91:6,

91:9, 167:2, 190:2, 190:21, 208:24, 215:13, 215:14, 215:17, 215:20, 222:3, 247:3, 247:7, 247:9, 247:15

**Witness** [5] - 117:23, 130:20, 133:13, 238:7, 248:9

**witness** [60] - 2:3, 2:19, 3:5, 30:18, 33:1, 33:2, 33:6, 33:8, 33:9, 33:13, 33:21, 33:22, 34:3, 35:2, 35:3, 35:13, 39:11, 53:8, 60:8, 61:17, 61:18, 61:19, 62:6, 62:7, 62:18, 63:10, 82:9, 90:7, 90:13, 90:25, 120:7, 120:19, 128:2, 128:5, 128:6, 129:7, 129:23, 129:24, 131:2, 131:6, 131:15, 131:19, 133:9, 133:21, 191:9, 191:16, 191:20, 191:21, 191:22, 212:11, 214:25, 215:6, 215:7, 220:8, 221:22, 236:1, 241:23, 242:8, 244:8

**witness'** [7] - 2:13, 33:11, 90:9, 90:11, 119:12, 121:4, 171:11

**witnesses** [13] - 35:5, 62:25, 191:3, 191:6, 191:12, 237:15, 237:25, 238:6, 240:21, 241:24, 242:4, 242:21, 243:11

**woke** [2] - 153:6, 195:21

**woken** [1] - 154:20

**wonder** [1] - 60:7

**wondering** [1] - 129:12

**Wooden** [8] - 2:4, 2:16, 3:7, 3:13, 19:6, 19:7, 26:9, 29:6

**WOODEN** [2] - 3:9, 247:3

**Wooden's** [1] - 26:11

**Woody** [7] - 194:18, 194:19, 194:22, 195:1, 195:3, 195:4, 195:6

**word** [15] - 9:5, 34:20, 70:24, 131:16, 161:23, 162:2, 162:4, 162:6, 163:10, 163:11, 163:16, 200:13, 201:1, 201:6, 201:8

**words** [9] - 31:15, 40:14, 42:21, 43:15, 63:6, 99:1, 117:13, 160:20, 163:22

**works** [2] - 35:9, 130:13

**worried** [4] - 131:20,

135:4, 155:16, 244:2

**worries** [1] - 135:5

**worry** [2] - 153:8, 238:15

**worrying** [1] - 235:12

**wrapped** [2] - 96:2, 138:2

**write** [2] - 17:15, 212:25

**writing** [4] - 170:2, 212:17, 241:5, 241:6

**written** [6] - 15:18, 15:19, 26:12, 96:9, 96:12, 96:14

**wrote** [4] - 17:11, 17:15, 212:20, 212:22

**WYCHE** [3] - 63:14, 91:5, 247:9

**Wyche** [148] - 61:19, 62:8, 62:24, 63:4, 63:13, 63:18, 63:21, 64:4, 67:3, 72:24, 74:7, 76:10, 81:23, 89:3, 90:18, 91:2, 91:3, 91:9, 91:12, 93:1, 93:2, 93:6, 93:24, 94:14, 94:18, 95:14, 96:21, 97:9, 98:9, 98:15, 99:18, 101:15, 101:16, 101:20, 103:8, 103:25, 104:1, 104:6, 104:10, 104:15, 106:10, 107:9, 108:15, 108:22, 109:4, 109:17, 110:6, 111:12, 113:8, 113:19, 114:5, 114:17, 115:10, 116:23, 117:3, 117:22, 118:2, 118:7, 118:11, 118:13, 118:14, 118:16, 118:25, 119:5, 119:7, 119:19, 119:22, 120:7, 120:8, 121:6, 123:7, 123:11, 123:13, 123:19, 124:21, 124:23, 126:4, 126:8, 126:19, 128:11, 131:8, 133:14, 133:19, 134:10, 134:14, 135:9, 136:15, 136:19, 137:23, 138:12, 142:19, 143:21, 146:4, 148:20, 149:12, 150:5, 150:6, 150:19, 153:19, 155:16, 160:17, 163:9, 167:1, 167:3, 167:8, 167:19, 168:4, 169:3, 169:13, 170:10, 171:11, 171:17, 171:22, 188:17, 188:20, 190:6, 191:9, 192:1, 192:8, 195:10, 195:19, 202:4, 203:20, 205:10, 205:17, 208:15, 210:24, 212:14, 214:24, 218:11, 218:17, 219:20, 221:8,

221:25, 223:8, 226:4, 226:7, 230:4, 230:15, 235:2, 235:6

**Wyche's** [4] - 101:15, 120:23, 129:2, 144:4

## X

**XXXVII** [1] - 1:11

## Y

**year** [6] - 92:10, 110:5, 174:8, 223:8, 224:7, 224:14

**years** [44] - 3:22, 4:11, 8:8, 8:17, 8:22, 14:9, 18:6, 26:15, 36:5, 52:18, 64:2, 64:7, 64:8, 64:15, 83:10, 83:12, 87:22, 93:15, 101:9, 103:19, 111:22, 111:23, 111:25, 138:4, 155:3, 173:3, 173:12, 173:13, 174:3, 174:20, 174:25, 178:2, 186:11, 187:9, 188:21, 192:7, 217:5, 218:14, 218:24, 230:17

**Years** [1] - 194:15

**yellowish** [1] - 140:18

**yesterday** [3] - 133:1, 134:3, 238:16

**Yom** [1] - 239:13

**York** [17] - 8:1, 8:24, 9:1, 13:17, 26:17, 29:22, 35:9, 35:13, 36:10, 50:14, 52:8, 52:10, 52:14, 52:15, 52:16, 61:2, 155:5

**young** [3] - 93:16, 172:1, 179:3

**younger** [4] - 109:1, 178:2, 194:15, 226:1

**youngest** [1] - 151:2

**yourself** [8] - 15:19, 20:22, 39:15, 61:3, 159:19, 166:23, 212:14, 222:10

**youthful** [1] - 172:2

## Z

**Zajac** [3] - 1:24, 248:3, 248:14

**zero** [3] - 49:10, 49:11, 115:18

**zeroes** [3] - 49:4, 50:25