IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

UNITED STATES OF AMERICA

v. CRIMINAL CASE NO. AMD-04-029

WILLIE MITCHELL,
SHELTON HARRIS,
SHELLY WAYNE MARTIN,
SHAWN GARDNER,

Defendants
__________________________/

VOLUME XIII OF XXXVII
Tuesday, October 14, 2008
Baltimore, Maryland

Before: Honorable Andre M. Davis, Judge
And a Jury

Appearances:
On Behalf of the Government:
Robert Harding, Esquire
Michael Hanlon, Esquire
On Behalf of Defendant Mitchell:
Laura Kelsey Rhodes, Esquire
Michael E. Lawlor, Esquire
On Behalf of Defendant Harris:
Gerard P. Martin, Esquire
Paul Flannery, Esquire
On Behalf of Defendant Martin:
Thomas L. Crowe, Esquire
James G. Pyne, Esquire
On Behalf of Defendant Gardner:
Adam H. Kurland, Esquire
Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

(Proceedings at 9:47 a.m.)

THE COURT: We're ready to proceed?

MR. HARDING: Yes, Your Honor.

THE COURT: All right. We'll have Mr. Mongtomery.

Mr. Coburn, it seems to me, if I understand the defense concerns here, the really easy and obvious way to give you what you want, and I don't know if you've discussed this with Mr. Harding and Mr. Hanlon, why can't you simply stipulate that Mr. Gardner has been incarcerated continuously, without interruption, since the date of his arrest? Have you discussed that?

MR. COBURN: Your Honor, I appreciate Your Honor suggesting that very much. It's not going to, it's not really a critical aspect of what's about to happen with Mr. Montgomery. So if it's all right with Your Honor, can I discuss it with Mr. Kurland and then we'll approach?

THE COURT: Of course. Of course. And Mr. Crowe, thank you for your letter. We'll take this up during the break, I guess. But I essentially agree with you. I don't see why that statement is admissible. I'll hear, of course, from the government. An admission is an admission and is for that reason admissible. But even an admission has got to be relevant. Just because an admission, just because it is an admission doesn't render the relevancy requirement irrelevant.

So I'll hear what Mr. Harding has to say about that because the Bruton problem actually, on the face of it, seems to

vitiate the admissibility of the statement altogether.

So to take out the one relevant item and play the rest of it doesn't seem to me to make a lot of sense. But the government may have some other reason why it wants the jury just to hear Mr. Martin's voice or something. I don't know. Okay? But we'll take it up during the break. You know what I'm referring to, Mr. Harding? Mr. Crowe's letter.

MR. HARDING: Yes.

THE COURT: All right. We'll have the jury. Thank you. Feeling better, Ms. Rhodes?

MS. RHODES: Yes.

THE COURT: Good. You can approach the lectern, Mr. Coburn.

MR. COBURN: Thank you so much, Your Honor.

(Jury enters the courtroom.)

THE COURT: Ladies and gentlemen, good morning. We trust you had a pleasant weekend. We're told that it's not properly referred to as Indian summer since we haven't had a first frost yet, but we'll take it whatever they call it.

Mr. Montgomery, you remain under oath. You may proceed when you're ready, Mr. Coburn.

CONT'D CROSS EXAMINATION

BY MR. COBURN:

Q Thank you so much, Your Honor. Good morning, Mr. Montgomery.

A Good morning.

Q Did I understand you correctly -- pardon me -- sir, to say that there were certain occasions on which, and we're talking obviously prior to the killing of Ms. Spence, certain occasions on which you went up to New York City to buy drugs and you indicated you went, at least on certain occasions, with the people you know as Wayne, Goo and Darryl, that's Darryl Bacon, right, sir?

A Yes.

Q Is it correct that you only went up to New York one time with the person you know as Bo for that purpose? Is that right?

A That I only went up one time with Bo?

Q That's my question.

A Yes.

Q You indicated, did you not, that when you would go up to New York City to buy drugs, you would buy them in Manhattan around 142nd Street. Was that your testimony?

A Yes.

Q Did you also indicate that Mr. Gardner was fronting you drugs for you to sell? Is that correct?

A Yes.

Q In other words, Mr. Gardner would give you a quantity of drugs, according to your testimony, he would not ask you to pay him for them at that time, you would sell the drugs, and then of the money you made you'd give some to Mr. Gardner, according to

your testimony, and you would keep some, is that right?

A Yes.

Q But it's your testimony, then, that despite the fact that Mr. Gardner was fronting you drugs and making money on your sale of those drugs, that he took you or went with you up to New York City to buy drugs from his supplier, is that correct?

A Yes.

Q Did you tell the jury, Mr. Montgomery, that when you would go up to New York City to buy drugs, you and the other people that you were with, the people you've just talked about, you would pool your money together to buy the drugs. Do you recall saying that last week in response to a question from Mr. Harding?

A Yes.

Q Now, let's talk a little bit about this concept of pooling the money. Does that mean that together you would approach a supplier and, you know, whatever money you had and whatever money Goo had and whatever money other people had, you would put it all in one big pot and make one transaction out of it? Is that your testimony?

A Yes.

Q So it would be just -- okay. Now, you're aware, Mr. Montgomery, that these four individuals to my right, the defendants in this case, are being tried together in this case, right, sir?

A Yes.

Q Did you ever -- actually, strike that. You testified, did you not, last week that you provided nine prior statements to law enforcement, plus your testimony in the federal grand jury, plus your testimony in another proceeding, is that correct?

MR. HARDING: Objection.

Q Was that your testimony?

THE COURT: The objection's sustained.

Q Do you recall my going through with you a list of the prior statements that you had made to law enforcement?

A No, not really.

Q You don't have any recollection of that last week?

A No.

Q Do you remember my asking you whether you had given a taped statement to Baltimore City homicide on July 2nd of '02 and you said yes, you did?

A Yes.

Q Do you remember my asking you whether you had given a second taped statement on July 3rd, '02, and you said you did?

A Yes.

Q And then a third statement to Baltimore Homicide?

A Yes.

Q Do you remember my asking you about, then, four proffer sessions with the U.S. Attorney's office?

A No.

Q Okay. Do you remember my asking you specifically, then, Mr.

Montgomery, whether you had a proffer session with the United States Attorney's office on August 13th, 2002 and you said yes? Do you remember that?

MR. HARDING: Objection.

THE COURT: Mr. Coburn, do you really care whether the witness remembers, and you might, which is fine, or do you want to know if the witness will affirm that that's when he talked to people?

Q I will be happy to go with just the latter, Your Honor.

THE COURT: Go ahead.

Q Is that true, then, did you have a proffer session with the U.S. Attorney's office on August 13th, '02?

A I don't know.

Q Do you remember saying that, yes, you did, when I asked you that question last week?

MR. HARDING: Objection.

THE COURT: The objection is sustained. Are you saying you don't know because you don't recall the date?

THE WITNESS: Right.

THE COURT: Okay. See, that's the problem, Mr. Coburn.

MR. COBURN: Okay. Well, I appreciate that, Your Honor.

THE COURT: All right.

BY MR. COBURN:

Q Do you remember having multiple proffer sessions with the

U.S. Attorney's office?

A Yes.

Q Do you remember giving a recorded statement to a prosecutor in January of 2003?

A No, not really.

Q Do you remember saying last week that you did?

MR. HARDING: Objection.

Q I mean --

THE COURT: Again, you want the witness to remember a date. And I think you're really more interested in the event. Again, it's up to you.

Q No, no, no. It's perfectly okay, Your Honor. I used the last date last week when I asked him the question but that's fine. Do you remember giving a recorded statement to a prosecutor?

A Yes.

Q Do you remember testifying in the grand jury on some date?

A Yes.

Q And do you remember testifying in a prior proceeding in September of 2004?

A Yes.

Q During the course of any of those things, any of those conversations you had with law enforcement, your recorded statement with the prosecutor, your federal grand jury testimony, or your testimony in that 2004 prior proceeding, ever, did you

ever say that you and these other individuals had pooled your money together to buy drugs up in New York?

A I believe so, yes.

Q Which one?

A I don't know.

Q Do you have any idea?

A No.

Q Well, is it your testimony, then, that you definitely did?

A Yes.

Q Do you remember whether it was in a conversation with the U.S. Attorney's office or a conversation with Baltimore City Homicide or in one of these other occasions?

A I don't know.

Q No idea? Okay. Is it correct that you did not sell your drugs with Wayne or Goo? Is that correct?

A Correct.

Q And is it correct that with respect to the drugs that you sold, you kept the proceeds, is that correct?

A Correct.

Q Is it correct that with respect to the drugs you bought up in New York when you would go up to New York, according to your testimony, with these other individuals, that what you would buy up there would be marijuana, is that correct?

A Right.

Q And is it correct that with respect to the marijuana that

you would buy up in New York when you would go up with the individuals you mentioned, that you would smoke it? Is that correct?

A Right.

Q So it was for your personal use, right?

A Right.

Q Now, you also testified that when you would go up to New York with these other individuals, they would buy cocaine, right?

A Right.

Q So it's your testimony, then, Mr. Montgomery, if I understand correctly, that you all would go up to New York, you would pool your money, whatever you had, into a pot, they would buy cocaine, you would buy marijuana, you would use that marijuana for personal use, and they would sell the cocaine? Is that your testimony?

A They also bought marijuana.

Q I see. Is it correct that your selling of marijuana had nothing to do with Goo, that's Shawn Gardner, is that correct?

A Right.

Q Is it correct that you do not, did not, and do not know Bo's full name? Is that correct?

A Right.

Q Is it correct that you did not and do not know, according to your testimony, where Bo sold drugs? Is that correct?

A Right.

Q Is it correct that when you spoke to law enforcement on these occasions that I just referred to, you told law enforcement that you could not remember the last time you had spoken to Bo, is that correct?
A Right.
Q It's correct, also, is it not, Mr. Montgomery, that at some point you took up the sale of heroin, is that right, sir?
A Right.
Q It's also true, is it not, Mr. Montgomery, that you did not get that heroin from any of these defendants? Is that right?
A Right.
Q You had a different source for your heroin that you sold, right, sir?
A Right.
Q And it's also correct, is it not, that you do not know where Wayne or Goo got the heroin that you say they sold, is that right?
A Right.
Q So with respect to that heroin, then, sir, since you have no idea where they got it, you cannot have pooled your money with theirs to buy it, right, sir?
A I never said we did, or I did.
Q Let me ask you now, sir, about some of your prior difficulties with the law. Do you recall during the course of your direct testimony Mr. Harding asking you a question about

whether you had ever been convicted of any criminal offenses and what were they?

A Yeah.

Q Let me ask you about some of those specifically now. Taking you back to 1999. Do you recall an incident, Mr. Montgomery, on February, and again, I guess I'm getting into the date problem, Your Honor, I'll just ask you, do you recall an incident in February, 1999 in which you got arrested?

A No.

Q You were using the name Michael Rowe. That's your brother, right?

A Right.

Q Does that help refresh your recollection at all about this incident?

A What's the charge?

Q Well, I'll tell you, basically -- I can't actually testify here. But do you remember an incident in which there were five gun shots?

MR. HARDING: Objection.

THE COURT: Well, the question the witness needs you to answer is what was the charge. You can refresh his recollection. That's not your testifying. If you want to refresh his recollection.

Q Fair enough, Your Honor. I'm just relying on the paperwork you gave me.

MR. HARDING: I object.

THE COURT: Speak to Mr. Coburn, please.

MR. COBURN: I can show you the documents right here.

MR. HARDING: Your Honor, the government objects to going into the underlying facts of arrests that Mr. Coburn can't even verify were convictions.

MR. COBURN: Well, I'm just asking. I mean, the government asked him specifically if he'd been arrested of any offenses. He said yes and delineated some of them.

MR. HARDING: I asked him about prior convictions.

THE COURT: Go ahead, Mr. Coburn. Why don't you put a question?

BY MR. COBURN:

Q Okay. Do you remember being arrested and then convicted of a handgun offense in February of 1999?

A Yes.

Q Did that relate to an attempted robbery, also?

A No.

Q Do you remember an offense around that time period of which I believe you were convicted, in which the complainant, the victim's name was Ronald Burke?

MR. HARDING: Objection.

THE COURT: Sustained.

Q Let me take you up, then, to November 29th of 2000. Do you remember using the name Charles Smith during that time period as

an alias?
A I remember using the name Charles Smith.
Q Okay. I mean, you testified yesterday that you used a lot of aliases, right?
A Right.
Q Was Charles Smith one of them?
A Yes.
Q Well, do you remember being arrested and convicted for an offense that occurred on November 29th, 2000, in which you and three other individuals driving a 1991 Mercury Grand Marquis participated in a robbery?
MR. HARDING: Objection.
THE COURT: The objection is sustained.
Q You testified last week that you had been placed on probation a number of times, right?
A Yes.
Q And that you, I believe it was your testimony, virtually always violated probation by being rearrested, is that right?
A Yes.
Q Do you remember being placed on probation on July 6th of 2000, three years supervised probation? That was by Judge Quarles. Do you remember that?
A Yes.
Q Do you remember what that offense was for that you were obviously convicted of since you were on probation?

A Handgun.
Q Handgun offense? Okay. During the course of that probation, how many times -- actually, strike that. I'm sorry. When you were placed on probation Judge Quarles told you what the conditions of your probation were, right?
A Yes.
Q He told you what was expected of you when you were on probation, right?
A Yes.
Q And one of the things that was expected of you, Judge Quarles told you, was that you were supposed to avoid any further trouble with the law, right, sir?
A I guess, yes.
Q How many arrests did you have within the next few months after being placed on probation?
MR. HARDING: Objection.
THE COURT: Overruled. You may answer.
Q How many?
A I don't know.
Q Well, you were placed on probation on July 6th of 2000. Do you remember being arrested on November 27th of 2000?
MR. HARDING: Objection.
THE COURT: Overruled. You may answer.
A What was the charge?
Q The charge was CDS, that stands for controlled dangerous

substance. It says not marijuana, possession with intent to distribute, firearm, drug traffic crime, manufacture, distribute narcotics. Your trial date was set for May 4th, 2001. Do you remember that?

A Yes.

Q Okay. So that was a violation of Judge Quarles's probation, right?

A No, not really.

Q It wasn't a violation of probation, is that your testimony?

A I wasn't found guilty.

Q Okay. So we're talking about a November 27th, 2000 arrest in which it's your testimony you were not found guilty, is that correct?

A Right.

Q Is it also correct, sir, that you were arrested again two days later?

MR. HARDING: Objection.

THE COURT: The objection's sustained.

Q Okay. Is it correct that with respect to that probationary period, you were continued on probation by Judge Quarles in November of 2001, is that right?

A Yes.

Q Okay. And after being continued on probation on November 26th, 2001, you were instructed that day to report to the Division of Parole and Probation, is that right?

A I believe so, yes.
Q And you didn't go, right?
A No.
Q Is it correct that you did not report?
A Right.
Q Okay. Then you were sent a letter in December of 2001 because you had failed to report to probation after being continued on probation by Judge Quarles, and you were supposed to report on December 20th of 2001, is that right?
A Didn't receive no letter.
Q I see. On December 21st, 2001, the day after you were instructed to report, is it correct that Probation Officer Colleen Nickerson made contact with you?
A No.
Q That's false?
A Right.
Q And it would be also false, then, that Colleen Nickerson told you to report to Probation on January 8th of 2002, right? That's false, right?
A Right.
Q According to your testimony. Okay. It's your testimony, is it not, Mr. Montgomery, that you had known Darius Spence since you were a little boy, is that right?
A Yes.
Q It's also your testimony, is it not, sir, that the person

you've referred to as E, that's Aaron Holly, right?
A Yes.
Q That E was involved first in the scheme to rob and murder Darius Spence and then Goo was involved after? Is that your testimony?
A Yes.
Q Now, you told the ladies and gentlemen of the jury last week that you'd had a conversation with Darius Spence in which Darius Spence asked you to do something to the person you called Momma, right, sir?
A Yes.
Q Do you know Momma's full name, real name?
A No.
Q Okay. And what was it that Mr. Spence asked you to do to Momma?
A He asked me to beat Momma up.
Q Okay. Did that conversation occur at Mosher and Monroe streets, is that right?
A No.
Q Okay. Let me take you back a little bit, then, sir. You told the ladies and gentlemen of the jury about someone by the name of Goose, right, Mr. Montgomery?
A Yes.
Q Was the plan to rob Goose before or after the plan to rob and murder Darius Spence?

A I'm not sure.

Q Is it also correct, Mr. Montgomery, that with respect to the plan to rob Goose, you discussed that only with the person you know as Wayne and not with Goo, is that correct?

A Yes.

Q That is correct?

A Yes.

Q Okay. So then to the extent you had indicated to the ladies and gentlemen of the jury that a conversation occurred in an automobile in which Goo had been present, about the robbery of Goose, that would be incorrect, right, sir?

A No. That's correct.

Q Okay. But it's also correct, then, according to your testimony, that you discussed robbing Goose only with Wayne and not with Goo, is that right?

A Right.

Q I see. Is it also your testimony, sir, that you were not sure if E was going to be part, and that's Aaron Holly, was going to be part of the robbery of Goose, is that right?

A Right.

Q And it's also true, is it not, Mr. Montgomery, that the plan to rob Goose had nothing to do with the plan to rob and murder Darius Spence, is that correct?

A Right.

Q Pardon me?

A Correct.

Q Correct. So after Darius Spence approached you about beating up Momma, it's your testimony that you told him, well, I might as well just kill him, right, sir?

A Yes.

Q And you asked him for a sum of money in exchange for killing Momma, is that right, sir? You asked him to pay you, right?

A Yes.

Q And what you asked him for was $5,000 in exchange for putting a bullet in Momma, is that right, sir?

A Yes.

Q And he didn't get back to you, right?

A Right.

Q Now, is it correct, Mr. Montgomery, that your, it's your understanding that the real reason that Momma wanted Spence dead was because Momma was having an affair with Tonya Jones Spence, is that right?

A Yes.

Q Momma admitted to you that he was having that affair with the victim, right, sir?

A Yes.

Q And you told -- well, strike that. It's correct, is it not, that the whole neighborhood was aware of this affair, is that correct?

A Yes.

Q Is it also correct that Momma told you, during the course of planning the robbery and murder of Darius Spence, Momma told you that Tonya Spence, with whom he was having this affair, had told him that Darius Spence was counting a lot of money, right?
A Yes.
Q That she had seen him counting about $100,000, right, sir?
A Yes.
Q Now, you told the ladies and gentlemen of the jury here, Mr. Montgomery, about this period of surveillance that occurred before Tonya Spence was killed, right, sir?
A Yes.
Q How long was that period of surveillance? In other words, from the time that you came up with this plan until the time Tonya Spence was murdered, how long was the period in which the apartment and the Spences were being surveilled, according to your testimony?
A Maybe two months.
Q Okay. Would it have been five to six days a week for about two months?
A Something like that, yes.
Q Now, remember that prior proceeding that we talked about in September of 2004?
A Yes.
Q Is it a fact that when you testified at that prior proceeding you said that the surveillance was a little over a

month?

A Yes.

Q Is it a fact that when you testified in the federal grand jury in this case you told them that the period of surveillance was, I'm referring to grand jury transcript Page 27, Line 7, you told them it was a couple of weeks, is that right?

A I don't know.

Q Okay. Let me see if I can refresh your recollection.

A If you say it's right, I believe you.

Q That's okay. You don't need to take my word for it. May I approach the witness, Your Honor? Or I can --

THE COURT: If there's no objection, you can show it on the DOAR.

Q See where it says on Page 27, starting on Line 4, that Momma showed you -- this is federal grand jury questioning by Mr. Harding, right, sir? The gentleman sitting over here to my left?

A Yes.

Q The prosecutor in this case. Says, but Momma showed you where he lived? And you answer yes. Do you see that?

A Yes.

Q And then question, so what happened after that? I'm on Line Seven now. Answer: We laid, we watched him for a couple weeks, couldn't, couldn't never really get Darius himself. And one day we went in there, well, they went in there. Do you see where it says that?

A Yes.

Q So which is it, then? Two months, a little over a month, or a couple of weeks?

A Almost two months.

Q Pardon?

A Almost two months.

Q Okay. It's a fact, is it not, Mr. Montgomery, that Aaron Holly, I think you've already told the jury this, was taller than Mr. Gardner, right?

A Yes.

Q He was considerably taller, right, sir?

A Not so much.

Q You think they're about the same height? Is that your testimony?

A No, I think Aaron is taller.

Q Okay. It's true, also, is it not, Mr. Montgomery, that on the day Tonya Spence lost her life, Aaron Holly was wearing a red hat, is that right?

A Yes.

Q Now, you've testified, have you not, that on that day Goo, Shawn Gardner, was carrying the .357, right?

A Yes.

Q And just to be clear, make sure that the ladies and gentlemen of the jury are clear on this particular detail, then, there are two guns involved, according to your testimony, right,

sir?

A Yes.

Q There's a .357, right?

A Yes.

Q That's a revolver, right?

A Right.

Q There's also what you referred to, I think, as a Glock .40, right?

A Yes.

Q That's a semiautomatic pistol, right?

A Right.

Q Okay. So it's your testimony, then, that Gardner was carrying the .357 and Holly was carrying the Glock .40, right, sir?

A Yes.

Q Now, do you recall when you were in one of these proffer sessions, one of these conversations with the U.S. Attorney's office, and just to state for the record, it's on September 26th, 2002 at 10 minutes after 11 a.m., do you recall being asked by the government about what Shawn Gardner's weapon of choice was? Do you remember that?

A Yes.

Q And you stated that his weapon of choice was a Glock .40, didn't you?

A Yes.

Q Now, on the day Tonya Spence was -- I'm sorry. It's proffer session September 26th, 2002, 1110 hours, Page 6. On the day Tonya Spence was killed, you were not part of any what's called identification procedure, right? I mean, you weren't held anywhere for anyone to come and look at you, right?
A No.
Q Because you were not arrested that day, right?
A Right.
Q Because you, in fact, have never been arrested or charged with the Spence homicide, right, sir?
A Right.
Q So then, I take it, neither your hands nor your clothing were ever tested for gunshot residue, were they?
A No.
Q How tall are you, Mr. Montgomery?
A Five-five.
Q It's correct, is it not, sir, that you have worn your hair in braids in the past, right, sir?
A Yes.
Q And it's correct, also, is it not, Mr. Montgomery, that you do not know, it's your testimony that you don't know if you had braids in your hair on the day of the Spence homicide, right, sir?
A Right.
Q It's your testimony, also, is it not, Mr. Montgomery, that

Tonya Spence was not supposed to get hurt or killed, right?

A Right.

Q It's your testimony that the plan was not to kill Tonya Spence, right?

A Right.

Q But when you testified last week in response to the government's questions, you said, and maybe it's important to try to get the language right here, it was your testimony that on that morning, the morning Tonya Spence was killed, your testimony is that Shawn Gardner said, "we're going to get the bitch today?"

A Yes.

Q So is it your testimony, then, Mr. Montgomery, that in any one of these prior statements that we've referred to to the U.S. Attorney's office or to Baltimore City Homicide or in your recorded statements or your testimony in a prior proceeding or your testimony in the grand jury, did you ever say that before, ever?

A I believe so, yes.

Q Which one?

A Don't know.

Q But you're sure you've said it before in one of those things, is that right?

A Yes.

MR. HARDING: I'm sorry, Your Honor. I missed what statement Mr. Coburn's talking about.

Q Any of them.

MR. HARDING: Any of what statement?

Q Any of the series of proffer sessions with the US Attorney's office.

THE COURT: No. No. He means what discrete assertion are you questioning the witness about?

Q Oh, oh, I'm sorry, Your Honor. His assertion that on the morning of the murder, Shawn Gardner said, "we're going to get the bitch today." And my question is, in any of these prior statements or your prior testimony, did you ever say that before, ever?

A I believe so, yes.

Q Are you sure or you just think so?

A I think so, yes.

Q Do you recall in which one?

A No.

Q You also said, though, just now, that it was your testimony that she wasn't supposed to get hurt, right, sir?

A Right.

Q So then after Mr. Gardner said, "we're going to get the bitch today", you must have said, what are you talking about, she's not supposed to get hurt, right, sir?

A No.

Q You didn't say that?

A No.

Q But it was your testimony that she was not supposed to get hurt, right, sir?

A Right.

Q And in fact, you had talked with Momma about this, right, about her not getting hurt, right, sir?

A I told Momma it was a possibility of her getting hurt.

Q But Momma told you that he didn't want her to get hurt, right?

A Right.

Q Let me ask you, sir, and I'm referring now to your prior tape recorded statement, Page 17, there are no line numbers on this, whether you were asked the following questions and gave the following answers?

(Tape played.)

Q Was that your voice?

A Yes.

Q So then you were asked on that occasion back on January, well, I won't use the date, you were asked on that occasion in 2003 that: And were you aware when you drove in on June 7th, '02, that this was going to be the date of the robbery? And you answered no, right, sir?

A Right.

Q And you were also asked: How was it you believe that Gardner was ready to do the robbery that day? And you answered: Because I know he was anxious, he was ready to do it any day.

Right, sir?

A Right.

Q And then you were asked: And when you say anxious, what do you mean? What was he doing that led you to believe that he wanted to do it that day? And you answered: He wanted to go out there so much, stuff like that. Um, he needed money. He was in, he was in need for money so he really want to go. Right, sir?

A Right.

Q So then where in there do you say that he said "we're going to get the bitch today?"

A Nowhere.

Q It's correct, is it not, Mr. Montgomery, that when you approached Momma about your scheme, your plan to rob and murder Darius Spence, you lied to him when you told him that Darius Spence had hired you to kill Momma, right, sir?

A Right.

Q And you used that lie to get Momma to hire you to kill Darius Spence, right, sir?

A Right.

Q And you did that because you wanted to make some money, right, sir?

A Right.

Q It's correct, is it not, that Momma said he would give you something for killing Darius Spence, is that right?

A Yes.

Q It's your testimony that you were right there on the scene when she was killed, right, sir?
A Right.
Q You said that you saw her fall from the balcony, right, sir?
A Right.
Q Your Honor, there's Government's Exhibit S-56, which is admitted into evidence. May I put it on the presenter?
THE COURT: Certainly.
Q It's a photo. You recognize that, sir?
A Yes.
Q What's that?
A Tonya Spence building.
Q Okay. Can you see the spot where you were standing, according to your testimony, sir, when Tonya Spence went over that second floor balcony?
A Yes.
Q Can you put your finger on that spot? It should make a little mark so that the ladies and gentlemen of the jury can see it. Thank you.
A (Witness complies.)
Q It's your testimony, in fact, that after she went over, you actually went up to her, within a couple of feet of her, right, sir?
A No.
Q That's wrong?

A Right.

Q Okay. Referring to the transcript of the prior proceeding on September 29th, 2004, Page 95. Starting on Line 8. Let me ask you, sir, whether or not at that time you were asked the following questions and you gave the following answers.

Question: When you came out of the apartment building, you claim that she was being shot at and had fallen to the ground, is that right? Answer: Yes.

Question: You went up to her, is that right? I'm sorry. You were within a couple of feet or the distance that you demonstrated today, is that right? Answer: Yes.

Were you asked those questions and did you give those answers in your testimony under oath at that prior proceeding?

A Yes.

Q And that was true, right, sir?

A Right.

Q According to your testimony?

A Yes.

Q It's your testimony that you were supposed to pick the other two individuals who were involved in this up after the incident was over, right, sir?

A Yes.

Q It's your testimony that you drove them there, right, sir?

A No.

Q Okay. You were in the car that went there, right, sir?

A Right.

Q It's your testimony that after the two other individuals got out of the car, you were driving what was supposed to be the getaway car, right, sir?

A Yes.

Q Now, it's correct, is it not, Mr. Montgomery, that it was your intention that it was going to be you who killed Darius Spence that day, right, sir?

A Yes.

Q And you were going to use one of the two guns that the other individuals were carrying in order to murder him, right, sir?

A Yes.

Q It didn't matter to you which gun, right, sir?

A No.

Q How many days, Mr. Montgomery, did you have the car for from the time of the incident until the time it was picked up by the police?

A Maybe a week.

Q Okay. During that period of time, you did not make any attempt to dispose of the latex gloves that were sitting in the trunk of that car, did you?

A No.

Q It's a fact, according to your testimony, is it not, Mr. Montgomery, that even after this incident, even after Tonya Spence fell off that balcony and had two bullets pumped into her

and died, it's a fact, is it not, that you kept trying to kill her husband, right, sir?

A Yes.

Q Even after her murder, you met with Momma and told him that you would still kill Darius Spence, right, sir?

A Yes.

Q But you have never been charged with any offense relating to the attempted robbery and murder of Darius Spence or the murder of Tonya Spence, right, sir?

A Right.

Q Your Honor, could I have the Court's indulgence just for a moment?

THE COURT: Certainly.

(Pause in proceedings.)

MR. COBURN: Thank you so much, Your Honor. Nothing further.

THE COURT: Mr. Coburn, let me invite you to retrieve your boom box.

MR. COBURN: Absolutely. Can I come around this way, Your Honor?

THE COURT: Yes.

MR. COBURN: Probably the last time I use that for another ten years.

THE COURT: They don't build them like that any more.

MR. CROWE: Seem to have a technical problem.

THE COURT: Make room for Mr. Hanlon.

MR. HARDING: All this high tech and he's trying to fix it with a paper clip.

CROSS EXAMINATION

BY MR. CROWE:

Q Good morning, Mr. Montgomery. My name is Tom Crowe and I represent Shelly Martin. Did you tell Mr. Coburn, I think it was last Wednesday, that part of your plea agreement with the State of Maryland required that you not try to withdraw your guilty plea?

A I think I did say that, yes.

Q Okay. And that, in fact, is your understanding, is it not?

A No.

Q Pardon?

A That's not my understanding.

Q So you told him that it was your understanding that you shouldn't withdraw your guilty plea but now you say that's not your understanding?

A Right.

Q Why did you tell him it was?

A At the time I thought it was.

Q Okay. In any event, is it true that, with respect to your state plea, it is your understanding that it is the state prosecutors, the State's Attorney's Office for Baltimore City, that makes the decision whether or not you have cooperated and,

thus, whether it is obligated to make the recommendation which is discussed in that plea agreement?

A Right.

Q If they simply decide that you haven't cooperated or that your cooperation isn't sufficient, they don't have to make the recommendation?

A Right.

Q And if they decide that you've cooperated, what they've agreed to do is to recommend that you get essentially no more than 40 years, is that right?

A Yes.

Q But as you told Mr. Coburn, you realize full well that they can recommend that you get less than that, is that right, also?

A Yes.

Q And you want them to make that recommendation, don't you?

A Yes.

Q And is it further your understanding that -- well, do you expect that they're going to be speaking with people from the United States Attorney's Office, such as Mr. Harding and Mr. Hanlon, before they decide what final recommendation to make?

A Yes.

Q And is this something which has been, in a sense, kind of held over your head for a period of many years?

A Yes.

Q Do you get the -- in fact, you actually signed this plea

agreement, I will tell you, on May 13 of 2003. Does that sound about right?

A Yes.

Q Do you have any idea why it is that it's been hanging over your head for a period of more than five years?

A Waiting on this trial.

Q Okay. Do you think that there's a little bit of distrust in terms of the state prosecutors and the federal prosecutors about what you may say?

MR. HARDING: Objection.

THE COURT: Rephrase the question.

Q Are you concerned that -- well, do you believe that the federal and state prosecutors are holding, are holding back on going, are holding back on your sentencing because of concerns as to what you may say at this trial?

A Yes.

Q Okay. And you want to make Mr. Harding and Mr. Hanlon happy, don't you?

A I ain't got to make them happy.

Q Now, you were arrested, as I understand it, on a handgun charge in July 2 of 2002?

A Yes.

Q Where were you arrested?

A I was arrested on Edmondson Avenue.

Q On Edmondson Avenue. You were arrested out on the street?

A Yes.

Q And what time of day was that?

A Afternoon.

Q Okay. Do you recall what time in the afternoon?

A Lunch time.

Q And there was a search of a house that same day, is that correct?

A Yes.

Q And that house turned up a 9 millimeter pistol, is that right, also?

A Yes.

Q And that was not the 9 millimeter pistol that you used to kill Terry Cheeks, was it?

A No.

Q This is a different 9 millimeter. What house was searched where they grabbed that gun?

A My girlfriend house.

Q Okay. And where's that located?

A Edmondson Village.

Q Okay. And that's the weapon for which the federal government has charged you in this court, is that correct?

A Yes.

Q And that's, that's the case that was before Chief Judge Legg of this court?

A I don't know.

Q Now, you were arrested in the afternoon, maybe around lunch time. And is it true that you were sitting down with detectives, giving them a taped statement, at about 7 p.m. on July 2?

A Probably so, yes.

Q And before you gave them the taped -- and you gave them the taped statement in the Homicide office?

A Yes.

Q That would be, that would be a section in the police headquarters in Downtown Baltimore?

A Yes.

Q Is that correct? And when you were originally arrested, you were taken over to the Western District, is that true?

A Yes.

Q And you gave them a second taped statement just a couple minutes after midnight on July 2, which would have been the very early morning hours of July 3, is that right?

A Yes.

Q And then you gave them the third taped statement that morning, a little before lunch, is that also correct?

A Yes.

Q Now, in the taped statement you admitted that you had shot your friend, Terry Cheeks, in the back of his head, is that right?

A Yes.

Q And was that a murder which occurred about May 14th of 2002?

Mid May.

A Sounds about right.

Q Sounds about right. Now, before you gave a statement, did the law, did the Baltimore City Police or other law enforcement people tell you that they had a great deal of information about you?

A Yes.

Q Did they tell you that they knew that you were implicated in the murder of Terry Cheeks?

A No.

Q Did they, did they talk to you at great length about a guy by the name of Tyree Stewart?

A Yes.

Q Did they tell you that they knew a lot about Tyree Stewart's organization?

A Yes.

Q Did they tell you that they had had wiretaps running for months on Tyree Stewart and his organization?

A Yes.

Q So that's what they, that's what they told you before you told them anything about Terry Cheeks, is that correct?

A Yes.

Q And was the fact that law enforcement had this much information on Tyree Stewart something which influenced you to tell them about the murder of Terry Cheeks?

A Yes.

Q So your statement on Tuesday that, essentially, that you just, you know, sort of caved in and gave law enforcement the information they wanted because you were tired of running was not correct, was it?

A No.

Q Okay. And the reason that you began talking with the law enforcement was because they, you thought that they had you?

A Yes.

Q And you knew it was only going to get, you knew it was only going to get worse?

MR. HARDING: I want to object to the question before this one, about --

THE COURT: Overruled.

MR. HARDING: Something that --

THE COURT: Overruled. Go ahead, Mr. Crowe.

BY MR. CROWE:

Q Now, finally, as I understand it, when you were arrested on July 2 of 2002, did you tell the police at that time that you were Michael Rowe?

A I probably did.

Q Okay. Could I just ask you, why, if you're arrested on a criminal charge, would you tell somebody, would you tell law enforcement, would you give law enforcement your brother's name?

A When I was first arrested, I didn't know what charge it was.

Didn't know I was going to be arrested when I gave the name.

Q Well, the question didn't specify the charge. When you were arrested, why did you give law enforcement your brother's name rather than your own?

A When they pulled me out of the truck and asked me my name, that's the name I gave, not knowing that I was going to be arrested.

Q Well, from, from your experience when law enforcement pulls you out of a vehicle on Edmondson Avenue around noon, around noon time, don't you, don't your thoughts naturally go to the fact that, God, they're going to arrest me?

A No, I was not dirty.

Q Pardon?

A I was not dirty.

Q But you were in violation of your probation or parole?

A Right.

Q Okay.

THE COURT: Tell the ladies and gentlemen of the jury what you mean by "dirty."

A I didn't have no gun, drugs, or anything illegal on me.

Q Now, would I also be correct that between, that you had a couple of hours, at least a couple of hours of discussion with police between the time you were arrested on noon of July 2 and the time that the tape recorder was turned on at about 7 that evening?

A Yes.

Q Did you have one or more such sessions?

A I don't know.

Q What place or places did the sessions take place?

A Western District.

Q When you came over to Homicide, were the Homicide detectives, did they talk to you before they started playing the tape, started rolling the tape?

A No, not really.

Q Now, Mr. Coburn has gone through with you what happened and I have, also. And you recalled, you recall the three sessions where tape was playing, is that correct?

A Right.

Q Those are three sessions that occurred within 24 hours after your arrest?

A Right.

Q Do you recall also coming over for a number of what are called proffer sessions, which, I don't know, 2002, probably would have been conducted in this building?

A Yes.

Q And there were times when you had as many as 13 and 14 people present in some of those proffer sessions, is that right?

A Yes.

Q And there were times when you had a couple of those proffer sessions a day, is that right, also?

A Yes.

Q Let me ask you this. On the three taped statements that you gave on July 2 and July 3, when's the last time you either listened to the tape of the statement or that you've reviewed sort of a question and answer thing which sets, which sets out the questions you were asked and the answers you gave?

A When's the last time I listened to it?

Q Either you listened to it or you reviewed what we lawyers call a transcript.

A Never.

Q Never?

A Except for what was played today.

Q Now, you have also indicated that, in addition to those five proffer sessions or so, that there was another question and answer session that you had with the prosecutor that had turned, that occurred sometime later than that, is that correct?

A Yes.

Q And was that prosecutor a man by the name of Dean Stocksdale?

A Yes.

Q And did you understand that he was a state prosecutor in Baltimore County?

A Yes.

Q Have you either listened, have you had the occasion either to listen to that tape or to read a transcript of that question

and answer session since the time that you sat down with Mr. Stocksdale?

A No.

Q And finally, you have testified that you testified before a federal grand jury here, is that correct?

A Yes.

Q And have you reviewed a transcript of that testimony?

A Yes.

Q And when did you review a transcript of that testimony?

A A couple months ago.

Q And by a couple of months ago, you're talking about sometime roughly in, I guess, August of this year?

A Yes.

Q And where did you review it?

MR. HARDING: Objection.

THE COURT: Sustained.

Q Did you review it with federal prosecutors?

A No.

Q Now, am I correct that years after your arrest you didn't know Bo's real name?

A They have, they have said it but I don't try to remember it.

Q Okay. But it's, at the time, at the time of the Tonya Jones-Spence killing, you didn't know Bo's real name, did you?

A Right.

Q There's an individual in this courtroom by the name of, name

of Shelton Harris. He supposedly has street names of Rock and Little Rock. Do you know that individual at all?

A No.

Q Have you ever heard of that individual?

A No.

Q Now, is it also true that you had really more dealings with Shawn Gardner or Goo than you had with Mr. Martin?

A Yes.

Q Is it true that Mr. Gardner would often front you drugs and that he did this over an extended period of time?

A Yes.

Q And I think this has already been discussed, but essentially by fronting, it meant that he would give you the drugs and then after you would sell them you would have to give him an agreed-on price, is that right?

A Yes.

Q So you were, even with Mr. Gardner, you weren't actually buying drugs from him, were you?

A Excuse me?

Q I said, you weren't buying drugs from Mr. Gardner?

A No.

Q And did you have an understanding as to what would happen, say, in a situation where you had some of Mr. Gardner's drugs and somebody robbed you of the drugs? Would you still owe Mr. Gardner the money?

A Yes.

Q So what we commercial lawyers, do you understand the term "risk of loss?"

A Yes.

Q Okay. So the risk of loss would essentially be on you, is that right?

A Right.

Q And that was the same, also, if you know, if you had sold the drugs and somebody, somebody got the money?

A Right.

Q The loss was going to be yours, is that right?

A Right.

Q Now, is it, did Mr. Martin ever actually front you any drugs?

A Front me?

Q Yeah.

A Yes. You can say so, yes.

Q Okay. Again, you say that you've recently reviewed your federal grand jury testimony?

A Right.

Q Give me just a second to check something.

(Pause in proceedings.)

Q Let's start at Page 10, Line 25. You see that you're asked the question, I think it's by Mr. Harding: Did you also sometimes obtain marijuana or cocaine from Goo or Wayne? Answer:

Yes.

Question: Both of them? No. Just Goo.

Was that, in fact, your testimony, was that, in fact, your testimony in January of 2004 before the federal grand jury?

A Yes.

Q And you realize that that was a serious occasion?

A Yes.

Q You were told by the prosecutor that it was absolutely essential that you tell the truth?

A Yes.

Q You raised your hand, is that right?

A Yes.

Q And you took an oath which, in terms of the words, was identical to the one that you took last Tuesday?

A Yes.

Q And your answer there was that Mr. Martin did not front you any drugs, is that right?

A Yes.

Q That only Mr. Gardner had? Now, you've also testified that you and Martin and Gardner and I think a guy by the name of Darryl Bacon would sometimes travel to New York City together, is that right?

A Yes.

Q And you've testified that on only one time did you go up with this guy Bo, whose real name you didn't know?

A Right.

Q And you started going up in about 1997?

A Yes.

Q And your testimony was that you went up there through about 2000 or 2001, is that right?

A Yes.

Q Now, did you understand that Mr. Martin was locked up from, oh, about June of 1997 until 2001, when you saw him out on the street?

A No.

Q You didn't? Okay. It was your understanding that when you saw him out on the street in 2001, that he had just finished a sentence, is that right?

A Yes.

Q And that he was in a halfway house. So I gather your answer is you don't know when the sentence began. Is that what you're telling me?

A Right.

Q Was there indeed an extended period of time when you were traveling to New York City, when Mr. Martin was not with you?

A Yes.

Q And were you going up with other people at that time?

A Yes.

Q Now, you weren't really a partner of either Mr. Martin or Mr. Gardner, were you?

A No.
Q They didn't work for you, did they?
A No.
Q You didn't work for them, is that right?
A No.
Q In fact, you had other people working for you, did you not?
A Yes.
Q And one of those people was a guy by the name of Aaron Holly, is that right, also?
A Yes.
Q And you would front drugs to Aaron Holly, is that right?
A Yes.
Q And your testimony was that Mr. Gardner would front drugs to Aaron Holly, is that right, also?
A Yes.
Q But you actually, but Mr. Martin, at least as far as you know, did not front drugs to Aaron Holly, is that correct, also?
A Right.
Q Now, you have never actually robbed anyone, whether a drug dealer or anybody else, with Mr. Martin, have you?
A Yes.
Q And was that the one occasion that you talked about when you were going on a trip to, I think it was to a marijuana house, and somebody, somebody jumped out and robbed a guy coming out of the house?

A Yes.

Q That was the time that we're talking about, is that right?

A Yes.

Q Did you know that Mr. Gardner was going to do that?

A Yes.

Q And how did you know that?

A I believe it was said.

Q Okay. And Mr. Martin stayed in the car, is that right?

A Yes.

Q So on that one occasion, it was actually Mr. Gardner who committed the, committed the robbery, is that correct?

A If you say so, yes.

Q Well, it's not what I say, sir. It's what you say. Mr. Gardner is the one who jumped out and robbed the man, is that correct?

A Yes.

Q There were, however, people with whom you regularly committed robberies, is that correct?

A Yes.

Q There was a fellow by the name of Marty Ball. Do you recognize that name?

A Yes.

Q Indeed, you have testified that you and Mr. Ball did a lot of bad things together, is that right?

A Yes.

Q Mr. --

THE COURT: Is that B-A-L-L?

Q B-A-L-L, Your Honor. Mr. Ball, was, in fact, your partner in extended criminal activity over a period of years, is that right?

A Yes.

Q And Aaron Holly was also somebody that you, that you were, that you had committed many crimes with, is that right, also?

A Yes.

Q Now, when you testified, and I think it was just about a week ago, on last Tuesday, you said that you considered that you and some other people were a family. Who were the people that you included in that term "family?"

A Who were the people?

Q Yeah.

A Goo, Wayne.

Q Okay. Mr. Mitchell?

A He was their family.

Q Pardon?

A He was their family.

Q Now, in any time in any of your discussions with law enforcement, and I'm going through the same series of things that Mr. Coburn did, in your three taped statements, in your federal grand jury testimony, in your question and answer session with Assistant State's Attorney Stocksdale, in your five proffer

sessions, have you ever told any law enforcement that you considered these people to be your family?

A I believe so, yes.

Q You've recently read your federal grand jury testimony. You know that it's not in there, don't you?

A No.

Q You don't? Okay. Well, if I, if I tell you that it isn't, will you accept my representation?

A Yes.

MR. HARDING: Objection.

THE COURT: Overruled.

Q And if I tell you that it's not in any of the question and answer sessions that have been taped, will you accept my representation on that, also?

A Yes.

Q Now, and if I tell you that it's not mentioned in any of the proffer memos, will you accept that representation?

A No.

Q Okay. Because you don't know what you said there, is that right?

A No, because I know I have said it so it got to be somewhere.

Q Who was there when you said it?

A Prosecutors.

Q Which prosecutors?

A Agents. Mr. Harding was there.

Q Mr. Harding was there. Now, this family, did you guys refer to each other in any way? Did it have a name?

A No.

Q Did it have any sort of, did you people in this family, did they have any tattoos, like gangs sometimes have?

A No.

Q Did this family have any sort of signature clothing or colors which they would typically wear?

A No.

Q You did belong to criminal groups which had those attributes, though, didn't you?

A Yes.

Q And what were the names of those groups?

A Groups?

Q Yeah.

A Just a group. Cruddy Crew.

Q Did any of them have a name?

A Cruddy Crew.

Q One of them was something called the Cruddy Crew, is that right?

A Yes.

Q And who was in the Cruddy Crew?

A Me, Elkie, Smokey. It was a lot of people.

Q And how many people are we talking about?

A Maybe ten or more.

Q Okay. And how long did that group, how long was that group in existence?

A For a while.

Q Well, what's -- are we talking about months, years?

A Years.

Q And from when to when?

A Maybe '94, '95.

Q Pardon?

A Maybe '94, '95 when it started.

Q 1994 to maybe as late as 1997, is that right? Did that group --

MR. HARDING: Objection. Objection.

THE COURT: Sustained.

Q I'm sorry. What were the dates that you said that the group was in existence?

A I said might have started maybe in '94, '95. It's still in existence today.

Q Oh, it's still in existence today?

A Yes.

Q So this is something that's -- did that group have any tattoos or wear any colors or have any sort of signature clothing?

A Yes.

Q And what sort of tattoos did that group have?

A Cruddy Crew.

Q Pardon? Cruddy Crew? Have you got a Cruddy Crew tattoo on you?
A Yes.
Q Okay. Was there any other group that had, criminal organization that you belonged to where the members had tattoos on wore colors?
A No.
Q Do you have a tattoo on your neck or your throat called OTM?
A Yes.
Q And what does that stand for?
A Out that mob.
THE COURT: I'm sorry. Say that again.
A Out that mob.
Q O-U-T, T-H-A-T, M-O-B, is that correct?
A Yes.
Q And was that a gang?
A No.
Q Okay. Did other people have that tattoo, also?
A Yes.
Q Okay. And was one of the people who had that tattoo a guy by the name of Terry Cheeks, whom you murdered?
A Yes.
Q And were there, in fact, a number of people, were there, in fact, a number of people who had that tattoo?
A Yes.

Q Why did they have the, why did they have that OTM tattoo?
A Neighborhood.
Q Pardon?
A It's a neighborhood thing.
Q And was this, this is a neighborhood thing, like a community association that throws barbeques or was it a bunch of people who got together and committed crimes?
A No.
Q Never committed crimes?
A They committed crimes.
Q Pardon?
A They committed crimes.
Q They committed crimes. And in fact, did this group actually have a color that it wore?
A No.
Q You sure about that?
A Yes.
Q Okay. Do you ever recall telling law enforcement that the OTM group wore the color red?
A No.
Q And what was the Cruddy Crew's color?
A They don't have no color.
Q Did you ever tell anybody that an organization that you belonged to wore the color red?
A No.

Q If I might have just a moment, Your Honor.

THE COURT: Yes.

(Pause in proceedings.)

Q I'm going to put up on the screen a portion of the taped statement, actually the very first taped statement that you gave on July 2.

MR. HARDING: Objection.

Q And I'm going to be referring to Pages 13 and 14.

THE COURT: I think there's an objection to your putting it on the screen, Mr. Crowe.

Q Okay. Let me just ask you this. Do you recall a Detective Carew asking you a question? Okay. All right. The, uh, what does OTM stand for? Montgomery: Out that mob.

Carew: And Terry had a tattoo, OTM, on him, didn't he? Montgomery: Out that mob.

Carew: Do you have a tattoo? Montgomery: Yeah, on my neck.

Carew: And uh, uh, what else, uh, see, where did that start from, the OTM? Your answer is: It came from around, like the time, and then it says inaudible.

And Carew says: When you say Cle, C-L-E, are you saying Cleo and Garrett? And you say yeah.

And Carew says: What, what colors? Montgomery says: Red.

Carew says: Red? And that's what you have on right

now? Montgomery: Yes.

Do you recall that, do you recall that passage?

A Not really, no.

Q Does it sound a little familiar to you?

A Somewhat, yes.

Q Okay. Do you recall there being a discussion in, if not the first taped statement, at least one of the early ones, about the gang color for Out That Mob?

A It's not a gang.

Q Pardon?

A It's not a gang.

Q Okay. Do you recall, do you recall a discussion about OTM and the fact that it had the color red?

A No.

Q Do you recall the fact that somebody making comment about the fact that you were actually wearing red the day you were arrested on Edmondson and when you gave that taped statement about seven hours later?

A No.

Q Okay. Now, there are a whole bunch of other gangs that I, that I assume that you're familiar with living in the neighborhood you do, is that correct?

A Yes.

Q There are the Bloods, is that right?

A Yes.

Q Are the Crips active, were they active in the neighborhood you were in?
A Not when I was out there.
Q Were there a whole bunch of different gangs which use the word "gorilla" in them?
A Yeah.
Q Have you ever heard about CBS?
A Yes.
Q Okay. And what is CBS?
A Calhoun, Baker and Stricker.
Q And was that a gang, also?
A No.
Q And what about Lexington Terrace?
A What about it?
Q Was that a gang?
A No.
Q The Lexington Terrace Boys were not a gang?
A The Lexington Terrace Boys?
Q Yeah.
A They probably was.
Q They probably were. Now, do you recall that last Wednesday Mr. Coburn played for you a part of the statement, of a taped statement that you gave with Mr. Stocksdale? Do you remember that?
A No.

Q You don't? Okay. Well, let's put it up on the screen. Do you recall that he asked you a series of questions about your relationship with Mr. Gardner and whether it was a relationship of honor?

A Yes.

Q Okay. And referring to Page 10.

MR. HARDING: Objection.

THE COURT: Again, you're not going to put it on there?

Q I was planning on it, yes, Your Honor.

THE COURT: There's an objection.

Q Sustain the objection?

THE COURT: Yes.

Q Okay. Do you recall Mr. Stocksdale asking the question, could you --

THE COURT: Let me explain to the jury. Members of the jury, I will instruct you at an appropriate time near the end of the case and perhaps before then as to the manner in which, as I've said to you before, you should evaluate witness testimony in this case.

One of the things that you've observed now repeatedly by really all the lawyers who've questioned witnesses is a lawyer will ask a question of a witness and then bring to the witness' attention what the lawyer may suggest or contend is a prior statement by the witness that is inconsistent with the witness' trial testimony. This is entirely appropriate for a lawyer to do

on both the government's side as well as the defense side.

But what I will instruct you, with certain exceptions, is that your verdict in this case to be based on the witness' testimony in this courtroom. Again, with certain exceptions, a witness' prior statement which a lawyer may use to cross examine or even examine a witness may be considered by you, with certain exceptions, only as you may find that the prior statement assists you in deciding what, if any, of the witness' in-court testimony to accept.

So as I've told you earlier, ultimately it is up to the jury to decide what, if any, testimony of any witness you choose to credit or believe. You can believe all of the testimony of a witness, none of the testimony of a witness, or some of the testimony of a witness.

So if you should find, as I will instruct you in greater detail, that a witness made a prior statement and that that prior statement, if you so find, is inconsistent with the witness' trial testimony, then you may consider the prior statement and any inconsistencies, and why there may be inconsistencies, and any explanation for any inconsistencies, in deciding how much weight, if any, you should give any particular witness' testimony in court.

Again, I'll elaborate on this instruction, as I will all of my instructions to you, at the appropriate time.

Sorry for the interruption, Mr. Crowe.

MR. CROWE: That's quite all right, Your Honor.

THE COURT: Oh, I left out. So in this connection, ladies and gentlemen, in my discussions with counsel, as you've seen, sometimes a lawyer will put a transcript of a prior interview or grand jury testimony on the DOAR when the lawyer is questioning the witness about the prior statement. Other times one or the other lawyers may not want the transcript to be placed on the DOAR. And that's entirely appropriate. So that sometimes you may get to actually see the statement when the witness is asked about it. Other times you will not be permitted to see the statement but you will hear the lawyer's summary or reading of the statement.

The prior statement itself and any transcript of the prior statement, unless there's an exception, is not itself evidence and the transcripts that have been placed on the DOAR for you to read are not exhibits in the case. So they will not be sent back into the jury room with you when you are excused to begin your deliberations.

So I tell you this now so that you have a better understanding of why it is, and perhaps you think it's been somewhat inconsistent, and it has, because as I say, sometimes the lawyers, the lawyers don't care if a transcript is shown to you. Other times the lawyers do care if the transcript is shown to you. You shouldn't speculate about why sometimes you're shown the transcript and why other times you're not shown the

transcript. What's important is that the transcript and the prior statement itself is not substantive evidence for you to consider in this case. Rather, it is only matters for you to consider in deciding what substantive evidence, including testimony by a witness in this courtroom, you should credit.

Okay. Go ahead, Mr. Crowe.

BY MR. CROWE:

Q Just to recap. Is it your testimony that you, in fact, didn't have a serious relationship with Mr. Gardner which had any component or element of honor to it?

A Is that my testimony?

Q Well, is that your testimony today?

A No.

Q Okay. Is it true that you didn't have the same sort of relationship with Mr. Gardner that you would have had for your friend Dirty or Davon Watson?

A Right.

Q Now, you do recall that Mr. Coburn actually played for you a tape of your question and answer session with Mr. Stocksdale on this subject. Do you recall that?

A Yes.

Q Okay. And was the following, was, were the following questions and answers given? Stocksdale: Could you describe your relationship or association with Mr. Gardner? Montgomery: He cool.

And when you say, quote, "he cool", unquote, what do you mean, Mr. Montgomery? Montgomery: We hook up a few times. It ain't, ain't no serious relationship with it, though, to have, to have honor to each other, no.

Stocksdale: To have honor with each other? Montgomery: Um, um, ain't nothing like that.

Stocksdale: How often would you associate with Mr. Gardner? Montgomery: Oh, we used to associate on a regular, on a regular, whenever we can, basically. If he come around, holler at E, I'm there, we would rap before E. And then there's something which is inaudible. We used to go up to New York together, stuff like that. But it wasn't nothing like we met every day. And he called me when he got in trouble. Stuff like how me and Dirty is, it ain't nothing like that?

Now, did you, in fact, have that discussion with Mr. Stocksdale?

A Yes.

Q And did you believe that you were telling him the truth at the time?

A No.

Q You thought you were lying with him at the time, lying to him at the time, is that right?

A Somewhat, yes.

Q And would you care to tell us why it was, after you'd made your agreement to cooperate and do nothing but tell the truth,

that you lied to Mr. Stocksdale?

A At that time I wasn't really sure that I wanted to, to get out stuff out about Dirty, Spence and Goo, and all that.

Q Well --

A -- because I wasn't charged with it.

Q Well, isn't it, in fact, true that in your prior taped statements you had, and in your proffer sessions, you had gone over the whole Darius Spence matter?

A Prior?

Q Yeah.

A I don't know.

Q And isn't it, in fact, that in this taped statement, you spend pages and pages and pages essentially telling the same story that you've told this grand, that you've told this jury about, about the attempted robbery and murder of Darius Spence and the killing of Tonya Jones-Spence?

A Yes.

Q You did it in the same session, is that right?

A I don't know.

Q I will tell you that this taped statement was taken in January 22 of 2003. Were you holding anything back from law enforcement people at that time?

A No.

Q No. Now, this Davon Dirty Watson that we've talked about was, in fact, one of the guys who helped you in the murder of

Terry Cheeks, is that right?

A Yes.

Q And he was there at the murder of Terry Cheeks, is that right?

A Yes.

Q Is he the man who pried Cheeks's .38, or whatever weapon it was, out of his, out of his dead hand?

A Yes.

Q Okay.

THE COURT: How much more do you have, Mr. Crowe?

MR. CROWE: I would think, Your Honor, probably 15, 20 minutes.

THE COURT: Okay. We should take a break now.

We'll take our morning recess, ladies and gentlemen. Please leave your note pads in your chairs. Have no discussion about the case. Continue to keep an open mind about all issues. We'll stand in recess for 15 minutes.

(Recess.)

THE COURT: Mr. Kurland, I'm aware of your concern, I don't think terribly concerned with my limiting instruction. I assure you I am very much aware of the fact that counsel for Mr. Gardner and perhaps others will be asking the Court to instruct the jury that certain prior statements should be considered by the jury as substantive evidence. That's why I said two or three or four times during my limiting instruction "with exceptions."

I emphasized, there will be exceptions. So I've cover that if that's your concern.

MR. KURLAND: Yes. That's largely the concern.

THE COURT: What's the other concern?

MR. KURLAND: Well, with respect to the grand jury testimony as prior inconsistent statements, which is largely, not exclusively, but largely the documents of which the government is having no objection to, those are all admissible as substantive evidence. And I think that the way the Court gave the instruction right now, it seems to kind of --

THE COURT: I think I covered it. I think I covered it.

MR. KURLAND: All right, Your Honor. Thank you.

THE COURT: Jury, please. Are we coming backwards with this witness? Is that what the agreement is?

MS. RHODES: Yes.

MR. LAWLOR: Yes, but I don't think we'll have anything.

THE COURT: Okay.

(Jury enters the courtroom.)

THE COURT: Mr. Coburn, you may -- excuse me. Mr. Crowe, you may proceed whenever you're ready.

BY MR. CROWE:

Q Thank you, Your Honor. About three weeks before June 7, you had murdered a man on a street corner in Baltimore County,

Baltimore City, had you not?

A Yes.

Q That man was named Terry Cheeks?

A Yes.

Q And you and Terry Cheeks were both out on that street corner and you were both, you were both armed, is that right?

A Yes.

Q He thought you were your friend?

A Yes.

Q He thought you guys were doing things together, is that right?

A Yes.

Q But in fact, you had a contract to put a hit out on him, is that right?

A I put a hit out on him?

Q No. You had a contract to kill him?

A Yes.

Q And your original contract was for $15,000?

A Yes.

Q But you wound up getting paid $10,000, is that right, also?

A Yes.

Q And as he peeked around the corner, was that McKean and Lanvale?

A Yes.

Q Snuck up, you came up behind him, didn't you?

A Yes.
Q You put a bullet through the back of his head?
A Yes.
Q And that was for 10 or $15,000?
A Yes.
Q And who else was with you there besides, besides Davon Watson?
A E.
Q Pardon?
A E.
Q E?
A E.
Q Mr. Holly was with you?
A Yes.
Q Okay. So Mr., this is the same Mr. Holly, obviously, who was there in the, for the Tonya, for the Tonya Spence killing, is that right?
A Yes.
Q Now, there has been mention of a guy by the name of Goose. And Goose is somebody that you had met, is that correct?
A Yes.
Q But he's not somebody that you knew terribly well, is that right, also?
A Right.
Q In fact, do you know Goose's full name?

A No.

Q Have you ever, you're never known his full name, have you?

A No.

Q Did you know where he worked?

A No.

Q And it's your testimony that Mr. Martin discussed a possible plan to rob this guy, Goose, is that correct?

A Yes.

Q What did he tell you about Goose?

A What you mean?

Q What did he tell you? What did he tell you about Goose?

A He just told me that he planned on robbing Goose.

Q I'm sorry. I couldn't hear the answer. Could you repeat it a little more slowly?

A He told me that he have plans on robbing Goose.

Q And that's it, is that right?

A Right.

Q Did he tell you where Goose worked?

A No.

Q Did he tell you that he had any particular relationship with this guy named Goose?

A No.

Q So he just told you he had a plan on robbing this guy named Goose. And isn't it, in fact, true that you yourself knew where you would be able to locate Goose if you had to?

A Yes.

Q So you didn't need Mr. Martin to locate Goose, is that right?

A No.

Q You said you knew that Goose lived in the city, is that right?

A No.

Q Did you know that Goose sometimes came out to the county and parked his car in a particular place?

A Yes.

Q And so, and where was that particular place where Goose used to park his car?

A Randallstown.

Q Well, where in Randallstown?

A Not too far from my mother house.

Q Okay. And where was it that he parked his car in Randallstown?

A I don't know the street name.

Q And isn't it true that you told the federal grand jury that the reason that Goose wasn't robbed was because you did not get the chance?

A Right.

Q And Mr. Martin's being available or unavailable really had very little to do with the matter, did it?

A Yes, it did.

Q And why was that?

A Because I wasn't going to touch him without him.

Q Pardon?

A I was not going to touch him without him.

Q That's because you're such an upstanding guy that you're always good to your friends, right?

A Yes.

Q Like Terry Cheeks?

A Yes.

Q You've testified that Mr. Gardner told you something about a tape and the words "Wayne" and the word "man." If I understand it, Mr., if I understood you correctly, Mr. Gardner said that somebody had said something on a tape and the detectives thought it was "Wayne" but it was actually "man?"

A He said Bo had said it, yes.

Q He said Bo had said it. How would one confuse the words "Wayne" and "man?"

A You got to ask the detectives, call them.

Q Is it true because in some, because a lot of people you know will pronounce the word "man" more like "main?"

A Sometimes, yes.

Q Okay. In fact, you've heard, you've heard it that way in rap songs, haven't you?

A I don't know.

Q You don't know. Okay. Fair enough. Now, your testimony,

as I recall it, last week was that you understood from Gardner that Mitchell, the fellow you knew as Bo and Gardner and Martin all had this alibi that they were at a movie?

A Yes. That was my understanding.

Q That was your understanding of it. And was this a fairly brief conversation that you had with Mr. Gardner?

A Yeah.

Q Now, he didn't tell you that Martin didn't go to the movie, did he?

A No.

Q In fact, what he told you was that he understood that Martin had actually purchased tickets, is that right?

A Yes.

Q He didn't tell you how many tickets, did he?

A No.

Q Did he tell you who had gone to the movie with Mr. Martin?

A No.

Q So for all you know, Mr. Martin was, in fact, at the movie the night that he was talking about, is that right?

A Yes.

Q Now, in all of the statements, in your federal grand jury testimony, which I have right here and which you've read a couple of weeks ago, you didn't tell the federal grand jury that Mr. Gardner was interested in participating in the robbery of Darius Spence because he needed money in order to help fund legal costs

for Mr. Martin, did you? You didn't say that in the grand jury, did you?

A I don't know.

Q Okay. If I represent to you that you didn't, would you accept that?

A Yes.

Q When you were talking, however, to Mr. Stocksdale, wasn't, didn't you, in fact, say that the reason, that the reason that Mr. Gardner was interested in participating in this robbery was that he had taken a nice fall and that he had lost a couple of thousand?

A Yes.

Q You remember the fact that Mr. Coburn played that tape for you?

A Yes.

Q And you certainly didn't tell Mr. Stocksdale at that point that Mr. Gardner needed to participate in the robbery because he wanted to raise any money for Mr. Martin, did you?

A On that tape? No.

Q What you told him was that Mr. Gardner had lost some money, is that correct?

A Right.

Q Was that true, also, or is this another time when you were kind of lying to Mr. Stocksdale?

A No, that was true.

Q That was true. How would he have lost the money? Never mind. Strike that. We don't need to go into that. But he had lost the money, is that right?

A That's what was told to me.

Q Now, I want to call your attention to a very specific proffer session that you had. Do you recall one session where there were a whole bunch of people in the room?

A What were we talking about?

Q I'm talking about a session that would have taken place on September 26th of 2002. Let me just read you the names of the people that I think were in there. John Sakellaris and Joan Fraser. They were both your lawyers, weren't they?

A Yes.

Q An Assistant U.S. attorney named James Green. 2 ATF special agents, a Thomas Love and a Michael Groth. I'm sorry. Mr. Love may not have been there that day. A whole bunch of Baltimore City Police detectives -- John Giganti, Keith Benson. Baltimore County Detective Phil Marll. Baltimore County Detective James Tincher. A Sergeant Garnell Green who came in from Homicide. A Ron, Ron Berger. A Major Anthony Barksdale from the city police department. A Lieutenant Dean Palmere. And a Detective Michael Coleman.

Do you remember one meeting in particular where there was just all of these people in the room?

A I don't remember all of them people. But yeah, I remember a

lot of people.

Q Okay. All right. Do you remember at one of the last proffer sessions, that you were asked about shootings which had taken place at 2700 Lauretta?

A Yes.

Q Okay. And do you recall that a law enforcement official came in and explained how two weapons that were used in those shootings, both .40 calibers, tied in to other shootings?

A I think so, yes.

Q Okay. And indeed, wasn't it after that, wasn't it then that you mentioned for the very first time that Mr. Gardner, that Mr. Gardner's .40 caliber Glock was a weapon that he said was dirty?

A I don't know.

Q Might have been the first time you mentioned it, is that right?

A Might have been.

Q And indeed, prior to that session that you had in that proffer session, had you ever told anybody before that Mr. Martin had made this supposed statement that had he a weapon with three bodies on it?

A I don't know.

Q You might not have, is that right?

A I might have.

Q But you clearly don't recall having mentioned it before that time, do you?

A I don't know if I did or not.

Q Okay. Do you remember being surprised at hearing this thing, and I will tell you that it was in late September, 2002, being aware for the first time that there might be any connection between, between weapons of the sort that I've described?

A Being surprised? No.

Q Do you remember thinking that that was the first time you'd ever heard anything like that?

A No.

Q Okay. If I understand things correctly, in really just the month before Tonya Jones-Spence died, you had murdered somebody that you had known as a child for money. And that was Terry Cheeks.

A I did not know him as a child.

Q Okay. You had known him, you had known him for a long time and he was a friend, is that right?

A I did not know him a long time, no.

Q He was a friend?

A Yes.

Q Okay. But you just put a bullet in the back of his head?

A Yes.

Q And that was for money, is that right?

A Yes.

Q And you were also involved in, in a plot to murder Darius Spence, is that correct?

A Yes.

Q And that was somebody that you'd known as a child, also, that you had known from the time you were a child, is that right?

A Yes.

Q And you have spoken about, you know, your going up with Mr. Gardner and Mr. Holly and essentially casing the apartment on Bramble Lane, is that right?

A Yes.

Q Isn't it also, in fact, true that you by yourself went out into the city, you went out into clubs that Terry Cheeks frequented, you spoke to women that he was close with about how much money he was flashing and about the sex that he was having with them, and that you were doing this as part of your plan to rob him?

A No.

Q That's not true?

A No.

Q Can I just have a moment, Your Honor?

THE COURT: Yes.

(Pause in proceedings.)

Q So you don't recall making that statement in a proffer session, is that right?

A No.

Q And that's because it never happened, right?

A Right.

Q Darius Spence was a friend of yours, is that right?
A Yes.
Q And did you know his wife?
A Yes.
Q And she was kind of an innocent bystander in this thing, is that right?
A Yes.
Q She was somebody who just happened to be there?
A Yes.
Q And because she just happened to be there, she, she had to be killed. That's the way you felt about it, is that right?
A No.
Q No? In fact, if one is to believe your testimony, you had a pretty good idea before you went out there that day that something bad was going to happen and something bad was going to happen to Ms. Spence, is that right?
A Yes.
Q And you could have stopped it, couldn't you?
A No.
Q You couldn't have said no, we're not doing this?
A No.
Q Wasn't, wasn't this your caper, your idea?
A Yes, it was.
Q But you think that if you told these, according to your testimony, you told these guys you didn't want to do it, they

just wouldn't have done it?

A I believe they still would have done it.

Q And indeed, after the shooting, you walked over, you made eye contact with Ms. Spence, and you just walked away, is that right?

A I walked over?

Q Did you make eye contact with her?

A Yes.

Q And you just kept on walking, is that right?

A Yes.

Q And that was all something you guys were going to do because you thought you were going to make some money, is that right?

A Yes.

Q Indeed, as you were walking away, you still had another murder plan, did you not?

A Yes.

Q And who was that person?

A Darius Spence.

Q Okay. What about a fellow by the name of either Marvin or Melvin?

A Don't know what you're talking about.

Q You're sure?

A Yes.

Q You don't recall telling any police officers in proffers that you had a plan to murder a man by the name of Melvin or

Marvin, is that right?

A I don't know what you're talking about, no.

Q Okay. Thank you.

MR. MARTIN: No questions.

MR. LAWLOR: No questions.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. HARDING:

Q Good afternoon, Mr. Montgomery.

A Good afternoon.

Q Mr. Coburn, and again this morning some of the other defense attorneys, I guess Mr. Crowe, went through a sort of list of occasions when you've given interviews to the police or to prosecutors or some combination, and federal agents as well, and sometimes these are called proffer sessions. Do you recall being asked --

A Yes.

Q -- about all that? And although you couldn't remember the dates of those sessions, you did remember that you started giving those proffers the very first day you were arrested back on July 2nd of 2002. Do you recall that?

A Yes.

Q And you testified just this morning, did you not, that the police officers didn't ask you about the murder of Terry Cheeks before you started telling them about it, is that correct?

A That's correct.

Q Because, in fact, you weren't arrested for that murder. You weren't even arrested for a handgun that day. You were arrested for violation of probation?

MR. LAWLOR: Objection, Your Honor, to the leading.

THE COURT: Yeah. Don't lead the witness.

Q What were you arrested for that day?

A Violation of probation.

Q And when they brought you down, they started talking to you, is that your testimony?

A Yes.

Q And did you tell them about the murder of Terry Cheeks or did they tell you --

MR. MARTIN: Objection.

Q -- about it?

THE COURT: Overruled. You may answer.

A I told them about it.

Q And did you tell them about the gun, the 9 millimeter, in Brittany's apartment or did they tell you about it?

A They told me about it.

Q How did they tell you about it?

A When they raided her house.

Q Why did they raid her house? How did they know to raid it?

MR. MARTIN: Objection, Your Honor.

THE COURT: Do you know why they raided the house?

THE WITNESS: Yes.

THE COURT: You may answer.

THE WITNESS: I was given a phone call down Homicide and I called Brittany. I told Brittany I was locked up. I told her I wasn't going to get no bail. I told her to wash my clothes and give them to my cousin.

BY MR. HARDING:

Q I see. And the police heard you say that?

A Yes.

Q And they knew what you were really saying, is that it?

A They knew I was talking in code, yes.

Q Okay. And so they went to your apartment and recovered a gun, is that correct?

A Yes.

Q Now, in the beginning you talked to the police mostly and it was mostly about the Terry Cheeks murder, is that correct?

A Yes.

Q And then you did these proffer sessions that we've heard so much about from both Mr. Crowe and Mr. Coburn over, at the U.S. Attorney's office, except that neither me nor Mr. Hanlon was present, is that correct?

A Right.

Q And at those sessions is it fair to say that you opened up and told about a great many different crimes that you knew about?

A Yes.

Q And that you told all about your prior relationships with Mr. Gardner, Mr. Martin, and Mr. Mitchell in those early proffers, is that correct?

A Yes.

Q Mr. Coburn asked you last week if you had ever before, before last week, disclosed the plan to rob Goose, and Mr. Gardner's involvement in that. Do you recall him asking you about that?

MR. COBURN: Objection, I did not.

THE COURT: The jury's recollection will control. Overruled.

A I think so, yes.

Q And you said that you did not know whether you had talked about that before, is that correct?

A Right.

Q Let me show you. If I may approach the witness, Your Honor?

THE COURT: Yes.

MR. HARDING: Or I'll put it on the screen if counsel don't object.

MR. COBURN: No objection.

BY MR. HARDING:

Q No objection. This is your grand jury testimony from January 14th, 2004. Do you recall being asked, what was the drug dealer, who was the drug dealer? His name was Goose. And you're talking about a plan to rob a drug dealer, and specifically a

discussion that you got into about that. And do you recall then being asked, I don't suppose you know Goose's real name, do you? And you said no. And then, and whose idea was it to rob Goose? And you said Wayne's or Goo's, I ain't sure. Is that correct?

A Right.

Q So nearly five years ago you put both of them in this robbery scheme with you, is that correct?

A Right.

Q And you said, in fact, as you did this morning, that you had discussed it only with Wayne, is that correct?

A Right.

Q But Goo was supposed to be part of it, also, is that your testimony?

A Yes.

Q It might have even been his idea?

MR. COBURN: Objection.

THE COURT: Sustained.

Q Mr. Coburn last week went through a long list of people whom you had talked about in your proffer sessions and asked you if you remembered telling the police about those people. Do you recall that?

A Yes.

Q And you, in fact, did give an enormous amount of information over and over again about a great many different crimes to the police and to federal agents?

MR. LAWLOR: Objection, Your Honor.

MR. COBURN: Objection.

THE COURT: Sustained. Don't lead the witness.

Q Did you give a great deal of information?

A Yes.

Q To the police and to federal agents?

A Yes.

Q When Mr. Coburn got to the end of his list of names, he said that he was finally at the end of his list and he wanted to ask you about one last name and that name was Bunk. Do you recall that?

A Yes.

Q And then he wanted to know why you had never before said that Bunk had tried to, why you had not said in this trial, I think he's referring to, that Bunk had tried to kill you in jail. Do you recall that?

MR. COBURN: Objection. I did not say that.

THE COURT: The jury's recollection will control. You may proceed.

A Yes.

Q Do you recall him talking about a guy named Real?

A Yes.

Q And what did you explain to him about Real?

A I told him Real wasn't in the plan of trying to kill me.

Q Okay. Do you remember, calling your attention to a proffer

you gave on August 13th, 2002, just a couple of, well, about five or six weeks after your arrest, do you recall giving a proffer session in which you described to the police this whole thing about Bunk and his attempt to have you killed in jail? Do you recall that?

A Yes.

Q Okay. And when you were talking about that in 2002, you were talking about something that had happened in the past, were you not?

A Yes.

Q Because, in fact, this had happened during one of the prior occasions --

MR. COBURN: Objection.

Q Did this happen during a prior occasion when you were locked up?

A Yes.

Q Do you have any idea how long ago it was that Bunk had tried to have you killed?

A 2000.

Q Eight years ago?

A Yes.

Q Okay. So does that attempt by Bunk to have you killed in 2000 have anything at all to do with this case or with your relationship with Bo and Goo and Wayne?

A No.

Q Did I ask you on direct about the fact that a guy named Bunk had tried to have you killed in 2000?
A Not that I remember.
Q Now, during the latter part of 2003 and the early part of 2004, did you begin to have meetings with me and federal agents about this case?
A I believe so, yes.
Q Okay. Did you tell us during those proffers all about the attempt to, the attempt to get Goose, to rob and kill Goose, and the attempt to rob and kill Darius Spence?
A Yes.
Q And did you, first of all, when you met with me or Mr. Hanlon or any other federal prosecutors, were there always agents present, also?
A I believe so, yes.
Q And those agents might be Mr. Klas or Mr. Benson or other federal agents, is that correct?
A Yes.
Q And did you use the term "family" to describe your relationship with Goo and Wayne and other, other people, including Mr. Mitchell and Mr. Darryl Bacon and Mr. Aaron Holly during those proffer sessions?
MR. CROWE: Objection.
THE COURT: Overruled. You may answer.
A I believe so, yes.

Q Did you come up with that word on your own?
A Yes.
Q Did anyone tell you to use that word?
A No.
Q Did you use that term repeatedly in describing your relationship with --

MS. RHODES: Objection.

THE COURT: Overruled. Go ahead.

Q -- with these three defendants you've testified about here today, as well as people like Darryl Bacon and Aaron Holly and Dirty, Davon Watson? Did you use that term "family" to describe your relationship with them?
A Yes.
Q In your meetings with me or Mr. Hanlon or these two agents here or any other federal agents, did we ever tell you to say something that wasn't true?

MR. MARTIN: Objection.

THE COURT: Overruled. You may answer.

A No.
Q What did we tell you to do, Mr. Montgomery?
A Tell the truth.
Q Let me go back to the Darius Spence robbery plan. Mr. Coburn asked you last week if it was your idea to rob Darius Spence and you said yes. Do you recall that?
A Yes.

Q Is that what you've always said?
A Yes.
Q And he asked you if it was you that got Goo involved in that plan. And you said, right. Is that correct?
A Yes.
Q Was Goo reluctant to get involved in the plan?
A Yes.
Q Why so?
A He was trying to pay for Wayne lawyer and he was hungry.
Q Oh, okay. So do you mean to say that he was eager to get involved in it?
A Yes.
Q Okay. And who was it that supplied both of the guns for use in that kidnapping and robbery?
A Goo.
Q Who usually drove out there when you were doing surveillances?
A Goo.
Q Who secured the duct tape, the latex gloves, and the walkie-talkies that you used in that operation?
A Goo.
Q Did Goo and E sometimes go out there without you to do surveillances?
A Probably. I don't know.
Q Okay. Who went into the building to figure out where in the

building Tonya and Darius had their apartment?

A Goo and E.

Q Who drove to the location on the day of the murder?

A Goo.

Q And who was carrying the .357 magnum when Goo and E got out of the car to go in and do that robbery that day?

A Goo.

Q Did Goo always carry that gun?

A Yes.

Q Okay. You were asked about that this morning by Mr. Coburn, and he pointed out to you that on a prior occasion, he asked you if on a prior occasion you had said that .40 calibers were Goo's weapon of choice. Do you recall him asking you about that this morning?

A Yes.

Q Okay. What I want to do is show you the passage where you talked about that.

MR. COBURN: Objection. That's a memorandum, Your Honor.

THE COURT: All right. Just use it with the witness.

Q Do you remember saying, quote, "Montgomery advised that the" --

MR. COBURN: Can we have the date, please?

Q This is September 26th, 2002, at 1110 hours, Page Six, the passage you referred to this morning. Montgomery advised that

the .40 caliber would not change hands. Montgomery advised they had a .40 caliber in Randallstown, referring to the murder of Jones-Spence. Montgomery advised that Goo, Gardner, had the .40 caliber but when Goo and E exited the vehicle, E had the .40 caliber and Goo had the .357.

Do you recall saying that in a prior proffer session?

A Yes.

Q And do you recall continuing, Montgomery cannot remember how long Gardner had the .40 caliber. Gardner would not give up the gun because it was dirty. Montgomery further explained that if someone else held the weapon, they could not use it since it was dirty. Montgomery thought that Gardner has had the .40 Glock weapons since 1997. The Glock .40 caliber is Gardner's weapon of choice.

That's the passage where you talked about Gardner's weapon of choice, is that correct, Mr. Montgomery?

MR. CROWE: Objection.

THE COURT: Overruled.

A Yes.

Q And it came in the context of explaining that he actually had the .357 --

MR. LAWLOR: Objection, Your Honor.

Q -- when he got out of the car?

THE COURT: The objection is overruled. You may answer.

A Yes.

Q Montgomery was questioned about, why is the gun dirty? Montgomery responded, because it had a body from a kidnapping or murder. Is that what you told the police back in 2002?

A Yes.

Q Do you recall in another prior proffer session, this is the one that Mr. Coburn played you a section of when you testified. Do you recall being asked about the .357?

MR. COBURN: Objection. I'm sorry.

THE COURT: No objection to the use of the document?

MR. COBURN: No, no objection. My fault.

Q Do you recall in this proffer with Dean Stocksdale, the Baltimore County prosecutor, you were asked about the .357 and a .40 caliber Glock. And you explained that you did not carry any of the guns. And then Mr. Stocksdale said, who would carry, excuse me, the .357 revolver? And did you say Goo?

A Yes.

Q Who would typically carry, uh, the .40 caliber, um, Glock? And did you say E?

A Yes.

Q Did, to the best of your knowledge, at any time, did they ever switch guns or did they always carry the same gun? Did you say they always carried the same guns?

A Yes.

Q Whose guns were they? You explained that they were both

Goo's guns, is that right?

A Yes.

Q And you added that Mr. Holly did not own a gun, is that correct?

A Right.

Q Okay. Now, back to your state plea agreement that Mr. Coburn questioned you about last week. He pointed out that under its terms, you won't be prosecuted in federal court for the murder of Terry Cheeks. Do you remember that provision?

A Yes.

Q But, of course, by entering into this plea agreement, you were convicted of the murder of Terry Cheeks in state court, is that your understanding?

A Yes.

Q And again, you're exposed to a possible 40 year sentence for that, is that correct?

A Yes.

Q Now, Mr. Coburn also elicited from you, and I think we went over this again this morning, the fact that you do not expect to be prosecuted for the murder of Tonya Jones-Spence, for your role in that murder, is that correct?

A Right.

Q Let me ask you, Mr. Montgomery. If you violated your plea agreement, do you understand that you could be prosecuted for that murder and any other crimes that you have committed?

A Yes.

Q If you, for example, said something knowingly untrue in this trial, are you aware that under the terms of your plea agreement, this is your state plea agreement, which is P-3, there is a provision that says, it is understood that, should the defendant commit any further crimes or should it be determined that he has knowingly withheld information, given false, incomplete, or misleading testimony or information, or should he otherwise fail in any way to fulfill completely each and every one of his obligations under this agreement, then the State will be completely released from any obligation under this agreement. In such event, and then it goes on in Paragraph B to say, the defendant shall be subject to prosecution by the state or federal authorities for any criminal violation of which the state or federal authorities have knowledge, including, but not limited to, perjury, false statement, and obstruction of justice.

This agreement does not protect defendant in any way from any prosecution for offenses which occur after the execution of this agreement or for any crimes that may have occurred prior to this agreement and are not part of this agreement as enumerated above. And that just refers to the murder of Terry Cheeks that you pled guilty to. Is that your understanding?

A Yes.

Q And so you could be prosecuted for the murder of Tonya Jones-Spence or any of these other crimes that you've described

here today or in any of your other prior proffer sessions, is that your understanding?

A That I can?

Q Yes.

A Yes.

Q In any such prosecution, this office may use as evidence in any criminal proceeding all statements made by the defendant to this office or other designated law enforcement agents, any testimony given by the defendant before a grand jury or other tribunal, and any documents or other tangible evidence provided by the defendant, whether prior to or subsequent to the signing of this agreement, and any leads therefrom.

And do you remember that there's language about this in your federal proffer agreement, also, Mr. Montgomery? This is P-17. There's this provision in here about what would happen if you knowingly withhold material information from the government or otherwise are not being completely truthful and candid about the government. The government may use against your client -- that's you -- for any purpose, including sentencing, any statements made or other information provided by you or your client at the meeting. If the government ever does so conclude, it will notify your client of our intent to make use of any such statements or other information.

Whether or not Mr. Montgomery has violated the terms of this agreement shall be determined by the Court at an appropriate

proceeding at which his disclosures and documents shall be admissible and at which this office shall be required to establish his breach by a preponderance of the evidence.

Do you understand that that means that whether or not you have violated this agreement is to be decided by a judge, not by me or Mr. Hanlon or anyone else who is a prosecutor? Do you understand that?

A Yes.

Q And you admitted in this courtroom this morning and last week that you knew that Tonya Jones-Spence was going to be killed that day just because you knew, you knew Goo and E very well, is that correct?

A Yes.

Q Goo was too smart to leave a witness and E was too wild, or words to that effect, is that correct?

MR. COBURN: Objection to the leading.

THE COURT: Overruled.

A Yes.

Q And is there any way on earth anyone could have known that you knew that --

MS. RHODES: Objection.

Q -- if you didn't tell --

THE COURT: Overruled. You may answer.

A No.

Q Now, you had second thoughts about your decision to plead

guilty at one point, is that correct, Mr. Montgomery?

A Yes.

Q Mr. Coburn showed you a document which was marked as Gardner Exhibit Number Three. And in that document there's a Motion to Withdraw Guilty Plea filed by your attorney. This is back in July 20th, 2004, in which the attorney represents that the undersigned counsel received a letter from the defendant stating, I have decided to try to withdraw my plea. Do you remember that?

A Yes.

Q And what happened was that the judge denied the motion, isn't that correct?

A Yes.

Q That's part of this exhibit, also. So isn't it accurate that you never did, in fact, withdraw from your plea?

A Right.

Q Is that what you meant this morning when you were talking to Mr. Crowe and you pointed out that you realized you had never, in fact, violated your plea agreement by trying to withdraw from your plea agreement?

MR. COBURN: Objection, leading.

THE COURT: Overruled. You may answer.

A Yes.

Q And what happened after that was --

MR. COBURN: Your Honor, we have an objection to the display of part of the letter Mr. Harding's about to use here.

MR. HARDING: This is in evidence, Your Honor. This is part of the exhibit in evidence.

MR. COBURN: That was the subject of some correspondence over the weekend, Your Honor.

MR. HARDING: I'm going to put part of it on the screen that doesn't include the part you're concerned about, Mr. Coburn.

MR. COBURN: Okay.

THE COURT: Thank you, Mr. Harding.

BY MR. HARDING:

Q Okay. Now, Mr. Montgomery, this is the letter from an Assistant State's Attorney. It's the cover letter on Exhibit Gardner number Three. Do you remember Mr. Coburn asking you about this?

A I think so, yes.

Q And this is a letter written just to some attorney. And in this letter Rachel Cogen, the State's Attorney in Baltimore County, explains that Mr. Montgomery advised that he no longer wished to withdraw his guilty plea. He advised that he asked for the motion to be filed because he did not like the amount of time jail time he would be receiving. Forty years is a long time, isn't it, Mr. Montgomery?

A Yes.

Q He further advised that at no time did he intend not to cooperate with state and federal authorities.

Now, you then gave up any attempt to withdraw your

plea, is that correct?

A Yes.

Q And also, Mr. Coburn called your attention to this sentence right here. Obviously, those discussions were private and are not covered under, and are covered under attorney/client privilege. Do you remember Mr. Coburn calling your attention to that?

A No, not really.

Q Okay. Well, do you remember him asking you if you thought the attorney/client privilege applied to your conversations with all of these people mentioned up here, including me? Do you recall him asking you that?

A Yes.

Q And let me just call your attention to this sentence immediately prior to that. Prior to the start of the meeting, Mr. Montgomery had time to confer with his attorney, Ms. Fraser. Obviously, those discussions were private and are covered under attorney/client privilege.

You understand that it's only your conversations with your attorney that are privileged, don't you, Mr. Montgomery?

A Yes.

Q You understand that what you said in proffer sessions with prosecutors and agents was not privileged?

A Right.

Q In other words, it's not confidential. You understand that,

of course, don't you?

A Yes.

Q And you understand that defense counsel in this case have all gotten copies of the transcripts and tapes of everything you said in the past?

A Yes.

Q Because they referred to it many times in the course of this trial, is that correct?

A Yeah, some of it, yes.

Q And you yourself never reviewed that material before you came to testify in this trial; is that your testimony?

A Right.

Q Now, Mr. Coburn last week, and again this morning, Mr. Crowe, went into a statement on a tape recorded proffer where you explained about your relationship with Goo and E and Dirty. And we heard those passages where you said your relationship with Goo was cool and that you associated with him regularly and used to go to New York with him, but you didn't see him every day and he would not call you whenever he got into trouble. Do you remember that?

A Yes.

MR. CROWE: Objection.

THE COURT: Overruled.

A Yes.

Q And there were similar questions about E, Aaron Holly, in

that tape, is that correct?

A Yes.

Q Was Dirty somebody that you met with every day?

A No.

Q Was your relationship with Dirty closer than your relationship with Goo and E?

A I wouldn't say so, no.

Q You indicated this morning that you were misleading Dean Stocksdale somewhat about that. Is that correct?

A Yes.

Q Why were you misleading him about that?

A At the time I didn't feel comfortable telling on Goo and I was still trying to build myself up to do that.

Q And so it helped you to overcome that discomfort to sort of play down the strength of your relationship with Goo by comparison with Dirty?

MR. CROWE: Objection.

THE COURT: Overruled. You may answer.

A Yes.

Q In fact, did you, in fact, rely on Goo when you got in trouble sometimes, and E as well?

A More of E.

Q You've told us that you told Goo about your beef with Tyree Stewart?

A Yes.

Q Because you knew he would retaliate on your behalf. Was that your testimony?
A Yes.
Q Did you also tell E about your beef with Tyree Stewart?
A E knew about it.
Q Was he somebody that you could rely on if you needed help in that beef with Tyree Stewart?
A Yes.
Q You consider both E and Goo to be part of your family, as you've called it?
A Yes.
Q You've testified that you're in the Federal Witness Protection Program, is that correct?
A Yes.
Q Are you nevertheless incarcerated?
A Yes.
Q In a federal prison, is that correct?
A Yes.
Q Does being in the Federal Witness Protection Program while incarcerated mean you're protected from other prisoners?
A Yes.
Q Mr. Coburn questioned you this morning about how Goo, first of all, Goo fronted drugs to you but he also took you to New York to meet his supplier. Do you recall that?
A Yes.

Q And you, in fact, testified, did you not, that there were many suppliers up in New York, is that correct?
A Yes.
Q Did you think there was any inconsistency between the fact that, first of all, Goo was supplying you with drugs and yet, nevertheless, willing to introduce you to his supplier?
MR. COBURN: Objection.
THE COURT: Overruled. You may answer.
A No.
Q You testified that, also this morning, that you have repeatedly said in proffers with the government or agents or police, you've repeatedly told them about how various people on these trips would pool their money together to get larger supplies of drugs, is that correct?
A Yes.
Q Have you told that in proffers where Agent Klas and TFO Benson were present, do you recall?
A I believe so.
Q Mr. Coburn elicited from you that on these trips you would often just go to buy marijuana for personal use. Do you recall that?
A Yes.
Q Was it part of your role to man the gun when you went on those trips?
A Yes.

Q You had control over the only gun you guys had in the car, is that correct?

A Yes.

Q Would it be accurate to say you were functioning as protection for the whole group on those trips?

A Yes.

Q Mr. Coburn asked you this morning if Wayne's, Mr. Martin's, selling of marijuana, it didn't have anything to do with Goo. And you agreed with that, is that correct? Do you remember that?

A I don't know. No.

Q No? Did I get that wrong?

A I think so.

Q Okay. Did he ask you about whether your selling of marijuana didn't have anything to do with Goo?

A Right.

Q Okay. Except, of course, that you went on these trips to New York together and, among other things, you got marijuana, is that correct?

MR. COBURN: Objection to the leading.

A Correct.

THE COURT: Overruled.

Q You testified that you could not remember the last time you spoke to Bo, or you said that on one occasion, is that correct?

A Yes.

Q And you were locked up from sometime in 2000 until the end

of 2001, is that correct?

A Yes.

Q Was it before that or after that that you last spoke to Bo?

A Before that.

Q Before that?

A Yeah.

Q Okay. You testified this morning that Bo was family with Mr. Martin and Mr. Gardner. Do you remember that?

A Yes.

Q What do you mean by that?

MR. LAWLOR: Objection.

THE COURT: Overruled.

A I mean I didn't deal with Bo like that. I didn't see him as much as I saw, saw the other two.

Q Okay. What about Bo and the other two, though?

MR. LAWLOR: Objection.

THE COURT: Overruled.

A That's their family.

MR. LAWLOR: Objection. Move to strike.

THE COURT: Motion denied. Objection overruled.

Q You were asked this morning about your use of the phrase or your description of Goo saying "we're going to get the bitch" that day when, the day of the actual murder, when he got into the car with you and you went off first to pick up E and then to go out to Darius Spence's apartment. Do you recall that?

A Yes.

Q And have you told us in your prior proffer sessions about that use of that phrase that day?

A I believe so, yes.

Q Would it be fair to say, Mr. Montgomery, that many of your prior proffer sessions have been sort of specialized around that particular event? Is that correct?

A Yes.

Q But when me and Mr. Hanlon and Agent Klas and TFO Benson have talked to you, it's been about these defendants and your whole history with them, is that correct?

A Yes.

Q Did we go into a great many things that you didn't really talk about when you were interviewed, say, by city Homicide detectives?

MR. CROWE: Objection.

THE COURT: Overruled.

A Yes.

Q You said that you were not sure the robbery was going to happen that day even though Goo had made this statement about "we're going to get the bitch" or "snatch up the bitch" that day. Do you recall that?

A Yes.

Q Did you know, Mr. Montgomery, whether she would even be home that day?

A I knew that she would be coming.

Q Okay. What, what made you unsure, then, that you would carry through with this that day?

A We, we could have got her any other day. We done seen her coming and going plenty of times.

Q Okay. Mr. Coburn was asking you this morning about your use of the term "couple of feet" to describe how far away you were from Tonya Jones-Spence when she fell to the ground. Do you recall that?

A No, not really.

Q Well, you disputed it, you weren't really as close as a couple of feet. Do you recall that in your conversation with Mr. Coburn this morning?

A Yes.

Q Do you recall him pointing out a passage in a transcript of a prior proceeding where you said you were a couple of feet away from her? Do you recall that?

A Yes.

Q Do you recall that actually becoming something that you were questioned about several more times in that same prior proceeding?

A Yes.

Q And do you recall that it was eventually cleared up? Calling your attention to Page 97. Do you recall being asked this question? And you were 10 feet or few feet away from the

victim that you didn't want to recognize you and you had intended to use a .357 magnum or a .40 caliber to kill her husband and all did you was walk away? And you answered yes. Do you recall that?

A Yes.

Q When you used the phrase "couple" or "couple of", does that mean two to you or just some vague number, Mr. Montgomery?

A Sometimes it mean two, sometimes it mean more.

Q Okay. You said that, when Mr. Crowe was questioning you this morning, he questioned you about your very first proffer session on July 2nd, 2002. And he pointed out that you had learned from the cops that there was this big investigation of Tyree Stewart going on. Is that correct?

A Yes.

Q And I believe you said that that encouraged you to tell all that you knew about the Terry Cheeks murder and other crimes that you described?

A Yes.

Q Okay. And then I think Mr. Crowe said something about how you had not exactly just caved in and told all you knew. You did it because you knew that the police knew a great deal already. Is that your testimony?

A Yes.

Q Can you explain what you mean by that?

A By what?

Q What was it that led you, why don't you explain to the ladies and gentlemen of the jury what led you, right after your arrest, to come in and start divulging all of these crimes that you had either committed yourself or that you knew had been committed by other people?

A When I was arrested, I was originally arrested for a violation of probation by some detectives who wouldn't normally be serving no warrant like that. I gave them the name Michael Rowe. They laughed at me once we got down Western District. The person I was with, they told me to tell that person my real name. Then they pulled me out and pulled me in the room, started asking me questions about Tyree Stewart and marijuana.

They told me -- no. First they asked me where was the Tech 9 that I normally carried. I said, how you know about the Tech 9, I don't carry a Tech 9? They said, everybody know you carry a gun.

Q You knew they knew a great deal about you already, is that your testimony?

A Yes.

Q So you figured the jig was up?

A Pretty much, yes.

Q And you started telling everything you knew?

A Yes.

Q Is that correct? So it wasn't just because you, you were tired of a life of crime. It was because you knew you were in

big trouble and you ought to try to help yourself out. Is that your testimony?

A Yes.

Q And you don't deny that, do you, Mr. Montgomery?

A No.

Q And when you did start telling what you knew, you told everything you knew?

MR. LAWLOR: Objection, Your Honor. Leading.

THE COURT: Rephrase the question.

BY MR. HARDING:

Q Did you tell about every crime you had any knowledge of?

A That I could remember, yes.

Q And in fact, there were so many crimes that they used to have --

MR. LAWLOR: Objection, leading.

THE COURT: Overruled.

Q Did they have big meetings, like the one we heard about this morning, where Mr. Crowe read off the list of all the Baltimore City Police brass and prosecutors from this whole region who came to hear what you had to say?

MS. RHODES: Objection, leading.

THE COURT: Overruled. You may answer.

A Yes.

Q Mr. Crowe called your attention to a passage in the grand jury transcript which was on the screen, so I'm going to put it

on the screen, also. I believe it was on the screen. And let me just ask you generally, do you listen very carefully to questions that are put to you, Mr. Montgomery?

A Sometimes, yes.

Q And you try to answer precisely, don't you, Mr. Montgomery?

A Yes.

Q Okay. You were asked this question in the grand jury. Did you also sometimes obtain marijuana or cocaine from Goo or Wayne? And your answer was yes. And then the question was, both of them? And you said, no, just Goo. Do you remember that?

A Yes.

Q Do you remember getting crack, pills, from Wayne?

A Yes.

Q Did you testify about that on direct in this trial?

A I don't think so.

Q You don't think so?

A Did I? I don't recall.

Q Okay. Now, Mr. Crowe this morning was asking you about the robbery that you have described where you pulled up on some guy who was coming out of a house where you four guys were going to buy marijuana. Do you remember that?

A Yes.

Q This was a house here in Baltimore. And you had Wayne and Goo and Darryl Bacon in the car with you. Is that correct?

A Yes.

Q And it was only you and Goo that got out of the car to actually do the robbery, is that correct?

A Yes.

Q Wayne stayed in the car, is that correct?

A Yes.

Q And Mr. Crowe asked you if it was actually just Goo who committed that robbery. Do you recall that?

A Yes.

Q Do you consider it participating in a robbery to wait in the car and watch while two other guys go out and actually do the dirty work?

MR. CROWE: Objection.

THE COURT: Overruled. You may answer.

A Yes.

Q In fact, would Wayne have been available to help you if you had any problem with this robbery, or do you know?

A I don't remember who was driving.

Q You don't remember who was driving?

A Right.

Q The two people in the car were Wayne and Darryl Bacon, I assume, correct?

A If Wayne was in the passenger seat, he would have been able to help. Yes.

Q I see. The driver wouldn't have gotten out to help?

A No.

Q But, of course, the driver would have been the person who would drive you away from the scene of the robbery?
A Right.
Q And that's participating in the robbery, too, isn't it, Mr. Montgomery?
A Yes.
Q Can you explain, Mr. Montgomery, what OTM is and what the color red has to do with the little crew, which was not a gang, called ATM, OTM?
A OTM stands for "out that mob." It's just a neighborhood thing. Everybody from Edmondson Avenue got an OTM tattoo. Everybody from Edmondson Avenue wear red rags. All them are not Bloods.
Q Okay. So they wear red but it doesn't mean anything?
A It just states wherever you from. At one point in time when you seen a red rag, you knew he was from Edmondson Avenue.
Q At one point in time?
A Yeah.
Q Is that no longer true?
A It's a lot of Bloods out there nowadays.
Q So you wouldn't want to wear red if you weren't a Blood?
A Right.
Q Mr. Crowe also asked you about your statements to the effect, on the one hand, that Goo was very eager to participate in the robbery of Darius Spence because he had lost a bunch of

money, and also your statement that Goo was very interested in participating in the robbery because he had to come up with money to pay for Martin's lawyer. Do you recall that?

A Yes.

Q Are those two things inconsistent, Mr. Montgomery, if you --

MR. COBURN: Objection.

THE COURT: Overruled.

Q Do you think that those are inconsistent?

A No.

Q Would it be fair to say that one of the reasons you might need money is because you've just lost money?

MR. COBURN: Objection. That's argument.

THE COURT: Overruled.

A Yes.

Q How did Goo lose that money, anyway?

A He said the police took it.

Q The police took it?

A Yes.

Q When he got arrested for that violation of probation around the middle of April?

A Yes.

Q And you've told us also that, just at the very end of Mr. Crowe's cross of you this morning, that you could not have stopped Goo and E from killing Tonya Jones-Spence.

A No.

Q Can you explain to the ladies and gentlemen of the jury why you could not have stopped them?

A They going to do what they want to do like I do what I want to do.

Q So if you had refused to go along that day, they would have done it, anyway?

A Probably so, yes.

Q Okay. Just one moment, Your Honor.

THE COURT: Yes.

(Pause in proceedings.)

Q Just one final thing, Mr. Montgomery, if you know. That money that you say was taken by the police when Goo got locked up, was that taken as evidence? Is that what you mean?

MR. COBURN: Objection. No way he would know that.

THE COURT: Rephrase the question.

BY MR. HARDING:

Q Do you know, was it taken as evidence?

A No, I don't.

Q Okay. Thank you. I have no further questions, Your Honor.

THE COURT: Brief recross.

RECROSS EXAMINATION

BY MR. COBURN:

Q Thank you, Your Honor. Good afternoon, Mr. Montgomery.

A Um-hum.

Q You remember during your direct examination when Mr. Harding

was originally asking you questions last week, he asked you about a conversation that you had with my client, Mr. Gardner, Goo, during which Mr., you indicated Mr. Gardner said that he was optimistic --

MR. HARDING: Objection. Scope.

THE COURT: Didn't hear it. Start over if you would, please, Mr. Coburn.

Q I'll just strike that question Your Honor, and just move on.

THE COURT: All right.

Q Do you remember at the very end of your direct examination, right after being asked about a conversation with my client, with Mr. Gardner, you were then shown an excerpt from the Stop Snitching II video? Do you remember that in your direct examination?

A Yes.

Q Okay. And then do you remember during the course of my, the beginning part of my cross examination, I asked you about a long series of other people that you, that you provided the government with information about. Mr. Harding just asked you about that, remember?

A Yes.

Q And one of those people was that person by the name of Bunk, right, sir? Right?

A Yes.

Q And I asked you whether or not Bunk had threatened to kill

you in jail, right, sir?

A Yes.

Q And the answer to that was yes, right?

A Yes.

Q And Bunk was one of the people who, in 2002, not 2000, but in 2002, August, 2002, you were telling the police about, right, sir?

A Yes.

Q Okay. You also told them, did you not, and I'm referring now to the memorandum of your proffer session, August 13th, 2002, you told them Real is to kill you. Did you say that? That Real is going to kill you? Is supposed to kill you?

A I don't know. I don't remember saying nothing like that. No.

Q So your answer is no, you didn't, right? Correct?

A Right.

Q And if the memorandum of the proffer session says that, then that would just be wrong, right, sir?

A Okay.

Q Referring to Page Six. Correct?

A It could be right. I don't remember saying it, though.

Q Okay. And that you also said Real is scared to do the job? Did you say that?

A I don't remember saying nothing like that.

Q So your testimony is you didn't, right, sir? Right?

A I thought I said I don't remember.
Q Okay. So you don't know one way or the other, right, sir?
A Right.
Q Now, do you remember in response to Mr. Harding's questions just now, just a few minutes ago, he asked you, did Goo always carry the .357? Do you remember that?
A Yes.
Q And you answered that question, right, sir? You said yes. Right?
A Yes.
Q That was your testimony just now in this trial under oath, right, sir?
A Yes.
Q Okay. It's also correct, is it not, and this is again something Mr. Harding just asked you about in a proffer session, September 26th, 2002, you said that Goo had the .40 caliber, is that correct? Page Six. Is that what you said?
A Yes.
Q Okay. You also said you could not remember how long Gardner had the .40 calibers, right?
A Right.
Q And your testimony was that Gardner would not give up the .40 calibers because it was dirty, or give up a .40 caliber because it was dirty, right?
A Right.

Q And you also said you thought he had the .40 caliber weapons since 1997, right?

A Right.

Q And you also said the Glock .40 caliber is Gardner's weapon of choice, right, sir?

A Yes.

Q So which is it? Was it Gardner's weapon of choice? Did he have it since '97? Did he have it on the, if I'm reading this correctly, Montgomery advised Goo had the .40 caliber but when Goo and E exited the vehicle, E had the .40 caliber and Goo had the .357. Are those things right or is it right that Goo always carried the .357? Which is it?

A He always carried the .357 on that job there, yes.

Q I see.

A Did he have the Glock .40 that day? Yes.

Q Now, you remember Mr. Harding asking you some questions about this part of your statement, the state prosecutor, about whether or not your relationship with Goo was a serious relationship and whether you had to honor each other?

A Right.

Q And you remember when I asked you questions before that, you had said, when you talked to Mr. Stocksdale, the state prosecutor, that you and Goo hook up a few times, it ain't, ain't no serious relationship with it, though, to have to honor each other, no. Right, sir?

A Right.

Q And you said it ain't nothing like that, right?

A Right.

Q Now, when Mr. Harding was asking you questions, Mr. Montgomery, you said -- or strike that. Initially, when Mr. Crowe was asking you questions, you said that you were not candid with Mr. Stocksdale about the relationship with Gardner, right?

A Right.

Q And you said that because, the reason was because you weren't sure at the time if you were going to give up the stuff about Darius because you had not been charged with it, right, sir?

A Right.

Q That's what you told Mr. Crowe under oath this morning, was the reason that you kind of understated, you know, you weren't candid about how close your relationship was with Mr. Gardner when you were talking to the prosecutor in January, 2003, right, sir?

A Right.

Q And then just now when Mr. Harding was asking you questions, you told him, did you not, that you, the reason you weren't candid, the reason you kind of said it wasn't that close, was because you were not comfortable telling on Goo. Was that your testimony?

A Right.

Q Okay. Isn't it a fact, sir, that months, months prior to January, 2003, you told law enforcement all about the Tonya Spence homicide, your initial intention to rob and kill Darius Spence, and what you said was Mr. Gardner's and E's involvement in it? Is that true? Months before.

A I don't know.

Q Okay. Isn't it a fact that you went into great detail about this in August of 2002, in a proffer session in the United States Attorney's Office attended by your lawyers, AUSA James Green, Special Agent Tom Love, Special Agent Mike Groth, and, and Sergeant James Hagin, John Giganti, and Michael Coleman? Is that true?

A Probably so.

Q Probably so?

A Yes.

Q And isn't it a fact that you went into great detail about the Tonya Spence homicide and what you said was Goo's involvement in it. Ten days later, August 23rd, 2002, this would be about five months before January, 2003. And this one would have been another proffer session, fifth floor conference room, U.S. Attorney's office. Again, your lawyer, John Sakellaris, was there, and most of the same people in addition, to Detective Phil Marll, is that right? And you told them all about it, the whole story, right, sir?

A Right.

Q Right. Now, you remember some questions that Mr. Harding put to you about the fact that documents about your prior conversations with law enforcement had been turned over to the defense lawyers in this case, as you know from the course of the questioning in this trial?

A Yes.

Q Do you remember he asked you about that?

A Yes.

Q What about the other proffer sessions in which Mr. Harding is indicating that you used the word "family" with respect to these defendants? Do you know whether or not any of the memoranda or transcripts, tapes, anything that we have contains that word in it?

A I don't know what you have.

Q Okay. You don't know what we have, right, sir?

A No.

Q Well, when you had these other proffer sessions that would have included, I believe Mr. Harding said Detectives Klas, Benson, and some prosecutors, were they taking notes?

A Yes.

Q There was always somebody taking notes when you were giving a proffer session, right, sir?

A Yes.

Q Okay. Do you know whether or not we have any of those notes?

MR. HARDING: Objection.

A I do not know.

THE COURT: Sustained.

Q Finally, you've told this jury that you now believe that you did not violate your plea agreement by attempting to withdraw your guilty plea, right, sir?

A Right.

Q But in point of fact, your motion, you didn't withdraw your motion, you didn't take it back, the motion to withdraw your guilty plea, it just got denied by a judge, right, sir?

A Right.

Q Right. And it's your testimony, then, that you don't think that violates language in your plea agreement that says the defendant shall not be permitted to withdraw a guilty plea entered pursuant to this agreement under any circumstances. You don't think you violated that now, right, sir?

A Right.

Q But last week you said that you did, right?

A Right.

Q Okay. Last question or series of questions relates to a proffer agreement dated July 17th, 2002. If I could inquire through Your Honor whether or not this has already been marked by the government. I thought it was. I thought it might have been their first exhibit with respect to this witness. But if not, I'm happy to mark it myself.

THE COURT: I think it's in.

MR. HARDING: P-17, Your Honor.

BY MR. COBURN:

Q P-17, Your Honor. Now, this is a letter written by the United States Attorney's Office, the office prosecuting this case, to your lawyer, John Sakellaris. Right, sir?

A Yes.

Q It's dated July 17th, 2002. Right, sir?

A Right.

Q That's more than six months prior to, before January, 2003, when you were talking to Mr. Stocksdale and you made those remarks about, you know, it ain't no serious relationship to have to honor each other, ain't nothing like that. Right, sir?

A Right.

Q Let me direct your attention to Paragraph Three of this letter of more than six months earlier. Your client's complete truthfulness and candor are express material conditions to the undertakings of the government set forth in this letter. Therefore, the government may use statements made or other information provided to you or your client during the proffer under the following circumstances. And it talks about a series of times that they can.

You see where it says, your complete truthfulness and candor are express material conditions?

A Yes.

Q So then in 2003, when, according to your testimony, you were not being candid with the prosecutor you were talking to, you violated that language, right, sir?

A Somewhat, yes.

Q Nothing further. Thank you, Your Honor.

MR. CROWE: It will be very brief, Your Honor.

THE COURT: I was expecting as much.

RECROSS EXAMINATION

BY MR. CROWE:

Q Do you recall that when Mr. Stocksdale asked you the question as to whether there was a reason Gardner was part of the plan, his precise question to you, "Was there a particular reason Gardner was or was part of this plan?"

A Yes.

Q And when you were asked if there was a particular reason, you gave one reason, didn't you?

A Maybe at the time, yes.

Q Okay. Well, would you like to see it?

A No.

Q Well, let me, let me have you take it look at it, anyway, Mr. --

MR. HARDING: Objection.

THE COURT: I thought that had been up there. But if it hasn't, it shouldn't be up there.

MR. HARDING: The witness is not denying the statement.

Q So you are admitting that you were asked if there was a particular reason and that the one reason you gave was that Goo had taken a nice fall because he had lost a couple of thousand, is that correct?

A At that time, yes.

Q Okay. Now, you were also asked a question by Mr. Harding about a difference between cocaine and crack, and I gather whether you drew a distinction between those. Let me show you your grand jury testimony. It begins at Page Ten.

Did you sometimes obtain marijuana or cocaine from Goo or Wayne? Yes.

Both of them? No. Just Goo. Just Goo.

This cocaine, by the way, when it was sold on the street at those locations that you've given me some examples of, was it powder cocaine or did they cook it up, cook it up into crack before they sold it? Answer: It was powder, but yes, they cook it up.

When they bought it, it was powder? Answer, yes. When they sold it, it was crack.

Okay. You just said that you bought some cocaine from Goo. Did you buy it as crack or as cocaine? Answer is crack.

So essentially "crack" a term of, is a type of, is a type of cocaine, is that correct?

A Yes.

Q You were read actually several paragraphs from a proffer

memo where you were talking, and these were not your words, but this is what some law enforcement officer wrote up, where you were talking about the .40 caliber gun that wouldn't change hands and the fact that Mr. Gardner had supposedly said it had a body on it.

Was that, in fact, not immediately after Sergeant Green or another law enforcement officer had told you about ballistics and how about various guns had tied, had been tied in supposedly through ballistics?

A I don't know.

Q Okay. You said earlier that you thought it might have been, is that correct?

A I don't think I said that earlier.

Q I asked you a question about a fellow by the name of Marvin. Let me be a little bit more particular.

MR. HARDING: Objection. Scope.

THE COURT: Go ahead, Mr. Crowe.

Q Were you planning your next crime against a man by the name of Marvin or Marvin Koch?

A I don't think so, no.

Q Okay. Do you know a fellow by the name of Marvin from whom you used to buy dope?

MR. HARDING: Objection.

THE COURT: Overruled. You may answer.

A Yes.

Q Did this Marvin drive a Mercedes Benz?
A Yes.
Q And was either the designation or the license plate number 5-DBL-0?
A I don't know.
Q But he did drive a Mercedes Benz, is that correct?
A Yes.
Q That's all that I have. Thank you.

MR. MARTIN: No questions, Your Honor.

RECROSS EXAMINATION

BY MR. LAWLOR:

Q Your Honor, very briefly. Mr. Montgomery, good afternoon.

MR. HARDING: Your Honor, I object. There was no --

THE COURT: The objection's noted. I didn't hear anything open up for you, Mr. Lawlor, but I'll let you go ahead, take a stab at it. Go ahead.

MR. LAWLOR: Your Honor --

THE COURT: Go ahead.

BY MR. LAWLOR:

Q Okay. Thank you. I want to clear up something about the notion of Mr. Mitchell or the person you know as Bo being family. He's no family to you, right?
A Right.
Q You don't even know the man, right?
A I know him, yes.

Q All right. But you hadn't seen him -- you got locked up in 2002, right?
A Yes.
Q And you hadn't seen him at least for two years prior to that, right?
A Something like that, yes.
Q Something like that or that?
A Something like that.
Q All right. And in fact, in 2003 you were shown some photo spreads, right?
A Yes.
Q And you were asked to pick out Bo, right?
A Right.
Q And you don't know Shelton Harris, right?
A Right.
Q Never saw the man in your life, right?
A Right.
Q All right?

MR. HARDING: Objection. Judge, this exhibit is not in evidence. I'm going to have to ask for --

THE COURT: Take it off, please.

MR. HARDING: -- re-redirect if Mr. --

THE COURT: I think we're way beyond any reasonable cross.

MR. LAWLOR: Your Honor, he was asked about this photo

spread on direct and he was asked about his relationship with Bo on redirect.

THE COURT: And he said --

MR. HARDING: We're on recross, Your Honor.

THE COURT: Yeah. That was on recross.

MR. LAWLOR: But he asked about his relationship with Bo on recross.

THE COURT: And you've just established that there's additional information which had been provided to the jury. Come on. You got another question, go ahead. But I'm not going to let you use the exhibit.

BY MR. LAWLOR:

Q All right. Were you shown some photo spreads and asked to identify Bo?

A Yes.

Q And you were shown one and you picked out somebody that you said, I think this is Bo, right?

A Yes.

Q And then four minutes later you were shown another photo spread and you identified another individual who you thought was Bo, right?

A Yes.

Q A different person?

A Yes.

Q Okay. And we have established, though, that you don't know

Shelton Harris whatsoever?

A Right.

Q Okay. Now, one final thing. Mr. Harding asked you about your sentence, said you were getting 40 years, right?

MR. HARDING: Objection. That's the cap, Your Honor.

THE COURT: Yeah.

Q You are getting no more than 40 years. Forgive me. Right?

A Right.

Q And he said that that's a long time, right?

A Right.

Q But you're parole eligible after 15 years, right?

MR. HARDING: Objection.

THE COURT: Sustained.

Q How much time do you think you should get for the murder of Mr. Cheeks --

MR. HARDING: Objection.

Q -- the murder of Ms. Spence --

THE COURT: The objection's sustained.

Q -- and the attempted murder of Darius Spence?

THE COURT: The objection is sustained.

MR. LAWLOR: No further questions.

THE COURT: Do you have anything else, Mr. Harding?

MR. HARDING: No, Your Honor.

THE COURT: All right. Mr. Montgomery is excused.

Members of the jury, we'll break for lunch at this

time. I anticipate that we will probably not have an afternoon recess. I'm going to ask you to be back in the jury room no later than 2:35. It's now 1:15.

Please be back in the jury room by 2:35, and I expect we'll just go straight through to pretty close to or shortly after 4:00 and we'll break shortly after 4:00.

Please leave your note pads on your chairs. Have no discussion about the case or any of the evidence.

Jury's excused until 2:35 p.m.

(Witness exits the courtroom.)

(Jury exits the courtroom.)

THE COURT: Counsel, we'll resume 2:35 and go until about four. I have a very short proceeding at 4:30, so I'm going to ask you to clear out as promptly as you can when we break for the afternoon. But my plan is to break a little bit before four -- excuse the jury a little bit before four, and then use 5 or 10 or 15 minutes if you have any legal issues. I think there was some correspondence this morning that I haven't even looked at yet and some correspondence over the weekend. And I believe Detective Niedermeier's the next witness, Mr. Harding, is that right?

MR. HARDING: Yes, Your Honor. And --

THE COURT: Are we going to get to anything controversial with Niedermeier before we resume?

MR. HARDING: Well --

THE COURT: In other words --

MR. HARDING: I don't know. He's going to be a fairly substantial witness. But I would like to be heard on this issue of Martin's statement, which the government believes --

THE COURT: Right. We'll do that when we come back.

MR. HARDING: Okay.

THE COURT: But in other words, is there anything else, in other words, can we resume -- other than Martin's statement, is there anything that we need to take up before we break at 3:55, 4:00, regarding Detective Niedermeier?

MR. HARDING: No. Not that I'm aware of.

THE COURT: It's pretty clean and straightforward, the first hour and a half?

MR. HARDING: It's always clean and straightforward, Your Honor.

THE COURT: That's a good answer. Mr. Kurland.

MR. KURLAND: Judge, if Detective Niedermeier is still on direct, I would agree with the government that the issues won't come up.

THE COURT: Great. All right.

MR. KURLAND: Thank you, Your Honor.

THE COURT: He surely will be on direct. We're in recess until 2:35.

(Recess at 1:15 p.m.)

(Jurors not present in courtroom.)

THE COURT: Ready to proceed? Mr. Harding? What did you want to say about that statement?

MR. HARDING: Yes, Your Honor. There are several important admissions in Mr. Martin's statement. And the part that's not valuable admissions is a false exculpatory story which, in the government's view, should come in.

THE COURT: But you don't need the tape for that. You don't need the tape for the detective to say he denied, etc. But go ahead. Go ahead. I won't interrupt.

MR. HARDING: On the tape he admits being confronted by a guy named Claudus about whether he had something to do with the murder of the Wyche brothers.

THE COURT: Right. Based on rumors in the street.

MR. HARDING: No. No. He was directly confronted by Claudus. The reason that's --

THE COURT: Claudus was confronting him because of rumors on the street, as I understand it. Let me pull it up and make sure I'm reading the transcript correctly. Go ahead.

MR. HARDING: The important point is, Your Honor, that Mr. Mitchell then puts out a hit on Claudus Lassiter, which we're going to hear about in subsequent testimony.

THE COURT: All right. Well, that's a different issue altogether.

MR. HARDING: The jury has a right to know why Claudus was targeted in this way. And furthermore, it shows the

connection between Mr. Mitchell and Mr. Martin, and their mutual acting in concert on this issue.

THE COURT: What's your proof that Mr. Mitchell put out a contract on Lassiter?

MR. HARDING: A witness we have, Your Honor, is going to come in and testify that he read a letter from Mr. Mitchell directing Shelton Harris, who was still on the street until June, to murder Claudus Lassiter, even drawing a little map about how to get to Lassiter's house.

THE COURT: Okay.

MR. HARDING: Our witnesses then went and warned Lassiter so Lassiter was not, in fact, killed.

THE COURT: And what's the proof that some witness warned Lassiter?

MR. HARDING: The witness is going to testify that he did.

THE COURT: The witness who warned him?

MR. HARDING: Yes.

THE COURT: Is that the same --

MR. HARDING: Yes.

THE COURT: -- same witness?

MR. HARDING: Yes.

THE COURT: Okay. Let me just pull up the -- what is it?

MR. HARDING: It's toward the end, Your Honor.

THE COURT: Yeah. Mr. Crowe, do you know which -- here it is, 485. Docket 485?

MR. HARDING: Yes.

MR. CROWE: Yes, Your Honor.

MR. HARDING: It's on Page Seven of the transcript. It starts down there and then he identifies Claudus at the top of Page Eight.

THE COURT: Okay. So this is at the very end of the interview.

MR. HARDING: He also admits in here that he knows Bo.

THE COURT: All right. Let's take them one at a time. So Hastings says, Wayne, is there anything else you can tell me about this case that, you know, that would help me in this investigation? So right off the bat, I mean, we could start the tape there. But let me see --

MR. HARDING: Judge, the whole tape is only four or five minutes.

THE COURT: Of course. I'm not trying to save time here. I'm trying to implement the Sixth Amendment.

So Martin says, I mean, I mean, I wasn't there so I could hardly, I mean, hardly help you out, help you all get somebody, no, because I wasn't there. I mean, all I know is he said-she said from off the streets. That's all I know. And then Hastings says, And all that he said-she said stuff is, is that all you heard was with your name implicated?

So I think this is just redundant because he's already answered that question from Niedermeier. Martin says, Yeah, but I mean, like, they like, first they was like, I, it was like when I ask somebody that was really close to the family, I'm like, yo, how my name come up in that shit? He like, they ain't, they ain't saying you did it, yo, they saying you had something to do with it, like you know who did it. I'm like, how you come up with that? He's like, well, I don't know. And who was that? That was Cloris. Okay.

So now you're saying because Cloris repeated to Martin what Martin says is simply rumors on the street, is that the reason you're proffering Mr. Mitchell put out a contract on Cloris?

MR. HARDING: Yes.

THE COURT: And --

MR. HARDING: Claudus put out, Claudus put their name in it, is the way.

THE COURT: Claudus. Okay. And his name is Claudus, correct?

MR. HARDING: Claudus Lassiter.

THE COURT: Right. He was a defendant before me in a case. Did you know that?

MR. HARDING: I knew that Mr. Peters in my office had a case against him.

THE COURT: Right. That's the case. Okay. So you

want two things, I take it. You want, you want to show the jury that Martin had at least a minimum familiarity with Claudus Lassiter so that you want, you want to play this tape so that the jury can hear Martin give the first name of this person who was repeating these statements on the street. And then you want to tie that and be able to argue that Mr., by inference, Mr. Martin told Mr. Mitchell about this and as a result Mr. Mitchell put out a contract on Claudus Lassiter?

MR. HARDING: Yes, Your Honor.

THE COURT: Now, was that because somebody thought Claudus Lassiter was going to seek revenge for the Wyche brothers? In other words, I could halfway understand why a contract would be put out on somebody who was thought to have a contract on somebody else but why, and this is rhetorical, why would you put out a contract on somebody just for repeating a rumor?

MR. HARDING: He didn't just repeat a rumor. He heard, he heard the voice mail tape and identified Mr. Martin and others, possibly, on the voice mail tape.

THE COURT: Okay. So Claudus Lassiter is actually a witness, a voice identification witness? I'm not suggesting you're going to call him. Are you?

MR. HARDING: No.

THE COURT: Okay. So he's a witness. So that's why Mitchell put out the contract on him, not because if he was

repeating rumors in the street.

MR. HARDING: Put out, he put out a contract on Claudus because Claudus had confronted Martin about whether he had something to do with this murder. Something --

THE COURT: So are you conceding that Mitchell didn't know that Claudus Lassiter had identified somebody's voice on the --

MR. HARDING: I am assuming Martin told him that.

THE COURT: Well, you're assuming that Martin -- how do you know Martin knew that Claudus Lassiter had identified anybody's name on the tape?

MR. HARDING: I am supposing that Claudus Lassiter confronted Martin with that information.

THE COURT: All right. That supposition is not going to, not going to help me here.

So I don't see a sufficient nexus between this tape and --

MR. HARDING: That's not the only reason, Your Honor, that the government thinks this is valuable evidence in this case.

THE COURT: Okay.

MR. HARDING: He admits to knowing Bo and Goo. He admits to knowing the Wyche brothers since 1998.

THE COURT: Okay. Does he actually admit that or does he -- where does he admit to knowing the Wyche brothers? I

thought he said he heard that the Wyche brothers had been murdered.

MR. HARDING: Well, it may be that it's in the -- the agent is going to testify about his prerecorded statement interview with Mr. Martin.

THE COURT: Okay. Tell me about that.

MR. HARDING: Okay.

THE COURT: And by the way, did we have a motions hearing on this?

MR. HARDING: Yes. We played this tape in court during the motions hearing, along with the tape of Mitchell's statement. And Your Honor ruled, and I of course admitted this at the outset, that we weren't going to try to get into evidence.

THE COURT: Right. But I mean, was it actually challenged or was it pro forms? In other words --

MR. HARDING: I think that it was just, I think we put on the evidence just in response to a boilerplate motion.

THE COURT: Okay. All right.

MR. HARDING: But I have maintained that we weren't going to use Mr. Martin's voice ID of Bo on the tape. But the understanding, I thought, until today was that we were going to simply redact that section of the tape.

THE COURT: Okay. Maybe I'm jumping ahead. Mr. Crowe, is your problem with the tape or with leaving something out of the tape? I probably should have started with you. Maybe you

just want what the government says it's not going to play played, leaving aside, of course, the Bruton issue.

MR. CROWE: Your Honor, we had originally argued that Mr. Martin's identification of Mr. Mitchell's voice on the tape was exculpatory with respect to him. And the Court didn't think very much of that argument.

THE COURT: Right. Okay. Thanks for refreshing my recollection.

MR. CROWE: We didn't get very far. I would be happy to have the reargument and have the Court revisit it if the Court wishes.

THE COURT: No.

MR. CROWE: The paper that I filed yesterday was simply that, there's really nothing in here that's an admission. Yeah, he knew Mr. Mitchell and, yes, he knew Mr. Gardner. And I don't think anybody in the jury thinks that he didn't know both of them.

But the real problem we have is the last part of this tape where there's discussion of what the street rumor, what the street is saying about who did what. And what I would point out is what this transcript says, is not that this man Claudus or Cloris, as it was in the original transcript, confronted Mr. Martin, but it seems to be that Mr. Martin talked to this man because he was close to the family, just to find out what was happening. It wasn't, it wasn't that Cloris or Claudus had

confronted Mr. Martin and therefore that there was a, there would be a motive to do something to him, but simply that Mr. Martin had reached out to him and had gotten this information.

THE COURT: Okay. All right. I haven't looked back at your letter. But I thought that a part of your complaint was that the government was taking the position that something shouldn't be played. And do I understand that to be simply Martin's statement that he thought that was Mitchell's voice on the tape?

MR. CROWE: That is what the Court, that is what the Court had previously ruled would be solved by a simple redaction, which the government is doing.

THE COURT: Right.

MR. CROWE: I wasn't trying to revisit that.

THE COURT: Okay. So is there something else in your letter that you --

MR. CROWE: Well, I say two things. I say, first of all, it's not an admission.

THE COURT: Well, it clearly is an admission. I thought -- I read your letter very quickly. I thought that there was a portion of the tape that the government didn't want to play. And you mentioned, maybe I'm confusing things, there's some mention of the rule of completeness.

MR. CROWE: Yeah. We were talking, there's a second element of this which I understand has been resolved. We thought

that the tape was misleading because what it does not report was the account Mr. Mitchell gave of his alibi.

THE COURT: Mr. Martin.

MR. CROWE: Mr. Martin. I have been told by Mr. Harding that they're going to elicit that from the detectives. So to the extent that was a concern, that is no longer.

THE COURT: Okay. That's what I was referring to. So is that a part of this pre-taped interview, Mr. Harding?

MR. HARDING: Yes, Your Honor. The alibi is in the pre-taped interview, along with some other valuable information.

THE COURT: Okay. All right. Okay. All right. I've got it now. All right.

MR. HARDING: So can the government play the tape, Your Honor?

THE COURT: Subject to hearing from any of other counsel, yes. I think the problem that I thought existed simply doesn't exist, if it ever did.

MR. CROWE: Your Honor, what about the portion of the tape where Mr. Martin is talking about what the rumor is on street? There's no way that should come in before the jury.

THE COURT: Well, sure, it should.

MR. CROWE: It's clearly a hearsay statement by Mr. Martin. It's hardly an admission to say that people are talking about him. It's classic hearsay.

THE COURT: Well, I don't --

MR. HARDING: It's an admission. The fact that --

THE COURT: Just a moment. Just a moment, Mr. Harding. So if you're right, Mr. Crowe, the rule providing for the admission of admissions is trumped. And an otherwise admissible admission is excluded because the defendant, who knowingly, intelligently and voluntarily waives his rights to remain silent is clever enough to include in that admission hearsay. I don't think you're going to convince me of that. But I'll give you a chance for a few seconds.

Now, I'll be happy to give the jury a limiting instruction just as I've given the jury a limiting instruction on certain other matters where words from a defendant's mouth either were demonstrably not true or should not be accepted by the jury for the truth of the matter asserted. Of course, I have in mind Mr. Mitchell's alleged statement that he did a bit for a body. You remember all of that excitement.

So if your client chose to talk to these officers, these detectives, about rumors, that's what he did.

MR. CROWE: Well, that may be, Your Honor. But if my client says that there are rumors out on the street that are false, why is that an admission by him?

THE COURT: Because the government's going to say, because his statement that they're false is false. That's why we have juries. Just because he says it's a rumor and that it's a false rumor doesn't make it false.

MR. CROWE: It doesn't make it an admission, either.

THE COURT: It's a part of his admission. An admission is, takes its character from the speaker and the proponent of the evidence. As I said this morning, an admission is admissible if it's relevant. And clearly here, based on what the government's now told me, this is relevant stuff.

MR. CROWE: Your Honor, our position is that an admission is only an admission when it is a concession or it is evidence of guilt.

THE COURT: Okay.

MR. CROWE: Or a false exculpatory. In this case --

THE COURT: But, you see, the whole point of whether it's false, the jury has to hear it, therefore it's got to be admissible for the jury to decide whether it's a false exculpatory. I can't make that decision.

MR. CROWE: If that were the case, we could simply have evidence in this, we could simply have evidence of what the rumor on the street was.

THE COURT: If it comes from the defendant's mouth, you betcha.

MR. CROWE: Just the fact that a defendant says that somebody is saying he did something that he didn't do is an admission?

THE COURT: Absolutely.

MR. CROWE: I --

THE COURT: It's not an admission of guilt. It's an admission under the hearsay exclusion. It's an admission. It's a custodial statement.

MR. CROWE: But it has to be incriminatory to be an admission.

THE COURT: It's incriminatory if the government wants to put it in. That's what makes it an admission. That's what makes an admission. You don't have to admit an element of the offense or an incriminatory fact. That's what false exculpatories are.

MR. CROWE: But it has to be an admission against penal interest.

THE COURT: No, it doesn't. That's called a statement against interest. An admission is a different animal.

Let me hear from Mr. Martin.

MR. MARTIN: Your Honor, I hesitate to add to the woes. I think we're out on so many limbs here, I hate to give you another one, but we're going to go out on the other one.

I object to the government being able to play this tape or, let's say I object to the way this is all going to come in because there is, if it wasn't for Bruton, the redacted portion would come in and it would be exculpatory to my client. And I think that I should be able to explore that.

THE COURT: See, I don't --

MR. MARTIN: When this guy says that this is Bo on the

tape, he doesn't say, This is Mr. Harris. The government's whole theory is these guys all know each other, are all in this together. When he says that, I should be entitled to explore that. And I'm not going to be entitled to explore it. But the government's going to be entitled to take advantage of the rest of his statement.

And I just think that's another limb we're out on here because we're all being tried together. I want be to able to ask that question, if not have the whole tape played, to at least ask Detective Niedermeier what the answer to that question was when he asked it.

I also would say, Your Honor, that the way in which they propose to play this, if you look at Page Five, and he says, Were any of those voices yours? And Martin says no. You were not there at the time? I was not there. And then there's a blank. And then the next question is, do you know Bo's real name? I'm not arguing Bo's case for him, Your Honor, but that seems to me to give him up right there.

THE COURT: All right. Well, you've --

MR. MARTIN: I think it's dangerous to do this this way.

THE COURT: This is a limb that I'm happy to go out on with you, Mr. Martin, because I'm sure Mr. Crowe perhaps would have gotten here. So let's look at it.

What you're saying is, arguably, the redaction is not

sufficiently complete.

MR. MARTIN: That's correct. Well, that's B. That's my fallback argument.

THE COURT: All right. I'm happy to look at that.

MR. MARTIN: My first argument is there shouldn't be a redaction because what would be said is exculpatory to my client. And if it weren't for this joint trial, I would be able to take advantage of that.

THE COURT: I think I agree with you. I'll hear from Mr. Harding.

MR. MARTIN: Thank you, Your Honor.

THE COURT: It seems to me if we're going to redact discussion of the tape, we're going to, of the voice mail, we're going to redact discussion of the voice mail. So I mean, I think I agree with you, that --

MR. MARTIN: I wish you agreed with me on the first premise. That would make me a lot happier.

THE COURT: The reason I don't is because one can be persuaded that Mr. Martin identifying Mr. Mitchell's voice on the voice mail is exculpatory but that's not at all self-evident. And so I see that you're being deprived if Mr. Martin doesn't testify of arguably exculpatory evidence, but that happens, at least potentially, in every joint trial.

I realize I'm preaching to the choir. But of course in any joint trial there is almost certain to be either a custodial

statement or some other statement about Defendant Number Two made by Defendant Number One that is arguably exculpatory to Defendants Three, Four and Five. I mean, that happens a lot.

MR. MARTIN: My experience has pretty much been the other way. It's inculpatory.

THE COURT: Perhaps I shouldn't say a lot. But it does happen. And of course we've got, what is it, I guess, Chambers or one of those cases. If a case could be made and none was even suggested, let alone made, that a severance here would have resulted in one of these defendants testifying in the trial of one of the others --

MR. MARTIN: I'm not going there.

THE COURT: No. You're not going there. But obviously, it would have been interesting if, it would have been interesting. And I forget what the original configuration was. Was it --

MR. MARTIN: I think the way it would have worked --

THE COURT: Gardner and Harris?

MR. MARTIN: -- my client would have been tried alone eventually. I think that's what you initially thought was, you would try Gardner first, and then you would try Martin --

THE COURT: Right.

MR. MARTIN: -- and Mitchell together. And then you would try Harris. That's what I thought was going to happen.

THE COURT: I think that's right. Anyway, that's water

over the dam.

MR. MARTIN: So Your Honor, just to say I, one of the things you said is, I don't think it's, you said it's not self-evident that this would be exculpatory.

THE COURT: Right. In other words, let me just fill in the blanks. The fact that Mr. Martin said to Detective Niedermeier, That's Bo on the tape, doesn't remotely in my mind, on the face of it, exculpate anybody. It inculpates Mr. Mitchell but it doesn't even begin to say who else was there.

MR. MARTIN: I think, Your Honor, an argument could be made that it does because in the context of the other evidence, you have all, you have, number one, how many voices are there on the tape? I'm not even sure what the government's theory is on that any more. But I think it's three. How many voices are there on the tape? The government's theory, maybe there's four. But I think there's evidence in this case that there's only three voices on tape.

So you plug one in there, that's Mr. Mitchell. And you've had other people identify Gardner and Martin. And the only people who are really going to identify my client are the trooper and the one witness who's already said that she heard him talk once or twice. I think arguably it's exculpatory. Maybe not self-evident but more self-evident than you thought, I think.

THE COURT: Well, look, it is, it is, it would be passing strange, I'll put it that way, if any drug dealer like

Mr. Wyche would permit four guys to run up on him, you know, under the, under the subway tracks on Wabash Avenue at one or 2:00 in the morning. I don't care who set it up.

So I think it's reasonable to say that, given the government's theory, I understand all four defendants are charged in that incident, but I think the government's going to argue, I don't know, but I think the government's going to argue that one, and perhaps two, and maybe three, people were waiting in the vehicle around the corner, up the street or something, and that the actual murders were committed of the Wyche brothers by one person. I don't know. Maybe two people. I forget the ballistics and all that.

MR. HARDING: It was one shooter.

THE COURT: It was one shooter. Okay. So there's one gun. And as I say, common sense tells us, there weren't four people standing around that car while the Wyche brothers were still alive.

So to say that it's exculpatory because somebody's voice shows up on that voice mail, which under the government's theory is made several minutes, not sure if it's 3 minutes or 13 minutes, but it's several minutes after the murder of the Wyche brothers, it's just not exculpatory. It doesn't tell us who was in the car. It doesn't tell us who was the shooter. It doesn't tell us where anybody was. It doesn't tell us anything except we know that there are at least two voices on the voice mail. But

it doesn't, it's not exculpatory.

Now, it can be argued that it should be interpreted in a way that if Mr. Martin heard Mr. Mitchell's voice on the voice mail and didn't hear Mr. Gardner's, and didn't hear Mr. Harris's, and he, Mr. Martin himself, is saying he wasn't there, then I suppose a fact finder could say, oh, okay, the only one there was Mr. Mitchell.

MR. MARTIN: But the problem I have with the Court's ruling is I can't argue that because it's not going to be in evidence. That's why I said I would prefer you agree with me on the first part and not the second part. And that's the extent to the redaction.

THE COURT: I see your point.

MR. MARTIN: I'm deprived of being able to argue that to the jury because it's not going to be in evidence.

THE COURT: Exactly. And that's what I mean, it's not in evidence because so far as we know Mr. Martin's not going to testify. But of course --

MR. MARTIN: The only reason it's not in evidence is because it's a joint trial. That's why it's not in evidence.

THE COURT: No. If Mr. Martin testifies, it will be in evidence.

MR. MARTIN: That's a different issue. But thank you, Your Honor.

THE COURT: Yeah. It's a closely related issue. All

right. Mr. Harding, what do you want to do about this further redaction?

MR. HARDING: Well, if Your Honor thinks that it suggests that Mr. Martin identified Bo's voice on the tape, I can further redact it. But I do want to point out that there is some important evidentiary value to having in evidence that Mr. Martin has heard this tape.

The reason is that, as you know from Mr. Montgomery, Gardner goes and reports to Montgomery the contents of this tape. The only way Gardner could have known it was from Mr. Martin or from --

THE COURT: That's not true. All the rumors on the street. Everybody was talking about this tape.

MR. HARDING: Well, he gives, he reports on who said what and whose voice was saying what thing. And it seems clear that he's talked to Martin about this. So I think it's important to have before the jury the fact that Martin's heard this tape.

I can redact it by, at the bottom of Page Five --

THE COURT: Do you want to sever Mr. Mitchell?

MR. HARDING: No, I certainly don't.

THE COURT: I'm serious.

MR. HARDING: No.

MR. LAWLOR: We'll take that.

MR. HARDING: No. Definitely not.

THE COURT: You sure?

MR. HARDING: Yes. In fact, I'm about to faint just because you said that.

THE COURT: Well, Mr. Hanlon, please, go to the lectern and, with your agents.

MR. MARTIN: We'll take that, Your Honor.

THE COURT: No. It's not a suggestion, Mr. Harding. I'm just trying to do my job here.

MR. HARDING: If Your Honor wants me to redact further the --

THE COURT: Yeah. I think you're going to have to redact further because I think Mr. Martin is right, that to set it up this way, You did you listen to the voices? Yes. Was any of those voices yours? No.

MR. HARDING: I'll cancel out where Hastings says, Were any of those voices yours, and the three succeeding lines, the three subsequent lines.

THE COURT: So what will be the last line on that page? That's Page Five. What will be the last line?

MR. HARDING: Yes. Martin says yes in response to the question, Did you listen to these voices?

THE COURT: No. I think we got to take that out, Mr. Harding. That's why I asked you if you want to sever. Because it looks like it's kind of important to you. I don't think it's fair to Mr. Harris, Mr. Martin -- excuse me. It's not fair to Mr. Harris and Mr. Gardner --

MR. HARDING: Okay. How about if I --

THE COURT: -- to let the jury know that Mr. Martin listened to the tape and just leave it hanging there.

MR. HARDING: Then I also --

THE COURT: It's not unfair to Mr. Mitchell because Mr. Martin says he heard Mr. Mitchell's voice on the tape. So if Martin were going to testify, I mean, that wouldn't be unfair to Mr. Mitchell. It's clearly not unfair to Mr. Martin.

MR. HARDING: How about if we go further up Page Five and I, you see where Hastings says, Now, there was a tape that I played in reference to this incident, is that correct? And Martin says yes. I could redact everything after that.

THE COURT: Including that. Including the question, Now, there was a tape that I played in reference to this incident.

MR. HARDING: Well, I want it in evidence, the fact that Martin had had heard the tape. That's all. I don't think there's any way a jury could suppose, because of hearing that question, that Martin identified Bo's voice on the tape.

THE COURT: But here the problem for Mr. Harris and Mr. Gardner, and I am agreeing with Mr. Martin to this extent, it's unfair to let the jury know that Martin listened to the tape, and leave them hanging about what, if any, identifications he made when, in fact, he made an identification of Mr. Mitchell but not of Mr. Harris and Mr. Gardner. It's the combination.

I don't think it's fair to Mr. Harris and Mr. Gardner.

MR. HARDING: Okay. Then I'll cancel that question and answer, also.

THE COURT: Right. I mean, I see your point and I feel your pain. So we start with, Do you know what Bo's real name is? That way, as Mr. Martin says, and he apologized for making Mr. Mitchell's arguments for him, that doesn't set it up in a way that there's a mention of the tape. Oh, and by the way, what's Bo's real name? Okay? So are you going to use the tape today?

MR. HARDING: No.

THE COURT: Okay.

MR. HARDING: I will have enough to avoid using the tape today. And then the problem is, Ms. Kelly here can prepare a redaction of the transcript.

THE COURT: All right.

MR. HARDING: I had transcript books here for everybody. We can simply replace the transcripts.

THE COURT: Great. I'm sorry to kill a few more trees. But that's great. Please be sure to show me and let me listen to the tape tomorrow. The last time I relied on a prosecutor to do a redaction I got reversed by the Supreme Court of the United States. I wasn't on this court.

So I have a habit of always listening and reading before we have the examination. All right. We'll have the beleaguered jury, Ms. Arrington.

The case I referred to, counsel, is the, the contextual Burton case that went to the Supreme Court about 10, 10 or 12 years ago. I was on the Circuit Court, State v. -- can't remember. It was, it was the case where the detective got on the stand and said, reading a statement, he said, State's Attorney said, And who was there? And the detective said, Jefferson and redacted, redacted.

(Jury enters the courtroom.)

MR. LAWLOR: Gray.

THE COURT: Right. Gray v. Maryland. Thank you, Mr. Lawlor.

Thank you for your patience once again, ladies and gentlemen. We're ready to continue. The government may call its next witness.

MR. HARDING: Thank you, Your Honor. Your Honor, the United States calls Detective Gary Niedermeier.

DET. GARY NIEDERMEIER, GOVERNMENT'S WITNESS, SWORN

THE WITNESS: I do.

THE CLERK: Be seated. Speak directly toward the mike. State your name and spell it for the record.

THE WITNESS: Detective Gary Niedermeier. N-I-E-D-E-R-M-E-I-E-R.

THE COURT: Detective, I know that we've kept you sort of hanging around for quite a few days. I apologize for that. But you understand we've tried to manage the trial as best we

could.

THE WITNESS: Yes, Your Honor.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. HARDING:

Q Good afternoon, Detective Niedermeier.

A Good afternoon, sir.

Q Could you tell us, sir, how are you employed?

A I'm a homicide detective with the Baltimore City Police Department.

Q And how long have you been with the police department?

A I'm in my 13th year.

Q And how long in homicide?

A Just completed seven.

Q Okay. Did you get involved back in 2002 in the investigation of the murders of Darryl and Anthony Wyche?

A I did.

Q Can you tell us when you got involved and how you got involved?

A That morning our office received a call for two males unresponsive in a vehicle. At that point, I was up, I was the lead detective on at that case. I responded to the scene.

Q Do you know what time you arrived there? What time you got the call and what time you arrived there?

A I believe the call came in at 6:52 a.m. and we arrived at

the scene probably around 7:30 a.m.

Q Did you go alone or with someone else?

A Sergeant Petry was with me.

Q Okay. Where did you go?

A The 4400 block of East Wabash Avenue.

Q Okay. I have two exhibits here and I am going to put them on the screen, I think. Once again. You've seen this photograph before, have you not, Detective?

A Yes, I have.

Q Okay. Does this show the location where you went that day?

A Yeah, it does.

Q I'm sorry. Did you say it was a 4400 block of East Wabash Avenue?

A Yes.

Q Okay. I'm now pointing to a street on this aerial photograph. Can you tell me what that is?

A That's the 4400 block of East Wabash Avenue.

MR. MARTIN: What's the exhibit number, Mr. Harding?

Q This is W-10. Okay. So it looks like it's only one block long, is that correct?

A Yes.

Q And what's this big street right here?

A That's Wabash.

Q And what's this, can you see my finger on your screen?

A Yes, sir. That's Coldspring.

Q Okay. And what's this thing right here?

A The light rail?

Q Light rail or metro?

A Metro. I'm sorry. Metro.

Q And if you know, you said this was Coldspring going all the way back here like this, is that right?

A Yes.

Q Do you know the name of this street right here?

A That would be Ridgewood.

Q Okay. And that actually goes through but it stops at the metro tracks, is that correct?

A Correct. It doesn't go all the way through.

Q Now, let me show you another picture. This time it's -- first, let me ask you. Can you, using your screen, if you point and touch the screen it will make a little mark on the screen. So can you point to where the car was that you went to that night. You said you responded to a call of two unresponsive males in a car.

A Approximately right here. Looks like the little pink dot is about two inches out to the right of where I touched.

Q It didn't, it didn't -- two inches to the right?

A I mean to the left. Yes. Closer to where your pen is. That's where.

Q Right about here?

A Yes.

Q Okay.

THE COURT: You know, I think, counsel, what's happened, for whatever reason, the witness' monitor is not quite in line, I think, with all the other monitors. So in the future, it might make more sense if counsel will use your monitor or the pen, probably even better, to point, to have the witness direct you to the location. Just a suggestion.

Q Okay. And that's, in effect, what I just did, is that correct, Detective Niedermeier? I made a mark where you wanted me to?

A Yes, sir.

Q Okay. Which side of the street was it on? The side closest to the railroad tracks or the side closest to --

A Closer to the tracks.

Q Okay. And in this picture, it looks like it's a construction site now with a lot of construction equipment. Was that the case when you went there back in 2002?

A No. There was a building there, actually, at that point.

Q What kind of building?

A I'm not even sure. It was some type of industrial building. Looked like it was possibly vacant even back then.

Q Okay. And here's another picture, which is W-11. And I'm going to call your attention on this one to this street right here. Is this the same street you were talking about?

A Yes.

Q Is this taken from the other direction?
A Correct. Looking the other way. That would be East Wabash where your pen was, would be metro tracks. And then Wabash out on the far side.
Q Okay. Is this Ridgewood over here?
A Yes. That would be the part going down to the dead end.
Q Tell me when I get to the spot where the car was.
A Approximately right there.
Q Right about here. Okay. Let me go back to this other map, W-10, for a second. I mean, it's not a map. It's an aerial photograph. Is there a McDonalds down here on Coldspring?
A Coldspring and Reisterstown.
Q Can you see Reisterstown Road on this?
A Not very well.
Q There's a street right --
A Yeah. Approximately right there.
Q Is that where Reisterstown crosses?
A That would be Reisterstown running north and south, crossing Coldspring at that point.
Q Okay. What did you do when you got to the scene that day?
A At that point, I was approached by the primary officer, began to gather information, direct Crime Lab what we wanted done.
Q What's the primary officer?
A First officer responding to the scene, usually uniformed

officer. They would get the call. They go to the scene. At that point, they determine what they have and they would call our office. We're basically a secondary responder.

Q Okay. Who was the primary?

A Officer Gladden.

Q Okay. And when you got there, were the medics already, was there an ambulance already there or had they not yet arrived?

A No, I believe the medics had already arrived.

Q And the two guys in the car, were they still there?

A Yes, they were.

Q Had they been pronounced dead already?

A They had.

Q Okay. Did they have identification on them?

A Yes.

Q Both of them?

A Yes, they did.

Q So you didn't have any trouble finding out who they were, is that correct?

A No, they were identified through the identifications on their person.

Q And what, what were their names?

A The driver was identified as Anthony Wyche and the front seat passenger was identified as Darryl Wyche.

Q Okay. Now, I have some photographs that I want to show you. First of all, Government Exhibit W-52. Can you tell us what that

depicts, Detective?
A That's the Honda station wagon as it appeared that morning, containing both the victims, in the 4400 block of Wabash.
Q So the victims are still in the car at this point?
A Yes, correct.
Q Who's this guy back here with the crewcut?
A That would be myself.
Q Okay. And so you're talking to a bunch of other detectives and officers, is that correct?
A Correct.
Q Okay. Here's another shot. This is W-49. Is this just another shot of the same scene from a different direction?
A Yes, it is.
Q Looks like the seat belt is still on the driver. Were both seat belts still attached and on at the time you got there?
A Yes. Both victims were still seat belted in the vehicle.
Q Here's W-51. This is just another close-up of the same thing. And is that you with your white pants and blue blazer?
A I believe so. I can only see the edge of it.
Q Is that better?
A No. I believe that's Sergeant Petry.
Q Oh. Okay. Here's another shot from the other side. You said Anthony was in the driver's seat, is that correct?
A Correct.
Q Your Honor, I want to give defense counsel an opportunity to

see some of these photographs before I actually show them. Can I do that now?

THE COURT: Yes, please.

(Pause in proceedings.)

MS. RHODES: Your Honor, may we approach?

THE COURT: Well, let's get everybody to look at them first. Everybody seen them? Yes. And you want to approach about one or more of the photographs, Ms. Rhodes?

MS. RHODES: Three of them, Your Honor.

THE COURT: Three of them? How many are there?

MR. HARDING: Four.

THE COURT: A total of four photographs?

MS. RHODES: Yes.

MR. HARDING: That I've shown to them. There are other crime scene photos here. But there's no controversy about them, Your Honor.

THE COURT: All right. Come on up.

(Bench conference with counsel on the record:)

THE COURT: This isn't going to be long, folks. What's the problem?

MS. RHODES: Just our position is that this top one is okay because it shows both, and the others are not necessary. The other three are not. They're repetitive. They don't show entrance or exit wounds. They're just gruesome.

THE COURT: All right. Objection is overruled. I

think the photographs are valid.

(End of bench conference.)

THE COURT: The objection is overruled.

BY MR. HARDING:

Q Okay. This is W-12. Again, just another shot of you guys at the scene. This one is W-13. Does that show the two bodies the way they were when you arrived there, Detective Niedermeier?

A Yes, it does.

Q And can you clearly see both seat belts still attached there?

A Yes.

Q Okay. Here's a close-up of -- tell us who that is.

THE COURT: The number, please, Mr. Harding?

Q I'm sorry. This is W-14.

A That's Darryl Wyche.

Q So he was in the passenger seat, is that correct?

A Correct.

Q This is W-16. Who is that?

A That's Anthony Wyche after he was removed.

Q Yes. When this picture was taken, was he taken outside of car at that time?

A Yes, he had been removed from the vehicle at that point.

Q And here's another one. This is W-17, shows the other side of his face. Okay?

A Yes.

Q Now, was the engine still on when you got there?

A No, it was not.

Q Do you know how it, whether it was on when Officer Gladden got there?

A Yes. She reported that it was on and that she had turned it off.

Q Were the doors opened or locked when the police first got there?

A They were closed and unlocked.

Q Okay. Was the heat on?

A It was.

Q What was the condition of the bodies when you got there in the, sometime after 7:00 in the morning?

A It was apparent that they had been deceased for a little while. Rigor had started to settle in, meaning that their muscles had contracted. We had a difficult time, or the medical officers, medical examiner -- excuse me -- medical examiners had a difficult time removing them from the vehicle because rigor mortis had set in.

Q Okay. Does that indicate they'd been dead for a while?

A Yes.

Q Let me show you W-26. This a photograph of the rear of the car?

A It is.

Q And what is this object right here on the rear seat?

A It's a child seat.

Q Was it positioned the way it is there when you first got there or was it -- where was it in the back seat?

A It was behind the passenger, behind Darryl Wyche.

Q Okay. So someone pushed it over here more to the left, is that correct?

A Yeah. That's correct. I believe they moved that to make it easier to remove both Darryl and Anthony from the vehicle.

Q Okay. Could you tell there at the scene that morning what, what the wounds were to the two victims?

A It was obvious gunshot wounds. Darryl sustained one to the, right behind his left ear. And Anthony was obviously shot multiple times.

Q Okay. So Darryl was only shot once, is that your testimony?

A That's what I observed right at the scene, yes.

Q Do you know what stippling is, Detective?

A I do.

Q Was there stippling on the wound associated with Darryl Wyche behind his left ear?

A Yes, you could observe stippling.

Q And what does that indicate, Detective?

A Stippling is a, when a gun's fired, gunshot residue comes out. If the gun is fired in close proximity to the skin, it will leave, it looks like pepper all over the skin, but it's actually imbedded into the skin. It will look like little black specs and

you could observe that just behind Darryl's left ear.
Q And you say that Anthony Wyche was shot several times, is that correct?
A Yes.
Q Okay. Now, you said before that the windows were up. Was there any broken glass anywhere?
A No.
Q And the police didn't have to break any glass to get into the car, is that correct?
A Correct.
Q You said the doors were open, in fact?
A They were unlocked, yes.
Q Unlocked. I'm sorry. But closed?
A Yes.
Q You would say? Yes. Now, when you looked inside the car, could you see bullets and shell casings inside the car?
A Yes.
Q Do you recall how many bullets and how many shell casings were recovered?
A At that point or later on?
Q Altogether.
A Altogether? Five shell casings, .40 caliber shell casings, and from the vehicle, two projectiles.
Q Were there additional projectiles or bullets recovered at the autopsies?

A Yes, there was.

Q How many?

A One from each victim.

Q So a total of four bullets and five shell casings, is that correct?

A Correct.

Q Let me show you, if I may, W-1, W-4, and W-3. You've had a chance to look at these before, have you not, Detective?

A Yes.

Q Are these the casings and bullets that were recovered at the scene?

A At the scene and the medical examiner's, yes.

Q Yes. Okay. Now, I have some more photographs to show you. Could you see the shell casings and the bullets when you looked inside the car?

A Some of them, yes.

Q Okay. Let me show you, first off, W-15. Do you recognize what this is?

A Yes. That's the projectile sticking out of the right side jaw of Darryl Wyche. You could actually observe that when he was in the vehicle.

Q So you said he was shot behind the left ear and this, on the right side of his neck, is the bullet sticking halfway out, is that correct?

A Correct.

Q This is W-53. Can you tell us what this shows?

A That's a photograph of the interior of the vehicle. The orange triangular shape is actually pointing at a location on the -- correct -- on the steering while where a projectile was also recovered.

Q Okay. And you said it was Anthony who was behind the driver's seat, is that correct?

A Correct.

Q This is W-54. Is this another, another shot of the hole on the steering wheel?

A Yes. It's closer.

Q W-55, is this just one of the bullets after it was recovered?

A Yes. I believe that's the one out of the steering wheel.

Q And W-56. Do you know what this is?

A It's a projectile on the floor of the vehicle, in front of Anthony Wyche. It's where it was located. A bullet on the ground there.

Q Okay. So this picture was taken while the bodies were still in the car, is that correct?

A Yes. It appears to be, yeah.

Q Is this one of the victim's feet here?

A Yes. Yes.

Q Okay. That was W-56.

I now have W-27. Can you tell us what that is?

A That's a photograph of a casing recovered from the rear of the vehicle.
Q This was like a station wagon, is that correct?
A Yes.
Q And what does this show?
A The little yellow numbered tags --
Q This is W-28.
A -- represent three other casings, each one of them marked.
Q Okay. And they're all in the back seat area, is that correct?
A Correct.
Q This is W-29. This is just a close-up of one of the casings, is that correct?
A Yes.
Q And here's W-64. Is this yet another casing that was discovered later?
A Yes.
Q Let me ask you about the two bodies of Darryl and Anthony Wyche. Did you recover anything from their persons?
A Yes. I believe $6.03 was recovered from Anthony. And $214.03 from Darryl. Each had their ID. Darryl also had a cell phone on his hip.
Q Okay. What about the location on their persons where this money was recovered?
A That would, I believe both of them were located in their

front pockets.

Q Pants pockets?

A Yes.

Q Okay. And what about watches? Did they have watches on?

A Yes. Each of the victims had a watch on.

Q Okay. Was there any sign at all that anybody had disturbed the corpses or gone through the pockets or anything like that?

A No.

Q Let me show you Government Exhibit W-22. Can you tell us what that is?

A That's the Nextel phone recovered from the hip of Darryl Wyche.

Q Part of this same exhibit, what is that?

A Pager.

Q Okay. Where were these recovered from Darryl? Where on his body?

A On his hip, clipped on to his sweatpants.

Q Okay. This is W-23. Does this actually show the telephone clipped to Darryl's sweatpants?

A Yes.

Q Do you remember what the phone number was for that phone that was attached to Darryl's hip?

A I believe it was 309-5057.

Q Okay. Did crime scene technicians gather blood samples from the scene?

A Yes.

Q And did they get tested for DNA?

A Yes.

Q Did they just come back to the victims?

A Yes.

Q Where on the scene were these blood samples recovered from?

A Right outside the vehicle, just to the driver's side.

Q Okay. But where outside the vehicle?

A Outside of the passenger side there was approximately four drops of blood. Looks like they were leading away from the vehicle.

Q Which of the Wyche brothers did those drops of blood come from?

A Anthony.

Q Let me show you one of these pictures I've already shown you. This is W-50. Do you see these markers out here on the street?

A Yes.

Q What are those for?

A Those are used to identify the spots where the drops of blood were so you could see them in the photograph.

Q And so actually it's on the driver's side, is it not, Detective?

A I'm sorry, yes. Rear driver's door area away from the vehicle.

Q Was there any sign that Anthony had moved after he had been shot?

A No.

Q Based on your experience, can you infer why there are blood spots on the street leading away from the car that come back to Anthony Wyche?

A There would only be two reasons in a case like this. Either the weapon used was fired so close that when the victim was shot, there's what's called blow back, blood spatters back either on to the shooter or on to the weapon. And as they exited the vehicle and began to walk away, blood dropped from either the weapon or his hand. Or while the incident was taking place inside the car, the shooter actually had to place his hands on Anthony while he shot him and got blood out of him that way. While exiting the vehicle, the droplets would then fall from him out there.

Q Okay. After the crime scene was processed, was the car towed down to Police Headquarters for further processing?

A Yes, it was.

Q And at that point when the car was towed away, did you learn about a call that had come through to Headquarters from a location in Baltimore County?

A I did.

Q Without giving the address, did you respond to a location in Baltimore County, specifically in Randallstown, that morning?

A Yes.

Q What residence did you respond to?
A That was the Magginson residence.
Q And who are the Magginsons?
A It would be Darryl's mother-in-law, father-in-law, and family.
Q Okay. What was the name of Darryl's mother-in-law?
A Irene Magginson.
Q Okay. When you got there, was Darryl's wife there?
A Yes, she was.
Q And I suppose Darryl's mother-in-law was there, too, is that correct?
A Yes, she was.
Q Were there other relatives there?
A Yes. There was a few people there.
Q And did they tell you about a tape recorded voice mail?
A Yes.
Q Did you, in fact, record the voice mail message?
A Yes.
Q How did you make the recording?
A I contacted the Secret Service, I mean the FBI, I'm sorry, in Quantico, provided them with the phone number for the phone, where that number was, or where that tape recorded message was relayed to on a voice mail, and actually provided them with a security number for that. And they were able to pull it off of, directly off of that.

Q Where did you get the security number from?
A The phone call was placed to Irene Magginson's phone and she provided me with that phone number and the security code to get into her voice mails.
Q Okay. Let me show you some more exhibits here. First of all, did you subsequently recover Irene Magginson's cell phone?
A Yes.
Q Let me show you Government Exhibit W-2. Is the actual, is this the actual cell phone from Irene Magginson?
A Yes.
Q I'll take it out of the bag. This is Government Exhibit W-33. Is this a CD that contains copies of a voice mail, including an enhanced copy?
A Yes, it is.
Q And is this, this is, I'm going to call this W-33A. Is this a CD version of the same audiotape?
A Yes, it is.
Q And these are Government Exhibits W-32 -- well, just one exhibit, actually. No. I'll put them both in. I'm going to call this, this one is W-32. Is this an audiotape that was made of the voice mail?
A Yes.
Q And W-32A. Is this a copy of the enhanced version of the same tape?
A Yes.

Q When you went out to the Magginson's house, can you give us a vague idea, at least, of how many of the family members and others there were present?

A There had to be at least eight individuals there. Maybe more.

Q And without telling us what they said, can you tell us, yes or no, whether the people there identified the voices on the tape?

A Yes.

Q Did you learn from the voice mail itself or from talking to the relatives what phone was used to place the call that was recorded on the voice mail?

A Yes.

Q How do you know what phone it was?

A Irene Magginson was able to provide that information of what the number was calling in under her cell phone.

Q Okay. Is that because it records the number that's the incoming number on the cell phone?

A Yes.

Q Was it one of the phones that you had recovered from the car?

A No.

Q Okay. Did Irene and Natasha Wyche both recognize and know that number?

A Yes.

Q Do you know what the number is? Can you tell it to us, what it is now?
A I believe it's 443-691-9203.
Q 9203. And that phone was not recovered in the car, is that your testimony?
A Correct.
Q Did you get from Natasha Wyche and from any other relatives who were there other phone numbers to phones that Darryl had?
A Yes.
Q First of all, did you make a record of the number that Irene Magginson had on her phone, the one that recorded the voice mail?
A I'm sorry?
Q What was the number to Irene Magginson's phone, the one that recorded the voice mail?
A I don't recall Ms. Magginson's phone number.
Q Okay. We'll come back to that. Do you recognize this number, 410-905-6490?
A Yes. It's familiar.
Q Okay. Was that one of the phones that was recovered from the car?
A Yes, I believe so. Yes.
Q Do you know, did you take notes of these numbers when the family members gave them to you that day?
A I had notes of the 2691 numbers that they said that Darryl had used that day.

Q I see. If I showed you a copy of your notes, would that refresh your recollection as to the --
A Yes.
Q -- information that they gave you? May I approach the witness, Your Honor?
THE COURT: Yes.
Q Okay. I asked you about the 6490 number.
A Yes.
Q Did they give you information about that number?
A Yes. They provided that as one of Anthony's phone numbers.
Q Now, was that phone actually recovered from the car?
A No.
Q Okay. What about the 443-691-9203? That's the number that you say recorded the voice mail, is that correct?
A Correct.
Q And then there was another number, was there not?
A Yes.
Q What was that?
A 443-691-8844.
Q Was that a phone that was recovered from the car?
A Yes, it was.
Q Where was that phone recovered from?
A In the center console between the driver, front driver and passenger seats.
Q Okay. And you already gave us the number for the phone that

was attached to Darryl's waistband, is that correct?

A Correct.

Q What were the last four digits of that number?

A 5057.

Q Okay. Did you go to the autopsy that morning, Detective Niedermeier?

A Yes, I did.

Q Did you actually stay around for the autopsy?

A No.

Q Okay. But you said that two of the bullets were recovered in the course of the autopsy, is that correct?

A Correct.

Q Is that where you -- did you get custody of them at some point?

A Yes, they were turned over to me and I submitted them to Evidence Control.

Q Was a search subsequently conducted on the car down there at Police Headquarters after it had been towed down there?

A Yes.

Q Okay. Let me show you some more pictures. First of all, this is Government Exhibit W-21. What is this?

A That's a photograph of the rear of the vehicle taken to the Crime Lab bay.

Q And this is W-25. What is that?

A And that's the tire well area of the same vehicle.

Q Was anything recovered from the tire well area?
A Yes. A large amount of narcotics, heroin and cocaine.
Q Okay. I'm showing you now W-20. Can you tell us what this shows?
A Yeah. That's the plastic garbage bag containing the narcotics.
Q Okay. This green stuff, what is that? Is that green?
A It appears to be dark. I believe that's heroin.
Q Okay. Let me show you now W, this is W-6. It's actually a bag that contains a number of things, including two telephones. Where were these recovered from?
A Those were recovered from the center console of the vehicle.
Q Okay. You mentioned that a moment ago. There's also a phone holder and a charger, is that correct?
A Yes. They were all in the center console.
Q These are all from the center console. Was there also money recovered from the center console?
A Yes.
Q How much?
A 5,770, I believe, dollars.
Q Okay. This is W-18. Does this show the money as it was in the console --
A Yes.
Q -- when you recovered it? More than $5700?
A Correct.

Q Is that correct? And this is W-19. Does this show the money and the phones that were recovered from the console?

A Yes.

Q I showed you a picture a moment ago of the child seat in the rear seat area of the car. Do you remember that?

A Yes.

Q Was there anything in the child's seat?

A It was a cellular phone box with a phone in it.

Q Okay. Another telephone?

A Yes.

Q Oh, getting back to the drug evidence for a minute. The stuff recovered from the trunk area. Did you or any of your fellow detectives who were working with you submit the drug evidence for fingerprints?

A Yes.

Q And were any latents recovered?

A No.

Q Were attempts made to lift latent fingerprints from the area of the car, the Honda station wagon, and the various items recovered from the Honda?

A Yes.

Q And did you make requests for comparisons with several people, including the defendants in this case, Willie Mitchell, Shawn Gardner, and Shelly Wayne Martin?

A Yes.

Q And did you also request a comparison with a brother of Mr. Gardner's, by the name of Alvin?
A Yes.
Q Did any matches come back?
A No.
Q Did you submit the request for comparison of Gardner's prints in your initial request for comparisons just a couple of days after the homicide on March 28th, 2002?
A No.
Q Why not?
A At that point I didn't know Mr. Gardner, his identity.
Q Okay. Did you have a nickname for him at that point?
A Yes.
Q What was the nickname you had for him?
A Goo.
Q But you didn't have him identified as yet; is that your testimony?
A Correct.
Q Did you subsequently learn who Goo was?
A Yes.
Q And did you then submit a request for comparison?
A I did.
Q Okay. Let me call your attention now to April 1st of 2002. Did you attend the funeral of the Wyche brothers that day?
A Yes.

Q Did you go inside the location where the funeral was?
A No. I was making observations from the parking area.
Q Do you know what the location was? I mean, was it a church or a funeral parlor or what?
A It was a large converted church.
Q Okay.
A My recollection, off of Reisterstown Road.
Q Okay. Did you go inside the location?
A No.
Q Okay. Did you have with you at that time photographs of Mr. Gardner, Mr. Martin, and Mr. Mitchell?
A Yes.
Q So you had by that time identified Mr. Gardner as --
MS. RHODES: Objection.
Q -- the guy you knew as Goo?
THE COURT: Overruled. You may answer.
A Yes.
Q Had you already subpoenaed telephone toll records for Darryl Wyche's cell phones?
A Yes.
Q Had you learned the subscriber of the phones to whom, or the users of the phones to whom Darryl was speaking just before he died? Let me rephrase the question.
You knew from the Wyche brothers' phone records who they were talking to just before they died, is that correct?

A Yes.
Q Specifically, Darryl Wyche, is that correct?
A Yes.
Q Okay. Had you learned by April 1st the subscribers for any of those phones?
A Yes.
Q Okay. Were you aware that Mr. Mitchell was arrested that day, April 1st, 2002, riding in a car just before the funeral?
A Yes.
Q And do you know what he was arrested for?
A He had an outstanding warrant on him at the time.
Q Just one or more than one?
A I believe that --
MR. LAWLOR: Objection.
A -- he had two.
THE COURT: Overruled.
A I believe he had two open warrants at that point.
Q Were any of those warrants associated with your investigation of the Wyche brothers murders?
A No.
Q What were they open warrants for?
MR. LAWLOR: Objection.
THE COURT: Overruled.
A I believe one was for a violation of probation and one was for either an assault or an attempt murder.

MR. LAWLOR: Objection. Move to strike.

Q And was there a crime --

THE COURT: Excuse me. Ladies and gentlemen, as I've indicated to you, the fact that a person has been arrested or is sought to be arrested is not evidence in this case of anybody's guilt of anything.

Q Was the attempt murder charge associated with an incident that occurred at Hammerjacks?

A Yes.

Q And was the other warrant, in fact, out of the state of Pennsylvania?

A Yes.

Q And are you sure that it was a violation of probation or could it have been some other kind of warrant?

A No. It could have been some other kind of warrant.

Q Were you aware that, following the arrest of Mr. Mitchell, a telephone was recovered from him?

A Yes.

Q That that was the telephone that placed the call to the voice mail?

MS. RHODES: Objection.

THE COURT: Overruled. You may answer.

A Yes.

Q What was the number of that phone again? You can use your notes to refresh your recollection. You have them right there in

front of you, do you not?

A I have them here.

Q Okay. Sorry. Let me back up and rephrase the question. It was actually Darryl's phone that placed the call to the voice mail, is that correct?

A Yes. It was the 9203 that was in possession --

MR. LAWLOR: Your Honor, forgive me. I object. Can we have a clarification of whom called whom, please?

THE COURT: Go ahead, Mr. Harding, yes. Clarify.

BY MR. HARDING:

Q Who called whom? Which phone?

A In the phone call that was placed to Irene Magginson's cell phone, it was Darryl Wyche's phone, 443-691-9203, that placed the call to Irene Magginson's cell phone.

Q So the one that you recovered from Mr. Mitchell, what was its involvement in this case, if any?

A Through the investigation, looking at Darryl Wyche's cell phone records, numerous calls were placed between that phone and Darryl Wyche's phone the night of the murder.

Q Okay. We'll come back to that.

Okay. Now, calling your attention to April 16th of 2002. Did you obtain arrest warrants for Mr. Mitchell and Mr. Martin for the murders, the Wyche brothers murders?

A Yes.

Q And where was Mr. Martin arrested?

A At Two Cree Court in Randallstown.
Q Okay. And did you have a search warrant for that location?
A Yes, I did.
Q Did you participate in the search?
A Yes, I did.
Q Let me show you some exhibits and ask you if you can identify them. First of all, this is an exhibit that's already in evidence, Government Exhibit W-5I. What's the date on this letter, Detective Neidermeier?
A 3/4/02.
Q And what's the signature?
A Lil Darryl maybe.
Q Okay. This is a letter that talks about, among other things, I can come to my dogs and get an eighth with no problem. It's a risky business but a nigga like me lives on the edge. I don't have no problem with ski masking it up. Is that correct, Detective?
A Correct.

THE COURT: At any good point, Mr. Harding, when you think.

MR. HARDING: For the day, Your Honor?

THE COURT: For the day, yes.

MR. HARDING: Well, we might, now is fine, Your Honor. Or do you want me to go on a little more?

THE COURT: No. I just wanted you to choose when it's

a convenient spot to break.

MR. HARDING: Okay. I'll just ask one more question.

THE COURT: Well, go ahead.

Q This is Governments Exhibit W-5-G. Can you tell me what this is, Detective?

A That's a pamphlet given out at the funeral for Darryl and Anthony Wyche.

Q Did you know from the day you were there at the funeral whether Mr. Martin and Mr. Gardner attended the funeral?

A I had no first-hand knowledge but I'd heard.

MR. KURLAND: Objection.

MR. CROWE: Objection.

THE COURT: He didn't say what he heard. The objection is overruled. The answer is no, he doesn't know.

BY MR. HARDING:

Q Okay. Let me show you on the back of this thing. There's a section called Acknowledgements from the family. Is that you and your partner down there at the bottom?

A Yes, it is.

Q And a bunch of pictures in here. And I want to call your attention to one name that appears in here. You see this?

A Yes.

Q Claudus?

A Yes.

Q Also known as Lovey?

A Yes.

Q Who's identified as a cousin to Darryl and Pete?

A Correct.

Q So this is a good time, Your Honor.

THE COURT: All right. Thank you, Mr. Harding. Members of the jury, you will be excused until 9:30 tomorrow morning. Please leave your note pads on your chairs.

Have no discussion, conduct no investigation. Continue to keep an open mind about all issues. Avoid any media reports about the case.

We'll see you tomorrow morning at 9:30. Thank you. The jury is excused.

You may step down, Detective.

(Jury exits the courtroom.)

THE COURT: So where are we? Let's see. Mr. Harding, you are going to arrange to have that tape further redacted and you're going to modify the transcript.

MR. HARDING: Yes, Your Honor.

THE COURT: All right. Mr. Kurland?

MR. KURLAND: I'm just waiting in line.

THE COURT: I don't think Mr. Harding had anything else. Or do you, Mr. Harding?

MR. HARDING: I have nothing else, Your Honor.

THE COURT: Is Detective Niedermeier likely to be all day tomorrow?

MR. HARDING: No, Your Honor.

THE COURT: Oh.

MR. HARDING: We have other witnesses.

THE COURT: All right. Good. Yes, Mr. Kurland.

MR. KURLAND: Judge, several things. I'll be very brief. The first is that, with respect to the last exhibit that was shown, that pamphlet from the funeral --

THE COURT: Yes.

MR. KURLAND: -- I don't believe that that has, no other witness, Niedermeier wasn't there. I'm going to object to it being admitted into evidence because there's no foundation for it. There's no testimony that it was actually handed out. He wasn't at the funeral. And Natasha Wyche testified and I don't believe it was any part of her examination. So there's no foundation for that.

THE COURT: Well, if you want me to require the government to bring back a witness, I will. But frankly, the document would appear to be self-authenticating.

MR. KURLAND: Maybe I missed something, Your Honor. I don't believe it's, it's kind of weird to have these piles of documents that we've all got in boxes and we don't know their serial numbers. A document comes up and it's hard to make an immediate objection.

Maybe the government could clarify as to, if it 's going to put on -- I don't believe, I'm not asking for Natasha

Wyche to come back to testify.

THE COURT: Okay. I'm sure the government can find somebody to come in who attended the funeral to authenticate that.

MR. HARDING: Judge, it was recovered from Mr. Martin's apartment. That's the nexus to this case.

MR. KURLAND: All right. That's fine, Judge. All right. There's several issues that I guess we're going to deal with, with respect to the proposed jury instruction and the proposed stipulation that the Court had talked about a little bit earlier. I don't, I think there's a possibility that the government, and at least Mr. Gardner, I guess the other defendants, too, might be able to work out a stipulation with respect to Mr. Gardner's incarceration status. But the manner in which the Court kind of just generally outlined it.

I think as starting point, I haven't talked, I haven't had a chance to talk about this with co-counsel in detail yet, but I don't have a problem with trying to work out a stipulation. My hunch is the government might dispute or disagree with certain aspects of that. But I'm more than willing to try to work out something this evening and perhaps then present it to the government sometime early tomorrow morning.

THE COURT: All right. That would be fine. I take no pride of authorship of any sort.

As I understand Mr. Gardner's position, what you and

Mr. Coburn are interested in, not to suggest that's all you're interested in, but you want clear, unmistakable, solid evidence that Mr. Gardner has been in continuous custody since the day he was arrested in 2002.

MR. KURLAND: And --

THE COURT: And perhaps you want the addition that it's, for the last several years, it's been in the Division of Correction. I leave that to you.

MR. KURLAND: Well, separately from the -- I understand the government's concern that it's true that when Mr. Gardner is transferred over here for these proceedings, he is, you know, whether his physical status or his legal status changes with respect to what sovereign has him. But it's important to us that it come out that he is incarcerated in a facility that is separate from the other codefendants.

THE COURT: Well --

MR. KURLAND: Physically separate.

THE COURT: Well, if you can prove that, obviously, you're invited and, of course, welcome to prove that. I don't see the significance. But it's not my call in terms of whether that's significant. I mean, you know, I'm not going to get into some dual sovereignty instruction just to try to --

MR. KURLAND: Not for that.

THE COURT: Okay. So talk to the government.

MR. KURLAND: We'll try to work that out. But the

other thing, Your Honor, is that if need be -- okay. We'll try to resolve that. The second thing is, with respect to the, one of the concerns in some of the correspondence that went on over the weekend, and the government's response, I guess they filed something late last night or early this morning, with respect to the dual sovereignty instruction, it would be our position, I don't think the Court needs to give a mid-trial dual sovereignty instruction.

THE COURT: Great. Because that's what I was thinking. So we don't need to talk about it any more.

MR. KURLAND: Well, no. But I think, though, that given the Court's limiting instruction that it's already given, once earlier in the trial and then a couple of days ago when the Court, I think at the close of the day on Wednesday, indicated that there are some aspects of it, that the federal charges incorporate state law, I do believe that something along the lines of the proposed dual sovereignty instruction that we, that we previously submitted, which is an accurate statement of the law, would be something that, that the Court would give. And given particularly with respect to this case.

And I know that it's a theoretical issue in every case and the instruction isn't always given in every case but it isn't simply because the defendant has objected to this, or the defendants.

The Court's ruling has permitted, it was over

government objection, but has permitted some inquiry with respect to some of the state crimes, the dispositions. In addition, the government's plea agreements and proffer agreements are the most excruciatingly detailed with respect to federal prosecution, state prosecution.

And we had earlier submitted something, I won't recite all the cites in it, but it's in the file, that in a situation like this, and again particularly with respect to the reference to the prior proceedings, I mean, I think all counsel up to this point have been incredibly restrained with respect to that. But several times we've commented on how smart this jury is.

This jury knows that there was a prior state court proceeding of the murder trial with respect to Tonya Spence as a victim. And with respect to that, I think even if we don't go down that other thing, maybe we'll talk about another time, but that a general dual sovereignty instruction is manifestly appropriate here because of the concern that the jury, if they don't get it, is going to assume, and the case law supports this, they're going to assume that the prior conviction, the prior, rather, the prior proceeding resulted in acquittal.

And the case law is abundant that in those situations it redounds to the detriment of the defendant because they say, We got to convict this guy in this proceeding no matter what. So --

THE COURT: Well, I certainly expect to give something.

MR. KURLAND: All right, Your Honor. One last thing, with respect to the redaction of the tape that was discussed prior to Detective Niedermeier's testimony, I think there's a possibility that the redaction could be a substantial detriment to Mr. Gardner's fair trial rights. And that's because, on the basis of Mr. Montgomery's testimony, all of the statements that Mr. Montgomery made concerning what Mr. Gardner allegedly told him about that never put Mr. Gardner directly at the scene. It was all sort of second-hand and third-hand, that Mr. Gardner allegedly knew this based on conversations from someone.

And we're concerned that the redaction, and again, this is something, I'll think about this overnight, but we're concerned that the redaction might work to the detriment of Mr. Gardner because it might make it seem like his knowledge of that is more first-hand than it was, than what it really was, in fact, which is second or third-hand from somebody. So we're concerned about that, sort of the like the flip side.

THE COURT: All right. I'll see if you have anything to say about it tomorrow.

MR. KURLAND: Thank you very much.

THE COURT: Thank you, Mr. Kurland. Okay. Counsel, thank you. I'll see you tomorrow morning at 9:30. We're in recess.

(Conclusion of Proceedings at 4:20 p.m.)

INDEX

| | PAGE |
|---|---|
| WITNESS: WILLIAM MONTGOMERY | |
| CROSS EXAMINATION BY MR. COBURN | 3 |
| CROSS EXAMINATION BY MR. CROWE | 34 |
| REDIRECT EXAMINATION BY MR. HARDING | 81 |
| RECROSS EXAMINATION BY MR. COBURN | 116 |
| RECROSS EXAMINATION BY MR. CROWE | 126 |
| RECROSS EXAMINATION BY MR. LAWLOR | 129 |
| | |
| WITNESS: DETECTIVE GARY NIEDERMEIER | |
| DIRECT EXAMINATION BY MR. HARDING | 159 |

REPORTER'S CERTIFICATE

I, Mary M. Zajac, do hereby certify that I recorded stenographically the proceedings in the matter of USA v. Willie Mitchell, et al., Case Number(s) AMD-04-029, on October 14, 2008.

I further certify that the foregoing pages constitute the official transcript of proceedings as transcribed by me to the within matter in a complete and accurate manner.

In Witness Whereof, I have hereunto affixed my signature this _________ day of __________________, 2009.

___________________________
Mary M. Zajac,
Official Court Reporter

## $

**$10,000** [1] - 68:20
**$100,000** [1] - 21:6
**$15,000** [2] - 68:18, 69:4
**$214.03** [1] - 173:21
**$5,000** [1] - 20:9
**$5700** [1] - 183:24
**$6.03** [1] - 173:20

## '

**'02** [4] - 6:14, 6:18, 7:12, 28:20
**'94** [3] - 54:7, 54:9, 54:16
**'95** [3] - 54:7, 54:9, 54:16
**'97** [1] - 120:8

## 1

**10** [8] - 24:19, 46:23, 60:6, 69:4, 108:25, 133:17, 158:2
**101** [1] - 1:25
**11** [1] - 24:19
**1110** [2] - 25:2, 91:24
**116** [1] - 199:8
**12** [1] - 158:2
**126** [1] - 199:9
**129** [1] - 199:10
**13** [4] - 36:1, 42:21, 57:8, 152:20
**13th** [5] - 7:2, 7:12, 87:1, 118:10, 159:12
**14** [4] - 1:11, 42:21, 57:8, 200:5
**142nd** [1] - 4:17
**14th** [2] - 38:25, 84:23
**15** [4] - 66:11, 66:17, 132:11, 133:17
**159** [1] - 199:13
**16th** [1] - 189:21
**17** [1] - 28:11
**17th** [2] - 124:21, 125:8
**1991** [1] - 14:10
**1994** [1] - 54:10
**1997** [5] - 48:2, 48:8, 54:10, 92:13, 120:2
**1998** [1] - 140:23
**1999** [3] - 12:5, 12:8, 13:15
**1:15** [2] - 133:3, 134:24
**1st** [3] - 185:23, 187:4, 187:8

## 2

**2** [8] - 36:21, 38:3, 38:15, 40:19, 41:23, 43:3, 57:6, 75:14
**20** [1] - 66:11
**2000** [12] - 13:24, 14:9, 14:21, 15:20, 15:21, 16:11, 48:5, 87:19, 87:23, 88:2, 105:25, 118:5
**2001** [10] - 16:3, 16:21, 16:24, 17:6, 17:9, 17:11, 48:5, 48:8, 48:12, 106:1
**2002** [33] - 7:2, 17:18, 24:19, 25:2, 36:21, 38:25, 40:19, 42:18, 75:10, 77:3, 81:21, 87:1, 87:7, 91:24, 93:4, 109:11, 118:5, 118:6, 118:10, 119:16, 122:8, 122:18, 124:21, 125:8, 130:2, 159:15, 162:17, 185:8, 185:23, 187:8, 189:22, 195:4
**2003** [11] - 8:4, 28:19, 36:1, 65:21, 88:4, 121:17, 122:2, 122:19, 125:10, 126:1, 130:9
**2004** [8] - 8:20, 8:25, 21:22, 31:3, 47:4, 84:23, 88:5, 98:6
**2008** [2] - 1:11, 200:5
**2009** [1] - 200:10
**20th** [2] - 17:9, 98:6
**21201** [1] - 1:25
**21st** [1] - 17:11
**22** [1] - 65:21
**23rd** [1] - 122:18
**24** [1] - 42:14
**25** [1] - 46:23
**2691** [1] - 180:24
**26th** [6] - 16:24, 24:18, 25:2, 75:10, 91:24, 119:16
**27** [2] - 22:5, 22:14
**2700** [1] - 76:4
**27th** [2] - 15:21, 16:11
**28th** [1] - 185:8
**29th** [3] - 13:24, 14:9, 31:3
**2:00** [1] - 152:3
**2:35** [5] - 133:3, 133:4, 133:9, 133:12, 134:23
**2nd** [3] - 6:14, 81:21, 109:11

## 3

**3** [4] - 38:16, 43:3, 152:20, 199:5
**3/4/02** [1] - 190:10
**309-5057** [1] - 174:23
**34** [1] - 199:6
**357** [14] - 23:21, 24:3, 24:13, 91:5, 92:5, 92:21, 93:8, 93:13, 93:16, 109:2, 119:6, 120:11, 120:12, 120:13
**38** [1] - 66:6
**3:55** [1] - 134:10
**3rd** [1] - 6:18

## 4

**4** [1] - 22:14
**40** [31] - 24:7, 24:13, 24:23, 35:10, 76:8, 76:12, 91:12, 92:1, 92:2, 92:3, 92:4, 92:9, 92:12, 92:13, 93:14, 93:18, 94:15, 109:2, 119:16, 119:20, 119:23, 120:1, 120:4, 120:9, 120:10, 120:15, 128:3, 132:4, 132:7, 170:22
**410-905-6490** [1] - 180:17
**4400** [4] - 160:5, 160:12, 160:17, 165:3
**443-691-8844** [1] - 181:19
**443-691-9203** [3] - 180:3, 181:13, 189:13
**485** [2] - 137:2
**4:00** [3] - 133:6, 134:10
**4:20** [1] - 198:24
**4:30** [1] - 133:13
**4th** [1] - 16:3

## 5

**5** [1] - 133:16
**5,770** [1] - 183:20
**5-DBL-0** [1] - 129:4
**5057** [1] - 182:4
**5515** [1] - 1:24

## 6

**6** [1] - 25:2
**6490** [1] - 181:7
**6:52** [1] - 159:25
**6th** [2] - 14:20, 15:20

## 7

**7** [4] - 22:5, 38:3, 41:24, 67:24
**7:00** [1] - 168:13
**7:30** [1] - 160:1
**7th** [1] - 28:19

## 8

**8** [1] - 31:3
**81** [1] - 199:7
**8th** [1] - 17:18

## 9

**9** [7] - 37:9, 37:12, 37:15, 82:18, 110:14, 110:15
**9203** [2] - 180:4, 189:6
**95** [1] - 31:3
**97** [1] - 108:24
**9:30** [3] - 192:6, 192:11, 198:22
**9:47** [1] - 2:1

## A

**a.m** [4] - 2:1, 24:19, 159:25, 160:1
**Aaron** [13] - 18:1, 19:18, 23:7, 23:15, 23:17, 49:8, 49:11, 49:14, 49:17, 51:7, 88:21, 89:10, 101:25
**able** [11] - 70:25, 113:22, 139:6, 147:19, 147:23, 148:8, 149:7, 153:14, 177:24, 179:15, 194:13
**absolutely** [1] - 47:8
**Absolutely** [2] - 33:19, 146:24
**abundant** [1] - 197:21
**accept** [5] - 52:8, 52:13, 52:17, 61:9, 74:5
**accepted** [1] - 145:13
**According** [2] - 17:21, 31:17
**according** [11] - 4:23, 4:25, 9:21, 10:23, 19:13, 21:15, 23:25, 30:14, 32:23, 79:24, 126:1
**account** [1] - 144:2
**accurate** [4] - 98:13, 105:4, 196:18, 200:8
**Acknowledgements** [1]

- 191:17
**acquittal** [1] - 197:20
**acting** [1] - 136:2
**active** [2] - 59:1
**activity** [1] - 51:4
**actual** [4] - 106:23, 152:10, 178:8, 178:9
**Adam** [1] - 1:22
**add** [1] - 147:16
**added** [1] - 94:3
**addition** [4] - 43:13, 122:22, 195:6, 197:2
**additional** [2] - 131:9, 170:24
**address** [1] - 176:23
**admissibility** [1] - 3:1
**admissible** [7] - 2:19, 2:21, 67:8, 97:2, 145:4, 146:4, 146:14
**admission** [29] - 2:20, 2:21, 2:22, 142:14, 143:18, 143:19, 144:23, 145:1, 145:4, 145:5, 145:7, 145:21, 146:1, 146:2, 146:4, 146:8, 146:23, 147:1, 147:2, 147:5, 147:7, 147:8, 147:11, 147:14
**admissions** [3] - 135:4, 135:5, 145:4
**admit** [3] - 140:24, 140:25, 147:8
**admits** [4] - 135:10, 137:10, 140:22, 140:23
**admitted** [6] - 20:19, 30:7, 38:21, 97:9, 141:12, 193:11
**admitting** [1] - 127:1
**advantage** [2] - 148:5, 149:8
**advised** [8] - 91:21, 91:25, 92:1, 92:3, 99:17, 99:18, 99:23, 120:9
**aerial** [2] - 160:15, 163:10
**affair** [4] - 20:16, 20:19, 20:23, 21:3
**affirm** [1] - 7:7
**affixed** [1] - 200:9
**Afternoon** [1] - 37:3
**afternoon** [10] - 37:4, 38:1, 81:9, 81:10, 116:23, 129:12, 133:1, 133:15, 159:6, 159:7
**agent** [1] - 141:4
**Agent** [4] - 104:16, 107:9, 122:10
**agents** [14] - 75:15, 81:14, 85:25, 86:6, 88:5, 88:13, 88:16, 88:17,

89:14, 89:15, 96:8, 100:23, 104:11, 155:4
**Agents** [1] - 52:25
**ago** [12] - 44:10, 44:11, 51:11, 73:23, 85:6, 87:17, 87:20, 119:5, 158:3, 183:13, 184:4, 196:13
**agree** [5] - 2:18, 134:18, 149:9, 149:15, 153:10
**agreed** [4] - 35:9, 45:14, 105:9, 149:16
**agreed-on** [1] - 45:14
**agreeing** [1] - 156:21
**agreement** [26] - 34:8, 35:2, 36:1, 64:25, 67:15, 94:6, 94:11, 94:24, 95:3, 95:4, 95:10, 95:11, 95:17, 95:19, 95:20, 96:12, 96:14, 96:25, 97:5, 98:18, 98:19, 124:5, 124:13, 124:15, 124:21
**agreements** [2] - 197:3
**ahead** [16] - 7:10, 13:11, 40:16, 63:6, 89:8, 128:17, 129:15, 129:16, 129:18, 131:10, 135:9, 135:18, 141:23, 189:9, 191:3
**ain't** [13] - 36:19, 64:3, 64:6, 64:14, 85:4, 120:23, 121:2, 125:12, 125:13, 138:5, 138:6
**al** [1] - 200:5
**alias** [1] - 14:1
**aliases** [1] - 14:4
**alibi** [3] - 73:3, 144:2, 144:9
**alive** [1] - 152:17
**alleged** [1] - 145:15
**allegedly** [2] - 198:7, 198:10
**almost** [1] - 149:25
**Almost** [2] - 23:4, 23:6
**alone** [3] - 150:9, 150:19, 160:2
**Altogether** [2] - 170:21, 170:22
**altogether** [2] - 3:1, 135:23
**Alvin** [1] - 185:2
**ambulance** [1] - 164:7
**AMD-04-029** [2] - 1:6, 200:5
**Amendment** [1] - 137:19
**AMERICA** [1] - 1:5
**amount** [3] - 85:23, 99:19, 183:2
**Andre** [1] - 1:13
**animal** [1] - 147:14
**Answer** [7] - 22:22, 31:8, 31:11, 46:25, 127:16, 127:18, 127:21
**answer** [36] - 12:21, 15:17, 15:23, 22:19, 43:5, 43:15, 44:1, 47:16, 48:15, 51:24, 52:13, 57:19, 63:19, 70:13, 82:16, 83:2, 88:24, 89:18, 92:25, 97:23, 98:21, 102:18, 104:8, 111:22, 112:5, 112:9, 113:13, 118:3, 118:15, 128:24, 134:16, 148:10, 157:3, 186:16, 188:22, 191:14
**answered** [6] - 28:21, 28:24, 29:5, 109:3, 119:8, 138:2
**answers** [5] - 28:13, 31:5, 31:13, 43:6, 63:23
**Anthony** [17] - 75:20, 159:16, 164:22, 165:23, 167:19, 169:8, 169:12, 170:2, 172:6, 172:17, 173:18, 173:20, 175:14, 176:1, 176:6, 176:13, 191:7
**Anthony's** [1] - 181:10
**anticipate** [1] - 133:1
**anxious** [2] - 28:25, 29:3
**Anyway** [1] - 150:25
**anyway** [3] - 115:15, 116:6, 126:20
**apartment** [8] - 21:15, 31:6, 78:6, 82:19, 83:12, 91:1, 106:25, 194:6
**apologize** [1] - 158:24
**apologized** [1] - 157:6
**apparent** [1] - 168:14
**appear** [1] - 193:18
**Appearances** [1] - 1:15
**appeared** [1] - 165:2
**applied** [1] - 100:10
**appreciate** [2] - 2:11, 7:21
**approach** [8] - 2:15, 3:12, 5:15, 22:11, 84:16, 166:5, 166:7, 181:4
**approached** [3] - 20:2, 29:13, 163:21
**appropriate** [6] - 60:16, 60:25, 61:24, 62:8, 96:25, 197:17
**April** [5] - 115:20, 185:23, 187:4, 187:8, 189:21
**area** [8] - 173:9, 175:24, 182:25, 183:1, 184:5, 184:12, 184:18, 186:2
**arguably** [4] - 148:25, 149:22, 150:2, 151:22
**argue** [5] - 139:6, 152:6, 152:7, 153:9, 153:14
**argued** [2] - 142:3, 153:2
**arguing** [1] - 148:17
**argument** [5] - 115:12, 142:6, 149:3, 149:5, 151:10
**arguments** [1] - 157:7
**armed** [1] - 68:6
**arrange** [1] - 192:16
**arrest** [9] - 2:10, 16:11, 41:11, 42:15, 44:19, 87:2, 110:3, 188:16, 189:22
**arrested** [36] - 12:8, 13:8, 13:14, 14:8, 15:21, 16:15, 25:7, 25:9, 36:20, 36:23, 36:24, 36:25, 38:1, 38:11, 40:18, 40:22, 40:25, 41:1, 41:3, 41:7, 41:23, 58:17, 81:20, 82:2, 82:3, 82:7, 110:6, 115:19, 187:7, 187:10, 188:4, 188:5, 189:25, 195:4
**arrests** [2] - 13:5, 15:14
**Arrington** [1] - 157:25
**arrived** [6] - 159:23, 159:24, 159:25, 164:7, 164:8, 167:7
**aside** [1] - 142:2
**aspect** [1] - 2:13
**aspects** [2] - 194:20, 196:15
**assault** [1] - 187:25
**asserted** [1] - 145:14
**assertion** [2] - 27:5, 27:7
**Assistant** [3] - 51:25, 75:14, 99:11
**assists** [1] - 61:7
**associate** [2] - 64:7, 64:8
**associated** [4] - 101:17, 169:18, 187:18, 188:7
**association** [2] - 56:6, 63:24
**assume** [4] - 58:21, 113:21, 197:18, 197:19
**assuming** [2] - 140:8, 140:9
**assure** [1] - 66:21
**ATF** [1] - 75:14
**ATM** [1] - 114:9
**attached** [4] - 165:15, 167:9, 174:22, 182:1
**attempt** [9] - 32:20, 87:4, 87:22, 88:9, 88:10, 99:25, 187:25, 188:7
**attempted** [4] - 13:17, 33:8, 65:15, 132:19
**attempting** [1] - 124:5
**attempts** [1] - 184:18
**attend** [1] - 185:24
**attended** [3] - 122:9, 191:9, 194:3
**attention** [13] - 60:23, 75:5, 86:25, 100:3, 100:6, 100:14, 108:24, 111:24, 125:15, 162:23, 185:23, 189:21, 191:21
**attorney** [6] - 75:14, 98:5, 98:6, 99:15, 100:16, 100:20
**Attorney** [4] - 51:25, 99:11, 99:16, 158:5
**Attorney's** [14] - 6:23, 7:2, 7:12, 8:1, 9:11, 24:17, 26:14, 27:3, 34:24, 35:19, 83:20, 122:9, 122:21, 125:5
**attorney/client** [3] - 100:5, 100:10, 100:18
**attorneys** [1] - 81:12
**attributes** [1] - 53:11
**audiotape** [2] - 178:16, 178:20
**August** [8] - 7:2, 7:12, 44:12, 87:1, 118:6, 118:10, 122:8, 122:18
**AUSA** [1] - 122:9
**authenticate** [1] - 194:3
**authenticating** [1] - 193:18
**authorities** [3] - 95:14, 95:15, 99:24
**authorship** [1] - 194:24
**automobile** [1] - 19:10
**autopsies** [1] - 170:25
**autopsy** [3] - 182:5, 182:8, 182:11
**available** [2] - 71:23, 113:15
**Avenue** [10] - 36:24, 36:25, 41:9, 114:11, 114:12, 114:16, 152:2, 160:5, 160:13, 160:17
**avoid** [2] - 15:11, 157:12
**Avoid** [1] - 192:9
**aware** [10] - 5:21, 20:23, 28:19, 66:19, 66:21, 77:4, 95:3, 134:11, 187:7, 188:16

## B

**backwards** [1] - 67:14
**Bacon** [6] - 4:7, 47:21, 88:21, 89:10, 112:24, 113:20
**bad** [3] - 50:24, 79:15
**bag** [3] - 178:11, 183:5, 183:10
**bail** [1] - 83:5
**Baker** [1] - 59:10
**balcony** [3] - 30:4, 30:15, 32:25
**Ball** [3] - 50:20, 50:23, 51:3
**BALL** [2] - 51:2, 51:3
**ballistics** [3] - 128:7, 128:9, 152:12
**Baltimore** [22] - 1:12, 1:25, 6:14, 6:20, 9:11, 26:14, 34:24, 38:9, 39:4, 43:22, 67:25, 68:1, 75:16, 75:17, 75:18, 93:13, 99:16, 111:18, 112:23, 159:9, 176:21, 176:24
**barbeques** [1] - 56:6
**Barksdale** [1] - 75:20
**Barry** [1] - 1:22
**based** [3] - 61:3, 146:5, 198:10
**Based** [2] - 135:13, 176:4
**basis** [1] - 198:6
**bat** [1] - 137:14
**bay** [1] - 182:23
**beat** [1] - 18:16
**beating** [1] - 20:3
**becoming** [1] - 108:19
**beef** [3] - 102:23, 103:4, 103:7
**began** [4] - 40:7, 48:16, 163:22, 176:11
**begin** [3] - 62:18, 88:5, 151:9
**beginning** [2] - 83:15, 117:17
**begins** [1] - 127:9
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behalf** [1] - 103:1
**behind** [8] - 68:25, 169:4, 169:12, 169:19, 170:1, 171:22, 172:6
**beleaguered** [1] - 157:25
**believes** [1] - 134:4
**belong** [1] - 53:10
**belonged** [2] - 55:5,

56:24
**belt** [1] - 165:14
**belted** [1] - 165:16
**belts** [2] - 165:15, 167:9
**Bench** [1] - 166:18
**bench** [1] - 167:2
**Benson** [5] - 75:17, 88:16, 104:17, 107:9, 123:19
**Benz** [2] - 129:1, 129:6
**Berger** [1] - 75:20
**best** [2] - 93:21, 158:25
**betcha** [1] - 146:20
**better** [4] - 3:10, 62:19, 162:6, 165:20
**between** [11] - 41:21, 41:23, 77:5, 104:4, 127:7, 127:8, 136:1, 140:16, 181:23, 189:18
**beyond** [1] - 130:23
**big** [5] - 5:18, 109:12, 111:1, 111:17, 160:22
**bit** [8] - 5:14, 18:20, 36:7, 128:15, 133:15, 133:16, 145:15, 194:10
**bitch** [7] - 26:10, 27:9, 27:21, 29:10, 106:22, 107:21
**black** [1] - 169:25
**blank** [1] - 148:16
**blanks** [1] - 151:6
**blazer** [1] - 165:18
**block** [5] - 160:5, 160:12, 160:17, 160:19, 165:3
**blood** [9] - 174:24, 175:6, 175:10, 175:12, 175:21, 176:4, 176:9, 176:11, 176:14
**Blood** [1] - 114:21
**Bloods** [3] - 58:24, 114:13, 114:20
**blow** [1] - 176:9
**blue** [1] - 165:18
**Bo** [26] - 4:11, 4:12, 10:24, 11:3, 47:25, 72:15, 72:16, 73:2, 87:24, 105:23, 106:3, 106:7, 106:13, 106:15, 129:21, 130:12, 131:1, 131:7, 131:14, 131:17, 131:21, 137:10, 140:22, 141:20, 147:25, 151:7
**Bo's** [9] - 10:20, 44:20, 44:23, 148:16, 148:17, 154:4, 156:19, 157:5, 157:9
**bodies** [5] - 76:20, 167:6, 168:12, 172:19, 173:18
**body** [4] - 93:3, 128:4, 145:15, 174:16
**boilerplate** [1] - 141:17
**books** [1] - 157:16
**boom** [1] - 33:18
**bottom** [2] - 154:18, 191:18
**bought** [4] - 9:20, 10:16, 127:18, 127:20
**box** [2] - 33:18, 184:8
**boxes** [1] - 193:21
**boy** [1] - 17:23
**Boys** [2] - 59:17, 59:18
**braids** [2] - 25:18, 25:22
**Bramble** [1] - 78:7
**brass** [1] - 111:19
**breach** [1] - 97:3
**break** [10] - 2:17, 3:6, 66:13, 132:25, 133:6, 133:14, 133:15, 134:9, 170:8, 191:1
**brief** [3] - 73:6, 126:6, 193:6
**Brief** [1] - 116:20
**briefly** [1] - 129:12
**bring** [2] - 60:22, 193:17
**Brittany** [2] - 83:4
**Brittany's** [1] - 82:19
**broken** [1] - 170:6
**brother** [2] - 12:10, 185:1
**brother's** [2] - 40:24, 41:3
**brothers** [12] - 135:12, 139:12, 140:23, 140:25, 141:1, 152:10, 152:16, 152:22, 175:12, 185:24, 187:19, 189:23
**brothers'** [1] - 186:24
**brought** [1] - 82:9
**Bruton** [3] - 2:25, 142:2, 147:21
**build** [2] - 33:24, 102:13
**building** [8] - 30:12, 31:6, 42:19, 90:25, 91:1, 162:18, 162:19, 162:20
**bullet** [5] - 20:10, 69:2, 77:20, 171:23, 172:17
**bullets** [9] - 32:25, 170:16, 170:18, 170:24, 171:4, 171:10, 171:14, 172:12, 182:10
**bunch** [8] - 56:6, 58:20, 59:4, 75:7, 75:16, 114:25, 165:8, 191:20
**Bunk** [10] - 86:10, 86:14, 86:15, 87:4, 87:17, 87:22, 88:1, 117:22, 117:25, 118:5
**Burke** [1] - 13:21
**Burton** [1] - 158:2
**business** [1] - 190:15
**buy** [17] - 4:5, 4:16, 5:6, 5:9, 5:11, 9:2, 9:22, 10:1, 10:8, 10:13, 11:21, 104:20, 112:21, 127:21, 128:22
**buying** [2] - 45:18, 45:20
**BY** [30] - 3:23, 7:24, 13:13, 34:5, 40:17, 63:7, 67:23, 81:8, 83:7, 84:21, 99:9, 111:10, 116:16, 116:22, 125:3, 126:9, 129:11, 129:19, 131:12, 159:5, 167:4, 189:10, 191:15, 199:5, 199:6, 199:7, 199:8, 199:9, 199:10, 199:13
**bystander** [1] - 79:5

## C

**Calhoun** [1] - 59:10
**caliber** [18] - 76:12, 92:1, 92:2, 92:4, 92:5, 92:9, 92:13, 93:14, 93:18, 109:2, 119:16, 119:23, 120:1, 120:4, 120:9, 120:10, 128:3, 170:22
**calibers** [4] - 76:8, 91:12, 119:20, 119:23
**cancel** [2] - 155:14, 157:2
**candid** [5] - 96:17, 121:6, 121:16, 121:22, 126:2
**candor** [2] - 125:17, 125:24
**cannot** [2] - 11:20, 92:8
**cap** [1] - 132:5
**caper** [1] - 79:22
**car** [45] - 31:25, 32:3, 32:4, 32:15, 32:21, 50:8, 71:9, 71:12, 71:16, 91:6, 92:23, 105:1, 106:24, 112:24, 113:1, 113:4, 113:10, 113:20, 152:16, 152:23, 161:16, 161:18, 163:7, 164:9, 165:4, 167:21, 168:23, 170:9, 170:15, 170:16, 171:15, 172:20, 176:5, 176:12, 176:16, 176:19, 179:21, 180:4, 180:20, 181:11, 181:20, 182:17, 184:5, 184:19, 187:8
**care** [5] - 7:5, 62:22, 62:23, 64:24, 152:3
**carefully** [1] - 112:2
**Carew** [7] - 57:12, 57:14, 57:16, 57:18, 57:21, 57:23, 57:25
**carried** [4] - 93:23, 110:14, 120:12, 120:13
**carry** [9] - 91:8, 93:14, 93:15, 93:18, 93:22, 108:3, 110:15, 110:16, 119:6
**carrying** [5] - 23:21, 24:13, 32:11, 91:5
**case** [43] - 5:23, 22:4, 22:18, 37:23, 60:17, 60:19, 61:3, 62:16, 63:3, 66:16, 87:23, 88:6, 101:3, 123:4, 125:6, 133:8, 137:13, 138:22, 138:24, 138:25, 140:20, 146:11, 146:16, 148:17, 150:8, 151:16, 158:1, 158:2, 158:4, 159:22, 162:17, 176:7, 184:23, 188:5, 189:16, 192:10, 194:6, 196:20, 196:21, 196:22, 197:18, 197:21
**Case** [1] - 200:5
**CASE** [1] - 1:6
**cases** [1] - 150:8
**casing** [3] - 78:6, 173:1, 173:15
**casings** [9] - 170:16, 170:18, 170:22, 171:4, 171:10, 171:14, 173:8, 173:13
**caved** [2] - 40:3, 109:20
**CBS** [2] - 59:7, 59:9
**CD** [2] - 178:12, 178:16
**CDS** [1] - 15:25
**cell** [9] - 173:21, 178:6, 178:9, 179:16, 179:18, 186:19, 189:12, 189:14, 189:17
**cellular** [1] - 184:8
**center** [5] - 181:23, 183:12, 183:15, 183:16, 183:17
**certain** [10] - 4:3, 4:4, 4:6, 61:2, 61:4, 61:6, 66:23, 145:12, 149:25, 194:19
**Certainly** [2] - 30:8, 33:13
**certainly** [3] - 74:16, 154:20, 197:25
**CERTIFICATE** [1] - 200:1
**certify** [2] - 200:3, 200:6
**chairs** [3] - 66:15, 133:7, 192:7
**challenged** [1] - 141:15
**Chambers** [1] - 150:7
**chance** [4] - 71:21, 145:9, 171:8, 194:17
**change** [2] - 92:1, 128:3
**changes** [1] - 195:12
**character** [1] - 146:3
**charge** [9] - 12:15, 12:21, 15:24, 15:25, 36:21, 40:23, 40:25, 41:2, 188:7
**charged** [6] - 25:9, 33:7, 37:21, 65:5, 121:11, 152:5
**charger** [1] - 183:14
**charges** [1] - 196:15
**Charles** [3] - 13:25, 14:2, 14:6
**check** [1] - 46:21
**Cheeks** [21] - 37:13, 38:22, 39:9, 39:21, 39:25, 55:21, 66:1, 66:3, 68:3, 68:5, 72:8, 77:13, 78:10, 81:24, 82:12, 83:16, 94:9, 94:12, 95:22, 109:16, 132:15
**Cheeks's** [1] - 66:6
**Chief** [1] - 37:23
**child** [6] - 77:12, 77:14, 78:2, 78:3, 169:1, 184:4
**child's** [1] - 184:7
**choice** [7] - 24:20, 24:23, 91:13, 92:14, 92:16, 120:5, 120:7
**choir** [1] - 149:24
**choose** [2] - 61:11, 190:25
**chose** [1] - 145:17
**church** [2] - 186:3, 186:5
**Circuit** [1] - 158:3
**circumstances** [2] - 124:15, 125:21
**cites** [1] - 197:7
**City** [15] - 4:5, 4:16, 5:6, 5:9, 6:14, 9:11, 26:14, 34:24, 39:4, 47:21, 48:20, 68:1, 75:17, 111:19, 159:9
**city** [4] - 71:5, 75:20, 78:10, 107:14
**claim** [1] - 31:7
**clarification** [1] - 189:8
**Clarify** [1] - 189:9
**clarify** [1] - 193:24
**classic** [1] - 144:24
**Claudus** [24] - 135:11, 135:15, 135:16, 135:20,

135:24, 136:8, 137:6, 138:16, 138:18, 138:20, 139:2, 139:8, 139:11, 139:20, 140:2, 140:3, 140:6, 140:10, 140:12, 142:21, 142:25, 191:23
**Cle** [1] - 57:21
**CLE** [1] - 57:21
**clean** [2] - 134:12, 134:14
**clear** [6] - 23:23, 23:24, 129:20, 133:14, 154:15, 195:2
**cleared** [1] - 108:23
**clearly** [6] - 76:24, 143:19, 144:22, 146:5, 156:8, 167:9
**Cleo** [1] - 57:22
**CLERK** [1] - 158:19
**clever** [1] - 145:7
**client** [12] - 96:18, 96:21, 96:22, 117:2, 117:11, 125:20, 145:17, 145:20, 147:22, 149:6, 150:19, 151:20
**client's** [1] - 125:16
**clip** [1] - 34:3
**clipped** [2] - 174:17, 174:19
**Cloris** [5] - 138:9, 138:10, 138:13, 142:22, 142:25
**close** [13] - 78:11, 108:11, 121:16, 121:22, 133:5, 138:4, 142:24, 165:17, 167:12, 169:23, 173:12, 176:8, 196:14
**close-up** [3] - 165:17, 167:12, 173:12
**closed** [2] - 168:9, 170:13
**closely** [1] - 153:25
**Closer** [2] - 161:22, 162:14
**closer** [2] - 102:5, 172:11
**closest** [2] - 162:12, 162:13
**clothes** [1] - 83:5
**clothing** [3] - 25:12, 53:7, 54:22
**clubs** [1] - 78:10
**co** [1] - 194:17
**co-counsel** [1] - 194:17
**Coburn** [41] - 1:22, 2:5, 3:13, 3:21, 7:5, 7:20, 13:2, 13:5, 13:11, 33:17, 34:7, 35:12, 42:10, 51:23, 59:22, 63:18, 67:21, 74:13, 81:11, 83:19, 84:5, 85:18, 86:8, 89:23, 91:10, 93:7, 94:7, 94:18, 98:3, 99:6, 99:12, 100:3, 100:6, 101:13, 103:22, 104:19, 105:7, 108:6, 108:13, 117:7, 195:1
**COBURN** [35] - 2:11, 3:14, 3:23, 7:21, 7:24, 13:3, 13:7, 13:13, 33:15, 33:19, 33:22, 84:9, 84:20, 85:16, 86:2, 86:17, 87:13, 91:18, 91:23, 93:9, 93:11, 97:16, 98:20, 98:24, 99:3, 99:7, 104:7, 105:19, 115:6, 115:12, 116:14, 116:22, 125:3, 199:5, 199:8
**Coburn's** [1] - 26:25
**cocaine** [13] - 10:8, 10:13, 10:14, 46:25, 112:8, 127:7, 127:10, 127:13, 127:15, 127:20, 127:21, 127:23, 183:2
**code** [2] - 83:11, 178:3
**codefendants** [1] - 195:15
**Cogen** [1] - 99:16
**Coldspring** [5] - 160:25, 161:5, 163:11, 163:12, 163:19
**Coleman** [2] - 75:22, 122:11
**Colleen** [2] - 17:13, 17:17
**color** [8] - 56:14, 56:19, 56:21, 56:22, 56:24, 58:8, 58:13, 114:8
**colors** [4] - 53:8, 54:21, 55:6, 57:23
**combination** [2] - 81:14, 156:25
**comfortable** [2] - 102:12, 121:23
**coming** [6] - 42:17, 49:24, 67:14, 108:1, 108:5, 112:20
**comment** [1] - 58:15
**commented** [1] - 197:11
**commercial** [1] - 46:2
**commit** [1] - 95:6
**committed** [14] - 50:11, 50:18, 51:8, 56:7, 56:9, 56:10, 56:12, 56:13, 94:25, 110:4, 110:5, 113:7, 152:10
**common** [1] - 152:15
**community** [1] - 56:5
**comparison** [4] - 102:16, 185:1, 185:6, 185:21
**comparisons** [2] - 184:22, 185:7
**complainant** [1] - 13:20
**complaint** [1] - 143:5
**complete** [4] - 125:16, 125:23, 149:1, 200:8
**completed** [1] - 159:14
**completely** [3] - 95:9, 95:11, 96:17
**completeness** [1] - 143:23
**complies** [1] - 30:20
**component** [1] - 63:10
**conceding** [1] - 140:5
**concept** [1] - 5:14
**concern** [7] - 66:19, 67:2, 67:3, 67:4, 144:6, 195:10, 197:17
**concerned** [6] - 36:12, 66:20, 99:6, 198:11, 198:13, 198:16
**concerning** [1] - 198:7
**concerns** [3] - 2:6, 36:14, 196:3
**concert** [1] - 136:2
**concession** [1] - 146:8
**conclude** [1] - 96:21
**Conclusion** [1] - 198:24
**condition** [1] - 168:12
**conditions** [3] - 15:5, 125:17, 125:24
**conduct** [1] - 192:8
**conducted** [2] - 42:19, 182:17
**confer** [1] - 100:16
**conference** [3] - 122:20, 166:18, 167:2
**confidential** [1] - 100:25
**configuration** [1] - 150:15
**confronted** [6] - 135:10, 135:14, 140:3, 140:13, 142:22, 143:1
**confronting** [1] - 135:16
**confuse** [1] - 72:16
**confusing** [1] - 143:22
**connection** [3] - 62:2, 77:4, 136:1
**consider** [5] - 61:18, 63:3, 63:4, 103:9, 113:9
**considerably** [1] - 23:11
**considered** [4] - 51:11, 52:2, 61:6, 66:23
**console** [7] - 181:23, 183:12, 183:15, 183:16, 183:17, 183:22, 184:2
**constitute** [1] - 200:6
**construction** [2] - 162:16
**CONT'D** [1] - 3:22
**contact** [3] - 17:13, 80:4, 80:7
**contacted** [1] - 177:20
**containing** [2] - 165:3, 183:5
**contains** [3] - 123:12, 178:12, 183:10
**contend** [1] - 60:23
**contents** [1] - 154:9
**context** [2] - 92:20, 151:11
**contextual** [1] - 158:1
**Continue** [2] - 66:16, 192:8
**continue** [1] - 158:13
**continued** [3] - 16:20, 16:23, 17:8
**continuing** [1] - 92:8
**continuous** [1] - 195:3
**continuously** [1] - 2:9
**contract** [11] - 68:13, 68:16, 68:18, 136:4, 138:12, 139:8, 139:13, 139:14, 139:15, 139:25, 140:2
**contracted** [1] - 168:16
**control** [3] - 84:10, 86:18, 105:1
**Control** [1] - 182:16
**controlled** [1] - 15:25
**controversial** [1] - 133:24
**controversy** [1] - 166:15
**convenient** [1] - 191:1
**conversation** [9] - 9:10, 9:11, 18:8, 18:17, 19:9, 73:6, 108:12, 117:2, 117:11
**conversations** [6] - 8:23, 24:17, 100:10, 100:19, 123:3, 198:10
**converted** [1] - 186:5
**convict** [1] - 197:23
**convicted** [6] - 12:1, 13:14, 13:20, 14:8, 14:25, 94:12
**conviction** [1] - 197:19
**convictions** [2] - 13:6, 13:10
**convince** [1] - 145:8
**cook** [3] - 127:15, 127:17
**cool** [3] - 63:25, 64:1, 101:17
**cooperate** [2] - 64:25, 99:24
**cooperated** [3] - 34:25, 35:4, 35:8
**cooperation** [1] - 35:5
**copies** [2] - 101:4, 178:12
**cops** [1] - 109:12
**copy** [3] - 178:13, 178:23, 181:1
**corner** [4] - 67:25, 68:5, 68:22, 152:9
**corpses** [1] - 174:7
**Correct** [25] - 9:16, 9:19, 20:1, 20:2, 105:20, 118:15, 118:20, 161:12, 163:2, 165:10, 165:24, 167:17, 170:10, 171:6, 171:25, 172:8, 173:11, 180:6, 181:15, 182:2, 182:12, 183:25, 185:18, 190:18, 192:3
**correct** [143] - 4:10, 4:20, 5:6, 6:4, 9:14, 9:15, 9:17, 9:18, 9:20, 9:23, 9:25, 10:3, 10:17, 10:18, 10:20, 10:21, 10:23, 10:24, 11:1, 11:4, 11:6, 11:15, 16:13, 16:15, 16:19, 17:4, 17:12, 19:2, 19:4, 19:6, 19:12, 19:13, 19:23, 20:14, 20:22, 20:24, 21:1, 25:17, 25:20, 29:12, 29:23, 32:6, 37:7, 37:21, 38:11, 38:19, 39:21, 40:5, 41:21, 42:12, 43:16, 44:5, 44:19, 49:17, 50:11, 50:15, 50:18, 55:14, 58:22, 69:20, 70:7, 74:21, 77:25, 81:25, 82:1, 83:13, 83:16, 83:21, 84:3, 84:14, 85:4, 85:7, 85:10, 88:17, 90:4, 92:16, 94:4, 94:16, 94:21, 97:12, 97:15, 98:1, 98:11, 100:1, 101:8, 102:1, 102:9, 103:13, 103:17, 104:2, 104:14, 105:2, 105:9, 105:18, 105:23, 106:1, 107:7, 107:11, 109:13, 110:24, 112:24, 113:2, 113:4, 113:21, 119:14, 119:17, 127:4, 127:23, 128:12, 129:6, 138:19, 149:2, 156:11, 160:20, 161:11, 162:9, 164:18,

165:5, 165:9, 165:23, 167:16, 169:6, 169:7, 170:3, 170:9, 171:5, 171:24, 172:4, 172:7, 172:20, 173:3, 173:10, 173:13, 177:11, 181:14, 182:1, 182:11, 183:14, 184:1, 186:25, 187:2, 189:5, 190:16
**Correction** [1] - 195:8
**correctly** [6] - 4:2, 10:11, 72:12, 77:10, 120:9, 135:18
**correspondence** [4] - 99:4, 133:18, 133:19, 196:3
**costs** [1] - 73:25
**counsel** [13] - 62:3, 66:21, 84:18, 98:7, 101:3, 144:16, 158:1, 162:2, 162:5, 165:25, 166:18, 194:17, 197:9
**Counsel** [2] - 133:12, 198:21
**counting** [2] - 21:4, 21:6
**county** [1] - 71:8
**County** [8] - 43:22, 67:25, 75:18, 93:13, 99:17, 176:21, 176:24
**couple** [22] - 22:6, 22:22, 23:3, 30:22, 31:10, 38:14, 41:22, 42:24, 44:10, 44:11, 73:22, 74:10, 87:1, 108:7, 108:12, 108:16, 109:6, 127:3, 185:7, 196:13
**course** [23] - 2:16, 2:19, 8:22, 11:24, 15:2, 21:1, 94:11, 101:1, 101:7, 105:16, 114:1, 117:16, 123:4, 137:18, 141:12, 142:2, 145:14, 149:24, 150:7, 153:18, 182:11, 195:19
**court** [9] - 37:21, 37:24, 61:8, 61:22, 94:8, 94:12, 141:10, 157:22, 197:12
**COURT** [258] - 1:1, 2:2, 2:4, 2:16, 3:9, 3:12, 3:16, 6:7, 7:5, 7:10, 7:17, 7:20, 7:23, 8:9, 12:20, 13:2, 13:11, 13:23, 14:13, 15:17, 15:23, 16:18, 22:12, 27:5, 30:8, 33:13, 33:17, 33:21, 33:24, 34:1, 36:11, 40:14, 40:16, 41:18, 44:16, 51:2, 52:11, 54:13, 55:12, 57:2, 57:9, 60:8, 60:10, 60:12, 60:15, 62:2, 66:10, 66:13, 66:19, 67:4, 67:11, 67:14, 67:19, 67:21, 78:19, 81:6, 82:6, 82:16, 82:25, 83:2, 84:10, 84:17, 85:17, 86:3, 86:18, 88:24, 89:8, 89:18, 91:20, 92:18, 92:24, 93:10, 97:17, 97:23, 98:21, 99:8, 101:23, 102:18, 104:8, 105:21, 106:12, 106:17, 106:20, 107:17, 111:9, 111:16, 111:22, 113:13, 115:7, 115:13, 116:9, 116:15, 116:20, 117:6, 117:9, 124:3, 125:1, 126:7, 126:23, 128:17, 128:24, 129:14, 129:18, 130:21, 130:23, 131:3, 131:5, 131:8, 132:6, 132:13, 132:18, 132:20, 132:22, 132:24, 133:12, 133:23, 134:1, 134:5, 134:7, 134:12, 134:16, 134:20, 134:22, 135:1, 135:7, 135:13, 135:16, 135:22, 136:3, 136:10, 136:13, 136:17, 136:19, 136:21, 136:23, 137:1, 137:8, 137:11, 137:18, 138:15, 138:18, 138:21, 138:25, 139:10, 139:20, 139:24, 140:5, 140:9, 140:14, 140:21, 140:24, 141:6, 141:8, 141:14, 141:18, 141:23, 142:7, 142:12, 143:4, 143:13, 143:15, 143:19, 144:3, 144:7, 144:11, 144:15, 144:21, 144:25, 145:2, 145:22, 146:2, 146:10, 146:12, 146:19, 146:24, 147:1, 147:6, 147:13, 147:24, 148:19, 148:22, 149:4, 149:9, 149:12, 149:18, 150:6, 150:13, 150:18, 150:22, 150:25, 151:5, 151:24, 152:14, 153:13, 153:16, 153:21, 153:25, 154:12, 154:19, 154:21, 154:25, 155:3, 155:6, 155:10, 155:17, 155:21, 156:2, 156:5, 156:13, 156:20, 157:4, 157:11, 157:15, 157:18, 158:10, 158:23, 159:3, 162:2, 166:3, 166:6, 166:10, 166:12, 166:17, 166:19, 166:25, 167:3, 167:13, 181:6, 186:16, 187:16, 187:23, 188:3, 188:22, 189:9, 190:19, 190:22, 190:25, 191:3, 191:13, 192:5, 192:15, 192:19, 192:21, 192:24, 193:2, 193:4, 193:8, 193:16, 194:2, 194:23, 195:6, 195:16, 195:18, 195:24, 196:9, 197:25, 198:18, 198:21
**Court** [18] - 66:22, 67:9, 96:25, 142:5, 142:10, 143:10, 143:11, 157:21, 158:2, 158:3, 190:1, 194:10, 194:15, 196:7, 196:14, 196:19, 200:15
**Court's** [4] - 33:11, 153:8, 196:12, 196:25
**Courthouse** [1] - 1:24
**courtroom** [11] - 3:15, 44:25, 61:4, 63:5, 67:20, 97:9, 133:10, 133:11, 134:25, 158:8, 192:14
**cousin** [2] - 83:6, 192:2
**cover** [2] - 67:1, 99:11
**covered** [5] - 67:11, 100:5, 100:17
**crack** [7] - 112:12, 127:7, 127:16, 127:19, 127:21, 127:22
**credit** [2] - 61:12, 63:5
**Cree** [1] - 190:1
**Crew** [7] - 53:16, 53:18, 53:19, 53:22, 54:25, 55:1
**crew** [1] - 114:8
**Crew's** [1] - 56:21
**crewcut** [1] - 165:6
**crime** [8] - 16:2, 110:25, 111:11, 128:18, 166:15, 174:24, 176:16, 188:2
**Crime** [2] - 163:22, 182:23
**crimes** [16] - 51:8, 56:7, 56:9, 56:10, 56:12, 56:13, 83:24, 85:24, 94:25, 95:6, 95:19, 95:25, 109:16, 110:3, 111:13, 197:2
**CRIMINAL** [1] - 1:6
**criminal** [7] - 12:1, 40:23, 51:4, 53:10, 55:4, 95:14, 96:7
**Crips** [1] - 59:1
**critical** [1] - 2:13
**cross** [4] - 61:5, 115:23, 117:17, 130:24
**CROSS** [4] - 3:22, 34:4, 199:5, 199:6
**crosses** [1] - 163:17
**crossing** [1] - 163:18
**CROWE** [38] - 33:25, 34:5, 40:17, 62:1, 63:7, 66:11, 67:23, 88:23, 92:17, 101:22, 102:17, 107:16, 113:12, 126:6, 126:9, 137:4, 142:3, 142:9, 142:13, 143:10, 143:14, 143:17, 143:24, 144:4, 144:18, 144:22, 145:19, 146:1, 146:7, 146:11, 146:16, 146:21, 146:25, 147:4, 147:11, 191:12, 199:6, 199:9
**Crowe** [27] - 1:20, 2:16, 34:6, 40:16, 57:10, 61:25, 63:6, 66:10, 67:22, 81:12, 83:19, 98:17, 101:14, 109:9, 109:19, 111:18, 111:24, 112:18, 113:6, 114:23, 121:6, 121:14, 128:17, 137:1, 141:23, 145:3, 148:23
**Crowe's** [2] - 3:7, 115:23
**Cruddy** [8] - 53:16, 53:18, 53:19, 53:22, 54:25, 55:1, 56:21
**custodial** [2] - 147:3, 149:25
**custody** [2] - 182:13, 195:3

**D**

**dam** [1] - 151:1
**dangerous** [2] - 15:25, 148:20
**Darius** [32] - 17:22, 18:4, 18:8, 18:25, 19:23, 20:2, 21:2, 21:4, 22:23, 29:14, 29:18, 29:24, 32:7, 33:5, 33:8, 65:8, 65:15, 73:24, 77:24, 79:1, 80:18, 88:10, 89:22, 89:23, 91:1, 106:25, 114:25, 121:11, 122:3, 132:19
**dark** [1] - 183:8
**Darryl** [32] - 4:7, 47:21, 88:21, 89:10, 112:24, 113:20, 159:16, 164:23, 167:15, 169:4, 169:8, 169:11, 169:14, 169:18, 171:20, 173:18, 173:21, 174:11, 174:15, 180:8, 180:24, 186:18, 186:22, 187:2, 189:13, 189:17, 189:19, 190:12, 191:6, 192:2
**Darryl's** [9] - 170:1, 174:19, 174:22, 177:4, 177:6, 177:8, 177:10, 182:1, 189:4
**date** [11] - 2:10, 7:18, 8:10, 8:13, 8:17, 12:6, 16:3, 28:18, 28:20, 91:23, 190:8
**dated** [2] - 124:21, 125:8
**dates** [2] - 54:14, 81:19
**Davis** [1] - 1:13
**Davon** [4] - 63:16, 65:24, 69:6, 89:11
**days** [7] - 16:16, 21:18, 32:15, 122:18, 158:24, 185:8, 196:13
**dead** [5] - 20:15, 66:7, 163:6, 164:11, 168:20
**deal** [6] - 39:5, 86:4, 106:13, 109:21, 110:17, 194:8
**dealer** [5] - 49:20, 84:24, 84:25, 151:25
**dealings** [1] - 45:6
**Dean** [4] - 43:18, 75:21, 93:12, 102:8
**deceased** [1] - 168:14
**December** [3] - 17:6, 17:9, 17:11
**decide** [5] - 35:4, 35:8, 35:20, 61:11, 146:14
**decided** [2] - 97:5, 98:8
**deciding** [3] - 61:8, 61:21, 63:4
**decision** [3] - 34:25, 97:25, 146:15
**defendant** [13] - 95:5, 95:13, 95:17, 96:7, 96:9, 96:11, 98:7, 124:14, 138:21, 145:5, 146:21, 196:23, 197:22
**Defendant** [6] - 1:17, 1:18, 1:20, 1:21, 150:1, 150:2
**defendant's** [2] - 145:12, 146:19
**defendants** [10] - 5:23, 11:10, 89:9, 107:10, 123:11, 150:10, 152:5, 184:23, 194:13, 196:24
**Defendants** [2] - 1:9, 150:3
**defense** [6] - 2:5, 61:1, 81:11, 101:3, 123:4, 165:25
**definitely** [1] - 9:8

**Definitely** [1] - 154:24
**deliberations** [1] - 62:18
**delineated** [1] - 13:9
**demonstrably** [1] - 145:13
**demonstrated** [1] - 31:11
**denied** [4] - 98:10, 106:20, 124:10, 135:8
**deny** [1] - 111:4
**denying** [1] - 126:25
**department** [2] - 75:21, 159:11
**Department** [1] - 159:10
**depicts** [1] - 165:1
**deprived** [2] - 149:21, 153:14
**describe** [4] - 63:23, 88:19, 89:11, 108:7
**described** [5] - 77:5, 87:3, 95:25, 109:17, 112:19
**describing** [1] - 89:5
**description** [1] - 106:22
**designated** [1] - 96:8
**designation** [1] - 129:3
**despite** [1] - 5:3
**DET** [1] - 158:17
**detail** [5] - 23:24, 61:16, 122:7, 122:16, 194:17
**detailed** [1] - 197:4
**DETECTIVE** [1] - 199:12
**Detective** [29] - 57:11, 75:18, 75:21, 122:22, 133:20, 134:10, 134:17, 148:10, 151:6, 158:16, 158:21, 158:23, 159:6, 160:8, 162:9, 165:1, 167:7, 169:16, 169:21, 171:8, 175:23, 182:5, 190:9, 190:17, 191:5, 192:13, 192:24, 198:3
**detective** [5] - 135:8, 158:4, 158:6, 159:9, 159:22
**detectives** [11] - 38:2, 42:7, 72:13, 72:18, 75:17, 107:15, 110:7, 144:5, 145:18, 165:8, 184:13
**Detectives** [1] - 123:18
**determine** [1] - 164:2
**determined** [2] - 95:6, 96:25
**detriment** [3] - 197:22, 198:4, 198:13
**died** [4] - 33:1, 77:11, 186:23, 186:25
**difference** [1] - 127:7
**different** [10] - 11:12, 37:15, 59:4, 83:24, 85:24, 131:23, 135:22, 147:14, 153:23, 165:12
**difficult** [2] - 168:16, 168:18
**difficulties** [1] - 11:24
**digits** [1] - 182:3
**DIRECT** [2] - 159:4, 199:13
**direct** [12] - 11:25, 88:1, 112:14, 116:25, 117:10, 117:13, 125:15, 131:1, 134:18, 134:22, 162:6, 163:22
**directing** [1] - 136:7
**direction** [2] - 163:1, 165:12
**directly** [4] - 135:14, 158:19, 177:25, 198:8
**dirty** [10] - 41:12, 41:14, 41:19, 76:12, 92:10, 92:12, 93:2, 113:11, 119:23, 119:24
**Dirty** [9] - 63:16, 64:14, 65:3, 65:24, 89:11, 101:15, 102:3, 102:5, 102:16
**disagree** [1] - 194:19
**disclosed** [1] - 84:6
**disclosures** [1] - 97:1
**discomfort** [1] - 102:14
**discovered** [1] - 173:16
**discrete** [1] - 27:5
**discuss** [1] - 2:14
**discussed** [9] - 2:7, 2:10, 19:3, 19:14, 35:2, 45:12, 70:6, 85:10, 198:2
**discussion** [11] - 41:22, 58:6, 58:12, 64:15, 66:15, 85:1, 133:8, 142:19, 149:13, 149:14, 192:8
**discussions** [4] - 51:21, 62:3, 100:4, 100:17
**display** [1] - 98:25
**dispose** [1] - 32:20
**dispositions** [1] - 197:2
**dispute** [1] - 194:19
**disputed** [1] - 108:11
**distance** [1] - 31:10
**distinction** [1] - 127:8
**distribute** [2] - 16:2
**DISTRICT** [2] - 1:1, 1:2
**District** [3] - 38:12, 42:5, 110:9
**distrust** [1] - 36:7
**disturbed** [1] - 174:6
**Division** [2] - 16:25, 195:7
**DIVISION** [1] - 1:2
**divulging** [1] - 110:3
**DNA** [1] - 175:2
**DOAR** [4] - 22:13, 62:5, 62:8, 62:15
**Docket** [1] - 137:2
**document** [5] - 93:10, 98:3, 98:4, 193:18, 193:22
**documents** [6] - 13:3, 67:7, 96:10, 97:1, 123:2, 193:21
**dogs** [1] - 190:14
**dollars** [1] - 183:20
**done** [5] - 80:1, 80:2, 108:4, 116:6, 163:23
**door** [1] - 175:24
**doors** [2] - 168:7, 170:11
**dope** [1] - 128:22
**dot** [1] - 161:19
**down** [15] - 38:2, 44:1, 82:9, 83:3, 102:15, 110:9, 137:6, 163:6, 163:11, 176:17, 182:17, 182:18, 191:18, 192:13, 197:15
**Downtown** [1] - 38:9
**drawing** [1] - 136:8
**drew** [1] - 127:8
**drive** [3] - 114:2, 129:1, 129:6
**driver** [6] - 113:24, 114:1, 164:22, 165:14, 181:23
**driver's** [5] - 165:23, 172:7, 175:7, 175:22, 175:24
**driving** [4] - 14:10, 32:3, 113:17, 113:18
**droplets** [1] - 176:15
**dropped** [1] - 176:11
**drops** [3] - 175:10, 175:12, 175:20
**drove** [4] - 28:19, 31:23, 90:16, 91:3
**drug** [8] - 16:2, 49:19, 84:23, 84:24, 84:25, 151:25, 184:11, 184:13
**drugs** [31] - 4:5, 4:16, 4:20, 4:23, 4:24, 5:4, 5:5, 5:6, 5:9, 5:11, 9:2, 9:15, 9:17, 9:20, 10:24, 41:20, 45:9, 45:13, 45:18, 45:20, 45:23, 45:24, 46:9, 46:14, 47:17, 49:11, 49:13, 49:17, 103:23, 104:5, 104:14
**dual** [5] - 195:22, 196:6, 196:7, 196:17, 197:16
**duct** [1] - 90:19
**during** [16] - 2:17, 3:6, 11:24, 13:25, 21:1, 66:25, 87:11, 87:14, 88:4, 88:8, 88:22, 116:25, 117:3, 117:16, 125:20, 141:10
**During** [3] - 8:22, 15:2, 32:19

## E

**E's** [1] - 122:4
**eager** [2] - 90:10, 114:24
**ear** [4] - 169:12, 169:19, 170:1, 171:22
**early** [6] - 38:16, 58:7, 84:2, 88:4, 194:22, 196:5
**earth** [1] - 97:19
**easier** [1] - 169:8
**East** [4] - 160:5, 160:12, 160:17, 163:2
**easy** [1] - 2:6
**edge** [2] - 165:19, 190:15
**Edmondson** [8] - 36:24, 36:25, 37:19, 41:9, 58:17, 114:11, 114:12, 114:16
**effect** [3] - 97:15, 114:24, 162:8
**Eight** [2] - 87:20, 137:7
**eight** [1] - 179:4
**eighth** [1] - 190:14
**either** [13] - 43:3, 43:24, 48:24, 80:19, 110:4, 129:3, 145:12, 146:1, 149:25, 176:9, 176:11, 187:25
**Either** [2] - 43:8, 176:7
**elaborate** [1] - 61:23
**element** [3] - 63:10, 143:25, 147:8
**elicit** [1] - 144:5
**elicited** [2] - 94:18, 104:19
**eligible** [1] - 132:11
**Elkie** [1] - 53:23
**emphasized** [1] - 67:1
**employed** [1] - 159:8
**encouraged** [1] - 109:15
**End** [1] - 167:2
**end** [9] - 60:16, 86:8, 86:9, 105:25, 115:22, 117:10, 136:25, 137:8, 163:6
**enforcement** [23] - 6:3, 6:9, 8:23, 11:1, 11:2, 39:4, 39:23, 40:3, 40:8, 40:24, 41:3, 41:8, 51:22, 52:1, 56:18, 65:22, 76:6, 96:8, 122:2, 123:3, 128:2, 128:7
**engine** [1] - 168:1
**enhanced** [2] - 178:13, 178:23
**enormous** [1] - 85:23
**entered** [1] - 124:15
**entering** [1] - 94:11
**enters** [3] - 3:15, 67:20, 158:8
**entirely** [2] - 60:25, 62:8
**entitled** [3] - 148:3, 148:4, 148:5
**entrance** [1] - 166:24
**enumerated** [1] - 95:21
**equipment** [1] - 162:16
**Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**essential** [1] - 47:9
**essentially** [8] - 2:18, 35:9, 40:2, 45:12, 46:5, 65:13, 78:6, 127:22
**establish** [1] - 97:3
**established** [2] - 131:8, 131:25
**et** [1] - 200:5
**etc** [1] - 135:8
**evaluate** [1] - 60:18
**evening** [2] - 41:25, 194:21
**event** [4] - 8:10, 34:22, 95:12, 107:7
**eventually** [2] - 108:23, 150:20
**Evidence** [1] - 182:16
**evidence** [39] - 30:7, 62:15, 63:2, 63:4, 66:24, 67:9, 96:6, 96:10, 97:3, 99:1, 99:2, 116:13, 116:17, 130:20, 133:8, 140:19, 141:13, 141:17, 146:4, 146:9, 146:17, 149:22, 151:11, 151:16, 153:10, 153:15, 153:17, 153:19, 153:20, 153:22, 154:6, 156:16, 184:11, 184:14, 188:5, 190:8, 193:11, 195:2
**evident** [4] - 149:20, 151:4, 151:23
**evidentiary** [1] - 154:6

**exactly** [1] - 109:20
**Exactly** [1] - 153:16
**EXAMINATION** [14] - 3:22, 34:4, 81:7, 116:21, 126:8, 129:10, 159:4, 199:5, 199:6, 199:7, 199:8, 199:9, 199:10, 199:13
**examination** [6] - 116:25, 117:10, 117:14, 117:17, 157:24, 193:14
**examine** [2] - 61:5, 61:6
**examiner** [1] - 168:17
**examiner's** [1] - 171:12
**examiners** [1] - 168:17
**example** [1] - 95:2
**examples** [1] - 127:14
**except** [2] - 83:20, 152:24
**Except** [2] - 43:12, 105:16
**exception** [1] - 62:14
**exceptions** [5] - 61:2, 61:4, 61:7, 66:25, 67:1
**excerpt** [1] - 117:12
**exchange** [2] - 20:6, 20:9
**excitement** [1] - 145:16
**excluded** [1] - 145:5
**exclusion** [1] - 147:2
**exclusively** [1] - 67:7
**excruciatingly** [1] - 197:4
**exculpate** [1] - 151:8
**exculpatories** [1] - 147:10
**exculpatory** [14] - 135:5, 142:5, 146:11, 146:15, 147:22, 149:6, 149:20, 149:22, 150:2, 151:4, 151:22, 152:18, 152:22, 153:1
**Excuse** [2] - 45:19, 188:3
**excuse** [5] - 67:21, 93:16, 133:16, 155:24, 168:17
**excused** [5] - 62:17, 132:24, 133:9, 192:6, 192:12
**execution** [1] - 95:18
**Exhibit** [10] - 30:6, 98:4, 99:11, 164:25, 174:9, 178:8, 178:11, 182:21, 190:8, 191:4
**exhibit** [10] - 98:13, 99:2, 124:24, 130:19, 131:11, 160:18, 174:13, 178:19, 190:7, 193:6
**exhibits** [4] - 62:16, 160:6, 178:5, 190:6
**Exhibits** [1] - 178:18
**exist** [1] - 144:17
**existed** [1] - 144:16
**existence** [4] - 54:2, 54:15, 54:17, 54:18
**exit** [1] - 166:24
**exited** [3] - 92:4, 120:10, 176:10
**exiting** [1] - 176:14
**exits** [3] - 133:10, 133:11, 192:14
**expect** [4] - 35:18, 94:19, 133:4, 197:25
**expected** [2] - 15:7, 15:10
**expecting** [1] - 126:7
**experience** [3] - 41:8, 150:4, 176:4
**explain** [6] - 60:15, 86:23, 109:24, 110:1, 114:7, 116:1
**explained** [5] - 76:7, 92:10, 93:14, 93:25, 101:15
**explaining** [1] - 92:20
**explains** [1] - 99:17
**explanation** [1] - 61:20
**explore** [3] - 147:23, 148:3, 148:4
**exposed** [1] - 94:15
**express** [2] - 125:17, 125:24
**extended** [3] - 45:10, 48:19, 51:4
**extent** [4] - 19:8, 144:6, 153:11, 156:21
**eye** [2] - 80:4, 80:7

## F

**face** [3] - 2:25, 151:8, 167:24
**facility** [1] - 195:14
**fact** [76] - 5:3, 21:24, 22:3, 23:7, 25:9, 28:4, 30:21, 32:23, 33:1, 34:12, 35:25, 39:23, 41:10, 47:3, 49:6, 51:3, 55:23, 55:24, 56:13, 58:13, 58:15, 58:16, 63:8, 64:15, 65:6, 65:12, 65:25, 66:21, 68:13, 69:25, 70:24, 72:22, 73:11, 73:18, 74:8, 74:13, 78:9, 79:13, 82:2, 85:9, 85:23, 87:11, 88:1, 94:19, 98:14, 98:18, 102:20, 104:1, 104:4, 111:13, 113:15, 122:1, 122:7, 122:16, 123:2, 124:8, 128:4, 128:6, 130:9, 136:12, 145:1, 146:21, 147:9, 151:6, 153:6, 154:17, 155:1, 156:16, 156:24, 170:11, 177:17, 188:4, 188:10, 198:15
**facts** [1] - 13:5
**fail** [1] - 95:8
**failed** [1] - 17:7
**faint** [1] - 155:1
**Fair** [2] - 12:24, 72:25
**fair** [7] - 83:23, 107:5, 115:10, 155:24, 157:1, 198:5
**fairly** [2] - 73:5, 134:2
**fall** [4] - 30:4, 74:10, 127:3, 176:15
**fallback** [1] - 149:3
**fallen** [1] - 31:7
**false** [15] - 17:15, 17:17, 17:19, 95:7, 95:16, 135:5, 145:21, 145:23, 145:25, 146:11, 146:13, 146:14, 147:9
**familiar** [3] - 58:4, 58:21, 180:18
**familiarity** [1] - 139:2
**family** [22] - 51:12, 51:13, 51:18, 51:20, 52:2, 53:1, 53:4, 53:7, 88:19, 89:11, 103:9, 106:7, 106:18, 123:10, 129:21, 129:22, 138:4, 142:24, 177:5, 179:2, 180:23, 191:17
**far** [6] - 49:16, 71:15, 108:7, 142:9, 153:17, 163:4
**father** [1] - 177:4
**father-in-law** [1] - 177:4
**fault** [1] - 93:11
**FBI** [1] - 177:20
**February** [3] - 12:6, 12:8, 13:15
**federal** [31] - 6:3, 8:24, 22:3, 22:15, 36:8, 36:13, 37:20, 44:5, 44:17, 46:19, 47:4, 51:23, 52:4, 71:19, 73:21, 73:23, 81:14, 85:25, 86:6, 88:5, 88:13, 88:17, 89:15, 94:8, 95:13, 95:15, 96:14, 99:24, 103:17, 196:15, 197:4
**Federal** [2] - 103:12, 103:19
**feet** [8] - 30:22, 31:10, 108:7, 108:12, 108:16, 108:25, 172:22
**fell** [2] - 32:25, 108:8
**fellow** [6] - 50:20, 73:2, 80:19, 128:14, 128:21, 184:13
**felt** [1] - 79:11
**few** [9] - 15:14, 64:2, 108:25, 119:5, 120:23, 145:9, 157:18, 158:24, 177:14
**fifth** [1] - 122:20
**figure** [1] - 90:25
**figured** [1] - 110:20
**file** [1] - 197:7
**filed** [4] - 98:5, 99:19, 142:13, 196:4
**fill** [1] - 151:5
**final** [3] - 35:20, 116:11, 132:3
**finally** [3] - 40:18, 44:4, 86:9
**Finally** [1] - 124:4
**finder** [1] - 153:6
**fine** [5] - 7:6, 8:14, 190:23, 194:7, 194:23
**finger** [2] - 30:17, 160:24
**fingerprints** [2] - 184:14, 184:18
**finished** [1] - 48:12
**firearm** [1] - 16:2
**fired** [3] - 169:22, 169:23, 176:8
**first** [32] - 3:19, 18:3, 40:25, 57:5, 58:7, 76:11, 76:14, 77:4, 77:7, 81:20, 88:12, 103:22, 104:5, 106:24, 109:10, 124:24, 134:13, 138:3, 139:4, 143:17, 149:5, 149:16, 150:21, 153:11, 161:14, 166:7, 168:7, 169:2, 171:17, 191:10, 193:6, 198:15
**First** [7] - 110:13, 163:25, 164:25, 178:5, 180:10, 182:20, 190:7
**first-hand** [2] - 191:10, 198:15
**five** [11] - 12:17, 21:18, 25:16, 36:5, 43:13, 51:25, 85:6, 87:1, 122:19, 137:17, 171:4
**Five** [7] - 25:16, 148:13, 150:3, 154:18, 155:18, 156:9, 170:22
**Five-five** [1] - 25:16
**fix** [1] - 34:2
**Flannery** [1] - 1:19
**flashing** [1] - 78:12
**flip** [1] - 198:17
**floor** [3] - 30:15, 122:20, 172:16
**folks** [1] - 166:19
**following** [8] - 28:12, 28:13, 31:5, 63:22, 125:21, 188:16
**FOR** [1] - 1:2
**foregoing** [1] - 200:6
**forget** [2] - 150:15, 152:11
**Forgive** [1] - 132:7
**forgive** [1] - 189:7
**forms** [1] - 141:15
**forth** [1] - 125:18
**Forty** [1] - 99:20
**foundation** [2] - 193:11, 193:15
**Four** [2] - 150:3, 166:11
**four** [17] - 5:22, 6:22, 66:25, 112:20, 131:19, 133:13, 133:16, 137:16, 151:15, 152:1, 152:5, 152:15, 166:12, 171:4, 175:9, 182:3
**frankly** [1] - 193:17
**Fraser** [2] - 75:12, 100:16
**frequented** [1] - 78:11
**friend** [6] - 38:22, 63:16, 68:8, 77:16, 77:18, 79:1
**friends** [1] - 72:6
**front** [11] - 45:9, 46:13, 47:16, 49:11, 49:13, 49:17, 164:22, 172:16, 174:1, 181:23, 189:1
**Front** [1] - 46:15
**fronted** [1] - 103:23
**fronting** [3] - 4:19, 5:4, 45:13
**frost** [1] - 3:19
**fulfill** [1] - 95:9
**full** [5] - 10:21, 18:12, 35:12, 69:25, 70:2
**functioning** [1] - 105:4
**fund** [1] - 73:25
**funeral** [10] - 185:24, 186:1, 186:4, 187:8, 191:6, 191:8, 191:9, 193:7, 193:13, 194:3
**furthermore** [1] - 135:25
**future** [1] - 162:4

## G

**gang** [8] - 55:16, 58:8,

58:9, 58:11, 59:11, 59:15, 59:17, 114:8
**gangs** [3] - 53:5, 58:20, 59:4
**garbage** [1] - 183:5
**GARDNER** [1] - 1:8
**Gardner** [83] - 1:21, 2:9, 4:19, 4:22, 4:25, 5:4, 10:18, 23:9, 23:21, 24:12, 26:10, 27:8, 27:20, 28:24, 45:7, 45:9, 45:17, 45:20, 45:25, 47:19, 47:20, 48:25, 49:13, 50:4, 50:10, 50:14, 60:3, 63:9, 63:15, 63:24, 64:8, 66:22, 72:10, 72:12, 73:1, 73:2, 73:6, 73:24, 74:9, 74:17, 74:20, 76:11, 78:6, 84:2, 92:3, 92:9, 92:12, 98:3, 99:12, 106:8, 117:2, 117:3, 117:12, 119:19, 119:22, 121:7, 121:16, 126:11, 126:13, 128:4, 142:15, 150:18, 150:21, 151:19, 154:9, 154:10, 155:25, 156:21, 156:25, 157:1, 184:24, 185:11, 186:11, 186:13, 191:9, 194:12, 195:3, 195:10, 198:7, 198:8, 198:9, 198:14
**Gardner's** [15] - 24:20, 45:23, 76:12, 84:7, 92:13, 92:15, 120:4, 120:7, 122:4, 153:4, 185:2, 185:6, 194:14, 194:25, 198:5
**Garnell** [1] - 75:19
**Garrett** [1] - 57:22
**Gary** [2] - 158:16, 158:21
**GARY** [2] - 158:17, 199:12
**gather** [4] - 48:15, 127:7, 163:22, 174:24
**general** [1] - 197:16
**generally** [2] - 112:2, 194:15
**gentleman** [1] - 22:16
**gentlemen** [14] - 3:16, 18:7, 18:21, 19:9, 21:8, 23:24, 30:18, 41:18, 62:3, 66:14, 110:2, 116:1, 158:13, 188:3
**Gerard** [1] - 1:19
**getaway** [1] - 32:4
**Giganti** [2] - 75:17, 122:11
**girlfriend** [1] - 37:17
**given** [15] - 6:13, 6:17, 63:23, 81:13, 83:3, 95:7, 96:9, 127:14, 145:11, 152:4, 191:6, 196:12, 196:20, 196:22
**Gladden** [2] - 164:5, 168:3
**glass** [2] - 170:6, 170:8
**Glock** [10] - 24:7, 24:13, 24:23, 76:12, 92:12, 92:13, 93:14, 93:18, 120:4, 120:15
**gloves** [2] - 32:20, 90:19
**God** [1] - 41:11
**Goo** [79] - 4:7, 5:17, 9:15, 10:18, 11:16, 18:4, 19:4, 19:10, 19:15, 23:20, 45:7, 46:25, 47:2, 51:16, 65:3, 85:12, 87:24, 88:20, 90:3, 90:6, 90:15, 90:18, 90:21, 90:22, 91:2, 91:4, 91:5, 91:7, 91:8, 92:3, 92:4, 92:5, 93:16, 97:11, 97:14, 101:15, 101:16, 102:6, 102:12, 102:15, 102:20, 102:23, 103:9, 103:22, 103:23, 104:5, 105:8, 105:14, 106:22, 107:20, 112:8, 112:10, 112:24, 113:1, 113:6, 114:24, 115:1, 115:15, 115:24, 116:12, 117:2, 119:5, 119:16, 120:9, 120:10, 120:11, 120:18, 120:23, 121:23, 127:2, 127:10, 127:12, 127:21, 140:22, 185:15, 185:19, 186:15
**Goo's** [4] - 85:4, 91:12, 94:1, 122:17
**Goose** [28] - 18:22, 18:24, 19:3, 19:11, 19:14, 19:19, 19:22, 69:19, 69:20, 70:7, 70:9, 70:11, 70:12, 70:15, 70:18, 70:21, 70:24, 70:25, 71:2, 71:5, 71:8, 71:11, 71:20, 84:6, 84:24, 85:3, 88:9
**Goose's** [2] - 69:25, 85:2
**gorilla** [1] - 59:5
**Government** [8] - 1:15, 164:25, 174:9, 178:8, 178:11, 178:18, 182:21, 190:8
**government** [35] - 2:20, 3:4, 13:4, 13:8, 24:20, 37:21, 67:7, 96:16, 96:18, 96:21, 104:11, 117:18, 124:23, 125:18, 125:19, 134:4, 134:18, 140:19, 142:1, 143:6, 143:12, 143:21, 144:13, 147:6, 147:19, 158:13, 193:17, 193:24, 194:2, 194:12, 194:19, 194:22, 195:24, 197:1
**GOVERNMENT'S** [1] - 158:17
**government's** [16] - 26:7, 61:1, 135:6, 145:22, 146:5, 148:1, 148:5, 151:13, 151:15, 152:5, 152:6, 152:7, 152:19, 195:10, 196:4, 197:3
**Government's** [1] - 30:6
**Governments** [1] - 191:4
**grabbed** [1] - 37:16
**Grand** [1] - 14:10
**grand** [24] - 6:3, 8:17, 8:24, 22:3, 22:5, 22:15, 26:16, 44:5, 46:19, 47:4, 51:24, 52:4, 62:5, 65:14, 67:5, 71:19, 73:21, 73:23, 74:1, 84:22, 96:9, 111:24, 112:7, 127:9
**Gray** [2] - 158:9, 158:10
**great** [11] - 39:5, 39:11, 83:24, 85:24, 86:4, 107:13, 109:21, 110:17, 122:7, 122:16, 157:19
**Great** [3] - 134:20, 157:18, 196:9
**greater** [1] - 61:16
**Green** [4] - 75:14, 75:19, 122:9, 128:6
**green** [2] - 183:7
**Groth** [2] - 75:15, 122:10
**ground** [3] - 31:8, 108:8, 172:18
**group** [11] - 53:16, 54:1, 54:11, 54:14, 54:20, 54:24, 55:4, 56:13, 56:19, 105:5
**groups** [2] - 53:10, 53:13
**Groups** [1] - 53:14
**gruesome** [1] - 166:24
**guess** [9] - 2:18, 12:6, 15:13, 44:12, 81:12, 150:7, 194:8, 194:12, 196:4
**guilt** [3] - 146:9, 147:1, 188:6
**guilty** [10] - 16:10, 16:12, 34:9, 34:17, 95:22, 98:1, 99:18, 124:6, 124:10, 124:14
**Guilty** [1] - 98:5
**gun** [17] - 12:18, 32:13, 37:16, 41:20, 82:18, 83:13, 91:8, 92:10, 93:2, 93:22, 94:3, 104:23, 105:1, 110:16, 128:3, 152:15, 169:23
**gun's** [1] - 169:22
**guns** [9] - 23:25, 32:10, 90:13, 93:15, 93:22, 93:23, 93:25, 94:1, 128:8
**gunshot** [3] - 25:13, 169:11, 169:22
**guy** [19] - 39:11, 47:20, 47:25, 49:8, 49:24, 55:20, 69:19, 70:7, 70:21, 70:23, 72:5, 86:21, 88:1, 112:19, 135:11, 147:25, 165:6, 186:15, 197:23
**guys** [12] - 53:1, 65:25, 68:10, 79:25, 80:11, 105:1, 112:20, 113:10, 148:2, 152:1, 164:9, 167:5

## H

**habit** [1] - 157:23
**Hagin** [1] - 122:11
**hair** [2] - 25:17, 25:22
**half** [1] - 134:13
**halfway** [3] - 48:15, 139:12, 171:23
**Hammerjacks** [1] - 188:8
**hand** [9] - 47:11, 66:7, 114:24, 176:12, 191:10, 198:9, 198:15, 198:16
**handed** [1] - 193:12
**handgun** [3] - 13:15, 36:20, 82:3
**Handgun** [2] - 15:1, 15:2
**hands** [4] - 25:12, 92:1, 128:3, 176:13
**hanging** [4] - 36:4, 156:3, 156:23, 158:24
**Hanlon** [11] - 1:16, 2:8, 34:1, 35:20, 36:17, 83:20, 88:13, 89:14, 97:6, 107:9, 155:3
**happier** [1] - 149:17
**happy** [8] - 7:9, 36:18, 36:19, 124:25, 142:9, 145:10, 148:22, 149:4
**hard** [1] - 193:22
**HARDING** [127] - 2:3, 3:8, 6:5, 7:4, 7:16, 8:7, 12:19, 13:1, 13:4, 13:10, 13:22, 14:12, 15:16, 15:22, 16:17, 26:24, 27:2, 34:2, 36:10, 40:12, 40:15, 44:15, 52:10, 54:12, 57:7, 60:7, 81:8, 83:7, 84:18, 84:21, 99:1, 99:5, 99:9, 111:10, 116:16, 117:5, 124:1, 125:2, 126:22, 126:25, 128:16, 128:23, 129:13, 130:19, 130:22, 131:4, 132:5, 132:12, 132:16, 132:23, 133:22, 133:25, 134:2, 134:6, 134:11, 134:14, 135:3, 135:10, 135:14, 135:19, 135:24, 136:5, 136:11, 136:15, 136:18, 136:20, 136:22, 136:25, 137:3, 137:5, 137:10, 137:16, 138:14, 138:16, 138:20, 138:23, 139:9, 139:17, 139:23, 140:2, 140:8, 140:12, 140:18, 140:22, 141:3, 141:7, 141:10, 141:16, 141:19, 144:9, 144:13, 145:1, 152:13, 154:3, 154:14, 154:20, 154:22, 154:24, 155:1, 155:8, 155:14, 155:19, 156:1, 156:4, 156:9, 156:16, 157:2, 157:10, 157:12, 157:16, 158:15, 159:5, 166:11, 166:14, 167:4, 189:10, 190:21, 190:23, 191:2, 191:15, 192:18, 192:23, 193:1, 193:3, 194:5, 199:7, 199:13
**Harding** [42] - 1:16, 2:8, 2:24, 3:7, 5:12, 11:25, 22:16, 35:19, 36:17, 46:24, 52:25, 53:1, 99:8, 116:25, 117:19, 119:15, 120:16, 121:4, 121:20, 123:1, 123:9, 123:18, 127:6, 132:3, 132:22, 133:20, 135:1, 144:5, 144:8, 145:2, 149:10, 154:1, 155:6, 155:22, 160:18, 167:13, 189:9, 190:19, 192:5, 192:15, 192:21, 192:22
**Harding's** [2] - 98:25, 119:4

**hardly** [3] - 137:21, 144:23
**HARRIS** [1] - 1:7
**Harris** [13] - 1:18, 45:1, 130:14, 132:1, 136:7, 148:1, 150:18, 150:24, 155:24, 155:25, 156:20, 156:25, 157:1
**Harris's** [1] - 153:4
**Hastings** [4] - 137:12, 137:24, 155:14, 156:10
**hat** [1] - 23:18
**hate** [1] - 147:17
**head** [5] - 35:23, 36:5, 38:22, 69:2, 77:20
**Headquarters** [3] - 176:17, 176:20, 182:18
**headquarters** [1] - 38:9
**hear** [15] - 2:19, 2:24, 3:5, 62:11, 70:13, 111:20, 117:6, 129:14, 135:21, 139:4, 146:13, 147:15, 149:9, 153:4
**heard** [22] - 45:4, 59:7, 72:22, 77:8, 83:8, 83:18, 101:16, 111:17, 134:3, 137:25, 139:17, 139:18, 141:1, 151:21, 153:3, 154:7, 154:17, 156:6, 156:17, 191:10, 191:13
**hearing** [5] - 77:2, 141:9, 141:11, 144:15, 156:18
**hearsay** [4] - 144:22, 144:24, 145:7, 147:2
**heat** [1] - 168:10
**height** [1] - 23:13
**held** [3] - 25:4, 35:23, 92:11
**help** [11] - 12:13, 73:25, 103:6, 111:1, 113:15, 113:23, 113:24, 137:13, 137:21, 140:15
**helped** [2] - 65:25, 102:14
**hereby** [1] - 200:3
**hereunto** [1] - 200:9
**heroin** [7] - 11:7, 11:10, 11:12, 11:16, 11:19, 183:2, 183:8
**hesitate** [1] - 147:16
**high** [1] - 34:2
**himself** [2] - 22:23, 153:5
**hip** [4] - 173:22, 174:11, 174:17, 174:22
**hire** [1] - 29:17
**hired** [1] - 29:15
**history** [1] - 107:11
**hit** [3] - 68:13, 68:15, 135:20
**holder** [1] - 183:14
**holding** [4] - 36:13, 36:14, 65:21
**hole** [1] - 172:9
**holler** [1] - 64:9
**Holly** [17] - 18:1, 19:18, 23:8, 23:17, 24:13, 49:9, 49:11, 49:14, 49:17, 51:7, 69:13, 69:15, 78:6, 88:21, 89:10, 94:3, 101:25
**home** [1] - 107:24
**homicide** [8] - 6:14, 25:10, 25:22, 122:3, 122:17, 159:9, 159:13, 185:8
**Homicide** [9] - 6:20, 9:12, 26:14, 38:6, 42:6, 75:19, 83:3, 107:14
**Honda** [3] - 165:2, 184:19, 184:20
**honor** [7] - 60:4, 63:10, 64:4, 64:5, 120:19, 120:24, 125:13
**Honor** [99] - 2:3, 2:11, 2:14, 3:14, 3:24, 7:9, 7:22, 8:12, 12:7, 12:24, 13:4, 22:11, 26:24, 27:7, 30:6, 33:11, 33:15, 33:20, 51:3, 57:1, 60:9, 62:1, 66:11, 67:13, 67:24, 78:18, 82:5, 82:24, 84:16, 86:1, 91:19, 92:22, 98:24, 99:1, 99:4, 111:8, 116:8, 116:19, 116:23, 117:8, 124:22, 125:2, 125:4, 126:5, 126:6, 129:9, 129:12, 129:13, 129:17, 130:25, 131:4, 132:5, 132:23, 133:22, 134:15, 134:21, 135:3, 135:19, 136:5, 136:25, 137:4, 139:9, 140:18, 141:12, 142:3, 144:9, 144:14, 144:18, 145:19, 146:7, 147:16, 148:12, 148:17, 149:11, 151:2, 151:10, 153:24, 154:3, 155:5, 155:8, 158:15, 159:2, 165:25, 166:5, 166:9, 166:16, 181:5, 189:7, 190:21, 190:23, 192:4, 192:18, 192:23, 193:1, 193:19, 196:1, 198:1
**Honorable** [1] - 1:13
**hook** [2] - 64:2, 120:23
**hour** [1] - 134:13
**hours** [7] - 25:2, 38:16, 41:22, 42:14, 58:18, 91:24
**house** [15] - 37:6, 37:9, 37:15, 37:17, 48:15, 49:23, 49:25, 71:15, 82:22, 82:23, 82:25, 112:20, 112:23, 136:9, 179:1
**hum** [1] - 116:24
**hunch** [1] - 194:19
**hungry** [1] - 90:9
**hurt** [7] - 26:1, 27:18, 27:22, 28:2, 28:5, 28:6, 28:7
**husband** [2] - 33:2, 109:2

**I**

**ID** [2] - 141:20, 173:21
**idea** [11] - 9:6, 9:14, 11:20, 36:4, 79:14, 79:22, 85:3, 85:15, 87:17, 89:23, 179:2
**identical** [1] - 47:14
**identification** [5] - 25:4, 139:21, 142:4, 156:24, 164:13
**identifications** [2] - 156:23, 164:19
**identified** [13] - 131:20, 139:18, 140:6, 140:10, 154:4, 156:19, 164:19, 164:22, 164:23, 179:7, 185:16, 186:13, 192:2
**identifies** [1] - 137:6
**identify** [5] - 131:14, 151:19, 151:20, 175:20, 190:7
**identifying** [1] - 149:19
**identity** [1] - 185:11
**II** [1] - 117:13
**illegal** [1] - 41:20
**imbedded** [1] - 169:25
**immediate** [1] - 193:23
**immediately** [2] - 100:15, 128:6
**implement** [1] - 137:19
**implicated** [2] - 39:8, 137:25
**important** [8] - 26:7, 63:1, 135:4, 135:19, 154:6, 154:16, 155:23, 195:13
**IN** [1] - 1:1
**in-court** [1] - 61:8
**inaudible** [2] - 57:20, 64:11
**incarcerated** [4] - 2:9, 103:15, 103:20, 195:14
**incarceration** [1] - 194:14
**inches** [2] - 161:20, 161:21
**incident** [12] - 12:5, 12:7, 12:14, 12:17, 31:20, 32:16, 32:24, 152:6, 156:11, 156:15, 176:12, 188:7
**include** [2] - 99:6, 145:7
**included** [2] - 51:13, 123:18
**Including** [2] - 156:13
**including** [8] - 63:4, 88:21, 95:15, 96:19, 100:11, 178:13, 183:10, 184:23
**incoming** [1] - 179:18
**incomplete** [1] - 95:7
**inconsistencies** [3] - 61:19, 61:20
**inconsistency** [1] - 104:4
**inconsistent** [6] - 60:24, 61:17, 62:21, 67:6, 115:5, 115:8
**incorporate** [1] - 196:16
**incorrect** [1] - 19:11
**incredibly** [1] - 197:10
**incriminatory** [3] - 147:4, 147:6, 147:9
**inculpates** [1] - 151:8
**inculpatory** [1] - 150:5
**Indeed** [2] - 50:23, 80:14
**indeed** [4] - 48:19, 76:10, 76:17, 80:3
**INDEX** [1] - 199:1
**Indian** [1] - 3:18
**indicate** [3] - 4:19, 168:20, 169:21
**indicated** [8] - 4:6, 4:15, 19:8, 43:13, 102:8, 117:3, 188:4, 196:14
**indicating** [1] - 123:10
**individual** [4] - 44:25, 45:2, 45:4, 131:20
**individuals** [10] - 5:22, 9:1, 9:22, 10:2, 10:8, 14:10, 31:20, 32:2, 32:11, 179:4
**indulgence** [1] - 33:11
**industrial** [1] - 162:20
**infer** [1] - 176:4
**inference** [1] - 139:6
**influenced** [1] - 39:24
**information** [20] - 39:5, 39:24, 40:4, 85:23, 86:4, 95:7, 95:8, 96:16, 96:20, 96:23, 117:19, 125:20, 131:9, 140:13, 143:3, 144:10, 163:22, 179:15, 181:4, 181:9
**initial** [2] - 122:3, 185:7
**innocent** [1] - 79:5
**inquire** [1] - 124:21
**inquiry** [1] - 197:1
**inside** [6] - 170:15, 170:16, 171:15, 176:12, 186:1, 186:8
**instruct** [4] - 60:16, 61:2, 61:15, 66:22
**instructed** [2] - 16:24, 17:12
**instruction** [14] - 61:23, 66:20, 66:25, 67:10, 145:11, 194:9, 195:22, 196:6, 196:8, 196:12, 196:17, 196:22, 197:16
**instructions** [1] - 61:24
**intelligently** [1] - 145:6
**intend** [1] - 99:23
**intended** [1] - 109:1
**intent** [2] - 16:1, 96:22
**intention** [2] - 32:7, 122:3
**interest** [2] - 147:12, 147:14
**interested** [6] - 8:10, 73:24, 74:9, 115:1, 195:1, 195:2
**interesting** [2] - 150:14, 150:15
**interior** [1] - 172:2
**interpreted** [1] - 153:2
**interrupt** [1] - 135:9
**interruption** [2] - 2:9, 61:25
**interview** [5] - 62:5, 137:9, 141:5, 144:8, 144:10
**interviewed** [1] - 107:14
**interviews** [1] - 81:13
**introduce** [1] - 104:6
**investigation** [6] - 109:12, 137:14, 159:16, 187:19, 189:17, 192:8
**invite** [1] - 33:17
**invited** [1] - 195:19
**involved** [11] - 18:3, 18:4, 23:25, 31:20, 77:24, 90:3, 90:6, 90:11, 159:15, 159:18, 159:19
**involvement** [4] - 84:7, 122:4, 122:17, 189:16
**Irene** [10] - 177:7, 178:2, 178:6, 178:9, 179:15, 179:23, 180:10, 180:13, 189:12, 189:14

**irrelevant** [1] - 2:23
**issue** [7] - 134:3, 135:22, 136:2, 142:2, 153:23, 153:25, 196:21
**issues** [5] - 66:16, 133:17, 134:18, 192:9, 194:8
**item** [1] - 3:2
**items** [1] - 184:19
**itself** [4] - 62:13, 62:14, 63:2, 179:10

## J

**jail** [4] - 86:15, 87:4, 99:20, 118:1
**James** [5] - 1:21, 75:14, 75:18, 122:9, 122:11
**January** [10] - 8:4, 17:18, 28:17, 47:4, 65:21, 84:23, 121:17, 122:2, 122:19, 125:10
**jaw** [1] - 171:20
**Jefferson** [1] - 158:6
**jig** [1] - 110:20
**Joan** [1] - 75:11
**job** [3] - 118:22, 120:13, 155:7
**John** [5] - 75:11, 75:17, 122:11, 122:21, 125:6
**joint** [4] - 149:7, 149:23, 149:25, 153:20
**Jones** [10] - 20:16, 44:23, 65:16, 77:11, 92:3, 94:20, 95:25, 97:10, 108:8, 115:24
**Jones-Spence** [9] - 44:23, 65:16, 77:11, 92:3, 94:20, 95:25, 97:10, 108:8, 115:24
**Judge** [14] - 1:13, 14:21, 15:4, 15:10, 16:6, 16:20, 17:8, 37:23, 130:19, 134:17, 137:16, 193:5, 194:5, 194:7
**judge** [3] - 97:5, 98:10, 124:10
**July** [18] - 6:14, 6:18, 14:20, 15:20, 36:21, 38:3, 38:15, 38:16, 40:19, 41:23, 43:3, 57:6, 81:20, 98:6, 109:11, 124:21, 125:8
**jumped** [2] - 49:24, 50:14
**jumping** [1] - 141:23
**June** [4] - 28:19, 48:8, 67:24, 136:7
**juries** [1] - 145:24
**Jurors** [1] - 134:25
**jury** [71] - 3:4, 3:9, 5:8, 6:3, 8:17, 8:24, 18:7, 18:21, 19:9, 21:8, 22:4, 22:5, 22:15, 23:8, 23:24, 26:16, 30:18, 41:18, 44:5, 46:19, 47:4, 51:24, 52:4, 60:15, 60:16, 61:11, 62:5, 62:17, 65:14, 66:23, 66:24, 67:5, 71:19, 73:21, 73:23, 74:1, 84:22, 96:9, 110:2, 111:25, 112:7, 116:1, 124:4, 127:9, 131:9, 132:25, 133:2, 133:4, 133:16, 135:24, 139:1, 139:4, 142:16, 144:20, 145:10, 145:11, 145:13, 146:13, 146:14, 153:15, 154:17, 156:2, 156:18, 156:22, 157:25, 192:6, 192:12, 194:9, 197:11, 197:12, 197:17
**Jury** [7] - 1:14, 3:15, 67:14, 67:20, 133:11, 158:8, 192:14
**jury's** [2] - 84:10, 86:18
**Jury's** [1] - 133:9
**justice** [1] - 95:16

## K

**keep** [3] - 5:1, 66:16, 192:9
**Keith** [1] - 75:17
**Kelly** [1] - 157:13
**Kelsey** [1] - 1:17
**kept** [4] - 9:18, 33:1, 80:9, 158:23
**kidnapping** [2] - 90:14, 93:3
**kill** [19] - 20:4, 26:3, 29:15, 29:17, 33:1, 33:5, 37:13, 68:16, 86:15, 86:24, 88:9, 88:10, 109:2, 117:25, 118:11, 118:12, 122:3, 157:18
**killed** [13] - 21:10, 25:3, 26:1, 26:9, 30:2, 32:7, 79:11, 87:4, 87:18, 87:22, 88:2, 97:10, 136:12
**killing** [7] - 4:4, 20:6, 29:24, 44:23, 65:16, 69:16, 115:24
**kind** [12] - 35:22, 67:10, 74:24, 79:5, 121:15, 121:22, 155:23, 162:19, 188:14, 188:15, 193:20, 194:15
**Klas** [4] - 88:16, 104:16, 107:9, 123:18
**knowing** [4] - 41:6, 140:22, 140:23, 140:25
**knowingly** [4] - 95:2, 95:7, 96:16, 145:5
**knowledge** [5] - 93:21, 95:15, 111:11, 191:10, 198:14
**known** [10] - 17:22, 70:2, 77:12, 77:15, 78:2, 78:3, 97:19, 154:10, 191:25
**knows** [2] - 137:10, 197:12
**Koch** [1] - 128:19
**KURLAND** [19] - 67:3, 67:5, 67:13, 134:17, 134:21, 191:11, 192:20, 193:5, 193:9, 193:19, 194:7, 195:5, 195:9, 195:17, 195:23, 195:25, 196:11, 198:1, 198:20
**Kurland** [7] - 1:22, 2:15, 66:19, 134:16, 192:19, 193:4, 198:21

## L

**Lab** [2] - 163:22, 182:23
**Ladies** [2] - 3:16, 188:3
**ladies** [12] - 18:7, 18:21, 19:8, 21:8, 23:23, 30:18, 41:18, 62:3, 66:14, 110:2, 116:1, 158:12
**laid** [1] - 22:22
**Lane** [1] - 78:7
**language** [4] - 26:8, 96:13, 124:13, 126:3
**Lanvale** [1] - 68:23
**large** [2] - 183:2, 186:5
**largely** [3] - 67:3, 67:6, 67:7
**larger** [1] - 104:13
**Lassiter** [14] - 135:20, 136:4, 136:8, 136:12, 136:14, 138:20, 139:3, 139:8, 139:11, 139:20, 140:6, 140:10, 140:12
**Lassiter's** [1] - 136:9
**Last** [1] - 124:20
**last** [41] - 5:12, 6:2, 6:11, 7:15, 8:6, 8:13, 11:3, 14:14, 18:7, 26:6, 33:22, 34:8, 43:3, 43:7, 47:14, 51:11, 59:21, 73:1, 76:2, 84:5, 84:6, 85:18, 86:10, 89:23, 94:7, 97:9, 101:13, 105:22, 106:3, 117:1, 124:18, 142:18, 155:17, 155:18, 157:20, 182:3, 193:6, 195:7, 196:5, 198:1
**late** [3] - 54:10, 77:3, 196:5
**latent** [1] - 184:18
**latents** [1] - 184:16
**latex** [2] - 32:20, 90:19
**latter** [2] - 7:9, 88:4
**laughed** [1] - 110:9
**Laura** [1] - 1:17
**Lauretta** [1] - 76:4
**law** [34] - 6:2, 6:9, 8:23, 11:1, 11:2, 11:24, 15:12, 39:4, 39:23, 40:3, 40:7, 40:23, 40:24, 41:3, 41:8, 51:21, 52:1, 56:18, 65:21, 76:6, 96:8, 122:2, 123:3, 128:2, 128:7, 177:4, 177:6, 177:10, 196:16, 196:19, 197:18, 197:21
**LAWLOR** [24] - 67:17, 81:5, 82:5, 86:1, 92:22, 106:11, 106:16, 106:19, 111:8, 111:15, 129:11, 129:17, 129:19, 130:25, 131:6, 131:12, 132:21, 154:23, 158:9, 187:14, 187:22, 188:1, 189:7, 199:10
**Lawlor** [3] - 1:18, 129:15, 158:11
**lawyer** [10] - 60:21, 60:23, 60:25, 61:5, 62:4, 62:5, 90:9, 115:3, 122:21, 125:6
**lawyer's** [1] - 62:11
**lawyers** [10] - 43:8, 46:2, 60:21, 62:7, 62:22, 62:23, 75:12, 122:9, 123:4
**lead** [3] - 82:6, 86:3, 159:22
**Leading** [1] - 111:8
**leading** [8] - 82:5, 97:16, 98:20, 105:19, 111:15, 111:21, 175:10, 176:5
**leads** [1] - 96:12
**learn** [3] - 176:19, 179:10, 185:19
**learned** [3] - 109:12, 186:21, 187:4
**least** [12] - 4:6, 41:22, 49:16, 58:7, 130:4, 139:2, 148:9, 149:23, 152:25, 179:2, 179:4, 194:12
**leave** [8] - 66:15, 97:14, 133:7, 156:3, 156:23, 169:24, 192:7, 195:8
**leaving** [2] - 141:24, 142:2
**lectern** [2] - 3:12, 155:3
**led** [3] - 29:4, 110:1, 110:2
**left** [8] - 22:16, 62:2, 161:22, 169:5, 169:12, 169:19, 170:1, 171:22
**legal** [3] - 73:25, 133:17, 195:12
**Legg** [1] - 37:23
**length** [1] - 39:11
**less** [1] - 35:13
**letter** [19] - 2:17, 3:7, 17:6, 17:10, 98:7, 98:25, 99:10, 99:11, 99:15, 99:16, 125:4, 125:16, 125:18, 136:6, 143:5, 143:16, 143:20, 190:9, 190:13
**Lexington** [3] - 59:13, 59:17, 59:18
**license** [1] - 129:3
**lie** [1] - 29:17
**lied** [2] - 29:14, 65:1
**Lieutenant** [1] - 75:21
**life** [3] - 23:17, 110:25, 130:16
**lift** [1] - 184:18
**light** [1] - 161:2
**Light** [1] - 161:3
**likely** [1] - 192:24
**Lil** [1] - 190:12
**limb** [2] - 148:7, 148:22
**limbs** [1] - 147:17
**limited** [1] - 95:15
**limiting** [5] - 66:20, 66:25, 145:10, 145:11, 196:12
**Line** [5] - 22:5, 22:14, 22:21, 31:3, 46:23
**line** [5] - 28:11, 155:17, 155:18, 162:4, 192:20
**lines** [3] - 155:15, 155:16, 196:17
**list** [6] - 6:8, 81:12, 85:18, 86:8, 86:9, 111:18
**listen** [5] - 43:25, 112:2, 155:12, 155:20, 157:19
**listened** [6] - 43:4, 43:7, 43:8, 43:24, 156:3, 156:22
**listening** [1] - 157:23
**lived** [2] - 22:19, 71:5
**lives** [1] - 190:15
**living** [1] - 58:21

**locate** [2] - 70:25, 71:2
**located** [3] - 37:18, 172:17, 173:25
**location** [11] - 91:3, 160:10, 162:7, 172:3, 173:23, 176:21, 176:23, 186:1, 186:3, 186:8, 190:2
**locations** [1] - 127:14
**locked** [7] - 48:7, 83:4, 87:14, 105:25, 116:12, 130:1, 168:7
**Lombard** [1] - 1:25
**look** [9] - 25:5, 126:20, 148:13, 148:24, 149:4, 151:24, 166:6, 169:25, 171:8
**Looked** [1] - 162:21
**looked** [4] - 133:18, 143:4, 170:15, 171:14
**looking** [1] - 189:17
**Looking** [1] - 163:2
**looks** [4] - 155:23, 160:19, 162:15, 169:24
**Looks** [3] - 161:19, 165:14, 175:10
**lose** [1] - 115:15
**loss** [3] - 46:3, 46:5, 46:11
**lost** [8] - 23:17, 74:10, 74:20, 75:1, 75:3, 114:25, 115:11, 127:3
**Love** [3] - 75:15, 122:10
**Lovey** [1] - 191:25
**Lunch** [1] - 37:5
**lunch** [3] - 38:1, 38:19, 132:25
**lying** [3] - 64:21, 74:24

## M

**Magginson** [5] - 177:2, 177:7, 178:9, 179:15, 180:11
**Magginson's** [7] - 178:2, 178:6, 179:1, 180:13, 180:15, 189:12, 189:14
**Magginsons** [1] - 177:3
**magnum** [2] - 91:5, 109:2
**mail** [20] - 139:18, 139:19, 149:13, 149:14, 149:20, 152:19, 152:25, 153:4, 177:15, 177:17, 177:23, 178:12, 178:21, 179:10, 179:12, 180:11, 180:14, 181:14, 188:20, 189:5
**mails** [1] - 178:4
**main** [1] - 72:20
**maintained** [1] - 141:19
**Major** [1] - 75:20
**males** [2] - 159:20, 161:18
**man** [16] - 43:18, 50:14, 66:6, 67:25, 68:3, 72:11, 72:14, 72:17, 72:20, 80:25, 104:23, 128:18, 129:24, 130:16, 142:21, 142:23
**manage** [1] - 158:25
**Manhattan** [1] - 4:16
**manifestly** [1] - 197:16
**manner** [3] - 60:17, 194:14, 200:8
**manufacture** [1] - 16:2
**map** [3] - 136:8, 163:9, 163:10
**March** [1] - 185:8
**marijuana** [17] - 9:23, 9:25, 10:13, 10:14, 10:16, 10:17, 16:1, 46:25, 49:23, 104:20, 105:8, 105:14, 105:17, 110:12, 112:8, 112:21, 127:10
**mark** [4] - 30:18, 124:25, 161:15, 162:9
**marked** [3] - 98:3, 124:22, 173:8
**markers** [1] - 175:16
**Marll** [2] - 75:18, 122:23
**Marquis** [1] - 14:10
**MARTIN** [26] - 1:8, 81:4, 82:14, 82:24, 89:17, 129:9, 147:16, 147:25, 148:20, 149:2, 149:5, 149:11, 149:16, 150:4, 150:12, 150:17, 150:19, 150:23, 151:2, 151:10, 153:8, 153:14, 153:19, 153:23, 155:5, 160:18
**Martin** [81] - 1:19, 1:20, 34:7, 45:7, 46:13, 47:16, 47:20, 48:7, 48:20, 48:24, 49:16, 49:20, 50:8, 70:6, 71:2, 73:2, 73:8, 73:11, 73:16, 73:18, 74:1, 74:18, 76:18, 84:2, 106:8, 136:1, 137:20, 138:2, 138:10, 138:11, 139:2, 139:4, 139:6, 139:18, 140:3, 140:8, 140:9, 140:10, 140:13, 141:5, 142:23, 143:1, 143:2, 144:3, 144:4, 144:19, 144:23, 147:15, 148:14, 148:23, 149:19, 149:21, 150:21, 151:6, 151:19, 153:3, 153:5, 153:21, 154:4, 154:6, 154:10, 154:16, 155:11, 155:19, 155:24, 156:2, 156:6, 156:7, 156:8, 156:12, 156:17, 156:19, 156:21, 156:22, 157:6, 184:24, 186:11, 189:23, 189:25, 191:9
**Martin's** [13] - 3:5, 71:23, 105:7, 115:3, 134:4, 134:8, 135:4, 141:20, 142:4, 143:8, 153:17, 154:17, 194:5
**Marty** [1] - 50:20
**Marvin** [7] - 80:19, 81:1, 128:14, 128:19, 128:21, 129:1
**Mary** [3] - 1:24, 200:3, 200:14
**MARYLAND** [1] - 1:2
**Maryland** [4] - 1:12, 1:25, 34:9, 158:10
**masking** [1] - 190:16
**matches** [1] - 185:4
**material** [4] - 96:16, 101:10, 125:17, 125:24
**matter** [7] - 32:13, 65:8, 71:24, 145:14, 197:23, 200:4, 200:8
**matters** [2] - 63:3, 145:12
**McDonalds** [1] - 163:11
**McKean** [1] - 68:22
**mean** [37] - 5:15, 8:8, 13:7, 14:3, 25:4, 29:4, 41:19, 64:2, 70:10, 90:10, 103:20, 106:10, 106:13, 109:7, 109:8, 109:24, 114:14, 116:13, 137:14, 137:20, 137:21, 137:22, 138:3, 141:14, 149:14, 150:3, 153:16, 156:7, 157:4, 161:22, 163:10, 177:20, 186:3, 195:21, 197:9
**meaning** [1] - 168:15
**means** [2] - 27:5, 97:4
**meant** [2] - 45:13, 98:16
**media** [1] - 192:9
**medical** [4] - 168:16, 168:17, 171:12
**medics** [2] - 164:6, 164:8
**meet** [1] - 103:24
**meeting** [3] - 75:23, 96:21, 100:15
**meetings** [3] - 88:5, 89:14, 111:17
**Melvin** [2] - 80:20, 80:25
**Members** [3] - 60:15, 132:25, 192:6
**members** [3] - 55:5, 179:2, 180:23
**memo** [1] - 128:1
**memoranda** [1] - 123:12
**memorandum** [3] - 91:18, 118:10, 118:17
**memos** [1] - 52:17
**mention** [3] - 69:19, 143:23, 157:8
**mentioned** [8] - 10:2, 52:16, 76:11, 76:14, 76:24, 100:11, 143:22, 183:13
**Mercedes** [2] - 129:1, 129:6
**Mercury** [1] - 14:10
**message** [2] - 177:17, 177:22
**met** [5] - 33:4, 64:12, 69:20, 88:12, 102:3
**metro** [3] - 161:3, 161:11, 163:3
**Metro** [2] - 161:4
**Michael** [8] - 1:16, 1:18, 12:10, 40:20, 75:15, 75:21, 110:8, 122:11
**Mid** [1] - 39:1
**mid** [1] - 196:7
**mid-trial** [1] - 196:7
**middle** [1] - 115:20
**midnight** [1] - 38:15
**Might** [2] - 76:14, 76:16
**might** [18] - 7:6, 20:4, 54:16, 57:1, 76:22, 76:23, 77:4, 85:15, 88:16, 115:10, 124:23, 128:11, 162:5, 190:23, 194:13, 194:19, 198:13, 198:14
**mike** [1] - 158:19
**Mike** [1] - 122:10
**millimeter** [4] - 37:9, 37:12, 37:15, 82:18
**mind** [5] - 66:16, 75:2, 145:14, 151:7, 192:9
**minimum** [1] - 139:2
**minute** [1] - 184:11
**minutes** [12] - 24:19, 38:15, 66:12, 66:17, 119:5, 131:19, 133:17, 137:17, 152:20, 152:21
**misleading** [4] - 95:8, 102:8, 102:11, 144:1
**missed** [2] - 26:24, 193:19
**MITCHELL** [1] - 1:7
**Mitchell** [32] - 1:17, 51:17, 73:2, 84:2, 88:21, 129:21, 135:20, 136:1, 136:3, 136:6, 138:12, 139:7, 139:25, 140:5, 142:15, 144:2, 150:23, 151:8, 151:18, 153:7, 154:19, 156:5, 156:8, 156:24, 184:23, 186:11, 187:7, 188:16, 189:15, 189:22, 200:5
**Mitchell's** [8] - 141:11, 142:4, 143:8, 145:15, 149:19, 153:3, 156:6, 157:7
**Mob** [1] - 58:8
**mob** [5] - 55:11, 55:13, 57:13, 57:15, 114:10
**MOB** [1] - 55:14
**modify** [1] - 192:17
**moment** [8] - 33:12, 57:1, 78:18, 116:8, 145:2, 183:13, 184:4
**Momma** [21] - 18:9, 18:15, 18:16, 20:3, 20:7, 20:10, 20:15, 20:16, 20:19, 21:1, 21:2, 22:14, 22:18, 28:4, 28:6, 28:7, 29:13, 29:15, 29:17, 29:23, 33:4
**Momma's** [1] - 18:12
**money** [37] - 4:25, 5:4, 5:11, 5:15, 5:16, 5:17, 9:2, 10:12, 11:20, 20:6, 21:4, 29:6, 29:7, 29:20, 45:25, 46:9, 73:25, 74:18, 74:20, 75:1, 75:3, 77:12, 77:22, 78:12, 80:12, 104:13, 115:1, 115:2, 115:11, 115:15, 116:12, 173:24, 183:16, 183:21, 184:2
**Mongtomery** [1] - 2:4
**monitor** [2] - 162:3, 162:5
**monitors** [1] - 162:4
**Monroe** [1] - 18:17
**MONTGOMERY** [1] - 199:4
**Montgomery** [76] - 2:13, 3:20, 3:25, 5:8, 5:22, 7:1, 10:10, 11:6, 11:9, 12:5, 17:22, 18:22, 19:2, 19:21, 20:14, 21:9, 23:7, 23:16, 25:15, 25:20, 25:25, 26:12, 29:12, 32:6, 32:15, 32:24, 34:6, 57:13,

57:15, 57:16, 57:23, 58:1, 63:24, 64:2, 64:6, 64:8, 81:9, 89:20, 91:21, 91:25, 92:1, 92:3, 92:8, 92:10, 92:12, 92:16, 93:2, 93:3, 94:23, 96:14, 96:24, 98:1, 99:10, 99:17, 99:21, 100:16, 100:20, 107:5, 107:24, 109:7, 111:4, 112:3, 112:5, 114:5, 114:7, 115:5, 116:11, 116:23, 120:9, 121:5, 129:12, 132:24, 154:8, 154:9, 198:7
**Montgomery's** [1] - 198:6
**month** [3] - 22:1, 23:2, 77:11
**Months** [1] - 122:5
**months** [15] - 15:14, 21:17, 21:19, 23:2, 23:4, 23:6, 39:18, 44:10, 44:11, 54:4, 122:1, 122:19, 125:10, 125:16
**morning** [47] - 3:16, 3:24, 4:1, 26:9, 27:8, 34:6, 38:16, 38:19, 66:14, 81:11, 81:23, 85:9, 91:10, 91:14, 91:25, 94:19, 97:9, 98:16, 101:13, 102:8, 103:22, 104:10, 105:7, 106:7, 106:21, 108:6, 108:13, 109:10, 111:18, 112:18, 115:23, 121:14, 133:18, 146:4, 152:3, 159:20, 165:2, 168:13, 169:9, 176:24, 182:5, 192:7, 192:11, 194:22, 196:5, 198:22
**mortis** [1] - 168:19
**Mosher** [1] - 18:17
**most** [2] - 122:22, 197:3
**mostly** [2] - 83:15, 83:16
**mother** [4] - 71:15, 177:4, 177:6, 177:10
**mother-in-law** [3] - 177:4, 177:6, 177:10
**Motion** [2] - 98:4, 106:20
**motion** [6] - 98:10, 99:19, 124:8, 124:9, 141:17
**motions** [2] - 141:8, 141:11
**motive** [1] - 143:2
**mouth** [2] - 145:12, 146:19
**Move** [2] - 106:19, 188:1
**move** [1] - 117:8
**moved** [2] - 169:7, 176:1
**movie** [4] - 73:3, 73:8, 73:16, 73:18
**MR** [268] - 2:3, 2:11, 3:8, 3:14, 3:23, 6:5, 7:4, 7:16, 7:21, 7:24, 8:7, 12:19, 13:1, 13:3, 13:4, 13:7, 13:10, 13:13, 13:22, 14:12, 15:16, 15:22, 16:17, 26:24, 27:2, 33:15, 33:19, 33:22, 33:25, 34:2, 34:5, 36:10, 40:12, 40:15, 40:17, 44:15, 52:10, 54:12, 57:7, 60:7, 62:1, 63:7, 66:11, 67:3, 67:5, 67:13, 67:17, 67:23, 81:4, 81:5, 81:8, 82:5, 82:14, 82:24, 83:7, 84:9, 84:18, 84:20, 84:21, 85:16, 86:1, 86:2, 86:17, 87:13, 88:23, 89:17, 91:18, 91:23, 92:17, 92:22, 93:9, 93:11, 97:16, 98:20, 98:24, 99:1, 99:3, 99:5, 99:7, 99:9, 101:22, 102:17, 104:7, 105:19, 106:11, 106:16, 106:19, 107:16, 111:8, 111:10, 111:15, 113:12, 115:6, 115:12, 116:14, 116:16, 116:22, 117:5, 124:1, 125:2, 125:3, 126:6, 126:9, 126:22, 126:25, 128:16, 128:23, 129:9, 129:11, 129:13, 129:17, 129:19, 130:19, 130:22, 130:25, 131:4, 131:6, 131:12, 132:5, 132:12, 132:16, 132:21, 132:23, 133:22, 133:25, 134:2, 134:6, 134:11, 134:14, 134:17, 134:21, 135:3, 135:10, 135:14, 135:19, 135:24, 136:5, 136:11, 136:15, 136:18, 136:20, 136:22, 136:25, 137:3, 137:4, 137:5, 137:10, 137:16, 138:14, 138:16, 138:20, 138:23, 139:9, 139:17, 139:23, 140:2, 140:8, 140:12, 140:18, 140:22, 141:3, 141:7, 141:10, 141:16, 141:19, 142:3, 142:9, 142:13, 143:10, 143:14, 143:17, 143:24, 144:4, 144:9, 144:13, 144:18, 144:22, 145:1, 145:19, 146:1, 146:7, 146:11, 146:16, 146:21, 146:25, 147:4, 147:11, 147:16, 147:25, 148:20, 149:2, 149:5, 149:11, 149:16, 150:4, 150:12, 150:17, 150:19, 150:23, 151:2, 151:10, 152:13, 153:8, 153:14, 153:19, 153:23, 154:3, 154:14, 154:20, 154:22, 154:23, 154:24, 155:1, 155:5, 155:8, 155:14, 155:19, 156:1, 156:4, 156:9, 156:16, 157:2, 157:10, 157:12, 157:16, 158:9, 158:15, 159:5, 160:18, 166:11, 166:14, 167:4, 187:14, 187:22, 188:1, 189:7, 189:10, 190:21, 190:23, 191:2, 191:11, 191:12, 191:15, 192:18, 192:20, 192:23, 193:1, 193:3, 193:5, 193:9, 193:19, 194:5, 194:7, 195:5, 195:9, 195:17, 195:23, 195:25, 196:11, 198:1, 198:20, 199:5, 199:6, 199:7, 199:8, 199:9, 199:10, 199:13
**MS** [11] - 3:11, 67:16, 89:7, 97:21, 111:21, 166:5, 166:9, 166:13, 166:21, 186:14, 188:21
**multiple** [2] - 7:25, 169:13
**murder** [46] - 18:3, 18:25, 19:22, 21:2, 27:8, 29:13, 32:11, 33:4, 33:8, 38:25, 39:9, 39:25, 65:15, 65:25, 66:3, 77:24, 80:15, 80:25, 81:24, 82:2, 82:12, 83:16, 91:3, 92:2, 93:4, 94:9, 94:12, 94:20, 94:21, 94:25, 95:21, 95:24, 106:23, 109:16, 132:14, 132:17, 132:19, 135:12, 136:8, 140:4, 152:21, 187:25, 188:7, 189:19, 197:13
**murdered** [5] - 21:14, 55:21, 67:25, 77:11, 141:2
**murders** [5] - 152:10, 159:16, 187:19, 189:23
**muscles** [1] - 168:16
**must** [1] - 27:21
**mutual** [1] - 136:1

## N

**N-I-E-D-E-R-M-E-I-E-R** [1] - 158:22
**name** [58] - 10:21, 12:10, 13:21, 13:25, 14:2, 18:12, 18:22, 34:6, 39:12, 40:24, 41:1, 41:3, 41:5, 41:6, 43:18, 44:20, 44:23, 44:25, 47:20, 47:25, 49:8, 50:20, 50:21, 53:2, 53:17, 55:21, 69:19, 69:25, 70:2, 71:18, 80:19, 80:25, 84:24, 85:2, 86:10, 110:8, 110:10, 117:22, 128:14, 128:18, 128:21, 137:25, 138:5, 138:16, 138:18, 139:4, 140:11, 148:17, 157:5, 157:9, 158:20, 161:8, 177:6, 185:2, 191:21
**named** [7] - 68:3, 70:21, 70:23, 75:14, 86:21, 88:1, 135:11
**names** [5] - 45:1, 53:13, 75:10, 86:8, 164:21
**narcotics** [3] - 16:3, 183:2, 183:6
**Natasha** [4] - 179:23, 180:7, 193:13, 193:25
**naturally** [1] - 41:10
**near** [1] - 60:16
**nearly** [1] - 85:6
**necessary** [1] - 166:22
**neck** [3] - 55:8, 57:17, 171:23
**need** [10] - 22:10, 29:7, 71:2, 75:2, 115:11, 134:9, 135:7, 135:8, 196:1, 196:10
**needed** [4] - 29:6, 73:25, 74:17, 103:6
**needs** [2] - 12:20, 196:7
**Neidermeier** [1] - 190:9
**Neighborhood** [1] - 56:2
**neighborhood** [6] - 20:23, 56:4, 56:5, 58:22, 59:1, 114:10
**never** [12] - 11:22, 22:23, 25:9, 33:7, 49:19, 70:2, 78:24, 86:13, 98:14, 98:17, 101:10, 198:8
**Never** [5] - 43:10, 43:11, 56:9, 75:1, 130:16
**nevertheless** [2] - 103:15, 104:6
**New** [18] - 4:5, 4:10, 4:15, 5:5, 5:9, 9:2, 9:21, 10:1, 10:7, 10:11, 47:21, 48:20, 64:11, 101:18, 103:23, 104:2, 105:17
**next** [5] - 15:14, 128:18, 133:20, 148:16, 158:14
**Nextel** [1] - 174:11
**nexus** [2] - 140:16, 194:6
**nice** [2] - 74:10, 127:3
**Nickerson** [2] - 17:13, 17:17
**nickname** [2] - 185:12, 185:14
**Niedermeier** [14] - 133:24, 134:10, 134:17, 138:2, 148:10, 151:7, 158:16, 158:21, 159:6, 162:9, 167:7, 182:6, 192:24, 193:10
**NIEDERMEIER** [2] - 158:17, 199:12
**Niedermeier's** [2] - 133:20, 198:3
**nigga** [1] - 190:15
**night** [4] - 73:19, 161:17, 189:19, 196:5
**nine** [1] - 6:2
**NO** [1] - 1:6
**none** [2] - 61:13, 150:8
**noon** [3] - 41:9, 41:23
**normally** [2] - 110:7, 110:14
**north** [1] - 163:18
**NORTHERN** [1] - 1:2
**note** [3] - 66:15, 133:7, 192:7
**noted** [1] - 129:14
**notes** [7] - 123:19, 123:21, 123:25, 180:22, 180:24, 181:1, 188:25
**nothing** [12] - 10:18, 19:22, 64:6, 64:12, 64:14, 64:25, 118:13, 118:24, 121:2, 125:13, 142:14, 192:23
**Nothing** [2] - 33:15, 126:5
**notify** [1] - 96:22
**notion** [1] - 129:21
**November** [6] - 13:24, 14:9, 15:21, 16:11, 16:21, 16:23
**nowadays** [1] - 114:20
**Nowhere** [1] - 29:11
**Number** [3] - 98:4,

150:1, 150:2
**number** [33] - 14:15, 42:17, 55:23, 55:24, 99:12, 109:7, 129:3, 151:12, 160:18, 167:13, 174:21, 177:21, 177:22, 177:24, 178:1, 178:3, 179:16, 179:17, 179:18, 179:24, 180:1, 180:10, 180:13, 180:15, 180:17, 181:7, 181:9, 181:13, 181:16, 181:25, 182:3, 183:10, 188:24
**Number(s** [1] - 200:5
**numbered** [1] - 173:6
**numbers** [6] - 28:11, 180:8, 180:22, 180:24, 181:10, 193:22
**numerous** [1] - 189:18

**O**

**oath** [5] - 3:20, 31:13, 47:13, 119:11, 121:14
**object** [9] - 13:1, 40:12, 84:19, 129:13, 147:19, 147:20, 168:25, 189:7, 193:10
**objected** [1] - 196:23
**Objection** [69] - 6:5, 7:4, 7:16, 8:7, 12:19, 13:22, 14:12, 15:16, 15:22, 16:17, 36:10, 44:15, 52:10, 54:12, 57:7, 60:7, 82:5, 82:14, 82:24, 84:9, 85:16, 86:1, 86:2, 86:17, 87:13, 88:23, 89:7, 89:17, 91:18, 92:17, 92:22, 93:9, 97:16, 97:21, 98:20, 101:22, 102:17, 104:7, 105:19, 106:11, 106:16, 106:19, 106:20, 107:16, 111:8, 111:15, 111:21, 113:12, 115:6, 115:12, 116:14, 117:5, 124:1, 126:22, 128:16, 128:23, 130:19, 132:5, 132:12, 132:16, 166:25, 186:14, 187:14, 187:22, 188:1, 188:21, 191:11, 191:12
**objection** [18] - 7:17, 14:13, 22:12, 57:9, 60:10, 60:11, 67:8, 84:20, 84:22, 92:24, 93:10, 93:11, 98:24, 132:20, 167:3, 191:13, 193:23, 197:1
**objection's** [4] - 6:7, 16:18, 129:14, 132:18
**objects** [1] - 13:4
**obligated** [1] - 35:1
**obligation** [1] - 95:11
**obligations** [1] - 95:10
**observations** [1] - 186:2
**observe** [3] - 169:20, 170:1, 171:20
**observed** [2] - 60:20, 169:15
**obstruction** [1] - 95:16
**obtain** [4] - 46:25, 112:8, 127:10, 189:22
**obvious** [2] - 2:6, 169:11
**obviously** [6] - 4:4, 14:25, 69:15, 150:14, 169:12, 195:18
**Obviously** [2] - 100:4, 100:17
**occasion** [10] - 28:17, 28:18, 43:24, 47:6, 49:22, 50:10, 87:14, 91:11, 91:12, 105:23
**occasions** [7] - 4:3, 4:4, 4:6, 9:12, 11:2, 81:13, 87:12
**occur** [2] - 18:17, 95:18
**occurred** [8] - 14:9, 19:9, 21:9, 38:25, 42:14, 43:16, 95:19, 188:8
**October** [2] - 1:11, 200:5
**OF** [3] - 1:2, 1:5, 1:11
**offense** [7] - 13:15, 13:19, 14:9, 14:24, 15:2, 33:7, 147:9
**offenses** [3] - 12:1, 13:9, 95:18
**office** [18] - 6:23, 7:2, 7:12, 8:1, 9:11, 24:18, 26:14, 27:4, 38:6, 83:20, 96:6, 96:8, 97:2, 122:21, 125:5, 138:23, 159:20, 164:3
**Office** [4] - 34:24, 35:19, 122:9, 125:5
**Officer** [3] - 17:12, 164:5, 168:3
**officer** [6] - 128:2, 128:7, 163:21, 163:24, 163:25, 164:1
**officers** [5] - 80:24, 81:24, 145:17, 165:9, 168:17
**Official** [1] - 200:15
**official** [2] - 76:6, 200:7
**often** [3] - 45:9, 64:7, 104:20
**once** [5] - 110:9, 151:22, 158:12, 169:14, 196:13
**Once** [1] - 160:7
**One** [5] - 53:19, 60:20, 150:2, 171:3, 198:1
**one** [101] - 3:2, 4:10, 4:12, 5:18, 9:4, 9:12, 14:6, 15:10, 22:23, 24:16, 24:17, 26:13, 26:19, 26:21, 27:15, 32:10, 40:13, 42:2, 47:14, 47:24, 49:8, 49:22, 50:10, 50:14, 55:20, 58:7, 62:7, 65:25, 72:16, 75:6, 75:23, 76:2, 79:13, 86:10, 87:11, 93:7, 95:9, 98:1, 105:23, 111:17, 114:15, 114:17, 114:24, 115:10, 116:8, 116:11, 117:22, 118:5, 119:2, 122:19, 126:16, 127:2, 131:16, 132:3, 137:11, 147:18, 149:18, 150:8, 150:10, 150:11, 151:2, 151:12, 151:18, 151:21, 152:2, 152:7, 152:10, 152:13, 152:14, 153:6, 160:19, 162:23, 166:8, 166:21, 167:6, 167:23, 169:11, 172:12, 172:14, 172:22, 173:8, 173:12, 175:15, 178:18, 178:20, 179:20, 180:11, 180:13, 180:19, 181:10, 187:12, 187:24, 189:15, 191:2, 191:21, 196:2
**ones** [1] - 58:7
**open** [6] - 66:16, 129:15, 170:11, 187:17, 187:21, 192:9
**opened** [2] - 83:23, 168:7
**operation** [1] - 90:20
**opportunity** [1] - 165:25
**optimistic** [1] - 117:4
**orange** [1] - 172:3
**order** [2] - 32:11, 73:25
**organization** [4] - 39:15, 39:18, 55:5, 56:23
**original** [3] - 68:18, 142:22, 150:15
**originally** [4] - 38:11, 110:6, 117:1, 142:3
**otherwise** [3] - 95:8, 96:17, 145:4
**OTM** [11] - 55:8, 56:1, 56:19, 57:13, 57:14, 57:19, 58:12, 114:7, 114:9, 114:10, 114:11
**ought** [1] - 111:1
**OUT** [1] - 55:14
**outlined** [1] - 194:15
**outset** [1] - 141:13
**outside** [3] - 167:20, 175:7, 175:8
**Outside** [1] - 175:9
**outstanding** [1] - 187:11
**overcome** [1] - 102:14
**overnight** [1] - 198:12
**overruled** [5] - 92:24, 106:20, 166:25, 167:3, 191:14
**Overruled** [31] - 15:17, 15:23, 40:14, 40:16, 52:11, 82:16, 84:11, 88:24, 89:8, 89:18, 92:18, 97:17, 97:23, 98:21, 101:23, 102:18, 104:8, 105:21, 106:12, 106:17, 107:17, 111:16, 111:22, 113:13, 115:7, 115:13, 128:24, 186:16, 187:16, 187:23, 188:22
**owe** [1] - 45:24
**own** [3] - 41:4, 89:1, 94:3

**P**

**P-17** [3] - 96:15, 125:2, 125:4
**P-3** [1] - 95:4
**p.m** [4] - 38:3, 133:9, 134:24, 198:24
**pads** [3] - 66:15, 133:7, 192:7
**PAGE** [1] - 199:3
**Page** [18] - 22:5, 22:14, 25:2, 28:11, 31:3, 46:23, 60:6, 91:24, 108:24, 118:20, 119:17, 127:9, 137:5, 137:7, 148:13, 154:18, 155:18, 156:9
**page** [1] - 155:17
**Pager** [1] - 174:14
**pages** [4] - 65:13, 200:6
**Pages** [1] - 57:8
**paid** [1] - 68:20
**pain** [1] - 157:5
**Palmere** [1] - 75:21
**pamphlet** [2] - 191:6, 193:7
**Pants** [1] - 174:2
**pants** [1] - 165:18
**paper** [2] - 34:3, 142:13
**paperwork** [1] - 12:24
**Paragraph** [2] - 95:12, 125:15
**paragraphs** [1] - 127:25
**pardon** [1] - 4:2
**Pardon** [12] - 19:25, 23:5, 34:14, 41:13, 51:19, 54:8, 55:1, 56:3, 56:11, 58:10, 69:9, 72:3
**park** [1] - 71:12
**parked** [2] - 71:9, 71:16
**parking** [1] - 186:2
**parlor** [1] - 186:4
**Parole** [1] - 16:25
**parole** [2] - 41:15, 132:11
**part** [30] - 19:18, 19:19, 25:3, 34:8, 59:22, 78:13, 85:12, 88:4, 95:20, 98:13, 98:25, 99:2, 99:5, 99:6, 103:9, 104:23, 117:17, 120:17, 126:11, 126:13, 135:4, 142:18, 143:5, 144:8, 146:2, 153:11, 163:6, 193:14
**Part** [1] - 174:13
**participate** [3] - 74:17, 114:24, 190:4
**participated** [1] - 14:11
**participating** [5] - 73:24, 74:9, 113:9, 114:4, 115:2
**particular** [11] - 23:24, 61:21, 70:20, 71:9, 71:11, 75:23, 107:7, 126:12, 126:15, 127:2, 128:15
**particularly** [2] - 196:20, 197:8
**partner** [3] - 48:24, 51:3, 191:18
**passage** [6] - 58:2, 91:16, 91:25, 92:15, 108:15, 111:24
**passages** [1] - 101:16
**passenger** [6] - 113:22, 164:23, 167:16, 169:4, 175:9, 181:24
**passing** [1] - 151:25
**past** [3] - 25:18, 87:8, 101:5
**patience** [1] - 158:12
**Paul** [1] - 1:19
**Pause** [6] - 33:14, 46:22, 57:3, 78:20, 116:10, 166:4
**pay** [4] - 4:23, 20:7, 90:9, 115:3
**peeked** [1] - 68:22
**pen** [3] - 161:22, 162:6, 163:3

**penal** [1] - 147:11
**Pennsylvania** [1] - 188:11
**people** [52] - 4:7, 5:9, 5:10, 5:17, 7:8, 35:18, 39:5, 42:22, 48:22, 49:6, 49:8, 50:17, 51:12, 51:14, 52:2, 53:4, 53:23, 53:24, 55:18, 55:20, 55:23, 55:24, 56:6, 65:22, 72:19, 75:7, 75:11, 75:24, 75:25, 76:1, 85:18, 85:20, 88:20, 89:10, 100:11, 104:12, 110:5, 113:20, 117:18, 117:22, 118:5, 122:22, 144:23, 151:19, 151:20, 152:8, 152:11, 152:16, 177:14, 179:7, 184:23
**pepper** [1] - 169:24
**perfectly** [1] - 8:12
**perhaps** [7] - 60:17, 62:20, 66:22, 148:23, 152:8, 194:21, 195:6
**Perhaps** [1] - 150:6
**period** [13] - 13:19, 13:25, 16:20, 21:9, 21:12, 21:14, 22:4, 32:19, 35:23, 36:5, 45:10, 48:19, 51:4
**perjury** [1] - 95:16
**permit** [1] - 152:1
**permitted** [4] - 62:10, 124:14, 196:25, 197:1
**person** [15] - 4:11, 17:25, 18:9, 19:3, 80:17, 110:10, 114:1, 117:22, 129:21, 131:23, 139:4, 152:11, 164:20, 188:4
**personal** [3] - 10:5, 10:14, 104:20
**persons** [2] - 173:19, 173:23
**persuaded** [1] - 149:19
**Pete** [1] - 192:2
**Peters** [1] - 138:23
**Petry** [2] - 160:3, 165:21
**Phil** [2] - 75:18, 122:22
**phone** [40] - 83:3, 173:22, 174:11, 174:21, 177:21, 178:2, 178:3, 178:6, 178:9, 179:11, 179:14, 179:16, 179:18, 180:4, 180:8, 180:11, 180:13, 180:15, 181:10, 181:11, 181:20, 181:22, 181:25, 183:14, 184:8, 186:24, 188:24, 189:4, 189:11, 189:12, 189:13, 189:14, 189:18, 189:19
**phones** [8] - 179:20, 180:8, 180:19, 184:2, 186:19, 186:21, 186:22, 187:5
**photo** [5] - 30:9, 130:9, 130:25, 131:13, 131:19
**photograph** [8] - 160:7, 160:16, 163:11, 168:22, 172:2, 173:1, 175:21, 182:22
**photographs** [7] - 164:24, 166:1, 166:8, 166:12, 167:1, 171:13, 186:10
**photos** [1] - 166:15
**phrase** [3] - 106:21, 107:3, 109:6
**physical** [1] - 195:12
**Physically** [1] - 195:17
**pick** [3] - 31:19, 106:24, 130:12
**picked** [2] - 32:16, 131:16
**picture** [6] - 161:13, 162:15, 162:22, 167:20, 172:19, 184:4
**pictures** [3] - 175:15, 182:20, 191:20
**piles** [1] - 193:20
**pills** [1] - 112:12
**pink** [1] - 161:19
**pistol** [3] - 24:10, 37:9, 37:12
**place** [9] - 42:4, 71:9, 71:11, 75:9, 76:4, 176:12, 176:13, 179:11
**placed** [13] - 14:14, 14:20, 15:4, 15:15, 15:20, 62:7, 62:15, 178:2, 188:19, 189:4, 189:12, 189:13, 189:18
**places** [1] - 42:4
**plan** [22] - 18:24, 19:3, 19:21, 19:22, 21:13, 26:3, 29:13, 70:7, 70:23, 78:13, 80:15, 80:25, 84:6, 84:25, 86:24, 89:22, 90:4, 90:6, 126:12, 126:13, 133:15
**planned** [1] - 70:12
**planning** [3] - 21:2, 60:9, 128:18
**plans** [1] - 70:15
**plastic** [1] - 183:5
**plate** [1] - 129:3
**play** [8] - 3:2, 102:15, 139:3, 142:1, 143:22, 144:13, 147:19, 148:13
**played** [12] - 28:14, 43:12, 59:22, 63:18, 74:13, 93:7, 141:10, 142:1, 143:7, 148:9, 156:11, 156:14
**playing** [2] - 42:7, 42:12
**plea** [23] - 34:8, 34:10, 34:17, 34:23, 35:2, 35:25, 94:6, 94:11, 94:23, 95:3, 95:4, 98:8, 98:14, 98:18, 98:19, 99:18, 100:1, 124:5, 124:6, 124:10, 124:13, 124:14, 197:3
**Plea** [1] - 98:5
**plead** [1] - 97:25
**pleasant** [1] - 3:17
**pled** [1] - 95:22
**plenty** [1] - 108:5
**plot** [1] - 77:24
**plug** [1] - 151:18
**plus** [2] - 6:3
**pockets** [3] - 174:1, 174:2, 174:7
**point** [31] - 11:7, 74:16, 98:1, 114:15, 114:17, 124:8, 135:19, 142:20, 146:12, 153:13, 154:5, 157:4, 159:21, 161:14, 161:16, 162:6, 162:18, 163:19, 163:21, 164:2, 165:4, 167:22, 170:20, 176:19, 182:14, 185:11, 185:12, 187:17, 190:19, 194:16, 197:10
**pointed** [4] - 91:11, 94:7, 98:17, 109:11
**pointing** [3] - 108:15, 160:15, 172:3
**police** [24] - 32:17, 38:8, 40:19, 41:23, 75:20, 80:24, 81:13, 81:24, 83:8, 83:15, 85:20, 85:25, 86:6, 87:3, 93:4, 104:12, 109:21, 115:16, 115:17, 116:12, 118:6, 159:11, 168:7, 170:8
**Police** [6] - 39:4, 75:17, 111:19, 159:9, 176:17, 182:18
**pool** [3] - 5:11, 10:12, 104:13
**pooled** [2] - 9:1, 11:20
**pooling** [1] - 5:14
**portion** [4] - 57:4, 143:21, 144:18, 147:21
**position** [5] - 143:6, 146:7, 166:21, 194:25, 196:6
**positioned** [1] - 169:2
**possession** [2] - 16:1, 189:6
**possibility** [3] - 28:6, 194:11, 198:4
**possible** [2] - 70:6, 94:15
**possibly** [2] - 139:19, 162:21
**pot** [2] - 5:18, 10:12
**potentially** [1] - 149:23
**powder** [3] - 127:15, 127:16, 127:18
**pre** [2] - 144:8, 144:10
**pre-taped** [2] - 144:8, 144:10
**preaching** [1] - 149:24
**precise** [1] - 126:12
**precisely** [1] - 112:5
**prefer** [1] - 153:10
**premise** [1] - 149:17
**prepare** [1] - 157:13
**preponderance** [1] - 97:3
**prerecorded** [1] - 141:4
**present** [8] - 19:10, 42:22, 83:21, 88:14, 104:17, 134:25, 179:3, 194:21
**presenter** [1] - 30:7
**pretty** [4] - 79:14, 133:5, 134:12, 150:4
**Pretty** [1] - 110:21
**previously** [2] - 143:11, 196:18
**price** [1] - 45:15
**pride** [1] - 194:24
**pried** [1] - 66:6
**primary** [3] - 163:21, 163:24, 164:4
**prints** [1] - 185:7
**prison** [1] - 103:17
**prisoners** [1] - 103:20
**private** [2] - 100:4, 100:17
**privilege** [3] - 100:6, 100:10, 100:18
**privileged** [2] - 100:20, 100:23
**pro** [1] - 141:15
**probation** [24] - 14:15, 14:18, 14:20, 14:21, 14:25, 15:3, 15:4, 15:5, 15:8, 15:15, 15:20, 16:6, 16:9, 16:20, 16:23, 17:7, 17:8, 41:15, 82:4, 82:8, 110:7, 115:19, 187:24, 188:13
**Probation** [3] - 16:25, 17:12, 17:18
**probationary** [1] - 16:19
**problem** [15] - 2:25, 7:20, 12:6, 33:25, 113:16, 141:24, 142:18, 144:16, 153:8, 156:20, 157:13, 166:20, 190:14, 190:16, 194:18
**procedure** [1] - 25:4
**proceed** [5] - 2:2, 3:20, 67:22, 86:19, 135:1
**proceeding** [16] - 6:4, 8:19, 8:25, 21:21, 21:25, 26:15, 31:2, 31:13, 96:7, 97:1, 108:16, 108:21, 133:13, 197:13, 197:20, 197:23
**proceedings** [10] - 33:14, 46:22, 57:3, 78:20, 116:10, 166:4, 195:11, 197:9, 200:4, 200:7
**Proceedings** [2] - 2:1, 198:24
**proceeds** [1] - 9:18
**processed** [1] - 176:16
**processing** [1] - 176:17
**proffer** [46] - 6:22, 7:1, 7:11, 7:25, 24:16, 25:1, 27:3, 42:18, 42:22, 42:24, 43:14, 51:25, 52:17, 65:7, 75:6, 76:3, 76:18, 78:21, 81:15, 83:18, 85:19, 86:25, 87:2, 88:22, 92:6, 93:6, 93:12, 96:1, 96:14, 100:22, 101:14, 107:2, 107:6, 109:10, 118:10, 118:17, 119:15, 122:8, 122:20, 123:9, 123:17, 123:22, 124:21, 125:20, 127:25, 197:3
**proffering** [1] - 138:12
**proffers** [6] - 80:24, 81:20, 84:3, 88:8, 104:11, 104:16
**Program** [2] - 103:13, 103:19
**projectile** [3] - 171:19, 172:4, 172:16
**projectiles** [2] - 170:23, 170:24
**promptly** [1] - 133:14
**pronounce** [1] - 72:20
**pronounced** [1] - 164:11
**proof** [2] - 136:3, 136:13
**properly** [1] - 3:18
**proponent** [1] - 146:3

**propose** [1] - 148:13
**proposed** [3] - 194:9, 194:10, 196:17
**prosecuted** [4] - 94:8, 94:20, 94:24, 95:24
**prosecuting** [1] - 125:5
**prosecution** [5] - 95:13, 95:18, 96:6, 197:4, 197:5
**prosecutor** [15] - 8:3, 8:15, 8:24, 22:18, 43:15, 43:18, 43:21, 47:8, 93:13, 97:6, 120:17, 120:23, 121:17, 126:2, 157:20
**Prosecutors** [1] - 52:23
**prosecutors** [11] - 34:24, 36:8, 36:13, 44:17, 52:24, 81:14, 88:13, 100:23, 111:19, 123:19
**protect** [1] - 95:17
**protected** [1] - 103:20
**Protection** [2] - 103:13, 103:19
**protection** [1] - 105:5
**prove** [2] - 195:18, 195:19
**provide** [1] - 179:15
**provided** [10] - 6:2, 96:10, 96:20, 117:18, 125:20, 131:9, 177:21, 177:23, 178:3, 181:10
**providing** [1] - 145:3
**provision** [3] - 94:9, 95:5, 96:15
**proximity** [1] - 169:23
**pull** [3] - 135:17, 136:23, 177:24
**pulled** [4] - 41:5, 110:11, 112:19
**pulls** [1] - 41:8
**pumped** [1] - 32:25
**purchased** [1] - 73:12
**purpose** [2] - 4:11, 96:19
**pursuant** [1] - 124:15
**pushed** [1] - 169:5
**put** [34] - 5:17, 13:11, 30:7, 30:17, 57:4, 60:1, 60:8, 62:4, 68:13, 68:15, 69:2, 77:20, 84:18, 85:6, 99:5, 111:25, 112:3, 123:2, 136:3, 138:12, 138:16, 139:7, 139:13, 139:15, 139:25, 140:2, 141:16, 147:7, 151:25, 160:6, 178:19, 193:25, 198:8
**Put** [1] - 140:2
**puts** [1] - 135:20
**putting** [2] - 20:10, 57:10
**Pyne** [1] - 1:21

## Q

**Quantico** [1] - 177:21
**quantity** [1] - 4:22
**Quarles** [5] - 14:22, 15:4, 15:11, 16:20, 17:8
**Quarles's** [1] - 16:6
**questioned** [6] - 60:21, 93:2, 94:7, 103:22, 108:20, 109:10
**questioning** [5] - 22:15, 27:6, 62:6, 109:9, 123:5
**questions** [24] - 26:7, 28:12, 31:5, 31:12, 43:6, 60:2, 63:23, 81:4, 81:5, 101:25, 110:12, 112:2, 116:19, 117:1, 119:4, 120:16, 120:21, 121:4, 121:6, 121:20, 123:1, 124:20, 129:9, 132:21
**quickly** [1] - 143:20
**quite** [3] - 62:1, 158:24, 162:3
**quote** [2] - 64:1, 91:21

## R

**Rachel** [1] - 99:16
**rag** [1] - 114:16
**rags** [1] - 114:12
**raid** [2] - 82:23
**raided** [2] - 82:22, 82:25
**rail** [2] - 161:2, 161:3
**railroad** [1] - 162:13
**raise** [1] - 74:18
**raised** [1] - 47:11
**Randallstown** [6] - 71:13, 71:14, 71:17, 92:2, 176:24, 190:1
**rap** [2] - 64:10, 72:23
**rather** [2] - 41:4, 197:20
**Rather** [1] - 63:3
**re** [1] - 130:22
**re-redirect** [1] - 130:22
**reached** [1] - 143:3
**read** [9] - 43:25, 52:4, 62:16, 73:22, 75:10, 111:18, 127:25, 136:6, 143:20
**reading** [5] - 62:11, 120:8, 135:18, 157:23, 158:5
**ready** [6] - 2:2, 3:21, 28:24, 28:25, 67:22, 158:13
**Ready** [1] - 135:1
**real** [11] - 18:12, 20:15, 44:20, 44:23, 47:25, 85:2, 110:10, 142:18, 148:16, 157:5, 157:9
**Real** [6] - 86:21, 86:23, 86:24, 118:11, 118:22
**realize** [3] - 35:12, 47:6, 149:24
**realized** [1] - 98:17
**really** [26] - 2:6, 2:12, 6:10, 7:5, 8:5, 8:10, 16:8, 22:23, 29:7, 42:9, 45:6, 48:24, 58:3, 60:21, 65:2, 71:23, 77:10, 83:10, 100:8, 107:13, 108:10, 108:11, 138:4, 142:14, 151:20, 198:15
**rear** [5] - 168:22, 168:25, 173:1, 182:22, 184:5
**Rear** [1] - 175:24
**reargument** [1] - 142:10
**rearrested** [1] - 14:18
**reason** [24] - 2:20, 3:4, 20:15, 40:7, 71:20, 74:8, 121:9, 121:15, 121:21, 121:22, 126:11, 126:12, 126:15, 126:16, 127:2, 135:15, 138:12, 140:18, 149:18, 153:19, 154:8, 162:3
**reasonable** [2] - 130:23, 152:4
**reasons** [2] - 115:10, 176:7
**recalled** [1] - 42:11
**recap** [1] - 63:8
**receive** [1] - 17:10
**received** [2] - 98:7, 159:20
**receiving** [1] - 99:20
**recently** [2] - 46:18, 52:4
**recess** [5] - 66:14, 66:17, 133:2, 134:23, 198:23
**Recess** [2] - 66:18, 134:24
**recite** [1] - 197:6
**recognize** [6] - 30:9, 50:21, 109:1, 171:17, 179:23, 180:16
**recollection** [11] - 6:11, 12:13, 12:21, 12:23, 22:8, 84:10, 86:18, 142:8, 181:2, 186:7, 188:25
**recommend** [2] - 35:9, 35:13
**recommendation** [4] - 35:1, 35:6, 35:15, 35:20
**record** [5] - 24:18, 158:20, 166:18, 177:17, 180:10
**recorded** [13] - 8:3, 8:14, 8:23, 26:15, 28:11, 101:14, 177:15, 177:22, 179:12, 180:11, 180:14, 181:14, 200:3
**recorder** [1] - 41:24
**recording** [1] - 177:19
**records** [4] - 179:17, 186:18, 186:24, 189:18
**recover** [2] - 173:19, 178:6
**recovered** [31] - 83:12, 170:19, 170:24, 171:10, 172:5, 172:13, 173:1, 173:20, 173:24, 174:11, 174:15, 175:6, 179:20, 180:4, 180:19, 181:11, 181:20, 181:22, 182:10, 183:1, 183:11, 183:12, 183:17, 183:24, 184:2, 184:12, 184:16, 184:20, 188:17, 189:15, 194:5
**recross** [4] - 116:20, 131:4, 131:5, 131:7
**RECROSS** [6] - 116:21, 126:8, 129:10, 199:8, 199:9, 199:10
**Red** [2] - 57:24, 57:25
**red** [10] - 23:17, 56:19, 56:24, 58:13, 58:16, 114:8, 114:12, 114:14, 114:16, 114:21
**redact** [8] - 141:22, 149:12, 149:14, 154:5, 154:18, 155:8, 155:11, 156:12
**redacted** [4] - 147:21, 158:7, 192:16
**redaction** [11] - 143:11, 148:25, 149:6, 153:12, 154:2, 157:14, 157:21, 198:2, 198:4, 198:11, 198:13
**redirect** [2] - 130:22, 131:2
**Redirect** [1] - 81:6
**REDIRECT** [2] - 81:7, 199:7
**redounds** [1] - 197:22
**redundant** [1] - 138:1
**refer** [1] - 53:1
**reference** [3] - 156:11, 156:14, 197:8
**referred** [8] - 3:18, 11:2, 18:1, 24:7, 26:13, 91:25, 101:7, 158:1
**Referring** [2] - 31:2, 118:20
**referring** [9] - 3:7, 22:5, 28:10, 57:8, 60:6, 86:15, 92:2, 118:9, 144:7
**refers** [1] - 95:21
**refresh** [6] - 12:13, 12:21, 12:22, 22:8, 181:2, 188:25
**refreshing** [1] - 142:7
**refused** [1] - 116:5
**regarding** [1] - 134:10
**region** [1] - 111:19
**regular** [2] - 64:8, 64:9
**regularly** [2] - 50:17, 101:17
**Reisterstown** [5] - 163:12, 163:13, 163:17, 163:18, 186:7
**relate** [1] - 13:17
**related** [1] - 153:25
**relates** [1] - 124:20
**relating** [1] - 33:7
**relationship** [24] - 60:3, 63:9, 63:15, 63:24, 64:3, 70:20, 87:24, 88:20, 89:6, 89:12, 101:15, 101:16, 102:5, 102:6, 102:15, 120:18, 120:19, 120:24, 121:7, 121:16, 125:12, 131:1, 131:6
**relationships** [1] - 84:1
**relatives** [3] - 177:13, 179:11, 180:7
**relayed** [1] - 177:23
**released** [1] - 95:11
**relevancy** [1] - 2:23
**relevant** [4] - 2:21, 3:2, 146:5, 146:6
**relied** [1] - 157:20
**reluctant** [1] - 90:6
**rely** [2] - 102:20, 103:6
**relying** [1] - 12:24
**remain** [2] - 3:20, 145:6
**remarks** [1] - 125:12
**remember** [79] - 6:13, 6:17, 6:22, 6:25, 7:3, 7:14, 7:25, 8:3, 8:6, 8:9, 8:14, 8:17, 8:19, 9:10, 11:3, 12:17, 13:14, 13:19, 13:25, 14:2, 14:8, 14:20, 14:22, 14:24, 15:21, 16:4, 21:21, 24:21, 44:21, 59:23, 74:13, 75:23, 75:25, 76:2, 77:2, 77:7, 81:18, 81:19, 86:25, 88:3, 91:21, 92:8, 94:9, 96:13,

98:8, 99:12, 100:6, 100:9, 101:19, 105:9, 105:22, 106:8, 111:12, 112:10, 112:12, 112:21, 113:17, 113:18, 116:25, 117:10, 117:13, 117:16, 117:20, 118:13, 118:21, 118:24, 119:1, 119:4, 119:6, 119:19, 120:16, 120:21, 123:1, 123:7, 145:16, 158:4, 174:21, 184:5
**remembered** [1] - 85:20
**remembers** [1] - 7:6
**remotely** [1] - 151:7
**remove** [1] - 169:8
**removed** [2] - 167:19, 167:22
**removing** [1] - 168:18
**render** [1] - 2:23
**repeat** [2] - 70:13, 139:17
**repeated** [1] - 138:10
**repeatedly** [4] - 60:20, 89:5, 104:11, 104:12
**repeating** [3] - 139:5, 139:15, 140:1
**repetitive** [1] - 166:23
**rephrase** [2] - 186:23, 189:3
**Rephrase** [3] - 36:11, 111:9, 116:15
**replace** [1] - 157:17
**report** [7] - 16:24, 17:4, 17:7, 17:9, 17:12, 17:18, 144:1
**reported** [1] - 168:5
**Reported** [1] - 1:23
**Reporter** [1] - 200:15
**REPORTER'S** [1] - 200:1
**reports** [3] - 154:9, 154:14, 192:9
**represent** [3] - 34:7, 74:4, 173:8
**representation** [3] - 52:8, 52:14, 52:17
**represents** [1] - 98:6
**request** [4] - 185:1, 185:6, 185:7, 185:21
**requests** [1] - 184:22
**require** [1] - 193:16
**required** [2] - 34:9, 97:2
**requirement** [1] - 2:23
**residence** [2] - 177:1, 177:2
**residue** [2] - 25:13, 169:22
**resolve** [1] - 196:2
**resolved** [1] - 143:25
**respect** [25] - 9:17, 9:20, 9:25, 11:19, 16:19, 19:2, 34:22, 67:5, 123:10, 124:24, 142:5, 193:6, 194:9, 194:14, 195:13, 196:2, 196:5, 196:20, 197:1, 197:4, 197:8, 197:10, 197:13, 197:14, 198:2
**respond** [2] - 176:23, 177:1
**responded** [3] - 93:3, 159:22, 161:17
**responder** [1] - 164:3
**responding** [1] - 163:25
**response** [6] - 5:12, 26:6, 119:4, 141:17, 155:19, 196:4
**rest** [2] - 3:2, 148:5
**restrained** [1] - 197:10
**result** [1] - 139:7
**resulted** [2] - 150:10, 197:20
**resume** [3] - 133:12, 133:24, 134:8
**retaliate** [1] - 103:1
**retrieve** [1] - 33:17
**revenge** [1] - 139:11
**reversed** [1] - 157:21
**review** [3] - 44:9, 44:14, 44:17
**reviewed** [5] - 43:4, 43:8, 44:7, 46:18, 101:10
**revisit** [2] - 142:10, 143:14
**revolver** [2] - 24:5, 93:16
**rhetorical** [1] - 139:14
**RHODES** [11] - 3:11, 67:16, 89:7, 97:21, 111:21, 166:5, 166:9, 166:13, 166:21, 186:14, 188:21
**Rhodes** [3] - 1:17, 3:10, 166:8
**Ridgewood** [2] - 161:9, 163:5
**riding** [1] - 187:8
**rights** [2] - 145:6, 198:5
**Rigor** [1] - 168:15
**rigor** [1] - 168:18
**risk** [2] - 46:3, 46:5
**risky** [1] - 190:15
**Road** [2] - 163:13, 186:7
**rob** [16] - 18:3, 18:24, 19:3, 19:22, 29:13, 70:7, 78:14, 84:6, 84:25, 85:3, 88:9, 88:10, 89:23, 122:3
**robbed** [5] - 45:24, 49:19, 49:24, 50:14, 71:20
**robberies** [1] - 50:18
**robbery** [27] - 13:17, 14:11, 19:10, 19:19, 21:2, 28:20, 28:24, 33:8, 50:11, 65:15, 73:24, 74:9, 74:17, 85:7, 89:22, 90:14, 91:6, 107:19, 112:19, 113:2, 113:7, 113:9, 113:16, 114:2, 114:4, 114:25, 115:2
**robbing** [4] - 19:14, 70:12, 70:15, 70:23
**Robert** [1] - 1:16
**Rock** [2] - 45:1, 45:2
**role** [2] - 94:20, 104:23
**rolling** [1] - 42:8
**Ron** [2] - 75:20
**Ronald** [1] - 13:21
**Room** [1] - 1:24
**room** [8] - 34:1, 62:17, 75:7, 75:24, 110:11, 122:20, 133:2, 133:4
**roughly** [1] - 44:12
**Rowe** [3] - 12:10, 40:20, 110:9
**RPR** [1] - 1:24
**rule** [2] - 143:23, 145:3
**ruled** [2] - 141:12, 143:11
**ruling** [2] - 153:9, 196:25
**rumor** [7] - 139:16, 139:17, 142:19, 144:19, 145:24, 145:25, 146:17
**rumors** [7] - 135:13, 135:17, 138:11, 140:1, 145:18, 145:20, 154:12
**run** [1] - 152:1
**running** [3] - 39:17, 40:4, 163:18

## S

**S-56** [1] - 30:6
**said-she** [2] - 137:23, 137:24
**Sakellaris** [3] - 75:11, 122:21, 125:6
**sale** [2] - 5:4, 11:7
**samples** [2] - 174:24, 175:6
**sat** [1] - 44:1
**save** [1] - 137:18
**saw** [6] - 30:4, 48:8, 48:12, 106:14, 130:16
**scared** [1] - 118:22
**scene** [19] - 30:1, 114:2, 159:22, 160:1, 163:20, 163:25, 164:1, 165:12, 166:15, 167:6, 169:9, 169:15, 171:11, 171:12, 174:24, 174:25, 175:6, 176:16, 198:8
**scheme** [3] - 18:3, 29:13, 85:7
**Scope** [2] - 117:5, 128:16
**screen** [13] - 57:4, 57:10, 60:1, 84:18, 99:5, 111:25, 112:1, 160:7, 160:24, 161:14, 161:15
**search** [4] - 37:6, 182:17, 190:2, 190:4
**searched** [1] - 37:15
**seat** [16] - 113:22, 164:23, 165:14, 165:15, 165:16, 165:23, 167:9, 167:16, 168:25, 169:1, 169:3, 172:7, 173:9, 184:4, 184:5, 184:7
**seated** [1] - 158:19
**seats** [1] - 181:24
**second** [11] - 6:17, 30:15, 38:14, 46:21, 97:25, 143:24, 153:11, 163:10, 196:2, 198:9, 198:16
**second-hand** [1] - 198:9
**secondary** [1] - 164:3
**seconds** [1] - 145:9
**Secret** [1] - 177:20
**section** [4] - 38:8, 93:7, 141:22, 191:17
**secured** [1] - 90:19
**security** [3] - 177:24, 178:1, 178:3
**See** [3] - 7:20, 22:14, 147:24
**see** [43] - 2:18, 10:17, 17:11, 19:17, 22:8, 22:19, 22:24, 30:13, 30:18, 46:23, 57:18, 62:9, 62:10, 83:8, 101:18, 106:13, 113:24, 120:14, 125:23, 126:18, 137:15, 140:16, 146:12, 149:21, 153:13, 156:10, 157:4, 160:24, 163:13, 165:19, 166:1, 167:9, 170:16, 171:14, 175:16, 175:21, 181:1, 191:21, 192:11, 192:15, 195:20, 198:18, 198:22
**seek** [1] - 139:11
**Seem** [1] - 33:25
**seem** [2] - 3:3, 198:14
**self** [5] - 149:20, 151:4, 151:23, 193:18
**self-authenticating** [1] - 193:18
**self-evident** [4] - 149:20, 151:4, 151:23
**sell** [5] - 4:20, 4:24, 9:14, 10:14, 45:14
**selling** [3] - 10:17, 105:8, 105:13
**semiautomatic** [1] - 24:10
**sense** [4] - 3:3, 35:22, 152:15, 162:5
**sent** [2] - 17:6, 62:17
**sentence** [6] - 48:13, 48:16, 94:15, 100:3, 100:14, 132:4
**sentencing** [2] - 36:14, 96:19
**separate** [2] - 195:15, 195:17
**separately** [1] - 195:9
**September** [9] - 8:20, 21:22, 24:18, 25:2, 31:3, 75:10, 77:3, 91:24, 119:16
**Sergeant** [5] - 75:19, 122:11, 128:6, 160:3, 165:21
**serial** [1] - 193:22
**series** [6] - 27:3, 51:22, 60:2, 117:18, 124:20, 125:21
**serious** [7] - 47:6, 63:9, 64:3, 120:18, 120:24, 125:12, 154:21
**Service** [1] - 177:20
**serving** [1] - 110:8
**session** [24] - 7:1, 7:11, 25:2, 43:15, 44:1, 51:24, 63:19, 65:18, 75:6, 75:9, 76:17, 76:18, 78:22, 87:3, 92:6, 93:6, 109:11, 118:10, 118:17, 119:15, 122:8, 122:20, 123:22
**sessions** [28] - 6:23, 7:25, 24:17, 27:3, 42:2, 42:4, 42:11, 42:14, 42:18, 42:22, 42:25, 43:14, 52:1, 52:13, 65:7, 76:3, 81:15, 81:19, 83:18, 83:23, 85:19, 88:22, 96:1, 100:22, 107:2, 107:6, 123:9, 123:17
**set** [6] - 16:3, 125:18, 152:3, 155:11, 157:7, 168:19
**sets** [2] - 43:5

**settle** [1] - 168:15
**seven** [2] - 58:18, 159:14
**Seven** [2] - 22:22, 137:5
**sever** [2] - 154:19, 155:22
**several** [11] - 108:20, 127:25, 135:3, 152:20, 152:21, 170:2, 184:22, 193:5, 194:8, 195:7, 197:11
**severance** [1] - 150:9
**sex** [1] - 78:12
**shall** [5] - 95:13, 96:25, 97:1, 97:2, 124:14
**shape** [1] - 172:3
**SHAWN** [1] - 1:8
**Shawn** [7] - 10:18, 23:21, 24:20, 26:10, 27:8, 45:7, 184:24
**shell** [6] - 170:16, 170:18, 170:22, 171:4, 171:14
**Shelly** [2] - 34:7, 184:24
**SHELLY** [1] - 1:8
**Shelton** [4] - 45:1, 130:14, 132:1, 136:7
**SHELTON** [1] - 1:7
**shit** [1] - 138:5
**shooter** [5] - 152:13, 152:14, 152:23, 176:10, 176:13
**shooting** [1] - 80:3
**shootings** [3] - 76:3, 76:8
**short** [1] - 133:13
**shortly** [2] - 133:5, 133:6
**shot** [14] - 31:7, 38:21, 165:11, 165:12, 165:22, 167:5, 169:12, 169:14, 170:2, 171:22, 172:9, 176:2, 176:8, 176:14
**shots** [1] - 12:18
**show** [29] - 13:3, 22:12, 84:16, 91:16, 127:8, 139:1, 157:19, 160:10, 161:13, 164:24, 166:1, 166:23, 167:6, 168:22, 171:7, 171:13, 171:17, 173:5, 174:9, 174:18, 175:15, 178:5, 178:8, 182:20, 183:9, 183:21, 184:1, 190:6, 191:16
**showed** [5] - 22:15, 22:18, 98:3, 181:1, 184:4
**showing** [1] - 183:3
**shown** [12] - 62:22, 62:23, 62:24, 62:25, 117:12, 130:9, 131:13, 131:16, 131:19, 166:14, 175:15, 193:7
**shows** [6] - 135:25, 152:19, 166:22, 167:23, 172:1, 183:4
**side** [14] - 61:1, 162:12, 162:13, 163:4, 165:22, 167:23, 171:19, 171:23, 175:7, 175:9, 175:22, 198:17
**sign** [2] - 174:6, 176:1
**signature** [4] - 53:7, 54:21, 190:11, 200:10
**signed** [1] - 35:25
**significance** [1] - 195:20
**significant** [1] - 195:21
**signing** [1] - 96:11
**silent** [1] - 145:6
**similar** [1] - 101:25
**simple** [1] - 143:11
**simply** [12] - 2:8, 35:4, 138:11, 141:22, 142:13, 143:2, 143:7, 144:16, 146:16, 146:17, 157:17, 196:23
**site** [1] - 162:16
**sitting** [3] - 22:16, 32:20, 38:2
**situation** [2] - 45:23, 197:7
**situations** [1] - 197:21
**Six** [3] - 91:24, 118:20, 119:17
**six** [4] - 21:18, 87:2, 125:10, 125:16
**Sixth** [1] - 137:19
**ski** [1] - 190:16
**skin** [3] - 169:23, 169:24, 169:25
**slowly** [1] - 70:14
**smart** [2] - 97:14, 197:11
**Smith** [3] - 13:25, 14:2, 14:6
**smoke** [1] - 10:2
**Smokey** [1] - 53:23
**snatch** [1] - 107:21
**Snitching** [1] - 117:13
**Snuck** [1] - 68:25
**sold** [8] - 9:18, 10:24, 11:12, 11:16, 46:8, 127:13, 127:16, 127:19
**solid** [1] - 195:2
**solved** [1] - 143:11
**someone** [5] - 18:21, 92:11, 160:2, 169:5, 198:10
**sometime** [5] - 43:16, 44:11, 105:25, 168:13, 194:22
**Sometimes** [3] - 72:21, 109:8, 112:4
**sometimes** [14] - 46:25, 47:21, 53:5, 62:4, 62:8, 62:21, 62:24, 71:8, 81:15, 90:22, 102:21, 109:8, 112:8, 127:10
**Somewhat** [3] - 58:5, 64:23, 126:4
**somewhat** [2] - 62:21, 102:9
**somewhere** [1] - 52:21
**songs** [1] - 72:23
**Sorry** [2] - 61:25, 189:3
**sorry** [18] - 15:3, 25:1, 26:24, 27:7, 31:10, 54:14, 55:12, 70:13, 75:15, 93:9, 157:18, 160:12, 161:4, 167:14, 170:13, 175:24, 177:20, 180:12
**sort** [15] - 40:3, 43:5, 53:4, 53:7, 54:21, 54:24, 63:14, 77:5, 81:12, 102:14, 107:6, 158:23, 194:24, 198:9, 198:17
**sought** [1] - 188:5
**sound** [2] - 36:1, 58:4
**Sounds** [2] - 39:2, 39:3
**source** [1] - 11:12
**south** [1] - 163:18
**sovereign** [1] - 195:13
**sovereignty** [5] - 195:22, 196:6, 196:7, 196:17, 197:16
**spatters** [1] - 176:9
**speaker** [1] - 146:3
**speaking** [2] - 35:18, 186:22
**special** [1] - 75:14
**Special** [2] - 122:10
**specialized** [1] - 107:6
**specific** [1] - 75:5
**specifically** [5] - 6:25, 12:4, 13:8, 84:25, 176:24
**Specifically** [1] - 187:2
**specify** [1] - 41:2
**specs** [1] - 169:25
**speculate** [1] - 62:24
**spell** [1] - 158:20
**Spence** [64] - 4:4, 17:22, 18:4, 18:8, 18:9, 18:14, 18:25, 19:23, 20:2, 20:15, 20:16, 21:2, 21:3, 21:4, 21:10, 21:14, 23:17, 25:1, 25:3, 25:10, 25:22, 26:1, 26:4, 26:9, 29:14, 29:15, 29:18, 29:24, 30:12, 30:14, 32:8, 32:25, 33:5, 33:8, 33:9, 44:23, 65:3, 65:8, 65:15, 65:16, 69:16, 73:25, 77:11, 77:25, 79:1, 79:16, 80:4, 80:18, 88:10, 89:22, 89:24, 92:3, 94:20, 95:25, 97:10, 108:8, 114:25, 115:24, 122:3, 122:4, 122:17, 132:17, 132:19, 197:13
**Spence's** [1] - 106:25
**Spences** [1] - 21:15
**spend** [1] - 65:13
**spoken** [2] - 11:3, 78:5
**spot** [4] - 30:13, 30:17, 163:7, 191:1
**spots** [2] - 175:20, 176:5
**spread** [2] - 131:1, 131:20
**spreads** [2] - 130:10, 131:13
**stab** [1] - 129:16
**stand** [4] - 55:10, 57:13, 66:17, 158:5
**standing** [2] - 30:13, 152:16
**stands** [2] - 15:25, 114:10
**Start** [1] - 117:6
**start** [7] - 46:23, 57:19, 100:15, 110:3, 111:6, 137:14, 157:5
**started** [12] - 42:7, 42:8, 48:2, 54:9, 54:16, 81:19, 81:25, 82:9, 110:11, 110:22, 141:25, 168:15
**Starting** [1] - 31:3
**starting** [2] - 22:14, 194:16
**starts** [1] - 137:6
**State** [4] - 34:8, 95:10, 158:3, 158:20
**state** [19] - 24:18, 34:23, 36:8, 36:13, 43:21, 94:6, 94:12, 95:4, 95:13, 95:14, 99:24, 120:17, 120:22, 188:10, 196:16, 197:2, 197:5, 197:12
**State's** [5] - 34:24, 51:25, 99:11, 99:16, 158:5
**statement** [65] - 2:19, 3:1, 6:14, 6:18, 6:20, 8:3, 8:14, 8:24, 26:25, 27:2, 28:11, 38:3, 38:6, 38:14, 38:18, 38:21, 39:3, 40:2, 43:4, 57:5, 58:7, 58:17, 59:22, 59:23, 60:24, 61:5, 61:7, 61:16, 61:17, 61:19, 62:6, 62:9, 62:11, 62:12, 62:13, 62:14, 63:2, 65:12, 65:20, 76:19, 78:21, 95:16, 101:14, 107:20, 115:1, 120:17, 126:25, 134:4, 134:8, 135:2, 135:4, 141:4, 141:11, 143:8, 144:22, 145:15, 145:23, 147:3, 147:13, 148:6, 150:1, 158:5, 196:18
**statements** [18] - 6:2, 6:9, 26:13, 26:15, 27:10, 43:2, 51:23, 65:7, 66:23, 67:6, 73:21, 96:7, 96:20, 96:23, 114:23, 125:19, 139:5, 198:6
**states** [1] - 114:15
**States** [6] - 7:2, 35:19, 122:8, 125:5, 157:22, 158:16
**STATES** [2] - 1:1, 1:5
**stating** [1] - 98:7
**station** [3] - 165:2, 173:3, 184:19
**status** [3] - 194:14, 195:12
**stay** [1] - 182:8
**stayed** [2] - 50:8, 113:4
**steering** [3] - 172:4, 172:10, 172:14
**stenographically** [1] - 200:4
**step** [1] - 192:13
**Stewart** [8] - 39:12, 39:18, 39:24, 102:24, 103:4, 103:7, 109:13, 110:12
**Stewart's** [1] - 39:14
**sticking** [2] - 171:19, 171:23
**still** [18] - 33:5, 45:24, 54:16, 54:18, 80:2, 80:14, 102:13, 134:17, 136:7, 152:17, 164:9, 165:4, 165:14, 165:15, 165:16, 167:9, 168:1, 172:19
**stippling** [3] - 169:16, 169:18, 169:20
**Stippling** [1] - 169:22
**stipulate** [1] - 2:8
**stipulation** [3] - 194:10, 194:13, 194:18
**Stocksdale** [21] - 43:19, 44:2, 51:25, 59:23, 60:13, 63:19, 63:23,

64:5, 64:7, 64:16, 65:1, 74:7, 74:16, 74:24, 93:12, 93:15, 102:9, 120:22, 121:7, 125:11, 126:10
**Stop** [1] - 117:12
**stopped** [3] - 79:18, 115:24, 116:2
**stops** [1] - 161:10
**story** [3] - 65:14, 122:24, 135:5
**straight** [1] - 133:5
**straightforward** [2] - 134:12, 134:14
**strange** [1] - 151:25
**street** [30] - 36:25, 45:1, 48:9, 48:12, 67:25, 68:5, 71:18, 127:14, 135:13, 135:17, 136:7, 138:11, 139:5, 140:1, 142:19, 142:20, 144:20, 145:20, 146:18, 152:9, 154:13, 160:15, 160:22, 161:8, 162:12, 162:23, 162:24, 163:15, 175:17, 176:5
**Street** [2] - 1:25, 4:17
**streets** [2] - 18:18, 137:23
**strength** [1] - 102:15
**Stricker** [1] - 59:10
**strike** [7] - 6:1, 15:3, 20:22, 106:19, 117:8, 121:5, 188:1
**Strike** [1] - 75:2
**Stuff** [1] - 64:13
**stuff** [8] - 29:6, 64:12, 65:3, 121:10, 137:24, 146:6, 183:7, 184:12
**Subject** [1] - 144:15
**subject** [3] - 63:20, 95:13, 99:3
**submit** [3] - 184:13, 185:6, 185:21
**submitted** [3] - 182:15, 196:18, 197:6
**subpoenaed** [1] - 186:18
**subscriber** [1] - 186:21
**subscribers** [1] - 187:4
**subsequent** [3] - 96:11, 135:21, 155:16
**subsequently** [3] - 178:6, 182:17, 185:19
**substance** [1] - 16:1
**substantial** [2] - 134:3, 198:4
**substantive** [4] - 63:2, 63:4, 66:24, 67:8
**subway** [1] - 152:2
**succeeding** [1] - 155:15
**sufficient** [2] - 35:5, 140:16
**sufficiently** [1] - 149:1
**suggest** [2] - 60:23, 195:1
**suggested** [1] - 150:9
**suggesting** [2] - 2:12, 139:21
**suggestion** [2] - 155:6, 162:7
**suggests** [1] - 154:4
**sum** [1] - 20:6
**summary** [1] - 62:11
**summer** [1] - 3:18
**supervised** [1] - 14:21
**supplied** [1] - 90:13
**supplier** [4] - 5:6, 5:16, 103:24, 104:6
**suppliers** [1] - 104:2
**supplies** [1] - 104:14
**supplying** [1] - 104:5
**supports** [1] - 197:18
**suppose** [4] - 85:2, 153:6, 156:18, 177:10
**supposed** [11] - 15:11, 17:8, 26:1, 27:18, 27:22, 28:1, 31:19, 32:3, 76:19, 85:12, 118:12
**supposedly** [3] - 45:1, 128:4, 128:8
**supposing** [1] - 140:12
**supposition** [1] - 140:14
**Supreme** [2] - 157:21, 158:2
**surely** [1] - 134:22
**surprised** [2] - 77:2, 77:6
**surveillance** [4] - 21:9, 21:12, 21:25, 22:4
**surveillances** [2] - 90:17, 90:23
**surveilled** [1] - 21:15
**Sustain** [1] - 60:11
**Sustained** [7] - 13:23, 44:16, 54:13, 85:17, 86:3, 124:3, 132:13
**sustained** [7] - 6:7, 7:17, 14:13, 16:18, 132:18, 132:20, 169:11
**sweatpants** [2] - 174:17, 174:19
**switch** [1] - 93:22
**SWORN** [1] - 158:17

## T

**tags** [1] - 173:6
**talkies** [1] - 90:20
**talks** [2] - 125:21, 190:13
**tall** [1] - 25:15
**taller** [3] - 23:8, 23:11, 23:15
**tangible** [1] - 96:10
**tape** [68] - 28:11, 41:24, 42:8, 42:12, 43:4, 43:25, 63:19, 72:11, 72:13, 74:13, 74:19, 90:19, 101:14, 102:1, 135:7, 135:8, 135:10, 137:15, 137:16, 139:3, 139:18, 139:19, 140:11, 140:16, 141:10, 141:11, 141:20, 141:22, 141:24, 141:25, 142:4, 142:19, 143:9, 143:21, 144:1, 144:13, 144:19, 147:19, 148:1, 148:9, 149:13, 151:7, 151:13, 151:15, 151:17, 154:4, 154:7, 154:9, 154:13, 154:17, 156:3, 156:6, 156:10, 156:14, 156:17, 156:19, 156:22, 157:8, 157:9, 157:13, 157:20, 177:15, 177:22, 178:24, 179:8, 192:16, 198:2
**Tape** [1] - 28:14
**taped** [21] - 6:13, 6:18, 38:3, 38:5, 38:6, 38:14, 38:18, 38:21, 43:2, 51:23, 52:13, 57:4, 57:5, 58:7, 58:17, 59:22, 65:6, 65:12, 65:20, 144:8, 144:10
**tapes** [2] - 101:4, 123:12
**targeted** [1] - 135:25
**tattoo** [9] - 55:1, 55:8, 55:18, 55:20, 55:24, 56:1, 57:14, 57:16, 114:11
**tattoos** [4] - 53:5, 54:21, 54:24, 55:5
**Tech** [3] - 110:14, 110:15
**tech** [1] - 34:2
**technical** [1] - 33:25
**technicians** [1] - 174:24
**telephone** [5] - 174:18, 184:9, 186:18, 188:17, 188:19
**telephones** [1] - 183:10
**ten** [2] - 33:23, 53:25
**Ten** [2] - 122:18, 127:9
**term** [7] - 46:2, 51:13, 88:19, 89:5, 89:11, 108:7, 127:22
**terms** [6] - 36:8, 47:13, 94:8, 95:3, 96:24, 195:20
**Terrace** [3] - 59:13, 59:17, 59:18
**terribly** [2] - 66:20, 69:22
**Terry** [21] - 37:13, 38:22, 39:9, 39:21, 39:25, 55:21, 57:14, 66:1, 66:3, 68:3, 68:5, 72:8, 77:12, 78:10, 81:24, 82:12, 83:16, 94:9, 94:12, 95:21, 109:16
**tested** [2] - 25:13, 175:2
**testified** [24] - 6:1, 10:7, 14:3, 14:14, 21:24, 22:3, 23:20, 26:6, 44:4, 47:19, 47:24, 50:23, 51:10, 72:10, 81:23, 89:9, 93:7, 103:12, 104:1, 104:10, 105:22, 106:7, 193:13
**testifies** [1] - 153:21
**testify** [10] - 12:16, 101:11, 112:14, 136:6, 136:15, 141:4, 149:22, 153:18, 156:7, 194:1
**testifying** [4] - 8:17, 8:19, 12:22, 150:10
**testimony** [104] - 4:17, 4:23, 5:1, 5:3, 5:19, 6:3, 6:4, 6:6, 8:24, 8:25, 9:8, 9:22, 10:10, 10:15, 10:24, 11:25, 14:17, 16:9, 16:12, 17:21, 17:25, 18:5, 19:14, 19:17, 20:3, 21:16, 23:14, 23:25, 24:12, 25:21, 25:25, 26:3, 26:8, 26:9, 26:12, 26:15, 26:16, 27:10, 27:17, 28:1, 30:1, 30:14, 30:21, 31:13, 31:17, 31:19, 31:23, 32:2, 32:23, 44:7, 44:9, 46:19, 47:3, 47:4, 48:4, 49:13, 51:24, 52:4, 60:18, 60:25, 61:4, 61:8, 61:11, 61:12, 61:13, 61:14, 61:18, 61:22, 62:5, 63:5, 63:8, 63:11, 63:12, 67:6, 70:6, 72:25, 73:22, 79:13, 79:25, 82:10, 84:22, 85:13, 95:8, 96:9, 101:11, 103:2, 109:22, 110:18, 111:2, 118:25, 119:11, 119:22, 121:24, 124:12, 126:1, 127:9, 135:21, 169:14, 180:5, 185:17, 193:12, 198:3, 198:6
**TFO** [2] - 104:16, 107:9
**THAT** [1] - 55:14
**THE** [266] - 1:1, 1:2, 2:2, 2:4, 2:16, 3:9, 3:12, 3:16, 6:7, 7:5, 7:10, 7:17, 7:19, 7:20, 7:23, 8:9, 12:20, 13:2, 13:11, 13:23, 14:13, 15:17, 15:23, 16:18, 22:12, 27:5, 30:8, 33:13, 33:17, 33:21, 33:24, 34:1, 36:11, 40:14, 40:16, 41:18, 44:16, 51:2, 52:11, 54:13, 55:12, 57:2, 57:9, 60:8, 60:10, 60:12, 60:15, 62:2, 66:10, 66:13, 66:19, 67:4, 67:11, 67:14, 67:19, 67:21, 78:19, 81:6, 82:6, 82:16, 82:25, 83:1, 83:2, 83:3, 84:10, 84:17, 85:17, 86:3, 86:18, 88:24, 89:8, 89:18, 91:20, 92:18, 92:24, 93:10, 97:17, 97:23, 98:21, 99:8, 101:23, 102:18, 104:8, 105:21, 106:12, 106:17, 106:20, 107:17, 111:9, 111:16, 111:22, 113:13, 115:7, 115:13, 116:9, 116:15, 116:20, 117:6, 117:9, 124:3, 125:1, 126:7, 126:23, 128:17, 128:24, 129:14, 129:18, 130:21, 130:23, 131:3, 131:5, 131:8, 132:6, 132:13, 132:18, 132:20, 132:22, 132:24, 133:12, 133:23, 134:1, 134:5, 134:7, 134:12, 134:16, 134:20, 134:22, 135:1, 135:7, 135:13, 135:16, 135:22, 136:3, 136:10, 136:13, 136:17, 136:19, 136:21, 136:23, 137:1, 137:8, 137:11, 137:18, 138:15, 138:18, 138:21, 138:25, 139:10, 139:20, 139:24, 140:5, 140:9, 140:14, 140:21, 140:24, 141:6, 141:8, 141:14, 141:18, 141:23, 142:7, 142:12, 143:4, 143:13, 143:15, 143:19, 144:3, 144:7, 144:11, 144:15, 144:21, 144:25, 145:2, 145:22, 146:2, 146:10, 146:12, 146:19, 146:24, 147:1, 147:6, 147:13, 147:24, 148:19, 148:22,

149:4, 149:9, 149:12,
149:18, 150:6, 150:13,
150:18, 150:22, 150:25,
151:5, 151:24, 152:14,
153:13, 153:16, 153:21,
153:25, 154:12, 154:19,
154:21, 154:25, 155:3,
155:6, 155:10, 155:17,
155:21, 156:2, 156:5,
156:13, 156:20, 157:4,
157:11, 157:15, 157:18,
158:10, 158:18, 158:19,
158:21, 158:23, 159:2,
159:3, 162:2, 166:3,
166:6, 166:10, 166:12,
166:17, 166:19, 166:25,
167:3, 167:13, 181:6,
186:16, 187:16, 187:23,
188:3, 188:22, 189:9,
190:19, 190:22, 190:25,
191:3, 191:13, 192:5,
192:15, 192:19, 192:21,
192:24, 193:2, 193:4,
193:8, 193:16, 194:2,
194:23, 195:6, 195:16,
195:18, 195:24, 196:9,
197:25, 198:18, 198:21

**theirs** [1] - 11:21
**theoretical** [1] - 196:21
**theory** [5] - 148:2,
151:13, 151:15, 152:5,
152:20
**Therefore** [1] - 125:19
**therefore** [2] - 143:1,
146:13
**therefrom** [1] - 96:12
**they've** [1] - 35:8
**thinking** [2] - 77:7,
196:9
**thinks** [3] - 140:19,
142:16, 154:3
**third** [4] - 6:20, 38:18,
198:9, 198:16
**third-hand** [2] - 198:9,
198:16
**Thomas** [2] - 1:20,
75:15
**thoughts** [2] - 41:10,
97:25
**thousand** [2] - 74:11,
127:3
**threatened** [1] - 117:25
**three** [17] - 14:10,
14:21, 42:11, 42:14,
43:2, 51:23, 66:24,
67:24, 76:19, 89:9,
151:14, 151:16, 152:8,
155:15, 155:16, 166:23,
173:8
**Three** [6] - 98:4, 99:12,

125:15, 150:3, 166:9,
166:10
**throat** [1] - 55:8
**throws** [1] - 56:6
**tickets** [2] - 73:12,
73:14
**tie** [1] - 139:6
**tied** [3] - 76:8, 128:8
**Tincher** [1] - 75:19
**tire** [2] - 182:25, 183:1
**tired** [2] - 40:4, 110:25
**today** [14] - 26:10, 27:9,
27:21, 29:10, 31:11,
43:12, 54:17, 54:18,
63:12, 89:10, 96:1,
141:21, 157:9, 157:13
**together** [14] - 5:11,
5:15, 5:23, 9:2, 47:21,
50:24, 56:7, 64:12,
68:10, 104:13, 105:17,
148:3, 148:8, 150:23
**toll** [1] - 186:18
**Tom** [2] - 34:6, 122:10
**tomorrow** [7] - 157:20,
192:6, 192:11, 192:25,
194:22, 198:19, 198:22
**Tonya** [28] - 20:16,
21:3, 21:10, 21:14,
23:17, 25:1, 25:3, 26:1,
26:3, 26:9, 30:12, 30:14,
32:24, 33:9, 44:22,
65:16, 69:16, 77:11,
91:1, 94:20, 95:24,
97:10, 108:8, 115:24,
122:2, 122:17, 197:13
**took** [7] - 5:5, 11:7,
47:13, 47:14, 103:23,
115:16, 115:17
**top** [2] - 137:6, 166:21
**total** [2] - 166:12, 171:4
**touch** [3] - 72:2, 72:4,
161:15
**touched** [1] - 161:20
**toward** [2] - 136:25,
158:19
**towed** [3] - 176:17,
176:19, 182:18
**tracks** [5] - 152:2,
161:11, 162:13, 162:14,
163:3
**traffic** [1] - 16:2
**transaction** [1] - 5:18
**transcribed** [1] - 200:7
**transcript** [24] - 22:5,
31:2, 43:9, 43:25, 44:7,
44:9, 62:4, 62:7, 62:13,
62:22, 62:23, 62:25,
63:1, 108:15, 111:25,
135:18, 137:5, 142:21,
142:22, 157:14, 157:16,

192:17, 200:7
**transcripts** [4] - 62:15,
101:4, 123:12, 157:17
**transferred** [1] - 195:11
**travel** [1] - 47:21
**traveling** [1] - 48:20
**trees** [1] - 157:18
**trial** [22] - 16:3, 36:6,
36:15, 60:25, 61:18,
86:14, 95:3, 101:8,
101:11, 112:14, 119:11,
123:5, 149:7, 149:23,
149:25, 150:10, 153:20,
158:25, 196:7, 196:13,
197:13, 198:5
**triangular** [1] - 172:3
**tribunal** [1] - 96:10
**tried** [8] - 5:23, 86:14,
86:15, 87:17, 88:2,
148:8, 150:19, 158:25
**trip** [1] - 49:23
**trips** [5] - 104:13,
104:19, 104:24, 105:5,
105:16
**trooper** [1] - 151:21
**trouble** [6] - 15:12,
64:13, 101:19, 102:21,
111:1, 164:17
**truck** [1] - 41:5
**true** [27] - 7:11, 11:9,
19:21, 23:16, 31:15,
34:22, 38:2, 38:12, 45:6,
45:9, 63:14, 65:6, 70:24,
71:19, 72:19, 74:23,
74:25, 75:1, 78:9, 78:16,
89:16, 114:19, 122:5,
122:12, 145:13, 154:12,
195:10
**trumped** [1] - 145:4
**trunk** [2] - 32:21,
184:12
**trust** [1] - 3:17
**truth** [5] - 47:9, 64:18,
64:25, 89:21, 145:14
**truthful** [1] - 96:17
**truthfulness** [2] -
125:17, 125:23
**try** [14] - 26:7, 34:9,
44:21, 98:8, 111:1,
112:5, 141:13, 150:21,
150:24, 194:20, 195:22,
195:25, 196:1
**trying** [11] - 33:1, 34:2,
86:24, 90:9, 98:18,
102:13, 137:18, 137:19,
143:14, 155:7, 194:18
**Tuesday** [4] - 1:11,
40:2, 47:14, 51:11
**turned** [6] - 37:9, 41:24,
43:15, 123:3, 168:5,

182:15
**twice** [1] - 151:22
**Two** [3] - 23:2, 150:1,
190:1
**two** [41] - 16:15, 21:17,
21:19, 23:4, 23:6, 23:25,
31:20, 32:2, 32:10,
32:25, 66:24, 76:7,
89:14, 106:14, 106:15,
109:7, 109:8, 113:10,
113:20, 115:5, 130:4,
139:1, 143:17, 152:8,
152:11, 152:25, 159:20,
160:6, 161:17, 161:20,
161:21, 164:9, 167:6,
169:10, 170:23, 173:18,
176:7, 182:10, 183:10,
187:15, 187:17
**type** [3] - 127:22,
127:23, 162:20
**typically** [2] - 53:8,
93:18
**Tyree** [9] - 39:12, 39:14,
39:18, 39:24, 102:23,
103:4, 103:7, 109:13,
110:12

## U

**U.S** [10] - 1:24, 6:23,
7:12, 8:1, 9:11, 24:17,
26:13, 75:14, 83:19,
122:20
**ultimately** [1] - 61:10
**Um-hum** [1] - 116:24
**unavailable** [1] - 71:23
**under** [18] - 3:20, 31:13,
94:7, 95:3, 95:10, 95:11,
100:5, 100:17, 119:11,
121:14, 124:15, 125:21,
147:2, 152:2, 152:19,
179:16
**underlying** [1] - 13:5
**undersigned** [1] - 98:7
**understated** [1] -
121:15
**understood** [4] - 72:12,
73:1, 73:11, 95:5
**undertakings** [1] -
125:18
**unfair** [4] - 156:5,
156:7, 156:8, 156:22
**uniformed** [1] - 163:25
**UNITED** [2] - 1:1, 1:5
**United** [6] - 7:1, 35:19,
122:8, 125:5, 157:21,
158:16
**unless** [1] - 62:14
**unlocked** [2] - 168:9,

170:12
**Unlocked** [1] - 170:13
**unmistakable** [1] -
195:2
**unquote** [1] - 64:1
**unresponsive** [2] -
159:21, 161:17
**unsure** [1] - 108:2
**untrue** [1] - 95:2
**up** [95] - 2:17, 3:6, 4:5,
4:10, 4:12, 4:15, 5:5,
5:9, 8:11, 9:2, 9:20,
9:21, 9:23, 10:1, 10:7,
10:11, 11:7, 13:24,
18:16, 20:3, 21:13,
30:22, 31:9, 31:20,
32:16, 37:9, 47:24, 48:2,
48:4, 48:7, 48:22, 57:4,
60:1, 61:10, 64:2, 64:11,
68:20, 68:25, 78:5, 83:4,
83:23, 87:15, 89:1, 92:9,
99:25, 100:11, 102:13,
104:2, 105:25, 106:24,
107:21, 108:23, 110:20,
112:19, 115:2, 116:13,
119:22, 119:23, 120:23,
121:10, 126:23, 126:24,
127:15, 127:17, 128:2,
129:15, 129:20, 130:1,
134:9, 134:19, 135:17,
136:23, 138:5, 138:7,
148:18, 152:1, 152:3,
152:9, 152:19, 155:12,
156:9, 157:7, 159:21,
165:17, 166:17, 167:12,
170:5, 173:12, 189:3,
190:16, 193:22, 197:9
**upstanding** [1] - 72:5
**US** [1] - 27:3
**USA** [1] - 200:4
**users** [1] - 186:22

## V

**vacant** [1] - 162:21
**vague** [2] - 109:7, 179:2
**valid** [1] - 167:1
**valuable** [3] - 135:5,
140:19, 144:10
**value** [1] - 154:6
**various** [3] - 104:12,
128:8, 184:19
**vehicle** [23] - 41:9, 92:4,
120:10, 152:9, 159:21,
165:16, 167:22, 168:18,
169:8, 170:23, 171:21,
172:2, 172:16, 173:2,
175:7, 175:8, 175:11,
175:25, 176:10, 176:15,

182:22, 182:25, 183:12
**verdict** [1] - 61:3
**verify** [1] - 13:6
**version** [2] - 178:16, 178:23
**victim** [5] - 20:20, 109:1, 171:3, 176:8, 197:14
**victim's** [2] - 13:21, 172:22
**victims** [6] - 165:3, 165:4, 165:16, 169:10, 174:5, 175:4
**video** [1] - 117:13
**view** [1] - 135:6
**Village** [1] - 37:19
**violate** [1] - 124:5
**violated** [7] - 14:18, 94:23, 96:24, 97:5, 98:18, 124:16, 126:3
**violates** [1] - 124:13
**Violation** [1] - 82:8
**violation** [9] - 16:6, 16:9, 41:15, 82:4, 95:14, 110:7, 115:19, 187:24, 188:13
**virtually** [1] - 14:17
**vitiate** [1] - 3:1
**voice** [35] - 3:5, 28:15, 139:18, 139:19, 139:21, 140:6, 141:20, 142:4, 143:8, 149:13, 149:14, 149:19, 149:20, 152:19, 152:25, 153:3, 154:4, 154:15, 156:6, 156:19, 177:15, 177:17, 177:23, 178:4, 178:12, 178:21, 179:10, 179:12, 180:11, 180:14, 181:14, 188:20, 189:4
**voices** [10] - 148:14, 151:12, 151:14, 151:17, 152:25, 155:12, 155:13, 155:15, 155:20, 179:7
**VOLUME** [1] - 1:11
**voluntarily** [1] - 145:6

## W

**W-1** [1] - 171:7
**W-10** [2] - 160:19, 163:10
**W-11** [1] - 162:22
**W-12** [1] - 167:5
**W-13** [1] - 167:6
**W-14** [1] - 167:14
**W-15** [1] - 171:17
**W-16** [1] - 167:18
**W-17** [1] - 167:23
**W-18** [1] - 183:21
**W-19** [1] - 184:1
**W-2** [1] - 178:8
**W-20** [1] - 183:3
**W-21** [1] - 182:21
**W-22** [1] - 174:9
**W-23** [1] - 174:18
**W-25** [1] - 182:24
**W-26** [1] - 168:22
**W-27** [1] - 172:25
**W-28** [1] - 173:7
**W-29** [1] - 173:12
**W-3** [1] - 171:7
**W-32** [2] - 178:18, 178:20
**W-32A** [1] - 178:23
**W-33** [1] - 178:12
**W-33A** [1] - 178:15
**W-4** [1] - 171:7
**W-49** [1] - 165:11
**W-5-G** [1] - 191:4
**W-50** [1] - 175:16
**W-51** [1] - 165:17
**W-52** [1] - 164:25
**W-53** [1] - 172:1
**W-54** [1] - 172:9
**W-55** [1] - 172:12
**W-56** [2] - 172:15, 172:24
**W-5l** [1] - 190:8
**W-6** [1] - 183:9
**W-64** [1] - 173:15
**Wabash** [8] - 152:2, 160:5, 160:12, 160:17, 160:23, 163:2, 163:3, 165:3
**wagon** [3] - 165:2, 173:3, 184:19
**waistband** [1] - 182:1
**wait** [1] - 113:9
**waiting** [2] - 152:8, 192:20
**Waiting** [1] - 36:6
**waives** [1] - 145:6
**walk** [2] - 109:3, 176:11
**walked** [3] - 80:3, 80:4, 80:6
**walkie** [1] - 90:20
**walkie-talkies** [1] - 90:20
**walking** [2] - 80:9, 80:14
**wants** [3] - 3:4, 147:6, 155:8
**warned** [3] - 136:11, 136:14, 136:17
**warrant** [6] - 110:8, 187:11, 188:10, 188:14, 188:15, 190:2
**warrants** [4] - 187:17, 187:18, 187:21, 189:22
**wash** [1] - 83:5
**watch** [2] - 113:10, 174:5
**watched** [1] - 22:22
**watches** [2] - 174:4
**water** [1] - 150:25
**Watson** [4] - 63:16, 65:24, 69:7, 89:11
**Wayne** [24] - 4:7, 9:15, 11:16, 19:4, 19:14, 46:25, 51:16, 72:11, 72:14, 72:17, 85:10, 87:24, 88:20, 90:9, 112:8, 112:12, 112:23, 113:4, 113:15, 113:20, 113:22, 127:11, 137:12, 184:24
**WAYNE** [1] - 1:8
**Wayne's** [2] - 85:4, 105:7
**weapon** [15] - 24:20, 24:23, 37:20, 66:6, 76:12, 76:19, 91:13, 92:11, 92:13, 92:16, 120:4, 120:7, 176:8, 176:10, 176:11
**weapons** [4] - 76:7, 77:5, 92:13, 120:1
**wear** [5] - 53:8, 54:21, 114:12, 114:14, 114:21
**wearing** [2] - 23:17, 58:16
**Wednesday** [3] - 34:8, 59:21, 196:14
**week** [22] - 5:12, 6:2, 6:11, 7:15, 8:6, 8:13, 14:14, 18:7, 21:18, 26:6, 32:18, 51:11, 73:1, 84:5, 84:6, 85:18, 89:23, 94:7, 97:10, 101:13, 117:1, 124:18
**weekend** [4] - 3:17, 99:4, 133:19, 196:4
**weeks** [6] - 22:6, 22:22, 23:3, 67:24, 73:23, 87:2
**weight** [1] - 61:21
**weird** [1] - 193:20
**welcome** [1] - 195:19
**West** [1] - 1:25
**Western** [3] - 38:12, 42:5, 110:9
**whatsoever** [1] - 132:1
**wheel** [2] - 172:10, 172:14
**Whereof** [1] - 200:9
**white** [1] - 165:18
**who've** [1] - 60:21
**whole** [15] - 20:23, 58:20, 59:4, 65:8, 75:7, 75:16, 87:3, 105:5, 107:11, 111:19, 122:23, 137:16, 146:12, 148:1, 148:9
**wife** [2] - 79:3, 177:8
**wild** [1] - 97:14
**WILLIAM** [1] - 199:4
**Willie** [2] - 184:23, 200:4
**WILLIE** [1] - 1:7
**willing** [2] - 104:6, 194:20
**windows** [1] - 170:5
**wiretaps** [1] - 39:17
**wish** [1] - 149:16
**wished** [1] - 99:18
**wishes** [1] - 142:11
**withdraw** [11] - 34:9, 34:17, 98:8, 98:14, 98:18, 99:18, 99:25, 124:5, 124:8, 124:9, 124:14
**Withdraw** [1] - 98:5
**withheld** [1] - 95:7
**withhold** [1] - 96:16
**Witness** [5] - 30:20, 103:12, 103:19, 133:10, 200:9
**witness** [42] - 7:6, 7:7, 8:9, 12:20, 22:11, 27:6, 60:18, 60:22, 60:24, 61:6, 61:11, 61:13, 61:14, 61:16, 62:6, 62:9, 63:5, 67:15, 82:6, 84:16, 86:3, 91:20, 97:14, 124:24, 126:25, 133:20, 134:3, 136:5, 136:13, 136:15, 136:17, 136:21, 139:21, 139:24, 151:21, 158:14, 162:6, 181:5, 193:10, 193:17
**WITNESS** [9] - 7:19, 83:1, 83:3, 158:17, 158:18, 158:21, 159:2, 199:4, 199:12
**witness'** [8] - 60:22, 60:24, 61:3, 61:5, 61:8, 61:18, 61:22, 162:3
**witnesses** [3] - 60:21, 136:11, 193:3
**woes** [1] - 147:16
**women** [1] - 78:11
**word** [8] - 22:10, 59:5, 72:11, 72:20, 89:1, 89:3, 123:10, 123:13
**words** [15] - 4:22, 21:12, 47:13, 72:11, 72:16, 97:15, 100:25, 128:1, 134:1, 134:7, 134:8, 139:12, 141:15, 145:12, 151:5
**wore** [4] - 55:6, 56:14, 56:19, 56:24
**worn** [1] - 25:17
**worse** [1] - 40:11
**wound** [2] - 68:20, 169:18
**wounds** [3] - 166:24, 169:10, 169:11
**written** [2] - 99:15, 125:4
**wrote** [1] - 128:2
**Wyche** [33] - 135:12, 139:11, 140:23, 140:25, 141:1, 152:1, 152:10, 152:16, 152:21, 159:16, 164:22, 164:23, 167:15, 167:19, 169:4, 169:19, 170:2, 171:20, 172:17, 173:19, 174:12, 175:12, 176:6, 179:23, 180:7, 185:24, 186:24, 187:2, 187:19, 189:23, 191:7, 193:13, 194:1
**Wyche's** [4] - 186:19, 189:13, 189:17, 189:19

## X

**XIII** [1] - 1:11
**XXXVII** [1] - 1:11

## Y

**year** [3] - 44:12, 94:15, 159:12
**Years** [1] - 54:5
**years** [17] - 14:21, 33:23, 35:10, 35:23, 36:5, 44:19, 51:4, 54:4, 85:6, 87:20, 99:20, 130:4, 132:4, 132:7, 132:11, 158:3, 195:7
**yellow** [1] - 173:6
**yesterday** [2] - 14:3, 142:13
**yo** [2] - 138:4, 138:6
**York** [18] - 4:5, 4:10, 4:16, 5:5, 5:9, 9:2, 9:21, 10:1, 10:8, 10:11, 47:21, 48:20, 64:11, 101:18, 103:23, 104:2, 105:17
**yourself** [5] - 70:24, 78:9, 101:10, 110:4, 111:1

**Z**

**Zajac** [3] - 1:24, 200:3, 200:14