1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA

        v.                              CRIMINAL CASE NO.
                                          AMD-04-029
WILLIE MITCHELL,
SHELTON HARRIS,
SHELLY WAYNE MARTIN,
SHAWN GARDNER,

        Defendants
_____/

              VOLUME XIV OF XXXVII
              Wednesday, October 15, 2008
              Baltimore, Maryland


Before:  Honorable Andre M. Davis, Judge
                And a Jury

Appearances:
        On Behalf of the Government:
         Robert Harding, Esquire
         Michael C. Hanlon, Esquire
        On Behalf of Defendant Mitchell:
         Laura Kelsey Rhodes, Esquire
         Michael E. Lawlor, Esquire
        On Behalf of Defendant Harris:
         Gerard P. Martin, Esquire
         Paul Flannery, Esquire
        On Behalf of Defendant Martin:
         Thomas L. Crowe, Esquire
         James G. Pyne, Esquire
        On Behalf of Defendant Gardner:
         Adam H. Kurland, Esquire
         Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 2 of 294

1          (Jury not present.  Defendants present.  Proceedings at

2    10:03 a.m.)

3          THE COURT:  Ready to proceed?

4          MR. HARDING:  Yes, sir.  I believe that what we're

5    going to do today is call Dwayne Denham, interrupting Detective

6    Niedermeier.  And Mr. Pyne tells me he would like to do a hearing

7    outside the presence of the jury on the voice ID issue with Mr.

8    Denham.  So we could do that now.

9          THE COURT:  All right.  Mr. Coburn, good morning.  I

10   saw that you filed a massive document.  You know, of course, that

11   under the rules you're supposed to provide a hard copy.  You

12   don't have to approach.  But you know you have to provide a hard

13   copy of any document more than 15 pages.

14         MR. COBURN:  I'm sorry, Your Honor.  I'll do that.

15         THE COURT:  Okay.  Just a reminder.

16      DWAYNE DENHAM, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

17         THE COURT:  Mr. Denham, good morning.  Welcome back.

18   You can be seated.  You remain under oath.

19         DIRECT EXAMINATION

20   BY MR. HARDING:

21   Q    Good morning, Mr. Denham.

22   A    Good morning.

23   Q    Mr. Denham, the jury's not here because we're doing, what

24   we're doing right now is a little hearing outside the presence of

25   the jury.  Okay?

1    A    All right.

2    Q    Let me call your attention to the morning you learned that

3    Anthony and Darryl had been shot.  Did you go over to Irene

4    Magginson's house that morning?

5    A    Yes.

6    Q    And did you have an opportunity while you were there that

7    morning to listen to a voice mail recording that had been

8    recorded on Irene Magginson's cell phone?

9    A    Yes.

10   Q    And did you believe that you knew one of the voices on the

11   tape?

12   A    Yes.

13   Q    Which, who did you think was on the tape?

14   A    Wayne.

15   Q    Okay.  Wayne is, do you know his real name, his full name?

16   A    Shelly something, Shelly.  I don't know his full name.

17   Q    Okay.  All right.  I'll turn it over to Mr. Pyne, Your

18   Honor.

19        THE COURT:  Mr. Denham, I would appreciate it, we can

20   give you water, but I'd appreciate if you wouldn't chew the gum

21   while you're on the witness stand.  Would that be okay?

22        THE WITNESS:  All right.

23        THE COURT:  Thank you.

24        CROSS EXAMINATION

25   BY MR. PYNE:

1    Q    Good morning, Mr. Denham.  I'm Jim Pyne.  I represent Mr.

2    Martin.  So we're talking about the morning that you learned that

3    the Wyche brothers were killed?

4    A    Yes.

5    Q    So you knew they had been killed before you went over to Ms.

6    Magginson's house?

7    A    When I got the phone call, Ms. Magginson and Fuji had told

8    me that they think it was Darryl, they seen the car on the news.

9    Q    So who exactly did you speak to?

10   A    The first call I spoke to Miss Irene.  The second call I

11   spoke to Fuji.

12   Q    Who's Fuji?

13   A    Natasha Magginson or Natasha Wyche.  That was his wife.

14   Q    Okay.  Darryl Wyche's wife?

15   A    Yes.

16   Q    And what did she tell you?  Did she tell you that Darryl had

17   been murdered?

18   A    She was crying when she called me on the phone and she told

19   me that she think, she seen the car so she thought it was Darryl

20   and Pete that was in the car.

21   Q    Okay.  So when you went over to the Magginson's house, you

22   had a strong supposition that they may have been murdered that

23   morning?

24   A    Yeah.

25   Q    Okay.  But you didn't officially know at that point, is that

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 5 of 294

1    correct?

2    A    Right.

3    Q    All right.  About what time did you get to the Magginson's

4    house?

5    A    I don't remember what time.  I came right over there.  I put

6    my clothes on and went right over there.  Probably took me like

7    15 minutes to get there.

8    Q    Do you recall if it was morning or afternoon?

9    A    It was in the morning.

10    Q    Can you recall who was there at the Magginson house when you

11    got there?

12    A    It was her brother, a couple family members over there, a

13    couple friends came over there.  I don't really know exactly.

14    Her brother Stimey was over there.  It was a couple other people

15    over there.

16    Q    Stimey?  Can you estimate how many people in total were

17    there?

18    A    Maybe about seven people, eight people.

19    Q    Okay.  Did they already know about this voice mail recording

20    by the time you had gotten there?

21    A    Yeah.  Everybody wanted me to listen to it.  They was all

22    telling me about the tape.

23    Q    All right.  So when you first got there, all of these eight

24    to ten people had already listened to the tape, is that correct?

25    A    Yeah.

1    Q    And were they all listening to the tape together or how was

2    it being played?

3    A    They already heard the tape.  So when I came there, they

4    just let me listen to the tape.

5    Q    Now, did you listen to it over a phone or did they have a

6    speaker phone or how exactly did you listen to it?

7    A    Over the speaker phone.

8    Q    Okay.  So everyone in the room was hearing it at the same

9    time?

10    A    Yeah.

11    Q    And it's your impression they had already heard it several

12    times before you got there?

13    A    Yeah.

14    Q    Was Anthony Magginson one of the individuals that was there?

15    A    Yeah.

16    Q    Okay.  And were you discussing with the other individuals

17    that were present who they thought the voices were?

18    A    Yeah.

19    Q    And do you recall who, if any, what, if any, suggestions

20    were made as to who the individuals were?

21    A    No.  Only, only, only name that they heard was Wayne voice

22    on it.  That's the only name that they heard on the tape, was

23    Wayne.

24    Q    Now, let me make sure I understand what you're saying.  The

25    only name they heard on the tape was Wayne?

1   A    Yeah.  You didn't hear nobody -- well, I didn't hear nobody

2   else's name and nobody else didn't say nothing else to me about

3   no other name but that name.

4   Q    Okay.  So you thought you heard the name "Wayne" on the

5   tape, is that correct?

6   A    Yeah.

7   Q    And everyone in the room agreed that they thought they heard

8   the name "Wayne", the name "Wayne" on the tape, is that correct?

9   A    Yeah.

10  Q    And so were you discussing what, if any, Waynes you knew?

11  A    Yup.

12  Q    And what, if any, Waynes did you come up with?

13  A    Wayne, Shelly, whatever -- yeah.  That's the only one that I

14  know.

15  Q    Oh, you don't know any other Waynes?

16  A    No.

17  Q    Did anyone else in the room know any other Waynes?

18  A    No, not that I know of.

19  Q    Okay.  Now, you didn't even know Wayne's last name, still

20  don't know Wayne's last name, do you?

21  A    Shelly, Shelly Mitchell or something.  I don't know.  I

22  don't care about his last name.  I know his name is Shelly.  I

23  know him, I know him by Wayne.

24  Q    Okay.  You know him by Wayne?

25  A    Yeah.

1   Q    Did you ever call him Weeze?

2   A    No, I ain't call him no Weeze.

3   Q    Okay.  Did you know if other individuals called him Weaze?

4   A    No.

5   Q    All right.  When was the last time you had spoken to Wayne?

6   A    I ain't spoke to him in years.

7   Q    Since 1994, '95?

8   A    Around that time.

9   Q    But you still thought that you recognized his voice even

10  after all that time?

11  A    At that time, yeah.  At that time, that's what I thought,

12  yeah.

13  Q    So if '94, '95, this would be seven or eight years later.

14  You hadn't spoken to him in seven or eight years, is that

15  correct?

16  A    Right.

17  Q    But you still thought you had a good enough recollection of

18  his voice to identify it?

19  A    At that time, that's what I thought, yeah.

20  Q    All right.  Isn't it true that you didn't even think of that

21  being Wayne's voice until you heard what you thought was the name

22  Wayne?

23  A    Right.

24  Q    Okay.  So it was the fact that you heard the name "Wayne"

25  that made you think that you could identify a voice on the tape?

1   A    Right.

2   Q    But this is, in fact, a voice that you hadn't heard in seven

3   or eight years?

4   A    When I thought about it, I already said that I can't be 100%

5   sure that that's him, you know.  I can't be 100% sure that that's

6   him.

7   Q    All right.  Today you're saying you can't be 100% sure?

8   A    I'm saying it today and I said it last week.

9   Q    Okay.  Didn't at some point you tell one of the detectives

10  you thought you were 100% sure?

11  A    Yeah.  Because that's what I, I said that because at that

12  time when I went over the house that's what I thought.  And

13  that's what I was told.

14  Q    Okay.  Who told you that that was Wayne's voice?

15  A    Tyrone.

16  Q    Now, who's Tyrone?

17  A    Tyrone Blanding was the person who told me that they was

18  going, that Darryl was going to go see Wayne.

19  Q    Okay.  So before you even hear the tape, an individual

20  Tyrone has told you that Wayne's voice is on that tape?

21  A    No.  This was after I heard the tape.

22  Q    Okay.  After you heard the tape Tyrone told you that that

23  was Wayne's voice?

24  A    Yeah.

25  Q    Did anyone else that was present there tell you that that

1    was Wayne's voice?

2    A    Stimey, Anthony, Anthony Magginson.

3    Q    Now, Stimey is Anthony?

4    A    Yeah.  That's Anthony.

5    Q    Okay.  So as you're all sitting around listening to this

6    tape on the speaker phone, did everyone pretty much tell you that

7    they thought it was Wayne's voice?

8    A    Yeah.  That's what everybody said, that's what everybody

9    thought.

10   Q    So it was kind of a group decision that it was Wayne's voice

11   on the tape?

12   A    I can't speak for everybody.  I'm just saying that's what

13   everybody said.  And that's the conclusion that, you know what I

14   mean, that I came up with.

15   Q    Okay.  I don't think I have anything further, Your Honor.

16            THE COURT:  All right.

17            MR. HARDING:  No further redirect, Your Honor.

18            THE COURT:  All right.  So where are we?  Mr. Denham,

19   would you just step out for a moment, please?  We'll be right

20   back with you.

21            (Witness leaves the courtroom.)

22            THE COURT:  Mr. Pyne, what is your understanding as to

23   who, if anyone, is going to elicit that the testimony?

24            MR. PYNE:  I was assuming the government was.

25            MR. HARDING:  Yes.

1          THE COURT:  All right.

2          MR. PYNE:  And I think it's clearly a prejudicial

3     procedure.  He had not heard Wayne's voice, by his own testimony,

4     since '94 or '95, seven or eight years earlier.  He's basically

5     told on the way in that, we've all listened to this, we think

6     it's Wayne, and that it was a group decision.  At the time he

7     said it was 100% sure.  Now he's clearly backtracking on that.

8          THE COURT:  When did he tell -- I'm sorry.  When did he

9     say he was 100% sure?

10         MR. PYNE:  I believe it was within a couple days he met

11    with homicide detectives and they again played the tape for him

12    and asked him to ID it.  And he told them he was 100% sure.

13         MR. HARDING:  Your Honor, just to expand on that.  I

14    was going to elicit this when the witness testified.  Mr. Denham

15    also said that in the grand jury, in 2004, that he was 100% sure.

16    But he told me when I prepped him that he no longer could say he

17    was 100% sure.  And I was going to elicit that when he testifies,

18    that he's not 100% sure.

19         And as he said here this morning, one of the reasons he

20    thought it was Wayne's voice was because he heard the name

21    "Wayne" mentioned on the tape.  So he still thinks it was Wayne's

22    voice.  He's just not 100% sure.  And it was partly because he

23    heard Wayne's name mentioned on the tape that he thought it was

24    Wayne.

25         THE COURT:  What about -- if you'll come to the

1   microphone, Mr. Harding, and you can stay there for a moment, Mr.

2   Pyne -- I didn't fully grasp it.  But what was this about someone

3   told him after the fact that the Wyches were going to meet with

4   Mr. Martin?  How does that figure into this, if at all?  First of

5   all, is that going to be elicited by the government?

6              MR. HARDING:  No, Your Honor, because it's hearsay.

7              THE COURT:  Right.  But I can consider it on

8   reliability.

9              MR. HARDING:  Certainly you can.

10             THE COURT:  So I'm just asking, can you explain to me

11  what he was saying?  Who told him that the Wyches were to meet

12  with Wayne?  Is that reliable hearsay?

13             MR. HARDING:  It's from a guy he identifies as Tyrone

14  this morning.  I think his full name is Tyrone Blanding.

15             THE COURT:  And who is Tyrone Blanding?

16             MR. HARDING:  He was somebody who was close to the

17  Wyche family and who did, participated in the drug business with

18  Darryl and Pete.

19             THE COURT:  Not a government witness in this case?

20             MR. HARDING:  No, he's not a government witness in this

21  case.

22             THE COURT:  Has he been debriefed or interviewed or

23  what do you know about him, if you can say?

24             MR. HARDING:  He was killed within the last year.  He

25  was killed less than a year ago in a, what appeared to be a

1     robbery attempt.

2            THE COURT:  Okay.  Is there anything more you can say

3     about that?  Because, in other words, what I'm getting at, if

4     Denham listened to the tape, heard the name "Wayne", heard other

5     people suggest to him that that's Wayne's voice on the tape, and

6     Denham makes an independent determination, yeah, I think that's

7     Martin's voice on the tape, and then after that somebody says to

8     Denham, well, Wyche was going to meet with Martin.  I mean, it

9     seems to me that that rises to evidence of reliability,

10    particularly given that, notwithstanding the earlier statements,

11    Denham was going to say, well, I thought I was 100% but now I'm

12    not 100%, but I think it was Wayne's voice.  I mean, that may be

13    enough to permit the Court to admit the evidence.

14           MR. HARDING:  I'd agree with that, Your Honor.

15           THE COURT:  Do you know of any reason the Court should

16    not credit the hearsay from Tyrone?

17           MR. HARDING:  No, none at all.  Your Honor, I should

18    add that Mr. Denham has been completely up front with me in

19    prepping for the testimony this time.  And he is going to, when

20    he testifies, acknowledge a couple of other inaccuracies in his

21    grand jury testimony that he wishes now to correct and regrets

22    saying in retrospect.

23           THE COURT:  Okay.

24           MR. HARDING:  So he is, as far as I can tell, he's come

25    completely clean.

1              THE COURT:  Do I have this right?  That he is

2    significantly motivated to assist the government to convict these

3    defendants?

4              MR. HARDING:  He's always been a cooperative and

5    voluntary witness for the government.

6              THE COURT:  But I mean, beyond that, he's close to the

7    family?

8              MR. HARDING:  Oh, he's the Godfather of two of Darryl

9    Wyche's children.

10              THE COURT:  Okay.  You're going to bring that out?

11              MR. HARDING:  Yes.

12              THE COURT:  Okay.  All right.  Thank you, Mr. Harding.

13    Mr. Pyne.

14              MR. PYNE:  Your Honor, this was the first that I've

15    heard of Tyrone Blanding.

16              THE COURT:  These things happen.  Stuff comes up.

17              MR. PYNE:  I understand that.

18              THE COURT:  This is the first time the witness has been

19    voir dired on his identification.

20              MR. PYNE:  Exactly.  But I think the fact that he does

21    not know Mr. Martin's last name but instead identifies Shelly

22    Wayne Mitchell, I think, can also bear on whether or not this

23    identification should come into evidence.  Is he confusing Mr.

24    Martin with Mr. Mitchell?  Since he has not met with Mr. Martin

25    in seven or eight years and everyone is telling him, oh, that's

1    Wayne's voice, that's Wayne's voice, and instead he thinks it's

2    Mr. Mitchell, what credibility can we give this voice

3    identification?

4              THE COURT:  Well, you know, the fact that he's relying

5    in part on having heard the name "Wayne" is a very interesting

6    phenomenon.  I referred yesterday to this funeral program as a

7    self-authenticating document.  And of course there's no

8    self-authentication of this tape here as Mr. Martin's voice.  But

9    certainly, he's entitled to rely, I mean, obviously, he's

10   entitled to rely, and the Court is entitled to consider and weigh

11   heavily on the issue of reliability that if somebody on that tape

12   in the course of that very garbled conversation should refer to

13   someone else who is clearly present using the name of a person

14   whose voice also seems to be on the tape, that would be pretty

15   powerful evidence of reliability.

16             Do you see what I'm getting at?

17             MR. PYNE:  I think it may be evidence that if you hear

18   the name "Wayne" on the tape, I think that you can argue that

19   Wayne may be in the car.  But what we're having here is a very

20   suggestive voice identification of, I'm assuming it's not the

21   voice that says "Wayne."  It must be the other voice.

22             THE COURT:  Right.

23             MR. PYNE:  That he's identifying this other voice in a

24   situation where he's been told this is Wayne's voice.  He himself

25   testified, I only identified it after I heard the name "Wayne."

1   I haven't heard this voice in seven or eight years but even

2   though I haven't heard this voice in seven or eight years, and

3   I'm surrounded by people telling me that this is Wayne's voice,

4   and I think that Wayne might be this guy named Mitchell, that

5   that is something that should be put before a jury.

6          THE COURT:  Well, I'm not impressed with the fact that

7   he doesn't know somebody's last name.  I mean, my goodness, how

8   many witnesses have we had, heard from in this case who don't

9   even know anybody's first name?  People only know people by their

10  street names.

11         MR. PYNE:  Hasn't heard this voice in seven or eight

12  years, Your Honor, by his own admission.

13         THE COURT:  That's absolutely the most powerful fact on

14  your side for exclusion.

15         MR. PYNE:  And the quality of this tape, I think anyone

16  will agree, is very poor at best.

17         THE COURT:  Is it keyed up, by any chance, the tape?

18         MR. PYNE:  We heard it repeatedly this morning so I

19  think it is.

20         THE COURT:  Can I hear it again, please?

21         MR. HARDING:  Yeah.  But now I have to log in.  I'm

22  sorry, Your Honor.

23         THE COURT:  That's all right.

24         MR. HARDING:  You don't want me to do it, or do you?

25         THE COURT:  Go ahead.

1          MR. PYNE:  Your Honor, on the tape, you hear loud and

2    clear the Wayne voice.  But the other voice --

3          THE COURT:  The Wayne voice?

4          MR. PYNE:  Who's ever saying, the alleged shit, Wayne.

5    But the other voice is much more, it's softer.

6          THE COURT:  I'm sorry.  I'm sorry.  I want to make

7    sure.  What voice do you hear loud and clear?

8          MR. PYNE:  Whatever voice is saying, "the alleged shit,

9    Wayne."  That's about the only clear thing you hear.

10          THE COURT:  I'm sorry.  The alleged shit, Wayne?

11          MR. PYNE:  Yes.

12          THE COURT:  What is the statement again?

13          MR. PYNE:  Your Honor, I don't know what the statement

14    is.  But according to the government transcript --

15          MR. HARDING:  I have it up to the --

16          (Tape playing.)

17          THE COURT:  Can you pause it right there?

18          MR. HARDING:  Yes.

19          THE COURT:  Was that the "shit Wayne?"

20          MR. HARDING:  Yes.

21          MR. PYNE:  Yes.

22          THE COURT:  Okay.  Go ahead.

23          MR. PYNE:  That's what everyone thinks they hear as the

24    voice Wayne.  So it's the other, softer, quieter voice you can't

25    hear as well that he has to be identifying as Mr. Martin.

1          THE COURT:  Go ahead, Mr. Harding.

2          (Tape playing.)

3          MR. HARDING:  I'm going to back it up a little.

4          (Tape playing.)

5          THE COURT:  Okay.

6          MR. PYNE:  Again, the fact that he has very little

7     basis on which to base his identification, I think, is a strong

8     factor.  The suggestiveness of the procedure, the fact that he's

9     listening to this tape, which even the enhanced version here is

10    difficult to hear.  He'd be hearing this over a speaker phone in

11    a room full of people telling him that this is Wayne's voice.  He

12    makes that identification.

13         I don't see how it's buttressed by information he later

14    receives that Wayne was supposed to meet with anyone.  He's

15    making that identification based upon his very limited knowledge

16    of Wayne's voice, hearing a very poor quality recording in the

17    midst of a very suggestive atmosphere.

18         As Your Honor pointed out, he's also very motivated to

19    try to identify this individual.  These are two people that were

20    murdered right after he left them.  He's very close friends with

21    them.  He said, his testimony, I think, will be that he had been

22    with Darryl Wyche for years and years and was extremely close to

23    them.  I think all that bodes in terms of improper

24    identification.

25         THE COURT:  All right.  Thank you, Mr. Pyne.  The

1    Court's going to admit the identification.

2           On the question of suggestiveness, certainly there is

3    an element of suggestiveness inherent in the way that this

4    recording was made, discovered, and then listened to by a group

5    of people who were obviously keenly interested in trying to

6    identify the apparent perpetrators of a double murder of their

7    loved ones.

8           Whether there is unnecessary suggestiveness in the due

9    process sense I think is a less close question than I had

10   previously contemplated.  Certainly, with respect to Mr. Denham,

11   the government had no role whatsoever in creating the suggestive

12   atmosphere or environment.  One would even say that the

13   suggestiveness was unavoidably present; that one can't really say

14   that there was unnecessary suggestiveness.  The suggestiveness,

15   to the contrary, was actually, as I say, unavoidable and

16   inevitable.

17          If you have a voice mail dialed accidentally to a

18   phone, left accidentally on a phone that is inadvertent, as it

19   certainly now appears, inadvertently dialed by the perpetrators

20   of a double homicide, and the family received that voice mail,

21   you would expect that family members, friends, loved ones, would

22   all gather to listen to the voice mail and use their joint

23   efforts not to make an unreliable identification but, to the

24   contrary, to make the most reliable identification that is

25   humanly possible.

1          And in fact, Mr. Denham's motivation cuts in favor of

2     the government because the motivation here by these lay witnesses

3     would be to do their absolute best to identify the person whose

4     voices they think they hear.  It would do no good whatsoever to

5     give false leads or to make knowingly false identifications.

6          So while there is some suggestiveness, much of that

7     suggestiveness is unavoidable and inevitable.  And certainly,

8     with respect to this witness, there is no hint that the

9     government played any role in fostering or bringing about at all

10    that suggestiveness.

11         So on the reliability side, the Court really has very

12    little hesitation, when you put it all together, the motivation

13    to be accurate on the part of Mr. Denham.  I accept the hearsay

14    proffer from the government that he was told after the fact that

15    Mr. Wyche had a meeting or had arranged to see Mr. Martin.  The

16    internal reliability which arises from the fact that someone else

17    on the tape uses the name and appears to refer to someone nearby

18    as Wayne bolsters the reliability.  And given that the witness

19    will admit that he's not 100% certain and given that he will be

20    essentially self-impeached by admitting that at one time he did

21    think he was 100% reliable or certain in his identification, but

22    now is less certain, all of that strongly cuts against the

23    evidence of unreliability based primarily on the fact that it had

24    been years and years since he had heard Mr. Martin's voice.

25         In the final analysis, the Court finds that the

1    government has established by a preponderance of the evidence

2    that the tentative identification by Mr. Denham is sufficiently

3    reliable such that the countervailing factors are properly to be

4    considered by the jury in evaluating the identification that is

5    offered to them.  And so the motion of Mr. Martin to exclude or

6    suppress Mr. Denham's voice identification from the voice mail is

7    denied.

8            All right.  We'll have the jury, please.  And Mr.

9    Denham.

10           (Jury enters the courtroom at 10:35 a.m.)

11           THE COURT:  Ladies and gentlemen of the jury, good

12   morning.  And once again, thank you for your patience.

13           We will interrupt Detective Niedermeier's testimony

14   this morning, and we've been rejoined by Mr. Dwayne Denham.

15           You will recall that Mr. Denham was with us exactly two

16   weeks ago today on a Wednesday.  You will recall that Mr. Denham

17   had testified that he was with Darryl Wyche on the, earlier in

18   the day of the day of Mr. Wyche's death.  And he was here, he

19   testified, fairly briefly right after Mrs. Natasha Wyche

20   testified.  And we ended the day with him.  And then the next day

21   we went to Mr. Christopher Dubrowski (sic).

22           So I give you that just brief background so that you

23   can re-orient yourself.

24           Mr. Denham, of course, you remain under oath.  You may

25   proceed when you're ready, Mr. Harding.

1              CONTINUED DIRECT EXAMINATION

2     BY MR. HARDING:

3     Q     Thank you, Your Honor.  Good morning, Mr. Denham.

4     A     Good morning.

5     Q     Mr. Denham, I'm going to pick up where we left off last time

6     but I just want to touch on something briefly that came up when

7     you testified two weeks ago.  I was asking you about whether

8     Darryl Wyche did drug business with people when you weren't

9     around.  Do you remember that?

10    A     Yes.

11    Q     Okay.  What's the answer to that question?

12    A     Yes.

13    Q     He did?  Okay.  And you told us about a couple of stores

14    that he had, I believe you said a cell phone store and a sedan

15    service store front, is that right?

16    A     Yes.

17    Q     And did he do drug business at those stores when you weren't

18    around necessarily?

19    A     Not that I know of.

20    Q     You don't know whether he did or not or you --

21    A     I'm not sure.

22    Q     Okay.  Were you working during the day at that time?

23    A     Yes.

24    Q     Let me ask you.  Back in 1997 and '98, thereabouts, were you

25    locked up at that time?

1   A    Yeah.

2   Q    Okay.  Were you aware that Darryl Wyche had a grocery store

3   that he operated with his wife at that time when you were locked

4   up?

5   A    No. I wasn't aware of that.

6   Q    Okay.  So you would have no way of knowing what business, if

7   any, Darryl was doing out of that grocery store, is that?

8   A    No, I don't know.

9   Q    Okay.  Okay.  When we left off last time, I had just asked

10  you about what Darryl's attitude was if one of his customers

11  didn't pay.  Do you remember that question?

12  A    Yes.

13  Q    What was his attitude if one of his customers didn't pay?

14  A    If somebody owes him money, he just, he would rather just

15  cut them off, stop dealing with them instead of worrying about,

16  you know, retaliation, unless it was a real big amount of money.

17  But a lot of times he just rather stop dealing with them.

18  Q    Okay.  Did you approve of that attitude?

19  A    No. I didn't approve of that.

20  Q    Why not?

21  A    Because they owed him some money, then they need to pay the

22  money that they owed him.

23  Q    Okay.  Let me show you a photograph.  Well, first let me ask

24  you, did you know a guy by the name of Claudus Lassiter?

25  A    Yes.

DIRECT EXAMINATION OF DENHAM                          24

1    Q    Who was he?

2    A    Something like his cousin.  It was real close.  I think it

3    was like his cousin, it was like his cousin.

4    Q    Cousin of who?

5    A    Darryl Wyche.

6    Q    Okay.  Was he fairly close to Darryl and Pete both?

7    A    Yeah.  He was close to them.

8    Q    Okay.  This is Government Exhibit PH-68.  Can you identify

9    the guy in that photograph?

10   A    That's Claudus.

11   Q    Okay.  And did you know a guy by the name of Tyrone

12   Blanding?

13   A    Yes.

14   Q    And who was he?

15   A    That's my brother-in-law.

16   Q    Your brother-in-law?

17   A    Yeah.

18   Q    Was he also tight with Darryl and Pete?

19   A    Yeah.

20   Q    And did he work in the drug business with Darryl and Pete?

21   A    Yeah.

22   Q    What kinds of things did he do for Darryl and Pete?

23   A    He was, he was running for Darryl.

24   Q    A runner.  What does a runner do?

25   A    I mean, he dealt, he moved, he moved a certain amount for,

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 25 of 294

1    for, for, for Darryl when, when, when, you know, when we used to

2    see him.

3    Q    Okay.  And you were more for protection, I believe you

4    testified, is that correct?

5    A    Yeah.  I was like his partner.

6    Q    Did there come a time in 2002 -- let's move to the year

7    2002, to the time period just before the murders.  Did Darryl

8    resume supplying Wayne?

9    A    I didn't know about that.

10   Q    Did you find out about it?

11        MR. CROWE:  Objection.

12   A    After the murder.

13        THE COURT:  Overruled.

14   Q    Who did you find out from?

15   A    From Tyrone.

16   Q    Okay.  Let me ask about Mr. Gardner.  Do you know, did Mr.

17   Gardner start getting supplied again or start getting supplied by

18   Darryl and Pete in 2002?

19        MR. COBURN:  Objection, foundation.

20        THE COURT:  Overruled.

21   A    I ain't know nothing about Mr. Gardner.

22   Q    Okay.  And you, I believe you identified both Mr. Gardner

23   and Mr., and Wayne when you were here last time, is that correct?

24   A    Yes.

25   Q    Let me ask you about something else.  Was there a time back

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 26 of 294

1    in the 1990's when Goo, Mr. Gardner, worked for Darryl?

2                    MR. COBURN:  Objection, foundation.

3                    THE COURT:  Overruled.  You may answer.

4    A    I really wasn't sure of Goo's position.  Goo was cool and he

5    used to be, he used to be around me and little Darryl.  But as

6    far as me ever seen him doing anything, I never seen him do

7    nothing.

8    Q    Did you hear that he did something with Darryl?

9                    MR. PYNE:  Objection.

10                   MR. COBURN:  Objection, hearsay.

11                   THE COURT:  Sustained.

12                   MR. HARDING:  I'm asking about whether he heard from

13   Darryl if Goo did something.

14                   THE COURT:  The objection is sustained.

15   BY MR. HARDING:

16   Q    Did there come a time, Mr. Denham, when Darryl got locked up

17   and Mr. Gardner came to you with some money?

18   A    Yeah.

19   Q    Do you recall about how much money?

20   A    Probably about $800.

21   Q    And what was that for?

22   A    It was for, it was for an ounce.

23   Q    An ounce of what?

24   A    Of coke.

25   Q    Who did he want to supply him with the ounce of coke?

1    A    He had gave it to me.  He had gave the money to me but I

2    never gave him no product.

3    Q    Why not?

4    A    I just kept the money.

5    Q    Why did he come to you with the $800?

6                MR. CROWE:  Objection.

7                THE COURT:  Overruled.  You may answer.

8    A    You said why did he come to me?

9    Q    Yes.

10   A    I think he want, he wanted to continue to do whatever he was

11   doing.  I guess he wanted to buy some from me.  But I didn't have

12   it so I just held on to the money.

13   Q    Okay.  Was Goo mad at you because of that?

14   A    I mean, I seen Goo several times after that.  He asked about

15   the money and I told him something.  So that was it.

16   Q    Okay.  In 2002, was Darryl the biggest drug dealer you knew

17   about in Randallstown?

18   A    I don't know if he was the biggest drug dealer but he was,

19   he was doing good.

20   Q    Tell us again what quantities he would buy at a time of

21   cocaine.

22   A    About ten keys a week.

23   Q    Let me call your attention to March 24th of 2002, which was

24   the day before the murders.  Did you go to work that day?

25   A    Yes.

1    Q    Did you make an arrangement with Darryl by telephone to do

2    something when you got off work?

3    A    Yes.

4    Q    What?

5    A    Take a ride to DC.

6    Q    Okay.  Did you meet up with him after work?

7    A    Yeah.  I met up with him after I got off of work.

8    Q    Where did you meet him?

9    A    Over Brandy's house.

10   Q    Okay.  Who's Brandy?

11   A    That was a friend, a friend of ours.

12   Q    Female?

13   A    Yeah, female.

14   Q    And where did she live?

15   A    She lived in Randallstown, off of Scotts Level Road, I

16   think.

17   Q    Scotts Level Road?

18   A    It was across the street from the Scotts Level Middle

19   School.  I don't know the exact address.

20   Q    Okay.  So how did you get there?

21   A    I drove over there and met Darryl over there.

22   Q    How did Darryl get over there?

23   A    He drove.

24   Q    Which car did he drive over there?

25   A    The Volkswagen.

1    Q    What kind of Volkswagen was it?

2    A    A Volkswagen Jetta.

3    Q    Do you remember what color it was?

4    A    I think it was green.

5    Q    Did he have another car parked nearby to Brandy's house?

6    A    Yeah.  He had a white, a white station wagon.

7    Q    Okay.  What kind of station wagon?  Do you know what the

8    make of car it was?

9    A    No.

10   Q    Okay.  Was there anything special about that white station

11   wagon?

12   A    It had a stash spot in it.

13   Q    Okay.  What's a stash spot?

14   A    A stash spot was where you can either conceal the gun or

15   conceal the drugs, whatever you wanted to hide in it.

16   Q    Do you know whereabouts in the white station wagon it was?

17   A    I didn't, I didn't know exactly where it was at.  I never

18   seen it.  He just told me about it.

19   Q    I see.  Do you know where Darryl got that car from?

20   A    Yeah.  He got it from the connect.

21   Q    The connect?

22   A    Yeah.

23   Q    Who was Darryl's connect?

24   A    That was this Dominican dude.

25   Q    A Dominican dude?

1    A    Yeah.

2    Q    Where did he live, do you know?

3    A    All I knew is that he lived in Jersey somewhere.

4    Q    In Jersey?  Did you ever meet him?

5    A    No, I never met him.

6    Q    Did you know his name?

7    A    No, I never knew his name.

8    Q    Where did Darryl used to meet up with him, if you know?

9    A    I don't know.

10   Q    Okay.  You were never with Darryl when he went to get

11   supplied by his connect?

12   A    No.

13   Q    Okay.  Back to the white station wagon you were telling us

14   about that Darryl got from his connect.  What kind of license

15   plates did it have?

16   A    It had temp tags on it.

17   Q    Okay.  Now, you say you met Darryl over at Brandy's house.

18   Do you recall how much time you spent there?

19   A    We wasn't there long.  A couple minutes before we left.

20   Q    Okay.  Were there other people there at the time?

21   A    Yeah.  It was a couple people, other people there.

22   Q    Okay.  Why did you meet Darryl at Brandy's?  Any particular

23   reason?

24   A    No particular reason.  I think that's where he just told me

25   to meet him at.

1   Q    Okay.  So you say that you had an arrangement with him to go

2   on a ride, is that right?

3   A    Yeah.

4   Q    Where to?

5   A    To DC.

6   Q    What, to do what?

7   A    We was going out there to serve somebody, to make a sale.

8   Q    Make a sale of what?

9   A    About a key, a key or two.  The guy said bring, you know,

10  bring the two.  He was supposed to buy two keys but he didn't buy

11  it.

12  Q    Okay.  This guy, where was he?

13  A    He was in DC.

14  Q    Okay.  Now, how did you get to DC that day?

15  A    We drove the, we drove the Volkswagen.

16  Q    Why didn't you go in the white station wagon?

17  A    We didn't want to drive the white station wagon because we

18  didn't have no hard tags for it.

19  Q    What's the problem with driving to Washington in a car that

20  has temp tags on it?

21  A    We didn't want to take a chance of getting pulled over with

22  out-of-state temp tags.

23  Q    Are you more likely to get pulled over on a highway if you

24  only have temp tags on your car?

25  A    Yeah.

1    Q    You know that from experience?

2    A    Yeah, I know that from experience.

3    Q    Okay.  Now, who was the guy you were going to see in

4    Washington?

5    A    This guy we knew named Greg.

6    Q    And he was like a regular customer of Darryl's?

7            MS. RHODES:  Sorry, Your Honor.  I didn't hear that

8    response.

9    A    It was guy we knew named Greg.

10           MS. RHODES:  Greg?

11   BY MR. HARDING:

12   Q    Okay.  Now, let me ask you something.  When you came to see

13   me, did you come to see me a few week ago to talk about your

14   testimony in this trial?

15   A    Yeah.

16   Q    And did you tell me that you had been to see a lawyer?

17   A    Yeah.

18   Q    And I believe you testified last time what that person's

19   name was, is that correct?

20   A    Yeah.

21   Q    What was his name?

22   A    Mr. Needleman.

23   Q    And did, and what was the result of your meeting with Mr.

24   Needleman?  Did you feel more comfortable about coming in and

25   talking to me and preparing for your trial testimony?

1    A    Yeah.  After I got legal counsel I was more comfortable with

2    the situation.

3    Q    And did you tell me that you had said a couple of things in

4    the grand jury back in early 2004 that you regretted saying?

5    A    Yeah.

6    Q    And was one of them the name of the guy in Washington that

7    you were going to go see?

8    A    Yeah.  That was one thing.

9    Q    Do you remember what name you gave in the grand jury?

10   A    I don't remember the exact name but it wasn't, it wasn't an

11   accurate name, though.

12   Q    Why didn't you want to give the accurate name in the grand

13   jury when you testified back in February of 2004?

14   A    For one reason, because I still like knew, I knew the guy

15   and I didn't want to implicate him.

16   Q    You didn't want to implicate him?

17   A    No, I still had affiliations with him.  Like I knew him so I

18   didn't want to put his name in anything.

19   Q    Okay.  Had you been to see a lawyer before you came to

20   testify in the grand jury?

21   A    The first time I spoke to you all, I didn't speak to no

22   lawyer.

23   Q    Okay.  You went down to Washington with Darryl in the green

24   Volkswagen.  Did Darryl have anything with him?

25   A    Yeah.  He had two, he had two keys with him, a scale, cell

1    phones, and that's, that's all, that's all I can remember right

2    now.

3    Q    Where did he keep that stuff?

4    A    He had a knapsack bag that he used to keep everything in.

5    Q    All that stuff, two keys and scales?

6    A    Yeah.

7    Q    And what else did you say?

8    A    Some cell phones.

9    Q    More than one?

10   A    Yeah.  He had several cell phones.

11   Q    How about money?  Did he have any money?

12   A    Yeah.  He always had money on him.

13   Q    Do you remember about how much money he had that day?

14   A    When we left to go there or when we came back?

15   Q    When you left to go there.

16   A    About, maybe about, about 20, maybe about 20,000.  I don't

17   know.  The guy, the guy bought half a key and I know he had money

18   on him before then.  So you talking, you looking at anywhere

19   between maybe 12, 20, anywhere between 12 and 20.

20   Q    Did he have it in his knapsack when he went down there?

21   A    No.  He didn't keep, he didn't have the money in the

22   knapsack.  I don't really, I ain't really see exactly where he

23   was putting the money at unless like it was like a quick deal.

24   So he usually put the money in the bag, keep the money in his

25   pocket or put the money in the arm rest of the car.

1    Q    Okay.  So you think he had about twenty some thousand

2    dollars or 12,000, or what was it?

3    A    It was anywhere between 12 and 20.

4    Q    And that's when he was on his way down to Washington, is

5    that correct?

6    A    No.  He had, he had about like, I think he had, on the way

7    going to Washington he probably had about probably 5 or 6000.  I

8    really don't know exactly how much he had on him before we left.

9    The only thing I know is that the guy paid 12 for the half a key.

10   Q    I see.  But that he didn't pick up until you were in

11   Washington?

12   A    Right.  So how much money he had before then, I don't know.

13   Q    Okay.  Did Darryl always carry that stuff around with him,

14   scales, cell phones?

15   A    He always carried the bag around with him.

16   Q    And did the bag always have that stuff in it?

17   A    Yeah.

18   Q    Did he have a gun when you went down to Washington?

19   A    No.

20   Q    Did you have a gun?

21   A    No.

22   Q    You say that Darryl had about two kilograms of cocaine in

23   his back pack when you went down to Washington, is that right?

24   A    Yeah.

25   Q    Now, is that another thing that you regret having said in

1    the grand jury, Mr. Denham?

2    A    Yeah.

3    Q    Did you give a smaller quantity in the grand jury?

4    A    Yes, I did.

5    Q    Do you remember how much you said he had?

6    A    A couple ounces.

7    Q    A couple of ounces?

8    A    Um-hum.

9    Q    Why did you give a smaller quantity than was in fact

10   accurate?

11   A    I wasn't sure.  I just, I was just uncomfortable with the

12   whole situation, so --

13   Q    You had been subpoenaed to testify in the grand jury, is

14   that correct?

15   A    Yeah.

16   Q    All right.  Do you know how many phones Darryl had?

17   A    It was a lot of them.  I ain't sure.

18   Q    Why so many?

19   A    He just wanted to keep different phones because he didn't

20   want to worry about wiretaps and police getting his number.  So

21   he say he switching up cell phones.  He call certain people from

22   different numbers.

23   Q    Okay.  If he got a call from somebody, would he sometimes

24   call him back on another phone?

25   A    Yeah.

1   Q    Is that something that's common in drug trafficking circles,

2   Mr. Denham?

3   A    Yeah.

4   Q    Why so?

5   A    Just worried about, just worried about wiretaps.  That's it.

6   Q    Okay.  Now, what happened when you got to DC?

7   A    The guy, he didn't want to buy all of it.  So being that we

8   took the ride, he just decided to buy half, half a key because it

9   was too, he didn't like, he didn't like it.

10  Q    Why didn't he like it?

11  A    He said it was too oily.

12  Q    Where did you go to do this transaction, anyway?

13  A    It was at a house in DC.  One of the houses in DC, his

14  cousin house.

15  Q    His cousin's house?  Greg's cousin house?

16  A    Yeah, Greg cousin house.

17  Q    Was Greg's cousin there, also?

18  A    Um-hum.

19  Q    You remember his name?

20  A    Nah.

21  Q    Do you remember where this cousin's house was in DC?

22  A    No.

23  Q    Okay.  So he only wanted to buy a half a key.  So how much

24  money did he give Darryl?

25  A    12,000.

1    Q    Did Darryl count it?

2    A    Yeah.  He counted it.

3    Q    While you were there?

4    A    Yeah.

5    Q    And what did you do while he was counting $12,000?

6    A    Watched the door.

7    Q    What do you mean, watched the door?

8    A    Just watched the door.  Just really just watching the door

9    to make sure nobody running in the house while he was in there.

10   Q    What did Darryl do with the $12,000 once he counted it up?

11   A    Put it in his pocket.

12   Q    Okay.  Did you guys drive back to Baltimore?

13   A    Yeah.  We left after that.

14   Q    Was Darryl at all worried about not selling most of the

15   cocaine he'd taken down to Washington with him?

16   A    No, he wasn't worried about it.

17   Q    Did he tell you why not?

18   A    He knew he would sell it.

19   Q    Okay.  Do you know, did Darryl owe money at that time to his

20   connect, the Dominican guy you told us about?

21   A    Yeah.  He owed money to him.

22   Q    About how much did he owe to him?

23   A    Over a hundred thousand.

24   Q    Okay.  Did you know, you say that Darryl knew he could sell

25   the rest of the cocaine, is that correct?

1    A    Yes.

2    Q    Did he tell you who he planned to sell it to?

3    A    No.

4    Q    Mr. Denham, did Darryl ever do sales of drugs to people in

5    the back seat of his car?

6    A    He did one but it didn't, it didn't go all the way through,

7    one time when I was with him.

8    Q    Why didn't it go all the way through?

9    A    Me and him was in the front seat of the car and somebody

10   that we had pulled up, somebody was getting in the car.  But

11   before, when he pulled over, I jumped out the car and then

12   stepped, and walked to the other, to the side of the walk and

13   told him I ain't want nobody sitting in the back of me.  So then

14   that's when the guy got in the front seat and they did whatever

15   they did.

16        But I told him don't, you know, don't never allow

17   anybody to sit behind us while we was doing that.

18   Q    Well, was this somebody that you knew?

19   A    No, I didn't know this guy at all.

20   Q    Would, would Darryl have been comfortable doing a

21   transaction with somebody he knew and trusted in his back seat?

22   A    Yeah, probably if he knew him and he trusted him, he

23   probably wouldn't mind doing it.  But I didn't want nobody

24   sitting behind me at all.

25   Q    You told us last time when you testified that Darryl had

1    actually been kidnapped on a couple of occasions, is that

2    correct?

3    A    Yeah, that's correct.

4    Q    Did you have any discussions with Darryl about security

5    after those kidnappings took place?

6    A    Yeah.  I just told him he needed to be more careful and try

7    to let, you know, let me know.  You know what I mean?  Just

8    really pay attention to what's going on around him.

9    Q    What time did you get back to Baltimore that night, if you

10   know?

11   A    I don't remember.

12   Q    Can you give us a vague idea?

13   A    It only took us, the ride was about maybe no more than an

14   hour, about 45 minutes.  Probably around maybe 9, somewhere

15   around there.

16   Q    Where did you go when you came back?

17   A    We went back to Brandy's house.

18   Q    Okay.  Who was there?

19   A    His brother Pete was there.  Several other people was there.

20   Q    Female?

21   A    Her sister-- yeah.  Her sister was over there.  Peaches was

22   there.  Damita.  It was a couple females there.

23   Q    Okay.  Damita?

24   A    Yeah.  She was there.

25   Q    Do you know her last name?

1   A    No.

2   Q    Who is she?

3   A    She was a friend, a friend of theirs.

4   Q    A friend of Darryl's?

5   A    Yeah, she was a friend of Darryl's and Peaches.  Everybody

6   over there was from, was like cool.

7   Q    You said Pete was there, is that correct?

8   A    Yeah.  Pete was over there.

9   Q    Did you go talk to Pete when you were at Brandy's house

10  later that night?

11  A    Yeah.  I spoke to Pete as soon as I got there.

12  Q    What about?

13  A    Trying to squash the beef that him and Darryl had.  They

14  wasn't speaking.

15  Q    What did they have a beef about?

16  A    Pete had owed Darryl some money and he wasn't trying to give

17  him the money because he felt, he felt that Darryl didn't need

18  it.  So they had stopped speaking behind that and they wouldn't

19  talk for about a month, something like that.

20  Q    Was Pete involved in drug trafficking, also?

21  A    Yeah.

22  Q    Did he owe money to Darryl because of drugs that he had

23  gotten from Darryl?

24  A    Yeah.

25  Q    And he didn't pay him back?

1   A    No, he ain't pay him.

2   Q    So what did you say to Pete that night?

3   A    Well, basically, I just was telling Pete that that shit was

4   small and it wasn't a reason to be, you know what I mean, it was

5   enough money being made and he need to go ahead, you know what I

6   mean, and get back with his brother so he can get this money

7   instead of, you know, beefing over something small and petty like

8   that.

9   Q    Do you know, did Pete and Darryl have a conversation after

10  that?

11  A    Yeah.  They made up that night.

12  Q    Were you there?

13  A    Yeah.  We all was talking outside.

14  Q    So they made up?

15  A    Yeah.

16  Q    They were on good terms?

17  A    Yeah.  They was on good terms.

18  Q    Were they around one another a lot generally, Mr. Denham?

19  A    Yes, they was.

20  Q    Were they often together?

21  A    Yes.

22  Q    While you were at Brandy's house, did Darryl talk on the

23  telephone?

24  A    His phone rang a couple times.

25  Q    Okay.  Did he talk a lot on the telephone in general?

1    A    Often he talked on the phone.

2    Q    Do you know who he talked to that night?

3    A    No.

4    Q    Did there come a time when you left Brandy's house?

5    A    Yeah.  I left, we all left.  We was outside.  Then before

6    we, before I pulled off, him and Pete was still outside.  And I

7    told him I was about to leave.

8    Q    Okay.  So you all left, meaning you, Pete, and Darryl all

9    left around the same time?

10   A    Yeah.

11   Q    Did you go somewhere together?

12   A    No.  We just went out, we was outside, out front of the

13   building.

14   Q    Okay.  What did you do?

15   A    I told him I was about to leave, I was about to go home.  I

16   said I just stop at the market first and I was going home.  And

17   at that time that's when he told me he was going to do the same

18   thing.

19   Q    Who told you that?

20   A    Darryl.

21   Q    Was Pete going to go with him?

22   A    Yeah.  I mean, I guess they was all staying over, over

23   Darryl's house, or they was going back to Miss Irene house.  I

24   wasn't sure which one.  But they were saying, he was getting

25   ready to go home.

1    Q    Did you know at the time, were they going to go anywhere

2    else?

3    A    Not at the time I didn't know.

4    Q    Did you find out later that they went somewhere else?

5    A    Yes.

6    Q    Where did they go?

7              MR. PYNE:  Objection.

8              THE COURT:  Lay a foundation.

9              MR. HARDING:  I'll withdraw the question, Your Honor.

10             THE COURT:  Okay.  Would you like some water, Mr.

11   Denham?

12             THE WITNESS:  No, I'm good.

13   BY MR. HARDING:

14   Q    Well, let me ask a question that you can answer yes or no.

15   Did you learn later that they were going somewhere else?

16             MS. RHODES:  Objection.

17             MR. PYNE:  Objection.

18             THE COURT:  Overruled.  You can answer yes or no.

19             THE WITNESS:  Yes.

20   BY MR. HARDING:

21   Q    Who was going to drive?

22             MS. RHODES:  Objection.

23   Q    Did they tell you?  Did Pete or Darryl say anything to you

24   to indicate who was going to drive?

25   A    Pete.  Because Darryl was tired because he just drove, took

1    the drive from DC.

2    Q    Was that the last time you saw Darryl and Pete alive?

3    A    Yeah.  That was the last time I seen them.

4    Q    Did you see which car they got into?

5    A    No.  Because when I left, they were still standing in front

6    of the building, talking.

7    Q    Okay.  Would Darryl have had his back pack with him at that

8    time when he left?

9    A    Absolutely.  He wouldn't leave it over Brandy house.

10   Q    So you said you were going to go home, is that correct?

11   A    Yeah.

12   Q    Did you go straight home or did you --

13   A    No.  I stopped at the market first and then I went home.

14   Q    What did you stop at the market for?

15   A    To pick up some milk.

16   Q    Do you remember what market you stopped at?

17   A    Yeah.  I stopped at the market that was on, right there on

18   the corner of Roland, Roland and Liberty.

19   Q    Okay.  And where do you live?  Could you tell us where you

20   were living at that time?

21   A    I was living in Woodlawn but I went to a house out in

22   Randallstown.

23   Q    Oh, I see.  You didn't go exactly home, then, is that

24   correct?

25   A    I went over my baby mother's house.

1    Q    I see.  Can you tell us the name of your baby's mother?

2    A    Yeah.  Patricia Lee.

3    Q    So was she there when you got there?

4    A    Yeah, she was there.

5    Q    And I suppose your baby was there, too, is that correct?

6    A    Yeah.

7    Q    Anybody else?

8    A    No.  That's it.

9    Q    Did you get a call the next morning, a telephone call?

10   A    Yeah.

11   Q    Who from?

12   A    From Ms. Irene.

13   Q    Who is Miss Irene?

14   A    His mother-in-law.

15   Q    Whose mother-in-law?

16   A    Darryl's mother-in-law.

17   Q    What did she say?

18   A    She was asking me if I seen Darryl because they didn't come

19   home.  They not answering the phone.

20   Q    Okay.  So what did you say?

21   A    I said, yeah, I seen them last night.  They said they was on

22   their way home.

23   Q    Okay.  What happened after that?

24   A    I told them I was on my way over there.  And before I got

25   dressed, Darryl's wife called me on the phone crying, and she was

1   telling me that she think Darryl and Pete was killed because she

2   seen it on the news, the station wagon.  They said they found two

3   bodies in the station wagon but they didn't know if it was Darryl

4   and Pete at that time.

5   Q    I see.  You mean that Darryl's wife saw that on TV or

6   something?

7   A    Yeah.  She seen it on the news.

8   Q    What's Darryl's wife's name again?

9   A    Natasha.

10  Q    Does she have a nickname, by the way?

11  A    Fuji.

12  Q    Okay.  So what did you do?

13  A    I still, I finished putting my clothes on and went over

14  there.

15  Q    What happened when you got over there?

16  A    I went over there, everybody was over there crying.  And

17  they told me that that they want me to hear the tape.

18  Q    Okay.  Everybody was crying.  Who was there?

19  A    It was a couple family members, close friends.  I don't

20  really remember everybody who was there because I was just

21  really, you know, trying to find out what was going on at that

22  time.  So her brother was there.  A couple of her cousins was

23  there.  The kids was there.  Miss Irene was there.

24  Q    Okay.  Now, if I understand your testimony, the names of the

25  two brothers had not yet been made public, is that correct?

1    A    Yeah.  It wasn't made public yet.

2    Q    But there was some kind of news clip that showed the white

3    station wagon on it, is that correct?

4    A    Yeah.

5    Q    Did you see that news show or you just --

6    A    Yeah.  I seen it, too.

7    Q    You saw it, also?

8    A    Um-hum.

9    Q    And you say that they were listening to a tape, is that

10   correct?

11   A    Yeah.  Because it was, it picked up on, on the answering

12   service.

13   Q    Whose answering service?

14   A    On Ms., I think it was Miss Irene's answering service.

15   Q    So did you listen to that voice mail?

16   A    Yeah.  I listened to it.

17   Q    Did you listen to it with earphones or speaker phone or just

18   holding a telephone up to your ear or what?

19   A    It was on the speaker.

20   Q    Okay.  Were there other people around when you listened to

21   it?

22   A    Yeah.

23   Q    Did you recognize someone's name being mentioned in the

24   course of that tape-recorded conversation?

25   A    Yeah.  The only name I kept hearing was Wayne.

1   Q    Wayne?

2   A    Yeah.

3   Q    Did you believe that you could identify one of the voices

4   that was on that tape?

5   A    Well, at that time, yeah, I believe I could identify Wayne

6   name, Wayne voice.

7   Q    Okay.  And in fact, did you testify in the grand jury that

8   you were 100% certain it was Wayne's voice?

9   A    Yeah.  At that time I said, I said I was 100% certain.

10  Q    And did you, was this the final thing you talked to me about

11  the other day when you came in to testify, when you came in to

12  prep, about you regretting having said something in the grand

13  jury?

14  A    Yeah.  I said I can't be 100% certain.

15  Q    Okay.  Do you still think it was Wayne's voice or do you

16  just, and you're less than 100% sure, or are you not sure at all,

17  or what?

18  A    Well, I'm not 100% certain.  I'm not saying I'm not 100%

19  certain out of fear or anything like that because I could care

20  less about it.  I'm just saying that even at that time, having

21  time to think about it, I'm not 100% certain that that was his

22  voice on the tape.

23  Q    Okay.

24  A    I wasn't intimidated or nothing like that.

25  Q    You knew Goo, also, did you not?

1  A    Yeah, I know him.

2  Q    Could you tell for sure whether he was on the voice mail?

3  A    No.

4  Q    Do you know a guy by the name of Bo?

5  A    No, I don't know him.

6  Q    Okay.  Did you hear about him?

7  A    After everything, yeah, that's when I heard about him.

8  Q    Okay.  So you've never heard Bo's voice, is that a safe --

9  A    No.

10 Q    Okay.  Now, you've given us three things that you said in

11 the grand jury that you regret.  One is the name of the customer

12 that Darryl had in the District of Columbia.  The second thing

13 was the amount of drugs.  You gave a smaller quantity in the

14 grand jury than was, in fact, the case.  And the third thing is

15 your level of certainty about the voice being Shelly Wayne

16 Martin's voice.

17      Those are the three things you now regret saying in the

18 grand jury, Mr. Denham?

19 A    Yes.

20 Q    Was there anything else?

21 A    No.

22 Q    Okay.  Could you tell when you listened to that voice mail

23 what they were talking about?

24 A    It sounded like they was counting, like they was counting

25 something.

Case 1:04-cr-00029-RDB   Document 684   Filed 06/08/09   Page 51 of 294

1          MS. RHODES:  Objection, Your Honor.

2          THE COURT:  Overruled.  You may answer.

3    A    It sounded like they was counting something.  I just heard

4    somebody say something about, you know, we straight now or we on

5    now.  Something like that.

6    Q    And you said you heard the name "Wayne" as well, is that

7    correct?

8    A    Yeah.  I heard the name "Wayne."

9    Q    Did Darryl have an open-faced telephone?

10   A    Yeah.  He had an open-faced telephone.

11   Q    What does that mean, exactly?

12   A    It wasn't a flip phone.  Just was an open-face number phone

13   with the digits on it.

14   Q    And did he have a speed dial feature on that phone whereby

15   if you pressed a button, it would make a call automatically, just

16   with one button push?

17   A    Yes.

18   Q    Did you later go to the funeral for the two brothers?

19   A    Yes.

20   Q    Where was it held?

21   A    At a funeral home on Reisterstown Road.

22   Q    Did you expect Wayne and Goo and Bo to show up there?

23        MS. RHODES:  Objection.

24        THE COURT:  Overruled.  You may answer.

25   A    I didn't know nothing about Goo or Bo at the time.  But I

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 52 of 294

1    expected Wayne to show up there because he was cool with him at

2    one time.

3    Q    Okay.  You, you knew Goo, though, of course?

4    A    Yeah, I knew Goo.

5    Q    You told us about your prior transaction with him.

6    A    Yeah.  Yeah.

7    Q    So did, in fact, Wayne show up at the funeral?

8    A    Yeah, he showed up.

9    Q    Did Goo show up, also?

10   A    Yeah.

11   Q    What did they do when they got to the funeral?

12   A    Well, Goo, Goo came in with some other dude and they were

13   sitting, Goo sat across, across from me.  And Wayne was by the

14   door on his cell phone.

15   Q    Do you remember what they were wearing?

16   A    Something, Coogi shirt, something.  Wayne had on all black.

17   Q    All black?

18   A    All black.  It was like a Coogi top and black, black bottom.

19   Q    What's Coogi?

20   A    It's a sweater, a knit sweater.

21   Q    Wayne had on a black Coogi sweater?

22   A    Yeah.  It was a similar sweater to what Darryl and Pete was

23   buried in.

24   Q    And what about Goo?  What was he wearing?

25   A    He had on, I think he had a Coogi top, too, but I don't

1    remember the color.

2    Q    Okay.  What did you make of that?

3    A    I ain't really make too much of nothing.  I was just really

4    zoned in on Wayne.  I wasn't zoned in too much on nobody else.

5    Q    Why were you zoned in on Wayne?

6    A    Because at that time I really heard his voice and everybody

7    was connecting him to the murder.

8    Q    So what was he doing in the funeral?

9    A    He was on the cell phone.  When I looked, when we left out

10   he was on the cell phone.  Goo had took a seat and Wayne was by

11   the door.

12   Q    So he was standing up?

13   A    Yeah, he was standing up.

14   Q    Did he talk on the cell phone the whole time he was there,

15   as far as you know?

16   A    It was briefly, because I walked past him.

17   Q    It was briefly?

18   A    I mean, I walked past him.  We wasn't standing there or

19   nothing.  When we was leaving out the funeral, I walked past him

20   and he was on the phone.

21   Q    Did you say anything to him?

22   A    No, I ain't say nothing to him.

23   Q    Was there a kind of commotion at that time?

24   A    Yeah.  It was a commotion when I left out.

25   Q    Why?

1   A    Certain people there was asking me, you know, again, I don't

2   know, they was asking me what I wanted to do because some of the

3   family members already had heard and thought it was Wayne in

4   there that had did it.  So when they seen him there,

5   automatically started coming towards me to ask me what I wanted

6   to do because I had people that was already in the funeral.

7   Q    What did you say?

8   A    At that time I told them to get, get away from me because I

9   already had, was told that Homicide was going to be there with

10  cameras and everything and I didn't want the heat drawn on me.

11  Q    Okay.  Did you, in fact, do anything to retaliate for the

12  murder of your close friends?

13  A    No. I didn't do nothing.

14  Q    Did you ever try to hook up with Darryl's source of supply

15  and continue in the drug business after?

16  A    No.  I didn't know him.  I ain't have no way of getting in

17  touch with him.

18  Q    Did there come a time when you stopped being involved in

19  drug trafficking, Mr. Denham?

20  A    Yeah.

21  Q    When was that?

22  A    A couple years ago.

23  Q    Okay.  So you didn't stop immediately after the murders, is

24  that your testimony?

25  A    Yeah.  Not immediately.

1    Q    You remained friendly with the Wyche family since the

2    murders happened?

3    A    Yeah.  I'm the Godfather of his sons.

4    Q    Of whose sons?

5    A    Of Darryl's sons.  Darrell and Darryl Wyche, I'm their

6    Godfather.

7    Q    So how often do you go over to visit the Wyche family?

8    A    About once a month.

9    Q    What about Miss Irene?  Do you stay in touch with her?

10   A    Yeah.  I talk to her about every two weeks.

11   Q    Okay.  When you went over to the house, to Irene Magginson's

12   house, you told us some of the people who were there.  Do you

13   remember, was Tyrone there, Tyrone Blanding?

14   A    Tyrone had came there shortly, shortly after because --

15   yeah, he came there shortly after.

16   Q    Okay.  What about Claudus Lassiter?  Do you remember if he

17   was there?

18   A    No, I don't remember seeing Claudus.

19   Q    Okay.  No further questions, Your Honor.

20           CROSS EXAMINATION

21   BY MS. RHODES:

22   Q    Court's indulgence.  Mr. Denham, you said that, at the

23   funeral, you didn't want the heat drawn on you because Homicide

24   was there, right?

25   A    Yeah.

1    Q    Okay.  So you were concerned about appearances and things

2    like that, right?

3    A    I was concerned that I had people around me that I was

4    protecting, me at that time, and I didn't want to, I didn't want

5    that kind of problem at that time.  I didn't want them rushing

6    me.

7    Q    Okay.  But at the funeral, you were concerned about how

8    things might look to Homicide, right?

9    A    No, I wasn't worried about how -- yeah, yeah, I was in a

10   way.  Because I didn't want, if something to happen to them, I

11   wasn't trying to be get arrested for their murder.

12   Q    Okay.  And you also said that Wayne was wearing all black at

13   the funeral?

14   A    Yeah.

15   Q    Were a lot of people wearing all black at the funeral?

16   A    I don't know.  I wasn't paying attention to a lot of people.

17   Q    Okay.  Do you remember what color you were wearing?

18   A    Yeah.  I had on a suit.  It was brown.

19   Q    Dark suit?

20   A    It was brown.

21   Q    Okay.  All right.  Now, you said that you eventually had a

22   chance to speak to an attorney, right?

23   A    Yes.

24   Q    Mr. Needleman.  And after you spoke to him you felt a little

25   more comfortable, right?

1    A    Yeah.

2    Q    Okay.  But you told the grand jury that you were comfortable

3    that day you testified, right?

4    A    I don't remember being asked was I comfortable.

5    Q    Okay.  Well, do you remember coming in here in 2004, coming

6    to the grand jury in 2004?

7    A    Do I remember?

8    Q    Yeah.

9    A    Yeah, I remember.

10   Q    Okay.  Around February 28th.  Do you remember that?

11   A    I mean, I don't remember the date.  I just remember coming

12   to the grand jury.

13   Q    Okay.  And you remember, you were being questioned by Mr.

14   Harding, right?

15   A    Yes.

16   Q    And he asked you a lot of questions at the beginning about,

17   do you understand why you're here, what we're doing, things like

18   that, right?

19   A    Yes.

20   Q    And one of the things he asked you, he said, this is a

21   federal grand jury and we're investigating criminal, criminal

22   federal violations of the law, right?

23   A    Yes.

24   Q    And he said that your, it's a crime to say something that's

25   not true in the grand jury.  And he asked you if you understood

1    that, right?

2    A    Yes.

3    Q    And he told you you have to tell the truth, right?

4    A    Yes.

5    Q    Okay.  And you said that you understood that?

6    A    Yes.

7    Q    All right.  He also told you that it's a crime to say

8    anything untrue and you could be sent to jail, right?

9    A    Yes.

10   Q    Okay.  And you said you understood that, too?

11   A    Yes.

12   Q    Okay.  He also said that you're just a witness here in this

13   investigation, you're not a target of the investigation, right?

14   A    Yes.

15   Q    Okay.  And that you don't have an attorney.  He confirmed

16   that, right?  And then he said, okay, are you comfortable

17   testifying without having an attorney, Mr. Denham?

18   A    Yeah, at that time, yeah.

19   Q    And you said yes?

20   A    Okay.

21   Q    Okay.  And then he said, and that's in view, in other words,

22   you're comfortable in view of the fact that you're not a target.

23   And you said yes, sir.  Do you remember that?

24   A    Yes.

25   Q    Okay.  So the fact that you weren't a target made you more

1    comfortable here in front of the grand jury?

2    A    Yes.

3    Q    And you were also told that nothing you said was going to be

4    used against you, right?

5    A    Yes.

6    Q    Okay.  Including what you said even outside the grand jury

7    when you were interviewed just privately by Mr. Harding, right?

8    A    Yes.

9    Q    So you knew that you could tell him the truth and you

10   wouldn't get prosecuted for it, right?

11   A    Yes.

12   Q    Okay.  But you didn't tell him the truth, right?

13   A    No.

14   Q    Okay.  And you've said today there's only three things that

15   you said that weren't true that day, right?

16   A    Yes, ma'am.

17   Q    Okay.  I want to go back over some things about the trip

18   to -- first of all, let me ask you.  When was the very first time

19   you ever cooperated, like you're cooperating in this case, with

20   law enforcement in your life?

21   A    I don't know.

22   Q    Well, have you ever done it before this case?

23   A    I don't remember.

24   Q    Well, wouldn't you remember if you'd been interviewed by the

25   police in a case where you were, when you had some stake in it?

CROSS EXAMINATION OF DENHAM BY RHODES                    60

1    A    Because I been arrested several times.  I put a lot of that

2    stuff behind me, so I don't really remember too much.

3    Q    Okay.  So you may, is it, would you say you've never

4    cooperated before?

5    A    It depends on what you call cooperation.

6    Q    Well, what do you think of as cooperation, sir?

7    A    I don't, I mean, I'm asking you.

8    Q    Well, cooperation would be when the police interview you and

9    you're told you don't have to talk and you talk to them, anyway,

10   and you tell them stuff that happened in the case, things you

11   know about somebody else, about what's going on.  That's

12   cooperation.  You don't have to testify in court to be

13   cooperating.  But did you ever cooperate like that, with the

14   police?

15   A    No.  I don't remember.

16   Q    Okay.  And the last, the last big arrest and conviction you

17   got got you a five year sentence, right?

18   A    Yes.

19   Q    Okay.  And that was with no cooperation, right?

20   A    Yes.

21   Q    Okay.  Now, let's talk about your, your names.  When you

22   testified back on October 1st, Mr. Harding asked you a little bit

23   just about using the name Dwayne Bryant, right?

24   A    Yeah.

25   Q    Okay.  Now, I know that from, that, well, you'll agree that

1    the Motor Vehicle records from Maryland show that you had a name

2    change back in 1990, right?

3    A    I don't remember.  I don't know.  I'm not sure.

4    Q    You don't remember that?

5    A    No.

6    Q    Well, you told us in here, back on October 1st, that you

7    used "Bryant" just a couple years ago or something like that?

8    A    Yeah.  I used to use it off and on.

9    Q    Okay.  Off and on.  So it wasn't really just a particular

10   time.  And then you decided because of a problem with your father

11   you weren't going to use it any more.  It wasn't like that, was

12   it?

13   A    I never gave it too much thought.  I just stopped using it.

14   Q    Okay.  But when you did use it, you used it when it was kind

15   of helpful to you, right?

16   A    Yeah.  I used it on job applications as well.

17   Q    Okay.  And sometimes on job applications that meant that it

18   wouldn't show up that you had a record?

19   A    Sometimes.  I don't know.  I mean, I did a lot of stuff that

20   didn't really make no sense back then.  I'm not going to try to

21   justify it.  I don't remember.

22   Q    Well, just to go over that because I think it's not clear to

23   the jury right now.  You used the name "Bryant" when you were on

24   probation for a while, didn't you?

25   A    No.  What you mean, when I was on probation I used the name

1    "Bryant?"  I used the name "Bryant" when I was in school as well.

2    Q    In school where?

3    A    In Randallstown.

4    Q    Okay.  So that was your name then?

5    A    I used it on a lot of papers.

6    Q    But this name change at MVA in 2000, was that when you

7    stopped using "Bryant" and started using "Denham?"

8    A    Well, when I came home.  I don't really remember too much

9    about that.  I just know I used to use the name "Bryant" and I

10   used to use the regular name.

11   Q    Okay.  Well, you have -- I want to ask you, then, if this

12   is, if this is correct.  For a while when you were first

13   arrested, the first couple times you were arrested in '91 for an

14   assault charge, later in '91 for another assault charge, and in

15   '93 for another assault charge, in '93 again for a possession

16   charge, possession of drugs, and again in, later in '93, you used

17   Denham that whole, all those times, right?

18   A    I ain't have no choice.  They already knew what my name was,

19   anyway.

20   Q    Okay.  But you used Denham?

21   A    Yes.

22   Q    And then it looks like once you were put on probation in one

23   of those cases and you got picked up for some smaller stuff, you

24   started to use Bryant, right?

25   A    Yes.

1   Q    So what that did was, and when you used Bryant that was just

2   for, it was a trespass case.  Do you remember that?

3   A    No, I don't remember that.

4   Q    And there was a possession with intent to distribute or

5   sell.  And that was under Bryant.  Do you remember that one?

6   A    I told you, I been arrested a lot of times.  It was a lot of

7   charges.

8   Q    Okay.  But back in '94, when you were on probation and you

9   used Bryant, that meant that they wouldn't figure out that you

10  violated probation, right?

11  A    You don't believe that.  You know they got my fingerprint.

12  So it matter what name.  Once I really found out, it don't matter

13  what name I use, when they run your fingerprints they're going to

14  find out what your name is, anyway.

15  Q    But you didn't get violated, though, did you?

16  A    In '94?

17  Q    Yeah.

18  A    I got violated when I caught my time.  They ran my time

19  concurrent.

20  Q    Yeah, but that wasn't for a couple of years, right?

21  A    I don't know.  I don't remember.  I don't look at my record

22  and study my criminal record.

23  Q    Do you know when you were in prison?  You know you were in

24  prison from '96 to 2000?

25  A    Yeah.  That's when I was sentenced.

1    Q    Okay.  And you know that that sentence started in '93 as

2    just five years all suspended, right?

3    A    In '93 or '94?  I know when I caught my time in '95, I was

4    already on five years' probation.

5    Q    Right.  What I'm saying is by using the name Bryant for a

6    couple of those times, other arrests, you didn't get violated,

7    right?

8    A    No, that's not true.  That's not true.

9    Q    Well, did you get, did you have a violation of probation

10   hearing on that case?

11   A    Yes, I did, in '98.  I believe it was '98.  When I was

12   already incarcerated in Hagerstown, I went back to court for a

13   violation.

14   Q    Okay.  But your arrests for the other cases weren't in '98.

15   They weren't in '97.  They weren't in '96.

16   A    Because I was in jail at the time.

17   Q    They were in '94.

18   A    I was on probation.  I was already on probation.  I had

19   several charges where I didn't actually do time.  I had a stet.

20   I had a probation.  It was a whole lot of different charges.

21   Q    But being on probation means you're not even, it's a

22   violation just to get arrested, isn't it?

23   A    Yeah.

24   Q    Okay.  So let me ask you about, you also said that you, that

25   trip to DC, you didn't carry a gun, the trip with Darryl, right?

1    A    Right.

2    Q    Okay.  You're his security, right?

3    A    That was like my brother.  That was like my best friend.  So

4    it was more than just security.  I just make sure I watch his

5    back.

6    Q    Okay.  So you and he were very tight?

7    A    Yes.

8    Q    And you even said that you were in the drug business, you

9    were like partners?

10   A    Right.

11   Q    Okay.  So certainly, and he, on that trip to DC, he wasn't

12   carrying a gun, right?

13   A    No.

14   Q    Okay.  He didn't always have a gun in the car with him, did

15   he?

16   A    No.

17   Q    Okay.  But you were the protection, right?

18   A    Yeah.

19   Q    And you're going into DC?

20   A    Yeah.

21   Q    And you're telling us you didn't have a gun that day on that

22   trip?

23   A    That's what I'm telling you.

24   Q    Okay.  So when Mr. Harding was asking you, you kind of led

25   people to believe that you don't really use a gun or carry a gun,

1  is that right?

2  A    I didn't need to.

3  Q    Okay.  You didn't need to because, why was that?

4  A    Because if you choose, if you choose who careful you do

5  business with, all the time you don't need to carry a gun on you.

6  Q    Okay.  But that hadn't always been the case for you, had it?

7  A    No, I carried a gun on me several times.

8  Q    In fact, most of your arrests are for carrying or using a

9  gun, right?

10  A    Yes, ma'am.

11  Q    In fact, I want to talk about one other arrest that I think

12  Mr. Harding, or one other case that Mr. Harding didn't mention.

13  And that is, you got out from your first, the first long sentence

14  you had that was in 2000, right?

15  A    Yes.

16  Q    Okay.  And then you had charges again, you had some gun --

17  some drugs charges the next year, right?

18             MR. HARDING:  Objection.

19             THE COURT:  Overruled.

20  Q    You had some drug charges the next year, right, felony drug

21  charges in 2001?

22  A    Yes.

23  Q    Okay.  And then in 2002, you had a charge involving a

24  handgun and use of a handgun in the commission of a crime of

25  violence, right?

1    A    In 2002?

2    Q    Yeah.

3    A    Yeah.

4    Q    That was in March of 2002, right?

5    A    I don't remember.  I don't remember the date.

6    Q    Okay.  Well, it was the same month when Darryl and his

7    brother died, right, in March of 2002?

8    A    I don't remember that.  I don't remember that.

9    Q    Okay.  Well, let me ask you if you remember these other

10   dates.  I mean, you remember, you remember it was 2002, right?

11   A    I can't say I remember that.

12   Q    Okay.  Does this jog your memory?  You were charged with

13   first and second degree assault, you were charged with carrying a

14   handgun, use of a handgun in a crime of violence?  Do you

15   remember that charge now?  Do you remember that case now?

16   A    I remember, I remember the charge but I'm not sure what case

17   you're talking about.  I can tell you about the charge because I

18   know what charge.  I'm just not sure, when you're reading it like

19   that, I don't know what you're talking about.

20   Q    Okay.  Did you ever talk to an attorney about that case?

21   A    I talked to an attorney about all my cases.

22   Q    Okay.  And did the attorney tell you that in that case that

23   one count, use of a handgun in a crime of violence, carries a

24   five year mandatory minimum sentence in Maryland?

25   A    Yes.

1  Q    Okay.  So that was a pretty serious case for you at that

2  moment, wasn't it?

3  A    I'm not sure exactly what case you was talking about.  The

4  gun case I had, that was put on the stet.  And I didn't actually,

5  I didn't have the gun on me.  The guy made a false statement

6  because he was scared.

7  Q    That's a different case.  The one I'm talking about is March

8  of 2002.  And then later in that month, that's when, that's when

9  Anthony and Darryl were killed, right?

10 A    I don't know.  I'm not sure of the case you're talking

11 about.  I'm really not sure.  Where did it take place at?

12 Q    Well, you remember the month they died, right?  Do you

13 remember the date they died?

14 A    I don't remember the exact date.

15 Q    Okay.  Well, does March 25th, 2002 sound right?

16 A    That sounds about right.

17 Q    Okay.  And you talked to the police within a day or two

18 after their murder, right?

19 A    Yeah.

20 Q    In fact, the next day, right, you talked to them?

21 A    Yeah.

22 Q    And then you gave a statement to them on April 3rd, a few

23 days later, right?

24 A    Yeah.

25 Q    And do you remember that on April 9th, all the charges in

1   your case were dropped?

2   A    No.  No.  I don't remember that.

3   Q    You don't remember that?

4   A    No.

5   Q    Okay.  And then since then, you've had just a couple of

6   other charges, but one's a drug case and something else, and a

7   theft case, right, where you pled guilty?

8   A    That theft case because I had temp tags on my car.

9   Q    But I mean, you pled guilty to it, right?

10  A    I ain't, I ain't have to plead nothing.  I don't even

11  remember what happened to that.  That was like, I had temp tags

12  on my car and they said the temp tags I had on the car was

13  stolen.  So that was a misdemeanor theft under $250.

14  Q    Okay.  Okay.  Now, you said that, you said a couple times

15  you didn't know the name of the connect that Darryl had for his

16  drugs, right?

17  A    Correct.

18  Q    You just know he's some Dominican guy.  Okay.  But you guys,

19  but you and Darryl were kind of partners on this, right?

20  A    Right.

21  Q    So there was just some stuff he never let you in on?

22  A    Some stuff I didn't want to know.

23  Q    Um-hum.  Okay.  Like you didn't want to know where the stash

24  was in the Honda, right?

25  A    No.  The Honda, the Accord, the station wagon was new so I

1   didn't even ride in the station wagon.  I just seen it.  He

2   showed it to me.

3   Q    Right.  But I'm just saying, you didn't want to know where

4   the stash was in that car, right?

5   A    It ain't that I ain't want to know.  I just didn't need to

6   know at that time.

7   Q    Okay.  Would it surprise you to learn that the stash was

8   where the spare tire is?

9   A    No.  It ain't surprise me.

10  Q    Okay.  So when you -- you also said that Darryl and Pete

11  were not talking, hadn't been talking for about a month, right?

12  A    Probably, around that time.

13  Q    Some kind of beef or something?

14  A    Yeah.

15  Q    Did Darryl tell you that he had actually paid Anthony's bail

16  money a couple days earlier to get him out of jail?

17  A    Yeah.  That was his brother.  They still seen each other

18  almost every day.

19  Q    Okay.  So they were beefing for a month, not talking to each

20  other, but Darryl went and bailed him out of jail?

21  A    Yes.

22  Q    Even though their beef was over money?

23  A    Yeah.

24  Q    Okay.  And so you're saying that they still weren't talking,

25  though, after he bailed him out of jail?

1    A    No.

2    Q    What was, how much money was at stake?  What were they

3    fighting over in terms of the money?

4    A    About, what, $2,000.

5    Q    Uh-huh.

6    A    Maybe 2500.

7    Q    Okay.  All right.  Do you know how much, how much bail money

8    Darryl paid?

9    A    No.

10   Q    All right.  And during this, this beefing, I mean, you said

11   earlier, I'm just thinking it doesn't really sound like Darryl,

12   because you said earlier Darryl's the kind of man who forgives

13   any kind of money debt.  He just says, well, that's it, I just

14   don't have to supply that person any more.  But he didn't do that

15   with his brother, right?  He wouldn't talk to him?

16   A    I mean, him not talking to his brother, that's still his

17   brother.  He still was the financial provider for everybody in

18   that house.

19   Q    Okay.  And he was pretty successful, right?

20   A    Yes.

21   Q    Now, another thing that maybe you forgot about that you said

22   earlier was, when you testified on October 1st, you said that you

23   were pulling in about 5000 a week?

24   A    Sometimes more, sometimes less.

25   Q    Okay.  When you testified before, you said it was more like

CROSS EXAMINATION OF DENHAM BY RHODES          72

1    3 to 400?  Do you remember that?

2    A    Yeah.  Yeah.  I remember that now by you saying it.

3    Q    So there were a lot of things before that you were trying to

4    kind of cover up, to cover up, right?

5    A    Yeah, I wasn't sure -- yeah.  You could say that.

6    Q    You were trying to minimize how bad things might look?

7    A    Yeah.

8    Q    Okay.  Including the $100,000?  You wanted to make things

9    not look so, maybe so bad, right?

10   A    Right.

11   Q    Or so big, right?  Okay.  Now, let's talk about this guy in

12   DC that we now know is named Greg.  When did you, when did you

13   first tell the government, Mr. Harding, that that was the correct

14   name?

15   A    After I spoke to my attorney and I came back and spoke to

16   him.

17   Q    When was that?  When was that?

18   A    A couple weeks ago.

19   Q    After you testified here on October 1st?

20   A    Well, when I came in here, the last time, when I was on the

21   stand for like five minutes.

22   Q    Right.

23   A    Yeah.  Well, I remember, I was asleep when I came out that

24   time.  So when I came in, I really didn't, you know what I mean,

25   I really didn't remember a whole lot.

1    Q    Wait a minute.  You were asleep, you mean when you came in

2    here October 1st?

3    A    I was asleep in the back when I was waiting.

4    Q    Okay.  Okay.  All right.  But so, had you already met with

5    Mr. Needleman before that time here, when you were here on

6    October 1st?

7    A    Yeah.

8    Q    Okay.  And had you already told Mr. Harding about the

9    differences?

10    A    Yeah.

11    Q    Okay.  And when was that meeting with Mr. Needleman, just

12    roughly?  Like two months ago?  Two years ago?  Two weeks ago?

13    What would you say?

14    A    A couple weeks ago.

15    Q    Okay.  So a little time, then just a couple of days or so

16    before you came in here on October 1st?

17    A    No.  I spoke to Mr. Needleman twice.  I spoke to him like, I

18    spoke to him a couple weeks ago.  And before then I spoke to him

19    when I found out that they was looking for me, for me to come to

20    court.

21    Q    Okay.  How long did you meet with Mr. Needleman for?

22    A    I don't know.  About a half an hour.

23    Q    Okay.  Okay.  Now, you said that Darryl has a whole bunch of

24    phones or several phones, right?

25    A    Yeah.

1    Q    Mr. Harding asked you if his phone was an open-faced phone

2    and you said yes.  Okay.  All his phones were?  Or do you know?

3    A    Not all of them.  Some of them flip phones.  Some of them's

4    open face.

5    Q    Okay.  So why do you suppose that since Darryl had just

6    gotten the Honda and still had the temp tags, you said he didn't

7    want to drive to DC that day, right?

8    A    Right.

9    Q    Okay.  Because, you know, your chances of getting stopped

10   are greater, right?

11   A    Yeah.

12   Q    Okay.  So why would he drive it at night in Baltimore?

13   Still out of state, right?

14   A    Yeah.

15   Q    Did you think that was a little bit odd the next morning

16   when you heard about that?

17   A    Nah.

18   Q    You didn't?  Okay.  You also mentioned that there were a

19   couple of kidnappings and house break-ins that Darryl had.  And

20   one of the times, after one of them he came to talk to you when

21   you were in jail?

22   A    Yeah.

23   Q    Right?  Okay.  Do you remember roughly when that was?  I

24   know you got out in 2000.

25   A    No, I don't remember.

CROSS EXAMINATION OF DENHAM BY RHODES                75

1    Q    But one of the kidnappings was before 2000?

2    A    Yeah.  It was before 2000.

3    Q    What about the other one?  Was that also when you were still

4    locked up?

5    A    One took place, I believe one took place after I was

6    released and one took place while I was incarcerated.

7    Q    Okay.  What about house break-ins they had?

8    A    Yeah.  I'm not sure of the dates with that.  He told me

9    about it but it wasn't nothing, I mean, I didn't know too much

10   about the house break-in.  I just knew he told me about somebody

11   broke in his house because that's why he was moving.

12   Q    Do you know if that's before or after you got out?

13   A    I can't really remember.  I know one was after I got out,

14   after I was out of prison.

15   Q    Okay.  So one of them might have been before then?

16   A    Yeah.

17   Q    Okay.  I want to ask you about a couple other things you

18   said.  I guess there's some other things.  I mean, you mentioned

19   the 50,000 but you're saying now it was really a hundred thousand

20   that he owed the Dominican, right?

21   A    Yeah.  A little bit over that.

22   Q    The other thing was that you said before it was four to

23   seven ounces but it was really two keys that he was supposed to

24   make, doing that deal in DC, right?

25   A    Right.

1    Q    You also said that the deal didn't happen, right?

2    A    No, the deal did happen.

3    Q    But I mean the first time you said the deal didn't happen?

4    A    I don't remember.  I don't remember saying that.  But the

5    deal did happen, though.

6    Q    Okay.  Well, the first time you said you don't, you had said

7    that they couldn't agree on price or something.  Do you remember

8    that?

9    A    I don't know.

10   Q    Okay.  And this guy Greg, he was a mutual acquaintance of

11   you and Darryl, right?

12   A    Um-hum.

13   Q    You knew him from jail?

14   A    Um-hum.

15   Q    And Darryl knew him from jail?

16   A    Right.

17   Q    Did you know both him at the same time in jail?

18   A    No.

19   Q    Okay.  And what jail was that in?

20   A    Well, I met him in Hagerstown.  I think Darryl met him out

21   ECI, something like that.

22   Q    Okay.  And was he from DC?

23   A    Yeah.

24   Q    Okay.  And did he have a nickname?

25   A    I just knew him by Greg.

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 77 of 294

1    Q    Okay.  Do you know his last name?

2    A    No.

3    Q    Okay.  So before when you said that it was a guy named Tony

4    Roma, that was a lie?

5    A    Yeah, that was a lie.

6    Q    And when you said his government name was Donald, that was a

7    lie?

8    A    Yeah.

9    Q    Okay.  Court's indulgence.  Well, I want to ask you some

10   other questions, then, about what happened in DC.  Who was

11   driving on that trip?

12   A    Darryl.

13   Q    I thought Darryl didn't like to drive.

14   A    I didn't say that.

15   Q    No, I'm not saying you said it.  But I thought Darryl didn't

16   like to drive.  Isn't that right?

17   A    No, that's not right.

18   Q    Did you have a license back then?

19   A    Yeah.

20   Q    Okay.  Did Darryl have a license?

21   A    Yes.

22   Q    So if somebody else says he didn't like to drive, they would

23   be wrong?

24   A    I don't know.  I can't speak for somebody else.  I'm just

25   telling you that I never said that.

1  Q    All right.  And you said the place was somewhere out in

2  southeast DC, is that right?

3  A    It was in DC.  I think it was southwest or southeast.  I'm

4  not sure.  I'm not too good with DC.

5  Q    Okay.  And what you said about how the person met you

6  somewhere off the Beltway or maybe 295 and brought you in, that's

7  true?

8  A    Excuse me.  Yes, ma'am.

9  Q    Okay.  And you didn't really know where you were?

10 A    No.  Not really.

11 Q    Did Darryl know where he was?

12 A    He was more familiar with DC than I was.

13 Q    Okay.  And you're his protection, right?

14 A    Yeah.

15 Q    And you don't have a gun?

16 A    No.

17 Q    Okay.  And do you remember saying that, when you were asked

18 by Mr. Harding, did you do a drug deal with Tony Roma that night,

19 you said, no, it did not take place?  Do you remember that now?

20 A    It was, it was a couple things written on that paper that I

21 didn't even say, that I don't remember saying.  But like I said,

22 that whole situation, I wasn't quite sure on.  I see it right

23 here.  I looked over that.

24 Q    Okay.  Well, just, so you see that what you were asked by

25 Mr. Harding was, did you do a drug deal?  And you said, no, it

1   didn't take place.  Right?  And he asked you, why not?  And you

2   said, I think they couldn't agree to the numbers.  The prices

3   was, I believe, too high or they couldn't come to an agreement on

4   the numbers.  Do you remember saying that now?

5   A    No, I still don't remember saying that.

6   Q    Okay.  Well, let me ask you about the next stuff, then.

7   Because he says then, so what did you do?  And you said, headed

8   back, well, we talked for a little while and they wanted us to go

9   to this club, we wasn't dressed for it so we headed back to

10  Baltimore.  Do you remember saying that?

11  A    Yeah, I remember saying that.

12  Q    And is that true?

13  A    Yeah, that's true.

14  Q    Okay.  And then you said, you were asked, was Darryl upset

15  that he couldn't sell the cocaine?  And you said no, not at all,

16  right?

17  A    Right.

18  Q    And that wasn't true because he had sold it, right?

19  A    Well, he didn't sell all of it.

20  Q    Right.  But the part saying that, I mean, Mr. Harding had

21  just been told that there was no sale.  So when he asked you

22  that, you said, no, not at all, that's really not true?

23  A    Yeah.  But see, when he, first time he spoke to me, a lot of

24  that stuff I wasn't sure about because I wasn't sure could I be

25  charged or was I going to be charged, even though I was told I

1   wasn't.  I just still wasn't sure.

2   Q    So even though, but you took the oath to tell the truth, but

3   you still weren't sure if something bad could happen to you?

4   A    Yeah.  I mean, I never said I was a saint, so --

5   Q    Okay.  So you then decided, I'm not going to take a chance,

6   I'm not going to tell the truth, I'll just, you know, say what I

7   think is safe.

8   A    Yeah.  At that time, yeah.

9   Q    And when you testified in front of the grand jury, would you

10  say that you were behaving and your demeanor was the same as it

11  is today?

12             MR. HARDING:  Objection.

13             THE COURT:  Overruled.  You understand the question?

14             THE WITNESS:  She said how was my demeanor?

15             THE COURT:  Yeah.

16             THE WITNESS:  I don't understand what you mean by

17  "demeanor."

18  BY MS. RHODES:

19  Q    Well, like your, your, you said you were comfortable then

20  but you said you're more comfortable now, right?  Because you've

21  talked to Mr. Needleman.

22  A    Yeah, and I'm not breaking the law any more.

23  Q    I'm thinking about, I mean, it's natural to be nervous in

24  front of this whole courtroom, right?  Are you nervous today?

25  A    No, I'm not nervous at all.

1    Q    Were you nervous when you testified in front of the grand

2    jury?

3    A    Yeah, I was nervous then.

4    Q    Were you sweating then?

5    A    I wasn't sweating.

6    Q    Okay.  Were you fidgeting?

7    A    No.

8    Q    Okay.  And you're not fidgeting or sweating today, either,

9    right?

10   A    No.

11   Q    Okay.  So just in terms of your behavior, it was pretty much

12   the same as it is today, right?

13   A    I believe so.

14   Q    Okay.  Okay.  And you said that Bo got drugs, you knew that

15   that Bo got drugs from Darryl, right?

16   A    I never said nothing about Bo.

17   Q    Okay.  So you didn't know anything about whether he was or

18   not?

19   A    Who you talking about?  Bo?

20   Q    Yeah.  Do you know who Bo is?

21   A    After.  Now I know who he is.

22   Q    Did you know when you testified in front of the grand jury

23   who he was?

24   A    No, I didn't know who he was.

25   Q    Okay.  And you also said that you heard Darryl on the

CROSS EXAMINATION OF DENHAM BY RHODES                82

1    phone -- first of all, you said you know that Darryl owed his

2    connect about $100,000, right?

3    A    Yes.

4    Q    And that once he paid him that money, he would have gotten

5    how much, how many keys?

6    A    About ten.

7    Q    About ten?  Okay.  And that's what he was doing every week,

8    right?  So you said about ten a week?

9    A    Yes.

10   Q    So that was not that unusual, I guess, for him to owe his

11   connect a hundred thousand, because he's doing a really big

12   business?

13   A    Right.

14   Q    Okay.  And you heard him talking to his connect a couple of

15   days or the day before or the day before that?

16   A    Yeah.

17   Q    Okay.  But his suppliers wouldn't, I mean, the people who

18   bought from Darryl, the people who got half a key or a quarter

19   key from him, they wouldn't necessarily know who he got his stuff

20   from, would they?

21   A    No.

22   Q    And they wouldn't necessarily know how much he was doing a

23   week, right?

24   A    Unless he told them.

25   Q    Okay.  And you, you said that you didn't really approve of

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 83 of 294

1    Darryl's attitude about just, if Darryl, I mean, Darryl's

2    attitude if somebody owed him money and they didn't pay, he would

3    just kind of let it go and just stop dealing with them?

4    A    It depends, like I said, depends on the amount of money.

5    Q    So if it's a small amount, it might be okay?

6    A    Yeah.

7    Q    He could just -- go ahead.

8    A    Yeah.  If it was a small amount, he wouldn't worry about it.

9    Q    Okay.  And what about if it's like 800 bucks?

10   A    He wouldn't worry about no $800.

11   Q    Okay.  But is that what you hoped Goo would do over the 800

12   bucks that you owed him, that you just never gave him or gave him

13   the drugs for?  You hoped he'd just forget about it?

14   A    I don't know.  I didn't hope anything.

15   Q    That was okay, you thought it was okay to steal that from

16   him?

17   A    You asking me do I think it was okay to take money from

18   somebody?

19   Q    Yeah.  That's what you did, right?

20   A    Yeah.  That's what I did.

21   Q    Okay.  I mean, apparently you think it's okay, right?

22   A    Wasn't nothing okay with the way I was living back then.  It

23   wasn't nothing okay about that whole situation.

24   Q    Okay.  So what you're saying is you needed to do that then

25   because you needed that money?

1    A    Yeah.  I needed that money.

2    Q    Okay.  All right.  And you got a call, I mean, you left that

3    apartment, you left Brandy's apartment or Brandy's house,

4    whatever, and you, the three of you walked out together, you,

5    Anthony, Darryl, right?

6    A    Yes.

7    Q    Okay.  And there's something about the milk that is a little

8    funny.  I mean, you said you had to go, you actually told Darryl,

9    I got to go get milk at the store, right, and then I'm going

10   home.

11   A    Yes.

12   Q    Right?  And then didn't Darryl say the same?

13   A    He said, yeah, he got to get ready go home, too.

14   Q    But did he also say he was going to get milk?

15   A    He didn't say he was going to get milk.  He just said that

16   he had to get home, too.  He had to stop at the store, too.  I

17   told him I was going to the market.  But he said, yeah, I'm going

18   to stop at the store, too.

19   Q    Okay.  So he did say he was going to stop at the store, but

20   he didn't say what for?

21   A    He didn't say what for.

22   Q    Okay.  Did you guys go to the same market then?

23   A    I don't know where -- I know where I went.  I don't know

24   where Darryl went.

25   Q    Okay.  Now, you also, you know, when you testified before,

1    you also said that you don't, you didn't want to know some of

2    these things about, like, the stash or about exactly how much

3    money somebody had, right?

4    A    Yeah.

5    Q    Okay.  Because you don't ever want to be a suspect, right?

6    A    Yeah.

7    Q    And that was always something that, in your business, you

8    had to watch out for?

9    A    Yes.

10   Q    Okay.  And so by sort of trying to keep yourself from some

11   of the information, you figured you would wouldn't look like a

12   suspect?

13   A    Yeah.

14   Q    Okay.  And you said that, when you testified, you mentioned

15   that a couple of times.  But you --

16        MR. HARDING:  What page are you talking about, Ms.

17   Rhodes?

18   Q    I'm not reading from the transcript right now.  I'm reading

19   from my notes.

20        MR. HARDING:  Can you give me a transcript citation for

21   this?  You're talking about his prior testimony.

22   Q    Yeah, but I'm asking him about it.  I'm not reading from it.

23   You said a couple of times before, when you testified, that you,

24   that you were, you would do things to make, to make sure that you

25   did not look like a suspect, right?

1    A    Certain things I just didn't want to know, like some certain

2    house robberies.  I never had certain people know where I lived

3    at because if something happened to somebody that was close to

4    me, if they didn't know where I lived at, then I didn't have to

5    assume or think that they had something to do with it.

6    Q    Because it's just important in that business to make sure

7    that you're protected and protecting yourself?

8    A    Yes.

9    Q    Okay.  Another thing you said that I'm not sure if it still

10   makes sense is that, that you were asked in the grand jury, Page

11   28, by a juror, not, by one of the grand jurors, not by the

12   attorney, who was Anthony getting his drugs from?  Do you

13   remember that?

14   A    Yeah.

15   Q    Okay.  And you said his brother, is that right?

16   A    Yes.

17   Q    Okay.  And that was, that's still correct?  That's your

18   testimony, is he got his drugs from Darryl?

19   A    Yes.

20   Q    Okay.  But then when you were asked, but they weren't

21   speaking right then, were they?

22   A    No.

23   Q    And then you changed your testimony and said, oh, well, Pete

24   wasn't doing anything?

25   A    Pete wasn't, Pete wasn't doing nothing major.  If he was

1    doing something, it was small.

2    Q    He wasn't doing anything what?

3    A    He wasn't doing nothing big.  He wasn't doing nothing major.

4    Q    Oh, okay.  Okay.  Okay.  Now, another thing that was, that

5    there were a lot of rumors going on after this, after Darryl was

6    killed, right?

7    A    Yeah.

8    Q    Everybody was talking about what was going on, right?

9    A    Yeah.

10   Q    When you went to the house the next day, a lot of people

11   were there?

12   A    Yeah.

13   Q    Maybe about ten people or so?

14   A    Probably so, yeah.

15   Q    Okay.  And everybody was trying to figure out what had

16   happened, naturally?

17   A    Right.

18   Q    Okay.  And people were saying, people had different ideas

19   about what might have happened, right?

20   A    Yes.

21   Q    Okay.  And there were some, one of the rumors was people

22   were mad at Darryl for not keeping his word about something,

23   right?

24   A    Something like -- yeah, that's what I heard.

25   Q    And there were some other, do you remember the other rumors,

1    too?

2    A    No.

3    Q    Okay.  Had you heard about any money that might have been

4    involved?  Were there any rumors about money, about it being a

5    robbery?

6    A    Yeah.  Well, I heard about it being a robbery, yeah.

7    Q    Okay.  And that meant money was involved, right?

8    A    Yeah.  Yeah.

9    Q    Okay.  But in the grand jury, you said that you hadn't heard

10   about a sum of money involved, right?

11   A    I believe so.

12   Q    Okay.  Court's indulgence.

13        Okay.  You also said that -- well, you, as somebody

14   who's got his back, you have kind of an eye for trouble, right,

15   in terms of watching out for him?

16   A    Yes.

17   Q    Okay.  And that was important to you because that was really

18   your job with him, right?

19   A    Yeah, because that was my people.

20   Q    Okay.  And also, when, if he had a concern about something

21   he was doing, he would ask you to come along?

22   A    Yes.

23   Q    So that night, did you -- were you aware of any of the

24   people who called him that day?

25   A    No.

1    Q    Okay.  Did he usually tell you what was going on in the drug

2    business, what he had coming up?

3    A    Not everything.  Some things he told me.  Some things he

4    didn't.

5    Q    Okay.  Had he told you that that night he had, he was going

6    to, after he left Brandy's, he was going over to Essex?

7    A    No.

8    Q    Had he told you after he left Brandy's he was going to go

9    over to East Baltimore?

10   A    No.

11   Q    Had he told you that after he left Brandy's he was going to

12   West Baltimore to make, to do a deal?

13   A    No.

14   Q    Okay.  So none of that had been communicated to you from

15   Darryl?

16   A    No.

17   Q    Okay.  And you were always -- strike that.  The other, the

18   one other item I want to ask you about is that everybody that

19   night was trying to figure out who didn't like Darryl, right, or

20   what might be going on?

21   A    No.

22   Q    When you were at the Magginson's the next day?

23   A    Was they trying to figure out who didn't like him?

24   Q    Who maybe didn't like Darryl.

25   A    No.

1    Q    To figure out why this might have happened?

2    A    No.  That wasn't, that wasn't, they wasn't talking, nobody

3    was talking about that.

4    Q    Okay.  Well, do you remember saying that before at the grand

5    jury?

6    A    No.

7    Q    All right.  But people were there.  People were talking

8    about why this might have happened, right?

9    A    Yeah.

10   Q    Okay.  And some people thought that he might be an

11   informant, right?

12   A    Yeah.  That was a rumor I heard, yes.  But that was like

13   way, that was way after.

14   Q    Okay.  Well, you talked about it at the grand jury, right?

15   A    Yeah.  People were saying that off and on, so, I'm not sure.

16   Q    Um-hum.  And that maybe he was telling on people and stuff

17   like that, right?

18   A    Yeah.

19   Q    Okay.  And you also said that there were some people,

20   certain people that you knew just didn't like him, right?

21   A    Yeah.

22   Q    Okay.  Thank you.  Nothing further, Your Honor.  Court's

23   indulgence.

24           MR. MARTIN:  No questions, Your Honor.

25   BY MS. RHODES:

1    Q    Court's indulgence.  When you were there at the Magginson's

2    and everybody was listening to the tape, was Natasha Magginson

3    there, Natasha Wyche?

4    A    Yes.

5    Q    Okay.  And did she listen to it as well?

6    A    Yeah.

7    Q    Okay.  And no one was, that morning, nobody was talking

8    about Bo's name listening to that tape, were they?

9    A    No.

10   Q    Okay.  Thank you.  Nothing further, Your Honor.

11          MR. PYNE:  Your Honor, just so I know, were you

12   planning on taking a break at any point?

13          THE COURT:  Eventually.

14          CROSS EXAMINATION

15   BY MR. PYNE:

16   Q    Okay.  Good morning, Mr. Denham.  I'm Jim Pyne.  I represent

17   Mr. Martin.  And I have a few questions for you.  Now, it's my

18   understanding that you did know Mr. Martin, is that correct?

19   A    Yes.

20   Q    You identified him earlier in your testimony.  Now, it's my

21   understanding that you first met Mr. Martin in 1993, is that

22   correct?

23   A    Somewhere around there.

24   Q    About that time?

25   A    Yes.

1    Q    And you would have been 20 years old at that time?

2    A    I believe so.

3    Q    Because you were born in 1973, is that correct?

4    A    Yes.

5    Q    So you would have been 20.  How old would Mr. Martin have

6    been at that time?

7    A    I don't remember.  I don't know.

8    Q    Well, he's substantially younger than you, though, isn't he?

9    A    Yes.

10   Q    Five or six years younger?

11   A    I believe so.

12   Q    So if you were 20 at the time, he probably would have been

13   14 or 15?

14   A    I believe so.

15   Q    Okay.  And I believe you testified that he lived in another

16   section of the apartments that you lived in, the Savoy

17   Apartments?

18   A    Yes.

19   Q    Okay.  And we know from your earlier testimony that you were

20   actually incarcerated from March of 1996 through the year 2000

21   sometime, is that correct?

22   A    Yes.

23   Q    Okay.  So if you first met him in 1993 and -- when was the

24   last time you saw him that you can recall, Mr. Martin?

25   A    The last time I saw him --

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 93 of 294

1    Q    Before you were incarcerated.

2    A    The last time I saw him was in the mall.  That was like the

3    last time I seen him.

4    Q    Where was it again?  I'm sorry.

5    A    I think up Reisterstown Plaza or Mondawmin.  That was the

6    last time I seen him.

7    Q    Before you were incarcerated?

8    A    Yes.

9    Q    And can you tell us what time frame that would have been?

10   A    I don't remember.  It was like in the '90s, early '90s.  I

11   don't remember the exact year.

12   Q    Okay.  Now, you testified in front of the grand jury, I

13   believe it was, that you last saw him in 1994/95.  Would that be

14   correct?

15   A    I seen him in the early, I just know I seen him before.  I

16   didn't see him since I came home from jail.  But I seen him

17   before then.

18   Q    Okay.  So any knowledge you had or any meetings or dealings

19   you had with Mr. Martin would have all been before 1996?

20   A    Yeah.  Before '96.

21   Q    March of 1996, because that's when you were arrested?

22   A    Right.

23   Q    Okay.  And any opportunity you would have had to hear his

24   voice would have been before 1996?

25   A    Yes.

1    Q    And again, if I say that you testified in the grand jury

2    that you hadn't seen him since '94 or '95, would that be correct?

3    A    Say that again.

4    Q    If I told you that you told the grand jury --

5              MR. HARDING:  Objection.

6              THE COURT:  I think it's been asked and answered.  But

7    go ahead, Mr. Pyne.  Go ahead.

8    Q    I'll move on.  If it's been asked and answered, I'll move

9    on.  Were you aware that during that period of time, that Mr.

10   Martin in 1994, '95 spent some degree of time in the Hickey

11   School or was incarcerated himself?

12   A    Yeah.

13   Q    Okay.  And so during that time, you didn't go and visit him

14   in the Hickey School or anywhere, did you?

15   A    No.

16   Q    So you wouldn't have had any opportunity to speak to him

17   during that period of time?

18   A    No.

19   Q    So would it be safe to say you hadn't heard Mr. Martin's

20   voice for approximately seven or eight years before you heard

21   this tape in 2002?

22   A    Yes.

23   Q    And in fact, you hadn't heard Mr. Martin's voice since Mr.

24   Martin was 16 or 17 years old, at best?

25   A    Probably so, yes.

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 95 of 294

1    Q    And in 2002, Mr. Martin would have been substantially older

2    than that, is that correct?

3    A    Yes.

4    Q    And in fact, as you sit here today you're not, weren't even

5    aware that was Mr. Martin's last name, isn't that correct?

6    A    I heard the last name, I just didn't pay, pay -- it wasn't

7    important to me so I didn't pay too much attention what his last

8    name is.  I know who he is.

9    Q    You knew who he was?  You knew him as Wayne?

10   A    Yes.

11   Q    Did you ever hear him called by the nickname "Weaze?"

12   A    No.

13   Q    Were you aware that his close friends referred to him as

14   Weaze?

15   A    That's something new.  That's what I heard, a nickname he

16   been going by the last couple years.

17   Q    But you weren't close enough to refer to him by the nickname

18   Weaze, were you?

19   A    No.

20   Q    Let's go to the morning that you went over to the

21   Magginson's house and heard this recording.  Who was there when

22   you arrived at the Magginson's house?

23   A    It was several people over there.  Some family, family

24   members and friends, her brother.  A couple of her cousins.

25   Q    Can you give any names of who the friends and cousins were?

1    A    Her brother Stimey was over there.  A couple of her cousins

2    was over there.  I don't really remember everybody name.

3    Q    Okay.  And had they all been listening to this tape

4    recording?

5    A    Before I got there?

6    Q    Yes.

7    A    Yeah.

8    Q    All right.  And when you got there, one of the first things

9    they had you do was listen to the recording?

10   A    Yeah.  After they, after they told me about what we seen on

11   the news.  Excuse me.  After they told me about what we seen on

12   the news, then they said they want me to hear the tape.

13   Q    Okay.  And before you listened to the tape, didn't they tell

14   you that they heard the name "Wayne" on the tape?

15   A    Um-hum.

16   Q    And didn't they tell you that, in fact, they thought it was

17   Wayne Martin on the tape?

18   A    Um-hum.  Yes, sir.

19   Q    And you were told all this before you ever even had a chance

20   to listen to the tape?

21   A    Yep.

22   Q    And when you listened to the tape, you thought you heard a

23   word that sounded like the name "Wayne", didn't you?

24   A    Yes.

25   Q    And it was only then that you said, okay, I think that might

CROSS EXAMINATION OF DENHAM BY PYNE                    97

1   sound like Wayne Martin's voice?

2   A    That day, yes.

3   Q    Okay.  Now, it wasn't the voice that was saying what you

4   thought was word "Wayne", was it, that you thought was Wayne

5   Martin?

6   A    No.

7   Q    It was one of the other voices?

8   A    Yeah.

9   Q    Can you specifically remember anything that was said on the

10  tape that sounded like Wayne Martin was saying it, Shelly Wayne

11  Martin was saying that?

12  A    No, it's been a long time since I heard the tape.  I can't

13  specifically say nothing.

14  Q    Okay.  When was the last time you heard the tape?

15  A    It was a long time ago.  I don't really know.

16  Q    And as you sit here today, can you say with any certainty to

17  the jury here today that you're sure that it was Shelly Wayne

18  Martin's voice on that tape?

19  A    No, I can't be 100% sure.

20  Q    With any degree of certainty, can you say that it was his

21  voice?

22  A    I'm not sure.

23  Q    Okay.  As you were sitting in a room full of people, were

24  they all discussing the fact that they heard this word "Wayne?"

25  A    Yes.

1    Q    And everyone was thinking about what Waynes they knew, isn't

2    that correct?

3    A    Yes.

4    Q    And the only Wayne that anyone could think of was Shelly

5    Wayne Martin?

6    A    Yes.

7    Q    No one else could think of another person named Wayne?

8    A    No.

9    Q    And it was at that point that everyone decided it was his

10   voice on the tape?

11   A    Yes.

12   Q    Did anyone consider whether or not -- what was the quality

13   of that recording that you were listening to over the speaker

14   phone?  Was it a good recording?  Was it, were you easily able to

15   hear the voices?

16   A    Yes.

17   Q    So it was loud and clear?  You had no problem hearing the

18   voices?

19   A    I mean, I could hear it.  I don't know the quality, I don't

20   know the quality of it.  I don't know quality of it.  But I heard

21   it.

22   Q    Okay.  Could you distinguish separate words on the tape?

23   A    Yeah.  I was able to distinguish some words, yeah.

24   Q    Some words or all the words?

25   A    What I heard.  Certain words that I heard I was able to

1    distinguish.

2    Q    How many words were you able to distinguish on that tape?

3    A    I said it was a long time since I heard that tape so I

4    really don't know.

5    Q    You don't really recall how many words you were able to

6    distinguish?

7    A    No.

8    Q    But you did think you heard the word "Wayne?"

9    A    Yeah.

10   Q    Okay.  But since you've been home, you haven't had any

11   dealings whatsoever with Shelly Wayne Martin, is that correct?

12   A    No.

13   Q    Now, let's talk about Darryl Wyche's drug dealing.  You

14   testified that basically it was your job to watch Darryl's back,

15   is that correct?

16   A    Yes.

17   Q    But you more considered yourself a partner rather than just

18   simply protection?

19   A    Yeah.  That was like, first I can say that, that was being

20   my brother, that was my brother literally.  So watching his back,

21   I would have did that for him for free.

22   Q    Okay.  But in fact, you were paid for it?

23   A    Yeah.

24   Q    But you weren't a partner in the sense that you were split,

25   you split the profits with Darryl?

1    A    Well, he told me if it was somebody I knew and I, you know,

2    I put him on with him, then I could receive the money from that

3    deal, from that cut.  So if I knew somebody and I introduce him

4    to him, I could receive the same amount.  Like basically,

5    whatever he paid for it is what I paid for it.  So if I knew

6    somebody and they wanted to buy something from him and I could

7    arrange the deal, I would get, I would get that profit.

8    Q    Okay.  Now, would you actually do the deal on those

9    occasions?

10   A    Some deals I would do, some deals I wouldn't.

11   Q    Okay.  I thought your earlier testimony was that you were

12   just there for enforcement.  But it sounds like you were actually

13   actively drug dealing, is that correct?

14   A    Sometimes.  But I didn't have to because I made enough.  He

15   kept money in my pocket all the time.  So I never really needed

16   or wanted for nothing.

17   Q    Okay.  But you weren't always around when Darryl did his

18   drug dealing, were you?

19   A    No, I wasn't always around.

20   Q    And Darryl didn't always follow your recommendations in

21   terms of his own safety, did he?

22   A    No, he didn't.

23   Q    Like this occasion which he let a person that was not known,

24   was not trusted, get right into the back of his car, isn't that

25   correct?

1    A    Yes.

2    Q    And you would have never allowed that?

3    A    No.

4    Q    And you told him not to ever do that?

5    A    Yes.

6    Q    And you constantly had to tell him to come in out of the

7    house, not be standing out on the street, because you knew he was

8    a target out there on the street?

9    A    Yes.

10   Q    And in fact, even during the times that you were providing

11   his protection, he was kidnapped, wasn't he?

12   A    Yes.

13   Q    And he was also robbed while you were out on the street

14   being his enforcer or providing protection for him, rather?

15   A    Well, the rob, the breaking in the house I didn't know

16   anything too much about that.  This is what he told me.  And then

17   the one kidnapping, this was early, this was like early when I

18   first came home.  So, and I don't really know, I didn't really

19   know the detail.  I'm not sure was he just saying that because he

20   wasn't home, because sometimes he would take trips and be gone

21   for a couple days and he didn't want his wife to know, whatever.

22   So I really wasn't sure.  I didn't question that too much.  A lot

23   of times I didn't question him about what he do on his personal

24   time.

25   Q    Okay.  So it wasn't a situation which you were with him all

1    the time while he's doing drug deals?

2    A    No, not all the time, not every single time.  I spoke to him

3    but sometimes I wouldn't be with him.

4    Q    And the time that he was kidnapped, in fact, you hadn't

5    spoken to him for several days when he was kidnapped, is that

6    correct?

7    A    Yeah.  About two or three days.

8    Q    And it was only after you finally met up with him that you

9    learned during the last few days he had been kidnapped?

10   A    Yeah.

11   Q    And in fact, you never were present at any of the meetings

12   in which he met with his source, is that correct?

13   A    Right.

14   Q    You didn't know who his source was?

15   A    No.

16   Q    You didn't know when he met with him?

17   A    He would tell me when he going to go see him, but not all

18   the time.  I meant like he told me one time he was about to go

19   see him because he picked up some money from me and then left to

20   go, went to go meet him.

21   Q    But he didn't always tell you when he was going to go meet

22   with his source?

23   A    No.

24   Q    But I believe your testimony was that at this particular

25   time, he was due to meet with his source to re-up, is that

1   correct?

2   A    Yeah.

3   Q    And when he would re-up, which was done on a weekly basis,

4   is that correct?

5   A    Excuse me.  Yes.

6   Q    He would usually get about ten kilos, kilograms of cocaine

7   at a time, is that correct?

8   A    Yes.

9   Q    Do you know how much he was paying for a kilogram of

10  cocaine?

11  A    Like 17.  About 17, 16.

12  Q    16 or 17?

13  A    Yeah.

14  Q    And so in order to purchase ten kilos, that would be

15  $160,000?

16  A    Yeah.  But he wouldn't have to have all the money.

17  Q    Okay.  How much would he have to have?

18  A    I'm not sure.

19  Q    Okay.  Because you weren't there when he met with the

20  source.  You don't know.  You just, your understanding is that he

21  didn't have to have the full $160,000?

22  A    Right.  He didn't have to have all of that in full.

23  Q    But in fact, he already owed his source more than $100,000,

24  isn't that correct?

25  A    Yes.

1    Q    And this source of supply is not someone that he had

2    traveled to meet, as in travel out of town.  This source came to

3    meet Darryl in Baltimore, is that correct?

4    A    Yes.

5    Q    So on the night he was murdered, in fact, he, Darryl, could

6    have been meeting with his source, isn't that correct?  Isn't

7    that one possibility?

8    A    It's a possibility.  But he told me that he wasn't supposed

9    to see him.  One thing that he had told me, that he was going to

10   go home.

11   Q    Okay.  He told you he was going to go home.  But obviously,

12   he didn't go home that night, is that correct?

13   A    Obviously, yeah.

14   Q    And he wouldn't necessarily have told you if he was going to

15   meet with his source, isn't that correct?

16   A    Well, I still had money.  So I think if he was going to see

17   the connect, he probably would have picked up the money that I

18   had before he went to see him.

19   Q    How much money did you have?

20   A    For him, I had about like 10,000.

21   Q    Okay.  Did you have it on your person?

22   A    Nah.

23   Q    So you would have had to go and get it?

24   A    I would have to go get it.

25   Q    All right.  Now, you had been with Darryl for most of the

1    day, is that correct?

2    A    No, I was at work that day.

3    Q    I'm sorry.  When did you meet up with Darryl?

4    A    After I got off of work.

5    Q    And what time is that?

6    A    About 3:00.

7    Q    All right.  Is that what time you normally got off work?

8    A    Yeah.

9    Q    And when did you meet with Darryl?

10   A    Right after I got off of work.  I went home and changed my

11   clothes and then I met over Brandy house, and that's where I met

12   Darryl.

13   Q    Okay.  And that was about 3:00 when you actually were at

14   Brandy's house?

15   A    No, it wasn't at 3:00.  I got out of work at three.

16   Q    Okay.  When did you actually meet up with Darryl, then?

17   A    Probably around maybe five, sometime around then.

18   Q    And that's when you went down to DC?

19   A    Yeah.

20   Q    Now, you originally told the grand jury that you saw Darryl

21   put I believe it was four to nine ounces of cocaine in a bag, in

22   a bag, is that correct?

23   A    Yeah.  That's what I told the grand jury, yeah.

24   Q    But now you're saying that's not correct?

25   A    Right.

1    Q    You're saying that, in fact, Darryl had two kilograms of

2    cocaine.

3    A    Right.

4    Q    How was that packaged?

5    A    In two blocks.  It was in two blocks, shrink-wrapped blocks.

6    Q    Two shrink-wrapped kilogram blocks?

7    A    Yeah.

8    Q    Of cocaine.  And where was that put in the car?

9    A    In the bag at the time.

10   Q    In that bag?

11   A    Knapsack bag.

12   Q    That knapsack?

13   A    Yeah.

14   Q    And you believe it was your earlier testimony that you don't

15   have any idea how much money Darryl might have had or not had in

16   that bag?

17   A    Right.

18   Q    But I believe your earlier testimony also was that it wasn't

19   unusual for him to have $5,000 or more, up to $50,000, in that

20   bag, is that correct?

21   A    Right.

22   Q    So the two kilos are put in the knapsack and then you drive

23   down to DC.  Do you recall what time you got down there?

24   A    Excuse me.

25   Q    Sorry to keep you up.

1    A    The sun was out.  So it probably was around about maybe

2    6:30.  It was only like an hour ride.

3    Q    Okay.  And you met up with this individual who you're

4    calling Greg at this point?

5    A    Yes.

6    Q    Do you have a last name for Greg?

7    A    No.

8    Q    Any other identifying features about Greg?

9    A    No.

10   Q    Do you have, did you have a telephone number for Greg?

11   A    Yeah.  I don't remember the number, though.

12   Q    Okay.  But you were able to call him?

13   A    Yeah.

14   Q    Did you set up this deal or did Darryl set up this deal?

15   A    Well, we both knew him.  So we both like, he knew that both

16   us was coming.  And the house that we was going to, I knew that

17   was a relative, you know what I mean.  Like before we went down

18   there, I knew everything I needed to know about him.

19   Q    But if you set up the deal, you were going to get the profit

20   from it, right?

21   A    But I didn't set that deal up.

22   Q    That's why I was asking.

23   A    No.  I didn't set that deal up.

24   Q    Okay.  So when you got there, you show him the two kilos of

25   cocaine that are shrink wrapped, and what happened then?

1    A    He broke it open and he sampled some of it.  He cooked some

2    of it up to see how it would, how it would come back.

3    Q    Okay.  And then what happened?  He didn't like it because it

4    was too oily?

5    A    Yeah.

6    Q    And so he only took half a kilo?

7    A    Yeah.

8    Q    Now, how was that accomplished?

9    A    Well, he said being that we took that ride, he didn't want

10   us to just go back empty-handed, so he just went on and bought

11   half of it.

12   Q    Physically, how is that accomplished?  Did somebody get out

13   a pocket knife and cut a key in half?  How did you do it?

14   A    Yeah.  Well, it was all in the kitchen.  He just broke it

15   open and that's when they put some of it in a pot, in a jar and

16   cooked it.

17   Q    Put it in a jar and cooked it?

18   A    Yeah.  He put it in a little Pyrex pot.

19   Q    Now, was this the sample to see how good the cocaine was

20   that he was cooking?

21   A    Yeah.  That was the sample.

22   Q    Okay.  Because that would indicate the purity of the cocaine

23   to him?

24   A    Yeah.

25   Q    All right.  He decided he didn't want to buy the two full

1    kilos, he just wanted to buy half.  So again, did somebody cut

2    the kilo in half?

3    A    Darryl gave it to him.  He gave him the key, let him look at

4    it.  And he said, all right.  Asked did we mind if he tested some

5    of it first.  So he took a piece off and then --

6    Q    I've got that much.  I'm trying to figure.  He told Darryl

7    at some point or told you at some point he wants to buy a half a

8    kilo, is that right?

9    A    Yeah.  After he cooked it up and seen that it was too oily,

10   that's when he said, well, he not going to buy the whole thing.

11   But he say he'll buy half of it.

12   Q    Okay.  What I'm trying to get is, how do you get half a kilo

13   from this big block?  What happened?

14   A    He weighed it on the scale.

15   Q    He weighed out half a kilo?

16   A    Yeah.

17   Q    Okay.  And so you still had the one shrink-wrapped kilo and

18   then you had another opened half a kilo?

19   A    Yeah.

20   Q    And what was done with that?

21   A    They wrapped it back up and put it in the bag.

22   Q    Put it where?

23   A    In the knapsack bag.

24   Q    As far as you know, that remained in the knapsack?

25   A    Yes.

1    Q    You don't know how much money was in there other than the

2    12,000 that was paid to Darryl?

3    A    Right.

4    Q    He put the $12,000 in the knapsack as well?

5    A    I think he put it in his pocket before we left out.  It was

6    in his pocket, not in the bag.

7    Q    Okay.  Did there come a time when you saw him take the

8    12,000 out of his pocket?

9    A    No.

10   Q    So as far as you knew, it was still in his pocket?

11   A    Yeah.

12   Q    All right.  Now, Darryl had numerous customers in the

13   Baltimore City area, didn't he?

14   A    Yes.

15   Q    And it was not unusual for him to drive around, as you

16   stated, with large amounts of money and substantial amounts of

17   drugs in his possession, in his little knapsack?

18   A    Right.

19   Q    And in the past he had been robbed, I believe on your direct

20   testimony, he had been robbed several times?

21   A    Yes.

22   Q    And he had been kidnapped on several times?

23   A    Twice, yes, so I heard.

24   Q    And you also knew, I believe your testimony was, that you

25   knew that there were certain people in the Baltimore area that

1    believed that Darryl was an informant, isn't that correct?

2    A    Yes.

3    Q    And in fact, these people had a problem with Darryl because

4    they thought that he had, in fact, acted as an informant against

5    them?

6    A    Yeah.

7    Q    And when you were in the grand jury, one of the grand jurors

8    asked you about whether or not there was a drug war going on,

9    isn't that correct?

10   A    I don't remember.

11   Q    Do you recall telling the grand juror that you couldn't say

12   for sure whether or not there was a drug war going on?

13   A    I didn't know about no drug war.

14   Q    Okay.  Now, on the night that the Wyche brothers were

15   murdered, I believe your testimony was that you returned to

16   Brandy's house between 9 and 10:00?

17   A    Excuse me.  Somewhere around there.

18   Q    Now, you said your earlier testimony you had just woken up,

19   is that correct?

20   A    When?

21   Q    When you testified last week.

22   A    On the 1st?

23   Q    Yes.

24   A    Yeah.

25   Q    Now, did you just wake up today?

1   A    No.

2   Q    Okay.  You seem to have a problem with yawning.  Are you

3   awake?  Are you aware of what your testimony --

4   A    Yeah, I'm awake, I'm aware.  I'm just tired.

5   Q    And do you have a recollection of the time that you got back

6   to Brandy's house?

7   A    Yeah, I don't remember exactly the time.  I don't remember

8   the exact time.  You asking me about a time.  Like, I'm not going

9   to be accurate exactly on the time frame.  I just know how long

10  it took us to get from Point A to Point B.  This is something

11  that happened like years ago.  I don't remember the exact time.

12  Q    Okay.  But you testified to the grand jury that it was

13  between 9 and 10:00.  Would that be accurate?

14  A    I guess so.  Somewhere around there.

15  Q    Okay.  And I believe your testimony was that you had heard

16  Darryl on the phone several times?

17  A    Yeah.  I knew he was on the phone.  I don't know who he was

18  talking to.

19  Q    All right.  Did you ever hear him on the phone say anything

20  about Bo?

21  A    No, I didn't.

22  Q    Okay.  Were you present in the same room with Brandy and

23  Peaches and Anthony Wyche when Darryl was answering the phone?

24  A    Well, it was an apartment so we was floating around.  Like I

25  said, when I went back into the house, I was talking to Pete.  So

1    I really wasn't in the room with everybody else.  Me and Pete

2    spoke one on one for a minute.

3    Q    But you did hear Darryl answer his phone on several

4    occasions?

5    A    Yeah.

6    Q    And you don't ever recall him saying anything about the name

7    Bo?

8    A    No, I wasn't paying attention to that.

9    Q    Okay.  Do you recall what time you left the house?

10   A    Well, I stayed, I stayed at the house about maybe, about a

11   half an hour.  We probably stayed at the house total for maybe a

12   half an hour, probably 45 minutes.

13   Q    Okay.  Do you recall meeting with homicide detectives,

14   specifically Detective Niedermeier, on April the 3rd of 2002?

15   A    I remember meeting with him.  I don't know the date.

16   Q    Okay.  Do you recall telling him at that time that you

17   remembered leaving the house at about 11:00?

18   A    No, I don't remember saying that.

19   Q    Let me show you a copy of the statement.  If you look at the

20   last two lines, I have it highlighted.  Detective Niedermeier

21   asked you, at what time was that when you last saw them?

22   A    Yeah.  It say 11:00.

23   Q    Yes.  It was around 11:00.  Does that refresh your memory?

24   A    Yeah.  It refreshes it.

25   Q    Okay.  And the last time you saw them, I'm assuming, is when

1    you left, is that correct?

2    A    Right.

3    Q    So you would have left around 11 o'clock, to the best of

4    your recollection?

5    A    Somewhere around there.

6    Q    While you were driving to and from DC with Darryl, did you

7    hear him on the phone at all?

8    A    To his wife, yeah.  He spoke to his wife.

9    Q    Okay.  Did you hear him speak to anyone else?

10   A    It was a couple times but it wasn't, I don't know the

11   conversation.  Like, the phone was ringing.  His phone rings a

12   lot.  So I wasn't like paying attention to what he was saying or

13   who he was on the phone with.  But yeah, the phone rang several

14   times.

15   Q    Well, let me ask you if you recall him ever mentioning the

16   name "Bo" during any of those conversations?

17   A    I never heard Bo name until after this.

18   Q    Okay.  Now, when you heard Darryl on the phone back at the

19   house, did you ever hear him ask anyone, any individual that he

20   was talking to, whether or not they were still trying to get

21   something?

22   A    No.  I can't recall that.

23   Q    Okay.  Did you ever hear Darryl tell anyone, Peaches,

24   Brandy, his brother, anyone there present, that he planned on

25   meeting someone in Essex?

CROSS EXAMINATION OF DENHAM BY PYNE                    115

1   A    No.

2   Q    Did you ever hear Darryl tell anyone while you were in the

3   apartment that night that he planned on going to East Baltimore

4   and then back over to West Baltimore that same night?

5   A    No.

6   Q    And it's your understanding that Darryl was going to go stop

7   at a store possibly, but was heading straight home, just like

8   you?

9   A    Yes.

10  Q    And you last saw him at about 11:00?

11  A    Could have been earlier than that.  I'm not sure of the

12  exact time.

13  Q    Okay.  Could have been earlier but not later, you don't

14  think?

15  A    No, I don't think.

16  Q    Okay.  And I believe you testified that you don't know

17  Shelton Harris, is that correct?

18  A    No.

19  Q    And therefore, you would not recognize his voice?

20  A    No.

21  Q    And you don't know Mr. Mitchell's voice, is that correct?

22  A    No.

23  Q    Now, you testified that you did see Shelly Wayne Martin at

24  the funeral home, is that right?

25  A    Yes.

1  Q    And you said he was dressed all in black, is that correct?

2  A    Yes.

3  Q    Is there anything unusual about that, someone wearing all

4  black to a funeral?

5  A    No.

6  Q    Okay.  And you said it didn't mean anything to you, I

7  believe your testimony was?

8  A    Yeah.  It didn't mean nothing to me.

9  Q    Okay.  Did you speak to Mr. Martin at the funeral?

10 A    No.

11 Q    So you did not have an opportunity hear his voice at that

12 time, either, did you?

13 A    No.

14 Q    Was that the first time that you had seen Mr. Martin since

15 1994, '95?

16 A    Yeah.

17 Q    Now, you testified that Darryl's attitude towards collecting

18 debt was that normally he would just cut the individual off

19 rather than go to any great lengths to try to collect that, is

20 that correct?

21 A    Yes.

22 Q    And you didn't necessarily agree with that position?

23 A    No.

24 Q    And most drug dealers probably wouldn't agree with that

25 position, is that correct?

1   A   Yes.

2   Q   Do you have any idea whether or not Darryl's source agreed

3   letting people slide who owed large amounts of money?

4          MR. HARDING:  Objection.

5   A   I don't know.

6          THE COURT:  Overruled.

7   Q   So you don't know what Darryl's source felt about the fact

8   that Darryl owed him over $100,000?

9   A   No.

10          MR. HARDING:  Objection.

11          THE COURT:  Overruled.

12   Q   Now, it's your testimony that on the night of the murder you

13   actually walked out of the house with Darryl and Anthony Wyche,

14   is that correct?

15   A   Yes.

16   Q   So as far as the individuals in the house knew, the three of

17   you were all leaving together, is that correct?

18   A   Yes.

19   Q   But it's your testimony you actually left before the two

20   Wyche brothers?

21   A   Yes.

22   Q   And you don't know which car they got into?

23   A   No.

24   Q   And you don't necessarily know who was driving?

25   A   No.

1    Q    Did you hear them discuss beforehand who was going to be

2    driving when they left?

3    A    I think, I think Darryl wanted Pete to drive because he was

4    tired.

5    Q    Okay.  Now, Irene Magginson called you the next morning, is

6    that correct?

7    A    Yes.

8    Q    Because as far as the people in this Brandy's apartment

9    knew, you were the last one to be seen with the Wyche brothers,

10   isn't that correct?

11   A    I guess so.

12   Q    And you're always very concerned about being a suspect in

13   anything that make might go wrong in one of these drug deals?

14   A    No, I wasn't concerned about that.  I wasn't concerned about

15   being a suspect in this right here.  I wasn't concerned about

16   that.

17   Q    Okay.  But again, you were the last person to be seen with

18   the Wyche brothers, isn't that correct?

19   A    No.

20   Q    As far as Brandy and Peaches?

21   A    Okay.  After we left the house, yeah.

22   Q    As far as they knew, you were leaving with Darryl and with

23   Anthony Wyche?

24   A    Right.

25   Q    Okay.  And if you all left together, and Anthony was driving

Case 1:04-cr-00029-RDB   Document 684   Filed 06/08/09   Page 119 of 294

1    and Darryl was in the front seat, you would have been in the back

2    seat, correct?

3    A    Yeah.

4    Q    And you knew that Darryl, everyone knew that Darryl carried

5    a knapsack in which he had large amounts of money and large

6    amounts of drugs?

7    A    Yeah.

8    Q    So wouldn't you be afraid that that would naturally put

9    suspicion on you?

10   A    No.  But I kind, I kind of figured that, you know, that

11   could have been a rumor.

12   Q    And you were concerned about that?

13   A    Yeah, I was concerned about that.

14   Q    And so when you showed up at the house the next day and

15   everyone is else is saying, that's Wayne on the tape, you were

16   more than ready to identify that being Wayne on the tape, weren't

17   you?

18   A    No.  I was, only reason I was concerned about it is because

19   I was concerned not that the family people think that, you know,

20   you don't need a lot of evidence for somebody to be detained for

21   a murder while you fighting it.  It take people years before they

22   even find out, before they even go to a trial for a murder.  So

23   that was my concern, not whether or not the family was going to

24   think that I did it.

25   Q    So you weren't worried about the family; you were worried

1    about the police?

2    A    Yeah, I was worried about that.

3    Q    Because, again, you were the last person to be seen with

4    them and automatically suspicion is going to go right to you?

5    A    Yeah.

6    Q    Because no matter how close you are in the drug trade,

7    people will kill other drug dealers even if they're very close

8    friends, isn't that correct?

9    A    Yeah.  They always want to think that, anyway.  People going

10   to think.  That's like if a husband and wife get killed, the wife

11   get killed or something happen to the wife, the husband going to

12   be the first suspect.  So by people knowing by my record, and

13   they knew I was with them, I knew how the police would think.

14   Q    Exactly.  They'd come looking right for you, wouldn't they?

15   A    Yeah.

16   Q    So it was important to find another suspect?

17   A    It wasn't important to me because I knew for a fact I didn't

18   have nothing to do with the murder.  I mean, everybody, everybody

19   around us know that I wouldn't do nothing like that.

20   Q    Did the police know that?

21   A    I don't know what the police thought.

22   Q    Okay.  So Darryl Wyche owed over $100,000 to his drug

23   source?

24   A    Yeah.

25   Q    And he's also planning to re-up and get another ten kilos?

1    A    Right.

2    Q    Which will cost $160,000.  So if Darryl Wyche is meeting

3    with his source after he left you, he would have a substantial

4    amount of money, potentially $260,000 with him?

5              MR. HARDING:  Objection.

6              THE COURT:  Sustained.

7    Q    Darryl Wyche, if he was going to meet with his source, could

8    have had a substantial amount of money?

9              MR. HARDING:  Objection.  Assumes a fact not in

10   evidence.

11             THE COURT:  Sustained.  The objection's sustained.

12   Q    Now, Mr. Harding asked you about three things that you

13   regretted telling the grand jury.  Were there any other things

14   that you regretted the grand jury, telling the grand jury because

15   they were incorrect?

16   A    No.

17   Q    Okay.  Now, in fact, you lied to the grand jury, isn't that

18   correct?

19   A    Yes.

20   Q    And you were told in the grand jury that it was absolutely

21   vital that you tell the truth or you could be prosecuted for

22   perjury?

23   A    Yes.

24   Q    Now, have you been advised that you're going to be

25   prosecuted for perjury?

1   A    No.

2   Q    Have you been told that you won't be prosecuted for perjury?

3   A    No.

4   Q    Have they made you any promises whatsoever in regards to the

5   fact you lied to the grand jury and you're giving a different

6   sworn testimony here today?

7   A    Yes.

8   Q    What have you been told?

9   A    That I wouldn't be charged.

10  Q    Okay.  So you were told that you wouldn't be charged with

11  perjury in light of your testimony here today?

12  A    Yes.

13  Q    Is it safe to say that whoever took the knapsack of Darryl

14  Wyche that night got some cell phones in that knapsack?

15  A    Yes.

16  Q    And probably an amount of drugs, possibly up to a kilo and a

17  half of cocaine?

18  A    Yes.

19  Q    And a substantial amount of money?

20  A    Yes.

21  Q    And whoever obtained that knapsack would not have any

22  difficulties hiring legal representation, would they?

23          MR. HARDING:  Objection.

24          THE COURT:  Sustained.

25  Q    And you testified that Darryl had, in the past, allowed

Case 1:04-cr-00029-RDB    Document 684    Filed 06/08/09    Page 123 of 294

1    people that he didn't trust, didn't know, people that were coming

2    to meet him to buy drugs, get into the back seat behind him,

3    isn't that correct?

4    A    Well, the guy who got, the guy who was attempting to get in

5    the back seat, I don't know him and Darryl's relationship so I

6    don't know how long he knew him.

7    Q    Okay.  But you certainly wouldn't let anyone, even that you

8    trusted, get in the back seat?

9    A    No.

10   Q    But Darryl wasn't necessarily that same way?

11   A    Right.

12   Q    If I can have one minute, Your Honor.

13            THE COURT:  Yes.

14            (Pause in Proceedings.)

15   Q    At this period of time, were you working for Maryland Cup,

16   is that correct?

17   A    Sweetheart Cup.

18   Q    Sweetheart Cup.  I'm sorry.  And what was your work

19   schedule?

20   A    Seven, six to two, seven to three.

21   Q    What days of the week did you work?

22   A    Monday through Friday.

23   Q    Okay.  Now, the night this occurred was a Sunday, wasn't it?

24   A    Yeah.

25   Q    But you worked that day?

1    A    Yeah.

2    Q    Was that unusual?

3    A    Nah, I get overtime.  I worked overtime.

4    Q    All right.  Thank you very much, Mr. Denham.  Thank you,

5    Your Honor.

6         THE COURT:  Ladies and gentlemen, we'll take our

7    luncheon recess at this time.  Mr. Coburn, I assume you have more

8    than just a couple of minutes.

9         MR. COBURN:  Probably about five minutes, Your Honor.

10   But whatever Your Honor wants to do is fine with me.

11        THE COURT:  Why don't we go ahead and break now?

12   Please, ladies and gentlemen, leave your note pads on your

13   chairs.  Have no discussion about the case or about any of the

14   evidence you've heard so far.  Please be back in the jury room at

15   2 p.m. and we'll resume at that time.

16        We're in recess until 2 p.m.

17        (Luncheon recess at 12:35 p.m.)

18        THE COURT:  Ready to proceed?  Ms. Rhodes?

19        MS. RHODES:  Your Honor, I have a matter before we

20   begin.  We have been talking over the break about a concern that

21   we have jointly about the fact that we didn't get Giglio material

22   from the government on Mr. Denham until he started testifying.

23   There were obviously substantial changes, in addition to the ones

24   he acknowledged.

25        Our concern is that we would have done some things

1    differently.  I know for one, I had been, I spent a lot of time

2    comparing the DOC records of the people involved to see if I

3    could figure out who this Donald character was, who turns out to

4    be Greg.  So it's an opportunity I didn't have of trying to

5    figure out who this person was, when they overlapped at DOC, that

6    sort of thing.

7           There are also some other theories we might have

8    pursued a little differently.  In light of that, our request is

9    for a mistrial at this point, and in the alternative, that we be

10   given an opportunity to speak to Mr. Denham this afternoon when

11   he is done and have him still under subpoena, because we may need

12   to recall him.

13          THE COURT:  I'll certainly keep him on hold.  Do all

14   counsel join in the request for a mistrial?  Record reflects that

15   all counsel --

16          MR. MARTIN:  Yes.

17          MR. PYNE:  Yes.

18          MR. KURLAND:  Yes.

19          THE COURT:  -- are joining in the request for a

20   mistrial.  The motion is denied.  Let me make sure, having denied

21   the motion, that I understand exactly what you're getting at.

22          Are you referring to the corrections that were made and

23   the changes, the corrections that were made on direct examination

24   and the additional modifications or changes that were elicited on

25   cross examination, Ms. Rhodes?

1          MS. RHODES:  Yes, Your Honor.

2          THE COURT:  Is there anything else?

3          MS. RHODES:  Well, I don't know.  I mean, that's part

4    of the problem, is that, from --

5          THE COURT:  No, I mean, is there anything else --

6          MS. RHODES:  From what we heard --

7          THE COURT:  -- you do know?

8          MS. RHODES:  From what we heard, this was disclosed to

9    Mr. Harding sometime before October 1st.  And as the Court

10   recalls, he began testifying on October 1st, testified for about

11   20 minutes.  There's about 20 pages of transcript from that date.

12   And none of this came out then.

13         And the other significant difference from that date

14   compared to the grand jury is that he said the $5,000 a week,

15   which now I don't, I'm not even sure if that was something he had

16   previously told Mr. Harding that was going to be a change from

17   the grand jury testimony.

18         It does change the dynamic a little bit of his

19   dealings, a little bit I say facetiously, a lot of his dealings

20   with Darryl Wyche and how significant they were and how

21   significant a dealer Darryl Wyche was.

22         THE COURT:  And do I understand what's implicit here is

23   that the jury's supposed to think that he may have done it?  I

24   mean, is that the bottom line here?

25         MS. RHODES:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  Your record is made.

2          MS. RHODES:  And the other, if I can just add one

3    thing.  The other aspect of it that we didn't know about until

4    today in light of this is that he was then told that he will not

5    be prosecuted for perjury or for any testimony today or any of

6    his prior, for perjuring himself in front of the grand jury.  So

7    that's a deal we didn't know about until he began testifying

8    today.

9          THE COURT:  Okay.  I'm hard pressed to understand how

10   the cross examination would have changed, but I accept your

11   representation that some decisions would have been made

12   differently.  I just don't perceive these to be major deviations

13   from the truth.  They certainly were deviations from the truth.

14   What he did was he minimized.  He minimized.  And I mean, you

15   know -- I thought it was actually pretty good for the defense.

16         MS. RHODES:  Well, it certainly, it's certainly new

17   information, though.  As the Court knows, these issues of times,

18   when people left, when people got there, the whole incident with

19   DC, my cross is going to be very different, I can tell you that,

20   because the whole incident in DC seemed unlikely that they had

21   gone down there and had made no deal, which was his initial

22   testimony, that they took four to seven ounces, they went down

23   there, and they made no deal because of a price problem.

24         THE COURT:  Well, they made no deal for a kilo.  It was

25   minimalization.  They made a deal for half a kilo.  He testified

1    they made no deal.

2              MS. RHODES:  His grand jury testimony, though, was they

3    went down there with four to seven ounces and they made no deal

4    at all and that Darryl was not troubled at all by that as they

5    came back.  That affects the motivation that Darryl might have

6    had later in the evening to get rid of some stuff.

7              I mean, it may not seem like it's significant, but in

8    preparing for cross for a witness that's crucial, it is

9    significant to us.

10             THE COURT:  Okay.  Mr. -- I'm sorry.

11             MS. RHODES:  I'm simply asking for an opportunity to

12   interview him because we still have some issues that we need to

13   investigate about.

14             THE COURT:  Well, you don't have to ask the Court for

15   an opportunity to interview him.

16             MS. RHODES:  Oh, we do.

17             THE COURT:  Has there been contact -- well, obviously

18   there hasn't.  You just learned that he consulted with Mr.

19   Needleman.  But just as we had an earlier conversation, call Mr.

20   Needleman.  You could have done it over the luncheon recess.  And

21   have Mr. Needleman get back to you as to whether Mr. Denham is

22   willing to talk to defense counsel.  Of course.

23             MS. RHODES:  All right.  I will do that.  Okay.  And if

24   that's not satisfactory, I mean, we have been trying to, without

25   realizing he was represented, we've been trying to reach Mr.

1    Denham for some time and have not been able to.  I'm not

2    optimistic about Mr. Needleman --

3              THE COURT:  Do you want me to ask Mr. Denham whether he

4    wants to talk to you?

5              MS. RHODES:  I would like you to instruct Mr. Denham to

6    talk to us in light of --

7              THE COURT:  I'm sure you would like me to do that.  I'm

8    not going to do that.  He's not required to talk to you.

9              MS. RHODES:  I just, well, in light of the fact that

10   the government's not giving us Giglio material, what are we

11   supposed do?  Have no remedy?

12             THE COURT:  Well, let's give Mr. Harding a chance.  Mr.

13   Harding, is it true that you knew this two weeks ago?

14             MR. HARDING:  Yes, Your Honor.  I knew it, I don't know

15   the exact date, but it was more than two weeks ago.  It was

16   before October 1st.  And I considered them to be modifications in

17   what he said and I fully intended to elicit it as I did.  But I

18   just didn't consider it to be anything that would impeach his

19   credibility on substantive issues in this trial.  The amount of

20   drugs involved or the -- I suppose in retrospect, I now think I

21   should have written a letter to defense counsel.

22             THE COURT:  Yeah.  There's no question about it, Mr.

23   Harding.  Let's be clear.  You absolutely positively should have

24   written a letter immediately to defense counsel pointing out

25   these discrepancies.  I have no doubt whatsoever about your good

1    faith.  In the middle of trial, honestly, I understand how it

2    could happen.  It shouldn't.  You will do better next time.

3    Please pay attention.  But I'm satisfied.

4          The motion for a mistrial is denied.

5          MS. RHODES:  And our request for the remedy, Your

6    Honor?

7          THE COURT:  Talk to Mr. Needleman and I'm sure he'll

8    let you know promptly.

9          MS. RHODES:  Very well.

10         THE COURT:  But I will tell Mr. Denham that he is

11   subject to recall.

12         MS. RHODES:  All right.  Thank you.

13         MR. KURLAND:  Good afternoon, Your Honor.  Your Honor,

14   right at the lunch break the government informed me that they're

15   planning on taking a couple of witnesses out of order.  They plan

16   to call Officers Mitchell and Mead with respect to the Spence

17   homicide.

18         THE COURT:  Before Niedermeier comes back?

19         MR. KURLAND:  Before Niedermeier.  And that impacts a

20   couple of decisions and some evidentiary resolutions that the

21   Court made at some pretrial hearings.

22         I think the government probably should go first just to

23   kind of clarify that so we don't have a problem when these

24   witnesses are called.

25         THE COURT:  Thank you, Mr. Kurland.  Who are they

1    again, Mr. Hanlon?

2            MR. HANLON:  Your Honor, I'm going to be wrong about

3    the ranks.  But there's Officer Greg Mead.

4            THE COURT:  Oh, Baltimore County?

5            MR. HANLON:  Baltimore County officer, first responder

6    to that murder.  Sergeant, then Corporal, now Sergeant Craig

7    Mitchell, who drove the two civilian witnesses to the show-ups.

8    And then a very short crime scene technician who actually

9    recovered a bullet from the autopsy of Ms. Spence.

10           THE COURT:  Okay.  That will probably finish the

11   afternoon?

12           MR. HANLON:  That's the general plan, Your Honor.  We

13   have Detective Niedermeier ready to recall if we need him.

14           There are a couple of issues which I think that Mr.

15   Kurland and I have actually worked out.  I'm assuming that none

16   of the other defense counsel are going to be impacted by this.

17           With respect to Officer Mead's testimony, the Court

18   will recall that there was a pretrial hearing about an excited

19   utterance that had been made by Andrea Smith.  During her initial

20   discussion or chat with Officer Mead, she gave basically the

21   information of what she had seen.

22           We litigated that.  The Court's preliminary ruling was

23   that it was admissible as an excited utterance, but the Court

24   also indicated that, I think on grounds of cumulativeness, that

25   if Ms. Smith testified, the Court didn't see that the excited

1    utterance needed to come in.  That was that ruling.

2            Mr. Kurland and I have discussed, and I think there's

3    an agreement between counsel, that provided the government

4    elicits the complete information provided to Officer Mead,

5    including that he was told that the red hat guy was the shooter,

6    Mr. Gardner's counsel will not object to that excited utterance

7    coming in.  If I should, for whatever reason, choose not to go

8    into it for any reason, Mr. Kurland, Mr. Coburn, I think, can

9    probably elicit it on cross examination, because it's still an

10   excited utterance.  I'll probably do it.  I'm honestly not sure.

11           That's issue one, which I think is resolved, correct?

12           MR. KURLAND:  Yes.  The only thing is, the point is

13   that I expect him to testify as he did at the hearing in this

14   matter and consistent.  He was shown the earlier statement.  And

15   as long as specifics come in in that manner, we don't have any

16   objection to that coming in as an excited utterance.

17           THE COURT:  Okay.  Good.

18           MR. HANLON:  I'll show the officer his report and have

19   him simply go off the report, if that's all right.

20           THE COURT:  All right.

21           MR. HANLON:  With respect to Sergeant Mitchell, we

22   litigated the question of the show-up ID's.  The show-up ID's

23   were ruled admissible.

24           The Court had one exception.  The government would not

25   be permitted to elicit from the officer that Ms. Smith had said

1    that the guy in the gray shirt was the shooter.  The government

2    has no intention of going there.

3             THE COURT:  Right.

4             MR. HANLON:  We've worked out what we think is

5    acceptable language because the government does believe that

6    we're entitled to an unambiguous identification that these are

7    the bad guys, so to speak.  So the language I think we've agreed

8    upon is this.  And I will ask it in a leading way.  Sergeant

9    Mitchell, did Ms. Smith identify the two men on the street as the

10   two men that had been involved in the shooting of the victim?

11            THE COURT:  Okay.

12            MR. KURLAND:  Yeah.  Again, our concern is that there's

13   no ambiguity and no suggestion that there were two shooters.  And

14   this language, both the government and defense find appropriate.

15            THE COURT:  Great.

16            MR. KURLAND:  Just wanted to bring that to the Court's

17   attention.

18            THE COURT:  Thanks very much, counsel.  All right.  If

19   we can have Mr. Denham back and the jury.

20            (Witness enters the courtroom.)

21            THE COURT:  Mr. Denham, it may be necessary, I think

22   it's unlikely, but it may be necessary for you to come back and

23   testify further after you're done today.  But you'll be notified

24   well in advance.  But I think it's unlikely.

25            THE WITNESS:  All right.

1        (Jury enters the courtroom.)

2        THE COURT:  Good afternoon, ladies and gentlemen.  Mr.

3   Coburn, you may proceed whenever you're ready.

4        CROSS EXAMINATION

5   BY MR. COBURN:

6   Q    Thank you, Your Honor.  Good afternoon, Mr. Denham.

7   A    Hello.

8   Q    Let me call your attention to some testimony you provided

9   just before the lunch break, when the gentleman before me, the

10   tall gentleman, Mr. Pyne, was asking you questions.  Do you

11   remember him asking you about Darryl Wyche's relationship with

12   his source and the fact that you never met the source?  Right?

13   A    Yes.

14   Q    Now, as you've already said, and I'm going to try not to go

15   over what's already said, but you and Darryl Wyche were very

16   close, extremely close, right, sir?

17   A    Yes.

18   Q    But nonetheless, despite the fact that you and he were very

19   close, he never introduced you to his source of illegal drugs,

20   right, sir?

21   A    Right.

22   Q    Never told you who that person was, right?

23   A    No.

24   Q    Never told you where he lived or any information that you

25   would be able to use in order to identify him, right, sir?

1    A    Right.

2    Q    Now, Darryl Wyche was, as I think you've already indicated,

3    an experienced drug dealer, right?

4    A    Yes.

5    Q    And you didn't find this particularly unusual or disturbing

6    at all, did you?

7    A    No.

8    Q    The fact of the matter is, when a drug dealer sells drugs,

9    makes money by selling illegal drugs, the source from which the

10   drug dealer gets the drugs, that's an important piece of

11   information, right?

12   A    Yes.

13   Q    They typically hold it pretty close, it's a pretty personal,

14   significant piece of information to them, right?

15   A    Yes.

16   Q    So in a situation in which a drug dealer is selling drugs to

17   somebody else or is fronting drugs to somebody else for them to

18   sell on the street and the drug dealer is making money by doing

19   that, it would be, I mean, in your experience, unusual for the

20   drug dealer just to kind of reach out to the person they're

21   fronting drugs to and say, hey, let me introduce you to my

22   connect, right, sir?

23   A    Yes.

24   Q    For the reasons we just discussed, right?

25   A    Yes.

1   Q    Now, this is your second time testifying before this jury,

2   right?

3   A    Yes.

4   Q    Your direct examination started something like about a week

5   ago, right, sir?

6   A    Yes.

7   Q    And at that time you covered some of the same ground that

8   you testified about here this morning, right?

9   A    Yes.

10  Q    And when you were here last time, you testified, did you

11  not, I didn't see Goo do anything, he didn't play any relevant

12  part, right, sir?

13  A    Yes.

14  Q    And that was accurate and truthful testimony, right, sir?

15  A    Yes.

16  Q    It's correct, is it not, that with respect to the person

17  who's been referred to during your testimony as Bo, you do not

18  know him, right?

19  A    Right.

20  Q    It's correct, is it not, that you know nothing about Bo,

21  right?

22  A    Right.

23  Q    But as you've told the ladies and gentlemen of the jury

24  already, you did know Goo from when you were younger, right, sir?

25  A    Yes.

1   Q    Now, do you remember when Mr. Harding, the gentleman seated

2   to my left, was asking you questions about that tape, you know,

3   the voice mail tape that a lot of your testimony related to?

4   A    Yes.

5   Q    Do you remember when he asked you the following question: Do

6   you know for sure whether Goo's voice was on that tape?  Do you

7   remember him asking you that?

8   A    Yes.

9   Q    And you said no, right?

10  A    Yes.

11  Q    The fact of the matter is, though, that you have never made

12  even the most tentative identification of Goo's voice as being on

13  that tape, right, sir?

14  A    Right.

15  Q    You have never said his voice was or might be on that tape,

16  correct?

17  A    Correct.

18  Q    You indicated that, at the funeral, the Wyche brothers'

19  funeral, you said that Goo took a seat there, right?

20  A    Yes.

21  Q    It's correct, is it not, that, obviously, as you just have

22  indicated, you saw him the night of the funeral, right?

23  A    Yes.

24  Q    But before that, before the night of the Wyche brothers'

25  funeral, you had not seen him since 1994 or 1995, correct?

1   A     Probably a little before then.  '94, '93.

2   Q     You hadn't seen him since '94 or '93, right, sir?

3   A     Yes.

4   Q     Thank you so much, Mr. Denham.  No further questions, Your

5   Honor.

6                  REDIRECT EXAMINATION

7   BY MR. HARDING:

8   Q     Good afternoon, Mr. Denham.

9   A     Good afternoon.

10  Q     When Ms. Rhodes was questioning you this morning, she

11  brought up the fact that you, after this murder which occurred on

12  March 25th of 2002, you were questioned by the police, by

13  Detective Niedermeier, is that correct?

14  A     Yes.

15  Q     And she mentioned then that you had a charge that was

16  dropped on April 9th of 2002, and she wanted to know if there was

17  some relationship between that and the Wyche investigation.  And

18  I think you, you laughed at that point, is that correct?

19  A     Yes.

20  Q     What was the connection, if any, between the charge that was

21  dropped on April 9th and the Wyche investigation?

22  A     There wasn't no connection.

23  Q     Okay.  Do you know why the charges were dropped on April

24  9th?

25  A     I think the charge, the charge that was dropped was, I was,

1    it was based off of a false statement to begin with.  And Darryl

2    was the one who actually bailed me out on that, I think on that

3    charge.  It was a false statement.  The guy made a false

4    statement.  And that's -- I don't even really remember that

5    charge, but I know it wasn't nothing to do with no cooperation

6    with this case.

7    Q    Okay.  Was that, when you say the charge was dropped, was it

8    dismissed by the prosecutor in state court?

9    A    I believe it was put on a stet.

10   Q    Okay.  That means basically that it was dismissed, though,

11   doesn't it?

12   A    Yes.

13   Q    Also, when she was questioning you this morning, she wanted

14   to know why it was that if Darryl was reluctant to drive down to

15   Washington in a car that had temporary tags on it, why he would

16   be willing to drive in such a car later on that night inside the

17   City of Baltimore.  Do you recall that?

18   A    Yes.

19   Q    Can you explain why it was that Darryl would be worried on

20   I-95 but not worried driving around the streets of Baltimore?

21   A    Well, it's a big, it's a time frame.  You talking about like

22   anywhere between 45 minutes to an hour ride on a highway with K-9

23   dogs and state troopers and everything like that, compared to

24   just going five, five minutes up the street for him to get home.

25   He stood a less chance of getting pulled over going five minutes

1    up the street than he did on the highway.

2    Q    Okay.  You also testified when Ms. Rhodes was questioning

3    you about some things you had said in the grand jury about not

4    wanting to know all the information about the drug trafficking

5    that people were involved in, Darryl and others were involved in,

6    like where stuff was stashed and things like that.

7         Do you recall that?

8    A    Yes.

9    Q    And you said that you didn't want to make yourself a

10   suspect.  Do you remember that?

11   A    Yes.

12   Q    Well, when you testified in the grand jury, do you

13   remember -- well, let me rephrase that.  Were you worried about

14   being suspected by other people involved in the drug business

15   with you of taking money or taking drugs or were you worried

16   about, about the police suspecting you of something?

17   A    I was worried about, about really the police at that time.

18   I really wasn't really worried about, you know, nobody else.

19   Q    Okay.  Well, let me read this answer that you gave in the

20   grand jury.

21        MS. RHODES:  Page?

22   Q    Page 24, the same page you referred him to.  You said:  I'm

23   not sure of the exact amount, referring to the amount he was

24   going to get when he re-upped, but I know, I know it was a lot.

25   But I'm not sure of the exact amount.  Like a lot of information,

1    I didn't want to know because being the way everything was

2    happening with him getting robbed and people stealing and stuff

3    like that, I didn't never want to make myself a suspect.  So the

4    least I knew, the better I would be.  If I didn't know how much

5    he was getting or where the stuff was stashed at, then

6    automatically you had to eliminate me from trying to be a suspect

7    if anything ever came up missing.

8            When you were talking in the grand jury, you were

9    worried, were you not, Mr. Denham, about being suspected by

10   Darryl and Pete or by other people in the drug business?

11   A    Yeah.  That statement right there, that's who I was

12   referring to.

13   Q    Okay.  Ms. Rhodes also went into considerable detail with

14   you about the content of rumors that were circulating after the

15   deaths of the Wyche brothers.  And Mr. Pyne also talked to you

16   just before lunch.  He speculated that people might suspect you

17   of being involved in the murders because you were the last one to

18   see the Wyche brothers.  Do you remember that?

19   A    Yes.

20   Q    But, in fact, you knew that you were not the last person to

21   see the Wyche brothers that night, isn't that correct, Mr.

22   Denham?

23   A    Yes.

24   Q    Because there was someone at the Magginsons the next morning

25   who had actually seen the Wyche brothers after you, isn't that

1    correct?

2    A    Yes.  I later found that out, that they later told me.

3    Q    And he told people at the Magginsons' house that he had seen

4    Pete and Tony after you saw them that night, isn't that correct?

5    A    Yes.

6              MR. PYNE:  Objection.

7              THE COURT:  Overruled.

8    Q    Is that correct?

9    A    Yes.

10   Q    And what was his name?

11   A    Ty.

12   Q    And Ty, is that Tyrone Blanding?

13   A    Yes.

14   Q    Is he the person you had in mind this morning when you said

15   that someone saw Pete and Tony after you did that night?

16   A    Yes.

17   Q    Did you think, Mr. Denham, that at the funeral of the Wyche

18   brothers Wayne and Goo were disrespecting the Wyche brothers?

19             MS. RHODES:  Objection.

20             THE COURT:  Overruled.  You may answer.

21   A    I didn't think too much of it with Goo.  But with Wayne,

22   yeah.  That's what I thought.

23   Q    Why did you think he was disrespecting the Wyche brothers?

24   A    Because the way the whole situation happened.  At that time,

25   everybody still was pretty much sure saying that, you know, Wayne

1    was there or he had something to do with it.  And for him to show

2    up, I mean, I felt like he disrespected the whole situation.

3    Because the way that went about, like if he is the person who did

4    it, then I thought that was a sucker way of going out because,

5    you know what I mean, that man, that man was like, he didn't do

6    nothing that I knew of but helped them, they could get money.  So

7    for him to, you know, take it, for the way he got killed and if

8    he got killed by their hands then, then I think that was a sucker

9    way to go out.  I think like all the rules and all the codes is

10   broke when he initiated that move, if he the one who had

11   something to do with it.

12   Q    Okay.  Was there anything specific to what he did --

13   A    Yeah.  I mean, when I seen him at the funeral he was on the

14   phone and he was at the door, you know, just like laughing.  I

15   just felt that whole shit was disrespectful.

16   Q    Okay.  It wasn't the clothing, then, that he and Goo were

17   wearing so much as the way Mr. Martin was behaving?

18   A    Yeah.  I didn't, I didn't pay no attention to the clothes.

19   Other people, other people was bringing that more to my

20   attention.

21   Q    Okay.  Other people complained about the clothes but it

22   didn't bother you very much?

23   A    I mean, I just didn't give it no thought.

24   Q    Okay.

25           THE COURT:  Now, again, ladies and gentlemen, we've

1    been over this before.  Any evidence that there were rumors or

2    people were talking or that people had an opinion about who was

3    responsible for the Wyche brothers' murder is not evidence

4    against Mr. Martin or any defendant in this case.

5         Go ahead, Mr. Harding.

6    BY MR. HARDING:

7    Q    You testified when Mr. Pyne was questioning you, also, about

8    what would have been in the knapsack when it was taken, the

9    backpack that was taken out of Darryl and Pete's car that night.

10   And I just want to ask.  Would there have been scales in that

11   backpack, also?

12   A    Yes.

13   Q    You testified that you didn't know how much money would have

14   been in the backpack, is that correct?

15   A    Yes.

16   Q    In fact, you testified that the $12,000 that you picked up

17   from Greg, you actually saw Darryl put that in his pocket and you

18   never saw him put it in the backpack, is that correct?

19   A    Yes.

20   Q    Do you know for a fact if there was any money in the

21   backpack then?

22   A    No, I don't know for a fact.

23   Q    When you came to see me and the agents, we told you, did we

24   not, that provided you were truthful we wouldn't use your own

25   words against you to prosecute you for any, any crime, isn't that

1   correct, Mr. Denham?

2   A    Yes.

3   Q    And when you went to see your lawyer, did he make you more

4   comfortable about coming in and talking to me and testifying even

5   though you, you hadn't told the complete truth on those three

6   issues that you testified about in the grand jury?

7   A    Yes.

8   Q    Just now, when Mr. Coburn was questioning you, he asked you

9   about whether it would be unusual for someone to introduce

10  someone else to his or her source of supply.  Do you recall that?

11  A    Yes.

12  Q    But you also told us this morning that you connected up

13  people to Darryl yourself, did you not?

14  A    Yes.

15  Q    And part of the reason for that was that you got a cut out

16  of the transactions, isn't that correct?

17  A    Yes.

18  Q    So depending upon the circumstances, it's not at all

19  unusual, is it, Mr. Denham, to introduce customers to a source of

20  supply?

21  A    No.

22  Q    No further questions, Your Honor.

23            RECROSS EXAMINATION

24  BY MS. RHODES:

25  Q    Mr. Denham, this afternoon and today you are telling the

1    jury the truth, is that right?

2    A    Yes.

3    Q    Okay.  And you understand that in this courtroom it's

4    important to tell the truth, right?

5    A    Yes.

6    Q    Okay.  I want to ask you a question about when you went to

7    MVA.  You said before you don't remember that name change you

8    did, right?

9    A    Yes.

10   Q    Okay.  Do you remember when you went there this March of

11   2008?

12   A    What did I go there for?  Name change?

13   Q    No.  For, to get a new license to replace a lost one.

14   A    Okay.

15   Q    Do you remember that?

16   A    Yes.

17   Q    Okay.  Did you give them your correct address when you went?

18   A    I gave them the address that was on my license.

19   Q    Okay.  Did you give them the address, the address on Painted

20   Tree Drive?  Is that where you were living at the time?

21   A    No.

22   Q    Okay.  So you gave them false information?

23   A    No.  I just gave them, that's the only information I had an

24   ID for.

25   Q    Okay.  Where were you actually living at the time?

1          MR. HARDING:  Objection.

2          THE COURT:  Sustained.  I think he's, he said Woodlawn.

3    Are you living in Woodlawn?

4          THE WITNESS:  Not now.

5          THE COURT:  Not now.

6          MS. RHODES:  In March, I mean.

7          THE COURT:  In March.

8          THE WITNESS:  Yeah.  At that time I was living in

9    Woodlawn.

10   BY MS. RHODES:

11   Q    Okay.  And where do you live now?

12         MR. HARDING:  Objection.

13         THE COURT:  Sustained.

14   Q    What area do you live in now?

15         THE COURT:  What state do you live in?

16         THE WITNESS:  Baltimore.

17   Q    Thank you.  You indicated, too, that these charges back from

18   March of 2002, that got dropped, you're saying that the handgun

19   charge and firing the weapon, that was all a false statement that

20   somebody made against you?

21   A    Yes.

22   Q    Okay.  And Darryl helped you get out of that?

23   A    Yes.

24   Q    Okay.  And so talking, the fact that you talked to the

25   police and gave a statement to them on April 3rd had nothing to

1    do with the fact that they were all dropped six days later?

2    A    No.

3    Q    Okay.  And you said that it would, it might make sense for

4    Darryl to drive the white Honda station wagon if he's just going

5    five minutes home?

6    A    Yes.

7    Q    Okay.  But what if he was going across town or to Essex?

8    A    It wouldn't make sense for him to do it.

9    Q    Okay.  When was the first time you told the government,

10    anybody, any of the police officers, any of the prosecutors, that

11    Tyrone Blanding told you he had seen the brothers later that

12    evening?

13    A    I don't remember the date.  It was a while ago.  It was a

14    while ago.

15    Q    Give me a ballpark.

16    A    I can't, I really don't remember.

17    Q    This year?

18    A    No.  It wasn't this year.

19    Q    Okay.  And Tyrone Blanding is deceased now, is that right?

20    A    Yes.

21    Q    Do you know when he died?

22    A    Last year.

23    Q    Last year.  Was it before he died that you told the police

24    about the information he had?

25    A    Yes.

1    Q    Mr. Harding asked you about your concerns about the police

2    or somebody suspecting you because of drug dealing, right?

3    A    Yes.

4    Q    You always have to be aware and careful that you could be

5    suspected, right?

6    A    Yeah.  He gave two different situations, though.  One

7    situation that he was referring to I was talking about in

8    reference with Darryl.

9    Q    Uh-huh.  But there's all kind of situations where you have

10   to be concerned about that, right?

11   A    Yes.

12   Q    Like even at funeral you said there was a situation you

13   thought, I don't want to be suspected of anything, right?

14   A    Yes.

15   Q    Okay.  Thanks.  Nothing further, Your Honor.  Oh, actually I

16   do have one more question.  Your attorney is Mr. Needleman now,

17   right?

18   A    Yes.

19   Q    And are you, by being here today, you're following his

20   advice?

21   A    Yes.

22   Q    Okay.  And if he -- are you willing to speak to any of these

23   defense counsel if he agrees that it's okay --

24            MR. HARDING:  Objection.

25   Q    -- after court today?

1        THE COURT:  Sustained.  That means don't answer.

2   Q    Are you, are you willing to follow his advice?

3        MR. HARDING:  Objection.

4        THE COURT:  Sustained.

5   Q    Your Honor, I have further information that I had a few

6   minutes ago when we discussed this.

7        THE COURT:  Objection's sustained.

8   Q    Okay.  Do you have anything to hide from anybody else in

9   this courtroom today, Mr. Denham?

10  A    No.

11  Q    Thank you.  Nothing further, Your Honor.

12       THE COURT:  Mr. Denham, thank you very much.  You're

13  excused.  Ladies and gentlemen, rather than going back now to

14  Detective Niedermeier, we're going to leave him standing by while

15  several other witnesses are called by the government.  Your next

16  witness, Mr. Hanlon.

17       MR. HANLON:  Your Honor, the United States calls

18  Officer Greg Mead.

19      OFFICER GREGORY MEAD, GOVERNMENT'S WITNESS, SWORN

20       THE WITNESS:  Yes, ma'am.

21       THE CLERK:  Be seated.  Speak directly toward the mike.

22  State your name and spell it for the record, please.

23       THE WITNESS:  My name is Gregory Mead.  Last name is

24  spelled M-E-A-D.

25       DIRECT EXAMINATION

1    BY MR. HANLON:

2    Q     Officer Mead, good afternoon to you.

3    A     Good afternoon, sir.

4    Q     Where do you work?

5    A     North Point Precinct for Baltimore County Police.

6    Q     How long have you been a member of the Baltimore County

7    Police Department?

8    A     Coming up on 13 years.

9    Q     And just generally, what kind of duties have you held as a

10   police officer?

11   A     Patrol, narcotics, a little bit of everything.

12   Q     I called you "officer" a moment ago.  What's your current

13   rank?

14   A     Corporal.

15   Q     I apologize, Officer.

16   A     That's quite all right.

17   Q     I'll try note to demote you again.

18             Back in 2002, June of 2002, you were working as a

19   police officer during that period?

20   A     Yes, sir.

21   Q     Where you were assigned?

22   A     Woodlawn precinct.

23   Q     And the Woodlawn precinct, what general area of Baltimore

24   County does that include?

25   A     Liberty Road corridor, Security Boulevard and Route 40, from

1  the Baltimore City line up to the Carroll County line.

2  Q    And how long did you work in the Woodlawn precinct?

3  A    Eight, eight years.

4  Q    Now, directing your attention to a particular day, June 7th

5  of 2002.  Were you on duty that afternoon?

6  A    Yes, sir.

7  Q    And what were you doing?

8  A    Patrol.  I was handling a call for a suspicious subject at a

9  Salvation Army at Brenbrook Drive and Liberty Road.

10  Q    You're on patrol that day.  Does that mean you're in uniform

11  in a marked car?

12  A    Yes, sir.

13  Q    Did you have a partner or anything like that?

14  A    No, sir.

15  Q    Now, this suspicious person call that you referenced, does

16  that have anything to do with the case that brings you to court

17  here?

18  A    No, sir.

19  Q    You investigated that call.  Did you eventually clear that

20  call?

21  A    Yes, sir.

22  Q    What does that mean, to clear a call?

23  A    We investigated it.  If there's nothing to it -- if there is

24  something to it, we take a report.  If there's not, we code the

25  call out and go back in service to take, handle other calls for

1    service.

2    Q    And coding a call out, does that mean you tell Dispatch, I'm

3    done and I'm back on the street?

4    A    Yes, sir.

5    Q    Now, at some point as you were getting ready to leave that

6    call, you're getting ready to go back out on the road, did you

7    hear something?

8    A    Yes, sir.

9    Q    What did you hear?

10   A    Approximately two gunshots.

11   Q    And what caused you to recognize them as gunshots?

12   A    It was in the close proximity to where I was and I've heard

13   them several times before.

14   Q    And that was, you've heard these kinds of sounds before?

15   A    Yes, sir.

16   Q    Did you have any sense of where approximately the gunshots

17   were coming from?

18   A    Yes, sir.

19   Q    And did you go in that direction?

20   A    Yes, I did.

21   Q    Did you turn your lights on and all that stuff?

22   A    Yes, sir.

23   Q    At some point did you arrive at a location or did you

24   receive any information over your radio that caused you to go to

25   a particular part of Baltimore County?

DIRECT EXAMINATION OF OFFICER MEAD                                154

1    A    Yes, I did.

2    Q    And based on that information, where did you go?

3    A    Village of Huntington.  It's Bramble Lane.  It's an

4    apartment complex, which is about a football field from where I

5    was on the original suspicious subject call.

6    Q    Your Honor, may I approach the witness?

7         THE COURT:  Yes.

8    Q    Officer, I've handed you a copy of your report.  If you need

9    to reference that to refresh your recollection about times or

10   numbers or things like that, let me know and I'll give you a

11   chance to do that.

12        What time did you arrive at this location on Bramble

13   Lane?

14   A    I believe I was out at the call on Brenbrook Lane at about

15   ten of five when I heard the gunshots.  I immediately started

16   heading over to Bramble Lane.  Approximately a minute to get to

17   that location from where I was.

18   Q    Just so there's no confusion, that initial call that was

19   sort of unrelated was Branbrook Lane, is that right?

20   A    Brenbrook Lane, sir.

21   Q    Brenbrook.

22   A    Brenbrook.

23   Q    Brenbrook.  Hopefully, I won't have to say that again.  And

24   then you were eventually led to Bramble Lane?

25   A    Yes, sir.

1    Q    Now, there's a map or an aerial photograph behind you,

2    Officer, or Corporal, rather.  It's been marked as Government's

3    Exhibit S-1.  Are you familiar with that area?

4    A    Yes, sir.

5    Q    And specifically, Your Honor, if I may approach.  I'm hoping

6    that the jury can see this.  I'm assuming -- Your Honor, I'm

7    assuming the jury will holler if anybody can't see the chart.

8              THE COURT:  All right.

9    Q    Corporal, just by way of setting the scene a little bit.

10   That is an area in Baltimore County, is that right?

11   A    Yes, sir.

12   Q    And this is Liberty Road, which runs down to 695 if you

13   continue down in that direction?

14   A    Yes, sir.

15   Q    And then off of Liberty Road there is Old Court Road, which

16   runs across the map?

17   A    Yes, sir.

18   Q    And then roughly in the middle of Government's Exhibit S-1,

19   off of the Old Court Run, there runs sort of south a Carlson

20   Lane, is that all correct?

21   A    Yes, sir.

22   Q    Now, does this map show 8618 Bramble Lane, where you went in

23   response to the shooting call?

24   A    Yes, it does.

25   Q    And is that approximately, circling with my hand over some

1    red language in the upper part of the Government's Exhibit S-1.

2    Is that approximately where the apartment complex was?

3    A    Yes, sir.

4    Q    To your knowledge, Corporal Mead, were you the first officer

5    on the scene?

6    A    Yes, I was.

7    Q    What did you see when you got to 8618 Bramble Lane?

8    A    It appeared that there was an adult female tending to a,

9    what looked to be a small female child.

10   Q    You thought initially that there was an injured person who,

11   to you, looked like a child, is that correct?

12   A    Yes, sir.

13   Q    Did you approach this person you initially thought to be a

14   child?

15   A    Yes, I did.

16   Q    And when you got a little closer, was it a child?

17   A    No, it wasn't.

18   Q    Describe the person, the injured person.

19   A    She was a 29-year-old female, after talking with her.  I

20   asked her several questions.  She told me she was 29 years old.

21   She was just smaller.

22   Q    Now, ultimately, did you identify that lady as Tonya Jones

23   Spence?

24   A    Yes, I did.

25   Q    Let me show you what's been marked as Government's Exhibit

1    S-56.  Is that photograph familiar to you?

2    A    Yes, sir.

3    Q    Is this the front entrance of 8618 Bramble Lane?

4    A    Yes, sir.

5    Q    I'm going to circle part of this photograph with my finger

6    here.  What have I circled with my finger?

7    A    That's the first floor balcony.  It's kind of an overhang

8    right above the ground.

9    Q    Now, where was the, the injured lady when you approached?

10   A    If you can see the blue bag in the picture, she was laying

11   on her left side.  Yes, sir, right there.

12   Q    So approximately in that area near where the blue bag was?

13   A    Yes, sir.

14   Q    Was she partly under that balcony overhang?

15   A    The top part of her body was underneath the overhang.

16   Q    What did you observe, Corporal, about Ms. Spence's condition

17   when you got there?

18   A    You could see that she was shot twice from the blood.  And

19   we were putting a towel to her chest to try to stop the bleeding.

20   After I asked her several questions she started to spit up blood

21   so I stopped asking her any questions.

22   Q    There was a period of time during which you did ask Ms.

23   Spence some questions?

24   A    Yes, sir.

25   Q    Corporal, during the time that you were speaking with Ms.

1    Spence, she was obviously injured, you've already indicated?

2    A    Yes, sir.

3    Q    Did she appear to be in pain?

4    A    Yes, sir.

5    Q    What kind, what was her demeanor?  How did she seem in terms

6    of her ability to communicate with you?

7    A    She was trying to catch her breath.  You could tell she was

8    in pain.  She was able to answer a couple questions.  But after

9    the third question, she was, she wasn't doing too well.

10   Q    Did you ask, Corporal, did you ask Ms. Spence whether or not

11   she knew the person or persons who had shot her?

12   A    Yes, I did.

13   Q    And what did Ms. Spence say to you in response to that

14   question?

15   A    She advised she didn't know who they were.

16   Q    Now, you did not see her fall over the balcony or anything

17   like that?

18   A    No, sir.

19   Q    She was already under the overhang when you arrived?

20   A    Yes, sir.

21   Q    At some point, did paramedics arrive on the scene?

22   A    Yes, they did.

23   Q    And did they begin to treat Ms. Spence?

24   A    Yes, they did.

25   Q    What did you do?

1    A    I went to try to find witnesses as soon as the medics

2    arrived.

3    Q    Let me show you a few additional photographs very briefly,

4    just to set the scene.

5          Obviously, the photograph we're looking at here, based

6    on the blue item and some of the other items that we see here,

7    and there's a red item here and a few other things, does this

8    photograph appear to have been taken on the day of your report to

9    that scene?

10   A    Yes, sir, to the best of my knowledge.

11   Q    But at this point, obviously, Ms. Spence had been taken

12   away, is that right?

13   A    Yes, sir.

14   Q    Was she taken away for medical treatment as far as you know?

15   A    Yes, she was.

16   Q    Let me show you a few photographs.  Government's Exhibit

17   S-101.  Is this a closer view of the same balcony overhang?

18   A    Yes, it is.

19   Q    And once again, there's a few items here and there.  These

20   clothing and other items that were in the area?

21   A    Yes, sir.

22   Q    Government's Exhibit S-103.  This is a closer view of the

23   lawn area near that entrance?

24   A    Yes, sir.

25   Q    And again, just to set the scene here.  Over on this edge,

1    do we see part of that same balcony overhang, if it shows up on

2    your monitor?

3    A    Yes, you do.

4    Q    And there's a few items here.  What is that, to the best of

5    your knowledge?

6    A    I believe it was her shirt.

7    Q    And there's some red marks on it.  Can you tell me what the

8    red marks are?

9    A    Blood.

10   Q    Government's Exhibit S-105.  Is that a close-up of the same

11   clothing with the blood stains?

12   A    Yes, sir.

13   Q    Now you mentioned one of the things you went about doing was

14   attempting to locate any possible witnesses to this event?

15   A    Yes, sir.

16   Q    Were you able to locate anyone?

17   A    Yes, I was.

18   Q    What were the names or, rather, what was the name of the

19   first person you located?

20   A    Andrea Smith.

21   Q    Now, approximately how long after your first arrival at 8618

22   Bramble Lane did you meet up with Andrea Smith?

23   A    Five to six minutes, approximately.  Somewhere in that

24   range.

25   Q    And Andrea Smith was a young girl, is that correct?

DIRECT EXAMINATION OF OFFICER MEAD                    161

1    A    Yes, she was.

2    Q    To your knowledge, what was her age at the time?

3    A    Twelve.

4    Q    Now, did you find out from Ms. Smith whether or not she'd

5    witnessed the event that led to you going to Bramble Lane?

6    A    Yes, I did.

7    Q    During the time that you were speaking with Ms. Smith, were

8    her parents around?  Was her mom around, anything like that?

9    A    No, they weren't.

10   Q    You were the first person to talk to her, as far as you

11   knew?

12   A    As far as I know, yes, sir.

13   Q    As far as the police went?

14   A    Yes, sir.

15   Q    What did her demeanor seem like?

16   A    Her demeanor?  She was excited and very nervous.  You could

17   tell, she was shaken but she was able to talk.  She gave a really

18   good description for being 12.  And for any witness she did a

19   good job.

20   Q    Did you have any difficulty getting information from Ms.

21   Smith at that time?

22   A    No, sir.

23   Q    Your Honor, may I approach the witness again?

24        THE COURT:  Yes.

25   Q    Now, Corporal, at some point you were able to get from Ms.

1    Smith a description of what she had seen, is that right?

2    A    Yes, sir.

3    Q    And if you, if you would, did she describe two individuals?

4    A    Yes, she did.

5    Q    All right.  And I've initialed a part of your report here.

6    On agreement with counsel, if you would just, first of all, take

7    a look at that.  Does this reflect basically what Ms. Smith told

8    you during that first interview?

9    A    Yes, it does, sir.

10   Q    Now, the section I've indicated with my pen, if you would

11   please read that to me.

12            THE COURT:  Slowly, please, Corporal.

13   A    Yes, sir.  Ms. Smith described the suspect as follows.

14   Number one was a black male, six-three, 170 pounds, wearing a red

15   and white baseball hat, a gray shirt, and light blue jeans.

16   Number two was a black male approximately five-eight, 145 pounds,

17   had tight braids, a gray shirt and light blue jeans.

18            Ms. Smith then stated that both subjects stopped out

19   front of the building, walked up to the victim, and while

20   standing only three to four feet away from the victim, the

21   suspect wearing a red hat pulled a handgun from his dip and fired

22   two shots into the victim while she was screaming No.  Ms. Smith

23   then advised that the suspects took off running towards Old Court

24   Road and Carlson Lane.

25   Q    If you could help orient me on the map.  Again, this red

1    star here on Bramble Lane is where you were conducting your

2    investigation?

3    A    Yes, sir.

4    Q    And Old Court and Carlson Lane are down here to the south.

5    Carlson Lane running north/south, is that right?

6    A    Yes, sir.

7    Q    Corporal, one part of your report I have a quick question

8    for you about.  You indicated that there were specific height and

9    weight descriptions given as part of the description.  Sitting

10   here today, I know this is several years ago, do you have a clear

11   memory about whether or not Ms. Smith actually specified those

12   particular numbers or are these numbers that you might have

13   derived from the overall information?

14   A    That's a possibility.  I can't remember that long ago.

15   Q    The report was written a few days or a couple of weeks after

16   the incident actually happened, based on your notes and things

17   like that, is that right?

18   A    Yes, sir.

19   Q    So it's possible Ms. Smith may not have said 145 pounds,

20   six-three, all that other kind of stuff?

21   A    It's possible, yes, sir.

22   Q    Aside from the height and weight descriptions, is what you

23   reported in that report basically what you heard from Ms. Smith's

24   lips?

25   A    Yes, sir.

1    Q    At some point did you make contact with another possible

2    witness?

3    A    Yes, I did.

4    Q    What was her name?

5    A    Ms. Kelly David.

6    Q    Now, again, without getting into what Ms. David told you,

7    and at some point did you introduce or connect Andrea Smith and

8    Kelly David up with another officer?

9    A    Yes, I did.

10   Q    Who was that other officer?

11   A    I think he was a corporal at the time.  Corporal Mitchell.

12   Q    Corporal Mitchell?  Corporal Craig Mitchell?

13   A    Yes, sir.

14   Q    Now, again, without getting into details about what's being

15   heard, did you relay the information, including the information

16   you received from Ms. Smith, over your radio to any other

17   officers who might be involved in a search at this point?

18   A    Yes, I did.

19   Q    And to your knowledge, was there a search happening in light

20   of the fact that the shooting had just taken place?

21   A    Yes, there was.

22   Q    And did there come a time that you received information that

23   suspects had been stopped by the police in another area?

24   A    Yes, sir.

25   Q    And about how long after you relayed, you received your

1    information, did you have information that suspects had been

2    stopped, if you remember?

3    A    Approximately 15, 20 minutes.

4    Q    And then you hooked Ms. Smith, you introduced Ms. Smith and

5    Ms. David up with then Corporal Mitchell.  As far as you know,

6    did Corporal Mitchell take the two ladies off somewhere else at

7    points in time to do a possible show-up?

8    A    Yes, he did.

9    Q    Were you involved in going to the location for the show-up

10   ID or anything like that?

11   A    No, sir.

12   Q    You stayed at Bramble Lane?

13   A    Yes, sir.

14   Q    At some point, did you enter what you believed to be Tonya

15   Jones Spence's apartment?

16   A    Yes, I did.

17   Q    If I can go back to one of my original photos, if I can find

18   it.  Taking a look at S-56 again, Corporal.  This apartment up

19   here, the upper left-hand apartment of Building 8618, is that the

20   apartment you entered?

21   A    Yes, sir.

22   Q    What was the purpose for you entering that apartment?

23   A    To make sure there was no other suspects left inside or any

24   other victims.

25   Q    Why would you want to make sure that there was no one else

1    inside the apartment?

2    A    To see if they needed medical attention or there was any

3    possible suspects that we could apprehend at the time.

4    Q    As far as you know, were you the first police officer to

5    actually enter the apartment?

6    A    Yes, I was.

7    Q    Let me show you a few photographs.  Showing you Government's

8    Exhibit S-107.  At some point later on, crime scene people came

9    by and actually entered the apartment, took photographs of

10   everything, is that right?

11   A    Yes, sir.

12   Q    So this would have been sometime after you made your initial

13   entry?

14   A    Yes, sir.

15   Q    I'll ask you if these photographs show the scene as they, as

16   they looked when you made your initial entry.  What is shown in

17   Government's Exhibit S-107?

18   A    A food bag and a shirt.

19   Q    And are these items that you observed on the floor in that

20   position when you first entered the apartment?

21   A    Yes, sir.

22   Q    Government's Exhibit S-109.  Is this the front door to the

23   apartment?

24   A    Yes, sir.

25   Q    Corporal, what was the condition of the front door when you

1    first entered?  Was it open or closed?

2    A    It was open, sir.

3    Q    You didn't have any difficulty getting in?

4    A    No, sir.

5    Q    Were you able to observe any evidence of any forced entry or

6    anything like that?

7    A    I didn't look at the time, no, sir.

8    Q    That's not your focus at that point?

9    A    No, sir.

10   Q    Government Exhibit S-110.  What is shown in S-110?

11   A    This is the family room.  As soon as you entered the front

12   door.

13   Q    I note that the television is turned on in this photograph,

14   is that right?

15   A    Yes, sir.

16   Q    Do you remember if the TV was on when you made your first

17   entry?

18   A    I can't recall.

19   Q    Again, that wasn't your focus at the time?

20   A    No, sir.

21   Q    Did you look through the entire apartment to confirm that

22   there weren't any other victims or suspects inside?

23   A    Yes, sir.

24   Q    Did you find any people inside the apartment?

25   A    No, sir.

1    Q    Show you a few other photographs.  S-114.  Is this a door

2    from the kitchen of the apartment to the balcony on the outside?

3    A    Yes, sir.

4    Q    Do you remember if that door was open or closed when you

5    made your first inspection?

6    A    I don't recall remembering whether it was open or closed.

7    Q    S-115.  Is this the view if you were to walk through that

8    kitchen door out on to the balcony?

9    A    Yes, sir.

10   Q    Just to make sure I have my bearings correct.  This is a

11   view from the balcony.  Government's S-56.  Is this the same door

12   up here?

13   A    Yes, sir.

14   Q    Government's Exhibit S-116.  Is this the other side of the

15   same balcony?

16   A    Yes, sir.  That's the door coming out of the family room.

17   Q    And you've indicated the door out of the family room.  Is

18   that that door right there?

19   A    Yes, sir.

20   Q    Again, from this exterior view.  Living room door right

21   there?

22   A    Yes, sir.

23   Q    Let me ask you about the conditions inside the apartment.

24   Did you note anything that seemed disturbed inside the apartment

25   when you made your initial sweep?

1    A    No, sir.

2    Q    Let me ask you if you noticed anything on the floor,

3    Government's Exhibit S-117.  Resolution is a little bit bright

4    because there's a lot of white paint.  But I'll focus in a little

5    bit.

6                Can you tell me what that item is on the ground there?

7    A    That was a roll of duct tape.  Everything in the first two

8    sections, there was nothing out of place.  But when you walked

9    back into the back bedroom right through the door, the duct tape

10   was laying at the, right inside the door.

11   Q    And you noticed that duct tape lying in that position when

12   you first went through?

13   A    Yes, sir.

14   Q    Government's Exhibit S-118.  Is this a close-up view of the

15   same duct tape?

16   A    Yes, sir.

17   Q    When you first noticed this duct tape, Corporal Mead, did

18   you notice in any part of it that the end was balled up or bent

19   over or anything like that?

20   A    Yes, sir.

21   Q    I'm going to show you what was previously marked in this

22   case as Government's Exhibit S-2.  Is Government's Exhibit S-2

23   that same roll of duct tape?

24   A    Yes, sir.

25   Q    And again, to be clear, this is a roll of duct tape that you

1    saw lying on the ground of Tonya Jones Spence's apartment on June

2    7th, 2002?

3    A    Yes, sir.

4    Q    Government's Exhibit S-119.  Can you tell me if you

5    recognize this scene, Corporal?

6    A    Yes, sir.  This is the back bedroom.

7    Q    And there are a couple of drawers on the ground there.  Do

8    you remember if they were in that condition?

9    A    Yes, they were.

10   Q    Now, Corporal Mead, your role in this investigation involved

11   staying at Bramble Lane that day, is that correct?

12   A    Yes, sir.

13   Q    Did you help in any further or complete search of the

14   apartment along with Detective Marll or any of the other

15   detectives on the case?

16   A    You mean --

17   Q    Beside what we just talked about?

18   A    The search warrant?

19   Q    Yes, sir.

20   A    I was at the location.  I can't remember what I searched.

21   Q    Aside from the duct tape and the items we've talked about,

22   do you have a specific recollection of being the recovering

23   officer on anything?

24   A    No, sir.

25   Q    Government's Exhibit S-121.  Do you recognize this

1    photograph?

2    A    Yes, sir.

3    Q    And do you know, do you recognize the item inside the

4    photograph?

5    A    Yes, I do.

6    Q    What is that item?

7    A    It's a handgun.

8    Q    And was there, to your knowledge, was there a handgun found

9    inside the apartment during the complete search done by the

10   detectives?

11   A    Yes, there was.

12   Q    Do you know, have any knowledge about the caliber of the

13   weapon or anything like that?

14   A    I can't recall now.  I knew then, but not now.

15   Q    Just a moment, please, Your Honor.  During the time that you

16   were getting Andrea Smith and Kelly David connected with Sergeant

17   Mitchell, then Corporal Mitchell, now Sergeant Mitchell, to go to

18   this other location to look at these suspects, do you remember,

19   Corporal, if you would have provided either of those two ladies

20   any information about who it is they were going to look at or the

21   circumstances under which those men had been detained?

22   A    No, sir, I wouldn't have known that at the time.

23   Q    You didn't even have the information to provide even if you

24   wanted to?

25   A    No, sir.

1    Q    Now, what we've gone over today, does that basically

2    conclude your work on June 7th of 2002?

3    A    Yes, it does.

4    Q    There were other times, Corporal, and Your Honor, I'm going

5    to approach one more time.

6         Were there a couple of other occasions where you

7    participated on different days in searches of this wooded area

8    between Carlson Lane and South Green Road, this wooded area here?

9    A    Yes, sir.

10   Q    And you participated in those searches along with, among

11   other people, Detective Phil Marll, who was one of the lead

12   homicide investigators on this case, is that right?

13   A    Yes, sir.

14   Q    I believe I'll reserve my questions about the searches for

15   Detective Marll.  Your Honor, may I consult with Mr. Harding?

16              THE COURT:  Yes.

17              (Pause in proceedings.)

18              MR. HANLON:  Thank you, Corporal.  Thank you, Your

19   Honor.

20              CROSS EXAMINATION

21   BY MR. KURLAND:

22   Q    I want to get your rank right.  Corporal Mead, correct?

23   A    Yes, sir.

24   Q    I just have a few questions, Corporal Mead.  Okay.  You

25   still have your report in front of you?

1    A    Yes, sir.

2    Q    Just focusing in on the general description that Andrea

3    Smith gave you.  I know Mr. Hanlon went over the details but then

4    you said, generally, it might not have been those precise words,

5    correct?  Do you recall that testimony?

6    A    Yes, sir.

7    Q    But it's clear, though, that there was a taller suspect and

8    a shorter suspect?

9    A    Yes, sir.

10   Q    And it was the taller suspect wearing the red hat that Ms.

11   Smith said was the one that shot the victim, correct?

12   A    At the time when I spoke with her, yes, sir.

13   Q    Excuse me?

14   A    At the time when I spoke with her, yes, sir.

15   Q    That's what she told you?

16   A    Yes, sir.

17   Q    Okay.  And with respect to Ms. Smith's statement, again, you

18   can refer to your statement, she made no other comments about

19   seeing any other weapon, isn't that correct?

20   A    Yes, sir.

21   Q    All right.  Just a moment, Your Honor.  Corporal, we can

22   send you back to get another rank promotion.  I have no further

23   questions.

24             THE COURT:  Thank you very much, Corporal Mead.  You're

25   excused.

1        MR. HANLON:  Your Honor, the United States will call

2    Sergeant Craig Mitchell.

3        SERGEANT CRAIG MITCHELL, GOVERNMENT'S WITNESS, SWORN

4        THE WITNESS:  Yes, ma'am.

5        THE CLERK:  Be seated.  Scoot up.  Speak directly

6    toward the mike.  State your name and spell it for the record,

7    please.

8        THE WITNESS:  Sergeant Craig Mitchell.

9    M-I-T-C-H-E-L-L.

10        DIRECT EXAMINATION

11    BY MR. HANLON:

12    Q    Sergeant Mitchell, good afternoon to you.

13    A    Good afternoon.

14    Q    Where do you work, sir?

15    A    I work out in Woodlawn precinct, Baltimore County.

16    Q    And the Woodlawn precinct in Baltimore County, how long have

17    you been assigned to that precinct?

18    A    I've been employed with Baltimore County for 15 years.

19    Q    And I assume you've been, we're talking about the Baltimore

20    County Police Department, is that right?

21    A    Yes.

22    Q    What kind of work have you done for the Baltimore County

23    Police over your 15 years?

24    A    I'm currently a sergeant with Baltimore County Police.  I've

25    been in patrol.  I am now supervisor of Investigative Services

1    Team, which is a violent crimes team.

2    Q    And how long have you been a supervisor with a violent

3    crimes team?

4    A    Three years.

5    Q    Directing your attention, Sergeant Mitchell, back to June of

6    2002.  You were working as a police officer then?

7    A    Yes, sir.

8    Q    And what was your assignment at that time?

9    A    Corporal in patrol.

10   Q    Were you at that time also in the Woodlawn precinct?

11   A    Yes, I was.

12   Q    Specifically, on June 7th of 2002, were you on duty that

13   day?

14   A    Yes.

15   Q    What were you doing?

16   A    I was in patrol.  I was working the evening shift, doing my

17   administrative duties and also on patrol.  I was on the road at

18   that time.

19   Q    And would you have been on duty around about 4:50, 5:00 in

20   the afternoon?

21   A    Yes, I was.

22   Q    At some point, Sergeant Mitchell -- were you a corporal in

23   those days?

24   A    Yes.

25   Q    At some point did you receive a call for service or a call

1   for assistance at 8618 Bramble Lane?

2   A    Yes, we did.

3   Q    Was this in reference to a shooting?

4   A    It was a shooting complaint.

5   Q    And did you go to 8618 Bramble?

6   A    Yes, sir, responded with my sergeant.

7   Q    And what was going on at that location when you arrived?

8   A    Upon my arrival, there were several officers already out at

9   the scene.  Medics were at the scene already.  There had been a

10  shooting.  The victim had already been placed inside the

11  ambulance.  And when I got out, I met up with ambulance personnel

12  just to inquire on the condition of the victim.

13  Q    And as far as you know, the victim was going to receive

14  medical attention at another location?

15  A    She was receiving medical attention inside the ambulance at

16  that time when I inquired.

17  Q    And this is all pretty routine stuff when you respond to a

18  shooting, is that right?

19  A    Yes, sir.

20  Q    Was there an Officer Greg Mead at the location as well?

21  A    Yes, sir.

22  Q    Was he also investigating, doing what he could to help out?

23  A    Yes, sir.  Setting up the scene, crime scene, establishing a

24  perimeter, etc.

25  Q    Now, at some point did Officer Mead introduce you to a lady

1    named Kelly David?

2    A    Yes, sir.

3    Q    And where did that take place?  Near Bramble Lane?

4    A    At the scene.

5    Q    And again, without getting into too much about what's being

6    told and things like that, did you have reason or did you learn

7    that there had been two individuals detained in another area

8    nearby?

9    A    Yes, sir.

10   Q    And taking a look at Government's Exhibit S-1.  With the

11   Court's permission, if you'll take this and I'll go back to my

12   little seat.  Did you receive information about where -- first of

13   all, does Government's Exhibit S-1 show Bramble Lane?

14   A    Yes, sir.  Yes, sir.

15   Q    And circle that with your hand, please.

16   A    Bramble Lane is up here (indicating).

17   Q    And does Government's Exhibit S-1, the aerial photo, also

18   show the location where these two suspects were detained at some

19   point?

20   A    Yes, sir.

21   Q    And if you would, Sergeant, circle that with your finger.

22   A    South Green and Green Knoll.

23   Q    And you're indicating with your finger a red star near the

24   bottom center of Government's Exhibit S-1?

25   A    Yes, sir.

1   Q    And I think you've already said so, Sergeant, but if you

2   would, what was the intersection, again?

3   A    South Green and Green Knoll.

4   Q    And that's a residential area, is that right?

5   A    Yes, sir.

6   Q    You can take your seat again.  Now, you received information

7   about these two individuals being detained at that intersection,

8   and you also had an individual named Kelly David who you were

9   told might be a witness, is that right?

10  A    Yes, sir.

11  Q    Was a decision made to do what is called a show-up

12  identification?

13  A    One on one show-up, yes, sir.

14  Q    One on one show-up.  What is a one on one show-up?

15  A    We take the witness to view possible subjects you have

16  detained, might be involved in criminal activity or the crime

17  itself, to see if they are the subjects that this person observed

18  commit the crime.

19  Q    And in this instance, you met up with Ms. David.  And did

20  you drive her to, what is that, the South Green area?

21  A    Yes, sir.

22  Q    How long did it take you, Sergeant, to get from Bramble to

23  the South Green neighborhood?

24  A    A minute or two.

25  Q    During that time, did you give any instructions or did you

1  tell Ms. David what it was that she was going to be asked to do?

2  A    I did advise her that I was taking her for a one-on-one

3  identification to see if the subjects we had currently detained

4  were the ones that ran in front of her vehicle on Carlson Lane.

5  Q    And again, and you've clarified something, to your

6  knowledge, Ms. David had not witnessed the shooting but had an

7  encounter with somebody on Carlson Lane, is that right?

8  A    Correct.

9  Q    And aside from giving Ms. David that instruction, did you

10 give her any information on the way over to South Green about who

11 the suspects were, how or why they'd been detained?

12 A    No, sir.

13 Q    Did you even have that information --

14 A    No, sir.

15 Q    -- if you wanted to give it?  Did you know anything about

16 these people?

17 A    No, sir.

18 Q    You get there.  Tell us what happened when you got into the

19 area of South Green.

20 A    Got into the area of South Green with Ms. David in my

21 vehicle.  I positioned my vehicle to where she could get a good

22 luck.  The subjects we had detained were currently sitting on the

23 curb at that location.  The officers got the subjects up and

24 brought them forward out into the street so Ms. David could get a

25 good look at them.  And she identified them as the subjects who

1    ran in front of her.

2    Q    Let me ask you, first of all, about who those subjects were

3    that Ms. David was being asked to look at.  Were they identified?

4    A    I'm sorry?

5    Q    Were the two subjects, did you know their identities?

6    A    I did not know their identities.

7    Q    Did you come to know them?

8    A    I did.

9    Q    And what were their names?

10   A    Gardner and Holly.

11   Q    Shawn Gardner and Aaron Holly?

12   A    Yes, sir.

13   Q    And let me ask you this, Sergeant.  Do you, would you

14   recognize Mr. Shawn Gardner if you saw him again?

15   A    Yes.

16   Q    Do you see him in court today?

17   A    Yes, I do.

18   Q    Would you please identify him?

19   A    The second subject from the left.

20   Q    Could you describe his clothing?

21   A    He's wearing a gray shirt right now, glasses.

22   Q    Your Honor, for the record, identifying defendant Shawn

23   Gardner.

24        THE COURT:  So noted.

25   Q    Now, Mr. Gardner was one of the people.  And there was

1    another individual ultimately identified as Aaron Holly?

2    A    Yes, sir.

3    Q    Showing you Government's Exhibit S-59.  Do you recognize

4    who's in that photograph?

5    A    That's Aaron Holly.

6    Q    If you remember, which of the two people was the taller, Mr.

7    Holly or Mr. Gardner?

8    A    Mr. Holly was quite a bit taller than Gardner.

9    Q    Let me ask you.  As far as you know, this is a booking photo

10   or a photograph taken of Mr. Holly that day, is that correct?

11   A    Correct.

12   Q    Lets me show you photographs.  As far as you know, was Mr.

13   Gardner also photographed?

14   A    Yes.

15   Q    Government's Exhibit S-100A.  Is that a photograph of Mr.

16   Gardner taken that day, later on at the station?

17   A    That appears to be the same photograph, yes, sir.

18   Q    I'm going to show you two other shots, profile shots.  This

19   is S-100A.  Now, let me ask you or show you S-100B.  Is this a

20   profile shot of Mr. Gardner that day?

21   A    Yes, sir.

22   Q    And I'm not, you didn't take note of his hairstyle that day,

23   is that correct, Sergeant?

24   A    Personally, I did not, no.

25   Q    Looking in the photograph, does Mr. Gardner's hair appear to

1    be braided?

2    A    Yes, sir.

3    Q    And from the other side, Government's Exhibit S-100C.  Is

4    this the other side of Mr. Gardner taken that day?

5    A    Yes, sir.

6    Q    Now, when you and Ms. David showed up at South Green, she

7    was given an opportunity to look at Mr. Gardner and Mr. Holly,

8    and again, what did she say?

9    A    She said those were the subjects that ran in front of her

10   vehicle.

11   Q    Did Ms. David express any hesitation about that, Sergeant?

12   A    No, sir.

13   Q    Did she need to be prompted by you or asked to take a second

14   look or anything like that?

15   A    No, sir.

16   Q    Did she express how certain she was about the fact that

17   these were the people she'd seen run in front of her car?

18   A    It was an immediate response.  She was positive.

19   Q    How long did it take her to make that response?

20   A    It was immediate.

21   Q    How long were you there before you and Ms. David left the

22   area?

23   A    Just a matter of possibly a minute.

24   Q    As you pulled out of the area, did you radio to your fellow

25   officers that an identification had been made?

1    A    I either radioed it or told them out the window, the car

2    window.  I'm not sure exactly how I did it.

3    Q    Whatever you communicated, that would have been after Ms.

4    David had made her identification?

5    A    Yes.

6    Q    You returned to Bramble Lane at that point?

7    A    We stopped at Carlson first.

8    Q    I apologize.  I always forget that.  What was the reason for

9    your stop on Carlson Lane?

10   A    I wanted Ms. David to show me where the subjects ran into

11   the woods up Carlson Lane.

12   Q    If you could briefly and generally with your finger, where

13   did Ms. David show you on Government's Exhibit S-1?

14   A    Carlson Lane right here.  Off Old Court, right in this area

15   right here.  Right off the parking lot, right there.

16   Q    And you can take your seat, Sergeant.  Thank you.  For the

17   record, you were indicating a wooded area in the middle of

18   Government's Exhibit S-1.

19         After taking Ms. David to Carlson, did you and she then

20   return to Bramble Lane?

21   A    Yes, sir.

22   Q    Now, let me ask you one question before we move on to the

23   next procedure.  At some point, you've been asked, you've had to

24   testify in some different proceedings in this case.  You've been

25   asked from time to time what was the distance between Ms. David

1    when you and your car stopped and she had an opportunity to look

2    at the two people, Mr. Gardner, Mr. Holly, what was the distance

3    between them?  Do you remember that?

4    A    15, 20 feet.  Wasn't very far.

5    Q    There may have been some point where you said in a prior

6    proceeding that it may have been 30 feet, is that correct?

7    A    Yes.

8    Q    Sitting here today, if you would, describe the position that

9    you took so that Ms. David would be able to get a look at Mr.

10   Gardner and Mr. Holly.

11   A    As I pulled into the intersection, I just stopped my vehicle

12   facing actually kind of toward the houses and the curb that they

13   could come off of, so she could have a clear shot down the street

14   of the subjects when they brought them forward.

15   Q    Ms. David, did she have to get out of the car?

16   A    No, sir.

17   Q    So everything she did was inside the vehicle?

18   A    Yes, sir.

19   Q    Now, you returned to Bramble Lane now.  At some point are

20   you introduced to another possible witness?

21   A    Yes.

22   Q    What was this person's name?

23   A    Andrea Smith.

24   Q    And was she a 12-year-old or 13-year-old girl?

25   A    About a 12-year-old little girl.

1    Q    And you had reason to believe that she may be a witness?

2    A    I was told, yes, she witnessed the shooting.

3    Q    Did you take Ms. Smith to South Green?

4    A    South Green and Green Knoll, yes, sir.

5    Q    And did anyone go with you and Ms. Smith?

6    A    Her mother, Ms. Maynard, was also in the vehicle.

7    Q    So Ms. Smith's mother accompanies you this time.  Had

8    anybody accompanied you and Ms. David during her ID?

9    A    No, sir.

10   Q    Why did you allow Ms. Smith's mother to go with her for the

11   second show-up?

12   A    Ms. Smith was a 12-year-old little girl.  The mother was

13   worried for her safety.  So I allowed her to come along.

14   Q    Had, to your knowledge, between being introduced to the two

15   ladies, Andrea Smith and Kelly David, did you ever see either one

16   of them communicate anything to each other about what they

17   observed or the results of Ms. David's show-up to Ms. Smith or

18   anything like that?

19   A    No, sir, I did not.

20   Q    On the way to South Green and Green Knoll, did you tell

21   Andrea Smith anything about what you knew about the two suspects,

22   what they looked like, or the results of Ms. David's positive

23   identification?

24   A    No, sir.

25   Q    It would have been improper for you to do so, is that

1    correct?

2    A    Yes, sir.

3    Q    Because it would have suggested to Ms. Smith what her answer

4    should be?

5    A    Yes, sir.

6    Q    How long did it take you to get there?

7    A    A matter of a minute or two.

8    Q    And as before, when you arrived in the area near Mr. Gardner

9    and Mr. Holly, did you position your vehicle in a way that would

10   give Ms. Smith a good view of those two gentlemen?

11   A    Same way.

12   Q    And in this instance, Sergeant Mitchell, did Andrea Smith

13   positively identify the two men, Mr. Gardner and Mr. Holly, that

14   she saw during her show-up?  Did she positively identify those

15   two men as the two men that had been involved in the shooting of

16   Tonya Jones Spence?

17   A    Yes, sir.

18   Q    Did she express any hesitation about that?

19   A    No, sir.

20   Q    Did it take her any time to make that identification?

21   A    No, sir.

22   Q    Did she express any doubt about that identification?

23   A    No, sir.

24   Q    How long did you stay at the scene with Ms. Smith?

25   A    Same time, about a minute or so.

1    Q    Did Ms. Smith stay in the car?

2    A    Yes, sir.

3    Q    And her mother as well?

4    A    Yes, sir.

5    Q    And where did you go after that procedure was done?

6    A    Returned to Bramble Lane.

7    Q    I gather at some point you communicated to other officers

8    that the ID had been made?

9    A    Yes, sir.

10   Q    This would have been after Ms. Smith had an opportunity to

11   look at the two men and made her identification?

12   A    Yes, sir.

13   Q    If you remember, Sergeant, we discussed that when you

14   arrived at the scene with Kelly David, Mr. Gardner, Mr. Holly

15   were on the curb and they stood up.  Do you remember where they

16   were when you arrived on the scene with Andrea Smith?  Were they

17   on a curb or were they in police cars at that point?

18   A    They were being brought out of the back of police cars.

19   Q    Do you remember if at that point Mr. Gardner and Mr. Holly

20   had been handcuffed or anything like that?

21   A    The second time, yes.  They were handcuffed.

22   Q    Did you get Ms. Smith back home successfully?

23   A    Yes, sir.

24   Q    Again, to your knowledge, Ms. Smith didn't have any

25   communication with Kelly David at any point?

1    A    No, sir.  To my knowledge, no.

2    Q    Just a moment, please, Your Honor.  Thank you, Sergeant.

3    Thank you, Your Honor.

4              CROSS EXAMINATION

5    BY MR. KURLAND:

6    Q    Good afternoon, Sergeant.

7    A    Good afternoon.

8    Q    If I can just get the ranks correct.  You are a sergeant

9    now; you were a corporal at the time of the events that you just

10   testified to?

11   A    Yes, sir.

12   Q    Okay.  But I will call you sergeant now.  I just have a

13   couple of questions.  With respect to -- let's first talk about

14   the show-up.  You described them or you first identified the

15   procedure in general as a one on one show-up, correct?

16   A    We call it one on one, yes, sir.

17   Q    But this wasn't a one on one show-up?

18   A    That's right.

19   Q    It was a two on one, correct?  Well, it was a two, it's the

20   one on one refers to one suspect/one witness, correct?

21   A    We call it a one on one show-up.  It's just basically when

22   you take the witness --

23   Q    No.  No.  That's what the one on one refers to?

24   A    Yes.  I guess.  I don't know where it came from, the name

25   came from.

1    Q    It's not basketball, is it?

2    A    I'm sorry?

3    Q    It's not a one on one basketball game?  It's a one on one

4    because it's --

5    A    That's what we call it, yes.

6    Q    This was not, though, a classic, traditional one on one

7    show-up, is it, because it had both, you testified that both --

8    A    Both subjects were there?

9    Q    Both subjects were there.

10   A    Yes.  Both subjects were there.

11   Q    Okay.  So that's not your classic, by the book, one on one

12   show-up?

13   A    I don't know what a classic one on one show-up is.  Like I

14   said, it's just where the witness would identify the subjects

15   involved at the scene.  That's all.

16   Q    But if they were all done in that manner, it's unlikely they

17   would be called one on one show-ups.  Would you agree with that?

18   A    I don't know.  Yeah.

19   Q    Yes?  I'm sorry?

20   A    I don't know.  It's up to your interpretation, I guess.  I

21   don't know what they would call it, sir.

22   Q    Okay.  In any event, both witnesses were shown two, two

23   suspects together?

24   A    Yes, sir.  Yes, sir.

25   Q    And you were aware even with your late arriving at the

1    scene, you were aware that there was just, that there were two

2    suspects involved?

3    A    That's correct.

4    Q    I just have a couple more questions.

5         With respect to Kelly David, the first person you took

6    out there, you were how far away?  Twenty or thirty feet?

7    A    15, 20 feet.

8    Q    And you positioned the car -- I was sitting over there, I

9    couldn't quite see it.  Were you positioning your car straight

10   ahead?

11   A    I pulled into the intersection, it was more angled towards

12   the curb which they got off of.  So when they brought them out

13   into the street, the end was around more.

14   Q    All right.  To the point where Ms. David in the car, she did

15   get out of the car, correct?

16   A    Ms. David did not get out of the car.

17   Q    And she was able to look straight at them?

18   A    Yes.

19   Q    Okay.  All right.  And with respect to the show-up for Ms.

20   David, neither suspect, neither Mr. Holly nor Mr. Gardner, nobody

21   had a hat on, correct?

22   A    I don't think they did, no.

23   Q    Okay.  Okay.  And the second show-up with respect to Ms.

24   Smith, the car was positioned, again, in the same general

25   position?

1    A    Similar fashion, yes, sir.  Yes.

2    Q    So Ms. Smith was able to, while staying in the car, be able

3    to get a straight-on look at --

4    A    Yes, sir.

5    Q    -- the two people there?  Okay.  And they were clearly in

6    handcuffs?

7    A    Second time, yes, sir.

8    Q    The second time?

9    A    Yes.

10   Q    You were able to observe that in the car?

11   A    Yes, I could see they were in handcuffs.

12   Q    So there's no reason to think that, that Ms. Smith also was

13   able to see the handcuffs?

14   A    Correct.

15   Q    Just a moment, Your Honor.  Let me just check a couple

16   things.  And again, the second time, you didn't observe any

17   change in the clothing of the suspects from the second show-up

18   and the first show-up?

19   A    No, sir.

20   Q    So there were no hats, nobody was wearing a hat, to the best

21   of your recollection?

22   A    Correct.

23   Q    I have no further questions, Your Honor.

24        MR. HANLON:  No redirect.

25        THE COURT:  Thank you very much, Sergeant.  You're

1   excused.

2           THE WITNESS:  Thank you.

3           THE COURT:  Next witness.

4           MR. HANLON:  Your Honor, the United States calls

5   Technician Graham Boyanich.

6       TECHNICIAN GRAHAM BOYANICH, GOVERNMENT'S WITNESS, SWORN

7           THE WITNESS:  Yes.

8           THE CLERK:  Be seated.  Speak directly toward the mike.

9   State your name and spell it for the record, please.

10          THE WITNESS:  Okay.  My name is Graham Boyanich.  The

11  last name is B-O-Y-A-N-I-C-H.  First name is G-R-A-H-A-M.

12          DIRECT EXAMINATION

13  BY MR. HANLON:

14  Q    Good afternoon, sir.  Could you please tell you where you

15  work?

16  A    I work with the Baltimore County Forensic Services Section,

17  Digital and Multimedia Evidence Unit.

18  Q    How long have you worked with the Baltimore County Police

19  Department?

20  A    Since March of 2000.

21  Q    And do you have a title or anything like that?

22  A    I currently am a Computer Forensic Examiner.  I used to be a

23  Forensic Service Technician II.

24  Q    And going back to June of 2002, were you employed by the

25  police department then?

1    A    Yes.

2    Q    And was that, were you doing forensic technician work at

3    that time?

4    A    Yes.

5    Q    And what was your basic job as a forensic technician?  What

6    did you have to do?

7    A    As a crime scene technician, your responsibility, your sole

8    responsibility is to respond to crime scenes and process crime

9    scenes for potential evidence, latent fingerprints, collect

10   evidence, photographs, sketching.

11   Q    With respect to a particular investigation beginning on June

12   7th of 2002, and continuing for sometime thereafter, did you

13   assist in the recovery of an item, a piece of evidence during an

14   autopsy?

15   A    Yes.

16   Q    The autopsy or the individual who was undergoing the autopsy

17   was the remains of a lady named Tonya Jones Spence, is that

18   right?

19   A    Correct.

20   Q    And directing your attention to June 8th of 2002.  Did you

21   actually go to the Office of the Chief Medical Examiner while the

22   autopsy was taking place?

23   A    Actually, it was on the 7th.

24   Q    I'm sorry.  It was the 7th?

25   A    Yes, I did.

1    Q    And at some point during the course, did you witness the

2    autopsy?  Were you there while it happened?

3    A    Yes.

4    Q    And you are there for what purpose?  Why do you go to

5    autopsies?

6    A    It's the responsibility of crime scene to respond to the

7    office of the, the OCME for autopsies, to do photographs prior to

8    autopsy, collect any evidence that may be collected or garnered

9    from the autopsy, and to fingerprint the victim.

10   Q    Now, in this case I'm going to ask you about a particular

11   item called Government's Exhibit S-4A.  This is a brown envelope.

12   Do you see it in front of you?

13   A    Yes.

14   Q    And I've put a copy of your report in front of you as well,

15   sir.  You can take reference to it if you wish to refresh your

16   recollection.  This reflects the recovery of an item, the date is

17   June 8th of 2002.  Is that right?

18   A    Correct.

19   Q    Now, this would have been when the item would be logged in

20   and processed and things like that?

21   A    Yes.

22   Q    But just so we're clear, what was, if you remember, what was

23   the date that you actually got hold of this item?

24   A    I must be, I must have made a mistake in my report it.  It

25   does appear to be 6/8 of '02.

1   Q    So this would have been the day after June 7th of '02?

2   A    Correct.

3   Q    And this item was recovered from OCME.  That's the Office of

4   the Chief Medical Examiner?

5   A    Correct.

6   Q    And then the individual you actually got the item from was a

7   Dr. Pestaner, P-E-S-T-A-N-E-R, is that right?

8   A    Correct.

9   Q    And he's one of the doctors who works as the Office of the

10  Chief Medical Examiner, is that right?

11  A    Correct.

12  Q    Was he one of the doctors who actually performed the autopsy

13  of Tonya Jones Spence?

14  A    Yes.

15  Q    And this particular item, it's a little bit difficult to see

16  so I may try to -- first of all, there's a big sticker on this

17  that says "biohazard."  This is something that you put on any

18  piece of evidence that you recover from a medical situation like

19  an autopsy, is that right?

20  A    Correct.  You want to assume, you want to assume universal

21  precautions in the event of biohazard, bio, blood or anything of

22  that nature.

23  Q    In this case, the particular item we're going to talk about

24  has, since you first recovered it, it's been treated and examined

25  by other technicians and it's been rendered biologically safe, is

1    that right?

2    A    I believe so.

3    Q    When you recovered this item, you marked it a particular

4    way, is that right?

5    A    Yes.

6    Q    How did you identify this particular item?

7    A    I identified it sa envelope labeled "bullet from back."

8    Q    And specifically, you logged this in as a bullet recovered

9    from the back of the victim, Tonya Jones Spence, is that right?

10   A    I labeled it as such as it was given to me by Dr. Pestaner.

11   Q    And then you took the entire item, including the envelope

12   from Dr. Pestaner, or Pestaner, and you logged it into evidence

13   under the case number for the Tonya Jones Spence investigation?

14   A    Yes.

15   Q    And then you put another identification number, 996.  Is

16   that your number as a technician at the time?

17   A    Yes.  That's our ID number.  That's my ID number.

18   Q    And 011 would be the 11th in a series of items you logged

19   in?

20   A    Correct.

21   Q    And then you took this and submitted it into evidence in

22   Baltimore County, is that right?

23   A    Yes.

24   Q    And you would not have been involved as a forensic

25   technician in any specific examination or processing or analysis

1    of any bullet recovered from the back?  You just log it into

2    evidence?

3    A    Correct.

4    Q    Thank you, sir.  Nothing further, Your Honor.

5              MR. KURLAND:  No questions, Your Honor.

6              THE COURT:  All right.  Thank you very much, Mr.

7    Boyanich.  Back to Detective Niedermeier?

8              MR. HARDING:  Yes, Your Honor.  The United States

9    recalls Detective Niedermeier.

10             THE COURT:  Okay.  You remain under oath, Detective, of

11   course.

12             DIRECT EXAMINATION

13   BY MR. HARDING:

14   Q    Good afternoon, Detective Niedermeier.

15   A    Good afternoon, sir.

16   Q    I apologize for taking your testimony in dribs and drabs,

17   Detective.

18   A    Yes, sir.

19   Q    Going back to one thing that you testified about yesterday,

20   Detective.  You testified about the recovery of drugs from the

21   trunk of that white Honda station wagon that the Wyche brothers

22   were found in that day.  Do you recall that?

23   A    Yes, sir.

24   Q    And did you submit those for analysis by the drug lab?

25   A    I didn't do it myself but they were submitted, yes.

1    Q    Okay.  Can you tell us, and I have here your paperwork if

2    you need to look at it, can you tell us the CC number and the

3    property number?

4    A    Yes.  The complaint number was 026-C-17149.  And the

5    property number was 02018653.

6    Q    Okay.  When we broke yesterday I was asking you about this

7    pamphlet or hand-out that you got at the funeral, Government

8    Exhibit 5-G.  Do you recall that?

9    A    Yes.

10   Q    And just one, one or two more questions about that.  Is this

11   document --

12            MS. RHODES:  I object to you putting it up there.

13            MR. HARDING:  It's in evidence.

14            MS. RHODES:  Your Honor, I object to it.  I don't think

15   it's appropriate to show the whole document there.

16            THE COURT:  Overruled.

17   BY MR. HARDING:

18   Q    Does this document identify another name for Darryl Wyche?

19   A    It does.

20   Q    What is it?

21   A    D.

22   Q    Okay.  And by the way, does it also identify other names for

23   Anthony Wyche?

24   A    Yes.

25   Q    What are they?

1    A    Pete and Little Tony.

2    Q    And also, you testified yesterday that this location where

3    the funeral occurred was in a, I believe you said a converted

4    church, is that correct?

5    A    Yeah.  I believe it was a building converted into a large

6    church.

7    Q    Okay.  There's a name on the back of this document.  Chatman

8    and Harris Funeral Home.  Is that the name of the place where the

9    funeral occurred?  Does that sound familiar?

10    A    It sounds familiar.

11    Q    You said it was on Reisterstown Road?

12    A    Right off of, yes.

13    Q    All right.  Let me show you these exhibits that I started

14    showing you yesterday, beginning with W-5I, the letter from

15    Little Darryl, these were all recovered from your search at Two

16    Cree Court that morning of April 17th, 2002, is that correct?

17    A    Correct.

18    Q    Including the pamphlet that we just talked about, is that

19    correct?

20    A    Yes, that was also recovered there.

21    Q    Okay.  Here's another document.  And this is marked W-5K.

22    And who's this letter from?

23    A    Dirty.

24    Q    Okay.  Do you know who Dirty is?

25    A    I don't.

1    Q    Okay.  Did you recover cell phone billing records in your

2    search, Detective?

3    A    Yes.  That was also recovered.

4    Q    This is W-5F as in Frank.  Is this Sprint individual phone

5    charges for 410-963-3912 in the name of Wayne Martin?

6    A    It is.

7    Q    And this is Government Exhibit W-5H.  Do you remember this

8    document, Detective?

9    A    Yes.

10   Q    Perhaps you can just read what it says.

11   A    It says "surveillance equipment" in quotations.  Soldier of

12   Fortune magazine for $5.95.

13            MS. RHODES:  Your Honor, I object.  Relevance.

14            THE COURT:  What's the point, Mr. Harding?

15            MR. HARDING:  I think it is relevant, Your Honor.

16            THE COURT:  Yeah.  I'm asking you to tell me.  Do you

17   need to approach the bench?  Perhaps you can just hand the

18   document to the clerk and let me take a look at it.

19            (Pause in proceedings.)

20            THE COURT:  Do you have other documents you want to

21   review with the detective?

22            MR. HARDING:  Yes.

23            THE COURT:  All right.  Why don't we take a recess and

24   lets me hear from Ms. Rhodes?

25            Members of the jury, let's take an afternoon recess.

1    Please leave your note pads in your chairs.  Have no discussion

2    about the evidence.  Continue to keep an open mind about all

3    issues.

4            You're excused for a 15 minute recess.  You may step

5    down, Detective.

6            (Jury exits the courtroom.  Witness exits the

7    courtroom.)

8            THE COURT:  Tell me about this document, Mr. Harding.

9            MR. HARDING:  Your Honor, people involved in narcotics

10   trafficking are notoriously interested in counter-surveillance

11   and in detecting bugging devices and wiretaps and things like

12   that.  I don't have it in front of me so I can't tell you what

13   all the equipment is on that list.  But there are several things

14   that show Mr. Martin's interest in what is commonly called

15   counter-surveillance equipment.

16           THE COURT:  Okay.  Where was this found, this document,

17   Government Exhibit W-5R?

18           MR. HARDING:  From the Two Cree Court residence of

19   Shelly Wayne Martin, Your Honor.

20           THE COURT:  And who lived there?

21           MR. HARDING:  Shelly Wayne Martin and his mother are

22   the only people I know who lived there.  There may have been

23   others but I don't know who they would have been.

24           THE COURT:  And do you know where this document was

25   actually found in the residence?

1          MR. HARDING:  I can't tell you that off the top of my

2     head.  I would have to ask the detective.  And of course he may

3     not -- he would probably have to look at the search warrant

4     return or something like that.

5          THE COURT:  Okay.  And do you know anything about the

6     handprinting on this document?  In other words, are you going to

7     have a witness or any comparison?  Because I assume you're going

8     to argue that Mr. Martin created this document?

9          MR. HARDING:  Yes, Your Honor.

10          THE COURT:  And do you have any evidence of that apart

11     from the fact that it's found among his belongings?

12          MR. HARDING:  No.  Just the fact that it was found at

13     his residence.

14          THE COURT:  Were there any of these magazines or, what

15     else do you have like this that you intend to introduce?

16          MR. HARDING:  Your Honor, it may, all I have are these

17     letters, some of which are clearly addressed to Mr. Martin.  I

18     have photographs of Mr. Martin and also of Goo.  And I have an

19     address book, which is actually not Mr. Martin's.  It's his

20     mother's.  But it contains phone numbers for Mr. Martin and for

21     Goo.  And so I was interested in introducing it just to establish

22     who the phone numbers were tied to.

23          THE COURT:  Can I see the photograph?  Can you just put

24     it on the DOAR, please?

25          MR. HARDING:  That's one of them.

203

1          THE COURT:  You have others?

2          MR. HARDING:  And this one is Goo.  And this one is Mr.

3     Martin.

4          THE COURT:  Okay.  What's that in his mouth?

5          MR. HARDING:  It looks like a cigar, Your Honor.

6          THE COURT:  Okay.  And these letters, who, remind me,

7     who is Dirty?

8          MR. HARDING:  Oh, Your Honor.  Dirty is somebody that

9     we've heard testimony about but I cannot verify that this is the

10    same Dirty.  There may be more than one Dirty in the world.

11         THE COURT:  I see.  Is there anything in the letter

12    that's, I mean, there was no objection.  But what's in that

13    letter?

14         MR. HARDING:  There's nothing, I wouldn't say that it's

15    a letter that talks about criminal activities, Your Honor.

16         THE COURT:  What's the relevance of the letter from

17    Dirty?

18         MR. HARDING:  I introduced it because I thought that it

19    might show a connection to Dirty.

20         THE COURT:  Well, it does show a connection to Dirty.

21         MR. HARDING:  Yeah.

22         THE COURT:  Which Dirty?

23         MR. HARDING:  I cannot at this time establish that it's

24    the same Dirty that we heard all about from Mr. Montgomery, Your

25    Honor.

1    THE COURT:  Okay.  But there was no objection, so it's

2    in.  And what else do you have in that box?

3    MR. HARDING:  That's about it.

4    THE COURT:  And there was one other letter, I thought,

5    wasn't there?

6    MR. HARDING:  There was the letter from Darryl Bacon to

7    Mr. Martin that we read in detail when Darryl Bacon was on the

8    stand.  And so I didn't have Niedermeier reread it.  But it's the

9    letter where he talks about all the ski masking it up that he's

10   ready to do with Mr. Martin when he gets out, and his desire for

11   an eighth, and stuff like that.

12   THE COURT:  Right.  Okay.  All right.  Ms. Rhodes,

13   there is some -- I assume you have a copy of this, yes?  Ms.

14   Rhodes?

15   MS. RHODES:  I don't have one in front of me, no.

16   THE COURT:  No.  But I mean, it was produced?

17   MS. RHODES:  Yes.  But we were never provided exhibit,

18   exhibit binders or anything like that from the government.  So we

19   are at a loss to, obviously, have everything handy.  But yes, I

20   was provided a copy of it at some point.

21   THE COURT:  Okay.  So there are some, I mean, what this

22   appears to be is a list of items, including catalogs.  The ones

23   that seem most, the items on this list that seem most likely

24   relevant, the top, as the detective read, reads "surveillance

25   equipment."  And then there's something called Steve Arnold Gun

1    Room Catalog.  Not sure what that means.  And then some other

2    catalogs.  And then the bottom portion of the document reads "Spy

3    Outlet", also in quotation marks.  And it says, The latest, high

4    tech professional electronic devices offer a huge selection of

5    surveillance/privacy devices.  World's smallest pinhole cameras,

6    $99.  Realtime, 12 hour telephone recorder, $139.  Touchtone

7    decoders, bugs, phone tap detectors, voice disguisers, wireless

8    video, locksmithing tools, GPS vehicle tracking via the Internet,

9    and more, Spy Outlet catalog, $5, and then an address.

10         So certainly, I can imagine that this would tend to

11   prove that Mr. Martin, in whom, in whose home it was seized, is

12   interested in this kind of stuff.  And one might imagine that a

13   drug dealer or a criminal in general might be interested in this

14   kind of stuff.

15         So it would appear to be clearly admissible against Mr.

16   Martin.  But I'm not sure it's admissible against any of the

17   other defendants, except that if they're in a conspiracy the jury

18   could infer that Mr. Martin either made this list or had somebody

19   make it for him, or, in any event, he obtained it.  And it's not

20   a big leap for the jury to infer that he wasn't acting only on

21   his own behalf but on behalf of others as well.  So what's the

22   basis for your objection?

23         MS. RHODES:  The basis, Your Honor, is it's not

24   relevant.  But there's a couple other things.  I want to back up.

25         THE COURT:  If we can move past the relevance, because

1    it clearly is relevant.

2              MS. RHODES:  I would like to back up a little bit to

3    the very end of what is happening when Niedermeier was

4    testifying.  There were two of these things.  One was the funeral

5    program and the other was the letter from Darryl Bacon.

6              And at that point they were both discussed.  As Mr.

7    Harding mentioned, we already heard the letter from Darryl Bacon,

8    and that's fine because he had read it.  Then again, then today

9    he wants to show a portion of the, essentially, the written

10   eulogy of one of the people who was killed.  And just by virtue

11   of saying simply, Wasn't Darryl also known by the letter D?  I

12   don't think that's appropriate.  I mean, I think putting that in

13   front of the jury is not at all --

14             THE COURT:  Ms. Rhodes, I disagreed with you.  I

15   overruled the objection.  It wasn't on the DOAR for more than a

16   few seconds.  And the purpose of the government putting it on

17   there was to establish that the Wyche's had nicknames --

18             MS. RHODES:  Okay.

19             THE COURT:  -- that were --

20             MS. RHODES:  Could I continue?

21             THE COURT:  Yes.  But I mean, talk about stuff that you

22   have a likelihood of persuading me of.

23             MS. RHODES:  My concern --

24             THE COURT:  Let's not go backwards.

25             MS. RHODES:  -- about the government's method of doing

1    this is just because something is introduced at some point, I

2    don't think it means that that whole document is relevant.  I

3    mean, if we're going to continue like this, it's going to be very

4    slow and painstaking because --

5              THE COURT:  It's been slow and painstaking.

6              MS. RHODES:  Because we don't know, we don't know what

7    they're going to be introducing.  And I don't think that every --

8    and I know I'm speaking generally here.  But I don't think that

9    every document seized in every search warrant here is necessarily

10   relevant.

11             THE COURT:  And I agree with you.  That's why I took

12   the recess.  That's why I asked Mr. Harding to bring me the

13   document.  That's why I've taken the time to review the document.

14   And I've ruled on this document.

15             MS. RHODES:  And what I'm suggesting --

16             THE COURT:  I appreciate your frustration.  But there's

17   time for that.  It's not during a 15 minute recess.

18             MS. RHODES:  I think what might solve this is if the

19   government would show us what documents they are intending to use

20   on the lunch break or in the morning or something so we know and

21   can discuss it and don't have to have it come up like this and

22   have something go on the DOAR and have to have it in front of the

23   jury and have discussions mid-witness.

24             THE COURT:  Well, I don't find that the government has

25   been overreaching or unfair in the way that it's handled the

1   documents.

2         When we agreed that we shouldn't automatically put a

3   prior inconsistent statement on the DOAR, everybody has been

4   compliant.  And it's worked wonderfully.  But I don't know what

5   else I can say about that.

6         You know that these documents were seized from Mr.

7   Martin's home.  You know that Detective Niedermeier was the one

8   on that warrant, or you should know.  And I'm not going to have

9   the government prepare some kind of road map for the defense.

10  I'm just not going to do it in a case of this sort.  I appreciate

11  --

12        MS. RHODES:  Your Honor, I'm talking about immediately

13  before the testimony.  I mean, in most instances --

14        THE COURT:  No.  I'm not going to have Mr. Harding walk

15  all the way over to the other side of this large courtroom the

16  way he did the other day with those crime scene photographs.  I

17  don't want to take that kind of time.

18        MS. RHODES:  I'm not talking about that kind of time.

19  I'm talking about before court begins at 9:30 in the morning or

20  before court begins at 2:00.  We can take two minutes and he can

21  show us those things.

22        THE COURT:  Well, you can go over to him and say, What

23  are you going to use today?  I mean, you can do that.  You can do

24  that.

25        MS. RHODES:  Is he required to show us, then?

1          THE COURT:  I'm sure he will.  Why wouldn't he?

2          MS. RHODES:  I don't know.  But he's not giving us

3     Giglio so why would he show us that?

4          THE COURT:  Have you asked?  I mean, have you actually

5     gotten here at 9:10 one day and went over to, and gone over to

6     Mr. Harding or Mr. Hanlon?

7          MS. RHODES:  I'll tell you honestly, Your Honor, what

8     I'm usually doing -- I get here at 8:30.  What I'm usually doing

9     at 9:25 is saying, What witness is going to be up in five minutes

10    because it's constantly changing.  And that is a more pressing

11    matter to me than the exhibits they're going to be using.

12         It's been extremely frustrating, as you can see and

13    hear.  And extremely difficult given the boxes and boxes that

14    they're dealing with, to have them be able to pull out any

15    document whenever they want and slap it on the DOAR and we're not

16    allowed to object.  That's what I feel like.

17         THE COURT:  All right.  Let's back up.  I received an

18    exhibit list on the first day of trial.

19         MS. RHODES:  I have an exhibit list.

20         THE COURT:  All right.  And there have been some

21    exceptions but the defense, the government has fairly faithfully

22    announced the number of an exhibit before or as it is going on

23    the DOAR.  Each of these defendants has two lawyers.  And I

24    appreciate that you divided the witnesses and so forth and you're

25    all busy.  I respect that.  But there is no reason one of the

1  lawyers can't have that exhibit list sitting in front of him or

2  her and turn to the exhibit which is listed in the government's

3  exhibit list and, indeed, go over the exhibit list at night and

4  try to figure out what you think you have an objection to.

5         I can't do more than that.  There have been one or two

6  instances when something went on the DOAR, that arguably it

7  shouldn't have gone on the DOAR.  But this document, Mr. Harding

8  was perfectly reasonable in believing that there either wouldn't

9  be an objection to this document or that the objection would be

10 overruled.  And so far it's been overruled.

11        So if you want to tell me why this document is not

12 admissible against your client, I'll be glad to hear you on that.

13        MS. RHODES:  All right.  On that issue, Your Honor, I

14 think there is no evidence, first of all, I think that it's,

15 there's no evidence that links anybody in here with any kind of

16 surveillance equipment, any kind of cameras, any of this.  It's

17 like a 12-year-old boy's Christmas list.

18        THE COURT:  That's not true.  We just heard about Mr.

19 Gardner going to CVS to buy walkie-talkies.  That's what this is

20 all about.  Come on.  See, when you make a statement like, There

21 is no evidence, you know, my brain begins to shut down.  Be more

22 focused, please.  Tell me what your objection is.  I'm willing to

23 give the defense a fair airing of all of your objections.  But

24 really, you've got to help me out.

25        MS. RHODES:  Your Honor, I don't see any relevance to

1   Mr. Mitchell's case.  That's all I can say.  Okay.  But I want to

2   add one other thing --

3           THE COURT:  Go ahead.

4           MS. RHODES:  -- regarding the issue of the exhibit

5   list.  Yes, we have it.  It does not tell us what's in every

6   letter.  And we have --

7           THE COURT:  Of course not.

8           MS. RHODES:  As we have scanned these things over the

9   past years, we naturally don't remember everything that's in

10  every letter and what might be damaging, or what might be not

11  damaging, but not even relevant.  Maybe some talked about some

12  prostitution business they're in.  If that letter gets put up on

13  the DOAR, how is that fair?  How is that relevant?

14          And the problem is when you compound that exhibit list

15  issue, okay, it's not that we don't have the list.  We don't

16  necessarily have all the documents right here because there are

17  boxes and boxes of them we've been provided.

18          When you compound that with the fact that we're getting

19  things like we're looking at tapes, we're looking at

20  Dobropolski's last minute statements.  We just got recently a

21  whole batch of Will Montgomery's proffer sessions a couple of

22  days before he testifies.  We just got this Giglio stuff here.

23  And we're up at nights still trying to match phone records and

24  everything else, and we're expected to do this, too.

25          I'm just saying, I think it ends up being not fair to

1    us, to not be able to have these exhibits laid out for us, at

2    least told to us, Here's what we're going to have today.

3    Compounding that with the fact we keep switching what witness is

4    going to be called.

5           Only because I asked Mr. Harding and Mr. Hanlon

6    yesterday sometime after court ended who was going to be called

7    next, who else was going to be called, I learned that Mr. Denham

8    was going to be first this morning.  We're supposed to have this

9    information 48 hours before, according to the Court.

10          THE COURT:  You don't care a bit about Mr. Denham.

11   What do you care about Mr. Denham?

12          MS. RHODES:  I was here, Your Honor, until 8:00 in the

13   courthouse last night working on my cross for him.  Excuse me.

14   You may not have known it, but I was.

15          THE COURT:  He doesn't even know Mr. Mitchell.

16          MS. RHODES:  He was important to us.

17          THE COURT:  I don't know why.

18          MS. RHODES:  Well, I guess we're not doing a very good

19   job, then.

20          THE COURT:  No.  It's not for me to know.  It's not for

21   me to know anything except what I need to know to make the

22   rulings as fairly as possible.

23          I hear you, Ms. Rhodes.  I don't know what else I can

24   say to you.

25          MR. HARDING:  Could I respond very briefly to Ms.

1    Rhodes?

2            THE COURT:  Let me hear everybody.  There's a line

3    there.  Mr. Crowe.

4            MR. CROWE:  Thank you, Your Honor.  I'm afraid I may be

5    the one who was really asleep because I didn't object to the

6    letter which had come in from Dirty.  I expected the Court has

7    the same government exhibit list that I did, that was given at

8    the beginning of the case?  There is no Government Exhibit W-5K

9    on that, which indeed is the letter from Dirty.

10           THE COURT:  Okay.

11           MR. CROWE:  There is no --

12           THE COURT:  Are you suggesting to me that you were

13   sitting there studying your exhibit list at the time --

14           MR. CROWE:  No.

15           THE COURT:  -- Mr. Harding --

16           MR. CROWE:  I am suggesting that we had none of the

17   pretrial notice that the Court has just discussed with counsel

18   for Mr. Mitchell, which would have justified this.  We were not

19   told that this was, this was an additional exhibit that was

20   coming in.  We were not shown the letter.  And quite honestly,

21   there is, you know, there's just, Judge, there's just no way to

22   be prepared for it.

23           THE COURT:  Here's my point, Mr. Crowe.  And, you know,

24   the government has gone to the trouble, I mean, look at the

25   exhibit list.  The government has provided you with a key.

1    Frankly, I've never seen this in a government witness list,

2    exhibit list.  A, AH, CH, GPS, H, HA, HS, L, LR, MAP, MB, N, P,

3    PA, PH, S and so on.  All right?  Now, W is the homicide of

4    Darryl and Anthony Wyche.  So we turn to W at the very end of the

5    exhibit list and we've got W-1 through W-44.  Everybody knows

6    that Niedermeier is the lead on the Wyche murders.  And I'm not

7    criticizing anybody and I know you folks have been staying up

8    burning the midnight oil, and I respect that.  I really do.  But

9    I don't know of any reason that, if you're interested in the

10   Wyche murders and the exhibits related to that, and you know that

11   Niedermeier began his direct yesterday, why you can't go over to

12   Mr. Harding this morning or during the luncheon recess, during

13   the morning recess, which we didn't take one this morning, and

14   get clarity about these exhibits.

15           Now, right there, W-5G, Wyche funeral program.  It's

16   right there on the list.

17           MR. CROWE:  Judge --

18           THE COURT:  No.  No.  No.  I hear you.  I realize you

19   didn't object to that.  I realize you didn't.  But I'm talking to

20   the defense here.  It's right there on the exhibit list.  It's

21   been sitting right there for the last four weeks.  We've all had

22   the exhibit list.

23           If somebody believes that a funeral program is not a

24   self-authenticating document such as a newspaper, or if somebody

25   believes the government should bring in a witness who actually

1    attended the funeral and identify the funeral program, that

2    should have been done.  All right?

3            Now, you say there's no W-5, what was it?

4            MR. CROWE:  W-5K, Your Honor, the letter from Dirty.

5            THE COURT:  Okay.  So I grant you that.  And as you

6    just heard Mr. Harding himself admitted, in effect, he put it in

7    by mistake because he can't tie the Dirty who's the author of

8    that letter with the Dirty who's been mentioned, who allegedly

9    has some connection with Mr. Martin or these defendants.  Okay.

10           So there was no objection.  It's not on the exhibit

11   list.  I don't recall specifically how soon in his examination of

12   the detective Mr. Harding mentioned the exhibit number.  I'm

13   sorry.  There's no reason that you and/or Mr. Pyne can't be

14   sitting there with the exhibit list and when Mr. Harding says,

15   Detective, let me show you Government Exhibit W-5K or L or

16   whatever it is, and you look at your exhibit list and it's not

17   there, you say, wait a minute, Rob, wait a second, take it off

18   the DOAR.

19           And I agree if the request here, if the request here,

20   as I said, if you can get focused with me, I'm with you -- if the

21   request here is that the government should not put any exhibit on

22   the DOAR that's not listed on the exhibit list first showing it

23   to counsel, I absolutely agree with you.  I absolutely agree with

24   you.

25           MR. CROWE:  Your Honor, I don't think the government

1    should do it, period.

2              THE COURT:  Should do what?

3              MR. CROWE:  Should put it in the thing if it's not

4    listed in the exhibit list.

5              THE COURT:  Well, I disagree.  I disagree.  I covered

6    this at the pretrial and I'm absolutely confident that the record

7    will bear me out.  I was very specific.  I said the provisions of

8    the local rule will apply.  You all know we have this electronic

9    equipment.  I don't want the carpet worn out.  And in the first

10   week of trial I said to Mr. Harding, I don't want you walking

11   back and forth to the witness to show the witness some document.

12   That's why we have the electronic equipment.  That's why we have

13   a pretrial conference.  That's why the government gives us an

14   exhibit list.  So that you all can look through this and make

15   your decision about what you want to object to.

16              That's why I'm available at 9:00 in the morning or 8:45

17   in the morning or 8:30 in the morning or 6:30 at night, if we

18   need to have time to review the government's exhibits.

19              So I'm sorry.  It's too little, too late.  I know you

20   all have a hard job.

21              MR. CROWE:  Your Honor, I assume Mr. Harding's known

22   about this for a long period of time.

23              THE COURT:  Known about what?  What's the "this?"

24              MR. CROWE:  About government exhibit W-5K.  It was not

25   on the exhibit list.  Believe me, that in preparing for these

1    witnesses, we're going through a lot of stuff.  And quite

2    honestly, I don't think we should be, you know, we should be

3    required to have everything right at hand and to know when the

4    government is going to try to introduce an exhibit which was

5    manifestly not on the exhibit list.

6              THE COURT:  And I just said, if the request had been

7    made of the Court a week ago, two weeks ago, three weeks ago, or

8    four week ago, Judge, direct the government not to place on the

9    DOAR any exhibit that's not listed on the exhibit list, I

10   absolutely would have allowed that request.  And I'm making it

11   now.  I'm directing the government.  But you can't wait until the

12   problem rears its head before you ask me to do anything about it.

13             MR. CROWE:  We're talking about minutes, Your Honor.

14   Could I also point out one other matter?  Fairly --

15             THE COURT:  Are we finished with that?

16             MR. CROWE:  It's related.

17             THE COURT:  Yeah.  But I want to be finished before I

18   move on to something else.

19             MR. CROWE:  Fairly early in the case I stood up and I

20   said, we have all of these government exhibits.  We've got boxes

21   and boxes of documents.  Would the Court ask the government to

22   give us one set of the government exhibit list?

23             THE COURT:  And I said no.

24             MR. CROWE:  Yes, you did.  That's correct.

25             THE COURT:  And I stand by that.  You're not entitled

1    to that.

2          MR. CROWE:  Your Honor, I just, it's common courtesy in

3    cases.

4          THE COURT:  It's common courtesy in a two week trial,

5    of course.  Of course.  But I'm not going to have the government

6    go through and compile exhibit books for defense counsel.

7          MR. CROWE:  We'd ask for one.

8          THE COURT:  No, you wouldn't.  I gave you one.  With

9    all respect to Mr. Coburn, you know, the government produced

10   everything to Mr. Coburn and Mr. Kurland, or nearly everything,

11   and then when two years later I directed Mr. Coburn to share all

12   of that with defense counsel, I had to get correspondence back

13   and forth and there were arguments between the defense and the

14   government because Mr. Coburn had moved his office three times

15   and couldn't put his fingers on, on stuff.

16         Now, I'm not criticizing Mr. Coburn.  Life operates

17   that way.  So I don't know what else I can do.

18         MR. CROWE:  Your Honor, we would move that the Court

19   have the government withdraw Government Exhibit W-5K.

20         THE COURT:  Any objection, Mr. Harding?

21         MR. CROWE:  And strike the testimony about a letter

22   from Dirty.

23         THE COURT:  There wasn't even any testimony about it.

24   It was just, yeah, I seized this at Cree Court.

25         MR. HARDING:  Judge, the reason we included it sort of

1  late, because it's not on the exhibit list, is because my agent

2  believes he may be able to tie it to the Dirty that we've heard

3  testimony about.

4          THE COURT:  All right.

5          MR. HARDING:  But we haven't succeeded in doing that

6  yet.  But I felt I better get it in when the time was

7  appropriate.

8          THE COURT:  I understand it.  So it's in subject to

9  connecting up.  And Mr. Crowe, if you'll remind me at the

10  appropriate time, I'll instruct the jury that the letter has been

11  withdrawn, the letter from Dirty, which the jury hasn't read.

12  Nobody knows what it says.  I'll instruct the jury that it's not

13  in.  Okay.  Anything else, Mr. Crowe?

14          MR. CROWE:  No, Your Honor.

15          THE COURT:  All right.  Mr. Kurland.

16          MR. KURLAND:  The letter's out subject to coming back

17  in again?

18          THE COURT:  No.  It's in subject to being stricken.

19          MR. KURLAND:  Okay.  That's appropriate.  Your Honor,

20  with respect to the list, Soldier of Fortune list and stuff like

21  that, I just wanted to state Mr. Gardner's objection that the

22  surveillance, the testimony has come in with respect to Mr.

23  Gardner has to do with walkie-talkies and items bought at

24  Wal-Mart.  This is far different.  This is kind of Spy Museum,

25  Get Smart kind of stuff, and the Soldier of Fortune that I would

220

1    submit is outside of the realm of any evidence that's going to

2    come in.  So I just want to state for the record the objection

3    that that should not be admitted.

4              THE COURT:  Okay.  I disagree.  Now, I do note, Mr.

5    Harding, that W-5R, unless I missed it, is also not on the

6    exhibit list.

7              MR. HARDING:  What is W-5R, Your Honor?  That thing.

8              THE COURT:  That thing.  The Soldier of Fortune list.

9              MR. HARDING:  I thought it was.

10             THE COURT:  Five stops at J on the exhibit list, if I

11   have it correct.

12             MR. HARDING:  I think it's W-5H, Your Honor.  It is on

13   the list.

14             THE COURT:  Oh, that's an H?

15             MR. MARTIN:  Yes.  And it is on the list.

16             THE COURT:  Okay.  So it is on the list.

17             MR. HARDING:  Yes.  And it's labeled surveillance

18   equipment in quotations.

19             THE COURT:  Yes, which is the title of the document.

20             MR. HARDING:  Yes.  Your Honor, if I could just say a

21   couple of other things.  In our witness notification policy, we

22   do provide notice of our witnesses 48 hours in advance.  Ms.

23   Rhodes and the other counsel here have been fully aware that

24   Denham was going to be called this week.  What we did was give

25   them notice of everybody who was going to be called this week.

1    We told them the two people we thought would testify on Tuesday.

2    But we also told them that we might change the order of

3    witnesses, you know, to accommodate people on Wednesday and

4    Thursday of this week.  And that's why we've taken witnesses out

5    of order.

6         But it's not as if she didn't have, and all counsel

7    didn't have, full notice of who we were going to be calling this

8    week, and be aware of the need to prepare for them.

9         Secondly, Your Honor, the proffer reports for

10   Montgomery that were turned over late were stuff that I should

11   have never turned over, actually.  These were things that were

12   not statements of Mr. Montgomery.  They were agents' summaries of

13   proffer sessions.  And they're not discoverable.  They're not

14   Jencks material.

15        I turned them over sort of in an abundance of

16   generosity to my adversaries.  And for them now to complain that

17   I had given to them late is a little galling, frankly.

18        THE COURT:  Well, you know that no good deed goes

19   unpunished, although I'm not calling your turning it over a good

20   deed, Mr. Harding.  I get it.  I understand.

21        MR. HARDING:  That's all, Your Honor.

22        MR. MARTIN:  One minute.

23        THE COURT:  Mr. Martin?

24        MS. RHODES:  Your Honor --

25        MR. MARTIN:  Your Honor, I understand what you're

1    saying.  I'm not complaining about the order of witnesses or

2    anything.  We knew who was going to be called.  I'm not worried

3    about that.

4            But a lot of these documents, Your Honor, that are on

5    this list have Bates numbers.  I kept meticulous records from the

6    minute I got into this case.  Mr. Harding would send me

7    something.  He would say, these are Bates numbers 1352-J through

8    K, and I would duteously go to my book and put them in there.  It

9    would be a lot easier if these numbers were on here for me to be

10   able to go to that book and dig them out.  What happens is he

11   puts a document up on the screen and Mr. Flannery and I are

12   scrambling through this big book we have to try to find it.  We

13   go to the Wyche stuff and we look, eventually we'll find it.  By

14   that time the document's been in evidence because, as you said,

15   once he gets it on the board, it's in.

16           It's not easy for us to find these things, Your Honor.

17   My point is that if the Bates numbers were on here, it would make

18   life a lot easier for everybody.

19           THE COURT:  All right.  Mr. Harding, in the future, I

20   think Bates numbers should be on there where they have been

21   numbered in advance?

22           MR. HARDING:  None of this stuff was actually --

23           THE COURT:  I understand.  I understand.  Mr. Coburn.

24           MR. COBURN:  I'm not here to air any grievances, Your

25   Honor.  I just wanted to say that with respect to those

```
1    statements that Mr. Harding was good enough to turn over to us, I

2    do --

3              THE COURT:  I'm sorry.  What is that around your neck?

4              MR. COBURN:  This is a little, what they call a thumb

5    drive or a flash drive.

6              THE COURT:  Yeah.  Could I ask you to take it off your

7    neck?

8              MR. COBURN:  Absolutely, I'm really sorry about that,

9    Your Honor.

10             THE COURT:  No.  I'm not offended or anything.  I'm

11   just afraid that the jury will see it --

12             MR. COBURN:  Actually, I never wear it when I'm sitting

13   over there.  I just put it on when we're going for a break.  I

14   apologize, Your Honor.

15             THE COURT:  Okay.

16             MR. COBURN:  I just wanted to note that my own reading

17   of those documents Mr. Harding turned over, three of them, the

18   Baltimore City prior statements, these are taped statements.  So

19   I mean, they're Jencks.

20             MR. HARDING:  Oh, the taped statements are Jencks.

21             THE COURT:  No.  He's referring to the proffer.

22             MR. COBURN:  But I think, my understanding, I think

23   that three, the first three Baltimore City taped statements were

24   the ones I believe that were just turned over, as well as four or

25   five memoranda with respect to proffer sessions.
```

1          So it's not like, you know, this is just generosity.  I

2     mean, this is Jencks.  The proffer sessions also were

3     substantially verbatim in large part.

4          The only other thing I wanted to say, without

5     belaboring the point, Your Honor, I know I was just kind of a

6     parenthetical there, but we try to really --

7          THE COURT:  But an important one, Mr. Coburn.

8          MR. COBURN:  I appreciate that.  We tried really hard,

9     Your Honor, to provide all that Jencks material.  That's been the

10     subject of a lot of correspondence.  I know Your Honor knows

11     that.

12          THE COURT:  I do.  I do.  And I didn't mean that as --

13     it wasn't a cheap shot, Mr. Coburn.

14          MR. COBURN:  I didn't take it that way.

15          THE COURT:  I was just trying to make the point, I

16     really was, that I know that everybody is working hard.  I have

17     no doubt about that.  Including the government.  It's a difficult

18     case to manage for all of us.  Lots of documents, lots of, I've

19     never seen a case -- well, let me stop.

20          The exhibit, W-5H is admissible over objection.  I

21     agree with the government that it is a reasonable argument to

22     make that Mr. Martin was interested in this material to further

23     the aims of a drug distribution conspiracy, among others.  And I

24     further agree with the government's implied assertion that if the

25     jury is convinced that Mr. Mitchell, Mr. Harris, and or Mr.

1    Gardner were in a conspiracy with Mr. Martin, then this document

2    becomes simply another co-conspirator's statement.

3            Now, I'm going to rely on counsel to remind me at the

4    time I instruct the jury to parse it out and, if necessary,

5    remind the jury when I give them the co-conspirator's statement

6    instruction that co-conspirators' statements would apply equally

7    as much to documents authored by or possessed, ratified, and

8    maintained by one defendant every bit as much as it applies to

9    oral statements and written statements of a defendant.

10           So that's my ruling.  The objection's overruled.

11           Let's stand in recess for 15 minutes.

12           (Recess.)

13           THE COURT:  Mr. Lawlor.

14           MR. LAWLOR:  I didn't get in the fight, Judge.  I felt

15   left out.

16           THE COURT:  We wouldn't want that.

17           MR. LAWLOR:  Judge, we were just provided, pursuant to

18   the last conversation, with a chart that purports to show

19   communications between, I believe Mr. Mitchell, Mr. Martin, and

20   Mr. Gardner.  I don't see anything pertaining to Mr. -- there is

21   one for Mr. Harris and then Mr. Wyche on the 24th and 25th.  And

22   we have been provided with the phone records.  But this is a

23   chart.  Maybe it will help if I just put it up here, for the

24   record, or bring to up to Your Honor.

25           So we were just provided with this.  Mr. Harding, I

1    don't want to make any misrepresentations, but we were never

2    provided this before.  It's not on the exhibit list.  And I

3    believe the government was going to go through this with

4    Detective Niedermeier.  This is the type of thing that I think

5    goes to the heart of what we're complaining about.

6              THE COURT:  Can you focus it in, please?

7              MR. LAWLOR:  Sure.

8              THE COURT:  Or zoom it in.

9              MR. MARTIN:  You'll still need a magnifying glass.

10             THE COURT:  Just show me the upper quadrant.  Okay.

11   Take a look.  See, these are based on phone records.

12             MR. LAWLOR:  Correct.

13             THE COURT:  So, obviously, what it is is a compilation

14   or a summary of records.

15             MR. LAWLOR:  Correct.

16             THE COURT:  Now, it's been gussied up with photographs

17   of the defendants.

18             MR. LAWLOR:  Actually, if I could just say mug shots,

19   Your Honor.

20             THE COURT:  If you will.  And images of residences and

21   images of cell phones and land lines.

22             MR. LAWLOR:  Right.

23             THE COURT:  So I don't see what the problem is.

24             MR. LAWLOR:  Well, Your Honor --

25             THE COURT:  -- from the point of view of the due

1    process clause.  I see what the problem is from the point of view

2    of a defense lawyer doesn't like this kind of stuff.

3           Now, we're not going to get to it this afternoon, are

4    we, Mr. Harding?

5           MR. HARDING:  Doesn't look like it, Your Honor.

6           THE COURT:  Well, we shouldn't get to it this

7    afternoon.  I will grant you, certainly, that you are entitled at

8    least to an overnight.

9           MR. HARDING:  May I respond to Mr. Lawlor?

10          THE COURT:  Yes.  You can respond.  You can respond.

11   Seems to me you are entitled to an overnight to study this.  And

12   since you have an overnight, what I would do, I think, if we were

13   sitting here at 10:00 this morning having this conversation,

14   rather than 4:43 this afternoon, is I would first make the

15   government, and maybe Mr. Harding intends to do this, anyway, but

16   I would first make the government actually go through the Q and A

17   with the witness with the phone records.  Now, that's very

18   boring.  Mr. Hanlon can tell you that.

19          MR. LAWLOR:  I'll tell you that.

20          THE COURT:  And we all know that.  But since the

21   government's giving it to you the day before the witness is using

22   this exhibit and you have overnight to go through and doublecheck

23   this data against the underlying records, while I have an open

24   mind and I'll hear from you all tomorrow morning, I know if the

25   government wants to use this in lieu of the records to give the

1    detailed testimony, I'm probably going to let them do it.

2              Now, you say they're mug shots.

3              MR. LAWLOR:  Can I just talk about the records portion

4    of it before we move on to the mug shots?

5              THE COURT:  Sure, go ahead.

6              MR. LAWLOR:  Your Honor, I mean, in fairness, in

7    candor, the overnight thing sort of alleviates.  Right.  If it

8    was 10 a.m., I think I'd be bouncing up and down.

9              THE COURT:  Sure.

10             MR. LAWLOR:  But, you know, if this is a summary under

11   the rules of evidence, then this is not on the government's

12   witness list.  And it is really a summary.  So I think the

13   government should have turned this over prior to, you know, even

14   a day before.  Here's where we get into sort of --

15             THE COURT:  I'm sure they just finished it this

16   weekend.  Let's find out.

17             MR. LAWLOR:  You sure?  You sure?

18             THE COURT:  Let's find out.  No.  Let's find out.  Mr.

19   Harding, Mr. Hanlon.

20             MR. LAWLOR:  Can I finish my complaint before we find

21   out?

22             THE COURT:  No.  Just a minute.  No.  No.  No.  Mr.

23   Harding.  When was document completed?

24             MR. HARDING:  Your Honor, this particular document with

25   these pictures on it was completed only in the last couple of

1    days.

2              THE COURT:  Right.

3              MR. HARDING:  But the underlying phone connections were

4    summarized in a table that has been provided to defense counsel

5    over a week ago.

6              THE COURT:  Okay.

7              MR. HARDING:  And the basic information has been

8    testified to in the grand jury by Niedermeier and --

9              THE COURT:  Right.

10             MR. HARDING:  -- Giganti.

11             THE COURT:  Okay.

12             MR. HARDING:  The information is not going to be a

13   surprise to defense counsel.

14             THE COURT:  No. I understand that.  I understand that.

15             MR. HARDING:  They've had the toll records since 2005,

16   Your Honor.  They complained a couple of weeks ago that they

17   hadn't gotten them.  So I handed out copies of the letter proving

18   that they had gotten them back in 2005.

19             THE COURT:  And I recall you did that in open court in

20   my presence.  So I appreciate that.  I understand all that, Mr.

21   Harding.

22             MR. HARDING:  Here's the summary that was previously

23   provided to defense counsel.

24             THE COURT:  All right.  Fine.  I understand.  Okay.

25   Can you draw back a little bit on that zoom, Mr. Lawlor, so I can

1    see it better?  Okay.  All right.  Go ahead, Mr. Lawlor.

2              MR. LAWLOR:  All right.  Your Honor, this is in the

3    category of a minor quarrel, okay, before I begin?

4              THE COURT:  Can I bring the jury out and let's do

5    another 15 or 20 minutes with Niedermeier?

6              MR. LAWLOR:  Sure.

7              THE COURT:  Let's bring the jury in.  Are you going to

8    play the tape?

9              MR. HARDING:  I would play the tape of Mr. Mitchell's

10   statement if we get to it.  How late are you going to go?

11             THE COURT:  I was going to try to go to about 5:15 or

12   so.  I meant the voice mail.  I mean the jury still hasn't heard

13   it.

14             MR. HARDING:  I was actually going to play the --

15             THE COURT:  Okay.  All right.

16             (Jury enters the courtroom.)

17             THE COURT:  Thanks again for your patience, ladies and

18   gentlemen.  We're ready to proceed for a few more minutes before

19   we recess.

20             The objection voiced by Ms. Rhodes is overruled.  You

21   may proceed, Mr. Harding.

22   BY MR. HARDING:

23   Q    Okay.  Yes, Your Honor.  This is W-5H.  I may have

24   previously said W-5R.  But that is actually an H, not an R.  So I

25   apologize.  And you were reading this to us, Detective

1    Niedermeier.  I guess what I'll ask you to do is skip down to the

2    material that's captioned "spy outlet" down here?

3    A    Yes, sir.

4    Q    Can you tell, can you just read what it says under that

5    caption?

6    A    The latest high-tech professional electronic devices offer a

7    huge selection of surveillance, privacy devices.  World's

8    smallest pinhole cameras for $99.  Realtime 12 hour telephone

9    recorder for $139.  And touchtone decoders, bugs, phone tap

10   detectors, voice disguisers, wireless video, locksmithing tools,

11   GPS vehicle tracking via the Internet and more.  Spy Outlet

12   Catalog, $5.

13   Q    Okay.  I have a few photographs from this same search of Two

14   Cree Court, where Mr. Martin was arrested on April 17th, 2002.

15   Starting with W-5C.  You recognize those two persons, Detective

16   Niedermeier?

17   A    Yes.

18   Q    Who are they?

19   A    That's Shelly Wayne Martin in the white and Shawn Gardner in

20   the gray with the baseball hat on.

21   Q    Okay.  And this is W-5A.  Who is that?

22   A    That's Shawn Gardner.

23   Q    And this is W-5B.

24   A    And Shelly Wayne Martin.

25   Q    And now I have W-5J.

1        MR. CROWE:  Objection.

2        THE COURT:  Overruled.

3   Q    Is this a telephone book that had, had the name of Joyce

4   Martin on the first page?

5   A    Yes.

6   Q    And do you know who Joyce Martin is?

7   A    Shelly Wayne Martin's mother.

8   Q    Okay.  I just want to call your attention to a few tabbed

9   pages in here.  Tell us what it says underneath this tab.

10  A    Goo number, 1-443-739-2762.

11  Q    Okay.  Also down here.

12  A    Just the address?

13  Q    Yeah.

14  A    82 Ambo Circle.

15  Q    Next one.  Can you read that?

16  A    Yes.  Wayne cell phone.  838-1933.

17  Q    Looks like there was a previous entry that was crossed out.

18  Can you read that out, also?

19  A    Yes.  One with the line through it.  443-677-3200.

20  Q    Does that appear to be a name you're familiar with?

21  A    Yes.

22  Q    What name is it?

23  A    That's Darryl Bacon.

24  Q    Okay.  Are the last two letters inverted on the first name?

25  A    Yes.

1    Q    Are you familiar with this address, 401 East Eager Street?

2    A    Yes.

3    Q    Was that?

4    A    That's a Detention Center in Baltimore City.

5    Q    Okay.  Here's another one.  Can you read what that says?

6    A    I believe it says Shelly Wayne.  Shelly Way.

7    Q    Are you reading right here?

8    A    Yes.  Shelly, maybe.

9    Q    Okay.  And what's the number?

10   A    1-540-345-0429.

11   Q    Down here?

12   A    Shelly.  1-540-588-1906.

13   Q    All right.  That's it for the stuff, Detective Niedermeier.

14        You told us that you subpoenaed telephone toll records

15   for the various telephones that you learned about in the

16   possession of the Wyche brothers, is that correct?

17   A    Yes.

18   Q    Did you and your colleagues in Homicide also go through the

19   telephones that were recovered from the car, the white Honda

20   station wagon that night, to try to recover from the internal

21   directories, the contacts directories, the names that were

22   entered into the directory?

23   A    Yes.

24   Q    Okay.  Now I'm going to show you Government Exhibit W-67 and

25   ask you if you can identify this list.

1    A    Yes.  That's a handwritten list of contacts.

2    Q    Okay.  And there are multiple pages in this list, is that

3    correct?

4    A    Correct.

5    Q    Okay.  I want to show you, I just want to call your

6    attention to several of the entries here.  Could you read the

7    name that appears here and the number that appears?

8    A    Bo.  410-899-9323.

9    Q    Okay.  And down, further down on the same page.  Can you

10    read this number?

11    A    Bo.  443-739-5811.

12    Q    Okay.  Were you familiar, Detective Niedermeier, with the

13    investigation that was being conducted of the murder of Oliver

14    McCaffity and Lisa Brown by Detective Ron Berger of your same

15    Homicide Unit, in Baltimore City?

16    A    I was aware of the investigation.

17    Q    And were you aware of the significance of that phone number,

18    the 5811 phone number, in that particular investigation?

19    A    Not at the time of the incident.  I became aware of it.

20    Q    No, not at the time of the incident.  I mean later on when

21    your investigation was under way, did you become aware of the

22    significance of this number?

23    A    Yes.

24    Q    Okay.  What was the significance of this number?

25         MR. LAWLOR:  Objection.

1          THE COURT:  Overruled.  You may answer.

2    A    That was the last phone number incoming calls to Woody's

3    phone.

4    Q    Okay.  And now -- okay.  Just to clarify.  This first page.

5    At the top it says 410-905-1681.  Was that one of the phones that

6    was recovered from the Wyche brothers' car?

7    A    Yes.

8    Q    Do you remember which one it is or where it was in the car?

9    A    I believe that may be the one from the box.

10   Q    In the child seat in the rear?

11   A    Yes.

12   Q    Okay.  You sound a little hesitant.  So I think you're going

13   to have an opportunity to check on that overnight.  So check on

14   it overnight and let us know for sure tomorrow, okay?

15   A    Yes, sir.

16   Q    And then this is another sheet.  The second sheet, actually,

17   relates to the same phone but it contains outgoing, history

18   outgoing.  Do you see that?

19   A    Yes.

20   Q    But it doesn't appear that there are any phone calls on

21   March 24th or 25th, is that correct?

22   A    Correct.

23   Q    And then Page Three in this exhibit is for a different

24   phone.  443-309-5057, is that correct?

25   A    Yes.

1    Q    And what phone was that, if you remember?

2    A    That was the one recovered from Darryl Wyche's hip.  He had

3    on his person.

4    Q    Okay.  And again, there's a list of recent calls.  And some

5    of these were on the 24th of March, is that correct?

6    A    Correct.

7    Q    And then it says phone book.  And I want to call your

8    attention again to this entry for Bo.  Do you see that?

9    A    Yes.

10   Q    Same 5811 number you just told us about, right?

11   A    Yes, it is.

12   Q    And I'll go to Page Two, which is, Page Two is a

13   continuation of the same phone book, is that correct?

14   A    That's correct.

15   Q    This is actually the fourth page of the exhibit, however.

16   And here's a number for Deezo.  Do you see that?

17   A    Yes.

18   Q    And then could you read this entry right here?

19   A    That's Goo.  410-493-1241.

20   Q    Okay.  Okay.  This appears to be the same phone on Page Five

21   of the exhibit.  This is the same phone, is that not correct,

22   Detective Niedermeier?  No.  This is a different one.  Sorry.

23   This is 443-418-5570.  Do you remember what phone that was?

24   A    No, not -- it was either in the center console or it was the

25   one recovered from the car seat.

1    Q    Okay.  Here again, can you read that?

2    A    Goo.  410-493-1241.

3    Q    Okay.  This same 5570 phone, there's a summary of missed

4    calls.  But again, there don't appear to be any on the 24th or

5    25th, is that correct?

6    A    Correct.

7    Q    Here's yet another phone, a blue Nokia phone.  Were there

8    only two entries in the phone book on that phone?  Is that your

9    recollection?

10   A    Yes.

11   Q    And then this last page in the exhibit is actually back to

12   the 5570 phone that we were just looking at.  And it gives

13   outgoing calls, is that correct?

14   A    Yes.

15   Q    But again, the most recent calls were on the 22nd of March,

16   is that correct?

17   A    Yes.

18   Q    And the incoming calls are all on March 14th, is that

19   correct?

20   A    Yes.

21   Q    Okay.  On April 17th, 2002, did you have Mr. Mitchell

22   transported over to Homicide?

23   A    Yes.

24   Q    Was he informed that you had an arrest warrant for him?

25   A    Yes.

1    Q    And this time it was for the Wyche brothers murder, is that

2    correct?

3    A    That's correct.

4    Q    Did you fill out in connection with bringing him over what's

5    known as an information sheet?

6    A    Yes.

7    Q    Okay.  This is Government Exhibit W-41.  Is this the

8    information sheet that was filled out for Willie Mitchell?

9    A    Yes.

10   Q    Did you fill it out or did someone else?

11   A    Detective Hastings filled that out.

12   Q    Okay.  Was he working with you that day?

13   A    Yes.  I was present when it happened.

14   Q    Was, was he asking Mr. Mitchell questions and writing down

15   the answers when he filled this out?

16   A    Yes.

17   Q    So did Mr. Mitchell give the nickname of Bo?

18   A    Yes.

19   Q    And what address did he give?

20   A    Four Valdavia Court, Apartment B.

21   Q    What phone number did he give?

22   A    410-496-6462.

23   Q    Girlfriend's name?

24   A    Jaquetta Smith.

25   Q    Last school attended, it says Bryant, is that correct?

1    A    Yes.

2    Q    Employer?

3    A    Too Exclusive, 24 North Avenue.

4    Q    Gives a phone number for Too Exclusive?

5    A    It does.

6    Q    Hours of employment, varies, is that correct?

7    A    Correct.

8    Q    And do you know what Too Exclusive is?

9    A    I believe it's a hair salon.

10   Q    Do you know, is it owned by a relative of Mr. Mitchell's?

11   A    I believe it's owned by his sister.

12   Q    Okay.  And it's signed at the bottom by Detective Hastings,

13   is that correct?

14   A    Correct.

15   Q    And Detective Hastings also checked some of these entries at

16   the bottom.  Did he ask Mr. Mitchell if he could read or write?

17   A    Yes.

18   Q    Whether he was under the influence or alcohol, is that

19   correct?

20   A    Yes, he did ask those questions.

21   Q    And Mr. Mitchell answered that he was not under the

22   influence of drugs and was sober, is that correct?

23   A    That's correct.

24   Q    Okay.  Did you also fill out what's known as an activity log

25   in connection with bringing Mr. Mitchell over?

1    A    Yes.

2    Q    Does it say the time that he arrived in the Homicide office

3    that day?

4    A    It does.

5    Q    What time was that?

6    A    10:05 a.m.

7    Q    And you say here that he was placed in Sergeant Petrey's

8    office, is that correct?

9    A    Correct.

10    Q    Information sheet was filled out at what time?

11    A    11:05 a.m.

12    Q    And who was present?

13    A    Hastings and myself.

14    Q    What's this entry down here?

15    A    It's an area where if a statement is taken, you fill that

16    out.  The area being the location where the statement was taken,

17    who the statement was taken by, who else was present, the time it

18    began, the time it concluded, and whether it was written or

19    typed.

20    Q    Okay.  And in this case it was taken at 12:40 p.m., then, is

21    that correct?

22    A    Correct.

23    Q    And ended at 12:52 p.m.?

24    A    Correct.

25    Q    It was taken by Hastings and witnessed by you, is that

1  correct?

2  A    Yes.

3  Q    And what does this say for area?

4  A    Sergeant Green's office.

5  Q    Okay.  Is he just another sergeant over in the Homicide

6  Unit?

7  A    He was at that time, yes.

8  Q    Okay.  Did you also have Mr. Mitchell read through or read

9  to him what's known as an Explanation of Rights form?

10  A    Yes.

11  Q    At 11:10 in the morning, is that correct?

12  A    Yes.

13  Q    And who then wrote these initials after each entry?  Who

14  wrote "yes" and wrote initials in here?

15  A    Willie Mitchell did.

16  Q    Okay.  Did he sign at the bottom?

17  A    He did.

18  Q    And in fact, at the very bottom it says, "I am willing to

19  answer questions.  I do not want any attorney at this time.  My

20  decision to answer questions without having an attorney present

21  is free and voluntary on my part."  Is that correct?

22  A    Correct.

23  Q    And then you signed and Hastings signed, is that correct?

24  A    Yes.

25  Q    That's Government Exhibit W-40.  And then did you also

1    converse with Mr. Mitchell before you took the taped statement

2    from him?

3    A    Yes.

4    Q    Did you jot down some notes as you were talking to him?

5    A    Yes, some brief notes, yes.

6    Q    Okay.  This is Government Exhibit W-42.  Can you tell us

7    what this is?

8    A    That's the notes from that pre-interview before he was tape

9    recorded.

10   Q    Okay.  There's an entry here.  Can you read what the first

11   line says?

12   A    Said, heard I did something, killed my man.

13   Q    How did that come up?

14   A    It was a statement Mr. Mitchell made.

15   Q    Was it in response to some question you had posed or

16   Hastings had posed?  Do you remember?

17   A    I think it was in reference to, as we informed him that he

18   was being charged in the murder.

19   Q    Okay.  What's this next reference say?

20   A    Coldspring and Reisterstown McDonald's, Big L.  He asked for

21   four and a half.  And then it says, uses girlfriend's cell phone

22   to call D, and then in parentheses, D being Darryl, about 10:00.

23   That's times 2, Big L drives a blue Buick, sets up a meeting.

24   Q    Okay.  These were your notes before you did the tape

25   recorded statement, is that correct?

1    A    Correct.

2    Q    What's your recollection of what four and a half referred

3    to?

4    A    Four and a half ounces.

5    Q    Of what?

6    A    I believe they were speaking of cocaine.

7    Q    Okay.  What does the Coldspring and Reisterstown McDonald's

8    have to do with this?

9    A    That's where he said that this was, this meeting was to take

10   place.

11   Q    What meeting?

12   A    He was, these notes are in reference to, he said he set up a

13   drug buy between Big L and D for four and a half ounces and that

14   he used his girlfriend's cell phone to call D, being Darryl

15   Wyche, to set the, to set the buy up around 10:00.  Then he

16   stated that's times two and a half, which is something that he

17   had stated to Darryl on the phone.

18            And then I asked him, you know, what Big L drives.  And

19   he said Big L drives a blue Buick.  And basically that he set up

20   the meeting.

21   Q    So was Big L going to be the buyer for these drugs from

22   Darryl?

23   A    According to Mr. Mitchell.

24   Q    Okay.  Did he give you any identification for Big L?

25   A    No.

1    Q    Okay.  Did he know where Big L lived?

2    A    No.

3    Q    Okay.  And then there, there's a telephone number here,

4    6426?

5    A    Yes.

6    Q    That's almost the same as the number on the information

7    sheet except that the last two digits are inverted, is that

8    correct?  496-6462 is what's written on the information sheet?

9    A    Yes.

10   Q    So did, is it possible Detective Hastings simply inverted

11   those numbers when he wrote them down or do you know?

12   A    That's a possibility.  Or they could have been stated that,

13   in that order.

14   Q    Either Mr. Mitchell or Detective Hastings inverted numbers,

15   is that correct?

16   A    That's a possibility, yes.

17   Q    And then there's an entry here that look like an incomplete

18   phone number.  Do you remember what phone number he gave you in

19   this entry right here for which the last four digits aren't

20   actually entered?

21   A    443-418-6204.

22   Q    Why does that stick in your mind?

23   A    That was one of the phone numbers that I was already

24   familiar with.

25   Q    Why were you familiar with it?

1   A    The records of Darryl Wyche's cell phone we had already in

2   our possession.  I had seen that number numerous times.  And

3   actually, I already knew who it belonged to.

4   Q    Who did it belong to?

5   A    That phone number is listed to Jaquetta Smith, the

6   girlfriend of Willie Mitchell.

7   Q    Okay.  Was that, was that the phone that was recovered from

8   Mr. Mitchell when he was arrested on April 1st?

9   A    Yes.

10  Q    And so did Mr. Mitchell say that Jaquetta called Darryl on

11  this phone?

12  A    That's what the note says.

13  Q    Do you recall what he said?

14  A    No.  That may have been what he said if I wrote it down that

15  way at that point.

16  Q    Do you recall why you didn't write the last four digits of

17  phone number?

18  A    I already knew that number.

19  Q    Okay.  And then you wrote D, able to identify L.  What does

20  that mean?

21  A    The bottom four notes were actually taken or written at the

22  time of the taped statement.  They were just notes to myself to

23  ask Mr. Mitchell when we were on tape.

24  Q    Okay.  What I want to do now, Your Honor, is play the

25  statement, if we have time.

1          THE COURT:  I think we do.  How long is it?

2          MR. HARDING:  I think it's six minutes, according to

3     the information sheet.  But we have transcript books to pass out

4     to the jurors.

5          THE COURT:  Okay.  Does any juror have a pressing

6     matter?  It's a little after five.  We normally don't stay this

7     late.  I think we can do another five or six or seven minutes,

8     Mr. Harding.

9          MR. HARDING:  Okay.

10          THE COURT:  If you want to hand out the transcripts.

11          MR. HARDING:  I'm going to ask the agent to do that, if

12     I may.

13          THE COURT:  All right.  Now, ladies and gentlemen, I

14     believe we had this experience once before in the trial.  The

15     transcript that you're being provided is simply for your use as

16     an aid in listening to the tape.  The actual evidence that is

17     before you is the tape.  So that if you, if you believe you hear

18     on the tape something different from the words you see printed on

19     the transcript contained in the booklets that are being handed

20     out, then you should be controlled, your consideration is to be

21     directed to the tape itself rather than to the transcript.  The

22     transcript is just to aid you.  And we'll recess after this.

23          MR. HARDING:  And could I, could I ask that the jurors

24     turn to Tab Number Two, Your Honor?

25          THE COURT:  Yes.  Apparently, there are more than, the

1    booklets contain more than one.

2              MR. HARDING:  Yes.

3              THE COURT:  So turn to Tab Number Two, please, ladies

4    and gentlemen.

5              (Tape played.)

6              THE COURT:  All right.  Ladies and gentlemen, if you

7    will leave your note pads and your transcript books in your

8    chair, on the floor.  This will conclude our court day.  I remind

9    you we'll be in session all day tomorrow and all day on Thursday

10   this week.  Continue to adhere to all of my instructions.  Have

11   no discussion about any of the evidence you've heard so far.

12   Continue to avoid any media reports about the case.  Do not

13   discuss the case.  Do not conduct any investigation of any sort.

14   Continue to keep an open mind about all issues.

15             Have a pleasant evening.  We'll see you tomorrow

16   morning at 9:30.  9:30 tomorrow.  Jury is excused.

17             (Jury exits the courtroom.)

18             THE COURT:  You're excused, Detective.

19             (Witness exits the courtroom.)

20             THE COURT:  Mr. Lawlor.

21             MR. LAWLOR:  Thank you, Your Honor.  As I was saying,

22   Your Honor, I do concede that this falls into the category of

23   sort of a minor quarrel.  And I think there's an evidentiary

24   objection but I think, more important, this falls clearly into

25   the category of professional courtesy.

248

1          It's 5:30 now.  So we have the toll records.  I concede

2     that.  And I concede that we were handed this sheet that has some

3     of the information that's on this newer sheet.  But this has 22

4     calls on it.  And this has 38 calls on it.  And this, this sheet

5     has information, the newer sheet has information about calls that

6     were connected and calls that went into voice mail, which is

7     further information that's not on the original sheet.  So this is

8     a summary.

9          My first real objection would be that under Rule of

10    Evidence 1006, this should have been provided to us.  And not at

11    5:30.  The government didn't answer exactly when this sheet was

12    compiled.  They said it was compiled two days ago with the mug

13    shots.  But I don't know when it was compiled without the mug

14    shots.  So if you, even if you don't think that the objection

15    under 1006 has any basis, it's professional courtesy.

16         Give us this two days ago when you had the mug shots or

17    a week ago when you didn't so that I don't have to go back to my

18    office at 5:30 in the middle of this witness's examination and

19    pull out hundreds of pages of toll records to compare these and

20    fashion a cross examination based on this, assuming it's correct.

21         Now, I understand, and I could be corrected on this

22    from one of the other counsel here, that there's information

23    that's wrong on here.  So now it's 5:30.  We'll get out of here

24    in the next ten minutes and I'll get back to my office in

25    Greenbelt at 6:30.

1           Now, every lawyer here is busy so I'm not going to say

2     that I'm special but I don't want to spend the next two hours,

3     from 6:30 to 8:30, digging through phone records.  I've got a

4     five-month-old baby.  So I shouldn't be expected to compare this

5     when it was at least available to me 48 hours ago, if not before

6     then.

7           You know, there's been a lot of complaints about

8     production, a lack of production.  Leaving that all aside.  This

9     to me falls clearly into the category of sort of just a lack of

10    courtesy not to provide this, because the government should, I

11    don't think the government should expect us to take this at face

12    value and I don't think the government should expect that the

13    course of my cross examination is not going to be influenced by

14    this record.

15          This is new.  It's not on the exhibit list.  It's not

16    in the discovery.  So I think the Court should exclude it under

17    1006.

18          And if the Court's not willing to do that, you know, if

19    I had this last, the end of last week, we had five days off from

20    trial.  So I would have had five days instead of having to go

21    back to my office from 6:30 to fill in the blank or set my alarm

22    for 5:00 tomorrow morning to recreate a cross examination I spent

23    a lot of time on and to compare toll records now based on

24    information that was never provided before.

25          So even, not before trial or three weeks ago, but even

1    the end of last week or even if it was only compiled 48 hours

2    ago, that would have helped me and I'm sure it would have helped

3    all the other attorneys here.  I think it's just rude.

4            This has nothing do with all the other complaints about

5    production.  This pertains to this one sheet of information.  So

6    that's my objection.

7            So I would ask the Court one of two things.  Exclude

8    it, number one.  Or number two, ask the government to inquire of

9    this sheet of information next week so I can have the weekend

10   this weekend that I would have had last weekend to prepare for

11   this examination.

12           THE COURT:  All right.  May I have a copy of it,

13   please?

14           MR. LAWLOR:  Sure.

15           THE COURT:  I don't want your copy.

16           MR. LAWLOR:  I think we have two.  But the

17   government --

18           THE COURT:  I'm sure the government has additional

19   copies.  Could you hand up a couple of copies, please, Mr.

20   Harding?  Anybody else want to be heard?

21           MR. PYNE:  Briefly, Your Honor.  The earlier sheet that

22   contained the fewer phone calls.  We talked to Mr. Harding about

23   that and he advised that Detective Niedermeier was going to get

24   into very limited information in regards to the telephone

25   records.

1          I have prepared all the telephone records.  I'm

2     familiar with all the toll records.  And based on what Mr.

3     Harding said, he said Detective Benson was going to be the one to

4     go into the telephone records.  So Mr. Crowe and I switched

5     around our witness responsibility so that he would have Detective

6     Niedermeier and I would take Detective Benson because I'm

7     familiar with all the toll records.

8          Well, if Detective Niedermeier is going to go into this

9     degree of detail with these phone records, I would just ask that

10    Your Honor make an exception to the normal one attorney/one

11    witness rule and allow me to cross examine him in regards to the

12    phone records.  That's just a very minor point in regards to

13    that.

14          THE COURT:  All right.  Thank you, Mr. Pyne.  Anybody

15    else?

16          MR. HARDING:  Very briefly, Your Honor.

17          THE COURT:  Just let me see if there's anybody else.

18    Go ahead, Mr. Harding.

19          MR. HARDING:  As I say, Your Honor, the government

20    turned over the toll records in this case in 2005 in several

21    deliveries.  The job of going back through them to verify or

22    criticize these calls is not nearly so daunting if you consider

23    that there are only, I don't know, six or seven phones involved

24    here.  There's one for each of the defendants.  And it's just the

25    fact that Darryl Wyche used a couple of different phones and that

1   a couple of home addresses were also called that makes it any

2   more complicated than that.  I just think that defense counsel

3   are exaggerating the difficulties here.

4           In any case, the government produced these records

5   years ago and defense counsel had every opportunity to analyze

6   it.

7           I would also add, Your Honor, that testimony has been

8   provided in the grand jury by Detective Niedermeier and Detective

9   Giganti about the calls setting up this homicide.  All that's

10  really new is the format and some of the information included in

11  this summary chart.

12          It was the case that I originally intended for Benson

13  to be the one to go into the most detail on this and I still

14  intend to have Benson be primarily the telephone toll guy for

15  this case.  But it seemed unwise to have Detective Niedermeier do

16  an analysis that focused on only certain of the calls, the bulk

17  of the calls, and leave out the ones that Detective Benson was

18  prepared to testify about.  And so I just decided to have them

19  work together on this summary chart, which they produced over the

20  weekend and e-mailed to me, I believe on Monday.  And I printed

21  them out on Monday.

22          THE COURT:  Can you walk me through the chart, please,

23  Mr. Harding?

24          MR. HARDING:  Yes.  I was actually going to, as

25  Detective Niedermeier was testifying, I was going to have him

1    begin with the first call and explain how he knows that that

2    particular number was used by Willie Mitchell.  And he's prepared

3    to answer that question for each of the phones on this list.

4                THE COURT:  I'm sorry.  You kind of jumped ahead of me.

5    But you actually raise a good point.

6                MR. HARDING:  Yeah.

7                THE COURT:  When you say "used by Willie Mitchell", do

8    you mean something other than in general or do you mean --

9                MR. HARDING:  In general.

10               THE COURT:  Right.  So Niedermeier is not going to be

11   able to testify that on 4:07 p.m., at 4:07 p.m. on March 24th,

12   Mr. Mitchell called Mr. Harris, right?  The testimony is going to

13   be that somebody in possession of a phone that is tied to Mr.

14   Mitchell called Mr. Harris's home.

15               MR. HARDING:  Well, that's the number that Willie

16   Mitchell told the detective he was using that night.

17               THE COURT:  I understand that.  I understand that.  But

18   I'm trying to avoid additional, additional objections.  And I

19   just want to be clear one way or the other.  You are not going to

20   have the witness say that Mr. Mitchell called anybody or Mr.

21   Martin called anybody or Mr. Gardner called anybody.  You are

22   going to have the witness say that someone using a phone

23   identified with Defendant A, B or C called a phone identified or

24   a home.  Do you see what I'm saying?  You don't have proof of who

25   made these calls.

1          MR. HARDING:  That's correct, Your Honor.

2          THE COURT:  Okay.  So let's take that piece of it off

3    the table right away.  Which raises the concern, although none of

4    counsel have raised it, although Mr. Lawlor alluded to it by way

5    of referring to the voice, to the mug shots.  I mean, I think

6    it's probably fair to have the photographs there but there is the

7    potential of some juror, notwithstanding my instruction, may

8    think, oh, yeah, well, Mr. Gardner's photograph is up there, he

9    must have been the one making this call.  Now that's a fair

10   inference but it's not -- okay.  So go ahead and walk me through

11   this.

12         So starting on the top left, you show a call at 4:07

13   p.m. that lasted 14 seconds on March 24th, '02 from 6204 to 6731,

14   which the evidence shows is Mr. Harris's phone number.

15         MR. HARDING:  Yes, Your Honor.

16         THE COURT:  Home phone.

17         MR. HARDING:  Yes, Your Honor.

18         THE COURT:  All right.  Now, with respect to the, some

19   of these entries have connected, like the third one, Mitchell to

20   Martin at 6:19.

21         MR. HARDING:  Yes.

22         THE COURT:  A cell phone.  What does it mean that you

23   have connected?

24         MR. HARDING:  Well --

25         THE COURT:  Why is that there for some and not for

1      others?

2                  MR. HARDING:  It's because if the toll records for

3      Willie Mitchell's phone and for Shelly Wayne Martin's phone both

4      show this call and both were billed for that call, that means

5      that the call went through.  That's what the agent and the

6      detective are going to testify to.

7                  THE COURT:  Okay.  And are these T-Mobile phones, or do

8      we know?

9                  MR. HARDING:  They're all different kinds of phones,

10     Your Honor.  But the agents and the detectives are prepared to

11     testify about that in general, Your Honor.

12                 THE COURT:  Okay.  Now, moving back just a little bit.

13     Item number two.  Martin to Mitchell's home on Gilray Drive.

14     These are all, why do we have five calls listed there between

15     6/11 and 6/19?

16                 MR. HARDING:  Well, they show up on Martin's tolls.

17     They don't show up on, there are no tolls for the residential

18     phone because there are no tolls charged for local calls on a

19     land line phone.

20                 THE COURT:  Right.

21                 MR. HARDING:  So we don't have any tolls for the land

22     line phones.  And so we don't, we can't say whether it went over

23     to voice mail or went through and was connected or what.  So

24     there's simply, the testimony is going to be that those calls

25     were placed.  And we don't know if they went through or went to

1    voice mail or what.

2              THE COURT:  Okay.  All right.  Now, what are, what is

3    the meaning -- oh, I see.  You don't have Wyche's phone on here,

4    Wyche's photograph on the chart.

5              MR. HARDING:  No.

6              THE COURT:  Just the defendants.  Okay.  So the voice

7    mail on Ms. Magginson's came at 12:38.

8              MR. HARDING:  Correct.

9              THE COURT:  And the last call from Wyche to Mr.

10   Mitchell is 12:30?

11             MR. HARDING:  That's correct.

12             THE COURT:  And lasted three minutes.

13             MR. HARDING:  That's correct.

14             THE COURT:  And are they in strict chronological,

15   temporal order starting from the top left --

16             MR. HARDING:  Yes.

17             THE COURT:  -- across the top, and then the bottom left

18   across the bottom?

19             MR. HARDING:  Yes, Your Honor.

20             THE COURT:  And then what is that, what's the call, the

21   next to the last call on the chart?  On the bottom?

22             MR. HARDING:  Yes.  There was a, you remember that

23   Natasha Wyche testified that she used her land line phone to call

24   Darryl Wyche's phone?  That call actually appears on Darryl

25   Wyche's toll records.

1          THE COURT:  Oh, that's the one that was accidentally

2     answered or --

3          MR. HARDING:  Yes.

4          THE COURT:  Where Ms. Wyche overheard the voices.

5          MR. HARDING:  That's what the agent believes, Your

6     Honor.

7          THE COURT:  And that's placed at 12:43 because that's

8     what Darryl Wyche's phone is telling us.

9          MR. HARDING:  Yes.

10          THE COURT:  Okay.  Now, I don't quite grasp the, the

11     impact that this has on anybody's preparation or cross

12     examination.

13          MR. LAWLOR:  Well, Judge, there's a couple things.

14     First of all, this is a summary.

15          THE COURT:  No.  I understand that.

16          MR. LAWLOR:  I mean, the cross examination doesn't

17     pertain to just what's on here, but what's not on here.  So not

18     knowing what they would include or exclude, because I didn't even

19     know this record existed, that there was any summary coming into

20     evidence in this case.  And now I got to go back and see what

21     this -- I see what it shows, but I don't know what it doesn't

22     show.

23          THE COURT:  Okay.  All right.  Let me process that.  We

24     know what it doesn't show.

25          MR. LAWLOR:  I don't know what it doesn't show.

258

1          THE COURT:  Well, we know a lot of what it doesn't

2     show.  We know it doesn't show, or we can reasonably safely infer

3     that it doesn't show all the calls that were made by any

4     defendant on this particular day.  We know that.

5          MR. LAWLOR:  And Mr. Wyche.  Amongst how many, how many

6     phones did Mr. Wyche have?

7          THE COURT:  Well, that has nothing to do with this.

8          MR. LAWLOR:  Sure, it does.

9          THE COURT:  No, it doesn't.  Look --

10         MR. LAWLOR:  Your Honor, with all due respect --

11         THE COURT:  Look, part of my problem in this case has

12    been, and I've had a lot of them, but part of it has been this

13    bleeding over, if you'll forgive the expression, of what I

14    conceive to be a defense case into the government's case.  The

15    defense is not entitled to put in its entire case during the

16    government's case.

17         So if you want, and I'll approve it, if you want to go

18    out and hire some web savvy, computer savvy firm to prepare a

19    chart like this in the next week or two using Darryl Wyche's

20    phones, I'll pay for it.  I'll authorize it.  But that has

21    nothing to do with when the government wants to show.

22         The government, apart from, from Brady, is not

23    interested in who Darryl Wyche called or how long the call was.

24    I wouldn't expect to see Darryl Wyche's calls in some fancy chart

25    prepared by the government.

1        MR. LAWLOR:  I agree.

2        THE COURT:  But if you want to do that, you're entitled

3   to do that.  But you're not entitled to bring all of that out in

4   the government's case in chief.

5        MR. LAWLOR:  Your Honor, I concede that.  My --

6        THE COURT:  So what --

7        MR. LAWLOR:  I may have questions --

8        THE COURT:  So what do you mean by what is not here?

9   Of course, what's not here --

10       MR. LAWLOR:  First of all, there's the fundamental

11  issue of the accuracy of the record.  That's point number one.

12       THE COURT:  Exactly.  And if there's a mistake on here,

13  frankly, that's going to help you.

14       MR. LAWLOR:  But Your Honor, the point, point number

15  one is, it's now 5:47.  I'll now get back to my office closer to

16  seven.  Mr. Harding already said he had this no later than

17  Monday.  I would like to know why he wouldn't extend the basic

18  courtesy --

19       THE COURT:  Let's cut to the chase.

20       MR. LAWLOR:  -- to us on Monday.

21       THE COURT:  Do you want me to interrupt Niedermeier's

22  testimony again?  You see how I keep getting, you know, whip

23  sawed?

24       MR. LAWLOR:  I didn't whipsaw Your Honor.

25       THE COURT:  Now, last week, last week I'm getting whip

1    sawed because the world was going to come to an end because we

2    interrupted some witness to bring in Montgomery.

3            MR. LAWLOR:  That wasn't my complaint.

4            THE COURT:  Well, I'm not pointing fingers at anyone in

5    particular.  But now what I'm hearing from the defense is, Judge,

6    we want you to interrupt a witness so that we have the weekend to

7    go through these records.

8            MR. LAWLOR:  That's not what I said.  What I said was I

9    would expect of Mr. Harding, since he had this on Monday and he

10   has an obligation, an affirmative obligation to provide this,

11   that he would do it in a timely fashion.  As I said, it's a

12   professional courtesy.

13           THE COURT:  Are you suggesting, Mr. Lawlor, that Mr.

14   Harding purposely did this?

15           MR. LAWLOR:  I have no idea why he did it.

16           THE COURT:  No.

17           MR. LAWLOR:  Or didn't do it.

18           THE COURT:  You're not suggesting that?

19           MR. LAWLOR:  Your Honor, there's kind of a trend of

20   information being disclosed late here.  I don't think that's, as

21   I said, that's not my complaint.  I got a complaint about this

22   record and this record alone.  The first time we found out about

23   this was sometime after lunch today.

24           THE COURT:  I don't see any evidence of that

25   whatsoever.  You know, I guess all of our blood sugar is way down

1    and we probably ought to stop it right now.

2            It is quite apparent, and I know the defense attorneys

3    in this case well know, that the government has been scrambling

4    in this case.  The suggestion, and I don't mean it's being made

5    maliciously, but the suggestion that the government somehow had

6    this case all packaged up and ready to go four years ago or two

7    years ago or six months ago is clearly not true.

8            MR. LAWLOR:  And I didn't say that.

9            THE COURT:  Well, but there are intimations here, and

10   I'm hearing it from all around.  And we're all being professional

11   and we're all being courteous.  And yes, there have been some

12   slip-ups along the way.  But let's, you know, let's maintain the

13   level of professionalism and respect that all of you are entitled

14   to, absolutely each and every one of you.  I'm trying my best to

15   do it.  I'm confident that all of you are trying your best to do

16   it.

17           MR. LAWLOR:  I agree.  And can I just say I don't want

18   to intimate anything.  Mr. Harding said he had this on Monday.

19   My stated complaint, without intimating anything other than my

20   stated complaint, is that he had an affirmative obligation, and

21   if not a professional courtesy, to turn this over on Monday.

22   That's all I'm saying.

23           THE COURT:  Well, I'm not so sure about that.  You say

24   it with the kind of determination and conviction that I respect.

25   Indeed, I admire.  But I'm not so sure about that.  Mr. Harding's

1    got children, too.  These agents have children, too.

2              MR. LAWLOR:  I'm aware of that.  As I said, I'm not

3    saying I'm special.  That's why I say, turn it over on Monday so

4    we all don't have this problem.

5              THE COURT:  Well, this is, this is pointless.  Who are

6    you going to have tomorrow in addition to Niedermeier?

7              MR. HARDING:  Going to let Mr. Hanlon answer that.

8              THE COURT:  Who do you have on deck, Mr. Hanlon?

9              MR. HANLON:  Your Honor, we have on deck a number of

10   witnesses relative to the Spence shooting.  We have Officer

11   Douglas Jess, J-E-S-S.  We have Officer Eric Saladino,

12   S-A-L-A-D-I-N-O.  We have Detective Bryant Edwards.  We have

13   Detective Phil Marll, who is one of the lead homicide detectives

14   in the case.  He's going to talk about all the searches in the

15   wood and things like that.

16             We may have, Your Honor, a very short crime scene

17   technician person, along the lines of the recovery of one of

18   these shell casings or bullets.  That would be Technician Bialek,

19   B-I-L, B-I-A-L-E-K.  And time allowing, Your Honor, we might have

20   Darius Spence.

21             THE COURT:  Okay.  Mr. Harding, how much more of your

22   direct do you anticipate with Niedermeier?  Ballpark?  Not going

23   to hold you to it.

24             MR. HARDING:  45 minutes, including the playing of two

25   more tapes, the voice mail and the Martin statement, Your Honor.

1          THE COURT:  So an hour at the outside.

2          All right.  What I'll willing to do, if this is what

3     the defense want, and really, it sounds like only Mr. Lawlor's

4     really interested, but maybe he's speaking for everybody, if you

5     want me to have Mr. Harding conclude his direct tomorrow and then

6     interrupt Niedermeier and go to the Baltimore County witnesses,

7     I'm perfectly happy to do that.

8          I'm probably happy to have, if Mr. Kurland or Mr. Pyne

9     want to go forward with their cross and push you to the back of

10    the line, Mr. Lawlor, I assume the government won't have,

11    government doesn't care what the order of the cross is.  And we

12    know that the government doesn't care about interrupting a

13    witness.

14         So I think we can accommodate your concern, Mr. Lawlor,

15    if you come in here tomorrow and say, I'm really not ready to

16    cross examine Detective Niedermeier because I need more time to

17    look at these phone records.

18         MR. LAWLOR:  Fair enough.  Thank you, Your Honor.

19         THE COURT:  So --

20         MR. KURLAND:  Your Honor, with Detective Niedermeier,

21    as with Detective Giganti, is obviously going to be subject to

22    recall in the defense case?

23         THE COURT:  Of course.

24         MR. CROWE:  Your Honor, Mr. Pyne and I, Mr. Pyne made a

25    request that, given the circumstances of this production, the

1    division of responsibility, that we be allowed to split the cross

2    of Detective Niedermeier.  I don't think the Court's ruled one

3    way or the other on that.

4            THE COURT:  And I don't think I'm going to let you do

5    that.  I'll give you a chance to tell me why I should tomorrow.

6    But again, if you want to recall him in a defense case and then

7    switch lawyers, I would have no problem with that.  But I'm not

8    going to have two lawyers cross examining one witness, other than

9    for the most compelling of reasons.

10           MR. CROWE:  Would we be allowed to join Mr. Mitchell's

11   lawyers, then, and have our cross examination not tomorrow, but a

12   couple of weeks --

13           THE COURT:  Sure.

14           MR. CROWE:  Okay.  Thank you.

15           MR. KURLAND:  Your Honor, we, given what we were

16   anticipating, how we were going to do Detective Niedermeier, we

17   don't want to change the order.  We'd like to defer as well.

18           THE COURT:  Okay.  So sounds like what we're probably

19   going to do tomorrow is simply complete the direct and then

20   interrupt Detective Niedermeier and bring in the Baltimore County

21   witnesses.  I don't think Mr. Harris, Mr. Martin wants to go

22   first, but maybe he does.

23           MR. MARTIN:  I want to do mine tomorrow, Your Honor.

24           THE COURT:  You want to do yours tomorrow?

25           MR. MARTIN:  Yes, sir.

1          THE COURT:  Okay.  That's fine.

2          MR. MARTIN:  Not that complicated.  I would like to do

3  it.

4          THE COURT:  You'll do yours and then we'll interrupt

5  and we'll bring him back.  Do you have a full day planned for

6  Thursday?  Apart from Niedermeier.

7          MR. MARTIN:  Tomorrow is Thursday.

8          THE COURT:  Oh.  See what you're doing to me.

9          MR. MARTIN:  You told the jury --

10          THE COURT:  See what you're doing to me.  All right.

11  So we can end the week tomorrow.  And Mr. Lawlor will be the

12  happiest guy in Maryland.  All right.  We're in recess until

13  9:30.  Thank you.

14          (Conclusion of Proceedings at 5:55 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3                                                    PAGE

4    WITNESS: DWAYNE DENHAM
     DIRECT EXAMINATION BY MR. HARDING (ON MOTION)       2
5    CROSS EXAMINATION BY MR. PYNE (ON MOTION)           4
     DIRECT EXAMINATION BY MR. HARDING                  22
6    CROSS EXAMINATION BY MS. RHODES                    55
     CROSS EXAMINATION BY MR. PYNE                      91
7    CROSS EXAMINATION BY MR. COBURN                   134
     REDIRECT EXAMINATION BY MR. HARDING               138
8    RECROSS EXAMINATION BY MS. RHODES                 145

9    WITNESS: OFFICER GREGORY MEAD
     DIRECT EXAMINATION BY MR. HANLON                  151
10   CROSS EXAMINATION BY MR. KURLAND                  172

11   WITNESS: SERGEANT CRAIG MITCHELL
     DIRECT EXAMINATION BY MR. HANLON                  174
12   CROSS EXAMINATION BY MR. KURLAND                  188

13   WITNESS: TECHNICIAN GRAHAM BOYANICH
     DIRECT EXAMINATION BY MR. HANLON                  192
14
     WITNESS: DETECTIVE GARY NIEDERMEIER
15   DIRECT EXAMINATION BY MR. HARDING                 197

16

17

18

19

20

21

22

23

24

25

1                           REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on October 15, 2009.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2009.

11

12

13

14        _____

          Mary M. Zajac,
15        Official Court Reporter

16

17

18

19

20

21

22

23

24

25

## $

**$100,000** [5] - 72:8, 82:2, 103:23, 117:8, 120:22
**$12,000** [4] - 38:5, 38:10, 110:4, 144:16
**$139** [2] - 205:6, 231:9
**$160,000** [3] - 103:15, 103:21, 121:2
**$2,000** [1] - 71:4
**$250** [1] - 69:13
**$260,000** [1] - 121:4
**$5** [1] - 231:12
**$5,000** [2] - 106:19, 126:14
**$5.95** [1] - 200:12
**$50,000** [1] - 106:19
**$800** [3] - 26:20, 27:5, 83:10
**$99** [2] - 205:6, 231:8

## '

**'02** [3] - 194:25, 195:1, 254:13
**'90s** [2] - 93:10
**'91** [2] - 62:13, 62:14
**'93** [7] - 62:15, 62:16, 64:1, 64:3, 138:1, 138:2
**'94** [9] - 8:13, 11:4, 63:8, 63:16, 64:3, 64:17, 94:2, 138:1, 138:2
**'95** [7] - 8:7, 8:13, 11:4, 64:3, 94:2, 94:10, 116:15
**'96** [3] - 63:24, 64:15, 93:20
**'97** [1] - 64:15
**'98** [4] - 22:24, 64:11, 64:14

## 0

**011** [1] - 196:18
**02018653** [1] - 198:5
**026-C-17149** [1] - 198:4

## 1

**1-443-739-2762** [1] - 232:10
**1-540-345-0429** [1] - 233:10
**1-540-588-1906** [1] - 233:12
**10** [1] - 228:8
**10,000** [1] - 104:20

**100%** [23] - 9:4, 9:5, 9:7, 9:10, 11:7, 11:9, 11:12, 11:15, 11:17, 11:18, 11:22, 13:11, 13:12, 20:19, 20:21, 49:8, 49:9, 49:14, 49:16, 49:18, 49:21, 97:19
**1006** [3] - 248:10, 248:15, 249:17
**101** [1] - 1:25
**10:00** [5] - 111:16, 112:13, 227:13, 242:22, 243:15
**10:03** [1] - 2:2
**10:05** [1] - 240:6
**10:35** [1] - 21:10
**11** [1] - 114:3
**11:00** [4] - 113:17, 113:22, 113:23, 115:10
**11:05** [1] - 240:11
**11:10** [1] - 241:11
**11th** [1] - 196:18
**12** [7] - 34:19, 35:3, 35:9, 161:18, 205:6, 231:8
**12,000** [4] - 35:2, 37:25, 110:2, 110:8
**12-year-old** [4] - 184:24, 184:25, 185:12, 210:17
**12:30** [1] - 256:10
**12:35** [1] - 124:17
**12:38** [1] - 256:7
**12:40** [1] - 240:20
**12:43** [1] - 257:7
**12:52** [1] - 240:23
**13** [1] - 151:8
**13-year-old** [1] - 184:24
**134** [1] - 266:7
**1352-J** [1] - 222:7
**138** [1] - 266:7
**14** [2] - 92:13, 254:13
**145** [3] - 162:16, 163:19, 266:8
**14th** [1] - 237:18
**15** [14] - 1:11, 2:13, 5:7, 92:13, 165:3, 174:18, 174:23, 184:4, 190:7, 201:4, 207:17, 225:11, 230:5, 267:5
**151** [1] - 266:9
**16** [3] - 94:24, 103:11, 103:12
**17** [4] - 94:24, 103:11, 103:12
**170** [1] - 162:14
**172** [1] - 266:10
**174** [1] - 266:11
**17th** [3] - 199:16, 231:14, 237:21

**188** [1] - 266:12
**192** [1] - 266:13
**197** [1] - 266:15
**1973** [1] - 92:3
**1990** [1] - 61:2
**1990's** [1] - 26:1
**1993** [2] - 91:21, 92:23
**1994** [4] - 8:7, 94:10, 116:15, 137:25
**1994/95** [1] - 93:13
**1995** [1] - 137:25
**1996** [4] - 92:20, 93:19, 93:21, 93:24
**1997** [1] - 22:24
**1st** [12] - 60:22, 61:6, 71:22, 72:19, 73:2, 73:6, 73:16, 111:22, 126:9, 126:10, 129:16, 245:8

## 2

**2** [4] - 124:15, 124:16, 242:23, 266:4
**20** [13] - 34:16, 34:19, 35:3, 92:1, 92:5, 92:12, 126:11, 165:3, 184:4, 190:7, 230:5
**20,000** [1] - 34:16
**2000** [8] - 62:6, 63:24, 66:14, 74:24, 75:1, 75:2, 92:20, 192:20
**2001** [1] - 66:21
**2002** [32] - 25:6, 25:7, 25:18, 27:16, 27:23, 66:23, 67:1, 67:4, 67:7, 67:10, 68:8, 68:15, 94:21, 95:1, 113:14, 138:12, 138:16, 147:18, 151:18, 152:5, 170:2, 172:2, 175:6, 175:12, 192:24, 193:12, 193:20, 194:17, 199:16, 231:14, 237:21
**2004** [5] - 11:15, 33:4, 33:13, 57:5, 57:6
**2005** [3] - 229:15, 229:18, 251:20
**2008** [2] - 1:11, 146:11
**2009** [2] - 267:5, 267:10
**21201** [1] - 1:25
**22** [2] - 248:3, 266:5
**22nd** [1] - 237:15
**24** [2] - 140:22, 239:3
**24th** [7] - 27:23, 225:21, 235:21, 236:5, 237:4, 253:11, 254:13
**2500** [1] - 71:6
**25th** [5] - 68:15, 138:12, 225:21, 235:21, 237:5

**28** [1] - 86:11
**28th** [1] - 57:10
**29** [1] - 156:20
**29-year-old** [1] - 156:19
**295** [1] - 78:6
**2:00** [1] - 208:20

## 3

**3** [1] - 72:1
**30** [1] - 184:6
**38** [1] - 248:4
**3:00** [3] - 105:6, 105:13, 105:15
**3rd** [3] - 68:22, 113:14, 147:25

## 4

**4** [1] - 266:5
**40** [1] - 151:25
**400** [1] - 72:1
**401** [1] - 233:1
**410-493-1241** [2] - 236:19, 237:2
**410-496-6462** [1] - 238:22
**410-899-9323** [1] - 234:8
**410-905-1681** [1] - 235:5
**410-963-3912** [1] - 200:5
**443-309-5057** [1] - 235:24
**443-418-5570** [1] - 236:23
**443-418-6204** [1] - 244:21
**443-677-3200** [1] - 232:19
**443-739-5811** [1] - 234:11
**45** [4] - 40:14, 113:12, 139:22, 262:24
**48** [4] - 212:9, 220:22, 249:5, 250:1
**496-6462** [1] - 244:8
**4:07** [3] - 253:11, 254:12
**4:43** [1] - 227:14
**4:50** [1] - 175:19

## 5

**5** [2] - 35:7, 205:9
**5-G** [1] - 198:8
**50,000** [1] - 75:19

**5000** [1] - 71:23
**55** [1] - 266:6
**5515** [1] - 1:24
**5570** [2] - 237:3, 237:12
**5811** [2] - 234:18, 236:10
**5:00** [2] - 175:19, 249:22
**5:15** [1] - 230:11
**5:30** [4] - 248:1, 248:11, 248:18, 248:23
**5:47** [1] - 259:15
**5:55** [1] - 265:14

## 6

**6/11** [1] - 255:15
**6/19** [1] - 255:15
**6/8** [1] - 194:25
**6000** [1] - 35:7
**6204** [1] - 254:13
**6426** [1] - 244:4
**6731** [1] - 254:13
**695** [1] - 155:12
**6:19** [1] - 254:20
**6:30** [5] - 107:2, 216:17, 248:25, 249:3, 249:21

## 7

**7th** [8] - 152:4, 170:2, 172:2, 175:12, 193:12, 193:23, 193:24, 195:1

## 8

**800** [2] - 83:9, 83:11
**82** [1] - 232:14
**838-1933** [1] - 232:16
**8618** [7] - 155:22, 156:7, 157:3, 160:21, 165:19, 176:1, 176:5
**8:00** [1] - 212:12
**8:30** [3] - 209:8, 216:17, 249:3
**8:45** [1] - 216:16
**8th** [2] - 193:20, 194:17

## 9

**9** [3] - 40:14, 111:16, 112:13
**91** [1] - 266:6
**996** [1] - 196:15
**9:00** [1] - 216:16
**9:10** [1] - 209:5
**9:25** [1] - 209:9

**9:30** [4] - 208:19, 247:16, 265:13
**9th** [4] - 68:25, 138:16, 138:21, 138:24

# A

**a.m** [5] - 2:2, 21:10, 228:8, 240:6, 240:11
**Aaron** [3] - 180:11, 181:1, 181:5
**ability** [1] - 158:6
**able** [25] - 98:14, 98:23, 98:25, 99:2, 99:5, 107:12, 129:1, 134:25, 158:8, 160:16, 161:17, 161:25, 167:5, 184:9, 190:17, 191:2, 191:10, 191:13, 209:14, 212:1, 219:2, 222:10, 245:19, 253:11
**absolute** [1] - 20:3
**Absolutely** [2] - 45:9, 223:8
**absolutely** [8] - 16:13, 121:20, 129:23, 215:23, 216:6, 217:10, 261:14
**abundance** [1] - 221:15
**accept** [2] - 20:13, 127:10
**acceptable** [1] - 133:5
**accidentally** [3] - 19:17, 19:18, 257:1
**accommodate** [2] - 221:3, 263:14
**accompanied** [1] - 185:8
**accompanies** [1] - 185:7
**accomplished** [2] - 108:8, 108:12
**Accord** [1] - 69:25
**According** [1] - 243:23
**according** [3] - 17:14, 212:9, 246:2
**accuracy** [1] - 259:11
**accurate** [8] - 20:13, 33:11, 33:12, 36:10, 112:9, 112:13, 136:14, 267:8
**acknowledge** [1] - 13:20
**acknowledged** [1] - 124:24
**acquaintance** [1] - 76:10
**acted** [1] - 111:4
**acting** [1] - 205:20
**actively** [1] - 100:13

**activities** [1] - 203:15
**activity** [2] - 178:16, 239:24
**actual** [1] - 246:16
**Adam** [1] - 1:22
**add** [4] - 13:18, 127:2, 211:2, 252:7
**addition** [2] - 124:23, 262:6
**additional** [6] - 125:24, 159:3, 213:19, 250:18, 253:18
**address** [10] - 28:19, 146:17, 146:18, 146:19, 202:19, 205:9, 232:12, 233:1, 238:19
**addressed** [1] - 202:17
**addresses** [1] - 252:1
**adhere** [1] - 247:10
**administrative** [1] - 175:17
**admire** [1] - 261:25
**admissible** [4] - 131:23, 132:23, 205:15, 205:16, 210:12, 224:20
**admission** [1] - 16:12
**admit** [3] - 13:13, 19:1, 20:19
**admitted** [2] - 215:6, 220:3
**admitting** [1] - 20:20
**adult** [1] - 156:8
**advance** [3] - 133:24, 220:22, 222:21
**adversaries** [1] - 221:16
**advice** [2] - 149:20, 150:2
**advise** [1] - 179:2
**advised** [4] - 121:24, 158:15, 162:23, 250:23
**aerial** [2] - 155:1, 177:17
**affects** [1] - 128:5
**affiliations** [1] - 33:17
**affixed** [1] - 267:9
**afraid** [3] - 119:8, 213:4, 223:11
**afternoon** [24] - 5:8, 125:10, 130:13, 131:11, 134:2, 134:6, 138:8, 138:9, 145:25, 151:2, 151:3, 152:5, 174:12, 174:13, 175:20, 188:6, 188:7, 192:14, 197:14, 197:15, 200:25, 227:3, 227:7, 227:14
**age** [1] - 161:2
**agent** [4] - 219:1, 246:11, 255:5, 257:5
**agents** [3] - 144:23,

255:10, 262:1
**agents'** [1] - 221:12
**ago** [39] - 12:25, 21:16, 22:7, 32:13, 54:22, 61:7, 72:18, 73:12, 73:14, 73:18, 97:15, 112:11, 129:13, 129:15, 136:5, 148:13, 148:14, 150:6, 151:12, 163:10, 163:14, 217:7, 217:8, 229:5, 229:16, 248:12, 248:16, 248:17, 249:5, 249:25, 250:2, 252:5, 261:6, 261:7
**agree** [16] - 13:14, 16:16, 60:25, 76:7, 79:2, 116:22, 116:24, 189:17, 207:11, 215:19, 215:23, 224:21, 224:24, 259:1, 261:17
**agreed** [4] - 7:7, 117:2, 133:7, 208:2
**agreement** [3] - 79:3, 132:3, 162:6
**agrees** [1] - 149:23
**AH** [1] - 214:2
**ahead** [16] - 16:25, 17:22, 18:1, 42:5, 83:7, 94:7, 124:11, 144:5, 190:10, 211:3, 228:5, 230:1, 251:18, 253:4, 254:10
**aid** [2] - 246:16, 246:22
**aims** [1] - 224:23
**ain't** [16] - 8:2, 8:6, 25:21, 34:22, 36:17, 39:13, 42:1, 53:3, 53:22, 54:16, 62:18, 69:10, 70:5, 70:9
**air** [1] - 222:24
**airing** [1] - 210:23
**al** [1] - 267:5
**alarm** [1] - 249:21
**alcohol** [1] - 239:18
**alive** [1] - 45:2
**alleged** [3] - 17:4, 17:8, 17:10
**allegedly** [1] - 215:8
**alleviates** [1] - 228:7
**allow** [3] - 39:16, 185:10, 251:11
**allowed** [7] - 101:2, 122:25, 185:13, 209:16, 217:10, 264:1, 264:10
**allowing** [1] - 262:19
**alluded** [1] - 254:4
**almost** [2] - 70:18, 244:6
**alone** [1] - 260:22
**alternative** [1] - 125:9

**ambiguity** [1] - 133:13
**Ambo** [1] - 232:14
**ambulance** [3] - 176:11, 176:15
**AMD-04-029** [2] - 1:6, 267:5
**AMERICA** [1] - 1:5
**amount** [15] - 23:16, 24:25, 50:13, 83:4, 83:5, 83:8, 100:4, 121:4, 121:8, 122:16, 122:19, 129:19, 140:23, 140:25
**amounts** [5] - 110:16, 117:3, 119:5, 119:6
**analysis** [4] - 20:25, 196:25, 197:24, 252:16
**analyze** [1] - 252:5
**Andre** [1] - 1:13
**Andrea** [12] - 131:19, 160:20, 160:22, 160:25, 164:7, 171:16, 173:2, 184:23, 185:15, 185:21, 186:12, 187:16
**angled** [1] - 190:11
**announced** [1] - 209:22
**answer** [19] - 22:11, 26:3, 27:7, 44:14, 44:18, 51:2, 51:24, 113:3, 140:19, 142:20, 150:1, 158:8, 186:3, 235:1, 241:19, 241:20, 248:11, 253:3, 262:7
**answered** [4] - 94:6, 94:8, 239:21, 257:2
**answering** [5] - 46:19, 48:11, 48:13, 48:14, 112:23
**answers** [1] - 238:15
**Anthony** [15] - 3:3, 6:14, 10:2, 10:3, 10:4, 68:9, 84:5, 86:12, 112:23, 117:13, 118:23, 118:25, 198:23, 214:4
**Anthony's** [1] - 70:15
**anticipate** [1] - 262:22
**anticipating** [1] - 264:16
**anyway** [6] - 37:12, 60:9, 62:19, 63:14, 120:9, 227:15
**apart** [2] - 202:10, 258:22
**Apart** [1] - 265:6
**apartment** [25] - 84:3, 112:24, 115:3, 118:8, 154:4, 156:2, 165:15, 165:18, 165:19, 165:20, 165:22, 166:1, 166:5, 166:9, 166:20, 166:23, 167:21, 167:24, 168:2,

168:23, 168:24, 170:1, 170:14, 171:9
**Apartment** [1] - 238:20
**apartments** [1] - 92:16
**Apartments** [1] - 92:17
**apologize** [5] - 151:15, 183:8, 197:16, 223:14, 230:25
**apparent** [2] - 19:6, 261:2
**appear** [8] - 158:3, 159:8, 181:25, 194:25, 205:15, 232:20, 235:20, 237:4
**appearances** [1] - 56:1
**Appearances** [1] - 1:15
**appeared** [2] - 12:25, 156:8
**applications** [2] - 61:16, 61:17
**applies** [1] - 225:8
**apply** [2] - 216:8, 225:6
**appreciate** [7] - 3:19, 3:20, 207:16, 208:10, 209:24, 224:8, 229:20
**apprehend** [1] - 166:3
**approach** [7] - 2:12, 154:6, 155:5, 156:13, 161:23, 172:5, 200:17
**approached** [1] - 157:9
**appropriate** [6] - 133:14, 198:15, 206:12, 219:7, 219:10, 219:19
**approve** [4] - 23:18, 23:19, 82:25, 258:17
**April** [11] - 68:22, 68:25, 113:14, 138:16, 138:21, 138:23, 147:25, 199:16, 231:14, 237:21, 245:8
**area** [25] - 110:13, 110:25, 147:14, 151:23, 155:3, 155:10, 157:12, 159:20, 159:23, 164:23, 172:7, 172:8, 177:7, 178:4, 178:20, 179:19, 179:20, 182:22, 182:24, 183:14, 183:17, 186:8, 240:15, 240:16, 241:3
**arguably** [1] - 210:6
**argue** [2] - 15:18, 202:8
**argument** [1] - 224:21
**arguments** [1] - 218:13
**arises** [1] - 20:16
**arm** [1] - 34:25
**Army** [1] - 152:9
**Arnold** [1] - 204:25
**arrange** [1] - 100:7
**arranged** [1] - 20:15
**arrangement** [2] - 28:1, 31:1

**arrest** [3] - 60:16, 66:11, 237:24
**arrested** [9] - 56:11, 60:1, 62:13, 63:6, 64:22, 93:21, 231:14, 245:8
**arrests** [3] - 64:6, 64:14, 66:8
**arrival** [2] - 160:21, 176:8
**arrive** [3] - 153:23, 154:12, 158:21
**arrived** [8] - 95:22, 158:19, 159:2, 176:7, 186:8, 187:14, 187:16, 240:2
**arriving** [1] - 189:25
**aside** [2] - 179:9, 249:8
**Aside** [2] - 163:22, 170:21
**asleep** [4] - 72:23, 73:1, 73:3, 213:5
**aspect** [1] - 127:3
**assault** [4] - 62:14, 62:15, 67:13
**assertion** [1] - 224:24
**assigned** [2] - 151:21, 174:17
**assignment** [1] - 175:8
**assist** [2] - 14:2, 193:13
**assistance** [1] - 176:1
**assume** [4] - 86:5, 124:7, 174:19, 195:20, 202:7, 204:13, 216:21, 263:10
**Assumes** [1] - 121:9
**assuming** [1] - 10:24, 15:20, 113:25, 131:15, 155:6, 155:7, 248:20
**atmosphere** [2] - 18:17, 19:12
**attempt** [1] - 13:1
**attempting** [2] - 123:4, 160:14
**attended** [2] - 215:1, 238:25
**attention** [21] - 3:2, 27:23, 40:8, 56:16, 95:7, 113:8, 114:12, 130:3, 133:17, 134:8, 143:18, 143:20, 152:4, 166:2, 175:5, 176:14, 176:15, 193:20, 232:8, 234:6, 236:8
**attitude** [6] - 23:10, 23:13, 23:18, 83:1, 83:2, 116:17
**attorney** [11] - 56:22, 58:15, 58:17, 62:10, 67:21, 67:22, 72:15, 86:12, 149:16, 241:19,

241:20
**attorney/one** [1] - 251:10
**attorneys** [2] - 250:3, 261:2
**authenticating** [2] - 15:7, 214:24
**authentication** [1] - 15:8
**author** [1] - 215:7
**authored** [1] - 225:7
**authorize** [1] - 258:20
**automatically** [5] - 51:15, 54:5, 120:4, 141:6, 208:2
**autopsies** [2] - 194:5, 194:7
**autopsy** [10] - 131:9, 193:14, 193:16, 193:22, 194:2, 194:8, 194:9, 195:12, 195:19
**available** [2] - 216:16, 249:5
**Avenue** [1] - 239:3
**avoid** [2] - 247:12, 253:18
**awake** [2] - 112:3, 112:4
**aware** [18] - 23:2, 23:5, 88:23, 94:9, 95:5, 95:13, 112:3, 112:4, 149:4, 189:25, 190:1, 220:23, 221:8, 234:16, 234:17, 234:19, 234:21, 262:2

**B**

**B-I-A-L-E-K** [1] - 262:19
**B-O-Y-A-N-I-C-H** [1] - 192:11
**baby** [3] - 45:25, 46:5, 249:4
**baby's** [1] - 46:1
**background** [1] - 21:22
**backpack** [5] - 144:9, 144:11, 144:14, 144:18, 144:21
**backtracking** [1] - 11:7
**backwards** [1] - 206:24
**Bacon** [5] - 204:6, 204:7, 206:5, 206:7, 232:23
**bad** [4] - 72:6, 72:9, 80:3, 133:7
**bag** [17] - 34:4, 34:24, 35:15, 35:16, 105:21, 105:22, 106:9, 106:10, 106:11, 106:16, 106:20, 109:21, 109:23, 110:6, 157:10, 157:12, 166:18

**bail** [2] - 70:15, 71:7
**bailed** [3] - 70:20, 70:25, 139:2
**balcony** [2] - 157:7, 157:14, 158:16, 159:17, 160:1, 168:2, 168:8, 168:11, 168:15
**balled** [1] - 169:18
**Ballpark** [1] - 262:22
**ballpark** [1] - 148:15
**Baltimore** [39] - 1:12, 1:25, 38:12, 40:9, 74:12, 79:10, 89:9, 89:12, 104:3, 110:13, 110:25, 115:3, 115:4, 131:4, 131:5, 139:17, 139:20, 147:16, 151:5, 151:6, 151:23, 152:1, 153:25, 155:10, 174:15, 174:16, 174:18, 174:19, 174:22, 174:24, 192:16, 192:18, 196:22, 223:18, 223:23, 233:4, 234:15, 263:6, 264:20
**Barry** [1] - 1:22
**base** [1] - 18:7
**baseball** [2] - 162:15, 231:20
**based** [10] - 18:15, 20:23, 139:1, 154:2, 159:5, 163:16, 226:11, 248:20, 249:23, 251:2
**basic** [3] - 193:5, 229:7, 259:17
**basis** [5] - 18:7, 103:3, 205:22, 205:23, 248:15
**basketball** [2] - 189:1, 189:3
**batch** [1] - 211:21
**Bates** [4] - 222:5, 222:7, 222:17, 222:20
**bear** [2] - 14:22, 216:7
**bearings** [1] - 168:10
**became** [1] - 234:19
**become** [1] - 234:21
**becomes** [1] - 225:2
**bedroom** [2] - 169:9, 170:6
**beef** [4] - 41:13, 41:15, 70:13, 70:22
**beefing** [3] - 42:7, 70:19, 71:10
**beforehand** [1] - 118:1
**began** [4] - 126:10, 127:7, 214:11, 240:18
**begin** [5] - 124:20, 139:1, 158:23, 230:3, 253:1
**beginning** [4] - 57:16, 193:11, 199:14, 213:8

**begins** [3] - 208:19, 208:20, 210:21
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behalf** [2] - 205:21
**behaving** [2] - 80:10, 143:17
**behavior** [1] - 81:11
**behind** [6] - 39:17, 39:24, 41:18, 60:2, 123:2, 155:1
**belaboring** [1] - 224:5
**believes** [4] - 214:23, 214:25, 219:2, 257:5
**belong** [1] - 245:4
**belonged** [1] - 245:3
**belongings** [1] - 202:11
**Beltway** [1] - 78:6
**bench** [1] - 200:17
**Benson** [5] - 251:3, 251:6, 252:12, 252:14, 252:17
**bent** [1] - 169:18
**Berger** [1] - 234:14
**Beside** [1] - 170:17
**best** [10] - 16:16, 20:3, 65:3, 94:24, 114:3, 159:10, 160:4, 191:20, 261:14, 261:15
**better** [4] - 130:2, 141:4, 219:6, 230:1
**between** [17] - 34:19, 35:3, 111:16, 112:13, 132:3, 138:17, 138:20, 139:22, 172:8, 183:25, 184:3, 185:14, 218:13, 225:19, 243:13, 255:14
**beyond** [1] - 14:6
**Bialek** [1] - 262:18
**Big** [8] - 242:20, 242:23, 243:13, 243:18, 243:19, 243:21, 243:24, 244:1
**big** [10] - 23:16, 60:16, 72:11, 82:11, 87:3, 109:13, 139:21, 195:16, 205:20, 222:12
**biggest** [2] - 27:16, 27:18
**BIL** [1] - 262:19
**billed** [1] - 255:4
**billing** [1] - 200:1
**binders** [1] - 204:18
**bio** [1] - 195:21
**biohazard** [2] - 195:17, 195:21
**biologically** [1] - 195:25
**bit** [16] - 60:22, 74:15, 75:21, 126:18, 126:19, 151:11, 155:9, 169:3, 169:5, 181:8, 195:15,

206:2, 212:10, 225:8, 229:25, 255:12
**black** [12] - 52:16, 52:17, 52:18, 52:21, 56:12, 56:15, 116:1, 116:4, 162:14, 162:16
**Blanding** [9] - 9:17, 12:14, 12:15, 14:15, 24:12, 55:13, 142:12, 148:11, 148:19
**blank** [1] - 249:21
**bleeding** [2] - 157:19, 258:13
**block** [1] - 109:13
**blocks** [4] - 106:5, 106:6
**blood** [5] - 157:18, 157:20, 160:11, 195:21, 260:25
**Blood** [1] - 160:9
**blue** [7] - 157:10, 157:12, 159:6, 162:15, 162:17, 237:7, 242:23, 243:19
**Bo** [18] - 50:4, 51:22, 51:25, 81:14, 81:15, 81:16, 81:19, 81:20, 112:20, 113:7, 114:16, 114:17, 136:17, 136:20, 234:8, 234:11, 236:8, 238:17
**Bo's** [2] - 50:8, 91:8
**board** [1] - 222:15
**bodes** [1] - 18:23
**bodies** [1] - 47:3
**body** [1] - 157:15
**bolsters** [1] - 20:18
**book** [8] - 189:11, 202:19, 222:8, 222:10, 222:12, 232:3, 236:7, 236:13, 237:8
**booking** [1] - 181:9
**booklets** [2] - 246:19, 247:1
**books** [3] - 218:6, 246:3, 247:7
**boring** [1] - 227:18
**born** [1] - 92:3
**bother** [1] - 143:22
**bottom** [12] - 52:18, 126:24, 177:24, 205:2, 239:12, 239:16, 241:16, 241:18, 245:21, 256:17, 256:18, 256:21
**bought** [4] - 34:17, 82:18, 108:10, 219:23
**Boulevard** [1] - 151:25
**bouncing** [1] - 52:17
**box** [2] - 204:2, 235:9
**boxes** [6] - 209:13,

211:17, 217:20, 217:21
**boy's** [1] - 210:17
**Boyanich** [3] - 192:5, 192:10, 197:7
**BOYANICH** [2] - 192:6, 266:13
**Brady** [1] - 258:22
**braided** [1] - 182:1
**braids** [1] - 162:17
**brain** [1] - 210:21
**Bramble** [22] - 154:3, 154:12, 154:16, 154:24, 155:22, 156:7, 157:3, 160:22, 161:5, 163:1, 165:12, 170:11, 176:1, 176:5, 177:3, 177:13, 177:16, 178:22, 183:6, 183:20, 184:19, 187:6
**Branbrook** [1] - 154:19
**Brandy** [6] - 28:10, 45:9, 105:11, 112:22, 114:24, 118:20
**Brandy's** [17] - 28:9, 29:5, 30:17, 30:22, 40:17, 41:9, 42:22, 43:4, 84:3, 89:6, 89:8, 89:11, 105:14, 111:16, 112:6, 118:8
**break** [10] - 74:19, 75:7, 75:10, 91:12, 124:11, 124:20, 130:14, 134:9, 207:20, 223:13
**break-in** [1] - 75:10
**break-ins** [2] - 74:19, 75:7
**breaking** [2] - 80:22, 101:15
**breath** [1] - 158:7
**Brenbrook** [6] - 152:9, 154:14, 154:20, 154:21, 154:22, 154:23
**brief** [2] - 21:22, 242:5
**Briefly** [1] - 250:21
**briefly** [8] - 21:19, 22:6, 53:16, 53:17, 159:3, 183:12, 212:25, 251:16
**bright** [1] - 169:3
**bring** [13] - 14:10, 31:9, 31:10, 133:16, 207:12, 214:25, 225:24, 230:4, 230:7, 259:3, 260:2, 264:20, 265:5
**bringing** [4] - 20:9, 143:19, 238:4, 239:25
**brings** [1] - 152:16
**broke** [5] - 75:11, 108:1, 108:14, 143:10, 198:6
**brother** [19] - 5:12, 5:14, 24:15, 24:16, 40:19, 42:6, 47:22, 65:3,

67:7, 70:17, 71:15, 71:16, 71:17, 86:15, 95:24, 96:1, 99:20, 114:24
**brother-in-law** [2] - 24:15, 24:16
**brothers** [18] - 4:3, 47:25, 51:18, 111:14, 117:20, 118:9, 118:18, 141:15, 141:18, 141:21, 141:25, 142:18, 142:23, 148:11, 197:21, 233:16, 238:1
**brothers'** [4] - 137:18, 137:24, 144:3, 235:6
**brought** [6] - 78:6, 138:11, 179:24, 184:14, 187:18, 190:12
**Brown** [1] - 234:14
**brown** [3] - 56:18, 56:20, 194:11
**Bryant** [14] - 60:23, 61:7, 61:23, 62:1, 62:7, 62:9, 62:24, 63:1, 63:5, 63:9, 64:5, 238:25, 262:12
**bucks** [2] - 83:9, 83:12
**bugging** [1] - 201:11
**bugs** [2] - 205:7, 231:9
**Buick** [2] - 242:23, 243:19
**Building** [1] - 165:19
**building** [4] - 43:13, 45:6, 162:19, 199:5
**bulk** [1] - 252:16
**bullet** [4] - 131:9, 196:7, 196:8, 197:1
**bullets** [1] - 262:18
**bunch** [1] - 73:23
**buried** [1] - 52:23
**burning** [1] - 214:8
**business** [15] - 12:17, 22:8, 22:17, 23:6, 24:20, 54:15, 65:8, 66:5, 82:12, 85:7, 86:6, 89:2, 140:14, 141:10, 211:12
**busy** [2] - 209:25, 249:1
**button** [2] - 51:15, 51:16
**buttressed** [1] - 18:13
**buy** [5] - 27:11, 27:20, 31:10, 37:7, 37:8, 37:23, 100:6, 108:25, 109:1, 109:7, 109:10, 109:11, 123:2, 210:19, 243:13, 243:15
**buyer** [1] - 243:21
**BY** [38] - 2:20, 3:25, 22:2, 26:15, 32:11, 44:13, 44:20, 55:21,

80:18, 90:25, 91:15, 134:5, 138:7, 144:6, 145:24, 147:10, 151:1, 172:21, 174:11, 188:5, 192:13, 197:13, 198:17, 230:22, 266:4, 266:5, 266:5, 266:6, 266:6, 266:7, 266:7, 266:8, 266:9, 266:10, 266:11, 266:12, 266:13, 266:15

---

# C

**caliber** [1] - 171:12
**cameras** [4] - 54:10, 205:5, 210:16, 231:8
**candor** [1] - 228:7
**cannot** [2] - 203:9, 203:23
**caption** [1] - 231:5
**captioned** [1] - 231:2
**car** [45] - 4:8, 4:19, 4:20, 15:19, 28:24, 29:5, 29:8, 29:19, 31:19, 31:24, 34:25, 39:5, 39:9, 39:10, 39:11, 45:4, 65:14, 69:8, 69:12, 70:4, 100:24, 106:8, 117:22, 139:15, 139:16, 144:9, 152:11, 182:17, 183:1, 184:1, 184:15, 187:1, 190:8, 190:9, 190:14, 190:15, 190:16, 190:24, 191:2, 191:10, 233:19, 235:6, 235:8, 236:25
**care** [6] - 7:22, 49:19, 212:10, 212:11, 263:11, 263:12
**careful** [3] - 40:6, 66:4, 149:4
**Carlson** [12] - 155:19, 162:24, 163:4, 163:5, 172:8, 179:4, 179:7, 183:7, 183:9, 183:11, 183:14, 183:19
**carpet** [1] - 216:9
**carried** [3] - 35:15, 66:7, 119:4
**carries** [1] - 67:23
**Carroll** [1] - 152:1
**carry** [4] - 35:13, 64:25, 65:25, 66:5
**carrying** [3] - 65:12, 66:8, 67:13
**cars** [2] - 187:17, 187:18
**case** [63] - 12:19, 12:21, 16:8, 50:14, 59:19, 59:22, 59:25, 60:10,

63:2, 64:10, 66:6, 66:12, 67:15, 67:16, 67:20, 67:22, 68:1, 68:3, 68:4, 68:7, 68:10, 69:1, 69:6, 69:7, 69:8, 124:13, 139:6, 144:4, 152:16, 169:22, 170:15, 172:12, 183:24, 194:10, 195:23, 196:13, 208:10, 211:1, 213:8, 217:19, 222:6, 224:18, 224:19, 240:20, 247:12, 247:13, 251:20, 252:4, 252:12, 252:15, 257:20, 258:11, 258:14, 258:15, 258:16, 259:4, 261:3, 261:4, 261:6, 262:14, 263:22, 264:6
**Case** [1] - 267:5
**CASE** [1] - 1:6
**cases** [4] - 62:23, 64:14, 67:21, 218:3
**casings** [1] - 262:18
**catalog** [1] - 205:9
**Catalog** [2] - 205:1, 231:12
**catalogs** [2] - 204:22, 205:2
**catch** [1] - 158:7
**category** [4] - 230:3, 247:22, 247:25, 249:9
**caught** [2] - 63:18, 64:3
**caused** [2] - 153:11, 153:24
**CC** [1] - 198:2
**cell** [19] - 3:8, 22:14, 33:25, 34:8, 34:10, 35:14, 36:21, 52:14, 53:9, 53:10, 53:14, 122:14, 200:1, 226:21, 232:16, 242:21, 243:14, 245:1, 254:22
**center** [2] - 177:24, 236:24
**Center** [1] - 233:4
**Certain** [3] - 54:1, 86:1, 98:25
**certain** [17] - 20:19, 20:21, 20:22, 24:25, 36:21, 49:8, 49:9, 49:14, 49:18, 49:19, 49:21, 86:1, 86:2, 90:20, 110:25, 182:16, 252:16
**Certainly** [2] - 12:9, 19:10
**certainly** [12] - 15:9, 19:2, 19:19, 20:7, 65:11, 123:7, 125:13, 127:13, 127:16, 205:10, 227:7
**certainty** [3] - 50:15, 97:16, 97:20

**CERTIFICATE** [1] - 267:1
**certify** [2] - 267:3, 267:6
**CH** [1] - 214:2
**chair** [1] - 247:8
**chairs** [2] - 124:13, 201:1
**chance** [9] - 16:17, 31:21, 56:22, 80:5, 96:19, 129:12, 139:25, 154:11, 264:5
**chances** [1] - 74:9
**change** [9] - 61:2, 62:6, 126:16, 126:18, 146:7, 146:12, 191:17, 221:2, 264:17
**changed** [3] - 86:23, 105:10, 127:10
**changes** [3] - 124:23, 125:23, 125:24
**changing** [1] - 209:10
**character** [1] - 125:3
**charge** [17] - 62:14, 62:15, 62:16, 66:23, 67:15, 67:16, 67:17, 67:18, 138:15, 138:20, 138:25, 139:3, 139:5, 139:7, 147:19
**charged** [6] - 67:12, 67:13, 79:25, 122:9, 122:10, 242:18, 255:18
**charges** [12] - 63:7, 64:19, 64:20, 66:16, 66:17, 66:20, 66:21, 68:25, 69:6, 138:23, 147:17, 200:5
**chart** [10] - 155:7, 225:18, 225:23, 252:11, 252:19, 252:22, 256:4, 256:21, 258:19, 258:24
**chase** [1] - 259:19
**chat** [1] - 131:20
**Chatman** [1] - 199:7
**cheap** [1] - 224:13
**check** [3] - 191:15, 235:13
**checked** [1] - 239:15
**chest** [1] - 157:19
**chew** [1] - 3:20
**Chief** [3] - 193:21, 195:4, 195:10
**chief** [1] - 259:4
**child** [5] - 156:9, 156:11, 156:14, 156:16, 235:10
**children** [3] - 14:9, 262:1
**choice** [1] - 62:18
**choose** [3] - 66:4, 132:7
**Christmas** [1] - 210:17

**Christopher** [1] - 21:21
**chronological** [1] - 256:14
**church** [2] - 199:4, 199:6
**cigar** [1] - 203:5
**Circle** [1] - 232:14
**circle** [3] - 157:5, 177:15, 177:21
**circled** [1] - 157:6
**circles** [1] - 37:1
**circling** [1] - 155:25
**circulating** [1] - 141:14
**circumstances** [3] - 145:18, 171:21, 263:25
**citation** [1] - 85:20
**City** [7] - 110:13, 139:17, 152:1, 223:18, 223:23, 233:4, 234:15
**civilian** [1] - 131:7
**clarified** [1] - 179:5
**clarify** [2] - 130:23, 235:4
**clarity** [1] - 214:14
**classic** [3] - 189:6, 189:11, 189:13
**Claudus** [4] - 23:24, 24:10, 55:16, 55:18
**clause** [1] - 227:1
**clean** [1] - 13:25
**clear** [14] - 17:2, 17:7, 17:9, 61:22, 98:17, 129:23, 152:19, 152:22, 163:10, 169:25, 173:7, 184:13, 194:22, 253:19
**clearly** [10] - 11:2, 11:7, 15:13, 191:5, 202:17, 205:15, 206:1, 247:24, 249:9, 261:7
**clerk** [1] - 200:18
**CLERK** [3] - 150:21, 174:5, 192:8
**client** [1] - 210:12
**clip** [1] - 48:2
**close** [22] - 12:16, 14:6, 18:20, 18:22, 19:9, 24:2, 24:6, 24:7, 47:19, 54:12, 86:3, 95:13, 95:17, 120:6, 120:7, 134:16, 134:19, 135:13, 153:12, 160:10, 169:14
**close-up** [2] - 160:10, 169:14
**closed** [3] - 167:1, 168:4, 168:6
**closer** [4] - 156:16, 159:17, 159:22, 259:15
**clothes** [5] - 5:6, 47:13, 105:11, 143:18, 143:21
**clothing** [5] - 143:16,

159:20, 160:11, 180:20, 191:17
**club** [1] - 79:9
**co** [3] - 225:2, 225:5, 225:6
**co-conspirator's** [2] - 225:2, 225:5
**co-conspirators'** [1] - 225:6
**Coburn** [14] - 1:22, 2:9, 124:7, 132:8, 134:3, 145:8, 218:9, 218:10, 218:11, 218:14, 218:16, 222:23, 224:7, 224:13
**COBURN** [15] - 2:14, 25:19, 26:2, 26:10, 124:9, 134:5, 222:24, 223:4, 223:8, 223:12, 223:16, 223:22, 224:8, 224:14, 266:7
**cocaine** [15] - 27:21, 35:22, 38:15, 38:25, 79:15, 103:6, 103:10, 105:21, 106:2, 106:8, 107:25, 108:19, 108:22, 122:17, 243:6
**code** [1] - 152:24
**codes** [1] - 143:9
**coding** [1] - 153:2
**coke** [2] - 26:24, 26:25
**Coldspring** [2] - 242:20, 243:7
**colleagues** [1] - 233:18
**collect** [3] - 116:19, 193:9, 194:8
**collected** [1] - 194:8
**collecting** [1] - 116:17
**color** [3] - 29:3, 53:1, 56:17
**Columbia** [1] - 50:12
**comfortable** [12] - 32:24, 33:1, 39:20, 56:25, 57:2, 57:4, 58:16, 58:22, 59:1, 80:19, 80:20, 145:4
**Coming** [1] - 151:8
**coming** [16] - 32:24, 54:5, 57:5, 57:11, 89:2, 107:16, 123:1, 132:7, 132:16, 145:4, 153:17, 168:16, 213:20, 219:16, 257:19
**comments** [1] - 173:18
**commission** [1] - 66:24
**commit** [1] - 178:18
**common** [3] - 37:1, 218:2, 218:4
**commonly** [1] - 201:14
**commotion** [2] - 53:23, 53:24

**communicate** [2] - 158:6, 185:16
**communicated** [3] - 89:14, 183:3, 187:7
**communication** [1] - 187:25
**communications** [1] - 225:19
**compare** [3] - 248:19, 249:4, 249:23
**compared** [2] - 126:14, 139:23
**comparing** [1] - 125:2
**comparison** [1] - 202:7
**compelling** [1] - 264:9
**compilation** [1] - 226:13
**compile** [1] - 218:6
**compiled** [4] - 248:12, 248:13, 250:1
**complain** [1] - 221:16
**complained** [2] - 143:21, 229:16
**complaining** [2] - 222:1, 226:5
**complaint** [8] - 176:4, 198:4, 228:20, 260:3, 260:21, 261:19, 261:20
**complaints** [2] - 249:7, 250:4
**complete** [6] - 132:4, 145:5, 170:13, 171:9, 264:19, 267:8
**completed** [2] - 228:23, 228:25
**completely** [2] - 13:18, 13:25
**complex** [2] - 154:4, 156:2
**compliant** [1] - 208:4
**complicated** [2] - 252:2, 265:2
**compound** [2] - 211:14, 211:18
**Compounding** [1] - 212:3
**computer** [1] - 258:18
**Computer** [1] - 192:22
**conceal** [2] - 29:14, 29:15
**concede** [4] - 247:22, 248:1, 248:2, 259:5
**conceive** [1] - 258:14
**concern** [8] - 88:20, 119:23, 124:20, 124:25, 133:12, 206:23, 254:3, 263:14
**concerned** [2] - 56:1, 56:3, 56:7, 118:12, 118:14, 118:15, 119:12,

119:13, 119:18, 119:19, 149:10
**concerns** [1] - 149:1
**conclude** [3] - 172:2, 247:8, 263:5
**concluded** [1] - 240:18
**conclusion** [1] - 10:13
**Conclusion** [1] - 265:14
**concurrent** [1] - 63:19
**condition** [4] - 157:16, 166:25, 170:8, 176:12
**conditions** [1] - 168:23
**conduct** [1] - 247:13
**conducted** [1] - 234:13
**conducting** [1] - 163:1
**conference** [1] - 14:23
**confident** [2] - 216:6, 261:15
**confirm** [1] - 167:21
**confirmed** [1] - 58:15
**confusing** [1] - 14:23
**confusion** [1] - 154:18
**connect** [13] - 29:20, 29:21, 29:23, 30:11, 30:14, 38:20, 69:15, 82:2, 82:11, 82:14, 104:17, 135:22, 164:7
**connected** [6] - 145:12, 171:16, 248:6, 254:19, 254:23, 255:23
**connecting** [2] - 53:7, 219:9
**connection** [7] - 138:20, 138:22, 203:19, 203:20, 215:9, 238:4, 239:25
**connections** [1] - 229:3
**consider** [5] - 12:7, 15:10, 98:12, 129:18, 251:22
**considerable** [1] - 141:13
**consideration** [1] - 246:20
**considered** [3] - 21:4, 99:17, 129:16
**consistent** [1] - 132:14
**console** [1] - 236:24
**conspiracy** [3] - 205:17, 224:23, 225:1
**conspirator's** [2] - 225:2, 225:5
**conspirators'** [1] - 225:6
**constantly** [2] - 101:6, 209:10
**constitute** [1] - 267:6
**consult** [1] - 172:15
**consulted** [1] - 128:18
**contact** [2] - 128:17,

164:1
**contacts** [2] - 233:21, 234:1
**contain** [1] - 247:1
**contained** [2] - 246:19, 250:22
**contains** [2] - 202:20, 235:17
**contemplated** [1] - 19:10
**content** [1] - 141:14
**continuation** [1] - 236:13
**Continue** [4] - 201:2, 247:10, 247:12, 247:14
**continue** [5] - 27:10, 54:15, 155:13, 206:20, 207:3
**CONTINUED** [1] - 22:1
**continuing** [1] - 193:12
**contrary** [2] - 19:15, 19:24
**controlled** [1] - 246:20
**conversation** [7] - 15:12, 42:9, 48:24, 114:11, 128:19, 225:18, 227:13
**conversations** [1] - 114:16
**converse** [1] - 242:1
**converted** [2] - 199:3, 199:5
**convict** [1] - 14:2
**conviction** [2] - 60:16, 261:24
**convinced** [1] - 224:25
**Coogi** [5] - 52:16, 52:18, 52:19, 52:21, 52:25
**cooked** [4] - 108:1, 108:16, 108:17, 109:9
**cooking** [1] - 108:20
**cool** [3] - 26:4, 41:6, 52:1
**cooperate** [1] - 60:13
**cooperated** [2] - 59:19, 60:4
**cooperating** [2] - 59:19, 60:13
**cooperation** [6] - 60:5, 60:6, 60:8, 60:12, 60:19, 139:5
**cooperative** [1] - 14:4
**copies** [3] - 229:17, 250:19
**copy** [9] - 2:11, 2:13, 113:19, 154:8, 194:14, 204:13, 204:20, 250:12, 250:15
**corner** [1] - 45:18

**Corporal** [30] - 131:6, 151:14, 155:2, 155:9, 156:4, 157:16, 157:25, 158:10, 161:25, 162:12, 163:7, 164:11, 164:12, 165:5, 165:6, 165:18, 166:25, 169:17, 170:5, 170:10, 171:17, 171:19, 172:4, 172:18, 172:22, 172:24, 173:21, 173:24, 175:9

**corporal** [3] - 164:11, 175:22, 188:9

**correct** [146] - 5:1, 5:24, 7:5, 7:8, 8:15, 13:21, 25:4, 25:23, 32:19, 35:5, 36:14, 38:25, 40:2, 40:3, 41:7, 45:10, 45:24, 46:5, 47:25, 48:3, 48:10, 51:7, 62:12, 72:13, 86:17, 91:18, 91:22, 92:3, 92:21, 93:14, 94:2, 95:2, 95:5, 98:2, 99:11, 99:15, 100:13, 100:25, 102:6, 102:12, 103:1, 103:4, 103:7, 103:24, 104:3, 104:6, 104:12, 104:15, 105:1, 105:22, 105:24, 106:20, 111:1, 111:9, 111:19, 114:1, 115:17, 115:21, 116:1, 116:20, 116:25, 117:14, 117:17, 118:6, 118:10, 118:18, 119:2, 120:8, 121:18, 123:3, 123:16, 132:11, 136:16, 136:20, 137:16, 137:21, 137:25, 138:13, 138:18, 141:21, 142:1, 142:4, 142:8, 144:14, 144:18, 145:1, 145:16, 146:17, 155:20, 156:11, 160:25, 168:10, 170:11, 172:22, 173:5, 173:11, 173:19, 181:10, 181:23, 184:6, 186:1, 188:8, 188:15, 188:19, 188:20, 190:3, 190:15, 190:21, 199:4, 199:16, 199:19, 217:24, 220:11, 233:16, 234:3, 235:21, 235:24, 236:5, 236:13, 236:14, 236:21, 237:5, 237:13, 237:16, 237:19, 238:2, 238:3, 238:25, 239:6, 239:13, 239:19, 239:22, 239:23, 240:8, 240:21, 241:1, 241:11, 241:21, 241:23, 242:25, 244:8, 244:15, 248:20, 254:1, 256:11, 256:13

**Correct** [30] - 69:17,

137:17, 179:8, 181:11, 191:14, 191:22, 193:19, 194:18, 195:2, 195:5, 195:8, 195:11, 195:20, 196:20, 197:3, 199:17, 226:12, 226:15, 234:4, 235:22, 236:6, 237:6, 239:7, 239:14, 240:9, 240:22, 240:24, 241:22, 243:1, 256:8

**corrected** [1] - 248:21

**corrections** [2] - 125:22, 125:23

**correspondence** [2] - 218:12, 224:10

**corridor** [1] - 151:25

**cost** [1] - 121:2

**counsel** [26] - 33:1, 125:14, 125:15, 128:22, 129:21, 129:24, 131:16, 132:3, 132:6, 133:18, 149:23, 162:6, 213:17, 215:23, 218:6, 218:12, 220:23, 221:6, 225:3, 229:4, 229:13, 229:23, 248:22, 252:2, 252:5, 254:4

**count** [2] - 38:1, 67:23

**counted** [2] - 38:2, 38:10

**counter** [2] - 201:10, 201:15

**counter-surveillance** [2] - 201:10, 201:15

**countervailing** [1] - 21:3

**counting** [4] - 38:5, 50:24, 51:3

**County** [19] - 131:4, 131:5, 151:5, 151:6, 151:24, 152:1, 153:25, 155:10, 174:15, 174:16, 174:18, 174:20, 174:22, 174:24, 192:16, 192:18, 196:22, 263:6, 264:20

**couple** [60] - 5:12, 5:13, 5:14, 11:10, 13:20, 22:13, 30:19, 30:21, 33:3, 36:6, 36:7, 40:1, 40:22, 42:24, 47:19, 47:22, 54:22, 61:7, 62:13, 63:20, 64:6, 69:5, 69:14, 70:16, 72:18, 73:14, 73:15, 73:18, 74:19, 75:17, 78:20, 82:14, 85:15, 85:23, 95:16, 95:24, 96:1, 101:21, 114:10, 124:8, 130:15, 130:20, 131:14, 158:8, 163:15, 170:7,

172:6, 188:13, 190:4, 191:15, 205:24, 211:21, 220:21, 228:25, 229:16, 250:19, 251:25, 252:1, 257:13, 264:12

**course** [16] - 2:10, 15:7, 15:12, 21:24, 48:24, 52:3, 128:22, 194:1, 197:11, 202:2, 211:7, 218:5, 249:13, 259:9, 263:23

**COURT** [316] - 1:1, 2:3, 2:9, 2:15, 2:17, 3:19, 3:23, 10:16, 10:18, 10:22, 11:1, 11:8, 11:25, 12:7, 12:10, 12:15, 12:19, 12:22, 13:2, 13:15, 13:23, 14:1, 14:6, 14:10, 14:12, 14:16, 14:18, 15:4, 15:22, 16:6, 16:13, 16:17, 16:20, 16:23, 16:25, 17:3, 17:6, 17:10, 17:12, 17:17, 17:19, 17:22, 18:1, 18:5, 18:25, 21:11, 25:13, 25:20, 26:3, 26:11, 26:14, 27:7, 44:8, 44:10, 44:18, 51:2, 51:24, 66:19, 80:13, 80:15, 91:13, 94:6, 117:6, 117:11, 121:6, 121:11, 122:24, 123:13, 124:6, 124:11, 124:18, 125:13, 125:19, 126:2, 126:5, 126:7, 126:22, 127:1, 127:9, 127:24, 128:10, 128:14, 128:17, 129:3, 129:7, 129:12, 129:22, 130:7, 130:10, 130:18, 130:25, 131:4, 131:10, 132:17, 132:20, 133:3, 133:11, 133:15, 133:18, 133:21, 134:2, 142:7, 142:20, 143:25, 147:2, 147:5, 147:7, 147:13, 147:15, 150:1, 150:4, 150:7, 150:12, 154:7, 155:8, 161:24, 162:12, 172:16, 173:24, 180:24, 191:25, 192:3, 197:6, 197:10, 198:16, 200:14, 200:16, 200:20, 200:23, 201:8, 201:16, 201:20, 201:24, 202:5, 202:10, 202:14, 202:23, 203:1, 203:4, 203:6, 203:11, 203:16, 203:20, 203:22, 204:1, 204:4, 204:12, 204:16, 204:21, 205:25, 206:14, 206:19, 206:21, 206:24, 207:5, 207:11,

207:16, 207:24, 208:14, 208:22, 209:1, 209:4, 209:17, 209:20, 210:18, 211:3, 211:7, 212:10, 212:15, 212:17, 212:20, 213:2, 213:10, 213:12, 213:15, 213:23, 214:18, 215:5, 216:2, 216:5, 216:23, 217:6, 217:15, 217:17, 217:23, 217:25, 218:4, 218:8, 218:20, 218:23, 219:4, 219:8, 219:15, 219:18, 220:4, 220:8, 220:10, 220:14, 220:16, 220:19, 221:18, 221:23, 222:19, 222:23, 223:3, 223:6, 223:10, 223:15, 223:21, 224:7, 224:12, 224:15, 225:13, 225:16, 226:6, 226:8, 226:10, 226:13, 226:16, 226:20, 226:23, 226:25, 227:6, 227:10, 227:20, 228:5, 228:9, 228:15, 228:18, 228:22, 229:2, 229:6, 229:9, 229:11, 229:14, 229:19, 229:24, 230:4, 230:7, 230:11, 230:15, 230:17, 232:2, 235:1, 246:1, 246:5, 246:10, 246:13, 246:25, 247:3, 247:6, 247:18, 247:20, 250:12, 250:15, 250:18, 251:14, 251:17, 252:22, 253:4, 253:7, 253:10, 253:17, 254:2, 254:16, 254:18, 254:22, 254:25, 255:7, 255:12, 255:20, 256:2, 256:6, 256:9, 256:12, 256:14, 256:17, 256:20, 257:1, 257:4, 257:7, 257:10, 257:15, 257:23, 258:1, 258:7, 258:9, 258:11, 259:2, 259:6, 259:8, 259:12, 259:19, 259:21, 259:25, 260:4, 260:13, 260:16, 260:18, 260:24, 261:9, 261:23, 262:5, 262:8, 262:21, 263:1, 263:19, 263:23, 264:4, 264:13, 264:18, 264:24, 265:1, 265:4, 265:8, 265:10

**Court** [32] - 13:13, 13:15, 15:10, 20:11, 20:25, 126:9, 127:17, 128:14, 130:21, 131:17, 131:23, 131:25, 132:24, 155:15, 155:19, 162:23, 163:4, 183:14, 199:16,

201:18, 212:9, 213:6, 213:17, 217:7, 217:21, 218:18, 218:24, 231:14, 238:20, 249:16, 250:7, 267:15

**court** [12] - 60:12, 64:12, 73:20, 139:8, 149:25, 152:16, 180:16, 208:19, 208:20, 212:6, 229:19, 247:8

**Court's** [11] - 19:1, 55:22, 77:9, 88:12, 90:22, 91:1, 131:22, 133:16, 177:11, 249:18, 264:2

**courteous** [1] - 261:11

**courtesy** [8] - 218:2, 218:4, 247:25, 248:15, 249:10, 259:18, 260:12, 261:21

**courthouse** [1] - 212:13

**Courthouse** [1] - 1:24

**courtroom** [13] - 10:21, 21:10, 80:24, 133:20, 134:1, 146:3, 150:9, 201:6, 201:7, 208:15, 230:16, 247:17, 247:19

**cousin** [7] - 24:2, 24:3, 37:14, 37:15, 37:16, 37:17

**Cousin** [1] - 24:4

**cousin's** [2] - 37:15, 37:21

**cousins** [4] - 47:22, 95:24, 95:25, 96:1

**cover** [2] - 72:4

**covered** [2] - 136:7, 216:5

**Craig** [4] - 131:6, 164:12, 174:2, 174:8

**CRAIG** [2] - 174:3, 266:11

**created** [1] - 202:8

**creating** [1] - 19:11

**credibility** [2] - 15:2, 129:19

**credit** [1] - 13:16

**Cree** [4] - 199:16, 201:18, 218:24, 231:14

**crime** [17] - 57:24, 58:7, 66:24, 67:14, 67:23, 131:8, 144:25, 166:8, 176:23, 178:16, 178:18, 193:7, 193:8, 194:6, 208:16, 262:16

**crimes** [2] - 175:1, 175:3

**CRIMINAL** [1] - 1:6

**criminal** [6] - 57:21, 63:22, 178:16, 203:15,

205:13
  **criticize** [1] - 251:22
  **criticizing** [2] - 214:7,
218:16
  **cross** [18] - 125:25,
127:10, 127:19, 128:8,
132:9, 212:13, 248:20,
249:13, 249:22, 251:11,
257:11, 257:16, 263:9,
263:11, 263:16, 264:1,
264:8, 264:11
  **CROSS** [12] - 3:24,
55:20, 91:14, 134:4,
172:20, 188:4, 266:5,
266:6, 266:6, 266:7,
266:10, 266:12
  **crossed** [1] - 232:17
  **CROWE** [25] - 25:11,
27:6, 213:4, 213:11,
213:14, 213:16, 214:17,
215:4, 215:25, 216:3,
216:21, 216:24, 217:13,
217:16, 217:19, 217:24,
218:2, 218:7, 218:18,
218:21, 219:14, 232:1,
263:24, 264:10, 264:14
  **Crowe** [6] - 1:20, 213:3,
213:23, 219:9, 219:13,
251:4
  **crucial** [1] - 128:8
  **crying** [4] - 4:18, 46:25,
47:16, 47:18
  **cumulativeness** [1] -
131:24
  **Cup** [3] - 123:15,
123:17, 123:18
  **curb** [5] - 179:23,
184:12, 187:15, 187:17,
190:12
  **current** [1] - 151:12
  **customer** [2] - 32:6,
50:11
  **customers** [4] - 23:10,
23:13, 110:12, 145:19
  **cut** [7] - 23:15, 100:3,
108:13, 109:1, 116:18,
145:15, 259:19
  **cuts** [2] - 20:1, 20:22
  **CVS** [1] - 210:19

**D**

  **damaging** [2] - 211:10,
211:11
  **Damita** [2] - 40:22,
40:23
  **Darius** [1] - 262:20
  **Dark** [1] - 56:19
  **Darrell** [1] - 55:5

  **Darryl** [192] - 3:3, 4:8,
4:14, 4:16, 4:19, 9:18,
12:18, 14:8, 18:22,
21:17, 22:8, 23:2, 23:7,
24:5, 24:6, 24:18, 24:20,
24:22, 24:23, 25:1, 25:7,
25:18, 26:1, 26:5, 26:8,
26:13, 26:16, 27:16,
28:1, 28:21, 28:22,
29:19, 30:8, 30:10,
30:14, 30:17, 30:22,
33:23, 33:24, 35:13,
35:22, 36:16, 37:24,
38:1, 38:10, 38:14,
38:19, 38:24, 39:4,
39:20, 39:25, 40:4,
41:13, 41:16, 41:17,
41:22, 41:23, 42:9,
42:22, 43:8, 43:20,
44:23, 44:25, 45:2, 45:7,
46:18, 47:1, 47:3, 50:12,
51:9, 52:22, 55:5, 64:25,
67:6, 68:9, 69:15, 69:19,
70:10, 70:15, 70:20,
71:8, 71:11, 73:23, 74:5,
74:19, 76:11, 76:15,
76:20, 77:12, 77:13,
77:15, 77:20, 78:11,
79:14, 81:15, 81:25,
82:1, 82:18, 83:1, 84:5,
84:8, 84:12, 84:24,
86:18, 87:5, 87:22,
89:15, 89:19, 89:24,
99:13, 99:25, 100:17,
100:20, 104:3, 104:5,
104:25, 105:3, 105:9,
105:12, 105:16, 105:20,
106:1, 106:15, 107:14,
109:3, 109:6, 110:2,
110:12, 111:1, 111:3,
112:16, 112:23, 113:3,
114:6, 114:18, 114:23,
115:2, 115:6, 117:8,
117:13, 118:3, 118:22,
119:1, 119:4, 120:22,
121:2, 121:7, 122:13,
122:25, 123:10, 126:20,
126:21, 128:4, 128:5,
134:11, 134:15, 135:2,
139:1, 139:14, 139:19,
140:5, 141:10, 144:9,
144:17, 145:13, 147:22,
148:4, 149:8, 198:18,
199:15, 204:6, 204:7,
206:5, 206:7, 206:11,
214:4, 232:23, 236:2,
242:22, 243:14, 243:17,
243:22, 245:1, 245:10,
251:25, 256:24, 257:8,
258:19, 258:23, 258:24
  **Darryl's** [20] - 23:10,

29:23, 32:6, 41:4, 41:5,
43:23, 46:16, 46:25,
47:5, 47:8, 54:14, 55:5,
71:12, 83:1, 99:14,
116:17, 117:2, 117:7,
123:5
  **data** [1] - 227:23
  **date** [11] - 57:11, 67:5,
68:13, 68:14, 113:15,
126:11, 126:13, 129:15,
148:13, 194:16, 194:23
  **dates** [2] - 67:10, 75:8
  **daunting** [1] - 251:22
  **David** [32] - 164:5,
164:6, 164:8, 165:5,
171:16, 177:1, 178:8,
178:19, 179:1, 179:6,
179:9, 179:20, 179:24,
180:3, 182:6, 182:11,
182:21, 183:4, 183:10,
183:13, 183:19, 183:25,
184:9, 184:15, 185:8,
185:15, 187:14, 187:25,
190:5, 190:14, 190:16,
190:20
  **David's** [2] - 185:17,
185:22
  **Davis** [1] - 1:13
  **days** [20] - 11:10, 68:23,
70:16, 73:15, 82:15,
101:21, 102:5, 102:7,
102:9, 123:21, 148:1,
163:15, 172:7, 175:23,
211:22, 229:1, 248:12,
248:16, 249:19, 249:20
  **DC** [26] - 28:5, 31:5,
31:13, 31:14, 37:6,
37:13, 37:21, 45:1,
64:25, 65:11, 65:19,
72:12, 74:7, 75:24,
76:22, 77:10, 78:2, 78:3,
78:4, 78:12, 105:18,
106:23, 114:6, 127:19,
127:20
  **deal** [24] - 34:23, 75:24,
76:1, 76:2, 76:3, 76:5,
78:18, 78:25, 89:12,
100:3, 100:7, 100:8,
107:14, 107:19, 107:21,
107:23, 127:7, 127:21,
127:23, 127:24, 127:25,
128:1, 128:3
  **dealer** [10] - 27:16,
27:18, 126:21, 135:3,
135:8, 135:10, 135:16,
135:18, 135:20, 205:13
  **dealers** [2] - 116:24,
120:7
  **dealing** [8] - 23:15,
23:17, 83:3, 99:13,

100:13, 100:18, 149:2,
209:14
  **dealings** [4] - 93:18,
99:11, 126:19
  **deals** [4] - 100:10,
102:1, 118:13
  **dealt** [1] - 24:25
  **death** [1] - 21:18
  **deaths** [1] - 141:15
  **debriefed** [1] - 12:22
  **debt** [2] - 71:13, 116:18
  **deceased** [1] - 148:19
  **decided** [6] - 37:8,
61:10, 80:5, 98:9,
108:25, 252:18
  **decision** [5] - 10:10,
11:6, 178:11, 216:15,
241:20
  **decisions** [2] - 127:11,
130:20
  **deck** [2] - 262:8, 262:9
  **decoders** [2] - 205:7,
231:9
  **deed** [2] - 221:18,
221:20
  **Deezo** [1] - 236:16
  **defendant** [5] - 144:4,
180:22, 225:8, 225:9,
258:4
  **Defendant** [5] - 1:17,
1:18, 1:20, 1:21, 253:23
  **defendants** [7] - 14:3,
205:17, 209:23, 215:9,
226:17, 251:24, 256:6
  **Defendants** [2] - 1:9,
2:1
  **defense** [27] - 127:15,
128:22, 129:21, 129:24,
131:16, 133:14, 149:23,
208:9, 209:21, 210:23,
214:20, 218:6, 218:12,
218:13, 227:2, 229:4,
229:13, 229:23, 252:2,
252:5, 258:14, 258:15,
260:5, 261:2, 263:3,
263:22, 264:6
  **defer** [1] - 264:17
  **degree** [4] - 67:13,
94:10, 97:20, 251:9
  **deliveries** [1] - 251:21
  **demeanor** [6] - 80:10,
80:14, 80:17, 158:5,
161:15, 161:16
  **demote** [1] - 151:17
  **Denham** [63] - 2:5, 2:8,
2:17, 2:21, 2:23, 3:19,
4:1, 10:18, 11:14, 13:4,
13:6, 13:8, 13:11, 13:18,
19:10, 20:13, 21:2, 21:9,
21:14, 21:15, 21:16,

21:24, 22:3, 22:5, 26:16,
36:1, 37:2, 39:4, 42:18,
44:11, 50:18, 54:19,
55:22, 58:17, 62:7,
62:17, 62:20, 91:16,
124:4, 124:22, 125:10,
128:21, 129:1, 129:3,
129:5, 130:10, 133:19,
133:21, 134:6, 138:4,
138:8, 141:9, 141:22,
142:17, 145:1, 145:19,
145:25, 150:9, 150:12,
212:7, 212:10, 212:11,
220:24
  **DENHAM** [2] - 2:16,
266:4
  **Denham's** [2] - 20:1,
21:6
  **denied** [4] - 21:7,
125:20, 130:4
  **Department** [3] - 151:7,
174:20, 192:19
  **department** [1] - 192:25
  **derived** [1] - 163:13
  **Describe** [1] - 156:18
  **describe** [3] - 162:3,
180:20, 184:8
  **described** [2] - 162:13,
188:14
  **description** [4] -
161:18, 162:1, 163:9,
173:2
  **descriptions** [2] -
163:9, 163:22
  **desire** [1] - 204:10
  **despite** [2] - 134:18
  **detail** [5] - 101:19,
141:13, 204:7, 251:9,
252:13
  **detailed** [1] - 228:1
  **details** [2] - 164:14,
173:3
  **detained** [9] - 119:20,
171:21, 177:7, 177:18,
178:7, 178:16, 179:3,
179:11, 179:22
  **detecting** [1] - 201:11
  **DETECTIVE** [1] -
266:14
  **Detective** [52] - 2:5,
21:13, 113:14, 113:20,
131:13, 138:13, 150:14,
170:14, 172:11, 172:15,
197:7, 197:9, 197:10,
197:14, 197:17, 197:20,
200:2, 200:8, 201:5,
208:7, 215:15, 226:4,
230:25, 231:15, 233:13,
234:12, 234:14, 236:22,
238:11, 239:12, 239:15,

244:10, 244:14, 247:18, 250:23, 251:3, 251:5, 251:6, 251:8, 252:8, 252:15, 252:17, 252:25, 262:12, 262:13, 263:16, 263:20, 263:21, 264:2, 264:16, 264:20
**detective** [6] - 200:21, 202:2, 204:24, 215:12, 253:16, 255:6
**detectives** [7] - 9:9, 11:11, 113:13, 170:15, 171:10, 255:10, 262:13
**detectors** [2] - 205:7, 231:10
**Detention** [1] - 233:4
**determination** [2] - 13:6, 261:24
**deviations** [2] - 127:12, 127:13
**devices** [5] - 201:11, 205:4, 205:5, 231:6, 231:7
**dial** [1] - 51:14
**dialed** [2] - 19:17, 19:19
**died** [5] - 67:7, 68:12, 68:13, 148:21, 148:23
**difference** [1] - 126:13
**differences** [1] - 73:9
**different** [16] - 36:19, 36:22, 64:20, 68:7, 87:18, 122:5, 127:19, 149:6, 172:7, 183:24, 219:24, 235:23, 236:22, 246:18, 251:25, 255:9
**differently** [3] - 125:1, 125:8, 127:12
**difficult** [4] - 18:10, 195:15, 209:13, 224:17
**difficulties** [1] - 122:22, 252:3
**difficulty** [2] - 161:20, 167:3
**dig** [1] - 222:10
**digging** [1] - 249:3
**Digital** [1] - 192:17
**digits** [4] - 51:13, 244:7, 244:19, 245:16
**dip** [1] - 162:21
**direct** [8] - 110:19, 125:23, 136:4, 214:11, 217:8, 262:22, 263:5, 264:19
**DIRECT** [12] - 2:19, 22:1, 150:25, 174:10, 192:12, 197:12, 266:4, 266:5, 266:9, 266:11, 266:13, 266:15
**directed** [2] - 218:11, 246:21

**directing** [3] - 152:4, 193:20, 217:11
**Directing** [1] - 175:5
**direction** [2] - 153:19, 155:13
**directly** [3] - 150:21, 174:5, 192:8
**directories** [2] - 233:21
**directory** [1] - 233:22
**dired** [1] - 14:19
**Dirty** [19] - 199:23, 199:24, 203:7, 203:8, 203:10, 203:17, 203:19, 203:20, 203:22, 203:24, 213:6, 213:9, 215:4, 215:7, 215:8, 218:22, 219:2, 219:11
**disagree** [3] - 216:5, 220:4
**disagreed** [1] - 206:14
**disclosed** [2] - 126:8, 260:20
**discoverable** [1] - 221:13
**discovered** [1] - 19:4
**discovery** [1] - 249:16
**discrepancies** [1] - 129:25
**discuss** [3] - 118:1, 207:21, 247:13
**discussed** [6] - 132:2, 135:24, 150:6, 187:13, 206:6, 213:17
**discussing** [3] - 6:16, 7:10, 97:24
**discussion** [4] - 124:13, 131:20, 201:1, 247:11
**discussions** [2] - 40:4, 207:23
**disguisers** [1] - 205:7, 231:10
**dismissed** [2] - 139:8, 139:10
**Dispatch** [1] - 153:2
**disrespected** [1] - 143:2
**disrespectful** [1] - 143:15
**disrespecting** [2] - 142:18, 142:23
**distance** [2] - 183:25, 184:2
**distinguish** [5] - 98:22, 98:23, 99:1, 99:2, 99:6
**distribute** [1] - 63:4
**distribution** [1] - 224:23
**DISTRICT** [2] - 1:1, 1:2
**District** [1] - 50:12
**disturbed** [1] - 168:24

**disturbing** [1] - 135:5
**divided** [1] - 209:24
**division** [1] - 264:1
**DIVISION** [1] - 1:2
**DOAR** [12] - 202:24, 206:15, 207:22, 208:3, 209:15, 209:23, 210:6, 210:7, 211:13, 215:18, 215:22, 217:9
**Dobropolski's** [1] - 211:20
**DOC** [2] - 125:2, 125:5
**doctors** [2] - 195:9, 195:12
**document** [32] - 2:10, 2:13, 15:7, 198:11, 198:15, 198:18, 199:7, 199:21, 200:8, 200:18, 201:8, 201:16, 201:24, 202:6, 202:8, 205:2, 207:2, 207:9, 207:13, 207:14, 209:15, 210:7, 210:9, 210:11, 214:24, 216:11, 220:19, 222:11, 225:1, 228:23, 228:24
**document's** [1] - 222:14
**documents** [10] - 200:20, 207:19, 208:1, 208:6, 211:16, 217:21, 222:4, 223:17, 224:18, 225:7
**dogs** [1] - 139:23
**dollars** [1] - 35:2
**Dominican** [5] - 29:24, 29:25, 38:20, 69:18, 75:20
**Donald** [2] - 77:6, 125:3
**done** [14] - 59:22, 103:3, 109:20, 124:25, 125:11, 126:23, 128:20, 133:23, 153:3, 171:9, 174:22, 187:5, 189:16, 215:2
**door** [20] - 38:6, 38:7, 38:8, 52:14, 53:11, 143:14, 166:22, 166:25, 167:12, 168:1, 168:4, 168:8, 168:11, 168:16, 168:17, 168:18, 168:20, 169:9, 169:10
**double** [2] - 19:6, 19:20
**doublecheck** [1] - 227:22
**doubt** [3] - 129:25, 186:22, 224:17
**Douglas** [1] - 262:11
**Down** [1] - 233:11
**down** [32] - 33:23, 34:20, 35:4, 35:18,

35:23, 38:15, 105:18, 106:23, 107:17, 127:21, 127:22, 128:3, 139:14, 155:12, 155:13, 163:4, 184:13, 201:5, 210:21, 228:8, 231:1, 231:2, 232:11, 234:9, 238:14, 240:14, 242:4, 244:11, 245:14, 260:25
**Dr** [3] - 195:7, 196:10, 196:12
**drabs** [1] - 197:16
**draw** [1] - 229:25
**drawers** [1] - 170:7
**drawn** [2] - 54:10, 55:23
**dressed** [3] - 46:25, 79:9, 116:1
**dribs** [1] - 197:16
**Drive** [2] - 146:20, 152:9, 255:13
**drive** [20] - 28:24, 31:17, 38:12, 44:21, 44:24, 45:1, 74:7, 74:12, 77:13, 77:16, 77:22, 106:22, 110:15, 118:3, 139:14, 139:16, 148:4, 178:20, 223:5
**drives** [3] - 242:23, 243:18, 243:19
**driving** [7] - 31:19, 77:11, 114:6, 117:24, 118:2, 118:25, 139:20
**dropped** [8] - 69:1, 138:16, 138:21, 138:23, 138:25, 139:7, 147:18, 148:1
**drove** [6] - 28:21, 28:23, 31:15, 44:25, 131:7
**drug** [12] - 17:7, 22:8, 22:17, 24:20, 27:16, 27:18, 37:1, 41:20, 54:15, 54:19, 65:8, 66:20, 69:6, 78:18, 78:25, 89:1, 99:13, 100:13, 100:18, 102:1, 111:8, 111:12, 111:13, 116:24, 118:13, 120:6, 120:7, 120:22, 135:3, 135:8, 135:10, 135:16, 135:18, 135:20, 140:4, 140:14, 141:10, 149:2, 197:24, 205:13, 224:23, 243:13
**drugs** [28] - 29:15, 39:4, 41:22, 50:13, 62:16, 66:17, 69:16, 81:14, 81:15, 83:13, 86:12, 86:18, 110:17, 119:6, 122:16, 123:2, 129:20, 134:19, 135:8, 135:9,

135:10, 135:16, 135:17, 135:21, 140:15, 197:20, 239:22, 243:21
**Dubrowski** [1] - 21:21
**duct** [8] - 169:7, 169:9, 169:11, 169:15, 169:17, 169:23, 169:25, 170:21
**dude** [3] - 29:24, 29:25, 52:12
**due** [4] - 19:8, 102:25, 226:25, 258:10
**During** [4] - 131:19, 161:7, 171:15, 178:25
**during** [22] - 22:22, 71:10, 94:9, 94:13, 94:17, 101:10, 102:9, 114:16, 136:17, 151:19, 157:22, 157:25, 162:8, 171:9, 185:8, 186:14, 193:13, 194:1, 207:17, 214:12, 258:15
**duteously** [1] - 222:8
**duties** [2] - 151:9, 175:17
**duty** [3] - 152:5, 175:12, 175:19
**Dwayne** [3] - 2:5, 21:14, 60:23
**DWAYNE** [2] - 2:16, 266:4
**dynamic** [1] - 126:18

**E**

**e-mailed** [1] - 252:20
**Eager** [1] - 233:1
**ear** [1] - 48:18
**early** [6] - 33:4, 93:10, 93:15, 101:17, 217:19
**earphones** [1] - 48:17
**easier** [2] - 222:9, 222:18
**easily** [1] - 98:14
**East** [3] - 89:9, 115:3, 233:1
**easy** [1] - 222:16
**ECI** [1] - 76:21
**edge** [1] - 159:25
**Edwards** [1] - 262:12
**effect** [1] - 215:6
**efforts** [1] - 19:23
**eight** [13] - 5:18, 5:23, 8:13, 8:14, 9:3, 11:4, 14:25, 16:1, 16:2, 16:11, 94:20, 152:3, 162:16
**Eight** [1] - 152:3
**eighth** [1] - 214:7
**either** [9] - 29:14, 81:8, 116:12, 171:19, 183:1,

185:15, 205:18, 210:8, 236:24

**Either** [1] - 244:14
**electronic** [4] - 205:4, 216:8, 216:12, 231:6
**element** [1] - 19:3
**elicit** [6] - 10:23, 11:14, 11:17, 129:17, 132:9, 132:25
**elicited** [2] - 12:5, 125:24
**elicits** [1] - 132:4
**eliminate** [1] - 141:6
**employed** [2] - 174:18, 192:24
**Employer** [1] - 239:2
**employment** [1] - 239:6
**empty** [1] - 108:10
**empty-handed** [1] - 108:10
**encounter** [1] - 179:7
**end** [8] - 169:18, 190:13, 206:3, 214:4, 249:19, 250:1, 260:1, 265:11
**ended** [3] - 21:20, 212:6, 240:23
**ends** [1] - 211:25
**enforcement** [2] - 59:20, 100:12
**enforcer** [1] - 101:14
**enhanced** [1] - 18:9
**enter** [2] - 165:14, 166:5
**entered** [7] - 165:20, 166:9, 166:20, 167:1, 167:11, 233:22, 244:20
**entering** [1] - 165:22
**enters** [4] - 21:10, 133:20, 134:1, 230:16
**entire** [3] - 167:21, 196:11, 258:15
**entitled** [11] - 15:9, 15:10, 133:6, 217:25, 227:7, 227:11, 258:15, 259:2, 259:3, 261:13
**entrance** [2] - 157:3, 159:23
**entries** [4] - 234:6, 237:8, 239:15, 254:19
**entry** [12] - 166:13, 166:16, 167:5, 167:17, 232:17, 236:8, 236:18, 240:14, 241:13, 242:10, 244:17, 244:19
**envelope** [3] - 194:11, 196:7, 196:11
**environment** [1] - 19:12
**equally** [1] - 225:6
**equipment** [8] - 200:11, 201:13, 201:15, 204:25,

210:16, 216:9, 216:12, 220:18
**Eric** [1] - 262:11
**Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**essentially** [2] - 20:20, 206:9
**Essex** [3] - 89:6, 114:25, 148:7
**establish** [3] - 202:21, 203:23, 206:17
**established** [1] - 21:1
**establishing** [1] - 176:23
**estimate** [1] - 5:16
**et** [1] - 267:5
**etc** [1] - 176:24
**eulogy** [1] - 206:10
**evaluating** [1] - 21:4
**evening** [4] - 128:6, 148:12, 175:16, 247:15
**event** [5] - 160:14, 161:5, 189:22, 195:21, 205:19
**events** [1] - 188:9
**Eventually** [1] - 91:13
**eventually** [4] - 56:21, 152:19, 154:24, 222:13
**evidence** [35] - 13:9, 13:13, 14:23, 15:15, 15:17, 20:23, 21:1, 119:20, 121:10, 124:14, 144:1, 144:3, 167:5, 193:9, 193:10, 193:13, 194:8, 195:18, 196:12, 196:21, 197:2, 198:13, 201:2, 202:10, 210:14, 210:15, 210:21, 220:1, 222:14, 228:11, 246:16, 247:11, 254:14, 257:20, 260:24
**Evidence** [2] - 192:17, 248:10
**evidentiary** [2] - 130:20, 247:23
**exact** [10] - 28:19, 33:10, 68:14, 93:11, 112:8, 112:11, 115:12, 129:15, 140:23, 140:25
**exactly** [16] - 4:9, 5:13, 6:6, 21:15, 29:17, 34:22, 35:8, 45:23, 51:11, 68:3, 85:2, 112:7, 112:9, 125:21, 183:2, 248:11
**Exactly** [3] - 14:20, 120:14, 259:12
**exaggerating** [1] - 252:3

**examination** [15] - 125:23, 125:25, 127:10, 132:9, 136:4, 196:25, 215:11, 248:18, 248:20, 249:13, 249:22, 250:11, 257:12, 257:16, 264:11
**EXAMINATION** [28] - 2:19, 3:24, 22:1, 55:20, 91:14, 134:4, 138:6, 145:23, 150:25, 172:20, 174:10, 188:4, 192:12, 197:12, 266:4, 266:5, 266:5, 266:6, 266:6, 266:7, 266:7, 266:8, 266:9, 266:10, 266:11, 266:12, 266:13, 266:15
**examine** [2] - 251:11, 263:16
**examined** [1] - 195:24
**Examiner** [4] - 192:22, 193:21, 195:4, 195:10
**examining** [1] - 264:8
**except** [3] - 205:17, 212:21, 244:7
**exception** [2] - 132:24, 251:10
**exceptions** [1] - 209:21
**excited** [7] - 131:18, 131:23, 131:25, 132:6, 132:10, 132:16, 161:16
**exclude** [3] - 21:5, 249:16, 257:18
**Exclude** [1] - 250:7
**exclusion** [1] - 16:14
**Exclusive** [3] - 239:3, 239:4, 239:8
**Excuse** [7] - 78:8, 96:11, 103:5, 106:24, 111:17, 173:13, 212:13
**excused** [6] - 150:13, 173:25, 192:1, 201:4, 247:16, 247:18
**exhibit** [46] - 204:17, 204:18, 209:18, 209:19, 209:22, 210:1, 210:2, 210:3, 211:4, 211:14, 213:7, 213:13, 213:19, 213:25, 214:2, 214:5, 214:20, 214:22, 215:10, 215:12, 215:14, 215:16, 215:21, 215:22, 216:4, 216:14, 216:24, 216:25, 217:4, 217:5, 217:9, 217:22, 218:6, 219:1, 220:6, 220:10, 224:20, 226:2, 227:22, 235:23, 236:15, 236:21, 237:11, 249:15
**Exhibit** [39] - 24:8, 155:3, 155:18, 156:1,

156:25, 159:16, 159:22, 160:10, 166:8, 166:17, 166:22, 167:10, 168:14, 169:3, 169:14, 169:22, 170:4, 170:25, 177:10, 177:13, 177:17, 177:24, 181:3, 181:15, 182:3, 183:13, 183:18, 194:11, 198:8, 200:7, 201:17, 213:8, 215:15, 218:19, 233:24, 238:7, 241:25, 242:6
**exhibits** [1] - 199:13, 209:11, 212:1, 214:10, 214:14, 216:18, 217:20
**existed** [1] - 257:19
**exits** [4] - 201:6, 247:17, 247:19
**expand** [1] - 11:13
**expect** [7] - 19:21, 51:22, 132:13, 249:11, 249:12, 258:24, 260:9
**expected** [4] - 52:1, 211:24, 213:6, 249:4
**experience** [4] - 32:1, 32:2, 135:19, 246:14
**experienced** [1] - 135:3
**explain** [2] - 12:10, 139:19, 253:1
**Explanation** [1] - 241:9
**express** [4] - 182:11, 182:16, 186:18, 186:22
**expression** [1] - 258:13
**extend** [1] - 259:17
**exterior** [1] - 168:20
**extremely** [4] - 18:22, 134:16, 209:12, 209:13
**eye** [1] - 88:14

**F**

**face** [3] - 51:12, 74:4, 249:11
**faced** [3] - 51:9, 51:10, 74:1
**facetiously** [1] - 126:19
**facing** [1] - 184:12
**fact** [62] - 8:24, 9:2, 12:3, 14:20, 15:4, 16:6, 16:13, 18:6, 18:8, 20:1, 20:14, 20:16, 20:23, 36:9, 49:7, 50:14, 52:7, 54:11, 58:22, 58:25, 66:8, 66:11, 68:20, 94:23, 95:4, 96:16, 97:24, 99:22, 101:10, 102:4, 102:11, 103:23, 104:5, 106:1, 111:3, 111:4, 117:7, 120:17,

121:9, 121:17, 122:5, 124:21, 129:9, 134:12, 134:18, 135:8, 137:11, 138:11, 141:20, 144:16, 144:20, 144:22, 147:24, 148:1, 164:20, 182:16, 202:11, 202:12, 211:18, 212:3, 241:18, 251:25
**factor** [1] - 18:8
**factors** [1] - 21:3
**Fair** [1] - 263:18
**fair** [5] - 210:23, 211:13, 211:25, 254:6, 254:9
**fairly** [4] - 21:19, 24:6, 209:21, 212:22
**Fairly** [2] - 217:14, 217:19
**fairness** [1] - 228:6
**faith** [1] - 130:1
**faithfully** [1] - 209:21
**fall** [1] - 158:16
**falls** [3] - 247:22, 247:24, 249:9
**false** [6] - 20:5, 68:5, 139:1, 139:3, 146:22, 147:19
**familiar** [12] - 78:12, 155:3, 157:1, 199:9, 199:10, 232:20, 233:1, 234:12, 244:24, 244:25, 251:2, 251:7
**family** [17] - 5:12, 12:17, 14:7, 19:20, 19:21, 47:19, 54:3, 55:1, 55:7, 95:23, 119:19, 119:23, 119:25, 167:11, 168:16, 168:17
**fancy** [1] - 258:24
**far** [24] - 13:24, 26:6, 53:15, 109:24, 110:10, 117:16, 118:8, 118:20, 118:22, 124:14, 159:14, 161:10, 161:12, 161:13, 165:5, 166:4, 176:13, 181:9, 181:12, 184:4, 190:6, 210:10, 219:24, 247:11
**fashion** [3] - 191:1, 248:20, 260:11
**father** [1] - 61:10
**favor** [1] - 20:1
**fear** [1] - 49:19
**feature** [1] - 51:14
**features** [1] - 107:8
**February** [2] - 33:13, 57:10
**federal** [2] - 57:21, 57:22
**feet** [5] - 162:20, 184:4, 184:6, 190:6, 190:7

**fellow** [1] - 182:24
**felony** [1] - 66:20
**felt** [8] - 41:17, 56:24, 117:7, 143:2, 143:15, 219:6, 225:14
**Female** [2] - 28:12, 40:20
**female** [4] - 28:13, 156:8, 156:9, 156:19
**females** [1] - 40:22
**few** [18] - 32:13, 68:22, 91:17, 102:9, 150:5, 159:3, 159:7, 159:16, 159:19, 160:4, 163:15, 166:7, 168:1, 172:24, 206:16, 230:18, 231:13, 232:8
**fewer** [1] - 250:22
**fidgeting** [2] - 81:6, 81:8
**field** [1] - 154:4
**fight** [1] - 225:14
**fighting** [2] - 71:3, 119:21
**figure** [10] - 12:4, 63:9, 87:15, 89:19, 89:23, 90:1, 109:6, 125:3, 125:5, 210:4
**figured** [2] - 85:11, 119:10
**filed** [1] - 2:10
**fill** [5] - 238:4, 238:10, 239:24, 240:15, 249:21
**filled** [4] - 238:8, 238:11, 238:15, 240:10
**final** [2] - 20:25, 49:10
**finally** [1] - 102:8
**financial** [1] - 71:17
**fine** [3] - 124:10, 206:8, 265:1
**Fine** [1] - 229:24
**finger** [5] - 157:5, 157:6, 177:21, 177:23, 183:12
**fingerprint** [2] - 63:11, 194:9
**fingerprints** [2] - 63:13, 193:9
**fingers** [2] - 218:15, 260:4
**finish** [2] - 131:10, 228:20
**finished** [4] - 47:13, 217:15, 217:17, 228:15
**fired** [1] - 162:21
**firing** [1] - 147:19
**firm** [1] - 258:18
**first** [72] - 4:10, 5:23, 14:14, 14:18, 16:9, 23:23, 33:21, 43:16,

45:13, 59:18, 62:12, 62:13, 66:13, 67:13, 72:13, 76:3, 76:6, 79:23, 82:1, 91:21, 92:23, 96:8, 99:19, 101:18, 109:5, 116:14, 120:12, 130:22, 131:5, 148:9, 156:4, 157:7, 160:19, 160:21, 161:10, 162:6, 162:8, 164:4, 166:20, 167:1, 167:16, 168:5, 169:7, 169:12, 169:17, 177:12, 180:2, 183:7, 188:13, 188:14, 190:5, 191:18, 195:16, 195:24, 209:18, 210:14, 212:8, 215:22, 216:9, 223:23, 227:14, 227:16, 232:4, 232:24, 235:4, 242:10, 248:9, 253:1, 260:22, 264:22
**First** [4] - 12:4, 192:11, 257:14, 259:10
**Five** [4] - 92:10, 160:23, 220:10, 236:20
**five** [21] - 60:17, 64:2, 64:4, 67:24, 72:21, 105:17, 124:9, 139:24, 139:25, 148:5, 154:15, 162:16, 209:9, 223:25, 246:6, 246:7, 249:4, 249:19, 249:20, 255:14
**five-eight** [1] - 162:16
**five-month-old** [1] - 249:4
**Flannery** [2] - 1:19, 222:11
**flash** [1] - 223:5
**flip** [2] - 51:12, 74:3
**floating** [1] - 112:24
**floor** [4] - 157:7, 166:19, 169:2, 247:8
**focus** [4] - 167:8, 167:19, 169:4, 226:6
**focused** [2] - 210:22, 215:20, 252:16
**focusing** [1] - 173:2
**folks** [1] - 214:7
**follow** [2] - 100:20, 150:2
**following** [2] - 137:5, 149:19
**follows** [1] - 162:13
**food** [1] - 166:18
**football** [1] - 154:4
**FOR** [1] - 1:2
**forced** [1] - 167:5
**foregoing** [1] - 267:6
**Forensic** [3] - 192:16, 192:22, 192:23
**forensic** [3] - 193:2,

193:5, 196:24
**forget** [2] - 83:13, 183:8
**forgive** [1] - 258:13
**forgives** [1] - 71:12
**forgot** [1] - 71:21
**form** [1] - 241:9
**format** [1] - 252:10
**forth** [3] - 209:24, 216:11, 218:13
**Fortune** [4] - 200:12, 219:20, 219:25, 220:8
**forward** [3] - 179:24, 184:14, 263:9
**fostering** [1] - 20:9
**foundation** [3] - 25:19, 26:2, 44:8
**Four** [2] - 238:20, 243:4
**four** [15] - 75:22, 105:21, 127:22, 128:3, 162:20, 214:21, 217:8, 223:24, 242:21, 243:2, 243:13, 244:19, 245:16, 245:21, 261:6
**fourth** [1] - 236:15
**frame** [3] - 93:9, 112:9, 139:21
**Frank** [1] - 200:4
**Frankly** [1] - 214:1
**frankly** [2] - 221:17, 259:13
**free** [2] - 99:21, 241:21
**Friday** [1] - 123:22
**friend** [7] - 28:11, 41:3, 41:4, 41:5, 65:3
**friendly** [1] - 55:1
**friends** [9] - 5:13, 18:20, 19:21, 47:19, 54:12, 95:13, 95:24, 95:25, 120:8
**front** [31] - 13:18, 22:15, 39:9, 39:14, 43:12, 45:5, 59:1, 80:9, 80:24, 81:1, 81:22, 93:12, 119:1, 127:6, 157:3, 162:19, 166:22, 166:25, 167:11, 172:25, 179:4, 180:1, 182:9, 182:17, 194:12, 194:14, 201:12, 204:15, 206:13, 207:22, 210:1
**fronting** [2] - 135:17, 135:21
**frustrating** [1] - 209:12
**frustration** [1] - 207:2
**Fuji** [4] - 4:7, 4:11, 4:12, 47:11
**full** [10] - 3:15, 3:16, 12:14, 18:11, 97:23, 103:21, 103:22, 108:25, 221:7, 265:5
**fully** [3] - 12:2, 129:17,

220:23
**fundamental** [1] - 259:10
**funeral** [30] - 15:6, 51:18, 51:21, 52:7, 52:11, 53:8, 53:19, 54:6, 55:23, 56:7, 56:13, 56:15, 115:24, 116:4, 116:9, 137:18, 137:19, 137:22, 137:25, 142:17, 143:13, 149:12, 198:7, 199:3, 199:9, 206:4, 214:15, 214:23, 215:1
**Funeral** [1] - 199:8
**funny** [1] - 84:8
**future** [1] - 222:19

**G**

**G-R-A-H-A-M** [1] - 192:11
**galling** [1] - 221:17
**game** [1] - 189:3
**garbled** [1] - 15:12
**GARDNER** [1] - 1:8
**Gardner** [33] - 1:21, 25:16, 25:17, 25:21, 25:22, 26:1, 26:17, 180:10, 180:11, 180:14, 180:23, 180:25, 181:7, 181:8, 181:13, 181:16, 181:20, 182:4, 182:7, 184:2, 184:10, 186:8, 186:13, 187:14, 187:19, 190:20, 210:19, 219:23, 225:1, 225:20, 231:19, 231:22, 253:21
**Gardner's** [4] - 132:6, 181:25, 219:21, 254:8
**garnered** [1] - 194:8
**GARY** [1] - 266:14
**gather** [2] - 19:22, 187:7
**general** [10] - 42:25, 131:12, 151:23, 173:2, 188:15, 190:24, 205:13, 253:8, 253:9, 255:11
**generally** [5] - 42:18, 151:9, 173:4, 183:12, 207:8
**generosity** [2] - 221:16, 224:1
**gentleman** [3] - 134:9, 134:10, 137:1
**gentlemen** [12] - 21:11, 124:6, 124:12, 134:2, 136:23, 143:25, 150:13, 186:10, 230:18, 246:13, 247:4, 247:6

**Gerard** [1] - 1:19
**Giganti** [3] - 229:10, 252:9, 263:21
**Giglio** [4] - 124:21, 129:10, 209:3, 211:22
**Gilray** [1] - 255:13
**girl** [4] - 160:25, 184:24, 184:25, 185:12
**girlfriend** [1] - 245:6
**Girlfriend's** [1] - 238:23
**girlfriend's** [2] - 242:21, 243:14
**given** [13] - 13:10, 20:18, 20:19, 50:10, 125:10, 163:9, 182:7, 196:10, 209:13, 213:7, 221:17, 263:25, 264:15
**glad** [1] - 210:12
**glass** [1] - 226:9
**glasses** [1] - 180:21
**Godfather** [3] - 14:8, 55:3, 55:6
**Goo** [29] - 26:1, 26:4, 26:13, 27:13, 27:14, 49:25, 51:22, 51:25, 52:3, 52:4, 52:9, 52:12, 52:13, 52:24, 53:10, 83:11, 136:11, 136:24, 137:19, 142:18, 142:21, 143:16, 202:18, 202:21, 203:2, 232:10, 236:19, 237:2
**Goo's** [3] - 26:4, 137:6, 137:12
**goodness** [1] - 16:7
**Government** [13] - 1:15, 24:8, 167:10, 198:7, 200:7, 201:17, 213:8, 215:15, 218:19, 233:24, 238:7, 241:25, 242:6
**government** [73] - 10:24, 12:5, 12:19, 12:20, 14:2, 14:5, 17:14, 19:11, 20:2, 20:9, 20:14, 21:1, 72:13, 77:6, 124:22, 130:14, 130:22, 132:3, 132:24, 133:1, 133:5, 133:14, 148:9, 150:15, 204:18, 206:16, 207:19, 207:24, 208:9, 209:21, 213:7, 213:24, 213:25, 214:1, 214:25, 215:21, 215:25, 216:13, 216:24, 217:4, 217:8, 217:11, 217:20, 217:21, 217:22, 218:5, 218:9, 218:14, 218:19, 224:17, 224:21, 226:3, 227:15, 227:16, 227:25, 228:13, 248:11, 249:10, 249:11,

249:12, 250:8, 250:17, 250:18, 251:19, 252:4, 258:21, 258:22, 258:25, 261:3, 261:5, 263:10, 263:11, 263:12

**GOVERNMENT'S** [4] - 2:16, 150:19, 174:3, 192:6

government's [10] - 129:10, 206:25, 210:2, 216:18, 224:24, 227:21, 228:11, 258:14, 258:16, 259:4

**Government's** [28] - 155:2, 155:18, 156:1, 156:25, 159:16, 159:22, 160:10, 166:7, 166:17, 166:22, 168:11, 168:14, 169:3, 169:14, 169:22, 170:4, 170:25, 177:10, 177:13, 177:17, 177:24, 181:3, 181:15, 182:3, 183:13, 183:18, 194:11

**GPS** [3] - 205:8, 214:2, 231:11

**Graham** [2] - 192:5, 192:10

**GRAHAM** [2] - 192:6, 266:13

grand [55] - 11:15, 13:21, 33:4, 33:9, 33:12, 33:20, 36:1, 36:3, 36:13, 49:7, 49:12, 50:11, 50:14, 50:18, 57:2, 57:6, 57:12, 57:21, 57:25, 59:1, 59:6, 80:9, 81:1, 81:22, 86:10, 86:11, 88:9, 90:4, 90:14, 93:12, 94:1, 94:4, 105:20, 105:23, 111:7, 111:11, 112:12, 121:13, 121:14, 121:17, 121:20, 122:5, 126:14, 126:17, 127:6, 128:2, 140:3, 140:12, 140:20, 141:8, 145:6, 229:8, 252:8

grant [2] - 215:5, 227:7
grasp [2] - 12:2, 257:10
gray [5] - 133:1, 162:15, 162:17, 180:21, 231:20
great [1] - 116:19
**Great** [1] - 133:15
greater [1] - 74:10
**Green** [16] - 172:8, 177:22, 178:3, 178:20, 178:23, 179:10, 179:19, 179:20, 182:6, 185:3, 185:4, 185:20
green [2] - 29:4, 33:23
**Green's** [1] - 241:4

**Greenbelt** [1] - 248:25
**Greg** [16] - 32:5, 32:9, 32:10, 37:16, 72:12, 76:10, 76:25, 107:4, 107:6, 107:8, 107:10, 125:4, 131:3, 144:17, 150:18, 176:20
**Greg's** [2] - 37:15, 37:17
**GREGORY** [2] - 150:19, 266:9
**Gregory** [1] - 150:23
grievances [1] - 222:24
grocery [2] - 23:2, 23:7
ground [5] - 136:7, 157:8, 169:6, 170:1, 170:7
grounds [1] - 131:24
group [3] - 10:10, 11:6, 19:4
guess [11] - 27:11, 43:22, 75:18, 82:10, 112:14, 118:11, 188:24, 189:20, 212:18, 231:1, 260:25
guilty [2] - 69:7, 69:9
gum [1] - 3:20
**Gun** [1] - 204:19
gun [16] - 29:14, 35:18, 35:20, 64:25, 65:12, 65:14, 65:21, 65:25, 66:5, 66:7, 66:9, 66:16, 68:4, 68:5, 78:15
gunshots [4] - 153:10, 153:11, 153:16, 154:15
gussied [1] - 226:16
guy [32] - 12:13, 16:4, 23:24, 24:9, 24:11, 31:9, 31:12, 32:3, 32:5, 32:9, 33:6, 33:14, 34:17, 35:9, 37:7, 38:20, 39:14, 39:19, 50:4, 68:5, 69:18, 72:11, 76:10, 77:3, 123:4, 132:5, 133:1, 139:3, 252:14, 265:12
guys [4] - 38:12, 69:18, 84:22, 133:7

## H

**HA** [1] - 214:2
**Hagerstown** [2] - 64:12, 76:20
hair [2] - 181:25, 239:9
hairstyle [1] - 181:22
half [26] - 34:17, 35:9, 37:8, 37:23, 73:22, 82:18, 108:6, 108:11, 108:13, 109:1, 109:2,

109:7, 109:11, 109:12, 109:15, 109:18, 113:11, 113:12, 122:17, 127:25, 242:21, 243:2, 243:4, 243:13, 243:16
hand [8] - 155:25, 165:19, 177:15, 198:7, 200:17, 217:3, 246:10, 250:19
hand-out [1] - 198:7
handcuffed [2] - 187:20, 187:21
handcuffs [3] - 191:6, 191:11, 191:13
handed [5] - 108:10, 154:8, 229:17, 246:19, 248:2
handgun [9] - 66:24, 67:14, 67:23, 147:18, 162:21, 171:7, 171:8
handle [1] - 152:25
handled [1] - 207:25
handling [1] - 152:8
handprinting [1] - 202:6
hands [1] - 143:8
handwritten [1] - 234:1
handy [1] - 204:19
**Hanlon** [10] - 1:16, 131:1, 150:16, 173:3, 209:6, 212:5, 227:18, 228:19, 262:7, 262:8
**HANLON** [18] - 131:2, 131:5, 131:12, 132:18, 132:21, 133:4, 150:17, 151:1, 172:18, 174:1, 174:11, 191:24, 192:4, 192:13, 262:9, 266:9, 266:11, 266:13
happiest [1] - 265:12
happy [2] - 263:7, 263:8
hard [7] - 2:11, 2:12, 31:18, 127:9, 216:20, 224:8, 224:16
**Harding** [67] - 1:16, 12:1, 14:12, 18:1, 21:25, 57:14, 59:7, 60:22, 65:24, 66:12, 72:13, 73:8, 74:1, 78:18, 78:25, 79:20, 121:12, 126:9, 126:16, 129:12, 129:13, 129:23, 137:1, 144:5, 149:1, 172:15, 200:14, 201:8, 206:7, 207:12, 208:14, 209:6, 210:7, 212:5, 213:15, 214:12, 215:6, 215:12, 215:14, 216:10, 218:20, 220:5, 221:20, 222:6, 222:19, 223:1, 223:17, 225:25,

227:4, 227:15, 228:19, 228:23, 229:21, 230:21, 246:8, 250:20, 250:22, 251:3, 251:18, 252:23, 259:16, 260:9, 260:14, 261:18, 262:21, 263:5
**HARDING** [129] - 2:4, 2:20, 10:17, 10:25, 11:13, 12:6, 12:9, 12:13, 12:16, 12:20, 12:24, 13:14, 13:17, 13:24, 14:4, 14:8, 14:11, 16:21, 16:24, 17:15, 17:18, 17:20, 18:3, 22:2, 26:12, 26:15, 32:11, 44:9, 44:13, 44:20, 66:18, 80:12, 85:16, 85:20, 94:5, 117:4, 117:10, 121:5, 121:9, 122:23, 129:14, 138:7, 144:6, 147:1, 147:12, 149:24, 150:3, 197:8, 197:13, 198:13, 198:17, 200:15, 200:22, 201:9, 201:18, 201:21, 202:1, 202:9, 202:12, 202:16, 202:25, 203:2, 203:5, 203:8, 203:14, 203:18, 203:21, 203:23, 204:3, 204:6, 212:25, 218:25, 219:5, 220:7, 220:9, 220:12, 220:17, 220:20, 221:21, 222:22, 223:20, 227:5, 227:9, 228:24, 229:3, 229:7, 229:10, 229:12, 229:15, 229:22, 230:9, 230:14, 230:22, 246:2, 246:9, 246:11, 246:23, 247:2, 251:16, 251:19, 252:24, 253:6, 253:9, 253:15, 254:1, 254:15, 254:17, 254:21, 254:24, 255:2, 255:9, 255:16, 255:21, 256:5, 256:8, 256:11, 256:13, 256:16, 256:19, 256:22, 257:3, 257:5, 257:9, 262:7, 262:24, 266:4, 266:5, 266:7, 266:15
**Harding's** [2] - 216:21, 261:25
**HARRIS** [1] - 1:7
**Harris** [7] - 1:18, 115:17, 199:8, 224:25, 225:21, 253:12, 264:21
**Harris's** [2] - 253:14, 254:14
**Hastings** [9] - 238:11, 239:12, 239:15, 240:13, 240:25, 241:23, 242:16,

244:10, 244:14
hat [7] - 132:5, 162:15, 162:21, 173:10, 190:21, 191:20, 231:20
hats [1] - 191:20
head [2] - 202:2, 217:12
headed [2] - 79:7, 79:9
heading [2] - 115:7, 154:16
hear [40] - 7:1, 9:19, 15:17, 16:20, 17:1, 17:7, 17:9, 17:23, 17:25, 18:10, 20:4, 26:8, 32:7, 47:17, 50:6, 93:23, 95:11, 96:12, 98:15, 98:19, 112:19, 113:3, 114:7, 114:9, 114:19, 114:23, 115:2, 116:11, 118:1, 153:7, 153:9, 200:24, 209:13, 210:12, 212:23, 213:2, 214:18, 227:24, 246:17
heard [80] - 6:3, 6:11, 6:21, 6:22, 6:25, 7:4, 7:7, 8:21, 8:24, 9:2, 9:21, 9:22, 11:3, 11:20, 11:23, 13:4, 14:15, 15:5, 15:25, 16:1, 16:2, 16:8, 16:11, 16:18, 20:24, 26:12, 50:7, 50:8, 51:3, 51:6, 51:8, 53:6, 54:3, 74:16, 81:25, 82:14, 87:24, 88:3, 88:6, 88:9, 90:12, 94:19, 94:20, 94:23, 95:6, 95:15, 95:21, 96:14, 96:22, 97:12, 97:14, 97:24, 98:20, 98:25, 99:3, 99:8, 110:23, 112:15, 114:17, 114:18, 124:14, 126:6, 126:8, 153:12, 153:14, 154:15, 163:23, 164:15, 203:9, 203:24, 206:7, 210:18, 215:6, 219:2, 230:12, 242:12, 247:11, 250:20
hearing [12] - 2:6, 2:24, 6:8, 18:10, 18:14, 48:25, 64:10, 98:17, 131:18, 132:13, 260:5, 261:10
hearings [1] - 130:21
hearsay [5] - 12:6, 12:12, 13:16, 20:13, 26:10
heart [1] - 226:5
heat [2] - 54:10, 55:23
heavily [1] - 15:11
height [2] - 163:8, 163:22
held [3] - 27:12, 51:20,

151:9
**Hello** [1] - 134:7
**help** [6] - 162:25, 170:13, 176:22, 210:24, 225:23, 259:13
**helped** [4] - 143:6, 147:22, 250:2
**helpful** [1] - 61:15
**hereby** [1] - 267:3
**hereunto** [1] - 267:9
**hesitant** [1] - 235:12
**hesitation** [3] - 20:12, 182:11, 186:18
**Hickey** [1] - 94:10, 94:14
**hide** [2] - 29:15, 150:8
**high** [3] - 79:3, 205:3, 231:6
**high-tech** [1] - 231:6
**highlighted** [1] - 113:20
**highway** [3] - 31:23, 139:22, 140:1
**himself** [4] - 15:24, 94:11, 127:6, 215:6
**hint** [1] - 20:8
**hip** [1] - 236:2
**hire** [1] - 258:18
**hiring** [1] - 122:22
**history** [1] - 235:17
**hold** [4] - 125:13, 135:13, 194:23, 262:23
**holding** [1] - 48:18
**holler** [1] - 155:7
**Holly** [15] - 180:10, 180:11, 181:1, 181:5, 181:7, 181:8, 181:10, 182:7, 184:2, 184:10, 186:9, 186:13, 187:14, 187:19, 190:20
**Home** [1] - 199:8, 254:16
**home** [33] - 43:15, 43:16, 43:25, 45:10, 45:12, 45:13, 45:23, 46:19, 46:22, 51:21, 62:8, 84:10, 84:13, 84:16, 93:16, 99:10, 101:18, 101:20, 104:10, 104:11, 104:12, 105:10, 115:7, 115:24, 139:24, 148:5, 187:22, 205:11, 208:7, 252:1, 253:14, 253:24, 255:13
**Homicide** [8] - 54:9, 55:23, 56:8, 233:18, 234:15, 237:22, 240:2, 241:5
**homicide** [8] - 11:11, 19:20, 113:13, 130:17, 172:12, 214:3, 252:9,

262:13
**Honda** [6] - 69:24, 69:25, 74:6, 148:4, 197:21, 233:19
**honestly** [5] - 130:1, 132:10, 209:7, 213:20, 217:2
**Honor** [142] - 2:14, 3:18, 10:15, 10:17, 11:13, 12:6, 13:14, 13:17, 14:14, 16:12, 16:22, 17:1, 17:13, 18:18, 22:3, 32:7, 44:9, 51:1, 55:19, 90:22, 90:24, 91:10, 91:11, 123:12, 124:5, 124:9, 124:10, 124:19, 126:1, 126:25, 129:14, 130:6, 130:13, 131:2, 131:12, 134:6, 138:5, 145:22, 149:15, 150:5, 150:11, 150:17, 154:6, 155:5, 155:6, 161:23, 171:15, 172:4, 172:15, 172:19, 173:21, 174:1, 180:22, 188:2, 188:3, 191:15, 191:23, 192:4, 197:4, 197:5, 197:8, 198:14, 200:13, 200:15, 201:9, 201:19, 202:9, 202:16, 203:5, 203:8, 203:15, 203:25, 205:23, 208:12, 209:7, 210:13, 210:25, 212:12, 213:4, 215:4, 215:25, 216:21, 217:13, 218:2, 218:18, 219:14, 219:19, 220:7, 220:12, 220:20, 221:9, 221:21, 221:24, 221:25, 222:4, 222:16, 222:25, 223:9, 223:14, 224:5, 224:9, 224:10, 225:24, 226:19, 226:24, 227:5, 228:6, 228:24, 229:16, 230:2, 230:23, 245:24, 246:24, 247:21, 247:22, 250:21, 251:10, 251:16, 251:19, 252:7, 254:1, 254:15, 254:17, 255:10, 255:11, 256:19, 257:6, 258:10, 259:5, 259:14, 259:24, 260:19, 262:9, 262:16, 262:19, 262:25, 263:18, 263:20, 263:24, 264:15, 264:23
**Honorable** [1] - 1:13
**hook** [1] - 54:14
**hooked** [1] - 165:4
**hope** [1] - 83:14
**hoped** [1] - 83:11, 83:13
**Hopefully** [1] - 154:23

**hoping** [1] - 155:5
**hour** [9] - 40:14, 73:22, 107:2, 113:11, 113:12, 139:22, 205:6, 231:8, 263:1
**Hours** [1] - 239:6
**hours** [5] - 212:9, 220:22, 249:2, 249:5, 250:1
**house** [55] - 3:4, 4:6, 4:21, 5:4, 5:10, 9:12, 28:9, 29:5, 30:17, 37:13, 37:14, 37:15, 37:16, 37:21, 38:9, 40:17, 41:9, 42:22, 43:4, 43:23, 45:9, 45:21, 45:25, 55:11, 55:12, 71:18, 74:19, 75:7, 75:10, 75:11, 84:3, 86:2, 87:10, 95:21, 95:22, 101:7, 101:15, 105:11, 105:14, 107:16, 111:16, 112:6, 112:25, 113:9, 113:10, 113:11, 113:17, 114:19, 117:13, 117:16, 118:21, 119:14, 142:3
**houses** [2] - 37:13, 184:12
**HS** [1] - 214:2
**huge** [2] - 205:4, 231:7
**hum** [9] - 36:8, 37:18, 48:8, 69:23, 76:12, 76:14, 90:16, 96:15, 96:18
**humanly** [1] - 19:25
**hundred** [3] - 38:23, 75:19, 82:11
**hundreds** [1] - 248:19
**Huntington** [1] - 154:3
**husband** [2] - 120:10, 120:11

**I**

**I-95** [1] - 139:20
**ID** [8] - 2:7, 11:12, 146:24, 165:10, 185:8, 187:8, 196:17
**ID's** [2] - 132:22
**idea** [4] - 40:12, 106:15, 117:2, 260:15
**ideas** [1] - 87:18
**identification** [27] - 14:19, 14:23, 15:3, 15:20, 18:7, 18:12, 18:15, 18:24, 19:1, 19:23, 19:24, 20:21, 21:2, 21:4, 21:6, 133:6, 137:12, 178:12, 179:3,

182:25, 183:4, 185:23, 186:20, 186:22, 187:11, 196:15, 243:24
**identifications** [1] - 20:5
**identified** [10] - 15:25, 25:22, 91:20, 179:25, 180:3, 181:1, 188:14, 196:7, 253:23
**identifies** [2] - 12:13, 14:21
**identify** [22] - 8:18, 8:25, 18:19, 19:6, 20:3, 24:8, 49:3, 49:5, 119:16, 133:9, 134:25, 156:22, 180:18, 186:13, 186:14, 189:14, 196:6, 198:18, 198:22, 215:1, 233:25, 245:19
**identifying** [4] - 15:23, 17:25, 107:8, 180:22
**identities** [2] - 180:5, 180:6
**II** [1] - 192:23
**illegal** [2] - 134:19, 135:9
**images** [2] - 226:20, 226:21
**imagine** [2] - 205:10, 205:12
**immediate** [2] - 182:18, 182:20
**immediately** [5] - 54:23, 54:25, 129:24, 154:15, 208:12
**impact** [1] - 257:11
**impacted** [1] - 131:16
**impacts** [1] - 130:19
**impeach** [1] - 129:18
**impeached** [1] - 20:20
**implicate** [2] - 33:15, 33:16
**implicit** [1] - 126:22
**implied** [1] - 224:24
**important** [10] - 86:6, 88:17, 95:7, 120:16, 120:17, 135:10, 146:4, 212:16, 224:7, 247:24
**impressed** [1] - 16:6
**impression** [1] - 6:11
**improper** [2] - 18:23, 185:25
**IN** [1] - 1:1
**inaccuracies** [1] - 13:20
**inadvertently** [2] - 19:18, 19:19
**incarcerated** [6] - 64:12, 75:6, 92:20, 93:1, 93:7, 94:11
**incident** [5] - 127:18,

127:20, 163:16, 234:19, 234:20
**include** [2] - 151:24, 257:18
**included** [2] - 218:25, 252:10
**Including** [4] - 59:6, 72:8, 199:18, 224:17
**including** [5] - 132:5, 164:15, 196:11, 204:22, 262:24
**incoming** [2] - 235:2, 237:18
**incomplete** [1] - 244:17
**inconsistent** [1] - 208:3
**incorrect** [1] - 121:15
**indeed** [2] - 210:3, 213:9
**Indeed** [1] - 261:25
**independent** [1] - 13:6
**INDEX** [1] - 266:1
**indicate** [2] - 44:24, 108:22
**indicated** [9] - 131:24, 135:2, 137:18, 137:22, 147:17, 158:1, 162:10, 163:8, 168:17
**indicating** [2] - 177:23, 183:17
**indicating)** [1] - 177:16
**individual** [10] - 9:19, 18:19, 107:3, 114:19, 116:18, 178:8, 181:1, 193:16, 195:6, 200:4
**individuals** [8] - 6:14, 6:16, 6:20, 8:3, 117:16, 162:3, 177:7, 178:7
**indulgence** [5] - 55:22, 77:9, 88:12, 90:23, 91:1
**inevitable** [2] - 19:16, 20:7
**infer** [3] - 205:18, 205:20, 258:2
**inference** [1] - 254:10
**influence** [2] - 239:18, 239:22
**influenced** [1] - 249:13
**informant** [3] - 90:11, 111:1, 111:4
**information** [48] - 18:13, 85:11, 127:17, 131:21, 132:4, 134:24, 135:11, 135:14, 140:4, 140:25, 146:22, 146:23, 148:24, 150:5, 153:24, 154:2, 161:20, 163:13, 164:15, 164:22, 165:1, 171:20, 171:23, 177:12, 178:6, 179:10, 179:13, 212:9, 229:7, 229:12,

238:5, 238:8, 244:6, 244:8, 246:3, 248:3, 248:5, 248:7, 248:22, 249:24, 250:5, 250:9, 250:24, 252:10, 260:20
**Information** [1] - 240:10
**informed** [3] - 130:14, 237:24, 242:17
**inherent** [1] - 19:3
**initial** [6] - 127:21, 131:19, 154:18, 166:12, 166:16, 168:25
**initialed** [1] - 162:5
**initials** [2] - 241:13, 241:14
**initiated** [1] - 143:10
**injured** [4] - 156:10, 156:18, 157:9, 158:1
**inquire** [2] - 176:12, 250:8
**inquired** [1] - 176:16
**inside** [13] - 139:16, 165:23, 166:1, 167:22, 167:24, 168:23, 168:24, 169:10, 171:3, 171:9, 176:10, 176:15, 184:17
**inspection** [1] - 168:5
**instance** [2] - 178:19, 186:12
**instances** [2] - 208:13, 210:6
**instead** [5] - 14:21, 15:1, 23:15, 42:7, 249:20
**instruct** [4] - 129:5, 219:10, 219:12, 225:4
**instruction** [3] - 179:9, 225:6, 254:7
**instructions** [2] - 178:25, 247:10
**intend** [2] - 202:15, 252:14
**intended** [2] - 129:17, 252:12
**intending** [1] - 207:19
**intends** [1] - 227:15
**intent** [1] - 63:4
**intention** [1] - 133:2
**interest** [1] - 201:14
**interested** [9] - 19:5, 201:10, 202:21, 205:12, 205:13, 214:9, 224:22, 258:23, 263:4
**interesting** [1] - 15:5
**internal** [2] - 20:16, 233:20
**Internet** [2] - 205:8, 231:11
**interpretation** [1] - 189:20
**interrupt** [6] - 21:13,

259:21, 260:6, 263:6, 264:20, 265:4
**interrupted** [1] - 260:2
**interrupting** [2] - 2:5, 263:12
**intersection** [4] - 178:2, 178:7, 184:11, 190:11
**interview** [5] - 60:8, 128:12, 128:15, 162:8, 242:8
**interviewed** [3] - 12:22, 59:7, 59:24
**intimate** [1] - 261:18
**intimating** [1] - 261:19
**intimations** [1] - 261:9
**intimidated** [1] - 49:24
**introduce** [8] - 100:3, 135:21, 145:9, 145:19, 164:7, 176:25, 202:15, 217:4
**introduced** [6] - 134:19, 165:4, 184:20, 185:14, 203:18, 207:1
**introducing** [2] - 202:21, 207:7
**inverted** [4] - 232:24, 244:7, 244:10, 244:14
**investigate** [1] - 128:13
**investigated** [2] - 152:19, 152:23
**investigating** [2] - 57:21, 176:22
**investigation** [13] - 58:13, 138:17, 138:21, 163:2, 170:10, 193:11, 196:13, 234:13, 234:16, 234:18, 234:21, 247:13
**Investigative** [1] - 174:25
**investigators** [1] - 172:12
**involved** [22] - 41:20, 54:18, 88:4, 88:7, 88:10, 125:2, 129:20, 133:10, 140:5, 140:14, 141:17, 164:17, 165:9, 170:10, 178:16, 186:15, 189:15, 190:2, 196:24, 201:9, 251:23
**involving** [1] - 66:23
**Irene** [10] - 3:3, 3:8, 4:10, 43:23, 46:12, 46:13, 47:23, 55:9, 55:11, 118:5
**Irene's** [1] - 48:14
**issue** [7] - 2:7, 15:11, 132:11, 210:13, 211:4, 211:15, 259:11
**issues** [7] - 127:17, 128:12, 129:19, 131:14,

145:6, 201:3, 247:14
**item** [18] - 89:18, 159:6, 159:7, 169:6, 171:3, 171:6, 193:13, 194:11, 194:16, 194:19, 194:23, 195:3, 195:6, 195:15, 195:23, 196:3, 196:6, 196:11
**Item** [1] - 255:13
**items** [10] - 159:6, 159:19, 159:20, 160:4, 166:19, 170:21, 196:18, 204:22, 204:23, 219:23
**itself** [2] - 178:17, 246:21

## J

**J-E-S-S** [1] - 262:11
**jail** [11] - 58:8, 64:16, 70:16, 70:20, 70:25, 74:21, 76:13, 76:15, 76:17, 76:19, 93:16
**James** [1] - 1:21
**Jaquetta** [3] - 238:24, 245:5, 245:10
**jar** [2] - 108:15, 108:17
**jeans** [2] - 162:15, 162:17
**Jencks** [5] - 221:14, 223:19, 223:20, 224:2, 224:9
**Jersey** [2] - 30:3, 30:4
**Jess** [1] - 262:11
**Jetta** [1] - 29:2
**Jim** [2] - 4:1, 91:16
**job** [9] - 61:16, 61:17, 88:18, 99:14, 161:19, 193:5, 212:19, 216:20, 251:21
**jog** [1] - 67:12
**join** [2] - 125:14, 264:10
**joining** [1] - 125:19
**joint** [1] - 19:22
**jointly** [1] - 124:21
**Jones** [8] - 156:22, 165:15, 170:1, 186:16, 193:17, 195:13, 196:9, 196:13
**jot** [1] - 242:4
**Joyce** [2] - 232:3, 232:6
**Judge** [9] - 1:13, 213:21, 214:17, 217:8, 218:25, 225:14, 225:17, 257:13, 260:5
**jumped** [2] - 39:11, 253:4
**June** [11] - 151:18, 152:4, 170:1, 172:2,

175:4, 175:12, 192:24, 193:11, 193:20, 194:17, 195:1
**juror** [4] - 86:11, 111:11, 246:5, 254:7
**jurors** [4] - 86:11, 111:7, 246:4, 246:23
**Jury** [8] - 1:14, 2:1, 21:10, 134:1, 201:6, 230:16, 247:16, 247:17
**jury** [83] - 2:7, 2:25, 11:15, 13:21, 16:5, 21:4, 21:8, 21:11, 33:4, 33:9, 33:13, 33:20, 36:1, 36:3, 36:13, 49:7, 49:13, 50:11, 50:14, 50:18, 57:2, 57:6, 57:12, 57:21, 57:25, 59:1, 59:6, 61:23, 80:9, 81:2, 81:22, 86:10, 88:9, 90:5, 90:14, 93:12, 94:1, 94:4, 97:17, 105:20, 105:23, 111:7, 112:12, 121:13, 121:14, 121:17, 121:20, 122:5, 124:14, 126:14, 126:17, 127:6, 128:2, 133:19, 136:1, 136:23, 140:3, 140:12, 140:20, 141:8, 145:6, 146:1, 155:6, 155:7, 200:25, 205:17, 205:20, 206:13, 207:23, 219:10, 219:11, 219:12, 223:11, 224:25, 225:4, 225:5, 229:8, 230:4, 230:7, 230:12, 252:8, 265:9
**jury's** [2] - 2:23, 126:23
**justified** [1] - 213:18
**justify** [1] - 61:21

## K

**K-9** [1] - 139:22
**keenly** [1] - 19:5
**keep** [12] - 34:3, 34:4, 34:21, 34:24, 36:19, 85:10, 106:25, 125:13, 201:2, 212:3, 247:14, 259:22
**keeping** [1] - 87:22
**Kelly** [9] - 164:5, 164:8, 171:16, 177:1, 178:8, 185:15, 187:14, 187:25, 190:5
**Kelsey** [1] - 1:17
**kept** [4] - 27:4, 48:25, 100:15, 222:5
**key** [11] - 31:9, 34:17, 35:9, 37:8, 37:23, 82:18, 82:19, 108:13, 109:3,

213:25
**keyed** [1] - 16:17
**keys** [6] - 27:22, 31:10, 33:25, 34:5, 75:23, 82:5
**kidnapped** [6] - 40:1, 101:11, 102:4, 102:5, 102:9, 110:22
**kidnapping** [1] - 101:17
**kidnappings** [3] - 40:5, 74:19, 75:1
**kids** [1] - 47:23
**kill** [1] - 120:7
**killed** [9] - 4:3, 4:5, 12:24, 12:25, 47:1, 68:9, 87:6, 120:10, 120:11, 143:7, 143:8, 206:10, 242:12
**kilo** [10] - 108:6, 109:2, 109:8, 109:12, 109:15, 109:17, 109:18, 122:16, 127:24, 127:25
**kilogram** [1] - 103:9, 106:6
**kilograms** [3] - 35:22, 103:6, 106:1
**kilos** [4] - 103:6, 103:14, 106:22, 107:24, 109:1, 120:25
**kind** [41] - 10:10, 29:1, 29:7, 30:14, 48:2, 53:23, 56:5, 61:14, 65:24, 69:19, 70:13, 71:12, 71:13, 72:4, 83:3, 88:14, 119:10, 130:23, 135:20, 149:9, 151:9, 157:7, 158:5, 163:20, 174:22, 184:12, 205:12, 205:14, 208:9, 208:17, 208:18, 210:15, 210:16, 219:24, 219:25, 224:5, 227:2, 253:4, 260:19, 261:24
**kinds** [3] - 24:22, 153:14, 255:9
**kitchen** [3] - 108:14, 168:2, 168:8
**knapsack** [14] - 34:4, 34:20, 34:22, 106:12, 106:22, 109:23, 109:24, 110:4, 110:17, 119:5, 122:13, 122:14, 122:21, 144:8
**Knapsack** [1] - 106:11
**knife** [1] - 108:13
**knit** [1] - 52:20
**Knoll** [4] - 177:22, 178:3, 185:4, 185:20
**knowing** [3] - 23:6, 120:12, 257:18
**knowingly** [1] - 20:5
**knowledge** [13] - 18:15,

93:18, 156:4, 159:10,
160:5, 161:2, 164:19,
171:8, 171:12, 179:6,
185:14, 187:24, 188:1
**Known** [1] - 216:23
**known** [8] - 100:23,
171:22, 206:11, 212:14,
216:21, 238:5, 239:24,
241:9
**knows** [5] - 127:17,
214:5, 219:12, 224:10,
253:1
**Kurland** [8] - 1:22,
130:25, 131:15, 132:2,
132:8, 218:10, 219:15,
263:8
**KURLAND** [15] -
125:18, 130:13, 130:19,
132:12, 133:12, 133:16,
172:21, 188:5, 197:5,
219:16, 219:19, 263:20,
264:15, 266:10, 266:12

### L

**lab** [1] - 197:24
**labeled** [3] - 196:7,
196:10, 220:17
**lack** [2] - 249:8, 249:9
**ladies** [10] - 124:12,
134:2, 136:23, 143:25,
165:6, 171:19, 185:15,
230:17, 246:13, 247:3
**Ladies** [4] - 21:11,
124:6, 150:13, 247:6
**lady** [4] - 156:22, 157:9,
176:25, 193:17
**laid** [1] - 212:1
**land** [4] - 226:21,
255:19, 255:21, 256:23
**Lane** [33] - 154:3,
154:13, 154:14, 154:16,
154:19, 154:20, 154:24,
155:20, 155:22, 156:7,
157:3, 160:22, 161:5,
162:24, 163:1, 163:4,
163:5, 165:12, 170:11,
172:8, 176:1, 177:3,
177:13, 177:16, 179:4,
179:7, 183:6, 183:9,
183:11, 183:14, 183:20,
184:19, 187:6
**language** [4] - 133:5,
133:7, 133:14, 156:1
**large** [7] - 110:16,
117:3, 119:5, 199:5,
208:15, 224:3
**Lassiter** [2] - 23:24,
55:16

**last** [65] - 7:19, 7:20,
7:22, 8:5, 9:8, 12:24,
14:21, 16:7, 22:5, 23:9,
25:23, 32:18, 39:25,
40:25, 45:2, 45:3, 46:21,
60:16, 72:20, 77:1,
92:24, 92:25, 93:2, 93:3,
93:6, 93:13, 95:5, 95:6,
95:7, 95:16, 97:14,
102:9, 107:6, 111:21,
113:20, 113:21, 113:25,
115:10, 118:9, 118:17,
120:3, 136:10, 141:17,
141:20, 192:11, 211:20,
212:13, 214:21, 225:18,
228:25, 232:24, 235:2,
237:11, 244:7, 244:19,
245:16, 249:19, 250:1,
250:10, 256:9, 256:21,
259:25
**Last** [4] - 148:22,
148:23, 150:23, 238:25
**lasted** [2] - 254:13,
256:12
**late** [8] - 189:25,
216:19, 219:1, 221:10,
221:17, 230:10, 246:7,
260:20
**latent** [1] - 193:9
**latest** [2] - 205:3, 231:6
**laughed** [1] - 138:18
**laughing** [1] - 143:14
**Laura** [1] - 1:17
**law** [8] - 24:15, 24:16,
46:14, 46:15, 46:16,
57:22, 59:20, 80:22
**LAWLOR** [42] - 225:14,
225:17, 226:7, 226:12,
226:15, 226:18, 226:22,
226:24, 227:19, 228:3,
228:6, 228:10, 228:17,
228:20, 230:2, 230:6,
234:25, 247:21, 250:14,
250:16, 257:13, 257:16,
257:25, 258:5, 258:8,
258:10, 259:1, 259:5,
259:7, 259:10, 259:14,
259:20, 259:24, 260:3,
260:8, 260:15, 260:17,
260:19, 261:8, 261:17,
262:2, 263:18
**Lawlor** [11] - 1:18,
225:13, 227:9, 229:25,
230:1, 247:20, 254:4,
260:13, 263:10, 263:14,
265:11
**Lawlor's** [1] - 263:3
**lawn** [1] - 159:23
**lawyer** [6] - 32:16,
33:19, 33:22, 145:3,

227:2, 249:1
**lawyers** [5] - 209:23,
210:1, 264:7, 264:8,
264:11
**Lay** [1] - 44:8
**lay** [1] - 20:2
**laying** [2] - 157:10,
169:10
**lead** [3] - 172:11, 214:6,
262:13
**leading** [1] - 133:8
**leads** [1] - 20:5
**leap** [1] - 205:20
**learn** [3] - 44:15, 70:7,
177:6
**learned** [6] - 3:2, 4:2,
102:9, 128:18, 212:7,
233:15
**least** [4] - 141:4, 212:2,
227:8, 249:5
**leave** [5] - 43:7, 43:15,
45:9, 124:12, 150:14,
153:5, 201:1, 247:7,
252:17
**leaves** [1] - 10:21
**leaving** [4] - 53:19,
113:17, 117:17, 118:22
**Leaving** [1] - 249:8
**led** [3] - 65:24, 154:24,
161:5
**Lee** [1] - 46:2
**left** [44] - 18:20, 19:18,
22:5, 23:9, 30:19, 34:14,
34:15, 35:8, 38:13, 43:4,
43:5, 43:8, 43:9, 45:5,
45:8, 53:9, 53:24, 84:2,
84:3, 89:6, 89:8, 89:11,
102:19, 110:5, 113:9,
114:1, 114:3, 117:19,
118:2, 118:21, 118:25,
121:3, 127:18, 137:2,
157:11, 165:19, 165:23,
180:19, 182:21, 225:15,
254:12, 256:15, 256:17
**left-hand** [1] - 165:19
**legal** [2] - 33:1, 122:22
**lengths** [1] - 116:19
**less** [7] - 12:25, 19:9,
20:22, 49:16, 49:20,
71:24, 139:25
**letter** [26] - 129:21,
129:24, 199:14, 199:22,
203:11, 203:13, 203:15,
203:16, 204:4, 204:6,
204:9, 206:5, 206:7,
206:11, 211:6, 211:10,
211:12, 213:6, 213:9,
213:20, 215:4, 215:8,
218:21, 219:10, 219:11,
229:17

**letter's** [1] - 219:16
**letters** [3] - 202:17,
203:6, 232:24
**letting** [1] - 117:3
**level** [2] - 50:15, 261:13
**Level** [3] - 28:15, 28:17,
28:18
**Liberty** [5] - 45:18,
151:25, 152:9, 155:12,
155:15
**license** [5] - 30:14,
77:18, 77:20, 146:13,
146:18
**lie** [3] - 77:4, 77:5, 77:7
**lied** [2] - 121:17, 122:5
**lieu** [1] - 227:25
**Life** [1] - 218:16
**life** [2] - 59:20, 222:18
**light** [8] - 122:11, 125:8,
127:4, 129:6, 129:9,
162:15, 162:17, 164:19
**lights** [1] - 153:21
**likelihood** [1] - 206:22
**likely** [2] - 31:23,
204:23
**limited** [2] - 18:15,
250:24
**line** [10] - 126:24, 152:1,
213:2, 232:19, 242:11,
255:19, 255:22, 256:23,
263:10
**lines** [3] - 113:20,
226:21, 262:17
**links** [1] - 210:15
**lips** [1] - 163:24
**Lisa** [1] - 234:14
**list** [50] - 201:13,
204:22, 204:23, 205:18,
209:18, 209:19, 210:1,
210:3, 210:17, 211:5,
211:14, 211:15, 213:7,
213:13, 213:25, 214:1,
214:2, 214:5, 214:16,
214:20, 214:22, 215:11,
215:14, 215:16, 215:22,
216:4, 216:14, 216:25,
217:5, 217:9, 217:22,
219:1, 219:20, 220:6,
220:8, 220:10, 220:13,
220:15, 220:16, 222:5,
226:2, 228:12, 233:25,
234:1, 234:2, 236:4,
249:15, 253:3
**listed** [6] - 210:2,
215:22, 216:4, 217:9,
245:5, 255:14
**listen** [11] - 3:7, 5:21,
6:4, 6:5, 6:6, 19:22,
48:15, 48:17, 91:5, 96:9,
96:20

**listened** [9] - 5:24, 11:5,
13:4, 19:4, 48:16, 48:20,
50:22, 96:13, 96:22
**listening** [9] - 6:1, 10:5,
18:9, 48:9, 91:2, 91:8,
96:3, 98:13, 246:16
**literally** [1] - 99:20
**litigated** [2] - 131:22,
132:22
**live** [6] - 28:14, 30:2,
45:19, 147:11, 147:14,
147:15
**lived** [10] - 28:15, 30:3,
86:2, 86:4, 92:15, 92:16,
134:24, 201:20, 201:22,
244:1
**Living** [1] - 168:20
**living** [7] - 45:20, 45:21,
83:22, 146:20, 146:25,
147:3, 147:8
**local** [2] - 216:8, 255:18
**locate** [2] - 160:14,
160:16
**located** [13] - 153:23,
154:12, 154:17, 165:9,
170:20, 171:18, 176:7,
176:14, 176:20, 177:18,
179:23, 199:2, 240:16
**locked** [4] - 22:25, 23:3,
26:16, 75:4
**locksmithing** [2] -
205:8, 231:10
**log** [3] - 16:21, 197:1,
239:24
**logged** [4] - 194:19,
196:8, 196:12, 196:18
**Lombard** [1] - 1:25
**Look** [2] - 258:9, 258:11
**look** [35] - 56:8, 63:21,
72:6, 72:9, 85:11, 85:25,
109:3, 113:19, 162:7,
165:18, 167:7, 167:21,
171:18, 171:20, 177:10,
179:25, 180:3, 182:7,
182:14, 184:1, 184:9,
187:11, 190:17, 191:3,
198:2, 200:18, 202:3,
213:24, 215:16, 216:14,
222:13, 226:11, 227:5,
244:17, 263:17
**looked** [6] - 53:9, 78:23,
156:9, 156:11, 166:16,
185:22
**Looking** [1] - 181:25
**looking** [7] - 34:18,
73:19, 120:14, 159:5,
211:19, 237:12
**Looks** [1] - 232:17
**looks** [2] - 62:22, 203:5

**loss** [1] - 204:19
**lost** [1] - 146:13
**loud** [3] - 17:1, 17:7, 98:17
**loved** [2] - 19:7, 19:21
**LR** [1] - 214:2
**luck** [1] - 179:22
**lunch** [5] - 130:14, 134:9, 141:16, 207:20, 260:23
**Luncheon** [1] - 124:17
**luncheon** [3] - 124:7, 128:20, 214:12
**lying** [2] - 169:11, 170:1

**M**

**M-E-A-D** [1] - 150:24
**M-I-T-C-H-E-L-L** [1] - 174:9
**ma'am** [5] - 59:16, 66:10, 78:8, 150:20, 174:4
**mad** [2] - 27:13, 87:22
**magazine** [1] - 200:12
**magazines** [1] - 202:14
**Magginson** [7] - 4:7, 4:13, 5:10, 6:14, 10:2, 91:2, 118:5
**Magginson's** [11] - 3:4, 3:8, 4:6, 4:21, 5:3, 55:11, 89:22, 91:1, 95:21, 95:22, 256:7
**Magginsons** [1] - 141:24
**Magginsons'** [1] - 142:3
**magnifying** [1] - 226:9
**mail** [16] - 3:7, 5:19, 19:17, 19:20, 19:22, 21:6, 48:15, 50:2, 50:22, 137:3, 230:12, 248:6, 255:23, 256:1, 256:7, 262:25
**mailed** [1] - 252:20
**maintain** [1] - 261:12
**maintained** [1] - 225:8
**major** [3] - 86:25, 87:3, 127:12
**male** [2] - 162:14, 162:16
**maliciously** [1] - 261:5
**mall** [1] - 93:2
**man** [4] - 71:12, 143:5, 242:12
**manage** [1] - 224:18
**mandatory** [1] - 67:24
**manifestly** [1] - 217:5
**manner** [3] - 132:15,

189:16, 267:8
**map** [5] - 155:1, 155:16, 155:22, 162:25, 208:9
**MAP** [1] - 214:2
**March** [19] - 27:23, 67:4, 67:7, 68:7, 68:15, 92:20, 93:21, 138:12, 146:10, 147:6, 147:7, 147:18, 192:20, 235:21, 236:5, 237:15, 237:18, 253:11, 254:13
**marked** [1] - 152:11, 155:2, 156:25, 169:21, 196:3, 199:21
**market** [7] - 43:16, 45:13, 45:14, 45:16, 45:17, 84:17, 84:22
**marks** [3] - 160:7, 160:8, 205:3
**Marll** [4] - 170:14, 172:11, 172:15, 262:13
**Mart** [1] - 219:24
**MARTIN** [12] - 1:8, 90:24, 125:16, 220:15, 221:22, 221:25, 226:9, 264:23, 264:25, 265:2, 265:7, 265:9
**Martin** [58] - 1:19, 1:20, 4:2, 12:4, 13:8, 14:24, 17:25, 20:15, 21:5, 91:17, 91:18, 91:21, 92:5, 92:24, 93:19, 94:10, 94:24, 95:1, 96:17, 97:5, 97:10, 97:11, 98:5, 99:11, 115:23, 116:9, 116:14, 143:17, 144:4, 200:5, 201:19, 201:21, 202:8, 202:17, 202:18, 202:20, 203:3, 204:7, 204:10, 205:11, 205:16, 205:18, 215:9, 221:23, 224:22, 225:1, 225:19, 231:14, 231:19, 231:24, 232:4, 232:6, 253:21, 254:20, 255:13, 262:25, 264:21
**Martin's** [16] - 13:7, 14:21, 15:8, 20:24, 50:16, 94:19, 94:23, 95:5, 97:1, 97:18, 201:14, 202:19, 208:7, 232:7, 255:3, 255:16
**Mary** [3] - 1:24, 267:3, 267:14
**MARYLAND** [1] - 1:2
**Maryland** [6] - 1:12, 1:25, 61:1, 67:24, 123:15, 265:12
**masking** [1] - 204:9
**massive** [1] - 2:10

**match** [1] - 211:23
**material** [6] - 124:21, 129:10, 221:14, 224:9, 224:22, 231:2
**matter** [14] - 63:12, 120:6, 124:19, 132:14, 135:8, 137:11, 182:23, 186:7, 209:11, 217:14, 246:6, 267:4, 267:8
**Maynard** [1] - 185:6
**MB** [1] - 214:2
**McCaffity** [1] - 234:14
**McDonald's** [2] - 242:20, 243:7
**Mead** [15] - 130:16, 131:3, 131:20, 132:4, 150:18, 150:23, 151:2, 156:4, 169:17, 170:10, 172:22, 172:24, 173:24, 176:20, 176:25
**MEAD** [2] - 150:19, 266:9
**Mead's** [1] - 131:17
**mean** [83] - 10:14, 13:8, 13:12, 14:6, 15:9, 16:7, 24:25, 27:14, 38:7, 40:7, 42:4, 42:6, 43:22, 47:5, 51:11, 53:18, 57:11, 60:7, 61:19, 61:25, 67:10, 69:9, 71:10, 71:16, 72:24, 73:1, 75:9, 75:18, 76:3, 79:20, 80:4, 80:16, 80:23, 82:17, 83:1, 83:21, 84:2, 84:8, 98:19, 107:17, 116:6, 116:8, 120:18, 126:3, 126:5, 126:24, 127:14, 128:7, 128:24, 135:19, 143:2, 143:5, 143:13, 143:23, 147:6, 152:10, 152:22, 153:2, 170:16, 203:12, 204:16, 204:21, 206:12, 206:21, 207:3, 208:13, 208:23, 209:4, 213:24, 223:19, 224:2, 224:12, 228:6, 230:12, 234:20, 245:20, 253:8, 254:5, 254:22, 257:16, 259:8, 261:4
**meaning** [4] - 43:8, 256:3
**means** [6] - 64:21, 139:10, 150:1, 205:1, 207:2, 255:4
**meant** [5] - 61:17, 63:9, 88:7, 102:18, 230:12
**media** [1] - 247:12
**Medical** [2] - 193:21, 195:4, 195:10
**medical** [5] - 159:14,

166:2, 176:14, 176:15, 195:18
**Medics** [1] - 176:9
**medics** [1] - 159:1
**meet** [23] - 12:3, 12:11, 13:8, 18:14, 28:6, 28:8, 30:4, 30:8, 30:22, 30:25, 73:21, 102:20, 102:21, 102:25, 104:2, 104:3, 104:15, 105:3, 105:9, 105:16, 121:7, 123:2, 160:22
**meeting** [12] - 20:15, 32:23, 73:11, 104:6, 113:13, 113:15, 114:25, 121:2, 242:23, 243:9, 243:11, 243:20
**meetings** [2] - 93:18, 102:11
**member** [1] - 151:6
**members** [5] - 5:12, 19:21, 47:19, 54:3, 95:24
**Members** [1] - 200:25
**memoranda** [1] - 223:25
**memory** [3] - 67:12, 113:23, 163:11
**men** [7] - 133:9, 133:10, 171:21, 186:13, 186:15, 187:11
**mention** [1] - 66:12
**mentioned** [11] - 11:21, 11:23, 48:23, 74:18, 75:18, 85:14, 138:15, 160:13, 206:7, 215:8, 215:12
**mentioning** [1] - 114:15
**met** [22] - 11:10, 14:24, 28:7, 28:21, 30:5, 30:17, 73:4, 76:20, 78:5, 91:21, 92:23, 102:8, 102:12, 102:16, 103:19, 105:11, 107:3, 134:12, 176:11, 178:19
**method** [1] - 206:25
**meticulous** [1] - 222:5
**Michael** [2] - 1:16, 1:18
**microphone** [1] - 12:1
**mid** [1] - 207:23
**mid-witness** [1] - 207:23
**middle** [4] - 130:1, 155:18, 183:17, 248:18
**Middle** [1] - 28:18
**midnight** [1] - 214:8
**midst** [1] - 18:17
**might** [32] - 16:4, 56:8, 72:6, 75:15, 83:5, 87:19, 88:3, 89:20, 90:1, 90:8, 90:10, 96:25, 106:15,

118:13, 125:7, 128:5, 137:15, 141:16, 148:3, 163:12, 164:17, 173:4, 178:9, 178:16, 203:19, 205:12, 205:13, 207:18, 211:10, 221:2, 262:19
**mike** [3] - 150:21, 174:6, 192:8
**milk** [5] - 45:15, 84:7, 84:9, 84:14, 84:15
**mind** [7] - 39:23, 109:4, 142:14, 201:2, 227:24, 244:22, 247:14
**mine** [1] - 264:23
**minimalization** [1] - 127:25
**minimize** [1] - 72:6
**minimized** [2] - 127:14
**minimum** [1] - 67:24
**minor** [3] - 230:3, 247:23, 251:12
**minute** [15] - 73:1, 113:2, 123:12, 154:16, 178:24, 182:23, 186:7, 186:25, 201:4, 207:17, 211:20, 215:17, 221:22, 222:6, 228:22
**minutes** [26] - 5:7, 30:19, 40:14, 72:21, 113:12, 124:8, 124:9, 126:11, 139:22, 139:24, 139:25, 148:5, 150:6, 160:23, 165:3, 208:20, 209:9, 217:13, 225:11, 230:5, 230:18, 246:2, 246:7, 248:24, 256:12, 262:24
**misdemeanor** [1] - 69:13
**misrepresentations** [1] - 226:1
**Miss** [6] - 4:10, 43:23, 46:13, 47:23, 48:14, 55:9
**missed** [2] - 220:5, 237:3
**missing** [1] - 141:7
**mistake** [3] - 194:24, 215:7, 259:12
**mistrial** [4] - 125:9, 125:14, 125:20, 130:4
**MITCHELL** [3] - 1:7, 174:3, 266:11
**Mitchell** [54] - 1:17, 7:21, 14:22, 14:24, 15:2, 16:4, 130:16, 131:7, 132:21, 133:9, 164:11, 164:12, 165:5, 165:6, 171:17, 174:2, 174:8, 174:12, 175:5, 175:22, 186:12, 212:15, 213:18,

224:25, 225:19, 237:21, 238:8, 238:14, 238:17, 239:16, 239:21, 239:25, 241:8, 241:15, 242:1, 242:14, 243:23, 244:14, 245:6, 245:8, 245:10, 245:23, 253:2, 253:7, 253:12, 253:14, 253:16, 253:20, 254:19, 256:10, 267:5

**Mitchell's** [7] - 115:21, 211:1, 230:9, 239:10, 255:3, 255:13, 264:10

**Mobile** [1] - 255:7

**modifications** [2] - 125:24, 129:16

**mom** [1] - 161:8

**moment** [8] - 10:19, 12:1, 68:2, 151:12, 171:15, 173:21, 188:2, 191:15

**Mondawmin** [1] - 93:5

**Monday** [9] - 123:22, 252:20, 252:21, 259:17, 259:20, 260:9, 261:18, 261:21, 262:3

**money** [67] - 23:14, 23:16, 23:21, 23:22, 26:17, 26:19, 27:1, 27:4, 27:12, 27:15, 34:11, 34:12, 34:13, 34:17, 34:21, 34:23, 34:24, 34:25, 35:12, 37:24, 38:19, 38:21, 41:16, 41:17, 41:22, 42:5, 42:6, 70:16, 70:22, 71:2, 71:3, 71:7, 71:13, 82:4, 83:2, 83:4, 83:17, 83:25, 84:1, 85:3, 88:3, 88:4, 88:7, 88:10, 100:2, 100:15, 102:19, 103:16, 104:16, 104:17, 104:19, 106:15, 110:1, 110:16, 117:3, 119:5, 121:4, 121:8, 122:19, 135:9, 135:18, 140:15, 143:6, 144:13, 144:20

**monitor** [1] - 160:2

**Montgomery** [4] - 203:24, 221:10, 221:12, 260:2

**Montgomery's** [1] - 211:21

**month** [8] - 41:19, 55:8, 67:6, 68:8, 68:12, 70:11, 70:19, 249:4

**months** [2] - 73:12, 261:7

**morning** [46] - 2:9, 2:17, 2:21, 2:22, 3:2,

3:4, 3:7, 4:1, 4:2, 4:23, 5:8, 5:9, 11:19, 12:14, 16:18, 21:12, 21:14, 22:3, 22:4, 46:9, 74:15, 91:7, 91:16, 95:20, 118:5, 136:8, 138:10, 139:13, 141:24, 142:14, 145:12, 199:16, 207:20, 208:19, 212:8, 214:12, 214:13, 216:16, 216:17, 227:13, 227:24, 241:11, 247:16, 249:22

**most** [13] - 16:13, 19:24, 38:14, 66:8, 104:25, 116:24, 137:12, 204:23, 208:13, 237:15, 252:13, 264:9

**mother** [11] - 46:1, 46:14, 46:15, 46:16, 185:6, 185:7, 185:10, 185:12, 187:3, 201:21, 232:7

**mother's** [2] - 45:25, 202:20

**mother-in-law** [3] - 46:14, 46:15, 46:16

**motion** [4] - 21:5, 125:20, 125:21, 130:4

**MOTION** [2] - 266:4, 266:5

**motivated** [2] - 14:2, 18:18

**motivation** [4] - 20:1, 20:2, 20:12, 128:5

**Motor** [1] - 61:1

**mouth** [1] - 203:4

**move** [9] - 25:6, 94:8, 143:10, 183:22, 205:25, 217:18, 218:18, 228:4

**moved** [3] - 24:25, 218:14

**moving** [2] - 75:11, 255:12

**MR** [285] - 2:4, 2:14, 2:20, 3:25, 10:17, 10:24, 10:25, 11:2, 11:10, 11:13, 12:6, 12:9, 12:13, 12:16, 12:20, 12:24, 13:14, 13:17, 13:24, 14:4, 14:8, 14:11, 14:14, 14:17, 14:20, 15:17, 15:23, 16:11, 16:15, 16:18, 16:21, 16:24, 17:1, 17:4, 17:8, 17:11, 17:13, 17:15, 17:18, 17:20, 17:21, 17:23, 18:3, 18:6, 22:2, 25:11, 25:19, 26:2, 26:9, 26:10, 26:12, 26:15, 27:6, 32:11, 44:7, 44:9, 44:13,

44:17, 44:20, 66:18, 80:12, 85:16, 85:20, 90:24, 91:11, 91:15, 94:5, 117:4, 117:10, 121:5, 121:9, 122:23, 124:9, 125:16, 125:17, 125:18, 129:14, 130:13, 130:19, 131:2, 131:5, 131:12, 132:12, 132:18, 132:21, 133:4, 133:12, 133:16, 134:5, 138:7, 142:6, 144:6, 147:1, 147:12, 149:24, 150:3, 150:17, 151:1, 172:18, 172:21, 174:1, 174:11, 188:5, 191:24, 192:4, 192:13, 197:5, 197:8, 197:13, 198:13, 198:17, 200:15, 200:22, 201:9, 201:18, 201:21, 202:1, 202:9, 202:12, 202:16, 202:25, 203:2, 203:5, 203:8, 203:14, 203:18, 203:21, 203:23, 204:3, 204:6, 212:25, 213:4, 213:11, 213:14, 213:16, 214:17, 215:4, 215:25, 216:3, 216:21, 216:24, 217:13, 217:16, 217:19, 217:24, 218:2, 218:7, 218:18, 218:21, 218:25, 219:5, 219:14, 219:16, 219:19, 220:7, 220:9, 220:12, 220:15, 220:17, 220:20, 221:21, 221:22, 221:25, 222:22, 222:24, 223:4, 223:8, 223:12, 223:16, 223:20, 223:22, 224:8, 224:14, 225:14, 225:17, 226:7, 226:9, 226:12, 226:15, 226:18, 226:22, 226:24, 227:5, 227:9, 227:19, 228:3, 228:6, 228:10, 228:17, 228:20, 228:24, 229:3, 229:7, 229:10, 229:12, 229:15, 229:22, 230:2, 230:6, 230:9, 230:14, 230:22, 232:1, 234:25, 246:2, 246:9, 246:11, 246:23, 247:2, 247:21, 250:14, 250:16, 250:21, 251:16, 251:19, 252:24, 253:6, 253:9, 253:15, 254:1, 254:15, 254:17, 254:21, 254:24, 255:2, 255:9, 255:16, 255:21, 256:5, 256:8, 256:11, 256:13, 256:16, 256:19, 256:22, 257:3, 257:5, 257:9, 257:13, 257:16,

257:25, 258:5, 258:8, 258:10, 259:1, 259:5, 259:7, 259:10, 259:14, 259:20, 259:24, 260:3, 260:8, 260:15, 260:17, 260:19, 261:8, 261:17, 262:2, 262:7, 262:9, 262:24, 263:18, 263:20, 263:24, 264:10, 264:14, 264:15, 264:23, 264:25, 265:2, 265:7, 265:9, 266:4, 266:5, 266:5, 266:6, 266:7, 266:7, 266:9, 266:10, 266:11, 266:12, 266:13, 266:15

**MS** [61] - 32:7, 32:10, 44:16, 44:22, 51:1, 51:23, 55:21, 80:18, 90:25, 124:19, 126:1, 126:3, 126:6, 126:8, 126:25, 127:2, 127:16, 128:2, 128:11, 128:16, 128:23, 129:5, 129:9, 130:5, 130:9, 130:12, 140:21, 142:19, 145:24, 147:6, 147:10, 198:12, 198:14, 200:13, 204:15, 204:17, 205:23, 206:2, 206:18, 206:20, 206:23, 206:25, 207:6, 207:15, 207:18, 208:12, 208:18, 208:25, 209:2, 209:7, 209:19, 210:13, 210:25, 211:4, 211:8, 212:12, 212:16, 212:18, 221:24, 266:6, 266:8

**mug** [7] - 226:18, 228:2, 228:4, 248:12, 248:13, 248:16, 254:5

**Multimedia** [1] - 192:17

**multiple** [1] - 234:2

**murder** [16] - 19:6, 25:12, 53:7, 54:12, 56:11, 68:18, 117:12, 119:21, 119:22, 120:18, 131:6, 138:11, 144:3, 234:13, 238:1, 242:18

**murdered** [5] - 4:17, 4:22, 18:20, 104:5, 111:15

**murders** [7] - 25:7, 27:24, 54:23, 55:2, 141:17, 214:6, 214:10

**Museum** [1] - 219:24

**must** [4] - 15:21, 194:24, 254:9

**mutual** [1] - 76:10

**MVA** [2] - 62:6, 146:7

# N

**Nah** [4] - 37:20, 74:17, 104:22, 124:3

**name** [106] - 3:15, 3:16, 6:21, 6:22, 6:25, 7:2, 7:3, 7:4, 7:8, 7:19, 7:20, 7:22, 8:21, 8:24, 11:20, 11:23, 12:14, 13:4, 14:21, 15:5, 15:13, 15:18, 15:25, 16:7, 16:9, 20:17, 23:24, 24:11, 30:6, 30:7, 32:19, 32:21, 33:6, 33:9, 33:10, 33:11, 33:12, 33:18, 37:19, 40:25, 46:1, 47:8, 48:23, 48:25, 49:6, 50:4, 50:11, 51:6, 51:8, 60:23, 61:1, 61:23, 61:25, 62:1, 62:4, 62:6, 62:9, 62:10, 62:18, 63:12, 63:13, 63:14, 64:5, 69:15, 72:14, 77:1, 77:6, 91:8, 95:5, 95:6, 95:8, 96:2, 96:14, 96:23, 107:6, 113:6, 114:16, 114:17, 142:10, 146:7, 150:22, 150:23, 160:18, 164:4, 174:6, 184:22, 188:24, 192:9, 192:10, 192:11, 198:18, 199:7, 199:8, 200:5, 232:3, 232:20, 232:22, 232:24, 234:7, 238:23

**Name** [1] - 146:12

**named** [9] - 16:4, 32:5, 32:9, 72:12, 77:3, 98:7, 177:1, 178:8, 193:17

**names** [8] - 16:10, 47:24, 60:21, 95:25, 160:18, 180:9, 198:22, 233:21

**narcotics** [2] - 151:11, 201:9

**Natasha** [7] - 4:13, 21:19, 47:9, 91:2, 91:3, 256:23

**natural** [1] - 80:23

**naturally** [3] - 87:16, 119:8, 211:9

**nature** [1] - 195:22

**Near** [1] - 177:3

**near** [4] - 157:12, 159:23, 177:23, 186:8

**nearby** [3] - 20:17, 29:5, 177:8

**nearly** [2] - 218:10, 251:22

**necessarily** [9] - 22:18, 82:19, 82:22, 104:14,

116:22, 117:24, 123:10, 207:9, 211:16

**necessary** [3] - 133:21, 133:22, 225:4

**neck** [2] - 223:3, 223:7

**need** [20] - 23:21, 41:17, 42:5, 66:2, 66:3, 66:5, 70:5, 119:20, 125:11, 128:12, 131:13, 154:8, 182:13, 198:2, 200:17, 212:21, 216:18, 221:8, 226:9, 263:16

**needed** [8] - 40:6, 83:24, 83:25, 84:1, 100:15, 107:18, 132:1, 166:2

**Needleman** [14] - 32:22, 32:24, 56:24, 73:5, 73:11, 73:17, 73:21, 80:21, 128:19, 128:20, 128:21, 129:2, 130:7, 149:16

**neighborhood** [1] - 178:23

**nervous** [6] - 80:23, 80:24, 80:25, 81:1, 81:3, 161:16

**never** [33] - 26:6, 27:2, 29:17, 30:5, 30:7, 30:10, 39:16, 50:8, 60:3, 61:13, 69:21, 77:25, 80:4, 81:16, 83:12, 86:2, 100:15, 101:2, 102:11, 114:17, 134:12, 134:19, 137:11, 137:15, 141:3, 144:18, 204:17, 214:1, 221:11, 223:12, 224:19, 226:1, 249:24

**Never** [2] - 134:22, 134:24

**new** [6] - 69:25, 95:15, 127:16, 146:13, 249:15, 252:10

**newer** [2] - 248:3, 248:5

**news** [7] - 4:8, 47:2, 47:7, 48:2, 48:5, 96:11, 96:12

**newspaper** [1] - 214:24

**next** [22] - 21:20, 46:9, 66:17, 66:20, 68:20, 74:15, 79:6, 87:10, 89:22, 118:5, 119:14, 130:2, 141:24, 150:15, 183:23, 212:7, 242:19, 248:24, 249:2, 250:9, 256:21, 258:19

**Next** [2] - 192:3, 232:15

**nickname** [6] - 47:10, 76:24, 95:11, 95:15, 95:17, 238:17

**nicknames** [1] - 206:17

**NIEDERMEIER** [1] - 266:14

**Niedermeier** [40] - 2:6, 113:14, 113:20, 130:18, 130:19, 131:13, 138:13, 150:14, 197:7, 197:9, 197:14, 204:8, 206:3, 208:7, 214:6, 214:11, 226:4, 229:8, 230:5, 231:1, 231:16, 233:13, 234:12, 236:22, 250:23, 251:6, 251:8, 252:8, 252:15, 252:25, 253:10, 262:6, 262:22, 263:6, 263:16, 263:20, 264:2, 264:16, 264:20, 265:6

**Niedermeier's** [2] - 21:13, 259:21

**night** [31] - 40:9, 41:10, 42:2, 42:11, 43:2, 46:21, 74:12, 78:18, 88:23, 89:5, 89:19, 104:5, 104:12, 111:14, 115:3, 115:4, 117:12, 122:14, 123:23, 137:22, 137:24, 139:16, 141:21, 142:4, 142:15, 144:9, 210:3, 212:13, 216:17, 233:20, 253:16

**nights** [1] - 211:23

**nine** [1] - 105:21

**NO** [1] - 1:6

**Nobody** [1] - 219:12

**nobody** [12] - 7:1, 7:2, 38:9, 39:13, 39:23, 53:4, 90:2, 91:7, 140:18, 190:20, 191:20

**Nokia** [1] - 237:7

**none** [6] - 13:17, 89:14, 126:12, 131:15, 213:16, 254:3

**None** [1] - 222:22

**nonetheless** [1] - 134:18

**normal** [1] - 251:10

**normally** [3] - 105:7, 116:18, 246:6

**North** [1] - 151:5, 239:3

**north/south** [1] - 163:5

**NORTHERN** [1] - 1:2

**note** [10] - 124:12, 151:17, 167:13, 168:24, 181:22, 201:1, 220:4, 223:16, 245:12, 247:7

**noted** [1] - 180:24

**notes** [6] - 85:19, 163:16, 242:4, 242:5, 242:8, 242:24, 243:12, 245:21, 245:22

**nothing** [33] - 7:2, 25:21, 26:7, 49:24, 51:25, 53:3, 53:19, 53:22, 54:13, 59:3, 69:10, 75:9, 81:16, 83:22, 83:23, 86:25, 87:3, 97:13, 100:16, 116:8, 120:18, 120:19, 136:20, 139:5, 143:6, 147:25, 152:23, 169:8, 203:14, 250:4, 258:7, 258:21

**Nothing** [5] - 90:22, 91:10, 149:15, 150:11, 197:4

**notice** [5] - 169:18, 213:17, 220:22, 220:25, 221:7

**noticed** [3] - 169:2, 169:11, 169:17

**notification** [1] - 220:21

**notified** [1] - 133:23

**notoriously** [1] - 201:10

**notwithstanding** [2] - 13:10, 254:7

**number** [45] - 36:20, 51:12, 107:10, 107:11, 196:13, 196:15, 196:16, 196:17, 198:2, 198:3, 198:4, 198:5, 209:22, 215:12, 232:10, 233:9, 234:7, 234:10, 234:17, 234:18, 234:22, 234:24, 235:2, 236:10, 236:16, 238:21, 239:4, 244:3, 244:6, 244:18, 245:2, 245:5, 245:17, 245:18, 250:8, 253:2, 253:15, 254:14, 255:13, 259:11, 259:14, 262:9

**Number** [4] - 162:14, 162:16, 246:24, 247:3

**Number(s** [1] - 267:5

**numbered** [1] - 222:21

**numbers** [16] - 36:22, 79:2, 79:4, 154:10, 163:12, 202:20, 202:22, 222:5, 222:7, 222:9, 222:17, 222:20, 244:11, 244:14, 244:23

**numerous** [2] - 110:12, 245:2

**O**

**o'clock** [1] - 114:3

**oath** [4] - 2:18, 21:24, 80:2, 197:10

**object** [8] - 132:6,

198:12, 198:14, 200:13, 209:16, 213:5, 214:19, 216:15

**objection** [20] - 26:14, 132:16, 203:12, 204:1, 205:22, 206:15, 210:4, 210:9, 210:22, 215:10, 218:20, 219:21, 220:2, 224:20, 230:20, 247:24, 248:9, 248:14, 250:6

**Objection** [28] - 25:11, 25:19, 26:2, 26:9, 26:10, 27:6, 44:7, 44:16, 44:17, 44:22, 51:1, 51:23, 66:18, 80:12, 94:5, 117:4, 117:10, 121:5, 121:9, 122:23, 142:6, 142:19, 147:1, 147:12, 149:24, 150:3, 232:1, 234:25

**objection's** [2] - 121:11, 225:10

**Objection's** [1] - 150:7

**objections** [2] - 210:23, 253:18

**obligation** [3] - 260:10, 261:20

**observe** [4] - 157:16, 167:5, 191:10, 191:16

**observed** [3] - 166:19, 178:17, 185:17

**obtained** [2] - 122:21, 205:19

**Obviously** [2] - 104:13, 159:5

**obviously** [11] - 15:9, 19:5, 104:11, 124:23, 128:17, 137:21, 158:1, 159:11, 204:19, 226:13, 263:21

**occasion** [1] - 100:23

**occasions** [4] - 40:1, 100:9, 113:4, 172:6

**occurred** [4] - 123:23, 138:11, 199:3, 199:9

**OCME** [2] - 194:7, 195:3

**October** [12] - 1:11, 60:22, 61:6, 71:22, 72:19, 73:2, 73:6, 73:16, 126:9, 126:10, 129:16, 267:5

**odd** [1] - 74:15

**OF** [3] - 1:2, 1:5, 1:11

**offended** [1] - 223:10

**offer** [2] - 205:4, 231:6

**offered** [1] - 21:5

**Office** [3] - 193:21, 195:3, 195:9

**office** [1] - 194:7, 218:14, 240:2, 240:8,

241:4, 248:18, 248:24, 249:21, 259:15

**OFFICER** [2] - 150:19, 266:9

**Officer** [13] - 131:3, 131:17, 131:20, 132:4, 150:18, 151:2, 151:15, 154:8, 155:2, 176:20, 176:25, 262:10, 262:11

**officer** [12] - 131:5, 132:18, 132:25, 151:10, 151:12, 151:19, 156:4, 164:8, 164:10, 166:4, 170:23, 175:6

**officers** [6] - 148:10, 164:17, 176:8, 179:23, 182:25, 187:7

**Officers** [1] - 130:16

**official** [1] - 267:7

**Official** [1] - 267:15

**officially** [1] - 4:25

**often** [4] - 42:20, 55:7

**Often** [1] - 43:1

**oil** [1] - 214:8

**oily** [3] - 37:11, 108:4, 109:9

**Old** [5] - 155:15, 155:19, 162:23, 163:4, 183:14

**old** [5] - 92:1, 92:5, 94:24, 156:20, 249:4

**older** [1] - 95:1

**Oliver** [1] - 234:13

**ON** [2] - 266:4, 266:5

**once** [8] - 21:12, 38:10, 55:8, 62:22, 82:4, 159:19, 222:15, 246:14

**Once** [1] - 63:12

**One** [11] - 19:12, 37:13, 50:11, 75:5, 104:9, 149:6, 178:13, 178:14, 206:4, 221:22, 232:19

**one** [160] - 3:10, 6:14, 7:13, 9:9, 11:19, 19:13, 20:20, 23:10, 23:13, 33:6, 33:8, 33:14, 34:9, 39:6, 39:7, 42:18, 43:24, 49:3, 51:16, 52:2, 57:20, 62:22, 63:5, 66:11, 66:12, 67:23, 68:7, 74:20, 75:1, 75:3, 75:5, 75:6, 75:13, 75:15, 86:11, 87:21, 89:18, 91:7, 96:8, 97:7, 98:7, 101:17, 102:18, 104:7, 109:17, 111:7, 113:2, 118:9, 118:13, 123:12, 125:1, 127:2, 132:11, 132:24, 139:2, 141:17, 143:10, 146:13, 149:16,

160:13, 162:14, 163:7, 165:17, 165:25, 172:5, 172:11, 173:11, 178:13, 178:14, 179:2, 180:25, 183:22, 185:15, 188:15, 188:16, 188:17, 188:19, 188:20, 188:21, 188:23, 189:3, 189:6, 189:11, 189:13, 189:17, 195:9, 195:12, 197:19, 198:10, 202:25, 203:2, 203:10, 204:4, 204:15, 205:12, 206:10, 208:7, 209:5, 209:25, 210:5, 211:2, 213:5, 214:13, 217:14, 217:22, 218:7, 218:8, 224:7, 225:8, 225:21, 232:15, 233:5, 235:5, 235:8, 235:9, 236:2, 236:22, 236:25, 244:23, 247:1, 248:22, 250:5, 250:7, 250:8, 251:3, 251:10, 251:24, 252:13, 253:19, 254:9, 254:19, 257:1, 259:11, 259:15, 261:14, 262:13, 262:17, 264:2, 264:8
**one's** [1] - 69:6
**one-on-one** [1] - 179:2
**ones** [7] - 19:7, 19:21, 124:23, 179:4, 204:22, 223:24, 252:17
**open** [15] - 51:9, 51:10, 51:12, 74:1, 74:4, 108:1, 108:15, 167:1, 167:2, 168:4, 168:6, 201:2, 227:23, 229:19, 247:14
**open-face** [1] - 51:12
**open-faced** [3] - 51:9, 51:10, 74:1
**opened** [1] - 109:18
**operated** [1] - 23:3
**operates** [1] - 218:16
**opinion** [1] - 144:2
**opportunity** [13] - 3:6, 93:23, 94:16, 116:11, 125:4, 125:10, 128:11, 128:15, 182:7, 184:1, 187:10, 235:13, 252:5
**optimistic** [1] - 129:2
**oral** [1] - 225:9
**order** [10] - 103:14, 130:15, 134:25, 221:2, 221:5, 222:1, 244:13, 256:15, 263:11, 264:17
**orient** [1] - 21:23, 162:25
**original** [3] - 154:5, 165:17, 248:7
**originally** [2] - 105:20,

252:12
**ought** [1] - 261:1
**ounce** [3] - 26:22, 26:23, 26:25
**ounces** [8] - 36:6, 36:7, 75:23, 105:21, 127:22, 128:3, 243:4, 243:13
**out-of-state** [1] - 31:22
**outgoing** [3] - 235:17, 235:18, 237:13
**Outlet** [3] - 205:3, 205:9, 231:11
**outlet** [1] - 231:23
**outside** [10] - 2:7, 2:24, 42:13, 43:5, 43:6, 43:12, 59:6, 168:2, 220:1, 263:1
**overall** [1] - 163:13
**overhang** [6] - 157:7, 157:14, 157:15, 158:19, 159:17, 160:1
**overheard** [1] - 257:4
**overlapped** [1] - 125:5
**overnight** [7] - 227:8, 227:11, 227:12, 227:22, 228:7, 235:13, 235:14
**overreaching** [1] - 207:25
**Overruled** [16] - 25:13, 25:20, 26:3, 27:7, 44:18, 51:2, 51:24, 66:19, 80:13, 117:6, 117:11, 142:7, 142:20, 198:16, 232:2, 235:1
**overruled** [5] - 206:15, 210:10, 225:10, 230:20
**overtime** [2] - 124:3
**owe** [4] - 38:19, 38:22, 41:22, 82:10
**owed** [12] - 23:21, 23:22, 38:21, 41:16, 75:20, 82:1, 83:2, 83:12, 103:23, 117:3, 117:8, 120:22
**owes** [1] - 23:14
**own** [6] - 11:3, 16:12, 100:21, 144:24, 205:21, 223:16
**owned** [2] - 239:10, 239:11

# P

**p.m** [9] - 124:15, 124:16, 124:17, 240:20, 240:23, 253:11, 254:13, 265:14
**PA** [1] - 214:3
**pack** [2] - 35:23, 45:7
**packaged** [2] - 106:4,

261:6
**pads** [3] - 124:12, 201:1, 247:7
**PAGE** [1] - 266:3
**page** [7] - 85:16, 140:22, 232:4, 234:9, 235:4, 236:15, 237:11
**Page** [7] - 86:10, 140:21, 140:22, 235:23, 236:12, 236:20
**pages** [6] - 2:13, 126:11, 232:9, 234:2, 248:19, 267:6
**paid** [8] - 35:9, 70:15, 71:8, 82:4, 99:22, 100:5, 110:2
**pain** [2] - 158:3, 158:8
**painstaking** [2] - 207:4, 207:5
**paint** [1] - 169:4
**Painted** [1] - 146:19
**pamphlet** [2] - 198:7, 199:18
**paper** [1] - 78:20
**papers** [1] - 62:5
**paperwork** [1] - 198:1
**paramedics** [1] - 158:21
**parentheses** [1] - 242:22
**parenthetical** [1] - 224:6
**parents** [1] - 161:8
**parked** [1] - 29:5
**parking** [1] - 183:15
**parse** [1] - 225:4
**part** [19] - 15:5, 20:13, 79:20, 126:13, 132:12, 145:15, 153:25, 156:1, 157:5, 157:15, 160:1, 162:5, 163:7, 163:9, 169:18, 224:3, 241:21, 258:11, 258:12
**participated** [3] - 12:17, 172:7, 172:10
**particular** [18] - 30:22, 30:24, 61:9, 102:24, 152:4, 153:25, 163:12, 193:11, 194:10, 195:15, 195:23, 196:3, 196:6, 228:24, 234:18, 253:2, 258:4, 260:5
**particularly** [2] - 13:10, 135:5
**partly** [1] - 11:22, 157:14
**partner** [4] - 25:5, 99:17, 99:24, 152:13
**partners** [2] - 65:9, 69:19

**pass** [1] - 246:3
**past** [7] - 53:16, 53:18, 53:19, 110:19, 122:25, 205:25, 211:9
**patience** [2] - 21:12, 230:17
**Patricia** [1] - 46:2
**Patrol** [2] - 151:11, 152:8
**patrol** [5] - 152:10, 174:25, 175:9, 175:16, 175:17
**Paul** [1] - 1:19
**Pause** [3] - 123:14, 172:17, 200:19
**pause** [1] - 17:17
**pay** [13] - 23:11, 23:13, 23:21, 40:8, 41:25, 42:1, 83:2, 95:6, 95:7, 130:3, 143:18, 258:20
**paying** [4] - 56:16, 103:9, 113:8, 114:12
**Peaches** [5] - 40:21, 41:5, 112:23, 114:23, 118:20
**pen** [1] - 162:10
**People** [4] - 16:9, 90:7, 90:15, 120:9
**people** [82] - 5:14, 5:16, 5:18, 5:24, 13:5, 16:3, 16:9, 18:11, 18:19, 19:5, 22:8, 30:20, 30:21, 36:21, 39:4, 40:19, 48:20, 54:1, 54:6, 55:12, 56:3, 56:15, 56:16, 65:25, 82:17, 82:18, 86:2, 87:10, 87:13, 87:18, 87:21, 88:19, 88:24, 90:7, 90:10, 90:16, 90:19, 90:20, 95:23, 97:23, 110:25, 111:3, 117:3, 118:8, 119:19, 119:21, 120:7, 120:12, 123:1, 125:2, 127:18, 140:5, 140:14, 141:2, 141:10, 141:16, 142:3, 143:19, 143:21, 144:2, 145:13, 166:8, 167:24, 172:11, 179:16, 180:25, 181:6, 182:17, 184:2, 191:5, 201:9, 201:22, 206:10, 221:1, 221:3
**perceive** [1] - 127:12
**perfectly** [2] - 210:8, 263:7
**performed** [1] - 195:12
**Perhaps** [2] - 200:10, 200:17
**perimeter** [1] - 176:24

**period** [8] - 25:7, 94:9, 94:17, 123:15, 151:19, 157:22, 216:1, 216:22
**perjuring** [1] - 127:6
**perjury** [5] - 121:22, 121:25, 122:2, 122:11, 127:5
**permission** [1] - 177:11
**permit** [1] - 13:13
**permitted** [1] - 132:25
**perpetrators** [2] - 19:6, 19:19
**person** [29] - 9:17, 15:13, 20:3, 71:14, 78:5, 98:7, 100:23, 104:21, 118:17, 120:3, 125:5, 134:22, 135:20, 136:16, 141:20, 142:14, 143:3, 152:15, 156:10, 156:13, 156:18, 158:11, 160:19, 161:10, 178:17, 190:5, 236:3, 262:17
**person's** [2] - 32:18, 184:22
**personal** [2] - 101:23, 135:13
**Personally** [1] - 181:24
**personnel** [1] - 176:11
**persons** [2] - 158:11, 231:15
**persuading** [1] - 206:22
**pertain** [1] - 257:17
**pertaining** [1] - 225:20
**pertains** [1] - 250:5
**Pestaner** [4] - 195:7, 196:10, 196:12
**PESTANER** [1] - 195:7
**Pete** [37] - 4:20, 12:18, 24:6, 24:18, 24:20, 24:22, 25:18, 40:19, 41:7, 41:8, 41:9, 41:11, 41:16, 41:20, 42:2, 42:3, 42:9, 43:6, 43:8, 43:21, 44:23, 44:25, 45:2, 47:1, 47:4, 52:22, 70:10, 86:23, 86:25, 112:25, 113:1, 118:3, 141:10, 142:4, 142:15, 199:1
**Pete's** [1] - 144:9
**Petrey's** [1] - 240:7
**petty** [1] - 42:7
**PH** [1] - 214:3
**PH-68** [1] - 214:3
**phenomenon** [1] - 15:6
**Phil** [2] - 172:11, 262:13
**phone** [50] - 3:8, 4:7, 4:18, 6:5, 6:6, 6:7, 10:6, 18:10, 19:18, 22:14, 36:24, 42:24, 43:1, 46:19, 46:25, 48:17,

51:12, 51:14, 52:14,
53:9, 53:10, 53:14,
53:20, 74:1, 82:1, 98:14,
112:16, 112:17, 112:19,
112:23, 113:3, 114:7,
114:11, 114:13, 114:18,
143:14, 200:1, 200:4,
202:20, 202:22, 205:7,
211:23, 225:22, 226:11,
227:17, 229:3, 231:9,
232:16, 234:17, 234:18,
235:2, 235:3, 235:17,
235:20, 235:24, 236:1,
236:7, 236:13, 236:20,
236:21, 236:23, 237:3,
237:7, 237:8, 237:12,
238:21, 239:4, 242:21,
243:14, 243:17, 244:18,
244:23, 245:1, 245:5,
245:7, 245:11, 245:17,
249:3, 250:22, 251:9,
251:12, 253:13, 253:22,
253:23, 254:14, 254:16,
254:22, 255:3, 255:18,
255:19, 256:3, 256:23,
256:24, 257:8, 263:17

**phones** [22] - 34:1,
34:8, 34:10, 35:14,
36:16, 36:19, 36:21,
73:24, 74:2, 74:3,
122:14, 226:21, 235:5,
251:23, 251:25, 253:3,
255:7, 255:9, 255:22,
258:6, 258:20

**photo** [2] - 177:17,
181:9

**photograph** [18] -
23:23, 24:9, 155:1,
157:1, 157:5, 159:5,
159:8, 167:13, 171:1,
171:4, 181:4, 181:10,
181:15, 181:17, 181:25,
202:23, 254:8, 256:4

**photographed** [1] -
181:13

**photographs** [14] -
159:3, 159:16, 166:7,
166:9, 166:15, 168:1,
181:12, 193:10, 194:7,
202:18, 208:16, 226:16,
231:13, 254:6

**photos** [1] - 165:17

**Physically** [1] - 108:12

**pick** [3] - 22:5, 35:10,
45:15

**picked** [5] - 48:11,
62:23, 102:19, 104:17,
144:16

**picture** [1] - 157:10

**pictures** [1] - 228:25

**piece** [6] - 109:5,
135:10, 135:14, 193:13,
195:18, 254:2

**pinhole** [2] - 205:5,
231:8

**place** [15] - 40:5, 68:11,
75:5, 75:6, 78:1, 78:19,
79:1, 164:20, 169:8,
177:3, 193:22, 199:8,
217:8, 243:10

**placed** [4] - 176:10,
240:7, 255:25, 257:7

**plan** [2] - 130:15,
131:12

**planned** [4] - 39:2,
114:24, 115:3, 265:5

**planning** [3] - 91:12,
120:25, 130:15

**plates** [1] - 30:15

**play** [5] - 136:11, 230:8,
230:9, 230:14, 245:24

**played** [4] - 6:2, 11:11,
20:9, 247:5

**playing** [4] - 17:16,
18:2, 18:4, 262:24

**Plaza** [1] - 93:5

**plead** [1] - 69:10

**pleasant** [1] - 247:15

**pled** [2] - 69:7, 69:9

**pocket** [9] - 34:25,
38:11, 100:15, 108:13,
110:5, 110:6, 110:8,
110:10, 144:17

**Point** [3] - 112:10,
151:5

**point** [52] - 4:25, 9:9,
91:12, 98:9, 107:4,
109:7, 125:9, 132:12,
138:18, 153:5, 153:23,
158:21, 159:11, 161:25,
164:1, 164:7, 164:17,
165:14, 166:8, 167:8,
175:22, 175:25, 176:25,
177:19, 183:6, 183:23,
184:5, 184:19, 187:7,
187:17, 187:19, 187:25,
190:14, 194:1, 200:14,
204:20, 206:6, 207:1,
213:23, 217:14, 222:17,
224:5, 224:15, 226:25,
227:1, 245:15, 251:12,
253:5, 259:11, 259:14

**pointed** [1] - 18:18

**pointing** [2] - 129:24,
260:4

**pointless** [1] - 262:5

**points** [1] - 165:7

**Police** [5] - 151:5,
151:7, 174:20, 174:23,
174:24, 192:18

**police** [25] - 36:20,
59:25, 60:8, 60:14,
68:17, 120:1, 120:13,
120:20, 120:21, 138:12,
140:16, 140:17, 147:25,
148:10, 148:23, 149:1,
151:10, 151:19, 161:13,
164:23, 166:4, 175:6,
187:17, 187:18, 192:25

**policy** [1] - 220:21

**poor** [2] - 16:16, 18:16

**portion** [3] - 205:2,
206:9, 228:3

**posed** [2] - 242:15,
242:16

**position** [8] - 26:4,
116:22, 116:25, 166:20,
169:11, 184:8, 186:9,
190:25

**positioned** [3] - 179:21,
190:8, 190:24

**positioning** [1] - 190:9

**positive** [2] - 182:18,
185:22

**positively** [3] - 129:23,
186:13, 186:14

**possessed** [1] - 225:7

**possession** [7] - 62:15,
62:16, 63:4, 110:17,
233:16, 245:2, 253:13

**possibility** [5] - 104:7,
104:8, 163:14, 244:12,
244:16

**possible** [11] - 19:25,
160:14, 163:19, 163:21,
164:1, 165:7, 166:3,
178:15, 184:20, 212:22,
244:10

**possibly** [3] - 115:7,
122:16, 182:23

**pot** [2] - 108:15, 108:18

**potential** [2] - 193:9,
254:7

**potentially** [1] - 121:4

**pounds** [3] - 162:14,
162:16, 163:19

**powerful** [2] - 15:15,
16:13

**pre** [1] - 242:8

**pre-interview** [1] -
242:8

**precautions** [1] -
195:21

**Precinct** [1] - 151:5

**precinct** [7] - 151:22,
151:23, 152:2, 174:15,
174:16, 174:17, 175:10

**precise** [1] - 173:4

**prejudicial** [1] - 11:2

**preliminary** [1] - 131:22

**prep** [1] - 49:12

**preparation** [1] - 257:11

**prepare** [4] - 208:9,
221:8, 250:10, 258:18

**prepared** [6] - 213:22,
251:1, 252:18, 253:2,
255:10, 258:25

**preparing** [3] - 32:25,
128:8, 216:25

**preponderance** [1] -
21:1

**prepped** [1] - 11:16

**prepping** [1] - 13:19

**presence** [3] - 2:7, 2:24,
229:20

**present** [13] - 2:1, 6:17,
9:25, 15:13, 19:13,
102:11, 112:22, 114:24,
238:13, 240:12, 240:17,
241:20

**pressed** [2] - 51:15,
127:9

**pressing** [2] - 209:10,
246:5

**pretrial** [5] - 130:21,
131:18, 213:17, 216:6,
216:13

**pretty** [10] - 10:6, 15:14,
68:1, 71:19, 81:11,
127:15, 135:13, 142:25,
176:17

**previous** [1] - 232:17

**PREVIOUSLY** [1] - 2:16

**previously** [5] - 19:10,
126:16, 169:21, 229:22,
230:24

**price** [2] - 76:7, 127:23

**prices** [1] - 79:2

**primarily** [2] - 20:23,
252:14

**printed** [2] - 246:18,
252:20

**prison** [3] - 63:23,
63:24, 75:14

**privacy** [1] - 231:7

**privately** [1] - 59:7

**probation** [11] - 61:24,
61:25, 62:22, 63:8,
63:10, 64:4, 64:9, 64:18,
64:20, 64:21

**problem** [16] - 31:19,
56:5, 61:10, 98:17,
111:3, 112:2, 126:4,
127:23, 130:23, 211:14,
217:12, 226:23, 227:1,
258:11, 262:4, 264:7

**procedure** [5] - 11:3,
18:8, 183:23, 187:5,
188:15

**proceed** [6] - 2:3,

**proceeding** [1] - 184:6

**proceedings** [5] -
172:17, 183:24, 200:19,
267:4, 267:7

**Proceedings** [3] - 2:1,
123:14, 265:14

**process** [4] - 19:9,
193:8, 227:1, 257:23

**processed** [1] - 194:20

**processing** [1] - 196:25

**produced** [4] - 204:16,
218:9, 252:4, 252:19

**product** [1] - 27:2

**production** [4] - 249:8,
250:5, 263:25

**professional** [7] -
205:4, 231:6, 247:25,
248:15, 260:12, 261:10,
261:21

**professionalism** [1] -
261:13

**proffer** [7] - 20:14,
211:21, 221:9, 221:13,
223:21, 223:25, 224:2

**profile** [2] - 181:18,
181:20

**profit** [2] - 100:7,
107:19

**profits** [1] - 99:25

**program** [5] - 15:6,
206:5, 214:15, 214:23,
215:1

**promises** [1] - 122:4

**promotion** [1] - 173:22

**prompted** [1] - 182:13

**promptly** [1] - 130:8

**proof** [1] - 253:24

**properly** [1] - 21:3

**property** [2] - 198:3,
198:5

**prosecute** [1] - 144:25

**prosecuted** [5] - 59:10,
121:21, 121:25, 122:2,
127:5

**prosecutor** [1] - 139:8

**prosecutors** [1] -
148:10

**prostitution** [1] -
211:12

**protected** [1] - 86:7

**protecting** [2] - 56:4,
86:7

**protection** [6] - 25:3,
65:17, 78:13, 99:18,
101:11, 101:14

**prove** [1] - 205:11

**provide** [7] - 2:11, 2:12,
171:23, 220:22, 224:9,

21:25, 124:18, 134:3,
230:18, 230:21

249:10, 260:10
**provided** [19] - 132:3, 132:4, 134:8, 144:24, 171:19, 204:17, 204:20, 211:17, 213:25, 225:17, 225:22, 225:25, 226:2, 229:4, 229:23, 246:15, 248:10, 249:24, 252:8
**provider** [1] - 71:17
**providing** [2] - 101:10, 101:14
**proving** [1] - 229:17
**provisions** [1] - 216:7
**proximity** [1] - 153:12
**public** [2] - 47:25, 48:1
**pull** [2] - 209:14, 248:19
**pulled** [10] - 31:21, 31:23, 39:10, 39:11, 43:6, 139:25, 162:21, 182:24, 184:11, 190:11
**pulling** [1] - 71:23
**purchase** [1] - 103:14
**purity** [1] - 108:22
**purports** [1] - 225:18
**purpose** [3] - 165:22, 194:4, 206:16
**purposely** [1] - 260:14
**pursuant** [1] - 225:17
**pursued** [1] - 125:8
**push** [2] - 51:16, 263:9
**Put** [3] - 38:11, 108:17, 109:22
**put** [36] - 5:5, 16:5, 20:12, 33:18, 34:24, 34:25, 60:1, 62:22, 68:4, 100:2, 105:21, 106:8, 106:22, 108:15, 108:18, 109:21, 110:4, 110:5, 119:8, 139:9, 144:17, 144:18, 194:14, 195:17, 196:15, 202:23, 208:2, 211:12, 215:6, 215:21, 216:3, 218:15, 222:8, 223:13, 225:23, 258:15
**puts** [1] - 222:11
**putting** [6] - 34:23, 47:13, 157:19, 198:12, 206:12, 206:16
**Pyne** [18] - 1:21, 2:6, 3:17, 4:1, 10:22, 12:2, 14:13, 18:25, 91:16, 94:7, 134:10, 141:15, 144:7, 215:13, 251:14, 263:8, 263:24
**PYNE** [30] - 3:25, 10:24, 11:2, 11:10, 14:14, 14:17, 14:20, 15:17, 15:23, 16:11, 16:15, 16:18, 17:1, 17:4, 17:8, 17:11, 17:13, 17:21,

17:23, 18:6, 26:9, 44:7, 44:17, 91:11, 91:15, 125:17, 142:6, 250:21, 266:5, 266:6
**Pyrex** [1] - 108:18

## Q

**quadrant** [1] - 226:10
**quality** [6] - 16:15, 18:16, 98:12, 98:19, 98:20
**quantities** [1] - 27:20
**quantity** [3] - 36:3, 36:9, 50:13
**quarrel** [2] - 230:3, 247:23
**quarter** [1] - 82:18
**questioned** [2] - 57:13, 138:12
**questioning** [5] - 138:10, 139:13, 140:2, 144:7, 145:8
**questions** [27] - 55:19, 57:16, 77:10, 90:24, 91:17, 134:10, 137:2, 138:4, 145:22, 156:20, 157:20, 157:21, 157:23, 158:8, 172:14, 172:24, 173:23, 188:13, 190:4, 191:23, 197:5, 198:10, 238:14, 239:20, 241:19, 241:20, 259:7
**quick** [2] - 34:23, 163:7
**quieter** [1] - 17:24
**quite** [8] - 78:22, 151:16, 181:8, 190:9, 213:20, 217:1, 257:10, 261:2
**quotation** [1] - 205:3
**quotations** [2] - 200:11, 220:18

## R

**radio** [3] - 153:24, 164:16, 182:24
**radioed** [1] - 183:1
**raise** [1] - 253:5
**raised** [1] - 254:4
**raises** [1] - 254:3
**ran** [5] - 63:18, 179:4, 180:1, 182:9, 183:10
**Randallstown** [4] - 27:17, 28:15, 45:22, 62:3
**rang** [2] - 42:24, 114:13
**range** [1] - 160:24
**rank** [3] - 151:13, 172:22, 173:22

**ranks** [2] - 131:3, 188:8
**rather** [10] - 23:14, 23:17, 99:17, 101:14, 116:19, 150:13, 155:2, 160:18, 227:14, 246:21
**ratified** [1] - 225:7
**re** [5] - 21:23, 102:25, 103:3, 120:25, 140:24
**re-orient** [1] - 21:23
**re-up** [3] - 102:25, 103:3, 120:25
**re-upped** [1] - 140:24
**reach** [2] - 128:25, 135:20
**read** [19] - 140:19, 162:11, 200:10, 204:7, 204:24, 206:8, 219:11, 231:4, 232:15, 232:18, 233:5, 234:6, 234:10, 236:18, 237:1, 239:16, 241:8, 242:10
**reading** [7] - 67:18, 85:18, 85:22, 223:16, 230:25, 233:7
**reads** [2] - 204:24, 205:2
**ready** [12] - 21:25, 43:25, 84:13, 119:16, 131:13, 134:3, 153:5, 153:6, 204:10, 230:18, 261:6, 263:15
**Ready** [2] - 2:3, 124:18
**real** [4] - 3:15, 23:16, 24:2, 248:9
**realize** [2] - 214:18, 214:19
**realizing** [1] - 128:25
**really** [60] - 5:13, 19:13, 20:11, 26:4, 34:22, 35:8, 38:8, 40:8, 47:20, 47:21, 53:3, 53:6, 60:2, 61:9, 61:20, 62:8, 63:12, 65:25, 68:11, 71:11, 72:24, 72:25, 75:13, 75:19, 75:23, 78:9, 78:10, 79:22, 82:11, 82:25, 88:17, 96:2, 97:15, 99:4, 99:5, 100:15, 101:18, 101:22, 113:1, 139:4, 140:17, 140:18, 148:16, 161:17, 210:24, 213:5, 214:8, 223:8, 224:6, 224:8, 224:16, 228:12, 252:10, 263:3, 263:4, 263:15
**realm** [1] - 220:1
**Realtime** [2] - 205:6, 231:8
**rear** [1] - 235:10
**rears** [1] - 217:12

**reason** [17] - 13:15, 30:23, 30:24, 33:14, 42:4, 119:18, 132:7, 132:8, 145:15, 177:6, 183:8, 185:1, 191:12, 209:25, 214:9, 215:13, 218:25
**reasonable** [2] - 210:8, 224:21
**reasonably** [1] - 258:2
**reasons** [3] - 11:19, 135:24, 264:9
**receive** [6] - 100:2, 100:4, 153:24, 175:25, 176:13, 177:12
**received** [6] - 19:20, 164:16, 164:22, 164:25, 178:6, 209:17
**receives** [1] - 18:14
**receiving** [1] - 176:15
**recent** [2] - 236:4, 237:15
**recently** [1] - 211:20
**Recess** [1] - 225:12
**recess** [15] - 124:7, 124:16, 124:17, 128:20, 200:23, 200:25, 201:4, 207:12, 207:17, 214:12, 214:13, 225:11, 230:19, 246:22, 265:12
**recognize** [9] - 48:23, 115:19, 153:11, 170:5, 170:25, 171:3, 180:14, 181:3, 231:15
**recognized** [1] - 8:9
**recollection** [9] - 8:17, 112:5, 114:4, 154:9, 170:22, 191:21, 194:16, 237:9, 243:2
**recommendations** [1] - 100:20
**record** [18] - 61:18, 63:21, 63:22, 120:12, 127:1, 150:22, 174:6, 180:22, 183:17, 192:9, 216:6, 220:2, 225:24, 249:14, 257:19, 259:11, 260:22
**Record** [1] - 125:14
**recorded** [5] - 3:8, 48:24, 242:9, 242:25, 267:3
**recorder** [2] - 205:6, 231:9
**recording** [9] - 3:7, 5:19, 18:16, 19:4, 95:21, 96:4, 96:9, 98:13, 98:14
**records** [32] - 61:1, 125:2, 200:1, 211:23, 222:5, 225:22, 226:11,

226:14, 227:17, 227:23, 227:25, 228:3, 229:15, 233:14, 245:1, 248:1, 248:19, 249:3, 249:23, 250:25, 251:1, 251:2, 251:4, 251:7, 251:9, 251:12, 251:20, 252:4, 255:2, 256:25, 260:7, 263:17
**recover** [3] - 195:18, 200:1, 233:20
**recovered** [14] - 131:9, 195:3, 195:24, 196:3, 196:8, 197:1, 199:15, 199:20, 200:3, 233:19, 235:6, 236:2, 236:25, 245:7
**recovering** [1] - 170:22
**recovery** [4] - 193:13, 194:16, 197:20, 262:17
**recreate** [1] - 249:22
**RECROSS** [2] - 145:23, 266:8
**red** [10] - 132:5, 156:1, 159:7, 160:7, 160:8, 162:14, 162:21, 162:25, 173:10, 177:23
**redirect** [2] - 10:17, 191:24
**REDIRECT** [2] - 138:6, 266:7
**refer** [4] - 15:12, 20:17, 95:17, 173:18
**reference** [7] - 149:8, 154:9, 176:3, 194:15, 242:17, 242:19, 243:12
**referenced** [1] - 152:15
**referred** [5] - 15:6, 95:13, 136:17, 140:22, 243:2
**referring** [6] - 125:22, 140:23, 141:12, 149:7, 223:21, 254:5
**refers** [2] - 188:20, 188:23
**reflect** [1] - 162:7
**reflects** [2] - 125:14, 194:16
**refresh** [3] - 113:23, 154:9, 194:15
**refreshes** [1] - 113:24
**regarding** [1] - 211:4
**regards** [4] - 122:4, 250:24, 251:11, 251:12
**regret** [3] - 35:25, 50:11, 50:17
**regrets** [1] - 13:21
**regretted** [3] - 33:4, 121:13, 121:14
**regretting** [1] - 49:12

**regular** [2] - 32:6, 62:10
**Reisterstown** [5] - 51:21, 93:5, 199:11, 242:20, 243:7
**rejoined** [1] - 21:14
**related** [3] - 137:3, 214:10, 217:16
**relates** [1] - 235:17
**relationship** [3] - 123:5, 134:11, 138:17
**relative** [3] - 107:17, 239:10, 262:10
**relay** [1] - 164:15
**relayed** [1] - 164:25
**released** [1] - 75:6
**relevance** [3] - 203:16, 205:25, 210:25
**Relevance** [1] - 200:13
**relevant** [9] - 136:11, 200:15, 204:24, 205:24, 206:1, 207:2, 207:10, 211:11, 211:13
**reliability** [7] - 12:8, 13:9, 15:11, 15:15, 20:11, 20:16, 20:18
**reliable** [4] - 12:12, 19:24, 20:21, 21:3
**reluctant** [1] - 139:14
**rely** [3] - 15:9, 15:10, 225:3
**relying** [1] - 15:4
**remain** [3] - 2:18, 21:24, 197:10
**remained** [2] - 55:1, 109:24
**remains** [1] - 193:17
**remedy** [2] - 129:11, 130:5
**remember** [126] - 5:5, 22:9, 23:11, 29:3, 33:9, 33:10, 34:1, 34:13, 36:5, 37:19, 37:21, 40:11, 45:16, 47:20, 52:15, 53:1, 55:13, 55:16, 55:18, 56:17, 57:4, 57:5, 57:7, 57:9, 57:10, 57:11, 57:13, 58:23, 59:23, 59:24, 60:2, 60:15, 61:3, 61:4, 61:21, 62:8, 63:2, 63:3, 63:5, 63:21, 67:5, 67:8, 67:9, 67:10, 67:11, 67:15, 67:16, 68:12, 68:13, 68:14, 68:25, 69:2, 69:3, 69:11, 72:1, 72:2, 72:23, 72:25, 74:23, 74:25, 75:13, 76:4, 76:7, 78:17, 78:19, 78:21, 79:4, 79:5, 79:10, 79:11, 86:13, 87:25, 90:4, 92:7, 93:10, 93:11,

96:2, 97:9, 107:11, 111:10, 112:7, 112:11, 113:15, 113:18, 134:11, 137:1, 137:5, 137:7, 139:4, 140:10, 140:13, 141:18, 146:7, 146:10, 146:15, 148:13, 148:16, 163:14, 165:2, 167:16, 168:4, 170:8, 170:20, 171:18, 181:6, 184:3, 187:13, 187:15, 187:19, 194:22, 200:7, 211:9, 235:8, 236:1, 236:23, 242:16, 244:18, 256:22
**remembered** [1] - 113:17
**remembering** [1] - 168:6
**remind** [5] - 203:6, 219:9, 225:3, 225:5, 247:8
**reminder** [1] - 2:15
**rendered** [1] - 195:25
**repeatedly** [1] - 16:18
**rephrase** [1] - 140:13
**replace** [1] - 146:13
**report** [12] - 132:18, 132:19, 152:24, 154:8, 159:8, 162:5, 163:7, 163:15, 163:23, 172:25, 194:14, 194:24
**Reported** [1] - 1:23
**reported** [1] - 163:23
**Reporter** [1] - 267:15
**REPORTER'S** [1] - 267:1
**reports** [2] - 221:9, 247:12
**represent** [2] - 4:1, 91:16
**representation** [2] - 122:22, 127:11
**represented** [1] - 128:25
**request** [10] - 125:8, 125:14, 125:19, 130:5, 215:19, 215:21, 217:6, 217:10, 263:25
**required** [2] - 129:8, 208:25, 217:3
**reread** [1] - 204:8
**reserve** [1] - 172:14
**residence** [3] - 201:18, 201:25, 202:13
**residences** [1] - 226:20
**residential** [2] - 178:4, 255:17
**Resolution** [1] - 169:3
**resolutions** [1] - 130:20
**resolved** [1] - 132:11

**respect** [23] - 19:10, 20:8, 130:16, 131:17, 132:21, 136:16, 173:17, 188:13, 190:5, 190:19, 190:23, 193:11, 209:25, 214:8, 218:9, 219:20, 219:22, 222:25, 223:25, 254:18, 258:10, 261:13, 261:24
**respond** [7] - 176:17, 193:8, 194:6, 212:25, 227:9, 227:10
**responded** [1] - 176:6
**responder** [1] - 131:5
**response** [6] - 32:8, 155:23, 158:13, 182:18, 182:19, 242:15
**responsibility** [5] - 193:7, 193:8, 194:6, 251:5, 264:1
**responsible** [1] - 144:3
**rest** [2] - 34:25, 38:25
**result** [1] - 32:23
**results** [2] - 185:17, 185:22
**resume** [2] - 25:8, 124:15
**retaliate** [1] - 54:11
**retaliation** [1] - 23:16
**retrospect** [2] - 13:22, 129:20
**return** [2] - 183:20, 202:4
**returned** [3] - 111:15, 183:6, 184:19
**Returned** [1] - 187:6
**review** [3] - 200:21, 207:13, 216:18
**Rhodes** [15] - 1:17, 85:17, 124:18, 125:25, 138:10, 140:2, 141:13, 200:24, 204:12, 204:14, 206:14, 212:23, 213:1, 220:23, 230:20
**RHODES** [61] - 32:7, 32:10, 44:16, 44:22, 51:1, 51:23, 55:21, 80:18, 90:25, 124:19, 126:1, 126:3, 126:6, 126:8, 126:25, 127:2, 127:16, 128:2, 128:11, 128:16, 128:23, 129:5, 129:9, 130:5, 130:9, 130:12, 140:21, 142:19, 145:24, 147:6, 147:10, 198:12, 198:14, 200:13, 204:15, 204:17, 205:23, 206:2, 206:18, 206:20, 206:23, 206:25, 207:6, 207:15, 207:18, 208:12,

208:18, 208:25, 209:2, 209:7, 209:19, 210:13, 210:25, 211:4, 211:8, 212:12, 212:16, 212:18, 221:24, 266:6, 266:8
**rid** [1] - 128:6
**ride** [8] - 28:5, 31:2, 37:8, 40:13, 70:1, 107:2, 108:9, 139:22
**Rights** [1] - 241:9
**ringing** [1] - 114:11
**rings** [1] - 114:11
**rises** [1] - 13:9
**Road** [11] - 28:15, 28:17, 51:21, 151:25, 152:9, 155:12, 155:15, 162:24, 172:8, 199:11
**road** [3] - 153:6, 175:17, 208:9
**rob** [1] - 101:15
**Rob** [1] - 215:17
**robbed** [4] - 101:13, 110:19, 110:20, 141:2
**robberies** [1] - 86:2
**robbery** [3] - 13:1, 88:5, 88:6
**Robert** [1] - 1:16
**Roland** [2] - 45:18
**role** [3] - 19:11, 20:9, 170:10
**roll** [3] - 169:7, 169:23, 169:25
**Roma** [2] - 77:4, 78:18
**Ron** [1] - 234:14
**room** [12] - 6:8, 7:7, 7:17, 18:11, 97:23, 112:22, 113:1, 124:14, 167:11, 168:16, 168:17, 168:20
**Room** [2] - 1:24, 205:1
**roughly** [3] - 73:12, 74:23, 155:18
**Route** [1] - 151:25
**routine** [1] - 176:17
**RPR** [1] - 1:24
**rude** [1] - 250:3
**Rule** [1] - 248:9
**rule** [2] - 216:8, 251:11
**ruled** [3] - 132:23, 207:14, 264:2
**rules** [3] - 2:11, 143:9, 228:11
**ruling** [1] - 131:22, 132:1, 225:10
**rulings** [1] - 212:22
**rumor** [2] - 90:12, 119:11
**rumors** [6] - 87:5, 87:21, 87:25, 88:4, 141:14, 144:1

**run** [2] - 63:13, 182:17
**Run** [1] - 155:19
**runner** [2] - 24:24
**running** [4] - 24:23, 38:9, 162:23, 163:5
**runs** [3] - 155:12, 155:16, 155:19
**rushing** [1] - 56:5

---

**S**

**S-1** [9] - 155:3, 155:18, 156:1, 177:10, 177:13, 177:17, 177:24, 183:13, 183:18
**S-100A** [2] - 181:15, 181:19
**S-100B** [1] - 181:19
**S-100C** [1] - 182:3
**S-101** [1] - 159:17
**S-103** [1] - 159:22
**S-105** [1] - 160:10
**S-107** [2] - 166:8, 166:17
**S-109** [1] - 166:22
**S-110** [2] - 167:10
**S-114** [1] - 168:1
**S-115** [1] - 168:7
**S-116** [1] - 168:14
**S-117** [1] - 169:3
**S-118** [1] - 169:14
**S-119** [1] - 170:4
**S-121** [1] - 170:25
**S-2** [2] - 169:22
**S-4A** [1] - 194:11
**S-56** [2] - 157:1, 165:18, 168:11
**S-59** [1] - 181:3
**S-A-L-A-D-I-N-O** [1] - 262:12
**sa** [1] - 196:7
**safe** [5] - 50:8, 80:7, 94:19, 122:13, 195:25
**safely** [1] - 258:2
**safety** [2] - 100:21, 185:13
**saint** [1] - 80:4
**Saladino** [1] - 262:11
**sale** [3] - 31:7, 31:8, 79:21
**sales** [1] - 39:4
**salon** [1] - 239:9
**Salvation** [1] - 152:9
**sample** [2] - 108:19, 108:21
**sampled** [1] - 108:1
**sat** [1] - 52:13
**satisfactory** [1] - 128:24

**satisfied** [1] - 130:3
**Savoy** [1] - 92:16
**savvy** [2] - 258:18
**saw** [21] - 2:10, 45:2, 47:5, 48:7, 92:24, 92:25, 93:2, 93:13, 105:20, 110:7, 113:21, 113:25, 115:10, 137:22, 142:4, 142:15, 144:17, 144:18, 170:1, 180:14, 186:14
**sawed** [2] - 259:23, 260:1
**scale** [2] - 33:25, 109:14
**scales** [3] - 34:5, 35:14, 144:10
**scanned** [1] - 211:8
**scared** [1] - 68:6
**scene** [24] - 131:8, 155:9, 156:5, 158:21, 159:4, 159:9, 159:25, 166:8, 166:15, 170:5, 176:9, 176:23, 177:4, 186:24, 187:14, 187:16, 189:15, 190:1, 193:7, 194:6, 208:16, 262:16
**scenes** [2] - 193:8, 193:9
**schedule** [1] - 123:19
**school** [3] - 62:1, 62:2, 238:25
**School** [3] - 28:19, 94:11, 94:14
**Scoot** [1] - 174:5
**Scotts** [3] - 28:15, 28:17, 28:18
**scrambling** [2] - 222:12, 261:3
**screaming** [1] - 162:22
**screen** [1] - 222:11
**search** [10] - 164:17, 164:19, 170:13, 170:18, 171:9, 199:15, 200:2, 202:3, 207:9, 231:13
**searched** [1] - 170:20
**searches** [4] - 172:7, 172:10, 172:14, 262:14
**seat** [16] - 39:5, 39:9, 39:14, 39:21, 53:10, 119:1, 119:2, 123:2, 123:5, 123:8, 137:19, 177:12, 178:6, 183:16, 235:10, 236:25
**seated** [5] - 2:18, 137:1, 150:21, 174:5, 192:8
**Second** [1] - 191:7
**second** [14] - 4:10, 50:12, 67:13, 136:1, 180:19, 182:13, 185:11, 187:21, 190:23, 191:8,

191:16, 191:17, 215:17, 235:16
**Secondly** [1] - 221:9
**seconds** [2] - 206:16, 254:13
**Section** [1] - 192:16
**section** [2] - 92:16, 162:10
**sections** [1] - 169:8
**security** [3] - 40:4, 65:2, 65:4
**Security** [1] - 151:25
**sedan** [1] - 22:14
**See** [4] - 210:20, 226:11, 265:8, 265:10
**see** [78] - 9:18, 15:16, 18:13, 20:15, 25:2, 29:19, 32:3, 32:12, 32:13, 32:16, 33:7, 33:19, 34:22, 35:10, 45:4, 45:23, 46:1, 47:5, 48:5, 78:22, 78:24, 79:23, 93:16, 102:17, 102:19, 104:9, 104:16, 104:18, 108:2, 108:19, 115:23, 125:2, 131:25, 136:11, 141:18, 141:21, 144:23, 145:3, 155:6, 155:7, 156:7, 157:10, 157:18, 158:16, 159:6, 160:1, 166:2, 178:17, 179:3, 180:16, 185:15, 190:9, 191:11, 191:13, 194:12, 195:15, 202:23, 203:11, 209:12, 210:25, 223:11, 225:20, 226:23, 227:1, 230:1, 235:18, 236:8, 236:16, 246:18, 247:15, 251:17, 253:24, 256:3, 257:20, 257:21, 258:24, 259:22, 260:24
**seeing** [2] - 55:18, 173:19
**seem** [6] - 112:2, 128:7, 158:5, 161:15, 204:23
**seized** [4] - 205:11, 207:9, 208:6, 218:24
**selection** [2] - 205:4, 231:7
**self** [4] - 15:7, 15:8, 20:20, 214:24
**self-authenticating** [2] - 15:7, 214:24
**self-authentication** [1] - 15:8
**self-impeached** [1] - 20:20
**sell** [7] - 38:18, 38:24, 39:2, 63:5, 79:15, 79:19, 135:18

**selling** [3] - 38:14, 135:9, 135:16
**sells** [1] - 135:8
**send** [2] - 173:22, 222:6
**sense** [7] - 19:9, 61:20, 86:10, 99:24, 148:3, 148:8, 153:16
**sent** [1] - 58:8
**sentence** [4] - 60:17, 64:1, 66:13, 67:24
**sentenced** [1] - 63:25
**separate** [1] - 98:22
**Sergeant** [25] - 131:6, 132:21, 133:8, 171:16, 171:17, 174:2, 174:8, 174:12, 175:5, 175:22, 177:21, 178:1, 178:22, 180:13, 181:23, 182:11, 183:16, 186:12, 187:13, 188:2, 188:6, 191:25, 240:7, 241:4
**SERGEANT** [2] - 174:3, 266:11
**sergeant** [5] - 174:24, 176:6, 188:8, 188:12, 241:5
**series** [1] - 196:18
**serious** [1] - 68:1
**serve** [1] - 31:7
**Service** [1] - 192:23
**service** [7] - 22:15, 48:12, 48:13, 48:14, 152:25, 153:1, 175:25
**Services** [2] - 174:25, 192:16
**session** [1] - 247:9
**sessions** [4] - 211:21, 221:13, 223:25, 224:2
**set** [13] - 107:14, 107:19, 107:21, 107:23, 159:4, 159:25, 217:22, 243:12, 243:15, 243:19, 249:21
**sets** [1] - 242:23
**setting** [2] - 155:9, 252:9
**Setting** [1] - 176:23
**Seven** [1] - 123:20
**seven** [17] - 5:18, 8:13, 8:14, 9:2, 11:4, 14:25, 16:1, 16:2, 16:11, 75:23, 94:20, 123:20, 127:22, 128:3, 246:7, 251:23, 259:16
**Several** [1] - 40:19
**several** [23] - 6:11, 27:14, 34:10, 60:1, 64:19, 66:7, 73:24, 95:23, 102:5, 110:20, 110:22, 112:16, 113:3,

114:13, 150:15, 153:13, 156:20, 157:20, 163:10, 176:8, 201:13, 234:6, 251:20
**shaken** [1] - 161:17
**share** [1] - 218:11
**SHAWN** [1] - 1:8
**Shawn** [5] - 180:11, 180:14, 180:22, 231:19, 231:22
**sheet** [17] - 235:16, 238:5, 238:8, 240:10, 244:7, 244:8, 246:3, 248:2, 248:3, 248:4, 248:5, 248:7, 248:11, 250:5, 250:9, 250:21
**shell** [1] - 262:18
**Shelly** [23] - 3:16, 7:13, 7:21, 7:22, 14:21, 50:15, 97:10, 97:17, 98:4, 99:11, 115:23, 201:19, 201:21, 231:19, 231:24, 232:7, 233:6, 233:8, 233:12, 255:3
**SHELLY** [1] - 1:8
**Shelton** [1] - 115:17
**SHELTON** [1] - 1:7
**shift** [1] - 175:16
**shirt** [7] - 52:16, 133:1, 160:6, 162:15, 162:17, 166:18, 180:21
**shit** [6] - 17:4, 17:8, 17:10, 17:19, 42:3, 143:15
**shooter** [2] - 132:5, 133:1
**shooters** [1] - 133:13
**shooting** [11] - 133:10, 155:23, 164:20, 176:3, 176:4, 176:10, 176:18, 179:6, 185:2, 186:15, 262:10
**short** [2] - 131:8, 262:16
**shorter** [1] - 173:8
**shortly** [2] - 55:14, 55:15
**shot** [7] - 3:3, 157:18, 158:11, 173:11, 181:20, 184:13, 224:13
**shots** [10] - 162:22, 181:18, 226:18, 228:2, 228:4, 248:13, 248:14, 248:16, 254:5
**show** [77] - 23:23, 48:5, 51:22, 52:1, 52:7, 52:9, 61:1, 61:18, 107:24, 113:19, 131:7, 132:18, 132:22, 143:1, 155:22, 156:25, 159:3, 159:16,

165:7, 165:9, 166:7, 166:15, 169:21, 177:13, 177:18, 178:11, 178:13, 178:14, 181:12, 181:18, 181:19, 183:10, 183:13, 185:11, 185:17, 186:14, 188:14, 188:15, 188:17, 188:21, 189:7, 189:12, 189:13, 189:17, 190:19, 190:23, 191:17, 191:18, 198:15, 199:13, 201:14, 203:19, 203:20, 206:9, 207:19, 208:21, 208:25, 209:3, 215:15, 216:11, 225:18, 226:10, 233:24, 234:5, 254:12, 255:4, 255:16, 255:17, 257:22, 257:24, 257:25, 258:2, 258:3, 258:21
**Show** [1] - 168:1
**show-up** [22] - 132:22, 165:7, 165:9, 178:11, 178:13, 178:14, 185:11, 185:17, 186:14, 188:14, 188:15, 188:17, 188:21, 189:7, 189:12, 189:13, 190:19, 190:23, 191:17, 191:18
**show-ups** [2] - 131:7, 189:17
**showed** [5] - 48:2, 52:8, 70:2, 119:14, 182:6
**showing** [2] - 199:14, 215:22
**Showing** [2] - 166:7, 181:3
**shown** [5] - 132:14, 166:16, 167:10, 189:22, 213:20
**shows** [3] - 160:1, 254:14, 257:21
**shrink** [4] - 106:5, 106:6, 107:25, 109:17
**shrink-wrapped** [3] - 106:5, 106:6, 109:17
**shut** [1] - 210:21
**sic)** [1] - 21:21
**side** [8] - 16:14, 20:11, 39:12, 157:11, 168:14, 182:3, 182:4, 208:15
**sign** [1] - 241:16
**signature** [1] - 267:10
**signed** [3] - 239:12, 241:23
**significance** [3] - 234:17, 234:22, 234:24
**significant** [6] - 126:13, 126:20, 126:21, 128:7, 128:9, 135:14
**significantly** [1] - 14:2

**Similar** [1] - 191:1
**similar** [1] - 52:22
**simply** [9] - 99:18, 128:11, 132:19, 206:11, 225:2, 244:10, 246:15, 255:24, 264:19
**single** [1] - 102:2
**sister** [3] - 40:21, 239:11
**sit** [3] - 39:17, 95:4, 97:16
**sitting** [13] - 10:5, 39:13, 39:24, 52:13, 97:23, 179:22, 190:8, 210:1, 213:13, 214:21, 215:14, 223:12, 227:13
**Sitting** [2] - 163:9, 184:8
**situation** [12] - 15:24, 33:2, 36:12, 78:22, 83:23, 101:25, 135:16, 142:24, 143:2, 149:7, 149:12, 195:18
**situations** [2] - 149:6, 149:9
**six** [10] - 92:10, 123:20, 148:1, 160:23, 162:14, 163:20, 246:2, 246:7, 251:23, 261:7
**six-three** [2] - 162:14, 163:20
**sketching** [1] - 193:10
**ski** [1] - 204:9
**skip** [1] - 231:1
**slap** [1] - 209:15
**slide** [1] - 117:3
**slip** [1] - 261:12
**slip-ups** [1] - 261:12
**slow** [2] - 207:4, 207:5
**Slowly** [1] - 162:12
**small** [6] - 42:4, 42:7, 83:5, 83:8, 87:1, 156:9
**smaller** [5] - 36:3, 36:9, 50:13, 62:23, 156:21
**smallest** [2] - 205:5, 231:8
**Smart** [1] - 219:25
**Smith** [45] - 131:19, 131:25, 132:25, 133:9, 160:20, 160:22, 160:25, 161:4, 161:7, 161:21, 162:1, 162:7, 162:13, 162:18, 162:22, 163:11, 163:19, 164:7, 164:16, 165:4, 171:16, 173:3, 173:11, 184:23, 185:3, 185:5, 185:12, 185:15, 185:17, 185:21, 186:3, 186:10, 186:12, 186:24, 187:1, 187:10, 187:16,

187:22, 187:24, 190:24, 191:2, 191:12, 238:24, 245:5
**Smith's** [4] - 163:23, 173:17, 185:7, 185:10
**sober** [1] - 239:22
**softer** [2] - 17:5, 17:24
**sold** [1] - 79:18
**Soldier** [4] - 200:11, 219:20, 219:25, 220:8
**sole** [1] - 193:7
**solve** [1] - 207:18
**someone** [3] - 12:2, 15:13, 20:16, 20:17, 104:1, 114:25, 116:3, 141:24, 142:15, 145:9, 145:10, 238:10, 253:22
**sometime** [7] - 92:21, 105:17, 126:9, 166:12, 193:12, 212:6, 260:23
**sometimes** [5] - 36:23, 61:17, 71:24, 101:20, 102:3
**Sometimes** [3] - 61:19, 71:24, 100:14
**Somewhere** [5] - 91:23, 111:17, 112:14, 114:5, 160:23
**somewhere** [8] - 30:3, 40:14, 43:11, 44:4, 44:15, 78:1, 78:6, 165:6
**sons** [3] - 55:3, 55:4, 55:5
**soon** [4] - 41:11, 159:1, 167:11, 215:11
**sorry** [19] - 2:14, 11:8, 16:22, 17:6, 17:10, 93:4, 105:3, 123:18, 128:10, 180:4, 189:2, 189:19, 193:24, 215:13, 216:19, 223:3, 223:8, 253:4
**Sorry** [3] - 32:7, 106:25, 236:22
**sort** [12] - 85:10, 125:6, 154:19, 155:19, 208:10, 218:25, 221:15, 228:7, 228:14, 247:13, 247:23, 249:9
**sound** [5] - 68:15, 71:11, 97:1, 199:9, 235:12
**sounded** [4] - 50:24, 51:3, 96:23, 97:10
**sounds** [6] - 68:16, 100:12, 153:14, 199:10, 263:3, 264:18
**source** [22] - 54:14, 102:12, 102:14, 102:22, 102:25, 103:20, 103:23, 104:1, 104:2, 104:6,

104:15, 117:2, 117:7, 120:23, 121:3, 121:7, 134:12, 134:19, 135:9, 145:10, 145:19
**South** [12] - 172:8, 177:22, 178:3, 178:20, 178:23, 179:10, 179:19, 179:20, 182:6, 185:3, 185:4, 185:20
**south** [2] - 155:19, 163:4
**southeast** [2] - 78:2, 78:3
**southwest** [1] - 78:3
**spare** [1] - 70:8
**speaker** [7] - 6:6, 6:7, 10:6, 18:10, 48:17, 48:19, 98:13
**speaking** [8] - 41:14, 41:18, 86:21, 157:25, 161:7, 207:8, 243:6, 263:4
**special** [3] - 29:10, 249:2, 262:3
**specific** [5] - 143:12, 163:8, 170:22, 196:25, 216:7
**Specifically** [1] - 175:12
**specifically** [6] - 97:9, 97:13, 113:14, 155:5, 196:8, 215:11
**specifics** [2] - 132:15
**specified** [1] - 163:11
**speculated** [1] - 141:16
**speed** [1] - 51:14
**spell** [3] - 150:22, 174:6, 192:9
**spelled** [1] - 150:24
**Spence** [16] - 130:16, 131:9, 156:23, 157:23, 158:1, 158:10, 158:13, 158:23, 159:11, 186:16, 193:17, 195:13, 196:9, 196:13, 262:10, 262:20
**Spence's** [3] - 157:16, 165:15, 170:1
**spend** [1] - 249:2
**spent** [4] - 30:18, 94:10, 125:1, 249:22
**spit** [1] - 157:20
**split** [3] - 99:24, 99:25, 264:1
**spoken** [3] - 8:5, 8:14, 102:5
**spot** [3] - 29:12, 29:13, 29:14
**Sprint** [1] - 200:4
**Spy** [4] - 205:2, 205:9, 219:24, 231:11
**spy** [1] - 231:2

**squash** [1] - 41:13
**stains** [1] - 160:11
**stake** [2] - 59:25, 71:2
**stand** [5] - 3:21, 72:21, 204:8, 217:25, 225:11
**standing** [7] - 45:5, 53:12, 53:13, 53:18, 101:7, 150:14, 162:20
**star** [2] - 163:1, 177:23
**start** [2] - 25:17
**started** [9] - 54:5, 62:7, 62:24, 64:1, 124:22, 136:4, 154:15, 157:20, 199:13
**Starting** [1] - 231:15
**starting** [2] - 254:12, 256:15
**stash** [7] - 29:12, 29:13, 29:14, 69:23, 70:4, 70:7, 85:2
**stashed** [2] - 140:6, 141:5
**State** [3] - 150:22, 174:6, 192:9
**state** [7] - 31:22, 74:13, 139:8, 139:23, 147:15, 219:21, 220:2
**statement** [28] - 17:12, 17:13, 68:5, 68:22, 113:19, 132:14, 139:1, 139:3, 139:4, 141:11, 147:19, 147:25, 173:17, 173:18, 208:3, 210:20, 225:2, 225:5, 230:10, 240:15, 240:16, 240:17, 242:1, 242:14, 242:25, 245:22, 245:25, 262:25
**statements** [1] - 13:10, 211:20, 221:12, 223:1, 223:18, 223:20, 223:23, 225:6, 225:9
**STATES** [2] - 1:1, 1:5
**States** [4] - 150:17, 174:1, 192:4, 197:8
**station** [16] - 29:6, 29:7, 29:10, 29:16, 30:13, 31:16, 31:17, 47:2, 47:3, 48:3, 69:25, 70:1, 148:4, 181:16, 197:21, 233:20
**stay** [5] - 12:1, 55:9, 186:24, 187:1, 246:6
**stayed** [4] - 113:10, 113:11, 165:12
**staying** [4] - 43:22, 170:11, 191:2, 214:7
**steal** [1] - 83:15
**stealing** [1] - 141:2
**stenographically** [1] - 267:4
**step** [2] - 10:19, 201:4

**stepped** [1] - 39:12
**stet** [3] - 64:19, 68:4, 139:9
**Steve** [1] - 204:25
**stick** [1] - 244:22
**sticker** [1] - 195:16
**still** [34] - 7:19, 8:9, 8:17, 11:21, 33:14, 33:17, 43:6, 45:5, 47:13, 49:15, 70:17, 70:24, 71:16, 71:17, 74:6, 75:3, 79:5, 80:1, 80:3, 86:9, 86:17, 104:16, 109:17, 110:10, 114:20, 125:11, 128:12, 132:9, 142:25, 172:25, 211:23, 226:9, 230:12, 252:13
**Still** [1] - 74:13
**Stimey** [5] - 5:14, 5:16, 10:2, 10:3, 96:1
**stolen** [1] - 69:13
**stood** [3] - 139:25, 187:15, 217:19
**stop** [14] - 23:15, 23:17, 43:16, 45:14, 54:23, 83:3, 84:16, 84:18, 84:19, 115:6, 157:19, 183:9, 224:19, 261:1
**stopped** [15] - 41:18, 45:13, 45:16, 45:17, 54:18, 61:13, 62:7, 74:9, 157:21, 162:18, 164:23, 165:2, 183:7, 184:1, 184:11
**stops** [1] - 220:10
**store** [12] - 22:14, 22:15, 23:2, 23:7, 84:9, 84:16, 84:18, 84:19, 115:7
**stores** [2] - 22:13, 22:17
**straight** [6] - 45:12, 45:13, 115:7, 190:9, 190:17, 191:3
**straight-on** [1] - 191:3
**Street** [2] - 1:25, 233:1
**street** [13] - 16:10, 28:18, 101:7, 101:8, 101:13, 133:9, 135:18, 139:24, 140:1, 153:3, 179:24, 184:13, 190:13
**streets** [1] - 139:20
**stricken** [1] - 219:18
**strict** [1] - 256:14
**strike** [2] - 89:17, 218:21
**strong** [2] - 4:22, 18:7
**strongly** [1] - 20:22
**study** [2] - 63:22, 227:11
**studying** [1] - 213:13
**stuff** [35] - 34:3, 34:5,

35:13, 35:16, 60:2, 60:10, 61:19, 62:23, 69:21, 69:22, 79:6, 79:24, 82:19, 90:16, 128:6, 140:6, 141:2, 141:5, 153:21, 163:20, 176:17, 204:11, 205:12, 205:14, 206:21, 211:22, 217:1, 218:15, 219:20, 219:25, 221:10, 222:13, 222:22, 227:2, 233:13
**Stuff** [1] - 14:16
**subject** [9] - 130:11, 152:8, 154:5, 180:19, 219:8, 219:16, 219:18, 224:10, 263:21
**subjects** [16] - 162:18, 178:15, 178:17, 179:3, 179:22, 179:23, 179:25, 180:2, 180:5, 182:9, 183:10, 184:14, 189:8, 189:9, 189:10, 189:14
**submit** [2] - 197:24, 220:1
**submitted** [2] - 196:21, 197:25
**subpoena** [1] - 125:11
**subpoenaed** [2] - 36:13, 233:14
**substantial** [5] - 110:16, 121:3, 121:8, 122:19, 124:23
**substantially** [3] - 92:8, 95:1, 224:3
**substantive** [1] - 129:19
**succeeded** [1] - 219:5
**successful** [1] - 71:19
**successfully** [1] - 187:22
**sucker** [2] - 143:4, 143:8
**sufficiently** [1] - 21:2
**sugar** [1] - 260:25
**suggest** [1] - 13:5
**suggested** [1] - 186:3
**suggesting** [5] - 207:15, 213:12, 213:16, 260:13, 260:18
**suggestion** [3] - 133:13, 261:4, 261:5
**suggestions** [1] - 6:19
**suggestive** [3] - 15:20, 18:17, 19:11
**suggestiveness** [10] - 18:8, 19:2, 19:3, 19:8, 19:13, 19:14, 20:6, 20:7, 20:10
**suit** [2] - 56:18, 56:19
**sum** [1] - 88:10

**summaries** [1] - 221:12
**summarized** [1] - 229:4
**summary** [10] - 226:14, 228:10, 228:12, 229:22, 237:3, 248:8, 252:11, 252:19, 257:14, 257:19
**sun** [1] - 107:1
**Sunday** [1] - 123:23
**supervisor** [2] - 174:25, 175:2
**supplied** [3] - 25:17, 30:11
**suppliers** [1] - 82:17
**supply** [6] - 26:25, 54:14, 71:14, 104:1, 145:10, 145:20
**supplying** [1] - 25:8
**suppose** [3] - 46:5, 74:5, 129:20
**supposed** [8] - 2:11, 18:14, 31:10, 75:23, 104:8, 126:23, 129:11, 212:8
**supposition** [1] - 4:22
**suppress** [1] - 21:6
**surprise** [3] - 70:7, 70:9, 229:13
**surrounded** [1] - 16:3
**surveillance** [8] - 200:11, 201:10, 201:15, 204:24, 210:16, 219:22, 220:17, 231:7
**surveillance/privacy** [1] - 205:5
**suspect** [17] - 85:5, 85:12, 85:25, 118:12, 118:15, 120:12, 120:16, 140:10, 141:3, 141:6, 141:16, 162:13, 162:21, 173:7, 173:8, 173:10, 190:20
**suspect/one** [1] - 188:20
**suspected** [4] - 140:14, 141:9, 149:5, 149:13
**suspecting** [2] - 140:16, 149:2
**suspects** [13] - 162:23, 164:23, 165:1, 165:23, 166:3, 167:22, 171:18, 177:18, 179:11, 185:21, 189:23, 190:2, 191:17
**suspended** [1] - 64:2
**suspicion** [2] - 119:9, 120:4
**suspicious** [3] - 152:8, 152:15, 154:5
**Sustained** [8] - 26:11, 121:6, 121:11, 122:24, 147:2, 147:13, 150:1,

150:4
**sustained** [3] - 26:14, 121:11, 150:7
**sweater** [4] - 52:20, 52:21, 52:22
**sweating** [3] - 81:4, 81:5, 81:8
**sweep** [1] - 168:25
**Sweetheart** [2] - 123:17, 123:18
**switch** [1] - 264:7
**switched** [1] - 251:4
**switching** [2] - 36:21, 212:3
**SWORN** [4] - 2:16, 150:19, 174:3, 192:6
**sworn** [1] - 122:6

# T

**T-Mobile** [1] - 255:7
**tab** [1] - 232:9
**Tab** [2] - 246:24, 247:3
**tabbed** [1] - 232:8
**table** [2] - 229:4, 254:3
**tags** [10] - 30:16, 31:18, 31:20, 31:22, 31:24, 69:8, 69:11, 69:12, 74:6, 139:15
**talkies** [2] - 210:19, 219:23
**talks** [2] - 203:15, 204:9
**tall** [1] - 134:10
**taller** [4] - 173:7, 173:10, 181:6, 181:8
**tap** [2] - 205:7, 231:9
**Tape** [4] - 17:16, 18:2, 18:4, 247:5
**tape** [80] - 3:11, 3:13, 5:22, 5:24, 6:1, 6:3, 6:4, 6:22, 6:25, 7:5, 7:8, 8:25, 9:19, 9:20, 9:21, 9:22, 10:6, 10:11, 11:11, 11:21, 11:23, 13:4, 13:5, 13:7, 15:8, 15:11, 15:14, 15:18, 16:15, 16:17, 17:1, 18:9, 20:17, 47:17, 48:9, 48:24, 49:4, 49:22, 91:2, 91:8, 94:21, 96:3, 96:12, 96:13, 96:14, 96:17, 96:20, 96:22, 97:10, 97:12, 97:14, 97:18, 98:10, 98:22, 99:2, 99:3, 119:15, 119:16, 137:2, 137:3, 137:6, 137:13, 137:15, 169:7, 169:9, 169:11, 169:15, 169:17, 169:23, 169:25, 170:21, 230:8,

230:9, 242:8, 242:24, 245:23, 246:16, 246:17, 246:18, 246:21
**tape-recorded** [1] - 48:24
**taped** [5] - 223:18, 223:20, 223:23, 242:1, 245:22
**tapes** [2] - 211:19, 262:25
**target** [4] - 58:13, 58:22, 58:25, 101:8
**Team** [1] - 175:1
**team** [2] - 175:1, 175:3
**tech** [2] - 205:4, 231:6
**Technician** [2] - 192:5, 192:23, 262:18
**TECHNICIAN** [2] - 192:6, 266:13
**technician** [7] - 131:8, 193:2, 193:5, 193:7, 196:16, 196:25, 262:17
**technicians** [1] - 195:25
**telephone** [17] - 28:1, 42:23, 42:25, 46:9, 48:18, 51:9, 51:10, 107:10, 205:6, 231:8, 232:3, 233:14, 244:3, 250:24, 251:1, 251:4, 252:14
**telephones** [2] - 233:15, 233:19
**television** [1] - 167:13
**temp** [8] - 30:16, 31:20, 31:22, 31:24, 69:8, 69:11, 69:12, 74:6
**temporal** [1] - 256:15
**temporary** [1] - 139:15
**ten** [11] - 5:24, 27:22, 82:6, 82:7, 82:8, 87:13, 103:6, 103:14, 120:25, 154:15, 248:24
**tend** [1] - 205:10
**tending** [1] - 156:8
**tentative** [2] - 21:2, 137:12
**terms** [8] - 18:23, 42:16, 42:17, 71:3, 81:11, 88:15, 100:21, 158:5
**tested** [1] - 109:4
**testified** [49] - 11:14, 15:25, 21:17, 21:19, 21:20, 22:7, 25:4, 32:18, 33:13, 39:25, 57:3, 60:22, 71:22, 71:25, 72:19, 80:9, 81:1, 81:22, 84:25, 85:14, 85:23, 92:15, 93:12, 94:1, 99:14, 111:21, 112:12, 115:16, 115:23, 116:17,

122:25, 126:10, 127:25, 131:25, 136:8, 136:10, 140:2, 140:12, 144:7, 144:13, 144:16, 145:6, 188:10, 189:7, 197:19, 197:20, 199:2, 229:8, 256:23
**testifies** [3] - 11:17, 13:20, 211:22
**testify** [13] - 33:20, 36:13, 49:7, 49:11, 60:12, 132:13, 133:23, 183:24, 221:1, 252:18, 253:11, 255:6, 255:11
**testifying** [8] - 58:17, 124:22, 126:10, 127:7, 136:1, 145:4, 206:4, 252:25
**testimony** [52] - 10:23, 11:3, 13:19, 13:21, 18:21, 21:13, 32:14, 32:25, 47:24, 54:24, 85:21, 86:18, 86:23, 91:20, 92:19, 100:11, 102:24, 106:14, 106:18, 110:20, 110:24, 111:15, 111:18, 112:3, 112:15, 116:7, 117:12, 117:19, 122:6, 122:11, 126:17, 127:5, 127:22, 128:2, 131:17, 134:8, 136:14, 136:17, 137:3, 173:5, 197:16, 203:9, 208:13, 218:21, 218:23, 219:3, 219:22, 228:1, 252:7, 253:12, 255:24, 259:22
**THE** [336] - 1:1, 1:2, 2:3, 2:9, 2:15, 2:17, 3:19, 3:22, 3:23, 10:16, 10:18, 10:22, 11:1, 11:8, 11:25, 12:7, 12:10, 12:15, 12:19, 12:22, 13:2, 13:15, 13:23, 14:1, 14:6, 14:10, 14:12, 14:16, 14:18, 15:4, 15:22, 16:6, 16:13, 16:17, 16:20, 16:23, 16:25, 17:3, 17:6, 17:10, 17:12, 17:17, 17:19, 17:22, 18:1, 18:5, 18:25, 21:11, 25:13, 25:20, 26:3, 26:11, 26:14, 27:7, 44:8, 44:10, 44:12, 44:18, 44:19, 51:2, 51:24, 66:19, 80:13, 80:14, 80:15, 80:16, 91:13, 94:6, 117:6, 117:11, 121:6, 121:11, 122:24, 123:13, 124:6, 124:11, 124:18, 125:13, 125:19, 126:2,

126:5, 126:7, 126:22,
127:1, 127:9, 127:24,
128:10, 128:14, 128:17,
129:3, 129:7, 129:12,
129:22, 130:7, 130:10,
130:18, 130:25, 131:4,
131:10, 132:17, 132:20,
133:3, 133:11, 133:15,
133:18, 133:21, 133:25,
134:2, 142:7, 142:20,
143:25, 147:2, 147:4,
147:5, 147:7, 147:8,
147:13, 147:15, 147:16,
150:1, 150:4, 150:7,
150:12, 150:20, 150:21,
150:23, 154:7, 155:8,
161:24, 162:12, 172:16,
173:24, 174:4, 174:5,
174:8, 180:24, 191:25,
192:2, 192:3, 192:7,
192:8, 192:10, 197:6,
197:10, 198:16, 200:14,
200:16, 200:20, 200:23,
201:8, 201:16, 201:20,
201:24, 202:5, 202:10,
202:14, 202:23, 203:1,
203:4, 203:6, 203:11,
203:16, 203:20, 203:22,
204:1, 204:4, 204:12,
204:16, 204:21, 205:25,
206:14, 206:19, 206:21,
206:24, 207:5, 207:11,
207:16, 207:24, 208:14,
208:22, 209:1, 209:4,
209:17, 209:20, 210:18,
211:3, 211:7, 212:10,
212:15, 212:17, 212:20,
213:2, 213:10, 213:12,
213:15, 213:23, 214:18,
215:5, 216:2, 216:5,
216:23, 217:6, 217:15,
217:17, 217:23, 217:25,
218:4, 218:8, 218:20,
218:23, 219:4, 219:8,
219:15, 219:18, 220:4,
220:8, 220:10, 220:14,
220:16, 220:19, 221:18,
221:23, 222:19, 222:23,
223:3, 223:6, 223:10,
223:15, 223:21, 224:7,
224:12, 224:15, 225:13,
225:16, 226:6, 226:8,
226:10, 226:13, 226:16,
226:20, 226:23, 226:25,
227:6, 227:10, 227:20,
228:5, 228:9, 228:15,
228:18, 228:22, 229:2,
229:6, 229:9, 229:11,
229:14, 229:19, 229:24,
230:4, 230:7, 230:11,
230:15, 230:17, 232:2,

235:1, 246:1, 246:5,
246:10, 246:13, 246:25,
247:3, 247:6, 247:18,
247:20, 250:12, 250:15,
250:18, 251:14, 251:17,
252:22, 253:4, 253:7,
253:10, 253:17, 254:2,
254:16, 254:18, 254:22,
254:25, 255:7, 255:12,
255:20, 256:2, 256:6,
256:9, 256:12, 256:14,
256:17, 256:20, 257:1,
257:4, 257:7, 257:10,
257:15, 257:23, 258:1,
258:7, 258:9, 258:11,
259:2, 259:6, 259:8,
259:12, 259:19, 259:21,
259:25, 260:4, 260:13,
260:16, 260:18, 260:24,
261:9, 261:23, 262:5,
262:8, 262:21, 263:1,
263:19, 263:23, 264:4,
264:13, 264:18, 264:24,
265:1, 265:4, 265:8,
265:10

**theft** [3] - 69:7, 69:8,
69:13
**theirs** [1] - 41:3
**them's** [1] - 74:3
**theories** [1] - 125:7
**thereabouts** [1] - 22:24
**thereafter** [1] - 193:12
**therefore** [1] - 115:19
**They've** [1] - 229:15
**thinking** [3] - 71:11,
80:23, 98:1
**thinks** [3] - 11:21, 15:1,
17:23
**third** [3] - 50:14, 158:9,
254:19
**thirty** [1] - 190:6
**Thomas** [1] - 1:20
**thousand** [4] - 35:1,
38:23, 75:19, 82:11
**Three** [2] - 175:4,
235:23
**three** [20] - 50:10,
50:17, 59:14, 84:4,
102:7, 105:15, 117:16,
121:12, 123:20, 145:5,
162:14, 162:20, 163:20,
217:7, 218:14, 223:17,
223:23, 249:25, 256:12
**thumb** [1] - 223:4
**Thursday** [4] - 221:4,
247:9, 265:6, 265:7
**tie** [2] - 215:7, 219:2
**tied** [2] - 202:22, 253:13
**tight** [3] - 24:18, 65:6,
162:17

**timely** [1] - 260:11
**tire** [1] - 70:8
**tired** [3] - 44:25, 112:4,
118:4
**title** [2] - 192:21, 220:19
**Today** [1] - 9:7
**today** [30] - 2:5, 9:8,
21:16, 59:14, 80:11,
80:24, 81:8, 81:12, 95:4,
97:16, 97:17, 111:25,
122:6, 122:11, 127:4,
127:5, 127:8, 133:23,
145:25, 149:19, 149:25,
150:9, 163:10, 172:1,
180:16, 184:8, 206:8,
208:23, 212:2, 260:23
**together** [9] - 6:1,
20:12, 42:20, 43:11,
84:4, 117:17, 118:25,
189:23, 252:19
**toll** [11] - 229:15,
233:14, 248:1, 248:19,
249:23, 251:2, 251:7,
251:20, 252:14, 255:2,
256:25
**tolls** [4] - 255:16,
255:17, 255:18, 255:21
**Tomorrow** [1] - 265:7
**tomorrow** [15] - 227:24,
235:14, 247:9, 247:15,
247:16, 249:22, 262:6,
263:5, 263:15, 264:5,
264:11, 264:19, 264:23,
264:24, 265:11
**Tony** [5] - 77:3, 78:18,
142:4, 142:15, 199:1
**Tonya** [8] - 156:22,
165:14, 170:1, 186:16,
193:17, 195:13, 196:9,
196:13
**took** [25] - 5:6, 37:8,
40:5, 40:13, 44:25,
53:10, 75:5, 75:6, 80:2,
108:6, 108:9, 109:5,
112:10, 122:13, 127:22,
137:19, 162:23, 166:9,
184:9, 190:5, 196:11,
196:21, 207:11, 242:1
**tools** [2] - 205:8, 231:10
**top** [9] - 52:18, 52:25,
157:15, 202:1, 204:24,
235:5, 254:12, 256:15,
256:17
**total** [2] - 5:16, 113:11
**touch** [3] - 22:6, 54:17,
55:9
**touchtone** [1] - 231:9
**Touchtone** [1] - 205:6
**toward** [4] - 150:21,
174:6, 184:12, 192:8

**towards** [4] - 54:5,
116:17, 162:23, 190:11
**towel** [1] - 157:19
**town** [2] - 104:2, 148:7
**tracking** [2] - 205:8,
231:11
**trade** [1] - 120:6
**traditional** [1] - 189:6
**trafficking** [5] - 37:1,
41:20, 54:19, 140:4,
201:10
**transaction** [3] - 37:12,
39:21, 52:5
**transactions** [1] -
145:16
**transcribed** [1] - 267:7
**transcript** [11] - 17:14,
85:18, 85:20, 126:11,
246:3, 246:15, 246:19,
246:21, 246:22, 247:7,
267:7
**transcripts** [1] - 246:10
**transported** [1] -
237:22
**travel** [1] - 104:2
**traveled** [1] - 104:2
**treat** [1] - 158:23
**treated** [1] - 195:24
**treatment** [1] - 159:14
**Tree** [1] - 146:20
**trend** [1] - 260:19
**trespass** [1] - 63:2
**trial** [11] - 32:14, 32:25,
119:22, 129:19, 130:1,
209:18, 216:10, 218:4,
246:14, 249:20, 249:25
**tried** [1] - 224:8
**trip** [6] - 59:17, 64:25,
65:11, 65:22, 77:11
**trips** [1] - 101:20
**troopers** [1] - 139:23
**trouble** [2] - 88:14,
213:24
**troubled** [1] - 128:4
**true** [13] - 8:20, 57:25,
59:15, 64:8, 78:7, 79:12,
79:13, 79:18, 79:22,
129:13, 210:18, 261:7
**trunk** [1] - 197:21
**trust** [1] - 123:1
**trusted** [4] - 39:21,
39:22, 100:24, 123:8
**truth** [11] - 58:3, 59:9,
59:12, 80:2, 80:6,
121:21, 127:13, 145:5,
146:1, 146:4
**truthful** [2] - 136:14,
144:24
**try** [16] - 18:19, 40:6,
54:14, 61:20, 116:19,

134:14, 151:17, 157:19,
159:1, 195:16, 210:4,
217:4, 222:12, 224:6,
230:11, 233:20
**Trying** [1] - 41:13
**trying** [23] - 19:5, 41:16,
47:21, 56:11, 72:3, 72:6,
85:10, 87:15, 89:19,
89:23, 109:6, 109:12,
114:20, 125:4, 128:24,
128:25, 141:6, 158:7,
211:23, 224:15, 253:18,
261:14, 261:15
**Tuesday** [1] - 221:1
**turn** [9] - 3:17, 153:21,
210:2, 214:4, 223:1,
246:24, 247:3, 261:21,
262:3
**turned** [8] - 167:13,
221:10, 221:11, 221:15,
221:17, 223:24, 228:13,
251:20
**turning** [1] - 221:19
**turns** [1] - 125:3
**TV** [2] - 47:5, 167:16
**Twelve** [1] - 161:3
**twenty** [1] - 35:1
**Twenty** [1] - 190:6
**twice** [2] - 73:17,
157:18
**Twice** [1] - 110:23
**two** [89] - 14:8, 18:19,
21:15, 22:7, 31:9, 31:10,
33:25, 34:5, 35:22, 47:2,
47:25, 51:18, 55:10,
68:17, 73:12, 75:23,
102:7, 106:1, 106:5,
106:22, 107:24, 108:25,
113:20, 117:19, 123:20,
129:13, 129:15, 131:7,
133:9, 133:10, 133:13,
149:6, 153:10, 162:3,
162:16, 162:22, 165:6,
169:7, 171:19, 177:7,
177:18, 178:7, 178:24,
180:5, 181:6, 181:18,
184:2, 185:14, 185:21,
186:7, 186:10, 186:13,
186:15, 187:11, 188:19,
189:22, 190:1, 191:5,
198:10, 206:4, 208:20,
209:23, 210:5, 217:7,
218:4, 218:11, 221:1,
231:15, 232:24, 237:8,
243:16, 244:7, 248:12,
248:16, 249:2, 250:7,
250:8, 250:16, 255:13,
258:19, 261:6, 262:24,
264:8
**Two** [10] - 73:12, 106:6,

199:15, 201:18, 231:13, 236:12, 246:24, 247:3
**Ty** [2] - 142:11, 142:12
**type** [1] - 226:4
**typed** [1] - 240:19
**typically** [1] - 135:13
**Tyrone** [18] - 9:15, 9:16, 9:17, 9:20, 9:22, 12:13, 12:14, 12:15, 13:16, 14:15, 24:11, 25:15, 55:13, 55:14, 142:12, 148:11, 148:19

## U

**U.S** [1] - 1:24
**ultimately** [2] - 156:22, 181:1
**Um-hum** [9] - 36:8, 37:18, 48:8, 69:23, 76:12, 76:14, 90:16, 96:15, 96:18
**unambiguous** [1] - 133:6
**unavoidable** [2] - 19:15, 20:7
**unavoidably** [1] - 19:13
**uncomfortable** [1] - 36:11
**under** [19] - 2:11, 2:18, 21:24, 63:5, 69:13, 125:11, 157:14, 158:19, 171:21, 196:13, 197:10, 228:10, 231:4, 234:21, 239:18, 239:21, 248:9, 248:15, 249:16
**undergoing** [1] - 193:16
**underlying** [2] - 227:23, 229:3
**underneath** [2] - 157:15, 232:9
**understood** [3] - 57:25, 58:5, 58:10
**unfair** [1] - 207:25
**uniform** [1] - 152:10
**Unit** [3] - 192:17, 234:15, 241:6
**UNITED** [2] - 1:1, 1:5
**United** [4] - 150:17, 174:1, 192:4, 197:8
**universal** [1] - 195:20
**Unless** [1] - 82:24
**unless** [3] - 23:16, 34:23, 220:5
**unlikely** [4] - 127:20, 133:22, 133:24, 189:16
**unnecessary** [2] - 19:8, 19:14

**unpunished** [1] - 221:19
**unrelated** [1] - 154:19
**unreliability** [1] - 20:23
**unreliable** [1] - 19:23
**untrue** [1] - 58:8
**unusual** [9] - 82:10, 106:19, 110:15, 116:3, 124:2, 135:5, 135:19, 145:9, 145:19
**unwise** [1] - 252:15
**up** [143] - 7:12, 10:14, 13:18, 14:16, 16:17, 17:15, 18:3, 22:5, 22:6, 22:25, 23:4, 26:16, 28:6, 28:7, 30:8, 35:10, 36:21, 38:10, 39:10, 42:11, 42:14, 45:15, 48:11, 48:18, 51:22, 52:1, 52:7, 52:8, 52:9, 53:12, 53:13, 54:14, 61:18, 62:23, 72:4, 75:4, 89:2, 93:5, 102:8, 102:19, 102:25, 103:3, 104:17, 105:3, 105:16, 106:19, 106:25, 107:3, 107:14, 107:19, 107:21, 107:23, 108:2, 109:9, 109:21, 111:18, 111:25, 119:14, 120:25, 122:16, 132:22, 138:11, 139:24, 140:1, 141:7, 143:2, 144:16, 145:12, 151:8, 152:1, 157:20, 160:1, 160:10, 160:22, 162:19, 164:8, 165:5, 165:7, 165:9, 165:18, 168:12, 169:14, 169:18, 174:5, 176:11, 176:23, 177:16, 178:11, 178:13, 178:14, 178:19, 179:23, 182:6, 183:11, 185:11, 185:17, 186:14, 187:15, 188:14, 188:15, 188:17, 188:21, 189:7, 189:12, 189:13, 189:20, 190:19, 190:23, 191:17, 191:18, 198:12, 204:9, 205:24, 206:2, 207:21, 209:9, 209:17, 211:12, 211:23, 211:25, 214:7, 217:19, 219:9, 222:11, 225:23, 225:24, 226:16, 228:8, 242:13, 242:23, 243:12, 243:15, 243:19, 250:19, 252:9, 254:8, 255:16, 255:17, 261:6
**upped** [1] - 140:24
**upper** [3] - 156:1, 165:19, 226:10
**ups** [3] - 131:7, 189:17,

261:12
**upset** [1] - 79:14
**USA** [1] - 267:4
**uses** [2] - 20:17, 242:21
**utterance** [6] - 131:19, 131:23, 132:1, 132:6, 132:10, 132:16

## V

**vague** [1] - 40:12
**Valdavia** [1] - 238:20
**value** [1] - 249:12
**varies** [1] - 239:6
**various** [1] - 233:15
**vehicle** [10] - 179:4, 179:21, 182:10, 184:11, 184:17, 185:6, 186:9, 205:8, 231:11
**Vehicle** [1] - 61:1
**verbatim** [1] - 224:3
**verify** [2] - 203:9, 251:21
**version** [1] - 18:9
**via** [2] - 205:8, 231:11
**victim** [10] - 133:10, 162:19, 162:20, 162:22, 173:11, 176:10, 176:12, 176:13, 194:9, 196:9
**victims** [2] - 165:24, 167:22
**video** [2] - 205:8, 231:10
**view** [12] - 58:21, 58:22, 159:17, 159:22, 168:7, 168:11, 168:20, 169:14, 178:15, 186:10, 226:25, 227:1
**Village** [1] - 154:3
**violated** [4] - 63:10, 63:15, 63:18, 64:6
**violation** [3] - 64:9, 64:13, 64:22
**violations** [1] - 57:22
**violence** [3] - 66:25, 67:14, 67:23
**violent** [2] - 175:1, 175:2
**virtue** [1] - 206:10
**visit** [2] - 55:7, 94:13
**vital** [1] - 121:21
**voice** [86] - 2:7, 3:7, 5:19, 6:21, 8:9, 8:18, 8:21, 8:25, 9:2, 9:14, 9:20, 9:23, 10:1, 10:7, 10:10, 11:3, 11:20, 11:22, 13:5, 13:7, 13:12, 15:1, 15:2, 15:8, 15:14, 15:20, 15:21, 15:23,

15:24, 16:1, 16:2, 16:3, 16:11, 17:2, 17:3, 17:5, 17:7, 17:8, 17:24, 18:11, 18:16, 19:17, 19:20, 19:22, 20:24, 21:6, 48:15, 49:6, 49:8, 49:15, 49:22, 50:2, 50:8, 50:15, 50:16, 50:22, 53:6, 93:24, 94:20, 94:23, 97:1, 97:3, 97:18, 97:21, 98:10, 115:19, 115:21, 116:11, 137:3, 137:6, 137:12, 137:15, 205:7, 230:12, 231:10, 248:6, 254:5, 255:23, 256:1, 256:6, 262:25
**voiced** [1] - 230:20
**voices** [8] - 3:10, 6:17, 20:4, 49:3, 97:7, 98:15, 98:18, 257:4
**voir** [1] - 14:19
**Volkswagen** [5] - 28:25, 29:1, 29:2, 31:15, 33:24
**VOLUME** [1] - 1:11
**voluntary** [2] - 14:5, 241:21

## W

**W-1** [1] - 214:5
**W-40** [1] - 241:25
**W-41** [1] - 238:7
**W-42** [1] - 242:6
**W-44** [1] - 214:5
**W-5** [1] - 215:3
**W-5A** [1] - 231:21
**W-5B** [1] - 231:23
**W-5C** [1] - 231:15
**W-5F** [1] - 200:4
**W-5G** [1] - 214:15
**W-5H** [4] - 200:7, 220:12, 224:20, 230:23
**W-5I** [1] - 199:14
**W-5J** [1] - 231:25
**W-5K** [6] - 199:21, 213:8, 215:4, 215:15, 216:24, 218:19
**W-5R** [4] - 201:17, 220:5, 220:7, 230:24
**W-67** [1] - 233:24
**wagon** [15] - 29:6, 29:7, 29:11, 29:16, 30:13, 31:16, 31:17, 47:2, 47:3, 48:3, 69:25, 70:1, 148:4, 197:21, 233:20
**wait** [2] - 215:17, 217:11
**Wait** [1] - 73:1

**waiting** [1] - 73:3
**wake** [1] - 111:25
**Wal** [1] - 219:24
**Wal-Mart** [1] - 219:24
**walk** [5] - 39:12, 168:7, 208:14, 252:22, 254:10
**walked** [8] - 39:12, 53:16, 53:18, 53:19, 84:4, 117:13, 162:19, 169:8
**walkie** [2] - 210:19, 219:23
**walkie-talkies** [2] - 210:19, 219:23
**walking** [1] - 216:10
**wants** [7] - 109:7, 124:10, 129:4, 206:9, 227:25, 258:21, 264:21
**war** [3] - 111:8, 111:12, 111:13
**warrant** [5] - 170:18, 202:3, 207:9, 208:8, 237:24
**Washington** [11] - 31:19, 32:4, 33:6, 33:23, 35:4, 35:7, 35:11, 35:18, 35:23, 38:15, 139:15
**watch** [3] - 65:4, 85:8, 99:14
**Watched** [1] - 38:6
**watched** [2] - 38:7, 38:8
**watching** [3] - 38:8, 88:15, 99:20
**water** [3] - 3:20, 44:10
**WAYNE** [1] - 1:8
**Wayne** [87] - 3:14, 3:15, 6:21, 6:23, 6:25, 7:4, 7:8, 7:13, 7:23, 7:24, 8:5, 8:22, 8:24, 9:18, 11:6, 11:21, 11:24, 12:12, 13:4, 14:22, 15:5, 15:18, 15:19, 15:21, 15:25, 16:4, 17:2, 17:3, 17:4, 17:9, 17:10, 17:19, 17:24, 18:14, 20:18, 25:8, 25:23, 48:25, 49:1, 49:5, 49:6, 50:15, 51:6, 51:8, 51:22, 52:1, 52:7, 52:13, 52:16, 52:21, 53:4, 53:5, 53:10, 54:3, 56:12, 95:9, 96:14, 96:17, 96:23, 97:1, 97:4, 97:10, 97:17, 97:24, 98:4, 98:5, 98:7, 99:8, 99:11, 115:23, 119:15, 119:16, 142:18, 142:21, 142:25, 200:5, 201:19, 201:21, 231:19, 231:24, 232:7, 232:16, 233:6, 255:3

**Wayne's** [23] - 7:19, 7:20, 8:21, 9:14, 9:20, 9:23, 10:1, 10:7, 10:10, 11:3, 11:20, 11:21, 11:23, 13:5, 13:12, 15:1, 15:24, 16:3, 18:11, 18:16, 49:8, 49:15

**Waynes** [5] - 7:10, 7:12, 7:15, 7:17, 98:1

**weapon** [3] - 147:19, 171:13, 173:19

**wear** [1] - 223:12

**wearing** [12] - 52:15, 52:24, 56:12, 56:15, 56:17, 116:3, 143:17, 162:14, 162:21, 173:10, 180:21, 191:20

**Weaze** [4] - 8:3, 95:11, 95:14, 95:18

**web** [1] - 258:18

**Wednesday** [3] - 1:11, 21:16, 221:3

**week** [29] - 9:8, 27:22, 32:13, 71:23, 82:7, 82:8, 82:23, 111:21, 123:21, 126:14, 136:4, 216:10, 217:7, 217:8, 218:4, 220:24, 220:25, 221:4, 221:8, 229:5, 247:10, 248:17, 249:19, 250:1, 250:9, 258:19, 259:25, 265:11

**weekend** [6] - 228:16, 250:9, 250:10, 252:20, 260:6

**weekly** [1] - 103:3

**weeks** [16] - 21:16, 22:7, 55:10, 72:18, 73:12, 73:14, 73:18, 129:13, 129:15, 163:15, 214:21, 217:7, 229:16, 249:25, 264:12

**Weeze** [2] - 8:1, 8:2

**weigh** [1] - 15:10

**weighed** [2] - 109:14, 109:15

**weight** [2] - 163:9, 163:22

**Welcome** [1] - 2:17

**West** [3] - 1:25, 89:12, 115:4

**whatsoever** [6] - 19:11, 20:4, 99:11, 122:4, 129:25, 260:25

**whereabouts** [1] - 29:16

**whereby** [1] - 51:14

**Whereof** [1] - 267:9

**whip** [2] - 259:22, 259:25

**whipsaw** [1] - 259:24

**white** [14] - 29:6, 29:10, 29:16, 30:13, 31:16, 31:17, 48:2, 148:4, 162:15, 169:4, 197:21, 231:19, 233:19

**whole** [18] - 36:12, 53:14, 62:17, 64:20, 72:25, 73:23, 78:22, 80:24, 83:23, 109:10, 127:18, 127:20, 142:24, 143:2, 143:15, 198:15, 207:2, 211:21

**wife** [11] - 4:13, 4:14, 23:3, 46:25, 47:5, 101:21, 114:8, 120:10, 120:11

**wife's** [1] - 47:8

**WILLIE** [1] - 1:7

**Willie** [8] - 238:8, 241:15, 245:6, 253:2, 253:7, 253:15, 255:3, 267:4

**willing** [8] - 128:22, 139:16, 149:22, 150:2, 210:22, 241:18, 249:18, 263:2

**window** [2] - 183:1, 183:2

**wireless** [2] - 205:7, 231:10

**wiretaps** [1] - 36:20, 37:5, 201:11

**wish** [1] - 194:15

**wishes** [1] - 13:21

**withdraw** [2] - 44:9, 218:19

**withdrawn** [1] - 219:11

**Witness** [5] - 10:21, 133:20, 201:6, 247:19, 267:9

**WITNESS** [25] - 2:16, 3:22, 44:12, 44:19, 80:14, 80:16, 133:25, 147:4, 147:8, 147:16, 150:19, 150:20, 150:23, 174:3, 174:4, 174:8, 192:2, 192:6, 192:7, 192:10, 266:4, 266:9, 266:11, 266:13, 266:14

**witness** [44] - 3:21, 11:14, 12:19, 12:20, 14:5, 14:18, 20:8, 20:18, 58:12, 128:8, 150:16, 154:6, 161:18, 161:23, 164:2, 178:9, 178:15, 184:20, 185:1, 188:20, 188:22, 189:14, 192:3, 194:1, 202:7, 207:23, 209:9, 212:3, 214:1,

214:25, 216:11, 220:21, 227:17, 227:21, 228:12, 251:5, 251:11, 253:20, 253:22, 260:2, 260:6, 263:13, 264:8

**witness's** [1] - 248:18

**witnessed** [4] - 161:5, 179:6, 185:2, 240:25

**witnesses** [18] - 16:8, 20:2, 130:15, 130:24, 131:7, 150:15, 159:1, 160:14, 189:22, 209:24, 217:1, 220:22, 221:3, 221:4, 222:1, 262:10, 263:6, 264:21

**woken** [1] - 111:18

**wonderfully** [1] - 208:4

**wood** [1] - 262:15

**wooded** [3] - 172:7, 172:8, 183:17

**Woodlawn** [10] - 45:21, 147:2, 147:3, 147:9, 151:22, 151:23, 152:2, 174:15, 174:16, 175:10

**woods** [1] - 183:11

**Woody's** [1] - 235:2

**word** [5] - 87:22, 96:23, 97:4, 97:24, 99:8

**words** [13] - 13:3, 58:21, 98:22, 98:23, 98:24, 98:25, 99:2, 99:5, 144:25, 173:4, 202:6, 246:18

**works** [1] - 195:9

**world** [2] - 203:10, 260:1

**World's** [2] - 205:5, 231:7

**worn** [1] - 216:9

**worried** [17] - 37:5, 38:14, 38:16, 56:9, 119:25, 120:2, 139:19, 139:20, 140:13, 140:15, 140:17, 140:18, 141:9, 185:13, 222:2

**worry** [3] - 36:20, 83:8, 83:10

**worrying** [1] - 23:15

**wrapped** [5] - 106:5, 106:6, 107:25, 109:17, 109:21

**write** [2] - 239:16, 245:16

**writing** [1] - 238:14

**written** [9] - 78:20, 129:21, 129:24, 163:15, 206:9, 225:9, 240:18, 244:8, 245:21

**wrote** [6] - 241:13, 241:14, 244:11, 245:14,

245:19

**Wyche** [62] - 4:3, 4:13, 12:17, 13:8, 18:22, 20:15, 21:17, 21:19, 22:8, 23:2, 24:5, 55:1, 55:5, 55:7, 91:3, 111:14, 112:23, 117:13, 117:20, 118:9, 118:18, 118:23, 120:22, 121:2, 121:7, 122:14, 126:20, 126:21, 134:15, 135:2, 137:18, 137:24, 138:17, 138:21, 141:15, 141:18, 141:21, 141:25, 142:17, 142:18, 142:23, 144:3, 197:21, 198:18, 198:23, 214:4, 214:6, 214:10, 214:15, 222:13, 225:21, 233:16, 235:6, 238:1, 243:15, 251:25, 256:9, 256:23, 257:4, 258:5, 258:6, 258:23

**Wyche's** [15] - 4:14, 14:9, 21:18, 99:13, 134:11, 206:17, 236:2, 245:1, 256:3, 256:4, 256:24, 256:25, 257:8, 258:19, 258:24

**Wyches** [2] - 12:3, 12:11

## X

**XIV** [1] - 1:11

**XXXVII** [1] - 1:11

## Y

**yawning** [1] - 112:2

**year** [13] - 12:24, 12:25, 25:6, 60:17, 66:17, 66:20, 67:24, 92:20, 93:11, 148:17, 148:18, 148:22, 148:23

**years** [37] - 8:6, 8:13, 8:14, 9:3, 11:4, 14:25, 16:1, 16:2, 16:12, 18:22, 20:24, 54:22, 61:7, 63:20, 64:2, 73:12, 92:1, 92:10, 94:20, 94:24, 95:16, 112:11, 119:21, 151:8, 152:3, 156:20, 163:10, 174:18, 174:23, 175:4, 211:9, 218:11, 252:5, 261:6, 261:7

**years'** [1] - 64:4

**yesterday** [7] - 15:6, 197:19, 198:6, 199:2, 199:14, 212:6, 214:11

**young** [1] - 160:25

**younger** [3] - 92:8, 92:10, 136:24

**yourself** [6] - 21:23, 85:10, 86:7, 99:17, 140:9, 145:13

**Yup** [1] - 7:11

## Z

**Zajac** [3] - 1:24, 267:3, 267:14

**zoned** [1] - 53:4, 53:5

**zoom** [2] - 226:8, 229:25