1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF MARYLAND
                       NORTHERN DIVISION
 3

 4

 5    UNITED STATES OF AMERICA

 6         v.                          CRIMINAL CASE NO.
                                        AMD-04-029
 7    WILLIE MITCHELL,
      SHELTON HARRIS,
 8    SHELLY WAYNE MARTIN,
      SHAWN GARDNER,
 9
          Defendants
10    _____/

11              VOLUME XV OF XXXVII
                Thursday, October 16, 2008
12              Baltimore, Maryland

13

      Before:  Honorable Andre M. Davis, Judge
14               And a Jury

15   Appearances:
             On Behalf of the Government:
16              Robert Harding, Esquire
                Michael Hanlon, Esquire
17           On Behalf of Defendant Mitchell:
                Laura Kelsey Rhodes, Esquire
18              Michael E. Lawlor, Esquire
             On Behalf of Defendant Harris:
19              Gerard P. Martin, Esquire
                Paul Flannery, Esquire
20           On Behalf of Defendant Martin:
                Thomas L. Crowe, Esquire
21              James G. Pyne, Esquire
             On Behalf of Defendant Gardner:
22              Adam H. Kurland, Esquire
                Barry Coburn, Esquire
23
     Reported by:
24   Mary M. Zajac, RPR
     Room 5515, U.S. Courthouse
25   101 West Lombard Street
     Baltimore, Maryland 21201
```

2

1          (Proceedings at 9:40 a.m.)

2          (Jury not present in courtroom.  Defendants present.)

3          THE COURT:  We're ready to proceed?

4          MR. HARDING:  Your Honor, could I have just one moment

5    with Ms. Rhodes?

6          THE COURT:  Certainly.  Certainly.

7          (Pause in proceedings.)

8          MR. HARDING:  I guess we're all ready, Your Honor.

9          THE COURT:  All right.  Can we get Detective

10   Niedermeier back in, please, and we'll have the jury?  I remind

11   the government the ruling yesterday was that you won't put an

12   exhibit on the DOAR that is not listed on the exhibit list

13   without first showing it to counsel.

14         MR. HARDING:  Well, I handed out a copy of some, of a

15   telephone bill that was recovered, this is W-68, that was

16   recovered from Two Cree Court that I neglected to introduce.  I

17   handed out copies to most counsel this morning.  I think --

18         MR. MARTIN:  I don't have it.

19         MR. HARDING:  Mr. Martin may be the one guy who doesn't

20   have one.

21         MR. MARTIN:  I don't have one.

22         MR. HARDING:  We had trouble with our copier this

23   morning and the agent wasn't able to make enough copies.  But

24   it's simply a telephone bill that was recovered from Two Cree

25   Court.

1          THE COURT:  Okay.

2          MR. HARDING:  And I'm going to introduce that at the

3     beginning.  I'm also going to introduce -- I think everything

4     else I have this morning, there are the telephone tolls, which

5     are certified records.  And then I have --

6          MR. MARTIN:  What number are they?

7          MR. HARDING:  They're T-1 through whatever.  And then

8     the rest of this stuff is the notes and statement of rights and

9     materials surrounding the statement Martin gave, which all

10    defense counsel have had a for a long time.

11         There's this chart we discussed about yesterday.  The

12    transcript of the voice mail.  And the materials marked W-30,

13    which are W-30, W-31, and W-63, which are materials that were

14    given over in discovery that relate to Mr. Martin's alibi that

15    the detective acquired in the course of his investigation.

16         THE COURT:  All right.

17         MR. KURLAND:  Your Honor, I've been in discussion with

18    Mr. Hanlon.  We have an objection to either the government's

19    third or fourth witness this morning.  It's probably going to be

20    after we take our morning break.  But I just wanted to alert the

21    Court to that.  So after the jury goes, after --

22         THE COURT:  Can we deal with it now since you're

23    standing there?  What's the objection?

24         MR. KURLAND:  Sure.  It has to do with testimony,

25    proposed testimony from, I guess, the Shock Trauma technician and

4

1    a bunch of photographs, which we object to as being --

2              THE COURT:  May I see the photographs, please?

3              MR. HANLON:  Yes, Your Honor.

4              MR. KURLAND:  -- as being irrelevant.

5              THE COURT:  What's the testimony from the Shock Trauma

6    technician?

7              MR. KURLAND:  Well, perhaps the government is in a

8    better position to say what their witness is going to say.

9              MR. HANLON:  Your Honor, the witness is Kerry Bialek.

10   She is a crime scene technician.  She responded to the Shock

11   Trauma.  She did two things.  She recovered, number one, a

12   possible bullet or projectile.  I don't think there's any

13   objection there.  She also took photographs of Ms. Jones Spence

14   on the treatment table, showing some of her injuries and things

15   like that.

16             This would have been at Shock Trauma, not at the crime

17   scene.  The government proposes to use these photographs in the

18   same way we've used some others.

19             THE COURT:  All right.  May I see?  Because there are

20   no photographs of her at the crime scene?

21             MR. HANLON:  Correct, Your Honor.

22             MR. KURLAND:  Your Honor, can I briefly be heard after

23   you take a look at the photos?

24             THE COURT:  Sure.  Sure.

25             (Pause in proceedings.)

5

1              THE COURT:  All right.  I've reviewed six photographs.

2     Actually, yes, six photographs of Ms. Jones Spence at Shock

3     Trauma.  As the government points out, obviously, because she was

4     transported immediately, there are no crime scene photographs of

5     her at the scene, and so the government intends to introduce

6     these photographs.

7              What would you like to say, Mr. Kurland?

8              MR. KURLAND:  Well, Your Honor, I know there are

9     autopsy photos of Ms. Spence that will show where the bullet

10    wounds are.  It's uncontroverted that she was shot.  Obviously,

11    those pictures are, show her unclothed and in a far different

12    condition than at the scene.  So these really aren't substitutes

13    for crime scene photographs, which would sort of be superfluous,

14    anyway.

15             Under the circumstances, they're highly inflammatory

16    and so far, so much more extreme than the crime scene photographs

17    that we saw with respect to the other homicides.  And given the

18    uncontroverted nature of the injuries and the extreme nature of

19    the photographs, the Shock Trauma testimony really is irrelevant.

20    They recovered a bullet there.  But other than that, these

21    pictures don't show the crime scene and really, you know, are

22    classic, you know, over the top inflammatory.

23             THE COURT:  Okay.  The Court disagrees.  The Court

24    finds that the photographs are not likely to inflame the passions

25    of the jury.  They certainly are graphic, no question about that.

Case 1:04-cr-00029-RDB    Document 685    Filed 06/12/09    Page 6 of 220

1    And they are, in some ways they are gruesome.  But that's what

2    you get in a homicide prosecution.  I don't think the

3    government's gone over the top with these and the Court will

4    permit them to display.

5              MR. KURLAND:  Could the Court limit, at least, not all

6    six are necessary.

7              THE COURT:  No.  I think six is reasonable and each one

8    shows something different.  And the Court's not going to delve

9    into how the government intends to argue.

10             So your objection's noted.  It's overruled.

11             MR. KURLAND:  Thank you, Your Honor.

12             THE COURT:  Thank you.  All right.  We'll have the

13   jury.

14             (Jury enters the courtroom.)

15             THE COURT:  Members of the jury, good morning.  Thank

16   you again for your patience.

17             Apparently, yesterday I said we'd be in session

18   tomorrow and Thursday.  And I think I'm right.  So we're ready to

19   continue.  Go ahead, Mr. Harding.

20             DIRECT EXAMINATION

21   BY MR. HARDING:

22   Q    Thank you, Your Honor.  Good morning, Detective Niedermeier.

23   A    Good morning, sir.

24   Q    I need to ask Ms. Arrington.  Going back for a moment,

25   Detective Niedermeier, to the search you participated in at Two

1    Cree Court, the residence of Shelly Wayne Martin on April 17th,

2    2002.  Did you also recover another phone bill besides the one

3    that we introduced yesterday?

4    A    Yes.

5    Q    And I'm showing you what's been marked W-68.  Is this a

6    phone bill you recovered?

7    A    Yes.

8    Q    And can you tell us the phone number that this bill relates

9    to?

10   A    It's only partially on the screen.  But it's 443 -- thank

11   you -- 838-1933.

12   Q    Okay.  Also yesterday -- I want to show you a tape

13   recording.  This is W-38, a cassette tape.  Is this a cassette

14   tape that you made of the interview you did with Willie Mitchell

15   that we heard yesterday?

16   A    Yes.

17   Q    And W-65A, is this a copy of the transcript that we leafed

18   through as we were going through the conversation yesterday on

19   the recording?

20   A    Yes.

21   Q    Your Honor, I have a number of toll records here that I'd

22   like to introduce into evidence, if I may.  Each of these has a

23   certification attached to it.

24            THE COURT:  Very well.

25   Q    These are for various phone numbers.  I'm just going to read

1     the exhibit numbers and, with the Court's permission, the exhibit

2     numbers, and briefly show the certification on the screen.  Is

3     that all right, Your Honor?

4                THE COURT:  That's fine.

5     Q     This is T-13.

6                MR. CROWE:  Your Honor, could Mr. Harding tell us the

7     number, telephone number, also?  That would help.

8     Q     That's fine, Your Honor.

9                THE COURT:  Okay.

10    Q     This is 443 --

11               THE COURT:  I'm sorry.  Mr. Harding, you know, I don't

12    think you need to show the certification.  The Court's perfectly

13    happy to accept your representation and counsel's been able to

14    confirm that the certifications are there.  So if you would just

15    give us the exhibit number and the phone number to which it

16    relates, I think that would be fine.

17    Q     Okay.  T-13 is 443-73 --

18               THE COURT:  I'm sorry, Mr. Harding.  I think it would

19    be helpful, though, to put it on the DOAR just so people can see

20    the number as you read it along.

21    Q     T-13 is 443-739-5811.  T-10 is 410-899-9323.  T-3 is

22    443-418-6204.  T-15 is 443-253-0187.

23               T-14 is three phone numbers -- 443-691-9203,

24    443-691-8844, and 443-691-2252.

25               T-12 is 410-493-1241.

Case 1:04-cr-00029-RDB    Document 685    Filed 06/12/09    Page 9 of 220

1          T-17 is 443-691-9203 and 443-691-8844.

2          T-18 is 410-905-1681 and 443-418-5570.

3          MR. MARTIN:  What was the last number?

4  Q    5570.  418-5570.

5          And then we have T-19, which is 443-418-6204.

6          T-16, which is 443-540-1253.  And 443-838-1933.

7          T-9, which is 410-808-9606.

8          T-8, which is 443-822-3608.

9          T-7, which is 443-253-0187.

10         And T-4, which is 410-963-3912.

11         Now, we just heard yesterday the statement that Mr.

12 Mitchell gave on April 17th, 2002.  What I'd like to do now,

13 Detective, is to play the tape recording of the voice mail that

14 was introduced yesterday, I believe it's W-33, that you made off

15 of the, or that the FBI made off of the voice mail machine.  And

16 so I believe if everybody has their transcript books, this is

17 going to be number one, Tab Number One.

18         And when I get done with this, Detective, I'm going to

19 come back and ask you questions about Mr. Mitchell's statement.

20 Okay?

21 A    Yes, sir.

22         (Tape played.)

23         MR. LAWLOR:  Your Honor, could we request the Court

24 give a limiting instruction regarding the transcript?

25         THE COURT:  Yeah.  As I told you on prior occasions,

1    ladies and gentlemen, the actual evidence for your consideration

2    is the tape that you just heard.  The transcript has been

3    prepared by the government agents, representing their best

4    assessment of what's said on the tape.  If you think you heard

5    something different on the tape from your listening to it

6    compared to what's appearing in the transcript, you are to be

7    guided by what you hear on the tape, not what's in the

8    transcript.  The transcript is simply an aid for you in listening

9    to the tape.

10                MR. HARDING:  Excuse me, Your Honor.

11                THE COURT:  Yes.

12   BY MR. HARDING:

13   Q    Speaking of the transcript and the tape, Detective

14   Niedermeier, did you prepare this transcript marked W-33A

15   together with Task Force Officer Keith Benson?

16   A    Yes.

17   Q    And did you have the advantage of being able to use

18   earphones and to listen to the tape many times?

19   A    Yes.

20   Q    Just one question about that tape.  At three minutes and

21   three seconds into the conversation, you hear, Why I ain't check

22   his pockets, Shorty?  Did you recover some money from both the

23   pants pockets of Darryl Wyche and Anthony Wyche?

24   A    Yes.

25   Q    Now, I want to go back and ask you some questions about Mr.

1    Mitchell's statement.  And I'm going to call your attention to

2    Transcript Number Two.  Do you have a copy of the transcript

3    book?

4    A    I do.

5    Q    This is Tab Two.  And I'd like to ask you first about a

6    passage -- let me call your attention to W-42, which is the set

7    of notes that you told us about yesterday, that you took from a

8    meeting prior to the actual recorded statement that we heard.

9         Do you recall these notes?

10   A    Yes.

11   Q    And I want to call your attention to this section right

12   here, where it says, Big L drives blue Buick.  Is that what Mr.

13   Mitchell told you?

14   A    Yes.

15   Q    Okay.  Now I want to call your attention to the transcript,

16   specifically to Page 12.  And about three-quarters of the way

17   down there's a sentence that begins with a quotation mark.  "All

18   right, I'm going to be outside.  So I tell him he got a blue, a

19   blue Buick.  That's what I know him, that's what I know D to have

20   when he be driving around."

21        Was it your understanding that Mr. Mitchell told you in

22   his recorded statement that it was not L who had the blue Buick

23   but Darryl Wyche who had the blue Buick?

24   A    Yes.

25   Q    And also, I'd like to draw your attention to Page 15 of the

1    transcript.  You see in the middle of the page Hastings asks Mr.

2    Mitchell to describe L, how tall he is.  And Mitchell begins to

3    describe L.  And then at the very bottom of Page 15, Hastings

4    says, what kind of car is he driving?  And Mitchell says over on

5    the top of Page 16, last I know he had like a little Cadillac,

6    old Cadillac.

7           So is it your understanding that Mitchell is now saying

8    that L had an old Cadillac that he identifies as white, about

9    halfway down Page 16?  He says it's a white Cadillac?

10   A    Yes.

11   Q    Okay.  Let me call your attention, also, to Page Nine.  I

12   want to ask you about the business relationship that existed

13   between Mitchell and Darryl Wyche, according to what Mr. Mitchell

14   told you in his statement.

15          And at the bottom of Page Nine -- sorry.  At the top of

16   Page Nine, Mr. Mitchell is quoted in the statement as saying,

17   Well, in a nutshell, D was going to meet the dude L that I had

18   turned him on to.  This isn't the first instance in time where I

19   had him meet somebody whereas though they was going to exchange

20   what we talked about.

21          And then over on Page 11, Mr. Mitchell is talking,

22   about three-quarters of the way down the page, he mentions his

23   grandmother's place.  And he says, It's not the first time that

24   it was that type of situation with D.  He met plenty of people

25   that I knew on his own and he came and gave me my money plenty of

1    times.  Okay?

2         This incident happened whereas though it was like I'd

3    say about 11:00 and I called and I checked about 11:30, 11:40,

4    and I called, called the dude L to see if he had met up with him

5    and he said no.

6         And then Mr. Mitchell picks up on what happened.

7         MR. LAWLOR:  Your Honor, I object.  Do we really need

8    Mr. Harding to reread the entire statement?  It's in evidence.

9         THE COURT:  The objection's overruled.

10   BY MR. HARDING:

11   Q    On Pages 17 and 18, down at the bottom of 17.  I'm going to

12   get a glass of water.  Mr. Mitchell says, bottom of Page 17:

13   Yeah, when I first talked to them but that was, it was a long

14   break in between there.  That's why I called him back to see if

15   it went down so I could see if I get my cut.

16        Can you tell us, based on those statements, Detective

17   Niedermeier, what was your understanding of the ongoing business

18   relationship between Mr. Mitchell and Darryl Wyche, according to

19   what Mr. Mitchell told you that night?

20        MR. LAWLOR:  Objection.

21   Q    Or that day?

22        MR. LAWLOR:  Objection.

23        THE COURT:  The objection is overruled.

24        MR. LAWLOR:  The transcript speaks for itself.

25        THE COURT:  The objection is overruled.  You may

1    answer.

2    A    Mr. Mitchell stated that, my understanding was that he was a

3    middle man.  He would get buyers together and then he would

4    contact Darryl Wyche, put them together to exchange drugs for

5    money.  After that exchange was done, Darryl Wyche would then

6    give Mr. Mitchell money for his part in the deal, his cut.

7    Q    Okay.  Now, let me ask you this, Detective.  What was the

8    time of the murder, according to your investigation?

9              MR. LAWLOR:  Objection.  Foundation, Your Honor.

10             THE COURT:  Overruled.  You may answer.

11   A    Between 12:33 and 12:38 on March 25th, 2002.

12   Q    And on what --

13   A    A.m.  I'm sorry.

14   Q    And on what do you base that determination?

15   A    Phone calls, phone records, and the time that the, the

16   recording we just made, that phone call was placed.

17   Q    And when was that recorded phone call placed?

18   A    0038.  12:38 a.m. on the 25th of March.

19   Q    When was the last conversation that Darryl Wyche had that

20   night?

21             MR. LAWLOR:  Objection.

22             THE COURT:  Rephrase the question.

23   Q    When was the last connected phone call between a phone

24   associated with Darryl Wyche and anyone else that night?

25   A    That would have been at 12:31, would have been when that

1    call was initiated, a.m., on that same date, from the phone

2    number 8844, which was found in the vehicle belonged to Darryl

3    Wyche, to a phone associated with Mr. Mitchell.

4    Q    Okay.  Which phone associated with Mr. Mitchell?

5    A    The 6204 number, the same number that was used repeatedly

6    throughout that evening to contact or be contacted by Darryl

7    Wyche and others.

8    Q    Okay.  So the last call that Darryl Wyche placed that

9    evening was to the phone associated with Willie Mitchell, is that

10   your testimony?

11   A    Yes.

12   Q    And that phone conversation was at 12:31?

13   A    Yes.  That's what time it began.

14   Q    And that's why you put the time of death between 12:31 and

15   12 -- sorry.  That phone conversation, when did that phone

16   conversation end?

17   A    Approximately 12:33 a.m.

18   Q    Okay.  So you placed the time of death between 12:33 and

19   12:38?

20   A    Correct.

21   Q    Now, let me ask you this, Detective.  Did Mr. Mitchell's

22   tolls show any call to Darryl Wyche after 12:31, to Darryl Wyche,

23   in order to get his cut?

24            MR. LAWLOR:  Objection.

25            THE COURT:  Rephrase the question.  I think the problem

1    is the last part, Mr. Harding.

2    Q    According to your toll analysis, were there any phone calls

3    between Mr. Mitchell and Mr. Wyche after that 12:31 to 12:33

4    phone call that you just told us about?

5    A    No.

6    Q    Okay.  Let me call your attention to another page in this

7    transcript, Page 12.  About one quarter of the way down, Mr.

8    Mitchell was talking here.  And he says:  That's okay.  He's

9    gone.  Meet him tomorrow about afternoon time.  I'm moving all

10   day the next day.  Right?  This is Mr. Mitchell reporting what he

11   told D over the telephone.

12        Now, the address that Mr. Mitchell gave you, you told

13   us yesterday, was that Valdivia Court residence.  That's when you

14   brought him in on April 17th, is that correct?

15   A    Yes.

16   Q    And he's describing here in his statement what happened on

17   the night of March 24th and 25th, 2002, some three weeks earlier?

18   A    Correct.

19   Q    Do you know where Mr. Mitchell was living prior to March

20   24th, where he moved from the next day, as he puts it in his

21   conversation?

22   A    4916 Gilray.

23   Q    Okay.  Also, on Page 13 and 14, starting at the bottom of

24   Page 13, Mr. Mitchell gives you a series of descriptions of where

25   this meeting was going to take place between --

1          MR. LAWLOR:  Objection to the characterization, Your

2    Honor.

3          THE COURT:  The objection's overruled.

4    Q    -- between L and D, who he's on the phone with, directing to

5    the meeting with L?

6    A    Correct.

7    Q    But L is already stationed, as he says at the bottom of Page

8    13 --

9          MR. MARTIN:  Objection, Your Honor, this is argument.

10   It's not a question.

11         THE COURT:  The objection is overruled.

12   Q    About three-quarters or four-fifths of the way down Page 13

13   he says:  So from there we still moving, but then when she --

14   sorry.  This is, this is actually a description of --

15         MR. LAWLOR:  Is this a question anywhere, Your Honor?

16         MR. HARDING:  I'm going to rephrase the question, Your

17   Honor.  In the middle of Page 12, Mitchell is talking and he's

18   describing what L told him over the phone.  Even says:  He say,

19   I'm on the block.  What's the block?  Ridgewood.  I'm on

20   Ridgewood.  All right.  Cool.  Calls D back.  Where you at?  He

21   say he on, like, Liberty Heights and Garrison.  And so then he

22   calls --

23         MR. LAWLOR:  Your Honor, is he going to ask a question?

24         THE COURT:  You may proceed, Mr. Harding.

25   BY MR. HARDING:

1    Q    Okay.  And then we get another description of the location

2    of this meeting on the bottom of Page 14.  Mr. Mitchell says:

3    After the subway, so when I hears that she, like it's in your

4    grandmother's area.

5              Actually, let me call your attention a little further

6    up that same page.  Mr. Mitchell says:  It's a side, it's a

7    street after the subway.  I just know Ridgewood.  That's a street

8    after the subway.  And then he continues:  After the subway.  So

9    when I hears that, she like, it's in your grandmother's area.  So

10   when I hear that, I immediately know who it was because I, I, I

11   know who I sent them to go see in that area, and like I told you

12   before.

13             MR. LAWLOR:  Is there a question, Your Honor?

14   Q    Where is Ridgewood?

15   A    That intersects with East Wabash Avenue, very short distance

16   from where the Wyche brothers' vehicle and their bodies were

17   located.

18   Q    Okay.  And I think we touched on this a few days ago.  But

19   I'm putting it back on to the screen, W-10.  And I think you

20   already told us that this was the subway right here, is that

21   correct?

22   A    I believe I was corrected.  It's the metro.  But yes.

23   Q    Okay.  It's actually above ground at this point in Baltimore

24   but it goes underground later on when you get closer into

25   Downtown, is that correct?

1    A    Yes.

2    Q    And then this is the street where you say the Wyche brothers

3    were in their car when they were killed, isn't that correct?

4    A    Correct.

5    Q    And what's the name of this street?

6    A    That's East Wabash Avenue.

7    Q    And what's this street right here?

8    A    Ridgewood.

9    Q    Okay.  Now, what do you understand to be the street after

10   the subway?

11   A    I believe that to be, he was describing East Wabash Avenue.

12   Q    Okay.  So is he telling D to meet with L at this, near this

13   area right here?  Is that your understanding?

14   A    Yeah.  To me, he was describing the location where the Wyche

15   vehicle and their bodies were discovered.

16   Q    Okay.  Let me call your attention, also, to some other

17   descriptions of this area.  Back on Page 11, two-thirds of the

18   way down the page.  Mr. Mitchell says:  He supposed to meet

19   around my grandmother's way at Ashburton's, at Ashburton

20   Apartments.

21        And then he also refers to the same thing on Page 14

22   near the bottom.  He says:  After the subway, so when I hears

23   that, she like, it's in your grandmother's area.

24        And also -- yeah.  On Page 13, he goes on to explain

25   that, at the top of the page, You'll make another left on

1    Ridgewood and you will see, and then I'm talking to him on this

2    other phone and he tells me I'm like, he said I see the car.  I'm

3    like, that is, that y'all at the corner?  Yeah.  All right.

4    That's him at the corner.  What's this description of right here

5    that I just read to you?

6    A    That's the description of how you would get to Ridgewood and

7    Wabash, directions.

8    Q    Okay.  And is this the final conversation he's having with D

9    as he's directing him into that location that night?

10   A    Yes.  That's what Mr. Mitchell said.

11   Q    Okay.  On Page 14 at the bottom, I just read this passage

12   where Mr. Mitchell said that after the subway, he's, actually,

13   his baby's mother, Jaquetta, is describing to him the next

14   morning what she had heard about the murder --

15               MR. LAWLOR:  Objection, Your Honor.

16               THE COURT:  The objection's overruled.

17   Q    What she had heard about the murder of D and Anthony.  And

18   then Mitchell says, after the subway, so when I hears that, she

19   like, it's in your grandmother's area, so when I hear that, I

20   immediately know who it was cause I, I know who I sent them to go

21   see in that area.  And like I told you before -- and then there's

22   a pause and Hastings interjects, I understand.  You don't have to

23   say anything about anything.  And you didn't do anything so you

24   don't have any intent, okay?

25               What was your understanding, Detective Niedermeier, of

1    the basic account Mr. Mitchell was giving to you of, of how this

2    murder happened?

3              MR. LAWLOR:  Objection.

4              THE COURT:  The objection's overruled.

5    A    Mr. Mitchell was giving an alibi.

6              MR. LAWLOR:  Objection, Your Honor.

7              THE COURT:  The objection's overruled.  Go ahead,

8    Detective.

9    A    He was giving an alibi.  We knew some of the things that he

10   was saying were true --

11             MR. LAWLOR:  Objection.

12   A    -- because we already had the phone records.

13             MR. LAWLOR:  Objection, Your Honor.

14             THE COURT:  The objection's overruled.  Go ahead,

15   Detective.

16   A    He was very familiar with the area.  And in his statement,

17   as he gave it, the points that we knew weren't true --

18             MR. LAWLOR:  Objection.

19   A    -- were obvious.

20             THE COURT:  The objection's overruled.

21             MR. LAWLOR:  Move to strike.

22             THE COURT:  Motion is denied.

23   BY MR. HARDING:

24   Q    What does, what does Mr. Mitchell mean when he says at the,

25   toward the top of Page 15, I don't have no intent?

1          MR. LAWLOR:  Objection.

2     Q    What was your understanding of what he meant?

3          THE COURT:  The objection is overruled.

4     A    He was stating that, he was trying to distance himself from

5     the incident of the murder, stating that his only part in it was

6     setting up the drug buy.

7          MR. LAWLOR:  Objection, move to strike.

8          THE COURT:  The objection is overruled.  The motion is

9     denied.

10    Q    Can you continue?

11    A    Yeah.  When, in fact, it is our belief that he was actually

12    setting up the robbery and murder.

13         MR. LAWLOR:  Objection, Your Honor.

14         THE COURT:  The objection's overruled.

15         MR. LAWLOR:  Move for a mistrial, Your Honor.

16         THE COURT:  The motion is denied.

17    BY MR. HARDING:

18    Q    Okay.  Let's go on Page 15.  Hastings says immediately after

19    that:  Do me a favor, describe L.  How tall is he?  And Mitchell

20    proceeds to give some information about L.  Six feet, six-one,

21    wears his hair bushy.  Be at, be on Reisterstown Road.  Hustles

22    right down Reisterstown Road and, um, Saint Ambrose.  Estimates

23    his age.  Tells us what we read before about the kind of car he

24    had.

25         And then Hastings asks who he hangs out with, over on

1  Page 16.  And Mr. Mitchell says, uh uh.  Is that all that Mr.

2  Mitchell gave you about L to be able to identify or locate this

3  man?

4  A    Yes.

5  Q    Let me call your attention now to Pages 18 and 19.  At the

6  bottom of Page 18, Mitchell says, no, I wasn't really, I just, I

7  just knew the time went by because, um, matter of fact, it was a

8  movie on but, um, the basketball playing, Rick Fox on, um, one of

9  them channels.  So I'm not really, you know, sure.

10          He's saying this in response to Hastings's questions

11  about when the final phone call occurred between him and Darryl.

12  What's your understanding of what Mitchell was saying there?

13          MR. LAWLOR:  Objection.

14          THE COURT:  Overruled.  You may answer.

15  A    He was claiming that he was home watching TV.

16  Q    Do you know who Rick Fox is?

17  A    I do.

18  Q    Who is Rick Fox?

19  A    A basketball player, used to play for the Lakers.

20  Q    Does he have a television show?

21  A    Not that I'm aware of.  I believe he's done some acting.

22  Q    In movies, is that your understanding?

23  A    Yes.

24  Q    Okay.  Do you know whether Mr. Mitchell was at home at that

25  time, the time of the last phone conversation between him and

1   Mr. --

2          MR. LAWLOR:  Objection.

3   Q   -- Wyche that night?

4          THE COURT:  Sustained.

5   Q   Okay.  At the end of that voice mail message we just called,

6   we just heard, at the end it says, I'm calling your house,

7   Shorty.  Do you recall that?

8          MR. MARTIN:  Objection to the characterization, Your

9   Honor.

10          THE COURT:  Overruled.  I'm sorry.  Are you finished

11   with the Mitchell statement now, Mr. Harding?

12          MR. HARDING:  Yes.

13          THE COURT:  All right.  I want to give the jury an

14   instruction.

15          Now, ladies and gentlemen of the jury, I have some

16   instructions for you at this time.

17          First of all, regarding this statement which the

18   detective has testified as to, which the detective says Mr.

19   Mitchell gave.  The statement, first of all, is only a statement

20   if you find it to be a statement.  In other words, among all of

21   the determinations you will have to make in this case based on

22   the evidence presented is whether Mr. Mitchell made a statement.

23          If you find that Mr. Mitchell made this statement, as I

24   will instruct you in greater detail later in the trial, you are

25   to consider this statement by Mr. Mitchell solely as evidence

1    against Mr. Mitchell.  In other words, Mr. Mitchell's statement

2    to law enforcement may not be considered by you as evidence

3    against any of the other three defendants.

4           Similarly, any statement by any other defendant to law

5    enforcement may not be considered by you against any defendant

6    other than the defendant who makes the statement.

7           Now, as I say, I will have very detailed instructions

8    for you at the appropriate time.  But let me simply point out to

9    you that there are instances, as you've seen in this trial, when

10   certain statements made by a defendant to someone other than law

11   enforcement may be considered by you against all the defendants.

12   But as I instruct you now, a statement by a defendant to a law

13   enforcement officer during interrogation may be considered by you

14   only against the defendant who makes the statement.

15          And I will give you further detailed instructions about

16   when and under what circumstances you may consider other

17   statements made by any defendant or any other person, for that

18   matter, against any of the other defendants other than the

19   speaker.

20          Now, number two.  As you have heard, there have been a

21   number of objections, which the Court has overruled, regarding

22   Mr. Harding's questioning of Detective Niedermeier concerning

23   Detective Niedermeier's assessment and explanation of what Mr.

24   Mitchell's statement intended to communicate.  You are entitled

25   to consider the effect of Mr. Mitchell's statement on Detective

1    Niedermeier and Detective Hastings and Detective Niedermeier's

2    understanding of what Mr. Mitchell was communicating.  And you

3    are entitled to consider how Detective Niedermeier himself

4    assessed what Mr. Mitchell was communicating or intending to

5    communicate.  But you are not bound in any way to accept

6    Detective Niedermeier's assessment of what Mr. Mitchell was

7    communicating or what he intended to communicate.

8             In other words, it's your determination, one, whether

9    Mr. Mitchell made a statement; two, if you find that he made a

10   statement, what was he intending to communicate; and three, what

11   did he actually communicate?

12            So these are all matters for your determination and

13   your determination only.  But you are entitled to consider, since

14   Detective Niedermeier was present, heard the statement, and

15   participated in the questioning, you are entitled to consider the

16   affect that Mr. Mitchell's statement, if you find he made a

17   statement, on the listener, Detective Niedermeier, and how

18   Detective Niedermeier assessed that information in the light of

19   other information he had gathered during his investigation.

20            Finally, the fact that Detective Niedermeier or any

21   other detective or any prosecutor may believe that Mr. Mitchell

22   was not telling the truth or was telling the truth or was telling

23   some of the truth, all of that may be considered by you but it is

24   in no way binding on you.  The effect of Mr. Mitchell's statement

25   and what weight to be given it and how you evaluate it in the

1    context of all the evidence in this case is solely for your

2    determination.

3              Thank you very much, Mr. Harding.  You may proceed.

4    BY MR. HARDING:

5    Q    Thank you, Your Honor.  Having said that we were done with

6    the statement, I discovered I have one more question for you.

7              THE COURT:  Okay.

8    Q    On Page 13.

9              THE COURT:  In other words, led me add this, just to

10   make it clear.  I think it is.  Just as I've told you before,

11   rumors in the street, speculation by others, opinions held by

12   others of what somebody may have done or was believed to have

13   done are not evidence that anybody actually did anything.

14             Similarly, Detective Niedermeier's opinion that Mr.

15   Mitchell may be guilty of something is not to be considered by

16   you as affirmative evidence that Mr. Mitchell or anybody else did

17   any particular thing.  Your duty in this case as the jury is to

18   be the judge of the facts, to consider all the evidence that the

19   Court permits you to consider, and reach your own independent

20   determination of whether the government has proven any

21   defendant's guilt beyond a reasonable doubt.

22             Go ahead, Mr. Harding.

23   BY MR. HARDING:

24   Q    Okay.  We just discussed, Detective Niedermeier, about how

25   Mr. Mitchell, in your understanding, was saying that he was at

1    home watching Rick Fox on television at the time of the final

2    phone conversation he had with Darryl Wyche.  Do you recall that?

3    A    Correct.

4    Q    Let me call your attention to the bottom of Page 12 and to

5    the top of Page 13, where he's describing his conversation with

6    Darryl as he's leading him into the final meeting with L that

7    night.  And he explains it toward the bottom of Page 12, about

8    how Darryl was driving that blue Buick.

9         And Darryl says, I'm like, I'm near your grand, and

10   then Bo interrupts and says, no, get on Coldspring, make a left

11   on Towanda, you'll make another left on Ridgewood, and you will

12   see, and then I'm talking to him on this other phone and he tells

13   me I'm like, he said, I see the car.  I'm like, that is, that

14   y'all at the corner?  Yeah.  All right.  That's him at the

15   corner.  Where you at?  I am in the street.  All right.  You see

16   him?  Good.  And I hung up the phone.

17        What was your understanding of where he was saying he

18   was at at that time when he's describing his final conversation

19   with D, as he's leading him into the meeting with L?

20            MR. LAWLOR:  Objection.

21            THE COURT:  Overruled.

22   A    I believe he was stating that he was at home at that point.

23   Q    No.  When he says --

24            MR. LAWLOR:  Objection.

25   Q    I'm like, that is, that y'all at the corner?  Is he asking

1    Mr. Mitchell -- is he asking Mr. Wyche?

2    A    Actually, at that point --

3         MR. LAWLOR:  Objection.

4    A    -- he kind of --

5         THE COURT:  Excuse me, Detective.  The objection is

6    overruled.  Go ahead.

7    A    Sorry, Your Honor.  He was kind of insinuating that he was

8    going back and forth on phones.

9    Q    Well, let me ask you this.  I'm like, that is, that y'all at

10   the corner?  And then he says, yeah, all right.  That's him at

11   the corner.  Was it your understanding that he was saying he

12   could see Darryl Wyche at the corner?

13        MR. LAWLOR:  Objection.

14        THE COURT:  Overruled.

15   A    No.  At that point, I believed he was quoting what was being

16   said to him on the phone.

17   Q    Okay.  Let me go on to Mr. Martin, then.  Did you also offer

18   Mr. Martin an opportunity to make a statement on the same day,

19   April 17th, 2002?

20   A    Yes.

21   Q    Okay.  Let me show you some documents relating to that.

22   First of all, this is W-62.  What time -- first of all, what is

23   this document?

24   A    That's an activity log kept by us when individuals are

25   brought to the Homicide Unit.

1    Q    What time was Mr. Martin brought to the Homicide Unit?

2    A    Seven a.m. on April 17th.

3    Q    And what time did you advise him of his rights?

4    A    9:20 a.m.

5    Q    And what time did the tape recorded statement begin?

6    A    12:04 p.m.

7    Q    Okay.  Now I have Government Exhibit 48.  Can you tell us

8    what this is?

9    A    That's the information sheet filled out by Detective

10   Hastings on information Mr. Martin provided him on that date.

11   Q    Okay.  Now, let me call your attention to a couple things.

12   Did Hastings ask him what his nickname was?

13   A    Yes.

14             MR. CROWE:  Objection.

15             THE COURT:  Overruled.

16   Q    And what two nicknames did he give?

17   A    Wayne and Weaze.  One in parentheses that you can barely

18   see.  Weazy.

19   Q    Okay.  What address did he give?

20   A    Two Cree Court in Randallstown.

21   Q    Telephone number?

22   A    496-4284.

23   Q    Who does he say his employer is?

24   A    He stated that he worked at County Sports.

25   Q    And the address?

1    A    It's on Loch Raven.

2    Q    Hours of employment?

3    A    Vary.

4    Q    Did you guys search County Sports that day, April 17th,

5    also?

6    A    Yes.

7    Q    Okay.  And you gave or Hastings, actually, asked him the

8    same kind of questions toward the end that you guys had asked of

9    Mitchell, also, about whether he could read or right, under the

10   influence of drugs, whether he was under the influence of

11   alcohol, is that correct?

12   A    Correct.

13   Q    What phone number did he give for his brother?

14   A    You can't see the whole thing, but it's 410 --

15   Q    I'm sorry.  Your screen is somewhat different from mine.  So

16   I am not always aware of the fact that you can't see what I'm

17   pointing to.

18   A    410-542-7285.

19   Q    Okay.  Here is Government Exhibit W-61.  What is this?

20   A    It's an Advice of Rights form that was filled out by Shelly

21   Wayne Martin on April 17th, 2002.

22   Q    Who wrote yes and those initials after each question?

23   A    Mr. Martin.

24   Q    And this is W 60.  Can you tell us what this is?

25   A    Yes.  Those are the handwritten notes I took during the

1    pre-interview.

2              MR. CROWE:  Your Honor, may we approach the bench on

3    this?

4              THE COURT:  No.

5              MR. MARTIN:  Your Honor, I object to this for the same

6    reasons we did for the statement the other day.

7              THE COURT:  The objection's noted.  Overruled.

8    BY MR. HARDING:

9    Q    Okay.  What does the first line say, Detective?

10   A    That he heard on street, I was supposed to kill two dudes.

11   Q    Okay.  Second line?

12   A    He knows Goo, Shawn Gardner, and Bo, Willie Mitchell.

13   Q    Next.

14   A    Knows the Wyches since '88.

15   Q    Okay.  This is all discussion you're having before the taped

16   statement, is that correct?

17   A    Correct.

18   Q    What's the next thing, the next entry?

19   A    He heard it was on tape or something.

20   Q    Okay.  What's the next passage?

21   A    Called Alex, told him they were dead the next morning.

22   Q    Do you remember who Alex was?

23   A    No.

24   Q    Okay.  Then what's the next passage?

25   A    If you could slide it over just a little bit.

1    Q    I'm sorry.  Is that good enough?

2    A    I think you need to shrink it down just a little bit.

3    Lakeisha McCoy, out for her birthday, stayed all night.  10:30

4    Owings, Blade II, credit card.  And underneath that line is two

5    addresses, 671 Washington Boulevard and 801 Kevin Road, 947-0934.

6    Q    Do you know what those two addresses are?

7    A    Addresses for Lakeisha McCoy.

8    Q    Okay.  What was Mr. Martin telling you there?

9    A    I'm not the shooter.  I'm not.

10    Q    Oh, okay.  That's the next line.

11    A    I'm sorry.

12    Q    What is this about Lakeisha McCoy being out for her birthday

13    and stayed all night?

14    A    Mr. Martin stated that the night of the 24th that he had

15    gone to the movie, Blade II, out in Owings Mills, to the 10:30

16    showing, with Lakeisha McCoy for her birthday, and that

17    afterwards she had spent the night with him.  And he provided

18    those addresses and contact numbers for Lakeisha McCoy.

19    Q    Okay.  And over here on the far right it says Blade II?

20    A    Yes.

21    Q    What's that?

22    A    That's a movie.

23    Q    Is that the movie he said he went to?

24    A    Yes.

25    Q    And credit card?

1    A    Yes.  That's how he, he volunteered that he had paid for it,

2    via credit card.

3    Q    Okay.  He's talking about something that had happened three

4    weeks earlier?

5    A    Yes.

6    Q    And then you just read the next line.  I'm not the shooter,

7    I'm not.  Is that something Mr. Martin told you?

8    A    Yes.

9    Q    Do you recall the context in which he made that comment?

10   A    He just blurted it out.

11   Q    Okay.  What's the next passage say?

12   A    Bo didn't say shit, Wayne.

13           MR. MARTIN:  Objection, Your Honor.  Move to strike.

14   Ask to approach the bench.

15           THE COURT:  Come on up.

16           (Bench conference on the record:)

17           THE COURT:  What's the context, Mr. Harding --

18           MR. HARDING:  Your Honor --

19           THE COURT:  -- of the "Bo didn't say shit?"  As well as

20   the "I'm not the shooter, I'm not."

21           MR. HARDING:  I just asked the detective about the

22   first statement, what the context was.  And I only know what he

23   just said.

24           THE COURT:  Okay.

25           MR. HARDING:  The second statement is obviously a

1   response to the voice mail message, which --

2           THE COURT:  Well, what did Mr. Martin, Mr. Martin

3   listened to the tape?  And what did he say?

4           MR. HARDING:  Well, first he said that he identified

5   Bo's voice on the tape.  And that's the section that is redacted

6   right here, which I showed Ms. Rhodes this morning.

7           THE COURT:  Clearly, that should have been redacted as

8   well.

9           MR. HARDING:  Why?

10          THE COURT:  Because that suggests that he listened to

11  the tape and he identified Bo's voice on the tape.

12          MR. HARDING:  No, it doesn't.

13          THE COURT:  Yes, of course it does.  If he says Bo

14  didn't say something he heard on the tape, that means he heard

15  the voice and he's identifying it as not Bo's voice.  That

16  suggests that --

17          MR. HARDING:  He's denying Bo's voice is on the tape.

18          THE COURT:  Exactly.

19          MR. MARTIN:  But that's not true.

20          THE COURT:  No.  He's denying that Bo said, Shit,

21  Wayne.  He's not denying that Bo's voice is on the tape.  There

22  are several voices on the tape.  And by saying that "Bo didn't

23  say that", the inference is left that Bo said something else on

24  the tape.

25          MR. HARDING:  Okay.  Well, Your Honor, I showed this to

1    Ms. Rhodes this morning.  I told her that this part had been

2    redacted.  And she initially told me she had --

3              THE COURT:  I understand Ms. Rhodes doesn't have a

4    problem with it.  It's Mr. Martin who has a problem with it.  Or

5    I guess it really should be Mr. Crowe.

6              MR. MARTIN:  I have a problem, too, Your Honor.

7              THE COURT:  Well, but the objection belongs to Mr.

8    Martin, not Mr. Martin, Esquire.

9              MR. MARTIN:  Right.

10             THE COURT:  Belongs to Mr. Martin, defendant.  So what

11   do you want me to do, if anything?

12             MR. MARTIN:  Your Honor, I, I think I need to ask for a

13   mistrial.

14             THE COURT:  Right.  I'm not going to grant a mistrial.

15             MR. MARTIN:  I have to ask for it.

16             THE COURT:  Of course, the motion made and denied.

17             MR. MARTIN:  Severance.

18             THE COURT:  We're not going to sever the defendants.

19             MR. KURLAND:  Strike this entire testimony.

20             THE COURT:  I'm not going to strike the entire

21   testimony.  I'm going to, I'm going to strike the exhibit and

22   I'll instruct the jury, if you want me to, to disregard what they

23   saw on the exhibit.  They can consider the testimony.

24             MR. CROWE:  Your Honor, there are portions of that

25   exhibit which are very important to us with respect to Mr. Martin

1    stating where he was that day.

2              THE COURT:  Well, we've got the testimony.  We don't

3    even need the exhibit.  I mean, technically, the detective could

4    have been holding the exhibit and using it to refresh his

5    recollection which, of course, is the way it should have been

6    done in this instance, given the last two lines, which Mr.

7    Harding apparently showed Ms. Rhodes and she had no problem with

8    it.

9              But the mention, as I say, Mr. Harding, so I can be

10   clear, the mention, in my judgment, of Wayne attributed by the

11   detective to, the mention of Bo by Mr. Martin during this

12   interrogation and the way that you have it there leaves the

13   inference available to the jury that the defendant, Mr. Martin,

14   listened to the tape and negatived Mr. Mitchell's assertion, but

15   thereby suggested that Mr. Mitchell was there.  Now, Ms. Rhodes

16   didn't object to that.

17             MR. HARDING:  May I be heard on that, Your Honor?

18             THE COURT:  I'm sorry?

19             MR. HARDING:  May I be heard?

20             THE COURT:  Okay.  Maybe, maybe, maybe I'm confusing

21   defendants here.  This is Mr. Martin's statement, correct?

22             MR. HARDING:  Yes.

23             THE COURT:  And so Mr. Martin says to -- I think I got

24   my Martins confused.

25             MR. MARTIN:  I hope not.

1          THE COURT:  I think that's the first time I did that in

2     this trial.  Okay.  So the objection, what is your objection, Mr.

3     Martin?

4          MR. MARTIN:  My objection, Your Honor, is this is the

5     exact point you made the other day when you were almost, when you

6     told Mr. Harding he had a choice of severing the trial or not

7     using that particular portion.  My objection is he identified Bo

8     as a speaker.  He said, Bo's a speaker and I want to put that in

9     evidence because he didn't identify my client.  But now what you

10    have is a statement that says Bo didn't say, "Shit, Wayne."  And

11    so the jury is left to infer, well, maybe it was Mr. Harris who

12    said, "Shit, Wayne."  And that's just not so.  I'm being

13    denied --

14         THE COURT:  Keep your voice down.  Keep your voice

15    down.

16         MR. MARTIN:  I'm being denied exculpatory evidence

17    because I'm being deprived again.

18         THE COURT:  I think the reason I'm confused is because

19    I'm reminded now, you made the objection, if I have this right,

20    that belongs to Mr. Crowe.

21         MR. HARDING:  Well, Mr. Crowe wants the statement in.

22         THE COURT:  Mr. Crowe wants it in.

23         MR. CROWE:  Mr. Crowe only asked to approach the bench

24    because of the problem with the statement that's now come up.

25         MR. LAWLOR:  Your Honor, could I jump in here?

1          THE COURT:  No.  No.  No.  No.

2          MR. CROWE:  I clearly want the rest of the statement in

3  because the --

4          THE COURT:  So you're not objecting to the statement?

5  You're not objecting to this exhibit?

6          MR. MARTIN:  I'm not either, Your Honor.

7          THE COURT:  Just a moment.  You're not objecting to

8  this exhibit?

9          MR. CROWE:  No.  All I asked to do is to approach the

10  bench to point out the difficulty there.

11          THE COURT:  Well, and what is the difficulty?

12          MR. CROWE:  The difficulty is what we've been

13  discussing here.

14          THE COURT:  No.

15          MR. CROWE:  Implicitly saying that --

16          THE COURT:  Pretend that we didn't discuss it before.

17  What is the difficulty with this exhibit?

18          MR. CROWE:  The difficulty with the exhibit is that it

19  suggests that Mr., that my client identified Mr. Mitchell on the

20  tape, which I understood the Court had barred.  My position in

21  the case was I thought that the, that that evidence should come

22  in, but I just wanted to alert the Court to a problem.

23          THE COURT:  Okay.  Here's where I am.  There was no

24  objection from Ms. Rhodes or Mr. Lawlor to this exhibit.

25          MR. LAWLOR:  There is to that line, Your Honor.

1          THE COURT:  Mr. Martin objects on behalf of Mr. Harris

2     because he's concerned that by negative inference the jury could

3     conclude that Mr. Martin identified Mr. Harris's voice on the

4     tape.

5          MR. MARTIN:  That's just part of it, Your Honor.

6          THE COURT:  Okay.  That objection is overruled.  Mr.

7     Crowe is not really objecting to the exhibit because he says he

8     wanted to bring to the Court's attention what he says is a

9     problem because, in fact, Mr. Crowe, on behalf of Mr. Martin, you

10    want the entire exhibit in, and indeed -- am I right so far?

11         MR. CROWE:  Yes.  In fact, we would like it in without

12    the redaction.

13         MR. MARTIN:  That's what I --

14         THE COURT:  Okay.  So you're not objecting.

15         MR. MARTIN:  And that's what I would like, Your Honor.

16    Everything without the redactions.

17         THE COURT:  Just one moment.  And I didn't hear an

18    objection.  I take it Mr. Lawlor is handling Detective

19    Niedermeier.  I don't think I heard an objection from you, Mr.

20    Lawlor.  Now that you're here, do you want to make one?  Are you

21    objecting to this exhibit?

22         MR. LAWLOR:  Well, if I could back up.

23         THE COURT:  No.  I don't want to back up.

24         MR. LAWLOR:  Yes, we are.

25         THE COURT:  And what is the basis for the objection?

1          MR. LAWLOR:  The Court has struck reference by Mr. --

2          THE COURT:  No.  Please don't tell me what I've done.

3    Answer my question.  What is the basis for your objection to the

4    this exhibit?

5          MR. LAWLOR:  I'm trying to answer the question.

6          THE COURT:  Just tell me.  Just tell me the basis for

7    the objection.

8          MR. LAWLOR:  I'm trying to.

9          THE COURT:  You don't have to try.  Just tell me.

10         MR. LAWLOR:  We object to "Bo didn't say shit, Wayne."

11         THE COURT:  Okay.  And what's the basis for your

12   objection to that?

13         MR. LAWLOR:  Your Honor has already struck on a Bruton

14   issue statements by Mr. Martin that say Bo did say this.  Now, I

15   don't know what the government is trying to elicit here.  But --

16         THE COURT:  So in other words, you regard this last

17   statement, "Bo didn't say shit, Wayne", to be of a piece with his

18   affirmative identification of Mr. Mitchell when he listened to

19   the tape and thus the tape has been redacted, correct, Mr.

20   Harding?  And the transcript's been redacted?

21         MR. HARDING:  Yes, Your Honor.

22         THE COURT:  Okay.  So your point is, what I started

23   with, which is that looks awfully much like the unredacted tape.

24         MR. LAWLOR:  I don't know what the detective's going to

25   say because he's interpreting the stuff.  I don't know what he's

1    going to say about Mr. Martin said about that.  But I think it's

2    either going to be inconsistent with the Court's prior ruling

3    striking Mr. Martin's identification of Bo's voice or it's going

4    to be the opposite of that, which would be --

5         THE COURT:  Here's my problem with your objection.  Mr.

6    Harding says -- and you have an unredacted copy, Mr. Martin?

7         MR. MARTIN:  Yes, Your Honor.

8         THE COURT:  Thank you.  Mr. Harding says he showed this

9    exhibit to Ms. Rhodes and by agreement, and at Ms. Rhodes's

10   request, he struck the note that says, Sounded like Bo talking on

11   the tape.  And as we can see, that's been stricken from this

12   exhibit.  I'm inferring that Ms. Rhodes did not object, when Mr.

13   Harding showed it to her, to the last entry on this exhibit,

14   quote, "Bo didn't say 'shit, Wayne.'"

15        So I'm left with some uncertainty about whether, first

16   of all, is Mr. Harding correct that he showed it to Ms. Rhodes,

17   they discussed it, and that part and only that part was redacted?

18   Or has there been some, just, innocent misunderstanding?

19        MS. RHODES:  Let me clarify, Your Honor.

20        THE COURT:  Yes.  Can you come in, Ms. Rhodes?

21        MS. RHODES:  Yes.  I informed Mr. Harding this morning

22   that we objected to the exhibit.  And then he asked me what on

23   the exhibit.  We took a look at it and the part that I was

24   looking for wasn't on his copy.  I didn't realize he redacted it

25   already.  So I got another copy.  And he said --

1          THE COURT:  The unredacted copy?

2          MS. RHODES:  I got the unredacted one and he said, Oh,

3     I've taken that out.  I was looking at that one line.  I didn't

4     focus on the bottom line and didn't ask him to redact that.  But

5     we do object to it now based on what Mr. Lawlor's saying, and ask

6     that the --

7          THE COURT:  I understand.  So it was basically just

8     what it was.  All right.  Let me hear from you, Mr. Harding.

9          MR. HARDING:  Judge, first of all --

10         THE COURT:  And all you have to address, all I'm

11    focused on now is that last entry because it sounds like Ms.

12    Rhodes, innocently enough, without input from Mr. Lawlor, who's

13    actually going to handle this witness, was looking for just the

14    express identification and simply overlooked the other part of

15    the exhibit which, as I've said, and I agree, logically, it

16    doesn't make sense to redact that, that is the third from the

17    bottom which you've already redacted, consistent with the Court's

18    prior ruling on the tape and the transcript, and not to redact

19    the final.

20         Now, that's not criticism of anybody.  But there is an

21    inconsistency there that Ms. Rhodes has now identified and has

22    asked the Court to make a ruling to correct that.

23         MR. HARDING:  Well, I --

24         THE COURT:  Go ahead.

25         MR. HARDING:  I went through this with Ms. Rhodes this

1    morning.  My understanding, and I think she agrees with this, is

2    that once I showed her she had redacted this passage, she no

3    longer had an objection to the exhibit.

4             THE COURT:  But what she says, I think, is, frankly,

5    she didn't pay a whole lot of attention to the rest of the

6    exhibit, to be perfectly blunt about it.  And Mr. Lawlor, who's

7    actually handling the witness apparently wasn't involved in that

8    exchange at all.

9             MR. HARDING:  Your Honor, I don't understand at all the

10   inference that some are drawing, that the statement, "Bo didn't

11   say, shit, Wayne", implies that Bo, Bo's voice had been

12   identified on the tape by Mr. Lawlor.  I don't see that at all.

13   I think, if anything, it's the opposite.  Mr. Martin is, if

14   anything, exonerating Bo with his statement.

15            THE COURT:  But that's not the point.  The point is Mr.

16   Mitchell does not want evidence coming from this witness that Mr.

17   Martin identified his voice on the tape.

18            MR. HARDING:  There's no suggestion.

19            THE COURT:  You just too close to it, Mr. Harding.  I'm

20   telling you, for Bo to say, Mr. Martin -- for Mr. Martin to say,

21   "Bo didn't say X" leaves available an inference that Bo did say Y

22   and Z.  I understand that's not, those aren't the facts and the

23   detective's not going to say any such thing but that's what a

24   reasonable person might well infer.

25            Nor does that solve the other problem, which I'm done

1   with, right?  I understand Mr. Gardner and Mr. Harris want the

2   alleged negative inference placed before the jury that Mr. Martin

3   did not identify their voices on the tape.

4            So I think the answer is I should instruct the jury

5   that the exhibit should not have been displayed to them, a

6   revised version of the exhibit will be displayed to them later,

7   and they should disregard the testimony concerning this exhibit

8   until a revised exhibit is made available.  That's my proposal.

9   And now you're ready to play the tape, right?

10           MR. HARDING:  I am.  And if I could say one more thing.

11           THE COURT:  Sure.  Go ahead.

12           MR. HARDING:  Mr. Crowe had a, he actually filed a

13  motion relating to this.  He wanted me to get in the fact that

14  his client had raised his alibi in his pre-statement interview.

15  It was very important to Mr. Crowe because there's nothing on the

16  tape about the alibi.

17           THE COURT:  Exactly.

18           MR. HARDING:  So I knew I was going to have to move

19  this into evidence.

20           THE COURT:  Sure.  And I'm saying you can and you will

21  but you're going to have to prepare a further redaction of that

22  "Bo didn't say, oh, shit, Wayne."  And the jury has seen it.  But

23  you haven't asked about it or you were about to when you

24  approached the bench.  But I will instruct the jury that they

25  should not consider this exhibit.  There will be a replacement

1    for this exhibit made available to them.

2              It is in and it's further redacted.  Just a moment.  Go

3    ahead, Mr. Harding.

4              MR. HARDING:  Well, I would, Your Honor said you were

5    going to instruct the jury that this exhibit should not have been

6    displayed.  I don't think that the Court should make that

7    instruction because, as I say, I went over this with Ms. Rhodes.

8              THE COURT:  Here's what I'll tell them.  I will tell

9    them that the copy of the exhibit that was displayed was not the

10   correct copy of the exhibit.  Okay?  And that the correct copy of

11   the exhibit will be made available to them at the appropriate

12   time.

13             MR. CROWE:  Your Honor, may I just put an objection on

14   the record?  Mr. Harding notes a possible interpretation.

15             THE COURT:  I'm sorry.  The jurors need a bathroom

16   break.  I guess we all do.

17             (End of bench conference.)

18             THE COURT:  I agree, ladies and gentlemen, this is a

19   good time for a recess.  Please leave your note pads on your

20   chairs.  Have no discussion about the case.  Continue to keep an

21   open mind about all issues.  You are excused for a 15 minute

22   recess.

23             (Jury exits the courtroom.)

24             (Witness exits the courtroom.)

25             THE COURT:  Okay.  Since we have taken the recess, Mr.

1    Harding, it may be that the way to deal with this is during the

2    recess, if you and Mr. Hanlon, and I'm sure Ms. Arrington can

3    find a moment to help you out if you need her to do so, if you

4    can do the additional redaction as we discussed here at the

5    bench, and just put an exhibit tag on it, I think that will take

6    care of it.  I'll tell the jury that the prior copy of exhibit

7    was not the correct copy and that they should disregard what they

8    saw on the prior copy, and you can put the revised copy back up

9    there.  Go ahead, Mr. Kurland.

10          MR. KURLAND:  Your Honor, Mr. Gardner wants to

11    specifically put on the record, we want to join Mr. Lawlor's

12    request for a mistrial with respect to the testimony of Detective

13    Niedermeier.  The investigator expressly expressed an opinion of

14    Mr. Mitchell's guilt of the robbery and the murder and

15    specifically said that he was giving an alibi.  And even though

16    the Court gave a very detailed and thorough instruction,

17    instructing the jury that that evidence is to be considered only

18    against Mr. Mitchell, it's our position that that has a very

19    substantial and unfair spillover effect, that we would want to

20    formally put on the record that we move for a mistrial as well on

21    that ground.

22          THE COURT:  Okay.  Motion for mistrial is denied.  Mr.

23    Lawlor.

24          MR. LAWLOR:  Your Honor, two quick things.  One on this

25    exhibit.  We would ask the Court not to give a limiting

1    instruction.  The fact it was up there --

2            THE COURT:  Okay.  That's fine.  So in other words --

3            MR. LAWLOR:  I don't know if you want to hear from

4    other counsel.

5            THE COURT:  No.

6            MR. LAWLOR:  On behalf of Mr. Mitchell, we would ask

7    the Court just that they redact it and we move on.

8            THE COURT:  I think that that's perfectly sensible.

9    Frankly, I think it's a better alternative.  Obviously, the jury,

10   or perhaps some of them, saw that last line.  But I agree with

11   you, Mr. Lawlor, it frankly makes more sense just for us to

12   resume, Mr. Harding can put it up there and they will think

13   they're seeing the same thing.

14           MR. LAWLOR:  Before I move on to my second point, I

15   just want to note for the record that's the first time you've

16   agreed with me in five weeks.

17           THE COURT:  Absolutely not.

18           MR. LAWLOR:  I should stop right here.

19           THE COURT:  That's not true.

20           MR. LAWLOR:  It is.  In fact, this is two trials, the

21   first time you've ever agreed with me in my life.

22           THE COURT:  That's not true.  Just a few minutes ago

23   I've sustained one of your objections.  And I've done it on prior

24   occasions.

25           MR. LAWLOR:  I don't remember that at all.  It was a

1    leading question objection?  One of those?  Your Honor, the Court

2    gave, after Detective Niedermeier testified concerning Mr.

3    Mitchell's statement, the Court gave three limiting instructions,

4    if I was counting correctly.  One concerning the ability of the

5    jury to consider Mr. Mitchell's statement at all.  The second,

6    whether they could consider and how they should consider

7    Detective Niedermeier's conclusions that he drew from Mr.

8    Mitchell's statement.  And the third being whether they could

9    consider Detective Niedermeier's opinion about the veracity of

10   portions of Mr. Mitchell's statements.

11           We objected to the testimony regarding the conclusions

12   and the veracity opinions by Detective Niedermeier, and we object

13   to the limiting instructions as not correct statements of the

14   law.

15           THE COURT:  So noted.

16           MR. LAWLOR:  Thank you.

17           THE COURT:  And again, as I've said repeatedly, Mr.

18   Lawlor, if anybody wants a further or modified or supplemental

19   limiting instruction on any issue, my door is open.  I'm glad --

20   and my computer is on.

21           MR. LAWLOR:  This time I'm saying I didn't want the

22   limiting instruction.

23           THE COURT:  I'm happy to consider anything you want to

24   submit.  Yes, Mr. Crowe.

25           MR. CROWE:  Your Honor, as Mr. Martin's lawyer, I feel

1    that I'm somewhat between a rock and a hard place in this matter.

2    Mr. Harding made the quite cogent argument up at the bench that

3    the jury could well take the statement, which was on the machine

4    and which they've seen, as my client's exonerating Mr. Mitchell

5    and saying that he wasn't on the tape at all.  I believe that

6    that is an available inference.  I believe that some of the

7    jurors may take that.

8            It has always been our position that what the jurors

9    should hear was what really happened, which was that Mr. Mitchell

10   had, that Mr. Martin had said that Mr. Mitchell was possibly the

11   voice on the tape.  On the basis of that, we'd ask for a

12   mistrial.  If not a mistrial, a severance.

13           In terms of the curative instruction, as bad as it is,

14   it's better than leaving the jury with the idea that it can draw

15   different inferences from this very misleading statement based on

16   the evidence which is now in front of it.

17           So on behalf of Mr. Martin, if we don't get the

18   mistrial and we don't get the severance, which I expect we won't,

19   we would like the limiting instruction.

20           THE COURT:  The one regarding the exhibit?

21           MR. CROWE:  The one regarding the exhibit.  Do I

22   understand that Detective Niedermeier didn't read that?

23           THE COURT:  He did not read it.

24           MR. CROWE:  Did not read that?

25           THE COURT:  He did not read it.  The record will

1   reflect that it was on the DOAR, the document camera, for, I

2   would estimate, perhaps a minute, perhaps a little bit more than

3   a minute.  Mr. Harding began at the top of the document,

4   questioned the detective about the entries.  There are a number

5   of entries.  And my recollection is that at one point Mr.

6   Harding, because of the lack of symmetry or lack of congruence

7   between the witness' monitor and the DOAR, he was moving the

8   exhibit around a bit.

9          In any event, at one point Mr. Harding slid it up so

10  that the witness could really see the bottom of the exhibit.  And

11  that's when that last statement showed up.

12         There was an objection, I think from Mr. Kurland.  It

13  came from my far left, which I overruled.  And then I think Mr.

14  Martin objected and asked to approach the bench, and I focused on

15  that last statement.  And that's when I invited counsel to come

16  to the bench.

17         So I think the objected-to portion of that exhibit was

18  before the jury for less than a minute.  The handwriting is not

19  the greatest.  And the witness never actually testified about

20  that last statement, quote, "Bo did not say shit, Wayne."

21         MR. CROWE:  Yeah.  I don't know that it makes any

22  difference, but when I initially asked to approach the bench, my

23  impression was that there was a completely unredacted statement

24  being displayed because we had never been shown the redacted

25  statement at all this morning.

1          THE COURT:  Okay.  Well --

2          MR. CROWE:  Despite the fact that there were notes on

3    my client's, on my client's statement.

4          THE COURT:  And by the way, just so we complete the

5    record, what's the number of that exhibit?

6          MR. HARDING:  W-60.

7          THE COURT:  W-60.  Now, there's no W-60 on the exhibit

8    list that I was given but I assume, Mr. Harding -- well, I won't

9    assume anything.  When did counsel become aware that there was a

10   W-60 and what W-60 was?

11         MR. HARDING:  I made it clear, I made it clear orally

12   this morning before the jury came out.  And I also had made it

13   clear yesterday on the record that I was introducing the same

14   kinds of documents --

15         THE COURT:  For Mr. Martin that you introduced for Mr.

16   --

17         MR. HARDING:  Yes.

18         THE COURT:  -- for Mr. Mitchell.

19         MR. HARDING:  And Ms. Rhodes actually questioned me

20   about the documents this morning.

21         THE COURT:  Right.  As we discussed here at the bench.

22         MR. HARDING:  Yes.

23         THE COURT:  And as you pointed out here at the bench,

24   again, just so the record is clear, consistent with the Court's

25   ruling regarding the recorded statement and the associated

1    transcript of Mr. Martin's interview, the government, before this

2    morning, had actually redacted the statement, the recordation by

3    Detective Niedermeier in his notes that Mr. Martin had identified

4    Mr. Mitchell's voice on the tape.  You whited that out or

5    otherwise redacted it.  And there's actually a blank space on the

6    exhibit.

7         And as Ms. Rhodes said here at the bench, when she

8    reviewed it this morning and you pointed out to her that you had

9    taken out that statement, she was satisfied and you had, the

10   government had no reason to think that anybody else had any

11   objection to the exhibit, apart from what we know to be Mr.

12   Gardner and Mr. Harris's desire to put all that evidence in to

13   provide a negative inference to the jury that if Mr. Martin could

14   identify Mr. Mitchell's voice but, by not identifying Mr. Gardner

15   or Mr. Harris's voices on the tape, that that was exculpatory and

16   probative.  And we've been over all of that.

17        So I think we're now clear how it all happened.  Mr.

18   Crowe, I regret, just the way life is, it would have been better,

19   surely, hindsight's always 20/20, if Mr. Harding had called a

20   huddle at some point and you and Mr. Martin and Ms. Rhodes and

21   Mr. Lawlor, since he's handling the witness, and Mr. Kurland and

22   Mr. Coburn, could all have gotten together and examined this

23   exhibit, both the unredacted and the redacted, etc.

24        And maybe I should have done more because, as I said, I

25   wanted to actually listen to the tape and review the transcript

1    in its redacted, those exhibits in the redacted form to insure

2    that what had been done, as the Court ruled the other day, had

3    been done.

4            I had no idea until I saw what Mr. Harding did

5    yesterday with Mr. Mitchell's notes, that is the notes of Mr.

6    Mitchell's pre-interview and then taped interview, that the

7    government was going to use an exhibit of that sort in that way.

8    There was no objection.

9            So I think I'm now clear about the course of events.

10           MR. CROWE:  Thank you, Your Honor.

11           THE COURT:  All right.  Mr. Martin.

12           MR. MARTIN:  Thank you, Your Honor.  I just wanted to

13   make clear what I'm not sure I made clear at the bench.  The

14   other day when we talked about the recorded statement, one of the

15   statements Your Honor made was it would be unfair for this jury

16   to know that Mr. Martin had listened to the tape and then not

17   allow me to go into the fact that he identified one of these

18   defendants and not my client.  That's exactly what has happened

19   now.

20           The jury is going to be clear, they know that he

21   listened to the tape because the only place in this whole trial

22   you're going to see "shit, Wayne" is on at that tape.  And that's

23   probably, as you know now, the clearest thing on that tape.

24   They're going to know now that he listened to that.

25           How am I going to argue this case to the jury later on

Case 1:04-cr-00029-RDB    Document 685    Filed 06/12/09    Page 55 of 220

1    and the inferences that could be drawn from that?

2              THE COURT:  Tell me why you're so sure that the jury

3    will know that he's listened to the tape?  The only thing that

4    will remain on that exhibit will be his statement, quote, "I am

5    not the shooter."

6              MR. MARTIN:  That's right.  But they've already seen

7    the thing that was on the DOAR that said "shit, Wayne."  And that

8    is the only place in this whole trial, the only time you're going

9    to hear "shit, Wayne" is probably a hundred times in Mr.

10   Harding's closing argument, and on that tape.  So they know that

11   Mr. Martin listened to the tape.

12             And you said the other day that it would be manifestly

13   unfair if they knew he'd listened to that tape and I was not

14   permitted to bring out the fact that he did not identify Mr.

15   Harris and that he did identify one of the other defendants.

16             It's the problem with a joint trial.  I renew my motion

17   for a mistrial or severance.  Barring that, Your Honor, which I

18   don't expect you to grant, but barring that I would like to

19   limiting instruction as well.  I agree with Mr. Crowe.  It's

20   better than nothing.  It's not sufficient, I don't think, but

21   it's better than nothing.

22             I just think at this stage because of this -- look, we

23   went through this whole thing the other day.  I thought we had a

24   deal.  Everything -- you were pretty clear with it.  Everything

25   that had anything to do with Mr. Martin listening to that tape

1    was supposed to come out.  So now today, Mr. Harding does a

2    redaction in good faith trying to redact it.  He didn't show it

3    to me.  I didn't see it until he flipped it down there.  I didn't

4    even know what Mr. Crowe was asking to approach the bench about

5    because, until he flipped it down, I didn't know that that was on

6    there.  I assumed that it wouldn't be.

7              So I am renewing my motions in the order of, you know,

8    mistrial, severance, or barring that, I want the limiting

9    instruction.

10             THE COURT:  Okay.

11             MR. MARTIN:  Thank you, Your Honor.

12             THE COURT:  Those requests and motions are denied.

13   Again, not to beat a dead horse, but let me be very clear.  It is

14   only Mr. Mitchell who has a Bruton/Sixth Amendment objection to

15   the evidence of Mr. Martin having listened to the tape and, more

16   importantly, having identified Mr. Mitchell's voice on the tape,

17   however tentatively.

18             The objections of Mr. Harris, and to the extent it's

19   joined in by Mr. Gardner, is, as I said the other day, a tenuous

20   objection rooted in the due process clause, the upshot of which

21   is that the Court is depriving Mr. Harris and/or Mr. Gardner of

22   exculpatory evidence in the form of what the Court regards as a

23   tenuous, if not implausible, inference that because Mr. Martin

24   made a tentative identification of Mr. Mitchell's voice on the

25   tape but not the voice of Mr. Harris or Mr. Gardner, that that is

1   compelling, or perhaps not compelling, I don't think Mr. Martin

2   suggests it's necessarily compelling, but that that provides a

3   basis for an argument to the jury that Mr. Harris and Mr. Gardner

4   respectively weren't present at the time that voice mail was

5   made.

6          I'm not prepared to say it's a specious argument.  Of

7   course it's not.  But the strength of that inference in my

8   judgment is de minimis.  It's absolutely de minimis.  It's not

9   that I wouldn't, I certainly would never prohibit a lawyer from

10  making the argument.  And it's a perfectly permissible argument

11  to make.

12         But in terms of any due process right to present

13  exculpatory evidence, I don't think it comes close.  I don't

14  think it comes close.

15         It is a happenstance.  It is a coincidence.  And some

16  reasonable judges and persons might find it to be not probative

17  at all.  All right?

18         So I'm treating the two categories of objections in the

19  way that I think the Court has to treat them.

20         The serious objection, the government's focus, the

21  Court's focus has been on Mr. Mitchell's rights here.  And

22  indeed, when we had the discussion the other day, Mr. Martin was

23  very candid when he stood there.  He said, well, I guess I'm

24  really making Mr. Mitchell's argument, and he's absolutely right.

25  It's Mr. Mitchell who has the Sixth Amendment objection to this

1    evidence.

2            So I see how it happened.  As I say, it would have been

3    better if that portion of the exhibit had also been redacted.

4    But if Mr. Lawlor doesn't want the limiting instruction, I am

5    satisfied that the likelihood that any particular juror or any

6    number of jurors actually saw that statement, understand that

7    statement, is so small that I'm going to cede to Mr. Mitchell's

8    request that a limiting instruction not be given.

9            Now, I disagree with you, Mr. Martin, that there is any

10   inference in what's happened so far that is more than de minimis

11   likelihood that the juror, any juror will infer that Mr. Martin

12   listened to that tape.  Frankly -- and Mr. Crowe wants it in.

13   Frankly, when I saw on that exhibit the statement, "I was not the

14   shooter", I didn't infer and don't believe a reasonable person or

15   a reasonable juror would infer from that that Mr. Martin had

16   listened to the tape and was saying, no, the portion of the tape

17   that says whatever was purportedly being quoted there, I didn't

18   say that.  It frankly sounds like a, a false confession or denial

19   of a confession by Mr. Martin.  I don't think it has anything to

20   do with the tape.

21           From the exhibit it looks to me like Detective

22   Niedermeier or Detective Hastings asked Mr. Martin, Were you the

23   shooter, and Mr. Martin said, No, I wasn't the shooter.

24           Now, Mr. Crowe wants that in because he wants the whole

25   exhibit in.  And that's fine.  But I don't infer from that

1    exhibit at all that Mr. Martin listened to the tape.  And

2    certainly, the one answer Detective Niedermeier gave doesn't

3    leave a basis for that.

4          So I think what the jury is going to focus on, frankly,

5    is the tape and the transcript of Mr. Martin's statement, which,

6    as we all know, is totally exculpatory.  Mr. Martin says, I

7    wasn't there, I don't know what you're talking about, there was

8    just these rumors in the street, I had nothing to do with it.

9    And we've already heard the testimony from Detective Niedermeier

10   about the credit card and going to Blade II and all of that.

11         So that's where I am on that.  All right.  Briefly.

12         MR. MARTIN:  I understand your ruling.

13         THE COURT:  Yes.

14         MR. MARTIN:  When we get to closing argument, if you

15   don't, if you haven't struck that testimony, what is Mr. Harding

16   get to say about it?

17         THE COURT:  Nothing.

18         MR. MARTIN:  And what do I say?

19         THE COURT:  About what testimony?

20         MR. MARTIN:  The stuff that was on the bottom of that.

21         THE COURT:  Mr. Harding's not going to mention it.

22         MR. MARTIN:  I hope that's right, Your Honor.

23         THE COURT:  He's absolutely not going to mention it.

24         MR. MARTIN:  Mr. Crowe has another point.

25         THE COURT:  Go ahead, Mr. Crowe.

1            MR. CROWE:  Yes, Your Honor.  If matters go as they now

2     appear to be headed, the jury's going to learn in about 15

3     minutes that the tape was played for Mr. Martin because that is

4     part --

5            THE COURT:  How?

6            MR. CROWE:  Because that was part of the question and

7     answer session on the tape is going to be played.

8            THE COURT:  That's been redacted.

9            MR. MARTIN:  No, it hasn't.

10           MR. CROWE:  No, it has not.

11           THE COURT:  Then what's been redacted?

12           MR. CROWE:  What's been redacted is the identification,

13    is the identification of Bo, the tentative identification of Bo.

14           THE COURT:  Which transcript is it?

15           MR. CROWE:  We're talking about the transcript behind

16    Tab Eight at Page Five.  Apparently, I just have the old

17    transcript.

18           THE COURT:  Right.

19           MR. CROWE:  I guess because I wasn't given the new one.

20           THE COURT:  Well, it was in the books that were handed

21    out yesterday.

22           MR. CROWE:  Not in mine, Your Honor.

23           MR. HARDING:  The books were handed out a couple of

24    days ago with the old transcript in it.  The Court then made that

25    ruling about how I had to make a more extensive redaction.

1          THE COURT:  Right.

2          MR. HARDING:  I sent my paralegal down to replace all

3     the transcripts in the transcript books.

4          THE COURT:  She didn't have their books.

5          MR. HARDING:  She didn't have their books, right.

6          THE COURT:  So they didn't get the revised transcript.

7     You got to leave your books here, Mr. Crowe.

8          MR. MARTIN:  They could have put the paper on our desk.

9          THE COURT:  I agree.  Do you have copies now?  Mr.

10    Harding, could we get them copies?

11         MR. HARDING:  We have lots of extra copies of all the

12    transcript books.

13         THE COURT:  They're not extra if the defense lawyers

14    don't have them.

15         MR. HARDING:  I'm going to have somebody make copies of

16    just this transcript because I don't want to --

17         THE COURT:  Right.  Of course.

18         MR. HARDING:  -- kill trees by handing out whole new --

19         THE COURT:  Maybe what you can do, Mr. Harding, look,

20    let's do this.  They can mark up the existing, they don't need

21    full copies.

22         MR. KURLAND:  I would like a copy.

23         MR. MARTIN:  I don't need one, Your Honor.

24         THE COURT:  Just take a pen and you line out the part

25    that's been redacted.  That's all.  It was about a page and a

1   half.  That's all.  All right?  During the recess, Mr. Harding

2   can make a copy or two available for any of counsel who need to

3   check it against the one that's in your book.

4           All right.  It's still fun, ladies and gentlemen.

5   Let's stand in recess for 15 minutes.

6           MR. HARDING:  Your Honor, may my agent check the

7   jurors' transcripts?

8           THE COURT:  Please.  Please do so.  Thank you.

9           (Recess.)

10          MR. KURLAND:  Your Honor, when the defendants arrive,

11  can I put one more brief objection on the record?

12          THE COURT:  I think you can do it now, Mr. Kurland,

13  with regard to a legal matter.

14          MR. KURLAND:  Your Honor, in light of the way the Court

15  handled the last issue and also in light of the manner in which

16  Officer Niedermeier's testified concerning, able to opine even

17  though there was a limiting instruction given concerning what he

18  considers to be a false, an alibi which he doesn't believe,

19  there's another Bruton issue with respect to the same transcript

20  of the Martin interview when Hastings asked the question -- I'm

21  looking now on Page Five --

22          (Defendants enter the courtroom.)

23          MR. KURLAND:  -- which is right above the redaction

24  stuff.  Did people implicate certain people?  And then Martin

25  responds, "Oh, yeah, yeah, implicated me, Shawn and Bo.  First it

Case 1:04-cr-00029-RDB   Document 685   Filed 06/12/09   Page 63 of 220

1  was Bo and then a couple days later it was me and Goo, and it was

2  a lot of us."

3          Given that that's going to be, Officer Niedermeier's

4  going to testify to that, too, as a false alibi, therefore this

5  also raises a Bruton problem and I believe should be redacted.

6          THE COURT:  Well, first of all, I don't expect to have

7  Detective Niedermeier explain Martin's statement at all, unlike

8  Mr. Mitchell's statement as to which it seemed to me, and thus my

9  rulings on Mr. Lawlor's many objections, that the jury could

10  benefit perhaps from Mr. Niedermeier's elaboration on his

11  understanding of what Mitchell was saying because it was

12  gibberish.  Mitchell's statement is absolute gibberish.

13          He goes from third person to first person.  He claims

14  he's talking on two different phones.  He talks in the first

15  person.  Then he talks in the, in the present.  And then he talks

16  in the past.  So the jury needed Niedermeier's assessment, for

17  whatever it's worth, as to what in the world Mitchell was

18  claiming.

19          I don't expect to go through that with this statement.

20  It's perfectly clear.  I wasn't there.  People were talking.

21  There were rumors.  They said we did it.  We didn't do it, had

22  nothing do with it.  End of discussion.  Niedermeier doesn't have

23  to explain any of that.

24          MR. KURLAND:  Well, we would still object on Bruton

25  grounds but if the Court --

Case 1:04-cr-00029-RDB   Document 685   Filed 06/12/09   Page 64 of 220

1              THE COURT:  All right.  I'm sorry.  I'm just trying to

2      be clear.  What are you objecting to?

3              MR. KURLAND:  Well, this, again, it helps a little bit

4      but it's not going to withdraw the objection.

5              THE COURT:  Okay.  What is the objection?  What is the

6      objection to?

7              MR. KURLAND:  The objection is that this is also going

8      to be construed, I guess not by --

9              THE COURT:  What is "this?"  I'm sorry.

10             MR. KURLAND:  The language in Mr. Martin's statement.

11             THE COURT:  What language?

12             MR. KURLAND:  On the top of his statement, Page Five.

13             THE COURT:  That people implicate certain people.

14             MR. KURLAND:  Yes.

15             THE COURT:  That's what you're referring to.  And

16     answer is, Oh, yeah, yeah, implicated me, Shawn and Bo.  First it

17     was Bo.  Then a couple of days came along.  Come along.  Then it

18     was me and Goo and it was a lot of us.

19             Question:  Just all the rumors on the street?  Answer:

20     Yes.  Do you know anything about this incident?  No.

21             MR. KURLAND:  This is in response to police

22     interrogation.  The government is going to argue that this is

23     false exculpatory evidence.

24             THE COURT:  And it's only admissible against Mr.

25     Martin.  I've already told the jury that statements by any

1    defendant to law enforcement are only admissible and may only be

2    considered against the defendant who gives the statement.

3          MR. KURLAND:  Your Honor, Bruton itself, though, says

4    sometimes a limiting instruction is just insufficient because the

5    government's going to argue carte blanche that these are all,

6    these are all alibis that are not worthy of belief.

7          THE COURT:  No.  They're not alibis.  It's Mr.

8    Martin's -- well, I don't know.  "I wasn't there" is not an

9    alibi.  I wasn't there is I didn't do it.  That's nothing more

10   than a not guilty plea.  There's no --

11         MR. KURLAND:  Are you going to instruct the jury, if

12   the jury's instructed of that, that this is equivalent to a not

13   guilty plea and therefore can't be considered as evidence, I

14   don't have a problem with that.

15         THE COURT:  Okay.  I'm sorry, Mr. Kurland.  I'm

16   confused.  I have already told the jury, as I just said to you,

17   I'm sorry to repeat myself, a statement by a defendant to law

18   enforcement may only be considered by the jury as evidence

19   against that defendant.  Mr. Mitchell's statement cannot be

20   considered as evidence against the other three.  Mr. Martin's

21   statement cannot be considered as evidence against the other

22   three.  I've told the jury that.

23         MR. KURLAND:  Your Honor, I understand that.  But I

24   believe in Bruton itself the Supreme Court said, though, that

25   there are certain circumstances in which even such a limiting

1    instruction is inadequate.

2              THE COURT:  I agree.  What I'm asking you now is to

3    tell me what is inadequate about that?

4              MR. KURLAND:  The government --

5              THE COURT:  In the statement?

6              MR. KURLAND:  The government is going to use this

7    evidence and argue far more than simply it's the equivalent of a

8    not guilty plea.

9              THE COURT:  No.  The Government's going to say this is

10   a false exculpatory.

11             MR. KURLAND:  It's a false exculpatory --

12             THE COURT:  Because when you hold this up against all

13   the other evidence, it's shown that Mr. Martin lied.  That's what

14   the government's going to say.  And it also shows that Mr. Martin

15   knows Goo, knows Bo.

16             MR. KURLAND:  That's uncontroverted.

17             THE COURT:  Well, a lot of this case is uncontroverted,

18   Mr. Kurland.

19             MR. KURLAND:  Judge, I understand that.  But it's not

20   so much that if there are issues, or to the extent that the

21   government can permissibly put in evidence and tons of evidence

22   as to the defendants knowing each other, I don't have a problem

23   with that.  They don't obviously need this piece of evidence to

24   prove that.  But in addition to that, the fact that it's going to

25   be used as a false exculpatory, it therefore fairly directly

1    becomes a kind of a Bruton problem because it's essentially, it's

2    a false exculpatory which includes as part of the false

3    exculpatory a statement by a defendant who I'm not going to be

4    able to cross examine that implicates Mr. Gardner, and we think

5    that is a Bruton problem.

6              THE COURT:  I don't think the statement implicates Mr.

7    Gardner.  The rumors that the statement mentions implicates Mr.

8    Gardner.

9              Mr. Mitchell, Mr. Martin's not saying a word here that

10   implicates Mr. Gardner.  Not a word.  If anything, Mr. Martin's

11   statement gives the benefit of the denial to the other

12   defendants.

13             MR. KURLAND:  Well, that's --

14             THE COURT:  When he says, when Mr. Martin says, They

15   put me in it, they put Bo in it, they put Goo in it, what he's

16   saying is these were false rumors circulating in the community

17   and they're all false.  I mean, he doesn't come right out and

18   say, Mitchell didn't do it or Goo didn't do it, but the clear

19   implication of the statement is, I wasn't there, I know Goo, I

20   know Bo, and these people are just talking about us.

21             MR. KURLAND:  That's correct.  But as we know, the

22   government's going to argue that the entire statement is false

23   and, therefore, they're going to argue that, in fact, all three

24   are involved.  Because it's just not, the rumors just happened to

25   match up with three out of the four people who are sitting right

1    here.  It's not like there's a bunch of other people.

2            It would be a different story if the statement had

3    mentioned, you know, other names of people that aren't here.

4            THE COURT:  Okay.  I think I have your objection.  It's

5    noted.

6            MR. KURLAND:  And I take it it's --

7            THE COURT:  Overruled.

8            MR. KURLAND:  Thank you, Your Honor.

9            THE COURT:  May I see the new exhibit, please?  Or you

10   can put it on DOAR, Mr. Harding.  Everybody's got good

11   transcripts now?  Good.  Okay.  Excellent.  Mr. Crowe?

12           MR. CROWE:  Yes, Your Honor.  During the break, I

13   noticed that there was a portion of the transcript that had been

14   redacted which I did not think should be redacted.  I'm referring

15   to the transcript of my client's statement.  It's two lines on

16   the beginning of Page Six.  And I gave Ms. Arrington a copy.

17           THE COURT:  Yeah.

18           MR. CROWE:  The language which has been taken out.

19           THE COURT:  Why did the government think that was okay

20   to do?  Is it because we just didn't discuss it the other day?

21           MR. CROWE:  Your Honor, to be honest with you, I can't

22   recall what was discussed.  I've had that problem the last couple

23   of days.

24           THE COURT:  Well, I remember, I seem to recall, Mr.

25   Crowe, that you wrote a letter --

1           MR. CROWE:  Yes.

2           THE COURT:  -- in which you brought this up.  And I

3    thought that when we spent all that time the other day talking

4    about what needed to be done with the transcript, that we were

5    clear.  And I agree with you, that should not have been redacted.

6    But it seems to me that when you cross examine Niedermeier, you

7    can ask him, by the way, part of that tape was redacted but in

8    part of that tape that was redacted, you asked or Hastings asked

9    Mr. Martin whether he was there and Mr. Martin said no, correct?

10          And I would permit you to elicit that evidence since

11   it's no longer in the transcript.  I understand you would rather

12   have it in the transcript and you certainly would rather have it

13   on the tape.  But I would rather not delay things.

14          MR. CROWE:  Okay.

15          THE COURT:  I think we just failed to address the issue

16   the other day because our attention was focused so much on Bo's,

17   the identification of Bo's voice on the tape.

18          MR. CROWE:  Thank you, Your Honor.  Could the Court

19   have that, the portion that I gave to Court marked as a hearing

20   exhibit or a motion exhibit or something so it's part of the

21   record?

22          THE COURT:  I'm not sure I know what -- you mean the

23   unredacted page?  The less redacted page?

24          MR. CROWE:  The less redacted page with the language

25   circled, yes.

1          THE COURT:  Can I just read it into the record?

2          MR. CROWE:  That would be fine, Your Honor.

3          THE COURT:  Okay.  What we've just been discussing is

4    Page Six of Mr. Martin's statement.  And by the way, it will be

5    obvious, I think relatively obvious, to the jury, I'm not sure

6    how the tape will sound, but it will be fairly obvious to the

7    jury when they use the transcript that something's been left out.

8    And thus, I think it's perfectly appropriate for you to elicit

9    this testimony from Detective Niedermeier by pointing out what I

10   think is going to be pretty obvious, and that is certain things

11   were left out of the tape, if you want to say by order of Judge

12   Davis or whatever you want to do.

13          But here's the exchange that Mr. Crowe has been given

14   permission to elicit from Detective Niedermeier and which he

15   wanted left in the tape and the transcript.

16          Question by Hastings:  You were not there at that time?

17   Answer by Martin:  I was not there.

18          MR. CROWE:  Yes, Your Honor.

19          THE COURT:  Okay.

20          MR. CROWE:  And I certainly have, if Detective

21   Niedermeier is on cross examination by the time we break for

22   lunch, I think Mr. Harding should be allowed to discuss that one

23   item with him.

24          THE COURT:  Sure.  Sure.  By the way, on that question,

25   has anything changed from last evening?  When we left last

1    evening, I think we were in a situation where Mr. Martin wanted

2    to go forward with his cross today and I wasn't sure about Mr.

3    Kurland.

4              MR. KURLAND:  No, I would like to wait, to defer

5    until --

6              THE COURT:  Okay.  And Mr. Crowe?

7              MR. CROWE:  We've decided to go forward.

8              THE COURT:  So you're going to go forward today.

9              MR. CROWE:  I mean, depending on what he says.  But I'm

10   99% certain we're going to go forward.

11             THE COURT:  Okay.  So I think where we are, Mr. Hanlon,

12   is we'll, have you agreed which one of you will go first?  Okay.

13   So Mr. Martin, assuming that the direct concludes, Mr. Harding,

14   within the next 20 minutes or so?

15             MR. HARDING:  Yes, Your Honor.

16             THE COURT:  All right.  So Mr. Martin will --

17             MR. HARDING:  Maybe more like a half hour.  I've still

18   got to get through that whole chart of the telephone contact.

19             THE COURT:  That's right.  Okay.  So Mr. Martin will

20   start after lunch.  And maybe we won't even complete the direct

21   until after lunch.

22             But Mr. Martin will start with Detective Niedermeier.

23   And then Mr. Crowe.  How long do you expect to be, Mr. Martin?

24             MR. MARTIN:  Not long, Your Honor.

25             THE COURT:  Mr. Crowe?

1          MR. CROWE:  Ballpark, 30 minutes.

2          THE COURT:  Okay.  So Mr. Hanlon, I guess you're just

3    going to have to keep your witnesses hanging around.

4          MR. HANLON:  That will be fine, Your Honor.

5          MR. LAWLOR:  Judge, one quick thing.  Could you just

6    tell the jury that some of us are going to pick up cross with the

7    detective on a later date?

8          THE COURT:  Sure.  I may not have to do that because we

9    may get to the end of the day with Niedermeier still on the

10   stand.

11         MR. LAWLOR:  From your lips to God's ears, Your Honor.

12         THE COURT:  All right.  You can have Detective

13   Niedermeier come back.

14         MR. HANLON:  Your Honor, just in terms of today's

15   schedule, I am telling the agent, at this point it's probably

16   safe to say I don't think Darius Spence will be making it in

17   today.  So I've just got some police witnesses.

18         THE COURT:  That's great.  In fact, Mr. Hanlon, as you

19   well know, I actually have a sentencing with you scheduled at

20   4:30.

21         MR. HANLON:  I seem to have that on my calendar, Your

22   Honor.

23         THE COURT:  So we'll break a little bit early.

24         (Witnesses enters the courtroom.)

25         THE COURT:  All right.  We'll have the jury.  I think

1    we can all use the week off next week.

2              Are you going to go back to that exhibit, Mr. Harding?

3              MR. HARDING:  No.

4              THE COURT:  Good.

5              (Jury enters the courtroom.)

6              THE COURT:  Good afternoon, ladies and gentlemen.

7    We're ready to continue.  Mr. Harding, whenever you're ready.

8    BY MR. HARDING:

9    Q    Thank you, Your Honor.  Detective Niedermeier, let me show

10   you Government Exhibit W-65.  Did you make a tape of a statement

11   given by Mr. Martin that day, April 17th, 2002?

12   A    Yes.

13   Q    And W-38A, is that a transcript that was prepared by someone

14   in the employment of the police department based on the tape

15   recording?

16   A    Yes.

17   Q    At this time, Your Honor, I would like to play the tape,

18   which is at Tab Eight in the transcript book.  And if I may,

19   Detective, were there a couple of places in this transcript when

20   you reviewed it where the transcribers appeared to make a minor

21   mistake?

22   A    Yes.

23   Q    Okay.  I'll try to flag those spots when we get to them.

24              (Tape played.)

25   Q    Detective Niedermeier, at the, toward the bottom of Page 4,

1    when Mr. Martin says, "Um, I really, I didn't know from what I

2    heard", did you, did you think the transcriber left out a phrase

3    right there?  Did it say "from what I heard on the streets?"

4    A    Yes.

5    Q    Okay.  And do you remember the other day when you were

6    testifying and we looked at the brochure from the funeral of the

7    Wyche brothers?

8    A    Yes.

9    Q    Do you remember the name Claudus being in that --

10   A    Yes.

11   Q    -- obituary?  Okay.  Now, Detective Niedermeier, was Mr.

12   Gardner also locked up approximately on April 17th?

13   A    Yes.

14   Q    Do you remember what for?

15   A    Violation of probation.

16   Q    And do you remember how long he stayed locked up for?

17   A    It was a short period of time.  A day or two.

18   Q    Do you know who Andre Noel is?

19   A    I do.

20   Q    Did you interview him in connection with this case?

21   A    Yes.

22   Q    And did you investigate and submit a request for a

23   fingerprint comparison for Andre Noel?

24   A    Yes.

25   Q    Did you get any information as a result of your

1    investigation that furthered your investigation?

2    A    No.

3    Q    In your notes about the statement that Mr. Martin gave to

4    you on April 17th, did he give you an alibi and an alibi witness

5    that day?

6    A    Yes.

7    Q    And was the alibi witness named Lakeisha McCoy?

8    A    Yes.

9    Q    Did you later pick her up and take a tape recorded statement

10    from her?

11    A    Yes.

12    Q    Did you also get faxed records and a movie theater receipt

13    relating to that?

14    A    Yes, I did.

15    Q    Okay.  I have here some additional exhibits.  This is

16    Government Exhibit W-30.  Can you tell us what this is,

17    Detective?

18    A    It's a copy of the credit card receipt from the Owings Mills

19    movie theater dated 3/24/02.

20    Q    Okay.  You say credit card receipt.  Is this the, is this

21    something the movie theater hands out to somebody who buys a

22    ticket?

23    A    No.  This is, if you pay with a credit card, they swipe your

24    card, this is printed out.  And then you sign at the bottom

25    acknowledging payment.

1    Q    Okay.  And what is the time on here indicated next to the

2    date 3/24/02?

3    A    9:41 p.m.

4    Q    And can you tell us, can you make out the signature on the

5    signature line?

6    A    Appears to be Shelly Martin.

7    Q    Is the name actually printed out here?

8    A    Yes.

9    Q    Okay.  Did you also send a subpoena to the credit card

10   company -- sorry.  Was this something that you obtained by

11   subpoena from the credit card company or did you get this from

12   the movie theater?

13   A    No.  I actually responded out to the movie theater and went

14   through the receipts.

15   Q    Okay.  So W-30 was from the movie theater.  Let me show you

16   W-63 and ask you if you recognize what this is.

17   A    Yes.  That's a copy of a fax I received in reference to a

18   subpoena for Shelly Martin's credit card information.

19   Q    Okay.  And again, does it contain, you've actually

20   highlighted or someone has highlighted an entry here on the first

21   page.  Can you read what it says?

22   A    24 March, General Cinema, Owings Mills, Maryland.  I can't

23   read the amount.

24   Q    Can you read it now?

25   A    No.

1    Q    I'm going to help you out.

2    A    $16.

3    Q    Okay.  And whose account is this?

4    A    Shelly Martin.

5    Q    Did you also learn what time the last showing of that movie,

6    Blade II, was at the movie theater on the night of March 24th,

7    2002?

8    A    Yes.

9    Q    Who told you?

10   A    Lakeisha McCoy and the manager I spoke to the day I

11   responded out there.

12   Q    What did they tell you?

13   A    Their last showing on that Sunday night would be 10 p.m.

14   Q    And you say that's what Lakeisha McCoy told you, also?

15   A    Yes.  She also told me that.

16   Q    Okay.  What did Mr. Martin tell you?

17   A    He told me that it was a 10:30 showing.

18   Q    Okay.  Also like to show you Government Exhibit W-31.  This

19   appears -- sorry -- appears to be another faxed document.  Was

20   this something that was faxed to you by the movie theater in

21   Owings Mills?

22   A    Yes.

23   Q    And can you tell us what it is?

24   A    I requested a copy of a total run time for the movie, Blade

25   II.  And this is in response to that.

1    Q    And what is the total run time of the movie, Blade II?

2    A    108 minutes.

3    Q    So would that be one hour and 48 months?

4    A    Yes, sir.

5    Q    Did you measure the distance between, or measure how long it

6    takes -- first of all, did you measure the distance between the

7    movie theater and the location where the Wyche brothers were

8    murdered on East Wabash Avenue?

9    A    Yes.

10   Q    How far is it?

11   A    11.2 miles.

12   Q    And did you also undertake to figure out how long it would

13   take to drive that distance on a Sunday night?

14   A    Yes.

15   Q    How long does it take?

16   A    19 minutes.

17   Q    How did you reach that determination?

18   A    Actually, I timed it twice.  Once on a Friday afternoon in

19   heavier traffic traveling at a regular rate of speed.  It was 27

20   minutes.  Then went back a second time, late on a Sunday night,

21   and once again starting out at the Owings Mills movie theater,

22   drove to the location.

23   Q    Okay.  And how long was, how much time did it take you on

24   Sunday night?

25   A    On Sunday night it was 19 minutes.

1    Q     And what, again, did you determine was the time of the

2    murder in this case?

3    A     Between 12:33 a.m. and 12:38 a.m.

4    Q     So let me just ask you, then.  And I'm not trying to

5    challenge your skill with mathematics.  But if the movie lasted

6    one hour and 48 minutes and began at 10:00, what time would it

7    have ended?

8                 MR. CROWE:  Objection.

9                 THE WITNESS:  At 11:48.

10                THE COURT:  Overruled.

11   BY MR. HARDING:

12   Q     And if the movie ended at 11:48 and someone then traveled to

13   the location on East Wabash Avenue late on a Sunday night, how

14   much would, what time would they arrive there?

15   A     Approximately 12:07.

16   Q     In 2003, Detective Niedermeier, did you talk to two

17   incarcerated prisoners by the name of Christopher and Felton

18   Byrd?

19   A     Yes.

20   Q     As a result of those interviews, did you submit a

21   fingerprint comparison for your murder as well as the murder of

22   Detective Ron Berger?

23   A     Yes.

24   Q     That being the Oliver McCaffity and Lisa Brown double

25   homicide?

1    A    Correct.

2    Q    And who did you ask that a fingerprint comparison be made

3    with?

4    A    The defendant, Shelton Harris.

5    Q    Okay.  What I want to do now, Detective, is to ask you about

6    the toll analysis you did for this case.  And I'm going to call

7    your attention, first of all, to Government Exhibit W-66 and ask

8    you if you can identify what this is.

9    A    It's basically a breakdown of phone calls made by

10   individuals involved in this case from March 24th to the early

11   morning hours of March 25th, 2002.

12           THE COURT:  Mr. Harding, would you take it out of the

13   envelope, please?

14           MR. HARDING:  I also have copies for the jurors, Your

15   Honor, if I may provide them to Ms. Arrington to hand out.

16           THE COURT:  Certainly.  Or Mr. Hanlon can hand them

17   out.  While he's doing that, ladies and gentlemen, let me

18   instruct you as follows.  This exhibit, this chart, each of you

19   will have a copy of it, has been prepared by the government to

20   aid your understanding of Detective Niedermeier's testimony which

21   he'll be offering to you in a moment.

22           As you can see, the exhibit, among other things,

23   contains photographs of the defendants in this case.  And those

24   photographs are associated with little images of telephones.  And

25   the detective will explain what this exhibit is intended to show.

1          What is important for you to appreciate, and I'm sure

2     you do, but it's important that I instruct you, that there is no,

3     this exhibit in no way, with the, I guess, two exceptions that

4     the witness will talk about, the content of any of these

5     conversations will not be presented to you.  What these records

6     purport to show is connections between certain telephones and

7     certain other telephones.  This exhibit does not show who made a

8     particular telephone call.

9          Now, you are entitled to consider all the evidence in

10    the case and draw reasonable conclusions as to who you find

11    likely made a particular phone call and, ultimately, if you so

12    find, who, beyond a reasonable doubt, made a particular phone

13    call.  But the mere fact that the photographs of the defendants

14    appear on this exhibit, while that may be of some assistance to

15    you in following the testimony, should not be taken by you as any

16    proof that any particular defendant made any particular phone

17    call as depicted in this exhibit.

18          Okay.  You may proceed, Mr. Harding.

19    BY MR. HARDING:

20    Q    Detective, first of all, is this chart something that you

21    and Task Force Officer Benson prepared together?

22    A    Yes.

23    Q    Have you, for preparing this, selected what you view as

24    pertinent calls out of a much larger volume of calls that were

25    made using these cell phones that night?

1    A    Yes.

2    Q    In other words, you haven't, for example, the first phone

3    listed on here is the one you've talked about a good deal in the

4    course of your testimony, Willie Mitchell, the phone associated

5    with Willie Mitchell that had the number 443-418-6204.  You

6    haven't included on this chart all of the calls that Mr. Mitchell

7    made between 4:07 p.m. and 12:44 a.m. the next morning, is that

8    correct?

9    A    Correct.

10   Q    What calls have you included on here, from Willie Mitchell?

11   A    Any calls between the phone associated with Mr. Mitchell and

12   the phone associated with Darryl Wyche, any of the other

13   codefendants or residents that they may be associated with.

14   Q    Okay.  Let me start, then, with that first call that you

15   have listed up here in the upper left-hand corner.  It says that

16   the call was placed at 4:07 p.m.  Is that right?

17   A    Yes.

18   Q    And it lasted 14 seconds.  Is that right?

19   A    Yes.

20   Q    How do you associate this number 443-418-6204 with Willie

21   Mitchell, first of all?

22   A    The phone is listed to Jaquetta Smith, Mr. Mitchell's

23   girlfriend.  Additionally, when he was interviewed, he admitted

24   that he was using the phone on that date.

25   Q    To call whom?  In his statement to you, whom did he say he

1    was using that phone to call?

2    A    Darryl Wyche.

3    Q    And was that phone actually recovered?

4    A    It was.  It was also recovered him, from the vehicle Mr.

5    Mitchell was in on April 1st, 2002.

6    Q    Okay.  So Mr. Mitchell was incarcerated from that time until

7    the time he gave his statement to you on April 17th of 2002, is

8    that correct?

9    A    Correct.

10   Q    And so two and a half weeks past.  And he knew that that

11   telephone was in police custody all that time, is that correct?

12   A    Yes.

13   Q    Okay.  Now, the telephone call was listed as having been

14   made to S. Harris's home, 410-669-6731.  Is that correct?

15   A    Correct.

16   Q    How is it that you associate that phone with Shelton

17   Harris's home?

18   A    A subpoena revealed that that came back to 205 North Amity

19   Street, an address Mr. Harris used multiple times, along with

20   that phone number as a contact number, as well as his listing for

21   his MVA, Motor Vehicle Association, his license.

22   Q    Okay.  And to whom was the phone actually subscribed?  In

23   whose name was the phone listed?

24   A    Arlene Williams.

25   Q    And who is that?

1    A    His mother.  Mr. Harris's mother.  I'm sorry.

2    Q    Okay.  And calling your attention again to Ron Berger's

3    double homicide, the Oliver McCaffity/Lisa Brown double homicide.

4    Do you recall that there was a list of phone numbers extracted

5    from Oliver McCaffity's cell phone after that murder?

6    A    Yes.

7    Q    Did this number appear on that list of --

8    A    It did.

9    Q    And do you remember how it was listed in the, in the list?

10   A    Yes.

11   Q    How?

12   A    It was listed as Bo's little nig.

13   Q    Okay.  Now, let me ask you something else.  On some of these

14   phone calls you have entered connected or voice mail.  On the

15   call, the very first call from Willie Mitchell, there's no

16   indication as to whether it was connected or went to voice mail

17   or what.  Is that correct?

18   A    Correct.

19   Q    Why is that?

20   A    That phone call was from the six -- excuse me -- the 6204

21   number was to a land line, a house phone.  And there's no record

22   on a house phone or land line unless that is a long distance

23   call.  So there's no, no way to retrieve information called

24   directly to a house phone unless it's from a long distance

25   number.

1    Q    Okay.  So all you know is that it lasted 14 seconds, is that

2    correct?

3    A    Yes.  The way we know that is looking at the records for

4    6204, you can see a call's placed and the duration of the call

5    was 14 seconds, and the number that the call was placed to.

6    Q    Okay.  Now, you would have no way of knowing, obviously, if

7    Mr. Mitchell and Mr. Harris met up or joined up after this call,

8    would you, Detective?

9    A    No.  No.

10   Q    Okay.  Let's go to the second call on your list, which is

11   listed as having been made from a phone associated with Shelly

12   Wayne Martin, 443-838-1933.  How do you associate that number

13   with Shelly Wayne Martin?

14   A    That phone is registered to Mr. Martin.  Also, a copy of the

15   bill in his name was recovered at Two Cree Court, his residence,

16   along with being listed, I believe, in --

17   Q    Joyce Martin's phone book?

18   A    Yes, Joyce Martin's phone book.

19   Q    And it's listed as, I mean, this indication here is that

20   there were five calls made in rapid succession over an eight

21   minute period roughly to Willie Mitchell's home, is that correct?

22   A    Correct.

23   Q    And how do you associate 410-254-5743, how do you associate

24   that with Willie Mitchell's residence?

25   A    That phone number comes back to 4916 Gilray Drive, an

1    address Mr. Mitchell used for a home address.  I believe the

2    registered owner was Jaquetta Smith's mother.

3    Q    Okay.  Did Jaquetta Smith reside there as well?

4    A    Yes.

5    Q    And are you aware that other telephones associated with Mr.

6    Mitchell frequently called that home number?

7    A    Yes.

8    Q    Okay.  Can you run through these five calls and tell us what

9    you can about those?

10   A    They're calls from, made in rapid succession, suggesting to

11   me that no connection was made, that nobody picked up on the

12   other end.  Might have gone to voice mail.

13   Q    Okay.  But again, it's to a residential phone and so you

14   have no way of knowing whether there was a connection or a voice

15   mail, is that correct?

16   A    Correct.

17   Q    Okay.  Third entry on here.  Back to Willie Mitchell's

18   443-418-6204 number.  Immediately following the last of those

19   calls from Mr. Martin to the phone associated with Willie

20   Mitchell's residence, there's a call that's indicated as having

21   connected to Shelly Wayne Martin, is that correct?

22   A    Yes.

23   Q    And how do you associate the number 443-838-1933 with Shelly

24   Wayne Martin?  Oh, you've just told us that.  We don't have to go

25   over that again.

1           Tell us what that call, tell us about the duration of

2    that call and how you know it was connected?

3    A    The duration of that call was 53 seconds.  With cellular

4    phones, if you place a call to another phone, your time

5    automatically starts, if you're being charged based on the amount

6    of usage, your time automatically starts.

7           When you receive a call on a cell phone, you're not

8    charged until there's actually connection made, you pick up.  If

9    it rolls to, if you don't answer and it goes to your voice mail,

10   you're not charged based on the time being used until you go

11   retrieve your voice mail.  So that's how you can tell if the

12   call's connected.  Plus looking at the duration of 53 seconds

13   indicates that there was some conversation, or a connection made.

14   I'm sorry.

15   Q    Okay.  But what I gather from your testimony that

16   "connected" means essentially that the phone call appears on both

17   the toll records for Willie Mitchell's 6204 cell phone and Shelly

18   Wayne Martin's 1933 cell phone, is that correct?

19   A    Correct.

20   Q    All right.  And that's at 6:19 p.m.

21          Let's go about one hour later to the fourth entry.

22   Tell us what that one shows.

23   A    That's phone call from the phone associated with Mr. Martin

24   to a phone associated with Mr. Gardner.  And I believe it says

25   7:18 p.m.  And it lasted 42 seconds, and it also says connected.

1    Q    And this number that ends in 1241, how do you associate that

2    with Mr. Gardner?

3    A    That was listed in, I believe, two of the Wyche phones as a

4    number for Goo.

5    Q    Okay.  And was that one also in Joyce Martin's phone book,

6    do you recall?

7    A    I believe so, yes.

8    Q    Okay.  All right.  Then let's go about an hour after that.

9    What's the next entry?

10   A    I believe it's 8:17 p.m., a call from the phone associated

11   to Mr. Mitchell to a phone associated with Mr. Martin.  Appears

12   the duration's 38 seconds.  And it also says connected.

13   Q    Okay.  And we've been over both of those phones.  So let's

14   go on to the next call, which is shortly thereafter, 8:30 p.m.

15   Can you tell us about that one?

16   A    A phone associated with Mr. Martin to the same 6204 number

17   associated with Mr. Mitchell.  And that one says voice mail.

18   Duration being, I believe, one minute.

19   Q    Okay.  How do you know that's voice mail again?

20   A    That didn't show up on Mr. Mitchell's toll records.  So at

21   no time did he answer when that phone rang.  It went to his voice

22   mail.

23   Q    Okay.  Let's go to the next call.

24   A    If it's okay, I think it would be easier for me to see the

25   chart --

1          THE COURT:  I was about to say exactly that.  Mr.

2    Harding, can you provide the witness with a hard copy of the

3    exhibit?

4    Q    Certainly.  I'm sorry, Detective Niedermeier.

5    A    Thank you.  Okay.  I'm sorry.  I believe we're on the 8:39

6    p.m. call?

7    Q    Yes.

8    A    That's a phone call associated with Mr. Martin to the land

9    line phone associated with Mr. Mitchell on Gilray.  Lasted two

10   minutes.

11   Q    Okay.  The next one?

12   A    And that would be the phone associated with Mr. Martin, once

13   again to the cell phone associated with Mr. Mitchell at 8:42 p.m.

14   And that once again once goes to voice mail.

15   Q    Okay.  So he called Mr. Mitchell's residence.  And it's

16   listed as having lasted a couple of minutes.  But you have no way

17   of knowing, am I correct, that Mr. Mitchell actually picked up

18   and there was a conversation or it went to voice mail or what, is

19   that correct?

20   A    No.  He could have spoken to another resident there, also.

21   Q    But then immediately thereafter, Mr. Martin tries Willie

22   Mitchell on his cell phone, is that correct?

23   A    Correct.

24   Q    And that goes to voice mail?

25          MR. KURLAND:  Objection.

1      THE COURT:  Overruled.

2      MR. KURLAND:  He don't know who's making the call?

3      THE COURT:  Overruled.  The jury understands, and I

4  will repeat, for ease of communication, ladies and gentlemen, as

5  you have heard, from time to time a witness or an attorney may

6  say Mr. Mitchell's phone, Mr. Gardner's phone, Mr. Martin's

7  phone, Mr. Mitchell's home phone, etc.. As I explained to you,

8  that is for ease of communication.

9      This witness has not and will not testify as to who

10  actually made any of these calls.  He's testifying on the basis

11  of the records and he's testifying on the basis of the evidence

12  that, as Detective Niedermeier has said to you, phones associated

13  with one or the other defendant.

14      It will be up to you, based on all the evidence before

15  you, in accordance with my instructions, to make a finding, if

16  you can, as to who made any of these calls.  But no witness is

17  going to tell you who made a particular call based on this chart.

18  Okay.  Go ahead, Mr. Harding.

19  BY MR. HARDING:

20  Q    Yes.  Thank you, Your Honor.  Okay.  But in any event, what

21  happened was that Mr. Martin, having first tried the residence of

22  Mr. Mitchell, then tried him on his cell phone, is that correct?

23      MR. CROWE:  Objection, Your Honor.

24      THE COURT:  Overruled.

25  A    Correct.  He attempted to look or contact the phone

1    associated with Mr. Mitchell.

2    Q    And that's at 8:42 p.m.?

3    A    Correct.

4    Q    Okay.  Then let's go to about 50 minutes or so later.

5    What's the next entry?

6    A    It's a phone associated with Mr. Mitchell attempting to

7    contact, or contacting phone associated with Mr. Martin at 9:34

8    p.m.  That's a connected call lasting 48 seconds.

9    Q    Okay.  And then shortly thereafter, 16 minutes or so later,

10   or 14 minutes or so later, what's the next entry?

11   A    It's numerous contacts in a row from a phone associated with

12   Mr. Martin to the phone associated with Mr. Gardner at 9:48,

13   9:49, 9:50, 9:51, all lasting one minute.  It's listed as going

14   to voice mail.

15   Q    Is that the last call that went to voice mail or do you

16   know?

17   A    I believe none of those calls ever showed up on Mr.

18   Gardner's, so they all probably went directly to voice mail,

19   charged a base one minute.

20   Q    Okay.  Next.  We are now about 10:38 p.m., another 50

21   minutes has passed.

22   A    And that's a phone associated with Mr. Mitchell, still the

23   6204 number, attempting to contact a phone associated with Mr.

24   Martin twice.  10:38 and 10:39.  And that's listed as going to

25   voice mail.

1    Q    Okay.  And then what's the next entry?

2    A    At 10:42, the phone associated with Mr. Mitchell, once again

3    the 6204, contacts the 5570 number associated with Darryl Wyche.

4    Looks like it's connected for 49 seconds at 10:42 and an

5    additional 40 seconds at 10:43 p.m.

6    Q    Was that one of the phones that was actually recovered from

7    Darryl Wyche's car, that 5570 number?

8    A    Yes.

9    Q    Okay.  Are those the first calls you know of that night

10   between Mr. Mitchell and Darryl Wyche, between phones associated

11   with Mr. Mitchell and phones associated with Mr. Wyche?

12   A    Yeah, that evening it was.

13   Q    Okay.  And then shortly thereafter, very shortly thereafter,

14   what's the next entry?

15   A    Almost immediately.  10:43 p.m., a call lasting a minute and

16   three seconds from the 691-9203 number associated with Mr. Wyche

17   to the 6204 number associated with Mr. Mitchell.

18   Q    So it looks like Mr. Mitchell had a couple of brief

19   conversations with Mr. Wyche, with Mr. Wyche using his 5570

20   number, and then Mr. Wyche called him back on a different phone,

21   is that right?

22            MR. CROWE:  Objection.

23            THE COURT:  Again, ladies and gentlemen, for ease of

24   communication, counsel may refer to a particular person as having

25   made a phone call and spoken to a particular person, but you

1    understand that that is strictly for ease of communication.

2    We're talking about connections between telephones.  Overruled.

3    Go ahead, Mr. Harding.

4    BY MR. HARDING:

5    Q    Okay.  Is that, you can answer the question.

6    A    I believe the answer would be yes.  They made two quick

7    phone calls to the 5570 phone and then a call was placed from the

8    9203 -- or 9203 phone associated with Darryl Wyche back to the

9    620 (sic) phone associated with Mr. Mitchell.

10   Q    Are you familiar with narcotics investigations, Detective

11   Niedermeier?

12   A    I am familiar, yes.

13   Q    Okay.  Have you, have you run into this pattern of some

14   person making a call to somebody on a particular phone and then

15   immediately getting a call back on an another phone?

16   A    Yes.

17            MR. MARTIN:  Objection.

18            THE COURT:  Overruled.

19   Q    Where do you see that, Detective Niedermeier?

20   A    You see that actually throughout the chart involving Mr.

21   Darryl Wyche.  He uses different phones throughout the chart.  He

22   uses the 5570, the 9203, and the 8844.

23   Q    Why?

24            MR. LAWLOR:  Objection.

25            THE COURT:  Overruled.  You may answer.

1    A    People engaged in narcotics activity are pretty savvy the

2    way that the police conduct investigations.  Mr. Wyche had been

3    in the game for quite sometime and, whether justified or not, I

4    believe he had a bit of paranoia and believed if he kept

5    switching the phones it would be more difficult to track his

6    activities, especially if the police were ever to get up on his

7    phone and put a tap on it and listen in.

8    Q    Okay.  And this is the first time we've seen in your chart

9    the 9203 number associated with Darryl Wyche.  Remind us again

10   what telephone that was?

11   A    That was the phone call, or, excuse me, the phone that was

12   not recovered from either Darryl or Anthony Wyche at the scene,

13   or the vehicle.  Additionally, that's the phone call that, that

14   was the phone that placed the call to Irene Magginson's cell

15   phone that was recorded on her voice mail, with the discussions

16   captured.

17   Q    Okay.  And you knew, how did you know that Darryl was using

18   that phone?  If you could remind us just one more time.

19   A    The information provided through the investigation, from the

20   family.

21   Q    Natasha Wyche and Irene Magginson?

22   A    Correct.

23   Q    Also, Mr. Mitchell is calling on his 6204 phone and gets

24   called back on that phone.  Is that the phone that Mr. Mitchell

25   admitted to you he was using to speak to Darryl Wyche that night?

1    A     Yes.

2    Q     Okay.  Next entry.

3    A     That would be the 11:16 p.m., phone associated with Mr.

4    Gardner calling the phone associated with Mr. Martin.  Indicated

5    that's a one minute charge and goes to voice mail.

6    Q     Okay.  Let's go town to the next row.  We're making progress

7    here.

8    A     This would be the 11:18 p.m. call.  This is a connected

9    call, which lasted 56 seconds.  Calls placed from the 6204 number

10   associated with Mr. Mitchell to the 9203 number, once again

11   associated with Mr. Wyche.

12   Q     Okay.  That lasted 56 seconds at 11:18 p.m.  So the next

13   call on your chart is about less than 15 minutes later?

14   A     Correct.

15   Q     Actually, it's slightly over.  It's about 17 minutes later?

16   A     Yes.

17   Q     What, tell us about that one.

18   A     That's a call from the Mitchell phone, 6204, to Shelly Wayne

19   Martin's phone, associated with him.  And that call went to voice

20   mail.  And it was charged at one minute 22 seconds.

21   Q     Okay.  The next call is a couple minutes later.  Tell us

22   about that.

23   A     That's a phone from, associated with Mr. Gardner calling Mr.

24   Martin's phone once again, associated with Mr. Martin.  And that

25   happened at 11:37, approximately two minutes after the last phone

1    call.  That call was connected and two minutes charged to each.

2    Q    Okay.  And then almost immediately after that, what's the

3    next call?

4    A    That's a, the phone associated with Mr. Mitchell, once again

5    contacting the phone associated with Darryl Wyche, the 9203

6    number, still using that number.  And that's a connected call

7    lasting only 34 seconds.

8    Q    Next one?

9    A    That's Mr., the phone associated with Mr. Mitchell again

10   contacting Mr. Martin approximately two minutes after the last

11   phone call.  That call was not connected.  It went to voice mail

12   and was only charged at 12 seconds.

13   Q    Okay.  Next one?

14   A    These are the first calls on the 25th, just after midnight.

15   This call was made at 12:08.  It's from the phone associated with

16   Mr. Mitchell to the same 9203 number associated with Darryl

17   Wyche.  And that call was connected and it lasted one minute and

18   35 seconds.

19   Q    Okay.  And about three minutes later?

20   A    Yeah.  12:11 a.m. and 12:13 a.m., calls were placed from the

21   phone associated with Mr. Mitchell to the phone associated with

22   Mr. Martin.  Neither call was connected.  And the 12:11 call

23   lasted ten seconds and the 12:13 call lasted 11 seconds.

24   Q    Okay.  And then just a couple minutes after that?

25   A    At 12:04 teen -- I'm sorry -- at 12:14 and 12:15 a.m. on the

1    25th, the phone associated with Mr. Mitchell made two, those two

2    calls to the 9203 number associated with Darryl Wyche.  Neither

3    call was connected, listed as voice mail.

4    Q    Okay.  And then very soon thereafter, what's the next entry?

5    A    Approximately three minutes later, the 8844 number

6    associated with Darryl Wyche, that's the first time this is

7    mentioned in this chart, is used to call the 6204 number of Mr.

8    Mitchell's.  And the 12:18 and 12:30, both calls are connected,

9    one lasting 35 seconds.  The 12:30 call lasting three minutes and

10   one second.

11   Q    Okay.  Where was the, was the 8844 phone actually recovered

12   in this case?

13   A    It was, from the vehicle of Darryl Wyche, Darryl and Anthony

14   Wyche.

15   Q    Okay.  All right.  So there's a connected call, two

16   connected calls within about 12 minutes or so, one at 12:18 and

17   one at 12:30, from Mr. Wyche to Mr. Mitchell, is that correct?

18   A    That's correct.

19   Q    Now, is the last one of those calls that lasted three

20   minutes and one second, is that where you testified earlier was

21   the last call known to have been made by Darryl Wyche that night

22   or known to have been made on a phone associated with Darryl

23   Wyche that night?

24   A    Yes.

25   Q    Okay.  What's the next entry?

1    A    Next entry is the Darryl Wyche phone, the 9203, the one that

2    was not recovered.  That phone was used to place a call to Irene

3    Magginson's cell phone, 443-677-2024.  That call's made at 12:38

4    a.m.  It lasts six minutes.  And that's recorded voice mail that

5    I had the FBI recover.

6    Q    And that's the one we listened to earlier, is that right?

7    A    Correct.

8    Q    Okay.  What's the next entry?

9    A    Next entry is a land line call was placed to the 9203 number

10   of Darryl Wyche.

11   Q    Okay.  And it's listed as having lasted three minutes, is

12   that correct?

13   A    That's correct.  That was made at 12:43 a.m.

14   Q    And did you interview Natasha Wyche in this case?

15   A    I did.

16   Q    Did she indicate that she tried to reach Darryl by telephone

17   several times when he didn't show up that night?

18   A    Yes.

19   Q    Is there any indication, I gather your information for this

20   comes from Darryl Wyche's toll records because you said there are

21   no toll records for a residential phone, is that correct?

22   A    That's correct, unless they're a long distance call.

23   Q    Okay.  And so you know it's an incoming call from a

24   residential phone but you don't seem to know what the number is

25   for the residential phone, is that correct, because it's not

1    listed on here?

2    A    That's correct.  It doesn't show on the toll records for the

3    9203 phone associated with Darryl.  Just shows a call lasting

4    three minutes and there's no number associated with it.

5    Q    Okay.  And then what's the final entry on here?

6    A    Final entry is a call made at 12:44 a.m. and that's from the

7    phone associated with Mr. Mitchell, 6204, to the Harris home

8    number, again, the phone number associated with the Harris home

9    number, 410-669-6731, the 205 North Amity which, as I stated,

10   he's used numerous times.

11   Q    Okay.  And calling your attention back to the voice mail for

12   a minute, which is in Tab Number One.  Four minutes and seven

13   seconds into that call roughly, you have on your transcript, Man,

14   I'm calling your house, Shorty.

15   A    That's correct.

16   Q    And when did this, the voice mail message started at --

17   A    12:38 a.m., lasted six minutes.

18   Q    Okay.  All right.  Were there any calls in your toll

19   analysis where Mr. Gardner or Mr. Martin called phones, where

20   phones associated with Mr. Martin and Mr. Gardner called phones

21   associated with Darryl Wyche?

22   A    I didn't, I didn't see any on the 24th or 25th.

23   Q    That's what I mean, just during this time period.

24   A    No.  No.

25   Q    So the only party you have in here as having called Darryl

1    Wyche is Willie Mitchell, is that correct?

2    A     That's correct, on that date.

3    Q     Okay.  Just one moment, Your Honor.

4            THE COURT:  I'll give you more than that, Mr. Harding.

5    We'll take our luncheon recess.  I know you're very near your,

6    the completion of your direct examination.

7            MR. HARDING:  Yes.

8            THE COURT:  You can think about that over the luncheon

9    recess and conclude any matters you need to conclude after lunch.

10           Members of the jury, we'll recess for lunch at this

11   time.  Please leave your note pads, your exhibits, on your chair,

12   on the floor beside your chair.  Have no discussion about the

13   case or about any of the evidence you've heard so far.  Enjoy

14   your lunch.

15           Please be back in the jury room no later than, I'm

16   going to ask you to be back at 2:20 this afternoon, 2:20 in the

17   jury room and we'll resume at that time.

18              The jury's excused and we are in recess until 2:20 p.m.

19              (Luncheon recess.)

20           (Jury not present in courtroom.)

21           THE COURT:  You got a few more, Mr. Harding?

22           MR. HARDING:  Yes.  Very few, Your Honor.

23           THE COURT:  Okay.  Then we'll go to Mr. Martin and Mr.

24   Crowe and then we'll go to Mr. Hanlon.  And we'll conclude not

25   long after four.

1           MR. HARDING:  May I inquire, Your Honor, as to when I,

2    can I do redirect for the two defense attorneys who are going to

3    do cross today and then do redirect again when the other two

4    defense attorneys do it?

5           THE COURT:  I was hoping you would just wait.  Would

6    you rather not?

7           MR. HARDING:  I would rather not, yes, but I don't want

8    to inconvenience the Court or delay.

9           THE COURT:  No.  It's no inconvenience.  If you want to

10   do it, I'll let you do it, sure, given the week long hiatus.

11          MR. HARDING:  I don't expect to take very long with

12   redirect, anyway.

13               THE COURT:  Okay.

14           (Jury enters the courtroom.)

15          THE COURT:  Good afternoon, ladies and gentlemen.  Mr.

16   Harding, you may proceed.

17          MR. HARDING:

18   Q    Thank you, Your Honor.  Just a couple more questions,

19   Detective.  Call your attention again to this chart, W-66.

20   Detective, you notice how for many of these calls, in particular

21   once that go to voice mail, they appear to be round numbers, one

22   minute long exactly or, here's one minute again, one minute

23   again, one minute again.  Do you know, do cell phone companies

24   sometimes round off the time duration of a voice mail message?

25   A    They don't round off.  They round up.

1    Q    Round up.  That's not surprising.  So on this call from

2    Darryl Wyche's cell phone to Irene Magginson's cell phone, the

3    famous voice mail message, it's listed as being six minutes.

4    Could that be rounded up, also, Detective?

5    A    Yes.

6    Q    And --

7            MR. MARTIN:  Excuse me, Your Honor.  Was the question

8    could that be?

9            MR. HARDING:  That was the question, Your Honor.

10           THE COURT:  Yes.

11           MR. MARTIN:  I just want to be clear what the question

12   was.

13           THE COURT:  Certainly.

14   BY MR. HARDING:

15   Q    Also, Detective, on the voice mail that we heard, which is

16   listed in the transcript book at Tab One, there are indications

17   of the amount of time that has passed next to many of these

18   lines.  And it appears to end around four minutes and seven

19   seconds except that the, there's another female automated voice

20   there at the end.  So it appears to run for a little more than

21   four minutes.  Is that correct?

22   A    Correct.

23   Q    Do you know, Detective, is the amount of time that's charged

24   in a toll, a telephone toll when it's a voice mail, does that

25   include more time than the time of the amount of the recorded

1    message that someone leaves on the voice mail?

2    A    Yes.

3    Q    Why so?

4    A    When you place a call and it goes to voice mail, you start

5    getting charged as soon as the phone's picked up, usually there's

6    a, Hello, this is Irene Magginson, I can't get to the phone right

7    now, if you could leave your name, number, any message that they

8    have prior to that.  You're already being charged as soon as that

9    answers, or the call's connected to the voice mail.  So that time

10   would include all of that preamble before the beep and leave your

11   message.

12   Q    Okay.  Now, when you were telling us about Mr. Mitchell's

13   statement to you and Detective Hastings on April 17th, 2002, you

14   testified this morning about how Mr. Mitchell explained that, in

15   his version, at the time of the final call he made to Darryl

16   Wyche, he was watching television, watching Rick Fox, a Rick Fox

17   movie on television, is that correct?

18   A    Correct.

19   Q    Okay.  Now, back to this voice mail for a minute.  When you

20   listened to that tape, as I know you did many times, did you hear

21   the sound of traffic?

22   A    Yes.

23   Q    Like what kind of sounds?

24   A    To me the sounds were of a vehicle traveling down 83, the

25   JFX.

1    Q    Why do you say 83?

2    A    If you've driven on 83, when you drive down, there's, the

3    entire stretch of 83 is a bridge.  So in between each section of

4    concrete there's a little break, so that in the heat or the cold

5    it has room to expand or contract.  If you listen to the tape,

6    you can here the ba-boom, ba-boom, ba-boom, ba-boom, as the

7    vehicle travels down the road.

8    Q    Could you hear the sound of cars going by sometimes?

9    A    I believe so, yes.

10   Q    Is one of those actually indicated on the transcript, just

11   after two minutes and six seconds?

12   A    Yes.

13   Q    Okay.  And again, this final call where Mr. Mitchell spoke

14   to Darryl Wyche, being just shortly before the voice mail

15   message, is that correct?  Lasting three minutes and starting at

16   12:30 a.m.?

17   A    Correct.

18   Q    Also in the recorded voice mail message, calling your

19   attention to 3 minutes and 32 seconds.  There is a sentence that

20   goes, I was fucking like, fuck him, buc-a, buc-a, buc-a, buc-a,

21   buc-a, they, you, they both fucked.  How many buck sounds did you

22   hear on that?

23   A    Five.

24   Q    And how many shell casings were recovered from the Wyche

25   brothers' car?

1    A    Five.

2    Q    Okay.  Now, you've also told us about the call that Natasha

3    Wyche made to Darryl Wyche's phone that evening.  And you even

4    indicated on the chart that you believe that call came through at

5    about 12:43 and 30 seconds, is that correct?

6    A    Correct.

7    Q    And you spoke to Natasha Wyche, did you not, Detective?

8    A    Yes.

9    Q    And you recorded a statement from her?

10   A    Yes.

11   Q    Did she, in her statement, mention hearing something about a

12   reservoir?

13        MR. MARTIN:  Objection.

14        MR. CROWE:  Objection.

15        THE COURT:  Overruled.  You may answer.

16   A    Yes, I believe she did.

17   Q    What did she say, if you recall?

18   A    I believe she told me that she had called trying to get a

19   hold of Darryl and had overheard a conversation about, t it, or

20   throw it in the reservoir.

21   Q    Okay.  Now, let's go back to the transcript of this voice

22   mail at 3 minutes and 57 seconds.  You have written here, You

23   want to go to Druid Hill, is that correct?

24   A    Correct.

25   Q    And is Druid Hill a reservoir, Detective?

1    A    It is.

2    Q    Those are my only questions, Your Honor.  That completes the

3    direct.  Thank you.

4              THE COURT:  All right.  By agreement of counsel, Mr.

5    Martin will proceed with his cross examination.

6              CROSS EXAMINATION

7    BY MR. MARTIN:

8    Q    Good afternoon, Detective Niedermeier.

9    A    Good afternoon, sir.

10   Q    I would tell you not to call me "sir."  My son's the only

11   one who calls me that, but he doesn't even do that any more.

12             You were the, I guess if you were a federal agent you

13   would be called a case agent on the Wyche brothers' murders, is

14   that correct?

15   A    Yeah, I believe that's what the federal definition would be.

16   Q    So you were the, you were the detective in charge of that

17   particular investigation, isn't that right?

18   A    Yes.

19   Q    Okay.  When you arrived at the scene, the victims were still

20   in the front seat?

21   A    Yes.

22   Q    Seat belts were still on them?

23   A    Correct.

24   Q    And the engine was still running?

25   A    No, when I arrived the engine was off.

1   Q    But it had been running when the first responder got there,

2   is that right?

3   A    Yes.

4   Q    Okay.  And at some point in your investigation you decided

5   to run the latent prints from the scene against some of the

6   individuals who are here in this courtroom, is that right?

7   A    Correct.

8   Q    Including Mr. Harris, isn't that right?

9   A    Yes.

10  Q    You didn't get a match for Mr. Harris, did you?

11  A    No, not in this case.

12  Q    You didn't get a match for anybody, right?

13  A    I believe they matched a couple to Darryl Wyche.

14  Q    All right.  Darryl Wyche, the victim?

15  A    Yes.

16  Q    Okay.  And when the crime scene technicians were there, did

17  they vacuum the car?

18  A    No, I don't believe the car was vacuumed.

19  Q    Did they take the carpeting out of the car?

20  A    No.

21  Q    So when they collected samples for DNA, is it only the blood

22  samples that were out on the road that they collected?

23  A    I believe so.  They may have taken samples from the front

24  part of the vehicle, also.

25  Q    But they didn't vacuum the seats or the, or the carpet?

1    A    No.

2    Q    Why not?

3    A    I didn't instruct them to do so.

4    Q    Why not?

5    A    At that point in the investigation, I didn't think it was

6    pertinent.

7    Q    So the match that you got on the blood, was that a DNA match

8    to the Wyche's blood?

9    A    To Anthony Wyche?

10   Q    Yes.

11   A    Yes.

12   Q    And you didn't run DNA samples of the other defendants

13   against anything that you may have found in the car or against

14   that blood, or did you?

15   A    Yes.  The defendants were run against the DNA taken from the

16   samples taken from the road.

17   Q    There were no matches?

18   A    No.

19   Q    And there was no attempt to match up any DNA that might have

20   been found in the car to the DNA of the defendants, isn't that

21   right?

22   A    No.

23   Q    Didn't bother with that?

24   A    No, I didn't do that, no.

25   Q    And there was never any DNA taken from Mr. Harris, isn't

1    that right?

2    A    That's correct.

3    Q    You've heard, you hear in this taped conversation that we've

4    been talking about so much and you've heard it in other parts of

5    this case, the use of the word "Shorty?"

6    A    Yes.

7    Q    Could you tell the jury what your understanding is of the

8    use of the word "Shorty?"

9    A    Used in multiple ways.  Can either be a nickname for

10   somebody in particular or in, I believe in this case they use it

11   more like, instead of Hey, man, or something like that,

12   everybody's Shorty.  You know, they may greet each other that

13   way.

14   Q    And it is not specific to any one individual, is it?

15   A    No, not that I know of in this case.

16   Q    It seems to you like in this case everybody's using the word

17   "Shorty", isn't that right?

18   A    I hear the word "Shorty", yes.

19   Q    And it's a common street name, isn't it?

20   A    I wouldn't label it as common.

21   Q    Well, that's what you told the grand jury, didn't you?

22   A    I don't recall.  I may have.

23   Q    Let me start with your comment about the, the sounds that

24   you heard on the tape being akin to what you might hear if you

25   were going, you said, down the Jones Falls, isn't that right?

Case 1:04-cr-00029-RDB    Document 685    Filed 06/12/09    Page 110 of 220

1    A    Correct.

2    Q    You could also hear them going up the Jones Falls, couldn't

3    you?

4    A    Yes.

5    Q    And you might especially hear it if you were going from the

6    area where these homicides took place to Druid Hill, isn't that

7    right?

8    A    Yeah.  The route you could take would include Jones Falls

9    Expressway.

10   Q    And that's almost that area between where you would get on

11   the Jones Falls and where you get off, it's almost all bridges,

12   isn't it?

13   A    I believe most of 83 is almost all.  But yes, that area is,

14   too.

15   Q    Both lanes.  So you could, you could get that sound if you

16   were going northbound on 83 or southbound on 83, isn't that

17   right?

18   A    Yes, that's correct.

19   Q    Okay.  It's also a sound similar to what you might hear when

20   you see on the highways where sometimes, when you come up to a

21   curve and there are those, I think I've tried to count them

22   before, there are always ten little white lines, and you hear

23   that buh-buh-buh-buh as you're going over them.  You know what

24   I'm talking about?

25   A    Like letting you know that there may be a curve coming up at

1    some point?

2    Q    Yes.  Or maybe they're testing for paint or something.

3    You've seen them on the highways?

4    A    I've seen them.  No, that doesn't sound like that to me.

5    Q    And in response to a question from Mr. Harding a few minutes

6    ago, you talked about how these calls on voice mails are rounded

7    up, correct?

8    A    Yes.  Some companies do that.

9    Q    And the reason for you doing that is to explain why it would

10   be that the tape recording that is roughly four minutes and ten

11   seconds long, if you look at the tape.  Actually says six minutes

12   on the, on the bill, isn't that correct?

13   A    I'm --

14   Q    You're trying to explain the difference between the length

15   of the recording, which is four minutes and, I can actually look

16   at it and tell you, according to the exhibit, according to the

17   transcript that Mr. Harding used, four minutes and seven seconds.

18   But the actual bill and your actual chart that you relied on this

19   morning says that call is six minutes long, isn't that right?

20   A    That's an explanation as to why there's a six minute call.

21   The actual only recorded time was four, I believe 07 or 4:11.

22   Q    4:07.  Right.  And that's why you were talking, also, about

23   the fact that when the call is made, that preamble that leads up

24   to the tone that says, Leave your message, that's also included

25   in the length of the call on the cell phone record, isn't that

1    right?

2    A    On the caller's.

3    Q    So there's not going to be an exact match between the length

4    of the taped conversation that you were listening to this morning

5    and that we were shown and the amount of time it shows on the

6    cell phone bill, isn't that right?

7    A    Correct.

8    Q    When you were testifying, and I can't remember, did you

9    first testify yesterday or the day before?  I can't remember when

10   you were on the stand.  I think it was Tuesday, wasn't it?

11   A    I testified both days.

12   Q    Okay.  When you were testifying, there was a photograph that

13   you were shown and it had a baby seat that, in the photograph,

14   was on the driver's side of the car.

15   A    Correct.

16   Q    And you testified, did you not, that that had been moved in

17   order to get the passenger's body out?

18   A    Correct.

19   Q    And so when you arrived at the scene, was that baby seat

20   behind the passenger seat?

21   A    Yes.

22   Q    And it wasn't in the middle and you couldn't put it in the

23   middle, could you?

24   A    No, I don't believe it would have fit in the middle the way

25   the, the chairs were.

1    Q    In a car that small, you have two seats.  You don't have

2    three, right?  You would have to put it on a hump in the middle,

3    wouldn't you?

4    A    Yes, I guess you would have to in that car.

5    Q    And I think you've surmised from where you found the, from

6    the fact of that baby seat and some other evidence in the case,

7    that there was only one shooter, isn't that right?

8    A    A look at all the evidence suggests to me that there's only

9    one shooter.

10   Q    And part of the reason is that you couldn't have put two

11   people in the back seat with that baby seat there, isn't that

12   right?

13   A    That's part of it, yes.

14   Q    The morning that you got involved with this case you took a

15   trip to the victim's mother-in-law's house, the Magginsons, isn't

16   that right?

17   A    Yes.

18   Q    And as part of what you did there, you had this tape

19   recording and people were listening to it, isn't that right?

20   They actually had the tape recording.

21   A    Well, it was on the phone.

22   Q    Right.

23   A    Yes.

24   Q    And were you there when people listened to it and were

25   trying to identify people on it?

1   A    No.

2   Q    Well, later on, did you have people from the home listen to

3   it in your presence?

4   A    Yes.

5   Q    And of all the people that you had listen to it in your

6   presence, no one identified Mr. Harris, did they?

7   A    Out of the house?

8   Q    People from the house, Magginsons.

9   A    No.

10  Q    You testified this morning, sir, that when you found the

11  bodies, you were, you were asked by Mr. Harding to look at the

12  transcript and listen to the tape, the portion of the tape about

13  checking the pockets, why I didn't check the pockets.  And then

14  the question you were asked was, Did you find cash in the

15  pockets, correct?  Do you remember that?

16  A    Yes, I remember that.

17  Q    You actually found, what?  Six dollars on Anthony Wyche and

18  $200 on Darryl Wyche?

19  A    214.03.

20  Q    214.03?

21  A    On Darryl.

22  Q    So a total $220 between these two guys?

23  A    On their persons.

24  Q    Yes, sir.  Exhibit W-66, which is this chart that you made?

25  A    Yes, sir.

1    Q    It shows a call being made, I guess it's the call that was

2    taped, at 12:38:21, is that correct?

3    A    Yes.

4    Q    And it shows this call being made from a cell phone

5    associated with Mr. Mitchell to an address or a home that Mr.

6    Harris is associated with?

7    A    No.  That's a call associated with Mr. Wyche.  I believe you

8    said Mitchell.

9    Q    I moved to the next call.  Sorry.  This call --

10   A    I'm sorry.

11   Q    This call is a call that is placed, I guess, I was in

12   another case a couple years ago when they had what was called a

13   pocket call.  The cell phone was in a car, in somebody's pocket,

14   and they moved it, it triggered a call.  This call that we've

15   listened to, this recording was made, the presumption is

16   unbeknownst to the person that actually triggered the cell phone

17   that caused the call to be made to Mrs. Magginson's cell phone,

18   correct?

19   A    If, if you're asking me --

20   Q    We're talking the 12:38:21 call.

21   A    -- do I think that they knew the phone was activated?

22   Q    Yeah.  I'm suggesting that you definitely think that they

23   didn't know the phone was activated, right?

24   A    I don't believe that they know that the call was being

25   placed to Ms. Magginson's phone, no.

CROSS EXAMINATION OF NIEDERMEIER BY MARTIN

1   Q    Now, and that call was placed, at least according to the

2   cell phone records, at 12:38:21 a.m., correct?

3   A    Correct.

4   Q    On March 25th?

5   A    Yes.

6   Q    You have as your last call here a call placed from Mr.

7   Mitchell's cell phone at 12:44:06, correct?

8   A    Correct.

9   Q    Okay.  And that's to an address associated with Mr. Harris?

10  That's where Mr. Harris at that point in time was residing with

11  his mother, isn't that right?

12  A    Yes.

13  Q    Anybody else living there at that time, that you know of?

14  A    I believe he had other family members but I'm not positive.

15  Q    Okay.  Now, the transcript, which is Tab One in the book,

16  that you have here, this is a transcript that you put together

17  with Detective Benson?

18  A    Yes, sir.

19  Q    You actually had put together a different transcript at some

20  earlier point in your handling of this case, hadn't you?

21  A    Yes.

22  Q    All right.  Your Honor, may I approach the witness?

23        THE COURT:  Yes.

24  Q    Detective Niedermeier, let me show you this document with

25  the date of May 22nd, 2003.  Does that look right?

CROSS EXAMINATION OF NIEDERMEIER BY MARTIN                117

1    A    That's what it's dated.

2    Q    Do you recognize this?

3    A    Appears to be a transcript of the conversation recorded.

4    Q    And that transcript was prepared at your direction or by

5    you, was it not?

6    A    I don't recall I've ever seen this one.

7    Q    You've never seen this one?  May I approach the witness

8    again?

9         THE COURT:  Yes.

10   Q    You see that document which I've had marked as Defendant's

11   Exhibit One?

12   A    Yes.

13   Q    It appears to be a State's supplemental disclosure in a case

14   entitled State of Maryland versus Shelly Wayne Martin and Willie

15   Mitchell, is that right?

16   A    Correct.

17   Q    And that was your case, wasn't it?

18   A    Yes.

19   Q    And that document is a supplemental disclosure of the

20   criminal case from the State's Attorney of Baltimore City, isn't

21   it?

22   A    Correct.

23   Q    And what is attached to it?

24   A    That's a transmission or the transmission or copy of it that

25   you had just shown me.

1    Q     Thank you.  Your Honor, I believe this is a

2    self-authenticating document.

3              MR. HARDING:  Objection, Your Honor.

4    Q     Have the jury see this transcript and have me play it.

5              THE COURT:  The objection's sustained.

6    BY MR. MARTIN:

7    Q     When I first questioned you about this, sir, you said you do

8    remember that you prepared an earlier transcript?

9    A     I believe there was a transcript that we had at grand jury.

10   Q     You believe it was a transcript you had at grand jury?

11   A     I believe so.  I thought that we had one at grand jury.

12   Q     And you can't say that this is that transcript?

13   A     No.  That one's not familiar to me at all.  That looks like

14   it was prepared by the State's Attorney's Office to me.

15   Q     Okay.  Same case, same call, correct?

16   A     Yes.

17   Q     Your Honor, I'll call someone from the State's Attorney's

18   Office to put that in.  If Mr. Harding makes me do it, that's

19   what I'll do.

20             MR. HARDING:  Objection.

21   Q     When you were questioned this morning, sir, you, you were

22   talking about, yesterday and today, two handwritten statements

23   that you had taken, one a hand, has something in your

24   handwriting, when you questioned Mr. Mitchell after he was

25   arrested?

1    A    My notes?

2    Q    Your notes, yes.

3    A    Yes.

4    Q    And those were notes that you took in Mr. Mitchell's case

5    both before you recorded him and a couple of words at the bottom

6    that you wrote on that sheet of paper while he was actually being

7    recorded, is that right?

8    A    Correct.

9    Q    Okay.  And other than those notes, do you have any other

10   notes from that session with Mr. Mitchell that was not on tape?

11   A    No.

12   Q    Mr. Mitchell was, I think if I recall correctly, brought to

13   homicide about 9 a.m. that day?

14   A    I believe it was around nine.  Nine or ten.

15   Q    And the recording didn't take place until noon?  12:30,

16   actually?

17   A    Correct.

18   Q    All right.  So in those three and a half hours, you at some

19   point took those handwritten notes, correct?

20   A    Yes.

21   Q    Any other notes that you have other than those one-page

22   handwritten notes?

23   A    Still no.

24   Q    So in the three and a half hours that he was there, that's

25   all you got was five or six lines on a piece of paper?

1   A    The amount of time that he was there I spent very little of

2   that time with him.

3   Q    You spent some of that time with Mr. Martin, correct?

4   A    Correct.

5   Q    And you took some notes from Mr. Martin?

6   A    Correct.

7   Q    Again, five or six lines, correct?

8   A    Correct.

9   Q    And that was done before you put him on the recorder and

10  taped him?

11  A    Yes.

12  Q    And you didn't tape Mr. Mitchell or Mr. Martin from the

13  beginning when you started out to question them, did you?

14  A    No.

15  Q    So you asked them questions and then you taped them?

16  A    Yes.

17  Q    And you didn't videotape anything of Mr. Martin or Mr.

18  Mitchell, did you?

19  A    No.

20  Q    And in your pre-interview notes, did you write everything

21  down that they said?

22  A    No.

23  Q    You did your telephone toll analysis, which I guess the

24  summary of that is just W-66, correct?

25  A    Correct.

1    Q    And in that analysis, there are no calls from Mr. Harris,

2    are there?

3    A    No, not in this analysis, no.

4    Q    As a matter of fact, through all your investigation, you

5    have never found that Mr. Harris ever had a cell phone, have you?

6    A    I don't have any information about a number for Mr. Harris,

7    no.

8    Q    And on this W-66, the arrow on this chart, does that

9    indicate, the way it's pointing, does that indicate that the call

10   goes from -- let's take the first one, where the arrow is

11   pointing down from Mitchell to Mr. Harris's home.  Does that

12   indicate the call is going from Mr. Mitchell to Mr. Harris's

13   home?

14   A    Correct.

15   Q    So the arrow is always the direction of the call.  In other

16   words, the call is being placed from the phone, and you have the

17   arrow pointing to the phone number that it's being placed to,

18   correct?

19   A    Correct.

20   Q    You testified this morning about Mr. Wyche having a number

21   of different cell phones?

22   A    I knew of two phones, two numbers that he used.

23   Q    And I think --

24   A    Cell phones.

25   Q    I think you testified that one of the reasons for that was

1   that drug dealers are savvy and they know that the police might

2   be listening to them and that's why they use multiple phones,

3   correct?

4   A    No.  I believe I was testifying to why Darryl Wyche had

5   multiple phones at that point.

6   Q    Because he was a drug dealer?

7   A    Yes.

8   Q    No other reason?

9   A    No, not in reference to what I was testifying to, no.

10  Q    So it's only a drug dealer would have multiple phones?

11  A    No.

12  Q    And you testified, too, that part of the reason was that as

13  a drug dealer, Mr. Wyche had a bit of paranoia, I think was your,

14  was the language that you used.  Do you recall that?

15  A    Correct.

16  Q    And the paranoia was about who might be listening to him,

17  correct?

18  A    Correct.

19  Q    Okay.  And do you know from your, your experience and what

20  you do that drug dealers carry a lot of paranoia around with

21  them, don't you?

22  A    I'm sorry.  Carry a lot of money?

23  Q    Paranoia.

24  A    I mean, it depends on the individual.

25  Q    And someone who, who was concerned about their safety or

1    whatever, is not likely to let someone that they didn't know in

2    the back seat of their car when they still have their seat belt

3    on, isn't that right?

4    A    No.  I believe Mr. Wyche's paranoia was of the police.

5    Q    My question still hasn't been answered.  I said someone who

6    is concerned about their safety, in your opinion, in your

7    experience, would not be likely to let someone they did not know

8    get in the back seat of their car on a dark street at night while

9    they were still strapped in with their seat belt, isn't that

10   right?

11            MR. HARDING:  Objection.

12            THE COURT:  Overruled.  You may answer.

13   A    Someone that was afraid for their safety would not let

14   somebody they didn't know.  Yes, I would agree with that.

15   Q    You recall a different transcript from the one that we've

16   been using, that Mr. Harding used here, exhibit, whatever the

17   exhibit is, but it's not exhibit, but Tab One, a different

18   transcript that you had at the grand jury?

19   A    I recall that, I believe we had a transcript at the grand

20   jury.  And it may or may not have been different from this one.

21   Q    Your Honor, I would ask that Mr. Harding produce that

22   transcript for me, please.  I have no further questions.

23            THE COURT:  Thank you, Mr. Martin.

24            MR. MARTIN:  Your Honor, I would like to get that

25   transcript before --

1      THE COURT:  You can talk to Mr. Harding.

2      By agreement of counsel, Mr. Crowe will conduct his

3   cross examination at this time.

4      CROSS EXAMINATION

5   BY MR. CROWE:

6   Q    Thank you, Your Honor.  Good afternoon, Detective.

7   A    Good afternoon, sir.

8   Q    I think you testified on direct examination today that you

9   were not the primary detective on the McCaffity/Brown case, is

10  that correct?

11  A    That's correct.

12  Q    In fact, that you weren't even the secondary detective on

13  that, were you?

14  A    No.

15  Q    But is it true that you did submit to some fingerprints for

16  comparison in that case?

17  A    Yes, I did.

18  Q    Going to show you what's been marked as Defendant's Exhibit

19  Two.  And first of all, can you see the upper right-hand corner

20  of that on your screen?

21  A    I can.

22  Q    Sometimes it's difficult.

23  A    Yes.

24  Q    You see the cc number is 02518908?

25  A    Yeah, 025-B-189.

1    Q    B.   Thank you.  And do you see that it does relate to the

2    McCaffity/Brown case?

3    A    Correct.

4    Q    And you indicate, do you see, also, that it was a document

5    that you submitted?

6    A    Yes.

7    Q    And I assume that the G-013 is your sequence number or badge

8    number, is that correct?

9    A    Yes.

10   Q    And this was submitted, and as I understand it, came back

11   negative on July 19th of 2004, is that right?

12   A    Correct.

13   Q    And it came back negative as to Mr. Martin, Mr. Gardner, and

14   is, is the other name Marvin Walker?

15   A    Yes.

16   Q    You know who Marvin Walker is?

17   A    Not off the top of my head right now.

18   Q    Fair enough.  Were you aware that there had been earlier

19   fingerprint, requests for fingerprints in this case?

20        MR. HARDING:  Which case?

21   Q    The McCaffity/Brown case.

22   A    No, I don't believe that I --

23   Q    Okay.  We'll pass over that for you, then.  You also

24   submitted a request for fingerprints in, in the Darryl and

25   Anthony Wyche case, did you not?

1    A    Yes.

2    Q    Okay.  I'm showing you what's been pre, what's been marked

3    as Defendant's Exhibit Eight.  Is that, again, a report which you

4    submitted?

5    A    Yes.

6    Q    And did you submit it for a Shelly Wayne Martin, a Calvin

7    Wilson, and an Alvin Martin?

8    A    Yes.

9    Q    And did that again come back negative for all three of those

10   individuals?

11   A    Yes, it did.

12   Q    Thank you.  Now, finally, Mr. Martin requested, asked you

13   some questions about DNA analysis.  My understanding is that the

14   car in which the murder occurred, which you believe the murder

15   occurred, was not processed for any DNA, is that right?

16   A    That's correct.

17   Q    And that was your decision on that, is that correct?

18   A    Yes.

19   Q    And is there any particular reason that you, that you made

20   that decision?

21   A    In 2002, vacuum extraction wasn't as up to date as it is

22   now.  Never crossed my mind to have it vacuumed.

23   Q    However, you did obtain warrants to obtain blood samples

24   from my client, Mr. Martin, Mr. Mitchell, and Mr. Gardner, did

25   you not?

1  A     I believe Mr. Mitchell and Mr. Martin were court orders.

2  And Mr. Gardner was a search and seizure warrant.

3  Q     Okay.  And when was that that you made that application, if

4  you remember?

5  A     I don't recall the date.  It was at the request of the

6  State's Attorney.

7  Q     Okay.  I'm going to show you what's been again marked as

8  Defendant Martin's Exhibit Number One.  Is that, in fact, the

9  copy of the request for DNA analysis which you submitted on or

10  about December 26th of 2002?

11  A     Yes.  That's the date marked on that.

12  Q     And is it correct that the samples you had were from Anthony

13  Wyche, Darryl Wyche, Shawn Gardner, Wayne Martin, and Willie

14  Mitchell?

15  A     Yes.

16  Q     And am I correct, also, that this came back negative for

17  everybody except, I think, one of the, one of the Wyche brothers,

18  is that correct?

19  A     The samples came back to Anthony Wyche.

20  Q     Samples came back Anthony Wyche and negative as to everybody

21  else?

22  A     They came back to Anthony Wyche.  I don't know if they term

23  it negative to anybody.

24  Q     Well, was there --

25  A     They were matched to Anthony.

1    Q    And were they matched to anybody else?

2    A    No, they weren't matched to anybody else.

3    Q    It's your understanding that they were compared with known

4    samples of blood which were taken from Mr. Martin and Mr.

5    Mitchell and Mr. Gardner?

6    A    And Mr. Gardner, yes.

7    Q    And in fact, you had obtained those samples, had you not?

8    A    Yes.

9    Q    Now, April 17 was a, was a fairly busy day for you, was it

10   not?

11   A    Yes.

12   Q    That was the day that you interviewed Mr. Mitchell?

13   A    Yes.

14   Q    And it was the day that you interviewed Mr. Martin?

15   A    Correct.

16   Q    And before you interviewed either of those, you participated

17   in some arrests and some searches, did you not?

18   A    One.  Yes.

19   Q    My recollection is that you testified on Tuesday, that was

20   sometime ago, that you were actually at Two Cree Court for the

21   execution of a search warrant at that location, is that right?

22   A    That's correct.

23   Q    And you understood that that was a home which was listed to

24   Joyce Martin, who is Mr. Martin's mother?

25   A    Correct.

1    Q    And when you went in there, you actually saw a 1992 LeBaron

2    sitting outside, is that correct?

3    A    Yes.

4    Q    The reports that I've seen indicate that the police made the

5    initial entry for the arrest at about 2:00 -- excuse me -- at

6    about 6:00.  Were you present for the arrest or just for the

7    later search?

8    A    We were stationed approximately two blocks away.  Baltimore

9    County Police did the entry there.

10   Q    Because this residence is located in Baltimore County, is

11   that right?

12   A    Yeah.  Randallstown.

13   Q    But you went in shortly thereafter, is that right?

14   A    Yes.

15   Q    And there were photographs taken of the exterior and the

16   interior of the house?

17   A    Yes.

18   Q    Can you describe what you would see when you walked in the

19   front door of Two Cree Court?

20   A    I can remember that Mr. Martin's bedroom was downstairs,

21   towards the front of the residence, towards the road.  I believe

22   as you come in, you go up a few steps with the kitchen to the

23   rear of the second floor.

24   Q    So when you walk in are you, essentially, do you see a set

25   of stairs heading down and then a set of stairs heading up?

1    A    I believe so.

2    Q    Okay.  And you found Mr. Martin downstairs, is that correct?

3    A    I believe the first time I saw him that day, he was actually

4    outside.

5    Q    Okay.  Did you, in fact, go to a downstairs bedroom?

6    A    Yes.

7    Q    Did it appear to be a bedroom that was occupied by a male?

8    A    Yes.

9    Q    Okay.  Was there anybody else in the house besides Mr.

10   Martin and the group of law enforcement officers?

11   A    Yes, a female.

12   Q    Okay.  Young female, is that correct?

13   A    Yes.

14   Q    Do you recall that her name was Sanchez Campbell?

15   A    That sounds correct.

16   Q    That sounds right?  Okay.  That's good enough.  Was Joyce

17   Martin in the house at that time?

18   A    No.

19   Q    Did you ask anybody where Joyce Martin was or why she wasn't

20   in the house at six in the morning?

21   A    No.

22   Q    Did you participate in the search of the entire house?

23   A    Yes.

24   Q    Did that include an upstairs bedroom or bedrooms?

25   A    They were searched, yes.

1    Q    Okay.  And was, did at least one of those bedrooms appear to

2    be a bedroom which was occupied by a female?

3    A    I don't recall.

4    Q    Don't recall?  Well, it's sometime ago and you did a lot of

5    stuff that day.

6            Do you know, the officers who did actually go in, do

7    you know where they found Mr. Martin?

8    A    I believe in the downstairs front bedroom.

9    Q    And do you know where they found the female, who you think

10   might have been named Sanchez Campbell?

11   A    I believe she was with Mr. Martin.

12   Q    Okay.  Now, you filled out an affidavit for a search warrant

13   for that search, did you not?

14   A    Yes.

15   Q    And did you say in that search warrant that you had reason

16   to believe that you would find firearms, that you would find

17   ammunition, that you would find clothing, and that you would find

18   trace evidence which might link an occupant of that home to the

19   Wyche brothers' homicide?

20   A    Yes, I believe those terms were used.

21   Q    And you didn't find any of those things there, did you?

22   A    No.

23   Q    In fact, you didn't even process any clothes for trace

24   elements, did you?

25   A    Trace could be DNA.

1    Q    Um-hum.

2    A    Could be anything.

3    Q    Okay.  But in your affidavit, you said that you had reason

4    to believe that there might be trace evidence found in the house.

5    Did you process anything that you took from the house for any

6    sort of trace evidence?

7    A    No.

8    Q    You've mentioned, also, that you did a search of County

9    Sports, is that right?

10   A    County Sports was searched, yes.

11   Q    And indeed, in one of the sheets that was put out, I think

12   maybe the information sheet that Mr. Harding put up, you

13   indicated that Mr. Martin had given County Sports as a place of

14   employment, is that right?

15   A    That's correct.

16   Q    But that was something that you knew even before you talked

17   to Mr. Martin, was it not?

18   A    Yes.

19   Q    You had spoken with Mr. Martin's federal probation officer,

20   a man by the name of Jason Epps?

21   A    Correct.

22   Q    And had he told you that Mr. Martin's place of employment

23   was County Sports?

24   A    Yes.

25   Q    Had he told you that he had found Mr. Martin in county, at,

1    working at County Sports about a week before that?

2    A    Yes, I believe he did.

3    Q    And did he also tell you that the 1992 LeBaron which you had

4    seen parked out in front of Two Cree Court was also seen at

5    County Sports?

6    A    He may have.  I don't recall discussing the vehicle.

7    Q    Okay.  And do you recall filing an affidavit for a search

8    and seizure warrant at, the 1992 Chrysler LeBaron?

9    A    Yes, I obtained that.

10   Q    Okay.  Let me show you a portion of the affidavit.  The copy

11   we've got isn't signed.  But do you see there where it indicates,

12   Shelly Martin is the only listed owner of the 1992 Chrysler

13   LeBaron, Maryland tag such and such, vehicle identification

14   number, and then you give it.  This vehicle has been observed at

15   Mr. Martin's residence and his place of employment while he is

16   working.

17   A    Okay.

18   Q    So if you said that in an affidavit, it must have been

19   information that you had at the time, is that a fair guess?

20   A    Well, I believe you asked me if I got that information from

21   Mr. Epps.

22   Q    I did.  Let me amend the question.  Did you understand that

23   Mr. Martin's, that this 1992 Chrysler LeBaron had been seen at

24   County Sports?

25   A    Yes.

1    Q    And that car would have been, what?  Approximately ten years

2    old at the time of the search?

3    A    Yes.

4    Q    Now, we've had a fair amount of discussion about telephone

5    analysis.  Do you remember being shown by Mr. Harding a document

6    entitled Government's Exhibit N-67?

7    A    Yes.

8    Q    And the several pages of this document, are these all pages

9    in your handwriting or were they done by you or by you and

10   somebody else?

11   A    I didn't write any of those.

12   Q    You didn't write any of them.  But you did testify to them,

13   right?

14   A    Yes.

15   Q    Do you know who did write them?

16   A    Sergeant Petry.

17   Q    Okay.  I'm sorry.  W-67.  Mr. Harding corrected me.  Thank

18   you.  And can you tell me generally from what objects or papers

19   the information on Government Exhibit W-67 was obtained?

20   A    Cell phones.

21   Q    And were those all cell phones that were found in the white

22   station wagon on Wabash?

23   A    I believe the one from Darryl Wyche's also is in there,

24   also.

25   Q    And you mean the one from Darryl Wyche that was never

1    recovered, correct?

2    A    No.  The one on his person.

3    Q    Oh, the one that was on his person.  So there's one on his

4    person in the car and the rest of them were in the car, is that

5    right?

6    A    Yes.

7    Q    Do any of these numbers on any of these pages, to your

8    recollection as you sit here today, tie in with Mr. Martin?

9    A    No, not to my knowledge.

10   Q    And indeed I think Mr. Harding asked you, were you able to

11   find any tie-in between any phone associated with Mr. Martin in

12   any of the Wyche brothers' phones, and your answer was no, is

13   that correct?

14   A    Correct.

15   Q    Now, you had mentioned in your chart, which is Government

16   Exhibit 66 -- Your Honor, does the jury still have this with

17   them?

18        THE COURT:  They do, yes.

19   Q    It's much easier to follow holding it up than it is here.

20        THE COURT:  Certainly.

21   Q    This is a chart that you helped prepare, is that right?

22   A    Yes.

23   Q    And you helped prepare that with Mr. Benson, is that

24   correct?

25   A    That's correct.

1   Q    And you had actually subpoenaed records for a couple of cell

2   phones associated with Mr. Martin, is that right?

3   A    I believe I only subpoenaed one.

4   Q    Okay.  And that would be the one with the, ending in the

5   numbers 1933?

6   A    Correct, sir.

7   Q    Was it, given the cell phones that you've seen in this case,

8   certainly with the possible exception of Irene Magginson's, is

9   there anything unusual or different about the cell phone

10  associated with Mr. Martin?

11  A    I believe he's the only one on this page, other than the

12  residents, that has the phone listed to him.

13  Q    That's right.  He's the only one with the phone listed to

14  him, isn't he?

15  A    That's correct.

16  Q    And the other people you're talking about are the land line

17  phones, which are indicated by the, by the icons?

18  A    Correct.

19  Q    Looks more like a desk phone.  And then I assume Irene

20  Magginson's was listed to her, also, is that right?

21  A    Yes, I believe so.

22  Q    Okay.  And indeed, you didn't find that Mr. Martin was using

23  a phone registered to somebody else this night?

24  A    That night, no.  Not that I know of.

25  Q    And he wasn't using something that people sometimes call a

1    burn phone, was he?

2    A    Not that night.  The phone he used was listed to him.

3    Q    And in fact, when you went to Mr. Martin's house, some of

4    the things you seized were records for that phone, is that right,

5    also?

6    A    That's correct.

7    Q    And they were in the, they were in the bedroom on the bottom

8    floor?

9    A    Yes, the basement.

10   Q    So to the extent Mr. Martin was using a phone that night, he

11   was using a phone that was traceable to him.  That's correct, is

12   it not?

13   A    Yes, sir.

14   Q    Let me ask you something.  You indicated, I think, that when

15   you first interviewed Mr. Mitchell on April 17 that you had a

16   bunch of this cell phone information, is that correct?

17   A    That's correct.

18   Q    Do you recall what you had on that date?

19   A    The analysis hadn't gone quite this far.  But we had

20   received records for phone calls, for phones used in this case.

21   Q    And you may not be able to remember now.  But do you recall

22   for which phone call, for which phones you had records on April

23   17, when you interviewed Mr. Mitchell?

24   A    I don't recall.

25   Q    Okay.  Let me ask you this.  This jury, in connection with

1   another segment of the case, has heard a fair amount of

2   information about cell towers and how you can determine where,

3   from what general area phone calls were placed if you have cell

4   tower records.

5           Did, as the primary detective, did you attempt to get

6   any cell tower records from areas near the scene on Wabash

7   Avenue?

8   A    No.

9   Q    And is there a reason you did not?

10  A    When I subpoenaed them, it was just for subscriber

11  information and toll information.

12  Q    Why didn't you subpoena the other information as well, cell

13  site tower information?

14  A    At that point I wasn't aware of how cell site towers and

15  triangulation worked.

16  Q    Were you aware that such records had been obtained by other

17  detectives in Homicide with respect to the McCaffity/Brown?

18  A    Yes, I found out later.

19  Q    -- murders, which took place basically two, three weeks

20  before that?

21  A    Yeah.  I found out later, yes.

22  Q    But you were not aware of that at the time?

23  A    No, not at the time that I subpoenaed.

24  Q    If you were going back and doing this again, I assume that

25  cell site information would have been one of the first things you

1    would have looked for, is that correct?

2    A    I certainly would have, yes.

3    Q    Because that not only tells you that, that may not only tell

4    you from what phone to what other phone a call was placed, but it

5    can tell you, give you a much better idea from where it was

6    placed, is that right?

7    A    That's correct.

8    Q    You're going to have to be patient with me when I go over

9    this because I'm a little, I have a little bit of trouble with

10   some of these, with some of these cell things.

11          My understanding is that the land line phones, such as

12   the one you see under the first one, the first one, which is

13   apparently what you say is a cell phone to Mr. Harris's phone, is

14   indicated by the type of icon you see there, is that correct?

15   A    That's correct.

16   Q    And that cell phone, I mean that land line phone was

17   actually listed to Mr. Harris's mother, whose name I think was

18   Arlene Williams?

19   A    Yes.

20   Q    Now, you've also indicated that, with cell phones, that --

21   well, let's start here.  If a phone, if a phone is made, if a

22   non-long distance call is made from a phone, whether a land line

23   phone or a cell phone into another land line phone, you're not

24   going to get any record of that call, is that correct?  Was that

25   question too -- was that question too bad?

1    A    You think I can clean it up.

2    Q    Thank you.

3    A    If a phone call is placed from a land line to a land line, I

4    mean house to house, and it's not long distance, there will be no

5    record.  If it's placed from a land line, a home phone to a cell

6    phone, you will get the record for the cell phone that was

7    called, but not the land line.

8    Q    Okay.  Thank you for correcting me on that.  And with

9    respect to phones, phone calls from cell phone to cell phone, my

10   understanding is that if it goes into voice mail, it will not

11   show up on the, on the bill of the phone that received it, is

12   that correct?

13   A    Yes, that's my understanding.

14   Q    And typically, when you're showing that there was, that it

15   went into voice mail, what you mean is that it doesn't, is that

16   charge does not show up on the receiving, on the phone bill for

17   the cell phone that received the phone call?

18   A    Yes.  That's my understanding, yes.

19   Q    Now, you were asked also about, about rounding up.  And of

20   course, telephone companies will round up rather than round down.

21        But I have noticed that on some of these you are

22   actually able to get some reasonable, you're able to get the

23   duration of phone calls even into seconds.  There, for example,

24   one which Mr. Mitchell supposedly makes to Mr. Martin.  That

25   would be, looks like fifth one over.  Do you see that?

1    A    Yes.

2    Q    Is that because Mr. Mitchell's bills typically show the

3    exact number of seconds?

4    A    Mr. Mitchell's bills, even the ones that appear to go to

5    voice mail, are down to the second.

6    Q    Are down to the second.

7    A    Whatever subscriber he was using.

8    Q    But Mr. Martin's all seem to be in even minute intervals, is

9    that correct?

10   A    Yes.  Calls made to his phone that went to, to his voice

11   mail are all in even minutes.

12   Q    And that may, that may mean, for example, that if you're

13   just getting the duration of the phone call from Mr. Martin's

14   cell phone, a minute can be anything between, between a second

15   and a minute, is that correct?

16   A    Yes.

17   Q    And if you go to minute and one second, then it bumps up,

18   bumps up to two minutes?

19   A    Yes.  That's my understanding of it.

20   Q    Now, if you would look over in what is, I think, the eighth

21   phone call on this chart, which is Government's Exhibit 66,

22   you'll see that that is, that's a phone call from Mr. Martin to

23   Mr. Mitchell, which goes into voice mail, is that correct?

24   A    The 8:42 p.m. one?

25   Q    The 8:42 p.m. one.

1    A    Yes.

2    Q    The next phone call that you have is 9:34 p.m., and that's

3    again from Mr. Mitchell to Mr. Martin.  In that case it is

4    connected, is that right?

5    A    Yes.

6    Q    Then there's a series of phone calls which you indicate Mr.

7    Martin made in rather rapid succession to Mr. Gardner, all of

8    which spilled over to voice mail, is that correct?

9    A    Yes, sir.

10    Q    And the last of those is at 9:51 p.m., is that correct?

11    A    Yes.

12    Q    Am I correct that the next phone call you have where there

13    was any connection with Mr. Martin's cell phone occurs at

14    something like 11:35 that evening?

15    A    I believe it's 11:37, yes.

16    Q    11:37.  I think you're right.  It is 11:37.  I apologize.

17          And Mr. Martin told you that he was in the movie during

18    that period of time, is that correct?

19    A    Yes, that's what he said.

20    Q    And indeed, you believe he was in the movie?

21    A    I have my doubts.

22    Q    Excuse me?

23          THE COURT:  You can answer.

24    A    I have my doubts.

25    Q    Okay.  But you certainly wouldn't swear under oath that he

1    wasn't, would you?

2    A    No.

3    Q    Okay.  And indeed, there is one phone call that Mr. Martin

4    then makes at, there's a phone call that Mr. Gardner makes to Mr.

5    Martin at 11:37, is that correct?

6    A    Yes.  I believe that's the one we were talking about that

7    was connected.

8    Q    And then Mr. Mitchell tries to get him and they just keep

9    ringing into voice mail, is that right?

10   A    Yes.

11   Q    And there are no, although Mr. Mitchell attempts to call Mr.

12   Martin a few times, they all ring into voice mail, is that right?

13   A    That's correct.

14   Q    And indeed, are you familiar, from going through the records

15   past this point, that essentially Mr. Martin doesn't have,

16   doesn't have his, doesn't have his phone turned on or is not

17   answering the phone for many, many hours after that?

18   A    Yeah.  That is my recollection.

19   Q    That's your recollection.  Now, you and Mr. Hastings

20   interviewed Mr. Martin on April 17 of 2002, is that correct?

21   A    Yes.

22   Q    And my recollection is that you followed what you've

23   testified is the routine procedure, which is that you and Mr.

24   Hastings did a pre-interview and then you did a recorded

25   statement, is that correct?

1    A    That's correct.

2    Q    Show you what is Government's Exhibit W-60.  See if I can,

3    let me see if I can get the whole thing on the screen.  That's a

4    pretty good accomplishment for me.  Are those notes in your

5    handwriting?

6    A    Yes.

7    Q    Were those notes that you actually made on April 17 of 2002?

8    A    Yes.

9    Q    The date's a little different, though, isn't it?

10   A    The wrong month.

11   Q    Do you know how that happened?

12   A    I wrote down the wrong month.

13   Q    Okay.  And you haven't caught it since then?

14   A    Thank you for pointing that out.

15   Q    Judge Davis can tell you some of the things he sees in my

16   brief.  You wouldn't feel so bad about it.

17          Is it true, you've testified that Mr. Martin told you

18   he was at a theater that night, is that correct?

19   A    Yeah.  He was at the Owings Mills movie theater.

20   Q    Okay.  And he gave you the name of the person that he was

21   with, is that right?

22   A    Yes.

23   Q    He told you that, and you understood the day he was there

24   was March 24th, is that right?

25   A    Yes.

1    Q    And he told you that he had taken a young lady and that that

2    was her birthday, is that right?

3    A    Yes.

4    Q    Did you ever determine if March 24 was, in fact, the

5    birthday of Lakeisha McCoy?

6    A    Yes.

7    Q    And you determined that it was her birthday, is that right?

8    A    Yes.

9    Q    He gave you the name of the movie that he was at, is that

10   right?

11   A    Yes.

12   Q    And he told you that he paid for it on a -- I see a note

13   down there.  It looks like Blade II, credit card, is that

14   correct?

15   A    Correct.

16   Q    And did he tell you that he'd done it on a credit card?

17   A    Yes.  That's what the note indicates.

18   Q    And did he also give you the address of Lakeisha McCoy?

19   A    Two addresses.

20   Q    He gave you two addresses for her.  And indeed, when you ran

21   out to find Lakeisha McCoy, you didn't have any trouble finding

22   her at one of those addresses, did you?

23   A    No, I located her there.

24   Q    Okay.  Did you see her that day?

25   A    No.

1    Q    Did you see her soon after you had interviewed Mr. Martin?

2    A    It was a little while after I had interviewed Mr. Martin.

3    Q    And did you then bring Ms. McCoy back for an interview at

4    the police headquarters?

5    A    At that point or when, when we took a statement?

6    Q    Well, I'm talking, did you in fact bring her, did you in

7    fact talk to her at some length before you recorded a statement

8    from her?

9    A    Yes.

10   Q    And who, who were the persons were, who were, who besides

11   you was, was present at that first interview of Lakeisha McCoy?

12   A    I can't recall if it was Detective Hastings or it could have

13   been another detective.

14   Q    And would you have taken any notes or written any memorandum

15   of that interview?

16   A    I don't recall if I did or didn't.

17   Q    Would it be in your file?

18   A    Yeah.

19   Q    If you'd done it?

20   A    If I had.

21   Q    And you don't have your whole file here today, do you?

22   A    No, not everything.

23   Q    I just ask you to look through the file.  And if you have

24   anything on that, consult, consult Mr. Hanlon or Mr. Harding,

25   okay?

CROSS EXAMINATION OF NIEDERMEIER BY CROWE                    147

1    A    Yes, sir.

2    Q    Would it be unusual for you to do an interview of somebody

3    and not at least take notes?

4    A    The first thing we do when we interview anybody is an

5    information sheet.  So --

6    Q    So there should at least be an information sheet for Ms.

7    McCoy dated sometime in the spring of 2002, is that right?

8    A    Yeah.  If she came to our office, an information sheet would

9    have been done.

10   Q    Do you recall if the interview was actually done at your

11   office or some place else?

12   A    I don't.  Not the first one.  I know the second one was done

13   at our office.

14   Q    At the first interview, did Ms. McCoy give you information

15   which was consistent with what Mr. Martin had given you?

16   A    Yes.

17   Q    But I think, I think you said she said the time of the movie

18   was 10 and he said it was 10:30, is that right?

19   A    Yes.

20   Q    Okay.  And then at a later time you actually did have a

21   taped interview of Ms. McCoy, is that right, also?

22   A    That's correct.

23   Q    My notes indicate that this was probably sometime in

24   November or December of 2002.  Does that sound about right to

25   you?  In fact, I think it was November of 2002.

1    A    I believe it was November.

2    Q    November of 2002.  Now, Mr. Martin had given you and

3    Detective Hastings a rather complete account of where he was that

4    night, is that correct?

5    A    He had given us an account, yes.

6    Q    And that account was that he had taken this young lady to

7    the movies, that they had stayed to the end of the movies, and

8    that after that they spent the night together, is that right?

9    A    Yes.

10   Q    Okay.  Now, in the taped interview that has been played,

11   Detective Hastings is the one who does most of the questioning,

12   is he not?

13   A    Yes.

14   Q    And then you were asked at the end if you have any

15   questions.  I forget whether you had one or two.  But it wasn't

16   much, is that right?

17   A    Correct.

18   Q    Was a conscious decision made not to address the specific

19   question to Mr. Martin as to where he was on March 24 and March

20   25?

21   A    No.

22   Q    Is there any reason that he wasn't specifically asked to

23   confirm on tape the account he had previously given you of where

24   he was?

25   A    No.

1    Q    Is it something that people just forgot to do it or was it,

2    or don't you know?

3    A    It was Mr. Martin's statement.  I mean, we asked some

4    questions and he answered the questions that we asked.

5    Q    I'm sorry, Your Honor.  May I have a minute?

6              THE COURT:  Certainly.

7              (Pause in proceedings.)

8    Q    Now, the tape that we have is not the, that was played in

9    the courtroom is not the complete tape of Mr. Martin's statement,

10   is it?

11   A    Yeah.  As far as I know, yes.  Oh, I apologize, Your Honor.

12             THE COURT:  In other words, what you're asking, Mr.

13   Crowe, I think everybody agrees that part of the tape was not

14   played for the jury by order of the Court.

15   Q    Yeah.  Now, was a portion of that tape Detective Hastings

16   asking the question of Mr. Martin, You were not there at the

17   time, and Mr. Martin replying, I was not there?

18   A    Can you point to that part in the --

19   Q    I don't believe it's going to be on the transcript that you

20   had because I believe it was left out.

21             THE COURT:  I think it's agreed that exchange did

22   occur, is it not, Mr. Harding?

23             MR. HARDING:  Yes, the government will stipulate that

24   that question and answer were in the unredacted version of the

25   tape.

1          THE COURT:  Thank you.

2    BY MR. CROWE:

3    Q    Now, Mr. Martin was quite firm that he wasn't there that

4    night, was he not?

5    A    Yes.

6    Q    Detective, you actually went to the AMC theater and, I think

7    you talked with a man that you said his name was Jason Walters or

8    Jason Waters?

9    A    I don't believe I gave his name.  But I wrote a report on

10   it.  A man that was a manager identified himself as a manager out

11   there, yes.

12   Q    Okay.  And he, in fact, let you take a look at the original

13   charge slip, the original credit card slip which the theater

14   still had, is that right?

15   A    Correct.  That's what the copy was.

16   Q    So you were there about nine months after Mr. Martin.  But

17   they still had that charge slip, is that right?

18   A    Yes.

19   Q    And my understanding was he wanted to keep the original, he

20   let you make a copy, and that's what you have in your records, is

21   that right?

22   A    Correct.

23   Q    And the copy we have is what's been marked as Government's

24   Exhibit 30.  Is that right, also?

25   A    Yes.

1    Q    And what you saw --

2              THE COURT:  I think it's W-30.

3    Q    You're right, Your Honor.

4              THE COURT:  The letter.

5    Q    Must be Mr. Harding's handwriting I have trouble with.

6              And the total, do you see where it says on, I think you

7    were asked something like this.  Do you see it on it it says 2 AD

8    Blade II?

9    A    Yes.

10   Q    Do you understand that to stand for two admissions?

11   A    That would seem that way, yes.

12   Q    $16.  It would seem to be that way, is that right?

13   A    Yes.

14   Q    Mr. Martin never told you that he and Mr. Mitchell and Mr.

15   Gardner were at the movies, did they?  Did he?

16   A    No.

17   Q    He only told you that there were two people, is that

18   correct?

19   A    Yes.

20   Q    And those two people were he and Ms. McCoy; is that right,

21   also?

22   A    Yes.

23   Q    Now, you've indicated that you also received by fax

24   something called a Monday Film Operations Report, which is

25   Government Exhibit W-31.  Is that right?

1    A    Yes.

2    Q    And that indicated the run time for Blade II of 108 minutes

3    that you testified.  And that's what the document shows, does it

4    not?

5    A    Yes.

6    Q    When you were going to the movies in 2002, you know, and

7    they said the thing started at 10:00, didn't you usually have a

8    lot of stuff that happened before the movie itself started?

9    A    You mean previews?

10   Q    Yeah.

11   A    I would imagine so.

12   Q    And didn't, in fact, Jason Waters, as noted in your report,

13   tell you that the running time for the previews and the trailers

14   and the entire movie might be as much as 2 hours and 15 minutes?

15   A    I asked him what the run time would be.  And he stated at

16   most 2 hours and 15 minutes, from his recollection at that point.

17   Q    And you understood that what he was talking about was not

18   just the movie, but all the rest of the junk that the, that

19   accompanies a movie, is that right?

20   A    Yes.

21   Q    Okay.  So Mr. Martin's account of where he was and at the

22   movie is by your testimony really not sufficient to preclude him

23   from being down on Wabash Avenue at the time you estimated death,

24   is that right?

25   A    If you're asking me --

1    Q    Yeah.

2    A    -- could he have done this?

3    Q    Um-hum.

4    A    Yes.

5    Q    Okay.  But do you agree with me that if he had stayed for

6    the entire movie, kept his, kept his cell phone off except maybe

7    for a trip to the men's room, that's pretty unlikely?

8    A    No.

9    Q    Pardon?

10   A    No.

11   Q    Okay.  Why did you wait some nine months to go up to AMC to

12   obtain information as to whether there was actual proof that Mr.

13   Martin and somebody else were there that night?

14   A    No particular reason.

15   Q    Okay.  As a Detective, you must have surely been aware that

16   most large theaters have security cameras in the lobbies, which

17   actually take pictures of people who are there?

18   A    I don't recall any back in 2002.

19   Q    Were you aware that the McCaffity/Brown case, that exactly,

20   that film of exactly that sort was obtained from the Muvico

21   Theater down in Anne Arundel Mills?

22   A    No.

23   Q    Okay.  So if they had it, you didn't know about it, is that

24   right?

25   A    That's correct.

1    Q    May I have just have a moment, Your Honor?

2              THE COURT:  Certainly.

3              MR. CROWE:  Thank you, Detective.  That's all that I

4    have.

5              THE COURT:  Now, ladies and gentlemen, by agreement of

6    counsel and the Court's permission, we're going to do something a

7    little bit different.  With the Court's permission, Mr. Lawlor

8    and Mr. Kurland have elected to defer their cross examination of

9    Detective Niedermeier until we resume the trial.  So at this time

10   Mr. Harding will conduct a cross examination -- excuse me -- a

11   redirect examination of Detective Niedermeier based solely on the

12   cross examinations by Mr. Martin and Mr. Crowe.

13             MR. MARTIN:  Your Honor, before Mr. Harding starts,

14   there's one thing that I didn't ask him about that I would like

15   to, with your permission.  One document.

16             THE COURT:  Certainly.

17             MR. MARTIN:  That way Mr. Harding can ask about it.

18             CROSS EXAMINATION

19   BY MR. MARTIN:

20   Q    Detective Niedermeier, do you fill out a report, a 24 hour

21   homicide incident report?  You fill a lot of those out?

22   A    Yes.

23   Q    And may I approach the witness, Your Honor?

24             THE COURT:  Yes.

25   Q    Show you what I've had marked for identification Defendant's

1    Exhibit One.  Do you recognize that as a report that you filled

2    out?

3    A    Yes.

4    Q    Tell the ladies and gentlemen of the jury what that is.

5    A    This is an internal report within the police department.

6    It's through Lotus Notes, which is a computer-generated database

7    so that they can keep track of cases.  All this was was

8    information about the arrest of Willie Mitchell and Shelton

9    Harris for the murder of Oliver McCaffity and Lisa Brown.

10   Q    Sort of a closing report that you've now closed the case?

11   A    Yes, but it's --

12   Q    And you listed at the top of the report under indications,

13   the word "retaliation?"

14   A    No.  That would have been filled out prior.  This, it's a

15   form report.  When you get a case, you start it, you enter victim

16   information, all things like that, the cc number and things like

17   that.  The only part that I authored on this was the paragraph.

18   Q    Is that because Detective Giganti was gone by then from the

19   police department?

20   A    No.  Detective Giganti was not gone.

21   Q    Was he on leave?  Was he in Iraq at that time, do you

22   remember?

23   A    Detective Berger was.

24   Q    Berger.  I'm sorry.  So whoever put this in there, that was

25   at the beginning of the case, retaliation?

1    A    That would be my guess, yeah.

2    Q    Do you have any idea what that means?

3    A    Retaliation?

4    Q    In the context of this particular case?

5    A    No, I don't, sir.

6    Q    Thank you.

7         MR. HARDING:  May I have a moment with Detective

8    Benson?

9         THE COURT:  Certainly.

10        (Pause in proceedings.)

11        THE COURT:  Mr. Hanlon, what's your pleasure?  I'm

12   happy to have you release your witnesses.  But if you've got one

13   short one that you want to try to get in today.  Whatever you

14   prefer.

15        MR. HANLON:  It all relates to another subject, Your

16   Honor.  So it probably just makes more sense to pick it up next

17   week.  I'll release them now if I can.

18        THE COURT:  All right.  Good.  With our apologies,

19   Agent.

20        MR. HANLON:  Your Honor, the agents reminded me that I

21   should be doing this.

22        THE COURT:  Yes.  Yes.  And they're not going to be

23   terribly happy.

24        MR. HANLON:  But I know it's important for me to stay

25   here.

1          THE COURT:  Absolutely.

2          REDIRECT EXAMINATION

3    BY MR. HARDING:

4    Q    Very briefly, Detective Niedermeier.

5    A    Yes, sir.

6    Q    When you went to the Magginson's house the day after the

7    murder of Anthony and Darryl Wyche, you told us that you saw

8    Natasha Wyche there and Irene Magginson, and you said there was

9    some other people.  To your knowledge, did any of those people

10   know Shelton Harris?

11   A    No.

12   Q    When --

13   A    That was on the day of the murder, also.  Not the day after.

14   Q    All right, yes.  Okay.  When did Shelton Harris's name first

15   come up in your investigation?

16   A    Not until much later.

17   Q    Okay.  I believe you testified this morning that you

18   interviewed two prisoners.  Christopher Dobropolski was one of

19   them and there was another one named Felton Byrd, is that right?

20   A    Correct.

21   Q    And it was after that that you made fingerprint requests

22   associated with Shelton Harris, is that, is that correct?

23   A    That's correct.

24   Q    And Mr. Crowe, in fact, asked you about those fingerprint

25   comparisons and pointed out that in the McCaffity/Brown homicide

1   there were no matches of any latent prints to either Mr. Martin

2   or Mr. Gardner.  Do you recall that?

3   A    Yes.

4   Q    And are you aware that there was only one suitable latent

5   print that was recovered from the McCaffity/Brown vehicle?

6   A    I know that there was one suitable.  I don't know if there

7   was others.

8   Q    Okay.  And that was, the one you know about is the one that

9   was matched to Shelton Harris, is that correct?

10  A    That's correct.

11  Q    And similarly, all of the blood samples that you got in the

12  Wyche investigation matched to Anthony Wyche, is that correct?

13  A    That's correct.

14  Q    Based on your experience, would you expect blood at a murder

15  scene to be from the victim?

16  A    Yes.

17  Q    Mr. Crowe also asked you about the fact that you recovered

18  no firearms or ammunition when you searched Two Cree Court.  Do

19  you know, Detective Niedermeier, based on your experience,

20  especially in narcotics-related crimes, do narcotics traffickers

21  often keep guns and ammunition away from their residences?

22  A    Yes.

23  Q    And why is that?

24  A    Because the fear that there will be a search and seizure

25  conducted, they will be caught with a firearm.

1    Q    He, Mr. Crowe also asked you about your conversations with a

2    probation officer.  I believe he identified him as Jason Epps.

3    Wasn't his name actually Leon Epps?

4    A    Yes.

5    Q    But there is a Jason Epps in this case, is there not?  Do

6    you know who Jason Epps is?

7    A    It's familiar, sir, but I'm not sure.

8    Q    Okay.  Mr. Crowe asked you about County Sports.  Do you know

9    who owned County Sports?

10   A    No, I don't.

11   Q    Okay.  You weren't present for that search?

12   A    No.

13   Q    Mr. Crowe pointed out that the Chrysler LeBaron that his

14   client had was ten years old.  Do you recall that?

15   A    Yes.

16   Q    If you know, do people in narcotics trafficking drive cars

17   called hoopties.  Do you know what a hoopty is?

18   A    Yes.

19   Q    What is a hoopty?

20        THE COURT:  Spell that, please.

21   Q    H-O-O-P-T-I-E.

22        MR. MARTIN:  It's T-Y, Your Honor.

23        THE COURT:  Some say P-Y, some say P-I-E.

24   A    Be a description used on the street to describe a vehicle

25   usually older make and model, little bit run down, not real

1    flashy, doesn't catch anybody's eye, keeps you kind of under the

2    radar.  A lot like a '94 Honda station wagon.

3    Q    Okay.  Do you know why narcotics traffickers frequently use

4    older or beat up cars?

5    A    There's a couple reasons for that.  One, it doesn't catch

6    anybody's eye.  An individual driving around at a high rate of

7    speed in a Corvette will draw attention.  And the other being, if

8    they are stopped and the vehicle seized, they're not losing a 40

9    or $50,000 vehicle.  They're losing a $5,000 vehicle.

10   Q    Okay.  What kind of car were Darryl and Anthony Wyche found

11   in when they were killed?

12   A    A 1994 Honda station wagon.

13   Q    Okay.  Now, you've told us about how you analyzed, this is

14   W-67.  You analyzed the, you or your colleagues analyzed the

15   entries in the phone book, the phones associated with Darryl

16   Wyche that were recovered from his car, is that correct?

17   A    Correct.

18   Q    Of course, you couldn't analyze the phones that were not

19   recovered from the car?

20   A    No.

21   Q    Okay.  I want to call your attention to one number.  Mr.

22   Crowe was asking you about whether there were any phones

23   associated with Mr. Martin in Darryl Wyche's phone books.  You

24   see this phone number that's associated with the name of Alvin in

25   the phone book?

1    A    Yes.

2    Q    Are you aware that the tolls for that phone were recovered

3    from Two Cree Court?

4    A    Yes, I believe so.

5    Q    And in fact, the phone is listed in the name of Wayne

6    Martin, Shelly Wayne Martin, is that correct?

7    A    That's my recollection, yes.

8    Q    Even though it's listed in the phone directory under the

9    name of Mr. Martin's brother, is that correct?

10   A    That's correct.

11   Q    And in fact, in another phone, the same entry appears.  Do

12   you recall that?  This is the phone with the number 443-309-5057?

13   A    Yes.

14   Q    By the way, do you remember to whom Mr. Gardner's cell phone

15   was listed, the 1241 number?

16   A    I believe that was a burn phone.

17   Q    And what is a burn phone?

18   A    It's a phone where they capture the information from a

19   legitimate phone and they make a SIM card and it's put into

20   another phone.  You're able to use that phone.

21   Q    Okay.  Does the name Samuel Handy mean anything to you?

22   A    I believe that's who the, the registered subscriber is for

23   that phone.

24   Q    Okay.  Now, there was one exchange between you and Mr.

25   Crowe, I believe, that I wasn't quite following.  He pointed out

1    that in some cases voice mails are nailed down to the second in

2    the toll records.  Do you recall that exchange?

3    A    Yes.

4    Q    And you indicated something about how in Mr. Mitchell's

5    phone they were, they were not, they were always rounded up, is

6    that correct?  Or did you say the opposite?  I can't remember.

7    A    I believe Mr. Mitchell's were accurate to the second.

8    Q    I see.  But there are a couple -- even though Gardner's call

9    to Wayne Martin appears to be rounded up here, there are calls to

10   Wayne Martin's phone, to one of them, at least, two of them, that

11   are voice mail messages that are not rounded up, is that correct?

12   A    Yes.  But that information would have been obtained from Mr.

13   Mitchell's records.

14   Q    I see.  Okay.  I think I'm beginning to understand that

15   exchange now.

16            MR. KURLAND:  Your Honor, I have an objection.  That

17   misstates that, there's no phone call --

18            THE COURT:  The objection is overruled.

19   BY MR. HARDING:

20   Q    Now, this phone call that Mr. Crowe called to your attention

21   between Mr. Mitchell and -- I'm sorry -- Mr. Gardner and Mr.

22   Martin that was connected at 11:37, that would have been during

23   the movie?

24   A    Yes.

25   Q    Whether the movie started at 10:00 or didn't start until

REDIRECT EXAMINATION OF NIEDERMEIER                    163

1  later than that because there was some preview of coming

2  attractions before the movie came on?

3  A    Yes.

4  Q    That would have been during the movie?

5  A    That's correct.

6  Q    And of course you have no idea, even if Mr. Martin went to

7  that movie, you have no idea how long he stayed, do you?

8  A    No.

9  Q    And similarly, you would have no idea at what time that

10 night Mr. Martin might have met up with Mr. Mitchell, is that

11 correct?

12 A    No.

13 Q    Mr. Crowe asked you about the statement that Mr. Martin gave

14 and about the fact that there was no account of Mr. Martin's

15 alibi in the tape that we heard.  And I just want to call your

16 attention on Page 4.  Do you recall the question that Detective

17 Hastings asked him at the outset of his statement?  Wasn't the

18 question, Just tell me what you know about what happened that

19 night?

20 A    Correct.

21 Q    Now, Mr. Crowe elicited from you that Mr. Martin told you

22 that he went to the movie with Lakeisha McCoy that night but, of

23 course, the documents that were admitted into evidence never

24 state who went to the movie with Mr. Martin that night, is that

25 correct?

1    A    No, they don't say who was there.

2    Q    Okay.  So you have no idea whether on March 24th, Mr. Martin

3    was intending to create an alibi for someone else other than

4    Lakeisha McCoy and him?  Is that a fair statement?

5            MR. CROWE:  Objection.

6            THE COURT:  You may answer.

7    A    No, I don't know whether he was or not.

8    Q    When you asked the manager what the run time was of the

9    movie, and this was before, this was before you got the document

10   that ended, that indicated what the run time was, is that

11   correct?

12   A    Yes.

13   Q    Was he looking at any document or computer screen when he

14   gave you the maximum possible amount of time or was he making an

15   off-the-cuff statement of how, what the maximum amount of time it

16   could have been was?

17           MR. CROWE:  Objection.

18           THE COURT:  Overruled.  You may answer.

19   A    No.  It was based on his knowledge of movies in general.

20   His statement was basically, at most, two hours and 15 minutes.

21   Q    Okay.  And then after that, you got the document that we

22   admitted into evidence showing it was exactly 108 minutes, is

23   that correct?

24   A    Yes.

25   Q    Okay.  I have no further questions, Your Honor.

1           THE COURT:  Ladies and gentlemen, we're going to be

2    recessing very, very shortly.  I'm going to ask you to return to

3    the jury room, however, at this time, for a very brief recess

4    while I take up a matter with counsel.  And then you'll be

5    brought back into the courtroom, again, very briefly, for my

6    parting instructions.

7           So you will be excused in a few minutes.  But for now

8    please return to the jury room.  Leave your note pads on your

9    chairs, please.  Have no discussion about the case or any of the

10   evidence.

11          (Jury exits the courtroom.)

12          THE COURT:  Detective Niedermeier, we'll be seeing you

13   again, of course.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  You're excused, yes.  Don't leave, though.

16   You can step out.

17          (Witness exits the courtroom.)

18          THE COURT:  Counsel, have a seat for a moment.  I just

19   wanted to take up with you, I think Mr. Coburn and Mr., there's

20   been a lot of these, quiet today.

21          MR. COBURN:  Sorry about that, Your Honor.

22          THE COURT:  No.  It's okay.  I think in Mr. Martin's

23   cross examination of Detective Niedermeier, at least to my

24   recollection, was the first time in quite the way it happened,

25   that a witness referred to another case.  And I don't know how

1    you all reacted or what you thought.  But it came across along

2    the lines that, again, we've been focused on Mr. Gardner.  It

3    came across, I thought, fairly graphically that there had been a

4    case, the State's Attorney for Baltimore City was involved in.

5    Of course, there have been earlier mentions of State's Attorneys.

6              And I just wanted to check in with you all to see

7    whether, as Mr. Kurland, I think, mainly has been lobbying,

8    whether this isn't the time to say something to the jury about,

9    about the fact that the jury should not speculate or whatever the

10   instruction's going to be.  So that's what I am raising with you

11   now.  Mr. Martin.

12             MR. MARTIN:  Your Honor, I think that, and I don't

13   know, Mr. Harding can correct me, that case was this case and it

14   was in the state.

15             THE COURT:  Oh, of course.  I understand that

16   perfectly.  Sure.

17             MR. MARTIN:  And at some point you'll have to tell them

18   something because I guess I'm going to have to call the State's

19   Attorney.  The problem is I don't know what's in their file.  I

20   don't even know where I got that from.

21             THE COURT:  Okay.

22             MR. MARTIN:  I believe I got it in discovery from Mr.

23   Harding.  But Mr. Kanwisher, when he was in the case, may have

24   gotten it from the State's file.  I don't know.  I would assume

25   if they took the State's file over, they got the whole State

1    file.  That was in there.

2         THE COURT:  Of course, we know better than that.

3         MR. MARTIN:  We found out, Your Honor.  But this was

4    definitely in the State's Attorney's file.  No question about it.

5         THE COURT:  No.  I have no doubt about that.  And I

6    don't have any problem with anything you did.  Please, don't

7    misunderstand me.

8         MR. MARTIN:  And there's a crucial difference in the

9    transcript.

10        THE COURT:  Sure.  You're entitled get a hold of, if

11   you can, prior versions of the transcript.  No question about it.

12   My point is much more narrow.  And that is simply that, as I say,

13   that was the most focused, I thought, disclosure to the jury

14   that, as Mr. Kurland again has been putting it, you know, there's

15   been another sovereign, another State's Attorney.  The jury now

16   knows that there was a prosecution.  But I understand fully that

17   that case is this case and it was transferred.

18        I just wonder if this is the time, before we break for

19   a week or, actually, ten days now, actually more than that, well,

20   ten days, whether this is the time to caution the jury not to

21   worry about other prosecutions.  Mr. Kurland, this has kind of

22   been your issue.

23        MR. KURLAND:  Yes, it has.  Two things.  One, Your

24   Honor, in one of the defense exhibits, I think it's Gardner

25   Three, it was inadvertent, and the next time it was shown, the

1     government covered up.  But there's also a reference in one

2     document that we admitted, which is the, it was, somebody's

3     motion, Montgomery's motion to withdraw his guilty plea, the

4     government insisted there was a cover letter to go along with it.

5          In that cover letter, this was all happening very

6     quickly.  Even though it's, quote, "my issue" for the last three

7     years, Mr. Coburn was doing this.  Inadvertently in the document

8     in the front page the government insisted come in, has a

9     reference to State v. Holly.  We were later going to try to deal

10    with that to get that redacted.

11         But with respect to the specific issue the Court is

12    raising, I had submitted in one of my earlier motions, I grabbed

13    the wrong one.  If I have a second, I can grab the correct one.

14         THE COURT:  I was actually trying to find it.

15         MR. KURLAND:  It's brilliant and it is a valid

16    statement of the law.  And I would ask that the Court give that,

17    that dual sovereignty instruction.

18         THE COURT:  Well, do you know what date you filed it?

19         MR. KURLAND:  Okay.  If Mr. Coburn did what he said he

20    was going to do, we filed it, we filed it Sunday, this, we filed

21    it Monday afternoon prior to this week because I brought that up,

22    I believe it was filed this Monday or probably was filed Tuesday,

23    maybe Tuesday morning here?

24         MR. COBURN:  Just can't remember.  I'm checking right

25    now.

1          THE COURT:  Wait a minute.  I think I may have --

2          MR. KURLAND:  Your Honor --

3          THE COURT:  I may have it.

4          MR. KURLAND:  All right.  I'm going to go find my copy.

5     So give me 30 seconds, Your Honor.

6          THE COURT:  Mr. Hanlon?

7          MR. HANLON:  Your Honor, just so the Court's aware.  I

8     have seen Mr. Coburn and Mr. Kurland's briefs about this issue.

9     Frankly, I'm not sure we've seen the instruction itself.  It

10    could simply be a question of me not getting the electronic

11    filing notice or something.  Just so the Court's aware, the

12    government has not actually seen the instruction as of yet.

13         THE COURT:  I think I have it in front of me now.

14         MR. COBURN:  October 13th, Your Honor.

15         THE COURT:  And it's an attachment that follows the

16    transcript excerpt?  Is that it?

17         MR. COBURN:  I think so.

18         MR. KURLAND:  I will get to the, follow the rule.  I do

19    not have an actual filed copy.  But the way we put the appendix

20    together, it is Defendant Gardner's proposed jury instruction

21    dual sovereignty, which I believe in the filing on the 13th would

22    follow the two-page printout of the, of an earlier mid trial

23    instruction that the Court gave at the beginning of the trial.

24         And that was, I believe it was a document e-filed to

25    everyone and that we properly complied with all of the, all of

1    the rules.

2             THE COURT:  Yeah.  The attachment includes a transcript

3    excerpt Pages Eight and Nine.  Is that what you're looking at,

4    Mr. Kurland?

5             MR. KURLAND:  Yes.

6             THE COURT:  I have it in front of me.

7             MR. KURLAND:  Then it follows with the dual sovereignty

8    proposed instruction.  This is a federal prosecution.  I wrote a

9    book on this, Your Honor.  This correctly states, this

10   unambiguously correctly states the law.  And it even has a

11   paragraph that deals with, so as not to mislead the jury at all,

12   with respect to the plea agreements that have been entered into

13   which, if the jury doesn't, you know, hasn't read my book, they

14   won't understand all the, quote, "the exceptions of dual

15   sovereignty", that the sovereigns can agree not to prosecute.

16            So it's thorough and completes and it's -- what's the

17   word I'm looking for -- it is arduously and fairly tailored to

18   the facts of this case in a manner that is wholly fair to all

19   parties to the proceeding.  No one is prejudiced.

20            THE COURT:  Okay.  Subject to hearing from counsel, Mr.

21   Kurland, and in light of your brilliance, I think the only thing

22   I might change, first of all, I would delete the last paragraph

23   entirely.

24            MR. KURLAND:  As of right now, I would not have a

25   problem with that.

1          THE COURT:  Okay.  So in that short paragraph on the

2     last page, what I would change is where you say, In addition, if

3     the State of Maryland -- perhaps if you put it on the DOAR

4     counsel can see it.  That would be useful.  Great.

5          Pull it down.  Yeah.  That first full paragraph which

6     reads:  "In addition, if the State of Maryland has not previously

7     prosecuted some of the alleged criminal acts that you have heard

8     about during this case."  I would change that to read:  "In

9     addition, whether or not the State of Maryland has previously

10    prosecuted some of the alleged criminal acts."

11         MR. KURLAND:  You make take out the "if" and change

12    that to "whether or not."

13         THE COURT:  Exactly.  Take out the "if" and take out

14    the "not" where it appears, and insert, "In addition, whether or

15    not the State of Maryland has previously prosecuted some of the

16    alleged criminal acts."  What strikes me as probably appropriate,

17    again, subject to hearing from counsel --

18         MR. KURLAND:  Your Honor, we have no objection to the

19    changes that are proposed by the Court.  We thinks that makes

20    this a better instruction.

21         THE COURT:  Can you give Mr. Hanlon your copy of that?

22    Mr. Hanlon, what I'm proposing to read to the jury starts at the

23    top of the page, it reads, "Defendant Gardner's proposed jury

24    instruction, dual sovereignty."  I'm not going to read the

25    caption.  But it goes as follows:

1          This is a federal prosecution.  Many of the federal

2     charges in this indictment refer to and incorporate to some

3     degree violations of the criminal law of the State of Maryland.

4     You have heard some evidence concerning the outcomes of some

5     prior state prosecutions.  In some circumstances a witness

6     remembered the particular outcome and in some circumstances they

7     did not recall the particular outcome.  Under the dual

8     sovereignty exception to the double jeopardy clause of the United

9     States -- I'm not sure I want to say that.  I probably will say,

10    under our system of law, both the federal government and the

11    state government may undertake a criminal prosecution for the

12    same general underlying conduct if the underlying conduct

13    constitutes a crime under both state and federal law.

14          Under the dual sovereignty doctrine, the federal

15    government can bring federal criminal charges even if state

16    prosecutors may previously have prosecuted some of the same

17    general underlying conduct under state law.  Moreover, the

18    federal government's decision to go forward with a federal

19    prosecution is based on a variety of factors.  It is not

20    dependent on a particular result, if any -- I would add -- of a

21    prior prosecution.  Indeed, federal prosecutions often are

22    authorized even after a prior state prosecution has resulted in a

23    conviction.  Even though the charges may sound similar and there

24    may be significant overlap of elements, the federal charges

25    require proof of several elements that are not a part of any

1    state prosecution.

2            So I think I would delete that next sentence about, you

3    must base your decision on, and then just go on and read that

4    final paragraph on the carry-over page.

5            In addition, whether or not the State of Maryland, etc.

6            MR. HANLON:  And what about that last last paragraph,

7    Your Honor?

8            THE COURT:  The last big paragraph?

9            MR. HANLON:  Yes.

10           THE COURT:  No, I'm not going to read that at all at

11   this time.

12           MR. HANLON:  The government's initial suggestion, Your

13   Honor --

14           THE COURT:  Go ahead, Mr. Hanlon.  I'm sorry.

15           MR. HANLON:  The government's initial suggestion, Your

16   Honor, would be this, that we not do it this afternoon.  The

17   government, as the Court is aware, opposed the giving of the

18   instruction, anyway.  We've had various objections.  Assuming

19   those are overruled, we'd at least like an opportunity to take a

20   look at this language which the Court has already, I think,

21   properly edited a bit, and at least make sure that there's

22   nothing in there that we find troubling.  And also consider the

23   possibility about whether, assuming the instruction's given, that

24   there should be language added in.

25           By way of example, the issue here with the State of

1    Maryland case that was referenced, it was a simple nol pros.  So

2    there was no result.

3            MR. KURLAND:  Not simple.

4            MR. HANLON:  Well, I could be wrong about that, Your

5    Honor.  But certainly many of the state cases that we've heard

6    about were simply nol prossed or stetted, sometimes possibly in

7    lieu of federal prosecution.  And that's the sort of thing that

8    possibly maybe the government would consider putting in this

9    instruction.

10           So the government simply is suggesting at this point

11   that we not do it this afternoon.  This is not the first time the

12   jury has heard about a state prosecution.  I don't think there

13   would be a problem if we take the break and we take this up again

14   when we resume.  That would be our initial thought.

15           THE COURT:  Okay.  Does anybody other than Mr. Kurland

16   want to be heard on this?  Mr. Lawlor?

17           MR. LAWLOR:  Judge, this dual sovereignty stuff is way

18   over my head.  Mr. Kurland keeps cutting the line.  But I think

19   the original question had to do with the fact that Mr. Martin

20   had, and I have no real complaint with this, but had brought out

21   the fact that there was a city prosecution regarding Mr. Martin

22   and Mr. Mitchell.  And certainly, I do request that the Court

23   address that with the jury.

24           I don't know if the government would be fine with this,

25   but we would just like, I suppose, in the absence of an

175

1    alternative suggestion, for the Court to say that that

2    prosecution was dropped in lieu of the federal prosecution.

3            THE COURT:  I think Mr. Hanlon likes your idea, Mr.

4    Lawlor.

5            MR. MARTIN:  That's the easy way to do it.

6            THE COURT:  That is an easy way to do it.

7            MR. KURLAND:  I object to that.

8            MR. LAWLOR:  It's Mr. Mitchell and Mr. Martin were the

9    once who were charged, Your Honor.

10           THE COURT:  That's a very fair point, Mr. Lawlor.

11           MR. KURLAND:  Your Honor --

12           THE COURT:  The problem is, if I say anything, and I

13   appreciate your objection, Mr. Kurland, because if, I don't know

14   that I can be less than comprehensive in this because if I only

15   mention -- I appreciate it came up in my mind basically because

16   of the cross examination here.  But Mr. Kurland is concerned, I

17   think justifiably so, that if I so limit it, then it leaves the

18   jury sort of at bay about, well, what about Mr. Gardner, who,

19   after all, what the only one who wasn't even incarcerated at the

20   time of the Tonya Jones Spence murder?

21           MR. KURLAND:  Your Honor, let me say one other thing.

22           THE COURT:  Yeah.  Say one other thing.  Because I will

23   tell you, I'm leaning in favor of Mr. Hanlon's position, which is

24   despite my perhaps overreaction, maybe it is best, since we're

25   going to have a ten day recess, to just let it go.  But go ahead,

1     Mr. Kurland.

2             MR. KURLAND:  Well, I want to speak to what I consider

3     a wholly unconstitutional unfair suggestion of Mr., by Mr.

4     Lawlor as it affects Mr. Gardner, and that's this.  Okay.  One is

5     that whether or not we redact that little portion of Exhibit

6     Three or not, we've again, we've lauded how brilliant this jury

7     is --

8             THE COURT:  I'm sorry.  I'm sorry.  Redact a portion of

9     the exhibit.

10            MR. KURLAND:  Even if we take out the reference to the

11    State versus Gardner prosecution that's on that cover page of

12    Defense Exhibit Three that was briefly shown on the DOAR for a

13    little while, that makes a reference, even if we put that

14    aside --

15            THE COURT:  You mean State v. Holly?

16            MR. KURLAND:  No, it says State v. Gardner.  The cover

17    letter, it said both, actually, I believe.  The cover letter.

18    Even if we remove that, Mr. Montgomery's been cross examined and

19    we've been faithfully hewing all of the Court's rulings here.

20    But the Court, prior to this issue coming up with respect to the

21    very clear reference to the State prosecution of Mr. Mitchell and

22    Mr., all the names blur together, the two defendants, that the

23    Court told us that we essentially would be able, we could cross

24    examine, we could refer to prior proceedings but we would do it

25    at our peril because you weren't going to give us, the existing

1   ruling right now is, is we can inquire and let the jury know that

2   there was a prior state prosecution of Mr. Gardner; we just can't

3   let them know the result.

4           Now, the suggestion of Mr. Lawlor, it permits the jury,

5   or the suggestion is to permit the jury to accurately know what

6   happened in that case but not let the jury know what accurately

7   happened in Mr. Lawlor's case.

8           Even though my co-counsel edited out of the last

9   pleading we filed, it is in an earlier pleading, of all of the

10  case law that supports the position that in a circumstance like

11  this, this is a, the classic paradigm case, that if the jury gets

12  a whiff that there was a prior proceeding, and they know that

13  there was a prior proceeding in the Spence murder and they know

14  that everybody else was, that Mr. Gardner, there's no evidence.

15  It's Mr. Gardner, Mr. Holly and Mr. Montgomery.  And they know

16  that Mr. Montgomery might go down the elevator with them at the

17  end of the trial if everything goes well in state court.  They

18  might have liked that.  But that's clear as to what his

19  expectation is.  Or his hope, rather.

20          So it's, it's manifestly unfair for the jury not to be

21  told of, one, either the result in Gardner's case, particularly

22  if you're going to give the specific corrective instruction to

23  Mr. Lawlor.  Or at a minimum, because we're still kind of not

24  100% sure about that, but at minimum, an instruction like this is

25  at least part way toward removing the implication that even if

1    they're told not to give any consideration, again, the case law

2    is clear that in circumstances like this, the jury's going to say

3    there was some problem in the other thing, he walked.  If they're

4    told in this particular proceeding that, that it was dropped in

5    lieu, they're going to think about, well, we know there was this

6    other state prosecution of Spence and if the other defendant is

7    sitting there, he must be free.  And that's manifestly unfair.

8         So we either have to accurately give them the

9    information or, at a minimum, hold off on that until perhaps the

10   defense case before we formulate some other arguments, but then

11   give this correct statement of law, if not today --

12             THE COURT:  That's where I am.

13             MR. KURLAND:  -- Monday.  I mean the 27th.

14             THE COURT:  I'm not going to promise to do it on

15   Monday.  But I think on balance my reaction to it was probably

16   somewhat exaggerated.  And in the context of five weeks of trial,

17   I'm now satisfied in the face of the government's objection and

18   in the face of a modified sort of objection from Mr. Mitchell

19   that we best let sleeping dogs lie at this stage.

20        I'm not saying I'm not going to give your dual

21   sovereignty instruction.  Clearly, you're absolutely right.  At

22   some point in these proceedings I'm going to have to cover all of

23   that, and I will.  But Mr. Hanlon is right as well.  The

24   government should have a chance to massage some language and do

25   some research and --

1          MR. KURLAND:  And I actually don't have a problem with

2     that.  I have more of a problem with what we would can consider

3     to be a manifestly unfair --

4          THE COURT:  I agree with you on that so I'm not going

5     to say anything.

6          MR. KURLAND:  Thanks, Judge.

7          THE COURT:  Quickly, Mr. Harding, where are we?  We've

8     got another, I guess, morning of Niedermeier, perhaps.  Perhaps

9     less than a morning.  And then after that we've got autopsies.

10    We've got the tying up the Tonya Jones Spence.  And then what

11    else is there?

12         MR. HARDING:  I would say we have one more major

13    cooperator and --

14         THE COURT:  And that is?

15         MR. HARDING:  -- search and seizure of 205 North Amity

16    Street.

17         THE COURT:  Right.  Who's the last?

18         MR. HARDING:  Rodney Hayes.

19         THE COURT:  Hayes, right.

20         MR. HARDING:  There's also Darius Spence and some other

21    minor cooperators.

22         THE COURT:  What's, what's Darius Spence going to

23    contribute?

24         MR. HARDING:  Well, he was a participant in this whole

25    scheme.  You remember, he's the one who --

1          THE COURT:  Oh, so he's going to, he's going to verify

2     that he wanted Momma taken care of and the whole conversation

3     with Montgomery.

4          MR. HARDING:  Yes.

5          THE COURT:  Okay.  Did they find anything in his

6     apartment that he was prosecuted for?  That gun, what was the

7     story on that gun?  I hadn't heard about that.

8          MR. HARDING:  I know he's been prosecuted federally and

9     that's what he's locked up for right now.

10          THE COURT:  Oh, he's in custody?

11          MR. HARDING:  Yes, he is.

12          THE COURT:  And you think it's on that gun?

13          MR. HARDING:  Also represented by counsel, still.  I do

14     not believe it's for that gun.  I believe it's for something

15     else.

16          MR. KURLAND:  Drugs.

17          THE COURT:  It's a federal drug prosecution?

18          MR. KURLAND:  I read the plea agreement yesterday.

19          THE COURT:  And who's his counsel?

20          MR. HARDING:  Gerald Ruter, Your Honor.

21          THE COURT:  And does he have an agreement?

22          MR. HARDING:  Yes.

23          THE COURT:  Okay.  All right.  Excuse me.  I'm just

24     asking.

25          MR. HARDING:  I'm sorry.  I didn't mean to appear, I

1    just meant --

2              THE COURT:  No.  That's quite all right.

3              MR. MARTIN:  You get the same reaction we do, Your

4    Honor.

5              THE COURT:  Reminded me of Montgomery.  That's the way

6    he answered some of the questions.

7              MR. HARDING:  Geez, compared Mr. Martin earlier to

8    Shelly Wayne Martin and now I'm being compared with Will

9    Montgomery.  I guess that's fair.

10             THE COURT:  I think it's fair.  I think it's fair.  So

11   Hayes, Spence, forensics from Baltimore County, medical examiner.

12             MR. HARDING:  A homicide detective from Baltimore

13   County, also.

14             THE COURT:  Right.  The search of Amity.

15             MR. HARDING:  Yes.

16             THE COURT:  Anything else?

17             MR. HARDING:  We're going to be bringing in all the

18   chemists.

19             THE COURT:  Chemists.  I thought we got rid of

20   chemists.  I think we got rid of chemists.  I think.

21             MR. MARTIN:  I thought we did.

22             THE COURT:  We got rid of chemists.

23             MR. MARTIN:  I thought we did.

24             MR. HARDING:  I'm sorry, Your Honor.  Mr. Coburn,

25   actually, is the one who has never agreed to stipulate.

1          THE COURT:  No.

2          MR. COBURN:  I gave up on that.

3          THE COURT:  He gave up on like the second day of trial.

4   I know it's been a long time.  But he gave up that ghost.  So you

5   don't need chemists.  You just need stipulations.

6          MR. HARDING:  There is also another significant

7   cooperator.  Ernest Reynolds, Your Honor.

8          THE COURT:  Oh, Reynolds.  Okay.  All right.  So we're

9   talking another, another eight days of government evidence at

10  this rate.

11         MR. HARDING:  I --

12         THE COURT:  Spence, Spence is going to be a whole day.

13         MR. HARDING:  No, he's not.  No, he's not.

14         THE COURT:  On cross?

15         MR. HARDING:  It's Mike Hanlon's witness, Your Honor.

16         THE COURT:  Spence is going to be a whole day.  I'm

17  sure of it.

18         MR. HANLON:  I'm not going to cross examine him, Your

19  Honor.  But I don't think it will be a full day.

20         THE COURT:  How long is your direct?

21         MR. HANLON:  My direct is --

22         THE COURT:  Two hours?

23         MR. HANLON:  I don't think it's two hours.  Between a

24  half hour and an hour.

25         THE COURT:  You got any exhibits?

1          MR. HANLON:  With Mr. Spence?

2          THE COURT:  Other than the plea agreement?

3          MR. HANLON:  Just his plea agreement.

4          THE COURT:  Just the plea agreement.

5          MR. HANLON:  He really just provides background

6     information.  He wasn't involved in any incident.  He doesn't

7     have to identify photographs, things like that.

8          THE COURT:  But does he have any history with any of

9     the defendants on the street?

10         MR. HANLON:  Not really, Your Honor.  Really mostly

11    will be his own history, what he had going on in the apartment

12    and all the Momma situation.

13         THE COURT:  All right.  Okay.  Before I hear you, Mr.

14    Martin, can I just get rid, not get rid of them, can I excuse the

15    jury?  Bring the jury in, please, Belinda.

16         (Jury enters the courtroom.)

17         THE COURT:  Ladies and gentlemen, once again, good

18    afternoon and thank you for your patience.  I'll excuse you in

19    just a few moments.

20         This will bring the curtain down on another day and

21    another week of trial.  We're still making good progress despite

22    the delays and interruptions.  I especially want to thank you for

23    your indulgence with respect to the interruption of certain

24    witness testimony.  As you can imagine, we've tried our best to

25    accommodate witnesses, lay witnesses, that is non-professional

1      witnesses, as well as professional witnesses.  Unfortunately,

2      several of them have been here ready to testify and we haven't

3      been able to get to them on the day that they were here.  But

4      they've been understanding and I'm grateful for that.

5             I have some good news for you, but you mustn't hold it

6      against me.  I've just recently learned that a new statute that

7      was recently signed by the President apparently increases your

8      fees.  Now, I know that that doesn't matter much because I

9      suspect most of you, probably all of you, under the policies of

10     most employers, have to give the jury fees to your employer in

11     return for your pay.  So you can report that to your employer,

12     that perhaps they'll get a little bit more money from you.  But

13     I'm not sure when the statute takes effect.  The President has

14     signed it.  But I'm not sure when it takes effect.  So don't,

15     don't take it as a firm promise.  I'm sure Ms. Arrington will

16     look into it and have some information for you to get back to

17     your employer next week.

18            So this will conclude this week.  I, of course, remind

19     you, and I'm sure you're fully aware, we have not in session next

20     week at all.  I have to tell you that when I planned this trial

21     and conferred with counsel and tried to figure out how best we

22     can minimize the inconvenience for everyone, I think it was my

23     idea to take a week off.  And I have to tell you, and I suspect

24     most, if not all, of you will agree with me, I think it was a

25     good idea.  I think we can all use a break.  Certainly, I know

1  that counsel can use a break to attend to some other matters and

2  also work on this case, as I know they all will be during this

3  week hiatus in the trial.

4          And I'm hopeful that you can get back a semblance of

5  normality in your own lives, go to work next week, and spend more

6  time, hopefully, with your family and friends.

7          So put the case out of your mind entirely.  It's a

8  vacation from the case.  The case is nonetheless important.  I

9  know you know that.  I appreciate that you scrupulously adhere to

10 all of my instructions and I have no doubt that during this ten

11 day break from the case, you will continue to adhere with

12 integrity and in accordance with your oath all of my instructions

13 that I've given you repeatedly.

14         Have no discussion about the case whatsoever with

15 anyone.  Conduct no investigation of any sort, not online, not in

16 the library, not on books.  Do not visit any of the scenes or

17 locations that have been discussed in the testimony.  Do not

18 conduct any investigation into cell phones or any other matter

19 that you've heard testimony and evidence about in this case.

20         Put the case out of your mind.  Enjoy the next ten

21 days.

22         We will resume on Monday the 27th, a week from Monday,

23 at 9:30.  And we'll pretty much have full days on the 27th, the

24 28 and the 29th, Monday, Tuesday and Wednesday, of that week.

25 And then we will not be in session on Thursday and Friday of that

1    week.

2              The following week, November 2nd, I believe is the

3    Monday, or November the 3rd, that will be our first five day

4    week.  So we'll be in session five days that week starting on

5    Monday the 3rd.  I remind you that on Election Day, Tuesday the

6    4th, we will start a little bit late and end a little bit early

7    so that those of you who want to vote early can do so and those

8    of you who want to vote late will have plenty of time to go and

9    do that.

10             We'll be in session on Wednesday, Thursday, and half a

11   day on Friday of that week.  So we'll start about 9:30.  Again,

12   we won't take a luncheon recess.  We'll take two morning recesses

13   and we'll go until about 1:30 or 2:00 on Friday, the 7th of

14   November.

15             So that's the plan for the next three weeks.  Most

16   importantly of all, enjoy your week off next week.  Continue to

17   adhere to my instructions, avoid any media reports about the

18   case.  Do not discuss the case.  Continue to keep an open mind

19   about all issues.  And Ms. Arrington will look into that jury fee

20   issue.

21             Please enjoy your time you away from us, ladies and

22   gentlemen.  Stay safe.  Please leave your note pads on your

23   chairs.  The jury is excused.  We'll see you on the 27th of

24   October.

25             (Jury exits the courtroom.)

1          THE COURT:  Okay.  Mr. Martin.

2          MR. MARTIN:  Yes, Your Honor.  Without having any

3    substantive discussion about this whatsoever, we were talking

4    about the schedule, I just want to remind the Court that I have

5    that motion I filed about Mr. Hayes that's going to have to be

6    heard in some form outside the presence of the jury.  I just want

7    to --

8          THE COURT:  I'm sorry.  Remind me, please.

9          MR. MARTIN:  I filed a motion asking for a hearing on

10   the issue of how Mr. Hayes ended up in the same cell with Mr.

11   Hayes.

12         THE COURT:  Right.

13         MR. MARTIN:  And then the statements that the

14   government proposed to use from Mr. Harris that day.  I don't

15   want to discuss it substantively today, but we'll have to find

16   sometime to do that.

17         THE COURT:  Certainly.  Mr. Hanlon, Mr. Harding, I

18   think it would be a good idea, as you put together your plan of

19   action, to do your best to arrange to have Mr. Hayes here either

20   first thing one day or, what might even be better, at the very

21   end of the day one day when we can do a short voir dire outside

22   the presence of the jury.

23         MR. HARDING:  And on what issue again, Your Honor?

24         THE COURT:  Well, the motion filed on behalf of Mr.

25   Harris plausibly suggests some prosecutorial misconduct.  And I'm

1   not, I'm trying to remember if you filed a response.  I know you

2   did sometime ago.

3          MR. HARDING:  Yes.

4          THE COURT:  But you know the more recent motion I'm

5   referring to?

6          MR. HARDING:  Yes, I do.

7          THE COURT:  I don't think you responded to that.

8          MR. HARDING:  No, I didn't.  I wasn't intending to,

9   actually.

10          THE COURT:  And I'm not asking you to, I'm just

11   suggesting if you want to stand to on your prior response, that's

12   fine.  But you might want to just submit something in letter form

13   if you have the time.  But I just want to give Mr. Martin a

14   chance, I think, based on his representations, I don't expect it

15   to be evidentiary beyond Mr. Hayes himself.

16          MR. HARDING:  My one concern I have, Your Honor, is

17   that this could be used as an opportunity to sort of elicit

18   evidence from the witness before actually having to cross examine

19   him on the stand.  It seems to me that, that this could be a

20   device for gaining some kind of litigation advantage.

21          THE COURT:  And I'm alert to that and I appreciate

22   that.  I will tell you, I think my principal interest is in

23   giving Mr. Martin an opportunity to question Mr. Hayes about Mr.

24   Hayes 's own movements.  And Mr. Hayes is the best potential

25   source of information.  I'm not making a ruling now.  But I

1    assure you this is not going to be a discovery deposition.

2            Mr. Martin is concerned, as he, I think, frankly, is

3    obligated to be concerned, it was pass, I mean, it's passing

4    strange -- by the way, I don't remember your response, but is it

5    true that he, was he ever in the same cell?

6            MR. MARTIN:  Yes.

7            THE COURT:  That's true?

8            MR. MARTIN:  On that day, yes.

9            THE COURT:  On that day.

10           MR. MARTIN:  Sure.  Because otherwise the fight

11   wouldn't have occurred.  He had to be in the same cell.

12           THE COURT:  Okay.  So I think Mr. Martin's entitled to

13   some minimal examination of Mr. Hayes to find out what Mr. Hayes

14   knows about his handling that day.

15           MR. MARTIN:  Your Honor, I am not so much interested in

16   obtaining discovery from Mr. Hayes about anything other than what

17   he has to say about that day.  But I also ask the Court if, if I

18   could obtain access to some U.S. marshal's documents as to why he

19   was being moved around like that, why my client was being moved

20   and how that happened.  Because the, the facts just appear

21   strange to me.  And I think you said it best, Your Honor.  If I

22   didn't explore this I would be subject to some claim later on.

23           THE COURT:  I think that's right.  But I think anything

24   in the possession of the U.S. marshal bearing on this that you

25   are entitled to is by definition Brady.  And so I'm going to

1    rely, in the absence of some further showing, on Mr. Harding, Mr.

2    Hanlon, and the agents reviewing whatever the marshals have and

3    bringing to your attention whatever fits within that broad

4    spectrum.

5            MR. MARTIN:  That's fine, Your Honor.  I don't care how

6    it happens, just that it happens.

7            MR. HARDING:  Judge, in my initial response, I included

8    the only documents I've ever had from the marshals as an exhibit,

9    namely the separation orders.

10           THE COURT:  Okay.  Well, I'm sorry to cut you off.  But

11   I want to bring us to a close.  I'm suggesting, and in fact, I

12   guess I'm ordering now you to sit down with the marshals and ask

13   to review the entire file.  Whatever.  And I'm using term "file",

14   you know, very loosely here.  You need to sit down with Ted and

15   find out, look at every piece of, every piece of paper that the

16   marshals have bearing on this question.

17           MR. HARDING:  Mr. Martin years ago subpoenaed the file

18   from Ted and Ted responded that they didn't have a file.

19           THE COURT:  Okay.  Well, great.  So now you just need

20   to go to Ted and say, Ted, I just want to confirm that there's no

21   file, there's no more paper.  Sounds like it will take 30

22   seconds.

23           MR. MARTIN:  I find that very strange that they don't

24   have a file.

25           THE COURT:  Well, truth is stranger than fiction.

1          MR. MARTIN:  I agree, Your Honor.

2          THE COURT:  This case shows that.

3          MR. KURLAND:  Your Honor, just very quick.  I want to

4     preface this.  The government has been, at least with respect to

5     me, quite cooperative in letting me know, letting everybody know

6     what witnesses are coming.  Because we have the week break and

7     the government just rattled off like 10 or 12 or 13, I was

8     wondering if sometime mid-week, because I expect right now we'll

9     finish Officer Niedermeier, we'll do his cross, and then the

10    witness who was supposed to come today with respect to Spence

11    will be here on Monday the 27th.  And because I'm just bringing a

12    bunch of boxes up from Montgomery County, I was just wondering if

13    sometime in the middle of the week the government could say who

14    was going to be here all of Monday, Tuesday and Wednesday.

15         THE COURT:  Mr. Hanlon, Mr. Harding, by, let's just say

16    close of business on Thursday next week, October 23rd, by close

17    of business October 23rd, please e-mail all of counsel, or file,

18    however you choose to do it, as close as you can come to the

19    order of their calling, the witnesses you expect to have on

20    Monday, Tuesday and Wednesday, October 27th, 28th and 29th.

21    Okay?  By close of business next Thursday.

22         MR. KURLAND:  Thank you, Judge.

23         THE COURT:  All right.  Mr. Pyne.

24         MR. PYNE:  Your Honor, before you left the bench I

25    wanted to know if I could approach with Mr. Hanlon in regards to

1    the matters we have following this.

2            THE COURT:  Can we do it when we come back?

3            MR. PYNE:  Well, that's what I was going to ask you

4    about scheduling.  I need a period of time to meet with my

5    client.  I didn't know if Your Honor would --

6            THE COURT:  Do you want to do it tomorrow?

7            MR. PYNE:  I was going to say, if you'd rather

8    reschedule.

9            THE COURT:  Can we do it tomorrow, Mr. Hanlon?

10            MR. HANLON:  Fine.

11            THE COURT:  I'm sorry to have put you all under such

12    enormous pressure.

13            MR. PYNE:  I was supposed to meet with my client last

14    night.  She couldn't make it.  I need 45 minutes to an hour to

15    meet with her.  I didn't want to keep Your Honor here that late.

16            THE COURT:  No.  I appreciate that.  Believe me.

17            MR. PYNE:  Be more than happy to reschedule it tomorrow

18    or next week.

19            THE COURT:  I would rather do it tomorrow.

20            MR. PYNE:  Okay.  You know, I scheduled it late in the

21    day because I knew she wasn't in custody and I thought we could

22    get away with scheduling.  Can we do it at --

23            MR. PYNE:  I'm open all day.

24            MR. HANLON:  Your Honor, I have an 11:30 sentencing

25    tomorrow.

193

1          THE COURT:  Can we do it at three?

2          MR. PYNE:  That would be fine.

3          THE COURT:  3:00 tomorrow?

4          MR. HANLON:  Fine, Your Honor.

5          THE COURT:  Mr. Gagen?

6          MR. GAGEN:  I'm not sure.  I have a 2 and 3:00 tomorrow

7     of my own.

8          THE COURT:  Okay.  I don't think it's going to be

9     terribly controversial, Mr. Pyne, do you?

10          MS. RHODES:  Sorry, Your Honor.  I just want to clear

11     with the Court because I have an out-of-state witness coming and

12     we had talked last week about it being November 6th or 7th.  And

13     he's fine with that.  But now I'm concerned it might have to

14     be --

15          THE COURT:  Excuse me.  The defendants are excused.

16     We're just talking schedule.

17          (Defendants exit the courtroom.)

18          MS. RHODES:  Now I'm concerned it might have to be a

19     couple days later.  Just want to get some clarity.  He just has

20     to make plane reservations to clear his schedule for other

21     things.

22          THE COURT:  Ms. Rhodes, I think you're looking at, I

23     think you're looking at, at the earliest, November 11th, 11th.

24     And it probably, probably it makes more sense the 13th which is,

25     you remember -- I'm sorry.  I said the 11th.

1          MS. RHODES:  That's a Tuesday.  That's right.

2          THE COURT:  But that's the holiday.

3          MS. RHODES:  So Monday?

4          THE COURT:  I'm thinking probably the 12th.  Rather

5    than Monday the 10th, Tuesday is a holiday.  I mean, it's up to

6    you.  If you want to bring him in.

7          MS. RHODES:  That's fine.  I don't particularly want to

8    call him out of order.  I just want to make sure that we don't

9    have two days of dead airtime.

10          THE COURT:  Let's assume, let's assume we'll be in the

11   defense case on the 12th.

12          MS. RHODES:  Thank you.

13          MR. HARDING:  Judge, Ms. Rhodes just informed us that

14   this is the rap expert that she wishes to call.  The government

15   is going to file something on this, Your Honor.  The rap expert

16   is apparently, according to what Ms. Rhodes said in her opening,

17   not being called to translate the meanings of words in rap songs,

18   but to basically provide a history of rap music and explain that

19   violence is part of rap and --

20          THE COURT:  Is this some professor of musicology at

21   Colgate College or something?  Who is this person?

22          MS. RHODES:  He is sort of loosely affiliated with

23   Berkeley, actually.  He's a DJ and a lecturer on rap music.

24          THE COURT:  So are you going to be --

25          MR. HARDING:  We're going to be opposing the calling of

195

1    the witness on relevance grounds.  And also, we've never been

2    provided with any documentation about this expert.  We served

3    notice that we, we wanted such documents.  But I've never, until

4    today I've never even known that Ms. Rhodes was definitely going

5    to call a rap expert, except for what she said in her opening

6    statement.

7         So we don't have a CV.  We don't have any information

8    on this person at all.

9         THE COURT:  All right.

10        MS. RHODES:  That's entirely true, Your Honor.  And

11   partly is because of the scheduling issue.  Initially he had said

12   he could come mid October.  Then he said he has an issue around

13   the election because of work he's doing.  So that's why I've been

14   anxious to clear the dates.  So as soon as -- basically, about 48

15   hours ago he confirmed with me.  So I'm hoping tomorrow to get

16   the information I can to Mr. Harding about this.

17        But I want to understand if they want to oppose this,

18   we can certainly have a discussion about it.

19        THE COURT:  Well, they've got plenty of time to file

20   their motion in limine and we'll air it out.  All right.  Thank

21   you all very much.

22        (Conclusion of Proceedings at 4:45 p.m.)

23

24

25

196

1                                INDEX

2

3                                                      PAGE

4    WITNESS: DETECTIVE GARY NIEDERMEIER

5    DIRECT EXAMINATION BY MR. HARDING                    6

6    CROSS EXAMINATION BY MR. MARTIN                    106

7    CROSS EXAMINATION BY MR. CROWE                     124

8    CROSS EXAMINATION BY MR. MARTIN                    154

9    REDIRECT EXAMINATION BY MR. HARDING                157

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

197

REPORTER'S CERTIFICATE

1

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on October 16, 2008.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2009.

11

12

13

14          _____

                Mary M. Zajac,
15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25

## $

**$16** [1] - 77:2, 151:12
**$200** [1] - 114:18
**$220** [1] - 114:22
**$5,000** [1] - 160:9
**$50,000** [1] - 160:9

## '

**'88** [1] - 32:14
**'94** [1] - 160:2
**'shit** [1] - 42:14

## 0

**0038** [1] - 14:18
**025-B-189** [1] - 124:25
**0251890** [1] - 124:24
**07** [1] - 111:21

## 1

**10** [3] - 77:13, 147:18, 191:7
**100%** [1] - 177:24
**101** [1] - 1:25
**106** [1] - 196:6
**108** [3] - 78:2, 152:2, 164:22
**10:00** [3] - 79:6, 152:7, 162:25
**10:30** [4] - 33:3, 33:15, 77:17, 147:18
**10:38** [2] - 91:20, 91:24
**10:39** [1] - 91:24
**10:42** [2] - 92:2, 92:4
**10:43** [2] - 92:5, 92:15
**10th** [1] - 194:5
**11** [3] - 12:21, 19:17, 96:23
**11.2** [1] - 78:11
**11:00** [1] - 13:3
**11:16** [1] - 95:3
**11:18** [2] - 95:8, 95:12
**11:30** [2] - 13:3, 192:24
**11:35** [1] - 142:14
**11:37** [6] - 95:25, 142:15, 142:16, 143:5, 162:22
**11:40** [1] - 13:3
**11:48** [2] - 79:9, 79:12
**11th** [3] - 193:23, 193:25
**12** [9] - 11:16, 15:15, 16:7, 17:17, 28:4, 28:7, 96:12, 97:16, 191:7

**124** [1] - 196:7
**1241** [2] - 88:1, 161:15
**12:04** [2] - 30:6, 96:25
**12:07** [1] - 79:15
**12:08** [1] - 96:15
**12:11** [2] - 96:20, 96:22
**12:13** [2] - 96:20, 96:23
**12:14** [1] - 96:25
**12:15** [1] - 96:25
**12:18** [2] - 97:8, 97:16
**12:30** [5] - 97:8, 97:9, 97:17, 104:16, 119:15
**12:31** [5] - 14:25, 15:12, 15:14, 15:22, 16:3
**12:33** [5] - 14:11, 15:17, 15:18, 16:3, 79:3
**12:38** [6] - 14:11, 14:18, 15:19, 79:3, 98:3, 99:17
**12:38:21** [3] - 115:2, 115:20, 116:2
**12:43** [2] - 98:13, 105:5
**12:44** [2] - 82:7, 99:6
**12:44:06** [1] - 116:7
**12th** [2] - 194:4, 194:11
**13** [8] - 16:23, 16:24, 17:8, 17:12, 19:24, 27:8, 28:5, 191:7
**13th** [3] - 169:14, 169:21, 193:24
**14** [8] - 16:23, 18:2, 19:21, 20:11, 82:18, 85:1, 85:5, 91:10
**15** [11] - 11:25, 12:3, 21:25, 22:18, 46:21, 60:2, 62:5, 95:13, 152:14, 152:16, 164:20
**154** [1] - 196:8
**157** [1] - 196:9
**16** [6] - 1:11, 12:5, 12:9, 23:1, 91:9, 197:5
**17** [9] - 13:11, 13:12, 95:15, 128:9, 137:15, 137:23, 143:20, 144:7
**17th** [12] - 7:1, 9:12, 16:14, 29:19, 30:2, 31:4, 31:21, 73:11, 74:12, 75:4, 83:7, 103:13
**18** [3] - 13:11, 23:5, 23:6
**19** [3] - 23:5, 78:16, 78:25
**1933** [2] - 87:18, 136:5
**1992** [5] - 129:1, 133:3, 133:8, 133:12, 133:23
**1994** [1] - 160:12
**19th** [1] - 125:11
**1:30** [1] - 186:13
**1st** [1] - 83:5

## 2

**2** [4] - 151:7, 152:14, 152:16, 193:6
**20** [1] - 71:14
**20/20** [1] - 53:19
**2002** [22] - 7:2, 9:12, 14:11, 16:17, 29:19, 31:21, 73:11, 77:7, 80:11, 83:5, 83:7, 103:13, 126:21, 127:10, 143:20, 144:7, 147:7, 147:24, 147:25, 148:2, 152:6, 153:18
**2003** [2] - 79:16, 116:25
**2004** [1] - 125:11
**2008** [2] - 1:11, 197:5
**2009** [1] - 197:10
**205** [3] - 83:18, 99:9, 179:15
**21201** [1] - 1:25
**214.03** [2] - 114:19, 114:20
**22** [1] - 95:20
**22nd** [1] - 116:25
**23rd** [2] - 191:16, 191:17
**24** [4] - 76:22, 145:4, 148:19, 154:20
**24th** [8] - 16:17, 16:20, 33:14, 77:6, 80:10, 99:22, 144:24, 164:2
**25** [1] - 148:20
**25th** [8] - 14:11, 14:18, 16:17, 80:11, 96:14, 97:1, 99:22, 116:4
**26th** [1] - 127:10
**27** [1] - 78:19
**27th** [6] - 178:13, 185:22, 185:23, 186:23, 191:11, 191:20
**28** [1] - 185:24
**28th** [1] - 191:20
**29th** [2] - 185:24, 191:20
**2:00** [2] - 129:5, 186:13
**2:20** [1] - 100:16, 100:18
**2nd** [1] - 186:2

## 3

**3** [2] - 104:19, 105:22
**3/24/02** [2] - 75:19, 76:2
**30** [5] - 72:1, 105:5, 150:24, 169:5, 190:21
**32** [1] - 104:19
**34** [1] - 96:7

**35** [2] - 96:18, 97:9
**38** [1] - 88:12
**3:00** [2] - 193:3, 193:6
**3rd** [2] - 186:3, 186:5

## 4

**4** [2] - 73:25, 163:16
**40** [2] - 92:5, 160:8
**410** [1] - 31:14
**410-254-5743** [1] - 85:23
**410-493-1241** [1] - 8:25
**410-542-7285** [1] - 31:18
**410-669-6731** [2] - 83:14, 99:9
**410-808-9606** [1] - 9:7
**410-899-9323** [1] - 8:21
**410-905-1681** [1] - 9:2
**410-963-3912** [1] - 9:10
**418-5570** [1] - 9:4
**42** [1] - 87:25
**443** [2] - 7:10, 8:10
**443-253-0187** [2] - 8:22, 9:9
**443-309-5057** [1] - 161:12
**443-418-5570** [1] - 9:2
**443-418-6204** [5] - 8:22, 9:5, 82:5, 82:20, 86:18
**443-540-1253** [1] - 9:6
**443-677-2024** [1] - 98:3
**443-691-2252** [1] - 8:24
**443-691-8844** [2] - 8:24, 9:1
**443-691-9203** [2] - 8:23, 9:1
**443-73** [1] - 8:17
**443-739-5811** [1] - 8:21
**443-822-3608** [1] - 9:8
**443-838-1933** [3] - 9:6, 85:12, 86:23
**45** [1] - 192:14
**46** [3] - 30:7, 78:3, 79:6, 91:8, 195:14
**49** [1] - 92:4
**4916** [2] - 16:22, 85:25
**496-4284** [1] - 30:22
**4:07** [3] - 82:7, 82:16, 111:22
**4:11** [1] - 111:21
**4:30** [1] - 72:20
**4:45** [1] - 195:22
**4th** [1] - 186:6

## 5

**50** [2] - 91:4, 91:20
**53** [2] - 87:3, 87:12
**5515** [1] - 1:24
**5570** [6] - 9:4, 92:3, 92:7, 92:19, 93:7, 93:22
**56** [2] - 95:9, 95:12
**57** [1] - 105:22

## 6

**6** [1] - 196:5
**60** [1] - 31:24
**620** [1] - 93:9
**6204** [13] - 15:5, 84:20, 85:4, 87:17, 88:16, 91:23, 92:3, 92:17, 94:23, 95:9, 95:18, 97:7, 99:7
**66** [2] - 135:16, 141:21
**671** [1] - 33:5
**691-9203** [1] - 92:16
**6:00** [1] - 129:6
**6:19** [1] - 87:20
**6th** [1] - 193:12

## 7

**7:18** [1] - 87:25
**7th** [2] - 186:13, 193:12

## 8

**801** [1] - 33:5
**83** [7] - 103:24, 104:1, 104:2, 104:3, 110:13, 110:16
**838-1933** [1] - 7:11
**8844** [4] - 15:2, 93:22, 95:2, 97:11
**8:17** [1] - 88:10
**8:30** [1] - 88:14
**8:39** [1] - 89:5
**8:42** [4] - 89:13, 91:2, 141:24, 141:25

## 9

**9** [1] - 119:13
**9203** [11] - 93:8, 93:22, 94:9, 95:10, 96:5, 96:16, 97:2, 98:1, 98:9, 99:3
**947-0934** [1] - 33:5
**99%** [1] - 71:10
**9:20** [1] - 30:4

**9:30** [2] - 185:23, 186:11
**9:34** [2] - 91:7, 142:2
**9:40** [1] - 2:1
**9:41** [1] - 76:3
**9:48** [1] - 91:12
**9:49** [1] - 91:13
**9:50** [1] - 91:13
**9:51** [2] - 91:13, 142:10

## A

**A.m** [1] - 14:13
**a.m** [19] - 2:1, 14:18, 15:1, 15:17, 30:2, 30:4, 79:3, 82:7, 96:20, 96:25, 98:4, 98:13, 99:6, 99:17, 104:16, 116:2, 119:13
**ability** [1] - 49:4
**able** [13] - 2:23, 8:13, 10:17, 23:2, 62:16, 67:4, 135:10, 137:21, 140:22, 161:20, 176:23, 184:3
**absence** [2] - 174:25, 190:1
**absolute** [1] - 63:12
**absolutely** [4] - 57:8, 57:24, 59:23, 178:21
**Absolutely** [2] - 48:17, 157:1
**accept** [2] - 8:13, 26:5
**access** [1] - 189:18
**accommodate** [1] - 183:25
**accompanies** [1] - 152:19
**accomplishment** [1] - 144:4
**accordance** [2] - 90:15, 185:12
**according** [7] - 12:13, 13:18, 14:8, 111:16, 116:1, 194:16
**According** [1] - 16:2
**account** [8] - 21:1, 77:3, 148:3, 148:5, 148:6, 148:23, 152:21, 163:14
**accurate** [2] - 162:7, 197:8
**accurately** [3] - 177:5, 177:6, 178:8
**acknowledging** [1] - 75:25
**acquired** [1] - 3:15
**acting** [1] - 23:21
**action** [1] - 187:19
**activated** [2] - 115:21, 115:23
**activities** [1] - 94:6

**activity** [2] - 29:24, 94:1
**acts** [3] - 171:7, 171:10, 171:16
**actual** [7] - 10:1, 11:8, 111:18, 111:21, 153:12, 169:19
**AD** [1] - 151:7
**Adam** [1] - 1:22
**add** [2] - 27:9, 172:20
**added** [1] - 173:24
**addition** [6] - 66:24, 171:2, 171:6, 171:9, 171:14, 173:5
**additional** [3] - 47:4, 75:15, 92:5
**Additionally** [2] - 82:23, 94:13
**address** [6] - 16:12, 30:19, 30:25, 43:10, 69:15, 83:19, 86:1, 115:5, 116:9, 145:18, 148:18, 174:23
**addresses** [4] - 33:5, 33:6, 33:18, 145:19, 145:20, 145:22
**Addresses** [1] - 33:7
**adhere** [3] - 185:9, 185:11, 186:17
**admissible** [2] - 64:24, 65:1
**admissions** [1] - 151:10
**admitted** [5] - 82:23, 94:25, 163:23, 164:22, 168:2
**advantage** [2] - 10:17, 188:20
**Advice** [1] - 31:20
**advise** [1] - 30:3
**affect** [1] - 26:16
**affects** [1] - 176:4
**affidavit** [5] - 131:12, 132:3, 133:7, 133:10, 133:18
**affiliated** [1] - 194:22
**affixed** [1] - 197:9
**afraid** [1] - 123:13
**afternoon** [11] - 16:9, 73:6, 78:18, 100:16, 101:15, 106:8, 106:9, 124:6, 124:7, 168:21, 173:16, 174:11, 183:18
**afterwards** [1] - 33:17
**age** [1] - 22:23
**Agent** [1] - 156:19
**agent** [5] - 2:23, 62:6, 72:15, 106:12, 106:13
**agents** [2] - 10:3, 156:20, 190:2
**ago** [10] - 18:18, 48:22, 60:24, 111:6, 115:12,

128:20, 131:4, 188:2, 190:17, 195:15
**agree** [13] - 43:15, 46:18, 48:10, 55:19, 61:9, 66:2, 69:5, 123:14, 153:5, 170:15, 179:4, 184:24, 191:1
**agreed** [5] - 48:16, 48:21, 71:12, 149:21, 181:25
**agreement** [9] - 42:9, 106:4, 124:2, 154:5, 180:18, 180:21, 183:2, 183:3, 183:4
**agreements** [1] - 170:12
**agrees** [2] - 44:1, 149:13
**ahead** [14] - 6:19, 21:7, 21:14, 27:22, 29:6, 43:24, 45:11, 46:3, 47:9, 59:25, 90:18, 93:3, 173:14, 175:25
**aid** [2] - 10:8, 80:20
**ain't** [1] - 10:21
**air** [1] - 195:20
**airtime** [1] - 194:9
**akin** [1] - 109:24
**al** [1] - 197:5
**alcohol** [1] - 31:11
**alert** [3] - 3:20, 39:22, 188:21
**Alex** [2] - 32:21, 32:22
**alibi** [14] - 3:14, 21:5, 21:9, 45:14, 45:16, 47:15, 62:18, 63:4, 65:9, 75:4, 75:7, 163:15, 164:3
**alibis** [2] - 65:6, 65:7
**alleged** [4] - 45:2, 171:7, 171:10, 171:16
**allow** [1] - 54:17
**allowed** [1] - 70:22
**almost** [5] - 38:5, 96:2, 110:10, 110:11, 110:13
**Almost** [1] - 92:15
**alternative** [2] - 48:9, 175:1
**Alvin** [2] - 126:7, 160:24
**Ambrose** [1] - 22:22
**AMC** [2] - 150:6, 153:11
**AMD-04-029** [2] - 1:6, 197:5
**amend** [1] - 133:22
**Amendment** [2] - 56:14, 57:25
**AMERICA** [1] - 1:5
**Amity** [4] - 83:18, 99:9, 179:15, 181:14
**ammunition** [3] - 131:17, 158:18, 158:21

**amount** [11] - 76:23, 87:5, 102:17, 102:23, 102:25, 112:5, 120:1, 134:4, 138:1, 164:14, 164:15
**analysis** [10] - 16:2, 80:6, 99:19, 120:23, 121:1, 121:3, 126:13, 127:9, 134:5, 137:19
**analyze** [1] - 160:18
**analyzed** [3] - 160:13, 160:14
**Andre** [3] - 1:13, 74:18, 74:23
**Anne** [1] - 153:21
**Answer** [4] - 41:3, 64:19, 70:17
**answer** [20] - 14:1, 14:10, 23:14, 41:5, 45:4, 59:2, 60:7, 64:16, 87:9, 88:21, 93:5, 93:6, 93:25, 105:15, 123:12, 135:12, 142:23, 149:24, 164:6, 164:18
**answered** [3] - 123:5, 149:4, 181:6
**answering** [1] - 143:17
**answers** [1] - 103:9
**Anthony** [15] - 10:23, 20:17, 94:12, 97:13, 108:9, 114:17, 125:25, 127:12, 127:19, 127:20, 127:22, 127:25, 157:7, 158:12, 160:10
**anxious** [1] - 195:14
**anyway** [5] - 5:14, 101:12, 173:18
**apart** [1] - 53:11
**apartment** [2] - 180:6, 183:11
**Apartments** [1] - 19:20
**apologies** [1] - 156:18
**apologize** [2] - 142:16, 149:11
**appear** [9] - 60:2, 81:14, 84:7, 101:21, 130:7, 131:1, 141:4, 180:25, 189:20
**Appearances** [1] - 1:15
**appeared** [1] - 73:20
**appearing** [1] - 106:8
**appendix** [1] - 169:19
**application** [1] - 127:3
**appreciate** [6] - 81:1, 175:13, 175:15, 185:9, 188:21, 192:16
**approach** [11] - 32:2, 34:14, 38:23, 39:9, 51:14, 51:22, 56:4, 116:22, 117:7, 154:23,

191:25
**approached** [1] - 45:24
**appropriate** [4] - 25:8, 46:11, 70:8, 171:16
**April** [18] - 7:1, 9:12, 16:14, 29:19, 30:2, 31:4, 31:21, 73:11, 74:12, 75:4, 83:5, 83:7, 103:13, 128:9, 137:15, 137:22, 143:20, 144:7
**arduously** [1] - 170:17
**area** [13] - 18:4, 18:9, 18:11, 19:13, 19:17, 19:23, 20:19, 20:21, 21:16, 110:6, 110:10, 110:13, 138:3
**areas** [1] - 138:6
**argue** [6] - 9:9, 54:25, 64:22, 65:5, 66:7, 67:22, 67:23
**argument** [9] - 17:9, 50:2, 55:10, 57:3, 57:6, 57:10, 57:24, 59:14
**arguments** [1] - 178:10
**Arlene** [2] - 83:24, 139:18
**arrange** [1] - 187:19
**arrest** [3] - 129:5, 129:6, 155:8
**arrested** [1] - 118:25
**arrests** [1] - 128:17
**Arrington** [6] - 6:24, 47:2, 68:16, 80:15, 184:15, 186:19
**arrive** [2] - 62:10, 79:14
**arrived** [3] - 106:19, 106:25, 112:19
**arrow** [4] - 121:8, 121:10, 121:15, 121:17
**Arundel** [1] - 153:21
**Ashburton** [1] - 19:19
**Ashburton's** [1] - 19:19
**aside** [1] - 176:14
**assertion** [1] - 37:14
**assessed** [2] - 26:4, 26:18
**assessment** [4] - 10:4, 25:23, 26:6, 63:16
**assistance** [1] - 81:14
**associate** [7] - 82:20, 83:16, 85:12, 85:23, 86:23, 88:1
**associated** [75] - 14:24, 15:3, 15:4, 15:9, 52:25, 80:24, 82:4, 82:11, 82:12, 82:13, 85:11, 86:5, 86:19, 87:23, 87:24, 88:10, 88:11, 88:16, 88:17, 89:8, 89:9, 89:12, 89:13, 90:12,

91:1, 91:6, 91:7, 91:11, 91:12, 91:22, 91:23, 92:2, 92:3, 92:10, 92:11, 92:16, 92:17, 93:8, 93:9, 94:9, 95:3, 95:4, 95:10, 95:11, 95:19, 95:23, 95:24, 96:4, 96:5, 96:9, 96:15, 96:16, 96:21, 97:1, 97:2, 97:6, 97:22, 99:3, 99:4, 99:7, 99:8, 99:20, 99:21, 115:5, 115:6, 115:7, 116:9, 135:11, 136:2, 136:10, 157:22, 160:15, 160:23, 160:24

**Association** [1] - 83:21

**assume** [8] - 52:8, 52:9, 125:7, 136:19, 138:24, 166:24, 194:10

**assumed** [1] - 56:6

**assuming** [2] - 71:13, 173:23

**Assuming** [1] - 173:18

**assure** [1] - 189:1

**attached** [2] - 7:23, 117:23

**attachment** [2] - 169:15, 170:2

**attempt** [2] - 108:19, 138:5

**attempted** [1] - 90:25

**attempting** [2] - 91:6, 91:23

**attempts** [1] - 143:11

**attend** [1] - 185:1

**attention** [25] - 11:1, 11:6, 11:11, 11:15, 11:25, 12:11, 16:6, 18:5, 19:16, 23:5, 28:4, 30:11, 40:8, 44:5, 69:16, 80:7, 84:2, 99:11, 101:19, 104:19, 160:7, 160:21, 162:20, 163:16, 190:3

**Attorney** [5] - 117:20, 127:6, 166:4, 166:19, 167:15

**attorney** [1] - 90:5

**Attorney's** [3] - 118:14, 118:17, 167:4

**Attorneys** [1] - 166:5

**attorneys** [2] - 101:2, 101:4

**attractions** [1] - 163:2

**attributed** [1] - 37:10

**authenticating** [1] - 118:2

**authored** [1] - 155:17

**authorized** [1] - 172:22

**automated** [1] - 102:19

**automatically** [2] -

87:5, 87:6

**autopsies** [1] - 179:9

**autopsy** [1] - 5:9

**available** [7] - 37:13, 44:21, 45:8, 46:1, 46:11, 50:6, 62:2

**Avenue** [7] - 18:15, 19:6, 19:11, 78:8, 79:13, 138:7, 152:23

**avoid** [1] - 186:17

**aware** [16] - 23:21, 31:16, 52:9, 86:5, 125:18, 138:14, 138:16, 138:22, 153:15, 153:19, 158:4, 161:2, 169:7, 169:11, 173:17, 184:19

**awfully** [1] - 41:23

## B

**ba** [4] - 104:6

**ba-boom** [4] - 104:6

**baby** [4] - 112:13, 112:19, 113:6, 113:11

**baby's** [1] - 20:13

**background** [1] - 183:5

**bad** [3] - 50:13, 139:25, 144:16

**badge** [1] - 125:7

**balance** [1] - 178:15

**Ballpark** [1] - 72:1

**Baltimore** [9] - 1:12, 1:25, 18:23, 117:20, 129:8, 129:10, 166:4, 181:11, 181:12

**barely** [1] - 30:17

**barred** [1] - 39:20

**Barring** [1] - 55:17

**barring** [2] - 55:18, 56:8

**Barry** [1] - 1:22

**base** [3] - 14:14, 91:19, 173:3

**based** [14] - 13:16, 24:21, 43:5, 50:15, 73:14, 87:5, 87:10, 90:14, 90:17, 154:11, 158:19, 164:19, 172:19, 188:14

**Based** [1] - 158:14

**basement** [1] - 137:9

**basic** [1] - 21:1

**basis** [9] - 40:25, 41:3, 41:6, 41:11, 50:11, 57:3, 59:3, 90:10, 90:11

**basketball** [2] - 23:8, 23:19

**bathroom** [1] - 46:15

**bay** [1] - 175:18

**bearing** [2] - 189:24,

190:16

**beat** [2] - 56:13, 160:4

**become** [1] - 52:9

**becomes** [1] - 67:1

**bedroom** [7] - 129:20, 130:5, 130:7, 130:24, 131:2, 131:8, 137:7

**bedrooms** [2] - 130:24, 131:1

**beep** [1] - 103:10

**began** [3] - 15:13, 51:3, 79:6

**begin** [1] - 30:5

**beginning** [6] - 3:3, 68:16, 120:13, 155:25, 162:14, 169:23

**begins** [1] - 11:17, 12:2

**behalf** [5] - 40:1, 40:9, 48:6, 50:17, 187:24

**Behalf** [7] - 1:15, 1:17, 1:18, 1:20, 1:21

**behind** [2] - 60:15, 112:20

**belief** [2] - 22:11, 65:6

**Belinda** [1] - 183:15

**belonged** [1] - 15:2

**belongs** [2] - 36:7, 38:20

**Belongs** [1] - 36:10

**belt** [2] - 123:2, 123:9

**belts** [1] - 106:22

**bench** [17] - 32:2, 34:14, 38:23, 39:10, 45:24, 46:17, 47:5, 50:2, 51:14, 51:16, 51:22, 52:21, 52:23, 53:7, 54:13, 56:4, 191:24

**Bench** [1] - 34:16

**benefit** [2] - 63:10, 67:11

**Benson** [5] - 10:15, 81:21, 116:17, 135:23, 156:8

**Berger** [3] - 79:22, 155:23, 155:24

**Berger's** [1] - 84:2

**Berkeley** [1] - 194:23

**beside** [1] - 100:12

**best** [8] - 10:3, 175:24, 178:19, 183:24, 184:21, 187:19, 188:24, 189:21

**better** [11] - 4:8, 48:9, 50:14, 53:18, 55:20, 55:21, 58:3, 139:5, 167:2, 171:20, 187:20

**between** [7] - 12:13, 13:14, 13:18, 14:23, 15:14, 15:18, 16:3, 16:25, 17:4, 23:11, 23:25, 50:1, 51:7, 78:5,

78:6, 81:6, 82:7, 82:11, 92:10, 93:2, 104:3, 110:10, 111:14, 112:3, 114:22, 135:11, 141:14, 161:24, 162:21

**Between** [3] - 14:11, 79:3, 182:23

**beyond** [3] - 27:21, 81:12, 188:15

**Bialek** [1] - 4:9

**big** [1] - 173:8

**Big** [1] - 11:12

**bill** [11] - 2:15, 2:24, 7:2, 7:6, 7:8, 85:15, 111:12, 111:18, 112:6, 140:11, 140:16

**bills** [2] - 141:2, 141:4

**binding** [1] - 26:24

**birthday** [6] - 33:3, 33:12, 33:16, 145:2, 145:5, 145:7

**bit** [15] - 32:25, 33:2, 51:2, 51:8, 64:3, 72:23, 94:4, 122:13, 139:9, 154:7, 159:25, 173:21, 184:12, 186:6

**Blade** [10] - 33:4, 33:15, 33:19, 59:10, 77:6, 77:24, 78:1, 145:13, 151:8, 152:2

**blanche** [1] - 65:5

**blank** [1] - 53:5

**block** [2] - 17:19

**blocks** [1] - 129:8

**blood** [8] - 107:21, 108:7, 108:8, 108:14, 126:23, 128:4, 158:11, 158:14

**blue** [6] - 11:12, 11:18, 11:19, 11:22, 11:23, 28:8

**blunt** [1] - 44:6

**blur** [1] - 176:22

**blurted** [1] - 34:10

**Bo** [33] - 28:10, 32:12, 34:12, 34:19, 35:13, 35:20, 35:22, 35:23, 37:11, 38:7, 38:10, 41:10, 41:14, 41:17, 42:10, 42:14, 44:10, 44:11, 44:14, 44:20, 44:21, 45:22, 51:20, 60:13, 62:25, 63:1, 64:16, 64:17, 66:15, 67:15, 67:20

**Bo's** [11] - 35:5, 35:11, 35:15, 35:17, 35:21, 38:8, 42:3, 44:11, 69:16, 69:17, 84:12

**bodies** [2] - 18:16, 19:15, 114:11

**body** [1] - 112:17

**book** [12] - 11:3, 62:3, 73:18, 85:17, 85:18, 88:5, 102:16, 116:15, 160:15, 160:25, 170:9, 170:13

**books** [10] - 9:16, 60:20, 60:23, 61:3, 61:4, 61:5, 61:7, 61:12, 160:23, 185:16

**boom** [1] - 104:6

**bother** [1] - 108:23

**bottom** [20] - 12:3, 12:15, 13:11, 13:12, 16:23, 17:7, 18:2, 19:22, 20:11, 23:6, 28:4, 28:7, 43:4, 43:17, 51:10, 59:20, 73:25, 75:24, 119:5, 137:7

**Boulevard** [1] - 33:5

**bound** [1] - 26:5

**boxes** [1] - 191:12

**Brady** [1] - 189:8

**break** [13] - 3:20, 13:14, 46:16, 68:12, 70:21, 72:23, 104:4, 167:18, 174:13, 184:25, 185:1, 185:11, 191:6

**breakdown** [1] - 80:9

**bridge** [1] - 104:3

**bridges** [1] - 110:11

**brief** [4] - 62:11, 92:18, 144:16, 165:3

**Briefly** [1] - 59:11

**briefly** [5] - 4:22, 8:2, 157:4, 165:5, 176:12

**briefs** [1] - 169:8

**brilliance** [1] - 170:21

**brilliant** [2] - 168:15, 176:6

**Bring** [1] - 183:15

**bring** [8] - 40:8, 55:14, 146:3, 146:6, 172:15, 183:20, 190:11, 194:6

**bringing** [3] - 181:17, 190:3, 191:11

**broad** [1] - 190:3

**brochure** [1] - 74:6

**brother** [2] - 31:13, 161:9

**brothers** [4] - 19:2, 74:7, 78:7, 127:17

**brothers'** [5] - 18:16, 104:25, 106:13, 131:19, 135:12

**brought** [6] - 16:14, 29:25, 30:1, 69:2, 119:12, 165:5, 168:21, 174:20

**Brown** [3] - 79:24, 84:3,

155:9
**Bruton** [8] - 41:13, 62:19, 63:5, 63:24, 65:3, 65:24, 67:1, 67:5
**Bruton/Sixth** [1] - 56:14
**buc** [5] - 104:20, 104:21
**buc-a** [5] - 104:20, 104:21
**buck** [1] - 104:21
**buh** [4] - 110:23
**buh-buh-buh-buh** [1] - 110:23
**Buick** [5] - 11:12, 11:19, 11:22, 11:23, 28:8
**bullet** [3] - 4:12, 5:9, 5:20
**bumps** [2] - 141:17, 141:18
**bunch** [4] - 4:1, 68:1, 137:16, 191:12
**burn** [3] - 137:1, 161:16, 161:17
**bushy** [1] - 22:21
**business** [5] - 12:12, 13:17, 191:16, 191:17, 191:21
**busy** [1] - 128:9
**buy** [1] - 22:6
**buyers** [1] - 14:3
**buys** [1] - 75:21
**BY** [27] - 6:21, 10:12, 13:10, 17:25, 21:23, 22:17, 27:4, 27:23, 32:8, 73:8, 79:11, 81:19, 90:19, 93:4, 102:14, 106:7, 118:6, 124:5, 150:2, 154:19, 157:3, 162:19, 196:5, 196:6, 196:7, 196:8, 196:9
**Byrd** [2] - 79:18, 157:19

## C

**Cadillac** [4] - 12:5, 12:6, 12:8, 12:9
**calendar** [1] - 72:21
**call's** [4] - 85:4, 87:12, 98:3, 103:9
**caller's** [1] - 112:2
**Calvin** [1] - 126:6
**camera** [1] - 51:1
**cameras** [1] - 153:16
**Campbell** [2] - 130:14, 131:10
**candid** [1] - 57:23
**cannot** [2] - 65:19, 65:21
**caption** [1] - 171:25
**capture** [1] - 161:18

**captured** [1] - 94:16
**car** [25] - 12:4, 19:3, 20:2, 22:23, 28:13, 92:7, 104:25, 107:17, 107:18, 107:19, 108:13, 108:20, 112:14, 113:1, 113:4, 115:13, 123:2, 123:8, 126:14, 134:1, 135:4, 160:10, 160:16, 160:19
**card** [15] - 33:4, 33:25, 34:2, 59:10, 75:18, 75:20, 75:23, 75:24, 76:9, 76:11, 76:18, 145:13, 145:16, 150:13, 161:19
**care** [3] - 47:6, 180:2, 190:5
**carpet** [1] - 107:25
**carpeting** [1] - 107:19
**carry** [2] - 122:20, 173:4
**Carry** [1] - 122:22
**carry-over** [1] - 173:4
**cars** [3] - 104:8, 159:16, 160:4
**carte** [1] - 65:5
**Case** [1] - 197:5
**case** [78] - 24:21, 27:1, 27:17, 39:21, 46:20, 54:25, 66:17, 74:20, 79:2, 80:6, 80:10, 80:23, 81:10, 97:12, 98:14, 100:13, 106:13, 107:11, 109:5, 109:10, 109:15, 109:16, 113:6, 113:14, 115:12, 116:20, 117:13, 117:17, 117:20, 118:15, 119:4, 124:9, 124:16, 125:2, 125:19, 125:20, 125:21, 125:25, 136:7, 137:20, 138:1, 142:3, 153:19, 155:10, 155:15, 155:25, 156:4, 159:5, 165:9, 165:25, 166:4, 166:13, 166:23, 167:17, 170:18, 171:8, 174:1, 177:6, 177:7, 177:10, 177:11, 177:21, 178:1, 178:10, 185:2, 185:7, 185:8, 185:11, 185:14, 185:19, 185:20, 186:18, 191:2, 194:11
**CASE** [1] - 1:6
**cases** [3] - 155:7, 162:1, 174:5
**cash** [1] - 114:14
**casings** [1] - 104:24
**cassette** [2] - 7:13
**catch** [2] - 160:1, 160:5
**categories** [1] - 57:18
**caught** [1] - 144:13,

158:25
**caused** [1] - 115:17
**caution** [1] - 167:20
**cc** [2] - 124:24, 155:16
**cede** [1] - 58:7
**Cell** [2] - 121:24, 134:20
**cell** [52] - 81:25, 84:5, 87:7, 87:17, 87:18, 89:13, 89:22, 90:22, 94:14, 98:3, 101:23, 102:2, 111:25, 112:6, 115:4, 115:13, 115:16, 115:17, 116:2, 116:7, 121:5, 121:21, 134:21, 136:1, 136:7, 136:9, 137:16, 138:2, 138:3, 138:6, 138:12, 138:14, 138:25, 139:10, 139:13, 139:16, 139:20, 139:23, 140:5, 140:6, 140:9, 140:17, 141:14, 142:13, 153:6, 161:14, 185:18, 187:10, 189:5, 189:11
**cellular** [1] - 87:3
**certain** [9] - 25:10, 62:24, 64:13, 65:25, 70:10, 71:10, 81:6, 81:7, 183:23
**certainly** [11] - 5:25, 57:9, 59:2, 69:12, 70:20, 136:8, 139:2, 142:25, 174:5, 174:22, 195:18
**Certainly** [12] - 2:6, 80:16, 89:4, 102:13, 135:20, 149:6, 154:2, 154:16, 156:9, 184:25, 187:17
**CERTIFICATE** [1] - 197:1
**certification** [3] - 7:23, 8:2, 8:12
**certifications** [1] - 8:14
**certified** [1] - 63:13
**certify** [2] - 197:3, 197:6
**chair** [2] - 100:11, 100:12
**chairs** [4] - 46:20, 112:25, 165:9, 186:23
**challenge** [1] - 79:5
**chance** [2] - 178:24, 188:14
**change** [4] - 170:22, 171:2, 171:8, 171:11
**changed** [1] - 70:25
**changes** [1] - 171:19
**channels** [1] - 23:9
**characterization** [2] - 17:1, 24:8
**charge** [5] - 95:5, 106:16, 140:16, 150:13,

150:17
**charged** [11] - 87:5, 87:8, 87:10, 91:19, 95:20, 96:1, 96:12, 102:23, 103:5, 103:8, 175:9
**charges** [4] - 172:2, 172:15, 172:23, 172:24
**chart** [20] - 3:11, 71:18, 80:18, 81:20, 82:6, 88:25, 90:17, 93:20, 93:21, 94:8, 95:13, 97:7, 101:19, 105:4, 111:18, 114:24, 121:8, 135:15, 135:21, 141:21
**check** [5] - 10:21, 62:3, 62:6, 114:13, 166:6
**checked** [1] - 13:3
**checking** [2] - 114:13, 168:24
**chemists** [5] - 181:18, 181:20, 181:22, 182:5
**Chemists** [1] - 181:19
**choice** [1] - 38:6
**choose** [1] - 191:18
**Christopher** [2] - 79:17, 157:18
**Chrysler** [4] - 133:8, 133:12, 133:23, 159:13
**Cinema** [1] - 76:22
**circled** [1] - 69:25
**circulating** [1] - 67:16
**circumstance** [1] - 177:10
**circumstances** [6] - 5:15, 25:16, 65:25, 172:5, 172:6, 178:2
**city** [1] - 174:21
**City** [2] - 117:20, 166:4
**claim** [1] - 189:22
**claiming** [2] - 23:15, 63:18
**claims** [1] - 63:13
**clarify** [1] - 42:19
**clarity** [1] - 193:19
**classic** [2] - 5:22, 177:11
**Claudus** [1] - 74:9
**clause** [2] - 56:20, 172:8
**clean** [1] - 140:1
**clear** [24] - 27:10, 37:10, 52:11, 52:13, 52:24, 53:17, 54:9, 54:13, 54:20, 55:24, 56:13, 63:20, 64:2, 67:18, 69:5, 102:11, 176:21, 177:18, 178:2, 193:10, 193:20, 195:14
**clearest** [1] - 54:23

**clearly** [1] - 39:2
**Clearly** [2] - 35:7, 178:21
**client** [9] - 38:9, 39:19, 45:14, 54:18, 126:24, 159:14, 189:19, 192:5, 192:13
**client's** [4] - 50:4, 52:3, 68:15
**close** [8] - 44:19, 57:13, 57:14, 190:11, 191:16, 191:18, 191:21
**closed** [1] - 155:10
**closer** [1] - 18:24
**closing** [3] - 55:10, 59:14, 155:10
**clothes** [1] - 131:23
**clothing** [1] - 131:17
**co** [1] - 177:8
**co-counsel** [1] - 177:8
**Coburn** [7] - 1:22, 53:22, 165:19, 168:7, 168:19, 169:8, 181:24
**COBURN** [5] - 165:21, 168:24, 169:14, 169:17, 182:2
**codefendants** [1] - 82:13
**cogent** [1] - 50:2
**coincidence** [1] - 57:15
**cold** [1] - 104:4
**Coldspring** [1] - 28:10
**Colgate** [1] - 194:21
**colleagues** [1] - 160:14
**collected** [2] - 107:21, 107:22
**College** [1] - 194:21
**coming** [6] - 44:16, 110:25, 163:1, 176:20, 191:6, 193:11
**comment** [2] - 34:9, 109:23
**common** [2] - 109:19, 109:20
**communicate** [5] - 25:24, 26:5, 26:7, 26:10, 26:11
**communicating** [3] - 26:2, 26:4, 26:7
**communication** [4] - 90:4, 90:8, 92:24, 93:1
**community** [1] - 67:16
**companies** [2] - 101:23, 111:8, 140:20
**company** [2] - 76:10, 76:11
**compared** [4] - 10:6, 128:3, 181:7, 181:8
**comparison** [4] - 74:23, 79:21, 80:2, 124:16

**comparisons** [1] - 157:25

**compelling** [3] - 57:1, 57:2

**complaint** [1] - 174:20

**complete** [5] - 52:4, 71:20, 148:3, 149:9, 197:8

**completely** [1] - 51:23

**completes** [2] - 106:2, 170:16

**completion** [1] - 100:6

**complied** [1] - 169:25

**comprehensive** [1] - 175:14

**computer** [3] - 49:20, 155:6, 164:13

**computer-generated** [1] - 155:6

**concern** [1] - 188:16

**concerned** [8] - 40:2, 122:25, 123:6, 175:16, 189:2, 189:3, 193:13, 193:18

**concerning** [7] - 25:22, 45:7, 49:2, 49:4, 62:16, 62:17, 172:4

**conclude** [5] - 40:3, 100:9, 100:24, 184:18

**concludes** [1] - 71:13

**Conclusion** [1] - 195:22

**conclusions** [3] - 49:7, 49:11, 81:10

**concrete** [1] - 104:4

**condition** [1] - 5:12

**Conduct** [1] - 185:15

**conduct** [7] - 94:2, 124:2, 154:10, 172:12, 172:17, 185:18

**conducted** [1] - 158:25

**conference** [2] - 34:16, 46:17

**conferred** [1] - 184:21

**confession** [2] - 58:18, 58:19

**confirm** [3] - 8:14, 148:23, 190:20

**confirmed** [1] - 195:15

**confused** [3] - 37:24, 38:18, 65:16

**confusing** [1] - 37:20

**congruence** [1] - 51:6

**connected** [25] - 14:23, 84:14, 84:16, 86:21, 87:2, 87:12, 87:16, 87:25, 88:12, 91:8, 92:4, 95:8, 96:1, 96:6, 96:11, 96:17, 96:22, 97:3, 97:8, 97:15, 97:16, 103:9, 142:4, 143:7, 162:22

**connection** [7] - 74:20, 86:11, 86:14, 87:8, 87:13, 137:25, 142:13

**connections** [2] - 81:6, 93:2

**conscious** [1] - 148:18

**consider** [20] - 24:25, 25:16, 25:25, 26:3, 26:13, 26:15, 27:18, 27:19, 36:23, 45:25, 49:5, 49:6, 49:9, 49:23, 81:9, 173:22, 174:8, 176:2, 179:2

**consideration** [2] - 10:1, 178:1

**considered** [12] - 25:2, 25:5, 25:11, 25:13, 26:23, 27:15, 47:17, 65:2, 65:13, 65:18, 65:20, 65:21

**considers** [1] - 62:18

**consistent** [3] - 43:17, 52:24, 147:15

**constitute** [1] - 197:6

**constitutes** [1] - 172:13

**construed** [1] - 64:8

**consult** [2] - 146:24

**contact** [8] - 14:4, 15:6, 33:18, 71:18, 83:20, 90:25, 91:7, 91:23

**contacted** [1] - 15:6

**contacting** [3] - 91:7, 96:5, 96:10

**contacts** [2] - 91:11, 92:3

**contain** [1] - 76:19

**contains** [1] - 80:23

**content** [1] - 81:4

**context** [6] - 27:1, 34:9, 34:17, 34:22, 156:4, 178:16

**continue** [4] - 6:19, 22:10, 73:7, 185:11

**Continue** [3] - 46:20, 186:16, 186:18

**continues** [1] - 18:8

**contract** [1] - 104:5

**contribute** [1] - 179:23

**controversial** [1] - 193:9

**conversation** [19] - 7:18, 10:21, 14:19, 15:12, 15:15, 15:16, 16:21, 20:8, 23:25, 28:2, 28:5, 28:18, 87:13, 89:18, 105:19, 109:3, 112:4, 117:3, 180:2

**conversations** [3] - 81:5, 92:19, 159:1

**conviction** [1] - 172:23

**Cool** [1] - 17:20

**cooperative** [1] - 191:5

**cooperator** [2] - 179:13, 182:7

**cooperators** [1] - 179:21

**copier** [1] - 2:22

**copies** [8] - 2:17, 2:23, 61:9, 61:10, 61:11, 61:15, 61:21, 80:14

**copy** [32] - 2:14, 7:17, 11:2, 42:6, 42:24, 42:25, 43:1, 46:9, 46:10, 47:6, 47:7, 47:8, 61:22, 62:2, 68:16, 75:18, 76:17, 77:24, 80:19, 85:14, 89:2, 117:24, 127:9, 133:10, 150:15, 150:20, 150:23, 169:4, 169:19, 171:21

**corner** [10] - 20:3, 20:4, 28:14, 28:15, 28:25, 29:10, 29:11, 29:12, 82:15, 124:19

**correct** [131] - 16:14, 18:21, 18:25, 19:3, 31:11, 32:16, 37:21, 41:19, 42:16, 43:22, 46:10, 47:7, 49:13, 67:21, 69:9, 82:8, 83:8, 83:11, 83:14, 84:17, 85:2, 85:21, 86:15, 86:21, 87:18, 89:17, 89:19, 89:22, 90:22, 97:17, 97:18, 98:12, 98:13, 98:21, 98:22, 98:25, 99:2, 99:15, 100:1, 100:2, 102:21, 103:17, 104:15, 105:5, 105:23, 106:14, 109:2, 110:18, 111:7, 111:12, 114:15, 115:2, 115:18, 116:2, 116:7, 118:15, 119:19, 120:3, 120:7, 120:24, 121:18, 122:3, 122:17, 124:10, 124:11, 125:8, 126:16, 126:17, 127:12, 127:16, 127:18, 128:22, 129:2, 130:2, 130:12, 130:15, 132:15, 135:1, 135:13, 135:24, 135:25, 136:15, 137:6, 137:11, 137:16, 137:17, 139:1, 139:7, 139:14, 139:15, 139:24, 140:12, 141:9, 141:15, 141:23, 142:8, 142:10, 142:12, 142:18, 143:5, 143:13, 143:20, 143:25, 144:1, 144:18, 145:14, 147:22,

**Correct** [62] - 4:21, 15:20, 16:18, 17:6, 19:4, 28:3, 31:12, 32:17, 80:1, 82:9, 83:9, 83:15, 84:18, 85:22, 86:16, 87:19, 89:23, 90:25, 91:3, 94:22, 95:14, 98:7, 102:22, 103:18, 104:17, 105:6, 105:24, 106:23, 107:7, 110:1, 112:7, 112:15, 112:18, 116:3, 116:8, 117:16, 117:22, 119:8, 119:17, 120:4, 120:6, 120:8, 120:25, 121:14, 121:19, 122:15, 122:18, 125:3, 125:12, 128:15, 128:25, 132:21, 135:14, 136:6, 136:18, 145:15, 148:17, 150:15, 150:22, 157:20, 160:17, 163:20

**corrected** [2] - 18:22, 134:17

**correcting** [1] - 140:8

**corrective** [1] - 177:22

**correctly** [4] - 49:4, 119:12, 170:9, 170:10

**Corvette** [1] - 160:7

**counsel** [21] - 2:13, 2:17, 3:10, 48:4, 51:15, 52:9, 62:2, 92:24, 106:4, 124:2, 154:6, 165:4, 170:20, 171:4, 171:17, 177:8, 180:13, 180:19, 184:21, 185:1, 191:17

**Counsel** [1] - 165:18

**counsel's** [1] - 8:13

**count** [1] - 110:21

**counting** [1] - 49:4

**County** [16] - 30:24, 31:4, 129:9, 129:10, 132:8, 132:10, 132:13, 132:23, 133:1, 133:5, 133:24, 159:8, 159:9, 181:11, 181:13, 191:12

**county** [1] - 132:25

**couple** [18] - 30:11, 60:23, 63:1, 64:17, 68:22, 73:19, 89:16, 92:18, 95:21, 96:24, 101:18, 107:13, 115:12, 119:5, 136:1, 160:5,

**162:8**, 193:19

**course** [17] - 3:15, 35:13, 36:16, 37:5, 54:9, 57:7, 61:17, 82:4, 140:20, 160:18, 163:6, 163:23, 165:13, 166:5, 166:15, 167:2, 184:18

**court** [2] - 127:1, 177:17

**COURT** [365] - 1:1, 2:3, 2:6, 2:9, 3:1, 3:16, 3:22, 4:2, 4:5, 4:19, 4:24, 5:1, 5:23, 6:7, 6:12, 6:15, 7:24, 8:4, 8:9, 8:11, 8:18, 9:25, 10:11, 13:9, 13:23, 13:25, 14:10, 14:22, 15:25, 17:3, 17:11, 17:24, 20:16, 21:4, 21:7, 21:14, 21:20, 21:22, 22:3, 22:8, 22:14, 22:16, 23:14, 24:4, 24:10, 24:13, 27:7, 27:9, 28:21, 29:5, 29:14, 30:15, 32:4, 32:7, 34:15, 34:17, 34:19, 34:24, 35:2, 35:7, 35:10, 35:13, 35:18, 35:20, 36:3, 36:7, 36:10, 36:14, 36:16, 36:18, 36:20, 37:2, 37:18, 37:20, 37:23, 38:1, 38:14, 38:18, 38:22, 39:1, 39:4, 39:7, 39:11, 39:14, 39:16, 39:23, 40:1, 40:6, 40:14, 40:17, 40:23, 40:25, 41:2, 41:6, 41:9, 41:11, 41:16, 41:22, 42:5, 42:8, 42:20, 43:1, 43:7, 43:10, 43:24, 44:4, 44:15, 44:19, 45:11, 45:17, 45:20, 46:8, 46:15, 46:18, 46:25, 47:22, 48:2, 48:5, 48:8, 48:17, 48:19, 48:22, 49:15, 49:17, 49:23, 50:20, 50:23, 50:25, 52:1, 52:4, 52:7, 52:15, 52:18, 52:21, 52:23, 54:11, 55:2, 56:10, 56:12, 59:13, 59:17, 59:19, 59:21, 59:23, 59:25, 60:5, 60:8, 60:11, 60:14, 60:18, 60:20, 61:1, 61:4, 61:6, 61:9, 61:13, 61:17, 61:19, 61:24, 62:8, 62:12, 63:6, 64:1, 64:5, 64:9, 64:11, 64:13, 64:15, 64:24, 65:7, 65:15, 66:2, 66:5, 66:9, 66:12, 66:17, 67:6, 67:14, 68:4, 68:7, 68:9,

68:17, 68:19, 68:24,
69:2, 69:15, 69:22, 70:1,
70:3, 70:19, 70:24, 71:6,
71:8, 71:11, 71:16,
71:19, 71:25, 72:2, 72:8,
72:12, 72:18, 72:23,
72:25, 73:4, 73:6, 79:10,
80:12, 80:16, 89:1, 90:1,
90:3, 90:24, 92:23,
93:18, 93:25, 100:4,
100:8, 100:21, 100:23,
101:5, 101:9, 101:13,
101:15, 102:10, 102:13,
105:15, 106:4, 116:23,
117:9, 118:5, 123:12,
123:23, 124:1, 135:18,
135:20, 142:23, 149:6,
149:12, 149:21, 150:1,
151:2, 151:4, 154:2,
154:5, 154:16, 154:24,
156:9, 156:11, 156:18,
156:22, 157:1, 159:20,
159:23, 162:18, 164:6,
164:18, 165:1, 165:12,
165:15, 165:18, 165:22,
166:15, 166:21, 167:2,
167:5, 167:10, 168:14,
168:18, 169:1, 169:3,
169:6, 169:13, 169:15,
170:2, 170:6, 170:20,
171:1, 171:13, 171:21,
173:8, 173:10, 173:14,
174:15, 175:3, 175:6,
175:10, 175:12, 175:22,
176:8, 176:15, 178:12,
178:14, 179:4, 179:7,
179:14, 179:17, 179:19,
179:22, 180:1, 180:5,
180:10, 180:12, 180:17,
180:19, 180:21, 180:23,
181:2, 181:5, 181:10,
181:14, 181:16, 181:19,
181:22, 182:1, 182:3,
182:8, 182:12, 182:14,
182:16, 182:20, 182:22,
182:25, 183:2, 183:4,
183:8, 183:13, 183:17,
187:1, 187:8, 187:12,
187:17, 187:24, 188:4,
188:7, 188:10, 188:21,
189:7, 189:9, 189:12,
189:23, 190:10, 190:19,
190:25, 191:2, 191:15,
191:23, 192:2, 192:6,
192:9, 192:11, 192:16,
192:19, 193:1, 193:3,
193:5, 193:8, 193:15,
193:22, 194:2, 194:4,
194:10, 194:20, 194:24,
195:9, 195:19
  **Court** [55] - 2:16, 2:25,

3:21, 5:23, 6:3, 6:5, 7:1,
9:23, 16:13, 25:21,
27:19, 30:20, 39:20,
39:22, 41:1, 43:22, 46:6,
47:16, 47:25, 48:7, 49:1,
49:3, 54:2, 56:21, 56:22,
57:19, 60:24, 62:14,
63:25, 65:24, 69:18,
69:19, 85:15, 101:8,
128:20, 129:19, 133:4,
149:14, 158:18, 161:3,
168:11, 168:16, 169:23,
171:19, 173:17, 173:20,
174:22, 175:1, 176:20,
176:23, 187:4, 189:17,
193:11, 197:15
  **Court's** [13] - 6:8, 8:1,
8:12, 40:8, 42:2, 43:17,
52:24, 57:21, 154:6,
154:7, 169:7, 169:11,
176:19
  **Courthouse** [1] - 1:24
  **courtroom** [17] - 2:2,
6:14, 46:23, 46:24,
62:22, 72:24, 73:5,
100:20, 101:14, 107:6,
149:9, 165:5, 165:11,
165:17, 183:16, 186:25,
193:17
  **cover** [6] - 168:4, 168:5,
176:11, 176:16, 176:17,
178:22
  **covered** [1] - 168:1
  **create** [1] - 164:3
  **credit** [13] - 33:4, 33:25,
34:2, 59:10, 75:18,
75:20, 75:23, 76:9,
76:11, 76:18, 145:13,
145:16, 150:13
  **Cree** [10] - 2:16, 2:24,
7:1, 30:20, 85:15,
128:20, 129:19, 133:4,
158:18, 161:3
  **crime** [9] - 4:10, 4:16,
4:20, 5:4, 5:13, 5:16,
5:21, 107:16, 172:13
  **crimes** [1] - 158:20
  **criminal** [7] - 117:20,
171:7, 171:10, 171:16,
172:3, 172:11, 172:15
  **CRIMINAL** [1] - 1:6
  **criticism** [1] - 43:20
  **cross** [19] - 67:4, 69:6,
70:21, 71:2, 72:6, 101:3,
106:5, 124:3, 154:8,
154:10, 154:12, 165:23,
175:16, 176:18, 176:23,
182:14, 182:18, 188:18,
191:9
  **CROSS** [6] - 106:6,

124:4, 154:18, 196:6,
196:7, 196:8
  **crossed** [1] - 126:22
  **Crowe** [39] - 1:20, 36:5,
38:20, 38:21, 38:22,
38:23, 40:7, 40:9, 45:12,
45:15, 49:24, 53:18,
55:19, 56:4, 58:12,
58:24, 59:24, 59:25,
61:7, 68:11, 68:25,
70:13, 71:6, 71:23,
71:25, 100:24, 124:2,
149:13, 154:12, 157:24,
158:17, 159:1, 159:8,
159:13, 160:22, 161:25,
162:20, 163:13, 163:21
  **CROWE** [48] - 8:6,
30:14, 32:2, 36:24,
38:23, 39:2, 39:9, 39:12,
39:15, 39:18, 40:11,
46:13, 49:25, 50:21,
50:24, 51:21, 52:2,
54:10, 60:1, 60:6, 60:10,
60:12, 60:15, 60:19,
60:22, 68:12, 68:18,
68:21, 69:1, 69:14,
69:18, 69:24, 70:2,
70:18, 70:20, 71:7, 71:9,
72:1, 79:8, 90:23, 92:22,
105:14, 124:5, 150:2,
154:3, 164:5, 164:17,
196:7
  **crucial** [1] - 167:8
  **cuff** [1] - 164:15
  **curative** [1] - 50:13
  **curtain** [1] - 183:20
  **curve** [2] - 110:21,
110:25
  **custody** [3] - 83:11,
180:10, 192:21
  **cut** [4] - 13:15, 14:6,
15:23, 190:10
  **cutting** [1] - 174:18
  **CV** [1] - 195:7

## D

  **Darius** [3] - 72:16,
179:20, 179:22
  **dark** [1] - 123:8
  **Darryl** [63] - 10:23,
11:23, 12:13, 13:18,
14:4, 14:5, 14:19, 14:24,
15:2, 15:6, 15:8, 15:22,
23:11, 28:2, 28:6, 28:8,
28:9, 29:12, 82:12, 83:2,
92:3, 92:7, 92:10, 93:8,
93:21, 94:9, 94:12,
94:17, 94:25, 96:5,
96:16, 97:2, 97:6, 97:13,

97:21, 97:22, 98:1,
98:10, 98:16, 98:20,
99:3, 99:21, 99:25,
102:2, 103:15, 104:14,
105:3, 105:19, 107:13,
107:14, 114:18, 114:21,
122:4, 125:24, 127:13,
134:23, 134:25, 157:7,
160:10, 160:15, 160:23
  **database** [1] - 155:6
  **date** [12] - 15:1, 30:10,
72:7, 76:2, 82:24, 100:2,
116:25, 126:21, 127:5,
127:11, 137:18, 168:18
  **date's** [1] - 144:9
  **dated** [3] - 75:19, 117:1,
147:7
  **dates** [1] - 195:14
  **Davis** [3] - 1:13, 70:12,
144:15
  **days** [14] - 18:18, 60:24,
63:1, 64:17, 68:23,
112:11, 167:19, 167:20,
182:9, 185:21, 185:23,
186:4, 193:19, 194:9
  **de** [3] - 57:8, 58:10
  **dead** [3] - 32:21, 56:13,
194:9
  **deal** [6] - 3:22, 14:6,
47:1, 55:24, 82:3, 168:9
  **dealer** [3] - 122:6,
122:10, 122:13
  **dealers** [3] - 122:1,
122:20
  **deals** [1] - 170:11
  **death** [3] - 15:14, 15:18,
152:23
  **December** [2] - 127:10,
147:24
  **decided** [2] - 71:7,
107:4
  **decision** [5] - 126:17,
126:20, 148:18, 172:18,
173:3
  **defendant** [18] - 25:4,
25:5, 25:6, 25:10, 25:12,
25:14, 25:17, 36:10,
37:13, 65:1, 65:2, 65:17,
65:19, 67:3, 80:4, 81:16,
90:13, 178:9
  **Defendant** [7] - 1:17,
1:18, 1:20, 1:21, 127:8,
169:20, 171:23
  **Defendant's** [4] -
117:10, 124:18, 126:3,
154:25
  **defendant's** [1] - 27:21
  **Defendants** [4] - 1:9,
2:2, 62:22, 193:17
  **defendants** [18] - 25:3,

25:11, 25:18, 36:18,
37:21, 54:18, 55:15,
62:10, 66:22, 67:12,
80:23, 81:13, 108:12,
108:15, 108:20, 176:22,
183:9, 193:15
  **Defense** [1] - 176:12
  **defense** [7] - 3:10,
61:13, 101:2, 101:4,
167:24, 178:10, 194:11
  **defer** [2] - 71:4, 154:8
  **definitely** [3] - 115:22,
167:4, 195:4
  **definition** [2] - 106:15,
189:25
  **degree** [1] - 172:3
  **delay** [2] - 69:13, 101:8
  **delays** [1] - 183:22
  **delete** [2] - 170:22,
173:2
  **delve** [1] - 6:8
  **denial** [2] - 58:18, 67:11
  **denied** [8] - 21:22, 22:9,
22:16, 36:16, 38:13,
38:16, 47:22, 56:12
  **denying** [1] - 35:17,
35:20, 35:21
  **department** [3] - 73:14,
155:5, 155:19
  **dependent** [1] - 172:20
  **depicted** [1] - 81:17
  **deposition** [1] - 189:1
  **deprived** [1] - 38:17
  **depriving** [1] - 56:21
  **describe** [5] - 12:2,
12:3, 22:19, 129:18,
159:24
  **describing** [7] - 16:16,
17:18, 19:11, 19:14,
20:13, 28:5, 28:18
  **description** [5] - 17:14,
18:1, 20:4, 20:6, 159:24
  **descriptions** [2] -
16:24, 19:17
  **desire** [1] - 53:12
  **desk** [2] - 61:8, 136:19
  **despite** [2] - 175:24,
183:21
  **Despite** [1] - 52:2
  **detail** [1] - 24:24
  **detailed** [3] - 25:7,
25:15, 47:16
  **detective** [16] - 3:15,
24:18, 26:21, 34:21,
37:3, 37:11, 51:4, 72:7,
80:25, 106:16, 124:9,
124:12, 138:5, 146:13,
181:12
  **Detective** [92] - 2:9,
6:22, 6:25, 9:13, 9:18,

10:13, 13:16, 14:7,
15:21, 20:25, 21:8,
21:15, 25:22, 25:23,
25:25, 26:1, 26:3, 26:6,
26:14, 26:17, 26:18,
26:20, 27:14, 27:24,
29:5, 30:9, 32:9, 40:18,
47:12, 49:2, 49:7, 49:9,
49:12, 50:22, 53:3,
58:21, 58:22, 59:2, 59:9,
63:7, 70:9, 70:14, 70:20,
71:22, 72:12, 73:9,
73:19, 73:25, 74:11,
75:17, 79:16, 79:22,
80:5, 80:20, 81:20, 85:8,
89:4, 90:12, 93:10,
93:19, 101:19, 101:20,
102:4, 102:15, 102:23,
103:13, 105:7, 105:25,
106:8, 116:17, 116:24,
124:6, 146:12, 148:3,
148:11, 149:15, 150:6,
153:15, 154:3, 154:9,
154:11, 154:20, 155:18,
155:20, 155:23, 156:7,
157:4, 158:19, 163:16,
165:12, 165:23
  **DETECTIVE** [1] - 196:4
  **detective's** [2] - 41:24,
44:23
  **detectives** [1] - 138:17
  **determination** [7] -
14:14, 26:8, 26:12,
26:13, 27:2, 27:20, 78:17
  **determinations** [1] -
24:21
  **determine** [3] - 79:1,
138:2, 145:4
  **determined** [1] - 145:7
  **device** [1] - 188:20
  **difference** [3] - 51:22,
111:14, 167:8
  **different** [17] - 5:11,
6:8, 10:5, 31:15, 50:15,
63:14, 68:2, 92:20,
93:21, 116:19, 121:21,
123:15, 123:17, 123:20,
136:9, 144:9, 154:7
  **difficult** [2] - 94:5,
124:22
  **difficulty** [5] - 39:10,
39:11, 39:12, 39:17,
39:18
  **dire** [1] - 187:21
  **DIRECT** [2] - 6:20,
196:5
  **direct** [7] - 71:13, 71:20,
100:6, 106:3, 124:8,
182:20, 182:21
  **directing** [2] - 17:4,

20:9
  **direction** [2] - 117:4,
121:15
  **directions** [1] - 20:7
  **directly** [3] - 66:25,
84:24, 91:18
  **directory** [1] - 161:8
  **disagree** [1] - 58:9
  **disagrees** [1] - 5:23
  **disclosure** [3] - 117:13,
117:19, 167:13
  **discovered** [2] - 19:15,
27:6
  **discovery** [4] - 3:14,
166:22, 189:1, 189:16
  **discuss** [5] - 39:16,
68:20, 70:22, 186:18,
187:15
  **discussed** [7] - 3:11,
27:24, 42:17, 47:4,
52:21, 68:22, 185:17
  **discussing** [3] - 39:13,
70:3, 133:6
  **discussion** [11] - 3:17,
32:15, 46:20, 57:22,
63:22, 100:12, 134:4,
165:9, 185:14, 187:3,
195:18
  **discussions** [1] - 94:15
  **display** [1] - 6:4
  **displayed** [5] - 45:5,
45:6, 46:6, 46:9, 51:24
  **disregard** [3] - 36:22,
45:7, 47:7
  **distance** [10] - 18:15,
22:4, 78:5, 78:6, 78:13,
84:22, 84:24, 98:22,
139:22, 140:4
  **DISTRICT** [2] - 1:1, 1:2
  **DIVISION** [1] - 1:2
  **DJ** [1] - 194:23
  **DNA** [11] - 107:21,
108:7, 108:12, 108:15,
108:19, 108:20, 108:25,
126:13, 126:15, 127:9,
131:25
  **DOAR** [8] - 2:12, 8:19,
51:1, 51:7, 55:7, 68:10,
171:3, 176:12
  **Dobropolski** [1] -
157:18
  **doctrine** [1] - 172:14
  **document** [19] - 29:23,
51:1, 51:3, 77:19,
116:24, 117:10, 117:19,
118:2, 125:4, 134:5,
134:8, 152:3, 154:15,
164:9, 164:13, 164:21,
168:2, 168:7, 169:24
  **documentation** [1] -

195:2
  **documents** [7] - 29:21,
52:14, 52:20, 163:23,
189:18, 190:8, 195:3
  **dogs** [1] - 178:19
  **dollars** [1] - 114:17
  **done** [22] - 9:18, 14:5,
23:21, 27:5, 27:12,
27:13, 37:6, 41:2, 44:25,
48:23, 53:24, 54:2, 54:3,
69:4, 120:9, 134:9,
145:16, 146:19, 147:9,
147:10, 147:12, 153:2
  **door** [2] - 49:19, 129:19
  **double** [4] - 79:24,
84:3, 172:8
  **doubt** [4] - 27:21,
81:12, 167:5, 185:10
  **doubts** [2] - 142:21,
142:24
  **down** [36] - 11:17, 12:9,
12:22, 13:11, 13:15,
16:7, 17:12, 19:18,
22:22, 33:2, 38:14,
38:15, 56:3, 56:5, 61:2,
103:24, 104:2, 104:7,
109:25, 120:21, 121:11,
129:25, 140:20, 141:5,
141:6, 144:12, 145:13,
152:23, 153:21, 159:25,
162:1, 171:5, 177:16,
183:20, 190:12, 190:14
  **downstairs** [4] -
129:20, 130:2, 130:5,
131:8
  **Downtown** [1] - 18:25
  **draw** [4] - 11:25, 50:14,
81:10, 160:7
  **drawing** [1] - 44:10
  **drawn** [1] - 55:1
  **drew** [1] - 49:7
  **Drive** [1] - 85:25
  **drive** [3] - 78:13, 104:2,
159:16
  **driven** [1] - 104:2
  **driver's** [1] - 112:14
  **drives** [1] - 11:12
  **driving** [4] - 11:20,
12:4, 28:8, 160:6
  **dropped** [2] - 175:2,
178:4
  **drove** [1] - 78:22
  **drug** [7] - 22:6, 122:1,
122:6, 122:10, 122:13,
122:20, 180:17
  **drugs** [2] - 14:4, 31:10
  **Drugs** [1] - 180:16
  **Druid** [3] - 105:23,
105:25, 110:6
  **dual** [9] - 168:17,

169:21, 170:7, 170:14,
171:24, 172:7, 172:14,
174:17, 178:20
  **dude** [2] - 12:17, 13:4
  **dudes** [1] - 32:10
  **due** [2] - 56:20, 57:12
  **duration** [7] - 85:4,
87:1, 87:3, 87:12,
101:24, 140:23, 141:13
  **Duration** [1] - 88:18
  **duration's** [1] - 88:12
  **During** [2] - 62:1, 68:12
  **during** [12] - 25:13,
26:19, 31:25, 37:11,
47:1, 99:23, 142:17,
162:22, 163:4, 171:8,
185:2, 185:10
  **duty** [1] - 27:17

**E**

  **e-filed** [1] - 169:24
  **e-mail** [1] - 191:17
  **earliest** [1] - 193:23
  **early** [4] - 72:23, 80:10,
186:6, 186:7
  **earphones** [1] - 10:18
  **ears** [1] - 72:11
  **ease** [4] - 90:4, 90:8,
92:23, 93:1
  **easier** [2] - 88:24,
135:19
  **East** [5] - 18:15, 19:6,
19:11, 78:8, 79:13
  **easy** [2] - 175:5, 175:6
  **edited** [2] - 173:21,
177:8
  **effect** [5] - 25:25, 26:24,
47:19, 184:13, 184:14
  **Eight** [4] - 60:16, 73:18,
126:3, 170:3
  **eight** [2] - 85:20, 182:9
  **eighth** [1] - 141:20
  **either** [10] - 3:18, 39:6,
42:2, 94:12, 109:9,
128:16, 158:1, 177:21,
178:8, 187:19
  **elaboration** [1] - 63:10
  **elected** [1] - 154:8
  **election** [1] - 195:13
  **Election** [1] - 186:5
  **electronic** [1] - 169:10
  **elements** [3] - 131:24,
172:24, 172:25
  **elevator** [1] - 177:16
  **elicit** [5] - 41:15, 69:10,
70:8, 70:14, 188:17
  **elicited** [1] - 163:21
  **employer** [4] - 30:23,

184:10, 184:11, 184:17
  **employers** [1] - 184:10
  **employment** [5] - 31:2,
73:14, 132:14, 132:22,
133:15
  **End** [2] - 46:17, 63:22
  **end** [13] - 15:16, 24:5,
24:6, 31:8, 72:9, 86:12,
102:18, 102:20, 148:7,
148:14, 177:17, 186:6,
187:21
  **ended** [4] - 79:7, 79:12,
164:10, 187:10
  **ending** [1] - 136:4
  **ends** [1] - 88:1
  **enforcement** [7] - 25:2,
25:5, 25:11, 25:13, 65:1,
65:18, 130:10
  **engaged** [1] - 94:1
  **engine** [2] - 106:24,
106:25
  **enjoy** [2] - 186:16,
186:21
  **Enjoy** [2] - 100:13,
185:20
  **enormous** [1] - 192:12
  **enter** [2] - 62:22, 155:15
  **entered** [2] - 84:14,
170:12
  **enters** [5] - 6:14, 72:24,
73:5, 101:14, 183:16
  **entire** [10] - 13:8, 36:19,
36:20, 40:10, 67:22,
104:3, 130:22, 152:14,
153:6, 190:13
  **entirely** [3] - 170:23,
185:7, 195:10
  **entitled** [10] - 25:24,
26:3, 26:13, 26:15, 81:9,
117:14, 134:6, 167:10,
189:12, 189:25
  **entries** [3] - 51:4, 51:5,
160:15
  **entry** [22] - 32:18,
42:13, 43:11, 76:20,
86:17, 87:21, 88:9, 91:5,
91:10, 92:1, 92:14, 95:2,
97:4, 97:25, 98:1, 98:8,
98:9, 99:5, 99:6, 129:5,
129:9, 161:11
  **envelope** [1] - 80:13
  **Epps** [6] - 132:20,
133:21, 159:2, 159:3,
159:5, 159:6
  **equivalent** [2] - 65:12,
66:7
  **Ernest** [1] - 182:7
  **especially** [4] - 94:6,
110:5, 158:20, 183:22
  **Esquire** [11] - 1:16,

1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22, 36:8

**essentially** [5] - 67:1, 87:16, 129:24, 143:15, 176:23

**estimate** [1] - 51:2

**estimated** [1] - 152:23

**Estimates** [1] - 22:22

**et** [1] - 197:5

**etc** [2] - 53:23, 173:5

**etc.** [1] - 90:7

**evaluate** [1] - 26:25

**evening** [7] - 15:6, 15:9, 70:25, 71:1, 92:12, 105:3, 142:14

**event** [2] - 51:9, 90:20

**events** [1] - 54:9

**evidence** [50] - 7:22, 10:1, 13:8, 24:22, 24:25, 25:2, 27:1, 27:13, 27:16, 27:18, 38:9, 38:16, 39:21, 44:16, 45:19, 47:17, 50:16, 53:12, 56:15, 56:22, 57:13, 58:1, 64:23, 65:13, 65:18, 65:20, 65:21, 66:7, 66:13, 66:21, 66:23, 69:10, 81:9, 90:11, 90:14, 100:13, 113:6, 113:8, 131:18, 132:4, 132:6, 163:23, 164:22, 165:10, 172:4, 177:14, 182:9, 185:19, 188:18

**evidentiary** [1] - 188:15

**exact** [3] - 38:5, 112:3, 141:3

**exactly** [6] - 54:18, 89:1, 101:22, 153:19, 153:20, 164:22

**Exactly** [1] - 35:18, 45:17, 171:13

**exaggerated** [1] - 178:16

**EXAMINATION** [10] - 6:20, 106:6, 124:4, 154:18, 157:2, 196:5, 196:6, 196:7, 196:8, 196:9

**examination** [11] - 70:21, 100:6, 106:5, 124:3, 124:8, 154:8, 154:10, 154:11, 165:23, 175:16, 189:13

**examinations** [1] - 154:12

**examine** [5] - 67:4, 69:6, 176:24, 182:18, 188:18

**examined** [2] - 53:22, 176:18

**examiner** [1] - 181:11

**example** [4] - 82:2, 140:23, 141:12, 173:25

**Excellent** [1] - 68:11

**except** [4] - 102:19, 127:17, 153:6, 195:5

**exception** [2] - 136:8, 172:8

**exceptions** [2] - 81:3, 170:14

**excerpt** [2] - 169:16, 170:3

**exchange** [9] - 12:19, 14:4, 14:5, 44:8, 70:13, 149:21, 161:24, 162:2, 162:15

**exculpatory** [11] - 38:16, 53:15, 56:22, 57:13, 59:6, 64:23, 66:10, 66:11, 66:25, 67:2, 67:3

**excuse** [6] - 84:20, 94:11, 129:5, 154:10, 183:14, 183:18

**Excuse** [6] - 10:10, 29:5, 102:7, 142:22, 180:23, 193:15

**excused** [6] - 46:21, 100:18, 165:7, 165:15, 186:23, 193:15

**execution** [1] - 128:21

**Exhibit** [21] - 30:7, 31:19, 73:10, 75:16, 77:18, 80:7, 114:24, 117:11, 124:18, 126:3, 127:8, 134:6, 134:19, 135:16, 141:21, 144:2, 150:24, 151:25, 155:1, 176:5, 176:12

**exhibit** [75] - 2:12, 8:1, 8:15, 36:21, 36:23, 36:25, 37:3, 37:4, 39:5, 39:8, 39:17, 39:18, 39:24, 40:7, 40:10, 40:21, 41:4, 42:9, 42:12, 42:13, 42:22, 42:23, 43:15, 44:3, 44:6, 45:5, 45:6, 45:7, 45:8, 45:25, 46:1, 46:5, 46:9, 46:10, 46:11, 47:5, 47:6, 47:25, 50:20, 50:21, 51:8, 51:10, 51:17, 52:5, 52:7, 53:6, 53:11, 53:23, 54:7, 55:4, 58:3, 58:13, 58:21, 58:25, 59:1, 68:9, 69:20, 73:2, 80:18, 80:22, 80:25, 81:3, 81:7, 81:14, 81:17, 89:3, 111:16,

123:16, 123:17, 176:9, 190:8

**exhibits** [5] - 54:1, 75:15, 100:11, 167:24, 182:25

**existed** [1] - 12:12

**existing** [2] - 61:20, 176:25

**exit** [1] - 193:17

**exits** [5] - 46:23, 46:24, 165:11, 165:17, 186:25

**exonerating** [2] - 44:14, 50:4

**expand** [1] - 104:5

**expect** [10] - 50:18, 55:18, 63:6, 63:19, 71:23, 101:11, 158:14, 188:14, 191:8, 191:19

**expectation** [1] - 177:19

**experience** [4] - 122:19, 123:7, 158:14, 158:19

**expert** [4] - 194:14, 194:15, 195:2, 195:5

**explain** [7] - 19:24, 63:7, 63:23, 80:25, 111:9, 111:14, 194:18

**explained** [2] - 90:7, 103:14

**explains** [1] - 28:7

**explanation** [2] - 25:23, 111:20

**explore** [1] - 189:22

**express** [1] - 43:14

**expressed** [1] - 47:13

**expressly** [1] - 47:13

**Expressway** [1] - 110:9

**extensive** [1] - 60:25

**extent** [3] - 56:18, 66:20, 137:10

**exterior** [1] - 129:15

**extra** [2] - 61:11, 61:13

**extracted** [1] - 84:4

**extraction** [1] - 126:21

**extreme** [2] - 5:16, 5:18

**eye** [2] - 160:1, 160:6

---

# F

**face** [2] - 178:17, 178:18

**fact** [40] - 22:11, 23:7, 26:20, 31:16, 40:9, 40:11, 45:13, 48:1, 48:20, 52:2, 54:17, 55:14, 66:24, 67:23, 72:18, 81:13, 111:23, 113:6, 121:4, 124:12, 127:8, 128:7, 130:5,

131:23, 137:3, 145:4, 146:6, 146:7, 147:25, 150:12, 152:12, 157:24, 158:17, 161:5, 161:11, 163:14, 166:9, 174:19, 174:21, 190:11

**factors** [1] - 172:19

**facts** [4] - 27:18, 44:22, 170:18, 189:20

**failed** [1] - 69:15

**fair** [9] - 133:19, 134:4, 138:1, 164:4, 170:18, 175:10, 181:9, 181:10

**Fair** [1] - 125:18

**fairly** [5] - 66:25, 70:6, 128:9, 166:3, 170:17

**faith** [1] - 56:2

**faithfully** [1] - 176:19

**Falls** [1] - 109:25, 110:2, 110:8, 110:11

**false** [12] - 58:18, 62:18, 63:4, 64:23, 66:10, 66:11, 66:25, 67:2, 67:16, 67:17, 67:22

**familiar** [6] - 21:16, 93:10, 93:12, 118:13, 143:14, 159:7

**family** [3] - 94:20, 116:14, 185:6

**famous** [1] - 102:3

**far** [11] - 5:11, 5:16, 33:19, 40:10, 51:13, 58:10, 66:7, 78:10, 100:13, 137:19, 149:11

**favor** [2] - 22:19, 175:23

**fax** [2] - 76:17, 151:23

**faxed** [3] - 75:12, 77:19, 77:20

**FBI** [2] - 9:15, 98:5

**fear** [1] - 158:24

**federal** [7] - 106:12, 106:15, 132:19, 170:8, 172:1, 172:10, 172:13, 172:14, 172:15, 172:18, 172:21, 172:24, 174:7, 175:2, 180:17

**federally** [1] - 180:8

**fee** [1] - 186:19

**fees** [2] - 184:8, 184:10

**feet** [1] - 22:20

**Felton** [2] - 79:17, 157:19

**female** [5] - 102:19, 130:11, 130:12, 131:2, 131:9

**few** [9] - 18:18, 48:22, 100:21, 100:22, 111:5, 129:22, 143:12, 165:7, 183:19

**fiction** [1] - 190:25

**fifth** [1] - 140:25

**fifths** [1] - 17:12

**fight** [1] - 189:10

**figure** [2] - 78:12, 184:21

**file** [17] - 146:17, 146:21, 146:23, 166:19, 166:24, 166:25, 167:1, 167:4, 190:13, 190:17, 190:18, 190:21, 190:24, 191:17, 194:15, 195:19

**filed** [14] - 45:12, 168:18, 168:20, 168:22, 169:19, 169:24, 177:9, 187:5, 187:9, 187:24, 188:1

**filing** [3] - 133:7, 169:11, 169:21

**fill** [2] - 154:20, 154:21

**filled** [5] - 30:9, 31:20, 131:12, 155:1, 155:14

**Film** [1] - 151:24

**film** [1] - 153:20

**Final** [1] - 99:6

**final** [10] - 20:8, 23:11, 28:1, 28:6, 28:18, 43:19, 99:5, 103:15, 104:13, 173:4

**finally** [1] - 126:12

**Finally** [1] - 26:20

**fine** [13] - 8:4, 8:8, 8:16, 48:2, 58:25, 70:2, 72:4, 174:24, 188:12, 190:5, 193:2, 193:13, 194:7

**Fine** [2] - 192:10, 193:4

**fingerprint** [6] - 74:23, 79:21, 80:2, 125:19, 157:21, 157:24

**fingerprints** [3] - 124:15, 125:19, 125:24

**finish** [1] - 191:9

**finished** [1] - 24:10

**firearm** [1] - 158:25

**firearms** [2] - 131:16, 158:18

**firm** [2] - 150:3, 184:15

**first** [53] - 2:13, 11:5, 12:18, 12:23, 13:13, 24:19, 29:22, 32:9, 34:22, 35:4, 38:1, 42:15, 43:9, 48:15, 48:21, 63:6, 63:13, 63:14, 71:12, 76:20, 78:6, 80:7, 81:20, 82:2, 82:14, 82:21, 84:15, 90:21, 92:9, 94:8, 96:14, 97:6, 107:1, 112:9, 118:7, 121:10, 124:19, 130:3, 137:15, 138:25, 139:12, 146:11, 147:4, 147:12, 147:14,

157:14, 165:24, 170:22, 171:5, 174:11, 186:3, 187:20
**First** [4] - 24:17, 29:22, 62:25, 64:16
**fit** [1] - 112:24
**fits** [1] - 190:3
**Five** [5] - 60:16, 62:21, 64:12, 104:23, 105:1
**five** [8] - 48:16, 85:20, 86:8, 119:25, 120:7, 178:16, 186:3, 186:4
**flag** [1] - 73:23
**Flannery** [1] - 1:19
**flashy** [1] - 160:1
**flipped** [2] - 56:3, 56:5
**floor** [3] - 100:12, 129:23, 137:8
**focus** [4] - 43:4, 57:20, 57:21, 59:4
**focused** [5] - 43:11, 51:14, 69:16, 166:2, 167:13
**follow** [1] - 135:19, 169:18, 169:22
**followed** [1] - 143:22
**following** [5] - 81:15, 86:18, 161:25, 186:2, 192:1
**follows** [4] - 80:18, 169:15, 170:7, 171:25
**FOR** [1] - 1:2
**Force** [2] - 10:15, 81:21
**foregoing** [1] - 197:6
**forensics** [1] - 181:11
**forget** [1] - 148:15
**forgot** [1] - 149:1
**form** [6] - 31:20, 54:1, 56:22, 155:15, 187:6, 188:12
**formally** [1] - 47:20
**formulate** [1] - 178:10
**forth** [1] - 29:8
**forward** [5] - 71:2, 71:7, 71:8, 71:10, 172:18
**Foundation** [1] - 14:9
**four** [9] - 17:12, 67:25, 100:25, 102:18, 102:21, 111:10, 111:15, 111:17, 111:21
**Four** [1] - 99:12
**four-fifths** [1] - 17:12
**fourth** [2] - 3:19, 87:21
**Fox** [6] - 23:8, 23:16, 23:18, 28:1, 103:16
**Frankly** [4] - 48:9, 58:12, 58:13, 169:9
**frankly** [5] - 44:4, 48:11, 58:18, 59:4, 189:2
**free** [1] - 178:7

**frequently** [2] - 86:6, 160:3
**Friday** [4] - 78:18, 185:25, 186:11, 186:13
**friends** [1] - 185:6
**front** [10] - 50:16, 106:20, 107:23, 129:19, 129:21, 131:8, 133:4, 168:8, 169:13, 170:6
**fuck** [1] - 104:20
**fucked** [1] - 104:21
**fucking** [1] - 104:20
**full** [4] - 61:21, 171:5, 182:19, 185:23
**fully** [2] - 167:16, 184:19
**fun** [1] - 62:4
**funeral** [1] - 74:6
**furthered** [1] - 75:1

## G

**G-013** [1] - 125:7
**Gagen** [1] - 193:5
**GAGEN** [1] - 193:6
**gaining** [1] - 188:20
**game** [1] - 94:3
**GARDNER** [1] - 1:8
**Gardner** [42] - 1:21, 32:12, 45:1, 47:10, 53:12, 53:14, 56:19, 56:21, 56:25, 57:3, 67:4, 67:7, 67:8, 67:10, 74:12, 87:24, 88:2, 91:12, 95:4, 95:23, 99:19, 99:20, 125:13, 126:24, 127:2, 127:13, 128:5, 128:6, 142:7, 143:4, 151:15, 158:2, 162:21, 166:2, 167:24, 175:18, 176:4, 176:11, 176:16, 177:2, 177:14, 177:15
**Gardner's** [7] - 90:6, 91:18, 161:14, 162:8, 169:20, 171:23, 177:21
**Garrison** [1] - 17:21
**GARY** [1] - 196:4
**gather** [2] - 87:15, 98:19
**gathered** [1] - 26:19
**Geez** [1] - 181:7
**general** [4] - 138:3, 164:19, 172:12, 172:17
**General** [1] - 76:22
**generally** [1] - 134:18
**generated** [1] - 155:6
**gentlemen** [14] - 10:1, 24:15, 46:18, 62:4, 73:6, 80:17, 90:4, 92:23,

101:15, 154:5, 155:4, 165:1, 183:17, 186:22
**Gerald** [1] - 180:20
**Gerard** [1] - 1:19
**ghost** [1] - 182:4
**gibberish** [1] - 63:12
**Giganti** [2] - 155:18, 155:20
**Gilray** [3] - 16:22, 85:25, 89:9
**girlfriend** [1] - 82:23
**given** [19] - 3:14, 5:17, 26:25, 37:6, 52:8, 58:8, 60:19, 64:8, 72:2, 81:3, 106:12, 113:4, 115:1, 115:11, 120:23, 133:19, 156:1, 166:18, 179:8, 181:9, 190:12
**Given** [1] - 63:3
**glad** [1] - 49:19
**glass** [1] - 13:12
**God's** [1] - 72:11
**Goo** [8] - 32:12, 63:1, 64:18, 66:15, 67:15, 67:18, 67:19, 88:4
**government** [37] - 2:11, 4:7, 4:17, 5:3, 5:5, 6:9, 10:3, 27:20, 41:15, 53:1, 53:10, 54:7, 64:22, 66:4, 66:6, 66:21, 68:19, 80:19, 149:23, 168:1, 168:4, 168:8, 169:12, 172:10, 172:11, 172:15, 173:17, 174:8, 174:10, 174:24, 178:24, 182:9, 187:14, 191:4, 191:7, 191:13, 194:14
**Government** [10] - 1:15, 30:7, 31:19, 73:10, 75:16, 77:18, 80:7, 134:19, 135:15, 151:25
**government's** [10] - 3:18, 6:3, 57:20, 65:5, 66:14, 67:22, 172:18, 173:12, 173:15, 178:17
**Government's** [5] - 66:9, 134:6, 141:21, 144:2, 150:23
**grab** [1] - 168:13
**grabbed** [1] - 168:12
**grand** [7] - 28:9, 109:21, 118:9, 118:10, 118:11, 123:18, 123:19
**grandmother's** [6] - 12:23, 18:4, 18:9, 19:19, 19:23, 20:19
**grant** [2] - 36:14, 55:18
**graphic** [1] - 5:25
**graphically** [1] - 166:3
**grateful** [1] - 184:4

**Great** [1] - 171:4
**great** [2] - 72:18, 190:19
**greater** [1] - 24:24
**greatest** [1] - 51:19
**greet** [1] - 109:12
**ground** [2] - 18:23, 47:21
**grounds** [2] - 63:25, 195:1
**group** [1] - 130:10
**gruesome** [1] - 6:1
**guess** [20] - 2:8, 3:25, 36:5, 46:16, 57:23, 60:19, 64:8, 72:2, 81:3, 106:12, 113:4, 115:1, 115:11, 120:23, 133:19, 156:1, 166:18, 179:8, 181:9, 190:12
**guided** [1] - 10:7
**guilt** [2] - 27:21, 47:14
**guilty** [5] - 27:15, 65:10, 65:13, 66:8, 168:3
**gun** [4] - 180:6, 180:7, 180:12, 180:14
**guns** [1] - 158:21
**guy** [1] - 2:19
**guys** [5] - 31:4, 31:8, 114:22

## H

**H-O-O-P-T-I-E** [1] - 159:21
**hair** [1] - 22:21
**half** [7] - 62:1, 71:17, 83:10, 119:18, 119:24, 182:24, 186:10
**halfway** [1] - 12:9
**hand** [5] - 80:15, 80:16, 82:15, 118:23, 124:19
**handed** [4] - 2:14, 2:17, 60:20, 60:23
**handing** [1] - 61:18
**handle** [1] - 43:13
**handled** [1] - 62:15
**handling** [5] - 40:18, 44:7, 53:21, 116:20, 189:14
**hands** [1] - 75:21
**handwriting** [5] - 51:18, 118:24, 134:9, 144:5, 151:5
**handwritten** [4] - 31:25, 118:22, 119:19, 119:22
**Handy** [1] - 161:21
**hanging** [1] - 72:3
**hangs** [1] - 22:25
**Hanlon** [21] - 1:16, 3:18, 47:2, 71:11, 72:2, 72:18,

80:16, 100:24, 146:24, 156:11, 169:6, 171:21, 171:22, 173:14, 175:3, 178:23, 187:17, 190:2, 191:15, 191:25, 192:9
**HANLON** [25] - 4:3, 4:9, 4:21, 72:4, 72:14, 72:21, 156:15, 156:20, 156:24, 169:7, 173:6, 173:9, 173:12, 173:15, 174:4, 182:18, 182:21, 182:23, 183:1, 183:3, 183:5, 183:10, 192:10, 192:24, 193:4
**Hanlon's** [2] - 175:23, 182:15
**happenstance** [1] - 57:15
**happy** [5] - 8:13, 49:23, 156:12, 156:23, 192:17
**hard** [2] - 50:1, 89:2
**HARDING** [110] - 2:4, 2:8, 2:14, 2:19, 2:22, 3:2, 3:7, 6:21, 10:10, 10:12, 13:10, 17:16, 17:25, 21:23, 22:17, 24:12, 27:4, 27:23, 32:8, 34:18, 34:21, 34:25, 35:4, 35:9, 35:12, 35:17, 35:25, 37:17, 37:19, 37:22, 38:21, 41:21, 43:9, 43:23, 43:25, 44:9, 44:18, 45:10, 45:12, 45:18, 46:4, 52:6, 52:11, 52:17, 52:19, 52:22, 60:23, 61:2, 61:5, 61:11, 61:15, 61:18, 62:6, 71:15, 71:17, 73:3, 73:8, 79:11, 80:14, 81:19, 90:19, 93:4, 100:7, 100:22, 101:1, 101:7, 101:11, 101:17, 102:9, 102:14, 118:3, 118:20, 123:11, 125:20, 149:23, 156:7, 157:3, 162:19, 179:12, 179:15, 179:18, 179:20, 179:24, 180:4, 180:8, 180:11, 180:13, 180:20, 180:22, 180:25, 181:9, 181:12, 181:15, 181:17, 181:24, 182:6, 182:11, 182:13, 182:15, 187:23, 188:3, 188:6, 188:8, 188:16, 190:7, 190:17, 194:13, 194:25, 196:5, 196:9
**Harding** [1] - 1:16, 6:19, 8:6, 8:11, 8:18, 13:8, 16:1, 17:24, 24:11, 27:3, 27:22, 34:17, 37:7,

37:9, 38:6, 41:20, 42:6, 42:8, 42:13, 42:16, 42:21, 43:8, 44:19, 46:3, 46:14, 47:1, 48:12, 50:2, 51:3, 51:6, 51:9, 52:8, 53:19, 54:4, 56:1, 59:15, 61:10, 61:19, 62:1, 68:10, 70:22, 71:13, 73:2, 73:7, 80:12, 81:18, 89:2, 90:18, 93:3, 100:4, 100:21, 101:16, 111:5, 111:17, 114:11, 118:18, 123:16, 123:21, 124:1, 132:12, 134:5, 134:17, 135:10, 146:24, 149:22, 154:10, 154:13, 154:17, 166:13, 166:23, 179:7, 187:17, 190:1, 191:15, 195:16

**Harding's** [4] - 25:22, 55:10, 59:21, 151:5

**HARRIS** [1] - 1:7

**Harris** [30] - 1:18, 38:11, 40:1, 45:1, 55:15, 56:18, 56:21, 56:25, 57:3, 80:4, 83:19, 85:7, 99:7, 99:8, 107:8, 107:10, 108:25, 114:6, 115:6, 116:9, 116:10, 121:1, 121:5, 121:6, 155:9, 157:10, 157:22, 158:9, 187:14, 187:25

**Harris's** [11] - 40:3, 53:12, 53:15, 83:14, 83:17, 84:1, 121:11, 121:12, 139:13, 139:17, 157:14

**Hastings** [21] - 12:1, 12:3, 20:22, 22:18, 22:25, 26:1, 30:10, 30:12, 31:7, 58:22, 62:20, 69:8, 70:16, 103:13, 143:19, 143:24, 146:12, 148:3, 148:11, 149:15, 163:17

**Hastings's** [1] - 23:10

**Hayes** [14] - 179:18, 179:19, 181:11, 187:5, 187:10, 187:11, 187:19, 188:15, 188:23, 188:24, 189:13, 189:16

**head** [2] - 125:17, 174:18

**headed** [1] - 60:2

**heading** [2] - 129:25

**headquarters** [1] - 146:4

**hear** [20] - 10:7, 10:21, 18:10, 20:19, 40:17, 43:8, 48:3, 50:9, 55:9,

103:20, 104:8, 104:22, 109:3, 109:18, 109:24, 110:2, 110:5, 110:19, 110:22, 183:13

**heard** [37] - 4:22, 7:15, 9:11, 10:2, 10:4, 11:8, 20:14, 20:17, 24:6, 25:20, 26:14, 32:10, 32:19, 35:14, 37:17, 37:19, 40:19, 59:9, 74:2, 74:3, 90:5, 100:13, 102:15, 109:3, 109:4, 109:24, 138:1, 163:15, 171:7, 172:4, 174:5, 174:12, 174:16, 180:7, 185:19, 187:6

**hearing** [5] - 69:19, 105:11, 170:20, 171:17, 187:9

**hears** [4] - 18:3, 18:9, 19:22, 20:18

**heat** [1] - 104:4

**heavier** [1] - 78:19

**Heights** [1] - 17:21

**held** [1] - 27:11

**Hello** [1] - 103:6

**help** [3] - 8:7, 47:3, 77:1

**helped** [2] - 135:21, 135:23

**helpful** [1] - 8:19

**helps** [1] - 64:3

**hereby** [1] - 197:3

**hereunto** [1] - 197:9

**hewing** [1] - 176:19

**hiatus** [2] - 101:10, 185:3

**high** [1] - 160:6

**highlighted** [2] - 76:20

**highly** [1] - 5:15

**highways** [2] - 110:20, 111:3

**Hill** [3] - 105:23, 105:25, 110:6

**himself** [4] - 22:4, 26:3, 150:10, 188:15

**hindsight's** [1] - 53:19

**history** [2] - 183:8, 183:11, 194:18

**hold** [5] - 66:12, 105:19, 167:10, 178:9, 184:5

**holding** [2] - 37:4, 135:19

**holiday** [1] - 194:2, 194:5

**Holly** [3] - 168:9, 176:15, 177:15

**home** [19] - 23:15, 23:24, 28:1, 28:22, 83:14, 83:17, 85:21, 86:1, 86:6, 90:7, 99:7,

99:8, 114:2, 115:5, 121:11, 121:13, 128:23, 131:18, 140:5

**Homicide** [3] - 29:25, 30:1, 138:17

**homicide** [9] - 6:2, 79:25, 84:3, 119:13, 131:19, 154:21, 157:25, 181:12

**homicides** [2] - 5:17, 110:6

**Honda** [2] - 160:2, 160:12

**honest** [1] - 68:21

**Honor** [155] - 2:4, 2:8, 3:17, 4:3, 4:9, 4:21, 4:22, 5:8, 6:11, 6:22, 7:21, 8:3, 8:6, 8:8, 9:23, 10:10, 13:7, 14:9, 17:2, 17:9, 17:15, 17:17, 17:23, 18:13, 20:15, 21:6, 21:13, 22:13, 22:15, 24:9, 27:5, 29:7, 32:2, 32:5, 34:13, 34:18, 35:25, 36:6, 36:12, 36:24, 37:17, 38:4, 38:25, 39:6, 39:25, 40:5, 40:15, 41:13, 41:21, 42:7, 42:19, 44:9, 46:4, 46:13, 47:10, 47:24, 49:1, 49:25, 54:10, 54:12, 54:15, 55:17, 56:11, 59:22, 60:1, 60:22, 61:23, 62:6, 62:10, 62:14, 65:3, 65:23, 68:8, 68:12, 68:21, 69:18, 70:2, 70:18, 71:15, 71:24, 72:4, 72:11, 72:14, 72:22, 73:9, 73:17, 80:15, 90:20, 90:23, 100:3, 100:22, 101:1, 101:18, 102:7, 102:9, 106:2, 116:22, 118:1, 118:3, 118:17, 123:21, 123:24, 124:6, 135:16, 149:5, 149:11, 151:3, 154:1, 154:13, 154:23, 156:16, 156:20, 159:22, 162:16, 164:25, 165:21, 166:12, 167:3, 167:24, 169:2, 169:5, 169:7, 169:14, 170:9, 171:18, 173:7, 173:13, 173:16, 174:5, 175:9, 175:11, 175:21, 180:20, 181:4, 181:24, 182:7, 182:15, 182:19, 183:10, 187:2, 187:23, 188:16, 189:15, 189:21, 190:5, 191:1,

191:3, 191:24, 192:5, 192:15, 192:24, 193:4, 193:10, 194:15, 195:10

**Honorable** [1] - 1:13

**hoopties** [1] - 159:17

**hoopty** [2] - 159:17, 159:19

**hope** [3] - 37:25, 59:22, 177:19

**hopeful** [1] - 185:4

**hopefully** [1] - 185:6

**hoping** [2] - 101:5, 195:15

**horse** [1] - 56:13

**hour** [9] - 71:17, 78:3, 79:6, 87:21, 88:8, 154:20, 182:24, 192:14

**hours** [10] - 80:11, 119:18, 119:24, 143:17, 152:14, 152:16, 164:20, 182:22, 182:23, 195:15

**Hours** [1] - 31:2

**house** [19] - 24:6, 84:21, 84:22, 84:24, 99:14, 113:15, 114:7, 114:8, 129:16, 130:9, 130:17, 130:20, 130:22, 132:4, 132:5, 137:3, 140:4, 157:6

**huddle** [1] - 53:20

**hum** [2] - 132:1, 153:3

**hump** [1] - 113:2

**hundred** [1] - 47:7

**hung** [1] - 28:16

**Hustles** [1] - 22:21

**I**

**icon** [1] - 139:14

**icons** [1] - 136:17

**idea** [12] - 50:14, 54:4, 139:5, 156:2, 163:6, 163:7, 163:9, 164:2, 175:3, 184:23, 184:25, 187:18

**identification** [10] - 41:18, 42:3, 43:14, 56:24, 60:12, 60:13, 69:17, 133:13, 154:25

**identified** [14] - 35:4, 35:11, 38:7, 39:19, 40:3, 43:21, 44:12, 44:17, 53:3, 54:17, 56:16, 114:6, 150:10, 159:2

**identifies** [1] - 12:8

**identify** [5] - 23:2, 38:9, 45:3, 53:14, 55:14, 55:15, 80:8, 113:25, 183:7

**identifying** [2] - 35:15, 53:14

**II** [10] - 33:4, 33:15, 33:19, 59:10, 77:6, 77:25, 78:1, 145:13, 151:8, 152:2

**images** [1] - 80:24

**imagine** [2] - 152:11, 183:24

**immediately** [8] - 5:4, 18:10, 20:20, 22:18, 89:21, 92:15, 93:15, 96:2

**Immediately** [1] - 86:18

**implausible** [1] - 56:23

**implicate** [2] - 62:24, 64:13

**implicated** [2] - 62:25, 64:16

**implicates** [4] - 67:4, 67:6, 67:7, 67:10

**implication** [2] - 67:19, 177:25

**Implicitly** [1] - 39:15

**implies** [1] - 44:11

**important** [6] - 36:25, 45:15, 81:1, 81:2, 156:24, 185:8

**importantly** [2] - 56:16, 186:16

**impression** [1] - 51:23

**IN** [1] - 1:1

**inadequate** [2] - 66:1, 66:3

**inadvertent** [1] - 167:25

**Inadvertently** [1] - 168:7

**incarcerated** [3] - 79:17, 83:6, 175:19

**incident** [3] - 13:2, 22:5, 64:20, 154:21, 183:6

**include** [4] - 102:25, 103:10, 110:8, 130:24

**included** [4] - 82:6, 82:10, 111:24, 190:7

**includes** [2] - 67:2, 170:2

**Including** [1] - 107:8

**incoming** [1] - 98:23

**inconsistency** [1] - 43:21

**inconsistent** [1] - 42:2

**inconvenience** [3] - 101:8, 101:9, 184:22

**incorporate** [1] - 172:2

**increases** [1] - 184:7

**indeed** [9] - 40:10, 57:22, 132:11, 135:10, 136:22, 142:20, 143:3, 143:14, 145:20

**Indeed** [1] - 172:21
**independent** [1] - 27:19
**INDEX** [1] - 196:1
**indicate** [8] - 98:16, 121:9, 121:12, 125:4, 129:4, 142:6, 147:23
**indicated** [13] - 76:1, 86:20, 104:10, 105:4, 132:13, 136:17, 137:14, 139:14, 139:20, 151:23, 152:2, 162:4, 164:10
**Indicated** [1] - 95:4
**indicates** [3] - 87:13, 133:11, 145:17
**indication** [3] - 84:16, 85:19, 98:19
**indications** [2] - 102:16, 155:12
**indictment** [1] - 172:2
**individual** [3] - 109:14, 122:24, 160:6
**individuals** [4] - 29:24, 80:10, 107:6, 126:10
**indulgence** [1] - 183:23
**infer** [6] - 38:11, 44:24, 58:11, 58:14, 58:15, 58:25
**inference** [11] - 35:23, 37:13, 40:2, 44:10, 44:21, 45:2, 50:6, 53:13, 56:23, 57:7, 58:10
**inferences** [2] - 50:15, 55:1
**inferring** [1] - 42:12
**inflame** [1] - 5:24
**inflammatory** [2] - 5:15, 5:22
**influence** [2] - 31:10
**information** [37] - 22:20, 26:18, 26:19, 30:9, 30:10, 74:25, 76:18, 84:23, 94:19, 98:19, 121:6, 132:12, 133:19, 133:20, 134:19, 137:16, 138:2, 138:11, 138:12, 138:13, 138:25, 147:5, 147:6, 147:8, 147:14, 153:12, 155:8, 155:16, 161:18, 162:12, 178:9, 183:6, 184:16, 188:25, 195:7, 195:16
**informed** [2] - 42:21, 194:13
**initial** [5] - 129:5, 173:12, 173:15, 174:14, 190:7
**initials** [1] - 31:22
**initiated** [1] - 15:1
**injuries** [2] - 4:14, 5:18
**innocent** [1] - 42:18

**innocently** [1] - 43:12
**input** [1] - 43:12
**inquire** [2] - 101:1, 177:1
**insert** [1] - 171:14
**insinuating** [1] - 29:7
**insisted** [2] - 168:4, 168:8
**instance** [2] - 12:18, 37:6
**instances** [1] - 25:9
**instead** [1] - 109:11
**instruct** [10] - 24:24, 25:12, 36:22, 45:4, 45:24, 46:5, 65:11, 80:18, 81:2, 108:3
**instructed** [1] - 65:12
**instructing** [1] - 47:17
**instruction** [29] - 9:24, 24:14, 46:7, 47:16, 48:1, 49:19, 49:22, 50:13, 50:19, 55:19, 56:9, 58:4, 58:8, 62:17, 65:4, 66:1, 168:17, 169:9, 169:12, 169:20, 169:23, 170:8, 171:20, 171:24, 173:18, 174:9, 177:22, 177:24, 178:21
**instruction's** [2] - 166:10, 173:23
**instructions** [10] - 24:16, 25:7, 25:15, 49:3, 49:13, 90:15, 165:6, 185:10, 185:12, 186:17
**insufficient** [1] - 65:4
**insure** [1] - 54:1
**integrity** [1] - 185:12
**intended** [3] - 25:24, 26:7, 80:25
**intending** [4] - 26:4, 26:10, 164:3, 188:8
**intends** [2] - 5:5, 6:9
**intent** [2] - 20:24, 21:25
**interest** [1] - 188:22
**interested** [1] - 189:15
**interior** [1] - 129:16
**interjects** [1] - 20:22
**internal** [1] - 155:5
**interpretation** [1] - 46:14
**interpreting** [1] - 41:25
**interrogation** [3] - 25:13, 37:12, 64:22
**interruption** [1] - 183:23
**interruptions** [1] - 183:22
**interrupts** [1] - 28:10
**intersects** [1] - 18:15
**intervals** [1] - 141:8

**interview** [20] - 7:14, 32:1, 45:14, 53:1, 54:6, 62:20, 74:20, 98:14, 120:20, 143:24, 146:3, 146:11, 146:15, 147:2, 147:4, 147:10, 147:14, 147:21, 148:10
**interviewed** [10] - 82:23, 128:12, 128:14, 128:16, 137:15, 137:23, 143:20, 146:1, 146:2, 157:18
**interviews** [1] - 79:20
**introduce** [5] - 2:16, 3:2, 3:3, 5:5, 7:22
**introduced** [3] - 7:3, 9:14, 52:15
**introducing** [1] - 52:13
**investigate** [1] - 74:22
**investigation** [14] - 3:15, 14:8, 26:19, 75:1, 94:19, 106:17, 107:4, 108:5, 121:4, 157:15, 158:12, 185:15, 185:18
**investigations** [2] - 93:10, 94:2
**investigator** [1] - 47:13
**invited** [1] - 51:15
**involved** [6] - 44:7, 67:24, 80:10, 113:14, 166:4, 183:6
**involving** [1] - 93:20
**Iraq** [1] - 155:21
**Irene** [8] - 94:14, 94:21, 98:2, 102:2, 103:6, 136:8, 136:19, 157:8
**irrelevant** [2] - 4:4, 5:19
**issue** [16] - 41:14, 49:19, 62:15, 62:19, 69:15, 167:22, 168:6, 168:11, 169:8, 173:25, 176:20, 186:20, 187:10, 187:23, 195:11, 195:12
**issues** [3] - 46:21, 66:20, 186:19
**item** [1] - 70:23
**itself** [5] - 13:24, 65:3, 65:24, 152:8, 169:9

## J

**James** [1] - 1:21
**Jaquetta** [4] - 20:13, 82:22, 86:2, 86:3
**Jason** [7] - 132:20, 150:7, 150:8, 152:12, 159:2, 159:5, 159:6
**jeopardy** [1] - 172:8
**JFX** [1] - 103:25

**join** [1] - 47:11
**joined** [2] - 56:19, 85:7
**joint** [1] - 55:16
**Jones** [8] - 4:13, 5:2, 109:25, 110:2, 110:8, 110:11, 175:20, 179:10
**Joyce** [6] - 85:17, 85:18, 88:5, 128:24, 130:16, 130:19
**Judge** [11] - 1:13, 43:9, 66:19, 70:11, 72:5, 144:15, 174:17, 179:6, 190:7, 191:22, 194:13
**judge** [1] - 27:18
**judges** [1] - 57:16
**judgment** [2] - 37:10, 57:8
**July** [1] - 125:11
**jump** [1] - 38:25
**junk** [1] - 152:18
**juror** [4] - 58:5, 58:11, 58:15
**jurors** [5] - 46:15, 50:7, 50:8, 58:6, 80:14
**jurors'** [1] - 62:7
**Jury** [10] - 1:14, 2:2, 6:14, 46:23, 73:5, 100:20, 101:14, 165:11, 183:16, 186:25
**jury** [88] - 2:10, 3:21, 5:25, 6:13, 6:15, 24:13, 24:15, 27:17, 36:22, 37:13, 38:11, 40:2, 45:2, 45:4, 45:22, 45:24, 46:5, 47:6, 47:17, 48:9, 49:5, 50:3, 50:14, 51:18, 52:12, 53:13, 54:15, 54:20, 54:25, 55:2, 57:3, 59:4, 63:9, 63:16, 64:25, 65:11, 65:16, 65:18, 65:22, 70:5, 70:7, 72:6, 72:25, 90:3, 100:10, 100:15, 100:17, 109:7, 109:21, 118:4, 118:9, 118:10, 118:11, 123:18, 123:20, 135:16, 137:25, 149:14, 155:4, 165:3, 165:8, 166:8, 166:9, 167:13, 167:15, 167:20, 169:20, 170:11, 170:13, 171:22, 171:23, 174:12, 174:23, 175:18, 176:6, 177:1, 177:4, 177:5, 177:6, 177:11, 177:20, 183:15, 184:10, 186:19, 186:23, 187:6, 187:22
**jury's** [4] - 60:2, 65:12, 100:18, 178:2
**justifiably** [1] - 175:17
**justified** [1] - 94:3

## K

**Kanwisher** [1] - 166:23
**keep** [8] - 46:20, 72:3, 143:8, 150:19, 155:7, 158:21, 186:18, 192:15
**Keep** [2] - 38:14
**keeps** [2] - 160:1, 174:18
**Keith** [1] - 10:15
**Kelsey** [1] - 1:17
**kept** [4] - 29:24, 94:4, 153:6
**Kerry** [1] - 4:9
**Kevin** [1] - 33:5
**kill** [2] - 32:10, 61:18
**killed** [2] - 19:3, 160:11
**kind** [12] - 12:4, 22:23, 29:4, 29:7, 31:8, 67:1, 103:23, 160:1, 160:10, 167:21, 177:23, 188:20
**kinds** [1] - 52:14
**kitchen** [1] - 129:22
**knowing** [4] - 66:22, 85:6, 86:14, 89:17
**knowledge** [2] - 135:9, 157:9, 164:19
**known** [4] - 97:21, 97:22, 128:3, 195:4
**knows** [5] - 32:12, 66:15, 167:16, 189:14
**Knows** [1] - 32:14
**KURLAND** [62] - 3:17, 3:24, 4:4, 4:7, 4:22, 5:8, 6:5, 6:11, 36:19, 47:10, 61:22, 62:10, 62:14, 62:23, 63:24, 64:3, 64:7, 64:10, 64:12, 64:14, 64:21, 65:3, 65:11, 65:23, 66:4, 66:6, 66:11, 66:16, 66:19, 67:13, 67:21, 68:6, 68:8, 71:4, 89:25, 90:2, 162:16, 167:23, 168:15, 168:19, 169:2, 169:4, 169:18, 170:5, 170:7, 170:24, 171:11, 171:18, 174:3, 175:7, 175:11, 175:21, 176:2, 176:10, 176:16, 178:13, 179:1, 179:6, 180:16, 180:18, 191:3, 191:22
**Kurland** [20] - 1:22, 5:7, 47:9, 51:12, 53:21, 62:12, 65:15, 66:18, 71:3, 154:8, 166:7, 167:14, 167:21, 170:4, 170:21, 174:15, 174:18, 175:13, 175:16, 176:1

**Kurland's** [1] - 169:8

## L

**label** [1] - 109:20
**lack** [2] - 51:6
**Ladies** [2] - 165:1,
183:17
**ladies** [12] - 10:1, 24:15,
46:18, 62:4, 73:6, 80:17,
90:4, 92:23, 101:15,
154:5, 155:4, 186:21
**lady** [2] - 145:1, 148:6
**Lakeisha** [14] - 33:3,
33:7, 33:12, 33:16,
33:18, 75:7, 77:10,
77:14, 145:5, 145:18,
145:21, 146:11, 163:22,
164:4
**Lakers** [1] - 23:19
**land** [13] - 84:21, 84:22,
89:8, 98:9, 136:16,
139:11, 139:16, 139:22,
139:23, 140:3, 140:5,
140:7
**lanes** [1] - 110:15
**language** [8] - 64:10,
64:11, 68:18, 69:24,
122:14, 173:20, 173:24,
178:24
**large** [1] - 153:16
**larger** [1] - 81:24
**last** [39] - 9:3, 12:5,
14:19, 14:23, 15:8, 16:1,
23:25, 37:6, 41:16,
42:13, 43:11, 48:10,
51:11, 51:15, 51:20,
62:15, 68:22, 70:25,
77:5, 77:13, 86:18,
91:15, 95:25, 96:10,
97:19, 97:21, 116:6,
142:10, 168:6, 170:22,
171:2, 173:6, 173:8,
177:8, 179:17, 192:13,
193:12
**lasted** [13] - 79:5,
82:18, 85:1, 87:25,
89:16, 95:9, 95:12,
96:17, 96:23, 97:19,
98:11, 99:17
**Lasted** [1] - 89:9
**lasting** [7] - 91:8, 91:13,
92:15, 96:7, 97:9, 99:3
**Lasting** [1] - 104:15
**lasts** [1] - 98:4
**late** [6] - 78:20, 79:13,
186:6, 186:8, 192:15,
192:20
**latent** [3] - 107:5, 158:1,

158:4
**lauded** [1] - 176:6
**Laura** [1] - 1:17
**law** [17] - 25:2, 25:4,
25:10, 25:12, 49:14,
65:1, 65:17, 130:10,
168:16, 170:10, 172:3,
172:10, 172:13, 172:17,
177:10, 178:1, 178:11
**law's** [1] - 113:15
**LAWLOR** [53] - 9:23,
13:7, 13:20, 13:22,
13:24, 14:9, 14:21,
15:24, 17:1, 17:15,
17:23, 18:13, 20:15,
21:3, 21:6, 21:11, 21:13,
21:18, 21:21, 22:1, 22:7,
22:13, 22:15, 23:13,
24:2, 28:20, 28:24, 29:3,
29:13, 38:25, 39:25,
40:22, 40:24, 41:1, 41:5,
41:8, 41:10, 41:13,
41:24, 47:24, 48:3, 48:6,
48:14, 48:18, 48:20,
48:25, 49:16, 49:21,
72:5, 72:11, 93:24,
174:17, 175:8
**Lawlor** [19] - 1:18,
39:24, 40:18, 40:20,
43:12, 44:6, 44:12,
47:23, 48:11, 49:18,
53:21, 58:4, 154:7,
174:16, 175:4, 175:10,
176:4, 177:4, 177:23
**Lawlor's** [4] - 43:5,
47:11, 63:9, 177:7
**lawyer** [2] - 49:25, 57:9
**lawyers** [1] - 61:13
**lay** [1] - 183:25
**leading** [3] - 28:6,
28:19, 49:1
**leads** [1] - 111:23
**leafed** [1] - 7:17
**leaning** [1] - 175:23
**learn** [2] - 60:2, 77:5
**learned** [1] - 184:6
**least** [11] - 6:5, 116:1,
131:1, 147:3, 147:6,
162:10, 165:23, 173:19,
173:21, 177:25, 191:4
**leave** [9] - 46:19, 59:3,
61:7, 100:11, 103:7,
103:10, 155:21, 165:15,
186:22
**Leave** [2] - 111:24,
165:8
**leaves** [4] - 37:12,
44:21, 103:1, 175:17
**leaving** [1] - 50:14
**LeBaron** [6] - 129:1,

133:3, 133:8, 133:13,
133:23, 159:13
**lecturer** [1] - 194:23
**led** [1] - 27:9
**left** [15] - 19:25, 28:10,
28:11, 35:23, 38:11,
42:15, 51:13, 70:7,
70:11, 70:15, 70:25,
74:2, 82:15, 149:20,
191:24
**left-hand** [1] - 82:15
**legal** [1] - 62:13
**legitimate** [1] - 161:19
**length** [4] - 111:14,
111:25, 112:3, 146:7
**Leon** [1] - 159:3
**less** [6] - 51:18, 69:23,
69:24, 95:13, 175:14,
179:9
**letter** [7] - 68:25, 151:4,
168:4, 168:5, 176:17,
188:12
**letting** [1] - 110:25,
191:5
**Liberty** [1] - 17:21
**library** [1] - 185:16
**license** [1] - 83:21
**lie** [1] - 178:19
**lied** [1] - 66:13
**lieu** [3] - 174:7, 175:2,
178:5
**life** [2] - 48:21, 53:18
**light** [4] - 26:18, 62:14,
62:15, 170:21
**likelihood** [2] - 58:5,
58:11
**likely** [4] - 5:24, 81:11,
123:1, 123:7
**limine** [1] - 195:20
**limit** [2] - 6:5, 175:17
**limiting** [14] - 9:24,
47:25, 49:3, 49:13,
49:19, 49:22, 50:19,
55:19, 56:8, 58:4, 58:8,
62:17, 65:4, 65:25
**line** [25] - 32:9, 32:11,
33:4, 33:10, 34:6, 39:25,
43:3, 43:4, 48:10, 61:24,
76:5, 84:21, 84:22, 89:9,
98:9, 136:16, 139:11,
139:16, 139:22, 139:23,
140:3, 140:5, 140:7,
174:18
**lines** [7] - 37:6, 68:15,
102:18, 110:22, 119:25,
120:7, 166:2
**link** [1] - 131:18
**lips** [1] - 72:11
**Lisa** [2] - 79:24, 155:9
**list** [6] - 2:12, 52:8,

84:4, 84:7, 84:9, 85:10
**listed** [31] - 2:12, 82:3,
82:15, 82:22, 83:13,
83:23, 84:9, 84:12,
85:11, 85:16, 85:19,
88:3, 89:16, 91:13,
91:24, 97:3, 98:11, 99:1,
102:3, 102:16, 128:23,
133:12, 136:12, 136:13,
136:20, 137:2, 139:17,
155:12, 161:5, 161:8,
161:15
**listen** [7] - 10:18, 53:25,
94:7, 104:5, 114:2,
114:5, 114:12
**listened** [18] - 35:3,
35:10, 37:14, 41:18,
54:16, 54:21, 54:24,
55:3, 55:11, 55:13,
56:15, 58:12, 58:16,
59:1, 98:6, 103:20,
113:24, 115:15
**listener** [1] - 26:17
**listening** [7] - 10:5,
10:8, 55:25, 112:4,
113:19, 122:2, 122:16
**listing** [1] - 83:20
**litigation** [1] - 188:20
**lives** [1] - 185:5
**living** [2] - 16:19,
116:13
**lobbies** [1] - 153:16
**lobbying** [1] - 166:7
**locate** [1] - 23:2
**located** [3] - 18:17,
129:10, 145:23
**location** [7] - 18:1,
19:14, 20:9, 78:7, 78:22,
79:13, 128:21
**locations** [1] - 185:17
**Loch** [1] - 31:1
**locked** [3] - 74:12,
74:16, 180:9
**log** [1] - 29:24
**logically** [1] - 43:15
**Lombard** [1] - 1:25
**look** [17] - 4:23, 42:23,
55:22, 61:19, 90:25,
111:11, 111:15, 113:8,
114:11, 116:25, 141:20,
146:23, 150:12, 173:20,
184:16, 186:19, 190:15
**looked** [2] - 74:6, 139:1
**looking** [12] - 42:24,
43:3, 43:13, 62:21, 85:3,
87:12, 164:13, 170:3,
170:17, 193:22, 193:23
**Looks** [2] - 92:4, 136:19
**looks** [6] - 41:23, 58:21,
92:18, 118:13, 140:25,

145:13
**loosely** [2] - 190:14,
194:22
**losing** [2] - 160:8, 160:9
**Lotus** [1] - 155:6
**lunch** [6] - 70:22, 71:10,
71:21, 100:9, 100:10,
100:14
**luncheon** [3] - 100:5,
100:8, 186:12
**Luncheon** [1] - 100:19

## M

**machine** [2] - 9:15, 50:3
**Magginson** [3] - 94:21,
103:6, 157:8
**Magginson's** [8] -
94:14, 98:3, 102:2,
115:17, 115:25, 136:8,
136:20, 157:6
**Magginsons** [2] -
113:15, 114:8
**mail** [52] - 3:12, 9:13,
9:15, 24:5, 35:1, 57:4,
84:14, 84:16, 86:12,
86:15, 87:9, 87:11,
88:17, 88:19, 88:22,
89:14, 89:18, 89:24,
91:14, 91:15, 91:18,
91:25, 94:15, 95:5,
95:20, 96:11, 97:3, 98:4,
99:11, 99:16, 101:21,
101:24, 102:3, 102:15,
102:24, 103:1, 103:4,
103:9, 103:19, 104:14,
104:18, 105:22, 140:10,
140:15, 141:5, 141:11,
141:23, 142:8, 143:9,
143:12, 162:11, 191:17
**mails** [2] - 111:6, 162:1
**major** [1] - 179:12
**male** [1] - 130:7
**Man** [1] - 99:13
**man** [6] - 14:3, 23:3,
109:11, 132:20, 150:7,
150:10
**manager** [4] - 77:10,
150:10, 164:8
**manifestly** [4] - 55:12,
177:20, 178:7, 179:3
**manner** [3] - 62:15,
170:18, 197:8
**March** [14] - 14:11,
14:18, 16:17, 16:19,
76:22, 77:6, 80:10,
80:11, 116:4, 144:24,
145:4, 148:19, 164:2
**mark** [2] - 11:17, 61:20

**marked** [1] - 3:12, 7:5, 10:14, 69:19, 117:10, 124:18, 126:2, 127:7, 127:11, 150:23, 154:25
**marshal** [1] - 189:24
**marshal's** [1] - 189:18
**marshals** [4] - 190:2, 190:8, 190:12, 190:16
**MARTIN** [68] - 1:8, 2:18, 2:21, 3:6, 9:3, 17:9, 24:8, 32:5, 34:13, 35:19, 36:6, 36:9, 36:12, 36:15, 36:17, 37:25, 38:4, 38:16, 39:6, 40:5, 40:13, 40:15, 42:7, 54:12, 55:6, 56:11, 59:12, 59:14, 59:18, 59:20, 59:22, 59:24, 60:9, 61:8, 61:23, 71:24, 93:17, 102:7, 102:11, 105:13, 106:7, 118:6, 123:24, 154:13, 154:17, 154:19, 159:22, 166:12, 166:17, 166:22, 167:3, 167:8, 175:5, 181:3, 181:21, 181:23, 187:2, 187:9, 187:13, 189:6, 189:8, 189:10, 189:15, 190:5, 190:23, 191:1, 196:6, 196:8
**Martin** [184] - 1:19, 1:20, 2:19, 3:9, 7:1, 29:17, 29:18, 30:1, 30:10, 31:21, 31:23, 33:8, 33:14, 34:7, 35:2, 36:4, 36:8, 36:10, 36:25, 37:11, 37:13, 37:23, 38:3, 40:1, 40:3, 40:9, 41:14, 42:1, 42:6, 44:13, 44:17, 44:20, 45:2, 50:10, 50:17, 51:14, 52:15, 53:3, 53:13, 53:20, 54:11, 54:16, 55:11, 55:25, 56:15, 56:23, 57:1, 57:22, 58:9, 58:11, 58:15, 58:19, 58:22, 58:23, 59:1, 59:6, 60:3, 62:20, 62:24, 64:25, 66:13, 66:14, 67:14, 69:9, 70:17, 71:1, 71:13, 71:16, 71:19, 71:22, 71:23, 73:11, 74:1, 75:3, 76:6, 77:4, 77:16, 85:12, 85:13, 85:14, 86:19, 86:21, 86:24, 87:23, 88:11, 88:16, 89:8, 89:12, 89:21, 90:21, 91:7, 91:12, 91:24, 95:4, 95:24, 96:10, 96:22, 99:19, 99:20, 100:23,

106:5, 117:14, 120:3, 120:5, 120:12, 120:17, 123:23, 125:13, 126:6, 126:7, 126:12, 126:24, 127:1, 127:13, 128:4, 128:14, 128:24, 130:2, 130:10, 130:17, 130:19, 131:7, 131:11, 132:13, 132:17, 132:25, 133:12, 135:8, 135:11, 136:2, 136:10, 136:22, 137:10, 140:24, 141:22, 142:3, 142:7, 142:17, 143:3, 143:5, 143:12, 143:15, 143:20, 144:17, 146:1, 146:2, 147:15, 148:2, 148:19, 149:16, 149:17, 150:3, 150:16, 151:14, 153:13, 154:12, 158:1, 160:23, 161:6, 162:9, 162:22, 163:6, 163:10, 163:13, 163:21, 163:24, 164:2, 166:11, 174:19, 174:21, 175:8, 181:7, 181:8, 183:14, 187:1, 188:13, 188:23, 189:2, 190:17
**Martin's** [40] - 3:14, 37:21, 42:3, 49:25, 53:1, 59:5, 63:7, 64:10, 65:8, 65:20, 67:9, 67:10, 70:4, 76:18, 85:17, 85:18, 87:18, 88:5, 90:6, 95:19, 95:24, 127:8, 128:24, 129:20, 132:19, 132:22, 133:15, 133:23, 137:3, 141:8, 141:13, 142:13, 149:3, 149:9, 152:21, 161:9, 162:10, 163:14, 165:22, 189:12
**Martins** [1] - 37:24
**Marvin** [2] - 125:14, 125:16
**Mary** [3] - 1:24, 197:3, 197:14
**MARYLAND** [1] - 1:2
**Maryland** [12] - 1:12, 1:25, 76:22, 117:14, 133:13, 171:3, 171:6, 171:9, 171:15, 172:3, 173:5, 174:1
**massage** [1] - 178:24
**match** [7] - 67:25, 107:10, 107:12, 108:7, 108:19, 112:3
**matched** [6] - 107:13, 127:25, 128:1, 128:2, 158:9, 158:12
**matches** [2] - 108:17, 158:1

**materials** [3] - 3:9, 3:12, 3:13
**mathematics** [1] - 79:5
**matter** [10] - 23:7, 25:18, 50:1, 62:13, 121:4, 165:4, 184:8, 185:18, 197:4, 197:8
**matters** [5] - 26:12, 60:1, 100:9, 185:1, 192:1
**maximum** [2] - 164:14, 164:15
**McCaffity** [2] - 79:24, 155:9
**McCaffity's** [1] - 84:5
**McCaffity/Brown** [7] - 124:9, 125:2, 125:21, 138:17, 153:19, 157:25, 158:5
**McCaffity/Lisa** [1] - 84:3
**McCoy** [19] - 33:3, 33:7, 33:12, 33:16, 33:18, 75:7, 77:10, 77:14, 145:5, 145:18, 145:21, 146:3, 146:11, 147:7, 147:14, 147:21, 151:20, 163:22, 164:4
**mean** [21] - 21:24, 37:3, 67:17, 69:22, 71:9, 85:19, 99:23, 122:24, 134:25, 139:16, 140:4, 140:15, 141:12, 149:3, 152:9, 161:21, 176:15, 178:13, 180:25, 189:3, 194:5
**meanings** [1] - 194:17
**means** [3] - 35:14, 87:16, 156:2
**meant** [2] - 22:2, 181:1
**measure** [3] - 78:5, 78:6
**media** [1] - 186:17
**medical** [1] - 181:11
**Meet** [1] - 16:9
**meet** [7] - 12:17, 12:19, 19:12, 19:18, 192:4, 192:13, 192:15
**meeting** [6] - 11:8, 16:25, 17:5, 18:2, 28:6, 28:19
**members** [1] - 116:14
**Members** [2] - 6:15, 100:10
**memorandum** [1] - 146:14
**men's** [1] - 153:7
**mention** [7] - 37:9, 37:10, 37:11, 59:21, 59:23, 105:11, 175:15
**mentioned** [4] - 68:3, 97:7, 132:8, 135:15

**mentions** [3] - 12:22, 67:7, 166:5
**mere** [1] - 81:13
**message** [11] - 24:5, 35:1, 99:16, 101:24, 102:3, 103:1, 103:7, 103:11, 104:15, 104:18, 111:24
**messages** [1] - 162:11
**met** [4] - 12:24, 13:4, 85:7, 163:10
**metro** [1] - 18:22
**Michael** [2] - 1:16, 1:18
**mid** [3] - 169:22, 191:8, 195:12
**mid-week** [1] - 191:8
**middle** [8] - 12:1, 14:3, 17:17, 112:22, 112:23, 112:24, 113:2, 191:13
**midnight** [1] - 96:14
**Might** [1] - 86:12
**might** [20] - 44:24, 57:16, 108:19, 109:24, 110:5, 110:19, 122:1, 122:16, 131:10, 131:18, 132:4, 152:14, 163:10, 170:22, 177:16, 177:18, 187:20, 188:12, 193:13, 193:18
**Mike** [1] - 182:15
**miles** [1] - 78:11
**Mills** [7] - 33:15, 75:18, 76:22, 77:21, 78:21, 144:19, 153:21
**mind** [6] - 46:21, 126:22, 175:15, 185:7, 185:20, 186:18
**mine** [2] - 31:15, 60:22
**minimal** [1] - 189:13
**minimis** [3] - 57:8, 58:10
**minimize** [1] - 184:22
**minimum** [3] - 177:23, 177:24, 178:9
**minor** [2] - 73:20, 179:21
**minute** [25] - 46:21, 51:2, 51:3, 51:18, 85:21, 88:18, 91:13, 91:19, 92:15, 95:5, 95:20, 96:17, 99:12, 101:22, 101:23, 103:19, 111:20, 141:8, 141:14, 141:15, 141:17, 149:5, 169:1
**minutes** [56] - 10:20, 48:22, 60:3, 62:5, 71:14, 72:1, 78:2, 78:16, 78:20, 78:25, 79:6, 89:10, 89:16, 91:4, 91:9, 91:10, 91:21, 95:13, 95:15,

95:21, 95:25, 96:1, 96:10, 96:19, 96:24, 97:5, 97:9, 97:16, 97:20, 98:4, 98:11, 99:4, 99:12, 99:17, 102:3, 102:18, 102:21, 104:11, 104:15, 104:19, 105:22, 111:5, 111:10, 111:11, 111:15, 111:17, 111:19, 141:11, 141:18, 152:2, 152:14, 152:16, 164:20, 164:22, 165:7, 192:14
**misconduct** [1] - 187:25
**mislead** [1] - 170:11
**misleading** [1] - 50:15
**misstates** [1] - 162:17
**mistake** [1] - 73:21
**mistrial** [11] - 22:15, 36:13, 36:14, 47:12, 47:20, 47:22, 50:12, 50:18, 55:17, 56:8
**misunderstand** [1] - 167:7
**misunderstanding** [1] - 42:18
**MITCHELL** [1] - 1:7
**Mitchell** [150] - 1:17, 7:14, 9:12, 11:13, 11:21, 12:2, 12:4, 12:7, 12:13, 12:16, 12:21, 13:6, 13:12, 13:18, 13:19, 14:2, 14:6, 15:3, 15:4, 15:9, 16:3, 16:8, 16:10, 16:12, 16:19, 16:24, 17:17, 18:2, 18:6, 19:18, 20:10, 20:12, 20:18, 21:1, 21:5, 21:24, 22:19, 23:1, 23:2, 23:6, 23:12, 23:24, 24:11, 24:19, 24:22, 24:23, 24:25, 25:1, 26:2, 26:4, 26:6, 26:9, 26:21, 27:15, 27:16, 27:25, 29:1, 31:9, 32:12, 37:15, 39:19, 41:18, 44:16, 47:18, 48:6, 50:4, 50:9, 50:10, 52:18, 56:14, 57:25, 63:11, 63:17, 67:9, 67:18, 82:4, 82:5, 82:6, 82:10, 82:11, 82:21, 83:5, 83:6, 84:15, 85:7, 86:1, 86:6, 88:11, 88:17, 89:9, 89:13, 89:17, 89:22, 90:22, 91:1, 91:6, 91:22, 92:2, 92:10, 92:11, 92:17, 92:18, 93:9, 94:23, 94:24, 95:10, 95:18, 96:4, 96:9, 96:16, 96:21, 97:1,

97:17, 99:7, 100:1, 103:14, 104:13, 115:5, 115:8, 117:15, 118:24, 119:10, 119:12, 120:12, 120:18, 121:11, 121:12, 126:24, 127:1, 127:14, 128:5, 128:12, 137:15, 137:23, 140:24, 141:23, 142:3, 143:8, 143:11, 151:14, 155:8, 162:21, 163:10, 174:22, 175:8, 176:21, 178:18, 197:5

**Mitchell's** [45] - 9:19, 11:1, 15:21, 25:1, 25:24, 25:25, 26:16, 26:24, 37:14, 47:14, 49:3, 49:5, 49:8, 49:10, 53:4, 53:14, 54:5, 54:6, 56:16, 56:24, 57:21, 57:24, 58:7, 63:8, 63:12, 65:19, 82:22, 85:21, 85:24, 86:17, 86:20, 87:17, 88:20, 89:15, 90:6, 90:7, 97:8, 103:12, 116:7, 119:4, 141:2, 141:4, 162:4, 162:7, 162:13

**model** [1] - 159:25
**modified** [2] - 49:18, 178:18
**moment** [11] - 2:4, 6:24, 39:7, 40:17, 46:2, 47:3, 80:21, 100:3, 154:1, 156:7, 165:18
**moments** [1] - 183:19
**Momma** [2] - 180:2, 183:12
**Monday** [15] - 151:24, 168:21, 168:22, 178:13, 178:15, 185:22, 185:24, 186:3, 186:5, 191:11, 191:14, 191:20, 194:3, 194:5
**money** [6] - 10:22, 12:25, 14:5, 14:6, 122:22, 184:12
**monitor** [1] - 51:7
**Montgomery** [6] - 177:15, 177:16, 180:3, 181:5, 181:9, 191:12
**Montgomery's** [2] - 168:3, 176:18
**month** [2] - 144:10, 144:12
**months** [3] - 78:3, 150:16, 153:11
**Moreover** [1] - 172:17
**morning** [34] - 2:17, 2:23, 3:4, 3:19, 3:20, 6:15, 6:22, 6:23, 20:14, 32:21, 35:6, 36:1, 42:21,

44:1, 51:25, 52:12, 52:20, 53:2, 53:8, 80:11, 82:7, 103:14, 111:19, 112:4, 113:14, 114:10, 118:21, 121:20, 130:20, 157:17, 168:23, 179:8, 179:9, 186:12
**Most** [1] - 186:15
**most** [10] - 2:17, 110:13, 148:11, 152:16, 153:16, 164:20, 167:13, 184:9, 184:10, 184:24
**mostly** [1] - 183:10
**mother** [8] - 20:13, 84:1, 86:2, 113:15, 116:11, 128:24, 139:17
**mother-in-law's** [1] - 113:15
**Motion** [2] - 21:22, 47:22
**motion** [13] - 22:8, 22:16, 36:16, 45:13, 55:16, 69:20, 168:3, 187:5, 187:9, 187:24, 188:4, 195:20
**motions** [3] - 56:7, 56:12, 168:12
**Motor** [1] - 83:21
**Move** [5] - 21:21, 22:15, 34:13
**move** [5] - 22:7, 45:18, 47:20, 48:7, 48:14
**moved** [6] - 16:20, 112:16, 115:9, 115:14, 189:19
**movements** [1] - 188:24
**movie** [39] - 23:8, 33:15, 33:22, 33:23, 75:12, 75:19, 75:21, 76:12, 76:13, 76:15, 77:5, 77:6, 77:20, 77:24, 78:1, 78:7, 78:21, 79:5, 79:12, 103:17, 142:17, 142:20, 144:19, 145:9, 147:17, 152:8, 152:14, 152:18, 152:19, 152:22, 153:6, 162:23, 162:25, 163:2, 163:4, 163:7, 163:22, 163:24, 164:9
**movies** [6] - 23:22, 148:7, 151:15, 152:6, 164:19
**moving** [3] - 16:9, 17:13, 51:7
**MR** [379] - 2:4, 2:8, 2:14, 2:18, 2:19, 2:21, 2:22, 3:2, 3:6, 3:7, 3:17, 3:24, 4:3, 4:4, 4:7, 4:9, 4:21, 4:22, 5:8, 6:5, 6:11,

6:21, 8:6, 9:3, 9:23, 10:10, 10:12, 13:7, 13:10, 13:20, 13:22, 13:24, 14:9, 14:21, 15:24, 17:1, 17:9, 17:15, 17:16, 17:23, 17:25, 18:13, 20:15, 21:3, 21:6, 21:11, 21:13, 21:18, 21:21, 21:23, 22:1, 22:7, 22:13, 22:15, 22:17, 23:13, 24:2, 24:8, 24:12, 27:4, 27:23, 28:20, 28:24, 29:3, 29:13, 30:14, 32:2, 32:5, 32:8, 34:13, 34:18, 34:21, 34:25, 35:4, 35:9, 35:12, 35:17, 35:19, 35:25, 36:6, 36:9, 36:12, 36:15, 36:17, 36:19, 36:24, 37:17, 37:19, 37:22, 37:25, 38:4, 38:16, 38:21, 38:23, 38:25, 39:2, 39:6, 39:9, 39:12, 39:15, 39:18, 39:25, 40:5, 40:11, 40:13, 40:15, 40:22, 40:24, 41:1, 41:5, 41:8, 41:10, 41:13, 41:21, 41:24, 42:7, 43:9, 43:23, 43:25, 44:9, 44:18, 45:10, 45:12, 45:18, 46:4, 46:13, 47:10, 47:24, 48:3, 48:6, 48:14, 48:18, 48:20, 48:25, 49:16, 49:21, 49:25, 50:21, 50:24, 51:21, 52:2, 52:6, 52:11, 52:17, 52:19, 52:22, 54:10, 54:12, 55:6, 56:11, 59:12, 59:14, 59:18, 59:20, 59:22, 59:24, 60:1, 60:6, 60:9, 60:10, 60:12, 60:15, 60:19, 60:22, 60:23, 61:2, 61:5, 61:8, 61:11, 61:15, 61:18, 61:22, 61:23, 62:6, 62:10, 62:14, 62:23, 63:24, 64:3, 64:7, 64:10, 64:12, 64:14, 64:21, 65:3, 65:11, 65:23, 66:4, 66:6, 66:11, 66:16, 66:19, 67:13, 67:21, 68:6, 68:8, 68:12, 68:18, 68:21, 69:1, 69:14, 69:18, 69:24, 70:2, 70:18, 70:20, 71:4, 71:7, 71:9, 71:15, 71:17, 71:24, 72:1, 72:4, 72:5, 72:11, 72:14, 72:21, 73:3, 73:8, 79:8, 79:11, 80:14, 81:19, 89:25,

90:2, 90:19, 90:23, 92:22, 93:4, 93:17, 93:24, 100:7, 100:22, 101:1, 101:7, 101:11, 101:17, 102:7, 102:9, 102:11, 102:14, 105:13, 105:14, 106:7, 118:3, 118:6, 118:20, 123:11, 123:24, 124:5, 125:20, 149:23, 150:2, 154:3, 154:13, 154:17, 154:19, 156:7, 156:15, 156:20, 156:24, 157:3, 159:22, 162:16, 162:19, 164:5, 164:17, 165:21, 166:12, 166:17, 166:22, 167:3, 167:8, 167:23, 168:15, 168:19, 168:24, 169:2, 169:4, 169:7, 169:14, 169:17, 169:18, 170:5, 170:7, 170:24, 171:11, 171:18, 173:6, 173:9, 173:12, 173:15, 174:3, 174:4, 174:17, 175:5, 175:7, 175:8, 175:11, 175:21, 176:2, 176:10, 176:16, 178:13, 179:1, 179:6, 179:12, 179:15, 179:18, 179:20, 179:24, 180:4, 180:8, 180:11, 180:13, 180:16, 180:18, 180:20, 180:22, 180:25, 181:3, 181:7, 181:12, 181:15, 181:17, 181:21, 181:23, 181:24, 182:2, 182:6, 182:11, 182:13, 182:15, 182:18, 182:21, 182:23, 183:1, 183:3, 183:5, 183:10, 187:2, 187:9, 187:13, 187:23, 188:3, 188:6, 188:8, 188:16, 189:6, 189:8, 189:10, 189:15, 190:5, 190:7, 190:17, 190:23, 191:1, 191:3, 191:22, 191:24, 192:3, 192:7, 192:10, 192:13, 192:17, 192:20, 192:23, 192:24, 193:2, 193:4, 193:6, 194:13, 194:25, 196:5, 196:6, 196:7, 196:8, 196:9

**MS** [11] - 42:19, 42:21, 43:2, 193:10, 193:18, 194:1, 194:3, 194:7, 194:12, 194:22, 195:10
**multiple** [5] - 83:19, 109:9, 122:2, 122:5, 122:10
**murder** [19] - 14:8, 20:14, 20:17, 21:2, 22:5,

22:12, 47:14, 79:2, 79:21, 84:5, 126:14, 155:9, 157:7, 157:13, 158:14, 175:20, 177:13
**murdered** [1] - 78:8
**murders** [2] - 106:13, 138:19
**music** [2] - 194:18, 194:23
**musicology** [1] - 194:20
**must** [4] - 133:18, 153:15, 173:3, 178:7
**Must** [1] - 151:5
**mustn't** [1] - 184:5
**Muvico** [1] - 153:20
**MVA** [1] - 83:21

### N

**N-67** [1] - 134:6
**nailed** [1] - 162:1
**name** [22] - 19:5, 74:9, 76:7, 79:17, 83:23, 85:15, 103:7, 109:19, 125:14, 130:14, 132:20, 139:17, 144:20, 145:9, 150:7, 150:9, 157:14, 159:3, 160:24, 161:5, 161:9, 161:21
**named** [3] - 75:7, 131:10, 157:19
**namely** [1] - 190:9
**names** [2] - 68:3, 176:22
**narcotics** [6] - 93:10, 94:1, 158:20, 159:16, 160:3
**narcotics-related** [1] - 158:20
**narrow** [1] - 167:12
**Natasha** [5] - 94:21, 98:14, 105:2, 105:7, 157:8
**nature** [2] - 5:18
**near** [5] - 19:12, 19:22, 28:9, 100:5, 138:6
**necessarily** [1] - 57:2
**necessary** [1] - 6:6
**need** [19] - 6:24, 8:12, 13:7, 33:2, 36:12, 37:3, 46:15, 47:3, 61:20, 61:23, 62:2, 66:23, 100:9, 182:5, 190:14, 190:19, 192:4, 192:14
**needed** [2] - 63:16, 69:4
**negative** [9] - 40:2, 45:2, 53:13, 125:11, 125:13, 126:9, 127:16,

127:20, 127:23
**negatived** [1] - 37:14
**neglected** [1] - 2:16
**never** [13] - 51:19,
51:24, 57:9, 108:25,
117:7, 121:5, 134:25,
151:14, 163:23, 181:25,
195:1, 195:3, 195:4
**Never** [1] - 126:22
**new** [4] - 60:19, 61:18,
68:9, 184:6
**news** [1] - 184:5
**Next** [7] - 32:13, 91:20,
95:2, 96:8, 96:13, 98:1,
98:9
**next** [46] - 16:10, 16:20,
20:13, 32:18, 32:20,
32:21, 32:24, 33:10,
34:6, 34:11, 71:14, 73:1,
76:1, 82:7, 88:9, 88:14,
88:23, 89:11, 91:5,
91:10, 92:1, 92:14, 95:6,
95:12, 95:21, 96:3, 97:4,
97:25, 98:8, 102:17,
115:9, 142:2, 142:12,
156:16, 167:25, 173:2,
184:17, 184:19, 185:5,
185:20, 186:15, 186:16,
191:16, 191:21, 192:18
**nickname** [2] - 30:12,
109:9
**nicknames** [1] - 30:16
**NIEDERMEIER** [1] -
196:4
**Niedermeier** [51] - 2:10,
6:22, 6:25, 10:14, 13:17,
20:25, 25:22, 26:1, 26:3,
26:14, 26:17, 26:18,
26:20, 27:24, 40:19,
47:13, 49:2, 49:12,
50:22, 53:3, 58:22, 59:2,
59:9, 63:7, 63:22, 69:6,
70:9, 70:14, 70:21,
71:22, 72:9, 72:13, 73:9,
73:25, 74:11, 79:16,
89:4, 90:12, 93:11,
93:19, 106:8, 116:24,
154:9, 154:11, 154:20,
157:4, 158:19, 165:12,
165:23, 179:8, 191:9
**Niedermeier's** [11] -
25:23, 26:1, 26:6, 27:14,
49:7, 49:9, 62:16, 63:3,
63:10, 63:16, 80:20
**nig** [1] - 84:12
**night** [39] - 13:19,
14:20, 14:24, 16:17,
20:9, 24:3, 28:7, 33:3,
33:13, 33:14, 33:17,
77:6, 77:13, 78:13,

78:20, 78:24, 78:25,
79:13, 81:25, 92:9,
94:25, 97:21, 97:23,
98:17, 123:8, 136:23,
136:24, 137:2, 137:10,
144:18, 148:4, 148:8,
150:4, 153:13, 163:10,
163:19, 163:22, 163:24,
192:14
**nine** [3] - 119:14,
150:16, 153:11
**Nine** [5] - 12:11, 12:15,
12:16, 119:14, 170:3
**NO** [1] - 1:6
**nobody** [1] - 86:11
**Noel** [2] - 74:18, 74:23
**nol** [2] - 174:1, 174:6
**non** [2] - 139:22, 183:25
**non-long** [1] - 139:22
**non-professional** [1] -
183:25
**none** [1] - 91:17
**nonetheless** [1] - 185:8
**noon** [1] - 119:15
**normality** [1] - 185:5
**North** [3] - 83:18, 99:9,
179:15
**northbound** [1] -
110:16
**NORTHERN** [1] - 1:2
**note** [8] - 42:10, 46:19,
48:15, 100:11, 145:12,
145:17, 165:8, 186:22
**noted** [5] - 6:10, 32:7,
49:15, 68:5, 152:12
**notes** [25] - 3:8, 11:7,
11:9, 31:25, 46:14, 52:2,
53:3, 54:5, 75:3, 119:1,
119:2, 119:4, 119:9,
119:10, 119:19, 119:21,
119:22, 120:5, 120:20,
144:4, 144:7, 146:14,
147:3, 147:23
**Notes** [1] - 155:6
**Nothing** [1] - 59:17
**nothing** [7] - 45:15,
55:20, 55:21, 59:8,
63:22, 65:9, 173:22
**notice** [3] - 101:20,
169:11, 195:3
**noticed** [2] - 68:13,
140:21
**November** [9] - 147:24,
147:25, 148:1, 148:2,
186:2, 186:3, 186:14,
193:12, 193:23
**Number** [4] - 9:17, 11:2,
99:12, 127:8
**number** [72] - 3:6, 4:11,
7:8, 7:21, 8:7, 8:15,

8:20, 9:3, 9:17, 15:2,
15:5, 25:20, 25:21,
30:21, 31:13, 51:4, 52:5,
58:6, 82:5, 82:20, 83:20,
84:7, 84:21, 84:25, 85:5,
85:12, 85:25, 86:6,
86:18, 86:23, 88:1, 88:4,
88:16, 91:23, 92:3, 92:7,
92:16, 92:17, 92:20,
94:9, 95:9, 95:10, 96:6,
96:16, 97:2, 97:5, 97:7,
98:9, 98:24, 99:4, 99:8,
99:9, 103:7, 121:6,
121:17, 121:20, 124:24,
125:7, 125:8, 133:14,
141:3, 155:16, 160:21,
160:24, 161:12, 161:15
**Number(s** [1] - 197:5
**numbers** [10] - 7:25,
8:1, 8:2, 8:23, 33:18,
84:4, 101:21, 121:22,
135:7, 136:5
**numerous** [2] - 91:11,
99:10
**nutshell** [1] - 12:17

## O

**oath** [2] - 142:25,
185:12
**obituary** [1] - 74:11
**object** [10] - 4:1, 13:7,
32:5, 37:16, 41:10,
42:12, 43:5, 49:12,
63:24, 175:7
**objected** [4] - 42:22,
49:11, 51:14, 51:17
**objected-to** [1] - 51:17
**objecting** [7] - 39:4,
39:5, 39:7, 40:7, 40:14,
40:21, 64:2
**objection** [46] - 3:18,
3:23, 4:13, 13:23, 13:25,
17:11, 22:3, 22:8, 29:5,
36:7, 38:2, 38:4, 38:7,
38:19, 39:24, 40:6,
40:18, 40:19, 40:25,
41:3, 41:7, 41:12, 42:5,
44:3, 46:13, 49:1, 51:12,
53:11, 54:8, 56:14,
56:20, 57:20, 57:25,
62:11, 64:4, 64:5, 64:6,
64:7, 68:4, 162:16,
162:18, 171:18, 175:13,
178:17, 178:18
**Objection** [38] - 13:20,
13:22, 14:9, 14:21,
15:24, 17:1, 17:9, 20:15,
21:3, 21:6, 21:11, 21:13,
21:18, 22:1, 22:7, 22:13,

23:13, 24:2, 24:8, 28:20,
28:24, 29:3, 29:13,
30:14, 34:13, 79:8,
89:25, 90:23, 92:22,
93:17, 93:24, 105:13,
105:14, 118:3, 118:20,
123:11, 164:5, 164:17
**objection's** [11] - 6:10,
13:9, 17:3, 20:16, 21:4,
21:7, 21:14, 21:20,
22:14, 32:7, 118:5
**objections** [6] - 25:21,
48:23, 56:18, 57:18,
63:9, 173:18
**objects** [2] - 40:1,
134:18
**obligated** [1] - 189:3
**observed** [1] - 133:14
**obtain** [4] - 126:23,
153:12, 189:18
**obtained** [7] - 76:10,
128:7, 133:9, 134:19,
138:16, 153:20, 162:12
**obtaining** [1] - 189:16
**obvious** [5] - 21:19,
70:5, 70:6, 70:10
**obviously** [4] - 5:3,
34:25, 66:23, 85:6
**Obviously** [2] - 5:10,
48:9
**occasions** [2] - 9:25,
48:24
**occupant** [1] - 131:18
**occupied** [2] - 130:7,
131:2
**occur** [1] - 149:22
**occurred** [4] - 23:11,
126:14, 126:15, 189:11
**occurs** [1] - 142:13
**October** [8] - 1:11,
169:14, 186:24, 191:16,
191:17, 191:20, 195:12,
197:5
**OF** [3] - 1:2, 1:5, 1:11
**off-the-cuff** [1] - 164:15
**offer** [1] - 29:17
**offering** [1] - 80:21
**Office** [2] - 118:14,
118:18
**office** [3] - 147:8,
147:11, 147:13
**officer** [3] - 25:13,
132:19, 159:2
**Officer** [5] - 10:15,
62:16, 63:3, 81:21, 191:9
**officers** [2] - 130:10,
131:6
**official** [1] - 197:7
**Official** [1] - 197:15
**often** [2] - 158:21,

172:21
**old** [6] - 12:6, 12:8,
60:16, 60:24, 134:2,
159:14
**older** [2] - 159:25, 160:4
**Oliver** [4] - 79:24, 84:3,
84:5, 155:9
**once** [12] - 44:2, 78:21,
89:12, 89:14, 92:2,
95:10, 95:24, 96:4,
101:21, 175:9, 183:17
**Once** [1] - 78:18
**One** [17] - 9:17, 30:17,
47:24, 49:1, 49:4, 99:12,
102:16, 116:15, 117:11,
123:17, 127:8, 128:18,
154:15, 155:1, 160:5,
167:23, 176:4
**one** [141] - 2:4, 2:19,
2:20, 2:21, 4:11, 6:7,
7:2, 9:17, 10:20, 16:7,
22:20, 23:8, 26:8, 27:6,
40:17, 40:20, 43:2, 43:3,
45:10, 48:23, 50:20,
50:21, 51:5, 51:9, 54:14,
54:17, 55:15, 59:2,
60:19, 61:23, 62:3,
62:11, 70:22, 71:12,
72:5, 78:3, 79:6, 82:3,
87:21, 87:22, 88:5,
88:15, 88:17, 88:18,
89:11, 90:13, 91:13,
91:19, 92:6, 94:18, 95:5,
95:17, 95:20, 96:8,
96:13, 96:17, 97:9,
97:10, 97:16, 97:17,
97:19, 97:20, 98:1, 98:6,
100:3, 101:21, 101:22,
101:23, 104:10, 106:11,
109:14, 113:7, 113:9,
114:6, 117:6, 117:7,
118:11, 118:23, 119:21,
121:10, 121:25, 123:15,
123:20, 127:17, 131:1,
132:11, 134:23, 134:25,
135:2, 135:3, 136:3,
136:4, 136:11, 136:13,
138:25, 139:12, 140:24,
140:25, 141:17, 141:24,
141:25, 143:3, 143:6,
145:22, 147:12, 148:11,
148:15, 154:14, 156:12,
156:13, 157:18, 157:19,
158:4, 158:6, 158:8,
160:21, 161:24, 162:10,
167:24, 168:1, 168:12,
168:13, 170:19, 175:19,
175:21, 175:22, 177:21,
179:12, 179:25, 181:25,
187:20, 187:21, 188:16

**one's** [1] - 118:13
**one-page** [1] - 119:21
**ones** [1] - 141:4
**ongoing** [1] - 13:17
**online** [1] - 185:15
**open** [4] - 46:21, 49:19, 186:18, 192:23
**opening** [2] - 194:16, 195:5
**Operations** [1] - 151:24
**opine** [1] - 62:16
**opinion** [4] - 27:14, 47:13, 49:9, 123:6
**opinions** [2] - 27:11, 49:12
**opportunity** [4] - 29:18, 173:19, 188:17, 188:23
**oppose** [1] - 195:17
**opposed** [1] - 173:17
**opposing** [1] - 194:25
**opposite** [3] - 42:4, 44:13, 162:6
**orally** [1] - 52:11
**order** [7] - 15:23, 56:7, 70:11, 112:17, 149:14, 191:19, 194:8
**ordering** [1] - 190:12
**orders** [2] - 127:1, 190:9
**original** [4] - 150:12, 150:13, 150:19, 174:19
**otherwise** [2] - 53:5, 189:10
**out-of-state** [1] - 193:11
**outcome** [2] - 172:6, 172:7
**outcomes** [1] - 172:4
**outset** [1] - 163:17
**outside** [5] - 11:18, 129:2, 130:4, 187:6, 187:21
**overheard** [1] - 105:19
**overlap** [1] - 172:24
**overlooked** [1] - 43:14
**overreaction** [1] - 175:24
**overruled** [20] - 6:10, 13:9, 13:23, 13:25, 17:3, 17:11, 20:16, 21:4, 21:7, 21:14, 21:20, 22:3, 22:8, 22:14, 25:21, 29:6, 40:6, 51:13, 162:18, 173:19
**Overruled** [18] - 14:10, 23:14, 24:10, 28:21, 29:14, 30:15, 32:7, 68:7, 79:10, 90:1, 90:3, 90:24, 93:2, 93:18, 93:25, 105:15, 123:12, 164:18
**Owings** [7] - 33:4, 33:15, 75:18, 76:22,

77:21, 78:21, 144:19
**own** [6] - 12:25, 27:19, 183:11, 185:5, 188:24, 193:7
**owned** [1] - 159:9
**owner** [2] - 86:2, 133:12

**P**

**P-I-E** [1] - 159:23
**p.m** [25] - 30:6, 76:3, 77:13, 82:7, 82:16, 87:20, 87:25, 88:10, 88:14, 89:6, 89:13, 91:2, 91:8, 91:20, 92:5, 92:15, 95:3, 95:8, 95:12, 100:18, 141:24, 141:25, 142:2, 142:10, 195:22
**pads** [4] - 46:19, 100:11, 165:8, 186:22
**Page** [36] - 11:16, 11:25, 12:3, 12:5, 12:9, 12:11, 12:15, 12:16, 12:21, 13:12, 16:7, 16:23, 16:24, 17:7, 17:12, 17:17, 18:2, 19:17, 19:21, 19:24, 20:11, 21:25, 22:18, 23:1, 23:6, 27:8, 28:4, 28:5, 28:7, 60:16, 62:21, 64:12, 68:16, 70:4, 73:25, 163:16
**PAGE** [1] - 196:3
**page** [19] - 12:1, 12:22, 16:6, 18:6, 19:18, 19:25, 61:25, 69:23, 69:24, 76:21, 119:21, 136:11, 168:8, 169:22, 171:2, 171:23, 173:4, 176:11
**Pages** [3] - 13:11, 23:5, 170:3
**pages** [4] - 134:8, 135:7, 197:6
**paid** [2] - 34:1, 145:12
**paint** [1] - 111:2
**pants** [1] - 10:23
**paper** [5] - 61:8, 119:6, 119:25, 190:15, 190:21
**papers** [1] - 134:18
**paradigm** [1] - 177:11
**paragraph** [8] - 155:17, 170:11, 170:22, 171:1, 171:5, 173:4, 173:6, 173:8
**paralegal** [1] - 61:2
**Paranoia** [1] - 122:23
**paranoia** [5] - 94:4, 122:13, 122:16, 122:20, 123:4

**Pardon** [1] - 153:9
**parentheses** [1] - 30:17
**parked** [1] - 133:4
**part** [27] - 14:6, 16:1, 22:5, 36:1, 40:5, 42:17, 42:23, 43:14, 60:4, 60:6, 61:24, 67:2, 69:7, 69:8, 69:20, 107:24, 113:10, 113:13, 113:18, 122:12, 149:13, 149:18, 155:17, 172:25, 177:25, 194:19
**partially** [1] - 7:10
**participant** [1] - 179:24
**participate** [1] - 130:22
**participated** [3] - 6:25, 26:15, 128:16
**particular** [22] - 27:17, 38:7, 58:5, 81:8, 81:11, 81:12, 81:16, 90:17, 92:24, 92:25, 93:14, 101:20, 106:17, 109:10, 126:19, 153:14, 156:4, 172:6, 172:7, 172:20, 178:4
**particularly** [2] - 177:21, 194:7
**parties** [1] - 170:19
**parting** [1] - 165:6
**partly** [1] - 195:11
**parts** [1] - 109:4
**party** [1] - 99:25
**pass** [2] - 125:23, 189:3
**passage** [6] - 11:6, 20:11, 32:20, 32:24, 34:11, 44:2
**passed** [2] - 91:21, 102:17
**passenger** [1] - 112:20
**passenger's** [1] - 112:17
**passing** [1] - 189:3
**passions** [1] - 5:24
**past** [3] - 63:16, 83:10, 143:15
**patience** [2] - 6:16, 183:18
**patient** [1] - 139:8
**pattern** [1] - 93:13
**Paul** [1] - 1:19
**Pause** [4] - 2:7, 4:25, 149:7, 156:10
**pause** [1] - 20:22
**pay** [3] - 44:5, 75:23, 184:11
**payment** [1] - 75:25
**pen** [1] - 61:24
**people** [25] - 8:19, 12:24, 62:24, 64:13, 67:20, 67:25, 68:1, 68:3, 113:11, 113:19, 113:24,

113:25, 114:2, 114:5, 136:16, 136:25, 149:1, 151:17, 151:20, 153:17, 157:9, 159:16
**People** [3] - 63:20, 94:1, 114:8
**perfectly** [7] - 8:12, 44:6, 48:8, 57:10, 63:20, 70:8, 166:16
**perhaps** [11] - 4:7, 48:10, 51:2, 57:1, 63:10, 171:3, 175:24, 178:9, 179:8, 184:12
**Perhaps** [1] - 179:8
**peril** [1] - 176:25
**period** [6] - 74:17, 85:21, 99:23, 142:18, 192:4
**permissible** [1] - 57:10
**permissibly** [1] - 66:21
**permission** [5] - 8:1, 70:14, 154:6, 154:7, 154:15
**permit** [3] - 6:4, 69:10, 177:5
**permits** [2] - 27:19, 177:4
**permitted** [1] - 55:14
**person** [16] - 25:17, 44:24, 58:14, 63:13, 63:15, 92:24, 92:25, 93:14, 115:16, 135:2, 135:3, 135:4, 144:20, 194:21, 195:8
**persons** [3] - 57:16, 114:23, 146:10
**pertinent** [2] - 81:24, 108:6
**Petry** [1] - 134:16
**phone** [230] - 7:2, 7:6, 7:8, 7:25, 8:15, 8:23, 14:15, 14:16, 14:17, 14:23, 15:1, 15:3, 15:4, 15:9, 15:12, 15:15, 16:2, 16:4, 17:4, 17:18, 20:2, 21:12, 23:11, 23:25, 28:2, 28:12, 28:16, 29:16, 31:13, 80:9, 81:11, 81:12, 81:16, 82:2, 82:4, 82:11, 82:12, 82:22, 82:24, 83:1, 83:3, 83:16, 83:20, 83:22, 83:23, 84:4, 84:5, 84:14, 84:20, 84:21, 84:22, 84:24, 85:11, 85:14, 85:17, 85:18, 85:25, 86:13, 86:19, 87:4, 87:7, 87:16, 87:17, 87:18, 87:23, 87:24, 88:5, 88:10, 88:11, 88:16,

88:21, 89:8, 89:9, 89:12, 89:13, 89:22, 90:6, 90:7, 90:22, 90:25, 91:6, 91:7, 91:11, 91:12, 91:22, 91:23, 92:2, 92:20, 92:25, 93:7, 93:8, 93:9, 93:14, 93:15, 94:7, 94:11, 94:13, 94:14, 94:15, 94:18, 94:23, 94:24, 95:3, 95:4, 95:18, 95:19, 95:23, 95:24, 95:25, 96:4, 96:5, 96:9, 96:11, 96:15, 96:21, 97:1, 97:11, 97:22, 98:1, 98:2, 98:3, 98:21, 98:24, 98:25, 99:3, 99:7, 99:8, 101:23, 102:2, 103:6, 105:3, 111:25, 112:6, 113:21, 115:4, 115:13, 115:16, 115:17, 115:21, 115:23, 115:25, 116:2, 116:7, 121:5, 121:16, 121:17, 135:11, 136:9, 136:12, 136:13, 136:19, 136:23, 137:1, 137:2, 137:4, 137:10, 137:11, 137:16, 137:20, 137:22, 138:3, 139:4, 139:13, 139:16, 139:21, 139:22, 139:23, 140:3, 140:5, 140:6, 140:9, 140:11, 140:16, 140:17, 140:23, 141:10, 141:13, 141:14, 141:21, 141:22, 142:2, 142:6, 142:12, 142:13, 143:3, 143:4, 143:16, 143:17, 153:6, 160:15, 160:23, 160:24, 160:25, 161:2, 161:5, 161:8, 161:11, 161:12, 161:14, 161:16, 161:17, 161:18, 161:19, 161:20, 161:23, 162:5, 162:10, 162:17, 162:20
**Phone** [1] - 14:15
**phone's** [1] - 103:5
**phones** [36] - 29:8, 63:14, 81:25, 87:4, 88:3, 88:13, 90:12, 92:6, 92:10, 92:11, 93:21, 94:5, 99:19, 99:20, 121:21, 121:22, 121:24, 122:2, 122:5, 122:10, 134:20, 134:21, 135:12, 136:2, 136:7, 136:17, 137:20, 137:22, 139:11, 139:20, 140:9, 160:15, 160:18, 160:22, 185:18
**photograph** [2] - 112:12, 112:13

**photographs** [18] - 4:1, 4:2, 4:13, 4:17, 4:20, 5:1, 5:2, 5:4, 5:6, 5:13, 5:16, 5:19, 5:24, 80:23, 80:24, 81:13, 129:15, 183:7
**photos** [2] - 4:23, 5:9
**phrase** [1] - 74:2
**pick** [4] - 72:6, 75:9, 87:8, 156:16
**picked** [2] - 86:11, 89:17, 103:5
**picks** [1] - 13:6
**pictures** [3] - 5:11, 5:21, 153:17
**piece** [5] - 41:17, 66:23, 119:25, 190:15
**place** [12] - 12:23, 16:25, 50:1, 54:21, 55:8, 87:4, 98:2, 103:4, 110:6, 119:15, 132:13, 132:22, 133:15, 138:19, 147:11
**placed** [24] - 14:16, 14:17, 15:8, 15:18, 45:2, 82:16, 85:4, 85:5, 93:7, 94:14, 95:9, 96:20, 98:9, 115:11, 115:25, 116:1, 116:6, 121:16, 121:17, 138:3, 139:4, 139:6, 140:3, 140:5
**places** [1] - 73:19
**plan** [2] - 186:15, 187:18
**plane** [1] - 193:20
**planned** [1] - 184:20
**plausibly** [1] - 187:25
**play** [5] - 9:13, 23:19, 45:9, 73:17, 118:4
**played** [7] - 9:22, 60:3, 60:7, 73:24, 148:10, 149:8, 149:14
**player** [1] - 23:19
**playing** [1] - 23:8
**plea** [9] - 65:10, 65:13, 66:8, 168:3, 170:12, 180:18, 183:2, 183:3, 183:4
**pleading** [2] - 177:9
**pleasure** [1] - 156:11
**plenty** [4] - 12:24, 12:25, 186:8, 195:19
**Plus** [1] - 87:12
**pocket** [2] - 115:13
**pockets** [5] - 10:22, 10:23, 114:13, 114:15
**point** [33] - 18:23, 25:8, 28:22, 29:2, 29:15, 38:5, 39:10, 41:22, 44:15, 48:14, 51:5, 51:9, 53:20, 59:24, 72:15, 107:4,

108:5, 111:1, 116:10, 116:20, 119:19, 122:5, 138:14, 143:15, 146:5, 149:18, 152:16, 166:17, 167:12, 174:10, 175:10, 178:22
**pointed** [5] - 52:23, 53:8, 157:25, 159:13, 161:25
**pointing** [6] - 31:17, 70:9, 121:9, 121:11, 121:17, 144:14
**points** [2] - 5:3, 21:17
**police** [12] - 64:21, 72:17, 73:14, 83:11, 94:2, 94:6, 122:1, 123:4, 129:4, 146:4, 155:5, 155:19
**Police** [1] - 129:9
**policies** [1] - 184:9
**portion** [11] - 38:7, 51:17, 58:3, 58:16, 68:13, 69:19, 114:12, 133:10, 149:15, 176:5, 176:8
**portions** [2] - 36:24, 49:10
**position** [6] - 4:8, 39:20, 47:18, 50:8, 175:23, 177:10
**positive** [1] - 116:14
**possession** [1] - 189:24
**possibility** [1] - 173:23
**possible** [4] - 4:12, 46:14, 136:8, 164:14
**possibly** [3] - 50:10, 174:6, 174:8
**potential** [1] - 188:24
**pre** [6] - 32:1, 45:14, 54:6, 120:20, 126:2, 143:24
**pre-interview** [4] - 32:1, 54:6, 120:20, 143:24
**pre-statement** [1] - 45:14
**preamble** [2] - 103:10, 111:23
**preclude** [1] - 152:22
**preface** [1] - 191:4
**prefer** [1] - 156:14
**prejudiced** [1] - 170:19
**prepare** [4] - 10:14, 45:21, 135:21, 135:23
**prepared** [8] - 10:3, 57:6, 73:13, 80:19, 81:21, 117:4, 118:8, 118:14
**preparing** [1] - 81:23
**presence** [4] - 114:3, 114:6, 187:6, 187:22

**present** [10] - 2:2, 26:14, 57:4, 57:12, 63:15, 100:20, 129:6, 146:11, 159:11
**presented** [2] - 24:22, 81:5
**President** [2] - 184:7, 184:13
**pressure** [1] - 192:12
**presumption** [1] - 115:15
**Pretend** [1] - 39:16
**pretty** [6] - 55:24, 70:10, 94:1, 144:4, 153:7, 185:23
**preview** [1] - 163:1
**previews** [2] - 152:9, 152:13
**previously** [5] - 148:23, 171:6, 171:9, 171:15, 172:16
**primary** [2] - 124:9, 138:5
**principal** [1] - 188:22
**print** [1] - 158:5
**printed** [2] - 75:24, 76:7
**printout** [1] - 169:22
**prints** [2] - 107:5, 158:1
**prisoners** [2] - 79:17, 157:18
**probation** [3] - 74:15, 132:19, 159:2
**probative** [2] - 53:16, 57:16
**problem** [25] - 15:25, 36:4, 36:6, 37:7, 38:24, 39:22, 40:9, 42:5, 44:25, 55:16, 63:5, 65:14, 66:22, 67:1, 67:5, 68:22, 166:19, 167:6, 170:25, 174:13, 175:12, 178:3, 179:1, 179:2
**procedure** [1] - 143:23
**proceed** [6] - 2:3, 17:24, 27:3, 81:18, 101:16, 106:5
**proceeding** [4] - 170:19, 177:12, 177:13, 178:4
**Proceedings** [2] - 2:1, 195:22
**proceedings** [8] - 2:7, 4:25, 149:7, 156:10, 176:24, 178:22, 197:4, 197:7
**proceeds** [1] - 22:20
**process** [4] - 56:20, 57:12, 131:23, 132:5
**processed** [1] - 126:15
**produce** [1] - 123:21

**professional** [2] - 183:25, 184:1
**professor** [1] - 194:20
**progress** [2] - 95:6, 183:21
**prohibit** [1] - 57:9
**projectile** [1] - 4:12
**promise** [2] - 178:14, 184:15
**proof** [3] - 81:16, 153:12, 172:25
**properly** [2] - 169:25, 173:21
**proposal** [1] - 45:8
**proposed** [6] - 3:25, 169:20, 170:8, 171:19, 171:23, 187:14
**proposes** [1] - 171:14
**proposing** [1] - 171:22
**pros** [1] - 174:1
**prosecute** [1] - 170:15
**prosecuted** [6] - 171:7, 171:10, 171:15, 172:16, 180:6, 180:8
**prosecution** [19] - 6:2, 167:16, 170:8, 172:1, 172:11, 172:19, 172:21, 172:22, 173:1, 174:7, 174:12, 174:21, 175:2, 176:11, 176:21, 177:2, 178:6, 180:17
**prosecutions** [3] - 167:21, 172:5, 172:21
**prosecutor** [1] - 26:21
**prosecutorial** [1] - 187:25
**prosecutors** [1] - 172:16
**prossed** [1] - 174:6
**prove** [1] - 66:24
**proven** [1] - 27:20
**provide** [4] - 53:13, 80:15, 89:2, 194:18
**provided** [4] - 30:10, 33:17, 94:19, 195:2
**provides** [2] - 57:2, 183:5
**Pull** [1] - 171:5
**purport** [1] - 81:6
**purportedly** [1] - 58:17
**put** [37] - 2:11, 8:19, 14:4, 15:14, 38:8, 46:13, 47:5, 47:8, 47:11, 47:20, 48:12, 53:12, 61:8, 62:11, 66:21, 67:15, 68:10, 94:7, 112:22, 113:2, 113:10, 116:16, 116:19, 118:18, 120:9, 132:11, 132:12, 155:24, 161:19, 169:19, 171:3,

176:13, 185:7, 187:18, 192:11
**Put** [1] - 185:20
**puts** [1] - 16:20
**putting** [3] - 18:19, 167:14, 174:8
**PY** [1] - 159:23
**Pyne** [3] - 1:21, 191:23, 193:9
**PYNE** [8] - 191:24, 192:3, 192:7, 192:13, 192:17, 192:20, 192:23, 193:2

---

**Q**

---

**quarter** [1] - 16:7
**quarters** [3] - 11:16, 12:22, 17:12
**questioned** [5] - 51:4, 52:19, 118:7, 118:21, 118:24
**questioning** [3] - 25:22, 26:15, 148:11
**questions** [14] - 9:19, 10:25, 23:10, 31:8, 101:18, 106:2, 120:15, 123:22, 126:13, 148:15, 149:4, 164:25, 181:6
**quick** [4] - 47:24, 72:5, 93:6, 191:3
**quickly** [1] - 168:6
**Quickly** [1] - 179:7
**quiet** [1] - 165:20
**quite** [8] - 50:2, 94:3, 137:19, 150:3, 161:25, 165:24, 181:2, 191:5
**quotation** [1] - 11:17
**quote** [5] - 42:14, 51:20, 55:4, 168:6, 170:14
**quoted** [2] - 12:16, 58:17
**quoting** [1] - 29:15

---

**R**

---

**radar** [1] - 160:2
**raised** [1] - 45:14
**raises** [1] - 63:5
**raising** [2] - 166:10, 168:12
**ran** [1] - 145:20
**Randallstown** [2] - 30:20, 129:12
**rang** [1] - 88:21
**rap** [7] - 194:14, 194:15, 194:17, 194:18, 194:19, 194:23, 195:5

**rapid** [3] - 85:20, 86:10, 142:7
**rate** [3] - 78:19, 160:6, 182:10
**Rather** [1] - 194:4
**rather** [11] - 69:11, 69:12, 69:13, 101:6, 101:7, 140:20, 142:7, 148:3, 177:19, 192:7, 192:19
**rattled** [1] - 191:7
**Raven** [1] - 31:1
**reach** [3] - 27:19, 78:17, 98:16
**reacted** [1] - 166:1
**reaction** [2] - 178:15, 181:3
**read** [22] - 7:25, 8:20, 20:5, 20:11, 22:23, 31:9, 34:6, 50:22, 50:23, 50:24, 50:25, 70:1, 76:21, 76:23, 76:24, 170:13, 171:8, 171:22, 171:24, 173:3, 173:10, 180:18
**reads** [2] - 171:6, 171:23
**ready** [7] - 2:3, 2:8, 6:18, 45:9, 73:7, 184:2
**real** [2] - 159:25, 174:20
**realize** [1] - 42:24
**really** [15] - 5:12, 5:19, 5:21, 13:7, 23:6, 23:9, 36:5, 40:7, 50:9, 51:10, 57:24, 74:1, 152:22, 183:5, 183:10
**Really** [1] - 183:10
**rear** [1] - 129:23
**reason** [12] - 38:18, 53:10, 111:9, 113:10, 122:8, 122:12, 126:19, 131:15, 132:3, 138:9, 148:22, 153:14
**reasonable** [9] - 6:7, 27:21, 44:24, 57:16, 58:14, 58:15, 81:10, 81:12, 140:22
**reasons** [3] - 32:6, 121:25, 160:5
**receipt** [3] - 75:12, 75:18, 75:20
**receipts** [1] - 76:14
**receive** [1] - 87:7
**received** [5] - 76:17, 137:20, 140:11, 140:17, 151:23
**receiving** [1] - 140:16
**recent** [1] - 188:4
**recently** [2] - 184:6, 184:7

**recess** [14] - 46:19, 46:22, 46:25, 47:2, 62:1, 62:5, 100:5, 100:9, 100:10, 100:18, 100:19, 165:3, 175:25, 186:12
**Recess** [1] - 62:9
**recesses** [1] - 186:12
**recessing** [1] - 165:2
**recognize** [3] - 76:16, 117:2, 155:1
**recollection** [10] - 37:5, 51:5, 128:19, 135:8, 143:18, 143:19, 143:22, 152:16, 161:7, 165:24
**record** [17] - 34:16, 46:14, 47:11, 47:20, 48:15, 50:25, 52:5, 52:13, 52:24, 62:11, 69:21, 70:1, 84:21, 111:25, 139:24, 140:5, 140:6
**recordation** [1] - 53:2
**recorded** [19] - 11:8, 11:22, 14:17, 30:5, 52:25, 54:14, 75:9, 94:15, 98:4, 102:25, 104:18, 105:9, 111:21, 117:3, 119:5, 119:7, 143:24, 146:7, 197:3
**recorder** [1] - 120:9
**recording** [11] - 7:13, 7:19, 9:13, 14:16, 73:15, 111:10, 111:15, 113:19, 113:20, 115:15, 119:15
**records** [25] - 3:5, 7:21, 14:15, 21:12, 75:12, 81:5, 85:3, 87:17, 88:20, 90:11, 98:20, 98:21, 99:2, 116:2, 136:1, 137:4, 137:20, 137:22, 138:4, 138:6, 138:16, 143:14, 150:20, 162:2, 162:13
**recover** [3] - 7:2, 10:22, 98:5
**recovered** [20] - 2:15, 2:16, 2:24, 4:11, 5:20, 7:6, 83:3, 83:4, 85:15, 92:6, 94:12, 97:11, 98:2, 104:24, 135:1, 158:5, 158:17, 160:16, 160:19, 161:2
**Redact** [1] - 176:8
**redact** [6] - 43:4, 43:16, 43:18, 48:7, 56:2, 176:5
**redacted** [30] - 35:5, 35:7, 36:2, 41:19, 41:20, 42:17, 42:24, 43:17, 44:2, 46:2, 51:24, 53:2, 53:5, 53:23, 54:1, 58:3,

60:8, 60:11, 60:12, 61:25, 63:5, 68:14, 69:5, 69:7, 69:8, 69:23, 69:24, 168:10
**redaction** [6] - 40:12, 45:21, 47:4, 56:2, 60:25, 62:23
**redactions** [1] - 40:16
**redirect** [4] - 101:2, 101:3, 101:12, 154:11
**REDIRECT** [2] - 157:2, 196:9
**refer** [3] - 92:24, 172:2, 176:24
**reference** [8] - 41:1, 76:17, 122:9, 168:1, 168:9, 176:10, 176:13, 176:21
**referenced** [1] - 174:1
**referred** [1] - 165:25
**referring** [3] - 64:15, 68:14, 188:5
**refers** [1] - 19:21
**reflect** [1] - 51:1
**refresh** [1] - 37:4
**regard** [2] - 41:16, 62:13
**regarding** [8] - 9:24, 24:17, 25:21, 49:11, 50:20, 50:21, 52:25, 174:21
**regards** [2] - 56:22, 191:25
**registered** [4] - 85:14, 86:2, 136:23, 161:22
**regret** [1] - 53:18
**regular** [1] - 78:19
**Reisterstown** [2] - 22:21, 22:22
**relate** [2] - 3:14, 125:1
**related** [1] - 158:20
**relates** [3] - 7:8, 8:16, 156:15
**relating** [3] - 29:21, 45:13, 75:13
**relationship** [2] - 12:12, 13:18
**relatively** [1] - 70:5
**release** [2] - 156:12, 156:17
**relevance** [1] - 195:1
**relied** [1] - 111:18
**rely** [1] - 190:1
**remain** [1] - 55:4
**remember** [25] - 32:22, 48:25, 68:24, 74:5, 74:9, 74:14, 74:16, 84:9, 112:8, 112:9, 114:15, 114:16, 118:8, 127:4, 129:20, 134:5, 137:21,

155:22, 161:14, 162:6, 168:24, 179:25, 188:1, 189:4, 193:25
**remembered** [1] - 172:6
**Remind** [2] - 94:9, 187:8
**remind** [5] - 2:10, 94:18, 184:18, 186:5, 187:4
**reminded** [2] - 38:19, 156:20
**Reminded** [1] - 181:5
**remove** [1] - 176:18
**removing** [1] - 177:25
**renew** [1] - 55:16
**renewing** [1] - 56:7
**repeat** [2] - 65:17, 90:4
**repeatedly** [3] - 15:5, 49:17, 185:13
**rephrase** [1] - 17:16
**Rephrase** [2] - 14:22, 15:25
**replace** [1] - 61:2
**replacement** [1] - 45:25
**replying** [1] - 149:17
**report** [11] - 126:3, 150:9, 152:12, 154:20, 154:21, 155:1, 155:5, 155:10, 155:12, 155:5, 184:11
**Report** [1] - 151:24
**Reported** [1] - 1:23
**Reporter** [1] - 197:15
**REPORTER'S** [1] - 197:1
**reporting** [1] - 16:10
**reports** [2] - 129:4, 186:17
**representation** [1] - 8:13
**representations** [1] - 188:14
**represented** [1] - 180:13
**representing** [1] - 10:3
**request** [9] - 9:23, 42:10, 47:12, 58:8, 74:22, 125:24, 127:5, 127:9, 174:22
**requested** [2] - 77:24, 126:12
**requests** [3] - 56:12, 125:19, 157:21
**require** [1] - 172:25
**reread** [1] - 13:8
**reschedule** [2] - 192:8, 192:17
**research** [1] - 178:25
**reservations** [1] - 193:20

**reservoir** [3] - 105:12, 105:20, 105:25
**reside** [1] - 86:3
**residence** [10] - 7:1, 16:13, 85:15, 85:24, 86:20, 89:15, 90:21, 129:10, 129:21, 133:15
**residences** [1] - 158:21
**resident** [1] - 89:20
**residential** [4] - 86:13, 98:21, 98:24, 98:25
**residents** [2] - 82:13, 136:12
**residing** [1] - 116:10
**respect** [12] - 5:17, 25:8, 47:12, 62:19, 138:17, 140:9, 168:11, 170:12, 176:20, 183:23, 191:4, 191:10
**respectively** [1] - 57:4
**responded** [5] - 4:10, 76:13, 77:11, 188:7, 190:18
**responder** [1] - 107:1
**responds** [1] - 62:25
**response** [9] - 23:10, 35:1, 64:21, 77:25, 111:5, 188:1, 188:11, 189:4, 190:7
**rest** [5] - 3:8, 39:2, 44:5, 135:4, 152:18
**result** [6] - 74:25, 79:20, 172:20, 174:2, 177:3, 177:21
**resulted** [1] - 172:22
**resume** [5] - 48:12, 100:17, 154:9, 174:14, 185:22
**retaliation** [2] - 155:13, 155:25
**Retaliation** [1] - 156:3
**retrieve** [2] - 84:23, 87:11
**return** [3] - 165:2, 165:8, 184:11
**revealed** [1] - 83:18
**review** [2] - 53:25, 190:13
**reviewed** [3] - 5:1, 53:8, 73:20
**reviewing** [1] - 190:2
**revised** [4] - 45:6, 45:8, 47:8, 61:6
**Reynolds** [2] - 182:7, 182:8
**Rhodes** [23] - 1:17, 2:5, 35:6, 36:1, 36:3, 37:7, 37:15, 39:24, 42:9, 42:12, 42:16, 42:20, 43:12, 43:21, 43:25,

46:7, 52:19, 53:7, 53:20, 193:22, 194:13, 194:16, 195:4

**RHODES** [11] - 42:19, 42:21, 43:2, 193:10, 193:18, 194:1, 194:3, 194:7, 194:12, 194:22, 195:10

**Rhodes's** [1] - 42:9
**Rick** [6] - 23:8, 23:16, 23:18, 28:1, 103:16
**rid** [5] - 181:19, 181:20, 181:22, 183:14
**Ridgewood** [8] - 17:19, 17:20, 18:7, 18:14, 19:8, 20:1, 20:6, 28:11
**right-hand** [1] - 124:19
**Rights** [1] - 31:20
**rights** [3] - 3:8, 30:3, 57:21
**ring** [1] - 143:12
**ringing** [1] - 143:9
**Road** [3] - 22:21, 22:22, 33:5
**road** [4] - 104:7, 107:22, 108:16, 129:21
**robbery** [2] - 22:12, 47:14
**Robert** [1] - 1:16
**rock** [1] - 50:1
**Rodney** [1] - 179:18
**rolls** [1] - 87:9
**Ron** [2] - 79:22, 84:2
**room** [6] - 100:15, 100:17, 104:5, 153:7, 165:3, 165:8
**Room** [1] - 1:24
**rooted** [1] - 56:20
**roughly** [3] - 85:21, 99:13, 111:10
**round** [6] - 101:21, 101:24, 101:25, 140:20
**Round** [1] - 102:1
**rounded** [5] - 102:4, 111:6, 162:5, 162:9, 162:11
**rounding** [1] - 140:19
**route** [1] - 110:8
**routine** [1] - 143:23
**row** [2] - 91:11, 95:6
**RPR** [1] - 1:24
**rule** [1] - 169:18
**ruled** [1] - 54:2
**rules** [1] - 170:1
**ruling** [9] - 2:11, 42:2, 43:18, 43:22, 52:25, 59:12, 60:25, 177:1, 188:25
**rulings** [2] - 63:9, 176:19

**rumors** [7] - 27:11, 59:8, 63:21, 64:19, 67:7, 67:16, 67:24
**run** [13] - 77:24, 78:1, 86:8, 93:13, 102:20, 107:5, 108:12, 108:15, 152:2, 152:15, 159:25, 164:8, 164:10
**running** [3] - 106:24, 107:1, 152:13
**Ruter** [1] - 180:20

**S**

**safe** [2] - 72:16, 186:22
**safety** [3] - 122:25, 123:6, 123:13
**Saint** [1] - 22:22
**samples** [1] - 107:21, 107:22, 107:23, 108:12, 108:16, 126:23, 127:12, 127:19, 128:4, 128:7, 158:11
**Samples** [1] - 127:20
**Samuel** [1] - 161:21
**Sanchez** [2] - 130:14, 131:10
**satisfied** [3] - 53:9, 58:5, 178:17
**savvy** [2] - 94:1, 122:1
**saw** [11] - 5:17, 36:23, 47:8, 48:10, 54:4, 58:6, 58:13, 129:1, 130:3, 151:1, 157:7
**scene** [16] - 4:10, 4:17, 4:20, 5:4, 5:5, 5:12, 5:13, 5:16, 5:21, 94:12, 106:19, 107:5, 107:16, 112:19, 138:6, 158:15
**scenes** [1] - 185:16
**schedule** [4] - 72:15, 187:4, 193:16, 193:20
**scheduled** [2] - 72:19, 192:20
**scheduling** [3] - 192:4, 192:22, 195:11
**scheme** [1] - 179:25
**screen** [7] - 7:10, 8:2, 18:19, 31:15, 124:20, 144:3, 164:13
**scrupulously** [1] - 185:9
**search** [16] - 6:25, 31:4, 127:2, 128:21, 129:7, 130:22, 131:12, 131:13, 131:15, 132:8, 133:7, 134:2, 158:24, 159:11, 179:15, 181:14
**searched** [3] - 130:25,

132:10, 158:18
**searches** [1] - 128:17
**seat** [12] - 106:20, 112:13, 112:19, 112:20, 113:6, 113:11, 123:2, 123:8, 123:9, 165:18
**Seat** [1] - 106:22
**seats** [2] - 107:25, 113:1
**Second** [1] - 32:11
**second** [7] - 34:25, 48:14, 49:5, 78:20, 85:10, 97:10, 97:20, 129:23, 141:5, 141:6, 141:14, 141:17, 147:12, 162:1, 162:7, 168:13, 182:3
**secondary** [1] - 124:12
**seconds** [33] - 10:21, 82:18, 85:1, 85:5, 87:3, 87:12, 87:25, 88:12, 91:8, 92:4, 92:5, 92:16, 95:9, 95:12, 95:20, 96:7, 96:12, 96:18, 96:23, 97:9, 99:13, 102:19, 104:11, 104:19, 105:5, 105:22, 111:11, 111:17, 140:23, 141:3, 169:5, 190:22
**section** [3] - 11:11, 35:5, 104:3
**security** [1] - 153:16
**see** [57] - 4:2, 4:19, 8:19, 12:1, 13:4, 13:14, 13:15, 18:11, 20:1, 20:2, 20:21, 28:12, 28:13, 28:15, 29:12, 30:18, 31:14, 31:16, 44:2, 44:11, 44:12, 51:10, 54:22, 56:3, 58:2, 68:9, 80:22, 85:4, 88:24, 93:19, 93:20, 99:22, 110:20, 117:10, 118:4, 124:19, 124:24, 125:1, 125:4, 129:18, 129:24, 133:11, 139:12, 139:14, 140:25, 141:22, 144:3, 145:12, 145:24, 146:1, 151:6, 151:7, 160:24, 162:8, 162:14, 166:6, 171:4, 186:23
**See** [1] - 144:2
**seeing** [2] - 48:13, 165:12
**seem** [6] - 68:24, 72:21, 98:24, 141:8, 151:11, 151:12
**sees** [1] - 144:15
**segment** [1] - 138:1
**seized** [2] - 137:4,

160:8
**seizure** [1] - 127:2, 133:8, 158:24, 179:15
**selected** [1] - 81:23
**self** [1] - 118:2
**self-authenticating** [1] - 118:2
**semblance** [1] - 185:4
**send** [1] - 76:9
**sense** [4] - 43:16, 48:11, 156:16, 193:24
**sensible** [1] - 48:8
**sent** [3] - 18:11, 20:20, 61:2
**sentence** [3] - 11:17, 104:19, 173:2
**sentencing** [2] - 72:19, 192:24
**separation** [1] - 190:9
**sequence** [1] - 125:7
**Sergeant** [1] - 134:16
**series** [2] - 16:24, 142:6
**serious** [1] - 57:20
**served** [1] - 195:2
**session** [7] - 6:17, 60:7, 119:10, 184:19, 185:25, 186:4, 186:10
**set** [3] - 11:6, 129:24, 129:25
**setting** [2] - 22:6, 22:12
**seven** [3] - 99:12, 102:18, 111:17
**Seven** [1] - 30:2
**sever** [1] - 36:18
**several** [5] - 35:22, 98:17, 134:8, 172:25, 184:2
**severance** [4] - 50:12, 50:18, 55:17, 166:8
**Severance** [1] - 36:17
**severing** [1] - 38:6
**Shawn** [4] - 32:12, 62:25, 64:16, 127:13
**SHAWN** [1] - 1:8
**sheet** [6] - 30:9, 119:6, 132:12, 147:5, 147:6, 147:8
**sheets** [1] - 132:11
**shell** [1] - 104:24
**Shelly** [16] - 7:1, 31:20, 76:6, 76:18, 77:4, 85:11, 85:13, 86:21, 86:23, 87:17, 95:18, 117:14, 126:6, 133:12, 161:6, 181:8
**SHELLY** [1] - 1:8
**Shelton** [7] - 80:4, 83:16, 155:8, 157:10, 157:14, 157:22, 158:9
**SHELTON** [1] - 1:7

**shit** [10] - 34:12, 34:19, 41:10, 41:17, 44:11, 45:22, 51:20, 54:22, 55:7, 55:9
**Shit** [3] - 35:20, 38:10, 38:12
**Shock** [6] - 3:25, 4:5, 4:10, 4:16, 5:2, 5:19
**shooter** [9] - 33:9, 34:6, 34:20, 55:5, 58:14, 58:23, 113:7, 113:9
**short** [5] - 18:15, 74:17, 156:13, 171:1, 187:21
**shortly** [7] - 88:14, 91:9, 92:13, 104:14, 129:13, 165:2
**Shorty** [8] - 10:22, 24:7, 99:14, 109:5, 109:8, 109:12, 109:17, 109:18
**shot** [1] - 5:10
**Show** [2] - 144:2, 154:25
**show** [26] - 5:9, 5:11, 5:21, 7:12, 8:2, 8:12, 15:22, 23:20, 29:21, 56:2, 73:9, 76:15, 77:18, 80:25, 81:6, 81:7, 88:20, 98:17, 99:2, 116:24, 124:18, 127:7, 133:10, 140:11, 140:16, 141:2
**showed** [9] - 35:6, 35:25, 37:7, 42:8, 42:13, 42:16, 44:2, 51:11, 91:17
**showing** [11] - 2:13, 4:14, 7:5, 33:16, 77:5, 77:13, 77:17, 126:2, 140:14, 164:22, 190:1
**shown** [8] - 51:24, 66:13, 112:5, 112:13, 117:25, 134:5, 167:25, 176:12
**shows** [9] - 6:8, 66:14, 87:22, 99:3, 112:5, 115:1, 115:4, 152:3, 191:2
**shrink** [1] - 33:2
**sic** [1] - 93:9
**side** [2] - 18:6, 112:14
**sign** [1] - 75:24
**signature** [3] - 76:4, 76:5, 197:10
**signed** [3] - 133:11, 184:7, 184:14
**significant** [2] - 172:24, 182:6
**SIM** [1] - 161:19
**similar** [2] - 110:19, 172:23
**similarly** [2] - 158:11, 163:9

**Similarly** [2] - 25:4, 27:14
**simple** [2] - 174:1, 174:3
**simply** [9] - 2:24, 10:8, 25:8, 43:14, 66:7, 167:12, 169:10, 174:6, 174:10
**sit** [3] - 135:8, 190:12, 190:14
**site** [3] - 138:13, 138:14, 138:25
**sitting** [2] - 67:25, 129:2, 178:7
**situation** [3] - 12:24, 71:1, 183:12
**six** [16] - 5:1, 5:2, 6:6, 6:7, 22:20, 84:20, 98:4, 99:17, 102:3, 104:11, 111:11, 111:19, 111:20, 119:25, 120:7, 130:20
**Six** [4] - 22:20, 68:16, 70:4, 114:17
**six-one** [1] - 22:20
**Sixth** [1] - 57:25
**skill** [1] - 79:5
**sleeping** [1] - 178:19
**slid** [1] - 51:9
**slide** [1] - 32:25
**slightly** [1] - 95:15
**slip** [3] - 150:13, 150:17
**small** [2] - 58:7, 113:1
**Smith** [2] - 82:22, 86:3
**Smith's** [1] - 86:2
**solely** [3] - 24:25, 27:1, 154:11
**solve** [1] - 44:25
**Someone** [1] - 123:13
**someone** [11] - 25:10, 73:13, 76:20, 79:12, 103:1, 118:17, 122:25, 123:1, 123:5, 123:7, 164:3
**something's** [1] - 70:7
**sometime** [9] - 94:3, 128:20, 131:4, 147:7, 147:23, 187:16, 188:2, 191:8, 191:13
**Sometimes** [1] - 124:22
**sometimes** [6] - 65:4, 101:24, 104:8, 110:20, 136:25, 174:6
**somewhat** [3] - 31:15, 50:1, 178:16
**son's** [1] - 106:10
**songs** [1] - 194:17
**soon** [5] - 97:4, 103:5, 103:8, 146:1, 195:14
**sorry** [38] - 8:11, 8:18, 12:15, 14:13, 15:15,

17:14, 24:10, 31:15, 33:1, 33:11, 37:18, 46:15, 64:1, 64:9, 65:15, 65:17, 76:10, 77:19, 84:1, 87:14, 89:4, 89:5, 96:25, 115:10, 122:22, 134:17, 149:5, 155:24, 162:21, 173:14, 176:8, 180:25, 181:24, 187:8, 190:10, 192:11, 193:25
**Sorry** [4] - 29:7, 115:9, 165:21, 193:10
**sort** [10] - 5:13, 54:7, 132:6, 153:20, 174:7, 175:18, 178:18, 185:15, 188:17, 194:22
**Sort** [1] - 155:10
**sound** [8] - 70:6, 103:21, 104:8, 110:15, 110:19, 111:4, 147:24, 172:23
**Sounded** [1] - 42:10
**sounds** [8] - 43:11, 58:18, 103:23, 103:24, 104:21, 109:23, 130:15, 130:16
**Sounds** [1] - 190:21
**source** [1] - 188:25
**southbound** [1] - 110:16
**sovereign** [1] - 167:15
**sovereigns** [1] - 170:15
**sovereignty** [9] - 168:17, 169:21, 170:7, 170:15, 171:24, 172:8, 172:14, 174:17, 178:21
**space** [1] - 53:5
**speaker** [3] - 25:19, 38:8
**Speaking** [1] - 10:13
**speaks** [1] - 13:24
**specific** [4] - 109:14, 148:18, 168:11, 177:22
**specifically** [4] - 11:16, 47:11, 47:15, 148:22
**specious** [1] - 57:6
**spectrum** [1] - 190:4
**speculate** [1] - 166:9
**speculation** [1] - 27:11
**speed** [2] - 78:19, 160:7
**Spell** [1] - 159:20
**Spence** [16] - 4:13, 5:2, 5:9, 72:16, 175:20, 177:13, 178:6, 179:10, 179:20, 179:22, 181:11, 182:12, 182:16, 183:1, 191:10
**spend** [1] - 185:5
**spent** [5] - 33:17, 69:3, 120:1, 120:3, 148:8

**spilled** [1] - 142:8
**spillover** [1] - 47:19
**spoken** [3] - 89:20, 92:25, 132:19
**Sports** [11] - 30:24, 31:4, 132:9, 132:10, 132:13, 132:23, 133:1, 133:5, 133:24, 159:8, 159:9
**spots** [1] - 73:23
**spring** [1] - 147:7
**stage** [2] - 55:22, 178:19
**stairs** [1] - 129:25
**stand** [6] - 62:5, 72:10, 112:10, 151:10, 188:11, 188:19
**standing** [1] - 3:23
**start** [10] - 71:20, 71:22, 82:14, 103:4, 109:23, 139:21, 155:15, 162:25, 186:6, 186:11
**started** [6] - 41:22, 99:16, 120:13, 152:7, 152:8, 162:25
**starting** [4] - 16:23, 78:21, 104:15, 186:4
**starts** [4] - 87:5, 87:6, 154:13, 171:22
**State** [14] - 117:14, 166:25, 168:9, 171:3, 171:6, 171:9, 171:15, 172:3, 173:5, 173:25, 176:11, 176:15, 176:16, 176:21
**state** [15] - 163:24, 166:14, 172:5, 172:11, 172:13, 172:15, 172:17, 172:22, 173:1, 174:5, 174:12, 177:2, 177:17, 178:6, 193:11
**State's** [12] - 117:13, 117:20, 118:14, 118:17, 127:6, 166:4, 166:5, 166:18, 166:24, 166:25, 167:4, 167:15
**statement** [111] - 3:8, 3:9, 9:11, 9:19, 11:1, 11:8, 11:22, 12:14, 12:16, 13:8, 16:16, 21:16, 24:11, 24:17, 24:19, 24:20, 24:22, 24:23, 24:25, 25:1, 25:4, 25:6, 25:12, 25:14, 25:24, 25:25, 26:9, 26:10, 26:14, 26:16, 26:17, 26:24, 27:6, 29:18, 30:5, 32:6, 32:16, 34:22, 34:25, 37:21, 38:10, 38:21, 38:24,

39:2, 39:4, 41:17, 44:10, 44:14, 45:14, 49:3, 49:5, 49:8, 50:3, 50:15, 51:11, 51:15, 51:20, 51:23, 52:3, 52:25, 53:2, 53:9, 54:14, 55:4, 58:6, 58:7, 58:13, 59:5, 63:7, 63:8, 63:12, 63:19, 64:10, 64:12, 65:2, 65:17, 65:19, 65:21, 66:5, 67:3, 67:6, 67:7, 67:11, 67:19, 67:22, 68:2, 68:15, 70:4, 73:10, 75:3, 75:9, 82:25, 83:7, 103:13, 105:9, 105:11, 143:25, 146:5, 146:7, 149:3, 149:9, 163:13, 163:17, 164:4, 164:15, 164:20, 168:16, 178:11, 195:6
**statements** [10] - 13:16, 25:10, 25:17, 41:14, 49:10, 49:13, 54:15, 64:25, 118:22, 187:13
**States** [1] - 172:9
**states** [2] - 170:9, 170:10
**STATES** [2] - 1:1, 1:5
**stating** [4] - 22:4, 22:5, 28:22, 37:1
**station** [3] - 134:22, 160:2, 160:12
**stationed** [2] - 17:7, 129:8
**statute** [2] - 184:6, 184:13
**Stay** [1] - 186:22
**stay** [1] - 156:24
**stayed** [6] - 33:3, 33:13, 74:16, 148:7, 153:5, 163:7
**stenographically** [1] - 197:4
**step** [1] - 165:16
**steps** [1] - 129:22
**stetted** [1] - 174:6
**Still** [1] - 119:23
**still** [19] - 17:13, 62:4, 63:24, 71:17, 72:9, 91:22, 96:6, 106:19, 106:22, 106:24, 123:2, 123:5, 123:9, 135:16, 150:14, 150:17, 177:23, 180:13, 183:21
**stipulate** [2] - 149:23, 181:25
**stipulations** [1] - 182:5
**stood** [1] - 57:23
**stop** [1] - 48:18
**stopped** [1] - 160:8

**story** [2] - 68:2, 180:7
**strange** [3] - 189:4, 189:21, 190:23
**stranger** [1] - 190:25
**strapped** [1] - 123:9
**Street** [3] - 1:25, 83:19, 179:16
**street** [15] - 18:7, 19:2, 19:5, 19:7, 19:9, 27:11, 28:15, 32:10, 59:8, 64:19, 109:19, 123:8, 159:24, 183:9
**streets** [1] - 74:3
**strength** [1] - 57:7
**stretch** [1] - 104:3
**stricken** [1] - 42:11
**strictly** [1] - 93:1
**strike** [5] - 21:21, 22:7, 34:13, 36:20, 36:21
**Strike** [1] - 36:19
**strikes** [1] - 171:16
**striking** [1] - 42:3
**struck** [4] - 41:1, 41:13, 42:10, 59:15
**stuff** [7] - 3:8, 41:25, 59:20, 62:24, 131:5, 152:8, 174:17
**subject** [3] - 156:15, 171:17, 189:22
**Subject** [1] - 170:20
**submit** [6] - 49:24, 74:22, 79:20, 124:15, 126:6, 188:12
**submitted** [6] - 125:5, 125:10, 125:24, 126:4, 127:9, 168:12
**subpoena** [5] - 76:9, 76:11, 76:18, 83:18, 138:12
**subpoenaed** [5] - 136:1, 136:3, 138:10, 138:23, 190:17
**subscribed** [1] - 83:22
**subscriber** [3] - 138:10, 141:7, 161:22
**substantial** [1] - 47:19
**substantive** [1] - 187:3
**substantively** [1] - 187:15
**substitutes** [1] - 5:12
**subway** [9] - 18:3, 18:7, 18:8, 18:20, 19:10, 19:22, 20:12, 20:18
**succession** [3] - 85:20, 86:10, 142:7
**sufficient** [2] - 55:20, 152:22
**suggested** [1] - 37:15
**suggesting** [5] - 86:10, 115:22, 174:10, 188:11,

190:11
   **suggestion** [7] - 44:18, 173:12, 173:15, 175:1, 176:3, 177:4, 177:5
   **suggests** [6] - 35:10, 35:16, 39:19, 57:2, 113:8, 187:25
   **suitable** [2] - 158:4, 158:6
   **summary** [1] - 120:24
   **Sunday** [7] - 77:13, 78:13, 78:20, 78:24, 78:25, 79:13, 168:20
   **superfluous** [1] - 5:13
   **supplemental** [3] - 49:18, 117:13, 117:19
   **supports** [1] - 177:10
   **suppose** [1] - 174:25
   **supposed** [5] - 19:18, 32:10, 56:1, 191:10, 192:13
   **supposedly** [1] - 140:24
   **Supreme** [1] - 65:24
   **surely** [2] - 53:19, 153:15
   **surmised** [1] - 113:5
   **surprising** [1] - 102:1
   **surrounding** [1] - 3:9
   **suspect** [2] - 184:9, 184:23
   **Sustained** [1] - 24:4
   **sustained** [2] - 48:23, 118:5
   **swear** [1] - 142:25
   **swipe** [1] - 75:23
   **switching** [1] - 94:5
   **symmetry** [1] - 51:6
   **system** [1] - 172:10

## T

**T-1** [1] - 3:7
**T-10** [1] - 8:21
**T-12** [1] - 8:25
**T-13** [3] - 8:5, 8:17, 8:21
**T-14** [1] - 8:23
**T-15** [1] - 8:22
**T-16** [1] - 9:6
**T-17** [1] - 9:1
**T-18** [1] - 9:2
**T-19** [1] - 9:5
**T-3** [1] - 8:21
**T-4** [1] - 9:10
**T-7** [1] - 9:9
**T-8** [1] - 9:8
**T-9** [1] - 9:7
**Tab** [8] - 9:17, 11:5, 60:16, 73:18, 99:12,

102:16, 116:15, 123:17
   **table** [1] - 4:14
   **tag** [2] - 47:5, 133:13
   **tailored** [1] - 170:17
   **talks** [3] - 63:14, 63:15
   **tall** [2] - 12:2, 22:19
   **tap** [1] - 94:7
   **Tape** [2] - 9:22, 73:24
   **tape** [90] - 7:12, 7:13, 7:14, 9:13, 10:2, 10:4, 10:5, 10:7, 10:9, 10:13, 10:18, 10:20, 30:5, 32:19, 35:3, 35:5, 35:11, 35:14, 35:17, 35:21, 35:22, 35:24, 37:14, 39:20, 40:4, 41:19, 41:23, 42:11, 43:18, 44:12, 44:17, 45:3, 45:9, 45:16, 50:5, 50:11, 53:4, 53:15, 53:25, 54:16, 54:21, 54:22, 54:23, 55:3, 55:10, 55:11, 55:13, 55:25, 56:15, 56:16, 56:25, 58:12, 58:16, 58:20, 59:1, 59:5, 60:3, 60:7, 69:7, 69:8, 69:13, 69:17, 70:6, 70:11, 70:15, 73:10, 73:14, 73:17, 75:9, 103:20, 104:5, 109:24, 111:10, 111:11, 113:18, 113:20, 114:12, 119:10, 120:12, 148:23, 149:8, 149:9, 149:13, 149:15, 149:25, 163:15
   **taped** [9] - 32:15, 54:6, 109:3, 112:4, 115:2, 120:10, 120:15, 147:21, 148:10
   **Task** [2] - 10:15, 81:21
   **technically** [1] - 37:3
   **technician** [3] - 3:25, 4:6, 4:10
   **technicians** [1] - 107:16
   **Ted** [5] - 190:14, 190:18, 190:20
   **teen** [1] - 96:25
   **telephone** [15] - 2:15, 2:24, 3:4, 8:7, 16:11, 71:18, 81:8, 83:11, 83:13, 94:10, 98:16, 102:24, 120:23, 134:4, 140:20
   **Telephone** [1] - 30:21
   **telephones** [5] - 80:24, 81:6, 81:7, 86:5, 93:2
   **television** [4] - 23:20, 28:1, 103:16, 103:17
   **ten** [11] - 96:23, 110:22, 111:10, 119:14, 134:1,

159:14, 167:19, 167:20, 175:25, 185:10, 185:20
   **tentative** [2] - 56:24, 60:13
   **tentatively** [1] - 56:17
   **tenuous** [2] - 56:19, 56:23
   **term** [2] - 127:22, 190:13
   **terms** [4] - 50:13, 57:12, 72:14, 131:20
   **terribly** [1] - 156:23, 193:9
   **testified** [18] - 24:18, 49:2, 51:19, 62:16, 97:20, 103:14, 112:11, 112:16, 114:10, 121:20, 121:25, 122:12, 124:8, 128:19, 143:23, 144:17, 152:3, 157:17
   **testify** [5] - 63:4, 90:9, 112:9, 134:12, 184:2
   **testifying** [7] - 74:6, 90:10, 90:11, 112:8, 112:12, 122:4, 122:9
   **testimony** [24] - 3:24, 3:25, 4:5, 5:19, 15:10, 36:19, 36:21, 36:23, 37:2, 45:7, 47:12, 49:11, 59:9, 59:15, 59:19, 70:9, 80:20, 81:15, 82:4, 87:15, 152:22, 183:24, 185:17, 185:19
   **testing** [1] - 111:2
   **THE** [368] - 1:1, 1:2, 2:3, 2:6, 2:9, 3:1, 3:16, 3:22, 4:2, 4:5, 4:19, 4:24, 5:1, 5:23, 6:7, 6:12, 6:15, 7:24, 8:4, 8:9, 8:11, 8:18, 9:25, 10:11, 13:9, 13:23, 13:25, 14:10, 14:22, 15:25, 17:3, 17:11, 17:24, 20:16, 21:4, 21:7, 21:14, 21:20, 21:22, 22:3, 22:8, 22:14, 22:16, 23:14, 24:4, 24:10, 24:13, 27:7, 27:9, 28:21, 29:5, 29:14, 30:15, 32:4, 32:7, 34:15, 34:17, 34:19, 34:24, 35:2, 35:7, 35:10, 35:13, 35:18, 35:20, 36:3, 36:7, 36:10, 36:14, 36:16, 36:18, 36:20, 37:2, 37:18, 37:20, 37:23, 38:1, 38:14, 38:18, 38:22, 39:1, 39:4, 39:7, 39:11, 39:14, 39:16, 39:23, 40:1, 40:6, 40:14, 40:17, 40:23, 40:25,

41:2, 41:6, 41:9, 41:11, 41:16, 41:22, 42:5, 42:8, 42:20, 43:1, 43:7, 43:10, 43:24, 44:4, 44:15, 44:19, 45:11, 45:17, 45:20, 46:8, 46:15, 46:18, 46:25, 47:22, 48:2, 48:5, 48:8, 48:17, 48:19, 48:22, 49:15, 49:17, 49:23, 50:20, 50:23, 50:25, 52:1, 52:4, 52:7, 52:15, 52:18, 52:21, 52:23, 54:11, 55:2, 56:10, 56:12, 59:13, 59:17, 59:19, 59:21, 59:23, 59:25, 60:5, 60:8, 60:11, 60:14, 60:18, 60:20, 61:1, 61:4, 61:6, 61:9, 61:13, 61:17, 61:19, 61:24, 62:8, 62:12, 63:6, 64:1, 64:5, 64:9, 64:11, 64:13, 64:15, 64:24, 65:7, 65:15, 66:2, 66:5, 66:9, 66:12, 66:17, 67:6, 67:14, 68:4, 68:7, 68:9, 68:17, 68:19, 68:24, 69:2, 69:15, 69:22, 70:1, 70:3, 70:19, 70:24, 71:6, 71:8, 71:11, 71:16, 71:19, 71:25, 72:2, 72:8, 72:12, 72:18, 72:23, 72:25, 73:4, 73:6, 79:9, 79:10, 80:12, 80:16, 89:1, 90:1, 90:3, 90:24, 92:23, 93:18, 93:25, 100:4, 100:8, 100:21, 100:23, 101:5, 101:9, 101:13, 101:15, 102:10, 102:13, 105:15, 106:4, 116:23, 117:9, 118:5, 123:12, 123:23, 124:1, 135:18, 135:20, 142:23, 149:6, 149:12, 149:21, 150:1, 151:2, 151:4, 154:2, 154:5, 154:16, 154:24, 156:9, 156:11, 156:18, 156:22, 157:1, 159:20, 159:23, 162:18, 164:6, 164:18, 165:1, 165:12, 165:14, 165:15, 165:18, 165:22, 166:15, 166:21, 167:2, 167:5, 167:10, 168:14, 168:18, 169:1, 169:3, 169:6, 169:13, 169:15, 170:2, 170:6, 170:20, 171:1, 171:13, 171:21, 173:8, 173:10, 173:14, 174:15, 175:3, 175:6, 175:10, 175:12, 175:22, 176:8,

176:15, 178:12, 178:14, 179:4, 179:7, 179:14, 179:17, 179:19, 179:22, 180:1, 180:5, 180:10, 180:12, 180:17, 180:19, 180:21, 180:23, 181:2, 181:5, 181:10, 181:14, 181:16, 181:19, 181:22, 182:1, 182:3, 182:8, 182:12, 182:14, 182:16, 182:20, 182:22, 182:25, 183:2, 183:4, 183:8, 183:13, 183:17, 187:1, 187:8, 187:12, 187:17, 187:24, 188:4, 188:7, 188:10, 188:21, 189:7, 189:9, 189:12, 189:23, 190:10, 190:19, 190:25, 191:2, 191:15, 191:23, 192:2, 192:6, 192:9, 192:11, 192:16, 192:19, 193:1, 193:3, 193:5, 193:8, 193:15, 193:22, 194:2, 194:4, 194:10, 194:20, 194:24, 195:9, 195:19
   **Theater** [1] - 153:21
   **theater** [14] - 75:12, 75:19, 75:21, 76:12, 76:13, 76:15, 77:6, 77:20, 78:7, 78:21, 144:18, 144:19, 150:6, 150:13
   **theaters** [1] - 153:16
   **thereafter** [2] - 88:14, 89:21, 91:9, 92:13, 97:4, 129:13
   **thereby** [1] - 37:15
   **therefore** [4] - 63:4, 65:13, 66:25, 67:23
   **they've** [4] - 50:4, 55:6, 184:4, 195:19
   **thinking** [1] - 194:4
   **thinks** [1] - 171:19
   **Third** [1] - 86:17
   **third** [4] - 3:19, 43:16, 49:8, 63:13
   **thirds** [1] - 19:17
   **Thomas** [1] - 1:20
   **thorough** [2] - 47:16, 170:16
   **Three** [3] - 167:25, 176:6, 176:12
   **three** [31] - 8:23, 10:20, 10:21, 11:16, 12:22, 16:17, 17:12, 25:3, 26:10, 34:3, 49:3, 65:20, 65:22, 67:23, 67:25, 92:16, 96:19, 97:5, 97:9, 97:19, 98:11, 99:4,

**104**:15, 113:2, 119:18, 119:24, 126:9, 138:19, 168:6, 186:15, 193:1
**three-quarters** [3] - 11:16, 12:22, 17:12
**throughout** [3] - 15:6, 93:20, 93:21
**throw** [1] - 105:20
**Thursday** [6] - 1:11, 6:18, 185:25, 186:10, 191:16, 191:21
**ticket** [1] - 75:22
**tie** [2] - 135:8, 135:11
**tie-in** [1] - 135:11
**timed** [1] - 78:18
**today** [15] - 56:1, 71:2, 71:8, 72:17, 101:3, 118:22, 124:8, 135:8, 146:21, 156:13, 165:20, 178:11, 187:15, 191:10, 195:4
**today's** [1] - 72:14
**together** [11] - 10:15, 14:3, 14:4, 53:22, 81:21, 116:16, 116:19, 148:8, 169:20, 176:22, 187:18
**toll** [14] - 7:21, 16:2, 80:6, 87:17, 88:20, 98:20, 98:21, 99:2, 99:18, 102:24, 120:23, 138:11, 162:2
**tolls** [3] - 3:4, 15:22, 161:2
**tomorrow** [10] - 6:18, 16:9, 192:6, 192:9, 192:17, 192:19, 192:25, 193:3, 193:6, 195:15
**tone** [1] - 111:24
**tons** [1] - 66:21
**Tonya** [2] - 175:20, 179:10
**took** [13] - 4:13, 11:7, 31:25, 42:23, 110:6, 113:14, 119:4, 119:19, 120:5, 132:5, 138:19, 146:5, 166:25
**top** [12] - 5:22, 6:3, 12:5, 12:15, 19:25, 21:25, 28:5, 51:3, 64:12, 125:17, 155:12, 171:23
**total** [4] - 77:24, 78:1, 114:22, 151:6
**totally** [1] - 59:6
**touched** [1] - 18:18
**Towanda** [1] - 28:11
**toward** [5] - 21:25, 28:7, 31:8, 73:25, 177:25
**towards** [2] - 129:21
**tower** [3] - 138:4, 138:6, 138:13

**towers** [2] - 138:2, 138:14
**town** [1] - 95:6
**trace** [4] - 131:18, 131:23, 132:4, 132:6
**Trace** [1] - 131:25
**traceable** [1] - 137:11
**track** [2] - 94:5, 155:7
**traffic** [2] - 78:19, 103:21
**traffickers** [1] - 158:20, 160:3
**trafficking** [1] - 159:16
**trailers** [1] - 152:13
**transcribed** [1] - 197:7
**transcriber** [1] - 74:2
**transcribers** [1] - 73:20
**transcript** [65] - 3:12, 7:17, 9:16, 9:24, 10:2, 10:6, 10:8, 10:13, 10:14, 11:2, 11:15, 12:1, 13:24, 16:7, 43:18, 53:1, 53:25, 59:5, 60:14, 60:15, 60:17, 60:24, 61:3, 61:6, 61:12, 61:16, 62:19, 68:13, 68:15, 69:4, 69:11, 69:12, 70:7, 70:15, 73:13, 73:18, 73:19, 99:13, 102:16, 104:10, 105:21, 111:17, 114:12, 116:15, 116:16, 116:19, 117:3, 117:4, 118:4, 118:8, 118:9, 118:10, 118:12, 123:15, 123:18, 123:19, 123:22, 123:25, 149:19, 167:9, 167:11, 169:16, 170:2, 197:7
**Transcript** [1] - 11:2
**transcript's** [1] - 41:20
**transcripts** [3] - 61:3, 62:7, 68:11
**transferred** [1] - 167:17
**translate** [1] - 194:17
**transmission** [2] - 117:24
**transported** [1] - 5:4
**Trauma** [6] - 3:25, 4:5, 4:11, 4:16, 5:3, 5:19
**traveled** [1] - 79:12
**traveling** [2] - 78:19, 103:24
**travels** [1] - 104:7
**treat** [1] - 57:19
**treating** [1] - 57:18
**treatment** [1] - 4:14
**trees** [1] - 61:18
**trial** [16] - 24:24, 25:9, 38:2, 38:6, 54:21, 55:8, 55:16, 154:9, 169:22,

169:23, 177:17, 178:16, 182:3, 183:21, 184:20, 185:3
**trials** [1] - 48:20
**triangulation** [1] - 138:15
**tried** [6] - 90:21, 90:22, 98:16, 110:21, 183:24, 184:21
**tries** [2] - 89:21, 143:8
**triggered** [2] - 115:14, 115:16
**trip** [2] - 113:15, 153:7
**trouble** [4] - 2:22, 139:9, 145:21, 151:5
**troubling** [1] - 173:22
**true** [10] - 21:10, 21:17, 35:19, 48:19, 48:22, 124:15, 144:17, 189:5, 189:7, 195:10
**truth** [4] - 26:22, 26:23, 190:25
**try** [4] - 41:9, 73:23, 156:13, 168:9
**trying** [12] - 22:4, 41:5, 41:8, 41:15, 56:2, 64:1, 79:4, 105:18, 111:14, 113:25, 168:14, 188:1
**Tuesday** [10] - 112:10, 128:19, 168:22, 168:23, 185:24, 186:5, 191:14, 191:20, 194:1, 194:5
**turned** [2] - 12:18, 143:16
**TV** [1] - 23:15
**twice** [2] - 78:18, 91:24
**two** [53] - 4:11, 19:17, 25:20, 26:9, 30:16, 32:10, 33:4, 33:6, 37:6, 47:24, 48:20, 57:18, 62:2, 63:14, 68:15, 74:17, 79:16, 81:3, 83:10, 88:3, 89:9, 93:6, 95:25, 96:1, 96:10, 97:1, 97:15, 101:2, 101:3, 104:11, 113:1, 113:10, 114:22, 118:22, 121:22, 129:8, 138:19, 141:18, 145:20, 148:15, 151:10, 151:17, 151:20, 157:18, 162:10, 164:20, 169:22, 176:22, 182:23, 186:12, 194:9
**Two** [16] - 2:16, 2:24, 6:25, 11:2, 11:5, 30:20, 85:15, 124:19, 128:20, 129:19, 133:4, 145:19, 158:18, 161:3, 167:23, 182:22
**two-page** [1] - 169:22

**two-thirds** [1] - 19:17
**TY** [1] - 159:22
**tying** [1] - 179:10
**type** [2] - 12:24, 139:14
**typically** [2] - 140:14, 141:2

## U

**U.S** [3] - 1:24, 189:18, 189:24
**ultimately** [1] - 81:11
**Um-hum** [2] - 132:1, 153:3
**unambiguously** [1] - 170:10
**unbeknownst** [1] - 115:16
**uncertainty** [1] - 42:15
**unclothed** [1] - 5:11
**unconstitutionally** [1] - 176:3
**uncontroverted** [4] - 5:10, 5:18, 66:16, 66:17
**under** [13] - 25:16, 31:9, 31:10, 139:12, 142:25, 155:12, 160:1, 161:8, 172:10, 172:13, 172:17, 184:9, 192:11
**Under** [3] - 5:15, 172:7, 172:14
**underground** [1] - 18:24
**underlying** [3] - 172:12, 172:17
**underneath** [1] - 33:4
**understood** [4] - 39:20, 128:23, 144:23, 152:17
**undertake** [2] - 78:12, 172:11
**unfair** [7] - 47:19, 54:15, 55:13, 176:3, 177:20, 178:7, 179:3
**Unfortunately** [1] - 184:1
**Unit** [2] - 29:25, 30:1
**United** [1] - 172:8
**UNITED** [2] - 1:1, 1:5
**unless** [3] - 84:22, 84:24, 98:22
**unlike** [1] - 63:7
**unlikely** [1] - 153:7
**unredacted** [8] - 41:23, 42:6, 43:1, 43:2, 51:23, 53:23, 69:23, 149:24
**unusual** [2] - 136:9, 147:2
**up** [80] - 13:4, 13:6, 18:6, 22:6, 22:12, 28:16,

34:15, 38:24, 40:22, 40:23, 47:8, 48:1, 48:12, 50:2, 51:9, 51:11, 61:20, 66:12, 67:25, 69:2, 72:6, 74:12, 74:16, 75:9, 82:15, 85:7, 86:11, 87:8, 88:20, 89:17, 90:14, 91:17, 94:6, 98:17, 101:25, 102:1, 102:4, 103:5, 108:19, 110:2, 110:20, 110:25, 111:7, 111:23, 126:21, 129:22, 135:22, 132:12, 135:19, 140:1, 140:11, 140:16, 140:19, 140:20, 141:17, 141:18, 153:11, 156:16, 157:15, 160:4, 162:5, 162:9, 162:11, 163:10, 165:4, 165:19, 168:1, 168:21, 174:13, 175:15, 176:20, 179:10, 180:9, 182:2, 182:3, 182:4, 187:10, 191:12, 194:5
**upper** [2] - 82:15, 124:19
**upshot** [1] - 56:20
**upstairs** [1] - 130:24
**USA** [1] - 197:4
**usage** [1] - 87:6
**useful** [1] - 171:4
**uses** [2] - 93:21, 93:22

## V

**vacation** [1] - 185:8
**vacuum** [3] - 107:17, 107:25, 126:21
**vacuumed** [2] - 107:18, 126:22
**Valdivia** [1] - 16:13
**valid** [1] - 168:15
**variety** [1] - 172:19
**various** [2] - 7:25, 173:18
**Vary** [1] - 31:3
**Vehicle** [1] - 83:21
**vehicle** [17] - 15:2, 18:16, 19:15, 83:4, 94:13, 97:13, 103:24, 104:7, 107:24, 133:6, 133:13, 133:14, 158:5, 159:24, 160:8, 160:9
**veracity** [2] - 49:9, 49:12
**verify** [1] - 180:1
**version** [3] - 45:6, 103:15, 149:24
**versions** [1] - 167:11
**versus** [2] - 117:14,

176:11
  **via** [1] - 34:2
  **victim** [3] - 107:14, 155:15, 158:15
  **victim's** [1] - 113:15
  **victims** [1] - 106:19
  **videotape** [1] - 120:17
  **view** [1] - 81:23
  **Violation** [1] - 74:15
  **violations** [1] - 172:3
  **violence** [1] - 194:19
  **visit** [1] - 185:16
  **voice** [73] - 3:12, 9:13, 9:15, 24:5, 35:1, 35:5, 35:11, 35:15, 35:17, 35:21, 38:14, 40:3, 42:3, 44:11, 44:17, 50:11, 53:4, 53:14, 56:16, 56:24, 56:25, 57:4, 69:17, 84:14, 84:16, 86:12, 86:14, 87:9, 87:11, 88:17, 88:19, 88:21, 89:14, 89:18, 89:24, 91:14, 91:15, 91:18, 91:25, 94:15, 95:5, 95:19, 96:11, 97:3, 98:4, 99:11, 99:16, 101:21, 101:24, 102:3, 102:15, 102:19, 102:24, 103:1, 103:4, 103:9, 103:19, 104:14, 104:18, 105:21, 111:6, 140:10, 140:15, 141:5, 141:10, 141:23, 142:8, 143:9, 143:12, 162:1, 162:11
  **voices** [3] - 35:22, 45:3, 53:15
  **voir** [1] - 187:21
  **VOLUME** [1] - 1:11
  **volume** [1] - 81:24
  **volunteered** [1] - 34:1
  **vote** [2] - 186:7, 186:8

**W**

  **W-10** [1] - 18:19
  **W-30** [5] - 3:12, 3:13, 75:16, 76:15, 151:2
  **W-31** [3] - 3:13, 77:18, 151:25
  **W-33** [1] - 9:14
  **W-33A** [1] - 10:14
  **W-38** [1] - 7:13
  **W-38A** [1] - 73:13
  **W-42** [1] - 11:6
  **W-60** [6] - 52:6, 52:7, 52:10, 144:2
  **W-61** [1] - 31:19
  **W-62** [1] - 29:22

  **W-63** [2] - 3:13, 76:16
  **W-65** [1] - 73:10
  **W-65A** [1] - 7:17
  **W-66** [5] - 80:7, 101:19, 114:24, 120:24, 121:8
  **W-67** [3] - 134:17, 134:19, 160:14
  **W-68** [2] - 2:15, 7:5
  **Wabash** [9] - 18:15, 19:6, 19:11, 20:7, 78:8, 79:13, 134:22, 138:6, 152:23
  **wagon** [3] - 134:22, 160:2, 160:12
  **Wait** [1] - 169:1
  **wait** [3] - 71:4, 101:5, 153:11
  **walk** [1] - 129:24
  **walked** [2] - 129:18, 178:3
  **Walker** [2] - 125:14, 125:16
  **Walters** [1] - 150:7
  **wants** [7] - 38:21, 38:22, 47:10, 49:18, 58:12, 58:24
  **warrant** [5] - 127:2, 128:21, 131:12, 131:15, 133:8
  **warrants** [1] - 126:23
  **Washington** [1] - 33:5
  **watching** [4] - 23:15, 28:1, 103:16
  **water** [1] - 13:12
  **Waters** [2] - 150:8, 152:12
  **WAYNE** [1] - 1:8
  **Wayne** [31] - 7:1, 30:17, 31:21, 34:12, 35:21, 37:10, 38:10, 38:12, 41:10, 41:17, 42:14, 44:11, 45:22, 51:20, 54:22, 55:7, 55:9, 85:12, 85:13, 86:21, 86:24, 87:18, 95:18, 117:14, 126:6, 127:13, 161:5, 161:6, 162:9, 162:10, 181:8
  **ways** [2] - 6:1, 109:9
  **wears** [1] - 22:21
  **Weaze** [1] - 30:17
  **Weazy** [1] - 30:18
  **Wednesday** [4] - 185:24, 186:10, 191:14, 191:20
  **week** [29] - 73:1, 101:10, 133:1, 156:17, 167:19, 168:21, 183:21, 184:17, 184:18, 184:20, 184:23, 185:3, 185:5,

185:22, 185:24, 186:1, 186:2, 186:4, 186:11, 186:16, 191:6, 191:8, 191:13, 191:16, 192:18, 193:12
  **weeks** [7] - 16:17, 34:4, 48:16, 83:10, 138:19, 178:16, 186:15
  **weight** [1] - 26:25
  **West** [1] - 1:25
  **whatsoever** [2] - 185:14, 187:3
  **whereas** [2] - 12:19, 13:2
  **Whereof** [1] - 197:9
  **whiff** [1] - 177:12
  **white** [4] - 12:8, 12:9, 110:22, 134:21
  **whited** [1] - 53:4
  **whole** [15] - 31:14, 44:5, 54:21, 55:8, 55:23, 58:24, 61:18, 71:18, 144:3, 146:21, 166:25, 179:24, 180:2, 182:12, 182:16
  **wholly** [2] - 170:18, 176:3
  **Williams** [2] - 83:24, 139:18
  **WILLIE** [1] - 1:7
  **Willie** [19] - 7:14, 15:9, 32:12, 82:4, 82:5, 82:10, 82:20, 84:15, 85:21, 85:24, 86:17, 86:19, 87:17, 89:21, 100:1, 117:14, 127:13, 155:8, 197:4
  **Wilson** [1] - 126:7
  **wishes** [1] - 194:14
  **withdraw** [2] - 64:4, 168:3
  **Witness** [3] - 46:24, 165:17, 197:9
  **witness** [27] - 3:19, 4:8, 4:9, 43:13, 44:7, 44:16, 51:10, 51:19, 53:21, 75:4, 75:7, 81:4, 89:2, 90:5, 90:9, 90:16, 116:22, 117:7, 154:23, 165:25, 172:5, 182:15, 183:24, 188:18, 191:10, 193:11, 195:1
  **WITNESS** [3] - 79:9, 165:14, 196:4
  **witness'** [1] - 51:7
  **witnesses** [9] - 72:3, 72:17, 156:12, 183:25, 184:1, 191:6, 191:19
  **Witnesses** [1] - 72:24
  **wonder** [1] - 167:18

  **wondering** [2] - 191:8, 191:12
  **word** [8] - 67:9, 67:10, 109:5, 109:8, 109:16, 109:18, 155:13, 170:17
  **words** [11] - 24:20, 25:1, 26:8, 27:9, 41:16, 48:2, 82:2, 119:5, 121:16, 149:12, 194:17
  **world** [1] - 63:17
  **worry** [1] - 167:21
  **worth** [1] - 63:17
  **worthy** [1] - 65:6
  **wounds** [1] - 5:10
  **write** [4] - 120:20, 134:11, 134:12, 134:15
  **written** [2] - 105:22, 146:14
  **wrote** [6] - 31:22, 68:25, 119:6, 144:12, 150:9, 170:8
  **Wyche** [87] - 10:23, 11:23, 12:13, 13:18, 14:4, 14:5, 14:19, 14:24, 15:3, 15:7, 15:8, 15:22, 16:3, 18:16, 19:2, 19:14, 24:3, 28:2, 29:1, 29:12, 74:7, 78:7, 82:12, 83:2, 88:3, 92:3, 92:10, 92:11, 92:16, 92:19, 92:20, 93:8, 93:21, 94:2, 94:9, 94:12, 94:21, 94:25, 95:11, 96:5, 96:17, 97:2, 97:6, 97:13, 97:14, 97:17, 97:21, 97:23, 98:1, 98:10, 98:14, 99:21, 100:1, 103:16, 104:14, 104:24, 105:3, 105:7, 106:13, 107:13, 107:14, 108:9, 114:17, 114:18, 115:7, 121:20, 122:4, 122:13, 125:25, 127:13, 127:17, 127:19, 127:20, 127:22, 131:19, 134:25, 135:12, 157:7, 157:8, 158:12, 160:10, 160:16
  **Wyche's** [8] - 92:7, 98:20, 102:2, 105:3, 108:8, 123:4, 134:23, 160:23
  **Wyches** [1] - 32:14

**X**

  **XV** [1] - 1:11
  **XXXVII** [1] - 1:11

**Y**

  **y'all** [4] - 20:3, 28:14, 28:25, 29:9
  **years** [5] - 115:12, 134:1, 159:14, 168:7, 190:17
  **yesterday** [17] - 2:11, 3:11, 6:17, 7:3, 7:12, 7:15, 7:18, 9:11, 9:14, 11:7, 16:13, 52:13, 54:5, 60:21, 112:9, 118:22, 180:18
  **Young** [1] - 130:12
  **young** [2] - 145:1, 148:6

**Z**

  **Zajac** [3] - 1:24, 197:3, 197:14