1

```
1                  IN THE UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF MARYLAND
                          NORTHERN DIVISION
3


4


5      UNITED STATES OF AMERICA

6           v.                             CRIMINAL CASE NO.
                                           AMD-04-029
7      WILLIE MITCHELL,
       SHELTON HARRIS,
8      SHELLY WAYNE MARTIN,
       SHAWN GARDNER,
9
            Defendants
10     _____/

11                  VOLUME XX OF XXXVII
                    Tuesday, November 4, 2008
12                  Baltimore, Maryland

13
       Before:  Honorable Andre M. Davis, Judge
14                    And a Jury

15     Appearances:
            On Behalf of the Government:
16           Robert Harding, Esquire
             Michael Hanlon, Esquire
17          On Behalf of Defendant Mitchell:
             Laura Kelsey Rhodes, Esquire
18           Michael E. Lawlor, Esquire
            On Behalf of Defendant Harris:
19           Gerard P. Martin, Esquire
             Paul Flannery, Esquire
20          On Behalf of Defendant Martin:
             Thomas L. Crowe, Esquire
21           James G. Pyne, Esquire
            On Behalf of Defendant Gardner:
22           Adam H. Kurland, Esquire
             Barry Coburn, Esquire
23
       Reported by:
24     Mary M. Zajac, RPR
       Room 5515, U.S. Courthouse
25     101 West Lombard Street
       Baltimore, Maryland 21201
```

1           (Proceedings at 11:10 a.m.)

2           MR. KURLAND:  One brief matter.  When the ATF agent

3    testifies, I think it might be before our first break, just so

4    there's no surprises, that's a witness who has reports which

5    reference the Mitchell organization.  Just like I said with

6    Detective Niedermeier, I didn't ask the question, it's

7    conceivable that with the ATF agents we will be asking questions

8    about that earlier name.  I just didn't want to have any, you

9    know, undue surprise in front of the jury.  That's why I'm

10   bringing that to the Court's attention.

11          THE COURT:  All right.  I would suggest that you not,

12   you're perfectly permitted to question, but not in terms of what

13   the indictment said.

14          MR. KURLAND:  No.  No.  He has his own report in which

15   the name is mentioned.

16          THE COURT:  Right.  Okay.

17          MR. KURLAND:  Thank you, Judge.

18          THE COURT:  All right.  Mr. Harding, Mr. Hanlon, I'm

19   not sure I get the gist of Mr. Lawlor's letter regarding this

20   letter delivered by Hayes.  Have you seen that?

21          MR. HARDING:  I saw a letter this morning about a

22   letter, but I didn't think it was from Mr. Lawlor.  Am I wrong

23   about that?  Was it from you?

24          MR. LAWLOR:  Yes.

25          THE COURT:  Yes.  It was a letter that Mr. Mitchell

3

1   allegedly wrote for delivery --

2             MR. HARDING:  Yes.

3             THE COURT:  -- to have Mr. Lassiter murdered.

4             MR. HARDING:  Yes.  This is a letter that is fully

5   described in Hayes's grand jury and so has been known to defense

6   counsel for a long time.

7             THE COURT:  Does the letter exist?

8             MR. HARDING:  No.  But what, what happened was that Mr.

9   Mitchell wrote a letter, not to Mr. Harris, but to, the address

10  he apparently didn't have or something.  He wrote it to TM, Mark

11  Herbert, Tony Montana, who was another member of this crew.

12            Mr. Montana or Mr. Herbert read it, together with Mr.

13  Hayes, and it included in it a map for how to get to Claudus

14  Lassiter's house, and instructions to contact Mr. Harris, give a

15  letter to Mr. Harris with the map, and have him kill Claudus

16  Lassiter.

17            THE COURT:  Okay.  I'm sorry.  Slow down.  First of

18  all, what's the date of the letter or the time frame we're

19  talking about?

20            MR. HARDING:  This would be --

21            THE COURT:  I'm sorry.  Are we going to get into this

22  today?

23            MR. HARDING:  Yeah.

24            THE COURT:  Okay.  All right.  So when was this,

25  approximately?

1          MR. HARDING:  May of 2002, Your Honor.

2          THE COURT:  Okay.

3          MR. HARDING:  After Mr. Mitchell is locked up but

4    before Mr. Hayes is locked up.

5          THE COURT:  Okay.  So Mr. Mitchell is charged with the

6    Wyche brothers' murders.

7          MR. HARDING:  Yes.

8          THE COURT:  The letter is delivered by Mr. Mitchell to

9    whom?  Who does he physically give it to?  Or did he mail it?

10         MR. HARDING:  He mailed it.

11         THE COURT:  He mailed it from Central Booking?

12         MR. HARDING:  Yes.  Or whenever he was housed.  I'm not

13   sure where.

14         THE COURT:  All right.  So he mails it to Hayes?

15         MR. HARDING:  No.  He mails it to this guy, Tony

16   Montana, TM, Tony Herbert, Mark Herbert.

17         THE COURT:  Okay.  So he mails it to Tony Montana and

18   then what happened?  Montana receives the letter?

19         MR. HARDING:  Yes.  And reads it, together with Mr.

20   Hayes.  Tony Montana and Mr. Hayes are very tight.

21         THE COURT:  Okay.

22         MR. HARDING:  And they read the letter together.  And

23   Hayes advises Montana on what to do with it.

24         THE COURT:  Okay.  So Montana gets the letter.  Do you

25   know where they read it?

1          MR. HARDING:  Yes.

2          THE COURT:  Where?

3          MR. HARDING:  2913 Edgecombe.

4          THE COURT:  Which is whose home?

5          MR. HARDING:  TM, that's where Tony, actually, Tony

6   Montana was hanging out there.  His sister was living there.

7   Shelton Harris often hung out there but was not exactly living

8   there.  He was living down on Amity Street.

9          THE COURT:  Okay.

10          MR. HARDING:  Mr. Mitchell often hung there and Mr.

11   Hayes often hung there.

12          THE COURT:  All right.  So people received mail there?

13          MR. HARDING:  Yes.

14          THE COURT:  Or it wouldn't have been surprising to

15   people to receive mail there from Mr. Mitchell?

16          MR. HARDING:  Right.

17          THE COURT:  All right.  So Tony Montana gets the

18   letter.  And he and Hayes read the letter or he shares it with

19   Hayes?

20          MR. HARDING:  Yes.

21          THE COURT:  To whom is the letter addressed?  I mean,

22   the letter itself, not the envelope.

23          MR. HARDING:  Tony Montana.

24          THE COURT:  Tony Montana.  And what does the letter

25   say?

6

1          MR. HARDING:  It contains instructions to kill Claudus

2    Lassiter, a map for how to get to his house.  It has to do with

3    Claudus telling on them.

4          THE COURT:  Right.

5          MR. HARDING:  Claudus, you remember, was --

6          THE COURT:  Right.  He was suspected of having been

7    cooperating.

8          MR. HARDING:  Yes.  Exactly.  And there's actually

9    mention of it in Mr. Martin's statement to the police.  We heard

10   about how Claudus Lassiter had approached Mr. Martin.

11         THE COURT:  After the Wyche brothers' murders?

12         MR. HARDING:  Yes.

13         THE COURT:  Right.  And so when you stay instructions

14   to kill, do you mean like a request to kill or a direction or --

15         MR. HARDING:  My understanding is that it's more like a

16   direction.

17         THE COURT:  Okay.  Including a map?

18         MR. HARDING:  Yes.  Including a map.

19         THE COURT:  All right.  Go ahead.

20         MR. HARDING:  Mr. Hayes, first of all, advises Tony not

21   to do it.

22         THE COURT:  And why did he tell him not to do it?

23         MR. HARDING:  I don't believe I know the answer to

24   that.

25         THE COURT:  Okay.

1          MR. HARDING:  I don't know that he explained why not.

2     He just told him not to do it as far as I know.  But in any

3     event, he proceeded to warn Claudus Lassiter.

4          THE COURT:  Hayes warned Lassiter?

5          MR. HARDING:  Yes.

6          THE COURT:  All right.

7          MR. HARDING:  They had a meeting and Hayes warned him.

8          THE COURT:  Who was present at that meeting?

9          MR. HARDING:  Just Hayes and Lassiter as far as I know.

10         THE COURT:  All right.

11         MR. HARDING:  So that's --

12         THE COURT:  That's it?

13         MR. HARDING:  Relevant evidence.  It's not 404(b)

14    because it's intrinsic to this whole criminal enterprise.  It

15    shows the existence of the enterprise.  It shows the ongoing

16    racketeering activity.  It's consistent with the whole pattern of

17    racketeering activity that we've heard about and many charged and

18    uncharged crimes in this trial.

19         It is part and parcel of this whole case.  And of

20    course, it also shows consciousness of guilt because any effort

21    to retaliate against a witness generally implies consciousness of

22    guilt.  It's consistent with other evidence we have of

23    retaliation against witnesses, including some we're going to hear

24    about today.

25         So the government considers it very relevant and not at

8

1    all 404(b) evidence.

2            THE COURT:  All right.  Thank you.  Anything you want

3    to say, Mr. Lawlor?

4            MR. LAWLOR:  Your Honor, I guess a couple things.

5    Number one, although Mr. Lassiter's name has come up in sort of,

6    we've had some notion of his relationship to Mr. Wyche, the

7    notion that he's a witness or that he approached Mr. Martin,

8    those references have been cryptic at best.  So that he's a

9    witness, I think, grossly overstates any foundation for who this

10   person is or why Mr. Mitchell might purportedly instruct Mr.

11   Harris, to what this letter purportedly said.

12           The second thing is, Your Honor, and I suppose this

13   goes to weight, but Mr., TM, Mr. Herbert, in his grand jury, he

14   says he never opened the letter.  So Hayes testifies, Well,

15   Herbert got the letter and he opened it and I read it over his

16   shoulder.  And Mr. Herbert says, I got the letter, I never opened

17   it, I handed it over to Shelton.

18           I suppose that goes to weight and I guess we'll have to

19   hear what Mr. Herbert has to say about this matter.

20           But that issue aside, the foundation for this is

21   non-existent.

22           THE COURT:  All right.  I'm satisfied that it is, as to

23   Mr. Mitchell, clearly, it's an admission.  It does indeed show

24   consciousness of guilt.  And this is one of those instances in

25   which the evidence can only be considered against the other three

9

1    defendants if the jury first concludes that they are members of a

2    conspiracy with Mr. Mitchell.  And then and only then would this

3    be a statement as to them, only then would this be a statement in

4    furtherance of the conspiracy.  So I'll instruct the jury

5    accordingly.  But the objection to testimony regarding the letter

6    is overruled.

7            Yes, Mr. Martin.

8            MR. MARTIN:  I'm not disputing that ruling, Your Honor.

9    When Mr. Hayes testifies, there's going to be a number of things

10   that are going to come up and I'll be objecting.  I just wanted

11   the Court to be listening when it happens because a number of his

12   assumptions about things are hearsay conversations that he had

13   with Mark Herbert and things that Mark Herbert supposedly said to

14   him.  And he doesn't know, he doesn't have any foundational

15   knowledge of it other than what some other person told him.

16           There are three or four specific instances.  There's a

17   statement Mark Herbert supposedly made on the night of the

18   McCaffity murders to Hayes, in which he said, Those dudes are

19   crazy, referring to Mr. Mitchell and Mr. Harris, I believe.

20           There's a reference to a .38 caliber pistol that Mr.

21   Hayes used to keep in the ceiling of his sister's house that went

22   missing.  And Mr. Hayes doesn't really know what happened to it

23   except from what somebody told him.

24           THE COURT:  This is the Edgecombe Circle address?

25           MR. MARTIN:  Yes.  And there's, so I guess some

1  statements about whether or not Mr. TM was in the drug business

2  and his brother, Hayes, who is, I think, is his half brother,

3  says that he was in the drug business.  And then the question

4  was, was he in the drug business with Mr. Mitchell and Mr.

5  Harris?  And his answer was, I guess so.

6          THE COURT:  Hayes and Harris are brother?

7          MR. MARTIN:  No, Hayes and TM, Hayes and TM, who is

8  Mark Herbert, are half brothers, I believe.  I think I would call

9  them half brothers.  I'm not sure exactly what they are.

10          THE COURT:  All right.  So it's Hayes, Harris, and TM?

11          MR. MARTIN:  Yeah.

12          THE COURT:  Who is Herbert?

13          MR. MARTIN:  The testimony revolves around who was at

14  the house on Edgecombe after the murders.  That's the big genesis

15  for it.  And Mr. Hayes's statements about certain of those things

16  come only from TM.  And he doesn't have any personal knowledge of

17  it at all other than that.

18          THE COURT:  I would just caution the government to make

19  sure to lay a foundation of personal knowledge.

20          MR. MARTIN:  Right.  If they haven't, I'll be

21  objecting.  Then if they can't, it won't be admissible.

22          THE COURT:  Exactly.  Yes.  Mr. Harding?

23          MR. HARDING:  Judge, I'll be laying a foundation that

24  Mr. Herbert and Mr. Hayes are coconspirators.

25          THE COURT:  All right.  Then in that case, you can do

1  that.  As long as these are statements in furtherance of the

2  conspiracy.  The government's position is that Hayes and Herbert

3  and Tony Montana were all part of the RICO conspiracy?

4           MR. HARDING:  Well --

5           THE COURT:  Or the drug conspiracy?

6           MR. HARDING:  It's a complicated picture, Your Honor.

7           THE COURT:  Tell me about it.

8           MR. HARDING:  Okay.  In the first place, let me say

9  that I'm not intending to elicit from this witness TM's

10  description of the murder.  TM, Tony Montana, Mr. Herbert, knew

11  that Shelton Harris killed Mr. McCaffity --

12           THE COURT:  McCaffity/Brown.

13           MR. HARDING:  -- and the other victim on the orders of

14  Bo that night.

15           THE COURT:  And how did he know that?

16           MR. HARDING:  Well, that's part of the reason that I'm

17  not going to attempt to elicit that piece of information.

18           THE COURT:  Okay.  All right.

19           MR. HARDING:  I'm not sure how he knows it.  He may

20  have witnessed it because, as you will hear, he was in the

21  vicinity at the time.  On the other hand, he may have simply

22  heard it from Bo and Shelton after it happened.

23           THE COURT:  The scene is just a few blocks.  The

24  Edgecombe Circle residence is just a few blocks from where

25  McCaffity and Brown met their end.

1          MR. HARDING:  Yes.  And Shelton Harris went back to

2    that Edgecombe Circle address immediately following the shooting.

3          THE COURT:  All right.

4          MR. HARDING:  So I'm not intending to offer that.  The

5    situation is that TM and Mr. Harris were both being supplied with

6    crack cocaine by Mr. Mitchell and they're both part of Shake

7    Down, as a matter of fact.  So the government considers them

8    coconspirators.

9          The government also considers TM and Mr. Hayes to be

10   coconspirators because they shared weapons together, because they

11   stood out and, together and sold drugs on Woodland Avenue

12   together and protected one another.

13         Mr. Hayes never got supplied by Mr. Mitchell or by

14   Shelton Harris, for that matter.  Shelton Harris would actually

15   stand on the other side of Woodland Avenue.  But Your Honor will

16   probably hear at some point that Mr. Hayes didn't really like Mr.

17   Mitchell or Mr. Harris.  He talked to them and conversed with

18   them quite a lot for an extended period of time.  But he was

19   really only tight with Tony Montana, this guy who was, who was

20   tight with Mr. Mitchell and Shelton Harris.

21         THE COURT:  All right.

22         MR. HARDING:  So I believe that they are

23   coconspirators.  But I'm not intending to elicit from this

24   witness the confession --

25         THE COURT:  All right.

1          MR. HARDING:  -- that TM would have relayed.  I am

2     intending to get through this witness some other statements that

3     TM made to him, including this statement about how those guys are

4     crazy.  But that's the --

5          THE COURT:  Can you contextualize that for me?

6          MR. HARDING:  Yes.  After, on the night of the murder,

7     Mr. Hayes comes, drives back into the vicinity and notices

8     there's a murder scene.  He then goes back to, and he knows, he

9     recognizes it as a murder scene.

10          He goes back to Edgecombe Circle, goes inside, sees

11     Shelton Harris inside, and has some conversations with Shelton

12     Harris, which are not any problem because this will all come in

13     as admissions.  But he then goes down to the basement, vials up

14     some drugs for a while, goes back upstairs, talks to Mr. Hayes

15     again briefly to find out --

16          THE COURT:  You mean Mr. Harris?

17          MR. HARDING:  To Mr. Harris, to find out where TM is.

18     TM is a few doors away at his mother's house on Dupont Avenue.

19          So he walks over to Dupont Avenue and briefly

20     encounters TM.  And TM's shaking his head and saying, them dudes

21     is crazy, or words to that effect.  And Mr. Hayes doesn't want to

22     hear any more.  He knows what TM is going to be talking about.

23     So he cuts him off and leaves.  He never get any more of an

24     explanation than that.

25          Rodney Hayes then goes off and does his thing.  He

14

1      sells drugs, actually, for the rest of the morning.

2              Later on the same day he has another conversation with

3      TM and it is then that TM tells Mr. Hayes what happened that

4      night; specifically, that Bo had Mr. Shelton Harris murder Mr.

5      McCaffity and the other victim, Lisa Brown.  I wasn't going to

6      elicit that.

7              THE COURT:  That last piece?

8              MR. HARDING:  Yeah.

9              THE COURT:  Okay.  All right.  Well, Them dudes is

10     crazy, I don't, I doubt if Mr. Martin will object to that.

11             MR. MARTIN:  To what?

12             THE COURT:  If he does, I mean, it's perfectly

13     innocuous, as far as I'm concerned.

14             MR. MARTIN:  Not under those circumstances, Your Honor.

15             THE COURT:  It's perfectly innocuous.  In other words,

16     the way you lay it out, Mr. Harding, he sort of encounters TM.

17     TM sort of shakes his head and says, Them dudes are crazy, and he

18     walks away.

19             MR. HARDING:  And Your Honor, the fact is that TM and

20     Mr. Hayes are coconspirators.

21             THE COURT:  Okay.  But I think what Mr. Martin is

22     concerned about, because "Them dudes is crazy" is not going to

23     make any sense to the jury.  And I think Mr. Martin's principal

24     concern is, how far do you go in trying to ask Mr. Hayes, so what

25     did that mean to you?  That's the problem.  I don't think Mr.

1    Hayes --

2            MR. HARDING:  I propose to ask what, why he just simply

3    left at that point.  And he's going to say something like he

4    didn't want to hear what, what TM was going to say.  I believe.

5    In any event, Your Honor --

6            THE COURT:  Okay.  All right.  If that's as far as it

7    goes, I'm going to admit it.  If you lay it out the way you've

8    laid it out, that this all occurred on the morning of the

9    McCaffity/Brown murders, that everybody was in the area, that

10   Harris was there, that TM was there, that Hayes and Herbert got

11   drugs and somebody liked somebody and somebody didn't like

12   somebody else and somebody said those guys are crazy, and I

13   walked away because I didn't want to hear any more, I think the

14   jury's entitled to see and hear that scene without getting into,

15   I assume what he meant by that was why would they kill Oliver

16   McCaffity kind of thing.  That's what he can't say.

17           MR. HARDING:  And just so the Court is clear, there are

18   going to be some subsequent developments later on, weeks later,

19   when, for example, Mr. Hayes goes and warns Quincy, Oliver

20   McCaffity's brother, and tells Quincy that he knows who killed

21   Woody, and proceeds to have a discussion with Quincy about it.

22   Quincy wants to know where Shelton Harris lives.  He wants Mr.

23   Hayes to take him around to Shelton's house.  Mr. Hayes never

24   does any of that.

25           But this is around the same time that there's a

1    kidnapping, first of all.  There's actually an incident where TM

2    gets kidnapped, it's believed by associates of Oliver McCaffity.

3    Actually going to be heard in one of these rap songs.

4            There are a series of interactions.  There's also this

5    knife fight on the street where Mr. Harris confronts Mr. Hayes on

6    the street, demanding a gun, Hayes believes to kill Claudus

7    Lassiter.  And Hayes eventually refuses to give him the gun and

8    pulls a gun out on him to scare him off after Mr. Harris pulls a

9    knife on him.  The Court may already have heard about this

10   incident.  I'm not sure.

11           THE COURT:  This isn't the one where --

12           MR. HARDING:  This isn't the one where Mr. Hayes lost

13   his tip of his finger, no.

14           THE COURT:  Not Hayes.

15           MR. HARDING:  Harris, I mean.

16           THE COURT:  Harris lost the tip.

17           MR. HARDING:  Yes.

18           THE COURT:  All right.  Let me hear from Mr. Martin.  I

19   think I'm getting it.

20           MR. MARTIN:  Your Honor, there's a whole lot of, a

21   whole lot in that proffer that is news to everybody sitting at

22   this side of the table.  So these conversations, if my client

23   supposedly confessed to TM, you know, we've never been given

24   anything.

25           THE COURT:  That's not coming in.

1          MR. MARTIN:  But, but the key to this, Your Honor, is

2     what I was trying to make clear when I was up here earlier.  If

3     he can lay this foundation that TM was part of a conspiracy with

4     these people, then I understand what you're doing, what the

5     Court's ruling is.

6          My question is, when I read the grand jury about

7     whether TM was involved in the drug business with these people,

8     his answer was, I guess so.  He doesn't know.  He wouldn't know

9     unless one of those people told him that.  And TM is the one who

10    would have to tell him.  He doesn't have any independent

11    knowledge of this.  I don't think that Mr. Harding's going to be

12    able to lay the foundation for that.

13         And the other stuff I know about.  We all know about

14    Lassiter.  And we know about the knife and the gun.  That stuff

15    is all going to come out.

16         THE COURT:  Okay.

17         MR. MARTIN:  But I, I just don't want, you know, what I

18    don't want to happen is to have me object without you at least

19    going through your mind and saying "overruled" and we don't get a

20    hearing.

21         THE COURT:  I very much appreciate that, Mr. Martin.

22    You know that.

23         MR. MARTIN:  Thank you, Your Honor.

24         THE COURT:  I would just caution the government, Mr.

25    Harding.  It's going to be very important now, do not lead the

1  witnesses.  You get to lay your foundation and rehabilitate as

2  much as you need to, but do not lead the witness.  Let the

3  witness tell his story.

4         Sounds to me like you're going to be able to do what

5  you want to do.  But do not lead the witness and just let the

6  witness tell the story straight away.

7         Mr. Coburn.

8         MR. COBURN:  Thank you so much, Your Honor.  Just as a

9  point of clarification.  Is the part about "these dudes is crazy"

10  or "are crazy", that's coming in, then?

11         THE COURT:  I think so.

12         MR. COBURN:  Can I just note an objection to that, Your

13  Honor?

14         THE COURT:  Of course.

15         MR. COBURN:  I heard what Your Honor said about it

16  being relatively innocuous, definitely a pretty vague phrase, and

17  that's part of my objection.  Actually, just to sort of

18  contextualize it a little bit further.  It sort of plays into a

19  theme that you see in some of the Jencks material in this case,

20  similar to which has been pulled out of the witnesses, and some

21  of it which so far hasn't.

22         Basically, it may very well be something that the

23  government's going to try to urge that this, kind of what they

24  see is this group, this crew, this conspiracy, is kind of, and I

25  think Your Honor already hears this, but I mean, that they're

1    very quick to violence, too quick, you know, very quick to kill

2    people.

3                THE COURT:  Well, there's direct evidence of that, Mr.

4    Coburn.

5                MR. COBURN:  I don't mean to, the government has a

6    right to try to prove that if they want.  But I'm just saying

7    that's what, it's not an innocuous phrase because that's what it

8    means in context.  And that's why I'm objecting to it.

9                THE COURT:  All right.  I'll note the objection.  The

10   government in a sense has a difficult line to walk here.  The

11   government is entitled to show, in my judgment, that as a result

12   of the alleged acts of these defendants other drug dealers sought

13   revenge and retaliation.  What the government's not going to be

14   permitted to argue is that because other drug dealers sought

15   retaliation and revenge, that the jury should infer from that

16   that they are guilty.  So it's a very fine line.

17               But the government's entitled to show within the

18   community of drug dealers how the community reacted to what the

19   government contends are the violent acts of these defendants.

20               So a statement like "those guys are crazy" is of a

21   piece with that.  But I will not permit the government to stand

22   up and say in closing argument, for example, because TM said

23   "those guys are crazy", ladies and gentlemen of the jury, you

24   should conclude that they're crazy, violent people.  All right?

25               But the government's entitled to show what happened.

1    That's what the government is doing.

2              MR. COBURN:  Understood, Your Honor.

3              THE COURT:  So the jury is not going to be permitted to

4    infer guilt from a belief by others that they're guilty.  But the

5    government is entitled to show the jury what was going on in

6    March and April of 2002 in the Park Heights area.  All right?

7              MR. COBURN:  Understood.

8              THE COURT:  But your objection is noted.  Yes, Mr.

9    Martin.

10             MR. MARTIN:  Your Honor, I don't, I think you got this

11   and I just want to repeat.  I'm getting like Mr. Kurland now, I

12   want to repeat it to make sure you got it.

13             We understand that TM has said none of this ever

14   happened.  That's the grand jury that we've been given.  And we

15   intend to call TM in this trial.  I just want the Court --

16             THE COURT:  And I take it the government's not calling

17   him.

18             MR. MARTIN:  They haven't told us they're calling him.

19             THE COURT:  So he'll be a defense witness and he can

20   contradict the government witnesses.  All right.

21             MR. HARDING:  I'm sorry, Your Honor.  Just --

22             THE COURT:  Yes.

23             MR. HARDING:  My agents assure me Mr. Herbert's been in

24   the courtroom almost every day of this trial.

25             THE COURT:  Is that right?

1          MR. MARTIN:  Somebody could have told us, Your Honor.

2     We don't know.

3          MS. RHODES:  He was on the government's list.

4          MR. MARTIN:  He was on their list, Your Honor.

5          MR. HARDING:  We attempted on one occasion to subpoena

6     him to talk to him to see if he changed his tune before this

7     trial.  He eluded us.  We never found him.  And we have seen him

8     here in this courtroom repeatedly during the course of this

9     trial.

10          THE COURT:  Well, all right.  Look, I got to get this

11    jury out here.  Just because a person shows up on the government

12    witness list doesn't mean the government intends to call him.  As

13    you all heard me say, and I say it in every trial, ladies and

14    gentlemen of the jury, I'm going to read you a list of names of

15    witnesses and people whose names will be mentioned by witnesses.

16    Now, we don't have to deal with this now.

17          But if a defendant, meaning counsel for a defendant,

18    intended to call a witness, you all know that you have every bit

19    of the responsibility to monitor that your witnesses aren't in

20    the courtroom, every bit as much as government has that

21    responsibility.  And if Mr. Herbert's been sitting in this trial,

22    it's going to take some convincing for me to permit you to call

23    him.  I'm not saying I won't.  But I can't charge the government

24    with monitoring everybody who's on the government list of

25    potential witnesses.  Mr. Martin?

1          MR. MARTIN:  Your Honor, we don't, I wouldn't know the

2    man if I fell over him.  I don't know he was here.

3          THE COURT:  Okay.  Then how could you serve him with a

4    subpoena?

5          MR. MARTIN:  In the context of this case, Your Honor,

6    in the context of this case, where we have clients who do not

7    talk to us, it makes a bit of a difference.

8          THE COURT:  Oh, of course.  I'm not blaming counsel.

9    I'm not blaming counsel.

10         MR. MARTIN:  Well, but --

11         THE COURT:  Obviously, your clients turned around and

12   they knew everybody who was in the courtroom more likely than

13   not.  If they didn't tell you that a defense witness was in,

14   sitting in the courtroom, it's their doing.

15         MR. MARTIN:  Because of the manner in which we are

16   forced to communicate in this case, we can't even tell them what

17   we intend to do.  Just those normal lines of communication aren't

18   there.

19         THE COURT:  I understand that.

20         MR. MARTIN:  And they don't understand that there's a

21   sequestration order necessarily, either.

22         THE COURT:  They understand that.  They know full well

23   what a sequestration order is.

24         MR. MARTIN:  I would disagree with you with respect to

25   my client.  I would strongly disagree with you.

1          THE COURT:  Your clients sat through numerous motions

2    hearings and heard me say, Witnesses on this motion leave the

3    courtroom.  Your clients have extensive experience in state

4    court.  I don't know how many jury trials they've had.

5    Certainly, Mr. Gardner's been through a jury trial, I know that.

6    One or two of the defendants have federal convictions.

7          I have no doubt whatsoever that the defendants

8    understand that during court proceedings witnesses who are going

9    to testify are not permitted to be in the courtroom.  And of

10   course, we had that incident with Ms. Cheatham just yesterday.

11         MR. MARTIN:  But if they don't know what we intend to

12   do, then they have no way of doing anything about it.

13         THE COURT:  And if they choose not to talk to counsel,

14   that's their prerogative.

15         MR. MARTIN:  I'm just saying --

16         THE COURT:  I understand.

17         MR. MARTIN:  --in a different context and in the

18   context of a fair trial that we don't want bounced back here some

19   day, I think you should be more amenable to being convinced that

20   the witness can testify.

21         THE COURT:  I appreciate that.  I don't know that that

22   follows.

23         MR. MARTIN:  Thank you.

24         THE COURT:  The defendants have made certain choices in

25   this trial.  And let me just say, this is a good time, frankly,

1   to say what I've been thinking, in all candor.

2          I deeply appreciate the respect that Mr. Mitchell, Mr.

3   Harris, Mr. Martin, and Mr. Gardner have shown to these

4   proceedings.  Now, Mr. Harris sort of fell off to sleep one day.

5   I made a comment about that.  And there have been, I think, just

6   a couple of incidents with the marshals where there was some

7   slow, some slowness in complying with the marshals' directions.

8          But I have to say in all honesty, and I appreciate the

9   difficulty that you counsel have had in trying to get your

10  clients to assist you in their defense, but I have to say that

11  when they've been in the courtroom, with the exception of that

12  early moment when I mentioned that Mr. Mitchell was mouthing

13  things at witnesses and that kind of thing, since then he stopped

14  doing that.  And as far as I've been able to tell and what I hear

15  from the marshals is that the defendants have absolutely shown

16  respect for these proceedings.  And I want to say that.  And I

17  respect that and I appreciate that.

18         I know that counsel wish that we were in a different

19  regime.  I know that you wish that your clients would actually

20  actively assist you in putting up this very vigorous defense.

21  But that said, they've made their choices and they're going to

22  have to live with their choices.

23         Okay.  Ms. Rhodes, I really need to bring the jury out.

24  Very quickly, please.

25         MS. RHODES:  Just very briefly, Your Honor.  I would

1   ask that in light of the situation, that since the agents

2   generally and our opponents know these witnesses, they have met

3   with them and put them in front of the grand jury, if we could be

4   apprised if anybody else does come in who is on their list so

5   that we can then, if it's somebody we want to have testify, ask

6   them to leave.

7              THE COURT:  I'll ask, I'll ask the agents and Mr.

8   Hanlon, Mr. Harding, if they see somebody in the courtroom who is

9   on the government's list or the defense list, anybody that you

10  think might be called by the defense, just hand over a note and

11  tell Ms. Rhodes and she can pass it along to other counsel, so

12  and so's in the courtroom, so and so's in the courtroom.  That's

13  all.

14             MS. RHODES:  Thank you, Your Honor.

15             THE COURT:  Sure.

16             MR. MARTIN:  Your Honor, just one other thing, if I can

17  say it from here.

18             THE COURT:  Sure.  Go ahead, Mr. Martin.

19             MR. MARTIN:  The decision to call him was only made

20  yesterday.

21             THE COURT:  I understand.

22             MR. MARTIN:  And number two, none of the testimony that

23  we're talking about here has been before the jury yet.  Hasn't,

24  there hasn't been anybody talking about this stuff.

25             THE COURT:  Okay.  All right.  That would be something

1      important for me to consider.  All right.

2              MR. HARDING:  I'm sorry, Your Honor.  The defense has

3      given us a new responsibility and we have no way of knowing what

4      the names of the people are that they want us to watch out for.

5              THE COURT:  No.  If they're on your list.  If they're

6      on the government list.  That's all.

7              MR. HARDING:  The agent also tells me that Mr. Herbert

8      was here for some time, up to a couple of weeks before they

9      recognized him for who he was.

10             THE COURT:  Okay.

11             MR. HARDING:  And remembered who he was, basically.

12             THE COURT:  All right.  If they want to call him, if

13     they can find him to subpoena him, maybe he'll just be in the

14     courtroom one day during the defense case.

15             MR. MARTIN:  Wish I had known.

16             THE COURT:  Just say, Come on down.

17             MR. HARDING:  His name was not on any of the defense

18     lists of witnesses that we received.

19             THE COURT:  Right.  But the defense, as you well know,

20     is entitled to rely on people who are listed by the government as

21     potentially available.  Okay.

22             I'm not imposing some big burden, Mr. Harding.  All I'm

23     saying is obviously the agents and you and Mr. Harding, as we saw

24     yesterday, are sort of monitoring who is in the courtroom, which

25     is entirely appropriate.  If you see somebody who jumps out at

1   you, that's all I'm saying.  Just make sure that Ms. Rhodes knows

2   that he or she's in the courtroom.  That's all.  Not a big deal.

3          Mr. Reynolds.  Thank you.

4          MS. RHODES:  Your Honor, if I can be excused for just

5   one minute?

6          THE COURT:  Certainly.

7          (Witness enters the courtroom.)

8          THE COURT:  We are pleased to have young Mr. Brendan

9   Ticknor sitting with us this morning, doing his project for

10  McDonough School.

11         THE COURT:  Mr. Coburn, you're up.

12         MR. COBURN:  Thank you, Your Honor.

13         (Jury enters the courtroom at 11:45 a.m.)

14         THE COURT:  Ladies and gentlemen, good morning.  And

15  again, I apologize for the delay.  But we're ready to proceed.

16         You will recall that Mr. Reynolds was on the stand.

17  Mr. Reynolds, you remain under oath in this case.  And Mr. Coburn

18  was about to commence his cross examination of Mr. Reynolds.

19  Whenever you're ready, Mr. Coburn.

20         CROSS EXAMINATION

21  BY MR. COBURN:

22  Q    Thank you so much, Your Honor.  Good morning, Mr. Reynolds.

23  A    Good morning.

24  Q    Mr. Reynolds, it's a fact, is it not, that you signed a

25  cooperation plea agreement with the government on May 24th, 2004,

1    is that right?

2    A    Yes.

3    Q    Okay.  I believe that's already been introduced into

4    evidence by the government.  But just in case, if I may show this

5    to the jury.  That's the first page of the agreement, right, sir?

6    A    Yes.

7    Q    As you can see, it's on United States Attorney's Office,

8    Northern District of Maryland stationery, right?

9    A    Yes.

10   Q    It's addressed to your lawyer at the time, and his name is

11   Andrew J. Graham, right?

12   A    Correct.

13   Q    And he's part of a law firm called Kramon and Graham,

14   correct?

15   A    Yes.

16   Q    Which has offices very near this courthouse, correct?

17   A    Yes.

18   Q    We'll be talking a little more about this agreement later.

19   But the next to the last page, you recognize any signatures on

20   this page?

21   A    Yes.

22   Q    At the very bottom, dated June 2nd, 2004, that is your

23   signature, correct?

24   A    Yes.

25   Q    And this agreement imposes some obligations on you, right,

1    Mr. Reynolds?

2    A    Correct.

3    Q    And you stated in response to some of Mr. Hanlon's questions

4    yesterday that you, it's your intention to abide by the

5    agreement, right, sir?

6    A    Yes.

7    Q    Because you expect to get a benefit from it, is that right?

8    A    Yes.

9    Q    And that benefit relates to a lesser sentence for your

10   federal charge, correct?

11   A    Yes.

12   Q    Now, it's your understanding, is it not, Mr. Reynolds, that

13   one of your obligations, part of what you've agreed to when you

14   signed that agreement that we just looked at was to cooperate

15   with the government by providing testimony when the government

16   needs it, is that right?

17   A    Correct.

18   Q    Do you remember your testimony yesterday, sir, about NA and

19   Card?

20   A    Yes.

21   Q    And you were describing, in response to some of Mr. Hanlon's

22   questions, that you felt you could rely on NA and Card for

23   anything, right, sir?

24   A    Yes.

25   Q    But of course you ultimately turned out to provide

1   cooperation, provided evidence or information about them to the

2   government, right, sir?

3   A    Yes.

4   Q    And you testified, did you not, that you all would purchase

5   heroin together, is that right?

6   A    No.

7   Q    Pardon?

8   A    I said Card purchased heroin.

9   Q    Okay.  With all of your money together, is that right?

10  A    No.

11  Q    Okay.  Did you testify that the three of you did anything

12  together with respect to heroin yesterday?

13  A    Yes, we was together as one unit, unit.

14  Q    You were together as one unit?

15  A    Yes.

16  Q    But you did not purchase heroin together?

17  A    No.

18  Q    The purchases were entirely separate, is that your

19  testimony?

20  A    Yes.  Yes.

21  Q    And you would sell it entirely separately.  Is that your

22  testimony?

23  A    Yes.

24  Q    Okay.  Was there somebody who was in charge of this unit

25  that you just referred to, somebody who was like the president or

1    something like that?

2    A    You could say Card was.

3    Q    Okay.  Was there a process by which he became that or was it

4    just something that you all kind of informally agreed on?  How

5    did he become the person who was in charge?

6    A    I mean, it wasn't no election or anything like that.  It was

7    just that he was the source.

8    Q    He was the source?

9    A    Right.

10   Q    So is it your testimony, then, that the three of you

11   functioned kind of like a company, like a corporation?  Is that

12   your testimony?

13           MR. HANLON:  Objection, Your Honor.

14           THE COURT:  Overruled.  You may answer.

15   Q    Is that your testimony?

16   A    Yes.

17   Q    It is?

18   A    Yes.

19   Q    Okay.  So it's your testimony, then, that everybody had a

20   role?  Everybody had a particular title or responsibilities as

21   part of this group?  Is that your testimony?

22   A    Yes.

23   Q    Do you understand the significance of this in the context of

24   this case, sir, in terms of, you know, how a group of people

25   either operate loosely or together?  Do you understand that?

CROSS EXAMINATION OF IBN-REYNOLDS BY COBURN                    32

1    A    Yes.

2    Q    And how do you understand that?  Did somebody talk to you

3    about it?

4    A    I guess when they went over my case with me.

5    Q    When who went over your case with you?

6    A    The U.S. attorneys.

7    Q    The ones sitting to my left?

8    A    Of course.

9    Q    And so they explained something to you about the

10   significance of how close knit or how kind of far apart people

11   who know each other or work together might be?

12   A    Not people.  Me, Card and NA.

13   Q    They explained that to you?

14   A    Briefly.

15   Q    And what did they briefly tell you about it?

16   A    Were we together, how did we work, how did we operate?

17   Q    And did they tell you why that could be important?

18   A    No.

19   Q    They didn't?

20   A    No.

21   Q    Did this group of people that you just described, NA, Card,

22   and you, did you all have a name?

23   A    No.

24   Q    No name?

25   A    No name.

1    Q    Okay.  Did you all ever do anything illegal in connection

2    with drug dealing with anybody else or was it just the three of

3    you together?

4    A    Just the three of us.

5    Q    You never did anything with anybody else that was illegal?

6    A    No.

7    Q    Did you all have -- now, you're aware of the Crips and the

8    Bloods, right, sir?

9    A    Of course.

10   Q    You heard of them?

11   A    Yes.

12   Q    Of course.  Everybody knows about them, right?

13   A    Yes.

14   Q    Did you and NA and Card, did you all have like colors, like

15   the Bloods do?

16   A    No.

17   Q    Did you have like a designated tattoo like the Crips or the

18   Bloods do?

19   A    No.

20   Q    Did you all have a dance?  I mean, the Crips and Bloods have

21   that, right?  They have a particular dance that they do.

22   A    Yes.

23   Q    Did you have that?

24   A    No.

25   Q    Okay.  Did you have an initiation ceremony, somebody to

1    become part of the Reynolds, Card, NA group?

2    A    No.

3    Q    And you sold drugs separately, you just told us?

4    A    Yes.

5    Q    Okay.  It's correct, is it not, you know somebody by the

6    name of Desi, right?

7    A    Yes.

8    Q    And it's correct, is it not, that Woody -- and do you know

9    Woody's real name?

10   A    I can't remember it offhand.

11   Q    Is that Mr. McCaffity?

12   A    Yeah.

13   Q    Is it correct that Woody and Desi used to rob drug dealers

14   together?

15   A    I don't know.

16   Q    You don't?

17   A    No.

18   Q    Okay.  Do you remember testifying in the grand jury on two

19   separate occasions?

20   A    Yes.

21   Q    You do?  Do you remember one particular occasion, the first

22   one, was on July 21st, 2004?

23   A    Yes.

24   Q    That would have been just a couple of months after you

25   actually signed your cooperation agreement, is that right?

1    A    Yes.

2    Q    Referring to Page Nine of the first transcript, July 21st,

3    '04, starting on Line 11.

4         Is it a fact -- actually, before I read you this, when

5    you testified on each of these two occasions, Mr. Reynolds, in

6    the grand jury, you put up your right hand and you swore an oath

7    to tell the truth, the whole truth, and nothing but the truth,

8    right?

9    A    Yes.

10   Q    And that would be the same oath that you swore here in this

11   courtroom yesterday, right?

12   A    Correct.

13   Q    And you understand that that oath still binds you because

14   you're still testifying today, right, sir?

15   A    Yes.

16   Q    You understand that if you lie under oath about a material

17   matter you may be prosecuted for perjury, correct?

18   A    Correct.

19   Q    And is it a fact, then, when you were in the grand jury back

20   in '04, July 21st, 2004, that you were asked the following

21   questions and gave the following answers?

22        Question:  And were you tight with Woody?  Answer:

23   Yeah.  We was friends.

24        Question:  What kind of business were Woody and Desi in

25   together?  Answer:  I know in the past they used to rob people.

1          Question:  What kind of people?  Answer:  Drug dealers.

2          So were you asked those questions under oath back in

3    '04 and did you give those answers?

4    A    Yes.

5    Q    And was that testimony true?

6    A    Yes.

7    Q    You know it's true, right, sir?

8    A    From what I was told by Desi.

9    Q    Pardon?

10   A    From what I was told by Desi.

11   Q    Okay.  You felt confident enough of it so you could testify

12   to it under oath in 2004, right, sir?

13   A    Yeah, he told me.

14   Q    Now, do you remember your testimony yesterday, when Mr.

15   Hanlon was asking you questions, about Wayne and Goo, right?

16   A    Yes.

17   Q    And do you remember Mr. Hanlon, and he did this, it was, you

18   know, it was an examination, took a little bit of time, he asked

19   you about your relationship in selling drugs, what you said was

20   your relationship in selling drugs with Wayne, right, sir?

21   A    Yes.

22   Q    And he also asked you about Goo, right, sir?

23   A    Yes.

24   Q    And do you remember testifying to the ladies and gentlemen

25   of the jury sitting immediately to your right, Mr. Hanlon asked

1   you specifically whether or not Wayne was selling for you out on

2   the street, right?

3   A    I can't remember if he asked me that.

4   Q    Well, this is just yesterday.

5   A    I can't remember if he asked me that.

6   Q    As you sit here right now, it is your testimony under oath

7   that you have no recollection of Mr. Hanlon, the gentleman

8   just --

9   A    He asked me several questions about Wayne.

10  Q    You don't remember if he asked you whether or not Wayne was

11  selling on the street for you?  You don't remember that?

12  A    No.  No.

13  Q    Well, do you remember that after you were asked that

14  question, you answered by saying no, he was just cutting heroin

15  for me.  And Mr. Hanlon asked you, followed up with a question to

16  the effect of why, and you said because the trust was there?

17  A    I remember saying that he was just cutting heroin for me and

18  the trust was there.

19  Q    Okay.  Well, since you remember saying that he was just

20  cutting heroin for you and the trust was there, do you remember

21  saying that he was not out on the street selling for you?

22  A    Yeah.  Because he wasn't out on the street selling for me.

23  Q    I mean, that would follow, right?  Because as you just told

24  us a second ago, he was just cutting heroin for you, according to

25  your testimony, right?

1    A    Correct.

2    Q    So it's your testimony under oath that he was not out on the

3    street selling for you, right, sir?

4    A    Correct.

5    Q    Okay.  And do you remember Mr. Hanlon also asking you some

6    questions about Goo?  Do you remember that?

7    A    Yes.

8    Q    And do you know who Goo is?

9    A    Yes.

10   Q    That's Mr. Gardner, right?  Correct?

11   A    Correct.

12   Q    And do you remember saying that Mr. Gardner also was not out

13   on the street, that he wasn't working for you at all?  Do you

14   remember saying that?

15   A    Yes, I do.

16   Q    And you stand by that, is that right?

17   A    Yes.

18   Q    You said, it was your testimony that Mr. Gardner was working

19   for NA, right, sir?

20   A    Yes.

21   Q    Not for you?

22   A    Correct.

23   Q    Right?

24   A    Correct.

25   Q    Okay.  Now, let's go back to the grand jury.  And with the

1    Court's permission, could I, could I display this testimony?  I'm

2    going to be seeking, Your Honor, to move some of this in pursuant

3    to the rule that we discussed last week, Rule 801.  I wonder if I

4    could have the Court's leave to display this.

5           THE COURT:  I think, you can do that.  But you can just

6    read it to him if you want.  Either way it's going to come in if

7    it's going to come in.

8    Q    If I could do both, I would appreciate it very much.

9           THE COURT:  All right.

10   Q    Tell us, back in 2004, July 21st, 2004, when you swore the

11   same oath that you swore here in this courtroom yesterday --

12   A    Yes.

13   Q    -- whether you were asked these questions and gave these

14   answers to the grand jury.  Okay?

15   A    Correct.

16   Q    Referring to Page 11 towards the bottom.  Starting on Line

17   16.  Do you see that?  Can you see that on your screen?

18   A    Yes.

19   Q    Okay.  Tell us whether you were asked these questions under

20   oath and gave these answers to the grand jury.

21          Question:  How old was Wayne?  Answer, he was maybe

22   around 12.

23          Question:  How did you get to know him?  Answer:  I

24   knew his older brother, Alvin.

25          Question -- by the way, I should say, this questioning

1    was being done by Mr. Harding and another prosecutor, is that

2    right?

3    A    Yeah.

4    Q    Okay.  I knew his older brother, Alvin.  Question:  Alvin?

5    Answer:  Right.

6         Question:  And were they involved in business with you

7    to some extent?  Answer:  Yes.

8         Question:  Doing what?  And move over to the next page.

9    Page 12, Line 1.  Answer:  They used to work for me.

10        Question: Doing what?  Answer:  Selling drugs.

11        Question:  What part of down?  Answer:  Pratt and

12    Monroe Street.

13        Question:  In West Baltimore?  Answer:  West Baltimore.

14        Question:  Okay.  Both Wayne and his older brother

15    worked for you selling drugs, then, is that right?  Answer:

16    Correct.

17        Were you asked those questions and gave those answers

18    in 2004, sir?

19    A    Yes.

20    Q    You were?

21    A    Yes.

22    Q    Now, let's turn to Shawn Gardner.  Remember you testified

23    just a minute ago that, and you testified yesterday, also, that

24    Mr. Gardner had not worked for you?

25    A    Yes.

1    Q    He just worked for NA, right?

2    A    Yes.

3    Q    Let's look at the next set of questions and answers.  Page

4    12, Line 11.

5         Question:  What about Shawn Gardner?  Did you get to

6    know him back in those days, too?  Answer:  Yes.  That was

7    Wayne's best friend.

8         Did he work for you, also?  Answer:  Yes.

9         Question:  When you say they worked for you, do you

10   mean that you used to supply them with drugs and that they would

11   go sell it somewhere on their own and then pay you back later?

12   Answer:  It was more like I had an area and it was already

13   established and they just ran the area for me.

14        Question:  Okay.  And that would be Pratt and Monroe?

15   Answer:  Yes.

16        Question:  And Mr. Gardner worked there, also?  Answer:

17   Yes.

18        Do you see that on the transcript?

19   A    Yes, I see it.

20   Q    And were you asked those questions when you were under oath

21   back in '04 in the grand jury and did you give those answers?

22   A    Yes.

23   Q    Okay.  It's your testimony, is it not, that with respect to

24   Bo, you had only met him a few months before you testified in the

25   grand jury in 2004, is that right?

1    A    Correct.

2    Q    Before that, you had no idea who, you had never met him,

3    right?

4    A    No.

5    Q    Okay.  Let's look now a little more closely at some of the

6    paperwork relating to your plea agreement, what ultimately became

7    your plea agreement with the government.

8          First, this is a document I believe you were shown on

9    direct examination.  It is a proffer letter dated February 24th,

10   2004.  Do you recognize that document?

11   A    Yes.

12   Q    And that's on U.S. Attorney's office stationery also, right?

13   A    Correct.

14   Q    And that's directed to the same lawyer that we talked about

15   a minute ago, Andrew Graham, Esquire, part of Kramon and Graham,

16   right, sir?

17   A    Right.

18   Q    And this is the letter that kind of is, it was, you got it

19   around the time of your first proffer session.  You know what

20   that means, right, sir, proffer session?

21   A    Yes.

22   Q    With the prosecutors?

23   A    Yes.

24   Q    And there was a detective present, also, right?

25   A    Yes.

1    Q    Is that Detective Kramer?

2    A    Yes.

3    Q    Anybody else there at the time for your first proffer

4    session?

5    A    I can't remember.  I just remember Kramer.

6    Q    And in the first paragraph it says, you have advised me,

7    this is the government saying to Mr. Graham, you have advised me

8    that you and your client wish to meet with the investigating

9    agents for the purpose of making an off-the-record proffer in

10   connection with the above matter.  Right?

11   A    Correct.

12   Q    And I think that Mr. Crowe may have already asked you this.

13   But that's your signature in the lower left-hand part of the

14   second page of that letter, right?

15   A    Yes.

16   Q    Okay.  Now, it's a fact, is it not, that before Mr. Graham

17   was your lawyer, you had a different lawyer, right?

18   A    Yes.

19   Q    And her name was Beth Farber, correct?

20   A    Correct.

21   Q    And it's correct, is it not, Mr. Reynolds, that right around

22   the time Mr. Graham became your lawyer, that is when you made the

23   decision to cooperate with the government, correct?

24   A    Correct.

25   Q    And he was obviously your lawyer on this date, February

1   24th, 2004, because the government's proffer letter is addressed

2   to him, right?

3   A    Correct.

4   Q    Now, you testified in response to some questions from Mr.

5   Hanlon that you and Mr. Gardner, Goo, were what you called cell

6   buddies, right?

7   A    Correct.

8   Q    Now, that means that you and Mr. Gardner were in the same

9   cell, correct?

10  A    Correct.

11  Q    And what was the name of the institution where you and Mr.

12  Gardner shared the same cell?

13  A    Supermax.

14  Q    Supermax.  That's right here in Baltimore, right?

15  A    Correct.

16  Q    When did you and he start being cell buddies?

17  A    I can't remember the date.

18  Q    Do your best.  Tell us approximately when it was, if you

19  know.

20  A    I would be guessing.

21  Q    Can you give us a year?

22  A    '04.

23  Q    Started being cell buddies in '04.  Can you give us any sort

24  of estimate in terms of when?

25  A    Maybe March, February, March.

CROSS EXAMINATION OF IBN-REYNOLDS BY COBURN          45

1    Q    Maybe February or March of '04?

2    A    Um-hum.

3    Q    So when was it that you got locked up, then?

4    A    '03.

5    Q    Do you know when in '03?

6    A    Can't remember.

7    Q    Where were you locked up initially before you and Mr.

8    Gardner became cell buddies?

9    A    DOC.

10   Q    Where's DOC?

11   A    Across the street from Supermax.

12   Q    This is like on Madison Street, right, sir?

13   A    Correct.

14   Q    And how long were you locked up in DOC before you were

15   transferred over to Supermax?

16   A    Probably about two weeks.

17   Q    And then you went to Supermax?

18   A    Correct.

19   Q    And how long after you arrived at Supermax did Mr. Gardner

20   become your cell mate?

21   A    I can't remember.

22   Q    Did you have any other cell mates?

23   A    I had a couple of them.

24   Q    So how many people were in the cell when you and Mr. Gardner

25   were cell buddies?

1    A    Just me and him.

2    Q    So there were no other cell mates at that time, is that

3    right?

4    A    Not together.  Only two people can be in a cell together.

5    Q    That's true at Supermax, right?  Only two people can be in

6    the cell together, right?

7    A    Correct.

8    Q    Do you remember what particular block you all were on in

9    Supermax during this period of time?

10    A    No.

11    Q    When did you and he stop being cell buddies?

12    A    Probably about a week and a half after that.

13    Q    So you were cell buddies for about a week and a half?

14    A    Yeah.

15    Q    And you were locked up for the charge that you ended up

16    pleading guilty and cooperating on with the federal government,

17    right?

18    A    Correct.

19    Q    And Mr. Gardner, you already testified, it was your

20    understanding, was locked up for murder at the time, right?

21    A    Right.

22    Q    Now, going back a couple of years.  You testified, do you

23    remember testifying that when you were released in 2002 you

24    either talked to, met with Wayne or had a telephone conversation

25    with him when he was in a halfway house?

1    A    Yes.

2    Q    When was that in 2002?

3    A    Can't remember the date.

4    Q    Can you give us any idea?  Like what season it was, were the

5    leaves on the ground, or was the sun, was it hot, or any idea?

6    A    Cold, maybe it was cold.

7    Q    Maybe it was cold?

8    A    Yeah.

9    Q    Can you be any more precise than that?

10   A    No.

11   Q    Okay. So you're out of prison at that point, right?  You're

12   not locked up?

13   A    Probably was on work release or something, too.

14   Q    You said "too?"

15   A    Yeah.

16   Q    Because it was your understanding that Wayne was in a

17   halfway house?

18   A    Right.

19   Q    At that point in 2002, right, sir?

20   A    Correct.

21   Q    What charge was he in a halfway house on in 2002 when you

22   and he had that conversation?

23   A    I believe a handgun, I guess.

24   Q    A handgun charge?

25   A    I think so.

1    Q    Federal or state?

2    A    Federal.

3    Q    Now, do you remember also talking about, in 2002, I think

4    you said you were working on Reisterstown and you had a visit

5    from Goo?

6    A    Correct.

7    Q    And when in 2002 was that?

8    A    It was around the same time.

9    Q    Was it before or after the conversation you had with Wayne?

10   A    I believe after.

11   Q    How long after?

12   A    Not that long.

13   Q    Did you say, did you tell the jury yesterday when you were

14   testifying about this that Goo had just come home?

15   A    Correct.

16   Q    And what had he come home from?

17   A    A charge on 95 or something.

18   Q    He had just come home from the charge on 95?

19   A    Came home from boot camp.

20   Q    He had just come home from boot camp?

21   A    Correct.

22   Q    For the charge on 95?

23   A    I believe so.

24   Q    Okay.  But you can't be any more exact about when in '02,

25   right, sir?

1   A    No.

2   Q    Now, you testified before the grand jury about this

3   conversation that you had when you and Goo were cell buddies,

4   right?

5   A    Correct.

6   Q    And you've already told the ladies and gentlemen of the jury

7   that during the course of this conversation Goo told you that

8   Montgomery, the person you understood to be Montgomery, had lied

9   about his role in the incident, is that right?

10  A    Lied about who role?

11  Q    Didn't you say that he had switched it up?

12  A    Right.

13  Q    About Goo's role?

14  A    Right.

15  Q    Goo told you that he hadn't shot anybody, right, sir?

16  A    Right.

17  Q    Pardon?

18  A    Correct.

19  Q    Okay.  Now, this conversation, it's your testimony that this

20  conversation happened sometime after, you said it was in 2004,

21  but it was sometime after you signed your initial proffer

22  agreement with the government, right, sir?

23  A    Yes.

24  Q    So you'd had one, at least one proffer session with the

25  government when, according to your testimony, you had this

1    conversation with Goo, right, sir?  When you and he were cell

2    buddies, right?

3    A    Correct.

4    Q    So it was sometime after February 24th of 2004, right, sir?

5    A    Yes.

6    Q    How long after?

7    A    I don't know.

8    Q    No idea at all, is that your testimony?

9    A    Yes.

10   Q    Okay.  Can you give us any sort of estimate at all?

11   A    Sometime maybe in March, maybe.

12   Q    Okay.  Now, you told the ladies and gentlemen of the jury

13   that during this conversation Goo, Mr. Gardner, had told you that

14   he, the reason or a reason for this incident, the one with Mr.

15   Montgomery, was that he needed money for Wayne's lawyer, right,

16   sir?

17   A    Correct.

18   Q    That's what you testified to here?

19   A    Yes.

20   Q    Right, sir?  By the way, how many proffer sessions have you

21   had with the government from, back from February 24th, '04, until

22   now?

23   A    I think about two or three.

24   Q    A total of about two or three?

25   A    Maybe.

1    Q    Does that include -- pardon?

2    A    Maybe four.

3    Q    Does that include the sessions where they're preparing you

4    to get ready to testify in this trial?

5    A    Yes.

6    Q    Do you know if there's any written record at all of any of

7    those proffer sessions, any memorandum, any tape, any transcript,

8    anything at all?

9    A    No.

10   Q    You don't know?

11   A    No.

12   Q    Are you aware of any written record of them?

13   A    No.

14   Q    Tell us whether it isn't a fact that back in the grand jury,

15   the one we were talking about before, July 21st, 2004 --

16   A    Correct.

17   Q    -- whether you were asked the following questions and gave

18   the following answers?  Okay, Mr. Reynolds?

19   A    All right.

20   Q    Referring to Page 17, again of the first transcript.

21        See on Line 16 there?

22   A    Yes.

23   Q    Question:  I see.  And this refers to the line before where

24   he said the profit was better in Pennsylvania.  Then it asks, did

25   you speak to Goo after Wayne got locked up in 2002?  Do you see

1    that?

2    A    Yes.

3    Q    And you say, yeah, we were cell buddies, right, sir?

4    A    Correct.

5    Q    And you gave that answer, right, in the grand jury?

6    A    Yes.

7    Q    And then you were asked, Question:  I see.  Did he talk to

8    you about Wayne needing money for something?  Answer:  Yeah.

9         Question:  What did he need money for?  Answer:  A

10   lawyer.

11        Question:  Okay.  What was Goo locked up when you were

12   cell buddies -- what was Goo locked, it doesn't say "for."  What

13   was Goo locked up when you were cell buddies with him?  Answer:

14   Murder.

15        Question:  Okay.  Did he talk to you about the murder?

16   See that?

17   A    Yes.

18   Q    Now, where in this transcript do you say that the reason,

19   that he told you that the reason he became involved in this

20   incident was in order, as in order to get money for Wayne's

21   lawyer?  I mean, you say, just looking carefully at this, you say

22   at the previous page he told you Wayne needed money for a lawyer,

23   right?

24   A    Right.

25   Q    Where do you say in this transcript that his reason for

1   becoming involved in this murder was to get that money for Wayne?

2   A    I don't say it.

3   Q    You don't say it?

4   A    Correct.

5   Q    Is it your testimony that you did say it in any of the other

6   proffer sessions earlier about which we have no written record?

7   A    No.

8   Q    It's not your testimony that you said that before?

9   A    No.

10  Q    Now, is it your testimony here today that Mr. Gardner told

11  you that he had, that there had been a search warrant executed at

12  his house and money had been seized and that's why he needed

13  money?

14  A    Yes.

15  Q    You're saying that that's what he said, right?

16  A    Yes.

17  Q    And how much earlier was it that he told you that there had

18  been a search warrant executed in which money had been taken?

19  A    I can't remember.

20  Q    Could it have been like years earlier or just recently or --

21  A    I can't remember.  It wasn't years.

22  Q    It wasn't years?

23  A    No.

24  Q    Do you know when Goo got locked up for murder?

25  A    No.

1    Q    No idea at all?

2    A    Not the date.

3    Q    Do you know when a search warrant was executed at his house?

4    A    No.

5    Q    Do you remember what phone numbers you were using back in

6    2002, 2003?

7    A    Not right offhand.

8    Q    You don't?

9    A    No.

10   Q    Do you remember the area code?

11   A    443 or 410.

12   Q    443 or 410?

13   A    Yes.

14   Q    Did you have cell phones or a land line?

15   A    Cell phones.

16   Q    You don't remember any of the numbers, is that your

17   testimony?

18   A    Yes.

19   Q    Okay.  If I may, Your Honor, could I mark an item as

20   Defendant Gardner's Exhibit Number Eight?

21        THE COURT:  All right.

22   Q    I'll show it to the government.  Just stupidly didn't bring

23   up a pen.  I'm not hearing any objections from the government,

24   Your Honor.

25        MR. HANLON:  No objection to having the document shown,

1    for what it's worth.

2    Q    No objection?  Okay.  May I put it on the --

3            THE COURT:  Sorry?

4            MR. HANLON:  Your Honor, the government doesn't object

5    to having the document shown to the witness.

6            THE COURT:  Okay.  But you're not moving its admission?

7    Q    I was, I was hoping to show it to the jury, if possible.

8            MR. HANLON:  I'm not troubled by that, either, Your

9    Honor.

10           THE COURT:  Okay.  So the government is saying the jury

11   can see it but it's not in evidence.

12   Q    That's fine with me, Your Honor.  This is a letter that I

13   don't think you've been shown before during your testimony in

14   this trial.  Do you recognize it?

15   A    No.

16   Q    Ever seen it before?

17   A    Yeah, I remember it.

18   Q    Pardon?

19   A    I remember the letter.

20   Q    Okay.  Now, this is a letter that's dated March 30th, 2004,

21   right?

22   A    Yes.

23   Q    And it's written from Mr. Harding and another prosecutor to

24   your lawyer, Mr. Graham, right?

25   A    Correct.

1    Q    And looking at it about three lines down, do you see where

2    it says, your client surprised us on March 22nd, '04, with the

3    information that he is currently sharing a cell with Shawn

4    Gardner, who is a defendant in another case we are prosecuting?

5    A    Yes.

6    Q    And it says, we have not asked or suggested to your client

7    that he elicit any information from Gardner or any other

8    prisoner?

9    A    Correct.

10   Q    You have now told us that your client's been moved so this

11   issue may not be moot.  Do you see that?

12   A    Yes.

13   Q    Okay.  So if you had already been moved, then the statement

14   that you're attributing to Mr. Gardner that you've already

15   testified about, it's your testimony it must have already been

16   made, right?

17   A    Yes.

18   Q    And you must have told the government about it, right, when

19   you met with them on March 22nd, 2004, which is why they would

20   have written you this letter through your lawyer, right?

21   A    Correct.

22   Q    Okay.  Now, your cooperation agreement, which we'll look at

23   now, this is dated just a month or so later, May 24th, 2004,

24   right, sir?

25   A    Yes.

1    Q    And what you admitted to was being what's called a felon in

2    possession, right, sir?

3    A    Yes.

4    Q    It says you knowingly and intentionally possessed a firearm,

5    right?

6    A    Yes.

7    Q    And before that time, you had been convicted of a crime

8    punishable by more than a year of incarceration, meaning a

9    felony, right, sir?

10   A    Correct.

11   Q    And this agreement is fairly lengthy.  It's a number of

12   pages, right?

13   A    Yes.

14   Q    Turning your attention to Page 4, Subparagraph F.  See that?

15   A    Yes.

16   Q    Says the defendant shall not commit any offense in violation

17   of federal, state, or local law between the date of this

18   agreement and his sentencing in this case and shall not violate

19   any regulation of the institution in which he is detained.

20   Right, sir?

21   A    Correct.

22   Q    Were you arrested, after you signed this agreement, for

23   another offense?

24   A    Yes.

25   Q    You were?  What were you arrested for?

1    A    60 pounds of marijuana.

2    Q    So then since you were arrested after you signed this

3    agreement for 60 pounds of marijuana, then you have violated this

4    agreement, right, sir?

5    A    Correct.

6    Q    So then I take it since you violated the agreement, the

7    government must have nullified it and done what they said they

8    were going to do in terms of making, you know, prosecuting you

9    for other things and so on, right, sir?

10   A    They haven't notified me yet.

11   Q    They haven't notified you yet?

12   A    No.

13   Q    Well, you already testified, did you not, in response to my

14   questions and Mr. Hanlon's questions and Mr. Crowe's questions

15   that you anticipate getting cooperation credit when you get

16   sentenced, right?

17   A    Correct.

18   Q    So you don't expect the government's going to declare you

19   violated this agreement at all, do you?

20   A    I don't know.

21   Q    When was that arrest for the marijuana?

22   A    In '06.

23   Q    When in '06?

24   A    June, July.

25   Q    June, July, '06?

1    A    Yes.

2    Q    Tell us the quantity again.

3    A    60, they say 60 pounds.  Came out to be 54 pounds and

4    something.

5    Q    54 pounds of marijuana?

6    A    Correct.

7    Q    Now, let's look at Paragraph 12 of this agreement, Page 6.

8    See where it says if this office determines that the defendant's

9    provided substantial assistance, then they're going to make a

10   motion under Section 5K1.1 of the sentencing guidelines?  See

11   that?

12   A    Correct.

13   Q    Mr. Graham explained all that to you, right, sir?

14   A    Yes.

15   Q    And it said that they would request a downward departure of

16   up to four levels.  Do you see that?

17   A    Yes.

18   Q    Now, you understand some things about how the sentencing

19   guidelines work in federal court, right, sir?

20   A    Some things.

21   Q    Do you understand a four level downward departure to be very

22   substantial?

23   A    Depending on how much time you're facing.

24   Q    Let me finally direct your attention, if I could, to April

25   27th, 2004.  Your Honor, if I may, I'll mark this as Defendant

1    Gardner's Exhibit Number Nine.  I cannot remember whether this

2    has been referred to before during his testimony.  But I'll show

3    it to the government.

4              MR. HANLON:  Your Honor, may I confer with Mr. Coburn

5    just briefly?

6              THE COURT:  Certainly.

7              (Pause in Proceedings.)

8    BY MR. COBURN:

9    Q    Showing you what's just been marked as Defendant Gardner's

10   Exhibit Number Eight.  Do you recognize that?

11   A    Yes.

12   Q    Whose handwriting is that?

13   A    It's my handwriting.

14   Q    And is this a letter that you wrote to Mr. Harding?

15   A    Yes.

16   Q    Is it your understanding that this letter was forwarded by

17   your lawyer, Mr. Graham, to Mr. Harding?

18   A    Of course.

19   Q    Pardon?

20   A    Yes.

21   Q    It was?

22   A    Yes.

23   Q    You intended for Mr. Graham to send it on to Mr. Harding,

24   right?

25   A    I wanted him to read it first.

1   Q   And then send it to Mr. Harding, right?

2   A   If he approved of it, yes.

3   Q   Okay.  Now, the date of this letter is April 26, 2004,

4   right, Mr. Reynolds?

5   A   Correct.

6   Q   So that would be after your proffer agreement?

7   A   Correct.

8   Q   Right?  But it would be before the May 24th, 2004

9   cooperation agreement got finalized, right?

10  A   You said before?

11  Q   I'll show it to you so you can look at it.  I just want to

12  show you the one that actually got marked.  This is your

13  cooperation agreement with the government.  Right, sir?

14  A   Yes.

15  Q   You looked at it just a minute ago, right?

16  A   Yes.

17  Q   That is your signature at the bottom, right?

18  A   Yes.

19  Q   As you've already told us?

20  A   Correct.

21  Q   Dated June 2nd, 2004, right?

22  A   Correct.

23  Q   And the cooperation agreement itself is dated May 24th,

24  2004, right?

25  A   Correct.

Case 1:04-cr-00029-RDB    Document 690    Filed 06/12/09    Page 62 of 207

1    Q    How many proffer sessions had you had with the government

2    from the time you first started proffering until you finally

3    signed the cooperation agreement with your lawyer and the

4    government?

5    A    You already asked me that.  I said about two or three.

6    Q    Actually, I asked you about a different time period.  But

7    okay, about two or three.  Now, this is April 26th, 2004, right?

8    A    Yes.

9    Q    So it's before you even signed your cooperation agreement

10   with the government, right, sir?

11   A    Correct.

12   Q    And you say in this letter to Mr. Harding, Page Two, at the

13   very top, at our last meeting we spoke about many things, right?

14   A    Correct.

15   Q    And one of the things I spoke about, me being able to go

16   home until the trial comes up or until it's time for me to get

17   sentenced, right?

18   A    Correct.

19   Q    And I think, as you say in the letter and as I believe you

20   told Mr. Crowe, you told them that you wanted to get, to be with

21   your family, right, sir?

22   A    Correct.

23   Q    So it was, and you've already told the jury that you have

24   not yet been sentenced, right, sir?

25   A    Right.

CROSS EXAMINATION OF IBN-REYNOLDS BY COBURN                    63

1    Q    So between the time you wrote -- you wrote this letter to

2    Mr. Harding, right?

3    A    Yes.

4    Q    And then at some point shortly thereafter you got released,

5    right?

6    A    Months.  Months later.

7    Q    A month later you got released, right?

8    A    Months.

9    Q    Months later?

10   A    Yes.

11   Q    Okay.  You signed the plea agreement, rather, yeah, the plea

12   and cooperation agreement in May of 2000 -- actually, your

13   signature's dated June 2nd, 2004, right?

14   A    Right.

15   Q    How soon after that did you get released?

16   A    I don't think I got released until that next year.

17   Q    Until '05?

18   A    Yes.

19   Q    And then in '06 you were in possession of 54 pounds of

20   marijuana, correct?

21   A    Correct.

22   Q    Court's indulgence, Your Honor.

23        THE COURT:  Yes.

24        (Pause in Proceedings.)

25        MR. COBURN:  Thank you so much, Your Honor.  Nothing

1   further.

2        THE COURT:  Mr. Coburn, you'll be sure to hand the

3   exhibits you mark to the clerk.

4        MR. COBURN:  Absolutely, Your Honor.

5        THE COURT:  All right.

6        REDIRECT EXAMINATION

7   BY MR. HANLON:

8   Q    Mr. Reynolds, good morning again.

9   A    Good morning.

10  Q    You were asked a number of questions by Mr. Coburn about

11  conversations you and I had in preparation for your testimony

12  today.  And he asked you what, if any, conversation you and I had

13  about how your group worked with NA and Card and all that stuff.

14  Do you remember those questions?

15  A    Yes.

16  Q    You and I did talk about all of that stuff in preparation

17  for your trial testimony today, is that right?

18  A    Correct.

19  Q    It wasn't my intention to throw you on the stand and just

20  ask you a bunch of questions and sit here and just find out what

21  you said for the first time when you testify to it, is that

22  right?

23  A    Yes.

24  Q    And I told you, I asked you these questions and you gave me

25  answers, and that's what you testified to here in court, is that

1    right?

2    A    Correct.

3    Q    Did I ever tell you, Mr. Reynolds, that it would be helpful

4    to my case if you put your evidence a certain way or if you said

5    this rather than that or anything like that?

6    A    No.

7    Q    I told you you probably would be cross examined about a

8    bunch of these same points, isn't that correct?

9    A    Correct.

10   Q    And what did I tell you to do on cross examination?

11   A    Tell the truth.

12   Q    Did I tell you that if you had something helpful to the

13   defense, that you should make sure that comes out if you're asked

14   about it on cross or on direct or whenever?

15   A    Yes.

16   Q    Did I tell you to hold anything back, whether it helped me

17   or the defense attorneys?

18   A    No.

19   Q    You were asked, shown a couple of references to your grand

20   jury transcripts.  Let me show you Page 16 of your grand jury

21   transcript.  This is your July 21st, 2004 testimony.  I want to

22   make sure I get this right.  If you can just give me a quick

23   moment.

24         Page 12 of your testimony.  This is a section that you

25   were asked about by Mr. Coburn.  Actually, he started asking

1    about Page 11, I think.  You were asked some questions here about

2    whether or not they, meaning Goo and Wayne, were involved in

3    business with you to some extent.  You said they were, is that

4    correct?

5    A    Yes.

6    Q    I want to ask you about this.  You mentioned here in your

7    grand jury, both Wayne and his older brother worked for you

8    selling drugs then, is that right?  And you said, correct.  And

9    they you also talked about Shawn Gardner and you indicated that

10   he worked for you as well.

11          And then you were asked this question.  When you say

12   they worked for you, do you mean that you used to supply them

13   with drugs and that they would go sell it somewhere on their own

14   and then pay you back later?  And you gave this answer.  It was

15   more like I had an area and it was already established and they

16   just ran the area for me.

17          Can you tell me what you mean by having an area and

18   running it for you and how that relates to the cutting of heroin

19   and the things you testified about in your direct?

20   A    Having an area means, meaning that we had that area, it was

21   established, and basically anyone can come in and run it if it

22   was already set up and directed for it to be ran.  Cutting the

23   heroin, that, that goes inside with having that area.

24   Q    In terms of Wayne that you are asked about here, when you

25   talked about him selling and running an area, does that mean that

1    he's on the street, slinging heroin to cars, or did he have a

2    different role in terms of running your area?

3    A    No.  He wasn't, he wasn't on the street.

4    Q    What was he doing?

5    A    He just cut the heroin.

6    Q    Cutting the heroin means running the shop and making sure

7    the supply --

8    A    That's part of running, that's part of running the shop.

9    Q    Now, you were also asked some questions about Mr. Gardner.

10   You talked about, here in your grand jury testimony, he worked

11   for you, I think in response to Mr. Harding's questions.

12           He's asked, you were asked, did Gardner work for you

13   also?  And you agreed yes, is that correct?

14   A    Yes.

15   Q    What do you mean, again sitting here today, what do you mean

16   that Gardner worked for you?  Does that mean you personally or

17   was he -- what do you mean by that?

18   A    Not personally.  You can say if Card had workers or if Card

19   had people working for him and NA had people working for him,

20   they was initially my workers, too.

21   Q    Did you sometimes -- I'm sorry, Mr. Reynolds.  I cut you off

22   there.

23   A    Because we was together.

24   Q    And let me ask you about that togetherness.  Did Card ever

25   tell you how to run your shop?

1    A    He advised me sometimes.  We advised each other.

2    Q    Did you have to take one another's advice?

3    A    No.

4    Q    Did you ever tell NA, this is how you need to run things,

5    and he was going to follow your orders?

6    A    I could suggest certain things to him.

7    Q    And he could take your suggestions or not?

8    A    Right.

9    Q    Were you free to do what you wanted to do, provided you

10   didn't interfere with the other guys?

11   A    Yeah.

12   Q    How about the other guys?  I mean, you might give them

13   advice.  Were they, did they have the discretion to do what they

14   wanted to do within their own shop?

15   A    Yeah, they could, if it didn't affect everyone else.

16   Q    And as long as it didn't affect anyone else or get in

17   anyone's way, you would you keep your own profits from your

18   personal shop, is that right?

19   A    Of course.

20   Q    And NA kept his own profits?

21   A    Of course.

22   Q    And Card kept his own profits?

23   A    Yes.

24   Q    So you were a unit but you ran your own groups separately

25   and independently, is that right?

1    A    Right.

2    Q    In terms of being a unit, that included advice?

3    A    Right.

4    Q    That included protecting one another when the time came?

5    A    Right.

6    Q    And it included being there for one another?

7    A    Yes.

8    Q    Let me ask you about the buying of the heroin.  I was a

9    little bit confused by something that came across.

10          Card was the one who had the connection with the

11   ultimate supplier, is that right?

12   A    Correct.

13   Q    In terms of actually getting the heroin and all that stuff,

14   I want to make sure that this is, that I'm understanding this

15   correctly.  How would you actually go about getting your supply?

16   Would you call Card and would he set it up for you?  Would Card

17   send you to somebody?  How would that work?

18   A    It would just be in one spot.  And it was

19   first-come-first-serve from the three, the three of us.  So if it

20   was two kilos of heroin, whoever got their first and use what

21   they could use, that's who it belonged to.

22   Q    So Card would get it and he would have it available?

23   A    Right.

24   Q    And you didn't know where it was coming from or anything

25   like that?

1    A    No.

2    Q    Did you ever pool money together with Card and NA and have

3    Card go get something and --

4    A    No.

5    Q    -- use your money?  You would just buy for it as it became

6    available?

7    A    Right.

8    Q    You were asked some questions, again, in reference to your

9    grand jury appearance.  You testified in the grand jury about

10   being cell buddies with Goo in 2004.  Is that right?

11   A    Correct.

12   Q    And you were asked some reference here.  You were asked in

13   grand jury -- first of all, I want to make sure I'm understanding

14   something.  This question here, Mr. Reynolds.  You were asked in

15   grand jury, Did you speak to Goo after Wayne got locked up in

16   2002?  I'm reading that, the 2002 is a reference to when Wayne

17   got locked up, is that right?

18   A    Yes.

19            MR. COBURN:  Objection, leading.

20            THE COURT:  Overruled.

21   Q    Just so we're clear, when did your conversations take place

22   with Goo, when you were cell buddies, if you remember the year?

23   A    '04.

24   Q    You were asked a number of dates and you were asked to put

25   timeframes on things during your cross examination.  Are you sure

REDIRECT EXAMINATION OF IBN-REYNOLDS                71

1    or certain about any of those specific dates, aside from a

2    general recollection of the year, Mr. Reynolds?

3    A    No.

4    Q    Now, in this series of questions, you're asked something

5    about having some conversations with Goo and at some point Goo

6    tells you, or you're asked, did he, meaning Goo, talk to you

7    about Wayne needing money for something?  And you indicated that

8    Goo told you Wayne needed money for a lawyer, is that right?

9    A    Correct.

10   Q    And then you were asked a couple of questions on the very

11   next page about the murder and about what Goo told you.  And then

12   you go on to talk about how there was $50,000 in a house and so

13   forth, and you sort of relayed everything that Goo told you, is

14   that correct?

15   A    Yes.

16   Q    Did anybody ask you specifically whether or not the need, in

17   this grand jury appearance, whether the need for the money was

18   the motivation or the specific reason that this crime took place

19   that you testified about in the very next series of questions?

20   A    No.

21   Q    You and I have met a couple of times in preparation for your

22   testimony, is that right?

23   A    Right.

24   Q    Have I asked you, Mr. Reynolds, is there, was there any

25   relationship between Wayne needing money and this crime involving

1    the $50,000?  I've asked you that question, is that fair to say?

2    A    Yes.

3    Q    And what have you told me?

4    A    A lawyer.

5    Q    Did I tell you that you needed to say that because it would

6    be helpful to my case or that it would be nice if you put it that

7    way?

8    A    No.

9    Q    In fact, did I suggest anything to you about how you should

10   articulate the relationship between Wayne's need for a lawyer and

11   the murder involving $50,000?

12   A    No.

13   Q    You were asked some questions about getting released

14   following your handgun charge, following the 2004 letter and all

15   that stuff.  I would like to ask you a few questions about that,

16   Mr. Reynolds.  Mr. Harding has been the prosecutor on your case,

17   is that right?

18   A    Yes.

19   Q    Back in 2004 when you first asked to be released and you

20   wrote that letter to him, isn't it correct that Mr. Harding

21   opposed --

22   A    Yes.

23   Q    -- your release?  Was there a court hearing in which Mr.

24   Harding argued that, because of the crime you were facing, that

25   you should remain locked up?

1    A    Yes.

2    Q    And a federal judge, not Judge Davis, but another federal

3    judge decided after hearing argument from your attorney, Mr.

4    Graham, that you should be released pending completion of your

5    case, is that right?

6    A    Right.

7    Q    Was it part of the Judge's reasoning, according to what he

8    said in court, was it part of the Judge's reasoning that you

9    should be released?

10            MR. CROWE:  Objection.

11            THE COURT:  Well, rephrase the question, Mr. Hanlon.

12    Q    Was it your understanding, Mr. Reynolds, that part of the

13    reason that you were released was because your case was

14    continuing --

15            MR. CROWE:  Objection.

16    Q    -- for a long time, because you were expected to testify?

17            THE COURT:  Rephrase the question.  Ask him what the

18    judge said.

19            MR. HANLON:  I'm sorry, Your Honor?

20            THE COURT:  I said ask him what he understood the judge

21    to say.  Not reasoning.

22    BY MR. HANLON:

23    Q    Did you understand the Judge's, did you understand the judge

24    to believe that you should be released?

25            MR. CROWE:  Objection.

1          THE COURT:  Well, the judge released you.

2          THE WITNESS:  Yes.

3          THE COURT:  Correct?

4          THE WITNESS:  Correct.

5          THE COURT:  Did he tell you why he was releasing you?

6          THE WITNESS:  Yes.

7          THE COURT:  Tell the jury why he released you.

8          THE WITNESS:  He said that this case right here would

9   probably take too long.  I think it was supposed to go to trial

10  in '07.  So he said it was no reason to keep me incarcerated for

11  that long.

12  BY MR. HANLON:

13  Q    And when you got in trouble again on a new drug charge, Mr.

14  Reynolds, did my office, Mr. Harding or anybody else, do anything

15  to give you any breaks on that?

16  A    No.

17  Q    You ended up getting convicted in state court and serving a

18  sentence and getting sentenced for that charge, is that right?

19  A    Yes.

20  Q    And Mr. Harding took the position with the Court again that

21  you should be re-detained, that you should go back in jail

22  because of that --

23  A    Right.

24  Q    -- is that right?  Has my office done any favors for you in

25  terms of that recent arrest or helping you get out of jail or

1    anything like that?

2    A    No.

3    Q    Nothing further, Your Honor.

4             MR. COBURN:  May I have a couple, Your Honor?

5             THE COURT:  Just a couple.

6             MR. LAWLOR:  Can I?

7             THE COURT:  Mr. Lawlor first.

8             MR. COBURN:  Absolutely.

9             RECROSS EXAMINATION

10   BY MR. LAWLOR:

11   Q    Sir, did you say that it was Card who had the connect?

12   A    Yes.

13   Q    And that was for the heroin that you all were selling?

14   A    Yes.

15   Q    And that's a valuable thing to have, right?

16   A    Yes.

17   Q    And you were out of business without the connect, right?

18   A    Of course.

19   Q    Okay.  Now, Mr. Hanlon just asked you about, that they

20   haven't done you any favors.  But you expect that day to come

21   when they'll do you a favor, right?

22   A    Repeat that.

23   Q    Mr. Hanlon just said that they haven't done you any favors

24   in relation to your arrest on this marijuana case.  But you

25   expect the day to come when they're going to do you some favors,

1    right?

2    A    No.

3    Q    You don't expect them to petition the Court for a more

4    lenient sentence for you some day?

5    A    I mean, it's up to the judge.

6    Q    Okay.  But they're going to ask the judge, right?  You fully

7    expect these attorneys, Mr. Harding, to ask a judge to be lenient

8    with you, correct?

9    A    I violated my plea agreement.

10   Q    All right.  But the plea agreement's still in effect as of

11   today?

12   A    I violated it.

13   Q    All right.  But they haven't told the Court that they're

14   going to back out of the agreement, right?

15   A    I don't know what they told the court.

16   Q    Okay.  No further questions.

17        THE COURT:  Mr. Coburn.

18        RECROSS EXAMINATION

19   BY MR. COBURN:

20   Q    Thank you, Your Honor.  Now, back when you were being asked

21   questions on direct examination yesterday by Mr. Hanlon at the

22   very beginning of your testimony --

23   A    Yes.

24   Q    -- you specifically stated that you expect that you are

25   going to get a more lenient sentence in your federal case because

1    of your cooperation, right, sir?

2    A    I can't remember.

3    Q    You can't remember saying that?

4    A    No.

5    Q    This was yesterday, right, sir?

6    A    Yeah, you said it was yesterday.

7    Q    Okay.  Did I understand you to testify that after you

8    violated your plea agreement with the government, the one that we

9    looked at, the one that was dated May 24th, 2004, by possessing

10   that 54 pounds of heroin, that Mr. Harding -- I'm sorry,

11   marijuana, my fault -- that Mr. Harding asked the court at that

12   time to have you locked up again?

13   A    Yes.

14   Q    When was that?

15   A    Right after I got locked up, I went in front of the judge.

16   Q    In front of the federal judge?

17   A    Yes.

18   Q    And it's your testimony that Mr. Harding made a request at

19   that time of the federal judge, not Judge Davis, that you be

20   locked up again?  That's your testimony?

21   A    Yes.

22   Q    Right, sir?

23   A    Yes.

24   Q    And that despite the fact that you were cooperating with the

25   government and despite the fact that the government was

1    requesting that you be locked up, and despite the fact that you

2    were in violation of your conditions of release in your pending

3    case, despite the fact that you had the previous record that

4    you've testified about, it's your testimony that the judge

5    refused to lock you up, despite the fact that you were in

6    possession of that 54 pounds of marijuana?

7    A    Yes.  Because other people came and testified at the

8    hearing.

9    Q    Okay.  Was Mr. Graham representing you then?

10   A    Yes.

11   Q    And when was that hearing?

12   A    After I got locked up.

13   Q    Can you give us an approximate date, anything like that?

14   A    I can't remember the exact date.

15   Q    Did you tell the jury at any point during your direct

16   testimony that you had, that you were in violation of your plea

17   agreement because you'd been rearrested?

18   A    I wasn't asked.

19   Q    You weren't asked?

20   A    No.

21   Q    So you didn't?

22   A    No.

23   Q    Finally, I believe I heard you say, in response to some

24   questions on redirect examination by Mr. Hanlon, that Card would

25   buy a quantity of heroin, right?

1    A    Yes.

2    Q    And that heroin then would be put in a place, like a stash,

3    right?

4    A    Yes.

5    Q    Now, heroin, largely because it is illegal, is very

6    valuable, right?

7    A    Yes.

8    Q    It costs a lot of money, right?

9    A    Yes.

10   Q    And about how much would Card buy on each occasion?

11   A    I don't know.  Different, different quantities of it.

12   Q    Like what would they vary between?

13   A    Two, three kilos.

14   Q    Two, three keys, kilos?

15   A    Yes.

16   Q    How much does a kilo of heroin cost back then?

17   A    Different, different prices.

18   Q    Well, what would the range be?

19   A    I couldn't tell you.  I didn't buy.

20   Q    You have no idea?  Is that your testimony?

21   A    I didn't buy.

22   Q    Is that your testimony?

23   A    Yes.

24   Q    You don't know, you have no idea how much a kilo of heroin

25   cost back in that time period?

1    A    Yes.

2    Q    Would you describe it as costing a lot of money?

3    A    It should.

4    Q    Okay.  And it's your testimony, as you've already told the

5    ladies and gentlemen of the jury a couple of times, that you and

6    NA and Card would sell by yourselves and keep the profits, right?

7    A    Yes.

8    Q    And it was your testimony, then, that after Card would buy

9    this quantity of heroin, one or two keys, did you say?

10   A    Right.

11   Q    That it would be first-come-first-serve?

12   A    Yes.

13   Q    So then you could just go over to the stash and take the

14   whole kilo and sell it yourself if you wanted?  Because I mean,

15   it's first-come-first-serve, right?

16   A    You couldn't sell a kilo in one day, though.

17   Q    Well, you could take it and sell it over a time period,

18   right?

19   A    It would stay in that house, though.  So whoever gets there

20   first and use whatever they use, they use it.  You can't just go

21   take three kilos out at one time.

22   Q    But you could, it was just, so you sort of left it to each

23   other's discretion how much you would take on any given occasion,

24   is that your testimony?

25   A    Yes.

1    Q      Thank you.  Nothing further, Your Honor.

2                THE COURT:  Thank you, Mr. Reynolds.  You are excused,

3    sir.  Next witness.

4                MR. HANLON:  Your Honor, the United States calls

5    Special Agent Alan Boroshok.

6         SPECIAL AGENT ALAN BOROSHOK, GOVERNMENT'S WITNESS, SWORN

7                THE WITNESS:  Yes.

8                THE CLERK:  Thank you.  Please have a seat.  Please

9    state your full name for the record, spell your first and last

10   name.

11               THE WITNESS:  Good morning.  My name is Alan, A-L-A-N.

12   Last name is Boroshok, B-O-R-O-S-H-O-K.

13               DIRECT EXAMINATION

14   BY MR. HANLON:

15   Q      Good afternoon or -- good afternoon, Special Agent.

16   A      Good afternoon.

17   Q      What do you do for a living?

18   A      I'm a Special Agent for the Bureau of Alcohol, Tobacco,

19   Firearms and Explosives.

20   Q      You investigate federal and state firearms offenses as an

21   ATF agent, is that right, sir?

22   A      Yes, sir.

23   Q      How long have you been an ATF agent?

24   A      For more than ten years.

25   Q      Could you tell us a little bit, Special Agent Boroshok,

1    about your training and experience as a special agent?

2    A    I've been a special agent with the federal government since

3    1991.  I started out with the U.S. Department of State.  I was in

4    their Internal Affairs Unit.  Came to ATF in 1998.  I completed

5    the ATF Academy.  And I received specialized training since then

6    in what we call firearms interstate nexus.  Basically, that's all

7    about the firearms and how they move in commerce.

8            I've received specialized training in terms of firearms

9    markings, firearms nomenclature.  I have attended sessions on

10   where firearms are produced.  I have attended training where I've

11   actually gone to firearms manufacturing facilities in the New

12   England area.  And I've been involved in multiple investigations

13   with federal, state and local authorities.

14           MR. HANLON:  Your Honor, may I confer with Mr. Kurland

15   quickly?

16           THE COURT:  Yes.

17   BY MR. HANLON:

18   Q    Sorry, Your Honor.  Special Agent Boroshok, have you had any

19   particular training or experience in researching the background

20   of firearms?

21   A    Yes, I have.

22   Q    What training is that?

23   A    The training I received is basically understanding firearm

24   markings and nomenclature and using various resources, whether it

25   be a commercial, commercially available publication or ATF

1    in-house manuscripts, documents, and other materials that we

2    keep.

3    Q    Part of the research and the training you have is to be able

4    to determine by a examining firearm and understanding its make,

5    model, and serial number to understand where the firearm was

6    manufactured and whether it would have crossed interstate lines

7    prior to being recovered in a particular area, is that right?

8    A    Yes, sir.

9    Q    Is there a publication called the Blue Book of Guns that's

10   sometimes used for that purpose?

11   A    Yes, sir.

12   Q    You use that publication and other publications in your

13   work, is that right?

14   A    That is correct.

15   Q    Have you been called upon, Special Agent Boroshok, to

16   testify as an expert witness on the question of interstate nexus,

17   that is the interstate transportation and movement of firearms in

18   other cases?

19   A    Yes, I have.

20   Q    Approximately how many times?

21   A    More than ten.

22   Q    Your Honor, the government would tender Special Agent Alan

23   Boroshok as an expert witness in the area of interstate nexus and

24   interstate transportation and movement of firearms.

25            MR. KURLAND:  Your Honor, may I just have a brief voir

1    dire?

2              THE COURT:  Yes.

3              CROSS EXAMINATION (On Voir Dire)

4    BY MR. KURLAND:

5    Q    Good afternoon.  Just a couple quick questions.  With

6    respect to the approximately ten times you've testified --

7    A    Yes, sir.

8    Q    -- on interstate nexus, have those all been in Federal

9    Court?

10   A    Yes.

11   Q    And -- I'm sorry.

12   A    I was going to say.  With one exception, in federal court in

13   New York City.  Eastern District of New York.

14   Q    And that's because you wouldn't testify in state court on

15   this matter because it's not a, it's not relevant to state

16   prosecutions?

17   A    No.  I'm not sure I follow your question.

18   Q    You testify in federal court because the interstate nexus is

19   relevant in federal prosecutions, correct?

20   A    Yes, sir.

21   Q    And not important in state prosecutions?

22   A    It doesn't play into state law, that's correct.

23   Q    Excuse me?

24   A    It does not factor into state law as one of the criteria.

25   Q    I have no further questions.  Thank you.

1          THE COURT:  The witness will be accepted as an expert

2     as tendered.

3          CONTINUED DIRECT EXAMINATION

4     BY MR. HANLON:

5     Q    Approach the witness, Your Honor?

6          THE COURT:  Yes.

7     Q    Special Agent Boroshok, I'm showing you an item that's been

8     marked as Government's Exhibit S-41.  Do you see it?

9     A    Yes, sir.

10    Q    That item is a .357 caliber Dan and Wesson revolver, is that

11    right?

12    A    That is correct.

13    Q    And have you checked that weapon by way of checking its

14    background?

15    A    Yes, I have.  I've examined it.

16    Q    And based on the resources you described, where would that

17    Dan and Wesson .357, where was it manufactured?

18    A    This particular firearm was manufactured in the State of

19    Massachusetts.

20    Q    And Special Agent, given that it was manufactured in

21    Massachusetts, in your opinion, would it have traveled in and

22    affected interstate commerce prior to a recovery in the State of

23    Maryland?

24         MR. CROWE:  Objection.

25    A    Yes, sir.

CONT'D DIRECT EXAMINATION OF BOROSHOK                    86

1              THE COURT:  Overruled.  You may answer.

2    Q    What's the answer, Agent?

3    A    Yes, sir, that's correct.

4    Q    Showing you what's been marked as Government's Exhibit S-42.

5    This is a Glock .40 caliber semiautomatic handgun, is that right?

6    A    Yes, sir.

7    Q    Special Agent Boroshok, are you familiar with Glock

8    handguns?

9    A    Yes, I am.

10   Q    Where are they manufactured?

11   A    Glock firearms can be manufactured in either Austria or the

12   United States.  In this particular case, this firearm was

13   actually manufactured in Austria.  It has a U.S. suffix at the

14   end of the serial number, which denotes that the firearm was

15   actually manufactured in Austria and subsequently imported to the

16   U.S. via Glock USA in Smyrna, Georgia.

17   Q    Based on that information that this weapon was manufactured

18   in the nation of Austria, in your opinion would it have affected

19   foreign commerce or interstate commerce prior to being recovered

20   within the State of Maryland?

21   A    Yes, sir.

22   Q    Special Agent Boroshok, I've just shown you what has been

23   marked as Government's Exhibit SE-1, a .45 caliber semiautomatic

24   Llama handgun, is that correct?

25   A    Yes, sir.

1    Q    Are you familiar with the manufacturer of this weapon?

2    A    Yes, I am.

3    Q    Where would it have been manufactured?

4    A    This particular Llama pistol was manufactured by a firm

5    known as Gabilonda y Cia in Spain.  It's a Spanish manufactured

6    pistol and was imported via the United States through New Jersey

7    by, I believe it's RSA, the enterprises.  They're an importer in

8    New Jersey.

9    Q    And again, based on this weapon's manufacture in the nation

10   of Spain, in your opinion would it have affected interstate or

11   foreign commerce prior to the recovery of the weapon in the State

12   of Maryland?

13   A    Yes, sir, that's correct.

14            THE COURT:  Can you spell that for the court reporter,

15   by any chance, Agent?

16   A    Certainly.  Gabilonda would be G-A-B-I-L-O-N-D-A.

17            THE COURT:  Thank you.

18   BY MR. HANLON:

19   Q    Special Agent Boroshok, finally, I've shown you an item

20   that's been marked as Government's Exhibit M as in Michael, M-21,

21   for purposes of this case.  This is a Hi-Point 9 millimeter

22   semiautomatic handgun, is that correct?

23   A    Yes, sir.

24   Q    Are you familiar with the manufacturer of weapons of this

25   type?

1    A    Yes, I am.

2    Q    Where are Hi-Point 9 millimeters such as this type

3    manufactured?

4    A    Hi-Point is a trade name for a company known as Beemiller.

5    They manufacture all of their firearms in the State of Ohio.

6    Q    And again, with the manufacture in the State of Ohio, in

7    your opinion, would this weapon, Government's Exhibit M-21, have

8    traveled in and affected interstate commerce prior to its

9    recovery within the State of Maryland?

10   A    Yes, sir.

11   Q    Apology, Special Agent Boroshok.  I said finally and I was

12   wrong.  I've shown you an item which will be marked as

13   Government's Exhibit N as in Nathan, One.  This weapon is a

14   Lorcin 9 millimeter semiautomatic pistol, is that correct?

15   A    Yes, sir.

16   Q    And are you familiar with the manufacturer of this item?

17   A    Yes, I am.

18   Q    Where are Lorcin's of this type manufactured?

19   A    All Lorcin's are manufactured in the State of California.

20   Q    Again, with a manufacture location of California, in your

21   opinion, would this weapon have traveled in and affected

22   interstate commerce prior to its recovery or any recovery in the

23   State of Maryland?

24   A    Yes, sir.

25   Q    Thank you, Special Agent Boroshok.  Nothing further, Your

1   Honor.

2               THE COURT:  Any questions on this side?

3               CROSS EXAMINATION

4   BY MR. KURLAND:

5   Q    I have a few.  Good afternoon again, Agent.  I just have a

6   few questions but I just want to make sure, because with respect

7   to some of the firearms, I just want to make sure that I have all

8   the reports that you'd made in this case.  Do you have any of

9   your reports with you today?

10  A    I have a draft copy.  I don't have the ones that were

11  submitted to you.

12  Q    Could I approach the witness very briefly, Your Honor?

13              THE COURT:  For what purpose?

14  Q    I want to show him, I have, I think, two reports that he

15  authored and not a third.  And I just want to just clarify a few

16  things that might --

17              THE COURT:  Perhaps you need to speak to Mr. Hanlon

18  rather than the agent.

19              MR. HANLON:  I would be happy to.

20              THE COURT:  Okay.

21              (Pause in proceedings.)

22              THE COURT:  Clarified, Mr. Kurland?

23              MR. KURLAND:  I still have a couple questions, though.

24              THE COURT:  All right.

25  BY MR. KURLAND:

1    Q    Agent Boroshok, I have -- well, you authored two formal

2    reports with respect to this investigation, is that correct?

3    A    Yes, sir.

4    Q    And do you have those reports with you or no?

5    A    No, I don't.

6    Q    Well, there's a few questions I would like to ask about

7    them.  And I could either put them on the DOAR or show the

8    witness the reports.

9             THE COURT:  Why do you have to show him the report?

10    I'm not clear.

11    Q    Well, then, I'll just ask the questions.

12             THE COURT:  Okay.

13    Q    With respect to the reports, the first report you submitted

14    on February 12th, 2004, or would you need the report in front of

15    you to be able to --

16             THE COURT:  I'm sorry, Mr. Kurland.  Are you really

17    concerned about the report or are you concerned about his

18    knowledge?

19             MR. KURLAND:  Your Honor, it's two or three questions.

20    It would help if he had the report in front of him to ask the

21    question.

22             THE COURT:  Maybe he don't need the report.  Why don't

23    you just ask him the question?

24    BY MR. KURLAND:

25    Q    Okay.  You did author some reports with respect to this

Case 1:04-cr-00029-RDB    Document 690    Filed 06/12/09    Page 91 of 207

1    investigation?

2    A    Yes, sir.

3    Q    And the ATF gave a name to this investigation, correct?

4    A    That's correct.

5    Q    And that name appears on the report?

6              MR. LAWLOR:  Objection, Your Honor.

7              THE COURT:  The objection's overruled.

8    Q    Do you recall?  And the name of the investigation that

9    appears on your reports, the reports written on two, on February

10   12th, 2004 and July 14th, 2004 was the Mitchell Criminal

11   Organization?

12             MR. LAWLOR:  Objection.

13             THE COURT:  You can answer.  Overruled.

14   A    Yes, that's correct.

15   Q    And you did no reports and submitted no information

16   concerning an entity called the Randallstown/Park organization,

17   is that correct?

18   A    That's correct.

19   Q    I'd have no further questions.

20             THE COURT:  Any questions, Mr. Lawlor?

21             MR. LAWLOR:  No, Your Honor.

22             THE COURT:  Any redirect?

23             MR. HANLON:  No, Your Honor.

24             THE COURT:  Thank you very much, Agent.  You're

25   excused.  Next witness.

1          MR. HARDING:  Yes, Your Honor.  The United States calls

2   Deputy Marshal Ted Stoler.

3          THE COURT:  Is it going to work this time, Mr. Harding?

4          MR. HARDING:  That's an excellent question, Your Honor.

5          THE COURT:  Well, at least you're getting a feed.

6   That's a good sign.  And you've got your support with you.

7          MR. HARDING:  Yes, I brought help this time.

8          TED STOLER, GOVERNMENT'S WITNESS, SWORN

9          THE WITNESS:  Yes, I do.

10          THE CLERK:  Thank you.  Please have a seat.  Please

11   state your full name for the record and spell your first and last

12   name.

13          THE WITNESS:  Ted Stoler.  T-E-D. S-T-O-L-E-R.

14          THE CLERK:  Thank you.

15          DIRECT EXAMINATION

16   BY MR. HARDING:

17   Q    Good afternoon, Mr. Stoler.  Can you tell us how you're

18   employed, sir?

19   A    I'm employed with the United States Marshal Service.

20   Q    And what's your position with the United States Marshal

21   Service?

22   A    Supervisory Deputy United States Marshal.

23   Q    How long have you been with the Marshal Service?

24   A    22 and a half years.

25   Q    And you say you're a Supervisory Deputy Marshal, is that

1    correct?

2    A    Yes, I am.

3    Q    What do you supervise?

4    A    I supervise the Prisoner Operation Section for the District

5    of Maryland.

6    Q    And where is your unit located?

7    A    In this courthouse.

8    Q    Is the Prisoner Operations area up on the sixth floor of

9    this courthouse?

10   A    Yes, it is.

11   Q    And does it include a lockup area where prisoners are kept?

12   A    Yes, it does.

13   Q    Okay.  Maybe you should give us an idea of what your

14   responsibilities are as supervisor of that unit.

15   A    I supervise the employees that work in the Prisoner

16   Operation Section.  I insure that they get paid.  I insure that

17   they get home safely every day.  I try to locate jail space for

18   District of Maryland and assure that the prisoner's needs are

19   met.

20   Q    Okay.  I want to call your attention back to June 13th of

21   2005, if I may, which I believe was a Monday.  Was Shelton Harris

22   brought over that day?

23   A    Yes, he was.

24   Q    Why was he brought over?

25   A    He was being transferred to a different detention facility.

1    Q     And can you tell us where he was being brought over from?

2    A     The Maryland Correctional Adjustment Center.

3    Q     Does that have another name?

4    A     Supermax.

5    Q     And where is that located?

6    A     Downtown Baltimore.

7    Q     And where was he being transferred to?

8    A     Allegheny County Detention Center in Cumberland, Maryland.

9    Q     Is it abnormal for prisoners to be transferred from Supermax

10   to Allegheny County or other outlying facilities?

11   A     It's routine.

12   Q     Why is it routine?

13   A     At that time, we had 144 bed spaces in Supermax.  And at the

14   time here in Maryland, Maryland total we have approximately 500

15   prisoners.  And for the Baltimore region, we have approximately

16   350 prisoners.  So we just have a need for additional bed space.

17   We use 18 jails routinely in the District of Maryland.

18   Q     Okay.  What is it that decides who gets switched out to the

19   outlying facilities, then?

20   A     Most time it's when they're needed -- if they're not needed

21   in court in the very near future, we transfer them to outlying

22   jails to make room here in Baltimore for prisoners that are on

23   trial or pending sentencings in the near future.

24   Q     Okay.  Is there any, also any financial motive to transfer

25   prisoners outside of Supermax?

1    A    Yes.  Supermax is also one of the most expensive jails in

2    the United States.  So outlying jails are less expensive, so it

3    saves tax dollars for the taxpayers.

4    Q    Okay.  Now, in your lockup area on the Sixth Floor of this

5    building, you say that there's space there for prisoners.  Can

6    you tell us how many cells there are up there?

7    A    We have seven holding cells that are used just during the

8    day to hold prisoners while they're here in court.

9    Q    Tell us, if you recall, what cell Mr. Shelton Harris was put

10   into when he came over that morning to be transferred to

11   Allegheny County?

12   A    He was placed in Cell Number Five.

13   Q    Were there other prisoners in that cell, also?

14   A    Yes, there were.

15   Q    Could he have been put in any of the cells on your floor?

16   A    If they were available, yes.

17   Q    Now, can you tell us what happened?  Who was it who placed

18   him in the cell, first of all?

19   A    Who placed Shelton Harris in the cell?

20   Q    Yeah.  Do you know?

21   A    That I do not know.

22   Q    Okay.  Are there surveillance cameras in the cell block

23   area?

24   A    Yes, there are.

25   Q    Is there one for each cell?

1    A    Yes, there is.

2    Q    Are there also surveillance cameras in the hallway area?

3    A    Yes.

4    Q    Are there video monitors in your office area outside the

5    cell block area where you can see what the surveillance cameras

6    are looking at?

7    A    Yes.

8    Q    Okay.  Okay.  Let me call your attention to later that same

9    morning, June 13th, 2005.  Was a prisoner named Rodney Hayes

10   brought over?

11   A    Yes, he was.

12   Q    Can you tell us who brought him over?

13   A    Agents from the Bureau of Alcohol, Tobacco and Firearms.

14   Q    And why, if you know, was he brought over?

15   A    They arrested him.

16   Q    So what's the point of bringing him over to your lockup?

17   A    All federal arrests have to appear in federal court here, if

18   they're arrested in this area.  This is the federal court.  So

19   agents always bring new arrests to the federal courthouse.

20   Q    Okay.  Can you tell us what happened to Mr. Hayes after he

21   was brought over by the ATF agents and presented to you and your

22   deputies, your, the people who work for you in the lockup area?

23   A    He was processed, which includes fingerprinting,

24   photographing, basic information obtained from him, searched.

25   And then he was placed in a holding cell.

1   Q    How long would that have taken?

2   A    Anywhere from five minutes to twenty minutes, depending upon

3   interruptions, cooperation of the prisoner, how much processing

4   actually needs to be done.

5   Q    Did the ATF agents stay during that processing?

6   A    Yes, they did.

7   Q    Can you tell us, Deputy Stoler, is it up to the agents to

8   transport the prisoner to the courtroom after he is processed by

9   you and put into, and held for however long until he has to go to

10  court?

11  A    Yes, it is.

12  Q    Okay.  Is that the universal rule?

13  A    It's the rule of this court.

14  Q    Okay.  You remember who of your, of the people you supervise

15  actually processed Mr. Hayes by searching him and taking his

16  personal information and getting him fingerprinted and

17  photographed?

18  A    Deputy Peter Rouse.

19  Q    Okay.  What happened after Deputy Peter Rouse got done

20  processing him that day?

21  A    He went and placed the new prisoner in Cell Number Five.

22  Q    Could Rouse have put him in any of the cells on your --

23  A    If they were available, yes.

24  Q    Well, were the cells available?

25  A    Some of them were.  It depends upon if we have females there

1    that day that day, juveniles, separatees.

2    Q    Okay.  But your recollection is that there were other cells

3    that were available that day?

4    A    Yes, there were.

5    Q    Whose decision was it to, was it just up to Peter Rouse to

6    decide where to put him or who?

7    A    Peter Rouse.

8    Q    You didn't order him to put him in any particular cell?

9    A    No.

10   Q    Okay.  Now, I want to try to play a videotape, which you've

11   seen before.  It's actually an exhibit marked as Government

12   Exhibit AH-1.  And it should hopefully appear on your monitor and

13   everyone's monitor.  And if it doesn't --

14             THE COURT:  Mr. Harding, just one moment, please.

15             Let me just take this opportunity, ladies and

16   gentlemen, to say a couple of things.  First, as I've instructed

17   you before, and I simply remind you now, that the fact that a

18   person is detained rather than released pending trial is not ever

19   to be considered by you as any evidence against the person with

20   respect to any of the charges placed against him.  Some people

21   are released.  Some people are not released.  The Court takes

22   into account a number of factors.  And the presumption of

23   innocence attaches to everyone who is charged with a crime.

24             The other thing is, counsel may well use the term

25   "prisoner" to describe persons who are detained awaiting trial.

1    A better word would be a "detainee", but you understand the

2    difference.  We often referred to prisoners as people who have

3    been convicted of a crime and sentenced.  But we also use the

4    term "prisoner" for anybody who may be detained or locked up at

5    any time.

6            So understand that a person who is awaiting trial

7    strictly speaking is not a prisoner, but is a detainee, a person

8    who is charged with a crime but nonetheless presumed innocent of

9    all charges.

10           You may proceed, Mr. Harding.

11   BY MR. HARDING:

12   Q    Thank you, Your Honor.  (Tape playing.)  Is that Cell Block

13   Number Five, Deputy Stoler?

14   A    That's Holding Cell Number Five.

15           THE COURT:  Move a little closer to the mike, please,

16   Deputy Stoler.

17   A    That's Holding Cell Number Five.

18   Q    What's happening right here?

19   A    Deputy Rouse is unlocking the door and placing the new

20   prisoner in the cell.

21   Q    The new prisoner being Rodney Hayes?

22   A    Yes.

23   Q    Okay.  Now what's Rouse doing now?  Can you tell?

24   A    He's entering the duress alarm.

25   Q    He's pressed an alarm?

1    A    Yes.  He activated the duress alarm.

2    Q    And did you respond to the duress alarm?

3    A    Yes, I did.

4    Q    Are those other deputy marshals there?

5    A    Yes, they are.

6    Q    Who's the prisoner they took out wearing the burgundy

7    jumpsuit?

8    A    Shelton Harris.

9    Q    Is that you on the screen now?

10    A    Yes, it is.

11    Q    In the black shirt?  Now, they seem to take Mr. Shelton

12    Harris off in the direction where that deputy just marched and

13    where you just went, also.  What was going on down the hall?

14    A    We placed him in a cell by himself.

15    Q    Okay.  Do you remember Rouse sustaining some minor injuries

16    as a result of this?

17    A    Yes, he did.

18    Q    And I've got here an exhibit marked AH-2.

19            THE COURT:  You're going to need to toggle the --

20    Q    Oh, yeah.  Have you seen this photograph before, Deputy

21    Stoler?

22    A    Yes, I have.

23    Q    And it has some writing at the bottom.  Does it show a sort

24    of swollen area on Deputy Rouse's right arm?

25    A    Yes, it does.

1   Q    And do you recall or do you know, did Rodney Hayes sustain

2   some minor injuries that day, also?

3   A    I believe he did, some minor injuries, yes.

4   Q    No further questions, Your Honor.

5              CROSS EXAMINATION

6   BY MR. MARTIN:

7   Q    Good afternoon, Deputy Stoler.

8   A    Good afternoon.

9   Q    Let me, I need to turn this on.  Trying to focus this up a

10  little bit, Deputy.  Do you see that?

11  A    Yes, I do.

12  Q    It says Criminal Investigation, USMS?

13  A    Says Rouse Criminal -- I can't see.

14  Q    I need to move it for you.  Is that better?

15  A    Investigator.

16  Q    Criminal investigator.  So that's you, then?

17  A    No.  That's Peter Rouse.

18  Q    Okay.  And then Rouse, for purposes of this particular

19  incident, is called a criminal investigator?

20  A    Official job title could be criminal investigator.  1811 job

21  series.

22  Q    Thank you.  Deputy, you were kind enough to supply me with

23  some documents that I asked for?

24  A    Yes.

25  Q    And let me ask you.  I have a document here.  It's titled,

1  Your Honor, would you prefer I just put it up?

2            THE COURT:  No objection?

3            MR. HARDING:  No objection.

4  Q    I have to focus out.  Let me see if I can.  You see this

5  document, Deputy?

6  A    Yes, I do.

7  Q    It's called an Individual Custody Detention Report?

8  A    Yes, it is.

9  Q    USM.  This is an official marshal's form?

10 A    Yes, it is.

11 Q    Okay.  And the form has some special, says special handling

12 remarks?

13 A    Yes.

14 Q    And let me see if I can get the whole thing on there.  You

15 see that?

16 A    Yes, I do.

17 Q    So on the left-hand side there it says separatees?

18 A    Yes.

19 Q    What does that mean?

20 A    People that the prisoner is supposed to be separated from.

21 Q    How do you know how to do that?  How do you know to separate

22 one prisoner from another?

23 A    We're normally informed by the U.S. Attorney's Office.

24 Q    So someone in the U.S. Attorney's Office will tell you keep

25 Prisoner A separate from Prisoner B?

1    A    Correct.

2    Q    For safety reasons, whatever?

3    A    Correct.

4    Q    And this is a normal thing, happens all the time?

5    A    Yes.

6    Q    But you don't separate somebody unless you get an order from

7    the U.S. Attorneys's Office?

8    A    It's not an order.  A request.

9    Q    A request.  So here you have a request to keep Mr. Harris

10   separate from William Montgomery, right?

11   A    Correct.

12   Q    From a person named Felton Byrd?

13   A    Correct.

14   Q    From Willie Mitchell?

15   A    Yes.

16   Q    And now this is from Rodney Hayes?

17   A    Correct.

18   Q    Darius Spence?

19   A    Correct.

20   Q    Gregory Mungo?

21   A    Correct.

22   Q    This separation, this order is dated 10/1/2008, correct?

23   A    No.

24   Q    Well, it's printed 10/1/2008?

25   A    Yes.

1    Q    Okay.  When was this particular separation requested, do you

2    know?

3    A    I do not know.

4    Q    But it would have had to precede this particular date?

5    A    Correct.

6    Q    That you printed this out?

7    A    Correct.

8    Q    Okay.  Did you print this out in response to a subpoena?

9    A    Yes.

10   Q    Okay.  And the request to separate Mr. Harris, let's say,

11   from Mr. Mitchell?

12   A    Yes.

13   Q    Would have been made by the U.S. Attorney's Office?

14   A    Most likely, yes.

15   Q    And when that request is made, you don't always honor them,

16   do you?

17   A    It depends what you mean by "honor."

18   Q    You don't always keep them separate, do you?

19   A    Not always.  Sometimes it's impossible to.

20   Q    And in fact, you know that Mr. Mitchell and Mr. Harris have

21   been actually kept together for months now, years?

22   A    Yes.

23   Q    Okay.  So even though there was this request, it's not

24   possible for you to honor it?

25   A    Correct.

1    Q    Okay.  Now, the transfer of Mr. Harris on June 13th you said

2    was done because you were moving him to Allegheny County?

3    A    Correct.

4    Q    And you were moving him to Allegheny County because it's

5    cheaper to house a prisoner in Allegheny County?

6    A    And he wasn't needed in the Baltimore area in the near

7    future.

8    Q    And how did you know that?

9    A    We look at our schedule, see if he's scheduled for any court

10   appearances.

11   Q    And what's the time frame on court appearances that would

12   cause you to move somebody?

13   A    It varies depending upon our needs for the jail space.

14   Q    Is there a normal time frame?  Is there months?  Two months?

15   Three months?

16   A    It varies.  It could be, depends how serious our bed space.

17   It could be a week or two or it could be months.  It varies upon

18   our needs.

19   Q    And would you move somebody from Baltimore to, to Allegheny

20   County if you were going to need him back in a month?

21   A    Possibly.  We have numerous times.

22   Q    And what is it that causes a particular prisoner's number to

23   get transferred to come up on any given day?

24   A    It's just a matter of random selection of prisoners.

25   Q    You're aware that up to the date of this transfer, Mr.

106

1    Harris had been held at Supermax for 18 months?

2    A    It's possible.

3    Q    Well, you would just all of a sudden decide to move him even

4    though he'd been there for 18 months?

5    A    His luck ran out.

6    Q    His luck ran out?

7    A    I guess so.

8    Q    I guess it did, didn't it?  Now, when Mr. Harris arrived in

9    your facility, there's certain paperwork that is done, correct?

10   A    Some.

11   Q    Do you do one of these individual custody and detention

12   reports?

13   A    On every prisoner that comes in our custody, yes.

14   Q    On every prisoner that comes in your custody, you do that?

15   A    Yes.

16   Q    All right.  Show you what I've had marked as Defendant

17   Harris's Exhibit Number Two.  Can you see that, Deputy?

18   A    Yes.

19   Q    Do I need to zoom in?  This is another individual Custody

20   and Detention Report Form?

21   A    Yes, it is.

22   Q    And the date on this one is 6/13 of 2005, correct?

23   A    It's hard to read because it's highlighted.

24   Q    Let me try to zoom in for you.

25   A    Yes, it is.

CROSS EXAMINATION OF STOLER BY MARTIN                    107

1    Q    Okay.  And that's the day of this incident, isn't it?

2    A    Excuse me?

3    Q    That's the day of the incident that you're here testifying

4    about?

5    A    Correct.

6    Q    All right.  And this report was filled out at 9:07 a.m.?

7    A    It was printed at that time.

8    Q    Printed at that time.  So as of 9:07 a.m. on this date,

9    then, you had an Individual Custody and Separation Report,

10   Individual Custody and Separation Report, Detention Report, and

11   there was a separation order requested to separate Mr. Harris

12   from Mr. Willie Mitchell as of that day, right?

13   A    Yes.

14   Q    Okay.  So this was in existence on that day?

15   A    Yes.

16   Q    And that report, or that separation request would have come

17   from the United States Attorney's Office?

18   A    Most likely, yes.

19   Q    And it would have preceded the incident in the jail?

20   A    Yes.  At our courthouse, not at the jail.

21   Q    At the courthouse?

22   A    Yes.

23   Q    It would have preceded the incident in the lockup, I meant.

24   I'm sorry.  Are you in charge of the lockup?

25   A    Yes, I am.

1    Q    And there are how many cells up there?

2    A    Seven.

3    Q    And do you have at present one of those cells, has it been

4    configured so that there's a camera that can broadcast from a

5    courtroom up there?

6    A    Yes.

7    Q    And you did that because there's some defendants in this

8    courthouse who have been, been proclaiming what they call a flesh

9    and blood defense, isn't that right?

10   A    That's not why the camera's there, but yes.

11   Q    And there were, actually a trial held in this courthouse

12   where the defendants --

13            MR. HARDING:  Objection.

14   Q    -- acted up so much that --

15            MR. HARDING:  Objection, Your Honor.

16            THE COURT:  The objection's overruled.  You may

17   proceed.

18   Q    Where the defendants acted up so much that they had to watch

19   that trial from the lockup, isn't that right?

20   A    It's not sure if it's ever been utilized or not.

21   Q    You don't know if it's ever been utilized?

22   A    No.

23   Q    Who would know in your office if it's ever been utilized?

24   A    I don't know if anybody actually would.  There's different

25   people up there at different times.  That camera's been up there

1    for years.

2    Q    You can't tell me whether anybody in your office would know

3    that there was actually a trial held in this courthouse where the

4    defendants, in recent months, last year, had to sit up there and

5    watch their trial from upstairs?

6    A    I'm not aware of any in the last year, no.

7    Q    What is the difference in cost between Supermax and

8    Allegheny County?

9    A    I really don't know right now.  Right now or back at that

10   date?

11   Q    Let's say back at that date.

12   A    I would estimate probably at that time, probably about $40 a

13   day.

14   Q    $40 a day.  That's an estimate?

15   A    Yes.

16   Q    And the separation order that would have resulted, the

17   separation request that would have resulted in the separation,

18   special handling code for, in Defendant's Exhibit Two, where's

19   that order?  That request?

20   A    It was superseded by a later one.

21   Q    So what happens to the old one when it gets superseded?

22   A    They're destroyed.

23   Q    They're destroyed.  And you don't keep anything

24   electronically and you don't scan them?

25   A    Nope.

CROSS EXAMINATION OF STOLER BY MARTIN                    110

1   Q    So all you'd have in your file, then, is the most recent

2   separation request?

3   A    Yes.

4   Q    Okay.  And the film, CD that we watched this morning, this

5   afternoon?

6   A    Yes.

7   Q    That is just one camera that we saw, right?  You have

8   several other cameras?

9   A    Correct.

10  Q    And you have cameras at either end of the hallway?

11  A    Correct.

12  Q    So you can see your deputies when they're out in the

13  hallway?

14  A    Correct.

15  Q    And you can also see in each individual cell?

16  A    Correct.

17  Q    And that machine that records all that puts it all on that

18  one CD, correct?

19  A    It puts it all on a master disk.

20  Q    All right.  So someone manipulating this disk can see what

21  was going on in other parts of the lockup at the time that this

22  incident took place in the cell block?

23  A    Correct.

24  Q    And did you say today that the, the various agents, let's

25  say, ATF or FBI, whoever brings someone in there, that when they

1    bring someone in for processing that they stay with the prisoner

2    by virtue of a court order until they get to the courtroom

3    itself?

4    A    No.

5    Q    They don't?

6    A    Not always.  They don't always stay in our lockup,

7    physically stay there the entire day, no.

8    Q    But they remain here until the court appearance takes place?

9    A    They remain some place.

10   Q    And who transports them to the courtroom?  Your deputies do,

11   right?

12   A    The arresting officers do.

13   Q    Okay.  So the arresting officers come back, if they leave

14   the lockup after you process them, they come back in and take

15   them downstairs?

16   A    Yes.

17   Q    Or upstairs, depending on where they're starting from, I

18   guess?

19   A    Correct.

20   Q    And if those agents were in the, in the lockup in the

21   hallways during this incident, then you would be able to see them

22   on the photos, wouldn't you?

23   A    Correct.

24   Q    Do you know if, in fact, Agent Klas was actually in the

25   hallway that day?

1    A    He responded when the alarm went off.  Agent were still in

2    the area of our office.  When they heard the alarm, they

3    responded with our deputies.

4    Q    So was he right there at the cell --

5    A    Not at the cell.  No, he was in the office area.

6    Q    You don't know if he actually came down to the cell itself?

7    A    I believe, I believe on the video I saw, the agents from ATF

8    were in the area and they did respond to help assist us in the

9    fight.

10    Q    Okay.  Thank you, Deputy.

11            MR. HARDING:  I have no further questions, Your Honor.

12            THE COURT:  Thank you, Deputy Stoler.

13            THE WITNESS:  Thank you.

14            THE COURT:  You're excused.  We'll take a 15 minute

15    recess at this time, ladies and gentlemen.  I remind you -- not

16    that you need to be reminded -- we'll not take a luncheon recess

17    today.  We'll take a 15 minute recess at this time and we'll

18    remain in session until 3:00 and you'll be excused for the day.

19            Please leave your note pads on your chairs.  Have no

20    discussion about the evidence.  Continue to keep an open mind

21    about all issues.  Jury's excused for a 15 minute recess.  And we

22    are in recess for 15 minutes.

23            (Recess.)

24            (Defendants not present in courtroom.  Jury not present

25    in courtroom.)

1          MR. MARTIN:  Before we start.  It occurs to me if we're

2     going to have Mr. Hayes identifying a voice on the tape, I want

3     to have a little out of the presence of the jury on that issue.

4     I think there's going to be two things.  He may also be

5     identifying Mr. Harris's voice or somebody's else's voice on the

6     Stop Snitching as well.  I don't know.  That's what I'm

7     surmising.

8          MR. HARDING:  Judge, we are going to use Mr. Harris, I

9     mean Mr. Hayes as a voice ID person for the Stop Snitching video

10    and for the voice mail as well, and possibly other things.

11         THE COURT:  What other things?

12         MR. HARDING:  However, I was unaware of any motion

13    having to do with suggestiveness on this issue.  So we've never

14    actually had any motion on this before, to my knowledge.

15         Mr. Crowe filed copious motions having to do with the

16    issue that came up in connection with the Wyche voice mail.

17         (Defendants enter the courtroom. )

18         MR. HARDING:  Of course, Mr. Hayes wasn't present at

19    the allegedly suggestive setting where that voice mail was played

20    on the day after the murder.

21         THE COURT:  I think I'm going to permit some, as I've

22    been calling it, voir dire of Mr. Hayes on the voice mail.  So we

23    can bring him in.  It won't take long.

24         Obviously, though, we're not going to finish with him

25    today.

1          MR. HARDING:  Okay.

2          THE COURT:  In fact, I'm not even sure from what you've

3    now said we're going to finish the direct.  Do you think we

4    might?

5          MR. HARDING:  No.  I think we're not going to finish

6    the direct because I do have a number of recordings.  I would

7    like to speak to him to warn him about what's going to happen

8    because he has no idea he's going to be brought in for a hearing

9    first.

10         THE COURT:  You don't have to speak to him.  He'll

11   adjust quickly enough.

12         Okay.  Agent, can you bring Mr. Hayes in, please?

13         I'm sorry.  Who's he going to identify on the voice

14   mail?

15         MR. MARTIN:  Mr. Harris, I believe.

16         MR. HARDING:  Mr. Harris and Mr. Mitchell.

17         THE COURT:  All right.  Mr. Lawlor, Ms. Rhodes, do

18   you --

19         MS. RHODES:  Yes, we would like to join Mr. Martin.

20         THE COURT:  You want Mr. Martin to go first?

21         MR. LAWLOR:  Always.

22         MS. RHODES:  That's fine.

23         THE COURT:  All right.

24         (Witness enters the courtroom.)

25         RODNEY HAYES, GOVERNMENT'S WITNESS, SWORN

1       THE WITNESS:  Yes.

2       THE CLERK:  Thank you.  Please have a seat.  Please

3  state your full name for the record.

4       THE WITNESS:  Rodney Lawrence Hayes.

5       THE CLERK:  Speak up into the microphone.

6       THE WITNESS:  Rodney Lawrence Hayes.

7       THE COURT:  All right.  Mr. Hayes, we need you to get

8  close to the microphone.  You can pull it down or maneuver it,

9  however you need to.  We're not yet ready for the jury.  There's

10  going to be some preliminary questioning of you before we bring

11  the jury in.  You may proceed, Mr. Martin.

12       CROSS EXAMINATION

13  BY MR. MARTIN:

14  Q    Thank you, Your Honor.  Mr. Hayes, good afternoon.

15  A    Good afternoon.

16  Q    Mr. Hayes, you realize that here today in this courtroom

17  you're going to be asked to identify some voices from a cell

18  phone call?

19  A    Yes.

20  Q    Okay.  You're also going to be asked to identify some

21  voices, I guess, from a Stop Snitching video?

22  A    Yes.

23  Q    So you've gone over these, this voice identification, you've

24  gone over this with Mr. Harding and some others?

25  A    Correct.

1  Q    All right.  Let's talk about the cell phone call.  When did

2  you first listen to that cell phone tape?

3  A    September the 1st, 2008.

4  Q    So September 1st, 2008.  Who was with you when you listened

5  to it?

6  A    Detective Benson and Agent Brown.

7  Q    Agent who?

8  A    And Mr. Harding.  Brown.

9  Q    And where did you do that?

10 A    At a military base in Frederick County.

11 Q    Military base in Frederick County?

12 A    Correct.

13 Q    Why there?

14 A    Because they needed the writ to bring all the way in the

15 city and they ain't have a writ.

16 Q    They didn't have a writ?

17 A    No.  The judge wouldn't issue a writ unless I be put in

18 federal custody.

19 Q    So where were you being held at the time?

20 A    Hagerstown.

21 Q    Okay.  So instead you went to a military base in Frederick

22 County?

23 A    Correct.

24 Q    And did you listen to it with cell phones, with earphones

25 on?

1    A    Yes.

2    Q    Okay.  And did they listen with earphones on at the same

3    time?

4    A    No.

5    Q    So you are the only one with earphones on?

6    A    Yeah.  They had speakers in there, too.

7    Q    Okay.  And then how many times did you listen to it?

8    A    Since September 1st, I listened to it for, over a course of

9    like 20 times.

10   Q    Let's talk about the first time.  When you listened to it

11   the first time, did they ask you if you could identify anybody on

12   the tape?

13   A    Yes.  Before they even played the tape.

14   Q    Before they even played the tape, they asked you if you

15   could identify anyone?

16   A    Correct.

17   Q    And what did you say?

18   A    Probably so.  Let me hear the tape.

19   Q    Okay.  So you didn't, you didn't know whether you could but

20   you knew, you knew Mr. Harris, for example?

21   A    Yes.

22   Q    And you knew Mr. Mitchell?

23   A    Correct.

24   Q    So is that what you based your answer on?  Because you knew

25   them, you figured if they were on the tape, you could hear them?

1   A    Correct.

2   Q    So when you listened to the tape, then, what did you do?

3   Did you identify them right away?

4   A    Yes.

5   Q    All right.  And did anybody have a transcript there?

6   A    No.

7   Q    So there was no transcript.  Did they ask you which

8   particular words on the tape you could identify?

9   A    Yes.

10  Q    And did you do that?

11  A    Yes.

12  Q    The first time?

13  A    Yes.

14  Q    Okay.  Was the tape clear to you?

15  A    Yeah.

16  Q    All right.  And so since that time you've listened to it at

17  least 20 other times?

18  A    Yeah.

19  Q    Did Detective Benson or Mr. Harding or Agent Brown suggest

20  to you at any time who would have been, you would have been

21  listening to on the tape?

22  A    No.

23  Q    All right.  So this is all you?

24  A    Yes.

25  Q    All right.  And the 19 times since then, what was your

1    purpose in listening to it since then?

2    A    To identify the voices.

3    Q    Well, I thought you identified them the first time.

4    A    I did.  To make sure my statements stay the same.

5    Q    Okay.  Did anybody write down what you were saying at the

6    time?

7    A    Yeah.

8    Q    Everybody?

9    A    Yes.

10    Q    Okay.  So somebody's making notes of what you were doing?

11    A    Yes.

12    Q    And have your identifications of the portions of the tape

13    been consistent since then?

14    A    What you say?  I can't understand what you're saying.

15    Q    Have they been consistent?

16    A    Yes.

17    Q    Did you always identify Mr. Harris as saying certain things

18    and Mr. Mitchell as saying certain things?

19    A    Correct.

20    Q    Are there any other voices on the tape that you were asked

21    to identify?

22    A    Yeah.  But I didn't, I didn't know no other voices on the

23    tapes or the CD's.

24    Q    But you heard other voices, you just couldn't identify them?

25    A    Yes.

1   Q    And at some point did they present you with a transcript and
2   ask you to identify which person was saying what?
3   A    Yeah.
4   Q    When did they do that?
5   A    Quite a few times.  I can't recall.
6   Q    Quite a few times?
7   A    Yes.
8   Q    And your testimony here today is that every time you
9   identified the same people in the same way?
10  A    Yes.
11  Q    All right.  What about the Stop Snitching video?  When did
12  you first watch that?
13  A    September 1st, 2008.
14  Q    So the same day?
15  A    Same day.
16  Q    And earphones again?
17  A    Yes.  And portable speakers.
18  Q    Okay.  And they were in the room with you?
19  A    Yes.
20  Q    And they took notes?
21  A    Yes.
22  Q    All right.  And did you identify voices on the Stop
23  Snitching video?
24  A    Yes.
25  Q    How many?

1    A    One.

2    Q    All right.  And that's Mr. Harris?

3    A    Yes.

4    Q    And did they take notes when you did that?

5    A    Yes.

6    Q    And have you, has it been marked somewhere on there that you

7    know of?

8    A    Yes.

9    Q    What do you hear Mr. Harris saying, do you remember?

10   A    Call TM a rat.

11   Q    Call TM a rat?

12   A    Yes.

13   Q    TM is your, a relative of yours in some way, right?

14   A    Yes.

15   Q    Is he a half brother?

16   A    My sister brother.

17   Q    Your sister's brother.  Okay.  Your Honor, I don't have any

18   further questions.

19           MR. LAWLOR:  Court's indulgence, please.

20           THE COURT:  All right.  Thank you, Mr. Martin.

21           MR. LAWLOR:  No questions, Your Honor.  Thank you.

22           THE COURT:  All right.  Thank you.  Mr. Harding, I

23   don't need --

24           MR. HARDING:  I can establish an independent basis,

25   even if there were suggestiveness.  But if the Court's going to

1    find there's no suggestiveness, I won't bother.

2          THE COURT:  The Court finds there's no suggestiveness

3    and that the identification testimony should be and will be

4    admitted as untainted.  We'll have the jury.  Thank you.

5          Mr. Hayes, I'm going to ask you, sir, to try to keep

6    your hand down from your face, and again, get as close as

7    possible to the microphone and speak directly to the microphone.

8    We have water if you ever want water.  The clerk will give you

9    water.

10         (Jury enters the courtroom.)

11         THE COURT:  Good afternoon, ladies and gentlemen.  The

12    government may call its next witness.

13         MR. HARDING:  Thank you, Your Honor.  The United States

14    calls Rodney Hayes.

15         THE CLERK:  Mr. Hayes, please stand, sir, and raise

16    your right hand.

17         RODNEY HAYES, GOVERNMENT'S WITNESS, SWORN

18         THE WITNESS:  Yes.

19         THE CLERK:  Thank you.  Please have a seat.  Please

20    state your full name for the record.

21         THE WITNESS:  Rodney Lawrence Hayes.

22         THE CLERK:  Thank you.

23         DIRECT EXAMINATION

24    BY MR. HARDING:

25    Q    Good morning or good afternoon, Mr. Hayes.  Can you tell us,

1    sir, how old are you?

2    A    29.

3    Q    How far did you get in school?

4    A    Eleventh grade.

5    Q    Where did you grow up?

6    A    Northwest Baltimore.

7    Q    Can you tell us what specific part of Northwest Baltimore?

8    A    Park Heights.

9    Q    Okay.  And have you been convicted of crimes, Mr. Hayes?

10   A    Yes.

11   Q    Can you tell us what crimes you've been convicted of?

12   A    CDS and handgun violations.

13   Q    Okay.  CDS is controlled dangerous substances?

14   A    Yes.

15   Q    And do you recall how many times you've been convicted of

16   CDS violations?

17   A    No.

18   Q    At least twice?

19   A    Yes.

20   Q    And you said a handgun violation.  How many times have you

21   been convicted of a handgun violation?

22   A    Twice.

23   Q    Okay.  You've testified that you've gotten a couple of CDS

24   convictions.  Did you used to deal drugs in Park Heights, Mr.

25   Hayes?

1    A    Yes.

2    Q    For a long time?

3    A    All my life.

4    Q    Whereabouts in Park Heights?

5    A    Woodland Avenue.

6    Q    Can you tell the ladies and gentlemen of the jury where

7    Woodland Avenue is?

8    A    Reisterstown Road in Northwest Baltimore, off of

9    Reisterstown, in Park Heights.

10   Q    Okay.  Does it run between Reisterstown Road and Park

11   Heights Avenue?

12   A    It run through there.

13   Q    Okay.  Let me ask you.  Did you sell weight or did you

14   actually stand out on the street and distribute drugs directly to

15   people who used them?

16   A    Hand to hand.

17   Q    Okay.  When you stood out there, did you sometimes stand

18   with somebody else?

19   A    Sometimes.

20   Q    Okay.  What kind of drug did you sell?

21   A    Crack cocaine.

22   Q    Just crack cocaine?

23   A    Yes.

24   Q    Let me ask you, Mr. Hayes.  Did you know a guy by the name

25   of Mark Herbert, or also known as TM?

1   A    Yes.

2   Q    And can you tell us what's your connection to him?

3   A    That's my sister little brother.

4   Q    Okay.  How did you used to refer to him?

5   A    As my brother.

6   Q    Okay.  But I guess he wasn't really your full brother at

7   least, is that correct?

8   A    Correct.

9   Q    Would you say he's your half brother or not your brother at

10  all?

11  A    My half brother.

12  Q    Your half brother?  Let me show you, this is Government

13  Exhibit PH-73.

14            THE COURT:  Need to toggle, Mr. Harding.

15  Q    You see there on the screen in front of you, Mr. Hayes?  You

16  can actually see this picture that I'm putting on the screen.

17  A    Yes.

18  Q    Who is that?

19  A    That's TM.

20  Q    What does TM stand for, if you know, Mr. Hayes?

21  A    Tony Montana.

22  Q    Who is Tony Montana, by the way?

23  A    Mark Herbert.

24  Q    Okay.  Was Tony Montana also a character in a movie?

25  A    Yeah.

1    Q    What movie?

2    A    <u>Scarface</u>.

3    Q    Okay.  Is that where he got his nickname from, the movie?

4    A    Correct.

5    Q    Okay.  Did he used to stand with you sometimes out there on

6    Woodland Avenue and sell drugs?

7    A    Yes.

8    Q    Do you know Shelton Harris, Mr. Hayes?

9    A    Correct.

10   Q    Do you see him in the courtroom here?

11   A    Yes.

12   Q    Could you point him out and tell us what kind of clothing

13   he's wearing?

14   A    Striped blue shirt.

15   Q    Can the record reflect that the witness has identified the

16   defendant, Shelton Harris, Your Honor?

17         THE COURT:  So noted.

18   Q    How long have you known Shelton Harris?

19   A    Since my teenage years, early teens.

20   Q    How long ago would that be?  You said you were --

21   A    Probably about.

22   Q    -- 29.

23   A    Probably about 16 years.

24   Q    Okay.  Did he grow up in the same area you did?

25   A    Correct.

1    Q    Okay.  Did he used to stand out there on Woodland Avenue,

2    also?

3    A    Yes.  Across the street.

4    Q    Was he selling drugs, also?

5    A    Yes.

6    Q    What kind of drug?

7    A    Crack cocaine.

8    Q    Does he have a nickname or nicknames?

9    A    Yes.

10   Q    What?

11   A    Little Roc.

12   Q    Okay.  Any other nicknames?

13   A    Hard Roc.

14   Q    Hard Roc.  Do you know a guy by the name of Willie Mitchell?

15   A    Yes.

16   Q    Also known as Bo?

17   A    Correct.

18   Q    Do you see him here in the courtroom today?

19   A    Yes.

20   Q    Could you point him out to us, please?

21   A    Gray polo shirt.

22   Q    Can the record reflect that the witness has identified the

23   defendant, Willie Mitchell, Your Honor?

24        THE COURT:  So noted.

25   Q    Did Mr. Mitchell supply Mr. Harris with drugs, to your

1    knowledge, Mr. Hayes?

2    A    Yes.

3    Q    How do you know that?

4    A    Because I seen him with my own eyes.

5    Q    Seen him do what?

6    A    Give him package, packaged drugs and unpackaged drugs.

7    Q    And did you ever, did you ever have occasion to see Mr.

8    Harris, for example, packaging up drugs?

9               MR. MARTIN:  Objection, Your Honor, leading.

10              THE COURT:  Overruled.  You may answer.

11   A    Yes.

12   Q    Did you ever see him do that with Mr. Mitchell?

13   A    Yes.

14   Q    How about Tony Montana or TM, your half brother?  Did Mr.

15   Mitchell supply TM?

16   A    Yes.

17   Q    And did you used to see them together with drugs?

18   A    No, I never seen them package drugs together.

19   Q    Did you ever see Mr. Mitchell hand drugs to TM?

20              MR. MARTIN:  Objection, Your Honor.  It's all leading.

21   A    Yes.

22              THE COURT:  It's overruled.

23   A    Yes.

24   Q    Okay.  Now, you've been locked up a number of times, Mr.

25   Hayes.  Did you get out of jail in 2001?

1    A    Correct.

2    Q    Do you recall about when in 2001 you got out of jail?

3    A    December the 10th.

4    Q    Okay.  Where did you go to live when you got out of jail on

5    December the 10th, 2001?

6    A    With my sister.

7    Q    And where was she living?

8    A    2913 Edgecombe Circle.

9    Q    Okay.  What's your sister's name?

10   A    Ayesha Hayes.

11   Q    Okay.  I'm going to show you a photograph that's been marked

12   PH-16.  Can you identify that house?

13   A    It's 2913 Edgecombe.

14   Q    So that's where you went to live when you got out of jail,

15   correct?

16   A    Correct.

17   Q    Now, who else was there, living there at the time with your

18   sister, if anybody?

19   A    My niece, my nephew, and Tony.

20   Q    So Tony Montana, your half brother, was living there, also?

21   A    Correct.

22   Q    Did Shelton Hayes used to hang out there, also?  I'm sorry.

23   Did Shelton Harris used to hang out there, also?

24   A    Correct.

25   Q    But he wasn't living there, is that, is that, or was he

DIRECT EXAMINATION OF HAYES

1   living there?

2   A    No.

3   Q    What about Mr. Mitchell?  Did he hang out there?

4   A    Yes.

5   Q    Okay.  This guy TM who was living there, did he have a

6   mother who lived nearby?

7   A    Yes.

8   Q    Where did she live?

9   A    Across the street, on Dupont, 2910.

10  Q    2910 Dupont.  I've got here an aerial map.  Actually, why

11  don't I do this?  You say that it was across the street, is that

12  correct?

13  A    Correct.

14  Q    Did you know a guy by the name of Shelly Wayne Martin?

15  A    Heard of him before.

16  Q    And how about Shawn Gardner, also known as Goo?

17  A    Yes.

18  Q    Did those guys come around Park Heights with Bo sometimes

19  when you were there?

20          MR. CROWE:  Objection.

21          THE COURT:  Overruled.  You may answer.

22  A    I seen them on one occasion before.

23  Q    Whereabouts?

24  A    In front of 2910 Dupont.

25  Q    Were they with Bo?

DIRECT EXAMINATION OF HAYES

131

1    A    Yes.

2    Q    2910 Dupont is your, is TM's mother's house, you say, is

3    that correct?

4    A    Correct.

5    Q    What business was Bo in at that time after you got out of

6    jail at the very end of 2001, Mr. Hayes?

7    A    Entertainment, drugs, and robbery.

8    Q    Entertainment, drugs, and robbery.  What kind of

9    entertainment?

10   A    Music business.

11   Q    Okay.  What kind of music?

12   A    Rap music.

13   Q    Did he have a business name?

14   A    Yeah.  Shake Down Entertainment.

15   Q    And did he have a group, a music group?

16   A    Sheistyville.

17   Q    And who were the other, who were the members of the group

18   that actually sang songs?

19   A    The twins, TM and Slo.

20   Q    Anybody else?

21   A    That's all to my knowledge.

22   Q    Okay.  Was Shelton Harris involved in it?

23   A    Yes.

24   Q    Okay.  So you've told us about TM already.  This is the same

25   TM who was your half brother, is that correct?

1    A    Correct.

2    Q    Do you know Slo's real name?

3    A    Marvin.

4    Q    Do you know his last name?

5    A    No.

6    Q    Did he live in Park Heights, also?

7    A    Yes.

8    Q    And you mentioned twins, is that correct?

9    A    Yes.

10   Q    And do you know their names?

11   A    Darryl and Dwayne.

12   Q    Do you know their last names?

13   A    No.

14   Q    Okay.  I'm going to get back to the rap music in a bit, in a

15   minute, Mr. Hayes, but I want to ask you, you said that he was

16   also, Bo was also in the drug business and the robbery business?

17   A    Correct.

18   Q    Was Shelton Harris in all three of those businesses with Bo?

19        MR. MARTIN:  Objection, Your Honor.

20        THE COURT:  The objection's overruled.  You may answer.

21   A    Yes.

22   Q    What, you've told us that, you've told us about the drug

23   connection between the two.  What did they do in the way of

24   robberies?  What kind of robberies?

25   A    Home invasions.

1    Q    Home invasion robberies?

2    A    Yes.

3    Q    Did they ever ask you to go along on a home invasion

4    robbery?

5    A    One time.

6            THE COURT:  Rephrase the question.  Who?

7    Q    Did Mr. Mitchell ask you to go along on a home invasion

8    robbery one time?

9    A    Yes.

10   Q    Did he tell you anything about what it was going to be or

11   who, who the victim was going to be?

12   A    No.

13   Q    Did you agree to go?

14   A    No.

15   Q    Do you know, was there any particular kind of person that

16   they would target in their home invasion robberies?

17   A    Other drug dealers.

18   Q    Other drug dealers?

19   A    Yes.

20   Q    Do you know why they would target other drug dealers, Mr.

21   Hayes?

22   A    Because they had more money than we had.

23   Q    Okay.  Do you know where Mr. Mitchell was living at that

24   time?

25   A    No, I never been to his house before.

Case 1:04-cr-00029-RDB   Document 690   Filed 06/12/09   Page 134 of 207

1   Q    Do you know what part of town he was living in?

2   A    I think Randallstown.

3   Q    Do you know where Mr. Harris was actually living at the

4   time?

5   A    Southwest Baltimore.

6   Q    Southwest Baltimore?

7   A    Yes.

8   Q    Did you ever go to his house?

9   A    Never.

10  Q    Okay.  Do you know how Mr. Mitchell and Mr. Harris met one

11  another?

12  A    Mr. Mitchell was working out Charles Hickey facility.

13  Q    And did he meet Mr. Harris there?

14  A    Yes.

15  Q    What was Mr. Harris doing there?

16  A    Serving time.

17  Q    Okay.  Do you know what their relationship was when they

18  were out there?

19          MR. MARTIN:  Objection, Your Honor.  Approach.

20          THE COURT:  Overruled.  You may answer.

21  A    Mr. Mitchell was a staff member.  Mr. Harris was his

22  enforcer.

23          MR. MARTIN:  Objection.  Foundation.

24          MR. LAWLOR:  Objection, move to strike.

25          MR. MARTIN:  Move to strike.

1      THE COURT:  The jury will disregard the witness' use of

2   the term "enforcer."

3   BY MR. HARDING:

4   Q    Do you know why it was that Mr. Mitchell stopped working at

5   the Hickey School?

6           MR. MARTIN:  Objection, foundation.

7           MR. LAWLOR:  Objection.

8           THE COURT:  Rephrase the question.

9   Q    Do you know from talking to either Mr. Mitchell or Mr.

10  Harris how Mr. Mitchell lost his job out there at the Hickey

11  School?

12  A    No.

13  Q    Do you know from talking to TM, Tony Montana, how he lost

14  his job out there?

15  A    Yes.

16  Q    What did TM tell you?

17          MR. MARTIN:  Objection.

18          MR. LAWLOR:  Objection.

19          THE COURT:  Sustained.  Sustained means don't answer

20  the question, Mr. Hayes.

21          THE WITNESS:  I know, Your Honor.

22          THE COURT:  Okay.  Just wanted to make sure.

23  BY MR. HARDING:

24  Q    Okay.  Back to the rap music business.  Did they used to rap

25  sometimes at Edgecombe Circle when you were living there and they

1    were hanging out there?  I'm talking about Mr. Mitchell and Mr.

2    Harris?

3    A    Never.

4    Q    Okay.  Do you know, did Bo actually sing in the group or

5    what was his role?

6    A    He was the producer.  He ain't never sing.

7    Q    He never sang?

8    A    Never rapped.

9    Q    He never rapped?

10   A    Or sung.

11   Q    Or sung.  Do you know, did he have anything to do with the

12   production of the songs at all?

13   A    Yes.

14   Q    What?

15   A    The funding.

16   Q    I'm sorry?

17   A    The funding, the money.

18   Q    Fund it?

19   A    Yeah.

20   Q    Was he the boss?

21   A    Yes.

22   Q    Did he, did he do anything when songs were being recorded?

23   Did he actually do anything to make noise?

24   A    Probably off the keyboard, off the beat machine or

25   something.

1    Q    You say probably?

2    A    Yes.

3    Q    You don't know for sure?

4    A    No, because I wasn't there when they made the songs.

5    Q    Okay.  Did they ever perform in clubs, to your knowledge,

6    Mr. Hayes?

7    A    Yes.

8    Q    Did they ever, did their songs ever get played on radio

9    stations?

10   A    Yes.

11   Q    What radio station?

12   A    88.9.

13   Q    Okay.  Was there some particular show that they used, radio

14   show that they used to get their songs placed on?

15   A    The Test Bin.

16   Q    The Test Bin?

17   A    Yes.

18   Q    What time does that come on?

19   A    1:30 at night.

20   Q    Okay.  Did you actually hear their songs played late at

21   night on that radio station?

22   A    Yes.

23   Q    To your knowledge, did they record some CD's, Mr. Hayes?

24   A    Correct.

25   Q    Did they market the CD's?  Did they sell them to people?

1   A    Yes.

2   Q    And where did they market them?

3   A    Throughout the city.

4   Q    Throughout the city?

5   A    Yes.

6   Q    Did you actually buy some of their CD's?

7   A    Yes.

8   Q    How many?

9   A    Two.

10  Q    Whom did you buy them from?

11  A    Bought one from Mr. Mitchell and I bought one from one of

12  the twins.

13  Q    From one of the twins?

14  A    Correct.

15  Q    How much did you have to pay Mr. Mitchell for the one you

16  bought from him?

17  A    $5.

18  Q    How about for the one you bought from one of the twins?

19  A    Same price.

20  Q    Now, you've told us that you and TM and Mr. Harris all used

21  to sell crack out on Woodland Avenue, is that correct?

22  A    Correct.

23  Q    I have here a couple of photographs that I'm going to put on

24  the screen.  The first one is PH-18.  Can you tell us what that

25  shows, Mr. Hayes?

1    A    3500 block of Woodland Avenue.

2    Q    Okay.  Did you used to stand out in that area?

3    A    No.  I stand on the other side of the street.

4         THE COURT:  A little closer to the mike, please.

5    A    I stood on the other side of the street.

6    Q    When you say that, are you talking about one of these two

7    sides of the street?

8    A    The left side.

9    Q    The left side.  You stood out on this side?

10   A    Yes.

11   Q    Of the 3500 block?

12   A    3400 block.

13   Q    3400 block.  Okay.  What's this street down here at the end

14   where you can see the traffic lights?

15   A    Reisterstown Road.

16   Q    Okay.  So we're looking west toward Reisterstown Road, is

17   that correct?

18   A    Yes.

19   Q    And here's another shot.  This is, I believe this is PH-19.

20   What does this show?

21   A    The same block, the 3500 block of Woodland.

22   Q    The 3500 block.  But you said the previous one was the 3400

23   block, didn't you?

24   A    The 35.

25   Q    They're both the 3500 block?

1   A    Correct.

2   Q    Okay.  This one looks like it's closer to Reisterstown Road,

3   is that correct?

4   A    Yes.

5   Q    Okay.  So this is just a shot a little further down the

6   street, is that correct?

7   A    Yes.

8   Q    Let me back up to the previous photo, PH-18, I believe.  You

9   stood on this side?

10  A    Yes.

11  Q    You said TM would stand on that side with you, is that

12  correct?

13  A    Correct.

14  Q    What about Mr. Harris?  Where did he stand?

15  A    Stood across the street.

16  Q    Over here?

17  A    Yeah.

18  Q    Were you guys out there at the same time sometimes?

19  A    Yes.

20  Q    Okay.  You told us about the home invasion robberies that

21  Mr. Mitchell and Mr. Harris were involved in.  Do you know, did a

22  guy named Woody ever get involved in doing heists with them?

23  A    I ain't sure.

24  Q    You ain't sure?

25  A    No.

1   Q   Did you, do you know who Woody is?

2   A   Yes.

3   Q   Who is he?

4   A   My friend brother.

5   Q   Your friend's brother?

6   A   Yes.

7   Q   Okay.  Did you ever meet him?

8   A   Yes.

9   Q   When did you meet him?

10  A   In home detention together.

11  Q   Are you talking about Woody or Woody's brother now?

12  A   Woody.

13  Q   Okay.  You were on home detention together?

14  A   Yes.

15  Q   When was that?

16  A   2000.

17  Q   Okay.  Well, to your knowledge, then, was Woody involved in

18  doing home invasion robberies with Mr. Mitchell and Mr. Harris at

19  that time?

20          MR. MARTIN:  Objection.

21  A   No.

22          THE COURT:  Overruled.

23  Q   Let me call your attention to February of 2002.  Do you

24  recall hearing about an incident at Hammerjacks night club?

25  A   Yes.

1    Q    What did you hear?

2    A    Some guys got --

3            MR. LAWLOR:  Objection, Your Honor.

4            THE COURT:  Well, it's not being offered to prove the

5    truth.  The jury's heard plenty of evidence.  But they can hear

6    what this witness heard.  Go ahead, Mr. Hayes.  What did you

7    hear?

8    A    It was a fight down there and some guys got stabbed up.

9    Come to find out, the fight was between Mr. Mitchell and another

10   guy I know.

11   Q    Who's the other guy you know?

12   A    Raeshio Rice.

13   Q    Let me show you what I believe has already been received in

14   evidence as PH-60.  Can you identify that guy?

15   A    Raeshio.

16   Q    Does he have a nickname?

17   A    Goody.

18   Q    Does he have another nickname?

19   A    Whip.

20   Q    Whip, as in --

21   A    W-I-P.

22   Q    Crack the whip?

23   A    Yes.

24   Q    Okay.  Was Mr. Mitchell with anybody else that night when he

25   was down there at Hammerjacks?

1    A    Yes.

2    Q    Who?

3    A    Donte.

4    Q    Do you know Donte?

5    A    Yes.

6    Q    Do you know his last name?

7    A    No.

8    Q    How do you know him?

9    A    Through my cousin.

10   Q    Through your cousin?

11   A    Yes.

12   Q    Who's your cousin?

13   A    Derek.

14   Q    Were Donte and Mr. Mitchell tight?

15   A    To my knowledge, yes.

16   Q    Let me show you what's been marked as Government Exhibit

17   PH-54 and already received in evidence.  Can you identify that

18   guy?

19   A    Donte.

20   Q    Now, did you see Mr. Mitchell soon after that Hammerjacks

21   incident?

22   A    Yes.

23   Q    Where was it that you saw him?

24   A    In my sister basement.

25   Q    So 2913 Edgecombe Circle, in the basement?

1   A    Yes.

2   Q    Did he, was there anything unusual about his appearance on

3   that occasion?

4   A    His face was messed up.

5   Q    Did he explain to you why?

6   A    Yeah.

7   Q    Why?

8   A    Because he was fighting down Hammerjacks.

9   Q    Okay.  What do you remember about his attitude on that

10  occasion?

11  A    He wanted to retaliate.

12  Q    Who did he want to retaliate against?

13  A    The Rices.

14  Q    The Rices?

15  A    Guys, the guys who did that to him.

16  Q    Okay.  Was anybody else present when you were talking to

17  Mitchell about that?

18  A    I think me and Tony was down there this day.

19  Q    Okay.  Did you and Tony and Mr. Mitchell and Hayes often

20  hang out in the basement at Edgecombe Circle?

21  A    I am Hayes.

22  Q    I'm sorry.  You and Mr. Mitchell and Mr. Harris and TM, did

23  you guys hang out in the basement at Edgecombe Circle?

24  A    Yes.

25  Q    What did you used to do down there?

1    A    Smoke marijuana.

2    Q    Anything else?

3    A    Package our drugs.

4    Q    You packaged -- sorry.

5    A    And played a game.  Play Station 2.

6    Q    Okay.  But you used to use that as a, as an area for

7    packaging drugs?

8    A    Yes.

9    Q    All of you, all four of you?

10    A    Yes, if --

11    Q    Okay.  Did Mr. Mitchell normally carry a gun, Mr. Hayes?

12    A    Yes.

13    Q    Always?

14    A    All the time.

15    Q    Did he have a knife often, too, Mr. Hayes, to your

16    knowledge?

17    A    Correct.

18    Q    How about Mr. Harris?  Did he always carry a gun?

19    A    Mainly a knife.

20    Q    Did he ever carry a gun?

21    A    Yes.

22    Q    And you say he always carried a knife, is that correct?

23    A    Yes.

24    Q    Did you own a gun back then, in February of 2002?

25    A    Two of them.

1    Q    What kind of guns?

2    A    .38 and a 9 millimeter.

3    Q    Okay.  Let me ask you about the .38.  Where did you get it?

4    A    From a person to get high.

5    Q    Okay.  You bought it from a drug addict?

6    A    Yeah.

7    Q    And did anybody buy it with you?

8    A    Me and Tony.

9    Q    You and Tony, meaning TM?

10   A    Correct.

11   Q    Mark Herbert?

12   A    Yes.

13   Q    Where did you used to keep it?

14   A    In the phone book or in the ceiling.

15   Q    I'm sorry.  Could you say that again?

16   A    In the phone book or in the ceiling.

17   Q    Ceiling of what?

18   A    The basement.

19   Q    At Edgecombe Circle?

20   A    Yes.

21   Q    And you say it was in a phone book?

22   A    Yeah.

23   Q    And then, so I assume what you're saying is that there were

24   loose tiles or something in the ceiling that you could put

25   something up in there, is that right?

1   A   A drop ceiling.

2   Q   A drop ceiling.  Okay.  Did there come a time after you got

3   that gun, you and Tony, when you saw Mr. Harris and Tony and

4   someone else with that gun?

5   A   Correct.

6   Q   Where were they when you saw them with your gun?

7   A   In the basement of 2913 Edgecombe.

8   Q   What were they doing?

9   A   Kept playing with the guns.

10  Q   More than one gun?

11  A   The 9 millimeter, too.

12  Q   Okay.  Tell us about the 9 millimeter.

13  A   It's a black 9 millimeter Larkin (sic).

14  Q   And did that belong to you, also?

15  A   Yes.

16  Q   Did you share that with anybody else?

17  A   TM.

18  Q   That was also the joint property of you and TM?

19  A   Correct.

20  Q   Okay.  And did you keep that one in the ceiling, also?

21  A   No.  I mainly carried it around all the time.

22  Q   You preferred to carry the 9 millimeter and you left the .38

23  in the ceiling?

24  A   Yeah.

25  Q   Did there come a day when a .38 went missing?

1    A    Yes.

2    Q    How did you discover that it was missing?

3    A    I went in the ceiling and looked for it and it was gone.

4    Q    So what did you do?

5    A    I asked Tony where the gun was at.

6              MR. MARTIN:  Objection.

7              THE COURT:  Overruled.

8    Q    What did he say?

9              MR. MARTIN:  Objection.

10             MR. LAWLOR:  Objection.

11             THE COURT:  Overruled.  You may answer.

12   A    He said Little Dwight ran off with the gun and ain't nobody

13   seen him since.

14   Q    Who's Little Dwight?

15   A    Another guy was trying to be in their rap group.

16   Q    He was trying to be in their rap group?

17   A    Yes.

18   Q    Did he have another nickname?

19   A    Little Pill.

20   Q    Little Pill?

21   A    Yes.

22   Q    Do you know his real name, by any chance?

23   A    Dwight.

24   Q    Dwight?

25   A    Yes.

1    Q    Okay.  So Little Dwight ran off with it, according to what

2    TM told you, is that correct?

3    A    Correct.

4    Q    Let me call your attention to the next day, after your gun

5    went missing.  Did there come a time in the wee morning hours

6    when you were driving home and you noticed a crime scene on the

7    streets up there near where you lived on Edgecombe Circle in Park

8    Heights?

9    A    Yes.

10   Q    Okay.  What kind, what did you notice about the crime scene?

11   A    I seen a lot of homicide detectives outside and yellow tape

12   everywhere and a car crash.

13   Q    Okay.  Now I'm going to use this aerial map, if I may.  This

14   is Government Exhibit MB-55.  You've had a chance to see this

15   before, have you not, Mr. Hayes?

16   A    Yes.

17   Q    And I've got some stickies on here which I'm going to

18   remove.  And I'm pointing to --

19        THE COURT:  Mr. Harding --

20   Q    It's not working very well, Your Honor?

21        THE COURT:  No, it's fine.  I would like to reduce the

22   glare, if at all possible.  Okay.  I guess that's reasonably,

23   reasonably good.  Perhaps only my monitor is glaring up.

24   Q    I'm going --

25        THE COURT:  No.  That will destroy the focus.

1    Q    I'm going to ask my technological assistant to come over

2    here and do whatever it is she's been trying to tell me to do

3    without me understanding.

4              It's a glossy finish.  She wasn't telling me to do

5    anything.

6              THE COURT:  Yeah.  It's a glossy finish and there's

7    only, there's only so much you can do with a glossy finish.  I

8    think it's okay.  I think the jury can see it.

9    Q    Is this the Edgecombe Circle area where you were living, Mr.

10   Hayes?

11   A    Yes.  You got to move the camera over to the left some.  You

12   got to move the picture down.  Yeah.

13   Q    Okay.  Now, I'm pointing, am I not, to where your house was

14   at 2913 Edgecombe Circle, roughly, is that right?

15   A    Correct.

16   Q    One of these row houses right here where my finger is?

17   A    Correct.

18   Q    And there's a school up here, isn't there?  Isn't this the

19   parking lot to a school here?

20   A    Yes.

21   Q    And is this, is this building part of the school or is that

22   an apartment building?

23   A    Apartment building.

24   Q    And so is the school over here?

25   A    That's the school right there.

1    Q    What's the school called?

2    A    Edgecombe Circle Elementary.

3    Q    Edgecombe Circle School?  Okay.  So you were living right in

4    here.  And this house right here where the arrow's pointing, is

5    that the Dupont Avenue location where TM's mother's house was?

6    A    That's near there.  The house on the corner, with the white

7    roof.

8    Q    This one?

9    A    The next house to your right.

10   Q    This one?

11   A    Yeah.  Your finger covering it up.

12   Q    Is the arrow now pointing at it?

13   A    Move it over to the right.

14           THE COURT:  You know, I'm sorry, Mr. Harding.  I think

15   if you turn off those lamps, at least it's worth a try.  I don't

16   think you need the lamps.  That's much better.

17   Q    Okay.  Good.  Okay.  Here's the school and the parking lot.

18   Here's where you said you were staying, the back of where you

19   were staying, right?

20   A    Yeah.

21   Q    And this house right here, is that the --

22   A    Your finger covering the house up.

23   Q    Oh, is it this house?

24   A    Right there, yeah.

25   Q    This house right there?

1  A    The last house on the corner.

2  Q    That's where I think I'm putting the arrow on.  But who

3  knows?  Anyway, it's right in there, right?

4  A    Yes.

5  Q    Okay.  Now, over here, let me ask you, moving over to the

6  right a bit, beyond the school.  And this would be moving south,

7  I believe.  Do you recognize this area right here?

8  A    It's Finney Avenue.

9  Q    Okay.  Where was the crime scene that you saw that night?

10  A    Just a little alley street.

11  Q    Okay.  Did you notice how when you pointed, the little

12  arrows appeared on the screen?

13  A    Yes.

14  Q    Okay.  So is that where you saw the yellow tape that night?

15  A    Yeah.

16  Q    Could you tell what kind of crime scene it was?

17  A    What you mean?

18  Q    What kind of crime had been committed, just by looking at

19  the people who were there?

20  A    From being in the streets, I can tell it was a shooting.

21  Q    Okay.  All right.  So where did you go after you saw this,

22  while you were driving home?

23  A    I made a right off of Edgecombe on to Finney.  I went in the

24  house.

25  Q    Your house at 2913 Edgecombe Circle?

DIRECT EXAMINATION OF HAYES                    153

1    A    Correct.

2    Q    Who did you see when you went inside?

3    A    Nobody upstairs.  But when I went in the basement, I seen

4    Mr. Harris in the basement.

5    Q    What was he doing?

6    A    He looked kind of jittery to me.

7    Q    Kind of jittery?

8    A    Yes.

9    Q    Did you attempt to have a conversation with him?

10   A    Me and him really wasn't never on good terms so I just asked

11   him where Tony was at.

12   Q    Did he tell you?

13   A    Yeah.

14   Q    Was this when you first went in the house or later on?

15   A    When I first went in there.

16   Q    Okay.  Did he tell you?

17   A    Yeah.  He told me Tony over his mother house.

18   Q    Okay.  You say he seemed jittery to you, is that correct?

19   A    Yeah.

20   Q    Did you make anything of that?

21   A    Yeah.

22   Q    What did you think?

23        MR. MARTIN:  Objection.

24        THE COURT:  Overruled.  You may answer.

25   A    That he had something to do with what was going on around

1    the corner.

2    Q    Okay.  What did you proceed to do after you had this brief

3    encounter with Mr. Hayes (sic)?

4    A    Vial my drugs up.

5    Q    Right there in the basement?

6    A    Yes.

7    Q    Did Mr. Hayes stay down there while you were doing it?

8    A    I am Mr. Hayes.

9    Q    I'm sorry.  Did Mr. Harris stay down there while you were,

10   while you were doing that?

11   A    Yes.

12   Q    Okay.  What was he doing?

13   A    Smoking marijuana.

14   Q    Anything else?

15   A    That's it.  Playing a game.

16   Q    Playing a game?

17   A    Yeah.

18   Q    What kind of game?

19   A    Grand Theft Auto 3.

20   Q    So he had like a Play Station monitor or something like

21   that?

22   A    Play Station 2.

23   Q    Play Station 2.  Okay.  So how long did it take you to vial

24   up your drugs?

25   A    Probably about like 45 minutes or an hour or so.

1    Q    And was Mr. Hayes, Mr. Harris there the whole time?

2    A    Yes.

3    Q    Did you talk to him?

4    A    No.

5    Q    Did you eventually leave?

6    A    Yes.

7    Q    You say anything when you left?

8    A    That's it.

9    Q    Why didn't you speak to him?

10   A    Because we wasn't never really on terms like that.

11   Q    Okay.  Where did you go?

12   A    Across the street.

13   Q    What for?

14   A    To see Tony.

15   Q    So you went over to the Dupont Avenue house where Tony's

16   mother lived?

17   A    Yes.

18   Q    Was Tony there?

19   A    Yes.

20   Q    Did you speak to him?

21   A    Yes.

22   Q    What did he say?

23        MR. MARTIN:  Objection.

24        THE COURT:  Overruled.  You may answer.

25   A    He tried to tell me something but I left.

1    Q    What did he try to tell you?

2              MR. MARTIN:  Objection.

3              THE COURT:  Sustained.

4    Q    Did he say something about --

5              MR. MARTIN:  Objection.

6    Q    -- them guys?

7    A    Yes.

8    Q    What did he say?

9              MR. MARTIN:  Objection.

10             THE COURT:  Overruled.  You may answer.

11   A    Them guys crazy.

12   Q    Did you know what he was talking about?

13             MR. MARTIN:  Objection.

14             THE COURT:  Sustained.

15   Q    What did you do after you had this -- let me ask you.  Did

16   you ask him what he was talking about?

17   A    No.

18   Q    Why not?

19   A    Because I ain't want to know.

20   Q    You didn't want to know?

21   A    Sure didn't.

22   Q    Okay.  What did you do then?

23   A    I left.

24   Q    Where did you go?

25   A    On Woodland Avenue.

1    Q    And what did you do?

2    A    Sell drugs.

3    Q    How long did you spend selling your drugs on Woodland

4    Avenue?

5    A    The rest of the night to like, probably like 12:00 in the

6    afternoon.

7    Q    So you were there through the middle of the next day?

8    A    Yes.

9    Q    Did you have another encounter with TM later on that day?

10   A    Yes, when I went in the house to change my clothes.

11   Q    You went home to change your clothes?

12   A    Yes.

13   Q    Meaning Edgecombe Circle?

14   A    Yes.

15   Q    And where did you go after that?

16   A    After I left Edgecombe Circle?

17   Q    Yeah.

18   A    I ain't quite sure.

19   Q    Okay.  Did you see TM again that day?

20   A    Yeah.  I'm a see him all the time because we stay in the

21   same house.

22   Q    Okay.  Did you have a conversation with him while you were

23   at Edgecombe Circle?

24   A    Yes.

25   Q    And if you could just answer yes or no without telling us

1    what was said.  Did he tell you what happened the previous night?

2    A    Yes.

3    Q    Did you know whether your missing .38 caliber gun was

4    involved in what had happened the previous night?

5    A    Yes.

6    Q    You did know?

7    A    Yes.

8    Q    How did you know?

9    A    Because Tony told me.

10          MR. LAWLOR:  Objection.  Move to strike, Your Honor.

11          THE COURT:  Well, Tony told you that your gun was

12    involved in what happened the night before?

13          THE WITNESS:  Yes.

14          THE COURT:  All right.  Are you going to develop that,

15    Mr. Harding?

16          MR. HARDING:  No, Your Honor.

17          MR. MARTIN:  Objection, move to strike.

18          MR. LAWLOR:  Objection, move to strike.

19          THE COURT:  All right.  The jury will disregard the

20    witness' testimony that the .38 caliber weapon that he's

21    previously testified about was involved in the matter that

22    occurred the night before the witness has described.  The jury is

23    to disregard that testimony.

24    BY MR. HARDING:

25    Q    Did you ever see the .38 caliber gun again?

DIRECT EXAMINATION OF HAYES                    159

1    A    Never.

2    Q    Was that a revolver, by the way, Mr. Hayes?

3    A    Yes.

4    Q    Did you ever see this guy named Dwight again?

5    A    Never.

6    Q    Okay.  You said you owned another gun besides the .38

7    caliber gun, is that correct?

8    A    Yes.

9    Q    The 9 millimeter?

10   A    Correct.

11   Q    And you owned that with Tony, also?

12   A    Correct.

13   Q    What happened to that gun?

14   A    Mr. Mitchell got locked up with the gun.

15   Q    How did Mr. Mitchell get it?

16   A    Tony gave it to him.  He told Tony he needed another gun.

17   Q    Okay.  And Tony gave it to him or loaned it to him or what?

18   A    Loaned it to him.

19   Q    And then Mr. Mitchell got locked up with it?

20   A    Yes.

21   Q    Let me show you what's been marked as Government Exhibit

22   N-1.  I'm just going to put this on screen because you've had an

23   opportunity to see this before, have you not, Mr. Hayes?

24   A    Correct.  I can't see it.

25   Q    Can you tell us what that is, Mr. Hayes?

1    A    The 9 millimeter.

2    Q    What kind of 9 millimeter?

3    A    A Larkin (sic).

4    Q    A Larkin?

5    A    Yes.

6    Q    Any particular kind of Larkin 9 millimeter?

7    A    I don't know all that.

8    Q    Okay.  Do you know, does it have a special name that results

9    from the fact that it has this sort of lever back here on the

10   back of the stock?

11   A    It's a limit squeeze.

12   Q    Lemon squeeze?

13   A    Limit.  Like limitations.  It's a limit squeeze.

14   Q    I see.  And what's that for?

15   A    So you can shoot the gun.

16   Q    Okay.  You can't shoot the gun unless you're depressing this

17   lever right here?

18   A    Correct.

19   Q    That pulls the trigger?

20   A    Correct.

21   Q    Okay.  Was that your gun, the gun that you had before Tony

22   loaned it to Mr. Mitchell?

23   A    Yeah.

24   Q    And the gun, according to your understanding, he was locked

25   up with, is that correct?

1   A    Correct.

2   Q    Did Mr. Mitchell already have a gun at the time that Tony

3   loaned him that 9 millimeter?

4   A    Yes.

5   Q    What kind of gun?

6   A    A .40 caliber.

7   Q    Why wasn't he happy with his .40 caliber?

8         MR. LAWLOR:  Objection.

9   Q    If you know.

10   A    I think because the gun, the gun was dirty.

11         MR. MARTIN:  Objection.

12         THE COURT:  The objection's sustained.  Go ahead, Mr.

13   Harding.  So the answer is you don't know, correct?

14         THE WITNESS:  I don't know.

15         THE COURT:  Okay.

16   BY MR. HARDING:

17   Q    Do you know how long after the shooting that occurred up at

18   Edgecombe Circle where your .38 went missing this was that Tony

19   loaned your 9 millimeter to Mr. Mitchell and he got arrested?

20   A    I ain't sure.  Probably, not long at all.  Probably like a

21   week.

22   Q    Okay.  So is it your testimony that both the guns that you

23   had with Tony got loaned out and went missing?

24   A    Yes.

25   Q    Were you angry about that?

1   A    Yes, I was.

2   Q    Did you later learn that Bo, Mr. Mitchell, got --

3        MR. MARTIN:  Objection to the leading, Your Honor.

4        THE COURT:  I don't think it's leading yet.  Go ahead.

5   Q    Did you later learn that Bo, Mr. Mitchell, got locked up?

6   A    Yes, I did.

7   Q    What did he get locked up for, according to what you

8   understood?

9        MR. LAWLOR:  Objection, Your Honor.

10       THE COURT:  Sustained.  Sustained.

11  Q    Did you know the Wyche brothers, Mr. Hayes?

12  A    Yes.

13  Q    What line of work were they in?

14  A    Selling drugs.

15  Q    Selling drugs?

16  A    Yes.

17  Q    Did you grow up with one of them?

18  A    Yes.

19  Q    Which one?

20  A    Tony.

21  Q    Okay.  Was he also known as Pete?

22  A    Yes.

23  Q    Where did you grow up with him?

24  A    Randallstown.

25  Q    Okay.  So you actually grew up in Randallstown, is that

1    correct?

2    A    I went to school up there.

3    Q    Oh, you went to school up there but you grew up in Park

4    Heights?

5    A    Yes.

6    Q    Okay.  After Mr. Mitchell got locked up with your gun, did

7    you undertake to tell anyone about who had killed Oliver

8    McCaffity, also known as Woody?

9    A    Yes.

10   Q    Can you tell us how that came about?

11            MR. LAWLOR:  Objection.

12            THE COURT:  Well, I'm not sure I understand, did he

13   undertake to tell.  Perhaps you can lead him just a little bit,

14   Mr. Harding.

15   Q    Who did you tell?

16   A    My home boy, Quincy.

17   Q    Okay.  Is Quincy connected to Mr. McCaffity somehow?

18   A    That's his brother.

19   Q    Okay.

20            THE COURT:  I'm sorry.  Just so we're clear.  You gave

21   some information that you believed was accurate to this person

22   named Quincy?

23            THE WITNESS:  Yes.

24            THE COURT:  Who is Mr. McCaffity's brother?

25            THE WITNESS:  Yes.

1       THE COURT:  Okay.  Go ahead, Mr. Harding.

2   BY MR. HARDING:

3   Q    Where did you have this conversation with Quincy?

4   A    At the car wash.

5   Q    What car wash?

6   A    On Woodland Avenue.

7   Q    Okay.  There's a car wash on Woodland Avenue, also?

8   A    It's not there no more.

9   Q    Oh, but there was one there in those days?

10  A    Yes.

11  Q    Did you just run into him or did you arrange a meeting with

12  him?

13  A    I arranged a meeting.

14  Q    How did you arrange a meeting?

15  A    I was at the car wash.  I seen the obituary in my friend

16  Quincy car.  It was Woody obituary.  My friend Marty, I told

17  Marty, man, go get Quincy, I got some information for him.

18  Q    So did Quincy come to the car wash?

19  A    Yes.

20  Q    And what did you tell him?

21       MR. MARTIN:  Objection.

22       THE COURT:  Sustained.

23  Q    Did you tell Quincy who you believed had killed his brother,

24  Oliver McCaffity?

25       MR. LAWLOR:  Objection.

1          THE COURT:  Overruled.  You can answer yes or no.

2    A    Yes.

3    Q    Who did you tell him?

4          MR. MARTIN:  Objection.

5          THE COURT:  Sustained.

6    Q    What was Quincy's response?

7          MR. LAWLOR:  Objection.

8          THE COURT:  In other words, are you asking for an oral

9    response or are you asking him what did Quincy do, if anything?

10         MR. HARDING:  First of all, for an oral response.

11         MR. MARTIN:  Objection.

12         THE COURT:  Did Quincy respond to what you said to him?

13         THE WITNESS:  He wanted to know who did it.

14         MR. LAWLOR:  Objection.

15         THE COURT:  Okay.  And you gave him your opinion?

16         THE WITNESS:  Correct.

17         THE COURT:  Okay.  All right.  Go ahead, Mr. Harding.

18         MR. HARDING:  And so what did Quincy do then?

19         MR. LAWLOR:  Objection.

20         THE COURT:  Did Quincy do anything?

21         THE WITNESS:  He ain't have a chance to do nothing

22   because I --

23         THE COURT:  Okay.  So the answer is he didn't do

24   anything.

25         THE WITNESS:  Right.

1          THE COURT:  Okay.  Go ahead, Mr. Harding.

2     BY MR. HARDING:

3     Q    Did you give him any information about where he could find

4     the person who had killed --

5          MR. LAWLOR:  Objection.

6     Q    -- his brother?

7          THE COURT:  Who you believed, who you believed had

8     killed his brother.  Did you give him that information?

9          THE WITNESS:  Yes.

10         THE COURT:  Okay.  And did you give him information

11    about where this person might be?

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.  Go ahead, Mr. Harding.

14         MR. HARDING:  And where did you tell him he might be?

15         MR. MARTIN:  Objection.

16         THE COURT:  The objection's sustained.

17    BY MR. HARDING:

18    Q    Okay.  Do you remember TM, Tony, Tony Montana, getting a

19    letter sometime after Bo, Mr. Mitchell, got locked up?

20    A    Yes.

21    Q    Where were you when he got the letter?

22    A    2913 --

23         THE COURT:  I'm sorry, Mr. Harding.  Please be clear.

24    Who got the letter?

25    Q    Who got the letter?  I asked you about a letter that TM or

1    Tony Montana, Mark Herbert got.

2    A    Yes.

3    Q    Okay.  And who was it from?

4    A    Mr. Mitchell.

5    Q    And were you with TM when he got the letter?

6    A    Yes.

7    Q    And did you read it with Mr., with TM?

8    A    Yes.

9    Q    Where were you when you were reading it?

10   A    In the living room of 2913 Edgecombe.

11   Q    What did the letter say?

12   A    It had a map in there giving directions to put a hit out on

13   somebody.

14           MR. LAWLOR:  Objection, Your Honor, for the reasons

15   previously stated.

16           THE COURT:  So noted.  The objection's overruled.

17   Q    Okay.  Mr. Mitchell's letter gave directions and a map on

18   putting a hit out on somebody.  On whom?

19   A    On Claudus Lassiter.

20   Q    And who is Claudus Lassiter?

21   A    Somebody I grew up with, I went to school with.

22   Q    Was he tight with anybody else you knew?

23   A    Yeah.  My cousin.

24   Q    Which cousin?

25   A    Yarnell.

1    Q    Okay.  Now, did you discuss with TM this letter?

2    A    I told TM to throw the letter in the trash.

3    Q    Why?

4    A    Because I ain't going to let no, I wouldn't let nothing like

5    that happen to one of my friends if I can stop it.

6    Q    Was the letter directing TM to do the hit on Claudus

7    Lassiter, or somebody else?

8    A    Mr. Harris.

9    Q    It was directing TM to tell Mr. Harris to do the hit?

10            MS. RHODES:  Objection, Your Honor.

11            MR. LAWLOR:  Objection, Your Honor.

12            THE COURT:  Overruled.  Overruled.

13   A    To given him the letter.

14   Q    To give the letter to TM?

15   A    Yes.

16            THE COURT:  I'm sorry.  To give the letter to TM?

17   Q    I'm sorry.  To give the letter to Mr. Harris?

18   A    Correct.

19   Q    I keep misspeaking.  Thank you, Your Honor.  Let me show you

20   a picture that's been marked PH-68 and that's already in

21   evidence.  Can you identify who is in that picture?

22   A    Claudus.

23   Q    Claudus Lassiter?

24   A    Yes.

25   Q    Well, why didn't you want TM to give the letter to Mr.

1    Harris?

2    A    Because I cared about my friend and I ain't want TM to get

3    caught up in this mess right here.

4    Q    Okay.  Did you undertake to contact Claudus Lassiter?

5    A    Yes.

6    Q    How did you get in touch with him?

7    A    Through my cousin.

8    Q    Did you talk to him over the phone or did you arrange a

9    meeting with him?

10   A    I met him in person.

11   Q    Where did you go to meet him?

12   A    At Silver Moon 2.

13   Q    What's that?

14   A    It's a restaurant.

15   Q    Where is it located?

16   A    On Baltimore and Pleasant Street.

17   Q    Okay.  Downtown here, then, right?

18   A    Yes.

19   Q    Did you tell him what was in the letter?

20   A    Yes.

21   Q    And was he, did he respond to what you told him?

22   A    Yeah.  He was scared.

23   Q    He was scared?

24   A    Yes.

25   Q    Anything else?

1    A    That's it.  Thank me for the information.

2    Q    Now, after you lost your two guns that you told us about,

3    the .38 and the 9 millimeter, did you get another gun?

4    A    Yeah.

5    Q    What kind of gun?

6    A    A .40 caliber.

7    Q    Where did you get it?

8    A    From TM.

9    Q    TM, Tony Montana?

10   A    Yes.

11   Q    Where did he get it?

12   A    From Mr., from Mr. Mitchell.

13   Q    He got it from Mr. Mitchell?

14        MR. LAWLOR:  Objection, Your Honor, move to strike.

15        THE COURT:  Overruled.  Motion denied.

16   A    Yes.

17   Q    Okay.  And why did he get it from Mr. Mitchell?

18        MR. LAWLOR:  Objection.

19        THE COURT:  Overruled.

20   A    TM was holding the gun for him in a safe place.

21   Q    He was holding the gun for you in a safe place?

22   A    For him.

23   Q    Was this at all related to the --

24        THE COURT:  I'm sorry.  I think you misspoke, Mr.

25   Harding.  I think the witness said that he was holding it for

1    him.

2    Q    Oh.  TM was holding it for somebody else?

3    A    For Mr. Mitchell.

4    Q    Oh.  This was after Mr. Mitchell was locked up?

5    A    He had the hold gun before he even got locked, he had the

6    gun even before he got locked up.

7    Q    So TM was holding a gun for Mr. Mitchell before Mr. Mitchell

8    got locked up?

9    A    Yes.

10   Q    Okay.  And you lost a 9 millimeter when Mr. Mitchell got

11   locked up?

12   A    Yes.

13   Q    Tell us, if you know, Mr. Hayes, why was Mr. Mitchell

14   borrowing your 9 millimeter and got arrested with it?

15            MR. LAWLOR:  Objection, Your Honor.

16            THE COURT:  Overruled.

17   Q    Rather than carrying his own .40 caliber that Tony had in

18   his custody?

19            MR. LAWLOR:  Foundation, Your Honor.

20            THE COURT:  Overruled.

21   A    Because his gun was dirty.

22            MR. LAWLOR:  Objection.  Move to strike.

23            THE COURT:  Motion denied.

24   Q    Did TM tell you why it was dirty?

25            MR. LAWLOR:  Objection.

1          THE COURT:  Overruled.

2    A    From putting work in with the gun.

3          MR. LAWLOR:  Objection, move to strike.

4          THE COURT:  Denied.  Overruled.

5    Q    Can you tell the ladies and gentlemen of the jury what it

6    means to put work in with a gun, Mr. Hayes?

7          MR. LAWLOR:  Objection.

8    A    To shoot somebody --

9          THE COURT:  Overruled.

10   A    -- hurt somebody.

11   Q    Okay.  Now, after this occasion when you read the letter

12   from Mr. Mitchell and you went and warned Claudus Lassiter, did

13   you have an encounter with Shelton Harris?

14   A    Yes.

15         THE COURT:  Are we going to the video?

16         MR. HARDING:  No, not yet.

17         THE COURT:  But that's the incident?  Or is this a

18   different incident?

19         MR. HARDING:  This is a different incident.

20         THE COURT:  Okay.  Go ahead.

21         MR. HARDING:  This is still back in 2002, Your Honor.

22         THE COURT:  Okay.  I would like to conclude in about

23   two or three minutes.

24         MR. HARDING:  Shall we just go through this one

25   incident, then?

DIRECT EXAMINATION OF HAYES

173

1      THE COURT:  Sure.  Yes, please.

2  BY MR. HARDING:

3  Q    Tell us about the incident where you ran into Mr. Harris.

4  A    I was getting out the car with my girlfriend at the time,

5  her and her home girl.  And it was a car parked across the street

6  from my grandmother's house.  The defendant, Mr. Harris, was in

7  the car.  He walked up to me and asked me for a gun.  I told him

8  I ain't had a gun.  So we got to arguing for like 45 seconds

9  about the gun.  He whipped a knife out on me.  He ain't know the

10  whole time I had the gun on me.  So I whipped the gun out on him.

11  My girlfriend friend got out the car and put me back in the car.

12  I left and went my way, he left and went his way.

13  Q    Okay.  So you pulled a gun on Mr. Hayes after he pulled a

14  knife on you?

15      THE COURT:  Mr. Harris.

16  Q    Sorry.  You pulled a gun on Mr. Harris after he pulled a

17  knife on you, is that right?

18  A    Correct.

19  Q    And which gun was it that you pulled on him?

20  A    .40 caliber.

21  Q    The same .40 caliber you were just telling us about that TM

22  was holding for Mr. Mitchell?

23  A    Correct.

24  Q    Did you know why Mr. Harris wanted your gun?

25      MR. MARTIN:  Objection.

1           THE COURT:  Overruled.  You may answer.

2    A    Yes.

3    Q    Why?

4           MR. MARTIN:  Objection, Your Honor, foundation.

5           THE COURT:  Overruled.  You may answer.

6    A    So he can do some harm to Mr. Lassiter.

7    Q    Okay.  That completes that incident, Your Honor.

8           THE COURT:  All right.  Members of the jury, this will

9    conclude our court day.  Please leave your note pads on your

10   chairs.  Have no discussion about any of the evidence you have

11   heard.  Do not discuss the case.  Conduct no investigation.  Do

12   not visit any scenes.  Do not look up any words.  Continue to

13   avoid any media reports about the case.  And enjoy your evening.

14          I'd like to start promptly tomorrow morning at 9:30.

15   Please be back in the jury room tomorrow morning at 9:30 a.m.

16          I should tell you that we continue to believe that the

17   government's going to conclude its presentation by the end of the

18   day on Thursday of this week.  If that should prove true, then we

19   will not need you to come in on Friday of this week.  But

20   continue to keep on your schedule until I tell you otherwise that

21   we will be in session on Friday of this week from starting at

22   about 9:30 until the latest 12:30 or 1:00 Friday afternoon.

23          But I will let you know either tomorrow, or more likely

24   Thursday, as to whether you will need to come in on Friday.

25          Thank you very much, ladies and gentlemen.  You are

1    excused until 9:30 tomorrow morning.

2              (Jury exits the courtroom.)

3              (Witness exits the courtroom.)

4              THE COURT:  All right, counsel.  I want to give you a

5    chance to make whatever record you think you need to make.  The

6    Court's rulings will, of course, speak for themselves.

7              It was quite apparent to the Court that while there

8    were some of Mr. Harding's questions that plainly called into

9    question the issue of whether the witness had personal knowledge

10   of the matters seemingly called for in the questions, there were

11   other matters that the Court was satisfied either directly or by

12   inference the witness either had personal knowledge or the

13   witness gained information from Mr. Mitchell or Mr. Harris or, in

14   the alternative, that, indeed, the description of the witness of

15   the interactions between Mr. Mitchell, Mr. Harris, Tony Montana,

16   and himself made it quite clear that certainly with respect to

17   the use, sharing, lending, and possession of the firearms, that

18   this was concerted action and that the witness should be

19   permitted to discuss the interactions around the firearms.

20             It's clear from the witness' testimony that he and Tony

21   Montana had joint ownership, dominion and control over the

22   firearms.  And to the extent that Tony Montana transferred

23   possession of a firearm or engaged in a conversation about the

24   particular firearms of Mr. Mitchell and/or Mr. Harris, that he

25   was acting on behalf of both himself and this witness.

1        And so therefore it was not hearsay, or certainly not

2   excludable hearsay, and was not excludable on the basis of lack

3   of personal knowledge for this witness to act on the basis of and

4   to offer testimony on the basis of interactions between Mr.

5   Mitchell and Tony Montana in regard to those firearms.

6        The corroboration arising from the fact that this

7   witness identified that semiautomatic handgun seized from Mr.

8   Mitchell as the handgun that was owned by himself and Tony

9   Montana jointly greatly enhanced the Court's confidence in the

10  rulings.

11       I did sustain the objection with respect to the .38

12  even though, as I recall, Mr. Harding, a .38 was used in the

13  McCaffity?

14       MR. HARDING:  Yes, Your Honor.

15       THE COURT:  Okay.  I thought that went a little too

16  far, frankly, and went over the line that I was trying to draw,

17  so I didn't permit the jury to consider that evidence.

18       So that's the basis for the Court's rulings in short.

19  But I'll give counsel an opportunity now to make whatever record

20  you think is necessary.

21       MR. LAWLOR:  Thank you, Your Honor.  Try not to belabor

22  this.  I think that contrary to what the Court just said, I think

23  there's a lack of a sufficient record that the witness was

24  speaking from first-hand knowledge about many of the things that

25  Mr. Mitchell was objecting to.  Rather, it was clear to us, the

1    record seems to suggest that many of the things he was testifying

2    to, some of which he said he heard from TM and other things he

3    was just voicing an opinion on without a determination or

4    foundation, whether he heard it from TM or somebody else.

5           So we think, you know, our objections would be that

6    there's an insufficient foundation, number one.  Number two, that

7    a lot of the foundation would have proven to have been hearsay.

8           And finally, the notion that the gun was dirty is just

9    kind of in the air.  It's conjecture, I think.  But it's also

10   just impermissible and irrelevant testimony.  It's excludable

11   under 403 and 404 and 401.

12          THE COURT:  Okay.  Well, we have a respectful

13   disagreement, Mr. Lawlor.

14          The testimony that Mr. Mitchell, who already had a

15   firearm, needed to borrow TM's firearm, which was Hayes's

16   firearm, because Mitchell's firearm was dirty is obviously, as to

17   Mr. Mitchell, an admission.  So under no circumstances is it

18   excludable by virtue of, by virtue of the hearsay rule.

19          The mere fact that Mr. Mitchell allegedly made the

20   statement to TM, who repeated it to Mr. Hayes, is of no

21   consequence because it's being admitted as an admission against

22   Mr. Mitchell.  Doesn't matter to whom he made the admission so

23   long as the admission is out there.

24          Of course, the same thing is true about the letter.

25   The letter is an admission by Mr. Mitchell.  And it doesn't

1   matter who read the letter.  Anybody who read the letter or knows

2   about the admission can testify against Mr. Mitchell as to the

3   admission made by Mr. Mitchell here in writing.

4        And the Court simply disagrees.  It's clear to the

5   Court that, based on the witness' testimony, he and TM, with

6   joint ownership, dominion and control and possession of the

7   firearm, he is entitled to rely on his agent in his agent's

8   dealings with Mr. Mitchell over these firearms.

9        The fact that -- well, I think that's enough for now.

10        MR. LAWLOR:  Your Honor, I don't mean to go back and

11   forth.

12        THE COURT:  No.  If you got something new to add to the

13   mix, I want to --

14        MR. LAWLOR:  I do.

15        THE COURT:  -- I want to know.  Because if the Court

16   has erred, I want to know.

17        MR. LAWLOR:  You definitely have.  I'm sure about that.

18        THE COURT:  Yeah.  But it's not enough just for you to

19   say so.

20        MR. LAWLOR:  I'm kidding.  Your Honor, I guess our

21   position would be that, certainly we agree, if Mr. Mitchell made

22   a statement, it's admissible, everyone's been using the phrase

23   "admission", but the statement of a party opponent, I agree with

24   the Court.  I don't agree, though, that if Mr. Mitchell made a

25   statement to, forget TM, but hypothetically to individual A,

1    individual A conveyed it to individual B, and individual B

2    testifies here in court, that it's admissible as a statement of a

3    party opponent, unless A testifies to what Mr. Mitchell says, not

4    what B says A was advised by Mitchell.

5        THE COURT:  See, I disagree, absolutely.  That at most

6    goes to weight.  If it's a communication by a party opponent, it

7    doesn't matter who the witness is who sponsors that.  Now, it's

8    hearsay and, granted, it's double hearsay.  I acknowledge that.

9    But the hearsay that's being admitted is the statement of Mr.

10   Mitchell.

11       MR. LAWLOR:  Right, but the problem --

12       THE COURT:  And here I have Mr. Hayes, the joint owner

13   of the property, with the person to whom Mr. Mitchell made the

14   admission.  And as to the letter, I have Mr. Hayes, whose own

15   testimony says he read the letter.

16       So even though Mr. Mitchell, when he made the

17   admission, when he drew that map, crediting that testimony, and

18   of course that's up to the jury whether they credit the

19   testimony, but when Mr. Mitchell drew that map and composed that

20   letter and sent that letter to somebody, anybody who read the

21   letter can be a sponsor of that admission.

22       MR. LAWLOR:  And I agree with the Court there in terms

23   of -- I don't agree, you know, the objection to the admissibility

24   of the letter was not based on hearsay grounds.

25       If, if the jury believes that Mr. Mitchell wrote a

1    letter and said X, Y and Z about Mr. Lassiter, that's admissible.

2    But Mr. Hayes testified he read that with his own eyes.  And

3    again, I don't, I really am not trying to go back and forth with

4    the Court here.  But our position, and it's really our objection

5    here, and I guess it's where we split with the Court, if Mr.

6    Mitchell made a statement to, to TM, TM conveyed that to Mr.

7    Hayes, there needs to be an independent exception as to the

8    hearsay that is what TM conveyed to Mr. Hayes, aside from whether

9    it came from Mr. Mitchell.

10            THE COURT:  And our disagreement has to do with the

11   fact that the admission related to the common res, R-E-S --

12            MR. LAWLOR:  Right, right.

13            THE COURT:  -- that Mr. Hayes and TM, Tony Montana,

14   were the joint owners of that weapon.  And when Tony Montana

15   loaned that weapon to Mr. Mitchell and Mr. Mitchell negotiated

16   with Tony Montana as far as when he was going to bring it back

17   and how long he was going to keep it and what he was going to use

18   it for and why he needed it, it doesn't matter under those

19   circumstances whether Mr. Mitchell makes those statements to Tony

20   Montana only, Mr. Hayes only, or to the two of them at the same

21   time.  He's dealing with one entity.  I see, I see our

22   difference.

23            MR. LAWLOR:  I understand what the Court's saying and I

24   just, I think our position and our exception is noted.

25            THE COURT:  The credibility, the credibility of Mr.

1    Mitchell's, or the admissibility of Mr. Mitchell's statement

2    doesn't depend on Tony Montana being here.

3              MR. LAWLOR:  Well, that's where we disagree.

4              THE COURT:  Of course.  Of course.

5              MR. LAWLOR:  I'll just say one other thing and I'll

6    conclude here.  That even if the Court's position is the correct

7    position, I still think as a separate point that Mr. Mitchell

8    said he needed another gun because his other gun was dirty is an

9    entirely separate analysis that is -- that's double hearsay.

10   It's not double hearsay.  But what TM said to Hayes about what

11   Mr. Mitchell said, what TM said is hearsay.

12             And that's not relevant to any issue other than just

13   to, no pun intended, to dirty up Mr. Mitchell on a vague notion

14   of why the gun was dirty.  So either he's speculatively involved

15   in this homicide or he was just running around with the gun for

16   other illicit purposes.

17             THE COURT:  All right.  I clearly disagree.  And by the

18   way, we recall that Mr. Hayes testified on one occasion, I

19   believe I'm remembering correctly, both Mr. Mitchell and Mr.

20   Harris were sitting in the basement with TM handling, examining,

21   I think he might have said playing with the guns, or at least

22   with the guns.

23             So it's clear that the four of them were in repeated

24   transactions, conversations, communication, apparent negotiations

25   over these two firearms.

182

1          And of course the government believes I should even

2     admit the evidence that it was Mr. Hayes's .38 that, that was

3     actually the murder weapon in the Oliver McCaffity killing.  Now,

4     the government can argue the inference but I wasn't willing to go

5     that far.  Mr. Martin.

6          MR. MARTIN:  Yes, Your Honor.  I'm not --

7          THE COURT:  You join in everything Mr. Lawlor says.

8          MR. MARTIN:  I'm joining in what he said and I also

9     object, Your Honor, to, I think one of the last things he said,

10    that he knew he was asking, Mr. Harris was asking for the gun

11    because he wanted to kill Mr. Lassiter.  He said in the grand

12    jury he was guessing at that.  He had no reason to know that for

13    any reason whatsoever.  And you let it in.  I think that's wrong.

14         There's no foundation for it.  There's no way he could

15    have known except from a third party.  And in the grand jury he

16    said he was guessing.

17         So my objection, I think it's very damaging

18    information.  And I move for a mistrial on the basis of that as

19    well.

20         THE COURT:  All right.  Motion denied.  Anybody else?

21    Anything else?

22         MR. LAWLOR:  Oh, I got one.  Unrelated to all this.

23         THE COURT:  All right.

24         MR. LAWLOR:  Could we start a few minutes late so we

25    can stay up late watching the returns and celebrate?

1          THE COURT:  Have we ever started on time?

2          MR. LAWLOR:  Exactly.  Why start now?

3          (An off-record discussion was held.)

4          THE COURT:  We're back on the record, Ms. Zajac.

5          MR. LAWLOR:  Every time we're in agreement, which is

6     only about once a month, I feel like we should hug.  But there's

7     still the Senate returns, Your Honor.

8          THE COURT:  I think.

9          MR. HARDING:  The government agrees with the Court,

10    also, Your Honor.

11         MR. MARTIN:  The government agrees with the Court.  We

12    agree with the Court.

13         Your Honor, tomorrow morning Mr. Flannery's going to be

14    in another court until about 11:30, so I'll be here by myself.  I

15    just wants to make sure that's okay with you.

16         THE COURT:  Of course.  All right.  Thank you all very

17    much.

18         MR. KURLAND:  Who's testifying tomorrow?

19         THE COURT:  Who do we have?  We got Hayes for another

20    30 minute on direct?  Are you going to play the two rap songs

21    with Mr. Hayes?

22         MR. HARDING:  Yeah.  More than two, Your Honor.

23         THE COURT:  More than two?

24         MR. HARDING:  I have one whole one and some, you

25    remember some excerpts.

1          THE COURT:  I thought I only admitted two.

2          MR. HARDING:  No.  You admitted excerpts of several

3    that amounts to the equivalent of about two.

4          THE COURT:  Okay.  All right.  So how long is he going

5    to be?  Another hour?

6          MR. HARDING:  Yeah.  Something like that.  And then we

7    have the two agents here.  It's very important, Your Honor, that

8    Agent Ellington testify for a number of reasons, not the least of

9    which is that we have, well, Mr. Hanlon can speak to this, but we

10   have, we have to show an interstate nexus requirement for the

11   racketeering charges.  That's going to require testimony about

12   where the narcotic came from in this case.  It's going to

13   require --

14         THE COURT:  Okay.  See, I'm happy to admit that kind of

15   thing, you know, that there's no heroin produced in the United

16   States, of course.  But I mean, in terms of the --

17         MR. MARTIN:  We'll stipulate to that.

18         MR. LAWLOR:  Stipulate to that.

19         THE COURT:  Right.  But in terms of the other stuff

20   that I'm concerned about.  So we'll open with that perhaps

21   tomorrow and I'll hear you further tomorrow, Mr. Hanlon, on

22   exactly what Agent Ellington should be permitted to do.

23         MR. HANLON:  Certainly, Your Honor.  In terms of

24   scheduling.

25         THE COURT:  Yes.

185

1          MR. HANLON:  Depending on scheduling and availability,

2     Karen Sullivan, who is the Baltimore City Firearms Examiner is

3     also scheduled to appear tomorrow.

4          THE COURT:  Okay.  So we have Hayes.  We have

5     Ellington.  We have --

6          MR. HANLON:  Sullivan.

7          THE COURT:  Benson and Klas?

8          MR. HANLON:  Klas and Benson.  All sort of available

9     tomorrow.

10         THE COURT:  All right.  And is that the end of the

11    government's case?  Who else is left, Mr. Harding?

12         MR. HARDING:  I actually wasn't listening to Mr. Hanlon

13    recite the list.  But we're very near the end.

14         THE COURT:  Klas, Benson, Ellington, Sullivan, Hayes.

15         MR. HARDING:  That's about it, yes.

16         THE COURT:  Anybody else?

17         MR. HARDING:  No one pops to mind but I --

18         THE COURT:  Okay, good.  So it sounds like we're going

19    to finish even before late on Thursday.  Perhaps.  Mr. Kurland?

20         MR. KURLAND:  We'll argue the motion tomorrow morning.

21    But also at some point before the government rests, the dual

22    sovereignty instruction.

23         THE COURT:  Yes.

24         MR. KURLAND:  See you tomorrow.

25         THE COURT:  All right.  Oh, Ms. Rhodes, I have your ex

1    parte.  Just one moment, please, please, guys.  You're fine right

2    there.  Fine right there.  On the --

3              MS. RHODES:  The witness matter.

4              THE COURT:  Yes.  On the Coach Lynch matter, you

5    understand I'm going to require you to discuss with the

6    government a possible stipulation?  So I'm happy to permit you to

7    do that ex parte, but a part of my ruling is that the government

8    is almost certainly willing to stipulate to virtually anything

9    Coach Lynch would have said.  We don't have to deal with it now.

10   But I just want you to understand that that's a part of the

11   Court's decision process.  Okay?

12             MS. RHODES:  I understand.

13             THE COURT:  All right.  So we're in recess.  Thank you

14   all very much.

15             (Conclusion of Proceedings at 3:17 p.m.)

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3                                                    PAGE

4    WITNESS: ERNEST IBN-REYNOLDS
     CROSS EXAMINATION BY MR. COBURN                 27
5    REDIRECT EXAMINATION BY MR. HANLON              64
     RECROSS EXAMINATION BY MR. LAWLOR               75
6    RECROSS EXAMINATION BY MR. COBURN               76

7    WITNESS: SPECIAL AGENT ALAN BOROSHOK
     DIRECT EXAMINATION BY MR. HANLON                81
8    CROSS EXAMINATION BY MR. KURLAND (ON VOIR DIRE) 84
     CONT'D DIRECT EXAMINATION BY MR. HANLON         85
9    CROSS EXAMINATION BY MR. KURLAND                89

10   WITNESS: DEPUTY MARSHAL TED STOLER
     DIRECT EXAMINATION BY MR. HARDING               92
11   CROSS EXAMINATION BY MR. MARTIN                 101

12   WITNESS: RODNEY HAYES
     CROSS EXAMINATION (ON MOTION)                   115
13   DIRECT EXAMINATION BY MR. HARDING               122

14

15

16

17

18

19

20

21

22

23

24

25

188

REPORTER'S CERTIFICATE

I, Mary M. Zajac, do hereby certify that I recorded stenographically the proceedings in the matter of USA v. Willie Mitchell, et al., Case Number(s) AMD-04-029, on November 4, 2008.

I further certify that the foregoing pages constitute the official transcript of proceedings as transcribed by me to the within matter in a complete and accurate manner.

In Witness Whereof, I have hereunto affixed my signature this _____ day of _____, 2009.

_____
Mary M. Zajac,
Official Court Reporter

**$**

**$40** [1] - 109:12, 109:14
**$5** [1] - 138:17
**$50,000** [3] - 71:12, 72:1, 72:11

**'**

**'02** [1] - 48:24
**'03** [2] - 45:4, 45:5
**'04** [10] - 35:3, 35:20, 36:3, 41:21, 44:22, 44:23, 45:1, 50:21, 56:2, 70:23
**'05** [1] - 63:17
**'06** [4] - 58:22, 58:23, 58:25, 63:19
**'07** [1] - 74:10

**1**

**1** [1] - 40:9
**10/1/2008** [2] - 103:22, 103:24
**101** [2] - 1:25, 187:11
**10th** [2] - 129:3, 129:5
**11** [4] - 35:3, 39:16, 41:4, 66:1
**115** [1] - 187:12
**11:10** [1] - 2:1
**11:30** [1] - 183:14
**11:45** [1] - 27:13
**12** [5] - 39:22, 40:9, 41:4, 59:7, 65:24
**122** [1] - 187:13
**12:00** [1] - 157:5
**12:30** [1] - 174:22
**12th** [2] - 90:14, 91:10
**13th** [2] - 93:20, 96:9, 105:1
**144** [1] - 94:13
**14th** [1] - 91:10
**15** [4] - 112:14, 112:17, 112:21, 112:22
**16** [4] - 39:17, 51:21, 65:20, 126:23
**17** [1] - 51:20
**18** [3] - 94:17, 106:1, 106:4
**1811** [1] - 101:20
**19** [1] - 118:25
**1991** [1] - 82:3
**1998** [1] - 82:4
**1:00** [1] - 174:22
**1:30** [1] - 137:19
**1st** [4] - 116:3, 116:4,

117:8, 120:13

**2**

**2** [4] - 145:5, 154:22, 154:23, 169:12
**20** [2] - 117:9, 118:17
**2000** [2] - 63:12, 141:16
**2001** [4] - 128:25, 129:2, 129:5, 131:6
**2002** [15] - 4:1, 20:6, 46:23, 47:2, 47:19, 47:21, 48:3, 48:7, 51:25, 54:6, 70:16, 141:23, 145:24, 172:21
**2003** [1] - 54:6
**2004** [32] - 27:25, 28:22, 34:22, 35:20, 36:12, 39:10, 40:18, 41:25, 42:10, 44:1, 49:20, 50:4, 51:15, 55:20, 56:19, 56:23, 59:25, 61:3, 61:8, 61:21, 61:24, 62:7, 63:13, 65:21, 70:10, 72:14, 72:19, 77:9, 90:14, 91:10
**2005** [3] - 93:21, 96:9, 106:22
**2008** [5] - 1:11, 116:3, 116:4, 120:13, 188:5
**2009** [1] - 188:10
**21201** [1] - 1:25
**21st** [6] - 34:22, 35:2, 35:20, 39:10, 51:15, 65:21
**22** [1] - 92:24
**22nd** [2] - 56:2, 56:19
**24th** [9] - 27:25, 42:9, 44:1, 50:4, 50:21, 56:23, 61:8, 61:23, 77:9
**26** [1] - 61:3
**26th** [1] - 62:7
**27** [1] - 187:4
**27th** [1] - 59:25
**29** [2] - 123:2, 126:22
**2910** [4] - 130:9, 130:10, 130:24, 131:2
**2913** [9] - 5:3, 129:8, 129:13, 143:25, 147:7, 150:14, 152:25, 166:22, 167:10
**2nd** [3] - 28:22, 61:21, 63:13

**3**

**3** [1] - 154:19
**30** [1] - 183:20
**30th** [1] - 55:20

**3400** [3] - 139:12, 139:13, 139:22
**35** [1] - 139:24
**350** [1] - 94:16
**3500** [5] - 139:1, 139:11, 139:21, 139:22, 139:25
**357** [2] - 85:10, 85:17
**38** [14] - 9:20, 146:2, 146:3, 147:22, 147:25, 158:3, 158:20, 158:25, 159:6, 161:18, 170:3, 176:11, 176:12, 182:2
**3:00** [1] - 112:18
**3:17** [1] - 186:15

**4**

**4** [3] - 1:11, 57:14, 188:5
**40** [7] - 86:5, 161:6, 161:7, 170:6, 171:17, 173:20, 173:21
**401** [1] - 177:11
**403** [1] - 177:11
**404** [1] - 177:11
**404(b** [2] - 7:13, 8:1
**410** [2] - 54:11, 54:12
**443** [2] - 54:11, 54:12
**45** [3] - 86:23, 154:25, 173:8

**5**

**500** [1] - 94:14
**54** [5] - 59:3, 59:5, 63:19, 77:10, 78:6
**5515** [1] - 1:24
**5K1.1** [1] - 59:10

**6**

**6** [1] - 59:7
**6/13** [1] - 106:22
**60** [4] - 58:1, 58:3, 59:3
**64** [1] - 187:5

**7**

**75** [1] - 187:5
**76** [1] - 187:6

**8**

**801** [1] - 39:3
**81** [1] - 187:7

**84** [1] - 187:8
**85** [1] - 187:8
**88.9** [1] - 137:12
**89** [1] - 187:9

**9**

**9** [17] - 87:21, 88:2, 88:14, 146:2, 147:11, 147:12, 147:13, 147:22, 159:9, 160:1, 160:2, 160:6, 161:3, 161:19, 170:3, 171:10, 171:14
**92** [1] - 187:10
**95** [3] - 48:17, 48:18, 48:22
**9:07** [2] - 107:6, 107:8
**9:30** [4] - 174:14, 174:15, 174:22, 175:1

**A**

**A-L-A-N** [1] - 81:11
**a.m** [5] - 2:1, 27:13, 107:6, 107:8, 174:15
**abide** [1] - 29:4
**able** [7] - 17:12, 18:4, 24:14, 62:15, 83:3, 90:15, 111:21
**abnormal** [1] - 94:9
**absolutely** [2] - 24:15, 179:5
**Absolutely** [2] - 64:4, 75:8
**Academy** [1] - 82:5
**accepted** [1] - 85:1
**according** [6] - 37:24, 49:25, 73:7, 149:1, 160:24, 162:7
**accordingly** [1] - 9:5
**account** [1] - 98:22
**accurate** [2] - 163:21, 188:8
**acknowledge** [1] - 179:8
**act** [1] - 176:3
**acted** [2] - 108:14, 108:18
**acting** [1] - 175:25
**action** [1] - 175:18
**activated** [1] - 100:1
**actively** [1] - 24:20
**activity** [2] - 7:16, 7:17
**acts** [2] - 19:12, 19:19
**Adam** [1] - 1:22
**add** [1] - 178:12
**addict** [1] - 146:5
**additional** [1] - 94:16

**address** [3] - 3:9, 9:24, 12:2
**addressed** [3] - 5:21, 28:10, 44:1
**adjust** [1] - 114:11
**Adjustment** [1] - 94:2
**admissibility** [2] - 179:23, 181:1
**admissible** [4] - 10:21, 178:22, 179:2, 180:1
**admission** [8] - 8:23, 55:6, 177:17, 177:21, 177:22, 177:23, 177:25, 178:2, 178:3, 178:23, 179:14, 179:17, 179:21, 180:11
**admissions** [1] - 13:13
**admit** [3] - 15:7, 182:2, 184:14
**admitted** [6] - 57:1, 122:4, 177:21, 179:9, 184:1, 184:2
**advice** [3] - 68:2, 68:13, 69:2
**advised** [5] - 43:6, 43:7, 68:1, 179:4
**advises** [1] - 4:23, 6:20
**aerial** [2] - 130:10, 149:13
**Affairs** [1] - 82:4
**affect** [2] - 68:15, 68:16
**affected** [5] - 85:22, 86:18, 87:10, 88:8, 88:21
**affixed** [1] - 188:9
**afternoon** [15] - 81:15, 81:16, 84:5, 89:5, 92:17, 101:7, 101:8, 110:5, 115:14, 115:15, 122:11, 122:25, 157:6, 174:22
**agent** [8] - 2:2, 26:7, 81:21, 81:23, 82:1, 82:2, 89:18, 178:7
**Agent** [27] - 81:5, 81:15, 81:18, 81:25, 82:18, 83:15, 83:22, 85:7, 85:20, 86:2, 86:7, 86:22, 87:15, 87:19, 88:11, 88:25, 89:5, 90:1, 91:24, 111:24, 112:1, 114:12, 116:6, 116:7, 118:19, 184:8, 184:22
**AGENT** [2] - 81:6, 187:7
**agent's** [1] - 178:7
**Agents** [1] - 96:13
**agents** [14] - 2:7, 20:23, 25:1, 25:7, 26:23, 43:9, 96:19, 96:21, 97:5, 97:7, 110:24, 111:20, 112:7, 184:7
**ago** [5] - 37:24, 40:23,

42:15, 61:15, 126:20
**agree** [7] - 133:13, 178:21, 178:23, 178:24, 179:22, 179:23, 183:12
**agreed** [3] - 29:13, 31:4, 67:13
**agreement** [32] - 27:25, 28:5, 28:18, 28:25, 29:5, 29:14, 34:25, 42:6, 42:7, 49:22, 56:22, 57:11, 57:18, 57:22, 58:3, 58:4, 58:6, 58:19, 59:7, 61:6, 61:9, 61:13, 61:23, 62:3, 62:9, 63:11, 63:12, 76:9, 76:14, 77:8, 78:17, 183:5
**agreement's** [1] - 76:10
**agrees** [2] - 183:9, 183:11
**AH-1** [1] - 98:12
**AH-2** [1] - 100:18
**ahead** [10] - 6:19, 25:18, 142:6, 161:12, 162:4, 164:1, 165:17, 166:1, 166:13, 172:20
**ain't** [13] - 116:15, 136:6, 140:23, 140:24, 148:12, 156:19, 157:18, 161:20, 165:21, 168:4, 169:2, 173:8, 173:9
**air** [1] - 177:9
**al** [1] - 188:5
**Alan** [3] - 81:5, 81:11, 83:22
**ALAN** [2] - 81:6, 187:7
**alarm** [6] - 99:24, 99:25, 100:1, 100:2, 112:1, 112:2
**Alcohol** [2] - 81:18, 96:13
**alleged** [1] - 19:12
**allegedly** [3] - 3:1, 113:19, 177:19
**Allegheny** [8] - 94:8, 94:10, 95:11, 105:2, 105:4, 105:5, 105:19, 109:8
**alley** [1] - 152:10
**almost** [2] - 20:24, 186:8
**alternative** [1] - 175:14
**Alvin** [3] - 39:24, 40:4
**AMD-04-029** [2] - 1:6, 188:5
**amenable** [1] - 23:19
**AMERICA** [1] - 1:5
**Amity** [1] - 5:8
**amounts** [1] - 184:3
**analysis** [1] - 181:9
**Andre** [1] - 1:13
**Andrew** [2] - 28:11,

42:15
**angry** [1] - 161:25
**another's** [1] - 68:2
**answer** [25] - 6:23, 10:5, 17:8, 31:14, 52:5, 66:14, 86:1, 86:2, 91:13, 117:24, 128:10, 130:21, 132:20, 134:20, 135:19, 148:11, 153:24, 155:24, 156:10, 157:25, 161:13, 165:1, 165:23, 174:1, 174:5
**Answer** [20] - 35:22, 35:25, 36:1, 39:21, 39:23, 40:5, 40:7, 40:9, 40:10, 40:11, 40:13, 40:15, 41:6, 41:8, 41:12, 41:15, 41:16, 52:8, 52:9, 52:13
**answered** [1] - 37:14
**answers** [9] - 35:21, 36:3, 39:14, 39:20, 40:17, 41:3, 41:21, 51:18, 64:25
**anticipate** [1] - 58:15
**Anyway** [1] - 152:3
**apart** [1] - 32:10
**apartment** [1] - 150:22
**Apartment** [1] - 150:23
**apologize** [1] - 27:15
**Apology** [1] - 88:11
**apparent** [2] - 175:7, 181:24
**appear** [3] - 96:17, 98:12, 185:3
**appearance** [4] - 70:9, 71:17, 111:8, 144:2
**appearances** [2] - 105:10, 105:11
**Appearances** [1] - 1:15
**appeared** [1] - 152:12
**appreciate** [6] - 17:21, 23:21, 24:2, 24:8, 24:17, 39:8
**apprised** [1] - 25:4
**approach** [1] - 89:12
**Approach** [2] - 85:5, 134:19
**approached** [2] - 6:10, 8:7
**appropriate** [1] - 26:25
**approved** [1] - 61:2
**approximate** [1] - 78:13
**April** [4] - 20:6, 59:24, 61:3, 62:7
**area** [35] - 15:9, 20:6, 41:12, 41:13, 54:10, 66:15, 66:16, 66:17, 66:20, 66:23, 66:25, 67:2, 82:12, 83:7, 83:23,

93:8, 93:11, 95:4, 95:23, 96:2, 96:4, 96:5, 96:18, 96:22, 100:24, 105:6, 112:2, 112:5, 112:8, 126:24, 139:2, 145:6, 150:9, 152:7
**argue** [3] - 19:14, 182:4, 185:20
**argued** [1] - 72:24
**arguing** [1] - 173:8
**argument** [2] - 19:22, 73:3
**arising** [1] - 176:6
**arm** [1] - 100:24
**arrange** [3] - 164:11, 164:14, 169:8
**arranged** [1] - 164:13
**arrest** [3] - 58:21, 74:25, 75:24
**arrested** [7] - 57:22, 57:25, 58:2, 96:5, 96:18, 161:19, 171:14
**arresting** [2] - 111:12, 111:13
**arrests** [2] - 96:17, 96:19
**arrived** [2] - 45:19, 106:8
**arrow** [2] - 151:12, 152:2
**arrow's** [1] - 151:4
**arrows** [1] - 152:12
**articulate** [1] - 72:10
**aside** [3] - 8:20, 71:1, 180:8
**assist** [3] - 24:10, 24:20, 112:8
**assistance** [1] - 59:9
**assistant** [1] - 150:1
**associates** [1] - 16:2
**assume** [2] - 15:15, 146:23
**assumptions** [1] - 9:12
**assure** [2] - 20:23, 93:18
**ATF** [12] - 2:2, 2:7, 81:21, 81:23, 82:4, 82:5, 82:25, 91:3, 96:21, 97:5, 110:25, 112:7
**attaches** [1] - 98:23
**attempt** [2] - 11:17, 153:9
**attempted** [1] - 21:5
**attended** [2] - 82:9, 82:10
**attention** [7] - 2:10, 57:14, 59:24, 93:20, 96:8, 141:23, 149:4
**attitude** [1] - 144:9
**attorney** [1] - 73:3

**Attorney's** [6] - 28:7, 42:12, 102:23, 102:24, 104:13, 107:17
**attorneys** [2] - 32:6, 65:17, 76:7
**Attorneys's** [1] - 103:7
**attributing** [1] - 56:14
**Austria** [4] - 86:1, 86:13, 86:15, 86:18
**author** [1] - 90:25
**authored** [2] - 89:15, 90:1
**authorities** [1] - 82:13
**Auto** [1] - 154:19
**availability** [1] - 185:1
**available** [9] - 26:21, 69:22, 70:6, 82:25, 95:16, 97:23, 97:24, 98:3, 185:8
**Avenue** [18] - 12:11, 12:15, 13:18, 13:19, 124:5, 124:7, 124:11, 126:6, 127:1, 138:21, 139:1, 151:5, 152:8, 155:15, 156:25, 157:4, 164:6, 164:7
**avoid** [1] - 174:13
**awaiting** [2] - 98:25, 99:6
**aware** [4] - 33:7, 51:12, 105:25, 109:6
**Ayesha** [1] - 129:10

**B**

**B-O-R-O-S-H-O-K** [1] - 81:12
**background** [2] - 82:19, 85:14
**Baltimore** [17] - 1:12, 1:25, 40:13, 44:14, 94:6, 94:15, 94:22, 105:6, 105:19, 123:6, 123:7, 124:8, 134:5, 134:6, 169:16, 185:2
**Barry** [1] - 1:22
**base** [3] - 116:10, 116:11, 116:21
**based** [5] - 85:16, 87:9, 117:24, 178:5, 179:24
**Based** [1] - 86:17
**basement** [11] - 13:13, 143:24, 143:25, 144:20, 144:23, 146:18, 147:7, 153:3, 153:4, 154:5, 181:20
**basic** [1] - 96:24
**basis** [6] - 121:24, 176:2, 176:3, 176:4,

176:18, 182:18
**beat** [1] - 136:24
**became** [6] - 31:3, 42:6, 43:22, 45:8, 52:19, 70:5
**become** [3] - 31:5, 34:1, 45:20
**becoming** [1] - 53:1
**bed** [3] - 94:13, 94:16, 105:16
**Beemiller** [1] - 88:4
**beginning** [1] - 76:22
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behalf** [1] - 175:25
**belabor** [1] - 176:21
**belief** [1] - 20:4
**believes** [3] - 16:6, 179:25, 182:1
**belong** [1] - 147:14
**belonged** [1] - 69:21
**benefit** [2] - 29:7, 29:9
**Benson** [5] - 116:6, 118:19, 185:7, 185:8, 185:14
**best** [3] - 8:8, 41:7, 44:18
**Beth** [1] - 43:19
**better** [4] - 51:24, 99:1, 101:14, 151:16
**between** [11] - 57:17, 63:1, 71:25, 72:10, 79:12, 109:7, 124:10, 132:23, 142:9, 175:15, 176:4
**beyond** [1] - 152:6
**big** [3] - 10:14, 26:22, 27:2
**Bin** [2] - 137:15, 137:16
**binds** [1] - 35:13
**bit** [11] - 18:18, 21:18, 21:20, 22:7, 36:18, 69:9, 81:25, 101:10, 132:14, 152:6, 163:13
**black** [2] - 100:11, 147:13
**blaming** [2] - 22:8, 22:9
**block** [13] - 46:8, 95:22, 96:5, 110:22, 139:1, 139:11, 139:12, 139:13, 139:21, 139:22, 139:23, 139:25
**Block** [1] - 99:12
**blocks** [2] - 11:23, 11:24
**blood** [1] - 108:9
**Bloods** [4] - 33:8, 33:15, 33:18, 33:20
**blue** [1] - 126:14
**Blue** [1] - 83:9
**Bo** [14] - 11:14, 11:22,

14:4, 41:24, 127:16,
130:18, 130:25, 131:5,
132:16, 132:18, 136:4,
162:2, 162:5, 166:19
**book** [3] - 146:14,
146:16, 146:21
**Book** [1] - 83:9
**Booking** [1] - 4:11
**boot** [2] - 48:19, 48:20
**Boroshok** [13] - 81:5,
81:12, 81:25, 82:18,
83:15, 83:23, 85:7, 86:7,
86:22, 87:19, 88:11,
88:25, 90:1
**BOROSHOK** [2] - 81:6,
187:7
**borrow** [1] - 177:15
**borrowing** [1] - 171:14
**boss** [1] - 136:20
**bother** [1] - 122:1
**bottom** [4] - 22:22,
39:16, 61:17, 100:23
**Bought** [1] - 85:4
**bought** [4] - 138:11,
138:16, 138:18, 146:5
**bounced** [1] - 23:18
**boy** [1] - 163:16
**break** [1] - 2:3
**breaks** [1] - 74:15
**Brendan** [1] - 27:8
**brief** [3] - 2:2, 83:25,
154:2
**Briefly** [1] - 32:14
**briefly** [6] - 13:15,
13:19, 24:25, 32:15,
60:5, 89:12
**bring** [9] - 24:23, 54:22,
96:19, 111:1, 113:23,
114:12, 115:10, 116:14,
180:16
**bringing** [2] - 2:10,
96:16
**brings** [1] - 110:25
**broadcast** [1] - 108:4
**brother** [29] - 10:2,
10:6, 15:20, 39:24, 40:4,
40:14, 66:7, 121:15,
121:16, 121:17, 125:3,
125:5, 125:6, 125:9,
125:11, 125:12, 128:14,
129:20, 131:25, 141:4,
141:5, 141:11, 163:18,
163:24, 164:23, 166:6,
166:8
**brothers** [3] - 10:8,
10:9, 162:11
**brothers'** [2] - 4:6, 6:11
**brought** [9] - 92:7,
93:22, 93:24, 94:1,
96:10, 96:12, 96:14,

96:21, 114:8
**Brown** [5] - 11:25, 14:5,
116:6, 116:8, 118:19
**buddies** [14] - 44:6,
44:16, 44:23, 45:8,
45:25, 46:11, 46:13,
49:3, 50:2, 52:3, 52:12,
52:13, 70:10, 70:22
**building** [4] - 95:5,
150:21, 150:22, 150:23
**bunch** [2] - 64:20, 65:8
**burden** [1] - 26:22
**Bureau** [2] - 81:18,
96:13
**burgundy** [1] - 100:6
**business** [14] - 10:1,
10:3, 10:4, 17:7, 35:24,
40:6, 66:3, 75:17, 131:5,
131:10, 131:13, 132:16,
135:24
**businesses** [1] - 132:18
**buy** [9] - 70:5, 78:25,
79:10, 79:19, 79:21,
80:8, 138:6, 138:10,
146:7
**buying** [1] - 69:8
**BY** [39] - 27:21, 60:8,
64:7, 73:22, 74:12,
75:10, 76:19, 81:14,
82:17, 84:4, 85:4, 87:18,
89:4, 89:25, 90:24,
92:16, 99:11, 101:6,
115:13, 122:24, 135:3,
135:23, 158:24, 161:16,
164:2, 166:2, 166:17,
173:2, 187:4, 187:5,
187:5, 187:6, 187:7,
187:8, 187:8, 187:9,
187:10, 187:11, 187:13
**Byrd** [1] - 103:12

# C

**caliber** [14] - 9:20,
85:10, 86:5, 86:23,
158:3, 158:20, 158:25,
159:7, 161:6, 161:7,
170:6, 171:17, 173:20,
173:21
**California** [2] - 88:19,
88:20
**camera** [3] - 108:4,
110:7, 150:11
**camera's** [2] - 108:10,
108:25
**cameras** [5] - 95:22,
96:2, 96:5, 110:8, 110:10
**camp** [2] - 48:19, 48:20
**candor** [1] - 24:1

**cannot** [1] - 60:1
**car** [12] - 149:12, 164:4,
164:5, 164:7, 164:15,
164:16, 164:18, 173:4,
173:5, 173:7, 173:11
**Card** [24] - 29:19, 29:22,
30:8, 31:2, 32:12, 32:21,
33:14, 34:1, 64:13,
67:18, 67:24, 68:22,
69:10, 69:16, 69:22,
70:2, 70:3, 75:11, 78:24,
79:10, 80:6, 80:8
**cared** [1] - 169:2
**carefully** [1] - 52:21
**carried** [2] - 145:22,
147:21
**carry** [4] - 145:11,
145:18, 145:20, 147:22
**carrying** [1] - 171:17
**cars** [1] - 67:1
**case** [30] - 7:19, 10:25,
18:19, 22:5, 22:6, 22:16,
26:14, 27:17, 28:4,
31:24, 32:4, 32:5, 56:4,
57:18, 65:4, 72:6, 72:16,
73:5, 73:13, 74:8, 75:24,
76:25, 78:3, 86:12,
87:21, 89:8, 174:11,
174:13, 184:12, 185:11
**Case** [1] - 188:5
**CASE** [1] - 1:6
**cases** [1] - 83:18
**caught** [1] - 169:3
**causes** [1] - 105:22
**caution** [2] - 10:18,
17:24
**CD** [2] - 110:4, 110:18
**CD's** [4] - 119:23,
137:23, 137:25, 138:6
**CDS** [4] - 123:12,
123:13, 123:16, 123:23
**Ceiling** [1] - 146:17
**ceiling** [9] - 9:21,
146:14, 146:16, 146:24,
147:1, 147:2, 147:20,
147:23, 148:3
**celebrate** [1] - 182:25
**Cell** [6] - 54:15, 95:12,
97:21, 99:12, 99:14,
99:17
**cell** [44] - 44:5, 44:9,
44:12, 44:16, 44:23,
45:8, 45:20, 45:22,
45:24, 45:25, 46:2, 46:4,
46:6, 46:11, 46:13, 49:3,
50:1, 52:3, 52:12, 52:13,
54:14, 56:3, 70:10,
70:22, 95:9, 95:13,
95:18, 95:19, 95:22,
95:25, 96:5, 96:25, 98:8,

99:20, 100:14, 110:15,
110:22, 112:4, 112:5,
112:6, 115:17, 116:1,
116:2, 116:24
**cells** [8] - 95:6, 95:7,
95:15, 97:22, 97:24,
98:2, 108:1, 108:3
**Center** [2] - 94:2, 94:8
**Central** [1] - 4:11
**ceremony** [1] - 33:25
**certain** [8] - 10:15,
23:24, 65:4, 68:6, 71:1,
106:9, 119:17, 119:18
**Certainly** [5] - 23:5,
27:6, 60:6, 87:16, 184:23
**certainly** [4] - 175:16,
176:1, 178:21, 186:8
**CERTIFICATE** [1] -
188:1
**certify** [2] - 188:3, 188:6
**chairs** [2] - 112:19,
174:10
**chance** [5] - 87:15,
148:22, 149:14, 165:21,
175:5
**change** [2] - 157:10,
157:11
**changed** [1] - 21:6
**character** [1] - 125:24
**charge** [14] - 21:23,
29:10, 30:24, 31:5,
46:15, 47:21, 47:24,
48:17, 48:18, 48:22,
72:14, 74:13, 74:18,
107:24
**charged** [4] - 4:5, 7:17,
98:23, 99:8
**charges** [2] - 98:20,
99:9, 184:11
**Charles** [1] - 134:12
**cheaper** [1] - 105:5
**Cheatham** [1] - 23:10
**checked** [1] - 85:13
**checking** [1] - 85:13
**choices** [3] - 23:24,
24:21, 24:22
**choose** [1] - 23:13
**Cia** [1] - 87:5
**Circle** [20] - 9:24, 11:24,
12:2, 13:10, 129:8,
135:25, 143:25, 144:20,
144:23, 146:19, 149:7,
150:9, 150:14, 151:2,
151:3, 152:25, 157:13,
157:16, 157:23, 161:18
**circumstances** [3] -
14:14, 177:17, 180:19
**city** [3] - 116:15, 138:3,
138:4
**City** [2] - 84:13, 185:2

**clarification** [1] - 18:9
**Clarified** [1] - 89:22
**clarify** [1] - 89:15
**Claudus** [15] - 3:13,
3:15, 6:1, 6:3, 6:5, 6:10,
7:3, 16:6, 167:19,
167:20, 168:6, 168:22,
168:23, 169:4, 172:12
**clear** [12] - 15:17, 17:2,
70:21, 90:10, 118:14,
163:20, 166:23, 175:16,
175:20, 176:25, 178:4,
181:23
**clearly** [2] - 8:23,
181:17
**CLERK** [4] - 81:8,
92:10, 92:14, 115:2,
115:5, 122:15, 122:19,
122:22
**clerk** [2] - 64:3, 122:8
**client** [5] - 16:22, 22:25,
43:8, 56:2, 56:6
**client's** [1] - 56:10
**clients** [6] - 22:6, 22:11,
23:1, 23:3, 24:10, 24:19
**close** [3] - 32:10, 115:8,
122:6
**closely** [1] - 42:5
**closer** [3] - 99:15,
139:4, 140:2
**closing** [1] - 19:22
**clothes** [2] - 157:10,
157:11
**clothing** [1] - 126:12
**club** [1] - 141:24
**clubs** [1] - 137:5
**Coach** [2] - 186:4,
186:9
**COBURN** [17] - 18:8,
18:12, 18:15, 19:5, 20:2,
20:7, 27:12, 27:21, 60:8,
63:25, 64:4, 70:19, 75:4,
75:8, 76:19, 187:4, 187:6
**Coburn** [1] - 1:22,
18:7, 19:4, 27:11, 27:17,
27:19, 60:4, 64:2, 64:10,
65:25, 76:17
**cocaine** [4] - 12:6,
124:21, 124:22, 127:7
**coconspirators** [5] -
10:24, 12:8, 12:10,
12:23, 14:20
**code** [2] - 54:10, 109:18
**Cold** [1] - 47:6
**cold** [2] - 47:6, 47:7
**colors** [1] - 33:14
**coming** [3] - 16:25,
18:10, 69:24
**commence** [1] - 27:18
**comment** [1] - 24:5

**commerce** [7] - 82:7,
85:22, 86:19, 87:11,
88:8, 88:22
**commercial** [1] - 82:25
**commercially** [1] -
82:25
**commit** [1] - 57:16
**committed** [1] - 152:18
**common** [1] - 180:11
**communicate** [1] -
22:16
**communication** [3] -
22:17, 179:6, 181:24
**community** [2] - 19:18
**company** [2] - 31:11,
88:4
**complete** [1] - 188:8
**completed** [1] - 82:4
**completes** [1] - 174:7
**completion** [1] - 73:4
**complicated** [1] - 11:6
**complying** [1] - 24:7
**composed** [1] - 179:19
**conceivable** [1] - 2:7
**concern** [1] - 14:24
**concerned** [5] - 14:13,
14:22, 90:17, 184:20
**concerning** [1] - 91:16
**concerted** [1] - 175:18
**conclude** [5] - 19:24,
172:22, 174:9, 174:17,
181:6
**concludes** [1] - 9:1
**Conclusion** [1] - 186:15
**conditions** [1] - 78:2
**Conduct** [1] - 174:11
**confer** [2] - 60:4, 82:14
**confessed** [1] - 16:23
**confession** [1] - 12:24
**confidence** [1] - 176:9
**confident** [1] - 36:11
**configured** [1] - 108:4
**confronts** [1] - 16:5
**confused** [1] - 69:9
**conjecture** [1] - 177:9
**connect** [2] - 75:11,
75:17
**connected** [1] - 163:17
**connection** [6] - 33:1,
43:10, 69:10, 113:16,
125:2, 132:23
**consciousness** [3] -
7:20, 7:21, 8:24
**consequence** [1] -
177:21
**consider** [2] - 26:1,
176:17
**considered** [2] - 8:25,
98:19

**considers** [3] - 7:25,
12:7, 12:9
**consistent** [4] - 7:16,
7:22, 119:13, 119:15
**conspiracy** [7] - 9:2,
9:4, 11:2, 11:3, 11:5,
17:3, 18:24
**constitute** [1] - 188:6
**CONT'D** [1] - 187:8
**contact** [2] - 3:14, 169:4
**contains** [1] - 6:1
**contends** [1] - 19:19
**context** [6] - 19:18, 22:5,
22:6, 23:17, 23:18, 31:23
**contextualize** [2] - 13:5,
18:18
**continue** [2] - 174:16,
174:20
**Continue** [1] - 112:20,
174:12
**CONTINUED** [1] - 85:3
**continuing** [1] - 73:14
**contradict** [1] - 20:20
**contrary** [1] - 176:22
**control** [2] - 175:21,
178:6
**controlled** [1] - 123:13
**conversation** [15] -
14:2, 46:24, 47:22, 48:9,
49:3, 49:7, 49:19, 49:20,
50:1, 50:13, 64:12,
153:9, 157:22, 164:3,
175:23
**conversations** [7] -
9:12, 13:11, 16:22,
64:11, 70:21, 71:5,
181:24
**conversed** [1] - 12:17
**conveyed** [3] - 179:1,
180:6, 180:8
**convicted** [7] - 57:7,
74:17, 99:3, 123:9,
123:11, 123:15, 123:21
**convictions** [2] - 23:6,
123:24
**convinced** [1] - 23:19
**convincing** [1] - 21:22
**cooperate** [2] - 29:14,
43:23
**cooperating** [3] - 6:7,
46:16, 77:24
**cooperation** [13] -
27:25, 30:1, 34:25,
56:22, 58:15, 61:9,
61:13, 61:23, 62:3, 62:9,
63:12, 77:1, 97:3
**copious** [1] - 113:15
**copy** [1] - 89:10
**corner** [3] - 151:6,
152:1, 154:1

**corporation** [1] - 31:11
**Correct** [126] - 28:12,
29:2, 29:17, 35:12,
35:18, 38:1, 38:4, 38:10,
38:11, 38:22, 38:24,
39:15, 40:16, 42:1,
42:13, 43:11, 43:20,
43:24, 44:3, 44:7, 44:10,
44:15, 45:13, 45:18,
46:7, 46:18, 47:20, 48:6,
48:15, 48:21, 49:5,
49:18, 50:3, 50:17,
51:16, 52:4, 53:4, 55:25,
56:9, 56:21, 57:10,
57:21, 58:5, 58:17, 59:6,
59:12, 61:5, 61:7, 61:20,
61:22, 61:25, 62:11,
62:14, 62:18, 62:22,
63:21, 64:18, 65:2, 65:9,
69:12, 70:11, 71:9, 74:3,
74:4, 103:1, 103:3,
103:11, 103:13, 103:17,
103:19, 103:21, 104:5,
104:7, 104:25, 105:3,
107:5, 110:9, 110:11,
110:14, 110:16, 110:23,
111:19, 111:23, 115:25,
116:12, 116:23, 117:16,
117:23, 118:1, 119:19,
125:8, 126:4, 126:9,
126:25, 127:17, 129:1,
129:16, 129:21, 129:24,
130:13, 131:4, 132:1,
132:17, 137:24, 138:14,
138:22, 140:1, 140:13,
145:17, 146:10, 147:5,
147:19, 149:3, 150:15,
150:17, 153:1, 159:10,
159:12, 159:24, 160:18,
160:20, 161:1, 165:16,
168:18, 173:18, 173:23
**correct** [59] - 28:14,
28:16, 28:23, 29:10,
34:5, 34:8, 34:13, 35:17,
43:19, 43:21, 43:23,
44:9, 63:20, 65:8, 66:4,
66:8, 67:13, 71:14,
72:20, 76:8, 83:14,
84:19, 84:22, 85:12,
86:3, 86:24, 87:13,
87:22, 88:14, 90:2, 91:3,
91:4, 91:14, 91:17,
91:18, 93:1, 103:22,
106:9, 106:22, 110:18,
125:7, 129:15, 130:12,
131:3, 131:25, 132:8,
138:21, 139:17, 140:3,
140:6, 140:12, 145:22,
149:2, 153:18, 159:7,
160:25, 161:13, 163:1,
181:6

**Correctional** [1] - 94:2
**correctly** [2] - 69:15,
181:19
**corroboration** [1] -
176:6
**cost** [3] - 79:16, 79:25,
109:7
**costing** [1] - 80:2
**costs** [1] - 79:8
**counsel** [11] - 3:6,
21:17, 22:8, 22:9, 23:13,
24:9, 24:18, 25:11,
98:24, 175:4, 176:19
**County** [11] - 94:8,
94:10, 95:11, 105:2,
105:4, 105:5, 105:20,
109:8, 116:10, 116:11,
116:22
**couple** [7] - 8:4, 24:6,
26:8, 34:24, 45:23,
46:22, 65:19, 71:10,
71:21, 75:4, 75:5, 80:5,
84:5, 89:23, 98:16,
123:23, 138:23
**course** [24] - 7:20,
18:14, 21:8, 22:8, 23:10,
29:25, 32:8, 33:9, 33:12,
49:7, 60:18, 68:19,
68:21, 75:18, 113:18,
117:8, 175:6, 177:24,
179:18, 181:4, 182:1,
183:16, 184:16
**COURT** [286] - 1:1, 2:11,
2:16, 2:18, 2:25, 3:3,
3:7, 3:17, 3:21, 3:24,
4:2, 4:5, 4:8, 4:11, 4:14,
4:17, 4:21, 4:24, 5:2,
5:4, 5:9, 5:12, 5:14,
5:17, 5:21, 5:24, 6:4,
6:6, 6:11, 6:13, 6:17,
6:19, 6:22, 6:25, 7:4,
7:6, 7:8, 7:10, 7:12, 8:2,
8:22, 9:24, 10:6, 10:10,
10:12, 10:18, 10:22,
10:25, 11:5, 11:7, 11:12,
11:15, 11:18, 11:23,
12:3, 12:21, 12:25, 13:5,
13:16, 14:7, 14:9, 14:12,
14:15, 14:21, 15:6,
16:11, 16:14, 16:16,
16:18, 16:25, 17:16,
17:21, 17:24, 18:11,
18:14, 19:3, 19:9, 20:3,
20:8, 20:16, 20:19,
20:22, 20:25, 21:10,
22:3, 22:8, 22:11, 22:19,
22:22, 23:1, 23:13,
23:16, 23:21, 23:24,
25:7, 25:15, 25:18,
25:21, 25:25, 26:5,

26:10, 26:12, 26:16,
26:19, 27:6, 27:8, 27:11,
27:14, 31:14, 39:5, 39:9,
54:21, 55:3, 55:6, 55:10,
60:6, 63:23, 64:2, 64:5,
70:3, 73:11, 73:17,
73:20, 74:1, 74:3, 74:5,
74:7, 75:5, 75:7, 76:17,
81:2, 82:16, 84:2, 85:1,
85:6, 86:1, 87:14, 87:17,
89:2, 89:13, 89:17,
89:20, 89:22, 89:24,
90:9, 90:12, 90:16,
90:22, 91:7, 91:13,
91:20, 91:22, 91:24,
92:3, 92:5, 98:14, 99:15,
100:19, 102:2, 108:16,
112:12, 112:14, 113:11,
113:21, 114:2, 114:10,
114:17, 114:20, 114:23,
115:7, 121:20, 121:22,
122:2, 122:11, 125:14,
126:17, 127:24, 128:10,
128:22, 130:21, 132:20,
133:6, 134:20, 135:1,
135:8, 135:19, 135:22,
139:4, 141:22, 142:4,
148:7, 148:11, 149:19,
149:21, 149:25, 150:6,
151:14, 153:24, 155:24,
156:3, 156:10, 156:14,
158:11, 158:14, 158:19,
161:12, 161:15, 162:4,
162:10, 163:12, 163:20,
163:24, 164:1, 164:22,
165:1, 165:5, 165:8,
165:12, 165:15, 165:17,
165:20, 165:23, 166:1,
166:7, 166:10, 166:13,
166:16, 166:23, 167:16,
168:12, 168:16, 170:15,
170:19, 170:24, 171:16,
171:20, 171:23, 172:1,
172:4, 172:9, 172:15,
172:17, 172:20, 172:22,
173:1, 173:15, 174:1,
174:5, 174:8, 175:4,
176:15, 177:12, 178:12,
178:15, 178:18, 179:5,
179:12, 180:10, 180:13,
180:25, 181:4, 181:17,
182:7, 182:20, 182:23,
183:1, 183:4, 183:8,
183:16, 183:19, 183:23,
184:4, 184:4, 184:14,
184:19, 184:25, 185:4,
185:7, 185:10, 185:14,
185:16, 185:18, 185:23,
185:25, 186:4, 186:13
**court** [26] - 23:4, 23:8,
59:19, 64:25, 72:23,

73:8, 74:17, 76:15, 77:11, 84:12, 84:14, 84:18, 87:14, 94:21, 95:8, 96:17, 96:18, 97:10, 97:13, 105:9, 105:11, 111:2, 111:8, 174:9, 179:2, 183:14

**Court** [24] - 9:11, 15:17, 16:9, 20:15, 74:20, 76:3, 76:13, 84:9, 98:21, 122:2, 175:7, 175:11, 176:22, 178:4, 178:5, 178:15, 178:24, 179:22, 180:4, 180:5, 183:9, 183:11, 183:12, 188:15

**Court's** [13] - 2:10, 17:5, 39:1, 39:4, 63:22, 121:19, 121:25, 175:6, 176:9, 176:18, 180:23, 181:6, 186:11

**courthouse** [9] - 28:16, 93:7, 93:9, 96:19, 107:20, 107:21, 108:8, 108:11, 109:3

**Courthouse** [1] - 1:24

**courtroom** [32] - 20:24, 21:8, 21:20, 22:12, 22:14, 23:3, 23:9, 24:11, 25:8, 25:12, 26:14, 26:24, 27:2, 27:7, 27:13, 35:11, 39:11, 97:8, 108:5, 111:2, 111:10, 112:24, 112:25, 113:17, 114:24, 115:16, 122:10, 126:10, 127:18, 175:2, 175:3

**cousin** [6] - 143:9, 143:10, 143:12, 167:23, 167:24, 169:7

**covering** [2] - 151:11, 151:22

**Crack** [3] - 124:21, 127:7, 142:22

**crack** [3] - 12:6, 124:22, 138:21

**crash** [1] - 149:12

**crazy** [13] - 9:19, 13:4, 13:21, 14:10, 14:17, 14:22, 15:12, 18:9, 18:10, 19:20, 19:23, 19:24, 156:11

**credibility** [2] - 180:25

**credit** [2] - 58:15, 179:18

**crediting** [1] - 179:17

**crew** [2] - 3:11, 18:24

**crime** [12] - 57:7, 71:18, 71:25, 72:24, 98:23, 99:3, 99:8, 149:6, 149:10, 152:9, 152:16,

152:18

**crimes** [3] - 7:18, 123:9, 123:11

**CRIMINAL** [1] - 1:6

**criminal** [3] - 7:14, 101:19, 101:20

**Criminal** [4] - 91:10, 101:12, 101:13, 101:16

**Crips** [3] - 33:7, 33:17, 33:20

**criteria** [1] - 84:24

**cross** [5] - 27:18, 65:7, 65:10, 65:14, 70:25

**CROSS** [10] - 27:20, 84:3, 89:3, 101:5, 115:12, 187:4, 187:8, 187:9, 187:11, 187:12

**crossed** [1] - 83:6

**Crowe** [4] - 1:20, 43:12, 62:20, 113:15

**CROWE** [5] - 73:10, 73:15, 73:25, 85:24, 130:20

**Crowe's** [1] - 58:14

**cryptic** [1] - 8:8

**Cumberland** [1] - 94:8

**Custody** [4] - 102:7, 106:19, 107:9, 107:10

**custody** [5] - 106:11, 106:13, 106:14, 116:18, 171:18

**cut** [2] - 67:5, 67:21

**cuts** [1] - 13:23

**Cutting** [2] - 66:22, 67:6

**cutting** [5] - 37:14, 37:17, 37:20, 37:24, 66:18

---

# D

**damaging** [1] - 182:17

**Dan** [2] - 85:10, 85:17

**dance** [2] - 33:20, 33:21

**dangerous** [1] - 123:13

**Darius** [1] - 103:18

**Darryl** [1] - 132:11

**date** [15] - 3:18, 43:25, 44:17, 47:3, 54:2, 57:17, 61:3, 78:13, 78:14, 104:4, 105:25, 106:22, 107:8, 109:10, 109:11

**dated** [8] - 28:22, 42:9, 55:20, 56:23, 61:23, 63:13, 77:9, 103:22

**Dated** [1] - 61:21

**dates** [2] - 70:24, 71:1

**Davis** [3] - 1:13, 73:2, 77:19

**days** [2] - 41:6, 164:9

**deal** [4] - 21:16, 27:2, 123:24, 186:9

**dealers** [8] - 19:12, 19:14, 19:18, 34:13, 36:1, 133:17, 133:18, 133:20

**dealing** [2] - 33:2, 180:21

**dealings** [1] - 178:8

**December** [2] - 129:3, 129:5

**decide** [2] - 98:6, 106:3

**decided** [1] - 73:3

**decides** [1] - 94:18

**decision** [4] - 25:19, 43:23, 98:5, 186:11

**declare** [1] - 58:18

**deeply** [1] - 24:2

**defendant** [7] - 21:17, 56:4, 57:16, 126:16, 127:23, 173:6

**Defendant** [8] - 1:17, 1:18, 1:20, 1:21, 54:20, 59:25, 60:9, 106:16

**defendant's** [1] - 59:8

**Defendant's** [1] - 109:18

**Defendants** [3] - 1:9, 112:24, 113:17

**defendants** [11] - 9:1, 19:12, 19:19, 23:6, 23:7, 23:24, 24:15, 108:7, 108:12, 108:18, 109:4

**defense** [14] - 3:5, 20:19, 22:13, 24:10, 24:20, 25:9, 25:10, 26:2, 26:14, 26:17, 26:19, 65:13, 65:17, 108:9

**definitely** [2] - 18:16, 178:17

**delay** [1] - 27:15

**delivered** [2] - 2:20, 4:8

**delivery** [1] - 3:1

**demanding** [1] - 16:6

**denied** [3] - 170:15, 171:23, 182:20

**Denied** [1] - 172:4

**denotes** [1] - 86:14

**Department** [1] - 82:3

**departure** [2] - 59:15, 59:21

**depressing** [1] - 160:16

**deputies** [4] - 96:22, 110:12, 111:10, 112:3

**DEPUTY** [1] - 187:10

**Deputy** [18] - 92:2, 92:22, 92:25, 97:7, 97:18, 97:19, 99:13, 99:16, 99:19, 100:20, 100:24, 101:7, 101:10,

101:22, 102:5, 106:17, 112:10, 112:12

**deputy** [2] - 100:4, 100:12

**Derek** [1] - 143:13

**describe** [2] - 80:2, 98:25

**described** [4] - 3:5, 32:21, 85:16, 158:22

**describing** [1] - 29:21

**description** [2] - 11:10, 175:14

**Desi** [5] - 34:6, 34:13, 35:24, 36:8, 36:10

**designated** [1] - 33:17

**despite** [4] - 77:24, 77:25, 78:1, 78:3, 78:5

**destroy** [1] - 149:25

**destroyed** [2] - 109:22, 109:23

**detained** [5] - 57:19, 74:21, 98:18, 98:25, 99:4

**detainee** [2] - 99:1, 99:7

**detective** [1] - 42:24

**Detective** [4] - 2:6, 43:1, 116:6, 118:19

**detectives** [1] - 149:11

**detention** [4] - 93:25, 106:11, 141:10, 141:13

**Detention** [4] - 94:8, 102:7, 106:20, 107:10

**determination** [1] - 177:3

**determine** [1] - 83:4

**determines** [1] - 59:8

**develop** [1] - 158:14

**developments** [1] - 15:18

**difference** [4] - 22:7, 99:2, 109:7, 180:22

**different** [12] - 23:17, 24:18, 43:17, 62:6, 67:2, 79:11, 79:17, 93:25, 108:24, 108:25, 172:18, 172:19

**Different** [2] - 79:11, 79:17

**difficult** [1] - 19:10

**difficulty** [1] - 24:9

**DIRE** [1] - 187:8

**dire** [2] - 84:1, 113:22

**Dire** [1] - 84:3

**DIRECT** [8] - 81:13, 85:3, 92:15, 122:23, 187:7, 187:8, 187:10, 187:13

**direct** [10] - 19:3, 42:9, 59:24, 65:14, 66:19, 76:21, 78:15, 114:3, 114:6, 183:20

**directed** [2] - 42:14, 66:22

**directing** [2] - 168:6, 168:9

**direction** [3] - 6:14, 6:16, 100:12

**directions** [3] - 24:7, 167:12, 167:17

**directly** [2] - 122:7, 124:14, 175:11

**dirty** [8] - 161:10, 171:21, 171:24, 177:8, 177:16, 181:8, 181:13, 181:14

**disagree** [5] - 22:24, 22:25, 179:5, 181:3, 181:17

**disagreement** [2] - 177:13, 180:10

**disagrees** [1] - 178:4

**discover** [1] - 148:2

**discretion** [2] - 68:13, 80:23

**discuss** [4] - 168:1, 174:11, 175:19, 186:5

**discussed** [1] - 39:3

**discussion** [4] - 15:21, 112:20, 174:10, 183:3

**disk** [2] - 110:19, 110:20

**display** [2] - 39:1, 39:4

**disputing** [1] - 9:8

**disregard** [2] - 135:1, 158:19, 158:23

**distribute** [1] - 124:14

**District** [5] - 3:8, 84:13, 93:4, 93:18, 94:17

**DISTRICT** [2] - 1:1, 1:2

**DIVISION** [1] - 1:2

**DOAR** [1] - 90:7

**DOC** [3] - 45:9, 45:10, 45:14

**document** [6] - 42:8, 42:10, 54:25, 55:5, 101:25, 102:5

**documents** [2] - 83:1, 101:23

**dollars** [1] - 95:3

**dominion** [2] - 175:21, 178:6

**done** [9] - 40:1, 58:7, 74:24, 75:20, 75:23, 97:4, 97:19, 105:2, 106:9

**Donte** [4] - 143:3, 143:4, 143:14, 143:19

**door** [1] - 99:19

**doors** [1] - 13:18

**double** [3] - 179:8, 181:9, 181:10

**doubt** [2] - 14:10, 23:7

**Down** [2] - 12:7, 131:14
**down** [21] - 3:17, 5:8, 13:13, 26:16, 40:11, 56:1, 100:13, 112:6, 115:8, 119:5, 122:6, 139:13, 140:5, 142:8, 142:25, 144:8, 144:18, 144:25, 150:12, 154:7, 154:9
**downstairs** [1] - 111:15
**Downtown** [2] - 94:6, 169:17
**downward** [2] - 59:15, 59:21
**draft** [1] - 89:10
**draw** [1] - 176:16
**drew** [2] - 179:17, 179:19
**drives** [1] - 13:7
**driving** [2] - 149:6, 152:22
**drop** [2] - 147:1, 147:2
**Drug** [1] - 36:1
**drug** [19] - 10:1, 10:3, 10:4, 11:5, 17:7, 19:12, 19:14, 19:18, 33:2, 34:13, 74:13, 124:20, 127:6, 132:16, 132:22, 133:17, 133:18, 133:20, 146:5
**drugs** [33] - 12:11, 13:14, 14:1, 15:11, 34:3, 36:19, 36:20, 40:10, 40:15, 41:10, 66:8, 66:13, 123:24, 124:14, 126:6, 127:4, 127:25, 128:6, 128:8, 128:17, 128:18, 128:19, 131:7, 131:8, 145:3, 145:7, 154:4, 154:24, 157:2, 157:3, 162:14, 162:15
**dual** [1] - 185:21
**dudes** [6] - 9:18, 13:20, 14:9, 14:17, 14:22, 18:9
**Dupont** [8] - 13:18, 13:19, 130:9, 130:10, 130:24, 131:2, 151:5, 155:15
**duress** [3] - 99:24, 100:1, 100:2
**during** [13] - 21:8, 23:8, 26:14, 46:9, 49:7, 50:13, 55:13, 60:2, 70:25, 78:15, 95:7, 97:5, 111:21
**Dwayne** [1] - 132:11
**Dwight** [6] - 148:12, 148:14, 148:23, 148:24, 149:1, 159:4

## E

**early** [2] - 24:12, 126:19
**earphones** [4] - 116:24, 117:2, 117:5, 120:16
**Eastern** [1] - 84:13
**Edgecombe** [26] - 5:3, 9:24, 10:14, 11:24, 12:2, 13:10, 129:8, 129:13, 135:25, 143:25, 144:20, 144:23, 146:19, 147:7, 149:7, 150:9, 150:14, 151:2, 151:3, 152:23, 152:25, 157:13, 157:16, 157:23, 161:18, 167:10
**effect** [3] - 13:21, 37:16, 76:10
**effort** [1] - 7:20
**Eight** [2] - 54:20, 60:10
**Either** [1] - 39:6
**either** [12] - 22:21, 31:25, 46:24, 55:8, 86:11, 90:7, 110:10, 135:9, 174:23, 175:11, 175:12, 181:14
**election** [1] - 31:6
**electronically** [1] - 109:24
**Elementary** [1] - 151:2
**Eleventh** [1] - 123:4
**elicit** [5] - 11:9, 11:17, 12:23, 14:6, 56:7
**Ellington** [4] - 184:8, 184:22, 185:5, 185:14
**eluded** [1] - 21:7
**employed** [2] - 92:18, 92:19
**employees** [1] - 93:15
**encounter** [2] - 154:3, 157:9, 172:13
**encounters** [2] - 13:20, 14:16
**end** [8] - 11:25, 86:14, 110:10, 131:6, 139:13, 174:17, 185:10, 185:13
**ended** [2] - 46:15, 74:17
**enforcer** [2] - 134:22, 135:2
**engaged** [1] - 175:23
**England** [1] - 82:12
**enhanced** [1] - 176:9
**enjoy** [1] - 174:13
**enter** [1] - 113:17
**entering** [1] - 99:24
**enterprise** [2] - 7:14, 7:15
**enterprises** [1] - 87:7
**enters** [4] - 27:7, 27:13, 114:24, 122:10

**Entertainment** [3] - 131:7, 131:8, 131:14
**entertainment** [1] - 131:9
**entire** [1] - 111:7
**entirely** [4] - 26:25, 30:18, 30:21, 181:9
**entitled** [7] - 15:14, 19:11, 19:17, 19:25, 20:5, 26:20, 178:7
**entity** [2] - 91:16, 180:21
**envelope** [1] - 5:22
**equivalent** [1] - 184:3
**ERNEST** [1] - 187:4
**erred** [1] - 178:16
**Esquire** [11] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22, 42:15
**establish** [1] - 121:24
**established** [3] - 41:13, 66:15, 66:21
**estimate** [4] - 44:24, 50:10, 109:12, 109:14
**et** [1] - 188:5
**evening** [1] - 174:13
**event** [2] - 7:3, 15:5
**eventually** [2] - 16:7, 155:5
**everywhere** [1] - 149:12
**evidence** [18] - 7:13, 7:22, 8:1, 8:25, 19:3, 28:4, 30:1, 55:11, 65:4, 98:19, 112:20, 142:5, 142:14, 143:17, 168:21, 174:10, 176:17, 182:2
**ex** [2] - 185:25, 186:7
**exact** [2] - 48:24, 78:14
**exactly** [3] - 5:7, 10:9, 184:22
**Exactly** [3] - 6:8, 10:22, 183:2
**examination** [7] - 27:18, 36:18, 42:9, 65:10, 70:25, 76:21, 78:24
**EXAMINATION** [24] - 27:20, 64:6, 75:9, 76:18, 81:13, 84:3, 85:3, 89:3, 92:15, 101:5, 115:12, 122:23, 187:4, 187:5, 187:5, 187:6, 187:7, 187:8, 187:8, 187:9, 187:10, 187:11, 187:12, 187:13
**examined** [2] - 65:7, 85:15
**Examiner** [1] - 185:2
**examining** [2] - 83:4,

181:20
**example** [4] - 15:19, 19:22, 117:20, 128:8
**excellent** [1] - 92:4
**except** [2] - 9:23, 182:15
**exception** [4] - 24:11, 84:12, 180:7, 180:24
**excerpts** [2] - 183:25, 184:2
**excludable** [4] - 176:2, 177:10, 177:18
**Excuse** [2] - 84:23, 107:2
**excused** [7] - 27:4, 81:2, 91:25, 112:14, 112:18, 112:21, 175:1
**executed** [3] - 53:11, 53:18, 54:3
**exhibit** [2] - 98:11, 100:18
**Exhibit** [54] - 54:20, 60:1, 60:10, 85:8, 86:4, 86:23, 87:20, 88:7, 88:13, 98:12, 106:17, 109:18, 125:13, 143:16, 149:14, 159:21
**exhibits** [1] - 64:3
**exist** [1] - 3:7
**existence** [2] - 7:15, 107:14
**existent** [1] - 8:21
**exits** [2] - 175:2, 175:3
**expect** [7] - 29:7, 58:18, 75:20, 75:25, 76:3, 76:7, 76:24
**expected** [2] - 73:16
**expensive** [2] - 95:1, 95:2
**experience** [3] - 23:3, 82:1, 82:19
**expert** [2] - 83:16, 83:23, 85:1
**explain** [1] - 144:5
**explained** [4] - 7:1, 32:9, 32:13, 59:13
**explanation** [1] - 13:24
**Explosives** [1] - 81:19
**extended** [1] - 12:18
**extensive** [1] - 23:3
**extent** [3] - 40:7, 66:3, 175:22
**eyes** [2] - 128:4, 180:2

## F

**face** [2] - 122:6, 144:4
**facilities** [3] - 82:11, 94:10, 94:19

**facility** [3] - 93:25, 106:9, 134:12
**facing** [2] - 59:23, 72:24
**fact** [22] - 12:7, 14:19, 27:24, 35:4, 35:19, 43:16, 51:14, 72:9, 77:24, 77:25, 78:1, 78:3, 78:5, 98:17, 104:20, 111:24, 114:2, 160:9, 176:6, 177:19, 178:9, 180:11
**factor** [1] - 84:24
**factors** [1] - 98:22
**fair** [2] - 23:18, 72:1
**fairly** [1] - 57:11
**familiar** [4] - 86:7, 87:1, 87:24, 88:16
**family** [1] - 62:21
**far** [12] - 7:2, 7:9, 14:13, 14:24, 15:6, 18:21, 24:14, 32:10, 123:3, 176:16, 180:16, 182:5
**Farber** [1] - 43:19
**fault** [1] - 77:11
**favor** [1] - 75:21
**favors** [4] - 74:24, 75:20, 75:23, 75:25
**FBI** [1] - 110:25
**February** [10] - 42:9, 43:25, 44:25, 45:1, 50:4, 50:21, 90:14, 91:9, 141:23, 145:24
**federal** [2] - 23:6, 29:10, 46:16, 57:17, 59:19, 73:2, 76:25, 77:16, 77:19, 81:20, 82:2, 82:13, 84:12, 84:18, 84:19, 96:17, 96:18, 96:19, 116:18
**Federal** [3] - 48:1, 48:2, 84:8
**feed** [1] - 92:5
**fell** [2] - 22:2, 24:4
**felon** [1] - 57:1
**felony** [1] - 57:9
**felt** [2] - 29:22, 36:11
**Felton** [1] - 103:12
**females** [1] - 97:25
**few** [12] - 11:23, 11:24, 13:18, 41:24, 72:15, 89:5, 89:6, 89:15, 90:6, 120:5, 120:6, 182:24
**fight** [4] - 16:5, 112:9, 142:8, 142:9
**fighting** [1] - 144:8
**figured** [1] - 117:25
**file** [1] - 110:1
**filed** [1] - 113:15
**filled** [1] - 107:6
**film** [1] - 110:4

**finalized** [1] - 61:9
**Finally** [1] - 78:23
**finally** [5] - 59:24, 62:2, 87:19, 88:11, 177:8
**financial** [1] - 94:24
**fine** [5] - 19:16, 55:12, 114:22, 149:21, 186:1
**Fine** [1] - 186:2
**finger** [4] - 16:13, 150:16, 151:11, 151:22
**fingerprinted** [1] - 97:16
**fingerprinting** [1] - 96:23
**finish** [7] - 113:24, 114:3, 114:5, 150:4, 150:6, 150:7, 185:19
**Finney** [2] - 152:8, 152:23
**firearm** [13] - 57:4, 82:23, 83:4, 83:5, 85:18, 86:12, 86:14, 175:23, 177:15, 177:16, 178:7
**Firearms** [3] - 81:19, 96:13, 185:2
**firearms** [20] - 81:20, 82:6, 82:7, 82:8, 82:9, 82:10, 82:11, 82:20, 83:17, 83:24, 86:11, 88:5, 89:7, 175:17, 175:19, 175:22, 175:24, 176:5, 178:8, 181:25
**firm** [2] - 28:13, 87:4
**first** [42] - 2:3, 6:20, 9:1, 11:8, 16:1, 28:5, 34:21, 35:2, 42:19, 43:3, 43:6, 51:20, 60:25, 62:2, 64:21, 69:19, 69:20, 70:13, 72:19, 75:7, 80:1, 80:15, 80:20, 81:9, 90:13, 92:11, 95:18, 114:9, 114:20, 116:2, 117:10, 117:11, 118:12, 119:3, 120:12, 138:24, 153:14, 153:15, 176:24
**First** [4] - 3:17, 42:8, 98:16, 165:10
**first-come-first-serve** [3] - 69:19, 80:11, 80:15
**first-hand** [1] - 176:24
**five** [1] - 97:2
**Five** [5] - 95:12, 97:21, 99:13, 99:14, 99:17
**Flannery** [1] - 1:19
**Flannery's** [1] - 183:13
**flesh** [1] - 108:8
**floor** [2] - 93:8, 95:15
**Floor** [1] - 95:4
**focus** [3] - 101:9, 102:4,

149:25
**follow** [3] - 37:23, 68:5, 84:17
**followed** [1] - 37:15
**following** [7] - 12:2, 35:20, 35:21, 51:17, 51:18, 72:14
**follows** [1] - 23:22
**FOR** [1] - 1:2
**forced** [1] - 22:16
**foregoing** [1] - 188:6
**foreign** [2] - 86:19, 87:11
**forget** [1] - 178:25
**Form** [1] - 106:20
**form** [2] - 102:9, 102:11
**formal** [1] - 90:1
**forth** [3] - 71:13, 178:11, 180:3
**forwarded** [1] - 60:16
**Foundation** [2] - 134:23, 171:19
**foundation** [13] - 8:9, 8:20, 10:19, 10:23, 17:3, 17:12, 18:1, 135:6, 174:4, 177:4, 177:6, 177:7, 182:14
**foundational** [1] - 9:14
**four** [6] - 9:16, 51:2, 59:16, 59:21, 145:9, 181:23
**frame** [3] - 3:18, 105:11, 105:14
**frankly** [2] - 23:25, 176:16
**Frederick** [3] - 116:10, 116:11, 116:21
**free** [1] - 68:9
**Friday** [4] - 174:19, 174:21, 174:22, 174:24
**friend** [6] - 41:7, 141:4, 164:15, 164:16, 169:2, 173:11
**friend's** [1] - 141:5
**friends** [2] - 35:23, 168:5
**front** [8] - 2:9, 25:3, 77:15, 77:16, 90:14, 90:20, 125:15, 130:24
**full** [6] - 22:22, 81:9, 92:11, 115:3, 122:20, 125:6
**fully** [2] - 3:4, 76:6
**functioned** [1] - 31:11
**Fund** [1] - 136:18
**funding** [2] - 136:15, 136:17
**furtherance** [2] - 9:4, 11:1
**future** [3] - 94:21,

94:23, 105:7

**G**

**G-A-B-I-L-O-N-D-A** [1] - 87:16
**Gabilonda** [2] - 87:5, 87:16
**gained** [1] - 175:13
**game** [4] - 145:5, 154:15, 154:16, 154:18
**GARDNER** [1] - 1:8
**Gardner** [26] - 1:21, 24:3, 38:10, 38:12, 38:18, 40:22, 40:24, 41:5, 41:16, 44:5, 44:8, 44:12, 45:8, 45:19, 45:24, 46:19, 50:13, 53:10, 56:4, 56:7, 56:14, 66:9, 67:9, 67:12, 67:16, 130:16
**Gardner's** [4] - 23:5, 54:20, 60:1, 60:9
**general** [1] - 71:2
**generally** [2] - 7:21, 25:2
**genesis** [1] - 10:14
**gentleman** [1] - 37:7
**gentlemen** [13] - 19:23, 21:14, 27:14, 36:24, 49:6, 50:12, 80:5, 98:16, 112:15, 122:11, 124:6, 172:5, 174:25
**Georgia** [1] - 86:16
**Gerard** [1] - 1:19
**girl** [1] - 173:5
**girlfriend** [2] - 173:4, 173:11
**gist** [1] - 2:19
**given** [7] - 16:23, 20:14, 26:3, 80:23, 85:20, 105:23, 168:13
**glare** [1] - 149:22
**glaring** [1] - 149:23
**Glock** [4] - 86:5, 86:7, 86:11, 86:16
**glossy** [3] - 150:4, 150:6, 150:7
**Goo** [28] - 36:15, 36:22, 38:6, 38:8, 44:5, 48:5, 48:14, 49:3, 49:7, 49:15, 50:1, 50:13, 51:25, 52:11, 52:12, 52:13, 53:24, 66:2, 70:10, 70:15, 70:22, 71:5, 71:6, 71:8, 71:11, 71:13, 130:16
**Goo's** [1] - 49:13
**Goody** [1] - 142:17

**Government** [6] - 1:15, 98:11, 125:12, 143:16, 149:14, 159:21
**government** [56] - 7:25, 10:18, 12:7, 12:9, 17:24, 19:5, 19:10, 19:11, 19:19, 19:21, 20:1, 20:5, 20:20, 21:11, 21:12, 21:20, 21:23, 21:24, 26:6, 26:20, 27:25, 28:4, 29:15, 30:2, 42:7, 43:7, 43:23, 46:16, 49:22, 49:25, 50:21, 54:22, 54:23, 55:4, 55:10, 56:18, 58:7, 60:3, 61:13, 62:1, 62:4, 62:10, 77:8, 77:25, 82:2, 83:22, 122:12, 182:1, 182:4, 183:9, 183:11, 185:21, 186:6, 186:7
**GOVERNMENT'S** [4] - 81:6, 92:8, 114:25, 122:17
**government's** [12] - 11:2, 18:23, 19:13, 19:17, 19:25, 20:16, 21:3, 25:9, 44:1, 58:18, 174:17, 185:11
**Government's** [6] - 85:8, 86:4, 86:23, 87:20, 88:7, 88:13
**grade** [1] - 123:4
**Graham** [8] - 28:11, 28:13, 42:15, 43:7, 43:16, 43:22, 55:24, 59:13, 60:17, 60:23, 73:4, 78:9
**Grand** [1] - 154:19
**grand** [27] - 3:5, 8:13, 17:6, 20:14, 25:3, 34:18, 35:6, 35:19, 38:25, 39:14, 39:20, 41:21, 41:25, 49:2, 51:14, 52:5, 65:19, 65:20, 66:7, 67:10, 70:9, 70:13, 70:15, 71:17, 182:11, 182:15
**grandmother's** [1] - 173:6
**granted** [1] - 179:8
**Gray** [1] - 127:21
**greatly** [1] - 176:9
**Gregory** [1] - 103:20
**grew** [3] - 162:25, 163:3, 167:21
**grossly** [1] - 8:9
**ground** [1] - 47:5
**grounds** [1] - 179:24
**group** [12] - 18:24, 31:21, 31:24, 32:21,

34:1, 64:13, 131:15, 131:17, 136:4, 148:15, 148:16
**groups** [1] - 68:24
**grow** [4] - 123:5, 126:24, 162:17, 162:23
**guess** [15] - 8:4, 8:18, 9:25, 10:5, 17:8, 32:4, 47:23, 106:7, 106:8, 111:18, 115:21, 125:6, 149:22, 178:20, 180:5
**guessing** [3] - 44:20, 182:12, 182:16
**guidelines** [2] - 59:10, 59:19
**guilt** [4] - 7:20, 7:22, 8:24, 20:4
**guilty** [3] - 19:16, 20:4, 46:16
**gun** [58] - 16:6, 16:7, 16:8, 17:14, 145:11, 145:18, 145:20, 145:24, 147:3, 147:4, 147:6, 147:10, 148:5, 148:12, 149:4, 158:3, 158:11, 158:25, 159:6, 159:7, 159:13, 159:14, 159:16, 160:15, 160:16, 160:21, 160:24, 161:2, 161:5, 161:10, 163:6, 170:3, 170:5, 170:20, 170:21, 171:5, 171:6, 171:7, 171:21, 172:2, 172:6, 173:7, 173:8, 173:9, 173:10, 173:13, 173:16, 173:19, 173:24, 177:8, 181:8, 181:14, 181:15, 182:10
**guns** [6] - 146:1, 147:9, 161:22, 170:2, 181:21, 181:22
**Guns** [1] - 83:9
**guy** [5] - 4:15, 12:19, 124:24, 127:14, 130:5, 130:14, 140:22, 142:10, 142:11, 142:14, 143:18, 148:15, 159:4
**Guys** [1] - 144:15
**guys** [15] - 13:3, 15:12, 19:20, 19:23, 68:10, 68:12, 130:18, 140:18, 142:2, 142:8, 144:15, 144:23, 156:6, 156:11, 186:1

**H**

**Hagerstown** [1] - 116:20
**half** [13] - 10:2, 10:8,

10:9, 46:12, 46:13, 92:24, 121:15, 125:9, 125:11, 125:12, 128:14, 129:20, 131:25
**halfway** [3] - 46:25, 47:17, 47:21
**hall** [1] - 100:13
**hallway** [4] - 96:2, 110:10, 110:13, 111:25
**hallways** [1] - 111:21
**Hammerjacks** [4] - 141:24, 142:25, 143:20, 144:8
**Hand** [1] - 124:16
**hand** [11] - 11:21, 25:10, 35:6, 43:13, 64:2, 102:17, 122:6, 122:16, 124:16, 128:19, 176:24
**handed** [1] - 8:17
**handgun** [11] - 47:23, 47:24, 72:14, 86:5, 86:24, 87:22, 123:12, 123:20, 123:21, 176:7, 176:8
**handguns** [1] - 86:8
**handling** [3] - 102:11, 109:18, 181:20
**handwriting** [2] - 60:12, 60:13
**hang** [5] - 129:22, 129:23, 130:3, 144:20, 144:23
**hanging** [2] - 5:6, 136:1
**Hanlon** [19] - 1:16, 2:18, 25:8, 36:15, 36:17, 36:25, 37:7, 37:15, 38:5, 44:5, 73:11, 75:19, 75:23, 76:21, 78:24, 89:17, 184:9, 184:21, 185:12
**HANLON** [24] - 31:13, 54:25, 55:4, 55:8, 60:4, 64:7, 73:19, 73:22, 74:12, 81:4, 81:14, 82:14, 82:17, 85:4, 87:18, 89:19, 91:23, 184:23, 185:1, 185:6, 185:8, 187:5, 187:7, 187:8
**Hanlon's** [3] - 29:3, 29:21, 58:14
**happy** [4] - 89:19, 161:7, 184:14, 186:6
**Hard** [2] - 127:13, 127:14
**hard** [1] - 106:23
**Harding** [46] - 1:16, 2:18, 10:22, 14:16, 17:25, 25:8, 26:22, 26:23, 40:1, 55:23,

60:14, 60:17, 60:23, 61:1, 62:12, 63:2, 72:16, 72:20, 72:24, 74:14, 74:20, 76:7, 77:10, 77:11, 77:18, 92:3, 98:14, 99:10, 115:24, 116:8, 118:19, 121:22, 125:14, 149:19, 151:14, 158:15, 161:13, 163:14, 164:1, 165:17, 166:1, 166:13, 166:23, 170:25, 176:12, 185:11
**HARDING** [108] - 2:21, 3:2, 3:4, 3:8, 3:20, 3:23, 4:1, 4:3, 4:7, 4:10, 4:12, 4:15, 4:19, 4:22, 5:1, 5:3, 5:5, 5:10, 5:13, 5:16, 5:20, 5:23, 6:1, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:23, 7:1, 7:5, 7:7, 7:9, 7:11, 7:13, 10:23, 11:4, 11:6, 11:8, 11:13, 11:16, 11:19, 12:1, 12:4, 12:22, 13:1, 13:6, 13:17, 14:8, 14:19, 15:2, 15:17, 16:12, 16:15, 16:17, 20:21, 20:23, 21:5, 26:2, 26:7, 26:11, 26:17, 92:1, 92:4, 92:7, 92:16, 99:11, 102:3, 108:13, 108:15, 112:11, 113:8, 113:12, 113:18, 114:1, 114:5, 114:16, 121:24, 122:13, 122:24, 135:3, 135:23, 158:16, 158:24, 161:16, 164:2, 165:10, 165:18, 166:2, 166:14, 166:17, 172:16, 172:19, 172:21, 172:24, 173:2, 176:14, 183:9, 183:22, 183:24, 184:2, 184:6, 185:12, 185:15, 185:17, 187:10, 187:13
**Harding's** [3] - 17:11, 67:11, 175:8
**harm** [1] - 174:6
**HARRIS** [1] - 1:7
**Harris** [89] - 1:18, 3:9, 3:14, 3:15, 5:7, 8:11, 9:19, 10:5, 10:6, 10:10, 11:11, 12:1, 12:5, 12:14, 12:17, 12:20, 13:11, 13:12, 13:16, 13:17, 14:4, 15:10, 15:22, 16:5, 16:8, 16:15, 16:16, 24:3, 24:4, 93:21, 95:9, 95:19, 100:8, 100:12, 103:9, 104:10, 104:20, 105:1, 106:1, 106:8, 107:11,

113:8, 114:15, 114:16, 117:20, 119:17, 121:2, 121:9, 126:8, 126:16, 126:18, 127:25, 128:8, 129:23, 131:22, 132:18, 134:3, 134:10, 134:13, 134:15, 134:21, 135:10, 136:2, 138:20, 140:14, 140:21, 141:18, 144:22, 145:18, 147:3, 153:4, 154:9, 155:1, 168:8, 168:9, 168:17, 169:1, 172:13, 173:3, 173:6, 173:15, 173:16, 173:24, 175:13, 175:15, 175:24, 181:20, 182:10
**Harris's** [2] - 106:17, 113:5
**HAYES** [3] - 114:25, 122:17, 187:12
**Hayes** [116] - 2:20, 3:13, 4:4, 4:14, 4:20, 4:23, 5:11, 5:18, 5:19, 6:20, 7:4, 7:7, 7:9, 8:14, 9:9, 9:18, 9:21, 9:22, 10:2, 10:6, 10:7, 10:10, 10:24, 11:2, 12:9, 12:13, 12:16, 13:7, 13:14, 13:21, 13:25, 14:3, 14:20, 14:24, 15:1, 15:10, 15:19, 15:23, 16:5, 16:6, 16:7, 16:12, 16:14, 96:9, 96:20, 97:15, 99:21, 101:1, 103:16, 113:2, 113:9, 113:18, 113:22, 114:12, 115:4, 115:6, 115:7, 115:14, 115:16, 122:5, 122:14, 122:15, 122:21, 122:25, 123:9, 123:25, 124:24, 125:15, 125:20, 126:8, 128:1, 128:25, 129:10, 129:22, 131:6, 132:15, 133:21, 135:20, 137:6, 137:23, 138:25, 142:6, 144:19, 144:21, 145:11, 145:15, 149:15, 150:10, 154:3, 154:7, 154:8, 155:1, 159:2, 159:23, 159:25, 162:11, 171:13, 172:6, 173:13, 177:20, 179:12, 179:14, 180:2, 180:7, 180:8, 180:13, 180:20, 181:10, 181:18, 183:19, 183:21, 185:4, 185:14
**Hayes's** [4] - 3:5, 10:15, 177:15, 182:2
**head** [2] - 13:20, 14:17
**hear** [18] - 7:23, 8:19, 11:20, 12:16, 13:22,

15:4, 15:13, 15:14, 16:18, 24:14, 117:18, 117:25, 121:9, 137:20, 142:1, 142:5, 142:7, 184:21
**Heard** [1] - 130:15
**heard** [17] - 6:9, 7:17, 11:22, 16:3, 16:9, 18:15, 21:13, 23:2, 33:10, 78:23, 112:2, 119:24, 142:5, 142:6, 174:11, 177:2, 177:4
**hearing** [8] - 17:20, 54:23, 72:23, 73:3, 78:8, 78:11, 114:8, 141:24
**hearings** [1] - 23:2
**hears** [1] - 18:25
**hearsay** [9] - 9:12, 176:1, 176:2, 177:7, 177:18, 179:8, 179:9, 179:24, 180:8, 181:9, 181:10, 181:11
**Heights** [10] - 20:6, 123:8, 123:24, 124:4, 124:9, 124:11, 130:18, 132:6, 149:8, 163:4
**heists** [1] - 140:22
**held** [6] - 97:9, 106:1, 108:11, 109:3, 116:19, 183:3
**help** [3] - 90:20, 92:7, 112:8
**helped** [1] - 65:16
**helpful** [3] - 65:3, 65:12, 72:6
**helping** [1] - 74:25
**Herbert** [22] - 3:11, 3:12, 4:16, 8:13, 8:15, 8:16, 8:19, 9:13, 9:17, 10:8, 10:12, 10:24, 11:2, 11:10, 15:10, 26:7, 124:25, 125:23, 146:11, 167:1
**Herbert's** [2] - 20:23, 21:21
**hereby** [1] - 188:3
**hereunto** [1] - 188:9
**heroin** [25] - 30:5, 30:8, 30:12, 30:16, 37:14, 37:17, 37:20, 37:24, 66:18, 66:23, 67:1, 67:5, 67:6, 69:8, 69:13, 69:20, 75:13, 77:10, 78:25, 79:2, 79:5, 79:16, 79:24, 80:9, 184:15
**Hi** [3] - 87:21, 88:2, 88:4
**Hi-Point** [3] - 87:21, 88:2, 88:4
**Hickey** [3] - 134:12, 135:5, 135:10

**high** [1] - 146:4
**highlighted** [1] - 106:23
**himself** [4] - 100:14, 175:16, 175:25, 176:8
**hit** [4] - 167:12, 167:18, 168:6, 168:9
**hold** [3] - 65:16, 95:8, 171:5
**holding** [8] - 95:7, 96:25, 170:20, 170:21, 170:25, 171:2, 171:7, 173:22
**Holding** [2] - 99:14, 99:17
**home** [20] - 5:4, 48:14, 48:16, 48:18, 48:19, 48:20, 62:16, 93:17, 133:3, 133:7, 133:13, 140:20, 141:10, 141:13, 141:18, 149:6, 152:22, 157:11, 163:16, 173:5
**Home** [1] - 132:25, 133:1
**homicide** [2] - 149:11, 181:15
**honesty** [1] - 24:8
**honor** [3] - 104:15, 104:17, 104:24
**Honor** [105] - 4:1, 8:4, 8:12, 9:8, 11:6, 12:15, 14:14, 14:19, 15:5, 16:20, 17:1, 17:23, 18:8, 18:13, 18:15, 18:25, 20:2, 20:10, 20:21, 21:1, 21:4, 22:1, 22:5, 24:25, 25:14, 25:16, 26:2, 27:4, 27:12, 27:22, 31:13, 39:2, 54:19, 54:24, 55:4, 55:9, 55:12, 59:25, 60:4, 63:22, 63:25, 64:4, 73:19, 75:3, 75:4, 76:20, 81:1, 81:4, 82:14, 82:18, 83:22, 83:25, 85:5, 89:1, 89:12, 90:19, 91:6, 91:21, 91:23, 92:1, 92:4, 99:12, 101:4, 102:1, 108:15, 112:11, 115:14, 121:17, 121:21, 122:13, 126:16, 127:23, 128:9, 128:20, 132:19, 134:19, 135:21, 142:3, 149:20, 158:10, 158:16, 162:3, 162:9, 167:14, 168:10, 168:11, 168:19, 170:14, 171:15, 171:19, 172:21, 174:4, 174:7, 176:14, 176:21, 178:10, 178:20, 182:6, 182:9, 183:7, 183:10, 183:13, 183:22, 184:7, 184:23

**Honorable** [1] - 1:13
**hopefully** [1] - 98:12
**hoping** [1] - 55:7
**hot** [1] - 47:5
**hour** [2] - 154:25, 184:5
**hours** [1] - 149:5
**house** [37] - 3:14, 6:2,
9:21, 10:14, 13:18,
15:23, 46:25, 47:17,
47:21, 53:12, 54:3,
71:12, 80:19, 83:1,
105:5, 129:12, 131:2,
133:25, 134:8, 150:13,
151:4, 151:5, 151:6,
151:9, 151:21, 151:22,
151:23, 151:25, 152:1,
152:24, 152:25, 153:14,
153:17, 155:15, 157:10,
157:21, 173:6
**housed** [1] - 4:12
**houses** [1] - 150:16
**hug** [1] - 183:6
**hum** [1] - 45:2
**hung** [3] - 5:7, 5:10,
5:11
**hurt** [1] - 172:10
**hypothetically** [1] -
178:25

## I

**IBN** [1] - 187:4
**IBN-REYNOLDS** [1] -
187:4
**ID** [1] - 113:9
**idea** [9] - 42:2, 47:4,
47:5, 50:8, 54:1, 79:20,
79:24, 93:13, 114:8
**identification** [2] -
115:23, 122:3
**identifications** [1] -
119:12
**identified** [5] - 119:3,
120:9, 126:15, 127:22,
176:7
**identify** [17] - 114:13,
115:17, 115:20, 117:11,
117:15, 118:3, 118:8,
119:2, 119:17, 119:21,
119:24, 120:2, 120:22,
129:12, 142:14, 143:17,
168:21
**identifying** [2] - 113:2,
113:5
**illegal** [3] - 33:1, 33:5,
79:5
**illicit** [1] - 181:16
**immediately** [2] - 12:2,
36:25

**impermissible** [1] -
177:10
**implies** [1] - 7:21
**important** [5] - 17:25,
26:1, 32:17, 84:21, 184:7
**imported** [2] - 86:15,
87:6
**importer** [1] - 87:7
**imposes** [1] - 28:25
**imposing** [1] - 26:22
**impossible** [1] - 104:19
**IN** [1] - 1:1
**in-house** [1] - 83:1
**incarcerated** [1] - 74:10
**incarceration** [1] - 57:8
**incident** [21] - 16:1,
16:10, 23:10, 49:9,
50:14, 52:20, 101:19,
107:1, 107:3, 107:19,
107:23, 110:22, 111:21,
141:24, 143:21, 172:17,
172:18, 172:19, 172:25,
173:3, 174:7
**incidents** [1] - 24:6
**include** [3] - 51:1, 51:3,
93:11
**included** [4] - 3:13,
69:2, 69:4, 69:6
**includes** [1] - 96:23
**including** [2] - 7:23,
13:3
**Including** [2] - 6:17,
6:18
**indeed** [2] - 8:23,
175:14
**independent** [3] -
17:10, 121:24, 180:7
**independently** [1] -
68:25
**INDEX** [1] - 187:1
**indicated** [2] - 66:9,
71:7
**indictment** [1] - 2:13
**Individual** [2] - 102:7,
107:9, 107:10
**individual** [7] - 106:11,
106:19, 110:15, 178:25,
179:1
**indulgence** [1] - 63:22,
121:19
**infer** [2] - 19:15, 20:4
**inference** [2] - 175:12,
182:4
**informally** [1] - 31:4
**information** [16] -
11:17, 30:1, 56:3, 56:7,
86:17, 91:15, 96:24,
97:16, 163:21, 164:17,
166:3, 166:8, 166:10,
170:1, 175:13, 182:18

**informed** [1] - 102:23
**initial** [1] - 49:21
**initiation** [1] - 33:25
**injuries** [3] - 100:15,
101:2, 101:3
**innocence** [1] - 98:23
**innocent** [1] - 99:8
**innocuous** [4] - 14:13,
14:15, 18:16, 19:7
**inside** [4] - 13:10,
13:11, 66:23, 153:2
**instances** [2] - 8:24,
9:16
**instead** [1] - 116:21
**institution** [2] - 44:11,
57:19
**instruct** [2] - 8:10, 9:4
**instructed** [1] - 98:16
**instruction** [1] - 185:22
**instructions** [3] - 3:14,
6:1, 6:13
**insufficient** [1] - 177:6
**insure** [2] - 93:16
**intend** [3] - 20:15,
22:17, 23:11
**intended** [3] - 21:18,
60:23, 181:13
**intending** [4] - 11:9,
12:4, 12:23, 13:2
**intends** [1] - 21:12
**intention** [2] - 29:4,
64:19
**intentionally** [1] - 57:4
**interactions** [4] - 16:4,
175:15, 175:19, 176:4
**interfere** [1] - 68:10
**Internal** [1] - 82:4
**interruptions** [1] - 97:3
**interstate** [14] - 82:6,
83:6, 83:16, 83:17,
83:23, 83:24, 84:8,
84:18, 85:22, 86:19,
87:10, 88:8, 88:22,
184:10
**intrinsic** [1] - 7:14
**introduced** [1] - 28:3
**invasion** [6] - 133:1,
133:3, 133:7, 133:16,
140:20, 141:18
**invasions** [1] - 132:25
**investigate** [1] - 81:20
**investigating** [1] - 43:8
**investigation** [5] - 90:2,
91:1, 91:3, 91:8, 174:11
**Investigation** [1] -
101:12
**investigations** [1] -
82:12
**Investigator** [1] -
101:15

**investigator** [3] -
101:16, 101:19, 101:20
**involved** [14] - 17:7,
40:6, 52:19, 53:1, 66:2,
82:12, 131:22, 140:21,
140:22, 141:17, 158:4,
158:12, 158:21, 181:14
**involving** [2] - 71:25,
72:11
**irrelevant** [1] - 177:10
**issue** [8] - 8:20, 56:11,
113:3, 113:13, 113:16,
116:17, 175:9, 181:12
**issues** [1] - 112:21
**item** [6] - 54:19, 85:7,
85:10, 87:19, 88:12,
88:16
**itself** [4] - 5:22, 61:23,
111:3, 112:6

## J

**jail** [11] - 74:21, 74:25,
93:17, 105:13, 107:19,
107:20, 128:25, 129:2,
129:4, 129:14, 131:6
**jails** [4] - 94:17, 94:22,
95:1, 95:2
**James** [1] - 1:21
**Jencks** [1] - 18:19
**Jersey** [2] - 87:6, 87:8
**jittery** [3] - 153:6, 153:7,
153:18
**job** [4] - 101:20, 135:10,
135:14
**join** [2] - 114:19, 182:7
**joining** [1] - 182:8
**joint** [5] - 147:18,
175:21, 178:6, 179:12,
180:14
**jointly** [1] - 176:9
**judge** [14] - 73:2, 73:3,
73:18, 73:20, 73:23,
74:1, 76:5, 76:6, 76:7,
77:15, 77:16, 77:19,
78:4, 116:17
**Judge** [6] - 1:13, 2:17,
10:23, 73:2, 77:19, 113:8
**Judge's** [3] - 73:7, 73:8,
73:23
**judgment** [1] - 19:11
**July** [9] - 34:22, 35:2,
35:20, 39:10, 51:15,
58:24, 58:25, 65:21,
91:10
**jumps** [1] - 26:25
**jumpsuit** [1] - 100:7
**June** [8] - 28:22, 58:24,
58:25, 61:21, 63:13,

93:20, 96:9, 105:1
**jury** [67] - 2:9, 3:5, 8:13,
9:1, 9:4, 14:23, 17:6,
19:15, 19:23, 20:3, 20:5,
20:14, 21:11, 21:14,
23:4, 23:5, 24:23, 25:3,
25:23, 28:5, 34:18, 35:6,
35:19, 36:25, 38:25,
39:14, 39:20, 41:21,
41:25, 48:13, 49:2, 49:6,
50:12, 51:14, 52:5, 55:7,
55:10, 62:23, 65:20,
66:7, 67:10, 70:9, 70:13,
70:15, 71:17, 74:7,
78:15, 80:5, 113:3,
115:9, 115:11, 122:4,
124:6, 135:1, 150:8,
158:19, 158:22, 172:5,
174:8, 174:15, 176:17,
179:18, 179:25, 182:12,
182:15
**Jury** [5] - 1:14, 27:13,
112:24, 122:10, 175:2
**jury's** [2] - 15:14, 142:5
**Jury's** [1] - 112:21
**juveniles** [1] - 98:1

## K

**Karen** [1] - 185:2
**keep** [16] - 9:21, 68:17,
74:10, 80:6, 83:2,
102:24, 103:9, 104:18,
109:23, 112:20, 122:5,
146:13, 147:20, 168:19,
174:20, 180:17
**Kelsey** [1] - 1:17
**Kept** [1] - 147:9
**kept** [6] - 68:20, 68:22,
93:11, 104:21
**key** [1] - 17:1
**keyboard** [1] - 136:24
**keys** [2] - 79:14, 80:9
**kidding** [1] - 178:20
**kidnapped** [1] - 16:2
**kidnapping** [1] - 16:1
**kill** [8] - 3:15, 6:1, 6:14,
15:15, 16:6, 19:1, 182:11
**killed** [6] - 11:11, 15:20,
163:7, 164:23, 166:4,
166:8
**killing** [1] - 182:3
**kilo** [4] - 79:16, 79:24,
80:14, 80:16
**kilos** [4] - 69:20, 79:13,
79:14, 80:21
**Kind** [1] - 153:7
**kind** [30] - 15:16, 18:23,
18:24, 24:13, 31:4,

31:11, 32:10, 35:24, 36:1, 42:18, 101:22, 124:20, 126:12, 127:6, 131:8, 131:11, 132:24, 133:15, 146:1, 149:10, 152:16, 152:18, 153:6, 154:18, 160:2, 160:6, 161:5, 170:5, 177:9, 184:14

**Klas** [4] - 111:24, 185:7, 185:8, 185:14

**knife** [9] - 16:5, 16:9, 17:14, 145:15, 145:19, 145:22, 173:9, 173:14, 173:17

**knit** [1] - 32:10

**knowing** [1] - 26:3

**knowingly** [1] - 57:4

**knowledge** [17] - 9:15, 10:16, 10:19, 17:11, 90:18, 113:14, 128:1, 131:21, 137:5, 137:23, 141:17, 143:15, 145:16, 175:9, 175:12, 176:3, 176:24

**known** [11] - 3:5, 26:15, 87:5, 88:4, 124:25, 126:18, 127:16, 130:16, 162:21, 163:8, 182:15

**knows** [8] - 11:19, 13:8, 13:22, 15:20, 27:1, 33:12, 152:3, 178:1

**Kramer** [2] - 43:1, 43:5

**Kramon** [2] - 28:13, 42:15

**Kurland** [6] - 1:22, 20:11, 82:14, 89:22, 90:16, 185:19

**KURLAND** [15] - 2:2, 2:14, 2:17, 83:25, 84:4, 89:4, 89:23, 89:25, 90:19, 90:24, 183:18, 185:20, 185:24, 187:8, 187:9

## L

**lack** [2] - 176:2, 176:23

**ladies** [12] - 19:23, 21:13, 36:24, 49:6, 50:12, 80:5, 98:15, 112:15, 122:11, 124:6, 172:5, 174:25

**Ladies** [1] - 27:14

**laid** [1] - 15:8

**lamps** [2] - 151:15, 151:16

**land** [1] - 54:14

**largely** [1] - 79:5

**Larkin** [4] - 147:13, 160:3, 160:4, 160:6

**Lassiter** [18] - 3:3, 3:16, 6:2, 6:10, 7:3, 7:4, 7:9, 16:7, 17:14, 167:19, 167:20, 168:7, 168:23, 169:4, 172:12, 174:6, 180:1, 182:11

**Lassiter's** [2] - 3:14, 8:5

**last** [13] - 14:7, 28:19, 39:3, 62:13, 81:9, 92:11, 109:4, 109:6, 132:4, 132:12, 143:6, 152:1, 182:9

**Last** [1] - 81:12

**late** [4] - 137:20, 182:24, 182:25, 185:19

**latest** [1] - 174:22

**Laura** [1] - 1:17

**law** [4] - 28:13, 57:17, 84:22, 84:24

**LAWLOR** [52] - 2:24, 8:4, 75:6, 75:10, 91:6, 91:12, 91:21, 114:21, 121:19, 121:21, 134:24, 135:7, 135:18, 142:3, 148:10, 158:10, 158:18, 161:8, 162:9, 163:11, 164:25, 165:7, 165:14, 165:19, 166:5, 167:14, 168:11, 170:14, 170:18, 171:15, 171:19, 171:22, 171:25, 172:3, 172:7, 176:21, 178:10, 178:14, 178:17, 178:20, 179:11, 179:22, 180:12, 180:23, 181:3, 181:5, 182:22, 182:24, 183:2, 183:5, 184:18, 187:5

**Lawlor** [8] - 1:18, 2:22, 8:3, 75:7, 91:20, 114:17, 177:13, 182:7

**Lawlor's** [1] - 2:19

**Lawrence** [3] - 115:4, 115:6, 122:21

**lawyer** [17] - 28:10, 42:14, 43:17, 43:22, 43:25, 50:15, 52:10, 52:21, 52:22, 55:24, 56:20, 60:17, 62:3, 71:8, 72:4, 72:10

**lay** [6] - 10:19, 14:16, 15:7, 17:3, 17:12, 18:1

**laying** [1] - 10:23

**lead** [4] - 17:25, 18:2, 18:5, 163:13

**leading** [5] - 70:19, 128:9, 128:20, 162:3, 162:4

**learn** [2] - 162:2, 162:5

**least** [9] - 17:18, 49:24, 92:5, 118:17, 123:18, 125:7, 151:15, 181:21, 184:8

**leave** [7] - 23:2, 25:6, 39:4, 111:13, 112:19, 155:5, 174:9

**leaves** [2] - 13:23, 47:5

**left** [16] - 15:3, 32:7, 43:13, 80:22, 102:17, 139:8, 139:9, 147:22, 150:11, 155:7, 155:25, 156:23, 157:16, 173:12, 185:11

**left-hand** [2] - 43:13, 102:17

**Lemon** [1] - 160:12

**lending** [1] - 175:17

**lengthy** [1] - 57:11

**lenient** [3] - 76:4, 76:7, 76:25

**less** [1] - 95:2

**lesser** [1] - 29:9

**letter** [69] - 2:19, 2:20, 2:21, 2:22, 2:25, 3:4, 3:7, 3:9, 3:15, 3:18, 4:8, 4:18, 4:22, 4:24, 5:18, 5:21, 5:22, 5:24, 8:11, 8:14, 8:15, 8:16, 9:5, 42:9, 42:18, 43:14, 44:1, 55:12, 55:19, 55:20, 56:20, 60:14, 60:16, 61:3, 62:12, 62:19, 63:1, 72:14, 72:20, 166:19, 166:21, 166:24, 166:25, 167:5, 167:11, 167:17, 168:1, 168:2, 168:6, 168:13, 168:14, 168:16, 168:17, 168:25, 169:19, 172:11, 177:24, 177:25, 178:1, 179:14, 179:15, 179:20, 179:21, 179:24, 180:1

**level** [1] - 59:21

**levels** [1] - 59:16

**lever** [2] - 160:9, 160:17

**lie** [1] - 35:16

**lied** [1] - 49:8

**Lied** [1] - 49:10

**life** [1] - 124:3

**light** [1] - 25:1

**lights** [1] - 139:14

**likely** [4] - 22:12, 104:14, 107:18, 174:23

**limit** [2] - 160:11, 160:13

**Limit** [1] - 160:13

**limitations** [1] - 160:13

**line** [6] - 19:10, 19:16, 51:23, 54:14, 162:13,

176:16

**Line** [5] - 35:3, 39:16, 40:9, 41:4, 51:21

**lines** [3] - 22:17, 56:1, 83:6

**Lisa** [1] - 14:5

**list** [11] - 21:3, 21:4, 21:12, 21:14, 21:24, 25:4, 25:9, 26:5, 26:6, 185:13

**listed** [1] - 26:20

**listen** [4] - 116:2, 116:24, 117:2, 117:7

**listened** [5] - 116:4, 117:8, 117:10, 118:2, 118:16

**listening** [4] - 9:11, 118:21, 119:1, 185:12

**lists** [1] - 26:18

**live** [5] - 24:22, 129:4, 129:14, 130:8, 132:6

**lived** [3] - 130:6, 149:7, 155:16

**lives** [1] - 15:22

**living** [17] - 5:6, 5:7, 5:8, 81:17, 129:7, 129:17, 129:20, 129:25, 130:1, 130:5, 133:23, 134:1, 134:3, 135:25, 150:9, 151:3, 167:10

**Llama** [2] - 86:24, 87:4

**loaned** [6] - 159:17, 160:22, 161:3, 161:19, 161:23, 180:15

**Loaned** [1] - 159:18

**local** [2] - 57:17, 82:13

**locate** [1] - 93:17

**located** [2] - 93:6, 94:5, 169:15

**location** [2] - 88:20, 151:5

**lock** [1] - 78:5

**locked** [35] - 4:3, 4:4, 45:3, 45:7, 45:14, 46:15, 46:20, 47:12, 51:25, 52:11, 52:12, 52:13, 53:24, 70:15, 70:17, 72:25, 77:12, 77:15, 77:20, 78:1, 78:12, 99:4, 128:24, 159:14, 159:19, 160:24, 162:5, 162:7, 163:6, 166:19, 171:4, 171:5, 171:6, 171:8, 171:11

**lockup** [1] - 93:11, 95:4, 96:16, 96:22, 107:23, 107:24, 108:19, 110:21, 111:6, 111:14, 111:20

**Lombard** [1] - 1:25

**Look** [1] - 21:10

**look** [7] - 41:3, 42:5, 56:22, 59:7, 61:11, 105:9, 174:12

**looked** [5] - 29:14, 61:15, 77:9, 148:3, 153:6

**looking** [5] - 52:21, 56:1, 96:6, 139:16, 152:18

**looks** [1] - 140:2

**loose** [1] - 146:24

**loosely** [1] - 31:25

**Lorcin** [1] - 88:14

**Lorcin's** [2] - 88:18, 88:19

**lost** [6] - 16:12, 16:16, 135:10, 135:13, 170:2, 171:10

**lower** [1] - 43:13

**luck** [2] - 106:5, 106:6

**luncheon** [1] - 112:16

**Lynch** [2] - 186:4, 186:9

## M

**M-21** [2] - 87:20, 88:7

**machine** [2] - 110:17, 136:24

**Madison** [1] - 45:12

**mail** [8] - 4:9, 5:12, 5:15, 113:10, 113:16, 113:19, 113:22, 114:14

**mailed** [2] - 4:10, 4:11

**mails** [3] - 4:14, 4:15, 4:17

**man** [2] - 22:2, 164:17

**maneuver** [1] - 115:8

**manipulating** [1] - 110:20

**manner** [2] - 22:15, 188:8

**manufacture** [4] - 87:9, 88:5, 88:6, 88:20

**manufactured** [15] - 83:6, 85:17, 85:18, 85:20, 86:10, 86:11, 86:13, 86:15, 86:17, 87:3, 87:4, 87:5, 88:3, 88:18, 88:19

**manufacturer** [3] - 87:1, 87:24, 88:16

**manufacturing** [1] - 82:11

**manuscripts** [1] - 83:1

**map** [11] - 3:13, 3:15, 6:2, 6:17, 6:18, 130:10, 149:13, 167:12, 167:17, 179:17, 179:19

**March** [8] - 20:6, 44:25,

45:1, 50:11, 55:20, 56:2,
56:19
   **marched** [1] - 100:12
   **marijuana** [10] - 58:1,
58:3, 58:21, 59:5, 63:20,
75:24, 77:11, 78:6,
145:1, 154:13
   **mark** [3] - 54:19, 59:25,
64:3
   **Mark** [10] - 3:10, 4:16,
9:13, 9:17, 10:8, 124:25,
125:23, 146:11, 167:1
   **marked** [1] - 60:9,
61:12, 85:8, 86:4, 86:23,
87:20, 88:12, 98:11,
100:18, 106:16, 121:6,
129:11, 143:16, 159:21,
168:20
   **market** [2] - 137:25,
138:2
   **markings** [2] - 82:9,
82:24
   **MARSHAL** [1] - 187:10
   **Marshal** [6] - 92:2,
92:19, 92:20, 92:22,
92:23, 92:25
   **marshal's** [1] - 102:9
   **marshals** [3] - 24:6,
24:15, 100:4
   **marshals'** [1] - 24:7
   **MARTIN** [66] - 1:8, 9:8,
9:25, 10:7, 10:11, 10:13,
10:20, 14:11, 14:14,
16:20, 17:1, 17:17,
17:23, 20:10, 20:18,
21:1, 21:4, 22:1, 22:5,
22:10, 22:15, 22:20,
22:24, 23:11, 23:15,
23:17, 23:23, 25:16,
25:19, 25:22, 26:15,
101:6, 113:1, 114:15,
115:13, 128:9, 128:20,
132:19, 134:19, 134:23,
134:25, 135:6, 135:17,
141:20, 148:6, 148:9,
153:23, 155:23, 156:2,
156:5, 156:9, 156:13,
158:17, 161:11, 162:3,
164:21, 165:4, 165:11,
166:15, 173:25, 174:4,
182:6, 182:8, 183:11,
184:17, 187:11
   **Martin** [19] - 1:19, 1:20,
6:10, 8:7, 9:7, 14:10,
14:21, 16:18, 17:21,
20:9, 21:25, 24:3, 25:18,
114:19, 114:20, 115:11,
121:20, 130:14, 182:5
   **Martin's** [2] - 6:9, 14:23
   **Marty** [3] - 164:16,

164:17
   **Marvin** [1] - 132:3
   **Mary** [3] - 1:24, 188:3,
188:14
   **MARYLAND** [1] - 1:2
   **Maryland** [15] - 1:12,
1:25, 28:8, 85:23, 86:20,
87:12, 88:9, 88:23, 93:5,
93:18, 94:2, 94:8, 94:14,
94:17
   **Massachusetts** [2] -
85:19, 85:21
   **master** [1] - 110:19
   **mate** [1] - 45:20
   **material** [2] - 18:19,
35:16
   **materials** [1] - 83:1
   **mates** [2] - 45:22, 46:2
   **matter** [17] - 2:2, 8:19,
12:7, 12:14, 35:17,
43:10, 84:15, 105:24,
158:21, 177:22, 178:1,
179:7, 180:18, 186:3,
186:4, 188:4, 188:8
   **matters** [2] - 175:10,
175:11
   **MB-55** [1] - 149:14
   **McCaffity** [12] - 9:18,
11:11, 11:25, 14:5,
15:16, 16:2, 34:11,
163:8, 163:17, 164:24,
176:13, 182:3
   **McCaffity's** [2] - 15:20,
163:24
   **McCaffity/Brown** [2] -
11:12, 15:9
   **McDonough** [1] - 27:10
   **mean** [30] - 5:21, 6:14,
13:16, 14:12, 14:25,
16:15, 18:25, 19:5,
21:12, 31:6, 33:20,
37:23, 41:10, 52:21,
66:12, 66:17, 66:25,
67:15, 67:16, 67:17,
68:12, 76:5, 80:14,
102:19, 104:17, 113:9,
152:17, 178:10, 184:16
   **Meaning** [1] - 157:13
   **meaning** [6] - 21:17,
57:8, 66:2, 66:20, 71:6,
146:9
   **means** [7] - 19:8, 42:20,
44:8, 66:20, 67:6,
135:19, 172:6
   **meant** [2] - 15:15,
107:23
   **media** [1] - 174:13
   **meet** [5] - 43:8, 134:13,
141:7, 141:9, 169:11
   **meeting** [7] - 7:7, 7:8,

62:13, 164:11, 164:13,
164:14, 169:9
   **member** [2] - 3:11,
134:21
   **members** [2] - 9:1,
131:17
   **Members** [1] - 174:8
   **memorandum** [1] - 51:7
   **mention** [1] - 6:9
   **mentioned** [5] - 2:15,
21:15, 24:12, 66:6, 132:8
   **mere** [1] - 177:19
   **mess** [1] - 169:3
   **messed** [1] - 144:4
   **met** [10] - 11:25, 25:2,
41:24, 42:2, 46:24,
56:19, 71:21, 93:19,
134:10, 169:10
   **Michael** [3] - 1:16, 1:18,
87:20
   **microphone** [4] - 115:5,
115:8, 122:7
   **middle** [1] - 157:7
   **might** [10] - 2:3, 8:10,
25:10, 32:11, 68:12,
89:16, 114:4, 166:11,
166:14, 181:21
   **mike** [2] - 99:15, 139:4
   **military** [2] - 116:10,
116:21
   **Military** [1] - 116:11
   **millimeter** [16] - 87:21,
88:14, 146:2, 147:11,
147:12, 147:13, 147:22,
159:9, 160:1, 160:2,
160:6, 161:3, 161:19,
170:3, 171:10, 171:14
   **millimeters** [1] - 88:2
   **mind** [3] - 17:19,
112:20, 185:17
   **minor** [3] - 100:15,
101:2, 101:3
   **minute** [9] - 27:5, 40:23,
42:15, 61:15, 112:14,
112:17, 112:21, 132:15,
183:20
   **minutes** [6] - 97:2,
112:22, 154:25, 172:23,
182:24
   **missing** [7] - 9:22,
147:25, 148:2, 149:5,
158:3, 161:18, 161:23
   **misspeaking** [1] -
168:19
   **misspoke** [1] - 170:24
   **mistrial** [1] - 182:18
   **MITCHELL** [1] - 1:7
   **Mitchell** [111] - 1:17,
2:5, 2:25, 3:9, 4:3, 4:5,
4:8, 5:10, 5:15, 8:10,

8:23, 9:2, 9:19, 10:4,
12:6, 12:13, 12:17,
12:20, 24:2, 24:12,
91:10, 103:14, 104:11,
104:20, 107:12, 114:16,
117:22, 119:18, 127:14,
127:23, 127:25, 128:12,
128:15, 128:19, 130:3,
133:7, 133:23, 134:10,
134:12, 134:21, 135:4,
135:9, 135:10, 136:1,
138:11, 138:15, 140:21,
141:18, 142:9, 142:24,
143:14, 143:20, 144:17,
144:19, 144:22, 145:11,
159:14, 159:15, 159:19,
160:22, 161:2, 161:19,
162:2, 162:5, 163:6,
166:19, 167:4, 170:12,
170:13, 170:17, 171:3,
171:4, 171:7, 171:10,
171:13, 172:12, 173:22,
175:13, 175:15, 175:24,
176:5, 176:8, 176:25,
177:14, 177:17, 177:19,
177:22, 177:25, 178:2,
178:3, 178:8, 178:21,
178:24, 179:3, 179:4,
179:10, 179:13, 179:16,
179:19, 179:25, 180:6,
180:9, 180:15, 180:19,
181:7, 181:11, 181:13,
181:19, 188:5
   **Mitchell's** [4] - 167:17,
177:16, 181:1
   **mix** [1] - 178:13
   **model** [1] - 83:5
   **moment** [4] - 24:12,
65:23, 98:14, 186:1
   **Monday** [1] - 93:21
   **money** [20] - 30:9,
50:15, 52:8, 52:9, 52:20,
52:22, 53:1, 53:12,
53:13, 53:18, 70:2, 70:5,
71:7, 71:8, 71:17, 71:25,
79:8, 80:2, 133:22,
136:17
   **monitor** [5] - 21:19,
98:12, 98:13, 149:23,
154:20
   **monitoring** [2] - 21:24,
26:24
   **monitors** [1] - 96:4
   **Monroe** [2] - 40:12,
41:14
   **Montana** [34] - 3:11,
3:12, 4:16, 4:17, 4:18,
4:20, 4:23, 4:24, 5:6,
5:17, 5:23, 5:24, 11:3,
11:10, 12:19, 125:21,

125:22, 125:24, 128:14,
129:20, 135:13, 166:18,
167:1, 170:9, 175:15,
175:21, 175:22, 176:5,
176:9, 180:13, 180:14,
180:16, 180:20, 181:2
   **Montgomery** [4] - 49:8,
50:15, 103:10
   **month** [4] - 56:23, 63:7,
105:20, 183:6
   **Months** [4] - 63:6, 63:8,
63:9
   **months** [10] - 34:24,
41:24, 104:21, 105:14,
105:15, 105:17, 106:1,
106:4, 109:4
   **Moon** [1] - 169:12
   **moot** [1] - 56:11
   **morning** [20] - 2:21,
14:1, 15:8, 27:9, 27:14,
27:22, 27:23, 64:8, 64:9,
81:11, 95:10, 96:9,
110:4, 122:25, 149:5,
174:14, 174:15, 175:1,
183:13, 185:20
   **Most** [3] - 94:20,
104:14, 107:18
   **most** [3] - 95:1, 110:1,
179:5
   **mother** [3] - 130:6,
153:17, 155:16
   **mother's** [3] - 13:18,
131:2, 151:5
   **MOTION** [1] - 187:12
   **Motion** [3] - 170:15,
171:23, 182:20
   **motion** [5] - 23:2,
59:10, 113:12, 113:14,
185:20
   **motions** [2] - 23:1,
113:15
   **motivation** [1] - 71:18
   **motive** [1] - 94:24
   **mouthing** [1] - 24:12
   **Move** [5] - 99:15,
134:25, 151:13, 158:10,
171:22
   **move** [15] - 39:2, 40:8,
82:7, 101:14, 105:12,
105:19, 106:3, 134:24,
150:11, 150:12, 158:17,
158:18, 170:14, 172:3,
182:18
   **moved** [2] - 56:10,
56:13
   **movement** [2] - 83:17,
83:24
   **movie** [3] - 125:24,
126:1, 126:3
   **moving** [5] - 55:6,

105:2, 105:4, 152:5, 152:6

**MR** [286] - 2:2, 2:14, 2:17, 2:21, 2:24, 3:2, 3:4, 3:8, 3:20, 3:23, 4:1, 4:3, 4:7, 4:10, 4:12, 4:15, 4:19, 4:22, 5:1, 5:3, 5:5, 5:10, 5:13, 5:16, 5:20, 5:23, 6:1, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:23, 7:1, 7:5, 7:7, 7:9, 7:11, 7:13, 8:4, 9:8, 9:25, 10:7, 10:11, 10:13, 10:20, 10:23, 11:4, 11:6, 11:8, 11:13, 11:16, 11:19, 12:1, 12:4, 12:22, 13:1, 13:6, 13:17, 14:8, 14:11, 14:14, 14:19, 15:2, 15:17, 16:12, 16:15, 16:17, 16:20, 17:1, 17:17, 17:23, 18:8, 18:12, 18:15, 19:5, 20:2, 20:7, 20:10, 20:18, 20:21, 20:23, 21:1, 21:4, 21:5, 22:1, 22:5, 22:10, 22:15, 22:20, 22:24, 23:11, 23:15, 23:17, 23:23, 25:16, 25:19, 25:22, 26:2, 26:7, 26:11, 26:15, 26:17, 27:12, 27:21, 31:13, 54:25, 55:4, 55:8, 60:4, 60:8, 63:25, 64:4, 64:7, 70:19, 73:10, 73:15, 73:19, 73:22, 73:25, 74:12, 75:4, 75:6, 75:8, 75:10, 76:19, 81:4, 81:14, 82:14, 82:17, 83:25, 84:4, 85:4, 85:24, 87:18, 89:4, 89:19, 89:23, 89:25, 90:19, 90:24, 91:6, 91:12, 91:21, 91:23, 92:1, 92:4, 92:7, 92:16, 99:11, 101:6, 102:3, 108:13, 108:15, 112:11, 113:1, 113:8, 113:12, 113:18, 114:1, 114:5, 114:15, 114:16, 114:21, 115:13, 121:19, 121:21, 121:24, 122:13, 122:24, 128:9, 128:20, 130:20, 132:19, 134:19, 134:23, 134:24, 134:25, 135:3, 135:6, 135:7, 135:17, 135:18, 135:23, 141:20, 142:3, 148:6, 148:9, 148:10, 153:23, 155:23, 156:2, 156:5, 156:9, 156:13, 158:10, 158:16, 158:17, 158:18,

158:24, 161:8, 161:11, 161:16, 162:3, 162:9, 163:11, 164:2, 164:21, 164:25, 165:4, 165:7, 165:10, 165:11, 165:14, 165:18, 165:19, 166:2, 166:5, 166:14, 166:15, 166:17, 167:14, 168:11, 170:14, 170:18, 171:15, 171:19, 171:22, 171:25, 172:3, 172:7, 172:16, 172:19, 172:21, 172:24, 173:2, 173:25, 174:4, 176:14, 176:21, 178:10, 178:14, 178:17, 178:20, 179:11, 179:22, 180:12, 180:23, 181:3, 181:5, 182:6, 182:8, 182:22, 182:24, 183:2, 183:5, 183:9, 183:11, 183:18, 183:22, 183:24, 184:2, 184:6, 184:17, 184:18, 184:23, 185:1, 185:6, 185:8, 185:12, 185:15, 185:17, 185:20, 185:24, 187:4, 187:5, 187:5, 187:6, 187:7, 187:8, 187:8, 187:9, 187:10, 187:11, 187:13

**MS** [9] - 21:3, 24:25, 25:14, 27:4, 114:19, 114:22, 168:10, 186:3, 186:12

**multiple** [1] - 82:12
**Mungo** [1] - 103:20
**murder** [13] - 11:10, 13:6, 13:8, 13:9, 14:4, 46:20, 52:15, 53:1, 53:24, 71:11, 72:11, 113:20, 182:3
**Murder** [1] - 52:14
**murdered** [1] - 3:3
**murders** [5] - 4:6, 6:11, 9:18, 10:14, 15:9
**Music** [1] - 131:10
**music** [3] - 131:11, 131:12, 131:15, 132:14, 135:24
**must** [3] - 56:15, 56:18, 58:7

**N**

**N-1** [1] - 159:22
**NA** [14] - 29:18, 29:22, 32:12, 32:21, 33:14, 34:1, 38:19, 41:1, 64:13, 67:19, 68:4, 68:20, 70:2, 80:6
**name** [35] - 2:8, 2:15,

8:5, 26:17, 28:10, 32:22, 32:24, 32:25, 34:6, 34:9, 43:19, 44:11, 81:9, 81:10, 81:11, 81:12, 88:4, 91:3, 91:5, 91:8, 92:11, 92:12, 94:3, 115:3, 122:20, 124:24, 127:14, 129:9, 130:14, 131:13, 132:2, 132:4, 143:6, 148:22, 160:8
**named** [5] - 96:9, 103:12, 140:22, 159:4, 163:22
**names** [5] - 21:14, 21:15, 26:4, 132:10, 132:12
**narcotic** [1] - 184:12
**Nathan** [1] - 88:13
**nation** [2] - 86:18, 87:9
**near** [7] - 28:16, 94:21, 94:23, 105:6, 149:7, 151:6, 185:13
**nearby** [1] - 130:6
**necessarily** [1] - 22:21
**necessary** [1] - 176:20
**Need** [1] - 125:14
**need** [24] - 18:2, 24:23, 52:9, 68:4, 71:16, 71:17, 72:10, 89:17, 90:14, 90:22, 94:16, 100:19, 101:9, 101:14, 105:20, 106:19, 112:16, 115:7, 115:9, 121:23, 151:16, 174:19, 174:24, 175:5
**needed** [13] - 50:15, 52:22, 53:12, 71:8, 72:5, 94:20, 105:6, 116:14, 159:16, 177:15, 180:18, 181:8
**needing** [3] - 52:8, 71:7, 71:25
**needs** [6] - 29:16, 93:18, 97:4, 105:13, 105:18, 180:7
**negotiated** [1] - 180:15
**negotiations** [1] - 181:24
**nephew** [1] - 129:19
**never** [17] - 8:14, 8:16, 12:13, 13:23, 15:23, 16:23, 21:7, 33:5, 42:2, 113:13, 128:18, 133:25, 136:6, 136:7, 136:9, 153:10, 155:10
**Never** [5] - 134:9, 136:3, 136:8, 159:1, 159:5
**New** [5] - 82:11, 84:13, 87:6, 87:8
**new** [7] - 26:3, 74:13,

96:19, 97:21, 99:19, 99:21, 178:12
**news** [1] - 16:21
**Next** [2] - 81:3, 91:25
**next** [10] - 28:19, 40:8, 41:3, 63:16, 71:11, 71:19, 122:12, 149:4, 151:9, 157:7
**nexus** [6] - 82:6, 83:16, 83:23, 84:8, 84:18, 184:10
**nice** [1] - 72:6
**nickname** [5] - 126:3, 127:8, 142:16, 142:18, 148:18
**nicknames** [2] - 127:8, 127:12
**niece** [1] - 129:19
**Niedermeier** [1] - 2:6
**night** [15] - 9:17, 11:14, 13:6, 14:4, 137:19, 137:21, 141:24, 142:24, 152:9, 152:14, 157:5, 158:1, 158:4, 158:12, 158:22
**Nine** [2] - 35:2, 60:1
**NO** [1] - 1:6
**nobody** [1] - 148:12
**Nobody** [1] - 153:3
**noise** [1] - 136:23
**nomenclature** [2] - 82:9, 82:24
**non** [1] - 8:21
**non-existent** [1] - 8:21
**none** [2] - 20:13, 25:22
**nonetheless** [1] - 99:8
**normal** [3] - 22:17, 103:4, 105:14
**normally** [2] - 102:23, 145:11
**NORTHERN** [1] - 1:2
**Northern** [1] - 28:8
**Northwest** [3] - 123:6, 123:7, 124:8
**note** [5] - 18:12, 19:9, 25:10, 112:19, 174:9
**noted** [5] - 20:8, 126:17, 127:24, 167:16, 180:24
**notes** [3] - 119:10, 120:20, 121:4
**Nothing** [4] - 63:25, 75:3, 81:1, 88:25
**nothing** [3] - 35:7, 165:21, 168:4
**notice** [2] - 149:10, 152:11
**noticed** [1] - 149:6
**notices** [1] - 13:7
**notified** [2] - 58:10, 58:11

**notion** [4] - 8:6, 8:7, 177:8, 181:13
**November** [2] - 1:11, 188:5
**nullified** [1] - 58:7
**Number** [11] - 8:5, 54:20, 60:1, 60:10, 95:12, 97:21, 99:13, 99:14, 99:17, 106:17, 177:6
**number** [14] - 9:9, 9:11, 25:22, 57:11, 64:10, 70:24, 83:5, 86:14, 98:22, 105:22, 114:6, 128:24, 177:6, 184:8
**Number(s** [1] - 188:5
**numbers** [2] - 54:5, 54:16
**numerous** [2] - 23:1, 105:21

**O**

**oath** [12] - 27:17, 35:6, 35:10, 35:13, 35:16, 36:2, 36:12, 37:6, 38:2, 39:11, 39:20, 41:20
**obituary** [2] - 164:15, 164:16
**object** [4] - 14:10, 17:18, 55:4, 182:9
**objecting** [4] - 9:10, 10:21, 19:8, 176:25
**Objection** [61] - 31:13, 70:19, 73:10, 73:15, 73:25, 85:24, 91:6, 91:12, 108:13, 108:15, 128:9, 128:20, 130:20, 132:19, 134:19, 134:23, 134:24, 135:6, 135:7, 135:17, 135:18, 141:20, 142:3, 148:6, 148:9, 148:10, 153:23, 155:23, 156:2, 156:5, 156:9, 156:13, 158:10, 158:17, 158:18, 161:8, 161:11, 162:3, 162:9, 163:11, 164:21, 164:25, 165:4, 165:7, 165:11, 165:14, 165:19, 166:5, 166:15, 167:14, 168:10, 168:11, 170:14, 170:18, 171:15, 171:22, 171:25, 172:3, 172:7, 173:25, 174:4
**objection** [13] - 9:5, 18:12, 18:17, 19:9, 20:8, 54:25, 55:2, 102:2, 102:3, 176:11, 179:23, 180:4, 182:17
**objection's** [6] - 91:7,

108:16, 132:20, 161:12, 166:16, 167:16
**objections** [2] - 54:23, 177:5
**obligations** [2] - 28:25, 29:13
**obtained** [1] - 96:24
**obviously** [3] - 26:23, 43:25, 177:16
**Obviously** [2] - 22:11, 113:24
**occasion** [10] - 21:5, 34:21, 79:10, 80:23, 128:7, 130:22, 144:3, 144:10, 172:11, 181:18
**occasions** [2] - 34:19, 35:5
**occurred** [3] - 15:8, 158:22, 161:17
**occurs** [1] - 113:1
**OF** [3] - 1:2, 1:5, 1:11
**off-record** [1] - 183:3
**off-the-record** [1] - 43:9
**offense** [2] - 57:16, 57:23
**offenses** [1] - 81:20
**offer** [2] - 12:4, 176:4
**offered** [1] - 142:4
**offhand** [2] - 34:10, 54:7
**Office** [6] - 28:7, 102:23, 102:24, 103:7, 104:13, 107:17
**office** [9] - 42:12, 59:8, 74:14, 74:24, 96:4, 108:23, 109:2, 112:2, 112:5
**officers** [2] - 111:12, 111:13
**offices** [1] - 28:16
**Official** [2] - 101:20, 188:15
**official** [1] - 102:9, 188:7
**often** [6] - 5:7, 5:10, 5:11, 99:2, 144:19, 145:15
**Ohio** [2] - 88:5, 88:6
**old** [3] - 39:21, 109:21, 123:1
**older** [4] - 39:24, 40:4, 40:14, 66:7
**Oliver** [6] - 15:15, 15:19, 16:2, 163:7, 164:24, 182:3
**ON** [2] - 187:8, 187:12
**once** [1] - 183:6
**one** [81] - 8:5, 8:24, 12:12, 16:3, 16:11, 16:12, 17:9, 21:5, 24:4,

25:16, 26:14, 27:5, 29:13, 30:13, 30:14, 34:21, 34:22, 49:24, 50:14, 51:15, 61:12, 62:15, 68:2, 69:4, 69:6, 69:10, 69:18, 77:8, 77:9, 80:9, 80:16, 80:21, 84:12, 84:24, 95:1, 95:25, 98:14, 102:22, 106:11, 106:22, 108:3, 109:20, 109:21, 110:7, 110:18, 117:5, 130:22, 133:8, 134:10, 138:11, 138:13, 138:15, 138:18, 138:24, 139:6, 139:22, 140:2, 147:10, 147:20, 151:8, 151:10, 162:17, 162:19, 164:9, 168:5, 172:24, 177:6, 180:21, 181:5, 181:18, 182:9, 182:22, 183:24, 185:17, 186:1
**One** [6] - 2:2, 23:6, 88:13, 121:1, 133:5, 150:16
**ones** [2] - 32:7, 89:10
**ongoing** [1] - 7:15
**open** [2] - 112:20, 184:20
**opened** [3] - 8:14, 8:15, 8:16
**operate** [2] - 31:25, 32:16
**Operation** [2] - 93:4, 93:16
**Operations** [1] - 93:8
**opinion** [7] - 85:21, 86:18, 87:10, 88:7, 88:21, 165:15, 177:3
**opponent** [3] - 178:23, 179:3, 179:6
**opponents** [1] - 25:2
**opportunity** [3] - 98:15, 159:23, 176:19
**opposed** [1] - 72:21
**oral** [2] - 165:8, 165:10
**order** [12] - 22:21, 22:23, 52:20, 98:8, 103:6, 103:8, 103:22, 107:11, 109:16, 109:19, 111:2
**orders** [2] - 11:13, 68:5
**Organization** [1] - 91:11
**organization** [2] - 2:5, 91:16
**otherwise** [1] - 174:20
**outlying** [5] - 94:10, 94:19, 94:21, 95:2
**outside** [3] - 94:25,

96:4, 149:11
**Overruled** [25] - 31:14, 70:20, 86:1, 91:13, 128:10, 130:21, 134:20, 141:22, 148:7, 148:11, 153:24, 155:24, 156:10, 165:1, 168:12, 170:15, 170:19, 171:16, 171:20, 172:1, 172:4, 172:9, 174:1, 174:5
**overruled** [7] - 9:6, 17:19, 91:7, 108:16, 128:22, 132:20, 167:16
**overstates** [1] - 8:9
**own** [13] - 2:14, 41:11, 66:13, 68:14, 68:17, 68:20, 68:22, 68:24, 128:4, 145:24, 171:17, 179:14, 180:2
**owned** [3] - 159:6, 159:11, 176:8
**owner** [1] - 179:12
**owners** [1] - 180:14
**ownership** [2] - 175:21, 178:6

---

## P

**p.m** [1] - 186:15
**package** [2] - 128:6, 128:18
**Package** [1] - 145:3
**packaged** [2] - 128:6, 145:4
**packaging** [2] - 128:8, 145:7
**pads** [2] - 112:19, 174:9
**PAGE** [1] - 187:3
**page** [7] - 28:5, 28:19, 28:20, 40:8, 43:14, 52:22, 71:11
**Page** [11] - 35:2, 39:16, 40:9, 41:3, 51:20, 57:14, 59:7, 62:12, 65:20, 65:24, 66:1
**pages** [2] - 57:12, 188:6
**paid** [1] - 93:16
**paperwork** [2] - 42:6, 106:9
**Paragraph** [1] - 59:7
**paragraph** [1] - 43:6
**parcel** [1] - 7:19
**pardon** [1] - 51:1
**Pardon** [5] - 30:7, 36:9, 49:17, 55:18, 60:19
**Park** [10] - 20:6, 123:8, 123:24, 124:4, 124:9, 124:10, 130:18, 132:6, 149:7, 163:3

**parked** [1] - 173:5
**parking** [2] - 150:19, 151:17
**part** [24] - 7:19, 11:3, 11:16, 12:6, 17:3, 18:9, 18:17, 28:13, 29:13, 31:21, 34:1, 40:11, 42:15, 43:13, 67:8, 73:7, 73:8, 73:12, 123:7, 134:1, 150:21, 186:7, 186:10
**Part** [1] - 83:3
**parte** [2] - 186:1, 186:7
**particular** [19] - 31:20, 33:21, 34:21, 46:8, 82:19, 83:7, 85:18, 86:12, 87:4, 98:8, 101:18, 104:1, 104:4, 105:22, 118:8, 133:15, 137:13, 160:6, 175:24
**parts** [1] - 110:21
**party** [4] - 178:23, 179:3, 179:6, 182:15
**pass** [1] - 25:11
**past** [1] - 35:25
**pattern** [1] - 7:16
**Paul** [1] - 1:19
**Pause** [3] - 60:7, 63:24, 89:21
**pay** [3] - 41:11, 66:14, 138:15
**pen** [1] - 54:23
**pending** [4] - 73:4, 78:2, 94:23, 98:18
**Pennsylvania** [1] - 51:24
**people** [32] - 5:12, 5:15, 17:4, 17:7, 17:9, 19:2, 19:24, 21:15, 26:4, 26:20, 31:24, 32:10, 32:12, 32:21, 35:25, 36:1, 45:24, 46:4, 46:5, 67:19, 78:7, 96:22, 97:14, 98:20, 98:21, 99:2, 108:25, 120:9, 124:15, 137:25, 152:19
**People** [1] - 102:20
**perfectly** [3] - 2:12, 14:12, 14:15
**perform** [1] - 137:5
**Perhaps** [4] - 89:17, 149:23, 163:13, 185:19
**perhaps** [1] - 184:20
**period** [5] - 12:18, 46:9, 62:6, 79:25, 80:17
**perjury** [1] - 35:17
**permission** [1] - 39:1
**permit** [5] - 19:21, 21:22, 113:21, 176:17, 186:6

**permitted** [6] - 2:12, 19:14, 20:3, 23:9, 175:19, 184:22
**person** [19] - 8:10, 9:15, 21:11, 31:5, 49:8, 98:18, 98:19, 99:6, 99:7, 103:12, 113:9, 120:2, 133:15, 146:4, 163:21, 166:4, 166:11, 169:10, 179:13
**personal** [7] - 10:16, 10:19, 68:18, 97:16, 175:9, 175:12, 176:3
**personally** [2] - 67:16, 67:18
**persons** [1] - 98:25
**Pete** [1] - 162:21
**Peter** [5] - 97:18, 97:19, 98:5, 98:7, 101:17
**petition** [1] - 76:3
**PH-16** [1] - 129:12
**PH-18** [2] - 138:24, 140:8
**PH-19** [1] - 139:19
**PH-54** [1] - 143:17
**PH-60** [1] - 142:14
**PH-68** [1] - 168:20
**PH-73** [1] - 125:13
**phone** [8] - 54:5, 115:18, 116:1, 116:2, 146:14, 146:16, 146:21, 169:8
**phones** [3] - 54:14, 54:15, 116:24
**photo** [1] - 140:8
**photograph** [2] - 100:20, 129:11
**photographed** [1] - 97:17
**photographing** [1] - 96:24
**photographs** [1] - 138:23
**photos** [1] - 111:22
**phrase** [3] - 18:16, 19:7, 178:22
**physically** [2] - 4:9, 111:7
**picture** [5] - 11:6, 125:16, 150:12, 168:20, 168:21
**piece** [3] - 11:17, 14:7, 19:21
**Pill** [2] - 148:19, 148:20
**pistol** [4] - 9:20, 87:4, 87:6, 88:14
**place** [9] - 11:8, 70:21, 71:18, 79:2, 110:22, 111:8, 111:9, 170:20, 170:21

**placed** [8] - 95:12, 95:17, 95:19, 96:25, 97:21, 98:20, 100:14, 137:14
**placing** [1] - 99:19
**plainly** [1] - 175:8
**Play** [4] - 145:5, 154:20, 154:22, 154:23
**play** [3] - 84:22, 98:10, 183:20
**played** [6] - 113:19, 117:13, 117:14, 137:8, 137:20, 145:5
**Playing** [2] - 154:15, 154:16
**playing** [3] - 99:12, 147:9, 181:21
**plays** [1] - 18:18
**plea** [9] - 27:25, 42:6, 42:7, 63:11, 76:9, 76:10, 77:8, 78:16
**pleading** [1] - 46:16
**Pleasant** [1] - 169:16
**pleased** [1] - 27:8
**plenty** [1] - 142:5
**Point** [3] - 87:21, 88:2, 88:4
**point** [14] - 12:16, 15:3, 18:9, 47:11, 47:19, 63:4, 71:5, 78:15, 96:16, 120:1, 126:12, 127:20, 181:7, 185:21
**pointed** [1] - 152:11
**pointing** [4] - 149:18, 150:13, 151:4, 151:12
**points** [1] - 65:8
**police** [1] - 6:9
**polo** [1] - 127:21
**pool** [1] - 70:2
**pops** [1] - 185:17
**portable** [1] - 120:17
**portions** [1] - 119:12
**position** [8] - 11:2, 74:20, 92:20, 178:21, 180:4, 180:24, 181:6, 181:7
**possessed** [1] - 57:4
**possessing** [1] - 77:9
**possession** [6] - 57:2, 63:19, 78:6, 175:17, 175:23, 178:6
**possible** [6] - 55:7, 104:24, 106:2, 122:7, 149:22, 186:6
**Possibly** [1] - 105:21
**possibly** [1] - 113:10
**potential** [1] - 21:25
**potentially** [1] - 26:21
**pounds** [8] - 58:1, 58:3, 59:3, 59:5, 63:19, 77:10,

78:6
**Pratt** [2] - 40:11, 41:14
**precede** [1] - 104:4
**preceded** [2] - 107:19, 107:23
**precise** [1] - 47:9
**prefer** [1] - 102:1
**preferred** [1] - 147:22
**preliminary** [1] - 115:10
**preparation** [3] - 64:11, 64:16, 71:21
**preparing** [1] - 51:3
**prerogative** [1] - 23:14
**presence** [1] - 113:3
**present** [8] - 7:8, 42:24, 108:3, 112:24, 113:18, 120:1, 144:16
**presentation** [1] - 174:17
**presented** [1] - 96:21
**president** [1] - 30:25
**pressed** [1] - 99:25
**presumed** [1] - 99:8
**presumption** [1] - 98:22
**pretty** [1] - 18:16
**previous** [6] - 52:22, 78:3, 139:22, 140:8, 158:1, 158:4
**previously** [2] - 158:21, 167:15
**price** [1] - 138:19
**prices** [1] - 79:17
**principal** [1] - 14:23
**print** [1] - 104:8
**Printed** [1] - 107:8
**printed** [3] - 103:24, 104:6, 107:7
**prison** [1] - 47:11
**Prisoner** [5] - 93:4, 93:8, 93:15, 102:25
**prisoner** [17] - 56:8, 96:9, 97:3, 97:8, 97:21, 98:25, 99:4, 99:7, 99:20, 99:21, 100:6, 102:20, 102:22, 105:5, 106:13, 106:14, 111:1
**prisoner's** [2] - 93:18, 105:22
**prisoners** [11] - 93:11, 94:9, 94:15, 94:16, 94:22, 94:25, 95:5, 95:8, 95:13, 99:2, 105:24
**problem** [3] - 13:12, 14:25, 179:11
**proceed** [5] - 27:15, 99:10, 108:17, 115:11, 154:2
**proceeded** [1] - 7:3
**Proceedings** [3] - 2:1, 60:7, 63:24, 186:15

**proceedings** [6] - 23:8, 24:4, 24:16, 89:21, 188:4, 188:7
**proceeds** [1] - 15:21
**process** [3] - 31:3, 111:14, 186:11
**processed** [2] - 96:23, 97:8, 97:15
**processing** [4] - 97:3, 97:5, 97:20, 111:1
**proclaiming** [1] - 108:8
**produced** [2] - 82:10, 184:15
**producer** [1] - 136:6
**production** [1] - 136:12
**proffer** [14] - 16:21, 42:9, 42:19, 42:20, 43:3, 43:9, 44:1, 49:21, 49:24, 50:20, 51:7, 53:6, 61:6, 62:1
**proffering** [1] - 62:2
**profit** [1] - 51:24
**profits** [4] - 68:17, 68:20, 68:22, 80:6
**project** [1] - 27:9
**promptly** [1] - 15:2
**property** [2] - 147:18, 179:13
**propose** [1] - 15:2
**prosecuted** [1] - 35:17
**prosecuting** [2] - 56:4, 58:8
**prosecutions** [3] - 84:16, 84:19, 84:21
**prosecutor** [3] - 40:1, 55:23, 72:16
**prosecutors** [1] - 42:22
**protected** [1] - 12:12
**protecting** [1] - 69:4
**prove** [3] - 19:6, 142:4, 174:18
**proven** [1] - 177:7
**provide** [1] - 29:25
**provided** [3] - 30:1, 59:9, 68:9
**providing** [1] - 29:15
**publication** [3] - 82:25, 83:9, 83:12
**publications** [1] - 83:12
**pull** [1] - 115:8
**pulled** [3] - 18:20, 173:13, 173:16, 173:19
**pulls** [3] - 16:8, 160:19
**pun** [1] - 181:13
**punishable** [1] - 57:8
**purchase** [2] - 30:4, 30:16
**purchased** [1] - 30:8
**purchases** [1] - 30:18
**purportedly** [2] - 8:10,

8:11
**purpose** [4] - 43:9, 83:10, 89:13, 119:1
**purposes** [3] - 87:21, 101:18, 181:16
**pursuant** [1] - 39:2
**put** [22] - 25:3, 35:6, 55:2, 65:4, 70:24, 72:6, 79:2, 90:7, 95:9, 95:15, 97:9, 97:22, 98:6, 98:8, 102:1, 116:17, 138:23, 146:24, 159:22, 167:12, 172:6, 173:11
**puts** [2] - 110:17, 110:19
**putting** [5] - 24:20, 125:16, 152:2, 167:18, 172:2
**Pyne** [1] - 1:21

### Q

**quantities** [1] - 79:11
**quantity** [3] - 59:2, 78:25, 80:9
**questioning** [2] - 39:25, 115:10
**questions** [50] - 2:7, 29:3, 29:22, 35:21, 36:2, 36:15, 37:9, 38:6, 39:13, 39:19, 40:17, 41:3, 41:20, 44:4, 51:17, 58:14, 64:10, 64:14, 64:20, 64:24, 66:1, 67:9, 67:11, 70:8, 71:4, 71:10, 71:19, 72:13, 72:15, 76:16, 76:21, 78:24, 84:5, 84:25, 89:2, 89:6, 89:23, 90:6, 90:11, 90:19, 91:19, 91:20, 101:4, 112:11, 121:18, 121:21, 175:8, 175:10
**quick** [5] - 19:1, 65:22, 84:5
**quickly** [3] - 24:24, 82:15, 114:11
**Quincy** [16] - 15:19, 15:20, 15:21, 15:22, 163:16, 163:17, 163:22, 164:3, 164:16, 164:17, 164:18, 164:23, 165:9, 165:12, 165:18, 165:20
**Quincy's** [1] - 165:6
**quite** [4] - 12:18, 157:18, 175:7, 175:16
**Quite** [2] - 120:5, 120:6

**proceeds** [1] - 15:21

### R

**racketeering** [3] - 7:16, 7:17, 184:11
**radio** [4] - 137:8, 137:11, 137:13, 137:21
**Raeshio** [2] - 142:12, 142:15
**raise** [1] - 122:15
**ran** [9] - 41:13, 66:16, 66:22, 68:24, 106:5, 106:6, 148:12, 149:1, 173:3
**Randallstown** [3] - 134:2, 162:24, 162:25
**Randallstown/Park** [1] - 91:16
**random** [1] - 105:24
**range** [1] - 79:18
**rap** [7] - 16:3, 132:14, 135:24, 148:15, 148:16, 149:2
**Rap** [1] - 131:12
**rapped** [2] - 136:8, 136:9
**rat** [2] - 121:10, 121:11
**rather** [4] - 63:11, 65:5, 89:18, 98:18
**Rather** [2] - 171:17, 176:25
**re** [1] - 74:21
**re-detained** [1] - 74:21
**reacted** [1] - 19:18
**read** [18] - 3:12, 4:22, 4:25, 5:18, 8:15, 17:6, 21:14, 35:4, 39:6, 60:25, 106:23, 167:7, 172:11, 178:1, 179:15, 179:20, 180:2
**reading** [2] - 70:16, 167:9
**reads** [1] - 4:19
**ready** [4] - 27:15, 27:19, 51:4, 115:9
**real** [3] - 34:9, 132:2, 148:22
**realize** [1] - 115:16
**really** [11] - 9:22, 12:16, 12:19, 24:23, 90:16, 109:9, 125:6, 153:10, 155:10, 180:3, 180:4
**rearrested** [1] - 78:17
**reason** [11] - 11:16, 50:14, 52:18, 52:19, 52:25, 71:18, 73:13, 74:10, 182:12, 182:13
**reasonably** [2] - 149:22, 149:23
**reasoning** [1] - 73:7,

73:8, 73:21
**reasons** [3] - 103:2, 167:14, 184:8
**receive** [1] - 5:15
**received** [7] - 5:12, 26:18, 82:5, 82:8, 82:23, 142:13, 143:17
**receives** [1] - 4:18
**recent** [3] - 74:25, 109:4, 110:1
**recently** [1] - 53:20
**recess** [6] - 112:15, 112:16, 112:17, 112:21, 112:22, 186:13
**Recess** [1] - 112:23
**recite** [1] - 185:13
**recognize** [5] - 28:19, 42:10, 55:14, 60:10, 152:7
**recognized** [1] - 26:9
**recognizes** [1] - 13:9
**recollection** [3] - 37:7, 71:2, 98:2
**record** [18] - 43:9, 51:6, 51:12, 53:6, 78:3, 81:9, 92:11, 115:3, 122:20, 126:15, 127:22, 137:23, 175:5, 176:19, 176:23, 177:1, 183:3, 183:4
**recorded** [2] - 136:22, 188:3
**recordings** [1] - 114:6
**records** [1] - 110:17
**recovered** [2] - 83:7, 86:19
**recovery** [5] - 85:22, 87:11, 88:9, 88:22
**RECROSS** [4] - 75:9, 76:18, 187:5, 187:6
**redirect** [2] - 78:24, 91:22
**REDIRECT** [2] - 64:6, 187:5
**reduce** [1] - 149:21
**refer** [1] - 125:4
**reference** [5] - 2:5, 9:20, 70:8, 70:12, 70:16
**references** [2] - 8:8, 65:19
**referred** [3] - 30:25, 60:2, 99:2
**Referring** [3] - 35:2, 39:16, 51:20
**referring** [1] - 9:19
**refers** [1] - 51:23
**reflect** [2] - 126:15, 127:22
**refused** [1] - 78:5
**refuses** [1] - 16:7
**regard** [1] - 176:5

**regarding** [2] - 2:19, 9:5
**regime** [1] - 24:19
**region** [1] - 94:15
**regulation** [1] - 57:19
**rehabilitate** [1] - 18:1
**Reisterstown** [7] - 48:4, 124:8, 124:9, 124:10, 139:15, 139:16, 140:2
**related** [2] - 170:23, 180:11
**relates** [2] - 29:9, 66:18
**relating** [1] - 42:6
**relation** [1] - 75:24
**relationship** [6] - 8:6, 36:19, 36:20, 71:25, 72:10, 134:17
**relative** [1] - 121:13
**relatively** [1] - 18:16
**relayed** [2] - 13:1, 71:13
**release** [3] - 47:13, 72:23, 78:2
**released** [16] - 46:23, 63:4, 63:7, 63:15, 63:16, 72:13, 72:19, 73:4, 73:9, 73:13, 73:24, 74:1, 74:7, 98:18, 98:21
**releasing** [1] - 74:5
**Relevant** [1] - 71:13
**relevant** [4] - 7:25, 84:15, 84:19, 181:12
**rely** [3] - 26:20, 29:22, 178:7
**remain** [5] - 27:17, 72:25, 111:8, 111:9, 112:18
**remarks** [1] - 102:12
**Remember** [1] - 40:22
**remember** [48] - 6:5, 29:18, 34:10, 34:18, 34:21, 36:14, 36:17, 36:24, 37:3, 37:5, 37:10, 37:11, 37:13, 37:17, 37:19, 37:20, 38:5, 38:6, 38:12, 38:14, 43:5, 44:17, 45:6, 45:21, 46:8, 46:23, 47:3, 48:3, 53:19, 53:21, 54:5, 54:10, 54:16, 55:17, 55:19, 60:1, 64:14, 70:22, 77:2, 77:3, 78:14, 97:14, 100:15, 121:9, 144:9, 166:18, 183:25
**remembered** [1] - 26:11
**remembering** [1] - 181:19
**remind** [2] - 98:17, 112:15
**reminded** [1] - 112:16
**remove** [1] - 149:18
**Repeat** [1] - 75:22

**repeat** [2] - 20:11, 20:12
**repeated** [2] - 177:20, 181:23
**repeatedly** [1] - 21:8
**rephrase** [1] - 73:11
**Rephrase** [3] - 73:17, 133:6, 135:8
**Report** [5] - 102:7, 106:20, 107:9, 107:10
**report** [10] - 2:14, 90:9, 90:13, 90:14, 90:17, 90:20, 90:22, 91:5, 107:6, 107:16
**Reported** [1] - 1:23
**reporter** [1] - 87:14
**Reporter** [1] - 188:15
**REPORTER'S** [1] - 188:1
**reports** [14] - 2:4, 89:8, 89:9, 89:14, 90:2, 90:4, 90:8, 90:13, 90:25, 91:9, 91:15, 106:12, 174:13
**representing** [1] - 78:9
**request** [13] - 6:14, 59:15, 77:18, 103:8, 103:9, 104:10, 104:15, 104:23, 107:16, 109:17, 109:19, 110:2
**requested** [2] - 104:1, 107:11
**requesting** [1] - 78:1
**require** [3] - 184:11, 184:13, 186:5
**requirement** [1] - 184:10
**res** [1] - 180:11
**RES** [1] - 180:11
**research** [1] - 83:3
**researching** [1] - 82:19
**residence** [1] - 11:24
**resources** [2] - 82:24, 85:16
**respect** [14] - 22:24, 24:2, 24:16, 24:17, 30:12, 41:23, 84:6, 89:6, 90:2, 90:13, 90:25, 98:20, 175:16, 176:11
**respectful** [1] - 177:12
**respond** [4] - 100:2, 112:8, 165:12, 169:21
**responded** [2] - 112:1, 112:3
**response** [10] - 29:3, 29:21, 44:4, 58:13, 67:11, 78:23, 104:8, 165:6, 165:9, 165:10
**responsibilities** [2] - 31:20, 93:14
**responsibility** [3] - 21:19, 21:21, 26:3

**rest** [2] - 14:1, 157:5
**restaurant** [1] - 169:14
**rests** [1] - 185:21
**result** [2] - 19:11, 100:16
**resulted** [2] - 109:16, 109:17
**results** [1] - 160:8
**retaliate** [3] - 7:21, 144:11, 144:12
**retaliation** [3] - 7:23, 19:13, 19:15
**returns** [2] - 182:25, 183:7
**revenge** [2] - 19:13, 19:15
**revolver** [2] - 85:10, 159:2
**revolves** [1] - 10:13
**Reynolds** [23] - 27:3, 27:16, 27:17, 27:18, 27:22, 27:24, 29:1, 29:12, 34:1, 35:5, 43:21, 51:18, 61:4, 64:8, 65:3, 67:21, 70:14, 71:2, 71:24, 72:16, 73:12, 74:14, 81:2
**REYNOLDS** [1] - 187:4
**RHODES** [9] - 21:3, 24:25, 25:14, 27:4, 114:19, 114:22, 168:10, 186:3, 186:12
**Rhodes** [6] - 1:17, 14:23, 25:11, 27:1, 114:17, 185:25
**Rice** [1] - 142:12
**Rices** [2] - 144:13, 144:14
**RICO** [1] - 11:3
**Road** [5] - 124:8, 124:10, 139:15, 139:16, 140:2
**rob** [2] - 34:13, 35:25
**robberies** [4] - 132:24, 133:1, 133:16, 140:20, 141:18
**robbery** [5] - 131:7, 131:8, 132:16, 133:4, 133:8
**Robert** [1] - 1:16
**Roc** [3] - 127:11, 127:13, 127:14
**RODNEY** [3] - 114:25, 122:17, 187:12
**Rodney** [9] - 13:25, 96:9, 99:21, 101:1, 103:16, 115:4, 115:6, 122:14, 122:21
**role** [6] - 31:20, 49:9, 49:10, 49:13, 67:2, 136:5

**roof** [1] - 151:7
**Room** [1] - 1:24
**room** [4] - 94:22, 120:18, 167:10, 174:15
**roughly** [1] - 150:14
**Rouse** [11] - 97:18, 97:19, 97:22, 98:5, 98:7, 99:19, 99:23, 100:15, 101:13, 101:17, 101:18
**Rouse's** [1] - 100:24
**routine** [2] - 94:11, 94:12
**routinely** [1] - 94:17
**row** [1] - 150:16
**RPR** [1] - 1:24
**RSA** [1] - 87:7
**rule** [4] - 39:3, 97:12, 97:13, 177:18
**Rule** [1] - 39:3
**ruling** [3] - 9:8, 17:5, 186:7
**rulings** [3] - 175:6, 176:10, 176:18
**run** [6] - 66:21, 67:25, 68:4, 124:10, 124:12, 164:11
**running** [7] - 66:18, 66:25, 67:2, 67:6, 67:8, 181:15

## S

**S-41** [1] - 85:8
**S-42** [1] - 86:4
**S-T-O-L-E-R** [1] - 92:13
**safe** [2] - 170:20, 170:21
**safely** [1] - 93:17
**safety** [1] - 103:2
**sang** [2] - 131:18, 136:7
**sat** [1] - 23:1
**satisfied** [2] - 8:22, 175:11
**saves** [1] - 95:3
**saw** [10] - 2:21, 26:23, 110:7, 112:7, 143:23, 147:3, 147:6, 152:9, 152:14, 152:21
**scan** [1] - 109:24
**scare** [1] - 16:8
**scared** [2] - 169:22, 169:23
**Scarface** [1] - 126:2
**scene** [8] - 11:23, 13:8, 13:9, 15:14, 149:6, 149:10, 152:9, 152:16
**scenes** [1] - 174:12
**schedule** [2] - 105:9, 174:20

scheduled [2] - 105:9, 185:3
scheduling [2] - 184:24, 185:1
School [4] - 27:10, 135:5, 135:11, 151:3
school [12] - 123:3, 150:18, 150:19, 150:21, 150:24, 150:25, 151:1, 151:17, 152:6, 163:2, 163:3, 167:21
screen [7] - 39:17, 100:9, 125:15, 125:16, 138:24, 152:12, 159:22
SE-1 [1] - 86:23
search [3] - 53:11, 53:18, 54:3
searched [1] - 96:24
searching [1] - 97:15
season [1] - 47:4
seat [4] - 81:8, 92:10, 115:2, 122:19
second [3] - 8:12, 37:24, 43:14
seconds [1] - 173:8
Section [3] - 59:10, 93:4, 93:16
section [1] - 65:24
See [8] - 51:21, 52:16, 57:14, 59:8, 59:10, 179:5, 184:14, 185:24
see [55] - 15:14, 18:19, 18:24, 21:6, 25:8, 26:25, 28:7, 39:17, 41:18, 41:19, 51:23, 51:25, 52:7, 55:11, 56:1, 56:11, 59:16, 85:8, 96:5, 101:10, 101:13, 102:4, 102:14, 102:15, 105:9, 106:17, 110:12, 110:15, 110:20, 111:21, 125:15, 125:16, 126:10, 127:18, 128:7, 128:12, 128:17, 128:19, 139:14, 143:20, 149:14, 150:8, 153:2, 155:14, 157:19, 157:20, 158:25, 159:4, 159:23, 159:24, 160:14, 180:21
seeking [1] - 39:2
seem [1] - 100:11
seemingly [1] - 175:10
sees [1] - 13:10
seized [2] - 53:12, 176:7
selection [1] - 105:24
Sell [1] - 157:2
sell [2] - 30:21, 41:11, 66:13, 80:6, 80:14, 80:16, 80:17, 124:13, 124:20, 126:6, 137:25,

138:21
selling [13] - 36:19, 36:20, 37:1, 37:11, 37:21, 37:22, 38:3, 40:15, 66:8, 66:25, 75:13, 127:4, 157:3
Selling [3] - 40:10, 162:14, 162:15
sells [1] - 14:1
semiautomatic [5] - 86:5, 86:23, 87:22, 88:14, 176:7
Senate [1] - 183:7
send [3] - 60:23, 61:1, 69:17
sense [2] - 14:23, 19:10
sent [1] - 179:20
sentence [4] - 29:9, 74:18, 76:4, 76:25
sentenced [5] - 58:16, 62:17, 62:24, 74:18, 94:3
sentencing [3] - 57:18, 59:10, 59:18
sentencings [1] - 94:23
separate [11] - 30:18, 34:19, 102:21, 102:25, 103:6, 103:10, 104:10, 104:18, 107:11, 181:7, 181:9
separated [1] - 102:20
separatees [2] - 98:1, 102:17
separately [3] - 30:21, 34:3, 68:24
Separation [2] - 107:9, 107:10
separation [8] - 103:22, 104:1, 107:11, 107:16, 109:16, 109:17, 110:2
September [4] - 116:3, 116:4, 117:8, 120:13
sequestration [2] - 22:21, 22:23
serial [2] - 83:5, 86:14
series [4] - 16:4, 71:4, 71:19, 101:21
serious [1] - 105:16
serve [4] - 22:3, 69:19, 80:11, 80:15
Service [3] - 92:19, 92:21, 92:23
Serving [1] - 134:16
serving [1] - 74:17
session [6] - 42:19, 42:20, 43:4, 49:24, 112:18, 174:21
sessions [6] - 50:20, 51:3, 51:7, 53:6, 62:1, 82:9
set [3] - 41:3, 66:22,

69:16
setting [1] - 113:19
seven [1] - 95:7
Seven [1] - 108:2
several [3] - 37:9, 110:8, 184:2
Shake [2] - 12:6, 131:14
shakes [1] - 14:17
shaking [1] - 13:20
shall [2] - 57:16, 57:18
Shall [1] - 172:24
share [1] - 147:16
shared [2] - 12:10, 44:12
shares [1] - 5:18
sharing [2] - 56:3, 175:17
SHAWN [1] - 1:8
Shawn [5] - 40:22, 41:5, 56:3, 66:9, 130:16
Sheistyville [1] - 131:16
SHELLY [1] - 1:8
Shelly [1] - 130:14
Shelton [25] - 5:7, 8:17, 11:11, 11:22, 12:1, 12:14, 12:20, 13:11, 14:4, 15:22, 93:21, 95:9, 95:19, 100:8, 100:11, 126:8, 126:16, 126:18, 129:22, 129:23, 131:22, 132:18, 172:13
SHELTON [1] - 1:7
Shelton's [1] - 15:23
shirt [3] - 100:11, 126:14, 127:21
shoot [3] - 160:15, 160:16, 172:8
shooting [2] - 12:2, 152:20, 161:17
shop [5] - 67:6, 67:8, 67:25, 68:14, 68:18
short [1] - 176:18
shortly [1] - 63:4
shot [3] - 49:15, 139:19, 140:5
shoulder [1] - 8:16
Show [1] - 106:16
show [26] - 8:23, 19:11, 19:17, 19:25, 20:5, 28:4, 54:22, 55:7, 60:2, 61:11, 61:12, 65:20, 89:14, 90:7, 90:9, 100:23, 125:12, 129:11, 137:13, 137:14, 139:20, 142:13, 143:16, 159:21, 168:19, 184:10
showing [1] - 85:7
Showing [2] - 60:9, 86:4
shown [10] - 24:3,

24:15, 42:8, 54:25, 55:5, 55:13, 65:19, 86:22, 87:19, 88:12
shows [5] - 7:15, 7:20, 21:11, 138:25
sic [1] - 154:3
sic) [2] - 147:13, 160:3
side [11] - 12:15, 16:22, 89:2, 102:17, 139:3, 139:5, 139:8, 139:9, 140:9, 140:11
sides [1] - 139:7
sign [1] - 92:6
signature [4] - 28:23, 43:13, 61:17, 188:10
signature's [1] - 63:13
signatures [1] - 28:19
signed [9] - 27:24, 29:14, 34:25, 49:21, 57:22, 58:2, 62:3, 62:9, 63:11
significance [2] - 31:23, 32:10
Silver [1] - 169:12
similar [1] - 18:20
simply [4] - 11:21, 15:2, 98:17, 178:4
sing [2] - 136:4, 136:6
sister [6] - 5:6, 121:16, 125:3, 129:6, 129:18, 143:24
sister's [3] - 9:21, 121:17, 129:9
sit [3] - 37:6, 64:20, 109:4
sitting [8] - 16:21, 21:21, 22:14, 27:9, 32:7, 36:25, 67:15, 181:20
situation [2] - 12:5, 25:1
sixth [1] - 93:8
Sixth [1] - 95:4
sleep [1] - 24:4
slinging [1] - 67:1
Slo [1] - 131:19
Slo's [1] - 132:2
Slow [1] - 3:17
slow [1] - 24:7
slowness [1] - 24:7
Smoke [1] - 145:1
Smoking [1] - 154:13
Smyrna [1] - 86:16
Snitching [5] - 113:6, 113:9, 115:21, 120:11, 120:23
so's [2] - 25:12
sold [2] - 12:11, 34:3
someone [5] - 102:24, 110:20, 110:25, 111:1, 147:4

sometime [4] - 49:20, 49:21, 50:4, 166:19
Sometime [1] - 50:11
Sometimes [2] - 104:19, 124:19
sometimes [8] - 67:21, 68:1, 83:10, 124:17, 126:5, 130:18, 135:25, 140:18
somewhere [3] - 41:11, 66:13, 121:6
songs [9] - 16:3, 131:18, 136:12, 136:22, 137:4, 137:8, 137:14, 137:20, 183:20
soon [2] - 63:15, 143:20
Sorry [5] - 55:3, 82:18, 173:16
sorry [23] - 3:17, 3:21, 20:21, 26:2, 67:21, 73:19, 77:10, 84:11, 90:16, 107:24, 114:13, 129:22, 136:16, 144:22, 145:4, 146:15, 151:14, 154:9, 163:20, 166:23, 168:16, 168:17, 170:24
sort [14] - 8:5, 14:16, 14:17, 18:17, 18:18, 24:4, 26:24, 44:23, 50:10, 71:13, 80:22, 100:23, 160:9, 185:8
sought [2] - 19:12, 19:14
sounds [1] - 185:18
Sounds [1] - 18:4
source [2] - 31:7, 31:8
south [1] - 152:6
Southwest [2] - 134:5, 134:6
sovereignty [1] - 185:22
space [5] - 93:17, 94:16, 95:5, 105:13, 105:16
spaces [1] - 94:13
Spain [2] - 87:5, 87:10
Spanish [1] - 87:5
speakers [2] - 117:6, 120:17
speaking [2] - 99:7, 176:24
Special [14] - 81:5, 81:15, 81:18, 81:25, 82:18, 83:15, 83:22, 85:7, 85:20, 86:7, 86:22, 87:19, 88:11, 88:25
SPECIAL [2] - 81:6, 187:7
special [6] - 82:1, 82:2, 102:11, 109:18, 160:8

**specialized** [2] - 82:5, 82:8

**specific** [4] - 9:16, 71:1, 71:18, 123:7

**specifically** [4] - 14:4, 37:1, 71:16, 76:24

**speculatively** [1] - 181:14

**spell** [3] - 81:9, 87:14, 92:11

**Spence** [1] - 103:18

**spend** [1] - 157:3

**split** [1] - 180:5

**sponsor** [1] - 179:21

**sponsors** [1] - 179:7

**spot** [1] - 69:18

**squeeze** [3] - 160:11, 160:12, 160:13

**stabbed** [1] - 142:8

**staff** [1] - 134:21

**stand** [15] - 12:15, 19:21, 27:16, 38:16, 64:19, 122:15, 124:14, 124:17, 125:20, 126:5, 127:1, 139:2, 139:3, 140:11, 140:14

**start** [5] - 44:16, 113:1, 174:14, 182:24, 183:2

**started** [4] - 62:2, 65:25, 82:3, 183:1

**Started** [1] - 44:23

**Starting** [1] - 39:16

**starting** [3] - 35:3, 111:17, 174:21

**stash** [2] - 79:2, 80:13

**state** [15] - 23:3, 48:1, 57:17, 74:17, 81:9, 81:20, 82:13, 84:14, 84:15, 84:21, 84:22, 84:24, 92:11, 115:3, 122:20

**State** [10] - 82:3, 85:18, 85:22, 86:20, 87:11, 88:5, 88:6, 88:9, 88:19, 88:23

**statement** [15] - 6:9, 9:3, 9:17, 13:3, 19:20, 56:13, 177:20, 178:22, 178:23, 178:25, 179:2, 179:9, 180:6, 181:1

**statements** [6] - 10:1, 10:15, 11:1, 13:2, 119:4, 180:19

**STATES** [2] - 1:1, 1:5

**States** [12] - 28:7, 81:4, 86:12, 87:6, 92:1, 92:19, 92:20, 92:22, 95:2, 107:17, 122:13, 184:16

**Station** [3] - 145:5, 154:20, 154:22, 154:23

**station** [2] - 137:11, 137:21

**stationery** [1] - 28:8, 42:12

**stations** [1] - 137:9

**stay** [11] - 6:13, 80:19, 97:5, 111:1, 111:6, 111:7, 119:4, 154:7, 154:9, 157:20, 182:25

**staying** [2] - 151:18, 151:19

**stenographically** [1] - 188:4

**stickies** [1] - 149:17

**still** [8] - 35:13, 35:14, 76:10, 89:23, 112:1, 172:21, 181:7, 183:7

**stipulate** [2] - 184:17, 186:8

**Stipulate** [1] - 184:18

**stipulation** [1] - 186:6

**stock** [1] - 160:10

**Stoler** [9] - 92:2, 92:13, 92:17, 97:7, 99:13, 99:16, 100:21, 101:7, 112:12

**STOLER** [2] - 92:8, 187:10

**stood** [5] - 12:11, 124:17, 139:5, 139:9, 140:9

**Stood** [1] - 140:15

**stop** [2] - 46:11, 168:5

**Stop** [5] - 113:6, 113:9, 115:21, 120:11, 120:22

**stopped** [2] - 24:13, 135:4

**story** [2] - 18:3, 18:6

**straight** [1] - 18:6

**Street** [5] - 1:25, 5:8, 40:12, 45:12, 169:16

**street** [24] - 16:5, 16:6, 37:2, 37:11, 37:21, 37:22, 38:3, 38:13, 45:11, 67:1, 67:3, 124:14, 127:3, 130:9, 130:11, 139:3, 139:5, 139:7, 139:13, 140:6, 140:15, 152:10, 155:12, 173:5

**streets** [2] - 149:7, 152:20

**strictly** [1] - 99:7

**strike** [8] - 134:24, 134:25, 158:10, 158:17, 158:18, 170:14, 171:22, 172:3

**Striped** [1] - 126:14

**strongly** [1] - 22:25

**stuff** [8] - 17:13, 17:14,

25:24, 64:13, 64:16, 69:13, 72:15, 184:19

**stupidly** [1] - 54:22

**submitted** [3] - 89:11, 90:13, 91:15

**Subparagraph** [1] - 57:14

**subpoena** [4] - 21:5, 22:4, 26:13, 104:8

**subsequent** [1] - 15:18

**subsequently** [1] - 86:15

**substances** [1] - 123:13

**substantial** [2] - 59:9, 59:22

**sudden** [1] - 106:3

**sufficient** [1] - 176:23

**suffix** [1] - 86:13

**suggest** [5] - 2:11, 68:6, 72:9, 118:19, 177:1

**suggested** [1] - 56:6

**suggestions** [1] - 68:7

**suggestive** [1] - 113:19

**suggestiveness** [4] - 113:13, 121:25, 122:1, 122:2

**Sullivan** [3] - 185:2, 185:6, 185:14

**sun** [1] - 47:5

**sung** [2] - 136:10, 136:11

**Supermax** [15] - 44:13, 44:14, 45:11, 45:15, 45:17, 45:19, 46:5, 46:9, 94:4, 94:9, 94:13, 94:25, 95:1, 106:1, 109:7

**superseded** [2] - 109:20, 109:21

**supervise** [4] - 93:3, 93:4, 93:15, 97:14

**supervisor** [1] - 93:14

**Supervisory** [2] - 92:22, 92:25

**supplied** [2] - 12:5, 12:13

**supplier** [1] - 69:11

**supply** [7] - 41:10, 66:12, 67:7, 69:15, 101:22, 127:25, 128:15

**support** [1] - 92:6

**suppose** [2] - 8:12, 8:18

**supposed** [2] - 74:9, 102:20

**supposedly** [3] - 9:13, 9:17, 16:23

**surmising** [1] - 113:7

**surprise** [1] - 2:9

**surprised** [1] - 56:2

**surprises** [1] - 2:4

**surprising** [1] - 5:14

**surveillance** [3] - 95:22, 96:2, 96:5

**suspected** [1] - 6:6

**sustain** [2] - 101:1, 176:11

**Sustained** [2] - 135:19, 156:3, 156:14, 162:10, 164:22, 165:5

**sustained** [2] - 161:12, 166:16

**sustaining** [1] - 100:15

**switched** [2] - 49:11, 94:18

**swollen** [1] - 100:24

**swore** [4] - 35:6, 35:10, 39:10, 39:11

**SWORN** [4] - 81:6, 92:8, 114:25, 122:17

---

## T

**T-E-D** [1] - 92:13

**table** [1] - 16:22

**talks** [1] - 13:14

**Tape** [1] - 99:12

**tape** [16] - 51:7, 113:2, 116:2, 117:12, 117:13, 117:14, 117:18, 117:25, 118:2, 118:8, 118:14, 118:21, 119:12, 119:20, 149:11, 152:14

**tapes** [1] - 119:23

**target** [2] - 133:16, 133:20

**tattoo** [1] - 33:17

**tax** [1] - 95:3

**taxpayers** [1] - 95:3

**technological** [1] - 150:1

**Ted** [2] - 92:2, 92:13

**TED** [2] - 92:8, 187:10

**teenage** [1] - 126:19

**teens** [1] - 126:19

**telephone** [1] - 46:24

**ten** [3] - 81:24, 83:21, 84:6

**tender** [1] - 83:22

**tendered** [1] - 85:2

**term** [3] - 98:24, 99:4, 135:2

**terms** [16] - 2:12, 31:24, 44:24, 58:8, 66:24, 67:2, 69:2, 69:13, 74:25, 82:8, 153:10, 155:10, 179:22, 184:16, 184:19, 184:23

**Test** [2] - 137:15, 137:16

**testified** [23] - 30:4, 35:5, 40:22, 40:23,

41:24, 44:4, 46:19, 46:22, 49:2, 50:18, 56:15, 58:13, 64:25, 66:19, 70:9, 71:19, 78:4, 78:7, 84:6, 123:23, 158:21, 180:2, 181:18

**testifies** [5] - 2:3, 8:14, 9:9, 179:2, 179:3

**testify** [14] - 23:9, 23:20, 25:5, 30:11, 36:11, 51:4, 64:21, 73:16, 77:7, 83:16, 84:14, 84:18, 178:2, 184:8

**testifying** [8] - 34:18, 35:14, 36:24, 46:23, 48:14, 107:3, 177:1, 183:18

**testimony** [60] - 9:5, 10:13, 25:22, 29:15, 29:18, 30:19, 30:22, 31:10, 31:12, 31:15, 31:19, 31:21, 36:5, 36:14, 37:6, 37:25, 38:2, 38:18, 39:1, 41:23, 49:19, 49:25, 50:8, 53:5, 53:8, 53:10, 54:17, 55:13, 56:15, 60:2, 64:11, 64:17, 65:21, 65:24, 67:10, 71:22, 76:22, 77:18, 77:20, 78:4, 78:16, 79:20, 79:22, 80:4, 80:8, 80:24, 120:8, 122:3, 158:20, 158:23, 161:22, 175:20, 176:4, 177:10, 177:14, 178:5, 179:15, 179:17, 179:19, 184:11

**THE** [320] - 1:1, 1:2, 2:11, 2:16, 2:18, 2:25, 3:3, 3:7, 3:17, 3:21, 3:24, 4:2, 4:5, 4:8, 4:11, 4:14, 4:17, 4:21, 4:24, 5:2, 5:4, 5:9, 5:12, 5:14, 5:17, 5:21, 5:24, 6:4, 6:6, 6:11, 6:13, 6:17, 6:19, 6:22, 6:25, 7:4, 7:6, 7:8, 7:10, 7:12, 8:2, 8:22, 9:24, 10:6, 10:10, 10:12, 10:18, 10:22, 10:25, 11:5, 11:7, 11:12, 11:15, 11:18, 11:23, 12:3, 12:21, 12:25, 13:5, 13:16, 14:7, 14:9, 14:12, 14:15, 14:21, 15:6, 16:11, 16:14, 16:16, 16:18, 16:25, 17:16, 17:21, 17:24, 18:11, 18:14, 19:3, 19:9, 20:3, 20:8, 20:16, 20:19,

20:22, 20:25, 21:10, 22:3, 22:8, 22:11, 22:19, 22:22, 23:1, 23:13, 23:16, 23:21, 23:24, 25:7, 25:15, 25:18, 25:21, 25:25, 26:5, 26:10, 26:12, 26:16, 26:19, 27:6, 27:8, 27:11, 27:14, 31:14, 39:5, 39:9, 54:21, 55:3, 55:6, 55:10, 60:6, 63:23, 64:2, 64:5, 70:20, 73:11, 73:17, 73:20, 74:1, 74:2, 74:3, 74:4, 74:5, 74:6, 74:7, 74:8, 75:5, 75:7, 76:17, 81:2, 81:7, 81:8, 81:11, 82:16, 84:2, 85:1, 85:6, 86:1, 87:14, 87:17, 89:2, 89:13, 89:17, 89:20, 89:22, 89:24, 90:9, 90:12, 90:16, 90:22, 91:7, 91:13, 91:20, 91:22, 91:24, 92:3, 92:5, 92:9, 92:10, 92:13, 92:14, 98:14, 99:15, 100:19, 102:2, 108:16, 112:12, 112:13, 112:14, 113:11, 113:21, 114:2, 114:10, 114:17, 114:20, 114:23, 115:1, 115:2, 115:4, 115:5, 115:6, 115:7, 121:20, 121:22, 122:2, 122:11, 122:15, 122:18, 122:19, 122:21, 122:22, 125:14, 126:17, 127:24, 128:10, 128:22, 130:21, 132:20, 133:6, 134:20, 135:1, 135:8, 135:19, 135:21, 135:22, 139:4, 141:22, 142:4, 148:7, 148:11, 149:19, 149:21, 149:25, 150:6, 151:14, 153:24, 155:24, 156:3, 156:10, 156:14, 158:11, 158:13, 158:14, 158:19, 161:12, 161:14, 161:15, 162:4, 162:10, 163:12, 163:20, 163:23, 163:24, 163:25, 164:1, 164:22, 165:1, 165:5, 165:8, 165:12, 165:13, 165:15, 165:16, 165:17, 165:20, 165:21, 165:23, 165:25, 166:1, 166:7, 166:9, 166:10, 166:12, 166:13, 166:16, 166:23, 167:16, 168:12, 168:16, 170:15, 170:19, 170:24, 171:16, 171:20, 171:23, 172:1, 172:4, 172:9, 172:15, 172:17, 172:20,

172:22, 173:1, 173:15, 174:1, 174:5, 174:8, 175:4, 176:15, 177:12, 178:12, 178:15, 178:18, 179:5, 179:12, 180:10, 180:13, 180:25, 181:4, 181:17, 182:7, 182:20, 182:23, 183:1, 183:4, 183:8, 183:16, 183:19, 183:23, 184:1, 184:4, 184:14, 184:19, 184:25, 185:4, 185:7, 185:10, 185:14, 185:16, 185:18, 185:23, 185:25, 186:4, 186:13

**Theft** [1] - 154:19
**theme** [1] - 18:19
**themselves** [1] - 175:6
**thereafter** [1] - 63:4
**therefore** [1] - 176:1
**they've** [1] - 23:4, 24:11, 24:21
**thinking** [1] - 24:1
**third** [2] - 89:15, 182:15
**Thomas** [1] - 1:20
**Three** [1] - 105:15
**three** [19] - 8:25, 9:16, 30:11, 31:10, 33:2, 33:4, 50:23, 50:24, 56:1, 62:5, 62:7, 69:19, 79:13, 79:14, 80:21, 90:19, 132:18, 172:23
**Throughout** [2] - 138:3, 138:4
**throw** [2] - 64:19, 168:2
**Thursday** [3] - 174:18, 174:24, 185:19
**Ticknor** [1] - 27:9
**tight** [6] - 4:20, 12:19, 12:20, 35:22, 143:14, 167:22
**tiles** [1] - 146:24
**timeframes** [1] - 70:25
**tip** [2] - 16:13, 16:16
**title** [2] - 31:20, 101:20
**titled** [1] - 101:25
**TM** [88] - 3:10, 4:16, 5:5, 8:13, 10:1, 10:7, 10:10, 10:16, 11:10, 12:5, 12:9, 13:1, 13:3, 13:17, 13:18, 13:20, 13:22, 14:3, 14:16, 14:17, 14:19, 15:4, 15:10, 16:1, 16:23, 17:3, 17:7, 17:9, 19:22, 20:13, 20:15, 121:10, 121:11, 121:13, 124:25, 125:19, 125:20, 128:14, 128:15, 128:19, 130:5, 131:19, 131:24, 131:25, 135:13, 135:16, 138:20,

140:11, 144:22, 146:9, 147:17, 147:18, 149:2, 157:9, 157:19, 166:18, 166:25, 167:5, 167:7, 168:1, 168:2, 168:6, 168:9, 168:14, 168:16, 168:25, 169:2, 170:8, 170:9, 170:20, 171:2, 171:7, 171:24, 173:21, 177:2, 177:4, 177:20, 178:5, 178:25, 180:6, 180:8, 180:13, 181:10, 181:11, 181:20
**TM's** [5] - 11:9, 13:20, 131:2, 151:5, 177:15
**Tobacco** [2] - 81:18, 96:13
**today** [15] - 3:22, 7:24, 35:14, 53:10, 64:12, 64:17, 67:15, 76:11, 89:9, 110:24, 112:17, 113:25, 115:16, 120:8, 127:18
**together** [28] - 3:12, 4:19, 4:22, 12:10, 12:11, 12:12, 30:5, 30:9, 30:12, 30:13, 30:14, 30:16, 31:25, 32:11, 32:16, 33:3, 34:14, 35:25, 46:4, 46:6, 67:23, 70:2, 104:21, 128:17, 128:18, 141:10, 141:13
**togetherness** [1] - 67:24
**toggle** [2] - 100:19, 125:14
**tomorrow** [12] - 174:14, 174:15, 174:23, 175:1, 183:13, 183:18, 184:21, 185:3, 185:9, 185:20, 185:24
**Tony** [58] - 3:11, 4:15, 4:16, 4:17, 4:20, 5:5, 5:17, 5:23, 5:24, 6:20, 11:3, 11:10, 12:19, 125:21, 125:22, 125:24, 128:14, 129:19, 129:20, 135:13, 144:18, 144:19, 146:8, 146:9, 147:3, 148:5, 153:11, 153:17, 155:14, 155:18, 158:9, 158:11, 159:11, 159:16, 159:17, 160:21, 161:2, 161:18, 161:23, 162:20, 166:18, 167:1, 170:9, 171:17, 175:15, 175:20, 175:22, 176:5, 176:8, 180:13, 180:14, 180:16, 180:19, 181:2
**Tony's** [1] - 155:15

**took** [6] - 36:18, 71:18, 74:20, 100:6, 110:22, 120:20
**top** [1] - 62:13
**total** [2] - 50:24, 94:14
**touch** [1] - 169:6
**toward** [1] - 139:16
**towards** [1] - 39:16
**town** [1] - 134:1
**trade** [1] - 88:4
**traffic** [1] - 139:14
**training** [8] - 82:1, 82:5, 82:8, 82:10, 82:19, 82:22, 82:23, 83:3
**transactions** [1] - 181:24
**transcribed** [1] - 188:7
**transcript** [11] - 35:2, 41:18, 51:7, 51:20, 52:18, 52:25, 65:21, 118:5, 118:7, 120:1, 188:7
**transcripts** [1] - 65:20
**transfer** [4] - 94:21, 94:24, 105:1, 105:25
**transferred** [7] - 45:15, 93:25, 94:7, 94:9, 95:10, 105:23, 175:22
**transport** [1] - 97:8
**transportation** [2] - 83:17, 83:24
**transports** [1] - 111:10
**trash** [1] - 168:2
**traveled** [2] - 85:21, 88:8, 88:21
**trial** [23] - 7:18, 20:15, 20:24, 21:7, 21:9, 21:13, 21:21, 23:5, 23:18, 23:25, 51:4, 55:14, 62:16, 64:17, 74:9, 94:23, 98:18, 98:25, 99:6, 108:11, 108:19, 109:3, 109:5
**trials** [1] - 23:4
**tried** [1] - 155:25
**trigger** [1] - 160:19
**trouble** [1] - 74:13
**troubled** [1] - 55:8
**true** [5] - 36:5, 36:7, 46:5, 174:18, 177:24
**trust** [2] - 37:16, 37:18, 37:20
**truth** [5] - 35:7, 65:11, 142:5
**try** [8] - 18:23, 19:6, 93:17, 98:10, 106:24, 122:5, 151:15, 156:1
**Try** [1] - 176:21
**Trying** [1] - 101:9
**trying** [8] - 14:24, 17:2,

24:9, 148:15, 148:16, 150:2, 176:16, 180:3
**Tuesday** [1] - 1:11
**tune** [1] - 21:6
**turn** [3] - 40:22, 101:9, 151:15
**turned** [1] - 22:11, 29:25
**Turning** [1] - 57:14
**twenty** [1] - 97:2
**twice** [1] - 123:18
**Twice** [1] - 123:22
**twins** [5] - 131:19, 132:8, 138:12, 138:13, 138:18
**Two** [2] - 62:12, 79:13, 79:14, 105:14, 106:17, 109:18, 138:9, 145:25
**two** [32] - 23:6, 25:22, 34:18, 35:5, 45:16, 46:4, 46:5, 50:23, 50:24, 62:5, 62:7, 69:20, 80:9, 89:14, 90:1, 90:19, 91:9, 105:17, 113:4, 132:23, 139:6, 170:2, 172:23, 177:6, 180:20, 181:25, 183:20, 183:22, 183:23, 184:1, 184:3, 184:7
**type** [3] - 87:25, 88:2, 88:18

## U

**U.S** [10] - 1:24, 32:6, 42:12, 82:3, 86:13, 86:16, 102:23, 102:24, 103:7, 104:13
**ultimate** [1] - 69:11
**ultimately** [2] - 29:25, 42:6
**Um-hum** [1] - 45:2
**unaware** [1] - 113:12
**uncharged** [1] - 7:18
**under** [13] - 14:14, 27:17, 35:16, 36:2, 36:12, 37:6, 38:2, 39:19, 41:20, 59:10, 177:11, 177:17, 180:18
**Understood** [2] - 20:2, 20:7
**understood** [3] - 49:8, 73:20, 162:8
**undertake** [3] - 163:7, 163:13, 169:4
**undue** [1] - 2:9
**unit** [8] - 30:13, 30:14, 30:24, 68:24, 69:2, 93:6, 93:14
**Unit** [1] - 82:4

**UNITED** [2] - 1:1, 1:5
**United** [12] - 28:7, 81:4, 86:12, 87:6, 92:1, 92:19, 92:20, 92:22, 95:2, 107:17, 122:13, 184:15
**universal** [1] - 97:12
**unless** [5] - 17:9, 103:6, 116:17, 160:16, 179:3
**unlocking** [1] - 99:19
**unpackaged** [1] - 128:6
**Unrelated** [1] - 182:22
**untainted** [1] - 122:4
**unusual** [1] - 144:2
**up** [99] - 4:3, 4:4, 8:5, 9:10, 13:13, 17:2, 19:22, 21:11, 24:20, 26:8, 27:11, 35:6, 37:15, 45:3, 45:7, 45:14, 46:15, 46:20, 47:12, 49:11, 51:25, 52:11, 52:13, 53:24, 54:23, 59:16, 62:16, 66:22, 69:16, 70:15, 70:17, 72:25, 74:17, 76:5, 77:12, 77:15, 77:20, 78:1, 78:5, 78:12, 93:8, 95:6, 97:7, 98:5, 99:4, 101:9, 102:1, 105:23, 105:25, 108:1, 108:5, 108:14, 108:18, 108:25, 109:4, 113:16, 115:5, 123:5, 126:24, 128:8, 128:24, 140:8, 142:8, 144:4, 146:25, 149:7, 149:23, 150:18, 151:11, 151:22, 154:4, 154:24, 159:14, 159:19, 160:25, 161:17, 162:5, 162:7, 162:17, 162:23, 162:25, 163:2, 163:3, 163:6, 166:19, 167:21, 169:3, 171:4, 171:6, 171:8, 171:11, 173:7, 174:12, 179:18, 181:13, 182:25
**upstairs** [4] - 13:14, 109:5, 111:17, 153:3
**urge** [1] - 18:23
**USA** [2] - 86:16, 188:4
**USM** [1] - 102:9
**USMS** [1] - 101:12
**utilized** [3] - 108:20, 108:21, 108:23

**V**

**vague** [2] - 18:16, 181:13
**valuable** [2] - 75:15, 79:6

**varies** [3] - 105:13, 105:16, 105:17
**various** [2] - 82:24, 110:24
**vary** [1] - 79:12
**via** [2] - 86:16, 87:6
**Vial** [1] - 154:4
**vial** [1] - 154:23
**vials** [1] - 13:13
**vicinity** [1] - 11:21, 13:7
**victim** [3] - 11:13, 14:5, 133:11
**video** [7] - 96:4, 112:7, 113:9, 115:21, 120:11, 120:23, 172:15
**videotape** [1] - 98:10
**vigorous** [1] - 24:20
**violate** [1] - 57:18
**violated** [6] - 58:3, 58:6, 58:19, 76:9, 76:12, 77:8
**violation** [5] - 57:16, 78:2, 78:16, 123:20, 123:21
**violations** [2] - 123:12, 123:16
**violence** [1] - 19:1
**violent** [2] - 19:19, 19:24
**virtually** [1] - 186:8
**virtue** [3] - 111:2, 177:18
**visit** [2] - 48:4, 174:12
**voice** [10] - 113:2, 113:5, 113:9, 113:10, 113:16, 113:19, 113:22, 114:13, 115:23
**voices** [7] - 115:17, 115:21, 119:2, 119:20, 119:22, 119:24, 120:22
**voicing** [1] - 177:3
**VOIR** [1] - 187:8
**voir** [2] - 83:25, 113:22
**Voir** [1] - 84:3
**VOLUME** [1] - 1:11

**W**

**W-I-P** [1] - 142:21
**walk** [1] - 19:10
**walked** [2] - 15:13, 173:7
**walks** [2] - 13:19, 14:18
**wants** [3] - 15:22, 183:15
**warn** [2] - 7:3, 114:7
**warned** [3] - 7:4, 7:7, 172:12
**warns** [1] - 15:19
**warrant** [3] - 53:11,

53:18, 54:3
**wash** [5] - 164:4, 164:5, 164:7, 164:15, 164:18
**watch** [4] - 26:4, 108:18, 109:5, 120:12
**watched** [1] - 110:4
**watching** [1] - 182:25
**water** [3] - 122:8, 122:9
**WAYNE** [1] - 1:8
**Wayne** [23] - 36:15, 36:20, 37:1, 37:9, 37:10, 39:21, 40:14, 46:24, 47:16, 48:9, 51:25, 52:8, 52:22, 53:1, 66:2, 66:7, 66:24, 70:15, 70:16, 71:7, 71:8, 71:25, 130:14
**Wayne's** [4] - 41:7, 50:15, 52:20, 72:10
**weapon** [11] - 85:13, 86:17, 87:1, 87:11, 88:7, 88:13, 88:21, 158:20, 180:14, 180:15, 182:3
**weapon's** [1] - 87:9
**weapons** [2] - 12:10, 87:24
**wearing** [2] - 100:6, 126:13
**wee** [1] - 149:5
**week** [8] - 39:3, 46:12, 46:13, 105:17, 161:21, 174:18, 174:19, 174:21
**weeks** [3] - 15:18, 26:8, 45:16
**weight** [4] - 8:13, 8:18, 124:13, 179:6
**Wesson** [2] - 85:10, 85:17
**West** [3] - 1:25, 40:13
**west** [1] - 139:16
**whatsoever** [2] - 23:7, 182:13
**Whereabouts** [2] - 124:4, 130:23
**Whereof** [1] - 188:9
**Whip** [2] - 142:19, 142:20
**whip** [1] - 142:22
**whipped** [2] - 173:9, 173:10
**white** [1] - 151:6
**whole** [11] - 7:14, 7:16, 7:19, 16:20, 16:21, 35:7, 80:14, 102:14, 155:1, 173:10, 183:24
**William** [1] - 103:10
**WILLIE** [1] - 1:7
**Willie** [5] - 103:14, 107:12, 127:14, 127:23, 188:4
**willing** [1] - 182:4,

186:8
**wish** [3] - 24:18, 24:19, 43:8
**Wish** [1] - 26:15
**WITNESS** [33] - 74:2, 74:4, 74:6, 74:8, 81:6, 81:7, 81:11, 92:8, 92:9, 92:13, 112:13, 114:25, 115:1, 115:4, 115:6, 122:17, 122:18, 122:21, 135:21, 158:13, 161:14, 163:23, 163:25, 165:13, 165:16, 165:21, 165:25, 166:9, 166:12, 187:4, 187:7, 187:10, 187:12
**Witness** [4] - 27:7, 114:24, 175:3, 188:9
**witness** [42] - 2:4, 7:21, 8:7, 8:9, 11:9, 12:24, 13:2, 18:2, 18:3, 18:5, 18:6, 20:19, 21:12, 21:18, 22:13, 23:20, 55:5, 81:3, 83:16, 83:23, 85:1, 85:5, 89:12, 90:8, 91:25, 122:12, 126:15, 127:22, 142:6, 158:22, 170:25, 175:9, 175:12, 175:13, 175:14, 175:18, 175:25, 176:3, 176:7, 176:23, 179:7, 186:3
**witness'** [4] - 135:1, 158:20, 175:20, 178:5
**witnessed** [1] - 11:20
**Witnesses** [1] - 23:2
**witnesses** [12] - 7:23, 18:1, 18:20, 20:20, 21:15, 21:19, 21:25, 23:8, 24:13, 25:2, 26:18
**wonder** [1] - 39:3
**Woodland** [13] - 12:11, 12:15, 124:5, 124:7, 126:6, 127:1, 138:21, 139:1, 139:21, 156:25, 157:3, 164:6, 164:7
**Woody** [12] - 15:21, 34:8, 34:13, 35:22, 35:24, 140:22, 141:1, 141:11, 141:12, 141:17, 163:8, 164:16
**Woody's** [2] - 34:9, 141:11
**word** [1] - 99:1
**words** [5] - 13:21, 14:15, 118:8, 165:8, 174:12
**workers** [2] - 67:18, 67:20
**worth** [2] - 55:1, 151:15
**writ** [4] - 116:14, 116:15, 116:16, 116:17

**write** [1] - 119:5
**writing** [2] - 100:23, 178:3
**written** [6] - 51:6, 51:12, 53:6, 55:23, 56:20, 91:9
**wrote** [8] - 3:1, 3:9, 3:10, 60:14, 63:1, 72:20, 179:25
**Wyche** [5] - 4:6, 6:11, 8:6, 113:16, 162:11

**X**

**XX** [1] - 1:11
**XXXVII** [1] - 1:11

**Y**

**Yarnell** [1] - 167:25
**year** [7] - 44:21, 57:8, 63:16, 70:22, 71:2, 109:4, 109:6
**years** [10] - 46:22, 53:20, 53:21, 53:22, 81:24, 92:24, 104:21, 109:1, 126:19, 126:23
**yellow** [2] - 149:11, 152:14
**yesterday** [5] - 23:10, 25:20, 26:24, 29:4, 29:18, 30:12, 35:11, 36:14, 37:4, 39:11, 40:23, 48:13, 76:21, 77:5, 77:6
**York** [2] - 84:13
**young** [1] - 27:8
**yourself** [1] - 80:14
**yourselves** [1] - 80:6

**Z**

**Zajac** [4] - 1:24, 183:4, 188:3, 188:14
**zoom** [2] - 106:19, 106:24