IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | |
| v. | : | Case No. RDB-04-029 |
| | : | |
| SHELLEY WAYNE MARTIN, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM IN SUPPORT OF MOTION FOR IMPOSITION OF A REDUCED SENTENCE PURSUANT TO SECTION 404 OF THE FIRST STEP ACT**

Shelley Wayne Martin has been in continuous custody for slightly more than 19 years, during which time he has:

- expressed remorse and accepted responsibility for his role in the charged drug conspiracy, his involvement in which began when he was only a teenager;

- completed an array of educational, vocational, and therapeutic programming, including classes on work habits, forklift safety, and business, courses on decision-making and alternatives to violence, drug education, non-residential drug treatment, and the first phase of the demanding Challenge Program, a residential, cognitive-behavioral treatment program; and

- maintained a strong support network of loved ones, who stand ready to assist him upon his return home, including his stepmother Julia Pauls, who is the Director of The End Recidivism Project.

Mr. Martin filed a *pro se* motion asking the Court to reduce his sentence to time served pursuant to Section 404 of the First Step Act. ECF No. 832. The Office of the Federal Public Defender has been appointed to represent Mr. Martin, ECF No. 851, and files this memorandum in support of his *pro se* motion.

Pursuant to Section 404 of the First Step Act, this Court has the authority to impose a reduced sentence because Mr. Martin was convicted of a pre-August 3, 2010, conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. §

1

841(b)(1)(A)(iii) (Count Eight), the statutory penalties for which were modified in part by the Fair Sentencing Act ("FSA"). *See United States v. Wirsing*, 943 F.3d 175, 186 (4th Cir. 2019) ("All defendants who are serving sentences for violations of 21 U.S.C. § 841(b)(1)(A)(iii) and (B)(iii), and who are not excluded pursuant to the expressed limitations in Section 404(c) of the First Step Act, are eligible to move for relief under that Act."); *see also United States v. Gravatt*, 953 F.3d 258, 263-64 (4th Cir. 2020) (holding that the defendant's conviction for conspiracy to possess with intent to distribute 50 grams of crack or more and 5 kilograms of powder cocaine or more is a "covered offense" under the First Step Act, even though the FSA "did not amend the penalties in 21 U.S.C. § 841(b)(1)(A)(ii) regarding powder cocaine"). This Court also has the authority to impose a reduced sentence because Mr. Martin was convicted of a pre-August 3, 2010, racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One), the statutory penalties for which were also modified in part by the FSA. *See United States v. Maupin*, No. 19-6817, ECF No. 30 (4th Cir. Sept. 9, 2019) (vacating the district court's order finding the defendant ineligible for Section 404 relief based on the government's concession that the defendant's § 1962(d) conviction qualified as a "covered offense" under Section 404(b)). Alternatively, this Court has the authority to impose a reduced sentence on the racketeering conspiracy count pursuant to the sentencing package doctrine because both Counts One and Eight were grouped at sentencing under U.S.S.G. § 3D1.2, with both counts of conviction related to the same underlying conduct.

    A time served sentence, which amounts to 229-months imprisonment day-for-day, would be a significant and weighty sentence by any measure, and would comport with current sentencing practices and prevent unwarranted sentencing disparities with similarly-situated defendants sentenced today. Mr. Martin is not the same person who went to trial long ago, denying his involvement in the drug conspiracy, to his great detriment. He comes before the Court a mature

43-year-old man, who is apologetic for the harm he caused to his community and his family. The Court should exercise its discretion to give Mr. Martin a second chance.

## BACKGROUND

On June 27, 2007, prosecutors charged Mr. Martin and co-defendants Willie Mitchell, Shelton Harris, and Shawn Gardner in a 19-count Fourth Superseding Indictment. The Fourth Superseding Indictment charged Mr. Martin, along with all three of his co-defendants, with: one count of participating in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); two counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts Five and Six); one count of conspiring to distribute and possess with the intent to distribute 50 grams or more of crack cocaine and 5 kilograms or more of powder cocaine, in violation of 21 U.S.C. § 846 (Count Eight); one count of possession of a firearm in furtherance of drug trafficking and a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Twelve); and two counts of possession of a firearm in furtherance of drug trafficking and a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j) (Counts Thirteen and Fourteen).

Mr. Mitchell and Harris were also charged with three additional counts of murder in aid of racketeering (Counts Two, Three, and Four), as well as three additional counts of possessing a firearm in furtherance of drug trafficking and a crime of violence resulting in death (Counts Nine, Ten, and Eleven). Mr. Gardner was charged with additional counts of murder in aid of racketeering (Count Seven), possession of a firearm in furtherance of drug trafficking and a crime of violence (Count Fifteen), possession of a firearm in furtherance of drug trafficking and a crime of violence resulting in death (Count Sixteen), and felon in possession of a firearm (Count Seventeen). Mr. Harris was also charged with felon in possession of a firearm (Count Eighteen) and witness retaliation (Count Nineteen). In recognition of the substantially lesser role Mr. Martin played in

the charged drug conspiracy, he was the only one of his four co-defendants for whom the government did not indicate any intent to seek the death penalty.

Leading up to trial, counsel for Mr. Martin and the government engaged in plea negotiations, during which the government offered him two alternative pleas: a "c plea" agreement with a range of 262 to 327 months in prison if he and all three of his co-defendants pled guilty; or a "c plea" agreement with a range of 292 to 325 months in prison if only Mr. Martin pled.[1]

On September 15, 2008, the date trial was scheduled to begin, the Court convened a hearing in anticipation of accepting Mr. Martin's plea of guilty to Counts One and Eight of the Fourth Superseding Indictment. However, when the Court asked Mr. Martin to take a seat on the witness stand to begin the plea colloquy, the following exchange ensued:

```
 3        THE COURT: Mr. Crowe, is it your belief that we're
 4   ready to proceed with Mr. Martin?
 5        MR. CROWE: Yes, it is, Your Honor.
 6        THE COURT: All right. Mr. Martin, would you come
 7   over here, please, and take a seat on the witness stand?
 8        DEFENDANT MARTIN: Excuse me?
 9        THE COURT: Would you take a seat on the witness
10   stand, please?
11        DEFENDANT MARTIN: For what?
12        THE COURT: I've been told that you wish to accept a
13   plea offer and plead guilty in this case.
14        DEFENDANT MARTIN: I indicated my acceptance. They
15   made me an offer and I accepted it and returned the offer for
16   value.
17        THE COURT: So are you going to plead guilty?
18        DEFENDANT MARTIN: I mean, I accept the offer in
19   return for value.
20        THE COURT: Okay. The other defendants can be brought
21   back to the courtroom. Mr. Martin is not pleading guilty.
```

---

[1] Undersigned counsel spoke with Thomas Crowe, Mr. Martin's former counsel, who provided email correspondence corroborating the existence of the two plea offers, as well as a proposed plea agreement formalizing the government's 292-365-month offer.

4

Mr. Martin and his three co-defendants proceeded to trial. On December 8, 2008, the jury returned a verdict convicting all four defendants of Counts One (racketeering conspiracy) and Eight (drug conspiracy). As to Count Eight, the jury found that 50 grams or more of crack, 5 kilograms or more of cocaine, and a detectable quantity of marijuana were attributable to the conspiracy. The jury acquitted Mr. Martin of the five remaining charges against him, including the two counts of murder in aid of racketeering (Counts Five and Six) and the two counts of possession of a firearm in furtherance of drug trafficking and a crime of violence resulting in death (Counts Thirteen and Fourteen). Mr. Mitchell and Mr. Harris were convicted of all charges, including the murders charged in Counts Five and Six for which Mr. Martin was acquitted. Mr. Gardner was convicted of all but five counts (Counts Five, Six, Twelve, Thirteen, and Fourteen).

At Mr. Martin's sentencing on March 30, 2009, the government asked the Court to apply the murder cross-reference under U.S.S.G. § 2A1.1 to calculate his guidelines range—despite the fact that Mr. Martin had been *acquitted* of all murder and weapons counts and only his co-defendants Mr. Mitchell and Mr. Harris were convicted by the jury of the two murders charged in Counts Five and Six. Over Mr. Martin's objection, the Court applied § 2A1.1, raising his base offense level to 43. *See* PSR ¶ 38. However, recognizing that Mr. Martin occupied a lesser role in the charged conspiracy, the Court departed downward by one level. With a final offense level of 42 and a criminal history category I (Mr. Martin had only a single criminal history point, *see* PSR ¶¶ 49-50), he faced a guidelines range of 360 months to life.

The Court sentenced Mr. Martin to 400-months incarceration, with concurrent terms of 400 months as to each of Counts One and Eight, followed by five years of supervised release. In the Statement of Reasons, the Court explained:

5

> The court has determined to grant a one level variance from offense level 43 in consideration of the manifest disparity in the jury's assessment of this defendant's culpability for the deaths proven in this case as compared to the assessment of the co-defendants. This assessment is bolstered by the government's initial decision not to seek capital punishment against this defendant, and the government's decision to offer this defendant a plea agreement for a term of years as late as the first day of trial. It appears that the defendant rejected the plea agreement out of a deeply misguided loyalty to his co-defendants and contrary to the advice of his counsel. Although the court determined that the murder cross-reference was fully justified based on the evidence adduced at trial, the court finds that a life sentence in the case of this defendant would be more harsh than is warranted under the circumstances. A sentence of 400 months (33 years, four months) is of sufficient length fully to achieve the purposes of sentencing in this case.

The Court sentenced Mr. Martin's three co-defendants to life in prison without parole.

Mr. Martin timely appealed. ECF No. 654. The U.S. Court of Appeals for the Fourth Circuit affirmed his conviction and sentence on June 15, 2011. *United States v. Willie Mitchell et al.*, No. 09-4215, ECF No. 210 (4th Cir. June 15, 2021). The U.S. Supreme Court denied certiorari on November 15, 2021. *Id.*, ECF No. 243.

The Court appointed the Office of the Federal Public Defender on December 8, 2020, to represent Mr. Martin on a motion for a sentence reduction under Section 404 of the First Step Act. Mr. Martin has a projected release date of December 23, 2032.

## ARGUMENT

**I.    Mr. Martin Is Eligible for a Reduced Sentence Pursuant to Section 404 of the First Step Act.**

Because Mr. Martin was convicted of offenses covered by the First Step Act, he is eligible for a reduced sentence. Section 404 of the First Step Act, by its plain language, is broadly applicable to any defendant who was convicted of an offense (1) the statutory penalties for which "were modified by section 2 or 3 of the Fair Sentencing Act of 2010," (2) that was "committed before August 3, 2010" (the date the FSA took effect). First Step Act of 2018, S. 3747, 115th Cong. § 404(a) (2018). For these eligible defendants, the sentencing court "may, on motion of the defendant . . . impose a reduced sentence as if Sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." *Id.* § 404(b). This authority to

resentence pre-FSA crack defendants is limited only in two ways. First, the Court shall not entertain a motion for resentencing under Section 2 or 3 of the FSA if the defendant was already sentenced under Sections 2 and 3 of the FSA. *Id.* § 404(c). And second, the Court shall not entertain a motion made under Section 404 if a previous motion under Section 404 was, after the First Step Act was enacted, "denied after a complete review of the motion on the merits." *Id.*

Interpreting the requirements of Section 404(a), the Fourth Circuit has held that "[a]ll defendants who are serving sentences for violations of 21 U.S.C. § 841(b)(1)(A)(iii) and (B)(iii), and who are not excluded pursuant to the expressed limitations in Section 404(c) of the First Step Act, are eligible to move for relief under that Act." *Gravatt*, 953 F.3d at 264 (quoting *Wirsing*, 943 F.3d at 186). Thus, offenses involving both crack cocaine and other drugs "remain [] covered offense[s]" under the First Step Act—even if the other drugs were charged in sufficient quantities to trigger the same mandatory-minimum penalty as the crack cocaine. *Id.* at 263-64. Additionally, in *Maupin*, Appeal No. 19-6817, the government conceded that the defendant's § 1962 conviction qualified as a "covered offense" under Section 404 of the First Step Act and moved the Fourth Circuit to vacate the district court's order finding the defendant ineligible for Section 404 relief. The Fourth Circuit granted the government's motion to vacate the district court's order, instructing the district court on remand to consider whether to exercise its discretion to reduce the defendant's sentence.

Following the Fourth Circuit's decisions in *Wirsing*, *Gravatt*, and *Maupin*, there is no question that Mr. Martin is eligible for a sentence reduction under the First Step Act. Before August 3, 2010, he committed a violation of § 841(b)(1)(A)(iii) (Count Eight), the statutory penalties for which were modified in part by Section 2 of the FSA. Additionally, before August 3, 2010, he committed a violation of § 1962 (Count One), the statutory penalties for which were

7

also modified in part by Section 2 of the FSA. Thus, both Counts One and Eight qualify as "covered offenses" under Section 404 of the First Step Act.

Alternatively, this Court has the authority to reduce the sentence for Count One pursuant to the sentencing package doctrine because it grouped with Count Eight at sentencing under § 3D1.2, with both counts of conviction "related to the same underlying conduct." *United States v. Hill*, __ F. Supp. __ 3d, 2020 WL 891009, at *4 (D. Md. Feb. 24, 2020). As Chief Judge Bredar has explained, "[s]everal district courts have concluded that where such grouping occurred at sentencing, a court can, in considering a First Step Act motion, reduce the sentence on all of the counts in a group if one of them qualified as a 'covered offense.'" *Id.* (citing *United States v. Harmer*, No. CCB-03-0216, ECF No. 113 (D. Md. Oct. 9, 2019); *United States v. Black*, 388 F. Supp. 3d 682, 688 (E.D. Va. 2019)). Thus, because Mr. Martin is "entitled to be considered for a sentence reduction on Count [Eight]," the Court can consider whether a reduction is appropriate on the remaining count of conviction. *Id.*

In sum, because Mr. Martin's "sentence involved a covered offense under Section 404(a)," he is eligible for a sentence reduction. *Gravatt*, 953 F.3d at 264.

**II.     Applying the § 3553(a) Factors, the Court Should Exercise Its Discretion Under Section 404 to Reduce Mr. Martin's Sentence.**

Although Section 404 does not "require a court to reduce any sentence pursuant to this section," *id.* § 404(c), the Court should exercise the discretion bestowed on it by Section 404(b) and reduce Mr. Martin's sentence to time served. As the Fourth Circuit has held, the Court should consider the factors set forth in 18 U.S.C. § 3553(a), including post-sentencing conduct, in ruling on a motion for sentence reduction where the defendant is eligible for relief under the First Step Act. *See United States v. Chambers*, 956 F.3d 667, 674-75 (4th Cir. 2020); *see also* 164 Cong. Rec. S7753-01, S7756 (Dec. 18, 2018) (statement of Sen. Nelson) ("This legislation will allow

8

judges to do the job that they were appointed to do—to use their discretion to craft an appropriate sentence to fit the crime."). The time Mr. Martin has served adequately reflects the seriousness of the offense, as well as his efforts to take advantage of resources in the Bureau of Prisons ("BOP") by completing an array of meaningful programming. Furthermore, a sentence reduction would be in keeping with the kinds of sentences imposed in similar cases today.

### A. The Requested Reduction Adequately Reflects the Seriousness of the Offense.

The time Mr. Martin has spent in prison is an extremely serious sanction and continues to send a strong message of deterrence to anyone considering whether to engage in the same conduct that landed Mr. Martin in prison. Even with the requested reduction, the 229-month term remains, by far, the longest sentence he has ever served.

At age 43, Mr. Martin has spent nearly half his life in custody. Mr. Martin was only a teenager when he joined the drug conspiracy for which he received a 400-month sentence. *See* PSR ¶¶ 8-10. The Probation Office assigned him a single criminal history point, placing him within a criminal history category I. *See* PSR ¶¶ 49-50. At sentencing, Mr. Martin's guidelines range was driven not by his prior convictions, but by two acts of violence which were committed by Mr. Mitchell and Mr. Harris and *for which Mr. Martin was acquitted*.

Senators Durbin, Grassley, Cohen, and Armstrong have introduced a bill titled the Prohibiting Punishment of Acquitted Conduct Act of 2021, which, if passed, would prohibit the use of acquitted conduct at sentencing. *See* https://www.judiciary.senate.gov/press/dem/releases/durbin-grassley-cohen-armstrong-introduce-bipartisan-bicameral-prohibiting-punishment-of-acquitted-conduct-act. As Senator Durbin has recognized, the practice of relying on acquitted conduct "is inconsistent with the Constitution's guarantees of due process and the right to a jury trial." *Id.*; *see Apprendi v. New Jersey*, 530 U.S. 466 (2000) (holding that any fact that increases the statutory penalty for a crime

9

must be submitted to the jury and proven beyond a reasonable doubt); *see also Hill*, 2020 WL 891009, at *2-3 (courts cannot "ignor[e]" or "double-down" on Sixth Amendment violations in Section 404 proceedings); *United States v. Jones*, No. JKB-96-0399, 2020 WL 886694, at *2-3 (D. Md. Feb. 24, 2020) (same).

Without the murder cross-reference, Mr. Martin would have faced a § 2D1.1 guidelines range of only 151 to 188 months (offense level 34/criminal history category I) based on the jury's findings that 5 kilograms of cocaine and 50 grams of cocaine base were attributable to the conspiracy. Mr. Martin is effectively requesting a 22% variance above the § 2D1.1 guidelines range, despite the Court's recognition that he occupied the lowest role in the charged conspiracy. *See* Statement of Reasons. Thus, his requested sentence fully reflects the offense conduct and his prior record. Indeed, as explained further below, the 229 months Mr. Martin has served is in keeping with recent sentence reductions granted by judges of this Court. *See infra* Argument Section II.C.

The requested sentence also falls only slightly below the "c plea" range negotiated by the parties, *see supra* at 4—an appropriate outcome given that Mr. Martin's incarceration during the COVID-19 pandemic has "increased the severity of the sentence beyond what was originally expected." *United States v. Mel*, No. TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020). The pandemic has disrupted Mr. Martin's ability to participate in programming through long and restrictive lock-downs, eliminated visits with his loved ones, and resulted in him being confined to a cell for most hours of the day. The fact that the pandemic has drastically impacted the conditions of Mr. Martin's confinement is yet another factor that should be considered as part of the § 3553(a) analysis in determining that a time-served sentence affords just punishment.

While U.S.S.G. § 3E1.1 contemplates lower guidelines for a defendant who pleads guilty, a 400-month sentence is an outsized penalty for Mr. Martin exercising his constitutional right to a

jury trial. His sentence was driven by an enhancement under § 2A1.1 that, as Senator Durbin has recognized, is inconsistent with his Sixth Amendment rights. He was not a leader or organizer. He did not obstruct justice. *See* PSR ¶ 35. As the Court recognized at sentencing in 2009, his decision to proceed to trial was based on a "deeply misguided loyalty to his co-defendants," *see* Statement of Reasons, a sign of his youthful immaturity and another mitigating circumstance for this Court to consider in determining the appropriate sentence in this case. As explained below, Mr. Martin is not the same young man who appeared before the Court long ago.

> **B. The Requested Reduction Reflects Mr. Martin's Remorse and Acceptance of Responsibility for His Past Actions, His Record of Programming in the BOP, and His Support Network for His Reentry.**

Reducing Mr. Martin's sentence to the 229 months he has served would reflect his growth since his sentencing in 2009, his efforts to make productive use of his time in custody, and the strong support network of loved ones awaiting his return home. A mature 43-year-old man who is no longer guided by the negative influences of his youth, Mr. Martin accepts "complete responsibility for [his] actions and involvement in the conspiracy [he] was convicted of." Exhibit 1 at 2 (Letter from Shelley Martin). He is "very remorseful about the troubles and pain I might have cause[d] to those known and unknown." *Id.* Looking back, Mr. Martin sees a close connection between "the hardships of [his] upbringing" and his conduct in this case. *Id.* at 1. As Mr. Martin explains:

> My father was non-existent in my life as a child, due to the fact that he was incarcerated for extended periods of my life. In his absence, I was left with a lack of guidance and discipline, in which my mother tried to compensate for, but due to her struggles with addiction and raising me and my two brothers alone she was unable to reach me. That also left to my own problems and struggles with addiction with drugs.

*Id.* at 2-3.

11

During his 19 years in custody, Mr. Martin has worked hard to address his addiction and avail himself of BOP resources, using his incarceration as an opportunity to "become a better person, father, son and a man of faith." *Id.* at 2. He has completed drug education and non-residential drug treatment, earning a recommendation for maximum RRC placement time. *See* Exhibit 2 (Letter from N. Rojas).

Most recently, Mr. Martin has enrolled in the Challenge Program, "an intensive, three phase, 500-hour residential treatment program." Exhibit 3 (Letter from M. Kost). Mr. Martin joined the Challenge Program on February 27, 2020, and completed Phase I of the program last year. On January 15, 2021, Treatment Program Specialist K. Kendall noted that the program had been placed on "Covid-19 Quarantine lockdown status," but that prior to this, Mr. Martin was "fully participat[ing] in the Community Morning Meeting and attend[ing] both journal and process groups weekly." Exhibit 4 at 1 (Psychology Services Records). Treatment Specialist Kendall further observed:

> Mr. Martin had been working [prior to the lockdown] on willingness to self-disclose and be more comfortable speaking in the groups. He has been observed over the last 60 days to be improving in this area . . . . He appears to be more comfortable with the group members and appears motivated to improve . . . . He also expressed enthusiasm once he was told that he had successfully demonstrated the knowledge to move through to the next Phase of the Challenge Program.

*Id.* Disruptions caused by the pandemic have caused Mr. Martin to remain in the "beginning of Phase II programming for several months," but his treatment provider notes that he has continued to have "a positive attitude," "is maintaining an active role in his treatment program," and "provides positive feedback for other[s] in the community." *Id.* On May 4, 2021, Treatment Specialist Kendall remarked that Mr. Martin "appears to have gained perspective on his prior substance abuse and the impact it had on his life" and that "[h]e is more actively present in the unit which has allowed him to enhance relationships in the community." *Id.* at 3.

12

In addition to progressing through drug treatment and the Challenge Program, Mr. Martin maintains employment as a compound worker and has completed an array of educational, vocational, and therapeutic courses. He has successfully completed: classes on work habits, forklift safety, and business; courses on decision-making, alternatives to violence, and anger management; and a myriad of art classes on drawing, beading, and crocheting—just to name a few. *See* Exhibit 5 (BOP Inmate Educational Data); Exhibit 6 (BOP Certificates). As Mr. Martin explains, he has also "attended mock job fairs to prepare [himself] for re-entry to the community and be a productive member." Exhibit 1.

Together with his family, Mr. Martin has begun thoughtfully planning for his future. His father, once absent from his life as a child, is now among his strongest supporters. He, along with Mr. Martin's stepmother, Ms. Pauls—who is the CEO of The End Recidivism Project—have offered Mr. Martin a home in New Port Richey, Florida, where he can have a fresh start far away from the negative influences to which he succumbed in Maryland. *See* Exhibit 7 (Letter from Julia Pauls); Exhibit 8 (Letter from Shelley Pauls). As Ms. Pauls explains, "I know that he is ready to return [to society] and we will assist him in any way we legally can to make the best of this second chance being afforded him." Exhibit 7. Ms. Pauls attests that Mr. Martin "is genuinely ready to be all he can be," and that she and her husband stand ready to "assist him with transitional housing, education, job and honing in on core values which will assist him in being productive in a positive way." *Id.*

Upon his release, Mr. Martin will also have the support of other family members, all of whom attest to his growth during his incarceration and their readiness to welcome him home after many years apart:

- "Since Shelley has been incarcerated he has grown up so much. . . . [H]e has become [a] man. Shelley has learned a lot from his mistake . . . . Now at this time I think

> Shelley has done enough time to come home to be with his family.  We the family [have] missed Shelley so much . . . ."  Exhibit 9 (Letter from Towanda Walker).

- "I'm very support[ive] of my son, he [has] accomplish[ed] a lot since he been lock[ed] up. . . .  He [has done] a lot of growing up to be [the] man he [is supposed] to be."  Exhibit 10 (Letter from Joyce Parsons).

- "I am Wayne's big cousin\big sister.  He is truly missed [by] me and the rest of his family. . . . [H]e is a very loving and caring man, father, son, and brother."  Exhibit 11 (Letter from Toshula Walker).

Mr. Martin recognizes that change didn't happen overnight, and that he is not finished growing and learning.  During the past two years, he has only sustained one disciplinary infraction, a modest infraction for using a third-party texting service.  *See* Exhibit 12 (BOP Program Review).  The marked improvement in Mr. Martin's disciplinary record during the past two years, together with his tremendous efforts to seek treatment and other rehabilitative programming, demonstrates that he is capable of succeeding with the structure of supervised release.  Mr. Martin embraces continued drug treatment as a condition of supervised release, as well as any other conditions this Court wishes to impose, including, if it deems it necessary, a period of home confinement when he first comes home.

### C. The Requested Reduction Is in Keeping with Recent Sentence Reductions Granted Pursuant to Section 404 of the First Step Act and 18 U.S.C. § 3582(c)(1)(A).

Finally, reducing Mr. Martin's sentence to the 229 months he has served would comport with current sentencing practices and prevent unwarranted sentencing disparities with similarly-situated defendants sentenced today.  Indeed, even with the requested reduction, Mr. Martin will serve a term only slightly below the average prison sentence imposed nationally for individuals who, unlike him, were actually convicted of murder.  *See* U.S. Sent'g Comm'n, 2019 Sourcebook of Federal Sentencing Statistics, Table 27 (average prison sentence imposed nationally for murder in federal court is 255 months for all offenders and 242 months for individuals falling within a

criminal history category I), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/2019-Annual-Report-and-Sourcebook.pdf. Mr. Martin's requested sentence is in keeping with recent sentence reductions granted for defendants who were sentenced pursuant to the § 2A1.1 cross-reference for murder.

For example, Judge Bredar reduced the life sentences for two co-defendants, Kevin Jones and Daniel Hill, who were convicted by a jury of joining a drug conspiracy involving violence, including a murder committed by a co-defendant that was deemed reasonably foreseeable to them as part of the conspiracy. *United States v. Jones*, No. JKB-96-0399, ECF No. 634 (D. Md. Apr. 30, 2020); *United States v. Hill*, No. JKB-96-0399, ECF No. 635 (D. Md. Apr. 30, 2020); *see also United States v. Jones*, No. JKB-96-0399, ECF No. 623 (D. Md. Feb. 24, 2020); *United States v. Hill*, No. JKB-96-0399, ECF No. 621 (D. Md. Feb. 24, 2020). Mr. Hill was not present at the time of the murder committed by his co-defendant, but occupied a leadership role in the conspiracy involving 47 kilograms of heroin and 53 kilograms of crack. (By contrast, the jury found that 50 grams of crack and 5 kilograms of cocaine were attributable to the drug conspiracy in Mr. Martin's case, and he did not receive a role enhancement.) Mr. Hill also attempted to influence the testimony of two witnesses to the murder. (By contrast, the Presentence Report in Mr. Martin's case specifically noted that there were no allegations that he attempted to obstruct justice. *See* PSR ¶ 35.). Mr. Jones' role in the conspiracy was to serve as an "enforcer," which meant that he carried or had access to a weapon and, on occasion, inflicted beatings to discipline members of the conspiracy or customers who took "testers" but did not purchase drugs from their organization. Mr. Jones was not only present at the time of the murder, but prosecutors alleged that Mr. Jones was the one who handed the gun to his co-defendant who then shot and killed the individual. Judge Bredar, weighing the serious nature of the offense conduct against their post-offense rehabilitation, reduced Mr. Jones' and Mr. Hill's sentences pursuant to Section 404 of the First Step Act to 330

15

months. Mr. Jones was released last May and Mr. Hill was released last July. The 100-month difference between the sentences of Mr. Jones and Mr. Hill and the sentence Mr. Martin is requesting appropriately reflects the differences in their roles in the charged conspiracies and the fact that the drug quantities in Mr. Jones and Mr. Hill's case were substantially greater.

In *United States v. Cheese*, No. ELH-98-0359, ECF No. 911 (D. Md. July 2, 2020), Judge Hollander reduced the life sentence for Alfred Cheese, who, as a man in his early thirties, was part of a "very violent" drug-trafficking organization, "particularly with respect to rival drug dealers and potential witnesses." *Id.* at 2. At trial, the government presented evidence of numerous attempted and completed murders during the course of the drug conspiracy, one of which—a contract killing for which Mr. Cheese "produced the money that was paid to [a co-defendant] in recompense for the murder"—led to the application of the cross-reference under § 2A1.1. *Id.* at 7 (internal quotation marks omitted). At sentencing, Mr. Cheese received a three-level leadership enhancement, as well as a two-level upward adjustment because the government claimed that he attempted to have witnesses killed prior to and while being detained. Based on a final offense level of 43 and a criminal history category VI (Mr. Cheese was deemed an armed career criminal but had 15 criminal history points, triggering a category VI even without the enhancement), Mr. Cheese faced a guidelines range of life. Judge Hollander, comparing Mr. Cheese's life sentence to the sentences imposed in similar cases today and weighing Mr. Cheese's post-offense accomplishments, determined that a sentence of 28 years would be sufficient to accomplish the goals of sentencing and reduced his sentence accordingly pursuant the Court's authority under Section 404. Judge Hollander later granted a further sentence reduction under 18 U.S.C. § 3582(c)(1)(A) to time served, resulting in Mr. Cheese's release this past February after slightly less than 23 years in continuous custody. The approximately four-year difference between Mr. Cheese's sentence and Mr. Martin's proposed sentence reflects that Mr. Martin was younger than

16

Mr. Cheese at the time of the alleged conduct, had a much more modest criminal history, and did not receive role or obstruction enhancements.

In *United States v. Brown et al.*, Judge Hollander reduced the life sentences for Bobby Brown, Thomas Carter, and Julius Brown to 40 years, 35 years, and time served, respectively. *See United States v. Julius Brown*, No. ELH-00-0100, ECF No. 465 (D. Md. Dec. 17, 2020); *United States v. Carter*, No. ELH-00-0100, ECF No. 424 (D. Md. Apr. 17, 2020); *United States v. Bobby Brown*, No. ELH-00-0100, ECF No. 414 (D. Md. Mar. 16, 2020). All three co-defendants were convicted of drug- and gun-related charges following a jury trial, and Julius Brown was also convicted of threatening a witness. Additionally, Julius Brown had been charged with attempting to kill a witness, but the jury acquitted him of that count. Likewise, Bobby Brown and Mr. Carter were charged with committing a murder, but were acquitted of that count. At sentencing, Judge Davis found by a preponderance of the evidence (and by the higher clear and convincing standard) that Bobby Brown and Mr. Carter had committed the murder and that the murder was also reasonably foreseeable to Julius Brown as part of the drug conspiracy. Even before the application of the murder cross-reference under § 2A1.1, all three defendants faced offense levels above 43, with each defendant receiving a four-level leadership enhancement for his role in the charged conspiracy and both Julius Brown and Bobby Brown receiving obstruction of justice enhancements. Judge Davis imposed sentences of life plus 30 years for each of the three men.

In the case of Bobby Brown, weighing the § 3553(a) factors, including his leadership and obstruction enhancements, the fact that he had a substantial criminal history establishing a natural criminal history category of V (but triggering a criminal history category of VI under the career-offender provision), and his disciplinary record (which included two 100-level infractions for possessing a dangerous weapon, one 100-level infraction for assaulting with serious injury, and three 200-level infractions for fighting), Judge Hollander reduced his sentence under Section 404

17

to 40 years. Acknowledging Mr. Carter's lesser role in the charged murder and his more modest criminal history (he had four criminal history points, triggering a criminal history category III), Judge Hollander reduced his sentence under Section 404 to 35 years. And, in the case of Julius Brown, Judge Hollander reduced his sentence under § 3582(c)(1)(A) to time served, despite his "extensive" criminal history (he had six criminal history points, triggering a criminal history category III) and the fact that he was significantly older than his co-defendants (he was 50 years old at the time of the charged conspiracy). Julius Brown was released after about 20 ½ years in custody. A sentence of 229 months for Mr. Martin reflects that his case is closer to Julius Brown's than Bobby Brown's or Thomas Carter's. Like Julius Brown, Mr. Martin occupied a lesser role in the charged conspiracy than his co-defendants. Imposing a sentence slightly below the one Julius Brown received is appropriate given that Mr. Martin was substantially younger than Julius Brown at the time of the alleged conduct and had a lower criminal history category.

Judge Blake recently reduced the life sentence for David Gray, who in 1996 was found guilty of murder in aid of racketeering and possession of a firearm in furtherance of a crime of violence. *United States v. Gray*, No. CCB-95-0364, ECF No. 201 (D. Md. May 10, 2021). Describing Mr. Gray's offense as "chilling," the Court explained that he, "at the best of a drug dealer and with the prospect of some significant financial gain, planned and committed what amounted to the execution of Jamie Lee Waller." *Id.* at 6. Mr. Gray, together with two other individuals, located and "ambushed" Waller and two other men. *Id.* at 2. At least 29 shots were fired at the three victims; "Waller was killed in the gunfire, and the two men with him were seriously injured." *Id.* The Court, balancing the extremely serious nature of the offense conduct and the fact that Mr. Gray "was 'deeply involved' in the drug trade in Baltimore" (as evidenced by multiple prior convictions resulting in a criminal history category V) against his difficult upbringing, his relative youth at the time of the shooting, and his record of rehabilitation, reduced

18

his sentence under 18 U.S.C. § 3582(c)(1)(A) to time served. *Id.* at 7. At the time of the Court's decision, Mr. Gray had served about 26 years in prison. Mr. Martin, like Mr. Gray, was a young man when he joined the charged drug conspiracy, and also had a difficult upbringing characterized by neglect and poverty. Unlike Mr. Gray, however, Mr. Martin had only one criminal history point and was not convicted of murder. Thus, a sentence below the sentence Mr. Gray received appropriately balances Mr. Martin's offense conduct with the mitigating circumstances surrounding his case.

The sentences in the above cases, together with Mr. Martin's accomplishments during the past 19 years, demonstrate that a sentence of 400 months far exceeds what is necessary to accomplish the purposes of sentencing. Even with the requested reduction, Mr. Martin will have served a very lengthy sentence, and he will be subject to the close oversight of U.S. Probation for five years following his release, during which this Court may order a period of home confinement or any other conditions it deems necessary.

## **CONCLUSION**

For the foregoing reasons, Mr. Martin respectfully requests that this Court reduce his sentence pursuant to Section 404 of the First Step Act and enter an amended judgment reducing his sentence to time served. He does not request a reduction of the five-year term of supervised release to follow his sentence.

Respectfully submitted,

JAMES WYDA
Federal Public Defender for the District of Maryland

_____/s/_____
SHARI SILVER DERROW (#19181)
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email: shari_derrow@fd.org